

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARTENS CARS OF WASHINGTON, INC., LANDERS AUTO GROUP NO. 1, INC., d/b/a LANDERS TOYOTA, HAMMETT MOTOR COMPANY, INC., SUPERSTORE AUTOMOTIVE, INC., LEE PONTIAC-OLDSMOBILE-GMC TRUCK, INC., WESTFIELD DODGE CITY, INC., V.I.P. MOTOR CARS LTD., DESERT EUROPEAN MOTORCARS, LTD., LANDERS MCLARTY FAYETTEVILLE TN, LLC, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) | MDL No. 2311 <br><br> Case Nos. 12-10676, 12-10681, 12-10687, 12-10688 |
| Plaintiffs, <br><br> v. | ) ) ) ) ) ) | |
| FURUKAWA ELECTRIC CO., LTD., AMERICAN FURUKAWA, INC., FURUKAWA WIRING SYSTEMS, AMERICA, INC., DELPHI AUTOMOTIVE SYSTEMS, LLC, DELPHI AUTOMOTIVE LLP, DPH HOLDINGS CORPORATION, LEAR CORPORATION, LEONI AG, KYUNGSHIN-LEAR SALES AND ENGINEERING, LLC, LEONI KABEL, GMBH, LEONI WIRE INC., LEONI WIRING SYSTEMS, INC., SUMITOMO ELECTRIC INDUSTRIES LTD., SUMITOMO ELECTRIC WINTEC AMERICA, INC., SUMITOMO WIRING SYSTEMS, LTD., SUMITOMO ELECTRIC WIRING SYSTEMS, INC., K&S WIRING SYSTEMS, INC., SUMITOMO WIRING SYSTEMS (U.S.A.) INC., TRAM INC., TOKAI RIKA CO., LTD., S-Y SYSTEMS TECHNOLOGIES GMBH, S-Y SYSTEMS TECHNOLOGIES, AMERICA LLC, YAZAKI CORPORATION, YAZAKI | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **AUTOMOBILE DEALERS CONSOLIDATED CLASS COMPLAINT** |

NORTH AMERICA, INC., FUJIKURA )
LTD. and FUJIKURA AMERICA, INC., )
                                 )
            Defendants.          )
_____ )

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"), Landers Auto Group

No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"), Hammett Motor Company, Inc.

("Plaintiff Hammett"), Superstore Automotive, Inc. ("Plaintiff Superstore"), Lee Pontiac-

Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"), Westfield Dodge City, Inc. ("Plaintiff

Westfield"), V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."), Desert European Motorcars, Ltd.

("Plaintiff Desert") and Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville")

(collectively "Plaintiffs"), hereby file this Consolidated Class Complaint on behalf of themselves

and all others similarly situated (the "Classes" as defined below).  This Consolidated Class

Complaint is intended to supersede the complaints pending in the transferor forums where

Plaintiffs filed their original actions against Defendants, and to replace those complaints in said

forums, becoming the operative complaints in all actions initiated by Plaintiffs in this multidistrict

litigation prior to transfer and consolidation.[1]  Plaintiffs bring this class action for damages,

injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair

competition, and consumer protection laws, demand a trial by jury, and allege as follows:

---

[1] The actions in which this Consolidated Complaint is intended to replace Plaintiffs' pending
complaints are as follows: *Hammett Motor Co., Inc. v. Delphi Automotive LLP, et al.*, 3:11-CV-
00647 (S.D. Miss.) (Filed Oct. 18, 2011); *Landers Auto Group No. 1 Inc. d/b/a Landers Toyota
v. Delphi Automotive LLP, et al.*, 4:11-CV-00757 (E.D. Ark.) (Filed Oct. 18, 2011); *Superstore
Automotive, Inc. v. Delphi Automotive LLP, et al.*, 11-CV-03092 (D. Minn.) (Filed Oct. 19,
2011); *Martens Cars of Washington Inc. v. Furukawa Electric Co., Ltd., et al.*, 1:11-CV-01892
(D.D.C.) (Filed Oct. 27, 2011).

## Nature of Action

1.      Defendants, the largest suppliers of Automotive Wire Harness Systems (defined below) globally and in the United States, engaged in a massive, decade-long conspiracy to unlawfully fix and artificially raise the prices of these products. Defendants' conspiracy successfully targeted the United States automotive industry, artificially raising prices charged to car manufacturers and automobile dealers.

2.      Defendant Furukawa Electric Co. Ltd. ("Furukawa Electric"), and three of its executives have pleaded guilty to federal price-fixing and bid-rigging charges brought by the United States Department of Justice ("DOJ") and have agreed to pay a $200 million fine for their misconduct. The informations to which Furukawa Electric and its three executives have pleaded guilty charge that, from at least as early as January 2000 and continuing until at least January 2010, Furukawa Electric and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain the prices of, wire harnesses and related products[2] sold to automobile manufacturers in the United States and elsewhere. The criminal information further charges that the combination and conspiracy engaged in by Furukawa Electric and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. As part of its plea agreement, Furukawa Electric has agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

---

[2] The DOJ defined related products as automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors.

3.      Defendant Yazaki Corporation ("Yazaki Corporation"), and four of its executives, have also agreed to plead guilty to fixing prices, rigging bids and allocating customers for Automotive Wire Harness Systems, between January 2000 and February 2010.  Yazaki Corporation has agreed to pay a $470 million fine, the second highest fine ever paid for a criminal antitrust violation, for its agreements to restrain prices for Automotive Wire Harness Systems, as well as several other automotive components.

4.      Plaintiffs bring this action on behalf of themselves and all automobile dealers that, during the period January 1, 2000 to September 30, 2011, (the "Class Period"):

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or

b) purchased vehicles[3] containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

5.      "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle.  Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle.  "Automotive Wire Harness Systems" include the following: automotive wire harnesses, automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors.

---

[3] "Vehicles" as used here, means any new vehicles sold by automobile dealers throughout the United States, including but not limited to sedans, trucks and sport utility vehicles.

6.       Defendants Furukawa Electric, American Furukawa, Inc. ("American Furukawa"), Furukawa Wiring Systems, America, Inc. ("Furukawa Wiring"), Delphi Automotive  Systems, LLC ("Delphi LLC"), Delphi Automotive, LLP ("Delphi LLP"), DPH Holdings Corporation ("DPH"), Lear Corporation ("Lear Corporation"), Kyungshin-Lear Sales and Engineering, LLC ("Kyungshin-Lear"), Leoni AG ("Leoni AG"), Leoni Kabel, GMBH ("Leoni Kabel"), Leoni Wire, Inc. ("Leoni Wire"), Leoni Wiring Systems, Inc. ("Leoni Wiring"), Sumitomo Electric Industries, Ltd. ("Sumitomo Electric"), Sumitomo Electric Wintec America, Inc. ("Sumitomo America"), Sumitomo Wiring Systems, Ltd. ("Sumitomo Wiring"), Sumitomo Electric Wiring Systems, Inc. ("Sumitomo Electric Wiring"), K&S Wiring Systems, Inc. ("K&S"), Sumitomo Wiring Systems (U.S.A.) ("Sumitomo Wiring USA"), S-Y Systems Technologies, GmbH ("S-Y Systems Technologies"), S-Y Systems Technologies, America, LLC ("S-Y Systems America"), TRAM, Inc. d/b/a Tokai Rika U.S.A., Inc. ("Tokai Rika USA"),  Tokai Rika, Co., Ltd. ("Tokai Rika Japan"), Yazaki Corporation, Yazaki North America Inc. ("Yazaki North America"), Fujikura, Ltd. ("Fujikura Ltd.") and Fujikura, America, Inc. ("Fujikura America"), all collectively hereinafter referred to as "Defendants," manufacture, market, and sell Automotive Wire Harness Systems throughout the United States.  The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

7.       Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems since at least February 2010.  As part of its criminal investigation, the DOJ is seeking information about anticompetitive conduct in the market for Automotive Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out

in at least some of the Defendants' offices.  The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants.

8.      As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems that they purchased from firms that directly purchased Automotive Wire Harness Systems from one or more Defendants during the Class Period.  Plaintiffs and the Classes members have thereby suffered antitrust injury to their business or property.

## Jurisdiction and Venue

9.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367, as this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

11.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

12.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Wire Harness Systems throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.  Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States and this jurisdiction.

## Trade and Commerce

13.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

14.    The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on the interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities have a direct, substantial and reasonably foreseeable effect on such commerce.

15.    Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harness Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Automotive Wire Harness Systems.

16.    Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Wire Harness Systems, including Plaintiffs and the Classes.

## Parties

17.    Plaintiff Martens is a Maryland corporation with its principal place of business in the District of Columbia. Plaintiff Martens is an authorized Volvo and Volkswagen dealer, who sells Volvo- and Volkswagen- brand vehicles (e.g., Passat and Jetta), containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

18.    During the class period Plaintiff Martens purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Volvo- and Volkswagen-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants. Plaintiff Martens also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of Volvo- and Volkswagen-

brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants.

19.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who sells Ford-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

20.     During the class period Plaintiff Hammett purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Ford-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants.  Plaintiff Hammett also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of Ford-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants.

21.     Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who sells Toyota-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

22.     During the class period Plaintiff Landers purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants.  Plaintiff Landers also purchased Automotive Wire Harness Systems, for its repair and service business,

during the class period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants.

23.    Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. Plaintiff Superstore sells Buick- and GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

24.    During the class period Plaintiff Superstore purchased vehicles containing Automotive Wire Harness Systems from manufacturers of GMC-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants. Plaintiff Superstore also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants.

25.    Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized GMC dealer. During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer. Plaintiff Lee sells GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants. During the Class Period, Plaintiff sold Pontiac-, Oldsmobile- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

26.     During the class period Plaintiff Lee purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Pontiac-, Oldsmobile-, GMC- and Jeep-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants.  Plaintiff Lee also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of Pontiac-, Oldsmobile-, GMC- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants.

27.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who sells Chrysler-, Dodge- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

28.     During the class period Plaintiff Westfield purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge- and Jeep-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants.  Plaintiff Westfield also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of Chrysler-, Dodge- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants.

29.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who sells Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing

Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

30.     During the class period Plaintiff V.I.P. purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants.  Plaintiff V.I.P. also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants.

31.     Plaintiff Desert is a California company, with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus and Spyker dealer who sells Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

32.     During the Class Period, Plaintiff Desert purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles who directly purchased Automotive Wire Harness Systems from one or more Defendants. Plaintiff Desert also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of Rolls Royce-, Bentley-, Aston Martin-,

Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants.

33.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee.  Plaintiff Fayetteville is an authorized Toyota dealer, who sells Toyota-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants.

34.     During the class period Plaintiff Fayetteville purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants.  Plaintiff Fayetteville also purchased Automotive Wire Harness Systems, for its repair and service business, during the class period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants.

35.     Defendant Delphi LLC is a Delaware corporation with its principal place of business in Troy, Michigan.  Defendant Delphi LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

36.     Defendant Delphi LLP is a partnership organized under the laws of England and Wales, with its principal place of business in London, England.  Delphi LLP wholly owns and controls Delphi LLC.  Defendant Delphi LLP, directly or through Delphi LLC, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

13

37.     Defendant DPH is a Delaware corporation with its principal place of business in Warren, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Delphi Automotive LLP.  Defendant DPH manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendants Delphi LLC, Delphi LLP and DPH are collectively referred to herein as "Delphi."

38.     Defendant Furukawa Electric is a Japanese corporation, with its principal place of business in Tokyo, Japan.  Defendant Furukawa Electric manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

39.     Defendant American Furukawa is a Delaware corporation, with its principal place of business in Plymouth, Michigan.  American Furukawa is a subsidiary of Furukawa Electric and is owned and controlled by Furukawa Electric.  Defendant American Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

40.     American Furukawa and Delphi LLC engaged in a joint venture, Delphi Furukawa Wiring Systems, LLC, between 2004 and 2010, during the Class Period, through which they manufactured and distributed Automotive Wire Harness Systems that were purchased throughout the United States, including in this district.

41.     Defendant Furukawa Wiring is a Delaware corporation with its principal place of business in El Paso, Texas.  Furukawa Electric owns 60% of Furukawa Wiring's shares and American Furukawa owns 40%.  Furukawa Wiring, operating under the names, Furukawa Lear Corporation and Lear Furukawa Corporation, was a joint venture, between Furukawa Electric and

Lear Corporation, with each Defendant owning a majority of the shares in different years, until June 1, 2010, when Furukawa Electric purchased Lear Corporation's shares in the company. Defendant Furukawa Wiring and its predecessors manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendants Furukawa Electric, American Furukawa and Furukawa Wiring are referred to collectively herein as "Furukawa."

42.    Defendant Lear Corporation is a Delaware corporation with its principal place of business in Southfield, Michigan.  Defendant Lear Corporation manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

43.    Defendant Lear Corporation filed for Chapter 11 bankruptcy protection on July 7, 2009.  Lear Corporation emerged from Chapter 11 bankruptcy proceedings on November 9, 2009, and continued to sell Automotive Wire Harness Systems and take part in Defendants' conspiracy.  Lear Corporation has sold a substantial number of Automotive Wire Harness Systems, at supracompetitive prices, since emerging from bankruptcy.  In 2010, Lear Corporation sold $2.5593 billion worth of electric power and management systems products, in the United States, including Automotive Wire Harness Systems.

44.    Defendant Kyungshin-Lear is a Delaware corporation with its principal place of business in Selma, Alabama. It is a joint venture between Defendant Lear Corporation and Kyungshin Corporation of South Korea.  Defendant Kyungshin-Lear manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendant Lear Corporation and Kyungshin-Lear are collectively referred to herein as "Lear."

45.     Defendant Leoni AG is a German corporation, with its principal place of business in Nuremberg, Germany.  Defendant Leoni AG manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

46.     Defendant Leoni Kabel is a German corporation with its principal place of business in Roth, Germany.  Defendant Leoni Kabel is affiliated with, and partially controlled by Defendant Leoni AG.  Defendant Leoni Kabel manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

47.     Defendant Leoni Wiring is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG.  Defendant Leoni Wiring manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

48.     Defendant Leoni Wire is a Massachusetts company with its principal place of business in Chicopee, Massachusetts.  Leoni Wire is a wholly-owned and controlled subsidiary of Defendant Leoni AG.  Defendant Leoni Wire manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendants Leoni AG, Leoni Kabel, Leoni Wiring and Leoni Wire are referred to collectively as "Leoni."

49.     Defendant Sumitomo Electric is a Japanese corporation with its principal place of business in Osaka, Japan.  Defendant Sumitomo Electric manufactured, marketed and/or sold

Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

50.     Defendant Sumitomo America is a Delaware company with its principal place of business in Edmonton, Kentucky.  Sumitomo America is a wholly-owned and controlled subsidiary of Defendant Sumitomo Electric.  Defendant Sumitomo America manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

51.     Defendant Sumitomo Wiring is a Japanese corporation, with its principal place of business in Yokkaichi, Japan.  Sumitomo Wiring is a subsidiary of Sumitomo Electric and is controlled by Sumitomo Electric.  Defendant Sumitomo Wiring manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

52.     Defendant Sumitomo Electric Wiring is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between Defendants Sumitomo Electric and Sumitomo Wiring.  Defendant Sumitomo Electric Wiring manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

53.     Defendant K&S is a Delaware corporation with its principal place of business in La Vergne, Tennessee.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric.  Defendant K&S manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

54.     Defendant Sumitomo Wiring U.S.A. is a Michigan corporation with its principal place of business in Novi, Michigan.  It is a joint venture between Defendants Sumitomo Electric and Sumitomo Wiring.  Defendant Sumitomo Wiring U.S.A. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendants Sumitomo Electric, Sumitomo America, Sumitomo Wiring, Sumitomo Electric Wiring, K&S and Sumitomo Wiring USA are collectively referred to herein as "Sumitomo."

55.     Defendant S-Y Systems Technologies is a German corporation with its principal place of business in Regensburg, Germany.  Defendant S-Y Systems Technologies is a joint venture between Yazaki Corporation and Continental AG.  During the Class Period, S-Y- Systems Technologies was at least partially controlled by Yazaki Corporation.  Defendant S-Y Systems Technologies manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

56.     Defendant S-Y Systems America is a Delaware corporation, with its principal place of business in Dearborn, Michigan.  S-Y Systems America was purchased by Defendant Yazaki Corporation in 2005, before which time it was a joint venture between Siemens VDO Automotive AG and Yazaki Corporation.  During the Class Period, S-Y- Systems America was at least partially controlled by Yazaki Corporation.   Defendant S-Y Systems America manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendants S-Y Systems Technologies and S-Y Systems America will be collectively referred to herein as "S-Y Systems."

57.     Defendant Tokai Rika U.S.A. is a Michigan corporation with its principal place of business in Plymouth, Michigan.  Defendant Tokai Rika U.S.A. is a subsidiary of and controlled by Tokai Rika Japan.  Defendant Tokai Rika U.S.A. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

58.     Defendant Tokai Rika Japan is a Japanese company with its principal place of business in Niwa-gun, Japan.  Defendant Tokai Rika Japan manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendants Tokai Rika U.S.A. and Tokai Rika Japan are herein collectively referred to as "Tokai Rika."

59.     Defendant Yazaki Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Yazaki Corporation manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

60.     Defendant Yazaki North America is an Illinois corporation and has its principal place of business in Canton Township, Michigan.  It is a subsidiary of and owned and controlled by its parent, Yazaki Corporation.  Defendant Yazaki North America manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Yazaki Corporation and Yazaki North America Inc. are herein collectively referred to as "Yazaki."

61.     Defendant Fujikura, Ltd. is a Japanese company with its principal place of business in Tokyo, Japan.  Defendant Fujikura Ltd. manufactured, marketed and/or sold

Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

62.     Defendant Fujikura America is a Delaware company with locations in Santa Clara, California and Farmington Hills, Michigan.  Defendant Fujikura America is a subsidiary of and controlled by Defendant Fujikura Ltd.  Defendant Fujikura America manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  Defendants Fujikura Ltd. and Fujikura America are collectively referred to herein as "Fujikura."

## Agents and Co-Conspirators

63.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

64.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

65.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

20

## Factual Allegations

### A.     The Automotive Wire Harness System Industry

66.     Automotive Wire Harness Systems comprise the "central nervous system" of an automotive vehicle and consist of the wires or cables and data circuits that run throughout the vehicle.  To ensure safety and basic functions (e.g., going, turning and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics which operate using control signals running on electrical power.  The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.

67.     Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") in new vehicles as part of the automotive manufacturing process.  They are also installed in vehicles to replace worn out, defective or damaged Automotive Wire Harness Systems.

68.     For new vehicles, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Wire Harness Systems directly from auto parts suppliers such as Defendants.  Automotive Wire Harness Systems may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier Manufacturers" in the automotive industry.  A Tier I manufacturer supplies Automotive Wire Harness Systems directly to an OEM.

69.     When purchasing Automotive Wire Harness Systems, OEMs issue Requests for Quotation ("RFQs") to the automotive parts suppliers.  Auto parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins

approximately three years prior to the start of production of a new model. Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

70.     Defendants comprise the majority of auto parts suppliers who manufacture wire harnesses for sale to OEMs.

71.     Defendants and the co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan, and possibly other countries, for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan, and possibly other countries, for installation in vehicles manufactured in Japan, and possibly other countries, for export to and sale in the United States.

72.     Plaintiffs and members of the proposed Classes purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants, having purchased new vehicles containing Automotive Wire Harness Systems or Automotive Wire Harness Systems themselves from OEMs, who in turn purchased Automotive Wire Harness Systems from Defendants.

73.     The global Automotive Wire Harness System market size reached US $21.9 billion in 2009, and increased by 32.2% to US $29 billion in 2010. According to *ResearchInChina*, a leading source for international market research and market data, the Automotive Wire Harness System market is steadily growing, and is expected to be US $32 billion in 2012.

74.     The global Automotive Wire Harness System market is dominated and controlled by large manufacturers, the top six of which are six of the Defendants, who control almost 90% of the global market; of those, four control almost 77% of the global market.

75.     Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009.  As it states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market."  In fact, 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in the Western Hemisphere.  Yazaki's largest customers are Toyota, followed by Chrysler, Ford, Renault-Nissan, Honda, and General Motors.  In the Western Hemisphere, Yazaki supplies Volvo, Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru and Toyota.

76.     Sumitomo is the second largest manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.  Sumitomo supplies Volkswagen, Toyota, Honda and Nissan.

77.     Delphi was the third largest maker of Automotive Wire Harness Systems as of 2009.  It controls 16.71% of the global market.  Its two largest customers are General Motors and Ford.

78.     Leoni controls 6% of the global market for Automotive Wire Harness Systems.

79.     Lear controls almost 5% of the global market for Automotive Wire Harness Systems.  Lear supplies Toyota, General Motors, Ford, and BMW.

80.     Furukawa controls almost 4% of the global market for Automotive Wire Harness Systems.

81.     Fujikura controls 2.69% of the global market for Automotive Wire Harness Systems.  Fujikura supplies Volkswagen and Subaru, among other OEMs.

82.     Tokai Rika supplies Toyota, among other OEMs.

83.     S-Y Systems supplies Ford, among other OEMs.

84.     By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and the world.

## B.     Defendants Increased Prices for Automotive Wire Harness Systems Despite Steady Costs

85.     In a competitive market, falling material and labor costs, or the stabilization of material and labor costs over time, would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower or predictably steady costs to lower their prices in order to capture market share.  The only economically rational action in such a situation is for each competitor to lower its own prices.

86.     In a market where ostensible competitors have engaged in a conspiracy to fix prices and refrain from competing for customers, however, competitors do not lower prices even when faced with steady or decreasing input costs.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to any lower-priced competitors.

87.     The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same.  In fact, according to *ResearchInChina*, Sumitomo and Furukawa own their own copper mines and effectively control their copper input costs.  Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems.  Thus, both of these Defendants had the power to effectively keep their costs steady and knew that due to their control of a key input in Automotive Wire Harness Systems, the costs of manufacture would likely remain steady.  In a competitive market,

such steady input costs should have caused Defendants to lower prices for Automotive Wire Harness Systems.  But in a market where Defendants have agreed not to compete on price, such steady input costs have no effect on price.

88.     Defendants' unwarranted, anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

### C.     The Structure and Characteristics of the Automotive Wire Harness SystemMarket Render the Conspiracy More Plausible

89.     The structure and other characteristics of the Automotive Wire Harness System market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  Specifically, the Automotive Wire Harness System market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

### 1.     The Automotive Wire Harness System Market Has High Barriers to Entry

90.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to join the industry and increase competition.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

91.     There are substantial barriers that preclude, reduce or make more difficult entry into the Automotive Wire Harness Systems market.  A new entrant into the business would face high and continuous start-up costs, including multi-million dollar costs associated with manufacturing plants, equipment, energy, transportation, distribution infrastructure, skilled labor and long-standing customer relationships.

92.     In addition, OEMs cannot change Automotive Wire Harness System suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System they purchase for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model. Thus, a new manufacturer of Automotive Wire Harness Systems entering the market would likely have to wait until the next cycle of vehicles was being manufactured by any given OEM to even have a chance at obtaining the bid for any model of car.  Also, the design of an Automotive Wire Harness System must be synergized by Automotive Wire Harness System manufacturers and OEMs.  Designing Automotive Wire Harness Systems pursuant to such stringent specifications involves a great degree of sunk costs and resources.

## 2.     There is Inelasticity of Demand for Automotive Wire Harness Systems

93.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

94.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

95.     Demand for Automotive Wire Harness Systems is highly inelastic.  This is because there are no close substitutes for these products.  Automobile manufacturers, and the automobile

dealers who buy their stock from automobile manufacturers, must purchase Automotive Wire

Harness Systems as an essential part of a vehicle—no vehicles are or can be sold without them—

even if the prices are kept at a supracompetitive level.

### 3.   The Market for Automotive Wire Harness Systems Is Highly Concentrated

96.     A highly concentrated market is more susceptible to collusion and other anti-

competitive practices, because the fewer competitors there are, the easier collusion is to coordinate.

97.     As discussed above, Defendants dominate the Automotive Wire Harness Systems

market.  Six of the Defendants control almost 90% of the global market, and four of the

Defendants control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo

controls 24%; Delphi controls 16.71%; Leoni controls 6%; Lear controls almost 5% and Furukawa

controls almost 4%.

### 4.   Defendants had Ample Opportunities to Conspire

98.     Defendants attended industry events where they had the opportunity to meet, have

improper discussions under the guise of legitimate business contacts and perform acts necessary

for the operation and furtherance of the conspiracy.

99.     For example, Defendants have regularly attended the annual North American

International Auto Show ("NAIAS") in Detroit, Michigan which provided the means and opportunity

to further the conspiracy alleged herein.  Defendants have also regularly attended the Automotive

Aftermarket Products Expo in Las Vegas, Nevada.

### D.   Government Investigations

100.     A globally coordinated antitrust investigation is taking place in the United States,

Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems.

101.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC.  One carmaker is said to have failed to attract competitive bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to take their complaint to the EC.

102.    On February 8, 2010, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anticompetitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems.  The EC also carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010.  Specifically, EC investigators raided the offices of Leoni AG, S-Y Systems Technologies, Lear Corporation's French subsidiary and Yazaki Corporation.  "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

103.    S-Y Systems Technologies has admitted that it is cooperating with the antitrust investigators.  Lear Corporation's Chief Executive Officer Bob Rossiter has stated that Lear Corporation was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers.  In addition, Delphi LLC has admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market."  Delphi LLC stated that it is cooperating fully with the European competition authorities.  Leoni AG has also stated that it is cooperating with the antitrust investigators.

104.    In February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric and Yazaki Corporation as part of an expansive investigation into collusion in the industry dating back to at least 2003.

105.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

106.    On February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including Yazaki Corporation's subsidiary in Canton Township, Michigan, Yazaki North America.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

107.    In 2010, the FBI also raided the offices of Tokai Rika USA and executed search warrants related to unfair competition, price-fixing and bid rigging of Automotive Wire Harness Systems.

108.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was

recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### E.     JFTC Cease and Desist Orders

109.    On January 19, 2012, the JFTC issued Cease and Desist orders against Fujikura Ltd., Sumitomo Electric and Yazaki Corporation, after investigating the companies' bidding practices with regard to wire harnesses and related products.

110.    The JFTC press release regarding the orders states "the JFTC gave the enterprises in question an advance notification on the contents of the orders and an opportunity to present their views and to submit evidence. Considering the views and evidence from them, the JFTC issued the orders."[4]

111.    Having evaluated all of the evidence before it, including rebuttal evidence from the accused companies, the JFTC determined that the companies had engaged in illegal anticompetitive activities.  Finding that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation all violated Japan's Antimonopoly Act by rigging bids to OEMs Toyota, Honda, Nissan and Fuji (manufacturer of Subaru-brand vehicles) on wire harnesses and related products, the JFTC stated that that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation carried out their conspiracy by "appointing the designated successful bidder and managing to have the designated successful bidder win the bidding."

112.    The JFTC stated that the conspiracy began as early as July 2000.

113.    The JFTC thus ordered each Defendant to make surcharge payments totaling 12.9 billion yen.

---

[4] Available at http://www.jftc.go.jp/en/pressreleases/uploads/2012_Jan_19.pdf (Last accessed January 28, 2012).

114.    The JFTC explained, in its press release, that Furukawa had also participated in the described bid-rigging conspiracy, in violation of the Antimonopoly Act.

**F.      Guilty Pleas**

###    1.    Guilty Pleas of Furukawa Electric, Junichi Funo,  Hirotsugu Nagata and Tetsuya Ukai

115.    On September 29, 2011, the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of Automotive Wire Harness Systems to automobile manufacturers.  Three Furukawa executives, who are Japanese nationals, also agreed to plead guilty and to serve prison time in the United States ranging from a year and a day to 18 months.

116.    Furukawa Electric is charged with price fixing, bid rigging and allocating customers, in violation of the Sherman Act.

117.    Furukawa Electric has pleaded guilty for its role in a conspiracy to rig bids, allocate customers and fix the prices of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere.  The DOJ announced in its information that Furukawa Electric participated in the conspiracy from at least as early as January 2000, until at least January 2010.

118.    Furukawa Electric stated in its press release regarding the plea agreement that "[a]fter analyzing the applicable laws and facts as a whole, Furukawa Electric has decided to enter into a plea agreement with the US Department of Justice."[5]

---

[5] Available at http://www.furukawa.co.jp/english/what/2011/kei_110930.pdf (Last accessed January 28, 2012).

119. The plea agreements are an outgrowth of the DOJ's first charges in its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry. According to four separate one-count felony charges filed in the Unites States District Court for the Eastern District of Michigan in Detroit, Furukawa Electric and its executives—Junichi Funo ("Funo"), Hirotsugu Nagata ("Nagata") and Tetsuya Ukai ("Ukai")—engaged in a conspiracy to rig bids for and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere.

120. Nagata was employed at American Furukawa in Plymouth, Michigan and a related joint venture from January 2004 until June 2009.

121. Funo worked at Furukawa Electric, in Japan and at American Furukawa from April 2003 until at least July 2009.

122. Ukai worked at Furukawa Electric in Japan from April 2003 until at least July 2009.

123. According to the criminal Informations filed, Furukawa Electric and its co-conspirators carried out the conspiracy by:

  a) Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

  b) Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

  c) Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

  d) Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e)   Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f)   Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g)   Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h)   Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i)   Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

124.   "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

125.   "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

126.   In its plea agreement, entered into on November 14, 2011, Furukawa Electric pleaded guilty to entering into agreements "to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to

fix, stabilize, and maintain the prices [of wire harnesses and related products] including coordinating price adjustments requested by automobile manufacturers . . ."

127.    Funo, Nagata and Ukai each pleaded guilty to the same allegations, in their guilty pleas.

128.    Furukawa Electric also admitted in its plea agreement that the Automotive Wire Harness Systems that were the subject of the conspiracy were sold to automobile manufacturers by its U.S. subsidiaries.

129.    The plea agreement stipulated that the DOJ would not bring charges against any of Furukawa Electric's directors, aside from Funo, Nagata and Ukai, the separately charged executives, and Shuji Hayashida, the Chief Executive Officer of American Furukawa from 2001 to 2010.

130.    According to the plea agreements, which are subject to court approval, Furukawa Electric, Funo, Nagata and Ukai have all agreed to assist the DOJ in its ongoing investigation into the automotive parts industry.

**2.    Guilty Pleas of Yazaki Corporation, Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa and Hisamitsu Takada**

131.    On January 30, 2012, Yazaki Corporation and four of its executives, Tsuneaki Hanamura ("Hanamura"), Ryoji Kawai ("Kawai"), Shigeru Ogawa ("Ogawa") and Hisamitsu Takada ("Takada"), agreed to plead guilty to conspiring to rig bids, fix prices and allocate customers for Automotive Wire Harness Systems from January 2000 until at least February 2010.

132.    Like Furukawa Electric, Yazaki Corporation agreed to confess to:

a)    Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b)      Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c)      Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d)      Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e)      Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f)      Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g)      Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h)      Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i)      Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

133.    Yazaki Corporation agreed to pay a fine of $470 million for its conspiracy with regard to Automotive Wire Harness Systems and several other automotive components, "the second largest criminal fine obtained for a Sherman Act antitrust violation," according to the DOJ press release describing Yazaki Corporation's agreement to plead guilty to the allegations of anticompetitive conduct.

134.    Hanamura, Kawai, Ogawa and Takada, four of Yazaki Corporation's executives, also agreed to enter guilty pleas for their participation in the Automotive Wire Harness Systems conspiracy and, like Yazaki Corporation, pleaded guilty to rigging bids, fixing prices and

allocating customers for Automotive Wire Harness Systems. These officials each agreed to serve 15 months to two years in prison.

135.    Hanamura worked at Yazaki Corporation from January 2000 until at least February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

136.    Kawai worked for Yazaki Corporation from January 2000 until February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

137.    Ogawa worked for Yazaki Corporation from January 2002 until at least February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

138.    Takada worked for Yazaki Corporation from September 2003 until at least February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

## G.    Damage to Plaintiffs and Other Automobile Dealers Caused by Defendants' Illegal Activities.

139.    The impact of Defendants' conspiracy on Plaintiffs' businesses was substantial. Analysis of automobile dealer profit margins and other data indicates that automobile dealers were substantially injured by higher but for prices regardless of the pass on of some portion of such prices to end users.

140.    Given the nature of their business, Plaintiffs and similarly situated automobile dealers had to and did absorb a significant portion of the overcharges that they paid due to Defendants' illegal activities. Plaintiffs and similarly situated automobile dealers did not "pass on" all of the overcharges or higher but for prices caused by Defendants' illegal activities.

141.     Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## Class Action Allegations

142.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the period January 1, 2000 to September 30, 2011,
> a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or
> b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,
> from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

143.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the state antitrust, unfair competition, and consumer protection laws on behalf of the following class (the "Damages Class"):

> All automobile dealers that, during the period January 1, 2000 to September 30, 2011, in states (as listed herein) having indirect purchaser laws,
> a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or
> b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,
> from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

144.     Alternatively, Plaintiffs bring Damages Classes on behalf of all persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state

statute(s), on behalf of all members of the following classes (collectively, the "State Classes"),

referred to together with the Damages Class as " Damages Classes":

(a)  **Arizona**:  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(b)  **Arkansas**: All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(c)  **California:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(d)  **District of Columbia:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(e)     **Florida:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(f)     **Hawaii:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(g)     **Illinois:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(h)   **Iowa:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(i)   **Kansas:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(j)   **Maine:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(k)   **Massachusetts:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(l)     **Michigan:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(m)     **Minnesota:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(n)     **Mississippi:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(o)     **Montana:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(p) **Nebraska:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(q) **Nevada:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(r) **New Hampshire:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(s)   **New Mexico:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(t)   **New York:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(u)   **North Carolina:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(v)   **North Dakota:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(w)     **Oregon:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(x)     **South Carolina:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(y)     **South Dakota:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(z)     **Tennessee:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(aa) **Utah:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(bb) **Vermont:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(cc) **West Virginia:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

(dd) **Wisconsin:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof.

145.     The Nationwide Class and the Damages Classes are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Wire Harness Systems directly from Defendants.

146.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class.

147.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of or rig bids for Automotive Wire Harness Systems sold in the United States;

b)     The identity of the participants of the alleged conspiracy;

c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d)     Whether the conspiracy violated the Sherman Act, as alleged in Count I;

e)      Whether the conspiracy violated state antitrust and unfair competition laws, as alleged in Count II;

f)      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Damages Classes to disgorgement of all benefits derived by Defendants, as alleged in Count III;

g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

h)      The effect of the conspiracy on the prices of Automotive Wire Harness Systems sold in the United States during the Class Period;

i)      Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

j)      The appropriate injunctive and related equitable relief for the Nationwide Class; and

k)      The appropriate class-wide measure of damages for the Damages Classes.

148.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems purchased from firms who purchased Automotive Wire Harness Systems from Defendants or their co-conspirators.

149.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

150.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

151.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including the provision to injured entities and persons of a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

152.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## Plaintiffs and the Classes Suffered Antitrust Injury

153.   Defendants' price-fixing conspiracy had the following effects, among others:

a)   Price competition has been restrained or eliminated with respect to Automotive Wire Harness Systems;

b)   The prices of Automotive Wire Harness Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

c)   Entities purchasing Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems from auto manufacturers have been deprived of free and open competition.

154.   During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Wire Harness Systems.

155.   The market for Automotive Wire Harness Systems and the market for vehicles are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market.  Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems.  As Lear Corporation stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

156.   Automotive Wire Harness Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Automotive Wire Harness Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Wire Harness Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

157.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs have suffered damages in an amount presently undetermined.  This is demonstrated by the facts, among others, that during the conspiracy, the prices manufacturers charged automobile dealers for new vehicles rose and since 2000 auto dealers' gross profits on new car sales declined sharply.  Plaintiffs' injuries are antitrust injuries of the type that the antitrust laws were meant to punish and prevent.

158.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property by, in some circumstances, losing sales and profits, as a result of lost volume, to the extent the inflated prices of Automotive Wire Harness Systems required Plaintiffs and members of the Damages Classes to raise prices on the Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems.  In fact, during the period of the conspiracy, the prices charged by dealers to consumers rose, and sales of new vehicles dramatically declined.  Plaintiffs' injuries are antitrust injuries of the type that the antitrust laws were meant to punish and prevent.

## Fraudulent Concealment

159.    Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until February 2010, at the earliest, when the EC raids were first publicly reported.

160.    Because Defendants' agreements, understandings and conspiracies were kept secret until February 2010, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct before that time, and they did not know until February 2010 that they were paying supra-competitive prices for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems, throughout the United States, during the Class Period.

161.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

162.    By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems are not exempt from antitrust regulation, and thus, before February 2010,

Plaintiffs reasonably considered the Automotive Harness Systems industry to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices for Automotive Wire Harness Systems before February 2010.

163.    As explained in the informations filed against several of the Defendants, the conspirators concealed their activities from the authorities by using code names and arranging meetings at private residences and remote locations.

164.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

165.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until February 2010, when reports of the investigations into anti-competitive conduct concerning Automotive Wire Harness Systems were first publicly disseminated.

166.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## Count I
## Violation of Section 1 of the Sherman Act
## (on behalf of Plaintiffs and the Nationwide Class)

167.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

168.     Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

169.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

170.     At least as early as January 2000, and continuing through at least September 30, 2011, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to rig bids for and to artificially fix, raise, stabilize and control prices for Automotive Wire Harness Systems thereby creating anticompetitive effects.

171.     The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harness Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout the United States.

172.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harness Systems.

173.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated members of the Nationwide Class who purchased Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems from firms who purchased Automotive Wire Harness Systems from Defendants have been harmed by being forced to pay inflated, supra-competitive prices for such products.

174.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and courses of conduct set forth herein.

175.    Defendants' conspiracy had the following effects, among others:

a)    Price competition in the market for Automotive Wire Harness Systems has been restrained, suppressed and/or eliminated in the United States;

b)    Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c)    Plaintiffs and members of the Nationwide Class who purchased Automotive Wire Harness Systems, or vehicles containing Automotive Wire Harness Systems from firms who purchased Automotive Wire Harness Systems from Defendants and their co-conspirators have been deprived of the benefits of free and open competition and have been forced to pay artificially inflated prices for such products.

176.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems purchased from firms who purchased such Automotive Wire Harness Systems from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

177.    The alleged contract, combination, or conspiracy is *a per se* violation of the federal antitrust laws.

178.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, pursuant to 15 U.S.C. §26, preventing and restraining the violations alleged herein.

## Count II

## Violation of State Antitrust and Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Classes)

179.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

180.    From as early as January 2000 through at least September 30, 2011, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harness Systems in an unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

181.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supra-competitive prices for Automotive Wire Harness Systems and to allocate customers for Automotive Wire Harness Systems in the United States.

182.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

  a)    Participating in meetings and conversations among themselves during which they agreed to price Automotive Wire Harness Systems at certain levels and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Classes with respect to Automotive Wire Harness Systems sold in the United States;

  b)    Allocating customers and markets and rigging bids for Automotive Wire Harness Systems in the United States in furtherance of their agreements; and

  c)    Participating in meetings and conversations among themselves to implement, adhere to and police the unlawful agreements they reached.

183.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices, to rig bids and to allocate customers with respect to Automotive Wire Harness Systems.

184.     Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the below-listed state antitrust and consumer protection statutes.

185.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

186.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-107(a)(10).

187.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.* and §§ 17200 *et seq.*

188.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 284501, *et seq.*

189.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

190.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

191.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

192.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

193.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

194.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

195.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Gen. Laws, Ch 93 A, § II.

196.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

197.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

198.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

199.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*

200.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

201.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

202.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

203.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

204.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

205.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

206.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

207.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705*, et seq.*

208.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

209.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

210.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

211.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

212.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Statutes Annotated §§ 2453, *et seq.*

213.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

214.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

215.    Plaintiffs and members of the Damages Classes in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Classes have paid more for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.

This injury is of the type the antitrust laws of the above states were designed to prevent and flows from Defendants' unlawful conduct.

216.    To the extent the inflated prices of Automotive Wire Harness Systems required Plaintiffs and members of the Damages Classes to raise prices on the Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems, Plaintiffs and members of the Damages Classes in each of the above states have been injured in their business and property through, in some circumstances, lost sales and lost profits, resulting from lost volume.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

217.    Defendants' violations of the above-listed state laws have proximately caused the injuries sustained by Plaintiffs and the members of the Damages Classes.

218.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Classes.

219.    Accordingly, Plaintiffs and the members of the Damages Classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust or consumer protection law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**Count III**
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Classes)**

220.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

221.     As a result of their unlawful conduct described above, Defendants have been and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Wire Harness Systems.

222.     Defendants have benefited from their unlawful acts, at the expense of Plaintiffs and the Damages Classes, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Classes for Automotive Wire Harness Systems and vehicles containing Automotive Harness Systems.   The amounts of such overpayments lawfully belong to Plaintiffs and the Damages Classes.

223.     Plaintiffs and the members of the Damages Classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiffs and the members of the Damages Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Classes may make claims on a pro rata basis.

## Prayer for Relief

Accordingly, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed:

      1.      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

      2.      A *per se* violation of Section 1 of the Sherman Act;

      3.      An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

      4.      Acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

Dated this  27th day of February, 2012.

By___/s/ Gerard V. Mantese_____
Gerard V. Mantese (Michigan Bar No. P34424)
David Hansma
Mantese Honigman Rossman
 and Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Phone: (248) 457-9200 ext. 203
Fax: (248) 457-9201
Email: gmantese@manteselaw.com
            dhansma@manteselaw.com

Jonathan W. Cuneo
Victoria Romanenko
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Phone: (202) 789-3960
Fax: (202)789-1813
Email: jonc@cuneolaw.com
            Vicky@cuneolaw.com

Joel Davidow
Daniel Cohen
Cuneo Gilbert & LaDuca, LLP
Bethesda, Maryland
8120 Woodmont Ave
Suite 810
Bethesda, MD 20814

Phone: (202) 789-3960
Email: joel@cuneolaw.com
danielc@cuneolaw.com

Preetpal Grewal
Cuneo Gilbert & LaDuca, LLP
Rockefeller Center
620 Fifth Avenue
New York, NY 10020
Phone: (917) 639-5510
Email: pgrewal@cuneolaw.com

Michael Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker Boulevard
No. 801
St. Louis, MO 6310
Phone: (202)789-3960
Fax: (202)789-1813
Email: Mflannery@cuneolaw.com

Shawn M. Raiter
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Phone: (651) 312-6500
Fax: (651) 312-6618
Email: sraiter@larsonking.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Phone: (952) 930-2485
Email: greg@gjohnsonlegal.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Phone: (501) 374-1058
Fax: (501) 374-2222
Email: tomthrash@sbcglobal.net

Phillip Duncan

Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Phone:  (501) 228-7600
Fax:  (501) 228-0415
Email:  phillip@duncanfirm.com
richard@duncanfirm.com

Don Barrett
David McMullan, Jr.
Brian Herrington
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Phone: (662) 834-2488
Fax: (662) 834-2628
Email: dbarrett@barrettlawgroup.com
         bherrington@barrettlawgroup.com
         dmcmullan@barrettlawgroup.com

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
Fax: (615) 515-3395
Email: charles@cfbfirm.com

Dewitt Lovelace
Alexander Peet
Lovelace Law Firm, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Phone: (850) 837-6020
Fax: (850) 837-4093
Email: dml@lovelacelaw.com