```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2                    SOUTHERN DIVISION

3                      —    —    —

4
     IN RE:  AUTOMOTIVE WIRE HARNESS
5    SYSTEMS ANTITRUST              Case No. 12-md-02311

6          MDL NO. 2311            Hon. Marianne O. Battani

7

8    _____/

9              INITIAL STATUS CONFERENCE

10        BEFORE THE HONORABLE MARIANNE O. BATTANI
               United States District Judge
11        Theodore Levin United States Courthouse
               231 West Lafayette Boulevard
12                  Detroit, Michigan
               Friday, March 16, 2012
13

14   APPEARANCES:

15   For the              DOUGLAS ABRAHAMS
     Direct Purchaser     KOHN, SWIFT & GRAF, P.C.
16   Plaintiffs:          One South Broad Street, Suite 2100
                          Philadelphia, PA  19107
17                        (215) 238-1700

18                        W. JOSEPH BRUCKNER
                          LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
19                        100 Washington Avenue S., Suite 2200
                          Minneapolis, MN  55401
20                        (612) 339-6900

21                        WILLIAM G. CALDES
                          SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
22                        1818 Market Street, Suite 2500
                          Philadelphia, PA  19103
23                        (215) 496-0300

24
          To obtain a copy of this official transcript, contact:
25            Robert L. Smith, Official Court Reporter
              (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1    APPEARANCES:   (Continued)

 2    For the                MANUEL J. DOMINGUEZ
      Direct Purchaser       COHEN MILSTEIN
 3    Plaintiffs:            3507 Kyoto Gardens Drive, Suite 200
                             Palm Beach Gardens, FL  33410
 4                           (561) 578-6850

 5                           DAVID H. FINK
                             FINK & ASSOCIATES LAW
 6                           100 West Long Lake Road, Suite 111
                             Bloomfield Hills, MI  48304
 7                           (248) 971-2500

 8                           JOSEPH M. FISCHER
                             CARSON FISCHER, P.L.C.
 9                           4111 Andover Road West, Second Floor
                             Bloomfield Hills, MI  48302
10                           (248) 644-4840

11                           GREGORY P. HANSEL
                             PRETI, FLAHERTY, BELIVEAU &
12                           PACHIOS, L.L.P.
                             One City Center
13                           Portland, ME  04112
                             (207) 791-3000
14
                             CRAIG E. HILBORN
15                           HILBORN & HILBORN, P.C.
                             999 Haynes Street, Suite 205
16                           Birmingham, MI  48009
                             (248) 642-8350
17
                             WILLIAM E. HOESE
18                           KOHN, SWIFT & GRAF, P.C.
                             One South Broad Street, Suite 2100
19                           Philadelphia, PA  19107
                             (215) 238-1700
20
                             STEVEN A. KANNER
21                           FREED, KANNER, LONDON & MILLEN, L.L.C.
                             2201 Waukegan Road, Suite 130
22                           Bannockburn, IL  60015
                             (224) 632-4502
23
                             JOSEPH C. KOHN
24                           KOHN, SWIFT & GRAF, P.C.
                             One South Broad Street, Suite 2100
25                           Philadelphia, PA  19107
                             (215) 238-1700
```

```
 1   APPEARANCES:  (Continued)

 2   For the              IRWIN B. LEVIN
     Direct Purchaser     COHEN & MALAD, L.L.P.
 3   Plaintiffs:          One Indiana Square, Suite 1400
                          Indianapolis, IN  46204
 4                        (317) 636-6481

 5                        WILLIAM H. LONDON
                          FREED, KANNER, LONDON & MILLEN, L.L.C.
 6                        2201 Waukegan Road, Suite 130
                          Bannockburn, IL  60015
 7                        (224) 632-4504

 8                        EUGENE A. SPECTOR
                          SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
 9                        1818 Market Street, Suite 2500
                          Philadelphia, PA  19103
10                        (215) 496-0300

11                        JASON J. THOMPSON
                          SOMMERS SCHWARTZ, P.C.
12                        2000 Town Center, Suite 900
                          Southfield, MI  48075
13                        (248) 355-0300

14                        RANDALL B. WEILL
                          PRETI, FLAHERTY, BELIVEAU &
15                        PACHIOS, L.L.P.
                          One City Center
16                        Portland, ME  04112
                          (207) 791-3000

17

18   For the              STEVEN A. ASHER
     End-Payor            WEINSTEIN, KITCHENOFF & ASHER, L.L.C.
19   Plaintiffs:          1845 Walnut Street, Suite 1100
                          Philadelphia, PA  19103
20                        (215) 545-7200

21                        JAN R. BARTELLI
                          FARUQI & FARUQI, L.L.P.
22                        369 Lexington Avenue, Tenth Floor
                          New York, NY  10017
23                        (212) 983-9330

24

25
```

Case 2:12-md-02311-SFC-RSW   ECF No. 68, PageID.758   Filed 03/26/12   Page 4 of 116
Initial Status Conference • March 16, 2012

4

```
 1    APPEARANCES:   (Continued)

 2    For the              DANIEL E. BECNEL, JR.
      End-Payor            BECNEL LAW FIRM, L.L.C.
 3    Plaintiffs:          106 W. Seventh Street
                           Reserve, LA  70084
 4                         (985) 536-1186

 5                         PATRICK E. CAFFERTY
                           CAFFERTY FAUCHER, L.L.P.
 6                         101 North Main Street, Suite 450
                           Ann Arbor, MI  48104
 7                         (734) 769-2144

 8                         JOSEPH W. COTCHETT
                           COTCHETT, PITRE & McCARTHY, L.L.P.
 9                         840 Malcolm Road
                           Burlingame, CA  94010
10                         (650) 697-6000

11                         ANTHONY L. DeLUCA
                           ANTHONY L. DeLUCA, P.L.C.
12                         14950 E. Jefferson Avenue, Suite 170
                           Grosse Pointe Park, MI  48230
13                         (313) 821-5905

14                         TODD F. FLOOD
                           FLOOD LANCTOT CONNOR & STABLEIN,
15                         P.L.L.C.
                           401 N. Main Street
16                         Royal Oak, MI  48067
                           (248) 547-1032
17
                           DANIEL E. GUSTAFSON
18                         GUSTAFSON GLUEK, P.L.L.C.
                           650 Northstar East
19                         608 Second Avenue South
                           Minneapolis, MN  55402
20                         (612) 333-8844

21                         JAMES L. KAUFFMAN
                           LEVIN, PAPANTONIO, THOMAS, MITCHELL,
22                         RAFFERTY & PROCTOR, P.A.
                           316 S. Baylen Street, Suite 600
23                         Pensacola, FL  32502
                           (850) 435-7147

24

25
```

```
 1   APPEARANCES:   (Continued)

 2   For the                   SUSAN G. KUPFER
     End-Payor                 GLANCY, BINKOW & GOLDBERG, L.L.P.
 3   Plaintiffs:               One Embarcadero Center, Suite 760
                               San Francisco, CA  94111
 4                             (415) 972-8160

 5                             E. POWELL MILLER
                               THE MILLER LAW FIRM, P.C.
 6                             950 W. University Drive, Suite 300
                               Rochester, MI  48307
 7                             (248) 841-2200

 8                             SHELDON L. MILLER
                               LAW OFFICE OF SHELDON L. MILLER, P.C.
 9                             31731 Northwestern Highway, Suite 280W
                               Farmington Hills, MI  48334
10                             (248) 538-3400

11                             JOHN F. NEVARES
                               JOHN F. NEVARES & ASSOCIATES
12                             P.O. Box 13667
                               San Juan, PR  00908
13                             (787) 722-9333

14                             PAUL F. NOVAK
                               MILBERG, L.L.P.
15                             777 Woodward Avenue, Suite 890
                               Detroit, MI  48226
16                             (313) 309-1760

17                             ALYSON OLIVER
                               KRESCH OLIVER, P.L.L.C.
18                             21400 Southfield Road, Suite 305
                               Southfield, MI  48075
19                             (248) 327-6556

20                             TERRELL W. OXFORD
                               SUSMAN GODFREY, L.L.P.
21                             901 Main Street, suite 5100
                               Dallas, TX  75202
22                             (214) 754-1902

23                             BERNARD PERSKY
                               LABATON SUCHAROW
24                             140 Broadway Avenue
                               New York, NY  10005
25                             (212) 907-0700
```

```
 1   APPEARANCES:   (Continued)

 2   For the                CAMILO K. SALAS, III
     End-Payor              SALAS & CO., L.C.
 3   Plaintiffs:            650 Poydras Street, Suite 2000
                            New Orleans, LA  70130
 4                          (504) 799-3080

 5                          HOLLIS L. SALZMAN
                            LABATON SUCHAROW
 6                          140 Broadway Avenue
                            New York, NY  10005
 7                          (212) 907-0700

 8                          ADAM T. SCHNATZ
                            THE MILLER LAW FIRM, P.C.
 9                          950 West University Drive, Suite 300
                            Rochester, MI  48307
10                          (248) 841-2200

11                          HOWARD J. SEDRAN
                            LEVIN, FISHBEIN, SEDRAN & BERMAN
12                          510 Walnut Street, Suite 500
                            Philadelphia, PA  19106
13                          (215) 592-1500

14                          BRIAN R. STRANGE
                            STRANGE & CARPENTER
15                          12100 Wilshire Boulevard, 19th Floor
                            Las Angeles, CA  90025
16                          (310) 207-5055

17                          STEVEN M. TOPRANI
                            LEECH, TISHMAN, FUSCALDO & LAMPL
18                          525 William Penn Place, 30th Floor
                            Pittsburgh, PA  15219
19                          (412) 261-1600

20                          STEVEN N. WILLIAMS
                            COTCHETT, PITRE & McCARTHY, L.L.P.
21                          840 Malcolm Road
                            Burlingame, CA  94010
22                          (650) 697-6000

23
     For the                DON BARRETT
24   Dealership             BARRETT LAW OFFICES
     Plaintiffs:            P.O. Drawer 987
25                          Lexington, MS  39095
                            (601) 834-2376
```

```
 1   APPEARANCES:   (Continued)

 2   For the              JONATHAN W. CUNEO
     Dealership           CUNEO, GILBERT & LaDUCA, L.L.P.
 3   Plaintiffs:          507 C Street NE
                          Washington, D.C.  20002
 4                        (202) 789-3960

 5                        GERARD V. MANTESE
                          MANTESE, HONIGMAN, ROSSMAN &
 6                        WILLIAMSON, P.C.
                          1361 E. Big Beaver Road
 7                        Troy, MI  48083
                          (248) 457-9200
 8
     For the              IRWIN M. ALTERMAN
 9   Defendants:          KEMP KLEIN LAW FIRM
                          201 W. Big Beaver Road, Suite 600
10                        Troy, MI  48084
                          (248) 528-1111
11                           on behalf of Furukawa Electric Company

12                        STEVEN F. CHERRY
                          WILMER HALE
13                        1875 Pennsylvania Avenue, NW
                          Washington, D.C.  20006
14                        (202) 663-6321
                             on behalf of Denso International
15                           America

16                        KENNETH R. DAVIS, II
                          LANE POWELL, P.C.
17                        601 SW Second Avenue, Suite 2100
                          Portland, OR  97204
18                        (503) 778-2100
                             on behalf of Furukawa Electric Company
19
                          GEORGE B. DONNINI
20                        BUTZEL LONG, P.C.
                          150 West Jefferson Avenue
21                        Detroit, MI  48226
                          (313) 225-7000
22                           on behalf of Tokai Rika America (TRAM)

23

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the                MICHAEL J. FANELLI
     Defendants:            COVINGTON & BURLING, L.L.P.
 3                          1201 Pennsylvania Avenue NW
                            Washington, D.C.  20004
 4                          (202) 662-5383
                              on behalf of S-Y Systems Technologies,
 5                            GmbH

 6                          KENNETH A. GALLO
                            PAUL, WEISS, RIFKIND, WHARTON &
 7                          GARRISON, L.L.P.
                            2001 K Street, NW
 8                          Washington, D.C.  20006
                            (202) 223-7356
 9                            on behalf of Delphi Automotive, L.L.P.

10                          LARRY S. GANGNES
                            LANE POWELL, P.C.
11                          1420 Fifth Avenue, Suite 4100
                            Seattle, Washington  98101
12                          (206) 223-7000
                              on behalf of Furukawa Electric Company
13
                            JEFFREY G. HEUER
14                          JAFFE, RAITT, HEUER & WEISS, P.C.
                            27777 Franklin Road, Suite 2500
15                          Southfield, MI  48034
                            (248) 351-3000
16                            on behalf of Kyungshin-Lear Sales and
                              Engineering
17
                            WILLIAM H. HORTON
18                          GIARMARCO, MULLINS & HORTON, P.C.
                            101 W. Big Beaver Road, Tenth Floor
19                          Troy, MI  48084
                            (248) 457-7000
20                            on behalf of Sumitomo Electric
                              Industries, Limited
21
                            HOWARD B. IWREY
22                          DYKEMA GOSSETT, P.L.L.C.
                            39577 Woodward Avenue, Suite 300
23                          Bloomfield Hills, MI  48304
                            (248) 203-0526
24                            on behalf of Lear Corporation

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the              ATLEEN KAUR
      Defendants:          YAZAKI NORTH AMERICA, INC.
 3                         6801 Haggerty Road, 46E
                           Canton, MI  48187
 4                         (734) 983-4622
                             on behalf of Yazaki North America,
 5                           Inc.

 6                         SHELDON H. KLEIN
                           BUTZEL LONG, P.C.
 7                         41000 Woodward Avenue
                           Bloomfield Hills, MI  48304
 8                         (248) 258-1414
                             on behalf of Tokai Rika America (TRAM)
 9
                           ANDREW S. MAROVITZ
10                         MAYER BROWN, L.L.P.
                           71 South Wacker Drive
11                         Chicago, IL  60606
                           (312) 701-7116
12                           on behalf of Lear Corporation

13                         JULIE E. McEVOY
                           JONES DAY
14                         51 Louisiana Avenue, NW
                           Washington, D.C.  20001
15                         (202) 879-4645
                             on behalf of Yazaki North America,
16                           Incorporated

17                         JOSEPH E. PAPELIAN
                           DELPHI CORPORATION
18                         5725 Delphi Drive
                           Troy, MI  48098
19                         (248) 813-2535
                             on behalf of Delphi Automotive, L.L.P.
20
                           MATTHEW L. POWELL
21                         KERR, RUSSELL & WEBER, P.L.C.
                           500 Woodward Avenue, Suite 2500
22                         Detroit, MI  48226
                           (313) 961-0200
23                           on behalf of Fujikura America,
                             Incorporated
24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the                WM. PARKER SANDERS
     Defendants:            SMITH, GAMBRELL & RUSSELL, L.L.P.
 3                          Promenade Two, Suite 3100
                            1230 Peachtree Street NE
 4                          Atlanta, GA  30309
                            (404) 815-3684
 5                            on behalf of Kyungshin-Lear Sales and
                              Engineering
 6
                            WILLIAM A. SANKBEIL
 7                          KERR, RUSSELL & WEBER, P.L.C.
                            500 Woodward Avenue, Suite 2500
 8                          Detroit, MI  48226
                            (313) 961-0200
 9                            on behalf of Fujikura America,
                              Incorporated
10
                            LARRY J. SAYLOR
11                          MILLER, CANFIELD, PADDOCK &
                            STONE, P.L.C.
12                          150 West Jefferson Avenue, Suite 2500
                            Detroit, MI  48226
13                          (313) 496-7986
                              on behalf of Denso International
14                            America

15                          DAVID M. SHERBIN
                            DELPHI CORPORATION
16                          5725 Delphi Drive
                            Troy, MI  48098
17                          (248) 813-3009
                              on behalf of Delphi Automotive, L.L.P.
18
                            KAREN D. STRINGER
19                          WILMER, CUTLER, PICKERING, HALE &
                            DORR, L.L.P.
20                          60 State Street
                            Boston, MA  02109
21                          (617) 526-6406
                              on behalf of Denso International
22                            America

23

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the                MARGUERITE M. SULLIVAN
      Defendants:            LATHAM & WATKINS, L.L.P.
 3                           555 Eleventh Street, NW, Suite 1000
                             Washington, D.C.  20004
 4                           (202) 637-2200
                               on behalf of Sumitomo Electric
 5                               Industries, Limited

 6                           MICHAEL F. TUBACK
                             O'MELVENY & MYERS, L.L.P.
 7                           Two Embarcadero Center, 28th Floor
                             San Francisco, CA  94111
 8                           (415) 984-8700
                               on behalf of Leoni Wire, Inc.
 9
                             MICHAEL R. TURCO
10                           BROOKS, WILKINS, SHARKEY &
                             TURCO, P.L.L.C.
11                           401 South Old Woodward Avenue, Suite 400
                             Birmingham, MI  48009
12                           (248) 971-1713
                               on behalf of Leoni AG, Leoni Wiring
13                               Systems, Leonishe Holding, Inc.

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## TABLE OF CONTENTS

2                                                            Page

3   OATH OF ADMISSION administered..................... 16

4   APPOINTMENT OF INTERIM LEAD AND LIAISON COUNSEL
        Direct Purchaser Plaintiffs by Mr. Kanner........ 38
5       Dealership Plaintiffs by Mr. Barrett............. 53
        End-Payor Plaintiffs by Mr. Becnel.............. 60
6       End-Payor Plaintiffs by Mr. Strange............. 68
        End-Payor Plaintiffs by Ms. Salzman............. 80

7

8   CASE MANAGEMENT ORDER DISCUSSION................... 82

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Friday, March 16, 2012

3    at about 10:07 a.m.

4                              —    —    —

5              (Court, Counsel and parties present.)

6              THE CASE MANAGER:  All rise.

7              The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10             You may be seated.

11             THE COURT:  Good morning.  It looks like we are

12   having a party here.

13             Okay.  I'm sorry about the heat.  There is nothing

14   we can do about it, so I don't know that there is anyplace

15   much cooler.  We did reserve another room in case but I think

16   we are going to stay here and bear with it.

17             Let me introduce myself.  My name is

18   Marianne Battani and I am the Judge who has had the great

19   fortune of being assigned this case.

20             I just want to say to begin with, I know some of

21   you were a little excited because I set this meeting I guess

22   early, only I was too ignorant of this to know that it was

23   early, but even if I had known that it was too early I would

24   do the same thing because I don't like to have cases,

25   especially cases of a significant magnitude like this that

 1     involves so many people and so many attorneys involved,

 2     without really knowing about them.  So when I sent you the

 3     notice of this and say I wanted to get a lay of the land, I

 4     really do.  I want to know a little bit more than what your

 5     pleadings tell me about what this case is about, and that

 6     that truly is the intention today.  I know we have in Court

 7     maybe more important issues in educating me like appointment

 8     of counsel, and we will get to that shortly.

 9              We have gotten your appearances.  However we, of

10     course, still don't know who most of you are, so when you

11     speak I'm going to ask that you identify yourself for

12     purposes of the record.  And I am having this on the record

13     just so I will have complete notes of what happened today.

14     Obviously if and when we get to motions they, of course, will

15     have to be on the record.

16              So I welcome all of you and I hope to make this an

17     informative meeting.  We will proceed as quickly as we can

18     and as efficiently as we can but consistent with justice so

19     everybody does have an opportunity to tell me what their

20     story is.

21              Okay.  Let me begin by introducing to you people

22     that you will get to know.  We do have a magistrate judge

23     assigned to this case, her name is Mona Majzoub.  She is not

24     here, she happens to be on duty today, so she may come in at

25     some point and I will introduce her just so you will see her.

 1    At this point I don't even know that I'm going to use her,

 2    but she is assigned to this case.

 3              Of course, sitting in front of me is

 4    Bernadette Thebolt, and I think most of you have if not

 5    already talked to her know that she is my case manager, and

 6    will be the court clerk in charge of this case so that when

 7    we work out the filings and the pleadings, et cetera, Bernie

 8    will keep track of that.

 9              Then my court reporter, Rob Smith, will be taking

10    down what is taking place here today.  I don't anticipate

11    that we will order a transcript, but I will get some notes

12    off of his notes, so that's what we are doing.

13              And then I have my two law clerks, in front is

14    Eric Westenberg and to my far right is Molly Roehrig, and

15    they will be working with me on this matter.

16              The first issue is the oath of admission.  I'm

17    sorry, I know a lot of you got excited about this because you

18    didn't have certificates of good standing, et cetera.  You

19    only need to be admitted if you are going to argue a motion

20    today.  You only need to be admitted, in fact, if you are

21    coming here to argue a motion.  We do not have pro hoc vice

22    in this district so you have to, as you most likely know

23    already, become members and then you will be welcome to come

24    here and argue any case.

25              All right.  For those of you, I have the

1   certificates and I will have Bernie give you these later,

2   but, if you will if, you are being admitted please stand up,

3   those of you, all right, and if you would please raise your

4   right hand.

5          Do you solemnly swear that you will conduct

6   yourself as an attorney and counselor of this Court with

7   integrity and respect for the law, and that you have read and

8   will abide by the Civility Principles approved by this Court,

9   and that you will support and defend the Constitution and

10  laws of the United States?

11         ATTORNEYS BEING SWORN:  (Collectively) I do.

12         THE COURT:  And do you so declare under the penalty

13  of perjury that the foregoing is true and correct?

14         ATTORNEYS BEING SWORN:  (Collectively) I do.

15         THE COURT:  Okay.  Thank you.  You are admitted and

16  you will be able to pick up your certificates from Bernie.

17         (The following attorneys were administered the

18         Oath of Admission:

19         Douglas A. Abrahams, Daniel E. Becnel,

20         W. Joseph Bruckner, William Caldes,

21         Michael Fanelli, Susan Gilah Kupfer,

22         Gregory P. Hansel, Steven A. Kanner,

23         James L. Kauffman, William H. London,

24         Andrew Marovitz, Julie E. McEvoy,

25         Marguerite Mitchell Sullivan, Terrell W. Oxford,

1              Bernard Persky, Hollis L. Salzman,

2              William Parker Sanders, Howard Sedran,

3              Brian R. Strange, Karen D. Stringer,

4              Steven M. Toprani, Michael Frederick Tubach,

5              Randall B. Weill and Steven N. Williams.)

6         THE COURT:  Let me stress, although after reading

7    the applications for lead attorneys I don't think this is

8    something that I have to say for you, it might be preaching

9    to the choir, but I do want to say that we do have Rules of

10   Civility and Principles of Civility and we do follow that.  I

11   think that in this Court really I have never had a problem,

12   and I would anticipate the same thing here that everybody

13   will act professionally with due regard and respect for each

14   other.

15        The first issue I would like to address is the

16   organization of the cases, the direct purchaser, indirect

17   purchaser organization.  Do you want to address that,

18   Mr. Fink?

19        MR. FINK:  Well, Your Honor --

20        THE COURT:  If you would give your name and go to

21   the podium, please.

22        I called on Mr. Fink because he was the first to

23   file an application for lead counsel and liaison counsel, he

24   filed it ex-parte and I did not sign it ex-parte, but I will

25   hear you today.  Go ahead.

1     MR. FINK:  Thank you, Your Honor.  I'm going to be

2  very brief because I'm actually going to introduce someone

3  else, but I did want to introduce to the Court the attorneys

4  who would be taking the lead -- or propose to take the lead

5  on behalf of the direct purchase plaintiffs, and that's

6  Greg Hansel, Steve Kanner, Gene Spector and Joe Kohn.

7     THE COURT:  Wait a minute.  Greg Hansel.  Okay.

8  And?

9     MR. FINK:  Steve Kanner.

10     THE COURT:  Steve Kanner.

11     MR. FINK:  Joe Kohn and Eugene Spector.

12     THE COURT:  Okay.

13     MR. FINK:  Your Honor, I know the Court has seen

14  the papers and I'm not going to argue that motion except to

15  say that the Court already obviously knows the tremendous

16  depth of experience that these attorneys have.  And I would

17  add this --

18     THE COURT:  Wait a minute before we get into the

19  applications, I'm not quite there yet.  I want you to tell me

20  because you filed as liaison as the direct purchasers,

21  obviously you decided that there would be -- or you all kind

22  of came to the conclusion about the direct and indirect and

23  how these categories are separate, but I would like to know

24  from you because I don't know, as I read some pleadings I

25  hear about the OEMs being the direct purchasers and having

1    direct contracts, and then you talk about other arrangements,

2    so I would like to know who are the direct purchasers?

3          MR. FINK:  Well, every plaintiff who we have filed

4    on behalf of -- who the direct purchasers have filed on

5    behalf of, every one of those plaintiffs have purchased wire

6    harnesses directly from one of the named defendants -- at

7    least one of the name defendants and in substantial volumes.

8    The OEMs also purchased the direct -- purchased directly from

9    the defendants, and may well -- they are members of the class

10   that we propose, and they may well choose to stay in the

11   class.  We don't know that they will stay in, but they are

12   direct purchasers.

13         THE COURT:  So they would be members of the class

14   that you propose?

15         MR. FINK:  That's correct, Your Honor.

16         THE COURT:  And how many people are members of the

17   class you propose?  How many, excuse me, companies do you

18   anticipate?

19         MR. FINK:  We think in the neighborhood of 1,000.

20         THE COURT:  In the neighborhood of thousands?

21         MR. FINK:  1,000, roughly 1,000, several hundreds

22   to 1,000.  We don't know the exact numbers and we won't until

23   the end.

24         THE COURT:  I understand.  All right.  Before we go

25   to the applications -- you may be seated -- I would like to

```
 1    hear from somebody from the dealerships.  Let's see,
 2    Mr. Cuneo, are you here?  All right.  Why don't you come up.
 3            MR. FINK:  Your Honor, as he's coming up, let me
 4    just say if this is the jury we are prepared to dismiss this
 5    case.
 6            THE COURT:  That would be interesting, wouldn't it?
 7    Okay.
 8            MR. CUNEO:  Good morning, Your Honor.
 9    Jonathan Cuneo, and I want to start by reading you your
10    rights, and that is that I have not yet been admitted.  I
11    have the application in my hand.  I am a member in --
12            THE COURT:  That's all right, you're not doing a
13    motion right now.  All I want for you to do because I know
14    you filed an application for lead co-counsel, I want you to
15    tell me a little bit about the dealership class.
16            MR. CUNEO:  Well, the dealership class are -- is a
17    class of indirect purchasers in those states in the
18    United States that have passed state legislation to overrule
19    or to create a private cause of action for indirect
20    purchasers.  As the Court is doubtless aware under federal
21    law the Illinois Brick decision says that the exclusive
22    federal right belongs to direct purchasers.
23            So we in our group all represent dealers from
24    various states and the District of Columbia across the
25    country, and we have put together basically a leadership
```

1    team -- or a proposed leadership team of three law firms, I'm

2    not making the motion now, but in any event we have been

3    working together harmoniously, we each bring something

4    different, slightly different, to the table, and we have been

5    able to coordinate ourselves sufficiently so that there are

6    only three of us in the courtroom.

7            And in any event, we -- the dealers, of course,

8    have a very substantial interest in the outcome of this

9    litigation.  Our complaints charge that they suffered

10   tremendous as yet unknown amounts of damages as a result.

11           THE COURT:  Is there some amount of damages they

12   suffered that they have not passed on to the end-payor

13   plaintiffs?

14           MR. CUNEO:  Yes, there is.

15           THE COURT:  What would that be?

16           MR. CUNEO:  Well, we are working on getting a

17   figure, but we have retained an economist, we are giving that

18   economist figures, but the preliminary conclusions of that

19   economist are that we have a definite percentage of recovery.

20   I'm hesitant to say exactly what the percentage is because if

21   there is a variation at the end then I don't want to be stuck

22   with something that I had said but it is a sizeable

23   percentage of the overage.

24           THE COURT:  And tell me in your class how many

25   dealerships are you talking about?  I heard a number of

1    20,000.  I don't know if that's --

2              MR. CUNEO:  I'm sorry, I missed the last --

3              THE COURT:  I heard like 20,000 or something.  Was

4    that from your papers or --

5              MR. CUNEO:  If it was in my papers I don't remember

6    that, and I don't know that we have measured it but it is in

7    the thousands, there is no question about it, it is in the

8    thousands.

9              THE COURT:  Okay.  All right.  Thank you.

10             MR. CUNEO:  Thank you.

11             THE COURT:  Mr. Becnel, could you tell us a little

12   bit about the end-payors?

13             MR. BECNEL:  Yes.

14             THE COURT:  I'm most anxious at first to know --

15   let me have you put your appearance on the record.

16             MR. BECNEL:  Daniel E. Becnel, Jr. from Louisiana.

17             THE COURT:  Okay.  I'm most interested in knowing

18   how many or what the size is -- proposed size of your class

19   is?

20             MR. BECNEL:  Probably millions.

21             THE COURT:  Millions?

22             MR. BECNEL:  Yeah.  It is anybody who bought one of

23   these cars that ultimately wound up dealing with the issue

24   and paying for the issue, and when you do a class notice you

25   are going to find out, you know, no matter what the case is,

1    whether it is a product liability case, whether it is an

2    antitrust case, they just come out of the woodwork, and

3    nobody really has been able to measure that, but it is going

4    to be tens of thousands, hundreds of thousands and maybe tens

5    of millions.

6         THE COURT:  Do you agree that the indirect

7    purchasers should be divided into these proposed classes of

8    dealerships and end-payors?

9         MR. BECNEL:  Not only that but you are going to

10   have at some future hearings additional cases with additional

11   products, and I would urge this Court to accept from the MDL

12   Panel, should Judge Heyburn call you, the rest of them

13   because they all consolidated basically with similar issues,

14   but those have not been argued and we will have arguments on

15   some of those cases at the hearing in San Diego at the end of

16   the month, but there is big-time precedent for that and the

17   precedent is just the last time we were arguing MDL cases

18   Judge Goodwin, who is from West Virginia, wound up in the

19   vaginal mesh cases getting three gigantic classes of people

20   who had this vaginal mesh problem that failed.

21        So I wanted to take this opportunity to urge you

22   to, first, take those additional cases, and to -- because we

23   have found just because of the BP case that just went through

24   multiple states with millions of people filing claims, and

25   with a fabulous special master appointed by the President and

1    BP, we have settled 225,000 cases for $6.2 billion, and I

2    would urge that now Mr. Feinberg is no longer doing that that

3    the Court consider him for a special master to get all of

4    these --

5           THE COURT:  We will get there, but I will jump

6    ahead here to the next item on other related cases because

7    you have addressed these other MDLs.  We looked up the

8    briefing schedule, which I think we had on the agenda

9    sometime in March is what -- it is March, so by now maybe all

10   the briefing is done on those but it doesn't look like it is

11   scheduled until --

12          MR. BECNEL:  The following one, I wanted to say

13   this one, the one after -- and they have it charted out,

14   Judge Heyburn has it charted out, it is probably not

15   San Diego, I don't know.

16          UNIDENTIFIED PERSON:  Washington, D.C.

17          MR. BECNEL:  Washington, D.C. is the one --

18          THE COURT:  And that would be the end of May?

19          MR. BECNEL:  Yes, about every six weeks.

20          THE COURT:  Okay.  So we have some time before we

21   know that.  Tell me this, those three other MDLs that I'm

22   aware of, the instrument panel, the fuel sender and the

23   heater control panel, those are the three MDLs that we are

24   looking at, are the proposed plaintiff classes the same?

25          MR. BECNEL:  Well, they basically are.  And the

 1    same group of lawyers are probably going to have I would say

 2    98 percent of those cases, so it doesn't make a lot of sense

 3    to take those three additional cases and divide them up

 4    either in this district or send them to various places

 5    because the learning curve of a federal judge in an

 6    automotive case, you've got to learn it in these direct,

 7    indirect and dealer cases, and you just as well handle the

 8    others because it is by and large similar type problems.

 9          THE COURT:  All right.  Let me ask you, we put this

10    on, we are not aware of any state court actions but is

11    anybody?

12          (No response.)

13          THE COURT:  No?

14          MR. BECNEL:  No.

15          THE COURT:  Okay.  Thank you very much.

16          MR. BECNEL:  Thank you.

17          THE COURT:  All right.  What about the effect --

18    Ms. Salzman, are you here?  What about the effect of the

19    pending criminal investigations and also the Lear bankruptcy

20    here, how do you at this very early stage see this?

21          MS. SALZMAN:  Well, so far the government

22    investigation, the Department of Justice has not sought to

23    intervene in this action or make any motions in this action

24    or appear at this hearing, so it is unclear at this point

25    what action they will take, if any, and I would venture to

1  guess that we will perhaps not see them appear until down the

2  road when the plaintiffs start seeking discovery from the

3  defendants.

4         THE COURT:  Okay.  And before I forget, would you

5  put your appearance on the record?

6         MS. SALZMAN:  Certainly.  Hollis Salzman,

7  Labaton Sucharow.

8         THE COURT:  So is it something that is anticipated

9  will happen, and I'm thinking will that in the future delay

10  discovery, et cetera?

11         MS. SALZMAN:  I certainly think that the Department

12  of Justice will make its presence known if they think that it

13  is necessary in a particular case.  I don't want to speak for

14  the government, but I have seen in many of my other antitrust

15  cases where there is also a pending government action that

16  when the government is interested in the case they are

17  looking at it and they will let the court know immediately if

18  they determine it is necessary to make their appearance in

19  the private action.

20         THE COURT:  Okay.  Thank you.

21         Mr. Fink?

22         MR. FINK:  Your Honor, if I may, Mr. Spector has

23  been in contact with the government and he has something to

24  offer on that.

25         THE COURT:  Okay.  Thank you.

1     MS. SALZMAN:  Thank you, Your Honor.

2     THE COURT:  Mr. Spector?

3     MR. SPECTOR:  Good morning, Your Honor.

4   Eugene Spector on behalf of the direct purchase plaintiffs.

5   My office has been in contact with the Department of Justice

6   with regard to this case.  We made sure that they got a copy

7   of your order scheduling the status conference.  We have

8   spoken to them.  They are obviously not here today.  We told

9   them that we would keep them advised of any progress in the

10  litigation and where coordination would be necessary to let

11  them know about it and work with it.  So as Ms. Salzman said,

12  right now with no depositions scheduled of any of the

13  potential witnesses it is not likely that the government is

14  going to see this as any interferences with the criminal

15  case.

16     THE COURT:  Okay.  Thank you very much.

17     MR. SPECTOR:  Thank you, Your Honor.

18     THE COURT:  And on the Lear bankruptcy, would you

19  put your appearance on the record, please?

20     MS. McEVOY:  Your Honor, Julie McEvoy for

21  Defendant Yazaki North America, Inc.

22     THE COURT:  All right.

23     MS. McEVOY:  And I have been designated as the

24  spokesperson for this respectable group of lawyers today, not

25  because our clients are similarly situated but for ease of

 1    administration for the Court.  And forgive me for jumping up,

 2    but the defendants did want to be heard on a couple of these

 3    topics before we get too much further.

 4         THE COURT:  Right.  You can stay right there, but

 5    let me hear --

 6         MR. PERSKY:  Yes.  My name is Bernard Persky of the

 7    Labaton Sucharow firm, one of the proposed interim co-lead

 8    counsel for the end-payor plaintiffs.

 9         We had argued the opposition to Lear's bankruptcy

10    motion, and we argued it on behalf of all of the end-payor

11    plaintiffs and --

12         THE COURT:  Okay.  You were who I was going to call

13    on to address that also.  I read that in your papers.  Could

14    you tell me a little bit more about it and how it will

15    effect --

16         MR. PERSKY:  Yes, and Mr. Marovitz, who represents

17    Lear, may chime in if I leave anything out.

18         THE COURT:  Okay.  Let's get appearances first.

19         MR. MAROVITZ:  Good morning, Your Honor.  I'm

20    Andy Marovitz from Mayer Brown and I represent

21    Lear Corporation.

22         THE COURT:  Okay.

23         MR. PERSKY:  So Lear had emerged from bankruptcy

24    and had an effective date of discharge of November 9, 2009.

25         THE COURT:  Wait a minute.  Are you having trouble

1    hearing in the back?  We have fans going, so let's -- I will

2    put the microphone on a little louder and speak into it.

3            MR. PERSKY:  Sorry.

4            THE COURT:  And speak into it.

5            MR. PERSKY:  Lear Corporation had been in

6    bankruptcy and emerged therefrom on November 9, 2009, which

7    was the effective date of discharge of whatever claims were

8    discharged.  After they learned of numerous antitrust claims

9    that were asserted against Lear Corporation and other

10   defendants Lear went back to the bankruptcy court in the

11   Southern District of New York before Bankruptcy Judge Gropper

12   and made a motion to stay all of the antitrust cases against

13   them by reason of their alleged discharge in bankruptcy.

14           They made such a motion, we responded to that

15   motion, briefed the motion and argued before Judge Gropper,

16   and he issued an order in which he agreed that claims through

17   the date of the discharge were discharged, the effective date

18   were discharged, however, he agreed with plaintiffs' position

19   that if and until the extent that Lear Corporation from and

20   after the effective date of the bankruptcy committed any

21   post-effective date antitrust violations we would be allowed

22   to amend our complaint in the antitrust court and assert

23   post-effective date antitrust violations, and the amount of

24   liability with respect to such violations would be measured

25   by the antitrust court and could extend from and after the

1    date they rejoined the conspiracy and under, we say,

2    established principles of antitrust law and conspiracy law,

3    once you join a conspiracy you are jointly and severally

4    liable for all of the damages from the beginning of the

5    conspiracy until the conspiracy's termination.

6            That order has been entered by Judge Gropper.  Lear

7    has appealed from that order and such an appeal would go to

8    the district judge when the district judge is assigned.

9    Currently we are specifying the record on appeal.  They have

10   specified the record, and by next Friday we will specify some

11   additional items for the appeal.  Once all of that is

12   submitted to the court the district judge will establish a

13   briefing schedule, Lear will file its brief in 14 days

14   thereafter, we will file our brief, but currently there is no

15   effect we say on the proceeding because we are permitted to

16   move forward, we are permitted to amend our complaint and to

17   assert post-effective date antitrust violations.

18           THE COURT:  All right.  Thank you.

19           Lear?

20           MR. MAROVITZ:  Again, Your Honor, Andy Marovitz for

21   Lear Corporation.

22           It is certainly the case that claims that arose

23   prior to November 9th, 2009 have been discharged, and I agree

24   with Mr. Persky to the extent that what he's told you is that

25   essentially the bankruptcy court has decided that this Court

1    is in a position to decide whether or not post-discharge

2    conduct can somehow allow for liability as to Lear.  It

3    really has asked Your Honor to make that decision.

4           Kirkland & Ellis represents Lear Corporation in the

5    bankruptcy court.  They have appealed, as Mr. Persky pointed

6    out.  We anticipate just in terms of the timing of the

7    appeal, and there is no briefing schedule set yet, but we

8    anticipate that the Lear brief to the District Court in the

9    Southern District of New York would be due some time in

10   April, that plaintiffs' brief probably some time in May, that

11   Lear's reply some time in May and then the district court

12   would obviously issue its decision on the appeal several

13   months down the road, no one knows exactly when.

14          THE COURT:  All right.  But it appears now that

15   that would not interfere with proceeding, as Mr. Persky

16   indicated?

17          MR. MAROVITZ:  Right.  We are certainly prepared to

18   make the arguments to this Court that the bankruptcy judge

19   suggested that we make to Your Honor that are antitrust

20   arguments as opposed to bankruptcy arguments.  The

21   preliminary question of whether or not bankruptcy law bars

22   all of these claims will be decided by the appeal from the

23   bankruptcy judge's order.

24          THE COURT:  Right.  Okay.  Thank you.

25          MR. PERKSY:  This is Mr. Persky again.

1           What we would be arguing is there would have been

2      conduct post the effective date of the discharge by the

3      Lear Corporation which would have rendered them liable under

4      the antitrust lawsuits.

5           THE COURT:  From the beginning?

6           MR. PERSKY:  Well, that would be one of our

7      arguments.  One argument would be they are liable from and

8      after the date they joined the conspiracy, but we say that is

9      not conspiracy law.  We would argue once we establish their

10     liability, the scope of that liability is to be determined by

11     Your Honor, the antitrust judge, and we would respectfully

12     suggest that if we can establish liability post-effective

13     date the dollar amount of that liability would be joint and

14     several liability for the damages caused by all of the

15     members of the conspiracy from the beginning of the

16     conspiracy to its termination.

17          MR. MAROVITZ:  Your Honor, if I could just respond,

18     we absolutely disagree with that.  Obviously we --

19          THE COURT:  See, they are not even arguing motions

20     and they can't stop.

21          MR. MAROVITZ:  That's right.  There's a very good

22     Sixth Circuit case, Travel Agents, which we will get to at

23     the right time.

24          THE COURT:  I like that you are talking about

25     conspiracy because right now we have a month-long conspiracy

1   criminal trial going with drugs and guns and fires and

2   killings and it is nasty, so I look forward to your type of

3   conspiracy.

4           MR. PERSKY:  As do we, Your Honor.

5           MR. MAROVITZ:  Your Honor, alleged conspiracy.

6           THE COURT:  Okay.

7           MR. GALLO:  Good morning, Your Honor.  Ken Gallo

8   from Paul, Weiss.  I represent Delphi.

9           THE COURT:  Okay.

10          MR. GALLO:  I wanted to make a couple of points

11  because Delphi is uniquely situated with respect to both the

12  bankruptcy issues and is situated somewhat differently than

13  some of the other defendants with respect to the impact of

14  the criminal proceedings that you have asked about, so there

15  are just four points that I wanted to make about this.

16          One is Delphi also came out of bankruptcy in

17  October of 2009.  Delphi is, in fact, going to file a motion

18  in the bankruptcy court once the consolidated amended

19  complaint has been filed here.  We have reached just a

20  different judgment than Lear about when it made sense to go

21  to the bankruptcy court.  We thought it made sense to wait

22  until there was a controlling pleading here.  We are going to

23  go to the bankruptcy because under the Delphi bankruptcy plan

24  we believe that the plaintiffs should not be proceeding in

25  this Court against Delphi.  Delphi was an asset purchase and

1  the bankruptcy -- the modified bankruptcy plan that come out

2  as a result of the Delphi purchase expressly said that

3  antitrust claims are gone, they are not carried forward to

4  the new Delphi corporation, that successor liability is not

5  carried forward, so we are going to be like Lear proceeding

6  in the bankruptcy court.

7       We certainly don't want to hold things up here, and

8  if the Court thinks we should go there more quickly we could.

9  Our bankruptcy counsel advised that it made sense to wait,

10 and we are in front of a different -- we have a different

11 bankruptcy judge and we should do it once there is an

12 actionable consolidated amended complaint here.

13      So Delphi has the same issue as Lear, although the

14 legal issue may be slightly different we think we have even a

15 more compelling argument than Lear, but I just wanted you to

16 know that issue is coming.

17      THE COURT:  Thank you.

18      MR. GALLO:  Second, with respect to the scope of

19 the criminal investigation and its impact on this case, we

20 feel it is very important to let the Court know that while a

21 few defendants have pled guilty, Delphi and certainly other

22 defendants have not pled guilty.  We don't believe we have

23 done a doggone thing wrong and no federal agency, the

24 Department of Justice or anybody else, has suggested to us

25 that we have.  So we don't think we belong in this case.

```
 1           The complaints that have been filed against Delphi,
 2    the allegations that are specific to Delphi are extremely
 3    conclusory.  There are no factual allegations, and we intend
 4    at the appropriate time to file a motion to dismiss under
 5    Twombly and the controlling law because we think if the
 6    consolidated amended complaint looks like the 50-something
 7    complaints that have been filed so far we don't think there
 8    are any actionable allegations against Delphi.  So we have
 9    both the bankruptcy issue and the pleading issue, and we
10    don't want to be treated with a broad brush that we've pled
11    guilty or done anything wrong because respectfully we don't
12    believe we have and we don't believe the plaintiffs have any
13    support for the notion that we have.
14           Thank you, Your Honor.
15           THE COURT:  But you wouldn't want to leave our
16    party, would you?
17           MR. GALLO:  Well, I would be happy to be here but
18    Mr. Sherbin and Mr. Papelian, who are here, would love to
19    leave your party.
20           THE COURT:  All right.  So I thank you for bringing
21    that up because I see the motions that are going to be
22    coming, and they will be handled -- we will do the schedule
23    and once we get that case management order and all of those
24    things we'll have a schedule for those motions.
25           MR. GALLO:  Thank you, Your Honor.
```

1          THE COURT:  Thank you very much.

2          MR. MAROVITZ:  Thank you.

3          THE COURT:  Let me ask -- go ahead.

4          MS. McEVOY:  Sorry, Your Honor.  I'm persistent if

5    nothing else.  Julie McEvoy for Yazaki North America, Inc.

6          Before we do move on I did just want to comment

7    briefly for the defendants generally on a couple of the

8    issues the Court has already addressed.

9          One follows nicely from the discussion that

10   Mr. Gallo just presented to the Court, and that is to the

11   fact of differently situated parties, and that's --

12         THE COURT:  They are having a little trouble

13   hearing you so --

14         MS. McEVOY:  Forgive me.

15         Mr. Gallo was speaking to the Court about the fact

16   of differently situated parties, and that's going to be a

17   recurring theme both today and throughout the case, and so I

18   particularly appreciated the Court's questions concerning

19   organizations of the cases, and defendants have no objection

20   to the organization of the cases as the plaintiffs have

21   proposed them, although, of course, we would take issue with

22   the specifics of class certification and other procedural

23   issues as we move down the pike.

24         I wanted to note that consolidation we believe is

25   appropriate of the wire harness cases that are presently

1    before the Court.  It is clearly an administrative and

2    efficient device to bring like claims all together.  Some of

3    us are defendants in the other MDL cases and it may well be

4    appropriate to talk about coordinating those cases, but we

5    would oppose consolidation of those claims into one big giant

6    mass before the Court, we wouldn't think that that would be

7    appropriate.  So that is all the defendants wanted to add on

8    those issues, Your Honor.  Thank you.

9            THE COURT:  Thank you.  All right.  Before we

10   proceed I would like to introduce Magistrate Judge

11   Mona Majzoub who came in.  Mona.  Thank you.

12           She is very experienced and will be a great aid if

13   we use her.  You may wonder why do I say use her because the

14   magistrate judges are quite overburdened here, and we are

15   going to be getting to how we are going to handle discovery

16   motions and the like so at this point, Magistrate Majzoub, I

17   don't want you to panic but we will work with you on this.

18   Thank you.

19           Is there anything that you want to bring up?  I

20   know that you can't stay.  You're more than welcome to stay,

21   but is there anything, Mona, that you want to say?

22           MAGISTRATE MAJZOUB:  No, Judge, not at this time.

23           THE COURT:  Okay.  Thank you.

24           Let me ask, I know Ms. McEvoy spoke for defendants,

25   but are there other defendants who have any comments that

 1    have not yet been expressed on any items discussed so far?

 2              (No response.)

 3              THE COURT:  You make a wonderful jury.  Okay.

 4    Thank you.

 5              All right.  Our next issue, which I think is the

 6    most difficult one for me today, is the application for lead

 7    and liaison counsel for the various groups, but before we

 8    even get to the applications, excuse my ignorance, but I

 9    really don't know how many attorneys does it take to handle a

10    class?  I mean, you know, how many lawyers does it take to

11    change a light bulb?  I don't know, and we need to discuss

12    that.  You want to address that?

13              MR. FINK:  Your Honor, on this subject

14    Steven Kanner will speak with respect to the direct purchaser

15    plaintiffs, and I hope this part is not a difficult motion.

16              THE COURT:  All right.  Then direct plaintiffs, I

17    think as you all know, have filed one application consisting

18    of a number of attorneys.

19              MR. KANNER:  Good morning, Your Honor.

20              THE COURT:  Your appearance, please.

21              MR. KANNER:  Good morning, Your Honor.  My name is

22    Steve Kanner from the firm Freed, Kanner, London & Miller.  I

23    represent multiple parties or direct purchasers in this case.

24              It is an honor to be here this morning, and I am

25    equally pleased to be able to tell you that within our

```
 1   leadership structure of four co-lead counsel it is
 2   uncontested, there are no objections, and we made the
 3   judgment based on what we perceive to be the size and
 4   complexity of this case and frankly the number of defendants,
 5   the need to cooperate and coordinate with various classes of
 6   indirect counsel, the need to work with various groups of
 7   many of my friends here sitting in the jury box, although
 8   that sounds odd to say.
 9           THE COURT:  Could you speak into the microphone?
10   I'm sorry.  There is a fan right in the back, and I think
11   that's blocking your voice.
12           MR. KANNER:  Certainly, Your Honor.  Nobody has
13   every told me that I can't be heard.
14           The case does represent -- and I'm trying to get
15   directly to the issue of how many lawyers it takes not
16   necessarily to change a light bulb but to effectively and
17   efficiently prosecute this case with an idea of doing it in a
18   streamlined fashion, in a coordinated fashion and in a
19   fashion that facilitates the ease of this Court in making
20   decisions and determining what issues are on the agenda and
21   what needs to be heard when and who is going to present those
22   motions.
23           There are a number of cases today and historically
24   where four co-lead counsel have been approved by the courts.
25   There are --
```

```
 1            THE COURT:  Four co-lead individual counsel, four
 2   co-lead firms?
 3            MR. KANNER:  Four co-lead firms.
 4            THE COURT:  Firms.
 5            MR. KANNER:  And there are reasons for that.  In
 6   fact --
 7            THE COURT:  You are aware in one of the classes
 8   there's an issue of whether to appoint individuals versus
 9   firms, and that's why -- maybe you're not aware of that but
10   there is, and I am asking you that question?
11            MR. KANNER:  I understand that, Your Honor.  Courts
12   have gone multiple ways, and typically focusing on the size
13   and complexity and logistics of the case.  I'm not going to
14   speak for the indirect end-payor or the automobile dealers,
15   they can certainly amply speak for themselves.  What I am
16   here to speak for -- the group I am here to speak for are the
17   thousands of direct purchasers.  Within certain categories of
18   direct purchasers there are in excess of 3,500, and these are
19   folks who buy wire harness products.
20            And if I can backtrack a little bit, a wire harness
21   is composed of lots of different elements.  There are the
22   cables, there are connectors, there are the pins, there's an
23   electronic control unit; it almost looks like an octopus with
24   one head and cables going out both ways.  The wire harness
25   cables come with pins, connectors, and all of those parts are
```

 1    sold into the stream of commerce.  Our clients are direct

 2    purchasers of some or all of those parts.

 3         The case does represent logistical, tactical and

 4    practical challenges to the direct purchasers.  The

 5    challenges we believe warrant four co-lead counsel as a team.

 6    The order that we have included and which I will present to

 7    Your Honor at the end of my comments is an order appointing

 8    interim and liaison counsel for the direct purchaser classes.

 9    It includes four firms.  I am pleased to talk about the depth

10    and wealth of experience of these four firms and about my

11    colleagues seated at the bench whom Mr. Fink introduced to

12    the Court earlier.

13         I can tell this Court that within the firms that

14    appear here today and the attorneys representing these firms,

15    we have collectively tried approximately 15 antitrust cases

16    to verdict.  We have represented plaintiffs as co-lead

17    counsel in literally dozens of major --

18         THE COURT:  You have tried these to verdict?  You

19    actually tried the cases?

20         MR. KANNER:  Yes, we have, Your Honor.

21         THE COURT:  That does not speak well for you.

22         MR. KANNER:  Well, it spoke well for plaintiffs in

23    some cases and it didn't speak well for plaintiffs in other

24    cases.  It is a rare event for an antitrust lawyer on the

25    plaintiff's side or on the defendant's side to say that they

 1    have tried cases, antitrust cases typically don't go that

 2    far, but we firmly believe to do our job we need to have that

 3    experience, and the group seated before you has that

 4    experience.

 5         Just among the four counsel over here, personally,

 6    not their firms, and I say this hesitantly, we have over

 7    100 years of experience, and looking over the group some of

 8    us have more experience than others.  My firm and I

 9    personally have been practicing this area of law almost

10    exclusively for 30 years, from the days of the government to

11    private practice this is what I do.  I know I can say the

12    same for my colleagues seated over here.  And as I said,

13    collectively we bring a wealth of knowledge and experience to

14    this case.

15         And it is our judgment, although our judgment is

16    secondary to your judgment, Your Honor, I recognize that,

17    that four is not only necessary but crucial.  Even within the

18    period of time before we have appeared in front of this Court

19    we have all taken specific tasks and roles which would be

20    incredibly burdensome for one firm.

21         THE COURT:  Could you give me examples?

22         MR. KANNER:  Certainly, Your Honor.  I happen to

23    have prepared a little chart for myself that identifies that.

24         THE COURT:  Okay.

25         MR. KANNER:  Two of the firms have principally

 1   conducted the investigation, and I can tell Your Honor we

 2   have been at this for over a year on the investigation phase.

 3   We have industry consultants and experts, and one firm has

 4   focused on that.  Another firm has been dealing specifically

 5   with the bankruptcy issues which, as you know from the

 6   previous presentations, are significant in this case.  We

 7   have another firm that has been primarily working on putting

 8   together the CMO, which Your Honor has, and which will be the

 9   subject of some discussion.  We have another firm that has

10   focused on service of process both domestically and using the

11   somewhat complex mechanism of the Hague Convention.  Another

12   firm has focused specifically on briefing and pleadings, and

13   yet another firm has focused on the organizational aspects of

14   the case, keeping everyone on track, on time, creating

15   time-reporting mechanisms which we believe is critical for

16   Your Honor, and the maintenance of an assignment sheet where

17   no two law firms are duplicating time.

18        THE COURT:  That's one of my concerns, of course,

19   because we will and I will have you address the issue of

20   attorney fees and how that is worked out amongst you.

21        MR. KANNER:  There is no arrangement.  Your Honor,

22   I'm happy to address that right off the bat.

23        THE COURT:  Okay.

24        MR. KANNER:  There is no prearranged deal with

25   respect to attorneys fees.  No one on this side has

1    whacked-up fees, as it were, carved out percentages, that's

2    just not present.  We don't practice that way.  Our fees are

3    dependent ultimately at the end of the day presuming that we

4    are successful on Your Honor's determination of what is

5    appropriate.

6         THE COURT:  Okay.  Can I ask a question, and this

7    really goes for all classes, there are attorneys who aren't

8    obviously lead counsels but have filed cases, how are

9    attorney fees arranged, in general, in a case like this?

10        MR. KANNER:  I think I understand, Your Honor.  One

11   of the functions of the co-lead counsel -- well, it is two

12   functions.  The first relating to efficiency, not just

13   between our own firms but between the firms who are not

14   co-lead counsel, and there are a number of those firms.

15        THE COURT:  Right.

16        MR. KANNER:  And, in fact, before I forget, as a

17   housekeeping matter, another case was filed yesterday, this

18   is the South Star -- I believe the South Star case.  The

19   attorneys on that complaint are not part of this case thus

20   far, but I have been in contact with those attorneys.

21        THE COURT:  This is another direct purchaser?

22        MR. KANNER:  It is a direct purchaser wire harness

23   case.

24        THE COURT:  Okay.

25        MR. KANNER:  I believe it was filed yesterday

1    afternoon.  The attorneys on that case called me and

2    specifically understood the nature of our motion today for

3    establishment of co-lead counsel, and they have authorized me

4    to represent to this Court that we have had that conversation

5    and that they approve the selection of co-lead counsel as set

6    forth in our motion.

7           Now, how that dovetails into your question, there

8    are 20, 30 firms that are going to be participating.  We will

9    assign work to firms as needed.  There will be billing caps

10   for certain roles.  Certainly individuals whose exposure is

11   limited to reviewing documents traditionally in these cases

12   are capped at a certain level.  Now, this isn't something

13   that we created for this case.  I run any number of cases, as

14   do my colleagues seated at the table, and this is what is the

15   standard approach because we know that the courts look to us

16   as part of our role as co-lead counsel to run the case

17   efficiently and to not have duplication of time and effort.

18          We have a time reporting requirement.  There is a

19   rather detailed sheet.  Individuals have to indicate name,

20   their role, the specific assignment and which co-lead counsel

21   assigned that task.

22          THE COURT:  Okay.

23          MR. KANNER:  Work that is not assigned by co-lead

24   counsel will not appear on any fee petition that we put

25   before this Court, it is simple as that.  And most of my

 1    colleagues in this room are well familiar with that approach.

 2         THE COURT:  In reading the applications and looking

 3    at the qualifications, and I have to say you are an

 4    impressive bunch, I don't know about you in the jury, but

 5    this side of the room, you certainly all have very impressive

 6    qualifications, but that doesn't mean I want to abandon my

 7    role and just say okay, you asked for it, you get it.  I like

 8    to be on top of the attorney-fee issue and when it comes up I

 9    will address it appropriately.

10         MR. KANNER:  Your Honor, we are happy to follow any

11    procedures that you would like to institute with respect to

12    that.  Some courts, while it can be burdensome, require

13    counsel to file quarterly time reports.  I don't know if Your

14    Honor wants to do that, but we are certainly amenable to

15    the --

16         THE COURT:  I'm not there yet.  I have read about

17    those things, I have read about different procedures, but to

18    be very honest I'm not there, that's why you are here to tell

19    me what your ideas are, okay.

20         MR. KANNER:  If Your Honor has any other questions

21    I would be happy to address them.

22         THE COURT:  Okay.  I have a question.  You also in

23    your application, or in Mr. Fink's application, have a

24    liaison counsel who is Mr. Fink, and I would like to go

25    discuss this with all due respect to David, who I know, I

 1    would like to discuss that.  What exactly is the role of

 2    liaison counsel?  I mean, as I read part of it, it is like

 3    the old local counsel, and we have great computer systems and

 4    CM/ECF which, of course, will be used.  So what exactly does

 5    liaison do?

 6          MR. KANNER:  The concept of liaison counsel, and I

 7    don't want to reveal my age by this, but a number of years

 8    ago liaison counsel was absolutely critical to any case that

 9    was in a different jurisdiction than that attorney's own home

10    jurisdiction.  Liaison counsel -- I hate to say in the old

11    days, I sound too much like my father, but liaison counsel

12    typically handled a lot of paper tasks.  That role has

13    changed over the years.  We look for liaison counsel that has

14    an intimate familiarity with the rules of that Court and that

15    district.  We look for a liaison counsel who is well-known to

16    the Court.  We look to liaison counsel as someone who can

17    communicate directly with the Court if there are any

18    questions.  Liaison counsel also works with us on the case in

19    general in a committee position and status and truly adds to

20    our ability to effectively litigate and efficiently litigate

21    within this district.

22          And for those reasons, in addition to Mr. Fink's

23    wealth of experiences both in antitrust and other litigation,

24    that we respectfully urge that the Court appoint Mr. Fink as

25    liaison counsel for our group.  We believe it is an issue of

```
 1    efficiency.

 2              THE COURT:  As I read his resume he could be a lead

 3    counsel but he pops up as a liaison counsel, and I just

 4    wonder why.  You feel that your group needs a liaison counsel

 5    obviously?

 6              MR. KANNER:  We believe it would benefit both our

 7    group and the Court candidly.

 8              THE COURT:  All right.

 9              MR. KANNER:  And it is not --

10              THE COURT:  Let me go one step further, and each of

11    these groups I'm going to ask this question so be prepared to

12    answer it, but there was a little bit of a discussion about a

13    master that was used in some case.  I am very much

14    considering a master except that I would like somebody

15    neutral, and I also am considering the executive committee

16    which some of you have mentioned, others have not.  I would

17    like your input on that based on your information considering

18    your position and considering the fact that there are other

19    cases, MDLs, that may be coming forward.

20              MR. KANNER:  I would be happy to address those.  I

21    heard the comments with respect to a special master.  My

22    experience over 30 years has indicated that special masters

23    aren't needed at the beginning of a case.  The issues that

24    are likely to be raised in the next year are really issues

25    that will be dispositive, unique to this Court, or on a
```

 1    discovery basis which are on occasion handled by the

 2    magistrate, particularly if that magistrate has

 3    discovery-related and ESI-related experience.  That's

 4    becoming more and more a hot-button issue in the prosecution

 5    of these cases.  ESI, of course, is electronically stored

 6    information.

 7            I don't think a special master is necessary in this

 8    case.  I don't think --

 9            THE COURT:  You don't see a special master as doing

10    discovery, do you, is that what you are saying?

11            MR. KANNER:  I don't, Your Honor.  And candidly the

12    concept of a special master along with an executive

13    committee, those are truly hybrids that come out of the mass

14    tort bar.  This is not a mass tort case.  There is nothing

15    mass tort about this case.  This is a conspiracy case.  There

16    are specific groups; there are direct plaintiffs, there are

17    indirect or end-payor, and then there are the car dealers.  I

18    don't see a need for a special master.  In fact, I think that

19    would end up potentially being a bottleneck.  I don't think

20    there is anything that the Court in the foreseeable future,

21    either Your Honor or the magistrate, couldn't handle easily.

22    I also think that the executive committee is --

23            THE COURT:  What is an executive committee?

24            MR. KANNER:  Well, it is typically -- the last

25    executive committee that I participated in was in the pedicle

 1   screw litigation, which was one of the few forays of my

 2   firm's 20 years ago into the mass tort industry.  It is a

 3   phenomena of mass tort cases where you have dozens, hundreds

 4   of lawyers all of whom have 1 client, 10 clients or 50

 5   clients.  There you need a special master.  There you need an

 6   executive committee.  The structure in this case, the

 7   structure in antitrust cases, I have never been in an

 8   antitrust case that had an executive committee that was

 9   composed of various competing interests.  Let's understand,

10   the direct plaintiffs have a very different claim as under

11   the Sherman Antitrust Act than my colleagues in the indirect

12   bar.  There is no subjective judgment with respect to that,

13   but they are very different claims.

14          There is a conflict actually -- there is a reason

15   that you can't have a lead counsel that represents each of

16   those classes, it is an inherent conflict, and there is a

17   reason why an executive committee doesn't make any sense.

18          Part of Your Honor's notes in the -- oh, my

19   goodness, in the order setting initial status conference,

20   your order had paragraph I listed which had four items;

21   willingness to commit to a time-consuming process, ability to

22   work cooperatively with others, professional experience and

23   sufficient resources.

24          Under Category 2 we have already accomplished that

25   which arguably an executive committee might do.  We have been

 1   working with the end-payor groups.  They are fine lawyers

 2   that we have worked with for many, many years, we know them

 3   well, they are friends, they are colleagues at the bar.  So

 4   each of the end-payor groups we have worked with on many

 5   occasions.  We have communicated with them to put together

 6   the CMO.  We have cooperatively worked with both of these

 7   groups and with defendants to put together the CMO.  That's

 8   what we do.  That's our job as co-lead counsel.  I don't see

 9   the need and, in fact, see again an executive committee as a

10   layer which is not going to promote efficiency or economy

11   within the case.

12         THE COURT:  Okay.  Thank you.

13         MR. KANNER:  Thank you very much, Your Honor.  May

14   I approach the Court and present the order?

15         THE COURT:  You may.

16         MR. KANNER:  Thank you.

17         THE COURT:  Let me ask the defendants if there's

18   any comments on this, any objections?

19         (No response.)

20         THE COURT:  No.  All right.

21         MR. BECNEL:  Your Honor, I would like to speak to

22   that issue if you don't mind?  Daniel Becnel.

23         Ms. McEVOY:  Your Honor, Julie McEvoy again.

24         We don't take any position with respect to any of

25   the applications currently before the Court other than to ask

1    the Court to appoint in your judgment the most experienced

2    antitrust counsel.  I would agree with Mr. Kanner in his

3    presentation and discussion concerning an executive committee

4    that it is a layer of bureaucracy that is not used in these

5    types of cases and would add some additional difficulty and

6    perhaps inefficiency particularly since we do know each

7    other, we have litigated against one another for many years

8    and work very well together without adding some additional

9    layer of structure.

10             THE COURT:  All right.  Thank you very much.

11             Any other comments on the application for direct

12   purchasers?

13             MR. BECNEL:  Oh, no, not on direct.  I'm sorry.

14             THE COURT:  All right.  The Court will grant the

15   order appointing interim lead and liaison counsel for the

16   direct purchasers as requested.

17             MR. KANNER:  Thank you, Your Honor.

18             THE COURT:  I'm not sure of the liaison, Mr. Fink,

19   but --

20             MR. FINK:  I will find something to do, Your Honor.

21             THE COURT:  But I am interested in seeing how it

22   works and trusting that when it comes to attorney fees we

23   will not be duplicating fees here.

24             MR. FINK:  Thank you, Your Honor.  We will respect

25   that.

```
 1              THE COURT:  All right.  As to the dealerships'
 2    application, we have somebody who is, in fact, admitted?
 3              MR. BARRETT:  I'm not admitted, Your Honor.
 4              THE COURT:  Come on forward, please.  May I have
 5    your appearance, please?
 6              MR. BARRETT:  My name is Don Barrett, Your Honor.
 7              THE COURT:  And you have been admitted or are
 8    admitted here?
 9              MR. BARRETT:  I have not been admitted here.
10              THE COURT:  Is there anyone who has been -- who can
11    argue your motion?
12              MR. MANTESE:  Your Honor, Gerard Mantese.  I am
13    obviously admitted.  I wasn't prepared to argue today, Your
14    Honor.  Mr. Barrett is well-known throughout the country, and
15    didn't get the paperwork submitted in time.
16              MR. BARRETT:  Your Honor, if I could just speak
17    generally about these topics without arguing the motion?
18              THE COURT:  We can make our first exception here,
19    and I will allow you to argue.  Go ahead.
20              MR. BARRETT:  Thank you, Your Honor.
21              THE COURT:  Nobody tell the Clerk on me, but go on.
22              MR. BARRETT:  Thank you.  May it please the Court,
23    I am one of the three proposed co-leads for the automobile
24    dealer class.
25              And the first thing I would emphasize and want to
```

 1    emphasize is that I think everybody here, at least on the

 2    plaintiffs' side, would agree that there is a real conflict

 3    between the two groups of indirect purchasers, the automobile

 4    dealers and the end-payors who are the consumers who buy from

 5    the automobile dealers.  Your Honor has already put your

 6    finger on it, it is the pass through, how much is passed

 7    through -- how much of the overcharges were passed through to

 8    the ultimate consumers, and that will, because of that, a

 9    pretty important issue.

10         Those of us who represent automobile dealers could

11    not represent the consumers nor could the consumer attorneys

12    represent the automobile dealers but, of course, we have

13    common interests and we have, as Mr. Kanner said, we have

14    cooperated already in the drafting of the CMO and there will

15    be a lot more cooperation and that won't be a problem.  We

16    know these folks, we have been friends for years, and we will

17    be able to cooperate not only with the direct purchasers but

18    with the end-payors as well.

19         And Your Honor I think understands that it is

20    important that these appointments be made as quickly as

21    possible so that in dealing with the CMO -- Ms. McEvoy told

22    us on one occasion that it is hard for us to deal with you

23    because you don't have any authority yet, speaking to all of

24    us, and, of course, she was right about that, but we are --

25    we have been working hard on this case, we have been

1    investigating it as well for almost a year now, and we have

2    done quite a bit already, and we are ready to hit the ground

3    running if Your Honor sees fit to appoint us.

4         You asked the question earlier how many auto

5    dealers there are.  There are about 20,000 roughly in the --

6    at any one time in the 29 states that have indirect purchaser

7    laws.  I point out that these are, generally speaking,

8    sophisticated businesses, the people that run them are

9    sophisticated businessmen, they want to be hands-on.  We

10   will -- it will require a considerable amount of effort.

11   These are not clients that, you know, a friend of your

12   secretary type clients that you have in consumer cases.

13   These are many, many sophisticated businesses all around the

14   country.

15        And the co-lead structure that we have proposed we

16   are geographically diverse and we have different strengths.

17   I've been in charge of several national MDLs over the years,

18   and I guess if I have a strength it is being able to work

19   cooperatively with people to herd cats, if you will, in

20   situations like this.

21        The Cuneo firm has vast experience in antitrust law

22   and international antitrust law.  One of Mr. Cuneo's partners

23   ran the justice department's division of international law

24   and antitrust law, and has actually written a book on the

25   subject.  So since this litigation started, I mean, we have

 1    worked it out among ourselves, we have a group that is

 2    capable, both financially capable of doing it, we have enough

 3    attorneys to do it, seasoned litigators, people who have

 4    tried cases, and we've hired experts, we've consulted

 5    extensively with them.

 6            Your Honor, there is no opposition.  We have gotten

 7    all of the firms, we have calls almost every day now from

 8    dealers around the country that want us to represent them.

 9    There seems to be in the dealership community a satisfaction

10    with us as representing this particular class, and we are

11    capable, we are ready to hit the ground running.

12            THE COURT:  All right.  You propose for co-lead

13    counsel your firm, Larson and King, and Cuneo --

14            MR. BARRETT:  And the Cuneo firm, yes, ma'am.

15            THE COURT:  Okay.  You also have an executive

16    committee, and, of course, you heard our discussion before

17    and I would like to hear your comment on that.

18            MR. BARRETT:  My take on it is a little bit

19    different than that.  I definitely agree with Mr. Kanner that

20    we don't need an overarching executive committee, that it

21    would add a useless layer of bureaucracy.  Within our group

22    an executive committee would be useful just as a way of

23    having a place for the people who want to be active in the

24    litigation to come in and assist.  It is our job as co-lead

25    counsel to see that there's no duplication of effort.

1            THE COURT:  Okay.

2            MR. BARRETT:  The executive committee that we

3    envision will help ensure that, and it won't be something

4    that -- it will help co-lead counsel be able to manage the

5    case better.

6            THE COURT:  And what about liaison counsel?

7            MR. BARRETT:  We think a liaison counsel is

8    important.  It is important to have in a sense local counsel,

9    I understand that, and I also understand electronic things

10   now and it is different than it used to be, but our -- the

11   Mantese firm is a good firm, they have been in active

12   litigation practice for over 30 years, they know what they

13   are doing, and --

14           THE COURT:  And they satisfy the local counsel

15   rule.

16           MR. BARRETT:  And they satisfy the local counsel

17   rule.

18           THE COURT:  So that they are admitted here.

19           MR. BARRETT:  Yes, ma'am, and I will be too the

20   next time we talk Lord willing.

21           THE COURT:  Thank you.

22           MR. BARRETT:  Thank you, ma'am.

23           THE COURT:  Wait a minute.  Before you sit down, do

24   you have any comments about the special master or use of

25   special masters?

1    MR. BARRETT:  Well, I do, and I don't want to

2  disagree with Steve but I'm lead counsel in an MDL that has

3  been going on nine years up in the Northern District of Ohio

4  in front of Judge O'Malley, Kate O'Malley up there, the

5  welding fume litigation.  She appointed a special master

6  early on mostly to do discovery work and to handle the

7  discovery.  And if you have a special master that is -- well,

8  if you have a magistrate who has the time to devote

9  exclusively to one case then that's all you need, but the

10  court in the Northern District of Ohio didn't have that and

11  so appointed a special master.  He proved himself invaluable

12  to both sides in having him there, and he attended all

13  trials, all hearings, and developed an institutional

14  knowledge of the case that was -- it was very important in

15  the litigation.  So my take is a little bit different but, of

16  course, we will be -- I'm not preaching for that.

17    THE COURT:  Thank you.

18    Ms. McEvoy?

19    MS. McEVOY:  Forgive me, Your Honor, because that

20  is an issue that I neglected to address a moment ago.  We

21  agree with Mr. Kanner on that point as well, we are far too

22  early in the litigation to talk about a special master.  It

23  may be that there comes a point where that would make sense,

24  but in this first year or so where as Mr. Kanner pointed out

25  we'll be putting dispositive issues in front of the Court,

1     those will be for you to decide, so we would ask the Court to

2     postpone or to forestall a decision about something like a

3     special master until we have a better idea of who is in the

4     case, who is out of the case, what claims are in or out, and

5     frankly what disputes are likely going to be appropriate for

6     a special master, and we are just not there yet.

7              THE COURT: All right. Thank you.

8              The Court has reviewed the applications and it

9     certainly finds the firms for co-lead counsel to be well

10    qualified and satisfies the four parameters that the Court

11    has put forth. We do need the liaison counsel as local

12    counsel so I will agree with that. I'm not going to appoint

13    an executive committee however. An order may be entered

14    excluding the request for executive committee, granting the

15    application for the dealerships for interim and lead counsel.

16             All right. Now we get to the end-payor

17    applications and for that the Court has three -- Mr. Miller?

18             MR. MILLER: Your Honor, I was just going to get to

19    the microphone.

20             THE COURT: We have three applications, and as I

21    understand this there are three totally separate groups, you

22    each have your co-lead counsel, correct? And also you seem

23    to be geographically diverse; we've got west coast, southern,

24    and then we have the national firm. So I will give you each

25    as I call upon you an opportunity to let me know why it

1    should be your firm or should there perhaps be a mix amongst

2    the three groups of applications.

3             So we will start with the first application, and

4    they are simply in alphabetical order, so that is Becnel,

5    Lambert and Nevares.  Who is speaking?  You also happen to be

6    the first to file, Mr. Becnel.

7             MR. BECNEL:  May it please the Court,

8    Daniel Becnel.

9             I'm going to make your job a little bit easier

10   because I am going to withdraw and support people that I know

11   well, and I would like to address the issues you talked about

12   early.

13            THE COURT:  All right.

14            MR. BECNEL:  When you go to Palm Beach shortly to

15   spend two or three days with all of the MDL's judges, they

16   have a conference there.

17            THE COURT:  Oh, I'm going to Palm Beach?

18            MR. BECNEL:  You are going to the Palm Beach to

19   The Breakers, to The Breakers.

20            THE COURT:  All right.  For the October meeting is

21   in Palm Beach you are telling me?

22            MR. BECNEL:  You're going to love it, you're going

23   to love it.

24            What happens, Judge, is as you know the first

25   manual for complex litigation was written by Judge Pointer

 1    who is now deceased.  And Mr. Joe Cotchett and I were

 2    involved in the first major MDL dealing with the swine flu

 3    inoculation program against the United States Government; we

 4    wound up taking depositions of Jonas Salk, Lou Saban,

 5    Joe Colafana (phonetic) and the President of the United

 6    States which was unheard of.  Gerhart Gizelle (phonetic) was

 7    in the process of sending people every time we would be in

 8    Washington, D.C. to the penitentiary for the Watergate break

 9    in, and we would be in between.

10            But here is what I want to talk to you about, the

11    firms that I know and who could do the absolute best job.

12    Number one, what works in an MDL, for example, Mr. Barrett

13    and I, I know him well, his son is married to my niece, and

14    it is three generations of Barretts that have been lawyers

15    just like in my firm three generations of my firm everybody

16    is a lawyer and married to a lawyer or a judge.

17            So what is important is to get a special master

18    from day one.  What you talked about is not having the

19    magistrate do a lot is basically what is being done in a lot

20    of MDLs.

21            For example, if you look around the room there are

22    only two Hispanics here, Mr. Salas and Mr. Nevares from

23    Puerto Rico.  The good Hollis Salzman was one -- and we were

24    all co-lead counsel in the Cabotage case.  We didn't have to

25    take one deposition, but it took us three years to get it

1    done.  We had Professor Arthur Miller from Harvard and NYU

2    there.  This is really, really important.  The judge,

3    Judge Fallon, who has done the Propulsid case, the Vioxx case

4    for 4.85 billion and the Chinese drywall case, which is

5    probably the most difficult case any of us have ever been on.

6    Judge Fallon had to go all the way to Hong Kong to supervise

7    depositions because the Chinese wouldn't answer questions and

8    they are dealing with a jurisdictional issue.

9         What Judge Heyburn has done is started a process in

10   these cases, he's hired Francis McGovern, the Kohn law firm

11   in the breast implant case that we all worked on years and

12   years ago, and it took 13 years and it is still not finished,

13   as did Kirkland & Ellis, and it is still not finished as the

14   defense lawyers.

15        So what you need to do is listen to what the new

16   techniques are to get cases settled and to get them resolved

17   because the criminal docket here, just like everywhere else

18   in the country, is just overwhelming, and civil litigation

19   sort of takes a back seat.

20        So he appointed Francis McGovern, who was a special

21   master that Judge Pointer appointed to help get that case

22   resolved, and that case was ultimately resolved for

23   $7.2 billion.

24        Mr. Barrett, on a tobacco case, we represented

25   everybody, the states, we represented individuals, we

 1    represented everybody.  Whoever heard of 300 plus billion

 2    dollars in settlements.  I was involved in representing

 3    California.  Barrett, half of the attorney generals in the

 4    country.  We took depositions, we had enumerable documents,

 5    we had whistleblowers and what have you.

 6            So what works is things that you can eliminate if

 7    you listen to some of this vast wealth of knowledge of all of

 8    these lawyers so you don't have to be behind a learning curve

 9    where you send lawyers to Hong Kong and then the Chinese will

10    not answer questions so they come back with nothing, and then

11    the judge has to go to the United States Embassy and have the

12    depositions there where he's in charge of them.  So --

13            THE COURT:  Sounds okay.

14            MR. BECNEL:  Well, it's a long flight.

15            I have had the opportunity to have been called upon

16    by Japanese industry and universities to help craft the

17    product liability law for Japan.  When I went there I was

18    amazed.  Virtually every one of the companies that are

19    dealing with many of the automobiles hired me to go teach

20    them what should they do because President Clinton was about

21    to be the president.  And I said look, there isn't a woman in

22    here, not one.  It was nothing but engineers and all men

23    bowing me giving me cards.  And I said the first thing you

24    are going to see is you are going see a transformation; you

25    are going to see Hispanics, you are going to see females, you

1    are going to see African-Americans all appointed to the

2    bench, and you darn well better have people in your

3    organizations that reflect if you are going to do business in

4    the United States and get sued in the United States.  If all

5    you due is send men, and if you look at this group, count the

6    number of women, one, two, three, four, five, half a dozen.

7    Not one African-American, not one African-American.  Only two

8    Hispanics.  That's wrong.  That's wrong.  You need a diverse

9    group.

10           Joe Cotchett's book, Federal Courtroom Evidence,

11   sits on almost every federal judge's bench that I have ever

12   been in, and he wrote that 15, 20 years ago, and supplements

13   it, and he donates it to all of the federal judges.  His

14   partner, Sue Illston, is a federal judge in San Francisco.

15   He's one of the most respected lawyers I know in this

16   country.

17           The original old Goodkind Labaton, which is now

18   Labaton Sucharow, I did a chemical case with them in

19   New Jersey, killed a bunch of people.  They have a diverse

20   practice, they know what they are doing, and the group that

21   they have put together makes me humble.  I'm sure I'm going

22   to get some work from all of them because I'm usually taking

23   depositions in London in Viagra, in Sulzer Orthopedic for

24   Judge O'Malley in Vienna, Austria.  I teach at the Technical

25   Institute of Vienna on experts.  I have been in every type of

 1   case there is in this country in my 43 years.  Almost every

 2   ship collision, train derailment, plant explosion, product

 3   liability.  I have been to this town so many times to take

 4   depositions in the Ford -- I have the Congress of the United

 5   States when the Deep Water Horizon happens calling me to give

 6   them the experts they need to do their investigation.  Same

 7   thing with the Toyota, and Joe's partner is one of the

 8   leaders in the Toyota case, Congressman Waxman and

 9   Congressman Markey and all of those that lead these

10   investigations, who are the best experts we can use, and we

11   talk to them.  Sometimes you get appointed to the committee,

12   sometimes you don't.

13        I'm getting too old to be worried that I need to

14   lead the parade every time, but I can tell you that if you

15   look at all of the big cases -- you know, one lawyer talked

16   about pedicle screw, I had 20 lawyers working on pedicle

17   screws.  I took depositions in France in the middle of a

18   strike for three weeks in pedicle screw.  We lost that case

19   before the United States Supreme Court the same day the

20   Bush-Gore case was argued.

21        So there is a vast amount of experience of all of

22   these lawyers, and I will withdraw and support their team as

23   being leaders that I can work under, and if I can work under

24   anybody usually wanting to lead the parade I can tell you I

25   have a great deal of respect for them.

1         Now, I would suggest David Kohn as a special

2    master.  He's right over here in Cleveland.  David, not only

3    with Judge O'Malley who now sits in the Circuit Court, but in

4    Toledo we have had two major cases, and Judge Katz, we

5    settled all of the Ortho Evra birth-control patch cases with

6    him.  He now has all of the cases involving hips that you

7    read about every day and all of the revisions that are

8    needed.  We've had virtually --

9         THE COURT:  Tell me succinctly how do you define or

10   what would you say a special master would do in a case of

11   this nature?

12        MR. BECNEL:  Okay.  Here is what happens.  All of

13   these lawyers are from Chicago, New York, the west coast and

14   so on and so forth.  I'm going to give you an example what

15   Judge Fallon does, let's just say in a big complex case.  He

16   calls on the liaison counsel, come to my chambers, and so

17   their liaison counsel shows up, this liaison counsel, and

18   they deal with issues so all of these lawyers don't have to

19   show up, and then they in turn notify the lawyers, look, the

20   judge has this motion, she is concerned about it, might need

21   oral arguments, might not need oral arguments, and they deal

22   with the issues on a day-to-day basis, and a lot of times

23   they are involved in the give and take of negotiations on

24   what is privileged, what is not privileged.

25        And what they also do in the MDLs today is they set

1    out a schedule right now when you start a case, eight to ten
2    months in advance, we are going to meet every 30 days, every
3    60 days, whatever the Court wishes, and you let everybody
4    know so nobody has conflicts.  And you don't send -- you will
5    never see this group of lawyers again, this many, and you
6    deal with who does that.  Mr. Cotchett might say, man, I'm on
7    the west coast, I'm in another case, Hollis, you handle this
8    or, Mr. Becnel, you handle that.  That's what you do and in
9    effect an executive committee that kind of assigns the task
10   or the lead counsel that assigns the task, but each group
11   should have a liaison counsel because there are conflicts
12   between them.
13          You know, I tell you what, once you go to Japan
14   you're not going to want to go again, it is a long, long way,
15   and especially if you are coming from the east coast it is
16   even longer.  But the thing is that we know how to make this
17   efficient.  We have learned to take a case like Vioxx, have
18   17 trials, wind up with a $4.85 billion settlement and it is
19   done and all of the people have been paid within two years.
20   Unheard of.  Unheard of.
21          THE COURT:  Okay.  So your recommendation or your
22   support is behind the Labaton Sucharow application?
23          MR. BECNEL:  Absolutely 100 percent and, you know,
24   the reason why the group I put together at first, as you saw,
25   one was an automotive engineer here for eight years and a

1   lawyer and a Michigan graduate, and I have worked with him

2   before, he knows everything about automobiles we need to

3   know.  I would hope that that group would utilize him.  We

4   have Hispanic -- I mean, this population in this country now

5   is 15 to 20 percent Hispanic, a lot of them don't speak

6   English, and these two fine lawyers -- and by the way, you

7   know, they could deal with those issues.

8              THE COURT:  Okay.

9              MR. BECNEL:  You need a diverse group of people to

10   work on this case.

11              THE COURT:  And I support a diverse group.

12              MR. BECNEL:  Thank you.

13              THE COURT:  Okay.  Thank you very much, Mr. Becnel.

14              Our west cost application, Brian Strange?

15              MR. STRANGE:  Good morning, Your Honor.  It is a

16   privilege to be in your courtroom and it is an honor to be

17   submitting my application.

18              I want to address this fairly succinctly if I can.

19   There are two main subject matters I want to cover.  The one

20   is the organization of the cases that Your Honor mentioned

21   and, two, my proposal that there be four co-leads for the

22   end-payors.

23              With respect to the organization of the cases, Your

24   Honor, three of the defendants, Yazaki, Sumitomo and Delphi,

25   represent 70 percent of the companies who manufacture the

 1     wiring harness.  And the reason that's significant is that
 2     those companies are the ones who gave bids to the car
 3     companies such as GM and Toyota, et cetera, to make those
 4     parts.  So in our investigation you ware GM and Ford,
 5     et cetera, buying from a small group of defendants and then
 6     selling those basically directly to the automotive dealers.
 7     And one of the issues here, Your Honor, is that the class
 8     includes not only wiring harnesses but related parts.  You
 9     will see a footnote to the complaints; related parts includes
10     a number of components which would include for instance
11     terminals and what are called electric control units or
12     electronic control units.
13             The reason I raise that is some of the dealers I
14     found out actually purchased terminals directly from some of
15     these defendants, but I'm not suggesting that you don't have
16     the dealership class, I'm suggesting that there may be issues
17     within that class in addition to the pass-through issue that
18     Your Honor raised is whether there were direct purchases from
19     those defendants, but this case is somewhat unusual in that
20     you don't have that many direct purchasers, you have the
21     corporations and the smaller companies that buy other than
22     the OEMs, the OEMs represent the mass number of direct
23     purchasers.
24             So what it really comes down to is the size of the
25     end-payor class, which is huge, which is why I submit we

1    should have four co-leads there.

2            With respect to the makeup of the case, Your Honor,

3    you have Yazaki who pled guilty on January of this year with

4    respect to wiring harnesses, and you have also a plea from

5    that company regarding instrument panel clusters, which is

6    another MDL, and fuel senders.  Those conspiracies with

7    respect to the wiring harness conspiracy went from January of

8    2000 to February of 2010.  For the instrument panel clusters,

9    the plea said it went from December of 2002 to February of

10   2010, and the fuel senders from March of 2004.  The reason I

11   raise those dates, Your Honor, is that I believe that the

12   conspiracy periods may have been different and the

13   participants in the conspiracy may be different, and that's

14   why when those MDLs get transferred to Your Honor, which I

15   believe they should, they may deserve different leadership or

16   at least different firms that address those separate

17   conspiracies.

18           The first defendant to plead guilty is the Furukawa

19   Electric, they pled in September of 2011 only as to wiring

20   harnesses.  And then you have Denso, who also pled in January

21   of this year, and their plea was regarding electronic control

22   units, ECUs, and the heating panels.  The reason I raise that

23   is the ECUs are part of the related products that are in this

24   case.  Denso is named by some but primarily Denso is in the

25   heating panel MDL.

1          So I raise those issues because I think they are

2     important with respect to organization and they kind of help

3     define the mass part of this case.  As Your Honor is aware,

4     this is not only an investigation and these pleas were not

5     only by the Department of Justice but there was

6     investigations by the Japanese Fair Trade Corporation and the

7     European Union, and with respect to the international realm

8     of this conspiracy you've got three categories of damages and

9     those categories were described in the plea agreements that

10    were entered as these defendants.  One category is parts made

11    in the United States and sold to cars in the United States; a

12    second category is parts made in Japan and sold to the U.S.

13    in those cars sold to the U.S.; a third category of damages

14    is parts made in Japan, put in cars in Japan, but ultimately

15    sold to consumers in the United States.  And that, Your

16    Honor, is only the Japanese components.

17         There is a European component alleged in this

18    overall conspiracy, so the number of cars involved include at

19    a minimum Toyota, Chrysler, Ford, Nissan, Honda, GM, Subaru,

20    Mazda, Renault, and then when you get into the European

21    models you have Mercedes and BMWs.

22         So that is sort of a long-winded way to say that

23    this is a massive case.  I think it deserves -- it has

24    millions of class members, it has very complicated issues.

25    And one of the reasons that we were still investigating and

```
 1    kind of filed late is other issues such as Toyota owns
 2    20 percent of Denso, and the former auditor of Denso is now a
 3    chairman of one of Toyota's companies.  We knew about the
 4    Delphi bankruptcy, so those kinds of issues are complicated
 5    and certainly the plaintiffs' bar here I have -- I am very
 6    humbly standing before Your Honor because their resumes would
 7    far outstretch mine, but I do believe that I can be of
 8    assistance both with my knowledge of class actions with the
 9    Japanese automobile industry based on my experience and
10    helping organize.
11            With respect to the work done, I have mentioned a
12    little bit of the investigation that we have done with
13    respect to both dealerships and repair shops, who they buy
14    from, what are the pricing arrangements between those
15    companies, those are some of the investigations we have done
16    including our economic analysis of the percentage of the
17    market.  And I think we already set forth in my application
18    that I'm currently on the executive committee of a
19    price-fixing case in polyurethane foam which is one of the
20    largest antitrust cases.  That case does have an executive
21    committee.
22            THE COURT:  How do you feel about it?
23            MR. STRANGE:  I think it works very well, Your
24    Honor, but executive committees really depend and leadership
25    depends on who the law firms are.  I mean, generally, the
```

```
 1    quality of counsel here can direct cases and will give out

 2    work appropriately.  The reason really for executive

 3    committee is to give an honor to someone who helps support

 4    you and then to make sure they get work.  In this size and

 5    magnitude of a case I think it definitely warrants for lead

 6    for the indirect purchasers, and the executive committee can

 7    work very well.  The leads are concerned with different

 8    issues, and the executive committee gets assignments from the

 9    lead counsel.

10            THE COURT:  How do you feel on a master?

11            MR. STRANGE:  With respect to the master I would

12    suggest holding off on that because one of the things that

13    happens in a special master is it sometimes gives lawyers the

14    impetus to say let's go talk with the special master instead

15    of working it out.

16            THE COURT:  Okay.

17            MR. STRANGE:  The best thing that can happen in

18    these kinds of cases with the skill of the defense bar and

19    the skill of the plaintiff bar is to try to work it out, and

20    if we bring it to Your Honor it's a serious matter, and no

21    one wants to bring it to Your Honor because Your Honor is

22    going to look at us first and say why didn't you work that

23    out, so I think you want to encourage that.  If we get

24    delayed then a special master would be a great asset.

25            Just finally, Your Honor, I think that my
```

1    experience in class actions will assist the Court which is

2    ultimately the goal of leadership is to try to resolve the

3    case and try to make it easier to the Court in these kind of

4    complex cases.

5              THE COURT:  Thank you.

6              MR. STRANGE:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              MS. SALZMAN:  My turn?

9              THE COURT:  You may.  Ms. Salzman?

10             MS. SALZMAN:  Hollis Salzman from Labaton Sucharow.

11   Thank you, Your Honor.

12             THE COURT:  See, I can remember the women because

13   there are so few.  It brings me back to the days that I

14   started to practice, but go ahead.

15             MS. SALZMAN:  I understand.  I want to thank

16   Mr. Becnel for his endorsement.  That brings the number of

17   cases that support the three co-lead structure to 36 out of

18   the 37 end-payor cases.

19             Our application is on behalf of a three-firm

20   co-lead structure, that's the Labaton Sucharow firm, the

21   Cotchett, Pitre firm and the Susman Godfrey firm, as well as

22   the Miller Law Firm as our liaison counsel for the end-payor

23   cases.

24             THE COURT:  What pray tell is additional counsel?

25             MS. SALZMAN:  Liaison counsel is -- when you say

1    additional --

2          THE COURT:  I don't know.  You have at the end you

3    have liaison counsel, Paul Miller, and then additional

4    counsel.

5          MS. SALZMAN:  What the reference to additional

6    counsel is those were firms that were on our original

7    complaints but they were not seeking a liaison or co-lead

8    spot in this case, so they are -- we didn't want to drop them

9    since they were on our complaints, they are additional

10   counsel supporting the leadership structure.  It was just to

11   give them some kind of name so it didn't look like they were

12   hanging out there.

13         THE COURT:  Well, would they be different than any

14   of the other counsels who have filed cases and aren't in any

15   one of these applications?

16         MS. SALZMAN:  They would not be different in any

17   respect.

18         THE COURT:  Okay.  Thank you.

19         MS. SALZMAN:  They just were on our original

20   complaints and the other lawyers were not.

21         THE COURT:  Thank you.

22         MS. SALZMAN:  You're welcome.

23         We think that the three co-leads that are proposed

24   here are the strongest, best-qualified group to lead this

25   case.  The three law firms, of the firms that have applied

1    for leadership for the end-payor cases, are nationally

2    recognized antitrust firms and have decades of antitrust

3    class-action experience and have been recognized by courts

4    and various awards throughout the country as to its successes

5    in antitrust case.

6          Also important to note about the three firms is

7    they have significant indirect purchaser or end-payor

8    experience.  I know we talked a lot about the difference --

9    the variations of the different groups.  The end-payor cases

10   are distinct in that they represent those class of people at

11   the very end of the distribution chain.  Those are purchasers

12   that do not resell, for example, like the middlemen cases do.

13   That's what sets us apart and is distinct.

14         All three firms, the Labaton firm, the Cotchett,

15   Pitre firm and the Susman Godfrey firm have experience also

16   with the cases involving automotive parts, automotive

17   companies, manufacturers and dealers and defendants located

18   in all parts of the world.  And we are a diverse group, we

19   are located -- I'm in New York, the Cotchett firm is in

20   Los Angeles, Susman Godfrey is in Los Angeles and Texas, and

21   I think we represent a group that can sufficiently handle

22   this litigation as a group of three.  I think this fact that

23   this group is supported by 36 of the 37 cases speaks measures

24   for their opinion as to the leadership put forth before Your

25   Honor, firms that have supported the structure or firms that

 1    could equally be standing here today with likewise

 2    qualifications for a leadership spot in this case.

 3              In terms of the commitment of resources so far in

 4    this case, this group of lawyers has been working on this

 5    investigation for months, if not longer than a year.  We

 6    filed, as you know, the first wire harness case that came

 7    before you, the LaCava case, that was in October of last

 8    year, and we have been working diligently on this case all

 9    the way through today.  We have not only taken the lead on

10    briefing and arguing the MDL motion, we have taken the lead

11    on the briefing and successfully arguing the Lear bankruptcy,

12    we have been the lead counsel that's been the spokesperson

13    for the end-payor cases with defendants in negotiating

14    various stipulations in the case, all the way up through the

15    agenda that has been provided to the Court and the case

16    management order.  We have already shown that we have good

17    relationships and the ability to work cooperatively with the

18    defendants.  Not only are we able to work cooperatively with

19    defendants but as the co-counsel stated we have known these

20    attorneys and worked with them as co-lead counsel in other

21    cases in the past and are able to work cooperatively with the

22    other groups of plaintiffs' lawyers.

23              Are there questions that I can answer for Your

24    Honor?

25              THE COURT:  Not regarding the firms.  I would like

```
 1    your comments as to the master issue and the executive
 2    committee issue.
 3            MS. SALZMAN:  With all due respect to Mr. Becnel,
 4    I'm in line with the other -- with the direct purchaser group
 5    and the defendants.  I think it is premature at this point to
 6    have a special master appointed.  I think there is going to
 7    be a lot to do in this case before we get to a point where we
 8    would even need a magistrate judge, and I think at that point
 9    the parties will be further along in the litigation and will
10    have a better understanding and be able to fine tune the
11    issues in the case and make a determination and a
12    recommendation to the Court, hopefully jointly at that point,
13    as to what the best course is for this case.
14            THE COURT:  All right.  Good.  Thank you.
15            MS. SALZMAN:  Any other questions?
16            THE COURT:  No.
17            MS. SALZMAN:  Thank you.
18            THE COURT:  All right.  Let's take a 20-minute
19    break.  We will resume -- maybe 15 if you can all get back
20    here by then.  Thank you.
21            THE LAW CLERK:  All rise.  Court in recess.
22            (Court recessed at 11:47 a.m.)
23                            _   _   _
24            (Court reconvened at 12:08 p.m.; Court, Counsel and
25            all parties present.)
```

1          THE CASE MANAGER:  All rise.  Court is now in

2     session.  You may be seated.

3          THE COURT:  All right.  On the end-payor

4     applications, are there any other -- Mr. Miller?

5          MR. MILLER:  Yes, Your Honor.  Sorry.  I was going

6     to get up and speak in favor of the Cotchett team of three,

7     who are superior lawyers in this field, but that area has

8     already been covered.

9          So just to take one moment, I think I have a unique

10    experience with your magistrate having litigated

11    malpractice -- complex malpractice cases with her in her

12    private practice and been in front of her as a magistrate

13    here.  She is more than competent to handle any and every

14    issue that would come before her involving evidentiary

15    matters.  If her workload is too great then I can understand

16    getting a substitute, but there is no question about her

17    competency to handle this complex litigation, and I would

18    move that the magistrate be in charge of this case, Your

19    Honor.

20         THE COURT:  No.  I think I'm going to keep in

21    charge of this case.  Thank you very much.

22         MR. MILLER:  I meant -- any questions of me, Your

23    Honor?

24         THE COURT:  No.

25         MR. MILLER:  Thank you.

```
 1          THE COURT:  I do agree she is more than competent
 2    to handle this case.
 3          MS. KUPFER:  Your Honor, if I may, I'm Susan Kupfer
 4    of Glancy, Binkow & Goldberg, San Francisco.
 5          I filed a third case in this, and I would also want
 6    to reaffirm that 36 of the 37 cases support the Labaton,
 7    Cotchett and Susman Godfrey leadership structure.  And I
 8    think you understand as you are aware of private ordering in
 9    this situation that many of us had long and thoughtful
10    discussions, many of us who are experienced antitrust
11    lawyers, have been ourself co-leads in other MDLs, have
12    stepped back to support this structure that is put forth
13    before you today.  And we think it would be unfair at this
14    point if that structure was altered without giving others the
15    opportunity to also submit their applications.  So I just
16    wanted to make that point.  Thank you.
17          THE COURT:  Thank you very much.  Any other
18    comments?
19          (No response.)
20          THE COURT:  All right.  The Court in reviewing this
21    matter has decided, with all due respect to Mr. Strange who
22    is more than qualified, but I do think that given the
23    structure that has been put forward and agreed upon by the
24    majority of the end-payors, and given the unique
25    qualifications of the three firms involved, the Court finds
```

1    that they meet the four criteria as set forth in the Court's

2    order, and the Court will grant the application for four

3    co-lead counsel as set forth in the application, and will

4    grant liaison counsel to the E. Powell Miller firm in the

5    case, and I am striking additional counsel.  I'm not quite

6    sure now whether that was in your motion or not, but I am

7    only going to do the co-lead and liaison.

8            So with that I think we have our counsel resolved,

9    and I wanted to do that because I don't know if any of you

10   need to leave early before -- I'm looking at the defendants,

11   not you, if any of you need to leave or anything before we

12   proceed.

13           Okay.  Let me just get through my notes.

14           We do have -- or the Court received yesterday your

15   case management -- proposed case management order, and let me

16   pull it up here.

17           MS. McEVOY:  Your Honor, on that note, I apologize,

18   it has been brought to my attention that there is a typo in

19   the cover letter.  The parties' respective position on the

20   two questions in dispute are in Section B of the case

21   management order rather than Section C, so I apologize for

22   that.

23           THE COURT:  I noted that.  That's fine.  I didn't

24   have a Section C actually.  Did you note that?

25           MS. McEVOY:  Yes, Your Honor, and that was my

1    typographical error, and I apologize for that.  The cover

2    letter should have read Section B, so that if you flip to the

3    case management order, on my copy it is page 5, the

4    plaintiffs' proposal is set forth first followed by the

5    defendants' proposal.

6              THE COURT:  Okay.  Now, as I see it here -- my

7    clerk is telling me I have been fading out.  If I do just say

8    so.

9              As I see the first issue on the case management

10   order is the service of process issue that needs to be

11   resolved, or at least the first one I would like to discuss.

12   And I think the first thing I'm noting is defendants want

13   more time to answer, which is why you're asking for

14   plaintiffs not to file until 45 days.  Is that a correct

15   statement or no?

16             MS. McEVOY:  I'm sorry, Your Honor.  You actually

17   did fade out in the beginning there so I missed the first

18   part of your question.

19             THE COURT:  Yes.  My question is it looks -- it is

20   this 45-day period, first of all, for filing the amended

21   complaint that is at issue.  Plaintiffs say within 45 days

22   and defendants say at 45 days.  I don't know if that means

23   the 45th day or the 46th day, whatever, but you want a 45-day

24   leeway, defense wants, before?

25             MS. McEVOY:  Let me tell you overall what we are

```
 1    trying to accomplish which will put that 45 days into

 2    context, Your Honor.

 3              THE COURT:  Okay.

 4              MS. McEVOY:  We have a situation where as I noted

 5    at the outset we have a lot of differently situated

 6    defendants, and that pertains to service as well as

 7    substantive issues, and so what we would like to do for

 8    convenience of all the parties, and quite frankly for the

 9    Court, is to have a uniform schedule.  We built the 45 days

10    in and we did have them filing at the end of the 45 days, we

11    would be flexible on filing sooner as long as the end date is

12    fixed.  We would like a single date for responses by all

13    defendants who are served, and we will have to talk of course

14    about the appropriate means of service in a moment, but that

15    45 days was just to put the first step into place, followed

16    by a 60-day service period.  And as I said a moment ago, you

17    know, if they want to file on day seven and reserve

18    additional time for themselves to service, we are amenable to

19    that, but what we want to do is to make sure that all of the

20    defendants are properly served via Rule 4 with the

21    consolidated amended complaint, and we think that is both a

22    substantive due-process issue as well as one of convenience

23    so that we avoid overlapping, duplicative briefs, lots of

24    different response dates.  There are --

25              THE COURT:  Wait a minute.  I'm not exactly
```

1    following why -- what this -- the 45-day period.

2          MS. McEVOY:  Sure.

3          THE COURT:  You don't want them to file within the

4    45 or do you care if they file within the 45 if you have a

5    more definite date for --

6          MS. McEVOY:  We don't care where they file in the

7    45, Your Honor, as long as the end date after filing, after

8    service, after a period to respond is fixed in time.  We

9    don't want to be in a situation where Defendant A files a

10   response on day one, Defendant B, who has some of the same

11   issues but not all of the same issues, files a different

12   response a week later so that there are overlapping and

13   duplicative briefs.  We want to have one date so that the

14   parties can coordinate their efforts as best as possible to

15   bring motions dealing with similar issues before the Court in

16   one paper at the same time.

17          I think this does -- if you would like me to I will

18   get into the service issue, Your Honor, because I think it

19   does dovetail into it.  The Plaintiffs are proposing that

20   they be allowed to serve the consolidated amended complaint

21   on counsel for defendant if the defendant has been served

22   with just one of the underlying complaints.  We are not

23   insisting that service need be effectuated of all of the

24   original complaints, but we would like the consolidated

25   amended complaint to be served via Rule 4 as to all

1    defendants so that those defendants know who's suing them,

2    they have had original service as to each of the plaintiffs,

3    not just one of them, and we think this is a real due-process

4    issue, Your Honor.

5            THE COURT:  So you're saying -- wait a minute --

6    that the defendants have been served with some complaints but

7    not all complaints?

8            MS. McEVOY:  Correct.

9            THE COURT:  So that if they are served with one

10   consolidated complaint you want it under 4(e) or whatever?

11           MS. McEVOY:  Yes, Your Honor, the appropriate

12   mechanism of Rule 4.

13           THE COURT:  Okay.

14           MS. McEVOY:  The reason for that is the

15   consolidation that we have talked about today does not merge

16   the cases or make one party to a case party to another by

17   virtue of someone else's service, and I think the law is

18   pretty clear in that regard.  The defendants retain their

19   due-process rights notwithstanding the consolidation to

20   insist on service, which the Sixth Circuit has described as

21   not some mindless technicality but the fundamental

22   prerequisite for the court exercising jurisdiction over a

23   party.

24           As I mentioned a moment ago, the other reason is

25   that the plaintiffs say gosh, you know, if you have these

 1    specific service issues for a particular defendant just go

 2    ahead and put them in a 12(b)(5) motion, the Court can decide

 3    whether it was sufficient service or not.  We think that's a

 4    big waste of time, Your Honor.  It will result in a lot of

 5    unnecessary paper for you.  It will shift the cost and burden

 6    of service to the defendants who will then be forced to brief

 7    these issues to the extent that individual clients are not in

 8    a position to accept or waive service of process, and that

 9    plaintiffs shouldn't be allowed to shift that burden to the

10    defendants and to the Court.

11         Their response is, gosh, you know, it costs a lot

12    of money, we don't want to have to go through what we view as

13    a formality, and defendants respectfully submit that it is

14    neither a formality according to the law, and that was the

15    Friedman case, Your Honor, 929 F.2nd 1151 at 1156.  And as a

16    matter of cost it would be the defendants who will bear the

17    initial cost of filing these 12(b)(5) motions, and I'm

18    guessing plaintiffs are going to end up spending more on

19    ultimately needless motions if we can agree to a protocol to

20    serve the consolidated amended complaint than if they had

21    just filed it in the first place.

22         THE COURT:  All right.  Who is going to speak?

23         MS. McEVOY:  Your Honor, if I may, just before I

24    sit down, one case I would call to your attention which I

25    think succinctly addresses the issues here particularly with

1    respect to service of the Japanese defendants is the Allstate

2    case at 249 F.R.D. 157, and it involved a situation, not an

3    MDL, but consolidated cases in which plaintiffs argued that

4    service by one defendant via the Hague Convention was

5    essentially effective as to a second complaint, and the court

6    disagreed, it talked about consolidation and the procedural

7    due-process issues that I have raised with the Court today,

8    and concluded that, in fact, service by one does not equal

9    service by both, and that each plaintiff had to serve the

10   complaint in order to put the parties at the same starting

11   line and give defendant adequate notice of the complaint by

12   one of the two plaintiffs.

13        THE COURT:  Well, those plaintiffs who have already

14   served a particular defendant would not have to go through a

15   Rule 4 service?

16        MS. McEVOY:  No, Your Honor.  I think that's a

17   closer question to be sure, but that feeds back into this

18   timing point, Your Honor, that, you know, have them serve the

19   consolidated amended complaint, it wouldn't be enough, for

20   example, for Susan LaCava to serve her original complaint on

21   Yazaki Corporation, the consolidated amended complaint, in

22   order to effectuate personal jurisdiction vis-à-vis the other

23   plaintiffs who are parties to the consolidated amended

24   complaint with respect to the two Yazaki corporations to

25   serve via Rule 4 the consolidated amended complaint.  So that

1    feeds a bit into the timing because, again, we would want to

2    build in a service period, let's get all of these cases, all

3    of these plaintiffs at the same starting line and then start

4    the briefing and motion practice, Your Honor.

5            THE COURT:  Mr. Fink?

6            MR. FINK:  Joe Kohn will address this.

7            THE COURT:  All right.  May I have your appearance,

8    please?

9            MR. KOHN:  May it please the Court, Joseph Kohn of

10   Kohn, Swift & Graf in Philadelphia for the direct purchaser

11   plaintiff.  And on these issues, Your Honor, we are

12   authorized to speak on behalf of the indirect groups as well,

13   both the dealers and the end-payors.

14           Your Honor, first of all, all of the U.S.

15   defendants have been served under Rule 4 with complaints in

16   all of the different classes.  Several of the foreign

17   defendants at our request, as we do in every case, whether it

18   be an MDL case or a non-MDL case, we ask the defendants'

19   counsel whether their client would authorize them to accept

20   service, and two of the foreign defendants, two of the

21   Japanese companies, did, and they have accepted service,

22   that's the 4 Cal Electric Company and Sumitomo Electric

23   Industries, Inc., their Japanese entities as well as their

24   U.S. entities have been served.

25           There are several foreign defendants where the

1    Hague service of process is underway.  Your Honor may recall

2    there was an order that the Court entered in February, I

3    think the 10th, authorizing the service that handled that

4    APS International to undertake service of the German entities

5    which require that under their procedures.  The service of

6    the Japanese entities is underway but there is a certain

7    amount of time that that takes under those procedures.

8            What we have asked our colleagues or the ladies and

9    gentlemen of the jury to consider is whether because all of

10   the entities that are not yet served in a foreign country

11   have a U.S. entity that have been served.  Two of them in

12   Japan have agreed to accept service.  That they consider

13   accepting service so we would all be at the same starting

14   point, and then it is clear under Rule 4 that service has

15   been accepted or waived, and I don't think there's any

16   disagreement that then the rules apply that under Rule 5 all

17   subsequent pleadings are served on counsel.  You don't go

18   back and send a summons or send the sheriff out or, you know,

19   registered mail or certified mail to serve people or to have

20   people continuing to knock on the door.

21           THE COURT:  Well --

22           MR. KOHN:  I think that is the usual process in

23   these MDLs by agreement, it is only a question of time.  We

24   will effect the service, it is not --

25           THE COURT:  It sounded to me though that what

1    Ms. McEvoy was saying is that some of the plaintiffs'

2    complaints have not been served on --

3            MR. KOHN:  That's right, Your Honor.  I think there

4    were 37 complaints of indirect purchasers where there are 11

5    or 12 complaints of direct purchasers.  It has been a

6    convention of counsel in these matters to serve at least a

7    complaint, sometimes several, to go through these Hague

8    procedures which take a tremendous amount of time, to serve

9    at least one complaint with respect to those claims, and then

10   under Rule 5 the amended consolidated complaint by agreement,

11   by stipulation or by operation of Rule 4 and Rule 5 and cases

12   that have interpreted it provide that the consolidated

13   complaint then proceeds with service on counsel, and you

14   don't go back -- so we would request respectfully on

15   plaintiffs' side of this, as I say, we will effect the

16   service, it takes some time, we try to get updates from APS

17   and then it is at the embassy and then they send somebody out

18   to do it and they just take time, which is a valuable

19   commodity for all of us, but it will occur is that in our

20   experience if the Article 3 MDL court asks the same question

21   that we asked, as persuasive as we like to think we all are,

22   frequently the defense counsel be able to get their client's

23   authorization to accept the service.

24           We have no issues, we are not trying to rush them

25   to file their briefs.  We said we will file the complaint

1    within 45 days.  They wanted 60 days to file a motion, we

2    agreed, they have 60 days to file a motion.  We also would

3    like it to be on uniform dates, and we think that's the best

4    way to do it without simply waiting on our hands while this

5    Hague process runs its course.  As we say, it is not novel

6    either in this case where two of the foreign defendants have

7    already agreed to proceed that way or in other matters that

8    we have been involved in.

9            There is a matter out in California, I think

10   Judge Illston's name was raised with respect to

11   Mr. Cotchett's lead counsel in the LCD case, and there was

12   some back and forth on this and the court said, okay,

13   defendants, you want the complaint to be served under Rule 4,

14   that's granted, but I'm also ordering your counsel to accept

15   that service under Rule 4, so you sort of get to the same

16   point.  And we would respectfully request the Court to, as we

17   say, ask the question that we ask, and I think you might be

18   more persuasive with this jury than I have been so far.

19           THE COURT:  All right.

20           MR. KANNER:  Your Honor, if I might, Steve Kanner

21   on behalf of the class representative.

22           We just did some pen to paper in terms of the time

23   that it would take to accomplish the process that Ms. McEvoy

24   suggested.  From the time that the consolidated amended

25   complaint would be filed until the time that the defendants

```
 1    would be obligated to respond, either by answer or most

 2    likely a motion, would be 165 -- 165, is that it, 165 days

 3    during which time we are, as Mr. Kohn stated, sitting on our

 4    hands.

 5            THE COURT:  All right.

 6            MS. McEVOY:  A couple of points, Your Honor.  There

 7    are circumstances under which Rule 5 would not supersede the

 8    need for Rule 4, and those are cited in Wright and Miller,

 9    4(b) Section 1478.  They involve situations where the amended

10    complaint contains new claims that differ significantly from

11    those in the original complaint, where the court believes

12    that service on the attorney is unlikely to ensure notice to

13    the party, which is a real concern for my client which

14    conducts business in Japanese and --

15            THE COURT:  What?  Say that again.

16            MS. McEVOY:  If service on the attorney is likely

17    to ensure notice to the party, that's a particular concern

18    for my client.  This is Wright and Miller addressing

19    situations in which Rule 5 might not supersede the need for

20    Rule 4 service of an amended complaint.  My client conducts

21    its business in Japanese, it wants to be engaged in the

22    process of understanding these claims, and it is difficult

23    for it to do so without the translation that would accompany

24    Hague service.

25            On the LCD case, with due respect, I believe the
```

1    facts were slightly different than Mr. Kohn described them,

2    and, in fact, the LCD model was one that we employed in

3    thinking about the 165 days, which in the abstract I will

4    grant you sounds like a long time, but what we were trying to

5    do was to give appropriate time for the plaintiffs to

6    effectuate Hague service of the consolidated amended

7    complaint.

8              In the LCD case the court gave the parties 60 days

9    to do that, and the order does acknowledge that there were

10   some defendants who were willing to stipulate to service,

11   there were others in that case who were not and that's why

12   the 60 days was --

13             THE COURT:  Those defendants or all of the

14   defendants I take it at this point, or at least most of them,

15   are represented by counsel here, right?

16             MS. McEVOY:  Yes, Your Honor.

17             UNIDENTIFIED PERSON:  All of them.

18             THE COURT:  All of them.  So why are we fooling

19   around?  What is this?  I'm willing to give -- I mean, I

20   don't know what plaintiffs want, but I am certainly willing

21   to give extra time so that, one, they can be converted to

22   Japanese, they can have time to talk to attorneys, but we are

23   actually talking about the service of process part, and if we

24   have attorneys who work for these companies, you know, are

25   you saying the companies are saying I don't care that you

1    work for me, I want to be -- I want somebody to come and

2    knock on my door and hand me the service?

3            MS. McEVOY:  No, Your Honor, I don't view it as

4    that technical an issue at all.  I really think they really

5    think it is an issue of process and their right to have the

6    complaint translated into the language in which they conduct

7    their business.

8            THE COURT:  Okay.  Let's stop there.  So they want

9    a complaint translated into Japanese if they are the Japanese

10   company, is that what you are saying?

11           MS. McEVOY:  Yes, Your Honor, which is an essential

12   component of service via the Hague convention.

13           THE COURT:  Why can't we do that, what is hard

14   about that?

15           MR. KOHN:  Joseph Kohn, Your Honor, for the direct

16   purchase plaintiffs.

17           We would be happy to have a translated copy of our

18   consolidated amended complaint, it is novel but we would be

19   happy to do it.

20           MR. PERSKY:  This is Mr. Persky.

21           I think it is important to note that all of the

22   defendants -- virtually all of the defendants have been

23   served with the underlying complaints.  Not every single one

24   of the complaints have been served on the defendants but

25   personal jurisdiction over the defendants has been obtained

1    either by service on the American subsidiaries, Hague service

2    on some of them, and waiver of service on the others, so if

3    we have obtained personal jurisdiction by the service of the

4    underlying complaint I don't understand why we have to go

5    through a Rule 4 process to serve the consolidated amended

6    complaint where the claims that we are asserting are only

7    wire harness claims, not new claims, and we don't intend as

8    far as I know to add additional parties.  So in my experience

9    we have served the underlying complaint, the amended

10   complaint gets served on counsel.

11            If we haven't served some of the defendants then,

12   yes, we have to serve them and I'm not sure that there is

13   more than one or two defendants abroad who have not yet been

14   served.  So it seems to me that the process they are

15   proposing is 45 days for the filing of a consolidated

16   complaint, 60 days for service, not service of the underlying

17   complaint, service of the consolidated amended complaint

18   under Rule 4 after they have already been served with the

19   underlying complaint, and then another 60 days to respond.

20   That's 145 days after we have already obtained personal

21   jurisdiction.  To the extent that our prior service was

22   insufficient under the Hague Convention or they claim that

23   they had insufficient nexus in the U.S., that defense is

24   preserved and they can assert it in response to the

25   consolidated amended complaint either in their answer or a

Initial Status Conference • March 16, 2012

96

```
 1   motion to dismiss.
 2           THE COURT:  All right.  Let me -- before we go on,
 3   we didn't talk about the consolidated amended complaints yet
 4   because we have process, direct plaintiffs have a
 5   consolidated -- they had a motion to consolidate originally
 6   and I take it will do a complaint, a consolidated amended
 7   complaint.  The indirect -- the dealerships will be doing the
 8   same thing, and the end purchasers -- end-payors will be
 9   doing the same thing, right?
10           MR. PERSKY:  Yes.
11           THE COURT:  All right.
12           MS. McEVOY:  Your Honor, I'm not sure this fixes
13   all of the problems, and that's really what we are trying to
14   get at here, what is the most sensible way to fix all the
15   problems so we are not ending up in a situation where we have
16   a pile of briefs and --
17           THE COURT:  We don't have any problems.
18           MS. McEVOY:  I appreciate that, Your Honor.
19           There are some defendants who I understand have not
20   been served, there are some who might have qualms with the
21   manner of service.  Let's just fix it, this is the right time
22   to do it.
23           THE COURT:  Well, okay, let me just rule on this.
24   If a defendant has been served, they have been served.  Now,
25   you have -- you may have some objections to the service, and
```

1   those will be raised at the appropriate time and as has been

2   indicated will be preserved with the amended consolidated

3   complaint, but I believe if you have been served then the

4   amended consolidated complaint is to be served on counsel or

5   through our electronic means.

6          MS. McEVOY:  Your Honor, Mr. Kohn was gracious

7   enough to offer a translation of the direct purchaser

8   complaint.  Is that something that the other parties would be

9   willing to stipulate to as well?

10          MR. KOHN:  Of course.

11          THE COURT:  I think that they would be.

12          MR. PERSKY:  Yes.

13          THE COURT:  I don't mean to speak for you but, yes,

14   I mean, it is not difficult in today's world to get a

15   Japanese translation.

16          MS. SALZMAN:  Yes, Your Honor we will do that for

17   the end-payors.

18          THE COURT:  Okay.  All right.  So that's taken care

19   of service.  Are there --

20          MS. McEVOY:  Forgive me, Your Honor, I'm reminded

21   by my colleagues that there are some German defendants as

22   well.

23          MR. TUBACH:  Your Honor, Michael Tubach for Leoni.

24   I can speak on behalf of Leoni.  We will not be insisting on

25   service or translation.

```
 1              THE COURT:  All right.  Thank you.  And you can
 2   take care of that later, you know, if you don't need
 3   translations you can just indicate that you don't need
 4   translations.  We would hate to give you one in Japanese and
 5   then you would have to translate it back to English to
 6   understand it, I don't know.
 7              MR. FANELLI:  Your Honor, Michael Fanelli on behalf
 8   of S-Y Systems Europe.  I would need to consult my clients on
 9   the translation issue.
10              THE COURT:  Okay.  All right.  Anybody who wants a
11   Japanese version will get it.  In fact, maybe you will get
12   both versions and if you don't want the Japanese you can just
13   discard it.
14              MR. FANELLI:  Just to clarify, it is a German
15   company.
16              THE COURT:  German.  Okay.  Do we understand that?
17              MS. McEVOY:  Yes, Your Honor.
18              THE COURT:  Let's talk about timing though.
19              MS. McEVOY:  Yes.
20              THE COURT:  Let's hear what plaintiffs have to say
21   in response to your issue on timing.
22              MR. SPECTOR:  Your Honor, Eugene Spector on behalf
23   of direct purchase plaintiffs.
24              We did negotiate a time frame for the filing of an
25   amended -- consolidated amended complaint, for the filing of
```

1  responsive pleadings to that complaint, and a briefing

2  schedule; that was the 45, 60 and 60.  The issue we have had

3  is that additional 60 for the additional Rule 4 service.  We

4  think that just delays the matter far too long and that we

5  can move it along much more quickly, certainly most easily if

6  counsel will accept service, that makes it easy, and then we

7  have a date certain by which we can start with everybody, but

8  the issues are going to be the same in all of this, we think

9  that we can get started and move this case along more quickly

10  by getting our consolidated amended complaint on behalf of

11  wire harnesses' clients, I think that's an underlying

12  assumption.

13          THE COURT:  Wait.  We are only talking about this

14  MDL wire harness.

15          MR. SPECTOR:  Absolutely.

16          THE COURT:  We do have a question because one of

17  the cases here has been amended already to include the other

18  parts.

19          MR. PERSKY:  There are two end-payor cases where

20  the complaints have been amended to pick up other products.

21  Since we have been appointed as interim end-payor lead

22  counsel, our consolidated amended complaint will not pick up

23  on that thought and will stick just to wire harnesses, Your

24  Honor.

25          THE COURT:  And so those are going to be dropped

1      for now?

2              MR. PERSKY:  Those are additional claims.

3              THE COURT:  They will go into the other MDLs?

4              MR. PERSKY:  Perhaps.

5              THE COURT:  Oh, good.  Okay.  That takes care of

6      that problem.  See, we don't have problems.

7              MR. SPECTOR:  Not a problem there, your Honor.

8              THE COURT:  All right.  So we'll have the

9      consolidated complaint strictly with the wire harness cases,

10     that's all.

11             MR. SPECTOR:  Yes.

12             THE COURT:  That's all, the MDL 2311, there will be

13     consolidated complaints for each of the classes that will be

14     filed when?

15             MR. SPECTOR:  We proposed 45 days from the entry of

16     the case management order in this case, Your Honor.  That's

17     the negotiated schedule, we are willing to work with it.

18             THE COURT:  Within the 45 days.

19             MR. SPECTOR:  Within the 45 days.

20             THE COURT:  What's the next date?

21             MR. SPECTOR:  The next date as far as we are

22     concerned would be 60 days later, we believe, in order for

23     the defendants to be able to file their responsive pleadings,

24     and we are assuming that it will be motions to dismiss.

25             THE COURT:  Okay.  Now, wait a minute.

1     MR. SPECTOR:  But maybe we will get an answer.

2     THE COURT:  Wait a second.  You are talking about

3  your filing because all of the defendants have been served?

4     MR. SPECTOR:  Correct.

5     THE COURT:  What about foreign defendants, do we

6  still have that issue with some of the defendants?

7     MR. SPECTOR:  We still have that issue, Your Honor.

8  Again, as Mr. Kohn requested, if these foreign defendants,

9  who really are represented here through their American

10  subsidiaries and their counsel, will accept service of those

11  complaints that makes it easy, we will translate them if they

12  want them in Japanese although it strikes me as rather

13  strange for a company for example like Yazaki that pled

14  guilty in a courtroom in this building not so long ago with

15  regard to these matters is now asking for a Japanese

16  complaint, but --

17     THE COURT:  Minor problem.

18     MR. SPECTOR:  Minor problem, Your Honor.

19     THE COURT:  But what about -- and I guess we will

20  hear from the defendants whether or not counsel will accept

21  service, but for those who have already been served then

22  you're saying 60 days to respond --

23     MR. SPECTOR:  Yes, Your Honor.

24     THE COURT:  -- either by motion or answer?

25     MR. SPECTOR:  Yes, Your Honor, and then we would --

1    since we expect to receive multiple motions, that's why we

2    asked for the 60 days to respond to those motions.  If we

3    weren't going to get multiple motions, Your Honor, we could

4    do it in less time than that.

5             THE COURT:  All right.  Thank you.

6             MR. SPECTOR:  Thank you.

7             THE COURT:  Let me hear from the defendants or

8    Ms. McEvoy regarding acceptance of service for the foreign

9    companies, if that's a possibility what needs to be worked

10   out to make it happen, and if not then I guess we go the

11   route of the Hague or whatever.

12            MS. McEVOY:  Your Honor, I think I will have to

13   defer to some of my co-counsel --

14            THE COURT:  All right.

15            MS. McEVOY:  -- because that is not going to be an

16   issue for my client so I'm not in a position to speak to it.

17            THE COURT:  All right.  Who wants to speak?

18            MS. McEVOY:  And, Your Honor, I say that on the

19   understanding because I think there is maybe still a little

20   ambiguity that you have ordered that service of the amended

21   complaint is effective upon service of counsel, correct?

22            THE COURT:  Correct.

23            MS. McEVOY:  As to those defendants who have

24   already been served with the complaint?

25            THE COURT:  With the complaint.

1        MS. McEVOY:  Okay.  Thank you.

2        THE COURT:  Yes.

3        MR. GANGNES:  Your Honor, good afternoon.  I'm

4  Larry Gangnes from the Lane Powell firm in Seattle.

5        THE COURT:  How do you spell your last name?

6        MR. GANGNES:  It is G-A-N-G-N-E-S.

7        THE COURT:  Thank you.

8        MR. GANGNES:  We represent Furukawa Electric and

9  American Furukawa.  We have already agreed to accept service

10  in a couple of the underlying cases, and we will work with

11  plaintiffs' counsel to resolve service on the other cases.

12        THE COURT:  Thank you, Counsel.

13        MS. SULLIVAN:  Good morning, Your Honor.

14  Marguerite Sullivan from Latham Watkins on behalf of Sumitomo

15  Electric Industries, Limited and the other Sumitomo entities.

16        We are in the same position as Furukawa, we have

17  agreed to accept service.

18        THE COURT:  Thank you, Counsel.

19        MR. SANKBEIL:  William Sankbeil of Kerr, Russell

20  and Weber.

21        Your Honor, we represent Fujikura America.

22  Fujikura Limited is the Japanese parent.  We do not have

23  authority at this point to accept service, but my

24  understanding from what Mr. Kohn said is service is underway

25  on the foreign defendants and I know they have had months to

 1   serve -- at least many of the plaintiffs have had months to

 2   serve and effectuate foreign service, so I assume that the

 3   Japanese parent will be getting served soon, but as far as

 4   authority today, no, we do not have authority today.

 5          THE COURT:  Thank you.

 6          MR. PERSKY:  Excuse me.  In the Beck case didn't

 7   Fujikura waive service and join the Beck stipulation?

 8          MR. SANKBEIL:  I don't know.

 9          MR. PERSKY:  Okay.  We will have to check.

10          THE COURT:  You will talk about that though and see

11   if you can work that out.

12          MR. FANELLI:  Your Honor, I'm Michael Fanelli from

13   the law firm of Covington and Burling, and we represent

14   S-Y Systems Technologies Europe, an entity which does not

15   have any U.S. presence whatsoever.

16          We have not until perhaps this week received

17   service in any of the cases.  Just last night I received some

18   documents purporting to serve our client under the Hague in

19   Europe, and so we are looking at those now to determine

20   whether service has been properly effected but otherwise I

21   have not been given authority from my client to waive

22   service.

23          THE COURT:  All right.

24          MR. TUBACH:  Good afternoon, Your Honor.  Michael

25   Tubach from O'Melveny & Myers for the Leoni entities.

1    We will not be insisting on service of any of the

2    consolidated amended complaints on the German entities.  I

3    would like to have a discussion with plaintiffs' counsel

4    about whether they have served the right entities in German

5    but we can have that discussion separately.

6    THE COURT:  All right.

7    MR. CHERRY:  Your Honor, I'm Steve Cherry of Wilmer

8    Hale.  We represent Denso International America.

9    Our Japanese parent, it is our position, has not

10   been served by anyone.  The closest we have come, I think one

11   of the complaints from maybe an indirect, somebody mailed a

12   complaint, made no effort to comply with the Hague at all,

13   and that's the closest, but our position is we haven't been

14   served at all and we should be served.  I don't have

15   authority to accept service.

16   THE COURT:  Okay.

17   MR. PERSKY:  Hague service on Denso, the Japanese

18   Denso company is in process right now.

19   THE COURT:  All right.

20   MR. GALLO:  Ken Gallo, Your Honor, from Paul, Weiss

21   for the Delphi entities.

22   We had previously agreed to accept service on

23   behalf of the Delphi entities and stand by that.  To the

24   extent that the consolidated amended complaint names a

25   non-U.S. Delphi entity, there may be a personal jurisdiction

```
 1    issue but we are not going to argue about service.
 2           Mr. Persky I think misspoke when he sort of -- just
 3    for the record I want to be sure, there is a difference
 4    between service and personal jurisdiction, but other than
 5    that we have agreed to accept service a long time ago.
 6           MR. PERSKY:  All I said though is that we have
 7    served and either we have gotten personal jurisdiction or we
 8    haven't.  If there is insufficient nexus or if service is
 9    improper that defense is preserved.
10           THE COURT:  Will be raised.
11           MR. GALLO:  I think we agree.
12           MR. DONNINI:  Good afternoon, Your Honor.
13    George Donnini from Butzel Long on behalf of Tokai Rika
14    America.
15           To my knowledge there has been no service on the
16    Japanese company Tokai Rika Japan, and I'm not in a
17    position -- I'm not authorized at this point to accept
18    service.
19           I would have one clarification.  You said with
20    respect to your earlier ruling service of the complaint -- an
21    underlying complaint would be effective service and thus the
22    consolidated amended complaint can go through ECF or on
23    counsel.  Is that with respect to at least one complaint per
24    class so direct, indirect, indirect, or is that just any one
25    complaint?
```

1           THE COURT:  Any one complaint per class would do

2      it.

3           MR. MAROVITZ:  Your Honor, Andy Marovitz from

4      Mayer Brown for Lear Corporation here in Michigan.  The

5      plaintiffs --

6           THE COURT:  We have service on you.

7           MR. MAROVITZ:  The plaintiffs can send me their

8      amended consolidated complaints and that would be fine for

9      us.

10          THE COURT:  Thank you.

11          MR. MAROVITZ:  Thank you.  In English.

12          MR. WILLIAMS:  Your Honor, my name is

13     Steve Williams of Cotchett, Pitre & McCarthy for the indirect

14     purchasers.

15          I just want to bring one authority to the Court's

16     attention because this situation comes up before.  Service is

17     important but also managing the case efficiently is

18     important.  In the CRT case Judge Conti in California, it is

19     2008 Westlaw 4104341, under Rule 403, in this exact situation

20     where you had a foreign parent, a domestic subsidiary has

21     been served, represented by counsel, under that rule

22     permitted service through the American counsel and the

23     American subsidiary.  It has been applied repeatedly in the

24     Southern District, in this Circuit and in the Northern

25     District, and it helps put everyone on that same timetable.

1      THE COURT:  So you're saying we don't need to serve

2  the foreign parents?

3      MR. WILLIAMS:  In this circumstance the Court has

4  the authority under Rule 4(f)(3) to order that service on the

5  American subsidiary and their counsel is effective service

6  that complies with due process.

7      THE COURT:  Okay.  That may be but I'm not going to

8  exercise that authority.  I think they have the right to

9  serve -- I mean, to be served.  I would hope you would,

10  Defendants, talk to your foreign parents and see if you can't

11  get permission.  I mean, it may be we are doing an exercise

12  in futility here, I don't know, but I do agree that they have

13  the right to be served.  So if you can waive it, that would

14  be wonderful; if not, you will serve.  You know how to serve,

15  and we will get it done.

16      Okay.  So does that take care of the time frame and

17  the service in the case management order?

18      MS. McEVOY:  I believe so, Your Honor, and I'm sure

19  my colleagues will tell me if they disagree, but I think that

20  effectively means one response date 60 days after the filing

21  of the consolidated amended complaint as to those defendants

22  who have previously been served, and then a series of

23  separate dates as the previously unserved defendants may be

24  served in accordance with Rule 4?

25      THE COURT:  I don't think I understood that.

1     MR. SPECTOR:  Your Honor, hopefully since the

2  process is underway -- this is Eugene Spector on behalf of

3  the direct purchasers.

4        Hopefully since the process is underway we may very

5  well be able to effectuate service of the original complaints

6  on these foreign defendants that haven't been served.  As

7  Mr. Fanelli just reported, he received word I believe you

8  said that your client has been served under the

9  Hague Convention.

10       MR. FANELLI:  I said that my client may have been

11  served.

12       MR. SPECTOR:  May have been served under the

13  Hague Convention.

14       THE COURT:  That might take care of --

15       MR. SPECTOR:  This 45 days before we file our

16  consolidated amended complaint may obviate that problem

17  entirely.

18       THE COURT:  Right, right, hopefully.

19       MS. McEVOY:  Hopefully that is the case, but there

20  may end up being separate response dates as a result of

21  lagging service issues.

22       THE COURT:  It may be but hopefully not, hopefully

23  that 45 days is sufficient.

24       MR. MAROVITZ:  Judge, Andy Marovitz again.

25       From the defendants' perspective it is very

1   important to us that the 60 days for us starts on the same

2   date.  For instance, for Lear Corporation we believe we have

3   a meritorious bankruptcy argument.  That argument is likely

4   going to be the same as applied to the directs, to the

5   end-payors and to the dealers.  Now, there may be differences

6   for each of those but it would be I think incredibly

7   inefficient if we had to file at different times those motion

8   papers in response to the three.

9          So our proposal is that whatever our 60 days runs

10  from that it run from some uniform date, not necessarily when

11  it is that the plaintiffs -- when each set of plaintiffs

12  files its individual papers.

13         THE COURT:  Okay.

14         MR. KOHN:  Your Honor, I think all plaintiffs would

15  propose that we would file on or about the 45th date and they

16  could have from the 45th day to start their 60 days.

17         MR. MAROVITZ:  Great.

18         THE COURT:  When you do your final case management

19  order, which I'm going to turn back to you to work on, put

20  that in there specifically so that they know.  I do agree it

21  would be -- it would be hard to have the different dates, so

22  thank you.  I understand why you want that exact date, and we

23  will arrange for that so however the wording in that order

24  make sure it provides for that.

25         All right.  On my agenda for the complaints I

1      included short-form master because those terms are used in

2      some of the agendas included but I think we have taken care

3      of it with the amended consolidated complaint, so we can move

4      on.

5              And also my next item had to do with how to handle

6      the complaint with the other parts, and that also has been

7      resolved so we are done with that.

8              Service we did.

9              Okay.  I had an issue on ECF service list

10     corrections.  There were some errors and some addresses being

11     changed or something.  I just want to make sure -- we do have

12     your cards now so we will go through and try to correct.  If

13     we have a question my clerk might call you in terms of saying

14     is this the right address or why do we have a different

15     address here, but I want to make sure that service list and

16     everybody's appearances are correct in terms of address.

17             Now, the other issues, and this is in the case

18     management order that we -- that was proposed, but I did talk

19     about protective orders and preservation orders and I think,

20     Ms. McEvoy, you had all of those things in there that you

21     would work on.

22             The next thing is the motion practice, and I don't

23     think we need to really go into that.  We had motions for

24     consolidation.  I don't hear any objections.  I think all of

25     the classes should be consolidated, and we'll have the

1   consolidated amended complaints, so those motions that are

2   pending will be granted, and you may submit orders if you

3   have filed a motion to consolidate.

4           I don't think we have any other pending motions.

5   Does anybody --

6           MR. KOHN:  None from the plaintiffs.

7           THE COURT:  None from the plaintiffs.  Any

8   defendants?

9           (No response.)

10          THE COURT:  Okay.  That takes care of the motions.

11  Okay.  The case management order then will be finalized.  I

12  would hope you could get together, put these dates in it and

13  finalize the language and submit it to me within this next

14  week.  All right.

15          MR. FINK:  Your Honor, may I suggest that rather

16  than file separate orders for consolidation, since we are

17  going to be filing the case management order anyway why don't

18  we include consolidation in the case management?

19          THE COURT:  I think that's an excellent idea.

20          MR. FINK:  Thank you.

21          THE COURT:  See, liaison, very good.

22          MR. FINK:  Yay.  Thank you, Your Honor.

23          THE COURT:  Okay.  The other thing is

24  court-sponsored website.  I haven't put together any website

25  yet.

1        MR. SPECTOR:  Your Honor, if I might,

2   Eugene Spector.

3        With regard to website, that sometimes happens in

4   some of the mass tort cases that we have been talking about

5   before.  Here in this case once class certification is

6   reached and notice has to go to the class, we will have a

7   website.  We'll have a site for this case that the class will

8   be able to go to see any documents that are necessary and

9   keep up to date with the class with the case, but until that

10  time there is no need for anything like a website.

11       THE COURT:  Good.  I was glad you are not sending

12  me back to IT school or something like that.  I did work for

13  IBM so you know I could do this.  Go ahead.

14       MS. McEVOY:  Your Honor, needless to say, I do not

15  share the same optimism that a class should or ought to be

16  certified here and therefore notice ought to issue, but I do

17  agree that there is not a need at this point in time for a

18  court-sponsored website.

19       THE COURT:  Thank you.  All right.  Things right

20  now, as you all know, will be filed under the MDL number

21  here.  Thinking ahead, if we get to the point that we have

22  other MDLs and this is something that we certainly won't know

23  here until at least the end of May, June sometime, then I'm

24  going to think ahead about some master number that would

25  include all of the MDLs.  I have already, just in case,

1   checked that we might use an MDL 000 or some good number so

2   that it would apply -- whatever goes on there would apply to

3   all MDLs, but that's something that we will deal with in the

4   future.

5            MR. STRANGE:  Your Honor?

6            THE COURT:  Yes.

7            MR. STRANGE:  Brian Strange.  With respect to those

8   other MDLs I assume that Your Honor will address the

9   leadership issue of those if and when they are transferred?

10            THE COURT:  Absolutely.  This does not apply to the

11   leadership of the other MDLs.  I don't know the relationship.

12   I'm just going to wait until I get it.

13            MR. STRANGE:  Thank you.

14            THE COURT:  Nobody is barred here or people here

15   who are lead counsel should not think they would

16   automatically be lead counsel in the other MDLs.  I don't

17   know yet, I haven't looked at those, I don't know who filed,

18   I think you might all be the same, I don't know.  Okay.  All

19   right.  And anything else, anybody have any other --

20            MR. KOHN:  Your Honor, I noted on your Court's

21   agenda there was one other item of status conference

22   schedule.

23            THE COURT:  Yes.

24            MR. KOHN:  There is that provision in the draft

25   case management order for a 60-day period for us to confer on

1    discovery matters, so maybe some time after that date.

2            THE COURT:  I was thinking in terms of the status

3    conference, the next status conference for this case it might

4    be good since this is March, April, May, I'm thinking we

5    should wait and see if we have the resolution on the MDLs,

6    the other MDLs, because I would like to talk to all of you

7    once I have that.  I don't even know yet what the issues -- I

8    haven't defined them, but I know I'm going to want to talk to

9    you once I have -- if I have -- if I have the other MDLs.

10   Okay.  So in terms of the next conference why don't you

11   coordinate a date.  It is my experience it takes them a

12   couple of weeks.  You may have different experiences because

13   you have done more of these MDLs so you might be better able

14   to coordinate a date, and if you contact my staff we will

15   work out a date that we can plan and hopefully keep that date

16   and have the resolution of the other cases.  Okay.  Thank you

17   for bringing that up.

18           Any other issues?

19           (No response.)

20           THE COURT:  No other issues.  All right.  Thank you

21   very much for coming in.  I appreciate it.  I look forward to

22   working with all of you.  Thank you.

23           (Proceedings concluded at 12:58 p.m.)

24                          —   —   —

25

```
 1
 2                          CERTIFICATION
 3
 4           I, Robert L. Smith, Official Court Reporter of
 5     the United States District Court, Eastern District of
 6     Michigan, appointed pursuant to the provisions of Title 28,
 7     United States Code, Section 753, do hereby certify that the
 8     foregoing pages comprise a full, true and correct transcript
 9     taken in the matter of IN RE: AUTOMOTIVE WIRE HARNESS
10     SYSTEMS ANTITRUST LITIGATION Case No. 12-mdl-2311, on Friday,
11     March 16, 2012.
12
13                              s/Robert L. Smith
                                Robert L. Smith, CSR 5098
14                              Federal Official Court Reporter
                                United States District Court
15                              Eastern District of Michigan
16
17
18     Date:  03/26/2012
19     Detroit, Michigan
20
21
22
23
24
25
```