**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| _____ | : Master File No. 12-md-02311 |
| IN RE AUTOMOTIVE WIRE | : |
| HARNESS SYSTEMS ANTITRUST | : Hon. Marianne O. Battani |
| LITIGATION | : Hon. Mona Majzoub |
| _____ | : |
| | : |
| THIS DOCUMENT RELATES TO: | : |
| | : **Jury Trial Demanded** |
| All Automobile Dealer Actions | : |
| _____ | : |

**AUTOMOBILE DEALERS**
**CONSOLIDATED CLASS COMPLAINT**

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"), Landers Auto Group

No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"), Hammett Motor Company, Inc.

("Plaintiff Hammett"), Superstore Automotive, Inc. ("Plaintiff Superstore"), Lee Pontiac-

Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"), Westfield Dodge City, Inc. ("Plaintiff

Westfield"), V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."), Desert European Motorcars, Ltd.

("Plaintiff Desert"), Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville"), Dale

Martens Nissan Subaru, Inc. ("Plaintiff Dale Martens"), Green Team of Clay Center Inc.

("Plaintiff Green Team"), McGrath Automotive Group, Inc. ("Plaintiff McGrath"), Table Rock

Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"), Archer-Perdue, Inc.,

d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"), Lee's Summit Chrysler Jeep Dodge

("Plaintiff Lee's Summit"), Bonneville and Son, Inc. ("Plaintiff Bonneville"), Holzhauer Auto

and Truck Sales, Inc. ("Plaintiff Holzhauer"), Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff

Pitre"), Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"),  John Greene Chrysler Dodge Jeep,

LLC ("Plaintiff John Greene"), SLT Group II, Inc., d/b/a Planet Nissan Subaru of Flagstaff

("Plaintiff Planet Nissan"), Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff

Champion"), Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet,

Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"),

Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth

Volkswagen"), Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff

Commonwealth Nissan"), Ramey Motors, Inc. ("Plaintiff Ramey"), Thornhill Superstore, Inc.,

d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"), Dave Heather Corporation, d/b/a

Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"), Central Salt Lake Valley GMC

Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"), Capitol

Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"), Capitol Dealerships, Inc., d/b/a Capitol

Toyota ("Plaintiff Capitol Toyota"), Beck Motors, Inc. ("Plaintiff Beck") (collectively

"Plaintiffs"), file this Consolidated Class Complaint on behalf of themselves and all others

similarly situated (the "Classes" as defined below).

This Automobile Dealers Consolidated Class Complaint is intended to supersede the

complaints in the transferor forums where certain Plaintiffs filed their original actions against

Defendants, and to replace those complaints in said forums, becoming the operative complaint in

all actions initiated by any Plaintiffs in this multidistrict litigation prior to transfer and

consolidation.[1]  Plaintiffs bring this class action for damages, injunctive relief, and other relief

---

[1] The actions in which this Consolidated Complaint is intended to replace certain Plaintiffs'
complaints are as follows: *Hammett Motor Co., Inc. v. Delphi Automotive LLP, et al.*, 3:11-CV-
00647 (S.D. Miss.) (Filed Oct. 18, 2011); *Landers Auto Group No. 1 Inc. d/b/a Landers Toyota
v. Delphi Automotive LLP, et al.*, 4:11-CV-00757 (E.D. Ark.) (Filed Oct. 18, 2011); *Superstore
Automotive, Inc. v. Delphi Automotive LLP, et al.*, 11-CV-03092 (D. Minn.) (Filed Oct. 19,
2011); *Martens Cars of Washington Inc. v. Furukawa Electric Co., Ltd., et al.*, 1:11-CV-01892
(D.D.C.) (Filed Oct. 27, 2011).

pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

## Nature of Action

1.      This lawsuit is brought as a proposed class action against Defendants, the largest suppliers of Automotive Wire Harness Systems (defined below) globally and in the United States, for engaging in a massive, more than decade-long conspiracy to unlawfully fix and artificially raise the prices of these products.  Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2.      Plaintiffs bring this action on behalf of themselves and all automobile dealers that, during the period January 1, 2000, to September 30, 2011, (the "Class Period"):

> a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator, or
>
> b) purchased vehicles[2] containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

3.      "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle.  Essentially, Automotive Wire Harness Systems serve as the "central

---

[2] "Vehicles" as used here, means any new vehicles sold by automobile dealers throughout the United States, including but not limited to sedans, trucks and sport utility vehicles.

nervous system" of a motor vehicle. "Automotive Wire Harness Systems" include the following: automotive wire harnesses, speed sensor wire assemblies, automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, high voltage wiring and power distributors.

4.      The Delphi Defendants, the Fujikura Defendants, the Furukawa Defendants, the Lear Defendants, the Leoni Defendants, the Sumitomo Defendants, the S-Y Systems Defendants, the Tokai Rika Defendants, the Yazaki Defendants and the G.S. Electech Defendants (all as defined below, and collectively "Defendants") manufacture, market, and sell Automotive Wire Harness Systems throughout the United States. The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

5.      Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Wire Harness Systems.

6.      Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems since at least February 2010. As part of its criminal investigation, the Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Automotive Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants.

7.      Defendant Furukawa Electric Co. Ltd. ("Furukawa Electric"), and three of its executives have pleaded guilty to participating in the Automotive Wire Harness Systems cartel from at least as early as January 2000 and continuing until at least January 2010, and Furukawa Electric has agreed to pay a $200 million fine related to its unlawful conduct.  Furukawa Electric and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems sold to automobile manufacturers in the United States.  The combination and conspiracy engaged in by Furukawa Electric and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      As part of their plea agreements, Furukawa Electric and its three executives have agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

9.      Defendant Yazaki Corporation ("Yazaki Corporation"), and four of its executives, have also pleaded guilty to fixing prices, rigging bids and allocating customers for Automotive Wire Harness Systems, between January 2000 and February 2010.  Yazaki Corporation has agreed to pay a $470 million fine, the second highest fine ever paid for a criminal antitrust violation, for its agreements to restrain prices for Automotive Wire Harness Systems, as well as several other automotive components.

10.      Defendant Fujikura, Inc. has admitted to engaging in the conspiracy to restrain competition for Automotive Wire Harness Systems between January 2006 and February 2010.  Fujikura Inc. has agreed to plead guilty to fixing prices, rigging bids and allocating the supply of Automotive Wire Harness Systems and to pay a $20 million fine for its participation in the Automotive Wire Harness Systems conspiracy.

11.     Defendant G.S. Electech Inc. has agreed to plead guilty to engaging in a conspiracy to fix prices, rig bids and allocate supply for speed sensor wire assemblies, which comprise the ABS/speed sensor wire harness, a portion of the Automotive Wire Harness System, between January 2003 and February 2010.  G.S. Electech has agreed to pay $2.75 million for engaging in these violations of the Sherman Act.

12.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems that they purchased from firms that directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators during the Class Period.  Plaintiffs and the Classes members have thereby suffered antitrust injury to their business or property.

## Jurisdiction and Venue

13.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367,

as this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

15.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

16.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Wire Harness Systems throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; and/or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States.  Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States and this district.

17.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable and intended anti-competitive effects upon

interstate commerce within the United States, and upon import trade and commerce within the United States.

18.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

19.     Automotive Wire Harness Systems manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Automotive Wire Harness Systems are purchased in the United States, and such Automotive Wire Harness Systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

20.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harness Systems, and that conspiracy unreasonably restrained trade and adversely affected the market for Automotive Wire Harness Systems.

21.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Wire Harness Systems, including Plaintiffs and the Classes.

## Parties

22.     Plaintiff Martens is a Maryland corporation with its principal place of business in the District of Columbia.  Plaintiff Martens is an authorized Volvo and Volkswagen dealer, who sells Volvo- and Volkswagen- brand vehicles (e.g., Passat and Jetta), containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

23.     During the Class Period Plaintiff Martens purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Volvo- and Volkswagen-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Martens also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Volvo- and Volkswagen-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

24.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who sells Ford-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

25.     During the Class Period Plaintiff Hammett purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Ford-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Hammett also purchased Automotive Wire Harness Systems, for its repair

9

and service business, during the Class Period, from manufacturers of Ford-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

26.     Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who sells Toyota-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

27.      During the Class Period Plaintiff Landers purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Landers also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

28.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota.  Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore.  Plaintiff Superstore sells Buick- and GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

29.     During the Class Period Plaintiff Superstore purchased vehicles containing Automotive Wire Harness Systems from manufacturers of GMC-brand vehicles, who purchased

Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators. Plaintiff Superstore also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

30.     Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized GMC dealer. During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer. Plaintiff Lee sells GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators. During the Class Period, Plaintiff sold Pontiac-, Oldsmobile- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

31.     During the Class Period Plaintiff Lee purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Pontiac-, Oldsmobile-, GMC- and Jeep-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators. Plaintiff Lee also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Pontiac-, Oldsmobile-, GMC- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

32.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who sells Chrysler-, Dodge- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

33.     During the Class Period Plaintiff Westfield purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge- and Jeep-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

34.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who sells Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

35.     During the Class Period Plaintiff V.I.P. purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff V.I.P. also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers

of Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

36.     Plaintiff Desert is a California company, with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus and Spyker dealer who sells Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

37.     During the Class Period, Plaintiff Desert purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff Desert also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

38.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee.  Plaintiff Fayetteville is an authorized Toyota dealer, who sells Toyota-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

39.     During the Class Period Plaintiff Fayetteville purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Fayetteville also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

40.     Plaintiff Dale Martens was a Kansas corporation, with its principal place of business in Lawrence, Kansas during the Class Period.  Plaintiff Dale Martens was an authorized Nissan and Subaru dealer during the Class Period, who, during the Class Period, sold Nissan- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

41.     During the Class Period Plaintiff Dale Martens purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Nissan- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Dale Martens also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Nissan- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

42.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge and Ram dealer, who sells Chrysler-, Jeep-, Dodge- and Ram-brand vehicles containing Automotive Wire

14

Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

43.     During the Class Period Plaintiff Green Team purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Jeep-, Dodge- and Ram-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Green Team also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Jeep-, Dodge- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

44.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia and Cadillac dealer, who sells Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia- and Cadillac-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

45.     During the Class Period Plaintiff McGrath purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia- and Cadillac-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff McGrath also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-,

Jeep-, Ram-, Kia- and Cadillac-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

46.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who sells Hyundai-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

47.     During the Class Period Plaintiff Table Rock purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Hyundai-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Table Rock also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Hyundai-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

48.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who sells Suzuki-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

49.     During the Class Period Plaintiff Archer-Perdue purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Suzuki-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Archer-Perdue also purchased Automotive Wire Harness Systems, for its

repair and service business, during the Class Period, from manufacturers of Suzuki-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

50.     Plaintiff Lee's Summit is a Missouri corporation, with its principal place of business in Lee's Summit, Missouri.  Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

51.     During the Class Period Plaintiff Lee's Summit purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Lee's Summit also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

52.     Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire.  Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

17

53.     During the Class Period Plaintiff Bonneville purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Bonneville also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

54.     Plaintiff Holzhauer is a Delaware corporation, with its principal place of business in Nashville, Illinois.  Plaintiff Holzhauer is an authorized Dodge, Chrysler and Jeep dealer, who sells Dodge-, Chrysler- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

55.     During the Class Period Plaintiff Holzhauer purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Dodge-, Chrysler- and Jeep-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Holzhauer also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Dodge-, Chrysler- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

56.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who sells Buick- and GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by

one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

57.     During the Class Period Plaintiff Pitre purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Buick- and GMC-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Pitre also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Buick- and GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

58.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who sells Chevrolet-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

59.     During the Class Period Plaintiff Patsy Lou purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Patsy Lou also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chevrolet-brand brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

60.     Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge,

Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

61.     During the Class Period Plaintiff John Greene purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff John Greene also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

62.     Plaintiff Planet Nissan is an Arizona corporation, with its principal place of business in Flagstaff, Arizona.  Plaintiff Planet Nissan is an authorized Nissan and Subaru dealer, who sells Nissan- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

63.     During the Class Period Plaintiff Planet Nissan purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Nissan- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Planet Nissan also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Nissan- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

64.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who sells Chevrolet-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

65.     During the Class Period Plaintiff Champion purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Champion also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chevrolet-brand brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

66.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda and Kia dealer, who sells Chevrolet- Honda- and Kia-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

67.     During the Class Period Plaintiff Commonwealth Motors purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-, Honda- and Kia-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Motors also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period,

from manufacturers of Chevrolet-, Honda- and Kia-brand brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

68.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who sells Volkswagen-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

69.     During the Class Period Plaintiff Commonwealth Volkswagen purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Volkswagen-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Volkswagen also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Volkswagen-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

70.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.  Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who sells Nissan-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

71.     During the Class Period Plaintiff Commonwealth Nissan purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Nissan-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Nissan also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Nissan-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

72.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Chrysler, Dodge, Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

73.     During the Class Period Plaintiff Ramey purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff Ramey also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

74.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick and GMC dealer, who sells Chevrolet-, Buick- and GMC-brand vehicles containing Automotive

Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

75.     During the Class Period Plaintiff Thornhill purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-, Buick- and GMC-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Thornhill also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chevrolet-, Buick- and GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

76.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda and Subaru dealer who sells Toyota- Honda-, Mazda- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

77.     During the Class Period Plaintiff Lakeland purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota- Honda-, Mazda- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Lakeland also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota- Honda-, Mazda- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

78.    Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who sells Buick- and GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

79.    During the Class Period Plaintiff Salt Lake Valley purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Buick- and GMC-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Buick- and GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

80.    Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac and Subaru dealer, who sells Chevrolet-, Cadillac- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

81.    During the Class Period Plaintiff Capitol Chevrolet purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-, Cadillac- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Capitol Chevrolet also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers

25

of Chevrolet-, Cadillac- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

82.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer who sells Toyota-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

83.     During the Class Period Plaintiff Capitol Toyota purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Capitol Toyota also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

84.     Plaintiff Beck is a South Dakota corporation, with its principal place of business in Pierre, South Dakota.  Plaintiff Beck is an authorized Chevrolet and Cadillac dealer, who sells Chevrolet- and Cadillac-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

85.     During the Class Period Plaintiff Beck purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet- and Cadillac-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Beck also purchased Automotive Wire Harness Systems, for its repair and

service business, during the Class Period, from manufacturers of Chevrolet- and Cadillac-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

**The Delphi Defendants**

86.     Defendant Delphi Automotive LLP is a partnership organized under the laws of England and Wales, with its principal place of business in London, England.  It was formed in 2009 to buy assets of Troy, Michigan-based Delphi Corporation, which filed for bankruptcy protection in 2005.  Defendant Delphi LLP, directly or through its subsidiaries which it wholly owned or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

87.     Defendant Delphi Automotive Systems LLC ("Delphi LLC") is a Delaware corporation with its principal place of business in Troy, Michigan.  It is a subsidiary or wholly owned and/or controlled by its parent Delphi Automotive LLP.  Officers from Defendant Delphi Automotive LLP work out of the Michigan offices of Defendant Delphi LLC.  Defendant Delphi LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

88.     Defendant DPH Holdings Corporation (f/k/a Delphi Corporation) is a Delaware corporation with its principal place of business in Warren, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Delphi Automotive LLP.  Defendant DPH Holdings Corporation manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

89.     Defendant Delphi Furukawa Wiring Systems LLC is a limited liability company created in 2004 through a joint venture with Delphi Corporation and Furukawa Electric with its

principal place of business in Ann Arbor, Michigan. The joint venture was responsible for sales and engineering activities for Automotive Wire Harness Systems, with a focus on sales to Toyota in North America. The joint venture used existing Delphi Corporation operation facilities.

90.     Defendants Delphi Automotive LLP, Delphi LLC, DPH Holdings Corporation and Delphi Furukawa Wiring Systems LLC are collectively referred to herein as the "Delphi Defendants" or "Delphi."

**The Fujikura Defendants**

91.     Defendant Fujikura, Ltd. is a Japanese company with its principal place of business in Tokyo, Japan. Defendant Fujikura Ltd., directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

92.     Defendant Fujikura America, Inc. is a Delaware company with locations in Santa Clara, California and Farmington Hills, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Defendant Fujikura Ltd. Defendant Fujikura America Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

93.     Defendants Fujikura Ltd. and Fujikura America, Inc. are collectively referred to herein as "Fujikura Defendants" or "Fujikura."

28

**The Furukawa Defendants**

94.     Defendant Furukawa Electric is a Japanese corporation, with its principal place of business in Tokyo, Japan.  Defendant Furukawa Electric, directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

95.     Defendant American Furukawa, Inc. ("American Furukawa") is a Delaware corporation, with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Furukawa Electric.  Defendant American Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

96.     Defendant Furukawa Wiring Systems, America, Inc. ("Furukawa Wiring") is a Delaware corporation with its principal place of business in El Paso, Texas.  Furukawa Electric owns 60% of Furukawa Wiring's shares and American Furukawa owns 40%.  Furukawa Wiring, operating under the names, Furukawa Lear Corporation and Lear Furukawa Corporation, was a joint venture, between Furukawa Electric and Lear Corporation.  In 1987, Furukawa Electric and a Lear Corporation corporate predecessor began Furukawa Wiring as a joint venture to manufacture and sell wire harnesses to Japanese automobile manufacturers in North America.  Lear held an 80% stake in the venture, with Furukawa holding the remaining 20%.  In April 2009, Furukawa purchased an additional 60% of the joint venture, raising its stake to 80%, and changed the joint venture's name to Furukawa Lear Corporation.  In June 2010, Furukawa Lear Corporation became

a wholly owned subsidiary of Furukawa called Furukawa Wiring.  Defendant Furukawa Wiring

and its predecessors manufactured, marketed and/or sold Automotive Wire Harness Systems that

were purchased throughout the United States, including in this district, during the Class Period.

97.    Defendants Furukawa Electric, American Furukawa and Furukawa Wiring are

referred to collectively herein as "Furukawa Defendants" or "Furukawa."

### The Lear Defendants

98.    Defendant Lear Corporation is a Delaware corporation with its principal place of

business in Southfield, Michigan.  Defendant Lear Corporation, directly or through its subsidiaries,

which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire

Harness Systems that were purchased throughout the United States, including in this district,

during the Class Period.

99.    Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware

corporation with its principal place of business in Selma, Alabama.  It is a joint venture between

Defendant Lear Corporation and Kyungshin Corporation of South Korea.  Defendant Kyungshin-

Lear Sales and Engineering, LLC manufactured, marketed and/or sold Automotive Wire Harness

Systems that were purchased throughout the United States, including in this district, during the

Class Period.

100.    Defendant Lear Corporation and Kyungshin-Lear Sales and Engineering, LLC are

collectively referred to herein as the "Lear Defendants" or "Lear."

101.    Defendant Lear Corporation filed for Chapter 11 bankruptcy protection on July 7,

2009.  After their emergence from Chapter 11 bankruptcy proceedings on November 9, 2009,

Lear Corporation continued to sell Automotive Wire Harness Systems pursuant to and as part of

its participation in furtherance of the conspiracy.  From and after November 2009, Lear

Corporation had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices.  In 2010 alone, Lear Corporation had $2.5593 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy hereinafter alleged.

**The Leoni Defendants**

102.     Defendant Leoni AG is a German corporation, with its principal place of business in Nuremberg, Germany.  Defendant Leoni AG, directly or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

103.     Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG.  Defendant Leoni Wiring Systems Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

104.     Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG.  Defendant Leonische manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

105.    Defendant Leoni Kabel, GMBH is a German corporation with its principal place of business in Roth, Germany.  Defendant Leoni Kabel, GMBH directly or through its affiliates or subsidiaries, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

106.    Defendant Leoni Wire Inc. is a Massachusetts company with its principal place of business in Chicopee, Massachusetts.  Leoni Wire Inc. is a wholly-owned and controlled subsidiary of Defendant Leoni AG.  Defendant Leoni Wire Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

107.    Defendants Leoni AG, Leoni Wiring Systems, Inc., Leoni Kabel, GMBH and Leoni Wire Inc. are referred to collectively as "Leoni Defendants" or "Leoni."

**The Sumitomo Defendants**

108.    Defendant Sumitomo Electric Industries, Ltd. ("Sumitomo Electric") is a Japanese corporation with its principal place of business in Osaka, Japan.  Defendant Sumitomo Electric Industries, Ltd. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

109.    Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation, with its principal place of business in Yokkaichi, Japan.  Defendant Sumitomo Wiring Systems, Ltd. has asserted that it is "proud to hold the world's top share in the automobile wiring harness field." Sumitomo Wiring Systems, Ltd. is a subsidiary of Sumitomo Electric Industries, Ltd. and is controlled by Sumitomo Electric Industries, Ltd.  Defendant Sumitomo Wiring Systems, Ltd. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

110.     Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

111.     Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd.  Defendant K&S Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

112.     Defendant Sumitomo Wiring (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Wiring (U.S.A.) Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

113.     Defendant Sumitomo Electric Wintec America, Inc. is a Delaware company with its principal place of business in Edmonton, Kentucky.  Sumitomo America is a wholly-owned

33

and controlled subsidiary of Defendant Sumitomo Electric Industries, Ltd.  Defendant Sumitomo Electric Wintec America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

114.    Defendants Sumitomo Electric Industries, Ltd., Sumitomo Electric Wintec America, Inc., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc., are collectively referred to herein as "Sumitomo Defendants" or "Sumitomo."

**The S-Y Systems and Yazaki Defendants**

115.    Defendant S-Y Systems Technologies Europe, GMBH, ("S-Y Systems Technologies") is a German corporation with its principal place of business in Regensburg, Germany.  Defendant S-Y Systems Technologies is a joint venture between Yazaki Corporation and Continental AG.  During the Class Period, S-Y Systems Technologies was at least partially controlled by Yazaki Corporation.  Defendant S-Y Systems Technologies, directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

116.    Defendant Yazaki Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Yazaki Corporation directly and/or through its subsidiaries, which it wholly owned and controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

117.    Defendant S-Y Systems Technologies, America, LLC, is a Delaware corporation, with its principal place of business in Dearborn, Michigan.  It is currently a wholly owned subsidiary of and/or controlled by its parent Defendant Yazaki Corporation, having been purchased by Yazaki Corporation in 2005, before which time it was a joint venture between Siemens VDO Automotive AG and Yazaki Corporation and wholly owned subsidiary and/or controlled by Defendant S-Y Systems Technologies Europe, GMBH.  Defendant S-Y Systems Technologies, America, LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of either its German parent, during the time it was owned and controlled by S-Y Systems Technologies Europe, GMBH, or its current Japanese parent, Yazaki Corporation.

118.    Defendant Yazaki North America, Inc. ("Yazaki North America") is an Illinois corporation and has its principal place of business in Canton Township, Michigan.  It is a subsidiary of and owned and controlled by its parent, Yazaki Corporation.  Defendant Yazaki North America manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

119.    Defendants S-Y Systems Technologies Europe, GMBH and S-Y Systems Technologies, America, LLC will be collectively referred to herein as "S-Y Systems Defendants" or "S-Y Systems."

120.    Defendants Yazaki Corporation and Yazaki North America, Inc. are herein collectively referred to as "Yazaki Defendants" or "Yazaki."

**The Tokai Rika Defendants**

121.     Defendant TRAM, Inc. ("TRAM") is a Michigan corporation with its principal place of business in Plymouth, Michigan.  Defendant TRAM is a subsidiary of and controlled by Tokai Rika Co., Ltd.  Defendant TRAM, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

122.     Defendant Tokai Rika Co., Ltd. is a Japanese company with its principal place of business in Niwa-gun, Japan.  Defendant Tokai Rika Co., Ltd. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

123.     Defendants TRAM and Tokai Rika Co., Ltd. are herein collectively referred to as "Tokai Rika Defendants" or "Tokai Rika."

**The G.S. Electech Defendants**

124.     Defendant G.S. Electech, Inc. is a Japanese company with its principal place of business in Toyota City, Japan.  Defendant G.S. Electech, Inc. manufactured, marketed and/or sold portions of Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

125.     Defendant G.S.W. Manufacturing, Inc. is an Ohio corporation, with its principal place of business in Findlay, Ohio.  It is a subsidiary of and owned and controlled by its parent, G.S. Electech, Inc.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.  Defendant G.S.W. Manufacturing, Inc. manufactured, marketed and/or sold portions of Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

126.    Defendants G.S. Electech, Inc. and G.S.W. Manufacturing, Inc. are collectively referred to as "G.S. Electech Defendants" or "G.S. Electech."

## Agents and Co-Conspirators

127.    Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

128.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

129.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## Factual Allegations

## A.    The Automotive Wire Harness System Industry

130.    Automotive Wire Harness Systems comprise the "central nervous system" of an automotive vehicle and consist of the wires or cables and data circuits that run throughout the vehicle.  To ensure safety and basic functions (e.g., moving, turning and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics which operate using control signals running on electrical power.  The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.

131.    Automotive vehicles contain masses of wires that can amount to several kilometers in length.  A vehicle's wiring system is organized into multiple wire harnesses.  Wire harnesses provide organized connection points for multiple wiring configurations.  The harness feature binds wires and cables into a bundle, which provides protection against deterioration or damage from vibration, abrasions, and moisture.

132.    Wire harnesses have color coded wires that are designed to support specific electrical and electronic motor vehicle features.  Most, if not all, electrical and electronic devices in a vehicle rely on a wire harness to provide electric current and data transmission for operation.

133.    Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") in new vehicles as part of the automotive manufacturing process.  They are also installed in vehicles to replace worn out, defective or damaged Automotive Wire Harness Systems.

134.    For new vehicles, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Wire Harness Systems directly from auto parts suppliers such as Defendants.  Automotive Wire Harness Systems may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier Manufacturers" in the automotive industry.  A Tier I manufacturer supplies Automotive Wire Harness Systems directly to an OEM.

135.    When purchasing Automotive Wire Harness Systems, OEMs issue Requests for Quotation ("RFQs") to the automotive parts suppliers.  Auto parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years, or the life of the model at issue.  Typically, the

bidding process begins approximately three years prior to the start of production of a new model. Foreign OEMs procure parts for U.S.-manufactured vehicles both abroad and the United States.

136.    Automotive Wire Harness Systems manufactured, distributed and sold for a particular make and model of a vehicle or other product by Defendants during the Class Period are not qualitatively distinguishable in any material way.

137.    Defendants comprise the majority of auto parts suppliers who manufacture Automotive Wire Harness Systems for sale to OEMs.

138.    Defendants and the co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States (including in all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*), for installation in vehicles manufactured and sold in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers as listed *infra*), (b) in Japan, and possibly other countries, for export to the United States (including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*) and installation in vehicles manufactured and sold in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers as listed *infra*), and (c) in Japan, and possibly other countries, for installation in vehicles manufactured in Japan, and possibly other countries, for export to and sale in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*).

139.    Plaintiffs and members of the proposed Classes purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants, having purchased new vehicles containing Automotive Wire Harness Systems or Automotive Wire Harness Systems themselves

from OEMs in the United States (including in each state having laws permitting recovery of damages by indirect purchasers, as listed *infra*), who in turn purchased Automotive Wire Harness Systems from Defendants.

140.    The global Automotive Wire Harness System market size reached US $21.9 billion in 2009, and increased by 32.2% to US $29 billion in 2010.  According to *ResearchInChina*, a leading source for international market research and market data, the Automotive Wire Harness System market is steadily growing, and is expected to be US $32 billion in 2012.

141.    The global Automotive Wire Harness System market is dominated and controlled by large manufacturers, the top six of which are six of the Defendants, who control almost 90% of the global market; of those, four control almost 77% of the global market.

142.    Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009.  As Yazaki states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market."  In fact, 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in the Western Hemisphere.  Yazaki's largest customers are Toyota, followed by Chrysler, Ford, Renault-Nissan, Honda, and General Motors.  In the Western Hemisphere, Yazaki supplies Volvo, Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru, Suzuki and Toyota.

143.    Sumitomo is the second largest manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.  Sumitomo supplies Volkswagen, Toyota, Honda and Nissan.

144.    Delphi was the third largest maker of Automotive Wire Harness Systems as of 2009.  It controls 16.71% of the global market.  Its two largest customers are General Motors and Ford.

145.    Leoni controls 6% of the global market for Automotive Wire Harness Systems.

146.    Lear controls almost 5% of the global market for Automotive Wire Harness Systems.  Lear supplies Toyota, General Motors, Ford, and BMW.

147.    Furukawa controls almost 4% of the global market for Automotive Wire Harness Systems.

148.    Fujikura controls 2.69% of the global market for Automotive Wire Harness Systems.  Fujikura supplies Volkswagen and Subaru, among other OEMs.

149.    Tokai Rika supplies Toyota, among other OEMs.

150.    S-Y Systems supplies Ford, among other OEMs.

151.    By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and the world.

## B.    Defendants Increased Prices for Automotive Wire Harness Systems Despite Steady Costs

152.    In a competitive market, falling material and labor costs, or the stabilization of material and labor costs over time, as well as the existence of and the desire to maintain economies of scale, would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower or predictably steady costs to lower their prices in order to capture market share.  The only economically rational action in such a situation is for each competitor to lower its own prices.

153.    In a market where ostensible competitors have engaged in a conspiracy to fix prices and refrain from competing for customers, however, competitors do not lower prices even

when faced with steady or decreasing input costs. Such price decreases are unnecessary because the conspirators know that they will not lose sales to any lower-priced competitors.

154. The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same. In fact, according to *ResearchInChina*, Sumitomo and Furukawa own their own copper mines and effectively control their copper input costs. Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems. Thus, both of these Defendants had the power to effectively keep their costs steady and knew that due to their control of a key input in Automotive Wire Harness Systems, the costs of manufacture would likely remain steady. In a competitive market, such steady input costs should have caused Defendants to lower prices for Automotive Wire Harness Systems. But in a market where Defendants have agreed not to compete on price, such steady input costs have no effect on price.

155. Defendants' unwarranted, anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

## C. The Structure and Characteristics of the Automotive Wire Harness System Market Render the Conspiracy More Plausible

156. The structure and other characteristics of the Automotive Wire Harness System market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Automotive Wire Harness System market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

42

### 1.    The Automotive Wire Harness System Market Has High Barriers to Entry

157.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to join the industry and increase competition.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

158.    There are substantial barriers that preclude, reduce or make more difficult entry into the Automotive Wire Harness Systems market.  A new entrant into the business would face high and continuous start-up costs, including multi-million dollar costs associated with manufacturing plants, equipment, energy, transportation, distribution infrastructure, skilled labor and long-standing customer relationships.

159.    In addition, OEMs cannot change Automotive Wire Harness System suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System they purchase for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model. Thus, a new manufacturer of Automotive Wire Harness Systems entering the market would likely have to wait until the next cycle of vehicles was being manufactured by any given OEM to even have a chance at obtaining the bid for any model of car and take advantage of the lack of competitive prices for Automotive Wire Harness Systems, by offering more competitive prices to OEMs.  Also, the design of an Automotive Wire Harness System must be synergized by Automotive Wire Harness System manufacturers and OEMs.  Designing Automotive Wire Harness Systems pursuant to such stringent specifications involves a great degree of sunk costs and resources.

160.    Also it is important for parts suppliers to maintain minimum viable scale in order to efficiently produce parts within the price and quantity parameters established by the major OEMs.

## 2.    There is Inelasticity of Demand for Automotive Wire Harness Systems

161.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

162.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

163.    Demand for Automotive Wire Harness Systems is highly inelastic.  This is because there are no close substitutes for these products.  Automobile manufacturers, and the automobile dealers who buy their stock from automobile manufacturers, must purchase Automotive Wire Harness Systems as an essential part of a vehicle—no vehicles are or can be sold without them— even if the prices are kept at a supracompetitive level.

## 3.    The Market for Automotive Wire Harness Systems Is Highly Concentrated

164.    A highly concentrated market is more susceptible to collusion and other anti-competitive practices, because the fewer competitors there are, the easier collusion is to coordinate.

165.     As discussed above, Defendants dominate the Automotive Wire Harness Systems market.  Six of the Defendants control almost 90% of the global market, and four of the Defendants control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo controls 24%; Delphi controls 16.71%; Leoni controls 6%; Lear controls almost 5% and Furukawa controls almost 4%.

### 4.     Defendants had Ample Opportunities to Conspire

166.     Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts and perform acts necessary for the operation and furtherance of the conspiracy.

167.     For example, Defendants have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan, which provided the means and opportunity to further the conspiracy alleged herein.  Defendants have also regularly attended the Automotive Aftermarket Products Expo in Las Vegas, Nevada.

### D.     Government Investigations

168.     A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems.

169.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC.  One carmaker is said to have failed to attract competitive bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to take their complaint to the EC.

170.     In February 2010, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anticompetitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems.  The EC also carried out additional raids at the

45

European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010. Specifically, EC investigators raided the offices of Leoni AG, S-Y Systems Technologies, Lear Corporation's French subsidiary, a European office of Delphi LLC and Yazaki Corporation. "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

171.     S-Y Systems Technologies has admitted that it is cooperating with the antitrust investigators.  Lear Corporation's Chief Executive Officer Bob Rossiter has stated that Lear Corporation was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers.  In addition, Delphi LLC has admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market."  Delphi LLC stated that it is cooperating fully with the European competition authorities.  Leoni AG has also stated that it is cooperating with the antitrust investigators.  Leoni Kabel GMBH is also being investigated by EC authorities.

172.     In February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric and Yazaki Corporation as part of an expansive investigation into collusion in the industry dating back to at least 2003.

173.     The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

174.    On February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including Yazaki Corporation's subsidiary in Canton Township, Michigan, Yazaki North America.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

175.    In 2010, the FBI also raided the offices of TRAM and executed search warrants related to unfair competition, price-fixing and bid rigging of Automotive Wire Harness Systems.

176.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### E.    JFTC Cease and Desist Orders

177.    On January 19, 2012, the JFTC issued Cease and Desist orders against Fujikura Ltd., and Yazaki Corporation, and fined Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation, after investigating the companies' bidding practices with regard to wire harnesses and related products.

178.    The JFTC press release regarding the orders states "the JFTC gave the enterprises in question an advance notification on the contents of the orders and an opportunity to present

their views and to submit evidence. Considering the views and evidence from them, the JFTC issued the orders."[3]

179.    Having evaluated all of the evidence before it, including rebuttal evidence from the accused companies, the JFTC determined that the companies had engaged in illegal anticompetitive activities.  Finding that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation all violated Japan's Antimonopoly Act by rigging bids to OEMs Toyota, Honda, Nissan and Fuji (manufacturer of Subaru-brand vehicles) on wire harnesses and related products, the JFTC stated that that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation carried out their conspiracy by "appointing the designated successful bidder and managing to have the designated successful bidder win the bidding."

180.    The JFTC stated that the conspiracy began as early as July 2000.

181.    The JFTC thus ordered each Defendant to make surcharge payments totaling 12.9 billion yen.

182.    The JFTC explained, in its press release, that Furukawa Electric had also participated in the described bid-rigging conspiracy, in violation of the Antimonopoly Act.

## F.    Guilty Pleas

### 1.    Guilty Pleas of Furukawa Electric, Junichi Funo, Hirotsugu Nagata and Tetsuya Ukai

183.    On September 29, 2011, the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of Automotive Wire Harness Systems to

---

[3] Available at http://www.jftc.go.jp/en/pressreleases/uploads/2012_Jan_19.pdf (Last accessed May 8, 2012).

automobile manufacturers.  Three Furukawa executives, who are Japanese nationals, also agreed to plead guilty and to serve prison time in the United States.

184.    Furukawa Electric is charged with price fixing, bid rigging and allocating customers, in violation of the Sherman Act.

185.    Furukawa Electric has pleaded guilty for its role in a conspiracy to rig bids, allocate customers and fix the prices of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere.  The DOJ announced in its information that Furukawa Electric participated in the conspiracy from at least as early as January 2000, until at least January 2010.

186.    Furukawa Electric stated in its press release regarding the plea agreement that "[a]fter analyzing the applicable laws and facts as a whole, Furukawa Electric has decided to enter into a plea agreement with the US Department of Justice."[4]

187.    The plea agreements are an outgrowth of the DOJ's first charges in its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry. According to four separate one-count felony charges filed in the Unites States District Court for the Eastern District of Michigan in Detroit, Furukawa Electric and its executives—Junichi Funo ("Funo"), Hirotsugu Nagata ("Nagata") and Tetsuya Ukai ("Ukai")—engaged in a conspiracy to rig bids for and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere.

188.    Nagata was employed at American Furukawa in Plymouth, Michigan and a related joint venture from January 2004 until June 2009.

---

[4] Available at http://www.furukawa.co.jp/english/what/2011/kei_110930.pdf (Last accessed January 28, 2012).

189.     Funo worked at Furukawa Electric, in Japan and at American Furukawa from April 2003 until at least July 2009.

190.     Ukai worked at Furukawa Electric in Japan from April 2003 until at least July 2009.

191.     According to the criminal Informations filed, Furukawa Electric and its co-conspirators carried out the conspiracy by:

a)     Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b)     Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c)     Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d)     Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e)     Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f)     Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g)     Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h)     Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i)     Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

192.    "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

193.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

194.    At its November 14, 2011, Plea and Sentencing hearing, Defendant Furukawa Electric pleaded guilty, and was ordered to pay its $200 million fine within 45 days.  At the hearing, Defendant Furukawa Electric described its participation in the conspiracy as follows:

> From the time period listed in the Information, that is, approximately from January, 2000 to January, 2010, officers and employees of my company had discussions with employees of competitors that also manufactured and sold automotive wire harness products. . . .  These discussions took place in face-to-face meetings or by telephone.  The discussions took place in the United States and elsewhere.
>
> During . . . such meetings and conversations, a conspiracy was formed and agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis and to rig bids quoted to automobile manufacturers for automotive wire harnesses and related products.
>
> Therefore, as a result of these meetings, my company produced and sold automotive wire harnesses and related products that were the subject of the illegal price fixing agreements that my company had made with competitors.  Those products and the payments for those products traveled in interstate and foreign commerce and substantially affected interstate and foreign trade and commerce.

> For the purposes of this plea agreement, during the time period of January, 2000 to January, 2010, our sales of automotive wire harnesses and related products affecting U.S. auto manufacturers totaled approximately $839 million.
>
> Finally, we note to the Court that some of the products affected by the conspiracy were sold to automobile manufacturers by one of our subsidiaries [American Furukawa], which is located here in the Eastern District of Michigan.

– Plea & Sentencing, *United States v. Furukawa Electric Co.*, No. 11-cr-20612 (E.D. Mich.), at 14-16.

195.    Furukawa Electric executives Funo, Nagata, and Ukai also admitted their participation in the unlawful cartel in open court:

(a)    At his October 24, 2011, Guilty Plea Hearing, Mr. Nagata admitted that he participated in "an agreement to submit non-competitive bids in an amount greater than $100 million."  The purpose of the agreement was to "suppress and eliminate competition in the automotive parts industry."  In Mr. Nagata's own words, he furthered the unlawful conspiracy with Defendants by having "a meeting [with] co-conspirators and some agreement [on] price for automobile manufacturing parts" primarily Automotive Wire Harness Systems.  He personally participated in "several" unlawful meetings to further the conspiracy, at which Defendants made agreements on pricing for Automotive Wire Harness Systems, including rigging bids.  Some of the meetings occurred within the Eastern District of Michigan, and Mr. Nagata conceded that the unlawful agreements would impact businesses with their principal place of business within the Eastern District of Michigan.  Mr. Nagata noted that the price-fixed Automotive Wire Harness Systems were being sold in a number of different states in the United States, and undermined and prevented competition within the United States.  The plea contemplates a prison sentence

of 15 months for Mr. Nagata, a $20,000 fine, and a promise of cooperation from Nagata in the ongoing investigation.

(b)      At his October 24, 2011, Guilty Plea Hearing, Furukawa Electric executive Junichi Funo admitted that he participated in a conspiracy to restrain trade.  Mr. Funo admitted entering into agreements with competitors i.e., Defendants herein, in order to set prices and maintain them, including rigging bids that were solicited from customers.  The agreements also sought to control, and did control, price adjustments.  In Mr. Funo's own words, he "did price fixing for automotive parts."  That price fixing "generally involved . . . wiring harnesses and related products."  The price fixing affected the sales of goods throughout the United States.  Mr. Funo was personally present at meetings during which such unlawful agreements were reached, including meetings that occurred in the Eastern District of Michigan.  The plea contemplates a prison sentence of 1 year for Mr. Funo, a $20,000 fine and a promise of cooperation from Funo in the ongoing investigation.

(c)      At his November 10, 2011, Guilty Plea and Sentencing Hearing, Furukawa Electric executive Tetsuya Ukai stated that he "fix[ed] price[s] over parts – auto parts with other suppliers."  He acknowledged that he met with competitors "in order to fix prices and rig bids with respect to wire harnesses and related products," and conceded that the price-fixing meetings occurred both within the United States and elsewhere.  He also acknowledged that the price-fixing would affect commerce in the United States and elsewhere, including in the Eastern District of Michigan through a Furukawa subsidiary – presumably American Furukawa.  In addition, Mr. Ukai agreed that the commerce affected exceeded $100 million.  As part of his plea, Mr. Ukai agreed to serve 18 months in prison and pay a $20,000 fine for his role in the conspiracy.

196.    The plea agreement stipulated that the DOJ would not bring charges against any of Furukawa Electric's directors, aside from Funo, Nagata and Ukai, the separately charged executives, and Shuji Hayashida, the Chief Executive Officer of American Furukawa from 2001 to 2010.

## 2.    Guilty Pleas of Yazaki Corporation, Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa and Hisamitsu Takada

197.    On January 30, 2012, Yazaki Corporation and four of its executives, Tsuneaki Hanamura ("Hanamura"), Ryoji Kawai ("Kawai"), Shigeru Ogawa ("Ogawa") and Hisamitsu Takada ("Takada"), agreed to plead guilty to conspiring to rig bids, fix prices and allocate customers for Automotive Wire Harness Systems from January 2000 until at least February 2010.

198.    Like Furukawa Electric, Yazaki Corporation agreed to confess to:

a)    Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b)    Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c)    Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d)    Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e)    Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f)    Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g)      Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h)      Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i)      Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

199.    Yazaki Corporation agreed to pay a fine of $470 million for its conspiracy with regard to Automotive Wire Harness Systems and several other automotive components, "the second largest criminal fine obtained for a Sherman Act antitrust violation," according to the DOJ press release describing Yazaki Corporation's agreement to plead guilty to the allegations of anticompetitive conduct.

200.    Yazaki Corporation has pleaded guilty to three counts of violations of Sherman Act, §1.

201.    Yazaki Corporation stated, with regard to its plea agreement that, "Yazaki Corporation concluded a plea agreement with the United States Department of Justice to the effect that the company acknowledges the allegations, pleads guilty and pays a fine of US$ 470 million in the criminal proceedings relating to cartel activities with certain competitors for automotive wire harnesses and related products."[5]  It also asserted that, "Yazaki Corporation has been faithfully cooperating with the DOJ investigation since its inception on February 23, 2010." *Id.*

202.    In addition to Yazaki Corporation, four executives from Yazaki (all Japanese nationals)–Hanamura, Kawai, Ogawa, and Takada–agreed to plead guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing

---

[5] http://www.yazaki-group.com/global/topics/005.html

to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harness Systems sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These four executives of Yazaki will serve prison time ranging from 15 months to two years.  The two-year sentences would be the longest term of imprisonment ever imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

203.    Hanamura worked at Yazaki Corporation from January 2000 until at least February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

204.    Kawai worked for Yazaki Corporation from January 2000 until February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

205.    Ogawa worked for Yazaki Corporation from January 2002 until at least February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

206.    Takada worked for Yazaki Corporation from September 2003 until at least February 2010, during part of which time he worked in the United States, for Yazaki Corporation's American subsidiary, Yazaki North America.

### 3.     Plea Agreement of Fujikura, Inc.

207.     On April 23, 2012, Fujikura, Inc. agreed to plead guilty to participating in the conspiracy to fix prices, rig bids and allocate supply with regard to Automotive Wire Harness Systems,[6] between January 2006 and February 2010.

208.     Like Furukawa Electric and Yazaki Corporation, Fujikura Inc. admitted to agreeing with its co-conspirators on "on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere," "to allocate the supply of automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis" and to "coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere."

209.     Fujikura, Inc. agreed to pay a fine of $20 million for its anticompetitive conduct.

### 4.     Plea Agreement of G.S. Electech, Inc.

210.     On April 3, 2012, G.S. Electech Inc. agreed to plead guilty to "participat[ing] in a combination and conspiracy to suppress and eliminate competition in the automotive industry by agreeing to rig bids for, and to fix stabilize, and maintain the prices of, speed sensor wire assemblies sold to an automobile manufacturer in the United States and elsewhere."

211.     Speed sensor wire assemblies are installed on vehicles with antilock brake systems ("ABS").  Their function is to connect a sensor on each tire of the vehicle to the ABS and carry electrical signals from those sensors to the ABS to alert it as to when to engage.  Speed sensor wire assemblies comprise the ABS/Speed sensor wire harness, a portion of the Automotive Wire Harness System.

---

[6] In the Fujikura Inc. Information "related products" are defined as cable bond, automotive wiring connectors, automotive wiring terminations and fuse boxes.

212.    G.S. Electech Inc. admitted to agreeing during meetings, conversations and communications to rig bids, fix prices and price quotations, and allocate the supply of speed sensor wire assemblies on a model-by-model basis between January 2003 and February 2010, to an automobile manufacturer in the United States and elsewhere.

213.    G.S. Electech Inc. agreed to $2.75 million for its violations.

## G.    Damage to Plaintiffs and Other Automobile Dealers Caused by Defendants' Illegal Activities

214.    The impact of Defendants' conspiracy on Plaintiffs' businesses was substantial. Analysis of automobile dealer profit margins and other data indicates that automobile dealers were substantially injured by higher but for prices regardless of the pass on of some portion of such prices to end users.

215.    Given the nature of their business, Plaintiffs and similarly situated automobile dealers had to and did absorb a significant portion of the overcharges that they paid due to Defendants' illegal activities.  Plaintiffs and similarly situated automobile dealers did not "pass on" all of the overcharges or higher but for prices caused by Defendants' illegal activities.

216.    Plaintiffs have standing, and have suffered damage, in the states where they reside, compensable by indirect purchaser laws, and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy and unlawful and unfair trade practices.

## Class Action Allegations

217.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All automobile dealers that, during the period January 1, 2000 to September 30, 2011,
a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator
from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

218.   Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

state antitrust, unfair competition, and consumer protection laws on behalf of the following class

(the "Damages Class"):

All automobile dealers that, during the period January 1, 2000 to September 30, 2011, in states (as listed herein) having laws permitting recovery of damages by indirect purchasers,
a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator
from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

219.   Alternatively, Plaintiffs bring Damages Classes on behalf of all persons similarly

situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state

statute(s), on behalf of all members of the following classes (collectively, the "State Classes"),

referred to together with the Damages Class as " Damages Classes":

(a)   **Arizona**:  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(b)  **Arkansas**: All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator.

(c)  **California:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(d)  **District of Columbia:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(e) **Florida:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(f) **Hawaii:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(g) **Illinois:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(h)     **Iowa:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(i)     **Kansas:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(j)     **Maine:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(k)  **Massachusetts:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(l)  **Michigan:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(m)  **Minnesota:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(n)  **Mississippi:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(o)   **Missouri:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(p)   **Montana:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(q)   **Nebraska:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator.

(r)      **Nevada:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator, or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(s)      **New Hampshire:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(t)      **New Mexico:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(u)   **New York:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(v)   **North Carolina:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(w)   **North Dakota:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(x)　　**Oregon:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

　　a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
　　b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

　　from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(y)　　**South Carolina:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

　　a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
　　b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

　　from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(z)　　**South Dakota:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

　　a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
　　b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

　　from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(aa)　　**Tennessee:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(bb)    **Utah:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(cc)    **Vermont:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(dd)    **West Virginia:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(ee)   **Wisconsin:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

220.    The Nationwide Class and the Damages Classes are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Wire Harness Systems directly from Defendants.

221.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class.

222.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the

69

prices of or rig bids for Automotive Wire Harness Systems sold in the
United States;

b)      Whether Defendants and their co-conspirators agreed to allocate the supply
of Automotive Wire Harness Systems sold in the United States on a
model-by-model basis;

c)      The identity of the participants of the alleged conspiracy;

d)      The duration of the alleged conspiracy and the acts carried out by
Defendants and their co-conspirators in furtherance of the conspiracy;

e)      Whether the conspiracy violated the Sherman Act, as alleged in Count I;

f)      Whether the conspiracy violated state antitrust and unfair competition
laws, as alleged in Count II;

g)      Whether Defendants unjustly enriched themselves to the detriment of the
Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and
the members of the Damages Classes to disgorgement of all benefits
derived by Defendants, as alleged in Count III;

h)      Whether the conduct of Defendants and their co-conspirators, as alleged in
this Complaint, caused injury to the business or property of Plaintiffs and
the members of the Classes;

i)      The effect of the conspiracy on the prices of Automotive Wire Harness
Systems sold in the United States during the Class Period;

j)      Whether the Defendants and their co-conspirators fraudulently concealed
the conspiracy's existence from the Plaintiffs and the members of the
Classes;

k)      The appropriate injunctive and related equitable relief for the Nationwide
Class; and

l)      The appropriate class-wide measure of damages for the Damages Classes.

223.    Plaintiffs' claims are typical of the claims of the members of the Classes, and

Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members

of the Classes are similarly affected by Defendants' wrongful conduct in that they paid

artificially inflated prices for Automotive Wire Harness Systems and vehicles containing

Automotive Wire Harness Systems purchased from firms who purchased Automotive Wire Harness Systems from Defendants or their co-conspirators.

224.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

225.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

226.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other reasons, such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including the provision to injured entities and persons of a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

227.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### Plaintiffs and the Classes Suffered Antitrust Injury

228.    Defendants' price-fixing conspiracy had the following effects, among others:

a)      Price competition has been restrained or eliminated with respect to Automotive Wire Harness Systems;

71

b)      The prices of Automotive Wire Harness Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

c)      Entities purchasing Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems from auto manufacturers have been deprived of free and open competition.

229.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Wire Harness Systems.

230.    The market for Automotive Wire Harness Systems and the market for vehicles are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market.  Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems.  As Lear Corporation stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

231.    Automotive Wire Harness Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Automotive Wire Harness Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Wire Harness Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

232.    By reason of the alleged violations of the antitrust laws and unlawful and unfair trade practices, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Wire Harness Systems or vehicles

containing Automotive Wire Harness Systems (in states including all of the states having laws permitting recovery of damages by indirect purchasers as listed *supra*,) than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs have suffered damages in an amount presently undetermined.  This is demonstrated by the fact, among others, that during the conspiracy, (since 2000) auto dealers' gross profits on new car sales declined sharply.  Plaintiffs' injuries are antitrust injuries of the type that the antitrust laws were meant to punish and prevent.

233.    The alleged conspiracy inflated, fixed and stabilized the prices of Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems and restrained competition in the United States, including in all of the states having laws permitting recovery of damages by indirect purchasers, as listed *supra*, and therefore had substantial effects on the commerce of the United States, including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *supra*.

## Fraudulent Concealment

234.    Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until February 2010, at the earliest, when the EC raids were first publicly reported.

235.    Because Defendants' agreements, understandings and conspiracies were kept secret until February 2010, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct before that time, and they did not know until February 2010 that they were paying supra-competitive prices for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems, throughout the United States, during the Class Period.

236.     The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

237.     By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems are not exempt from antitrust regulation, and thus, before February 2010, Plaintiffs reasonably considered the Automotive Harness Systems industry to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices for Automotive Wire Harness Systems before February 2010.

238.     As explained in the informations filed against several of the Defendants, the conspirators concealed their activities from the authorities by using code names and arranging meetings at private residences and remote locations.

239.     Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy and combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination and conspiracy.

240.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, including through fraudulent misrepresentations, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until February 2010, when reports of the investigations

into anti-competitive conduct concerning Automotive Wire Harness Systems were first publicly disseminated.

241.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## Count I
## Violation of Section 1 of the Sherman Act
## (on behalf of Plaintiffs and the Nationwide Class)

242.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

243.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

244.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

245.    At least as early as January 2000, and continuing through at least September 30, 2011, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to rig bids for and to artificially fix, raise, stabilize and control prices for Automotive Wire Harness Systems thereby creating anticompetitive effects.

246.    The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harness Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout the United States.

247.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harness Systems.

248.    As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs and other similarly situated members of the Nationwide Class who purchased Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems from firms who purchased Automotive Wire Harness Systems from Defendants or their co-conspirators have been harmed by being forced to pay inflated, supra-competitive prices for such products.

249.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and courses of conduct set forth herein.

250.    Defendants' conspiracy had the following effects, among others:

a)    Price competition in the market for Automotive Wire Harness Systems has been restrained, suppressed and/or eliminated in the United States;

b)    Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c)    Plaintiffs and members of the Nationwide Class who purchased Automotive Wire Harness Systems, or vehicles containing Automotive Wire Harness Systems from firms who purchased Automotive Wire Harness Systems from Defendants and their co-conspirators have been deprived of the benefits of free and open competition and have been forced to pay artificially inflated prices for such products.

251.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems purchased from firms who purchased such Automotive Wire Harness Systems from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

252.    The alleged contract, combination, or conspiracy is *a per se* violation of the federal antitrust laws.

253.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, pursuant to 15 U.S.C. §26, preventing and restraining the violations alleged herein.

## Count II
## Violation of State Antitrust and Consumer Protection Statutes
## (on behalf of Plaintiffs and the Damages Classes)

254.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

255.    From as early as January 2000 through at least September 30, 2011, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harness Systems in an unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

256.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supra-competitive prices for Automotive Wire Harness Systems and to allocate customers for Automotive Wire Harness Systems in the United States.

257.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

        a)    Participating in meetings and conversations among themselves during which they agreed to price Automotive Wire Harness Systems at certain levels and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Classes with respect to Automotive Wire Harness Systems sold in the United States;

        b)    Allocating customers and markets and rigging bids for Automotive Wire Harness Systems in the United States in furtherance of their agreements; and

      c)      Participating in meetings and conversations among themselves to implement, adhere to and police the unlawful agreements they reached.

258.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices, to rig bids and to allocate customers with respect to Automotive Wire Harness Systems.

259.    The anti-competitive acts were intentionally directed at the market for Automotive Wire Harness Systems in all states allowing indirect purchasers to collect damages, as listed *infra*, and had a substantial and foreseeable effect on intrastate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout those states.

260.    Defendants' anticompetitive, unfair acts described above were knowing, willful and constitute violations or flagrant violations of the below-listed state antitrust and consumer protection statutes.

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

262.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-107(a)(10).

263.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.* and §§ 17200 *et seq.*

264.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

265.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

266.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

267.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

268.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

269.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

270.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

271.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Gen. Laws, Ch 93 A, § II.  Leoni Wire, Inc., the Defendant that has its place of business in Massachusetts was served with a demand letter 30 days prior to the filing of this Complaint.

272.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws §§ 445.771, *et seq.*

273.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

274.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

275.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Missouri Statutes Annotated, V.A.M.S. §§ 407.010, *et seq.*

276.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

278.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

279.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

280.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

281.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

282.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

283.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

284.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705*, et seq.*

285.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

286.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

287.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

288.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

289.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Statutes Annotated §§ 2453, *et seq.*

290.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

291.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

292.    Plaintiffs and members of the Damages Classes in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Classes have paid more for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from Defendants' unlawful conduct.

293.    Defendants' violations of the above-listed state laws have proximately caused the injuries sustained by Plaintiffs and the members of the Damages Classes.

294.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Classes.

295.    Accordingly, Plaintiffs and the members of the Damages Classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust or consumer protection law,

and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### Count III
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Classes)

296.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

297.    As a result of their unlawful conduct described above, Defendants have been and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Wire Harness Systems.

298.    Defendants have benefited from their unlawful acts, at the expense of Plaintiffs and the Damages Classes, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Classes for Automotive Wire Harness Systems and vehicles containing Automotive Harness Systems.   The amounts of such overpayments lawfully belong to Plaintiffs and the Damages Classes.

299.    Plaintiffs and the members of the Damages Classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiffs and the members of the Damages Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Classes may make claims on a pro rata basis.

300.    Pursuit of any remedies against the OEMs from whom Plaintiffs and the Class members purchased vehicles containing Automotive Wire Harness Systems and Automotive Wire

Harness Systems subject to Defendants' conspiracy would have been futile, given that the OEMs did not take part in Defendants' conspiracy.

## Prayer for Relief

Accordingly, Plaintiffs respectfully request that:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.      That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed:

1.      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

2.      A *per se* violation of Section 1 of the Sherman Act;

3.      An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

4.      Acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand trial by jury.

Dated this 14th day of May, 2012.

By    /s/ Gerard V. Mantese
Gerard V. Mantese (Michigan Bar No.
P34424)
David Hansma (Michigan Bar No. P71056)
Brendan Frey (Michigan Bar No. P70893)
Joshua Lushnat (Michigan Bar No. P75319)
Mantese Honigman Rossman
 and Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Phone: (248) 457-9200 ext. 203
Fax: (248) 457-9201
Email: gmantese@manteselaw.com
        dhansma@manteselaw.com
        bfrey@manteselaw.com
        jlushnat@manteselaw.com

Don Barrett
David McMullan
Brian Herrington
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
Email: dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Dewitt Lovelace
Alex Peet
Lovelace Law Firm, P.A.
12870 US Hwy 98 West, Ste. 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Email: dml@lovelacelaw.com
alex@lovelacelaw.com

Richard Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road. Ste. 1011
Oxford, Mississippi 38655
Phone:(662) 380-5018
Fax:   (866) 430-5459
Email:  rrb@rrblawfirm.net

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
Email: phillip@duncanfirm.com
richard@duncanfirm.com

George A. Barton
Stacey Burrows
Law Offices of George A. Barton, P.C.
4435 Main St.
Suite 920
One Main Plaza
Kansas City, MO

Jonathan W. Cuneo
Victoria Romanenko
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Phone:  (202) 789-3960
Fax: (202) 789-1813
Email: jonc@cuneolaw.com
Vicky@cuneolaw.com

Shawn M. Raiter
Paul A. Sand
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
Email: sraiter@larsonking.com
psand@larsonking.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
Email: tomthrash@sbcglobal.net

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
Email: charles@cfbfirm.com

Joel Davidow
Daniel Cohen
Cuneo Gilbert & LaDuca, LLP
Bethesda, Maryland
8120 Woodmont Ave
Suite 810
Bethesda, MD 20814
Phone: (202) 789-3960
Email: joel@cuneolaw.com

64111
Phone: (816) 300-6253
Fax: (816) 300-6259
Email: gab@georgebartonlaw.com
stacy@georgebartonlaw.com


*Additional Counsel for Dale Martens Nissan
Subaru, Inc., Green Team of Clay Center, Inc.
and Herb Hallman Chevrolet, Inc. d/b/a
Champion Chevrolet*

danielc@cuneolaw.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker Boulevard
Suite 801
St. Louis, MO 63101
Phone: (202) 789-3960
Fax: (202) 789-1813
Email: mflannery@cuneolaw.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
Email: greg@gjohnsonlegal.com

*Attorneys for Plaintiffs and Proposed Class*