# EXHIBIT 1



**LEGAL LANGUAGE SERVICES**

A division of ALS International
8014 State Line Road
Suite 110
Leawood, KS 66208-3712

Telephone (913) 341-3167
Toll Free (800) 755-5775
Telefax (913) 341-3168
www.legallanguage.com

May 11, 2012
*11. Mai 2012*

**Certification:**
*Bestätigung:*

**This is to certify that the attached translation from English into German is an accurate representation of the document received by this office. This document is designated as:**
*Hiermit wird bestätigt, daß die beigefügte Übersetzung aus der englischen in die deutsche Sprache eine genaue Wiedergabe des von diesem Büro erhaltenen Schriftstücks ist. Das Schriftstück ist wie folgt bezeichnet:*

**Consolidated Amended Class Action Complaint**
*Zusammengelegte Geänderte Gruppenklage*

**I, Maria Victoria Portuguez, General Manager of this company, hereby certify that Domenic Saller, who translated this document, is fluent in German and standard North American English and qualified to translate. I attest to the following:**
*Ich, Maria Victoria Portuguez, Hauptgeschäftsführer/Hauptgeschäftsführerin von dieser Gesellschaft, hiermit bescheinige dass Domenic Saller, der/die dieses Schriftstück übersetzt hat, ist fließend in den deutschen und englischen Sprachen und qualifiziert für Übersetzungen. Ich attestiere das Folgende:*

**"To the best of my knowledge, the accompanying text is a true, full and accurate translation of the specified document."**
*"Nach meinem besten Wissen ist der beiliegende Text eine wahre, vollständige und genaue Übersetzung des angeführten Schriftstücks."*


**Signature of Maria Victoria Portuguez**
*Unterschrift von Maria Victoria Portuguez*

**Subscribed and sworn to before me this May 11, 2012.**
*Vor mir unterzeichnet und beeidigt am 11. Mai 2012.*

**Vicki Farron**
**Notary Public, State of Kansas**
**Qualified in Johnson County**
**Commission Expires December 9, 2012**
*Vicki Farron*
*Öffentlicher Notar des Staates Kansas*
*Qualifiziert in Bezirk Johnson*
*Ermächtigung läuft am 9.dezember 2012 ab*

VICKI FARRON
NOTARY
My Appt. Expires
12/9/12
PUBLIC
STATE OF KANSAS

**Sincerely,**
*Hochachtungsvoll,*

**Victor J. Hertz**
**President**/*Präsident*

BEZIRKSGERICHT DER VEREINIGTEN STAATEN
FÜR DEN BEZIRK MICHIGAN-OST
SÜDLICHER KREIS

| | |
|---|---|
| BETR. KARTELLRECHTLICHES VERFAHREN BEZÜGLICH FAHRZEUG-KABELSYSTEMEN | : Bestands-Akte Nr. 12:md-02311 : : : : : |
| DIESER SCHRIFTSATZ BETRIFFT: Alle Verfahren zu Direktabnehmern | : : : : |

## ZUSAMMENGELEGTE GEÄNDERTE GRUPPENKLAGE

## ZUSAMMENFASSUNG DES FALLS

1.      Die Kläger, in eigenem Namen und für die nachstehend beschriebene Gruppe, strengen diese Gruppenklage gegen die Beklagten auf Schadensersatz und Unterlassungsanspruch gemäß den Antikartellgesetzen der Vereinigten Staaten für Direktabnehmer an, die während der Gruppenklagefrist Kabelsystem-Produkte, wie im Folgenden definiert, in den Vereinigten Staaten von einer oder mehreren der Beklagten kauften.  Die Beklagten sind Hersteller oder Verkäufer von Kabelsystem-Produkten, die in den Vereinigten Staaten hergestellt oder verkauft werden.

2.      Die Kläger behaupten, dass die Beklagten sich zur Angebotsabsprache und zur Anhebung, Absprache, Aufrechterhaltung oder Stabilisierung der Preise für in den Vereinigten Staaten verkauften Kabelsystem-Produkten im Zeitraum ab mindestens bereits 1. Januar 2000 bis mindestens 28. Februar 2010 unter Verletzung des Paragraph 1 des Sherman-Kartellgesetzes verschworen haben.  Die Kläger behaupten ferner, dass die Beklagten ihre Verschwörung auf arglistige Weise verschwiegen haben.

3.    Als Folge des rechtswidrigen Verhaltens der Beklagten zahlten die Kläger und Mitglieder der Gruppe höhere Preise für Kabelsystem-Produkte, als sie auf einem wettbewerbsorientierten Markt gezahlt hätten.

## ZUSTÄNDIGKEIT UND GERICHTSSTAND

4.    Die Kläger strengen diese Klage an, um einen Unterlassungsanspruch und Schadensersatz, einschließlich Schadensersatz in dreifacher Höhe, die Erstattung der Prozesskosten und die Erstattung angemessener Awaltskosten zu erwirken, und zwar in Folge der Verstöße der Beklagten gegen Paragraph 1 des Sherman-Kartellgesetzes, 15 U.S.C. § 1.

5.    Dieses Gericht ist gemäß den Paragraphen 4(a) und 16 des Clayton Act, 15 U.S.C. §§ 15 und 26, und 28 U.S.C. §§ 1331 und 1337, für den Gegenstand dieser Klage zuständig. Der Gerichtsstand liegt ordnungsgemäß nach Paragraph 12 des Clayton Act, 15 U.S.C. § 22, und 28 U.S.C. § 1391(b), (c) und (d) in diesem Bezirk, weil ein erheblicher Teil der Vorfälle, die Anlass zu den Forderungen der Kläger gaben, sich in diesem Bezirk ereignet haben, weil ein erheblicher Teil des betroffenen zwischenstaatlichen Handelsverkehrs und Handels in diesem Bezirk abgewickelt wurde und weil eine oder mehrere der Beklagten in diesem Bezirk ansässig sind.

6.    Dieses Gericht hat die Zuständigkeit für eine Klage gegen *eine Person* für jede einzelne Beklagte, weil jede Beklagte entweder direkt oder durch Besitz oder Kontrolle ihrer US-amerikanischen Tochtergesellschaften: (a) Geschäfte in den Vereinigten Staaten, einschließlich in diesem Bezirk, abwickelte; (b) direkt oder indirekt erhebliche Mengen an Kabelsystem-Produkten in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, verkaufte bzw. vermarktete; (c) erhebliche Gesamtkontakte mit den Vereinigten Staaten insgesamt einschließlich in diesem Bezirk, unterhielt; oder (d) an einer gesetzwidrigen Verschwörung zur Preisabsprache beteiligt war, die sich gegen die Unternehmen oder das Eigentum von Personen und

Organisationen richtete, die in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, ansässig, angesiedelt oder dort geschäftstätig waren, und eine direkte, erhebliche, nach vernünftigem Ermessen vorhersehbare und beabsichtigte nachteilige Wirkung hatte, die diese schädigte.  Die Beklagten sind in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, geschäftstätig und haben sich die Gesetze der Vereinigten Staaten gezielt zunutze gemacht.

7.      Die Beklagten befleißigten sich innerhalb und außerhalb der Vereinigten Staaten eines Verhaltens, das eine direkte, erhebliche und nach vernünftigem Ermessen vorhersehbare und beabsichtigte wettbewerbsfeindliche Wirkung auf den zwischenstaatlichen Handel innerhalb der Vereinigten Staaten verursachte.

8.      Hilfsweise gilt gerichtliche Zuständigkeit über ausländische Beklagte gemäß Bundeszivilprozessordnung bzw. Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONEN

9.      Die "Gruppenklagefrist" reicht von 1. Januar 2000 bis heute.

10.     Der Begriff "Kabelsystem-Produkte", wie in dieser Klage verwendet, bezieht sich auf Kabelsysteme und die folgenden verwandten Produkte:  elektrische Leitungen für Fahrzeuge, Zuleitungsdrahtverbindungen, Kabelbonding, Autokabelverbinder, Autokabelanschlüsse, Hochspannungskabel, elektronische Steuereinheiten, Sicherungskästen, Relaisboxen, Klemmenblöcke und Stromverteiler, die in Kraftfahrzeugen verwendet werden.

11.     Kabelsysteme sind elektrische Verteilungssysteme, verwendet zur Steuerung und Kontrolle elektronischer Komponenten, Kabel und Leiterplatten in Kraftfahrzeugen.

12.     "Beklagte" oder "Beklagten", wie hierin verwendet, schließt alle Rechtsvorgänger der genannten Beklagten während der Gruppenklagefrist mit ein.

## HANDELSVERKEHR UND HANDEL

13.     Während der Gruppenklagefrist verkaufte jede Beklagte Kabelsystem-Produkte in den Vereinigten Staaten, in einem fortlaufenden und ununterbrochenen Fluss des zwischenstaatlichen Handels.

14.     Während der Gruppenklagefrist kontollierten die Beklagten kollektiv einen Großteil des Marktes für Kabelsystem-Produkte, sowohl weltweit als auch in den Vereinigten Staaten.

15.     Die geschäftlichen Aktivitäten der Beklagten hatten erhebliche Auswirkung auf den zwischenstaatlichen Handel und Handelsverkehr in den Vereinigten Staaten.

## DIE PARTEIEN

### Kläger

16.     Die Klägerin Mexican Industries in Michigan, Inc., durch und über Timothy Miller, ihrem Konkursverwalter ("Mexican Industries"), ist eine Gesellschaft in Michigan mit ihrem Hauptsitz in Detroit, Michigan.  Die Klägerin Mexican Industries kaufte Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten während der Gruppenklagefrist.

17.     Der Kläger Paesano Connecting Systems, Inc. ("Paesano") ist eine Gesellschaft in Pennsylvania mit ihrem Hauptsitz in Ridgway, Pennsylvania.  Der Kläger Paesano kaufte Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten während der Gruppenklagefrist.

4

18.     Der Kläger Craft-Co Enterprises, Inc. ("Craft-Co") ist eine Gesellschaft in Mississippi mit ihrem Hauptsitz in Brandon, Mississippi. Der Kläger Craft-Co kaufte Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten während der Gruppenklagefrist.

19.     Der Kläger Findlay Industries, Inc. ("Findlay") ist eine Gesellschaft in Ohio mit ihrem Hauptsitz in Findlay, Ohio. Der Kläger Findlay kaufte Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten während der Gruppenklagefrist.

20.     Der Kläger Cesar-Scott, Inc. ("Cesar-Scott") ist eine Gesellschaft in Texas mit ihrem Hauptsitz in El Paso, Texas. Der Kläger Cesar-Scott kaufte Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten während der Gruppenklagefrist.

21.     Der Kläger Martinez Manufacturing, Inc. ("Martinez") ist eine Gesellschaft in Illinois mit ihrem Hauptsitz in Cary, Illinois. Der Kläger Martinez kaufte Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten während der Gruppenklagefrist.

22.     Der Kläger South Star Corporation ("South Star") ist eine Gesellschaft in Virginia mit ihrem Hauptsitz in Elliston, Virginia. Der Kläger South Star kaufte Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten während der Gruppenklagefrist.

**Die Beklagten Delphi**

23.　　Die Beklagte Delphi Automotive LLP ist eine Handelsgesellschaft, die nach dem Recht von England und Wales organisiert ist. Sie wurde 2009 gegründet, um Vermögen von der in Troy, Michigan, ansässigen Delphi Corporation zu kaufen, die 2005 um Konkursschutz ersucht hatte. Die Beklagte Delphi Automotive LLP produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

24.　　Die Beklagte Delphi Automotive Systems, LLC ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in Troy, Michigan. Sie ist eine Tochtergesellschaft von und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Delphi Automotive LLP. Leitende Angestellte der Beklagten Delphi Automotive LLP arbeiten im Büro der Beklagten Delphi Automotive Systems, LLC in Michigan. Die Beklagte Delphi Automotive Systems, LLC produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

25.　　Die Beklagte DPH Holdings Corporation (früher: Delphi Corporation) ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in Warren, Ohio. Sie ist eine Tochtergesellschaft und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Delphi Automotive LLP. Die Beklagte DPH Holdings Corporation produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

26.     Die Beklagte Delphi Furukawa Wiring Systems LLC ist eine Gesellschaft mit beschränkter Haftung, die 2004 als ein Joint Venture zwischen Delphi Corporation und Furukawa Electric Co., Ltd. gegründet wurde, mit ihrem Hauptsitz in Ann Arbor, Michigan. Delphi Furukawa Wiring Systems LLC produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

27.     Die Beklagten Delphi Automotive LLP, Delphi Automotive Systems, LLC, DPH Holdings Corporation und Delphi Furukawa Wiring Systems LLC sollen hierin zusammenfassend als die „Beklagten Delphi" bzw. „Delphi" bezeichnet werden.

**Die Beklagten Denso**

28.     Die Beklagte Denso Corporation ist ein japanisches Unternehmen. Die Beklagte Denso Corporation produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

29.     Die Beklagte Denso International America, Inc. ist ein Unternehmen in Delaware mit ihrem Hauptsitz in Southfield, Michigan. Sie ist eine Tochtergesellschaft und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Denso Corporation. Die Beklagte Denso International America, Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Denso Corporation.

7

30.     Die Beklagte Asmo Co. Ltd. ("Asmo") ist ein japanisches Unternehmen mit Hauptsitz in Japan. Asmo ist eine Tochtergesellschaft im hundertprozentigen Besitz und unter der Kontrolle der Beklagten Denso Corporation. Die Beklagte Asmo produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Denso Corporation·

31.     Die Beklagten Denso Corporation, Denso International America, Inc. und Asmo Co., Ltd. werden hierin zusammenfassend als die „Beklagten Denso" bzw. „Denso" bezeichnet.

**Die Beklagten Fujikura**

32.     Die Beklagte Fujikura Ltd. ist ein japanisches Unternehmen.  Die Beklagte Fujikura Ltd. produzierte, vermarktete oder verkaufte  – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

33.     Die Beklagte Fujikura America, Inc. ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in Atlanta, Georgia.  Sie ist eine Tochtergesellschaft von und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Fujikura Ltd.  Die Beklagte Fujikura America, Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.  Ihre Aktivitäten in den

Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Fujikura Ltd.

34.     Die Beklagten Fujikura Ltd. und Fujikura America, Inc. sollen hierin zusammenfassend als die „Beklagten Fujikura" bzw. „Fujikura" bezeichnet werden.

### Die Beklagten Furukawa

35.     Die Beklagte Furukawa Electric Co., Ltd. ist ein japanisches Unternehmen.  Die Beklagte Furukawa Electric Co., Ltd. produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

36.     Die Beklagte American Furukawa, Inc. ist eine Gesellschaft in Delaware mit Hauptsitz in Plymouth, Michigan.  Sie ist eine Tochtergesellschaft von und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Furukawa Electric Co. Ltd.  Die Beklagte American Furukawa, Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter Kontrolle und Leitung von Furukawa Electric Co., Ltd.

37.     Die Beklagte Furukawa Wiring Systems America, Inc., früher Furukawa Lear Corporation und Lear Furukawa Corporation, ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in El Paso, Texas. Die Beklagte Furukawa Wiring Systems America, Inc. ist zu 60% im Besitz von Furukawa Electric Co., Ltd. und zu 40% im Besitz von American Furukawa, Inc.  Während der Gruppenklagefrist war Furukawa Wiring

Systems America, Inc. als Joint Venture zwischen Lear Corporation und Furukawa Electric Co., Ltd. tätig, das Kabelsystem-Produkte produzierte, vertrieb oder verkaufte, die in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Im Juni 2010 erwarb Furukawa Electric Co., Ltd. sämtliche verbleibenden Anteile von der Lear's Corporation.

38.     Die Beklagten Furukawa Electric Co., Ltd., American Furukawa, Inc. und Furukawa Wiring Systems America, Inc. sollen hierin zusammenfassend als die „Beklagten Furukawa" bzw. „Furukawa" bezeichnet werden.

**Die Beklagten Lear**

39.     Die Beklagte Lear Corporation ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in Southfield, Michigan. Die Beklagte Lear Corporation produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

40.     Die Beklagte Kyungshin-Lear Sales and Engineering, LLC ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in Selma, Alabama. Sie ist ein Joint Venture zwischen der Beklagten Lear Corporation und der Kyungshin Corporation aus Südkorea. Die Beklagte Kyungshin-Lear Sales and Engineering, LLC produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

41.     Die Beklagten Lear Corporation und Kyungshin-Lear Sales and Engineering, LLC werden hierin zusammenfassend als die „Beklagten Lear" bzw. „Lear" bezeichnet.

42.     Am 7. Juli 2009 beantragte Lear Konkursschutz gemäß Chapter 11. Nach Abschluss des Konkursverfahrens gemäß Chapter 11 am 9. November 2009 verkaufte Lear weiterhin Kabelsystem-Produkte gemäß und im Rahmen ihrer Teilnahme zur Förderung der Verschwörung.  Ab November 2009 und danach tätigte Lear beachtliche Verkäufe von Kabelsystem-Produkten in den Vereinigten Staaten zu Preisen weit über dem wettbewerbsfähigen Niveau. Allein im Jahr 2010 verzeichnete Lear Gesamtumsätze in Höhe von 2,56 Milliarden US$ bei ihren Elektro- und Steuerungssystemen, wobei dies erhebliche Umsätze aus Kabelsystem-Produkten in den Vereinigten Staaten gemäß der Verschwörung umfasst.

**Die Beklagten Leoni**

43.     Die Beklagte Leoni AG ist ein deutsches Unternehmen.  Die Beklagte Leoni AG produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

44.     Die Beklagte Leoni Wiring Systems, Inc. ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in Tucson, Arizona.  Sie ist eine Tochtergesellschaft von und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Leoni AG.  Die Beklagte Leoni Wiring Systems Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.  Ihre Aktivitäten in den

11

Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Leoni AG.

45. Die Beklagte Leonische Holding, Inc. ist eine Gesellschaft in Delaware mit Hauptsitz in Tucson, Arizona. Sie ist eine Tochtergesellschaft von und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Leoni AG. Die Beklagte Leonische Holding, Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Leoni AG.

46. Die Beklagte Leoni Kabel GmbH ist ein deutsches Unternehmen. Die Beklagte Leoni Kabel GmbH produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

47. Die Beklagte Leoni Wire Inc. ist ein Unternehmen in Massachusetts mit ihrem Hauptsitz in Chicopee, Massachusetts. Leoni Wire Inc. ist eine Tochtergesellschaft in hundertprozentigem Besitz und unter Kontrolle der Beklagten Leoni AG. Die Beklagte Leoni Wire Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Leoni AG.

48.     Die Beklagten Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding, Inc., Leoni Kabel GmbH und Leoni Wire Inc. sollen hierin zusammenfassend als die „Beklagten Leoni" bzw. „Leoni" bezeichnet werden.

**Die Beklagten Sumitomo**

49.     Die Beklagte Sumitomo Electric Industries, Ltd. ist ein japanisches Unternehmen.  Die Beklagte Sumitomo Electric Industries, Ltd. produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

50.     Die Beklagte Sumitomo Wiring Systems, Ltd. ist ein japanisches Unternehmen. Die Beklagte Sumitomo Wiring Systems, Ltd. produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

51.     Die Beklagte Sumitomo Electric Wiring Systems, Inc. ist eine Gesellschaft in Delaware mit Hauptsitz in Bowling Green, Kentucky.  Sie ist ein Joint Venture zwischen den Beklagten Sumitomo Electric Industries, Ltd. und Sumitomo Wiring Systems, Ltd.  Die Beklagte Sumitomo Electric Wiring Systems, Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.  Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der

13

Kontrolle und Leitung von Sumitomo Electric Industries, Ltd. und Sumitomo Wiring Systems, Ltd.

52.     Die Beklagte K&S Wiring Systems, Inc. ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in La Vergne, Tennessee.  Sie ist eine Tochtergesellschaft von und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Sumitomo Electric Industries, Ltd.  Die Beklagte K&S Wiring Systems, Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.  Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Sumitomo Electric Industries, Ltd.

53.     Die Beklagte Sumitomo Wiring Systems (U.S.A.) Inc. ist ein Unternehmen in Michigan mit Hauptsitz in Novi, Michigan.  Sie ist ein Joint Venture zwischen den Beklagten Sumitomo Electric Industries, Ltd. und Sumitomo Wiring Systems, Ltd.  Die Beklagte Sumitomo Wiring Systems (U.S.A.) Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.  Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Sumitomo Electric Industries, Ltd. und Sumitomo Wiring Systems, Ltd.

54.     Die Beklagte Sumitomo Electric Wintec America, Inc. ist ein Unternehmen in Kentucky mit Hauptsitz in Edmonton, Kentucky. Sumitomo Electric Wintec America, Inc. ist eine Tochtergesellschaft im hundertprozentigen Besitz und unter der Kontrolle der Beklagten Sumitomo Electric Industries, Ltd.  Die Beklagte Sumitomo

14

Electric Wintec America, Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Sumitomo Electric Industries, Ltd.

55. Die Beklagten Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., Sumitomo Wiring Systems (U.S.A.) Inc., und Sumitomo Electric Wintec America, Inc. sollen hierin zusammenfassend als die „Beklagten Sumitomo" bzw. „Sumitomo" bezeichnet werden.

**Die Beklagten Yazaki**

56. Die Beklagte Yazaki Corporation ist ein japanisches Unternehmen. Die Beklagte Yazaki Corporation produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen – Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

57. Die Beklagte Yazaki North America, Inc. ist ein Unternehmen in Illinois mit Hauptsitz in Canton Township, Michigan. Sie ist eine Tochtergesellschaft von und steht im hundertprozentigen Besitz oder unter der Kontrolle ihrer Muttergesellschaft, Yazaki Corporation. Die Beklagte Yazaki North America Inc. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden. Ihre

Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Yazaki Corporation.

58.     Die Beklagte S-Y Systems Technologies Europe GmbH ist ein deutsches Unternehmen.  S-Y Systems Technologies Europe GmbH wurde als ein Joint Venture zwischen Siemens und Yazaki Corporation gegründet.  Die Beklagte S-Y Systems Europe GmbH produzierte, vermarktete oder verkaufte – direkt oder durch ihre Tochtergesellschaften, die in ihrem hundertprozentigen Besitz oder unter ihrer Kontrolle standen –  Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

59.     Die Beklagte S-Y Systems Technologies America, LLC ist eine Gesellschaft in Delaware mit ihrem Hauptsitz in Dearborn, Michigan.  Sie ist derzeit eine hundertprozentige Tochtergesellschaft im Besitz oder unter der Kontrolle ihrer Muttergesellschaft, der Beklagten Yazaki Corporation, wovor sie jedoch ein Joint Venture zwischen Siemens VDO Automotive AG und Yazaki Corporation gewesen war. Die Beklagte S-Y Systems Technologies America, LLC, produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.  Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Siemens und Yazaki Corporation oder ihrer derzeitigen japanischen Muttergesellschaft, Yazaki Corporation.

60.     Yazaki Corporation, Yazaki North America, Inc., S-Y Systems Technologies Europe GmbH und S-Y Systems Technologies America, LLC, werden hierin bezeichnet, wie sie hierin zusammenfassend als die „Beklagten Yazaki" bzw. „Yazaki" bezeichnet werden sollen.

16

**Die Beklagten Tokai Rika**

61.    Die Beklagte Tokai Rika Co., Ltd. ist ein japanisches Unternehmen. Die Beklagte Tokai Rika Co., Ltd. produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.

62.    Die Beklagte TRAM, Inc. ("TRAM") ist ein Unternehmen in Michigan mit Hauptsitz in Plymouth, Michigan.  TRAM ist eine Tochtergesellschaft in hundertprozentigem Besitz und unter der Kontrolle der Beklagten Tokai Rika Co., Ltd. Die Beklagte TRAM produzierte, vermarktete oder verkaufte Kabelsystem-Produkte, die während der Gruppenklagefrist in den gesamten Vereinigten Staaten, einschließlich in diesem Bezirk, gekauft wurden.  Ihre Aktivitäten in den Vereinigten Staaten standen während der Gruppenklagefrist unter der Kontrolle und Leitung von Tokai Rika Co., Ltd.

63.    Die Beklagten Tokai Rika Co., Ltd. und TRAM, Inc. werden hierin zusammenfassend als „Tokai Rika" bezeichnet.

## MITVERSCHWÖRER UND HANDLUNGSBEAUFTRAGTE DER BEKLAGTEN

64.    Diverse Personen oder Firmen, die hierin nicht als Beklagte genannt werden, haben sich als Mitverschwörer an den hierin zur Last gelegten widerrechtlichen Handlungen beteiligt und haben zur Förderung derselben Handlungen begangen und Erklärungen abgegeben.  Die Beklagten sind gemeinschaftlich und einzeln für die Handlungen ihrer Mitverschwörer haftbar, ungeachtet dessen, ob diese in der vorliegenden Klage namentlich als Beklagte genannt werden, oder nicht.

17

65.    Jede Beklagte handelte als Beauftragter oder Joint Venture-Partner von oder für andere Beklagte, was die von den Klägern behaupteten Handlungen, Verstöße und gemeinsamen Verhaltensweisen anbelangt.

## BEHAUPTUNGEN DER GRUPPENKLAGE

66.    Die Kläger strengen diese Klage sowohl in eigener Sache als auch für alle natürlichen und juristischen Personen in ähnlicher Situation  (die "Gruppe") gemäß der Rechtsregeln 23(a), 23(b)(2) und (b)(3) der Bundeszivilprozessordnung an.  Die Gruppe ist wie folgt definiert:

> Alle natürlichen und juristischen Personen, die im Zeitraum von 1. Januar 2000 bis heute Kabelsystem-Produkte in den Vereinigten Staaten direkt von einer oder mehreren Beklagten oder deren Mitverschwörern kauften.

67.    Den Klägern ist die exakte Anzahl an Gruppenmitgliedern unbekannt, wobei diese Information unter der ausschließlichen Kontrolle der Beklagten steht. Wegen der Art des betroffenen Handels und Handelsverkehrs nehmen die Kläger jedoch an, dass die Gruppe so zahlreich und geographisch über die gesamten Vereinigten Staaten verteilt ist, dass ein Beitritt aller Gruppenmitglieder nicht machbar ist.

68.    In Bezug auf die Gruppe bestehen gemeinsame rechtliche und faktische Fragen:

> a.    Ob die Beklagten ein Abkommen, einen Zusammenschluss bzw. eine Verschwörung zur Angebotsabsprache, Anhebung, Absprache, Aufrechterhaltung oder Stabilisierung der Preise von in den Vereinigten Staaten verkauften Kabelsystem-Produkten eingegangen sind;
>
> b.    Ob die Beklagten die Aufteilung des Angebots an Kabelsystem-Produkten, die in den Vereinigten Staaten auf Modellbasis an bestimmte Direktabnehmer verkauft wurden, vereinbart hatten;

18

c.   Ob das Verhalten der Beklagten bewirkte, dass Kabelsystem-Produkte in den Vereinigten Staaten bei künstlich überhöhten Preisen verkauft wurden;

d.   Ob die Kläger und andere Mitglieder der Gruppe durch das Verhalten der Beklagten geschädigt wurden, und, falls ja, die Festlegung des insgesamten angemessenen Schadensersatzes für Gruppenmitglieder; und

e.   Ob die Kläger und andere Mitglieder der Gruppe berechtigt sind, eine Unterlassungsverfügung zu erwirken, und, falls ja, Art und Ausmaß einer solchen Verfügung.

69.    Diese der Gruppen gemeinsamen rechtlichen und faktischen Fragen haben Vorrang vor allen Fragen, die nur einzelne Gruppenmitglieder betreffen.

70.    Die Forderungen der Kläger sind typisch für die Forderungen der Gruppe, weil die Kläger Kabelsystem-Produkte direkt von einer oder mehreren der Beklagten kauften, alle Mitglieder der Gruppe durch dieselbe, hierin behauptete Verschwörung geschädigt wurden, und das vom Kläger beantragte Begehren der Gruppe gemeinsam ist.

71.    Die Kläger werden die Interessen der Gruppe auf faire und angemessene Weise schützen, da die Kläger Direktabnehmer von Kabelsystem-Produkten sind und ihre Interessen denjenigen anderer Gruppenmitglieder nicht widersprechen. Außerdem werden die Kläger von kompetenten Anwälten vertreten, die in der Durchführung von kartellrechtlichen Verfahren, Gruppenklagen und anderen komplexen Streitverfahren erfahren sind.

72.    Die Beklagten handelten mit Vorsätzen, die die Gruppe gemeinsam betrafen, weshalb der letztliche Unterlassungsanspruch angemessen der Gruppe als Ganzes zusteht.

73.    Eine Gruppenklage ist vorrangig vor etwaigen Alternativen zur gerechten

19

und gültigen Urteilsfindung in diesem Rechtsstreit. Das Betreiben dieses Verfahrens als Gruppenklage beugt der Möglichkeit etwaiger Wiederholungsprozesse vor, und es bestehen keine verdeckten Hemmnisse zur Handhabung des Falls in Form einer Gruppenklage.

74.    Das Vorbringen separater Klagen durch einzelne Gruppenmitglieder würde die Gefahr nicht übereinstimmender oder abweichender Entscheidungen schaffen.

75.    Die Gruppe ist ferner leicht zu definieren und ist eine solche, für die wahrscheinlich Aufzeichnungen in den Akten der Beklagten und ihrer Mitverschwörer existieren.

## INDUSTRIELLER HINTERGRUND

76.    Kabelsysteme sind Systeme von elektrischen und elektronischen Kabeln, Leitungen und Anschlüssen, die zur Übertragung von Informationssignalen oder Betriebsströmen an elektronische Steuereinheiten, Leitungen, Leiterplatten und andere Bauteile in Motor- bzw. Kraftfahrzeugen (KFZ) verwendet werden.

77.    Kabelsystem-Baugruppen bestehen aus rohem, gewickelten Draht, der abgelängt und mit Klemmen versehen wird. Einzelschaltkreise werden auf einer Halterung oder Tafel zusammengebaut, in Stecker eingesetzt und mit Folie oder Klebeband umhüllt, um Kabelsystem-Baugruppen zu bilden.

78.    Kabelsysteme umfassen farbcodierte Kabel, die ausgelegt sind, um spezielle elektrische und elektronische Einrichtungen im Kraftfahrzeug zu unterstützen. Die meisten, wenn nicht alle, elektrischen und elektronischen Geräte in einem Fahrzeug brauchen ein Kabelsystem, um elektrischen Strom und die Datenübertragung für den Betrieb zu gewährleisten.

79.     Kraftfahrzeuge enthalten Massen an Kabeln, welche sich bis zu einigen Kilometern Länge addieren können. Das Leitungssystem eines Fahrzeugs ist in mehreren Kabelsystemen organisiert. Kabelsysteme sehen organisierte Anschlusspunkte für mehfache Leitungskonfigurationen vor. Die Systemarchitektur bindet Leitungen und Kabel zu einem Bündel, das Schutz vor Verschleiß oder Schaden durch Vibration, Abrieb und Feuchtigkeit bietet.

80.     Kabelsystem-Produkte werden von Herstellern in Neuwägen als Teil des Herstellungsprozess eingebaut. Außerdem werden Kabelsystem-Produkte in Fahrzeugen als Ersatz von verschlissenen, defekten oder beschädigten Teilen eingebaut.

81.     Elektrische Leitungen für Fahrzeuge bilden das Leitungsnetz, das durch das gesamte  Fahrzeug läuft.

82.     Hochspannungskabel sind integraler Bestandteil bei mit Hybrid-, Brennstoffzellen- oder Elektroantrieb ausgerüsteten Fahrzeugen.

83.     Zuleitungsdrahtverbindungen verbinden einen spannungsführenden Draht aus der Stromquelle mit einem Elektrodenhalter oder einer Verteilerklemme.

84.     Kabelbondings verbinden elektrisch die Armierung oder Hülle eines Kabels mit jener eines benachbarten Kabels, gegebenenfalls über einen Draht in der Armierung.

85.     Autokabelverbinder verbinden verschiedene Typen an Kabeln in einem KFZ.

86.     Autokabelanschlüsse sind die Enden einer Leitung, welche einen Anschlusspunkt an externe Stromkreise bereitstellen.

87.     Elektronische Steuereinheiten ("ECUs") sind eingebettete Module oder Systeme, die ein oder mehrere der elektrischen Systeme oder Subsysteme in einem Kraftfahrzeug steuern. Kraftfahrzeuge sind mit einer großen Zahl an ECUs ausgestattet,

21

die diverse Kraftfahrzeug-Funktionen vollführen und untereinander große Datenmengen austauschen.

88.     Sicherungskästen sind Module, die die Sicherungen für die diversen Stromkreise enthalten, die alle durch den Sicherungskasten geführt werden.  Der Hauptzweck einer elektrischen Sicherung  ist es, beim Schutz der Komponenten eines Stromkreises vor Schaden im Fall eines Kurzschlusses oder einer Stromspitze bzw. Überlastung zu helfen.

89.     Relaisboxen sind Module, welche die elektrischen Schalter enthalten, die Impulse von einer Komponente zur nächsten leiten, und können zum Anschließen oder Unterbrechen des Stromflusses in einem Schaltkreis dienen. Sobald ein Relais aktiviert ist, verbindet es eine elektrische oder sonstige Datenzufuhr mit einem bestimmten Bauteil oder Zubehörteil.

90.     Klemmenblöcke werden als elektrische Verbindungspunkte für die Verteilung des Stroms oder Verteilung einer Erdung verwendet.

91.     Stromverteiler dienen der Verteilung des Stroms in verschiedenen Stärken an diverse elektrische Komponenten.

**Angebotsanfragen**

92.     Kraftfahrzeug-Originalgerätehersteller ("OEMs") benötigen mehrere Quellen für Kraftfahrzeugteile.  Als Teil ihrer Lieferkette und ihres Beschaffungsprozesses stellen OEMs Angebotsanfragen ("RFQs") an Teilezulieferer auf Modellbasis für Modell-spezifische Kabelsystem-Produkte.

93.     RFQs sind eine standardmäßige Handelspraktik, die den Teilezulieferern erlaubt,  Preisvorschläge oder -angebote für spezifische Produkte oder Leistungen zu unterbreiten.

94. Ausländische OEMs nehmen an RFQs zur Lieferung von Teilen für in den U.S.A. produzierte Fahrzeuge sowohl im Ausland als auch in den Vereinigten Staaten teil.

95. Im Allgemeinen stellen OEMs Kabelsystem-Produkte-RFQs zum Beginn des Ausschreibungsprozesses ungefähr drei Jahre vor Produktionsbeginn eines Kraftfahrzeugs.

96. Die RFQs der OEMs enthalten typischerweise Spezifikationen und andere relevante Angaben für jedes Kraftfahrzeugprodukt. Als Antwort auf RFQs, unterbreiten Teilezulieferer Preisangebote bzw. Gebote an OEMs, um einen Auftrag zu gewinnen.

97. Nach Erhalt der Antworten auf RFQs von den einzelnen Anbietern, vergeben OEMs dann den Auftrag an die von ihnen gewählten Teilezulieferer, zumeist für die Lebensdauer des Fahrzeugmodells, und erneuern dies mit jährlichen Auftragsbestätigungen.

98. Zulieferer an OEMs mussten Kabelsystem-Produkte direkt von den Beklagten zu Preisen kaufen, die durch die OEMs und die Beklagten im Ausschreibungsprozess festgesetzt wurden.

**Die Branche für Kabelsystem-Produkte**

99. Für den Erfolg des hierin behaupteten Kartells war es entscheidend, dass seine Mitglieder die von OEMs gezahlten Preise kontrollieren und manipuieren, um die von allen anderen Direktabnehmern von Kabelsystem-Produkte gezahlten Preise zu steuern.

100. Die Branche für Kabelsystem-Produkte ist stark konzentriert. Hersteller von Kabelsystem-Produkten sind alle in der Lage, Kabelsystem-Produkte zur Verwendung in jedem Kraftfahrzeug zu produzieren.

23

101.     Während der Gruppenklagefrist hatten die vier wichtigsten Hersteller von Fahrzeug-Kabelsystemprodukten 76,95% des weltweiten Marktes unter ihrer Kontrolle, und die sieben wichtigsten, die alle Beklagte sind, kontrollierten 87,95% des weltweiten Marktes.  Siehe Abbildung 1.

**Marktanteile der weltweit bedeutendsten Hersteller von Fahrzeug-Kabelsystemen, 2009**

| | |
|---|---|
| Yazaki | 29,81% |
| Sumitomo | 24,38% |
| Delphi | 16,71% |
| Leoni | 6,05% |
| Lear | 4,70% |
| Furukawa | 3,61% |
| Fujikura | 2,69% |

Abbildung 1.

102.     Laut Angaben von *Research in China*, einer Quelle für internationale Marktforschungs- und Marktdaten, erreichte der weltweite Markt für Fahrzeug-Kabelsysteme 25,3 Milliarden US$ im Jahre 2009, und stieg um 6,6% auf 26,9 Milliarden US$ im Jahre 2010.  Bis 2013 wird der weltweite Markt für Fahrzeug-Kabelsysteme voraussichtlich auf fast 33 Milliarden US$ anwachsen.  Siehe Abbildung 2.



**Weltweites Marktvolumen für Fahrzeug-Kabelsysteme, 2007-2013**

*Market Scale (US $ mln) = Marktvolumen (Millionen US$)*          *Growth Rate = Wachstumsrate*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Marktvolumen (Millionen US$) | 29302 | 24980 | 25317 | 26982 | 29380 | 30010 | 32980 |
| Wachstumsrate | 16,9% | -14,7% | 1,3% | 6,6% | 9,3% | 9,0% | 3% |

Abbildung 2.

103.    Es bestehen erhebliche Barrieren für den Einstieg in den Markt für Kabelsystem-Produkte aufgrund hoher Kapitalinvestionen in Fertigungsanlagen, Ausrüstung und Facharbeitskräfte.  Es ist von entscheidender Wichtigkeit für Teilezulieferer, Mindestabsätze rentabel zu halten, um Teile innerhalb der Preis- und Mengenvorgaben, die seitens der OEMs festgesetzt werden, wirtschaftlich zu produzieren.  Daher könnte der Verlust der eigenen Position als Zulieferer der Wahl

25

ernsthafte Folgen für die Geschäftsmodelle der Beklagten und ihrer Mitverschwörer nach sich ziehen.

104.    In einem wettbewerbsorientierten Markt würden sinkende Material- und Arbeitskosten zu niedrigeren Preisen führen, weil Hersteller in der Regel eher ihre Preise senken werden, anstatt Marktanteile zu verlieren.  In einem Markt, der einer Verschwörung zur Absprache von Preisen unterliegt, haben die Konkurrenten jedoch keinen Anreiz mehr, ihre Preise zu senken, selbst wenn die Herstellungskosten gleich bleiben oder niedriger werden, weil wegen eines verschwörerischen Abkommens eine geringere Gefahr besteht, Umsätze an Konkurrenten mit niedrigeren Preisen zu verlieren.

105.    Die Preise für Kabelsystem-Produkte stiegen während der Gruppenklagefrist, obwohl die wichtigsten Herstellungskosten konstant blieben. Tatsächlich besitzen die Beklagten Yazaki, Sumitomo, Leoni, Furukawa, Delphi, Lear und Fujikura umfassende Erfahrung in der Kabelherstellung und sind in der Lage, die anfallenden Herstellungskosten zu kontrollieren.

**Gelegenheiten zur Verschwörung**

106.    Die Beklagten und ihre Mitverschwörer nahmen an Branchenveranstaltungen teil, bei denen sie Gelegenheit zum Treffen, Führen ihrer unzulässigen Gespräche und zur Vornahme von Handlungen zur Förderung der Verschwörung hatten.  So haben die Beklagten und ihre Mitverschwörer zum Beispiel regelmäßig an der jährlich stattfinden Automesse "North American International Auto Show" ("NAIAS") in Detroit, Michigan, und an der "Automotive Aftermarket Products Expo" in Las Vegas, Nevada, teilgenommen.

**Die Verschwörung**

107.    Während der Gruppenklagefrist bildeten die Beklagten und ihre Mitverschwörer ein internationales Kartell zur Unterdrückung und Eliminierung des

Wettbewerbs für Kabelsystem-Produkte, indem sie Angebotsabsprachen sowie Anhebung, Absprache, Stabilisierung oder Aufrechterhaltung der Preise für Kabelsystem-Produkte vereinbarten.

108. Die Beklagten und ihre Mitverschwörer nahmen an Meetings, Gesprächen und Kommunikationen in den Vereinigten Staaten und im Ausland teil, um Gebote und Preisangebote für Kabelsystem-Produkte abzusprechen, die Autoherstellern in den Vereinigten Staaten unterbreitet wurden.

109. Die Beklagten und ihre Mitverschwörer vereinbarten während diesen Meetings, Gesprächen und Kommunikationen, das Lieferangebot von Kabelsystem-Produkten, die an Autoherstellern in den Vereinigten Staaten auf einer Modellbasis verkauft wurden, aufzuteilen.

110. Die Beklagten und ihre Mitverschwörer vereinbarten während Meetings, Gesprächen und Kommunikationen ebenfalls die Koordinierung von Preisanpassungen, die von Autoherstellern in den Vereinigten Staaten gefordert wurden.

111. Die Beklagten und ihre Mitverschwörer unterbreiteten Angebote, Preisangebote und Preisanpassungen an Autohersteller in den Vereinigten Staaten in Übereinstimmung mit ihren verschwörerischen Absprachen.

112. Die Preisfestlegungs-Handlungen der Beklagten bezüglich ihrer Verkäufe von Kabelsystem-Produkten an Autohersteller hatten eine Auswirkung auf die Preise für Kabelsystem-Produkte für alle Direktabnehmer von Kabelsystem-Produkten in den gesamten Vereinigten Staaten.

113. Die Beklagten und ihre Mitverschwörer hielten Meetings und Gespräche in den Vereinigten Staaten, um die Einhaltung der vereinbarten Verschwörung zur Angebots- und Preisabsprache zu überwachen und durchzusetzen.

114.     Die Beklagten und ihre Mitverschwörer ergriffen Maßnahmen zur Geheimhaltung ihres ungesetzlichen Verhaltens, einschließlich, aber nicht beschränkt auf die Verwendung von Decknamen und Zusammenkünfte in Privathäusern oder an entlegenen Standorten.

**Staatliche Ermittlungen**

115.     Diverse US-amerikanische  und internationale Regierungsbehörden, einschließlich dem US-Justizministerium („DOJ")  vermittels seiner Kartellrechtsabteilung bzw. „Antitrust Division", stellen derzeit Ermittlungen zu wettbewerbsfeindlichem Verhalten im Zusammenhang mit der Branche für Kabelsystem-Produkte an.

116.     Am 23. Februar 2010 führten die Abteilung Detroit des U.S.-Bundeskriminalamts ("FBI") und das DOJ unangekündigte Durchsuchungen in den U.S.-Büroniederlassungen von Denso, Yazaki und TRAM durch.  Die Sprecherin des DOJ, Gina Talamona erklärte: „[Die] Kartellrechtsabteilung stellt Nachforschungen zu möglichen wettbewerbsfeindlichen Kartell-Verhaltensweisen an . . . .  Wir koordinieren die Ermittlungen mit der EU-Kommission und anderen ausländischen Wettbewerbsbehörden".

117.     Am 24. Februar 2010 führten Beamte der Direktion Wettbewerb der EC unangekündigte Durchsuchungen der Büros von Kabelsystemprodukte-Herstellern durch, und eine EC-Presserklärung vom 25. Februar 2010 besagte, dass die „Kommission Ermittlungen gegen das vermutete Kartell auf dem Sektor von elektrischen und elektronischen Autoteile-Zulieferern bestätigt. . . . Die Kommission hat Grund zu der Annahme, dass die betreffenden Unternehmen u.U. gegen die Kartellgesetze der EU verstoßen haben, die die Bildung von Kartellen und beschränkenden Geschäftspraktiken untersagen." Laut Berichten betraffen die EU-Ermittlungen Leoni AG, Leoni Kabel GmbH, Lear Automotive France, Delphi, Yazaki und S-Y Systems.

118. Am 24. Februar 2010 wurde zudem berichtet, dass die japanische Wettbewerbskommission ("JFTC") Durchsuchungen bei drei japanischen Kabelsystem-Herstellern durchgeführt hatte, die verdächtigt wurden, an einem Kartell zur Preisabsprache beteiligt zu sein: Yazaki Corporation, Sumitomo Electric Industries, Ltd., und Furukawa Electric Co., Ltd. Die drei Hersteller besitzen einen kombinierten Anteil von 90% am japanische Markt für Kabelsysteme.

119. Am 30. Juni 2011, gab die Beklagte Fujikura Ltd. bekannt, dass sie von der JFTC eine Vorankündigung einer disziplinarischen Maßnahme gegen das Unternehmen wegen Verstoß gegen Wettbewerbsgesetze bezüglich des Handels mit Kabelsystemen erhalten hatte. Fujikura Ltd. wurde verurteilt, eine Strafe von1,2 Milliarden Yen zu zahlen (14,8 Millionen US$).

120. Am 20. Juli 2011 durchsuchte die JFTC sieben japanische Autoteilehersteller, einschließlich der Beklagten Denso Corporation und ihrer hundertprozentigen Tochtergesellschaft Asmo. Die *Japan Times* berichtete, dass die JFTC „vermutet, dass die Teilehersteller Meetings seit 2002 oder früher hielten, um Autoteilepreise festzulegen und zu entscheiden, welche Firmen Aufträge erhalten sollen, bevor Gebote für Auftragsausschreibungen von Autoherstellern unterbreitet wurden."

121. Am 27. Juli 2011 gab die Beklagte Delphi in ihrem zusammengefassten Geschäftsbericht zum zweiten Quartal 2011 bekannt, dass sie "eine Anfrage von Wettbewerbsbehörden der Europäischen Kommission erhielt, die Auskunft über das Verhalten seitens Delphi im Zusammenhang mit Ermittlungen in der Europäischen Union bezüglich des Marktes für elektrische und elektronische Komponenten verlangten" und mit den Europäischen Behörden kooperiert.

122. Am 29. September 2011 beschuldigte das DOJ die Beklagte Furukawa Electric Co., Ltd. und drei ihrer leitenden Angestellten der Teilnahme in einem "Zusammenschluß und einer Verschwörung zur Unterdrückung und Eliminierung des

29

Wettbewerbs in der Autoteile-Branche durch Absprechen von Angeboten und Festsetzen, Stabilisieren und Aufrechterhalten von Preisen für Fahrzeug-Kabelsysteme und damit verbundene Produkte" unter Verletzung des Sherman-Anti-Kartellgesetzes.

123.    Ebenfalls am 29. September 2011 willigten die Beklagte Furukawa Electric Co., Ltd. und ihre drei leitenden Angestellten ein, sich ihrer Beteiligung an einer kriminellen Verschwörung zur Preis- und Angebotsabsprache im Zusammenhang mit dem Verkauf von Kabelsystem-Produkten schuldig zu bekennen.  Furukawa Electric Co., Ltd. willigte ein, eine Geldstrafe von $200 Millionen zu zahlen, während drei ihrer leitenden Angestellten einwilligten,  Haftstrafen in den Vereinigten Staaten im Bereich von einem Jahr und einem Tag bis zu achtzehn Monaten abzubüßen.

124.    Das DOJ beschrieb diese Vorkommnisse als die "ersten Anklagen in Folge seiner laufenden internationalen Kartell-Ermittlungen zur Preis- und Angebotsabsprache in der Autoteile-Industrie."

125.    In einer Presseerklärung des DOJ vom 29. September 2011 verkündete Sharis A. Pozen, stellvertretende Generalstaatsanwältin für die Kartellrechtsabteilung des DOJ: „[d]ieses Kartell hat eine wichtige Branche unserer heimischen Wirtschaft geschädigt und die Kartellrechtsabteilung wird weiter mit dem Bundeskriminalamt (FBI) zusammenarbeiten, um sicher zu stellen, dass dieser Art von Verschwörungen Einhalt geboten wird".

126.    „Wenn sich Unternehmen zur Preiskontrolle, Preisabsprache oder Absprache von Verträgen zusammenschließen, unterminiert dies die Grundlagen des Wirtschaftssystems der Vereinigten Staaten," sagte außerdem der zuständige FBI-Sonderagent Andrew G. Arena.  „Das FBI setzt sich nachdrücklich für die Strafverfolgung von in kartellrechtlichen Verbrechen verwickelten Unternehmen ein."

127.    Laut dem DOJ produzierten die Beklagte Furukawa Electric Co., Ltd. und ihre Mitverschwörer Fahrzeug-Kabelsystemprodukte (a) in den Vereinigten Staaten zur Installation in Fahrzeugen, die in den Vereinigten Staaten hergestellt und verkauft werden, (b) in Japan zum Export in die Vereinigten Staaten und zur Installation in Fahrzeugen, die in den Vereinigten Staaten hergestellt und verkauft werden, und (c) in Japan zur Installation in Fahrzeugen, die in Japan zum Export und Verkauf in die bzw. in den Vereinigten Staaten hergestellt werden.

128.    Das DOJ behauptet, dass Furukawa Electric Co., Ltd. und ihre Mitverschwörer: (a) Meetings und Kommunikationen in den Vereinigten Staaten und Japan zur Besprechung der Angebote und Preisgebote, die Autoherstellern in den Vereinigten Staaten unterbreitet werden sollten, abhielten, (b) Absprachen von Angeboten und Preisgeboten, die Autoherstellern in den Vereinigten Staaten unterbreitet werden sollten, trafen, (c) die Aufteilung des Angebots an Fahrzeug-Kabelsystemen und verwandten Produkten, die in den Vereinigten Staaten auf Modellbasis verkauft wurden, vereinbarten, (d) die Koordinierung der von Autoherstellern in den Vereinigten Staaten verlangten Preisanpassungen vereinbarten, (e) Angebote, Preisgebote und Preisanpassungen für Autohersteller in den Vereinigten Staaten entsprechend den getroffenen Absprachen unterbreiteten, (f) Kabelsystem-Produkte an Autohersteller in den Vereinigten Staaten zu wettbewerbswidrig abgestimmten und nichtwettbewerbsfähigen Preisen verkauften, und (g) an Meetings und Kommunikationen teilnahmen, um die Einhaltung der Verschwörung zu überwachen und um ihr ungesetzliches Verhalten geheim zu halten, einschließlich, aber nicht beschränkt auf die Verwendung von Decknamen und Zusammenkünfte in Privathäusern oder an entlegenen Standorten.

129.    Am 24. Oktober 2011 bekannte sich Hirotsugu Nagata, vor dem Richter George Steeh des U.S.-Bezirksgerichts für den Bezirk Michigan-Ost, einer

31

Verschwörung zur Beschränkung des Handels auf dem Markt für Kabelsystem-Produkte unter Verletzung des Sherman-Kartellgesetzes schuldig. Nagata war bei Furukawa America in Plymouth, Michigan, als Vertriebsgeschäftsführer von Januar 2004 bis November 2007, als Finanzvorstand von Januar 2004 bis März 2009, und als Marketingmanager für ein verwandtes Joint Venture von Januar 2004 bis Juni 2009 angestellt. Nagata gestand in seinem Schuldbekenntnis, dass während Meetings und Gesprächen mit Mitverschwörern "Vereinbarungen zur Aufteilung des Angebots an Fahrzeug-Kabelsystemen und verwandten Produkten, die an Autohersteller auf Modellbasis verkauft wurden, zur Absprache von Preisangeboten, die Autoherstellern für Fahrzeug-Kabelsysteme und verwandte Produkte unterbreitet wurden, und zur Festsetzung, Stabilisierung und Aufrechterhaltung der Preise getroffen wurden", und zwar für in den Vereinigten Staaten verkaufte Kabelsystem-Produkte.

130.    Am 24. Oktober 2011  bekannte sich Junichi Funo, vor dem Richter George Steeh des U.S.-Bezirksgerichts für den Bezirk Michigan-Ost, einer Verschwörung zur Beschränkung des Handels auf dem Markt für Kabelsystem-Produkte unter Verletzung des Sherman-Kartellgesetzes schuldig. Funo arbeitete bei Furukawa Electric Co., Ltd. in Japan als Repräsentant in der Honda-Verkaufsabteilung von April 2003 bis August 2003, dann als stellvertrender Geschäftsführer im Honda-Verkauf bei Furukawa America von August 2003 bis März 2009, und außerdem als Manager der Honda-Verkaufsabteilung in Japan von März 2009 bis mindestens Juli 2009.  Funo gestand in seinem Schuldbekenntnis, dass während Meetings und Gesprächen mit Mitverschwörern "Vereinbarungen zur Aufteilung des Angebots an Fahrzeug-Kabelsystemen und verwandten Produkten, die an Autohersteller auf Modellbasis

verkauft wurden, zur Absprache von Preisangeboten, die Autoherstellern für Fahrzeug-Kabelsysteme und verwandte Produkte unterbreitet wurden, und zur Festsetzung, Stabilisierung und Aufrechterhaltung der Preise getroffen wurden", und zwar für in den Vereinigten Staaten verkaufte Kabelsystem-Produkte.

131.   Am 10. November 2011 bekannte sich Tetsuya Ukai, vor dem Richter George Steeh des U.S.-Bezirksgerichts für den Bezirk Michigan-Ost, einer Verschwörung zur Beschränkung des Handels auf dem Markt für Kabelsystem-Produkte unter Verletzung des Sherman-Kartellgesetzes schuldig. Ukai arbeitete bei Furukawa Electric Co., Ltd. in Japan als Manager in der Honda-Verkaufsabteilung von April 2003 bis Juli 2005, als Abteilungsleiter in der Honda-Verkaufsabteilung von Juli 2005 bis April 2007, und danach als Geschäftsführer der Honda-Verkaufsabteilung von April 2007 bis mindestens Juli 2009.  Ukai gestand in seinem Schuldbekenntnis, dass während Meetings und Gesprächen mit Mitverschwörern "Vereinbarungen zur Aufteilung des Angebots an Fahrzeug-Kabelsystemen und verwandten Produkten, die an Autohersteller auf Modellbasis verkauft wurden, zur Absprache von Preisangeboten, die Autoherstellern für Fahrzeug-Kabelsysteme und verwandte Produkte unterbreitet wurden, und zur Festsetzung, Stabilisierung und Aufrechterhaltung der Preise getroffen wurden", und zwar für in den Vereinigten Staaten verkaufte Kabelsystem-Produkte.

132.   Am 14. November 2011 bekannte sich die Beklagte Furukawa Electric Co., Ltd. ihrer Beteiligung an einer kriminellen Verschwörung zur Preis- und Angebotsabsprache im Zusammenhang mit dem Verkauf von Kabelsystem-Produkten schuldig.  Furukawa Electric Co., Ltd. gestand in ihrem Schuldbekenntnis, dass während des relevanten Zeitraums "Vereinbarungen zur Aufteilung des Angebots an Fahrzeug-Kabelsystemen und verwandten Produkten, die an Autohersteller auf Modellbasis

verkauft wurden, zur Absprache von Preisangeboten, die Autoherstellern für Fahrzeug-Kabelsysteme und verwandte Produkte unterbreitet wurden, und zur Festsetzung, Stabilisierung und Aufrechterhaltung der Preise getroffen wurden" und zwar für in den Vereinigten Staaten verkaufte Kabelsystem-Produkte. Furukawa Electric Co., Ltd. willigte ein, eine Geldstrafe von $200 Millionen zu zahlen.

133. Am 19. Januar 2012 erließ die JFTC Unterlassungsanordnungen gegen die Beklagten Yazaki Corporation und Fujikura Ltd. Die JFTC verurteilte Yazaki Corporation, Sumitomo Electric Industries Ltd. und Fujikura Ltd außerdem zu Geldstrafen. Die Unterlassungsanordnungen der JFTC und die Geldstrafen gegen diese Beklagten beruhten auf deren Beteiligung an einer Verschwörung zur Preis- und Angebotsabsprache in Zusammenhang mit dem Verkauf von Kabelsystem-Produkten unter Verstoß gegen Artikel 3 des japanischen Antimonopol-Gesetzes. Laut einer Presserklärung der JFTC hatten Yazaki Corporation, Sumitomo Electric Industries Ltd., Fujikura Ltd., und Furukawa Electric Co., Ltd., "den Wettbewerb erheblich eingeschränkt . . . [durch] Ernennen des vorgesehenen erfolgreichen Anbieters und Vereinbaren, den vorgesehenen erfolgreichen Anbieter die Ausschreibung gewinnen zu lassen." Die JFTC verurteilte Yazaki Corporation zu einer Geldstrafe von ungefähr 125,8 Millionen US-Dollar, Sumitomo Electric Industries Ltd. zu 27,5 Millionen US-Dollar, und Fujikura Ltd. zu 14,4 Millionen US-Dollar. Furukawa Electric Co., Ltd. gestand seine Beteiligung an einer Verschwörung zur Preis- und Angebotsabsprache, wurde aber zu keiner Geldstrafe verurteilt, weil es der JFTC Informationen lieferte, die zu der Ermittlung führten.

134. Am 30. Januar 2012 gab das DOJ bekannt, dass die Beklagte Yazaki Corporation die Strafanzeige anerkennt, sich schuldig bekennt und eine Geldstrafe von US$ 470 Millionen zahlt wegen drei Anklagepukten, die Yazaki Corporation unter

34

anderem der Teilnahme an einem Zusammenschluss und einer Verschwörung mit ihren Mitverschwörern zur Unterdrückung und Eliminierung des Wettbewerbs durch Absprache von Angeboten und Festsetzung, Stabilisierung und Aufrechterhaltung der Preise für an bestimmte Autohersteller in den Vereinigten Staaten und andernorts verkaufte Kabelsystem-Produkte ab mindestens bereits Januar 2000 und fortdauernd bis mindestens Februar 2010 unter Verletzung von Paragraph 1 des Sherman-Kartellgesetzes bezichtigen. Am 1. März 2012 bekannte sich die Beklagte Yazaki Corporation dieser Anklage schuldig.

135. Zusätzlich zur Yazaki Corporation, willigten vier leitende Angestellte von Yazaki, Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa und Hisamitsu Takada, ein, sich kartellrechtlicher Vergehen durch ihre Teilnahme an einer Verschwörung zur Unterdrückung und Eliminierung des Wettbewerbs durch Absprache von Angeboten und Festsetzung, Stabilisierung und Aufrechterhaltung der Preise für Kabelsystem-Produkte, die an gewisse Autohersteller in den Vereinigten Staaten und andernorts verkaut wurden, schuldig zu bekennen. Die vier leitenden Angestellten von Yazaki Corporation werden Haftstrafen im Bereich von 15 Monaten bis zwei Jahren verbüßen. Die Zwei-Jahre-Urteile wären die längsten Gefängnisstrafen, die einem fremden Staatsbürger, der sich freiwillig der U.S.-Justiz wegen wettbewerbsrechtlichem Verstoß gegen das Sherman-Kartellgesetz stellt, auferlegt werden.

136. Am 30. Januar 2012 gab das DOJ auch bekannt, dass die Beklagte Denso Corporation die Strafanzeige anerkennt, sich schuldig bekennt und eine Geldstrafe von insgesamt US$ 78 Millionen zahlt wegen zwei Anklagepukten, die Denso Corporation unter anderem der Teilnahme an einem Zusammenschluss und einer Verschwörung mit ihren Mitverschwörern zur Unterdrückung und Eliminierung des Wettbewerbs durch Absprache von Angeboten und Festsetzung, Stabilisierung und Aufrechterhaltung der Preise für bestimmte an Autohersteller in den Vereinigten Staaten und andernorts

verkaufte ECUs ab mindestens bereits Januar 2000 und fortdauernd bis mindestens Februar 2010 unter Verletzung von Paragraph 1 des Sherman-Kartellgesetzes bezichtigen. ECUs sind Kabelsystem-Produkte, wie in dieser Klageschrift dargelegt, und sind "essentiell für Kabel, Leiterplatten, Armaturen und Treibstofftanks von Automobilen." Am 5. März 2012 bekannte sich Denso Corporation dieser Anklage schuldig.

137.    Am 23. April 2012 gab das DOJ bekannt, dass die Beklagte Fujikura Ltd. sich in einem Strafverfahren mit einem Anklagepukt schuldig bekannte, der sie der Teilnahme an einem Zusammenschluss und einer Verschwörung mit ihren Mitverschwörern zur Unterdrückung und Eliminierung des Wettbewerbs durch Absprache von Angeboten und Festsetzung, Stabilisierung und Aufrechterhaltung der Preise von an Autohersteller in den Vereinigten Staaten und andernorts verkauften Kabelsystem-Produkten ab mindestens bereits Januar 2006 und fortdauernd bis mindestens Februar 2010 unter Verletzung des Paragraph 1 des Sherman-Kartellgesetzes bezichtigt. Fujikura Ltd. willigte ebenfalls ein, eine Geldstrafe von US$ 20 Millionen wegen seiner Rolle in der Verschwörung zu zahlen.

## ARGLISTIGES VERSCHWEIGEN

138.    Die Beklagten verheimlichten aktiv und ungesetzmäßig ihr wettbewerbswidriges Verhalten vor den Klägern und der Gruppe seit mindestens 1. Januar 2000 bis einschließlich mindestens Februar 2010, als Berichte über die kartellrechtlichen Ermittlungen zu Herstellern von Kabelsystem-Produkten öffentlich wurden. Während dieses Zeitraums erfuhren oder entdeckten die Kläger und die Gruppe trotz Ausübung angemessener Sorgfalt nichts über die operativen Fakten, die nun Anlass für ihre Forderungen geben. Infolge des arglistigen Verschweigens durch die Beklagten ist daher die Anwendung von Verjährungsfristen bis einschließlich mindestens Februar 2010 unterbrochen worden.

139.    Die Beklagten stellten sowohl vor Kunden als auch anderweitig öffentlich dar, dass ihre Preisgestaltungs- und Angebotsaktivitäten einseitig wären. Durch Abgeben dieser Falschdarstellungen täuschten die Beklagten die Kläger und die Mitglieder der Gruppe über die wahre, betrügerisch abgestimmte und koordinierte Art ihrer Aktivitäten bei Angebotabsprachen, Kundenaufteilung und Preisabsprachen.

140.    Die von den Beklagten begangenen ungesetzlichen Handlungen wurden absichtlich arglistig verheimlicht und zum Teil auf eine Art und Weise ausgeführt, die sich tatsächlich der Erkennung entzog.

141.    Insbesondere nahmen die Beklagten an Meetings, Gesprächen und Kommunikationen zum Absprechen der Angebote und Preisvorschläge teil, die Kunden in den Vereinigten Staaten und andernorts unterbreitet werden sollten.

142.    Während dieser Meetings, Gespräche und Kommunikationen, sprachen die Beklagten Angebote und Preisvorschläge ab, die Kunden in den Vereinigten Staaten und andernorts unterbreitet wurden.

143.    Die Beklagten vereinbarten des Weiteren die Aufteilung des Lieferangebots an Kabelsystem-Produkten, die an Kunden in den Vereinigten Staaten und andernorts verkauft wurden.

144.    Die Beklagten vereinbarten ebenfalls die Koordinierung von Preisanpassungen, die von Kunden in den Vereinigten Staaten und andernorts verlangt wurden.

145.    Gemäß den von den Beklagten eingangenen Absprachen, unterbreiteten sie betrügerisch abgestimmte Angebote, Preisvorschläge und Preisanpassungen an Kunden in den Vereinigten Staaten und andernorts .

146.    Als Folge solcher koordinierten Handlungen und von den Klägern unbemerkt, verkauften die Beklagten Kabelsystem-Produkte an Abnehmer in den Vereinigten Staaten bei abgesprochenen und nichtwettbewerbsfähigen Preisen.

147.    Zur Geheimhaltung ihres Verhaltens beim Verkauf von Kabelsystem-Produkten zu abgesprochenen und nichtwettbewerbsfähigen Preisen, ergriffen die Beklagten gewisse Maßnahmen, einschließlich, aber nicht beschränkt auf die Verwendung von Decknamen und Zusammenkünfte in Privathäusern oder an entlegenen Standorten.

148.    Die erfolgreiche wettbewerbswidrige Übereinkunft, Absprache bzw. Verschwörung der Beklagten war außerdem ihrer Beschaffenheit nach inhärent zur Verschleierung ausgelegt.

149.    Trotz Ausübung angemessener Sorgfalt hatten die Kläger keine Kenntnis von dem rechtswidrigen Abkommen, Zusammenschluß bzw. der Verschwörung der Beklagten.

150.    Im Verlauf des Kaufs von Kabelsystem-Produkten, studierten die Kläger die Preise der betreffenden spezifischen Produkte.

151.    Die Kläger empfingen von einer oder mehreren Beklagten diverse Preisinformationen. Die Kläger konnten keineswegs wissen, dass die Preise der Beklagten wegen der hierin behaupteten Verschwörung höher waren, als sie es gewesen sein sollten.

152.    Trotz Ausübung angemessener Sorgfalt erkannten die Kläger nicht das rechtswidrige Abkommen, das Zusammenwirken bzw. die Verschwörung der Beklagten zu einem früheren Zeitpunkt, und hätten dies auch nicht entdecken können. Die Beklagten unternahmen aktive Handlungen zur Verheimlichung ihres Abkommens, Zusammenwirkens bzw. ihrer Verschwörung, einschließlich ihrer Teilnahme an

38

geheimen Meetings, Falschdarstellungen an die Kläger und die Gruppe über die Gründe für die verlangten Preise, und Führen unzulässiger geheimer Gespräche über die Aufteilung von Kunden, Angebotsabsprachen und Preisabsprachen für Kabelsystem-Produkte.

## VERLETZUNG DES KARTELLGESETZES

153.    Die Verschwörung der Beklagten verursachte eine Schädigung der Kläger und Mitglieder der Gruppe durch Unterdrücken des Preiswettbewerbs unter Herstellern von Kabelsystem-Produkten, wodurch die Abnehmer von Kabelsystem-Produkten um die Vorteile eines wettbewerbsorientierten Markts gebracht wurden und die Preise von Kabelsystem-Produkten auf künstlich überhöhtem Niveau festgesetzt wurden.

154.    Als direkte Folge der Verschwörung der Beklagten sind die Kläger und die Mitglieder der Gruppe in ihren Unternehmen oder ihrem Eigentum dadurch geschädigt worden, dass sie weit mehr für Kabelsystem-Produkte zahlten, als dies sonst in einem wettbewerbsorientierten Markt der Fall gewesen wäre.

## FORDERUNG VON RECHTSMITTELN
### (Sherman Kartellgesetz Paragraph 1 – Horizontale Preisabsprache gegen alle Beklagten)

155.    Die Kläger nehmen durch Bezugnahme alle der oben stehenden Behauptungen als Bestandteil auf, als ob sie hier vollumfänglich dargelegt wären.

156.    Während der Gruppenklagefrist gingen die Beklagten und ihre Mitverschwörer eine fortlaufende Vereinbarung, Absprache bzw. Verschwörung unter Einschränkung des Handels zur künstlichen Anhebung, Festsetzung, Aufrechterhaltung oder Stabilisierung der Preise für in den Vereinigten Staaten verkaufte Kabelsystem-Produkte, unter Verstoß gegen Paragraph 1 des Sherman Kartellgesetzes, 15 U.S.C. §1, ein.

39

157.   Die Übereinkunft, Absprache bzw. Verschwörung führte zu einem Abkommen, Einverständnis oder einer konzertierten Handlungsweise zwischen und unter den Beklagten und ihren Mitverschwörern, zu dessen Förderung die Beklagten und ihre Mitverschwörer die Preise für in den Vereinigten Staaten verkaufte Kabelsystem-Produkte festlegten, anhoben, aufrecht hielten oder stabilisierten.  Eine solche Übereinkunft, Absprache bzw. Verschwörung stellt *per se* einen Verstoß gegen die Bundeskartellgesetze dar.

158.   Den Beklagten gelang die Angebotsabsprache sowie die Festlegung, Anhebung, Aufrechterhaltung und Stabilisierung der Preise für während der Gruppenklagefrist in den Vereinigten Staaten verkaufte Kabelsystem-Produkte.

159.   In der Absicht der Ausarbeitung und Ausführung ihrer Verschwörung begingen die Beklagten und ihre Mitverschwörer folgende Handlungen zur Förderung ihrer Verschwörung, einschließlich:

a.   Teilnahme an Meetings und Gesprächen in den Vereinigten Staaten und andernorts, bei denen sie die Angebote und Preisangebote für Kabelsystem-Produkte besprachen, die an Direktabnehmer in den Vereinigten Staaten unterbreitet wurden;

b.   Absprache von Angeboten und Preisangeboten, die an Direktabnehmer in den Vereinigten Staaten unterbreitet wurden;

c.   Absprache zum Manipulieren von Preisen und Aufteilen des Lieferangebots für Kabelsystem-Produkte, die in den Vereinigten Staaten verkauft wurden, in einer Art, welche Direktabnehmer um einen freien und offenen Wettbewerb  brachte;

d.   Absprache zum Koordinieren von Preisanpassungen in den Vereinigten Staaten;

    e.     Unterbreiten von Angeboten, Preisvorschlägen und Preisanpassungen an Direktabnehmer von Kabelsystem-Produkten gemäß den unter einander getroffenen Absprachen;

    f.     Verkaufen von Kabelsystem-Produkten an Direktabnehmer in den Vereinigten Staaten zu nichtwettbewerbsfähigen Preisen; und

    g.     Ergreifen von Maßnahmen zur Geheimhaltung der wahren Beschaffenheit  ihres rechtswidrigen Verhaltens vor den Klägern und anderen Mitgliedern der Gruppe zur Föderung der Verschwörung.

160.    Als direkte und unmittelbare Folge des gesetzeswidrigen Betragens der Beklagten wurden die Kläger und die anderen Mitglieder der Gruppe in ihren Unternehmen oder ihrem Eigentum dadurch geschädigt, dass sie für Kabelsystem-Produkte mehr bezahlten, als sie ansonsten auf einem wettbwerbsorientierten Markt gezahlt hätten.

### KLAGEBEGEHREN

DAHER ersuchen die Kläger das Gericht, ein Urteil zugunsten der Kläger und der hierin beschriebenen Gruppe zu fällen, und fordern hochachtungsvoll die folgenden Rechtsmittel:

A.    Dass das Gericht entscheiden möge, dass diese Klage als Gruppenklage gemäß Regel 23 der Bundeszivilprozessordnung geltend gemacht werden soll, und zwar mit den Klägern als den zugelassenen Repräsentanten der Gruppe und deren Rechtsbeiständen als Rechtsbeiständen der Gruppe;

B.    Dass das Übereinkommen, Zusammenwirken bzw. die Verschwörung und die zu deren Förderung durch die  Beklagten und ihre Mitverschwörer begangenen Taten, wie in dieser Klage dargelegt, als ein *per se* Verstoß gegen Paragraph 1 des Sherman-Act

gerichtlich erkannt und verurteilt werden mögen;

C.     Dass die Kläger und die Mitglieder der Gruppe Ersatz des ihnen entstandenen Schadens in Höhe des nach den Bundeskartellgesetzen zulässigen Umfangs erhalten mögen und dass ein gesamtschuldnerisches und im Einzelfall wirksames Urteil zugunsten der Kläger und der Gruppe gegen die Beklagten in Höhe eines Betrags gefällt werden möge, der nach 15 U.S.C. §15(a) verdreifacht werden soll;

D.     Dass den Beklagten, deren Tochtergesellschaften, verbundenen Unternehmen, Nachfolgern, Erwerbern, Zessionaren und jeweiligen leitenden Angestellten, Vorstandsmitgliedern, Gesellschaftern, Beauftragten und deren Mitarbeitern sowie allen anderen Personen, die in ihrem Auftrag handeln oder angeblich in ihrem Auftrag oder in Abstimmung mit ihnen handeln, dauerhaft untersagt und verboten werden soll, auf irgendeine Weise das/die hierin behauptete Zusammenwirken, Verschwörung oder Absprache fortzuführen und aufrecht zu erhalten;

E.     Dass die Kläger und die Mitglieder der Gruppe ihre Prozesskosten einschließlich angemessenerAnwaltskosten, wie vom Gesetz vorgesehen, zurückerhalten sollen;

F.     Dass den Klägern und den Mitgliedern der Gruppe Zinsen für die Zeit vor und nach dem Urteil zuerkannt werden mögen; und

G.     Dass die Kläger und die Mitglieder der Gruppe solche anderweitige oder zusätzliche Rechtsmittel erhalten mögen, die das Gericht für gerecht und billig erachtet.

## FORDERUNG EINER GESCHWORENENVERHANDLUNG

Die Kläger fordern eine Geschworenenverhandlung gemäß Regel 38(b) der Bundeszivilprozessordnung für alle derart verhandelbaren Streitpunkte.

Datum:  14. Mai 2012

/[gez.]/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road; Ste. 111
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Einstweilige zuständige Direktabnehmer-
Rechtsbeistände

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU
  & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME  04112-9546
Telephone:  (207) 791-3000
ghansel@preti.com
rweill@preti.com
jcarver@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Telephone:  (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Michael J. Freed
Steven A. Kanner
William H. London
Michael L. Silverman
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:  (224) 632-4500
mfreed@fklmlaw.com
skanner@fklmlaw.com
blondon@fklmlaw.com
msilverman@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
  & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Einstweilige leitende Direktabnehmer-Rechtsbeistände

W. Joseph Bruckner
LOCKRIDGE GRINDAL
    NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wjbruckner@locklaw.com

Robert Bonsignore
Richard Kirchner
Brian Hagen
Paula Flannery
Lisa Sleboda
BONSIGNORE & BREWER
193 Plummer Hill Road
Belmont, NH 03220
Telephone:  (781) 856-7650
rbonsignore@class-actions.us
rkirchner@class-actions.us
bhagen@class-actions.us
pflannery@class-actions.us
lsleboda@class-actions.us

Brian Murray
Lee Albert
MURRAY FRANK LLP
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
bmurray@murrayfrank.com
lalbert@murrayfrank.com

Garret Blanchfield
REINHARDT, WENDORF
    & BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
Telephone:  (651) 287-2100
g.blanchfield@rwblawfirm.com

Solomon B. Cera
GOLD BENNETT CERA
    & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
scera@gbcslaw.com

James F.B. Daniels
MCDOWELL, RICE, SMITH
    & BUCHANAN, P.C.
605 West 47th Street, Suite 350
Kansas City, MO 64112-1005
Telephone:  (816) 753-5400
jdaniels@mcdowellrice.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS & TOLL
    PLLC
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 578-6850
jdominguez@cohenmilstein.com

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
vesades@heinsmills.com

44

Karlos F. Finley
BOTELER, FINLEY & WOLFE, P.C.
1252 Dauphin Street
Mobile, AL 36604
Telephone: (251)433-7766
karlos@bfw-lawyers.com

Joseph M. Fischer
CARSON FISCHER, P.L.C.
4111 Andover Road West - Second Floor
Bloomfield Hills, MI 48302-1924
Telephone: (248) 644-4840
jfischer@carsonfischer.com

Bruce E. Gerstein
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
Telephone: (212) 398-0055
bgerstein@garwingerstein.com

Lewis Goldfarb
MCELROY, DEUTSCH, MULVANEY
   & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ  07962-2075
Telephone: (973) 425-8689
lgoldfarb@mdmc-law.com

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
Telephone: (513) 345-8291
jgoldenberg@gs-legal.com

Steve Greenfogel
LITE DEPALMA GREENBERG, LLC
1521 Locust Street
Philadelphia, PA 19102
Telephone: (215) 564-5182
sgreenfogel@litedepalma.com

Steven D. Irwin
LEECH TISHMAN FUSCALDO
   & LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219
Telephone: (412) 261-1600
sirwin@leechtishman.com

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 687-6611
dmogin@moginlaw.com

D. Michael Noonan
SHAHEEN & GORDON, P.A.
P.O. Box 977
140 Washington Street, 2nd floor
Dover, NH 03821
Telephone: (603) 749-5000
mnoonan@shaheengordon.com

Linda P. Nussbaum
Robert G. Eisler
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:  (646) 722-8500
lnussbaum@gelaw.com

Dustin M. Roach
VAN GILDER & TRZYNKA, P.C.
436 E. Wayne Street
Fort Wayne, IN 46802
Telephone:  (260) 424-8132
droach@vgtlaw.com


Wesley Steury
BURT BLEE DIXON SUTTON &
BLOOM, LLP
200 East Main Street, Suite 1000
1st Source Banking Center
Fort Wayne, IN 46802
Telephone: (260) 426-1300
Wsteury@burtblee.com

Stephen M. Smith
JOSEPH SMITH, LTD.
2100 Kecoughtan Road
Hampton, VA 23661
Telephone: (757) 244-7000 Ext. 123
ssmith@braininjurylawcenter.com

Robert Peurach
DAKMAK PEURACH, P.C.
615 Griswold Street, Suite 600
Detroit, MI 48226
Telephone: (866) 732-9522
rpeurach@gdakmak.com

R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
rick@saveri.com
cadio@saveri.com

Michael T. Smith
LAW OFFICES OF
MICHAEL T. SMITH
440 West Irving Park Road
Roselle, IL 60172
Telephone: (847) 380-5899
lawoffice0724@sbcglobal.net

Jason J. Thompson
Lance A. Young
SOMMERS SCHWARTZ PC
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone: (248) 355-0300
jthompson@sommerspc.com
lyoung@sommerspc.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE AUTOMOTIVE WIRE HARNESS SYSTEMS ANTITRUST LITIGATION | : Master File No. 12-md-02311 |
| THIS DOCUMENT RELATES TO: | : |
| All Direct Purchaser Actions | : |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## SUMMARY OF THE CASE

1.     Plaintiffs, individually and on behalf of the Class described below, bring this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States on behalf of direct purchasers who, during the Class Period, purchased Wire Harness Products, as defined below, in the United States from one or more of the Defendants.  Defendants are manufacturers or sellers of Wire Harness Products that are manufactured or sold in the United States.

2.     Plaintiffs allege that Defendants conspired to rig bids for, and to raise fix, maintain, or stabilize the prices of, Wire Harness Products sold in the United States from at least as early as January 1, 2000 until at least February 28, 2010 in violation of Section 1 of the Sherman Act.  Plaintiffs further allege that Defendants fraudulently concealed their conspiracy.

3.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class paid higher prices for Wire Harness Products than they would have paid in a competitive market.

## JURISDICTION AND VENUE

4.     Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.     The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and one or more of the Defendants reside in this District.

6.     This Court has personal jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Wire Harness Products throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was

directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

7.      Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

8.      Alternatively, there is jurisdiction over foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

<u>DEFINITIONS</u>

9.      The "Class Period" is from January 1, 2000 through the present.

10.     The term "Wire Harness Products", as used in this Complaint, refers to wire harnesses and the following related products:  automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, high voltage wiring, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors used in motor vehicles.

11.     Wire harnesses are electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in motor vehicles.

12.     "Defendant" or "Defendants" as used herein, includes all of the named Defendants' predecessors during the Class Period.

## TRADE AND COMMERCE

13.     During the Class Period each Defendant sold Wire Harness Products in the United States, in a continuous and uninterrupted flow of interstate commerce.

14.     During the Class Period, Defendants collectively controlled a majority of the market for Wire Harness Products, both globally and in the United States.

15.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## THE PARTIES

### Plaintiffs

16.     Plaintiff Mexican Industries in Michigan, Inc. by and through Timothy Miller, its Trustee in Bankruptcy ("Mexican Industries") is a Michigan corporation with its principal place of business in Detroit, Michigan.  Plaintiff Mexican Industries purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

17.     Plaintiff Paesano Connecting Systems, Inc. ("Paesano") is a Pennsylvania corporation with its principal place of business in Ridgway, Pennsylvania.  Plaintiff Paesano purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

18.      Plaintiff Craft-Co Enterprises, Inc. ("Craft-Co") is a Mississippi corporation with its principal place of business in Brandon, Mississippi.  Plaintiff Craft-Co purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

19.      Plaintiff Findlay Industries, Inc. ("Findlay") is an Ohio corporation with its principal place of business in Findlay, Ohio.  Plaintiff Findlay purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

20.      Plaintiff Cesar-Scott, Inc. ("Cesar-Scott") is a Texas corporation with its principal place of business in El Paso, Texas.  Plaintiff Cesar-Scott purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

21.      Plaintiff Martinez Manufacturing, Inc. ("Martinez") is an Illinois corporation with its principal place of business in Cary, Illinois.  Plaintiff Martinez purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

22.      Plaintiff South Star Corporation ("South Star") is a Virginia corporation with its principal place of business in Elliston, Virginia.  Plaintiff South Star purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

## The Delphi Defendants

23.     Defendant Delphi Automotive LLP is a partnership organized under the laws of England and Wales.  It was formed in 2009 to buy assets of Troy, Michigan-based Delphi Corporation, which filed for bankruptcy protection in 2005. Defendant Delphi Automotive LLP – directly or through its subsidiaries, which it wholly owned or controlled –  manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

24.     Defendant Delphi Automotive Systems, LLC is a Delaware corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Delphi Automotive LLP.  Officers from Defendant Delphi Automotive LLP work out of the Michigan offices of Defendant Delphi Automotive Systems, LLC. Defendant Delphi Automotive Systems, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

25.     Defendant DPH Holdings Corporation (f/k/a Delphi Corporation) is a Delaware corporation with its principal place of business in Warren, Ohio.  It is a subsidiary of and wholly owned or controlled by its parent, Delphi Automotive LLP. Defendant DPH Holdings Corporation manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

26.     Defendant Delphi Furukawa Wiring Systems LLC is a limited liability company created in 2004 as a joint venture between Delphi Corporation and Furukawa Electric Co., Ltd. with its principal place of business in Ann Arbor, Michigan.  Delphi Furukawa Wiring Systems LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

27.     Defendants Delphi Automotive LLP, Delphi Automotive Systems, LLC, DPH Holdings Corporation and Delphi Furukawa Wiring Systems LLC shall collectively be referred to herein as the "Delphi Defendants" or "Delphi."

**The Denso Defendants**

28.     Defendant Denso Corporation is a Japanese corporation.  Defendant Denso Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

29.     Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Denso Corporation. Defendant Denso International America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Denso Corporation.

7

30.     Defendant Asmo Co. Ltd. ("Asmo") is a Japanese corporation with its principal place of business in Japan.  Asmo is a wholly-owned and controlled subsidiary of Defendant Denso Corporation.  Defendant Asmo manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Denso Corporation.

31.     Defendants Denso Corporation, Denso International America, Inc. and Asmo Co., Ltd. shall collectively be referred to herein as the "Denso Defendants" or "Denso."

**The Fujikura Defendants**

32.     Defendant Fujikura Ltd. is a Japanese corporation.  Defendant Fujikura Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

33.     Defendant Fujikura America, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.  It is a subsidiary of and wholly owned or controlled by its parent, Fujikura Ltd.  Defendant Fujikura America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

During the Class Period, its activities in the United States were under the control and direction of Fujikura Ltd.

34.   Defendants Fujikura Ltd. and Fujikura America, Inc. shall collectively be referred to herein as the "Fujikura Defendants" or "Fujikura."

**The Furukawa Defendants**

35.   Defendant Furukawa Electric Co., Ltd. is a Japanese corporation. Defendant Furukawa Electric Co., Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

36.   Defendant American Furukawa, Inc. is a Delaware corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Furukawa Electric Co. Ltd.  Defendant American Furukawa, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Furukawa Electric Co., Ltd.

37.   Defendant Furukawa Wiring Systems America, Inc. f/k/a Furukawa Lear Corporation and Lear Furukawa Corporation is a Delaware corporation with its principal place of business in El Paso, Texas.  Defendant Furukawa Wiring Systems America, Inc. is 60% owned by Furukawa Electric Co., Ltd. and 40% owned by American Furukawa, Inc.  During the Class Period, Furukawa Wiring Systems

9

America, Inc. operated as a joint venture between Lear Corporation and Furukawa Electric Co., Ltd. that manufactured, distributed or sold Wire Harness Products that were purchased throughout United States, including in this District.  In June 2010, Furukawa Electric Co., Ltd. purchased all of Lear's Corporation's remaining interest.

38.    Defendants Furukawa Electric Co., Ltd. American Furukawa, Inc. and Furukawa Wiring Systems America, Inc. shall collectively be referred to herein as the "Furukawa Defendants" or "Furukawa."

**The Lear Defendants**

39.    Defendant Lear Corporation is a Delaware corporation with its principal place of business in Southfield, Michigan.  Defendant Lear Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

40.    Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware corporation with its principal place of business in Selma, Alabama.  It is a joint venture between Defendant Lear Corporation and Kyungshin Corporation of South Korea.  Defendant Kyungshin-Lear Sales and Engineering, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

41.     Defendants Lear Corporation and Kyungshin-Lear Sales and Engineering, LLC shall collectively be referred to herein as the "Lear Defendants" or "Lear."

42.     Lear filed for Chapter 11 bankruptcy protection on July 7, 2009. After its emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Wire Harness Products pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear had significant Wire Harness Products sales in the United States at supra-competitive prices. In 2010 alone, Lear had $2.56 billion in total sales in its electric power and management systems, which includes significant sales of Wire Harness Products in the United States pursuant to the conspiracy.

**The Leoni Defendants**

43.     Defendant Leoni AG is a German corporation. Defendant Leoni AG – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

44.     Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned or controlled by its parent, Leoni AG. Defendant Leoni Wiring Systems Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

45.     Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned or controlled by its parent, Leoni AG.  Defendant Leonische Holding, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

46.     Defendant Leoni Kabel GmbH is a German corporation.  Defendant Leoni Kabel GmbH manufactured, marketed  or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

47.     Defendant Leoni Wire Inc. is a Massachusetts corporation with its principal place of business in Chicopee, Massachusetts.  Leoni Wire Inc. is a wholly-owned and controlled subsidiary of Defendant Leoni AG.  Defendant Leoni Wire Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

48.     Defendants Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding, Inc., Leoni Kabel GmbH and Leoni Wire Inc. shall collectively be referred to herein as the "Leoni Defendants" or "Leoni."

**The Sumitomo Defendants**

49.     Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation. Defendant Sumitomo Electric Industries, Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

50.     Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Defendant Sumitomo Wiring Systems, Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

51.     Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control

and direction of Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.

52.     Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee.  It is a subsidiary of and wholly owned or controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant K&S Wiring Systems, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd.

53.     Defendant Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.

54.     Defendant Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky.  Sumitomo Electric Wintec America, Inc. is a wholly-owned and controlled subsidiary of

14

Defendant Sumitomo Electric Industries, Ltd. Defendant Sumitomo Electric Wintec America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd.

55.     Defendants Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., Sumitomo Wiring Systems (U.S.A.) Inc., and Sumitomo Electric Wintec America, Inc. shall collectively be referred to herein as the "Sumitomo Defendants" or "Sumitomo."

**The Yazaki Defendants**

56.     Defendant Yazaki Corporation is a Japanese corporation.  Defendant Yazaki Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

57.     Defendant Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Yazaki Corporation.  Defendant Yazaki North America Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District,

during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Yazaki Corporation.

58.   Defendant S-Y Systems Technologies Europe GmbH is a German corporation.  S-Y Systems Technologies Europe GmbH was formed as a joint venture between Siemens and Yazaki Corporation.  Defendant S-Y Systems Europe GmbH – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

59.   Defendant S-Y Systems Technologies America, LLC is a Delaware corporation with its principal place of business in Dearborn, Michigan.  It is currently a wholly owned subsidiary of or controlled by its parent Defendant Yazaki Corporation, but was formerly a joint venture between Siemens VDO Automotive AG and Yazaki Corporation.  Defendant S-Y Systems Technologies America, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Siemens and Yazaki Corporation, or its current Japanese parent, Yazaki Corporation.

60.   Yazaki Corporation, Yazaki North America, Inc., S-Y Systems Technologies Europe GmbH, and S-Y Systems Technologies America, LLC are herein referred to as shall collectively be referred to herein as the "Yazaki Defendants" or "Yazaki."

16

## The Tokai Rika Defendants

61.     Defendant Tokai Rika Co., Ltd. is a Japanese corporation.  Defendant Tokai Rika Co., Ltd. manufactured, marked or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

62.     Defendant TRAM, Inc. ("TRAM") is a Michigan corporation with its principal place of business in Plymouth, Michigan.  TRAM is a wholly-owned and controlled subsidiary of Defendant Tokai Rika Co., Ltd. Defendant TRAM manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Tokai Rika Co., Ltd.

63.     Defendants Tokai Rika Co., Ltd. and TRAM, Inc. are collectively referred to herein as "Tokai Rika."

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

64.     Various persons or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

65.     Each Defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs.

<u>CLASS ACTION ALLEGATIONS</u>

66.     Plaintiffs bring this action both on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3).  The Class is defined as follows:

> All individuals and entities that purchased Wire Harness Products in the United States directly from one or more Defendants or co-conspirators from January 1, 2000 through the present.

67.     Plaintiffs do not know the exact number of Class members, such information being in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

68.     There are questions of law or fact common to the class:

    a.    Whether Defendants engaged in a contract, combination, or conspiracy to rig bids for, or to raise, fix, maintain, or stabilize prices of Wire Harness Products sold in the United States;

    b.    Whether Defendants agreed to allocate the supply of Wire Harness Products sold to certain direct purchasers in the United States on a model-by-model basis;

c.   Whether Defendants' conduct caused Wire Harness Products to be sold in the United States at artificially high prices;

d.   Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

e.   Whether Plaintiffs and other members of the Class are entitled to injunctive relief and, if so, the nature and extent of such relief.

69.   These questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

70.   Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased Wire Harness Products from one or more of the Defendants, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

71.   Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of Wire Harness Products and have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

72.   Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

73.   A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

74.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

75.   The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## INDUSTRY BACKGROUND

76.   Wire harnesses are systems of electrical and electronic cables, wires and connectors used to transmit informational signals or operating currents to electronic control units, wiring, circuit boards, and other components in motor vehicles.

77.   Wire harness assemblies consist of raw, coiled wire, which is cut to length and terminated.  Individual circuits are assembled together on a jig or table, inserted into connectors and wrapped or taped to form wire harness assemblies.

78.   Wire harnesses have color coded wires that are designed to support specific electrical and electronic motor vehicle features.  Most, if not all, electrical and electronic devices in a vehicle rely on a wire harness to provide electric current and data transmission for operation.

79.   Motor vehicles contain masses of wires that can amount to several kilometers in length.  A motor vehicle's wiring system is organized into multiple

wire harnesses.  Wire harnesses provide organized connection points for multiple wiring configurations.  The harness feature binds wires and cables into a bundle, which provides protection against deterioration or damage from vibration, abrasions, and moisture.

80.   Wire Harness Products are installed by manufacturers in new vehicles as part of the manufacturing process.  Also, Wire Harness Products are installed in vehicles to replace worn out, defective or damaged parts.

81.   Automotive electrical wiring is the wiring that runs throughout the vehicle.

82.   High voltage wiring is integral to vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

83.   Lead wire assemblies connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

84.   Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

85.   Automotive wiring connectors connect various types of wires in a motor vehicle.

86.   Automotive wiring terminals are the ends of a wire that provide a point of connection to external circuits.

87.   Electronic control units ("ECUs") are embedded modules or systems that control one or more of the electrical systems or subsystems in a motor vehicle.

Motor vehicles are equipped with a large number of ECUs that operate various motor vehicle functions and exchange large volumes of data with one another.

88.     Fuse boxes are modules that hold the fuses for the various electrical circuits, all of which are routed through the fuse box.  The primary purpose of an electrical fuse is to help protect components on a circuit from damage in the event of a short circuit or a current spike or overload.

89.     Relay boxes are modules that hold the electrical switches that transmit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit.  Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

90.     Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

91.     Power distributors serve to distribute power at varying levels to various electrical components.

Requests For Quotation

92.     Motor vehicle Original Equipment Manufacturers ("OEMs") require multiple sources for motor vehicle parts.  As part of their supply chain and procurement process, OEMs issue Requests for Quotation ("RFQs") to parts suppliers on a model-by-model basis for model specific Wire Harness Products.

93.     RFQs are a standard business practice that allow parts suppliers to submit price quotations or bids on specific products or services.

94.    Foreign OEMs participate in RFQs to procure parts for U.S.-manufactured vehicles both abroad and in the United States.

95.    Generally, OEMs issue Wire Harness Products RFQs to begin the bidding process approximately three years prior to production of a motor vehicle.

96.    OEMs' RFQs typically include specifications and other relevant information for each motor vehicle product.  In response to RFQs, parts suppliers submit price quotations, or bids, to OEMs to be considered for an award.

97.    After receiving responses to RFQs from each respective bidder, OEMs then award the business to the selected parts suppliers generally for the life of the vehicle model and further confirmed with annual purchase orders.

98.    Suppliers to OEMs have been required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process.

## The Wire Harness Products Industry

99.    It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of Wire Harness Products.

100.   The Wire Harness Products industry is heavily concentrated.  Wire Harness Products manufacturers are all capable of producing Wire Harness Products for use in any motor vehicle.

101. During the Class Period the top four automotive Wire Harness Products manufacturers controlled 76.95% of the global market, and the top seven, all of which are Defendants, controlled 87.95% of the global market. See Figure 1.

**Market Shares of World's Major Manufacturers of Automotive Wiring Harness, 2009**

| Yazaki | 29.81% |
|---------|--------|
| Sumitomo | 24.38% |
| Delphi | 16.71% |
| Leoni | 6.05% |
| Lear | 4.70% |
| Furukawa | 3.61% |
| Fujikura | 2.69% |

Figure 1.

102. According to *Research in China*, an international market research and market data firm, the global automotive wiring harness market reached U.S. $25.3 billion in 2009, and grew by 6.6% to $26.9 billion in 2010. By 2013, the global automotive wiring harness market is projected to increase to almost U.S. $33 billion. See Figure 2.



Figure 2.

103.    There are high barriers to entry in the Wire Harness Products market

due to high capital investment in plant and machinery and technical expertise.  It is

critically important for parts suppliers to maintain minimum viable scale in order

to efficiently produce parts within the price and quantity parameters established by

the OEMs.  As such, loss of one's position as a supplier of choice could have severe

consequences to the business models of Defendants and their co-conspirators.

104.   In a competitive market, economies of scale and decreasing costs would lead to lower prices because manufacturers typically will reduce pricing rather than lose market share.  In a market subject to a conspiracy to fix prices, however, competitors do not have the same incentive to lower prices despite steady or decreasing input costs because, based on a conspiratorial agreement, there is a smaller risk of losing sales to lower-priced competitors.

105.   During the Class Period, the prices of Wire Harness Products increased, while the primary manufacturing input costs remained steady.  In fact, the Yazaki, Sumitomo, Leoni, Furukawa, Delphi, Lear and Fujikura Defendants have extensive experience in wiring production and are able to control associated input costs.

## Opportunities To Conspire

106.   Defendants and their co-conspirators attended industry events that provided the opportunity to meet, disguise their improper discussions, and perform acts in furtherance of the conspiracy.  For example, Defendants and their co-conspirators have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan and the Automotive Aftermarket Products Expo in Las Vegas, Nevada.

## The Conspiracy

107.   During the Class Period, Defendants and their co-conspirators formed an international cartel to suppress and eliminate competition for Wire Harness

Products by agreeing to rig bids for, and to raise, fix, stabilize, or maintain the prices of, Wire Harness Products.

108.   Defendants and their co-conspirators participated in meetings, conversations, and communications in the United States and abroad to discuss bids and price quotations for Wire Harness Products to be submitted to automobile manufacturers in the United States.

109.   Defendants and their co-conspirators agreed during those meetings, conversations, and communications to allocate the supply of Wire Harness Products sold to automobile manufacturers in the United States on a model-by-model basis.

110.   Defendants and their co-conspirators also agreed during meetings, conversations, and communications to coordinate price adjustments requested by automobile manufacturers in the United States.

111.   Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with their conspiratorial agreements.

112.   Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States.

113.   Defendants and their co-conspirators held meetings and conversations in the United States to monitor and police the agreed-upon bid-rigging and price-fixing conspiracy.

114.    Defendants and their co-conspirators undertook measures to maintain the secretive nature of their unlawful conduct, including but not limited to, using code names and meeting at private residences or remote locations.

Government Investigations

115.    Various U.S. and international governmental authorities, including the U.S. Department of Justice ("DOJ") via its Antitrust Division, are currently investigating anticompetitive conduct in connection with the Wire Harness Products industry.

116.    On February 23, 2010, the Federal Bureau of Investigation's ("FBI") Detroit division and the DOJ raided the U.S. offices of Denso, Yazaki, and TRAM. DOJ spokeswoman Gina Talamona said that "[t]he antitrust division is investigating the possibility of anticompetitive cartel conduct. . . . We are coordinating with the European Commission and other foreign competition authorities."

117.    On February 24, 2010, officials from the Competition Directorate of the EC raided the offices of Wire Harness Products manufacturers and a February 25, 2010 EC press release disclosed that the "Commission confirms investigation into suspected cartel in the sector of automotive electrical and electronic components suppliers. . . . The Commission has reason to believe that the companies concerned may have violated EU antitrust rules that prohibit cartels and restrictive business practices." Reports indicated that the EU's investigation included Leoni AG, Leoni Kabel GmbH, Lear Automotive France, Delphi, Yazaki and S-Y Systems.

118.   Also on February 24, 2010, it was reported that the Japanese Fair Trade Commission ("JFTC") raided three Japanese wire harness manufacturers suspected of participating in a price-fixing cartel: Yazaki Corporation, Sumitomo Electric Industries, Ltd., and Furukawa Electric Co., Ltd.  The three manufacturers have a combined 90% share of the Japanese wire harness market.

119.   On June 30, 2011, Defendant Fujikura Ltd. announced that it received an advance notice of disciplinary action against the company from the JFTC for violating antitrust laws regarding the trading of wiring harnesses.  Fujikura Ltd. was ordered to pay 1.2 billion yen (U.S. $14.8 million).

120.   On July 20, 2011, the JFTC raided seven Japanese auto parts makers, including Defendants Denso Corporation and its wholly-owned subsidiary Asmo. The *Japan Times* reported that the JFTC "suspects the parts manufacturers had meetings from 2002 or earlier to set parts prices and decided which companies would win contracts before bidding for orders from automakers."

121.   On July 27, 2011, Defendant Delphi announced in its consolidated second quarter 2011 financial statements that it "received a request from antitrust authorities at the European Commission seeking information about conduct by Delphi in connection with an investigation in the European Union related to the electrical and electronic components market" and is cooperating with European authorities.

122.   On September 29, 2011, the DOJ charged Defendant Furukawa Electric Co., Ltd. and three of its executives with participating in a "combination

and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses and related products" in violation of the Sherman Antitrust Act.

123.   Also on September 29, 2011, Defendant Furukawa Electric Co., Ltd. and its three executives agreed to plead guilty for their involvement in a criminal price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products.  Furukawa Electric Co., Ltd. agreed to pay a $200 million fine while three of its executives agreed to serve prison time in the United States ranging from a year and a day to eighteen months.

124.   The DOJ described these as the "first charges as a result of its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry."

125.   In a September 29, 2011 DOJ press release, Sharis A. Pozen, Acting Assistant Attorney General of the DOJ's Antitrust Division stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

126.   FBI Special Agent in Charge Andrew G. Arena also said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system."  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

127.   According to the DOJ, Defendant Furukawa Electric Co., Ltd. and its co-conspirators manufactured automotive Wire Harness Products (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

128.   The DOJ alleges that Furukawa Electric Co., Ltd. and its co-conspirators: (a) had meetings and communications in the United States and Japan to discuss bids and price quotations to be submitted to automobile manufacturers in the United States, (b) agreed on bids and price quotations to be submitted to automobile manufacturers in the United States, (c) agreed to allocate the supply of automotive wire harnesses and related products sold in the United States on a model-by-model basis, (d) agreed to coordinate price adjustments requested by automobile manufacturers in the United States, (e) submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with the agreements reached, (f) sold Wire Harness Products to automobile manufacturers in the United States at collusive and noncompetitive prices, and (g) participated in meetings and communications to monitor the conspiracy and conceal their unlawful conduct, including but not limited to using code names and meeting at private residences or remote locations.

129.   On October 24, 2011, Hirotsugu Nagata pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the

Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Nagata was employed at Furukawa America in Plymouth, Michigan as General Manager of Sales from January 2004 to November 2007, Chief Financial Officer from January 2004 until March 2009, and Marketing Manager for a related joint venture from January 2004 until June 2009.  Nagata admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

130.   On October 24, 2011, Junichi Funo pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Funo worked at Furukawa Electric Co., Ltd. in Japan as a Honda Sales Division representative from April 2003 to August 2003, then as Assistant General Manager for Honda Sales at Furukawa America from August 2003 to March 2009, and also as Manager of the Honda Sales Division in Japan from March 2009 until at least July 2009.  Funo admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile

manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

131.   On November 10, 2011, Tetsuya Ukai pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Ukai worked at Furukawa Electric Co., Ltd. in Japan as a Manager in the Honda Sales Division from April 2003 to July 2005, Unit Chief in the Honda Sales Division from July 2005 to April 2007, and then General Manager of the Honda Sales Division from April 2007 until at least July 2009.  Ukai admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

132.   On November 14, 2011, Defendant Furukawa Electric Co., Ltd. pleaded guilty for its involvement in a criminal price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products.  Furukawa Electric Co., Ltd. admitted in its guilty plea that during the relevant period, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig

bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.  Furukawa Electric Co., Ltd. agreed to pay a $200 million fine.

133.   On January 19, 2012, the JFTC issued cease and desist orders to Defendants Yazaki Corporation and Fujikura Ltd.  The JFTC also fined Yazaki Corporation, Sumitomo Electric Industries Ltd. and Fujikura Ltd.  The JFTC's cease and desist orders and fines against these Defendants were based on their involvement in a price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products in violation of Article 3 of the Japanese Antimonopoly Act.  According to a JFTC press release, Yazaki Corporation, Sumitomo Electric Industries Ltd., Fujikura Ltd., and Furukawa Electric Co., Ltd. "substantially restrained competition . . . [by] appointing the designated successful bidder and managing to have the designated successful bidder win the bidding."  The JFTC fined Yazaki Corporation approximately $125.8 million, Sumitomo Electric Industries Ltd. $27.5 million, and Fujikura Ltd. $14.4 million.  Furukawa Electric Co., Ltd. admitted to its participation in a price-fixing and bid-rigging conspiracy, but was not fined because it provided information to the JFTC that led to the investigation.

134.   On January 30, 2012, the DOJ announced that Defendant Yazaki Corporation had agreed to pay a $470 million fine and to plead guilty to a three-count criminal information charging Yazaki Corporation with, among other things,

participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Wire Harnesses Products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act.  On March 1, 2012, Defendant Yazaki Corporation pleaded guilty to this charge.

135.   In addition to Yazaki Corporation, four Yazaki executives, Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada, agreed to plead guilty to antitrust violations arising from their participation in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Wire Harness Products sold to certain automobile manufacturers in the United States and elsewhere.  The four executives of Yazaki Corporation will serve prison time ranging from 15 months to two years.  The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act violation.

136.   On January 30, 2012, the DOJ also announced that Defendant Denso Corporation agreed to plead guilty and pay a total of $78 million in criminal fines to a two-count criminal information charging Denso Corporation with, among other things, participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain ECUs sold to an automobile manufacturer in the

United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. ECUs are Wire Harness Products as alleged in this Complaint and are "essential to the wiring, circuit boards, gauges and fuel tanks of automobiles." On March 5, 2012, Denso Corporation pleaded guilty to this charge.

137.   On April 23, 2012, the DOJ announced that Defendant Fujikura Ltd. had agreed to plead guilty to a one-count criminal information charging it with participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Wire Harnesses Products sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2006 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. Fujikura Ltd. also agreed to pay a $20 million fine for its role in the conspiracy.

## FRAUDULENT CONCEALMENT

138.   Defendants affirmatively and wrongfully concealed their anti-competitive conduct from Plaintiffs and the Class from at least January 1, 2000 through at least February 2010, when the antitrust investigations of the Wire Harness Products manufacturers became public. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least February 2010.

139.  Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer allocation, and price-fixing activities.

140.  Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

141.  In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

142.  During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

143.  Defendants likewise agreed to allocate the supply of Wire Harness Products sold to customers in the United States and elsewhere.

144.  Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

145.  In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

146.   As a result of such coordinated actions, and unbeknownst to Plaintiffs, Defendants sold Wire Harness Products to purchasers in the United States at collusive and noncompetitive prices.

147.   To keep the sale of Wire Harness Products at collusive and noncompetitive prices a secret, Defendants employed certain measures, including but not limited to, using code names and meeting at private residences or remote locations.

148.   Moreover, Defendants' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

149.   Despite due diligence, Plaintiffs had no knowledge of Defendants' unlawful contract, combination, or conspiracy.

150.   In the course of purchasing Wire Harness Products, Plaintiffs studied prices of the specific products involved.

151.   Plaintiffs received from one or more Defendants various pricing information.  Plaintiffs had no way to know that Defendants' prices were higher than they should have been due to the conspiracy alleged herein.

152.   Plaintiffs did not and could not have discovered Defendants' unlawful contract, combination, or conspiracy at any earlier date, despite due diligence. Defendants undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiffs and the Class of the reasons for the prices charged,

and engaging in secret conversations concerning the allocation of customers, bid-rigging, and price-fixing of Wire Harness Products.

## ANTITRUST INJURY

153.   Defendants' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among Wire Harness Products manufacturers, thereby depriving purchasers of Wire Harness Products of the benefits of a competitive market and setting prices of Wire Harness Products at artificially high levels.

154.   As a direct result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for Wire Harness Products than otherwise would have been the case in a competitive market.

## CLAIM FOR RELIEF

**(Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)**

155.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

156.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Wire Harness Products sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

157.   The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-

conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for Wire Harness Products sold in the United States. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

158. Defendants succeeded in rigging bids, fixing, raising, maintaining and stabilizing the prices of Wire Harness Products sold in the United States during the Class Period.

159. For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they conspired to do, including:

   a. Participating in meetings and conversations in the United States and elsewhere to discuss the bids and price quotations of Wire Harness Products to be submitted to direct purchasers in the United States;

   b. Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;

   c. Agreeing to manipulate prices and allocate supply of Wire Harness Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

   d. Agreeing to coordinate price adjustments in the United States;

e.    Submitting bids, price quotations, and price adjustments to direct purchasers of Wire Harness Products in accordance with the agreements reached;

f.    Selling Wire Harness Products to direct purchasers in the United States at noncompetitive prices; and

g.    Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

160.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses or property in that they have paid more for Wire Harness Products than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act;

C.      That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest; and

G.      That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated:  May 14, 2012

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road, Ste. 111
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Direct Purchaser Interim Liaison
Counsel

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU
  & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME  04112-9546
Telephone:  (207) 791-3000
ghansel@preti.com
rweill@preti.com
jcarver@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Telephone:  (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Michael J. Freed
Steven A. Kanner
William H. London
Michael L. Silverman
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:  (224) 632-4500
mfreed@fklmlaw.com
skanner@fklmlaw.com
blondon@fklmlaw.com
msilverman@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
  & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Direct Purchaser Interim Lead Counsel

43

W. Joseph Bruckner
LOCKRIDGE GRINDAL
    NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wjbruckner@locklaw.com

Robert Bonsignore
Richard Kirchner
Brian Hagen
Paula Flannery
Lisa Sleboda
BONSIGNORE & BREWER
193 Plummer Hill Road
Belmont, NH 03220
Telephone:  (781) 856-7650
rbonsignore@class-actions.us
rkirchner@class-actions.us
bhagen@class-actions.us
pflannery@class-actions.us
lsleboda@class-actions.us

Brian Murray
Lee Albert
MURRAY FRANK LLP
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
bmurray@murrayfrank.com
lalbert@murrayfrank.com

Garret Blanchfield
REINHARDT, WENDORF
    & BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
Telephone:  (651) 287-2100
g.blanchfield@rwblawfirm.com

Solomon B. Cera
GOLD BENNETT CERA
    & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
scera@gbcslaw.com

James F.B. Daniels
MCDOWELL, RICE, SMITH
    & BUCHANAN, P.C.
605 West 47th Street, Suite 350
Kansas City, MO 64112-1005
Telephone: (816) 753-5400
jdaniels@mcdowellrice.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS & TOLL
    PLLC
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 578-6850
jdominguez@cohenmilstein.com

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
vesades@heinsmills.com

Karlos F. Finley
BOTELER, FINLEY & WOLFE, P.C.
1252 Dauphin Street
Mobile, AL 36604
Telephone:  (251)433-7766
karlos@bfw-lawyers.com

Joseph M. Fischer
CARSON FISCHER, P.L.C.
4111 Andover Road West - Second Floor
Bloomfield Hills, MI 48302-1924
Telephone:  (248) 644-4840
jfischer@carsonfischer.com

Bruce E. Gerstein
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
Telephone: (212) 398-0055
bgerstein@garwingerstein.com

Lewis Goldfarb
MCELROY, DEUTSCH, MULVANEY
   & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ  07962-2075
Telephone: (973) 425-8689
lgoldfarb@mdmc-law.com

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
Telephone: (513) 345-8291
jgoldenberg@gs-legal.com

Steve Greenfogel
LITE DEPALMA GREENBERG, LLC
1521 Locust Street
Philadelphia, PA 19102
Telephone:  (215) 564-5182
sgreenfogel@litedepalma.com

Steven D. Irwin
LEECH TISHMAN FUSCALDO
   & LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219
Telephone: (412) 261-1600
sirwin@leechtishman.com

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  (619) 687-6611
dmogin@moginlaw.com

D. Michael Noonan
SHAHEEN & GORDON, P.A.
P.O. Box 977
140 Washington Street, 2nd floor
Dover, NH 03821
Telephone: (603) 749-5000
mnoonan@shaheengordon.com

Linda P. Nussbaum
Robert G. Eisler
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
lnussbaum@gelaw.com

Dustin M. Roach
VAN GILDER & TRZYNKA, P.C.
436 E. Wayne Street
Fort Wayne, IN 46802
Telephone: (260) 424-8132
droach@vgtlaw.com


Wesley Steury
BURT BLEE DIXON SUTTON &
BLOOM, LLP
200 East Main Street, Suite 1000
1st Source Banking Center
Fort Wayne, IN 46802
Telephone: (260) 426-1300
Wsteury@burtblee.com

Stephen M. Smith
JOSEPH SMITH, LTD.
2100 Kecoughtan Road
Hampton, VA 23661
Telephone: (757) 244-7000 Ext. 123
ssmith@braininjurylawcenter.com

Robert Peurach
DAKMAK PEURACH, P.C.
615 Griswold Street, Suite 600
Detroit, MI 48226
Telephone: (866) 732-9522
rpeurach@gdakmak.com

R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
rick@saveri.com
cadio@saveri.com

Michael T. Smith
LAW OFFICES OF
MICHAEL T. SMITH
440 West Irving Park Road
Roselle, IL 60172
Telephone: (847) 380-5899
lawoffice0724@sbcglobal.net

Jason J. Thompson
Lance A. Young
SOMMERS SCHWARTZ PC
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone: (248) 355-0300
jthompson@sommerspc.com
lyoung@sommerspc.com