UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE WIRE HARNESS SYSTEMS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
| | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| THIS DOCUMENT RELATES TO: | |
| END-PAYOR ACTIONS | <u>JURY TRIAL DEMANDED</u> |

Plaintiffs Rebecca Lynn Morrow; Erica Shoaf; Ifeoma Adams; Melissa Barron; John Hollingsworth; Meetesh Shah; Gary Arthur Herr; Michael Tracy; Jane Taylor; Jennifer Chase; Darrel Senior; AGA Realty LLC;  James Marean; Ron Blau; Roger Olson; Susan Olson; Nilsa Mercado; Darcy Sherman; Curtis Gunnerson; David Bernstein; Ellis Winston McInnis; Thomas Wilson; Lauren C Primos; Robert Klingler; Jessica DeCastro; Lori Curtis; Virginia Pueringer; Nathan Croom; Richard Stoehr; Edward Muscara; Michael Wick; Ian Groves; Tenisha Burgos; Jason Grala; Peter Brook; Kathleen Tawney; Kelly Klosterman; Melinda Harr DDS PC; Cindy Prince; Paul Gustafson; Frances Gammell Roach; William Picotte; Phillip Young; Becky Bergeson; Jessee Powell; Alena Farrell; Jane FitzGerald; Arthur Stukey; Janne Rice; Robert Rice, Jr.; Stacey Nickell; Carol Ann Kashishian; and Susan LaCava (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to them and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, Plaintiffs demand a trial by jury, and allege as follows:

## NATURE OF ACTION

1.     This lawsuit is brought as a proposed class action against Defendants, the largest suppliers of Automotive Wire Harness Systems (defined below) globally and in the United States, for engaging in a massive, decade-long conspiracy to unlawfully fix and artificially raise the prices of these products.  Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2.     Plaintiffs seek to represent consumers who purchased or leased new motor vehicles containing Automotive Wire Harness Systems or replacement Automotive Wire Harness Systems during the period from and including January 1, 2000 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period").

3.     "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle.  Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle.   "Automotive Wire Harness Systems" include the following:  automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and speed sensor wire assemblies.

4.     The Delphi Defendants, the Denso Defendants, the Fujikura Defendants, the Furukawa Defendants, the Lear Defendants, the Leoni Defendants, the Sumitomo Defendants, S-Y Systems, the Yazaki Defendants, the Tokai Rika Defendants, and the G.S. Electech Defendants (all as defined below, and collectively "Defendants") manufacture, market, and sell Automotive Wire Harness Systems throughout the United States.  The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

5.      Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Wire Harness Systems.

6.      Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems since at least February 2010.  As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Automotive Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices.  The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants.

7.      As hereafter more fully alleged, Defendants Furukawa Electric Co. Ltd., Yazaki Corporation, Denso Corporation, G.S. Electech, Inc., and Fujikura Ltd., have pleaded guilty to participating in the Automotive Wire Harness Systems cartel during the Class Period and have agreed to pay substantial fines for their unlawful conduct.  These Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harness Systems sold to automobile manufacturers and others in the United States.  The combination and conspiracy engaged in by these Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      As part of their plea agreements, Defendants have agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

9.      As a direct result of the anti-competitive and unlawful conduct alleged herein,
Plaintiffs and the Classes paid artificially inflated prices for Automotive Wire Harness Systems
during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to
secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman
Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages pursuant to
state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution,
recover damages and secure other relief against Defendants for violation of those state laws.
Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and
state law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to
Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1),
and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter
jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that:  (i) this is
a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of
interests and costs, and in which some members of the proposed Classes are citizens of a state
different from some Defendants; and (ii) Plaintiffs' state law claims form part of the same case
or controversy as their federal claims under Article III of the United States Constitution.

12.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15
U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events
giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected
interstate trade and commerce discussed below has been carried out in this district, and one or

4

more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

13.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Wire Harness Systems throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district. Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States.

14.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

15.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

16.     Automotive Wire Harness Systems manufactured abroad by Defendants and sold for use in automobiles that were either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any Automotive Wire Harness Systems are

purchased in the United States, and such Automotive Wire Harness systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

17.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harness Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Automotive Wire Harness Systems.

18.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Wire Harness Systems for personal use, including Plaintiffs and members of the Classes.

## PARTIES

19.     Plaintiff Rebecca Lynn Morrow is a Glendale, Arizona resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

20.     Plaintiff Erica Shoaf is a Phoenix, Arizona resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

21.     Plaintiff Ifeoma Adams is a Hercules, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

22.     Plaintiff Melissa Barron is an Oakland, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

23.     Plaintiff John Hollingsworth is a Saratoga, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

24.     Plaintiff Meetesh Shah is a Daly City, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

25.     Plaintiff Gary Arthur Herr is an Orlando, Florida resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

26.     Plaintiff Michael Tracy is a Pensacola, Florida resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

27.     Plaintiff Jane Taylor is a Kapaa, Hawaii resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

28.     Plaintiff Jennifer Chase is a Waterloo, Iowa resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

29.     Plaintiff Darrel Senior is a Lenexa, Kansas resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

30.     Plaintiff AGA Realty LLC, a Limited Liability Company with its principal place of business in Portland, Maine, purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

31.     Plaintiff James Marean is a Westbrook, Maine resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

32.     Plaintiff Ron Blau is a Newton Highlands, Massachusetts resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

33.     Plaintiff Roger Olson is a South Haven, Michigan resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

34.     Plaintiff Susan Olson is a South Haven, Michigan resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

35.     Plaintiff Nilsa Mercado is a Waterford, Michigan resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

36.     Plaintiff Darcy Sherman is a Minneapolis, Minnesota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

37.     Plaintiff Curtis Gunnerson is a South Haven, Minnesota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

38.     Plaintiff David Bernstein is a Minnetonka, Minnesota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

39.     Plaintiff Ellis Winton McInnis is a Flowood, Mississippi resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

40.     Plaintiff Thomas Wilson is a Tupelo, Mississippi resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

41.     Plaintiff Lauren C. Primos is a Flowood, Mississippi resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

42.     Plaintiff Robert Klingler is a Manchester, Missouri resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

43.     Plaintiff Jessica DeCastro is a St. Louis, Missouri resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

44.     Plaintiff Lori Curtis is a St. Louis, Missouri resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

45.     Plaintiff Virginia Pueringer is a Billings, Montana resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

46.     Plaintiff Nathan Croom is an Omaha, Nebraska resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

47.     Plaintiff Richard Stoehr is a Henderson, Nevada resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

48.     Plaintiff Edward Muscara is a Manchester, New Hampshire resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

49.     Plaintiff Michael Wick is a Rio Rancho, New Mexico resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

50.     Plaintiff Ian Groves is an Albuquerque, New Mexico resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

51.     Plaintiff Tenisha Burgos is a Bronx, New York resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

52.     Plaintiff Jason Grala is a Holbrook, New York resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

53.     Plaintiff Peter Brook is a Bayside, New York resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

54.     Plaintiff Kathleen Tawney is a Charlotte, North Carolina resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

55.     Plaintiff Kelly Klosterman is a Mooreton, North Dakota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

56.     Plaintiff Melinda Harr DDS PC, a corporation with its principal offices in Fargo, North Dakota, purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

57.     Plaintiff Cindy Prince is a Langlois, Oregon resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

58.     Plaintiff Paul Gustafson is a Milwaukie, Oregon resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

59.     Plaintiff Frances Gammell Roach is a Warwick, Rhode Island resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

60.     Plaintiff William Picotte is a former resident of South Dakota who purchased Automotive Wire Harness Systems indirectly from one or more Defendants in South Dakota during the Class Period.

61.     Plaintiff Phillip Young is a Bon Aqua, Tennessee resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

62.     Plaintiff Becky Bergeson is a Merry, Utah resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

63.     Plaintiff Jesse Powell is a Lehi, Utah resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

64.     Plaintiff Alena Farrell is a South Burlington, Vermont resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

65.     Plaintiff Jane FitzGerald is a Milton, Vermont resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

66.    Plaintiff Arthur Stukey is a Montpelier, Vermont resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

67.    Plaintiff Janne Rice is a Kenova, West Virginia resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

68.    Plaintiff Robert Rice, Jr. is a Kenova, West Virginia resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

69.    Plaintiff Stacey Nickell is a Beckley, West Virginia resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

70.    Plaintiff Carol Ann Kashishian is a Milwaukee, Wisconsin resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

71.    Plaintiff Susan LaCava is a Madison, Wisconsin resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

**The Delphi Defendants**

72.    Defendant Delphi Automotive LLP is headquartered in Troy, Michigan and is a limited liability partnership incorporated under the laws of England and Wales. Delphi Automotive LLP, together with its subsidiaries and affiliates, manufactured Automotive Wire Harness Systems that were sold and/or purchased in the United States during the Class Period, including in this District.

73.    Defendant Delphi Automotive Systems, LLC is incorporated in Delaware and headquartered in Troy, Michigan. Delphi Automotive Systems, LLC manufactured Automotive Wire Harness Systems that were sold and/or purchased in the United States during the Class Period, including in this District.

74.    Defendants Delphi Automotive LLP and Delphi Automotive Systems, LLC shall collectively be referred to herein as the "Delphi Defendants" or "Delphi."

75.    Delphi Automotive LLP and Delphi Automotive Systems, LLC were both formed in 2009 to acquire certain automotive parts assets from Delphi Corporation and its subsidiaries which were then in bankruptcy. Delphi Automotive LLP and Delphi Automotive Systems, LLC continued the Automotive Wire Harness Systems business that had been conducted by Delphi Corporation and its subsidiaries prior to their entry into the bankruptcy proceedings hereinafter more fully described.

76.    In December 2004, for example, Delphi Corporation and Furukawa Electric (defined below) announced the creation of a joint venture responsible for selling Automotive Wiring Harness Systems to Toyota in North America. The joint venture – named Delphi Furukawa Wiring Systems LLC – was based in Warren, Ohio. As Furukawa Electric stated in a press release:

> Delphi Furukawa Wiring Systems LLC has the abilities for design, development and quality control of Wiring Harness succeeded from Furukawa Electric and the abilities for system integration, manufacturing and customer support in North America from Delphi, in order to meet and exceeds [sic] the customer's expectations. The joint venture is responsible for the sales and engineering activities for the Wiring Harness, which both Delphi and Furukawa Electric have agreed upon for Toyota programs in North America, and it will take charge of sales activities directly to the customer. Regarding the manufacturing of Wiring Harness, the joint venture will utilize existing Delphi's operation facility under its direction, in order to put know-how from the both parent companies.

77.    In October, 2005, Delphi Corporation and certain U.S. subsidiaries and affiliates, including Delphi Furukawa Wiring Systems LLC, filed 42 petitions for Chapter 11 bankruptcy protection. These proceedings were jointly administered in the United States Bankruptcy Court for the Southern District of New York. *See* Docket Nos. 05-44481 (Delphi Corporation); 05-47452 (Delphi Furukawa Wiring Systems LLC).

78.     In 2006, Delphi Furukawa Wiring Systems LLC opened a 5,500 square foot Customer Service Center at 2311 Green Road in Ann Arbor, Michigan, near the Toyota Technical Center.

79.     On July 30, 2009, the bankruptcy court approved a modified plan of reorganization.  [Docket No. 05-44481, Doc. No. 18707].  The modified plan of reorganization became effective on October 6, 2009 (the "Effective Date").

80.     On October 6, 2009, Delphi Corporation (which in bankruptcy had changed its name to DPH Holdings Corporation) substantially consummated the terms of the modified plan of reorganization.  On that date, Delphi Automotive LLP, through subsidiaries and affiliates owned and controlled by it, acquired substantially all of the bankrupt Delphi entities' global core businesses, including the portion of the bankrupt Delphi entities' Automotive Wire Harness Business.

81.     Following the Effective Date, the Delphi Defendants continued the Automotive Wire Harness Systems supply relationships that had been developed by the bankrupt entities, including, for example, Delphi Furukawa Wiring Systems LLC's supply relationship with Toyota.  Delphi Automotive Systems, LLC currently maintains and operates the Delphi Ann Arbor Customer Service Center in Ann Arbor, Michigan near the Toyota Technical Center.  On March 15, 2011, Toyota recognized "Delphi Automotive" as one of its top suppliers for 2010, noting "wire harness" among the products supplied.

82.     Following the Effective Date, the Delphi Defendants continued to sell Automotive Wire Harness Systems pursuant to, and as part of their participation in furtherance of, the conspiracy alleged herein.  From and after October 6, 2009, the Delphi Defendants sold a significant number of Automotive Wire Harness Systems in the United States at supra-

competitive prices.  For 2010 alone, Delphi Automotive LLP reported $5.6 billion in total sales for its Electronic/Electronic Architecture business segment, which included significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy.

**The Denso Defendants**

83.     Defendant Denso Corp. is a Japanese corporation.  Defendant Denso Corp. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

84.     Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corp.  Defendant Denso International America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

85.     Defendants Denso Corp., and Denso International America, Inc. shall collectively be referred to herein as the "Denso Defendants" or "Denso."

**The Fujikura Defendants**

86.     Defendant Fujikura Ltd. is a Japanese corporation.  Defendant Fujikura Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

87.     Defendant Fujikura America, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.  It is a subsidiary of and wholly owned and/or controlled by its parent, Fujikura Ltd.  Defendant Fujikura America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

88.     Defendants Fujikura Ltd. and Fujikura America, Inc. shall collectively be referred to herein as the "Fujikura Defendants" or "Fujikura."

**The Furukawa Defendants**

89.     Defendant Furukawa Electric Co., Ltd. ("Furukawa Electric") is a Japanese corporation.  Defendant Furukawa Electric – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

90.     Defendant American Furukawa, Inc. ("American Furukawa") is a Delaware corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Furukawa Electric.  Defendant American Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

91.     Defendant Furukawa Wiring Systems America, Inc. f/k/a Furukawa Lear Corporation and Lear Furukawa Corporation ("Furukawa Wiring") is a Delaware corporation

with its principal place of business in El Paso, Texas.  Defendant Furukawa Wiring is 60%

owned by Furukawa Electric and 40% owned by American Furukawa.  During the Class Period,

Furukawa Wiring operated as a joint venture between Lear Corporation and Furukawa Electric

that manufactured, distributed or sold Wire Harness Products in the United States.  In June 2010,

Furukawa Electric purchased all of Lear's remaining interest.

92.    Defendants Furukawa Electric, American Furukawa and Furukawa Wiring shall

collectively be referred to herein as the "Furukawa Defendants" or "Furukawa."

**The Lear Defendants**

93.    Defendant Lear Corp. is a Delaware corporation with its principal place of

business in Southfield, Michigan.  Defendant Lear – directly and/or through its subsidiaries,

which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive

Wire Harness Systems that were purchased throughout the United States, including in this

district, during the Class Period.

94.    Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware

corporation with its principal place of business in Selma, Alabama.  It is a joint venture between

Defendant Lear Corp. and Kyungshin Corporation of South Korea.  Defendant Kyungshin-Lear

Sales and Engineering, LLC manufactured, marketed and/or sold Automotive Wire Harness

Systems that were purchased throughout the United States, including in this district, during the

Class Period.

95.    Defendants Lear Corp. and Kyungshin-Lear Sales and Engineering, LLC shall

collectively be referred to herein as the "Lear Defendants" or "Lear."

96.    Lear filed for Chapter 11 bankruptcy protection on July 7, 2009.  After their

emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to

sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy alleged herein. From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices. In 2010 alone, Lear had $2.5593 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy hereinafter alleged.

**<u>The Leoni Defendants</u>**

97.    Defendant Leoni AG is a German corporation. Defendant Leoni AG – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

98.    Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG. Defendant Leoni Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

99.    Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG. Defendant Leonische Holding, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including

in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

100.    Defendant Leoni Wire Inc. is a Massachusetts corporation with its principal place of business in Chicopee, Massachusetts.  It is a subsidiary of and wholly owned and/or controlled by its parent Leoni AG.   Defendant Leoni Wire Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

101.    Defendant Leoni Kabel GmbH is a German corporation   Defendant Leoni Kabel GmbH manufactured, marketed  or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

102.    Defendants Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding, Inc., and Leoni Kabel GmbH shall collectively be referred to herein as the "Leoni Defendants" or "Leoni."

**The Sumitomo Defendants**

103.    Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation. Defendant Sumitomo Electric Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled –  manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

104.    Defendant Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd.  Defendant Sumitomo

Electric Wintec America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent. Defendant Sumitomo Electric Wintec America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

105.     Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Defendant Sumitomo Wiring Systems, Ltd. has asserted that it is "proud to hold the world's top share in the automobile wiring harness field." It – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

106.     Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

107.     Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee. It is a subsidiary of and wholly owned and/or

controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant K&S Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

108. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

109. Defendants Sumitomo Electric Industries, Ltd., Sumitomo Electric Wintec America, Inc., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc. shall collectively be referred to herein as the "Sumitomo Defendants" or "Sumitomo."

**S-Y Systems and the Yazaki Defendants**

110. Defendant S-Y Systems Technologies Europe GmbH ("S-Y Systems") is a German corporation. Defendant S-Y Systems – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

111.     Defendant Yazaki Corporation is a Japanese corporation.  Defendant Yazaki Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

112.     Defendant S-Y Systems Technologies America, LLC ("S-Y Systems")  is a Delaware corporation with its principal place of business in Dearborn, Michigan.  It is currently a wholly owned subsidiary of and/or controlled by its parent Defendant Yazaki Corporation, but was formerly a wholly owned subsidiary of and/or controlled by Defendant S-Y Systems. Defendant S-Y Systems Technologies America, LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of either its German parent, during the time it was owned and controlled by S-Y Systems, or its current Japanese parent, Yazaki Corporation.

113.     Defendant Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Yazaki Corporation.  Defendant Yazaki North America Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

114.     Yazaki Corporation, Yazaki North America, Inc. and S-Y Systems Technologies America, LLC are herein referred to as shall collectively be referred to herein as the "Yazaki Defendants" or "Yazaki."

**The Tokai Rika Defendants**

115.     Defendant Tokai Rika, Ltd. is a Japanese company with its principal place of business in Toyota, Japan.  Defendant Tokai Rika, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

116.     Defendant  TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan Corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent Tokai Rika, Ltd.  During the Class Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including this district, during the Class Period.

117.     Tokai Rika, Ltd. and TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. are herein referred collectively as the " Tokai Rika Defendants" or "Tokai Rika."

**G.S. Electech Defendants**

118.     Defendant GS Electech, Inc. is a Japanese corporation with its principal place of business in Toyota, Japan.   Defendant GS Electech, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

119.     Defendant G.S. Wiring Systems Inc. is an Ohio corporation based in Findlay, Ohio.  Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc.  G.S. Wiring Systems Inc. manufactured, marketed and/or sold

Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

120.    Defendant G.S.W. Manufacturing Inc. is an Ohio corporation based in Findlay, Ohio.  Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc.  G.S.W. Manufacturing Inc. represents itself as a Tier 1 and 2 supplier of Automotive Wire Harness Systems.   G.S.W. Manufacturing Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

## AGENTS AND CO-CONSPIRATORS

121.    Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

122.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

123.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

**A.**     **The Automotive Wire Harness System Industry**

124.     Automotive Wire Harness Systems comprise the "central nervous system" of an automotive vehicle and consist of the wires or cables and data circuits that run throughout the vehicle.  To ensure safety and basic functions (e.g., going, turning, and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics that operate using control signals running on electrical power supplied from the battery.  The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.  See Figures 1 and 2.



Figure 1.



Figure 2.

125.    Automotive electrical wiring is the wiring that runs throughout the vehicle.

126.    High voltage wiring is integral to vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

127.    Lead wire assembles connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

128.    Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

129.    Automotive wiring connectors connect various types of wires in an automobile. Wire connectors that carry reduced amps tend to be small, while those connectors that are handling heavy loads tend to be much larger.  Automotive wiring connectors can snap, slide, or clip together.

130.    Automotive wiring terminals are the ends of a wire that provide a point of connection to external circuits.

131.    Electrical control units are embedded modules or systems that control one or more of the electrical systems or subsystems in a motor vehicle.  Motor vehicles are equipped with a

large number of electronic control units which operate various automotive functions and exchange large volumes of data with one another.

132.    Fuse boxes are modules that hold the fuses for the various electrical circuits, all of which are routed through the fuse box.  The primary purpose of an electrical fuse is to help protect components on a circuit from damage in the event of a short circuit or a current spike or overload.  Vehicles have several fuses that are necessary to safeguard electrical circuits.

133.    Relay boxes are modules that hold the electrical switches that transit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit.  Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

134.    Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

135.    Power distributors serve to distribute power at varying levels to various electrical components.

136.    Speed sensor wire assemblies are installed on automobiles with Antilock Brake Systems ("ABS").  The speed sensor wire assemblies connect a sensor on each tire to the ABS and carry electrical signals from the sensors to the ABS to instruct it when to engage.

137.    Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Automotive Wire Harness Systems.

138.    For new cars, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Wire Harness Systems directly from

Defendants.  Automotive Wire Harness Systems may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier I Manufacturers supply Automotive Wire Harness Systems directly to an OEM.

139.    When purchasing Automotive Wire Harness Systems and related products, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

140.    Defendants and their co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

141.    Plaintiffs and members of the proposed Classes purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants.  By way of example, an owner of a vehicle may indirectly purchase an Automotive Wire Harness System from Defendants as part of purchasing or leasing the new vehicle.   An owner of a vehicle may also indirectly

purchase a replacement Automotive Wire Harness System from Defendants when repairing a damaged vehicle or where the vehicle's Automotive Wire Harness System is defective.

142.    The global Automotive Wire Harness Systems market size reached US $21.9 billion in 2009, and increased by 32.2% to US $29 billion in 2010.  According to Research in China, a leading source for international market research and market data, the Automotive Wire Harness Systems market is steadily growing, and is expected to be US $32 billion in 2012.

143.    The global Automotive Wire Harness Systems market is dominated and controlled by large manufacturers, the top six of which are Defendants who control almost 90% of the global market; of those, four control almost 77% of the global market.  See Figures 3 and 4.

**Market Shares of World's Major Manufacturers of Automotive Wiring Harness, 2009**



Figure 3.

**Ranking by Revenue of Automotive Wiring Harness Manufacturers Worldwide, 2009**

| | Revenue in 2009 (US$ M) |
|---|---|
| Yazaki | 7,548 |
| Sumitomo | 6,172 |
| Delphi | 4,230 |
| Leoni | 1,531 |
| Furukawa | 914 |
| Lear | 1,190 |
| Coroplast | 400 |
| THB Group | 136 |
| Fujikura | 682 |
| YURA | 404 |
| Comba | 98 |
| Others | 2,012 |

Figure 4.

144.     Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009.  As it states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market."  In fact, 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in the Western Hemisphere.  Yazaki's largest customers are Toyota, followed by Chrysler, Ford, Renault-Nissan, Honda, and finally General Motors.  In the Western Hemisphere, it supplies Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru, and Toyota.

145.     Defendant Sumitomo is the second largest manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.

146.    Defendant Delphi is the third largest maker of Automotive Harness Systems as of 2009.  It controls 16.71% of the global market.  Its two largest customers are General Motors and Ford.

147.    Defendant Lear controls almost 5% of the global market for Automotive Wire Harness Systems.  Lear supplies Toyota, General Motors, Ford, and BMW.

148.    Defendant Furukawa controls almost 4% of the global market for Automotive Wire Harness Systems.

149.    Defendant Leoni controls 6% of the global market for Automotive Wire Harness Systems.

150.    By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and the world.

**B.    Defendants Increased Prices for Automotive
         Wire Harness Systems Despite Steady Costs**

151.    In a competitive market, falling material and labor costs would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower costs to lower their prices in order to capture market share.  The only economically rational action in such a situation is for each competitor to lower its own prices.

152.    In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with steady or decreasing input costs.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

153.    The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same.  In fact, according to Research in China, Sumitomo and Furukawa own their own copper mines and effectively control their copper

31

input costs.  Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems.  In a competitive market, steady input costs should not have resulted in rising prices to Defendants' customers for Automotive Wire Harness Systems.  Such anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

     **C.**    **The Structure and Characteristics of the Automotive Wire Harness Systems Market Render the Conspiracy More Plausible**

154.     The structure and other characteristics of the Automotive Wire Harness Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  Specifically, the Automotive Wire Harness Systems market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

     **1.**    **The Automotive Wire Harness Systems Market Has High Barriers to Entry**

155.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

156.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Wire Harness Systems market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

157.    In addition, OEMs cannot change Automotive Wire Harness Systems suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System it purchases for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model. Thus, the design must be synergized by Automotive Wire Harness Systems manufacturers and OEMs. It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for Automotive Wire Harness Systems

158.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

159.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

160.    Demand for Automotive Wire Harness Systems is highly inelastic. Demand for Automotive Wire Harness Systems is inelastic because there are no close substitutes for these products. In addition, customers must purchase Automotive Wire Harness Systems as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### 3.     The Market for Automotive Wire
### Harness Systems Is Highly Concentrated

161.     A highly concentrated market is more susceptible to collusion and other anti-competitive practices.

162.     As discussed above, Defendants dominate the Automotive Wire Harness Systems market.  Six of the Defendants control almost 90% of the global market, and four of the Defendants control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo controls 24%; Delphi controls 16.71%; Lear controls almost 5%; Furukawa controls almost 4%; and Leoni controls 6%.

### 4.     Defendants had Ample Opportunities to Conspire

163.     Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  For example, Defendants and their co-conspirators have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan and the Automotive Aftermarket Products Expo in Las Vegas, Nevada.  Indeed, according to the NAIAS website, Defendant Denso was a premier sponsor of the 2012 event, held January 9 to January 22.

### D.     <u>Government Investigations</u>

164.     A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems.

165.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  One carmaker is said to have failed to attract competitive bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to take their complaint to the EC.

166.    On February 8, 2010, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anti-competitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems.  The EC also carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010.  Specifically, EC investigators raided the offices of Leoni, S-Y Systems, and Yazaki.  "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

167.    Defendants S-Y Systems and Leoni have admitted that they are cooperating with the antitrust investigators.  Lear's Chief Executive Officer Bob Rossiter has stated that Lear was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers.  In addition, Delphi has admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market."  Delphi stated that it is cooperating fully with the European competition authorities.  Leoni has also stated that it is cooperating with the antitrust investigators.

168.    In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of Furukawa, Sumitomo, and Yazaki as part of an expansive investigation into collusion in the industry dating back to at least 2003.

169.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.  "The antitrust

division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

170.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including Defendants Denso, Tokai Rika, as well as Yazaki's subsidiary in Canton Township, Michigan.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

171.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### E.    Guilty Pleas

172.    On September 29, 2011, the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of Automotive Wire Harness Systems to automobile manufacturers.

173.    Furukawa Electric is charged with price fixing in violation of the Sherman Act.

174.    Furukawa Electric has pleaded guilty for its role in a conspiracy to rig bids for and to fix the prices of the sale of Automotive Wire Harnesses and related products sold to

automobile manufacturers in the United States and elsewhere.  The DOJ announced in a press release that Furukawa Electric participated in the conspiracy from at least as early as January 2000, until at least January 2010.

175.    The plea agreements discussed herein are an outgrowth of the DOJ's first charges in its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry.  According to four separate one-count felony charges filed in the Unites States District Court for the Eastern District of Michigan in Detroit, Furukawa Electric and its executives – Junichi Funo, Hirotsugu Nagata, and Tetsuya Ukai – engaged in a conspiracy to rig bids for and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere.

176.    According to the Information filed, Furukawa Electric and its co-conspirators carried out the conspiracy by:

(a)    participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

177.    "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

178.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge

Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

179.    At its November 14, 2011 Plea and Sentencing hearing, Defendant Furukawa Electric pleaded guilty, and was ordered to pay its $200 million fine within 45 days. At the hearing, Defendant Furukawa Electric described its participation in the conspiracy as follows:

> From the time period listed in the Information, that is, approximately from January, 2000 to January, 2010, officers and employees of my company had discussions with employees of competitors that also manufactured and sold automotive wire harness products. . . . These discussions took place in face-to-face meetings or by telephone. The discussions took place in the United States and elsewhere.
>
> During . . . such meetings and conversations, a conspiracy was formed and agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis and to rig bids quoted to automobile manufacturers for automotive wire harnesses and related products.
>
> Therefore, as a result of these meetings, my company produced and sold automotive wire harnesses and related products that were the subject of the illegal price fixing agreements that my company had made with competitors. Those products and the payments for those products traveled in interstate and foreign commerce and substantially affected interstate and foreign trade and commerce.
>
> For the purposes of this plea agreement, during the time period of January, 2000 to January, 2010, our sales of automotive wire harnesses and related products affecting U.S. auto manufacturers totaled approximately $839 million.
>
> Finally, we note to the Court that some of the products affected by the conspiracy were sold to automobile manufacturers by one of our subsidiaries [American Furukawa], which is located here in the Eastern District of Michigan.
>
> – Plea & Sentencing, *United States v. Furukawa Electric Co.*, No. 11-cr-20612 (E.D. Mich.), at 14-16.

180.     Furukawa Electric's executives Funo, Nagata, and Ukai also admitted their

participation in the unlawful cartel in open court:

(a)      At his October 24, 2011 Guilty Plea Hearing, Furukawa executive Junichi

Funo admitted that he participated in a conspiracy to restrain trade.  Mr. Funo admitted entering

into agreements with competitors – *i.e.*, Defendants herein – in order to set prices and maintain

them, including rigging bids that were solicited from customers.  The agreements also sought to

control, and did control, price adjustments.  In Mr. Funo's own words, he "did price fixing for

automotive parts."  That price fixing "generally involved . . . wiring harnesses and related

products."  The price fixing affected the sales of goods throughout the United States.  Mr. Funo

was personally present at meetings during which such unlawful agreements were reached,

including meetings that occurred in the Eastern District of Michigan.  Pursuant to his plea, Mr.

Funo was sentenced to one year of prison, fined $20,000, and pledged to cooperate in the DOJ's

ongoing investigation.

(b)      At his October 24, 2011 Guilty Plea Hearing, Furukawa executive

Hirotsugu  Nagata admitted that he participated in "an agreement to submit non-competitive bids

in an amount greater than $100 million."  The purpose of the agreement was to "suppress and

eliminate competition in the automotive parts industry."  In Mr. Nagata's own words, he

furthered the unlawful conspiracy with Defendants by having "a meeting [with] co-conspirators

and some agreement [on] price for automobile manufacturing parts" – primarily Automotive

Wire Harness Systems.  He personally participated in "several" unlawful meetings to further the

conspiracy, at which Defendants made agreements on pricing for Automotive Wire Harness

Systems, including rigging bids.  Some of the meetings occurred within the Eastern District of

Michigan, and Mr. Nagata conceded that the unlawful agreements would impact businesses with

their principal place of business within the Eastern District of Michigan.  Mr. Nagata noted that

the price-fixed Automotive Wire Harness Systems were being sold in a number of different

states in the United States, and undermined and prevented competition within the United States.

Pursuant to his plea, Mr. Nagata was sentenced to serve 15 months in prison, fined $20,000, and

pledged to cooperate with the DOJ's ongoing investigation.

(c)      At his November 10, 2011 Guilty Plea and Sentencing Hearing, Furukawa

executive Tetsuya Ukai stated that he "fix[ed] price[s] over parts – auto parts with other

suppliers."  He acknowledged that he met with competitors "in order to fix prices and rig bids

with respect to wire harnesses and related products," and conceded that the price-fixing meetings

occurred both within the United States and elsewhere.  He also acknowledged that the price-

fixing would affect commerce in the United States and elsewhere, including in the Eastern

District of Michigan through a Furukawa subsidiary – presumably American Furukawa.  In

addition, Mr. Ukai agreed that the commerce affected exceeded $100 million.  As part of his

plea, Mr. Ukai agreed to serve 18 months in prison and pay a $20,000 fine for his role in the

conspiracy.

181.    Defendant Furukawa Electric, as well as Messrs. Funo, Nagata and Ukai, have all

agreed to assist the DOJ in its ongoing investigation into the automotive parts industry.

182.    On January 30, 2012, the DOJ announced that Defendant Yazaki Corporation had

agreed to pay a $470 million fine and to plead guilty to a three-count criminal information

charging Yazaki Corporation with:  (1) participating in a combination and conspiracy with its co-

conspirators to suppress and eliminate competition in the automotive parts industry by agreeing

to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and

related products sold to certain automobile manufacturers in the United States and elsewhere

from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufacturers in the United States and elsewhere from at least as early as December 2002 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (3)  participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of fuel senders sold to certain automobile manufacturers in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

183.    In addition to Yazaki Corporation, four executives from Yazaki Corporation (all Japanese nationals) – Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada – agreed to plead guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These four executives of Yazaki Corporation will serve prison time ranging from 15 months to two years. The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

184.    On March 26, 2012, the DOJ announced that Defendant Denso Corporation agreed to plead guilty and pay a total of $78 million in criminal fines to a two-count criminal information charging Denso with:  (1) participating in a combination and conspiracy with its co-

conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of electronic control units sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of heater control panels sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1. The "electronic control units" referenced herein are included within the definition of Automotive Wire Harness Systems alleged in this Complaint (see *supra*, paragraph 3).

185. On April 3, 2012, the DOJ announced that Defendant G.S. Electech Inc. agreed to plead guilty and pay a $2.75 million criminal fine to a one-count criminal information charging G.S. Electech Inc. with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of speed sensor wire assemblies sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2003 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1. The "speed sensor wire assemblies" referenced herein are included within the definition of Automotive Wire Harness Systems alleged in this Complaint (see *supra*, paragraph 3).

186. On April 23, 2012, the DOJ announced that Defendant Fujikura Ltd. has agreed to plead guilty and pay a $20 million criminal fine to a one-count criminal information charging Fujikura with participating in a combination and conspiracy with its co-conspirators to suppress

and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2006 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

187.    To date, Defendants that have pleaded guilty to their participation in the Automotive Wire Harness Systems cartel have agree to pay criminal fines totaling $770.75 million, among the largest criminal cartels ever obtained by the DOJ.

## CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that indirectly purchased or leased in the United States, during the Class Period, Automotive Wire Harness Systems, for personal use and not for resale, including the purchase of Automotive Wire Harness Systems as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

189.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, consumer protection, and unjust enrichment laws of the states whose laws are identified in Paragraphs 236-276 below ("Plaintiffs' States"). These claims are brought by Plaintiffs on behalf of themselves and persons and entities in Plaintiffs' States as follows (the "Damages Class"):

> All persons and entities that indirectly purchased or leased in the Plaintiffs' States, during the Class Period, Automotive Wire Harness Systems, for personal use and not for resale, including the

purchase of Automotive Wire Harness Systems as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

190.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Wire Harness Systems directly or for resale.

191.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

192.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Wire Harness Systems sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law,  as alleged in the Second and Third Claims for Relief;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Automotive Wire Harness Systems sold in the United States during the Class Period;

(i)     Whether any of the Plaintiffs knew, or had any reason to know, of the conspiracy engaged in by Defendants;

(j)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

193.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid

artificially inflated prices for Automotive Wire Harnesses purchased indirectly from Defendants or their co-conspirators.

194.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

195.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

196.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

197.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

198.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to Automotive Wire Harness Systems;

47

(b)      The prices of Automotive Wire Harness Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

(c)      Indirect purchasers of Automotive Wire Harness Systems have been deprived of free and open competition.

199.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Wire Harness Systems.

200.    The markets for Automotive Wire Harness Systems and the market for cars are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market.  Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems.  As Lear stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

201.    Automotive Wire Harness Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Automotive Wire Harness Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Wire Harness Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

202.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Wire Harness Systems than they would have paid in the absence of

Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

203.    Plaintiffs repeat and reallege the allegations set forth above.

204.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before the initial complaint was filed in this multi-district litigation. Plaintiffs and the members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 29, 2011, at the earliest, the date that the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty for its role in the criminal price-fixing and bid-rigging conspiracy alleged herein.

205.    Plaintiffs and the members of the Classes are consumers who purchased or leased automobiles or purchased Automobile Wire Harness Systems to replace or repair damaged or defective Wire Harness Systems in their automobiles. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the DOJ's September 29, 2011 announcement alleged above.

206.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the DOJ's announcement on September 29, 2011 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal

conspiracy to price-fix and rig bids for Automotive Wire Harness Systems.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMS or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

207.    For these reasons, the statute of limitations as to Plaintiffs and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

208.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not know and could not have known of the existence of the conspiracy and unlawful combination alleged herein until September 29, 2011 at the earliest, the date that the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty for its role in the criminal price-fixing and bid-rigging conspiracy alleged herein.

209.    Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that that they were paying supra-competitive prices for Automotive Wire Harness Systems throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

210.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

211. By its very nature, Defendants' anti-competitive conspiracy and unlawful combinations were inherently self-concealing. Automotive Wire Harness Systems are not exempt from antitrust regulation and, thus, Plaintiffs and the members of the Classes reasonably considered it to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

212. For instance, the DOJ charged Defendants Fujikura Ltd., Furukawa Electric, G.S. Electech, Inc. and Yazaki Corporation with, among other unlawful acts, "employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations." These corporate Defendants have since pleaded guilty to charges levied against them by the DOJ.

213. In addition, the DOJ charged individual corporate officers of certain Defendants with using code names and engaging in secret, conspiratorial meetings to hide Defendants' conspiracy from the public and competition authorities. To date, Junichi Funo from Furukawa and Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, and Hisamitsu Takada from Yazaki Corporation have all pleaded guilty to charges levied against them by the DOJ. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the lawfulness of Defendants' Automotive Wire Harness Systems prices.

214. Plaintiffs and the members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

215.    Throughout the course of the conspiracy, the Defendants met and communicated in secret  in order to conceal their conspiracy from the public and avoid detection thereof.  Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations.   The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty in this Court to criminal violations of the Sherman Act.   These Defendants have not provided any documents and information about these admitted acts of concealment to Plaintiffs or the members of the Classes.

216.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and the members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until September 29, 2011, at the earliest, the date that the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty for its role in the criminal price-fixing and bid-rigging conspiracy alleged herein.

217.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until September 29, 2011.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

218.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

219.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

220. The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

221. At least as early as January 2000, and continuing through the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Wire Harness Systems, thereby creating anticompetitive effects.

222. The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harness Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout the United States.

223. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harness Systems.

224. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Wire Harness Systems have been harmed by being forced to pay inflated, supra-competitive prices for Automotive Wire Harness Systems.

225. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

226. Defendants' conspiracy had the following effects, among others:

(a)      Price competition in the market for Automotive Wire Harness Systems has been restrained, suppressed, and/or eliminated in the United States;

(b)      Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)      Plaintiffs and members of the Nationwide Class who purchased Automotive Wire Harness Systems indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

227.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harness Systems purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

228.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

229.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

230.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

231.    From as early as January 2000 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harness Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

232. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Automotive Wire Harness Systems and to allocate customers for Automotive Wire Harness Systems in the United States.

233. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Wire Harness Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Wire Harness Systems sold in the United States;

(b) allocating customers and markets for Automotive Wire Harness Systems in the United States in furtherance of their agreements; and

(c) participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

234. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Automotive Wire Harness Systems.

235. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

236. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Wire Harness Systems at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Wire Harness Systems.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in any way limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Automotive Wire Harness Systems; and (2) Allocating among themselves the production of Automotive Wire Harness Systems.

(d)     The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Automotive Wire Harness Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Automotive Wire Harness Systems directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of defendants' violation of Section

16720 of the California Business and Professions Code, Plaintiffs and members of the Damages

Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant

to Section 16750(a) of the California Business and Professions Code.

238.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1)

Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated

throughout the District of Columbia; (2) Automotive Wire Harness Systems prices were raised,

fixed, maintained and stabilized at artificially high levels throughout the District of Columbia;

(3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected

District of Columbia commerce.

(c)    As a direct and proximate result of defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available

under District of Columbia Code Ann. §§ 28-4501, *et seq.*

239.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*.

240.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire

Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

Kansas commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-

101, *et seq.*

241.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1)

Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated

throughout Maine; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained

and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire

Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws Ann. 93 §§ 1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mass. Gen. Laws Ann. 93 §§ 1, *et seq.*  Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under Mass. Gen. Laws Ann. 93 §§ 1, *et seq*.

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

246.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

247.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

248.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

249.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems when they purchased vehicles containing Automotive Wire Harness Systems, or purchased products that were otherwise of lower quality, than would have been absent the conspirators illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

252.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

253.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

254.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

255.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Wire Harness Systems prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)　　During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)　　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)　　By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

256.　　Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq*.

(a)　　Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

257.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq*.

259.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

260.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

261.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Damages Class.

262.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
Violation of State Consumer Protection Statutes
(on behalf of Plaintiffs and the Damages Class)

263.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

265.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these defendants for acts, as

alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq., of the California Business and Professions Code, set forth above;

(d)     Defendants' acts, omissions, misrepresentations, practices, an non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     Defendants' acts or practices are unfair to consumers of  Automotive Wire Harness Systems (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and professions Code.

(g)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Automotive Wire Harness Systems (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

266.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Automotive Wire Harness Systems was sold, distributed or obtained in the District of Columbia.

(b)      The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)      Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels  throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)      As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* , and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

267.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a)      Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

268.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)     Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

269.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

(a)     Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(c)     Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)     Certain of the Defendants have been served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

(f)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)     Missouri Plaintiff and members of this Damages Class purchased Automotive Wire Harness Systems for personal, family, or household purposes.

(b)     Defendants engaged in the conduct described herein in connection with the sale of Automotive Wire Harness Systems in trade or commerce in a market that includes Missouri.

(c)     Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning defendants' unlawful activities and artificially inflated prices for Automotive Wire Harness Systems.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Wire Harness Systems they purchased.

(e)      Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Automotive Wire Harness Systems by making public statements that were not in accord with the facts.

(f)      Defendants' statements and conduct concerning the price of Automotive Wire Harness Systems were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Automotive Wire Harness Systems at prices established by a free and fair market.

(g)      Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(h)      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(i)      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(j)      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

271.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

(a)      Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Montana; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

272.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Wire Harness Systems was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Wire Harness Systems as set forth in N.M.S.A., § 57-12-2E.

(c)      Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of

the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the

members of the Damages Class paid supra-competitive, artificially inflated prices for

Automotive Wire Harness Systems.

(d)     During the Class Period, Defendants' illegal conduct substantially affected

New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the

Defendants, Plaintiffs and the members of the Damages Class have been injured and are

threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and

the members of the Damages Class seek all relief available under that statute.

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of  N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce

by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the

prices at which Automotive Wire Harness Systems were sold, distributed or obtained in New

York and took efforts to conceal their agreements from Plaintiffs and members of the Damages

Class.

(b)     The conduct of the defendants described herein constitutes consumer-

oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which

resulted in consumer injury and broad adverse impact on the public at large, and harmed the

public interest of New York State in an honest marketplace in which economic activity is

conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

(e)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Wire Harness Systems in New York.

(f)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

274.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in

consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

      (c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

      (d)    During the Class Period, defendants' illegal conduct substantially affected North Carolina commerce and consumers.

      (e)    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Wire Harness Systems in North Carolina.

      (f)    Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)     Members of this Damages Class purchased Automotive Wire Harness Systems for personal, family, or household purposes.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Rhode Island.

(c)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Wire Harness Systems. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that defendants' Automotive Wire Harness Systems prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price  competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(e)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial

practices as set forth above. That loss was caused by defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Automotive Wire Harness Systems, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Automotive Wire Harness Systems at prices born by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Wire Harness Systems they purchased.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

276.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of  9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Wire Harness Systems.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, defendants breached that duty by their silence. Defendants misrepresented to all consumers

during the Class Period that defendants' Automotive Wire Harness Systems prices were competitive and fair.

(c)       Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)       As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by defendants' willful and deceptive conduct, as described herein.

(e)       Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Automotive Wire Harness Systems, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Automotive Wire Harness Systems at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

277.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

278.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Wire Harness Systems.

279.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs of the members of the Damages Class for Automotive Wire Harness Systems.

280.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be

adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1

of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert

of action in violation of the state antitrust and unfair competition and consumer protection laws

as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the

maximum extent allowed under such laws, and that a joint and several judgment in favor of

Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to

be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the

maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits

unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers,

directors, partners, agents and employees thereof, and all other persons acting or claiming to act

on their behalf or in concert with them, be permanently enjoined and restrained from in any

manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination

alleged herein, or from entering into any other contract, conspiracy, or combination having a

similar purpose or effect, and from adopting or following any practice, plan, program, or device

having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED:  May 14, 2012

**THE MILLER LAW FIRM, P.C.**

By   /s/ E. Powell Miller
E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison Counsel for the Proposed End-Payor Plaintiffs Classes*

Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

Joseph W. Cotchett
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
jcotchett@cpmlegal.com
swilliams@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-
Lead Class Counsel for  the Proposed
End-Payor Plaintiffs Classes*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

DATED:  May 14, 2012

**THE MILLER LAW FIRM, P.C.**

By   /s/ E. Powell Miller
E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com

*Attorneys for Plaintiffs and Interim
Liaison Counsel for the Proposed End-
Payor Plaintiffs Classes*

Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: (214) 754-1900
Facsimile: (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

Joseph W. Cotchett
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
jcotchett@cpmlegal.com
swilliams@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-
Lead Class Counsel for the Proposed
End-Payor Plaintiffs Classes*