# EXHIBIT I

2009 WL 2160777
United States District Court, W.D. Washington,
at Seattle.

Timothy LUBIC, on behalf of himself and
all others similarly situated, Plaintiff,
v.
FIDELITY NATIONAL
FINANCIAL, INC. et al, Defendants.

No. C08–0401 MJP. | July 20, 2009.

**Opinion**

### ORDER ON DEFENDANTS' MOTION TO DISMISS

MARSHA J. PECHMAN, District Judge.

*\*1* This matter comes before the Court on Defendants' motions to dismiss. (Dkt.No.62). Having reviewed the motion, Plaintiffs' response (Dkt. No. 67), Defendants' reply (Dkt. No. 79), Plaintiffs' Notice of Supplemental Authority in Opposition to Defendants' Motion to Dismiss (Dkt. No. 81), Defendants' Response to Plaintiffs' Notice of Supplemental Authority in Opposition to Dismiss (Dkt. No. 82), Defendants' First Notice of Supplemental Authority in Support of Motion to Dismiss (Dkt. No. 83), Plaintiffs' Response to Defendants' First Notice of Supplemental Authority in Support of Motion to Dismiss (Dkt. No. 84), Defendants' Second Notice of Supplemental Authority in Support of Motion to Dismiss (Dkt. No. 86), Plaintiffs' Response to Defendants' Second Notice of Supplemental Authority in Support of Motion to Dismiss (Dkt. No. 87), Defendants' Third Notice of Supplemental Authority (Dkt. No. 88), Plaintiffs' Response to Defendants' Third Notice of Supplemental Authority (Dkt. No. 89), and the balance of the record, the Court makes the following ruling:

IT IS ORDERED that Defendants' motion is GRANTED and Plaintiffs' claims are ordered DISMISSED without prejudice.

### Background

According to Plaintiffs' Amended Complaint ("Complaint," Dkt. No. 54) Defendants, a group of major title insurance sellers from around the country, are alleged to have conspired to fix title insurance prices in New York, Pennsylvania, Ohio, and New Jersey. Complaint, ¶¶ 74– 80. According to Plaintiffs, the conspiracy sprang from Defendants' involvement in those states' voluntary title insurance associations, which file rates with the applicable state insurance authority. *Id.*, ¶¶ 43–54. The profits made from the rates set by these associations are alleged to "vastly" exceed the actual costs associated with creating and servicing the policies which are offered. *Id.* at ¶ 98.

"Having agreed to fix prices in states where joint rate setting occurs through their Trade Association, the companies agreed to not compete based on price to the consumer in other states, including Washington, where regulation of filed rates for title insurance is non-existent." *Id.* at ¶ 7. Plaintiffs claim that the conspiracy has not been addressed by Washington's state government because rates have become "principally based on costs that the Insurance Commissioner has neither the authority nor the ability to assess." *Id.* at ¶ 8. Although the Complaint alleges that Washington's state government has detected questionable practices relating to title insurance, the primary action it has taken to address the problem has been passing new forward-looking regulations in 2008 that requires title insurance companies provide more information about their rate-setting procedures. *Id.* at ¶¶ 96, 103–111.

Plaintiffs, a putative class of title insurance consumers, allege that title insurance rates are supra-competitive and are substantially higher than corresponding rates in Iowa, a state that allows only the government to sell title insurance. *Id.* at ¶ 183. Plaintiffs also allege that the conspiracy in Washington was established to protect the existing conspiracies in New York and elsewhere, since Defendants allegedly feared that lower title insurance rates in other states would reveal the conspiracy. The excess profits from the price fixing scheme are allegedly used for kickbacks and bribes to insurance middlemen with the goal of creating more business. *Id.* at ¶¶ 116–149.

*\*2* Based on their allegations, Plaintiffs seek relief from this Court for violations of Section 1 of the Sherman Act (conspiracy in unreasonable restraint of interstate commerce), RCW 19.86.090 (Washington Consumer Protection Act) and unjust enrichment.

### Legal Standard

A motion to dismiss pursuant to FRCP 8(a)(2) will succeed where the pleadings fail to state a claim upon which relief can be granted. The Court construes the complaint in the light most favorable to the plaintiffs and assumes the truth of all

material allegations in the complaint. *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir.1986).

For a plaintiff to sufficiently state a claim under FRCP 8(a)(2), mere "labels and conclusions" will not suffice—the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly,* U.S. 550 U.S. 544, 555–556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiffs "must plead not just ultimate facts (such as conspiracy) but evidentiary facts which, if true, will prove ... a contract, combination or conspiracy among two or more persons or distinct business entities." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir.2008).

As the Supreme Court noted in *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009), this standard applies to all civil actions in United States District Courts. This standard does not require that it is probable that illegal activity will be uncovered during discovery (*William O. Gilley Enters., Inc. v. Atl. Richfield Co.,* 561 F.3d 1004, 1011 (9th Cir.2009)), but requires that complaints have enough facts "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 550 U.S. at 556. The legal standard is no longer "possibility," but "plausibility," which is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556). "When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly,* 550 U.S. at 557).

### Discussion

### I. Sherman Act Claims

Plaintiffs attempt by this lawsuit to plead the existence of a conspiracy within the state of Washington to fix title insurance rates. By the standards of *Twombly, Iqbal* and their progeny, they have failed to do so. The Complaint is bereft of any factual allegations which establish the plausibility of a conspiracy within this state; i.e., conspiratorial conduct pertaining to the setting of title insurance rates in the state of Washington. Plaintiffs' attempt to *infer* the existence of a conspiracy from parallel conduct in other states is exactly the "evil" that *Twombly* was intended to curtail. This attempt is further undermined by their inability to produce any factual evidence (e.g., a criminal conviction or civil verdict) that what is happening in the other states (the activities of the title insurance associations) is actually illegal.

**\*3** In fact, the truth appears to be just the opposite—the rating bureaus are authorized by statute in the states where they exist.[1] No instances have been alleged where any of these Defendants have admitted to acting improperly in the course of conducting business in these rate-setting organizations. There are a plethora of conclusory assertions regarding price-fixing and agreements not to compete, and inferences which the Court is asked to draw from facts such as the uniformity of rates from state to state, but there are no factual allegations that directly establish the existence of a conspiracy in the other states, much less the state of Washington. The case law is replete with instances where participation in trade organizations has been held insufficient to establish proof of a conspiracy. *See, e.g., In re Digital Music Antitrust Litig.,* 592 F.Supp.2d 435, 441 (S.D.N.Y.2008); *In re LTL Shipping Servs. Antitrust Litig.,* 2009 WL 323219 (N.D. Ga. Jan. 28 .2009); *cf. In re Citric Acid Litig.,* 996 F.Supp. 951, 958–959 (N.D.Cal.1998) (inference of conspiracy does not arise from fact of meetings between defendants), *aff'd,* 191 F.3d 1090, 1103 (9th Cir.1999).

The Court finds that the fact that Defendants may have been involved in collective rate-setting in other states which statutorily authorize such activity does not create a plausible inference that those same defendants have conspired to unlawfully set rates in the state of Washington. This issue has been litigated and resolved in defendants' favor on multiple occasions. *See, e.g., In re Late Fee and Over Limit Fee Litig.,* 528 F.Supp.2d 953, 963–64 (N.D.Cal.2007); *In re Graphics Process Units Antitrust Litig.,* 527 F.Supp.2d 1011, 1023 (N.D.Cal.2007); *Classic Homes and Development LLC v. Fidelity National Title Ins. Co.,* 4:08–CV–217–GTE, Order Granting Motion to Dismiss slip. op. at 7–8 (E.D.Ark. May 14, 2009); *In re California Title Ins. Antitrust Litig.,* 2009 WL 1458025 \* 5 (N.D.Cal. May 21, 2009).

Further fatal to Plaintiffs' Complaint is the absence of any factual allegations concerning the "specific time, place or person involved in the alleged conspirac[y]." *Twombly,* 127 S.Ct. at 1971 n. 10. Plaintiffs have failed to allege which Defendants may have attended meetings of rate-setting organizations, whether the setting of rates in Washington was discussed at those (or other) meetings, where those meetings were held and whether anyone who attended those meetings reported back to their parent organizations.

Neither is the Court favorably impressed by Plaintiffs' reliance on parallel conduct and uniformity of rates to support a plausible inference of collusion. "[P]arallel behavior in a concentrated market is insufficient to suggest a conspiracy because is is a 'common reaction of firms in a concentrated market' to 'recogniz[e] their shared economic interests' and to reach similar 'price and output decisions' independently." *In re Late Fee and Over–Limit Fee Litig.,* 528 F.Supp.2d 953, 964 (quoting *Twombly,* 550 U.S. at 553–54). *Twombly* does allow for the possibility that some instances of parallel behavior may point toward a plausible theory of conspiracy (*Id.* at 556 n. 4), but it would require allegations of prior patterns of pricing, coordinated shifts in rate and unaccountable changes in Defendants' price structures which are absent from this Complaint.

**\*4** In the absence of direct evidence establishing the level of plausibility required by *Twombly,* Plaintiffs' allegations of a variety of "plus factors" (pre-*Twombly* indicia of the existence of a conspiracy) become even less compelling. The Court does not see evidence of the "uniformity" of title insurance rates within Washington to which Plaintiffs allude. Pltf. Response, p. 22; Complaint, ¶¶ 111, 113, 177. Plaintiff's own charts (Complaint, pp. 26–27) reveal rate differentials ranging from 5%–20%, which the Court finds to be a material margin.

Even were the Court to find that a 20% margin of difference did not make the rates in the state of Washington "non-uniform," a finding of uniformity would not "nudge [Plaintiffs'] claims across the line from conceivable to plausible." *Twombly,* 55 U.S. at 570. In a "concentrated" market such as that Plaintiffs allege in Washington, uniformity is not unexpected—"price uniformity is normal in a market with few sellers and homogeneous products." *E .I. DuPont de Nemours & Co. v. Federal Trade Comm'n,* 729 F.2d 128, 139 (2d Cir.1984). Nor do higher prices (even if proven) establish a plausible inference of conspiracy; see *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 237, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("[R]ising prices do not themselves permit an inference of a collusive market dynamic.").

Plaintiffs also posit the existence of a "strong motive to fix the rates ... at supra-competitive levels" (Pltf Resp., p. 17), a factor which even their own treatise authority finds a questionable indicator of conspiracy.[2] Nor have the courts been sympathetic to this argument. See *In re Digital Music,* 592 F.Supp.2d at 444 (Plaintiffs' allegation of a 'motive to conspire' is nothing more than an assertion of interdependence."); *In re Late Fee,* 528 F.Supp.2d at 964 ("[I]f a motive to achieve higher prices were sufficient [to successfully allege conspiracy] every company in every industry could be accused of conspiracy ...").

Finally, Plaintiffs allege a variety of kickbacks, incentives and other inducements on the part of Defendants as evidence of another "plus factor" favoring a finding of conspiracy. However, Plaintiffs do not respond to Defendants' authority rejecting antitrust claims based on such activities for the simple reason that, whatever other ethical or legal considerations are implicated, they do not constitute a violation of federal antitrust law. See *Rick–Mik Enter. Inc. v. Equilon Enter. LLC,* 532 F.3d 963, 976 (9th Cir.2008); *Mesirow v. Pepperidge Farm, Inc.,* 703 F.2d 339, 343 (9th Cir.1983). Furthermore, the Court does not find that incentives and inducements to third-party agents (which would have the effect of persuading the recipients to do business with one of the defendants instead of the other) are plausible evidence of an agreement to fix prices among those same defendants.

The Court understands its obligation to view Plaintiffs' allegations as a whole, and it has done so. Not even in their totality does the accumulation of inferences, conclusions, speculations and possibilities that Plaintiffs have assembled amount to the necessary quantum of factual allegations necessary to plausibly plead a conspiracy.

## II. Allegations Against Corporate Parents

**\*5** The Complaint is silent as to any act transpiring between the Corporate Parent Defendants—who are not alleged to be themselves members of any rate-setting organization—and any of the other Defendants in furtherance of a conspiracy. A "complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 586 F.Supp. 1109, 1117 (N.D.Cal., 2008) (internal quotations and citations omitted).

Put to their proof as to the adequacy of their claims against the Corporate Parents, Plaintiffs cite to a case which holds that an adequate complaint must allege facts that "each individual defendant joined the conspiracy and played some role in it" (*In re OSB Antitrust Litig.,* No. 06–826, 2007 WL 2253419 at \*5 (E.D.Pa. Aug.3, 2007) and to a paragraph of their complaint which merely alleges that "[b]eginning at least as early as February 2004, and continuing thereafter to the

present, the exact dates unknown to plaintiffs, defendants and their co-conspirators engaged in a ... conspiracy." Complaint, ¶ 174. These general allegations, devoid of any specific allegations of acts by the Corporate Parents, are insufficient to put them on notice of the claims asserted against them, the *sine qua non* of federal pleading.

Bearing in mind the long-held rule that a parent corporation is "not liable for the acts of its subsidiaries," (*United States v. Bestfoods,* 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the Court finds that Plaintiffs have not pled sufficient facts concerning the acts of the Corporate Parent Defendants to hold that it has been plausibly established that they participated in the conspiracy alleged in this complaint.

### III. Consumer Protection Act and Unjust Enrichment Claims

Plaintiffs' state law claims do not survive this motion to dismiss. The Consumer Protection Act ("CPA") is modeled after federal antitrust statutes. The state legislature has decreed that courts interpreting the CPA are to "be guided by final decisions of the federal courts ... interpreting the various federal statutes dealing with the same or similar matters." RCW 19.86.920; *Blewett v. Abbott Labs.,* 86 Wash.App. 782, 787–88, 938 P.2d 842 (1997). For the same reasons that dismissal of the Sherman Act claims is being ordered, the Court dismisses Plaintiffs' state CPA claims.

If the Court is correct that Plaintiffs' contractual relationship with Defendants is not subject to the antitrust provisions of the Sherman Act, then their unjust enrichment claims must also fail.[3] In the absence of an antitrust violation, all Plaintiffs have left is a contract with their title insurance company. "[C]ourts will not allow a claim for unjust enrichment in contravention of a provision of a valid express contract." *MacDonald v. Hayner,* 43 Wash.App. 81, 86, 715 P.2d 519 (1986) (citations omitted).

### Conclusion

**\*6** Plaintiffs have failed to allege sufficient factual proof to render their claims of conspiracy to violate the antitrust provisions of the Sherman Act plausible. Nor have they alleged sufficient acts by the Corporate Parent Defendants in furtherance of the alleged conspiracy to give those defendants notice of the claims against them. The federal claims will be dismissed without prejudice.

The Court further finds that the state law claims do not survive Defendants' motion to dismiss, either. The CPA claims fall for the same reasons as the federal claims. Plaintiffs' unjust enrichment claim, which is based on the existence of properly-plead antitrust violations, will be dismissed along with the antitrust violations.

The Clerk is directed to send a copy of this order to all counsel of record.

**Parallel Citations**

2009-2 Trade Cases P 76,699

### Footnotes

1. *See* N.Y. Ins. Law § 2306; N.J. Stat. § 17:46B–42(b); 40 P.S. § 910–37(b); Ohio Rev.Code § 3935.04, 3953.28 (Def. Reply, p. 6 fn. 4.)
2. In *Antitrust Law* (Phillip E. Areeda & Herbert Hovenkamp) ¶¶ 1434c, 1434c1, 1434c2, "motivation" is described as "synonymous" with "interdependent parallelism" rather than a § 1 violation.
3. Plaintiffs themselves acknowledge that "the unjust enrichment claims arise from the antitrust violations." Pltfs. Resp., p. 24.

**End of Document** © 2012 Thomson Reuters. No claim to original U.S. Government Works.