# EXHIBIT L

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2782 Filed 07/13/12 Page 2 of 10
In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

1979 WL 1690
United States District Court; E.D. Washington.

In re Fertilizer Antitrust Litigation (This document relates to: Washington, No. C-75-118; Montana, No. C-75-119; Idaho, No. C-75-120; Smith, No. C-75-121; Alaska, No. C-75-156; and Oregon, No. C-76-287).

Master File No. MF-75-1 | Filed September 14, 1979

**Opinion**

COPPLE, D. J.

**Memorandum and Order**

*1 *Factual Background*

Plaintiffs Alaska, Idaho, Montana, Oregon, Washington, and certain private individuals filed complaints alleging antitrust violations by the defendants beginning in 1965. The defendants are Chevron Chemical Co.; Collier Carbon & Chemical Corp.; Cominco American, Inc.; Phillips Pacific Chemical Co.; J. R. Simplot and Simplot Industries, Inc.; Union Oil Co. of California; Western Farm Service, Inc.; Shell Oil Co. and its subsidiaries Shell Chemical, Inc. and $^{Ind.}/_{Ag.}$ Chemicals, Inc.; and Phillips Petroleum Co.

The complaints allege injuries to plaintiffs arising out of a combination and conspiracy in restraint of fertilizer trade or commerce and combination and conspiracy to monopolize such trade or commerce in violation of sections 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 et seq. (1976). The complaints further allege injury to the plaintiffs arising out of acquisitions by defendants of formerly independent fertilizer dealers in violation of section 7 of the Clayton Act, 15 U. S. C. § 18 (1976). More specifically, the plaintiffs charge defendants with fixing and stabilizing factory, wholesale, and retail prices of fertilizer in the Northwest region. The Northwest region includes Alaska, Idaho, Montana, Oregon, Washington, and four Canadian provinces. The plaintiffs also charge defendants with eliminating competition by exchanging trade information, adopting uniform prices, trading fertilizer among themselves at discount prices, artificially restricting the supply of fertilizer, and acquiring independent fertilizer wholesalers, distributors, and retailers.

[*Class Definition*]

On August 9, 1978, the Court granted the plaintiffs' motion to amend the definition of the plaintiffs' class to read as follows:

A class consisting of all persons in each of the respective states involved in this litigation who, during the period in controversy, have purchased commercially manufactured fertilizer for their own use within said state(s) from a defendant, or from an entity owned or controlled by a defendant, either.

(A) directly; or

(B) indirectly under circumstances which are the economic equivalent of a pre-existing cost-plus contract; but

(C) Excluding

i) defendants and entities owned or controlled by any of them;

ii) the state of Oregon and its agencies, political subdivisions and municipalities;

iii) those whose fertilizer purchases for use within the state of Washington, Oregon, Idaho, and Montana during the period in controversy did not not equal or exceed $500 in cost; and

iv) those whose fertilizer purchases with the State of Alaska during any one year during the period in controversy did not equal or exceed $250 in cost.

The Court then certified the actions as class actions under Rule 23(b)(3), but also ordered further discovery with regard to *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES P 61,460], 431 U. S. 720 (1977), in order to further delineate the plaintiffs' class. Then, on July 2, 1979, the Court ordered that the following six matters be heard:

*2 (a) delineation of plaintiffs' class in light of *Illinois Brick;*

(b) defendants' motion for reconsideration of an order concerning certain *Illinois Brick* issues or for certification for interlocutory appeal;

(c) defendants' motion for summary judgment on the complaints of the State of Alaska and the complaint of Smith and Minoggie;

(d) defendants' motions to dismiss and to strike allegations of fraudulent concealment;

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2783 Filed 07/13/12 Page 3 of 10

In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

(e) the form of class notice to be approved by the Court; and

(f) plaintiffs' motion to compel discovery.

Each of these matters will be considered separately in the discussion that follows.

*Analysis*

(a) *Delineation of plaintiffs' class in light of Illinois Brick*

The discovery in connection with this issue was to be completed within ninety days of the August 9, 1978 order. The period has elapsed, and the parties have filed memoranda in support of their respective positions. The Court is now in a position to decide whether, in light of *Illinois Brick,* those who bought fertilizer (1) from retailers allegedly controlled by defendants[*], (2) from retailers who sold fertilizer on consignment from defendants, or (3) from cooperatives owned by the purchasers have standing to sue for damages as plaintiffs and thus may be included in the class of plaintiffs to be given notice. For the reasons that follow, those falling within the above-mentioned categories do not have standing to sue for damages and therefore cannot be included in plaintiffs' class.

In *Illinois Brick,* the Supreme Court ruled that indirect purchasers could not sue antitrust violators for damages. The Supreme Court reasoned that to allow indirect purchasers to sue would create a risk of double recovery, reduce the incentive of direct purchasers to sue, and impose unreasonable burdens on courts because of the difficulties of measuring, tracing, and apportioning damages. The Supreme Court indicated, however, that in situations where complex market interactions were circumvented, the indirect purchasers would be entitled to bring suit. 431 U. S. at 736 & n. 16.

The plaintiffs have not established a factual basis for concluding that defendants somehow control the independent retail companies so as to circumvent the complex interaction of market forces. The affidavits submitted by defendants establish without dispute that the defendants did not control the independent retailers by making decisions as to whom to sell and at what price. Although defendants exert some control over the price charged by the independent retailers in that the retail price is a function of the wholesale price, the retailers decide whether to absorb all or part of the overcharge or to pass on the overcharge. In either case, the independent retailers have a claim for damages either because of the absorbed overcharge or lost profits due to reduced sales from having passed on the entire overcharge. Thus, the *Illinois Brick* rule requires the exclusion from plaintiffs' class of those who purchased fertilizer from independent retailers.

[*Consignment*]

**\*3** The same reasoning applies in the situation where purchases were made from independent retailers who hold fertilizer on consignment from defendants. Even assuming that title to the fertilizer passed to plaintiffs directly from defendants and that defendants set the price of the fertilizer sold to plaintiffs, such an arrangement does not circumvent complex market interactions. Although the consignment agreements do give defendants considerable control over the independent retailers, the question under *Illinois Brick* is whether an overcharge is borne by the plaintiffs or by some middleman. The agency relationship between defendants and these independent retailers does not mean the independents are not injured by the alleged illegal overcharge either because of lost profits due to reduced sales or because they are required to absorb all or part of the overcharge. There is no evidence that the consignee-independent retailers are paid by the defendant-manufacturers independently of the amount of fertilizer sold. Thus, purchases from the independent dealers who sold fertilizer on consignment from the defendants cannot give the purchasers a basis for claiming damages. Moreover, nothing bars these independent retailers from suing the defendants. To permit those who purchased from these retailers to sue for damages would reduce the incentive of the independent retailers to sue for damages to enforce the antitrust laws, create the risk of double recovery because of the difficulty of apportioning damages, and impose on the Court a considerable burden in tracing and apportioning damages.

[*Cooperatives*]

Plaintiffs also have not established circumstances sufficient to permit plaintiffs who are members of cooperatives to sue defendants for damages. The cooperatives purchase fertilizer from the defendants. They then sell the fertilizer to the member-patrons and others. The complex interaction of market forces is circumvented to a degree because any loss the cooperatives incur from reduced sales because of passing on the overcharge is suffered indirectly and uniformly by the members of the cooperative in the form of reduced dividends or reduction in capital growth of the cooperative. Any overcharge borne by the cooperative would be passed

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2784 Filed 07/13/12 Page 4 of 10

In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

on to the member-patrons in the same manner. But there remain considerable tracing and apportioning problems. This is because those who are members of the cooperatives purchase fertilizer in varying amounts. Thus, to compensate the ultimate purchasers in an equitable fashion, it must be determined how much, if any, of the alleged overcharge was passed on to the purchasers directly. If all of the overcharge was directly passed on, then those member-patrons who purchased more price-fixed fertilizer than others would receive more compensation than the others. But if all of the overcharge was absorbed by the cooperative, then the member-patrons of the cooperative would receive essentially the same amount of damages, regardless of the amount of fertilizer they purchased individually. Also, fertilizer allegedly price-fixed is mixed with fertilizer that has not been price-fixed, thus creating additional tracing problems as to the damages to be awarded individual purchasers of fertilizer from the cooperatives.

**\*4** Plaintiffs' argument that the cooperative cannot sue because the cooperatives suffered only indirect injury at the retail level is invalid. The complaint in the present litigation seeks damages for price-fixing at the factory, wholesale, and retail price levels. Nothing prevents the cooperatives from suing for price-fixing at the wholesale level, and although the damage suffered by the cooperatives may be less than that suffered by the member-patrons, that does not prevent the cooperatives from recovering for full overcharge. *See* P. Areeda & D. Turner, Antitrust law, P 337e (1978). That a cooperative may seek recovery for the full overcharge regardless of the amount of the overcharge passed on to the member-patrons also makes irrelevant the plaintiffs' point that cooperatives may not assert the rights of its members under the antitrust laws. Given the problems of apportionment, tracing, and the possibility of double recovery, those purchased from cooperatives can not be permitted to sue merely because they are members of the cooperatives.

(b) *Defendants' motion for reconsideration of an order concerning the "ownership or control" exception in Illinois Brick or for certification for interlocutory appeal*

On August 9, 1978, the Court ruled that those who purchased or paid for commercial fertilizer from a defendant, or from an entity owned or controlled by a defendant, either (1) directly or (2) indirectly under circumstances that are the economic equivalent of a pre-existing cost-plus contract could be included within plaintiff's class. The defendants contend that this ruling is in error and ask the Court for a redetermination of whether an exception to the *Illinois Brick* rule exists where the direct purchaser is a wholly owned subsidiary of the defendant.

In *Illinois Brick,* the Supreme Court indicated that there are exceptions to the rule precluding indirect purchasers from suing for damages in antitrust actions: one is the pre-existing cost-plus contract situation, 431 U. S. at 736, and "[a]nother situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customers." *Id.* at 736 n. 16. The defendants are, of course, correct in contending that the example of the circumvention of market forces set forth in footnote 16 does not expressly apply to situations where plaintiffs purchase from direct purchaser was completely independent by defendants. And it is true that if the direct purchaser was cmopletely independent from the defendants, only the direct purchaser and not the ultimate purchasers would be permitted to sue the defendants for overcharges under the holding and rationale of *Illinois Brick*. Yet, the circumvention of complex market forces is the focal point of whether suit may be maintained against sellers who do not sell directly to the buyer, and market forces will be circumvented in a sense by the defendants' ownership of businesses selling fertilizer to the plaintiffs. For three reasons, purchasers of fertilizer from subsidiaries wholly owned by defendants should be allowed to sue defendants for damages.

[*Passing On*]

**\*5** First, if the direct supplier to the plaintiff-purchaser is owned by the defendant, it is likely that the direct supplier will pass on the overcharge since to fail to do so would reduce the profit the supplier-subsidiary would otherwise make, which the defendant-parent corporation receives directly or indirectly through dividend or increased capitalization of the subsidiary. Presumably, the defendant-parent corporation would make no net gain from the overcharge if the entire overcharge were absorbed by its subsidiary.

[*Damage Payments to Self*]

Second, if the subsiidary is permitted to sue, to the exclusion of all others, for lost profit due to reduced sales caused by passing on the overcharge partially or completely $^{\text{and}}/_{\text{or}}$ for damages from absorbing all or part of the overcharge, the defendant will in effect compensate its subsidiary for all damages from the overcharge, including the damages incurred by the plaintiff-purchasers from any overcharge

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2785 Filed 07/13/12 Page 5 of 10
In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

passed on to them. The damages paid to the wholly owned subsidiary constitute an indirect payment by the defendant to itself, thereby defeating an objective of the antitrust laws–to make anti-competitive activity unprofitable.

[*Antitrust Enforcement*]

Third, to prevent the plaintiff-purchasers from suing would have a deleterious effect on the enforcement of antitrust laws. As noted by the Supreme Court in *Illinois Brick,* private enforcement of the antitrust laws is essential to the proper functioning of that statutory scheme. *See id. at 745-46.* Although independent retailers may be hesitant to sue their wholesalers for fear of disrupting relations, it is highly unlikely that a subsidiary would sue its parent. Therefore, it is necessary to allow those who purchased from the defendants' subsidiaries to sue for damages. In reaching this same conclusion, the Third Circuit Court of Appeals stated:

> To adopt any other view would invite evasion [of the antitrust laws] by the simple expedient of inserting a subsidiary between the violator and the first non-controlled purchaser. The Supreme Court anticipated this situation in *Illinois Brick's* now famous footnote 16, commenting on exceptions to nonuse of defensive passing on . . . Mirroring that exception to offensive passing on reflects the situation here where the direct seller is owned by the alleged price fixer.

In re Sugar Industry Antitrust Litigation [1978-2 TRADE CASES P 62,139], 579 F. 2d 13, 19 (3d Cir. 1978). See also In re Beef Industry Litigation, 1979-2 CCH TRADE CASES P 62,802 at 78-676 (August 17, 1979). In a subsequent Third Circuit decision, the court concluded that those who purchased from the defendants' subsidiaries were not entitled to sue for damages. Midwest Paper Products Co. v. Continental Group, Inc. [1979-1 TRADE CASES P 62,531], 596 F. 2d 573, 589 (3d Cir. 1979). Although the court in *Midwest Paper* purported to distinguish its earlier decision, the basis for that distinction is not readily discernible. As a result, the position of the Third Circuit with respect to this question is unclear. However, the reasoning of the *In re Sugar Industry Antitrust Litigation* decision is sound and will be followed in the present case.

[*Immediate Appeal*]

 *6 The defendants have moved that the ruling on purchases from subsidiaries wholly owned by defendants be certified for interlocutory appeal. The criteria for certification under 28 U. S. C. § 1292(b) (1976) are that the district court is of the opinion (1) that the August 9, 1978 order involves a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) that an immediate appeal may materially advance the ultimate termination of the litigation. In essence, the court must weigh the benefits and costs resulting from an immediate appeal.

Whether plaintiffs who purchase fertilizer from subsidiaries wholly owned by defendants may sue defendants for damages under *Illinois Brick* is clearly a controlling legal question. Resolution of the question will determine whether certain purchasers should be included in the plaintiffs' class and whether the named plaintiffs can in fact sue for damages, and if so, what transactions may be considered for purposes of computing damages. If the Ninth Circuit rules that those who purchase from subsidiaries wholly owned by defendants cannot sue defendants for damages, there may be no remaining plaintiffs, thereby considerably advancing the ultimate termination of the case. There is obviously substantial ground for difference of opinion on this issue as well. Thus, the order will be certified for appeal as a similar order was certified for interlocutory appeal under 28 U. S. C. § 1292(b) in *Hanover v. United Shoe Machinery Corp.* [1960 TRADE CASES P 69,614], 185 F. Supp. 826, 831 (N. D. Pa.), aff'd [1960 TRADE CASES P 69,754], 281 F. 2d 481 (3d Cir.), cert. denied, 364 U. S. 901 (1960). It should be noted, however, that discovery with respect to matters unrelated to the issue certified for interlocutory appeal should continue while the appeal is pending.

(c) *Defendants' motions for summary judgment*

The facts with regard to the State of Alaska are not in dispute. The State of Alaska bases its claim for damages on purchases made by the State through local retailers and purchases made by the University of Alaska from defendant Collier Carbon & Chemical Co. These purchases are not sufficient, however, to give the State of Alaska standing to sue the defendants for damages.

The State of Alaska has not alleged that the retailers from whom it purchased fertilizer were owned or controlled by the defendants or that it bought fertilizer under circumstances

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2786 Filed 07/13/12 Page 6 of 10

In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

that circumvented the complex interactions of market forces. There being no factual dispute that Alaska did not purchase fertilizer directly from defendants or in a manner otherwise circumventing complex interaction of market forces, the State of Alaska is not entitled to sue the defendants for damages on the basis of these purchases. See *Illinois Brick Co. v. Illinois, supra.*

Nor do purchases made by the University of Alaska give the State of Alaska standing to sue. Although the University of Alaska is an instrumentality of the state, it is an independent corporate entity holding title to all real and personal property conveyed to it, it has the capacity to sue or be sued, and the University's board of regents is responsible for the care, control, and management of all real and personal property and all money of the University. *University of Alaska v. National Aircraft Leasing, Ltd.,* 536 P. 2d 121, 123 (1975). Moreover, it cannot be said that the State of Alaska has incurred damages to the extent that the University of Alaska has, on the theory that the funds used to pay any overcharge came from the State of Alaska, because the University of Alaska receives substantial funds from sources other than the State of Alaska. For instance, in 1974 over one-third of the budget for the University of Alaska came from federal and private sources. Therefore, the State of Alaska cannot be considered a direct or indirect purchaser of fertilizer based on purchases made by the University of Alaska.

### [*Land Owners*]

\*7 The facts concerning the claims of plaintiffs Smith and Minoggie are also undisputed. Vincent Dobbins, who is a tenant farmer on land owned by plaintiffs Smith and Minoggie jointly and plaintiff Smith individually, purchases fertilizer from defendants for use on plaintiffs Smith's and Minoggie's farm land. From gross profit is subtracted the expense of the fertilizer. One-third of the net profit is given to the plaintiffs and tenant farmer Dobbins retains the remaining two-thirds profit. Thus, it is clear that the tenant farmer bears two-thirds of any overcharge by the defendants, and the plaintiffs bear one-third. Apportionment and tracing do not present a problem, and there is no threat of double recovery. The complex interactions of market forces normally associated with the sale of a commodity by an independent middleman are not present because Dobbins is not a middleman. He is not seeking to sell fertilizer to the plaintiffs either for a profit or without regard to profit. There is no evidence that Dobbins billed plaintiffs separately for fertilizer or other evidence to suggest that Dobbins and the plaintiffs treated Dobbins' purchase of fertilizer as a transaction preceding a sale of fertilizer to Smith and Minoggie. Rather, Dobbins, as a tenant farmer, is in effect an agent of the plaintiffs: he buys fertilizer to be used on the plaintiffs' land in order to make a profit for the plaintiffs from which his efforts as a tenant farmer are compensated on a percentage basis. Plaintiffs Smith and Minoggie are not indirect purchasers and, therefore, are entitled to sue the defendants for damages.

(d) *Defendants' motions to dismiss and to strike allegations of fraudulent concealment*

The issues now being considered were first before the court in 1975 in connection with defendants' motions to dismiss, to strike, or to compel a more definite statement with respect to all plaintiffs' claims that arose more than four years before the plaintiffs filed their complaints. In its Memorandum and Order of December 3, 1975, the Court concluded that "dismissing or striking the claims antedating four years of filing would not be proper at this stage of the litigation. Instead, plaintiffs may amend to adequately plead fraudulent concealment if they can do so." Shortly thereafter, the plaintiffs filed their first amended complaint, and on January 16, 1976, defendants again moved to dismiss and to strike the fraudulent concealment allegations. Finally, in April of 1979, the plaintiffs filed their second amended complaint, and the defendants renewed their motions to dismiss and to strike by filing the present motions.

The plaintiffs seek to invoke the doctrine of fraudulent concealment in order to avoid the four-year statute of limitation for actions under federal antitrust law. In support of their claim, plaintiffs have alleged that they did not discover the defendants' unlawful activities until just prior to filing the complaints for two reasons: first, the unlawful activities were self-concealing, and second, the defendants acted affirmatively to prevent disclosure of the defendants' unlawful activities.

\*8 The plaintiffs have failed to state with particularity the circumstances giving rise to the defendants' alleged self-concealing conduct. Thus, the Court cannot determine whether, through the exercise of ordinary diligence, the plaintiffs might have discovered the defendants' alleged unlawful activities at an earlier time. In other words, the allegation of fraudulent concealment based on conduct that was self-concealing remains conclusory and thus defective under *Rule 9(b), Federal Rules of Civil Procedure*. Cf. *Hall v. E. I. DuPont De Nemours & Co.* [1970 TRADE CASES

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2787 Filed 07/13/12 Page 7 of 10

In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

P 73,300], 312 F. Supp. 358, 362 (E. D. N. Y. 1970) (mere non-disclosure or denial does not constitute fraud or deceit for tolling purposes; otherwise, the tolling exception to the statute of limitations would eclipse the basic statute itself).

As for the affirmative acts of concealment, the plaintiffs have pleaded in subparagraph (f) of paragraph 31 of their complaint:

(f) there were affirmative acts of concealment by defendants including

(1) the submission of bids which were required to be competitive, had the appearance of regularity and were by their submission represented to be competitive and regular, but which in fact were not;

(2) falsely signing non-collusion affidavits $^{and}/_{or}$ certificates of regularity;

(3) making false and misleading statements concerning the cause of and justification for prices and price increases and the existence of shortages; and

(4) other acts presently unknown to plaintiffs.

These specific acts of concealment do not, however, constitute fraudulent concealment or conduct that is pleaded with sufficient particularity to meet the requisites of Rule 9(b). Bids that had the appearance of regularity and their submission, which allegedly inferred that the bids were complete and regular, are not affirmative acts aimed at fraudulent concealment of anticompetitive conduct; such acts are at best passive conduct of concealment, if not simply silence. The submission of bids is merely failure to disclose the existence of a possible claim for relief, and that does not constitute an affirmative act of concealment. See *Suckow Borax Mines Consolidated v. Borax Consolidated, Ltd.* [1950-1951 TRADE CASES P 62,714], 185 F. 2d 196, 209 n. 10 (9th Cir. 1950), cert. denied, 340 U. S. 943 (1951) (an answer to an accusation of wrongdoing that is, in practical effect, no more than a failure to disclose the existence of a cause of action does not constitute fraudulent concealment, and the statute of limitations is not suspended merely by reason of the plaintiffs' ignorance of or failure to discover the existence of the cause of action). Similarly, falsely signing non-collusion affidavits or the like is not sufficient to permit an inference that the plaintiffs, who are not insensitive to the implications of the antitrust laws nor naive about the conduct of antitrust violators, would be significantly influenced by a simple denial of wrongdoing. In short, under the circumstances of the present case, such conduct would not lead a reasonable person to believe that he did not have a claim for relief, and, therefore, cannot serve as a basis for invoking the doctrine of fraudulent concealment. See *Rutledge v. Boston Woven Hose & Rubber Co.* [1978-1 TRADE CASES P 62,117], 576 F. 2d 248, 250 (9th Cir. 1978). In addition, signing non-collusion affidavits or certificates, of regularity amount to no more than a denial of wrongdoing, which does not constitute fraudulent concealment. *King & King Enterprises v. Champlin Petroleum Co.* [1978-2 TRADE CASES P 62,263], 446 F. Supp. 906, 912 (E. D. Okla. 1978). Finally, the allegations of false and misleading statements are inadequate under Rule 9(b) because they are no more than conclusory allegations; plaintiffs have not identified the content of the statements, who made the statements, or when statements were made.

**\*9** There are two additional reasons for granting defendants' motion to strike the allegations of fraudulent concealment. First, the plaintiffs have not stated when the alleged fraudulent concealment was discovered or what that discovery was, as expressly required by the Court in its Memorandum and Order of December 3, 1975.

Even under modern liberal rules of pleading "justice" still requires that a plaintiff seeking to escape the statute in such a case [fraudulent concealment] shall make "distinct averments as to the time when the . . . concealment . . . was discovered, and what the discovery is, so that the Court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been before made."

*Moviecolor Ltd. v. Eastman Kodak Co.* [1961 TRADE CASES P 69,957], 288 F. 2d 80, 88 (2d Cir. 1961). The plaintiffs have stated that they discovered the existence of their cause of action in a report published by the Canadian Province of Manitoba, but they have not averred the information required by the Court in connection with the discovery of the alleged concealment.

Second, the plaintiffs have failed to explain how the facts that motivated them to file their complaint were not available to them at an earlier date, and whether or not the unavailability of such facts flowed from the defendants' conduct. This was also required by the Court in its Memorandum and Order of December 3, 1975. Although the plaintiffs alleged that they discovered the facts of a possible antitrust violation in the Manitoba report, which concerned an investigation into the manufacture, distribution, and pricing of chemical fertilizers, there is no explanation of why the report was not

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2788 Filed 07/13/12 Page 8 of 10

In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

discovered until nearly two years after it was published. The inference to be drawn is that plaintiffs were not diligent in discovering the basis for their claim of relief. In this type of situation, the plaintiffs cannot reply on the doctrine of fraudulent concealment to avoid the statute of limitations. See *Willmar Poultry Co. v. Morton-Norwich Products* [1975-2 TRADE CASES P 60,410], 520 F. 2d 289, 295-96 (8th Cir. 1975), cert. denied, 424 U. S. 915 (1976); *Gaetzi v. Carling Brewing Co.* [1962 TRADE CASES P 70,339], 205 F. Supp. 615, 623 (E. D. Mich. 1962). In addition, the plaintiffs have not alleged that the information in the Manitoba report was not otherwise available to them prior to its publication.

The plaintiffs have been given adequate opportunity, but have failed to plead fraudulent concealment with the specificity required by Rule 9(b) and have failed to explain why they could not have discovered the cause of action or the concealment earlier. It is, therefore, proper to strike the allegations of fraudulent concealment and dismiss those claims antedating the four-year period preceding the filing of plaintiffs' complaint.

(e) *Form of class notice*

This Court has enlisted the aid of counsel in the preparation of the notice to be given members of the class. The forms of notice proposed by the plaintiffs and the defendants meet the general requirements of Rule 23(c)(2), Federal Rules of Civil Procedure, but both are inadequate as formulated.

 *10  The form of notice proposed by plaintiffs assumes that resolution of the *Illinois Brick* issues addressed earlier in this Memorandum and Order would be deferred, perhaps until trial, and that fraudulent concealment tolls the statute of limitations. Neither assumption is correct, and the plaintiffs' proposed form of notice is, therefore, inconsistent with the rulings of this Court.

[*Statement of Claim*]

The form of notice proposed by the defendants contains a section requiring members of plaintiffs' class to file a statement of claim prior to litigation or be barred from recovery. Requiring class members to submit a statement of claim, as proposed by defendants, under pain of being barred from any recovery is tantamount to requiring class members to opt into this class action. Such a requirement is inappropriate and contrary to the majority view which postpones the requirement of filing a statement and proof of claim until after liability has been established. See Manual for Complex Litigation, § 1.45 at 37-38 (1973).

In all other respects, the defendants' proposed form of notice is acceptable. The form of notice permits incorporation of the rulings concerning the *Illinois Brick* issues by listing on the reverse side of the notice the entities (other than the defendants) from which purchases will permit a suit for damages. Thus, on the reverse side can be listed the retailers of fertilizer that are subsidiaries wholly owned by defendants. Notice will not be disseminated, however, until after the Ninth Circuit reviews the matter certified for interlocutory appeal.

(f) *Plaintiffs' motion to compel discovery*

The plaintiffs move for an order compelling answers to (1) interrogatories concerning occurrences taking place on or after January 1, 1965 affecting a geographic region composed of fourteen states and four Canadian provinces and (2) testimony by defendants J. R. Simplot Co., Inc. and Cominco American, Inc. concerning occurrences that took place on or after January 1, 1965. Defendants argue that discovery should be limited to a time period beginning on January 1, 1970 and to a geographic area consisting of the five Northwestern states involved in this action.

[*Time Frame*]

The plaintiffs are correct in contending that Rule 26(b), Federal Rules of Civil Procedure, has been liberally interpreted to permit broad discovery limited only by the requirement that the material or information sought be somehow remotely relevant to the general subject matter involved in the action. But the Federal Rules of Civil Procedure, including Rule 26(b), "shall be construed to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. In keeping with the Rules of Civil Procedure and in the interest of facilitating the progress of this litigation, the plaintiffs' motion must be carefully scrutinized.

Plaintiffs have not advanced a persuasive reason for allowing discovery concerning occurrences taking place on or after January 1, 1965. They argue that the information they seek to discover is relevant to their claims of antitrust violations preceding the four-year statute of limitation because fraudulent concealment tolls the statute of limitation. But, as indicated previously in this Memorandum and Order, the claims based on events preceding the statute of limitations period are to be dismissed with prejudice. The plaintiffs also cite cases where courts have held that discovery can

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2789 Filed 07/13/12 Page 9 of 10

In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

go beyond the period for damages permitted by the statute of limitations. See, e. g., *Quonset Real Estate Corp. v. Paramount Film Distributing Corp.* [1970 TRADE CASES P 73,179], 50 F. R. D. 240, 242 (S. D. N. Y. 1970). Yet other courts have recognized the need to limit the time frame of discovery. See, e. g., *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.* [1974-1 TRADE CASES P 75,020], 373 F. Supp. 1225, 1228 (S. D. N. Y. 1974). In balance, the plaintiffs have not presented sufficient justification for the burden that would be placed on the defendants and the court by extending the time frames for discovery. However, this conclusion does not preclude requests for discovery into matters occurring on or after January 1, 1965 if a specific need can be demonstrated.

[*Geographic Frame*]

 *11  The plaintiffs' request for information concerning an area composed of four Canadian provinces and nine states in addition to Alaska, Idaho, Montana, Oregon, and Washington must also be denied. Only the five named states are involved in this litigation as parties. The alleged conspiracy involves only the above-named states and the four Canadian provinces. The request for information concerning states adjacent to the northwestern states to the south and east does not appear relevant to establishing antitrust violations and the results thereof, at least to the degree necessary to counter-balance the undue burden, delay, and possible obfuscation of issues that would result if such discovery were compelled. Other courts have not hesitated to restrict the geographic scope of discovery where such action was warranted. See, e.g., *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, supra,* at 1228; *William Goldman Theatres, Inc. v. Metro-Goldwin-Mayer, Inc.* [1972 TRADE CASES P 74,039], 54 F. R. D. 201, 202 (E. D. Pa. 1971). As for the discovery of information concerning the Canadian provinces, the plaintiffs have alleged in their complaints that the conspiracy included the sales of fertilizer in four particular Canadian provinces. The defendants need not produce documents physically located in Canada, however, in order to prevent a possible conflict with Canada resulting from the Court's exercise of its power to compel discovery.

> The defendants have stated that they would have this Court limit initial discovery to the geographic area composed of Alaska, Washington, Oregon, Montana, and Idaho, . . . and the period from January 1, 1970 through June 11, 1975, the four year statute of limitations period plus a one and one-half year period for "background" information. Defendants recognize that these initial limitations on discovery are not absolutes, and that one or more plaintiffs may have a particularized need for specific information outside these limits.

Defendants' Joint Memorandum in Opposition to Plaintiffs' Motions for Leave to Compel Discovery and to Propound Document Requests at 5. The limitation proposed by the defendants is reasonable, with the clarification that information that the defendants have within the five-state northwest region concerning the four Canadian provinces is discoverable. The burden on the defendants and the Court that would be caused by adopting the scope of discovery requested by the plaintiffs, the delay and possible obscuring of issues, and the possible frustration of antitrust goals are not outweighed by the remote relevance, if any, of that sought to be discovered by the plaintiffs. Therefore, their motion must be denied, but without prejudice.

It Is Ordered:

1. The plaintiffs' class is further delineated to exclude those who purchased fertilizer (a) from independent retailers, (b) from retailers who sold fertilizer on consignment from defendants, and (c) from cooperatives owned by the purchasers.

 *12  2. The order of August 9, 1979 permitting those who purchased commercial fertilizer from a defendant, or an entity owned or controlled by a defendant, either directly, or indirectly under circumstances that are the economic equivalent of a preexisting cost-plus contract is reaffirmed, and the matter is certified for interlocutory appeal pursuant to 28 U. S. C. § 1292(b) (1976).

3. Defendants' motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, with respect to claims made by the State of Alaska is granted, and the State of Alaska's complaint and cause of action are dismissed. Defendants' motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, with respect to claims made by plaintiffs Smith and Minoggie is denied.

4. Defendants' motion to strike allegations of fraudulent concealment is granted. Defendants' motion to dismiss claims antedating the four-year period preceding the filing of plaintiffs' complaint is granted, and the complaint and action with respect to those claims are dismissed.

Case 2:12-md-02311-SFC-RSW ECF No. 228-13, PageID.2790 Filed 07/13/12 Page 10 of 10

In re Fertilizer Antitrust Litigation, Not Reported in F.Supp. (1979)
1979-2 Trade Cases P 62,894

5. The form of notice proposed by the defendants with the deletion of section IV of that form of notice is adopted for purposes of Rule 23(b)(2), Federal Rules of Civil Procedure. The notice to class members shall be disseminated following review of order numbered 2 above by the Ninth Circuit Court of Appeals on interlocutory appeal.

6. Plaintiffs' motion to compel discovery is denied.

**Parallel Citations**

1979-2 Trade Cases P 62,894

Footnotes

\* This does not include subsidiaries or outlets wholly owned by defendants. That situation is addressed in part (b) *infra.*

**End of Document** © 2012 Thomson Reuters. No claim to original U.S. Government Works.