# EXHIBIT T



2012 WL 2131937 (D.C.Super.)     Page 1

Superior Court of the District of Columbia,
Civil Division.
Sarah DAHLGREN, Plaintiff,
v.
AUDIOVOX COMMUNICATIONS CORPORATION, et al., Defendants.
No. 2002 CA 007884 B.
March 15, 2012.

Memorandum on Defendant Motorola, Inc.'s Substitute Motion for Summary Judgment on Standing

A. Franklin Burgess, Jr., Judge.
Calendar 3

Sarah Dahlgren has brought a complaint against several defendants, including Motorola, Inc., on behalf of herself and the general public of the District of Columbia. She alleges misrepresentations and omissions in connection with the sale and marketing of cellular telephones, all in violation of various provisions of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3904 et seq. Ms. Dahlgren also includes a count alleging unjust enrichment.

For reasons that the court need not explain, Motorola is the only remaining defendant. It has moved for summary judgment, arguing that Ms. Dahlgren lacks standing. The court agrees with Motorola and will enter an order dismissing the Third Amended Complaint for want of jurisdiction.

*Facts*

Ms. Dahlgren's claims under CPPA are based on the purchase of three Motorola cell phones, two in 1999 and one in 2005. The court here summarizes the undisputed facts with respect to those phones, taking the factual inferences in the light most favorable to Ms. Dahlgren. *See, e.g., Grant v. May Dep't Stores Co.,* 786 A.2d 580, 583 (D.C. 2001)(citing *Nader v. de Toledano,* 408 A.2d 31, 42 (D.C. 1979)).

A. *1999 Purchases*

Ms. Dahlgren bought two cell phones in 1999: one for herself, one for her mother. (Dahlgren Dep. Tr. 372.) She does not remember who manufactured the cell phones, or where she bought them. (*Id.* 334-335.) Verizon records indicate that one of the cell phones became associated with Ms. Dahlgren's account on July 23, 1999, but they do not indicate whether, when, or where she bought it. (Polinsky Aff. para 21 (c).) The parties agree that the cell phone associated with that account was manufactured by Motorola. (Stipulation of Facts paras. 1-2.)

Motorola argues that there exists insufficient evidence to show that Ms. Dahlgren purchased the cell phones from Verizon. Verizon supplies cell phones. It supplied Ms. Dahlgren an Audiovox cell phone by mail at no cost on March 17, 1999. It sold her another Audiovox cell phone from its Verizon Wireless store in the District of Columbia on or about August 25, 2000 (Polinsky Aff. para. 21(d).) It sold her a Motorola cell phone from its Bethesda, Maryland store in 2005. (*Id.* paras. 21 (b), (e), and (k).) Ms. Dahlgren could have bought the Motorola cell phone from another store or through the internet and then got her service from Verizon, or she could have

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2131937 (D.C.Super.)                                                                                             Page 2

bought the cell phone from a Verizon store and then associated it with a Verizon account. While the latter is perhaps a speculative inference, the court will assume that it is reasonable for purposes of this discussion.

When she made her purchase, Ms. Dahlgren relied on information provided at the point of sale and communications with sales representatives at the point of sale. (Def.'s Statement of Undisputed Material Facts ("DSUMF") para. 17; Pl.'s Statement of Disputed Material Facts ("PSDMF") para. 17.) She could not recall any information or materials she received in 1999 when she bought her 1999 phones. (DSUMF paras. 18-20; PSDMF paras. 18-20.) Verizon would have provided her with a "manufacturer-drafted user manual corresponding to [the] phone model in the box with [the] phone." (Polinsky Aff. para. 22.) But Ms. Dahlgren does not recall reading what was in the manual. (Dahlgren Tr. 340.) She interacted with someone who sold her the phones, but she does not recall what was said. She saw displays but does not recall what they contained. (*Id.* 377.) Ms. Dahlgren could not identify any problem with the service of the phones she bought in 1999. (*Id.* 343.)

B. *2005 Purchase*

Ms. Dahlgren bought a Motorola cell phone on July 21, 2005 from EuroMotors in Bethesda, Maryland. (DSUMF paras. 25, 26; PSDMF paras. 25, 26.). The only information she relied on in making the purchase was information available at the point of sale and communications with sales representatives at the time she bought the phone. (DUSMF para. 27; PSDMF para. 27.) Ms. Dahlgren recalled no information from a sales representative other than information about price and installation time, and information that the Motorola phone was the only phone available for her car that was hands-free. (DSUMF para. 28; PSDMF para. 28.) She could not recall whether or not the sales representative was an employee of Mercedes. (3/10/11 Tr. 79-80.) She received a manual that came with the car phone (*Id.* at 174-175), but she does not remember reading it. (*Id.* at 90.) Sometime before she bought the phone, Ms. Dahlgren might have seen an advertisement for a Motorola cell phone, but she did not identify where she was when she saw the advertisement. (*Id.* at 90-91.)

*Discussion*

Article III of the Constitution allows the federal judiciary to decide only "Cases" and "Controversies." U.S. Const. Art. III § 2. Enforcing this requirement, the Supreme Court requires a plaintiff to have standing before a court, established pursuant to Article III, may adjudicate an action brought by that plaintiff. *Warth v. Seldin,* 422 U.S. 490, 498 (1975). Congress established the District of Columbia courts pursuant to Article I of the Constitution. *See District of Columbia v. Walters,* 319 A.2d 332, 338 n.13 (D.C. 1974). As a result, courts in the District are not bound by Article III requirements. Nevertheless, Article III standing principles have been applied to a claim brought in the District of Columbia courts to test whether the court has jurisdiction over the claim. *See Grayson v. AT&T Corp.,* 15 A.3d 219, 233-234 (D.C. 2011) (en banc).

Prior to amendments occurring in 2000, the CPPA allowed a cause of action only to " '[a]ny consumer who suffers any damage as a result of [an unlawful trade practice] ....' " *Id.* at 236 (quoting D.C. Code § 28-3905(k) (1981) (1996 Repl.)). When the District of Columbia City Council eliminated those words in 2000, the question was presented whether it intended to eliminate the standing requirement that otherwise would have applied. *Id.* at 236. In *Grayson,* the court held that "the 2000 amendments to the CPPA do not evidence an intent by the Council to override or disturb our constitutional standing requirement." *Id.* at 245. Accordingly, this court must determine whether Ms. Dahlgren has constitutional standing to pursue her claims under the CPPA.

The issue comes before the court on Motorola's Motion for Summary Judgment. Accordingly, Ms. Dahlgren bears the burden of showing standing through " 'specific facts' " set forth " 'by affidavit or other evidence.' " *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2131937 (D.C.Super.)                                                                                                                         Page 3

at 246 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)(citations and internal quotations omitted)).

### I. *CPPA Claims*

To meet standing requirements, a plaintiff must show injury in fact; a causal connection between the injury and the alleged wrong; and a likelihood that a favorable decision will address the injury. *Grayson, supra,* 15 A.3d at 246 (citing *Lujan, supra,* 504 U.S. at 560-61 (citations and internal quotation marks omitted)). This court holds that Ms. Dahlgren has not produced sufficient evidence to meet the first requirement.

#### A. *1999 Purchases*

##### 1. *Theories of Standing*

The *Grayson* court recognized that the injury-in-fact requirement can be met in two ways. First, a plaintiff can sustain an actual injury. *Id.* at 246. Second, a plaintiff can show an injury in fact " 'solely by virtue of [a] statute [] creating legal rights, the invasion of which creates standing.' " *Id.* at 247 (quoting *Warth,* supra, 422 U.S. at 500 (intent quotations omitted). This court will refer to standing stemming from the latter category as "statutory standing."

*Grayson, supra,* involved two complaints, one by Paul Breakman and one by Alan Grayson. The court held that Breakman lacked standing under either of the theories just described. First, he alleged no actual injury, bringing his case only in a representative capacity. *Id.* at 246-247. Second, he did not allege an "invasion of statutorily conferred rights ... personal to [him]." *Id.* at 247. He was a District resident, but he was a "non-subscriber to AOL." *Id.* at 242-243 n.71. As such, he could not assert "anything to which he [was] entitled under the CPPA statute, from AOL's alleged failure to disclose material facts to established customers." *Id.*

Grayson sued AT&T for violation several subsections of the CPPA.[FN1] *See id.* at 247-248. It is not necessary here to summarize all the allegations because the court made clear that "[i]n terms of standing ..., Mr. Grayson's injury is derived solely from a violation or an invasion of his statutory legal rights created by the CPPA." *Id.* at 248-249. The injury in fact was "defendants' violation of [Mr. Grayson's] statutory right .. to the disclosure of information about [defendants'] failure to report and turn over to the District government breakage for the benefit of those who obtain calling cards in the District." [FN2] *Id.* at 249. The court held that Grayson sufficiently alleged injury in fact because he "personally obtained calling cards in consumer transactions in which the breakage information was not disclosed." *Id.* at 249 n.97.

> FN1. He had a claim under the District of Columbia False Claims Act that is not relevant for the present discussion. *See id.* at 223 n.1.
>
> FN2. Breakage was described as the "unused portion of a prepaid calling card." *Id.* at 225.

Here, Ms. Dahlgren argues that her "basis for standing (based on both the 1999 and 2005 purchases) is completely analogous to Mr. Grayson's, and this court need look no further in evaluating [her] standing." (Opp'n 10.) She argues that, like Grayson, her "injury[]in[]fact is derived from the legal rights created by the D.C. CPPA." (Id.) Further, she argues, she has alleged a sufficient personal stake in the outcome because she has produced evidence that she "purchased cell phones in consumer transactions in which the misrepresented and omitted information was not disclosed." (Id.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4 of 15
Case 2:12-md-02311-SFC-RSW   ECF No. 230-21, PageID.3190   Filed 07/13/12   Page 5 of 16

2012 WL 2131937 (D.C.Super.)                                                                    Page 4

### 2. *Retroactivity of the 2000 Amendments*

The court disagrees with Ms. Dahlgren's argument that she may claim statutory standing based on her 1999 purchases as alleged in the complaint. "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S v. Richard D.,* 410 U.S. 614, 617 n.3 (1973) (citations omitted). But statutory standing, as may be self-evident from the foregoing quotation, must be conferred by the statute itself. Thus, in *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205 (1972), one of the first cases proceeding on this principle, the statute at issue gave a right of action to any " 'person aggrieved,' " defined as any " 'person who claims to have been injured by a discriminatory housing practice.' " *Id.* at 208 (quoting 42 U.S.C § 3610(a)(1968)). The plaintiffs were not members of the minority group alleged to have been discriminated against, but they claimed to have been injured because they were denied the benefits of a racially integrated housing unit. *Id.* at 205. They had standing to sue, the court reasoned, because of the "broad and inclusive" language of the statute and because they claimed to have been injured within the intent of the legislation. *Id.* at 209-210.

Likewise, the amended CPPA allows "[a] person, whether acting for the interests of itself, its members, or the general public, [to] bring an action ... seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia ...." D.C. Code § 28-3905(k) (1)(2001). It thus provides standing to any consumer seeking to bring an action for a violation of the law, so long as, as held in *Grayson,* that person him or herself has been deprived of a right under that law. *See Grayson,* 15 A.3d at 249.

Before its amendment, however, the statute did not confer such a broad right. It limited the cause of action to "any consumer who suffers any damage." D.C. Code § 28-3905(k)(amended 1996). Thus it was held in *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 204 (D.C. 1991), that
[o]bviously, suffering damage is a condition precedent to suit, and one who has not been injured cannot sue under this statute for any relief whatever. Nothing in the regulations purports to extend the statutory right to such relief, or, indeed, to any remedy, to an individual who has suffered no injury.

*Id.* The plaintiff there had argued, to no avail, that he was entitled to sue, despite the lack of injury to himself, simply to "assure compliance with the law ..." *Id.* at 203. That is the result Ms. Dahlgren wants here by invoking statutory standing as to the 1999 purchases. As in *Beard,* that is not enough.

The court next turns to the question of whether Ms. Dahlgren's complaint, insofar as it is predicated on the 1999 purchases, is controlled by the statute as it existed before the 2000 amendments. In answering this question,
the court's first task is to determine whether [the legislature] has expressly prescribed the statute's proper reach. If [the legislature] has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf USI Film Prods.,* 511 U.S. 244, 280 (1944).

The amendments themselves do not expressly state that they apply to conduct occurring before their effective date. Accordingly, the court turns to whether they have a retroactive effect.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5 of 15
Case 2:12-md-02311-SFC-RSW   ECF No. 230-21, PageID.3191   Filed 07/13/12   Page 6 of 16

2012 WL 2131937 (D.C.Super.)                                                                                       Page 5

In *Landgraf,* the court noted the complexity of this task, at least in some cases, and the various formulations used to make that determination. See *id.* at 268-270 (citations omitted). It summed up the analytical approach as follows:
[T]he court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.

*Id.* at 269-270.

There are two lines of authority that offer guidance as to the judgment to be made in the present case. In *Edwards v. Lateef,* 558 A.2d 1144 (D.C. 1989), the court noted that the legislature had amended the definition of "duty to support" to provide that a parent had the duty to pay child support arrearage, and held that courts therefore could permissibly impose that duty in a decree. *Id.* at 1146 (citations omitted). Although the amended statute thereby added to the potential liability of the miscreant parent, the court held that the statute did not have an impermissible retroactive effect. "The statutory amendment at issue in this case did not affect or amend a substantive right. The amendatory language merely provided an additional remedy pursuable under the [child support statute's] petition mechanism to enforce an existing obligation." *Id.* at 1147. Ms. Dahlgren argues that the 2000 amendments to the CPPA were likewise remedial, or procedural, in nature, and thus fall within the rule employed in *Lateef.*

On the other hand, there exists a line of authority that supports Motorola's position. In *Hughes Aircraft Co.* v. *United States ex rel. Schumer,* 520 U.S. 939 (1997), the alleged wrongful conduct under the False Claims Act occurred at a time when the Act disallowed a private party from bringing an action based on information already known to the government. *Id.* at 941. Congress amended the statute to withdraw that part, thereby allowing a private party to bring action based on information known to the government. *Id.* A *qui tam* plaintiff brought a whistleblowing action based on conduct occurring before the amendment, and the question was whether the amendment had retroactive effect. *Id.* The Court held that it did. *Id.* at 951-952. It concluded that the amended statute created a new cause of action that could be brought by a new class of plaintiffs motivated, unlike the government, "primarily by prospects of monetary reward rather than the public good ...." *Id.* at 949. The court held:
In permitting actions by an expanded universe of plaintiffs with different incentives, the 1986 amendment essentially creates a new cause of action, not just an increased likelihood that an existing cause of action will be pursued. Prior to the 1986 amendment, respondent's *qui tam* action was completely barred because of Hughes' disclosure to the Government of information about its claim submissions. The 1986 amendment would revive that action, subjecting Hughes to previously foreclosed *qui tam* litigation, much like extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action ...

*Id.* at 950 (citations omitted). The court declined to apply the amended Act because doing so would impermissibly affect a substantive defense that could have been raised under the previous version of the Act. *Id.* at 951-52.

In *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.,* 339 F.3d 1001 (8th Cir. 2003), Congress enacted a new statute, the Interstate Commerce Commission Termination Act ("ICCTA"), which changed the law governing who could bring an action to enforce regulations governing lease agreements between truck motor carriers and motor carriers. The prior law allowed only the Interstate Commerce Commission to enforce the regulations. *Id.* at 1006 (citing 49 U.S.C. § 13501 (1996)). The new law afforded a private right of action. Analo-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6 of 15
Case 2:12-md-02311-SFC-RSW   ECF No. 230-21, PageID.3192   Filed 07/13/12   Page 7 of 16

2012 WL 2131937 (D.C.Super.)                                                                                        Page 6

gizing the case to *Hughes, supra,* the court concluded that the new law had a retroactive effect because it "expand[ed] the class of plaintiffs who could bring their claims [thereby altering] the defendants' substantive rights." *Id.* at 1007. It also concluded that "Owner-Operators who sue motor carriers will likely be motivated by their own potential financial gain. This increases defendant motor carriers' potential liability, thereby creating a retroactive effect." *Id.* Accord *Rivas v. Rail Delivery Serv. Inc.,* 423 F.3d 1079, 1084 (9th Cir. 2005) (statute "retroactively expand[ed] the universe of potential plaintiffs ... [and] "[b]ecause application of the [law] to pre-1996 agreements would increase Defendants' potential liability, the statute has a retroactive effect.")

The 2000 amendments to the CPPA also expanded the class of plaintiffs that could bring claims. They eliminated "any consumer who suffers damage," replacing that clause with "[a] person whether acting in the interests of itself, its members, or the general public ...." See *Grayson, supra,* 15 A.3d at 236. This not only added statutory standing but also allowed plaintiffs to act as private attorneys general on behalf of the general public. It thus "enlarg [ed] the category of persons authorized to bring a CPPA enforcement action." *Id.* at 245. Just as in the cases cited above, the amendments thereby increased the potential liability of those subject to the statute's provisions.

It is true, as Ms. Dahlgren argues, that the provisions of the statute relating to wrongs - the "substantive provisions" - were not changed. But that was true also in *Hughes, New Prime,* and *Rivas.* Further, as in the cited cases, this new class of plaintiffs would have a financial motive that does not exist when the Attorney General brings an action.

The court concludes that the effects of the 2000 amendments to the CPPA are more in line with the *Hughes* line of cases than with *Lateef.* Accordingly, the 2000 amendments had a retroactive effect.[FN3]

> FN3. The court recognizes that the issue is difficult and that some cases have not taken from *Hughes* what the courts in *New Prime* and *Rivas* did. *See, e.g., Owner-Operator Independent Driver Ass'n, Inc. v. Arctic Express, Inc.,* 270 F.Supp.2d 990, 994-995 (S.D. Ohio 2003) (ICTTA has "no retroactive effect as it neither takes away nor impairs vested rights, nor creates a new obligation or duty, nor attaches a new disability .... Rather ... [it] simply shifted the power to bring the Defendants into court form the ICC to the owner-operators themselves."; *Hess v. Chase Manhattan Bank, U.S.A., N.A.,* 220 S.W.3d 758, 772 and n.9 (Mo. 2007) (same, and saying *New Prime* erred in relying on *Hughes*).

The final question is whether the City Council evidenced a "clear ... intent favoring [retroactive application]." *Landgraf, supra,* 511 U.S. at 280. The answer to this question is not difficult. Ms. Dahlgren does not argue that the Council did evidence such and intent, and the court can perceive none in the legislative history of the amendments.

### 3. *Ms. Dahlgren Has Not Shown Injury in Fact*

Since Ms. Dahlgren cannot avail herself of statutory standing under the CPPA as amended in 2000, she must show "damage as a result of the use of employment by any person by any person of a trade practice in violation of the law of the District of Columbia." D.C. Code § 28-3905(k)(1) (1998). To do this, she must produce evidence sufficient to withstand summary judgment that she "suffered actual damages because of the misrepresentation[s] or omissions [] claimed to violate the Act." *Williams v. Purdue Pharma Co.,* 297 F.Supp.2d 171, 176 (D.D.C. 2003).

As Motorola points out, Ms. Dahlgren has produced no evidence that the cell phones she bought failed to func-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7 of 15
Case 2:12-md-02311-SFC-RSW   ECF No. 230-21, PageID.3193   Filed 07/13/12   Page 8 of 16

2012 WL 2131937 (D.C.Super.)                                                                                    Page 7

tion as intended. She has produced no evidence that she actually heard or read any misrepresentations or heard any statements made by Motorola or its agents in which material omissions were made. Ms. Dahlgren argues, however, that she need not show that she suffered injury in the sense that the cell phones did not work. She argues that she has "alleged an out-of-pocket loss in the purchase price of the two phones she purchased in 1999 for which she has requested a refund." (Opp'n 22.) As Ms. Dahlgren points out, the court found this argument persuasive in its July 8, 2010 memorandum providing the reasons for denial of defendant's motion to dismiss under Rule 12(b)(6). The court, however, has concluded, after further consideration and research, that its previous reasoning and result were faulty.

The analysis starts with the language of the pre-2000 statute: "[a]ny consumer who suffers any damage as a result of the use of or employment of a trade practice" has a cause of action. D.C. Code § 28-3905(k)(1)(1998). In *Osbourne v. Capital City Mortgage Corp.,* 667 A.2d 1321 (D.C. 1995), the court focused on this language in stating that if "the Osbournes can prove that Capital City made a material misrepresentation and that they suffered damages as a result, they may seek relief ..." *Id.* at 1330. With respect to the Osbournes' cause of action under another section of the CPPA, the court said that *"if* [they] are able to demonstrate that they were harmed by the alleged misrepresentation, they may seek relief for this Statutory claim as well." *Id.* at 1330-1331.

The court followed *Osbourne* in *Athridge v. Aetna Cas. & Sur. Co.,* 163 F.Supp.2d 38, 56 (D.D.C. 2001), premising its summary judgment decision on the CPPA's requirement that that "the consumer suffered actual damages because of the misrepresentation or omission claimed to violate the Act." [FN4] In *Purdue, supra,* the court cited *Athridge* for the same proposition. 297 F.Supp.2d at 176.

> FN4. On appeal, the Court of Appeals held that the lower court erred in determining that the consumer had not suffered damage but did not disturb the premise of the lower court's ruling. *See Athridge v. Aetna Cas. & Sur. Co.,* 359 U.S. App. D.C. 22, 32, 351 F.3d 1166, 1176 (2003).

As Motorola argues, *Purdue* is particularly on point because it rejected the same argument that Ms. Dahlgren makes here - that she has suffered damage under the CPPA in the form of the price of what she purchased. *Id.* In *Purdue,* the plaintiffs alleged false and misleading advertising of a drug, but they did not allege that the drug failed to give them effective pain relief or that they suffered any adverse consequences from using the drug. *Id.* They were thus like Ms. Dahlgren, who produces no evidence that the cell phones she bought failed to function as intended or that she suffered any adverse consequences from using the cell phones. The *Purdue* court held that "[w]ithout alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs." *Id.* The basis for the court's holding was that the loss of the purchase price was not damage " 'as a result of misrepresentation or omission claimed to violate the Act.' " *Id.* (quoting *Athridge, supra,* 163 F.Supp.2d at 56).

*Purdue* came up on a motion to dismiss under Rule 12(b)(6) for failure to state a claim and arguably can be distinguished on that ground. The principal case on which *Purdue* relied, however - *Rivera v. Wyeth-Ayerst Laboratories,* 283 F.3d 315 (5th Cir. 2002) - cannot be distinguished for that reason. In Rivera, the plaintiff brought suit under the Texas Deceptive Trade Practices Act arguing a failure to warn about possible dangers associated with a defective drug. She alleged no injury from the drug to herself or members of the class she wished to represent. She asserted, however, that she suffered "economic injury" in the price she paid for the drug, and that that was sufficient to show an injury in fact. Like Ms. Dahlgren, she wanted a refund. *See Rivera, supra,* 283 F.3d at 319-320.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2131937 (D.C.Super.)                                                                                              Page 8

The court rejected the argument. It pointed out that to have standing under Article III, a plaintiff must be " 'among the injured.' " *Id.* at 320 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 734-35 (1972)). The Rivera plaintiffs did not allege breach of contract, but even if they had, they had received the benefit of their bargain and thus would have no standing to make a contract claim. Moreover, they could not, for standing purposes, "recast their product liability claim in the language of contract law. The wrongs they allege - failure to warn and sale of a defective product - are products liability claims .... Yet, the damages they assert - benefit of the bargain, out of pocket expenditures - are contract law damages." *Id.* On their product liability claims, they suffered no "concrete injury." *Id.* at 320-321.

Ms. Dahlgren is in the same position as the plaintiffs in *Rivera.* She asserts economic injury from her purchase of the cell phones, but her claim is not a contract claim; it is a claim under the CPPA. She is not "among the injured" from violations of that Act because she suffered no harm from any misrepresentation or omission.

The court in *Purdue, supra,* cited several cases that were in accord with *Rivera. See* 297 F.Supp.2d at 178 and n.3. To these may be added: *Ryan v. Brookdale Int'l Sys.,* 230 Fed. Appx. 366 (5th Cir. 2007); *Wang v. OCZ Tech. Group, Inc.,* 276 F.R.D. 618 (N.D. Cal. 2011); *In re Toyota Motor Corp. Unintended Accel. Mktg.,* 754 F.Supp.2d 1145 (C.D. Cal. 2010); *Whitson v. Bumbo,* No. C 07-05597 MHP, 2009 U.S. Dist. LEXIS 32282 (N.D. Cal. Apr. 16, 2009); *Ziegelmann v. Daimler Chrysler Corp.,* 649 N.W.2d 556 (N.D. 2002); *Coker v. Daimler Chrysler Corp.,* 01 CVS 1264, 2004 NCBC LEXIS 2 (N.C. Sup. Ct. Jan. 5, 2004). Ms. Dahlgren has not brought to the court's attention any authority to the contrary, nor has the court has found any on its own.

For these reasons, the court concludes that Ms. Dahlgren has produced insufficient evidence to demonstrate injury in fact for purposes of standing to bring her claims relating to the 1999 purchases.

As will be explained below, however, the court holds alternatively that Ms. Dahlgren has no standing for the 1999 purchases even under the amended statute. With respect to those purchases, she is in the same position as she is with respect to the 2005 purchase.

B. *1999 and 2005 Purchases: Statutory Standing*

As noted above, Ms. Dahlgren says that her case for standing is "completely analogous to Mr. Grayson's." (Opp'n at 10.) That is true in that they each claimed that they were denied a right to truthful information under the CPPA. But Ms. Dahlgren fails to take into account (at least in this portion of her opposition) footnote 98 of the *Grayson* opinion. *Grayson, supra,* 15 A.3d at 250. There the court held that Grayson did not have standing with respect to one defendant, Verizon, because, as the court read the complaint, "[Grayson] did not purchase a Verizon calling card in the District." *Id.* at 250 n.98. Motorola argues that this holding solves this case because, just as in *Grayson,* there exists no proof that Ms. Dahlgren purchased her cell phones in the District.[FN5] (Mot. 21-22.)

> FN5. It is immaterial that, with respect to the cell phones bought in 1999, Ms. Dahlgren did not admit that she bought the phones outside the District but simply testified that she did not remember where she bought them. Where, in a summary judgment motion, a moving party simply points to the absence of evidence necessary to support the nonmovant's case, the opponent has the burden of coming forward with the evidence that would support it. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Ms. Dahlgren argues that Motorola misreads *Grayson* in arguing that the Court of Appeals held that Grayson had no standing to bring a complaint against Verizon because he did not buy his calling card from Verizon in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9 of 15
Case 2:12-md-02311-SFC-RSW   ECF No. 230-21, PageID.3195   Filed 07/13/12   Page 10 of 16

2012 WL 2131937 (D.C.Super.)                                                                                                Page 9

District. She cites Grayson's complaint at length and concludes from it that "Mr. Grayson did not allege that he purchased a Verizon prepaid calling card at all, not that he did not allege such a purchase in the District." (Opp'n at 44.) It is not material, however, how this court interprets the Grayson complaint; what matters is how the Court of Appeals read it. The *Grayson* court read it to allege that Grayson "did not purchase a Verizon calling card in the District," and that was the premise of its holding. Even if the court was mistaken in that reading, its holding based on that premise stands.

It is true, as plaintiff points out, that the *Grayson* court said that "[Mr. Grayson] is in the same posture as Mr. Breakman is with respect to AOL." 15 A.3d at 250 n.98. Plaintiff uses this to argue that the court must have meant that Grayson had no standing because, like Breakman, he bought no Verizon card at all. (Opp'n 44-46.) Yet, this argument, if accepted, would render completely immaterial the court's point that Grayson did not buy a Verizon card in the District. A better interpretation of the court's placing Grayson in the same category as Breakman is that, because Grayson did not buy a card in the District, he did not assert a "deprivation of anything he is entitled to under the CPPA statute." 15 A.3d at 243-244 n.71.

Nevertheless, *Grayson* is not on all fours with this case because Grayson was not a resident of the District of Columbia, 15 A.3d at 228, while Ms. Dahlgren is. Thus, while guiding this court, the *Grayson* opinion and holding do not dictate the outcome in this case.

At this juncture, the court will pause to consider the *Grayson* court's point that " 'standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.' " *Id.* at 229 (quoting *Warth, supra,* 422 U.S. at 500). *Grayson,* relying principally on *Parker v. District of Columbia,* 375 U.S. App. D.C. 140, 148, 478 F.3d 370, 378 (2007), stated that even where there exists overlap between "the standing and merits inquiries," the court must not conflate the two. *Id.* at 230-31. The court also relied on *Public Citizen v. United States Department of Justice,* 491 U.S. 440 (1989), in pointing out that "at the point of the standing inquiry, the court did not look to whether the statutory right actually existed, but only whether plaintiffs alleged that they were denied information potentially covered by [the Federal Advisory Committee Act]." 15 A.3d at 231.

As this court reads the cases on which *Grayson* relied, the plaintiff claimed an injury apart from the deprivation of a statutory right. In *Parker, supra,* the plaintiff had been denied a registration permit to own a handgun. 478 F.3d at 376. Parker's inability to get the permit was his injury in fact, and the court had "consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury." *Id.* In *Public Citizen, supra,* the plaintiffs had been denied information and documents to which they claimed they were entitled. The Court held that "refusal to permit appellants to scrutinize the ABA Committee's activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue." 491 U.S. at 449.

Neither of the two foregoing cases was analyzed as conferring standing solely because of an invasion or violation of a statutorily conferred right in the absence of any " 'judicially cognizable injury.' " *Grayson, supra,* 15 A.3d at 249 (quoting *Shaw v. Marriott Int'l Inc.,* 390 U.S. App. D.C. 422, 425, 605 F.3d 1039, 1042 (2010)). In this case, however, Ms. Dahlgren is relying on that kind of standing, and this court is of the opinion that it must necessarily determine whether the CPPA reaches the conduct alleged by Ms. Dahlgren.

This point is illustrated in *Shaw, supra,* where the court analyzed the CPPA. to determine whether the transaction alleged by Shaw was within the Act's reach. The court reasoned: "... [T]he violation of a statute can create the particularized injury required by Article III only when 'an individual right' has been 'conferred on a person by statute.' The question is whether Shaw and Mendelson are within the class of individuals protected by the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2131937 (D.C.Super.)                                                                                             Page 10

CPPA." 605 F.3d at 1042 (quoting *Zivotofsky ex rel. Ari Z. v. Sec'y of State,* 370 U.S. App. D.C. 269, 274, 444 F.3d 614, 619 (2006)). The court "first look [ed] to the statute's text to determine whether Shaw and Mendelson engaged in 'consumer' transactions within the meaning of the [CPPA] ." *Id.* It ultimately concluded:

[Shaw and Mendelson] did not engage in consumer transactions within the meaning of the Act and are not entitled to its protections. Because they lack any rights under the Act, they could not have suffered any injury-in-fact stemming from a violation of the statute. They accordingly lack Article III standing to sue in federal court.

*Id.* at 1044.

Indeed, although the *Grayson* court did not say so explicitly, it also held that Mr. Grayson was not entitled to the protection of the CPPA insofar as his claim against Verizon and its affiliates was concerned because he, like Breakman, was not "depriv[ed] of anything to which he [was] entitled under the CPPA. statute." 15 A.3d at 250 n.98, 243-244 n. 71; *see also* 13B WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE, § 3531.13 at 250-251 (3d ed. 2008) (question whether statute expands standing beyond the "ordinary judicial tests" ... is one of legislative intent .... Interpretation to determine intent may call for all the skills used in other interpretation chores ...."); 15 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 101.40[5][a] at 101-57 (Matthew Bender 3d ed.) ("Although standing does not depend on the merits of the plaintiff's contention that particular conduct is illegal, it does require a claim of injury to a legally cognizable right.") The court therefore turns to the question of whether Ms. Grayson has produced sufficient evidence to create a genuine issue of material fact as to whether she was "depriv[ed] of anything to which [she] was entitled under the statute." *Grayson, supra,* 15 A.3d at 243-244 n.71.

The CPPA affords a right of action to "[any] person ... seeking relief from the use of any person by a trade practice in violation of a law of the District of Columbia." D.C. Code § 28-3905 (k) (1). The statute does not limit "person" to a resident of a District of Columbia. *See* D.C. Code § 28-3901(a)(1). Nor does it provide that a "trade practice" must occur in the District of Columbia. *See* D.C. Code § 3901(a)(6). Indeed, the statute nowhere states its territorial reach expressly. Nevertheless, it gives a strong clue when its states that one of it purposes is to "promote, through effective enforcement, fair business practices throughout the community." D.C. Code § 28-3901(b) (2). While one might think of "community" as the territory of the District of Columbia, the word "community" is not precise and therefore is not determinative legislative intent.

In these circumstances, the court agrees with Ms. Dahlgren's argument, implicit in her opposition and made clear at oral argument, that choice-of-law principles govern the analysis. Where the court cannot find from the language, structure and history of the statute a legislative intent as to the statute's territorial reach, the court must resort to judge-made choice-of-law principles, as a stand-in for statutory construction. *See* Robert A. Leflar, *Choice of Law Statutes,* 44 Tenn. L. Rev. 951, 953-954 (1977); *see also, e.g., Chesapeake Operating,* Inc. v. Nabors Drilling USA, Inc., 94 S.W.3d 163, 175 (Tex. App. 2002)("The actual terms of each statute contain no limitations whatsoever, and thus apply to all oilfield contracts everywhere, regardless of where the company or well is located. The choice-of-law question is whether and under what circumstances these statutes can extend that far ....").

Using a choice-of-law analysis, Ms. Dahlgren cites, among others, *Washkoviak v. Student Loan Mktg. Ass'n,* 900 A.2d 168 (D.C. 2006) and *Williams v. First Gov't Mortg. & Investors Corp.,* 336 U.S. App. D.C. 71, 176 F.3d 497 (1999) for the principle that residency in the District plus other "ties to the District" or "relevant nexuses to the District" are sufficient under a governmental interest analysis to establish that the CPPA applies to the trans-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2131937 (D.C.Super.)                                                                                           Page 11

action. (Opp'n 42 and n.34; 46.) *Washkoviak* states:
Under [the governmental interest] analysis, [the court] "evaluates[s] the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review .... As part of this analysis, [the court] also consider[s] the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145:
a) the place where the injury occurred;
b) the place where the conduct causing the injury occurred;
c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
d) the place where the relationship is centered."

*Washkoviak, supra,* 900 A.2d at 180 (quoting *District of Columbia v. Coleman,* 667 A.2d 811, 816 (D.C. 1995)).

In the present case, the District was neither the place of injury nor the place where the conduct causing it occurred. The place of injury and of the conduct causing the injury was the same: at the point of sale where Ms. Dahlgren bought her cellphone and where she was the alleged victim of misrepresentations and omission. According to Ms. Dahlgren, these transactions all occurred either in Maryland or at a place she was unable to remember; no evidence places any of the cell phone sales in the District. The third factor favors neither party. Ms. Dahlgren is a District resident, but Motorola's principal place of business and place of incorporation are elsewhere. The relationship is not centered in the District. While Ms. Dahlgren uses her cell phone in the District and elsewhere, all other aspects of the transaction occurred outside the District. Evaluating these factors without simply counting them, the court does not perceive how Ms. Dahlgren's residence in the District and use of her cell phone outweigh the factors favoring application of the law of the foreign jurisdiction.

The court concludes that the cases on which Ms. Dahlgren relies do not support her position. In *Washkoviak, supra,* the plaintiffs were residents of Wisconsin, and the trial court concluded that the wrongful conduct occurred in Virginia and Pennsylvania. However, the defendant (Sallie Mae) was required by statute to be incorporated and have its principal place of business in the District, and " 'for purposes of venue and jurisdiction in civil actions, []be a resident and citizen thereof.' " 900 A.2d at 171 (quoting 20 U.S.C. § 1087-2(b)(1)(2000). Further, "the conduct causing the injury occurred in the District of Columbia." *Id.* at 181.

The *Washkoviak* court found that the first Restatement factor (place of injury) favored application of the law of the foreign state; the second (the place of the wrongful conduct) favored application of the District's law; the third (place of residence, incorporation and place of business) favored application of neither law, as the plaintiff was resident of Wisconsin but Sallie Mae was in the District; and the fourth (place where the relationship was centered) favored applying Wisconsin law. *Id.* at 181. Nevertheless, not just counting, but weighing, the factors, the court held that the trial court's judgment dismissing the case could not be sustained. In so ruling, the court discounted the place of injury because it was not an injury to person, property, or one resulting from false imprisonment of malicious prosecution. *Id.* at 181-182.

*Washkoviak* was a very close case, and this case presents facts stronger in favor of application the law of the foreign state. Here, there is no evidence that the wrong occurred in the District of Columbia. Ms. Dahlgren says that the misrepresentations and omissions occurred at the point of sale, which was not in the District of Columbia. She cannot locate the place where she heard or saw the advertisement for Motorola. Although Motorola does business in the District, it was not organized in the District and does not have its principal place of business in the District. Thus, unlike in *Washkoviak, supra,* the District does not have a strong interest "in ensuring that its corporate citizens refrain from fraudulent activities." *See id.* at 180-181. Evaluating these factors

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12 of 15
Case 2:12-md-02311-SFC-RSW    ECF No. 230-21, PageID.3198    Filed 07/13/12    Page 13 of 16

2012 WL 2131937 (D.C.Super.)                                                                Page 12

without simply counting them, the court concludes that it should be applying the law of the foreign jurisdiction, and not the CPPA.

Ms. Dahlgren also relies on several cases in which courts have found that the CPPA applies to loan transactions consummated in another jurisdiction. *See Williams v. First Mortg. & Investors Corp.,* 336 U.S. App. D.C. 71, 176 F.3d 497 (1999); *Wiggins v. AVCO Fin. Servs.,* 62 F. Supp. 2d 90 (D.D.C. 1999); *Williams v. Cent. Money Co.,* 974 F. Supp. 22 (D.D.C. 1997). *Williams v. First Mortgage Investors Corp.* affirmed the judgment in *Williams v. Central Money Co.,* and *Wiggins* simply followed the D.C. Circuit's holding. 62 F. Supp. 2d at 98 n.10. Accordingly, the only case this court needs to address is *Williams v. First Mortg. Investors Corp.*

In that case, a District resident took a loan from a Maryland corporation, mortgaging his residence located in the District. The meetings between the borrower and lender occurred in Maryland, and the borrower sent his mortgage payments to the lender's Maryland office. 176 F.3d at 499. Applying a governmental interests test, the court concluded that the interests of each jurisdiction were equally weighty, thus making the District law applicable. *Id.* The basis for the court's result was the District's "interest in protecting its citizens from predatory loan practices" and the transaction's "significant contacts with the District." *Id.* Those "significant contacts" were the real property in the District that provided the collateral for the loan, and the plaintiff's residence in the District. *Id.*

*Williams* is distinguishable from this case in two important ways. First, it was a loan transaction involving an ongoing relationship between the parties. Second, and relatedly, it rests on a fact not present in this case: the part that the District-located real property played in the transaction. Key to the court's decision was the fact that the defendant mortgage company " 'by issuing a loan to a D.C. resident and taking his D.C. home as collateral ... availed [itself] of, and subjected [itself] to, the consumer protection laws of the District of Columbia.' " *Id.* at 499 (quoting *Williams v. Cent. Money Co., supra,* 974 F. Supp. at 27). The real property, a central part of the loan transaction, was the significant contact with the District that made the CPPA applicable. A cell phone, like other forms of personal property that can be bought anywhere in the world, is in a different category.

In *Williams,* the court was concerned that " '[i]f the CPPA did not apply to cases like this one ... loan and mortgage companies could ... evade D.C. consumer protection laws by locating themselves just across the District line from the D.C. citizens they seek as customers.' " *Id.* at 499 (quoting *Williams v. Cent. Money Co., supra,* 974 F. Supp. at 27). That concern does not obtain here. Motorola and other cell phone manufacturers market and sell their products nationwide, including in the District of Columbia. The CPPA will apply to purchases made in the District of Columbia - and its policies will be effectuated - when a person who has made a purchase in the District brings an action complaining about them. While it is theoretically possible that Motorola and other retailers would shut down their District markets and leave it to Maryland and Virginia locations to sell their goods in order to evade the CPPA, this court does not view that as a significant risk.

Moreover, the court sees a significant concern in applying the CPPA to Ms. Dahlgren's complaint. Suppose a manufacturer or seller not incorporated or having a principal place of business in the District, yet with a District business location, sells a product to a District resident out of another of its business locations somewhere else in the country - to a person vacationing in Alaska or Hawaii, for example, just to highlight the point. The manufacturer or seller makes misrepresentations at the point of that sale. Under Ms. Dahlgren's interpretation of the CPPA, the statute would reach that transaction. This would be so even though no misrepresentation or injury arising out of that transaction occurred in the District. The court believes that an interpretation of the CPPA to give a right to a District of Columbia consumer to receive accurate information in another jurisdiction would, in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2131937 (D.C.Super.) Page 13

the absence of a contrary intent found in the words, structure or history of the CPPA, give an illogical and unwarranted reach to the statute, straining the concept of "community" beyond its reasonable bounds. *Cf. Grayson, supra,* 15 A.3d at 143 (noting that interpreting the 2000 amendments to the CPPA to override standing requirements "would open our courts to any person from anywhere who decides to lodge a complaint labeled as a 'representative action' under the CPPA, even though that person has suffered no injury-in-fact related to a District of Columbia merchant's unlawful trade practice.") (Footnote omitted).

In its July 8, 2010 memorandum opinion, this court denied defendants' motion to dismiss predicated on the inapplicability of the CPPA. (*Id.* 28-32.) In view of that ruling, Ms. Dahlgren asserts that this court has already decided the issue now presented. (Opp'n 42.) The holding there, however, came in response to a motion to dismiss under Rule 12(b) (6), where the court was required to construe the complaint liberally and give all reasonable inferences to the plaintiff. (July 8, 2010 Mem. at 5 (citing cases).) And, as Ms. Dahlgren herself points out, the court's conclusion then was premised in part on the inference from her pleading that Ms. Dahlgren, "herself a resident of the District, or other members of the general public residing in the District on whose behalf plaintiff sues, received in the District some if not all of the communications which included misrepresentations or omitted allegedly material information." (*Id.* at 30-31.) Ms. Dahlgren cannot predicate her own standing on what misrepresentations and omissions other District residents received, and, now that the record has been developed, the court sees no evidence that Ms. Dahlgren received any communications in the District in which material omissions or misrepresentations were made. That is an important point because the first two factors in the governmental interests test - place of injury and wrong - are now known to be outside the District.

Ms. Dahlgren also argues that she has shown contacts with the District that assist her argument that the CPPA applies. Since 2002, her cell phone has had a 202 area code. She both works and resides in the District. She has visited Verizon stores in the District that sell Motorola phones and accessories. She has purchased cell phones not manufactured by Motorola. (Opp'n 43.) These factors are either irrelevant to the choice-of-law analysis or otherwise add little to her case. The court's analysis assumed that Motorola does business in the District. Ms. Dahlgren's cell phone area code and workplace do not add appreciably to the fact that she resides in the District. Ms. Dahlgren's purchases of cell phones manufactured by companies other than Motorola are wholly irrelevant.

## II. *Unjust Enrichment Claim*

Ms. Dahlgren argues that she has standing to assert her unjust enrichment claim because Motorola has been unjustly enriched by the purchase price of her cell phones. Motorola argues that she has no standing because her CPPA claims fail. The court agrees with Motorola.

"Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another." *4934, Inc. v. District of Columbia Dep't of Employment Servs.,* 605 A.2d 50, 55 (D.C. 1992) (citations omitted). Restitution is an equitable remedy imposed when unjust enrichment has been proved. *Id.* at 55-56. To prove unjust enrichment, a plaintiff must prove that the defendant's enrichment was unjust and hence must prove a " 'wrongful act giving rise to the duty to make restitution.' " *News World Communs., Inc. v. Thompsen,* 878 A.2d 1218, 1225 (D.C. 2005) (quoting *Congregation Yetev Lev* D'Satmar v. 26 Adar N.B. Corp., 596 N.Y.S.2d 435, 437 (N.Y. App. Div. 1993)). In the present case, the sole basis for Ms. Dahlgren's unjust enrichment claim (brought only on her own behalf) is the "unlawful conduct" described in the Third Amended Complaint - *i.e.,* the various violations of the CPPA. (Third Am. Compl. para. 147.) On the basis of those violations, Ms. Dahlgren asks for disgorgement of Motorola's profits from its sale of cell phones to her. (*Id.,* paras. 148-149.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14 of 15
Case 2:12-md-02311-SFC-RSW   ECF No. 230-21, PageID.3200   Filed 07/13/12   Page 15 of 16

2012 WL 2131937 (D.C.Super.) Page 14

The court has held that Ms. Dahlgren has no standing to assert her CPPA claims because she has not suffered an injury in fact and because the CPPA does not reach her extra-territorial purchase. Her unjust enrichment claim, while equitable in the relief for which it prays, is based exclusively on the same violations that the court has held she has no standing to assert. It follows that she has no standing to assert her unjust enrichment claim. She has no actual injury from her 1999 purchases, and she has no statutory standing to assert violations in relation to those and her 2005 purchase.

*Peterson v. Cellco P'ship,* 80 Cal. Rptr. 3d 316 (Cal. Ct. App. 2008), supports the result the court reaches here. There, the plaintiffs alleged violations of insurance provisions of California's Unfair Competition Law (UCL), California's Business and Professions Codes, § 17200 *et seq.* They also brought unjust enrichment claims predicated on those violations. The court affirmed dismissal of "(1) plaintiffs' UCL claim because plaintiffs failed to allege sufficient facts to support their standing to bring the claim, and (2) plaintiffs' unjust enrichment claim because it was based on alleged Insurance Code violations for which no private right of action exists ...." *Id.* at 318. The court rejected plaintiffs' argument that their unjust enrichment claim was not solely based on the alleged violations of the UCL, reasoning that the allegations of unjust enrichment "can only be predicated on plaintiffs' implied assertion that defendant failed to comply with the Insurance Code." *Id.* at 325.[FN6] The court concluded that "[p]laintiffs lack standing to bring an action under the UCL or under the Insurance Code, and they cannot do so under the guise of unjust enrichment. Moreover, they are not entitled to restitution because they received the benefit of the bargain." *Id.* at 326. Thus, in the context of standing to assert unjust enrichment, the court implicitly agreed with the reasoning and result of *Rivera* and cases in accord with it. *See supra* at 23-25.

> FN6. Here, of course, Ms. Dahlgren expressly predicates her unjust enrichment claim on violations of the CPPA.

At the oral hearing on the present motion, this court suggested that to hold that Ms. Dahlgren lacked standing on the unjust enrichment claim would violate *Grayson's* admonition not to conflate standing issues with issues going to the merits. *See supra,* 15 A.3d at 230-31. After further reflection, and in light of *Peterson,* the court sees merit in Motorola's argument that lack of standing to prosecute the CPPA claim necessarily means lack of standing to obtain a remedy predicated wholly on it. *See also Johnson v. Mitsubishi Digital Elecs. Am., Inc.,* 365 Fed. Appx. 830, 832 (9th Cir. 2010) (following *Peterson); Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 737 F.Supp.2d 380, 431 (E.D. Pa. 2010) ("A California court ruling on plaintiffs' unjust enrichment claim would look to the underlying theory for recovery, and grant or deny a motion to dismiss the unjust enrichment claim based on whether the underlying claim could proceed.") (citing *Peterson); Whitson,* supra, 2009 U.S. Dist. LEXIS 32282, at *15-*17.

*Conclusion*

Ms. Dahlgren lacks standing under the CPPA. Therefore this court lacks jurisdiction to consider her CPPA claims and her unjust enrichment claim. The court will enter judgment for Motorola accordingly.

SIGNED IN CHAMBERS

<<signature>>

A. Franklin Burgess, Jr.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2131937 (D.C.Super.)                                                                 Page 15

Judge

March 15, 2012

Copies eserved to:

*All Counsel listed on CaseFileXpress*

Dahlgren v. Audiovox Communications Corp.
2012 WL 2131937 (D.C.Super. ) (Trial Order )

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.