# EXHIBIT BB





Positive
As of: Jul 10, 2012

IN RE MAGNESIUM OXIDE ANTITRUST LITIGATION

Civ. No. 10-5943 (DRD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2011 U.S. Dist. LEXIS 121373*; *2012-1 Trade Cas. (CCH) P77,878*

October 20, 2011, Decided
October 20, 2011, Filed

**NOTICE:** NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *In re Magnesium Oxide Antitrust Litig., 2012 U.S. Dist. LEXIS 48427 (D.N.J., Apr. 5, 2012)*

**COUNSEL:** **[*1]** Appearances: TRUJILLO, RODRIGUEZ & RICHARDS, LLC, by: Lisa J. Rodriguez, Esq., Haddonfield, NJ; GOLD BENNETT CERA & SIDENER LLP, by: Solomon B. Cera, Esq., C. Andrew Dirksen, Esq., San Francisco, CA; GOLDMAN SCARLATO & KARON, P.C., by: Daniel R. Karon, Esq., Cleveland, OH, Attorneys for Direct Purchaser Plaintiffs.

LITE DEPALMA GREENBERG, LLC, by: Allyn Z. Lite, Esq., Joseph J. DePalma, Esq. Newark, NJ; HAGENS BERMAN SOBOL SHAPIRO LLP, by: Steve W. Berman, Esq., Anthony D. Shapiro, Esq., Elizabeth A. Fegan, Esq., Jason A. Zweig, Esq., New York, NY; HUDSON MALLANEY & SHINDLER, by: J. Barton Goplerud, Esq., West Des Moines, IA; GIRARDI KEESE, by: Stephen G. Larson, Esq., Los Angeles, CA,

Attorneys for Indirect Purchaser Plaintiffs.

LOWEINSTEIN SANLER PC, by: Douglas S. Eakley, Esq., Michael J. Hahn, Esq., Roseland, New Jersey; PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, by: Aidan Synnott, Esq., Daniel A. Crane, Esq., New York, NY; COZEN O'CONNOR, P.C., by: John P. Johnson, Esq., Francis P. Newell, Esq., Peter M. Ryan, Esq., Philadelphia, PA; FINKLESTEIN THOMPSON LLP, by: Rosalee B. Connell, Esq., Douglas G. Thompson, Esq., Michael G. McLellan, Esq., Washington, DC, Attorneys for Defendants.

**JUDGES:** DICKINSON R. DEBEVOISE **[*2]** , Senior United States District Judge.

**OPINION BY:** DICKINSON R. DEBEVOISE

**OPINION**

### DEBEVOISE, Senior District Judge

This matter arises out of the consolidation of five separate actions in this Court [1] alleging a conspiracy to fix prices in and allocate shares of the domestic

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3292 Filed 07/13/12 Page 3 of 26

Page 2

2011 U.S. Dist. LEXIS 121373, *2; 2012-1 Trade Cas. (CCH) P77,878

Magnesium Oxide market from January 2002 to the present ("the Class Period"). On November 15, 2010, Direct Purchaser Plaintiffs ("DP Plaintiffs") Orangeburg Milling Company, Inc., Bar Ale, Inc., and Air Krete, Inc. filed a Class Action Complaint ("CAC") against Defendants Premier Chemicals, LLC ("Premier"), Sumitomo Corporation of America ("Sumitomo"), and YAS, Inc. ("YAS") pursuant to Sections 4 and 16 of the Clayton Act, *15 U.S.C. §§ 15, 26*, alleging violations of Section 1 of the Sherman Act, *15 U.S.C. § 1*, and seeking class certification under *Federal Rule of Civil Procedure 23(b)(2)* and *(3)*, declaratory judgment, treble damages, costs and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

> 1    See Docket Nos. 10-cv-5174, 10-cv-5352, 10-cv-6095, and 10-cv-6093, and 10-cv-5943, all of which were consolidated under Docket **[*3]** No. 10-cv-5943.

On October 7, 2010, Indirect Purchaser Plaintiffs ("IP Plaintiffs") Ronald Hayek, Daniel, Walker, Sue Walker, and John Bidart filed a CAC against Defendants under *Section 16* of the Clayton Act, alleging violations of *Section 1* of the Sherman Act, and under various state antitrust and consumer protection laws. IP Plaintiffs seek similar relief as DP Plaintiffs. [2] On December 31, 2010, IP Plaintiffs filed an Amended CAC to add similar factual allegations as those added by DP Plaintiffs in their Amended CAC.

> 2    To be sure, IP Plaintiffs seek only injunctive relief for Defendants' alleged violations of federal antitrust laws, as only direct purchasers may bring federal antitrust actions for damages. *Illinois Brick v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977).*

On March 1, 2011, Defendants filed a Motion to Dismiss [3] all of Plaintiffs' claims pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons set forth below, Defendants' motion is granted. No Defendant is entitled to dismissal of Plaintiffs' federal and state antitrust claims on the merits because Plaintiffs sufficiently allege a meeting of the minds among all Defendants to fix prices in and allocate shares of the domestic **[*4]** Magnesium Oxide market. However, Defendants are entitled to dismissal of IP Plaintiffs' federal and state antitrust claims and the majority of their consumer protection claims for lack of standing. In

addition, those consumer protection claims under which IP Plaintiffs have standing are dismissed to the extent they are based on allegations of fraud because those allegations do not comply with the requirements of *Federal Rule of Civil Procedure 9(b)*. Finally, Plaintiffs' federal and state antitrust claims are dismissed because they are time-barred by their respective statutes of limitations.

> 3    In fact, Sumitomo, Premier, and YAS each filed separate motions to dismiss. However, each joined in the others' arguments. Therefore, for the sake of simplicity and brevity, the Court will treat them as a single motion.

# I. BACKGROUND

Magnesium Oxide ("MgO") is a solid, white, naturally occurring mineral that is used in producing a wide variety of products, including refractory products, animal feeds, fertilizers, electrical insulation, and pharmaceuticals. It is formed by an ionic bond between one magnesium atom and one oxygen atom. MgO can be mined from magnesite or processed from seawater or subterranean **[*5]** brines containing magnesium chloride. This case concerns the two most common forms of MgO: Caustic-calcined magnesia ("CCM") and dead-burned magnesia ("DBM"). DBM and CCM are produced differently and have different commercial applications. [4]

> 4    CCM "is manufactured at lower temperatures than [DBM] and is used in products like animal feeds and fertilizers." (Direct CAC ¶ 25; Indirect CAC ¶ 31.) DBM, on the other hand, "is most often used in refractory applications." (Id.)

In 2000, according to the CACs, domestic consumption of DBM and CCM came from two sources: the United States and China. Roughly 50% of CCM "and a lesser amount of" DBM consumed in the United States were produced domestically, while the rest was imported from China. (Direct Purchasers' Consolidated Amended Class Action Complaint ("Direct CAC") ¶ 27; (Indirect Purchasers' Consolidated Amended Class Action Complaint ("Indirect CAC") **[*6]** ¶ 33.) At that time, Premier allegedly maintained control over the majority of DBM and CCM consumed in the United States by (1) purchasing imported CCM and DBM for resale to its customers in the United States, and (2) sourcing magnesite from China for production into DBM to be sold domestically.

Case 2:12-md-02311-SFC-RSW   ECF No. 230-29, PageID.3293   Filed 07/13/12   Page 4 of 26

Page 3

2011 U.S. Dist. LEXIS 121373, *6; 2012-1 Trade Cas. (CCH) P77,878

"Sumitomo similarly purchased Chinese MgO but only [DBM] for resale to its U.S. customers" and "sourced magnesite from China for manufacture into [DBM] for sale in the U.S." (Direct CAC ¶ 27; Indirect CAC ¶ 34.) To do so, it enlisted the help of YAS to (1) "facilitate[] [its] purchases of Chinese magnesite" (Direct CAC ¶ 27; Indirect CAC ¶ 35), and (2) purchase Chinese DBM for resale in the United States.

This arrangement proved successful because Hideo Sumikawa, the current president of YAS, previously worked for Sumitomo and has since maintained relationships with certain Chinese magnesite mines. "In particular, Sumitomo, through Coy Akiyama--head of Sumitomo's inorganic chemicals unit--purchases [DBM] from Chinese mines that Sumikawa (YAS) has facilitated, thereby allowing Sumitomo and YAS to participate together in the U.S. MgO market." (Direct CAC ¶ 33; Indirect CAC ¶ 41.)

According to Plaintiffs, [*7] sometime before the Class Period, Premier "saw its share of MgO markets shrink due to increased Chinese competition." (Direct CAC ¶ 28; Indirect CAC ¶ 36.) Specifically, "cheaper imports, mainly from China ha[d] replaced some of the U.S. domestic production, notably affecting Premier." (Direct CAC ¶ 29; Indirect CAC ¶ 37.) Thus, during the Class Period, Premier and Sumitomo allegedly bought nearly all of the Chinese DBM available for purchase and resold it to their customers in the United States.

In addition, Plaintiffs allege that, "[d]uring the Class Period, with some limited exceptions, the MgO markets were considered to be fairly saturated, with limited potential for growth." (Direct CAC ¶ 30; Indirect CAC ¶ 38.) However, "[i]nstead of competing, representatives from Premier, Sumitomo, and YAS began meeting regularly to discuss fixing U.S. MgO prices and allocating MgO markets." (Direct CAC ¶ 31; Indirect CAC ¶ 39.) Specifically, Plaintiffs allege a conspiracy among Premier, Sumitomo, and YAS to (1) fix prices in and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier so that it could fix prices in that market, which resulted in Plaintiffs' [*8] purchasing DBM and CCM at artificially high prices.

*i. The DBM and CCM Agreements*

Plaintiffs allege that, during the Class Period, Cary W. Ahl, Sr. Premier's then-president, "regularly called" Mr. Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S." (Direct CAC ¶ 34; Indirect CAC ¶ 42.) These market allocation and price-fixing schemes were allegedly implemented by Mr. Ahl and his successors at Premier and Terry Wakisama at Sumitomo.

In the summer of 2004, Coy Akiyama of Sumitomo, Mr. Sumikawa of YAS, Gary Vannorsdel, an animal nutrition broker, and Mr. Vannorsdel's son, met at a Holiday Inn, in Tulsa, Oklahoma, to discuss plans for Sumitomo to enter the CCM market without upsetting Premier. Sumitomo had been shipping DBM to the United States on "partially empty barges and wanted to maximize efficiencies by filling these barges with [CCM] for sale to the western U.S." (Direct CAC ¶ 39; Indirect CAC ¶ 48.) Indeed, DBM shipments filled only half of Sumitomo's New Orleans barge capacity. Apparently, "Tulsa was the only port that could accommodate this barge, and Sumitomo had access to a very large storage facility [*9] in Tulsa." (Direct CAC ¶ 36; Indirect CAC ¶ 44.)

At the Tulsa meeting, "[i]n the course of discussing a strategy for Sumitomo to enter the U.S. [CCM] market, Akiyama (Sumitomo) recounted to Sumikawa (YAS) multiple discussions between him and Ahl where Ahl had called Akiyama to set [DBM] prices; to allocate [DBM] markets; and to ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets." (Direct CAC ¶ 40; Indirect CAC ¶ 49.) At one point, Mr. Vannorsdel "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, to which Mr. Akiyama responded, "'Don't be concerned because we [Sumitomo] talk with Premier on a daily basis to set prices and to discuss what accounts they can have.'" (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

Shortly after the Tulsa meeting, Mr. Ahl discovered Sumitomo's plan to enter the CCM market and retaliated by dropping DBM prices. [5] As a result, Sumitomo did not follow through with its plans to enter the CCM market. "Following the [CCM]-related message that Premier sent to Sumitomo and YAS via Premier's pre-market-entry retaliation, Sumitomo [*10] and YAS illegally agreed with Premier to remain out of the [CCM] market--a market Sumitomo, as a rational profit-seeking entity, was motivated to enter--thus allowing Premier to maintain its

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3294 Filed 07/13/12 Page 5 of 26

Page 4

2011 U.S. Dist. LEXIS 121373, *10; 2012-1 Trade Cas. (CCH) P77,878

control over [CCM] pricing." (Direct CAC ¶ 43; Indirect CAC ¶ 52.)

    5   These prices were later restored.

### ii. Fraudulent Concealment

Plaintiffs allege that the MgO conspiracy was "inherently self-concealing" and that Defendants took affirmative measures to conceal it. (Direct CAC ¶ 48-49; Indirect CAC ¶ 55-56.) Specifically, Plaintiffs allege that "[D]efendants met secretly and among themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO." (Direct CAC ¶ 50; Indirect CAC ¶ 57.) In addition, Defendants allegedly explained increases in the price of MgO "by references to tight supply, thinning margins, and increased energy and freight costs." (Direct CAC ¶ 51; Indirect CAC ¶ 58.) As a result, Plaintiffs allege that "neither [P]laintiffs nor the class members had knowledge of any of the foregoing violations, and neither [P]laintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators [*11] had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56.)

### iii. The Complaints

On November 15, 2010, DP Plaintiffs--i.e. those who purchased either DBM or CCM directly from one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period--filed a CAC against Defendants under Sections 4 and 16 of the Clayton Act alleging violations of Section 1 of the Sherman Act, and seeking class certification under *Federal Rule of Civil Procedure 23(b)(2)* and *(3)*, declaratory judgment, treble damages, costs and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

On October 7, 2010, IP Plaintiffs--i.e. those who purchased products containing DBM or CCM that was manufactured, distributed or sold by one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period--filed a CAC against Defendants under Section 16 of the Clayton Act, alleging violations of Section 1 of the Sherman Act, and under various state antitrust and consumer protection laws, and seeking similar relief as the DP Plaintiffs. On December 31, [*12] 2010, IP Plaintiffs filed an

Amended CAC to add similar factual allegations as those added by DP Plaintiffs in their Amended CAC.

## II. DISCUSSION

Defendants now move to dismiss both Amended CACs pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. In doing so, Defendants argue that Plaintiffs (1) lack standing to assert their federal and state antitrust claims; (2) fail to allege a plausible antitrust conspiracy to fix DBM prices, allocate portions of the domestic DBM market, and allocate the domestic CCM market to Premier; and (3) fail to plead fraudulent concealment with particularity to equitably toll the applicable federal and state antitrust statutes of limitations. Defendants further argue that IP Plaintiffs' lack standing to assert their consumer protection and unfair competition claims, and that those claims are improperly pled.

### A. Standard of Review

In assessing the parties' arguments, the Court must apply the standard of review applicable to requests for dismissal pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. That rule permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a *Rule 12(b)(6)* motion, the Court [*13] must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*. The Court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr. Props., Inc., 311 F.3d 198, 215 (3d Cir. 2002)*.

The Supreme Court recently clarified the *Rule 12(b)(6)* standard in two cases: *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*, and *Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The decisions in those cases abrogated the rule established in *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, *Bell Atlantic, 550 U.S. at 545*, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Thus, the assertions in the complaint

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3295 Filed 07/13/12 Page 6 of 26

Page 5
2011 U.S. Dist. LEXIS 121373, *13; 2012-1 Trade Cas. (CCH) P77,878

must be enough to "state a claim to relief that **[*14]** is plausible on its face," *id. at 570*, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Iqbal, 129 S. Ct. at 1949*; see also, *Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)* (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions - which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted - from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal, 129 S. Ct. at 1949*. Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id. at 1950*. Thus, "a court considering a motion to dismiss can **[*15]** choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

When a claim is dismissed pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, leave to amend and reassert that claim is ordinarily granted. *In re Burlington Coat Factory Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)*. A claim may be dismissed with prejudice, however, if amending the complaint would be futile. Id. "Futile," as used in this context, means that the complaint could not be amended to state a legally-cognizable claim. Id. (citing *Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996))*.

### B. Plaintiffs' Standing to Bring Antitrust Claims

Standing is a jurisdictional prerequisite under Article III of the United States Constitution. "Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'" *Arizona Christian Sch. Tuition Org. v. Winn, 131 S.Ct. 1436, 1441, 179 L. Ed. 2d 523 (2011)*. "To state a case or controversy under Article III, a plaintiff must establish standing." *Id. at 1442* (citing *Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984))*. The

Supreme Court explained the elements **[*16]** of standing in *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*:

> "First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"

Defendants argue that Plaintiffs lack antitrust standing because they do not identify whether they purchased DBM or CCM. Specifically, Defendants contend that the alleged agreements regarding DBM and CCM, respectively, amount to "two conspiracies [that] are allegedly directed at different purchasers and encompass different time frames[,] and [n]othing indicates that anticompetitive activity in one market would have an effect on prices in the other market." (YAS Br., 9.) "Under these circumstances," according **[*17]** to Defendants, "a purchaser of [DBM] would suffer no redressable injury from anticompetitive conduct in the [CCM] market, and would accordingly lack standing to maintain claims based on such conduct (and vice versa)." (Id.).

This argument is unavailing because, as discussed fully below, Plaintiffs allege a single conspiracy in the domestic MgO market comprised of two agreements: one to fix prices in and allocate shares of the domestic DBM market, and one to allocate the domestic CCM market to Premier. These agreements are interdependent in that Defendants entered into the CCM agreement in order to maintain the DBM agreement. As a result, price-fixing in the DBM market has an effect on prices in the CCM market, and vice versa, because the absence of one agreement would eliminate the consideration for the other.

2011 U.S. Dist. LEXIS 121373, *17; 2012-1 Trade Cas. (CCH) P77,878

As a general matter, DP Plaintiffs' allegation that they were "injured by having paid more for MgO [6] than they otherwise would have paid absent [D]efendants' unlawful conduct" (Direct CAC ¶ 56) is sufficient to establish antitrust standing. Standing to sue under Section 4 of the Clayton Act is determined by a five-factor test: [7] "(1) the causal connection between the antitrust [*18] violation and the harm to the plaintiff; (2) whether the plaintiff's alleged injury is of the type that the antitrust laws were intended to redress; i.e., did the plaintiff suffer antitrust injuries; (3) the directness of the injury; (4) the existence of more direct victims of the violation; and (5) the potential for duplicative recovery or complex apportionment of damages." *In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 399 (3d Cir. 2000)* (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 538, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. Here, there is little doubt that those who purchased DBM and/or CCM directly from Defendants at supracompetitive prices have standing to sue for damages under Section 4 and for injunctive relief under Section 16. See *id. at 401* ("It is difficult to imagine a more formidable demonstration of antitrust injury" than supra-competitive pricing.); *In re Mercedez Benz AntiTrust Litig., 157 F. Supp. 2d 355, 364 (D.N.J. 2001)* ("Where, as here, it is alleged that consumers paid a price higher than the price that would have been offered had the dealers been competing, the purpose of the antitrust laws is obviously thwarted."). [*19] Thus, DP Plaintiffs have standing to pursue their antitrust claims.

6 MgO collectively refers to DBM and/or CCM. (Direct CAC ¶ 1.)

7 As discussed further below, standing to assert claims for injunctive relief under Section 16 of the Clayton Act are analyzed under a more relaxed standard. See *In re Warfarin, 214 F.3d at 399.*

IP Plaintiffs, however, do not. While they seek solely injunctive relief under Section 16 of the Clayton Act--and therefore are not subject to the aforementioned five-factor test, see Note 7--they must still allege "(1) [a] threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfin, 214 F.3d at 400.* In analyzing whether an antitrust injury proximately caused an alleged loss to an indirect purchaser, this Circuit has been guided by the Supreme Court's decision in *Shield of Virginia v. McCready, 457 U.S. 465, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982).* [8]

McCready explained that "an antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but . . . [i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action." *457 U.S. at 476.* [*20] Thus, in determining whether an injury was proximately caused by an antitrust violation for Article III standing purposes, courts should "look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy." *Id. at 478.* In doing so, they should consider whether the plaintiff's injury is "inextricably intertwined with the injury that the conspirators sought to inflict," *In re Warfarin, 214 F.3d at 400-01* (purchasers of prescription drug whose active ingredient was the subject of a price-fixing conspiracy maintained standing to sue as indirect purchasers because "the excess amount paid" for the drug was "inextricably intertwined with the injury [Defendant] aimed to inflict"), or, put another way, "whether the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause." *McCready, 457 U.S. at 479* [*21] (quotations and citations omitted) (alleged conspiracy among psychiatrists and Blue Shield to take patients away from psychologists by refusing to reimburse Blue Shield subscribers for psychotherapeutic services resulted in "clearly foreseeable" harm to Blue Shield subscribers and "was a necessary step in effecting the ends of the alleged illegal conspiracy.").

8 Although that decision analyzed proximate causation in the context of a Section 4 claim for damages, the Court of Appeals has applied its analysis to Section 16 claims because proximate cause is an element of standing under both. See *In re Warfin Sodium Antitrust Litig., 214 F.3d 395, 400-01 (3d Cir. 2000).*

Here, IP Plaintiffs allege that "as a direct and proximate result of Defendants' and their co-conspirators' unlawful contract, combination and conspiracy, Plaintiffs and the Class members were injured and financially damaged in their business and property by having paid more for MgO Products than they would have absent Defendants' and their coconspirators' unlawful conduct."

2011 U.S. Dist. LEXIS 121373, *21; 2012-1 Trade Cas. (CCH) P77,878

(Indirect CAC ¶ 54.) However, they fail to specify which MgO products-- i.e. products containing DBM or CCM--they purchased. The mere fact that a product [*22] contains DBM or CCM does not necessarily mean that an increase in the price of that product is "inextricably intertwined" with, or an "a necessary step in achieving the ends" of, the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets. Indeed, the price of DBM and CCM would have a minimal foreseeable effect on the price of products containing trace amounts of them, but a significant foreseeable effect on the price of products in which they are major ingredients. Thus, without knowing which specific products IP Plaintiffs purchased, it is impossible to determine whether an increase in their price is the type of injury that furthers the object of the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets. Accordingly, IP Plaintiffs' federal antitrust claims are dismissed for lack of standing. [9] However, IP Plaintiffs are granted leave to amend in order to allege (1) the specific purchased products containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets.

[9] IP Plaintiffs also lack [*23] standing to assert their state antitrust claims because those claims are construed in accordance with federal antitrust principles. See *In re Digital Music Antitrust Litig., 592 F. Supp. 2d 435, 448 n.21 (S.D.N.Y. 2008)* (Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, North Carolina, South Dakota, Vermont, West Virginia, Wisconsin), rev'd on other grounds by, *Starr v. Sony BMG Music Entm't., 592 F.3d 314 (2d Cir. 2010)*; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 635-36 (9th Cir. 1987)* (Hawaii); *Gutnayer v. Cendant Corp., 116 Fed. App'x 758, 761 (7th Cir. 2004)* (Illinois); *Monsanto Co. v. Swann, No. 4:00-CV-1481, 2001 U.S. Dist. LEXIS 25134, 2001 WL 34079480, at *3 (E.D. Mo. Sept. 19, 2001)* (Mississippi); *Neb. Rev. Stat. § 59-829* (2010) (Nebraska); *Nev. Rev. Stat. § 598A.050* (2011) (Nevada); *Minuteman, LLC v. Microsoft Corp., 147 N.H. 634, 637, 795 A.2d 833 (N.H. 2002)* (New Hampshire); *Clough v. Rush, 959 F.2d 182, 187 (10th Cir. 1982)* (New Mexico); *Fido's Fences v. Canine Fence Co., 672 F. Supp.* 2d 303, 313 (E.D.N.Y. 2009) (New York); *Westgo Indus., Inc. v. W.J. King Co., Civil No. A3-75-82, 1981 U.S. Dist. LEXIS 9567, 1981 WL 2064, at *6 (D.N.D. Mar. 31, 1981)* (North Dakota); *Oregon Laborers-Employees Health & Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d 957, 963 n.4 (9th Cir. 1999)* [*24] (Oregon); *In re Refalen Antitrust Litig., 221 F.R.D. 260, 278-79 (D. Mass. 2004)* (Tennessee); *Am. Airlines v. Christensen, 967 F.2d 410, 414 (10th Cir. 1992)* (Utah).

Defendants further argue that IP Plaintiffs lack standing to assert their state law antitrust claims, with the exception of Iowa and California, because they only allege purchasing MgO products in Iowa and California. Specifically, Defendants contend that IP Plaintiffs "have no standing to bring claims based on violations of states in which they neither reside nor purchased any MgO products." (Sumitomo Br. (IP Pl.), 4.) IP Plaintiffs counter that "Defendants improperly confuse 'standing' with class certification issues," which, at this point, are premature. (IP Pl's Br., 30.) Specifically, IP Plaintiffs maintain that they "are not bringing claims in their own name in other states; rather they are seeking to *represent* similarly situated persons in other states," and that "[t]his issue, improperly raised by Defendants on a motion to dismiss will be addressed at class certification under *Rule 23*." (Id. at 31) (emphasis in original).

It is well-settled that a named plaintiff in a class action lawsuit is required to establish [*25] Article III standing. See *Lewis v. Casey, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)* ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (quotations and citations omitted)); *Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)* ("[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants."); *O'Shea v. Littleton, 414 U.S. 488, 494, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)* ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (citations omitted)); *Winer Family Trust v. Queen, 503 F.3d, 319, 326 (3d Cir. 2007)* ("The

Case 2:12-md-02311-SFC-RSW   ECF No. 230-29, PageID.3298   Filed 07/13/12   Page 9 of 26

Page 8

2011 U.S. Dist. LEXIS 121373, *25; 2012-1 Trade Cas. (CCH) P77,878

initial inquiry in either case is whether the lead plaintiff individually has standing.").

Less well-settled is whether, pre-class certification, named plaintiffs are required to establish standing for each and every [*26] claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to *Federal Rule of Civil Procedure 23*. This issue typically arises in cases, such as this one, where named plaintiffs assert analogous causes of action under the laws of many states but cannot specifically tie their injuries to each state. Indeed, here, IP Plaintiffs, who allege that they purchased MgO products in Iowa and California, assert violations of twenty-five states' antitrust laws. [10]

[10]   At this time, IP Plaintiffs lack Article III standing to assert violations of the following state antitrust laws because they fail to allege a causal connection between their injuries and the conduct prohibited by the laws of those states, which require a showing that such conduct occurred, or whose effect was felt, in-state. See *A.R.S. § 44-1402* (Arizona) ("A contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, [*27] any part of which is within this state, is unlawful"); *DC ST § 28-4502* (District of Columbia) (same); *HRS § 480-4* (Hawaii) (same); *10 M.R.S.A. § 1101* (Maine) (same); *SDCL § 37-1-3.1* (South Dakota) (same); *K.S.A. § 50-101* (Kansas) ("A trust is a combination of capital, skill, or acts, by two or more persons," among other things, "[t]o fix any standard or figure, whereby such person's price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state"); *M.C.L.A. §§ 445.771, 445.772* (Michigan) ("A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful. . . . Relevant market means the geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state"); *M.S.A. § 325D.54* (Minnesota) (act applies to "(a) any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in this state; and (b) any contract, combination, or conspiracy, wherever created, formed, or entered into; any establishment, [*28] maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power; whenever any of the foregoing affects the trade or commerce of this state."); *Neb. Rev. St. § 59-801* (Nebraska) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal."); *N.R.S. § 598A.060* (Nevada) (same); *N.M.S.A. § 1978, 57-1-1* (New Mexico) (same); *W.Va. Code § 47-18-3* (West Virginia) (same); *NY GBL § 340* (New York) ("Every contract, agreement, arrangement or combination whereby. . . [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained. . . is hereby declared to be against public policy, illegal and void."); *N.C.G.S.A. § 75-1* (North Carolina) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."; *NDCC, 51-08.1-01, 02* (North Dakota) ("A contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, [*29] trade or commerce in a relevant market is unlawful. . . . Relevant market means the geographical area of actual or potential competition in a line of commerce, all or any part of which is within this state."); *O.R.S. 646.705* (Oregon) ("As used in *ORS 136.617* and *646.705 to 646.805*, 'trade or commerce' means trade or commerce within the state; or between the state and any state, territory, or foreign nation."); (Tennessee) *T.C.A. § 47-25-101* ("All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between

2011 U.S. Dist. LEXIS 121373, *29; 2012-1 Trade Cas. (CCH) P77,878

persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void."). IP Plaintiffs' allegations that "[P]rices for MgO and MgO Products were raised, fixed, maintained, and stabilized **[*30]** at artificially high levels throughout the states," and "Defendants' illegal conduct had a substantial effect on commerce in the above states" (Indirect CAC ¶¶ 72, 73) are conclusory and fail to specifically tie their injuries to the alleged MgO conspiracy occurring or its effects in those states.

IP Plaintiffs lack statutory standing to sue under Utah's antitrust laws because they have a citizenship/residency requirement. See *U.C.A. §§ 1953 76-10-919* ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant."), and under Illinois's antitrust laws because they do not allow a private right of action. See *740 ILCS 10/7* ("This State, counties, municipalities, townships and any political subdivision organized under the authority of this State, and the United States, are considered a person having standing to bring an action under this subsection.").

However, IP Plaintiffs apparently have standing to sue under Mississippi, New Hampshire, **[*31]** Vermont, and Wisconsin antitrust laws, as they provide a private right of action and have no discernible requirement of in-state conduct or effect, or residency. See *Miss. Code Ann. §§ 75-21-1, 9* (Mississippi); *N.H. Rev. Stat § 356:1* (New Hampshire); *9 V.S.A. §§ 2453, 2465* (Vermont); *W.S.A. §§ 133.03, 133.18* (Wisconsin).

Courts, including this one, have held that "the fact that the named Plaintiffs may not have individual standing to allege violations of . . . laws in states other than those in which they purchased Defendants' [product] is immaterial [because] [t]he issue . . . is one of predominance--whether questions of law or fact common

to all class members predominate over any questions affecting only individual members." *Ramirez v. STI Prepaid LLC, 644 F. Supp. 2d 496, 505 (D.N.J. 2009)* (quotations and citations omitted); see also *In re Grand Theft Auto Video Game Consumer Litig. (No. II), No. 06-MD-1739, 2006 U.S. Dist. LEXIS 78064, 2006 WL 3039993, at \*3 (S.D.N.Y. Oct. 25, 2006)* ("The relevant question . . . is not whether the Named Plaintiffs have standing to sue Defendants--they most certainly do--but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution **[*32]** of a nationwide class action. This question is, at least in the first instance, appropriately answered through the class certification process."); *In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002)* ("[T]hese alleged problems with standing will not arise unless class certification is granted. If certification is granted, the proposed class would contain plaintiffs who have personal standing to raise claims under the laws governing purchases in all of the [] states, and the only relevant question about the named plaintiffs' standing to represent them will be whether the named plaintiffs meet the ordinary criteria for class standing. . .").

Other courts find that they must initially "review[] the standing of actual, not proposed plaintiffs" to assert the claims in a class action complaint because "[t]he alternative . . . would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union." *In re Wellbutrin XL Antitrust Litig., 260 F.R.D. 143, 154-56 (E.D.Pa. 2009)*; see also *In re Potash Antitrust Litig., 667 F. Supp. 2d 907, 924 (N.D.Ill. 2009)* **[*33]** (named plaintiffs are required to establish standing for each claim under which they purport to represent class members because "[t]o have standing as a class representative, the plaintiff must be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." (quotations and citations omitted)), rev'd on other grounds by, *Minn-Chem Inco. V. Agrium Inco., 657F.3d650, No. 10-1712, 2011 U.S. App. LEXIS 19433, 2011 WL 4424789 (7th Cir. Sept. 23, 2011)*; *In re Packaged Ice Antitrust Litig., 08-md-01952, 779 F. Supp. 2d 642, 2011 U.S. Dist. LEXIS 26048, 2011 WL 891160, at \*11 (E.D.Mich. Mar. 11, 2011)* ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.").

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3300 Filed 07/13/12 Page 11 of 26

Page 10

2011 U.S. Dist. LEXIS 121373, *33; 2012-1 Trade Cas. (CCH) P77,878

Two Supreme Court decisions, *Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)* and *Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999)*, are at the heart of this issue. In Amchem, the Supreme Court reviewed a challenge to certification of a global settlement class involving persons who were exposed to asbestos. See *521 U.S. at 591-92*. In doing so, it analyzed the role of settlement in determining class certification under *Rule 23*, as well as arguments set **[*34]** forth by objectors that certain members of the settlement class lacked standing to sue because they had not sustained a cognizable injury or because their injury was not redressable. *Id. at 612.* The Court declined to reach the standing arguments because it found that the class certification issues under *Rule 23* to be dispositive. Id. Consequently, the Court held that because resolution of the class certification issues "here is logically antecedent to the existence of Article III issues, it is appropriate to reach them first." Id. (citation omitted).

The Court further explained that it was "follow[ing] the path taken by the [Third Circuit] Court of Appeals" in "declin[ing] to reach these issues because they 'would not exist but for the [class-action] certification.'" Id. (quoting *Georgine v. Amchem Prods., Inc., 83 F.3d 610, 623 (3d Cir. 1996)).* To be sure, in Georgine, the Court of Appeals, when faced with class certification and Article III issues simultaneously, decided the class certification issues first because they were dispositive. *83 F.3d at 623.* In doing so, the Court found "it prudent not to decide issues unnecessary to the disposition of the case, especially when many of these **[*35]** issues implicate constitutional questions." Id. (citing *Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S. Ct. 152, 89 L. Ed. 101 (1944)* (expressing the rule that courts will avoid constitutional questions when possible)). Thus, these rulings echo the "fundamental and longstanding principle of judicial restraint [] requir[ing] that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988).*

The Ortiz court also dealt with certification issues regarding a global settlement class for asbestos related injuries and arguments regarding the Article III standing of certain class members who petitioners alleged did not suffer an injury-in-fact. *527 U.S. at 821, 831.* As in Amchem, the Court decided to address the class certification issues before the Article III questions. *Id. at 831.* In doing so, it explained:

> Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. *Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 88-89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).* But the class certification issues are, as they were in Amchem, **[*36]** "logically antecedent" to Article III concerns, *521 U.S., at 612, 117 S.Ct. 2231,* and themselves pertain to statutory standing, which may properly be treated before Article III standing, see *Steel Co., supra, at 92, 118 S.Ct. 1003.* Thus the issue about *Rule 23* certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints. . . ." *Amchem, supra, at 612-613, 117 S.Ct. 2231.*

Id.

Thus, *Amchem* and *Ortiz* stand for the proposition that, in cases where a court is presented with class certification and Article III standing issues simultaneously, and the class certification issues are dispositive in that they pertain to statutory standing--i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are "logically antecedent" to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint. Under these circumstances, if a court finds that "certification of [a] proposed class [is] improper, the issue of certain class members' standing would [be] moot." *In re Welbutrin XL, 260 F.R.D. at 153.*

Here, however, the Court **[*37]** is presented solely with the issue of whether the named IP Plaintiffs have standing to assert the causes of action in the Indirect CAC, a threshold issue that the Court must address. See *Lewis 518 U.S. at 357.* Contrary to *Ramirez* and *In re Grand Theft Auto*, the "[Supreme] Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335, 126 S. Ct. 1854, 164 L. Ed. 2d*

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3301 Filed 07/13/12 Page 12 of 26

Page 11

2011 U.S. Dist. LEXIS 121373, *37; 2012-1 Trade Cas. (CCH) P77,878

589 (2006); see also *Allen v. Wright, 468 U.S. 737, 752, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)* ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); *Blum v. Yaretsky, 457 U.S. 991, 999, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982)* ("It is not enough that the conduct of which the plaintiff complains will injure *someone*. The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). Otherwise, a plaintiff would be able to **[*38]** bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis. In other words, the plaintiff would have to do "no more than name the preserve on which he intends to hunt." *Johnson v. Ga. Highway Express, Inc., 417 F.2d 1122, (5th Cir. 1969)*, overruled on other grounds by *Griffin v. Dugger, 823 F.2d 1476 (11th Cir. 1987)*. Accordingly, because the named IP Plaintiff lack standing to assert antitrust violations under the laws of Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, and West Virginia, see Note 10, IP Plaintiffs' claims under those laws are dismissed.

## C. The Alleged MgO Conspiracy

### i. One Conspiracy or Two

As an initial matter, Defendants maintain that Plaintiffs allegations are confusing to the point where it is impossible to determine whether the alleged conspiracy relates to DBM, CCM, or MgO in general. As a result, Defendants contend that **[*39]** Plaintiffs fail to allege a plausible antitrust conspiracy. This contention is unfounded. While Plaintiffs at times refer to anticompetitive conduct regarding MgO generally, it is clear from the surrounding allegations whether such conduct concerns DBM or CCM. [11] Indeed, as evidenced by their next contention, Defendants have no problem categorizing Plaintiffs' individual allegations as relevant to DBM or CCM.

11 Moreover, the CACs specifically note at the outset that the term MgO can refer to DBM or CCM. See (Direct CAC ¶ 1; Indirect CAC ¶ 1 n.1).

On that note, Defendants contend that, to the extent that the Court finds that Plaintiffs allege distinct conspiracies regarding DBM and CCM, respectively, the Court should analyze the allegations relating to each conspiracy separately and require that those allegations independently meet the pleading requirements of Twombly and Iqbal. Plaintiffs counter that they allege a single MgO conspiracy comprised of intertwined and interdependent anticompetitive agreements.

As Plaintiffs point out, it is well-settled that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking **[*40]** at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962)*; see also *In re Fine Paper Antitrust Litig., 685 F.2d 810, 822 (3d Cir. 1982)* ("a seriatim examination of [] claims against each [] conspiracy defendant[] as if they were separate lawsuits . . . overlook[s] the conspiracy itself."). Defendants contend that the Supreme Court's ruling in Continental Ore is inapposite because that case concerned a monopolistic exclusion conspiracy, as opposed to a price-fixing conspiracy. This contention is remarkably unpersuasive. The very case that Continental Ore cites for the proposition that a court must look to an alleged conspiracy as a whole, *United States v. Patten, 226 U.S. 525, 33 S. Ct. 141, 57 L. Ed. 333 (1913)*, concerned a conspiracy to artificially inflate the price of cotton. Furthermore, there is no indication that Continental Ore limited its ruling to conspiracies based on monopolistic exclusion. See *370 U.S. at 699* ("we do not believe that . . . liability under the antitrust laws can be measured by any rigid or mechanical formula . . ."). Finally, Defendants fail to present, nor does the Court see, a single reason why it would be any less logical or equitable to assess **[*41]** an alleged price-fixing or market allocation conspiracy as a whole than a monopolistic exclusion conspiracy.

Defendants' contention that the Court should analyze Plaintiffs' allegations separately with respect to DBM and CCM because Plaintiffs allege "two different courses of conduct as to the two different products at two different times" (Sumitomo Reply Br., 3) is also unavailing. While

Case 2:12-md-02311-SFC-RSW   ECF No. 230-29, PageID.3302   Filed 07/13/12   Page 13 of 26

Page 12

2011 U.S. Dist. LEXIS 121373, *41; 2012-1 Trade Cas. (CCH) P77,878

it is true that Defendants initially "agreed to fix prices and allocate markets for DBM," ("the DBM Agreement") and subsequently agreed to allocate the domestic CCM market to Premier ("the CCM Agreement"), (id.), those agreements are not mutually exclusive. To the contrary, the CCM Agreement is dependent on the DBM Agreement, and vice versa. See *In re Vitamins Antitrust Litig., 320 F. Supp. 2d 1, 16 (D.D.C. 2004)* (recognizing the potential "interdependency between various branches of a common conspiracy."). Specifically, Defendants entered into the CCM Agreement in order to restore and maintain the DBM Agreement after Premier broke that agreement due to Sumitomo and YAS's attempt to enter the domestic CCM market. Consequently, the absence of one eliminates the consideration for the other. Moreover, **[\*42]** "[h]orizontal antitrust conspiracies commonly include sellers in more than one relevant market." *In re Vitamins Antitrust Litig., No. MISC 99-197, 2000 U.S. Dist. LEXIS 7397, 2000 WL 1475705, at \*10 (D.D.C. May 9, 2000).* Accordingly, the Court will treat Plaintiffs CACs as alleging a single conspiracy not to compete in the sale of two forms of MgO.

### ii. The Necessity of Allegations Regarding the MgO Market

Defendants argue that Plaintiffs fail to allege an unlawful price-fixing and market allocation conspiracy because they do not set forth relevant market conditions and Sumitomo's, YAS's, and Premier's relative market power indicating that they plausibly could have fixed the price of DBM and allocated the domestic DBM and CCM markets. Plaintiffs argue that they are alleging per se violations of Section 1 of the Sherman Act and therefore "Defendants' arguments concerning market power and relevant markets are legally irrelevant." (DP Pl's. Br., 12.)

"Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010)* **[\*43]** (quoting *15 U.S.C. § 1*). "[T]his statutory language imposes two essential requirements on an antitrust plaintiff." Id. "First, the plaintiff must show that the defendant was a party to a contract, combination . . . or conspiracy." *Id. at 315* (quotation and citation omitted). This requires the plaintiff to demonstrate "some form of concerted action" indicating a "unity of purpose or a common design and

understanding or a meeting of the minds or a conscious commitment to a common scheme." Id. (quotations and citations omitted).

Second, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." Id. (quotation and citation omitted). "[T]he usual standard applied to determine whether a challenged practice unreasonably restrains trade is the so-called rule of reason." Id. (quotation and citation omitted). "[U]nder a rule-of-reason analysis, the plaintiff bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." Id. (quotation and citation omitted). "[S]uccessful attempts to meet this burden typically include a demonstration of defendants' **[\*44]** market power, as a judgment about market power is [a] means by which the effects of the [challenged] conduct on the market place can be assessed." *Id. at 315-16* (quotation and citations omitted).

"If the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits." Id. However, "Judicial experience has shown that some classes of restraints" almost never have "redeeming competitive benefits," and therefore a court need not apply the rule of reason analysis. Id. Instead, they are "subject to a 'per se' standard." Id. "Paradigmatic examples are horizontal agreements among competitors to fix prices or to divide markets." Id. (quotation and citation omitted). If a plaintiff's allegations "fall into one of the recognized classes," an unreasonable restraint on trade is "conclusively presumed" and therefore "plaintiffs are relieved of the obligation to define a market and prove market power." Id. (citations omitted).

As discussed below, Plaintiffs sufficiently allege that Defendants entered into (1) a horizontal agreement to fix prices in and allocate shares of the domestic DBM market **[\*45]** and (2) a horizontal agreement to allocate the domestic CCM market to Premier. Accordingly, Plaintiffs assert per se antitrust violations that do not require allegations regarding the nature of the domestic DBM and CCM markets or Defendants' power within those markets. [12]

12   This also disposes of Sumitomo's contention that the Court should consider "certain relevant

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3303 Filed 07/13/12 Page 14 of 26

Page 13

2011 U.S. Dist. LEXIS 121373, *45; 2012-1 Trade Cas. (CCH) P77,878

facts" noted in *Animal Science Prods., Inc. v. China Nat'l Metals & Minerals, 596 F. Supp. 2d 842 (D.N.J. 2008)* regarding the domestic DBM and CCM markets. (Sumitomo (DP Pl.'s) Br., 4.)

### *iii. The DBM Agreement*

Defendants argue that Plaintiffs' allegations of an agreement to fix prices in and allocate shares of the domestic DBM market are facially insufficient because (1) they fail to provide the substance of the agreement, (2) they fail to rule out potentially alternative, lawful explanations for such an agreement, and (3) their "factual narrative is inherently implausible." (Sumitomo (DP Pl.'s). Br., 15.) Plaintiffs argue that their allegations of a price-fixing and market allocation agreement are sufficient because (1) they "explicitly state who was conferring with whom about MgO pricing, markets and customers" (DP Pl's. Br., **[*46]** 15.), and (2) Defendants' arguments regarding the inherent plausibility of the alleged conspiracy implicate factual questions that are not properly resolved on a motion to dismiss.

Defendants' contention that Plaintiffs' allegations are inadequate because they "fail to disclose the actual substance of the alleged conversations or agreements" (Sumitomo (DP Pl.'s) Br., 14) is unavailing. *Twombly* does not require detailed allegations regarding the specific nature of a price-fixing or market allocation agreement; rather, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *550 U.S. at 556*. Put another way, a complaint "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Id. Requiring Plaintiffs to set forth the full details of an antitrust conspiracy at this stage of the litigation would present an onerous burden because "in antitrust cases, [] the proof is largely in the hands of the alleged conspirators." *In re Neurontin Antitrust Litig., No. 02-1390, 2009 U.S. Dist. LEXIS 77475, 2009 WL 2751029, at *7 (D.N.J. Aug. 28, 2009)* (quoting *Hosp. Building Co. Trustees of Rex Hosp., 425 U.S. 738, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)).*

Here, **[*47]** Plaintiffs allege that (1) a significant portion of DBM consumed in the United States comes from China; (2) during the Class Period, Premier and Sumitomo bought nearly all Chinese DBM available for purchase and resold it to their customers in the United States; (3) Mr. Ahl of Premier "regularly called" Mr.

Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S" (Direct CAC ¶ 34; Indirect CAC ¶ 42); (4) these market allocation and price-fixing schemes were implemented by Mr. Ahl and his successors at Premier and Mr. Wakisama of Sumitomo; (5) at the 2004 Tulsa meeting, Mr. Akiyama recounted to Mr. Sumikawa "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ 49); and (5) when Mr. Vannorsdel allegedly "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, Mr. Akiyama responded, "'Don't be concerned because we [Sumitomo] talk with Premier on a **[*48]** daily basis to set prices and to discuss what accounts they can have.'" (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

These allegations plausibly suggest that Defendants entered into an agreement to fix prices in and allocate shares of the domestic DBM market, the specifics of which can be reasonably expected to be revealed in discovery. Plaintiffs state (1) the subject of the alleged agreement, (2) the parties to the agreement and the specific individuals that discussed and implemented the agreement, and (3) the context in which the agreement arose. This is sufficient to withstand a motion to dismiss.

Defendants' contention that Plaintiffs fail to assert a plausible antitrust conspiracy because their allegations could, in fact, refer to a lawful vertical agreement between Sumitomo and Premier to fix prices for DBM whereby Sumitomo purchases DBM from Premier as a reseller, is irrelevant. At the pleading stage, Plaintiffs need only set forth allegations that create an inference of an unlawful agreement, *Twombly, 550 U.S. at 556*, which, as previously discussed, they have done; they need not set forth allegations tending to rule out potential alternative explanations. 13

13  This is to be distinguished **[*49]** from the requirement to plead plus factors to rule out independent action "when a plaintiffs' claims of conspiracy rest on parallel conduct," *In re Ins. Brokerage, 618 F.3d at 323*, which is discussed below regarding the alleged CCM Agreement. Plaintiffs need not assert plus factors to establish

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3304 Filed 07/13/12 Page 15 of 26

Page 14

2011 U.S. Dist. LEXIS 121373, *49; 2012-1 Trade Cas. (CCH) P77,878

the plausibility of the DBM Agreement because they set forth direct allegations of that agreement. See *In re Ins. Brokerage, 618 F.3d at 323* ("Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate.").

Finally, Defendants' contention that the alleged DBM Agreement is "inherently implausible" in that, on the one hand, Sumitomo was allegedly worried about retaliatory action by Premier for attempting to enter the CCM market and, on the other hand, "could give credible assurances to the Vannorsdels that it could shield them from Premier['s] retaliation because of [Sumitomo's] 'daily' contact with Premier," (Sumitomo (DP Pl.'s) Br., 15) is similarly irrelevant because it asks the Court to improperly assess the merits of Plaintiffs' allegations. [14] See *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 17, 381 U.S. App. D.C. 76 (D.C. Cir. 2008)* ("Twombly was **[*50]** concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim. A court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success . . . the court must assume that all the allegations in the complaint as true (even if doubtful in fact)" (quotations and citations omitted)). Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to fix prices in and allocate shares of the domestic DBM market.

14    Moreover, there is nothing "inherently implausible" about Sumitomo's attempt to assuage the Vannorsdels' concern about Premier's potential retaliation by stating that it speaks with Premier on a daily basis to set DBM prices and allocate shares of the DBM market. It is certainly plausible that Sumitomo was aware of the risk of retaliation by Premier but believed it could "enter the [CCM] market discreetly" (Direct CAC ¶ 39; Indirect CAC ¶ 48) because Premier's attention was focused on maintaining their agreement in the DBM market.

### iv. The CCM Agreement

Defendants contend that Plaintiffs fail to allege the existence of an unlawful agreement to allocate the domestic CCM market to Premier because **[*51]** (1) they merely allege parallel conduct that does not indicate concerted action, (2) there are obvious alternative explanations for Sumitomo's and YAS's decision not to

enter the CCM market, and (3) they fail to establish that Defendants were competitors in the CCM market. Plaintiffs counter that they are not relying on parallel conduct but rather direct admissions of an agreement among Defendants to allocate the domestic CCM market to Premier, and therefore Defendants' proffered alternative explanations are irrelevant.

As previously discussed, Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy." *Twombly, 550 U.S. at 553* (quotation and citation omitted). This is because seemingly anticompetitive conduct may be just as "consistent with conspiracy . . . [as] with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id. at 554* (citation omitted). Accordingly, "[t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id. at 553* **[*52]** (quotation and citation omitted). "Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id. at 557*.

This is usually accomplished by pleading one or more "plus factors" that "indicate the existence of an actionable agreement." *In re Ins. Brokerage, 618 F.3d at 321*. While "[t]here is no finite set of such criteria," the Court of Appeals has identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a [] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id. at 321-22* (quotations and citation omitted).

Here, Plaintiffs' allegations suggest an agreement among Defendants to allocate the CCM market to Premier. Plaintiffs allege that (1) representatives from Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market **[*53]** and retaliated by lowering DBM prices; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

To be sure, contrary to Plaintiffs' contentions, these allegations do not amount to a direct admission of an

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3305 Filed 07/13/12 Page 16 of 26

Page 15

2011 U.S. Dist. LEXIS 121373, *53; 2012-1 Trade Cas. (CCH) P77,878

unlawful agreement to allocate the CCM market to Premier; taken in isolation, they merely amount to parallel conduct plus a conclusory allegation of an agreement. Placing these allegations in the context of the CACs as a whole, however, Plaintiffs successfully demonstrate the first plus factor--that Sumitomo and YAS had a motive to enter into an unlawful agreement with Premier to stay out of the domestic CCM market--and provide a plausible context for that agreement. As previously discussed, Sumitomo and YAS maintained an agreement with Premier to fix prices in and allocate shares of the domestic DBM market. As a result, as the CACs indicate, Sumitomo and YAS wanted to enter the CCM market undetected so that they could continue to maintain their agreement with Premier in the DBM market. When Premier discovered their plans and, in response, cut prices in the DBM market, Sumitomo and YAS agreed with Premier to stay out of the CCM market with the motive **[*54]** of restoring and maintaining their agreement in the DBM market.

In this context, Defendants' alternative explanations that a profit-maximizing entity could independently decide not to enter a market in which (1) it remained unfamiliar with the product and its customers and (2) the dominant player recently cut prices are by no means "obvious" or "more plausible" (Sumitomo (DP Pl's.) Br., 18) than an illegal agreement to stay out of the CCM market and therefore do not provide a basis for dismissal. At the pleading stage, "a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *In re Ins. Brokerage, 618 F.3d at 326.* Plaintiffs' allegations need not rule out all potential alternative explanations. See *Starr v. Sony BMG Music Entertainment, 592 F.3d 314, 325 (2d Cir. 2010)* ("Although the Twombly court acknowledged that for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, it specifically held that, to survive a motion **[*55]** to dismiss, plaintiffs need only enough factual matter (taken as true) to suggest that an agreement was made" (quotations and citations omitted)).

Finally, Sumitomo's argument that Plaintiffs fail to allege a plausible agreement to allocate the CCM market to Premier because there is no indication that Defendants were actual or potential competitors in the CCM market

is unavailing. Sumitomo specifically contends that Plaintiffs must establish that it had the intent and capability of entering the CCM market as a competitor in order to allege a plausible agreement among Defendants to allocate the CCM market to Premier. However, the authority cited by Sumitomo provides little support for this contention. See *Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49-50, 111 S. Ct. 401, 112 L. Ed. 2d 349 (1990)* (parties need not have competed in the same territorial market to unlawfully allocate that market); *Andrx Pharms, Inc. v. Bioval Corp., Int'l, 256 F.3d 799, 806-07, 347 U.S. App. D.C. 178 (D.C. Cir. 2001)* (potential competitor must show background and experience in new market, financial capability to enter market, and affirmative steps toward entry in order to establish injury-in-fact for standing to sue under Section 4 of the Clayton Act); *Engine Specialities, Inc. v. Bombardier Ltd., 605 F.2d 1, 9 (1st Cir. 1979)* **[*56]** (to sustain jury finding of unlawful horizontal market allocation agreement among potential competitors, there must have been sufficient support in the record to establish that potential competitors had the "necessary desire, intent, and capability to enter the market").

To be sure, the Court of Appeals has generally recognized that the existence of an unlawful horizontal agreement to allocate a given market must occur among competitors or potential competitors in that market:

An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes *brutum fulmen* . . . To some extent, of course, a horizontal agreement tends to define the relevant market, for it tends to show that the parties to it are at least potential competitors. If they were not, there would be no point to such an agreement. Thus its very existence supports an inference that it would have an effect in a relevant market. Where, . . . however, the disputed issue is the existence or scope of the alleged horizontal agreement that is to be inferred from circumstantial evidence, the first inquiry must be whether or not each firm alleged to have been a party to it was an actual **[*57]** or potential competitor in that market.

Case 2:12-md-02311-SFC-RSW   ECF No. 230-29, PageID.3306   Filed 07/13/12   Page 17 of 26

Page 16
2011 U.S. Dist. LEXIS 121373, *57; 2012-1 Trade Cas. (CCH) P77,878

*United States v. Sargent Elec. Co., 785 F.2d 1123, 1127 (3d Cir. 1986)* (reversing dismissal of indictment on double jeopardy grounds). However, Sumitomo fails to present, nor is the Court aware of, any authority requiring a purchaser plaintiff to specifically establish, at the pleading stage, that the parties to a horizontal agreement to allocate a given market were competitors or potential competitors in that market. To require Plaintiffs, pre-discovery, to establish Sumitomo's background and experience in the CCM market, its financial capability to enter that market, and the specific steps taken by Sumitomo to enter it, would be overly onerous, as much of this information is likely to be exclusively in the hands of Sumitomo. [15] Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to allocate the domestic CCM market to Premier.

> 15   In any event, Plaintiffs allege Sumitomo's motive for entering the CCM market (filling excess barge capacity), and certain steps taken to enter that market (meeting with the Vannorsdels in Tulsa).

### v. YAS' Involvement in the Alleged Conspiracy

YAS separately argues that Plaintiffs fail to establish [*58] its participation in the alleged conspiracy because they fail to show that it came to a meeting of the minds with Sumitomo and Premier to (1) fix prices in and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier. [16] Plaintiffs counter that (1) they have set forth direct allegations indicating YAS's knowledge and participation in the alleged conspiracy, and (2) YAS need not have played the same role in the conspiracy, maintain the same motives as Sumitomo or Premier for participating in it, or sell MgO to be held liable.

> 16   Citing to *Toledo Mack Sales & Serv. v. Mack Trucks, Inc., 530 F.3d 204 (3d Cir. 2008)*, YAS further argues that Plaintiffs' failure to establish that YAS occupies the same level as Sumitomo and Premier on the MgO supply chain "precludes *per se* treatment of YAS' alleged antitrust violations." (YAS Br., 4 n. 5.) This argument misses the mark. While Toledo Mack noted that, "[i]n contrast to horizontal price-fixing agreements between entities at the same level of a product's distribution chain, the legality of a vertical agreement that imposes a restriction on the dealer's ability to sell the manufacturer's

product is governed [*59] by the rule of reason," and that "[t]he rule of reason analysis applies even when . . . the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers," *530 F.3d at 225* (citation omitted), Plaintiffs do not allege YAS' arrangement with Sumitomo to source Chinese magnesite and MgO constitutes an unlawful vertical agreement to support a horizontal conspiracy between Sumitomo and Premier. Rather, Plaintiffs allege that YAS participated directly with Sumitomo and Premier in the alleged horizontal conspiracy to fix prices in and allocate shares of the DBM market and allocate the CCM market to Premier. Moreover, "[t]he law is settled that where an upstream supplier participates in a conspiracy involving horizontal competitors, it is proper to analyze the entire restraint as one of horizontal price-fixing." *In re Mercedes-Benz, 157 F. Supp. 2d at 362.*

As previously discussed, to hold YAS or any other Defendant liable, Plaintiffs must set forth allegations suggesting that YAS maintained "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment [*60] to a common scheme" with Sumitomo and Premier to (1) fix prices in and allocate shares of the domestic DBM market, and (2) allocate the CCM market to Premier. *In re Ins. Brokerage, 618 F.3d at 315* (quotations and citation omitted). This does not require a showing that YAS knew of or participated in every transaction in furtherance of or related to the alleged conspiracy. See *TV Signal Co. of Aberdeen v. American Tel. & Tel. Co., 462 F.2d 1256, 1259 (8th Cir. 1972)* ("Although knowledge is implicit in the requirement of unity of purpose, no case of which we are aware requires that each party to a conspiracy knows of each transaction encompassed by the conspiracy in order to be held accountable therefore."); *In re Vitamins Antitrust Litig., 320 F. Supp. 2d 1, 15 (D.D.C. 2004)* ("Although Plaintiffs must show that each Defendant had knowledge of an agreement as to the overall conspiracy, they need not show (1) evidence of a formal agreement, or (2) knowledge, on behalf of the Defendant, of every detail of the alleged conspiracy."); *In re Mercedes-Benz, 157 F. Supp. 2d at 375* ("That a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy [*61] . . . does not affect its status as a conspirator."). On the other hand, "knowledge

2011 U.S. Dist. LEXIS 121373, *61; 2012-1 Trade Cas. (CCH) P77,878

alone [of the conspiracy] is not sufficient" to hold it liable. *In re Vitamins, 320 F. Supp. 2d at 16*. Plaintiffs must therefore set forth allegations suggesting that YAS (1) had knowledge of the conspiracy to fix prices in and allocate shares of the domestic DBM market, and allocate the CCM market to Premier, and (2) intended to join that conspiracy. Id. "[A] a party progresses form mere knowledge of an endeavor to intent to join it when there is 'informed and interested cooperation, stimulation, instigation. And there is also a stake in the venture which, even if it may not be essential, is not irrelevant to the question of conspiracy.'" Id. (quoting *Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S. Ct. 1265, 87 L. Ed. 1674 (1943)*).

1. The DBM Agreement

Plaintiffs allege that Mr. Sumikawa of YAS (1) facilitates Sumitomo's purchases of Chinese DBM for resale in the domestic DBM market, (2) received regular phone calls from Mr. Ahl of Premier "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective [DBM] accounts in the U.S," (Direct CAC ¶ 34; Indirect CAC ¶ 42), and (3) attended the 2004 Tulsa **[*62]** meeting where (i) Mr. Akiyama of Sumitomo recounted to him "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ ) and (ii) it was revealed that Sumitomo communicates with Premier on a daily basis fix prices and allocate accounts. These allegations create a plausible inference that YAS had knowledge of an agreement to fix prices in and allocate shares of the domestic DBM market and the intent to join it. Accepting Plaintiff's allegations as true and making all reasonable inferences in their favor, YAS' facilitation of Sumitomo's DBM purchasing indicates a plausible stake in the DBM Agreement, while its receipt of phone calls to discuss the Agreement and attendance at a meeting at which it was revealed indicates that YAS had knowledge of the DBM Agreement and that it engaged in informed and interested cooperation.

Citing to *In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007)* and *Hinds County, Mississippi v. Wachovia Bank N.A., 620 F. Supp. 2d 499, 518 (S.D.N.Y. 2009)*, YAS argues that these **[*63]** allegations should be "discounted" because they amount to mere "averments of agreements made at some unidentified place and time."

(YAS Br., 4.) In re Elevator Antitrust Litig. concerned a list of "basically every type of conspiratorial activity that one could imagine . . . in entirely general terms without any specification of any particular activities by any particular defendant." *502 F.3d at 50*. Similarly, Hinds County dealt with conclusory allegations of "'*per se* illegal horizontal communications' in support of [an] alleged conspiracy." *620 F. Supp. 2d at 518*. Here, in contrast, Plaintiffs allege (1) the way in which YAS participates with Sumitomo-- a member of the conspiracy--in the domestic DBM market, (2) phone calls from Premier-- another party to the conspiracy--to YAS to discuss fixing prices in and allocating shares of the domestic DBM market, and (3) YAS's attendance at a meeting where Sumitomo--its partner in the domestic DBM market--recounted to YAS discussions in which it set prices in and allocated shares of the domestic DBM market with Premier. These allegations, do not amount to a mere "list of theoretical possibilities," *In re Elevator Antitrust Litig., 502 F.3d at 50*, **[*64]** or "require the Court to assume the existence of the conspiracy." *Hinds County, 620 F. Supp. 2d at 518*. Rather, they make the alleged conspiracy more plausible.

YAS further argues that "it is wholly implausible that [it] (a minor player that was not itself a manufacturer, importer or seller [17]) would have discussed fixing Premier's and Sumitomo's [DBM] prices," particularly since Plaintiffs fail to "allege that YAS had any ability to influence (let alone) dictate Sumitomo's [DBM] prices, nor which customers Sumitomo dealt with." (YAS Br., 5.) As previously discussed, this line of argument is not only improper at the pleading stage--where the Court must accept Plaintiffs' allegations as true--it is also unpersuasive. There is nothing "wholly implausible" **[*65]** about YAS participating in discussions to fix prices in and allocate shares of the domestic DBM market. Sumitomo was only able to participate in the domestic DBM market in the first place due to YAS's relationship with Chinese mines from which Sumitomo could purchase DBM and magnesite. Consequently, it is certainly plausible that YAS could participate in discussions with co-conspirators to fix prices and allocate shares of the DBM market.

17   Citing to *Howard Hess Dental Laboratories Inc. v. Dentsply Intern, Inc., 424 F.3d 363 (3d Cir. 2005)*, YAS also argues that Plaintiffs' failure to allege that it sold DBM or CCM requires its dismissal from this case as a matter of law. While

Case 2:12-md-02311-SFC-RSW   ECF No. 230-29, PageID.3308   Filed 07/13/12   Page 19 of 26

Page 18

2011 U.S. Dist. LEXIS 121373, *65; 2012-1 Trade Cas. (CCH) P77,878

that case notes the well-settled proposition that only direct purchasers may recover damages in federal antitrust suits, it by no means indicates that only a seller of the product in question may be found liable in a Section 1 conspiracy. As previously discussed, YAS need not have participated in a particular act in furtherance of the conspiracy to be held liable.

2. The CCM Agreement

Plaintiffs' allegations suggesting an agreement among Sumitomo and Premier to allocate the CCM market to Premier apply with equal **[*66]** force to YAS. As previously discussed, Plaintiffs allege that (1) Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market and retaliated by lowering DBM prices to keep Sumitomo and YAS out of the CCM market; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

YAS argues that these allegations are conclusory because they "provide[] no details whatsoever about YAS's participation in this alleged agreement, including what role it is alleged to have played." (YAS Br., 7.) At the pleading stage, however, Plaintiffs need not allege the specific nature of YAS's or any other Defendant's participation in the agreement to allocate the CCM market to Premier. See *In re Static Random Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 904 (N.D.Cal. 2008)* ("Although Plaintiffs will need to provide evidence of each Defendants' participation [at summary judgment] . . . they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."). **[*67]** As previously discussed, Plaintiffs must set forth allegations suggesting that YAS had knowledge of the agreement and the intent to join it. Plaintiffs' allegations that YAS, as Sumitomo's partner in the domestic MgO market, (1) attended a meeting to arrange for Sumitomo to enter the domestic CCM market and (2) subsequently agreed with Sumitomo and Premier to allocate that market to Premier in order to maintain their agreement to fix prices and allocate shares of the domestic DBM market, do just that.

Finally, like Sumitomo, YAS argues that it cannot be held liable for the alleged agreement to allocate the domestic CCM market to Premier because Plaintiffs fail

to establish that YAS was an actual or potential competitor in that market. For the reasons discussed in Point IIC*iv*, at the pleading stage, Plaintiffs, as purchasers, need not establish that YAS was an actual or potential competitor in the CCM market in order to allege its participation in a horizontal conspiracy. Furthermore, YAS's (1) role in facilitating Sumitomo's purchase of Chinese DBM and (2) attendance at the 2004 Tulsa meeting where it, Sumitomo, and the Vannorsdels discussed entering into the CCM market, suggests that **[*68]** YAS intended to participate with Sumitomo in the CCM market in the same way as they had been participating in the DBM market. Thus, Plaintiffs have set forth allegations plausibly suggesting that YAS participated in an agreement to allocate the CCM market to Premier.

### D. Statute of Limitations and Fraudulent Concealment

Actions brought under the Clayton Act are subject to a four-year statute of limitations. *15 U.S.C. § 15b*. In an antitrust conspiracy that continues over a period of years, each overt act in furtherance thereof that injures the plaintiff--for example, the selling of a price-fixed product--starts the statute of limitations period running for that particular act. *Klehr v. A.O. Smith Corp., 521 U.S. 179, 189, 117 S. Ct. 1984, 138 L. Ed. 2d 373 (1997)*; see also *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S. Ct. 795, 28 L. Ed. 2d 77* ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business" (citations omitted)). However, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr, 521 U.S. at 190* (citations omitted).

Defendants argue **[*69]** that Plaintiffs' federal antitrust claims are barred by the applicable four-year statute of limitations. Specifically, Defendants contend that Plaintiffs (1) fail to allege overt acts in furtherance of the alleged conspiracy that occurred after 2004 and (2) fail to plead fraudulent concealment with particularity to otherwise toll the statute of limitations. Plaintiffs do not dispute that they fail to allege overt acts after 2004, but maintain that they plead fraudulent concealment with the requisite particularity to toll the statute of limitations.

The equitable doctrine of fraudulent concealment applies to every federal statute of limitations. *Holmberg*

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3309 Filed 07/13/12 Page 20 of 26

Page 19

2011 U.S. Dist. LEXIS 121373, *69; 2012-1 Trade Cas. (CCH) P77,878

*v. Armbrecht, 327 U.S. 392, 397, 66 S. Ct. 582, 90 L. Ed. 743 (1946)*. To toll a statute of limitations through fraudulent concealment, a plaintiff must show "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action." *In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1178-79 (3d Cir. 1993)* (citation omitted). In addition, allegations of fraudulent concealment must be pled with particularity in accordance with *Federal Rule of Civil Procedure 9(b)*. **[*70]** *In re Mercedes-Benz, 157 F. Supp. 2d at 368*.

However, "*Rule 9[(b)]* does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control." Id. (citing *In re Craftmatic Secs. Litig., 890 F.2d 628, 645 (3d Cir. 1989)*). Indeed, "[c]ourts must be sensitive to the fact that [a rigid] application of *Rule 9(b)* prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Craftmatic, 890 F.2d at 645* (quotation and citation omitted). "Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control." Id. Accordingly, under the more flexible application of *Rule 9(b)*, Plaintiffs need not allege the specific information that is exclusively within Defendants' knowledge or control. See *id. at 646*. However, Plaintiffs must allege facts suggesting fraudulent concealment and "why additional information lies exclusively within the defendants' control." Id.

As discussed fully below, Plaintiffs fail to satisfy each element of fraudulent concealment, thus requiring dismissal of their federal antitrust claims as time-barred. However, the Court will grant **[*71]** Plaintiffs leave to amend their allegations of fraudulent concealment to equitably toll the statute of limitations. [18]

> 18    IP Plaintiffs' state antitrust law claims similarly require dismissal for failure to establish fraudulent concealment, as their applicable statutes of limitations range from three to six years. See *Ariz. Rev. Stat. Ann. § 44-1410(A)* (Arizona) (2011) (four years); *Cal. Bus. & Prof. Code § 16750.1* (2011) (California) (four years); *D.C. Code § 28-4511(b)* (2011) (four years); *Haw. Rev. Stat. § 480-24(a)* (2010) (Hawaii) (four years); *Ill. Comp. Stat. ch. 740, § 10/7(2)* (2010) (four years); *Iowa Code § 553.16* (2011) (Iowa)

(four years); *Four B Corp. v. Daicel Chem. Indus., Ltd., 253 F. Supp. 2d 1147, 1156 (D. Kan. 2003)* (Kansas) (three years) (citing *Kan. Stat. Ann. § 60-512(2)* (2010)); *McKinnon v. Honeywell Int'l, Inc., 2009 ME 69, 977 A.2d 420, 424 (Me. 2009)* (Maine) (six years) (citing *Me. Rev. Stat. Ann. tit. 14 § 752* (2008)); *Mich. Comp. Laws § 445.781* (2010) (Michigain) (four years); *Am. Computer Trust Leasing v. Jack Farrell Implement Co., 763 F. Supp. 1473, 1491 n.21 (D.Minn. 1991)* (Minnesota) (four years) (citing *Minn. Stat. § 325D.64 (subdiv. 1)* (2010)); *Miss. Code Ann. § 15-1-49(1)* **[*72]** (2010) (three years); *Neb. Rev. Stat. § 25-206* (2010) (Nebraska) (four years); *Nev. Rev. Stat. § 598A.220(2)(a)* (2010) (four years); *N.H. Rev. Stat. § 356:12(II)* (1973) (New Hampshire) (four years); *N.M. Stat. § 57-1-12(B)* (1978) (New Mexico) (four years); *N.Y. Gen. Bus. Law § 340(5)* (2004) (New York) (four years); *N.C. Gen. Stat. § 75-16.2* (2010) (North Carolina) (four years); *N.D. Century Code § 51-08.1-10(2)* (1987) (four years); *Or. Rev. Stat. § 646.800(2)* (1975) (Oregone) (four years); *S.D. Codified Laws § 37-1-14.4* (1975) (South Dakota) (four years); State ex rel. Leech v. Levi Strauss & Co., No. 79-722-III, 1980 WL 4696, at *3 (Tenn. Ch. Sept. 25, 1980) (Tennessee) (three years) (citing Tenn. Stat. § 28-3-105(3) (2011)); *Utah Code § 76-10-925(2)* (1979) (Utah) (four years); *Vt. Stat. Ann. tit. 12, § 511* (2010) (Vermont) (six years); *W. Va. Code § 47-18-11* (1978) (West Virginia) (four years); *Wis. Stat. § 133.18(2)* (2011) (Wisconsin) (six years). However, to the extent that IP Plaintiffs sufficiently amend their allegations to establish fraudulent concealment of their federal antitrust claims, they will also have established fraudulent concealment of their state law antitrust claims. **[*73]** See Note 9.

### i. Affirmative Acts of Concealment

Defendants argue that (1) Plaintiffs fail to sufficiently allege affirmative acts of concealment and (2) their allegations that the MgO conspiracy is self-concealing cannot satisfy the first element of fraudulent concealment. [19] Plaintiffs contend that they have alleged (1) a self-concealing conspiracy that satisfies the first element of fraudulent concealment, or, (2) in the alternative, affirmative acts of concealment

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3310 Filed 07/13/12 Page 21 of 26

Page 20

2011 U.S. Dist. LEXIS 121373, *73; 2012-1 Trade Cas. (CCH) P77,878

committed by Defendants.

19 Defendants further argue that Sumitomo's alleged admission to the Vannorsdels of the DBM Agreement cuts against their fraudulent concealment allegations. This is unpersuasive because the admission in no way put Plaintiffs on notice of their claims during the limitations period. See *Emerson Elec. Co. v. Le Carbone Lorraine, SA, 500 F. Supp. 2d 437, 448 (D.N.J. 2007)* ("Where fraudulent concealment of a federal antitrust claim has been shown, the four-year federal statute of limitations begins anew from the time the plaintiff knew or should have known of the existence of the federal claim." (quotations and citations omitted)).

The Court of Appeals has yet to define what constitutes an affirmative act **[\*74]** of concealment in antitrust cases. However, courts have generally taken two distinct views. *In re Mercedez-Benz, 157 F. Supp. 2d at 368.* The first requires a plaintiff to show one or more affirmative acts to conceal an antitrust conspiracy that are wholly extrinsic to the conspiracy itself. See, e.g., *Colorado v. Western Paving Constr. Co., 630 F. Supp. 206, 210 (D.Colo. 1986),* aff'd en banc by an equally divided court, *841 F.2d 1025 (10th Cir. 1988),* cert. denied, *488 U.S. 870, 109 S. Ct. 179, 102 L. Ed. 2d 148 (1988).* The second also requires a plaintiff to show one or more affirmative acts of concealment, but those acts may be part and parcel to, or in furtherance of, the conspiracy. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 122 (4th Cir. 1995)* (citing *Texas v. Allen Constr. Co., 851 F.2d 1526, 1532 (5th Cir. 1988)).* The Court finds the first view to be overly restrictive in this case. In a conspiracy involving price-fixing, "it **[\*75]** is virtually impossible to distinguish between acts in furtherance of the conspiracy and acts designed to maintain the conspiracy's secrecy because the conspiracy's success is often contingent upon its ability to avoid detection by regulators and purchasers." *In re Aspartame Antitrust Litig., No. 06-1732, 2007 U.S. Dist. LEXIS 16995, 2007 WL 5215231, at \*5 (E.D.Pa. Jan. 18, 2007);* See also *In re Mercedez-Benz, 157 F. Supp. 2d at 372* ("secrecy is [the] natural lair" of a price-fixing conspiracy).

Several courts, including those in this Circuit, have found that a plaintiff may avoid the affirmative act requirement altogether in cases where an antitrust conspiracy is "inherently self-concealing." See, e.g., *In re Aspartame, 2007 U.S. Dist. LEXIS 16995, 2007 WL 5215231, at \*5; In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000); In re Mercedez-Benz, 157 F. Supp. 2d at 371; Pennsylvania Milk Indus. Mgmt. Corp., 812 F. Supp. 500 (E.D.Pa. 1992); Bethlehem Steel Corp. v. Fischbach & Moore, Inc., 641 F. Supp. 271, 273-74 (E.D.Pa. 1986).* However, the definition of a self-concealing antitrust conspiracy, particularly one that involves price-fixing, remains nebulous. The In re Mercedez-Benz court held that a self-concealing **[\*76]** antitrust conspiracy is one where "concealment is so intertwined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled." *157 F. Supp. 2d at 371.* Other courts maintain that all properly alleged price-fixing conspiracies are inherently self-concealing. See, e.g., *In re Issuer Plaintiff Initial Public Offering Antitrust Litig., No. 00-7804, 2004 U.S. Dist. LEXIS 3892, 2004 WL 487222, at \*4 (S.D.N.Y. Mar. 12, 2004); Nine West, 80 F. Supp. 2d at 192.*

The Court agrees that, under certain circumstances, an antitrust conspiracy may depend on its own concealment to the point that any act in furtherance thereof can also be said to conceal it. As the Supreme Court explained long ago, the purpose of the fraudulent-concealment doctrine is to prevent a defendant from "concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L. Ed. 636 (1874).* However, the Court cannot find that conspiracies involving price-fixing are *per se* self-concealing, as such a finding would render **[\*77]** them wholly exempt from the applicable statute of limitations.

Although not binding, *In re Publication Paper Antitrust Litig., No. 04-1631, 2005 U.S. Dist. LEXIS 19896, 2005 WL 2175139 (D.Conn. Sept. 6, 2005)* provides a helpful framework under which to determine whether a conspiracy involving price-fixing is self-concealing for the purposes of establishing fraudulent concealment. That case found that a price-fixing conspiracy may be self-concealing, depending on the nature of the industry in which the item is price-fixed:

In a competitive, well-regulated industry

Case 2:12-md-02311-SFC-RSW   ECF No. 230-29, PageID.3311   Filed 07/13/12   Page 22 of 26

Page 21

2011 U.S. Dist. LEXIS 121373, *77; 2012-1 Trade Cas. (CCH) P77,878

it will often be the case that a price-fixing conspiracy, if not concealed, would immediately fail because of governmental or private legal action. In such circumstances, any announcement of a price increase will carry with it an implicit statement that the price increase is legitimate, i.e., the result of competitive forces, not collusion. Nevertheless, not every price-fixing conspiracy is self-concealing. For example, there may be industries in which the participants are aware of collusion but it is not stopped because of indifference, fear, or because the perpetrators are exempt from, or beyond the reach of, antitrust laws. In such circumstances, the **[*78]** defendants' announcement of a price increase will not carry with it any implied certification of legitimacy, and so, absent additional circumstances, will not be self-concealing.

*In re Publication Paper, 2005 U.S. Dist. LEXIS 19896, 2005 WL 2175139, at *4.* Accordingly, "whether a particular price-fixing conspiracy or, more precisely, whether a particular announcement of a price increase necessarily conceals its true nature depends on the nature of the industry and the circumstances surrounding the announcement." Id. In other words, a plaintiff must show circumstances indicating that a price increase "carries with it a pretense of legitimacy" or "that it would necessarily be assumed that [it was] the result of legitimate market forces." Id. To do so, a plaintiff may, for example, set forth allegations showing "that price increases are not abnormal, that such increases are typically ascribed to market forces, that an openly collusive price increase would not be tolerated, and that there was nothing suspicious about the circumstances under which each of the pre-limitations period price announcements were made." Id.

Here, Plaintiffs fail to allege particular circumstances surrounding the MgO market indicating that the **[*79]** alleged conspiracy was self-concealing. Plaintiffs come close to pleading an affirmative act of concealment in alleging that "price increases for MgO were justified by references to tight supply, thinning margins, and increased energy and freight costs" (Direct CAC ¶ 51; Indirect CAC ¶ 58), however they fail to explain the particular circumstances surrounding Defendants' price

increases and pretextual justifications for those increases-- information which is in Plaintiffs' control--in accordance with *Rule 9(b).* [20] Thus, Plaintiffs have failed to meet the first element of fraudulent concealment to toll the statute of limitations. However, the Court will grant Plaintiffs leave to amend to adequately plead either (1) circumstances surrounding the MgO market during the Class Period indicating that the alleged conspiracy is self-concealing, or (2) particular circumstances surrounding Defendants' price increases and the allegedly pretextual justifications for those price increases. See *In re Burlington Coat Factory Litig., 114 F.3d at 1434.*

> 20   Nor can Plaintiffs' conclusory allegation that "defendants met secretly and among themselves for the express purpose of fixing prices and allocating markets **[*80]** of domestically sold MgO" (Direct CAC ¶ 50; Indirect CAC ¶ 57) satisfy the affirmative act requirement.

### ii. Reliance

Defendants argue that Plaintiffs fail to meet the second element of fraudulent concealment because they have not alleged that that they relied on Defendants' alleged affirmative acts of concealment. Plaintiffs argue that there is no reliance requirement to establish fraudulent concealment.

While the aforementioned elements of fraudulent concealment do not specifically note a reliance requirement, the language of the second element strongly suggests one. As previously noted, the second element of fraudulent concealment requires a showing that the defendant's concealment misled or relaxed the plaintiff's potential inquiry into what otherwise would have been evidence of its cause of action. *In re Lower Lake Erie, 998 F.2d at 1179;* see also *Forbes v. Eagleson, 228 F.3d 471, 487 (3d Cir. 2000)* ("[T]he plaintiff must show that he actually was mis[led] . . . into thinking that he d[id] not have a cause of action" (quotation and citation omitted)). Implicit in the notion that a plaintiff's inquiry was misled or relaxed by an act of concealment is that the plaintiff relied on that **[*81]** act of concealment. That is, the plaintiff's inquiry would not have been misled or relaxed if it did not rely on the defendant's act of concealment. Here, Plaintiffs make no allegations that they were misled by Defendants' concealment of the alleged conspiracy and therefore have failed to meet the second element of fraudulent concealment. However, the Court will grant Plaintiffs leave to amend to adequately

Case 2:12-md-02311-SFC-RSW   ECF No. 230-29, PageID.3312   Filed 07/13/12   Page 23 of 26

Page 22

2011 U.S. Dist. LEXIS 121373, *81; 2012-1 Trade Cas. (CCH) P77,878

plead that they relied on the self-concealing nature of Defendants' conspiracy and/or pretextual justifications for Defendants' price increases. See *In re Burlington Coat Factory Litig., 114 F.3d at 1434*.

### iii. Due Diligence

Defendants argue that Plaintiffs fail to satisfy the due diligence element of fraudulent concealment because they do not allege any due diligence performed during the Class Period, particularly that which led to the discovery of the alleged conspiracy. Plaintiffs counter that, under the fraudulent concealment doctrine, they need only plead that they would not have discovered their claim, even in the exercise of reasonable due diligence. Plaintiffs further argue that determinations of due diligence are fact-intensive and therefore not properly addressed on a motion **[*82]** to dismiss.

The parties cite somewhat differently worded standards to support their respective positions on what the due diligence prong requires. Defendants cite In re Lower Lake Erie, in which the Court of Appeals held that a plaintiff must show that he "exercised due diligence in investigating his cause of action." *998 F.2d at 1178-79*. Plaintiffs, on the other hand cite Matthews v. Kidder, Peabody & Co., Inc., where the Court of Appeals held that a plaintiff must show that his ignorance is not attributable to a lack of "reasonable due diligence in attempting to uncover the relevant facts." *260 F.3d 239, 256 (3d Cir. 2001)*.

While the wording of the due diligence prong has differed slightly among Third Circuit case law, its substance has remained consistent. The due diligence prong is rooted in the notion of inquiry notice: that an injury accrues when a reasonable plaintiff under the circumstances should have discovered it. See *Matthews, 260 F.3d at 251*. As previously discussed, a federal antitrust injury accrues when an overt act is committed that injures the plaintiff, thereby triggering the four-year statute of limitations; however, one or more affirmative acts of concealment "may **[*83]** toll the statute of limitations [] if [they] mislead[] a plaintiff into thinking that he does not have a cause of action." *Davis v. Grusemeyer, 996 F.2d 617, 624 (3d Cir. 1993)*, overruled on other grounds by *Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644 (3d Cir. 1998)*. Thus, to establish the due diligence prong of fraudulent concealment, a plaintiff must affirmatively show that he was not on inquiry notice of the alleged antitrust

conspiracy. See id. ("A key aspect of a plaintiff's case alleging fraudulent concealment is [] proof that the plaintiff was not previously on notice of the claim he now brings." (citations omitted)).

In this Circuit, "inquiry notice [is] analyzed in two steps." [21] *Matthews, 260 F.3d at 252*. "First, the burden is on the defendant[s] to show the existence of 'storm warnings.'" Id. In this case, a storm warning would be information or data that would alert a reasonable MgO purchaser of ordinary intelligence to potentially culpable conduct. "Second, if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discovery their injuries." Id. **[*84]** This requires Plaintiffs to show that (1) they investigated the storm warnings and (2) in their investigation, they exercised the due diligence expected of a reasonable DBM or CCM purchaser of ordinary intelligence. See id.

> 21   While the following inquiry notice analysis is laid out in the context of a RICO case, it has also been applied in antitrust cases involving price-fixing. See *In re Aspartame Antitrust Litig., 416 Fed. App'x. 208, 211-12 (3d Cir. 2011)*; *In re Electrical Carbon Prods. Antitrust Litig., 333 F. Supp. 2d 303, 317 (D.N.J. 2004)*.

As Plaintiffs point out, this inquiry is necessarily bound up with the facts of the case because it "implicates factual questions as to when [a] plaintiff discovered or should have discovered the elements of the cause of action," *id. at 250* (quotations and citation omitted); see also *Mercedez-Benz, 157 F. Supp. 2d at 373* ("At a minimum, this issue will involve assessing the factual circumstances surrounding the accused purchasing transactions and whether those circumstances would have put a reasonably diligent plaintiff on notice of a price-fixing conspiracy"), and, as a result, at the pleading stage, this court has been hesitant to dismiss an **[*85]** otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence. See *In re Electrical Carbon Prods., 333 F. Supp. 2d at 317-18*; *Mercedez-Benz, 157 F. Supp. 2d at 374*.

Citing to In re Publication Paper and Hinds County, Defendants maintain that, at the pleading stage, the due diligence prong nonetheless requires that "Plaintiffs [] allege with particularity when the Named Plaintiffs or Class members became aware of the antitrust violations

2011 U.S. Dist. LEXIS 121373, *85; 2012-1 Trade Cas. (CCH) P77,878

and what inquiries [they] made into the activities alleged in the complaint." (Sumitomo Reply Br., 18) (internal quotations omitted). In re Publication Paper, the plaintiffs alleged that they were aware of certain suspicious activities two years before the end of the limitations period. See *2005 U.S. Dist. LEXIS 19896, 2005 WL 2175139, at *5*. Accordingly, the court found that the plaintiffs were therefore required allege they steps they took to investigate those activities. See id. Here, however, Plaintiffs do not allege any suspicious activities or storm warnings within the limitations period.

Defendants' citation to Hinds County is more persuasive. In that case, the plaintiffs attempted to satisfy the due diligence prong by alleging that they **[*86]** "did not discover, nor could have discovered through reasonable diligence, that [d]efendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because [d]efendants and their co-conspirators were using deceptive and secret methods to avoid detection and affirmatively conceal their violations." *Hinds County, 620 F. Supp. 2d at 521-22*. The court found that allegation too vague to satisfy *Rule 9(b)* and further explained that to deem such an allegation sufficient would "allow[] the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong." *Id. at 521-22*.

The Court finds this logic persuasive. Here, Plaintiffs allege that, due to the secretive nature of the alleged MgO conspiracy, "neither plaintiffs nor the class members had knowledge of any of the foregoing violations, and neither plaintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56.) This allegation cannot satisfy the requirements of *Rule 9(b)*, particularly when **[*87]** it fails to encompass when and how Plaintiffs ultimately discovered the alleged MgO conspiracy--information that is certainly with Plaintiffs' control. See *In re Craftmatic, 890 F.2d at 645*. Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period. Thus, Plaintiffs have failed to meet the due diligence prong of fraudulent concealment. However, Plaintiffs will be granted leave to amend to adequately plead, in accordance with *Rule 9(b)*, (1) when and how they

discovered the alleged MgO conspiracy, and (2) that the self-concealing nature of the conspiracy and/or pretextual justifications for Defendants' price increases made it so that they were not alerted to any storm warnings that would otherwise trigger an obligation to perform due diligence. See *In re Burlington Coat Factory Litig., 114 F.3d at 1434*.

**E. IP Plaintiffs' Claims for Violations of Various States' Consumer Protection Laws**

IP Plaintiffs assert claims under California, Florida, Hawaii, Massachusetts, Montana, Nebraska, New Hampshire, New York, South Carolina, and Vermont consumer **[*88]** protection and unfair competition laws. As with IP Plaintiffs' antitrust claims under state law, Defendants argue that IP Plaintiffs lack standing to assert their consumer protection claims, except that under California law, because they "do not allege purchases in any of the 10 states other than California." (Sumitomo (IP Pl.'s) Br., 5). Defendants further argue that these claims should be dismissed because IP Plaintiffs do not plead them with particularity in accordance with *Federal Rule of Civil Procedure 9(b)*.

*i. Standing*

IP Plaintiffs' standing to sue under a state's consumer protection law is analogous to their standing under a state's antitrust law. As discussed in Point B, IP Plaintiffs' failure to tie their injuries or Defendants' unlawful conduct to a number of states was fatal to their standing to sue because the antitrust laws of those states require a showing that part of Defendants' conduct occurred or had an effect in-state. On the other hand, IP Plaintiffs have standing to sue under the antitrust laws that have no such requirement.

Similarly, many of the consumer protection and unfair competition laws asserted by IP Plaintiffs require that Defendants' unlawful conduct **[*89]** affect trade and commerce in the state under whose law they are suing, see *MCA 30-14-103*, *102* (Montana) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. . . . [T]rade or commerce [must] directly or indirectly affect[] the people of this state."); *MGLA §§ 93A 1*, 2 (Massachusetts) (same); *S.C. Code 1976 §§ 39-5-10, 20* (South Carolina) (same); *Neb. Rev. St. §§ 59-1602*, *1601* (Nebraska) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

Case 2:12-md-02311-SFC-RSW ECF No. 230-29, PageID.3314 Filed 07/13/12 Page 25 of 26

Page 24

2011 U.S. Dist. LEXIS 121373, *89; 2012-1 Trade Cas. (CCH) P77,878

commerce shall be unlawful. . . . Trade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."); *N.H. Rev. Stat. § 358-A:2* (New Hampshire) ("It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."); *N.Y. Gen. Bus. Law § 349* (New York) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."); *Sherman v. Ben & Jerry's Franchising, Inc., 08-CV-207, 2009 U.S. Dist. LEXIS 72663, 2009 WL 2462539, at *10 (D.Vt. Aug. 10, 2009)* **[*90]** (Out of state plaintiffs alleging out of state conduct do not have standing to sue under Vermont Consumer Fraud Protection Act), while others do not, see *F.S.A. 501.204, 501.211* (Florida); *HRS 480-2, 480-13* (Hawaii). [22]

> 22   Thus, contrary to Defendants' contention, the fact that IP Plaintiffs fail to allege that they reside or purchased an MgO product in a given state does not automatically deprive them of standing to sue under the state's consumer protection or unfair competition law. To be sure, the case Defendants cite in support of this contention held that the named plaintiffs in that case lacked standing to assert consumer protection and unfair competition claims under the laws of states in which they neither resided nor suffered an injury. See *In re Potash 667 F. Supp. 2d at 924*. However, the Court cannot accept this holding as a bright line rule. Standing issues are intimately bound up with the elements of the particular claim asserted, as a plaintiff must establish that his injury is "fairly traceable to the challenged action of the defendant." *Lujan, 504 U.S. at 560*; see also *Blum, 457 U.S. at 999* ("The **[*91]** complaining party must also show that he is within the class of persons who will be concretely affected."); *Allen, 468 U.S. at 752* ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

IP Plaintiffs' allegations that "Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes the above states, by affecting, fixing, controlling, and/or maintaining, at artificial and

noncompetitive levels, the prices at which MgO and MgO Products were sold, distributed, or obtained in those states;" "MgO price competition was restrained, suppressed, and eliminated throughout the states;" and "MgO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the states" (Indirect CAC ¶¶ 79, 81) are conclusory and do not tie their injuries to the alleged conspiracy's effect on trade and commerce in those specific states. Therefore, IP Plaintiffs' consumer protection claims under Montana, Massachusetts, Nebraska, New Hampshire, and New York law are dismissed for lack of standing.

### ii.  **[*92]** *Pleading Requirements*

The consumer protection laws of Florida and Hawaii--under which IP Plaintiffs currently maintain standing to sue--require that they plead the circumstances of any alleged fraudulent conduct with particularity in accordance with *Rule 9(b)*. See *Jovine v. Abbott Laboratories, Inc., 11-CV-80111, 795 F. Supp. 2d 1331, 2011 U.S. Dist. LEXIS 39702, 2011 WL 1376029 (S.D.Fla. Apr. 12, 2011)* (applying *Rule 9(b)* to allegations of unfair or deceptive acts or practices under the Florida Deceptive and Unfair Trade Practices Act); *Cannon v. U.S. Bank, NA, Civ. No. 11-00079, 2011 U.S. Dist. LEXIS 46455, 2011 WL 1637415, (D. Hawai'i Apr. 29, 2011)* (applying *Rule 9(b)* to allegations of fraudulent business practices under the Hawaii State Unfair and Deceptive Business Practices Act); *Athena Feminine Techs., Inc. v. Wilkes, No. C 10-4868, 2011 U.S. Dist. LEXIS 103209, 2011 WL 4079927 (N.D.Cal. Sept. 13, 2011)* ("[A] claim brought under the fraudulent prong of the [Unfair Competition Law] must be pled with particularity under *Rule 9(b)*").

IP Plaintiffs' allegations that "Defendants deliberately failed to disclose material facts to Plaintiff and the classes concerning Defendants' unlawful activities and artificially inflated prices for MgO and MgO Products," and "misrepresented to all consumers **[*93]** during the Class Period that Defendants' MgO prices were competitive and fair" (Indirect CAC ¶ 80); see also (Indirect CAC ¶ 83) (alleging "affirmative misrepresentations and omissions concerning the price of MgO") are not set forth with any measure of particularity. See *In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006)* (Under *Rule 9(b)*, a plaintiff must allege fraud with particularity by pleading the following: "(1) a specific false representation [or omission] of

2011 U.S. Dist. LEXIS 121373, *93; 2012-1 Trade Cas. (CCH) P77,878

material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." (quotations and citation omitted)). Accordingly, IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed to the extent they are premised on Defendants' fraudulent conduct. However, IP Plaintiffs are granted leave to amend their allegations to comply with the requirements of *Rule 9(b)*. Additionally, at this time, those claims may move forward to the extent they are premised on allegations of Defendants' **[*94]** engaging in unfair competition, as there is no indication that *Rule 9(b)* applies to such allegations.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED to the following extent only. The Court rules as follows:

(1) IP Plaintiffs' federal and state antitrust claims are dismissed without prejudice for lack of standing. IP Plaintiffs have thirty (30) days to amend their allegations to set forth (1) the specific products purchased containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets.

(2) IP Plaintiffs' antitrust claims under Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South

Dakota, Tennessee, Utah, and West Virginia law are dismissed with prejudice for lack of standing.

(3) Plaintiffs' federal and state antitrust claims are dismissed without prejudice as time-barred under the applicable statutes of limitations. Plaintiffs have thirty (30) days to amend their allegations of fraudulent concealment to equitably toll those **[*95]** statutes of limitations.

(4) IP Plaintiffs' consumer protection and unfair competition claims under Montana, Massachusetts, Nebraska, New Hampshire, and New York are dismissed with prejudice for lack of standing.

(5) IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed without prejudice to the extent they are premised on allegations of Defendants' fraudulent conduct. IP Plaintiffs have thirty (30) days to amend those allegations to comply with *Federal Rule of Civil Procedure 9(b)*.

The Court will enter an order implementing this opinion.

/s/ **Dickinson R. Debevoise**

DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: October 20, 2011