# EXHIBIT HH



Page 1

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

Only the Westlaw citation is currently available.

Superior Court of Maine.
Kenneth KAROFSKY, et al., Plaintiffs
v.
ABBOTT LABORATORIES, et al., Defendants.

No. CV-95-1009.
Oct. 16, 1997.

DECISION AND ORDER ON MOTION FOR CLASS CERTIFICATION
LEIGH I. SAUFLEY, Justice.

*1 Plaintiffs in this anti-trust proceeding have moved to certify a class pursuant to M.R. Civ. P. 23. The class sought to be certified is defined as follows: all individual consumers who purchased brand-named prescription drugs from retail drug stores and pharmacies in the State of Maine, which were manufactured, marketed and distributed, and directly or indirectly sold by defendants during the period commencing six years prior to the date of the Complaint and continuing through the present.

For the reasons set out below, plaintiffs' motion must be denied.

*I. PROCEDURAL BACKGROUND*
On November 3, 1995, plaintiffs Kenneth Karofsky (Karofsky) and Paul Cady (Cady) on behalf of themselves and all Other Similarly Situated Individuals filed a class action anti-trust complaint for declaratory judgment, injunctive relief [FN1] and damages in the Cumberland County Superior Court. Plaintiffs named twenty-four manufacturers and marketers of brand named prescription drugs (BNPDs) as defendants. In essence, plaintiffs claim that the manufacturers conspired to provide their products to certain "favored purchasers" at reduced or discounted rates and denied such discounted rates to retailers. Alleging that the overcharges caused by the conspiracy were passed on to plaintiff consumers, plaintiffs seek damages and attorneys fees on behalf of those consumers.

FN1. Effective July 14, 1994, the Legislature enacted 32 M.R.S.A. § 13801-805, entitled Non-discrimination in Pharmaceuticals Pricing, which requires equal access to manufacturers discounts. The Attorney General has not undertaken any enforcement action regarding that statute and has not sought to join in the pending proceeding.

By notice docketed December 15, 1995, defendants removed the matter to the United States District Court for the District of Maine, asserting diversity of citizenship. After hearing on plaintiffs' motion for remand, the federal court determined that plaintiffs had failed to satisfy the $50,000 jurisdictional amount in controversy requirement and remanded the matter to the Cumberland County Superior Court by order docketed March 15, 1996, (*Hornby, J*.).

Thereafter, discovery proceeded and plaintiffs filed their Motion for Class Certification on October 3, 1996. The parties submitted affidavits of experts in support of their relative positions and oral argument was held on February 6, 1997. Following oral argument, this court determined that the testimony of plaintiffs' expert would be necessary and helpful to a determination of the requisites of Rule 23. On May 29, 1997, a testimonial proceeding occurred at which both plaintiffs' and defendants' experts testified and were subject to cross-examination. Lead counsel for the parties then presented final oral argument to the court. Since the close of the record, the court has received supplemental pleadings regarding the applicability of the *AMCHEM* [FN2] decision to the proceedings at bar.

FN2. *AMCHEM Prods, Inc. v. Windsor*, 117 S.Ct. 2231 (1997).

This motion for class certification has been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

https://findprint.westlaw.com/print/printstream.aspx?prid=ia744b45b0000013872f3baeb27... 7/10/2012

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

vigorously contested by the defendants. The parties have extensively and capably briefed the issues and argued to the court. Discovery has been undertaken sufficient to address the motion and the court has been provided with the affidavits, testimony and exhibits of both parties' experts. This court has also had the benefit of decisions relating to identical claims and motions to certify nearly identical classes in other jurisdictions.

***2** During the May 1997 testimonial proceeding, defendants moved to strike, in full, the testimony of plaintiffs' expert, Dr. Michael Sattinger. Defendants alleged that Dr. Sattinger's analysis was based entirely on information related to "favored purchasers" who did not exist in the market in Maine during the six-year time frame at issue and therefore that his testimony and affidavit were irrelevant. The court took that matter under advisement along with the motion to certify the class.

*II. MOTION FOR CLASS CERTIFICATION*

A. General Standards for Certification of a Class

Pursuant to M.R. Civ. P. 23, a class may be certified where the plaintiffs demonstrate the following:

1. The class is so numerous the joinder of all of the members is impracticable;

2. There are questions of law or facts common to the class;

3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4. The representative parties will fairly and adequately protect the interests of the class.

M.R. Civ. P 23(a).

If the court is satisfied that all four of the Rule 23(a) prerequisites have been met, it must go on to determine whether the plaintiffs have demonstrated one of three additional prerequisites set out at Rule 23(b). The plaintiffs before this court rely on Rule 23(b)(3) to establish the appropriateness of class certification in this proceeding.

The Law Court has not had an opportunity to opine in detail regarding the prerequisites to class certification. Maine's Rule 23 is patterned on the federal rule [FN3] and both federal and state courts have discussed and expounded upon the federal rule. Not surprisingly, the approaches taken are occasionally inconsistent. The purpose of class certification, however, has been universally recognized.

FN3. Fed.R.Civ.P. 23.

The class action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only'. Class relief is 'particularly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.' For in such cases, 'the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23 .' *General Tel. Co. Of Southwest v. Falcon,* 457 U.S. 147, 155 (1982)(quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-701 (1979)).

Particularly in the private enforcement of antitrust actions, class certification enhances "the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 266 (1972).

Pursuit of economic redress through the mechanism of class certification carries with it the reality that certain approaches to proof must either be relaxed or reworked in order for the certification of the class to have meaning in the context of litigation of economic injury. It is perhaps because of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

this unique aspect of class action suits that some of the standards for certification of a class appear to be internally contradictory.

**\*3** The determination of class certification is committed to the broad discretion of the trial court. *Anderson v. City of Albuquerque,* 690 F.2d 796, 799 (10th Cir.1982). The plaintiffs have the burden to demonstrate under a "strict burden of proof" that the requirements of Rule 23 have been satisfied. *Rex v. Owens Ex rel State of Oklahoma,* 585 F.2d 432, 435 (10th Cir.1978). However, it is frequently held that the benefit of doubt regarding certification of the class must favor certification. *See, In re Infant Formula Antitrust Litig.,* 1992 WL 503465, at \*3 (N.D.Fla. Jan. 13, 1992) and cases cited therein.

The motion justice must not evaluate or decide the merits of plaintiffs' claims, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-178 (1974), and the allegations set out in the complaint are to be taken as true for purposes of determining whether a class should be certified. *Guenther v. Pacific Telcom, Inc.,* 123 F.R.D. 333, 335 (D.Or.1988); *Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). And yet, the motion justice must look beyond the bald allegations of the complaint and review the facts procured through discovery in undertaking the review of plaintiff's proffered facts. *Liberty Lincoln Mercury v. Ford Mktg,* 149 F.R.D. 65, 73, (D.N.J.1993)(citing *Peil v. National Semiconductor Corp.,* 86 F.R.D. 357, 368 (E.D.Pa.1980)).

Similarly, while the motion justice may not engage in an analysis of the credibility or persuasiveness of the parties' proffered proof, *Eisen v. Carlisle & Jacqueline,* 417 U.S. at 178, he or she must fully "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). The motion justices must ultimately undertake a "rigorous analysis" of whether the proposed class satisfies the requirements of Rule 23. See, *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982). This analysis may well require the court to understand and consider evidence which goes to the requirements of Rule 23 even though that same evidence relates to the merits of the plaintiffs claims. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir.1992).

It is incumbent, then, on this court to walk the fine line between a rigorous analysis of the basic claims and method of proof presented by the plaintiffs and the inappropriate delving into an assessment of the merits of those claims. Ultimately, this court must be convinced that plaintiffs have, in fact, met their burden, by a preponderance of the evidence, of demonstrating each of the requisites to Rule 23(a) and 23(b)(3). With this background, the court turns to the substantive law providing the basis of plaintiffs' claims and the methods of proof proposed by the plaintiffs.

B. Applicable Substantive Law: Maine's Anti-Trust Statute

**\*4** Plaintiffs, indirect purchasers of brand name prescription drugs, bring this action under the Maine Trade Regulation Law of 1954, 10 M.R.S.A. § 1101-109 (Anti-Trust Statute).[FN4] Specifically, plaintiffs allege that the defendant drug manufacturers horizontally and vertically conspired to fix, raise, maintain or stabilize prices charged to certain "favored purchasers" which prices were not available to the pharmacies from which plaintiffs purchase their prescription drugs.

> FN4. Plaintiffs as *indirect* purchasers cannot, and do not assert any claims under the federal Sherman Act. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 730-31 (1977) (holding only direct purchasers have standing to sue an alleged price fixer under the Sherman Act).

The Maine Anti-Trust Statute parallels the Sherman Act. *Tri-State Rubbish v. Waste Mgmt,* 998 F.2d 1073, 1081 (1st Cir.1993).[FN5] It is well established that, to prevail on a price-fixing claim a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

plaintiff must demonstrate: (1) an anti-trust violation, (2) proof of a resultant injury to the plaintiffs, (sometimes referred to as "fact of injury," "impact," or "causation"), and (3) the damages sustained by plaintiffs. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9 (1969), rev'd on other grounds, 401 U.S. 321 (1971); *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 693-4 (D.Minn.1995).

> FN5. The Sherman Act, 15 U.S.C.A. §§ 1-7 (1997), was expanded by the Clayton Act, 15 U.S.C.A. §§ 12-27(1997), to include a private cause of action for antitrust violations. The Maine antitrust statute is often referred to as the "mini-Sherman act." *State of Maine v. McCain Foods Ltd., No. CV-87-342,* 1987 WL 119744 (Me.Super.Dec. 11, 1987).

C. Motion to Strike Testimony of Dr. Michael J. Sattinger

Dr. Sattinger was retained by the plaintiffs primarily to address the second and third element of their antitrust claim. His role was to determine whether the class suffered injury in the form of paying higher prices for BNPDs, and to determine whether there exist damage methodologies to estimate the damage to class members.[FN6] Dr. Sattinger's original affidavit in this matter defines favored purchasers to include HMO's (Health Management Organizations) with inhouse pharmacies and mail order pharmacies.[FN7]

> FN6. Tr. of May 29, 1997, proceeding, at 140.

> FN7. Sattinger Aff. of 9/12/96, ¶ 12.

When pressed in the course of discovery to disclose the definition of favored purchasers on which plaintiffs intended to rely at trial, plaintiffs responded in an interrogatory that favored purchasers include IPA model HMO's, PBM's (Pharmaceutical Benefit Managers), nursing home pharmacies, and PPO's (Preferred Provider Organizations). At the hearing on May 29, 1997, plaintiffs' counsel clarified that the only favored purchasers to which Dr. Sattinger had applied his expertise are mail order pharmacies.[FN8] Plaintiffs' counsel further clarified at the hearing that the response to the interrogatory was the result of "an overly broad statement and a lawyer drafted interrogatory answer and we'll correct that."[FN9]

> FN8. Tr. of May 29, 1997, proceeding, at 154.

> FN9. *Id.* at 153.

Dr. Sattinger's affidavit and opinion in this matter are directly applicable only to those circumstances in which mail order pharmacies were present in Maine and operating as "favored purchasers." Defendants, arguing that the significantly limited foundation upon which Dr. Sattinger has based his testimony renders it irrelevant, have moved to strike the testimony in its entirety.

This court concludes that Dr. Sattinger's testimony is relevant, not to demonstrate the specific results that would be obtained if the studies suggested by the doctor were undertaken, but rather to demonstrate to the court generally that there are existing methodologies by which the plaintiffs could provide class-wide evidence as to impact (fact of injury) and damages. Although the efforts Dr. Sattinger has undertaken to date have limited applicability to the actual BNPD market in Maine, his opinions regarding economic theory and technique to be applied to the problem remain relevant to the issue before the court, at least to the extent that they provide the court with an outline of plaintiffs' proposed method of proof of those two relevant facts. Therefore, defendants' motion to strike must be denied.

D. Facts Alleged by Plaintiffs

***5** Plaintiffs assert the following facts in support of their Motion to Certify the Class. The manufacturer defendants have collectively implemented a multi-tiered, industry wide pricing system,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

whereby independent and chain pharmacies, and ultimately consumers, have paid supra competitive prices for brand name drugs.[FN10] According to plaintiffs, each manufacturer has been able to charge significantly more to independent and chain pharmacies than to "favored purchasers."[FN11] Plaintiffs allege that such price discrepancies are not related to volume or other economic justifications.[FN12] Plaintiffs assert that the higher costs paid by the non-favored purchasers are ultimately passed through by the independent and chain pharmacies to the Maine consumers who would make up the class.[FN13]

    [FN10]. Complaint ¶¶ 7-10, 59-93.

    [FN11]. *Id.* ¶¶ 7-8, 57-89.

    [FN12]. *Id.* ¶¶ 8, 80.

    [FN13]. *Id.* ¶¶ 10, 70-71 and 89.

As previously set out, at trial, plaintiffs must demonstrate the existence of a conspiracy or price fixing scheme, the fact of injury to the indirect purchasers, and the damages suffered. The focus of the parties' argument and submissions to the court regarding certification of the class has been on the assertion that the putative class members have, in fact, suffered an injury as a result of the conspiracy. Whether or not the higher costs, assumed for purposes of this analysis to have occurred, have been passed on to those indirect purchasers of the manufacturers' product is therefore the focal point upon which much of this court's analysis must turn. Unless there has been a "pass on" of the allegedly higher costs to Maine consumers, those consumers have not been injured, and no claim will lie.

In support of their motion, plaintiffs rely in great part on the affidavit and testimony of Dr. Sattinger. Dr. Sattinger is a professor of economics at the State University of New York at Albany. He avers that the fact of injury to members of the class "can be demonstrated by showing that the conspiracy as alleged in the complaint resulted in an overcharge to retail pharmacies in the State of Maine and at least *some portion* of this overcharge was passed on to retail purchasers of BNPDs."[FN14]

    [FN14]. Sattinger Aff. of 9/12/96, ¶ 10.

Dr. Sattinger proposes two methods of demonstrating the injury to the indirect purchasers. The first method would consider the "optimal pharmacy response." This theory assumes that the pharmacy would act to maximize its profits at all times and will respond directly and immediately to increases in acquisition costs. In general terms, this theory assumes that the pharmacies' optimal response to an increased cost of acquisition is simply to raise its prices. The theory therefore assumes within its hypothesis that the pass on always occurs in some amount. The theory is based entirely on economic models and theories, and it does not incorporate specific empirical data.

The second method proposed by Dr. Sattinger for establishing that the retail pharmacies passed on overcharges to the indirect purchasers is statistical regression analysis. Regression analysis is a commonly used "statistical tool that attempts to isolate and measure the effect of one variable on another variable in interest."[FN15] Dr. Sattinger would use regression analysis to "make a determination of what the isolated affect of acquisition costs are on the prices charged by retail pharmacies [to Maine consumers]."[FN16] While there is no dispute between the parties' experts that regression analysis is a statistical technique that has been useful and relied upon by economic theorists in other generalized or academic contexts, the defendants vigorously dispute the efficacy of such an analysis to demonstrate the fact of injury to class members. The dispute over the use of this technique is addressed further in the following sections, most specifically in the analysis under 23(b)(3).

    [FN15]. Tr. of May 29, 1997, proceeding, at 159 (testimony of Dr. Snyder).

    [FN16]. *Id.* at 16 (testimony of Dr. Sat-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

tinger).

III. DISCUSSION

A. Rule 23(a)

1. Rule 23(a)(1)-Numerosity

   ***6** Defendants do not seriously dispute that the numerosity requisite for class certification has been satisfied. Where numerosity is a close question, the courts typically will find that numerosity exists and that a later decertification can occur if certification was determined to have been erroneous. *See, e.g. Evans v. U.S. Pipe and Foundry Co.,* 696 F.2d 925, 930 (11th Cir.1983). Here, the numerosity question is not a close one. A class encompassing all persons who have purchased any brand name prescription drug from a Maine pharmacy within the past six years would encompass thousands of individuals.[FN17] This court concludes that joinder of all class members is impracticable and therefore the numerosity requirement of Rule 23(a)(1) has been met.

> FN17. Indeed, this judge would be a member of the class. This fact was disclosed to all counsel at the first oral argument on the motion for class certification. After an opportunity to consult with their clients, no counsel objected to this court's presiding over the matter. From a practical perspective, it would be extremely difficult to locate any judge in the State of Maine who had not purchased a brand name prescription drug at some time within the past six years.

2. Rule 23(a)(1)-Commonality of Questions of Law or Fact

   It is not necessary under the commonality requirement for plaintiffs to demonstrate that identical questions of law or fact are common to the class. The focus with regard to this requisite is on commonality of liability. It has been held in a number of cases that proof of a conspiracy, which is the linchpin of liability in any anti-trust proceeding, is itself sufficient to satisfy the commonality requirement. *In Re Folding Carton Antitrust Litig.,* 75 F.R.D. 727, 731 (N.D.Ill.1977).

   The commonality requirement of Rule 23(a)(2) overlaps with, but is distinguishable in several aspects from, the predominance requirement of Rule 23(b)(3). Although sometimes intermingled in analysis, the commonality requirement focuses primarily on issues of the antitrust violation and does not require the court to determine either predominance of that issue over others or to undertake an in depth analysis of disparate claims or defenses that might be presented. Commonality does not require a finding "that every question of law or fact [is] common to every member of the class." *Beebe v. Pacific Realty Trust,* 99 F.R.D. 60, 65 (D.Or.1983). Where, as here, the plaintiffs' claims set forth a single common claim of an illegal price-fixing scheme, "[n]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 509 (S.D.N.Y., 1996).[FN18] This court concludes that plaintiffs have demonstrated commonality.

> FN18. *See also, Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,* 116 F.R.D. 384, 386 (E.D.Cal.1986); *In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 324 (E.D.N.Y.1982); *In re South Cent. States Bakery Prods Litig.,* 86 F.R.D. 407, 415 (M.D.La.1980); *In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322, 335 (E.D.Pa.1976); *Illinois v. Harper & Row Publishers, Inc.,* 301 F.Supp. 484, 486 (N.D.Ill.1969).

3. Rule 23(a)(3)-Typicality

   A claim by a representative party may not be pressed on behalf of the class unless it is "typical"; that is, one which should reasonably be expected to be raised by members of the proposed class. Where it is alleged that the defendants have engaged in a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

common scheme relative to all members of the class, courts have determined that there is a strong presumption that the claims of the representative parties will be "typical" of the class members. *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3rd Cir.1985). Typicality does not mean that the claims of class members must be identical. *Id.; Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984).

**\*7** The requirement of "typicality" overlaps considerably with the predominance issue of 23(b)(3), and the adequacy of representation of 23(a)(4). The typicality requirement, however, focuses on the similarity of legal theory upon which plaintiffs' claim rests. It has been held that a strong similarity of legal theory will satisfy typicality requirements even where substantial factual differences exist. *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985). The typicality requirement does not require that all members of a proposed class pay the same amount or use similar purchase methods. *In re Potash Antitrust Litig.,* 159 F.R.D. at 690-91.[FN19] In general, differences in the methods of purchase or the type of the product purchased will not bar a finding of typicality. See, 1 Newberg on Class Actions § 3.13, 3-79, n. 208. As noted by the *Potash* court, anti-trust claims are usually found to satisfy Rule 23(a)(3)'s typicality requirement. *In re Potash,* at 688.[FN20]

> FN19. *See also, Id.* at 691 n. 11
>
> FN20. Although the *Potash* court, along with several others referenced in this court's analysis of the Rule 23(a) requisites, were not called upon to certify indirect purchaser classes, their analyses provide useful guidance in the 23(a) considerations.

In general terms, plaintiffs Karofsky and Cady assert that when they purchased BNPDs in Maine from retailers who had purchase those drugs at anti-competitive prices, they paid more for the drugs than they would have absent the conspiracy, and therefore were harmed by the action of the manufacturer defendants. The legal theory upon which they base their claim is found entirely in the standards set out in Maine's anti-trust statute. Although there would, without dispute, be factual differences between and among the individual plaintiffs and the class plaintiffs, with regard to the drugs purchased, the retailer from which the drugs were purchased, market conditions under which the purchase may have occurred, and the methods of purchase, such individual factual differences, although relevant to other considerations on class certification, do not defeat a determination of typicality.

This court determines that the plaintiffs have met their burden in demonstrating that the individual plaintiffs are typical of the members of the proposed class.

4. Rule 23(a)(4)-Adequacy of Representation
In order to prevail in their demonstration that they are adequate representatives of the class, plaintiffs must demonstrate that "(1) the representatives and their attorneys are able and willing to prosecute the action completely and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *In re Potash Antitrust Litig.* 159 F.R.D. at 692 (citations omitted); *General Tel. Co.* 457 U.S. at 157, n. 13. Plaintiffs' counsel have demonstrated both a willingness and an ability to vigorously and competently pursue the claims against the defendants. There can be no question that counsel before this court are experienced in both the subject matter of this litigation and in the process of class certification itself. Counsel have demonstrated an ability to address the issues articulately, and to respond to the defendants' counsels' equally skilled defense in this matter. Defendants do not seriously dispute the competence and ability of plaintiffs' counsel to pursue the litigation.

**\*8** Defendants do, however, challenge the ability of the individual plaintiffs to act as representatives of the class. Specifically, defendants refer to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

the depositions of Karofsky and Cady in which it is made clear that neither of the individual plaintiffs have any meaningful financial stake in the case, that the individual plaintiffs have not necessarily met or dealt with Maine counsel for plaintiff and that the individual plaintiffs were unaware of several developments in this case and others in which they had been named as intervenor plaintiffs. In addition, the defendants argue that the named plaintiffs' method of purchase may put them at odds with the interests of the other class members.

Defendants' assertions regarding the individual plaintiffs cannot lightly be set aside. One of the roles of the individual plaintiffs has traditionally been oversight of counsel. A plaintiff who is unfamiliar with the substance of the litigation and has no financial stake whatsoever in the proceedings may be of little value in this role. As the court noted in *Rolex Employees Retirement Trust v. Mentor Graphics,* 136 F.R.D. 658 (D.Or.1991), "[t]o satisfy Rule 23(a)(4), the named representative of a class must be in a position to 'check the otherwise unfettered discretion of counsel in prosecuting this suit,' not only with respect to the facts of the case but also with respect to the economic consequences of the suit." *Id.* at 666 (quoting *Weisman v. Darneille,* 78 F.R.D. 669, 671 (S.D.N.Y.1978)). "If the representative client is not financially responsible, the attorneys have free rein over the prosecution of the action. *In Re Mid-Atlantic Toyota Antitrust Litig.,* 93 F.R.D. 485, 490 (D.Md.1982). This is tantamount to the unacceptable situation of the attorney being a member of the class of litigants while serving as class counsel.' *Id." Id.*

Other courts, however, have determined that it is not imperative that the individual plaintiffs be sophisticated and aware of the legal issues involved. "An anti-trust litigant is not expected to appreciate the finer points of [the applicable law] or the ... Rules of Civil Procedure governing class action certification. To require the class representative to be sophisticated and knowledgeable enough to help counsel in this quest would reduce the class action device, especially in complicated antitrust cases, to an impotent tool." ' *In re Catfish Antitrust Litig.,* 826 F.Supp. at 1037(quoting *Chevalier v. Baird Sav. Ass'n,* 72 F.R.D. 140, 146 (E.D.Pa.1976) ). In fact, it will often be the case that individual plaintiffs alleged to have been injured are not likely to be sophisticated users of the court system and are equally unlikely to have the financial wherewithal to sponsor litigation costs. If the inability to undertake significant financial responsibility, or the need to be sophisticated in issues of anti-trust litigation, were a complete bar to the ability of an individual to represent a class, Rule 23 would become meaningless in many circumstances.

**\*9** Cady, a computer programmer, has purchased a variety of BNPDs over the last several years at a number of different retail pharmacies. Karofsky has owned and sold several businesses and has now retired to Maine. He has also purchased BNPD's from retail pharmacies in southern Maine over the last several years. Both disclaim financial responsibility for costs of the suit. Both were solicited to act as named plaintiffs. Neither sought out counsel to enforce their rights or to redress an injury. Although neither plaintiff is intimately familiar with the details of the litigation, this court concludes that both are sufficiently aware of the issues to act as representatives of the class so long as their interests do not conflict with those of the class.

The facts specific to Cady's and Karofsky's purchases of BNPDs, however, could place them in a position antagonistic to the other class members. Both of the named plaintiffs purchased BNPDs with a prescription drug card through PCS Health Systems, Inc. (PCS). Each plaintiff appears to have a different health benefit plan, but both purchased BNPDs by the use of their PCS card. Karofsky pays a "co-pay," and Cady receives a discounted price by presenting his card. Both plaintiffs believe that the use of their cards ultimately allowed them to purchase BNPDs at more favorable prices.[FN21] If

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

the named plaintiffs have received the benefit of the favored purchasers' prices in whole or in part, their motivation and method of litigating could conflict significantly with that of other class members who purchased BNPDs through other means.[FN22]

> FN21. Karofsky Dep. at 81; Cady Dep. at 23, 24.

> FN22. Plaintiffs assert that the collateral source rule prevents defendants from inquiring into the amount paid by PCS on their behalf. In adopting the collateral source rule in Maine, the Law court accepted the policy set out by the 9th Circuit. "The philosophy underlying the Collateral Source Rule seems to be that either the injured party or the tort feasor is going to receive a windfall ... and ... it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tortfeasor." *Werner v. Lane,* 393 A.2d 1329, 1335 (Me.1978)(quoting *Olivas v. U.S.,* 506 F.2d 1158, 1163-1164 (9th Cir.1974)). If defendants' proffered evidence suggests that PCS received the prices of a favored purchaser, it may be argued that neither PCS nor the named plaintiff have suffered any harm. Under such circumstances the Collateral Source Rule may have no applicability. All such arguments would likely occur on an individualized basis.

The potential for conflict, which exists here, may preclude certification of the class, *Cutler v. Lewiston Daily Sun,* 611 F.Supp. 746, 756 (D.Me.1985). However, at this stage of the proceeding, this court would not deny certification solely on that basis. After further development of the record, if the conflict becomes clear and outweighs other commonalities with class members, the class could be decertified. If the predominance issue were not a bar to class certification, the court would be inclined to conclude that the plaintiffs have *preliminarily,* although tentatively, demonstrated adequacy of representation.[FN23] For purposes of this analysis, therefore, it is determined that plaintiffs have, at least preliminarily, prevailed on Rule 23(a) requisites.

> FN23. If the trial court determines that a class has been improperly certified, it may decertify the class at any appropriate time. *Evans v. U.S. Pipe and Foundry Co.,* 696 F.2d 925, 930 (11th Cir.1983).

B. Rule 23(b)(3), predominance and manageability

Because the court concludes that the plaintiffs meet their burden as to Rule 23(a) at this stage of the proceedings, the focus now turns to the requirements of Rule 23(b)(3). Rule 23(b)(3) requires that the court find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In determining whether the standards set forth in Rule 23(b)(3) have been met, the court is directed by the Rule to consider the following:

**\*10** (A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) The desirability or undesirability of concentrating the litigation of the claims in a particular forum; and

(D) The difficulties likely to be encountered in the management of a class action.

The defendants assert that individual questions regarding both the alleged violation of the antitrust laws and the fact of injury or impact will predominate over other common questions of law or fact and that the evidence relevant on both issues will be so diverse and individualized that the matter will be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

unmanageable as a class action. Although the court and counsel have focused on the element of impact (or "fact of injury") in discussions regarding predominance and manageability, the court must also be satisfied that plaintiffs have a colorable class-wide method of proving the anti-trust violation which will not be overwhelmed by individualized proof.

1. Predominance

The mere fact that plaintiffs have alleged a conspiracy in violation of the State anti-trust provisions will not on its own allow a conclusion that common questions will predominate on this element. *See Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 321 (5th Cir.1978); *In Re Hotel Tel. Charges,* 500 F.2d 86, 89 (9th Cir.1974). The court must analyze the proposed method of proof to assure that common issues will predominate.

Plaintiffs claim that the twenty-four manufacturer defendants, responsible for hundreds of different BNPDs, engaged in a conspiracy to deny discount opportunities to retail pharmacies. Defendants assert that the complexity in marketing of BNPDs would result in predominance of proof related to individual manufacturers' actions over that of a generalized conspiracy. It is defendants' position that the variability in the pricing structures of the individual products, the variety of rebates, discounts, the market forces at work, the retailers willingness or ability to make use of discounts or rebates, and the sheer number of retailers involved would preclude common proof of a conspiracy.

This court is not persuaded that the complexity of the market itself or the number of different approaches to pricing demonstrates that individual issues will predominate in the proof of violation.[FN24] "[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." *In Re Folding Carton Antitrust Litig.,* 75 F.R.D. 727, 734 (N.D.Ill.1977). Indeed, it is the entirety of the actions of those manufacturers alleged to have engaged in the illegal pricing scheme that would or could demonstrate the conspiracy. Therefore, at least as to the presentation of evidence on the alleged antitrust violation, common issues would predominate.

> FN24. Courts have had little difficulty concluding that, notwithstanding the complexity of a particular area of marketing, the proof of liability, that is, proof of a conspiracy to fix prices, can be presented through a common proof. *See, e.g., In Re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1039 (N.D.Miss.1993).

**\*11** The true heart of the issue at bar is plaintiffs' proposed proof of impact. It is important to distinguish here between proof of impact and proof of amount of damages. While damages, of necessity, may be subject to individualized proof without precluding certification of the class, impact may not.[FN25] As has been noted by other courts, "[p]roof of 'impact' is not only essential to demonstrating defendants' liability under the antitrust laws, it is also the key element in determining whether common issues will predominate." *In Re Domestic Air Transp.,* 137 F.R.D. 677, 689 (N.D.Ga.1991).

> FN25. Individualized proof of damages is almost unavoidable in class action matters, and courts addressing this issue in direct purchaser antitrust litigation have "consistently and firmly adhered to the principle that once liability has been demonstrated, complexity or uncertainty as to the amount of damages will not preclude recovery." *In re Folding Carton Antitrust Litig.,* 75 F.R.D. 727, 735 (N.D.Ill.1977). *See, e.g., In re Potash Antitrust Litigation,* 159 F.R.D. at 694-95; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.,* 191 Cal.App. 3rd 1341, 1349 n. 7 (1987)("Courts and commentators have taken great pains to point out that injury or 'fact of damages,' which must be proven on a class-wide basis, is separate and distinct from the is-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

Page 11

sue of actual damages.")

A key distinction between the matter at bar and many of the decisions upon which plaintiffs rely is the distinction between the proof of impact on a direct purchaser and proof of impact on those who have purchased indirectly.[FN26] Proof of impact has been far more troubling for plaintiffs proposing class certification of indirect purchasers. Because indirect purchasers must demonstrate that any overcharges resulting from the illegal action of the defendants have been passed on to them, an entirely separate level of evidence and proof is injected into litigation of indirect purchaser claims.[FN27] Proof of an antitrust conspiracy may logically lead to a conclusion that the subject of the conspiracy, the retailers, have each been harmed. No such conclusion logically follows without specific proof tracing that overcharge on to consumers. It is this additional level of proof, added to the already extraordinary level of complexity of market issues, that has been the focus of all courts asked to certify classes similar to the one pending before this court.

> FN26. Where the class to be certified is a direct purchaser class, some courts have engaged in a presumption that direct purchasers are injured by a price-fixing conspiracy. *In Re Catfish Antitrust Litig.,* 826 F.Supp. at 1041 (citing *In Re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 327 (E.D.N.Y.1982)).

> FN27. Although not dispositive of this proceeding, plaintiffs and the proposed class are in many circumstances separated by not one but two tiers from the defendant manufacturers. In most circumstances, BN-PD manufacturers provide the drugs to a wholesaler who then sells them to the local retailer from whom the individual consumer will then purchase the drugs. In other litigation, it has been argued that the wholesalers are entirely controlled and captive to the manufacturers. Therefore, in most of the brand named drug litigation occurring, the consumers are treated as the first indirect purchaser.

At least five other courts have confronted the issue. Three of those courts, including the Federal District Court in which the multi-district litigation (MDL) regarding pharmaceutical pricing is pending, have concluded that individual issues will predominate over class wide issues and that the class would be unmanageable. *Wood v.. Abbott Laboratories,* No. 96-512561-CZ (Oakland Co, Mich. Sept. 15, 1997)(finding that individual issues as to both injury and damages predominate over the conspiracy theory common to the class); *Kerr v. Abbott Labs.,* No. 96-002837, 1997 WL 314419, (Hennepin Co, Minn. Feb. 14, 1997)(finding that "tracing individualized transactions through the complex distribution network of the brand-name prescription drug industry would clearly cause individual questions of fact to predominate over questions common to the proposed class"); and *In re Brand Name Prescription Drug Antitrust Litig.,* 1994 WL 663590 (N.D.Ill., Nov. 18, 1994) (certifying the direct purchaser class of retailers, but declining to certify the indirect consumer class).

One court granted the motion to certify the class based on legislation unique in that jurisdiction. *See, Goda v. Abbott Labs,* No. 01445-96, 1997 WL 156541 (D.C.Super.Feb. 3, 1997). In contrast to Maine and most other states, the District of Columbia finessed the proof of impact problem by creating a statutorily prescribed presumption of injury for indirect purchasers.[FN28] That legislation goes a significant step beyond that which has been enacted here or elsewhere in specifically eliminating the requirement that the plaintiffs prove the fact of injury to the individual plaintiffs.

> FN28. Following the decision in *Illinois Brick,* Congress attempted unsuccessfully on many occasions to amend the Sherman Act to allow for indirect purchaser claims. (See, Lee J. Potter, Kansas and Missouri v. Utilicorp United, Inc.: *The Supreme Court Applies the Illinois Brick Rule to Regu-*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

lated Utilities, 69 N.C. L.Rev. 1041, 1059 n. 142 (1991)). In 1989, the Supreme Court clarified the right of individual states to enact anti-trust legislation allowing a right of action for indirect purchasers. *California v. ARC America Corp.,* 490 U.S. 93, 98 n. 3 (1989). Immediately following the Court's decision in *ARC America,* many states, including Maine, amended their own anti-trust statutes to provide such an express right of action for indirect purchasers. See, 10 M.R.S.A. § 1104(1).

**\*12** In any class action brought under this section by purchasers or sellers, *the fact of injury* and the amount of damages sustained by members of the class may be proven on a class wide basis, *without requiring proof of such damages by each individual member* of the class.
D.C.Code Ann. § 28-4508(c) (1996). (emphasis added).

That provision was pivotal in the Superior Court's decision to certify a class of consumers in an anti-trust case based on claims identical to those of plaintiffs herein. The court acknowledge the difficulties presented by indirect purchaser cases, noting that "[w]e are in the domain of *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), beset by the quandaries involved in tracing the effects of alleged conspiratorial overcharges down the relevant line of distribution through successive purchasers who may or may not have passed on the overcharge in whole or in part." *Goda,* 1997 WL 156541, at \*1. The court ultimately certified the class of BNPD purchasers, with heavy emphasis on § 28-4508(c). *Id.* at \*10.[FN29]

> FN29. *See also, Preciado v. Abbott Labs.,* No. 962294 (San Francisco Co, Cal. Aug. 16, 1995)(certifying class with no reasoned analysis).

No such legislative circumvention of the necessity of proof of impact has occurred in Maine.[FN30] Plaintiffs' proposed evidence on the issue of impact differs little if at all from the proof offered in the other jurisdictions that have declined to certify the class. After considering the arguments of counsel, the affidavits of plaintiffs' expert, the testimony of plaintiffs' expert, and the other evidence and exhibits offered in support of a colorable approach to class wide proof of impact, this court is similarly unpersuaded that questions of law or fact on the element of impact will predominate over individualized proof.

> FN30. The Statement of Fact accompanying Maine's "Illinois Brick Repealer" contains the following language:
>
> This bill amends Maine law to provide Maine citizens and corporations with a right to sue a manufacturer *for damages suffered* as a result of the manufacturers violation of state anti-trust laws, regardless of whether the citizens or corporations are direct or indirect purchasers from the defendant. (emphasis added).

There are two flaws in the method of proof offered by plaintiffs. First, plaintiffs have failed to persuade this court that Dr. Sattinger's class wide proposed proof is even possible; and second, Dr. Sattinger himself concedes that the method by which he would propose to offer proof of fact of injury would likely have to be broken down into a number of distinct and individualized formulas, thereby defeating the very effort at demonstrating common class wide proof of injury.

Addressing first the difficulties with Dr. Sattinger's approach in general, the court will focus on the technique referred to as a regression analysis.[FN31] Dr. Sattinger proposes to undertake a regression analysis by which he would measure the affect of the change in acquisition cost on the retail charges to Maine consumers. As he explained: "What you get out of the regression is a range within which the true value of the pass-on rate falls with a particular likelihood." [FN32] Dr Sattinger testified that he had not yet undertaken such an analysis with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

regard to Maine data [FN33] and that he had only completed a regression analysis in circumstances such as this in one other proceeding. In that case, the regression was applied to only one retailer. Dr. Sattinger concluded that the work there had not produced empirically valid results and that he would not rely on the results obtained there.[FN34] Such evidence would obviously not be admissible at trial.

> FN31. The optimum response theory has not been pressed by plaintiffs and has not been relied on seriously in other courts. Because it assumes the impact without any reference to Maine data, it is of limited use.
>
> FN32. *Id.,* at 118.
>
> FN33. Tr. of May 29, 1997 proceeding, at 98.
>
> FN34. *Id.* at 98.

**\*13** Although plaintiffs have attempted through the expertise of Dr. Sattinger to propose a method of class wide proof of impact, the proposals presented by Dr. Sattinger fall far short of demonstrating that a specific, class wide approach to impact even exists. Courts have been cautioned against allowing certification of a class where plaintiffs' suggested method of proof remains so uncertain. Where the court has concluded, on substantial evidence presented by the plaintiffs, "that there are serious problems now appearing, it should not certify the class merely on the assurance of counsel [or the expert] that some solution will be found." *Windham,* 555 F.2d at 70.

While this court is aware that its review of the proposed approach of Dr. Sattinger may be seen as coming close to an evaluation of its persuasiveness or credibility, in fact, the proffered proof falls so far short of demonstrating a colorable approach to class wide evidence on impact that the court must discount it, even at this stage of the proceeding. As the Law Court has recently confirmed, an expert may not give evidence simply because he or she is presented as an expert. The expert's opinion must not rest on " 'surmise or conjecture.' " *Green v. Cessna Aircraft Co.,* 673 A.2d 216, 218 (Me.1996) (quoting *Parker v. Hohman,* 250 A.2d 698, 702 (Me.1969)). Dr. Sattinger suggests that regression analysis *could* provide a method for class wide proof of impact. However, he has not undertaken even a preliminary regression analysis on any Maine pharmacy. His previous efforts in other jurisdictions have not provided evidence that could be offered at a trial. He cannot say that a regression analysis undertaken here (or, more likely, the multiple analyses necessary to the facts in Maine) would be any more likely to yield a result that would be sufficiently reliable as to be admissible at trial.

The second difficulty presented by the plaintiffs' proposed evidence on the fact of injury can be found within Dr. Sattinger's testimony as well. Even if the court were convinced that the plaintiffs should be allowed to pursue the suggestions their expert, it would not eliminate the necessity for evidence of a multitude of individualized facts. Dr. Sattinger has not at this point determined whether pass on varies drug by drug or retailer by retailer. In addition, he has not run any of the regression analyses on Maine data to determine whether the time or geography of the sale affects pass on. He opined that some retailers may not have passed on increases at all in some instances,[FN35] that there could be different rates of pass on for different retailers,[FN36] and that different rates could result from the differing profit margins of the product or the retailer.[FN37]

> FN35. *Id.* at 109-110.
>
> FN36. *Id.* at 113.
>
> FN37. *Id.*

From his proposed regression analysis, Dr. Sattinger would obtain a number representing the best

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

estimate of a pass on rate. That best estimate would only apply to the data used to estimate it. Different data would likely be necessary for each of the different pharmacies, products, distinct time frames, or possibly even methods of purchase. He agreed that it may be necessary to do hundreds of different regressions.[FN38] Following each such regression, there could be challenges to the validity of each calculation.[FN39]

> FN38. *Id.* at p. 126.
>
> FN39. Defendants' expert opined, and plaintiffs did not dispute, that there has been a "huge variation" in the actions and decisions of Maine's pharmacies with respect to passing on. *Id.* at 163, 164.

**\*14** Finally, even if this court were inclined to allow Dr. Sattinger to develop the necessary regressions after gathering the Maine specific data, and to attempt from those regressions to develop a class wide estimate of pass on, this court would still conclude that the individual issues regarding impact or fact of injury would predominate over the class wide issues. The defendants in this matter are entitled to challenge plaintiffs' evidence and present evidence of their own with regard to each of the elements plaintiffs must prove in order to meet their burden. In particular, the twenty-four individual defendants would each have the opportunity to present specific evidence regarding the facts of the alleged overcharge to the retailers and the circumstances under which customers purchased BNPDs after the overcharge had occurred.

The predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy ..." *AMCHEM Prods, Inc. v. Windsor,* 117 S.Ct. at 2231 Those legal and factual questions will be separate and individualized to both the retailers at issue and the BNPD purchased by the consumer. The question of the amount, if any, of the pass through to the consumer cannot be addressed in a full and fair defense without the result that individualized facts and proof will predominate over questions common to the class. The class action would eventually degenerate into hundreds of different trials with the result that individual issues would overwhelmingly predominate over any issues common to the class. This court agrees with the conclusion of Judge Korkoras in the MDL litigation that "tracing the alleged overcharges from manufacturers, to wholesalers, to retailers to consumers presents individualized issues which would dominate this litigation and preclude certification under Rule 23(b)(3)." *In re Brand Name Prescription Drugs Antitrust Litig.,* 1994 WL 663590, at \*5.

2. Manageability

Plaintiffs here seek damages for a class of all individuals who have purchased brand named drugs in the State of Maine from retail pharmacies over a period in excess of six years. The defendants constitute twenty-four separate manufacturers of BNPD's. The products at issue total as many as eight hundred different prescriptions. Simply on the face of the complaint, manageability is certainly an issue that this court cannot ignore.

The reality of the limited resources of the State Superior Court is one of the issues to be considered by this court in determining manageability. However, on its own, complex litigation cannot be precluded by the court simply because its resources will be strained. The public is entitled to trial on issues of importance and complexity, and the court, should the class be certified, would be required to locate and maximize the resources available in order to assure access to justice. This court, therefore, concludes that manageability cannot turn on whether the matter is to be tried in the state court or the federal court with its greater resources.

**\*15** None-the-less, after reviewing the arguments of the parties and in particular considering the difficulty in demonstrating actual injury to the consumers, this court concludes that there are so many individual issues of retail pricing strategies, market forces, profit margins, geography, individual drugs, and circumstances of purchase, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)
**(Cite as: 1997 WL 34504652 (Me.Super.))**

Page 15

presentation of plaintiffs' claims as a class action would simply be unmanageable.

*CONCLUSION*

Although the court concludes that the plaintiffs have preliminarily demonstrated that they have met the requisites of Rule 23(a), it is further concluded that they cannot demonstrate that issues common to the class would predominate over individual issues. Further, plaintiffs have failed to convince the court that this matter would be manageable as a class action. Therefore, for the reasons set out above, plaintiffs' motion for class certification must be denied.

Wherefore, the entry shall be

Defendants' motion to strike the testimony of Dr. Sattinger is DENIED. Plaintiffs' motion for class certification is DENIED.

Me.Super.,1997.
Karofsky v. Abbott Laboratories
Not Reported in A.2d, 1997 WL 34504652 (Me.Super.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.