# EXHIBIT QQ



Not Reported in A.2d, 2001 WL 1736498 (Me.Super.)
**(Cite as: 2001 WL 1736498 (Me.Super.))**

Only the Westlaw citation is currently available.

Superior Court of Maine.
David F. RIVERS, Plaintiff
v.
Jerry AMATO, et al., Defendants

No. CIV. A. CV-00-131.
June 22, 2001.

Steven E. Cope, Esq.-Pl.

Jacqueline W. Rider, Esq.-Def.

ORDER

BRENNAN, Justice.

**\*1** Pending are Defendants' Motion for Summary Judgment and Defendants' Motion to Strike Portions of Plaintiff's Affidavits. Following hearing, the Motion for Summary Judgment is Granted.

FACTUAL BACKGROUND

In 1999, Defendants owned property located at York Beach commonly referred to as "Nubble Point" ("the property") DSMF ¶ 1. Defendant Jerry Amato engaged Rivers by the Sea to act as the agent for Defendants to market the property for sale. Complaint ¶ 6. Plaintiff David Rivers alleges that he entered into an enforceable agreement with Amato, on or about June 18, 1999, to buy the property. Complaint ¶ 8. The offer was for the full asking price of $ 3,000,000 and was accompanied by an earnest money deposit of $20,000. PSMF ¶ 3, Complaint ¶ 7. A final agreement was signed by Amato and Rivers on June 28, 1999. PSMF ¶ 4.[FN1]

> FN1. Defendants do not necessarily agree that the purchase and sale agreement was valid (due the alleged fact that Jerry Amato's son signed the Agreement, not Jerry Amato and because Defendants' contract with realtor Rivers by the Sea had expired), but for the purposes of summary judgment, Defendants are not disputing that a valid agreement existed.

On July 10, 1999, Jerry Amato and his son James Amato met with Rivers concerning the property. DSMF ¶ 3. According to Rivers, the Amatos stated that they would not go through with the contract because the property was worth more than when the contract was signed. PSMF ¶ 7.[FN2] According to Rivers, at the July 10 meeting, Jerry Amato stated that he intended to develop the property himself and that he would sell the property to Rivers for $4,800,000. PSMF ¶ 14. James Amato suggested that he and his father would discuss the matter further, and would let Rivers know if they had a change of position. [FN3] PSMF ¶ 7.

> FN2. In Rivers' Affidavit # 3, ¶ 16, Rivers speculates that the Amatos' position was based on developer Paul Hollis' proposal to develop the property through a joint venture that would have netted Amato more than $3,000,000 for the property. However, this allegation is not based on personal knowledge and as such, may not be considered.

> FN3. The Defendants do not dispute that a meeting took place on July 10, but deny the substance of the conversation as alleged by Plaintiff. Defendants' Reply SMF ¶ 5. However, for the purposes of summary judgment, Defendants admit that they repudiated the purchase and sale agreement on July 10. Id.

Immediately following the July 10 meeting, Rivers sent a letter (dated July 10) to Defendants' broker, Rivers by the Sea [FN4] (Plaintiff's brother's real estate agency) stating that he wanted to "cancel the Purchase and Sale Agreement for the property located at 235 Nubble Road, York, Maine initiated by me on 6/28/99" and that this "action is being taken based on the outcome of my 7/10/99 meeting

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in A.2d, 2001 WL 1736498 (Me.Super.)
**(Cite as: 2001 WL 1736498 (Me.Super.))**

and on the advice of my lawyer". DSMF ¶ 4. Rivers also wrote a memorandum dated July 10, in which he stated that his intention was to "walk away from this deal." DSMF ¶ 5. Also on July 10, Rivers requested a return of the earnest money deposit that he had paid to Rivers by the Sea in the amount of $20,000 and on or about July 12, 1999 he received a full refund of this deposit. DSMF ¶ 6. Rivers has alleged that he knew that pursuing the sale was futile and that a lawsuit to compel performance of the Agreement would be expensive and protracted. PSMF ¶ 8. He alleges, therefore, that he canceled the contract intending to pursue a breach of contract claim. Id.

> FN4. As noted, Defendants allege that their agreement with Rivers by the Sea had expired. However, for the purposes of summary judgment, they will not dispute the fact that Rivers by the Sea was still their agent.

Rivers further alleges that after the Agreement was signed (but prior to the July 10 meeting), at the direction of Amato he had discussions with Paul Hollis, a local developer, regarding development of the property. PSMF ¶ 15. Subsequently, Rivers alleges, Hollis persuaded Amato to develop the property in a joint venture with him in derogation of the contract with Rivers. Id. This offer, it is alleged, was part of the reason why Amato reneged on the contract with Rivers. Id. Defendants counter that Hollis began discussions with Amato in the summer of 1998 and that these discussions culminated in an agreement between Amato and Hollis on August 16, 1999, more than a month after Plaintiff canceled the purchase and sale agreement. Defendants' Reply SMF ¶ 15. The amount to be received by Amato under the agreement was $3,000,000-the same amount offered by Plaintiff, except that Hollis agreed to pay a sewer lien on the property at a cost of $41,000. Id.

**\*2** Count I of the Complaint alleges breach of contract and requests monetary damages. Count II of the Complaint alleges unjust enrichment. Essentially, Rivers has brought suit to "recover the benefit of the bargain under the Agreement in the form of lost net profits." Plaintiff's Objection to Defendants' Motion for Summary Judgment p. 5. Rivers alleges that after subtracting all development and acquisition costs, the net profit he could have realized was not less than $ 1,700,000. PSMF ¶ 13.

### COUNT I-BREACH OF CONTRACT

Defendants argue that Rivers' breach of contract theory is that Defendants anticipatorily breached the alleged Agreement. However, it is undisputed that Rivers canceled the alleged Agreement on July 10, 1999 and received the return of his earnest money deposit on July 12, 1999. Rivers cannot recover for an alleged breach of contract that he himself canceled. It is undisputed that Rivers canceled and accepted the rescission of the alleged Agreement.

Assuming that Defendants repudiated the alleged Agreement, Rivers, the non-breaching party, could have either accepted the contract as rescinded or waited and brought a lawsuit when the time for performance has arrived. Because Rivers chose to rescind the agreement, he retains no right to performance nor does he retain any right to damages based on Defendants' alleged anticipatory breach. Rivers cannot now have it both ways by rescinding the contract based on Defendants' alleged anticipatory breach and receiving a refund of his earnest money deposit and suing for damages.

Plaintiff argues that an agreement to rescind a contract is itself a contract and must be evaluated by principals of contract law. Whether Rivers' cancellation of the Agreement is tantamount to an acceptance of rescission of the Agreement is a factual matter to be resolved by the trier of fact. Defendants have the burden of proof on the issue of rescission. Defendants have failed to provide any facts from which the Court could conclude that Rivers agreed to discharge all of Amatos' contractual obligations following Amatos' admitted anticipatory breach.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1736498 (Me.Super.)
**(Cite as: 2001 WL 1736498 (Me.Super.))**

Page 3

## DISCUSSION

An anticipatory repudiation of a contract is "a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Wholesale Sand & Gravel, Inc. v. Decker,* 630 A.2d 710, 711 (Me.1993)(citing 4 CORBIN, *Corbin on Contracts,* § 973 (1951); RESTATEMENT (SECOND) OF CONTRACTS § 250). Defendants have admitted, for the purpose of this their summary judgment motion, that Amato repudiated the contract with Rivers. Rivers agrees that Amato repudiated the contract. Plaintiff's Objection to Defendants' Motion for Summary Judgment, p. 3 -4 ("[t]he Amatos unilaterally, unequivocally and unambiguously repudiated Amatos' obligations under the Agreement").

Where there has been a renunciation of a contract by one party, the other party has a right to pursue one of three remedies: (1) to rescind the contract and pursue remedies based on such a rescission, (2) to treat the contract as binding until the time for performance arrives, and at such time bring an action on the contract for breach, or (3) to treat the renunciation as an immediate breach and sue immediately for any damages sustained. 17B C.J.S. *Contracts* §§ 534, 535 (1999); *see also* 17A AM.JUR. 2D *Contracts* § 737. "The party not in default has alternative remedies open to him or her, and he or she may not pursue all of them." *Id.* § 535; *see also* 17A AM.JUR. 2D *Contracts.* § 744 ("Where one party has, before the time for performance, repudiated an executory contract, the adverse party has an election to treat the contract as broken or not so to treat it, and upon such repudiation the latter must make his choice between the courses open to him"); *Harmony Homes Corp. v. Cragg,* 390 A.2d 1033, 1035 (Me.1978)("a party may not affirm, or make use of, a contract to recover damages for breach thereof consistently with treating the contract as having been disaffirmed and proceeding on a 'money had and received' (restitution) rationale of recovery"). In *Harmony Homes,* the Law Court specifically stated that "a return of the down payment would be inconsistent with a breach of contract rationale of recovery." *Harmony Homes Corp. v. Cragg,* 390 A.2d at 1036.

**\*3** Based on the above principles, Defendants argue that Rivers elected the remedy of rescinding the Agreement and cannot now pursue a breach of contract claim. Rivers argues, however, that the Agreement was not effectively rescinded because there was no meeting of the minds with respect to terminating the agreement-that there was no offer and acceptance of rescission. If there was an offer of rescission, Rivers argues that whether his conduct is tantamount to an acceptance of rescission is a factual matter to be resolved by the trier of fact. Plaintiff's Objection to Defendants' Motion for Summary Judgment, p. 4, 6.

"Rescission is the unmaking of a contract, which not only terminates the contract but abrogates it and undoes it from the beginning." 17A AM. JUR. 2D *Contracts* § 539. An agreement to rescind a contract is itself a contract and must be evaluated by principles of contract law. *Drinkwater v. Patten Realty Corp.,* 563 A.2d 772, 775 (Me.1989)(citing RESTATEMENT (SECOND) OF CONTRACTS § 283 & comment a (1981)). The agreement need not be expressed in words. RESTATEMENT (SECOND) OF CONTRACTS § 283, comment a. Generally, a contract cannot be rescinded without the consent of both parties. *Listman Mill Co. v. Dufresne,* 111 Me. 104, 106 (1913). "The rescission of a contract by one party thereto is permitted for the other party's repudiation of the contract." 17A AM. JUR. 2D *Contracts* § 582 (1991).

In *Drinkwater v. Patten Realty Corp.,* 563 A.2d 772 (Me.1989), the Defendant announced unilaterally that it was terminating the purchase and sale agreement and sent the Drinkwaters a cheque refunding the earnest money deposit. *Id.* The Drinkwaters negotiated this cheque. The Law Court stated that whether cashing the cheque manifested an intention to rescind the contract could not be determined by resort to any per se rule or conclusive

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in A.2d, 2001 WL 1736498 (Me.Super.)
**(Cite as: 2001 WL 1736498 (Me.Super.))**

presumption; the relevant facts must be ascertained from the totality of the circumstances. *Id.* The Law Court found that summary judgment, entered against the Drinkwaters, was inappropriate because a factual issue remained whether or not the Drinkwaters, by cashing the cheque, manifested an acceptance of the rescission of their contract or whether the Drinkwaters merely believed that because Defendant had sold the property to someone else, that failing to cash the check would be a futile act. *Id.*

Applying the general principles of rescission and holding of Drinkwater, the question becomes: did Rivers and Amato mutually agree to rescind the contract (if so, Rivers is precluded from electing the remedy of damages under a breach of contract theory as noted above), or, does a factual issue exist regarding whether or not Rivers merely believed that pursuing the sale was futile and that he could cash the cheque and pursue a breach of contract claim. There is essentially no dispute regarding the material facts-rather, there is only an issue regarding the legal significance of the facts. There are two possible scenarios to consider when evaluating whether or not the contract was rescinded. First, did Defendants' renunciation of the Agreement amount to an offer to rescind that was accepted by Plaintiff. Or, second, did Plaintiff's conduct amount to an offer to rescind which was accepted by Defendants when Amato entered a purchase and sale agreement with Hollis.[FN5]

> FN5. This scenario may apply because Rivers alleges that at the July 10 meeting James Amato suggested that he and his father would "discuss the matter further, and let Rivers know if they had a change of position." PSMF ¶ 7. Immediately thereafter (i.e. without allowing time for the Amatos to discuss the matter and get back to Rivers) Rivers requested his deposit back and stated his intentions to cancel the contract.

**\*4** Under the first scenario, as noted, there is no dispute that Defendants repudiated the agreement. The question is did Rivers accept this repudiation by rescinding the agreement. It would appear that Rivers' acts only can be construed as acceptance of the repudiation. Rivers not only requested and received a full refund of his deposit [FN6], but (going beyond the facts of *Drinkwater* ), expressly stated that he wanted to "cancel the Purchase and Sale Agreement" and that he intended to "walk away from [the] deal." Given these actions/words it would seem that Rivers did not merely acquiesce to Defendants repudiation, but that Rivers affirmatively accepted the repudiation and thereby effectively rescinded the Agreement.

> FN6. Note, in *Drinkwater,* Defendants sent Plaintiffs the cheque refund of their deposit along with a notice terminating the agreement. *Drinkwater v. Patten Realty Corp.,* 563 A.2d at 775. Plaintiffs felt they had no choice but to cash the cheque. *Id.* In the present case, Rivers demanded a refund of his deposit.

Under the second scenario, Rivers' actions, stated above, could be construed as an offer to rescind. The action of Defendants-entering into an agreement with Hollis-could be construed as accepting the offer to rescind.

In either situation, it would appear that the contract was effectively rescinded. Because Rivers elected this remedy, he may not also pursue damages under a breach of contract theory. Summary Judgment should be granted on Count I of the Complaint.

COUNT II-UNJUST ENRICHMENT
Plaintiff's factual support for his unjust enrichment claim is two-fold. First, the evidence offered by the Plaintiff establishes that through Plaintiff's communications and efforts in working out a development plan with Paul Hollis, the Plaintiff induced Hollis to make an offer to purchase the Nubble Road property for a higher amount than the purchase price set forth in the Agreement between Am-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2001 WL 1736498 (Me.Super.)
**(Cite as: 2001 WL 1736498 (Me.Super.))**

Page 5

ato and Rivers. The effort resulted in Amato repudiating his contract with the Plaintiff and entering into a new contract with Hollis.

Second, Defendants are unjustly enriched because Defendants will receive a portion of the purchase price from the contract with Hollis that Defendants would not have received if they had not repudiated and had closed on the Agreement with Plaintiff. The benefit conferred on the Defendants by the Plaintiff is the additional profit that properly belonged to the Plaintiff, but for the wrongful conduct of the Defendants. A person is not permitted to profit by his own wrong at the expense of another. Defendants are unjustly enriched by the contract with a third party to the detriment of Plaintiff. Plaintiff is harmed by Defendants' contract with the third party because Plaintiff lost the net profit he could have realized from the development of the property.

### DISCUSSION

The three elements of an unjust enrichment claim are: "(1) a benefit conferred upon the defendant *by the plaintiff;* (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Simpson v. Central Maine Motors, Inc.,* 669 A.2d 1324, 1326 (Me.1996)(emphasis added). Rivers does not allege that *he* (at least directly), conferred a benefit on Defendants. Rather, Rivers' unjust enrichment claim is based on an indirect (and speculative) theory that through his efforts, Hollis conferred a benefit on Amato. No authority can be found for this "indirect benefit" theory, which is, in any case, based on speculation. Furthermore, as Defendants argue, Plaintiff has not offered any facts that demonstrate that Defendants had knowledge of any purported benefit indirectly conferred on them by Plaintiff. Summary judgment is granted on Count II of the Complaint.

**\*5** Because Defendant's Motion for Summary Judgment is granted, the motion to strike portions of plaintiff's affidavit is moot.

The clerk may incorporate this order in the docket by reference.

Me.Super.,2001.
Rivers v. Amato
Not Reported in A.2d, 2001 WL 1736498 (Me.Super.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.