# EXHIBIT RR



Page 1

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Rhode Island.
Julie A. ROSETTA and Judith Moretti, individually and in her capacity as trustee and successor executrix under the estate of Ralph P. Moretti
v.
Leo R. MORETTI and Charles J. Sposato

No. 98-89.
May 4, 2005.

DECISION

LANPHEAR, J.

**\*1** This matter is before the Court on a variety of post-trial motion.

Ralph Moretti, Leo Moretti, and Charles Sposato entered into an agreement to acquire a liquor store in Westerly, Rhode Island. Generally, the plan was to acquire the business with little or no money down, to be operated by the two Moretti brothers. When the Moretti brothers were unable to obtain credit to purchase the business, they included Charles Sposato as an equal partner. Together, they formed W.J.M., Inc. with each owner receiving 100 shares. Using Mr. Sposato's credit, they were able to acquire the business. Eventually, the relationship between the Moretti brothers and Mr. Sposato soured to the point where Mr. Sposato was excluded from the business. In March 1988 Mr. Sposato demanded to sell his shares pursuant to the terms of the stock purchase agreement. The Moretti brothers delayed.

On April 18, 1989, Ralph Moretti passed away. Leo Moretti became Executor of Ralph's estate and trustee of certain assets. Shortly thereafter, the two remaining shareholders, through counsel, were able to come to terms for the purchase of Mr. Sposato's shares. Mr. Sposato's shares were sold in July, 1989 for $600,000.[FN1] In 1995, W.J.M., Inc. went bankrupt. At approximately the same time, interest payments to Julie Moretti (the only beneficiary of Ralph's estate) ceased, leading her to conduct an investigation into the finances and legal transactions of the corporation. This suit commenced in early 1998. Claims against Attorney Henry Cesario were settled shortly before the trial.

> FN1. This event is referred to as "the 1989 closing" or "the Sposato closing" herein.

*I. EVIDENCE PRESENTED*

As a motion for a new trial is pending, the trial court is encouraged to review the evidence which was presented at trial. *Oliveira v. Jacobson,* 846 A.2d 822, 826, (R.I.2004).

Plaintiffs first called defendant, Leo Moretti who was trained as a Certified Public Accountant. He described his relationship with his brother Ralph, and Ralph's daughter, Julie. As Ralph had previously been divorced, the beneficiary of his estate was Julie. Because she was a minor,[FN2] Leo served as Executor of Ralph Moretti's estate and Trustee of the trust created under Ralph's estate. He described the difficulties that he and his brother encountered in attempting to obtain financing for the acquisition, not having credit to do so. The two brothers brought in Charles Sposato, and formed W.J.M., Inc. All were jointly and severally liable for the debts of the corporation and personal residences were pledged as security. The three shareholders agreed that Henry Cesario would serve as the attorney for the corporation. In 1985, the three men entered into a Stock Purchase Agreement, Exhibit 1. Exhibit 2 is the letter of March 1988, evidencing the discord between the shareholders and Mr. Sposato's attempts to remove himself from the corporation.

> FN2. Julie Moretti was nineteen years old at the time of the death. The will created a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

https://findprint.westlaw.com/print/printstream.aspx?prid=ia744a4970000013876b7336ee2... 7/11/2012

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

Page 2

trust, hence she would not receive the inheritance until she was 30 years of age.

Mr. Moretti testified the Stock Purchase Agreement required a $400,000 life insurance policy for each shareholder. When a shareholder passed away, the surviving shareholders would buy the deceased shareholder's stock and the deceased shareholder's estate would receive the $400,000 in insurance proceeds. He agreed that this was an 'automatic' payout provision. At the 1989 closing, he described an assignment of Ralph's life insurance proceeds in order to finance the acquisition of Mr. Sposato's shares.

**\*2** Leo Moretti testified that after he and his brother received the March 1988 letter from Mr. Sposato requesting a purchase of his shares, the parties became embroiled in a new dispute concerning the meaning of schedule A of the Stock Purchase Agreement. Schedule A was designed to set the price of stock in the event of such a sale, but apparently failed to include the outstanding debt of the corporation in the valuation of the shares. Leo Moretti therefore allowed Attorney Cesario to negotiate on his behalf with the attorney for Mr. Sposato.

The Moretti brothers had signed an October 17, 1988 Stock Purchase Agreement, Exhibit 4, which indicated that the value of any buyout would be $250,000, funded by life insurance, to be purchased by the corporation. Mr. Sposato did not sign this document. Negotiations continued for the purchase of Mr. Sposato's shares. Mr. Moretti testified that $300,000 was offered to Mr. Sposato prior to Ralph's death, but was not sure what other terms were being discussed. The brothers discussed various methods of financing the buyout, including posting their own real estate.

On April 18, 1989, Ralph Moretti passed away without any resolution to Mr. Sposato's demands. Leo Moretti was appointed executor of Ralph's estate. He recognized his obligations "to safeguard the assets" of the estate and trust and to make sure that the debts were paid. He signed an application for probate, (Exhibit 27), and enlisted the services of Attorney Cesario to represent the estate. Mr. Sposato, already alienated from the Moretti family, now demanded a one-half interest in the corporation. Leo Moretti and Attorney Cesario eventually agreed to pay Mr. Sposato $600,000 for his remaining shares.

The Sposato shares were conveyed at a closing at Washington Trust wherein Mr. Moretti endorsed a number of checks for the life insurance proceeds. Mr. Moretti was firm that his goal was to sever the relationship with Mr. Sposato, and preserve the integrity of the corporation for the Moretti family. Though trained as an accountant Leo Moretti testified that he was confused about the precise transactions that occurred at the closing with Mr. Sposato. He was unable to explain all of the paperwork but was clearly attempting to buy out and conclude Mr. Sposato's ownership interest.

Leo Moretti testified that the bank insisted that money from Ralph Moretti's insurance policy not go into the estate. It was his intent that the estate be an equal shareholder with him after the buyout. Mr. Moretti acknowledged the documents appear to leave him as the sole shareholder of the corporation. He testified "I signed [closing documents] blindly and should not have." Even during testimony he was confused as to what happened at the closing stating "honestly, I'm more confused now than I was". He was not able to adequately describe what happened to all the life insurance proceeds. Leo Moretti received 1099 tax forms for the stock in his own name, rather than for the estate, and never corrected it. He acknowledges paying the tax on all of the income. He believed the corporation was obligated to purchase Ralph Moretti's shares after his death for $350,000. He listed all of the corporate stock on his own personal financial statements with the bank (exhibit 24), but continued to pay Judy Moretti for expenses.

**\*3** On examination by his own attorney, Leo Moretti testified that Washington Trust was con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

tinuing to threaten collection after the death, given the significant shareholder dispute. Prior to Ralph's death, the value of the liquor store was substantial. Its worth, inventory, net profit and income were increasing, while its debt was being paid down. He also knew that the debts of the estate needed to be paid first, including the outstanding obligations to Washington Trust for $400,000. He was concerned that the bank would collect this $400,000 by foreclosing on the business and Ralph's properties. The bank was encouraging him to buy Mr. Sposato's shares to protect the ownership and real estate.

The corporation later went bankrupt because of embezzlement by an employee, unrelated to this litigation. Prior to the bankruptcy, some $53,000 in payments were made to the Morettis, apparently as dividends.

The second witness was Attorney Henry Cesario. He described his relationship with the Morettis and his preparation of the stock purchase agreement in 1985. In March of 1988, he was retained to negotiate a buyout with Mr. Sposato after Leo Moretti brought Mr. Sposato's letter to him. Attorney Cesario dealt only with the attorneys for Mr. Sposato, eventually reaching a consensus that the two Moretti brothers would purchase Mr. Sposato's shares. As the Moretti brothers were intent on revoking the original stock purchase agreement, they formed the new Stock Purchase Agreement (Exhibit 4) and took the position that Mr. Sposato was obligated to sell according to the terms of the new agreement. Mr. Sposato never signed or assented to the new agreement. On April 27, 1989, after Ralph Moretti passed away, Mr. Sposato's attorneys claimed that Mr. Sposato now owned 50% of the corporation. Significant negotiations took place with the parties disputing the value of the buyout and which stock agreement was in effect. Attorney Cesario acknowledges "we were posturing" to attempt to negotiate the best payoff. Attorney Cesario then drafted and filed a Miscellaneous Petition to the Westerly Probate Court (Exhibit 8) to obtain authorization to "release certain life insurance policies".

Even Mr. Cesario was hard pressed to explain the transfer of stock at the closing. He was unsure whether the conveyance was a purchase or a transfer, and whether or not the estate had an interest in the policy or the stock. Clearly, no stock certificates were issued in the name of the estate. Mr. Cesario acknowledged that he was representing an "unholy Trinity" of the estate, the corporation and an individual shareholder.

Attorney Cary Coen was then called by the plaintiffs. Mr. Coen, a Rhode Island attorney for 25 years, represented Mr. Sposato in his buyout. Indicating his desire to protect Mr. Sposato after he had been excluded from the business, removed from the store, and given no authority over the business, Attorney Coen described various proposals made by Attorney Cesario to accomplish Mr. Sposato's buyout. Attorney Cesario indicated that Ralph Moretti would post some of his property as collateral to protect Mr. Sposato, but Attorney Coen was never convinced that Mr. Sposato would be protected enough. Prior to Ralph's death, there were a variety of issues still unresolved-including Mr. Sposato's purchase price. Attorney Coen was continuing to prepare documents and sending drafts to Attorney Cesario. Attorney Coen testified that it was Attorney Cesario's position that the new Stock Purchase Agreement was binding even though it had only been signed by two of the shareholders.

**\*4** Upon the death of Ralph Moretti, Attorney Coen asserted that Mr. Sposato was a 50% owner of the corporation. He acknowledged that Mr. Sposato received $600,000 for his shares at the closing. Attorney Coen was insistent that the Probate Court approve the transfer of use of any of the assets of the estate for the buyout. Attorney Coen did not specify how the request to the Probate Court should be drafted because he did not know what the purpose was of using the life insurance proceeds. Attorney Coen did not realize at the time that none of the resulting shares were left in the name of Ralph Moretti's estate.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

Page 4

Gloria Jones was called as a witness. She served as a secretary for Mr. Sposato. Ms. Jones testified that Mr. Sposato told her to tell her cousin Judy Moretti that she better "watch out" for Leo Moretti.

Charles Sposato was then called by the plaintiffs. He described the initial negotiations prior to Ralph Moretti's death but acknowledged that there was no consensus for the purchase of his shares. He acknowledged that each of the owners received $17,000 during the first year of bonuses, but denied they received $36,000 in cash, as others alleged. He acknowledged signing a great deal of documents at the 1989 closing. Mr. Sposato testified "who got the money, I couldn't tell you." He acknowledged receiving $600,000 for the sale of his 50% interest in the corporation. He insisted that Leo Moretti had two choices-either Leo would buy him out or he would buy the Morettis out-but the price was firmly set at $600,000. He testified that he gave Leo Moretti an ultimatum to "to either be bought out or to buy him out." Mr. Sposato categorized the method of the buyers' financing as "none of my business." His testimony was clear that he was simply attempting to extricate himself from a poor investment, and he was unaware of what the different arguments of the parties were stating "I don't recall thinking of it that deep, truthfully." Mr. Sposato knew that probate papers were being filed, but did not know why.

Examination by his own attorney revealed that Mr. Sposato believed there was "no way" the business could continue without him having control over his investment.

Julie Rosetta, one of the plaintiffs, then testified. She testified that she signed the Miscellaneous Petition, Exhibit 8, because her uncle Leo Moretti said it needed to be signed to release money for the insurance policy. She did not realize that she was not getting the proceeds. She reported that she relied on Leo Moretti as "I trusted him." She assumed the periodic payments she was receiving were interest payments on the insurance proceeds. Leo Moretti never asked Ms. Rosetta for her consent to borrow money from the trust. Ms. Rosetta stated her father and Mr. Sposato were very good friends at one time. She also testified that Leo Moretti came to her in 1995 indicating that he did not steal her money, but he never explained what happened.

**\*5** Extensive documentary evidence was admitted for the corporation formation, the probate proceedings and the Sposato closing.

## II. ANALYSIS OF CLAIMS AGAINST CHARLES SPOSATO
### A. Motion for Remittitur

Mr. Sposato has moved the court for a Remittitur as there is "no evidence justifying an award ... against Mr. Sposato for any sum in excess of $200,000". Sposato Post-Trial Memorandum, page 22.

*1. Amount of Damages*

The jury found against Leo Moretti for $650,000 in compensatory and $350,000 in punitive damages. It found against Charles Sposato for $650,000 in compensatory damages. The amount of the compensatory damage awards were significantly higher than those damages demonstrated at trial.

The total amount of money received by Mr. Sposato as compensation for his 50% interest at the 1989 closing was $600,000. There is absolutely no evidence or inference to substantiate a compensatory damage award against Mr. Sposato for a greater amount.

Plaintiff, the Ralph Moretti Estate claimed that it lost its interest in the corporation without adequate compensation. No evidence of the market value of the shares was presented. There was no appraisal of the business (or the stock) at its purchase, at Mr. Moretti's death or at the Sposato closing. In fact, there was little evidence concerning any values.

Such proof of market value is not required. In

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

Page 5

the Stock Purchase Agreement (Exhibit 1), which Ralph Moretti entered, the parties agreed that the value of their shares was $400,000 each, for a total $1,200,000. Had the Moretti brothers consented to a purchase of Mr. Sposato's shares in 1988 (when Mr. Sposato demanded the corporation purchase of his shares) this would be a much different case.[FN3] As the Moretti brothers repelled Mr. Sposato's reasonable attempts to opt out,[FN4] all three shareholders continued to own a one-third interest in the corporation when Ralph Moretti passed away. Pursuant to the 1985 Stock Purchase Agreement still in effect, Ralph Moretti's estate would be paid $400,000 at best [FN5] for these shares in the event of his death. Exhibit 1, Article 2.

> FN3. At the time of the 1989 closing, Mr. Sposato was selling his remaining one-half interest in the corporation. Plaintiffs claim the Stock Purchase Agreement was ambiguous because it does not clearly describe the sale of stock by two of the three shareholders. However, Mr. Sposato had not yet been bought out because the Moretti brothers refused to pay him, even though his right to be bought out is clear in Article 5 of Exhibit 1. Ralph Moretti and Leo Moretti refused to purchase his shares. This breach left him a shareholder at Ralph Moretti's passing. Neither of the Moretti brothers should be compensated for their breaches. Unfortunately, neither should their survivors. The estate is to collect hold and distribute only the assets which the estate is entitled to receive. *Wickes' Estate v. Stein,* 107 R.I. 260, 266 A.2d 911, 915 (R.I.1970). He who seeks equity must do equity. *Shiller v. Gemma,* 106 R.I. 163, 256 A.2d 487 (1969).

> FN4. Prior to Mr. Moretti's death, Mr. Sposato did not breach. However Mr. Sposato had been barred from entering the store and (unlike the Morettis) excluded from any returns for his investment. Then the Morettis refused to allow Mr. Sposato to sell his shares.

> FN5. At best as the Moretti brothers had insisted that the value of Sposato's 100 shares were not even worth $400,000.

Mr. Sposato is alleged to have committed his breach at the time of the closing. There is no evidence to infer that any wrong was committed by Mr. Sposato prior to Mr. Moretti's death. If Mr. Sposato is required to pay any compensatory damages, the damages would be limited to the value which the estate was entitled to receive after Ralph Moretti's death. By the Stock Purchase Agreement, all three shareholders agreed that only $400,000 would be paid to the estate of the first to pass away. The amount to make the estate whole or to restore the estate to the position it would be in prior to any breach is $400,000. The compensatory damages therefore total $400,000 at best. [FN6] Accordingly, significant compensatory damages were awarded which were not substantiated by the evidence presented.

> FN6. The court is left to ponder how the jury calculated compensatory damages at $650,000 as the Stock Purchase Agreement set the value of the corporation at $1,200,000 and the three shareholders each owned one-third. As no other damages were awarded the court fears that the jury considered interest or litigation costs. It is not within the realm of the jury to do so. However, the resultant orders herein resolve this defect.

This Court, having independently weighed the evidence, finds a reasonable jury could not have reasonably awarded $650,000 in compensatory damages against Mr. Sposato in the instant case. It is clearly excessive in light of the damages demonstrated by the plaintiffs. The award in question was not sustained by the evidence, which is insufficient to justify the jury award.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

Page 6

**\*6** Prior to deliberations, the Court instructed the jury concerning the burden of proof, and computation of compensatory damages. The jury in the instant case, having some discretion in determining the amount of the award, failed to evaluate and assign the appropriate weight to the relevant evidence. Clearly, the jury was influenced by passion and prejudice. As the jury failure to heed the Court's instructions on burden of proof, and calculation of damages, mandates a new trial on the issue of damages, if liability was established.

*2. Joint Liability.*

Compensatory damages to the estate did not exceed $400,000. This amount is all-encompassing, and makes plaintiffs whole. The Court crafted a special jury interrogatory which it posed to assist in its determination of whether an award of damages should be joint or several against the two remaining defendants. The question read:

   11. If you placed any amount in your answer to Question 10 [damages caused by Charles Sposato], how much of this amount, if any, is included in any amount which you placed in your answer to number 9 [damages caused by Leo Moretti]?

It was hoped that the answer to this question would assist the court if awards of two lower amounts were rendered. This interrogatory would show whether the jury was intending to compensate for the same loss or two different losses.[FN7] As an advisory interrogatory, it was not binding on the court to award, in effect, double damages, particularly when there was no legal basis to do so.[FN8] The issue of joint liability is clearly a legal one, and somewhat complex. As an issue of law, it is for the court only. *State v. Price,* 820 A.2d 956, 971 (R.I., 2003).

   FN7. For example, if the jury returned verdicts of $100,000 against each defendant, this interrogatory would assist the court in determining if the jury was declaring that each defendant caused distinct damages of $100,000, or if each participated in causing the same damage to the plaintiffs.

   FN8. A similar procedure, pursuant to Superior Court Rule of Civil Procedure 39(c) was followed and accepted in *Filippi v. Filippi,* 818 A.2d 608 (R.I., 2003).

Fortunately, the other findings in this order and the jury's clear goal of compensating the plaintiffs for all of their losses eliminates the need for the court to determine who pays for what. If this court did need to reach this issue, it would address the definition of joint tortfeasors as discussed by our high court in *Wilson v. Krasnoff,* 560 A.2d 335 (1989) and *DePasquale v. Venus Pizza, Inc.* 727 A.2d 683 (R.I., 1999). However, it is clear that the interrogatory was not binding upon the court, and posed for advisory purposes only.

*B. Renewed Motion for Judgment as a Matter of Law*

At the close of plaintiff's case, the defendants moved for judgment as a matter of law. R.C.P. 50. This motion was granted for Mr. Sposato in regard to the fraud and larceny counts as there had been no showing of intent, as was more fully described by the Court previously. This court reserved its ruling in respect to the remaining counts.

*1. Unjust Enrichment.*

Prior to submitting the case to the jury, this Court held that Count 2, Unjust Enrichment, would be submitted to the jury in an advisory interrogatory. The answer would not be binding upon the court. Unjust enrichment sounds in equity and as such, it is a matter to be decided ultimately by the Court. It is a matter for the Court, not the jury, to decide. *State v. Price,* supra.

**\*7** To establish a claim for unjust enrichment, plaintiffs must show that Mr. Sposato received compensation which he was not entitled to. The equitable doctrine of unjust enrichment applies under certain circumstances "to prevent the person from retaining a benefit received from another

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

without appropriate payment for same." *Doe v. Burkland,* 808 A.2d 1090, 1095 (R.I.2002) citing *Rhode Island Hospital Trust Co. v. The Rhode Island Covering Co.,* 96 R.I. 178, 179-180, 190 A.2d 219 (1963).

When Mr. Sposato sold his shares, he owned one-half of the outstanding shares of the corporation. (By then, Ralph Moretti's shares were to have been automatically repurchased by the other shareholders, Exhibit 1, Article 2.) The value of Mr. Sposato's shares was never established but clearly they were then worth over $600,000.[FN9] More importantly, his sale was a bargained for buyout, an arm's length transaction. He was not acting in concert with Ralph Moretti, Leo Moretti, the estate of Ralph Moretti, or the corporation. To the contrary, he was at odds with each of them. Mr. Sposato was left to negotiate against Leo Moretti and he offered either to buy his interest or to sell his own share to Leo Moretti. Mr. Sposato set a firm price for the stock purchase or stock sale at $600,000. Represented by capable counsel, Mr. Sposato effectively negotiated a hostile buyout.

> FN9. During early negotiations, the shareholders debated whether the debt of the corporation reduced the value of the shares, contrary to Schedule A of the Stock Purchase Agreement, Exhibit 1. At trial this was not addressed and the amount of the debt was never described.

A great deal has been argued about the alleged improprieties of Mr. Sposato because his agent did something underhanded. The evidence does not support the allegation. Mr. Sposato was represented by Attorney Cary Coen, a respected member of the Rhode Island Bar. Mr. Coen's actions may seem suspicious to non-attorneys, but his role as an attorney is summarized by the Rhode Island Supreme Court Rules of Professional Conduct Preamble "As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system." Mr. Coen was sworn to vigorously protect Mr. Sposato's rights. He acted well within his role, interpreting the stock purchase agreements quite differently, but reasonably. Mr. Coen contended the 1985 Stock Purchase Agreement remained in effect, so his client owned a 50% share of the corporation.[FN10] Neither he nor Mr. Sposato made any representations to the Probate Court. It was Ms. Julie (Moretti) Rosetta, the Estate of Ralph Moretti, and their counsel, who signed the Miscellaneous Petition. It was reasonable for Attorney Coen to conclude that the Morettis all consented, because they all signed the consent form. Further, the Probate Court approved the Miscellaneous Petition.

> FN10. Attorney Coen's contention that the second Stock Purchase Agreement was of no effect was well-founded. Only two of the three shareholders had consented to the amendment. Article 12 of the original Stock Purchase Agreement, Exhibit 1, requires consent "by the shareholders" to amend the agreement. Clearly, this means all three shareholders.

It is easy to look at a hard-fought negotiation after the fact and to claim the result was a bad deal. Who knew the store would eventually go bankrupt? Attorney Coen negotiated and did so firmly. His conduct was appropriate for his position.

All parties to this action knew that Mr. Coen was representing Mr. Sposato-an alienated, minority shareholder. Mr. Sposato had already been locked out of the business, with no control. Mr. Sposato had no assurance of receiving any future income. Mr. Sposato's credit was on the line, having guaranteed the debts of the corporation. At this point, neither Mr. Sposato nor Attorney Coen owed any fiduciary duty to the other shareholders, see pages 16-17, supra. The best thing they could do was to bargain Mr. Sposato out of the corporation.

**\*8** As the doctrine of unjust enrichment focuses on preventing one from retaining a benefit received without appropriate payment, *Doe v. Burkland,* 808 A.2d 1090, 1095 (R.I.2002) supra, the court considers the benefit of the bargain. Here, the shares

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

were worth $600,000 to the Morettis. If they thought they were worth anything less, Leo Moretti could have and would have sold the Moretti shares for $600,000. The Plaintiffs failed to establish that allowing Mr. Sposato to retain the negotiated purchase price would be inequitable. The reserved motion for judgment as a matter of law is granted in favor of defendant Sposato with respect to the unjust enrichment count.

*2. Breach of contract.*

To establish a breach, the plaintiffs must show that Mr. Sposato failed to perform the contract in good faith. "[V]irtually every contract contains an implied covenant of good faith and fair dealing between the parties." *Dovenmuehle Mortg., Inc. v. Antonelli,* 790 A.2d 1113, 1115 (R.I., 2002) quoting *Centerville Builders, Inc. v. Wynne,* 683 A.2d 1340, 1342 (R.I.1996) and *Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 10 (1st Cir .1994) . However, the uncontroverted evidence established that the Morettis breached the agreement first. Mr. Sposato was locked out of the business without hope of future income. The Moretti brothers refused to buy his shares for over a year. Mr. Sposato simply attempted to negotiate his way out of a poor investment. Plaintiffs failed to establish that Mr. Sposato violated the terms of the contract, or his covenant of good faith and fair dealing.

The evidence established that the Morettis were the first to breach the contract's implied covenant of good faith, to the detriment of Mr. Sposato. Mr. Sposato was locked out of the store and prevented from receiving returns on his investment while the Morettis continued to take salaries. The Morettis then failed to compensate Mr. Sposato for his investment. As the dispute continued, the Morettis drafted a new Stock Purchase Agreement (Exhibit 4) and insisted that it was binding upon Mr. Sposato, although he never consented to it.

This is not a rescission, where the parties mutually agree to discharge their duties under an existing contract, *McFarland v. Brier,* 850 A.2d 965 (R.I., 2004), but a breach by the Morettis after Mr. Sposato substantially performed his obligations. In such a case Mr. Sposato, not the Morettis, are entitled to recover the benefit of the bargain. *Butera v. Boucher,* 798 A.2d 340 (R.I.2002). The Morettis have failed to show that Mr. Sposato breached the contract.

*3. Fiduciary Duty.*

As indicated, Mr. Sposato's relationship with the Morettis was completely strained well before Ralph Moretti's death and the subsequent closing. As such, neither he, nor his attorney, had a fiduciary duty to the other shareholders. In *Broccoli v. Broccoli,* 710 A.2d 669 (R.I., 1998) the Supreme Court recognized that fiduciary duties may apply among shareholders in small corporations, but the duties depend on the particular facts presented.

**\*9** Federal courts, in applying Rhode Island law, have noted that shareholders in closely held corporations have fiduciary responsibilities to one another when they act as if they are partners, *Lawton v. Nyman,* 327 F.2d 30 (C.A.1, 2003) and when they manage together, *Bogosian v. Wolhoojian,* 167 F.Supp.2d 491 (D.C.R.I., 2001)(appeal denied, judgment affirmed 323 F.3d 55). Clearly, Mr. Sposato was already frozen out and, in his minority position, excluded from any role in management. Though this was a small corporation, closely held by three shareholders, the uncontroverted evidence shows that by March, 1988 Mr. Sposato was alienated from the others and had no management role. Hence he had no fiduciary duty to the other shareholders.

As Mr. Sposato owed no fiduciary duty to the corporation, other shareholders or the estate, judgment as a matter of law shall enter in favor of Mr. Sposato in regard to Counts 3, 4 and 5 of the Amended Complaint.[FN11]

> FN11. It was not Mr. Sposato's concern that the estate did not transfer the shares to the correct beneficiaries or that the executors never transferred the money into the estate. In fact, Mr. Sposato had no know-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

Page 9

ledge of who got what after the closing.

*4. Releases.*

As set forth above, the Morettis' own actions were the death knell to their recovery. Another coffin nail remains. The estate and the corporation executed releases and an indemnity agreement in favor of Charles Sposato. Exhibits A, B, and F. As this court has already resolved the claims pending against Mr. Sposato, it need not reach the issue of the releases. However, suffice it to say that the language of the releases was quite broad, the releases were knowingly and voluntarily entered into at the closing, and there was no evidence introduced at closing to question their authenticity, intent or effect.

After viewing all evidence in a light most favorable to the plaintiffs, and giving the plaintiffs the benefit of reasonable and legitimate inferences, there is no conflicting evidence, and no evidence which would entitle the plaintiffs to recover against Mr. Sposato relative to the unjust enrichment, breach of contract and breach of fiduciary duty counts.

### III. ANALYSIS OF THE CLAIMS AGAINST LEO MORETTI

The actions of Leo Moretti were quite different from those of Mr. Sposato. While Mr. Sposato was alienated from the corporation, the store and its profits, Leo Moretti was in the midst of it. Ralph Moretti was also an active participant, prior to his death.

*A. Motion for New Trial.*

The standard to be applied by the court when considering a motion for new trial has recently been restated by our Supreme Court:

> When considering a motion for a new trial, the trial justice sits as a super-juror: he or she must weigh and evaluate the evidence, and assess the credibility of the trial witnesses. *Hefner v. Distel,* 813 A.2d 66, 69 (R.I.2003) (per curiam). If, in his or her independent judgment, the evidence is balanced and reasonable minds could differ on the outcome, the trial justice must approve the verdict. *Skene v. Beland,* 824 A.2d 489, 493 (R.I.2003) (per curiam). If, however, the verdict is not supported by credible evidence, a new trial should be ordered. Id. On appeal we accord great weight to a trial justice's decision on a motion for a new trial, and will not disturb it unless it is clearly wrong or otherwise overlooks or misconceives material and relevant evidence. Id.; *Graff v. Motta,* 748 A.2d 249, 255 (R.I.2000). *Oliveira v. Jacobson,* 846 A.2d 822, 826, (R.I.2004).

**\*10** This court has reviewed the testimony and documentary evidence introduced at trial (infra pp. 1-8).

*1. Liability.*

As executor and trustee, Leo Moretti had fiduciary duties to the estate. *Francis v. Buttonwood Realty Co.,* 765 A.2d 437, 442 (R.I.2001). As shareholder and operator of the small corporation, he had additional fiduciary responsibilities. See *Hendrick v. Hendrick,* 755 A.2d 784 (R.I., 2000), *DiLuglio v. Providence Auto Body, Inc.* 755 A.2d 757 (R.I.2000), and *In re DiPippo,* 61 A.2d 1219, 1220 (R.I., 2001). He acknowledged his responsibilities were to "safeguard the assets". Trained as an accountant, he knew his role. It was reasonable and appropriate for the jury to find that Leo Moretti had breached his fiduciary duties by converting the purchased shares to his own name, after the Sposato closing. Leo Moretti received I.R.S. 1099 forms for the income on the shares, and paid taxes on this income. An accountant, he knew these were indicia of ownership and recognized his fiduciary obligations to the estate. Still, he afforded no explanation, and never corrected the error.

It is reasonable to infer that the Sposato shares should not have been placed in the estate name because the Stock Purchase Agreement required that Ralph Moretti's shares were to be bought out upon his death. Exhibit 1, paragraph 2. This could have been easily accomplished by transferring $400,000 of the closing proceeds into an estate account. The

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

funds were available to Leo Moretti after the 1989 closing.

Liability on counts 3 and 4 was grounded in the evidence, logical and appropriate.

*2. Compensatory damages.*
The jury used an inappropriate award of damages against Mr. Sposato (see pp.9-11 herein), so the compensatory damage award against Leo Moretti deserves similar scrutiny by this court. Prior to his death, Ralph Moretti participated in the breaches against Mr. Sposato. Along with Leo, Ralph worked to deprive Mr. Sposato from the store, profits, management and the ability to sell his shares.

The jury found Leo Moretti to have breached his fiduciary duty owed to the corporation. Damages for such wrongs are awarded to compensate for the injury or loss sustained. *Profitt v. Rice,* 463 A.2d 514 (R.I.1983). At trial, the parties agreed that W.J.M., Inc. went bankrupt in 1995. This bankruptcy was precipitated by the embezzlement of an employee. There was no evidence to show that the downfall of the business was caused by any of the parties. As a result of the bankruptcy, the shares were valueless. Query then, how to value the compensatory damages.

Under the terms of the will, Julie Moretti would not receive any bequest until she turned age 30 (exhibit 1). As Julie was 19 when her father passed away, she would not have been 30 until about 2000, well after the bankruptcy. Ralph Moretti's will left Leo Moretti as the executor (and trustee). Ralph knew that control of the corporation would be merged in Leo, who would control, but not own, at least 1/2 of the shares.

*11 The estate and its beneficiaries would be left with worthless stock by the time distributions would be made. There is no evidence that Leo Moretti's acts contributed to the fall of the corporation. A separate, independent act, the embezzlement of a third party, rendered the shares valueless. Accordingly, the plaintiffs appear to be left without compensatory damages. It is arguable that the plaintiffs are not entitled to any compensatory damages, other than $1.00 in nominal damages. However, the court recognizes that the Stock Purchase Agreement (exhibit 1, Article 2) mandates that the estate be paid for the value of its stock. Although the Morettis seem to ignore the provisions of the agreement from time to time, the court assumes that the jury recognized this provision and weighed it in favor of the estate. Accordingly, the plaintiffs' award against Leo Moretti should be for $400,000, the amount which the Stock Purchase Agreement set for the sale of the stock.

This Court, having independently weighed the evidence, concludes a reasonable jury could not have reasonably awarded $650,000 in compensatory damages against Leo Moretti in the instant case. It is clearly excessive in light of the damages demonstrated by the plaintiffs. The larger amount shocks the conscience of this Court. For all of the foregoing reasons, and in light of the evidence presented as to Plaintiffs' damages, a new trial, limited to the issue of compensatory damages to be awarded to Plaintiffs against Mr. Leo Moretti, is warranted and ordered unless Plaintiffs file a remittitur within ten days from the issuance of this Decision pursuant to Rhode Island law. See *Kelaghan v. Roberts,* 433 A.2d 226, 229 (R.I.1981) (stating "[i]f the trial justice finds that a new trial is warranted on the question of damages, it is his duty, before ordering a new trial thereon, to give the plaintiff an opportunity to file a remittitur or the defendant an additur").[FN12]

> FN12. The use of remittitur has been approved by our Supreme Court as a technique which serves as a "means of avoiding unnecessary relitigation of the same issues and [ ] [provides] just and speedier resolutions." *Michalopoulos v. C & D Restaurant, Inc.,* 764 A.2d 121, 125 (R.I.2001) (per curiam) (quoting *Gardiner v. Schobel,* 521 A.2d 1011, 1015

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)
**(Cite as: 2005 WL 1109638 (R.I.Super.))**

Page 11

(R.I.1987)). See also *Cotrona v. Johnson & Wales College,* 501 A.2d 728, 734 (R.I.1985).

B. Motion for New Trial.

Sufficient evidence was introduced to substantiate substantial claims against Leo Moretti. Accordingly, to the extent that Leo Moretti's Motion for Judgment as a Matter of Law was reserved, such motion is now denied.

### IV. PLAINTIFF'S MOTION FOR NEW TRIAL

The Plaintiffs requested a new trial against Mr. Sposato on the claim of fraud. They also requested a new trial on the claim of civil conspiracy against both of the defendants. In order to establish a claim of fraud in Rhode Island "the plaintiff must prove that the defendant made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage." *Women's Development Corp. v. City of Central Falls,* 764 A.2d 151, 160 (R.I.2001). The plaintiffs have failed to establish that Mr. Sposato made a false representation. Moreover, the plaintiffs failed to establish that they were induced or justifiably relied upon anything said by Mr. Sposato or his attorney. The plaintiffs have not met their burden in establishing a fraud case against Mr. Sposato.

**\*12** To establish a conspiracy claim, the claimant must establish that "(1) there was an agreement between two or more parties and (2) the purpose of the agreement was to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means. *Smith v. O'Connell,* 997 F.Supp. 226, 241 (R.I.1998). The actors must agree on the object or course of action. *Moss v. Kent Pemigewassett, Inc.,* 312 F.3d 503, 512 (C.A.1, 2002). Furthermore, "a civil conspiracy claim requires the specific intent to do something illegal or tortuous." *Guibeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp 2d 263, 268 (D.R.I.2000) see also *Chain Store Maintenance Inc. v. National Glass,* 2004 R.I.Super. Lexis 81. While there was a clear agreement between Mr. Sposato and Leo Moretti, the purpose of the agreement was not to accomplish an unlawful objective, but simply to resolve a shareholders dispute concerning the value of Mr. Sposato's shares. The resolution was to determine the proper valuation for the shares. The plaintiffs have failed to establish that a conspiracy action lies in the case at bar.

### V. CONCLUSION

Mr. Sposato's renewed Motion for Judgment as a Matter of Law is granted. Thus, judgment shall enter in favor of defendant Charles Sposato in respect to all counts of the complaint. The Court need not reach Mr. Sposato's Motion for New Trial, having already decided all issues in his favor.

Leo Moretti's Motion for New Trial is denied and his renewed Motion for Judgment as a Matter of Law is denied.

Plaintiffs' Motion for a New Trial is denied.

Counsel shall submit appropriate orders and a judgment.

R.I.Super.,2005.
Rosetta v. Moretti
Not Reported in A.2d, 2005 WL 1109638 (R.I.Super.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.