# EXHIBIT XX



Page 1

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. West Virginia,
Martinsburg.
Dianna WITTENBERG, Plaintiff,
v.
FIRST INDEPENDENT MORTGAGE COMPANY, et al., Defendants.

Civil Action No. 3:10–CV–58.
April 11, 2011.

Bobbie U. Vardan, R & B Lawgroup, PLLC, Falls Church, VA, Garry G. Geffert, Garry G. Geffert, Attorney at Law, Martinsburg, WV, for Plaintiff.

John O. Easton, Jordan, Coyne & Savits, LLP, Fairfax, VA, Jeremy Cook Hodges, Marc E. Williams, Nelson Mullins Riley & Scarborough, LLP, Huntington, WV, Christopher R. Arthur, Lesley A. Wheeler, Samuel I. White, PC, Charleston, WV, for Defendant.

*MEMORANDUM OPINION AND ORDER*
JOHN PRESTON BAILEY, District Judge.

**\*1** Currently pending before the Court are Defendant U.S. Bank N.A.'s ("U.S.Bank") Motion to Dismiss [Doc. 66], filed February 14, 2011; Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss [Doc. 68], filed February 14, 2011; Defendant Mortgage Electronic Registration Systems, Inc.'s ("MERS") Motion to Dismiss [Doc. 73], filed February 22, 2011; Defendant First Independent Mortgage Company's ("First Independent") Motion to Dismiss [Doc. 75], filed February 23, 2011; and the plaintiff's Motion for Leave to File a Surreply [Doc. 93], filed April 7, 2011. These motions have been fully briefed and are now ripe for decision. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that U.S. Bank's, First Independent's, and MERS' motions should be **GRANTED**;

Wells Fargo's motion should be **GRANTED IN PART** and **DENIED IN PART**; and the plaintiff's motion should be **GRANTED.**

*BACKGROUND*
I. *Factual Allegations*

**A. Consummation of Loan at Issue**

In 2005, while attending a financial seminar, the plaintiff met a mortgage loan broker employed by First Independent named Andy Swanson ("Swanson"). ( [Doc. 65] at ¶¶ 18–19). Swanson told the plaintiff that he could get her a refinance loan with beneficial and favorable terms. (*Id.*). At some point thereafter, the plaintiff contacted Swanson to refinance her loan and extract equity for outstanding expenses. (*Id.* at ¶ 20). Swanson informed the plaintiff that she had close to $200,000.00 of equity in her house and advised the plaintiff that she should take out 90% of her equity. (*Id.* at ¶ 21). The plaintiff, however, only agreed to withdraw 60% of her equity. (*Id.* at ¶ 22). Nevertheless, the plaintiff agreed to apply for a refinance loan under the terms that Swanson explained, including low closing costs, a low interest rate, and a low monthly payment. (*Id.* at ¶ 23). Swanson requested the plaintiff's financial information for the loan application, which the plaintiff then provided. (*Id.* at ¶ 24). In filling out the plaintiff's loan application, Swanson overstated the plaintiff's monthly income as $16,000.00. (*Id.* at ¶ 25). The plaintiff protested several times and instructed Swanson to state her income correctly; however, Swanson said the income amount was just *pro forma* and accuracy was unimportant. (*Id.* at ¶ 26). Although Swanson promised to correct the plaintiff's income in the loan application, he did not make the correction. (*Id.* at ¶ 27).

In February 2006, the plaintiff attempted to close on the refinance loan. (*Id.* at ¶ 28). However, after initially signing some of the proffered documents, the plaintiff walked away from the closing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

because the closing costs were much greater than Swanson had previously promised. (*Id.*). Swanson rescheduled the closing; however, the plaintiff again declined to execute the documents because they showed different closing costs. (*Id.* at ¶ 29). On March 21, 2006, the plaintiff also walked away from a closing, after partially signing a number of loan documents. (*Id.* at ¶ 30). At the end of each failed closing, the plaintiff was informed that the papers she signed would be shredded. (*Id.* at ¶ 31).

**\*2** Finally, on March 27, 2006, the plaintiff closed on her refinance loan at the office of attorney George Glass ("Glass"), signing, initialing, and dating each page of the loan documents, including a promissory note ("Note") of $416,000.00 [FN1] and deed of trust ("DOT"). (*Id.* at ¶ 32). The loan terms did not require payment of an amount for escrow for property taxes and insurance; instead, the plaintiff was to pay the taxes and insurance herself. (*Id.* at ¶ 33). The plaintiff did not receive copies of the signed loan documents that day because Glass said he would mail a copy of the documents to the plaintiff. (*Id.* at ¶ 34). The plaintiff did not receive copies from the March 27, 2006, closing until she went to Glass' office to retrieve them in June 2009. (*Id.* ¶ at 35). The copies obtained at that time did not accurately reflect the loan terms to which the plaintiff had agreed. (*Id.* at ¶ 36).

> FN1. Approximately $280,000.00 of the proceeds were used to pay off the existing loan, and approximately $125,000.00 of the proceeds were paid to the plaintiff in cash. ( [Doc. 69] at 1 n. 1).

**B. Escrow Issues, Imminent Default, Loan Modifications**

One year after the March 27, 2006, closing, Wells Fargo, the servicer of the plaintiff's loan, began to send the plaintiff letters threatening to add tax and insurance escrows to the monthly payments of the loan. (*Id.* at ¶ 37). In response, the plaintiff sent several letters and made numerous phone calls to Wells Fargo to address the escrow issues and to avert potential problems and double payments; Wells Fargo did not respond. (*Id.* at ¶¶ 38, 39). When the plaintiff went to the county tax office to pay her property tax, she learned that Wells Fargo had already paid the tax. (*Id.* at ¶ 40). Subsequently, when the plaintiff tried to make her usual mortgage payment, Wells Fargo refused to accept it unless the payment included an additional amount for escrow for taxes. (*Id.* at ¶ 41).

Facing an imminent default, the plaintiff and a Wells Fargo executive specialist named Leann Miller ("Miller") reached an arrangement whereby Wells Fargo would accept the plaintiff's monthly payments without escrow until Wells Fargo could investigate the escrow and return the loan to non-escrow status. (*Id.* at ¶¶ 42, 43). Miller also encouraged the plaintiff to modify her loan to obtain a fixed interest rate and referenced several modification programs available at Wells Fargo. (*Id.* at ¶ 44). In particular, Miller offered the plaintiff a "payment moratorium" for six months with the assurance that the modification process would only take 45 to 90 days and that the plaintiff's credit would not be negatively affected during the processing time. (*Id.* at ¶ 46). At the same time, Miller also informed the plaintiff that, as part of the modification, Wells Fargo would extend the loan term, reduce the interest rate, and reduce the plaintiff's monthly payments by $500.00 to $600.00. (*Id.*). In reliance upon Miller's statements, the plaintiff submitted all of the required documents to Wells Fargo for the modification and stopped making her monthly loan payments. (*Id.* at ¶¶ 47, 49).

**\*3** In March 2009, the plaintiff received from Wells Fargo a proposed loan modification, dated February 11, 2009, that raised her monthly payment to $2,433.37, a payment higher than the amount Wells Fargo asserted the plaintiff had to pay under the original loan terms after adding the escrow amount. (*Id.* at ¶ 50). At the same time, Wells Fargo refused to accept monthly payments from the plaintiff, claiming that she was three months in arrears. (*Id.* at ¶ 51). When contacted, Wells Fargo would not explain why the plaintiff's monthly pay-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

ment had increased. (*Id.* at ¶ 52). Shortly thereafter, the plaintiff was able to contact Miller who confirmed that Wells Fargo was participating in the Home Affordable Modification Program ("HAMP") but would not answer any questions about the program. (*Id.* at ¶ 57). At that time, Miller informed the plaintiff that she did not fully understand any Wells Fargo modification processes and that the plaintiff would have to resubmit all required documentation to Well's Fargo's Loss Mitigation Department. (*Id.* at ¶ 58). The plaintiff resubmitted documents for modification, as directed. (*Id.* at ¶ 60).

In May 2009, the plaintiff received a second modification offer from Wells Fargo proposing to lower her monthly payments to $2,013.36 (including escrow), resulting in a payment that was $23.31 lower. (*Id.* at ¶ 61). The plaintiff believed her monthly payments under the HAMP would have been between $1,500.00 and $1,700 .00 (31% of gross income), though Wells Fargo would not answer the plaintiff's questions about the calculation of her income for purposes of the program. (*Id.* at ¶ 62). By letter dated August 3, 2009, Wells Fargo informed the plaintiff that it was unable to offer a HAMP modification because of a monthly income deficiency of $279.97. (*Id.* at ¶ 66).

In February 2010, after correcting an error in the plaintiff's income calculation, Wells Fargo informed the plaintiff that she qualified for a $1,570.00 monthly payment and promised that if she made timely payments for three months, the modification would become permanent. (*Id.* at ¶ 75). The plaintiff timely made the three agreed-upon payments. (*Id.* at ¶ 76). In May 2010, however, Wells Fargo informed the plaintiff that it had placed her in active foreclosure status again. (*Id.* at ¶ 77). That same month, another Wells Fargo executive specialist named Bonnie Shenker ("Shenker") informed the plaintiff that her modification offers had been "traditional modifications" and that Wells Fargo was "uncertain whether her investor would participate under HAM P." (*Id.* at ¶ 79). Shenker told the plaintiff to complete another modification application; that she did not qualify for the HAMP because she was delinquent on her loan; that Bank of America, N.A. ("BofA") was the "investor" on the loan; and advised the plaintiff to find another more affordable place to live. (*Id.* at ¶ 80).

**C. Defective Documents, Securitization in Secondary Mortgage Market**

**\*4** In an August 3, 2009, response to a Qualified Written Request, Wells Fargo presented a note purportedly signed by the plaintiff on March 21, 2006, as evidence of her underlying obligation and stated that the plaintiff's loan originated on March 21, 2006. (*Id.* at ¶ 84). Wells Fargo also presented a DOT purportedly dated March 27, 2006, and allegedly signed by the plaintiff. (*Id.* at ¶ 85). However, the DOT is devoid of the plaintiff's initials on the middle 13 pages, and it appears that her initials have been forged on the first page and the date of the document altered. (*Id.*). Despite repeated requests, Wells Fargo has not produced the March 27, 2006, Note.

At some point subsequent to its execution, MERS assigned the March 27, 2006, DOT to U.S. Bank, as Trustee for Banc of America Funding Corporation 2006–G, effective July 31, 2009. (*Id.* at ¶ 88). The plaintiff disputes that she approved the assignment and argues that the date of the document has been altered. (*Id.*). The plaintiff alleges that the securitization of her loan on the secondary mortgage market was actually the object of a joint venture among certain defendants. In particular, the plaintiff alleges that: (1) First Independent acted as a "broker" for Wells Fargo; (2) First Independent processed the plaintiff's application using Wells Fargo's underwriting criteria; (3) First Independent closed the plaintiff's loan in its name, but Wells Fargo promptly acquired the loan; (4) the funding for First Independent loans came from "investors," who bought the certificate and bonds of the mortgage-backed securities; and (5) First Independent loans were pre-sold into multiple trusts as collaterized debt obligations. (*Id.* at ¶¶ 96–100). According

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

to the plaintiff, "the Trusts have been paid many times the full value of [her] Note through a derivative and/or credit default swap instrument by AIG, MBIA Insurance Corporation or a comparable entity." (*Id.* at ¶ 109).

**II. *Procedural History***

On June 8, 2010, the plaintiff filed suit in this Court against, *inter alia,* First Independent (Original Lender), Wells Fargo (Servicer), MERS (Nominal Lender), and U.S. Bank (Trustee) [Doc. 1]. The plaintiff's First Amended Complaint [Doc. 65], filed on February 4, 2011, contains twelve causes of action against the above-named defendants, either jointly or individually: (Count I) violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.;* (Count II) violations of the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.,* and 12 C.F.R. § 226 ("Regulation Z"); (Count III) civil conspiracy; (Count IV) breach of contract/implied covenant of good faith and fair dealing (Count V) unjust enrichment; (Count VI) fraud; (Count VII) breach of fiduciary duty; (Count VIII) negligence; (Counts IX) fraudulent, deceptive, or misleading representations in violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W.Va.Code § 46A–2–122, *et seq.;* (Count XI) unfair or deceptive acts or practices in violation of the WVCCPA; (Count XII) slander of title; and (Count XIII) declaratory judgment. Between February 14, 2011, and February 23, 2011, the above-named defendants moved to dismiss the First Amended Complaint for failure to state a claim against them upon which relief can be granted [Docs. 66, 68, 73, & 75].

**A. First Independent's Motion**

*5 First Independent argues that the plaintiff has no private right of action under RESPA and that her TILA, civil conspiracy, fraud, breach of fiduciary duty, and negligence claims are time-barred. First Independent also argues that the plaintiff's unjust enrichment, WVCCPA, and slander of title claims lack legal and factual support.

In response, the plaintiff argues that First Independent's joint venture with Wells Fargo supports a claim under section 2605 of RESPA for which a private cause of action exists. The plaintiff also contends that the statute of limitations for her TILA, civil conspiracy, fraud, breach of fiduciary duty, and negligence claims should be tolled based upon allegations of joint venture. Finally, the plaintiff argues that her other claims are legally and factually supported.

First Independent replies that the plaintiff's claims must be dismissed because she has failed to sufficiently plead the elements of a joint venture.

**B. Wells Fargo's Motion**

Like First Independent, Wells Fargo argues that the plaintiff has no private right of action under RESPA and that her TILA claim is time-barred. Wells Fargo also argues that the plaintiff has failed to state a breach of contract claim because she has no private right of action under the HAMP, nor is she an intended beneficiary of the Servicer Participation Agreement ("SPA") or the Pooling and Servicing Agreement ("PSA"). As for the plaintiff's civil conspiracy, fraud, unjust enrichment, breach of fiduciary, negligence, WVCCPA, and slander of title claims, Wells Fargo argues that those claims are either preempted by the National Bank Act ("NBA") or insufficiently pled.

In response, the plaintiff concedes that she has no private right of action under section 2604 of RESPA, but she again contends that she has stated a claim under section 2605. The plaintiff also reasserts that the TILA statute of limitations should be tolled. Next, the plaintiff concedes that she has no private right of action under the HAMP but claims she has asserted a breach of contract claim independent of the HAMP. Finally, the plaintiff argues that the NBA does not preempt her remaining claims, which she contends are sufficiently pled in connection with an alleged joint venture.

Wells Fargo replies that the plaintiff has failed to state a RESPA claim under section 2605, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

TILA statute of limitations should not be tolled, the plaintiff has failed to state a breach of contract claim independent of the HAMP, and the plaintiff's remaining claims are preempted.

### C. MERS' Motion

In support of its dismissal, MERS incorporates by reference the arguments of Wells Fargo and U.S. Bank. In response, the plaintiff argues that, as a participant of an alleged joint venture, MERS should not be dismissed. MERS replies that the plaintiff has failed to sufficiently plead the requirements of a joint venture, and even if not, the plaintiff's DOT authorizes MERS to assign her Note to third parties.

### D. U.S. Bank's Motion

***6** U.S. Bank argues that the plaintiff's TILA claim is untimely and that the other claims are either insufficiently pled or preempted by the NBA. According to U.S. Bank, the civil conspiracy claim fails to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, the unjust enrichment and negligence claims lack factual and legal support, and the declaratory judgment requested is legally unwarranted.

In response, the plaintiff argues that the TILA statute of limitations should be tolled, NBA preemption is unavailable to U.S. Bank, and her other claims are supported in fact and law.

U.S. Bank replies that the plaintiff has failed to demonstrate facts sufficient to justify application of equitable tolling and that NBA preemption is available.

### E. Plaintiff's Motion for Leave to File Surreply

On April 7, 2011, a week after completion of briefing, the plaintiff filed a Motion for Leave to File Surreply [Doc. 93]. According to the plaintiff, her proposed Surreply would serve two purposes. Namely, the filing would clarify some of her factual allegations and provide newly discovered evidence. As for clarification, the plaintiff argues that: (1) she has "impliedly" alleged violations of sections 2607(a) and 2605(e)(1)(A) of RESPA; (2) the TILA statute of limitations should be tolled; (3) she has plead the requisite elements of joint venture; and (4) she is an intended beneficiary of the PSA. ( [Doc. 93] at 4–6). With regard to newly discovered evidence, the plaintiff states that she discovered on March 10, 2011, that AIG is now repurchasing several assets, including the plaintiff's loan. (*Id.* at 6–8).

Upon careful consideration, this Court finds that the plaintiff has shown good cause to file a surreply and hereby **GRANTS** the plaintiff's motion **[Doc. 93].** Accordingly, the plaintiff's Surreply should be deemed already filed.

### *DISCUSSION*
### I. *Motion to Dismiss Standard*

In assessing a Rule 12(b)(6) motion for failure to state a claim, the court must accept the factual allegations contained in the complaint as true. *Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.,* 910 F.2d 139, 143 (4th Cir.1990). A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is *plausible* on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007) (emphasis added).

"A complaint need only give 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *In re Mills,* 287 Fed.Appx. 273, 280 (4th Cir.2008) (quoting Fed.R.Civ.P. 8(a)(2)). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (internal quotations and citations omitted). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancements." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

1949, 173 L.Ed.2d 868 (May 18, 2009) (internal quotations and citations omitted).

**\*7** Additionally, a 12(b)(6) motion must be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56(c) where "matters outside the pleadings are presented to and not excluded by the court." Fed.R.Civ.P. 12(d). Here, other than those documents which are matters of public record, e.g., the plaintiff's DOT and Note, this Court has excluded all other matters which are "outside the pleadings." See *Mack v. South Bay Beer Distrib., Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986) "[O]n a motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment."). Accordingly, a summary judgment standard is inapplicable to the defendants' motions. See Fed.R.Civ.P. 12(d).

**II.** *Analysis*

In their motions, the defendants move to dismiss the First Amended Complaint for failure to state a claim upon which relief may be granted. The defendants provide support for dismissal of each count pled against them, while the plaintiff contends that each count should proceed. Below, the Court will consider each count, in turn. First, however, the Court must address whether the plaintiff has sufficiently pled that a joint venture and/or civil conspiracy existed among any combination of the movants, including First Independent, Wells Fargo, MERS, and U.S. Bank.

**A. Joint Venture/Conspiracy**

**1. Joint Venture**

In response to a majority of the defendants' arguments, the plaintiff often relies on the theory of joint venture. The defendants reply that the plaintiff has failed to sufficiently plead the requisite elements of a joint venture. This Court agrees.

In West Virginia, a joint venture is defined as "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." *Armor v. Lantz,* 207 W.Va. 672, 677, 535 S.E.2d 737, 742 (2000) (quoting *Price v. Halstead,* 177 W.Va. 592, 595, 355 S.E.2d 380, 384 (1987)). "[A joint venture] arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied." *Id.* Once established, "each venturer is liable for the unlawful acts of a co-venturer when the act is committed within the scope of the venture and with the implied consent of the venturer." *Short v. Wells Fargo Bank Minn., N.A.,* 401 F.Supp.2d 549, 563 (S.D.W.Va.2005).

In the First Amended Complaint, the plaintiff alleges joint venture only in the following context:

Upon information and belief, defendant First Independent, the listed "Lender" in plaintiff's closing documents actually acted as the "broker," and engaged in a Joint Venture with Wells Fargo Bank to underwrite the plaintiff's loan.

First Independent processed plaintiff's application using Wells Fargo's underwriting criteria.

First Independent closed plaintiff's loan in its name and Wells Fargo promptly purchased it.

**\*8** Upon information and belief, the funding for the First Independent loans which were securitized came from the purchasers, known as "investors," who had the certificate and bonds of the mortgage backed securities. These investors are the true "lenders."

First Independent was simply an intermediary. It put up none of its own money, and was never at risk. Loans it closed were presold into multiple Trusts as collateralized debt obligations.

...

Wells Fargo, as co-venturer with First Independent Mortgage Company and 2006–G trust in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

procuring of the mortgage loan from plaintiff and int [sic] the sale of the Note, is equally responsible for the damages Plaintiff has suffered.

( [Doc. 65] at ¶¶ 96–100, 201).

In other words, the plaintiff alleges that First Independent and Wells Fargo entered into a joint venture the object of which was to close on the plaintiff's loan and then immediately sell the Note to investors on the secondary mortgage market. The above-quoted allegations neither mention MERS or U.S. Bank nor outline any alleged misconduct beyond the securitization of the plaintiff's Note. As such, the dispositive issue is not whether First Independent and Wells Fargo formed a joint venture but whether either of their alleged participation in a plan to securitize the plaintiff's Note is unlawful.

However, the plaintiff has failed to cite a single case, and this Court's independent research was unable to discover one, which stands for the proposition that securitization is unlawful. In fact, this Court has found only cases in which district courts have rejected claims based upon securitization, finding that the practice is lawful. *See e.g., Bukhari v. T.D. Services Co.,* 2010 WL 2762794, *5 (D.Nev. July 13, 2010) (rejecting conversion claims based upon securitization of mortgage); *Bello v. Chase Home Finance,* 2011 WL 13351, *1 (S.D.Cal. Jan. 14, 2011) (rejecting securities fraud claim based upon securitization of mortgage); *Koehler v. Wells Fargo Bank,* 2011 WL 691583, *3 (D.Md. Feb.18, 2011) (rejecting civil conspiracy to defraud claim based upon securitization of mortgage); *Labuanan v. U.S. Bank, N.A.,* 2011 WL 939039, *9 (D.Haw. Feb.24, 2011) (rejecting civil conspiracy claim in case involving mortgage securitization for failure to allege underlying claim). In addition, the DOT provides that "the Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times **without prior notice to Borrower.** " ( [Doc. 1–2] at ¶ 20) (emphasis added). Accordingly, this Court finds that the plaintiff has failed to plead an underlying wrongdoing to support any claim of joint venture .

FN2 As such, the plaintiff's references to a joint venture in her briefs in opposition to the instant motions are unavailing and will be disregarded below.

> FN2. Neither the plaintiff's arguments regarding joint venture nor the "new material evidence" in her Surreply dissuade this Court from this conclusion.

**2. Count III: Civil Conspiracy**

In Count III, the plaintiff alleges that "First Independent, Wells Fargo, MERS and U.S. Bank acted together in a combined and concerted effort to achieve a preconceived plan to induce [her] to enter into a securities transaction, the details of which were intentionally concealed from [her], in violation of law." ( [Doc. 65] at ¶ 134). Specifically, the plaintiff alleges that "defendants had an understanding that the underlying debt obligation created by plaintiff's loan would be immediately packaged and sold, to investors on a secondary mortgage market...." (*Id* . at ¶ 135). "In an effort to conceal the true identity of the transaction," the plaintiff alleges, "defendants agreed ... to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the plaintiff." (*Id.* at ¶ 139). Finally, the plaintiff alleges that "Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense and detriment to plaintiff." ( *Id.* at ¶ 141).

**\*9** In West Virginia, "[a] civil conspiracy is not a *per se,* stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." *Dunn v. Rockwell,* 225 W.Va. 43, 57, 689 S.E.2d 255, 269 (2009) (citing *Kessel v. Leavitt,* 204 W.Va. 95, 129, 511 S.E.2d 720, 754 (1998)). Here, the plaintiff's conspiracy claim, as pled, appears to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

be based upon the underlying tort of fraud, i.e., that the defendants fraudulently induced the plaintiff into a mortgage loan that they fraudulently concealed would be sold on the secondary mortgage market.

Similar to the plaintiff's allegations of joint venture, her civil conspiracy claim alleges that the defendants conspired to close on the plaintiff's loan and then immediately sell the Note to investors on the secondary mortgage market. As with joint venture, the issue here is not whether the plaintiff has sufficiently pled that the defendants formed a conspiracy. Instead, the dispositive issue is whether the conspiracy, assuming it was formed, had an unlawful purpose. As explained above, however, securitization of a mortgage loan is not unlawful and was expressly permitted by the DOT. *See Bukhari,* 2010 WL 2762794 at *5; *Bello,* 2011 WL 13351 at *1; *Koehler,* 2011 WL 691583 at *3; *Labuanan,* 2011 WL 939039 at *9; ( [Doc. 1–2] at ¶ 20). Accordingly, Count III (Civil Conspiracy) is hereby **DISMISSED** as to all defendants to the extent it relies upon the securitization of the plaintiff's loan.

**B. Counts Common to All Movants**

**1. Count II: TILA**

In Count II, the plaintiff alleges that "Defendants were required by the TILA and Reg. Z to truthfully disclose, before consummation of the loan transaction, [*inter alia,*] the name of all creditors in the transaction [and the] security interest acquired and by whom...." ( [Doc. 65] at ¶ 125). The plaintiff further alleges that "Defendants failed to provide to [her] the pre-disclosures required by the TILA and Reg. Z within the time frame established [therein]," and that "certain disclosures provided by defendants were inaccurate or contradictory disclosures in violation of the TILA and Reg. Z." (*Id.* at ¶¶ 126, 127). "But for defendants' failure to provide the accurate disclosures required by the TILA and Reg. Z," the plaintiff alleges "[she] would not have entered into the subject loan or negotiated more favorable terms." (*Id.* at ¶ 131).

In their motions, the defendants argue that the plaintiff's TILA claim is untimely. The plaintiff responds that the statute of limitations should be equitably tolled because she lacked sufficient notice of any violations due to the defendants' alleged fraud and other misrepresentations. The defendants reply that the plaintiff failed to exercise due diligence in that she waited over three years before she affirmatively attempted to obtain a copy of her March 27, 2006, Note.

**\*10** Upon careful consideration of the above, this Court concludes that the plaintiff's TILA claim is time-barred. In so concluding, this Court finds that the plaintiff has failed to provide sufficient factual allegations, including those in her Surreply, to demonstrate that equitable tolling should apply.

Pursuant to 15 U.S.C. § 1640(e), civil liability claims under TILA are subject to a one-year statute of limitations which begins to run on the "date of the occurrence of the violation." "The 'date of the occurrence of the violation' is the date on which the borrower accepts the creditor's extension of credit." *Mosley v. Countrywide Home Loans, Inc.,* 2010 WL 4484566, *2 (E.D.N.C. Oct.26, 2010) (citing *Davis v. Wilmington Fin. Inc.,* 2010 WL 1375363, *5 (D.Md. Mar.26, 2010)).

Here, the plaintiff accepted First Independent's extension of credit on March 27, 2006. The plaintiff then commenced the present lawsuit on June 8, 2010, almost four-and-one-half years later. As such, more than one year elapsed between the consummation of the loan and the filing of the instant action. Therefore, the plaintiff's claim is barred by the statute of limitations unless equitable tolling applies.

"[T]o withstand a motion to dismiss, [the plaintiff] must set forth facts sufficient to show the necessary elements of the doctrine [of equitable tolling] are present...." *Brackett v. Corinthian Mortg. Corp.,* 2010 WL 1254705, *7 (Bankr.N.D.W.Va. Mar.25, 2010). The Fourth Circuit has previously outlined the "quite narrow" circumstances under which equitable tolling has been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

permitted:

> Equitable tolling has been allowed in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have also recognized that equitable tolling is appropriate when extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time. Equitable tolling is not appropriate, however, where the claimant failed to exercised due diligence in preserving his legal rights.

*Chao v. Va. DOT,* 291 F.3d 276, 283 (2002).

In the instant case, the plaintiff apparently argues that she was "tricked by [the defendants'] misconduct into allowing the filing deadline to pass." (See [Doc. 81] at 6–8). According to the plaintiff, that misconduct includes, *inter alia:* (1) the receipt of false information at the time of closing that First Independent was the lender, when Wells Fargo was the true lender; (2) a joint venture by, among others, Wells Fargo and U.S. Bank to make a profit on the her loan from its inception; (3) the receipt of false information about the true owner of her Note in July and August 2009; and (4) "[a]round August 14, 2009 Defendants, including U.S. Bank knowingly submitted fraudulent information to the Plaintiff to conceal true facts and relationships of the various Defendants involved in Plaintiff's loan when they sent a false substitution of trustee." (*Id.* at 7–8). This Court is unpersuaded.

**\*11** First, the final two allegations of misconduct allegedly occurred in July and August 2009, and thus, cannot possibly explain why the plaintiff was unable to discover the TILA violations by March 27, 2007, when the one-year limitations period expired. Second, the allegation of joint venture is too conclusory to justify application of equitable tolling. See *Labuanan v. U.S. Bank, N.A.,* 2011 WL 939039, \*5 (D.Haw. Feb.24, 2011)

(rejecting plaintiffs' assertion that defendants "fraudulently misrepresented" and "fraudulent[ly] conceal[ed]" the terms of plaintiffs' mortgage as too "conclusory" to justify application of equitable tolling). Finally, the allegation regarding the true identity of her lender is insufficient in light of the plaintiff's failure to exercise due diligence in even obtaining a copy of her Note, waiting almost three-and-a-half years after her closing to affirmatively seek a copy. These allegations, without more, are insufficient for the plaintiff to invoke the doctrine of equitable tolling. As such, the plaintiff's TILA claim is barred by the statute of limitations. Accordingly, the Court finds that Count II (TILA) should be **DISMISSED** as to all defendants.

**2. Count VIII: Negligence**

Count VIII includes both allegations that, *inter alia,* First Independent, Wells Fargo, MERS, and U.S. Bank breached their respective duties to preserve the original Note and have instead referred to an invalid note signed at an aborted closing to threaten foreclosure, as well as an allegation that First Independent breached its duty to verify the plaintiff's income. ( [Doc. 65] at ¶¶ 174–176, 178–180). The Court will consider each, in turn.

**i. Failure to Preserve Note**

The plaintiff alleges that First Independent, Wells Fargo, MERS, and U.S. Bank breached their collective duty to preserve the original March 27, 2006, Note and instead have been operating with an invalid note signed at the March 21, 2006, aborted closing. The defendants argue that the plaintiff has failed to state a plausible negligence claim on these allegations. This Court agrees.

In West Virginia, a plaintiff seeking to recover under a theory of negligence "must prove each of four elements of a tort: duty, breach, causation, and damages." *Carter v. Monsanto,* 212 W.Va. 732, 737, 575 S.E.2d 342, 347 (2002). In arguing that the plaintiff has failed to sufficiently plead the element of damages, the defendants emphasize that the First Amended Complaint: (1) acknowledges that the plaintiff sought and received financing, (2) fails

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

to allege that there were any differences between the March 21, 2006 note and the March 27, 2006 Note, (3) fails to allege that the plaintiff ever repaid the loan or any note evidencing the loan, and (4) concedes that the plaintiff defaulted on the loan. (See [Doc. 67] at 14–15; [Doc. 69] at 18–19). This Court finds the second of these arguments the most persuasive. In fact, this Court has already dismissed breach of fiduciary and negligence claims against the closing attorney based upon his failure to preserve the Note for this reason:

**\*12** [T]he plaintiff has not once alleged that the terms of the March 21, 2006, Note differ in any way from those in the March 27, 2006, Note. Instead, it appears from her allegations, which is all that matters at this stage, that the plaintiff pursues this claim based solely on the fact that the Notes are dated six days apart. That will not suffice to survive a 12(b)(6) motion to dismiss.

...

[F]or the same reasons outlined above, the Court finds that the plaintiff has failed to adequately allege how she has been harmed by Glass' alleged failure to preserve the Note from the completed closing, and by extension, his providing her lender and servicer with the Note from the aborted closing.

( [Doc. 58] at 10, 11).

Again, this Court finds that the plaintiff has failed to adequately allege how she has been harmed by the defendants' failure to preserve her original Note. Accordingly, Count VIII (Negligence) is hereby **DISMISSED** as to all defendants to the extent it is based upon a failure to preserve the plaintiff's March 27, 2006, Note.

**ii. Failure to Verify Income**
The plaintiff alleges that "First Independent breached its duties to [her] when it failed to verify [her] accurate income, and instead used an inflated figure of $16,000.00 per month ($192,000.00 annually) to qualify her for the subject loan." ( [Doc. 65] at ¶ 176). First Independent argues that the plaintiff's claim is time-barred. This Court agrees.

Negligence is governed by the two-year statute of limitations found in W.Va.Code § 55–2–12. *See Dunn,* 689 S.E.2d at 268. Here, any failure to verify the plaintiff's income would have occurred, if at all, prior to the March 27, 2006, closing. At best, therefore, the statute of limitations would have run in March 2008.[FN3] Because the plaintiff failed to bring suit until June 8, 2010, her negligence claim is time-barred. Accordingly, Count VIII (Negligence) is hereby **DISMISSED** as to First Independent to the extent it is based upon a failure to verify income.

> FN3. There is no need to conduct a discovery rule analysis insofar as the plaintiff alleges that she protested the income, and thus, was on notice that it had been inflated prior to her closing. (See [Doc. 65] at ¶¶ 24–27).

**C. Counts Common to First Independent, Wells Fargo, and MERS**

**1. Count VI: Fraud**

Count VI includes both allegations that First Independent, Wells Fargo, and MERS jointly defrauded the plaintiff, as well as allegations that First Independent alone defrauded the plaintiff. ( [Doc. 65] at ¶¶ 161–162). The Court will consider each, in turn.

**i. Misrepresentations by First Independent, Wells Fargo, and MERS**
The plaintiff alleges that First Independent, Wells Fargo, and MERS fraudulently represented that: (1) First Independent is the lender; (2) the plaintiff qualified for the loan; (3) MERS has authority to initiate foreclosure on the plaintiff's property; and (4) Wells Fargo is merely the servicer. ( [Doc. 65] at ¶ 162). The defendants argue that the plaintiff's claim is untimely and insufficiently pled.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

This Court agrees.

In West Virginia, a claim of fraud will be successful only if a plaintiff proves: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it." *Terra Firma Co. v. Morgan,* 223 W.Va. 329, 334, 674 S.E.2d 190, 195 (2008) (quoting *Horton v. Tyree,* 104 W.Va. 238, 242, 139 S.E. 737, 738 (1927)). A cause of action for fraud is governed by the two-year statute of limitations found in W.Va.Code § 55–2–12. *See Dunn,* 689 S.E.2d at 268.

**\*13** Any alleged misrepresentation as to the identity of the lender and servicer, and as to whether the plaintiff qualified for the loan would have necessarily been made, if at all, prior to or at the time of the closing which occurred more than four years before the filing of this suit. Thus, those claims are untimely. Moreover, even if timely, the plaintiff has failed to allege how she would be damaged if First Independent were not the "true" lender or Wells Fargo were more than "merely" the servicer. As such, those claims are insufficiently pled.

Any representation that MERS has the authority to initiate foreclosure is not false if made prior to assignment, and could not have damaged the plaintiff if made after assignment. Prior to assignment, "MERS (as nominee for Lender and Lender's successors and assigns) ha[d] the right ... to foreclose and sell the Property" pursuant to the DOT. ( [Doc. 1–2] at 3). After assignment, there is no allegation that MERS initiated foreclosure. Instead, the plaintiff alleges repeatedly that the substitute trustee, Seneca Trustees, Inc. ("Seneca") *attempted* to initiate foreclosure on behalf of Wells Fargo. (See [Doc. 65] at ¶ ¶ 95, 170, 171). As such, the plaintiff has insufficiently pled the elements of falsity and damages. Accordingly, Count VI (Fraud) is hereby **DISMISSED** as to First Independent, Wells Fargo, and MERS to the extent it relies upon the above-outlined alleged misrepresentations.

**ii. Misrepresentations by First Independent**

Exclusive to First Independent, the plaintiff alleges that "at numerous times before and at the time of the closing, First Independent, ... made representations to plaintiff pertaining to the loan that were false and fraudulent," including that: (1) "the plaintiff was qualified for this loan based upon the financial information provided by plaintiff;" (2) "the overstated income on the application would be corrected;" (3) "the charged fees were the lowest;" (4) "her credit score" was sufficient and would be protected; and (5) "if plaintiff paid for 3 months, Plaintiff would get a permanent modification." ( [Doc. 65] at ¶ 161).

Again, the first four alleged misrepresentations would been made, if at all, prior to or at the time of the closing, which occurred more than two years before the filing of this suit. Those claims are, therefore, untimely. The allegation that First Independent misrepresented that the plaintiff would receive a permanent loan modification also fails to state a plausible fraud claim. First, the plaintiff alleges that all five allegations were made "at numerous times before and at the time of the closing." ( [Doc. 65] at ¶ 161). As such, a fraud claim based upon that representation is also time-barred. Second, insofar as everywhere else in the First Amended Complaint the plaintiff alleges that she dealt exclusively with Wells Fargo for a loan modification, this allegation can only be interpreted as another attempt to hold First Independent liable for the actions of Wells Fargo under a theory of joint venture. However, because this Court has already rejected that theory, this allegation cannot support a claim of fraud against First Independent. Accordingly, Count VI (Fraud) is hereby **DISMISSED** as to First Independent to the extent it relies upon the above-outlined alleged misrepresentations.

**2. Count IX: WVCCPA—Fraudulent, Deceptive, or Misleading Representations**

**\*14** In Count IX, the plaintiff alleges that "[e]ach of the letters written by or on behalf of defendants First Independent, [MERS], Wells Fargo,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

Samuel I. White, PC and Seneca Trustees to [her] claiming a delinquency in her mortgage is a separate fraudulent, deceptive or misleading representation of the character, extent or amount of [their] claim against [her], in violation of W.Va.Code § 46A–2–127( [d] )." ( [Doc. 65] at ¶ 187). Specifically, the plaintiff alleges that she received "foreclosure notices sent to her by Wells Fargo," that "Wells Fargo sent [her] foreclosure notices referencing a different loan number [than on the DOT]," and that she received "several notices from Defendant Samuel I. White, PC stating that it had been retained by defendant Wells Fargo to institute foreclosure proceedings...." (*Id.* at ¶¶ 70, 104, 106, 689 S.E.2d 255). The defendants argue that the plaintiff has failed to state a claim under section 46A–2–127(d), and even if not, said claim is preempted by the NBA. This Court agrees.

First, the plaintiff has failed to allege that she was not delinquent on her loan payments. In fact, she admits that she was three months behind, though she alleges that she stopped making payments in reliance upon statements by a Wells Fargo representative. (See [Doc. 65] at ¶ 51). If, according to her own allegations, the plaintiff was delinquent, then the foreclosure notices could not have been fraudulent, deceptive, or misleading as a matter of law.

Moreover, to the extent the plaintiff argues that any claim of delinquency was fraudulent, deceptive, or misleading because she only became delinquent in reliance upon representations made by Wells Fargo during a potential loan modification, her claim is preempted. Specifically, the plaintiff's claim is preempted by the NBA and the regulations promulgated thereunder as a "servicing" claim that "obstructs, impairs, or conditions" a national bank, Wells Fargo. See 12 C.F.R. § 34.4(a)(10) ("[A] national bank may make real estate loans ... without regard to state law limitations concerning, *inter alia* ... [p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages[.]"). In other words, because restricting the content of Wells Fargo's communications with a borrower in considering a potential loan modification implicates the "processing" and "servicing" of mortgages by a national bank, the plaintiff's claim is expressly preempted. Accordingly, Count IX (WVCCPA) is hereby **DISMISSED** as to Wells Fargo and the other named-defendants to the extent this Court has rejected the plaintiff's joint venture theory.

**D. Count Common to First Independent, Wells Fargo, and U.S. Bank**

**1. Count V: Unjust Enrichment**

Count V contains both allegations that the securitization of the plaintiff's loan has resulted in unjust enrichment for, *inter alia,* First Independent, Wells Fargo, and U.S. Bank, as well as an allegation that Wells Fargo alone was unjustly enriched by collecting a fee without performing a loan modification. ( [Doc. 65] at ¶¶ 154, 156). The Court will consider each, in turn.

**i. Securitization of Loan**
*15 The plaintiff alleges that First Independent, Wells Fargo, and U.S. Bank were unjustly enriched by securitization in the form of "payments from third parties including but not limited to investors, insurers, Credit Default Swaps, other borrowers, the United States Department of the Treasury, the United States Federal Reserve, and Federal bailout from the tax payer money." ( [Doc. 65] at ¶ 159).

"A claim of unjust enrichment generally entails the establishment of three elements: (1) a benefit conferred upon the [defendant], (2) an appreciation or knowledge by the defendant of such benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value ." *Veolia Es Special Services, Inc. v. Techsol Chem. Co.,* 2007 WL 4255280, at *9 (S.D.W.Va. Nov.30, 2007) (citation omitted). In West Virginia, however, the third element is satisfied only if "it would be inequitable

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*and* unconscionable to permit the party receiving [benefits] to avoid payment therefor...." *Realmark Developments, Inc. v. Ranson,* 208 W.Va. 717, 721–22, 542 S.E.2d 880, 884–85 (2000) (emphasis added).

Here, even assuming that the securitization of the plaintiff's loan on the secondary mortgage market conferred a benefit upon the defendants, and that the defendants appreciated that benefit, the plaintiff has failed to sufficiently allege how the defendants' retention of that benefit is both inequitable and unconscionable. As with the plaintiff's joint venture and civil conspiracy theories, her unjust enrichment can be successful only if the securitization of her loan was wrongful. Again, however, this Court finds that the securitization of the plaintiff's loan was neither unlawful nor unauthorized by the DOT. *See Bukhari,* 2010 WL 2762794 at *5; *Bello,* 2011 WL 13351 at *1; *Koehler,* 2011 WL 691583 at *3; *Labuanan,* 2011 WL 939039 at *9; ( [Doc. 1–2] at ¶ 20). Accordingly, Count V (Unjust Enrichment) is hereby **DISMISSED** as to all defendants to the extent it relies upon the securitization of the plaintiff's loan.

**ii. Upfront Loan Modification Fee**

The plaintiff alleges that Wells Fargo was unjustly enriched by "collect[ing] an upfront fee from [her] without performing a loan modification." ( [Doc. 65] at ¶ 154). Without clarification, this Court can only assume that by "upfront fee" the plaintiff is referring to the three loan payments she made during a trial modification. (See *Id.* at ¶¶ 75–77). However, the plaintiff fails to allege that those trial payments were not credited to her account. As such, Wells Fargo could not have been unjustly enriched. Accordingly, Count V (Unjust Enrichment) is hereby **DISMISSED** to the extent it relies upon the plaintiff's loan payments during a trial modification.

**E. Counts Common to First Independent and Wells Fargo**

**1. Count I: RESPA**

**\*16** Count I contains both allegations that First Independent and Wells Fargo jointly violated RESPA and that Wells Fargo alone violated RESPA. ( [Doc. 65] at ¶¶ 118–119). The Court will consider each allegation, in turn.[FN4]

> FN4. However, this Court will not consider the alleged violations of RESPA mentioned in the plaintiff's Surreply that she argues she "implied" in her First Amended Complaint. If this Court must search high and low for "implied" claims, by their very nature those claims are insufficiently pled.

**i. RESPA Violation by First Independent and Wells Fargo**

The plaintiff alleges that First Independent and Wells Fargo "violated 12 U.S.C. § 2604(c) by failing to provide [her] the required pre-disclosure statements along with the Good Faith Estimate ('GFE') and the Uniform Residential Loan Application ('URLA') within three business days after the URLA was received or prepared." ( [Doc. 65] at ¶ 118). In their motions, the defendants argue that the plaintiff has no private right of action under section 2604 of RESPA. In response, the plaintiff concedes that she has no private right of action under section 2604. Accordingly, Count I (RESPA) is hereby **DISMISSED** as to First Independent and Wells Fargo to the extent it relies upon section 2604.

**ii. RESPA Violation by Wells Fargo**

The plaintiff also alleges that "Wells Fargo failed to adequately respond to a Qualified Written Request sent on June 10, 2009, as Wells Fargo did not provide [her] with a copy of the Note that [she] signed on March 27, 2006," in violation of section 2605 of RESPA. ( [Doc. 65] at ¶ 119). Wells Fargo argues that the plaintiff has failed to state a claim under section 2605. This Court agrees.

"A 'qualified written request' is a 'written correspondence' that (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for borrower's belief that the account is in error

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

or provides sufficient detail to the servicer regarding other information sought by the borrower." *Sipe v. Countrywide Bank,* 690 F.Supp.2d 1141, 1154 (E.D.Cal.2010) (citing 12 U.S.C. § 2605(e)(1)(B)(i)-(iii)). Once received, a loan servicer may properly respond to a Qualified Written Request ("QWR") in three ways:

> First, the loan servicer has the option of making corrections to the borrower's account, and informing the borrower of the corrections in writing while also including the contact information of a representative who could provide further assistance. 12 U.S.C. § 2605(e)(2)(A). The servicer's second option is to investigate the request and provide the borrower with a written explanation that includes the reasons the servicer believes that the account is correct, combined with the contact information of a representative who could provide further assistance. 12 U.S.C. § 2605(e)(2)(B). Lastly, the servicer may investigate the matter and provide written response to the borrower as to the reasons the servicer cannot obtain the information the borrower requested if indeed such information could not be obtained. 12 U.S.C. § 2605(e)(2)(C).

*Carter v. Countrywide Home Loans, Inc.,* 2009 WL 2742560, \*6 (E.D.Va. Aug.25, 2009). Finally, a plaintiff must allege that the loan servicer's failure to properly respond to a QWR caused pecuniary damage. *See Allen v. United Financial Mortgage Corp.,* 660 F.Supp.2d 1089, 1097 (N.D.Cal.2009) (holding that the plaintiff's failure "to allege any pecuniary loss attributable to the violation [was] fatal to [his] RESPA claim").

**\*17** Upon a very liberal review of the First Amended Complaint, the plaintiff alleges that she requested a copy of her March 27, 2006, Note, and Wells Fargo sent her the invalid March 21, 2006, note. According to the plaintiff, Wells Fargo's response with the invalid note "caused both [her] home debt to increase by over $37,000.00 and loss of her good credit." ( [Doc. 80] at 6) (citing [Doc. 65] at §§ 81–82).

Even assuming the plaintiff has adequately pled that she sent a QWR to Wells Fargo to which the loan servicer failed to properly respond, this Court finds that the plaintiff has failed to sufficiently allege the element of pecuniary loss. First, this Court is at a loss to understand how Wells Fargo's response with an invalid note caused the plaintiff's home debt to increase over $37,000.00. In fact, the plaintiff clearly attributes the increase in debt to her reliance upon Wells Fargo's representations to stop making her monthly loan payments during the pendency of a modification application. (See [Doc. 65] at ¶¶ 46, 49, 82). Second, even assuming that Wells Fargo's response with an invalid note somehow caused a loss to the plaintiff's credit score, the plaintiff's RESPA claim is still inadequately pled because she failed to allege a denial of credit based upon inaccurate reporting. *See Hutchinson v. Del. Sav. Bank. FSB,* 410 F.Supp.2d 374, 383 (D.N.J.2006) (sustaining a section 2605(e)(3) claim based upon plaintiffs' inability to obtain further financing as a result of negative reports). Accordingly, Count I (RESPA) is hereby **DISMISSED** as to Wells Fargo to the extent it relies upon section 2605.

**2. Count VII: Breach of Fiduciary Duty**

In Count VII, the plaintiff alleges that, *inter alia,* First Independent and Wells Fargo "breached their fiduciary duties to [her] by fraudulently inducing plaintiff to enter a transaction that was contrary to the plaintiff's stated intentions of finding an affordable loan and contrary to the plaintiff's interests in preserving ownership of her home and the equity in her home." ( [Doc. 65] at ¶ 168). The defendants argue that the plaintiff has failed to state a claim for breach of fiduciary duty. This Court agrees.

In West Virginia, the required elements of a cause of action for breach of a fiduciary duty are three-fold: (1) existence of the fiduciary relationship, (2) its breach, and (3) damage proximately caused by the breach. *State ex rel. Affiliated Const. Trades Foundation v. Vieweg,* 205 W.Va. 687, 701,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

520 S.E.2d 854, 868 (1999) (citing *Pierce v. Lyman,* 1 Cal.App.4th 1093, 3 Cal.Rptr.2d 236, 240 (1991)). A cause of action for breach of fiduciary duty is governed by the two-year statute of limitation found in W.Va.Code § 55–2–12. *Dunn,* 689 S.E.2d at 268 (citing *Vorholt v. One Valley Bank,* 201 W.Va. 480, 486, 498 S.E.2d 241, 247 (1997) (applying the "catch-all" periods of limitation in W.Va.Code § 55–2–12 to action for breach of fiduciary duty)).

**\*18** The plaintiff's allegation that First Independent and Wells Fargo owed her a fiduciary duty to "take into account her income and expenses in qualifying her for a mortgage loan to reduce the risk of default and foreclosure" fails to support a breach of fiduciary duty claim for two reasons. First, the defendants' consideration of whether the plaintiff's income and expenses qualified her for a mortgage loan would have logically taken place before the March 27, 2006, closing. As such, the plaintiff's claim is barred by the two-year statute of limitations.

Second, West Virginia does not recognize a fiduciary duty between a lender and borrower unless a special relationship has been established. *See Michael v. Wesbanco Bank, Inc.,* 2006 WL 2560108, \*2–3 (N.D.W.Va. Sept.1, 2006); *Knapp v. Am. Gen. Fin. Inc.,* 111 F.Supp.2d 758, 766 (S.D.W.Va.2000). Specifically, courts consider whether the lender has created a special relationship by performing services not normally provided by a lender to a borrower. *See Glascock, v. City Nat'l Bank of West Virginia,* 213 W.Va. 61, 66–67, 576 S.E.2d 540, 545–46 (2002); *Willis v. Countrywide Home Loans Servicing, L.P.,* 2009 WL 5206475, \*5 (D.Md. Dec.23, 2009). Here, the plaintiff challenges only whether the defendants properly qualified her for the loan, a service normally provided by a lender. Thus, the plaintiff has not adequately pled a special relationship. As such, the plaintiff has failed to sufficiently alleged that a fiduciary duty existed. Accordingly, Count VII (Breach of Fiduciary Duty) is hereby **DISMISSED** as to First Independent and Wells Fargo.

**3. Count XII: Slander of Title**

In Count XII, the plaintiff alleges that "[b]y selling the Note without [her] knowledge or consent through securitization trusts, First Independent irreparably damaged plaintiff's title to the property and such cloud on her title makes it impossible for plaintiff to sell the property with clean title." ( [Doc. 65] at ¶ 200). The plaintiff further alleges that "Wells Fargo, as a co-venturer with First Independent ... in the procuring of the mortgage loan from plaintiff and int [sic] the sale of the Note, is equally responsible for the damages Plaintiff has suffered." (*Id.* at ¶ 201).

In West Virginia, the elements of a slander of title claim are six-fold: (1) publication of (2) a false statement (3) derogatory to plaintiff's title (4) with malice (5) causing special damages (6) as a result of diminished value in the eyes of third parties. *See TXO Prod. Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 466, 419 S.E.2d 870, 879 (1992). As a general rule, "wrongfully recording an unfounded claim to the property of another" satisfies the first three elements and is actionable "provided that the other elements for slander of title, namely malice and special damages, are present." *Id.* at 880.

Apparently, the plaintiff alleges that the securitization of her loan on the secondary mortgage market constitutes the wrongful recording of an unfounded claim to her property. However, as this Court has already held, the securitization of the plaintiff's loan is neither unlawful nor unauthorized by the DOT. *See Bukhari,* 2010 WL 2762794 at \*5; *Bello,* 2011 WL 13351 at \*1; *Koehler,* 2011 WL 691583 at \*3; *Labuanan,* 2011 WL 939039 at \*9; ( [Doc. 1–2] at ¶ 20).[FN5] Accordingly Count XII (Slander of Title) is hereby **DISMISSED** as to First Independent and Wells Fargo to the extent it relies upon the securitization of the plaintiff's loan.

> FN5. Moreover, this Court notes that the plaintiff does not, and cannot, dispute that her property is subject to the DOT.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

### F. Count Common to MERS and U.S. Bank

#### 1. Count XIII: Declaratory Judgment

**\*19** In Count XIII, the plaintiff seeks a declaration that "the Deed of Trust currently encumbering [her] property to be null and void and to order such Deed of Trust and all related fillings to be removed from the land records." ( [Doc. 65] at ¶ 219). In support of this request, the plaintiff alleges that "[t]he negotiable instruments for [her] loan are not enforceable because the note was securitized and, therefore, is subject to and governed by a Pooling and Servicing Agreement ('PSA')." (*Id.* at ¶ 209).

In two cases, *Suss v. JP Morgan Chase Bank, N.A.,* 2010 WL 2733097, \*5–6 (D.Md. July 9, 2010) and more recently, *Labuanan v. U.S. Bank, N.A.,* 2011 WL 939039, \*10 (D.Haw. Feb.24, 2011), district courts rejected identical arguments by borrowers that securitization rendered their notes unenforceable. Those courts found both arguments without legal and factual support. As for legal support, the court in *Suss* cited *U.S. Bank, N.A. v. Cook,* 2009 WL 35286, \*4 (N.D.Ill. Jan.6, 2009), a foreclosure action in which the district court rejected a borrower's challenge to the plaintiff's status as holder in due course based upon the securitization of the note. *Suss,* 2010 WL 2733097, at \*5. Likewise, the court in *Labuanan* admitted that "it [was] entirely unclear as to what cause of action Plaintiffs are brining this claim under. Plaintiffs fail to cite any relevant statute or law under which Defendants' alleged behavior is prohibited." *Labuanan,* 2011 WL 939039, at \*10. With regard to factual support, both courts cited provisions in the plaintiffs' deeds of trust explicitly permitting assignment of the mortgage notes without prior consent. *Suss,* 2010 WL 2733097, at \*6; *Labuanan,* 2011 WL 939039, at \*10.

Therefore, for the reasons already articulated by the courts in *Suss* and *Labuanan,* this Court rejects the plaintiff's argument that the securitization of her loan rendered her Note unenforceable. Accordingly, Count XIII (Declaratory Judgment) is hereby **DISMISSED** as to all defendants.

### G. Counts Pled Exclusively Against Wells Fargo

#### 1. Count IV: Breach of Contract/Implied Covenant of Good Faith and Fair Dealing

Count IV contains two alleged breaches of contract based upon Wells Fargo's denial of a permanent loan modification. First, the plaintiff alleges that the denial breached a contract formed in a HAMP trial modification, or alternatively, in a "traditional" trial modification. ( [Doc. 65] at ¶¶ 147–150). Second, the plaintiff alleges the denial breached the Servicer Participation Agreement ("SPA"). (*Id.* ¶ at 150). In addition, Count IV contains an alleged breach of the Pooling Servicing Agreement ("PSA") based upon the securitization of the plaintiff's loan. (*Id.* at ¶ 151). The Court will consider each, in turn.

#### i. HAMP or "Traditional" Trial Modification

The plaintiff claims that Wells Fargo is liable for breach of contract for "failing to offer a permanent HAMP modification." ( [Doc. 65] at ¶ 150). In her response to the instant motions, however, the plaintiff concedes that the HAMP does not provide a private right of action for borrowers.[FN6] ( [Doc. 80] at 7). Accordingly, Count IV (Breach of Contract) is hereby **DISMISSED** as to Wells Fargo to the extent it relies upon the HAMP.

> FN6. The Court notes that this concession was unavoidable in light of several holdings around the country. See *Hart v. Countrywide Home Loans, Inc.,* 2010 WL 3272623, \*5 (E.D.Mich. Aug.19, 2010); *Dugger v. BofA/Countrywide Loans,* 2010 WL 3258383, \*2 (E.D.Mo. Aug.16, 2010); *Zeller v. Aurora Loan Servs.,* 2010 WL 3219134, \*1 (W.D.Va. Aug.10, 2010).

**\*20** Alternatively, the plaintiff claims that Wells Fargo breached a contract formed during a "traditional" trial modification by failing to offer a permanent modification after three trial payments.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

Page 17

In support of this claim, the plaintiff alleges the following: (1) in February 2010, Wells Fargo informed the plaintiff that she qualified for a $1,570.00 monthly payment and promised that if she made timely payments for three months, the modification would become permanent; (2) the plaintiff timely made the three agreed-upon payments; (3) in May 2010, however, Wells Fargo informed the plaintiff that it had placed her in active foreclosure status again; and (4) also in May 2010, another Wells Fargo executive specialist named Bonnie Shenker ("Shenker") informed the plaintiff that her modification offer had been a "traditional modification" and that Wells Fargo was "uncertain whether her investor would participate under HAMP." (*Id.* at ¶¶ 75–77, 79). In its motion, Wells Fargo argues that the plaintiff has either failed to state a claim for breach of contract or the claim is preempted by the NBA. This Court disagrees.

In a recent case, this Court found that borrowers had stated an express breach of contract based upon their servicer's similar representation that it would consider their account current after a number of payments, but then foreclosing after those payments. *Warden v. PHH Mortg. Corp.,* 2010 WL 3720128, *5 (N.D.W.Va. Sept.16, 2010).* Even more recently, a district court in the Southern District of West Virginia found that a borrower had stated an express breach of contract claim based upon a servicer's identical representation that if a borrower made three trial modification payments she would receive a permanent modification. *Koontz v. Wells Fargo, N.A.,* 2011 U.S. Dist. LEXIS 35569, *24–28, 2011 WL 1297519 (S.D.W.Va. Mar. 31, 2011).*

Therefore, based upon *Warden* and *Koontz,* this Court finds that the plaintiff has stated an express breach of contract claim by alleging that Wells Fargo denied a permanent loan modification even though it had promised one if she paid three trial payments. In addition, as in *Warden,* this Court finds that the plaintiff has stated a breach of the implied covenant of good faith and fair dealing based

upon the same allegation.[FN7] *See Warden,* 2010 WL 3720128, at *5–6.* As for preemption, this Court has previously found that a federal savings bank's breach of a modification agreement was not preempted because "even a federal savings bank must abide by its agreements," and "[w]hen it does not, '[i]t would be surprising for a federal regulation to forbid [a] homeowner's state to give the homeowner a defense based on the mortgagee's breach of contract.' " *Faulkner v. One West Bank,* 2010 WL 2472275, *9 n. 5 (N.D.W.Va. June 16, 2010)* (quoting *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litigation,* 491 F.3d 638, 643–44 (7th Cir.2007)). This Court finds no reason not to also hold a national bank to its agreements by way of a breach of contract claim. Accordingly, Count IV (Breach of Contract) **MAY PROCEED** insofar as it relies upon a contract formed during a traditional trial modification.

> FN7. However, as this Court noted in *Warden,* "upon completion of discovery, the plaintiff['s] burden of presenting a genuine issue of material fact on the issue of bad faith will be a heavy one. *See Benito v. Indymac Mortg. Serv.,* 2010 WL 2130648, *7 (D.Nev. May 21, 2010)* (granting summary judgment in favor of defendant on nearly identical implied covenant of good faith and fair dealing claim because, 'No contract term in the loans required OneWest to engage in loan modification, and it would not breach the covenant for OneWest to refuse to take on an additional obligation it was not required to undertake in the contract itself.')." *Warden,* 2010 WL 3720128, *6 n. 3).

**ii. SPA**

***21** Next, the plaintiff alleges that Wells Fargo breached the Servicer Participation Agreement by, *inter alia,* "instituting and/or continuing with foreclosure proceeding against [her] in a trial program." ( [Doc. 65] at ¶ 150). Wells Fargo argues, without opposition, that the plaintiff lacks standing to assert

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18 of 19
Case 2:12-md-02311-SFC-RSW   ECF No. 230-51, PageID.3509   Filed 07/13/12   Page 19 of 20

Page 18

Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)
**(Cite as: 2011 WL 1357483 (N.D.W.Va.))**

a breach of the SPA because: (1) the plaintiff does not allege factual support for third-party beneficiary status and (2) even assuming third-party beneficiary status, the plaintiff lacks standing because she is at most an incidental beneficiary to the SPA as a matter of law. See *McKensi v. BofA,* 2010 WL 3781841, *5 (D.Mass. Sept.22, 2010); *Villa v. Wells Fargo Bank, N.A.,* 2010 WL 935680, *3 (S.D.Cal. Mar.15, 2010); *Escobedo v. Countrywide Home Loans, Inc.,* 2009 WL 4981618, *3 (S.D.Cal. Dec.15, 2009). This Court agrees.

For example, the court in *Escobedo* found that "[p]arties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary." *Escobedo,* 2009 WL 4981618, *2. Here, the plaintiff has not alleged factual support for an intent that she be any more than an incidental beneficiary of the SPA, and thus, she cannot enforce the SPA. As such, she has failed to state either an express or implied breach of contract. Accordingly, Count IV (Breach of Contract) is hereby **DISMISSED** to the extent it relies upon the SPA.

### iii. PSA

Finally, the plaintiff claims that "defendants Wells Fargo and BOA breached the Pooling and Servicing agreement ('PSA') submitted for the 2006–G Trust that included [her] loan." ( [Doc. 65] at ¶ 151). In support of this claim, the plaintiff alleges that "the assignment of [her] loan is contrary to the requirements of Banc of America Funding Corporation 2006–G Trust ('2006–G Trust') as the alleged assignment of plaintiff's Deed of Trust takes place after the cut-off date when assets could be added to the 2006–G Trust." (*Id.* at ¶ 90). Again, Wells Fargo argues that the plaintiff has failed to state a claim because she has failed to allege any factual basis for her claim and she has failed to allege that she was an intended beneficiary of the PSA. This Court agrees.

In *Bittinger v. Wells Fargo Bank, N.A.,* 744 F.Supp.2d 619, 625–26 (2010), a district court rejected a borrower's argument that the securitization of his loan breached the pooling and servicing agreement because "[the borrower] [wa]s not a party to [the] agreement and did not become a party, or a third-party beneficiary of the agreement...." See also *Barberan v. Nationpoint,* 706 F.Supp.2d 408, 425 n. 10 (S.D.N.Y.2010) (finding that borrowers had failed to adequately allege a breach of pooling and servicing agreements because they "failed to raise a plausible claim that they were parties to or third-party beneficiaries of the contracts"). In her Surreply, the plaintiff cites a March 30, 2011, Alabama state court opinion, which found that a borrower is an intended third-party beneficiary of a pooling and servicing agreement. Specifically, the court in *Horace v. LaSalle Bank, N.A* ., found that "plaintiff Horace is a third party beneficiary of the Pooling and Servicing Agreement created by the defendant trust (LaSalle Bank National Association). Indeed without such Pooling and Servicing Agreements, plaintiff Horace and other mortgagors similarly situated would never have been able to obtain financing." ( [Doc. 93–1] at 2).

**\*22** In the instant case, the plaintiff alleges that "First Independent reduced its underwriting standards" based upon its plan to sell her Note on the secondary mortgage market. ( [Doc. 65] at 211). However, this Court is unpersuaded that the reduction of underwriting standards based upon an intent to securitize a loan automatically makes the borrower an intended beneficiary of a later-established pooling and servicing agreement. Thus, even assuming the plaintiff has alleged a breach of the PSA, this Court finds that the plaintiff has not sufficiently alleged that she is an intended beneficiary of the PSA. Accordingly, Count IV (Breach of Contract) is hereby **DISMISSED** as to all defendants to the extent it relies upon the PSA.

### 2. Count XI: WVCCPA—Unfair or Deceptive Acts or Practices

In Count XI, the plaintiff alleges that "[t]he refusal of defendant Wells Fargo to comply with the terms of the loan modification agreement is an un-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

fair and deceptive practice prohibited by W.Va.Code § 46A–6–104." ( [Doc. 65] at ¶ 196). Again, Wells Fargo argues that the plaintiff has either failed to state a claim under section 46A–6–104 or the claim is preempted by the NBA. This Court disagrees.

In *Padgett v. OneWest Bank, FSB,* 2010 WL 1539839, *10–11 (N.D.W.Va. Apr.19, 2010), this Court allowed a similar WVCCPA claim to survive a motion to dismiss despite arguments of preemption and inadequate pleading. Padgett and IndyMac Bank, F.S.B. ("IndyMac") had entered into an agreed order in bankruptcy court providing that the sole payment for which Padgett was in arrears would be added onto the end of the mortgage. *Id.* at *11. Despite not missing another payment, OneWest Bank, F.S.B., which purchased IndyMac, imposed late fees on Padgett's account. *Id.* Based upon these allegations, this Court found that Padgett had stated a breach of the loan agreement, as modified by the agreed order, and claims under the WVCCPA, including section 46A–6–104. *Id.* In so doing, this Court found that none of those claims were preempted to the extent that they were based upon a breach of contract. *Id.* at *11 n. 7.

In the instant case, this Court has already found above that the plaintiff has successfully stated a claim for breach of contract based upon Wells Fargo's refusal to grant a permanent "traditional" modification, as promised. Pursuant to *Padgett,* therefore, this Court finds that the plaintiff has stated a claim under section 46A–6–104, which is not preempted. Accordingly, Count XI (WVCCPA) **MAY PROCEED.**

### *CONCLUSION*

For the foregoing reasons, the Court finds that U.S. Bank's, First Independent's, and MERS' motions to dismiss **[Docs. 66, 73, & 75]** should be **GRANTED.** Accordingly, the Court finds that U.S. Bank, First Independent, and MERS, should be, and hereby are, **DISMISSED WITH PREJUDICE.** In addition, this Court finds that Wells Fargo's motion to dismiss **[Doc. 68]** should be **GRANTED IN PART** and **DENIED IN PART.** Finally, this Court finds that the plaintiff's motion for leave to file a surreply **[Doc. 93]** should be **GRANTED** and the surreply deemed already filed.

**\*23** It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

N.D.W.Va.,2011.
Wittenberg v. First Independent Mortg. Co.
Not Reported in F.Supp.2d, 2011 WL 1357483 (N.D.W.Va.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.