**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____
                                                :
IN RE AUTOMOTIVE PARTS                          :
ANTITRUST LITIGATION                            :    Master File No. 12-md-02311
                                                :
_____:        Lead Case: W-12-cv-00000-MOB-MKM
                                                :
THIS DOCUMENT RELATES TO:                       :    **Oral Argument Requested**
                                                :
Product(s): Wire Harnesses                      :
                                                :
All Actions                                     :
_____:

## DEFENDANT LEAR CORPORATION'S
## RULE 12(b)(6) MOTION TO DISMISS

Lear Corporation ("Lear"), by and through its counsel, Mayer Brown LLP and Dykema Gossett PLLC, moves to dismiss all Complaints against Lear, pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of the forgoing Motion, Lear states as follows:

1.      On May 14, 2012, Plaintiffs filed the Automobile Dealers Consolidated Class Complaint (Dkt. No. 85), the Direct Purchasers' Consolidated Amended Class Action Complaint (Dkt. No. 86), and the End-Payors' Consolidated Amended Class Action Complaint (Dkt. No. 87, later amended at Dkt. No. 174) (collectively, the "Complaints").

2.      Lear bases this Motion upon Lear's accompanying brief in support of its Motion, oral argument of counsel, and such other and further material as the Court may consider, including codefendants' briefs in support of their Joint Motions To Dismiss The Complaints brought by the Direct Purchaser Plaintiffs, Automobile Dealers, and End-Payors.

3.      As required by E.D. Mich. LR 7.1(a), counsel for Lear, Andrew S. Marovitz, sought concurrence from counsel for the Direct Purchaser and the End-Payor Plaintiffs on July 6,

2012, and the Automobile Dealer Plaintiffs on July 9, 2012.  During those three calls, counsel for Lear explained the nature of the Motion and its legal bases and requested but did not obtain concurrence in the relief sought (dismissal of all complaints).

WHEREFORE, for the reasons stated herein, and in the accompanying brief in support hereof, Lear respectfully requests that all claims against it be dismissed with prejudice.

Dated: July 13, 2012                                         Respectfully submitted,

                                                             LEAR CORPORATION

                                                        By:  /s/ Andrew S. Marovitz
                                                             *One of its Attorneys*
Howard B. Iwrey (P39635)                                     Andrew S. Marovitz
Dante Stella (P60443)                                        Britt M. Miller
DYKEMA GOSSETT PLLC                                          MAYER BROWN LLP
39577 Woodward Ave.                                          71 S. Wacker Drive
Bloomfield Hills, Michigan 48304                             Chicago, Illinois 60606
Tel: 248-203-0526                                            Tel: 312-782-0660
Fax: 248-203-0763                                            Fax: 312-701-7711
E-mail: hiwrey@dykema.com                                    E-mail: amarovitz@mayerbrown.com
E-mail: dstella@dykema.com                                   E-mail: bmiller@mayerbrown.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS | : | |
| ANTITRUST LITIGATION | : | Master File No. 12-md-02311 |
| | : | |
| | : | Lead Case: W-12-cv-00000-MOB-MKM |
| | : | |
| THIS DOCUMENT RELATES TO: | : | **Oral Argument Requested** |
| | : | |
| Product(s): Wire Harnesses | : | |
| | : | |
| All Actions | : | |
| | : | |

# DEFENDANT LEAR CORPORATION'S INDIVIDUAL BRIEF IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS

Dated: July 13, 2012

## <u>STATEMENT OF ISSUES PRESENTED</u>

1. Whether Plaintiffs have stated a plausible claim for relief against Lear, where their Complaints contain no specific allegations that Lear ever knew of or joined the alleged conspiracy and do not allege any overt act in furtherance of the conspiracy by Lear.

2. Whether Plaintiffs have stated a plausible claim for relief against Lear, where (i) the Bankruptcy Court for the Southern District of New York already has ruled that claims that arose before November 9, 2009, have been discharged,  (ii) only an overt predicate act occurring after Lear's November 9, 2009 discharge could form the basis of a claim against Lear, and (iii) the only post-discharge allegations contained in the Complaints are that Lear continued to sell wire harnesses at previously established prices and briefly held a minority ownership interest in a separately incorporated (and separately sued) joint venture co-defendant.

## <u>STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)

*City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521 (5th Cir. 1978)

*Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401 (6th Cir. 1999)

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045 (5th Cir. 1982)

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)

*Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896 (6th Cir. 2009)

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)

## <u>TABLE OF CONTENTS</u>

Introduction ........................................................................................................ 1

I.  The Complaints Fail To Plausibly Suggest That Lear Joined The Alleged Conspiracy .... 3

    A.  The Complaints Contain No Specific Allegations That Lear Joined Or Participated In Any Conspiracy .............................................................. 4

    B.  Neither Lear's Maintenance Of Pre-Discharge Pricing Nor Its Former 20% Stake In A Completely Separate Joint Venture Supports Antitrust Liability . 5

    C.  The Pleadings Are Inconsistent With Lear's Participation In A Conspiracy ......... 7

II.  Plaintiffs' Claims Have Been Discharged By Lear's Bankruptcy ..................................... 8

    A.  Plaintiffs Rely Solely Upon Post-Discharge Sales For Lear's Alleged Overt Acts ....................................................... 11

    B.  Under The Sixth Circuit's Tam Travel Decision, Post-Discharge Sales Are Insufficient To State A Claim Against Lear ........................................ 12

    C.  Plaintiffs Do Not And Cannot Allege That Lear Engaged In Post-Discharge Bid Rigging ................................................................. 14

III.  Lear Cannot Be Held Liable For Any Pre-Discharge Aspects Of The Conspiracy.......... 15

IV.  Further Amendment Would Be Futile ................................................................. 19

Conclusion ...................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................2, 8

*Azar v. Conley,*
    480 F.2d 220 (6th Cir. 1973) ............................................................................4

*Barnosky Oils, Inc. v. Union Oil Co. of Cal.,*
    665 F.2d 74 (6th Cir. 1981) ...........................................................................11

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................2, 3, 5, 6

*Campbell v. A.H. Robins Co., Inc.,*
    615 F. Supp. 496 (D. Wis. 1985) ...............................................................16, 17

*City of El Paso v. Darbyshire Steel Co.,*
    575 F.2d 521 (5th Cir. 1978) .......................................................................11, 14

*Gaff v. Federal Deposit Ins. Corp.,*
    919 F.2d 384 (6th Cir. 1990) .........................................................................19

*Grand Rapids Plastics, Inc. v. Lakian,*
    188 F.3d 401 (6th Cir. 1999) .......................................................................14, 15

*Green v. Welsh,*
    956 F.2d 30 (2d Cir. 1992)............................................................................19

*Hinds City v. Wachovia Bank, NA,*
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)..............................................................8

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,*
    794 F. Supp. 1424 (D. Ariz. 1992) ...............................................................16

*In re Chateaugay Corp.,*
    944 F.2d 997 (2d Cir. 1991)..........................................................................18

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...........................................................15

*In re Digital Music Antitrust Litig.,*
    812 F. Supp. 2d 390 (S.D.N.Y. 2011).............................................................6

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)..................................................................................................4, 7

*In re Lear Corporation, et al.*,
    Case No. 1:12-CV-02626-KBF, Dkt. 11 (S.D.N.Y. April 12, 2012) .....................................10

*In re Lear Corporation*,
    No. 09-14326, Dkt. 1660 (Bankr. S.D.N.Y. Nov. 17, 2011) ...................................................9

*In re Penn Cent. Transp. Co.*,
    771 F.2d 762 (3rd Cir. 1985) .............................................................................................9, 11

*In re Processed Egg Products Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................................................17

*In re Refrigerant Compressors Antitrust Litig.*,
    Case No. 2:09-md-02042-SFC, Dkt # 300 at 12-13 (E.D. Mich. June 11, 2012).....................3

*In re Refrigerant Compressors*,
    Case No. 2:09-md-02042-SFC, Dkt # 300 at 13.....................................................................4

*In re Travel Agent Comm'n*,
    2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) .....................................................................11

*Johnson v. Home State Bank*,
    501 U.S. 78 (1991)................................................................................................................19

*Jung v. Assoc. of Am. Medical Colleges*,
    300 F. Supp. 2d 119 (D.D.C. 2004) .......................................................................................4

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
    677 F.2d 1045 (5th Cir. 1982) .............................................................................................14

*Kidron v. Movie Acquisition Corp.*,
    40 Cal. App. 4th 1571 (Cal. App. 1995)................................................................................16

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)...................................................................................................18, 19, 20

*LaCava v. Delphi Auto LLP, et al.*,
    No. 11-cv-14399 (E.D. Mich. Oct. 5, 2011) ...........................................................................9

*Machovec v. Council for Nat. Register of Health*,
    616 F. Supp. 258 (E.D. Va. 1985) ..........................................................................................8

*Michigan Division-Monument Builders of N.A. v. Michigan Cemetery Assoc.*,
    524 F.3d 726 (6th Cir. 2008) ..................................................................................................3

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) ....................................................................................15

*Peck v. General Motors Corp.*,
   894 F.2d 844 (6th Cir.1990) ........................................................................11

*Re/Max Intern., Inc., v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) .......................................................................11

*Sovoie v. Martin*,
   673 F.3d 488 (6th Cir. 2012) .........................................................................2

*Tam Travel, Inc. v. Delta Airlines, Inc.*,
   583 F.3d 896 (6th Cir. 2009) ................................................................ passim

*United States v. Cross*,
   113 F. Supp. 2d 1253 (S.D. Ind. 2000) ..........................................................8

*United States v. Furukawa Electric Co.*,
   No. 2:11-cr-20612-GCS-PJK (E.D. Mich. Nov. 14, 2011) ..............................8

*United States v. Yazaki Corp.*,
   No. 2:12-cr-20064-DML-MKM (E.D. Mich. March 1, 2012) ..........................8

*United States v. Yazaki Corp.*,
   No. 2:12-cr-20064-DML-MKM, at 2 (E.D. Mich. Jan. 30, 2012)...................12

*Wallace v. Bank of Bartlett*,
   55 F.3d 1166 (6th Cir. 1995) ..........................................................................6

*Yuhasz v. Brush Wellman, Inc.*,
   341 F.3d 559 (6th Cir. 2003) ........................................................................19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971)........................................................................11, 13, 18

## STATUTES

11 U.S.C. § 101(5) ............................................................................................9

11 U.S.C. § 1141(d)(1) ......................................................................................9

## INTRODUCTION

Headquartered in Southfield, Michigan, Lear Corporation ("Lear") employs almost 98,000 people, including more than 7,400 in North America.[1] Lear sells automotive wire harness systems to original equipment manufacturers ("OEMs"), which in turn sell completed vehicles to Automobile Dealers and, through them, to End-Payor consumers. On May 14, 2012, certain Direct Purchasers, Automotive Dealers, and End-Payor consumers filed three Amended Consolidated Complaints (collectively the "Complaints"),[2] alleging that wire harness suppliers conspired to rig bids and fix prices for their systems. In support of these claims, Plaintiffs rely upon criminal charges brought by the Department of Justice (the "DOJ") and guilty pleas entered by certain of Lear's competitors.

None of these allegations, however, implicates Lear in the least. The DOJ has never accused Lear of wrongdoing in connection with any conspiracy, and Lear has never pled guilty to any crime. Indeed, Lear has never even been served with a DOJ subpoena. The Complaints allege no facts to suggest that Lear ever knew of or joined in the alleged conspiracy, and not one of the Complaints identifies a single act committed by Lear in furtherance of the alleged conspiracy. The only apparent reason that Lear was named in this lawsuit is that it sells the same

---

[1]     *See* Form 10-K Lear Corporation for the Fiscal Year Ended December 31, 2011, at 9-12, available at http://files.shareholder.com/downloads/LEA/1962324896x0x545347/3F82963B-3A37-41CD-BC32-9E7C7F89BC12/2011_Form_10-K_final_.pdf). Plaintiffs allege that Lear holds less than a 5% share of the global wire harness market, compared to nearly 30% held by larger competitors. Dealer Compl. ¶¶ 142, 146.

[2]     The terms "Direct Purchasers," "Automotive Dealers," and "End-Payors" have the meanings given to them in the Complaints. For purposes of this Motion To Dismiss, all three Complaints are considered together. The Complaints are alike in language and structure, and they all suffer from the same fatal infirmities with respect to Lear. For ease of reference, we cite primarily to the Automobile Dealers' Complaint and attach as Exhibit A a chart showing the citations to the other Complaints that correspond to the paragraphs cited herein. The Complaints may be found at Dkt. Nos. 85 (Automobile Dealers), 86 (Direct Purchasers), and 174 (End-Payor Plaintiffs).

product as certain competitors that admitted to breaking the law. Claiming guilt by association is no way to survive the plausibility requirements of *Twombly* and *Iqbal*.[3]

Lear is unique among the Defendants for another reason: the purported claims against Lear have been discharged by virtue of Lear's Chapter 11 bankruptcy. In February 2012, the Bankruptcy Court for the Southern District of New York enjoined Plaintiffs' claims against Lear based on conduct that predated Lear's November 2009 bankruptcy, a holding that the Complaints fail to acknowledge. *See In re Lear Corporation*, Case No. 09-14326, Dkt. # 1676 at 3 (Bankr. S.D.N.Y. Feb. 2, 2012) (Ex. B) (Plaintiffs' claims "should be enjoined to the extent they arose before [Lear's] November 9, 2009" emergence from bankruptcy). In light of the Bankruptcy Court's ruling, at a minimum, Plaintiffs are required to allege specific overt acts taken by Lear in furtherance of a conspiracy *after November 9, 2009*. The immediate question before this Court is whether Plaintiffs have done so. The answer to that question is plainly "no."

With respect to Lear's post-discharge conduct, the Complaints plead nothing more than that (a) Lear "continued to sell" wire harnesses at "supra-competitive prices" and (b) Lear held a minority stake (20%) in a *separate* joint venture with a separate Defendant (Furukawa) that pled guilty to conduct *unrelated* to Lear.[4] Neither of these allegations is sufficient to support a post-discharge claim against Lear. On their face, the allegations both fail to satisfy *Twombly* and run afoul of Lear's bankruptcy discharge. Crucially, the Sixth Circuit already has rejected the main argument Plaintiffs now make: that a business's *post-discharge* transactions can support

---

[3]      *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[4]      At the motion to dismiss stage, the "well-pled facts in the complaint must be accepted as true." *Sovoie v. Martin*, 673 F.3d 488, 492 (6th Cir. 2012). Accordingly, for purposes of this Motion only, Lear presumes the veracity of any well-pled facts in the Complaints. But Lear did not conspire to rig bids or fix prices, which is a fact borne out by the absence of any substantive allegation in the Complaints that would support antitrust liability against Lear.

imposing antitrust liability for a *pre-discharge* conspiracy. *See Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 902 (6th Cir. 2009) (holding that a reorganized bankruptcy debtor's "continuation" of alleged anticompetitive practices—refusing to pay commissions to travel agents—were not overt acts giving rise to liability). As discussed below, *Tam Travel* governs here and requires dismissal.

No defendant should be sued without an individualized basis, and no reorganized debtor can be sued on the basis of discharged liabilities. Lear never should have been included in this action. It should be dismissed now.

## ARGUMENT

### I.    The Complaints Fail To Plausibly Suggest That Lear Joined The Alleged Conspiracy

In antitrust litigation, the "'district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Michigan Division-Monument Builders of N.A. v. Michigan Cemetery Assoc.*, 524 F.3d 726, 732 (6th Cir. 2008) (quoting *Twombly,* 550 U.S. at 558). To survive a motion to dismiss, therefore, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "[T]he allegations in the complaint 'must be specific enough to establish the 'who, what, where, when, how, and why' [of the conspiracy] …. Furthermore, *they must specify how [each] defendant [was] involved* in the alleged conspiracy.'" *In re Refrigerant Compressors Antitrust Litig.*, Case No. 2:09-md-02042-SFC, Dkt # 300 at 12-13 (E.D. Mich. June 11, 2012) (quoting *Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430, 445 (6th Cir. 2012)) (emphasis added).

It is not enough for Plaintiffs to rely only upon general allegations about the supposed participants in the conspiracy. "Plaintiffs cannot escape their burden of alleging that each

3

defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations as to [an individual defendant]." *Jung v. Assoc. of Am. Medical Colleges*, 300 F. Supp. 2d 119, 164 (D.D.C. 2004). "[E]ach defendant is entitled to know whether he is alleged to be liable as a part of the conspiracy … and whose rights he is alleged to have infringed." *Azar v. Conley*, 480 F.2d 220, 222 (6th Cir. 1973).

### A.    The Complaints Contain No Specific Allegations That Lear Joined Or Participated In Any Conspiracy

Absent from the Complaints are any facts to suggest that *Lear* knew of or joined in a conspiratorial agreement or engaged in anticompetitive acts pursuant to such an agreement. And, as to Lear, Plaintiffs' general allegations that "Defendants" engaged in anti-competitive price increases or other acts (*see, e.g.,* Dealer Compl. ¶ 155) are plainly insufficient to meet their burden. *See In re Refrigerant Compressors,* Case No. 2:09-md-02042-SFC, Dkt # 300 at 13 ("Such generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy is insufficient to allege an antitrust conspiracy claim."). The Complaints offer only vague generalities about the existence of a conspiracy and opportunities to conspire, none of which names Lear specifically. *See, e.g.*, Dealer Compl. ¶ 167 (claiming that the presence of "defendants" at the annual Detroit Auto Show—which is attended by over 800,000 people[5]—constitutes an "opportunity" to conspire). These "entirely general" allegations are "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (citation omitted). They are not nearly enough to state a claim against Lear.

---

[5]    *See* 2012 North American International Auto Show Statistics Report, *available at* http://www.naias.com/media/107912/12naias-statreport&debutlist.pdf.

Though Plaintiffs make allegations against other Defendants based on their plea agreements (naming individual employees, dollar amounts, and/or component systems allegedly involved in the conspiracy) (*see* Dealer Compl. ¶¶ 194-95, 198-202, 207-11), nowhere in the Complaints is there any identification of unlawful conduct committed by Lear. Plaintiffs do not allege that Lear is the subject of any antitrust investigation or other action by the DOJ.[6] Plaintiffs do not allege that Lear attended any particular conspiratorial meetings or discussions. Plaintiffs do not identify a single bid that Lear supposedly rigged.

### B. Neither Lear's Maintenance Of Pre-Discharge Pricing Nor Its Former 20% Stake In A Completely Separate Joint Venture Supports Antitrust Liability

During the period following Lear's emergence from bankruptcy in November 2009—the only time when Lear's behavior arguably might have given rise to a non-discharged claim— Plaintiffs allege conduct that definitively *does not* support antitrust liability. Post-discharge, Plaintiffs complain that (1) Lear "continued to sell Automotive Wire Harness Systems … at supra-competitive prices" (Dealer Compl. ¶ 101); and (2) Lear owned a small minority stake (20%) in Defendant Furukawa Wiring Systems, America, Inc. ("Furukawa Wiring") (formerly a joint venture known as Furukawa Lear Corp.) until Lear completely divested its interest in June 2010. *Id.* ¶ 96. Neither allegation is sufficient to show participation in an antitrust conspiracy.

*First*, the allegation that Lear maintained "supra-competitive prices" is a "wholly conclusory statement" that fails the Rule 8(a) pleading standard. *Twombly* 550 U.S. at 561. But even assuming the truth of this bare-bones assertion, it is nothing more than an allegation of parallel conduct: that Lear continued to charge the same allegedly elevated price that its

---

[6]     Lear agrees with the other Defendants that the existence of an investigation (or the receipt of a subpoena) is no grounds upon which to base an antitrust action (*see* Defs. Jt. Mot. To Dismiss The Direct Purchaser Actions at 9-10 (July 13, 2012)), but that debate is academic as to Lear. Lear has not received any subpoena and there is no reason to believe that it is the subject or target of any DOJ investigation.

competitors charged. *Id.* at 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy."). Supra-competitive pricing "[does] not itself establish a violation of the Sherman Act." *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1168 (6th Cir. 1995) (standing alone, evidence that defendants charged similar, noncompetitive fees was insufficient to state a claim). Further, as discussed in Part II (*infra* at 12-14), the Sixth Circuit has held that the maintenance of pricing upon emerging from bankruptcy does not constitute an overt act giving rise to post-discharge liability; Plaintiffs themselves allege that Lear was merely selling at prices "established by the OEMs" pursuant to *pre-discharge* bidding processes. Direct Purchaser Compl. ¶ 98. As the Sixth Circuit explained in *Tam Travel*, a business's continuation of *pre-discharge* operations or policies is not a basis to impose *post-discharge* liability. 583 F.3d at 89.

*Second*, with respect to Lear's former minority stake in Furukawa Wiring, Lear cannot be held liable for the acts of a separately incorporated joint venture or a separate *joint venturer* (Furukawa) that allegedly committed misconduct in its own separate business. It is a general principle of corporate law "deeply ingrained in our economic and legal systems" that a corporation is not liable for the acts of separately-incorporated entities in which it invests. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417-18 (S.D.N.Y. 2011) (citations omitted) (holding that a joint venture investor was not liable for the anticompetitive acts of its joint venture or partners). Here, Plaintiffs separately named the joint venture as a Defendant— acknowledging that the joint venture is an independent entity that is capable of answering for its own conduct—and Plaintiffs list the joint venture as a member of the "Furukawa Defendants," not as part of Lear. Dealer Compl. ¶¶ 7, 96. Plaintiffs never allege that *Lear* engaged in any

wrongdoing in connection with the joint venture, and they acknowledge that the joint venture itself has never admitted guilt in connection with the alleged conspiracy. *Id.* ¶ 96.

### C.  The Pleadings Are *Inconsistent* With Lear's Participation In A Conspiracy

Beyond lacking specific allegations as to Lear, the Complaints actually contain allegations that *undermine* any inference that Lear participated in any conspiracy. For example, Plaintiffs allege that, pursuant to a "coordinat[ed] investigation" with the DOJ, the European Commission conducted raids on a number of European wire harness manufacturers in February 2010, including a French affiliate of Lear. Dealer Compl. ¶¶ 170, 173. Plaintiffs further allege that the DOJ later obtained search warrants in the US for *other* Defendants in this case, *id.* ¶¶ 174-76, which led to leniency requests and guilty pleas. But Lear's name is conspicuously absent from Plaintiffs' description of the DOJ's investigations. More than two years have elapsed since the European Commission's initial raids. Given Plaintiffs' allegation that the European Commission "coordinat[ed]" its investigation with the DOJ investigations (*id.* ¶¶ 170, 173), the DOJ surely would have taken some action against Lear if enforcers had reason to suspect that Lear was involved in a conspiracy.[7]

Plaintiffs' emphasis on the significance of the DOJ search warrants served upon *other Defendants* (but not Lear) is highly revealing. Plaintiffs stress that, to obtain search warrants,

> the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

---

[7]     That an overseas affiliate of Lear was asked to produce documents in Europe is no basis for a Sherman Act claim in the United States in any event. *See In re Elevator Antitrust Litigation,* 502 F.3d 47, 51-52 (2d Cir. 2007).

Dealer Compl. ¶ 176. That Plaintiffs cannot apply their own reasoning to Lear reflects the fact that there is no basis upon which to support any claim against Lear.[8] Ultimately, the *only* reason why Lear is named in the Complaints is that it happens to be in the same industry as other Defendants that have entered guilty pleas. But the "mere fact that defendants are involved in an industry that is purportedly rife with antitrust violations is not, without more, enough to state a [15 U.S.C.] § 1 claim." *Hinds City v. Wachovia Bank, NA*, 620 F. Supp. 2d 499, 515 (S.D.N.Y. 2009) (a criminal investigation as to certain defendants was "not sufficient to state a claim against the [defendants] who are not the subject of specific allegations in the [complaint]").

To survive a motion to dismiss, Plaintiffs must allege "'concerted action,' not mere guilt by association." *Machovec v. Council for Nat. Register of Health*, 616 F. Supp. 258, 268 (E.D. Va. 1985). The Complaints contain no allegation of concerted action by Lear. There is simply nothing alleged to suggest that Lear was ever a member of any conspiracy, particularly after its November 2009 emergence from bankruptcy. With respect to Lear, therefore, Plaintiffs have failed to cross the "line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 677 (quoting *Twombly*, 550 U.S. at 557.). Their claims against Lear should be dismissed.

## II.    Plaintiffs' Claims Have Been Discharged By Lear's Bankruptcy

Even assuming that Plaintiffs once held viable claims against Lear—and there is nothing in the Complaints to suggest that they did—such claims were discharged by Lear's bankruptcy.

---

[8]      In light of Plaintiffs' heavy reliance upon the DOJ investigation and search warrants, it is no answer to claim that "a prosecutor may choose not to prosecute … for any number of reasons." *United States v. Cross*, 113 F. Supp. 2d 1253, 1267 (S.D. Ind. 2000). Here, the DOJ already has invested substantial resources in its investigation and prosecution of wrongdoing in the automotive wire harness industry and has obtained guilty pleas from responsible parties. *See United States v. Yazaki Corp.*, No. 2:12-cr-20064-GCS-PJK (E.D. Mich. March 1, 2012) (Plea), *located at* www.justice.gov/atr/cases/f280600/280689.pdf; *United States v. Furukawa Electric Co.*, No. 2:11-cr-20612-GCS-PJK (E.D. Mich. Nov. 14, 2011) (Plea), *located at* www.justice.gov/atr/cases/f277300/277397.pdf. Plaintiffs' Complaints rely heavily upon those guilty pleas, search warrants and affidavits.

In July 2009, following the collapse of global demand for automobiles and the worldwide financial crisis, Lear voluntarily filed for Chapter 11 protection in the Bankruptcy Court for the Southern District of New York. *See* Mem. of Op. at 4 (Ex. B). Over a four-month highly supervised reorganization process, Lear negotiated with its creditors and stakeholders to discharge over $3 billion in indebtedness. The Bankruptcy Court confirmed Lear's plan of reorganization effective November 9, 2009. Under the Bankruptcy Code, "confirmation of a plan…discharges the debtor from any debt that arose before the date of such confirmation."[9]

Plaintiffs never filed proofs of claim against Lear with the Bankruptcy Court. *See* Dealer Compl. ¶¶ 101, 234. Rather, Plaintiffs waited until October 5, 2011—almost two years after Lear's plan of reorganization was confirmed—to file their first complaint alleging an antitrust violation. *See* Class Action Complaint, *LaCava v. Delphi Auto LLP, et al.*, No. 11-cv-14399 (E.D. Mich. Oct. 5, 2011). In response, Lear filed a motion with the Bankruptcy Court, asking that it enforce the discharge and injunction provisions of Lear's confirmed Chapter 11 plan. *In re Lear Corporation*, No. 09-14326, Dkt. # 1660 (Bankr. S.D.N.Y. Nov. 17, 2011). In its ruling on that request, the Bankruptcy Court unambiguously held that Plaintiffs' claims had been discharged to the extent they arose before November 9, 2009. Mem. of Op. at 3, 19 (Ex. B). This part of the Bankruptcy Court's order has not been appealed by any party and, therefore, is final.

A different part of the order has been appealed by Lear. To avoid complete dismissal before the Bankruptcy Court, Plaintiffs represented that they would "include in any consolidated

---

[9]    *See* 11 U.S.C. § 1141(d)(1). Section 101(12) defines "debt" as "liability on a claim." Section 101(5) further explains "claim" includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured [or] unmatured." 11 U.S.C. § 101(5). Prospective liability based on antitrust violations plainly falls within this provision. *See In re Penn Cent. Transp. Co.*, 771 F.2d 762, 766 (3rd Cir. 1985) ("[antitrust] actions constitute bankruptcy 'claims' within the meaning of [the Bankruptcy Code] since they are based upon federal statutes that create substantive obligations wholly separate from bankruptcy law").

amended complaint" allegations that "Lear had committed overt acts subsequent to the Effective

Date of the Plan, in furtherance of the price fixing conspiracy, and that such conduct made Lear

liable for damages throughout the term of the conspiracy under principles of antitrust law." *Id.* at

18. The Bankruptcy Court declined to consider whether such future, hypothetical antitrust claims

might be permissible, stating that "the nature and extent of Lear's conduct *after* the Effective

Date of the Plan in violation of the antitrust laws, if any, and its effect" were issues to be

addressed "by the antitrust court in connection with the prosecution of a consolidated amended

complaint." *Id.* at 18-19 (emphasis added). Lear believes that the Bankruptcy Court should not

have ceded its jurisdiction in this way, and has appealed this aspect of the Bankruptcy Court's

decision to the United Sates District Court for the Southern District of New York. *See In re Lear*

*Corporation, et al.*, Case No. 1:12-CV-02626-KBF, Dkt. # 11 (S.D.N.Y. April 12, 2012).

Regardless how the Southern District ultimately resolves the post-discharge bankruptcy

question posed by Lear's bankruptcy appeal, Plaintiffs' post-discharge claims here completely

fail as a matter of antitrust law.[10] Plaintiffs' Consolidated Amended Complaints, in fact, *do not*

identify post-discharge overt acts in furtherance of the alleged conspiracy that would support a

liability finding against Lear. The alleged acts comprising the predicate of Plaintiffs' conspiracy

theory—rigging the bid processes—all took place *before* Lear's bankruptcy. It is well-

established that the relevant predicate act in bid-rigging cases is submitting the anticompetitive

bid itself; subsequent payments received pursuant to a bid do not constitute separate relevant acts

giving rise to a continuing violation. *See City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521,

523 (5th Cir. 1978) (rejecting a "continuing benefits" theory of liability in bid rigging cases).

---

[10]     It is appropriate for this Court to consider Plaintiffs' claims now on antitrust grounds,
given the Bankruptcy Court's deferral on those issues.

Any claim Plaintiffs once held against Lear based on the alleged conspiracy has been completely discharged in bankruptcy and cannot be revived.

### A.     Plaintiffs Rely Solely Upon Post-Discharge Sales For Lear's Alleged Overt Acts

"An antitrust conspiracy … accrues when a defendant commits an act in furtherance of the conspiracy that injures the plaintiff and results in ascertainable damages." *In re Penn Cent. Transp. Co.*, 771 F.2d 762, 766 (3rd Cir. 1985). The conduct that determines the moment of accrual is "a defendant's overt acts rather than the effects of those acts." *Re/Max Intern., Inc., v. Realty One, Inc.*, 173 F.3d 995, 1021 (6th Cir. 1999) (citing *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir.1990)); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("[T]he focus is on the timing of the causes of injury, *i.e.*, the defendant's overt acts, as opposed to the effects of the overt acts.") Accordingly, accrual depends on the commission of an "injurious act" rather than "the abatable but unabated inertial consequences" of that act. *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir. 1981) (quoting *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975)). "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action *immediately accrues to him* to recover" both provable present and future damages. *Zenith*, 401 U.S. at 339 (emphasis added). "[T]he fact that an antitrust plaintiff may suffer continuing damages from an on-going conspiracy is irrelevant." *In re Travel Agent Comm'n*, 2007 WL 3171675 at *5 (N.D. Ohio Oct. 29, 2007) (citing *Peck*, 894 F.2d at 849).

This well-established case law combined with the Bankruptcy Court's decision requires Plaintiffs to allege an overt act that occurred after Lear's discharge from bankruptcy on November 9, 2009. Plaintiffs have failed to meet this requirement. While Plaintiffs allege a bid-rigging conspiracy that began in January 2000, almost a decade before Lear's bankruptcy

(Dealers Compl. ¶ 2), they do not allege that Lear rigged any bid after its emergence from bankruptcy in November 2009. The only post-discharge conduct alleged in the Complaints is that Lear "continued to sell Automotive Wire Harness Systems … in furtherance of the conspiracy" at "supra-competitive prices" (*id.* ¶ 101). But such sales, by definition, would have been made pursuant to bids that were submitted and accepted *well before November 9, 2009*.[11] That is because of the nature of the automotive procurement process. According to Plaintiffs' Complaint, "the bidding process begins approximately *three years prior to the start of production of a new model,*" and "OEMs usually award the business to the selected automotive parts supplier for four to six years, or the life of the model at issue." Dealer Compl. ¶ 135 (emphasis added); *see id.* ¶ 134. Once bids are accepted, a supplier cannot unilaterally alter prices in the middle of a bidding cycle. *Id.* ¶ 159. Accordingly, consistent with Plaintiffs' allegations, bids for the wire harness products at issue must have been submitted, at the latest, by October 5, 2008, three years before the first complaint was filed. That, of course, is more than a year before Lear's debts were discharged in bankruptcy. Accordingly, under the governing case law and the facts pled, post-discharge sales made pursuant to pre-discharge bids are not post-discharge "overt acts" giving rise to antitrust liability.

## B.   Under The Sixth Circuit's *Tam Travel* Decision, Post-Discharge Sales Are Insufficient To State A Claim Against Lear

The Sixth Circuit already has addressed and resolved this issue of post-discharge sales. In *Tam Travel*, the Sixth Circuit considered allegations that a number of air carriers engaged in a conspiracy to "cap, cut, and eliminate" commissions paid to travel agents. 583 F.3d at 900. During the course of the alleged conspiracy, United Airlines entered and emerged from Chapter 11 bankruptcy. Both before and after the bankruptcy, United paid no commission to travel

---

[11]    Plaintiffs also allege that Lear briefly held a minority stake in a separate joint venture, but as discussed in Part I (*supra* at 5-7), this allegation plainly fails the pleading standard.

agents. *Id.* at 901. Just as Plaintiffs do now, the *Tam Travel* plaintiffs argued that, by

"continu[ing]" to pay "the 'conspiracy commission rate' (which at this point, was 0%) after its

reorganization," United "rejoined the conspiracy" and "created a new § 1 claim under the

Sherman Act." *Id.* at 901-02. The Sixth Circuit flatly rejected that argument, holding instead that

"United's post-reorganization 0% commission policy did not create a new § 1 claim because its

decision was 'merely a reaffirmation of a previous act.'" *Id.* at 902 (quoting the district court

opinion). Quoting the line of cases that followed from *Zenith*, the Sixth Circuit explained:

> [T]he focus [in an antitrust case] is on the timing of the *causes of injury* as opposed to the *effects* of the overt acts…. [T]he fact that [ ] injuries have a rippling effect into the future only establishes that [plaintiffs] might have been entitled to future damages….

*Id.* (quoting *Peck*, 894 F.2d at 849). The Sixth Circuit therefore "reject[ed] plaintiffs' attempt to

characterize United's decision to maintain its 0% commission policy as an overt act…. Although

United's participation in the alleged conspiracy would certainly create a rippling effect, plaintiffs

assert that United's final act to effectuate that conspiracy occurred in 2002, long before United

emerged from bankruptcy." *Id.*

*Tam Travel* is both directly on point and controlling here. Like United's payment of its

existing commission rate, Lear's honoring of prices that were previously negotiated and

"established…in the bidding process" was merely the reaffirmation of a previous act: the earlier

submission of bids. Direct Purchaser Compl. ¶ 98. As Plaintiffs acknowledge, a wire harness

supplier cannot unilaterally alter its prices in the middle of a bidding cycle. Dealer Compl. ¶ 159.

Upon "[re]entering the market" after its bankruptcy, Lear would have had "to wait until the next

cycle of vehicles being manufactured by any given OEM to even have a chance at obtaining the

bid for any model of car and take advantage of the lack of competitive prices … by offering

more competitive prices to OEMs." *Id.* Plaintiffs' allegation that Lear continued to charge

"supra-competitive" prices, therefore, is simply an allegation that pre-November 9, 2009 bidding had a "rippling effect into the future" (*Tam Travel*, 583 F.3d at 902), and is not a new, overt act in furtherance of a conspiracy.

*Tam Travel* is consistent with other well-established precedent that sales pursuant to pre-established bid awards do not constitute overt acts that support an independent §1 claim. *See City of El Paso*, 575 F.2d at 523 (holding that the accrual of claims arising out of an allegedly rigged bidding process was not extended by subsequent payments made pursuant to the bidding process). Mere performance under the bid does not transform the initial transaction into a series of overt acts. *Id.*; *see Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1053 (5th Cir. 1982) ("To the extent that Kaiser received benefits under the contract, such receipts were merely the abatable but unabated inertial consequences of some pre-limitations action, rather than from some injurious act actually occurring during the limitations period.") (quotation marks and citations omitted); *accord Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (payments received pursuant to a corrupt agreement "are only a manifestation of the previous agreement," not overt acts). Like the payments in *Lakian*, sales made after alleged bid-rigging are merely reaffirmations of the original bids themselves and "do not constitute a 'new and independent act.'" 188 F.3d at 406.

### C.  Plaintiffs Do Not And Cannot Allege That Lear Engaged In Post-Discharge Bid Rigging

Under the well-established precedent cited above, the only "overt acts" capable of supporting claims against Lear post-discharge would involve the submission of rigged bids after November 2009. Plaintiffs, however, do not and cannot allege that any bid cycle relevant to their claims took place after Lear's emergence from bankruptcy. Nor do Plaintiffs allege that Lear

14

submitted a single rigged bid in the short window between its emergence from bankruptcy (November 2009) and the very public government raids of its competitors (February 2010).[12]

Plaintiffs are asserting that the *effects* of alleged pre-discharge bid rigging continued to impact Lear's sales and pricing post-discharge. *Tam Travel* makes clear that there can be no post-discharge liability for such a claim. Plaintiffs' claims were fully accrued prior to the confirmation of Lear's Chapter 11 plan and were thus completely discharged.

## III. Lear Cannot Be Held Liable For Any Pre-Discharge Aspects Of The Conspiracy

Despite the Bankruptcy Court's Order that Plaintiffs' claims are enjoined "to the extent they arose before November 9, 2009" (Mem. of Op. at 3) (Ex. B), the Complaints draw no distinction between Lear's alleged pre-discharge or post-discharge liability. Based on this omission, it appears that Plaintiffs, remarkably, seek to hold Lear jointly liable for the entire course of the more than 10-year alleged conspiracy, under a theory of retroactive liability. Even assuming, *arguendo*, that Lear's post-discharge sales were sufficient to establish some "rejoinder" of a conspiracy (and, as discussed above, they are not), Plaintiffs still could not hold Lear liable for alleged illegal actions that occurred prior to discharge for several reasons.

*First*, as shown above, the purported anticompetitive acts that caused Plaintiffs' damages were completed long before Lear arguably could have joined any conspiracy post-discharge. "[R]etrospective liability of co-conspirators does not operate to make the late-entering conspirator responsible for the already completed substantive offenses of his cohorts." *Campbell*

---

[12]     Plaintiffs do not allege any acts in furtherance of the purported price-fixing conspiracy following the global public raids. *Cf. In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 224 (E.D.N.Y. 2003) ("A price-fixing agreement has a similar set-up with a secret agreement as to price. Thus, if one gets word of the collusion as to price or bids (i.e., the illegal conspiracy), the entire scheme is compromised and collapses."). No wonder: they have no basis to allege that, following these public investigations, which informed every buyer of wire harness systems in the world of the conspiracy alleged here, the conspirators maintained any "conscious commitment to a common scheme" (*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (quotations omitted)).

*v. A.H. Robins Co., Inc.*, 615 F. Supp. 496, 500 (D. Wis. 1985); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1437 (D. Ariz. 1992) ("A conspirator may not be held liable for an offense committed before his or her agreement to join the conspiracy, if that prior offense completed the ultimate objective of the conspiracy."); *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1593 (Cal. App. 1995) (late-joining co-conspirator may not be held liable for "a tort that has already been committed by another"). Plaintiffs allege conspiratorial agreements to rig discrete bidding processes, each having a beginning and an end. *See, e.g.*, Dealer Compl. ¶¶ 135, 191, 194 (bids are submitted on a model-by-model basis; certain other Defendants admitted to rigging bids for specific models). The object of these agreements—the selection of bids and the establishment of wire-harness prices for each vehicle model—occurred well before Lear emerged from bankruptcy. *Id.* ¶ 135 (OEMs issue RFQs "approximately three years prior to the start of production of a new model"). The conspiratorial purpose of the bid-rigging committed by others already had been achieved. Put another way, Lear could not have conspired *post-discharge* to rig bid processes that had been consummated *pre-discharge*. Lear may not be held liable for damages arising from alleged bid rigging completed pre-discharge.

*Second*, Plaintiffs' theory of retroactive liability is not generally accepted law. As many courts have recognized, the imputation of retrospective liability to late-joining conspirators is "a questionable proposition at best." *Campbell*, 615 F. Supp. at 500 (dismissing plaintiffs' "novel claim" that "[b]y joining this conspiracy, Aetna assumed liability for the acts of its co-conspirators."); *see also In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d 709, 742 n.33 (E.D. Pa. 2011) (noting that the Third Circuit has never fully decided "whether a latecomer can be liable for earlier alleged conspiratorial participation in a civil antitrust action"). We are aware of no Sixth Circuit case that has ever adopted a theory of retroactive conspiracy liability in

16

an antitrust context. Indeed, such a theory is patently inconsistent with the policy concerns expressed in *Tam Travel*:

> If we were to adopt plaintiffs' continuing violation theory, the applicable limitations period for a § 1 claim would be infinite—an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct.

583 F.3d at 902. As with the "continuing violation theory" alleged in *Tam Travel*, Plaintiffs' theory of retroactive liability would undermine the important policy purpose of finality, a concern that is even more critical where the conclusiveness of a bankruptcy court's confirmation order is at stake. The confirmation order serves as a *complete* bar to litigation, and damages and conduct occurring prior to its entry are not actionable. *See In re Chateaugay Corp.*, 944 F.2d 997, 1002 (2d Cir. 1991) (the Bankruptcy Code is a "comprehensive" statute that "is intended to override many provisions of law that would apply in the absence of bankruptcy—especially laws otherwise providing creditors suing promptly with full payment of their claims").

In the Bankruptcy Court (which deferred the issue to this Court), Plaintiffs cited *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), as their purported basis for glossing over Lear's bankruptcy discharge. But Plaintiffs fundamentally misapply *Klehr*, which cited the "injurious act" rule from *Zenith*, 401 U.S. at 339, with approval. 521 U.S. at 189. *Klehr* was a RICO case related to the sale of a single cattle feed silo and a seller that, at the time of sale, allegedly misrepresented the silo's ability to preserve feed. 521 U.S. at 183-84.  It was not a bid-rigging or price-fixing claim; it did not involve a series of transactions for goods sold pursuant to pre-

established prices; and it had nothing to do with claims alleged to have arisen before or after a Chapter 11 proceeding.[13]

Equally important, Plaintiffs get the retroactivity holding of *Klehr* precisely backward. *Klehr* involved the interpretation of the statutory limitations period for a RICO claim and held—directly at odds with Plaintiffs' retroactive liability arguments—that the commission of overt acts in furtherance of a conspiracy *does not* allow a plaintiff to bootstrap a new act to recover for "old overt acts outside the limitations period." 521 U.S. at 189-90 (rejecting "the last predicate act rule," which allowed plaintiffs to recover "not just for any added harm caused them by that late-committed act, but for all the harms caused them by all the acts that make up the total 'pattern'"). In other words, the argument that Plaintiffs now make—that post-discharge sales could create pre-discharge liability for Lear—was soundly rejected by *Klehr*, which holds that plaintiffs may not rely upon later acts to recover damages for prior acts that are otherwise barred. *Id.*

The rejection of the retroactive liability theory in *Klehr* was motivated by the same concern for finality recognized in *Tam Travel*. Allowing the aggregation of damages for acts beyond the limitations period "would permit plaintiffs who know defendant's pattern of activity to simply wait, 'sleeping on their rights,' as the pattern continues and … damages accumulate, perhaps bringing suit only after the 'memories of the witnesses have faded or evidence is lost.'" *Id.* at 187. Thus, to the extent *Klehr* is germane at all, it requires the dismissal of Lear from the lawsuit. The imposition of retroactive liability for pre-discharge damages would run contrary to finality interests and would plainly violate the statutory purpose of the Bankruptcy Code, which is to give reorganized debtors "the opportunity to make a financial fresh start." *Green v. Welsh*,

---

[13]    The Sixth Circuit has already rejected Plaintiffs' argument that *Klehr* allows an evasion of a bankruptcy discharge. *See Tam Travel*, 583 F.3d at 899 (*Klehr* does not apply because, among other things, it "did not involve a formerly bankrupt corporation").

956 F.2d 30, 33 (2d Cir. 1992); *see also Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (bankruptcy reorganization is intended to discharge "all legal obligations of the debtor, no matter how remote or contingent"). Plaintiffs' theory would undermine this "fresh start" by allowing creditors to circumvent discharge simply by alleging an ongoing continuous conspiracy.

*Klehr* and *Tam Travel* avoid these perverse incentives of retroactivity. The bankruptcy process would be rendered meaningless if the Court were to accept Plaintiffs' novel theory and read those cases to nullify well-settled law. In sum, Plaintiffs have not properly pled that Lear was involved in any conspiracy at all, and they cannot plead that any part of their claims against Lear survives Lear's bankruptcy discharge.

## IV. Further Amendment Would Be Futile

In light of the circumstances present here, this Court should dismiss the Complaints without leave to amend as to Lear. The Bankruptcy Court opinion addressed the need for the earlier amendment, observing that Plaintiffs "represented that they planned to file a consolidated amended complaint, which will recognize the Lear bankruptcy and allege that Lear is nonetheless liable because of its overt acts in furtherance of the conspiracy subsequent to confirmation of its Plan." Mem. of Op. at 3 (Ex. B). Plaintiffs now have filed that amendment, which does not survive well-settled antitrust law or the principles espoused in *Tam Travel*. And because Plaintiffs' claims have been conclusively discharged by Lear's bankruptcy, granting leave to amend would be futile (and would cause Lear to incur even more unnecessary expense to defend). *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 569 (6th Cir. 2003) (leave to amend may be denied where the amendment would be futile).

## CONCLUSION

Plaintiffs cannot assert a viable claim against Lear. For the reasons stated herein, Lear respectfully requests that all claims against it be dismissed with prejudice.

Dated: July 13, 2012                         Respectfully submitted,

                                             LEAR CORPORATION

                                        By:   /s/ Andrew S. Marovitz
                                              *One of its Attorneys*

Howard B. Iwrey (P39635)                     Andrew S. Marovitz
Dante Stella (P60443)                        Britt M. Miller
DYKEMA GOSSETT PLLC                          MAYER BROWN LLP
39577 Woodward Ave.                          71 S. Wacker Drive
Bloomfield Hills, Michigan 48304             Chicago, Illinois 60606
Tel: 248-203-0526                            Tel: 312-782-0660
Fax: 248-203-0763                            Fax: 312-701-7711
E-mail: hiwrey@dykema.com                    E-mail: amarovitz@mayerbrown.com
E-mail: dstella@dykema.com                   E-mail: bmiller@mayerbrown.com

<u>**CERTIFICATE OF SERVICE**</u>

       I, Andrew S. Marovitz, an attorney, hereby certify that on July 13, 2012, I caused a true and correct copy of the foregoing **DEFENDANT LEAR CORPORATION'S RULE 12(b)(6) MOTION TO DISMISS** and **DEFENDANT LEAR CORPORATION'S INDIVIDUAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** to be filed and served electronically via the court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

Dated:  July 13, 2012               MAYER BROWN LLP

                           By: /s Andrew S. Marovitz_____
                             Andrew S. Marovitz
                             Attorney for Defendant Lear Corporation
                             71 South Wacker Drive
                             Chicago, IL  60606
                             (312) 782-0600
                             (312) 701-7711 - facsimile
                             *email*:  amarovitz@mayerbrown.com

702404403