# Exhibit A

# EXHIBIT A

## CHART OF CORRESPONDING CITATIONS IN THE CONSOLIDATED AMENDED COMPLAINTS

| Allegation Cited Or Addressed In Lear's Brief In Support Of Its Motion To Dismiss | Automobile Dealers' Consolidated Amended Complaint | Direct Purchasers' Consolidated Amended Complaint | End-Payors' Consolidated Amended Complaint |
|---|---|---|---|
| Lear controls almost 5% of the global market for Automotive Wire Harness Systems. Lear supplies Toyota, General Motors, Ford, and BMW (Br. at 1). | ¶¶ 142, 146 | ¶ 101 | ¶¶ 144, 147 |
| Defendants' unwarranted, anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices (Br. at 4). | ¶ 155 | ¶ 112 | ¶ 153 |
| Defendants have regularly attended the annual North American International Auto Show in Detroit, Michigan, which provided the means and opportunity to further the conspiracy alleged herein (Br. at 4). | ¶ 167 | ¶ 106 | ¶ 163 |
| Lear filed for Chapter 11 bankruptcy protection on July 7, 2009, and emerged from Chapter 11 bankruptcy proceedings on November 9, 2009 (Br. at 5, 9, 12). | ¶ 101 | ¶ 42 | ¶ 96 |
| After emerging from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices (Br. at 5, 9, 12). | ¶ 101 | ¶ 42 | ¶ 96 |

| Allegation Cited Or Addressed In Lear's Brief In Support Of Its Motion To Dismiss | Automobile Dealers' Consolidated Amended Complaint | Direct Purchasers' Consolidated Amended Complaint | End-Payors' Consolidated Amended Complaint |
|---|---|---|---|
| In 1987, Furukawa Electric and another corporation began Furukawa Wiring as a joint venture to manufacture and sell wire harnesses to Japanese automobile manufacturers in North America. Lear came to acquire an 80% stake in the venture, with Furukawa holding the remaining 20%. In April 2009, Furukawa purchased an additional 60% of the joint venture, raising its stake to 80%, and changed the joint venture's name to Furukawa Lear Corporation. In June 2010, Furukawa Lear Corporation became a wholly owned subsidiary of Furukawa called Furukawa Wiring (Br. at 5-6). | ¶¶ 96-97 | ¶¶ 37-38 | ¶¶ 91-92 |
| A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems.<br><br>In February 2010, the European Comission ("EC") executed surprise raids at the European offices of certain Defendants as part of an investigation into anticompetitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems. The EC also carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010.<br><br>Specifically, EC investigators raided the offices of Leoni AG, S-Y Systems Technologies, Lear Corporation's French affiliate, a European office of Delphi LLC and Yazaki Corporation (Br. at 7). | ¶¶ 170-173 | ¶¶ 115-117 | ¶¶ 164-166 |

2

| **Allegation Cited Or Addressed In Lear's Brief In Support Of Its Motion To Dismiss** | **Automobile Dealers' Consolidated Amended Complaint** | **Direct Purchasers' Consolidated Amended Complaint** | **End-Payors' Consolidated Amended Complaint** |
|---|---|---|---|
| The DOJ has executed warrants and/or pursued criminal charges against other Defendants, but not against Lear (Br. at 5, 7). | ¶¶ 174-175, 183-187 | ¶¶ 122-123, 134-135 | ¶¶ 169-170, 172-176 |
| To obtain search warrants, the United States was legally required to have probable cause accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information (Br. at 7-8). | ¶ 176 | -- | ¶ 171 |
| Plaintiffs and the members of the Classes did not first allege the existence of a conspiracy until after at least February 2010. (Br. at 9). | ¶ 234 | ¶ 138 | ¶ 204 |
| The alleged conspiracy began at least as early as January 1, 2000 (Br. at 11-12). | ¶ 2 | ¶ 2 | ¶ 2 |
| Motor vehicle Original Equipment Manufacturers ("OEMs") as part of their supply chain and procurement process, issue Requests for Quotation to parts suppliers on a model-by-model basis for model specific wire harness products (Br. at 12-16). | ¶¶ 133-135 | ¶ 92 | ¶ 139 |

3

| Allegation Cited Or Addressed In Lear's Brief In Support Of Its Motion To Dismiss | Automobile Dealers' Consolidated Amended Complaint | Direct Purchasers' Consolidated Amended Complaint | End-Payors' Consolidated Amended Complaint |
|---|---|---|---|
| OEMs usually award the business to the selected automotive parts supplier for four to six years, or the life of the model at issue. Typically, the bidding process begins approximately three years prior to the start of production of a new model (Br. at 12-16). | ¶ 135 | ¶¶ 94-97 | ¶ 139 |
| OEMs cannot change Automotive Wire Harness System suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System they purchase for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model (Br. at 6, 12-15). | ¶ 159 | ¶ 98 ("Suppliers to OEMs have been required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process") | ¶ 157 |
| A new manufacturer of Automotive Wire Harness Systems entering the market would likely have to wait until the next cycle of vehicles was being manufactured by any given OEM to even have a chance at obtaining the bid for a vehicle model and take advantage of the lack of competitive prices for Automotive Wire Harness Systems, by offering more competitive prices to OEMs (Br. at 12-16). | ¶ 159 | ¶ 98 | ¶ 157 |
| The design of an Automotive Wire Harness System must be synergized by Automotive Wire Harness System manufacturers and OEMs. Designing Automotive Wire Harness Systems pursuant to such stringent specifications involves a great degree of sunk costs and resources (Br. at 12-16). | ¶ 159 | ¶ 98 | ¶ 157 |

4