# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : : | Master File No. 12-md-02311 |
| PRODUCT(S): | : : : | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| AUTOMOTIVE BEARINGS | : : | |
| This Document Relates to: | : : | <u>JURY TRIAL DEMANDED</u> |
| ALL END-PAYOR ACTIONS | : : : | |

# TABLE OF CONTENTS

Page(s)

I.      NATURE OF ACTION ................................................................................1

II.     JURISDICTION AND VENUE ...................................................................3

III.    PARTIES ......................................................................................................6

        A.      Plaintiffs ...........................................................................................6

        B.      Defendants JTEKT Corporation and Koyo Corporation of U.S.A.
                ("JTEKT Defendants") ...................................................................11

        C.      Defendant NSK Ltd. ("NSK") ........................................................12

        D.      Defendant Schaeffler AG ("Schaefler") ........................................12

        E.      Defendant AB SKF ("SKF") ..........................................................12

        F.      Defendants NTN Corporation ("NTN") ..........................................12

IV.     AGENTS AND CO-CONSPIRATORS .....................................................13

V.      FACTUAL ALLEGATIONS .....................................................................14

        A.      The Automotive Bearings Industry..................................................14

        B.      Defendants Increased Prices for Automotive Bearings in the Face
                of Declining Demand during the Class Period ................................17

        C.      The Structure and Characteristics of the Automotive Bearings Market
                Render the Conspiracy More Plausible.............................................19

                1.      The Automotive Bearings Market Has High Barriers to Entry ..............19
                2.      The Demand for Automotive Bearings is Inelastic ...................20
                3.      The Market for Automotive Bearings Is Highly Concentrated ..............21
                4.      Defendants had Ample Opportunities to Conspire ...................21

        D.      Government Investigations ..............................................................22

                1.      United States and European Investigations................................21
                2.      Japanese Investigation ..................................................................23
                3.      Historical Industry Investigations and Cartels...........................24

E.      Admissions of Price-Fixing in the Automotive Bearings Industry ......................25

VI.     CLASS ACTION ALLEGATIONS .................................................................25

VII.    PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY......................29

VIII.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE
        OF LIMITATIONS..............................................................................................33

        A.      The Statute of Limitations Did Not Begin to Run Because Plaintiffs
                Did Not And Could Not Discovery Their Claims ..................................................33

        B.      Fraudulent Concealment Tolled the Statute of Limitations ..................................33

FIRST CLAIM FOR RELIEF
Violation of Section 1 of the Sherman Act
(on behalf of Plaintiff and the Nationwide Class) ..........................................................36

SECOND CLAIM FOR RELIEF
Violation of State Antitrust Statutes
(on behalf of Plaintiffs and the Damages Class)............................................................38

THIRD CLAIM FOR RELIEF
Violation of State Consumer Protection Statutes
(on behalf of Plaintiffs and the Damages Class)............................................................58

FOURTH CLAIM FOR RELIEF
Unjust Enrichment
(on behalf of Plaintiffs and the Damages Class)............................................................76

PRAYER FOR RELIEF ........................................................................................76

JURY DEMAND ................................................................................................82

Plaintiffs Rebecca Lynn Morrow, Erica Shoaf, Tom Halverson, Stephanie Petras, Melissa Barron, John Hollingsworth, Meetesh Shah, Michael Tracy, Jane Taylor, Jennifer Chase, Darrel Senior, James Marean, Ron Blau, Antonio and Nilsa Mercado, Darcy Sherman, David Bernstein, Ellis Winton McInnis, Thomas Wilson, Lauren Primos, Robert Klinger, Jessica DeCastro, Lori Curtis, Virginia Pueringer, Nathan Croom, Richard Stoehr, Edward Muscara, Michael Wick, Tenisha Burgos, Jason Grala, Howard Tepler, Rochelle Meyer, Eugene Friedman, Kathleen Tawney, Melinda and Curtis Harr DDS PC, Cindy Prince, Paul Gustafson, France Gammell-Roach, William Dale Picotte, Becky Bergeson, Jesse Powell, Alena Farrell, Arthur Stuckey, Janne Rice, Robert Rice, Stacey Nickell, Carol Ann Kashishian (collectively, "Plaintiffs"), on behalf of herself and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to herself and upon information and belief as to all other matters, based on the investigation of counsel, brings this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demands a trial by jury, and alleges as follows:

## I.       NATURE OF ACTION

1.       This lawsuit is brought as a proposed class action against Defendants, suppliers of Automotive Bearings (defined below) globally and in the United States, for engaging in a massive conspiracy to unlawfully fix and artificially raise the prices of these products.  Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and purchasers alike.

2.       Plaintiffs seek to represent a proposed class of consumers that purchased or leased new motor vehicles containing Automotive Bearings or who purchased replacement Automotive

1

Bearings for their motor vehicles during the period from and including January 1, 2004 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period").

3.      "Automotive Bearings" are devices in an automotive vehicle used to position, hold and guide moving parts, as well as to reduce friction between moving and fixed parts. Automotive Bearings are located throughout an automotive vehicle.  "Automotive Bearings" include the following devices used in automotive vehicles: ball bearings, tapered roller bearings, roller bearings, mounted bearings, and parts and components for ball and roller bearings.

4.      Defendants JTEKT Corporation, Koyo Corporation of U.S.A., NSK Ltd., , Schaeffler AG, AB SKF, and NTN Corporation (all as defined below, and collectively "Defendants") manufacture, market, and sell Automotive Bearings throughout the United States. The manufacture and sale of Automotive Bearings is a multi-billion dollar industry.

5.      Defendants and their co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Bearings.

6.      Defendants' anticompetitive conduct is also the subject of a global criminal investigation being conducted by competition authorities in the United States, the European Union, Canada and Japan.

7.      As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Automotive Bearings, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices in connection with a probe into the automotive industry.  The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants.  The Japan Fair Trade Commission ("JFTC") confirmed, in July 2011, that Japanese bearing manufacturing companies

2

NSK Ltd., NTN Corporation, JTEKT Corporation, and Nachi-Fujikoshi Corp. were being

investigated for possible participation in an unlawful price-fixing cartel.  On June 14, 2012, the

JFTC filed a criminal complaint against NSK Ltd., NTN Corporation and Nachi-Fujikoshi Corp.,

accusing those entities of meeting and conspiring to raise the component prices for Automotive

Bearings and industrial bearings on multiple occasions beginning in 2004.  (Defendant JTEKT

was exempted from the criminal complaint under the JFTC's leniency program.)  Officials of

NSK Ltd. and Nachi-Fujikoshi Corp. have admitted their roles in the cartel and, according to

news reports, some NTN Corporation officials have begun to make statements, during voluntary

questioning with Tokyo prosecutors, admitting their involvement in fixing prices for Automotive

Bearings.

8.      Defendants participated in a combination and conspiracy to suppress and eliminate

competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and

maintain the prices of, Automotive Bearings sold to automobile manufacturers in the United

States.  The combination and conspiracy engaged in by Defendants was in unreasonable restraint

of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C.

§ 1, as well as in unreasonable restraint of intrastate trade and commerce within the individual

states.

9.      As a direct result of the anticompetitive and unlawful conduct alleged herein,

Plaintiff and the Classes paid artificially inflated prices for Automotive Bearings during the Class

Period and have thereby suffered antitrust injury to their business or property.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to

secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman

Act (15 U.S.C. § 1).   Plaintiff also asserts claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seeks to obtain restitution, recover damages and secure other relief against Defendants for violation of those state laws. Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.

12.     This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants.

13.     This Court also has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because they are so related to the claims asserted in this action over which the court has original jurisdiction that they form part of the same case or controversy.

14.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

15.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Bearings throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.  Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States.

16.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate and intrastate commerce within the United States and its individual States.

17.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States, as well as on intrastate commerce within the individual States.  Defendants' products are sold in the flow of interstate and intrastate commerce.

18.     Automotive Bearings manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Automotive Bearings are purchased in the United States, and such Automotive Bearings do not constitute import commerce, Defendants' unlawful activities with

respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

19.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in a conspiracy affecting all states, to fix or inflate prices of Automotive Bearings, which unreasonably restrained trade and adversely affected the market for Automotive Bearings.

20.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Bearings for personal use and not for resale, including Plaintiffs and members of the Classes.

### III.     PARTIES

**A.     Plaintiffs**

21.     Plaintiff Rebecca Lynn Morrow is an Arizona resident who purchased Automotive Bearings indirectly from one or more Defendants.

22.     Plaintiff Erica Shoaf is an Arizona resident who purchased an Automotive Bearings indirectly from one or more Defendants.

23.      Plaintiff Tom Halverson is an Arizona resident who purchased an Automotive Bearings indirectly from one or more Defendants.

24.     Plaintiff Stephanie Petras is an Arizona resident who purchased an Automotive Bearings indirectly from one or more Defendants.

25.     Plaintiff Melissa Barron is a California resident who purchased an Automotive Bearings indirectly from one or more Defendants.

26.     Plaintiff John Hollingsworth is California resident who purchased an Automotive Bearings indirectly from one or more Defendants.

27.     Plaintiff Meetesh Shah is a California resident who purchased an Automotive Bearings indirectly from one or more Defendants.

28.     Plaintiff Gary Herr is a Florida resident who purchased an Automotive Bearings indirectly from one or more Defendants.

29.     Plaintiff Michael Tracy is a Florida resident who purchased an Automotive Bearings indirectly from one or more Defendants.

30.     Plaintiff Jane Taylor is a Hawaii resident who purchased an Automotive Bearings indirectly from one or more Defendants.

31.     Plaintiff Jennifer Chase is an Iowa resident who purchased an Automotive Bearings indirectly from one or more Defendants.

32.     Plaintiff Darrel Senior is Kansas resident who purchased an Automotive Bearings indirectly from one or more Defendants.

33.     Plaintiff James Marean is a Maine resident who purchased an Automotive Bearings indirectly from one or more Defendants.

34.     Plaintiff Ron Blau is a Massachusetts resident who purchased an Automotive Bearings indirectly from one or more Defendants.

35.     Plaintiff Roger Olson is a Michigan resident who purchased an Automotive Bearings indirectly from one or more Defendants.

36.     Plaintiffs Antonio and Nilsa Mercado are Michigan residents who purchased an Automotive Bearings indirectly from one or more Defendants.

37.     Plaintiff Darcy Sherman is a Minnesota resident who purchased an Automotive Bearings indirectly from one or more Defendants.

38.     Plaintiff David Bornstein is a Minnesota resident who purchased an Automotive Bearings indirectly from one or more Defendants.

39.     Plaintiff Ellis Winton McInnis is a Mississippi resident who purchased an Automotive Bearings indirectly from one or more Defendants.

40.     Plaintiff Thomas Wilson is a Mississippi resident who purchased an Automotive Bearings indirectly from one or more Defendants.

41.     Plaintiff Lauren Primos is a Mississippi resident who purchased an Automotive Bearings indirectly from one or more Defendants.

42.     Plaintiff Robert Klinger is a Missouri resident who purchased an Automotive Bearings indirectly from one or more Defendants.

43.     Plaintiff Jessica DeCastro is a Missouri resident who purchased an Automotive Bearings indirectly from one or more Defendants.

44.     Plaintiff Lori Curtis is a Missouri resident who purchased an Automotive Bearings indirectly from one or more Defendants.

45.     Plaintiff Virginia Pueringer is a Montana resident who purchased an Automotive Bearings indirectly from one or more Defendants.

46.     Plaintiff Nathan Croom is a Nebraska resident who purchased an Automotive Bearings indirectly from one or more Defendants.

47.     Plaintiff Richard Stoehr is a Nevada resident who purchased an Automotive Bearings indirectly from one or more Defendants.

48.     Plaintiff Edward Muscara is a New Hampshire resident who purchased an Automotive Bearings indirectly from one or more Defendants.

49.     Plaintiff Michael Wick is a New Mexico resident who purchased an Automotive Bearings indirectly from one or more Defendants.

50.     Plaintiff Tenisha Burgos is a New York resident who purchased an Automotive Bearings indirectly from one or more Defendants.

51.     Plaintiff Jason Grala is New York resident who purchased an Automotive Bearings indirectly from one or more Defendants.

52.     Plaintiff Howard Tepler is a New York resident who purchased an Automotive Bearings indirectly from one or more Defendants.

53.     Plaintiff Rochelle Meyer is a New York resident who purchased an Automotive Bearings indirectly from one or more Defendants.

54.     Plaintiff Eugene Friedman is a New York resident who purchased an Automotive Bearings indirectly from one or more Defendants.

55.     Plaintiff Kathleen Tawney is a North Carolina resident who purchased an Automotive Bearings indirectly from one or more Defendants.

56.     Plaintiffs Melinda and Curtis Harr DDS PC are North Dakota residents who purchased an Automotive Bearings indirectly from one or more Defendants.

57.     Plaintiff Cindy Prince is an Oregon resident who purchased an Automotive Bearings indirectly from one or more Defendants.

58.     Plaintiff Paul Gustafson is an Oregon resident who purchased an Automotive Bearings indirectly from one or more Defendants.

59.     Plaintiff France Gammell-Roach is a Rhode Island resident who purchased an Automotive Bearings indirectly from one or more Defendants.

60.     Plaintiff William Dale Picotte is a South Dakota resident who purchased an Automotive Bearings indirectly from one or more Defendants.

61.     Plaintiff Becky Bergeson is a Utah resident who purchased an Automotive Bearings indirectly from one or more Defendants.

62.     Plaintiff Jesse Powell is a Utah resident who purchased an Automotive Bearings indirectly from one or more Defendants.

63.     Plaintiff Alena Farrell is a Vermont resident who purchased an Automotive Bearings indirectly from one or more Defendants.

64.     Plaintiff Arthur Stuckey is a Vermont resident who purchased an Automotive Bearings indirectly from one or more Defendants.

65.     Plaintiff Janne Rice is a West Virginia resident who purchased an Automotive Bearings indirectly from one or more Defendants.

66.     Plaintiff Robert Rice is a West Virginia resident who purchased an Automotive Bearings indirectly from one or more Defendants.

67.     Plaintiff Stacey Nickell is a West Virginia resident who purchased an Automotive Bearings indirectly from one or more Defendants.

68.     Plaintiff Carol Ann Kashishian is a Wisconsin resident who purchased an Automotive Bearings indirectly from one or more Defendants.

B.     **Defendants JTEKT Corporation and Koyo Corporation of U.S.A. ("JTEKT Defendants")**

69.     Defendant JTEKT Corporation ("JTEKT"), formerly known as Koyo Seiko Co., Ltd., is a Japanese corporation with its principal place of business in Osaka, Japan.  Defendant JTEKT— directly and/or through its wholly owned and/or controlled subsidiaries, including Defendant Koyo Corporation of U.S.A.—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

70.     Defendant Koyo Corporation of U.S.A., LLC ("Koyo USA"), is incorporated in South Carolina with headquarters in Westlake, Ohio.  Defendant Koyo USA is a wholly-owned subsidiary of, and is wholly controlled by, Defendant JTEKT.

71.     According to a corporate press release, Koyo USA "is a major supplier of bearings to industrial OEM and automotive manufacturers.  It is the sales, marketing and distribution arm of JTEKT for ball and roller bearings [in the United States]. . . ."

72.     During the Class Period, Defendant Koyo USA sold, marketed and distributed Automotive Bearings for Defendant JTEKT that were purchased in the United States, including in this District.  During the Class Period, its activities in the United States were under the control and direction of Defendant JTEKT.

73.     This control and direction is accomplished, *inter alia*, through the sharing of officers and executives.  For example, Noriya Murase, President and CEO of Koyo USA, is a Director on the Board of Directors of JTEKT.  Tomokazu Takahashi, Senior Executive Vice President of Koyo USA, is a Managing Officer of JTEKT.

11

C.      **Defendant NSK Ltd. ("NSK")**

74.      Defendant NSK Ltd. ("NSK") is a Japanese corporation with its principal place of business in Tokyo, Japan.  NSK— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

D.      **Defendant Schaeffler AG ("Schaefler")**

75.      Defendant Schaeffler AG ("Schaeffler") is a German corporation with its principal place of business in Herzogenaurach, Germany.  Schaeffler— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

E.      **Defendant AB SKF ("SKF")**

76.      Defendant AB SKF ("SKF") is a Swedish corporation with its principal place of business in Göteborg, Sweden.  SKF—directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

F.      **Defendants NTN Corporation ("NTN")**

77.      Defendant NTN Corporation ("NTN") is a Japanese corporation with its principal place of business in Osaka, Japan.  NTN Corporation— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings  that were purchased throughout the United States, including in this district, during the Class Period.

78.      To the extent that subsidiaries, divisions and other affiliates within Defendants' corporate families sold Bearings to direct purchasers, these related entities played a material role

in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Bearings would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing or collecting monies from Plaintiff and the members of the Class was known to and approved by their respective corporate parent named as a Defendant in this complaint.

## IV.      AGENTS AND CO-CONSPIRATORS

79.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

80.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

81.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## V.       FACTUAL ALLEGATIONS

### A.       The Automotive Bearings Industry

82.      Automotive Bearings are rolling elements that are used to decrease the rotational friction between a vehicle and the surface it runs on, such as a cemented road.  Automotive Bearings help maintain balance in the event of speed changes or sudden braking while the automotive vehicle is in motion.  Automotive Bearings are, among other things, inserted inside the wheels of the vehicle in a special slot called the "cage."  The Automotive Bearings then rotate around the cage while the vehicle is operating, thereby evenly distributing the load of the vehicle during operation.  Automotive Bearings serve an essential role in most vehicles because they improve car performance and allow for smooth driving.  Automotive Bearings are prone to wear and tear, and are usually replaced rather than repaired.  See Figure 1.



**Figure 1.**

14

83.     Automotive Bearings are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Automotive Bearings.

84.     For new cars, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Bearings directly from Defendants. Automotive Bearings may also be purchased by component manufacturers who then supply such components to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply Automotive Bearings directly to an OEM.

85.     Defendants and their co-conspirators supplied Automotive Bearings to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured Automotive Bearings (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) abroad for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) abroad for installation in vehicles manufactured abroad for export to and sale in the United States.

86.     Plaintiff and members of the proposed Classes purchased Automotive Bearings indirectly from one or more of the Defendants.  By way of example, an owner or lessee of a vehicle may indirectly purchase Automotive Bearings from Defendants when purchasing or leasing a new vehicle that contains Automotive Bearings as a component product.   An owner or lessee of a vehicle may also indirectly purchase replacement Automotive Bearings from Defendants when repairing a damaged vehicle or where the vehicle's Automotive Bearings are defective.

87.     The U.S. market size for Automotive Bearings was $2.71 billion in 2008.  See Figure 2.

15



**Figure 2.**

88.    The Automotive Bearings market is dominated and controlled by a small number of manufacturers, which include Defendants.

**B.    Defendants Increased Prices for Automotive Bearings in the Face of Declining Demand during the Class Period**

89.    The Producer Price Index ("PPI") measures the average change over time in the prices received by domestic producers for their output.  The chart below (see Figure 3) provides a 2003-2009 illustration of bearing industry pricing.  Because Automotive Bearings account for almost 40 percent of the bearings market (see Figure 2), the PPI for bearings is a good indicator of the change over time in the prices received by domestic producers of Automotive Bearings.

90.    The PPI for bearings suggests that the prices for bearings have increased significantly between January 2004 and February 2009.  According to the Bureau of Labor Statistics, the PPI for bearings increased by 32 percent in the period between January 2004 and February 2009.



**Figure 3.**

91.   Meanwhile, according to the auto sales demand curve (see Figure 4 below) by the Bureau of Economic Analysis, from 2003 to the end of 2007, demand for automobiles in the United States has remained sluggish or flat.  The PPI for bearings for the very same period indicates that prices for bearings—and by extension Automotive Bearings—were sharply rising (see Figure 3).   In the absence of an unlawful price-fixing conspiracy, according to the laws of supply and demand, prices during this period should have followed demand.

U.S. Auto Sales



**Figure 4.**

92.    From 2008 to 2009, at the height of the recession, the auto industry experienced a significant 37 percent drop in demand.  See Figure 4.  The PPI for bearings for the very same period indicates that prices for bearings increased by almost 10 percent (see the steep increase in Figure 3).  According to the law of supply and demand, prices during this period should have fallen, but instead rose.

93.    In a competitive market, falling demand would lead to decreased prices because competitors would need to lower prices in order to attract customers and increase demand.  In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with decreasing demand.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

94.    The price of bearings—and by extension Automotive Bearings—increased during the Class Period, even during periods when demand decreased.  In a competitive market, falling demand should not have resulted in rising prices for Automotive Bearings.  Such anticompetitive

price increases have resulted in Plaintiffs and members of the Classes paying supracompetitive prices.

**C.** **The Structure and Characteristics of the Automotive Bearings Market Render the Conspiracy More Plausible**

95.     The structure and other characteristics of the Automotive Bearings market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  Specifically, the Automotive Bearings market: (1) has high barriers to entry; (2) has demand inelasticity; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

**1.** **The Automotive Bearings Market Has High Barriers to Entry**

96.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

97.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Bearings market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

98.     Research and development is necessary for product innovation as players in this industry compete primarily based on product pricing.  In order to effectively compete, an entrant must be committed to spending a significant amount of resources on research and development.

99.     Defendants also own several patents for Automotive Bearings.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

### 2.     The Demand for Automotive Bearings is Inelastic

100.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to make purchases despite a price increase.

101.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

102.     Demand for Automotive Bearings is highly inelastic because there are no close substitutes for these products.  In addition, customers must purchase Automotive Bearings as an essential part of a vehicle, even if the prices are kept at a supracompetitive level.

### 3.     The Market for Automotive Bearings Is Highly Concentrated

103.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices.   There is a high level of concentration among firms in the Automotive Bearings market.  According to a leading industry report, the top three suppliers of Automotive Bearings control nearly 75 percent of the U.S. market.

### 4.      Defendants had Ample Opportunities to Conspire

104.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  According to one confidential witness who was the territory manager of a major Automotive Bearings manufacturer, employees of Defendants often ran into and spoke to one another at trade shows.

105.    In addition, SKF, NSK, NTN, and Schaeffler are members of the seven-member World Bearing Association (WBA).  The WBA is not registered, not incorporated, has no Articles of Association, has no record of any meetings and does not file documents with any government entity globally.

106.    Defendants also had opportunities to conspire and trade information pursuant to the numerous acquisitions in the Automotive Bearings industry over the past five years.  For example, The Timken Company announced at the end of 2009 that it sold its Needle Roller Automotive Bearings business to JTEKT.  On information and belief, Defendants also sell products, including Automotive Bearings, to one another as a general business practice.

### D.    Government Investigations

107.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts in general, and Automotive Bearings in particular.

### 1.                          <u>United States and European Investigations</u>

108.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC.   Throughout 2010 and 2011, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anticompetitive

conduct related to the manufacturing and sale of automotive parts.  The EC confirmed that, starting on November 8, 2011, Commission officials undertook unannounced inspections at companies active in the bearings industry in several member states due to concerns that the companies may have violated EU antitrust rules prohibiting cartels and restrictive business practices.

109.    The DOJ is conducting an investigation of potential antitrust activity in the Automotive Bearings market.  According to Defendant NTN's 2011 Financial Report, the DOJ has subpoenaed Defendant NTN's United States "consolidated subsidiary" (believed to include at least Defendants NTN USA and NTN Bearing) for information related to transactions in Automotive Bearings.

110.    Defendant Schaeffler has acknowledged the global antitrust investigation in its 2011 Annual Report, stating "The European Commission as well as the US Department of Justice have commenced antitrust investigations of various manufacturers of rolling bearings, including Schaeffler. The European and the U.S. competition authorities are investigating whether manufacturers of rolling bearings participated in unlawful agreements and/or concerted practices concerning rolling or plain bearings."  Schaeffler's facilities have been inspected by the EC in connection with its antitrust investigation.

111.    Defendants JTEKT, NSK and NTN have all admitted that they have European subsidiaries and related entities that are being investigated by the EC:

      a.  Defendant JTEKT has admitted that its Dutch unit is being investigated by the EC as part of its antitrust investigation of the Automotive Bearings industry.

      b.  Defendant NSK had admitted that its German unit is being investigated by the EC over suspected price-fixing.

      c.   Defendant NTN has admitted, in its 2011 Financial Report, that its "European consolidated subsidiaries also received an on-site inspection by the European Commission into transactions in bearings, on suspicion of noncompliance with EU Competition Law."

      d.   NTN's operations in France and Germany were also probed by the EC as part of its antitrust investigation into the Automotive Bearings industry.

112.    Defendant SKF has admitted in its 2011 Annual Report that it and "other companies in the bearing industry became part of an investigation by the European Commission regarding a possible violation of EU antitrust rules."   SKF also said in a statement that EU officials visited its facilities in Gothenburg, Sweden and Schweinfurt, Germany.

### 2.         Japanese Investigation

113.    The JFTC began its investigation of Defendants JTEKT, NSK, and NTN in July 2011.  The targets of the JFTC investigation on average export approximately 55 percent of their total shipments, including to the United States and Europe.

114.    On or about June 14, 2012, the JFTC filed a Criminal Complaint against Defendants NSK, Nachi-Fujikoshi Corporation, and NTN, as well as seven of their senior officials, for their involvement in the price-fixing cartel of industrial and automotive bearings. Defendant JTEKT was not named in the criminal complaint under the JFTC leniency program.

115.    The four Japanese Defendants are alleged to have agreed to (i) ranges of price-hikes and (ii) the timing of price increases for Automotive Bearings on at least five different occasions since 2004.

116.     To effectuate their conspiracy, senior officials of these Japanese Defendants repeatedly and secretly met in Japan to reach agreement on increasing prices for Automotive Bearings.

117.     The JFTC has specifically accused Defendants of meetings between May and August 2010 during which time the Japanese Defendants agreed to the range of and timing of price increases.  The JFTC has also accused Defendants NSK and NTN of secretly reaching an agreement to fix prices for Automotive Bearings as recently as July 2010.

118.     The JFTC has searched the headquarters of certain Defendants, as well as 20 other locations, including major sales offices and executives' homes.

119.     In addition, NSK has admitted in its 2011 Annual Report that "in July 2011 the Japan Fair Trade Commission conducted on-site investigations of NSK on suspicion that sales of certain products infringed upon Japan's Antimonopoly Act . . . ."  NSK stated that it "intend[ed] to cooperate fully with the commission investigation."

120.     In its 2011 Financial Report, NTN stated

[I]n July 2011, the Company underwent an on-site inspection by the Japan Fair Trade Commission into domestic transactions on bearings, on suspicion that the Company had decided to raise sale prices in cooperation with other manufactures, and in April this year a search was carried out by special investigators from Tokyo District Public Prosecutor's Office and the Fair Trade Commission.

**3.        Historical Industry Investigations and Cartels**

121.     In 1973, the JFTC found that the exact same targets that it is currently investigating formed a similar price cartel.  In the 1973 case, the JFTC found that NSK, Koyo Seiko Co. (currently JTEKT), the Nachi-Fujikoshi Corporation and a sales arm of NTN Toyo

24

Bearing Co. (currently NTN) formed a cartel and that the companies' sales executives held secret meetings at which they determined to raise prices.

122.    Additionally, in 2002, the French Competition Authorities levied fines totaling 19 million Euros on the main manufacturers of bearings in the French market after finding the bearings manufacturers had entered into an anticompetitive agreement.  Three of the Defendants named here, SKF, Schaeffler and NSK, were found to be members of the price-fixing cartel.  The French Competition Authorities found that between 1993 and 1997, the price-fixing caused a cumulative increase in gross industry prices of bearings by 16.4 percent.

## E.      Admissions of Price-Fixing in the Automotive Bearings Industry

123.    The JFTC began its investigation in July 2011 after JTEKT Corporation reported the cartel, and its involvement in the cartel, to JFTC so that it would be given leniency treatment.

124.    Officials of NSK and Nachi-Fujikoshi have already admitted to their roles in the cartel, and some NTN officials, during voluntary questioning with Tokyo prosecutors, have begun to make statements admitting their involvement in fixing prices for Automotive Bearings.

## VI.        CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this action on behalf of herself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that indirectly purchased or leased in the United States, during the Class Period, Automotive Bearings, for personal use and not for resale, including the purchase of Automotive Bearings as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any

Defendant or any current or former subsidiary or affiliate thereof,

or any co-conspirator.

126.    Plaintiffs also bring this action on behalf of herself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, consumer protection, and unjust enrichment laws of the states whose laws are identified below (the "Indirect Purchaser States").  These claims are brought by Plaintiffs on behalf of herself and persons and entities in the Indirect Purchaser States as follows (the "Damages Class"):

All persons and entities that indirectly purchased or leased in the Indirect Purchaser States, during the Class Period, Automotive Bearings, for personal use and not for resale, including the purchase of Automotive Bearings as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

127.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Bearings directly or for resale.

128.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

129.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Bearings sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law,  as alleged in the Second and Third Claims for Relief;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Automotive Bearings sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

130.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Bearings purchased indirectly from Defendants or their co-conspirators.

131.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

132.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

133.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous

individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

134.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.      PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

135.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)      Price competition has been restrained or eliminated with respect to Automotive Bearings;

(b)      The prices of Automotive Bearings have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

(c)      Indirect purchasers of Automotive Bearings have been deprived of free and open competition.

136.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Automotive Bearings.  These inflated prices have been passed on to them by OEMs and dealers.   Those overcharges have unjustly enriched defendants.

137.    The markets for Automotive Bearings and vehicles are inextricably linked and intertwined because the market for Automotive Bearings exists to serve the vehicle market. Without the vehicles, the Automotive Bearings have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Automotive Bearings.  As stated in a report by a leading economic research firm,

Ball bearing manufacturers rely heavily on several key industries
to purchase their products. For example, automotive and
transportation manufacturers are major purchasers of Automotive
Bearings. Therefore, the collapse of the domestic automotive
industry throughout 2008 and 2009 caused demand for new cars to
plummet, which reduced demand for Automotive Bearings used in
the auto manufacturing process.

138.   Automotive Bearings are identifiable, discrete physical products that remain
essentially unchanged when incorporated into a vehicle. As a result, Automotive Bearings follow
a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the
Classes, and cost changes attributable to Automotive Bearings can be traced through the chain of
distribution to Plaintiffs and the members of the Classes.

139.   Just as Automotive Bearings can be physically traced through the supply chain, so
can their price be traced to show that changes in the prices paid by direct purchasers of
Automotive Bearings affect prices paid by indirect purchasers of new motor vehicles containing
Automotive Bearings and of Automotive Bearings purchased for repair purposes.

140.   While even a monopolist would increase its prices when the cost of its inputs
increased, the economic necessity of passing through cost changes increases with the degree of
competition a firm faces. The OEM and dealer markets for new motor vehicles are subject to
vigorous price competition. The OEMs and dealers have thin net margins, and are therefore at the
mercy of their component costs, such that increases in the price of components such as
Automotive Bearings lead to corresponding increases in prices for new motor vehicles and
replacement parts at the OEM and dealer levels. When downstream distribution markets are

highly competitive, as they are in the case of new motor vehicles containing Automotive Bearings as components, overcharges are passed through to ultimate consumers, such as the indirect-purchaser plaintiffs and class members.

141.    Hence, the inflated prices of Automotive Bearings both in new motor vehicles and purchased for repair resulting from defendants' bid rigging and price-fixing conspiracy have been passed on to plaintiffs and the other class members by OEMs and dealers.

142.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

143.    As P rofessor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge
> will be passed on by distributors to end consumers.  When the distribution
> markets are highly competitive, as they are here, all or nearly the entire
> overcharge will be passed on through to ultimate consumers…Both of Microsoft's
> experts also agree upon the economic phenomenon of cost pass through, and how

it works in competitive markets.  This general phenomenon of cost pass through is
well established in antitrust laws and economics as well.

144.    The purpose of the conspiratorial conduct of the Defendants and their co-
conspirators was to raise, fix, rig or stabilize the price of Automotive Bearings and, as a direct and
foreseeable result, the price of new motor vehicles containing Automotive Bearings and the price
of Automotive Bearings purchased for repair purposes.  Economists have developed techniques to
isolate and understand the relationship between one "explanatory" variable and a "dependent"
variable in those cases when changes in the dependent variable are explained by changes in a
multitude of variables, even when all such variables may be changing simultaneously.  That
analysis - called regression analysis - is commonly used in the real world and in litigation to
determine the impact of a price increase on one cost in a product (or service) that is an assemblage
of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of
Automotive Bearings on prices for new motor vehicles even though such products contain a
number of other components whose prices may be changing over time.  A regression model can
explain how variation in the price of Automotive Bearings affects changes in the price of new
motor vehicles.  In such models, the price of Automotive Bearings would be treated as an
independent or explanatory variable.  The model can isolate how changes in the price of
Automotive Bearings impact the price of new motor vehicles containing Automotive Bearings
while controlling for the impact of other price-determining factors.

145.    The precise amount of the overcharge impacting the prices of new motor vehicles
containing Automotive Bearings can be measured and quantified.  Commonly used and well-
accepted economic models can be used to measure both the extent and the amount of the supra-

32

competitive charge passed-through the chain of distribution.  Thus, the economic harm to

Plaintiffs and the class members can be quantified.

146.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members

of the Classes have sustained injury to their businesses or property, having paid higher prices for

Automotive Bearings than they would have paid in the absence of Defendants' illegal contract,

combination, or conspiracy, and, as a result, have suffered damages in an amount presently

undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish

and prevent.

### VIII.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

**A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims**

147.    Plaintiffs repeat and reallege the allegations set forth above.

148.    Plaintiffs and the members of the Classes had no knowledge of the combination or

conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set

forth herein, until the public announcements of criminal accusations by the Japanese government

of Automotive Bearings price-fixing on June 14, 2012.

149.    Plaintiff and the members of the Classes are purchasers who purchased or leased

automobiles or purchased Automotive Bearings to replace or repair damaged or defective

Automotive Bearings in their automobiles.  They had no direct contact or interaction with any of

the Defendants in this case and had no means from which they could have discovered the

combination and conspiracy described in this Complaint the public announcements of criminal

accusations by the Japanese government of Automotive Bearings price-fixing on June 14, 2012.

150.     No information in the public domain was available to the Plaintiff and the members of the Classes prior to the public announcements of criminal accusations by the Japanese government of Automotive Bearings price-fixing on June 14, 2012 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix and rig bids for Automotive Bearings.  Plaintiff and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

151.     For these reasons, the statute of limitations as to Plaintiff and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiff and the members of the Classes have alleged in this Complaint.

**B.      Fraudulent Concealment Tolled the Statute of Limitations**

152.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Classes.  Plaintiff and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Automotive Bearings price-fixing began.

153.     Defendants orchestrated the combination or conspiracy alleged herein in secret, including through private meetings held among Defendants.

154.     Because Defendants' agreements, understandings and conspiracies were kept secret and wrongfully concealed until July 2011, Plaintiff and members of the Classes before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they

were paying supracompetitive prices for Automotive Bearings throughout the United States during the Class Period.

155.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

156.    By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing.  Automotive Bearings are not exempt from antitrust regulation, and thus, before July 2011, Plaintiff reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Automotive Bearings prices before July 2011.

157.    Plaintiff and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

158.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 2011, when reports of the investigations into anticompetitive conduct concerning Automotive Bearings were first publicly disseminated.

159.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the members of the Classes have alleged in this Complaint.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

160.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

161.     Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

162.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

163.     At least as early as January 2004, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Bearings, thereby creating anticompetitive effects.

164.     The anticompetitive acts were intentionally directed at the United States market for Automotive Bearings and had a substantial and foreseeable effect on interstate and intrastate commerce by raising and fixing prices for Automotive Bearings throughout the United States and within the individual States.

165.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Bearings.

166. As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Bearings have been harmed by being forced to pay inflated, supracompetitive prices for Automotive Bearings.

167. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

168. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for Automotive Bearings has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for Automotive Bearings sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c) Plaintiff and members of the Nationwide Class who purchased Automotive Bearings indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

169. Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Bearings purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

170. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

37

171.    Plaintiff and members of the Nationwide Class are entitled to an injunction against

Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

172.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

173.    During the Class Period, Defendants and their co-conspirators engaged in a

continuing contract, combination or conspiracy with respect to the sale of Automotive Bearings in

unreasonable restraint of trade and commerce and in violation of the various state antitrust and

other statutes set forth below.

174.    The contract, combination, or conspiracy consisted of an agreement among the

Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially

supra-competitive prices for Automotive Bearings and to allocate customers for Automotive

Bearings in the United States.

175.    In formulating and effectuating this conspiracy, Defendants and their co-

conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the

United States and elsewhere during which they agreed to price Automotive Bearings at certain

levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by

Plaintiffs and members of the Damages Class with respect to Automotive Bearings sold in the

United States;

(b)    allocating customers and markets for Automotive Bearings in the United

States in furtherance of their agreements; and

(c) participating in meetings and conversations among themselves in the
United States and elsewhere to implement, adhere to, and police the unlawful agreements they
reached.

176. Defendants and their co-conspirators engaged in the actions described above for
the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize
prices and to allocate customers with respect to Automotive Bearings.

177. Defendants' anticompetitive acts described above were knowing, willful and
constitute violations or flagrant violations of the following state antitrust statutes.

178. Defendants have entered into an unlawful agreement in restraint of trade in
violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

 (a) Defendants' combinations or conspiracies had the following effects:  (1)
Automotive Bearings price competition was restrained, suppressed, and eliminated throughout
Arizona; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at
artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class
were deprived of free and open competition; and (4) Plaintiffs and members of the Damages
Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

 (b) During the Class Period, Defendants' illegal conduct substantially affected
Arizona commerce.

 (c) As a direct and proximate result of defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business and property
and are threatened with further injury.

 (d) By reason of the foregoing, Defendants entered into agreements in
restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

179.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Bearings at supracompetitive levels.

(b)    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Bearings.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Automotive Bearings; and (2) Allocating among themselves the production of Automotive Bearings.

(d)    The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Automotive Bearings has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Bearings sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United

States; and (3) Those who purchased Automotive Bearings directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

180.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

181.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*.

182.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

183.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

43

Maine; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

184.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws Ann. 93 §§ 1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

44

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mass. Gen. Laws Ann. 93 §§ 1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mass. Gen. Laws Ann. 93 §§ 1, *et seq*.

185.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

186.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

187.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

Mississippi; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

188.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

47

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

189.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

190.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

191.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

New Mexico; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

192.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings when they purchased vehicles containing Automotive Bearings, or purchased products that were otherwise

of lower quality, than would have been absent the conspirators illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

193.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

194.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

195.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

196.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

South Dakota; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

197.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

198.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, defendants' illegal conduct had a substantial effect on Utah commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

199.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

200.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

56

West Virginia; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq*.

201.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

202.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Automotive Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

203.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Damages Class.

204.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

205.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

206.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

207.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*.

(a)     During the Class Period, defendants marketed, sold, or distributed Automotive Bearings in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq., of the California Business and Professions Code, set forth above;

(d)     Defendants' acts, omissions, misrepresentations, practices, an non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     Defendants' acts or practices are unfair to consumers of  Automotive Bearings (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(g)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Automotive Bearings (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair

competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

208.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Automotive Bearings were sold, distributed or obtained in the District of Columbia.

(b)   The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Bearings. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Bearings because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges. Defendants' conduct with regard to sales of Automotive Bearings, including their illegal conspiracy to secretly fix the price of Automotive Bearings at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Automotive Bearings.

(c)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels  throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)     As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

209.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for Automotive Bearings.

        (b)      During the Class Period, Defendants' illegal conduct substantially affected

Florida commerce and consumers.

        (c)      As a direct and proximate result of defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured and are threatened with further

injury.

        (d)      Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

        210.     Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

        (a)      Defendants' unlawful conduct had the following effects:  (1) Automotive

Bearings price competition was restrained, suppressed, and eliminated throughout Hawaii; (2)

Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for Automotive Bearings.

        (b)      During the Class Period, Defendants' illegal conduct substantially affected

Hawaii commerce and consumers.

        (c)      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured and are threatened with further

injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

211.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

(a)     Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(c)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)     Certain of the Defendants have been served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than

thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

(f)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

212.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)     Missouri Plaintiff and members of this Damages Class purchased Automotive Bearings for personal, family, or household purposes.

(b)     Defendants engaged in the conduct described herein in connection with the sale of Automotive Bearings in trade or commerce in a market that includes Missouri.

(c)     Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)     Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning defendants' unlawful activities and artificially inflated prices for Automotive Bearings.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Bearings they purchased.

(e)     Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Automotive Bearings by making public statements that were not in accord with the facts.

(f)     Defendants' statements and conduct concerning the price of Automotive Bearings were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Automotive Bearings at prices established by a free and fair market.

(g)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(h)     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(i)     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(j)     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in

trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

213.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

(a)   Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Montana; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Bearings.

(b)   During the Class Period, defendants marketed, sold, or distributed Automotive Bearings in Montana, and defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)   As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

214.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Bearings were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Bearings as set forth in N.M.S.A., § 57-12-2E.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Bearings.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Bearings because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs' could avoid the overcharges.  Defendants' conduct with regard to sales of Automotive Bearings, including their illegal conspiracy to secretly fix the price of Automotive Bearings at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has resulted from

Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Automotive Bearings.

(c)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

215.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

69

(b)      Defendants and their co-conspirators made public statements about the prices of Automotive Bearings and products containing Automotive Bearings that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Automotive Bearings and products containing Automotive Bearings; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

(c)      Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Automotive Bearings were misled to believe that they were paying a fair price for Automotive Bearings or the price increases for Automotive Bearings were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

(d)      Defendants knew that their unlawful trade practices with respect to pricing Automotive Bearings would have an impact on New York consumers and not just the Defendants' direct customers.

(e)      Defendants knew that their unlawful trade practices with respect to pricing Automotive Bearings would have a broad impact, causing consumer class members who indirectly purchased Automotive Bearings to be injured by paying more for Automotive Bearings than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(f)      The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the

public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(g)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(h)     During the Class Period, defendants marketed, sold, or distributed Automotive Bearings in New York, and defendants' illegal conduct substantially affected New York commerce and consumers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Bearings in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

216.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware.  Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases.  Defendants' public statements concerning the price of Automotive Bearings created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy.  Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

(c)     The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(e)     During the Class Period, defendants marketed, sold, or distributed Automotive Bearings in North Carolina, and defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(f)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Bearings in North Carolina.

(g)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

217.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)     Members of this Damages Class purchased Automotive Bearings for personal, family, or household purposes.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed, or obtained in Rhode Island.

(c)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Bearings. Defendants owed a duty to disclose such facts, and

considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that defendants' Automotive Bearings prices were competitive and fair.

(d)    Defendants' unlawful conduct had the following effects: (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(e)    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by defendants' willful and deceptive conduct, as described herein.

(f)    Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Automotive Bearings, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Automotive Bearings at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Bearings they purchased.

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

218.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed, or obtained in Vermont.

(b)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Bearings.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that defendants' Automotive Bearings prices were competitive and fair.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by defendants' willful and deceptive conduct, as described herein.

75

(e)     Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Automotive Bearings, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Automotive Bearings at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

219.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

220.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Bearings.

221.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs of the members of the Damages Class for Automotive Bearings.

222.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

### PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

1.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any

manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED:  July _____, 2012                    **COTCHETT, PITRE & McCARTHY, LLP**

By     __**DRAFT**_____

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com

swilliams@cpmlegal.com
azapala@cpmlegal.com
gkim@cpmlegal.com


Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

*Attorneys for Plaintiffs and Interim Co-Lead Class*
*Counsel for  the Proposed End-Payor Plaintiffs*
*Classes*

E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison Counsel*
*for the Proposed End-Payor Plaintiffs Classes*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  July _____, 2012          **COTCHETT, PITRE & McCARTHY, LLP**

By   **DRAFT** _____

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
fdamrell@cpmlegal.com
azapala@cpmlegal.com
gkim@cpmlegal.com

Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com

81

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

*Attorneys for Plaintiffs and Interim Co-Lead
Class Counsel for  the Proposed End-Payor
Plaintiffs Classes*

E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison
Counsel for the Proposed End-Payor Plaintiffs
Classes*