# Exhibit 3

Slip Copy, 2012 WL 1033464 (E.D.Mich.)
**(Cite as: 2012 WL 1033464 (E.D.Mich.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
ALEXANDER ASSOCIATES, INC., Plaintiff,
v.
FCMP, INC., FCMP France, FCMP Industries, FCMP Developpement, and KFI Kartal FCMP Otomotiv San. Tic. C.A.S., Defendants.

No. 10–12355.
March 27, 2012.

Stephen K. Valentine, Jr., Victoria A. Valentine, Valentine & Associates, P.C., West Bloomfield, MI, for Plaintiff.

Anthony J. Rusciano, Michael J. Barton, Plunkett & Cooney, Bloomfield Hills, MI, Brian D. Gwitt-Not Sworn, Damon Morey LLP, Buffalo, NY, for Defendants.

***OPINION AND ORDER DENYING DEFENDANT FCMP, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS AND GRANTING IN PART AND DENYING IN PART MOTION BY ADDED DEFENDANTS TO DISMISS FOR WANT OF PERSONAL JURISDICTION***

DAVID M. LAWSON, District Judge.

*\*1* Plaintiff Alexander Associates, Inc. filed the present action in state court to collect sales commissions allegedly due under a contract in which the plaintiff agreed to sell automotive products manufactured by defendant FCMP, Inc. After defendant FCMP, Inc. removed the case to federal court, it filed a motion for judgment on the pleadings. That motion calls into question two aspects of the parties' contract: the identity of the customers to whom the plaintiff had the exclusive right to sell the defendant's products; and whether the contract describes an exclusive agency agreement, or an exclusive sales agreement. The motion also attacks counts of the complaint seeking recovery on an implied contract theory and a declaratory judgment. The motion was argued in June of last year and remains under advisement. While the motion was pending, the plaintiff sought and obtained leave to amend the complaint to add additional defendants. The newly-added defendants, foreign companies that are related to FCMP, Inc., moved to dismiss arguing that they have no contact with this forum and the Court does not have personal jurisdiction over them. The plaintiff has answered that motion and the defendants have replied. The Court has reviewed the pleadings and motion papers and finds that the papers adequately set forth the relevant facts and law and oral argument will not aid in the disposition of the motion to dismiss. Therefore, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(f)(2).

FCMP, Inc.'s motion for judgment on the pleadings will be denied because the agreement explicitly states that changes to the exclusive customer list need not be in writing; the provision of the agreement governing the parties' relationship is ambiguous; even though the existence of a contract precludes recovery under the theories of *quantum meruit* and unjust enrichment, the plaintiff is entitled to plead in the alternative at this stage of the lawsuit; and a declaratory judgment may be useful in determining the parties' obligations concerning future commissions.

The personal jurisdiction motion was brought by defendants FCMP France, FCMP Industries, FCMP Developpement, and KFI Kartal FCMP Otomotiv San. Tic. C.A. S. ("KFI"). That motion will be denied as to defendant FCMP France and granted as to the others. The plaintiff has not demonstrated sufficient contacts with Michigan by any of the newly-added defendants to allow the exercise of general personal jurisdiction. Nor has the plaintiff shown that FCMP Industries, FCMP Developpement, or KFI have had sufficient contacts with Michigan to support limited personal jurisdiction or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that FCMP, Inc. is a subsidiary of those companies acting as their *alter ego.* However, the plaintiff has set out a *prima facie* case that FCMP France has purposefully availed itself of the privilege of doing business in Michigan and that exercising personal jurisdiction over it would be reasonable. Therefore, the motion to dismiss for want of personal jurisdiction will be granted in part and denied in part.

I. Facts

**\*2** FCMP, Inc., along with the related companies FCMP France, FCMP Industries, FCMP Developpement, and KFI, manufactures and supplies a variety of automotive parts including valves, pistons, sleeves, end caps, end plugs, automatic braking system components, and air bag parts. According to the amended complaint, on July 14, 2004, the plaintiff entered into an agreement with defendant, FCMP, Inc. that granted the plaintiff "the exclusive right (to the exclusion of Principal and all claiming by or through Principal) to act as the exclusive sales representative of Principal." Defs.' Mot. to Dismiss Ex. B ¶ 1.1 (Agreement). In return for acting as a sales representative for FCMP, Inc., FCMP, Inc. agreed to pay the plaintiff a commission for sales made to a list of "Exclusive Customers." *Ibid.* The plaintiff contends that it successfully solicited orders for the defendant and is owed commissions under the agreement. The agreement states that it shall be enforced and construed under the laws of Michigan.

The agreement names only the plaintiff and FCMP, Inc. as parties. However, by its terms it is binding not only on those two parties, but also "their respective successors, assigns, transferees, asset purchasers and joint ventures." Agreement ¶ 13.1. The agreement continues that if FCMP, Inc. sold its assets or any of its "commissionable" business, the agreement "shall be binding upon the successor, assignee, transferree, asset purchaser, or joint venture to the same extent as it would be binding on [FCMP, Inc.] if no sale or transfer had taken place." *Ibid.* The plaintiff alleges that FCMP, Inc. and FCMP France directed it to represent all the related companies. The plaintiff also alleges that FCMP, Inc. was acting as an agent for all the other defendants in directing the plaintiff's activities.

The agreement required the plaintiff to "use its best efforts to solicit orders from the Exclusive Customers to develop profitable business for [FCMP, Inc.] and to promote the goodwill, name and interest of [FCMP, Inc.] and its products to the Exclusive Customers." Agreement ¶ 4.1. The plaintiff's duties under the agreement were to (1) make quotations, demonstrations, and presentations as reasonably necessary to sell the products, (2) promptly resolve inquiries and problems raised by customers, (3) maintain familiarity with the current and prospective requirements of customers on the list of Exclusive Customers, (4) solicit business only from customers listed as Exclusive Customers, and (5) forward all requests for quotes, proposals, orders, or offers to the defendant.

FCMP, Inc. agreed to pay the plaintiff a commission of five percent for products or parts that were sold, unless otherwise agreed upon. The agreement required FCMP, Inc. to pay commissions "for the life of the product or part," as long as the product or part remained substantially the same. Agreement ¶ 7.1. In the event of termination, the agreement entitled the plaintiff to receive commissions for the life of the part or product if the "request for quotation or an inquiry was received prior to the effective termination date." Agreement ¶ 9.

**\*3** One of the main disputes in this case is whether the plaintiff must have been the procuring cause of the sale before it would be entitled to a commission. The plaintiff argues that it earned a commission under the agreement, regardless of who made the sale. However, FCMP, Inc. contends that commissions are only earned if the plaintiff procured the sale, and the agreement allowed FCMP, Inc. to sell its own products without obliging it to pay the plaintiff a commission. However, the agreement states that FCMP must provide the plaintiff copies of all communications relating to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff's customers or prior customers within 30 days of receiving such communication.

The agreement included a list of Exclusive Customers attached to the agreement as Exhibit A. The agreement stated that the plaintiff had "the exclusive right to solicit orders for the Products from those customers listed in Exhibit 'A'." Agreement ¶ 3.1. The list was subject to modification, but not necessarily by means of a formal modification. The agreement states that "with the exception of mutually agreed upon changes to Exhibit A, [the agreement] may be amended only by an instrument in writing signed by both parties ...." Agreement ¶ 14. The list was amended formally in writing three times over the course of the agreement; first on December 6, 2005, then on February 8, 2006, and finally on May 2, 2006. The plaintiff contends that the list of Exclusive Customers was amended at other times during the agreement, although it was not amended in a writing signed by both parties. The defendant, on the other hand, argues that the plaintiff is only entitled to commissions for sales to customers on the list of Exclusive Customers that was written and signed by both parties.

The duration of the agreement was one year from the date of its signing, with a provision that it would automatically renew each year upon the same terms and conditions. However, either party could terminate the agreement with thirty days written notice to the other party. FCMP, Inc. terminated the agreement effective February 15, 2010 with a letter to the plaintiff dated February 12, 2010. FCMP, Inc. alleges that the plaintiff failed to use its best efforts in performing its duties. The plaintiff contends, however, that it did everything it was called upon to do throughout the entire relationship. The plaintiff alleges that the defendants have not paid all the pre- and post-termination commissions required by the agreement Additionally, the plaintiff argues that the termination was an attempt by the defendants to avoid the payment of commissions that were likely to materialize. However, the plaintiff does not offer any specificity concerning the amount of the commissions owed, the dates on which the sales were completed, or to whom the sales occurred. The plaintiff also alleges that the termination violated the agreement because the defendant did not give thirty days written notice.

**\*4** On May 10, 2010, the plaintiff filed the present action in the Oakland County, Michigan circuit court. The original complaint presented claims for (1) breach of contract, (2) *quantum meruit* or unjust enrichment, and (3) declaratory judgment. The plaintiff requested actual damages, exemplary damages, and a declaration concerning continuing commissions, and also asked the Court to impose a constructive trust and order the defendant to pay in all previously owed and future commissions. The only defendant named in the original complaint, FCMP, Inc., filed a motion for judgment on the pleadings on April 25, 2011.

On June 24, 2011, the plaintiff filed a motion for leave to file an amended complaint. The Court granted the motion on August 4, 2011, and the plaintiff filed its amended complaint that same day that added as defendants FCMP France, FCMP Developpement, FCMP Industries, and KFI. All of the new defendants are foreign corporations incorporated in France or, in the case of KFI, Turkey, that the plaintiff alleges are doing business in Michigan and around the world.

On November 3, 2011, the newly-added defendants filed a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). In support of their motion, the newly-added defendants filed affidavits from corporate officers David Callendrier and Thierry Callendrier that discuss the relationship between FCMP and the newly-added defendants. David Callendrier states that he is the president of FCMP France, FCMP Developpement, and FCMP Industries. He states that KFI has not been served with the amended complaint, has not consented to jurisdiction, is a joint venture located and based in Turkey that sells non-automotive parts to Europe, and has no business dealings in Michigan. He states that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FCMP France, FCMP Developpement, and FCMP Industries are incorporated in France, have not consented to jurisdiction, and have no sales or business dealings in Michigan. He states that although he communicated with Doug Deeds, an employee of the plaintiff, by e-mail, it was a courtesy answer to inquiries for the purpose of helping the plaintiff get orders "by using the name dropping technique." Defs.' Mot. to Dismiss Ex. C ¶ 19.

Thierry Callendrier states that he is the Chief Operating Officer of FCMP. He states that each of the defendants maintains its own books and records and keeps separate financial accounts, and that the defendants do not have access to each other's records. He avers that Claude Aymard of FCMP France has been designated to testify in response to some of the plaintiff's inquiries because he is familiar with the archival of technical documents. The newly-added defendants also furnished deposition testimony from Thierry Callendrier in which he states that he owns 20% of FCMP, Inc. and the other 80% is owned by FCMP France. He also testified that FCMP France sells parts to FCMP, Inc. Thierry Callendrier appears to be the son of David Callendrier.

**\*5** The plaintiff filed a response to the foreign defendants' motion on November 23, 2011. In support of its response, the plaintiff provided a screen shot of the defendants' website, affidavits from its president Alex Goldis and employee Douglas Deeds, e-mails between the plaintiff's and the defendants' employees, and quotation statuses. In his affidavit, Alex Goldis states that he is the president of plaintiff Alexander Associates, Inc., that he informed Thierry Callendrier at the beginning of negotiations that customers would need to be supplied with products produced in France, and that during negotiations and during the course of the business relationship there was no distinction made between FCMP, Inc. and the foreign defendants. Goldis also states that all e-mails from employees of the defendants came from addresses with the domain name "fcmp. fr." Goldis states that the plaintiff set up meetings for David Callendrier in Michigan. Goldis states that none of the employees that the plaintiff had contact with were employees of FCMP, Inc. except Thierry Callendrier, and the plaintiff's primary contacts were at FCMP France. Goldis states that he received quotes from David Callendrier and other FCMP France employees and never received quotes from FCMP, Inc. Douglas Deeds states in his affidavit that he is an employee of the plaintiff, that the business relationship between the plaintiff and the defendants centered on FCMP France's production facilities, and that the plaintiff always communicated with FCMP France and did not distinguish between FCMP, Inc. and FCMP France.

The plaintiff also presents two documents entitled "Quotation Status" that discuss the provision of quotations of prices for automotive parts. In both documents, the "principal" is listed as "FCMP, Inc.," with an address of ZI des Pres Paris, 430 rue des Techniques, Marignier; the name of the agent is listed as Olivier Ruiz. The FCMP website lists that location as the address of FCMP France and FCMP Developpement. The plaintiff also excerpts deposition testimony from Thierry Callendrier, in which he states that some of the orders for FCMP, Inc. are managed by FCMP France and that individuals in France look at orders for customers of FCMP, Inc. to determine what FCMP France needs to produce. Thierry Callendrier's also testified that Claude Aymard is the quality director for FCMP France and Olivier Ruiz was a former employee of FCMP France. The plaintiff presents various internal e-mails and e-mails sent by the plaintiff's employees to clients indicating that FCMP, Inc. was located in France. The e-mails show that employees of the plaintiff corresponded with Olivier Ruiz and both Callendriers, as well as other employees of "FCMP Industries." The plaintiff submits e-mails between the plaintiff and David Callendrier planning meetings to take place during a visit by Callendrier to Detroit, an e-mail from Thierry Callendrier addressed to two individuals named Dan and Pierre on which Alex Goldis is cc'ed that states "I need you

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

starting March 1 st (date of your bill) to invoice FCMP France and not FCMP Inc.," Pl.'s Resp. Ex. 8, and an e-mail from defense counsel stating that Claude Aymard will be the records keeper for the purpose of this litigation.

***6** In their reply, the newly-added defendants present additional affidavits from David and Thierry Callendrier. In his second affidavit, Thierry Callendrier reiterates his contention that FCMP, Inc. and the foreign defendants are not connected, that any contact between the plaintiff and FCMP France was done out of convenience and to ensure that FCMP France could manufacture the parts required, and that FCMP France merely sold products to FCMP, Inc. Thierry Callendrier states that the e-mail regarding invoicing FCMP France was sent to Goldis by mistake and that the plaintiff never invoiced FCMP France or responded to the e-mail. He states that the defendants share e-mail servers, and which explains the fact that employees' e-mail addresses share the fcmp.fr domain name. He states that Claude Aymard was designated record keeper because he is familiar with the shared server, which is located in France. In his second affidavit, David Callendrier states that he is the CEO of FCMP, Inc. and that he traveled to Michigan in that capacity.

II. Motion for judgment on the pleadings

FCMP, Inc. argues that the Court should dismiss the plaintiff's breach of contract claim in part because it seeks commissions from customers that do not appear on the original Exclusive Customers list attached to the agreement or any of the written modifications. The plaintiff counters that the agreement did not require a writing to modify that list, and it attached e-mail messages that suggest the list was modified on occasions in addition to the formal amendments. FCMP, Inc. also argues that the agreement must be read as an exclusive agency agreement, which means that FCMP, Inc. did not have to pay commissions on parts it sold itself, and the plaintiff must establish that it was the procuring cause of any sales on which it claims commissions. FCMP, Inc. also contends that the count for *quantum meruit* or unjust enrichment must be dismissed because such a claim cannot lie where an express contract governs the subject matter at issue between the parties. FCMP, Inc. does not contest the existence of the contract; it disputes its terms. Finally, FCMP, Inc. argues that the third count for declaratory judgment must be dismissed because it is duplicative of the claim for breach of contract.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) applies the same standards that govern motions to dismiss. *See* Fed.R.Civ.P. 12(c); *Vickers v. Fairfield Med. Ctr.,* 453 F.3d 757, 761 (6th Cir.2006); *Ziegler v. IBP Hog Mkt., Inc.,* 249 F.3d 509, 511–12 (6th Cir.2001). Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When deciding a motion under that Rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers,* 87 F.3d 176, 179 (6th Cir.1996). "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Nat'l Res., Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Ibid.* "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal,* [556] U.S. [662], 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)." *Fabian v. Fulmer Helmets, Inc.,* 628 F.3d 278, 280 (6th Cir.2010).

***7** The plaintiff attached evidentiary materials to its answer to the motion, and the parties dispute

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

whether the court should convert the defendant's motion for judgment on the pleadings to a motion for summary judgment as allowed by Rule 12(d). The Court does not believe it appropriate to do so for three reasons. First, the defendant did not receive sufficient notice that conversion would occur. Second, only the plaintiff has attached documents outside the pleadings. In its reply, the defendant stated that it did not want the Court to consider materials outside the pleadings and argues that the Court should apply the motion to dismiss standard. It is true that "[e]ither the pleader or the moving party or both may bring the conversion provision into operation by submitting matter that is outside the challenged pleading ...." Wright & Miller, 5 Fed. Prac. & Proc. Civ.3d § 1366; *see Basel v. Knebel,* 551 F.2d 395, 398 (D.C.Cir.1977) (finding that the court can convert a motion to dismiss to one for summary judgment by considering the non-moving party's affidavits); *see also Hanna v. U.S. Veterans' Administration Hospital,* 514 F.2d 1092, 1094 (3d Cir.1975). However, "when one party moves to dismiss solely upon the pleadings; as is the present case, it is inappropriate for the responding party to introduce extraneous materials in an attempt to convert the dismissal motion into one for summary judgment under Rule 56." *Collins v. Palczewski,* 841 F.Supp. 333, 334 (D.Nev.1993). Third, the local rules require a party to obtain leave of court to file more than one motion for summary judgment. E.D. Mich. LR 7.1(b)(2). It would be unfair to convert the defendant's motion without its consent because that may bar the defendant from filing a motion for summary judgment later in the case.

This case is before the Court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. Therefore, the Court must apply the substantive law of the forum state's highest court. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir.1995) (quoting *Bailey v. v. & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985)). "Relevant data includes the state's intermediate appellate court decisions, as well as the state supreme court's relevant *dicta,* restatements of law, law review commentaries, and the majority rule among other states." *Ososki v. St. Paul Surplus Lines,* 156 F.Supp.2d 669, 674 (E.D.Mich.2001) (internal quotes and citation omitted).

### A. Breach of contract

When construing a contract or one of its provisions, the intentions of the parties govern. *First Nat. Bank of Ypsilanti v. Redford Chevrolet Co.,* 270 Mich. 116, 121, 258 N.W. 221, 223 (1935). To ascertain the parties' intentions, the Court looks first to the language in the written agreement. *Haywood v. Fowler,* 190 Mich.App. 253, 258, 475 N.W.2d 458, 461 (1991) ("Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning."); *see also Wilkie v. Auto–Owners Ins. Co.,* 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language. If the plain language is clear, there can be only one reasonable interpretation of its meaning and, therefore, only one meaning the parties could reasonabl[y] expect to apply. If the language is ambiguous, longstanding principles of contract law require that the ambiguous provision be construed against the drafter." (citation omitted)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Dillon v. DeNooyer Chevrolet Geo,* 217 Mich.App. 163, 166, 550 N.W.2d 846, 848 (1996). The Court should "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 468, 663 N.W.2d 447, 453 (2003). " 'Where the language of the writing is not ambiguous the construction is a question of law for the court' on a consideration of the entire instru-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment.' " *In re Landwehr's Estate,* 286 Mich. 698, 702, 282 N.W. 873, 874 (1938) (quoting *Griffin Mfg. Co. v. Mitshkun,* 233 Mich. 640, 642, 207 N.W. 814, 816 (1926)).

**\*8** A contract is unambiguous if it "fairly admits of but one interpretation." *Allstate Ins. Co. v. Goldwater,* 163 Mich.App. 646, 648, 415 N.W.2d 2, 4 (1987). Disagreement among the parties as to the meaning of a contract term does not necessarily create ambiguity as a matter of law. *Steinmetz Elec. Contractors Ass'n v. Local Union No. 58 Int'l Bhd. of Elec. Workers, AFL–CIO,* 517 F.Supp. 428, 432 (E.D.Mich.1981).

However, if "the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." *Port Huron Educ. Ass'n MEAINEA v. Port Huron Area Sch. Dist.,* 452 Mich. 309, 323, 550 N.W.2d 228, 237 (1996); *see also Klapp,* 468 Mich. at 469, 663 N.W.2d at 453–54. Where the terms of a contract are ambiguous, the Court must look to extrinsic facts along with the terms of the agreement to determine the parties' intentions. *Klapp,* 468 Mich. at 469, 663 N.W.2d at 454. Ambiguous contracts generally present questions of fact for trial. *Klapp,* 468 Mich. at 469, 663 N.W.2d at 453–54.

### 1. List of exclusive customers

Paragraph 14.1 of the agreement states that "[t]his Agreement, *with the exception of mutually agreed upon changes to Exhibit A,* may be amended only by an instrument in writing signed by both parties, which expressly refers to this Agreement and specifically states that it is intended to amend it." Agreement ¶ 14.1 (emphasis added). The italicized language refers to the agreement's Exhibit A, which is the list of customers to whom the plaintiff could sell the defendant's products and earn commissions. Changes to that list are excepted from the requirement that amendments be in writing and signed by both parties.

That language is not ambiguous. To support its argument that a mutually signed writing is required to amend the customer list, the defendant points to the provisions in paragraph 1.1, which states that the plaintiff has "the exclusive right ... to act as the exclusive sales representative of Principal ... for all customers and accounts listed in Exhibit 'A' ...," and paragraph 3.1, which states that the plaintiff has "the exclusive right to solicit orders for the Products from those customers listed in Exhibit 'A.' " Agreement, ¶¶ 1.1, 3.1. But those provisions neither contradict paragraph 14.1 nor create an ambiguity in the agreement. Instead, those provisions establish the plaintiff's rights as the exclusive sales representative, and they limit the possible universe of contact opportunities to those customers on the list attached to the agreement. However, neither paragraph discusses how changes to the list of Exclusive Customers may be made. For guidance on how amendments to the list can be made, one must consult paragraph 14.1, which does not support the defendant's position that a mutually signed writing is required.

The plaintiff alleged in the amended complaint that Exhibit A to the agreement was "amended from time to time," not necessarily by a mutually signed writing. Am. Compl. ¶ 7. The plaintiff is not foreclosed from recovering commissions on the newer accounts in the absence of such a writing because of the plain language of paragraph 14.1.

### 2. Procuring cause requirement

**\*9** The defendant contends the agreement is an exclusive agency agreement, and as a result the plaintiff is entitled to commissions only for sales it actually procured. The defendant looks to paragraph 1.1 of the agreement to support its assertion that it retained the ability to sell its own products. Paragraph 1.1 says that the plaintiff has "the exclusive right (to the exclusion of Principal and all claiming by or through Principal) to act as the exclusive sales representative of Principal ...." The defendant maintains that paragraph 7.1 supports its reading of paragraph 1.1; paragraph 7.1 states that commissions are payable "on all products and parts sold by Representative for Principal ...."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The plaintiff argues that paragraph 1.1 actually *excludes* the defendant as a seller of its own products in favor of the plaintiff. The plaintiff says its interpretation is fortified by paragraph 3.1, which states that the plaintiff has "the exclusive right to solicit orders for the Products from those customers listed in Exhibit 'A'," and paragraph 5.2, which states that the defendant must provide the plaintiff with copies of documents "relating to any of Representative's customers or prior customers, programs or parts previously ordered." Further, the plaintiff notes that paragraph 9.1 authorized it to receive "commissions for life of the part or product for all parts or products for which a request for quotation or an inquiry was received prior to the effective termination date ...." None of those provisions, the plaintiff contends, requires the plaintiff to be the procuring cause of orders placed by customers on the Exclusive Customer list.

Michigan law recognizes two types of exclusive representation contracts: (1) exclusive agency agreements and (2) exclusive right to sell agreements. Ladd v. Teichman, 359 Mich. 587, 592, 103 N.W.2d 338, 341 (1960); Roberts Assoc. Inc. v. Blazer Int'l Corp., 741 F.Supp. 650, 656 (E.D.Mich.1990). Under an exclusive agency agreement, the principal retains the ability to sell its own products and is precluded only from hiring other representatives to sell the products. Roberts, 741 F.Supp. at 656. In contrast, under an exclusive right to sell agreement, the representative is "entitled to commissions on all sales regardless of whether they are made by another agent or the principal himself." Ibid.; see also Ladd, 359 Mich. at 592, 103 N.W.2d at 341.

In determining which type of agreement exists in a given case, the Court must apply the conventional rules of contract interpretation discussed above, giving primary consideration to ascertaining the parties' intent. See Roberts Assoc. Inc., 741 F.Supp. at 652. The fact that a contract declares that it grants an "exclusive agency" is not conclusive as to which type of agreement exists between the parties. Roberts, 741 F.Supp. at 656. But to find that a principal has no right to sell its own products, the agency contract must plainly so state. Hardy v. Reynolds & Reynolds Co., No. 06–12331, 2007 WL 2713736, at *5 (E.D.Mich. Sept. 17, 2001) (stating that if the parties agreed that the plaintiff would earn a commission on any sale, the parties "could have explicitly so stated"); see also Ladd, 359 Mich. at 592, 103 N.W.2d at 341 (noting the unambiguous language of the agreement in finding the parties created an exclusive right to sell agreement); Restatement (Third) of Agency § 8.13 (2006); see also 3 Am.Jur.2d Agency § 260 (stating that "[a]n intent to give an agent an exclusive right to sell any specified territory must appear from unequivocal terms or by necessary implication").

**\*10** In *Roberts,* on which the defendant relies heavily, the court concluded that the parties created an exclusive agency agreement because the language of the contract stated that the representative "will be paid 5% commissions on these items and any other items they may sell." 741 F.Supp. at 656. The language governing the parties' relationship simply stated that the plaintiff "is the exclusive representative for [the defendant]." *Ibid.* The court expressed concern that if the agreement created an exclusive right to sell, it "would compensate plaintiff all out of proportion to its efforts or its business value to [the defendant]." *Id.* at 657. In *Ladd,* the court held that the contract was an exclusive right to sell agreement rather than an exclusive agency agreement because the agreement granted the agent the right of "exclusive sale of this property until the 31st day of December, 1957." 359 Mich. at 592, 103 N.W.2d at 341.

In contrast, in *Michigan Incentive Representatives, Inc. v. Sears, Roebuck & Co.,* No. 05–71274, 2007 WL 313569, at *3 (E.D.Mich. Jan.29, 2007), the court found the agreement ambiguous, requiring the jury to determine the parties' intent. The plaintiff alleged that the defendant sold its own products to a customer in an attempt to avoid paying commissions. Although neither party could loc-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1033464 (E.D.Mich.)
**(Cite as: 2012 WL 1033464 (E.D.Mich.))**

ate a copy of the original agreement, the parties agreed the contract stated: "Yours is the only Premium Rep firm within your Market to whom [the defendant] shall provide sales materials, samples, leads from trade shows and/or advertising, and is the only Premium Rep firm in your marketing area that our Special Markets Manager will work with in the field." *Id.* at *1. Additionally, the contract provided that "[the plaintiff] will be paid a commission of 5% on all Net sales generated by your firm ...." *Ibid.* Focusing on the contract language, the court stated the "[p]laintiff may be entitled to commissions for the sales [by the defendant] regardless of whether it actually 'procured' those sales, if the jury finds that [the defendant] breached the exclusive agreement." *Id.* at *3. The court later acknowledged that nature of the plaintiff's exclusivity "is not clear from the contract." *Id.* at *3 n. 2. The agreement, the court stated, could be read to entitle the plaintiff to all sales within its territory.

Paragraph 1.1 of the agreement could be interpreted reasonably in two ways. The parenthetical language—"to the exclusion of Principal and all claiming by or through Principal"—could be understood to create an exception to the plaintiff's exclusive right to sell in favor of the "Principal and all claiming by or through Principal." Alternatively, the language can be read to mean that the plaintiff's "exclusive right" extends even "to the exclusion of Principal...." The former interpretation would reserve to the defendant the right to sell its own products without the obligation to pay commissions to its exclusive representative, rendering the contract an exclusive agency contract. The later interpretation would specifically prohibit the defendant from selling its own products, creating an exclusive right to sell agreement.

**\*11** The defendant argues that adopting the latter interpretation would render the phrase "the exclusive right" surplusage in violation of a basic rule of contract interpretation. *See Klapp,* 468 Mich. at 467, 663 N.W.2d at 453 (stating that courts must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory"). That may be true. But the sentence itself is not a model of clarity and contains redundancy no matter which interpretation prevails. The word "exclusive" or its derivative is used three times, describing an "exclusive right," an "exclusive sales representative," "to the exclusion of the Principal." Words that emphasize the agent's exclusivity are not mere surplusage, especially when the intent to create an exclusive right to sell agreement must be clearly expressed.

The other terms of the agreement do not clear up the ambiguity. Paragraph 7.1 implies that the plaintiff must actually sell the product in order to earn a commission. But paragraph 3.1 says that only the plaintiff may solicit orders (which would exclude the defendant from that activity), and paragraph 9.1 requires the defendant to pay commissions on orders for which quotes were received while the agreement was in effect regardless of who generated the quote. The latter paragraphs suggest that the parties intended to create an exclusive right to sell agreement. *See Roberts,* 741 F.Supp. at 656 (explaining that "[u]nder an exclusive right to sell arrangement, the agent is entitled to commissions on all sales regardless of whether they are made by another agent or the principal himself. The exclusive agent need not be the procuring cause").

The ambiguity prevents the Court from rendering judgment on this point in the defendant's favor on the pleadings. Ambiguous contracts generally present questions of fact for trial. *Klapp,* 468 Mich. at 469, 663 N.W.2d at 453–54.

### B. Quasi contract

A party cannot recover under theories of *quantum meruit* or unjust enrichment when a transaction is governed by a valid contract. *Morris Pumps v. Centerline Piping, Inc.,* 273 Mich.App. 187, 194–95, 729 N.W.2d 898, 904 (2006) (holding that "an implied contract may not be found if there is an express contract *between the same parties* on

the same subject matter"). The plaintiff argues that the Michigan Court Rules allow it to advance alternative claims. Of course, those rules do not apply in this forum. Although federal courts in diversity cases apply state substantive law, they apply federal procedural law, provided that the federal rule "shall not abridge, enlarge or modify any substantive right." *See* 28 U.S.C. § 2072(b); *Erie R.R.,* 304 U.S. at 78.

Federal Rule of Civil Procedure 8(a)(3) permits a pleader to include "a demand for the relief sought, which may include relief in the alternative or different types of relief." Where there is a dispute between the parties as to whether an express agreement exists, the plaintiff can proceed under an action for breach of contract and an action for unjust enrichment. *Cascade Elec. Co. v. Rice,* 70 Mich.App. 420, 426–27, 245 N.W.2d 774, 777 (1976) (finding that the plaintiff could bring both actions because the plaintiff performed work that was not contemplated under the express contract and the defendant disputed the existence of an express verbal contract). A party is not required to "elect to proceed under one theory or the other, but could seek recovery on the basis either of an express [ ] contract, or an implied contract if the [trier of fact] found that the express [ ] contract did not exist." *Id.* at 427, 245 N.W.2d 774; *see also H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.,* 234 Mich.App. 550, 573, 595 N.W.2d 176, 188 (1999) (holding that a claim for unjust enrichment should not be dismissed because the court may find that the express contract was no longer in force). The plaintiff also may bring a breach of contract claim and an unjust enrichment claim in cases where the defendant has "kept its options open, and may deny the existence of a contract." *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.,* 96 F.3d 174, 182 (6th Cir.1996) (holding that the plaintiff may proceed under a claim for breach of contract and unjust enrichment because the defendant "admitted the existence of a contract solely for the purposes of summary judgment").

**\*12** The defendant has admitted that it entered into an agreement with the plaintiff, but it disputes that the agreement covered the plaintiff's sales activity with some of the customers from whom the plaintiff generated orders. At the pleading stage, the Court believes it is premature to dismiss the plaintiff's alternative count based on quasi contract before the parties have had the benefit of discovery and their positions have gelled.

C. Declaratory judgment

The defendant argues that the declaratory judgment count seeks no more relief than the plaintiff asks in its breach of contract count. However, the plaintiff may not seek commissions for sales on orders that have not been placed, even though it may be entitled to those commissions eventually under the agreement. The Federal Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes courts to adjudicate controversies between parties before a conflict blossoms into a larger and more costly claim. This statute permits suit when a controversy, although real and immediate, has not ripened to the point where one of the parties could invoke a coercive remedy, that is, a suit for damages or an injunction. *See* 12 James Wm. Moore et al., Moore's Federal Practice § 57.03[2] (3d ed.1999) (stating that the Act enables "parties to adjudicate disputes before either suffers great damage").

The Act also confers "unique and substantial discretion" *not* to exercise jurisdiction. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). A court may decline to hear a declaratory judgment action even where jurisdiction exists. *See Brillhart v. Excess Ins. Co. of Am.,* 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). The general inquiry is whether "the judgment will serve a useful purpose in clarifying and settling the legal relationships in issue and whether it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Aetna Cas. & Sur. Co. v. Sunshine Corp.,* 74 F.3d 685, 687 (6th Cir.1996) (internal quotes omitted). The Sixth Circuit has de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

veloped a list of factors for a Court to consider when deciding whether a suit should proceed under the Declaratory Judgment Act:

(1) whether the declaratory action would settle the controversy;

(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;"

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and

(5) whether there is an alternative remedy which is better or more effective.

Travelers Indem. Co. v. Bowling Green Prof. Assoc., PLC, 495 F.3d 266, 271 (6th Cir.2007).

The Court believes that a declaratory judgment will aid in resolving any lingering issues not covered by the breach of contract adjudication. The Court does not see that such a declaration of rights will confer a tactical advantage upon either side, and the count was not prompted by procedural fencing. Damages not yet incurred could not be awarded, even though most of the issues that would have to be decided are presented already in the other counts of the amended complaint. The declaratory judgment count need not be dismissed.

### III. Personal jurisdiction motion

**\*13** The newly-added defendants—FCMP France, FCMP Developpement, FCMP Industries, and KFI—all contend that they do not have sufficient (or in some cases, *any* ) contacts with Michigan to justify having to defend a lawsuit here.

In a motion to dismiss for want of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of proving the court's jurisdiction over the defendant. Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir.2002). "[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir.1991). However,

> [w]here, as here, the district court relies solely on written submissions and affidavits to resolve a Rule 12(b)(2) motion, rather than resolving the motion after either an evidentiary hearing or limited discovery, the burden on the plaintiff is "relatively slight," Am. Greetings Corp. v. Cohn, 839 F.2d 1164, 1169 (6th Cir.1988), and "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal," Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir.1991). In that instance, the pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh "the controverting assertions of the party seeking dismissal." Id. at 1459.

Air Prods. & Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 549 (6th Cir.2007). A plaintiff "can meet this burden by 'establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction.' " Neogen, 282 F.3d at 887 (internal citations omitted).

"In a diversity case, personal jurisdiction must be appropriate both under the law of the state in which the district court sits and the Due Process Clause of the Fourteenth Amendment." Bagsby v. Gehres, 195 F.Supp.2d 957, 961 (E.D.Mich.2002) (citing Neogen Corp., 282 F.3d at 887–88). The Sixth Circuit has explained that "[w]here the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due pro-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

cess." *Bridgeport Music, Inc. v. Still N The Water Publ'g,* 327 F.3d 472, 477 (6th Cir.2003) (per curiam). In Michigan, jurisdiction may be asserted over a corporation on the basis of general personal jurisdiction, *see* Mich. Comp. Laws § 600.711, or limited personal jurisdiction, *see* Mich. Comp. Laws § 600.715. Those statutes are circumscribed by the Due Process Clause. "[T]his Circuit historically has understood Michigan to intend its long-arm statute to extend to the boundaries of the fourteenth amendment." *Theunissen,* 935 F.2d at 1462.

### A. General jurisdiction

**\*14** General personal jurisdiction invests the Court with authority to pass judgment on a defendant regardless of where the facts giving rise to the cause of action occurred. General personal jurisdiction exists over any corporation that is incorporated in Michigan, consents to jurisdiction, or engages in continuous and systematic business in Michigan. Mich. Comp. Laws § 600.711. General jurisdiction is consistent with due process when the corporation's relationship with the state is "of a continuous and systematic" nature. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Sporadic or temporary contacts for a particular purpose are not sufficient to establish general jurisdiction. *Nationwide Mut. Ins. Co. v. Tryg Intern. Ins. Co., Ltd.,* 91 F.3d 790, 794 (6th Cir.1996); *see also Landoil Res. Corp. v. Alexander & Alexander Serv., Inc.,* 918 F.2d 1039, 1046 (2d Cir.1990) (holding that thirteen business trips made by different employees of defendant over eighteen months was insufficient for general jurisdiction).

The plaintiff has not demonstrated that any of the added defendants have had sufficient contacts with Michigan to justify the exercise of general personal jurisdiction. They are not incorporated in Michigan. Although the plaintiff argues that the foreign defendants consented to suit in Michigan because of the agreement's choice of law provision, it is clear that the foreign defendants are not parties to the agreement. The agreement states that it is between the plaintiff and FCMP, and identifies FCMP as being located in Buffalo, New York. The plaintiff argues that section 13.1 of the agreement makes it binding on the foreign defendants. That section states that the agreement "is binding upon the parties hereto as well as their respective successors, assigns, transferees, asset purchasers and joint ventures." Agreement ¶ 13.1. But the second sentence in that paragraph clarifies that the section applies only in the event of an asset sale or transfer of commissionable business. Further, the plaintiff has not produced any evidence that the foreign defendants actually are successors, assigns, transferees, asset purchasers, or joint ventures of FCMP.

Further, the contacts described by the plaintiff are insufficient to constitute continuous or systematic contact with Michigan. The foreign defendants have no facilities, bank accounts, or registered agents in Michigan, have never paid taxes in Michigan, and have not manufactured products in Michigan. The plaintiff's main contentions with respect to the foreign defendants' contact with Michigan are communications with the plaintiff regarding sales to be made in Michigan and several business trips by David Callendrier to Michigan. Such contacts are similar to contacts that courts previously have found to be insufficient to render the exercise of general personal jurisdiction inappropriate. *See Helicopteros Nacionales de Colombia,* 466 U.S. at 416 (finding a visit by a CEO to Texas to negotiate a contract, accepting checks drawn on a Houston bank, sending employees for training in Texas, and purchasing equipment from a company located in Texas insufficient to confer general personal jurisdiction); *Bird v. Parsons,* 289 F.3d 865, 874 (6th Cir.2002) (finding that registering domain names for 4,666 Ohio residents was insufficient to confer general personal jurisdiction in Ohio over domain name registering corporation); *Landoil Res. Corp.,* 918 F.2d at 1045–46 (holding that thirteen business trips made by different employees of defendant over eighteen months was insufficient for general jurisdiction).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*15** General personal jurisdiction has not been established.

### B. Limited jurisdiction

Limited personal jurisdiction may be exercised over a defendant who has certain minimum contacts with the forum, but only over claims that arise from or relate to those contacts. Theunissen, 935 F.2d at 1459–61. Limited personal jurisdiction may be exercised over a corporations if it has one of the following relationships with the state:

(1) The transaction of any business within the state.

(2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

(3) The ownership, use, or possession of any real or tangible personal property situated within the state.

(4) Contracting to insure any person, property, or risk located within this state at the time of contracting.

(5) Entering into a contract for services to be performed or for materials to be furnished in the state by the defendant.

Mich. Comp. Laws § 600.715. In the present case, the only possible ground for exercising limited personal jurisdiction over the defendants is the transaction of business in Michigan. The question is whether the foreign defendants have transacted business in Michigan sufficient to justify the exercise of personal jurisdiction.

Under the Due Process Clause, jurisdiction over a non-resident defendant is allowed only if the "facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.' " Theunissen, 935 F.2d at 1459 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Limited personal jurisdiction for a specific case may be consistent with the due process clause. The Sixth Circuit has identified three considerations to determine whether limited personal jurisdiction extends to the defendant in a particular case:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Theunissen, 935 F.2d at 1460 (quoting LAK, Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1299 (6th Cir.1989)); *see also* Neogen Corp., 282 F.3d at 890 (quoting Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir.1968)).

### 1. Transaction of business/purposeful availment

"[A] single contact with the forum state may suffice for personal jurisdiction if it is directly and substantially related to the plaintiff's claim." Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc., 148 F.3d 1355, 1359 (Fed.Cir.1998). In addition, the Sixth Circuit has explained that the "transaction of any business" clause is quite broad:

**\*16** [T]he Michigan Supreme Court stated that "[t]he word 'any' means just what it says. It includes 'each' and 'every.' ... It comprehends the 'slightest.' " Lanier v. Am. Board of Endodontics, 843 F.2d 901, 905–06 (6th Cir.[1988] ) (quoting [ Sifers v. Horen, 385 Mich. 195, 199 n. 2, 188 N.W.2d 623, 624 n. 2 (1971)) ].

Theunissen, 935 F.2d at 1463–64. Transaction of business includes "contact with Michigan customers through the mail and the wires." Neogen, 282 F.3d at 892 (citing Sifers v. Horen, 385 Mich. 195, 188 N.W.2d 623 (1971)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Sixth Circuit "views the purposeful availment prong of the *Southern Machine* test as 'essential' to a finding of personal jurisdiction." *Intera Corp. v. Henderson,* 428 F.3d 605, 616 (6th Cir.2005) (quoting *Calphalon Corp. v. Rowlette,* 228 F.3d 718, 722 (6th Cir.2000)). "Purposeful availment" occurs when "the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.' " *Neogen Corp.,* 282 F.3d at 889 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (emphasis in original)). This requirement " 'ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person.' " *Ibid.* (quoting *Burger King,* 471 U.S. at 475) (internal quotations omitted). In that respect, the Sixth Circuit "has found that contacts lack quality when they are initiated by the plaintiff rather than the defendant, in part because '[t]he unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum.' " *Air Products,* 503 F.3d at 552 (quoting *LAK, Inc.,* 885 F.2d at 1301). On the other hand, "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King,* 471 U.S. at 473 (internal quotation omitted).

The Supreme Court has held that the mere act of entering into a contract with a party in a state is insufficient to establish purposeful availment. *Burger King,* 471 U.S. at 478. The law is clear that the act of an out-of-state entity contracting with an in-state entity, and undertaking communication related to that contract, does not constitute purposeful availment of the forum state for an action based on the breach of that contract. Instead, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479. "The acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action." *Neal v. Janssen,* 270 F.3d 328, 332 (6th Cir.2001). Ultimately, though, "[i]t is the quality of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.' " *Ibid.* (citing *LAK, Inc.,* 885 F.2d at 1301).

**\*17** The plaintiff has presented sufficient information establishing that FCMP France has transacted business in Michigan and has purposefully availed itself of the privilege of doing business in Michigan. The plaintiff has presented e-mails from Olivier Ruiz who discussed providing quotes for parts for TRW Automotive, a company whose world headquarters is located in Livonia. Olivier Ruiz was, as the foreign defendants concede, an employee of FCMP France. The plaintiff has also presented two quotation status forms on which the principal is identified as FCMP, but the address given is that of FCMP France and the agent is identified as Olivier Ruiz. The foreign defendants have argued that these contacts were "limited" and were undertaken only to aid FCMP. However, an equally plausible inference from the e-mails themselves is that FCMP France was involved in the effort to sell the products it manufactured in Michigan. The foreign defendants have also stated that David Callendrier was both the president of FCMP France and the CEO of FCMP and that Thierry Callendrier was both the vice president of FCMP France and the COO of FCMP. The plaintiff has presented evidence that David Callendrier visited Michigan on business on several occasions to meet with potential purchasers. The defendants contend that those visits were made in his capacity as CEO of FCMP. However, when relying on the affidavits to determine a motion to dismiss for lack of personal jurisdiction, the court must view the pleadings and affidavits in the light most favorable to the plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and not weigh "the controverting assertions of the party seeking dismissal." *Theunissen,* 935 F.2d at 1459. The plaintiff has presented affidavits stating that David Callendrier visited Michigan in his capacity as owner and president of FCMP France.

As noted above, the Michigan statute providing limited jurisdiction over corporations based on the transaction of any business has been interpreted broadly to include the "slightest" transaction. *Sifers v. Horen,* 385 Mich. 195, 199 n. 2, 188 N.W.2d 623 624 n. 2 (1971). The provision of price quotations for a Michigan customer by Olivier Ruiz and visits to Michigan by David Callendrier to meet with potential purchasers certainly meets that threshold. It also constitutes purposeful availment. FRCMP France's contacts with Michigan were not solely the result of the plaintiff's location here. Instead, FCMP France was seeking to sell products to Michigan-based customers, and its president visited Michigan with the purpose of meeting with Michigan-based customers. It cannot be said that FCMP France's contacts with Michigan were "fortuitous"; instead, it is clear that FCMP France was "attempting to exploit [a] market for its products in Michigan." *International Technologies Consultants, Inc. v. Euroglas S.A.,* 107 F.3d 386, 395 (6th Cir.1997). Indeed, it is difficult to see what the purpose of providing sales quotations and meeting with potential customers in Michigan could be if it was not to "create continuing relationships and obligations" with Michigan customers. *Burger King,* 471 U.S. at 473. Presumably the hope was that these potential customers would go on to purchase parts manufactured by FCMP France. In all events, the plaintiff has presented sufficient evidence to constitute a *prima facie* showing that FCMP France purposefully availed itself of the privilege of transacting business in Michigan.

**\*18** The plaintiff also argues that the defendants in this case operated as one global entity that did not differentiate between the different organizations. The plaintiff's argument is that the foreign defendants controlled or acted as alter egos for FCMP, Inc., and thus FCMP, Inc.'s contacts with Michigan should be attributed to the foreign defendants. The foreign defendants counter that all corporate formalities were maintained between the various defendants.

"Normally, courts apply the alter-ego theory of personal jurisdiction to parent-subsidiary relationships." *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide,* 545 F.3d 357, 362 (6th Cir.2008). "The alter-ego theory provides for personal jurisdiction 'if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction.' " *Indah v. United States Securities and Exchange Comm'n,* 661 F.3d 914, 921 (6th Cir.2011) (quoting *Estate of Thomson,* 545 F.3d at 362). In applying the alter-ego theory of personal jurisdiction, the Court must look to Michigan law. *Estate of Thomson,* 545 F.3d at 362.

In a recent unpublished decision, the Michigan Court of Appeals discussed the alter-ego theory of personal jurisdiction:

> Michigan courts will not disregard the separate corporate existence of a subsidiary unless it is "a mere instrumentality" of the parent corporation, and "where an otherwise separate corporate existence has been used to subvert justice or cause a result that [is] contrary to some other clearly overriding public policy." *Seasword v. Hilti, Inc.,* 449 Mich. 542, 548, 537 N.W.2d 221 (1995) (internal quotation marks and citation omitted; alteration by *Seasword* Court). Facts tending to show the existence of an alter ego relationship include if the parent and subsidiary share principal offices, if they share board members or executives, if all of the parent's revenue comes from the subsidiary's sales, if all capital for the subsidiary is provided by the parent, if the subsidiary purchases supplies exclusively from the parent, if the subsidiary is seriously undercapitalized, if the parent regularly provided gratuitous services to the subsidiary, if the parent handled the subsidi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ary's payroll, if the parent directed the policies and decisions of the subsidiary, and if the parent considered the subsidiary's project to be its own. *Id.* at 548, 537 N.W.2d 221 n.10; *Herman v. Mobile Homes Corp.,* 317 Mich. 233, 239–241, 26 N.W.2d 757 (1947).

*United Ins. Group Agency, Inc. v. Patterson,* No. 299631, 2011 WL 5067251, at *2 (Mich.Ct.App. Oct.25, 2011).

There is no need to apply the alter-ego test to FCMP France because the Court already has found that defendant to have sufficient minimum contacts based on its own conduct.

The plaintiff has not provided anything to suggest that FCMP, Inc. is a subsidiary of any of the other foreign defendants. Instead, the plaintiff has merely asserted that the foreign defendants did not distinguish among themselves when doing business with the plaintiff. It is true the e-mails produced by the plaintiff and the FCMP website leave the impression of a single, unitary enterprise that has various plants and offices. It is very difficult based on the materials presented by the parties to get a clear sense of the relationships between the defendants in this case. But the failure to present anything to suggest that FCMP, Inc. was the subsidiary of FCMP Industries, FCMP Developpement, or KFI forecloses the possibility of exercising jurisdiction over those entities under an alter-ego theory. That theory permits parent corporations to be subjected to personal jurisdiction based on the actions of their subsidiaries, not vice versa.

**\*19** The plaintiff has not presented sufficient evidence of contacts with Michigan by FCMP Industries, FCMP Developpement, or KFI to constitute purposeful availment. The plaintiff has presented e-mails from Frederic Daval discussing production of parts and planning for a conference call, and with Anne–Sophie Pilon discussing quality-control issues for some parts ordered by a customer. Frederic Daval and Anne–Sophie Pilon's e-mail signatures identify them as employees of FCMP Industries. The plaintiff has also presented some e-mails from David Callendrier discussing operations at KFI, the Turkish corporation, and an e-mail from an employee of TRW requesting a quote for parts manufactured at TRW. The plaintiffs also argue that David Callendrier's visits to Michigan were on behalf of FCMP Industries and FCMP Developpement, as well as FCMP France. However, the e-mails from David Callendrier discussing KFI and the e-mail from Anne–Sophie Pilon were responses to an inquiry from an employee of the plaintiff. The e-mails from Frederic Daval appear to be responses to the plaintiff's inquiries as well. Although one set of e-mails in which Frederic Daval participated references a conference call between Daval and the plaintiff, it is impossible to tell from the e-mails what the conference call dealt with or who initiated it; that piece of information is of limited value. Contacts with the forum state that "are initiated by the plaintiff rather than the defendant" are insufficient to demonstrate purposeful availment. *Air Products,* 503 F.3d at 552.

What remains are the visits by David Callendrier to Michigan allegedly on behalf of both FCMP Industries and FCMP Developpement. As noted above, the plaintiff has presented affidavits stating that David Callendrier visited Michigan to meet with Michigan customers. However, the affidavits state that this visit was made in Callendrier's capacity as president of FCMP France, and make no mention of FCMP Industries or FCMP Developpement. The plaintiff's argument in its response that the visits were in David Callendrier's capacity as president of those two companies thus lacks the evidentiary support in the record that would constitute a *prima facie* showing with respect to those companies.

The plaintiff has failed to demonstrate that FCMP Industries, FCMP Developpement, or KFI purposefully availed themselves of the privilege of transacting business in Michigan.

 2. Cause of action arising from contacts
The "arising from" prong is satisfied "when the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

operative facts of the controversy arise from the defendant's contacts with the state." *Calphalon,* 228 F.3d at 723. The Sixth Circuit has held that personal jurisdiction may exist over a non-resident defendant if the defendant "purposefully directs communications into the forum that cause injury within the forum, and those communications form the 'heart' of the cause of action." *Neal,* 270 F.3d at 333. However, " 'the locus of ... a monetary injury is immaterial, as long as the obligation did not arise from a privilege the defendant exercised in the forum state.' " *Kerry Steel, Inc. v. Paragon Indus., Inc.,* 106 F.3d 147, 151 (6th Cir.1997) (quoting *LAK, Inc.,* 885 F.2d at 1301) (internal quotation omitted). *But see Neogen,* 282 F.3d at 892 (determining that the plaintiff's allegations of economic harm from trademark infringement were sufficient to support a *prima facie* case for personal jurisdiction).

  ***20** In *Lanier v. American Board of Endodontics,* 843 F.2d 901, 908–09 (6th Cir.1988), a female dentist sued the Illinois-based American Board of Endodontics in federal court in Michigan, alleging that she was denied a license by the Board on the basis of gender. The Board moved to dismiss, arguing that it had insufficient minimum contacts with the State of Michigan. The court of appeals disagreed, finding that the Board had transacted business within Michigan by exchanging correspondence and telephone calls with the plaintiff, and that the plaintiff's cause of action arose out of those business transactions. The court considered two possible theories defining the "arising from" requirement: whether the business transactions "made possible" the cause of action; and whether the cause of action arose in the "wake" of the business transactions. *Id.* at 909. Applying both theories, the court held that the discrimination was made possible and occurred in the wake of the plaintiff's filing of her application, which constituted the transaction of business in Michigan by the Board. *Id.* at 908–09. The court found that the application process, evaluation, testing, and rejection were part of a "mosaic of activity," "every step of which was a constituent part of the whole." *Id.* at 908. The court reasoned that if the defendant discriminated against Dr. Lanier on account of her gender, it "must have done so, based at least in part, upon what it learned about her from its professional business contacts with her in Michigan during the very earliest stages of the application process." *Id.* at 909. Because those contacts made possible the rejection and concomitant discrimination, and the cause of action lay in the wake of them, the court found that the claims arose from the contacts with the forum.

  The plaintiff's breach of contract claim arises at least in part from FCMP France's contacts with Michigan. The plaintiff alleges that it is entitled to commissions based on sales that the defendants made to a list of exclusive customers under either a breach of contract or an unjust enrichment theory. FCMP France's contacts with Michigan include providing quotes to and meeting with potential customers in Michigan, facilitated by the plaintiff, and the plaintiff contends that it is entitled to commissions on sales eventually made to those customers in Michigan. The plaintiff's claim that FCMP France breached a contract is "made possible" by the fact that the plaintiff allegedly worked with FCMP France to develop customer relationships which FCMP France then exploited without paying a required commission; the plaintiff's claim lies "in the wake" of the plaintiff's facilitation of FCMP France's relationships with new customers. That meets the "lenient standard" used to evaluate the arising from requirement, which "does not require that the cause of action formally arise from defendant's contacts with the forum," but merely requires that the plaintiff's cause of action be "at least marginally related" to the defendant's contacts with the forum. *Bird,* 289 F.3d at 875 (internal quotations omitted).

### 3. Reasonableness

  ***21** If the first two elements are met, an "inference of reasonableness arises ... [and] only the unusual case will not meet this third criterion."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Theunissen,* 935 F.2d at 1461 (internal quotations and citations omitted); *see also Intera Corp.,* 428 F.3d at 618. "Once plaintiff shows that a defendant purposefully directed its activities towards forum residents, the defendant cannot defeat jurisdiction unless it presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' " *Lanier,* 843 F.2d at 910 (quoting *Burger King,* 471 U.S. at 477). In the Sixth Circuit, courts also determine the reasonableness of exercising personal jurisdiction over a defendant by weighing several factors, including "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp.,* 428 F.3d at 618. The foreign defendants have offered no argument to rebut the inference of reasonableness that arises when the first two requirements are met. Further, consideration of the four factors listed above suggests that the exercise of personal jurisdiction over FCMP France is reasonable. Although FCMP France is a foreign corporation, the burden on FCMP France in defending this action is lessened by the fact that FCMP France's president and vice-president are also the CEO and COO of FCMP, Inc., and an employee of FCMP France, Claude Aymard, has been named the keeper of records for FCMP, Inc. Michigan also has an interest in adjudicating this controversy, as the plaintiff is a Michigan corporation, and the state has an interest in protecting the legal rights of its resident corporations. *Intera Corp.,* 428 F.3d at 618. The plaintiff has an obvious interest in obtaining relief. And there has been no showing that any other state has any interest in this controversy. It is reasonable to exercise personal jurisdiction over FCMP France.

### IV. Conclusion

The Court concludes that defendant FCMP, Inc. is not entitled to judgment in its favor on the pleadings. The Court finds that the plaintiff has established a *prima facie* case that supports exercising personal jurisdiction over defendant FCMP France. The plaintiff has failed to establish sufficient minimum contacts by defendants FCMP Industries, FCMP Developpement, or KFI Kartal FCMP Otomotiv San. Tic. C.A.S. to allow the Court to exercise personal jurisdiction over them.

Accordingly, it is **ORDERED** that defendant FCMP, Inc.'s motion for judgment on the pleadings [dkt. # 18] is **DENIED.**

It is further **ORDERED** that the motion to dismiss by defendants FCMP France, FCMP Industries, FCMP Developpement, and KFI Kartal FCMP Otomotiv San. Tic. C.A. S. [dkt. # 72] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the amended complaint is **DISMISSED WITHOUT PREJUDICE** as to defendants FCMP Industries, FCMP Developpement, and KFI Kartal FCMP Otomotiv San. Tic. C.A. S., **ONLY.** The motion to dismiss is **DENIED** in all other respects.

**\*22** It is further **ORDERED** that counsel for the parties appear for a status conference on **April 12, 2012 at 3:30 p.m.**

E.D.Mich.,2012.
Alexander Associates, Inc. v. FCMP, Inc.
Slip Copy, 2012 WL 1033464 (E.D.Mich.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.