# Exhibit 21

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

C

United States District Court, N.D. California,
San Jose Division.
In re HIGH–TECH EMPLOYEE ANTITRUST
LITIGATION.
This Document Relates to: All Actions.

Master No. 11–CV–02509–LHK.
April 18, 2012.

**Background:** Employees of high-tech companies filed putative class actions in multiple state courts against their employers alleging a conspiracy to eliminate competition between them for skilled labor by fixing and suppressing employee compensation and restricting employees' mobility in violation of Sherman Act, California's Cartwright Act, and California's Unfair Competition Law (UCL). Following removal and consolidation of cases, employers moved to dismiss.

**Holdings:** The District Court, Lucy H. Koh, J., held that:

(1) court would take judicial notice of documents from Department of Justice (DOJ) investigation and civil lawsuit;

(2) doctrine of judicial estoppel did not prevent defendants from taking inconsistent position from one taken in earlier suit brought by DOJ;

(3) complaint sufficiently alleged employers' overarching conspiracy, as required to state claim for Sherman Act violation;

(4) complaint sufficiently alleged employers' knowledge of and intent to engage in conspiracy;

(5) complaint sufficiently alleged a per se violation of Sherman Act;

(6) plaintiffs had Article III standing to bring restraint of trade claim;

(7) plaintiffs sufficiently alleged antitrust injury, as required to bring claim under Sherman Act; but

(8) employees had no vested interest protected by California's UCL; and

(9) federal enclave doctrine did not extinguish claim for violation of California's Cartwright Act.

Motion granted in part and denied in part.

West Headnotes

**[1] Evidence 157 ⟨⟩43(4)**

157 Evidence
    157I Judicial Notice
        157k43 Judicial Proceedings and Records
           157k43(4) k. Proceedings in other courts.
Most Cited Cases
    A court may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.

**[2] Evidence 157 ⟨⟩1**

157 Evidence
    157I Judicial Notice
        157k1 k. Nature and scope in general. Most Cited Cases

**Evidence 157 ⟨⟩43(1)**

157 Evidence
    157I Judicial Notice
        157k43 Judicial Proceedings and Records
           157k43(1) k. In general. Most Cited Cases
    A court may take judicial notice of the existence of matters of public record, such as a prior order or decision, but not the truth of the facts cited therein.

**[3] Federal Civil Procedure 170A ⟨⟩1832**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
           170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1832 k. Matters considered in general. Most Cited Cases

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

**Federal Civil Procedure 170A ⌘2533.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2533 Motion
               170Ak2533.1 k. In general. Most Cited Cases

A court may consider documents referenced in, but not attached to a complaint without converting a motion to dismiss into one seeking summary judgment. Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.

**[4] Evidence 157 ⌘43(3)**

157 Evidence
   157I Judicial Notice
      157k43 Judicial Proceedings and Records
         157k43(3) k. Records and decisions in other actions or proceedings. Most Cited Cases

**Evidence 157 ⌘48**

157 Evidence
   157I Judicial Notice
      157k48 k. Official proceedings and acts. Most Cited Cases

**Federal Civil Procedure 170A ⌘1832**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1832 k. Matters considered in general. Most Cited Cases

For purposes of determining motion to dismiss employees' consolidated antitrust class action against their employers, court would take judicial notice of documents from a related Department of Justice (DOJ) investigation and civil lawsuit that were referenced in complaint or attached as exhibits to plaintiffs' declarations. Sherman Act, § 1, 15 U.S.C.A. § 1; West's Ann.Cal.Bus. & Prof.Code §§

16600, 16720; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a).

**[5] Estoppel 156 ⌘68(2)**

156 Estoppel
   156III Equitable Estoppel
      156III(B) Grounds of Estoppel
         156k68 Claim or Position in Judicial Proceedings
            156k68(2) k. Claim inconsistent with previous claim or position in general. Most Cited Cases

Doctrine of judicial estoppel did not prevent high-tech employers accused of conspiring to fix and suppress employee compensation from taking inconsistent positions in civil suit brought by employees and suit brought by Department of Justice (DOJ), even though allegations were the same in both actions; employers' apparent concession that DOJ had stated a claim under Section 1 of the Sherman Act was not clearly inconsistent with later position that employees failed to state a claim under Section 4 of the Clayton Act, since Section 1 of the Sherman Act governed a claim for relief by the government and Section 4 of the Clayton Act governed a claim for relief by an individual, which had the additional requirement of antitrust injury inapplicable to the government's Section 1 claim. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a).

**[6] Antitrust and Trade Regulation 29T ⌘524**

29T Antitrust and Trade Regulation
   29TVI Antitrust Regulation in General
      29TVI(A) In General
         29Tk522 Constitutional and Statutory Provisions
            29Tk524 k. Construction. Most Cited Cases

Since California's Cartwright Act was modeled after the Sherman Act, analysis under California's antitrust law mirrors the analysis under federal law. Sherman Act, § 1, 15 U.S.C.A. § 1; West's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866

**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

Ann.Cal.Bus. & Prof.Code § 16720.

**[7] Antitrust and Trade Regulation 29T ⬅537**

29T Antitrust and Trade Regulation
   29TVI Antitrust Regulation in General
      29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
         29Tk537 k. In general. Most Cited Cases

To state a claim for conspiracy in restraint of trade under Sherman Act, plaintiff must allege that: (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[8] Action 13 ⬅3**

13 Action
   13I Grounds and Conditions Precedent
      13k3 k. Statutory rights of action. Most Cited Cases

**Antitrust and Trade Regulation 29T ⬅960**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
            29Tk960 k. In general. Most Cited Cases

The Clayton Act creates a private right of action under the Sherman Act for a plaintiff who has been injured in his business or property by reason of anything forbidden in the antitrust laws. Clayton Act, § 4(a), 15 U.S.C.A. § 15(a).

**[9] Antitrust and Trade Regulation 29T ⬅972(4)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement

29TXVII(B) Actions
   29Tk972 Pleading
      29Tk972(2) Complaint
         29Tk972(4) k. Conspiracy or combination. Most Cited Cases

Employees of high-tech companies sufficiently alleged their employers' overarching conspiracy, as required to state claim for conspiracy in restraint of trade in violation of Sherman Act, since complaint detailed the actors, effect, victims, location, and timing of six bilateral agreements between the employers to eliminate competition between them for skilled labor by fixing and suppressing employee compensation and restricting employees' mobility. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a); West's Ann.Cal.Bus. & Prof.Code § 16720.

**[10] Conspiracy 91 ⬅2**

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k1 Nature and Elements in General
            91k2 k. Combination. Most Cited Cases

To establish a conspiracy, the conspirators must have a unity of purpose or a common design and understanding, but a co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy.

**[11] Antitrust and Trade Regulation 29T ⬅935**

29T Antitrust and Trade Regulation
   29TXV Antitrust Law and Labor
      29Tk935 k. In general. Most Cited Cases

**Antitrust and Trade Regulation 29T ⬅972(4)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

29TXVII(B) Actions
  29Tk972 Pleading
    29Tk972(2) Complaint
      29Tk972(4) k. Conspiracy or combination. Most Cited Cases

Employees of high-tech companies sufficiently alleged their employers' knowledge of and intent to engage in conspiracy, as required to state claim for conspiracy in restraint of trade in violation of Sherman Act, since complaint detailed the not only six parallel bilateral agreements between individual employers but also alleged that employers had the means, motive and opportunity to restrain competition for skilled labor; allegations included that over two-year period employers' senior executives had negotiated, executed, monitored, and policed a series of identical "do not cold call" agreements in an effort to eliminate competition for skilled labor, and that, at all relevant times, at least one of three individuals had significant influence over at least one party to each of the six bilateral agreements through board of director status. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a); West's Ann.Cal.Bus. & Prof.Code § 16720.

**[12] Antitrust and Trade Regulation 29T ⬤══ 980**

29T Antitrust and Trade Regulation
  29TXVII Antitrust Actions, Proceedings, and Enforcement
    29TXVII(B) Actions
      29Tk978 Trial, Hearing and Determination
        29Tk980 k. Questions of law and fact. Most Cited Cases

The existence of a relevant market, for purposes of restraint of trade claim under Sherman Act, is typically a factual inquiry for the jury. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[13] Antitrust and Trade Regulation 29T ⬤══ 972(3)**

29T Antitrust and Trade Regulation
  29TXVII Antitrust Actions, Proceedings, and

Enforcement
    29TXVII(B) Actions
      29Tk972 Pleading
        29Tk972(2) Complaint
          29Tk972(3) k. In general. Most Cited Cases

An antitrust restraint of trade complaint may be dismissed on grounds of lack of existence of a relevant market only if the market definition is facially unsustainable. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[14] Antitrust and Trade Regulation 29T ⬤══ 972(3)**

29T Antitrust and Trade Regulation
  29TXVII Antitrust Actions, Proceedings, and Enforcement
    29TXVII(B) Actions
      29Tk972 Pleading
        29Tk972(2) Complaint
          29Tk972(3) k. In general. Most Cited Cases

There is no requirement that the market definition elements of an antitrust restraint of trade claim be pled with specificity. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[15] Antitrust and Trade Regulation 29T ⬤══ 935**

29T Antitrust and Trade Regulation
  29TXV Antitrust Law and Labor
    29Tk935 k. In general. Most Cited Cases

Employees of high-tech companies sufficiently alleged a per se violation of the Sherman Act, as required to state claim against their employers for conspiracy in restraint of trade in violation of Clayton Act; complaint alleged that employers were high-tech companies in the market for skilled labor, where cold calling to lure employees away from competitors played an important role in determining salaries and labor mobility, that the labor market for skilled high-tech labor was national, and that employers had succeeded in lowering the compensation and mobility of their employees below

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

what would have prevailed in a lawful and properly functioning labor market. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a); West's Ann.Cal.Bus. & Prof.Code § 16720.

**[16]** **Antitrust and Trade Regulation 29T** ⌖ **972(6)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(6) k. Demurrer and motions in general. Most Cited Cases

Whether per se or rule of reason analysis applied to antitrust restraint of trade claim was more appropriately determined on a motion for summary judgment than on motion to dismiss. Sherman Act, § 1, 15 U.S.C.A. § 1; Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.

**[17]** **Antitrust and Trade Regulation 29T** ⌖ **963(3)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
            29Tk963 Injury to Business or Property
               29Tk963(3) k. Particular cases. Most Cited Cases

Employees of high-tech companies had Article III standing to bring antitrust restraint of trade claim under Sherman Act against their employers, since they had suffered injury in fact through reduced wages caused by employers' alleged conspiracy to eliminate competition for skilled labor by fixing and suppressing employee compensation and restricting employees' mobility, which would be redressed through payment of damages upon successful resolution. U.S.C.A. Const. Art. 3, § 2, cl. 1; Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, §

4(a), 15 U.S.C.A. § 15(a); West's Ann.Cal.Bus. & Prof.Code § 16720.

**[18]** **Antitrust and Trade Regulation 29T** ⌖ **963(1)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
            29Tk963 Injury to Business or Property
               29Tk963(1) k. In general. Most Cited Cases

In general, an antitrust injury under the Sherman Act requires plaintiff to have suffered its injury in the market where competition is being restrained. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[19]** **Antitrust and Trade Regulation 29T** ⌖ **963(2)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
            29Tk963 Injury to Business or Property
               29Tk963(2) k. Causation. Most Cited Cases

It is not status as a consumer or competitor that confers antitrust standing under the Sherman Act, rather, it is the relationship between defendant's alleged unlawful conduct and resulting harm to plaintiff. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a).

**[20]** **Antitrust and Trade Regulation 29T** ⌖ **960**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk960 k. In general. Most Cited Cases

When an employee is the direct and intended object of an employer's anticompetitive conduct, that employee has standing to sue for antitrust injury under Sherman Act. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a).

**[21] Antitrust and Trade Regulation 29T ⟜ 963(3)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(3) k. Particular cases. Most Cited Cases

Employees of high-tech companies sufficiently alleged antitrust injury resulting from their employers' conspiracy, as required to have standing to bring claim against employers for conspiracy in restraint of trade under Sherman Act; complaint alleged that employee salaries and mobility had been directly suppressed by employers' bilateral agreements to fix salaries at artificially low levels. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 4(a), 15 U.S.C.A. § 15(a); West's Ann.Cal.Bus. & Prof.Code § 16720.

**[22] Antitrust and Trade Regulation 29T ⟜ 388**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(E) Enforcement and Remedies
29TIII(E)7 Relief

29Tk387 Monetary Relief; Damages
29Tk388 k. In general. Most Cited Cases

Damages and disgorgement are unavailable under California's Unfair Competition Law (UCL). West's Ann.Cal.Bus. & Prof.Code § 17203.

**[23] Antitrust and Trade Regulation 29T ⟜ 370**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(E) Enforcement and Remedies
29TIII(E)7 Relief
29Tk370 k. In general. Most Cited Cases

**Antitrust and Trade Regulation 29T ⟜ 388**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(E) Enforcement and Remedies
29TIII(E)7 Relief
29Tk387 Monetary Relief; Damages
29Tk388 k. In general. Most Cited Cases

Under California's Unfair Competition Law (UCL), the concept of restoration or restitution is not limited only to the return of money or property that was once in possession of that person; instead, restitution is broad enough to allow plaintiff to recover money or property in which he or she has a vested interest. West's Ann.Cal.Bus. & Prof.Code § 17203.

**[24] Antitrust and Trade Regulation 29T ⟜ 389(1)**

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(E) Enforcement and Remedies
29TIII(E)7 Relief
29Tk387 Monetary Relief; Damages

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

29Tk389 Grounds and Subjects
29Tk389(1) k. In general. Most Cited Cases

A mere expectation interest is not a "vested interest" for purposes of stating a claim for restitution under California's Unfair Competition Law (UCL). West's Ann.Cal.Bus. & Prof.Code § 17203.

**[25]** **Antitrust and Trade Regulation 29T** 389(2)

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(E) Enforcement and Remedies
29TIII(E)7 Relief
29Tk387 Monetary Relief; Damages
29Tk389 Grounds and Subjects
29Tk389(2) k. Particular cases. Most Cited Cases

High-tech employees' speculation that they would have received higher compensation absent employers' alleged conspiracy to eliminate competition for skilled labor by fixing and suppressing employee compensation and restricting employees' mobility, and that employers had profited through alleged conspiracy were merely expectation interests, rather than "vested interests" required for restitution or disgorgement under California's Unfair Competition Law (UCL). West's Ann.Cal.Bus. & Prof.Code § 17203.

**[26]** **Antitrust and Trade Regulation 29T** 290

29T Antitrust and Trade Regulation
29TIII Statutory Unfair Trade Practices and Consumer Protection
29TIII(E) Enforcement and Remedies
29TIII(E)1 In General
29Tk287 Persons Entitled to Sue or Seek Remedy
29Tk290 k. Private entities or individuals. Most Cited Cases

**Federal Civil Procedure 170A** 181

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak181 k. In general. Most Cited Cases

Class certification of nationwide classes under California's Unfair Competition Law (UCL) is not permitted. West's Ann.Bus. & Prof.Code § 17203; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[27]** **United States 393** 3

393 United States
393I Government in General
393k3 k. Authority over places acquired or reserved within states for public purposes. Most Cited Cases

Any state law enacted after a property becomes a federal enclave cannot be enforced on the enclave unless Congress specifically authorizes its enforcement on the federal enclave.

**[28]** **Antitrust and Trade Regulation 29T** 537

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
29Tk537 k. In general. Most Cited Cases

To state a claim under California's Cartwright Act, plaintiff must allege: (1) formation and operation of a conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts. West's Ann.Cal.Bus. & Prof.Code § 16720.

**[29]** **Antitrust and Trade Regulation 29T** 530

29T Antitrust and Trade Regulation
29TVI Antitrust Regulation in General
29TVI(A) In General
29Tk530 k. What law governs. Most

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

Cited Cases

**United States 393 ☞3**

393 United States
    393I Government in General
        393k3 k. Authority over places acquired or reserved within states for public purposes. Most Cited Cases

Even though employer's business was located on a federal enclave, the federal enclave doctrine did not extinguish high-tech employees' antitrust claims against employer brought pursuant to California's Cartwright Act, since the acts forming the basis of the claim had all occurred prior to employer's move to the enclave; employees alleged that employer had conspired to eliminate competition for skilled labor by fixing and suppressing employee compensation and restricting employees' mobility through its agreements with other employers, and that all activity had occurred prior to 2005 when employer's relocation to enclave had occurred. West's Ann.Cal.Bus. & Prof.Code § 16720.

Anne Brackett Shaver, Brendan Patrick Glackin, Dean Michael Harvey, Eric B. Fastiff, Joseph Richard Saveri, Katherine M. Lehe, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA, Eric L. Cramer, Sarah Rebecca Schalman–Bergen, Shanon Jude Carson, Berger & Montague, P.C., Philadelphia, PA, John D. Radice, Grant & Eisenhofer P.A., Linda Phyllis Nussbaum, Grant & Eisenhofer P.A., New York, NY, for Plaintiffs.

Craig Andrew Waldman, David Craig Kiernan, Robert Allan Mittelstaedt, Craig Ellsworth Stewart, Jones Day, Christina Joanne Brown, Flora F. Vigo, George Riley, Michael Frederick Tubach, O'Melveny & Myers, Donn P. Pickett, Frank Hinman, Zachary J. Alinder, Bingham McCutchen, LLP, Cody Shawn Harris, Daniel Edward Purcell, Eugene Morris Paige, John Watkins Keker, Paula Lenore Blizzard, Keker & Van Nest LLP, San Francisco, CA, Donald M. Falk, Edward D. Johnson,

Lee H. Rubin, Mayer Brown LLP, Catherine Tara Zeng, Jones Day Palo Alto, CA, Robert T. Haslam, III, Emily Johnson Henn, Covington & Burling LLP, Redwood Shores, CA, Deborah A. Garza, Jonathan A. D. Herczeg, Covington and Burling LLP, Washington, DC, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION TO DISMISS; DENYING LUCASFILM LTD.'S MOTION TO DISMISS**

LUCY H. KOH, District Judge.

**\*1** Before the Court are Defendants' Joint Motion to Dismiss the Consolidated Amended Complaint ("Joint Mot."), ECF No. 79, and Defendant Lucasfilm Ltd.'s Motion to Dismiss ("Lucasfilm Mot."), ECF No. 83. The Court held a hearing on the motions on January 26, 2012. Having considered the parties' submissions, arguments, and the relevant law, the Court GRANTS IN PART and DENIES IN PART Defendants' joint motion to dismiss, and DENIES Lucasfilm's motion to dismiss.

**I. BACKGROUND**

This is a consolidated class action brought by employees alleging antitrust claims against their employers, all of whom are high-tech companies with a principal place of business in the San Francisco–Silicon Valley area of California. Plaintiffs challenge an alleged conspiracy among Defendants to fix and suppress employee compensation and to restrict employee mobility.

The Court recites the factual allegations as pled in the Consolidated Amended Complaint ("CAC"), ECF No. 65, and as indicated in judicially noticed documents. The Court then recounts the procedural background.

**A. Factual Background**

[1][2][3][4] Unless otherwise noted, the following allegations are taken from the CAC and presumed to be true for purposes of ruling on Defendants' motions to dismiss. *See Marder v. Lopez,* 450 F.3d 445, 447 n. 1 (9th Cir.2006). The Court also

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

takes judicial notice of documents from a related Department of Justice ("DOJ") investigation and civil lawsuit that are referenced in the CAC or attached as exhibits to the Declaration of Christina J. Brown ("Brown Decl."), ECF No. 79–1, and the Declaration of Dean M. Harvey ("Harvey Decl."), ECF No. 93. A court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir.1992). A court may also take judicial notice of the existence of matters of public record, such as a prior order or decision, but not the truth of the facts cited therein. *See Lee v. City of L.A.,* 250 F.3d 668, 689–90 (9th Cir.2001). The Court may consider documents referenced in, but not attached to a complaint without converting a motion to dismiss into one seeking summary judgment. *See Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th Cir.2007).

### 1. The Parties

Defendants include the following high-tech companies with principal places of business located in the following cities in California: Adobe Systems Inc. ("Adobe"), San Jose; Apple Inc. ("Apple"), Cupertino; Google Inc. ("Google"), Mountain View; Intel Corp. ("Intel"), Santa Clara; Intuit Inc. ("Intuit"), Santa Clara; Lucasfilm Ltd. ("Lucasfilm"), San Francisco; and Pixar, Emeryville. CAC ¶¶ 16–20.

Plaintiffs Michael Devine, Mark Fichtner, Siddharth Hariharan, Brandon Marshall, and Daniel Stover (collectively "Named Plaintiffs"), all worked as software engineers for some of the Defendants. *Id.* ¶¶ 21–27. Mr. Devine worked for Adobe in the State of Washington from October 2006, through July 7, 2008. *Id.* ¶ 16. Mr. Fichtner worked for Intel in Arizona from May 2008 through May 2011. *Id.* ¶ 17. Mr. Hariharan worked for Lucasfilm in California from January 8, 2007, through August 15, 2008. *Id.* ¶ 18. Mr. Marshall worked for Adobe in California from July 2006 through

December 2006. *Id.* ¶ 19. Finally, Mr. Stover worked for Intuit in California from July 2006 through December 2010. *Id.* ¶ 20.

**\*2** Named Plaintiffs purport to represent the following nationwide class of similarly situated individuals:

> All natural persons employed by Defendants in the United States on a salaried basis during the period from January 1, 2005 through January 1, 2010 (the "Class Period"). Excluded from the Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of Defendants who entered into the illicit agreements alleged herein; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

*Id.* ¶ 30.

### 2. DOJ Investigation

Many of the factual allegations in the CAC come directly from two civil complaints filed by the DOJ in the United States District Court for the District of Columbia (the "D.C. District Court"). *See* Joint Mot. 5–6. Plaintiffs reference these documents in the CAC, and both Defendants and Plaintiffs have attached documents from the DOJ lawsuit to their briefing. *See* Harvey Decl. Exs. A–B; Brown Decl. Exs. A–F.

From 2009 through 2010, the Antitrust Division of the DOJ conducted an investigation into Defendants' employment and recruitment practices. CAC ¶¶ 3, 111. After receiving documents produced by Defendants and interviewing witnesses, the DOJ concluded that Defendants reached "facially anticompetitive" agreements that "eliminated a significant form of competition ... to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities." DOJ Complaint against Adobe, et al. ("DOJ Adobe Compl."), Harvey Decl. Ex. A, at ¶¶ 2, 14; DOJ Complaint against Lucasfilm ("DOJ Lucasfilm

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

Compl."), Harvey Decl. Ex. D, at ¶¶ 2, 15, 22; CAC ¶ 112. The DOJ also determined that the agreements "were not ancillary to any legitimate collaboration," "were much broader than reasonably necessary for the formation or implementation of any collaborative effort," and "disrupted the normal price-setting mechanisms that apply in the labor setting." DOJ Adobe Compl. ¶ 16; DOJ Lucasfilm Compl. ¶ 17; CAC ¶ 112. The DOJ concluded that Defendants entered into agreements that were naked restraints of trade that were *per se* unlawful under the antitrust laws. DOJ Adobe Compl. ¶ 35; DOJ Lucasfilm Compl. ¶ 3; CAC ¶ 112.

[5] On September 24, 2010, the DOJ filed a complaint against Adobe, Apple, Google, Intel, Intuit, and Pixar regarding Defendants' agreements. DOJ Final J. against Adobe, et al. ("DOJ Adobe J."), Brown Decl. Ex. A, at 2; CAC ¶ 114. On December 14, 2010, the DOJ filed another complaint against Lucasfilm and Pixar regarding Defendants' agreements. DOJ Final J. against Lucasfilm ("DOJ Lucasfilm J.") Order at 1, *United States v. Lucasfilm, Inc.,* No. 10–02220–RBW (D.D.C. June 3, 2011), 2011 WL 2636850 at *1; [FN1] CAC ¶ 114. In both cases, the DOJ filed stipulated proposed final judgments in which Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar agreed that the DOJ's complaints "state[ ] a claim upon which relief may be granted" under federal antitrust law. DOJ Proposed Final J. against Lucasfilm ("DOJ Proposed Lucasfilm J."), Brown Decl. Ex. B, at 2; CAC ¶ 114. [FN2] Although Defendants did not admit any wrongdoing or violation of law, Defendants agreed to be "enjoined from attempting to enter into, maintaining or enforcing any agreement with any other person or in any way refrain from, requesting that any person in any way refrain from, or pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees of the other person." DOJ Adobe J. at 5; DOJ Proposed Lucasfilm J. at 4; CAC ¶ 115. The D.C. District Court entered the stipulated proposed final judgments on March 17, 2011, and June 2, 2011, respectively. DOJ Adobe J.

at 12, DOJ Lucasfilm J. at 1; CAC ¶ 115. [FN3]

### 3. Alleged Conspiracy [FN4]

**\*3** Plaintiffs allege that Defendants engaged in a conspiracy to eliminate competition between them for skilled labor, with the intent and effect of suppressing the compensation and mobility of Defendants' employees. CAC ¶ 55.

According to Plaintiffs, the conspiracy consisted of an interconnected web of express bilateral agreements, each with the active involvement and participation of a company under the control of the late Steven P. Jobs ("Mr. Jobs") and/or a company whose board shared at least one member of Apple's board of directors. *Id.* Defendants' senior executives actively participated in negotiating, executing, monitoring compliance with, and policing violations of the bilateral agreements. *Id.* ¶¶ 56, 65, 74, 79, 84, 85, 91, 98, 102, 104, 107. Defendants' senior executives also actively concealed each bilateral agreement, and Defendants' employees were not informed of, nor did they agree to, the terms of any of the agreements. *Id.* ¶¶ 64, 77, 82, 89, 100, 105.

From 2005 to 2007, each pair of Defendants in a bilateral agreement entered into nearly identical "Do Not Cold Call" agreements, whereby each company placed the names of the other company's employees on a "Do Not Cold Call" list and instructed recruiters not to cold call the employees of the other company. *See id.* ¶¶ 67, 78, 83, 90, 101. [FN5] In a properly functioning and lawfully competitive labor market, each Defendant would compete for employees by "cold calling," that is, soliciting current employees of one or more other Defendants. *Id.* ¶ 41. Cold calling includes communicating directly in any manner (including orally, in writing, telephonically, or electronically) with another company's employee who has not otherwise applied for a job opening. *Id.* The use of cold calling among competitors commonly increases total compensation and mobility of all Defendants' employees. *Id.* ¶ 50.

Each bilateral agreement in this case applied to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

all employees of a given pair of Defendants; was not limited by geography, job function, product group, or time period; and was not related to a collaboration between that pair of Defendants. *Id.* ¶¶ 63, 76, 81, 88, 100, 105. The bilateral relationships between pairs of Defendants are described in more detail below.

*Pixar and Lucasfilm.* In January 2005, while Mr. Jobs was CEO of Pixar, senior executives of Pixar and Lucasfilm entered into express, written agreements to eliminate competition between them for skilled labor. *Id.* ¶¶ 58, 62. Pixar drafted the terms of the agreements in Emeryville, California and sent those terms to Lucasfilm. *Id.* ¶ 62. Pixar and Lucasfilm entered into agreements: (1) not to cold call each other's employees; (2) to notify the other company when making an offer to an employee of the other company, even if that employee had applied for the prospective position on his own initiative in the absence of cold calling; and (3) not to engage in "bidding wars," i.e., counteroffer above the initial offer, if either company made an offer to the employee of the other company. *Id.* ¶¶ 59–61.

**\*4** In 2007, Pixar twice contacted Lucasfilm regarding suspected violations of the agreement, and Lucasfilm responded by changing its conduct to conform to the agreement. *Id.* ¶ 65.

*Apple and Adobe.* In May 2005, while Mr. Jobs was CEO of Apple (concurrently serving as CEO of Pixar), Apple, and Adobe entered into an express "Do Not Cold Call" agreement, similar to the first agreement between Pixar and Lucasfilm. *Id.* ¶¶ 72, 73. Apple and Adobe reached the agreement through direct and explicit communications between their senior executives, who actively managed and enforced the agreement through further direct communications. *Id.* ¶ 74.

*Apple and Google.* In 2006, while Arthur D. Levinson ("Mr. Levinson") sat on the boards of both Apple and Google, these two companies entered into an express "Do Not Cold Call" agreement identical to the "Do Not Cold Call" agreement

between Apple and Adobe. *Id.* ¶ 79.

In February and March 2007, Apple contacted Google to complain about suspected violations of the agreement. In response, Google conducted an internal investigation and reported its findings back to Apple. *Id.* ¶ 84.

*Apple and Pixar.* In April 2007, Apple entered into an agreement with Pixar that was identical to Apple's earlier "Do Not Cold Call" agreements with Adobe and Google. *Id.* ¶ 85. At this time, Mr. Jobs, as the single largest shareholder of the Walt Disney Company ("Disney"), continued to exert substantial control over Pixar. *Id.* ¶ 87. Disney had acquired Pixar in 2006, and Mr. Jobs thereafter sat on Disney's board of directors and continued to oversee Pixar's animation business. *Id.* ¶ 15.

*Google and Intuit.* In June 2007, Google entered into an express "Do Not Cold Call" agreement with Intuit that was identical to Google's earlier agreement with Apple, and identical to the earlier agreements between Apple and Adobe, and between Apple and Pixar. *Id.* ¶ 103. At this time, Google CEO Eric Schmidt ("Mr. Schmidt") sat on Apple's board of directors, along with Mr. Levinson, who continued to sit on the boards of both Apple and Google. *Id.*

*Google and Intel.* In September 2007, Google entered into an express "Do Not Cold Call" agreement with Intel that was identical to Google's earlier agreements with Apple and Intuit, and identical to Apple's earlier agreements with Adobe and Pixar. *Id.* ¶ 98. At this time, Google CEO Mr. Schmidt continued to sit on Apple's board of directors, along with Mr. Levinson, who continued to sit on the boards of both Apple and Google. *Id.* ¶ 97.

Plaintiffs allege that each member of the Class was harmed by each and every agreement described above, which together made up "an overarching conspiracy" to decrease competition for skilled labor, reduce employee mobility, and suppress compensation. *Id.* ¶¶ 108–110. Each Defendant is

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

alleged to have entered into this conspiracy with knowledge of the other Defendants' participation in the conspiracy, and with the intent of suppressing Plaintiffs' compensation and mobility through eliminating competition for skilled labor. *Id.* ¶¶ 55, 108. The elimination of competition and suppression of compensation and mobility had a cumulative effect on all Class members. *Id.* ¶ 110.

**\*5** Plaintiffs allege that in August 2007, Mr. Jobs contacted the CEO of Palm Inc. ("Palm"), Edward T. Colligan ("Mr. Colligan"), to propose that Apple and Palm also agree to refrain from cold calling and hiring each other's employees. *Id.* ¶¶ 92, 94. Mr. Jobs said to Mr. Colligan, "We must do whatever we can" to stop cold calling each other's employees and other competitive recruiting efforts between the companies. *Id.* ¶ 94. Mr. Jobs also threatened litigation to intimidate Palm into entering into a "Do Not Cold Call" agreement. *Id.* Mr. Colligan declined Mr. Jobs's proposal, telling him, "Your proposal that we agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal." *Id.* ¶ 95.

### 4. Claims

Plaintiffs' CAC contains four claims for relief under the following statutes: (1) Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) California's Cartwright Act, Cal. Bus. & Prof.Code §§ 16720, *et seq.;* (3) Cal. Bus. & Prof.Code § 16600 [FN6]; and (4) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code §§ 17200, *et seq. Id.* ¶¶ 119–152. Plaintiffs seek damages, restitution, costs, attorneys' fees, and prejudgment and post-judgment interest. *Id.* ¶¶ 153–164.[FN7]

### B. Procedural Background

The original complaints in the five actions underlying this consolidated action were filed in California state court. *Hariharan v. Adobe Sys. Inc.,* Case No. 11574066 (Alameda Super.Ct. filed May 4, 2011); *Marshall v. Adobe Sys. Inc.,* Case No. 11–CV–204052 (Santa Clara Super.Ct. filed June 28, 2011); *Devine v. Adobe Sys. Inc.,* Case No.

11–CV–204053 (Santa Clara Super.Ct. filed June 28, 2011); *Fichtner v. Adobe Sys. Inc.,* Case No. 11–CV–204187 (Santa Clara Super.Ct. filed June 30, 2011); *Stover v. Adobe Sys. Inc.,* Case No. 11–CV–25090 (Santa Clara Super.Ct. filed July 14, 2011).[FN8] Defendants subsequently removed the five state court actions to the United States District Court for the Northern District of California. *Hariharan v. Adobe Sys. Inc.,* Case No. 11–CV–2509–JCS (removed May 23, 2011); *Marshall v. Adobe Sys. Inc.,* Case No. 11–CV–3538–HRL (removed July 19, 2011); *Devine v. Adobe Sys. Inc.,* Case No. 11–3539–HRL (removed July 19, 2011); *Fichtner v. Adobe Sys. Inc.,* Case No. 11–CV–3540–PSG (removed July 19, 2011); *Stover v. Adobe Sys. Inc.,* Case No. 11–CV–3541–PSG (removed July 19, 2011).

On June 1, 2011, the lead case, *Hariharan v. Adobe Systems Inc.,* was reassigned from Magistrate Judge Spero to Judge Armstrong. ECF No. 24. On July 19, 2011, Intuit filed a motion to relate the five underlying actions, ECF No. 41, which Judge Armstrong granted on July 27, 2011, ECF No. 52. On August 2, 2011, Plaintiff Siddharth Hariharan moved to transfer the five underlying actions to the San Jose Division, ECF No. 56, which Judge Armstrong granted on August 4, 2011, ECF No. 58.

**\*6** On August 5, 2011, the underlying actions were reassigned to the undersigned judge. The Court consolidated the five underlying actions on September 12, 2011, ECF No. 64, and Plaintiffs filed the CAC on September 13, 2011. ECF No. 65.

On October 26, 2011, the Court held a Case Management Conference, where the Court granted in part and denied in part Defendants' joint motion to stay discovery, ECF No. 80. *See* ECF No. 88. The Court ordered that Defendants respond to Plaintiffs' Document Request Nos. 1–7 and produce responsive, non-privileged documents already produced to the DOJ. *See id.* Pursuant to the Court's instructions at the Case Management Conference, Plaintiffs withdrew their prayer for injunctive relief, ECF No. 89, and voluntarily dismissed a re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

lated case, *Lieff, Cabraser, Heimann & Bernstein, LLP v. U.S. Dep't of Justice, Antitrust Div.,* Case No. 11–CV–5105–HRL (N.D.Cal. Oct. 18, 2011), ECF No. 90.

Defendants filed the instant joint motion to dismiss on October 13, 2011, ECF No. 79, and, with leave of the Court, Lucasfilm filed its separate motion to dismiss on October 17, 2011, ECF No. 83. Plaintiffs opposed both of these motions on November 4, 2011. ECF Nos. 91, 92. Defendants filed their joint reply on December 2, 2011, ECF No. 97, and Lucasfilm filed its reply that same day, ECF No. 96.

**II. Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismissal under Rule 12(b)(6) may be based on either (1) the "lack of a cognizable legal theory," or (2) "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990). While " 'detailed factual allegations' " are not required, a complaint must include sufficient facts to " 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Twombly,* 550 U.S. at 544, 127 S.Ct. 1955.

For purposes of ruling on a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations of material fact as true and construes the pleadings in the light most favorable to the plaintiffs. *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir.2008). The Court need not, however, accept as true pleadings that are no more than legal

conclusions or the " 'formulaic recitation of the elements' of a cause of action." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.,* 83 F.3d 1136, 1140 (9th Cir.1996); *accord Iqbal,* 129 S.Ct. at 1949–50. However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 129 S.Ct. at 1940–41.

**III. ANALYSIS**

**\*7** The Court addresses Defendants' joint motion to dismiss before turning to Lucasfilm's motion to dismiss.

**A. Defendants' Joint Motion to Dismiss**

Defendants jointly move to dismiss the CAC on the grounds that it fails to state an antitrust claim under federal and California law because: (1) the CAC fails to allege evidentiary facts to support the claim of an "overarching conspiracy" among all Defendants to suppress their employees' wages; (2) such a conspiracy is implausible on its face; and (3) the CAC fails to plead antitrust injury. Defendants also argue that Plaintiffs' claims under the UCL fail for the same reasons as Plaintiffs' antitrust claims. Finally, Defendants argue that Plaintiffs lack standing to assert claims for injunctive or declaratory relief because Plaintiffs are former employees with no stated intention of working for any Defendant, and the alleged conduct has already been enjoined by the DOJ. The Court need not reach this last argument, however, because it was rendered moot by Plaintiffs' withdrawal of their prayer for declaratory and injunctive relief. ECF Nos. 89, 111.

**1. Antitrust Claims Under the Sherman Act and California's Cartwright Act**

[6] The parties appear to agree that Plaintiffs' federal and state antitrust claims rise and fall together. "Indeed, the analysis under California's antitrust law mirrors the analysis under federal law

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

because the Cartwright Act was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1160 (9th Cir.2001); *see also Nova Designs, Inc. v. Scuba Retailers Ass'n,* 202 F.3d 1088, 1091 (9th Cir.2000). Thus, if Plaintiffs plead a valid Sherman Act claim, they likewise plead a valid Cartwright Act claim.

### a. Legal Standard

[7] Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade." To state a claim under Section 1, a plaintiff must allege that "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis;[FN9] and (3) the restraint affected interstate commerce."[FN10] *Am. Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 784 (9th Cir.1996); *see also Tanaka v. Univ. of S. Cal.,* 252 F.3d 1059, 1062 (9th Cir.2001). The Supreme Court has stated that a plaintiff must plead " 'enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.... [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.' " *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir.2008) (quoting *Twombly,* 550 U.S. at 556–57, 127 S.Ct. 1955).

**\*8** [8] Section 4 of the Clayton Act creates a private right of action under the Sherman Act for a plaintiff who has been "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Thus, an antitrust plaintiff must have suffered antitrust injury, that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1055 (9th Cir.1999).

### b. Failure to State a Claim

Defendants argue that Plaintiffs fail to allege sufficient facts to establish an "overarching conspiracy." Specifically, Defendants argue that: (1) Plaintiffs fail to plead the "who, what, where, and when" describing the alleged conspiracy, and (2) Plaintiffs have not alleged the requisite knowledge and intent to show a conspiracy. Joint Mot. 2 (citing *Kendall,* 518 F.3d 1042). Defendants also contend that an "overarching conspiracy" consisting of six bilateral agreements is implausible on its face, primarily because each Defendant remained free to cold call most of the other Defendants' employees. *Id.* at 3. Finally, Defendants argue that Plaintiffs have failed to plead antitrust injury. The Court addresses these arguments in turn.

#### i. Who, What, to Whom, Where, and When

Defendants argue that Plaintiffs fail to plead the "who, what, where, and when" of the alleged overarching conspiracy. Defendants urge the Court to ignore Plaintiffs' "labels and conclusions" and mere "formulaic recitation[s] of the elements of a cause of action." Joint Mot. 9 (citing *Iqbal,* 129 S.Ct. at 1949). While it is true, as Defendants note, that Plaintiffs refer to the "overarching conspiracy," CAC ¶¶ 55, 108, as an "interconnected web of agreements," *id.* ¶¶ 1, 55, 108, these labels are not the only facts that Plaintiffs have alleged here.

Defendants rely primarily on *Kendall* to support their argument that Plaintiffs have failed to allege sufficient facts supporting an overarching conspiracy. *Kendall,* however, is distinguishable. Even after conducting depositions, the plaintiffs in *Kendall* did "not allege *any* facts to support their theory that the [defendants] conspired or agreed with each other ... to restrain trade." *Kendall,* 518 F.3d at 1048 (emphasis added). The Ninth Circuit held that the plaintiffs' allegations of mere parallel conduct, without more, were insufficient to plead a Section 1 violation. *Id.* at 1049. The Ninth Circuit also held that, to survive a motion to dismiss, a Section 1 claim should "answer the basic questions: who, did what, to whom (or with whom), where, and when?"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

*Id.* at 1048.

[9] Plaintiffs here have alleged much more than mere parallel conduct, despite not having any discovery before filing the CAC. Unlike the plaintiffs' complaint in *Kendall,* Plaintiffs' CAC details the actors, effect, victims, location, and timing of the six bilateral agreements between Defendants.

**\*9** *Who.* Plaintiffs allege that the agreements were negotiated, executed, and, in most cases, enforced by Defendants' "senior executives." CAC ¶¶ 62, 64, 65, 74, 77, 79, 84, 85, 91, 98, 102, 107. The Ninth Circuit has expressed concern that "[a] bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements." *Kendall,* 518 F.3d at 1047. This concern, however, is inapplicable here, where Plaintiffs allege that, at all relevant times, at least one of three individuals had significant influence over at least one party to each of the six bilateral agreements: Apple CEO and Pixar CEO Mr. Jobs; Apple and Google board member Mr. Levinson; and Google CEO and Apple board member Mr. Schmidt. CAC ¶¶ 55, 57, 58, 72, 79, 87, 97, 103, 108. Specifically, Mr. Jobs exerted significant influence over companies involved in four of the bilateral "Do Not Cold Call" agreements: Pixar–Lucasfilm; Apple–Pixar; Apple–Google; and Apple–Adobe. *Id.* ¶¶ 58, 72, 79, 85, 87. Mr. Schmidt, CEO of Google, sat on Apple's board of directors when Google entered into agreements with Intel and Inuit. *Id.* ¶ 97. Mr. Levinson sat on the boards of both Apple and Google when the two companies entered into their bilateral agreement; when Google entered into agreements with Intel and with Intuit; and when Apple entered into an agreement with Pixar. *Id.* ¶¶ 79, 97, 103.

Moreover, the identical nature of the six bilateral agreements may support the inference that these individuals played a role in shaping these agreements. For example, it strains credulity that Apple and Adobe reached an agreement in May

2005 that was identical to the "Do Not Cold Call" agreement Pixar entered into with Lucasfilm in January 2005, *id.* ¶¶ 58, 72, without some communication or coordination between these two sets of Defendants. The only apparent link between the Apple–Adobe agreement and the Pixar–Lucasfilm agreement is Mr. Jobs, who controlled Apple, *id.,* and who oversaw Pixar. *Id.* ¶ 87. Plaintiffs allege that all of the bilateral agreements were reached in secrecy. *Id.* ¶¶ 56–91. Thus, the identical nature of the six secret bilateral agreements further supports the plausible inference that the agreements were negotiated, reached, and policed at the highest levels of the Defendant companies.

Furthermore, Plaintiffs provide an example of Mr. Jobs personally negotiating a potential "Do Not Cold Call" agreement directly with the CEO of Palm, Mr. Colligan. *Id.* ¶¶ 92–96. Plaintiffs quote Mr. Jobs as allegedly telling Mr. Colligan, " 'We must do whatever we can' to stop cold calling each other's employees and other competitive recruiting efforts between the companies." *Id.* ¶ 94. Based on Mr. Jobs's attempt to negotiate a "Do Not Cold Call" agreement directly with Palm's CEO, it is reasonable to infer that such agreements were negotiated directly CEO to CEO.

**\*10** Finally, because the bilateral agreements were not limited by geography, job function, product group, or time period, and were not related to a collaboration between defendants. *Id.* ¶¶ 63, 76, 81, 88, 100, 105, it is reasonable to infer that such significant wide-ranging, company-wide, and worldwide policies would have been approved at the highest levels.

The Court finds that at the pleading stage, Plaintiffs have sufficiently pled who negotiated and entered into the bilateral "Do Not Cold Call" agreements.

What, to Whom, Where, and When. Plaintiffs also allege that the agreements removed cold calling as an upward pressure on Plaintiffs' salaries, resulting in artificially lower salaries. CAC ¶¶ 70,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

72, 79, 85, 98. As discussed in greater detail in Section III.A.1.b.ii, *infra*, Plaintiffs describe a plausible scenario as to how, in light of basic economic principles, these agreements formed an overarching conspiracy that resulted in artificially lower salaries. Plaintiffs also set forth how the nearly identical agreements, of identical scope, were entered into in various cities and counties in California, *id.* ¶¶ 62, 75, 80, 86, 99, between 2005 and 2007. *Id.* ¶¶ 58, 73, 79, 85, 98, 103. Plaintiffs allege how these agreements were the subject of a DOJ investigation in which the DOJ found the agreements to be "per se unlawful" and in which Defendants agreed that the DOJ stated a federal antitrust claim. *Id.* ¶¶ 112, 114. Indeed, Defendants note that "virtually all of the facts alleged in the Complaint relate to six bilateral agreements among Defendants," apparently conceding that Plaintiffs have pled sufficient facts to establish the existence of these bilateral agreements. Joint Mot. 9.

Unlike the plaintiffs in *Kendall,* Plaintiffs here have "answer[ed] the basic questions: who, did what, to whom (or with whom), where, and when?" *Kendall,* 518 F.3d at 1047. Moreover, Plaintiffs have alleged facts beyond mere parallel conduct that "tend[ ] to exclude the possibility of independent action." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (holding that "evidence that tends to exclude the possibility of independent action ... create[s] a jury issue"); *see also Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.,* 850 F.2d 477, 484 (9th Cir.1988) ("concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings") (internal citation omitted); *In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 627–29 (7th Cir.2010) *cert. denied,* —— U.S. ——, 131 S.Ct. 2165, 179 L.Ed.2d 937 (2011) (holding that where a "complaint allege[d] a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion," this "constitute[d] supporting evidence of collusion," and "provide[d] a sufficiently plausible case of price fixing to war-

rant allowing the plaintiffs to proceed to discovery").

**\*11** Accordingly, failure to plead the "who, what, to whom, where, and when" is not a basis to dismiss Plaintiffs' Section 1 claims here. *Cf. In re Cathode Ray Tube (CRT) Antitrust Litig.,* 738 F.Supp.2d 1011, 1018 (N.D.Cal.2010) (Conti, J.) (distinguishing *Kendall* on the ground that the CRT "complaints allege[d] a governmental investigation, hundreds of meetings between 1995 and 2007, and detailed allegations concerning the structure and typical pattern of those meetings").

### ii. Knowledge and Intent

Defendants argue that Plaintiffs have failed to show "some meeting of the minds." Specifically, Defendants argue that the mere fact of overlapping board members is not evidence of a conspiracy and that multiple bilateral agreements do not make up an overarching conspiracy. Joint Mot. 11–12. The Court is not persuaded.

[10] In order to plausibly state a Section 1 claim, Plaintiffs must allege something more than parallel conduct and a conclusory allegation of agreement at some unidentified point. "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly,* 127 S.Ct. at 1966. To establish a conspiracy, the conspirators must have a unity of purpose or a common design and understanding. *Am. Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). A co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy. *Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n,* 620 F.2d 1360, 1366–67 (9th Cir.1980) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result."); *cf. Blumenthal v. United States,* 332 U.S.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947) (stating the same proposition in the criminal context). In antitrust conspiracy cases, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole...." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

[11] Plaintiffs allege that Defendants had the means, the motive, and the opportunity to implement a conspiracy to restrain competition for employees. Plaintiffs allege that Defendants' senior executives negotiated, executed, monitored, and policed a series of identical "Do Not Cold Call" agreements in an effort to eliminate competition for skilled labor. CAC ¶¶ 1, 56, 74, 79, 85, 98, 104. Furthermore, Plaintiffs allege that, at all relevant times, at least one of three individuals had significant influence over at least one party to each of the six bilateral agreements: Apple and Pixar CEO Mr. Jobs, Apple and Google board member Mr. Levinson, and Google CEO and Apple board member Mr. Schmidt. *Id.* ¶¶ 55, 57, 58, 72, 79, 87, 97, 103, 108.

**\*12** Defendants cite *Jicarilla Apache Tribe v. Supron Energy Corp.,* 728 F.2d 1555, 1561 (10th Cir.1984), for the proposition that service on multiple boards is "not evidence of a conspiracy." Joint Mot. 12. However, *Jicarilla* does not stand for this proposition. To the contrary, the *Jicarilla* Court acknowledged that overlapping board membership "may indicate an opportunity to conspire...." *Jicarilla,* 728 F.2d at 1561. This is precisely the reason for which Plaintiffs allege overlapping board membership here: to indicate an opportunity to conspire.

Specifically, Mr. Levinson sat on the boards of both Apple and Google when the two companies entered into their bilateral agreement; when Google entered into an agreement with Intel and Intuit; and

when Apple entered into an agreement with Pixar. *Id.* ¶¶ 79, 97, 103. Mr. Schmidt, CEO of Google, sat on Apple's board of directors when Google entered into agreements with Intel and Inuit, *id.* ¶ 97. Mr. Levinson's and Mr. Schmidt's positions on the boards of companies entering into virtually identical, yet secret, bilateral "Do Not Cold Call" agreements provided an opportunity for Defendants to share knowledge and to conspire. Thus, their overlapping board membership lends plausibility to Plaintiffs' allegations that each Defendant entered into this conspiracy "with knowledge of the other Defendants' participation in the conspiracy, and with the intent of ... reduc[ing] employee compensation and mobility through eliminating competition for skilled labor." *Id.* ¶ 55; *see also id.* ¶ 108. These bilateral "Do Not Cold Call" agreements were negotiated by senior executives and represented the "policies" of several hi-tech companies. *Id.* ¶ 116. Thus, it is reasonable to infer that such significant policies would have to be approved at the highest levels. The Court agrees with Plaintiffs, Opp'n to Joint Mot. 10, that it is plausible to infer that the overlapping board membership here provided an opportunity to conspire and an opportunity for transfer of the requisite knowledge and intent regarding the bilateral agreements.

The plausibility of these inferences increases when the Court considers that Mr. Jobs also exerted significant influence over companies involved in four of the bilateral "Do Not Cold Call" agreements: Pixar–Lucasfilm; Apple–Pixar; Apple–Google; and Apple–Adobe. Plaintiffs provide an example of Mr. Jobs personally negotiating the same kind of "Do Not Cold Call" agreement directly with the CEO of Palm. *Id.* ¶¶ 92–96. Notwithstanding the fact that this example involved a non-Defendant, Mr. Jobs's alleged personal involvement lends further plausibility to Plaintiffs' allegations that the agreements at issue here were executed, policed, and enforced by senior executives. Furthermore, Plaintiffs quote Mr. Jobs as allegedly telling Palm's CEO, Mr. Colligan, " 'We must do whatever we can' to stop cold calling each other's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

employees and other competitive recruiting efforts between the companies." *Id.* ¶ 94. From this quote it is reasonable to infer that Mr. Jobs had the intent to reduce competition for skilled labor and was aware that "Do Not Cold Call" agreements were effective means of doing so. Given that Mr. Jobs, as CEO of Apple, had contact with Messrs. Levinson and Schmidt, who were members of Apple's Board, it is also reasonable to infer that the overlapping board membership provided an opportunity for Mr. Jobs to expand the conspiracy. Thus, Plaintiffs have alleged sufficient facts plausibly suggesting "a unity of purpose[,] a common design and understanding, or a meeting of minds in an unlawful arrangement." *Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464 (internal citation omitted).

**\*13** Defendants also argue that six bilateral "Do Not Cold Call" agreements do not add up to an overarching conspiracy. Defendants rely principally on *In re Iowa Ready–Mix Concrete Antitrust Litigation,* 768 F.Supp.2d 961 (N.D.Iowa 2011), to support this argument. In addition to not being binding on this Court, *Iowa Ready–Mix Concrete* is distinguishable. There, the plaintiffs sought to rely on bilateral agreements—which were the basis for three of the defendants' guilty pleas to criminal antitrust violations—to show one conspiracy among all defendants. *Id.* at 972. The plaintiffs' complaint alleged that the defendants "did those things which they combined and conspired to do, including, among other things, discussing, forming and implementing agreements to raise and maintain at artificially high levels the prices for Ready–Mix Concrete," an allegation that, without more, was not only "conclusory," but also "tautolog[ical]." *Id.* at 974–75. In dismissing the complaint, the court noted that the plaintiffs failed to allege: (1) "parallel conduct," *id.* at 974; (2) a "larger picture from which inferences of a wider conspiracy can be drawn from guilty pleas to separate bilateral conspiracies," *id.* at 975; (3) "any facts that could tie together the specific, discrete incidents of admitted misconduct and the overarching all-defendant four-plus year conspiracy ...," *id.* at 972; and (4) "that

the defendants ever systematically interacted with each other, much less that they had some mechanism to operate the alleged conspiracy, allocate its profits, and police its participants," *id.* The plaintiffs' complaint had the additional defect of failing to allege when, where, and from whom plaintiffs purchased the allegedly price-fixed product. *Id.* at 964.

As discussed above, Plaintiffs here have alleged a "larger picture" of senior executives from closely connected high-tech companies in Northern California contemporaneously negotiating and enforcing six bilateral "Do Not Cold Call" agreements. The fact that all six identical bilateral agreements were reached in secrecy among seven Defendants in a span of two years suggests that these agreements resulted from collusion, and not from coincidence. Unlike the plaintiffs in *Iowa Ready–Mix Concrete,* therefore, Plaintiffs here have alleged facts plausibly suggesting "a unity of purpose[,] a common design and understanding, or a meeting of minds in an unlawful arrangement." *Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464 (internal citation omitted). Whether Plaintiffs can adduce sufficient evidence in discovery to *prove* an overarching conspiracy is a question that is not before the Court today. At the pleading stage, Plaintiffs have alleged sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. Accordingly, failure to plead sufficient evidentiary facts supporting an overarching conspiracy is not a ground for dismissal of Plaintiffs' antitrust claims.

### iii. Plausibility of the Conspiracy Theory

**\*14** Defendants also argue that Plaintiffs' theory of an overarching conspiracy is implausible. Joint Mot. 14 (citing *William O. Gilley Enters., Inc. v. Atl. Richfield Co.,* 588 F.3d 659, 662 (9th Cir.2009) (" *Gilley* ")). While it is true that the facts alleged must be " 'plausible' in light of basic economic principles," *Gilley,* 588 F.3d at 662, Plaintiffs' allegations meet this plausibility standard

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

here.

As Defendants note, the bilateral "Do Not Cold Call" agreements alleged in Plaintiffs' CAC do not cover all possible pairings between Defendants—that is, while Adobe cannot cold call Apple employees or vice versa, nothing in the CAC indicates that Adobe could not cold-call Adobe, Intuit, Google, Lucasfilm, and Pixar. Joint. Mot. 15. In fact, of the 21 possible pairings between the 7 Defendants, only 6 pairings have a bilateral "Do Not Cold Call" agreement, leaving competition open among the remaining 15 pairings. *Id.* Defendants argue that the economics of this situation evidence the lack of an overarching conspiracy, as a rational conspiracy would seek to eliminate these additional price pressures in order to make the existing bilateral constraints effective. *Id.* Relatedly, Defendants argue that Plaintiffs' alleged conspiracy is implausible because Plaintiffs have failed to allege that Defendants have market power over a relevant market. *Id.* at 16. For the reasons below, neither of these arguments prevails.

First, the Court does not agree with Defendants that Plaintiffs' allegations of an overarching conspiracy are implausible on their face. While Defendants accurately point out that only 6 bilateral "Do Not Cold Call" agreements have been alleged, Plaintiffs nonetheless adequately allege that the "compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein. Instead, the effects of ... eliminating cold calling ... commonly impact all salaried employees of the participating companies." *Id.* ¶ 50. Plaintiffs allege that "Plaintiffs and each member of the Class were harmed by each and every agreement herein alleged. The elimination of competition and suppression of compensation and mobility had cumulative effect on all Class members." *Id.* ¶ 110. For example, "an individual who was an employee of Lucasfilm received lower compensation and faced unlawful obstacles to mobility

as a result of not only the illicit agreements with Pixar, but also as a result of Pixar's agreement with Apple." *Id.*

Defendants do not attack Plaintiffs' allegations of the cumulative harm of the bilateral agreements beyond calling the allegations "conclusory." Joint Mot. 17. The Court disagrees with Defendants' characterization. Far from asserting mere conclusions of law, Plaintiffs' CAC details how cold calling normally works in the labor market for skilled employees in the high-tech industry and how eliminating cold calling would reduce such employees' compensation and mobility. CAC ¶¶ 41–54. Plaintiffs provide specific examples of various ways in which cold calling significantly impacts employee compensation. First, Plaintiffs allege that when an employee of Company A receives a cold call from rival Company B, the current employee may either move to Company B, or use Company B's offer as leverage to negotiate increased compensation from Company A. *Id.* ¶ 46. Second, when a current employee of Company A receives a cold call from rival Company B, that information is likely to spread through informal employee communication channels, empowering other Company A employees to use that information in their own compensation negotiations. *Id.* ¶ 47. Third, when rival Company B cold calls a Company A employee, Company B is likely to glean information about Company A's compensation practices. As a result, in a normal, competitive labor market, Company B is likely to match or exceed the compensation package offered by its rivals. This iterative process tends to lead to increased compensation levels across the industry, as companies vie for rivals' employees. *Id.* ¶ 48. Finally, when Company A knows that its employees may be cold called by rival Company B, Company A is more likely to forfend prospective poaching of its employees by preemptively increasing the compensation of its current employees. *Id.* ¶ 49.

**\*15** While these allegations concerning the labor market effects of cold calling remain to be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

proven, the Court presumes these factual allegations to be true for purposes of ruling on a motion to dismiss. In light of Plaintiffs' specific allegations concerning the industry-wide procompetitive effects of cold calling recruiting practices, it is plausible to infer that even a single bilateral agreement would have the ripple effect of depressing the mobility and compensation of employees of companies that are not direct parties to the agreement. Plaintiffs' allegations of six parallel bilateral agreements render the inference of an anticompetitive ripple effect that much more plausible. Accordingly, the Court finds that Plaintiffs have sufficiently pled facts alleging the economic plausibility of the conspiracy.

[12][13][14] Defendants' second argument, which challenges the plausibility of Plaintiffs' conspiracy theory based on Plaintiffs' failure to allege a relevant market and that Defendants have power within that market, also fails. "There is no requirement that [the market definition] elements of the antitrust claim be pled with specificity." *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1045 (9th Cir.2008). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.* The existence of a "relevant market" is typically a factual inquiry for the jury. *Id.* A complaint may be dismissed on this ground only if the market definition is "facially unsustainable." *Id.*

[15] Here, Plaintiffs allege that Defendants are high-tech companies in the market for skilled labor, where cold calling plays an important role in determining salaries and labor mobility. CAC ¶¶ 41–54. Plaintiffs further allege that the labor market for skilled high-tech labor is national. *Id.* ¶¶ 30, 39. Finally, Plaintiffs allege that "Defendants succeeded in lowering the compensation and mobility of their employees below what would have prevailed in a lawful and properly functioning labor market." *Id.* ¶ 108. Thus, the Court accepts as true, as the Court must on a motion to dismiss, Plaintiffs'

allegation that Defendants succeeded in distorting the market through their agreements. Accordingly, it is reasonable to infer that Defendants had the market power to do so. *Cf. Theme Promotions, Inc. v. News Am. Mktg. FSI,* 546 F.3d 991, 1001 (9th Cir.2008) ("Evidence of restricted output and supracompetitive prices is direct evidence of market power." (quoting *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir.1997))).

[16] Moreover, the Court need not engage in a market analysis until the Court decides whether to apply a *per se* or rule of reason analysis. *See F.T.C. v. Ind. Fed'n of Dentists,* 476 U.S. 447, 462, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Defendants' argument relies on the false assumption that the Court should apply a rule of reason analysis, but as the parties agree, Joint Mot. 9; Tr. 29:15–17, the Court need not decide now whether *per se* or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment. *See Pecover v. Elecs. Arts Inc.,* 633 F.Supp.2d 976, 983 (N.D.Cal.2009) (deferring market analysis under rule of reason, under Cartwright Act, until after deciding motion to dismiss); *In re Beer Distrib. Antitrust Litig.,* 188 F.R.D. 557, 564 (N.D.Cal.1999) (Williams, J.). Plaintiffs have successfully pled a *per se* violation of the Sherman Act for purposes of surviving a 12(b)(6) motion, *see* CAC ¶¶ 2, 32(b), 125, 134, 155; Opp'n to Joint Mot. 1, and therefore no market analysis is required at this time. *See United States v. Socony–Vacuum Oil,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (noting that a *per se* Section 1 violation does not require evidence of market power or the ability to affect prices); *Datagate, Inc. v. Hewlett–Packard Co.,* 60 F.3d 1421, 1425 (9th Cir.1995) ("The foundational principle of *per se* antitrust liability is that some acts are considered so inherently anticompetitive that no examination of their impact on the market as a whole is required."); *In re WellPoint, Inc. Out–of–Network UCR Rates Litig.,* —— F.Supp.2d ——, ——, No. MDL

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

09–2074–PSG, 2011 WL 3555610, at *14 (C.D.Cal. Aug. 11, 2011).

**\*16** For all these reasons, Plaintiffs' antitrust claims cannot be dismissed on the basis of implausibility.

### iv. Antitrust Injury [FN11]

[17] Defendants argue that Plaintiffs have not alleged antitrust injury. Joint Mot. 16. The Court disagrees.

[18][19][20] In general, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *Am. Ad Mgmt.,* 190 F.3d at 1057. However, "it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Id.* at 1058. The Ninth Circuit has held that, where, as here, an employee is the direct and intended object of an employer's anti-competitive conduct, that employee has standing to sue for antitrust injury. *Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739, 742–43 (9th Cir.1984); *accord Eichorn v. AT & T Corp.,* 248 F.3d 131, 140–41 (3d Cir.2001); *Roman v. Cessna Aircraft Co.,* 55 F.3d 542 (10th Cir.1995).

[21] Plaintiffs have asserted that their salary and mobility were suppressed by Defendants' agreements not to cold call, and that the alleged agreements were entered into to suppress competition for skilled labor. CAC ¶¶ 108–10. Plaintiffs have specifically alleged that they were injured by Defendants' alleged anticompetitive conduct, *id.* ¶¶ 16–20, 70, 108, 110; have explained the means by which Defendants allegedly caused this injury, *id.* ¶¶ 41–55, 108; and have suggested how this injury should be quantified, *id.* ¶ 32(h). In alleging that Defendants conspired to fix salaries at artificially low levels, Plaintiffs have alleged "an example of the type of injury the antitrust laws are meant to protect against." *Doe v. Ariz. Hosp. & Healthcare Ass'n,* No. CV07–1292–PHX–SRB, 2009 WL 1423378, at *4 (D.Ariz. Mar. 19, 2009) (citing *Am.*

*Ad Mgmt.,* 190 F.3d at 1054). Plaintiffs have further alleged that Defendants' attempts to suppress competition had the intended "effect of fixing the compensation of [Plaintiffs] at artificially low levels." CAC ¶ 108. Plaintiffs have thus also alleged that their injury is a direct result of Defendants' conduct. *Ariz. Hosp.,* 2009 WL 1423378, at *4.

Thus, Plaintiffs have adequately pled antitrust injury.[FN12] Accordingly, Defendants' motion to dismiss Plaintiffs' Sherman Act claim and Cartwright Act claim is DENIED.

### 2. Cal. Bus. & Prof.Code § 16600

Plaintiffs have voluntarily dismissed their claim under Cal. Bus. & Prof.Code § 16600. *See* ECF No. 111. Defendants' Joint Motion to Dismiss this claim is therefore DENIED as MOOT.

### 3. UCL

Plaintiffs also allege that Defendants' actions violate California's UCL, which does not prohibit specific activities but instead broadly proscribes "any unfair competition, which means 'any unlawful, unfair or fraudulent business act or practice.' " *In re Pomona Valley Med. Group, Inc.,* 476 F.3d 665, 674 (9th Cir.2007) (quoting Cal. Bus. & Prof.Code §§ 17200, *et seq.*); *see also Boschma v. Home Loan Ctr., Inc.,* 198 Cal.App.4th 230, 251–52, 129 Cal.Rptr.3d 874 (2011).

**\*17** [22] The UCL provides for restitutionary, injunctive, and declaratory relief. *See* Cal. Bus. & Prof.Code § 17203 (authorizing injunctive and restitutionary relief); *AICCO, Inc. v. Ins. Co. of N. Am.,* 90 Cal.App.4th 579, 590, 109 Cal.Rptr.2d 359 (2001) (authorizing declaratory relief). Damages and disgorgement are unavailable under the UCL. *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1152, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). As discussed above, Plaintiffs withdrew their prayers for injunctive and declaratory relief. Thus, the only relief Plaintiffs seek under the UCL is restitution. However, because, as explained below, Plaintiffs are not entitled to restitution, Plaintiffs' UCL claim is DISMISSED.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

Plaintiffs' alleged injury is in the form of elimination of competition and suppression of compensation and mobility. CAC ¶ 110. In their claim under the UCL, Plaintiffs pray that Defendants be required to "disgorge their illegal gains for the purpose of making full restitution to all injured class members." *Id.* ¶ 150.

[23][24] Under the UCL, " 'the concept of restoration or restitution ... is not limited only to the return of money or property that was once in the possession of that person. Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest.' " *Lozano v. AT & T Wireless Servs. Inc.,* 504 F.3d 718, 733–34 (9th Cir.2007) (quoting *Juarez v. Arcadia Fin., Ltd.,* 152 Cal.App.4th 889, 61 Cal.Rptr.3d 382 (2007)). For example, a plaintiff has a vested interest in unpaid wages and therefore may state a restitution claim under the UCL to recover such lost money or property. *See Cortez v. Purolator Air Filtration Prods. Co.,* 23 Cal.4th 163, 177–78, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000). The California Supreme Court has made clear, however, that a mere "expectation interest" is not a "vested interest" for purposes of stating a claim for restitution under the UCL. *See Pineda v. Bank of Am.,* 50 Cal.4th 1389, 1401–02, 117 Cal.Rptr.3d 377, 241 P.3d 870 (2010).

[25] The Court finds that the speculative higher compensation Plaintiffs may have gotten in the absence of the alleged conspiracy, unlike unpaid wages, is not a vested interest. In *Cortez,* the California Supreme Court held that "earned wages that are due and payable pursuant to section 200 *et seq.* of the Labor Code are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice." 23 Cal.4th at 178, 96 Cal.Rptr.2d 518, 999 P.2d 706. "[R]estitutionary awards encompass quantifiable sums one person owes to another." *Id.* The Court agrees with Defendants that the salaries Plaintiffs may have been able to negotiate in the ab

sence of the alleged conspiracy is an "attenuated expectancy"—akin to "lost business opportunity" or lost revenue—which cannot serve as the basis for restitution. *Korea Supply,* 29 Cal.4th at 1150–51, 131 Cal.Rptr.2d 29, 63 P.3d 937. Plaintiffs are notably silent in response to Defendants' arguments that Plaintiffs are not entitled to restitutionary relief. Plaintiffs request for disgorgement is also foreclosed, because this remedy is available "only to the extent that it constitutes restitution." *Id.* at 1145, 131 Cal.Rptr.2d 29, 63 P.3d 937. Any profits Defendants made through the alleged conspiracy at the expense of Plaintiffs' wages are likewise attenuated expectancies. Accordingly, Plaintiffs are entitled neither to restitution nor to disgorgement.

**\*18** [26] Thus, because "the only relief the UCL provides is unavailable here, [Plaintiffs'] UCL claim fails." *Doe v. Starbucks, Inc.,* No. SACV 08–0582 AG (CWx), 2009 WL 5183773, at \*15 (C.D.Cal. Dec. 18, 2009). Accordingly, Defendants' joint motion to dismiss Plaintiffs' UCL claim is GRANTED.[FN13]

**B. Lucasfilm's Motion to Dismiss**

In addition to joining the other Defendants' joint motion to dismiss, Lucasfilm brings its own motion to dismiss premised on the federal enclave doctrine.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Lucasfilm seeks to dismiss Plaintiffs' Cartwright Act claim. Lucasfilm argues that Plaintiffs' Cartwright Act claim fails as a matter of law because, under the federal enclave doctrine, the Act does not apply to conduct on the Presidio, where Lucasfilm has been located since July 2005. Lucasfilm Mot. 3. All other Defendants join Lucasfilm's motion on the ground that some of the events of the alleged overarching conspiracy occurred on the Presidio. Joint Mot. 1 n. 1. The Court disagrees with Defendants.

[27] The parties appear to agree that since July 2005, Lucasfilm has been located on the Presidio of

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
(Cite as: 2012 WL 1353057 (N.D.Cal.))

Page 23

San Francisco—a federal enclave that was ceded to the United States government by the state of California in 1897. Lucasfilm Mot. 1. The parties also agree that any state law enacted after a property becomes a federal enclave cannot be enforced on the enclave unless Congress specifically authorizes its enforcement on the federal enclave. Plaintiffs' only remaining state law claim is under the Cartwright Act. The parties apparently agree that, because the Cartwright Act was enacted after 1897, and Congress has not authorized its enforcement on the Presidio, the Cartwright Act does not apply to the Presidio. The parties disagree, however, on the nexus required between the Cartwright Act claim and the Presidio for the federal enclave doctrine to bar Plaintiffs' Cartwright Act claim here.

Defendants argue that the federal enclave doctrine applies as long as some of the alleged events occurred on the federal enclave. Plaintiffs, on the other hand, argue that the federal enclave doctrine only applies when the locus in which the claim arose is the federal enclave itself. The Court agrees with Plaintiffs. The Ninth Circuit has held that in federal enclave cases, "the jurisdiction of the federal court depends upon ... the locus in which the claim arose." *Alvares v. Erickson,* 514 F.2d 156, 160 (9th Cir.1975).[FN14] That Lucasfilm is now located on the Presidio, therefore, does not automatically bar *all* state law claims brought against it. Rather, the federal enclave doctrine bars only those claims which arose "on a federal enclave." *Totah v. Bies,* No. 10–CV–05956–CW, 2011 WL 1324471, at *2 (N.D.Cal. Apr. 6, 2011). Thus, the Court looks to whether the locus in which Plaintiffs' Cartwright Act claim arose is the Presidio.

[28][29] To state a claim under the Cartwright Act, Plaintiffs must allege, "(1) the formation and operation of the conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts." *Kolling v. Dow Jones & Co.,* 137 Cal.App.3d 709, 718, 187 Cal.Rptr. 797 (1982). Plaintiffs allege that Lucasfilm and Pixar formed a conspiracy by entering into a bilateral agreement

"no later than January 2005." CAC ¶ 128. Though Plaintiffs allege that this conspiracy would later expand to include numerous other players, Plaintiffs have successfully alleged that the conspiracy had already formed and was operating by January 2005, six months before Lucasfilm moved to the Presidio. Plaintiffs also allege that the negotiation, execution, and enforcement of this bilateral agreement—the first of the six such agreements in the overarching conspiracy—took place in Emeryville, CA. *Id.* ¶¶ 62, 65–70. Thus, the locus of the first two Cartwright Act elements was not the Presidio.

**\*19** The Court recognizes that the federal enclave doctrine may extinguish the Cartwright Act claims of a putative subclass of Plaintiffs, and may not extinguish the Cartwright Act claims of another putative subclass of Plaintiffs. For example, the named Plaintiff who suffered the earliest injury, Mr. Marshall, began work at Adobe in July 2006, over a year after Adobe had entered into its bilateral "Do Not Cold Call" agreement with Apple. *Id.* ¶¶ 73. Although Mr. Marshall's injury did not arise until a year after Lucasfilm had moved to a federal enclave, Adobe is not located on the Presidio, and nothing in the CAC suggests that Mr. Marshall was injured on the Presidio. Thus, regardless of the fact that Lucasfilm had already moved to the Presidio by the time of Mr. Marshall's alleged injury in 2006, all three elements of Mr. Marshall's Cartwright Act claim arose outside the Presidio. Accordingly, the locus in which Mr. Marshall's Cartwright Act claim arose was not the Presidio, and the federal enclave doctrine does not extinguish Mr. Marshall's Cartwright Act claim.

Defendants' federal enclave defense is more appropriately addressed when the Court considers class certification, and is not ground to dismiss Plaintiffs' CAC. Accordingly, Lucasfilm's motion to dismiss is DENIED.

**IV. CONCLUSION**

For the reasons set forth above, the Court rules as follows on Defendants' joint motion to dismiss and Lucasfilm's motion to dismiss:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866

**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

1. Defendants' joint motion to dismiss is DENIED as to Plaintiffs' Section 1 Sherman Act claim.

2. Defendants' joint motion to dismiss is DENIED as to Plaintiffs' Cartwright Act claim.

3. Defendants' joint motion to dismiss is DENIED, as moot, as to Plaintiffs' Cal. Bus. & Prof.Code § 16600 claim.

4. Defendants' joint motion to dismiss is GRANTED as to Plaintiffs' UCL claim.

5. Defendants' joint motion to dismiss is DENIED, as moot, as to Plaintiffs' prayer for injunctive and declaratory relief.

6. Lucasfilm's motion to dismiss is DENIED.

**IT IS SO ORDERED.**

> FN1. The D.C. District Court Order suggests that the DOJ's complaint against Lucasfilm was filed on December 21, 2010, whereas the CAC states that it was filed on December 14, 2010. The difference is immaterial here, but the Court takes the date as pled in the CAC to be true for purposes of these motions.

> FN2. Plaintiffs ask this Court to apply the doctrine of judicial estoppel to prevent Defendants from taking a position on this motion that is inconsistent with the position they took before the D.C. District Court that the same allegations "stated a claim upon which relief may be granted." Opp'n to Joint Mot. 6 n. 2 (citing *New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). The Court declines to apply the judicial estoppel doctrine here. Defendants' apparent concession that the DOJ stated a claim under Section 1 of the Sherman Act is not clearly inconsistent with Defendants' position here that Plaintiffs fail to state a claim under Section 4 of the Clayton Act. Section 1 of the

Sherman Act governs a claim to relief by the government. Section 4 of the Clayton Act governs a claim to relief by an individual and has the additional requirement of antitrust injury, which is inapplicable to the government's Section 1 claim.

> FN3. As with the discrepancy in the date of the filing of the DOJ's complaint against Lucasfilm, as described in footnote 1, the D.C. District Court Order suggests that the final judgment against Lucasfilm was filed on June 3, 2011, whereas the CAC states that it was filed on June 2, 2011. The difference is immaterial here, but the Court takes the date as pled in the CAC to be true for purposes of this motion.

> FN4. Plaintiffs included additional factual allegations supporting a conspiracy, allegedly uncovered in discovery, in their section of the Joint Case Management Statement. ECF No. 109. Although the Court does not opine on the eventual admissibility of this evidence, the Court presently gives no weight to these additional factual allegations as they are not properly before the Court on these motions.

> FN5. As discussed below, Pixar and Lucasfilm entered into other agreements in addition to entering into a "Do Not Cold Call" agreement.

> FN6. After the hearing, Plaintiffs withdrew their claim under Cal. Bus. & Prof.Code § 16600. ECF No. 111. Accordingly, Defendants' joint motion to dismiss as to this claim is DENIED AS MOOT.

> FN7. The CAC originally contained a prayer for injunctive relief, *see* CAC ¶¶ 126, 135, 143, and declaratory relief, *see id.* ¶¶ 143, 152, 154, 155, 157, 158. However, Plaintiffs have since withdrawn

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

their prayer for injunctive relief, *see* ECF No. 89, and declaratory relief, *see* ECF No. 111.

FN8. While the name of each Superior Court case listed only Adobe Systems Inc. as the defendant, the Superior Court complaints also named as defendants Apple, Google, Intel, Intuit, Lucasfilm, Pixar, and Does 1–200.

FN9. Defendants' briefing does not contest that the individual bilateral agreements are horizontal agreements between competitors in restraint of trade, which are either *per se* unlawful, *Am. Ad Mgmt.,* 92 F.3d at 786, or at least, as alleged here, prima facie anticompetitive under the rule of reason analysis. *See Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1198 (9th Cir.2012). As an initial matter, the parties agree that the Court need not decide, at this stage, whether the rule of reason or *per se* analysis applies to this case. Reply 9; Tr. 29:15–17. Thus, whether Defendants had a procompetitive justification for their bilateral agreements, a consideration that is relevant only under a rule of reason analysis, is properly decided in later stages of litigation. *See Arizona v. Maricopa Cnty. Med. Soc'y,* 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

FN10. The third factor, whether the alleged restraint affected interstate commerce, is not in dispute.

FN11. Defendants focus their arguments on antitrust injury, but appear cursorily to attack Plaintiffs' Article III standing. Joint Mot. 9. Plaintiffs meet the requirements for Article III standing: (1) injury in fact; (2) causal connection; (3) redressability. *Takhar v. Kessler,* 76 F.3d 995, 999–1000 (9th Cir.1996) (internal quotations omitted). Plaintiffs allege that their salaries

were artificially reduced as a result of Defendants' alleged anticompetitive conduct and that their injury can be redressed through the payment of damages should Plaintiffs establish liability. As Plaintiffs were directly affected by the alleged agreement to eliminate competition, they have antitrust standing as well. *AGC v. Cal. State Council of Carpenters,* 459 U.S. 519, 545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

FN12. Defendants repeat their argument that Plaintiffs have failed to allege a relevant market and control of that market, *see* Section III.A.1.b.iii, *supra,* to argue that Plaintiffs have also failed to allege antitrust injury. *See* Joint Mot. 18–19. As discussed above, the Court declines to require a market analysis at the motion to dismiss stage.

FN13. The Court notes that even if Plaintiffs' UCL claim were to survive a motion to dismiss, the UCL claim would likely face an insurmountable hurdle at the class certification stage given that the Ninth Circuit has foreclosed the certification of nationwide classes under the UCL. *See Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 585 (9th Cir.2012).

FN14. To the extent *Corley v. Long–Lewis, Inc.,* 688 F.Supp.2d 1315, 1336 (N.D.Ala.2010), conflicts by suggesting that the federal enclave doctrine applies as long as "some of the events alleged ... occurred on a federal enclave," the Court instead follows the Ninth Circuit, which has held to the contrary. While it is true, as Lucasfilm notes, Lucasfilm Reply 2, that Judge Wilken applied the federal enclave doctrine to bar plaintiff's defamation claim in *Totah* even though the defamatory statement was uttered and republished outside of the Presidio, *Totah* is not an example of a sister court adopting *Corley's* "some of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.), 2012-1 Trade Cases P 77,866
**(Cite as: 2012 WL 1353057 (N.D.Cal.))**

the events" standard. Judge Wilken stated
that "the substance and consummation of
the tort [of libel] occurs when and where
the third person receives, reads, and com-
prehends the libelous matter," and held
that federal enclave jurisdiction applied be-
cause the allegedly libelous statements at
issue in that case had been received on a
federal enclave. *Totah,* 2011 WL 1324471,
at *2.

N.D.Cal.,2012.
In re High-Tech Employee Antitrust Litigation
--- F.Supp.2d ----, 2012 WL 1353057 (N.D.Cal.),
2012-1 Trade Cases P 77,866

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.