# Exhibit 24

Not Reported in F.Supp., 1980 WL 1819 (E.D.La.), 1980-1 Trade Cases P 63,277
**(Cite as: 1980 WL 1819 (E.D.La.))**

United States District Court; E.D. Louisiana.
**Ingram Corp., et al.**
v.
**J. Ray McDermott & Co., Inc., et al.**

Civil Action No. 79-2575
Filed January 10, 1980

SEAR, D. J.

### [Opinion]

*1 Ingram Corporation and Ingram Contractors, Inc. (Ingram) have brought this private antitrust suit against J. Ray McDermott & Co., Inc. and its wholly owned subsidiary Oceanic Contractors, Inc.; Halliburton Co. and its wholly owned subsidiary Brown & Root, Inc.; and various individuals who at the times relevant to the complaint were officials of the corporate defendants. The individual defendants include Charles Graves, who was president and chairman of the board of McDermott; James Cunningham, who was executive vice-president and chief administrator of McDermott; Robert Richie, who was president of Oceanic and a director of McDermott; and Hugh Gordon, who was executive vice-president of Brown & Root. For the sake of convenience, McDermott, Oceanic, Graves, Richie and Cunningham will be referred to collectively as "McDermott", and Halliburton, Brown & Root and Gordon will be referred to collectively as "Brown & Root".

### [*Predatory Pricing*]

The complaint centers on activity which occurred between 1964 and 1971. McDermott and Brown & Root were engaged in the marine construction and contracting business on a worldwide basis. Ingram decided to enter this business in 1964 and claims that by 1970 it had become the third-largest marine construction contractor in the world. It alleges that beginning in 1969 the defendants engaged in a bid rigging conspiracy designed to drive it out of business. In areas of the world where Ingram was unable to compete with them, Ingram charges that the defendants submitted artificially inflated bids, but in those areas where Ingram was able to compete, they submitted artificially low bids. Plaintiffs claim that as a consequence, they were not able to secure any marine construction work except at ruinously low rates and so began to suffer serious losses which threatened their total financial ruin by late 1971. As a result of these financial problems, Ingram sold all of its marine construction assets to Oceanic on November 19, 1971, allegedly on very unfavorable terms, and has not been involved in the offshore construction business since.

In the complaint Ingram charges specifically that the defendants (1) conspired to restrain trade in the maritime construction and contracting industry by rigging bids, in violation of § 1 of the Sherman Act, 15 U. S. C. § 1,[FN1] (2) conspired to monopolize that industry by rigging bids, in violation of § 2 of the Sherman Act, 15 U. S. C. § 2,[FN2] (3) engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U. S. C. § 1961 *et seq.*,[FN3] by defrauding purchasers of marine construction services in violation of 18 U. S. C. § 1341 (mail fraud) and 18 U. S. C. § 1343 (wire fraud) and using the proceeds of that fraud in their businesses, and (4) committed various unlawful acts which render Ingram's sale of assets to Oceanic invalid due to error, fraud, and duress. La. C. C. Arts. 1824 *et seq.*, 1847 *et seq.*, and 1950 *et seq.* Ingram prays for three times its asserted damages of $612,000,000, restoration of the assets sold to Oceanic, and restoration to a competitive position within the offshore marine construction and contracting industry.

FN1 Section 1 of the Sherman Act provides in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in re-

Not Reported in F.Supp., 1980 WL 1819 (E.D.La.), 1980-1 Trade Cases P 63,277
**(Cite as: 1980 WL 1819 (E.D.La.))**

straint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

FN2 Section 2 of the Sherman Act declares that it shall be illegal to:

"monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations. . ."

FN3 18 U. S. C. § 1962(a) provides in relevant part:

"It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

"Racketeering activity" includes any act which is indictable under 18 U. S. C. § 1341 (mail fraud) or 18 U. S. C. § 1343 (wire fraud). 18 U. S. C. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity, the last of which has occurred within ten years after the commission of a prior act. 18 U. S. C. § 1961(5).

[*Statute of Limitations; Release*]

**\*2** Both McDermott and Brown & Root move to dismiss the complaint on the ground that the statutes of limitations for the causes of action asserted in the complaint have already run. In addition, McDermott asserts that a release it executed with Ingram in 1973 absolves it from any liability for the offenses alleged in the complaint.

I. *Statutes of Limitations*

All of plaintiff's claims accrued by November 18, 1971, the date on which Ingram sold its marine construction assets to Oceanic and left the business. Defendants contend that each of the four counts of the complaint must be dismissed as time barred. The first two counts are governed by § 4B of the Clayton Act, 15 U. S. C. § 15b, which bars private antitrust claims unless commenced within four years from accrual of the cause of action. The RICO statute fails to provide a limitations period for civil actions, and therefore the analogous one-year period of C. C. Art. 3536 applies. The state law claims for rescission expire in five years. C. C. Art. 3542. However, these statutes may be tolled if the defendant has "fraudulently concealed" the cause of action from the plaintiff. *Prather v. Neva Paperbacks, Inc.*, 446 F. 2d 338 (5th Cir. 1971), *Akron Pressform Mold Co. v. McNeil Corp.* [1974-1 TRADE CASES P 75,010], 496 F. 2d 230 (6th Cir. 1974). In their complaint plaintiffs assert that the defendants fraudulently concealed the existence of the unlawful conspiracy and that despite the exercise of due diligence, they failed to discover its existence until December 14, 1978, when the defendants were indicted on criminal antitrust charges in this district. Defendants counter that plaintiffs' allegations of fraudulent concealment and due diligence are inadequate as a matter of law and that the complaint still must be dismissed.

To support a claim of fraudulent concealment there must be:

(1) wrongful concealment of their actions by the defendants,

(2) failure of the plaintiffs to discover the operative facts which form the basis of the cause of action within the limitations period, and

(3) due diligence of plaintiffs prior to discovery of those facts.

*Dayco Corp. v. Goodyear Tire & Rubber Co.* [1975-2 TRADE CASES P 60,483], 523 F. 2d 389 (6th Cir. 1974). A plaintiff must specifically allege

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and establish the applicability of the fraudulent concealment tolling exception, *Akron Pressform Mold, supra*, 496 F. 2d at 233, and since fraud is involved, the pleading requirements of F. R. C. P. 9(b) apply. *Dayco Corp., supra.* That rule provides,

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity . . .

Defendants argue that the complaint fails to adequately allege wrongful concealment and due diligence.

A. *Wrongful Concealment*.

Paragraph 44 of the complaint contains all of the allegations concerning wrongful concealment of the conspiracy. It states,

At the time of negotiations leading to the sale agreement, as well as prior and subsequent thereto, the defendants, acting in accordance with and in furtherance of the conspiracy alleged herein, fraudulently concealed from plaintiffs the existence of the causes of action stated in this Complaint, through acts and omissions including but not limited to the following:

**\*3** (a) Conducting clandestine meetings in hotel rooms and other places, arranged outside the usual business channels, to discuss rigging of bids and suppression of competition;

(b) Submitting prearranged losing bids by the company that had agreed not to receive the award, in order to give the illusion of competition among the corporate defendants;

(c) Maintaining agreed-upon ratios of major equipment spreads, and positioning equipment in particular localities throughout the world, so as to give the false impression that excessive bids on particular projects were the result of equipment availability rather than of the unlawful conspiracy;

(d) Falsifying, destroying and concealing from accountants, auditors, independent directors and attorneys, records of the corporate defendants that would have revealed the existence of the unlawful conspiracies;

(e) Making payments of cash and other things of value to employees of customers, and to employees and former employees of the defendants, in order to prevent such employees from revealing to others their knowledge of the unlawful activities of the defendants in this Complaint;

(f) Causing to be filed with the Securities and Exchange Commission and to be distributed to shareholders and the public generally, statements regarding the operations and financial condition of defendants McDermott and Halliburton, and regarding the fitness of the directors thereof, including defendants Graves, Richie, Cunningham, and Gordon, to be elected to the Board of Directors, which statements failed to disclose, despite a duty to do so, the existence of the criminal conspiracies alleged in this Complaint, the participation of the individual defendants and others therein, and the liability of McDermott-Oceanic and Brown & Root for treble damages suffered by competitors and customers injured by the conspiracies.

Defendants argue that none of the allegations of concealment are legally sufficient.

In order to sustain a claim of wrongful concealment, plaintiffs must show more than ignorance of the cause of action. There must be some affirmative deceptive act of the defendants which prevents discovery of the wrongful conduct. *Rutledge v. Boston Woven Hose & Rubber Co.* [1978-1 TRADE CASES P 62,117], 576 F. 2d 248, 249-50 (9th Cir. 1978). Concealment by silence is not sufficient; rather "there must be some trick or contrivance intended to exclude suspicion and prevent inquiry." *Wood v. Carpenter*, 101 U. S. 135, 143 (1879). Moreover, the simple allegation of the existence of a secret conspiracy is not enough to toll the statute of limitations. *Burnham Chemical Co. v. Borax Consolidated, Ltd.* [1948-1949 TRADE CASES P 62,322], 170 F. 2d 569 (9th Cir. 1948).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[*Independent Acts*]

Paragraphs 44(a), (b) and (c) describe concealment activities which allegedly occurred as part of the bid rigging operation itself. Defendants argue that these allegations simply describe the substantive antitrust offense and that if they are sufficient to toll the statute of limitations, then the statute of limitations is effectively repealed. They contend that wrongful concealment must involve "independent" acts, acts occurring outside the scope of the conspiracy itself. While there is some support for this argument,[FN4] I believe it to be an exaggeration of the relevant case law and in conflict with Fifth Circuit jurisprudence.

> FN4 See *Overfield v. Pennroad Corp.,* 146 F. 2d 889 (3d Cir. 1944).

**\*4** Defendants derive their argument from a line of fraudulent concealment cases in which the plaintiffs were unable to demonstrate more than silence or denial on the part of the defendants. All of those cases emphasize the need for an "affirmative" act of concealment.[FN5] However, there is nothing in any of them indicating that the affirmative act must take place outside of the conspiracy alleged to comprise the wrongful conduct. Defendants interpret "affirmative" to mean "independent", and in so doing they place an unwarranted gloss on the cases they cite.

> FN5 *Rutledge, supra, Burnham Chemical Co. v. Borax Consolidated, Ltd.* [1948-1949 TRADE CASES P 62,322], 170 F. 2d 569, 577-78 (9 Cir. 1948), *Gaetzi v. Carling Bearing Co.* [1962 TRADE CASES P 70,339], 205 F. Supp. 615, 620 (E. D. Mich. 1962); *Hall v. E. I. DuPont deNemours & Co.* [1970 TRADE CASES P 73,300], 312 F. Supp. 358, 362 (E. D. N. Y. 1970).

In any event, this argument is foreclosed by *Crummer Co. v. DuPont* [1955 TRADE CASES P 68,042], 223 F. 2d 238 (5th Cir. 1955). In that case plaintiffs alleged that the defendants had conspired to drive them out of business by instigating unwarranted investigations of them by various government bodies and by causing two unfounded indictments to be returned against them. The Fifth Circuit found that these allegations sufficiently alleged wrongful concealment even though the affirmative conduct conprising the concealment was also an integral part of the alleged conspiracy in restraint of trade. *Id.* at 248-49.

. . . [W]e think it quite clear that plaintiffs' amended complaint does well state their claim, that by secretly moving under the guise and protection of the public interest and through the public authorities, the defendants fraudulently intended to and did conceal the scheme and their participation in it . . .

I therefore reject defendants' argument that wrongful concealment must include acts independent of the alleged conspiracy and proceed to examine the sufficiency of the allegations in subparagraphs (a), (b) and (c).

Subparagraph (a) speaks of "clandestine meetings in hotel rooms" at which the rigging of bids was discussed. This allegation amounts to very little, for there is no obligation on the part of antitrust conspirators to advertise their conduct. One cannot expect bid riggers to hold a public meeting for that purpose. However, subparagraphs (b) and (c) are quite different. In each plaintiffs allege that the defendants performed certain acts in furtherance of the conspiracy which created the false impression that project bids were competitively made rather than rigged. This is something more than silence; if true, it constitutes an attempt to deceive both the competition and the public into the belief that all of their bids were made legitimately and as the result of competitive considerations. It is precisely the sort of affirmative act of deception required by the jurisprudence. See *Crummer, supra.* In short, the complaint does adequately allege wrongful concealment by the defendants.

**\*5** Although not strictly necessary for decision

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1980 WL 1819 (E.D.La.), 1980-1 Trade Cases P 63,277
**(Cite as: 1980 WL 1819 (E.D.La.))**

of the motion, it is helpful to consider subparagraphs (d) and (e) also.[FN6] Defendants contend that since both subparagraphs concern the dissemination of information about the alleged conspiracy to persons not in "privity" with Ingram, such as accountants, attorneys, and employees of the defendants or their customers, plaintiffs could not have been misled by any of the acts of concealment alleged therein. That is a *non sequitur*. If, as Ingram alleges, all of these persons were deprived of information about the conspiracy or were bribed to remain silent, a large potential source of information about possible antitrust violations thereby unavailable to plaintiffs. If plaintiffs can show that the falsification of records and bribery helped keep information about the conspiracy from reaching them, then they will have satisfied their burden of proving wrongful concealment.

> [FN6] I pretermit any consideration of the adequacy of P 44(f).

Defendants also assert that the allegations of subparagraphs (d) and (e) are conclusory and overbroad, thus falling afoul of the pleading requirement of Rule 9(b). There is some conflict in the case law on this point. In *Illinois v. Ralph Vancil, Inc.*, 1976-2 TRADE CASES P 61,025 (S. D. Ill. 1976), plaintiffs alleged as acts of wrongful concealment:

> the submission of complementary bids, the fraudulent affirmation that there was no collusion in bid preparation and submission, the payment of secret bribe monies to the Secretary of State, the concealment of the source and destination of those monies, and an agreement to conceal the acts done in furtherance of the conspiracy.

The court held that rather general allegations were sufficient. Much more strict about the pleading requirement is *Clinton Hudson & Sons v. Lehigh Valley Cooperative Farms, Inc.*, 73 F. R. D. 420, 424 (E. D. Pa. 1977), aff'd without opinion 586 F. 2d 834 (3 Cir. 1978), in which the court stated (in a securities law context),

> [T]o bring this action [the plaintiff] must be able to identify what financial statements and reports he relied on, in what respect they were false, misleading or inaccurate, and the relative time frame involved. The complaint is replete with allegations of "illegal conduct," "conspiracy," "misdeeds," and "fraudulent and deceitful manner" of conduct, but these conclusory assertions tracking the language of 10b-5 simply do not pass muster under Rule 9(b).

*Id.*

The allegations made in subparagraphs (d) and (e) are more specific than those made in *Hudson*, although it is true that they fail to allege particular acts of falsification or bribery. In approaching this problem, it is important to remember that Rule 9(b) must still be construed in light of the basic pleading philosophy of the federal rules:

> This means that even those portions of Rule 9 that require specific or detailed allegations should not be construed strictly; it must be remembered that the federal rules contemplate a de-emphasis of the pleadings and a general simplicity in pleading practice. Thus, although Rule 9(b) calls for fraud to be pleaded with particularity, the allegations still must be as short, plain, simple, direct, and concise as is reasonable under the circumstances.

**\*6** 5 Wright and Miller, *Federal Practice & Procedure*, § 1291. While subparagraphs (d) and (e) may be somewhat light on detail, they do alert the defendants to the sort of conduct plaintiffs claim has occurred. Enough is present so that the nature of the alleged wrongful concealment is exposed. A requirement that more specificity be forthcoming would force the plaintiffs to plead in unwarranted detail, particularly in a complaint of this scope and complexity. *Hudson* is consistent with this holding. when a plaintiff pleads wholly in conclusory allegations of "fraud" or "conspiracy," the complaint cannot withstand even a relaxed application of Rule 9(b). I therefore conclude that subparagraphs (d) and (e) also adequately allege wrongful

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

concealment.

B. *Due diligence.*

Defendants next argue that even if wrongful concealment of the cause of action has been properly pleaded, the due diligence of the plaintiffs has not been. The issue of due diligence is raised in only two paragraphs of the complaint. Paragraph 25 states in relevant part:

Despite the exercise of due diligence, plaintiffs were unaware of and did not discover the existence of causes of action set forth in this Complaint until on or about December 14, 1978.

In paragraph 46 plaintiffs repeat that contention.

Plaintiffs exercised all due diligence in informing themselves of facts that might give rise to claims against the defendants but were prevented by the defendants' fraudulent concealment from learning of the existence of the causes of action stated in this Complaint until the return of the criminal indictment on December 14, 1978, described in Paragraph 24 above.

Defendants contend that these allegations are insufficient to support a claim of due diligence. In addition, they assert that the evidence they have submitted via affidavit demonstrates that plaintiffs in fact failed to exercise due diligence.

I consider the pleading requirements first. Defendants rely on language from an 1849 Supreme Court case, *Stearns v. Page*, 7 How. 819, 829 (1849), wherein the Court stated that it could not determine "whether, by the exercise of ordinary diligence, the discovery [of the cause of action] might not have been before made." In a similar circumstance the Sixth Circuit has held that when pleading due diligence, the plaintiffs must fully plead "the facts and circumstances surrounding their belated discovery." *Dayco Corp., supra*, 523 F. 2d at 394. Plaintiffs have pleaded the facts surrounding their discovery of the cause of action, namely the return of the indictment. It makes no sense to interpret the above cases to require plaintiffs to plead with any more specificity any facts showing that they exercised due diligence. They have already alleged that they knew of nothing to cause them to investigate the conduct of the defendants until the return of the indictment; there is little more they can say. Defendants' interpretation of the pleading rules would render it virtually impossible to plead due diligence.

*7 In the alternative, defendants argue that the evidence already available shows that plaintiffs had good reason to know of the existence of a conspiracy by late 1971 and that any claim of due diligence must therefore fail. The affidavits submitted thus far create a contested issue of fact as to how much the officers of Ingram actually knew or suspected about any bid rigging conspiracy.[FN7] Defendants contend that even if that is so, had Ingram exercised due diligence, it would have known of the existence of any such conspiracy no later than the end of 1971. They note that by 1969 Ingram had been heavily involved in the marine construction business for five years and that plaintiffs were heavily staffed by former Oceanic and Brown & Root executives. In addition, as early as 1967 Ingram had been concerned about possible antitrust violations by McDermott, albeit in another context. In light of these factors defendants submit that if they were submitting abnormally low bids during 1969-71, Ingram should have suspected some form of illegal activity at that time and that its claim of due diligence is thus implausible.

> FN7 Compare affidavit of Frederic B. Ingram, P 7 with affidavit of Robert E. Howson, P 9.

They rely heavily on *Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd.* [1950-1951 TRADE CASES P 62,714], 185 F. 2d 196 (9th Cir. 1950). In *Suckow* plaintiff alleged that defendants had conspired to drive it out of business by monopolizing borate deposits, fixing prices and allocating production and refinery markets. In re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1980 WL 1819 (E.D.La.), 1980-1 Trade Cases P 63,277
**(Cite as: 1980 WL 1819 (E.D.La.))**

sponse to defendants' assertion that the claim was time-barred plaintiff countered with an assertion of fraudulent concealment and due diligence, complete with supporting affidavits. Nonetheless, the Ninth Circuit held that summary judgment for the defendants was appropriate. It based that holding on uncontradicted evidence showing that plaintiff had accused the defendants in several judicial and legislative proceedings held during the existence of the alleged conspiracy of (1) attempting to control the production of crude borax, (2) initiating lawsuits as "part of a plan to throttle competition and to create an unlawful monopoly in restraint of trade," and (3) "trying to close down [the plaintiff's business] . . . in order to maintain a worldwide monopoly of the borax industry." *Id.* at 202. In view of that evidence, the Ninth Circuit felt justified in ignoring plaintiff's self-serving affidavits disclaiming all knowledge of a formal conspiracy because they failed to create a genuine issue of fact. *Id.* at 206.

[*Business Losses*]

This case is much different. Defendants ask me to infer from the fact that plaintiffs were suffering serious losses in 1970 and 1971 that they should have known, or at least suspected, that such harm was due to an illegal conspiracy. In *Suckow* the Ninth Circuit had to make no such inference, for the evidence presented there showed that plaintiff had believed and stated publicly that its financial difficulties were caused by the illegal activities of the defendants. In this case there is no reason to assume automatically that because Ingram was unable to generate many competitive bids during 1970 and 1971, it should have known that the problem was caused by bid rigging. McDermott and Brown & Root controlled about 80% of the market, and plaintiffs could have reasonably believed that economies of scale and greater engineering expertise were responsible for the differential in bids. Moreover, if, as alleged in the complaint, equipment was positioned to give a false impression that excessive bids were based on equipment availability,[FN8] plaintiffs would have had even less reason to suspect illegal conduct by the defendants. Finally, the fact that Ingram contacted the Justice Department in 1967 because of the possible anticompetitive effects of a proposed McDermott acquisition does not prove that Ingram should have suspected that a wholly different form of antitrust violation lay behind its financial problems in 1971. The evidence at trial may show that plaintiffs failed to exercise due diligence, but at this stage of the proceedings the evidence is subject to too many conflicting interpretations to warrant summary disposition on this issue.

FN8 Complaint, P 44(c).

**\*8** In sum, the allegations of fraudulent concealment and due diligence are sufficient to enable the complaint to withstand dismissal on statute of limitations grounds. Moreover, the evidence in the record is insufficient for me to conclude at this time that as a matter of fact plaintiffs have failed to exercise due diligence. Since Brown & Root's Motion to Dismiss is based solely on these grounds, it is therefore Denied. McDermott has also asserted that plaintiffs' claims against it are barred by a release. I now consider that issue.

II. *The Release Agreement*

In connection with the 1971 sale by Ingram of its offshore construction assets to Oceanic, there were actually three separate contracts:

(1) a Purchase Agreement, by which the assets were sold,

(2) a Subcontract Agreement, whereby Oceanic agreed to complete some of Ingram's offshore construction work in progress in exchange for its costs plus $10,000,000, and

(3) an Option Agreement, which gave Oceanic a right of first refusal if Ingram later elected to sell a damaged barge known as Ingram Derrick Barge 6.

After these agreements were executed, various disputes arose concerning, *inter alia*, warranties of title to some of the foreign assets Ingram had sold

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1980 WL 1819 (E.D.La.), 1980-1 Trade Cases P 63,277
**(Cite as: 1980 WL 1819 (E.D.La.))**

to Oceanic and amounts due to Oceanic under the subcontract agreement. At the same time, plaintiffs were demanding a recalculation of the formula on which the purchase price of the assets had been based. By early 1973 Oceanic was asserting claims for $11,000,000 in unpaid billings, and Ingram was asserting various counterclaims against Oceanic in excess of $1,000,000.

A new round of negotiations ensued among the senior executives and counsel for both sides, and on April 23, 1973 a settlement was reached. Ingram agreed to pay Oceanic $1,233,651 and to convey the Derrick Barge 6 to Oceanic, and the parties also agreed to an exchange of general release. The Settlement Agreement was executed on May 2, 1973, and the releases (two, one for each Ingram company) were executed on July 20, 1973. In each release the Ingram company involved "remised, released and forever discharged" the McDermott defendants:

> from all manner of actions, causes of actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bill, specialities, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, and demands whatsoever in law, in admiralty or in equity, which against them or any of them, [releasor or its] successors or assigns hereafter can, shall or may have, in [its] own right or in a representative capacity, *for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of these presents, including without limitation of the generality hereof, any past, present, or future claims, matters or causes or things that [releasor has] or may hereafter have arising out of, based upon or in any way relating to the Purchase Agreement, the Subcontract Agreement, and the Agreement regarding the INGRAM DERRICK BARGE NO. 6*, all dated November 16, 1971, by and between Ingram Corporation, a Delaware corporation, and Oceanic (and, in the case of the Agreement regarding Ingram Derrick Barge No. 6, Ingram Contractors, Inc.) and the transactions contemplated thereby, Excepting Only [two exceptions not relevant here]. (Emphasis supplied.)

**\*9** McDermott contends that these releases comprehend the antitrust and related claims brought here.[FN9] It argues that the releases are clear on their face and operate to discharge it from any liability to the plaintiffs which may have existed at the time of their execution. McDermott particularly emphasizes the fact that they were bargained for in a commercial context in which both sides were represented by competent counsel. Noting that no express reference to an antitrust violation is required to make a release effective against an antitrust claim, *Suckow Borax Mines Consolidated, supra,* 185 F. 2d at 207, it concludes that the "ecumenical scope" of the releases operates to bar plaintiffs' claims.

> FN9 Brown & Root, not being a party to either release, makes no claim thereunder.

In addressing that contention, it must first be determined whether federal or state law applies in interpreting them. While there is some conflict in the circuits,[FN10] the Fifth Circuit has made clear in *Redel's, Inc. v. General Electric Co.* [1974-2 TRADE CASES P 75,181], 498 F. 2d 95, 98 (5th Cir. 1974), that it believes a uniform federal common law governs the interpretation of any asserted release of antitrust liability. The logic of *Redel* applies as well to any release of the RICO claim, which is a peculiarly federal cause of action. See *Dice v. Akron, Canton & Youngstown Railroad Co.,* 342 U. S. 359, 361-63 (1952). Of course, state law still governs the effect of the release on the state cause of action.

> FN10 Compare *Three Rivers Motors Co. v. Ford Motor Co.* [1975-2 TRADE CASES P 60,394], 522 F. 2d 885 (3 Cir. 1975) (applying state contract law as federal common law) with *Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc.* [1965 TRADE CASES P

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

71,592], 351 F. 2d 925 (9 Cir. 1965) (applying a uniform federal common law).

A. *The federal claims*.

Plaintiffs appear to concede that the broad scope of the language contained in the releases would ordinarily bar the antitrust and RICO claims asserted against McDermott. However, they contend that some ambiguities as to the intended scope of the releases as well as certain flaws in the negotiating and bargaining process leading to their execution render them unenforceable insofar as those claims are concerned. Three of plaintiffs' arguments are meritless; the fourth has some merit, although plaintiffs have failed to submit sufficient evidence to support their position.

[*Intent*]

They first argue that despite the all-inclusive language of the releases, they never intended to release any antitrust claims. Perhaps that is correct, but *Redel, supra*, indicates that it makes no difference. In *Redel* a general release similar to that involved here was before the court. Plaintiff therein released defendant from:

all claims . . . and liabilities, if any there be, as of the date of execution of this agreement . . .

The Fifth Circuit found no ambiguity in this language and held that there was therefore no basis for allowing the plaintiff to introduce parol evidence concerning the scope of the release. 498 F. 2d at 100. The same is true here. The release which the parties signed is nearly as broad as the human mind can devise. If the release in *Redel* was adjudged sufficiently clear to bar the introduction of parol evidence, the result must be the same here.

[*Duress*]

**\*10** Next plaintiffs claim that they entered into the agreement under duress. They argue that economic circumstances caused by defendants' misconduct forced them into the 1971 sale of assets. Ingram reasons that from 1971 until 1973 it "was literally at the mercy of McDermott" as a result of the earlier bid rigging conspiracy and that the 1973 sale was therefore made under duress. Even if one assumes that the sale in 1971 was the result of an unlawful conspiracy and thus perhaps made under duress, it is difficult to understand how a 1973 release intended to settle various monetary claims arising out of the implementation of the 1971 agreements is therefore void by reason of duress. In 1973 Oceanic claimed that money was due it under the 1971 agreement; Ingram denied that it owed anything thereunder. Instead of forcing the matter to court, as it had the right to do, Ingram decided to settle all the disputes out of court, and as part of the settlement, the parties entered into the releases in dispute here. A party's capacity to be sued is not, without more, duress. See 13 Williston,*Law of Contracts*, § 1618 at 720. Ingram has wholly failed to provide any basis to support its assertion that the 1973 agreements, as opposed to the 1971 agreements, were executed because of unlawful coercion or duress.

As a third position Ingram contends that the release is "part and parcel" of the antitrust conspiracy alleged in the complaint. It relies upon *Redel, supra*, wherein the court indicated that when a release is one of the objects of the antitrust conspiracy or an integral part of the scheme, it is of no effect. However, in this case the complaint fails to mention the 1973 events leading to the execution of the release; Brown & Root, the other alleged co-conspirator had no part in the 1973 events; and the objective of the alleged conspiracy, forcing Ingram from the offshore contracting industry, was achieved in 1971. There is nothing plaintiffs have alleged which indicates that the release in any way furthered the goals of the conspiracy. See *Taxin v. Food Fair Stores, Inc.* [1961 TRADE CASES P 69,934], 287 F. 2d 448, 451 (3d Cir. 1961).

[*Concealment*]
Finally, Ingram asserts that McDermott failed to notify it in 1973 of the possibility of any antitrust claims or of any facts which could have alerted it to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the possibility of such claims. It argues that this act of concealment voids the 1973 release. If the factual premise of concealment is supported by the evidence, dicta in *Redel* gives solid judicial support for plaintiffs' argument.

[I]t should not be concluded that this Court condones the use of the general release as a device to immunize parties with superior economic power from the penalties and restraints imposed by the enforcement of our antitrust laws. There are two policies which must be accommodated. The first requires the greatest respect for private enforcement as the hallmark of the federal antitrust regulatory system. The second policy requires us to respect the amicable settlement and release of antitrust claims by the parties themselves. Where these policies are brought into conflict, the first must prevail. The Court is wary of the problem noted by Judge Winter in his dissent to the majority opinion in *Virginia Impression Products Co., Inc. v. SCM Corporation* [1971 TRADE CASES P 73,684], 448 F. 2d 262 (4th Cir. 1971), cert. denied, 405 U. S. 936, 92 S. Ct. 945, 30 L. Ed. 2d 811 (1972), *whereby the draftsman fails to disclose to the releasing party the factual predicate for an antitrust claim or indeed, the fact that antitrust claims are even embraced by the release, and thus attempts forever to bar the unsuspecting victim of antitrust violations from his statutorily granted recourse to the federal courts*. Although absent here, similar controversies may well set forth facts which require jury consideration of claims that the release itself was an integral part of a scheme to violate the antitrust laws. While not an absolute requirement, antitrust policy certainly encourages the parties to evidence their intention to release antitrust claims. (Emphasis supplied.)

**\*11** 498 F. 2d at 100-01. See also *Suckow Borax, supra*, 185 F. 2d at 206, *Three Rivers Motors Co. v. Ford Motor Co.* [1975-2 TRADE CASES P 60,39 4], 522 F. 2d 885, 894, n. 24 (3d Cir. 1975). While the *Redel* court uses some "part and parcel" language, it is not central to the principle espoused therein that deliberate withholding of facts material to an antitrust claim can void a purported release.

Unfortunately, plaintiffs have wholly failed to supply the court with any evidence to support their factual predicate of concealment. They must show (1) misrepresentation, (2) scienter, (3) reasonable reliance, and (4) injury. See Williston, *supra*, § 1487A at 330. Insofar as the McDermott motion is based upon the release, it is a motion for summary judgment, for McDermott has submitted the release agreement and some affidavits in support thereof. If plaintiffs are to defeat the motion as to their federal causes of action, they must submit evidence which places some material fact in dispute. This portion of the McDermott motion will therefore be Continued for a period of thirty days to allow plaintiffs to submit evidence in support of this concealment claim or to explain, pursuant to F. R. C. P. 56(f), why evidence in support of this claim is presently unavailable.

B. *State Law Claims*.

Plaintiffs have asserted in their complaint that the 1971 sale of assets is void under state law due to error, fraud and duress resulting from the price fixing conspiracy. McDermott contends that this cause of action is also barred by the 1973 releases. Plaintiffs have countered with evidence showing that the parties intended by their release to cover only those claims arising out of the implementation of the 1971 sale and subcontract agreements and that they had no intention of releasing any claims going to the validity of those agreements.[FN11] Louisiana is more liberal than the Fifth Circuit in admitting such parol evidence as an aid in interpreting general releases. According to *American Metal Window Co. v. St. Tammany Parish School Board*, 183 So. 2d 667, 669 (La. App. 1 Cir. 1966),

FN11 See affidavit of Thomas Lind.

Evidence is always admissible to show the circumstances under which the release was executed and the true intention of the parties.

Since the plaintiffs' affidavits create a material

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

issue of fact as to the intention of the contracting parties, McDermott's motion should be denied as regards the state cause of action. Moreover, plaintiffs' claim that McDermott withheld information during the 1973 negotiations, which would warrant denial of the motion as to the federal causes of action provided sufficient supporting evidence is submitted, would also warrant denial of the motion as to the state cause of action. See *American Guaranty Co. v. Sunset Realty and Planting Co.*, 208 La. 772, 23 So. 2d 409, 449 (1944). Accordingly,

It Is Ordered the Motion to Dismiss brought by Brown & Root is Denied, and the Motion for Summary Judgment of Dismissal brought by McDermott is Denied insofar as that motion is based upon (1) the insufficiency of plaintiffs' allegations of fraudulent concealment and due diligence and (2) the effect of the 1973 release on the state cause of action.

**\*12** It Is Further Ordered that the Motion for Summary Judgment of Dismissal brought by McDermott is Continued for thirty days insofar as it is based upon the effect of the 1973 release on the federal causes of action to allow plaintiffs to submit evidence in support of their claim that the release is void because McDermott deliberately withheld material information during the 1973 negotiations or to explain, pursuant to F. R. C. P. 56(f), why evidence in support of this contention is presently unavailable.

E.D.La. 1980.
Ingram Corp. v. J. Ray McDermott & Co.
Not Reported in F.Supp., 1980 WL 1819 (E.D.La.), 1980-1 Trade Cases P 63,277

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.