# Exhibit 27

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

H

United States Bankruptcy Court,
S.D. New York.
In re LEAR CORPORATION, et al., Reorganized Debtors.

No. 09–14326 (ALG).
Feb. 10, 2012.

James H.M. Sprayregen, Esq., Marc Kieselstein, Esq., Kirkland & Ellis LLP, New York, NY, Ryan Blaine Bennett, Esq., Michael B. Slade, Esq., Andrew S. Marovitz, Esq., Mayer Brown LLP, Chicago, IL, for Reorganized Debtors.

Eugene A. Spector, Esq., Jeffrey J. Corrigan, Esq., Jeffrey L. Spector, Esq., Spector, Roseman, Kodroff & Willis, P.C., Philadelphia, PA, for Technical Aids to Independence, Inc. and the Proposed Direct Purchaser Class [FN1].

> FN1. Joining Spector, Roseman, Kodroff & Willis, P.C., on its brief are Freed, Kanner, London & Millen, LLC; Lockridge, Grindal, Nauen PLLP; and Sommers, Scwartz PC, all counsel to Technical Aids to Independence, Inc. and the Proposed Direct Purchaser Class (as defined below).

Gregory P. Hansel, Esq., Preti Flaherty Beliveau & Pachios LLP, Portland, ME, for Direct Purchasers Martinez Manufacturing, Inc. and ACAP LLC.

Bernard Persky, Esq., Hollis L. Salzman, Esq., Kellie Lerner, Esq ., Seth Gassman, Esq., Amy Garzon, Esq., Labaton Sucharow LLP, New York, NY, for Susan LaCava and the Proposed Indirect Purchaser Class [FN2].

> FN2. Joining Labaton Sucharow LLP on its brief are (i) Todd F. Flood, local counsel to Susan LaCava and the Proposed Indirect Purchaser Class (as defined below); (ii) Glancy, Binkow & Goldberg LLP, counsel to George Nicoud; (iii) Zelle, Hofman, Voelbel & Mason LLP, counsel to Craig Kelly and Tye Smith; (iv) Anthony L. Deluca, PLC; Zelle, Hofmann, Voelbel & Mason LLP; Gregory J. Semanko, P.A.; and Foland, Wickens, Eisfelder, Roper & Hofer, PC, all counsel to Jennifer Chase, Curtis Gunnerson, Kelly Klosterman, David Rochon, and Darrel Senior; (v) Wienner & Gould, P.C.; Goldman, Scarlato, Karon & Penny, P.C.; and the Law Offices of M. Stephen Dampier, P.C., all counsel to Jimmy Junkins; (vi) Wienner & Gould, P.C. and Ademi & O'Reilly LLP, both counsel to Carol Ann Kashishian; (vii) Cafferty Faucher LLP and Finkelstein Thompson LLP, both counsel to Halley Ascher and Ifeoma Adams; (viii) Cafferty Faucher LLP, counsel to Gary Arthur Herr; (ix) Wienner & Gould, P.C. and Chimicles & Tikellis LLP, both counsel to Teresa Ballek; (x) Milberg LLP and Susman Godfrey LLP, both counsel to Meredith Heller; (xi) Cafferty Faucher LLP; Faruqi & Faruqi, LLP; and Berger & Montague, P.C., all counsel for Peter Brownson; (xii) Larson King LLP; Cuneo, Gilbert & LaDuca, LLP; and G Johnson Law, PLLC, all counsel to Superstore Automotive, Inc.; (xiii) Williams, Williams, Rattner, & Plunkett, P.C.; Mehri & Skalet, PLLC; Barrett Law Office, PLLC; and Barrett Law, PLLC, all counsel to Ellis Winton McInnis; and (xiv) Cuneo, Gilbert & LaDuca, LLP and Larson King, LLP, both counsel to Martens Cars of Washington, Inc.

***MEMORANDUM OF OPINION***
ALLAN L. GROPPER, Bankruptcy Judge.
***Introduction***
*1 On November 17, 2011, Lear Corporation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

and the other reorganized debtors (collectively, "Lear" or the "Reorganized Debtors") filed a motion requesting entry of an order (i) enforcing the discharge provisions of their joint plan of reorganization (the "Plan") and (ii) directing dismissal of antitrust litigation recently commenced against them by a purported class of parties who claimed to be indirect purchasers of a Lear product (the "Motion") [ECF No. 1660]. The Reorganized Debtors argue that the antitrust claims were discharged under the confirmed Plan and that sufficient notice was given so that the Plan's discharge of the plaintiffs' claims does not offend due process. Susan LaCava and a Proposed Indirect Purchaser Class (collectively, the "Indirect Purchasers")[FN3] appeared initially and objected to the Motion. At oral argument, their principal assertion was that the Reorganized Debtors engaged in overt acts after the Effective Date of the Plan, giving rise to antitrust liability not discharged by the Plan. Various alleged "direct purchasers" of products from Lear (the "Direct Purchasers"[FN4] and, together with the Indirect Purchasers, the "Antitrust Plaintiffs") also appeared in opposition to the Motion.

> FN3. The "Proposed Indirect Purchaser Class" is comprised of "[a]ll persons and entities that indirectly purchased, during the Class Period, Automotive Wire Harness Systems, for personal use and not for resale" from the defendants, including Lear. *Class Action Complaint* ¶ 75, *LaCava v. Delphi Auto. LLP,* 11–cv–14399–MOB–MKM (E.D.Mich. Oct. 5, 2011). The class period is January 1, 2000 until October 5, 2011. *Id.* ¶ 2. The Indirect Purchasers thus allege they bought from OEM's (as defined below), who bought from Lear, or are otherwise remote purchasers and consumers.

> FN4. The "Proposed Direct Purchaser Class" is comprised of "direct purchasers who, during the Class Period, purchased Wire Harness Products in the United States from one of more Defendants or their co-conspirators." *Class Action Complaint* ¶ 4, *Tech. Aids to Independence, Inc. v. Delphi Auto. LLP,* 11–cv–15428–VAR–MKM (E.D.Mich. Dec. 9, 2011). Thus, the Direct Purchasers claim they purchased directly from Lear. The class period extends from at least January 1, 2000 until at least January 1, 2010. *Id.* ¶ 2.

Since the Motion was argued, the Judicial Panel on Multidistrict Litigation (the "MDL Panel") heard and granted a motion to transfer the antitrust cases to a single court. As further discussed below, the Antitrust Plaintiffs have represented that they plan to file a consolidated amended complaint, which will recognize the Lear bankruptcy and allege that Lear is nonetheless liable because of its overt acts in furtherance of the conspiracy subsequent to confirmation of its Plan.

For the reasons set forth below, the Court decides the Motion as follows. The Antitrust Plaintiffs hold "claims" against the Reorganized Debtors that should be enjoined to the extent they arose before November 9, 2009, the Effective Date of the Plan (the "Effective Date"). However, the Antitrust Plaintiffs are entitled to seek recovery from Lear on their alleged post-Effective Date claims, and the question of Lear's liability under antitrust law for post-Effective Date conduct should be determined in the antitrust litigation, not in this Court. Moreover, the Antitrust Plaintiffs are not precluded from moving for permission to file late proofs of claim herein and to have those claims accorded class status, but the Court expresses no opinion on the disposition of any such motions.

*Relevant Background Facts*

Lear manufactures and sells, among other things, wire harness systems, which help control and coordinate the other electrical components and circuits in an automobile. Lear sells these products to original equipment manufacturers ("OEMs") and OEM suppliers, referred to herein as "Direct Purchasers." Direct Purchasers may incorporate the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW ECF No. 384-27, PageID.5276 Filed 09/11/12 Page 4 of 13

Page 3

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

wire harnesses into vehicles themselves or resell the systems to manufacturers ("Indirect Purchasers"), with the vehicles ultimately being sold to consumers (also Indirect Purchasers).

**\*2** Increasing challenges to North American car manufacturers as well as the global financial crisis led the Reorganized Debtors to file petitions for relief under chapter 11 of the Bankruptcy Code on July 7, 2009 (the "Petition Date"). As a part of their bankruptcy cases, they filed a motion to establish deadlines and procedures for filing proofs of claim. On August 29, 2009, the Court entered an order setting October 2, 2009 (the "General Bar Date") as the last date for filing prepetition proofs of claim (the "General Bar Date Order") [ECF No. 449]. The General Bar Date Order provided that, with certain exceptions not applicable here, "[i]f a Proof of Claim is not received by [the notice and claims agent or the Clerk of the Bankruptcy Court] by the General Bar Date ... the holders ... of the Underlying Claims ... shall be barred from asserting such claims against the Debtors." *General Bar Date Order* ¶ 7.

The General Bar Date Order affected only claims that arose prior to the filing of the petitions on July 7, 2009, whereas confirmation of a plan discharges all claims prior to confirmation. 11 U.S.C. § 1141(d).FN5 On December 8, 2009, the Reorganized Debtors requested and the Court entered an order setting January 15, 2010 (the "Administrative Bar Date" and, together with the General Bar Date, the "Bar Dates") as the last date for filing proofs of claim for claims for expenses arising during the period between the Petition Date and the Effective Date of the Plan on November 9, 2009 (the "Administrative Bar Date Order" and, together with the General Bar Date Order, the "Bar Date Orders") [ECF No. 1213]. The Administrative Bar Date Order provided that

> FN5. Section 1141(d) provides, "Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—(A) discharges the debtor from any debt that arose before the date of such confirmation .... whether or not—(i) a proof of the claim based on such debt is filed or deemed filed...." A "debt" is defined as liability on a "claim," which in turn is defined "as right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. §§ 101(5), 101(12).

any party that is required to file but fails to file an Administrative Claim in accordance with this Order on or before the Administrative Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claim against the Debtors, their estates or the Reorganized Debtors (as defined in the Plan), and the Debtors, their estates and property and the Reorganized Debtors shall be forever discharged from any and all indebtedness or liability with respect to such Administrative Claim.
*Administrative Bar Date Order* ¶ 9.

The Reorganized Debtors served notices of the respective Bar Dates on all the Debtors' known creditors and published notice in the *Wall Street Journal* and the *Globe and Mail (National Edition);* notice of the General Bar Date was also published in the *Detroit Free Press* [ECF Nos. 543, 554–56 (General Bar Date notices); 1270, 1312–13 (Administrative Bar Date notices) ]. None of the Antitrust Plaintiffs filed a proof of claim in the case and none has since then requested leave to file a late proof of claim.

On September 18, 2009, the Reorganized Debtors filed the Plan [ECF No. 633], which contained a broad discharge at Article IX.A:

> Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW  ECF No. 384-27, PageID.5277  Filed 09/11/12  Page 5 of 13

Page 4

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever ... whether known or unknown, against, liabilities of, ... [and] rights against ... the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests ... whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

**\*3** The Plan contained a corollary injunction at Article IX.H:

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that: (1) have been discharged pursuant to Article IX.A ... are permanently enjoined and precluded, from and after the Effective Date, from: (A) commencing or continuing in any manner any action or other proceeding of any kind against any Entity so released, discharged, or exculpated (including the Reorganized Debtors)....

The Plan defined "claim" as "any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code." *Plan,* Art. I .B.35. Notice of the Plan confirmation hearing was sent to creditors and published in the *Wall Street Journal, USA Today,* the *Globe and Mail (National Edition),* and the *Detroit Free Press* [ECF Nos. 673, 767–69, 828]. The Plan was confirmed by order of the Court on November 5, 2009 (the "Confirmation Order") and became effective on November 9, 2009 [ECF Nos. 1070, 1081]. The Confirmation Order explicitly approved and authorized the Plan's injunction provisions. *Confirmation Order* ¶ 78.

On October 5, 2011, almost two years after the Effective Date, Susan LaCava, on behalf of the Indirect Plaintiff Purchasers, filed a class action complaint alleging that Lear and other wire harness system manufacturers (collectively, the "Antitrust Defendants") had engaged in a continuous price fixing conspiracy from January 1, 2000 until at least the filing date of the complaint (the "Class Period"). *Class Action Complaint* ¶¶ 2, 21, *LaCava v. Delphi Auto. LLP, et al.,* 11–cv–14399–MOB–MKM (E.D.Mich. Oct. 5, 2011). LaCava asserts in her complaint that the Indirect Purchasers only realized that they might have claims against an alleged cartel of industry conspirators after European antitrust regulators issued a press release on February 24, 2010 disclosing searches of facilities owned by certain Antitrust Defendants. *Id.* ¶ 90. Discovery of the scheme was delayed until that time, they argue, because the Antitrust Defendants fraudulently concealed it from the public. *Id.* LaCava's complaint is one of at least forty-four filed against Lear and others in various jurisdictions, and the MDL Panel has granted her motion to transfer the cases to the District Court for the Eastern District of Michigan. *See Transfer Order, In re Auto. Wire Harness Sys. Antitrust Lit.,* MDL No. 2311, ECF No. 179 (J.P.M.L. Feb. 7, 2012) (transferring action commenced in Northern District of California and noting forty-two potential tag-along actions). In response, among other things, Lear filed the instant Motion on November 17, 2011, requesting that the Court enforce the discharge and injunction provisions of the Plan and Confirmation Order and direct the Indirect Purchasers to withdraw the complaints.

After Lear filed its motion, Direct Purchasers began to file lawsuits against Lear, with the first apparently being filed on December 9, 2011. *See Class Action Complaint, Tech. Aids to Independ-*

Case 2:12-md-02311-SFC-RSW ECF No. 384-27, PageID.5278 Filed 09/11/12 Page 6 of 13

Page 5

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

*ence, Inc. v. Delphi Auto. LLP, et al.,* 11–cv–15428–VAR–MKM (E.D.Mich. Dec. 9, 2011). The Direct Purchasers (who claim they bought directly from Lear) make substantially the same allegations as the Indirect Purchasers, but allege that they became aware of the conspiracy in September 2010. *Id.* ¶¶ 108, 123–26.[FN6] Given the timing of the various filings, the Motion was initially addressed only to the Indirect Purchaser litigation, but certain of the Direct Purchasers filed an objection to the Motion [ECF No. 1671], joined the Indirect Purchasers' *Joint Response in Opposition to Debtor's Motion* ("Brief in Opposition") [ECF No. 1665], and had counsel who participated in the hearing on the Motion, both in person and by telephone. As far as this decision is concerned, the issues raised are common to all the Antitrust Plaintiffs.

> [FN6]. In addition, the Direct Purchaser class period is slightly shorter, from January 1, 2000 until January 1, 2010. *Class Action Complaint* ¶ 2, *Tech. Aids to Independence, Inc. v. Delphi Auto. LLP, et al.,* 11–cv–15428–VAR–MKM (E.D.Mich. Dec. 9, 2011). The duration of the class period after the Effective Date is irrelevant for purposes of this Motion since the Plan and Confirmation Order do not purport to discharge liabilities after the Effective Date, November 9, 2009. Thus, the Court will use "Class Period" in reference to both putative classes without distinction.

**\*4** In addition, after Lear's motion was filed, at least one complaint was filed that took a new tack that recognized Lear's bankruptcy and its possible implications. This complaint contains specific allegations of antitrust violations by Lear after the Effective Date of the Plan, as follows:

> After [Lear's] emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices.

*Class Action Complaint* ¶ 42, *Beck v. Delphi Auto. LLP,* 11–cv–15445–PJD–MJH (E.D.Mich. Dec. 12, 2011). It was stated at the hearing on the Motion that any amended or consolidated class action complaint will include these allegations. *Transcript of Oral Argument* at 25–26 (Dec. 16, 2011) [ECF No. 1673].

*Discussion*

As indicated above, the principal issue on the Motion is whether the Plan and Confirmation Order preclude the Antitrust Plaintiffs from asserting antitrust claims against the Reorganized Debtors. Lear argues that the causes of action are bankruptcy claims that existed before the Effective Date and that the discharge provisions of the Plan and Confirmation Order are binding. The Antitrust Plaintiffs initially disputed Lear's argument that their assertions of antitrust violations are claims discharged in the bankruptcy, but at oral argument the thrust of their argument centered on the proposition that post-Effective Date conduct by Lear gave rise to antitrust liability that was not discharged in the bankruptcy. Further, the Antitrust Plaintiffs argued that this Court lacks subject-matter jurisdiction to rule on Lear's motion, that the Court should abstain from deciding the Motion, and that the District Court's reference of this matter to this Court should be withdrawn.

For the reasons set forth hereafter, the Court finds that it has subject matter jurisdiction to decide the Motion and that this Court can and should decide the relevant issues of bankruptcy law. Whether Lear's post-Effective Date conduct makes it liable under antitrust principles—and jointly and severally liable for all the effects of the alleged conspiracy—is a separate issue that can and should be decided in the antitrust litigation itself.

The Court turns to the jurisdictional issues first.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

## I. Jurisdictional Issues

### A. Subject Matter Jurisdiction

The question whether the Court has jurisdiction to enter the order requested by Lear is easily answered in the affirmative. A bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co. v. Bailey,* 557 U.S.-, 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009) (citation omitted). This jurisdiction extends into the post-confirmation period: "A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." *Luan Inv. S.E. v. Franklin 145 Corp. ( In re Petrie Retail, Inc.),* 304 F.3d 223, 230 (2d Cir.2002).

**\*5** As courts have also found, "[t]he retention of jurisdiction by the bankruptcy court is particularly appropriate where, as here, the bankruptcy court expressly retains jurisdiction under the plan." *LTV Corp. v. Back ( In re Chateaugay Corp.),* 201 B.R. 48, 66 (Bankr.S.D.N.Y.1996) (citations omitted). The Confirmation Order provides that "this Court shall retain jurisdiction over all matters arising out of or related to the chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including as set forth in Article XI of the Plan." [FN7] *Confirmation Order* ¶ O. In turn, Article XI of the Plan provides in pertinent part that the Court retains jurisdiction to:

> FN7. Section 105 states, in pertinent part, "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 1142 states, in pertinent part, "[T]he debtor ... shall carry out the plan and shall comply with any orders of the court."

7. Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

11. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

20. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order ...;

22. Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge ...; [and]

23. Enforce all orders previously entered by the Bankruptcy Court.

The Antitrust Plaintiffs have cited no authority that establishes that the Court does not have jurisdiction to decide the Motion. They note that this Court's jurisdiction is not exclusive, which is correct, but that has no bearing on whether the Court has non-exclusive jurisdiction. It clearly does.

### B. Abstention and Withdrawal of the Reference

Notwithstanding the fact that the Court retained and has jurisdiction over this proceeding, the Antitrust Plaintiffs argue that the Court should exercise its discretion to abstain from deciding the Motion. There are two provisions of the Judicial Code that expressly provide for abstention by bankruptcy courts. 28 U.S.C. § 1334(c)(2) provides for mandatory abstention of certain bankruptcy proceedings in favor of "a State forum of appropriate jurisdiction" if the proceeding is "based on a State law claim or State law cause of action." It obviously has no relevance to the instant proceeding, based on federal antitrust law. 28 U.S.C. § 1334(c)(1), providing for discretionary abstention, also applies primarily to abstention "in the interest of comity with State courts or respect for State law," and it derives from a Supreme Court case that authorized abstention in favor of State courts. *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). Nevertheless, bankruptcy courts have abstained in favor of a federal court, as § 1334(c)(1)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW ECF No. 384-27, PageID.5280 Filed 09/11/12 Page 8 of 13

Page 7

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

provides for abstention "in the interest of justice." See *In re Motors Liquidation Co.,* 457 B.R. 276 (Bankr.S.D.N.Y.2011) (discretionary abstention in favor of U.S. District Court for Eastern District of Michigan in Labor–Management Relations Act dispute); *In re Portrait Corp. of Am.,* 406 B.R. 637 (Bankr.S.D.N.Y.2009) (discretionary abstention in favor of U.S. District Court for Northern District of Ohio in trademark action).

**\*6** As both the *Motors Liquidation* and *Portrait* courts held, discretionary abstention may be warranted under the "interest of justice" clause depending on a number of factors, including:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which [non-bankruptcy] law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable [non-bankruptcy] law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing [non-bankruptcy] law claims from core bankruptcy matters to allow judgments to be entered in [non-bankruptcy] court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

*In re Motors Liquidation Co.,* 457 B.R. at 289 (citation omitted); *In re Portrait Corp. of Am.,* 406 B.R. at 641–42 (citation omitted). Here, the Reorganized Debtors request that the Court enforce its own order confirming a plan and discharging the debtors, implicating core bankruptcy issues. On the other hand, the core bankruptcy issues can be severed from the antitrust issues, and the antitrust issues that are raised are not readily answered on the instant record. As discussed below, the just disposition is for this Court to decide the bankruptcy issues and abstain in favor of a decision by the antitrust court on other issues that primarily involve antitrust law.

The Antitrust Plaintiffs' further contention, that 28 U.S.C. § 157(d) compels mandatory and discretionary withdrawal of the reference, is also easily dealt with. Motions for withdrawal of the reference are heard by the district court, not the bankruptcy court. 28 U.S.C. § 157(d); Bankruptcy Rule 5011(a). The Court has no authority to decide such a motion. In any event, as already stated, this Court will not decide the antitrust issues raised, abstaining in favor of the antitrust court.

## II. Scope of the Plan and Confirmation Order

The first question on the Motion is whether the causes of action asserted by the Antitrust Plaintiffs are "claims" as defined in the Bankruptcy Code. By its terms, the Plan discharged Lear, "as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever ... whether or not ... a Proof of Claim based upon such Claim, debt, right, or Interest is Filed [and whether or not] a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code." *Plan,* Art. IX.A.[FN8] The Plan's definition of "claim" incorporates by reference the Bankruptcy Code's definition of the same term in 11 U.S.C. § 101(5). *Id.* Art. I.B.35. Accordingly, to the extent that the antitrust claims are "claims" under the Bankruptcy Code, the Confirmation Order by its terms discharged them. 11 U.S.C. § 1141(d); *Confirmation Order* ¶ 78; *Plan,* Art. IX.A.

> FN8. The discharge language substantially tracks 11 U.S.C. § 1141(d), quoted in note 5, *supra.*

### A. "Claims" under the Bankruptcy Code

**\*7** The Bankruptcy Code defines a "claim" as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW   ECF No. 384-27, PageID.5281   Filed 09/11/12   Page 9 of 13

Page 8

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5). Congress intended to give the term the "broadest possible" scope in order to facilitate comprehensive proceedings dealing with all of a debtor's legal obligations in a bankruptcy case. *Pa. Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990), quoting H.R.Rep. No. 95–595, at 309 (1977).

The leading decision in the Second Circuit addressing the definition of "claim" is *United States v. LTV Steel Co. ( In re Chateaugay Corp.),* 944 F.2d 997 (2d Cir.1991) ("Chateaugay I"), where the Circuit Court affirmed the holding of the Bankruptcy Court that "before a contingent claim can be discharged, it must result from pre-petition conduct fairly giving rise to that contingent claim." *Id.* at 1005, quoting 112 B.R. 513, 521. In a later appeal in the same case, the Second Circuit reaffirmed this principle by holding that "the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." *LTV Steel Co. v. Shalala ( In re Chateaugay Corp.),* 53 F.3d 478, 497 (2d Cir.1995) ("Chateaugay II").[FN9] The Second Circuit's approach in *Chateaugay* has sometimes been called the "debtor-creditor relationship" standard, positing that liability is discharged "so long as the underlying act occurred before the bankruptcy petition was filed." *Signature Combs, Inc. v. United States,* 253 F.Supp.2d 1028, 1036 (W.D.Tenn.2003).

> FN9. As the Second Circuit later acknowledged, there is an inconsistency between the language of 11 U.S.C. § 1141(d), discharging debts incurred prior to plan confirmation, and the *Chateaugay II* holding that a discharged debt must arise prior to the filing of a petition. *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.),* 209 F.3d 125, 128 n.

1 (2d Cir.2000). The Plan and Confirmation Order explicitly contemplated a discharge pursuant to 11 U.S.C. 1141(d) covering obligations of the Reorganized Debtors as of the Effective Date of the Plan, which was a few days after the Confirmation Order was entered. *Plan,* Art. IX.A.

The principles set forth by the Second Circuit in *Chateaugay* and followed in many subsequent cases have been applied in the antitrust field. In *Eisenberg Bros., Inc. v. Clear Shield National, Inc. ( In re Envirodyne Industries, Inc.),* 214 B.R. 338 (N.D.Ill.1997), the plaintiffs alleged that the debtor had engaged in a national conspiracy to fix the prices of plastic cutlery and sought a declaratory judgment that the debtor's bankruptcy discharge did not extend to their antitrust causes of action. The District Court in *Envirodyne,* like the Bankruptcy Court there, 206 B.R. 468, 471 (Bankr.N.D.Ill.1997), analogized the antitrust claims before it to the environmental claims discharged in *In re Texaco,* 182 B.R. 937 (Bankr.S.D.N.Y.1995), a case that applied the *Chateaugay* test and held that certain environmental claims against Texaco were discharged in its bankruptcy because "[a]ll the physical events required to establish the elements of causation and damage for such claims occurred prior to confirmation." *Id.* at 951–53. The District Court in *Envirodyne* affirmed the holding of the Bankruptcy Court that the antitrust plaintiffs held claims and that their claims had been discharged. *In re Envirodyne,* 214 B.R. at 349, 351–52.

***8** The same principles were applied in *In re Penn Central Transportation Co.,* 771 F.2d 762 (3d Cir.1985), a case that arose under the prior Bankruptcy Act. Although the Bankruptcy Act had a narrower definition of the term "claim," *see* Bankruptcy Act § 77(b), 11 U.S.C. § 205(b) (repealed), the Third Circuit nevertheless held that the antitrust plaintiffs there had a right to payment because the alleged antitrust conspiracy predated the confirmation of the railroad's Chapter X plan. The Circuit

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW   ECF No. 384-27, PageID.5282   Filed 09/11/12   Page 10 of 13

Page 9

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

Court said:

> [Antitrust claims] constitute bankruptcy "claims" within the meaning of section 77 [of the Act] since they are based upon federal statutes that create substantive obligations wholly separate from bankruptcy law. The court below determined ... that [plaintiffs'] "claims" against [the debtors] due to the alleged antitrust conspiracy existed prior to and during the reorganization proceedings. We therefore must begin with the assumption that their claims have been discharged by section 77(f) and the provisions of the [order granting the debtors' discharge].

> *Id.* at 766.

The Antitrust Plaintiffs make no effort to refute or distinguish the holdings in *Penn Central* and *Envirodyne* that parties hold "claims" where the conduct constituting an alleged antitrust violation takes place before plan confirmation. Instead, they contend that a debtor's bankruptcy discharge is subject to a creditor's constitutional right to "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (citations omitted). They assert that it would be inequitable to hold their claims discharged where they had inadequate notice of Lear's bankruptcy and of the need to file a proof of claim, and that they were creditors entitled to actual notice of the Bar Dates. *See Tulsa Prof. Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988); *DePippo v. Kmart Corp.,* 335 B.R. 290, 295 (S.D.N.Y.2005). The Reorganized Debtors, in response, deny that the Antitrust Plaintiffs were "known" creditors and contend that publication notice was constitutionally adequate, citing *Mullane,* 339 U.S. at 317, and *In re Union Hosp. Ass'n of the Bronx,* 226 B.R. 134, 134 (Bankr.S.D.N.Y.1998).

At the outset, it is noted that the *Penn Central* and *Envirodyne* courts gave little credence to similar notice arguments. In *Penn Central,* the Third Circuit rejected the contention of the antitrust plaintiffs there that it would be inequitable or unconstitutional to discharge their claims because "their claims were unknown and undisclosed to them during the reorganization proceeding due to [the debtor's] fraudulent concealment of the conspiracy." Among other things, the Circuit Court noted that nothing in the applicable statute, the former Bankruptcy Act, required a bankruptcy trustee to provide creditors with notice as to the character of their claims. 771 F.2d at 767, 768. FN10 The District Court in that case held even more broadly that

> FN10. The same is true in the Bankruptcy Code.

**\*9** Under § 77 [of the Bankruptcy Act] and the Bankruptcy Code, claims which are asserted after confirmation and consummation [of a plan] are discharged and there is no exception made for claims which were unknown to a claimant until after consummation [or confirmation] of the Plan. Thus, assuming [the claimants] neither knew nor had reason to know of their antitrust claims because of the alleged conspiracy, their lack of knowledge would not be a ground for exception from the discharge [under either the Act or the Code].

42 B.R. 657, 675 (E.D.Pa.1984). Similarly, the *Envirodyne* court adopted the holding in *Texaco* that a claimant's knowledge that it had been damaged was irrelevant on the question whether a cause of action met the statutory definition of "claim" and that the claims "were neither contingent nor unmatured as of the Bar Date, and even if unknown to [the claimants] at that time, their claims were unquestionably capable of detection." *In re Texaco,* 182 B.R. at 951, 954. The *Envirodyne* Court said: "The alleged [antitrust] violations were as susceptible to detection as the chemical contamination in the *Texaco* case. The claims were matured and uncontingent ... and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW ECF No. 384-27, PageID.5283 Filed 09/11/12 Page 11 of 13

Page 10

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

were therefore discharged by the Confirmation Order." *In re Envirodyne,* 206 B.R. at 472.

The instant record is not adequate to make a determination as to whether the Antitrust Plaintiffs' claims were capable of detection, assuming that issue is controlling, and, in any event, the Court need not do so because the Antitrust Plaintiffs' contentions that they did not receive constitutionally adequate notice of the Bar Dates are not ripe for decision. The question of adequacy of notice is a separate issue from the question whether a party possessed a "claim." See *Chemetron Corp. v. Jones,* 72 F.3d 341 (3d Cir.1995) (remanding to the district court to determine whether claims by individuals alleging injury from exposure to toxic chemicals as a result of prepetition time spent in area could be brought four years after bar date under the excusable neglect standard), *cert. denied,* 517 U.S. 1137, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996). If a party who has a "claim" asserts lack of adequate notice of the applicable Bar Date, its recourse should ordinarily be to request permission to file a late proof of claim.

Moreover, the named plaintiffs who assert due process violations cannot, at this stage of the litigation, assert the rights of a class that has not been certified. In a very recent decision, the Fourth Circuit held that named plaintiffs in an uncertified class action "do not have standing to assert the due process rights of others who are not parties.... We decline [the named plaintiffs'] invitation to evaluate the adequacy of notice provided to the nonparty unnamed class members because the Named Claimants lack standing to raise the issue." *Gentry v. Siegel,* No. 10–2418, 2012 U.S.App. LEXIS 1934, at *30, 2012 WL 310870 (4th Cir. Feb. 2, 2012).[FN11]

> FN11. As a separate issue, plaintiffs would also have to seek authority to file a class proof of claim. Although nothing in the Bankruptcy Code or Bankruptcy Rules permits the filing of a class proof of claim, it has been held that a court has discretion to extend class treatment to the filing of proofs of claim. *See, e.g*., *In re Am. Reserve Corp.,* 840 F.2d 487 (7th Cir.1988); *Carrera v. Bally Total Fitness (In re Bally Total Fitness),* 411 B.R. 142, 145 (S.D.N.Y.2009). On the other hand, the "cases make clear that bankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action and that class certification may be 'less desirable in bankruptcy than in ordinary litigation.' " *In re Ephedra Prods. Liability Lit.,* 329 B.R. 1, 5 (S.D.N.Y.2005), quoting *In re Am. Reserve,* 840 F.2d at 493. Among other things, the class proponent must file a motion under Bankruptcy Rule 9014 to have Fed.R.Civ.P. 23 applied to the proposed proof of claim and demonstrate, *inter alia,* that the class recovery would not "unreasonably waste an estate that was already grossly insufficient to pay the allowed claims of creditors...." *In re Ephedra,* 329 B.R. at 9. In addition, the proponent of a class proof of claim must show generally "that the benefits derived from the use of the class claim device are consistent with the goals of bankruptcy." *In re Motors Liquidation Co.,* 447 B.R. 150, 156–57 (Bankr.S.D.N.Y.2011) (citation omitted).

Based on the foregoing, if any of the Antitrust Plaintiffs desire to file a late proof of claim and assert a right to do so because of constitutionally inadequate notice, nothing in this decision precludes such action. The Court expresses no view on any such motions and only notes that it is premature to assume that the Antitrust Plaintiffs could proceed as a class.

**B. Alleged Conduct after the Effective Date**

*\*10* As indicated above, at oral argument the Antitrust Plaintiffs made virtually no effort to counter Lear's contentions with respect to the fore-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW ECF No. 384-27, PageID.5284 Filed 09/11/12 Page 12 of 13

Page 11

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

going "claim" and notice issues. They proposed, in fact, to include in any consolidated amended complaint the allegation that

> After [Lear's] emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices.

*Class Action Complaint* ¶ 42, *Beck v. Delphi Auto. LLP,* 11–cv–15445–PJD–MJH (E.D.Mich. Dec. 12, 2011). Their principal contention at the hearing was that Lear had committed overt acts, subsequent to the Effective Date of the Plan, in furtherance of the price fixing conspiracy, and that such conduct made Lear liable for damages throughout the term of the conspiracy under principles of antitrust law. *See, e.g., Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). The Antitrust Plaintiffs assert in support that governing antitrust law imposes joint and several liability on co-conspirators for all damages caused during the life of a price fixing scheme, including damages caused before a particular co-conspirator joins (or re-joins) the cartel, citing *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 710 F.Supp. 152 (E.D.Pa.1989).

In response, Lear argues that an original conspiratorial agreement is the salient act for antitrust purposes; if later individual sales only effectuate that agreement in a "rippling effect" manner, they cannot be a basis for antitrust liability. Lear relies on *Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Commission Antitrust Litigation),* 583 F.3d 896 (6th Cir.2008), for the proposition that "[m]ere maintenance of an allegedly anti-competitive policy post-confirmation does not give rise to a post-confirmation claim." *Motion* ¶ 30. Lear contends that the Antitrust Plaintiffs are attempting to revive debts that were otherwise discharged and that the result would be an unacceptable end-run around § 1141(d) and the Plan's discharge.

The nature and extent of Lear's conduct after the Effective Date of the Plan in violation of the antitrust laws, if any, and its effect are issues that can and should be decided by the antitrust court in connection with the prosecution of a consolidated amended complaint. They involve intensely factual inquiries and are not susceptible to determination on the existing record. If antitrust law imposes joint and several damages on a conspirator for prior harm caused by his co-conspirators, it is premature for Lear to contend it is entitled to an injunction barring lawsuits alleging liability for claims based on post-Effective Date conduct. Bankruptcy policy affords debtors a fresh start, but a debtor is responsible for the consequences of its actions after it emerges from chapter 11, and if bankruptcy law discharges a liability, but the debtor takes new action and incurs a similar liability after receiving its discharge, there may be no entitlement to an injunction against prosecution of the latter. *See Browning v. MCI, Inc. ( In re WorldCom, Inc.),* 546 F.3d 211, 220–21 (2d Cir.2008) (putative class action claim discharged because claimant failed to allege illegal post-confirmation conduct by debtor); *O'Loghlin v. County of Orange,* 229 F.3d 871, 875 (9th Cir.2000) ("A 'fresh start' means only that; it does not mean a continuing licence [sic] to violate the law."). The questions of Lear's antitrust liability for post-Effective Date conduct and the scope of damages, if any, are for the antitrust court to decide on a more complete record.

### Conclusion

*11 For the reasons set forth above, Lear's motion is granted in part and denied in part. The Court will enjoin the Antitrust Plaintiffs and all similarly situated plaintiffs from commencing or continuing the prosecution of claims based on conduct by the Reorganized Debtors that occurred before the Effective Date. However, Lear is not entitled to an injunction barring the Antitrust Plaintiffs from amending their complaints in the antitrust actions to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW ECF No. 384-27, PageID.5285 Filed 09/11/12 Page 13 of 13

Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191
**(Cite as: 2012 WL 443951 (Bkrtcy.S.D.N.Y.))**

Page 12

rely on post-Effective Date conduct as a predicate to liability or from seeking to measure the liability by activity prior to the Effective Date. The Antitrust Plaintiffs may also move for permission to file one or more late proofs of claim, subject to the limitations discussed above. Either party may settle an order on seven days' notice.

Bkrtcy.S.D.N.Y.,2012.
In re Lear Corp.
Slip Copy, 2012 WL 443951 (Bkrtcy.S.D.N.Y.), 67 Collier Bankr.Cas.2d 54, Bankr. L. Rep. P 82,191

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.