# Exhibit 29

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**



United States District Court,
E.D. Michigan,
Southern Division.
Martin G. McNULTY, Plaintiff,
v.
REDDY ICE HOLDINGS, INC., Reddy Ice Corporation, Arctic Glacier Income Fund, Arctic Glacier, Inc., Arctic Glacier International, Inc ., Home City Ice Company, Inc., Keith Corbin, Charles Knowlton, Joseph Riley, Defendants.

No. 08–CV–13178.
May 29, 2009.

West KeySummary**Release 331 &⁼⁼⁼29(1)**

331 Release
 331II Construction and Operation
  331k26 Parties
   331k29 Joint Wrongdoers
    331k29(1) k. In General. Most Cited Cases

 The release did not bar salesman's claims of unlawful collusion against members of the packaged ice industry. A packaged ice salesman alleged that ice companies were colluding in an unlawful market allocation scheme, with which he refused to participate. He was subsequently terminated and alleged that the participants conspired to prevent him from being hired again in the packaged ice industry. When terminated, salesman signed a release form. It was unclear, however, whether the release pertained to certain defendants in the industry outside of salesman's former employer.

Andrew A. Paterson, Jr., Pleasant Ridge , MI, Daniel A. Kotchen, Daniel L. Low, Kotchen & Low LLP, Washington, DC, for Plaintiff.

David H. Bamberger, DLA Piper US, LLP, Washington, DC, David A. Ettinger, Honigman, Miller, Schwartz and Cohn LLP, Lisa A. Brown, Dykema Gossett, Anthony T. Chambers, Detroit, MI, James

R. Nelson, DLA Piper US, LLP, Dallas, TX, Mark H. Hamer, DLA Piper, San Diego, CA, Howard B. Iwrey, Dykema Gossett, Bloomfield Hills, MI, Melissa B. Hirst, Paula W. Render, Jones Day, Chicago, IL, John B. Pinney, Michael A. Roberts, Graydon Head & Ritchey, LLP, Cincinnati, OH, Peter R. Silverman, Shumaker, Loop, Toledo, OH, Pamela C. Dausman, Scott L. Mandel, Foster, Swift, Lansing, MI, for Defendants.

*OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS*

PAUL D. BORMAN, District Judge.

 **\*1** Now before the Court are Defendants' Motions to Dismiss Plaintiff Martin McNulty's ("Plaintiff") Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and Defendants Arctic Glacier Income Fund's and Arctic Glacier, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint for want of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Plaintiff responded to all the Motions on December 21, 2008 and Defendants all replied on January 9, 2009. A hearing on the matter was held on April 2, 2009. For the following reasons, the Court DENIES IN PART and GRANTS IN PART Defendants' Motions to Dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(2) and 12(b)(6).

**I. BACKGROUND**

 This action arises from Plaintiff's allegations that Defendants were involved in an unlawful conspiracy and enterprise among competing distributors of packaged ice to (1) terminate Plaintiff from Arctic Glacier for refusing to participate in an unlawful market allocation scheme and (2) conspire to boycott Plaintiff from employment in the packaged ice industry. (Am.Compl.¶ 1). Packaged ice is sold at retail stores and gas stations.

 Plaintiff is a resident of Michigan, residing at various times in Wayne, Livingston, and Oakland

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2
Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

Counties. (*Id.* ¶ 2).

Defendant Arctic Glacier Income Fund ("Arctic Fund") is a Canadian company with its principal place of business in Winnipeg, Manitoba. (*Id.* ¶ 3). Defendant Arctic Glacier, Inc. (Arctic Inc."), a Canadian corporation also with its principal place of business in Winnipeg, Manitoba, is a wholly-owned subsidiary of Arctic Fund and the parent of Defendant Arctic Glacier International Inc. (*Id.* ¶ 4). Defendant Arctic Glacier International Inc. ("Arctic International") is a Delaware corporation with its principal place of business in West St. Paul, Minnesota. (*Id.* ¶ 5). Arctic Fund, Arctic Inc., and Arctic International are collectively referred to as "Arctic Glacier." Arctic Glacier is the second largest manufacturer and distributor of packaged ice in the United States. (*Id.* ¶ 6).

Defendant Home City Ice Company ("Home City") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. (*Id.* ¶ 8). Home City manufactures and distributes packaged ice primarily in the upper-Midwest. (*Id.*) With sales of approximately $50 million per year, Home City represents the third largest manufacturer and distributor of packaged ice in the United States. (*Id.*)

Defendants Reddy Ice Holdings, Inc. and Reddy Ice Corporation (collectively "Reddy Ice") are Delaware corporations with their principal place of business in Dallas, Texas. (*Id.* ¶ 9). Reddy Ice is the largest manufacturer and distributor of packaged ice in the United States.

Defendant Keith E. Corbin resides in Hendersonville, Tennessee and was employed by Arctic Glacier as Vice President of Sales. (*Id.* ¶ 11).

Defendant Charles Knowlton resides in Port Huron, Michigan. (*Id.* ¶ 12). Mr. Knowlton owned Party Time Ice ("Party Time") prior to it being acquired by Arctic Glacier in 2004 and then served as Director, Franchise Operations for Arctic Glacier. ( *Id.*)

**\*2** Defendant Joseph Riley resides in Traverse City, Michigan. (*Id* . ¶ 13). Mr. Riley owned Tropic Ice Company ("Tropic Ice") prior to it being acquired by Arctic Glacier and served as its president. (*Id.* ¶¶ 13, 45).

### A. Plaintiff's Career in the Packaged Ice Industry

Plaintiff is a packaged ice salesman. (*Id.* ¶ 16). In 1991, Plaintiff began his career as a sales representative for Great Lakes Ice Company ("Great Lakes") in Warren, Michigan. (*Id.* ¶ 17). Within his first six months of being at Great Lakes, the company promoted him to sales manager, and then in 1994, Great Lakes promoted him again, this time to Vice President of Sales. (*Id.*) Also, in 1994, Great Lakes was acquired by a larger competitor, Party Time. (*Id.* ¶ 19). By 1996, Party Time promoted Plaintiff from sales manager to Vice President of Sales. (*Id.* ¶ 23).

In October 2004, Party Time announced that it was being purchased by Arctic Glacier. (*Id.* ¶ 25). Arctic Glacier allegedly offered Plaintiff a five year employment contract in exchange for him agreeing not to work for one of Arctic Glacier's competitors for five years. (*Id.* ¶ 26). Also at this time, Arctic Glacier offered Plaintiff and some of the other Party Time employee an "earn out" of two year's salary if the employees did not resign within a certain time frame after the acquisition and if Arctic Glacier met certain financial goals. (*Id.* ¶ 26). Although Plaintiff accepted the "earn out" offer, Plaintiff declined the five year contract because he wanted to ensure that Arctic Glacier's culture and environment were satisfying before accepting a long-term commitment. (*Id.* ¶ 27). After Plaintiff denied Arctic Glacier's five-year contract offer, Plaintiff alleges that Mr. Corbin contacted Plaintiff to ensure that he planned to stay with Arctic Glacier and told him that Plaintiff would succeed Mr. Corbin, who was roughly 70 years old at the time, when Mr. Corbin retired in the near future. (*Id.* ¶ 28).

### B. Alleged Collusion Between Competitors in the

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

**Packaged Ice Industry**

Plaintiff alleges that while at Party Time, and as early as 1997, he heard rumors about possible cooperation between Party Time and Home City. (*Id.* ¶ 29). For instance, he heard that Party Time declined to service certain stores because they were serviced by Home City and that both companies agreed in advance which company would submit a lower bid to potential customers. (*Id.*)

Plaintiff claims that he never directly had been privy to information about explicit or widespread collusion until late 2004, when Steven Knowlton, on behalf of his father Defendant Charles Knowlton, asked Plaintiff to save a Party Time account that was in danger of being lost. (*Id.* ¶ 30). According to Plaintiff, Steve Knowlton told him that his father had received a phone call from a Home City executive informing him that one of Party Time's customers had approached Home City because the customer was not satisfied with Party Time's prices and services. (*Id.*) Allegedly, Home City declined to supply ice to the customer because of an agreement it had with Party Time not to compete for customers in specific geographic areas. (*Id.*) Plaintiff refused to take over the account. (*Id.*)

**\*3** Plaintiff claims that he spoke with Charles Knowlton about the cooperation on at least two separate occasions. (*Id.* ¶ 31). During one such occasion, Plaintiff informed Mr. Knowlton that he would not participate in the alleged conspiracy and that if necessary he would go work for another packaged ice company. (*Id.*) During another conversation, Mr. Knowlton allegedly told Plaintiff that he would perjure himself if necessary to maintain the secrecy of the alleged conspiracy. (*Id.*)

Shortly thereafter, Plaintiff discovered that Arctic Glacier was also colluding with Home City when Mr. Corbin told Plaintiff that Arctic Glacier maintained the same agreement with Home City as Party Time, after Plaintiff attempted to warn Mr. Corbin of Party Time's agreement with Home City. (*Id.* ¶ 32).

In December 2004, Arctic Glacier acquired Party Time and Plaintiff became an Arctic Glacier employee. (*Id.* ¶ 33).

In January 2005, Plaintiff traveled with Mr. Corbin, who at that point was Plaintiff's supervisor, to Ohio to meet with one of Plaintiff's accounts, Speedway SuperAmerica, LLC ("Speedway"). (*Id.* ¶ 34). During the trip, Plaintiff claims that he questioned Mr. Corbin about the details of the market allocation between Arctic Glacier and Home City. (*Id.* ¶ 35). According to Plaintiff, Corbin explained that Arctic Glacier, Home City, and Reddy Ice agreed to geographically divide the market for the sale and delivery of packaged ice. (*Id.*) In addition, since Mr. Corbin did not want to disrupt Arctic City's commitment to its competitors, he could not allow Plaintiff to compete aggressively for Speedway's business in a broad geographic area. (*Id.* ¶ 35). Plaintiff alleges that he told Mr. Corbin that he believed these arrangements between Arctic Glacier and its competitors were illegal and that he could not participate in such unlawful activity. (*Id.*)

**C. Plaintiff's Termination from Arctic Glacier**

In late January 2005, less than one week after learning of Plaintiff's unwillingness to participate in the alleged conspiracy, Plaintiff received a phone call from an Arctic Glacier human resources employee informing Plaintiff that he had been terminated. (*Id.* ¶ 38). On January 27, 2005, Arctic Glacier sent a letter to Plaintiff confirming his termination. (*Id.* ¶ 39). The letter purportedly stated that the termination decision "was made as a result of the restructuring of the Corporate Marketing department." (*Id.*)

Following his termination, Plaintiff signed a severance agreement, titled "FULL AND FINAL RECEIPT, RELEASE, DISCHARGE AND NON–COMPETITION AGREEMENT" ("Release") with the Arctic Glacier. (*Id.* ¶ 42). The Release contains a non-compete clause, which restricted Plaintiff's ability to work for one of Arctic Glacier's competitors for a period of six months, expiring on July 28, 2005. (*Id.*) During this six

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

month non-compete period, Plaintiff contacted federal authorities and informed them of the collusion in the packaged ice industry. (*Id.*) He then began working with the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") in their investigation of the alleged unlawful business practices of Arctic Glacier, Home City, and Reddy Ice. (*Id.*)

**\*4** Once the six month non-compete period ended, Plaintiff claims that he actively began looking for employment with manufacturers and distributors of packaged ice. (*Id.* ¶ 43). For instance, on September 16, 2005, Plaintiff sent a letter to Home City seeking employment with the company, but Home City informed Plaintiff that it was not interested in hiring him. (*Id.* ¶ 44).

Plaintiff also sent a letter to Mr. Riley. (*Id.* ¶ 45). In response to the letter, Mr. Riley agreed to meet with Plaintiff on January 27, 2006 at a restaurant in Lansing, Michigan to discuss Plaintiff's application for employment. (*Id.* ¶¶ 45–46). Because the DOJ and FBI suspected that Tropic Ice was conspiring with Arctic Glacier and Home City, Plaintiff wore a recording device to the meeting. During the meeting, Mr. Riley allegedly told Plaintiff that Arctic Glacier and its co-conspirators in the market allocation scheme had agreed not to hire Plaintiff—that is, Plaintiff was being "blackballed" from the industry. (*Id.* ¶ 46). Plaintiff claims that Mr. Riley also admitted that Tropic Ice had been conspiring with Arctic Glacier to allocate markets. (*Id.* ¶ 47). Nevertheless, Mr. Riley allegedly said that he would call Plaintiff within several weeks to discuss employment opportunities with Tropic Ice. (*Id.*) When Mr. Riley never called, Plaintiff called him and was told by Mr. Riley that Tropic Ice had agreed with Arctic Glacier that it would not hire Plaintiff. (*Id.* ¶ 48).

Over two years after Plaintiff began providing information to federal authorities, Home City entered a plea agreement where it admitted to participating in a conspiracy among packaged ice producers with the purpose of allocating customers and territories for packaged ice at least as early as January 1, 2001. (*Id.* ¶ 49).

On July 23, 2008, Plaintiff filed an action in this Court alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); the Sherman Act, 15. U.S.C. § 1; the Michigan Antitrust Reform Act, M.C.L. § 445.772; and common law tortious interference with business relations, and tortious interference with prospective economic advantage. From October 3, 2008 through October 13, 2008, Defendants Reddy Ice, Riley, Arctic Glacier, Mr. Knowlton, Home City, and Mr. Corbin each filed a Motion to Dismiss Plaintiff's Complaint. (Dkt. Nos. 23, 26–29, and 35). On December 2, 2008, Plaintiff filed an Amended Complaint, setting forth the same causes of action as those in his original Complaint, with the exception of his tortious interference with business relations claim, which he eliminated. (Dkt. No. 43). Defendants now move this Court to dismiss Plaintiff's Amended Complaint. (Dkt.Nos.54–59).

## II. ANALYSIS

### A. Personal Jurisdiction over Arctic Fund or Arctic Inc.

At the hearing, Arctic Glacier conceded that the issue of whether this Court enjoys personal jurisdiction over Arctic Fund and Arctic Inc. could wait until trial. Therefore, the Court declines to address whether it has personal jurisdiction over Arctic Fund and Arctic Inc until after the conclusion of discovery.

### B. Defendants' Motions to Dismiss

### 1. Standard of Review

**\*5** Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
(Cite as: 2009 WL 1508381 (E.D.Mich.))

allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir.2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.,* 510 F.3d 631, 634 (6th Cir.2007).

To survive a motion to dismiss, the "[f]actual allegations contained in [the] complaint must 'raise a right to relief above the speculative level.' " *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir.2008) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). This "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 127 S.Ct. at 1974). A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007) (citing *Twombly,* 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *LULAC,* 500 F.3d at 527 (citing *Twombly,* 127 S.Ct. at 1969).

**2. Release Agreement**

Nearly all of the Defendants attached the Release to their respective motions. Although Plaintiff mentioned the Release in his Complaint, he did not attach it to his pleadings.

Rule 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." But, in addition to the allega-

tions and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA,* 528 F.3d 426, 430 (6th Cir.2008) (citing *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir.2001)); *see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir.1997).

**\*6** Defendants attached the Release as an exhibit to their motions. Plaintiff does not dispute its authenticity and even referenced the Release—which he refers to as a "Severance Agreement"—in his Amended Complaint. (*See* Am. Comp. ¶ 43). Therefore, the issue becomes whether the Release is central to Plaintiff's claims.

Plaintiff's various causes of action can be boiled down to two overarching claims: (1) Plaintiff was terminated for refusing to participate in the alleged unlawful collusion and (2) Defendants conspired against Plaintiff and effectively blackballed him from the packaged ice industry. Between the time that Plaintiff was terminated and being blackballed, he signed the Release, which provides in pertinent part:

In consideration of the money to be paid ... as severance (the "Severance Pay") and other good and valuable consideration, [Plaintiff] release[s], and agree[s] not to sue the Company, its current, former and successor subsidiaries, parent corporations, affiliates, and partners, and each of their officers, directors, employees, agents, representatives, insurance carriers, benefit plans, fiduciar-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

ies and attorneys, or any other related parties, with respect to any claims that [Plaintiff has] ... prior to or as of the time [he] sign[s] this [Release]. These claims include, but are not limited to, claims arising under any ... federal, state or local civil rights, employee benefit, labor contract, tort, or common law.

Plaintiff points to several factors that counsel against dealing with the Release at this stage in the proceedings. First, Plaintiff argues that while the release may be "central" to Defendants' affirmative defense, it is not "central" to Plaintiff's claims as that term has been expressed in relevant case law. For support, Plaintiff cites *JP Morgan Trust Co. v. Mid–America Pipeline Co.,* 413 F.Supp.2d 1244, 1258 (D.Kan.2008), where the court refused to consider three authenticated State of Delaware certificates, which were not attached to the Complaint because they were "central to [an] affirmative defense, not to plaintiff's claims." Unlike the instant action, however, the documents in *JP Morgan Trust* were *not* referenced in the complaint and only related to a collateral issue—namely, whether the defendant has the capacity to be sued. *Id.* Furthermore, Plaintiff failed to fully explain the contents of the "Severance Agreement"—i.e. the Release—in his Complaint, thereby rendering it someone misleading. By revealing only those portions that help his case, while hiding those which clearly are relevant and applicable, Plaintiff has put the Release in play.

Plaintiff also claims that the facts demonstrate that the Release was procured through fraud and economic duress and cites paragraphs thirty-nine and fifty three in the Amended Complaint for support. Both Plaintiff's economic duress and fraud arguments are unconvincing as pled in the Amended Complaint. Plaintiff claims that the economic hardship he suffered was a result of the Defendants' boycott against him, not his termination from Arctic Glacier. (*Id.* ¶ 53) ("Defendants' *boycott* deprived [Plaintiff] of employment opportunities.") (emphasis added). In support of his fraud argument,

Plaintiff cites a paragraph from his Amended Complaint, where he claims that a January 27, 2005 letter from Arctic Glacier falsely states that the decision to terminate him "was made as a result of the restructuring of the Corporate Marketing department." (*Id.* at ¶ 39). While Plaintiff's claim may be true, Plaintiff does not provide any indication in his Complaint that he relied on this statement in any way when he signed the Release. In fact, the gravamen of his Amended Complaint leads to an opposite conclusion.

**\*7** Finally, Plaintiff argues that factual issues counsel against resolving the validity of the release on a motion to dismiss. In support of that argument, Plaintiff cites *Cottman Transmission Sys ., LLC v. Kershner,* which held that a pre-answer motion "is not the time to raise or decide the validity of a prior settlement." 492 F.Supp.2d 461, 473 (E.D.Pa.2007) (citing *Worldcom, Inc. v. Graphnet, Inc.,* 343 F.3d 651, 657 (3d Cir.2003). At least one court in this district, in addressing a release governed by Michigan law held, however, that a release may be considered on a motion to dismiss where the release is unambiguous. *See Mady v. Commodity Futures Trading Comm'n,* No. 05–73745, 2006 U.S. Dist. LEXIS 17947, at \*4 (E.D.Mich.2006). The *Mady* court also acknowledged that "Michigan law [FN1] holds that if the language used in a release is unambiguous, 'the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.' " *Id.* (citing *Taggart v. United States,* 880 F.2d 867, 870 (6th Cir.1989)).

FN1. "Under well-established law, courts construe releases consistent with general state law contract principles." *Barden Detroit Casino, L.L.C. v. City of Detroit,* 59 F.Supp.2d 641, 659 (E.D.Mich.1999).

Here, the Release is unambiguous as to some of the claims and parties its covers and ambiguous as to others. The Release clearly covers Arctic Glacier, Mr. Knowlton, and Mr. Corbin, as Mr. Knowlton and Mr. Corbin were employees of Arctic Gla-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

cier at the time Plaintiff signed the Release. In addition, the Release unambiguously provides that it covers "any claims that [Plaintiff has] ... prior to or as of the time [he] sign[s] this [Release]." Because the Complaint clearly demonstrates that Plaintiff knew of the alleged market allocation scheme at the time he signed the Release, any claims based on Arctic Ice's involvement in that scheme are barred by the Release.

What is not so clear, however, is whether the Release bars Plaintiff's claims against Defendants as to the alleged conspiracy against him. In the Complaint, Plaintiff alleges that Mr. Corbin told him before he was fired—and before Arctic Glacier acquired Party Time—that "if [Plaintiff] left Party Time/Arctic Glacier, Mr. Corbin would ensure that [Plaintiff] would not be hired by a competing ice manufacturer." (Comp.¶ 32). While such a statement may have put Plaintiff on notice of some sort of retaliation by at least Mr. Corbin, the Court cannot find that at the time he was terminated, Plaintiff was aware of any alleged conspiracy to boycott him from the packaged ice industry. Therefore, to the extent that Plaintiff's RICO, antitrust, and tortious interference claims are based on the alleged conspiracy to boycott Plaintiff from the packaged ice industry, they are not barred by the Release. *See Forry, Inc. v. Neundorfer,* 837 F.2d 259, 263 (6th Cir.1988) ("It has also been held that general language of the release will not encompass claims of which the releasor was unaware...."); *Medtronic Ave., Inc. v. Advance Cardiovascular Sys. Inc.,* 247 F.3d 44, 58 (3d Cir.2001) ("[A] release usually will not be construed to bar a claim which had not accrued at the date of its execution or a claim which was not known to the party giving the release.").

**\*8** Also not clear is whether the Release pertains to the other Defendants: Home City, Reddy Ice, and Mr. Riley. The Release states that it applies to Arctic Ice; its subsidiaries, employees, agents, fiduciaries, etc.; and "any other related parties." Given the corporate relationship of the other parties benefitting from the Release, it appears that the "any

other related parties" language does not apply to Home City, Reddy Ice, or Mr. Riley, as their relationship with Arctic Ice is that of a competitor or co-conspirator in corporate wrongdoing. The Court need not reach a conclusion on this issue yet. At this point, it is enough to find that the language of the Release is ambiguous as to the meaning of "any other related parties." *See Mady,* 2006 U.S. Dist. LEXIS 17947, at \*4; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 343–48, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (holding that a release did not apply to co-conspirators where the language of the release did not indicate that they were included in the release). Because the reach of the Release is at best unclear, the Court finds that the Release does not bar any of Plaintiff's claims against Home City, Reddy Ice, and Mr. Riley.

**3. Standing to Assert RICO Claims**

RICO allows a civil cause of action for treble damages and attorney's fees to "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The "by reason of" language means that a plaintiff must demonstrate that the alleged RICO violation caused his injury. *Sedima v. Imrex,* 473 U.S. 479, 496 (1985). In *Holmes v. Securities Investors Protection Corp.,* 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court held that a plaintiff may sue under section 1964(c) only if the alleged RICO violation is both the "but for" and proximate cause of the plaintiff's injury. Thus, to establish standing to assert a caused of action under section 1964(c), a civil RICO plaintiff must establish: (1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury. *See id.* at 268; *Sedima,* 473 U.S. at 496.

**a. Violation of Section 1962(c)**

In the case at bar, Plaintiff asserts RICO claims under subsections (c) and (d) of section 1962. Section 1962(c) of the RICO Act provides, in part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). Section 1961(1)(B) of the RICO Act defines the requisite "racketeering activity" to include so called predicate acts: "any act which is indictable under any of the following provisions of title 18, United States Code ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ... section 1512 (relating to tampering with a witness, victim, or an informant), [and] section 1513 (relating to retaliating against a witness, victim, or an informant)." 18 U.S.C. § 1961(1)(B). In addition, a " 'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

**\*9** The Supreme Court has stated the elements of a viable cause of action under 18 U.S.C. § 1962(c) as follows: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, 473 U.S. at 496; see also Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir.2006).

**(1) Acts of Racketeering Activity—Predicate Acts**

The Court first analyzes whether Plaintiff adequately pled the predicate acts of mail fraud, wire fraud, and witness retaliation and witness tampering against the Defendants.

To state a claim for mail or wire fraud, a plaintiff must show that: "1) the defendants formed a scheme or artifice to defraud; 2) the defendants used the United States mails [or interstate wires] ... in furtherance of the scheme; and 3) the defendants did so with the specific intent to deceive or defraud." Central Distributors of Beer, Inc. v. Conn., 5 F.3d 181, 184 (6th Cir.1993). Although reliance on the false statements or omissions is not required, Bridge v. Phoenix Bond & Indem. Co., —— U.S. ——, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), a defendant must have made false statements or omissions of material fact.

Plaintiff asserts that Defendants committed the predicate act of witness tampering by violating 18 U.S.C. § 1512(b)-(d). Those subsections provide:

(b) Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from-

**\*10** (1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

In addition, in his responses to Defendants' Motions but not in his Amended Complaint, Plaintiff cites 18 U.S.C. § 1512(k), which provides: "Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

In his Amended Complaint, Plaintiff also alleges that Defendants committed the predicate act of witness retaliation in violation of 18 U.S.C. § 1513(e)-(f), which provides as follows:

(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information

relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

(f) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.[FN2]

> FN2. Unlike a conspiracy to commit mail or wire fraud, a conspiracy to commit to retaliate against a witness may serve as a predicate act because it is specifically included in the statutory offense and therefore "indictable under" the listed statute. *Cf. United States v. Brooklier,* 685 F.2d 1208, 1216 (9th Cir.1983) (finding conspiracy to extort under 18 U.S.C.1951 a proper predicate because conspiracy is "indictable under" that provision).

Plaintiff alleges that Defendants used interstate mails and wires to further their fraudulent customer and territorial allocation scheme. (Am.Compl.¶ 61). Namely, throughout the duration of the conspiracy, Defendants used interstate mails and wires to submit rigged bids to potential customers, and submitted fraudulently inflated monthly or periodic invoices to customers, who submitted payments using interstate mails and wires." (*Id.* ¶ 62).

In addition, Defendant claims that Arctic Glacier used interstate mails to terminate his employment, providing false and fraudulent reasons for doing so; that Mr. Corbin and Arctic Glacier used interstate wires to fraudulently corroborate the letter; and that Home City utilized interstate wires to provide false and fraudulent reasons for its unwillingness to discuss potential employment opportunities with Plaintiff.

Plaintiff's first mention in his Amended Complaint of any type of intimidation, threat or retali-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
(Cite as: 2009 WL 1508381 (E.D.Mich.))

ation against Plaintiff was Mr. Knowlton's statement in response to Plaintiff's statement that he would leave Party Time before participating in the market allocation scheme, where Mr. Knowlton allegedly told him: "Marty, everyone knows that you are the best corporate salesman in the ice industry. Now, see what that will do for you." (*Id.* ¶ 31). Plaintiff then alleges that after he talked with Mr. Corbin about the alleged unlawful price-fixing conspiracy, Mr. Corbin told Plaintiff if he left Party Time or Arctic Glacier, "Mr. Corbin would ensure that [Plaintiff] would not be hired by a competing ice manufacturer." (*Id.* ¶ 31).

**\*11** Plaintiff further alleges that after he was terminated and contacted the authorities regarding the price-fixing scheme, Mr. Knowlton,[FN3] through two different intermediaries, offered to re-hire Plaintiff if he stopped cooperating with authorities and informed Plaintiff that he was being black-listed because of this cooperation and that he would not receive his earn-out bonus until he ceased the cooperation. (*Id.* ¶¶ 41, 49). In addition, Plaintiff alleges that during two conversations that he tape recorded with Mr. Riley, Mr. Riley told him that "Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire [Plaintiff]" and that Tropic Ice had agreed with Arctic Glacier that Tropic Ice would not hire Plaintiff. (*Id.* ¶ 46; *see id.* ¶ 48).

> FN3. Plaintiff alleges that at this point, Mr. Knowlton was working for Arctic Glacier after it purchased Party Time.

As to the predicate acts of mail fraud and wire fraud, in drawing all inferences in favor of Plaintiff, accepting his factual allegations as true, and construing the Amended Complaint in the light most favorable to him, Plaintiff has properly alleged the predicate acts of mail and wire fraud only against Home City, Reddy Ice, and Mr. Riley, as any mail or fraud claims against Arctic Glacier, Mr. Knowlton, and Mr. Corbin are barred by the Release.

A plaintiff must plead the circumstances con-

stituting the fraud, including mail and wire fraud, with particularity. *Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir.1984); FED. R. CIV. P. 9(b). Here, Plaintiff has thoroughly described the circumstances surrounding the price-fixing scheme, including detailed accounts of Home City's and Reddy Ice's involvement in that scheme[FN4] and an admission from Mr. Riley as to his company's involvement in the scheme. While it is true that Plaintiff has not alleged any specific instances where Home City, Reddy Ice, or Mr. Riley used the mails in furtherance of the alleged market allocation scheme, Plaintiff does allege that they were involved in a scheme to defraud and that they used the mails to submit rigged bids to potential customers and fraudulently inflated invoices. Given Plaintiff's numerous years of experience in the packaged ice industry, it is reasonable to infer that Home City, Reddy Ice, and Mr. Riley generally used the mails and wires as Plaintiff described to carry out the market allocation scheme.

> FN4. For instance, Plaintiff claims that Home City has already entered into a plea agreement with the United States, in which Home City admits that it participated in a conspiracy among packaged ice producers to allocate customers and territories for packaged ice. (Compl.¶ 51). Plaintiff also alleges that while he was still working at Arctic Glacier, Mr. Corbin told him that "Arctic Glacier had agreed with both Home City and Reddy Ice to geographically divide the market for the sale and delivery of packaged ice." (Compl.¶ 35). Plaintiff further provides an account from Mr. Corbin, where he describes how Arctic Ice backed away from buying an ice company in Nevada as part of an agreement between Arctic Ice and Reddy Ice, where Arctic Ice agreed to stay out of the South and Southwest. (Compl.¶ 36).

As to Plaintiff's alleged predicate acts of witness tampering and retaliation, the Court finds that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

Plaintiff has properly alleged the predicate act of witness tampering against Mr. Knowlton and Arctic Glacier, and witness retaliation against Arctic Glacier, Home City, Reddy Ice, and Mr. Riley.

First, any allegation of retaliation or tampering by Mr. Knowlton, Mr. Corbin, or Arctic Glacier that took place before February 17, 2005 is barred by the Release.

Second, Plaintiff provides specific allegations of how Mr. Knowlton, through other Arctic Glacier agents, attempted to persuade Plaintiff to stop co-operating with the authorities and to come back to work at Arctic Glacier. Given Mr. Knowlton's alleged involvement in the price-fixing conspiracy, his prior supervisory role over Plaintiff, and his new position of Director of Franchise Operations at Arctic Glacier, it certainly is plausible that Mr. Knowlton had two different employees of Arctic Glacier call Plaintiff and first offer him his job back and then threaten him with the withholding of his earn out.

**\*12** Third, Plaintiff provides two specific allegations regarding acts of intimidation or retaliation by Home City. The first is his claim that he sent a letter to Home City and that when he called later to inquire about a position, "Home City provided false and fraudulent reasons for why it was not interested in speaking to [Plaintiff] about potential employment opportunities." (Am.Compl.¶ 44). The second is his allegation that Mr. Riley told him that Arctic Glacier and "its co-conspirators in the market allocation scheme" had all agreed not to hire Plaintiff. ( *Id.* at ¶ 46). While Plaintiff does not name Home City here, given that Plaintiff provided several in-depth factual allegations of Arctic Glacier's alleged collusion with Home City, and that Home City allegedly entered a plea agreement where it admitted to participating in a conspiracy among package ice producers, the Court can infer that Home City was one of the co-conspirators mentioned in paragraph forty-fix. Reading the two allegations together—and certainly in the light most favorable to Plaintiff—the Court finds that Plaintiff adequately

alleged that Home City committed the predicate act witness retaliation under section 1513(e) and (f).

Fourth, the only allegation alluding to any retaliation by Reddy Ice is Mr. Riley's alleged statement that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire Plaintiff. Still, because of Plaintiff's allegations regarding Reddy Ice's involvement in that scheme, *see* footnote four *supra*, the Court can reasonably infer that Mr. Riley was referring to Reddy Ice. Reading this allegation in the light move favorable to the Plaintiff, the Court finds that Plaintiff has sufficiently alleged that Reddy Ice conspired with Arctic Glacier to retaliate against Plaintiff in violation of section 1513(f).

Finally, as to Mr. Riley, Plaintiff claims that he tape recorded a telephone conversation between them, where Mr. Riley admits that "Tropic Ice had agreed with Arctic Glacier that Tropic Ice would not hire Plaintiff." (Compl.¶ 48). Because Mr. Riley allegedly was not only the owner of Tropic Ice but also served as its president, the Court finds that Plaintiff has stated a claim against Mr. Riley for witness retaliation under section 1513(f). At this point in the proceedings, the Court cannot summarily dismiss Plaintiff's claim against Mr. Riley merely because it would have been against Mr. Riley's better judgment to inform Plaintiff that Tropic Ice was boycotting Plaintiff if Mr. Riley had known that Plaintiff was cooperating with the federal authorities. The alleged facts demonstrate that Mr. Riley, on behalf of Tropic Ice, agreed to boycott Plaintiff, and at that point in time, Arctic Glacier knew that Plaintiff may have been cooperating with the authorities. This is sufficient to state a claim against Mr. Riley for conspiring to retaliate against Plaintiff as a potential witness in a federal investigation.

**(2) Enterprise**

**\*13** A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

(Cite as: 2009 WL 1508381 (E.D.Mich.))

U.S.C.1961(4). As the Sixth Circuit has recently set forth, it must have some "enterprise-like structure":

> The hallmark of an enterprise is structure.... [T]here must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much. A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making. The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise.

United States v. Johnson, 440 F.3d 832, 840 (6th Cir.2006) (alterations in original) (quoting United States v. Rogers, 89 F.3d 1326, 1137 (7th Cir.1996)).FN5

> FN5. "The standard is the same for both criminal and civil RICO violations." United States v. Shifman, 124 F.3d 31, 35 n. 1 (1st Cir.1997) (citing 18 U.S.C. § 1962).

Defendants argue that "[t]o satisfy the enterprise requirement, an association-in-fact must be an ongoing organization, its members must function as a continuing unit, and it *must be separate from* the pattern of racketeering activity in which it engages." Frank v. D'Ambrosi, 4 F.3d 1378, 1386 (6th Cir.1993) (emphasis added). Plaintiff, however, asks this Court to adopt the recent holding in United States v. Hammoud, 556 F.Supp.2d 710 (E.D.Mich.2008), which explicitly rejected *Frank's* requirement that the enterprise "must be separate from the pattern of racketeering activity." The court concluded as much because *Frank* "loosely used [this] language in dicta" and because the language was inconsistent with United States v. Qaoud, 777 F.2d 1105, 1115 (6th Cir.1985), a case that the "*Frank* court never acknowledged." *Id.* at 714 n. 6. *Hammoud* further noted that because the *Frank* opinion was not *en banc,* it could not have overruled *Qaoud. Id.* Further, the Sixth Circuit's de-

cision in *Johnson,* 440 F.3d at 840,FN6 which was subsequent to *Frank,* "reaffirmed its holding in *Qaoud." Id.* In other words, "Defendant[ ] rel[ies] upon an interpretation of the RICO statute and United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 ... (1981) , which has been squarely rejected by the Sixth Circuit." Hammoud, 556 F.Supp.2d at 713 .

> FN6. Johnson, 440 F.3d at 840 ( " '*Turkette* requires the government to prove both the existence of an "enterprise" and a "pattern of racketeering activity." We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent [.]' ") (quoting Qaoud, 777 F.2d at 1115).

As noted by Plaintiff, just last year, the Ninth Circuit joined the D.C., First, Second, and Eleventh Circuits in finding that "an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise." Odom v. Microsoft Corp., 486 F.3d 541, 551 (9th Cir.2007). The Ninth Circuit explained:

> To require that an associated-in-fact enterprise have a structure beyond that necessary to carry out its racketeering activities would be to require precisely what the Court in *Turkette* held that RICO does not require. Such a requirement would necessitate that the enterprise have a structure to serve both illegal racketeering activities as well as legitimate activities. In other words, it would require-as the First Circuit sought to require in *Turkette*-that the enterprise have a structure serving both illegitimate and legitimate purposes. But the Court in *Turkette* held precisely the opposite. It held that a purely criminal enterprise can be an associated-in-fact enterprise within the meaning of RICO.

*14 *Id.* at 551–52.

Here, because of the apparent diverging views within this circuit and among the several circuits,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

this Court applies the standards set forth in *Johnson,* as it is the most recent published articulation of this Circuit, and *Turkette,* which held that the existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." 452 U.S. at 583.

Because Plaintiff has not alleged facts that establish any kind of meaningful structure among Defendants that would otherwise distinguish their relationship from a mere conspiracy, especially given the conflict with the Release, Plaintiff has not alleged that Defendants, or any combination of Defendants, constitute a RICO enterprise. Nevertheless, the Court finds that Plaintiff has alleged facts showing that Arctic Glacier functioned as an enterprise under section 1962(c).

**(3) Pattern of Racketeering Activity**

In the instant action, Plaintiff asserts that Defendants committed multiple fraudulent and racketeering acts, which constitute a pattern of racketeering, as Defendants engaged in a scheme to defraud customers and deprive Plaintiff of employment in the packaged ice industry. The Court initially notes that for the purposes of establishing a pattern of racketeering activity, it is irrelevant whether or not Plaintiff was harmed by all of the alleged predicate acts (e.g., mail fraud and wire fraud). *See Vild v. Visonsi,* 956 F.2d 560, 567 (6th Cir.1992) ("We do not hold that a civil RICO plaintiff must necessarily be directly harmed by all the alleged predicate acts, because harm from one enumerated violation may, in certain situations, be sufficiently connected). What is relevant, though, is that, as set forth above, Plaintiff only has alleged facts sufficient to show that Arctic Glacier acted as a RICO enterprise. Therefore, only those predicate acts, which were committed by Arctic Glacier, or its representatives, and which were not barred by the Release, can be considered in determining whether Plaintiff has pled a pattern of racketeering. Those predicate acts consist of witness tampering by Arctic Ice and Mr. Knowlton and witness retaliation by Arctic Ice.

"[T]o prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. NW Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "Continuity and relationship constitute two analytically distinct prongs of the pattern requirement." *Vild v. Visonsi,* 956 F.2d 560, 566 (6th Cir.1992).

Predicate acts are "related" for RICO purposes if they " 'have the same or similar purposes, results, participants, victims, or method of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H .J. Inc.,* 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). The predicate acts of witness tampering and witness retaliation clearly share the same purpose and involve the same participants and victims.

**\*15** The continuity prong is rather more complex. " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. "Whether a pattern of racketeering activity satisfies the continuity requirement depends on the particular facts of each case." *Moon v. Harrison Piping Supply,* 465 F.3d 719, 724 (6th Cir.2006). At the pleading stage, continuity may be established by alleging facts of either closed- or open-ended racketeering activity. A plaintiff may demonstrate a closed period of continuity "by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.,* 492 U.S. at 242. Open-ended continuity may be "pleaded through facts showing 'a distinct threat of long-term racketeering activity' *or* by showing 'that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.' " *Moon,* 465 F.3d at 727 (quoting *H.J ., Inc.,* 492 U.S. at 242) (emphasis added)).[FN7]

FN7. Both Arctic Glacier and Home City

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

cite *Moon* for the proposition that "open-ended continuity ... requires that 'the predicate acts or offenses are part of an ongoing entity's regular way of doing business.' " (Arctic Glacier Br. at 9 (quoting *Moon,* 465 F.3d at 726–27)). As the quoted passage above from *Moon* indicates, this simply is not the case. A plaintiff may also set forth factual allegations showing a distinct threat of continuing racketeering activity.

In the case at bar, while some of the predicate acts alleged by Plaintiff extend over a lengthy period of time, the predicate acts available for establishing a pattern of racketeering activity began around March 2005 and ended in March 2006, a period of roughly twelve months. The pattern of racketeering here involved only one victim, but that single victim was allegedly subject to multiple predicate acts of witness tampering and witness retaliation. In addition, although Plaintiff has reported the alleged predicate acts to the federal authorities,[FN8] under the facts alleged here, there is a distinct threat that Arctic Ice or Mr. Knowlton or their co-conspirators in the market allocation scheme continued or will continue to blacklist Plaintiff from the packaged ice industry or retaliate against Plaintiff again. In fact, even after Plaintiff had gone to the federal authorities, Arctic Ice allegedly got Tropic Ice to agree that it too would boycott Plaintiff. While the threat of repetition here may not involve a more systematic threat of repetition as that offered as an example in *H.J., Inc.,* the fact that Plaintiff was allegedly retaliated against after he went to the authorities makes it distinct for our purposes. Therefore, the Court finds that Plaintiff has pled facts, which establish at least an open-ended continuity.

> FN8. In *Moon,* the Sixth Circuit reasoned that there was no risk of ongoing racketeering because the plaintiff petitioned the Michigan Workers' Disability Compensation Bureau ("Bureau"), which could result

in a final binding decision to prevent the defendants from continuing to commit the alleged predicate acts against the plaintiff—namely, suspending the plaintiff's benefits—without first going through the Bureau. That is, once a decision was made by the Bureau, the defendants would have to seek approval from the Bureau before petitioning the plaintiff's benefits. In the instant case, there is no such mechanism that would essentially guarantee the cessation of the alleged predicate acts.

Accordingly, in sufficiently alleging facts that satisfy the continuity and relationship prongs of the pattern of racketeering element, Plaintiff has adequately pled the *Sedima* factors of a section 1962(c) violation against Arctic Ice. In addition, because Plaintiff alleges that Mr. Knowlton held a management position within Arctic Glacier—namely, director of franchise operations—and that he committed predicate acts that were part of the alleged pattern of racketeering activity, the Court finds that he has adequately pled a 1962(c) violation against Mr. Knowlton. *See Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (" '[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself.").

**b. Violation of Section 1962(d)**

**\*16** Section 1962(d) provides that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of this section." In order for a plaintiff to establish a RICO conspiracy, the plaintiff need not "prove that the defendant committed or agreed to commit two predicate acts himself, or even that any overt acts have been committed." *United States v. Saadey,* 393 F.3d 669, 676 (6th Cir.2005) (citing *Salinas v. United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). In *Salinas,* the Court held:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

*Id.* at 65. Thus, a plaintiff need only show that the defendant agreed "that someone would commit two predicate acts." *United States v. Driver,* 535 F.3d 424, 432 (6th Cir.2008).[FN9]

> FN9. Some circuits have more exacting standards, while others are less stringent. *Compare Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961, 995 (7th Cir.2001) (" '[The plaintiff] must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals.' ") *with United States v. Browne,* 505 F.3d 1229, 1263 (11th Cir.2007) ("The touchstone of liability is an agreement to participate in a RICO conspiracy, which may be shown in two ways: (1) showing an agreement on the overall objective of the conspiracy, or (2) showing that a defendant agreed to commit personally two predicate acts, thereby agreeing to participate in a 'single objective.' ").

As set forth above, Plaintiff sufficiently alleged that Home City, Reddy Ice, and Mr. Riley all agreed with Arctic Glacier not to hire Plaintiff and

that such an agreement to retaliate against Plaintiff was in violation of 18 U.S.C. § 1513(f). Plaintiff, however, has not provided the Court with any factual allegations tending to show that Home City, Reddy Ice, or Mr. Riley agreed to any acts of tampering against Plaintiff that are in violation of 18 U.S.C. § 1512. That is, Plaintiff has not alleged that any of the other Defendants agreed with Arctic Ice for it to commit two predicate acts.

Plaintiff asserts that Arctic Glacier employees, at the behest of Mr. Knowlton, offered to rehire Plaintiff if he ceased his cooperation with the federal authorities and then after he refused informed him that he was being blacklisted because of this cooperation and that he would not receive his earnout bonus until he ceased the cooperation. While such factual allegations support a claim witness tampering claim against Arctic Glacier and Mr. Knowlton, there are no allegations that Home City, Reddy Ice, or Mr. Riley ever agreed to these alleged acts of retaliation. Likewise, their alleged agreement with Arctic Glacier to boycott Plaintiff does not give rise a witness tampering claim. Because Plaintiff has only alleged facts that show that Home City, Reddy Ice, and Mr. Riley agreed with Arctic Glacier not to hire Plaintiff, the Court dismisses Plaintiff's RICO conspiracy claims against all Defendants.

**c. Injury**

Defendant Home City contends that Plaintiff does not have standing to assert his civil RICO claims for the additional reason that he does not allege an injury to his "business and property." As noted by Plaintiff, however, "courts have generally viewed the loss of employment as an injury to one's business or property." *Mruz v. Caring, Inc.,* 991 F.Supp. 701, 712–13 (D.N.J.1998) (citing *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1170 (3d Cir.1989); *see also Quinonez v. Nat'l Asso. of Sec. Dealers, Inc.,* 540 F.2d 824, 830 (5th Cir.1976) (holding that "the loss of the opportunity to perform work [i]s an injury contemplated by the 'injury to business' language"); *Nichols v. Spencer Int'l Press,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

*Inc.,* 371 F.2d 332, 334 (7th Cir.1967) ("[W]e readily conclude that one who has been damaged by loss of employment as a result of the antitrust laws is 'injured in his business or property' ").[FN10] Because Plaintiff seeks to recover for a continued loss of employment, Plaintiff has sufficiently alleged an injury to his "business or property."

> **FN10.** Although *Quinonez* and *Nichols* addressed the "business or property" requirement of the Clayton Act, the RICO "business or property" requirement was modeled after and has been interpreted consistent with the Clayton Act. *Evans v. City of Chicago,* 434 F.3d 916, 929 n. 23 (7th Cir.2003).

**d. Proximate Cause**

*17 To establish proximate cause for a section 1962(c) violation, Plaintiff must allege that the Defendants' violations of section 1962(c) led directly to his injuries. *See Anza v. Ideal Steel Supply,* 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). Defendants contend that, as a matter of law, their alleged violations of section 1962 are not the proximate cause of Plaintiff's alleged injuries and that consequently, Plaintiff lacks RICO standing to pursue his claims. Throughout their Motions, Defendants assume that the requisite pattern of racketeering includes predicate acts pertaining to Plaintiff's termination and Defendants' alleged participation in the market allocation scheme. The Court, however, found that the pattern of racketeering activity here is limited to the alleged acts of witness retaliation and witness tampering. Unlike the several cases cited by both parties, where the pattern of racketeering activity was larger in scope and included predicate acts directed at third parties as well as those directed toward the plaintiff, the pattern of racketeering involving the predicate acts of witness tampering and witness retaliation are squarely directed at Plaintiff.

Therefore, the Court finds that the pattern of racketeering was the direct cause of his inability to find employment in the packaged ice industry.

Accordingly, the Court GRANTS Home City's, Reddy Ice's, Mr. Corbin's, and Mr. Riley's Motions to Dismiss Plaintiff's RICO claim under 18 U.S.C.1962(c) but DENIES Defendants Arctic Glacier's and Mr. Knowlton's Motions to Dismiss as to that claim. In addition, the Court GRANTS Defendants Motions to Dismiss Plaintiff's RICO claim under 18 U.S.C.1962(d).

**3. Plaintiff's Antitrust Claims**

In his Amended Complaint, Plaintiff avers that "Defendants have engaged in a *per se* unlawful conspiracy by agreeing that [Plaintiff] should be terminated from Arctic Glacier and then terminating [Plaintiff] from Arctic Glacier [and] ... by agreeing to boycott [Plaintiff] from the packaged ice industry." (Am.Compl.¶¶ 72). Plaintiff then claims that "Defendants by and through their anti-competitive actions as outlined herein,[FN11] have violated Section 1 of the Sherman Act, 15 U.S.C. § 1."[FN12]

> **FN11.** Both Home City and Arctic Glacier initially based their Motions to Dismiss, in part, on the grounds that Plaintiff cannot recover for Defendants' alleged conspiracy to allocate markets. Such an interpretation is understandable given Plaintiff's somewhat vague allegation that Defendants have violated the Sherman Act "by and through their anticompetitive actions as outlined herein," which might seem to include the alleged conspiracy to allocate markets. In his Response to those motions, however, Plaintiff clarifies that his antitrust claims seek recovery for Defendants' conspiracy to boycott Plaintiff from the packaged ice industry, not for their conspiracy to allocate markets. (Pl.'s Resp. to Home City's Mot. to Dismiss at 6). Therefore, the Court only focuses on the alleged conspiracy to boycott Plaintiff from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
(Cite as: 2009 WL 1508381 (E.D.Mich.))

packaged ice industry.

FN12. "The private cause of action for antitrust violations is provided in section 4 of the Clayton Act, which states that 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States.' " *In Town Hotels Ltd. P'ship v. Marriott Int'l, Inc.,* 246 F.Supp.2d 469, 474 (S.D.W.V.2003) (quoting 15 U.S.C. 15(a)).

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared illegal." 15 U.S.C. § 1. A private party who is injured due to actions in violation of antitrust laws may bring a private suit but must show that it has standing to sue under the antitrust laws. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

"The Supreme Court has articulated certain factors to be analyzed in determining whether a plaintiff has established antitrust standing." *Indeck Energy Servs. v. Consumers Energy Co.,* 250 F.3d 972, 976 (6th Cir.2000) (citing *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Those factors include:

*18 (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Id.* (citations omitted).

Of the various requirements for establishing antitrust standing, the one primarily at issue here is antitrust injury, "which is a 'necessary, but not always sufficient,' condition of antitrust standing." *NicSand, Inc. v. 3M Co.,* 507 F.3d 442, 450 (6th Cir.2007). Antitrust injury is an "injury the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Valley Prods. Co., Inc. v. Landmark,* 128 F.3d 398, 402 (6th Cir.1997) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* This requirement "ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

Traditionally, the Sixth Circuit "has been reasonably aggressive in using the antitrust doctrine to bar recovery where the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Valley Prods. Co.,* 128 F.3d at 403. The Sixth Circuit has adopted a two-part test to analyze antitrust injury under *Brunswick:*

"the antitrust plaintiff 'must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Tennessean Truckstop, Inc. v. NTS, Inc.,* 875 F.2d 86, 88 (6th Cir.1989) (citing P. Areeda & H. Hovenkamp, Antitrust Law P 334. 1b at 299 (1988 Supp.)). In *Tennessean Truckstop,* the Sixth Circuit concluded that because the plaintiff was really not complaining about a decrease in competition in general, its injury did not flow from a competition-reducing aspect of the act at issue. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
(Cite as: 2009 WL 1508381 (E.D.Mich.))

In support of his argument that he suffered an-titrust injury, Plaintiff relies primarily upon *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Quinonex v. National Association of Securities Dealers, Inc.,* 540 F.2d 824 (5th Cir.1976); and *Roman v. Cessna Aircraft Co.,* 55 F.3d 542 (10th Cir.1995).

*Radovich* involved an alleged agreement among defendant football teams of the National Football League ("NFL") to blacklist any player who violated a standard player contract by signing with another team without the consent of the team holding the player's contract. *Id.* at 449. The plaintiff originally signed with the Detroit Lions, an NFL team. *Id.* at 448. But after his father became ill, he requested a transfer to an NFL team in Los Angeles. *Id.* When the Lions refused his transfer re-quest, the plaintiff broke his contract with the Lions by signing and playing two seasons for the Los Angeles Dons, a member of the All–America Con-ference and a competing league to the NFL. *Id.* Subsequently, the plaintiff attempted to sign with the San Francisco Clippers, a member of the Pacific Coast League, which was affiliated with but not a competitor of the NFL. *Id.* The NFL, however, ad-vised the plaintiff that he was black-listed and any team attempting to sign him would suffer severe penalties. *Id.* The Clippers refused to sign him to any position. *Id.* Plaintiff then filed suit against the NFL, alleging that the defendants purportedly had utilized the player boycott as the means by which to destroy the rival league, with the object of the over-all conspiracy to monopolize professional football. *Id.* 448–49. The Supreme Court held that the plaintiff had adequately stated a cause of action un-der the Sherman Act. *Id.* at 446, 453.

**\*19** In *Quinonez,* the Fifth Circuit held that a terminated securities salesman stated a treble dam-age claim under Section 4 of the Clayton Act where he alleged that securities dealers conspired to deny employment to persons who had been fired by an-other dealer. 540 F.2d at 830. Specifically, the plaintiff alleged that there was an express or tacit agreement among the securities dealers not to "pirate" persons from the other firms and would deny employment to persons who had either been fired or rejected for employment by any other se-curities dealer. *Id.* at 827. The plaintiff further al-leged that such agreements artificially reduced competition in the sale and purchase of securities in the United States. *Id.* The *Quinonez* court found that these "no-switching agreements," which may impair competition among the security dealers, was sufficient to state a claim under the Sherman Act. *Id.* at 829.

The *Roman* opinion relied upon both *Radovich* and *Quinonez.* In *Roman,* the plaintiff, an airplane engineer at Boeing, applied for an engineering posi-tion at Cessna while he was still employed at Boe-ing. 55 F.3d at. Initially, Cessna told him that he could expect a firm offer but later informed him that it would not hire him "solely because of an agreement between Cessna and Boeing that they would not hire engineers away from each other." *Id.* In reversing the district court's dismissal under Rule 12(b)(6), the court cited *Radovich* and *Quinonez* for the proposition that "plaintiffs whose opportunities in the employment market have been impaired by an anticompetitive agreement directed at them *as a particular segment of employees* have suffered an antitrust injury under the governing standard." *Id.* (emphasis added).

Notwithstanding that both *Radovich* and *Quinonez* were decided before the Supreme Court's promulgation of the antitrust injury requirement in *Brunswick,* they, like *Roman,* are critically distinct from the case at bar. That is, although *Radovich, Quinonez,* and *Roman* support Plaintiff's argument that loss of employment is actionable under the an-titrust laws, these cases are not controlling. The plaintiffs in all three cases alleged an anti-competitive conspiracy directed at a respective em-ployment market—football players in *Radovich,* se-curities brokers in *Quinonez,* and airplane engineers in *Roman.* In his Complaint, under the heading "Relevant Markets," Plaintiff states that "[t]he

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
(Cite as: 2009 WL 1508381 (E.D.Mich.))

United States market for the purchasing of pack-aged ice sales service is a distinct and separate mar-ket." (Am.Compl.¶ 55). Even assuming that this is a proper market,[FN13] Plaintiff has not alleged any anti-competitive effect on that market. Plaintiff ap-pears to acknowledge this in his responses to De-fendants' Motions, when he contends that "he is the immediate victim of an anticompetitive boycott that diminished competition for *his* services." (Pl.'s Resp. to Arctic Glacier's Mot. to Dismiss 9). Plaintiff's adaptation of the alleged relevant market from packaged ice sale representatives in his Com-plaint to the market for his services in his responses may be explained by language found in *Roman*. There, after noting that the plaintiff alleged being part of the labor market for airplane engineers and discussing how competition in that market was sup-pressed, the Court held that:

> FN13. The Sixth Circuit explained in "supplier markets such as the employment market in the instant case: the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant." *NHL Players Ass'n v. Plymouth Whalers Hockey Club,* 419 F.3d 462, 472 (6th Cir.2005).

*20 Mr. Roman has alleged that competition in *the market for his services* as an employee has been directly impeded by defendant's agreement not to compete for each other's employees. He further alleges that he was injured by that agree-ment because it prevented him from selling his services to the highest bidder.... We believe this is sufficient to allege antitrust standing.
*Roman,* 55 F.3d at 544–55. But any purported narrowing of the market by the *Roman* court to encompass only individual markets for one's re-spective services was not only unnecessary in that case but also would have been in conflict with the antitrust standing factors articulated in *Associated General Contractors.* The second factor requires courts to analyze "the nature of the plaintiff's alleged injury" including whether

the plaintiff was a "consumer [ ]or a competitor in the market in which trade was restrained." *Associated Gen. Contractors,* 459 U.S. at 538–39; *see also Vinci v. Waste Mgmt. Inc.,* 80 F.3d 1372, 1376 ("[A] plaintiff who is neither a competitor nor a consumer' in the relevant market does not suffer 'antitrust injury.' ") (citations and internal quotations omitted)). Just like in the in-stant action, the plaintiff in *Roman* was not a con-sumer or competitor in any market for his ser-vices. Rather, he was a competitor in the market for airplane engineers.

Plaintiff also relies on *Ostrofe v. H.S. Crocker Co.,* 740 F.2d 739, 742 (9th Cir.1984), which was expressly limited by *Vinci v. Waste Mgmt., Inc.,* 80 F.3d 1372 (9th Cir.1996). In *Ostrofe,* the plaintiff, a sales manager, allegedly was forced to resign after his employer, a manufacturer of paper lithograph labels, coerced the plaintiff to rig bids, fix prices, and allocate markets. 740 F.2d at 742. The plaintiff then claims that there was an implied agreement among label manufacturers to boycott him from the label industry. The Ninth Circuit held that the plaintiff satisfied the *Associated General Contract-ors* antitrust standing factors, including alleging an-titrust injury:

> [Plaintiff's] injury flowed from a violation of the antitrust policy, since it resulted from the elimin-ation of competition in the market for managerial services and would be ameliorated by the restora-tion of competition in that market.... As the im-mediate victim of the breach of antitrust policy he was its natural vindicator. No one else had a greater incentive to sue to restore competition in the market for his services.

*Id.* at 742–43. So, like the Tenth Circuit in *Ro-man,* the *Ostrofe* Court vacillated between a larger market for managerial services and an individual market for the plaintiff's services. But, just like in *Roman,* any narrowing of the market to include only the plaintiff appears to be both unintentional and inconsequential as both courts focused on the anticompetitive effects on the larger market, where

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

both of the plaintiffs were competitors.

**\*21** Regardless of the purported basis of the holdings in *Roman* or *Ostrofe,* Plaintiff's Amended Complaint clearly states that the relevant market is the market for packaged ice sales representatives. Instead of alleging an anticompetitive effect on that market, however, Plaintiff—under the heading "The Anticompetitive Effects of the Defendants' Termination and Boycott of [Plaintiff]"—merely alleges that the group boycott injured him personally. His Complaint does not mention any injury to the packaged ice sales market as a result of the alleged group boycott against him. Precedent from this Circuit clearly instructs that an antitrust plaintiff must allege not only an injury to himself but also an injury to the relevant market. *Bassett v. NCAA,* 528 F.3d 426, 430 (6th Cir.2008) (affirming dismissal of a complaint on antitrust injury grounds that alleged a similar "group boycott" of an employee); *see also Indeck Energy Servs., Inc. v. Consumers Energy Co.,* 250 F.3d 972, 977 (6th Cir.2000). Because Plaintiff has not alleged an anticompetitive effect on the market for packaged ice sales representatives, his antitrust claim must fail.

Finally, Plaintiff argues that since he alleges that Defendants' conspiracy to boycott Plaintiff is *per se* unlawful under the Sherman Act, he has stated a claim under the Sherman Act. But as noted by Home City, a plaintiff who pleads a *per se* violation must also plead antitrust injury. *See Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 339–40, n. 8, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (" '[P]roof of a *per se* violation and of antitrust injury are distinct matters that must be shown independently.' ") (quoting P. Areeda & H. Hovenkamp, Antitrust Law para. 334.2c, p. 330 (1989 Supp.).

Accordingly, the Court dismisses Plaintiff's antitrust claims because Plaintiff has failed to properly allege antitrust injury.

**c. Plaintiff's State Law Antitrust Claims**

In *Blair v. Checker Cab Co.,* 219 Mich.App.

667, 675, 558 N.W.2d 439 (1996), the Michigan Court of Appeals held that Michigan's antitrust law, the Michigan Antitrust Reform Act ("MARA") and the federal antitrust law (Sherman Act) "require similar evidence of concerted action or combination [such that the court must] consider federal precedent interpreting the Sherman Act's prohibition on combination in restraint of trade." The court then went on to analyze the plaintiff's claims solely with reference to federal case law interpreting the Sherman Act. Therefore, because Michigan courts apply Sherman Act analysis to the MARA, the preceding analysis applies to Count III as well as Count IV, for the allegations of both state and federal antitrust violations.

Accordingly, the Court dismisses Plaintiff's state law antitrust claims under MARA.

**7. Tortious Interference with Prospective Economic Advantage**

Defendants argue that Plaintiff fails to allege the required elements of his tortious interference claim.

In Michigan, the elements of a claim of tortious interference with a business relations are: "[1] the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, [3] an intentional interference by the defendant inducing or causing a breach or termination of the expectancy, and [4] resultant damage to the plaintiff." *BPS Clinical Labs. v. Blue Cross & Blue Shield,* 217 Mich.App. 687, 698–99, 552 N.W.2d 919 (1996) (citing *Lakeshore Community Hosp. ., Inc. v. Perry,* 212 Mich.App. 396, 401, 538 N.W.2d 24 (1995)).

**\*22** Plaintiff alleges that he had an "expectancy of a valid business relationship with manufacturers and distributors of packaged ice, given his acumen, experience, contacts, and accounts in the packaged ice industry." (Am.Compl.¶ 85). Plaintiff also claims that Defendants agreed to boycott him from the packaged ice industry with the purpose of perpetuating their unlawful market allocation scheme

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
(Cite as: 2009 WL 1508381 (E.D.Mich.))

and that as a result of this boycott, Plaintiff was deprived of employment opportunities in the only industry in which he had professional experience. (*Id.* ¶¶ 53, 88, 538 N.W.2d 24).

Several courts have held that tortious interference with business relations includes the interference with the prospect of obtaining employment. *See, e.g., Hoffman v. Roberto,* 85 B.R. 406, 415 (W.D.Mich.1987) (citing *Schipano v. Ford Motor Co.,* 102 Mich.App. 606, 621, 302 N.W.2d 307 (1981)); *Wilkerson v. Carlo,* 101 Mich.App. 629, 300 N.W.2d 658 (1980)); *see also* Restatement (Second) of Torts § 766B cmt. c (1979). But, " '[t]he [business relationship or expectancy of a relationship] must be a reasonable likelihood or a probability, not mere wishful thinking.' " *Grand Rapids Plastic, Inc. v. Lakian,* 188 F.3d 401, 408 (6th Cir.1999) (quoting *Trepel v. Pontiac Osteopathic Hosp.,* 135 Mich.App. 361, 354 N.W.2d 341 (1984)).

For instance, in *Wilkinson,* the plaintiff, an owner and trainer of standardbred horses, filed suit alleging tortious interference with advantageous economic relations after the executive manager at a local horse racing track made public accusations implicating plaintiff in a race-fixing scheme at the track. 101 Mich.App. at 631, 300 N.W.2d 658. Plaintiff's Complaint merely asserted that the executive manager disseminated the statements to the "community at large," and not to individuals who might maintain some influence on the type of economic relationships plaintiff might enjoy in the racing community. *Id.* at 661. Nonetheless, the Michigan Court of Appeals found that the plaintiff adequately stated a claim:

Considering the facts most favorable to plaintiff, there are only a small number of places where plaintiff could ply his trade. These tracks could reasonably, if not certainly be expected to be aware of defendant's accusations. Defendant reasonably could have expected other tracks to bar plaintiff from entering his horses in their races, and thus, ruin plaintiff's business.

*Id.*

Likewise, in *Hoffman,* the plaintiff, a former president of a trucking company, filed suit against a union official and the union itself after the union official sent two allegedly defamatory teleflexes to union locals with members employed by the trucking company. *Id.* at 408. Plaintiff alleged that "he had a reasonable expectation of obtaining further employment as a manager in the trucking industry since he had several years of experience working in that industry and that since prior to the alleged interference, his reputation in that industry was generally good." *Id.* at 416. He further averred that since the defendants knew of his experience and good reputation, they must have been aware of this expectation. *Id.* Finally, he submitted that the defendants distributed the teleflexes with the purpose of hampering plaintiff from finding further employment in the trucking industry. *Id.* In addition to these allegations in opposition to the defendant's motion for summary judgment, plaintiff offered as evidence (1) his testimony that although he distributed over 350 resumes over a four-year period, he never received a serious job offer in the trucking industry; and (2) the testimony of two employment counselors who found plaintiff's inability to find a job "unusual." *Id.* The court found that a reasonable jury could conclude that plaintiff had a reasonable expectation of finding employment in the trucking industry. *Id.* at 416. In so holding, the court focused on the appearance of an industry-wide blacklist and noted that while the trucking industry is not as small as the horse-racing community in *Wilkinson,* "it is still a relatively small community where one's reputation would be a valuable tool in finding employment." *Id.*

**\*23** Plaintiff's Amended Complaint thoroughly details Plaintiff's experience in the packaged ice industry, his ascension into sales management at Great Lakes, and his continued success at Party Time and then at Arctic Glacier. In addition, the Amended Complaint describes how the packaged ice industry is dominated by a few large compan-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
(Cite as: 2009 WL 1508381 (E.D.Mich.))

ies—three of which are defendants in this case. Finally, Plaintiff alleges specific factual allegations of Arctic Glacier's and Home City's involvement in a scheme to boycott Plaintiff from the packaged ice industry.

In addition to these general allegations of a business expectancy in the industry as a whole—like those in *Wilkinson* and *Hoffman*—Plaintiff provides specific allegations of the existence of a valid business relationship or expectancy. Plaintiff avers that in response to a letter he sent to Mr. Riley, the President of Tropical Ice, Mr. Riley agreed to meet with Plaintiff to discuss his employment application. (Am.Compl.¶ 45). During the course of that meeting, after informing Plaintiff that he was being "blackballed" from the industry by Arctic Glacier and its co-conspirators, Mr. Riley allegedly informed Plaintiff that he would call Plaintiff within several weeks to discuss Plaintiff's potential employment at Tropical Ice. (*Id.* ¶¶ 46–47). Lastly, Plaintiff alleges that after not hearing from Mr. Riley for roughly six weeks, Plaintiff called Mr. Riley, who told Plaintiff that Tropic Ice had agreed with Arctic Glacier to boycott Plaintiff as well. (*Id.* ¶ 48). In fact, according to Plaintiff, these conversations between Mr. Riley and Plaintiff at the restaurant and over the telephone were tape recorded. (*Id.* ¶¶ 46–48).

This alleged business expectancy with Tropic Ice was not mere "wishful thinking," as Plaintiff not only met with the president of a packaged ice corporation to discuss employment prospects, but at the conclusion of the meeting, Mr. Riley allegedly informed Plaintiff that he wanted to discuss Plaintiff's employment prospects further. Once Plaintiff called to inquire further about a position at Tropic Ice, he was informed that Tropic Ice had agreed with Arctic Ice not to hire Plaintiff. From this, the Court concludes that Plaintiff has adequately pled a cause of action for tortious interference of prospective economic advantage against Arctic Ice.

Plaintiff's tortious interference claims against

the remaining Defendants are based on a business expectancy similar to that found in *Wilkinson* and *Hoffman*. As noted above, Plaintiff alleged that before his termination he had a very good reputation in an industry dominated by a few major players. Therefore, Plaintiff has sufficiently pled the first element of his tortious interference claim.

The issue of whether Mr. Knowlton, Mr. Corbin, Home City, Reddy Ice, and Mr. Riley knew of the expectancy and whether they intentionally interfered with it—the second and third elements of Plaintiff's tortious interference claim—is not so easily resolved. Plaintiff alleges that during the course of his first meeting with Mr. Riley, "Mr. Riley told him that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire [Plaintiff]. According to Mr. Riley, Plaintiff was being "blackballed" from the industry." (Compl.46) (emphasis added).

**\*24** Even assuming that the co-conspirators in the market allocation scheme referenced by Mr. Riley include Mr. Knowlton, Mr. Corbin, Home City, and Reddy Ice, or any combination thereof, and that they agreed not to hire Plaintiff, Plaintiff has failed to alleged facts showing that Mr. Knowlton, Mr. Corbin, Home City, Reddy Ice, or Mr. Riley intentionally interfered with Plaintiff's reasonable expectation of employment in the packaged ice industry. By agreeing not to hire Plaintiff, the particular Defendant may have defeated any reasonable expectation that Plaintiff had of being hired by that Defendant. A defendant, however, cannot be held liable for interfering with its own business relationship or expectancy with a plaintiff. The defendant must be a "third party" to the expectancy or business relationship. *See, e.g., Dziera v. Mich. Oil Co., 152 Mich.App. 281, 287, 393 N.W.2d 610* (citing *Seven D Ents., Ltd. v. Fonzi, 438 F.Supp. 161 (E.D.Mich.1977)*). Plaintiff has not alleged any facts demonstrating that any of the Defendants besides Arctic Ice interfered with an employment expectancy that Plaintiff allegedly had with a third party. Further, the mere existence of a conspiracy

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-md-02311-SFC-RSW ECF No. 384-29, PageID.5332 Filed 09/11/12 Page 24 of 30

Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723
**(Cite as: 2009 WL 1508381 (E.D.Mich.))**

among the Defendants not to hire Plaintiff does mean that any Defendant intentionally interfered with the business expectancy of any third party, including another one of the Defendants. Because Plaintiff has not alleged facts showing that any of the Defendants besides Arctic Ice interfered with the business expectancy of any third party, Plaintiff's tortious interference claim against Mr. Knowlton, Mr. Corbin, Home City, Reddy Ice, and Mr. Riley must be dismissed.

Accordingly, the Court GRANTS Mr. Knowton, Mr. Corbin's, Home City's, Reddy Ice's, and Mr. Riley's Motions to Dismiss Plaintiff's claim of tortious interference with prospective economic advantage. The Court, however, DENIES Arctic Glacier's Motion to Dismiss Plaintiff's tortious interference claim.

**III. CONCLUSION**

For the reasons stated, the Court:

(1) GRANTS Defendants Home City's, Reddy Ice's, Mr. Corbin's, and Mr. Riley's Motions to Dismiss Plaintiff's RICO claim under 18 U .S.C. § 1962(c) (Count I);

(2) DENIES Defendants Arctic Glacier's and Mr. Knowlton's Motions to Dismiss Plaintiff's RICO claim under 18 U.S.C.1962(c) (Count I);

(3) DISMISSES Plaintiff's RICO claim under 18 U.S.C. § 1962(d) (Count II);

(4) DISMISSES Plaintiff's Sherman antitrust claim (Count III);

(5) DISMISSES Plaintiff's Michigan antitrust claim under Mich. Comp. Laws § 445.772 (Count IV);

(6) DENIES Defendant Arctic Glacier's Motion to Dismiss Plaintiff's tortious interference with prospective economic advantage claim (Count V);

(7) GRANTS Defendants Home City's, Reddy

Ice's, Mr. Knowlton's, Mr. Corbin's, and Mr. Riley's Motions to Dismiss Plaintiff's tortious interference with prospective economic advantage claim (Count V);

**SO ORDERED.**

E.D.Mich.,2009.
McNulty v. Reddy Ice Holdings, Inc.
Not Reported in F.Supp.2d, 2009 WL 1508381 (E.D.Mich.), 2009-1 Trade Cases P 76,670, RICO Bus.Disp.Guide 11,723

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Attachment 1

Not Reported in F.Supp.2d, 2009 WL 2168231 (E.D.Mich.), RICO Bus.Disp.Guide 11,724
**(Cite as: 2009 WL 2168231 (E.D.Mich.))**

H

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
Martin G. McNULTY, Plaintiff,
v.
REDDY ICE HOLDINGS, INC., Reddy Ice Cor-
poration, Arctic Glacier Income Fund, Arctic Glaci-
er, Inc., Arctic Glacier International, Inc., Home
City Ice Company, Inc., Keith Corbin, Charles
Knowlton, Joseph Riley, Defendants.

No. 08–CV–13178.
July 17, 2009.

Andrew A. Paterson, Jr., Pleasant Ridge, MI,
Daniel A. Kotchen, Daniel L. Low, Kotchen & Low
LLP, Washington, DC, for Plaintiff.

Howard B. Iwrey, Dykema Gossett, Bloomfield
Hills, MI, Lisa A. Brown, Dykema Gossett, Detroit,
MI, Melissa B. Hirst, Paula W. Render, Jones Day,
Chicago, IL, Peter R. Silverman, Shumaker, Loop,
Toledo, OH, for Defendants.

*OPINION AND ORDER (1) GRANTING
PLAINTIFF'S MOTION FOR RECONSIDERA-
TION; (2) REVERSING THE COURT'S MAY 29,
2009 ORDER DISMISSING PLAINTIFF'S RICO
CLAIM UNDER 18 U.S.C. § 1962(c) AGAINST
DEFENDANTS REDDY ICE HOLDINGS, INC.,
REDDY ICE CORPORATION, HOME CITY ICE
COMPANY, AND JOSEPH RILEY; AND (3) RE-
INSTATING PLAINTIFF'S RICO CLAIM UN-
DER 18 U.S.C. § 1962(c) AGAINST DEFEND-
ANTS REDDY ICE HOLDINGS, INC., REDDY
ICE CORPORATION, HOME CITY ICE COM-
PANY, AND JOSEPH RILEY*

PAUL D. BORMAN, District Judge.

**\*1** Now before the Court is plaintiff Martin G.
McNulty's ("Plaintiff") Motion for Reconsideration
filed on June 28, 2009. (Dkt. No. 88). Plaintiff filed
the Motion as a result of the U.S. Supreme Court's
recent decision in *Boyle v. United States,* No.
07–1309, 2009 WL 1576571, —— U.S. —— (June
8, 2009). Plaintiff asks this Court to reconsider its
findings regarding the existence of a RICO enter-
prise in light of *Boyle.* Because Plaintiff's factual
allegations against Home City Ice Company, Reddy
Ice Holdings, Inc., Reddy Ice Corporation, and
Joseph Riley meet the threshold standard for a
RICO enterprise articulated in *Boyle,* the Court
GRANTS Plaintiff's Motion for Reconsideration
and REINSTATES his claim under 18 U.S.C. §
1962(c) against Home City Ice Company, Reddy
Ice Holdings, Inc., Reddy Ice Corporation, and
Joseph Riley.

**I. BACKGROUND**

Plaintiff, a former packaged ice salesperson,
was an employee of Arctic Glacier International,
Inc., the wholly-owned subsidiary of Arctic Glaci-
er, Inc., which is the wholly-owned subsidiary of
Arctic Glacier Income Fund. These three compan-
ies are collectively referred to as "Arctic Glacier."
Plaintiff alleges that while he was employed by
Arctic Glacier, he discovered that Arctic Glacier
was involved in a market allocation scheme with
Home City Ice Company ("Home City"). Upon
questioning Keith Corbin, a former vice president
of sales for Arctic Glacier, about the market alloca-
tion scheme between Arctic Glacier and Home
City, Mr. Corbin allegedly informed him that Arctic
Glacier had the same market allocation arrangement
with Reddy Ice Holdings, Inc. and Reddy Ice Cor-
poration (collectively, "Reddy Ice"). Plaintiff al-
leges that he refused to participate in the market al-
location scheme and that as a result, Arctic Glacier
terminated him.

Shortly following his termination from Arctic
Glacier, Plaintiff signed an agreement with Arctic
Glacier, titled "FULL AND FINAL RECEIPT, RE-
LEASE, DISCHARGE AND
NON–COMPETITION AGREEMENT"
("Release"). In addition to containing a six month

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2168231 (E.D.Mich.), RICO Bus.Disp.Guide 11,724
**(Cite as: 2009 WL 2168231 (E.D.Mich.))**

non-compete clause, the Release provides that in consideration of a severance payment, Plaintiff agreed not to sue Arctic Glacier or its employees with respect to any claims that he has prior to or as of the time that he signed the Release. During the pendency of the non-compete period, Plaintiff informed the federal government of alleged collusion among his former employer, Arctic Glacier, and Home City and Reddy Ice, and began working with federal authorities on the matter, including the Federal Bureau of Investigation ("FBI") and the Department of Justice.

After the non-compete period expired, Plaintiff alleges that he actively began looking for employment with manufacturers and distributors of packaged ice; his only promising lead was from Tropic Ice Company ("Tropic Ice"), which was later acquired by Arctic Glacier. Joseph Riley, the President of Tropic Ice agreed to meet with Plaintiff to discuss his application for employment. During the meeting, Mr. Riley informed Plaintiff, who allegedly was wearing a recording device provided to him by the FBI, that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed not to hire Plaintiff—specifically, that Plaintiff was being "blackballed" from the industry. Mr. Riley also informed Plaintiff that Tropic Ice had also been conspiring with Arctic Glacier to allocate markets. Despite this, Plaintiff alleges that Mr. Riley told him that he would call him to discuss Plaintiff's potential employment with Tropic Ice. After Mr. Riley never called Plaintiff, Plaintiff called him and was told that Tropic Ice had agreed with Arctic Glacier that it would not hire Plaintiff.

**\*2** On July 23, 2008, Plaintiff filed the instant suit against Reddy Ice, Arctic Glacier, Home City, Mr. Corbin, Mr. Knowlton, and Mr. Riley (collectively "Defendants"), alleging, *inter alia,* violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). Defendants each moved this Court to dismiss all of Plaintiff's claims. In an Opinion and Order dated May 29, 2009 ("Order"), the Court dis-

missed all of Plaintiff's claims against Defendants Reddy Ice, Home City, Mr. Corbin, and Mr. Riley. As to Plaintiff's RICO claim, the Court found that Plaintiff alleged facts, which if true, would establish only that Arctic Glacier, not the other Defendants implicated in the market allocation scheme, constituted a RICO enterprise.

## II. ANALYSIS

### A. Standard of Review

Plaintiff indicates that his Motion is brought pursuant to Federal Rule of Civil Procedure 54(b). Under Rule 54(b), district courts may revise any interlocutory judgments "at any time before the entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties." *See also Mallory v. Eyrich,* 922 F.2d 1273, 1282 (6th Cir.1991) ("District courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of final judgment. A district court may modify, or even rescind, such interlocutory orders.") (citations omitted). Although Local Rule 7.1(g)(1) provides that "[a] motion for rehearing or reconsideration must be filed within 10 days after entry of the judgment or order," that rule is inapplicable where, as here, there is a purported intervening change in controlling law, especially considering that a district court's power under Rule 54(b) is discretionary and may be exercised at "any time." *See Kniffen v. Macomb County,* 2006 WL 3205364, at \*1 (E.D.Mich. Nov.3, 2006) (citing *Lamar Advertising of Mobile, Inc. v. City of Lakeland,* 189 F.R.D. 480, 492 (D.C.Fla.1999)).

### B. RICO Enterprise

As noted by Plaintiff, the U.S. Supreme Court decision in *Boyle,* recently clarified the standard for demonstrating a RICO enterprise. According to *Boyle,* an association-in-fact enterprise requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at \*5. An association-in-fact under *Boyle,* however, does not require any hierarchical struc-

Not Reported in F.Supp.2d, 2009 WL 2168231 (E.D.Mich.), RICO Bus.Disp.Guide 11,724
**(Cite as: 2009 WL 2168231 (E.D.Mich.))**

ture:

[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*3 *Id.* at *6.

While Boyle does not represent a watershed change in controlling law, it does constitute a important clarification of the standards for establishing a RICO enterprise originally set forth in *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Such a clarification was necessary because many of the circuits, including the Sixth Circuit, either wrongly applied or cited a more stringent standard than was required under *Turkette.*

In support of their respective Motions to Dismiss Plaintiffs' Amended Complaint, Reddy Ice, Home City, and Mr. Riley all argued that this Court should apply the standard espoused in *Frank v. D'Ambrosi,* 4 F.3d 1378, 1386 (6th Cir.1993) and later cited in *VanDenBroeck v. CommonPoint Mortgage Co.,* 210 F.3d 696 (6th Cir.2000) and *United States v. Chance,* 306 F.3d 356 (6th Cir.2002). In those cases, the Sixth Circuit held that "an association-in-fact ... must be separate from the pattern of racketeering activity in which it engages," *Frank,* 4 F.3d at 1386, and that a "hallmark of a RICO enter-

prise is its *ability to exist apart from the pattern of wrongdoing." VanDenBroeck,* 210 F.3d at 699 (emphasis added). Some courts have taken this language to mean that the existence of an enterprise may not be inferred from evidence showing that associates engaged in a pattern of racketeering; they must be separate—a standard which the Supreme Court specifically rejected in *Boyle.*

In deciding Defendants' Motions to Dismiss, this Court chose not to apply the language in *Frank.* Instead, the Court relied on a more recent Sixth Circuit decision in *United States v. Johnson,* 440 F.3d 832 (6th Cir.2006). There, the Sixth Circuit held that "[a] RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making. The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise." *Id.* at 840. Certainly, such a standard is much closer to the Supreme Court's clarification in *Boyle* than that enumerated in *Frank* or *VanDenBroeck,* but *Johnson* does not go quite as far as *Boyle.* As quoted above, the *Boyle* Court specifically rejected any requirement of rigid decision-making schemes.

In applying *Johnson,* this Court held that Plaintiff did not allege facts establishing "any kind of meaningful structure among Defendants that would otherwise distinguish their relationship from a mere conspiracy," and that as a result, Plaintiff did not allege that Defendants, or any combination of Defendants, constituted a RICO enterprise. Order at 23. The lack of "meaningful" structure was predicated on *Johnson's* organizational requirements. *Boyle* removed any such requirements and instead held that an association-in-fact enterprise need only have three structural features: "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle,* —— U.S. ——, at ——, 129 S.Ct. 2237, —— L.Ed.2d ——, at ——, 2009 WL 1576571, at *5.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2168231 (E.D.Mich.), RICO Bus.Disp.Guide 11,724
**(Cite as: 2009 WL 2168231 (E.D.Mich.))**

**\*4** In the instant action, the Court finds that Plaintiff adequately pled a RICO enterprise against Defendants Arctic Glacier, Reddy Ice, Home City, and Mr. Riley, alleging facts sufficient to satisfy *Boyle's* three structural elements.

Initially, it is important to remember that the Court found that Plaintiff, in signing his Release, has waived any and all claims that he had against Arctic Glacier, and its employees, Mr. Knowlton and Mr. Corbin, prior to February 17, 2005, including claims pertaining to alleged price fixing scheme. Therefore, the Court cannot use allegations of Arctic Glacier's, Mr. Knowlton's, or Mr. Corbin's involvement in the market allocation scheme prior to February 17, 2005 to establish a RICO enterprise, which includes one or all of these Defendants as an associate of that enterprise.

As to the first *Boyle* element, Plaintiff contends that Defendants had a common purpose: "to raise the price of packaged ice and decrease competition in order to increase profits, and to prevent or discourage others—including Plaintiff—from interfering with profitable schemes." (Pl.'s Br. at 5 n. 7). In spite of the constraints imposed by the Release, Plaintiff has pled facts, that if proven to be true, would establish a common purpose among Arctic Glacier, Home City, Reddy Ice, and Mr. Riley to boycott Plaintiff's employment in the packaged ice market in order to further their alleged market allocation scheme. For instance, Plaintiff alleges that Mr. Riley not only told him that Tropic Ice had been conspiring with Arctic Glacier to allocate markets but also more importantly, that Arctic Glacier and its co-conspirators in the market allocation scheme, i.e., Home City and Reddy Ice, had all agreed not to hire Plaintiff in furtherance of their market allocation scheme. (*See* Am. Compl. ¶¶ 46–47, 64).

As to the second structural feature, Plaintiff contends that he alleged sufficient relationships "among the Defendants, including periodic meetings and telephone calls in furtherance of the market allocation conspiracy and in furtherance of the

scheme to tamper with and retaliate against Plaintiff." (Pl.'s Br. at 5 n. 7). In support, Plaintiff cites paragraphs fifty and fifty-one of his Amended Complaint. These paragraphs, when read in conjunction with paragraphs forty-six through forty-eight, are sufficient to establish relationships among Defendants Arctic Glacier, Home City, Reddy Ice, and Mr. Riley. That is, although these paragraphs do not establish any more formal organizational structure such as hierarchical decision-making or fixed roles, they are sufficient to establish a continuing relationship among Arctic Glacier, Home City, Reddy Ice, and Mr. Riley to boycott Plaintiff's employment in the packaged ice industry in furtherance of their market allocation scheme.

Plaintiff has also alleged facts sufficient to establish the third structural element—longevity sufficient to permit Arctic Glacier, Home City, Reddy Ice, and Mr. Riley to boycott Plaintiff from the packaged ice industry in order to further their market allocation scheme. Arctic Glacier terminated Plaintiff in January 2005. In March 2005, Arctic Glacier allegedly attempted to bribe Plaintiff by offering his job back at an increased salary if he ceased cooperating with the government. In September 2005, Plaintiff applied for employment with Home City, but his application was rejected. Sometime in late 2005 or early 2006, Plaintiff applied for employment with Tropic Ice and arranged a meeting with its president, Mr. Riley. During the January 27, 2006 meeting, Plaintiff allegedly learned that Arctic Glacier, Home City, and Reddy Ice had all agreed not to hire Plaintiff. Six weeks later, Plaintiff also allegedly learned that Mr. Riley agreed with Arctic Glacier not to hire Plaintiff. Therefore, roughly a year had passed from the time that Arctic Glacier had attempted to bribe Plaintiff to Plaintiff finding out that even Tropic Ice had agreed to boycott Plaintiff from employment in the packaged ice industry. The Court finds that this is a sufficient period of time for these associates to carry out the enterprise's purpose, thereby satisfying *Boyle's* third structural element.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2168231 (E.D.Mich.), RICO Bus.Disp.Guide 11,724
**(Cite as: 2009 WL 2168231 (E.D.Mich.))**

**C. Pattern of Racketeering Activity and Proximate Cause**

**\*5** Including Home City, Reddy Ice, and Mr. Riley as part of the RICO enterprise does not alter the pattern of racketeering activity and proximate cause findings. As alleged, and as limited by the Release, the RICO enterprise consisting of Arctic Glacier, Home City, Reddy Ice, and Mr. Riley was to boycott Plaintiff from employment in the packaged ice industry in order to persuade Plaintiff from cooperating with government officials and to punish Plaintiff for actually doing so. Therefore, while the pattern of racketeering activity may include predicate acts of mail fraud and wire fraud by Home City, Reddy Ice, and Mr. Riley, it remains squarely directed at Plaintiff.

**III. CONCLUSION**

For the reasons stated, the Court

(1) GRANTS Plaintiff's Motion for Reconsideration;

(2) REVERSES its May 29, 2009 Order dismissing Plaintiff's RICO claim under 18 U.S.C. § 1962(c) against Home City, Reddy Ice, and Mr. Riley for failing to adequately allege their involvement in a RICO enterprise; and

(3) REINSTATES Plaintiff's RICO claim under 18 U.S.C. § 1962(c) against Home City, Reddy Ice, and Mr. Riley.

**SO ORDERED.**

E.D.Mich.,2009.
McNulty v. Reddy Ice Holdings, Inc.
Not Reported in F.Supp.2d, 2009 WL 2168231 (E.D.Mich.), RICO Bus.Disp.Guide 11,724

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.