## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION** | 12-md-02311<br>Honorable Marianne O. Battani |
| **In Re: WIRE HARNESS CASES** | |
| **THIS RELATES TO:** | |
| **ALL DEALERSHIP ACTIONS AND ALL END-PAYOR ACTIONS** | W:12-cv-00102-MOB-MKM<br>W:12-cv-00103-MOB-MKM |

## END-PAYOR AND AUTOMOBILE DEALER PLAINTIFFS' BRIEF IN OPPOSITION TO LEAR CORPORATION'S RULE 12(b)(6) MOTION TO DISMISS

Dated: September 11, 2012

## **TABLE OF CONTENTS**

COUNTER-STATEMENT OF ISSUES PRESENTED ....................................................v

STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................. vi

ARGUMENT ...............................................................................................................1

I.      Summary of the Argument..............................................................................1

II.     Plaintiffs' Allegations Are More than Sufficient to Establish Lear's
        Participation in the Conspiracy.......................................................................1

        A.      Standard of Review...................................................................................1

        B.      The allegations in the Complaints are sufficient to proceed to
                discovery...................................................................................................2

        C.      Lear turns blinders to Plaintiffs' allegations.............................................7

        D.      Lear's relationship with Furukawa further supports the plausible
                inference of conspiracy.............................................................................7

        E.      Lear's arguments find no support in relevant case law..............................8

        F.      Lear impermissibly asks the Court to draw inferences in Lear's favor. ...............10

III.    Lear Is Liable for Its Post-November 2009 Conduct.......................................10

        A.      Lear again turns the pleading standard on its head. ...............................11

        B.      Lear mischaracterizes the Bankruptcy Court's opinion............................12

        C.      Lear cannot escape liability for its post-discharge conduct. ...................14

        D.      Lear is jointly and severally liable for damages arising from the
                conspiracy before its bankruptcy discharge.............................................17

CONCLUSION..........................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Ambook Enters. v. Time Inc.*,
 612 F.2d 604 (2d Cir. 1979) ................................................................................ 20

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................................... 4, 11

*Azar v. Conley*,
 480 F.2d 220 (6th Cir. 1973) ................................................................................ 11

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................... 4, 11

*Carrier Corp. v. Outokumpu Oyj*,
 673 F.3d 430 (6th Cir. 2012) ................................................................. 11, 12, 13

*Conley v. Gibson*,
 355 U.S. 41 (1957) ................................................................................................ 4

*Costco Wholesale Corp. v. AU Optronics Corp.*,
 2011 U.S. Dist. LEXIS 96741 (N.D. Cal. Aug. 29, 2011) ...................................... 11

*Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*,
 187 F. Supp. 2d 400 (W.D. Pa. 2002) ................................................................... 21

*Garlington v. O'Leary*,
 879 F.2d 277 (7th Cir. 1989) ................................................................................ 10

*Hanover Shoe, Inc., v. United Shoe Mach. Corp.*,
 392 U.S. 481 (1968) ....................................................................................... 18, 19

*Havoco of Am., Ltd. v. Shell Oil Co.*,
 626 F.2d 549 (7th Cir. 1980) ......................................................................... 13, 20

*Hinds County v. Wachovia Bank N.A.*,
 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ................................................................... 11

*In re Digital Music Antitrust Litig.*,
 812 F. Supp. 2d 390 (S.D.N.Y. 2011) ................................................................... 11

*In re Elevator Antitrust Litig.*,
 502 F.3d 47 (2d Cir. 2007) .................................................................................... 11

*In re High Fructose Corn Syrup Antitrust Litig.*,
 295 F.3d 651 (7th Cir. 2002) ................................................................................ 12

*In re Korean Air Lines Co. Antitrust Litig.*,
  2008 U.S. Dist. LEXIS 111722 (C.D. Cal. June 25, 2008) .................................... 11

*In re Lear Corporation*,
  No. 09-14326, 2012 Bankr. LEXIS 440 (Bankr. S.D.N.Y. Feb. 10, 2012)............................ 15

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
  710 F. Supp. 152 (E.D. Pa. 1989) .............................................................. 20, 21, 22

*In re Nine West Shoes Antitrust Litig.*,
  80 F. Supp. 2d 181 (S.D.N.Y. 2000) ...................................................................... 17

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010)............................................................... 11, 12

*In re Refrigerant Compressors Antitrust Litig.*,
  2012 U.S. Dist. LEXIS 80269 (E.D. Mich. June 11, 2012)..................................... 11

*In re TFT-LCD Antitrust Litig.*,
  599 F. Supp. 2d 1179 (N.D. Cal. 2009) ................................................................ 11

*In re Travel Agent Commission Antitrust Litigation*,
  583 F.3d 896 (6th Cir. 2009) .......................................................... 17, 18, 19

*In re WorldCom, Inc.*,
  546 F.3d 211 (2d Cir. 2008) .............................................................................. 20

*Jung v. Assoc. of Am. Med. Colls.*,
  300 F. Supp. 2d 119 (D.D.C. 2004)....................................................................... 11

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
  775 F. Supp. 2d 1071 (N.D. Ill. 2011) .................................................................. 22

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997).......................................................................... 17, 18, 19

*Machovec v. Council for Nat'l Register of Health Service Providers*,
  616 F. Supp. 258 (E.D. Va. 1985) ....................................................................... 11

*Mich. Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
  524 F.3d 726 (6th Cir. 2008) ............................................................................... 11

*Milliken & Co. v. CNA Holdings, Inc.*,
  2011 U.S. Dist. LEXIS 87677 (W.D.N.C. Aug. 8, 2011)....................................... 11

*Morton's Mkt. v. Gustafson's Dairy Inc.*,
  198 F.3d 823 (11th Cir. 1999) ............................................................................. 17

iii

*O'Loghlin v. Cnty. of Orange*,
   229 F.3d 871 (9th Cir. 2000) ............................................................ 20

*Pedreira v. Kentucky Baptist Homes for Children, Inc.*,
   579 F.3d 722 (6th Cir. 2009) ............................................................ 4

*Phillips v. Cnty. Of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ............................................................ 4

*Texas Indus. v. Racliff Materials, Inc.*,
   451 U.S. 630 (1981).......................................................................... 21

*United States v. Abelis*,
   146 F.3d 73 (2d Cir. 1998) ............................................................... 10

*United States v. Aleskerova*,
   300 F.3d 286 (2d Cir. 2002) ............................................................. 10

*United States v. Consol. Packaging Corp.*,
   575 F.2d 117 (7th Cir. 1978) ........................................................... 10

*United States v. Gallerani*,
   68 F.3d 611 (2d Cir. 1995) ............................................................... 20

*Wallace v. Bank of Bartlett*,
   55 F.3d 1166 (6th Cir. 1995) ........................................................... 11

*Watson Carpet & Floor Covering, Inc. v. Mohawk Inds., Inc.*,
   648 F.3d 452 (6th Cir. 2011) ........................................................... 20

*Wilk v. Am. Med. Ass'n*,
   735 F.2d 217 (7th Cir. 1983) ........................................................... 10

## COUNTER-STATEMENT OF ISSUES PRESENTED

1.    Is it plausible that a firm whose CEO announced that it was under investigation by the
      European Commission for price fixing actually participated in price fixing with
      competitors who admitted to price fixing?

      Suggested Answer: Yes.

2.    Is it plausible that a firm whose CEO announced that it was under investigation by the
      European Commission for price fixing actually participated in price fixing on or after
      November 9, 2009 with competitors who admitted to participating in a price fixing
      conspiracy that lasted "at least" through February 2010?

      Suggested Answer: Yes.

v

## <u>STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

*Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir. 1980)

*In re Lear Corporation*, No. 09-14326, 2012 Bankr. LEXIS 440 (Bankr. S.D.N.Y. Feb. 10, 2012)

*In re Lower Lake Erie Iron Ore Antitrust Litigation*, 710 F. Supp. 152 (E.D. Pa. 1989)

*In re Packaged Ice Antitrust Litig.*, 723 F. Supp.2d 987 (E.D. Mich. 2010)

*In re TFT-LCD Antitrust Litig.*, 599 F. Supp.2d 1179 (N.D. Cal. 2009)

*In re Travel Agent Commission Antitrust Litigation*, 583 F.3d 896 (6th Cir. 2009)

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)

## <u>ARGUMENT</u>

**I.     Summary of the Argument.**

Attempting to extricate itself from the allegations of conspiracy, Lear[1] seeks dismissal of End-Payor and Automobile Dealer Plaintiffs' ("Plaintiffs") Complaints based on two flawed arguments: first, that the Complaints make no specific allegations as to Lear, and therefore fail to state a claim under Rule 12(b)(6); second, that any theoretical liability which Lear might have was erased when it was discharged from bankruptcy in November 2009.

Lear's motion turns blinders to Plaintiffs' allegations, which are more than sufficient to render Lear's participation in the conspiracy plausible.  Further, Lear cannot escape financial responsibility for its actions.  Well-established principles of antitrust law make even a late-joining conspirator liable for all the damages caused by the conspiracy, even those caused before it joined.  Accordingly, Lear's post-discharge conduct renders it jointly and severally liable for all damages flowing from the conspiracy.

**II.    Plaintiffs' Allegations Are More than Sufficient to Establish Lear's Participation in the Conspiracy.**

**A.     Standard of Review.**

In *Twombly* the Supreme Court reaffirmed that Rule 8, "'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests,' " and that this standard does not require "detailed factual allegations." *Twombly,* 127 S.Ct. at 1964 (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99). *Twombly* did not displace the "notice pleading" standard of

---

[1] The Complaints define Lear Corporation and Kyungshin-Lear Sales and Engineering, LLC together as "Lear."  E-P Complaint ¶95; D Complaint ¶100.  Because Lear Corporation filed a Motion to Dismiss separately from Kyungshin-Lear Sales and Engineering, LLC, this Memorandum will use "Lear" to refer only to Lear Corporation.

Federal Rule of Civil Procedure 8, and its application is still valid in antitrust cases.[2]   Further, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Twombly,* 127 S.Ct. at 1964, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).   In antitrust cases, where the plaintiff alleges an illegal agreement, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; but simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly* at 556.[3]

In applying *Twombly*, the Sixth Circuit has reaffirmed that courts must "construe the Complaint in the light most favorable to Plaintiffs and accept all allegations as true." *Pedreira v. Kentucky Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009).   Further, a motion to dismiss should be denied if "factual allegations [are] enough to raise a right to relief above a speculative level" and that "the claim to relief is plausible on its face."   *Id.*

## B.    The allegations in the Complaints are sufficient to proceed to discovery.

In this case, Plaintiffs have more than met their pleading burden under Rule 8, as well as *Twombly* and its progeny.   Plaintiffs' Complaints contain numerous, detailed factual allegations concerning Lear and the conspiracy in which Plaintiffs allege Lear participated.   Plaintiffs'

---

[2]*See, e.g. Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (noting that under *Twombly*, notice pleading is "still the rule" and "requires only a short and plain statement of the claim showing that the pleader is entitled to relief.")

[3]Unlike the facts here, in *Twombly* there was no plausible conspiracy to engage in anticompetitive conduct.   The best that the *Twombly* plaintiffs could allege was "parallel conduct" by defendants that gave rise to an inference of a conspiracy.   As the Court explained, the *Twombly* complaint "failed to set forth a single fact that suggested an agreement."  550 U.S. at 561-562.   Even so, the Court recognized that the allegation of "parallel conduct . . . gets the complaint close to stating a claim" but that by itself it did not "nudge claims across the line from conceivable to plausible."  *Id.* at 556-57.   The *Twombly* plaintiffs lacked facts that are detailed in the present Complaints, including specific allegations of collusion, admissions of anticompetitive agreement, DOJ investigations, indictments, and guilty pleas.

2

factual allegations establish a plausible conspiracy in which Lear joined.   These allegations include, without limitation:

> "Defendant Furukawa Wiring Systems America, Inc. f/k/a Furukawa Lear Corporation and Lear Furukawa Corporation ("Furukawa Wiring") is a Delaware corporation with its principal place of business in El Paso, Texas. Defendant Furukawa Wiring is 60% owned by Furukawa Electric and 40% owned by American Furukawa. During the Class Period, Furukawa Wiring operated as a joint venture between Lear Corporation and Furukawa Electric that manufactured, distributed or sold Wire Harness Products in the United States. In June 2010, Furukawa Electric purchased all of Lear's remaining interest.   End-Payor Plaintiffs' Corrected Consolidated Amended Class Action Complaint ("E-P Complaint") ¶91; Automobile Dealers Consolidated Class Complaint ("D Complaint") ¶96.

> "Defendant Lear Corp. is a Delaware corporation with its principal place of business in Southfield, Michigan. Defendant Lear – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period."   E-P Complaint ¶93; D Complaint ¶98.

> "Lear filed for Chapter 11 bankruptcy protection on July 7, 2009. After their emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy alleged herein. From and after

November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices. In 2010 alone, Lear had $2.5593 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy hereinafter alleged." E-P Complaint ¶96; D Complaint ¶101.

➤ "Defendants [collectively] and their co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States." E-P Complaint ¶140; D Complaint ¶138.

➤ "By virtue of their market shares, Defendants [including Lear with 5%] are the dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and the world." E-P Complaint ¶150; D Complaint ¶151.

➤ "The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same," thereby supporting an inference of anticompetitive conduct. E-P Complaint ¶153; D Complaint ¶154.

➤ "The structure and other characteristics of the Automotive Wire Harness Systems market in the United States are conducive to a price-fixing agreement, and have

made collusion particularly attractive in this market."  E-P Complaint ¶154; *see also* E-P Complaint ¶¶155-63 (detailing characteristics of the wire harness market rendering it ripe for collusion); D Complaint ¶156-67.

➤ "A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems."  E-P Complaint ¶164; D Complaint ¶168; *see also* E-P Complaint ¶¶165-69 (providing additional details concerning the global investigation, as well as raids and seizures of evidence); D Complaint ¶164-82.

➤ "Lear's Chief Executive Officer Bob Rossiter has stated that Lear was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers."  E-P Complaint ¶167; D Complaint ¶171.

➤ Numerous co-defendant corporations and individuals have already pleaded guilty to the conspiracy End-Payor Plaintiffs allege.  *See* E-P Complaint ¶¶172-83; D Complaint ¶183-213.

➤ "In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of Furukawa, Sumitomo, and Yazaki as part of an expansive investigation into collusion in the industry dating back to at least 2003."  E-P Complaint ¶168; D Complaint ¶172.

➤ "On September 29, 2011, the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of Automotive Wire

Harness Systems to automobile manufacturers." E-P Complaint ¶172; D Complaint ¶183.

➢ "Furukawa Electric was charged with price fixing in violation of the Sherman Act." E-P Complaint ¶173; D Complaint ¶184.

➢ "Furukawa Electric has pleaded guilty for its role in a conspiracy to rig bids for and to fix the prices of the sale of Automotive Wire Harnesses and related products sold to automobile manufacturers in the United States and elsewhere. The DOJ announced in a press release that Furukawa Electric participated in the conspiracy from at least as early as January 2000, until at least January 2010. E-P Complaint ¶174; D Complaint ¶185.

➢ "The plea agreements discussed herein are an outgrowth of the DOJ's first charges in its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry. According to four separate one-count felony charges filed in the Unites States District Court for the Eastern District of Michigan in Detroit, Furukawa Electric and its executives – Junichi Funo, Hirotsugu Nagata, and Tetsuya Ukai – engaged in a conspiracy to rig bids for and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere." E-P Complaint ¶175; D Complaint ¶187.

Taken together and accepted as true for the purpose of analyzing Lear's motion to dismiss, Plaintiffs' allegations establish: (1) Lear manufactured automotive wire harnesses and participated in the market for the same; (2) the wire harness market was ripe for Defendants to enter into an unlawful conspiracy; (3) anticompetitive price increases during the Class Period

6

support the inference of a conspiracy; (4) Lear is under investigation by European authorities for anticompetitive practices; (5) guilty pleas establish that the Defendants actually entered into a price-fixing conspiracy; and (6) Lear's own joint venture partner pleaded guilty to the alleged conspiracy. Plaintiffs have satisfied their pleading burden.

### C. Lear turns blinders to Plaintiffs' allegations.

The foundation of Lear's Motion to Dismiss is that "the Complaint alleges no facts to <u>suggest</u> that Lear ever … joined in the alleged conspiracy. … The only apparent reason that Lear was named … is that it sells the same product as certain competitors that admitted to breaking the law."[4] Lear mischaracterizes the Complaints. As detailed above, Plaintiffs' allegations are by no means so bare-boned. For example, in so arguing Lear chooses to ignore the statement by its CEO admitting that Lear "was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers . . . ." E-P Complaint ¶ 167; D Complaint ¶171. When Lear's admission of a government investigation is coupled with allegations that some of Lear's competitors and its own joint venture partner (Furukawa Electric) pleaded guilty to a conspiracy to fix prices with *their* competitors (which include Lear, even if not specifically named), Lear's alleged participation in the conspiracy appears more than plausible.

### D. Lear's relationship with Furukawa further supports the plausible inference of conspiracy.

Lear cannot escape the inferences to be drawn from its close relationship with Furukawa during the class period. "[O]nce the conspiracy has been established," as is the case here, only "slight evidence is needed to connect a particular participant" to it. *Wilk v. Am. Med. Ass'n*, 735 F.2d 217, 219 (7th Cir. 1983) (quoting *United States v. Consol. Packaging Corp.*, 575 F.2d 117,

---

[4] Lear's Memorandum, pp. 1-2 (emphasis added).

126 (7th Cir. 1978)); *see also United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002)

("Moreover, 'only slight evidence is required to link another defendant with a conspiracy once

the conspiracy has been shown to exist.'") (quoting *United States v. Abelis*, 146 F.3d 73, 80 (2d

Cir. 1998)). Indeed, even "the circumstances surrounding a party's actions can support an

inference of participation in a conspiracy." *Garlington v. O'Leary*, 879 F.2d 277, 281 (7th Cir.

1989).

Lear's joint venture partner Furukawa, and three of its executives, pleaded guilty to

participating in the very same conspiracy in which Lear is alleged to have participated and which

gives rise to this case. E-P Complaint ¶¶172-75; D Complaint ¶183-96. Furukawa's

involvement in the conspiracy stretched from January 2000 until at least January 2010—well

after November 2009, the date of Lear's release in bankruptcy. E-P Complaint ¶174; D

Complaint ¶185. Even after Lear's bankruptcy discharge, Lear continued to partner with

Furukawa (an admitted felon) in the Automotive Wire Harness Systems joint venture and

financially benefited from the unlawful, supra-competitive prices charged by its co-conspirators,

at least until June 2010, when Lear's interest in the joint venture was purchased by Furukawa.

E-P Complaint ¶91; D Complaint ¶101. When coupled with Lear's own admission that it is

being investigated by European authorities for anticompetitive conduct, Lear's partnership with

Furukawa further supports an inference of conspiracy that is more than plausible.

E. **Lear's arguments find no support in relevant case law.**

Lear cites no cases in which an antitrust complaint was dismissed against a defendant

where, as here, the complaint alleged both 1) a government investigation into the defendant for

price fixing, and 2) guilty pleas by the defendant's competitors.[5]  Guilty pleas to price-fixing

---

[5] In *Bell Atlantic Corp. v. Twombly, Mich. Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726 (6th Cir. 2008), *Jung v. Assoc. of Am. Med. Colls.*, 300 F. Supp.

8

conspiracies typically make allegations that the guilty parties' competitors participated in the conspiracy plausible for *Twombly* purposes under Rule 12(b)(6).  *See, e.g., In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1006-07 (E.D. Mich. 2010) (guilty pleas by some defendants supported plausibility of allegations that all defendants conspired); *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009) (same); *Costco Wholesale Corp. v. AU Optronics Corp.*, 2011 U.S. Dist. LEXIS 96741, *22 (N.D. Cal. Aug. 29, 2011) ("In light of the factual allegations in [the] complaint, as well as the guilty pleas of many defendants for conspiring to fix prices of TFT-LCD panels, [plaintiff's] allegations that the conspiracy encompassed STN-LCD products are plausible on their face"); *Milliken & Co. v. CNA Holdings, Inc.*, 2011 U.S. Dist. LEXIS 87677 (W.D.N.C. Aug. 8, 2011), *37 ("When viewed in context, however, the guilty plea does enhance the expectation that discovery might lead to evidence of an illegal agreement."); and *In re Korean Air Lines Co. Antitrust Litig.*, 2008 U.S. Dist. LEXIS 111722 (C.D. Cal. June 25, 2008) ("While the above allegations, standing alone, may not suffice to establish a conspiracy, taken together, against the backdrop of Korean Air's guilty plea, they render Plaintiffs' allegation of a price-fixing conspiracy between Defendants plausible").  Lear's Motion to Dismiss should be denied.

---

2d 119 (D.D.C. 2004), *Wallace v. Bank of Bartlett*, 55 F.3d 1166 (6th Cir. 1995) (summary judgment), and *Machovec v. Council for Nat'l Register of Health Service Providers*, 616 F. Supp. 258 (E.D. Va. 1985), there were no guilty pleas or government investigations alleged.  In *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) and *Hinds County v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009), there were government investigations alleged but no guilty pleas.  In *In re Refrigerant Compressors Antitrust Litig.*, 2012 U.S. Dist. LEXIS 80269 (E.D. Mich. June 11, 2012), there were no allegations of government investigations into the dismissed defendants.  In *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011), the court <u>denied</u> a motion to dismiss the antitrust claims, and in *Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430 (6th Cir. 2012), the Sixth Circuit <u>reversed</u> the district court's dismissal of the complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Azar v. Conley*, 480 F.2d 220 (6th Cir. 1973), were civil rights cases.

**F.      Lear impermissibly asks the Court to draw inferences in Lear's favor.**

Lear asks the Court to dismiss the Complaints because "the DOJ surely would have taken some action against Lear if enforcers had reason to suspect that Lear was involved in a conspiracy."[6]  But this is asking the Court to infer from DOJ's inaction (so far) that Lear is innocent.  Lear's argument flies in the face of black letter law.  When considering a 12(b)(6) motion, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Carrier Corp.*, 673 F.3d at 444.  With respect to antitrust complaints, it is improper "to infer lack of a civil conspiracy from the government's decision not to move against certain defendants."  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d at 1012 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-665 (7th Cir. 2002)).

Lear incorrectly characterizes the Complaints as alleging only that "an overseas affiliate of Lear was asked to produce documents in Europe …,"[7] but the Complaints actually allege that Lear itself was investigated, not just "an overseas affiliate."  E-P Complaint ¶167; D Complaint ¶171.  That is why Lear's quotation from the *Hinds County*[8] opinion – that allegations of an investigation of <u>some</u> defendants were "not sufficient to state a claim against the [defendants] who are not the subject of specific allegations in the [complaint]" – makes no sense.  As alleged in the Complaints, Lear <u>is</u> the subject of an investigation, and Lear <u>is</u> the "subject of specific allegations in the complaint."  Lear's Motion to Dismiss should be denied.

**III.      Lear Is Liable for Its Post-November 2009 Conduct.**

---

[6] Lear's Memorandum, p. 7.

[7] Lear's Memorandum, p. 7, note 7.

[8] Lear's Memorandum, p. 8.  Lear mis-cites <u>Hinds County</u> as "<u>Hinds City</u>."

Lear's argument that its bankruptcy discharge on November 9, 2009 requires dismissal of the Complaints against it is based on faulty logic, both as to the premise and the conclusion.  The premise is that it was literally impossible for Lear to have colluded with its competitors between its November 9, 2009 discharge and the end of the conspiracy, which Lear posits as February 2010 (when the first guilty pleas were announced).  But Lear had ample opportunity to continue to conspire during that window, and to assume that such a conspiracy was impossible requires drawing inferences against Plaintiffs.

Lear's conclusion is that, regardless whether it conspired after November 9, 2009, any liability for its pre-bankruptcy acts was wiped away by its bankruptcy discharge.  But Lear cites no case under federal antitrust law that so holds.  Instead, established antitrust law provides that a defendant is liable for the acts of its co-conspirators, even those that took place before the defendant joined.  *See, e.g., Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980).  Lear should not benefit from the fact that it was able to keep the conspiracy a secret until after its bankruptcy discharge.

### A.    Lear again turns the pleading standard on its head.

As with its 12(b)(6) argument, Lear's bankruptcy argument also asks the Court to draw inferences in its favor, contrary to the Rule and *Carrier Corp.*, 673 F.3d at 444.  Lear argues that the Complaints include no allegations of post-discharge (November 9, 2009) bid-rigging,[9] but that requires drawing an inference in Lear's favor.  The Complaints in fact allege that the guilty pleas included admissions that the conspiracies continued "at least" through February 2010, allowing Lear ample post-discharge time and opportunity to conspire.  Indeed, the Complaints further allege that after its emergence from bankruptcy, Lear continued to sell Automotive Wire

---

[9] Lear's Memorandum, pp. 11-12.

11

Harness Systems at supra-competitive prices "pursuant to and as part of its participation in furtherance of the conspiracy alleged herein." E-P Complaint ¶96; D Complaint ¶101.

Lear argues that the three year bid process and the "usual" four to six-year contract for wire harnesses somehow forecloses the possibility that Lear participated in bid rigging after November 2009. But nothing in the bid timeline renders impossible Lear's participation in the conspiracy throughout the class period, including after November 9, 2009. Nor is there any allegation that Plaintiffs and the class were damaged only by pre-discharge bids. The bankruptcy did not prevent Lear from participating in the conspiracy "at least through February 2010."

It comes with particular ill grace for Lear to say that Plaintiffs "waited"[10] until two years after Lear's bankruptcy to file their Complaints, as if Plaintiffs should have been aware of Lear's participation in the illegal conspiracy in real time. Lear points to nothing in its plan of reorganization that disclosed the conspiracy. And the Complaint alleges that Plaintiffs were not aware of the conspiracy until the DOJ announced the first guilty plea on September 29, 2011. E-P Complaint ¶ 204; *see also* D Complaint ¶234. For purposes of Lear's Motion, the Court must accept that allegation as true. Lear's Motion posits no reason why the Court should not.

### B. Lear mischaracterizes the Bankruptcy Court's opinion.

After the filing of the first complaints in these cases, and after its discharge from bankruptcy, Lear moved the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to dismiss the antitrust actions against it. In a decision particularly applicable here, the Bankruptcy Court denied Lear's motion. It held, in part:

> The Antitrust Plaintiffs hold "claims" against the Reorganized Debtors [Lear and certain affiliates] that should be enjoined to the extent they arose before November 9, 2009, the Effective Date of the Plan (the "Effective Date"). However, the Antitrust Plaintiffs

---

[10] Lear's Memorandum, p. 9.

> are entitled to seek recovery from Lear on their alleged post-
> Effective Date claims, and the question of Lear's liability under
> antitrust law for post-Effective Date conduct should be determined
> in the antitrust litigation, not in this Court. [11]

Lear mischaracterizes the Bankruptcy Court opinion in two important ways. First, Lear wrongly

claims that "the Bankruptcy Court unambiguously held that Plaintiffs' claims had been

discharged to the extent they arose before November 9, 2009."[12] The bankruptcy court actually

held:

> If antitrust law imposes joint and several damages on a conspirator
> for prior harm caused by his co-conspirators, it is premature for
> Lear to contend it is entitled to an injunction barring lawsuits
> alleging liability for claims based on post-Effective Date conduct.

Bankruptcy Court opinion, p. 19 (emphasis added). Thus, as further discussed below, the

Bankruptcy Court did not foreclose the possibility that traditional antitrust principles regarding

joint and several liability may render Lear liable for damages caused by its co-conspirators pre-

discharge from bankruptcy.

Second, Lear wrongly says that Plaintiffs represented to the Bankruptcy Court that

Plaintiffs would "'include in any consolidated amended complaint' allegations that 'Lear had

committed overt acts subsequent to the Effective Date …'".[13] The bankruptcy court actually

said:

> They [Plaintiffs] proposed, in fact, to include in any consolidated amended
> complaint the allegations that
>
>> After [Lear's] emergence from Chapter 11 bankruptcy proceedings
>> on November 9, 2009, Lear continued to sell Automotive Wire

---

[11] *In re Lear Corporation*, No. 09-14326, 2012 Bankr. LEXIS 440 (Bankr. S.D.N.Y. Feb. 10, 2012), pp. 3-4 ("Bankruptcy Court opinion") (emphasis added) (attached as Exhibit A).

[12] Lear's Memorandum, p. 9.

[13] Lear's Memorandum, pp. 9-10.

> Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices.

Bankruptcy Court opinion, pp. 17-18. Consistent with Plaintiffs' representation to the bankruptcy court, the Complaints include the following allegation:

> After their emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices. …

E-P Complaint ¶96; D Complaint ¶101.

### C. Lear cannot escape liability for its post-discharge conduct.

The Complaints uniformly allege that that after Lear's emergence from bankruptcy on November 9, 2009, it continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy. E-P Complaint ¶96; D Complaint ¶101. Indeed, from and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices. *Id.*

Each time Lear sold an Automotive Wire Harness System after its discharge from bankruptcy on November 9, 2009, it charged an unlawfully inflated price in furtherance of the alleged conspiracy. It is a well-accepted principle of antitrust law that the act of causing each and every one of those sales was an affirmative, overt act in furtherance of the conspiracy which financially benefited Lear. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (holding that "each sale to the plaintiff" at prices fixed pursuant to an ongoing conspiracy is an "overt act that is part of the violation"). This well-established principle is in accord with the concept of accrual of a cause of action in antitrust cases, which holds that in a continuing antitrust conspiracy, every sale of a price-fixed product and every sale of a product pursuant to a market

14

allocation or bid rigging conspiracy constitutes a violation of the antitrust laws for which each

co-conspirator is jointly and severally liable. As the Supreme Court has specifically held:

> Antitrust law provides that, in the case of a continuing violation,
> say, a price–fixing conspiracy that brings about a series of
> unlawfully high priced sales over a period of years, each overt act
> that is part of the violation and that injures the plaintiff, e.g., each
> sale to the plaintiff, starts the statutory period running again,
> regardless of the plaintiff's knowledge of the alleged illegality at
> much earlier times.

*Klehr*, 521 U.S. at 189 (emphasis added) (internal quotation marks omitted); *see also Morton's*

*Mkt. v. Gustafson's Dairy Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) ("[W]hen sellers conspire to

fix the price of a product, each time a customer purchases that product at the artificially inflated

price, an antitrust violation occurs") (emphasis added); *In re Nine West Shoes Antitrust Litig.*, 80

F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (observing that each sale at a fixed price is a "separate[ ]

overt act[.]"). Because a party joins a conspiracy by committing even one overt act, Lear's

alleged involvement in hundreds or even thousands of such acts after November 2009,

amounting to billions of dollars in sales of Automotive Wire Harness Systems, brings it firmly

within the conspiracy's ambit.

Lear's heavy reliance on *In re Travel Agent Commission Antitrust Litigation*, 583 F.3d

896 (6th Cir. 2009), does not support its argument that it is not liable for it post-discharge

unlawful conduct. That case, in contrast to the facts here, does not address affirmative acts done

pursuant to and in furtherance of a conspiracy post-bankruptcy, which is what is alleged in the

the cases at bar. In *Travel Agent Commission*, plaintiffs alleged defendant and other co-

conspirator airlines illegally conspired to cap, cut, and eliminate base commissions in violation

of the Sherman Act. *See id.* at 900. Each defendant successfully eliminated base commissions

by May 2002 and defendant United filed for bankruptcy some time thereafter. *See id.* at 900-01.

Plaintiffs alleged that United rejoined the conspiracy when it maintained the 0% base

15

commission policy upon emerging from bankruptcy in 2006 by "failing" to pay travel agents commissions.  The district court granted United's motion to dismiss on the ground that United's maintenance post-reorganization of the "0% commission policy did not create a new § 1 claim because its decision was merely a reaffirmation of a previous act" in March 2002 to cut its commissions.  *Id.* at 902 (quotations omitted).  In other words, United's inaction in maintaining its pre-existing policy was not an affirmative, overt act sufficient to create new antitrust liability.

Unlike the defendant in *Travel Agent Commission* (who merely maintained a pre-existing commission policy fixed in place years earlier), Lear sold Automotive Wire Harness Systems after November 2009 at supra-competitive prices, and each sale was an affirmative, overt act that inflicted continuing and accumulating harm upon Plaintiffs and the Classes.  *Hanover Shoe, Inc., v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968), and *Klehr,* 521 U.S. at 188-89, make clear that each such sale is an injurious overt act as to which a new Section 1 Sherman Act cause of action accrues, regardless of whether such sales also occurred pre-confirmation. Plaintiffs do not allege that Lear's conduct, spanning approximately a decade, was merely the reaffirmation of an initial agreement hatched in 2000, the rippling effects of which were felt for years thereafter.  To the contrary, Plaintiffs allege a continuing conspiracy, and Lear's active, ongoing participation in that conspiracy, whereby a new Section 1 claim accrued upon each sale of an Automotive Wire Harness System.  *See Hanover Shoe*, 392 U.S. at 502 ("[W]e are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm [upon Plaintiffs]").  *See also Klehr*, 521 U.S. at 188-89.

Moreover, courts have distinguished between price-fixing and other anti-competitive acts specifically in the context of "continuing violations."  In *Travel Agent Commission*, the Court of Appeals specifically rejected plaintiffs' continuing violation theory because defendant's

16

maintenance of the pre-existing 0% commission policy after emerging from bankruptcy in 2006 did not constitute an overt act—*i.e.*, the "final act to effectuate [the] conspiracy occurred in 2002, long before [defendant] emerged from bankruptcy." *Travel Agent Commission*, 583 F.3d at 902. By contrast, here, Lear affirmatively and repeatedly sold Automotive Wire Harness Systems post-confirmation at supra-competitive prices in furtherance of the conspiracy. Thus, this case is distinguishable from the decision in the *Travel Agent Commission* case, which involved only a claim of "inaction" made by travel agents against airlines. Indeed, the Court of Appeals in *Travel Agent Commission* pointed out that the action before it was unlike a price-fixing case. *See id.* The court noted that the Supreme Court in *Klehr* "reiterates that the antitrust laws recognize continuing violations and, more precisely, that a new § 1 claim [under the Sherman Antitrust Act] arises each time a company sells a price-fixed product." *Id.* Accordingly, the holding in *In re Travel Agent Commission Antitrust Litigation* does not support Lear's position here. *See id.*

Lear also cannot claim to have abandoned the conspiracy. To abandon a price fixing conspiracy, Lear must have engaged in acts inconsistent with the object of the conspiracy and communicated its withdrawal in a manner reasonably calculated to reach co-conspirators. *Watson Carpet & Floor Covering, Inc. v. Mohawk Inds., Inc.*, 648 F.3d 452, 460 (6th Cir. 2011). No such facts are present in this case.

> **D.    Lear is jointly and severally liable for damages arising from the conspiracy before its bankruptcy discharge.**

Lear is jointly and severally here liable for <u>all</u> damages stemming from the alleged price fixing conspiracy—both before and after discharge. There can be no doubt that Lear is liable for

its unlawful conduct after the Effective Date.[14]   But Lear's liability extends to pre-discharge conduct as well.   It is "well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators."  *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980); *see also United States v. Gallerani*, 68 F.3d 611, 620 (2d Cir. 1995) ("Once a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy.") (internal quotations omitted); *see also Ambook Enters. v. Time Inc.*, 612 F.2d 604, 620 (2d Cir. 1979) (holding all members of conspiracy jointly and severally liable).

Because Lear participated in the conspiracy after emerging from bankruptcy, its bankruptcy release does not shield it from liability for damages occurring before November 2009.  This result is consistent with applicable precedent.  In *In re Lower Lake Erie Iron Ore Antitrust Litigation* ("Lower Lake Erie"), 710 F. Supp. 152 (E.D. Pa. 1989), the court applied that basic principle in the bankruptcy context, holding that "[e]ach participant in an antitrust conspiracy is liable for the entire amount of damages caused by the conspiracy . . . ."[15]  *Id.* (citing *Texas Indus. v. Racliff Materials, Inc.*, 451 U.S. 630 (1981)) (emphasis added).  In that case, plaintiffs sought to hold defendant Conrail liable for damages sustained as a result of an almost 22 year conspiracy (from 1958 through 1980) to monopolize the transportation of iron

---

[14] *See In re WorldCom, Inc.*, 546 F.3d 211, 221 (2d Cir. 2008) (holding that a reorganized debtor was liable for independent conduct arising after confirmation of its bankruptcy plan); *O'Loghlin v. Cnty. of Orange*, 229 F.3d 871, 875 (9th Cir. 2000) (holding that fresh start after bankruptcy does not provide "a continuing license to violate the law").

[15] Although *Lower Lake Erie* was decided under the Regional Rail Reorganization Act, 45 U.S.C. § 701, et seq., which is a pre-Bankruptcy Code statute, the principles embodied in that decision should apply here. Indeed, courts continue to cite *Lower Lake Erie* with approval for the proposition that co-conspirators may be "liable for acts committed prior to their joining the conspiracy."  *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 414 (W.D. Pa. 2002).

ore based on Conrail's conduct after its assumption of ownership in 1976 of bankrupt northeastern railroads that allegedly participated in the conspiracy.  Conrail contended that (1) it could not be held liable for damages occurring before 1976, and (2) subjecting it to liability for the entire period of the conspiracy would be contrary to the public policies intended by Congress underlying the Railroad Reorganization Act, including that Conrail "start with a 'clean slate'." *See Lower Lake Erie*, 710 F. Supp. at 154.

The *Lower Lake Erie* court rejected both of Conrail's contentions and held that Conrail was potentially liable for the entirety of damages caused by the conspiracy. First, it relied in part on the well-established antitrust principle of joint and several liability:  "Those who, with knowledge of the conspiracy, aid or assist in the carrying out of the purposes of the conspiracy, make themselves party thereto and are equally liable [for] or guilty with the original conspirators."  *See id.*

Second, the Court noted that the "Rail Act does reflect a congressional intent to enable Conrail to start out, as of April 1, 1976, with a clean slate."  *See id.*  However, "there is plainly no basis for suggesting that Congress wished to enable Conrail to engage in an antitrust conspiracy thereafter <u>without incurring the same penalties as other antitrust violators</u>."  *Id.* (emphasis added).  Thus, if plaintiffs' allegations concerning Conrail's participation in the conspiracy post-1976 proved true, "Conrail would thereby be rendered liable for all of the damages caused by the conspiracy . . ."  *Id.* at 155.

Congress' intent to provide Lear with a "fresh start" by discharging "claims" by operation of the Bankruptcy Code is analogous to the intent embodied in the Rail Act to provide Conrail a "clean slate" in 1976 upon its assumption of ownership of the bankrupt northeastern

railroads.[16]  That purpose, however, provides no basis for concluding that the Bankruptcy Code operates as a shield from liability, which would permit Lear to continue to participate in an antitrust conspiracy without incurring the same penalties as its co-conspirators.  *See, e.g., Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1081-82 (N.D. Ill. 2011) (finding bankrupt defendant could be held liable for its post-discharge antitrust violations and that pre-discharge violations could be considered with respect to specific issues such as intent).

## CONCLUSION

For all the foregoing reasons, Defendant Lear Corporation's Rule 12(b)(6) Motion to Dismiss should be denied.

Dated:  September 11, 2012          **COTCHETT, PITRE & McCARTHY, LLP**

By _  /s/ Frank C. Damrell  _____

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
gkim@cpmlegal.com

---

[16] Conrail was created pursuant to the Regional Rail Reorganization Act to assume ownership and operation of the rail properties of the bankrupt northeastern railroads. The mandated conveyance of the rail properties to Conrail was effective as of April 1, 1976.  *Id.* 21

September 11, 2012                            **LABATON SUCHAROW LLP**

By  _/s/ Hollis Salzman_ _____

Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com


September 11, 2012                            **SUSMAN GODFREY L.L.P.**

By  _/s/ Marc M. Seltzer_ _____

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone: (214) 754-1900
Facsimile: (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

2402055v1/012878

September 11, 2012                    **THE MILLER LAW FIRM, P.C.**

                                     By   _/s/ E. Powell Miller_ _____

                                     E. Powell Miller (P39487)
                                     Adam T. Schnatz (72049)
                                     **THE MILLER LAW FIRM, P.C.**
                                     950 W. University Dr., Ste. 300
                                     Rochester, Michigan 48307
                                     Telephone: (248) 841-2200
                                     Facsimile: (248) 652-2852
                                     epm@millerlawpc.com

                                     *Attorneys End-Payor Plaintiffs*


September 11, 2012                    **MANTESE HONIGMAN ROSSMAN
                                     AND WILLIAMSON, P.C.**

                                     By___ _/s/ Gerard V. Mantese_____
                                     Gerard V. Mantese (Michigan Bar No.
                                     P34424)
                                     David Hansma (Michigan Bar No. P71056)
                                     Brendan Frey (Michigan Bar No. P70893)
                                     Joshua Lushnat (Michigan Bar No. P75319)
                                     **MANTESE HONIGMAN ROSSMAN
                                     AND WILLIAMSON, P.C.**
                                     1361 E. Big Beaver Road
                                     Troy, Michigan 48083
                                     Phone: (248) 457-9200 ext. 203
                                     Fax: (248) 457-9201
                                     gmantese@manteselaw.com
                                     dhansma@manteselaw.com
                                     bfrey@manteselaw.com
                                     jlushnat@manteselaw.com

September 11, 2012                         **BARRETT LAW GROUP, P.A.**

                                          By ___/s/ *Don Barrett*_____

                                          Don Barrett
                                          David McMullan
                                          Brian Herrington
                                          **BARRETT LAW GROUP, P.A.**
                                          P.O. Box 927
                                          404 Court Square
                                          Lexington, MS 39095
                                          Telephone: (662) 834-2488
                                          dbarrett@barrettlawgroup.com
                                          bherrington@barrettlawgroup.com
                                          dmcmullan@barrettlawgroup.com

September 11, 2012                         **CUNEO GILBERT & LADUCA, LLP**

                                          By ___/s/ *Jonathan W. Cuneo*_____

                                          Jonathan W. Cuneo
                                          Victoria Romanenko
                                          **CUNEO GILBERT & LADUCA, LLP**
                                          507 C Street, N.E.
                                          Washington, DC 20002
                                          Phone: (202) 789-3960
                                          Fax: (202) 789-1813
                                          jonc@cuneolaw.com
                                          Vicky@cuneolaw.com

                                          Joel Davidow
                                          Daniel Cohen
                                          **CUNEO GILBERT & LADUCA, LLP**
                                          Bethesda, Maryland
                                          8120 Woodmont Ave
                                          Suite 810
                                          Bethesda, MD 20814
                                          Phone: (202) 789-3960
                                          joel@cuneolaw.com

2402055v1/012878

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
300 North Tucker Boulevard
Suite 801
St. Louis, MO 63101
Phone: (202) 789-3960
Fax: (202) 789-1813
mflannery@cuneolaw.com

September 11, 2012                    **LARSON • KING, LLP**

By ___ /s/ *Shawn M. Raiter*_____

Shawn M. Raiter
Paul A. Sand
**LARSON • KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

*Attorney for Auto Dealer Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION** | 12-md-02311<br>Honorable Marianne O. Battani |
| **In Re: WIRE HARNESS CASES** | |
| **THIS RELATES TO:** | |
| **ALL DEALERSHIP ACTIONS AND ALL END-PAYOR ACTIONS** | W:12-cv-00102-MOB-MKM<br>W:12-cv-00103-MOB-MKM |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 11, 2012 I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all filing users indicated on the Electronic Notice List through the Court's electronic filing system. I also certify that I will serve copies via First Class U.S. Mail upon all other parties indicated on the Manual Notice List.

> Respectfully submitted,
> */s/ Warren T. Burns*
> Warren T. Burns
> Susman Godfrey, LLP
> 901 Main Street, Suite 5100
> Dallas, Texas 75202
> Phone: (214) 754-1900
> wburns@susmangodfrey.com

25