UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————————————————————
                                        :
IN RE: AUTOMOTIVE PARTS ANTITRUST       :    Master File No. 12-MD-02311
LITIGATION                              :    Honorable Marianne O. Battani
—————————————————————:
                                        :
PRODUCT(S):                             :
WIRE HARNESS SYSTEMS                    :
—————————————————————:
                                        :
THIS DOCUMENT RELATES TO:               :    Lead Case No. W:12-cv-00101
Direct Purchaser Actions                :
—————————————————————:

**DIRECT PURCHASER PLAINTIFFS' RESPONSE
IN OPPOSITION TO DEFENDANTS' COLLECTIVE
<u>MOTION TO DISMISS THE DIRECT PURCHASER ACTIONS</u>**

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500

David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road, Suite 111
Bloomfield Hills, MI 48304
(248) 971-2500

Interim Liaison Counsel for the Direct Purchaser
Plaintiffs

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300

Interim Lead Counsel for the Direct Purchaser Plaintiffs

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED ........................................................................ iii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................................................ iv

TABLE OF AUTHORITIES ....................................................................................................... v

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND AND THE CAC'S ALLEGATIONS ............................................................... 2

DEFENDANTS' ARGUMENTS AND SUMMARY OF DP PLAINTIFFS'RESPONSES .......... 4

ARGUMENT ................................................................................................................................ 6

    I.    THE CAC SUFFICIENTLY ALLEGES DP PLAINTIFFS' CLAIMS AND MEETS THE STANDARDS OF RULE 8. .................................................... 6

        A.    The CAC Meets Rule 8 Standards. ............................................................... 6

        B.    The Alleged Conspiracy Is Plausible Because Guilty Pleas, Fines, And Government Investigations Support The CAC's Conspiracy Allegations. ................................................................................................... 12

        C.    In Addition To The U.S. Guilty Pleas And The JFTC Action Against Wire Harness Products Conspirators, Market Factors Support The Conclusion That The Alleged Wire Harness Conspiracy Is Plausible. ................................................................................ 18

            1.    The Wire Harness Industry's Market Structure Facilitates Collusion. ....................................................................................... 18

                a.    The Industry's High Concentration Facilitates Collusion ......................................................... 19

                b.    The Nature Of Wire Harness Products Supports The Claim Of Collusion .................................... 19

                c.    The Industry's High Barriers To Entry. ............................ 20

            2.    Trade Shows Gave The Defendants Opportunities To Collude.... 20

    II.    DP PLAINTIFFS ALLEGE THAT THEY ARE DIRECT PURCHASERS OF DEFENDANTS' WIRE HARNESS PRODUCTS ......................................... 21

    III.    FRAUDULENT CONCEALMENT HAS BEEN PROPERLY PLED. ................ 25

i

A.      The CAC Adequately Alleges Affirmative Acts Of Concealment.............26

B.      The CAC Adequately Alleges Due Diligence. ...........................................31

IV.    THE CAC PROPERLY PLEADS ENTITLEMENT TO
       INJUNCTIVE RELIEF...........................................................................................34

CONCLUSION        .....................................................................................................38

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (the "CAC") alleges more than "labels and conclusions" and a "formulaic recitation of the elements of a cause of action," thereby satisfying Fed.R.Civ.P. 8 and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (*"Twombly"*), where that Complaint alleges:

- guilty pleas by multiple Defendants and key company executives to antitrust violations involving wire harnesses and related products,

- cease and desist orders and fines against multiple Defendants issued by the Japanese Fair Trade Commission,

- wire harness products investigations of Defendants by U.S., Japanese and European law enforcement entities,

- a market structure conducive to collusion, and

- opportunities to collude.

2.      Whether Defendants' argument that the Court should ignore the well-pleaded allegations in the CAC that DP Plaintiffs purchased wire harness products directly from one or more of the Defendants during the class period and find that some purchases by some DP Plaintiffs were not direct "in any economic sense" should be rejected.

3.      Whether Defendants' motion to dismiss the antitrust claim for part of the class period pled in the CAC should be denied, where the Complaint alleges facts establishing the elements of fraudulent concealment and several Defendants pled guilty to participating in a wire harness products conspiracy beginning at least as early as January 2000.

4.      Whether Defendants' motion to dismiss the request for an injunction should be denied because the CAC's allegations are sufficient and the motion is premature.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

*Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975)

*In re Flat Glass Antitrust Litig. II*, 2009 WL 331361 (W.D. Pa. Feb. 11, 2009)

*In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718 (N.D. Cal. April 19, 2012)

*In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010)

*In re Polyurethane Foam Antitrust Litig.,* 799 F. Supp.2d 777 (N.D. Ohio 2011)

*In re Static Random Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008)

*Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877 (N.D. Ill. 2009)

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010)

<u>**TABLE OF AUTHORITIES**</u>

## Cases

*Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230 (6th Cir.),
  *cert. denied,* 419 U.S. 997 (1974).................................................................... 33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 6, 10

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) .................................... ii, 6, 9, 17

*Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360 (9th Cir. 1980)........................... 8

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883 (6th Cir. 2004) ........................... 28

*Campbell v. Upjohn Co.*, 676 F.2d 11226th Cir. 1982).......................................... 32, 33

*Campos v. Ticketmaster Corp.,* 140 F.3d 1166 (8th Cir. 1998),
  *cert denied,* 525 US 1102 (1999).................................................................... 24, 25

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012).......................................... passim

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)...................... 7, 14

*Dart Drug Corp. v. Parke, Davis & Co.*, 344 F.2d 173 (D.C. Cir. 1965) .............................. 38, 39

*Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975)................. 27, 32, 33

*Duncan v. Leeds*, 742 F.2d 989 (6th Cir. 1984)........................................................ 27

*Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278 (6th Cir. 2011) ...................................... 9

*Ford Motor Co. v. Lane*, 86 F. Supp.2d 711 (E.D. Mich. 2000) .................................... 21

*Fowler v. UPMC Shadyside*, 578 F. 3d 203 (3d Cir. 2009)............................................ 6

*Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652 (E.D.N.C. 2003),
  *aff'd* ,118 Fed. Appx. 680 (4th Cir. 2004)............................................................ 11

*Hamilton Cnty. Bd.of Comm'rs v. Nat'l Football League*, 491 F.3d 310 (6th Cir. 2007)........... 27

*Hinds County v. Wachovia Bank, N.A.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................... 8

*Hyland v. Homeservice of Am.*, 2007 WL 2407233 (W.D. Ky. Aug. 17, 2007) .................. 10, 17

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ............................................... 24, 25

*In re Aftermarket Filters Antitrust Litig.*, 08 C 4883,
  2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) .......................................................... 26

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2009 WL 3443405 (E.D. N.Y. Aug. 21, 2009) ........................................................ 17

*In re Bath and Kitchen Fixtures Antitrust Litig.*, 2006 WL 2038605 (E.D. Pa. July 19, 2006) ... 18

*In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623 (E.D. Pa. 2010).................................. 8

*In re Carbon Black Antitrust Litig.*, 2005 WL 102966 (D. Mass. Jan. 18, 2005) ........................ 19

*In re Cathode Ray Tube (CRT) Litig.*, 738 F.Supp.2d 1011 (N.D. Cal. 2010) ............................... 9

*In re Elec. Carbon Prods. Antitrust Litig.*, 333 F.Supp.2d 303 (D.N.J. 2004) ............................. 28

*In re Fasteners Antitrust Litig.*, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ................. 9, 16, 18

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ............................. 8

*In re Flat Glass Antitrust Litig. II*, 2009 WL 331361 (W.D. Pa. Feb. 11, 2009) ............ 10, 13, 17

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999) ............................................... 18

*In re Graphics Processing Units Antitrust Litig.*,
   2007 WL 2127577 (N.D. Cal. July 24, 2007) .......................................................... 5

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002),
   *cert. denied,* 537 U.S. 1188 (2005).......................................................................... 12

*In re High-Tech Employee Antitrust Litig.*, 2012 WL 1353057 (N.D. Cal. April 18, 2012).......... 8

*In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961 (N.D. Iowa 2011) ........... 11

*In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718 (N.D. Cal. April 19, 2012) .... 15, 18,
   35, 36

*In re OSB Antitrust Litig.*, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007)......................................... 9

*In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010)....................... passim

*In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603 (N.D. Ga. 1997) ........................... 12

*In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp.2d 777 (N.D. Ohio 2011)....... 9, 31, 32, 34

*In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp.2d 363 (M.D. Pa. 2008).......... 7

*In re Refrigerant Compressors Antitrust Litig.*,
   2012 WL 2114997 (E.D. Mich. June 11, 2012) ................................................. 11, 28

*In re Refrigerant Compressors Antitrust Litig.*, 795 F.Supp.2d 647 (E.D. Mich. 2011).............. 31

*In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007) .......................... 8

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008),
   *cert. denied*, ___ U.S. ___, 129 S.Ct. 1673 (2009)............................................... 27, 31

*In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008).................................... 7, 26

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008)............................................................... passim

*In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203 (N.D. Cal. 2005)............................ 11, 17

*In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187 (2d Cir. 2006) ......................................... 7

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) ........................................... 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010)
   *amended in part*, M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011)............... 36, 37

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009). ............... 16

*In re Transpacific Passenger Air Transportation Antitrust Litig.*,
   2011 WL 1753738 (N.D. Cal. May 9, 2011)...................................................... 8, 16

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)................................ 11

*In re Vitamins Antitrust Litig.*, 2000 WL 1475705 (D. D.C. May 9, 2000) ................................ 13

*Ingram Corp. v. J. Ray McDermott & Co.*, 1980 WL 1819 (E.D. La., Jan. 10, 1980),
   *rev'd on other grounds*, 698 F.2d 1295 (5th Cir.1983) ............................................. 29

*Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037 (6th Cir. 1984).................................................... 27

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990)................................................................... 22

*Lucas Auto. Engineering v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998)........... 35

*Michigan v. McDonald Dairy Company,* 905 F. Supp 447 (W.D. Mich. 1995) ................... 28, 29

*Milliken v. CNA Holdings, Inc.*, 2011 WL 3444013 (W.D.N.C. Aug. 8, 2011). ......................... 16

*NLRB v. Express Pub. Co.*, 312 U.S. 426 (1941) ........................................................................ 35

*Ohio v. Louis Trauth Dairy*, 856 F.Supp. 1229 (S.D. Ohio 1984) ............................................... 29

*Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F. 2d 1445 (6th Cir.),
   *cert. denied*, 488 U.S. 880 (1988)................................................................ 28, 32, 33

*Safeway Stores, Inc. v. Federal Trade Comm'n*, 366 F.2d 795 (9th Cir. 1966) ............................ 9

*Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877 (N.D. Ill. 2009)...................... passim

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ........................................ 8, 10, 17

*U.S. v. W.T. Grant Co.*, 345 U.S. 629 (1953). ............................................................................... 35

*United States ex rel. Miller v. Bill Harbert International Constr.*, Inc.,
    608 F.3d 871 (D.C. Cir. 2010)................................................................................................... 14

*United States v. Consolidated Packaging Corp.,* 575 F.2d 117 (7th Cir. 1978)..................... 9, 20

*United States v. Parke, Davis & Co.,* 362 U.S. 29 (1960) ............................................................ 38

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100 (1969).................................................. 35

*Zenith Radio Corp. v. Hazeltine Research, Inc.* 401 U.S. 321 (1971)........................................... 26

*Ziss Bros. Constr. v. City of Independence*, 439 Fed. Appx. 467 (6th Cir. 2011) ..................... 6, 7

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................................... 1, 6

Federal Rule of Civil Procedure 8 .................................................................................................. ii, 6

Federal Rule of Civil Procedure 8(a)(2) ........................................................................................... 6

Federal Rule of Evidence 201 .......................................................................................................... 2

## PRELIMINARY STATEMENT

Defendants[1] move under Fed.R.Civ.P. 12(b)(6)(Doc. No. 228) to dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (the "CAC") (Doc. No. 86) on the ground that it fails to state an antitrust claim upon which relief can be granted.  But the totality of the allegations in the CAC, including those describing the multiple guilty pleas in the United States, actions taken by Japanese law enforcement officials, and governmental investigations spanning three continents involving wire harness products renders the alleged conspiracy pled in the CAC plausible on its face.

Defendants make three subsidiary arguments that, even were they to be credited by the Court, would not result in dismissal of the entire CAC.  First, ignoring the allegations that Direct Purchaser Plaintiffs ("DP Plaintiffs") purchased wire harness products directly from one or more of the Defendants during the class period, they contend that some of the purchases by some of the DP Plaintiffs may not be direct "in any economic sense" because some suppliers to automobile original equipment manufacturers ("OEM") were required to purchase wire harness products from Defendants at supracompetitive prices established by the rigged bids submitted to the OEMs.  A plain reading of the allegations of the CAC torpedoes this claim.

Second, Defendants seek to limit the period during which DP Plaintiffs can collect damages at trial.  DP Plaintiffs have, however, set forth grounds in the CAC for tolling the running of the statute of limitations until February 2010, and several Defendants pled guilty to participating in a

---

[1] The Defendants are American Furukawa, Inc.; Furukawa Electric Co., Ltd.; Denso Corporation; Denso International America, Inc.; Fujikura America, Inc.; Fujikura Ltd.; Kyungshin-Lear Sales and Engineering, LLC; Lear Corporation; Leoni AG; Leoni Wire Inc.; Leoni Wiring Systems, Inc.; Leoni Kabel GmbH; Leonische Holding Inc.; Sumitomo Electric Industries, Ltd.; Sumitomo Electric Wintec America, Inc.; Sumitomo Wiring Systems, Ltd.; Sumitomo Electric Wiring Systems, Inc.; K&S Wiring Systems, Inc.; Sumitomo Wiring Systems (U.S.A.) Inc.; S-Y Systems Technologies Europe GmbH; Tokai Rika Co., Ltd.; TRAM,  Inc.; Yazaki Corporation; and Yazaki North America, Inc.  Some of the Defendants in the CAC have been voluntarily dismissed without prejudice.

conspiracy beginning as early as January 2000. DP Plaintiffs' initial complaints and the CAC were all filed within the limitations period.

Third, Defendants ask the Court to find that DP Plaintiffs have not properly alleged the basis for an injunction prohibiting the continuation or revival of the conspiracy. But, this argument is unavailing. The facts and circumstances pled about the alleged conspiracy support the request for injunctive relief.

## BACKGROUND AND THE CAC'S ALLEGATIONS

As the Court is aware, there are a number of criminal proceedings, investigations, and civil actions involving wire harness products antitrust violations. These include: the Department of Justice ("DOJ") investigation, which so far has resulted in four of the Defendants and seven of their executives pleading guilty to antitrust violations involving wire harnesses and related products;[2] the Japanese Fair Trade Commission's ("JFTC") cease and desist orders against four of the Defendants (and fines against three of them, as the fourth was let off without a fine as a reward for turning in other conspirators); the European Commission's ("EC") ongoing investigation, and; the direct and indirect purchaser antitrust class actions.[3]

Defendants are the major producers of wire harnesses and related products. (CAC ¶¶14, 100-101). The Yazaki Defendants had nearly 30% (29.81%) of the market. (*Id.* ¶101). The Sumitomo

---

[2] Various Defendants agreed to plead guilty to antitrust violations with respect to wire harnesses and related products: cable bond, automotive wiring connectors, automotive wiring terminals, fuse boxes, relay boxes, junction blocks, power distributors, automotive electrical wiring, high voltage wiring, electronic control units and lead wire assemblies. A description of wire harnesses and related products is set forth in the Plea Agreements attached as Exhibits A-D to Defendants' Collective Motion, at pages 3-4 in each of the Exhibits. The Court may take judicial notice of the contents of the Plea Agreements for purposes of making its plausibility determination. *In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *2 (N.D. Cal. April 19, 2012); *Milliken v. CNA Holdings, Inc.*, 2011 WL 3444013, at *10 (W.D.N.C. Aug. 8, 2011). *See* Fed.R.Evid. 201. The CAC at ¶10 defines the term "Wire Harness Products" as used in the CAC.

[3] In an article that appeared in *Automotive News* on October 26, 2011 titled *Supplier price-fixing probe could expand to more criminal pleas, billions in fines, lawyers say*, Matthew Leitman, identified as a principal at Miller, Canfield, Paddock and Stone, reportedly said at an industry event in suburban Detroit that "[c]ompanies that cooperate first or early in the investigation are offered more leniency … [o]ne supplier cooperated with the DOJ, uncovering collusion, and received complete amnesty." Exhibit A.

Defendants were close behind with nearly 25% (24.38%). (*Id.*). Collectively, the Sumitomo and Yazaki Defendants controlled over 54% of the market. (*Id.*). Adding other Defendants' market shares into the equation increases the total to over seventy percent (70%). (*Id.*).

The first shoes to drop were raids on Defendants by law enforcement agencies. In January and February 2010, the DOJ and FBI raided the U.S. offices of Defendants Yazaki Corporation ("Yazaki"), Denso Corporation ("Denso") and Tokai Rika Co., Ltd.[4] (*Id.* ¶ 116). Among others, Leoni AG, Leoni Kabel, Yazaki, Lear Automotive France and S-Y Systems Europe GmbH[5] were raided by the EC. (*Id.* ¶117). Not to be outdone, the JFTC raided Sumitomo Electric Industries, Ltd. ("Sumitomo"), Yazaki, and Furukawa Electric Co., Ltd. ("Furukawa"). (*Id.* ¶ 118).

Another shoe dropped in June 2011. Fujikura Ltd. ("Fujikura") announced that month that the JFTC proposed to penalize it for violating antitrust laws in connection with wire harnesses. (*Id.* ¶ 119).

Additional shoes started falling soon thereafter. In September 2011, the DOJ announced that Furukawa and three of its executives had agreed to plead guilty to bid rigging and price fixing involving wire harnesses and related products. (*Id.* ¶¶ 123, 127-28). In November 2011, Furukawa pled guilty to violating Section One of the Sherman Act by participating in a wire harness and related products conspiracy.[6] (*Id.* ¶32). Furukawa's plea was preceded by guilty pleas of three Furukawa executives: Hirotsugu Nagata, Junichi Funo and Tetsuya Ukai.[7] (*Id.* ¶¶ 129-131).

On January 19, 2012, the JFTC issued a cease and desist order and levied fines against Sumitomo, Yazaki, and Fujikura, and issued a cease and desist order against Furukawa. (*Id.* ¶133)

---

[4] Yazaki North America, Inc., Denso International America, Inc., and TRAM, Inc.
[5] The "Y" in "S-Y" stands for Yazaki.
[6] Furukawa's Plea Agreement is attached as Exhibit A to Defendants' Collective Motion.
[7] Messrs. Nagata, Funo and Ukai's Plea Agreements are attached hereto as Exhibits B-D, respectively.

The JFTC based its actions on the involvement of these Defendants in a price-fixing and bid rigging conspiracy for wire harnesses and related products. (*Id.*).

On January 30, 2012, the DOJ announced that Yazaki had agreed to plead guilty to antitrust violations with respect to wire harnesses and related products.[8]  Four Yazaki executives, Tsuneaki Hanamura, Royoji Kawai, Shigera Ogawa, and Hisamitsu Takeda, also agreed to plead guilty to violating antitrust laws.[9] (*Id.* ¶135).

On March 5, 2012, Denso pled guilty to antitrust violations with respect to the related wire harness product electronic control units.[10] (*Id.* ¶ 136)  The next month, the DOJ announced that Fujikura had agreed to plead guilty to antitrust violations with respect to wire harnesses and related products.[11] (*Id.* ¶ 137).

The CAC makes additional allegations that, in context, allow the Court to conclude that the alleged conspiracy is plausible.  The market is heavily concentrated. (*Id.* ¶¶ 100-101).  There are high barriers to entry. (*Id.* ¶ 103).  The Defendants were capable of producing wire harness products for use in any motor vehicle. (*Id.* ¶ 100).  Defendants had opportunities to conspire, for example, at automobile industry trade shows. (*Id.* ¶ 106).

## DEFENDANTS' ARGUMENTS AND SUMMARY OF DP PLAINTIFFS' RESPONSES

Against this backdrop, each of the Defendants argues for dismissal of the CAC against it. They all contend that it cannot be plausibly inferred from the U.S. guilty pleas, the JFTC enforcement action, the governmental investigations and the structure of the market, that the Defendants entered into a conspiracy to rig bids and fix prices for wire harnesses and related

---

[8] Yazaki's Plea Agreement is attached as Exhibit B to Defendants' Collective Motion.
[9] Messrs. Hanamura, Kawai, Ogawa and Takada's Plea Agreements are attached hereto as Exhibits E-H, respectively.
[10] Denso's Plea Agreement is attached as Exhibit D to Defendants' Collective Motion.
[11] Fujikura's Plea Agreement is attached as Exhibit C to Defendants' Collective Motion.

products generally.[12]  Defendants' view is that the scope of Plea Agreements and JFTC orders they were able to negotiate limits what constitutes a plausible conspiracy.  Similarly, Defendants attempt to take solace in the fact that the Plea Agreements speak to antitrust violations directed at automobile manufacturers.  According to them, this provides a shield from the plausible allegations in the CAC that their conspiracy affected the market generally.

Attempts by defendants to pick complaints apart and peer at certain facts in isolation, or to limit claims to the four corners of guilty pleas, are commonly rejected, as they should be here.  As the decisions in numerous cases attest, when judging plausibility, complaints are not to be atomized, and the contents of guilty pleas should not be restrictive.[13]

Defendants also attack the CAC on the extremely shaky theory that, regardless of well-pleaded allegations to the contrary in the CAC, economically-speaking, some of the DP Plaintiffs made some purchases that Defendants contend were not direct.  The allegations in the CAC belie this assertion, and the single off-point case they cite does not support their argument.

Defendants also try to limit the time period during which DP Plaintiffs can seek damages to November 2007 forward.  They claim that certain elements of fraudulent concealment have not been adequately alleged, and therefore that the statute of limitations was not tolled.  DP Plaintiffs have sufficiently alleged the elements of fraudulent concealment, tolling the running of the statute of limitations, and their complaints were filed within the limitations period.  Further, numerous Defendants agreed to plead guilty to participating in a conspiracy that began in January 2000.

---

[12]The court in *In re Graphics Processing Units Antitrust Litig*., 2007 WL 2127577, at *5 (N.D. Cal. July 24, 2007), would not agree.  In that case the court noted that it is "almost certain that the complaint is viable" when "guilty pleas have already been entered in a parallel criminal case."

[13] Defendants acknowledge that a guilty plea is *prima facie* evidence of a violation of the Sherman Act pursuant to 15 U.S.C. § 16(a). Defendants' Collective Memorandum at 10.

Finally, Defendants ask the Court to dismiss the request for injunctive relief.  In support, they argue that because they were caught, they must have stopped conspiring, and that they can be trusted to never, ever, do it again.  Because the effects of Defendants' alleged conspiracy may extend into the future, and the conditions still exist for continued or new collusion, the request for injunctive relief should not be stricken.

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the pleading to state a claim for relief.  It is not the proper vehicle to establish the scope and impact of the alleged conspiracy.  The notice pleading standard of Fed.R.Civ.P. 8 was not displaced by *Twombly,* and it applies to civil antitrust cases.[14]  Defendants have sufficient notice from the CAC, the DOJ, JFTC and EC investigations, the guilty pleas, the JFTC enforcement action, and their own internal investigations to be able to answer the CAC.  That is all that Rule 8 requires.  Defendants' Collective Motion to Dismiss should be denied and they should answer the CAC.

## **ARGUMENT**

### I.  **THE CAC SUFFICIENTLY ALLEGES DP PLAINTIFFS' CLAIMS AND MEETS THE STANDARDS OF RULE 8.**

#### **A.  The CAC Meets Rule 8 Standards.**

Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 444 (6th Cir. 2012); *Ziss Bros. Constr. v. City of Independence*, 439 Fed. Appx. 467, 470 (6th Cir. 2011).  Consequently, a plaintiff's complaint "does not need detailed factual allegations." *Twombly,* 550 U.S. at 555; *Iqbal*, 556 U.S. at 678 ("the pleading standard Rule 8 announces does not require 'detailed factual allegations'"); *In re*

_____

[14] *E.g., Fowler v. UPMC Shadyside*, 578 F. 3d 203, 213 (3d Cir. 2009)("The standards for dismissing claims under Fed. R. Civ. P. 12(b)(6) and granting [summary] judgment under either Fed. R. Civ. P. 50 or . . . 56 are vastly different."); *Milliken,* 2011 WL 3444013, at *5.

*Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 900 (N.D. Cal. 2008) ("The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which it bases its claim."). A court "[i]n reviewing a motion to dismiss … construe[s] the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Ziss Bros. Constr.*, 439 Fed. Appx. at 470.

In evaluating antitrust pleadings, "'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 201 (2d Cir. 2006) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at 699; *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009); *In re South*eastern *Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008).

It is improper under Rule 12(b)(6) for a defendant to dissect an antitrust complaint and then complain that individual allegations in isolation do not meet *Twombly's* pleading standard. *See e.g.*, *Southeastern Milk*, 555 F. Supp. 2d at 943-44 ("Moreover, defendants['] attempt to parse and dismember the complaints [is] contrary to the Supreme Court's admonition that "[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts."). In fact, "[n]othing in *Twombly* . . . contemplates this "dismemberment" approach to assessing the sufficiency of a complaint." *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp.2d 363, 373 (M.D. Pa. 2008). Instead, "a district court must consider a complaint in its entirety without isolating each allegation for individualized review." *Id.* In *Twombly*, the "complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.'" *Id.*

(quoting *Twombly*, 550 U.S. at 569 n.14); *Standard Iron Works*, 639 F. Supp. 2d at 902 ("Defendants' attempt to parse the complaint and argue that none of the allegations … support a plausible inference of conspiracy is contrary to the Supreme Court's admonition").[15]

Viewing the complaint as a whole means allegations need not be drafted defendant-by-defendant, or conversation-by-conversation. Defense arguments "that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation" are "incorrect." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010); *Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result."); *In re High-Tech Employee Antitrust Litig.*, 2012 WL 1353057, *11 (N.D. Cal. April 18, 2012) (same) (quoting *Beltz*); *id*. ("A co-conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy.").

Nor must the DP Plaintiffs plead the detailed involvement of each Defendant in the claimed conspiracy. *See e.g. In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142 n. 7 (N.D. Cal. 2009) (in which the court denied the motions of several defendants who argued that there were no specific allegations directed at their particular company.). The allegations need not be detailed on a "defendant by defendant" basis. *See SRAM*, 580 F. Supp. 2d at 903-907; *Hinds County v. Wachovia Bank, N.A.*, 700 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (plaintiffs are not required to plead details about each individual defendant's conduct in furtherance of the conspiracy); *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal. 2007) (allegations of defendant's involvement in agreement to implement price increases and other allegations of "general participation" in alleged

---

[15] *Accord, e.g., In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010); *In re Transpacific Passenger Air Transportation Antitrust Litig.*, 2011 WL 1753738, at *10, *14 (N.D. Cal. May 9, 2011).

conspiracy were sufficient to state an antitrust claim); *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("[a]ntitrust conspiracy allegations need not be detailed defendant by defendant."); *In re Cathode Ray Tube (CRT) Litig.,* 738 F.Supp.2d 1011, 1018-19 (N.D. Cal. 2010). *See id.* at 1022 ("[d]efendants' arguments for dismissal based on a failure to adequately plead against each Defendant rely upon arguments more appropriate at the summary-judgment stage of these proceedings when Defendants can put Plaintiffs to their burden of proof.").   It is well recognized that the "plausibility pleading standard does not require a court to construct a mandatory checklist of the who, what, when and how of an antitrust agreement for each defendant." *In re Polyurethane Foam Antitrust Litig.,* 799 F. Supp.2d 777, 795 (N.D. Ohio 2011).

Consequently, "[p]laintiffs are not required to allege the exact nature of the agreements and the extent to which each conspirator furthered the conspiracy's objectives prior to discovery." *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *8-9 (E.D. Pa. Aug. 12, 2011) (rejecting defense argument that complaint was deficient because it "does not allege that each Defendant explicitly colluded with every other Defendant"); *see also United States v. Consolidated Packaging Corp.,* 575 F.2d 117, 126 (7th Cir. 1978) ("That same testimony also put Consolidated, not deep into the conspiracy, but at least into its outer crust.  Once the conspiracy has been established, slight evidence is needed to connect a particular participant."); *Safeway Stores, Inc. v. Federal Trade Comm'n*, 366 F.2d 795, 801 (9th Cir. 1966) ("Once the existence of the common scheme is established, very little is required to show that defendant became a party").

*Twombly* requires that a plaintiff's claim be plausible, but it does not require more than plausibility.  A complaint must plead "'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.'" *Fabian v. Fulmer Helmets, Inc*., 628 F.3d 278, 280 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556).  "Plausibility requires showing more than the 'sheer

9

possibility' of relief but less than a 'probab[le]' entitlement to relief." *Fabian*, 628 F.3d at 280

(quoting *Iqbal*, 556 U.S. at 678); *accord In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 629

(7th Cir. 2010)("the complaint must establish a nonnegligible probability that the claim is valid; but

the probability need not be as great as such terms as 'preponderance of the evidence' connote."ance.").

The complaint must contain "enough 'factual enhancement' to 'nudge [the] claim across the line

from conceivable to plausible.'" *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 444 (6th Cir. 2009)

(quoting *Twombly*, 550 U.S. at 570).

However, "[a]sking for plausible grounds to infer an agreement does not impose a probability

requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation

that discovery will reveal evidence of illegal agreement." *Starr*, 592 F.3d at 322 (quoting *Twombly*,

550 U.S. at 556). At the pleading stage, a plaintiff need only allege "enough factual matter (taken as

true) to suggest that an agreement was made." *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d

987, 1017 (E.D. Mich. 2010) (quoting *Starr*, 592 F.3d at 321). *Accord In re Flat Glass Antitrust

Litig. II*, 2009 WL 331361, at *2 (W.D. Pa. Feb. 11, 2009); *Standard Iron Works*, 639 F. Supp. 2d at

894 (same).

Defendants' conduct "must be placed in a context that raises a suggestion of a [preceding]

agreement." *Hyland v. Homeservice of Am.*, 2007 WL 2407233, *2 (W.D. Ky. Aug. 17, 2007)

(quoting *Twombly*); *accord Starr*, 592 F.3d at 322. "If the Court can discern some 'factual

enhancement' pointing toward, or suggesting a basis for inferring, an illegal agreement, the motion

to dismiss must be denied." *Packaged Ice*, 723 F. Supp. 2d at 1004.

The CAC contains numerous factual allegations establishing the plausibility of the

conspiracy. The CAC describes guilty pleas by multiple Defendants and their executives, the DOJ,

EC and JFTC investigations, and the JFTC orders and fines. The CAC describes admissions by

10

Defendants' executives—in guilty pleas—that they met and agreed to allocate supply, rig bids, and fix prices for wire harnesses and related products. The CAC alleges, among other things, how the wire harness industry's structure makes it susceptible to collusion, and the opportunities Defendants had to collude. Considered in its entirety, the CAC's factual enhancements provide a basis for inferring an illegal agreement to rig bids and fix prices that harmed DP Plaintiffs and class members, satisfying the requirements of *Twombly*, *Iqbal*, and Rule 8.

The cases cited by Defendants are either inapposite or readily distinguished. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009), like *Twombly*, is a pure parallel conduct case, with "no 'setting' provided suggesting an agreement." *Packaged Ice* at 1007 n.12.[16] In *In re Refrigerant Compressors Antitrust Litig.*, 2012 WL 2114997, *8 (E.D. Mich. June 11, 2012), the indirect purchaser plaintiffs' complaint sought to rely on allegations in the direct purchaser's complaint. The *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) court disapproved of the plaintiffs' reliance on the opening of an investigation, but still sustained the complaint as a whole. The essentially local product sold in *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961 (N.D. Iowa 2011), made allegations of defendants' colluding (or competing) in a large statewide market implausible because of the short travel time and distance available for ready-mix concrete. The court in *Carrier Corp.*, 673 F.3d at 430, reversed dismissal of the complaint, finding it met the pleading requirements.

---

[16] *Travel Agents* must also be understood in light of its unique procedural history. There the court affirmed the dismissal of antitrust claims by plaintiffs who had opted-out of a class action brought in another court and then reasserted the identical claims as those in the dismissed case. *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652 (E.D.N.C. 2003), *aff'd* ,118 Fed. Appx. 680 (4th Cir. 2004). Thus, neither the district court nor the appellate court wrote on a clean slate when dismissing the opt-out case, and the key to the decision affirming dismissal is set forth on page 909 n.8 of the Sixth Circuit's opinion. There the Sixth Circuit explains that the court in the identical class action case "granted summary judgment in favor of defendants" and that "'[o]nly the gravest reasons should lead [a] court in [an] opt-out suit to come to a conclusion that departs from that in the class suit.'" *Id.* (citation omitted). Under the circumstances it would have made no sense for the district court or the Sixth Circuit to conclude that the opt-out complaint stated a valid claim where the same claim had already been rejected on summary judgment.

### B.  The Alleged Conspiracy Is Plausible Because Guilty Pleas, Fines, And Government Investigations Support The CAC's Conspiracy Allegations.

Defendants' main argument is that the conspiracy described in the CAC cannot be plausible because it is not pled in exactly the same terms as the Plea Agreements.[17]  Defendants cannot—and do not—deny that a conspiracy with respect to wire harnesses and related products took place. Instead, they argue that despite what is alleged in the CAC, the conspiracy was more circumscribed. This argument simply ignores the facts supporting a reasonable inference of a broader agreement, as pled in the CAC.  It also ignores the law that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is not the appropriate procedural device to ask a court to decide the scope of a conspiracy that has otherwise been adequately alleged.  Defendants' argument also runs afoul of the principle that a civil suit should not be "be circumscribed or defined by the boundaries of the criminal investigations or plea agreements." *Packaged Ice*, 723 F. Supp. 2d at 1011.  The DOJ often agrees to allow criminal defendants to plead guilty to more limited charges. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 664-65 (7th Cir. 2002), *cert. denied,* 537 U.S. 1188 (2005) (setting forth reasons why the DOJ's decision to limit criminal charges and to not prosecute ADM for fixing prices of high fructose corn syrup, when it had prosecuted ADM for participating in two other price-fixing cartels, had no evidentiary value in the civil case; one reason was that the private bar would pursue the case with vigor); *and see In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 619-20 (N.D. Ga. 1997) (stating that "the Court is aware of no authority that requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment.  To the contrary, several cases flatly reject this theory."); *SRAM*, 580 F. Supp. 2d at 903 (guilty pleas in DRAM industry supported "inference of a conspiracy in the SRAM industry."); *In re Vitamins Antitrust Litig.,* 2000 WL 1475705, at *11 (D. D.C. May 9, 2000) ("Finally, the Court rejects the notion that the guilty pleas

---

[17] The Plea Agreements do not identify co-conspirators.

and cooperation agreements and the class settlements foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."); *Id*. at *11 n.13 ("the government may undertake plea bargains in order to achieve certain strategic objectives and these goals may be different from those of private litigants"); *Flat Glass*, 2009 WL 331361, at *3 (the court observed that the fact that one of the defendants was not a participant in a European conspiracy referred to in the complaint did not provide a basis for dismissal in light of the other allegations plausibly suggesting that the defendant was part of a U.S. conspiracy).

Multiple Defendants and their executives have agreed to plead guilty to criminal charges, admitting they engaged in price-fixing and bid-rigging in this industry. For example, Hirotsugu Nagata, Junichi Funo, and Tetsuya Ukai of Furukawa, agreed to plead guilty and admitted meetings and conversations with co-conspirators in which they reached agreements to rig bids and fix prices for wire harness products. (CAC ¶¶129, 130, 131). Furukawa agreed to plead guilty to the same misconduct, and agreed to a $200 million fine. (*Id.*¶¶123, 132). Defendant Yazaki agreed to plead guilty and pay a $470 million fine for the same offense. (*Id.* ¶134). Four Yazaki executives agreed to plead guilty and accept prison terms from 15 to 24 months for the same conduct. (*Id.* ¶135). Denso agreed to plead guilty and pay a $78 million fine for fixing prices and rigging bids of the wire harness product electronic control units. (*Id.* ¶136). Fujikura also agreed to plead guilty to fixing prices and rigging bids for wire harnesses and related products in the United States, and to pay a $20 million fine. (Id. ¶137).

Defendants dismember the CAC—contrary to the holding in *Continental Ore*, 370 U.S. at 699—by arguing that the guilty pleas, each considered separately and in isolation, do not plausibly suggest a broader conspiracy, and argue that "none of the pleas say anything about the conduct of

any of the other Defendants."[18]  But such long-discredited attempts should be rejected.  This is an antitrust case where the CAC sufficiently alleges that Defendants rigged bids and fixed prices in order to affect the market for wire harnesses and related products.

Factors in considering a conspiracy include: "(1) whether the conspirators share[d] a common goal; (2) the degree of dependence inherent in the conspiracy; and (3) the overlap of participants between the arguably separate schemes." *United States ex rel. Miller v. Bill Harbert International Constr.*, Inc., 608 F.3d 871, 899 (D.C. Cir. 2010) (quotations omitted).  First, in assessing the goal, "a conspiracy's purpose should not be defined in too narrow or specific terms." *Id*.  Second, interdependence "requires that each defendant's actions facilitate the endeavors of other alleged co-conspirators or facilitate the venture as a whole." *Id*. at 900.  Bid-rigging conspiracies satisfy the independence factor where they contemplate "future collusion." *Id*.  Overlap among participants "is less significant than the other [factors], requiring only that the main [co-]conspirators work with all the participants." *Id*.

In the present case, the CAC alleges the Defendants shared a common goal of raising and fixing prices for wire harness products.  Defendants controlled the overwhelming majority of the market.  As to overlap, Defendants are tied together by plea agreements admitting that they conspired with other (unnamed) producers, by their being investigated, raided and fined at the same time by government agencies and because they control the market.

Recently, in *Optical Disk Drive*, the court denied a motion to dismiss a complaint alleging that numerous foreign defendants conspired to fix optical disk drive prices.[19]  The complaint upheld

---

[18] Defendants' Collective Memorandum at 10.  As stated above, the U.S. Plea Agreements do not provide the names of the other conspirators.  Defendants do concede that the JFTC action ties four of them together.

[19] Defendants cite an earlier decision in this case dismissing a complaint, principally because the court found implausible a conspiracy "among not only the named defendants but also numerous unnamed entities that manufacture and sell products containing ODDs." *Optical Disk Drive,* 2012 WL 1366718, at *1.  The court found it implausible that

by the court alleged bid-rigging conduct by defendants of optical disk drives involving procurements by large computer manufacturers, and that the bid-rigging conduct reflected an overall effort by defendants to stabilize optical disk drive prices.  After the complaint was filed, some indictments were issued against and guilty pleas entered into by certain defendants.  The defendants urged dismissal of the complaint, postulating (as the Defendants do here) that while plaintiffs had arguably alleged a plausible conspiracy regarding bid-rigging, they had not pled enough facts to support a claim of a broader agreement among all the defendants to fix prices generally. *Id.* at *3.  The court determined that the guilty pleas were relevant to the plausibility of the conspiracy claim, reviewed the complaint in its entirety, and denied the motion to dismiss.  The court explained that the plaintiffs had alleged a conspiracy (although large) involving (as here) a discrete number of interrelated entities.  *Id*. at *3.  Plaintiffs also alleged (as here) a sustained practice of bid-rigging, which they tied to an overall theory explaining the various ways the conspiracy was carried out. *Id.*  The court was also unmoved by defendants' arguments that allegations about the plaintiffs' purchases were too vague. *Id.* at *6.  The court also rejected arguments by certain defendants that, while the complaint may assert viable claims as to other defendants more clearly involved in the conspiracy, it did not contain enough factual averments to tie them into the conspiracy.  The court found that the allegations of the complaint were sufficient as to all the defendants. *Id.* at *7.

Similarly, in *Milliken* the court rejected an argument that certain guilty pleas by non-defendants and participation in the DOJ leniency program were inconsistent with the plaintiffs' claims that one of the defendants was involved in the conspiracy.  The court concluded that the guilty pleas made the alleged conspiracy more plausible, even if they did not directly implicate the

---

some large purchasers would be both co-conspirators and victims of the conspiracy under the theory advanced by plaintiffs. *Id.*

other defendant. 2011 WL 3444013, at *10.  The government investigations and participation in an amnesty program also bolstered the plausibility of the antitrust claim. *Id.* at *13.

Other courts have rejected similar arguments.  In *Packaged Ice*, the court sustained claims of a nationwide price-fixing and market allocation conspiracy even though the government had only initiated a prosecution as to market allocation in Southeastern Michigan. 723 F.Supp.2d at 1008-09. In *Fasteners*, 2011 WL 3563989, at *8, the district court rejected the assertion that "[p]laintiffs' allegations, many of which describe bilateral meetings, fail to support an inference that Defendants engaged in the single, broad, overarching conspiracy that Plaintiffs allege[.]"[20] *Hinds County,* 700 F. Supp. 2d at 394, 406, which involved bid-rigging claims, is similar.

As they concede, the guilty pleas of Defendants and their executives' are dispositive that they engaged in antitrust violations set forth in their respective Plea Agreements.  Even though they are not dispositive in this civil case as to the scope of the anticompetitive conduct and agreements, they are indicia of widespread conspiracy.[21]  Further, "taken as part of the larger picture, and considering

---

[20] Complaints alleging long running conspiracies involving large numbers of defendants and multiple products have been sustained in numerous cases.  For instance, in *Flash Memory,* the court upheld a complaint alleging a conspiracy against thirteen defendants based in the United States, Japan and South Korea to fix prices for NAND Flash Memory and products containing such memory that lasted from 1999 to February of 2008. 643 F. Supp. 2d at 1139-1140, 1164.  Similarly, in *TFT-LCD,* the court upheld a complaint alleging a conspiracy against twenty-six defendants based in the United States, Taiwan, Japan and South Korea to fix prices for TFT-LCD panels and products containing them from 1996 through late 2006. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009). The complaint upheld in *In re Transpacific Passenger Air Transportation Antitrust Litig.*, 2011 WL 1753738, at *1, involved twenty-six airlines alleged to have fixed prices for air travel over a ten year period.

[21] Defendants' Plea Agreements admit that their officers and employees, sometimes "including high-level personnel of the defendant," conspired with multiple other persons and entities to rig bids and fix prices for automotive wire harnesses "and related products."  Furukawa Plea Agreement ¶4(b), Exhibit A to Defendants' Collective Motion; Yazaki Plea Agreement ¶4(a)(ii), Exhibit B to Defendants' Collective Motion; Fujikura Plea Agreement ¶4(b), Exhibit C to Defendants' Collective Motion; Denso's Plea Agreement ¶4(a)(ii), Exhibit D to Defendants' Collective Motion. (plea to conspiring with multiple co-conspirators to fix prices of electronic central units which connect with wire harness products). The government investigations similarly show relationships among the Defendants.  For example, the JFTC fined Yazaki, Sumitomo, and Fujikara, and publicly announced that those companies had conspired with each other and with Furukawa.  (CAC ¶¶118, 133)  Further, Defendants admit that the JFTC order "link[s] the conduct of four of the named Defendants," Yazaki, Fujikura, Furukawa, and Sumitomo.  Defendants' Collective Memorandum at 14-15 n.5. Similarly, the raids on Denso, Yazaki, and Tokai Rika's TRAM (CAC ¶116) suggests a linkage. The EC investigation includes Leoni AG, Leoni Kabel GmbH, Yazaki, Lear Automotive France and S-Y Systems Europe GmbH (a Yazaki joint venture) (CAC ¶117), suggesting their ties.

[other investigations], these guilty pleas do enhance the expectation that discovery might lead to evidence of a nationwide illegal agreement among these same actors." *Packaged Ice*, 723 F. Supp. 2d at 1011.  Consequently, the guilty pleas and investigations give the CAC substantially more than "some 'factual enhancement' pointing toward, or suggesting a basis for inferring, an illegal agreement" so that "the motion to dismiss must be denied." *Id.* at 1004; *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3443405, *1 (E.D. N.Y. Aug. 21, 2009) (quoting *Twombly*, 550 U.S. at 556) ("[A]dmissions of price-fixing by so many of the defendants [who pled guilty or entered the DOJ's leniency program] certainly 'are suggestive enough to render a § 1 conspiracy plausible.'")

The existence of so many investigations involving the Defendants is likewise relevant to the analysis.  Allegations that the defendants' price-fixing activity "was the subject of a pending investigation," along with other allegations, "taken together, place the parallel conduct 'in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Starr*, 592 F.3d at 323-24 (quoting *Twombly*, 550 U.S. at 557); *see Flat Glass*, 2009 WL 331361 at *2; *Hyland v. Homeservices of Am.*, 2007 WL 2407233 at *3; *SRAM*, 580 F. Supp. 2d at 903.

The CAC alleges more than just government investigations.[22]  Defendants' arguments fail to consider the investigations the context of guilty pleas.  Even if the opening of a governmental investigation, by itself, were not important for an antitrust complaints, subsequent guilty pleas in connection with a DOJ investigation can raise investigations "to an item of relevance as to the

---

[22]*In re Tableware Antitrust Litig.*, 363 F. Supp. 2d at 1203, cited by Defendants, is readily distinguishable, since those plaintiffs relied mainly on the mere existence of an investigation, and the court analyzed that limited theory.  *Id.* at 1204 ("Plaintiffs argue in essence that an invocation of this prior investigation provides defendants with all the notice required by [Fed. R. Civ. P.] 8.").  That court upheld the complaint based on all of its allegations.

plausibility of plaintiffs' conspiracy claims." *Optical Disk Drive*, 2012 WL 1366718, *2; *Packaged Ice*, 723 F. Supp. 2d at 1008-09.[23]

Nor do the Defendants' usual arguments about selling some different products or otherwise being different from each other dilute the sufficiency of the CAC's overall conspiracy allegations:

> With respect to defendants' arguments regarding diverse products, markets and pricing, in light of the alleged price increase announcements, internal documents and proposed witnesses, we fail to see how the existence of these factors would prevent plaintiffs from establishing an overarching conspiracy based on a common body of evidence. "[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected…. More importantly, any difference in the manner in which the conspiracy was manifested throughout the marketing and distribution of the various products does not change the common question, namely, whether defendants acted in concert to decrease competition among themselves.

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 484-85 (W.D. Pa. 1999) (granting class certification).  Even if all Defendants did not make every wire harness product, that does not render it implausible that they entered into a conspiracy with the other Defendants with the overall goal to raise, fix, maintain or stabilize prices of the wire harness products they did produce.

### C. In Addition To The U.S. Guilty Pleas And The JFTC Action Against Wire Harness Products Conspirators, Market Factors Support The Conclusion That The Alleged Wire Harness Conspiracy Is Plausible.

1.   The Wire Harness Industry's Market Structure Facilitates Collusion.

Recent cases have found market structure allegations probative under *Twombly*.  "Allegations that a market is characterized by economic factors that courts and antitrust experts and economists have found are conducive to collusive behavior, support an inference of plausibility." *Packaged Ice*, 723 F. Supp. 2d at 1014; a*ccord, e.g., Standard Iron Works,* 639 F. Supp. 2d at 883; *In re Carbon*

---

[23] Defendants' reliance on *In re Bath and Kitchen Fixtures Antitrust Litig.,* 2006 WL 2038605 (E.D. Pa. July 19, 2006), is misplaced.  The complaint in *Bath* "devoted only two paragraphs to describing the alleged antitrust violations, [and] was 'devoid of even a minimal factual background.'" *Fasteners*, 2011 WL 3563989, at *10 (quoting *Bath*, 2006 WL 2038605, at *3).

*Black Antitrust Litig.,* 2005 WL 102966, at *6 (D. Mass. Jan. 18, 2005) (allegations of fungibility, lack of substitutes, high barriers to entry, high market concentration, inelastic demand, and barriers to entry are evidence supporting plausible conspiracy).  This industry has such characteristics.

        a.      The Industry's High Concentration Facilitates Collusion.

An allegation that an industry is highly concentrated, along with other allegations, places parallel conduct "in a context that raises a suggestion of a preceding agreement" sufficient to defeat a motion to dismiss. *Starr*, 592 F.3d at 323-24 (citing studies showing coordinated price increases likely when four leading firms control 50% - 80% of market); *see Standard Iron Works*, 639 F. Supp. 2d at 883 ("high concentration on the supply side (80-85% controlled by Defendants)"); *Packaged Ice*, 723 F. Supp. 2d at 1014 ("oligarchic sellers" conducive to collusion).

The wire harness industry fits this picture.  In this case, the Defendants controlled over 70% of the global market during the Class Period. (CAC ¶101).[24]  Collectively, the industry concentration is part of the context suggesting that the alleged collusion is plausible.

        b.      The Nature Of Wire Harness Products Supports The Claim Of Collusion.

Wire harness products are electrical and electronic cables, wires, and connectors and other parts used to transmit electrical signals or operating currents in motor vehicles. (*Id.* ¶ 76).  They consist of "raw, coiled wire, which is cut to length and terminated.  Individual circuits are assembled together on a jig or table, inserted into connectors and wrapped or taped to form wire harness

_____

[24] Figure 1 in the CAC (¶ 101, at p. 24) shows market shares of Defendants to demonstrate the concentrated market.  Denso pled guilty to rigging bids and fixing prices for electronic control units, one of the wire harness related products, and Fujikura with 2.69% of the market, and Furukawa with 3.61%, pled guilty to antitrust violations.  The Complaint alleges all the Defendants manufactured, marketed or sold wire harness products that were purchased throughout the United States. (CAC ¶¶ 23-26, 28-30, 32-33, 35-37, 39-40, 43-47, 49-54, 56-59, 61-62).  Contrary to Defendants' suggestion, Denso's and Tokai Rika's absence from Figure 1 does not compel a conclusion that they were not part of a conspiracy.  They could still conspire with the other Defendants, even if they lacked the largest market shares.  *See United States v. Consolidated Packaging*, 575 F.2d at 127 ("The evidence does not show Consolidated to have been a major conspirator, but neither does it show Consolidated to have been a major producer.").

assemblies." (*Id.* ¶77).  "Wire Harness Products manufacturers are all capable of producing Wire Harness Products for use in any motor vehicle." (*Id.* ¶100).  This aspect of the industry also supports the plausibility of the alleged conspiracy.

c.      <u>The Industry's High Barriers To Entry.</u>

High barriers to new firms entering the market also facilitate collusion. *E.g., Packaged Ice*, 723 F. Supp. 2d at 1014 ("prohibitive entry barriers" conducive to collusion); *Standard Iron Works*, 639 F. Supp. 2d at 883 ("high barriers to entry" conducive to collusion).  Firms that raise prices above competitive levels risk attracting other firms to enter the market and sell for less.  But high entry barriers discourage potential competitors from entering the market by making entry slower, difficult, risky, or less profitable, reducing the risk to the incumbent firms associated with raising prices beyond competitive levels.

In this case, "high capital investment in plant and machinery and technical expertise" pose substantial barriers to entering the wire harness products market. (CAC ¶103).  Wire harness products producers need substantial scale "in order to efficiently produce parts within the price and quantity parameters established by the [Original Equipment Manufacturers]." (*Id.*).  A new market entrant would need to commit substantial capital to reach such a scale, which increases the risk of any firm contemplating such a step.  These industry circumstances provide additional support for the plausibility of the alleged conspiracy.

2.      <u>Trade Shows Gave The Defendants Opportunities To Collude.</u>

Multiple Defendants have pled guilty to colluding.  In addition, participation in trade shows and organizations provide recognized means to collude. *Packaged Ice*, 723 F. Supp. 2d at 1017 ("When viewed in the context of the allegations of the CAC as a whole, these 'opportunities' bolster the plausibility of a conspiracy and 'attendance at said meetings should be easily ascertained through

20

discovery such that there is a reasonable expectation that discovery may reveal evidence of the alleged illegal conspiracy.'"). *SRAM*, 580 F. Supp.2d at 903.

Defendants had regular opportunities to meet, collude, coordinate pricing, and disguise their collusive activities.  Defendants attended automobile and parts trade shows. (CAC ¶106)  As admitted in their guilty pleas, Defendants' executives met to collude, rig bids, and fix prices.  Their admitted meetings to rig bids and fix prices support a reasonable inference that they took advantage of their trade show opportunities as well.

## II. DP PLAINTIFFS ALLEGE THAT THEY ARE DIRECT PURCHASERS OF DEFENDANTS' WIRE HARNESS PRODUCTS.

The CAC alleges plainly that each DP Plaintiff "purchased Wire Harness Products directly from one or more of the Defendants during the Class Period." (*Id*. ¶¶16-22).  Nevertheless, Defendants attack the CAC by asserting that some DP Plaintiffs' purchases may not have been direct "in any economic sense." Defendants' Collective Memorandum at 21.

Direct purchasers are immediate buyers from the alleged antitrust violators.  By contrast, "[a]n 'indirect purchaser' is one who is not the 'immediate buyer from the alleged antitrust violator.'" *Ford Motor Co. v. Lane*, 86 F. Supp.2d 711, 716 (E.D. Mich. 2000) (quoting *Kansas v. Utilicorp United, Inc*., 497 U.S. 199, 207 (1990)).  Here, just because DP Plaintiffs aren't automobile manufacturers cannot change the fact that they allege direct purchases from Defendants.

The CAC also alleges that, pursuant to the conspiracy, Defendants "succeeded in rigging bids, fixing, raising, maintaining and stabilizing the prices of Wire Harness Products sold in the United States during the Class Period." (CAC ¶158).  "It was important to the success of the cartel alleged [in the CAC] that its members control and manipulate the prices paid by OEMs [Original Equipment Manufacturers] in order to control the prices paid by all other direct purchasers of Wire Harness Products." (*Id.* ¶99).  The OEMs award supply contracts based on requests for quotations.

(*Id.* ¶¶ 92-97). DP Plaintiffs allege that not only did this process establish prices paid by the OEMs, it also affected prices for the entire wire harness products market generally. In addition, the CAC states that some suppliers to OEMs "have been required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process." (*Id.* ¶98). Controlling prices to the OEMs was important in order to control prices for all other direct purchasers, including companies that supplied parts to the OEMs. (*Id.* ¶99). To do so, Defendants met and agreed on bids and price quotations to submit to automobile manufacturers in the United States. (*Id.* ¶110). "Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to automobile manufacturers" consistent with those agreements. (*Id.* ¶111). [25] This resulted in Defendants' actions affecting prices in the rest of the market. Consequently, "Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States." (*Id.* ¶112).

Defendants' Plea Agreements and the JFTC orders cover all wire harness products as defined in the CAC. For example, the Yazaki Plea Agreement (Exhibit B to Defendants' Collective Motion) states that Count 1 of the Information will charge Yazaki with conspiring to suppress "competition in the automotive parts industry" by rigging bids and fixing prices of "automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere." *Id.* at 2. Yazaki's Plea Agreement states:

> Automotive wire harnesses are automotive electrical distribution systems used to direct and control electronic components, wiring and circuit boards. The following are defined as 'related products' for the purposes of this Plea Agreement: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring

---

[25] *See also* CAC ¶¶130, 131, 132 (executives' guilty plea admissions) and ¶137 (DOJ announcement of Fujikura plea agreement and its admissions).

> connectors, automotive wiring terminals, high voltage wiring, electronic control
> units, fuse boxes, relay boxes, and junction blocks.

*Id.* at 4. The factual basis for the Plea states that Yazaki conspired "with other persons and entities engaged in the manufacture and sale of automotive wire harnesses and related products" to rig bids and fix prices of "automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere." *Id.* at 4-5. [26] Similarly, the JFTC action was based on Sumitomo, Yazaki, Fujikura and Furukawa's "involvement in a price-fixing and bid rigging conspiracy in connection with the sale of Wire Harness Products." (CAC ¶ 133)

The CAC similarly describes wire harnesses as "systems of electrical and electronic cables, wires and connectors used to transmit informational signals or operating currents to electrical control units, wiring, circuit boards, and other components in motor vehicles." (*Id.* ¶76) The CAC describes many of the same components, being products related to wire harnesses. (Id. ¶¶ 10, 80-91) (defining Wire Harness Products to include wiring, cable bonds, high voltage wiring, connectors, terminals, electronic control units, fuse boxes, relay boxes, junction blocks and power distributors, and describing their use). Consequently, DP Plaintiffs have alleged that they made direct purchases from Defendants of products covered by the Plea Agreements.

The only case Defendants cite in support of their novel theory is the majority opinion in *Campos v. Ticketmaster Corp.,* 140 F.3d 1166 (8th Cir. 1998), *cert denied,* 525 US 1102 (1999), a fourteen-year-old anomalous, non-binding decision from another Circuit involving service fees tacked on to concert tickets. *Campos* does not support Defendants' argument. There, plaintiffs were concert ticket purchasers who alleged that Ticketmaster, *inter alia*, violated Section One of the

---

[26] Furukawa Plea Agreement, Exhibit A to Defendants' Collective Motion (same language); Fujikura Plea Agreement, Exhibit C to Defendants' Collective Motion (similar language defining wire harness products); and Denso Plea Agreement, Exhibit D to Defendants' Collective Motion (plea to electronic control unit conspiracy); and CAC ¶10 (defining Wire Harness Products).

Sherman Act by fixing prices with concert venues and promoters and boycotting the band Pearl Jam, and violated Section Two by monopolizing the market for ticket distribution services. *Campos*, 140 F. 3d at 1168.  Ticketmaster had long-term exclusive contracts with almost every concert promoter, which ensured that Ticketmaster would handle most ticket sales for popular music concerts, regardless of whether Ticketmaster had a contract with the concert venue.   Because of this relationship, Ticketmaster allegedly could extract supracompetitive fees from ticket purchasers for Ticketmaster's distribution services.   The district court dismissed the complaint, concluding that plaintiffs were not direct purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  The Eighth Circuit affirmed dismissal of the plaintiffs' federal damages claim (it concluded that they were not foreclosed from bringing a claim for injunctive relief).  For the reasons discussed below, even if, for arguments sake, one were to agree that *Campos* was correctly decided (there is a better-reasoned dissent advocating reversal), neither its holding nor reasoning is applicable here.

As a general matter, for purposes of bringing a damages claim under the federal antitrust laws, a plaintiff must be the immediate buyer from the antitrust violator, precisely the relationship DP Plaintiffs allege in the CAC in this case.  The examples used in *Campos* of indirect purchasers of ovens and flour and paint (by retail bread buyers and homeowners who hire a housepainter), *Campos*, 140 F.3d at 1169-70, are completely inapt when considering the direct purchaser allegations in this case.  The court in *Campos* explained that there was "no proper allegation that the direct purchasers have conspired with or otherwise been party with Ticketmaster to any antitrust violation." *Id.* at 1171.  The court believed that the concert venues were the direct purchasers of the ticket distribution services.  *Id.*  According to the court, if the venues conspired with Ticketmaster, then the *Illinois Brick* rule would not apply to the plaintiffs.  Although they alleged that the venues participated in Ticketmaster's illegal activities, the plaintiffs had not, as required by Eighth Circuit

law, joined them as co-conspirator defendants. *Id.* Had plaintiffs done so, it appears that they would have avoided the court's application of *Illinois Brick* to bar their claims.

As the Eight Circuit viewed it, ticket purchasers "only buy Ticketmaster's services because concert venues have been required to buy those services first." *Id.* at 1171. But, as the dissent pointed out, this was a mischaracterization of the situation. As Judge Arnold explained, the venues do not buy a product from Ticketmaster to resell to plaintiffs, and the venues were not overcharged, only the ticket buyers from Ticketmaster were. *Id.* at 1174. To be considered an indirect purchaser under *Illinois Brick*, there must be a "'passing on' of monopoly costs from the direct purchaser to the indirect purchaser." *Id.* (quoting *Illinois Brick*, 431 U.S. at 746). Nothing in the CAC suggests any such passing on occurred in this case.

DP Plaintiffs allege that they are direct purchasers of wire harness product from Defendants. *Illinois Brick* simply does not apply.[27]

### III. FRAUDULENT CONCEALMENT HAS BEEN PROPERLY PLED.

Defendants' argue that the claim for damages suffered from the conspiracy pre-November 2007 must be dismissed. In this case, the first direct purchaser civil complaint was filed in November, 2011. The CAC was filed in May, 2012. The four year statutory period (without consideration of tolling) goes back to November, 2007. But, Defendants are wrong to assert that damages are unavailable prior to November 2007—the conspiracy began in January, 2000,[28] and DP Plaintiffs sufficiently plead that the statute was tolled until February 2010.

"'Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative

---

[27] Defendants' argument by its terms is not applicable to all the DP Plaintiffs. Instead, it only applies to a Tier 1 supplier that was required by an OEM to make all of its purchases of wire harness products from Defendants based on prices agreed to by the Defendants and the OEM.

[28] Multiple Defendants pled guilty to a conspiracy that began in January, 2000. (CAC ¶¶ 134, 136)

facts that are the basis of his cause of action within the limitation period; and (3) plaintiff's due diligence until discovery of the facts.'" *Carrier Corp., supra* (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)).[29] Defendants assert only that the CAC fails to appropriately plead affirmative acts of concealment and due diligence.

While it is true that "[a] plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity," the Sixth Circuit also recognizes the unfairness of dismissing fraudulent-concealment allegations prior to discovery. *Carrier Corp.,* 673 F.3d at 446, 448 (citing *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1043 (6th Cir. 1984)); *Duncan v. Leeds*, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe allegations of fraudulent concealment liberally and in the plaintiff's favor at such an early stage in the litigation)). Furthermore, "'[f]raudulent concealment . . . may be established through the acts of co-conspirators.'" *Id.* at 447 n.8 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008), *cert. denied,* ___ U.S. ___, 129 S.Ct. 1673 (2009)). Finally, fraudulent concealment is a question best left for the jury. *Packaged Ice*, 723 F.Supp.2d at 1018. As set forth below, DP Plaintiffs have adequately pleaded their fraudulent concealment claim.

### A. The CAC Adequately Alleges Affirmative Acts Of Concealment.

"With regard to the 'wrongful concealment' element the plaintiff must point to 'affirmative acts of concealment.'" *Carrier Corp.*, 673 F.3d at 446 (quoting *Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 319 (6th Cir. 2007)). While "mere silence or unwillingness to divulge wrongful activities is not sufficient," it is sufficient to allege some "trick or contrivance

---

[29] Absent tolling, civil antitrust claims are subject to a four-year statute of limitations, which runs from accrual of the cause of action. 15 U.S.C. §15b. *Carrier Corp.,* 673 F.3d at 446. In price-fixing cases, accrual occurs separately each time the plaintiff purchases a product the price of which has been tainted by an antitrust conspiracy. *Zenith Radio Corp. v. Hazeltine Research, Inc.* 401 U.S. 321, 338 (1971). In a continuing conspiracy, such as this, each sale at the inflated price starts the running of the limitations clock anew. *Zenith,* 401 U.S. at 338. *Accord Southeastern Milk,* 555 F. Supp. 2d at 941; *In re Aftermarket Filters Antitrust Litig.*, 08 C 4883, 2009 WL 3754041, *4-5 (N.D. Ill. Nov. 5, 2009).

intended to exclude suspicion and prevent inquiry." *Id.* at 446–47 (quotations omitted). The CAC satisfies this standard.

In *Carrier Corp.*, the Sixth Circuit found that the complaint provided specific details of an alleged cover-up sufficient to adequately plead affirmative acts of concealment. *Id.* The allegations made in *Carrier Corp.* were not lengthy. They: (1) quoted EC findings that conspirators "established security rules to prevent a paper trail . . . and used a coding-system to hide the identity of the producers in their documents and spreadsheets;" and (2) alleged "that because of the co-conspirators' misstatements and attempts at suppressing evidence of illegal conduct, [they] had no knowledge of the Defendants' conspiracy until the release of the EC decision." *Id.* The Sixth Circuit held that these allegations were "sufficiently affirmative for purposes of satisfying the 'wrongful concealment' element because the alleged actions involved taking active steps to hide evidence, as opposed to simply meeting in secret" and that this conduct "would have both concealed from [plaintiff] the very 'means of discovering [its] cause of action,' and prevented [plaintiff] from discovering the basis for its antitrust claim within the limitations period." *Id.* at 448 (quotation omitted) (citing *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F.Supp.2d 303, 316 (D.N.J. 2004) (plaintiff "injected precision" into its fraudulent-concealment claim by "pleading the findings of the United States Department of Justice and the European Commission"); *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004) ("hiding evidence" can constitute affirmative concealment)).

Indeed, contrary to Defendants' position (Collective Memorandum at 24), in the Sixth Circuit, affirmative acts of concealment may be committed at any time, "including during the course and in furtherance of the underlying conspiracy." *Michigan v. McDonald Dairy Company,* 905 F.

Supp 447, 451 (W.D. Mich. 1995)(citing *Pinney Dock and Transport Co. v. Penn Central Corp.,* 838 F. 2d 1445, 1471-76 (6th Cir.), *cert. denied,* 488 U.S. 880 (1988)).[30]

The submission of rigged bids is an example of an affirmative act of concealment.  In *Pinney Dock*, the Sixth Circuit described affirmative acts of concealment:

> The affirmative acts [alleged] included submitting prearranged bids by the company that had agreed not to receive the award, in order to give the illusion of competition among corporate defendants, and maintaining agreed-upon ratios of major equipment in particular localities throughout the world, so as to give the false impression that excessive bids on particular projects were the result of equipment availability rather than of the unlawful conspiracy.

*Id*. at 1473 (citing *Ingram Corp. v. J. Ray McDermott & Co*., 1980 WL 1819, at *4 (E.D. La., Jan. 10, 1980), *rev'd on other grounds*, 698 F.2d 1295 (5th Cir.1983)). *Accord, e.g., Michigan v. McDonald Dairy Co.,* at 451-52 (bid-rigging constituted affirmative acts under *Pinney Dock*); *Ohio v. Louis Trauth Dairy*, 856 F.Supp. 1229, 1237 (S.D. Ohio 1984) ("We are satisfied that the allegation of the use of prearranged rigged bids, which were secretly negotiated and subsequently concealed is sufficient to meet the affirmative misconduct requirement of fraudulent concealment.").

The CAC alleges affirmative acts of concealment that easily satisfy the *Carrier Corp.* standard:

- Defendants (and their executives) rigged bids for wire harnesses and related products. (CAC ¶¶2, 107-08, 111, 122-23, 128-137)

---

[30] Defendants' reliance on *Refrigerant Compressors* is misplaced. To the extent that *Refrigerant Compressors* relies on *Bridgeport Music* for the proposition that a plaintiff must plead specific affirmative conduct on the part of defendants that is separate from the alleged conspiracy that concealed the means for discovering plaintiff's claims, *Bridgeport Music* engenders no such proscription. Indeed, the cited section of *Bridgeport Music* does not even address the question of fraudulent concealment, but instead speaks to that plaintiff's failure to seek written confirmation of the arrangement that formed the basis of its claim despite being told years earlier by defendant that it would do so. There is no other authority in *Refrigerant Compressors* that supports the proposition that a plaintiff must plead specific affirmative conduct on the part of defendants that is separate from the alleged conspiracy itself that concealed the means for discovering plaintiff's claim.  There is actually longstanding precedent in the Sixth Circuit to the contrary. See *Pinney Dock*, *supra.*

- Defendants and their co-conspirators undertook measures to maintain the secretive nature of their unlawful conduct, including but not limited to, using code names and meeting at private residences or remote locations. (CAC ¶ 114)

- The Department of Justice alleges that Furukawa … and its co-conspirators participated in meetings and communications to monitor the conspiracy and conceal their unlawful conduct, including but not limited to using code names and meeting at private residences or remote locations. (*Id.* ¶ 128)

- Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer allocation, and price-fixing activities. (*Id.* ¶ 139)

- Defendants' successful contract, combination, or conspiracy was by its nature inherently self-concealing. (*Id.* ¶148)

- Defendants affirmatively and wrongfully concealed their anti-competitive conduct from Plaintiffs and the Class from at least January 1, 2000 through at least February 2010, when the antitrust investigations of the Wire Harness Products manufacturers became public. (*Id.* ¶ 138)

(*See also Id.* ¶¶ 140-47) (alleging the "means and methods" Defendants used "to avoid detection, and which, in fact, successfully precluded detection.").

As in *Carrier Corp.*, here DP Plaintiffs allege that the Defendants pled guilty to criminal conduct that included using code names and meeting at private residences or remote locations to maintain the secretive nature of their misconduct. 673 F.3d at 447-48 (allegations of a "coding-system to hide the identity of the producers in their documents and spreadsheets"). Also like in *Carrier Corp.*, DP Plaintiffs allege that because of the co-conspirators' misrepresentations and attempts to suppress evidence of misconduct, they had no knowledge of the conspiracy until the antitrust investigations became public. *Id.* (allegations "that because of the co-conspirators' misstatements and attempts at suppressing evidence of illegal conduct, it had no knowledge of the Defendants' conspiracy until the release of the EC decision.") Therefore, the CAC's allegations are "sufficiently affirmative for purposes of satisfying the 'wrongful concealment' element because the

alleged actions involved taking active steps to hide evidence, as opposed to simply meeting in secret" and these allegations show that Defendants' conduct "would have both concealed from [plaintiffs] the very 'means of discovering [their] cause of action,' and prevented [plaintiffs] from discovering the basis for its antitrust claim within the limitations period." *Id*.

In *Packaged Ice*, 723 F.Supp.2d at 1018, the plaintiffs alleged that they "did not and could not have discovered Defendants' unlawful contract, combination or conspiracy at any earlier date" and that defendants "undertook affirmative acts of concealment of their contract, combination or conspiracy, including their attendance at secret meetings, and engaging in secret conversations concerning the allocation of markets and customers for Packaged Ice." Where the defendants, like Defendants here, had pled guilty to a conspiracy that clearly embraced the entire proposed class period, the Court found that these allegations plausibly alleged affirmative acts of concealment. *Id. See also Polyurethane Foam.*, 799 F.Supp.2d at 804 (the complaint "establish[ed] that no facts existed that did or should have excited Plaintiffs' suspicions about alleged price-fixing and customer allocation conspiracy until the 2010 government raids," and thus, "Plaintiffs plausibly allege they could not have discovered the alleged conspiracy at an earlier time.").

Moreover, in *Scrap Metal*, the Sixth Circuit held that the jury was properly instructed as follows:

> In deciding whether plaintiffs have proved fraudulent concealment by the alleged conspirators, you may consider a number of factors. First, the law recognizes that a conspiracy is, by nature, self-concealing. Thus, you may consider the very acts giving rise to the conspiracy when deciding whether it was concealed from the plaintiffs; there is no requirement that the affirmative acts of concealment be independent of the conspiracy itself. . . .

527 F.3d at 537.  Therefore, this Court may also consider the allegations about the conspiracy itself (CAC ¶¶ 106–37), and the allegation that the conspiracy was inherently self-concealing (*Id.* ¶ 148).

The allegations in *Carrier Corp,* which are similar to the allegations here, were found to sufficiently plead affirmative acts of concealment. Defendants just ignore *Scrap Metal*.[31]

Moreover, DP Plaintiffs need not specify which Defendant made which misrepresentation. *Carrier,* 673 F.3d at 446, n. 8 (citing *In re Scrap Metal*, 527 F.3d at 538) ("Although Carrier does not always specify whether Outokumpu engaged in the relevant concealment, this is irrelevant because "[f]raudulent concealment . . . may be established through the acts of co-conspirators."). Under *Carrier Corp.* and *Scrap Metal*, the Sixth Circuit's most recent pronouncements on the standards for pleading fraudulent-concealment claims in the antitrust context, DP Plaintiffs have adequately alleged affirmative acts of concealment and the issue of fraudulent concealment (and the appropriate damages period) should properly be left to a jury.[32]

## B. The CAC Adequately Alleges Due Diligence.

"[I]n evaluating the due-diligence element, the court should evaluate . . . acts of active concealment as a factor in determining whether the plaintiff's investigation was reasonable under the

---

[31] Defendants do make much of *In re Refrigerant Compressors Antitrust Litig.*, 795 F.Supp.2d 647 (E.D. Mich. 2011), which held that fraudulent concealment was not pled with particularity. But *Refrigerant Compressors* was decided prior to the Sixth Circuit's decision in *Carrier Corp.* and *Refrigerant Compressors*, like Defendants, ignores *Scrap Metal. See also Polyurethane Foam*, 799 F.Supp.2d at 803-04 (declining to follow *Refrigerant Compressors* and following "the more well-reasoned approach" in *Packaged Ice*).

[32] Defendants' argument (Collective Memorandum at 25-26) that any allegation of affirmative acts of concealment based on rigged bids is insufficient because the rigged bids were submitted to automotive OEMs, not Plaintiffs, is without merit. First because under Sixth Circuit law Defendants' affirmative acts of fraudulent concealment will toll the statute if they "prevented plaintiff from discovering the cause of action within the limitations period," *Pinney Dock,* 838 F. 2d at 1465 (citing *Dayco Corp.,* 523 F.2d at 394) (also cited by Defendants on pages 23-24 of their Collective Memorandum ), and second because Plaintiffs have alleged that Defendants' affirmative acts of fraudulent concealment did prevent them from discovering that they purchased wire harness products from Defendants at supra-competitive prices that were derived from these rigged bids. *See, e.g.,* CAC ¶ 98 (suppliers to OEMs required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process), ¶ 111 (Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with their conspiratorial agreements, ¶ 112 (Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States), ¶ 139 (Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer allocation, and price-fixing activities). *See also* ¶¶ 139-147.

circumstances." *Carrier Corp.*, 673 F.3d at 447 (citing *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982)). "Thus '[a]ctions such as would deceive a reasonably diligent plaintiff will toll the statute . . . ." *Id.* (quoting *Campbell*, 676 F.2d at 1128); *see also In re Polyurethane Foam Antitrust Litig.*, 799 F.Supp.2d at 804 (due diligence element requires "*reasonable* diligence, not constant cynicism") (emphasis in original).

In *Carrier Corp.*, the Sixth Circuit found due diligence was sufficiently pled when the complaint alleged steps that were taken once plaintiff became aware that the EC was investigating the conspiracy. 673 F.3d at 448.  The plaintiff alleged that it could not uncover information about the conspiracy from the defendants or the defendants' public statements and filings, and filed suit once it obtained additional information from an EC decision. *Id.* The Sixth Circuit held that "this is not a[n] instance in which the plaintiff presented a mere allegation of due diligence without asserting what steps were taken." *Id.* (quoting *Dayco*, 523 F.2d at 394). The Sixth Circuit held that it was "not prepared to conclude that such efforts were insufficient to satisfy *Dayco's* 'due diligence' requirement at such an early stage of litigation and without the benefit of discovery." *Id.*

Moreover, Defendants efforts to conceal their price collusion by submitting rigged bids to their best customers, the OEMs, to falsely assert that their prices were competitively derived, and selling wire harnesses and related products to other direct purchasers at prices affected by the rigged-bids and price-fixing further diminished the likelihood that reasonable diligence could have uncovered the conspiracy.  In contrast to the situation pled in the CAC, Defendants rely on cases where there was a basis to find that a plaintiff failed to address available information that would have reasonably allowed suspicion to be aroused and a fuller investigation pursued.  Indeed, in cases where plaintiffs have been denied the benefit of tolling, the courts repeatedly focused on knowledge and due diligence. *See Pinney Doc, supra*; *Campbell v. Upjohn* (holding that the plaintiff was not

32

entitled to a tolling of the statute when he did not read the merger agreement at the time he signed it and should have learned of the alleged scheme more than two years before suit was actually filed); *Dayco Corp. v. Goodyear Tire & Rubber Co* (denying tolling when congressional hearings and press coverage should have alerted the plaintiff); *Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230 (6th Cir.), *cert. denied,* 419 U.S. 997 (1974) (holding that ignorance by the plaintiff of his legal rights would not toll the statute).

With respect to due diligence, the CAC alleges as follows:

- Despite due diligence, [DP] Plaintiffs had no knowledge of Defendants' unlawful contract, combination, or conspiracy. (CAC ¶ 149)

- In the course of purchasing Wire Harness Products, [DP] Plaintiffs studied prices of the specific products involved. (*Id.* ¶ 150)

- [DP] Plaintiffs received from one or more Defendants various pricing information. [DP] Plaintiffs had no way to know that Defendants' prices were higher than they should have been due to the conspiracy alleged herein. (*Id.* ¶ 151)

- [DP] Plaintiffs did not and could not have discovered Defendants' unlawful contract, combination, or conspiracy at any earlier date, despite due diligence. Defendants undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to [DP] Plaintiffs and the Class of the reasons for the prices charged, and engaging in secret conversations concerning the allocation of customers, bid-rigging, and price-fixing of Wire Harness Products. (*Id.* ¶ 152)

As these allegations set forth, no facts existed to alert DP Plaintiffs to the conspiracy before early February, 2010, when the governmental investigations were made public—DP Plaintiffs could not have discovered the conspiracy before that time.  Further, DP Plaintiffs allege that steps were taken, but that the conspiracy was not uncovered.  Under *Carrier Corp.*, *Packaged Ice*, and *Polyurethane Foam*, DP Plaintiffs have adequately alleged fraudulent concealment of collusion that has resulted in

multiple guilty pleas.  The issue of tolling the statute of limitations for the entire class period should properly be left to a jury.[33]

## IV. THE CAC PROPERLY PLEADS ENTITLEMENT TO INJUNCTIVE RELIEF

Defendants claim that DP Plaintiffs lack standing to seek injunctive relief as they have "failed to plead facts supporting a continuing conspiracy."  To reach that conclusion, Defendants ignore the specific allegations in the CAC, which detail the ongoing harm that DP Plaintiffs have suffered and will continue to suffer as a result of Defendants' continuing conspiracy.

Section 16 of the Clayton Act, 15 U.S.C. § 26, provides in part:

> Any person, firm, corporation, or association *shall be entitled to sue for and have injunctive relief*, in any court of the United States having jurisdiction over the parties, *against threatened loss or damage by a violation of the antitrust laws*, including sections 13, 14, 18 and 19 of this title, when and under the same     conditions and principles as injunctive relief against threatened conduct that will   cause  loss  or damage is granted by courts of equity….

(Emphasis added).  The Supreme Court has interpreted Section 16 to allow courts to enjoin antitrust violations when they have been proven:

> We see no reason that the federal courts, in exercising the traditional equitable powers extended to them by § 16, should not respond to the "salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts."

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 133 (1969) (quoting *NLRB v. Express Pub. Co.*, 312 U.S. 426, 436 (1941)).   Injunctive relief can be granted "without a showing of past wrongs." *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("Grant").  "The necessary determination [in granting injunctive relief] is that there exists *some* cognizable danger of recurrent violation." *Id.*

---

[33] Defendants' assertion that DP Plaintiffs should have been on notice of the conspiracy based on the discrepancy between high prices for wire harness products and decreasing demand (Defendants' Collective Memorandum at 29) contradicts their insistence that the CAC is not plausible even with multiple guilty pleas. If their advice were followed and a complaint had been filed based solely on this economic allegation, Defendants would immediately argue that *Twombly* required dismissal because such information is by itself is insufficient to "nudge" the complaint across the line dividing the merely possible from the plausible.

(emphasis added). "'[A]n antitrust plaintiff seeking injunctive relief need only show a *threatened* injury, not an actual one.'" *Optical Disk Drive*, 2012 WL 1366718, at *8 (quoting *Lucas Auto. Engineering v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998) (emphasis in original)).

DP Plaintiffs allege that Defendants have engaged in a conspiracy that lasted at least a decade. (CAC ¶ 2) DP Plaintiffs also allege that Defendants and their co-conspirators operate in a market with high barriers to entry, among companies that engaged in frequent secret meetings that commenced in 2000 and continued through "at least February 28, 2010", and who have continuing opportunities to conspire.[34] (CAC ¶¶2, 103, 106-114). The same market conditions and opportunities to conspire that facilitated Defendants' long-running conspiracy continue today. Courts have found similar allegations sufficient to sustain a nationwide injunctive relief claim. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 595-97 (N.D. Cal. 2010) *amended in part*, M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (finding plaintiffs' allegations of a multi-company conspiracy, operated in a market with high barriers to entry, with frequent secret meetings in an industry with continuing opportunities to conspire, sufficient to seek injunctive relief); *SRAM*, 264 F.R.D. at 610-11 (same); *Optical Disk Drive*, 2012 WL 1366718, at *8.

Defendants' argument against injunctive relief is comprised of two main assertions, both of which fail. First, Defendants claim that DP Plaintiffs have not been injured because they are not OEMs—that "automobile manufacturers, not the [DP Plaintiffs], were the targets" of the conspiracy and therefore the DP Plaintiffs would not be subject to future harm. This argument is rebutted by the

---

[34] Defendants' assertion (in a footnote ) that Plaintiffs' Counsel "conceded at the June 15, 2012, status conference that Plaintiffs are not aware of any facts supporting any claim that the alleged conspiracy continued after … February 2010" is misleading. Defendants' Collective Memorandum at 31, footnote 12. Plaintiffs' Counsel specifically informed the Court at the status conference that "there have been cases where the defendants did continue the conspiratorial conduct … after the investigation" and that here, the cartel may have "continuing effects" on Plaintiffs and the class given the "bid rigged … five-year contracts" at issue. Tr. of June 15, 2012 Status Conference at 61, 67-68 (Doc. No. 136).

CAC, which details the many ways in which all direct purchasers have been and will continue to be harmed by the conspiracy.  The CAC specifically alleges, *inter alia*: "It was important to the success of the cartel alleged [in the CAC] that its members control and manipulate the prices paid by OEMs [Original Equipment Manufacturers] in order to control the prices paid by all other direct purchasers of Wire Harness Products." (CAC ¶99).  DP Plaintiffs allege that not only did this process establish prices paid by the OEMs, but also for wire harnesses and related products in the market generally. The CAC also states that suppliers to the OEMs "have been required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process." (CAC ¶98).  Controlling prices to the OEMs was important in order to control prices for all other direct purchasers, including companies that supplied parts to the OEMs. (CAC ¶99). Consequently, "Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States." (CAC ¶112).  Therefore, contrary to Defendants' claim, all direct purchasers and not just OEMs are alleged to be victims of this conspiracy.

Second, Defendants argue that DP Plaintiffs are not entitled to injunctive relief because the illegal conduct has allegedly stopped by virtue of the worldwide investigations and guilty pleas. This argument also fails.  DP Plaintiffs have alleged that the wire harness request for quotation process begins "approximately three years prior to production of a motor vehicle." (CAC ¶95). Therefore, any prices set as a result of a collusive bidding process beginning before Defendants claim their conspiratorial conduct would have ceased in February 2010, would be in effect until at least 2013 and possibly beyond.  This factor strongly weighs in favor of allowing DP Plaintiffs' injunctive relief claim to stand.

In any event, Defendants' bare assertions that their illegal conduct terminated simply because "enforcement agencies around the world had so publicly commenced their investigations in February 2010," and further that the terms of the subsequent guilty pleas entered into by Defendants are sufficient to ensure that Defendants' illegal conduct ceases are unpersuasive. Several courts have recognized that the presence of finite time periods in criminal pleas or class periods do not preclude a claim for injunctive relief. *See TFT-LCD*, 267 F.R.D. at 597; *SRAM*, 264 F.R.D. at 611. In pleading guilty, Defendants have acknowledged that they have already chosen to ignore the antitrust laws. One cannot assume, as Defendants suggest, that the terms of the JFTC orders (requiring "measures to ensure that future violations do not occur, including regular training for sales staff") and the U.S. guilty pleas (requiring "continuing cooperation") will prevent Defendants from backsliding. In sum, the threat of Defendants re-engaging in their violations of the antitrust laws demonstrates that injunctive relief is particularly appropriate here.

Finally, Defendants' attempts to analogize the factual circumstances in *Grant* and *Dart Drug Corp. v. Parke, Davis & Co.*, 344 F.2d 173 (D.C. Cir. 1965). This sails well past the mark. Injunctive relief in *Grant* was granted when a motion to dismiss was treated as a motion for summary judgment. The defendant (a director serving on the boards of competing companies— conduct that the Government sought to enjoin) filed an affidavit disclosing the resignations from the boards. This public display of abandonment of the conduct that the government sought to enjoin distinguishes *Grant* from the present case. Here, the public does not have the ability to discern the termination of the illegal conduct. Moreover, the Court in *Grant*, treating the motion to dismiss as a motion for summary judgment, held that there was no issue of material fact in part due to a "voluntary terminat[ion]" of the violation with "no threatened [future] violations." *W.T. Grant Co.*, 345 U.S. at 635. The present motion is brought under Rule 12 and issues of material fact are not

before the Court.  Further, the Defendants in the present case did not voluntarily terminate their illegal conduct, but rather were the subjects of raids around the world.  Moreover, in this matter, as described *supra*, DP Plaintiffs have alleged a significant threat of future damage.

Similarly, Defendants' citation to *Dart Drug* is inapt.  Defendants here cite the portion of that opinion pertaining to *United States v. Parke, Davis & Co.,* 362 U.S. 29 (1960), where a trial court made findings of fact following a trial as to the Government's right to injunctive relief.  Following the denial of injunctive relief at trial, the Government appealed and the Supreme Court "reversed and remanded with directions to issue an injunction" unless the defendant company in that case submitted evidence refuting the Government's right to injunctive relief. *Dart Drug,* 344 F.2d at 177. Thereafter, the Government "chose to submit no further evidence" and the trial judge made further findings of fact and denied the Government's injunctive relief claim. *Id.*  As the present motion is a Rule 12 motion and not a trial on the merits, Defendants' analogy to *Dart Drug* is misplaced.

Without injunctive relief, Defendants could continue to sell or resume selling their products at supra-competitive prices, forcing repeat litigation by DP Plaintiffs.  Moreover, in this particular case, DP Plaintiffs and the class may in the future be impacted by the conspiratorial conduct, as a result of the bidding process, thereby necessitating injunctive relief as a remedy.  Because DP Plaintiffs have pled facts that plausibly establish a significant risk of future harm, Defendants' motion to dismiss DP Plaintiffs' claim for injunctive relief should be denied.

## CONCLUSION

The CAC tells a straightforward, familiar, tale based on numerous guilty pleas, fines and investigations, as well as a market structure conducive to collusion.  Defendants, however, claim that when viewed under an electron microscope the CAC's story should be rejected in favor of Defendants' view that, while there was conspiracy, it is not the one that appears on the pages of the CAC.  For the Court to accept Defendants' argument and dismiss the CAC, it has to find the story

told by the CAC to be implausible.  It is not.  And Defendants' arguments about direct purchases,

tolling, and injunctive relief should fare no better.

The totality of the allegations set forth in the CAC support the conspiracy pled therein, and

rebuts Defendants' positions.   Because the CAC sufficiently pleads a plausible conspiracy,

Defendants' Collective Motion should be completely, and utterly, denied.

Dated: September 11, 2012                   Respectfully Submitted,

By: /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road, Suite 111
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkandassociateslaw.com

*Interim Liaison Counsel for the DP Plaintiffs*

| | |
|---|---|
| Joseph C. Kohn | Gregory P. Hansel |
| William E. Hoese | Randall B. Weill |
| Douglas A. Abrahams | Joshua R. Carver |
| KOHN, SWIFT & GRAF, P.C. | PRETI, FLAHERTY, BELIVEAU |
| One South Broad Street, Suite 2100 | & PACHIOS LLP |
| Philadelphia, PA 19107 | One City Center, P.O., Box 9546 |
| (215) 238-1700 | Portland, ME 04112-9546 |
| jkohn@kohnswift.com | (207) 791-3000 |
| | ghansel@preti.com |
| Steven A. Kanner | |
| William H. London | Eugene A. Spector |
| Michael E. Moskovitz | William G. Caldes |
| Michael L. Silverman | Jonathan M. Jagher |
| FREED KANNER LONDON | Jeffrey L. Spector |
| & MILLEN LLC | SPECTOR ROSEMAN KODROFF |
| 2201 Waukegan Road, Suite 130 | & WILLIS, P.C. |
| Bannockburn, IL 60015 | 1818 Market Street, Suite 2500 |
| (224) 632-4500 | Philadelphia, PA 19103 |
| skanner@fklmlaw.com | (215) 496-0300 |
| | espector@srkw-law.com |

*Interim Lead Counsel for the Direct Purchaser*
*Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2012, I electronically filed the foregoing paper with

the Clerk of the court using the ECF system which will send notification of such filing to all counsel

of record registered for electronic filing.

FINK + ASSOCIATES LAW

By: /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Interim Liaison Counsel for DP Plaintiffs
100 West Long Lake Road, Suite111
Bloomfield Hills, MI  48304
(248) 971-2500
dfink@finkandassociateslaw.com