

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                          —   —   —

 4
       IN RE:  AUTOMOTIVE WIRE HARNESS
 5     SYSTEMS ANTITRUST                    MDL NO. 2311

 6     _____/

 7
                  STATUS CONFERENCE / MOTION HEARING
 8
             BEFORE THE HONORABLE MARIANNE O. BATTANI
 9                 United States District Judge
             Theodore Levin United States Courthouse
10                231 West Lafayette Boulevard
                         Detroit, Michigan
11                Wednesday, December 5, 2012

12
       APPEARANCES:
13
       Direct Purchaser Plaintiffs:
14
                          DOUGLAS ABRAHAMS
15                        KOHN, SWIFT & GRAF, P.C.
                          One South Broad Street, Suite 2100
16                        Philadelphia, PA  19107
                          (215) 238-1700
17

18                        MATTHEW BARSENAS
                          OLIVER LAW GROUP
19                        950 West University Drive, Suite 200
                          Rochester, MI  48307
20                        (248) 436-3385

21
                          WILLIAM G. CALDES
22                        SPECTOR, ROSEMAN, KODROFF & WILLIS,
                          P.C.
23                        1818 Market Street, Suite 2500
                          Philadelphia, PA  19103
24                        (215) 496-0300

25
```

```
 1   APPEARANCES:  (Continued)

 2   Direct Purchaser Plaintiffs:

 3                        SOLOMON B. CERA
                          GOLD, BENNET, CERA & SIDENER, L.L.P.
 4                        595 Market Street, Suite 2300
                          San Francisco, CA  94105
 5                        (415) 777-2230

 6

 7                        DAVID H. FINK
                          FINK & ASSOCIATES LAW
 8                        100 West Long Lake Road, Suite 111
                          Bloomfield Hills, MI  48304
 9                        (248) 971-2500

10                        GREGORY P. HANSEL
                          PRETI, FLAHERTY, BELIVEAU &
11                        PACHIOS, L.L.P.
                          One City Center
12                        Portland, ME  04112
                          (207) 791-3000
13

14                        WILLIAM E. HOESE
                          KOHN, SWIFT & GRAF, P.C.
15                        One South Broad Street, Suite 2100
                          Philadelphia, PA  19107
16                        (215) 238-1700

17

18                        BRENT W. JOHNSON
                          COHEN MILSTEIN
                          1100 New York Avenue NW, Suite 500 West
19                        Washington, D.C.  20005
                          (202) 408-4600
20

21                        STEVEN A. KANNER
                          FREED, KANNER, LONDON & MILLEN, L.L.C.
22                        2201 Waukegan Road, Suite 130
                          Bannockburn, IL  60015
23                        (224) 632-4502

24

25
```

```
 1   APPEARANCES: (Continued)

 2   Direct Purchaser Plaintiffs:

 3                         JOSEPH C. KOHN
                           KOHN, SWIFT & GRAF, P.C.
 4                         One South Broad Street, Suite 2100
                           Philadelphia, PA  19107
 5                         (215) 238-1700

 6

 7                         WILLIAM H. LONDON
                           FREED, KANNER, LONDON & MILLEN, L.L.C.
 8                         2201 Waukegan Road, Suite 130
                           Bannockburn, IL  60015
 9                         (224) 632-4504

10                         MELISSA H. MAXMAN
                           COZEN O'CONNOR
11                         1627 I Street, NW, Suite 1100
                           Washington, D.C.  20006
12                         (202) 912-4800

13                         EUGENE A. SPECTOR
14                         SPECTOR, ROSEMAN, KODROFF & WILLIS,
                           P.C.
15                         1818 Market Street, Suite 2500
                           Philadelphia, PA  19103
16                         (215) 496-0300

17                         JASON J. THOMPSON
18                         SOMMERS SCHWARTZ, P.C.
                           2000 Town Center, Suite 900
19                         Southfield, MI  48075
                           (248) 355-0300
20

21                         RANDALL B. WEILL
                           PRETI, FLAHERTY, BELIVEAU &
22                         PACHIOS, L.L.P.
                           One City Center
23                         Portland, ME  04112
                           (207) 791-3000
24

25
```

```
 1   APPEARANCES: (Continued)

 2   End-Payor Plaintiffs:

 3                       THOMAS E. AHLERING
                         HAGENS, BERMAN, SOBOL, SHAPIRO, L.L.P.
 4                       1144 West Lake Street, suite 400
                         Oak Park, IL  60301
 5                       (708) 628-4961

 6
                         WARREN T. BURNS
 7                       SUSMAN GODFREY, L.L.P.
                         901 Main Street, Suite 5100
 8                       Dallas, TX  75202
                         (214) 754-1928

 9

10                       FRANK C. DAMRELL
                         COTCHETT, PITRE & McCARTHY, L.L.P.
11                       840 Malcolm Road
                         Burlingame, CA  94010
12                       (650) 697-6000

13
                         LAUREN CRUMMEL
14                       THE MILLER LAW FIRM, P.C.
                         950 West University Drive, Suite 300
15                       Rochester, MI  48307
                         (248) 841-2200

16

17                       BERNARD PERSKY
                         LABATON SUCHAROW
18                       140 Broadway Avenue
                         New York, NY  10005
19                       (212) 907-0700

20
                         MARC M. SELTZER
21                       SUSMAN GODFREY, L.L.P
                         190 Avenue of the Stars, Suite 950
22                       Los Angeles, CA  90067
                         (310) 789-3102

23

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    End-Payor Plaintiffs:

 3                         ELIZABETH T. TRAN
                           COTCHETT, PITRE & McCARTHY, L.L.P.
 4                         840 Malcolm Road
                           Burlingame, CA  94010
 5                         (650) 697-6000

 6

 7                         STEVEN N. WILLIAMS
                           COTCHETT, PITRE & McCARTHY, L.L.P.
                           840 Malcolm Road
 8                         Burlingame, CA  94010
                           (650) 697-6000
 9

10                         ADAM J. ZAPALA
                           COTCHETT, PITRE & McCARTHY, L.L.P.
11                         840 Malcolm Road
                           Burlingame, CA  94010
12                         (650) 697-6000

13    Dealership Plaintiffs:

14                         DON BARRETT
                           BARRETT LAW OFFICES
15                         P.O. Drawer 987
                           Lexington, MS  39095
16                         (601) 834-2376

17

18                         JONATHAN W. CUNEO
                           CUNEO, GILBERT & LaDUCA, L.L.P.
19                         507 C Street NE
                           Washington, D.C.  20002
20                         (202) 789-3960

21                         JOEL DAVIDOW
                           CUNEO, GILBERT & LaDUCA, L.L.P.
22                         507 C Street NE
                           Washington, D.C.  20002
23                         (202) 789-3960

24

25
```

1    APPEARANCES:  (Continued)

2    **Dealership Plaintiffs:**

3                              BRENDAN FREY
                             **MANTESE, HONIGMAN, ROSSMAN &**
4                            **WILLIAMSON, P.C.**
                             1361 East Big Beaver Road
5                            Troy, MI  48083
                             (248) 457-9200
6

7                              GERARD V. MANTESE
                             **MANTESE, HONIGMAN, ROSSMAN &**
8                            **WILLIAMSON, P.C.**
                             1361 East Big Beaver Road
9                            Troy, MI  48083
                             (248) 457-9200
10

11                             SHAWN M. RAITER
                             **LARSON KING, L.L.P.**
12                           30 East Seventh Street, Suite 2800
                             Saint Paul, MN  55101
13                           (651) 312-6500

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:12-md-02311-SFC-RSW   ECF No. 489, PageID.7310   Filed 01/02/13   Page 7 of 173
Status Conference/Motion Hearing • December 5, 2012

7

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                   BRIAN M. AKKASHIAN
                     PAESANO AKKASHIAN
 4                   132 North Old Woodward Avenue
                     Birmingham, MI  48009
 5                   (248) 792-6886

 6
                     CRAIG D. BACHMAN
 7                   LANE POWELL, P.C.
                     601 SW Second Avenue, Suite 2100
 8                   Portland, OR  97204
                     (503) 778-2100
 9

10                   THOMAS E. BEJIN
                     BEJIN, VANOPHEM BIENSMAN
11

12                   PETER E. BOIVIN
                     HONIGMAN, MILLER, SCHWARTZ AND COHN, L.L.P.
13                   2290 First National Building
                     660 Woodward Avenue
14                   Detroit, MI  48226
                     (313) 465-7396
15

16                   STEVEN F. CHERRY
                     WILMER HALE
17                   1875 Pennsylvania Avenue NW
                     Washington, D.C.  20006
18                   (202) 663-6321

19
                     JAMES W. COOPER
20                   ARNOLD & PORTER, L.L.P.
                     555 Twelfth Street NW
21                   Washington, DC  20004
                     (202) 942-5000
22

23                   SAMUEL B. DAVIDOFF
                     WILLIAMS & CONNOLLY, L.L.P.
24                   725 Twelfth Street NW
                     Washington, DC  2005
25                   (202) 434-5648
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                    KENNETH R. DAVIS, II
                      LANE POWELL, P.C.
 4                    601 SW Second Avenue, Suite 2100
                      Portland, OR  97204
 5                    (503) 778-2100

 6
                      DEBRA H. DERMODY
 7                    REED SMITH
                      225 Fifth Avenue
 8                    Pittsburgh, PA 15222
                      (412) 288- 3131
 9

10                    GEORGE B. DONNINI
                      BUTZEL LONG, P.C.
11                    150 West Jefferson Avenue
                      Detroit, MI  48226
12                    (313) 225-7000

13
                      DAVID P. DONOVAN
14                    WILMER, CUTLER, PICKERING, HALE and DORR,
                      L.L.P.
15                    1875 Pennsylvania Avenue, NW
                      Washington, D.C.  20006
16                    (202) 663-6868

17
                      MOLLY M. DONOVAN
18                    WINSTON & STRAWN, L.L.P.
                      200 Park Avenue
19                    New York, NY  10166
                      (212) 294-4692
20

21                    DAVID F. DuMOUCHEL
                      BUTZEL LONG, P.C.
22                    150 West Jefferson Avenue
                      Detroit, MI  48226
23                    (313) 225-7000

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3               PETER M. FALKENSTEIN
                 JAFFE, RAITT, HEUER & WEISS, P.C.
 4               27777 Franklin Road, Suite 2500
                 Southfield, MI  48034
 5               (248) 351-3000

 6
                 JAMES P. FEENEY
 7               DYKEMA GOSSETT, P.L.L.C.
                 39577 Woodward Avenue, Suite 300
 8               Bloomfield Hills, MI  48304
                 (248) 203-0841
 9

10               MICHELLE K. FISCHER
                 JONES DAY
11               51 Louisiana Avenue NW
                 Washington, D.C.  20001
12               (202) 879-4645

13
                 LARRY S. GANGNES
14               LANE POWELL, P.C.
                 1420 Fifth Avenue, Suite 4100
15               Seattle, Washington  98101
                 (206) 223-7000
16

17               DANIEL W. GLAD
                 LATHAM & WATKINS, L.L.P.
18               233 South Wacker Drive, Suite 5800
                 Chicago, IL 60606
19               (312) 777-7110

20
                 FRED K. HERRMANN
21               KERR, RUSSELL & WEBER, P.L.C.
                 500 Woodward Avenue, Suite 2500
22               Detroit, MI  48226
                 (313) 961-0200
23
                 HOWARD B. IWREY
24               DYKEMA GOSSETT, P.L.L.C.
                 39577 Woodward Avenue, Suite 300
25               Bloomfield Hills, MI  48304
                 (248) 203-0526
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3                   BENJAMIN W. JEFFERS
                     DYKEMA GOSSETT, P.L.L.C.
 4                   400 Renaissance Center
                     Detroit, MI  48243
 5                   (313) 568-5340

 6
                     SHELDON H. KLEIN
 7                   BUTZEL LONG, P.C.
                     41000 Woodward Avenue
 8                   Bloomfield Hills, MI  48304
                     (248) 258-1414

 9

10                   PETER KONTIO
                     ALSTON & BIRD, L.L.P.
11                   1201 West Peachtree Street
                     Atlanta, GA  30309
12                   (404) 881-7000

13
                     ERIC MAHR
14                   WILMER, CUTLER, PICKERING, HALE and DORR,
                     L.L.P.
15                   1875 Pennsylvania Avenue, NW
                     Washington, D.C.  20006
16                   (202) 663-6099

17
                     ANDREW S. MAROVITZ
18                   MAYER BROWN, L.L.P.
                     71 South Wacker Drive
19                   Chicago, IL  60606
                     (312) 701-7116

20

21                   W. TOOD MILLER
                     BAKER & MILLER, P.L.L.C.
22                   2401 Pennsylvania Avenue NW, Suite 300
                     Washington, DC  20037
23                   (202) 663-7822

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3               SONIA KUESTER PFAFFENROTH
                 ARNOLD & PORTER, L.L.P.
 4               555 Twelfth Street NW
                 Washington, DC  20004
 5               (202) 942-5094

 6
                 ANNA M. RATHBUN
 7               LATHAM & WATKINS, L.L.P.
                 555 Eleventh Street NW, Suite 1000
 8               Washington, D.C.  20004
                 (202) 637-2200
 9

10               SALVATORE A. ROMANO
                 PORTER, WRIGHT, MORRIS & ARTHUR
11               1919 Pennsylvania Ave., NW, Suite 500
                 Washington, D.C. 20006
12               (202) 778-3054

13
                 WM. PARKER SANDERS
14               SMITH, GAMBRELL & RUSSELL, L.L.P.
                 Promenade Two, Suite 3100
15               1230 Peachtree Street NE
                 Atlanta, GA  30309
16               (404) 815-3684

17
                 WILLIAM A. SANKBEIL
18               KERR, RUSSELL & WEBER, P.L.C.
                 500 Woodward Avenue, Suite 2500
19               Detroit, MI  48226
                 (313) 961-0200
20

21               CONNOR B. SHIVELY
                 LANE POWELL, P.C.
22               1420 Fifth Avenue, Suite 4100
                 Seattle, Washington  98101
23               (206) 223-7000

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                    ANITA STORK
                      COVINGTON & BURLING, L.L.P.
 4                    One Front Street
                      San Francisco, CA  94111
 5                    (415) 591-7050

 6

 7                    MARGUERITE M. SULLIVAN
                      LATHAM & WATKINS, L.L.P.
                      555 Eleventh Street NW, Suite 1000
 8                    Washington, D.C.  20004
                      (202) 637-2200

 9

10                    JOANNE GEHA SWANSON
                      KERR, RUSSELL & WEBER, P.L.C.
11                    500 Woodward Avenue, Suite 2500
                      Detroit, MI  48226
12                    (313) 961-0200

13

14                    MICHAEL F. TUBACH
                      O'MELVENY & MYERS, L.L.P.
                      Two Embarcadero Center, 28th Floor
15                    San Francisco, CA  94111
                      (415) 984-8700

16

17                    MICHAEL R. TURCO
                      BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.
18                    401 South Old Woodward Avenue, Suite 400
                      Birmingham, MI  48009
19                    (248) 971-1713

20

21                    A. PAUL VICTOR
                      WINSTON & STRAWN, L.L.P.
                      200 Park Avenue
22                    New York, NY  10166
                      (212) 294-4655

23

24

25
```

```
 1  APPEARANCES:  (Continued)

 2  For the Defendants:

 3              ALISON WELCHER
                SHEAVMAN & STERLING
 4              801 Pennsylvania Avenue, NW, Suite 900
                Washington, D.C. 20004
 5              (202) 508-8122

 6
                ROBERT WIERENGA
 7              SCHIFF HARDIN, L.L.P.
                350 South Main Street, Suite 210
 8              Ann Arbor, MI  48104
                (734) 222-1507
 9

10              STEPHANIE K. WOOD
                WILMER, CUTLER, PICKERING, HALE and DORR,
11              L.L.P.
                1875 Pennsylvania Avenue, NW
12              Washington, D.C.  20006
                (202) 663-6099
13

14              MASA YAMAGUCHI
                LANE POWELL, P.C.
15              601 SW Second Avenue, Suite 2100
                Portland, OR  97204
16              (503) 778-2174

17

18

19

20

21

22

23

24

25
```

```
 1 │ TABLE OF CONTENTS
   │
 2 │
   │                                                          Page
 3 │
   │ STATUS CONFERENCE................................ 17
 4 │
   │
 5 │ MOTION TO DISMISS REGARDING DIRECT PURCHASERS
   │ Motion by Mr. Cooper............................. 41
 6 │ Motion by Mr. Gangnes............................ 54
   │ Response by Mr. Kohn............................. 59
 7 │ Response by Mr. Spector.......................... 78
   │ Reply by Mr. Cooper.............................. 82
 8 │ Reply by Mr. Gangnes............................. 88
   │ Sur Response by Mr. Kohn......................... 91
 9 │ Sur Response by Mr. Spector...................... 93
   │ Sur Reply by Mr. Cooper.......................... 93
10 │ Sur Reply by Mr. Gangnes......................... 93
   │
11 │
   │ MOTION TO DISMISS REGARDING TRAM
12 │ Motion by Mr. Klein.............................. 94
   │ Response by Mr. Kohn.............................104
13 │ Reply by Mr. Klein...............................108
   │
14 │
   │ MOTION TO DISMISS REGARDING DENSO
15 │ Motion by Mr. Cherry.............................110
   │ Response by Mr. Kohn.............................120
16 │ Reply by Mr. Cherry..............................124
   │
17 │ MOTION TO DISMISS REGARDING LEAR CORPORATION
   │ Motion by Mr. Marovitz...........................127
18 │ Response by Mr. Persky...........................152
   │ Reply by Mr. Marovitz............................164
19 │ Sur Response by Mr. Persky.......................179
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

1    Detroit, Michigan

2    Wednesday, December 5, 2012

3    at about 9:31 a.m.

4                              —    —    —

5              (Court and Counsel present.)

6              THE CASE MANAGER:  All rise.

7              The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10             You may be seated.

11             The Court calls Automotive Parts Antitrust

12   Litigation.

13             THE COURT:  Why are there so many of you here?  I

14   thought by now we would --

15             THE CASE MANAGER:  They have doubled in size,

16   Judge.

17             THE COURT:  It is amazing.  Good morning.  I'm very

18   sorry about what happened at the door today.  I understand

19   some of you were delayed.  I know my staff was delayed for

20   quite some time coming through security.  I guess that's one

21   thing I didn't think about when we had it on this day --

22   well, no, tomorrow we will also have immigration coming in,

23   naturalization, although, Bernie, they come in the other door

24   so that shouldn't create more of a problem, but today there

25   was a Grand Jury and there was the Kwame Kilpatrick case

1    continuing, so I apologize but everybody is here now.  Okay.

2         Let's begin with going over the agenda.  On wire

3    harness, who wants to give a status report on that?

4         MR. FINK:  Your Honor, on wire harness for the

5    direct purchaser plaintiffs, Greg Hansel will address the

6    first few products.

7         THE COURT:  Okay.

8         MR. HANSEL:  May it please the Court, good morning,

9    Your Honor.  Greg Hansel for the direct purchaser plaintiffs.

10        This should be a pretty short presentation.  One

11   thing that we recommended to the Court in this conference

12   agenda was to take the cases on a part-by-part basis rather

13   than a topic-by-topic basis because it helps us all keep it

14   clear in our head because there are so many parts, if you

15   take the parts one at a time it seems to be more coherent to

16   us.

17        THE COURT:  That's fine.

18        MR. HANSEL:  So the direct cases are fully served

19   in wire harness, as we previously reported, and Shawn Raiter

20   on behalf of the auto dealers will address the auto dealer

21   cases.

22        THE COURT:  All right.

23        MR. RAITER:  Good morning, Your Honor.

24   Shawn Raiter for the auto dealers.

25        All the defendants are served on behalf of the auto

1  dealers in wire harnesses as well.

2        THE COURT:  Good.  End payor?

3        MR. PERSKY:  Bernard Persky of the Labaton Sucharow

4  firm for the end payors.  The end payor cases are fully

5  served, but the plaintiffs are awaiting written confirmation

6  of service on Defendant Tokai Rika Co. Limited, and by fully

7  served so that there be no misunderstanding if we have

8  multiple cases that have been filed on behalf of end payors

9  what we mean is at least one of the constituent cases have

10 served fully -- a defendant has been served in one of the

11 constituent cases so all defendants have been served in at

12 least one of those cases.

13       THE COURT:  So they have not been served with the

14 consolidated amended complaint?

15       MR. PERSKY:  No.  What happens after the defendants

16 are all fully served, there will be a service of a

17 consolidated amended complaint on counsel, and if that

18 defendant is a foreign defendant they get a translation at

19 the same time, and that's been consistent with the template

20 that has been arrived at in the other matters.

21       THE COURT:  Okay.  Thank you.  Well, wait a minute,

22 while you are there I do have a question.  When would you

23 anticipate that the consolidated complaints would be filed on

24 counsel for everybody?

25       MR. PERSKY:  Well, on wire harness --

1          THE COURT:  In the wire harness.

2          MR. PERSKY:  -- they have been filed.

3          THE COURT:  With counsel.  Okay.  All right.  Thank

4   you.

5          MR. HANSEL:  Your Honor, there is one other matter

6   that is not in the agenda that we wanted to bring up today

7   that we believe applies to all three groups of cases.

8          THE COURT:  Okay.

9          MR. HANSEL:  The directs, the auto dealers and the

10  end payors, and it is with respect to the correct identity of

11  one of the Fujikura defendants, and Mr. Persky will address

12  that for all the groups.

13         MR. PERSKY:  Okay.  An entity called Fujikura

14  America, Inc., a subsidiary of a Japanese company called

15  Fujikura, Limited, is a defendant and has made a motion to

16  dismiss.  In the answering papers, in the reply defendant --

17  the counsel for I will call it FAI, Fujikura America, Inc.,

18  disputed the allegation that it was a subsidiary identified

19  in the parent plea agreement as a subsidiary that sold the

20  prix fixe product to the OEM, and that OEM's bid was fixed,

21  and the parent pleaded guilty to that unlawful conduct.

22         So upon further research we determined that instead

23  of FAI, Fujikura America, Inc., it was Fujikura Automotive

24  America, LLC as a subsidiary.  And in conversations with

25  counsel for Fujikura, James Cooper of Arnold & Porter, who is

1    here, we have orally determined that, as I understand it, and

2    he will correct me if I say it wrong, the motion will be

3    withdrawn, we will amend our pleading to include allegations

4    including Fujikura America -- Fujikura Automotive America,

5    Inc., FAA, and those allegations will specifically include

6    assertions in the plea agreement and the transcript.  We will

7    dismiss FAI, Fujikura America, Inc., without prejudice

8    pursuant to an agreed upon tolling agreement which is being

9    drafted now.  After getting the amended pleading, counsel for

10   Fujikura Automotive America and Fujikura, Limited, will

11   decide if they want to make a motion against that replead

12   complaint, but just speaking for myself, once we specifically

13   state that it was Fujikura Automotive America, LLC that its

14   parent admitted -- made the sales of the prix fixe wire

15   harness products to a specific OEM we don't think there will

16   be any basis for a motion but I'm not sure counsel will

17   commit without having seen the complaint that it won't make a

18   motion, but I believe this will resolve the dispute

19   concerning Fujikura.

20            THE COURT:  Okay.  Mr. Cooper?

21            MR. COOPER:  Thank you, Your Honor.  James Cooper

22   from Arnold & Porter on behalf of Fujikura.

23            I think that everything Mr. Persky said is more or

24   less correct.  My understanding is that we have agreed --

25            THE COURT:  It is the less that I'm worried about.

1     MR. COOPER:  Right, you and me both.  We have

2  agreed that so we have time today and tomorrow for motions to

3  dismiss FAI out of the directs today and the indirects

4  tomorrow.  I believe that we have negotiated sort of a global

5  resolution whereby those motions will be moot in essence

6  because both the indirects and the directs will amend to take

7  out FAI, they will put in FAA, along with presumably

8  supporting allegations with respect to FAA, that's assuming,

9  of course, that the group motions to dismiss, the direct and

10  the indirects, don't result in the complaints being dismissed

11  with prejudice.  If that were to happen obviously then there

12  would be no need to amend.

13     THE COURT:  Right.

14     MR. COOPER:  Thank you, Your Honor.

15     MR. PERSKY:  Thank you.

16     THE COURT:  Thank you very much.  When we get to

17  those motions just remind me of this agreement.  Okay.

18     MR. HANSEL:  So that was sort of a

19  semi-housekeeping, semi-merits issue but we thought we would

20  bring it up now.

21     Turning now to instrument panel clusters, if I may,

22  Your Honor?

23     THE COURT:  All right.

24     MR. HANSEL:  The direct cases are fully served, and

25  I would ask Mr. Raiter to address the auto dealer cases.

1          MR. RAITER:  The auto dealers -- again,

2    Shawn Raiter on behalf of the auto dealers.

3          The auto dealers have either accomplished service

4    or we have an agreement to accept service in the fuel senders

5    case.

6          THE COURT:  Okay.  End payors?

7          MR. PERSKY:  The end payor cases have been fully

8    served.

9          THE COURT:  Mr. Persky, you said fully served?

10         MR. PERSKY:  Yes.  The end payor cases have been

11   fully served.

12         THE COURT:  Thank you.

13         MR. HANSEL:  The deadline for the consolidated

14   amended complaints is December 24th.

15         THE COURT:  I wanted to talk to you about these

16   deadlines, and this really goes to the fuel senders and the

17   heater control panels also.  I know the deadlines were set

18   but it seems to me you are talking about filing it

19   December 24th, I mean, really?

20         MR. HANSEL:  Your Honor, I know that sounds nutty

21   but here is why it is really okay with the plaintiffs.  We

22   actually have to get these things to the translator a couple

23   of weeks ahead of time to translate them into Japanese and in

24   some cases German pursuant to the template that has been

25   established to serve foreign language documents on counsel

1    who -- for clients who have already been served with one

2    complaint, so since we have already got these things well in

3    hand ahead of time and at least for the directs we are not

4    requesting an extension and it is not a problem for us

5    because we are ahead of the game because of necessity because

6    of the requirement to translate them.

7         THE COURT:  Okay.  And I'm jumping ahead as to the

8    other two because, I mean, I really was thinking of spacing

9    these a little bit more, even though you might be ready, both

10   because of when things come in here and how the motions are

11   going to be following I hesitate to have everything at one

12   time.

13        MR. HANSEL:  The direct purchasers, by the way,

14   don't have a fuel senders case so that's not an issue for us.

15        THE COURT:  That's not an issue, yeah.

16        MR. HANSEL:  Of course, we will do whatever the

17   Court wants.

18        THE COURT:  If you are comfortable with it, fine.

19   I was thinking of some deadlines like January 15th, the end

20   of February, the middle of April for the third, you know, to

21   scatter them, but if that causes a problem -- I'm throwing

22   that out so I'm sure we will hear because we already have

23   some up here.

24        MR. WILLIAMS:  Good morning.  Steve Williams for

25   the end payor plaintiffs.

1    The Court's suggestion is fine with us if you want

2   to have a -- stagger those by a 30-day period given the

3   briefing, we have all done this, I think that does make sense

4   for probably the Court and the parties to have that, so we

5   could stick with that first December 24th date and then have

6   a date roughly 30 days out for the heating control panels and

7   the instrument cluster cases.

8    THE COURT:  Okay.

9    MR. WILLIAMS:  The attendant briefing schedules

10   would then be the same.

11    THE COURT:  All right.  What if we stick to the

12   December 24th date, and then for the fuel senders go to

13   February 28th, and the heater control April 15th.  Now, do

14   those dates cause any trouble for anybody?

15    MR. HANSEL:  It is fine with us, Your Honor.

16    MR. WILLIAMS:  That's fine with the end payors.

17    MS. FISCHER:  That's fine with us.  On behalf of

18   Yazaki, Michelle Fischer.

19    MR. RAITER:  Fine for the auto dealers.

20    MR. WILLIAMS:  The response dates for the

21   complaints will just be pushed out?

22    THE COURT:  Yes, everything will follow from the

23   dates of the filing, so whatever scheduling orders you have

24   or that it would go from these dates.

25    MR. WILLIAMS:  Great.  Thank you.

 1          THE COURT:  Thank you.  Please, I don't want to be

 2   the grinch who stole Christmas, so you tell the people that

 3   you are working with that --

 4          MR. HANSEL:  Thank you.  The interpreters thank you

 5   also I'm sure.

 6          On fuel senders the directs have no case at present

 7   so it is auto dealers.

 8          MR. RAITER:  Shawn Raiter on behalf of the auto

 9   dealers again.

10          Your Honor, on fuel senders, I may have misspoken

11   before, I was referring to instrument panels, but on fuel

12   senders we also have either accomplished service or have an

13   agreement to accept service as well.

14          THE COURT:  On fuel senders?

15          MR. RAITER:  Correct, both fuel senders and

16   instrument panel clusters.

17          THE COURT:  And instrument panels.

18          MR. RAITER:  Thank you.

19          MR. PERSKY:  That is the same for the end payors.

20          THE COURT:  Okay.

21          MR. HANSEL:  On heater control panels, the direct

22   cases are against Denso International America, Inc. and Denso

23   Corporation, and they have both agreed to accept service.

24          THE COURT:  Auto dealers?

25          MR. RAITER:  Shawn Raiter, again, on behalf of the

1    auto dealers, and we have the same status.

2         MR. PERSKY:  The same with respect to the

3    end payors.

4         THE COURT:  Okay.  So that's Denso and Denso what,

5    the defendants on that one?

6         MR. RAITER:  International America.

7         THE COURT:  Denso International America.

8         MR. FINK:  With respect to bearings, Steve Kanner

9    will speak for the directs.

10        MR. KANNER:  Good morning, Your Honor.

11        THE COURT:  Good morning.

12        MR. KANNER:  Let's start I suppose next on the

13   agenda is item 5, and that's bearings.

14        THE COURT:  Yes.

15        MR. KANNER:  With respect to the status of service

16   for the direct cases all the defendants have accepted

17   service.

18        THE COURT:  Very good.  Auto dealers?

19        MR. RAITER:  Thank you, Your Honor.  For the auto

20   dealers, we have either accomplished service or have

21   agreements from all but two of the defendants at this point.

22   We have asked the remaining two, which are NSK, Limited and

23   Nachi-Fujiokoshi to accept service consistent with the

24   agreements with the directs, so those are the two that we

25   have not yet accomplished service or received an agreement to

1    accept service.

2         THE COURT:  Okay.  End payor?

3         MR. PERSKY:  That is the same with respect to

4    end payors, defendant Natshi Fugishaski and NSK, Limited,

5    have agreed to accept service.  We haven't yet gotten the

6    acceptance of service back yet.

7         THE COURT:  Very good.

8         MR. KANNER:  Your Honor, with respect to case

9    management orders, the following is going to apply both to

10   bearings and to occupant safety systems as far as the case

11   management order goes and the attenuate documents, the

12   discovery plan, the expert stipulation, protective order and

13   ESI stipulation.  So with respect to the CMO and the

14   attenuate documents, there is a difference of opinion between

15   plaintiffs' counsel and defense's counsel with respect to not

16   just the CMO but the timing and filing and substance, of

17   course, of the related documents, the discovery plan, the

18   expert stip and what have you.

19        I think part of that is caused by the fact that

20   there has been a lot of preparation for other issues on the

21   schedule today and CMOs have -- drafts of the CMOs have gone

22   back and forth and we are all studying them now.  In fact,

23   this morning I spoke with counsel for defendants to try and

24   coordinate what we believe would be an expedited schedule for

25   getting a CMO to you and what that CMO would include.  As I

1    said, there are some differences of opinion but we are going

2    to attempt to work those out and have a CMO to this Court by

3    January 15th.  If we are unable to do so, and not just the

4    CMO but the related documents.

5              THE COURT:  Uh-huh.

6              MR. KANNER:  If we are unable to do so, Your Honor,

7    and there is a chance that that is going to happen, we have

8    agreed, if it pleases the Court, to submit opposing documents

9    with respect to the CMO and the related documents to the

10   Court no later than January 15th, and we are open to a

11   telephonic hearing or whatever the Court might prefer to do

12   rather than have everyone come in town just on that limited

13   issue of the CMOs and the timing and what have you.  If that

14   pleases the Court we will try to save a lot of time by

15   arguing that this morning.

16             THE COURT:  All right.  I have no problem with

17   telephone conferences to resolve -- I mean, as long as there

18   is a reasonable number of you, I don't have any problem with

19   that at all so that's fine.

20             MR. KANNER:  All right.  With that in mind --

21             THE COURT:  January 15th.  Are you saying you have

22   until January 15th to work it out or by that date you are

23   going to submit it to me?

24             MR. KANNER:  By that date if we do not have it

25   worked out we will submit our position papers to the Court.

 1            THE COURT:  Okay.

 2            MR. KANNER:  I believe that applies to the auto

 3    dealers and the end payors have agreed with that, and defense

 4    counsel, before I go on, if that's --

 5            MR. FENNEY:  For the record, Jim Fenney, Your

 6    Honor, in OSS.  Mr. Kanner has accurately stated the

 7    agreement.

 8            THE COURT:  Okay.  Let me indicate you will send

 9    the papers here and then I will have Bernie contact you to

10    set up the telephone conference if necessary.  Okay.

11            MR. KANNER:  That would be great.  Thank you, Your

12    Honor.

13            THE COURT:  All right.

14            MR. KANNER:  With respect to occupant safety

15    systems, which I believe is the last item on our agenda

16    today?

17            THE COURT:  Right.

18            MR. KANNER:  On status of service of the direct

19    cases, all the Autoliv defendants and TRW have accepted

20    service.  I note that TRW Deutschland, which is one of --

21    which is the holding company, has as a corporate policy

22    requires service through the Hague, and for direct plaintiffs

23    has been put into effect some 30 or 40 days ago, so that

24    remains outstanding.

25            THE COURT:  Okay.

1      MR. KANNER:  Mr. Fink reminds me that on the

2  bearings discussion, we have -- we have agreement by defense

3  counsel for on the OSS but --

4      THE COURT:  Wait a minute.  On bearings?

5      MR. KANNER:  Yes.  Your Honor, it is my fault.  I

6  jumped ahead and I asked if defense counsel agreed with how I

7  stated the position with respect to the CMOs, and I neglected

8  to invite Mr. Iwrey to lend his consensus to that, so I do

9  apologize.  No slight intended.

10      MR. IWREY:  Thank you, Your Honor.  For the

11  bearings defendant, we agree that Mr. Kanner has accurately

12  stated what we agreed upon.

13      THE COURT:  Okay.  Let me ask you while we have

14  gone back to the bearings, you want me to give you a

15  suggested date right now for the telephone conference, would

16  that help anybody?

17      MR. KANNER:  Certainly.

18      THE COURT:  Let me get the calendar.  How about

19  Thursday, January 24th at 2:00?  Everyone who is involved can

20  check that out.  Is that a problem?

21      MR. WILLIAMS:  That's good for end payors.

22      MR. IWREY:  Could we do it later in the day?  I may

23  be returning from California, so is it possible to do it

24  later?

25      THE COURT:  You know, you go on a lot of trips.

1      MR. IWREY:  Not voluntarily.

2      THE COURT:  Why don't I move it forward to the

3   28th, would that be better, that's the Monday?

4      MR. KANNER:  That works for me.

5      MR. WILLIAMS:  Fine for the end payors.

6      THE COURT:  We will set it for 2:00 for

7   January 28th.  Who will initiate the call then, the

8   conference call?

9      MR. KANNER:  I have no problem initiating it.  We

10  will certainly contact your clerk, or whoever you designate,

11  or Mr. Fink will tell us the best way to accomplish that and

12  we will do so.

13      THE COURT:  All right.  Let's go back to occupant

14  safety.

15      MR. KANNER:  I apologize for the detour.  As I

16  said, TRW Deutschland Holding is being served through Hague

17  Convention, and otherwise I believe with the direct cases we

18  have, as I said, everyone has been served.

19      MR. RAITER:  On behalf of the auto dealers on OSS,

20  we have either accomplished service or have agreements by the

21  defendants to accept service with the exception of TRW

22  Deutschland and Tokata Corp., both of which we are underway

23  with the Hague process.

24      MR. PERSKY:  For the end payors, we have

25  accomplished service except that Defendant Tokai Rika Co.,

1    Limited, TRW Deutschland Holding, GmbH and Tokata Corp., we

2    have commenced service under the Hague for all three of those

3    defendants.

4         THE COURT:  I have a question just because I'm

5    curious:  That GmbH, is that a form of corporate structure?

6    Yeah?  All right.

7         MR. KANNER:  And I think that concludes the

8    pretrial issues or the status with the exception of a date

9    for the next status conference.

10        THE COURT:  Okay.  All right.  Let me ask you while

11   I have the calendar open here, what is your -- you are saying

12   some convenient time in March.  Is that sufficient time?

13   Anybody have any other questions?

14        MS. FISCHER:  Your Honor --

15        THE COURT:  Your appearance first.

16        MR. FEENEY:  I have no comments, Your Honor.

17        MS. FISCHER:  Michelle Fischer from Jones Day on

18   behalf of the wire harness defendants.  We are also involved

19   in instrument panel clusters and fuel senders.

20        When the parties talked about the next status

21   conference it was linked to the timing of the CACs, so from

22   my perspective I'm not sure that there is a need to have

23   another status conference in March.  It would simply raise

24   for the Court that question about when it would make sense to

25   have the next one given the changes in the due dates for the

1   CACs.

2           THE COURT:  Our last due date was April 15th.

3           MS. FISCHER:  15th.

4           MR. HANSEL:  Greg Hansel for the direct purchasers,

5   Your Honor.

6           In our discussions about when the next status

7   conference should be, the plaintiffs requested February,

8   defendants suggested April, and we agreed on March as a

9   compromise.  I don't believe that was necessarily tied to the

10  deadlines for the CACs since the process for handling those

11  CACs is already established by CMOs that are already in place

12  with respect to briefing on motions to dismiss.  We just

13  think it is important to have the status conference really

14  for its own sake to keep the case on track as a whole.

15          THE COURT:  And do you anticipate in terms of what

16  will be covered in the status conference to be similar,

17  service, miscellaneous issues?

18          MR. HANSEL:  Yes, Your Honor, miscellaneous issues

19  and, you know, there may be additional cases filed between

20  now and then.  There have been developments in the related

21  global criminal investigations with respect to a number of

22  products, there have been additional guilty pleas made in the

23  U.S. criminal cases and --

24          THE COURT:  Additional products?

25          MR. HANSEL:  Yes, Your Honor.

1        THE COURT:  Really?

2        MR. FINK:  Congratulations.

3        THE COURT:  What would they be?

4        MR. HANSEL:  Well, there's a class of products

5   called automotive anti-vibration rubber products, and about a

6   week and-a-half ago there was a guilty plea by a Japanese

7   national in the United States with respect to those products,

8   which the Justice Department stated in its press release are

9   part of their overall automotive parts antitrust

10  investigation, so it appears to be, you know, headed your

11  way, Your Honor.  Those products are used to dampen vibration

12  and noise in cars from the shaking of the engines and other

13  parts in a car.  In Japan there were fines and the Japanese

14  equivalent of indictments with respect to four new products

15  including automotive generators, radiators and fans and two

16  other products, I can't remember right now.

17       THE COURT:  Are they the same defendants?

18       MR. HANSEL:  No.  I think there are some overlap.

19       MR. KANNER:  Your Honor, Steve Kanner.

20       The list of products which I suspect as my

21  colleague indicated, will find their way to your courtroom

22  include automotive generators, automotive starters,

23  automotive windshield wiper systems, automotive radiators and

24  electrical fans.  There is some commonality of defendants but

25  among the entities which are involved are Mitsubishi

1    Electric, Mitsuba, T.Rad, Calsonic Kansei, Hitachi Automotive

2    Systems, Hitachi and Denso.  So there are some familiar names

3    that will come up but --

4           THE COURT:  We don't have that much more room in

5    our jury box.

6           MR. SANKBEIL:  Can I comment?  I am involved for

7    Autoliv and NTN, for example.  I think it is very

8    inefficient.  If there are new cases those new cases will

9    follow their separate tracks just like all the other cases.

10   To have every defendant appear for a status conference

11   because the case in which that defendant is not involved with

12   has been filed does not make a lot of sense to me.

13          THE COURT:  Could you put your appearance on the

14   record?

15          MR. SANKBEIL:  I'm sorry.  William Sankbeil from

16   Kerr Russell.

17          MR. KANNER:  Your Honor, we are certainly aware of

18   that and Mr. Sankbeil or his colleagues made that reference

19   very early in the history of these cases.  I think what the

20   Court has found, there are two points I would like to

21   address, number one, the periodic status hearings which the

22   Court has conducted every couple of months have a distinct

23   way of defining what the issues are.  If there are issues

24   that come to light, they get resolved before the hearing or

25   Your Honor resolves them.  So that in and of itself with a

1    case of this magnitude to me makes imminent sense.

2         Secondly, certainly those counsel who have nothing

3    up that day have a choice and certainly don't need to send,

4    you know, staffing of three or four deep to those types of

5    hearings, but I believe, as Your Honor as set it forth thus

6    far, when we have a status conference we get everything done,

7    and I think from our standpoint efficiencies are served by

8    taking that process.

9         THE COURT:  I will tell you what, what we will do

10   is -- what did I say, February 28th?  Let's go mid March, and

11   that would really leave just the heater control panels that

12   would not have been served -- or the complaint filed.

13        MR. KANNER:  I think that makes sense.

14        THE COURT:  So we are okay.  Is the best day -- I

15   know we did this today because of motions, but is a best day

16   for you who are traveling here a Friday, a Monday, you know,

17   any -- you don't care, you just come whenever?  Okay.

18        MR. KANNER:  I think it may actually be easier for

19   those of us who are flying here to fly midweek rather than a

20   Monday or a Friday.

21        THE COURT:  Well, that's a very good comment.  How

22   about Wednesday -- let's see if I can find a Wednesday that's

23   free -- March 20th?

24        MR. WILLIAMS:  Your Honor, I apologize to be the

25   only one, but I do have a conflict that date.  Is there

1    another March date we can do?

2          THE COURT:  Okay.  Let's take a look.  March 19th

3    or is that still --

4          MR. WILLIAMS:  Same conflict.

5          THE COURT:  Same problem.  Okay.  Let's look at the

6    next week.  How's March 27th?

7          MS. FISCHER:  That's a problem for us, Your Honor.

8    That last week in March is a problem for many defendants.

9          THE COURT:  Okay.

10          MR. KANNER:  Is the 13th available?  My calendar is

11    clear.

12          THE COURT:  March 13th is available.  How is that?

13          MR. WILLIAMS:  That's fine, Your Honor.

14          MS. FISCHER:  Fine.

15          MR. KANNER:  I think we have a good number.

16          THE COURT:  Good.

17          MR. KANNER:  Thank you very much, Your Honor.

18          THE CASE MANAGER:  Do you have a time, Judge?

19          THE COURT:  10:00.  All right.  Let's see.  I did

20    want to speak with you about the page limits on your briefs

21    because I noted that you couldn't meet the page limits so you

22    have exhibits that are quite extensive that really should be

23    in the brief.  I like in reading a brief having the case

24    cited in the brief, not footnotes, not charts.  I like the

25    charts, I like that, but I also like the citing in the brief,

1    so let's talk about page limits -- realistic page limits so

2    we can get all of this in the brief and not in attachments.

3    Anybody want to comment?

4            MR. WILLIAMS:  Your Honor, Steve Williams for the

5    end payors.

6            This actually anticipated one of the disagreements

7    on the CMOs.  We propose just have a page limit for the

8    briefs and not have additional authorities and argument in

9    those attachments.  It appears that the 30 or 35, whatever it

10   was, wasn't sufficient.  I would propose then a 40-page

11   limit, and I think this is really an issue with the indirect

12   briefs, not the direct briefs, because of the state law

13   issues, but I do think it is more helpful to the parties and

14   the Court to have all of the arguments and authorities in the

15   brief, not in eight or ten additional exhibits because then

16   we respond and then there is a reply response.  My proposal

17   would be a 40-page limit for those briefs and no further

18   authorities and arguments in exhibits or attachments.

19           THE COURT:  I know my law clerk is saying amen.  Go

20   ahead.

21           MS. FISCHER:  Your Honor, Michelle Fischer.

22           We would propose particularly on the indirects that

23   because of the number of states involved that if we are going

24   to no longer have appendixes that we just increase it to 50

25   pages and stick with it in the 50-page limit.  It is awfully

1    difficult to provide authority, especially if you don't want

2    it in footnotes, for up to 32 states as the case was in the

3    indirect cases.

4            THE COURT:  I know.  Those states are -- that was a

5    hard -- yeah.  Okay.  Let me raise the limit then to 40,

6    except with the states I'm going to give you 50.  All right.

7    So if you are dealing with the states you can have 50 for

8    your briefs.  Those without the states 40.

9            MS. FISCHER:  Thank you.

10           MR. WILLIAMS:  Thank you.

11           THE COURT:  All right.  Is there anything else?

12   Oh, wait a minute, what about the replies, the page limits?

13           MR. WILLIAMS:  If --

14           THE COURT:  Not 40 or 50.

15           MR. WILLIAMS:  If I recall, were replies 25?

16           MS. FISCHER:  15.

17           MR. WILLIAMS:  15, so I would propose 20, I think

18   that should be sufficient.

19           MS. FISCHER:  So of course I have to propose 25.

20           THE COURT:  All right.  I will give it to you, 20

21   and 25, that's fine.  So we are distinguishing it just for

22   those classes that have -- the class that has the state

23   claims.

24           MR. WILLIAMS:  It would seem to me it really is

25   just an issue of the omnibus brief for the indirect cases.

1          THE COURT:  All right.  Thank you.  Is there

2    anything else?

3          MR. HANSEL:  Nothing from the directs, Your Honor.

4          THE COURT:  All right.  Indirects, anything?

5          MR. WILLIAMS:  Nothing for the end payors, Your

6    Honor.

7          MR. RAITER:  Nothing for the auto dealers, Your

8    Honor.

9          THE COURT:  All right.  Very interesting.  Thank

10   you all for coming in, I appreciate it.

11          We are going to go to motions.  I don't know how

12   you are going to divide up and who wants to stay but why

13   don't we take a ten-minute break and then we will start with

14   the motions.

15          THE CASE MANAGER:  All rise.  Court in recess.

16          (Court recessed at 10:08 a.m.)

17                        —   —   —

18          (Court reconvened at 10:20 a.m.; Court and Counsel

19          present.)

20          THE CASE MANAGER:  All rise.  United States

21   District Court is now in session.  You may be seated.

22          THE COURT:  All right.  I see you're sitting at

23   counsel table in some particular order.  My order may be

24   different than your order, so let me ask you what you have in

25   mind.

1            Give your appearance continually so the record --

2            MR. COOPER:  Thank you.  Good morning, Your Honor.

3    James Cooper from Arnold & Porter on behalf of Fujikura and

4    this morning on behalf of the defense group with respect to

5    the direct purchase omnibus motion to dismiss, which we were

6    thinking we would take up first --

7            MR. FINK:  That's our case, Your Honor.

8            THE COURT:  All right.  That's fine.  I was looking

9    at the personal jurisdiction because it was smaller but let's

10   go right ahead with what you have.  That's fine.  All right.

11   So this will be the collective motion that you are dealing

12   with for the direct.

13           MR. COOPER:  That's correct, direct joint purchaser

14   motion to dismiss.

15           THE COURT:  You may proceed.

16           MR. COOPER:  Thank you.  First, as a matter of

17   housekeeping, during the break I handed up to the clerk I

18   think it is three slides with a cover page and I distributed

19   those to counsel as well.  I would like to refer to those

20   during my argument?

21           THE COURT:  All right.

22           MR. COOPER:  I'm going to address what I will call

23   generally the Twombly issues raised in the brief and my

24   colleague, Mr. Gangnes, will address the fraudulent

25   concealment and injunctive relief.  We would like to -- I

1   know Your Honor has set a time limit, and we would like to

2   reserve seven minutes of our time for rebuttal unless we end

3   up with more time in which case we'll take all of it, if we

4   can.

5        I want to focus this morning on really two major

6   points for the Court.  The first is the four guilty pleas

7   that are referred to and discussed in the complaint and which

8   are in our view the only substantive allegations that the

9   plaintiffs have in the complaint.  And what I'm going to talk

10  about with respect to that this morning is how those guilty

11  pleas and the related allegations cannot support the

12  plausibility of an overarching 12-product, all-purchaser

13  conspiracy that the plaintiffs allege -- these particular

14  direct purchasing plaintiffs allege has impacted them.

15       And in that connection just in the status

16  conference earlier this morning I think it was Mr. Kanner

17  talked about with respect to other products a global

18  conspiracy or something like that.  Certainly the Court

19  should understand that the defendants don't agree with that

20  characterization of even this case let alone other product

21  cases.

22       THE COURT:  I understand that.

23       MR. COOPER:  Thank you.  The second major point I

24  wanted to talk about was to focus on how the complaint does

25  not establish which plaintiffs have bought which products

1    from which defendants.  And as Judge Cox observed in the

2    compressors case, which I'm sure Your Honor is familiar with,

3    and many other courts have made the same observation, that

4    pleading what you bought and from whom is an essential part

5    of pleading standing in antitrust injury, so I'm going to

6    talk about those two points.

7              As an initial matter I have included in our first

8    slide some of the pleading standards from Twombly which I'm

9    sure the Court is familiar.

10             THE COURT:  I've heard of it.

11             MR. COOPER:  Yes.  Just two things on that:  First,

12   that the plaintiff must plead more than speculation or

13   possibility that it is entitled to relief, in other words, it

14   has to connect itself with the substantive allegations on

15   more than just a speculative or possible basis.

16             THE COURT:  What does plausible mean to you?

17             MR. COOPER:  It means more than speculation, it

18   means something on which if you look at the complaint and

19   there are facts that are alleged, not just conclusions, that

20   there would be an entitlement to relief if the evidence were

21   to prove it up.

22             The other thing I should mention, Your Honor, is of

23   course the prejudice that Twombly seeks to avoid or the

24   guidance that it seeks to give, at least in our view, is the

25   burden on the Court and the parties in engaging in discovery

1   in complex litigation for claims that don't meet that

2   standard.  In other words, Twombly suggests that close

3   attention to the pleadings early on is important in avoiding

4   the burden of complex litigation that would -- that proves to

5   be unnecessary.

6           So with that in mind let me turn to the two

7   substantive areas that I wanted to talk about this morning.

8   First of all, the cartel conduct that the complaint alleges.

9   The next page in our slide is a chart that summarizes the

10  guilty pleas that are at least with respect to the first four

11  that are referred to in the complaint.  The first four are

12  Furukawa, Denso, Fujikura and Yazaki.  Those pleas were

13  either announced or entered into by the time of the

14  complaint, they are referred to in the complaint and attached

15  to our motions.  The last line is for Tokai Rika for which

16  there has been a criminal information, this was post

17  briefing, but no plea has actually been entered yet but from

18  the information it is clear that it relates to heater control

19  panels.

20          The points with respect to this chart are really

21  three.  First, the conduct in the pleas, and this is

22  reflected in the complaint too, involve specific and

23  different products.  Now, in the complaint the plaintiffs

24  have dumped them all into this category which they have

25  defined as wire harness products and they do that early in

1   the complaint and then refer to just wire harness products

2   without any specificity.

3           THE COURT:  There is like 11 or 12 in that --

4           MR. COOPER:  Well --

5           THE COURT:  -- in that group?

6           MR. COOPER:  -- that's sort of a philosophical

7   question, Your Honor, because it's not -- there's at least

8   12, I think, and then it is not clear whether the plaintiffs

9   mean that wire harnesses and wire harness assemblies are

10  different things, in which case there's maybe 13, it is just

11  not clear.

12          We've listed the parts that are identified in the

13  pleas on the third column of the chart that you have there,

14  and as you can see they are all different parts.  So the

15  point being that the pleas are directed at specific and

16  different parts for each company.

17          THE COURT:  The pleas don't say much though, I

18  mean, they really don't.

19          MR. COOPER:  I guess that's a matter of

20  interpretation.

21          THE COURT:  Okay.

22          MR. COOPER:  They do talk about what parts are

23  involved, and I guess that gets to my second point, which

24  maybe you can say they say a little bit less, which is it is

25  clear from the pleas, and certainly once you look at the

1    individuals who have pled that the conduct is directed at

2    particular OEMs or automobile manufacturers, and you can see

3    from the individual pleas that are listed in the second

4    column there that the conduct is directed at Honda, Toyota

5    and Subaru.  There is an N.A. for Fujikura now because there

6    was nothing in the record with respect to -- Fujikura's

7    conduct was directed towards other than in the plea it says

8    an automobile manufacturer.  Now, last night the indirect

9    purchasers filed the plea transcript for Fujikura and asked

10   the Court to take judicial notice, and in the plea transcript

11   it is clear that the conduct was directed towards Subaru, so

12   you will see that when you have time to get to their motion.

13        The third point with respect to the pleas, the

14   pleas and the complaint are both clear that the conduct that

15   the plaintiffs are relying on is directed at this sort of

16   specialized RFQ process, request for quotation process, that

17   automobile manufacturers engage in when they are procuring

18   parts, and it is sort of a sui generis thing where you start

19   three years ahead of the actual production of the car,

20   sending out RFQs, and the allegations are that there was

21   cartel activity associated with particular RFQs and then with

22   particular follow-on bidding or price negotiations that

23   particular defendants and particular automotive manufacturers

24   engaged in, so it is a specialized procurement process, it is

25   not like --

1          THE COURT:  Who does that process go on between?

2     You've got the OEMs and the manufacturers.  I mean, what goes

3     on?

4          MR. COOPER:  Well, the complaint doesn't say

5     anything about that.  I mean, I know a little something about

6     it but there is nothing in the complaint -- there is nothing

7     in the complaint about what product are we talking about, are

8     these RFQs for electronic control units, for wire harnesses,

9     for fuse boxes, for relay boxes.  All of those could be

10    different.  The complaint doesn't tell us anything about

11    that, which is part of the problem, we don't know what the --

12    what the details are of the substantive allegations that they

13    are basing their conspiracy claims here on.

14         THE COURT:  Okay.

15         MR. COOPER:  So then the question arises, Your

16    Honor, how do the plaintiffs tie -- they have these

17    allegations that are based on the pleas, and how do they tie

18    that to the impact on them?  How do they relate their

19    purchases to the substantive cartel allegations that they

20    make?  And in my review of the complaint, that's my next

21    slide, I think there are two paragraphs where it can be

22    fairly said where they seek to do this.  They seek to make

23    the connection that they have to make in order to meet

24    plausibility between the subsequent conduct they are alleging

25    and the impact that they say occurred to them.

1          The first is paragraph 98, which is the subject of

2    some of the briefing, particularly the reply brief.

3    Paragraph 98 says that suppliers to OEMs have been required

4    to directly purchase wire harness products from defendants at

5    prices established by the OEMs and defendants in the bidding

6    process.  In other words, a supplier is told by an OEM that

7    it has to purchase a product at the price set by the OEM.

8          THE COURT:  So at the outset the OEMs and the

9    defendants have --

10          MR. COOPER:  The allegation is that the OEMs and

11   the defendants reach an agreement on a price and that

12   somewhere in the world, not necessarily one of these

13   plaintiffs because they don't plead that they are in this

14   situation, what they plead is that somewhere in the world

15   some direct purchaser is in this situation.  That in and of

16   itself isn't good enough to show that impact on them, they

17   don't say anywhere in the complaints -- you know, none of

18   these plaintiffs say I purchased from one of these defendants

19   a product where I was told the price I had to pay as a result

20   of --

21          THE COURT:  Well, do the OEMs and the direct

22   plaintiff purchasers, do they negotiate a price or is it just

23   OEMs say this is what it is?

24          MR. COOPER:  I don't know that, Your Honor, because

25   there is no allegation in the complaint about how they get --

1  how these plaintiffs get to their price.  I don't know the

2  answer to that.  That's a very good question.  It is

3  obviously relevant.  I think the Court is right to want to

4  know that, and it should be alleged in the complaint.

5      THE COURT:  Well, it says in the complaint in your

6  paragraph 98.

7      MR. COOPER:  It says suppliers to OEMs, in other

8  words, they don't say they are suppliers to OEMs.

9      THE COURT:  Oh, I see what you are saying, the

10  defendants don't say --

11      MR. COOPER:  No, and the plaintiffs don't say that

12  either.  The plaintiffs don't say we supply the OEMs and

13  we -- and in that relationship we have been told what prices

14  we have to pay for a product, they don't allege that.

15  Paragraph 98 just says it may be that in the world there are

16  direct purchasers who face this situation.

17      The other thing I would say about paragraph 98, in

18  addition to the fact that it is not connected at all to these

19  particular plaintiffs, is, as Your Honor may have seen in our

20  reply brief, we make a point that if the OEM is dictating

21  your price by virtue of its negotiations then that's an

22  indirect impact and you don't have standing as a direct

23  purchaser, and we cited the Campos case there for Your Honor.

24  So that would be a second -- even if they were to add the

25  allegation that they were in that situation that would be a

1    second problem that they would face.

2         The other paragraph I think, Your Honor, that can

3    be read is seeking to tie these particular plaintiffs to

4    this -- to the allegations in the complaint taken from the

5    guilty pleas is paragraph 112, which simply says, you know,

6    defendants' pricing actions regarding their sales of wire

7    harness products to automobile manufacturers had an impact on

8    our prices.  That's all they say.  It is a bare conclusory

9    allegation that simply pleads an element of the claim, all it

10   does is plead the elements of the claim which case law is

11   replete that that's insufficient.  Just saying pricing

12   actions, when you are talking about 12 or 13 or maybe more

13   different products, and had an impact is not sufficient to

14   put the defendants on notice as to what the basis is for the

15   claim that the plaintiffs are making.

16        There are no allegations in the complaint, Your

17   Honor, that discuss the pricing relationship between, for

18   example, these RFQs that are the subject of the guilty pleas

19   and the prices paid by these plaintiffs.  In fact, there are

20   no allegations that talk about -- other than wire harness

21   products as a group of 13 different products, there are no

22   allegations that talk about relationships between what it is

23   that the OEMs buy using these RFQs and what it is that the

24   plaintiffs actually buy, which product are they buying.

25   There is -- we don't know the answer to that because it is

1    not in the complaint, and it is relevant to the defenses

2    because if the products are different we will have defenses

3    that we might not otherwise have.

4         There are no allegations -- well, certainly there

5    are no allegations in the complaint that the plaintiffs

6    themselves are auto manufacturers so there's nothing that

7    says we are the direct target of this conduct and, indeed, as

8    I have already discussed, there is nothing that says we are

9    the suppliers to the auto manufacturers.

10        THE COURT:  What if they aren't the direct target

11   of the conduct but they have a direct effect?  What if they

12   are direct purchasers, they purchase directly from the

13   defendants say?

14        MR. COOPER:  So they haven't -- this is -- this

15   raises another point.  So maybe there would be a theory by

16   which they would say they could allege there was price fixing

17   directed at us, forget the OEMs, there was something directed

18   at us, they haven't pled that, that's not their theory.  All

19   they pled -- what you see in 112 is their theory, which is

20   pricing actions regarding sales of wire harness products to

21   automobile manufacturers had an impact.  In other words, the

22   theory seems to be your negotiations with the auto

23   manufacturers has an impact over here on us.  Well, how?  You

24   are not auto manufacturers as far as we know so how --

25        THE COURT:  Well, let's say, you know, they have

1    pricing which is inflated and if these direct plaintiffs want

2    to purchase from defendants they have to pay the inflated

3    price, right, isn't that the implication?

4         MR. COOPER:  We could come up with complaints -- if

5    we can assume facts and we can come up with complaints that

6    would state a claim, I don't disagree with that, but we have

7    to -- we have the cards we are dealt, we have the complaint

8    we have in front of us, which doesn't meet that standard, it

9    might be possible.  I should be clear, I'm not saying either

10   that there isn't a plaintiff who could make a claim on the

11   basis of the guilty pleas or that there wouldn't be some way

12   that relief could be granted to somebody who was impacted by

13   the conduct in the guilty pleas, I'm not saying that.  I'm

14   saying these plaintiffs can't and don't state a claim in this

15   complaint.

16        Your Honor, let me turn quickly to the product

17   question.  It is sort of a second major failure in the

18   complaint.  We have touched on it a little bit so I don't

19   want to spend a huge amount of our time on it, but in order

20   to establish standing in antitrust injury the plaintiffs have

21   to allege what it is that they bought so that we can

22   understand whether -- so we can understand a whole number of

23   things, but whether they have standing is one.  Some, if they

24   didn't buy products made by a particular defendant, that

25   defendant is going to have defenses it is entitled to raise.

1    So to use an example, my client Fujikura does not make

2    electronic control units, ECUs.  Denso make ECUs but doesn't

3    make wire harnesses.  Denso pled to ECUs, we did not,

4    Fujikura did not plead to ECUs because we don't even make

5    them.  Did the plaintiffs, did they just buy an ECU?  If they

6    did, if that's all they bought, I would like to know that.

7    And I think Denso would like to know if they didn't -- if

8    they didn't buy an ECU.  We are entitled to know what it is

9    that they bought and from whom.

10          THE COURT:  I think the question though, what's

11   plausible?  Is it plausible that because these different

12   defendants have allegedly through -- well, through their

13   pleas have conspired on various auto parts, is it plausible

14   that the whole industry as to auto parts is involved?

15          MR. COOPER:  Well, no, Your Honor.

16          THE COURT:  Can you take that big leap?

17          MR. COOPER:  That's sort of where I started.  First

18   of all, let me be clear, the pleas -- the pleas are with

19   respect to, as I said, particular products and particular

20   manufacturers.

21          THE COURT:  Right.

22          MR. COOPER:  In other words, the pleas suggest

23   that, you know, supplier A and supplier B may have agreed on

24   how they were going to bid this particular RFQ.  Okay.

25   That -- so that's its own particular conduct, it may not

1    involve anybody else.  So it is not plausible from that --

2    first of all, it is not plausible from that to say one of

3    these direct purchasers, and we don't even know what they

4    bought, has stated a claim, but it certainly wouldn't be

5    plausible from that to say well, there is this great

6    overarching conspiracy involving all auto parts.  There is

7    no -- I don't think Your Honor will see an allegation, and it

8    was already clear in the status conference this morning,

9    these are all different companies and these are all different

10   procurements and different points in time, different

11   products, not fungible, not interchangeable so, no, I don't

12   think it would be plausible.

13             THE COURT:  Okay.

14             MR. COOPER:  Okay.  Thank you, Your Honor.  We will

15   reserve the rest of my time and let Mr. Gangnes --

16             THE COURT:  All right.  Mr. Gangnes?  Is it

17   G-A-G-N-E-R?

18             MR. GANGNES:  It is Gangnes, G-A-N-G-N-E-S.

19             THE COURT:  Oh, say that again slower.

20             MR. GANGNES:  G-A-N-G-N-E-S, Gangnes.

21             THE COURT:  Thank you.

22             MR. GANGNES:  From Lane Powell, Your Honor.  Good

23   morning.

24             THE COURT:  Good morning.

25             MR. GANGNES:  Representing Furukawa and America

 1    Furukawa, and speaking today on behalf of all defendants for

 2    dismissal of plaintiffs' fraudulent concealment allegations

 3    and injunctive claim.

 4         In the brief few moments I have I would like to

 5    focus on the first two elements plaintiffs must plead to

 6    allege fraudulent concealment.  They must allege, first,

 7    affirmative acts of concealment by defendants and, second,

 8    that those acts deceived plaintiffs and prevented them from

 9    discovering their claim.

10         The linchpin of plaintiffs' opposition is the

11    argument that simply because they allege that defendants rig

12    bids to automobile manufacturers they have alleged the

13    requisite affirmative acts of concealment with respect to

14    their claim.  Because the plaintiffs have not adequately

15    alleged any other acts of concealment, their allegations

16    survive only if the ruling of some courts that bid rigging is

17    an affirmative act of concealment apply in this case, and

18    they don't.

19         Those rulings apply for the simple reason that

20    plaintiffs have not themselves alleged a bid-rigging claim.

21    They do allege a bid-rigging claim for certain auto

22    manufacturers but none of the plaintiffs is an automobile

23    manufacturer and none of them allege that they received any

24    bids, rigged or otherwise, from defendants.

25         As Mr. Cooper pointed out, it is hard from this

1    complaint to understand exactly what sort of conspiracy the

2    plaintiffs are alleging, but they seem to be alleging some

3    sort of overarching conspiracy by defendants to fix the

4    prices of all wire harness products they sold to all

5    customers, and that claim is separate and distinct from the

6    alleged bid-rigging conspiracy involving the automobile

7    manufacturers.

8              The cases that the plaintiffs cite confirm that

9    they have not alleged a bid-rigging claim themselves or an

10   affirmative act of concealment.  The first case they cite is

11   the Pinney Dock case of the Sixth Circuit but that case had

12   nothing to do with bid rigging.  It had -- it involved

13   collusive rate making by railroads.  In the dicta that the

14   plaintiffs quote from the Pinney Dock case, the court was

15   simply describing the allegations in an actual bid-rigging

16   case, the Ingram case.  And if you look at the Ingram case,

17   in that case the defendants allegedly rigged bids on public

18   construction projects in order to drive the plaintiff, a

19   competing bidder, out of the business.  The Ingram court

20   found that the rigged bids were affirmative acts of

21   concealment because they deceived competing bidders and the

22   public as to whether the bids that the defendants were

23   submitting were actually competitive.  In other words, the

24   rigged bids prevented the plaintiff and the public from

25   discovering their claims.

1          The rulings in the other two cases plaintiffs cite

2     are based on the same rationale.  In those cases defendants

3     allegedly rigged bids on school milk contracts, and those

4     courts also emphasized that the school districts had

5     exercised due diligence by using a sealed bidding system in

6     an effort to uncover any collusion and then reviewing the

7     bids in detail before selecting the winner.  In all three of

8     those cases, and in every case we found where bid rigging was

9     held to be an affirmative act of concealment, the plaintiffs

10    in those cases had either received the rigged bids or were

11    competing bidders.

12         Here the plaintiffs do not allege that they

13    received bids, submitted competing bids, were even aware of

14    defendants' bids to the automobile manufacturers or, in fact,

15    did any due diligence.

16         THE COURT:  Well, isn't that the point, they

17    weren't aware of the agreement or the rig bidding between the

18    defendants or the agreements between the automobile

19    manufacturers and the defendants?  How would they know, what

20    reason would they have to suspect?

21         MR. GANGNES:  Well, that's the whole point.

22         THE COURT:  Right.

23         MR. GANGNES:  The mere fact they didn't know is not

24    enough.  What they have to show is that the defendants

25    engaged in affirmative acts of concealment that deceived them

1    and prevented them from discovering their claim.

2          THE COURT:  Well, they do allege some secret

3    meetings and things like that.

4          MR. GANGNES:  Well, the case law is clear that --

5          THE COURT:  Code names.

6          MR. GANGNES:  -- using code names to meet secretly

7    or meeting secretly in remote locations is not enough because

8    from the beginning the law has been that mere silence or

9    refusal or failure to divulge the wrongful conduct does not

10   constitute fraudulent concealment.

11         There have to be affirmative acts of concealment,

12   and those affirmative acts must have been directed to the

13   plaintiffs, deceived the plaintiffs and prevented them from

14   discovering their claim.

15         So in this case if an automobile manufacturer had

16   learned that the defendants were rigging bids, that

17   automobile manufacturer would have discovered its claim but

18   these plaintiffs would not, and because they haven't

19   adequately alleged an affirmative act of concealment their

20   fraudulent concealment allegations must be dismissed.

21         THE COURT:  Okay.  Thank you.

22         MR. GANGNES:  The injunction issues are addressed

23   in the briefs, and if the Court has no further questions I

24   would like to reserve some time for rebuttal.

25         THE COURT:  Okay.  Thank you.

1         MR. GANGNES:  Thank you, Your Honor.

2         THE COURT:  Plaintiffs?

3         MR. FINK:  Your Honor, with respect to the

4    response, Joe Kohn will speak to the arguments that were

5    addressed by Mr. Cooper, and Gene Spector will respond to

6    Mr. Gangnes' argument.

7         THE COURT:  All right.  Mr. Kohn?

8         MR. KOHN:  Thank you, Your Honor.  May it please

9    the Court, Joseph Kohn with Kohn, Swift & Graf in

10   Philadelphia for the direct purchaser plaintiffs.

11        Your Honor, first and foremost, I'm here to answer

12   any questions that the Court may have.  Obviously I did want

13   to take the 15 or 20 minutes or so of our time that I have to

14   really just discuss with the Court, first, what Twombly

15   requires.

16        THE COURT:  First discuss who you -- not who you

17   are, but who your clients are.  Are they the suppliers to the

18   OEMs, the direct suppliers?

19        MR. KOHN:  The clients, Your Honor, include those

20   entities.  They are anyone who purchases directly from the

21   defendants named in the case.  They include suppliers, which

22   some of the named -- which the named plaintiffs are, they

23   were generally smaller companies that bought the products

24   directly from the defendants, would assemble them, put into a

25   dashboard or into the doors of a car, and then those were

 1    sold to the OEMs.  The class also includes, and this claim is

 2    brought on behalf of a class which includes the OEMs, not

 3    just the large auto manufacturers but truck manufacturers,

 4    recreational vehicle manufacturers.  There is a group of

 5    purchasers that buy these products direct.  We think the

 6    class is several hundred separate entities.

 7         Now, defendants have gotten --

 8         THE COURT:  Well, they are talking about direct

 9    plaintiffs not being direct plaintiffs.

10         MR. KOHN:  And we disagree with that --

11         THE COURT:  No, and their argument has some weight

12    so --

13         MR. KOHN:  -- to the direct purchasers that would

14    be invoiced directly from these defendants and our clients

15    pay for it.

16         Now, our clients enter in the marketplace and they

17    turn around and do different things with their products.  An

18    OEM, like a Ford or a Honda, at times will buy the products

19    directly from the defendants and at times will buy them from

20    other members of the class, so that they have direct claims

21    and they have other kind of claims.  We are asserting the

22    direct purchase claims for all of those entities.

23         And what I heard from the defendants, Your Honor,

24    particularly Mr. Cooper, and Twombly speaks to does the

25    defendant have sufficient notice to formulate a defense and

```
 1    answer the complaint, which is the basic standard under
 2    Rule 8.  And what I heard were defenses to the complaint.
 3    They weren't scratching their head saying what is this case
 4    about.  They were zeroing in on the kinds of defenses they
 5    will assert at a class certification stage to say, oh, some
 6    of these products might be priced differently or the various
 7    products that make up the wire harness system, some of them
 8    they don't make and et cetera.  Those are the kinds of
 9    argument we hear all the time at class cert. as to our
10    ultimate damage amounts and damage claims, those are not
11    pleading impediments under Twombly or under Rule 8 and
12    Rule 12.
13             THE COURT:  Well, they are claiming that you don't
14    even allege what you purchased from these defendants.
15             MR. KOHN:  That's simply not the case, Your Honor.
16    The complaint is very clear, it alleges beginning
17    paragraphs 76 through 91 each of the various 12 products that
18    are mentioned in the complaint as wire harness and related
19    products are identified individually.  The complaint goes on
20    to speak directly to this issue that the paragraph 99, that
21    the success of the cartel required manipulation to the OEMs
22    and then that price became the price in the marketplace, and
23    we allege that specifically.  Now, they can defend that
24    claim.  They can say as a matter of proof when you look at
25    every one of these invoices and when you do your economic
```

1    analysis that does not hold but that doesn't mean that the

2    complaint hasn't stated that claim.

3            THE COURT:  But which plaintiff purchased what

4    product, that's not defined?

5            MR. KOHN:  All of the plaintiffs purchased wire

6    harness and related products, some or all of those products.

7    Now, we are not asserting -- we heard a lot of talk about the

8    overarching conspiracy, that is, I would submit, a straw man

9    or a red herring.  If we were alleging that every auto

10   product and we were in here in re auto product litigation,

11   and if we had a complaint that said we have one complaint and

12   it includes the heater control panels and the occupant

13   safety, et cetera, okay, that might be some theoretical

14   overarching conspiracy.  This complaint was narrowly drawn

15   with respect to the definition that the industry gives to

16   these products, wire harness and related products, to the way

17   the Government in the U.S. case and in the foreign cases

18   define --

19           THE COURT:  Does that include the electronic

20   control units?

21           MR. KOHN:  Yes, it does, and they are defined in

22   our complaint, they are listed in the complaint as one of

23   the --

24           THE COURT:  I know you listed it as a related

25   product but --

1   MR. KOHN:  Yes, as a related product, and it is a

2   related product.  That's the way the Government, which

3   investigated this industry, defined the products that were

4   subject to those indictments.  And the guilty pleas are

5   admissions with respect to, and they all talk about the same

6   language, there is an investigation into wire harness and

7   related products.  This complaint was drawn and filed after

8   those proceedings, no one relied simply on an investigation

9   or a rumor as you see in some cases and then fortuitously a

10  guilty plea may occur later.  After those actions were taken,

11  after party defendants admitted to the conduct, then these

12  allegations were drawn in the civil case, and I would submit

13  that gets us well beyond the Twombly standard, which is --

14      THE COURT:  But how do you get from what these

15  defendants pled guilty to on these individual parts to

16  this -- all of these defendants --

17      MR. KOHN:  Yeah.

18      THE COURT:  -- most of whom have not plead guilty

19  to anything?

20      MR. KOHN:  First of all, the Twombly standard, of

21  course, is that we simply have to nudge our claim across the

22  line.  And in Twombly the Court was clear that the plaintiffs

23  alleged a bare -- just simply a parallel conduct and no other

24  facts.  They had the bare assertion of an agreement, and the

25  Supreme Court Justice Souter's opinion at page 566 is that

1    there were no facts alleged.  They looked at market and they

2    said these baby Bells are not competing with each other, ipse

3    dixit there is an agreement or we can take discovery to see

4    if there is an agreement.

5          We have submitted four separate categories of

6    factual averments in this complaint that nudge us across the

7    line, and some have a subset, some overlap.  The first piece

8    of evidence and factual pleading are admissions of the party

9    -- of four party defendants in the forum of the guilty pleas.

10   Now, the defendants like to refer to four pleas, they say

11   that at page 8 of their brief and we just heard it in the

12   argument, and that there are dozens of defendants.  Your

13   Honor, there are only seven groups of corporate defendants so

14   that now of those seven, four have pled guilty, a majority.

15         Second, there are not simply four guilty pleas,

16   there are 11 guilty pleas just as to the wire harness and

17   related products, not getting into some of the others that

18   were on the chart that was just shown, and I would like to

19   discuss in a little more detail even as a separate category

20   the individual guilty pleas, but there are seven flesh and

21   blood human beings who have also pled guilty to being

22   involved in these antitrust agreements.  One of them,

23   Mr. Funo, worked for Furukawa, and his guilty plea recites

24   that not only did he work for the Japanese company, he worked

25   for the U.S. subsidiary.  Now, the U.S. subsidiary yet hasn't

1    pled guilty but we would submit that is an additional fact

2    that while working for the U.S. defendant, which has not yet

3    pled guilty, this individual has pled guilty to his conduct

4    during that time period.

5          A Mr. Hanna Morro (phonetic), same story, worked

6    for Yazaki for the U.S. sub and the Japanese company.  The

7    U.S. sub hasn't pled guilty yet.  So there is more than just

8    four isolated, if you will, in the language of the case law,

9    the attempt to dismember these allegations or to

10   compartmentalize them has been uniformly rejected, and

11   Judge Borman wrote about that, among other things, in the

12   Packaged Ice case.

13         So these pleas are alleged in detail in our

14   complaints, they are allegations in the complaint, paragraphs

15   122 to 137, we set forth the facts these defendants have

16   admitted to.  The guilty pleas themselves refer to meetings,

17   they refer to communications between competitors, they refer

18   to agreements, plural, being reached between and among the

19   competitors.  Now, does that mean we win the case?  Does that

20   end the whole case?  No.  We have class issues, we have the

21   precise amounts of the damage, we have the effects that these

22   agreements may have on the market.  No conspiracy is ever

23   perfect.

24         THE COURT:  Do you allege any individual

25   conspiracies versus groups of defendants conspiring with each

1    other?

2            MR. KOHN:  No.  We allege, Your Honor, from these

3    facts that it is plausible that there was one conspiracy to

4    fix --

5            THE COURT:  The overarching conspiracy?

6            MR. KOHN:  With respect to wire harness and related

7    products.  You know, defendants point to the fact that, well,

8    so and so pled guilty with respect to sales made to Toyota,

9    and another individual defendant who is the salesperson for

10   Honda plead guilty, and those should be dismembered and

11   looked at separately.  Was it just a coincidence that at the

12   very same time and over the same lengthy period of time the

13   Honda people were getting together and fixing bids, sales to

14   Honda, and the executives from these companies who then sold

15   to Toyota were just doing -- just totally coincidental?  No,

16   we say that is a fact that we can piece together brick by

17   brick with other facts to show this industry behaved this

18   way, and those agreements, and the guilty pleas talk about

19   agreements plural, were sufficient conduct to -- again, it

20   may not win the case with the jury yet, we haven't had

21   discovery, but it is plausible, it makes the allegations of

22   the complaint plausible and all of the case law supports

23   that.

24           This is a far cry from a Twombly or the Travel

25   Agents case in the Sixth Circuit that defendants principally

1   rely.  Your Honor, if in Travel Agents four of the airlines

2   had pled guilty to some agreement to effect the travel

3   agents' commissions and seven executives were in federal

4   prison I don't think the Travel Agents case would have been

5   dismissed on a pleading.  And we had one of those small-type

6   footnotes that Your Honor has reminded us about that

7   discussed some of the quirks about Travel Agents, that there

8   has been a prior case with summary judgment, et cetera.  If

9   in Twombly the, you know, four of the seven baby Bells had

10  pled guilty to an agreement to stay out of each other's

11  territories, I don't think we would have -- we wouldn't have

12  the Twombly case.  That case would have proceeded and you

13  wouldn't have a decision on pleading.  This case presents a

14  far stronger record in the complaint, much more detailed

15  factual basis than many of the cases that have been sustained

16  in which Twombly motions have been denied.

17          The aftermarket filters case didn't have admissions

18  by the defendants like this, it had one disgruntled employee.

19  We had argued the Packaged Ice case before Judge Borman.  It

20  warms my heart now to see the defendants think that was a

21  really strong case at the time; some of these very same law

22  firms said it wasn't.  There was, again, one disgruntled

23  employee who filed an employment discrimination or wrongful

24  termination case which he alleged a hearsay conversation with

25  one of the company executives who admitted to the illegal

1    agreement.  That individual ultimately had his deposition

2    taken, the other party of the conversation, and denied it.

3          We don't have one disgruntled employee here, we

4    have seven people who worked for the defendants who have

5    already admitted that they were talking to their competitors,

6    that they were having meetings, plural, communications,

7    reaching agreements.  They have sworn under oath that that

8    occurred.

9          And, you know, I have been working in antitrust

10   cases for longer than I like to admit, and I think I speak

11   for my colleagues as well, there is something that is still a

12   little jarring to us that people go to prison for this

13   conduct and, you know, it is pretty serious stuff and these

14   folks -- you know, Mr. Nagata was the general manager of

15   sales at Furukawa U.S.A. and the chief financial officer.  So

16   what do I have at the time of filing my complaint, I have an

17   admission by the chief financial officer of one of the party

18   defendants that he, in fact, entered into illegal antitrust

19   agreements in this industry with respect to these products.

20         Again, it doesn't give us the whole case but these

21   guilty pleas are used in many antitrust cases at the summary

22   judgment stage.  They are evidence that's submitted to show

23   that defendant is not entitled to summary judgment.  There is

24   evidence of some agreement, the precise contours of it --

25         THE COURT:  But is there evidence with these

1    defendants that there's more than they are just members of an

2    industry?

3          MR. KOHN:  Yes, Your Honor.  There are admissions

4    now by four of the corporate defendants, seven individuals,

5    that they participated in an agreement to affect this market.

6    Again, the precise contours have not been fully determined by

7    discovery but there is certainly enough to say that it is

8    plausible that this relatively limited number of

9    corporations, the seven different groups that all make these

10   products participated in this conspiracy.  Other evidence

11   that we have, of course, is -- or other categories of

12   evidence which the courts have looked to in addition to these

13   admissions are guilty pleas, so you can look to the scope of

14   the investigation.  Now, an investigation alone the courts

15   have said is not going to get you over the line of

16   plausibility, but when you look at it in conjunction with

17   where that investigation has been going it is another

18   separate factor.

19          Now, for example, paragraph 116 of our complaint

20   alleges an FBI raid which included one of the entities that

21   has not pled guilty.  In order to have an FBI raid there is a

22   prior approval by a judicial officer of some kind of a

23   warrant to show that there is at least some evidence -- some

24   reason to believe they were involved in the conduct.  I don't

25   know what the precise standard is for the criminal warrant

1    but I know it is more than plausibility, it is more than mere

2    plausibility.

3            Paragraph 125 of our complaint refers to a

4    statement by the assistant attorney general for antitrust.

5    It says, quote, this cartel harmed an important industry in

6    our nation -- in our nation's economy, close quote.  That is

7    another fact we have alleged with respect to the scope of the

8    investigation, not it harmed one manufacturer, not it harmed

9    a particular auto manufacturer, it harmed the industry.

10           Another broad category --

11           THE COURT:  Wait a minute.  I'm thinking of this

12   search warrant that you are talking about.

13           MR. KOHN:  Yes.

14           THE COURT:  So you are saying there was a search

15   warrant, they went in and that that fact -- now, I know you

16   say not standing alone but you do raise -- you raise an

17   interesting thing, somebody thought there was some connection

18   or they wouldn't be there, some judicial officer signed it,

19   that had to have been alleged in the search warrant itself --

20           MR. KOHN:  Correct.

21           THE COURT:  -- some connection to all of this?

22           MR. KOHN:  Correct, Your Honor.  And that is a

23   fact, and I would submit there is case law where that fact

24   together with the economic allegations that we have about the

25   concentration in this market would be enough to get us over

1     the line, but we don't need to be making that kind of close

2     call here when we have this, you know, long record and,

3     again, you can't dissect them and dismember them.  Defendants

4     use the term that the guilty pleas were all discreet.  You

5     know, I looked up discreet; consisting of distinct and

6     unconnected elements.  I don't think these are discreet.

7     They are part of one coordinated global investigation, A.

8     They are all in a defined time period beginning in

9     January 2000, ending in 2010, some were for a shorter period

10    of time but all within that time period.

11            The complaint is not one -- this is not a situation

12    where there was, let's say, a guilty plea for the year 2005

13    and the private plaintiffs come in with a complaint for 2007

14    to 2010, our complaint is right within this same time period.

15    They are all for the harnesses and related products.  Again,

16    we are not trying to borrow from the heater control

17    indictment or the instrument panel indictment and say see,

18    they are doing some bad things out there, so that gives us

19    some plausibility with respect to wire harnesses.  No, every

20    one of these was with respect to wire harness and related

21    products.

22            And I would note all of the guilty pleas require

23    ongoing cooperation by the pleading defendant in the ongoing

24    unitary investigation of wire harnesses, so they are not

25    discreet or separate or atomized events.

 1          THE COURT:  Okay.

 2          MR. KOHN:  I want to touch very briefly on a whole

 3   other category of allegations, and these are really two

 4   separate subgroups with respect to the economic allegations,

 5   and there are a number of cases, we cited the Ice case among

 6   them, Standard Ironwork case, Carbon Black, that look to

 7   allegations of concentration in the industries and barriers

 8   to entry that is conducive to collusive conduct, and those

 9   are additional facts that push you over the line of

10   plausibility with respect to Twombly.

11          Also in paragraphs 104 and 105 we allege that the

12   input costs were flat or stable yet prices were going up,

13   which is economic behavior and economic fact consistent with

14   collusive behavior.  Those are additional facts that push us

15   over the line.

16          And in a number of cases, the Flash Memory, SRAM,

17   TFT, look to those types of allegation even in cases without

18   guilty pleas where there may just be some smoke about an

19   investigation.

20          And additionally -- finally, Your Honor, there is a

21   fourth group we do allege opportunities to conspire, not only

22   in paragraph 106, which refers to trade association meetings,

23   but the detailed allegations about the guilty pleas because

24   the guilty pleas all mention meetings and communications with

25   co-conspirators.  Those are opportunities to conspire.

1      Now, the Government may draw from that a plea as to

2 one agreement that has four corners but when conspirators are

3 getting together and doing something that they now admit is

4 against the law such that they will go to prison, it is

5 perfectly plausible to assume that they may have discussed

6 other agreements and/or broader agreements or other customers

7 other than the ones that they can parse out and limited.

8      The guilty pleas, Your Honor, are not some sort of

9 safe harbor, that if a defendant -- if what they plead to and

10 if they can stay within the four corners of the plea they are

11 exonerated from anything else that might be related to it or

12 outside of it.  It is just the opposite at this stage of

13 pleading, it gives us plausibility as to the antitrust

14 agreement.

15      Now, how the damage models will ultimately play

16 out, whether certain classes or even you get into situations

17 where you have subclasses that have different degrees of

18 impact or different degrees of damage, but that is an issue

19 after discovery of certainly alleged antitrust injury,

20 specifically in separate numbered paragraphs 153 and 154,

21 paragraph 99 we set forth the allegation with respect to the

22 effect that the bid rigging to the OEMs has on the prices

23 paid to, quote, all other direct purchasers of wire harness

24 products.

25      THE COURT:  Okay.

1          MR. KOHN:  So it is not a mystery, we have alleged

2      it.

3          THE COURT:  What about the other half of the

4      defendants who aren't connected to the guilty pleas or the

5      raids, are they in simply because of market share?  Does a

6      chart showing their market share make them --

7          MR. KOHN:  They are in, Your Honor, because of the

8      plausibility of the agreements with respect to this industry,

9      yes.  As I said, some of them had their individual employees

10     plead for periods of time when they worked for a subsidiary.

11     Others, T-ram was subject to the FBI raid, so you can look to

12     specifics, but through the economic facts and the allegations

13     of agreement, the allegation of meetings and, again, the case

14     law is full of decisions that you do not have any

15     requirements at the pleading stage to get into a defendant by

16     defendant listing of that behavior.  And I would -- well,

17     there are a number cases that state that and a number I have

18     mentioned.

19         THE COURT:  Okay.

20         MR. KOHN:  Your Honor, on this issue of the bid

21     rigging to the large purchasers affecting the overall market,

22     we have discussed in some detail the Optical Disk Drive case

23     in our brief, I think at pages 18 and 19.  That is a

24     perfectly analogous situation where there was bid rigging to

25     the large computer manufacturers, Dell and HP, and the court

1    discusses in detail and says that's absolutely an allegation

2    that can show those bids will then affect the price paid by

3    the smaller purchasers in the market.

4        And perhaps one other small hypothetical on that

5    situation, if there was conspiracy in the City of Detroit

6    between the soft drink -- local soft drink bottlers, between

7    Coke, Pepsi and the local bottled water company, and they

8    want to rig the bids they are going to charge to raise the

9    prices that they can charge to every restaurant and bar in

10   the Detroit area. And one of the ways they go about doing

11   this is they rig the bids to the Westin and to the Double

12   Tree, where most of us are all housed for the last couple

13   days, and they can determine, okay, you get the Westin, we

14   will get the water business at the Double Tree, you get the

15   Cokes at the other hotel, and then that price becomes the

16   price that they charge to the Gateway Deli and to the other

17   folk across the street and to the smaller restaurants and

18   bars. That's all the theory is. That's what was in Optical

19   Disk Drive, that's what's happening here or what we have

20   alleged to happen here. Obviously we will be put to our

21   ultimate proofs.

22       THE COURT: Let me ask one question because your

23   time is up. How did you decide to leave certain defendants

24   out of this lawsuit, was it their market share?

25       MR. KOHN: Your Honor, with respect to the amended

1    complaints?

2            THE COURT:  Yes.

3            MR. KOHN:  No, it was not with respect to market

4    share, it was with respect to further discussions and

5    investigation that we did with respect to the entities that

6    we believe were focused in these agreements and in this

7    conduct.

8            As class counsel we have obligations to protect the

9    class's rights with respect to the statute of limitations for

10   possible defense, we believe we have done that appropriately

11   and properly, and as part of the process and exchange of

12   information that is already underway.

13           THE COURT:  I was just curious.

14           MR. KOHN:  Certain defendants are already producing

15   their documents, there's a lot of talk about what the

16   discovery will lead to.  We are already into the discovery

17   with respect to a number of them.

18           Your Honor, if I can take another minute, I think I

19   have already rambled on too long on some of these points, but

20   just a minute on this secondary argument that's the indirect

21   purchaser issue.  Again, we believe we discussed that in our

22   brief but defendants point to a case, Campos vs. Ticketmaster

23   case.

24           THE COURT:  Okay.

25           MR. KOHN:  And there was some language in that case

1   where the court said that the agreement between Ticketmaster

2   and the stadiums or the venues, that's the agreement where

3   Ticketmaster imposed a service charge, then you are buying

4   the ticket so you are an indirect purchaser of that service

5   charge.  They said that's a, quote, antecedent transaction.

6       I think what the defendants did here was simply

7   seize on that terminology, antecedent transaction, and said

8   the bids to the OEMs are some kind of antecedent transaction

9   so if you then buy in the market, a la the Optical Disk Drive

10  case or my example about the hotels and the sodas, that it is

11  an antecedent transaction and therefore you are an indirect

12  purchaser.

13      Now, not every separate transaction makes you an

14  indirect purchaser.  I mean, here we have purchased a product

15  directly from the named defendants.  The other counsel who

16  represent the dealers and the end payors then buy it

17  indirectly in the chain of commerce.  The Campos case spoke

18  about examples of how a baker who buys price-fixed dough and

19  then sells bread.  We are buying the dough, we are not buying

20  the bread, the indirects are buying the bread, so I think

21  that issue is not again at this point an issue.

22      So, Your Honor, respectfully I think we have more

23  than met the Twombly standard of plausibility.  I think this

24  case is well within the mainstream of those cases which have

25  denied such motions and sustained the complaints.  There are

1   only a handful of cases where there are guilty pleas that

2   have had any kind of narrowing of the case.  I don't know one

3   that has done what the defendants have said, which is the

4   entire case should be dismissed, and I guess there's the old

5   saying of where there is smoke there is fire.  Now, I don't

6   need to prove today that there is fire, I just need to say

7   where there is smoke coming out of seven stories of a

8   20-story building, and seven people have run out of the

9   building covered in soot, and I'm the fire chief, I would

10  like to go in there and see if there is a fire, is it at

11  least plausible that there might be a fire in there.  I think

12  the defendants' position is, no, Fire Chief, it is okay,

13  everything is under control here, you can all go home.

14          So with that I would respectfully request that the

15  motion as to Twombly be denied in its entirety, and my

16  colleague, Mr. Spector --

17          THE COURT:  How do you conceal a fire is what the

18  question is?  Okay.  Let's hear that.

19          MR. KOHN:  Until the smoke comes out the fire may

20  have been smoldering for some time.

21          MR. SPECTOR:  Thanks for giving me something to

22  play with.  Now I have to figure out how we hide a fire.

23          THE COURT:  Yeah.

24          MR. SPECTOR:  Eugene Spector on behalf of the

25  direct purchaser plaintiffs, Your Honor.  I will address the

1    issue of fraudulent concealment and injunctive relief, and I

2    will be very brief.

3           The issue is whether we have pled fraudulent

4    concealment so that our fraudulent concealment claim is

5    plausible.  We have to satisfy the Twombly standard.  Does it

6    mean we have to satisfy you now that fraudulent concealment

7    has, in fact, taken place?  That's something to prove at a

8    later date.  And it is fundamentally a factual issue and one

9    that really should not be decided at this stage.  It can be,

10   of course, it has been in other cases, but it really is

11   something that is a factual issue.

12          Here what have we alleged with regard to fraudulent

13   concealment?  Have we alleged that there has been affirmative

14   acts of concealment?  We certainly have, Your Honor.  We have

15   alleged rigged bids, we have alleged efforts to keep that

16   secret, we have alleged monitoring and concealing the

17   conspiracy, we have alleged that the pricing has been

18   unilateral, we have alleged everything was hidden.  Actually

19   nobody really could have known anything until the Government

20   action took place, and once the Government action took place

21   and we were aware we acted promptly, we acted within the

22   statute of limitations and we have brought actions -- and our

23   clients have brought actions that are appropriate.

24          THE COURT:  Would there be any reason to know that

25   these prices were rigged -- or fixed, excuse me, before the

1    Government action?

2          MR. SPECTOR:  No.

3          THE COURT:  Any reason?

4          MR. SPECTOR:  None, and the defendants can't point

5    to any because there aren't any.  There is nothing that would

6    have put plaintiffs on inquiry notice of this price-fixing

7    conspiracy prior to the Government action.

8          THE COURT:  Well, defendants I think kind of talk

9    in their pleadings about, you know, did you do your due

10   diligence.

11         MR. SPECTOR:  The question is when does the due

12   diligence duty arise, and I think it is pretty clear from the

13   cases of Carrier, Polyurethane Foam by Judge Zouhary in the

14   Northern District of Ohio, the Packaged Ice case here by

15   Judge Borman, that that duty to arise -- that duty of due

16   diligence doesn't arise until you have some reason to believe

17   that there is something to pursue, something to follow.

18         THE COURT:  Well, did the prices go up -- maybe

19   this is factual as you are saying, but did prices simply go

20   up when maybe input costs or material costs did not, I mean,

21   could there be something like that?

22         MR. SPECTOR:  Even if prices did go up and input

23   costs did not, that would not in and of itself be enough to

24   tell you that there is a price-fixing conspiracy; you need

25   more than that, and so I don't believe that that would put

 1    anyone on inquiry notice.

 2            THE COURT:  What would it tell you?

 3            MR. SPECTOR:  It would tell us that prices went up

 4    because they could.

 5            THE COURT:  Okay.

 6            MR. SPECTOR:  These are the suppliers, Your Honor.

 7    I mean, if the suppliers -- if suppliers -- it is kind of

 8    like Twombly in that sense, if you've got parallel pricing as

 9    the Supreme Court said, that parallel conduct in and of

10    itself is not enough, it doesn't give rise to a claim and I'm

11    not sure that it would even give rise to an inquiry notice.

12            THE COURT: All right.

13            MR. SPECTOR:  There is a quote from I think it is

14    Judge Zouhary in Polyurethane Foam quoting from a case that

15    says -- the Pinney case, requires reasonable diligence, not

16    constant cynicism.  And I think that that really is the kind

17    of standard that you need to look at -- look to in

18    determining whether due diligence is called for, whether

19    there is something that would trigger the need to do that

20    investigation.  Just as in Packaged Ice I think this is a

21    question that the Court should leave for the jury and not

22    decide at this stage.

23            With regard to the injunctive -- unless Your Honor

24    has another question for me with regard to fraudulent

25    concealment, with regard to the injunctive relief claim

 1    Mr. Gangnes really said nothing except they will rely on

 2    their briefs, and as will we, but I only raise one question,

 3    and that is, we don't have a separate count for injunctive

 4    relief, it is just one of the forms of relief we ask for at

 5    the end of the day, and if we don't prove it at the end of

 6    the day we won't get it, and so it seems to me that just like

 7    fraudulent concealment this is something that should wait

 8    until the end of the day and not be decided now.

 9            THE COURT:  All right.

10            MR. SPECTOR:  Thank you, Your Honor.

11            THE COURT:  Okay.  Thank you.  Reply?

12            MR. COOPER:  Thank you, Your Honor.  I will confess

13    that I haven't tracked my time but I will try to be quick.

14            THE COURT:  I will give you --

15            MR. FINK:  In that case, Your Honor, they are out

16    of time.

17            THE COURT:  We will give him a few minutes.

18            MR. COOPER:  No good deed.

19            THE COURT:  Go ahead.

20            MR. COOPER:  Your Honor, you asked Mr. Kohn exactly

21    the right question, which is a simple question which he

22    didn't answer, and that is who are your clients and what did

23    they buy.  And he talked about the class and what direct

24    purchasers out in the world who might be members of the class

25    might have bought or under what conditions, but we don't have

1    a class; maybe one day but not now.  We have these particular

2    direct purchaser plaintiffs and they have to have standing,

3    so he needs to know what they bought.  And he I think then

4    retreated to, well, they bought wire harness products, 1 or,

5    I don't know, more of the 13 or 12 or 14 products that are in

6    that basket.  The complaint needs to answer that question in

7    the allegations.

8            With respect to -- Mr. Kohn spent a lot of time

9    talking about the pleas.  First of all, there is no dispute

10   that the conduct pleaded to -- it was serious conduct and

11   there are serious repercussions, and we are not disputing

12   that.

13           THE COURT:  You dispute the numbers like there are

14   four defendants who pled guilty but really there were also

15   the individuals?

16           MR. COOPER:  Well, I didn't -- I didn't audit the

17   numbers, Your Honor, as I was sitting back there.  I don't

18   have reason to dispute it other than let me make this point,

19   you know, they sued, for example, Tokai Rika, and I think you

20   will hear from them separately, and since now we have an

21   announcement, it looks like, of a plea and it is for heater

22   control panels, so it's completely separate.  Each of these

23   products are separate.  There is no -- the Department of

24   Justice in the pleas doesn't set out to define a market, it's

25   just writing language about the products, and the products

1    are different in every plea.  So when Mr. Kohn is saying, oh,

2    that's -- wire harness products is a market, you know, that

3    the Government -- a term that the Government uses and that

4    the defendants use, I don't think that's right.  For example,

5    look at the Denso plea where wire harnesses aren't even

6    involved and yet Denso is a defendant.

7         Mr. Kohn said well, you know, a plea is not a safe

8    harbor, and I don't disagree with that, and obviously there

9    are a lot of cases where pleas are part -- are part of the

10   allegations that support a complaint, including Packaged Ice,

11   which I will come to in a second, but pleas are also not a

12   free pass that, oh, if a defendant has pled to something they

13   can be sued by any participant in any market where the

14   defendant might participate.  That's not true either.  There

15   has to be a linkage, as I said in my main argument, between

16   the pleas and the conduct that's alleged in the complaint.

17        THE COURT:  What's your primary case where a

18   defendant has pled guilty and the antitrust complaint has

19   been dismissed?

20        MR. COOPER:  Well, elevators.

21        THE COURT:  Elevators.

22        MR. COOPER:  That's one.  Even if you look at Iowa

23   Ready Mix, that's another one, if you look -- let's take

24   Packaged Ice.  If you look at that, there isn't -- it is not

25   just that somebody entered a plea, and the court recounts, in

1    fact, there is this phrase if there, then here, that's in a

2    lot of the cases.

3            THE COURT:  Uh-huh.

4            MR. COOPER:  And in every -- well, at least I'm not

5    aware of a case where the court talks about if there, then

6    here and doesn't -- where it finds the complaint is supported

7    doesn't find that there is -- that there are allegations that

8    link the pleas to the particular conduct affecting the

9    plaintiffs.

10           Even in Packaged Ice we had -- as Mr. Kohn said, we

11   had confidential witnesses who gave detailed statements with

12   respect to a national conspiracy.  You had the same type of

13   purchasers in Packaged Ice so that the plaintiffs -- the

14   pleas were in a certain geographic market, the plaintiffs say

15   well, we are the same kind of purchaser just in a geographic

16   market.  Here -- well, first of all, obviously we don't even

17   know what these guys purchased, but they are clearly not

18   automobile manufacturers, and that's a distinction right off

19   the bat.  Also in Packaged Ice the corporate actors were the

20   same in the region and nationally so that -- that's not been

21   alleged here.  There were separate internal investigations

22   into national conspiracies in Packaged Ice, we don't have

23   that.

24           So in every one of the if there, then here cases

25   there is something more than just the pleas that support the

1    complaint.  The other -- if Your Honor had more questions?

2              THE COURT:  No.

3              MR. COOPER:  The other thing I wanted to touch on

4    briefly were the market structure arguments which get very

5    short shrift in the complaint, and Mr. Kohn mentioned them

6    and I just want to touch on them very briefly.

7              THE COURT:  Okay.

8              MR. COOPER:  The complaint does allege there is a

9    high concentration in the market but doesn't explain, as I

10   think Your Honor was observing, why it is that some major

11   companies with major market shares were not defendants.

12   Usually the point of alleging high concentration is to say we

13   have all the cartel members who have most of the sales in the

14   market and that makes it easier for them to succeed.  When

15   you have a cartel member -- or when you have a producer who

16   has a high market share and is not part of the cartel, then

17   actually that is evidence going the other way, that doesn't

18   support market structure as a basis for plausibility.  And,

19   indeed, in the chart there are some non-defendants who have

20   big market shares and there are some defendants who are not

21   even listed in the chart, so that's not explained in the

22   complaint.

23              In their brief, but not in the complaint, they make

24   the argument market structure wise that all defendants can

25   produce all products.  It is not alleged in the complaint, I

 1    believe, because it is not true and it can't be --

 2              THE COURT:  Wait a minute.  They didn't say in the

 3    complaint that --

 4              MR. COOPER:  No, no, in their brief, so in the

 5    event that I just want to be clear that there is no

 6    allegation with respect to defendants' ability to substitute

 7    products on the supply side.

 8              THE COURT:  All right.

 9              MR. COOPER:  Then the only other structural point I

10    think they make is they just allege high barriers to entry.

11              THE COURT:  Correct.

12              MR. COOPER:  It is not clear from that allegation

13    how that would relate to the market structure, and, in fact,

14    we don't know what these -- we don't know in the complaint

15    what these plaintiffs do.  It may be that they make wire

16    harnesses in which case the argument --

17              THE COURT:  What is that high barrier to entry was

18    like the cost of the machinery to produce these things or

19    what?  What was --

20              MR. COOPER:  It was sort of the boilerplate that

21    it -- yes, that a lot of investment is required to get into

22    this business without any detailed support for that.

23              THE COURT:  Okay.

24              MR. COOPER:  One thing I want to draw Your Honor's

25    attention to if you were even considering this market

1    structure allegations is the absence of --

2         THE COURT:  Of course I will consider it.

3         MR. COOPER:  Well, then let me suggest that you

4    also consider this:  The absence of an allegation with --

5    that these are commodity products and, indeed, the

6    allegations in the complaint suggest they are not, that they

7    are model specific, for example, that they involve individual

8    circuits, et cetera, that they are custom -- that wire

9    harnesses, and I'm not even talking about all the other

10   products are custom, and that actually is again another

11   factor that would point against the market structure as

12   helping with plausibility.

13        THE COURT:  All right.

14        MR. COOPER:  So the absence of that allegation is

15   important.

16        THE COURT:  Thank you.

17        MR. COOPER:  Thank you, Your Honor.

18        MR. KOHN:  Your Honor, may I?

19        THE COURT:  No, we are not done yet.  Mr. Gangnes?

20        MR. GANGNES:  Briefly, Your Honor.  Mr. Spector

21   said that a Twombly standard applies to the fraudulent

22   concealment, and that's just not right.  They have pled fraud

23   so it is clear in all the case law that Rule 9(b) applies to

24   their allegations, they must plead facts that meet each of

25   the three parts of the Pinney Dock or Carrier Corporation

1    test with particularity to satisfy the pleading standards for

2    fraudulent concealment, and they haven't done that.

3            He mentioned affirmative acts of rigged bids, and I

4    explained in my opening remarks why plaintiffs are not

5    asserting a bid-rigging claim themselves here so that doesn't

6    work for them.  He said that everything was hidden and that

7    the defendants had made representations publicly that their

8    pricing was unilateral and these very points were addressed

9    by the Sixth Circuit last March in the Carrier case.  In that

10   case the complaint alleged that defendants utilized covert

11   meetings and gave false and pretextual reasons for the

12   pricing of copper tubing, and described such pricing falsely

13   as being the result of competitive factors.

14           The Sixth Circuit held that those allegations were

15   conclusory, not supported by any facts, and therefore lacked

16   the requisite particularity as it failed to specify the time,

17   place and content of the alleged fraudulent acts as required

18   by Rule 9(b).

19           THE COURT:  Okay.

20           MR. GANGNES:  As far as everything being hidden, as

21   I mentioned in responding to Your Honor earlier, the

22   Sixth Circuit has been quite clear that mere silence or

23   unwillingness to divulge wrongful activity is not sufficient.

24   There must be some trick or connivance intended to exclude

25   suspicion and prevent inquiry.  In other words, the

1    affirmative act must be directed at the plaintiff, deceive

2    the plaintiff and prevent the plaintiff from discovering

3    their cause of action.  In this case the rigged bids don't do

4    that because the rigged bids were not directed to these

5    plaintiffs, they were directed to automobile manufacturers.

6         The Sixth Circuit noted that actions such as would

7    deceive a reasonably diligent statute will toll the statute,

8    and in this case there simply aren't any affirmative acts of

9    the defendants that were directed to these plaintiffs and

10   deceived them so that they were unable to discover their

11   claims.

12        THE COURT:  So then is it your position that the

13   plaintiffs should have been on notice before the guilty pleas

14   and needed to do some due diligence?

15        MR. GANGNES:  Well, that's a separate part of the

16   three-part test.  That's the due-diligence prong and Your

17   Honor is quite correct that the duty is investigate does not

18   arise until the plaintiffs are on notice that they might have

19   a claim.  In this case they admit that they were on notice

20   that they might have a claim when the Government

21   investigations were announced in February 2010.  What the

22   case law requires them to do is then allege what steps they

23   took to investigate, and if you look at the plaintiffs'

24   complaint here there is nothing about --

25        THE COURT:  So we are looking on the period between

1    the Government getting started and the guilty pleas, that

2    period there?

3            MR. GANGNES:  That's correct, that's when the duty

4    of due diligence arises.  And, again, when you compare what

5    happened in the Carrier case with what happened here, this

6    complaint is deficient because it does not allege any steps

7    that the plaintiffs took to investigate their claims.

8            THE COURT:  Good.  Thank you.

9            MR. GANGNES:  Thank you.

10           THE COURT:  All right.

11           MR. KOHN:  Your Honor, if we could between us have

12   about 60 seconds?

13           THE COURT:  What is there, surrebuttal?

14           MR. KOHN:  I appreciate it.  Thank you, Your Honor.

15   Your Honor, just as to the case law that was cited with

16   respect to the question of whether guilty pleas have been --

17   the Elevator case had no U.S. -- didn't even have a U.S.

18   investigation, no U.S. guilty pleas, the original complaint

19   was based on some investigations in Europe, there were no

20   U.S. guilty pleas.

21           The Ice case, Your Honor, was a guilty plea by one

22   of the defendants to the Detroit metro market and southern

23   Michigan.  Judge Borman sustained a nationwide complaint.

24   Later a second defendant pled guilty to a similarly narrow

25   market, the Michigan market.  The third defendant that was

1    kept in the case had not -- never pled to anything, never was

2    prosecuted by the Government.  Those guilty pleas said

3    nothing about the rest of the country; Pennsylvania,

4    Illinois, Kentucky, Florida, what have you.

5          Iowa Concrete, Your Honor, one case that the

6    judge's decision latched onto, an allegation in the complaint

7    about the specific properties of Ready Mix Concrete which

8    convinced the Court that the statewide or regional guilty

9    pleas could not apply, and what the judge said was this,

10    quote, third, allegations of an overall conspiracy appear to

11    be implausible in light of the nature of Ready Mix Concrete

12    as alleged in the amended consolidated complaint, paragraphs

13    22, 23.  As alleged, Ready Mix Concrete must be produced and

14    delivered within a limited geographic area such that it is

15    not clear how all the defendants could compete within the

16    entire undefined Iowa region, close quote.  So in that case,

17    yes, there were guilty pleas but the court said the guilty

18    pleas were localized, you couldn't expand it because of

19    allegations in the complaint that the product -- it is mixing

20    and the concrete hardens if you don't get it where it should

21    be.

22          THE COURT:  Okay.

23          MR. KOHN:  With respect to the chart, Your Honor,

24    just one point, that was a worldwide chart, the market share,

25    so some are -- there is a dominant player in Europe and it

1    did not -- it was for background and it did not represent

2    U.S. market share.

3            THE COURT:  All right.

4            MR. SPECTOR:  If I might, Your Honor, just one

5    point?

6            THE COURT:  I can count.

7            MR. SPECTOR:  Mr. Gangnes referred to the Carrier

8    opinion and how the conclusory allegations were insufficient.

9    I would like to read to you from the conclusion of the court:

10   We therefore conclude that taking the allegation in Carrier's

11   favor as we must at this stage of the litigation, Carrier has

12   adequately pleaded its fraudulent concealment claim, and its

13   cause of action should not be dismissed as time barred.

14           Thank you, Your Honor.

15           THE COURT:  Go ahead.

16           MR. COOPER:  They opened the door, Your Honor.

17   Very quickly.  I just want from -- Mr. Kohn read a quote from

18   Iowa Ready Mix, Judge Bennet's opinion there.  I want to just

19   read very quickly where he is talking about Packaged Ice

20   compared to Ready Mix Concrete, and he says what is missing

21   in this case, however, is the larger picture from which

22   inferences of a wire conspiracy can be drawn from guilty

23   pleas to separate bilateral conspiracies.  That's the same

24   situation we are in here, Your Honor.  Thank you.

25           MR. GANGNES:  I like this Carrier case, and I'm

1   glad Mr. Spector mentioned it again because the portion of

2   the opinion he's referring to shows how that case differs

3   from this case.   In the Carrier case there were European

4   Commission findings that the plaintiffs were able to import

5   into their complaint in which the conspirators had

6   established security rules and coding systems in order to

7   hide documents and evidence, and the Carrier court held that

8   that was affirmative conduct and it was sufficiently

9   affirmative because the alleged actions involved taking

10   active steps to hide evidence as opposed to simply meeting in

11   secret.   So meeting in secret is insufficient, there has to

12   be affirmative acts, and in the Carrier case it was hiding

13   evidence that allowed the court to permit the fraudulent

14   concealment allegations to go forward.   Thank you.

15        THE COURT:   All right.   Thank you.   Okay.   One

16   second here.   All right.   Next, Fujikura is out of this, so

17   TRAM.

18        MR. FINK:   Your Honor, with respect to the motions

19   involving -- both the motions involving TRAM and later

20   there's motions involving Denso, these motions relate to both

21   the motions -- the motions themselves are addressed to both

22   the direct and indirects.

23        THE COURT:   We are just going to do the direct.

24        MR. FINK:   Okay.   The indirects are prepared but --

25        MR. KLEIN:   I will say that I don't expect that I

1    will have anything separate to say about the indirects --

2            THE COURT:  Okay.

3            MR. KLEIN:  -- tomorrow.

4        I don't -- for these purposes I don't think there

5    are material difference that we need to worry about.

6        Your Honor, Sheldon Klein, Butzel Long, on behalf

7    of Tokai Rika Co., Limited and TRAM, Inc.  TRAM is the

8    American subsidiary of the Tokai Rika Limited.

9        For the topics that I'm going to expect to talk

10   about today I don't think there is a distinction so I will

11   generally just refer to Tokai Rika encompassing both of them.

12           THE COURT:  All right.

13           MR. KLEIN:  Your Honor, I don't know if you noticed

14   that late yesterday evening one of the plaintiff groups filed

15   a request that the Court take judicial notice regarding, in

16   part, recent developments regarding Tokai Rika, specifically

17   the fact that a criminal information has been filed with

18   respect to Tokai Rika and a Justice Department press release

19   relating to that criminal information.

20           THE COURT:  I did not see that.

21           MR. KLEIN:  If I can approach the Court and give

22   the Court a copy?

23           THE COURT:  All right.

24           MR. KLEIN:  I will note that there were three

25   documents which you were asked to take judicial notice of,

 1    only two of them related to TRAM or Tokai Rika, and those are

 2    the only ones that are attached there.

 3              THE COURT:  Okay.

 4              MR. KLEIN:  We have no objection to the Court

 5    taking judicial notice, but what the Court is going to notice

 6    when it does so is that the plea does not mention wire

 7    harnesses or wire harness components; the plea relates solely

 8    to heater control panels, the HCP market, as we sometimes

 9    abbreviate it.  And so after a two-year investigation -- in

10    that two-year investigation what comes out of that is a

11    conspiracy in an entirely separate market.

12              Mr. Kohn went to lengths to explain how careful

13    they were in defining this conspiracy and so, for example, he

14    said, and I think this is an exact quote, we are not trying

15    to borrow from heater control panels, you know, to show how

16    careful they were.  And I'm going to return to this in a bit

17    but it is obviously central that they ask the Court to take

18    judicial notice of a -- of a plea relating solely to heater

19    control panels apparently believing that it has some

20    application here, not withstanding Mr. Kohn's comments, and,

21    you know, I think Mr. Kohn's comments were entirely proper

22    because that's what the law says.

23              Turn to the complaint, they only make two

24    substantive allegations regarding Tokai Rika, and it is

25    probably being generous to call one of them substantive.  The

1    first is that we participate in the market, that's paragraph

2    101 of the direct complaint.  The second is that we were

3    subject to a raid back in February of 2010.  Now, with

4    respect to the participation in the market, the main briefs

5    and Mr. Cooper's argument addresses the relative unimportance

6    of participation.  Of course, you know, if you don't

7    participate in the market you can't be an antitrust defendant

8    but that obviously doesn't carry the ball very far.

9            There's just a few specific facts regarding Tokai

10   Rika that I think are relevant.  One is the market share

11   chart that has been referred to a couple of times.  Tokai

12   Rika is absent.  After doing their due diligence, and I will

13   accept the plaintiffs did good due diligence here, apparently

14   they could find nothing that mentioned Tokai Rika or

15   identified Tokai Rika sales in the context of this market

16   and, of course, it doesn't identify a single product -- as

17   with everyone it doesn't identify a single product that

18   Tokai Rika sells, so we are left with the raids.

19           Now, in general the facts that the raids are not

20   sufficient for -- one, raids don't necessarily -- an

21   investigation or a raid doesn't lead to an end result, as we

22   have seen here, and also because there is actually nothing in

23   the complaint that says the raid even involved -- the raid on

24   us involved wire harnesses, but the more important fact is

25   that we now have the plea agreement where the raid didn't

```
 1   lead to any findings or any plea regarding or doesn't even
 2   mention the wire harness market.
 3            You know, Mr. Kohn talked about where there is
 4   smoke there is fire.  Well, this time there is no fire.  You
 5   know, based on this filing, the agreement with the Government
 6   here, we know there was an investigation and there is no fire
 7   with respect to Tokai Rika.  Needless to say, the heater
 8   control panels we will need to deal with at some point
 9   civilly but that is for another case.
10            Now, does the fact that we didn't plead to wire
11   harness irrebuttably (sic) prove that we weren't part of a
12   wire harness conspiracy?  No, it doesn't, but we are talking
13   about plausibility and the question of whether it is too
14   speculative to leap from the fact of a raid and the fact of a
15   non-plea to any sort of wire harness conspiracy.
16            THE COURT:  Well, a number of defendants didn't
17   plead to wire harness conspiracy.
18            MR. KLEIN:  I'm sorry, I didn't hear you, Your
19   Honor.
20            THE COURT:  A number of the defendants didn't
21   plead.
22            MR. KLEIN:  Sure, that's absolutely true but what's
23   changed now for Tokai Rika is that we have now - you know,
24   the Government investigation has come to an end and it has
25   resulted in a plea that doesn't involve wire harnesses.  You
```

1   know, again, we now know there's -- that the investigation at

2   least didn't lead to the fire that Mr. Kohn referred to.

3          Now, I expect defendants are going to try to rely

4   on a series of cases, and Mr. Cooper mentioned at least the

5   theory of the cases and discussed some of them.  The if

6   there, then here cases where courts have found that pleas

7   with respect to a narrower or somewhat different conspiracy

8   at the pleading stage are relevant to, not sufficient but

9   relevant to, the adequacy of the pleading and those cases are

10  entirely distinguishable, even if they are good law.  And, of

11  course, it is a thread that runs throughout the law that in

12  general bad conduct is -- doesn't -- I mean, certainly at an

13  evidentiary level but for other purposes bad conduct, you

14  know, doesn't prove anything in other areas, it is not enough

15  to say he's a bad person, he could have done anything, and so

16  in general it is appropriate to view these cases from that

17  general, narrow perspective, but if you look at the cases,

18  and there is -- I believe it is referred to as the SRAM case,

19  there is a Flash Memory case, I think I can give -- no, I

20  guess I didn't include the cites in the notes I brought up

21  here, but they are discussed in all the briefs and I can

22  provide the cites later.

23          THE COURT:  Yes.

24          MR. KLEIN:  A case that I am going to discuss a

25  little bit, Milliken & Company vs. CNA Holdings, 2011

1    West Law 3444013, also discussed in the cases, and each of

2    them -- when you read the cases there are specific

3    allegations directly connecting the conspiracy to which there

4    was a plea to the conspiracy that's subject to the complaint,

5    and each of the cases find that the fact of the plea in the

6    other case is not sufficient alone to carry the ball on a

7    Twombly analysis of whether from the fact that you

8    participated in one conspiracy it is a reasonable inference,

9    a plausible inference, that you participated in another

10   different conspiracy.

11        In the Milliken case that I have mentioned the

12   complaint, quote, identifies the specific ways that the

13   defendants in the other involved entities implemented their

14   conspiracy, close quote, quite separate from the different

15   conspiracy that some of the defendants pled to.  That's

16   entirely lacking in this case.

17        And then the court is -- it discusses the pleas, it

18   actually separates the allegations into two buckets.  One are

19   the facts related to the conspiracy, and then it goes on to

20   say that the other conspiracy to which there was a plea and

21   some other similar conduct is contextual, and given the

22   specific allegations the contextual information was

23   sufficient to nudge the case-specific allegations over the

24   line.  And it concludes by saying, quote, these allegations

25   standing alone probably would not establish a plausible

1    suggestion of conspiracy, closed quote.

2        That's exactly what we have here.  There -- as to

3    Tokai Rika there is nothing in the complaint that connects

4    the allegation -- connects Tokai Rika to the conspiracy other

5    than the fact that they allege that we participate in some

6    unknown way in the market and the fact that we were subject

7    of a raid.  They don't have a single other allegation, I

8    mean, other than place of business, et cetera, that even

9    mentions Tokai Rika, and under those circumstances they just

10   haven't met their Twombly burden of making us part of any

11   conspiracy that did exist here relating to one or any of the

12   products that are the subject of this case.

13        THE COURT:  Thank you.

14        MR. KLEIN:  If I can just briefly, I hope I haven't

15   exhausted my time, it is actually a slight change of subject

16   but I do want to touch on something that was touched on

17   before.  There was a fair amount of discussion about the fact

18   that their allegations say that the OEMs dictate the prices

19   and require --

20        THE COURT:  Right.

21        MR. KLEIN:  -- these plaintiffs to buy at those

22   prices.

23        There is a term of art in the industry that's

24   called a directed supply relationship.

25        THE COURT:  What?

1    MR. KLEIN:  A directed supply.  They would be a

2  directed supplier.  It is a commonly used -- I raise it in

3  part because I think it would be very helpful shorthand as we

4  go, there are directed supplier agreements.  I have actually

5  spoken numerous times at supplier trade association meetings

6  and the type about directed supply agreements, so it is a

7  very common relationship commercial practice in the industry.

8  And the point of the directed supply relationship, and their

9  allegations just flat out say, all of the economics of the

10  deal, the price, are between the OEM and the supplier.  Now,

11  so, of course, it is the economics that matter for antitrust

12  purpose.  Now, if this was a breach of warranty claim might

13  it matter that the fact that a purchase order, you know, as a

14  matter of administrative convenience is, even though the

15  economic deal is between the directed supplier and the OEM,

16  that in the middle there is an intermediary?  This is just a

17  product liability claim and we were talking about whether

18  privity was necessary or that sort of thing, all that

19  matters, but given that antitrust law is focused on

20  agreements that restrain trade and inflate prices, and the

21  only agreement here is between -- that is alleged at least is

22  between the OEM and us, not between us and them, we believe

23  that the directed supply relationship is a fundamental flaw

24  in their case if, indeed, they are directed suppliers and as

25  an economic matter it means that they are not a direct

```
 1    purchaser notwithstanding --
 2            THE COURT:  Wait a minute.  Even if the OEMs set
 3    the price ultimately, and that's the agreement, the effect is
 4    to all people who purchase from them, right?  All people who
 5    purchase have to pay this particular price?
 6            MR. KLEIN:  I think Mr. Kohn confused two separate
 7    issues.  In the example that he used of an agreement to fix
 8    the price to a big hotel and it turns out to be the same
 9    price that gets paid by the small bar, the difference --
10    that's not our situation.  The difference here is that the
11    OEM is dictating the price.  It is not that it has the
12    consequence of raising the price to the small bar.  It is
13    that, in using his example, the hotel said -- the hotel is
14    negotiating the price both for the small bar and for the
15    hotel.  So it is a fundamental -- it is not that they are
16    affected -- simply affected by the agreement, this pricing
17    agreement between the OEM and us, it is that that is their
18    price; the OEM says get out of the way, you aren't -- we are
19    going to work out the economic deal, when it is done we are
20    going to say you are going to buy from the directed supplier
21    and you are going to buy at this price, and they are almost
22    irrelevant to the economics of the transaction.  It is
23    fundamentally different from the fact that a price negotiated
24    by a big supplier may wind up being a broader market price
25    paid by people who are otherwise strangers to the
```

1    relationship.  I hope that makes sense.

2         THE COURT:  I'm not seeing the distinction here.

3    I'm lost.

4         MR. KLEIN:  Okay.  So --

5         THE COURT:  Try again.

6         MR. KLEIN:  I'm trying to come up with hopefully a

7    clearer analogy.  The OEM says to their clients, according to

8    the allegations of that complaint, you have to buy this part,

9    the specific part, from this defendant, and we are going to

10   sit down with that defendant and tell you what price you are

11   going to pay.  In the hotel example, the big hotel doesn't go

12   to the small bar and say we are going to insist --

13        THE COURT:  Okay.  I see what you're saying, they

14   don't have any communication with the bar, it is just they

15   end up paying that much.

16        MR. KLEIN:  Sure, just as a matter of function of

17   the market as opposed to -- I mean, the hotel doesn't dicker

18   and dictate the price that the small bar pays, it may be that

19   the small bar winds up paying that same price but it is

20   fundamentally different from a directed supply relationship.

21        THE COURT:  I see.  Thank you.

22        MR. KLEIN:  Thank you, Your Honor.

23        THE COURT:  Mr. Kohn?

24        MR. KOHN:  May it please the Court, Joseph Kohn for

25   the direct purchaser plaintiffs.

1          Your Honor, I think with respect to the individual

2    defendants' separate motions we obviously do rely upon the

3    omnibus briefing and --

4          THE COURT:  And you don't have to repeat, it is

5    just if you have something specific.

6          MR. KOHN:  I will limit myself to something new,

7    and also the briefing, which was much more concise with

8    respect to these we really rely upon and stand upon those.

9          So in addition to the overarching and the

10   plausibility, et cetera, of the conspiracy, any number of

11   cases have held that a guilty plea as to some defendants but

12   not others does not mean the others who were not -- where

13   there was not yet a guilty plea or never is a guilty plea are

14   dismissed from the case.  Such cases include the Fructose

15   decision which actually was on summary judgment in the

16   Seventh Circuit, the Flat Glass case.  The Air Cargo case

17   where there were in that case dozen -- really were dozens of

18   separate corporate defendants, some had been indicted and

19   pled, many hadn't, and the magistrate judge entered a long

20   opinion dismissing those that had not been indicted or pled

21   guilty, that was reversed by the district judge.  The SRAM

22   and Flash cases in California which counsel referred to.  The

23   Hinds case in New York, many banks and financial

24   institutions, some had been named in a criminal proceeding,

25   others hadn't, and the ones that hadn't were kept in the

1    criminal case.  All of these cases were cited at page 12 and

2    13 of our principal brief and then as well as in the brief

3    with respect to TRAM.

4         The FBI raid, I think counsel has conflated the

5    concept of raid and investigation.  He says there's courts

6    that say an investigation doesn't get you anywhere but there

7    are all kinds of investigation.  This one moved from the

8    level of we have opened a file where there is a press release

9    to an FBI raid for all the reasons we previously stated

10   within paragraph 116.

11        The criminal law standard is a much more stringent

12   one than the civil law standard and, again, we are not even

13   at the point of proving our claim under the civil law

14   standard, we are just at the stage under Rule 8 and Rule 12

15   of alleging a civil law violation.

16        THE COURT:  Let me ask you directly, did this plea

17   to another part, not wire harness, heater control --- -

18        MR. KOHN:  Yes.

19        THE COURT:  Does that have any impact on the

20   argument that you gave before?

21        MR. KOHN:  I think it does.  I think it helps the

22   plaintiffs.  If you look at the SRAM case and the Flash case,

23   there the courts were saying the fact that you did plead to

24   another product may very well establish that you were part of

25   a conspiracy on the second product.  Now, this just came in

 1   the last day or two, we have not argued that, but if you look

 2   at those cases, yeah, there had to be some additional facts.

 3   For example, were the employees who worked in the sale of

 4   product A, did they overlap with the ones that sold product

 5   B?  So it certainly doesn't give them a

 6   get-out-of-civil-court free card.  If anything, it would be

 7   some additional factor --

 8          THE COURT:  They wouldn't get out, they would just

 9   move to another category.

10          MR. KOHN:  Yeah, right.  It seems to me it is

11   another billow of smoke and it certainly does not exonerate

12   them.

13          We also relied in our briefing on the allegation

14   with respect to the direction and control of Tokai Rika, and

15   I think those are all adequate allegations as well.

16          We would invite Your Honor's review of the Milliken

17   case which counsel cited, again, one, which does not have the

18   extensive admissions in the forms of the pleas, et cetera,

19   here.  And, again, any number of the cases; the Fastener case

20   is yet another one, a recent decision in the Eastern District

21   of Pennsylvania that there is no requirement for plaintiffs

22   to go defendant by defendant and separately repeat

23   allegations or separately define.

24          The Optical Disk case says, quote, detailed

25   defendant-by-defendant allegations are not required.  A

1    complaint must allege that each individual defendant joined
2    the conspiracy and played some role in it because at the
3    heart of the antitrust conspiracy is an agreement that a
4    conscious decision by each defendant to join it.  The
5    complaint alleges that.  We identified each of the group of
6    defendants, we identified that they sell these products, we
7    have allegations and they are summarized in our brief
8    paragraph 115, paragraphs throughout that these defendants
9    participated in the meetings and agreed, so we have made
10   those allegations --
11         THE COURT:  Okay.  I don't want to go into it
12   again.
13         MR. KOHN:  -- that are necessary to join then.
14         All right.  Thank you.
15         THE COURT:  Thank you.  Any reply?
16         MR. KLEIN:  I'm going be very, very brief.
17   Mr. Kohn said there's lots of cases that say a plea in a
18   different market establishes -- is sufficient to establish
19   the claim, and that's just not true.  In none of the cases
20   does a court rely on a plea in the other market as sufficient
21   to state a claim.  In every one of the cases, as I said,
22   there are case-specific allegations connecting the defendant
23   involved to the conspiracy to the extent that it considered
24   the other pleas and, you know, it speaks in terms -- it is
25   something to be considered to nudge it over the line but it

1     is not a replacement for factual allegations connecting us to

2     the conspiracy.  And, again, the only allegation here is the

3     fact of a raid and that we participated in some unknown way

4     in the market, and that's not enough.  Thank you, Your Honor.

5            THE COURT:  Thank you.

6            All right.  We have, let's see, Leoni, Denso and

7     Lear, right?

8            MR. FINK:  Yes.  With respect to Leoni, the

9     direct -- in the direct case the Leoni defendants have been

10    dismissed -- voluntarily dismissed.

11           MR. TUBACH:  Your Honor, Michael Tubach for the

12    Leoni defendants.

13           The Court's order scheduled a hearing for today and

14    tomorrow stated the Court wanted to hear jurisdictional

15    arguments today.  We are -- counsel is right that we are out

16    of the direct purchaser case, but the indirects have still

17    made jurisdictional arguments with respect to one of my

18    clients.  Did the Court want to hear that jurisdiction today

19    or tomorrow?

20           THE COURT:  No, tomorrow.

21           MS. STORK:  Anita Stork for S-Y.

22           THE COURT:  I'm sorry.  Your name?

23           MS. STORK:  Anita Stork for S-Y Systems Technology

24    Europe GmbH.

25           We are in a similar situation in that we still have

 1    a jurisdiction motion but the direct purchasers have

 2    dismissed S-Y Europe without prejudice so our jurisdiction

 3    motion goes only to the indirect purchaser complaint.

 4              THE COURT:  Okay.

 5              MS. STORK:  And we are scheduled for today, but the

 6    Court may want too recess that if you are moving the interim

 7    purchaser argument to tomorrow for jurisdiction.

 8              THE COURT:  All right.  Maybe we'll take that for

 9    tomorrow.  Okay.

10              MR. FINK:  Your Honor, finally, the same holds true

11    for Kyungshin Lear's motion.  They have also as I understand

12    it been dismissed voluntarily.

13              THE COURT:  Lear did?

14              MR. SANDERS:  Yes, Your Honor.  This is

15    Parker Sander for Kyungshin Lear.  We have been dismissed

16    from the direct --

17              THE COURT:  Okay.

18              MR. FINK:  In the direct case.

19              THE COURT:  Oh, dismissed from direct, yeah.

20              MR. SANDERS:  In the direct case only.

21              MR. FINK:  Without prejudice.  You heard that,

22    right?

23              MR. SANDERS:  I did.

24              THE COURT:  Okay.  Denso, then, is that -- you're

25    the electronic control person?

1        MR. CHERRY:  Yes.  Good morning, Your Honor, or

2   almost good afternoon.  I'm Steve Cherry and I'm with the law

3   firm Wilmer, Cutler, Pickering, Hale & Dorr, and we represent

4   Denso.

5        THE COURT:  Okay.

6        MR. CHERRY:  With respect to Denso, Denso does not

7   make any of the products at issue here other than body ECUs,

8   and there are no allegations in the complaint that contrary

9   we don't believe they we can allege in good faith that we do

10  make any products at issue here other than body EUCs, and

11  that's all that our plea addresses is body ECUs.  There's not

12  any reference in our plea to wire harnesses or anything to do

13  with wire harnesses, it's just body ECUs.  We also pled

14  guilty to the sale of body ECUs as to a single automobile

15  manufacturer, so that was the conspiracy.

16       THE COURT:  Is the ECU part of wire harness?  I

17  mean, I asked that in the very beginning.

18       MR. CHERRY:  Frankly we never thought of it that

19  way, Your Honor.

20       THE COURT:  I thought there was some conflict.

21       MR. CHERRY:  No, we make body ECUs, we don't make

22  wire harnesses.  We don't make any of these things.  We sell

23  body ECUs, we sell them primarily to one automobile

24  manufacturer, and that's what we pled to and that is what we

25  did.  And nonetheless the plaintiffs have asserted this

1    overarching conspiracy claim against us involving sales of at

2    least 11 products that we don't make, and for sales to people

3    we have never sold to.  To our knowledge they never bought a

4    body ECU from anyone.

5           I have heard you ask them repeatedly what they

6    bought and from whom, and they never answered the question.

7    I would like to hear the answer because we know we didn't

8    sell anything to them and I don't think anyone else did.

9           So they have this claim of this overarching

10   conspiracy which is completely divorced from our plea and

11   from the reality of our business.  And they provide -- and

12   their response to that because they don't want to tell us

13   what they bought and they want to lump all of this stuff in

14   together basically to hide the ball is they say it is all one

15   market, they say it is the same market, but they don't allege

16   any facts to support that.  They don't allege facts showing

17   any of these products are reasonably interchangeable, they

18   don't allege any cross elasticity of demands, they don't

19   allege facts showing any relationship in the pricing of a

20   body ECU versus automotive wiring or a fuse box or anything

21   else.  They just baldly assert same market so we don't have

22   to tell you, so there's no facts to support that assertion,

23   not one, and the cases are very clear on this point and they

24   are directly against them.

25           In regard to Elevator, the plaintiffs there

1    asserted a conspiracy to fix prices as to elevators and

2    elevator maintenance services, and their claim was based on

3    an overarching conspiracy -- a global conspiracy that

4    involved the U.S., and it was based on facts coming out of

5    the E.U.  There was an E.U. investigation and there were

6    findings of violations there, and they were saying those were

7    supportive of their claim of a broader conspiracy beyond the

8    findings of a violation, much like here where they have a

9    narrow violation involving ECUs and they say this is, you

10   know, it would support an overarching conspiracy.  So they

11   made the same argument, global market.  The court there

12   rejected that and dismissed the complaint because they failed

13   to allege facts to support that bald assertion of that type

14   of global market, and the court specifically said that they

15   failed to allege facts of any sort of global marketing, of

16   any fungibility among the products sold in Europe versus the

17   products sold here.

18          There were no allegations of the actual pricing to

19   show any relationship in the pricing.  You can't just make it

20   up, you just can't say it is all one market, you have to

21   allege facts to show it.  And, in fact, the court said, and

22   I'm quoting, to survive our motion to dismiss an alleged

23   product market must bear a rational relation to the

24   methodology courts prescribe to define a market for antitrust

25   purposes, an analysis of the interchangeability of the use

 1    and the cross elasticity of demand, and it must be plausible.

 2         Also, a second case, in regards to Iowa Ready Mix

 3    Concrete, there were three criminal guilty pleas all to the

 4    sale of the very same product and with overlapping time

 5    periods, but the plaintiffs tried to allege an overarching

 6    conspiracy of a broader region and a broader time period

 7    rather than the three discreet conspiracies.  And the court

 8    dismissed saying they failed to allege facts to fill in to

 9    show any sort of overarching conspiracy beyond the terms of

10    the plea agreements.  And beyond that, the court said that

11    they failed to allege facts showing that the defendants are,

12    in fact, competitors in the same market.  They said it, there

13    was a bald assertion that they are competitors in some

14    regional market but they didn't allege facts to show it.  And

15    the court said indeed the plaintiffs do not even allege that

16    the geographical market in which any of the defendants

17    operated or any overlap among their geographical markets such

18    that a wide range of conspiracy can be inferred.  Bald

19    allegations that defendants are competitors certainly do not

20    suffice to cross a line from possibility to plausibility, and

21    dismissed their claim.

22         They rely on this point primarily on a case called

23    in regard Chocolate, which really doesn't help them at all.

24    And there the issue was there were findings of violation in

25    Canada and the plaintiffs alleged a U.S./Canadian conspiracy,

```
 1    so, again, an overarching conspiracy involving the U.S. based

 2    on conduct in what the defendant said was another market,

 3    Canada.  The court denied the motion but based on the

 4    finding, and there is a detailed discussion of this by the

 5    court, that they -- that the plaintiffs had alleged abundant

 6    facts to support their allegation of a U.S./Canadian market.

 7    They had alleged facts showing that the markets were tightly

 8    interwoven, to use the court's terms, that they consisted of

 9    homogeneous interchangeable chocolate products.  The

10    complaint in turn included facts showing that a substantial

11    amount of the chocolate sold in Canada was manufactured in

12    the U.S. and imported to Canada, and that a substantial

13    amount of the chocolate sold in the U.S. likewise came from

14    Canada.  And the complaint also alleged that the defendants

15    had integrated their sales organization so they didn't have a

16    U.S. sales organization and a Canadian sales organization,

17    they had a North American sales organization that sold to

18    both places and set the same prices to both places, and that

19    was central, that was what the court based its holding on.

20           Those facts are totally lacking here.  There is not

21    one fact to support any assertion of the same market, none of

22    those facts exist here.

23           They also rely on --

24           THE COURT:  They do have the same investigation

25    though, it seems like the Government went off in Japan and
```

1    Europe and U.S. and --

2            MR. CHERRY:  I'm sorry?

3            THE COURT:  They seem to allege some commonality

4    because of the Government investigations that were going on

5    across the continent.

6            MR. CHERRY:  Your Honor, the Government is

7    investigating auto parts and we were raided, we weren't

8    raided because of anything to do with wire harnesses, that

9    was not part of our investigation, it had nothing to do with

10   us.  The Government came in the door and they knew that we

11   don't make wire harnesses.  It had nothing to do with us.  It

12   was body ECUs and heater control panels, and that's what we

13   pled to.

14           You know, there are other people maybe still here

15   from the status conference that make totally different parts.

16   You know, the investigation by the Government and these

17   various raids we are hearing about involved different parts

18   and different markets and different companies, and no one can

19   infer from a raid that that somehow has anything to do with

20   wire harnesses.

21           So the other case the plaintiffs rely on largely is

22   SRAM, and in that case, as was just discussed with Tokai

23   Rika's counsel, the defendants in SRAM some of them had also

24   pled guilty as to DRAM, and the court held that the plea as

25   to this other product was relevant.  The court said it is not

1    sufficient standing alone to get you over the mark but will

2    consider it because the same defendant had a large market

3    share both in DRAM and in SRAM and because the same

4    salespeople at the defendants had pled guilty to fixing

5    prices on DRAM, those same salespeople were responsible for

6    their sales of SRAM so the court said under those

7    circumstances we will consider that, that's relevant.  Not

8    enough to get you over the bar but it is relevant.

9           Well, here, again, we don't make any of these other

10   products so that case is completely inapposite to us.  Our

11   salespeople who sell body ECUs, they don't sell any of those

12   other products.  The case is completely different.

13          They also refer to Flash memory, that's almost

14   identical to SRAM.

15          THE COURT:  All right.

16          MR. CHERRY:  They refer to Packaged Ice as been

17   discussed there.  Everybody made packaged ice, there was no

18   dispute about that, the issue was just reagents.  Some of the

19   people had pled to a plea involving southeastern Michigan and

20   the Detroit area, and the issue was whether you could

21   consider that in the mix of the other factual allegations in

22   the complaint in deciding whether they -- the plaintiffs had

23   adequately alleged an overarching conspiracy involving the

24   entire nation.

25          Well, there they had detailed factual allegations

 1  based not only on a disgruntled employee, as Mr. Kohn said,

 2  but also on two confidential witnesses who worked for

 3  different defendants that described the details of a

 4  nationwide conspiracy including explicit allocations of

 5  customers and market outside of Michigan, outside of the

 6  boundaries of the plea.  We have nothing like that here.

 7  There's no facts that describe any conduct by Denso outside

 8  of the boundaries of its plea.  There's no allegations that

 9  we did anything with wire harnesses or any of these products

10  because we didn't, and it is not in the complaint.

11          THE COURT:  Okay.

12          MR. CHERRY:  There is one other case that they may

13  address, it actually isn't in the briefing on our motion but

14  we notice that they have cited it in opposing some of the

15  other individual motions, so I will go ahead and address it,

16  if you don't mind.

17          It is in regard to Fasteners, and that's a case

18  that was brought originally against four companies that made

19  various types of fasteners like zippers and snaps and buttons

20  and all thing that fasten apparel, are things that facially

21  are somewhat interchangeable.  And there was no dispute that

22  the defendants made all the various type of fasteners.  The

23  E.U. had in that case investigated and imposed fines on each

24  of the defendants for various type of fasteners, and made a

25  public announcement that the four of them had conspired in

 1    the markets, plural, for fasteners.

 2            In addition to that, the complaint itself contained

 3    detailed factual allegations as to over 50 meetings among the

 4    four defendants in which they defined the companies that

 5    attended, some of the people at some of those companies, when

 6    and where they met, and the types of agreements they reached

 7    about various types of fasteners.

 8            We would contend that case is completely

 9    distinguishable here.  There are no such facts about us

10    making any other type of product, every meeting with any

11    defendants and discussing any other type of product.  It is

12    completely inapposite, and so I just wanted to address that

13    in case it comes up.

14            THE COURT:  Okay.

15            MR. CHERRY:  Thank you.

16            THE COURT:  Response?

17            MR. FINK:  Mr. Kohn will be responding.  I just

18    wanted to take one moment to make sure I didn't mislead the

19    Court when I made the reference to Kyungshin Lear being

20    dismissed.  Lear is still a party, and they are still -- that

21    motion is still up next.

22            THE COURT:  Are you talking about Lear's bankruptcy

23    issue?

24            MR. FINK:  Right, the bankruptcy issue is still

25    before the Court.  I just didn't want to trick the Court into

1   thinking this was almost over and then suddenly there was

2   another motion to argue -- or disappoint the Court.

3           THE COURT:  No.  I see some of you looking, we may

4   break for lunch after this and then we will do Lear

5   bankruptcy motion.

6           MR. FINK:  Keep in mind, counsel is allowed to nap

7   during these proceedings.

8           THE COURT:  Oh, okay, but I'm not.

9           MR. FINK:  I didn't say that, Your Honor.

10          MR. KOHN:  Your Honor, Joseph Kohn for the direct

11  plaintiffs.  I think the half life of these arguments are

12  moving in the right direction, so I will try to keep it that

13  way.

14          Wire harnesses and related products.  It is in our

15  complaint, that's the class we seek recovery for.  Where did

16  that come from?

17          THE COURT:  Yeah, where did it come from?

18          MR. KOHN:  Where did it come from?

19          THE COURT:  How did we get ECUs?

20          MR. KOHN:  Is it something that we made up?  No.

21  Let's start with the first guilty plea in these cases with

22  respect to Furukawa, it was Exhibit A to the defendants'

23  motion to dismiss.  Page 3, it talks about the relevant time

24  period.  First of all, January 2000 to January 2010.

25  Automotive wire harnesses are automotive electrical

 1   distribution systems used to direct and control electronic

 2   components, wiring and circuit boards.  The following are

 3   defined as, quote, related products, close quote, for

 4   purposes of this plea agreement, and it says automotive

 5   electrical wiring, lead wire assemblies, et cetera, et

 6   cetera, and you move down to electric -- electronic control

 7   units, fuse boxes, et cetera.  This is something that

 8   defendant Furukawa agreed to.  It is evidence.  It is an

 9   admission.

10        The next one is Yazaki, same introductory language,

11   January 2000 to February 2010.  During the relevant period,

12   it defines auto wire harnesses are automotive electronic

13   distribution systems.  The following are defined as, quote,

14   related products for the purpose of this plea agreement,

15   automotive electrical wiring, lead wire assemblies, down to

16   electronic control units, fuse boxes, relay boxes and

17   junction boxes.  Yazaki agrees to this.

18        Next is the Denso plea.  For purposes of this plea

19   agreement the relevant time period is January 2000 to

20   February 2010, same period.  During the relevant period

21   defendant's sale of ECUs that were affecting U.S. automotive

22   manufacturers totaled 237 million.  During the relevant

23   period the defendant, through certain of its managers and

24   employees including high-level personnel of the defendant,

25   participated in a conspiracy with other persons and entities

1   engaged in the manufacture and sale of ECUs, the primary

2   purpose of which was to rig bids and to fix, stabilize and

3   maintain prices of certain ECUs.

4        It continues, during such meetings and

5   conversations agreements were reached so that the number of

6   related products here of 12, Your Honor, is a relatively

7   small number of sub products --

8        THE COURT:  Denso only talks about ECUs and the

9   other two pleas talk about the whole kit and caboodle.

10       MR. KOHN:  That include ECUs.

11       So what we have seen in a number of cases, and,

12  again, these are usually arguments that develop in the

13  summary judgment or the class certification stage.  For

14  example, the major Vitamins antitrust case, a lot of reported

15  decisions.  Not every defendant made every kind of vitamin

16  that was the subject of the case, some did.  There was a list

17  of vitamins, that was a lot more than 12.

18       The Flat Glass case which my colleague,

19  Mr. Spector, was involved in.  We cite this as page 18 of our

20  principal brief, and this, again, is usually in the summary

21  judgment or class cert. stage, but it has this language which

22  is classic.  Quote, contentions of infinite diversity of

23  product, marketing practices and pricing have been made in

24  numerous cases and rejected.  More importantly, any

25  difference in the manner in which the conspiracy was

1    manifested throughout the marketing and distribution of the

2    various products does not change the common question, namely

3    whether defendants acted in concert to decrease competition

4    among themselves, and that was again at the class

5    certification stage where there has already been discovery

6    and there are proofs.

7            They say the glass case there were dozens of

8    different kinds of glasses, some are tinted, some are used in

9    office building, some are residential.  Not all defendants

10   made all products but that doesn't mean that there wasn't an

11   illegal agreement for all of them to do what they could to

12   raise the price of those products that fit within that

13   definition.

14           That's all we are saying here about harnesses, we

15   are not reaching into the other products.  I suppose the

16   defendants would say in addition -- if there is going to

17   be -- since there's already the six, seven, eight matters

18   scheduled for status, I think what Denso is saying is, no,

19   there should be a separate case for ECUs on its own track,

20   separate despite these agreements.  No, we think we have --

21   our contention is that it was one of the related products

22   which these entities sell as a part of a unified system which

23   they agreed to, that they conspired, and the fact that one

24   vitamin maker might only sell the vitamin B line and gets

25   involved with this conspiracy for B, you know, that's tough

1   luck, if you join a conspiracy you can be responsible for the

2   broader effects of it.

3           THE COURT:  Okay.

4           MR. KOHN:  Thank you.

5           THE COURT:  Thank you.  Mr. Cherry?

6           MR. CHERRY:  Your Honor, again, the cases we have

7   cited are crystal clear.  I mean --

8           THE COURT:  What about the Vitamin case?

9           MR. CHERRY:  First of all, it is pre-Twombly.

10  Second of all, part of the conspiracy there alleged was an

11  agreement -- an allocation of products that you will not make

12  this particular type of vitamin; I will make this, you will

13  make that.  It was an allocation of products, not only of

14  customers and reagents.  That was all part of the alleged

15  overarching conspiracy.  There is no allegation of that here

16  nor could there be.  There's no fact to support it, it is a

17  completely inapposite case.

18          Instead, the cases that deal with this situation

19  are crystal clear that if you are going to allege it is the

20  same market you have to allege facts to prove it, to show it,

21  and there is no fact, not one, to support that bald assertion

22  in this complaint.  In fact, the sparse facts in the

23  complaint which say what these products are show it is

24  exactly not the same thing.  Clearly, wire -- you know,

25  automotive wiring is not a body ECU.  A body ECU is a little

1    computer.  You can't stretch that out and use it as

2    automotive wiring, it is completely different things.

3          THE COURT:  And do you think the fact that it is

4    mentioned in the two other -- in the Furukawa and Yazaki plea

5    makes any bit of difference at all?

6          MR. CHERRY:  No.  I mean, heater control panels are

7    mentioned in our plea, that doesn't mean they can sue

8    somebody here who just makes wire harnesses for heater

9    control panels.  You know, we had conduct involving two

10   products that we sell, those are markets we are in.  Other

11   people had conduct perhaps involving other products that they

12   are in that have nothing to do with us, just as heater

13   control panels may have nothing to do with them, so I don't

14   believe that's the case.

15         I think that's it.  I mean, I think the law is

16   clear.  There is absolutely no facts to support their

17   position.

18         THE COURT:  Okay.

19         MR. CHERRY:  Mr. Kohn brought up the idea of a

20   separate product track.  I think that is sort of a starting

21   point here for any claim against --

22         THE COURT:  We are not going there yet.

23         MR. CHERRY:  Well, I mean, it clearly is something

24   separate.  I mean, you know, heater control panels is in our

25   plea too and that's clearly a separate product track, but in

1    any event, there is no showing of an overarching conspiracy.

2         I also just want to make the point that the law is

3    clear here.  Plausible, you have asked a few times what

4    plausible is.  The law isn't real clear in defining what

5    plausible means, but it is pretty clear on what it doesn't

6    mean, and the cases are clear, it is not speculative and it

7    is not merely possible.  I think it gets thrown around a lot

8    in place of possibility, like who knows, maybe discovery will

9    show that, who knows, but the fact is they have to allege

10   facts that give rise to a reasonable inference that this is,

11   in fact, what happened, and they are totally lacking in our

12   complaint.

13        THE COURT:  All right.  Thank you.  All right.  Now

14   we have the Lear bankruptcy.  I'm willing to stay if you want

15   to proceed on it or you want to go to lunch?

16        MR. MAROVITZ:  Judge, Andy Marovitz for Lear.

17        The argument is a combination really of the

18   bankruptcy and the pleading standard, and it will go -- I

19   think the Court allocated 40 minutes per side, and I think it

20   will go 40 minutes per side.

21        THE COURT:  Okay.

22        MR. MAROVITZ:  So I'm happy to do it now or do it

23   after lunch, whichever you prefer.

24        THE COURT:  I think we will break for lunch because

25   that will be another -- okay.  All right.  Let's -- it is

```
 1    12:30, let's meet back here at 1:45.  Thank you.
 2            THE CASE MANAGER:  All rise.  Court is in recess.
 3            (Court recessed at 12:32 p.m.)
 4                        —   —   —
 5            (Court reconvened at 1:53 p.m.; Court, Counsel and
 6            all parties present.)
 7            THE LAW CLERK:  All rise.  United States District
 8    Court is again in session.  You may be seated.
 9            THE COURT:  Good afternoon.
10            ATTORNEYS:  (Collectively) Good afternoon, Your
11    Honor.
12            THE COURT:  I'm glad you all came back.
13            MR. MAROVITZ:  I was worried when you mentioned
14    bankruptcy the crowd may be much smaller.
15            THE COURT:  Yes.
16            UNIDENTIFIED PERSON:  It is.
17            THE COURT:  It is.  You know, it is an exciting
18    topic.  For the record again, your appearance.
19            MR. MAROVITZ:  Thank you, Your Honor.
20    Andy Marovitz for Lear Corporation.
21            My colleague, Howard Iwrey, is here with me today
22    as are Terry Larkin, Lear's senior vice president and senior
23    counsel, and Harry Kemp next to him, the vice president and
24    divisional counsel for the electrical power management
25    system.  I'm going to try to reserve about 10 minutes of the
```

1    40 combined for reply.

2          THE COURT:  All right.

3          MR. MAROVITZ:  Your Honor, plaintiffs' pursuit of

4    Lear in this case violates bedrock principles of bankruptcy

5    law, antitrust law and federal pleading.  There are no

6    properly pled facts against Lear in any of the three

7    complaints.  There is no guilty plea, there is no DOJ

8    investigation, there was no raid, there is nothing against

9    Lear that ties Lear against any alleged conspiracy in the

10   case.

11         Mr. Kohn this morning discussed the importance with

12   Your Honor of the FBI raids based upon a judicial officer's

13   review of the situation and authorization of FBI subpoenas.

14   None of that occurred with respect to Lear.

15         Mr. Kohn this morning talked about the importance

16   of guilty pleas and the fact that there was ongoing

17   cooperation with respect to those people who had pled guilty,

18   and he mentioned Furukawa, Denso, Yazaki, Fujikura and GS

19   Electech, none of that relates to Lear.  Even after that

20   investigation has taken place, none of that relates to Lear.

21          Plaintiffs' entire pleading against Lear is one of

22   guilt by association.  The reputational and economic harm to

23   the Southfield, Michigan based company which only three years

24   ago was able to climb out of bankruptcy cannot be justified

25   on any ground.  It is an expensive and burdensome litigation,

1    fishing expedition based upon the conduct or alleged conduct

2    of others.

3            Keeping Lear in this case sends a signal that any

4    time there is a guilty plea in any industry there is a green

5    light to sue everybody in the industry.  That shouldn't be

6    the law and it isn't the law, and, in fact, throughout this

7    morning's proceedings despite hearing about many other

8    competitors in the industry plaintiffs didn't mention Lear

9    once.

10            Accordingly, as we walk through the bankruptcy and

11    the pleading issues, it is important not simply to allow any

12    party to throw around conclusory labels about conspiracies

13    but instead to look at exactly what actually is pled with

14    respect to Lear, and we are going to go through that in just

15    a minute.

16            First, it is important to define what is in dispute

17    here, particularly given Lear's bankruptcy and the

18    proceedings in the bankruptcy court.  One thing is worth

19    mentioning, this Court only needs to reach the

20    bankruptcy-related issues at all if, in fact, it finds -- if

21    it believes that the plaintiffs have pled some claim against

22    Lear in the first instance.  If the Court finds, as we

23    believe it should, that plaintiffs have pled no claim over

24    any period of time as against Lear the Court doesn't even

25    need to reach the bankruptcy issues, but let's talk about the

1    bankruptcy issues in the first instance.

2         Following the global financial crisis of 2008,

3    which had a severe impact on the U.S. automotive industry,

4    Lear underwent a transformative event in November of 2009.

5    It was able to keep its doors open, its employees working,

6    its customers up and running and its suppliers paid during a

7    successful Chapter 11 bankruptcy under 11 U.S.C. 1141 which

8    reorganized the company and discharged all of the company's

9    debts that arose before November 9th, 2009.

10        Because of that bankruptcy there is no dispute

11   between the parties that predischarge conduct cannot give

12   rise to claims against Lear for liability.  And so, Your

13   Honor, I've handed up a packet of demonstratives, maybe seven

14   or eight slides, to your clerk and I think to you, and I also

15   blew up a couple of those slides just for demonstrative

16   purposes.

17        If you look at the left side of the slide --

18        THE COURT:  Let me ask you one question to be clear

19   about this, the district court opinion in Lear, the appeal

20   took care of the predischarge issues here?

21        MR. MAROVITZ:  The district court opinion in the

22   Lear appeal essentially is an opinion that discusses

23   whether -- to put it commonly or easily, the amount of

24   damage.

25        THE COURT:  Right.

1    MR. MAROVITZ:  That is nobody alleges -- if I can

2    come around here, nobody alleges that this period of time,

3    anything before November 9th, 2009, conduct undertaken in

4    this period of time, can give rise to liability as to Lear.

5         THE COURT:  Right, but as to the damages --

6         MR. MAROVITZ:  Correct.  The district court is

7    going to consider whether as a matter -- has sent back to the

8    bankruptcy court to consider whether as a matter of

9    bankruptcy law a properly pled complaint against a real

10   antitrust violator could, based upon these three months, this

11   little snippet in turquoise here, could somehow seek damages

12   for this entire period as a matter of law under bankruptcy

13   law.  We say it can't but that's a question for the

14   bankruptcy court, not for this Court.

15        THE COURT:  Just to look ahead as to one possible

16   scenario, if the bankruptcy says, yes, it could, it would

17   come back here for the damages issue or would --

18        MR. MAROVITZ:  The bankruptcy court would only

19   reach -- I think the bankruptcy court might reach that issue

20   in the event that plaintiffs were able to properly plead a

21   cause of action against Lear.

22        THE COURT:  I understand that, but I just wonder if

23   all of those things fell into place whether or not it would

24   get back here anyway?

25        MR. MAROVITZ:  Yes, I think so.  I think if there

 1    were a proper pleading against Lear and if the bankruptcy

 2    court decided that somehow a claim in this early period which

 3    is dead as a result of bankruptcy could, like a phoenix,

 4    spring back to life, if that happened then ultimately the

 5    plaintiffs would not be enjoined from pursuing this case here

 6    for this period of time for the damages only, not for the

 7    liability.

 8             THE COURT:  Right.  Okay.

 9             MR. MAROVITZ:  So that's really the red stop sign

10    on the other chart.  The conduct at issue here is the

11    postbankruptcy discharge, liability there is in dispute.

12             The first real issue, as I've mentioned, is the

13    pleading issue, whether or not the plaintiffs have properly

14    pled anything as against Lear.  What makes this case unique

15    is the fact that because of the bankruptcy issue and the

16    discharge in November of 2009 it really is able to help

17    define what's at issue before this Court.  The plaintiffs

18    have to show that there has been some allegation properly

19    pled in this window of time.  Allegations over here

20    pre-November 2009 are all discharged, the acts are

21    discharged, they have to show something in their complaint

22    that they have alleged post-November of 2009 that Lear did

23    something to conspire to fix prices, to rig bids, et cetera.

24    That's what makes this case unique.  They don't do it, and

25    that's what I'm going to walk through in a few minutes.

1        Let's start at the beginning.  We have already

2   spoken a bit today about the Twombly and Iqbal plausibility

3   standard.  Your Honor has asked a number of questions about

4   what the plausibility standard means, and I won't repeat any

5   of that.  I would like to focus on a different aspect of

6   particularly Iqbal.  What I have done in the third slide that

7   is in the packet, Your Honor, is I have essentially excised a

8   couple quotes from Ashcroft vs. Iqbal that apply directly to

9   the Lear situation.  What hasn't received any attention

10  really in plaintiffs' briefs is Iqbal's insistence that

11  labels and conclusions, words like participated in a

12  conspiracy, are, as the Court said, disentitled to the

13  presumption of truth.  So as the slide shows, a pleading that

14  offers labels and conclusions or a formulated recitation of

15  the elements of the cause of action will not do.

16       We cite a number of cases in our briefs for that

17  proposition, and this morning the counsel for the plaintiffs

18  said well, we don't have to tie each and every defendant into

19  the conspiracy as long as we can show that there is some

20  conspiracy going on.  That's just not right, Judge.  That's

21  not the state of the law in the United States or in this

22  district.

23       On page 3 of our opening brief we cited in re

24  Refrigerant Compressors which cited the Sixth Circuit's

25  decision in Carrier Corp.  They must specify how each

1    defendant was involved in the alleged conspiracy.  And in

2    in re Refrigerant Compressors, quote, the allegations in the

3    complaint must be specific enough to establish the who, what,

4    where, when, how and why of the conspiracy.  That's a quote

5    from that case.

6          So the Court should not indulge any presumption for

7    conclusory pleadings like plaintiffs' undefined general

8    allegations that everybody is involved in some kind of a

9    conspiracy somewhere.  Here we should turn to the specific

10   overt acts that the plaintiffs claim that Lear engaged in,

11   and there are really only -- they fall into three categories,

12   and I have put them on the board to my right and they also

13   appear in the handout that I have submitted.  Just to walk

14   through them, the first are prosecutions and investigations.

15   Guilty pleas by others, DOJ investigation against others, and

16   an E.C., European Commission, investigation and statement of

17   objection against others.  That's the first bucket of overt

18   acts they say.  All of this conduct that is being

19   investigated against other people, not Lear.

20         Second is Lear's postdischarge 20 percent share in

21   a separate Delaware corporation, Furukawa-Lear, called the

22   joint venture loosely, and we are going to go through that in

23   a minute.

24         And then third, Lear's postdischarge marketplace

25   wire harness sale to customers.  Just like any other

1    manufacturer who sold wire harnesses, Lear sold wire

2    harnesses after its bankruptcy, so that's the third and final

3    overt act.  That's it against Lear, there is nothing else in

4    either the complaint or in the briefs.

5         So let's go to what I like to call the guilt by

6    association argument number one, law enforcement actions

7    against others.  We have already talked about the fact that

8    the guilty pleas by others don't touch upon Lear, and Lear

9    doesn't have to argue about the scope of the guilty pleas or

10   whether the scope of the conspiracy is limited to some other

11   product or platform or model.  Lear didn't plead to anything,

12   Lear's employees didn't plead to anything.

13        We host -- we cited a host of cases in our brief

14   demonstrating that in this country guilt by association is an

15   insufficient basis to file a lawsuit against someone, and I

16   mentioned those just a minute ago.

17        Lear hasn't even been investigated by the

18   Department of Justice.  Plaintiffs know this, we included the

19   letter notifying them of this fact as Exhibit B in our reply.

20        Now, on the European Commission investigation it is

21   important to remember that this is a key point in the end

22   payor and the automobile dealers brief.  You may remember,

23   Judge, that the plaintiffs stressed this point in their

24   counter statement of issues presented, it is a little Roman

25   five in their brief.  If you take a look you will see the

 1   European Commission statement of objections and investigation

 2   is the only thing that the indirect plaintiffs cite as being

 3   part of their counter statement.

 4        Now, number one, as I think it was Mr. Cooper

 5   pointed out earlier, that's insufficient as a matter of law

 6   and the Elevator antitrust litigation case makes clear that

 7   you can't simply say if something happened there it also

 8   happened here, but now we know that it didn't even happen to

 9   Lear.  In our reply brief we identified the fact that the

10   European Commission has already notified those entities

11   against whom it is going to file a statement of objection,

12   and Lear and Lear France were not so notified.  So the

13   European Commission investigation statement of objection

14   falls out completely.  There is nothing in A that could tie

15   Lear to any conspiracy here.

16        The second point that is in the bucket of the three

17   allegations is the postdischarge share in a separate Delaware

18   corporation, Furukawa-Lear.  The dealer complaint identifies

19   this at paragraph 96.  The problem with the argument that

20   somehow Lear should -- is plausibly connected to a conspiracy

21   because it is in a joint venture with another company that

22   actually pled guilty is that it is not a common loosey-goosey

23   joint venture or partnership at all.  It is a separately

24   incorporated Delaware company entitled to all the rights and

25   privileges of a corporation to be shielded from exactly the

1    kind of lawsuit that the plaintiffs are bringing here.

2         In fact, the dealer complaint at paragraph 96

3    pleads that Furukawa-Lear is a separately incorporated

4    company and as a result of that, of this corporate forum,

5    like every other company duly incorporated under Delaware

6    law, means that you can't sue shareholders for the acts

7    either of the corporation or of another shareholder, in this

8    case Furukawa.

9         In Longhi vs. Animal and Plant Health Inspection, a

10   Sixth Circuit case from 1999, which we cite at page 4 of our

11   reply, the Sixth Circuit wrote that Michigan appears to

12   follow the general rule that requires demonstration of patent

13   abuse of the corporate forum in order to pierce the corporate

14   veil.

15        Plaintiffs here don't even allege that the veil

16   should be pierced because their brief doesn't even

17   acknowledge there is a veil.  They plead, as I mentioned

18   before, that it is a corporation but their briefs cite cases

19   like Schutze vs. Springmeyer that address this as though it

20   is a partnership or a loosey-goosey joint venture, when it is

21   not.  Plaintiffs have no answer to the fact that the separate

22   Delaware corporation, Furukawa-Lear, is, in fact, its own

23   corporation and therefore Lear cannot have as a matter of law

24   any liability for any acts it may or may not have undertaken.

25        Incidentally, that joint venture did not plead

1   guilty to anything, but aside from that the fact is that Lear

2   can't have any liability for any act of it.

3         THE COURT:  So basically you are claiming the only

4   thing they have against you is the fact that you are a member

5   of the industry?

6         MR. MAROVITZ:  Yes, yes.  We have the fortune of

7   having survived a successful reorganization in bankruptcy and

8   the misfortune in some sense of because we have survived it

9   we have now been sued because we are a member of the

10  industry.  What they claim in their third bucket is that

11  somehow the post-discharge marketplace wire harness sales,

12  because we are a member of the industry and because we've

13  sold things that somehow that continues a conspiracy that

14  they don't allege previously but somehow we should still be

15  on the hook.

16        THE COURT:  But that you sold things at a

17  heightened price?

18        MR. MAROVITZ:  I suppose that's right.  It is not

19  entirely clear from the complaint, but I suppose that's

20  right.  There are two problems with that argument.  First of

21  all, there is no link obviously between any conduct that

22  we've taken and what the price is.  And antitrust law is

23  clear that we are entitled to sell at any price we wish so

24  long as we don't reach a conspiracy or an agreement with a

25  competitor to do it.  The plaintiffs claim somehow that a

 1   higher price effected by something called umbrella liability,

 2   that other people have raised their price through a

 3   conspiracy and we then as a competitor simply took account of

 4   that and matched the price, that is not unlawful, can't be

 5   unlawful, and no court in the country as far as I know,

 6   certainly not the Sixth Circuit, has said that it is

 7   unlawful.

 8          And second, they have also said that somehow these

 9   post November 2009 sales have caused this earlier conduct

10   over a period of ten years to, like I said before, spring

11   back to life like a phoenix rising from the ashes.  It is

12   important to understand, and I know that Mr. Cooper started

13   to make -- but I think that the nature of the automobile

14   industry and the bid process is really important to

15   understanding why that point C doesn't hold water even in the

16   matter of pleading.

17          Plaintiffs' own complaint alleges that each bid is

18   submitted on a model by model basis and that it takes three

19   years from the accepted bid to the actual delivery of the

20   harness.  Crediting that allegation, any overt act, whether a

21   bid or a sale, as against Lear must have occurred

22   prebankruptcy and therefore is discharged because

23   November 9th was just about three years from today and they

24   filed the complaint long ago.  I'm going to get to how that

25   process works in just a second.

1          Second, plaintiffs' allegations are barred by

2     blackletter bid-rigging law which makes clear that the overt

3     act in a bid-rigging case is the bid process itself, it is

4     not some subsequent sale or some subsequent delivery but

5     simply if the bid occurred before November 9th that's the

6     overt act and there can be no liability.

7          Third, even if this weren't a bid-rigging case, the

8     Sixth Circuit in Travel Agents and another district court in

9     this circuit already have rejected exactly the arguments that

10    plaintiffs are making, that somehow a postbankruptcy

11    discharge sale of this kind causes a dead claim to spring

12    back to life or that it somehow nullifies the bankruptcy

13    discharge altogether.

14         Fourth and maybe as a policy matter most

15    importantly, the logical consequence of plaintiffs' argument

16    is that every debtor that has the benefit of a postbankruptcy

17    discharge, it is able to keep its doors open, its employees

18    working and its customers supplied, it would have to stop and

19    abrogate all contracts going forward so that no one could

20    claim somehow that a postbankruptcy sale could trigger

21    prebankruptcy liability.  That result is completely anathema

22    to Chapter 11 bankruptcy policy and what a reorganized debtor

23    is supposed to do, and that is to continue the business for

24    the benefit of its stakeholders who agreed in some instances

25    to take less than the full amount of their credit, to the

1    businesses that they serve and to the employees that they

2    employe.

3            Plaintiffs can never get that far here, as I have

4    mentioned, because they haven't alleged an overt act either

5    before or after the discharge, but let me spend one quick

6    minute on the timing of the bid because I think that's an

7    important point, and I did do a slide on that. If Your Honor

8    will turn to the third or fourth slide, it is called

9    plaintiffs' complaints, timing of bid process. We have taken

10   a snippet out of each plaintiff's complaint, the direct

11   plaintiffs, direct purchasers, the dealers and then the

12   end payors, and they all tell not surprisingly a similar

13   story; they say that the bidding process begins approximately

14   three years prior to production of a motor vehicle. So bids

15   are made on a model by model basis. The bid is either

16   accepted or rejected at which time the sale occurs. Three

17   plus years later the wire harness is actually delivered when

18   the model is -- after the model is engineered and

19   constructed, so it does not happen at the time of the bid, it

20   is a very long process as the plaintiffs make clear in their

21   complaint.

22           The reason that is important to Lear and Lear's

23   motion here is that under the theory that plaintiffs have

24   pled the OEMs wouldn't even start production of their

25   automobiles that might be affected by postbankruptcy conduct

 1    until three years after the bids, and sales were made on

 2    November 9th of 2009.  Plaintiffs have no answer to this

 3    because there isn't one.

 4         The second point that I raised and foreshadowed

 5    before is that the bid-rigging law is different in some

 6    respects than simple sales.  The law on bid rigging is that

 7    the overt act is the rigging of the bids, not the payments on

 8    the bid, not the, quote/unquote, sale.  We cited a series of

 9    cases in our opening memorandum at page 10, at page 14, and

10    in our reply at page 2 and 12, like City of El Paso show that

11    bid-rigging cases, the overt act is the rigged bid itself.

12    In El Paso, for example, the court considered a joint bid

13    amongst steel fabricators, the bid was signed in 1970, the

14    statute of limitations ran, the city didn't sue until 1975,

15    and the plaintiff said its suit was still within the four

16    years because of payments made in 1974.  Does that sound

17    familiar?  That's exactly what the plaintiffs are alleging

18    here.  The Fifth Circuit rejected this argument completely

19    ruling that the rights and liabilities of the parties were

20    finalized by the contract signed on September 4th, 1970.

21         In El Paso the statute of limitations cut off

22    liability.  In this case the bankruptcy discharge cuts off

23    liability, and because of the three-year process there is no

24    way as a matter of math Lear could somehow be responsible.

25         Plaintiffs cite zero bid-rigging cases, zero, to

1    suggest that we are wrong about this.  Instead they say that

2    a case from the Supreme Court called Klehr, which isn't an

3    antitrust case, it isn't a bankruptcy case, it isn't a

4    bid-rigging case, somehow overruled these cases and yet these

5    cases occurred, as you will see in the brief, both before and

6    after the Supreme Court decided Klehr.

7         THE COURT:  I'm trying to think about what the

8    bankruptcy court decision could have covered if, in fact,

9    your argument is that it would be impossible to have a future

10   overt act because of this bidding process, why would not the

11   bankruptcy court have decided that?

12        MR. MAROVITZ:  I don't want to speak for

13   Judge Gropper or for Judge Forrest, the judge in the Southern

14   District, but my interpretation of that is that they were

15   focused on the core bankruptcy issues and the core legal

16   issue under the bankruptcy rules, which is whether or not

17   once there is a properly pled allegation against a defendant

18   whether, in fact, you can go back in time under the

19   bankruptcy law and try to rope back in this earlier conduct.

20   They did not, number one, deign to address the antitrust

21   implications of that, and, number two, they didn't even want

22   to get to the pleading itself, which, of course, is the

23   province of this Court, and that's why I think the parties

24   have tried to separate the two issues so that the bankruptcy

25   court did what it's expert at and the parties are asking the

1     Court to do what it is expert at.

2         Third, the Court doesn't have to write on a clean

3     slate here.  The Sixth Circuit and a district court in the

4     Sixth Circuit have already considered this question.  In the

5     Travel Agents litigation, which has been discussed a little

6     bit this morning for pleading purposes but not for bankruptcy

7     purposes, and the Sixth Circuit decision in Travel Agents is,

8     of course, real precedent.  In Travel Agents the situation

9     was that travel agents' commissions were reduced that

10    resulted in airlines eliminating commissions in March of 2002

11    reducing the commissions to zero essentially.  United

12    declared bankruptcy in December of that year, 2002, and the

13    plaintiffs sued after that in April of 2003, and the United

14    bankruptcy plan was confirmed in 2006.  The plaintiffs in

15    Travel Agents claimed that United's decision postbankruptcy

16    to continue the conspiracy commission rate of zero percent to

17    travel agents was somehow an overt act that put United back

18    on the hook just as plaintiffs here claim that these sales

19    that we made postdischarge were overt acts that somehow put

20    us back on the hook, even though all we were really doing was

21    honoring previous commitments to customers.

22        The Sixth Circuit completely rejected this

23    argument, and I created a slide but I won't take the time to

24    go through it, it is quoted in our brief, but it is the next

25    slide.  In particular, if you look at -- I guess the fourth

1   point is the only one I will go through, it is the Travel

2   Agents slide, and it says here we reject plaintiffs' attempt

3   to characterize United's decision to maintain its

4   zero-percent commission policy as an overt act.

5        Now, the plaintiff says, well, it really wasn't a

6   new act, it is just that United refused to pay any commission

7   so it is an inaction, but the harm to the travel agents was

8   the same, they claimed that as a result of a conspiracy they

9   weren't getting paid.  And the language that the

10  Sixth Circuit uses makes clear that plaintiffs'

11  interpretation is not correct.  In the top bullet we cite

12  that language, and the Sixth Circuit says specifically

13  plaintiffs contend that United's decision to, quote,

14  continue, end of quote, not my language but the

15  Sixth Circuit's language, continue the conspiracy commission

16  rate, which at this point was zero, after its reorganization

17  created a new Section One claim under the Sherman Act.

18        So plaintiffs are asking you to interpret this case

19  in a way that is contrary to its language and contrary to

20  common sense.  Imagine, Judge, if you would, that the

21  commission rate wasn't zero but instead was .000001 and

22  United went back do that same rate.  The plaintiffs'

23  argument -- they couldn't make that argument because now

24  there is an action, there is a .000001 commission rate, but

25  the fact is that the commission is still tiny, whether it is

 1    zero or tiny, and the fact is that the travel agents would

 2    still be saying exactly the same thing, they have been harmed

 3    by a continuation.

 4         Other cases from the Sixth Circuit, and we cite

 5    Grand Rapids Plastics at our opening brief at 14 and reply

 6    brief at 12 to 13, say exactly the same thing.

 7         All plaintiffs can say about this is cite the Klehr

 8    case, K-L-E-H-R.  And Klehr isn't even an antitrust case, it

 9    is a RICO case in which a dairy farmer bought a silo in 1974

10    to store cattle feed and didn't bring his action until 1993,

11    well beyond the statute of limitations.  The Klehrs in that

12    case allege that the company made continuous

13    misrepresentations that kept restarting the statute of

14    limitations.

15         Plaintiffs, in referring to the sale in Klehr, make

16    no mention of the kind of RFQ delivery process that I have

17    just gone through here.  It is a totally different situation

18    and, in fact, the plaintiffs don't even focus on the language

19    that the Supreme Court used to reject plaintiffs' claim in

20    Klehr.  Plaintiffs in Klehr lost, and the reason that they

21    lost is because, and if you look two slides over, the court

22    said the commission of a separate new overt act generally

23    does not permit the plaintiff to recover for the injury

24    caused by old overt acts outside of the limitations period,

25    so think about the way that that applies to this case.

1    The statute of limitations in Klehr is the

2    equivalent of a bar and in that respect is no different than

3    a bankruptcy bar; once the old overt act is barred, whether

4    by the statute of limitations in Klehr or by the bankruptcy

5    discharge in our case, it is done, you can't go back and try

6    to assert liability for that period.  The court continued, as

7    we wrote -- as we noted in that same opinion, as in the

8    antitrust cases the plaintiffs cannot use an independent new

9    predicate act as a bootstrap to recover for injuries caused

10   by other earlier predicate acts that took place outside of

11   the limitations period.  That is our case where any kind of

12   alleged action that the plaintiffs might claim prebankruptcy

13   can't have anything to do to hold us in this case.

14       The bankruptcy discharge is just like the

15   expiration of the statute of limitations in Klehr, and the

16   Supreme Court in Klehr made clear that you can't somehow

17   spring this back to life.

18       We referred to the Lower Lake Erie case in our

19   brief because the plaintiffs have referred to that as somehow

20   allowing this kind of claim.  Lower Lake Erie is a case in

21   which Conrail was -- there was an effort to hold Conrail

22   responsible for an entire conspiracy period because of its

23   monopolization of transportation of iron ore, that was the

24   allegation, but that was based on a very specific statute,

25   not the Sherman Act but a very specific statute, and this

1    whole issue was created as a result of the consolidation of

2    the rail industry.

3            That statute, which we have included on the next

4    slide, makes clear that if certain conditions are met then

5    the antitrust rules essentially don't apply.  If you look at

6    the one that is in re Lower Lake Erie Iron Ore antitrust

7    litigation, part of the statute, section 1, says except as

8    specifically provided in paragraph 2, no provision of the

9    chapter shall be deemed to convey to any railroad or employee

10   or director any immunity from civil or criminal liability.

11           And then part two it says, the antitrust laws are

12   inapplicable to any action taken to formulate or implement

13   the final system plan where such action was in compliance

14   with the requirements of such plan.

15           The plaintiffs say that language tells us that

16   somehow there is a policy of allowing antitrust law to trump

17   bankruptcy law, but it couldn't be further from the truth.

18   This case, Lower Lake Erie, makes clear that the opposite is

19   true because in Lower Lake Erie, section 601 has a very

20   specific exception for the application of the antitrust laws.

21   It says essentially that you get a free pass so long as you

22   comply with a specific part of the statute, and otherwise you

23   don't.  The bankruptcy law is exactly the opposite.

24   Everything in the bankruptcy law gets discharged, that's the

25   point of the discharge, all debts are discharged.  In the

1    environmental context, in the employment context, there

2    oftentimes are continuing sources of liability that happen

3    before and after the alleged discharge, and in those series

4    of cases everything before is still discharged.

5           So in re Lower Lake Erie is exactly why our case

6    shows that the plaintiffs can't go ahead and say that there

7    is somehow an exception for antitrust law. The bankruptcy

8    code contains no exception for bankruptcy (sic) law.

9    Everything is discharged for us on that November 9th, 2009

10   date.

11          Finally, Your Honor, plaintiffs' argument if

12   adopted would require reorganized debtors to walk away from

13   all of their contracts and therefore be in breach if they

14   happen to manufacture products in an industry with

15   competitors that are being investigated for antitrust

16   violations even if the manufacturer is not. It is not enough

17   for plaintiffs to get up and say, well, you could avoid it by

18   not doing it. All right. We haven't pled guilty, we haven't

19   been investigated, we haven't had a search warrant.

20          This is a situation where we are in this case

21   because we make wire harnesses, and it is exactly that

22   situation that goes firmly to why the bankruptcy discharge

23   and giving stakeholders who invest postbankruptcy a chance

24   for the company to succeed.

25          THE COURT: Now, did the defendants -- the

 1    plaintiffs are saying that each sale postdischarge is an

 2    overt act, right, each one?

 3            MR. MAROVITZ:  That's what they say.

 4            THE COURT:  And you are saying that that's

 5    impossible and -- well, under the commission case and the

 6    Travel --

 7            MR. MAROVITZ:  The bid-rigging case, yeah, because

 8    the --

 9            THE COURT:  Because the plan was made predischarge,

10    the request --

11            MR. MAROVITZ:  The request for quote would have

12    been predischarge.

13            THE COURT:  Okay.

14            MR. MAROVITZ:  That's right.  The bid-rigging cases

15    say that's the overt act that you look at, and it was

16    discharged.  But in any event, you only get to that question

17    if there is actually something that the plaintiffs can stand

18    up and say that Lear did.  You know, that somehow we attended

19    a meeting or that there is a guilty plea against us or that,

20    you know, we somehow are involved in the conspiracy.  They

21    don't ever get to that point, that's the problem.

22            Mere sales can't be enough to keep Lear in this

23    case.  As we said in the brief, zero the guilty pleas plus

24    zero the joint venture plus zero postdischarge sales still

25    equals zero.

```
 1              I want to return in conclusion to the three issues

 2      that we raised in our original flowchart.  For the first two

 3      issues we've seen that there is nothing there, and for the

 4      third issue we have learned that bid rigging and straight

 5      sales don't constitute affirmative acts and that they can't

 6      justify taking debts that have been discharged and having

 7      them spring back to life.

 8              There is simply no case law supporting plaintiffs'

 9      position on this.  I have one -- if I can hand this up,

10      Judge, I have one more slide that didn't make it into our

11      packet.  I will give copies to counsel as well.

12              So these are the basic arguments that are left for

13      the Court at the end of the day:  Can plaintiffs impose

14      predischarge damages for postdischarge anticompetitive

15      conduct?  Plaintiffs cite zero cases on that point to support

16      it.

17              Postdischarge sales, can they be overt acts in

18      furtherance of predischarge -- in furtherance of predischarge

19      conspiracy?  Again, zero cases on that.  Klehr does fit that

20      box, there's no conspiracy in Klehr.

21              Overt act was a later sale of a product, not the

22      rigged bid.  Again, zero cases on that from plaintiffs.

23              Then finally whether or not you can have liability

24      against a shareholder for acts of a separately and duly

25      incorporated company.  Again, zero cases.  The European
```

1    Commission investigation question doesn't even make this

2    chart anymore because it has been shown that Lear wasn't part

3    of that.

4            Final, Lear shouldn't be here.  Its need to defend

5    this action is affirmatively harmful to its postbankruptcy

6    efforts.  Even after all of the work that plaintiffs

7    undertook to prepare this case, including the work they

8    described in detail in previous court appearances, there

9    isn't any support for keeping Lear in this case.  Lear should

10   be dismissed with prejudice now.  Thank you.

11           THE COURT:  Thank you.  All right.  I think we are

12   going to hear another side to this?

13           MR. FINK:  Your Honor, Bernard Persky is going to

14   be arguing both for the direct and for the indirect

15   plaintiffs on the bankruptcy issue, and then Joe Kohn will

16   speak for the directs on the Twombly issues that remain.

17           MR. PERSKY:  I will try to do the Twombly issues

18   too, and if I leave anything out Mr. Kohn will supplement

19   that.

20           I will be getting into the bankruptcy issues as

21   well but I wanted to at least initially clarify the

22   pleadings, the allegation against Lear.  We have pleaded that

23   they are part of the conspiracy, we have pleaded that they

24   have made sales of wire harnesses pursuant to that

25   conspiracy.

1          THE COURT:  But how do you address --

2          MR. PERSKY:  In furtherance of that conspiracy and

3    at super competitive pricing.  I will get into detail in a

4    second, but we have said they are part of the conspiracy.

5    What do we have in support of that aside from the fact that

6    they sell wire harness products?  Well, there have been

7    multiple guilty pleas by multiple defendants including, and

8    this is fairly important, Furukawa.

9          Now, Furukawa has pleaded guilty to the felony of

10   price fixing with respect to wire harnesses.  Lear has been a

11   partner of Furukawa for more than a decade and, indeed, Lear

12   was the majority joint venture -- owner of that joint venture

13   in terms of 80 percent versus 20 percent ownership of -- by

14   Furukawa.  After the effective date of the bankruptcy, Lear

15   continued to partner with Furukawa in the sales of wire

16   harnesses.

17         THE COURT:  Wait a minute.  Lear partnered with --

18         MR. PERSKY:  With Furukawa.

19         THE COURT:  Furukawa.

20         MR. PERSKY:  Furukawa is the admitted felon, the

21   defendant that has admitted to price fixing wire harnesses.

22         THE COURT:  But Furukawa was the separate --

23         MR. PERSKY:  No.  The Lear -- the Lear-Furukawa

24   joint venture is a defendant in this case.  There is case law

25   contrary to the case law that Mr. Marovitz said that

1   indicates that a joint venturer who participates in the

2   unlawful acts of the joint venture is liable with the joint

3   venture partners.  These are, in essence, partners in a joint

4   venture and we have cited cases to that effect.

5           So the fact that, one, Lear sold wire harnesses

6   itself postdischarge and predischarge at super competitive

7   prices pursuant to the conspiracy, and separate and apart

8   from its own sales of wire harnesses it partnered with an

9   admitted price fixer in a joint venture, and we have cited

10  cases to indicate that one joint venturer is liable for the

11  other joint venturer's unlawful conduct.

12          THE COURT:  Wait a minute.  I'm just a little bit

13  confused on that relationship.  I thought that was a separate

14  corporate Delaware entity?

15          MR. PERSKY:  Yes.  We pleaded it as a joint

16  venture, and they treated it as a joint venture, and we have

17  cited cases indicating that where an entity proceeds as a

18  joint venture the joint venturers are jointly and severally

19  liable for their joint unlawful activities, and that's what

20  we believe is true with respect to Lear.  So it is not

21  just --

22          THE COURT:  How did they proceed as a joint venture

23  versus a separate entity?

24          MR. PERSKY:  They made a joint venture entity which

25  at one point Lear was an 80 percent owner and then after the

```
 1    effective date it was a 20 percent owner.  That entity made
 2    sales of wire harnesses at price fixed -- at super
 3    competitive prices, so Lear was not just selling on its own
 4    we say at super competitive prices, it was partnering with
 5    somebody who is an admitted price fixer.  So that's a further
 6    fact to support the plausibility of keeping Lear in the case.
 7    We have to prove it but we have alleged it.  It is more
 8    than -- it is not entirely accurate to say that Lear is not
 9    under investigation.  We have not alleged that Lear is under
10    DOJ investigation but at paragraph 167, for example, of the
11    end payors' complaint we allege that Lear's chief executive
12    officer, Bob Rossiter, has stated that Lear was notified by
13    the E.C., that's the European Commission, the European
14    antitrust authorities, that it is part of an investigation
15    into anticompetitive practices among automotive electrical
16    and electric component suppliers.  Why is that important?
17    Well, they might not have been yet charged but they are under
18    investigation, and we say that when a company is admittedly
19    by its president under investigation with respect to the sale
20    of the products that are the subject of this suit we don't
21    have to wait until charges are filed, charges may or may not
22    be filed by the Government authorities, there's a lot of
23    reasons why Government authorities don't file charges but
24    civil claims can be brought.  And the fact that Lear has
25    stated it's under investigation, has partnered with an
```

1    admitted price fixer and sells separately and apart from the

2    joint venture the same product in a concentrated injury -- in

3    a concentrated industry, all of which lends character to our

4    complaint and all of which supports that we have satisfied

5    Twombly's pleading requirements to make it more plausible

6    that --

7         THE COURT:  Tell me when was Lear -- when did

8    Lear's CEO say this?

9         MR. PERSKY:  Sometime after February of 2010.

10        THE COURT:  This investigation is still ongoing?

11        MR. PERSKY:  I believe it is ongoing.  I think

12   Mr. Marovitz may be contending that the investigation has not

13   resulted in charges against Lear or any of Lear's

14   subsidiaries such as the Lear subsidiary in France.  We have

15   no such information.  What we have pleaded is that Lear is

16   under investigation for sales of these products, wire harness

17   products, so it is not just that we have brought them into

18   the case because they happen to be in the industry; one, they

19   partnered with the felon, Furukawa, in the sale of these

20   products; two, we say they have sold these products themself

21   at price fixed products; and, three, they are under

22   investigation by a Government antitrust authority, not the

23   United States Government authority, yes, no charges have been

24   filed but that's not, we say, necessary in order to satisfy

25   Twombly.

1          Getting back to the beginning questions here, does

2     Lear's bankruptcy discharge immunize it from antitrust

3     liability for its post-effective date unlawful acts?  Well,

4     if that were true we wouldn't be here, Your Honor.  Lear made

5     a motion to the bankruptcy court making precisely the same

6     contention that they could not possibly be subject to this

7     suit because their sales were somehow immunized postdischarge

8     because of the discharge that it got.  That was rejected by

9     the bankruptcy judge.  Indeed, he deferred to this Court as

10    to the scope of Lear's possible liability.

11          They took an appeal to the Southern District of New

12    York.  That argument was again rejected.  What the Southern

13    District of New York court judge did was to say it was a

14    mistake by the bankruptcy court not to have interpreted the

15    discharge so as to decide once and for all what could the

16    scope of Lear's liability be if, one, it was found to have

17    engaged in posteffective date unlawful conduct.  If it has

18    what could the scope of that liability be?  One, if it turns

19    out that it has engaged in posteffective date unlawful

20    conduct can Lear's liability for damages extend for -- to

21    damages for its predischarge conduct?  Does its discharge for

22    its predischarge conduct immunize it from the damages that

23    were caused by its predischarge conduct if it was guilty of

24    joining the conspiracy postdischarge?  That's question one

25    that it remanded -- the court remanded to the bankruptcy

1    court.

2            Two, separate from that question, if Lear and its

3    co-conspirators engaged in postdischarge unlawful conduct

4    under the antitrust laws, could Lear be jointly and severally

5    liable for the predischarge conduct of its co-conspirators?

6    Those questions have been left open.

7            We have a status conference before Bankruptcy Judge

8    Gropper in the Southern District of New York on

9    December 10th.  That court will let us know if it wants

10   further briefing on the issue, but let's get back to the

11   basic question that Mr. Marovitz was trying to raise.  It

12   clearly is not immunized from its postdischarge conduct by

13   the bankruptcy discharge because if it was we wouldn't be

14   here.  The question is have we properly pleaded postdischarge

15   unlawful conduct?  We think we have, Your Honor.

16           Let me go into some of the conduct that we have

17   pleaded.  Indeed, we think that --

18           THE COURT:  Sold at inflated prices so go by that

19   one.

20           MR. PERSKY:  One, postdischarge, it chose to

21   continue to make sales under contracts that we say are

22   reflective of an unlawful conspiracy.  The discharge cannot

23   possibly immunize that because it didn't have to continue to

24   sell at super competitive prices pursuant to contracts for

25   which it was discharged.  It could have stopped its unlawful

1    conduct.  It voluntarily chose to continue to make sales of

2    price-fixed products at super competitive prices

3    continuing --

4            THE COURT:  But let's say it didn't engage in this

5    conspiracy --

6            MR. PERSKY:  Then it shouldn't be.

7            THE COURT:  -- how would it know what the price

8    should be?

9            MR. PERSKY:  We will have to demonstrate that its

10   participation in the conspiracy resulted in super competitive

11   prices.  It is claiming that it was discharged.  However, if

12   we are correct that the people running Lear, both before and

13   after its discharge, continued to make sales under the

14   contracts that we say were unlawfully entered into, it chose

15   to continue to violate the law, it chose to continue to

16   participate in the conspiracy.  The discharge doesn't permit

17   it to do that.  It would have to stop and sell it at

18   competitive prices instead of super competitive prices.

19           Indeed, each sale was an overt act, each sale

20   continued to inflict injury on the class, continued to add to

21   Lear's unlawful profits, and had the sales not been made the

22   classes wouldn't have been injured.  So one of the issues

23   that Judge Forrest raised that she's remanding to the

24   bankruptcy judge is, gee, if Lear continued its unlawful

25   conduct then certainly if it did continue its unlawful

 1    conduct it would be under antitrust law and conspiracy law

 2    principles jointly and severally liable for all the damages

 3    caused by the co-conspirators during the entire period of

 4    conspiracy.  That's not in dispute.  Judge Forrest held that.

 5    Judge Gropper, the bankruptcy judge, assumed it, and left it

 6    for your court -- for Your Honor to decide if an antitrust

 7    claim has been stated.

 8           What the bankruptcy judge is being asked to decide

 9    is to weigh the policy of the bankruptcy laws to grant a

10    discharge and a clean slate against the moral hazard that

11    would be created by allowing a co-conspirator who chooses to

12    participate in the conspiracy to have less liability than its

13    co-conspirators.  Judge Forrest in a footnote pointed that

14    out, those are the policy questions the bankruptcy judge

15    would have to decide in determining the scope of the

16    discharge.  Does the discharge prevent Lear from being held

17    liable for either its own unlawful conduct predischarge if it

18    is guilty of postdischarge antitrust violations?  Does the

19    bankruptcy discharge present Lear from being held liable

20    jointly and several for the activity of its co-conspirators

21    predischarge?  That's being remanded to the bankruptcy.

22           We would like to think, Your Honor, but that's up

23    to the Court for its decision that this isn't a core

24    bankruptcy law question.  We persuaded the bankruptcy judge

25    to defer to Your Honor that it is a core antitrust issue.  We

 1    still believe that, but it is up to Your Honor to decide if

 2    it wishes at any point to defer to the bankruptcy court when

 3    it determines the remand questions.  Those remand questions,

 4    as I mentioned, are set forth in Judge Forrest's order, the

 5    possibility of Lear's liabilities for predischarge damages

 6    because it joined a conspiracy postdischarge.

 7              As we have said, we have alleged that Lear, its

 8    posteffective date conduct involved selling wire harnesses

 9    pursuant to and as part of and in furtherance of the unlawful

10    conspiracy.  After November '09 Lear had significant sales of

11    wire harnesses in the United States we allege at super

12    competitive prices and profited from these unlawful acts and

13    sales and continued to inflict injury on plaintiffs and the

14    classes.

15              We have also alleged in addition, and separate and

16    apart from those sales, that Lear actively participated in

17    the joint venture with Furukawa post November '09 through

18    June 2010, and that company, Furukawa, has pleaded guilty to

19    price fixing this product.  Lear's CEO, as we have indicated,

20    admitted that Lear was under investigation by European

21    antitrust authorities.

22              The Supreme Court Klehr case and other cases that

23    we have cited indicate that it is blackletter law that in a

24    continuing price-fixing conspiracy each sale of a price-fixed

25    product is a separate overt act giving rise to antitrust

1  claim, and that's what we allege in our complaint, that it

2  continued to make these sales.  It voluntarily chose to

3  participate in the conspiracy and to inflict injury on the

4  classes involved in this case and to profit from such

5  unlawful conduct.  That's the very purpose of the conspiracy,

6  they didn't have to continue, they voluntarily chose to do

7  that, that makes them liable posteffective date and we say

8  under antitrust principles and conspiracy law principles

9  liable for damages caused by the entire scope of the

10 conspiracy from the beginning of the conspiracy.

11      Lear has not alleged that it ever withdrew from the

12 conspiracy, that would be one possible defense.  A bankruptcy

13 discharge is not a withdrawal from a conspiracy nor do they

14 allege that they withdrew from the conspiracy.  We don't

15 think that the Travel Agents case is in point for them.  The

16 only posteffective date conduct alleged in the Travel Agents

17 case was inaction, the failure to change a policy; they

18 merely failed to change their zero commission policy that was

19 already in place.  That was in the Travel Agents case.

20      Here there are numerous overt acts.  Each sale at a

21 price-fixed price or pursuant to the bid-rigging conspiracy

22 was an overt act posteffective date.

23      In Travel Agents the final act to effectuate the

24 conspiracy occurred --

25      THE COURT:  Wait a minute.  Before you go on with

1   that, defense cites -- Lear cites a number of cases regarding

2   the fact that the -- it was the bid, the request for the

3   proposal that really was the overt act, not each subsequent

4   sale.  And I -- can you distinguish your --

5           MR. PERSKY:  Well, unless there was a sale there

6   would have been no injury.  Unless cars were purchased at the

7   super competitive price, unless the parts were sold no one

8   would have been injured.  So, first of all, this is not just

9   a bid-rigging conspiracy, we allege that bid rigging --

10          THE COURT:  Alleged price fixing.

11          MR. PERSKY:  Price-fixing conspiracy, that's one

12  major distinction.  And, two, it is the sales that cause the

13  injury.  The fact that the contract is awarded doesn't hurt

14  the consumer, it doesn't hurt anyone else until something

15  occurs that results in somebody overpaying.  So the cause of

16  action was not complete in the conspiracy that we allege

17  until sales were made.  That's our contention, Your Honor.

18          THE COURT:  Okay.

19          MR. PERSKY:  We further contend that as under the

20  O'Lockland (phonetic) County of Orange case in the Ninth

21  Circuit, a fresh start after the bankruptcy discharge does

22  not provide, quote, a continuing license to violate the law,

23  unquote.

24          And we think the Lower Lake Erie case is on point,

25  and that what happened to Conrail is, yes, they bought these

1    railroads pursuant to the Railroad Reorganization Act but for

2    whatever reason they chose to join a preexisting antitrust

3    conspiracy and by joining that conspiracy after they bought

4    these railroads, which were in essence bankrupt railroads,

5    the court said they could be liable for the full scope of the

6    conspiracy including the activities of those railroads that

7    it purchased for the whole 22-year period of the conspiracy.

8            Similarly, if we are correct, and we believe we

9    are, that we have pleaded posteffective date unlawful

10   conduct, we believe that under antitrust and conspiracy law

11   principles Lear not only would be liable for the damage it

12   caused posteffective date, it would be jointly and severally

13   liable for the damages caused during the entire period of the

14   conspiracy, early through its own act preeffective date

15   and/or because of the unlawful activity of its

16   co-conspirators preeffective date.

17           So Lear is not here because they happen to be

18   passing by an industry that is under investigation.  One,

19   they are under investigation; two, they partnered with a

20   felon; and, three, we allege that they profited from that

21   activity by making sales of wire harnesses at super

22   competitive prices posteffective date and indeed preeffective

23   date.

24           I would be happy to answer any questions the Court

25   may have.  Thank you.

1    THE COURT:  A lot of questions.  All right.  Reply,
2  or is there anything else from -- no.
3    MR. FINK:  The directs are done.
4    THE COURT:  Mr. Marovitz?
5    MR. MAROVITZ:  Thank you, Your Honor.
6    THE COURT:  How about this plea again?  Let's go
7  back to the joint venture plea.  It wasn't the entity, it was
8  the person, right, in that --
9    MR. MAROVITZ:  I would love to go back there.
10  Let's take a look in particular at paragraph 96 of the
11  automotive dealers' consolidated class complaint, which
12  alleges quite clearly that this -- I mean, Mr. Persky keeps
13  referring to it as a joint venture, but the pleading is, and
14  I quote, defendant Furukawa Wiring System America, Inc.,
15  Furukawa Wiring, is a Delaware corporation with its principal
16  place of business in El Paso, and then it describes the way
17  in which the percentage ownership has changed and it says in
18  April of 2009 Furukawa purchased an additional 60 percent of
19  the joint venture raising its stake to 80 percent and changed
20  the joint venture's name to Furukawa-Lear Corporation.  So
21  before the bankruptcy -- before the bankruptcy this Delaware
22  corporation had two shareholders, my client Lear owned
23  20 percent of it, it was not a partnership, it was not a
24  loosey-goosey joint venture, it is a Delaware corporation.
25  And now the Court understands why I spent so much time at the

```
 1    beginning with the Iqbal slide and talking about the reason
 2    that plaintiffs are not allowed to give conclusory
 3    allegations and formulate recitations about things that just
 4    aren't.  This is a Delaware corporation, they pled it as a
 5    Delaware cooperation.
 6            To answer your question, Judge, this Delaware
 7    corporation never pled guilty.  All right.  So I really don't
 8    know when the plaintiffs say that we somehow associated with
 9    a felon what they mean.  It is true that Furukawa, a separate
10    company, pled guilty.  It is also true that this corporation,
11    this Delaware corporation that I have listed there, is
12    separately represented.  I'm not representing them.  That's a
13    different company.
14            THE COURT:  Wait a minute.  Furukawa pled guilty?
15            MR. MAROVITZ:  Correct, one of the Furukawa
16    entities.  I don't want to -- there is a Furukawa entity that
17    pled guilty.
18            THE COURT:  An entity, not an individual?
19            MR. MAROVITZ:  Correct.
20            THE COURT:  And it was the partner -- I don't want
21    to say partner if it is a corporate structure.
22            MR. MAROVITZ:  So a Furukawa entity was a
23    shareholder --
24            THE COURT:  With Lear?
25            MR. MAROVITZ:  -- with Lear.
```

1           Before the bankruptcy the Furukawa entity owned

2    80 percent, so Lear had a small 20-percent stake in this

3    corporation, and this corporation did not plead guilty, I

4    can't emphasize that enough.  The Furukawa entity that pled

5    guilty is a separate corporation, separately represented, the

6    joint venture/corporation -- plaintiffs keep calling it a

7    joint venture but they plead that it is a corporation.  They

8    are separately represented.  I don't represent them.  Lear

9    doesn't own them anymore.  If there ever were a case where it

10   was clear that a defendant was being roped into the case as a

11   result of guilt by association, Mr. Persky's argument makes

12   that perfectly clear here, that's the only reason that we are

13   here.

14           And when the Court asked what is it that Lear did,

15   all we kept hearing about was, well, they continued to make

16   sales; well, they associated with somebody who pled guilty.

17   What is it that Lear did in the first instance?  What meeting

18   did it attend?  What agreement did it reach?  All we have are

19   the things that are on that chart, those three things; guilty

20   by association, one; guilty by association, two; and sales,

21   which everybody does.  We are here because we make wire

22   harnesses, that's why we are in this case.

23           I also want to clarify one point that Mr. Persky

24   made about the investigation in Europe.  Mr. Persky said that

25   Lear was under investigation in Europe, and I thought I had

```
 1   mentioned in my original presentation, and we certainly
 2   mention in our reply brief at page 7, and also we showed at
 3   Exhibit A, that Lear is not being pursued in Europe.  Okay.
 4   We are not under investigation any longer in Europe.  The
 5   fact is that in Europe when there are investigations the
 6   equivalent to a charging document here like an information or
 7   an indictment is called a statement of objections.  That's
 8   what the European Commission brings.  It is essentially a
 9   complaint.  It is much more complicated than that.
10           I don't want to go through -- I'm not an expert,
11   I'm not a European lawyer, but what they do is they prepare a
12   statement of objections and those are essentially objections
13   against certain conduct and then those objections have to be
14   proven much as they might be proven in this country.  Here
15   the European Commission has said that it is not filing a
16   statement of objections against Lear Corporation, so for
17   plaintiffs to stand up and say well, you were under
18   investigation before and not to mention the fact that there
19   is no statement of objections that has been filed against us,
20   is arguing the exact opposite of what Mr. Kohn argued this
21   morning on how important it was that a judicial officer would
22   look at and would sign a warrant on how important it was that
23   there were guilty pleas.  Here the investigation apparently
24   was done in Europe and not pursued against Lear, that has to
25   be at least as, if not more, important.
```

1          THE COURT:  Is there anything that comes out of the

2     European investigation that confirms what you said, there

3     will be no objections filed or there will be --

4          MR. MAROVITZ:  The best we can do for now, Judge,

5     is what we did was we attached to our reply brief at

6     Exhibit A a statement from the European Commission, it is a

7     press release, and on page 2 of Exhibit A in the fourth

8     paragraph -- could I hand it up, would that be helpful?

9          THE COURT:  I know what you are talking about.

10          MR. MAROVITZ:  Okay.

11          THE COURT:  It is a press release.

12          MR. MAROVITZ:  Yes.  It says the Commission has

13     informed the companies and the competition authorities of the

14     member states that it has opened proceedings in this case.

15     Lear Corporation has not been informed and as a result there

16     are no proceedings against it.

17          THE COURT:  Okay.  Thank you.

18          MR. MAROVITZ:  In addition, I do need to correct

19     one point.  Mr. Rossiter, the then CEO of the company, not

20     only explained as a result of being under investigation like

21     a lot of people and therefore giving notice as may be

22     required under certain security laws but he also said we have

23     done nothing wrong.  And, I mean, that's -- the fact is that

24     Mr. Rossiter's statement was borne out by what the European

25     Commission did with respect to Lear.  It is not pursuing a

1    statement of objections as against Lear.

2            Final point that I guess I would make, Your Honor,

3    is I don't agree but I don't think we ever need to reach that

4    issue as to what the scope of joint and several liability is

5    for past acts, et cetera.  You only reach this final issue,

6    this sales issue, you only reach that if you find that they

7    properly pled some misconduct by Lear.  Otherwise it is just

8    a sale like everybody else's.  The fact is Your Honor asked

9    plaintiffs what it is that Lear did, and they said, well,

10   they fraternized essentially with somebody who pled guilty in

11   a joint venture even though it was a corporation, and they

12   made sales.  This original list of sales that I put up as to

13   specific allegations and is contained in the demonstratives,

14   the plaintiffs haven't identified anything else despite given

15   the opportunity to do so in their poor delivery.  This is it,

16   and this is not enough under Twombly.

17           THE COURT:  Thank you.

18           MR. PERSKY:  Your Honor, I just want to correct one

19   statement after Mr. Marovitz sits down.  He has confirmed, as

20   I said, that Lear was under investigation by a European

21   authority, I didn't say they were charged with anything.  The

22   fact that they have been and either are under investigation

23   lends plausibility to our allegation that they are -- they

24   participated in the conspiracy.

25           With respect to the joint venture he quoted from

 1   the auto dealers' complaint.  I would like to quote from our

 2   complaint, paragraph 91 of the consolidated amended complaint

 3   of the end payors, about paragraph 91, Defendant Furukawa

 4   Wiring Systems America, Inc., formerly known as Furukawa-Lear

 5   Corporation, and Lear-Furukawa Corporation (Furukawa Wiring)

 6   is a Delaware corporation with its principal place of

 7   business in El Paso, Texas.  Defendant Furukawa Wiring is

 8   60 percent owned by Furukawa Electric and 40 percent owned by

 9   American Furukawa.  During the class period Furukawa Wiring

10   operated as a joint venture between Lear Corporation and

11   Furukawa Electric that manufactured, distributed or sold wire

12   harness products in the United States.  In June 2010 Furukawa

13   Electric purchased all of Lear's remaining interest.  We

14   expressly plead that Lear was in a joint venture with

15   Furukawa and operated it as a joint venture, and then we cite

16   in our brief cases that say with respect to a joint venture

17   between two entities if that joint venture operates

18   unlawfully the joint venturers are liable for the unlawful

19   conduct.

20        THE COURT:  But are you saying that the -- the

21   joint venture is not the company that was a Delaware company?

22        MR. PERSKY:  It is a Delaware company but we allege

23   that it was operated as a joint venture, not as some

24   corporation with shares owned by one person and shares owned

25   by another person.  In essence what we are trying to allege

1    here it was operated as a form of joint venture like a

2    partnership, the two joint venturers were Lear and --

3            THE COURT:  How is it that they disregarded the

4    corporate structure, what is it that they did that

5    disregarded the --

6            MR. PERSKY:  They jointly operated the company

7    together and operated as a joint venture.  That's the intent

8    of the allegation.  We believe that by making that allegation

9    we come within the case of finding joint venturers liable.

10   Now, do we say that is an open and shut argument?  No.  We

11   say that it lends plausibility to including Lear amongst

12   those sued for this wire harness conspiracy.  One, they are

13   under investigation in Europe for wire harness sales; two,

14   they partnered within a joint venture with a company that

15   admitted that it was guilty of price fixing of wire

16   harnesses; and, three, we say they made posteffective date

17   sales.

18           THE COURT:  Let me met ask you this question again.

19   What did they do to show it was a joint venture versus a

20   corporate structure?

21           MR. PERSKY:  We allege that it was operated as a

22   joint venture.

23           THE COURT:  I know you allege, that's a conclusion

24   it is operated as a joint venture.  What did they do to show

25   that it operated as a joint venture?

 1          MR. PERSKY:  I wanted to make it clear that when

 2     they -- when Mr. Marovitz quoted from the dealers' complaint

 3     that it is just a corporation, we went further than that and

 4     said no, the two entities that owned that corporation

 5     operated it as a joint venture.  What did they do?  They sold

 6     wire harnesses at super competitive prices, the joint venture

 7     did.  That's what we allege.  Based on that, we say since

 8     Lear was part of that joint venture as a joint venturer it

 9     could be held liable under the joint venture cases.

10     That's -- we are not hanging our hat just on that, we believe

11     that adds plausibility to including Lear among those named as

12     defendants here.

13          THE COURT:  All right.  Anything else?

14          MR. MAROVITZ:  No.  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.  What else do we

16     have?  What else do we have today?  That's it.

17          Okay.  We are done for today.  Tomorrow morning I

18     want to -- I think we had said 10:00 but I would ask that you

19     come at 9:30 because there is -- we just have so many things

20     going on at the courthouse the doors are going to be jammed

21     again but 9:30 seems to be a window of opportunity, so let's

22     try that.  Okay.  All right.  Thank you.  We will see you

23     tomorrow morning.

24          (Proceedings concluded at 3:07 p.m.)

25                              —    —    —

1          *CERTIFICATION*

2

3          I, Robert L. Smith, Official Court Reporter of

4     the United States District Court, Eastern District of

5     Michigan, appointed pursuant to the provisions of Title 28,

6     United States Code, Section 753, do hereby certify that the

7     foregoing pages comprise a full, true and correct transcript

8     taken in the matter of In Re: Automotive Parts Antitrust

9     Litigation, Case No. 12-02311, on Wednesday, December 5,

10    2012.

11

12

13                          *s/Robert L. Smith*
                            Robert L. Smith, RPR, CSR 5098
14                          Federal Official Court Reporter
                            United States District Court
15                          Eastern District of Michigan

16

17

18    Date:  12/14/2012

19    Detroit, Michigan

20

21

22

23

24

25