# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : | Master File No. 12-md-02311 |
| | : : | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| PRODUCT(S): | : : | |
| BEARINGS | : : | JURY TRIAL DEMANDED |
| This Document Relates to: | : : : | |
| ALL END-PAYOR ACTIONS | : : : | |

Plaintiffs Rebecca Lynn Morrow, Erica J. Shoaf, Tom Halverson, Sophie O'Keefe-Zelman, Stephanie Petras, Melissa Barron, John W. Hollingsworth, Meetesh Shah, Michael J. Tracy, Jane Taylor, Keith Uehara, Jennifer Chase, Darrel Senior, James E. Marean, Ron Blau, Roger D. Olson, Nilsa Mercado, Darcy C. Sherman, David Bernstein, Ellis Winton McInnis, IV, Thomas N. Wilson, Lauren C. Primos, Robert  P. Klinger, Jessica DeCastro, Lori Curtis, Virginia Pueringer, Nathan Croom, Richard Stoehr, Edward T. Muscara, Michael Wick, Tenisha Burgos, Jason Grala, Kathleen A. Tawney, Kelly Klosterman, Kent Busek, Cindy Prince, Paul Gustafson, France H. Gammell-Roach, William Dale Picotte, Phillip G. Young, Jesse Powell, Alena Farrell, Jane FitzGerald, Arthur Stukey, Janne Rice, Robert M. Rice, Jr., Stacey R. Nickell, Carol Ann Kashishian ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and alleges as follows:

## NATURE OF ACTION

1.     This lawsuit is brought as a proposed class action against Defendants, suppliers of Automotive Bearings (defined below) globally and in the United States, for engaging in a massive conspiracy to unlawfully fix and artificially raise the prices of these products. Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and purchasers alike.

2.     Plaintiffs seek to represent all persons and entities that purchased or leased new motor vehicles containing Automotive Bearings or who purchased replacement Automotive

2

Bearings for their motor vehicles during the period from and including January 1, 2004 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period").

3.      "Automotive Bearings" are devices in an automotive vehicle used to position, hold and guide moving parts, as well as to reduce friction between moving and fixed parts. Automotive Bearings are located throughout an automotive vehicle.  "Automotive Bearings" include the following devices used in automotive vehicles: ball bearings, tapered roller bearings, roller bearings, mounted bearings, and parts and components for ball and roller bearings.

4.      Defendants JTEKT Corporation, Nachi-Fujikoshi Corp., NSK Ltd., Schaeffler AG, AB SKF, NTN Corporation and NTN USA Corporation (all as defined below, and collectively "Defendants") manufacture, market, and sell Automotive Bearings throughout the United States.  The manufacture and sale of Automotive Bearings is a multi-billion dollar industry.

5.      Defendants and their co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Bearings.

6.      Defendants' anticompetitive conduct is also the subject of a global criminal investigation being conducted by competition authorities in the United States, the European Union, Canada and Japan.

7.      As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Automotive Bearings, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices in connection with a probe into the automotive industry.  The European Commission Competition Authority ("EC")

has also conducted dawn raids at the European offices of several of the Defendants.  The Japan

Fair Trade Commission ("JFTC") has confirmed that Defendants NSK Ltd., NTN Corporation,

JTEKT Corporation, and Nachi-Fujikoshi Corp. are being investigated for possible

participation in an unlawful price-fixing cartel.  The JFTC began its investigation in July 2011

after JTEKT Corporation reported the cartel to the JFTC so that it would be given leniency

treatment.  Officials of NSK Ltd. and Nachi-Fujikoshi Corp. have also admitted their roles in

the cartel and, according to recent news reports, some NTN Corporation officials have begun

to make statements, during voluntary questioning by Tokyo prosecutors, admitting their

involvement in fixing prices for Automotive Bearings.

8.      Defendants participated in a combination and conspiracy to suppress and

eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix,

stabilize, and maintain the prices of, Automotive Bearings sold to automobile manufacturers in

the United States.  The combination and conspiracy engaged in by Defendants was in

unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman

Antitrust Act, 15 U.S.C. §1.

9.      As a direct result of the anticompetitive and unlawful conduct alleged herein,

Plaintiffs and the Classes paid artificially inflated prices for Automotive Bearings during the

Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26)

to secure equitable and injunctive relief against Defendants for violating Section 1 of the

Sherman Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages

pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain

restitution, recover damages and secure other relief against Defendants for violation of those

4

state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.

12.     This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants.

13.     This Court also has supplemental jurisdiction of the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because they are so related to the claims asserted in this action over which the court has original jurisdiction that they form part of the same case or controversy.

14.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

15.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Automotive Bearings

throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

16.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

17.    The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.  Defendants' products are sold in the flow of interstate commerce.

18.    Automotive Bearings manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Automotive Bearings are purchased in the United States, and such Automotive Bearings do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

19.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in a conspiracy affecting all states, to fix or inflate prices of Automotive Bearings, which unreasonably restrained trade and adversely affected the market for Automotive Bearings.

20.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Bearings for personal use and not for resale, including Plaintiffs and members of the Classes.

## PARTIES

### Plaintiffs

21.     Plaintiff Rebecca Lynn Morrow is an Arizona resident who purchased Automotive Bearings indirectly from one or more Defendants.

22.     Plaintiff Erica J. Shoaf is an Arizona resident who purchased Automotive Bearings indirectly from one or more Defendants.

23.     Plaintiff Tom Halverson is an Arizona resident who purchased Automotive Bearings indirectly from one or more Defendants.

24.     Plaintiff Sophie O'Keefe-Zelman is an Arizona resident who purchased Automotive Bearings indirectly from one or more Defendants.

25.     Plaintiff Stephanie Petras is an Arizona resident who purchased Automotive Bearings indirectly from one or more Defendants.

26.     Plaintiff Melissa Barron is a California resident who purchased Automotive Bearings indirectly from one or more Defendants.

27.     Plaintiff John W. Hollingsworth is a California resident who purchased Automotive Bearings indirectly from one or more Defendants.

28.     Plaintiff Meetesh Shah is a California resident who purchased Automotive Bearings indirectly from one or more Defendants.

29.     Plaintiff Michael J. Tracy is a Florida resident who purchased Automotive Bearings indirectly from one or more Defendants.

30.     Plaintiff Jane Taylor is a Hawaii resident who purchased Automotive Bearings indirectly from one or more Defendants.

31.     Plaintiff Keith Uehara is a Hawaii resident who purchased Automotive Bearings indirectly from one or more Defendants.

32.     Plaintiff Jennifer Chase is an Iowa resident who purchased Automotive Bearings indirectly from one or more Defendants.

33.     Plaintiff Darrel Senior is a Kansas resident who purchased Automotive Bearings indirectly from one or more Defendants.

34.     Plaintiff James E. Marean is a Maine resident who purchased Automotive Bearings indirectly from one or more Defendants.

35.     Plaintiff Ron Blau is a Massachusetts resident who purchased Automotive Bearings indirectly from one or more Defendants.

36.     Plaintiff Roger D. Olson is a Michigan resident who purchased Automotive Bearings indirectly from one or more Defendants.

37.     Plaintiff Nilsa Mercado is a Michigan resident who purchased Automotive Bearings indirectly from one or more Defendants.

38.     Plaintiff Darcy C. Sherman is a Minnesota resident who purchased Automotive Bearings indirectly from one or more Defendants.

39.     Plaintiff David Bernstein is a Minnesota resident who purchased Automotive Bearings indirectly from one or more Defendants.

40.     Plaintiff Ellis Winton McInnis, IV is a Mississippi resident who purchased Automotive Bearings indirectly from one or more Defendants.

41.     Plaintiff Thomas N. Wilson is a Mississippi resident who purchased Automotive Bearings indirectly from one or more Defendants.

42.     Plaintiff Lauren C. Primos is a Mississippi resident who purchased Automotive Bearings indirectly from one or more Defendants.

43.     Plaintiff Robert P. Klinger is a Missouri resident who purchased Automotive Bearings indirectly from one or more Defendants.

44.     Plaintiff Jessica DeCastro is a Missouri resident who purchased Automotive Bearings indirectly from one or more Defendants.

45.     Plaintiff Lori Curtis is a Missouri resident who purchased Automotive Bearings indirectly from one or more Defendants.

46.     Plaintiff Virginia Pueringer is a Montana resident who purchased Automotive Bearings indirectly from one or more Defendants.

47.     Plaintiff Nathan Croom is a Nebraska resident who purchased Automotive Bearings indirectly from one or more Defendants.

48.     Plaintiff Richard Stoehr is a Nevada resident who purchased Automotive Bearings indirectly from one or more Defendants.

49.     Plaintiff Edward T. Muscara is a New Jersey resident who purchased Automotive Bearings indirectly from one or more Defendants.

50.     Plaintiff Michael Wick is a New Mexico resident who purchased Automotive Bearings indirectly from one or more Defendants.

51.     Plaintiff Tenisha Burgos is a New York resident who purchased Automotive Bearings indirectly from one or more Defendants.

52.     Plaintiff Jason Grala is a New York resident who purchased Automotive Bearings indirectly from one or more Defendants.

53.     Plaintiff Kathleen A. Tawney is a North Carolina resident who purchased Automotive Bearings indirectly from one or more Defendants.

54.     Plaintiff Kelly Klosterman is a North Dakota resident who purchased Automotive Bearings indirectly from one or more Defendants.

55.     Plaintiff Kent Busek is a North Dakota resident who purchased Automotive Bearings indirectly from one or more Defendants.

56.     Plaintiff Cindy Prince is an Oregon resident who purchased Automotive Bearings indirectly from one or more Defendants.

57.     Plaintiff Paul Gustafson is an Oregon resident who purchased Automotive Bearings indirectly from one or more Defendants.

58.     Plaintiff France H. Gammell-Roach is a Rhode Island resident who purchased Automotive Bearings indirectly from one or more Defendants.

59.     Plaintiff William Dale Picotte is a South Dakota resident who purchased Automotive Bearings indirectly from one or more Defendants.

60.     Plaintiff Phillip G. Young is a Tennessee resident who purchased Automotive Bearings indirectly from one or more Defendants.

61.    Plaintiff Jesse Powell is a Utah resident who purchased Automotive Bearings indirectly from one or more Defendants.

62.    Plaintiff Alena Farrell is a Vermont resident who purchased Automotive Bearings indirectly from one or more Defendants.

63.    Plaintiff Jane FitzGerald is a Vermont resident who purchased Automotive Bearings indirectly from one or more Defendants.

64.    Plaintiff Arthur Stukey is a Vermont resident who purchased Automotive Bearings indirectly from one or more Defendants.

65.    Plaintiff Janne Rice is a West Virginia resident who purchased Automotive Bearings indirectly from one or more Defendants.

66.    Plaintiff Robert M. Rice, Jr. is a West Virginia resident who purchased Automotive Bearings indirectly from one or more Defendants.

67.    Plaintiff Stacey R. Nickell is a West Virginia resident who purchased Automotive Bearings indirectly from one or more Defendants.

68.    Plaintiff Carol Ann Kashishian is a Wisconsin resident who purchased Automotive Bearings indirectly from one or more Defendants.

## Defendants

**JTEKT Defendants**

69.    Defendant JTEKT Corporation ("JTEKT") is a Japanese corporation with its principal place of business in Osaka, Japan.  JTEKT— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this District, during the Class Period.

70.     Defendant Koyo Corporation of U.S.A. ("Koyo") is a South Carolina corporation with its principal place of business in Westlake, Ohio. It is a subsidiary of, and wholly-owned or controlled by, its parent, JTEKT. Defendant Koyo sold Automotive Bearings that were purchased in the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of JTEKT.

71.     JTEKT and Koyo also share and have shared numerous executives.  Hiroyuki Miyazaki, an executive director at JTEKT is also a Director at Koyo.  Noriya Murase, a Senior Executive Director at JTEKT is the former President and Chief Executive Officer of Koyo.

72.     Defendants JTEKT and Koyo shall collectively be referred to herein as the "JTEKT Defendants" or "JTEKT".

**Nachi Defendants**

73.     Defendant Nachi-Fujikoshi Corp. ("Nachi") is a Japanese corporation with its principal place of business in Toyama, Japan.  Nachi— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

74.     Defendant Nachi America Inc. ("Nachi America") is an Indiana corporation with its principal place of business in Greenwood, Indiana. It is a subsidiary of, and wholly-owned or controlled by, its parent, Nachi-Fujikoshi. Defendant Nachi America sold Automotive Bearings that were purchased in the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Nachi-Fujikoshi.

75.     Nachi and Nachi America also share and have shared numerous executives. Toru Inoue, a corporate officer at Nachi, is listed in its 2013 Company Profile as the President of Nachi America, and "[i]n Charge of North & Central America."  Nobuo Segawa, a former director at Nachi is also a former President of Nachi America.  Makoto Sasaki, a Managing Director and General Manager of Sales Strategy of Nachi is the former Chairman of the Board of Nachi America.

76.     Nachi America is referred to in Nachi's 2013 Annual Report as one of its "Sales Offices."  Nachi's 2013 report also states that one of its management policies is "creating markets in Japan, Europe, and the USA as new volume zones."  Nachi's company profile indicates that it has been "marketing with large OEM customers . . . in America" since 1955.

77.     Defendants Nachi and Nachi America shall collectively be referred to herein as the "Nachi Defendants" or "Nachi".

**NSK Defendants**

78.     Defendant NSK Ltd. ("NSK") is a Japanese corporation with its principal place of business in Tokyo, Japan.  NSK— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

79.     Defendant NSK Americas, Inc. ("NSK Americas") is a Delaware corporation with its principal place of business in Ann Arbor, Michigan. It is a subsidiary of, and wholly owned or controlled by, its parent, NSK.  Defendant NSK Americas sold Automotive Bearings that were purchased in the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of NSK.

80.     NSK's annual report sets forth aggregate financials for all of the NSK entities. Sales are reported by the sectors the entities supply, like the automotive sector, rather than by entity.

81.     NSK's 2008 report describes its performance in each of its markets. In doing so it sets forth one reason for decreased sales in the U.S. "demand in the U.S. for minivans declined, and total sales was flat in the Americas, year-on-year." That report also lists one of NSK's concerns as "a weak U.S. dollar."

82.     NSK and NSK Americas have also shared numerous executives. Bernard Lindsay served as COO for NSK Americas and then as Chief Executive Officer, CEO, and Vice President of NSK. Masahide Matsubara, a senior Vice President at NSK, is the former Chief Executive Officer of NSK Americas.

83.     Defendants NSK and NSK Americas shall collectively be referred to herein as the "NSK Defendants" or "NSK".

**Schaeffler Defendants**

84.     Defendant Schaeffler AG ("Schaeffler") is a German corporation with its principal place of business in Herzogenaurach, Germany. Schaeffler— directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

85.     Defendant Schaeffler Group USA Inc. ("Schaeffler USA") is a Delaware corporation with its principal place of business in Fort Mill, South Carolina. It is a subsidiary of, and wholly-owned or controlled by, its parent, Schaeffler. Defendant Schaeffler USA sold Automotive Bearings that were purchased in the United States, including in this District,

14

during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Schaeffler.

86.    Schaeffler USA is described on the Schaeffler website as one of Schaeffler's "Worldwide Locations."

87.    Schaeffler's Q1 Report describes one of the "primary dampers of economic growth" as "the restrictive spending policy in the U.S."

88.    Schaeffler USA and Schaeffler have shared numerous executives.  Klaus Rosenfeld, the Chief Financial Officer and Member of the Executive Manager Board of Schaeffler is also the Chief Financial Officer of Schaeffler USA.  Dr. Jürgen M. Geissenger is the CEO of both Schaeffler USA and Schaeffler.  Georg F.W. Schaeffler is a Board Member at both Schaeffler and Schaeffler USA.

89.    Defendants Schaeffler and Schaeffler USA shall collectively be referred to herein as the "Schaeffler Defendants" or "Schaeffler".

**SKF Defendants**

90.    Defendant AB SKF ("SKF") is a Swedish corporation with its principal place of business in Göteborg, Sweden.  SKF—directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

91.    Defendant SKF USA, Inc. ("SKF USA") is a Delaware corporation with its principal place of business in Lansdale, Pennsylvania. It is a subsidiary of, and wholly-owned or controlled by, its parent, SKF. Defendant SKF USA sold Automotive Bearings that were purchased in the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of SKF.

15

92.     SKF and SKF USA have also shared numerous executives.  Tom Johnstone, the Chief Executive Officer and President at SKF also served as Co-President and Chief Executive Officer as well as a Director at SKF USA.  Henrik Lange, the Executive Vice President and Chief Financial Officer of SKF and previously served as President of the Industrial Division at SKF USA. Poul Jeppesen, the Chief Executive Officer and President of USA Operations at SKF is also the as Chief Executive Officer of SKF USA.

93.     SKF reports its sales by business segment, such as the Automotive segment rather than by subsidiary.  The sales of SKF USA are not separately reported in SKF's Annual report; rather, automotive OEM sales are reported as part of the Automotive segment.  The Automotive segment president, Tom Johnstone, is located at SKF, in Goteborg.

94.     Defendants SKF and SKF USA shall collectively be referred to herein as the "SKF Defendants" or "SKF".

**NTN Defendants**

95.     Defendant NTN Corporation ("NTN") is a Japanese corporation with its principal place of business in Osaka, Japan.  NTN — directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this district, during the Class Period.

96.     Defendant NTN USA Corporation ("NTN USA") is a Delaware corporation with its principal place of business in Mount Prospect, Illinois.  NTN USA—directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased throughout the United States, including in this District, during the Class Period.

97.     NTN and NTN USA have shared executives.  For instance, Tadatoshi Kato, the president of NTN USA, is a former Managing Director and Senior Managing Director of NTN. Yasunobu Suzuki, the Chairman of the Board and Representative Director, is the former Chairman of NTN USA.

98.     Defendants NTN and NTN USA Corporation shall collectively be referred to herein as the "NTN Defendants" or "NTN."

## AGENTS AND CO-CONSPIRATORS

99.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

100.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

101.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.    The Automotive Bearings Industry

102.    Automotive Bearings are rolling elements that are used to decrease the rotational friction between a vehicle and the surface it runs on, such as a cemented road. Automotive Bearings help maintain balance in the event of speed changes or sudden braking while the automotive vehicle is in motion.  Automotive Bearings are, among other things, inserted inside the wheels of the vehicle in a special slot called the "cage."  The Automotive Bearings then rotate around the cage while the vehicle is operating, thereby evenly distributing the load of the vehicle during operation.  Automotive Bearings serve an essential role in most vehicles because they improve car performance and allow for smooth driving.  Automotive Bearings are prone to wear and tear, and are usually replaced rather than repaired.  See Figure 1.



Figure 1.

103.    Automotive Bearings are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Automotive Bearings.

104.    For new cars, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Bearings directly from Defendants.  Automotive Bearings may also be purchased by component manufacturers who then supply such components to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply Automotive Bearings directly to an OEM.

105.    Defendants and their co-conspirators supplied Automotive Bearings to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured Automotive Bearings (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) abroad for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) abroad for installation in vehicles manufactured abroad for export to and sale in the United States.

106.    Plaintiffs and members of the proposed Classes purchased Automotive Bearings indirectly from one or more of the Defendants.  By way of example, an owner or lessee of a vehicle may indirectly purchase Automotive Bearings from Defendants when purchasing or leasing a new vehicle that contains Automotive Bearings as a component product.   An owner or lessee of a vehicle may also indirectly purchase replacement Automotive Bearings from Defendants when repairing a damaged vehicle or where the vehicle's Automotive Bearings are defective.

107.    The U.S. market size for Automotive Bearings was $2.71 billion in 2008.  See Figure 2.



Figure 2.

108.    The Automotive Bearings market is dominated and controlled by a small number of manufacturers, which include Defendants.

**B.    Defendants Increased Prices for Automotive Bearings in the Face of Declining Demand during the Class Period**

109.    The Producer Price Index ("PPI") measures the average change over time in the prices received by domestic producers for their output.  The chart below (see Figure 3) provides a 2003-2009 illustration of bearing industry pricing.  Because Automotive Bearings account for almost 40 percent of the bearings market (see Figure 2), the PPI for bearings is a good indicator of the change over time in the prices received by domestic producers of Automotive Bearings.

110.    The PPI for bearings suggests that the prices for bearings have increased significantly between January 2004 and February 2009.  According to the Bureau of Labor

Statistics, the PPI for bearings increased by 32 percent in the period between January 2004 and

February 2009.



Figure 3.

111.    Meanwhile, according to the auto sales demand curve (see Figure 4 below) by

the Bureau of Economic Analysis, from 2003 to the end of 2007, demand for automobiles in

the United States has remained sluggish or flat.  The PPI for bearings for the very same period

indicates that prices for bearings—and by extension Automotive Bearings—were sharply

rising (see Figure 3).   In the absence of an unlawful price-fixing conspiracy, according to the

laws of supply and demand, prices during this period should have followed demand.



Figure 4.

112.    From 2008 to 2009, at the height of the recession, the auto industry experienced a significant 37 percent drop in demand.  See Figure 4.  The PPI for bearings for the very same period indicates that prices for bearings increased by almost 10 percent (see the steep increase in Figure 3).  According to the law of supply and demand, prices during this period should have fallen, but instead rose.

113.    In a competitive market, falling demand would lead to decreased prices because competitors would need to lower prices in order to attract customers and increase demand.  In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with decreasing demand.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

114.    The price of bearings—and by extension Automotive Bearings—increased during the Class Period, even during periods when demand decreased.  In a competitive

market, falling demand should not have resulted in rising prices for Automotive Bearings. Such anticompetitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

**C.    The Structure and Characteristics of the Automotive Bearings Market Render the Conspiracy More Plausible**

115.    The structure and other characteristics of the Automotive Bearings market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  Specifically, the Automotive Bearings market: (1) has high barriers to entry; (2) has demand inelasticity; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

**1.    The Automotive Bearings Market Has High Barriers to Entry**

116.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

117.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Bearings market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

118.    Research and development is necessary for product innovation as players in this industry compete primarily based on product pricing.  In order to effectively compete, an entrant must be committed to spending a significant amount of resources on research and development.

119.    Defendants also own several patents for Automotive Bearings.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

### 2.    The Demand for Automotive Bearings is Inelastic

120.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to make purchases despite a price increase.

121.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

122.    Demand for Automotive Bearings is highly inelastic because there are no close substitutes for these products.  In addition, customers must purchase Automotive Bearings as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### 3.    The Market for Automotive Bearings Is Highly Concentrated

123.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices.   There is a high level of concentration among firms in the Automotive Bearings market.  According to a leading industry report, the top three suppliers of Automotive Bearings control nearly 75 percent of the U.S. market.

### D.    **Government Investigations**

124.    Globally-coordinated antitrust investigations are taking place in the United States, Japan, Europe, Australia, Canada, South Korea, and Singapore regarding Automotive Bearings.  In Japan, competition authorities prosecuted criminal proceedings against certain defendants and obtained guilty verdicts. In addition, Canada's investigation has so far led to the filing of a criminal action against JTEKT, which has pleaded guilty.

**Japan Investigation and Convictions**

125.    The JFTC launched an investigation in July 2011 after Defendant JTEKT sought leniency by alerting the regulatory agency of the Automotive Bearings conspiracy. Japan's leniency program grants full immunity from prosecution to the applicant if it admits its participation in the cartel and provides the JFTC with the relevant information.  Because of its admission and cooperation, JTEKT was not prosecuted criminally by the JFTC.

126.    On July 26 and 27, 2011, the JFTC conducted on-site inspections of Defendants NSK, NTN, JTEKT and Nachi based on evidence that the companies violated Japan's anti-monopoly law in relation to their sales of Automotive Bearings.

127.    NTN confirmed in its 2012 Financial Report that in July 2011, the Company underwent an on-site inspection by the JFTC, based on evidence that the Company had decided to raise sale prices of Automotive Bearings in cooperation with other manufacturers, and further reported that in April of 2012 a search was conducted by special investigators from Tokyo District Public Prosecutor's Office and the JFTC.

128.    In its 2012 Annual Report, NSK confirmed that its "headquarters and relevant sales branches of NSK were investigated on July 26 and 27, 2011, by the JFTC in relation to the Japan Antimonopoly Act regarding the sales of bearings of NSK."

129.    On April 20, 2012, the Special Investigation Department of the Tokyo District Public Prosecutors Office and the JFTC raided NSK facilities regarding a potential violation of the Antimonopoly Act of Japan ("AMA").

130.    On May 18, 2012, the Japan Times reported that certain NTN officials have made statements admitting their participation in the Automotive Bearings price-fixing conspiracy during voluntary questioning by Japanese prosecutors.  This article also noted that officials of NSK, JTEKT and Nachi had already admitted to their roles in the conspiracy.

131.    Nachi's 2012 Business Report confirms that on December 28, 2012, Nachi and two of its executives were convicted in Tokyo District Court of violating Japan's Antimonopoly Act.

132.    On February 25, 2013, the Tokyo District Court found Defendant NSK and three former executives guilty of participating in a price-fixing cartel for automotive and industrial machinery bearings.  Keisuke Takagawa and Katsumi Kuwabara, former senior vice presidents, were sentenced to fourteen months in prison, while Yoshi Nishiyama, a former head of the industrial machinery business division, was sentenced to twelve months.  The Tokyo District Court also issued a 380 million yen (approximately U.S. $4 million) criminal fine against NSK.

133.    On February 25, 2013, Nikkei Japan Business Newspaper reported that the presiding judge stated, "[t]he crime is malicious – large in scope and carried out systematically. Having the largest market share, NSK carried out the central role in this cartel."

134.    On the same day, Defendant NSK President and CEO Norio Otsuka issued a press release stating: "[w]e express our sincere regret for the concern this matter has caused our shareholders, customers, and other stakeholders.  NSK regards the situation with the utmost

26

gravity and will take comprehensive measures to ensure strict compliance with all applicable laws and regulations during our corporate activities."

135.    On March 29, 2013, the JFTC issued cease and desist orders and surcharge payment orders to Defendants NTN, NSK, and Nachi for their involvement in a price-fixing conspiracy in connection with the sale of automotive bearings in violation of Article 3 of the AMA.  The JFTC fined NTN approximately 7.2 billion yen, NSK 5.6 billion yen, and Nachi 509 million yen (totaling approximately U.S. $142 million).  Defendant JTEKT admitted to its participation in a price-fixing conspiracy, but was not fined.  JTEKT provided information to the JFTC that led to the investigation after it applied to the leniency program in June 2011.

136.    On the same day, Defendant JTEKT President Shoji Ikawa stated that "we express our deepest regrets for the fact that the JFTC named JTEKT CORPORATION as one of the companies involved in conduct which violated the AMA.  We would like to take this opportunity to again offer our sincere apologies to all of our customers, shareholders and stakeholders for the concerns that this has caused."

137.    On April 1, 2013, Defendant NTN followed suit and issued a press release stating that "NTN sincerely regrets the great deal of concern caused to shareholders, customers and all relevant personnel by this matter notwithstanding the fact that NTN has been committed to complying with the laws and regulations."

**United States**

138.    The DOJ is also conducting an investigation into the Automotive Bearings industry.

139.    In its 2012 Final Report, NTN stated: "[I]n November 2011 our United States consolidated subsidiary received a subpoena from the United States Department of Justice requesting the submission of information related to transactions in bearings."

140.    In its 2011 Annual Report, Schaeffler similarly reported that it was a subject of the DOJ's Automotive Bearings antitrust investigation.

141.    In its 2012 Annual Report, NSK stated that on November 9, 2011, its subsidiary in the U.S. received from the DOJ a subpoena, which requested that it provide information regarding sales of Automotive Bearings.

142.    The DOJ investigation into price fixing in the Auto Parts industry, including Automotive Bearings, is ongoing.  The U.S. government has said the case will continue and other automotive suppliers could be charged.

143.    On February 15, 2013, Scott Hammond, Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . .  [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  *I say biggest with respect to the __impact__ on U.S. businesses and __consumers__, and the number of companies and executives that are subject to the investigation*." (Emphasis added).

**European Commission**

144.    This global antitrust investigation originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC in 2010 and 2011, the EC executed surprise raids as the European offices of certain Defendants as part of an investigation

into anticompetitive conduct related to the manufacturing and sale of automotive parts, including Automotive Bearings.

145.    Subsequently, on November 8, 2011, the EC announced that it had made unannounced inspections at the premises of companies that manufacture Automotive Bearings over concerns that these companies may have violated antitrust rules.  Defendants SKF and Schaeffler have admitted that their facilities were raided by European Union regulators.

146.    A number of Defendants have acknowledged that they are subjects of the Automotive Bearings investigations.  JTEKT has admitted that the EC is investigating its Dutch unit as part of the EC's Automotive Bearings antitrust investigation.

147.    In its 2012 Annual Report, NSK stated that its sales subsidiary in Germany was inspected on November 8, 2011, by the EC in relation to EU competition law regarding the sales of Automotive Bearings.

148.    Likewise, in its 2011 Annual Report, SKF explained that, along with other companies in the Automotive Bearing industry, it is "part of an investigation by the European Commission regarding a possible violation of EU antitrust rules."  SKF has also acknowledged that EU officials have visited its Gothenburg, Sweden and Schweinfurt, Germany facilities.

149.    Schaeffler's 2011 Annual Report also acknowledges the worldwide Automotive Bearings antitrust investigation, noting, "[t]he European Commission as well as the US Department of Justice have commenced antitrust investigations of various manufacturers of rolling bearings, including Schaeffler.  The European and the U.S. competition authorities are investigating whether manufacturers of rolling bearings participated in unlawful agreements and/or concerted practices concerning rolling or plain bearings."

150.    NTN reported in its 2012 Financial Report that: "[i]n November 2011, our European consolidated subsidiaries also received an on-site inspection by the European Commission into transactions in bearings, on suspicion of noncompliance with the EU Competition Law."

151.    NTN's operations in France and Germany were also probed by the EC as part of its antitrust investigation into the automotive Bearings industry.

**Australia**

152.    On July 15, 2013, the Australian Competition and Consumer Commission ("ACCC") announced that it has instituted civil proceedings in the Federal Court against Koyo Australia Pty Ltd (Koyo), a subsidiary of JTEKT, for alleged cartel conduct relating to the supply of ball and roller bearings for use in motor vehicles and industrial applications. The ACCC alleges that in 2008 and 2009, Koyo and at least two of its competitors made and gave effect to two separate cartel arrangements for an increase to the price of Automotive Bearings to their aftermarket customers.

**Canada**

153.    On July 12, 2013, the Competition Bureau of Canada ("CBC") announced that JTEKT pleaded guilty to two counts of bid-rigging and was fined $5 million by the Superior Court of Quebec for its participation in an international bid-rigging cartel, making it the first party to plead guilty in relation to the investigation into automotive bearings. JTEKT's plea relates to automotive wheel hub unit bearings supplied to Toyota Motor Corporation ("Toyota") and its North American affiliates between 2007 and 2013.

154.    On or about the same day, JTEKT and CBC filed a statement of admissions (the "Statement of Admissions") with the Superior Court Quebec which included an admission by

JTEKT of the facts constituting an offence under Canada's Competition Act.  According to the Statement of Admissions, JTEKT secretly conspired with NSK to submit bids or tenders in response to requests for quotations ("RFQs") to supply Toyota that were predetermined by prior agreement.  These agreements were reached, at least in part, through direct communications between JTEKT sales management level personnel and their counterparts at NSK where the employees discussed, among other things, Toyota's RFQs and how to coordinate their respective responses to Toyota.  These discussions resulted in an agreement whereby JTEKT would win certain RFQs while NSK would win others; both JTEKT and NSK submitted bids to Toyota in accordance with the agreement.

155.    The CBC became aware of the Automotive Bearings cartel by way of its Immunity Program.  Under this Immunity Program, the first party to disclose to the CBC an offense not yet detected or to provide evidence leading to a referral of evidence to the Public Prosecution Service of Canada ("PPSC") may receive immunity from the PPSC, provided that it fully cooperates with the CBC's investigation and any ensuing prosecution.  Subsequent cooperating parties may receive lenient treatment under the CBC's Leniency Program.  JTEKT participated in the CBC's Leniency Program and provided substantial assistance to the CBC and the PPSC.

**Singapore**

156.    On February 6, 2013, NSK's Singapore-based sales subsidiary received an on-the-spot inspection from the Competition Commission of Singapore.

**Korea**

157.    NTN reported in its 2012 Financial Report that: "[i]n July 2012, a consolidated subsidiary of the Company in South Korea underwent an on-site inspection from the Korea

Fair Trade Commission on suspicion of a violation of the Monopoly Regulation and Fair Trade Act in connection with bearings business."

158.    Likewise, NSK's 2012 Annual Report stated: "in July 2012, the Korea Fair Trade Commission conducted an on-site investigation against NSK's Korean subsidiary regarding a potential violation of the Monopoly Regulations and Fair Trade Act of Korea in transactions involving bearings products."

### E.    Opportunities to Conspire

159.    During the Class Period, Defendants and their co-conspirators had opportunities to meet and perform acts in furtherance of their conspiracy while attending industry events. Defendants and their co-conspirators had opportunities to meet privately at annual or semi-annual trade association meetings, including, but not limited to, the Association of Steel and Iron Engineers, the Bearings Specialties Association, the Small Motors Manufacturers Association, and the Electric Motor Repair Group.

160.    Defendants NSK, NTN, Schaeffler, Nachi, Koyo and SKF are six of the seven members of the World Bearing Association ("WBA").  The WBA, comprising the seven largest Bearings manufacturers in the world, was created in 2006.  Its founding member associations include the American Bearing Manufacturers Association, the Japanese Bearing Industrial Association and the Federation of European Bearing Manufacturers.

161.    The WBA afforded these six defendants additional opportunities to engage in improper discussions and perform acts in furtherance of their price-fixing conspiracy.  The WBA has been referred to as the "World Cartel of Bearing manufacturers."  The WBA is not registered, not incorporated, has no Articles of Association, has no record of any meetings and has not filed documents with any government department globally.

162.    Golf outings organized by distributors presented additional opportunities for employees of the Defendants to conspire.  It was not uncommon for the golf outings to draw more employees from bearings manufacturers than from distributors.  Thus, Defendants' employees had an opportunity to meet and were often paired together as part of the golf outing.

163.    During such meetings or golf outings, Defendants and their co-conspirators had the opportunity to engage in private meetings, conversations and communications to discuss pricing and customer allocation for Automotive Bearings sold in the United States.

164.    Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss pricing for Automotive Bearings sold in the United States.

165.    Defendants and their co-conspirators routinely produced and sold Automotive Bearings to each other.  For example, at times, a particular manufacturer would shut down a product line (*i.e.*, cease production of a particular size or type of bearing) while maintaining the item on its price list.  If a customer ordered a product that was no longer being produced, the nonproducing manufacturer would purchase it from a competitor.   To facilitate such purchase and sales transactions, senior level employees, a General Manager or President of the Defendant manufacturer, would meet or communicate to discuss and finalize these arrangements. These transactions provided numerous additional opportunities for Defendants to collude on customer allocation and pricing structures in the U.S. Bearings market.

166.    The above-referenced meetings, conversations, and communications provided ample opportunity for Defendants to coordinate pricing, sales, and market allocation with respect to Bearings sold in the United States.

### F.    Likely Existence of an Amnesty Applicant

167.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party who has been accepted into the DOJ's ACPERA program as an amnesty applicant.  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

168.    In light of the multiple guilty pleas in related automotive parts antitrust cases, the DOJ's ongoing investigation into the industry, the fine paid in Canada by JTEKT (as well as JTEKT's admission of its participation in the price-fixing conspiracy), and the existence of an amnesty applicant in the JFTC proceedings, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

## CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities who, during the Class Period, purchased or leased a new vehicle in the United States for personal use and not for resale which included one or more Automotive Bearings as a component part, or indirectly purchased one or more Automotive Bearings as a replacement part, which were manufactured or sold by any Defendant, any current or former subsidiary of a Defendant or any co-conspirator of a Defendant.

170.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, consumer protection, and unjust enrichment laws of the

states whose laws are identified below (the "Indirect Purchaser States").  These claims are

brought by Plaintiffs on behalf of themselves and persons and entities in the Indirect Purchaser

States as follows (the "Damages Class"):

> All persons and entities who, during the Class Period, purchased or
> leased a new vehicle in the United States for personal use and not
> for resale which included one or more Automotive Bearings as a
> component part, or indirectly purchased one or more Automotive
> Bearings as a replacement part, which were manufactured or sold
> by any Defendant, any current or former subsidiary of a Defendant
> or any co-conspirator of a Defendant.

171.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and

affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal

government, states and their subdivisions, agencies and instrumentalities, and persons who

purchased Automotive Bearings directly or for resale.

172.    While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are (at least) thousands of members in each Class.

173.    Common questions of law and fact exist as to all members of the Classes.  This

is particularly true given the nature of Defendants' conspiracy, which was generally applicable

to all the members of both Classes, thereby making appropriate relief with respect to the

Classes as a whole.  Such questions of law and fact common to the Classes include, but are not

limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination

and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive

Bearings sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

35

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)    The effect of the alleged conspiracy on the prices of Automotive Bearings sold in the United States during the Class Period;

(i)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)    The appropriate class-wide measure of damages for the Damages Class.

174.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all

36

members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Bearings purchased indirectly from Defendants or their co-conspirators.

175.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

176.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

177.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

178.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

179. Defendants' price-fixing conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to Automotive Bearings;

(b) The prices of Automotive Bearings have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

(c) Indirect purchasers of Automotive Bearings have been deprived of free and open competition.

180. During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Bearings.

181. The markets for Automotive Bearings and vehicles are inextricably linked and intertwined because the market for Automotive Bearings exists to serve the vehicle market. Without the vehicles, the Automotive Bearings have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for Automotive Bearings. As stated in a report by a leading economic research firm,

> Ball bearing manufacturers rely heavily on several key industries to purchase their products. For example, automotive and transportation manufacturers are major purchasers of Automotive Bearings. Therefore, the collapse of the domestic automotive industry throughout 2008 and 2009 caused demand for new cars to plummet, which reduced demand for Automotive Bearings used in the auto manufacturing process.

182. Automotive Bearings are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Bearings follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Bearings can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

183.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Bearings than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

184.    Plaintiffs repeat and reallege the allegations set forth above.

185.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until the public announcements of the government investigations into Automotive Bearings price-fixing began in July 2011.

186.    Plaintiffs and the members of the Classes are purchasers who purchased or leased automobiles or purchased Automotive Bearings to replace or repair damaged or defective Automotive Bearings in their automobiles.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the public announcements of the government investigations began in July 2011.

187.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcements of the government investigations beginning in July 2011 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix and rig bids for Automotive

Bearings. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

188.    For these reasons, the statute of limitations as to Plaintiffs and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

189.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Automotive Bearings price-fixing began.

190.    Because Defendants' agreements, understandings and conspiracies were kept secret until July 2011, Plaintiffs and members of the Classes before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supra-competitive prices for Automotive Bearings throughout the United States during the Class Period.

191.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

192.    By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Automotive Bearings are not exempt from antitrust regulation, and thus, before July 2011, Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a

40

reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Automotive Bearings prices before July 2011.

193.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

194.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 2011, when reports of the investigations into anticompetitive conduct concerning Automotive Bearings were first publicly disseminated.

195.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

196.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

197.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

198.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers,

agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

199.    At least as early as January 2004, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Bearings, thereby creating anticompetitive effects.

200.    The anticompetitive acts were intentionally directed at the United States market for Automotive Bearings and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Bearings throughout the United States.

201.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Bearings.

202.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Bearings have been harmed by being forced to pay inflated, supra-competitive prices for Automotive Bearings.

203.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

204.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Automotive Bearings has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Automotive Bearings sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased Automotive Bearings indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

205.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Bearings purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

206.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

207.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

208.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

209.    From as early as January 2004 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Bearings in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

210.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at

artificially supra-competitive prices for Automotive Bearings and to allocate customers for Automotive Bearings in the United States.

211.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Bearings at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Bearings sold in the United States;

(b)    allocating customers and markets for Automotive Bearings in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

212.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Automotive Bearings.

213.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

214.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

44

Arizona; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

215.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

(a)      During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Bearings at supra-competitive levels.

(b)      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of

action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Bearings.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Automotive Bearings; and (2) Allocating among themselves the production of Automotive Bearings.

(d)    The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Automotive Bearings has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Bearings sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Automotive Bearings directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

216.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

217.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially

high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*.

218.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

219.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Maine; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

221.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

Minnesota; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

      (b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

222.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

      (a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

      (b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

224.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout

New Hampshire; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

226.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings when they purchased vehicles containing Automotive Bearings, or purchased products that were otherwise of lower quality, than would have been absent the conspirators illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

228.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

229.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

230.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

232.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq*.

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Bearings prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

237.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Automotive Bearings than they otherwise would have paid in the absence of

Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

238.    In addition, Defendants have profited significantly from the aforesaid conspiracy.  Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

239.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

240.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

241.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

242.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)    During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)    The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(d)    Defendants' acts, omissions, misrepresentations, practices, an non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)    Defendants' acts or practices are unfair to purchasers of Automotive Bearings (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(g)    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(h)    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(i)    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for Automotive Bearings (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

243.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels,

the prices at which Automotive Bearings were sold, distributed or obtained in the District of

Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the

meaning of D.C. Code § 28-3904.

(c)     Defendants' unlawful conduct had the following effects:  (1) Automotive

Bearings price competition was restrained, suppressed, and eliminated throughout the District of

Columbia; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at

artificially high levels  throughout the District of Columbia; (3) Plaintiffs and the Damages Class

were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid

supra-competitive, artificially inflated prices for Automotive Bearings.

(d)     As a direct and proximate result of the Defendants' conduct, Plaintiffs and

members of the Damages Class have been injured and are threatened with further injury.

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of District of Columbia Code § 28-3901, *et seq.* , and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

244.     Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices

Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) Automotive

Bearings price competition was restrained, suppressed, and eliminated throughout Florida; (2)

Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

245.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

246.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

(a)    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Fuel Senders were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(c)    Defendants' unlawful conduct had the following effects:  (1) Fuel Senders price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Fuel Senders prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Fuel Senders.

(d)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)    Certain of the Defendants have been served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

247.    By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

248.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)    Plaintiffs and the Damages Class purchased Automotive Bearings for personal, family, or household purposes.

(b)    Defendants engaged in the conduct described herein in connection with the sale of Automotive Bearings in trade or commerce in a market that includes Missouri.

(c)    Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

69

(d)    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Bearings.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Bearings they purchased.

(e)    Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(f)    The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(g)    As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(h)    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR

60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

249.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

(a)    Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Montana; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

250.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Bearings was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Bearings as set forth in N.M.S.A., § 57-12-2E.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

251.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)    Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)    During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

(e)    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Bearings in New York.

73

(f)    Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

252.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)    Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Bearings was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(e)    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Bearings in North Carolina.

(f)    Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

253.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)    Plaintiffs and members of the Damages Class purchased Automotive Bearings for personal, family, or household purposes.

(b)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed, or obtained in Rhode Island.

(c)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Bearings. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Automotive Bearings prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects:  (1) Automotive Bearings price  competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(e)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including their omissions concerning the price of Automotive Bearings, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Bearings at prices born by a free and fair market.  Defendants' omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Bearings they purchased.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

254.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at

artificial and non-competitive levels, the prices at which Automotive Bearings were sold, distributed, or obtained in Vermont.

(b)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Bearings. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Automotive Bearings prices were competitive and fair.

(c)    Defendants' unlawful conduct had the following effects: (1) Automotive Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Bearings.

(d)    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)    Defendants' deception, including their omissions concerning the price of Automotive Bearings, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Automotive Bearings at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or

unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

255.    Plaintiffs incorporate and reallege by reference the allegations in the preceding paragraphs.

256.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Bearings.

257.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Automotive Bearings.

258.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

**PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED:  August 21, 2013                         **SUSMAN GODFREY LLP**


By  _____

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
Omar Ochoa
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

oochoa@susmangodfrey.com

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
gkim@cpmlegal.com


Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
hsalzman@rkmc.com
bpersky@rkmc.com
wvreiss@rkmc.com

*Attorneys for Plaintiffs and Interim Co-Lead
Class Counsel for  the Proposed End-Payor
Plaintiffs Classes*


E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison*
*Counsel for the Proposed End-Payor Plaintiffs*
*Classes*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  August 21, 2013                        **SUSMAN GODFREY LLP**


By  /s/ Warren T. Burns

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
Omar Ochoa
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com
oochoa@susmangodfrey.com

Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com

swilliams@cpmlegal.com
fdamrell@cpmlegal.com
azapala@cpmlegal.com
gkim@cpmlegal.com

Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com

*Attorneys for Plaintiffs and Interim Co-Lead
Class Counsel for the Proposed End-Payor
Plaintiffs Classes*

E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com

*Attorneys for Plaintiffs and Interim Liaison
Counsel for the Proposed End-Payor Plaintiffs
Classes*