

# DEPARTMENT OF JUSTICE

OECD Competition Committee
Working Party No. 3

"The U.S. Model of Negotiated Plea Agreements:
A Good Deal With Benefits For All"

Address By:

SCOTT D. HAMMOND
Deputy Assistant Attorney General
for Criminal Enforcement
Antitrust Division
U.S. Department of Justice

Paris, France
October 17, 2006

## The U.S. System of Negotiated Plea Agreements:
## A Good Deal With Benefits for All

**I.**     <u>**Introduction**</u>

The Antitrust Division's success in cracking cartels is largely attributed to its ability to obtain the cooperation of cartel insiders.  The Division secures the cooperation of corporate participants in two ways.  It offers the promise of leniency or full immunity to the first company to report a criminal antitrust violation and to meet the conditions of the Division's Corporate Leniency Program.[1]  A company that self-reports and qualifies under the leniency program avoids a criminal conviction, pays no criminal fine, and keeps its cooperating executives out of jail.  A company that loses the race for full immunity faces dire consequences.  However, the Division can still offer that company and its executives substantial benefits in return for timely cooperation.  In the United States, negotiated plea agreements are used to obtain that cooperation in exchange for a lesser sentence.  The vast majority of the Division's major international investigations have involved the cooperation of a corporate leniency applicant and, over the last twenty years, over 90 percent of the corporate defendants charged with an antitrust offense have entered into plea agreements with the Division where they admitted guilt and cooperated with the Division's criminal investigations.

In recent years, corporate leniency programs have been adopted by competition authorities from around the world.  The programs share the common goal of deterring and detecting cartel offenses by inducing self-reporting and cooperation through the promise of lenient treatment.  Competition authorities understand that transparency and predictability in the application of a leniency program are essential to encouraging companies to self-report and, therefore, have amended and refined their leniency programs to maximize this certainty.  This consensus has led to a developing global convergence among leniency programs – convergence of transparency that allows a potential leniency applicant to predict with precision, in each jurisdiction where it is considering reporting, both the benefits that are available if it is the first company to report, and whether it is eligible to receive those benefits.  The end result is that participants in international cartels are making informed decisions to simultaneously apply for full immunity in multiple jurisdictions where they face the prospect of severe sanctions.  In turn, antitrust enforcers in multiple jurisdictions are obtaining the cooperation of insiders, cooperating with one another, and coordinating their investigative strategy against the remaining conspirators.  Most importantly, cartel activity is being halted, those responsible are being held accountable, and victims are being compensated.

The global convergence in leniency programs dissipates, however, when the topic turns to how to treat companies and their executives who lose the race for full immunity but are still in a position to offer timely and valuable cooperation.  Every jurisdiction reserves full immunity benefits to only the first company to come forward and cooperate, and virtually every jurisdiction offers reduced sanctions for those who come forward afterwards and advance the investigation with their cooperation.  However, there is wide divergence in terms of how this is done and the degree of transparency in the process that is provided by the enforcement authority.

Some jurisdictions have expanded leniency programs that cover full immunity for the first-in company, as well as sentencing reductions for companies that follow the immunity applicant and provide assistance to the investigation. These expanded leniency programs vary in terms of the degree of transparency they provide to a prospective cooperator to predict the benefits that it will receive in return for the applicant's full cooperation. They typically provide guidance in terms of a percentage fine reduction or discount that a cooperator will receive in return for its cooperation. Some programs use a fixed percentage discount – such as a promised 50 percent fine reduction for the second company to obtain leniency – and other programs state the discount in terms of a fixed range of discounts – such as a 30 to 50 percent reduction for the second-in company. The level of transparency that these programs afford will depend not only on whether the fine reduction is expressed as a fixed figure or range, but also on the certainty with which the company can predict the *starting point* for the fine reduction. Put another way, presenting clear guidelines on how fines are calculated is at least as important, and may be more important, to promoting transparency than is advising companies on the precise percentage discount they will receive in return for their cooperation.

In the United States and a number of other jurisdictions, the benefits of the leniency program are only available to the first company to come forward and be accepted into the program. In these jurisdictions, however, companies and individuals that do not qualify for full immunity but offer timely and valuable cooperation can still obtain significant sentencing benefits, including a substantial reduction in fines and more favorable treatment for culpable executives. Sentencing discounts for these cooperators are handled outside of the Division's Corporate Leniency Program. In the United States, the benefits are conferred through the negotiation of plea agreements whereby the defendant is obligated to plead guilty and provide full and continuing cooperation. In exchange, the government commits to making a specific sentencing recommendation to the court which, as discussed below, the courts are very likely to follow. Therefore, in most cases, the defendant knows what the government's sentencing recommendation will be and what the sentencing court is very likely to impose at the time the defendant enters into a plea agreement with the Division. Since the Division negotiates, signs, and publicly files plea agreements throughout the course of its investigations, most corporate defendants do not have to wait until their cooperation is complete, or until the investigation is over, before they learn the value that the government places on their cooperation.

The term "plea bargaining" sometimes carries a negative connotation, because it implies that prosecutors are bargaining away justice by securing guilty pleas that allow defendants to plead guilty to lesser offenses. The Division's experience of using negotiated plea agreements in cartel cases has very few, if any, detractors, however. Doing so benefits the government, cooperating defendants, the judicial system, the victims, and the public at large by encouraging early cooperation and acceptance of responsibility by cartel members through the promise of a transparent, proportional, expedited, certain and final plea disposition.

This paper is intended to provide guidance on the U.S. system of negotiated plea agreements and also explain the essential role that these agreements play in the Division's cartel enforcement program. The paper will first discuss the role of transparent policies and penalties in encouraging early cooperation. Second, it will discuss Department of Justice policies related

to the selection of charges and sentencing.  Third, it will discuss some of the core principles behind the U.S. system of negotiating plea agreements, including a discussion of key federal rules that govern plea agreement procedures as well as the role of federal courts in deciding whether to accept a plea agreement and sentence a defendant pursuant to its terms.  Fourth, the paper will explain the standard provisions found in the Division's model plea agreements that are attached to this paper.  Finally, the paper will conclude by discussing the many advantages of the U.S. system of negotiated plea agreements, illustrating how plea agreements are a good deal with benefits for all.

## II.   <u>Tradition of Transparency</u>

The Division has a tradition of maximizing transparency and predictability throughout its cartel enforcement program.  Examples of this include:  transparent standards for opening criminal antitrust investigations; transparent standards for deciding whether to file criminal antitrust charges; transparent prosecutorial priorities; transparent application of the Division's Corporate Leniency Policy; transparent policies relating to the negotiation of plea agreements; and transparent policies on the application of the antitrust Sentencing Guidelines.[2]  Transparency is not only critical to fostering confidence among the defense bar and the business community that the Division provides proportional and equitable treatment of antitrust offenders, but it is also essential to securing cooperation from culpable parties.

Prospective cooperating parties come forward in direct proportion to the predictability and certainty of their treatment following cooperation.  Therefore, a party must be able to predict, with a high degree of certainty, how it will be treated if it cooperates, and what the consequences will be if it does not.  This requires that an antitrust offender be able to predict:

- what the likely sentence will be if convicted at trial with no acceptance of responsibility and no credit for cooperation;

- how the party can qualify for full immunity by being the first to report the conduct and meet the other conditions of either the Division's Corporate Leniency or Individual Leniency Programs; and

- what benefits are available to a party that loses the race for leniency but still offers to provide timely and valuable cooperation pursuant to a plea agreement.

To maximize the goals of transparency, authorities must not only provide explicitly stated standards and policies, but also clear explanations of prosecutorial discretion in applying those standards and policies.  The Division has continuously sought to provide such guidance with respect to admission into the Division's leniency program[3] as well as in the negotiation of plea agreements.  Because plea agreements in international cartel prosecutions generate a number of complex issues that are not raised in domestic cases, the Division has issued several papers on this topic.

For example, in 1999, the Division published a paper entitled *Negotiating The Waters Of International Cartel Prosecutions: Antitrust Division Policies Relating To Plea Agreements In International Cases*.[4]  As the title suggests, this seminal speech set forth the Division's policy on a number of novel issues that arose when the Division first began detecting and successfully prosecuting international cartels aimed at the U.S. market.  For each issue, the paper provided the Division's policy and rationale, and, where appropriate, sample model plea agreement language, case history, and practical considerations relating to the issue.  Most of the Division policies announced in the "Negotiating The Waters" speech are still in effect today, but there have been some significant changes, particularly with respect to the prosecution of individuals.  In March 2006, the Division issued a paper titled *Charting New Waters in International Cartel Prosecutions*[5] which gave guidance on how the Division's enforcement policies with respect to individuals has evolved since 1999, such as the elimination of the "no jail deal" in plea agreements with foreign national defendants,[6] and the evolution of the Division's policy of "carving out" certain culpable executives from the nonprosecution protection language found in corporate plea agreements.[7]  Also in March 2006, the Division issued a paper entitled *Measuring the Value of Second-In Cooperation in Corporate Plea Negotiations* that provided transparency as to the potential rewards and incentives available for a company that is second in the door to offer its cooperation, and the factors the Division will consider when determining the credit it will receive.[8]

Although the Division has strived to help companies predict in advance how they will be treated if they offer to cooperate pursuant to a plea agreement, maximizing transparency is more difficult with plea agreements than in the corporate leniency context where the rewards are fixed.  The rewards for second-in companies are not uniform, because the value of a second-in corporation can vary dramatically from case to case.  The value to the government of a company's cooperation varies because what the defendant brings to the table (e.g., credible witnesses, compelling documents, previously undisclosed information), and what the government can already prove, is not a constant and varies from case to case.  So, while a second-in company's cooperation typically will significantly advance an investigation, there are times when the cooperation is either cumulative or no longer needed.

For example, second-in cooperation likely would more significantly advance an investigation of a five-firm conspiracy than a two-firm conspiracy.  Second-in cooperation could come at the outset of an investigation when the Division is still developing key evidence against others, or after significant evidence has already been provided through a leniency applicant or a successful covert investigation, complete with consensual monitoring and coordinated search warrants.  The second-in company's cooperation could include self-reporting on previously unidentified cartels warranting "Amnesty-Plus" credit, or be limited to conduct already detected.  The second-in company could offer its cooperation immediately after learning of the existence of the investigation, or only after it receives a target letter or after it has been indicted.  If the Division were to establish an absolute, fixed discount for second-in cooperation without consideration of these types of variables, then the need for proportionality would be sacrificed for increased transparency.

4

### III.    Department of Justice Policies on Selection of Charges and Sentencing

The U.S. Department of Justice's Principles of Federal Prosecution lays out the considerations prosecutors must weigh in determining whether it would be appropriate to enter into a plea agreement.  Department prosecutors are instructed to weigh all relevant considerations, including:

1.    The defendant's willingness to cooperate in the investigation or prosecution of others;
2.    The defendant's history with respect to criminal activity;
3.    The nature and seriousness of the offense or offenses charged;
4.    The defendant's remorse or contrition and his/her/its willingness to assume responsibility for his/her/its conduct;
5.    The desirability of prompt and certain disposition of the case;
6.    The likelihood of obtaining a conviction at trial;
7.    The probable effect on witnesses;
8.    The probable sentence or other consequences if the defendant is convicted;
9.    The public interest in having the case tried rather than disposed of by a guilty plea;
10.    The expense of trial and appeal;
11.    The need to avoid delay in the disposition of other pending cases; and
12.    The effect upon the victim's right to restitution.[9]

These factors do not create rights for defendants, but rather provide general guidance to prosecutors in deciding whether to enter a plea agreement with a defendant rather than seek a conviction at trial.[10]

Department of Justice policies related to charging decisions and sentencing recommendations ensure that plea agreements entered into by federal prosecutors do not bargain away justice and result in transparent, proportional and just dispositions.  Department of Justice policies require that federal prosecutors charge and pursue the most serious, readily provable offense or offenses supported by the facts of the case.[11]  Department policies are essentially the same with respect to the resolution of cases through plea agreements, providing that prosecutors should seek a plea to the most serious, readily provable offense charged.[12]

Department policies explicitly prohibit filing charges to exert leverage to induce a plea or dismissing charges in exchange for a plea to lesser charges; a practice commonly referred to as "charge bargaining."[13]  However, charges, or contemplated charges, may be dismissed or declined under certain circumstances, such as: (1) when the applicable Guidelines range from which a sentence may be imposed would be unaffected; (2) when a prosecutor has a good-faith doubt as to the government's ability to readily prove a charge for legal or evidentiary reasons; or (3) under certain exceptional and rare circumstances, such as caseload considerations, with approval of the appropriate Department management.[14]

Before accepting a plea agreement in lieu of taking a case to trial, Department prosecutors are required to evaluate the probable sentence a defendant would face if convicted of all counts for which the defendant could be charged, versus the sentence imposed pursuant to a plea agreement.  Department of Justice policies require that any sentence recommended by the government must honestly reflect the totality and seriousness of the defendant's conduct and be fully consistent with the U.S. Sentencing Guidelines and applicable statutes and with the readily provable facts about the defendant's history and conduct.[15]  This "honesty in sentencing" policy also requires that Department prosecutors not stand silent while a defendant argues for the application of a sentencing factor that the prosecutor does not believe is supported by law or facts.[16]  This policy is consistent with the Congressionally mandated purpose of the U.S. Sentencing Commission to "provide certainty and fairness in meeting the purposes of sentencing [and] avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."[17]

## IV.  Plea Agreement Basics

### A.  Admission of Guilt

In order to enter into a plea agreement with the Division, a defendant must be willing to plead guilty to the charged conduct at arraignment and make a factual admission of guilty.  In the vast majority of Division cases, a plea agreement is negotiated prior to indictment and the defendant will waive indictment by a grand jury and plead guilty to an information that will be filed with the court by the Division prior to the court's acceptance of the plea agreement.  Unlike civil settlements, which can be resolved without an admission of wrongdoing, the Division will not enter into a plea agreement to resolve a criminal matter if the defendant refuses to admit to participation in the charged conduct.[18]

### B.  Rights and Safeguards

Division plea agreements contain an enumeration of the rights and procedural safeguards afforded the defendant.  These rights include: the right to be charged by indictment; the right to plead not guilty; the right to a trial by jury (where the defendant can cross-examine witnesses); the right against self-incrimination; and the right to appeal a conviction and sentence.  Plea agreements advise the defendant of these rights and then require the defendant to waive certain rights.  At the plea hearing, the court will establish that the defendant understands these rights and has waived them knowingly, voluntarily, and with the advice of counsel before accepting the plea agreement.

### C.  Role of Court

Courts are specifically prohibited from participating in plea discussions.[19]  A signed plea agreement will be submitted to the court for consideration.[20]  The court's role in the plea agreement process is to accept or reject a plea agreement once it has been agreed to by the parties, and if accepted, to impose sentence.

Federal Rule of Criminal Procedure ("F.R.C.P.") 11(c)(2) requires that the parties must disclose the plea agreement in open court, unless the court finds good cause and allows the parties to disclose the plea agreement *in camera,* to the judge only.  The Division will disclose the plea agreement in open court except in limited circumstance, such as where disclosure will jeopardize the integrity of a covert investigation.  Publicly filed plea agreements also provide transparency to the bar and business world by disclosing the terms of those agreements.  For example, if corporate defendants were regularly allowed to enter into secret deals with the government, investors, members of the public, and the victims of the charged crime would naturally question the fairness and transparency of the sentence imposed.  Practically, it is also important to publicly file plea agreements because they create momentum in investigations and may spur others to accept responsibility and plead guilty.

### D.     Contract Principles

A plea agreement is a legal document memorializing the negotiated disposition of criminal charges between the prosecutor and the defendant.  In compliance with Department policy, plea agreements entered into with the Division must be in writing.[21]  Written agreements help to avoid misunderstandings between the parties as to the terms of the agreement, and also fully apprise the court of the terms of the agreement the parties have reached.  Courts often consider contract principles when analyzing plea agreements.[22]

### E.     Confidentiality of Plea Negotiations

Plea negotiations are generally considered confidential.  Pursuant to F.R.C.P. 11(f) and Federal Rule of Evidence ("F.R.E.") 410, statements made by the defendant or the defendant's counsel in the course of plea negotiations are generally not admissible at trial if the negotiations break down.  However, if a defendant enters into a plea agreement and then breaches the agreement by, for example, failing to fully cooperate, then documents, statements, information, testimony, or evidence provided by the defendant or defendant's counsel or a corporate defendant's employees, may be used against the defendant notwithstanding F.R.E. 410.  An explicit waiver allowing the use of this evidence in the event of the defendant's breach is contained in Division plea agreements.[23]

F.R.E. 410 provides two exceptions to its general rule of inadmissability at trial of statements made in connection with a guilty plea.  A statement made by a defendant in the course of failed plea discussions is admissible if: (1) another statement in the course of the same plea discussions is introduced into evidence and the statement in fairness ought to be considered contemporaneously with it;[24] or (2) in a criminal proceeding for perjury or false statement, if the statement was made by the defendant under oath, on the record and in the presence of counsel.

### F.    Types of Plea Agreements

There are two types of plea agreements that the Division typically enters into with defendants charged with Sherman Act offenses, commonly referred to as type "B" agreements and type "C" agreements.  There are certain central principles specific to each type of agreement.

### 1.    F.R.C.P. 11(c)(1)(B) Agreements

F.R.C.P. 11(c)(1)(B) provides for a type of plea agreement, known as a "B" agreement, where an attorney for the government may recommend, or agree not to oppose, that a particular sentence or sentencing range is appropriate, or that a particular provision of the Sentencing Guidelines does or does not apply.  "B" agreements may also make recommendations as to specific sentencing factors, as well as to whether restitution or probation are appropriate.  A defendant may join the government in its recommendation but is not required to do so under the Federal Rules.

The key provision that makes a plea agreement a "B" agreement is that it is *not* binding upon the court.  "B" agreements are binding upon the defendant, however, so long as the attorney for the government makes a sentencing recommendation consistent with the recommended sentence contained in the plea agreement.  In other words, a defendant cannot withdraw a guilty plea even if the court imposes a sentence other than the recommended sentence contained in a "B" agreement.[25]

### 2.    F.R.C.P. 11(c)(1)(C) Agreements

F.R.C.P. 11(c)(1)(C) provides for a type of plea agreement, commonly referred to as a "C" agreement, specifying that the government and the defendant jointly agree that a specific sentence or sentencing range is appropriate.  Like a "B" agreement, a "C" agreement can contain an agreement as to whether a specific sentencing factor applies, as well as to whether restitution or probation are appropriate.  The defining feature of a "C" agreement is that if the court accepts the plea agreement the joint sentencing recommendation of the parties is *binding* upon the court, and the court may not deviate from it in sentencing the defendant.  In order to accept a "C" agreement, a court must find that the recommended sentence and the other terms of the plea agreement serve the interests of justice.  The court may request a presentence report from the Probation Office or additional information from the parties to the agreement before deciding whether to accept the plea agreement.

The Division has achieved a near perfect track record in persuading courts to accept negotiated "C" agreements.[26]  Thus, when a defendant enters into a "C" agreement with the Division, the defendant can have confidence that the Division will be a strong advocate for the negotiated disposition and that the court is highly likely to go along with the recommendation of the parties.  This high degree of certainty is particularly attractive to foreign corporate and individual defendants who might be leery of pleading guilty, providing cooperation, and submitting to the jurisdiction of U.S. courts without the surety that "C" agreements provide.

While extremely rare in the Division's experience, if the court does not accept the recommended sentence contained in a "C" agreement, the agreement is rendered void[27] and the defendant is free to withdraw its/his plea of guilty.[28]  If the court rejects the "C" agreement, neither the defendant nor the government will be prejudiced by the failed attempt to reach a plea resolution.  F.R.C.P 11(f) and F.R.E. 410 provide that no statements made in the course of plea negotiations may be used against the defendant.  Division plea agreements provide that if the court does not accept the plea agreement and the defendant chooses to withdraw the plea of guilty, that the statute of limitations period will be tolled for the period between the signing of the plea agreement and withdrawal of the plea (or 60 days, whichever is greater) to protect the government's interests.[29]  Moreover, in the event that a court does not accept the terms of a "C" agreement,[30] the Division will restrict its ability to take action to arrest, serve with process or detain foreign national defendants residing abroad for three days after the withdrawal of a guilty plea.

## G.  Withdrawal from a Plea Agreement

Most Division plea agreements are signed shortly before the filing of charges, so withdrawal from a plea agreement prior to the filing of charges has not been an issue in Division cases.  However, if a defendant has stated an intention to plead guilty, but the court has not yet accepted the plea of guilty, a defendant may withdraw the plea of guilty for any reason.[31]  Once charges are filed and the defendant enters a plea of guilty to those charges, a defendant may only withdraw a plea of guilty before the court imposes sentence if the defendant can show a "fair and just reason for requesting the withdrawal."[32]  After the court imposes sentence, the defendant may not withdraw a plea of guilty, except if the court does not accept the recommended sentence contained in a "C" plea agreement and the agreement is rendered void.[33]

## H.  Initiating Plea Negotiations

Plea negotiations can take place at any time during the course of a criminal investigation, but usually begin pre-indictment, after prospective defendants become aware that they are subjects or targets of the investigation.  While the Division will entertain plea proposals both before and after indictment, most are entered pre-indictment where early cooperation holds an array of benefits for defendants.  Either the government or the defendant can initiate plea negotiations, which, at the Division, are predominantly handled at the staff level.[34]  The Division negotiates, signs, and publicly files plea agreements throughout the course of its investigation.  Therefore, for the most part, defendants do not have to wait until their cooperation is complete or until the investigation is over before they are advised as to the value that the government places on their cooperation.

While the following list is certainly not exhaustive, plea negotiations in cartel cases will focus on the following key issues:[35]

9

- **Who will have to plead guilty?**  For corporate defendants, what specific entity will be charged.  Wherever possible, the Division will prosecute the most culpable corporate entity involved in the conspiracy.[36]

- **What will be the violations for which the defendant must admit guilt?**  In addition to a criminal antitrust charge, has the defendant committed any collateral offenses, including mail fraud, wire fraud, obstruction, money laundering, bribery or tax offenses, that may be charged.

- **What will be the scope of the antitrust charge?**  The scope of the alleged conspiratorial conduct to be charged including the nature of the anticompetitive conduct (e.g. bid rigging, price fixing and/or market allocation), the products or services covered by the conspiratorial agreement, and the duration and geographic scope of the conspiracy.

- **What cooperation will the defendant provide?**  A detailed proffer of the cooperation that the defendant is prepared to offer.

- **Who will be covered by the nonprosecution and cooperation provisions of the plea agreement?**  For corporations, the corporate entities and employees subject to the cooperation and nonprosecution provisions of the plea agreement as well as those entities or individuals specifically "carved out" or excluded from these provisions.[37]  The cooperation requirements imposed upon the defendant, including the production of documents and witnesses, wherever located.[38]

- **What will be the sentencing recommendations of the parties?**  The recommended sentence, including the fine for corporations and the period of incarceration and fine for individuals, taking into account the defendant's Sentencing Guidelines calculations and any substantial assistance reduction. When the sentencing will take place will also be discussed.

## V.   Standard Provisions from the Division's Model Plea Agreements

In an effort to achieve maximum transparency, proportionality and efficiency, the Division has developed standard model corporate and individual plea agreements for Sherman Act offenses.  Annotated versions of these model agreements are attached.[39]  These models are intended to be a general guide to the standard provisions contained in a plea agreement for an antitrust offense, although they may be modified to comply with local practice where necessary. The models will also be updated periodically by the Division to comply with changing laws, statutes or policies.  The most recent versions of the Division's model plea agreements are available at http://www.usdoj.gov/atr/public/criminal.htm.  What follows is a discussion of the standard provisions found in the Division's Sherman Act plea agreement with endnotes cross referencing the relevant paragraphs in the model agreements.

### A.      Rights of Defendant

The "Rights of Defendant" section of the Division's corporate and individual plea agreements[40] sets forth the procedural protections and rights a defendant foregoes by pleading guilty.  The language generally tracks the checklist forth in F.R.C.P. 11(b)(1) that a court must inform the defendant of, and determine that the defendant understands, prior to accepting a defendant's plea of guilty.

### B.      Agreement to Plead Guilty and Waive Certain Rights

Division plea agreements require the defendant to plead guilty to criminal charges and make a factual admission of guilt to the court.[41]  The defendant must also explicitly waive the rights enumerated in the "Rights of Defendant" section of the plea agreement.[42]  Defendants must acknowledge that these waivers are made knowingly and voluntarily.  Foreign defendants also must waive any jurisdictional defenses available.

Plea agreements will also contain an appellate waiver.[43]  Unless local practice or, in rare instances, case-specific facts require modification, the Division's standard waiver requires that the defendant agree to waive any direct appeal or collateral attack challenging the sentence imposed if that sentence is consistent with or below the recommended sentence contained in the plea agreement.  This waiver allows the defendant to appeal a sentence imposed by the court only if that sentence is above that recommended in the plea agreement.[44]  The plea agreement provides that the government maintains the appeal rights afforded under 18 U.S.C. § 3742, allowing appeal under certain conditions, such as where the court imposed a sentence in violation of law; incorrectly applied the Sentencing Guidelines; or, in the case of a type "C" plea agreement, imposed a sentence below the recommended sentence set forth in the agreement.[45]

### C.      The Factual Basis Required To Support A Guilty Plea

A factual basis is included in Division plea agreements unless inconsistent with local practice.[46]  The purpose of this section of the plea agreement is to provide the court with a sufficient factual basis to support the plea, as required by F.R.C.P. 11(b)(2).  Practitioners will observe that the factual detail typically found in a Division plea agreement and criminal information is noticeably less than that contained in the charging documents used by many other competition authorities.  One reason for that is because, as noted above, the Division will file plea agreements with cooperating defendants throughout the course of an investigation.  Therefore, in order to protect the integrity of the ongoing investigation, the Division must often limit the degree of detail in the factual statement.  A collateral consequence of this practice is that pleading defendants do not have every aspect of their participation in a cartel recounted in specific detail as would be the case if the matter were litigated at a public trial.

Under the decision in *United States v. Booker*,[47] the government is not required to allege facts supporting Guidelines enhancements in an indictment nor prove them beyond a reasonable doubt.  Therefore, facts that would support Guidelines enhancements need not be included in the

factual basis section of plea agreements. But, facts that authorize a higher statutory maximum must be proved to a jury beyond a reasonable doubt or admitted by the defendant. Thus, if 18 U.S.C. § 3571(d) is used to obtain a fine greater than the statutory maximum, the plea agreement will address the gain or loss issue.[48]

### D. Possible Maximum Sentence

The plea agreement will enumerate the statutory maximum penalty that may be imposed against the defendant upon conviction of each charged offense.[49] The statutory maximum will include the highest possible fine, probation and restitution that may be imposed for each offense charged, the special assessment for each count, and the maximum term of imprisonment for individuals.

### E. Sentencing Guidelines

Plea agreements will address which edition of the U.S. Sentencing Guidelines applies, noting any *ex post facto* issues.[50] While it is the norm to apply the Guidelines Manual in effect at sentencing, note that under U.S.S.G. §1B1.11(b)(1) if that version of the Manual would violate the *ex post facto* clause of the Constitution by resulting in greater punishment, the Manual in effect on the date the offense was committed shall be used, except where this practice contravenes existing case law.[51] The amended Antitrust Guideline, U.S.S.G. § 2R1.1 increased the applicable Guidelines range and became effective on November 1, 2005. It will apply to defendants who engage in conspiratorial conduct that continued until on or after that date, except where applicable case law requires otherwise.

Plea agreements will contain an acknowledgment by the defendant that the Sentencing Guidelines are advisory and not mandatory, but that the court must consider them and will make the Guidelines determination by a preponderance of the evidence.[52]

### F. Limitations on Use of Self-incriminating Information

Division plea agreements for Sherman Act offenses commonly contain a provision[53] stating that self-incriminating information provided by the defendant pursuant to the plea agreement will not be used to increase the volume of affected commerce attributable to the defendant or the applicable Guidelines range, except under certain circumstances provided for in U.S.S.G. § 1B1.8(b).[54] The Division is not required to restrict the use of self-incriminating information in calculating a defendant's applicable Guidelines fine range. However, the Division's practice is to agree to do so in plea agreements with early cooperators as an additional incentive for companies to cooperate fully.[55] In addition, while the Sentencing Commission is clear that a court may rely on the information provided by a defendant pursuant to §1B1.8 as a basis for refusing to give the defendant a downward departure for substantial assistance,[56] the Division has routinely recommended that companies qualifying for §1B1.8 credit also receive downward departures, and no court has refused to accept the Division's recommendation to grant

a downward departure on this basis. This generous concession by the Division has resulted in drastically reduced fines for numerous early cooperating corporate defendants.

### G. Sentencing Agreement

#### 1. The Recommended Sentence

Division plea agreements lay out the recommended sentence, either of the government or the joint recommendation of the parties.[57] The recommended sentence must include all agreed-upon or recommended aspects of the agreement between the government and the defendant. The recommended sentence in Division plea agreements typically includes the proposed fine and any restitution to be paid, as well as the term of incarceration for individuals. If the parties agree that the recommended fine needs to be paid in installments because of the defendant's inability to pay the entire amount immediately, the plea agreement will include the installment schedule and any interest terms.[58] The payment of a special assessment[59] and any recommendation on a term of probation[60] or expedited sentencing[61] for corporations, or requests by individual defendants to be placed in a specific correctional facility,[62] will also be addressed in the plea agreement.

#### 2. When a Fine in Excess of the Statutory Maximum is Sought

The statutory maximum fine for a Sherman Act offense committed on or after June 22, 2004 is $100 million for a corporation and $1 million for an individual.[63] If pecuniary gain is derived from the offense, or if the offense results in pecuniary loss to someone other than the defendant, then the defendant may be fined up to twice the gross gain or loss, whichever is greater.[64] If the plea agreement contains a recommended sentence above the statutory maximum, then it will include a statement that had the case gone to trial, the government would have presented evidence to prove that the gain or loss resulting from the charged offense is sufficient to justify the recommended fine pursuant to 18 U.S.C. § 3571(d).[65] Division plea agreements will also contain a waiver stating that the defendant will not contest the gain or loss calculation for purposes of the plea and sentencing.[66] The statement of gain or loss and the explicit waiver were added after the Supreme Court's ruling in *Booker* requiring that facts that authorize a sentence above the statutory maximum must either be proved to a jury beyond a reasonable doubt or admitted by the defendant.[67] The Division will not engage in plea negotiations with a company that desires to litigate gain or loss in the midst of an investigation. Companies interested in litigating the gain or loss will have that opportunity once the investigation is complete. Of course, by that time, the defendant will have lost the opportunity to obtain any credit for timely cooperation.[68]

#### 3. Substantial Assistance Departures

The government must recommend a Guidelines sentence unless a downward departure as provided for in the Guidelines is warranted. After the Supreme Court's decision in *Booker*, courts will treat Guidelines as advisory but Department of Justice prosecutors will continue to recommend Guidelines sentences. The primary way a defendant can earn the Division's

recommendation of a downward departure resulting in a below-Guidelines sentence is by providing substantial assistance to the Division's investigation and prosecution of criminal offenses.[69]  The Sentencing Guidelines specifically provide that upon the motion of the government, the court may depart from the Guidelines based on the defendant's substantial assistance to the investigation or prosecution of another person[70] who has committed an offense.[71]

Early cooperation from cartel members is absolutely critical to the detection and prosecution of cartel conduct, and the Division seeks to favorably reward – and thus encourage – such cooperation.  Where the ultimate prize of full immunity is no longer available, second-in or early cooperators can still obtain substantial discounts below their Guidelines fine and incarceration ranges.  The amount of the substantial assistance departure, commonly referred to as the "cooperation discount", that the Division will recommend to the sentencing court is within the discretion of the Division.  The Division will consider a number of factors primarily focusing on the timeliness and value of the cooperation the defendant can provide.[72]  The Division's Amnesty-Plus Policy also affords defendants the ability to receive a substantial cooperation discount for discovering and reporting an antitrust violation to the Division that is unrelated to the conduct to which the defendant is pleading guilty.  A company receiving Amnesty-Plus credit not only receives the benefits of full immunity for the newly reported conduct, if it meets the requirements of the Corporate Leniency Program for the newly reported conduct, but also receives a substantial additional discount in its fine for its participation in the charged conspiracy.[73]

The agreement to make a motion for a substantial assistance departure, and any conditions placed on the promise to make such a recommendation, will be included in Division plea agreements.[74]  Most Division plea agreements providing for a substantial assistance departure recommend a specific reduced fine or jail term (or both).  Some Division plea agreements, primarily in type "B" agreements entered into with individuals, contain an unspecified or "freefall" departure wherein both the Division and defendant are free to argue for the amount of departure each deems appropriate.[75]  The Division, however, will only agree to a freefall departure that maintains the Division's ability to argue for jail time and will not agree to stand silent while the defendant argues for no jail time.[76]

### 4.    Expedited Sentencing for Foreign-Based Defendants

The Division will agree to expedite the sentencing process for foreign-based defendants who have agreed to submit to U.S. jurisdiction and have pled guilty to antitrust charges in the United States.  Specifically, in judicial districts where the practice is permissible, the Division generally will not oppose a request for expedited sentencing made by a foreign-based defendant who is pleading guilty pursuant to a Rule 11(e)(1)(C) plea agreement.  The Division's model language allows a foreign-based defendant to combine arraignment, taking of the plea, and sentencing into a single proceeding as a matter of convenience to the defendant.[77]  The provision is appropriate in "C" agreements where the court's discretion on sentencing is limited once it

accepts the plea agreement.  But the "C" agreement will not be voided if the court denies the defendant's request for expedited sentencing.

### H.    Defendant's Cooperation

The defendant's cooperation is the primary benefit that the Division receives from entering into a plea agreement.  Therefore, a commitment by the defendant to provide full, continuing, and complete cooperation is virtually always required in Division plea agreements.[78]  As discussed above, the amount of the substantial assistance reduction in the fine or period of incarceration below the Guidelines range that the government will recommend is directly tied to the timeliness and quality of the cooperation that the defendant is able and willing to provide.

The specific types of cooperation that a defendant is required to provide to the government is specified in the plea agreement, including providing the government with all non-privileged documents and information, wherever located, in the possession, custody, or control of the defendant and appearing for interviews, grand jury appearances and trials.[79]  For corporate defendants, the defendant and any related entities covered under the plea agreement must also use their "best efforts" to secure the cooperation of current, and sometimes also former, corporate employees covered under the plea agreement, including making employees (even foreign-located employees), available at the defendant's expense for interviews and testimony.  Corporate employees covered under the plea agreement are also bound to cooperate with the government.  If a covered employee fails to comply with his cooperation obligations, the government's agreement not to prosecute that person will be rendered void and the government will be free to prosecute the non-cooperating employee[80] and the government may use information provided by that individual against that person in a criminal trial.[81]  In rare situations, the government's nonprosecution promise with the company may be specifically tied to the full cooperation of certain executives where the company's cooperation is essentially meaningless without the full cooperation of those executives.[82]

It is important to note that the cooperation requirements contained in a plea agreement are ongoing obligations and the plea agreement may be voided by the government, as discussed below, for failure to comply with the cooperation obligations contained in the plea agreement even after acceptance of the plea and imposition of sentencing, so long as the investigation that gave rise to the defendants charge or a federal investigation, litigation or proceeding arising or resulting from the investigation is still pending.[83]

### I.    Government's Agreement Not to Bring Further Criminal Charges

Division plea agreements typically include a promise not to bring further criminal charges against a defendant for certain criminal acts committed prior to the date the plea agreement was signed.[84]  In corporate plea agreements, the non-prosecution promise may extend to related corporate entities[85] and/or to certain cooperating employees.  The non-prosecution protection is always conditioned on the completion of other events, such as the court's acceptance of the guilty plea and the imposition of the recommended sentence.  The scope of the

nonprosecution terms of the plea agreement is fact-specific and is negotiated to provide the defendants with the needed assurances that they will not be subjected to further prosecution for the crimes the defendant is pleading guilty to and about which the defendant is providing cooperation to the government, while at the same time ensuring that the Division is not inadvertently immunizing defendants for crimes it is not aware of or for which it is not the proper prosecuting authority.  Violations of federal tax, securities law or crimes of violence are specifically exempted from the nonprosecution terms of the plea agreement.[86]

### J.  Carve Outs

The Division routinely "carves out" certain individuals from the nonprosecution protections afforded to employees in corporate plea agreements.  The carved-out individuals may include culpable employees, employees who refuse to cooperate with the Division's investigation, or employees against whom the Division is still developing evidence.[87]  The Division will insist that carved-out individuals obtain separate counsel from the corporation and will only conduct plea negotiations directly with the individual's counsel.

The Division has recently released two policy statements addressing issues related to carve outs, including: (1) the elimination of the no-jail deal for cooperating foreign nationals;[88] (2) the Division's practice of routinely excluding multiple individuals from the non-prosecution coverage of corporate plea agreements;[89] (3) the opportunity for early cooperating companies to minimize the number of individual employees carved out of the nonprosecution protections of a corporate plea agreement;[90] and (4) the possibility of more favorable deals for those executives carved out of plea agreements entered into with early cooperating corporations because these executives, like their employers, are in a position to offer valuable and timely cooperation.[91]

### K.  Safe Passage for Foreign Nationals

When the Division enters into plea agreements that require foreign nationals to travel to the United States for interviews or testimony in order to fulfill cooperation requirements under the plea agreement, the Division will agree not to take any action to arrest, detain or serve the individual with process or prevent the individual from departing, unless that individual commits perjury, contempt, obstructs justice or makes a false statement.[92]

### L.  Immigration Relief for Cooperating Defendants

The  Immigration and Naturalization Service ("INS"), and now its successor, the Immigration and Customs Enforcement ("ICE") of the Department of Homeland Security ("DHS"), considers Sherman Act offenses to be crimes of moral turpitude.  As a result, a foreign national convicted of an antitrust offense is subject to deportation and exclusion from the United States, whether for personal or business travel.  In March 1996, the Division entered into a Memorandum of Understanding ("MOU") with the INS (now implemented by ICE as INS's successor) that establishes a protocol whereby the Division will advise cooperating aliens whether they will be granted a waiver of inadmissibility for the antitrust offense they are

prepared to admit to before they enter into a plea agreement.[93]  Prior to the MOU, the Division was unable to guarantee that a criminal conviction would not result in an alien's deportation and permanent exclusion from the United States.  Cooperating foreign nationals granted immigration relief pursuant to the MOU now receive written assurances in their plea agreements that their convictions will not be used by the ICE, DHS or the State Department as a basis to deport or exclude them from the United States after they have served their sentence.[94]

## M.    Debarment and Other Administrative Actions

The Division cannot immunize the cooperating defendant from debarment proceedings or any administrative action that may be taken by another federal or state agency based upon the defendant's conviction.  Division plea agreements, however, regularly contain a provision stating that, if requested, the Division will advise the appropriate officials of any government agency considering administrative action of the fact, manner, and extent of the cooperation of the defendant.  While this provision cannot guarantee the outcome of any administrative action by another agency, it provides assurances that the Division will advocate on defendant's behalf, wherever possible, such as when debarment from future government projects is contemplated.

## N.    Representation by Counsel

Division plea agreements contain a general statement wherein the defendant acknowledges that all legal and factual aspects of the case and plea agreement have been reviewed with an attorney, and that the defendant is satisfied with that attorney's legal representation in the matter, and the defendant's decision to enter the plea agreement is made knowingly and voluntarily.[95]

## O.    Voluntary Plea

Division plea agreements contain a statement that the defendant's decision to enter the plea agreement and to plead guilty was freely and voluntarily made.[96]  Plea agreements also state that the Division has made no promises as to whether the Court will accept or reject the recommendations contained in the plea agreement.[97]

## P.    Violation of the Plea Agreement

A pleading defendant who does not comply with the cooperation requirements or other provisions of the plea agreement will have its/his plea agreement voided with serious ramifications.  Division plea agreements provide that upon notice from the Division that the defendant, or any related entity, has failed to provide full and truthful cooperation, or has otherwise violated the plea agreement, the Division may void the plea agreement and the defendant will be subject to prosecution for the offense it previously plead guilty to, and for any federal crime of which the government is aware.[98]  If the plea agreement is voided, the model language provides that statements, information, testimony, or evidence provided by the defendants to the United States may be used against the defendant in any prosecution and the

defendant waives the right to challenge the use of such evidence.[99]  In addition, the statute of limitations is tolled for the period between the date of the signing of the plea agreement and six months after the date that the Division gives notice of its intent to void the plea agreement.

Also, for individual defendants located abroad, the language on voiding the agreement will include a provision that the factual basis contained in the plea agreement provides a sufficient basis for any possible future extradition request made by the United States, and that the defendant agrees not to oppose such extradition request.[100]

Q.     Entirety of the Agreement

Division plea agreements contain a statement that the written plea agreement constitutes the entire agreement between the Division and the defendant, and it cannot be modified, except in writing.[101]  Corporate plea agreements must also reference and attach a resolution of the company's board of directors authorizing the signatory to enter into the plea agreement on behalf of the defendant company.[102]

VI.  Benefits of Plea Agreements

Plea Agreements are mutually beneficial to the prosecuting agency and the defendants. In addition, the ability of plea agreements to resolve a defendant's criminal exposure provides benefits to the bar, business community and judicial system.

A.     Benefit #1: Transparency

As discussed in Part II of this paper, transparency in the plea negotiation process is not only essential to securing cooperation from culpable parties, but also it is critical to fostering public confidence that there is proportional and equitable treatment of antitrust offenders. Publicly filed plea agreements in prior cases - available on the Division's website - provide a starting place for companies and individuals weighing cooperation to assess how others similarly situated were sentenced and to predict, with some degree of confidence, the possible rewards they could receive for early cooperation.[103]  Transparency is also important to the prosecuting agency's credibility among the business community and the bar.  Plea agreements provide a written, publicly available record of the prosecuting agency's policies and positions that the business community and the bar can point to in counseling their employees and clients.  By developing and making public model language, such as that contained in the attached model plea agreements, prosecuting agencies place cooperating parties on notice of the terms and obligations that will bind the parties if they enter into a plea agreement.

B.     Benefit #2: Proportionality

The Division ensures that its sentencing recommendation for a defendant is proportionate, not only with respect to recommendations made as to other members of the cartel, but also to similarly-situated defendants in other cartels prosecuted by the Division.  In making

its sentencing recommendations, the Division will give great weight to the timeliness of the cooperation, the quality of the cooperation, and the culpability of the putative defendant *relative* to other members of the same cartel. During plea negotiations, at the request of counsel for a putative defendant, the Division will discuss proportionality of the defendant's treatment compared to that of other members of the cartel. While courts decide the defendant's sentence, Division prosecutors will attempt to ensure that the defendant receives a proportionate sentence by adhering to any agreed-upon disposition with the defendant – despite any inclination of the court to impose a higher sentence.

### C.  Benefit #3: Certainty

When antitrust defendants enter into plea negotiations with the Division, they are often looking for certainty about the type of sentence they will receive by the court. To that end, both the government and the antitrust defendants are often able to agree to many, if not all, of the material terms of the defendant's sentence *prior* to sentencing. Indeed, in some cases, the parties may reach an agreement on a jointly recommended sentence. Once the defendant has entered into a plea agreement, the defendant can approach sentencing with a degree of certainty as to what sentence the prosecutor will recommend to the court. Type "C" plea agreements provide the highest degree of certainty because the court can only impose a sentence consistent with the agreement's recommended sentence once it accepts the plea agreement. With type "B" plea agreements, the defendant at least knows with certainty what sentence the government will recommend to the court and remains free to appeal a sentence imposed by the court that is above the recommended sentence.

The certainty that comes with the Division plea agreement carries wide-ranging benefits. For instance, corporate executives covered by a corporate plea agreement are also provided with the certainty that if they fully cooperate they will not be prosecuted for the conduct to which their employer pled guilty. Likewise, customers, banks, shareholders, and other financial partners of the pleading corporation can rely on the certainty provided by a corporate plea agreement that the corporation has resolved its criminal liability and has put its legal troubles with the government behind it. And as previously discussed, foreign nationals pleading guilty and receiving immigration relief receive pre-adjudicated certainty as to their post-conviction immigration status.

### D.  Benefit #4: Expediency

When a defendant enters into plea agreements, Division criminal investigations are expedited to the benefit of both parties – the Division's ability to secure early cooperation though plea agreements inevitably hastens the pace of the investigation, and defendants' ability to resolve their criminal liability by plea agreements leads to more swift imposition of sentences that amply reward the defendants for their early cooperation. If our justice system did not provide an opportunity to resolve criminal charges through plea agreements, Division investigations and prosecutions would be substantially prolonged. Similarly, a defendant's opportunity to resolve criminal charges would be stretched out for years, as would a victim's

ability to obtain damages, while the government completed its investigation and prepared the case for trial.

Moreover, the longer that a prosecution is delayed after the conduct ceases, the less of a deterrent effect the prosecution will have.  Negotiated settlements provided for in plea agreements, especially when working in conjunction with an effective leniency program, are a fast and efficient means for uncovering and prosecuting cartel activity.  The benefits do not end with the investigation resolved through plea agreements – not only are resources freed to investigate other cartels, but the swift prosecution of more cases leads to an increased fear of detection, resulting in future self-reporting and ultimately increased deterrence.

### E.      Benefit #5: Finality

Every defendant desires finality.  A protracted criminal investigation and prosecution that has no apparent end in sight is the worst nightmare of both companies and individuals alike.  Plea agreements provide the opportunity for both the defendant and the prosecutor to arrive at a final and definitive resolution of the matter.  The Division saves precious resources by not having to incur the time, labor and expense of litigating a trial; the court and public are spared the time and expense of a trial; and the defendant moves one giant step closer to putting the conduct to rest without having to face the expense and media attention of a public trial.

### F.      Benefit #6: Cooperation

As discussed throughout this paper, the primary benefit that the prosecuting agency and the defendant receive through plea agreements is derived from the defendant's commitment to continuing cooperation with the government's investigation.  For both parties, the rewards are significant when the defendant decides to break ranks with the other cartel members and becomes a cooperating witness for the government.

For the Division, the early cooperation of a pleading defendant, pursuant to a plea agreement, often leads to the swift prosecution of other cartel members.  After the first company or individual pleads guilty, there is tremendous momentum gained in an investigation.  Other cartel members, knowing that one of their own has cracked and can provide information inculpating them, frequently race to the door to begin plea negotiations with Division staff.  If the Division is required to indict any holdouts, then the cooperating defendant and its employees, along with any leniency applicant, become key witnesses in providing the insider evidence that is critical to securing a conviction.

For early cooperating companies, a variety of important benefits may be sought depending on the value of its cooperation, including: (1) reducing the scope of the charged conduct or the affected commerce used to calculate a company's Guidelines fine range; (2) limiting the scope of conduct charged against the company or the amount of commerce attributed to the company; (3) obtaining a substantial cooperation discount; (4) securing more favorable treatment for culpable executives; and (5) possibly qualifying for Amnesty Plus or

affirmative amnesty consideration.[104]  For individual defendants, the benefits of early cooperation are quite simple – the opportunity to avoid a lengthy jail sentence.

Finally, cooperation provided pursuant to a plea agreement can often lead to the detection of other previously unidentified cartels relating to different products or in different geographic markets.  As discussed in Section V(G)(3) above, through the Division's Amnesty-Plus Policy, the ability to tell the Division about an additional cartel can lead to a substantial sentencing benefit as to the first offense and complete immunity for the newly reported conduct.  Amnesty Plus is a win-win situation for the defendant, and the Division and has become an increasingly important cartel-detection and case-generation tool for the Division.

## VII.   Conclusion

The U.S. system of negotiated plea agreements, along with the Division's Corporate Leniency Policy, continues to play a vital role in cracking cartels and swiftly advancing the Division's investigation and prosecution of cartel members.  As this paper has demonstrated, plea agreements provide enormous benefits to the government, cooperating defendants, the courts, the victims, and the public at large by persuading cartel members -- though the promise of transparent, proportional, expedited, certain, and final plea dispositions -- to cooperate early and accept responsibility for their criminal conduct.  Put simply, negotiated plea agreements are a good deal with benefits for all.

**Endnotes**

1.  The Antitrust Division's Corporate Leniency Policy (1993) is *available at* http://www.usdoj.gov/atr/public/guidelines/0091.htm.

2.  *See* Gary R. Spratling, Transparency in Enforcement Maximizes Cooperation from Antitrust Offenders (hereinafter "Transparency in Enforcement"), Presented Before The Fordham Corporate Law Institute 26th Annual Conference on International Antitrust Law & Policy (October 15, 1999), *available at* http://www.usdoj.gov/atr/public/speeches/3952.htm.

3.  *See* Leniency Policy Speeches, available at http://www.usdoj.gov/atr/public/criminal.htm.

4.  Gary R. Spratling, Negotiating The Waters Of International Cartel Prosecutions: Antitrust Division Policies Relating To Plea Agreements In International Cases (hereinafter "Negotiating the Waters"), Speech Before the ABA Criminal Justice Section Thirteenth Annual National Institute on White Collar Crime (March 4, 1999) *available at* http://www.usdoj.gov/atr/public/speeches/2275.htm.

5.  Scott D. Hammond, Charting New Waters in International Cartel Prosecutions (hereinafter "Charting New Waters"), Speech Before the ABA Criminal Justice Section's Twentieth Annual National Institute on White Collar Crime (Mar. 2, 2006) *available at* http://www.usdoj.gov/atr/public/speeches/214861.htm.

6.  *See* Charting New Waters, at § II(F).

7.  *See* Charting New Waters, at § II(G).

8.   For a detailed discussion of the benefits available to early cooperators, *see* Scott D. Hammond, Measuring the Value of Second-In Cooperation in Corporate Plea Negotiations (hereinafter "Measuring the Value of Second-In Cooperation"), Address Before the 54th Annual Spring Meeting of the ABA Section of Antitrust Law (March 29, 2006), *available at* http://www.usdoj.gov/atr/public/speeches/215514.pdf.

9.  *See* Principles of Federal Prosecution, U.S. Attorney's Manual § 9-27.420, *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/27mcrm.htm#9-27.420

10.  *Id.* at § 9-27.150.

11.  *See* Memo from Attorney General John Ashcroft to All Federal Prosecutors, Memo Regarding Policy On Charging Of Criminal Defendants (September 22, 2003) (hereinafter "September 22, 2003 Ashcroft Memo"), at § (I)(A), *available at*, http://www.usdoj.gov/opa/pr/2003/September/03_ag_516.htm.

12.  *See* Principles of Federal Prosecution, U.S. Attorney's Manual §§ 9-27.400 and 9-27.430(A)(1), *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/27mcrm.htm.

13.  *See* September 22, 2003 Ashcroft Memo at § I(A) and § II(C).

14.  For a full list of exceptions to the charging of the most serious, readily provable offense, some of which are inapplicable to criminal antitrust cases, *see* September 22, 2003 Ashcroft Memo at § I(B).

15.  *See* Memo from Attorney General John Ashcroft to All Federal Prosecutors, Department Policies and Procedures Concerning Sentencing Recommendations and Sentencing Appeals (July 28, 2003) (hereinafter "July 28, 2003 Ashcroft Memo"), at § II(B), *available at* http://www.nacdl.org/public.nsf/legislation/ci_03_32/$FILE/AG_Guidance_Stcg_Recs.pdf, and September 22, 2003 Ashcroft Memo.

16.  July 28, 2003 Ashcroft Memo at § II(A)(2).

17.  28 U.S.C. § 991(b)(1)(B).

18.  While F.R.C.P. 11(a) provides that with court's permission a defendant may plead *nolo contendere* (no contest) without admitting guilt, the Division will not accept plea agreements where the defendant is not prepared to admit guilt and the Division will strongly oppose defendant's request to the court to enter a *nolo* plea without a plea agreement.  F.R.C.P. 11(a) also provides for conditional pleas (which require government consent and are extremely rare) and pleas of guilty to an indictment (with or without a plea agreement).

19.  *See* F.R.C.P. 11(c)(1).

20.  *See* F.R.C.P. 11(c)(3).

21.  *See* September 22, 2003 Ashcroft Memo at § II(A).  Note, however, that in rare instances where exigencies require that plea agreements not be in writing, the terms of the agreement must be formally stated on the court record.

22.  For a review of case law *see Guilty Pleas*, 91 Geo. L.J. 362, n.1239 (2003).

23.  *See* ¶ 20 of the attached individual model plea agreement and ¶ 23 of corporate model plea agreements.

24.  This exception is consistent with the so-called "rule of completeness" contained in Federal Rule of Evidence 106.

25.  *See* ¶ 11 of attached corporate and individual model plea agreements.

26.  In the past decade, the Division has filed hundreds of "C" agreements in federal courts and there has only been one instance in which a judge declined to accept the recommended sentence contained in a "C" agreement entered into by the Division.  The plea agreement in that case called for a $29 million fine for a cooperating corporate defendant.  The court rejected the recommended sentence because it found the proposed fine reduction for the defendant's

23

cooperation excessive.  The parties then submitted a revised "C" agreement recommending a fine range of $29 to $32.5 million, and the head of the Antitrust Division, the Assistant Attorney General, personally appeared before the court to urge the Court to sentence the defendant to the low end of the recommended fine range.  The court accepted the plea agreement and imposed a $32.5 million fine.  *See* Negotiating the Waters, at § VI(A), and final SDC plea agreement *available at* http://www.usdoj.gov/atr/cases/f3800/3869.htm.

27.  *See* ¶ 11(a) of attached corporate and individual model plea agreements.

28.  *See* ¶ 11(b) of attached corporate and individual model plea agreements.

29.  *Id.*

30.  *Id.*

31.  Fed. Rule Crim. P. 11(d)(1).

32.  Fed. Rule Crim. P. 11(d)(2).

33.  Fed. Rule Crim. P. 11(e).

34.  Recommendations to enter into plea agreements on certain terms are made by the staff, with their office chief's recommendation, to the Deputy Assistant Attorney General for Criminal Enforcement.  All plea agreements must be approved by the Assistant Attorney General for Antitrust.

35.  For a discussion of plea negotiations generally, and issues to be discussed at the initial meeting with the Antitrust Division, *see* ABA Section of Antitrust Law, *Criminal Antitrust Litigation Manual*, at 77-86 (2d ed. 2006).

36.  *See* Negotiating the Waters at § VI(B).

37.  *See* Negotiating the Waters at § II(A); Charting New Waters at § II(G).

38.  *See* Negotiating the Waters at § II(B).

39.  These Models provide only internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.  No limitations are hereby placed on otherwise lawful investigative and litigative prerogatives of the Department of Justice.

40.  *See* ¶ 1 of attached corporate and individual model plea agreements.

41.  *See* ¶ 3 of attached corporate and individual model plea agreements.

42.  *See* ¶ 2 of attached corporate and individual model plea agreements.

43.  *Id.*

44.  This waiver should theoretically only ever apply to type "B" plea agreements, because if a court accepts a type "C" agreement it must impose a sentence consistent with the recommended sentence.

45.  18 U.S.C. § 3742(b) and (c).

46.  *See* ¶ 4 of attached corporate and individual model plea agreements.

47.  125 S. Ct. 738 (2005).

48.  For a discussion of the implications of the *Booker* decision on the Division's charging and plea agreement practice, *see* Scott D. Hammond, Antitrust Sentencing in the Post-Booker Era: Risks Remain High for Non-Cooperating Defendants (hereinafter "Antitrust Sentencing in the Post-Booker Era"), Speech Before the ABA Section of Antitrust Law Spring Meeting (Mar. 30, 2005), *available at* http://www.usdoj.gov/atr/public/speeches/208354.htm.

49.  *See* ¶¶ 5 and 6 of attached corporate and individual model plea agreements.

50.  *See* ¶ 7 of attached corporate and individual model plea agreements.

51.  *See e.g., United States v. DeMaree*, 459 F.3d 791 (7th Cir. 2006) (holding that the *ex post facto* clause does not apply to the now advisory Guidelines).

52.  *See* ¶ 7 of attached corporate and individual model plea agreements.

53.  *Id.*

54.  U.S.S.G. § 1B1.8(b) provides that the government may use information: (1) known to the government prior to entering the plea/cooperation agreement; (2) concerning the existence of prior convictions and sentences; (3) in a prosecution for perjury of giving a false statement; (4) if there is a breach of the plea/cooperation agreement by the defendant; or (5) in determining whether, or to what extent, a downward departure is warranted for substantial assistance.  *See* optional part of ¶ 7 of attached corporate and individual model plea agreements.

55.  *See*  Measuring the Value of Second-In Cooperation at § II(a).

56.  *See* U.S.S.G. § 1B1.8(b)(5) and Application Note 1.

57.  *See* ¶ 8 of attached corporate and individual model plea agreements.

58.  *See* ¶ 8(a) of attached corporate and individual model plea agreements.

59.  *See* ¶ 8(b) of attached corporate model plea agreement and ¶ 8(c) of the individual model plea agreement.

60. *See* ¶ 8(c) of attached corporate model plea agreement.

61. *See* ¶ 8(d) of attached corporate model plea agreement.

62. *See* ¶ 8 of attached corporate model plea agreement.

63. Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 215, 118 Stat. 665, 668 (2004).

64. 18 U.S.C. § 3571(d).

65. *See* ¶ 8(b) of attached individual model plea agreement and ¶ 8(e) of the corporate model plea agreement.

66. *Id.*

67. *See* Antitrust Sentencing in the Post-Booker Era at § IV.

68. *Id.*

69. If the court finds that the defendant has an inability to pay a Guidelines fine, the defendant's fine may also fall below the Guidelines fine range pursuant U.S.S.C. § 8C3.3 (for organizations) or U.S.S.C. § 5E1.2(e) (for individuals). *See* alternative ¶ 9 of the attached corporate and individual model plea agreement.

70. Corporations cannot received substantial assistance departures for cooperating against its own employees or agents who were responsible for the offense which the organization is being sentenced. *See* U.S.S.G. §§ 5K1.1, application n.1.

71. U.S.S.G. §§ 5K1.1 (individuals) and 8C4.1 (corporations).

72. For a discussion of the factors considered in determining the size of the cooperation discount, *see generally* Measuring the Value of Second-In Cooperation at § II(B).

73. *See Id.* at § II(E).

74. *See* ¶ 9 of attached corporate and individual model plea agreements.

75. *See* n.30 of attached individual model plea agreement.

76. *See* Charting New Waters at § II(F).

77. *See* ¶ 8(d) of the attached corporate model plea agreement

78. In limited, rare instances where a defendant wishes to plead guilty but will not or cannot provide meaningful cooperation, the Division will enter into a plea agreement with a defendant that does not require the defendant's cooperation. However, these types of agreements are more

akin to sentencing agreements than plea/cooperation agreements.

79. *See* ¶ 12 of attached individual model plea agreement and ¶ 14 of the corporate model plea agreement.

80. *See* ¶ 17(c) of the attached corporate model plea agreement.

81. *See* ¶ 17(e) of the attached corporate model plea agreement.

82. *See* optional ¶ 14(b) of the attached corporate model plea agreement. For a discussion of this policy, *see* Negotiating The Waters at § II(E).

83. *See* ¶ 12 of attached individual model plea agreement and ¶ 14 of the corporate model plea agreement.

84. *See* ¶ 13 of attached individual model plea agreement and ¶ 16 of the corporate model plea agreement.

85. *See* ¶¶ 14, 16 and n.29 of the attached corporate model plea agreement.

86. *See* ¶ 16 of the attached corporate model plea agreement.

87. *See* Charting New Waters at § II(G)

88. *See* Charting New Waters at § II(F)

89. *See* Charting New Waters at § II(G)

90. *See* Measuring the Value of Second-In Cooperation at § II(D).

91. *Id.*

92. *See* ¶ 14 of the attached individual model plea agreement and ¶ 18 of the corporate model plea agreement.

93. *See* Memorandum of Understanding Between the Antitrust Division United States Department of Justice and The Immigration and Naturalization Service United States Department of Justice (Mar. 15, 1996), *available at* http://www.usdoj.gov/atr/public/criminal/9951.htm; *see also* Negotiating the Waters at § IV(B), for a discussion of the INS MOU.

94. *See* optional ¶ 15 of the attached individual model plea agreement.

95. *See* ¶ 17 of the attached individual model plea agreement and ¶ 20 of the corporate model plea agreement.

96.  *See* ¶ 18 of the attached individual model plea agreement and ¶ 21 of the corporate model plea agreement.

97.  *Id.*

98.  *See* ¶ 19 of the attached individual model plea agreement and ¶ 22 of the corporate model plea agreement.

99.  *See* ¶ 20 of the attached individual model plea agreement and ¶ 23 of the corporate model plea agreement.

100.  *See* ¶ 21 of the attached individual model plea agreement.

101.  *See* ¶ 22 of the attached individual model plea agreement and ¶ 24 of the corporate model plea agreement.

102.  *See* ¶ 25 of the attached corporate model plea agreement.

103.  Publicly filed plea agreements *available at* http://www.usdoj.gov/atr/cases.html.

104.  *Id.*