```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                           SOUTHERN DIVISION

3                              —    —    —

4

     IN RE:  AUTOMOTIVE PARTS
5    ANTITRUST LITIGATION                 MDL NO. 2311

6    _____/

7

8              STATUS CONFERENCE / MOTION HEARING

9         BEFORE THE HONORABLE MARIANNE O. BATTANI
                  United States District Judge
          Theodore Levin United States Courthouse
10                231 West Lafayette Boulevard
                         Detroit, Michigan
11               Wednesday, November 13, 2013

12

     APPEARANCES:
13
```

**Direct Purchaser Plaintiffs:**

```
                    ROBERT W. BOSSLET, III
15                  KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
                    1633 Broadway
16                  New York, NY  10019
                    (212) 506-1868
17
                    THOMAS C. BRIGHT
18                  GOLD, BENNET, CERA & SIDENER, L.L.P.
                    595 Market Street   , Suite 2300
19                  San Francisco, CA  94105
                    (415) 777-2230
20
                    WILLIAM G. CALDES
21                  SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
                    1818 Market Street, Suite 2500
22                  Philadelphia, PA  19103
                    (215) 496-0300
23

24

25
```

Case 2:12-md-02311-SFC-RSW   ECF No. 659, PageID.9039   Filed 12/03/13   Page 2 of 178
Status Conference / Motion Hearing • November 13, 2013

2

```
1    APPEARANCES: (Continued)
     Direct Purchaser Plaintiffs:
2
                    DAVID H. FINK
3                   FINK & ASSOCIATES LAW
                    100 West Long Lake Road, Suite 111
4                   Bloomfield Hills, MI  48304
                    (248) 971-2500
5
                    LEWIS H. GOLDFARB
6                   McELROY, DEUTSCH, MULVANEY & CARPENTER
                    1200 Mount Kemble Avenue
7                   Morristown, NJ  07962
                    (973) 993-8100
8
                    GREGORY P. HANSEL
9                   PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
                    One City Center
10                  Portland, ME  04112
                    (207) 791-3000
11
                    WILLIAM E. HOESE
12                  KOHN, SWIFT & GRAF, P.C.
                    One South Broad Street, Suite 2100
13                  Philadelphia, PA  19107
                    (215) 238-1700
14
                    JONATHAN M. JAGHER
15                  SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
                    181 Market Street, Suite 2500
16                  Philadelphia, PA  19103
                    (215) 496-0300
17
                    JOSEPH C. KOHN
18                  KOHN, SWIFT & GRAF, P.C.
                    One South Broad Street, Suite 2100
19                  Philadelphia, PA  19107
                    (215) 238-1700
20
                    HAROLD G. LEVISON
21                  KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
                    1633 Broadway
22                  New York, NY  10019
                    (212) 506-1716
23
                    EDWARD E. McNALLY
24                  KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
                    1633 Broadway
25                  New York, NY  10019
                    (212) 506-1708
```

Case 2:12-md-02311-SFC-RSW   ECF No. 659, PageID.9040   Filed 12/03/13   Page 3 of 178
Status Conference / Motion Hearing • November 13, 2013

3

```
 1    APPEARANCES: (Continued)
      Direct Purchaser Plaintiffs:
 2
                      MICHAEL MOSKOVITZ
 3                    FREED, KANNER, LONDON & MILLEN, L.L.C.
                      2201 Waukegan Road, Suite 130
 4                    Bannockburn, IL  60015
                      (224) 632-4502
 5
                      ERIC J. PELTON
 6                    KEINBAUM, OPPERWALL, HARDY & PELTON, P.L.C.
                      280 North Old Woodward, Suite 400
 7                    Birmingham, MI  48009
                      (248) 645-0000
 8
                      MATTHEW RYAN
 9                    COHEN MILSTEIN
                      1100 New York Avenue NW, Suite 500 West
10                    Washington, D.C.  20005
                      (202) 408-4600
11
                      MICHAEL S. SMITH
12                    PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
                      One City Center
13                    Portland, ME  04112
                      (207) 791-3000
14
                      JASON J. THOMPSON
15                    SOMMERS SCHWARTZ, P.C.
                      2000 Town Center, Suite 900
16                    Southfield, MI  48075
                      (248) 355-0300
17
                      HECTOR TORRES
18                    KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
                      1633 Broadway
19                    New York, NY  10019
                      (212) 506-1730
20
                      RANDALL B. WEILL
21                    PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
                      One City Center
22                    Portland, ME  04112
                      (207) 791-3000
23

24

25
```

```
1    APPEARANCES: (Continued)
     End-Payor Plaintiffs:
2
                     GORDON BALL
3                    GORDON BALL, L.L.P.
                     7001 Old Kent Drive
4                    Knoxville, TN  37919
                     (865) 525-7028
5
                     WARREN T. BURNS
6                    SUSMAN GODFREY, L.L.P.
                     901 Main Street, Suite 5100
7                    Dallas, TX  75202
                     (214) 754-1928
8
                     LAUREN CRUMMEL
9                    THE MILLER LAW FIRM, P.C.
                     950 West University Drive, Suite 300
10                   Rochester, MI  48307
                     (248) 841-2200
11
                     FRANK C. DAMRELL
12                   COTCHETT, PITRE & McCARTHY, L.L.P.
                     840 Malcolm Road
13                   Burlingame, CA  94010
                     (650) 697-6000
14
                     LISA GRAY
15                   OLIVER LAW GROUP
                     950 West University Drive, Suite 200
16                   Rochester, MI  48307
                     (248) 436-3385
17
                     WILLIAM V. REISS
18                   LABATON SUCHAROW
                     140 Broadway Avenue
19                   New York, NY  10005
                     (212) 907-0858
20
                     HOLLIS L. SALZMAN
21                   ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
                     601 Lexington Avenue, Suite 3400
22                   New York, NY  10022
                     (212) 980-7405
23

24

25
```

```
 1   APPEARANCES: (Continued)
     End-Payor Plaintiffs:
 2
                    MARC M. SELTZER
 3              SUSMAN GODFREY, L.L.P
                190 Avenue of the Stars, Suite 950
 4              Los Angeles, CA  90067
                (310) 789-3102
 5
                    STEVEN N. WILLIAMS
 6              COTCHETT, PITRE & McCARTHY, L.L.P.
                840 Malcolm Road
 7              Burlingame, CA  94010
                (650) 697-6000
 8
     Dealership Plaintiffs:
 9
                    DON BARRETT
10              BARRETT LAW OFFICES
                P.O. Drawer 987
11              Lexington, MS  39095
                (601) 834-2376
12
                    JONATHAN W. CUNEO
13              CUNEO, GILBERT & LaDUCA, L.L.P.
                507 C Street NE
14              Washington, D.C.  20002
                (202) 789-3960
15
                    JOEL DAVIDOW
16              CUNEO, GILBERT & LaDUCA, L.L.P.
                507 C Street NE
17              Washington, D.C.  20002
                (202) 789-3960
18
                    BRENDAN FREY
19              MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON,
                P.C.
20              1361 East Big Beaver Road
                Troy, MI  48083
21              (248) 457-9200
22                  GERARD V. MANTESE
                MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON,
23              P.C.
                1361 East Big Beaver Road
24              Troy, MI  48083
                (248) 457-9200
25
```

```
 1   APPEARANCES: (Continued)
     Dealership Plaintiffs:
 2
                 SHAWN M. RAITER
 3               LARSON KING, L.L.P.
                 30 East Seventh Street, Suite 2800
 4               Saint Paul, MN  55101
                 (651) 312-6500
 5
                 VICTORIA ROMANENKO
 6               CUNEO, GILBERT & LaDUCA, L.L.P.
                 507 C Street NE
 7               Washington, D.C.  20002
                 (202) 789-3960
 8
     For the Defendants:
 9
                 GARY K. AUGUST
10               ZAUSMER, KAUFMAN, AUGUST & CALDWELL, P.C.
                 31700 Middlebelt Road, Suite 150
11               Farmington Hills, MI  48334
                 (248) 851-4111
12
                 DONALD M. BARNES
13               PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
                 1919 Pennsylvania Avenue, NW, Suite 500
14               Washington, D.C.  20006
15               MICHAEL L. BROWN
                 ALSTON & BIRD, L.L.P.
16               1201 West Peachtree Street
                 Atlanta, GA  30309
17               (404) 881-7000
18               JEREMY CALSYN
                 CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
19               2000 Pennsylvania Avenue NW
                 Washington, D.C.  20006
20
                 STEVEN F. CHERRY
21               WILMER HALE
                 1875 Pennsylvania Avenue NW
22               Washington, D.C.  20006
                 (202) 663-6321
23
                 JAMES W. COOPER
24               ARNOLD & PORTER, L.L.P.
                 555 Twelfth Street NW
25               Washington, D.C.  20004
                 (202) 942-5000
```

Case 2:12-md-02311-SFC-RSW   ECF No. 659, PageID.9044   Filed 12/03/13   Page 7 of 178
Status Conference / Motion Hearing • November 13, 2013

7

```
 1    APPEARANCES:   (Continued)
      For the Defendants:
 2
                      KENNETH R. DAVIS, II
 3                    LANE POWELL, P.C.
                      601 SW Second Avenue, Suite 2100
 4                    Portland, OR  97204
                      (503) 778-2100
 5
                      DEBRA H. DERMODY
 6                    REED SMITH
                      225 Fifth Avenue
 7                    Pittsburgh, PA 15222
                      (412) 288- 3131
 8
                      GEORGE B. DONNINI
 9                    BUTZEL LONG, P.C.
                      150 West Jefferson Avenue
10                    Detroit, MI  48226
                      (313) 225-7000
11
                      DAVID P. DONOVAN
12                    WILMER, CUTLER, PICKERING, HALE and DORR,
                      L.L.P.
13                    1875 Pennsylvania Avenue NW
                      Washington, D.C.  20006
14                    (202) 663-6868

15                    MOLLY M. DONOVAN
                      WINSTON & STRAWN, L.L.P.
16                    200 Park Avenue
                      New York, NY  10166
17                    (212) 294-4692

18                    DAVID F. DuMOUCHEL
                      BUTZEL LONG, P.C.
19                    150 West Jefferson Avenue
                      Detroit, MI  48226
20                    (313) 225-7000

21                    J. CLAYTON EVERETT, JR.
                      MORGAN, LEWIS & BOCKIUS, L.L.P.
22                    1111 Pennsylvania Avenue NW
                      Washington, D.C.  20004
23                    (202) 739-5860

24

25
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2

 3                   PETER M. FALKENSTEIN
                     JAFFE, RAITT, HEUER & WEISS, P.C.
 4                   27777 Franklin Road, Suite 2500
                     Southfield, MI  48034
 5                   (248) 351-3000

 6                   JAMES P. FEENEY
                     DYKEMA GOSSETT, P.L.L.C.
 7                   39577 Woodward Avenue, Suite 300
                     Bloomfield Hills, MI  48304
 8                   (248) 203-0841

 9                   MICHELLE K. FISCHER
                     JONES DAY
10                   51 Louisiana Avenue NW
                     Washington, D.C.  20001
11                   (202) 879-4645

12                   LARRY S. GANGNES
                     LANE POWELL, P.C.
13                   1420 Fifth Avenue, Suite 4100
                     Seattle, Washington  98101
14                   (206) 223-7000

15                   MEGAN HAVSTAD
                     O'MELVENY & MYERS, L.L.P.
16                   Two Embarcadero Center, 28th Floor
                     San Francisco, CA  94111
17                   (415) 984-8700

18                   FRED K. HERRMANN
                     KERR, RUSSELL & WEBER, P.L.C.
19                   500 Woodward Avenue, Suite 2500
                     Detroit, MI  48226
20                   (313) 961-0200

21                   HOWARD B. IWREY
                     DYKEMA GOSSETT, P.L.L.C.
22                   39577 Woodward Avenue, Suite 300
                     Bloomfield Hills, MI  48304
23                   (248) 203-0526

24

25
```

Case 2:12-md-02311-SFC-RSW   ECF No. 659, PageID.9046   Filed 12/03/13   Page 9 of 178
Status Conference / Motion Hearing • November 13, 2013

9

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
                     HEATHER LAMBERG KAFELE
 3                   SHEARMAN & STERLING, L.L.P.
                     801 Pennsylvania Avenue, NW
 4                   Washington, D.C.  20004
                     (202) 508-8097
 5
                     YUKO KANAMARU
 6                   SUMITOMO ELECTRIC INDUSTRIES, L.T.D.
                     1-3-13 Motoakasaka, Minato-ku
 7                   Tokyo 107-8468, Japan
                     +81-3-6406-2750
 8
                     KURT G. KASTORF
 9                   WILMER, CUTLER, PICKERING, HALE and DORR,
                     L.L.P.
10                   1875 Pennsylvania Avenue, NW
                     Washington, D.C.  20006
11                   (202) 663-6868

12                   JEFFREY L. KESSLER
                     WINSTON & STRAWN, L.L.P.
13                   200 Park Avenue
                     New York, NY  10166
14                   (212) 294-4655

15                   SHELDON H. KLEIN
                     BUTZEL LONG, P.C.
16                   41000 Woodward Avenue
                     Bloomfield Hills, MI  48304
17                   (248) 258-1414

18                   JAY L. LEVIN
                     PORTER, WRIGHT, MORRIS & ARTHUR
19                   1900 K Street NW, Suite 1110
                     Washington, D.C. 20006
20                   (202) 778-3054

21                   FRANKLIN LISS
                     ARNOLD & PORTER, L.L.P.
22                   555 Twelfth Street NW
                     Washington, D.C.  20004
23                   (202) 942-5000

24

25
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
 3                    ANDREW S. MAROVITZ
                      MAYER BROWN, L.L.P.
 4                    71 South Wacker Drive
                      Chicago, IL  60606
 5                    (312) 701-7116

 6                    KELSEY A. McPHERSON
                      LATHAM & WATKINS, L.L.P.
 7                    555 Eleventh Street NW, Suite 1000
                      Washington, D.C.  20004
 8                    (202) 637-2200

 9                    W. TOOD MILLER
                      BAKER & MILLER, P.L.L.C.
10                    2401 Pennsylvania Avenue NW, Suite 300
                      Washington, D.C.  20037
11                    (202) 663-7822

12                    BRIAN M. MOORE
                      DYKEMA GOSSETT, P.L.L.C.
13                    39577 Woodward Avenue, Suite 300
                      Bloomfield Hills, MI  48304
14                    (248) 203-0772

15                    GEORGE A. NICOUD, III
                      GIBSON, DUNN & CRUTCHER, L.L.P.
16                    555 Mission Street
                      San Francisco, CA  94105
17                    (415) 393-8200

18                    RONALD NIXON
                      KEMP KLEIN LAW FIRM
19                    201 West Big Beaver Road, Suite 600
                      Troy, MI  48084
20                    (248) 528-1111

21                    CATHERINE E. PALMER
                      LATHAM & WATKINS, L.L.P.
22                    885 Third Avenue
                      New York, NY  10022
23                    (212) 906-1200

24

25
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2

 3                   MICHAEL RUBIN
                     ARNOLD & PORTER, L.L.P.
 4                   555 Twelfth Street NW
                     Washington, D.C.  20004
 5                   (202) 942-5094

 6                   TIANA LEIA RUSSELL
                     ARNOLD & PORTER, L.L.P.
 7                   555 Twelfth Street NW
                     Washington, D.C.  20004
 8                   (202) 942-6807

 9                   WM. PARKER SANDERS
                     SMITH, GAMBRELL & RUSSELL, L.L.P.
10                   Promenade Two, Suite 3100
                     1230 Peachtree Street NE
11                   Atlanta, GA  30309
                     (404) 815-3684
12
                     LARRY J. SAYLOR
13                   MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
                     150 West Jefferson, Suite 2500
14                   Detroit, MI  48226
                     (313) 496-7986
15
                     CRAIG SEEBALD
16                   VINSON & ELKINS, L.L.P.
                     2200 Pennsylvania Avenue NW, Suite 500 West
17                   Washington, D.C.  20037
                     (202) 639-6585
18
                     STEPHEN J. SQUERI
19                   JONES DAY
                     901 Lakeside Avenue
20                   Cleveland, OH  44114
                     (216) 586-3939
21
                     ANITA STORK
22                   COVINGTON & BURLING, L.L.P.
                     One Front Street
23                   San Francisco, CA  94111
                     (415) 591-7050
24

25
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
 3                    MARGUERITE M. SULLIVAN
                      LATHAM & WATKINS, L.L.P.
 4                    555 Eleventh Street NW, Suite 1000
                      Washington, D.C.  20004
 5                    (202) 637-2200

 6                    JOANNE GEHA SWANSON
                      KERR, RUSSELL & WEBER, P.L.C.
 7                    500 Woodward Avenue, Suite 2500
                      Detroit, MI  48226
 8                    (313) 961-0200

 9                    THOMAS TALLERICO
                      BODMAN, P.L.C.
10                    201 West Big Beaver Road, Suite 500
                      Troy, MI  48084
11                    (248) 743-6000

12                    MAUREEN T. TAYLOR
                      BROOKS, WILKINS, SHARKEY & TURCO
13                    401 South Old Woodward, Suite 400
                      Birmingham, MI  48009
14                    (248) 971-1721

15                    KATHERINE A. TREFZ
                      WILLIAMS & CONNOLLY, L.L.P.
16                    725 Twelfth Street NW
                      Washington, D.C.  2005
17                    (202) 434-5648

18                    MICHAEL R. TURCO
                      BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.
19                    401 South Old Woodward Avenue, Suite 400
                      Birmingham, MI  48009
20                    (248) 971-1713

21                    LINDSEY ROBINSON VAALA
                      VINSON & ELKINS, L.L.P.
22                    2200 Pennsylvania Avenue NW, Suite 500 West
                      Washington, D.C.  20037
23                    (202) 639-6585

24

25
```

```
1    APPEARANCES:  (Continued)
     For the Defendants:
2
                      ANNA VALK
3                     KERR, RUSSELL & WEBER, P.L.C.
                      500 Woodward Avenue, Suite 2500
4                     Detroit, MI  48226
                      (313) 961-0200
5
                      A. PAUL VICTOR
6                     WINSTON & STRAWN, L.L.P.
                      200 Park Avenue
7                     New York, NY  10166
                      (212) 294-4655
8
                      ROBERT WIERENGA
9                     SCHIFF HARDIN, L.L.P.
                      350 South Main Street, Suite 210
10                    Ann Arbor, MI  48104
                      (734) 222-1507
11
                      DREW R. WISNIEWSKI
12                    LATHAM & WATKINS, L.L.P.
                      555 Eleventh Street NW, Suite 1000
13                    Washington, D.C.  20004
                      (202) 637-2200
14
     Also present:   TIMOTHY FRASER
15                    OFFICE OF THE ATTORNEY GENERAL, STATE OF
                      FLORIDA
16                    The Capital, PL-01
                      Tallahassee, FL  32399
17                    (850) 414-3733
18                    R. SCOTT PALMER
                      OFFICE OF THE ATTORNEY GENERAL, STATE OF
19                    FLORIDA
                      The Capital, PL-01
20                    Tallahassee, FL  32399
                      (850) 414-3300
21

22

23

24

25
```

```
 1                    TABLE OF CONTENTS

 2                                              Page

 3   STATUS CONFERENCE................................ 15

 4
            MOTIONS REGARDING INSTRUMENT PANEL CLUSTER
 5
     COLLECTIVE DEFENDANTS/DIRECT PURCHASER
 6   Motion by Mr. Cherry............................. 81
     Response by Mr. Kohn............................. 91
 7   Reply by Mr. Cherry.............................100

 8   NIPPON/DIRECT PURCHASER
     Motion by Mr. Victor............................102
 9   Response by Mr. Kohn............................106
     Reply by Mr. Victor.............................108
10
     COLLECTIVE DEFENDANTS/INDIRECT PURCHASERS
11   Motion by Ms. Fischer...........................109
     Response by Mr. Burns...........................124
12   Response by Mr. Williams........................127
     Response by Ms. Romanenko.......................128
13   Response by Mr. Cuneo...........................133
     Reply by Ms. Fischer............................134
14

15              MOTIONS REGARDING HEATER CONTROL

16   COLLECTIVE DEFENDANTS/DIRECT PURCHASER
     Motion by Mr. Cherry............................137
17   Response by Mr. Kohn.......................141, 145
     Reply by Mr. Cherry.............................144
18
     COLLECTIVE DEFENDANTS/INDIRECT PURCHASERS
19   Motion by Ms. Sullivan..........................146
     Motion by Ms. McPherson.........................155
20   Response by Mr. Williams........................160
     Response by Ms. Romanenko..................165, 169
21   Reply by Ms. Sullivan...........................167
     Reply by Ms. McPherson..........................169
22
     ALPS/INDIRECT PURCHASERS
23   Motion by Ms. Stork.............................170
     Response by Mr. Seltzer.........................172
24   Reply by Ms. Stork..............................177

25
```

 1  Detroit, Michigan

 2  Wednesday, November 13, 2013

 3  at about 11:00 a.m.

 4                          —   —   —

 5           (Court and Counsel present.)

 6           THE CASE MANAGER:  All rise.

 7           The United States District Court for the Eastern

 8  District of Michigan is now in session, the Honorable

 9  Marianne O. Battani presiding.

10           You may be seated.

11           THE COURT:  Good morning.

12           ATTORNEYS PRESENT:  Good morning.

13           THE COURT:  It looks like you've expanded.

14           THE CASE MANAGER:  It is growing, Judge.

15           THE COURT:  It is growing.  We have our same

16  defendants.  Where are our other defendants?  Just all over

17  the place?  Okay.

18           Welcome back.  I see that we have had -- I guess we

19  all see that we have had an increase in the number of parts

20  since we last met.  I have a total of 27.  Everybody count

21  that up right?

22           UNIDENTIFIED ATTORNEY:  Yes.

23           THE COURT: Yes.  Okay.  I hate to miss one.  The

24  first thing on the agenda is the motion of the United States

25  for the temporary and limited stay of certain discovery.  Let

1    me, for those of you who have not been here before, tell you

2    the way we do this is we do need to use the microphone so

3    everyone can hear.  Those of you in the back if you can't

4    hear please let us know.  But before you speak, no matter how

5    well you think we know you, please state your name for the

6    record and then speak.  All right.  Now, if I had a pen we

7    could start.

8           Let me start with one thing, not to single anybody

9    out, but I would like to make this disclosure.

10          Tom Tallerico, are you here?

11          MR. TALLERICO:  Yes, Your Honor.

12          THE COURT:  Tom Tallerico and I -- well, before I

13   even disclose that, what are you appearing for?

14          MR. TALLERICO:  I represent T.Rad, that's a

15   defendant in the radiator case and --

16          THE COURT:  I'm sorry, I can't hear you, Tom.

17   Radiator --

18          MR. TALLERICO:  I represent a defendant, T.Rad, and

19   they are a defendant in the radiator case and in the

20   automotive transmission fluid warmer case.

21          THE COURT:  Okay.  All right.  Tom Tallerico has a

22   first cousin, Randall Tallerico, who is also my first cousin

23   but we are not related.  We have first cousins through

24   opposite sides of a family but we are not related.  We don't

25   see each other very often, the last year I don't know that we

```
 1    have seen each other, but I do want to disclose that.  If
 2    anybody has any difficulty with that please let it be known?
 3             (No response.)
 4             THE COURT:  Okay.  Dave, you look like you are
 5    ready to jump out of your chair?
 6             MR. FINK:  It is my job, Your Honor, and I'm
 7    concerned that your family isn't closer.
 8             THE COURT:  Okay.  All right.  As we view this
 9    motion, who is going to argue?  Can I have your appearances?
10             MR. GALLAGHER:  Good morning, Your Honor.
11    Paul Gallagher of the antitrust division for the Department
12    of Justice.
13             MR. FINK:  Your Honor, for the -- for all of the
14    plaintiffs, Warren Burns of the -- who represents the
15    end payors will be speaking today.
16             THE COURT:  For all of the plaintiffs?
17             MR. FINK:  For all of the plaintiffs' groups, yes.
18             MR. DONOVAN:  Good morning, Your Honor.
19    David Donovan, Wilmer, Hale, representing Denso International
20    America and Denso Corp.  I will be speaking on behalf of the
21    defendants, although Mr. Iwrey is also going to address one
22    of the issues.
23             THE COURT:  Why don't you put your appearance on
24    too?
25             MR. IWREY:  Your Honor, Howard Iwrey, and I will be
```

```
 1    addressing the later case defendant issues.
 2          THE COURT:  Okay.  I have tried -- I have read and
 3    I have copious notes on your briefs, and I get to the end and
 4    then I go what are they agreeing on?  I mean, it is like you
 5    seem to agree with both sides, I thought the Government is
 6    very cooperative that way, but first of all, as to the stay,
 7    we discussed that last time and the stay itself we are going
 8    for six months at a time.
 9          MR. GALLAGHER:  That's correct, Your Honor.
10          THE COURT:  So that's clear.  All right.  The next
11    thing I would like to address is the scope, if you would,
12    because that's where I don't quite understand where the
13    Government fits in, and I might say to all sides I seem to
14    have a different opinion than all of you so what the heck.
15    Go ahead.
16          MR. GALLAGHER:  Your Honor, after several months of
17    negotiations we were able to reach resolution on most of the
18    major issues primarily with the plaintiffs, which is where
19    the main issues were between DOJ in terms of seeking a stay.
20    The only issue that we were not able to reach complete
21    resolution on and that plaintiffs and the DOJ have agreed to
22    put off for a time, in essence, we have agreed to disagree
23    and we don't believe is an issue that needs to be in front of
24    the Court right now, is the plaintiffs wish to reserve their
25    right once the stay is lifted to come to the Court and ask
```

1     the Court if they can obtain discovery not from DOJ but from

2     defendants' files of statements made by any individual or

3     entity, a defendant, to the DOJ during the course of plea

4     negotiations or any sort of cooperation that these defendant

5     individuals or entities provide to the Department of Justice.

6             We have serious concerns with regard to that.  We

7     have indicated that to plaintiffs, but there is no specific

8     request at this time by the plaintiffs for such materials so

9     we have agreed to a placeholder on that issue.

10            THE COURT:  So when you say basically that you will

11    likely object --

12            MR. GALLAGHER:  That's correct.

13            THE COURT:  -- to any attempt to get this

14    information, and then you leave it to the Court, I don't like

15    that wording because it sounds like it is not an agreement,

16    but as I hear you explain it now it is not an agreement, it

17    is simply putting it off?

18            MR. GALLAGHER:  That's right.

19            THE COURT:  Is that right?

20            MR. GALLAGHER:  That's correct.  The stipulation

21    was that everyone agrees no one can get materials directly

22    from the DOJ even after the stay is lifted, but then there

23    was an exception requested by plaintiffs for this specific

24    scenario that I just set out.  DOJ was concerned that having

25    that exception language in there could be viewed to be tacit

1    approval by DOJ that we recognized that they had the right,

2    the ability to request those materials from defendants when

3    we adamantly oppose them obtaining such material because

4    regardless of who the materials are obtained from, whether it

5    is DOJ or the defendants, it still has a significant and

6    direct impact on DOJ's leniency program and any cooperation

7    that we get in the future from defendants.

8            Now, again, I'm not here to go into that in detail

9    and to make an argument in detail on that, we want to reserve

10   our right to do so in the future when there are specific

11   requests and there is a context under which -- or in which we

12   can make those arguments as to why that discovery would be

13   inappropriate.  So we and the plaintiffs in essence have

14   agreed to table it.  They reserve their right to ask for it,

15   we reserve our rights and they acknowledge that we are likely

16   to come in and oppose that in the future.  It is basically a

17   provision of fair notice to everyone about what is going to

18   happen in the future.

19           THE COURT:  Okay.

20           MR. GALLAGHER:  I'm sorry.  That didn't directly

21   address your question, but if you have any questions on that

22   I'm happy to --

23           THE COURT:  Well, the question is it is basically

24   putting it off?

25           MR. GALLAGHER:  That's correct.

1          THE COURT:  That's what I'm understanding now?

2          MR. GALLAGHER:  That's correct.

3          THE COURT:  This is document information basically?

4          MR. GALLAGHER:  Yes, primarily that's my

5    understanding, we have not, and again that's why the context

6    is important when these requests are actually made, we don't

7    know specifically what plaintiffs are going to request,

8    whether it be documentary or otherwise regardless --

9    especially with regard to documentary evidence we would

10   object to that.

11         THE COURT:  Okay.  Right now it is until the stay

12   is lifted there will be no discovery from defendants' files

13   on matters of the DOJ --

14         MR. GALLAGHER:  That's correct.

15         THE COURT:  -- as matters related to the DOJ?

16         MR. GALLAGHER:  And never any -- before or after

17   the stay never any discovery directly from DOJ.

18         THE COURT:  Okay.  I would like that reworded that

19   way if it ends up that way.

20         MR. GALLAGHER:  Okay.

21         THE COURT:  Objections to this, let's talk about

22   the stay period, first of all, as to the scope of discovery.

23   There is a lot of discussion about merit versus non-merit

24   depositions.

25         MR. GALLAGHER:  Yes, Your Honor.

1    THE COURT:  And I looked at what both sides

2  indicated and as I understand it defendants' position is

3  conduct that is or has been under investigation by the DOJ,

4  and plaintiffs' position is that the stay would apply to

5  discovery of actual or potential criminal conduct the DOJ is

6  currently investigating.  It is a little tricky to me and a

7  little murky on a lot of areas.

8    MR. GALLAGHER:  It is a little murky.  I think

9  unfortunately it would be difficult, if not impossible, to

10  come up with a specific set -- you know, type of wording that

11  would characterize what's appropriate, and that's why the

12  parties had difficulty and now are in conflict over what

13  should be within this stayed-subject category.  From the

14  DOJ's perspective we don't want to see any discovery that

15  relates to our investigations, okay, that would disclose in

16  any way either process or substance relating to what we are

17  investigating.

18    THE COURT:  What if they hit on something that is

19  part of the leniency or amnesty program that they wouldn't --

20  I mean, they may not know about directly but obviously they

21  are going to be able through questioning to find out about

22  who the amnesty -- I don't know what you call it, you know,

23  or leniency person, company, is?

24    MR. GALLAGHER:  Right.  We have a specific tranche,

25  if you will, of the three tranches that are in the

1    stipulation.  The first tranche is what discovery is

2    permitted in the initial cases, the second is for the

3    subsequent cases, and the third is informal discovery.  And

4    we see that that type of discovery, whether it is settlement

5    discussions and information exchanged between defendants and

6    plaintiffs relating to settlement discussions, or information

7    that is provided by an amnesty applicant defendant to the

8    plaintiffs pursuant to their Ex Pari obligations, we view

9    that as informal discovery that would be permitted but with

10   certain constraints such as the existence of a

11   confidentiality order so the information could not be shared

12   beyond the parties who are exchanging the information, and

13   also that any time that that information was used by the

14   plaintiffs in the future in any court filings or memos,

15   pleadings, it would have to be done under seal, again, to

16   protect how far that information was disseminated.

17          THE COURT:  Okay.  And the response to that,

18   plaintiff?

19          MR. BURNS:  Good morning, Your Honor.  Warren Burns

20   again for the plaintiffs.

21          Our principal concern on the scope of the

22   stayed-subject issues here is the breadth of the language

23   that the defendants have proposed.  We feel that our language

24   is narrow and precise, it affects precisely the issues that

25   were under investigation by the DOJ and therefore protects

 1    the key governmental interest involved here, but we feel --

 2            THE COURT:  But how do you do this?  It applies

 3    only to actual or potential criminal conduct the DOJ is

 4    currently investigating.  Unless you know what they are

 5    investigating you could start asking questions, I mean, and

 6    then they are going to stop, and guess what, you know what

 7    they are investigating.  I mean, it is like I don't see

 8    this -- I just don't see how you can do this.

 9            MR. BURNS:  There is a mutual onus in that regard

10    that applies to --

11            THE COURT:  A mutual what?

12            MR. BURNS:  Mutual onus to this definition, so

13    obviously if we know what the scope of the Government's

14    investigation was then we would be precluded from asking

15    those questions, but the --

16            THE COURT:  So the Government would have to tell

17    you what the scope of their investigation is?

18            MR. BURNS:  No, the defendants could refuse to

19    reply to a question or reply to discovery on the basis that

20    it was covered by the definition of stayed subjects in the

21    order.  So in essence the mutual onus is really on the civil

22    parties.  We can't ask those questions if we know they are

23    getting at that discovery.

24            THE COURT:  Why can't you wait?

25            MR. BURNS:  Why can't we wait until after the stay

1    is lifted?

2           THE COURT:  Until after the criminal proceedings.

3           MR. BURNS:  That's a subject of significant

4    negotiation between us and the Government, the two parties

5    principally interested here.  I think the Government took the

6    position that with respect to the initial cases their

7    investigation was largely over, they saw fewer concerns about

8    allowing us to get into those topics because they didn't

9    think it would reach into their current and ongoing

10   investigation, and given obviously the timing and procedural

11   posture of this case we wanted to move it along as quickly as

12   we could while respecting the key governmental interest that

13   they are seeking to protect.

14          THE COURT:  Defendants?

15          MR. DONOVAN:  Good morning, Your Honor.

16   David Donovan.

17          Initially the Department of Justice came in with a

18   request for a stay of merits discovery and merits

19   depositions, and plaintiffs agreed with that.  And as we got

20   a little further into the weeds the plaintiffs backed off,

21   and I think it is becoming increasingly clear that's exactly

22   what they want to do, they want to start getting into merits

23   discovery.

24          The problem for the defendants is, especially the

25   way they have formulated their standard, is that a witness in

1    a deposition or his lawyer would have to essentially assert

2    or concede that the subject matter about which they are

3    asking was related to either actual or potential criminal

4    conduct.

5          Now, there is a couple problems with that.  Number

6    one, it might not in that defendant's view relate to criminal

7    conduct at all.  They may think -- that defendant may think

8    that the subject matter was perfectly innocuous and the

9    defendant did nothing wrong, so some defendants in that

10   circumstance -- some witnesses would be testifying about the

11   merits of the Government's investigation because they thought

12   they had done nothing wrong whereas others would have to

13   assert, wait a minute, I think that maybe I did something

14   wrong so now I'm not going to answer this question.  It is a

15   rabbit hole, and we will -- it will lead to endless disputes

16   at depositions about what is and what is not within the scope

17   of the stay.

18         THE COURT:  Do you have any different opinion

19   regarding the initial cases' depositions?

20         MR. DONOVAN:  Well, I'm speaking to the initial

21   cases' depositions.  In the initial cases document discovery

22   is what gets sliced and diced a little bit.

23         THE COURT:  But the document discovery has already

24   been taken care of basically except for the redaction thing

25   that we have to deal with?

1     MR. DONOVAN:  In terms of the scope I think that's

2  correct, Your Honor, but document discovery of products in

3  the initial cases and defendants in the initial cases does go

4  forward.  Deposition discovery that goes to the merits does

5  not go forward, whether it deals with the initial products or

6  the initial defendants or not, there is to be no depositions

7  in the initial cases that go to the merits, and what we have

8  been fighting about is trying to define what that means.  I

9  think we all know what it means.  What they are trying to do

10  is to create an exception so they can start to wedge into --

11  during the stay wedge into areas that the Department of

12  Justice wants to keep off limits.

13     THE COURT:  Okay.  One minute.

14     MR. BURNS:  Just to respond briefly, Your Honor, to

15  that point.  The difference here is the defendants know what

16  the Government's investigation was about, about that actual

17  or potential criminal conduct.  They are in the position to

18  answer the question and to invoke their objection.  The truth

19  is either under their formulation or our formulation there

20  are going to be judgment calls on their part.  The difference

21  is that their formulation, this broader formulation of

22  matters under investigation -- that were under investigation

23  by the DOJ may include things that really don't touch on the

24  merits, don't touch on criminal liability, don't touch on the

25  investigation.

1           For example, the DOJ has been investigating

2    certainly their pricing activities but if we look at that as

3    a broad general hold then they can withhold information that

4    relates to their general practices that have nothing to do

5    with any type of criminal liability or the issues at stake in

6    this case.

7           THE COURT:  Okay.  I think that this is -- what did

8    you call it, a rabbit's hole?  I agree.  I do not see at all

9    how you can proceed with these depositions without getting

10   into what the Government is investigating.  I mean, after all

11   that's what you want to know, that's why you really want to

12   talk to these people.  So at this point the Court is going to

13   ban any merit questions.  That does not mean the depositions

14   cannot go forward in terms of other things, your 30(b), your

15   corporate representatives, your -- if there is anything

16   towards class certification, if there's anything on damages.

17   You mentioned something about money but I don't see why they

18   couldn't go into anything here about damages, but anything

19   else is going to have to be held for a later date, so this is

20   not a permanent bar, I'm not saying you can never go into any

21   of these things, obviously I don't know where that's going,

22   but right now during this stay period the stay subjects are

23   everything that goes to the merits of the cases.

24           Now as to the documents and the redaction versus

25   the withholding of the document, Government?

1      MR. GALLAGHER:  This is another one of those issues

2  where we are not really contesting the approach of either

3  side.  We do have a strong preference for withholding of

4  those documents as opposed to redaction.  Our biggest concern

5  is that regardless of how carefully a redaction process takes

6  place, if you are getting into large numbers of documents

7  redaction almost certainly will not catch everything, and we

8  are in a position where our preference is to over exclude as

9  opposed to under exclude, we don't think that that's going to

10  cause that much harm to the plaintiffs, these are things they

11  are going to get ultimately down the road anyway, and our

12  preference then would be for the defendants to withhold

13  any --

14      THE COURT:  As I understand it, these are all Bates

15  stamped materials, is this because this is all material that

16  has been given to the Government and it was Bates stamped at

17  that time or --

18      MR. GALLAGHER:  I will let the defendants speak to

19  that because --

20      THE COURT:  Because I didn't understand when it was

21  Bates stamped.

22      MR. GALLAGHER:  There may be Bates stamping in

23  different ways depending on what they are doing with the

24  documents.

25      THE COURT:  Okay.  Plaintiff?

1          MR. BURNS:  Your Honor, plaintiffs' preference is
2    for redaction.  Obviously it is laid out in our position
3    statement.  Our concern again is over scope, we worry about a
4    document that is 85 pages long dealing with pricing issues
5    and has one reference on one page to another competitor or to
6    another part.  Perhaps there is not a -- perhaps we don't
7    have to look at this as a binary choice because it would
8    strike me in that case redaction would be appropriate and the
9    defendants could redact and log, but certainly there are
10   going to be situations where we understand there would be
11   significant redactions in a document.  So if the Court is
12   inclined to permit the defendants to withhold then we would
13   simply ask for a Folsom log so that we can monitor what is
14   being withheld, and it is relevant to our discovery going
15   forward and our prosecution of the case.  We are mindful of
16   the fact that at least one defendant in this case has
17   admitted in its plea agreement to destroying documents, these
18   are people who have pled guilty and the burden on them
19   frankly is one that should be expected.  We want to move the
20   case forward and that's why we would like to see what is
21   being withheld and be able to challenge it if we can.
22          THE COURT:  Okay.  Defendant, Mr. Donovan?
23          MR. DONOVAN:  This one frankly has us scratching
24   our heads a little bit.  We have collectively produced in the
25   wire harness case more than 12 million pages of documents.

1    According to defendants -- plaintiffs' discovery responses

2    last week they can't even answer most of our questions

3    because they are still reviewing the documents we produced a

4    year ago.  There's not going to be any merits deposition

5    during the stay so there's no use they can make of these

6    documents during the stay other than to just look at them.

7    And by the time we get done with the redaction process they

8    are proposing and the logging process they are proposing and

9    presumably the meet and confers that we will then have to

10   engage in about whether the redactions are okay or not the

11   stay will likely be over and the entire thing would be

12   entirely moot and a waste of time.

13           In the meantime --

14           THE COURT:  Okay.  Start -- go back a little bit

15   though.

16           MR. DONOVAN:  Sure.

17           THE COURT:  I want to know about the Bates stamping

18   because they are interested in documents maybe disappearing

19   or being lost, et cetera.

20           MR. DONOVAN:  Sure.  What we proposed from the

21   get-go is any document withheld would be identified by a

22   Bates number.  When we do our document reviews, Your Honor,

23   documents get numbered, that's the first thing you can do so

24   you can keep track of them.  If you don't number them right

25   away you are talking about millions of pages of paper.  You

1   have to number them to keep track of them.  Any document

2   under our proposal that is withheld for this reason because

3   it contains a reference to other products not in the initial

4   cases or other competitors not in the initial cases would be

5   identified by a Bates number and we would give them a list of

6   the Bates numbers, that way when the stay is lifted and we

7   produce all of the documents that were withheld for this

8   reason they can compare the documents that they are getting

9   with the lists of Bates numbers and see they have got them or

10  see there is some document that was withheld that has now not

11  been produced and they can inquire why.  I think it is pretty

12  straightforward really.

13          The logistical nightmare of doing what they suggest

14  really can't understate -- or overstated, I always get that

15  wrong.  There are multiple copies of many of these documents,

16  especially e-mails, not all of which are entirely identical.

17  So what they are asking us to do is not only -- when we

18  identify a document that contains a reference to another

19  product or another competitor, redact that reference, but

20  then continue reading the entire document to redact all the

21  references.  So when you have got 6, 8, 15 copies of any

22  given document you have got to make sure that you have

23  identified all the duplicates, to the extent they are not

24  duplicates identify what is different, review every page, as

25  the Department of Justice said, very carefully to make sure

1    you have redacted it in an identical way, and then I guess

2    log it with all of the steps of the logging process they

3    propose.

4         It is unlikely in a case of this size with this

5    many pieces of paper that you are going to do it consistently

6    every time, and so you are going to have some versions of a

7    document that get produced that doesn't have all of the

8    redactions of another version of the document so the cat's

9    out of the bag in that event.  That's the concern I think the

10   Department of Justice appropriately raises, you are just not

11   going to get it right, there are too many pieces of paper, so

12   withholding is the only way to go.

13        There is more than enough paper going to be

14   produced in this case, there already has been more than

15   enough paper produced in this case to keep the plaintiffs

16   very, very busy reviewing paper until well after the stay is

17   over.  Withholding whatever tiny percentage falls within the

18   scope of the stayed areas is no burden on anyone and

19   requiring us to redact and log all of those pieces of paper

20   is an enormous burden, extraordinary expensive and ultimately

21   I think a complete waste of time.

22        In the alternative, they are suggesting that if we

23   are allowed to withhold that we produce an even more detailed

24   log with respect to every document that is withheld with the

25   date, the author, the recipients, the custodians, the subject

1    matter, the Bates numbers and the specific reason that the

2    document is being withheld.  Again, it is entirely pointless.

3    By the time we get done providing it the stay will likely be

4    over in which case all of that expense and all of that effort

5    is completely wasted.  And the only advantage to the process

6    they are proposing is if during the course of the stay we are

7    going to be in here arguing about the log and whether the log

8    is Folsom enough or whether the subject matter has been

9    identified clearly enough or whether the document really

10   should or should not have been withheld, all of which will

11   get resolved just about the time the stay is over and they

12   get the documents anyway.

13         So we are just asking that we not be put to a

14   burden that is entirely unnecessary, very expensive, unlikely

15   to be successful, and ultimately to be no value to anybody.

16         THE COURT:  Out of curiosity, when you have these

17   documents that you turned over, like you said, the 12 million

18   pages.

19         MR. DONOVAN:  Collectively, not just ours.

20         THE COURT:  Good.  You all shared 12 million pages.

21   You know, back in the day when I did this it was manual, now

22   I know there are computer programs that do that.  Do you, in

23   fact, use computer programs, I'm just curious, or does

24   somebody read all of these documents?

25         MR. DONOVAN:  Those documents are all reviewed.

 1    There may come a point where we talk about predictive coding,

 2    but to this point -- and I can't speak for everyone here.

 3              THE COURT:  Just for yourself.  I'm just curious.

 4              MR. DONOVAN:  But these are the documents that were

 5    produced in response to the Department of Justice Grand Jury

 6    subpoenas, and those documents have all been eyeballed by

 7    somebody.  And, of course, a lot of those documents are in

 8    Japanese -- in fact, the vast majority are in Japanese.  They

 9    have been reviewed by Japanese-speaking attorneys and legal

10    assistants and the like.

11              THE COURT:  I was just curious as to how that

12    works.

13              MR. DONOVAN:  It is quite an undertaking.

14              THE COURT:  Mr. Burns?

15              MR. BURNS:  Just briefly, Your Honor.  I mean, we

16    have heard quite a parade of burdensome horribles, and I'm

17    not insensitive to those concerns but --

18              THE COURT:  Have you read the 12 million documents?

19              MR. BURNS:  I have not personally read those

20    12 million, Your Honor, but actually that brings up a point.

21    The 12 million documents are not the ones that we are arguing

22    about now, we are talking about other documents that may be

23    produced in response to discovery.  We have heard counsel

24    represent that it is a tiny percentage of whatever they are

25    going to produce.  We know that they are reviewing each of

1   those documents for responsiveness and for this redaction and

2   to redact if necessary or to withdraw if necessary.  So it is

3   hard for me -- I'm scratching my head a little bit to

4   appreciate this significant and appreciable burden that

5   arises after they have done the review and know that there is

6   something in there they don't want to turn over or redact.

7           THE COURT:  What are you going to do with that

8   information?

9           MR. BURNS:  Well, Your Honor, if we are given a

10  Folsom log then we would review the log like we would a

11  privilege log and determine if there were any documents in

12  there that we wanted to ask further questions on.  My

13  experience in many cases is that those questions are fairly

14  limited.  We are not going to -- I can't imagine a situation

15  where we would march down a 100-page list or a 100-page log

16  and go document by document, but it provides us some security

17  that they are abiding by appropriate control mechanisms and

18  doing these redactions or withholdings and that we have the

19  ability to challenge it if necessary.

20          THE COURT:  Okay.  In looking at this I think this

21  is another rabbit's hole and that these documents should be

22  withheld.  I think you having a log with a Bates number is

23  sufficient.  It will give you enough information to be

24  assured that at a later time you get those particular

25  documents or some reason why you shouldn't get those

1   particular documents, and I think there is plenty to be done

2   here that this does not delay this litigation, so that's my

3   ruling.

4          Okay.  What other things on that order did I not

5   cover?

6          MR. DONOVAN:  Mr. Iwrey is going to address an

7   issue with respect to the later cases, but there is one more

8   issue for the initial cases that I would like Your Honor to

9   address.

10          THE COURT:  Okay.

11          MR. DONOVAN:  We proposed that as we know there are

12   no merits depositions during the initial stay.  There will

13   likely, however, be some witnesses who have factual

14   information not subject to the stay but who also have factual

15   information that is subject to the stay, and we don't think

16   it makes any sense to have those witnesses be deposed more

17   than once, once during the stay with respect to the things

18   that are within the limits and then again after the stay with

19   respect to things that are outside of the limits.  So what we

20   propose is that if either side notices up a deposition of a

21   witness who that party's counsel believes to have information

22   covered by the stay and about which that witness, of course,

23   won't be able to testify, that if the other side nonetheless

24   decides to go forward with that deposition during the stay

25   that any redeposition of that witness after the stay they

 1   have to pay the costs and expenses associated with that

 2   second deposition.

 3          We are not trying to impose any additional costs on

 4   anybody, we are just asking that the parties be smart about

 5   what they do during the stay so as not to impose needless

 6   expense on either side.  If these witnesses were all in

 7   Michigan and we were all in Michigan and conducting

 8   depositions in Michigan it wouldn't be such a big deal, but

 9   most of these witnesses are outside of the United States, and

10   to require dozens of lawyers to travel outside of the United

11   States to take a deposition of a witness about something

12   reasonably non-controversial during the stay and then make

13   everybody schlep out there again after the stay is over to do

14   it again now that the stay is over just doesn't make any

15   sense to us.

16          We think there's plenty of witnesses -- we expect

17   there will be plenty of witnesses if the parties want to go

18   forward with depositions during the stay who can be deposed

19   who won't raise this issue at all, and for those witnesses

20   who do have information about other products or other

21   competitors about which the witness cannot be deposed during

22   the stay we suggest we just put those depositions off but

23   that if somebody wants to go forward anyway and they really

24   want to take that witness's deposition now then they should

25   have to pay the expense incurred in redeposing the witness.

1    THE COURT:  Let me ask you about the list that I

2  received of the individual defendants who are being released

3  from prison.  Was -- are they going back to their homelands,

4  a number of them, immediately or is there something to do

5  with being able to take depositions before they leave the

6  United States?

7    MR. DONOVAN:  Mr. Cherry has been addressing this

8  issue on behalf of our clients, and I will let him address

9  that issue.

10    THE COURT:  Okay.  Your appearance, Mr. Cherry?

11    MR. CHERRY:  Yes, Your Honor.  I'm Steve Cherry

12  with the law firm Wilmer, Hale, and I represent Denso.

13    With respect to our own people, they will be

14  returning to Japan and -- but we have worked out an agreement

15  with the plaintiffs, we haven't executed the stipulation yet

16  but we are in agreement on the terms that they will agree to

17  come to one of various locations at their choice that has

18  been worked out for a deposition at the appropriate time.

19    THE COURT:  So they are still in the United States

20  or once they leave the United States are they able to get

21  back into the United States?

22    MR. CHERRY:  Oh, yes, yes.  As part of the plea

23  agreements the antitrust division -- there is an MOU process

24  with Homeland Security and ICE, and the individuals are able

25  to come and go from the U.S., so they will be able to come.

1          THE COURT:  All right.  So the Government has

2     agreed on that?

3          MR. CHERRY:  They have agreed to do that pursuant

4     to the terms.

5          THE COURT:  That answers a big question.

6          MR. SQUERI:  Your Honor, Stephen Squeri on behalf

7     of Yazaki North America and Yazaki Corporation.

8          If I could address that question with respect to

9     certain individuals from Yazaki that have been sentenced to

10    serve time in prison.

11         Your Honor, we have, in fact, entered into a

12    stipulation and agreement with plaintiffs that would call for

13    those individuals in the wire harness cases to return to the

14    United States in order to sit for depositions.  That

15    stipulation was filed with the Court back in early August as

16    a result of some pretty extensive negotiations between us and

17    plaintiffs.  Each of those individuals have agreed to do so.

18         As in the case of Mr. Cherry's -- the employees of

19    Mr. Cherry's client, Denso, each of the Yazaki individuals

20    were provided immigration waivers that allow them to continue

21    to travel into the United States, they will have to go to the

22    U.S. Embassy.

23         THE COURT:  Okay.  That's what I didn't know from

24    reading that stipulation is were they remaining here somehow

25    or were they going back and then how could they get back in

 1    the country, but that answers the question so that's good.

 2    Thank you.

 3              All right.  Mr. Iwrey?

 4              MR. BURNS:  Your Honor, may I respond just on the

 5    multiple deposition point briefly?

 6              THE COURT:  Yes.

 7              MR. BURNS:  Again, our issue comes down to scope on

 8    this.  It is entirely one-sided and the defendants --

 9    particularly with respect to 30(b)(6) witnesses the

10    defendants are going to choose the deponent and we are going

11    to be, in essence, stuck with the choice of whether to go

12    forward with that deposition, which won't be stayed, and be

13    subjected potentially to paying expenses and attorney fees on

14    the back end.  We don't think that's fair and we don't think

15    it is going to help us sufficiently move this case forward.

16              THE COURT:  All right.  Does your comments,

17    Mr. Iwrey, have to do anything with this?

18              MR. IWREY:  No.

19              THE COURT:  No.  Okay.  Let me just rule on this.

20    I think that it's very logical to say that you may depose the

21    witness now, you may depose the witness later, but if you

22    depose the witness now and you want to do it later then you

23    would have to pay the cost and expense.  However, I think

24    there is an exception for 30(b)(6) witnesses because I think

25    that there is a need for -- of a 30(b)(6) witness now, not

1   later.  And so if the witness presented by the defendants is

2   a 30(b)(6) witness and also has factual information that you

3   cannot go into now, that witness may be deposed twice with

4   everybody bearing their own costs, but if it is a

5   non-30(b)(6) witness then you have to make a choice of when

6   you want to depose them or run the risk of paying the costs.

7   Okay.

8           MR. BURNS:  Thank you, Your Honor.

9           THE COURT:  Mr. Iwrey?

10          MR. IWREY:  Your Honor, Howard Iwrey on behalf of

11  the later-case defendants.  Given the newcomers to this case

12  we may have additional ones if they care to weigh in.

13          I think that you addressed the issue with respect

14  to the later cases in terms of document production and other

15  discovery in your ruling on staying the merits of the case,

16  so this may be very brief.  I think you had it right --

17          THE COURT:  It does apply to the later cases

18  obviously.

19          MR. IWREY:  Okay.  Thank you.  The only particular

20  issue that I would like to address then is the wording of the

21  plaintiffs' proposed order which said that they want a stay

22  of discovery that inquires into, and the words inquire into

23  are important, because that would only stay discovery for

24  instance if they took a -- if they issued a document request

25  all communications with competitors.  That is too narrow

1  because it would allow plaintiffs to circumvent the stay of

2  merits discovery simply by asking for all documents that

3  refer or relate to pricing, all documents that refer or

4  relate to RFQs, et cetera, because that could encompass the

5  stayed subjects.  So I think our language that says discovery

6  relating to or inquiring into the stayed subjects would cover

7  that.

8          And I think Your Honor had it exactly right when

9  you said why can't you wait?  We as defendants want the

10  ability to review the documents only one time and produce it

11  at that time, and as counsel pointed out it may be a very

12  short delay anyway.

13          THE COURT:  All right.  I'm going to have you work

14  on another order together.  I think you know the substance of

15  what I ordered and I think that you could work this out.

16          MR. IWREY:  I think we can.

17          MR. BURNS:  Thank you, Your Honor.

18          THE COURT:  If not, please call me and I will have

19  you come in soon, not wait until the next status conference,

20  but I think you can do that.

21          MR. IWREY:  Thank you, Your Honor.

22          THE COURT:  Okay.

23          MR. BURNS:  Thank you, Your Honor.

24          THE COURT:  Now, there is one other thing on the

25  depositions, and that's -- well, let me look at the agenda,

1    maybe I'm ahead of myself here.  I'm thinking of the Ford

2    Motor Company's request for the three additional hours.

3    There's quite a bit on the agenda on Ford later but let's

4    talk about this.

5            MR. SQUERI:  Your Honor, Stephen Squeri on behalf

6    of Yazaki Corporation and Yazaki North America.

7            THE COURT:  Could you spell your last name for me,

8    please?

9            MR. SQUERI:  Yes, S-Q-U-E-R-I.

10           THE COURT:  Okay.  Mr. Squeri?

11           MR. SQUERI:  If I could just start, Your Honor,

12   with providing some background with respect to the entering

13   of the stipulations and agreements.  This goes back to the

14   early part of this year when plaintiffs first raised the

15   issue of taking the depositions of the individuals who are

16   incarcerated.  It was raised first in the January, February

17   time period.  We proceeded for Yazaki at that point in March,

18   actually, to tell plaintiffs that we would be willing to

19   support some type of an arrangement that would have the

20   individuals returning to the United States, which we did.  We

21   had meetings with each of the individuals, we met with them

22   on two occasions, Your Honor, first to get them to agree in

23   principle to the concept, and then we met with them again

24   after we had some extended negotiation with the plaintiffs in

25   order to arrive at an appropriate stipulation.

1          The stipulation that we entered into is wholly

2    consistent with the initial discovery plan that was entered

3    in the case.  It calls for the deposition of these

4    individuals to last a total of 12 hours because they do not

5    speak English, over a period of -- and it would take place

6    over a period of two days, which is precisely what the

7    initial discovery plan that was signed by the Court calls

8    for.

9          The one thing that we did do that was an exception,

10   and this was part of the negotiated deal between us and the

11   individuals and plaintiffs' counsel, was to provide that the

12   individuals would return to the United States on appropriate

13   notice and to have their depositions taken at certain

14   designated cities that the parties agreed would be

15   appropriate places for these depositions.

16         We signed those agreements, it was by June that we

17   reached the agreement in principle.  Those agreements -- the

18   stipulation and agreement was signed during the course of the

19   month of August -- of July, excuse me, we provided it to

20   plaintiffs' counsel who filed it in August, and at that time

21   it was simply made part of the Court's record.  It was an

22   agreement that was reached in good faith, we think it is

23   fair, and everyone including the individuals were willing to

24   assume the undertaking that was being -- that is set forth in

25   those stipulations.

```
 1          Ford filed a response or objection to that -- that
 2   stipulation in August shortly after it was placed on file,
 3   and it was sometime after Ford had filed its own separate
 4   lawsuit against Fujikura, it was our position that we should
 5   not be rewriting that stipulation, certainly not at this
 6   point in time, that there was no basis for it, and we also
 7   didn't think there was any basis for Ford to object to an
 8   agreement that was reached between Yazaki, Yazaki
 9   Corporation, and these individuals and the plaintiffs who had
10   sued our client.  I mean, they are the parties who we entered
11   into this agreement with.
12          It is certainly our position that any depositions
13   or any discovery that takes place in the case ought to be
14   conducted in coordination.  We have no objection to Ford
15   sitting in on the depositions, participating in the
16   depositions, and I know that later on the agenda it would
17   be -- is the question of exactly what Ford's status is in the
18   case, but we certainly not only agree with or are willing to
19   agree to but we support the concept of coordinated discovery.
20   What we are opposing is the concept certainly at this point
21   in time of trying to rewrite the stipulation, rewrite the --
22          THE COURT:  You don't want to extend the 12 hours?
23          MR. SQUERI:  We don't want to extend the 12 hours,
24   we don't think we are at a point where that's appropriate,
25   and a large part of the reason, Your Honor, beyond Ford's
```

1   standing to object is simply the fact that these individuals,

2   while they have been employed by Yazaki, and this is apparent

3   from the plea agreements, worked solely on Honda, Toyota and

4   one worked on -- a little bit on Subaru business but there is

5   no indication that they had anything to do with Ford

6   business, so we feel that under the circumstances there would

7   be no justification at this point anyway to increase the time

8   of the depositions because of Ford's later-filed lawsuit.

9          THE COURT:  Okay.  Ford?

10         MR. TORRES:  Good morning, Your Honor.

11  Hector Torres for Kasowitz, Benson, Torres and Friedman for

12  Ford Motor Company.

13         Your Honor, briefly just in terms of the background

14  of the Ford action, the Ford action was filed on July 16th of

15  this year, and at the time it was filed this stipulation was

16  being circulated among the parties that were then in the

17  case.  On the 6th of August the action was assigned to Your

18  Honor as a companion case, and pursuant to the initial

19  case-management order in this case Section 1 provides that

20  any subsequently-filed direct-purchaser action concerning

21  wire harness systems shall be consolidated for pretrial

22  purposes.

23         The master document in the case now reflects that

24  Ford is a plaintiff in its action and as part of the MDL.

25  Yazaki has taken the position that with respect to this

1    stipulation we had no right to participate in the negotiation

2    of the stipulation.  True, it had been in negotiation but it

3    was submitted -- the first time we learned about the

4    stipulation was when it was filed by the Court.  Now we had

5    been -- we had filed our action more than a month at that

6    point and never had any idea that the stipulation was being

7    negotiated, and the problem with the stipulation as currently

8    drafted is that it is simply we believe unfair as to Ford

9    because it has absolutely no provision for Ford's right to

10   take -- to participate in this deposition of these five

11   Yazaki employees who are critical witnesses in these cases.

12   They have pled guilty to price fixing and bid rigging during

13   the ten-year period of the conspiracy that is alleged by Ford

14   in its complaint.  Yazaki is a major supplier of wire

15   harnesses to Ford.  The allegations of the complaint clearly

16   set forth while it is a claim against Fujikura that Yazaki

17   was a co-conspirator, and there is nothing unusual in those

18   allegations because they are essentially taken from the

19   guilty plea from Yazaki and the individuals.

20          With respect to the argument that because they are

21   Honda and Toyota and therefore Ford should have no interest

22   in them, that's precisely backwards, Your Honor, because this

23   was under the plea agreement a conspiracy to allocate the

24   business of the OEMs around the world, and Ford obviously as

25   alleged in our complaint was allocated to Yazaki among others

1    and part of the deal was that Fujikura would not go after the

2    Ford business.  So the notion that we have to establish some

3    kind of relevancy under those facts we believe is not

4    sustainable.  We clearly have a right to participate in the

5    discovery of these witnesses.

6            THE COURT:  You're asking for three hours?

7            MR. TORRES:  Your Honor, when we were attempting to

8    negotiate initially we went to the plaintiffs and the

9    plaintiffs -- we requested that with respect to the initial

10   order that was set forth that we have the right to

11   participate and cooperate with them but have a right to take

12   part of that time for Ford to examine the witnesses.  The

13   plaintiffs' counsel indicated that we would prefer that you

14   go to Yazaki and seek additional time from Yazaki.  We went

15   to Yazaki, we requested the additional time, Yazaki refused

16   to grant the additional time.

17           At this point what our motion is and it is simply a

18   motion that essentially recognizes Ford's right to

19   participate in the depositions, we are not seeking the

20   additional three hours, all we are seeking is the right --

21   that we have a right to participate in the depositions in

22   coordination and in cooperation with the plaintiffs.

23           THE COURT:  Okay.

24           MR. TORRES:  Thank you, Your Honor.

25           MR. SQUERI:  Your Honor, if I could address a few

 1    of the issues that were raised by Ford's counsel.  I mean,

 2    first of all, to be clear again the parties concluded their

 3    negotiations and actually began signing the stipulation prior

 4    to the filing of Ford's lawsuit.  And, secondly, it is still

 5    a fundamental fact that there is no lawsuit involving us and

 6    Ford so I don't think we had any obligation at that point in

 7    time particularly given the recent filing of that lawsuit to

 8    involve Ford in a negotiation.  But I think, you know, more

 9    importantly, what Ford is asking the Court essentially to do

10    is not just to ignore the terms of the stipulation that was

11    agreed to at arm's length between the parties but Ford is

12    asking the Court to not apply the terms of the initial

13    discovery plan that was signed in the case in that it -- and

14    that plan calls for 6 -- excuse me, 12 hours of depositions

15    for individuals who do not speak English unless someone is

16    able to come in and they have the burden of doing so under

17    that plan to show need.  We --

18         THE COURT:  All right.  But as I understand it now,

19    I thought this was more a timing issue, but as I understand

20    it now Ford wants to participate in the deposition.  We

21    aren't looking for extending the hours that you are speaking

22    of, it is participation, correct?

23         MR. SQUERI:  Your Honor, we do not object to their

24    participation in the deposition.  It is the extension of the

25    hours that we disagree with --

1              THE COURT:  Okay.

2              MR. SQUERI:  -- because we don't feel that they

3     have shown appropriate cause at this point in time.

4              THE COURT:  All right.  Thank you.

5              MR. FINK:  Your Honor, Randall Weill will speak on

6     behalf of the -- the plaintiffs -- direct-purchaser

7     plaintiffs and others.  I should note -- I'm sorry.

8     David Fink, for the record.

9              I should note that Steve Kanner and Gene Spector,

10    who have been at all the previous proceedings, are both

11    slightly ill today so rather than spread that illness among

12    our friends they are not here.  Fortunately we have enough

13    counsel on the plaintiffs' side that others can speak to it.

14             THE COURT:  I don't think it is a problem.

15             MR. WEILL:  Good morning, Your Honor.

16    Randall Weill for the direct purchasers in this case, and I

17    will let the indirects speak if they would like to add to my

18    remarks.

19             With respect to Ford, the plaintiffs are happy to

20    cooperate and coordinate our efforts but I think it is

21    helpful to clarify a couple of things that might touch on the

22    question of Ford's status in the litigation to help

23    understand where we sit with this deposition stipulation.

24             The concern that the direct-purchaser, auto-dealer

25    and end-payor plaintiffs have is that they have -- respect

1    separate classes, they have three classes, they have a number

2    of very complex issues that they have to address in the

3    context of this litigation.  We have been working on this for

4    three years.  We have been told endlessly how many millions

5    of pages of documents that we have provided with, but in the

6    context of this deposition we in the initial discovery plan

7    agreed with the defendants that we have sued, seven on behalf

8    of direct purchasers, that there would be 12 hours of

9    deposition time allotted for people who wouldn't be able to

10   testify in English, no more than seven in one day, leaving

11   five for the next day, and it doesn't have to be contiguous.

12        But the concern that we have where the three

13   plaintiff groups are working carefully to try to coordinate

14   their efforts at these depositions is that we have to

15   represent these classes, and Ford and I understand and

16   respect Ford's statement now that they are not looking for

17   any additional time, but Ford's request at least initially

18   that they be allotted time for their case impinges on our

19   ability to represent and pursue discovery on behalf of these

20   classes.  Ford is not a class case, it has sued one

21   defendant.  Ford is represented by separate counsel, and

22   there's some confusion about its status I think with respect

23   to --

24        THE COURT:  We are going to talk about that later,

25   but let's stick to the depositions right now.

1    MR. WEILL:  With that background in mind, our very

2  deep concern, Your Honor, is we have an absolute need to use

3  the time that we have carefully set aside in the initial

4  discovery plan that's been in existence for more than a year,

5  and then with respect to these particular deponents who are

6  being released from jail we are trying to preserve their

7  testimony by being able to bring them back to the

8  United States and use the time that we have agreed in our

9  initial discovery plan.

10    Now, Ford may and I suspect will have its own

11  case-management orders for its case.  We would ask the Court

12  not to interfere with the case-management orders and initial

13  discovery plan and subsequent discovery plans that the class

14  cases have pursued carefully with the defendants.

15    THE COURT:  All right.  What I see here and I see

16  that this is going to be happening, we have a lot of things

17  that are going to be interfering with the individual cases

18  because we have companion cases coming in, we have tagalongs,

19  we have all of these things, and I don't think it would serve

20  anybody to be on vastly different discovery schedules or do

21  things separately just because you want to preserve your

22  place, your right, your whatever.

23    I think that given the size and nature of this case

24  that cooperation is critical, and I believe that Ford Motor's

25  counsel could cooperate with the plaintiffs' counsel, the

1    interim lead counsel in the deposition.  You could get

2    together beforehand and decide how much -- what questions you

3    want to ask or what you might need specifically.  I just have

4    trust that you can do this.

5         So Ford is not asking for more time, I think it

6    makes very good sense to allow Ford to participate in the

7    depositions of these Japanese individuals, and you know I'm

8    happy that they agreed to come back here because it is so

9    difficult, we get into those foreign depositions and it

10   always takes forever.

11        So at this point I'm going to allow Ford to

12   participate in the deposition.  No allocation of time, you

13   will have to work out how you are going to do that amongst

14   counsel.  Okay.  That takes care of that.

15        MR. TORRES:  Thank you, Your Honor.

16        THE COURT:  All right.  Status.  Pending cases.

17   Wire harness, who is going speak to that?  Mr. Iwrey?  Oh,

18   he's just running away.  I thought you were going to speak.

19        MR. FINK:  David Fink.

20        Your Honor, initially on the discovery issue,

21   Steve Williams will be speaking for the plaintiffs.  That's

22   the first point I think where the Court -- where there's any

23   issues to present to the Court.  Okay.  There's no issues on

24   the pleadings so the first issue relates to initial

25   disclosure obligations of certain defendants.  And if not

1    Mr. Williams then Greg Hansel will speak.

2         MR. HANSEL:  May it please the Court, good morning,

3    Your Honor.  Greg Hansel for the direct-purchaser plaintiffs.

4         THE COURT:  Good morning.

5         MR. HANSEL:  Early in the case the Court entered

6    the initial discovery plan, as the Court is aware, which is

7    Document 201, and as a part of that plan in the wire harness

8    case the defendants who had pled guilty agreed to produce to

9    the plaintiffs the documents that they had produced to the

10   Department of Justice.  Related to that agreement was

11   paragraph 4 of the initial discovery plan which states that

12   those defendants' initial disclosure obligations under

13   Rule 26 would be deferred to be then discussed in a

14   meet-and-confer process after the Court had ruled on the

15   motions to dismiss in the wire harness case.

16        After the Court ruled on the motions to dismiss

17   last summer the plaintiffs initiated a meet-and-confer

18   process on the Rule 26 obligations of the guilty-plea

19   defendants, and that process is still underway.  We have not

20   reached a resolution yet but we are hopeful that we'll be

21   able to meet and confer with them in detail and either reach

22   a resolution or if not we will come to the Court at that

23   time, but that process is ongoing and I simply wanted to

24   report that to the Court.

25        THE COURT:  Okay.  So this is relating just to your

1    Rule 26 and how you are going to proceed, the timing, so we

2    can develop some other orders in terms of discovery, right?

3            MR. HANSEL:  That's correct, Your Honor, and that

4    segues into a second related issue.  The Court had entered

5    the initial discovery plan back in July of 2012, and now the

6    parties are in discussions regarding a second discovery plan

7    which you could call the supplemental discovery plan.  In

8    that regard the defendants have made a proposal, the

9    plaintiffs have reviewed it.  In the view of the plaintiffs

10   it was premature to sit down with the defendants about a new

11   discovery plan until we knew what the resolution of the

12   Department of Justice's motion for a stay of discovery would

13   be.  That is a threshold issue that has a significant effect

14   on discovery, and the plaintiffs felt we couldn't really plan

15   a schedule for the rest of the case until we knew to what

16   extent the DOJ's partial and temporary stay would affect

17   discovery.

18           I think after today we have a much better sense of

19   that, it is still not completely resolved, but the Court has

20   encouraged the parties to resolve the remaining issues by

21   agreement and I'm sure that will happen with the guidance

22   that the Court has given today.

23           I will say the plaintiffs and the defendants have

24   had some difficulty agreeing on the logistics and details of

25   the discussions regarding these discovery plans, both the

1   Rule 26 and the supplemental discovery plan.  There are also

2   other discovery issues that are out there that need to be

3   discussed including the plaintiffs' objection to the

4   defendants' discovery -- written discovery, the defendants'

5   objections to the plaintiffs' written discovery, and the

6   production of transactional data by the defendants, which is

7   a critical matter for the plaintiffs' analysis on the class

8   certification issues coming down the road.  So there are

9   really five major areas of discovery that are now the subject

10  of a meet-and-confer process.  Some of those are defendant

11  specific such as when a defendant made unique objections to

12  plaintiffs' written discovery requests to that defendant.  In

13  other cases there are some common issues such as the

14  supplemental discovery plan, that's more of a common issue.

15       So we are trying to -- we are grappling with what

16  is the best way to -- logistically to negotiate all of this.

17  Does it make sense to gather everyone in a room with a table

18  about the size of this room or does it make more sense to

19  work things out between individual plaintiffs and defendants

20  or individual classes and defendants where there are unique

21  objections to discovery requests.

22       So we are working with defendants to try to reach

23  some kind of agreement on those discovery issues, and if we

24  are unable to agree in due course I'm sure we will be back in

25  front of Your Honor.

1          THE COURT:  I'm interested in the discovery issues,

2     I say this for all cases and classes, et cetera, because I'm

3     not -- I don't have a feeling yet as to the time involved in

4     these discovery issues and whether these discovery issues are

5     things that could go to the magistrate judge realizing, of

6     course, the magistrate judge has a full document and this is

7     just one case to her so, you know, or whether the Court

8     should keep all of the discovery matters, so we are trying to

9     see.  We at times get overwhelmed because of the volume of

10    work involved in this.  Molly has done a marvelous job with

11    me, but the two of us can plod along, but it may be that I

12    have to consider another source like the magistrate judge.

13         So I'm going to be interested in what these

14    discovery objections or motions might look like because I

15    think I need to wait to see that so then I can decide how I

16    want to handle it.  So I want you to know right now -- I know

17    somebody filed an objection but not a motion to discovery, I

18    think, and you mentioned that.  I'm not doing anything on

19    discovery so I don't -- if there is anything out there that I

20    should be working on you better let me know because I don't

21    know of any discovery yet that I need to work on.

22         MR. HANSEL:  We will let you know, Your Honor.

23         THE COURT:  I know you will.

24         MR. HANSEL:  Thank you.

25         THE COURT:  Okay.

1   MR. SQUERI:  Yes, Your Honor.  Steven Squeri again

2   on behalf of Yazaki Corporation and Yazaki North America,

3   and I'm also speaking on behalf of the other defendants in

4   the wire harness cases regarding this issue.

5   First of all, with respect to the issues that came

6   up regarding the initial disclosures, just to be clear, the

7   first request for those came to us on September 21st from

8   plaintiffs, and we have been trying to set a date to meet

9   since that time, we have proposed ten dates and none of those

10  were taken and no alternatives were provided.  We now have

11  plaintiffs suggesting meetings the week of November 18th for

12  the discussion of our discovery responses.  The defendants

13  have indicated they are available the later part of that week

14  and we are happy to do that because I think it is important

15  for us to move forward with these things.

16  Regarding the supplemental discovery plan, Your

17  Honor, I think one of things that is important for the

18  defendants to communicate today is the fact that we want very

19  much to move that process forward.  At the last conference

20  before the Court I believe it was counsel for Sumitomo

21  mentioned the fact that we felt there was a need for a

22  supplemental discovery plan, and that's because there are a

23  number of issues that were not addressed in the initial

24  discovery plan that need to be addressed at that time.

25  Hence what defendants did -- our eight defendant

1    groups together, we collectively drafted a proposed discovery

2    plan that we sent to the plaintiffs, the plaintiffs' lead and

3    liaison counsel back on September 19th.  Since that time we

4    have been trying to schedule a meeting in order to discuss

5    that.  We have -- also we proposed ten separate dates, no

6    dates were taken.  At the same time plaintiffs did not

7    propose any alternative dates.  As counsel for plaintiffs

8    recently pointed out they -- plaintiffs took the position

9    that they couldn't discuss the discovery plan until after the

10   Court ruled on the DOJ stay issues.  We didn't feel that was

11   necessary or at least we felt we could make substantial

12   progress.

13        As it stands right now the parties have agreed to

14   put things off until after this hearing, which we indicated

15   we were ultimately fine with -- actually we had no choice

16   because none of our meeting dates were accepted but, Your

17   Honor, we believe that when it comes to the discovery plan we

18   believe that it is critical that the parties establish a high

19   priority for getting that done.

20        THE COURT:  So you are going to meet the week of

21   November 18, that's next week?

22        MR. SQUERI:  That's -- plaintiffs proposed the week

23   of November 18th, we wrote back with a letter indicating that

24   we could meet on the 21st and 22nd.  We have not heard back

25   from plaintiffs as to whether or not they are ready to go

1   forward on those dates, but we --

2          THE COURT:  So we need a date.  Wait a minute, stop

3   because now I will be secretary.  I will put that hat on.  We

4   need a date.  I hear -- you are shaking your head so come on

5   up and let us know.

6          MR. WILLIAMS:  Thank you, Your Honor.

7   Steve Williams for the end-payor plaintiffs.

8          We are happy to discuss this with the defendants.

9   What actually was proposed for the week of the 18th was a

10  request to talk about just defendants' responses to our

11  discovery.  They then sent a letter and said here's six

12  things we want to talk about and everyone should fly from

13  around the country to Chicago to sit in a room and talk about

14  all of these six other things.  We thought that was a little

15  wasteful because, for example, there's no reason for me to

16  fly to Chicago to talk about the direct plaintiffs' discovery

17  responses.

18         So I don't think there is anything the Court needs

19  to take action on here today.  Defendants want to talk about

20  a supplemental discovery plan that would essentially put in

21  place the calendar and the limits for all discovery to be

22  taken in wire harness until the case is done, and we --

23         THE COURT:  In wire harness --

24         MR. WILLIAMS:  Until the case is over.  And we

25  agree that's something we should do, but what we don't agree

1    and what the defendants repeatedly did was create arbitrary

2    deadlines; it must happen in 30 days, period, including the

3    Thanksgiving holiday, this appearance in Court, arguing

4    motions to dismiss, whatever might happen with the DOJ stay,

5    which we now know.  So we think in this case which has a

6    small amount of complexity in terms of parties and issues and

7    facts that now we're not going to really delve into because

8    of that stay that it makes some sense to have some

9    deliberation to that and we are prepared to.  I think we

10   could provide them with our responses to their proposed

11   discovery plan within a couple of weeks, and then we could

12   work that out and be prepared to present it probably by the

13   end of the year if we have to, but what we don't need to do

14   is take every disparate issue in the case, put them all

15   together and say we are not going to talk to you about issue

16   A unless you come talk to us about issue B, so that's what

17   was going on.  So in terms of the meeting for the week of the

18   18th that was in response to a request that we had to talk

19   about one issue.

20        What I would suggest is there is no time urgency to

21   it, and I'm not meaning to diminish their concern about this

22   point, it is a fair point, but that if we are going to now

23   agree and submit to the Court an order on all discovery

24   limits and timing for the rest of this case, it is fair to us

25   to have an appropriate time to do that, we are prepared to do

1    it promptly.  The bottom line is I don't think there is this

2    critical urgency now, I don't think there is the need to

3    order a date now given how many parties need to participate

4    in that process.  I think this is really not an issue the

5    Court has to take action on today, but that as with Ford and

6    the depositions we can work together, we can work it out, and

7    if the defendants really think that there is a critical

8    problem that needs the Court's time they can raise it.  I

9    don't think that will happen until we see you again either in

10   February or beforehand if we are here to come back on the

11   supplemental discovery plan.

12           THE COURT:  Okay.

13           MR. SQUERI:  Your Honor, I would respectfully

14   disagree with Mr. Williams in a number of respects.  First,

15   to some extent he's putting the cart before the horse.  It is

16   a fundamental -- it is fundamental to have a discovery plan

17   in place that is going to work.  The plan that we drafted and

18   sent them nearly two months ago addresses a number of issues.

19   We are happy to meet with them with regard to any issues they

20   have concerning our request or our interrogatories, we spent

21   a lot of time responding to them, they were extensive, we are

22   happy to meet with them, we are not saying we won't meet with

23   them on that, we will, but we feel that in a case that is now

24   approximately two years old, it has been five months since

25   the Court ruled on the motions to dismiss, it has been two

1    months since we sent them a draft discovery plan that is

2    intended to try to allow the parties to proceed in an orderly

3    way addressing issues of coordination, addressing timing of

4    document requests, requests being made, how the productions

5    are going to be made, issues like maximum number of

6    interrogatories and how we are going to count them.  There

7    are -- and some issues regarding the way depositions are

8    going to be conducted and how we are going to try to be

9    scheduling ourselves for ultimately presenting to the Court

10   the motions for class certification that are going to be very

11   critical in this case.  We think it is absolutely important

12   to do that now and not later.

13            THE COURT:  Okay.  That's enough.  All right.  Some

14   of you probably aren't old enough for this but you go to bed

15   tonight and tomorrow it is six months later, so there really

16   isn't time to put off anything in this case.  I think that a

17   discovery schedule needs to be set up, there should be one, I

18   have one in every case, and I don't see this as any

19   different.  I don't think it is critical that it is going to

20   be this week or next week, it is certainly not critical for

21   me to come here and pull out arbitrary dates and I don't

22   intend to do that, but I do think that you need a discovery

23   schedule in this case even before you address your issues

24   of -- your issues on discovery that you are talking about

25   meeting on.

1        So why don't you try and work out a discovery

2    schedule?  Perhaps plaintiffs can give a response to whatever

3    the supplemental schedule was that defendants set and try to

4    work that out in the next 30 days so that by that time you

5    can submit to the Court a discovery schedule in the wire

6    harness cases.  All right.  30 days.  To be specific, what is

7    today's date, the 13th, so 30 days from today, just figure it

8    out in December.

9        I don't -- I'm not asking you to meet over the

10   holidays and all of that kind of stuff, that this is of such

11   urgency that you have to do that, this case has been going

12   along, but you do need to move and that's why I think that's

13   a first step.

14       In terms of meeting -- your meeting that you had

15   planned on the discovery issue, I don't see any reason why

16   you can't go forward with that also.  You will be working on

17   two things at one time, and you can do it.  Okay.

18       All right.  Now going down the docket -- I want to

19   back up.  On page 2 of your agenda, Ford vs. Fujikura, there

20   is a motion to dismiss.  I'm thinking we'll be able to hear

21   that at our next status conference, which is February 12th.

22       I don't believe -- on number 4 I think we have

23   covered everything on the agenda, but let's talk now about

24   Ford's participation and how we classify Ford in our case,

25   and how we get it on CM/ECF?

1      MR. TORRES:  Thank you, Your Honor.

2      THE COURT:  Where are you exactly?

3      MR. TORRES:  Thank you, Your Honor.  Hector Torres,

4 again, on behalf of Ford Motor Company.

5      Where we are, Your Honor, is we are a large

6 non-class direct purchaser of wire harnesses and under the

7 existing --

8      THE COURT:  You say non-class.  I mean, we don't

9 have any classes yet.

10      MR. TORRES:  Right, but non -- as compared to the

11 punitive class actions -- the punitive direct-purchaser class

12 actions we have a non-class action in that we are just a

13 direct purchaser and not seeking --

14      THE COURT:  Wouldn't you be a direct purchaser

15 under the proposed class?

16      MR. TORRES:  Pardon me?

17      THE COURT:  Wouldn't you be an OEM, a direct

18 purchaser, under the proposed class in the consolidated

19 amended complaints?

20      MR. TORRES:  With respect to the action against

21 Fujikura, Ford has asserted its own claim and there is -- no

22 class has been certified, it is a punitive class, but we have

23 asserted our own individual Sherman Act claims against

24 Fujikura, so with respect to that action we have the right to

25 proceed as a direct purchaser, and our action obviously does

```
 1    not require certification because it is a non-class action.

 2              THE COURT:  You are not doing a class action, you

 3    are doing your own separate --

 4              MR. TORRES:  That's correct.

 5              THE COURT:  Which is a companion case assigned

 6    here?

 7              MR. TORRES:  Exactly.  Now, with respect to where

 8    we fit in, if you look at the initial case-management order I

 9    think it makes it pretty clear that, as I indicated before,

10    that once the action was assigned to this Court, designated

11    as a case that is part of the MDL and is now in the master

12    docket for the MDL, we are now part of the MDL, the subaction

13    relating to wire harnesses.

14              Now, Section 5 of the initial case-management order

15    also provides that the case-management order -- the initial

16    one that was entered by the Court on March 29th, 2012 also

17    applies to subsequently-filed actions that are transferred to

18    the Court.

19              Now, a separate section of the CMO, section 14,

20    provides that once the case is transferred the Clerk of the

21    Court is required to place a copy of the CMO in a separate

22    file of our action and an entry, as I indicated, has already

23    been made on the master docket.

24              So the question and the relief that we were

25    seeking, which should not be controversial, simply requires
```

1    an adjustment or a modification or a proposed order that

2    makes clear that Ford shall be represented by its own counsel

3    in connection with its action and with respect to the

4    responsibilities that are delineated in the March 19th, 2012

5    order where the Court appointed the interim lead counsel for

6    the direct-purchaser class, she made clear that Ford has the

7    right to participate by its own counsel because under the way

8    it is currently structured, for example, with respect to the

9    opposition to this Fujikura brief, if you applied the CMO

10   order technically the interim lead counsel for the class

11   direct purchasers is the only entity -- the only party that

12   has a right to submit a brief.  Well, obviously now there is

13   a non-class party here and Ford should be entitled to

14   participate in the lawsuit in connection with all the

15   responsibilities that are designated in the March 19th order

16   with respect to its action.

17          There is one additional adjustment with respect to

18   paragraph 16 of the case-management order which provides for

19   service of documents or filings that are not electronically

20   filed on the interim lead counsel for the punitive direct

21   class, the requested modification is to make clear that

22   Ford's counsel also has a right to the filings that otherwise

23   are covered by paragraph 16 of the CMO.

24          THE COURT:  Wait a minute.  Paragraph 16?  Let me

25   just look.  Okay.

1          MR. TORRES:  That's it, Your Honor.  Thank you.

2          MR. WEILL:  Randall Weill again, Your Honor, for

3     direct purchasers.

4          We don't have any problem with what Ford is

5     proposing to the extent that it wants to be represented by

6     its own counsel and to the extent that the defendants don't

7     have an objection to participate in discovery, that's fine.

8     The issue is about signing protective orders and that kind of

9     thing are a concern with respect to highly-confidential

10    information that we can't disclose unless Ford is part of

11    that protective order, if we have that from the defendants,

12    we can't expose ourselves to that, so that's an issue that

13    Ford would have to work out with the defendants, and in the

14    context of its case how does discovery proceed where it has

15    only sued Fujikura and we have sued, of course, six other

16    defendants, and then how does those -- how do those

17    relationships work where Ford has its own case?

18          Now, with respect to Ford as an individual case,

19    not a class case, we would suggest that it has nothing to do

20    with us as class counsel but maybe should be accommodated as

21    part of the original case-management order under part B,

22    which speaks to a coordination of the indirect, the

23    auto-dealer, the end-payor and the direct-purchaser cases

24    because as direct purchaser counsel we don't represent auto

25    dealers or end payors, and similar as class counsel for

1    direct purchasers now that Ford has entered an appearance

2    with their own case and their own counsel we don't purport to

3    represent them in any way.  I mean, we hope and look forward

4    to cooperating with them but looking at the existing

5    case-management order perhaps the way to accommodate Ford's

6    concern is to simply state that Ford is a coordinated case,

7    not a consolidated case, a coordinated case within the

8    meaning of part B of case-management order number 1.  I think

9    that gives Ford the comfort it needs to go forward being

10   represented by its own counsel to pursue its own claim

11   against Fujikura.

12          THE COURT:  All right.  What do you have to say

13   about that?

14          MR. COOPER:  Good morning, Your Honor.

15   James Cooper on behalf of Fujikura.

16          I don't think we disagree, we certainly want Ford

17   to be coordinated in all of the discovery as we have spent

18   time talking to you about this morning it should be

19   coordinated.  I wasn't sure -- there are some technical

20   things that are required before I think the Ford case is

21   officially part of these coordinated cases; there has to be a

22   copy of the case-management order that is entered in the Ford

23   docket, there has to be -- the master docket has to have an

24   entry reflecting coordination of the Ford case, but we don't

25   have any objection to those things happening, I just don't

1    think they have happened yet.

2         THE COURT:  Well, they haven't happened yet and we

3    need to come up with a number in CM/ECF for you.  Let me just

4    tell you something I was thinking of; we have the 100 direct,

5    200, 300, maybe Ford would be a 400 number or do you think it

6    should be filed under the -- this is beyond you?

7         MR. COOPER:  Yes, this is above my level of

8    competency, Your Honor.

9         THE COURT:  It would be 104 when we have our

10   classes.  We have, you know, 101 for direct, 102 for dealers,

11   103 for end payors, and I'm saying 104 might be Ford.  It is

12   just a category to put all the Ford stuff in.  It is just --

13   which I think I might do unless you think about it.  Where is

14   Mr. Iwrey?  You always do those computer things.  Think about

15   that.

16        MR. IWREY:  That would work.

17        THE COURT:  Would that work?  Because we also

18   have -- we are going to come up with some others like we need

19   some miscellaneous things like Ford would be four but we have

20   some miscellaneous like Florida --

21        UNIDENTIFIED ATTORNEY:  The State of Florida, Your

22   Honor.

23        THE COURT:  Florida, yeah, maybe 5.  Think about

24   it, Mr. Iwrey, and I'm going to have my clerk call you and

25   see is this okay, we are going to add these in that way and

```
 1   then we will send a notice to everybody.  Okay.
 2            MR. TORRES:  Thank you, Your Honor.
 3            THE COURT:  Thank you.
 4            MR. SQUERI:  Your Honor, Stephen Squeri again just
 5   speaking on behalf of the other defendants who haven't been
 6   sued by Ford.
 7            For the record, we do agree with coordination
 8   between the cases and encourage that and think that the
 9   parties ought to sit down and work that out.  The only thing
10   I would just say is that coordination does not mean that Ford
11   becomes a plaintiff in cases where they haven't filed a
12   lawsuit, but as far as we are concerned we are more than
13   happy and we think it is the right way to go in terms of
14   coordinating all the discovery efforts, and I'm prepared to
15   sit down and talk to them about that.
16            THE COURT:  What I would like is for you to --
17   maybe both of you or three of you to go over all of these
18   orders and see what needs to be modified in order to
19   accomplish this coordination and then submit orders by way of
20   stipulation.
21            MR. TORRES:  Certainly, Your Honor.
22            THE COURT:  Okay.
23            MR. SQUERI:  Thank you, Your Honor.
24            THE COURT:  Thank you.  All right.  Instrument
25   panel clusters?
```

1    MR. SQUERI:  Excuse me, Your Honor.  Your Honor,

2    with respect to the wire harness defendants, I have been

3    asked by some of them if they could have the Court's leave to

4    leave the hearing at this point in time?  They say they don't

5    have any other business but they wanted me to communicate

6    that to the Court or make that request on their behalf.

7        THE COURT:  Certainly.  Anybody who does not need

8    to participate in the rest of this feel free to leave.

9        All right.  Instrument panel cluster update.  Who

10   is going to speak to that?  There is a motion pending on

11   that.

12       MR. FINK:  Your Honor, David Fink with direct

13   plaintiffs.

14       Other than the update that is included, and

15   obviously the oral argument to proceed later, there is

16   nothing that we have to address.

17       THE COURT:  Okay.  I'm thinking on that instrument

18   panel cluster that there is Nippon Seiki's motion to dismiss

19   in the Florida case, and Florida's response is due around

20   Christmas, the reply is due February 3rd, but I think we are

21   going to set that case also for argument on February 12th.  I

22   think we can get it in there.  Okay.  Is that -- all right.

23   Okay.  So February 12th on the Florida complaint and Nippon's

24   response.

25       On fuel senders, the motion will be heard on

1    February 12th as indicated on the calendar.

2          The heater control -- well, we'll have those

3    arguments.

4          MR. HANSEL:  Your Honor, Greg Hansel in heater

5    control panels on behalf of the direct purchasers.

6          As Steve Cherry reported during the wire harness

7    portion of the program a little earlier, Denso -- his client

8    Denso has reached an agreement with the three groups of

9    plaintiffs, three groups of class plaintiffs, on a

10   stipulation between them and Denso with respect to

11   incarcerated persons from Denso.  We haven't signed it yet

12   but we have reached agreement on the terms and will be

13   signing that and submitting it to the Court.

14          THE COURT:  Good.

15          MR. HANSEL:  Thank you.

16          THE COURT:  Thank you.  All right.  Bearings, we

17   have motions due, reply is March 25th, and I think this goes

18   to the next hearing date after the February 14th so let's

19   just take a break and talk about that.  I'm thinking

20   June 4th, it's a Wednesday.  It could have been the end of

21   May but I don't want to do anything during the summer because

22   it is too hard to get you all together, so I thought if we

23   did June 4th, June, July, August, we could then meet early in

24   September, I don't have a date yet, we will discuss it in the

25   next week.  How is June 4th?  Anybody have any -- I hope

 1    that's before graduations and all of those things.  Okay.

 2    All right.  Let's plan June 4th then, and so the bearings

 3    motions will be heard on that date.

 4          On the occupant safety we have motions that were

 5    filed, replies are due February 10th, and I don't think I can

 6    fit that in on the 14th so the date for oral argument on that

 7    one will also be June 4th.

 8          Do we have anything else on the update on

 9    stipulation on occupant safety?  I don't think there is.

10          MR. HANSEL:  Nothing further.

11          THE COURT:  Then we have anti-vibration rubber

12    parts.  Is there anything else outside of that update?

13          (No response.)

14          THE COURT:  No.  Okay.  Then we have all of our

15    other actions, and basically all I'm going to say on that is

16    we will follow the same procedure that we have been following

17    as we add them on.  They will be getting their CM/ECF numbers

18    and you will be notified obviously of those numbers for those

19    cases.

20          The next thing is -- oh, let me ask the Government.

21    Where is the Government attorney?  We are up to I believe I

22    counted 27 now, and you have an ongoing investigation.  Do

23    you have any idea when and if or if and when there will be

24    more parts?  I don't like that smile.

25          MR. GALLAGHER:  Unfortunately I actually wish I had

1    left before you --

2             THE COURT:  Yes, asked that question.

3             MR. GALLAGHER:  -- raised that question, that was

4    something I was hoping to avoid today.

5             I don't have any information that I can provide to

6    the Court at least in open court.

7             THE COURT:  Okay.

8             MR. GALLAGHER:  If additional information is needed

9    I'm happy to address the Court in --

10            THE COURT:  No.  I think we have plenty to keep us

11   busy right now so I'm not worried about it, but I will in the

12   six months, so in two settlement conferences, I will want

13   something in writing from you on the status if you expect to

14   ask for further delay.

15            MR. GALLAGHER:  Understood, and that's part of the

16   stipulation is the fact that the stay goes on for six months

17   and then we will continue unless somebody moves to modify,

18   but regardless of whether anybody moves to modify the

19   Government will provide the Court with a written status

20   update indicating anything that no longer needs to be subject

21   to the stay.

22            THE COURT:  Okay.  Thank you.

23            MR. GALLAGHER:  Thank you.

24            THE COURT:  All right.  The next status conference

25   is February 12th at 11:00.  The next one after that will be

1    June 4th at 11:00.  Right now I'm not scheduling any interim

2    conferences.  If they should become necessary you will have

3    to obviously let me know.  I will be looking for those

4    discovery issues that we had talked about before so I can see

5    what needs to be done with that.

6            The only other thing I do want, it is not on the

7    agenda, but I want an update on attorney fees from

8    plaintiffs.

9            MR. HANSEL:  Jury fees?

10           THE COURT:  Attorney fees.  When did we get it

11   last?  I think it has been a couple months.  Go ahead.

12           MS. SALZMAN:  Hollis Salzman for the end payors.

13           The last report we gave you I believe was June.

14   Would you like us to update that?

15           THE COURT:  Yes, I would.

16           MS. SALZMAN:  Okay.

17           THE COURT:  Thank you.  Anything else?  Anybody

18   have anything else?

19           MR. BALL:  May I approach?

20           THE COURT:  Certainly.

21           MR. BALL:  May it please the Court, my name is

22   Gordon Ball of the Tennessee bar, and --

23           THE COURT:  I could tell.

24           MR. BALL:  I understand.  I have been accused of

25   that before.

```
 1              Earlier this week we filed five new separate
 2   end-payor cases specifically against Denso Corporation.  Of
 3   course, obviously they have not been served.  And yesterday
 4   we filed a motion in those cases and a copy of which was
 5   delivered I think hopefully to your chambers and a copy to
 6   hopefully the end-payors' counsel, and obviously it is not
 7   ripe for consideration at this point in time, but I just
 8   wanted to introduce myself to the Court, and hopefully our
 9   motion if granted by the Court will aid the Court and the
10   plaintiffs in this case.  So I just wanted --
11              THE COURT:  Your motion will aid us?  Good.  We
12   will take all the help we can get.
13              MR. BALL:  I would hope it would aid the
14   plaintiffs.
15              THE COURT:  I haven't had a chance to read it, my
16   clerk did tell me that these came in.  You are end payors on
17   what products?
18              MR. BALL:  On the five separate ones, heater
19   control panels, air conditioner systems, air flow meters,
20   fuel injection systems and the ignition coils.  All of those
21   are made by Denso in Tennessee, if Your Honor pleases.
22              THE COURT:  Is your aim to get the Tennessee state
23   laws into this?  I mean, what are we doing here?
24              MR. BALL:  Yes, the Tennessee -- and I don't want
25   to argue to prejudice --
```

```
 1              THE COURT:  No, I don't want you to argue, I'm just
 2   trying to figure out where you are coming from.
 3              MR. BALL:  My aim is to get the Tennessee --
 4   Tennessee law -- Tennessee is the only state in the country
 5   that allows nonresident purchasers --
 6              THE COURT:  Oh, we are not going there.
 7              MR. BALL:  -- to avail themselves of Tennessee law.
 8              THE COURT:  Oh, of Tennessee law.
 9              MR. BALL:  To avail themselves of Tennessee law,
10   and that's been accepted -- it has been granted -- ruled upon
11   by the Tennessee court in the Freeman case, which we attached
12   to our motion, it's been ruled upon and granted by federal
13   district courts in this Sixth Circuit.
14              THE COURT:  I don't want to get into argument on
15   that, I really do not.
16              MR. BALL:  I understand, I don't want to argue that
17   either, but that's our -- I just wanted to introduce myself
18   to the Court.
19              THE COURT:  Thank you very much.
20              MR. BALL:  Thank you.
21              THE COURT:  So we may have another -- we have to
22   figure out where to put you in the case-numbering schedule.
23              MS. SALZMAN:  Your Honor, Hollis Salzman again.
24              Just briefly, we were just served with Mr. Ball's
25   papers last night.  We were obviously preparing for the
```

Status Conference / Motion Hearing • November 13, 2013

80

1    briefing, so we really would like an opportunity to analyze

2    what he's filed and to present something to the Court to aid

3    the Court in its decision.

4            THE COURT:  Okay.  Why don't you do that, but we'll

5    have this on the agenda for the next status conference and

6    see --

7            MS. SALZMAN:  Thank you.

8            THE COURT:  -- where we end up with that, but I

9    would appreciate anything you had before that so that we

10   can -- I can be prepared to rule or others can be prepared to

11   file whatever they want to file.

12           MS. SALZMAN:  Thank you.

13           THE COURT:  Okay.  Thank you.  Is there anything

14   else?

15           (No response.)

16           THE COURT:  All right.  We are going to break for

17   lunch and then we will do the motions.  We are going to do

18   the instrument panel motions followed by the heater control

19   motions.  I would suggest that you have 10 to 15 minutes per

20   side.  You don't need to repeat.  And what am I looking for?

21   I know you called and everybody was excited about this.  I'm

22   looking to see what is different from the wire harness case,

23   I will be very blunt.  If it is the same argument, you may

24   not agree with me and I can appreciate that, but I'm

25   consistent, so just keep that in mind.

```
 1          Let's take -- let's come back by 2:00.  Okay.
 2   2:00.  Thank you.
 3          THE LAW CLERK:  All rise.  Court is in recess.
 4          (At 12:39 p.m. court recessed.)
 5                          -   -   -
 6          (Court reconvened at 2:06 p.m.; Court, Counsel and
 7          all parties present.)
 8          THE CASE MANAGER:  All rise.
 9          The United States District Court for the Eastern
10   District of Michigan is now in session, the Honorable
11   Marianne O. Battani presiding.
12          You may be seated.
13          THE COURT:  Good afternoon.  All right.  The first
14   motion we will do is the collective defendants' motion in the
15   instrument panel case against the direct purchasers.
16          MR. CHERRY:  Good afternoon.  My name is
17   Steve Cherry, again, and I'm with the law firm Wilmer Hale.
18   I represent Denso but I'm going to be speaking on behalf of
19   all the defendants.
20          THE COURT:  All right.  You may proceed.
21          MR. CHERRY:  Thank you.  Well, ACAP's complaint
22   should be dismissed because ACAP lacks standing to sue and
23   also because it fails to allege facts sufficient to establish
24   the material elements of ACAP's claim.
25          Now, the few facts set forth in the complaint
```

1    actually contradict ACAP's claim that it was harmed by the

2    conspiracy that ACAP alleges.  Beyond that, ACAP alleges no

3    facts to link its own alleged purchases to defendants' guilty

4    pleas or to plausibly suggest that the market conditions

5    would have caused defendants' conduct to have an impact on

6    all prices of all instrument panel clusters sold to all

7    customers.

8              Now, this case involves a single punitive

9    direct-purchase plaintiff, ACAP.

10             THE COURT:  Now, ACAP was the one that was out of

11   business in a year --

12             MR. CHERRY:  Exactly.

13             THE COURT:  -- from the conspiracy?

14             MR. CHERRY:  Yes, its voluntarily liquidation

15   proceedings in mid 2002, it filed materials on its own behalf

16   that established that its sole business had previously been

17   to assemble dashboards for GM's Cadillac Deville, but it went

18   out of business and liquidated in 2002, laid off all of its

19   employees, sold all of its equipment, and it has not been an

20   L.L.C. in good standing in the State of Michigan since then.

21             Nonetheless, ACAP purports to assert a Sherman Act

22   claim against Yazaki, Nippon Seiki and Denso for an alleged

23   conspiracy between January 2001 and February 2010.  Now, ACAP

24   alleges that defendants Yazaki, Nippon Seiki and Denso

25   colluded as to RFQs to certain automobile manufacturers

 1    referred to as OEMs during that time period, and ACAP alleges

 2    that RFQs were issued three years before the sales of any

 3    products actually occurred.

 4         So we have two main points, Your Honor.  The first

 5    is that ACAP lacks standing to sue.  ACAP has no standing to

 6    sue because it could not have been harmed by the conspiracy

 7    it alleges.  Under the facts alleged in the complaint an RFQ

 8    issued in January of 2001 at the start of the alleged

 9    conspiracy would not have resulted in sales until 2004, which

10    is two years after ACAP had gone out of the business.  Point

11    number two, ACAP alleges no fact to support any claim for

12    relief.

13         As an initial matter we should note that the

14    complaint in this case contains none of the factual

15    allegations that this Court found sufficient to state a claim

16    in wire harnesses.  ACAP points out that two of the

17    defendants, Yazaki and Nippon Seiki, have pleaded guilty as

18    to instrument panel clusters but on their face those pleas

19    have no connection to ACAP.  Yazaki's plea agreement concerns

20    sales to certain OEMs but between December 2002 and

21    February 2010.  That's obviously after ACAP was already out

22    of business.

23         Nippon Seiki's plea agreement concerns sales to a

24    single OEM, and that was between April 2008 and

25    February 2010, so that's years after ACAP was out of the

1   business.

2          ACAP also refers to Denso's plea agreement but

3   Denso's plea concerns two entirely different products, body

4   ECUs and heater control panels, and concerns sales to only

5   one OEM, Toyota, so again obviously no connection to ACAP.

6   That's it.

7          Other than that the complaint is really just a

8   bunch of boilerplate and entirely conclusory assertions

9   without factual grounds to support them.

10          THE COURT:  Who is the other plaintiff there,

11  Collins and Aikman, is that it?

12          MR. CHERRY:  One plaintiff, ACAP.

13          THE COURT:  What is Collins and Aikman, is that

14  another name for them?

15          MR. CHERRY:  Yeah, I think that was an initial name

16  for ACAP.

17          THE COURT:  Okay.

18          MR. CHERRY:  So ACAP's complaint includes

19  conclusory assertions about meetings among defendants and

20  agreements to RFQs issued by an OEM, but each of those

21  assertions is lifted directly word for word from the

22  defendants' plea agreements where they were supported by

23  actual factual allegations to support, you know, those

24  assertions in the plea.  But as we just went through, the

25  plea agreements have nothing to do with ACAP.  And standing

1    alone divorced from the plea agreements and the facts that

2    contain therein these are just conclusory assertions with no

3    factual grounds to support their application to ACAP.

4         THE COURT:  There was some discussion, I believe

5    this morning somebody raised this RFQ process and how in the

6    alleged conspiracy an RFQ may go to -- you know, one

7    manufacturer said you deal with this model car, the other

8    manufacturer you deal with this model car, that was alleged

9    in some of these parts.  Could this somehow affect ACAP?  In

10   other words, maybe it didn't do the particular model cars

11   that --

12        MR. CHERRY:  There's no allegations of that, Your

13   Honor.  The allegation here is really just a bald assertion

14   that there's these pleas that, as I just said, have nothing

15   to do with ACAP and we must have fixed prices for all

16   instrument panel clusters to all customers everywhere of

17   every kind.  That's their overarching claim.  We pled guilty,

18   as I just described, so we fixed prices to everyone, and

19   there is nothing to support that.

20        And as I just said, there are these bare assertions

21   but they are taken right out of the plea where there are

22   factual allegations that lead to those assertions but there

23   are none supporting them in ACAP's plea, they took them out

24   of pleas where they made sense, they are putting them in

25   their complaint where there is nothing to support them.

1          THE COURT:  But there is a general bid-rigging

2     allegation?

3          MR. CHERRY:  It is an allegation, it is not a fact,

4     Your Honor.  There's no facts to support its application to

5     ACAP.  And this next point goes to their overarching claim.

6     They really allege in even more conclusory assertion that

7     defendants knew -- this is really the key to their claim,

8     paragraph 75 and paragraph 76 of their complaint.  They

9     allege having just referred to the pleas that -- and these

10    conclusory assertions about meetings, that defendants knew

11    and intended that their actions in responding to certain RFQs

12    issued by OEM would have a direct impact on all prices of all

13    purchasers of all types of IPCs but, again, there are no

14    facts to support that conclusion of theirs, and that's

15    exactly at this point --

16         THE COURT:  Are you saying there's no facts or it

17    is impossible because of the three year RFQ process and the

18    2001 --

19         MR. CHERRY:  Well, there's two points.  The first

20    one, it is impossible, but even if they were doing business

21    in the time period there's no facts alleged to support that

22    conclusion, and this goes directly to Ashcroft vs. Iqbal.  In

23    Ashcroft vs. Iqbal there were allegations the plaintiff had

24    been abused in prison and was alleging claims against various

25    people but including John Ashcroft and the FBI Director

1    Mueller.  And as the Supreme Court said, we begin our

2    analysis in looking at any complaint by identifying the

3    allegations in the complaint that are not entitled to the

4    assumption of truth, and that's what we have here.  And I'm

5    quoting, respondent pleads that petitioners knew of, condoned

6    and willfully and maliciously agreed to subject him to harsh

7    conditions of confinement as a matter of policy solely on

8    account of his religion, race and/or national origin for no

9    legitimate penological interest, and the complaint alleges

10   that Ashcroft was the principal architect of this invidious

11   policy and that Mueller was instrumental in adopting it and

12   executing.

13          The court recognized that if those were facts that

14   they may have stated a claim, it may have been sufficient,

15   but the Court rejected that conclusion and instead the

16   Supreme Court held, and I'm quoting again, these bare

17   assertions, much like the pleading of conspiracy in Twombly,

18   amount to nothing more than a formulaic recitation of the

19   elements of a claim.  As such, the allegations are conclusory

20   and are not entitled to be assumed true.

21          That's all we have here is this formulaic, bare

22   assertions that are not entitled to be assumed true.  And it

23   is important to note the differences between this case and

24   wire harnesses, as Your Honor mentioned that you wanted to

25   hear.  And, of course, in wire harnesses we had plaintiffs

1    who were still -- it was our understanding was still in

2    business and allegedly purchased various wire harness

3    products directly from at least some of the defendants

4    throughout the alleged class period.  So the standing issue

5    that we just discussed that ACAP was not in business at the

6    time of any instrument panel cluster sale impacted by the

7    alleged conspiracy was not present in wire harnesses at all,

8    so that's a very different set of circumstances.

9           But there is also a second critical distinction.

10   In wire harnesses the Court found that plaintiffs had made

11   certain specific factual allegations about the

12   characteristics of the market for wire harness products that

13   were sufficient to bridge the gap between defendants'

14   narrower guilty pleas and the overarching conspiracy claim in

15   wire harnesses.  And in particular plaintiffs had alleged

16   specific facts showing market concentration -- you will

17   remember their chart that showed the market shares, they

18   showed the market that was heavily concentrated -- and that

19   defendants had market power, and they also alleged facts

20   showing an effect on prices generally.  In fact, in wire

21   harnesses the plaintiffs allege specific facts to show that

22   the market was heavily concentrated and defendants had market

23   power.  They showed that --

24           THE COURT:  Well, here they showed they had the

25   majority.  I think the words were the majority of the market.

1          MR. CHERRY:  No, they don't allege that here, Your

2    Honor.

3          THE COURT:  Not in the instrument panel?

4          MR. CHERRY:  No, they don't, Your Honor.  There is

5    no allegation that says that.  In wire harnesses they allege

6    that six of the defendants accounted for over 70 percent of

7    the market share, and if you add one other company, just one,

8    that was initially named as a defendant you get to over

9    90 percent.  So there's facts there, not just a conclusion

10   that it is heavily concentrated but they show facts to

11   support that conclusion that concentration, market power on

12   behalf of the defendants.  Those allegations are essential to

13   the cases they rely on.

14          They cite to In re: Packaged Ice.  In Packaged Ice

15   beside having specific allegations of the agreements among

16   the defendants, the court also relied on the fact that there

17   were allegations that the three defendants had over

18   70 percent of the market share, it was a concentrated market,

19   they had market power.

20          In In re: Ductile Iron Pipefitting, which is a case

21   again that ACAP relies upon, there were detailed factual

22   allegations about the agreement, communications among the

23   defendants, but more importantly, and this was something the

24   court repeatedly came back to, as there were detailed factual

25   allegations about market concentration and market power.  In

    1    fact, the defendants had 90 percent of the market for import

    2    ductile iron pipefittings and 100 percent of domestic -- of

    3    the domestic market, and that was critical to the court's

    4    decision.

    5          I would also note in that case, which again ACAP

    6    relies upon, the court also noted that the plaintiffs also

    7    specifically alleged what they bought, who they bought it

    8    from and when they bought it, so it showed that their own

    9    purchases lined up perfectly with the agreements that were

   10    alleged, unlike in this case, and when the plaintiffs -- and

   11    when the defendants had this market power.

   12          But here ACAP alleges no facts to show market

   13    concentration or that defendants had market power either

   14    individually or collectively.  ACAP fails to allege the three

   15    defendants collective market share even in the most general

   16    terms.

   17          THE COURT:  Let me ask you this because you are

   18    running out of time.

   19          MR. CHERRY:  Yep.

   20          THE COURT:  Let's go to the unjust enrichment

   21    claims --

   22          MR. CHERRY:  That's not in the direct purchasers.

   23          THE COURT:  -- in the direct purchasers.

   24          MR. CHERRY:  No.

   25          THE COURT:  Okay.  That's not in it.  That's the

1    question.

2         Now, do you have -- what do you -- if you were on

3    the other side, if you were plaintiff, what would you have to

4    support the claim, the antitrust claim?

5         MR. CHERRY:  Your Honor, this claim should not have

6    been brought.  Their pleas are clearly a disconnect with

7    their client and there are no facts here to support the claim

8    they are trying to bring.

9         THE COURT:  Okay.  Let me hear what they have to

10   say.

11        MR. CHERRY:  Thank you.

12        THE COURT:  Plaintiff?

13        MR. KOHN:  Thank you, Your Honor.  Joseph Kohn,

14   Kohn, Swift & Graf, for ACAP and direct-purchaser plaintiffs.

15        Your Honor had said this morning you did not want

16   to hear the case if it was the same -- or the arguments that

17   were the same as wire harness.  This is not the same as wire

18   harness.  From our perspective this case the facts are

19   better.

20        THE COURT:  How are they better when you have got

21   this company that hardly had time to be damaged, if it was

22   damaged at all?

23        MR. KOHN:  Your Honor, the class period we have

24   alleged is from 2001 forward.  ACAP, and these were issues

25   that were decided by Your Honor, is in the exact same

1  position as were the supplier direct-purchaser plaintiffs in

2  wire harness.  Your Honor dealt with all of these same

3  arguments about the guilty pleas in wire harness, they only

4  referred to auto manufacturers.  They referred to, and I have

5  them here, I can read from the Denso plea, referred to a

6  manufacturer.  Yazaki referred to certain auto manufacturers.

7  We heard all of these same arguments and Your Honor dealt

8  with the reams of briefing and incorporated and digested all

9  of that law that that did not impair or require the dismissal

10 of the claims by the supplier plaintiffs who were also direct

11 purchasers.

12         In looking at the decision in the version I was

13 working off of was the one in the 2013 trade cases, it is

14 paragraph 78418, so it begins with the asterisk page 9, and

15 Your Honor wrote, OEMs may have been the largest group of

16 direct purchasers but according to the CAC they are not the

17 only direct purchasers.  The CAC contains allegations that

18 each DPP, direct purchaser, purchased wire harness product

19 directly from one or more of the defendants during the class

20 period.  The fact that they are not automobile manufacturers

21 did not change the fact that they purchased directly from the

22 defendants.

23         The same allegations here.  The -- Mr. Cherry just

24 referred to the complaint and the allegations we made in the

25 wire harness complaint and tried to contrast them with the

1    allegations we made in this complaint.
2            THE COURT:  If we have only one plaintiff --
3            MR. KOHN:  Right.
4            THE COURT:  -- why isn't there an allegation about
5    what was purchased and from whom --
6            MR. KOHN:  Well, the allegation --
7            THE COURT:  -- with one plaintiff?
8            MR. KOHN:  The plaintiff has made the appropriate
9    allegations it purchased during the class period and it did.
10   It purchased hundreds of thousands, if not millions, of
11   dollars worth of these products during the period of time
12   that it was in business, which includes the class period.  It
13   is not necessary that a class representative have purchased
14   continuously or continually throughout a period of a
15   conspiracy.  A purchase in the -- of the affected product
16   during the period of the conspiracy gives one standing to
17   assert that claim, any different than let's take an end-payor
18   purchaser, they buy an automobile, they don't buy an
19   automobile every day or every year or every model of
20   automobile.  The purchasers in the cargo -- the Air Cargo
21   case, the plaintiffs, some were in business for certain
22   periods of time, others were in business for other periods of
23   time.
24           THE COURT:  That's a direct purchase --
25           MR. KOHN:  You don't have to show a direct purchase

1    throughout or bracket the entire class period to have

2    asserted the claim for Rule 12 purposes.  There may be

3    some --

4            THE COURT:  But how in this case the way this comes

5    about did the -- how the conspiracy worked, how did they

6    purchase something before the conspiracy unfolded, that's in

7    2001, I mean, there has to be something purchased then?

8            MR. KOHN:  Yes.  ACAP was in operation through the

9    middle of 2002.

10           THE COURT:  But if --

11           MR. KOHN:  So they did purchase within the class

12   period, the period of the conspiracy that we have alleged.

13   What defendants are trying to say is, ah, let's look at those

14   guilty pleas, that's our safe harbor.  The first guilty plea

15   begins December 2002, Yazaki.  And I would point out, Your

16   Honor, that the guilty plea on its face says at least as

17   early as December 2002 that the conduct occurred.

18           THE COURT:  So if that conduct occurred in 2002 --

19           MR. KOHN:  Correct, and we contend it occurred

20   earlier.  And again, as Your Honor ruled in wire harness on

21   this issue of timing, this was at asterisk page 7 of the

22   trade cases, Your Honor was distinguishing the Iowa Concrete

23   case, quote, in the case before this Court it is not

24   necessary to confine the admissions regarding the product or

25   time frame to those defendants that have pleaded guilty.

1          So this is right back where we started from last
2     December when we were arguing and we briefed them.  The
3     guilty pleas are facts that are asserted in the complaint
4     from which the Court can draw inferences and which gives meat
5     to the bones that puts us beyond Twombly where there were no
6     facts, where there were no guilty pleas, where there were no
7     admissions.  No one in the Ashcroft case admitted guilt.  If
8     there had been guilty pleas by the head of the prison
9     department or somebody who worked and then undersecretary of
10    this or the deputy attorney general, then that case would
11    have proceeded.  We have -- Your Honor has ruled and the case
12    law from the Fructose case and others that time period of the
13    guilty plea is not a safe harbor, it is a fact.
14          We have from our investigation, and we believe in
15    good faith and there are other ways that defendants could
16    test if they didn't believe it, have asserted a class period
17    beginning in 2001.  This class representative, proposed class
18    representative, this plaintiff, purchased its -- actually it
19    is millions of dollars worth of IPC and I have seen samples
20    of the invoices and we have seen the computer runs from their
21    records up through the period of time that they ceased doing
22    business in mid 2002, we contend that is part of the
23    conspiratorial period, and the facts of the complaint are
24    sufficient to allege that.
25          THE COURT:  What about the market-share argument?

1       MR. KOHN:  Your Honor, we do allege a number of

2   things about the economics.  Let me just find my note on that

3   having my papers out of order.  We allege facts concerning

4   price and elasticity, we allege the barriers to entry, which

5   Your Honor focused on and which were alleged in the wire

6   harness.  We did not have the words market concentration,

7   which were in the other complaint in wire harness, I do not

8   believe that those are some sort of magic words or magic

9   incantation.  We did have in paragraph 52 of our complaint

10  allegations, which I do not believe were in the wire harness,

11  that, quote, a cartel existed.  That it had, quote, cartel

12  profits.  That's paragraph 52 of the ACAP complaint.

13      I believe that concept of cartel has within it a

14  notion of market concentration and the ability to control

15  price as do our allegations about price and elasticity.  So I

16  don't think -- you know, they are trying to obviously --

17  defendants are trying to latch onto any way they can to

18  distinguish this from and get out from under the law that

19  Your Honor has announced, which really is the most

20  significant decision in this field since we were here arguing

21  these motions a year ago.  There is no other change in the

22  law.  The wire harness decision is the leading recent case.

23  So they are looking for some word that they can grasp onto

24  that we didn't --

25      THE COURT:  Just one more thing.  I want to go back

 1   again because I have to get this clear in my mind.  These

 2   RFQs are done three years in advance?

 3            MR. KOHN:  Right.

 4            THE COURT:  So the purchasing doesn't actually

 5   start until say the end of the third year, right?

 6            MR. KOHN:  Your Honor, we do not believe that that

 7   is --

 8            THE COURT:  Is that right or no?

 9            MR. KOHN:  In certain circumstance that is, but we

10   have not confined our complaint to those allegations, and I

11   think again there are some leaps here that I would like to

12   clarify if I could.

13            THE COURT:  It is because -- let's even say that

14   2010 was the beginning of the conspiracy, so then we get

15   to -- I mean -- I don't mean 2010, I mean 2000 was the

16   beginning of the conspiracy, so then we would get to 2003

17   before we have any damage, any injury?

18            MR. KOHN:  No, Your Honor.  The Yazaki guilty plea

19   starts -- it says at least as early as December 2002.  It

20   also -- it does not limit itself to the -- and does not

21   define or limit the conspiracy to this lead-time argument

22   that the defendants are asserting.  In fact, the guilty plea

23   says during the relevant time period, which was at least as

24   early as 2002, one of the offenses is that they received

25   revenue and payments.  That is a factual dispute as to when,

1    you know, these RFQs began, when they were fixed, when it

2    started to affect commerce.  The guilty pleas talk about an

3    effect on commerce beginning at least as early as

4    December 2002.

5           THE COURT:  Okay.

6           MR. KOHN:  So it is not cast in stone or carved in

7    granite that there is this three-year lead time, then

8    arguably the guilty plea would begin in 2005.  So those are

9    issues that are the subject of discovery, and as Twombly

10   said, have we established -- have we nudged ourselves across

11   the line such that we can have that kind of discovery to put

12   the precise parameters of damage around those facts?  We do

13   make an allegation both in harness and in this case about

14   that process but we by no means meant to or did limit our

15   claim to that.

16           I would ask the Court -- counsel referred to I

17   think paragraph 75 or 76 of the ACAP complaint, these prices

18   affected both the bids and it was then the baseline price for

19   other purchases.  That is precisely what we alleged in wire

20   harness, paragraphs 98 and 99 of the wire harness complaint,

21   our direct-purchaser complaint, suppliers to OEMs have been

22   required to purchase wire harnesses at prices established by

23   the OEMs.  It is important to the success of the cartel that

24   the prices paid by OEMs in order to control the prices paid

25   by all other direct purchasers of wire harnesses, that's the

1    ACAPs and the plaintiffs in wire harness.

2         Paragraph 112 of wire harness, defendants' pricing

3    actions regarding their sales of wire harness products to

4    automobile manufacturers had an impact on prices for wire

5    harness products for all direct purchasers of wire harness

6    products throughout the United States, and that's the --

7    those are the allegations which Your Honor upheld in the

8    pages that I cited to the Court earlier.

9         Paragraph 69 of the ACAP complaint, we allege the

10   winning price is also used when the OEM suppliers that were

11   not part of RFQ process purchased, so that is another fact.

12   Defendants may dispute it, they may say that price doesn't

13   take effect until some years later, we say it is the price

14   that is used.

15        I stood before Your Honor in the wire harness

16   argument, I posited the hypothetical of the beverage

17   distributors, the bottled water, the soda distributors, if

18   they had a bid-rigging scheme in the city to the big hotels

19   and that becomes the price that the bars or the smaller

20   restaurants would pay.

21        We have looked at materials, we have looked at

22   documents, there's confidentiality and cross orders.  I'm not

23   to disclose what those say except to say we stand before the

24   Court and assert that theory with respect to this claim.

25   There was a rigged-bid price, that is the price that becomes

```
 1    the base price that everybody else who purchases was
 2    affected.  That's our claim.  The guilty pleas do not cut off
 3    the time, Your Honor has already ruled to that effect.
 4         THE COURT:  All right.
 5         MR. KOHN:  And, indeed, the guilty pleas on their
 6    face go back sometime at least as early as the guilty pleas
 7    in wire harness, there were a number of them that were in the
 8    period '03 to '09, they were all over the lot in terms of
 9    their time period.  They did not have a uniform time frame
10    and the courts sustained allegations for a time period before
11    that.
12         ACAP, Your Honor, is an L.L.C. in being.  It is
13    registered in what they call the LARA in Michigan, the
14    Department of Licensing and Regulatory Affairs.  It is -- it
15    files tax returns every year.  The management --
16         THE COURT:  It just doesn't do business --
17         MR. KOHN:  It is winding down.
18         THE COURT:  -- for a number of years.
19         Okay.  That's enough.
20         MR. KOHN:  Thank you, Your Honor.
21         MR. CHERRY:  Can I just make a couple last points,
22    Your Honor?
23         THE COURT:  One minute.
24         MR. CHERRY:  Thank you.  Your Honor, it is ironic
25    that, you know, the plaintiffs are usually getting on the
```

1    defendants about arguing about the plea agreement, they want

2    to focus on the complaint.  I heard Mr. Kohn up here talking

3    about the plea agreement says this or that.  I'm focusing on

4    the complaint.  In the complaint it says that OEMs issue RFQs

5    and that the products are sold three years later.  In fact,

6    that's really the way it works.  They, we know, from their

7    bankruptcy filings were, in fact, a supplier to OEMs -- to

8    one OEM, GM, so they do fit into that process, but they --

9           THE COURT:  Your client in its plea talked about --

10           MR. CHERRY:  To Toyota, one OEM, to Toyota.

11           THE COURT:  But it talked about a time period?

12           MR. CHERRY:  Yes.

13           THE COURT:  The effect of it?

14           MR. CHERRY:  Yes, the time period of the

15    conspiracy, not the time period of sales, the time period of

16    the conspiracy, which is what their complaint says.  They

17    said there was a conspiracy from December 2001 to

18    February 2010.  If there is a conspiracy starting in

19    December 2001 and an RFQ takes three years, which it does,

20    that tainted RFQ results in sales years after they have gone

21    out of the business.  That's just a fact.  And, you know,

22    they can talk about this or that but that's a fact in their

23    complaint and it shows they don't have a claim.

24           THE COURT:  It shows they don't have a really good

25    plaintiff?

1          MR. CHERRY:  Yeah, that's true.

2          THE COURT:  All right.  Thank you.

3          MR. CHERRY:  Thank you.

4          THE COURT:  While we are on that, let's do -- is it

5   Nippon?  How do you say that?

6          MR. VICTOR:  Nippon Seiki.

7          THE COURT:  Nippon.  You are on instrument panel

8   clusters, motion to dismiss all of the actions.

9          MR. VICTOR:  Yes, Your Honor.  Paul Victor of

10  Winston & Strawn representing the Nippon Seiki Company and

11  its two subsidiaries, NS International and NewSibian

12  Industries.

13          I will be arguing the motion to dismiss just the

14  direct-purchasers' complaint because as the Court was

15  apprised yesterday we have an agreement in principle with the

16  indirects -- both classes of the indirects so we will not be

17  arguing that motion today.

18          As Your Honor knows, the direct plaintiffs assert

19  far-ranging claims against the Nippon Seiki defendants, a

20  conspiracy period of at least as early of January 2001 and

21  including to the present involving every meter sold in the

22  United States during that time, and those claims rest

23  entirely on the fact that just one of the defendants,

24  Nippon Seiki, a Japanese company, entered into a plea

25  agreement that describes an entirely different conspiracy

1    involving less than two years and a few RFQs for a single OEM

2    customer.

3         So notwithstanding the Court's decision in wire

4    harness, we believe the CAC the directs have filed is

5    insufficient and should be dismissed.  I'm not going to go

6    into Iqbal and stuff of that nature, you asked this morning

7    that we not go into it, I would like to refer to our briefs,

8    we have covered certain points in our brief in that regard.

9         First, let me talk about why the case should be

10   dismissed as against the subsidiaries.  Under the Sixth

11   Circuit Carrier rule there's two ways that a plaintiff can

12   plead a plausible antitrust conspiracy claim against an

13   individual defendant that is also a subsidiary; one, by

14   pleading direct facts specifying the defendant's role in the

15   alleged conspiracy, or, two, by pleading facts to support a

16   determination that the subsidiaries are alter egos of the

17   parent.

18        We don't believe that either of those tests have

19   been met by the plaintiffs in this situation.  Other than

20   generic group allegations that lump the defendants together,

21   the complaint is devoid of any direct factual allegations

22   describing how either subsidiary participated in the alleged

23   collusion notwithstanding the fact that the direct plaintiffs

24   had our DOJ documents prior to filing their CAC.  And under

25   the total benefits and --

1    THE COURT:  But in your plea, in Nippon's plea -- I

2  can't find where that is right now -- didn't it say in

3  connection or using its subsidiaries?  Let me see if I can

4  find that word in here.  Well, they say agreed to the full

5  truthful and continuing cooperation of the defendants and its

6  subsidiaries.

7    MR. VICTOR:  The plea only deals -- as far as I

8  recall, Your Honor, with respect to the subsidiaries it

9  basically says that the subsidiaries would cooperate with the

10  Government with respect to further investigation.

11    So we think that under the Total Benefits and

12  Travel Agent rules that are applicable here in the

13  Sixth Circuit, not to mention Iqbal, that the plaintiffs have

14  to allege specific action that is taken by each defendant in

15  the collusive conduct.  It is their obligation to plead such

16  facts showing each defendant's role.  They don't do it here

17  with respect to the subsidiaries, so we don't think they

18  satisfy the first prong of the Carrier test.

19    That brings us then to the alter ego prong, the

20  second prong of the Carrier test, with respect to the

21  relationship between Nippon Seiki and its subsidiaries.

22    THE COURT:  Well, they don't allege anything about

23  alter ego.

24    MR. VICTOR:  That's the point, Your Honor, so they

25  have no basis to be in this case.

1        THE COURT:  I agree with you there, there is

2   nothing -- we will see what they have to say about it.

3        MR. VICTOR:  Okay.  That makes that a fairly short

4   argument.

5        THE COURT:  Okay.  Thank you.

6        MR. VICTOR:  Oh, I'm not finished, please.

7        THE COURT:  Go to the third thing.

8        MR. VICTOR:  I'm not quite finished.  I would like

9   to also talk about the parent, Nippon Seiki, and why we think

10  this CAC should be dismissed as to the parent.

11       Yes, there is a plea agreement, yes, we acknowledge

12  that, but it cannot be that once you have a plea agreement

13  the plaintiffs have free reign to allege any conceivable

14  conspiracy even if it is vastly different from what is

15  covered by the plea agreement.  There has to be some kind of

16  limitation on that.

17       What are they doing here?  They are alleging this

18  10, 12-year conspiracy whereas we had a 22-month conspiracy

19  in the plea agreement.  What are they doing here?  They are

20  saying every meter we sold for 12 years -- for 10 years was

21  tainted by collusion, and they are saying that it affected

22  all customers that we sold to when the plea agreement just

23  alludes to one.

24       Now, it doesn't do it.  We really don't understand

25  how that does it, and it is different from wire harness.  In

1    the wire harness case when you sustained the claims against

2    the five defendants that entered into plea agreements, with

3    respect to three of them, I think it was Denso, Yazaki and

4    Furukawa, it covered the period from January 2000 to

5    February 2010, almost identical to the period that they are

6    alleging.  It is very different from us.  There was one other

7    company, Fujikura, where you did extend the plea period that

8    could be considered but here, again, as I'm saying, they are

9    asking you to take 22 months and say that's 12 years.  It

10   is -- it just can't really be.  The Supreme Court gave courts

11   Twombly and Iqbal as a tool to control what is going on.  Why

12   should Nippon Seiki be subject to 12 years of discovery for

13   something like -- which is just no factual underpinning for.

14   We have a lot of trouble understanding that.

15          So with respect to -- well, I think I will stop

16   there, Your Honor.  Thank you.

17          THE COURT:  Thank you.

18          MR. KOHN:  Your Honor, if I may very quick, I think

19   when you are referring to the Nippon guilty plea, there is

20   some more specificity with regard to the subsidiary issue.

21   It is page 4 of the Nippon guilty pleas, subparagraph D, the

22   conspiratorial meetings and conversations described above

23   took place in Japan, and instrument panel clusters that were

24   the subject of the conspiracy were sold to an automobile

25   manufacturer by a co-conspirator which is located in the

1   Eastern District of Michigan, and as we allege in the

2   complaint, that is the N.S. -- I think that's what we were

3   looking at.

4          In wire harness you sustained claims not only

5   against defendants who pled guilty to a shorter time period,

6   you upheld the complaints against defendants who hadn't pled

7   guilty at all and who still haven't pled guilty; Lear,

8   others.  The guilty pleas again are admissions, they are

9   facts that are powerful, that place these complaints so far

10  outside the zone of the Twombly and the Travel Agents case,

11  et cetera.  And there is this battle we have been fighting,

12  is it the safe harbor or isn't it?

13         If they join a conspiracy, even if they were only

14  active participants for some period of time, you are liable

15  for what went earlier.  If you admit, you know, put your hand

16  on the Bible and swear to a felony, that is a fact that

17  provides the opportunity under Twombly for more discovery

18  that may lead to flesh out our complaint.  The time period we

19  allege is consistent with another guilty plea.

20         THE COURT:  Yeah, but they are claiming there their

21  own guilty plea is another conspiracy totally different

22  from --

23         MR. KOHN:  And relying on the same verbiage that

24  was in the guilty pleas in wire harness, different time

25  periods, a manufacturer, a certain manufacturer, those are

 1    building block facts that you look together with the other

 2    facts, the market, the recidivist behavior, et cetera, to

 3    sustain a complaint which we believe we have met in this case

 4    as well.  Thank you.

 5           THE COURT:  Thank you.

 6           MR. VICTOR:  Your Honor --

 7           THE COURT:  Reply?  Yes.

 8           MR. VICTOR:  Thank you.  Two very quick points.

 9           First, this business about joining a conspiracy is

10    totally irrelevant to the issue before you.  It has got

11    nothing to do with the proper allegations of a complaint with

12    respect to whether or not we committed collusion.

13           Secondly, the portion of the plea agreement that

14    they read to you, I think it is paragraph 4 --

15           THE COURT:  4.

16           MR. VICTOR:  -- 4-D, the conspiratorial meetings

17    and conversations described above took place in Japan, and

18    instrument panel clusters that were the subject...were sold

19    to an automobile manufacturer by a co-conspirator which is

20    located in the Eastern District of Michigan.  It says

21    co-conspirator, it doesn't say subsidiary.  Thank you.

22           THE COURT:  Who is the co-conspirator?  All right.

23    Thank you.

24           Let me move on to the instrument panel, the

25    defendants' collective motion as to the end payors.

Status Conference / Motion Hearing • November 13, 2013

1    MS. FISCHER:  Thank you, Your Honor.

2  Michelle Fischer from Jones Day on behalf of Yazaki, and

3  speaking today on behalf of all defendants.

4    Since I have the dubious honor of arguing the very

5  long motion I prepared a handout to help facilitate and

6  quicken up the argument.  Can I approach the bench?

7    THE COURT:  You may.

8    MS. FISCHER:  Thank you.  Whatever the appropriate

9  scope of this case might be it is certainly not what the

10  indirect-purchaser plaintiffs have alleged here, a claim on

11  behalf of every dealership and every buyer of every vehicle

12  of every make and model over anywhere from a period of

13  roughly nine years to more than a decade depending on which

14  complaint you look at.

15    You have already heard that the two pleas in the

16  complaints and even in their case the seven so-called

17  illustrative examples on which they rely in their complaints

18  are obviously much more limited than the

19  all-meters-everywhere, all-the-time conspiracy that they have

20  alleged.

21    Rest assured, Your Honor, defendants are not here

22  trying to argue that an antitrust conspiracy in a civil case

23  can be no broader than the conspiracy alleged in the plea,

24  but the Supreme Court has made clear that for a broader claim

25  like the indirect-purchaser plaintiffs to survive a motion to

In Re: Automotive Parts Antitrust Litigation • 12-md-02311

 1    dismiss they must allege enough factual matter taken as true

 2    to suggest that the claimed broader conspiracy they are

 3    alleging actually took place and that the defendants actually

 4    entered into it.

 5          So what that means here is that the plaintiff must

 6    plead facts sufficient to support an alleged conspiratorial

 7    agreement with respect to every meter sold to every OEM

 8    during the relevant period.  They haven't done so because at

 9    a minimum plaintiffs here, unlike the plaintiffs in wire

10    harnesses, have not pled facts about the market, defendants'

11    shares within it or the breadth, or more accurately the lack

12    thereof, of defendants' meters customer bases.

13          So while our briefs detail a number of arguments

14    that the defendants continue to press, for today's purposes I

15    would like to start by focusing on the factual differences

16    between this case and wire harnesses.  To do that I would

17    like to refer you to page 2 of your handout.  I'm not going

18    to go over this in detail because you have already heard a

19    lot of this, but as you can see on the left-hand side --

20          THE COURT:  Wait just a minute before you go on.

21          MS. FISCHER:  Sure.

22          THE COURT:  You have given us multiple copies of

23    this.

24          MS. FISCHER:  I gave one for Molly.

25          THE COURT:  Yes, that's what I wanted.  Okay.

1      MS. FISCHER:  If you turn to page 2 you will see

2  graphics on the left-hand side taken directly from the

3  end-payors' wire harness complaint.  As heard from

4  Mr. Cherry, there were detailed factual allegations in wire

5  harnesses indicating that the market shares of the six

6  defendants was over 70 percent of the global wire harness

7  market.  In terms of market concentration they made detailed

8  factual allegations that including Delphi, who was later

9  dismissed, four defendants had over 77 percent of the market

10  and even after Delphi was dismissed six of the defendants had

11  over 70 percent of the market.  It was against that factual

12  background that this Court reasoned in wire harness that even

13  though the guilty pleas concerned only certain automobile

14  manufacturers it was plausible at the motion to dismiss stage

15  to infer that the conspiracy might have impacted all the

16  buyers, but as you can see from the right-hand side of the

17  page these plaintiffs allege absolutely nothing about the IPC

18  market or defendants' share of it.  They allege that Denso is

19  the, quote, largest meter supplier.

20      You can look at paragraph 121 of the auto-dealers'

21  complaint and 84 of the end-payors' complaint, but they

22  allege nothing about how large Denso's share is or what the

23  combined shares of these three defendants collectively might

24  be.  In fact, if you look at their complaints they allege

25  nothing at all about the size or dollar volume of Yazaki's

1   meter sales at all, they just make irrelevant allegations

2   about Yazaki's overall global automotive parts sales to

3   unspecified automotive OEMs.  They also allege absolutely

4   nothing about the identity or market shares of the many

5   meters' competitors who are not defendants in this case and

6   who are not alleged to have conspired.  For all plaintiffs

7   here have alleged the three defendants before this Court may

8   have less than 20 percent of the market, of a global market,

9   even less in the United States, and have faced very stiff

10  competition from dozens of other meters competitors rendering

11  it completely implausible that any collusion by these three

12  defendants as to a couple OEMs would have necessarily

13  affected prices to every OEM on every meter sale throughout

14  the period, but without allegations that these three

15  defendants controlled a substantial majority of the market

16  their claims that the defendants participated in a conspiracy

17  that affected every IPC to every OEM for every car model

18  since December 2002 is just not plausible, and then you add

19  to that the fact that meters are not fungible commodities.

20          An instrument panel cluster, which I also call a

21  meter, is designed for a specific car so that means that the

22  dashboard in, let's say, a Toyota Prius would look nothing

23  like and act nothing like the dashboard in a Cadillac or

24  Mercedes-Benz, and there is nothing in their complaint to

25  plausibly suggest therefore that a conspiracy with respect to

1    say a Toyota instrument panel cluster would have any impact

2    on the price of an instrument panel cluster for any other

3    vehicle, much less every other meter for every other vehicle.

4    Yet nonetheless the plaintiffs persist with this every meter

5    sale to every OEM claim.

6          The auto dealers, if you look at their complaint,

7    they go to great pains to identify the defendants' customers

8    but they are ambiguous as to whether those are even customers

9    for meters.  And, in addition, they then go on to make claims

10   in their complaint on behalf of every OEM to which --

11         THE COURT:  Let me stop you there.  I just want to

12   clarify this.  For the instrument panel clusters, which you

13   call meters as another name, are there -- I mean, does each

14   model have different actual -- the actual meters themselves

15   have different sizes or if they made a meter for one model

16   could it be used in other models so the dashboard would be

17   different?

18         MS. FISCHER:  Typically, Your Honor, they are

19   customized by vehicle, so you would have an instrument panel

20   cluster for a Prius that would differ from an instrument

21   panel cluster for a Honda Accord, a Chevy Cruze, et cetera,

22   so they are different.

23         Their complaint goes on to -- I'm talking about the

24   auto dealers, to assert claims on behalf of OEMs to which

25   they don't even list as customers of any of the defendants in

1   this case.  Simply put, without facts to support the broader

2   conspiracy, at least those auto dealers who do not allege

3   that they bought from cars or stand alone IPCs from the two

4   OEMs that are actually identified in their complaints they

5   have stated no claim, and neither have any of the end payors,

6   none of whom have alleged anything about what they bought in

7   terms of the make or model of any car, they have never said

8   whether they even bought a stand-alone repair part at all.

9        Speaking of repair parts, their repair part claim

10  is even one giant step further removed from the completely

11  implausible global conspiracy regarding sales of all IPCs to

12  all OEMs.  Plaintiffs allege no facts at all about

13  defendants' market shares in any market for repair parts, who

14  any of the other repair part suppliers are, how pricing of

15  repair parts relates in any way to pricing of parts for new

16  cars.  Your Honor, telling us as they do in their opposition

17  brief that, quote, it is difficult to imagine that a

18  conspiracy with respect to instrument panel clusters for new

19  cars would not also affect repair parts is not pleading

20  facts, it is just saying, gee, it is difficult to imagine.

21       These pleading failures require dismissal then of

22  their complaints on two different grounds.  First, their

23  complaints have to be dismissed under Twombly and Iqbal

24  because those cases make very clear that to survive dismissal

25  on a motion to dismiss they must plead sufficient factual

```
 1    content to allow this Court to draw the reasonable inference
 2    that the defendant is liable for the misconduct alleged.
 3    What is the misconduct alleged?  This all IPC all the time
 4    conspiracy.
 5           So what have they pled?  They pled to IPC related
 6    guilty pleas by Yazaki and Nippon Seiki, they pled several
 7    examples of illustrative conduct which are within the scope
 8    of the pleas and which relate only to two OEMs, so they don't
 9    support the broad all-OEM conspiracy that they have claimed.
10    They refer to pleas by other -- the other defendant and other
11    companies that have nothing to do with instrument panel
12    clusters, and they make reference to a couple governmental
13    investigations elsewhere.  The key question then is all of
14    that is within the scope of the pleas so the key question
15    then is what else have they alleged to allow this Court to
16    draw the reasonable inference that the broader conspiracy can
17    survive?
18           In wire harnesses, as we said before, this Court
19    held that that gap was filled by the market facts, and that
20    is completely consistent with several other cases which
21    upheld Twombly challenges.  For example, in aftermarket
22    filters the plaintiffs' conspiracy claim survived a Twombly
23    challenge because the plaintiffs allege that the defendants
24    were the leading manufacturers, that four of them controlled
25    80 percent of the market.
```

1    THE COURT:  We have already gone over those cases

2  so let's move along.

3    MS. FISCHER:  And Chocolate is another for the

4  Court's reference.

5    THE COURT:  I like the Chocolate but that's okay.

6    MS. FISCHER:  But the indirect-purchaser plaintiffs

7  here have not alleged any of those market things including no

8  homogenating, no fungibility and no disperse buyers.

9    Since they have not connected the dots between the

10  facts they have pled and those relating to the broader

11  conspiracy they allege, their complaints fail Twombly and

12  must be dismissed.  For the same reason, Your Honor, the same

13  pleading failures require dismissal of their complaints for

14  lack of standing, both Article 3 and antitrust.  In other

15  words, they have failed to plead facts even reasonably

16  suggesting that every one of them suffered injury at all,

17  much less injury that would be fairly traceable to or that

18  approximately resulted from the defendants' conduct, which is

19  required for both Article 3 and antitrust standing, and for

20  that -- those reasons their complaints fail in their entirety

21  for this reason as well.

22    I have obviously talked to this point about the

23  overall failures of their complaint.  I would like to focus a

24  little bit now on the specific antitrust consumer-protection

25  and unjust-enrichment claims, if I could.  Obviously we also

1    believe and have argued that they are also deficient on

2    many -- for multiple reasons.  If you look to page 3 of the

3    handout I have listed many of the reasons why.  Obviously I

4    don't intend to address all of them today, Your Honor, I

5    certainly can't.

6         I would like to touch on the ones that are

7    highlighted in blue on your slide starting with a couple pure

8    questions of law including the fact that as businesses auto

9    dealers lack standing to bring consumer protection claims in

10   D.C. and Missouri.  Now, the consumer-protection laws in both

11   D.C. and Missouri clearly do not permit those who made

12   purchases for commercial purposes to bring claims.  Instead

13   they only permit claims by those who purchased or leased

14   purely for personal, family or household purposes.

15        In paragraphs 23, 51 and 102 of their complaint the

16   auto dealers specifically plead that they bought IPCs for

17   their repair and service businesses and cars to sell to

18   customers.  These are purely commercial, not personal

19   purposes.

20        The Court already ruled in wire harnesses that the

21   plain language of the Missouri statute precludes the auto

22   dealers' claim because it, just like the D.C. statute that is

23   now before the Court, limits the claims to the actual

24   customers, and we simply ask that the Court apply the exact

25   same legal reasoning to the D.C. claim as well and, of

1    course, reach the same conclusion with respect to Missouri.

2         THE COURT:  And the same as we go on with the

3    unjust enrichment I take it that the Court did with the wire

4    harness?

5         MS. FISCHER:  Yes, exactly.  With respect to the

6    efforts to bring class claims under the antitrust laws of

7    Illinois and the consumer-protection laws of South Carolina,

8    I would like to touch on this a little bit because the Court

9    split the difference in wire harnesses.  I learned at 10:30

10   this morning that although the end payors' opposition brief

11   says they were dropping their Montana consumer-protection

12   claim, they meant to say they were dropping their Montana

13   antitrust claim, so the same argument I'm about to make also

14   applies to their Montana consumer-protection claim.  My

15   handouts don't address it because I didn't know that it was

16   still on the table.

17        In any event, as you can see if you turn to the

18   next page, page 4, the plain language of both the Illinois

19   Antitrust Act and South Carolina's Unfair Trade Practices Act

20   make clear that claims under those acts may not be pursued as

21   class actions.  The auto dealers, however, nonetheless argue

22   by reference to the non-controlling portion of the Supreme

23   Court's opinion in a case called Shady Grove that these

24   express class bars are not enforceable in the wake of that

25   opinion, but that is just not true.  Justice Stevens'

1   opinion, which is the controlling Shady Grove opinion under
2   the narrowest grounds rule, is shown on page 5.  That opinion
3   makes clear that Shady Grove is not a blanket ban on
4   enforcing state class-action bars in diversity actions.
5   Rather that case held only that pure state procedural rules
6   will be displaced by federal procedure rules like Rule 23 in
7   diversity actions.  Where, however, the state procedure rule
8   is so intertwined with the substantive right or remedy that
9   it actually defines the right it will continue to be
10  enforced.  For that reason, as you can see from the next
11  page, page 6, several courts have found that the class action
12  bars in the Illinois Antitrust Act and South Carolina's
13  Unfair Trade Practices Act survive Shady Grove because they
14  are so intertwined with the rights and remedies in those
15  statutes that they actually function to define the scope of
16  the substantive right.
17          This Court, in fact, already found that the
18  Illinois Antitrust Act class claim was precluded and barred
19  and dismissed it in wire harnesses applying the analysis set
20  forth in Digital Music which reached the same result.
21          Now, frankly, the analysis in Digital Music was
22  that the ban should continue to be enforced because it was
23  contained in the same paragraph of the same statute as the
24  substantive antitrust right.  That analysis actually applies
25  perhaps with even more force to the South Carolina

1    consumer-protection claim because that bar contains not only

2    in the same paragraph but in the same sentence with the bar

3    limiting the right as it is granted, and the same thing is

4    true, Your Honor, under the Montana Unfair Trade Practices

5    Act claim that end payors have revived today.

6         We are, of course, aware, Your Honor, that you

7    ruled against defendants' position in wire harnesses with

8    respect to South Carolina, but the leading reason you gave

9    for not enforcing the bar there was that defendants had

10   failed to cite any post-Shady Grove case law specifically

11   addressing the South Carolina Consumer Protection Act, that

12   is no longer true.  In November of 2012 after the wire

13   harness briefing was over the District of South Carolina

14   issued a decision called In re: MI Windows and Doors, that

15   dismissed a claim under the Consumer Protection Act of South

16   Carolina specifically holding that it was not persuaded, that

17   Shady Grove required the class-action bar to be trumped by

18   Rule 23.  That case postdates Optical Disc Drive, which is

19   the only case that the plaintiffs cite, and unlike Optical

20   Disc Drive actually contained substantive analysis of Shady

21   Grove and also is consistent with the Digital Music analysis

22   that the court applied in reaching its Illinois Antitrust

23   Act.

24        THE COURT:  That's the only other newer case was

25   that --

1          MS. FISCHER:  That's the only case, it cites to a

2    couple other cases within it but those other cases, Your

3    Honor, did not specifically discuss Shady Grove.

4          So I would like to turn now if I could -- sorry.

5    So where we want to go with that is we believe the

6    class-action bars should continue to be enforced in South

7    Carolina, Illinois and Montana, and those claims should be

8    dismissed, pure issue of law.

9          I would like to turn now to an argument that

10   actually applies to eight different states though I won't

11   deal with all of them.  Specifically I want to turn to the

12   requirement to adequately plead a sufficient nexus with

13   interstate commerce.

14         Now the plaintiffs concede and the Court has

15   already recognized that the California, New York and

16   North Carolina consumer-protection statutes and the D.C.,

17   Mississippi, Nevada, New York, North Carolina and

18   West Virginia antitrust statutes all require plaintiffs to

19   plead a sufficient nexus with interstate commerce, but even

20   though all of these states have a nexus requirement you can

21   see from page 7 of the handout that the nexus requirement as

22   well as what satisfies it varies not only by state but as

23   New York and North Carolina show even by claim within the

24   state.  In other words, the nexus requirement is different

25   under North Carolina antitrust and consumer protection law by

1    way of example.

2         So whether the state law requirements are satisfied

3    are questions of state law and as laid out on the next page,

4    page 8, and as this Court already recognized in wire

5    harnesses, both the Supreme Court and the Sixth Circuit have

6    said that when an issue is one of state law it should be

7    assessed by looking to state cases or to the extent state

8    cases are not available at least to federal cases construing

9    that particular state's laws.  In other words, there has to

10   be a state-by-state analysis and since we don't have time I

11   just want to touch on a few examples.

12        Let's look at first Mississippi antitrust law.  To

13   allege a viable claim under Mississippi antitrust law the

14   indirect purchasers must allege, quote, at least some conduct

15   by defendants performed wholly within Mississippi.  This

16   requirement actually derives from a Mississippi Supreme Court

17   case called Standard Oil which held that for an act to be

18   punishable under the Mississippi Antitrust Act the act must

19   be accomplished by at least one transaction that was

20   accomplished wholly interstate.

21        The Court found that requirement satisfied in

22   Standard Oil because plaintiffs allege that defendants sold

23   and distributed products within Mississippi.  Here plaintiffs

24   do not allege any conduct by defendants in Mississippi, nor

25   do they distinguish defendants' cited cases.  Instead, what

1    they do is wrongly claim that three cases, specifically GPU2,

2    In re: New Motor Vehicles and LCD2 I believe it is, supports

3    the sufficiency of their allegations.  But as you can see

4    from the next slide -- or next page, Your Honor, all of those

5    cases involved allegations of in-state sales either by the

6    defendants or their co-conspirators, and so did Standard Oil,

7    as I just said.

8            They make no similar allegations here.  The only

9    case they cite that held that allegations like theirs were

10   sufficient to satisfy the Mississippi antitrust interstate

11   nexus requirement was LCD2, but if you look at that case that

12   case actually relied on GPU2, Infineon and Standard Oil, all

13   of which required an allegation of some in-state misconduct

14   by the defendants.  Respectfully, Your Honor, those were the

15   same cases to which this Court pointed in wire harnesses

16   but --

17           THE COURT:  Counsel, you are going to have to wind

18   up now.

19           MS. FISCHER:  Okay.  But for the reasons -- but

20   those cases really don't support that conclusion.  The

21   reason -- the best analogy I can draw is like to a recipe say

22   for bread; you need flour, water and yeast to make bread.  If

23   you don't have all three of those ingredients you've got

24   something but you don't have bread.  And in these cases they

25   all say if you have these ingredients then you get to

1    conclude that the interstate nexus requirement is satisfied.

2    They don't have all of those ingredients in any of those

3    cases, and for that reason their Mississippi claim fails.

4            Your Honor, I have several more examples.  If there

5    is anything in particular you want me to address I can or I

6    can just --

7            THE COURT:  No, you don't have to because I have

8    read it and I will go over it again.

9            MS. FISCHER:  Thank you.

10           THE COURT:  I guarantee you.  Okay.  Response?

11           MR. BURNS:  Good afternoon, Your Honor.

12           THE COURT:  Good afternoon.

13           MR. BURNS:  Again, Warren Burns from Susman Godfrey

14   for the end payors.  I will be joined by a couple other

15   colleagues in a moment.  There's a lot to get through here.

16   I will be covering the Twombly response.

17           Your Honor, we heard this morning that there are

18   now I believe 27 different auto parts cases before this Court

19   involving multiple often overlapping defendants.  Absent

20   merits discovery, the full scope, the particulars of the

21   scope of the individual conspiracies will have to be

22   discovered and it would be an exaggeration to say we know

23   that full scope at this moment.

24           In announcing the latest round of guilty pleas and

25   fines Attorney General Holder made one thing clear, and that

 1     was the Department of Justice's investigation had uncovered

 2     conspiracies that touched practically every major make of

 3     cars sold in the United States.  We are not in Denmark, Your

 4     Honor, but to paraphrase the Great Bard, there is something

 5     very, very rotten in the auto parts industry that cuts across

 6     all of these defendants and touches every major manufacturer

 7     of cars that sell here in the United States.

 8            Yet the consistent refrain we hear from the

 9     defendants and we heard so stridently just a moment ago is

10     that the plaintiffs have got it wrong.  The allegations of

11     overarching conspiracies are far too broad, and that the

12     conspiracies alleged simply are not plausible.  This Court

13     properly rejected that argument in wire harness, and the

14     dissimilarities between wire harness and the IPC case are

15     very few and of no moment here.  Respectfully, this Court

16     should reject those arguments again.

17            The major thrust of the argument the Court heard

18     today centered on the lack of market allegations to support

19     plaintiffs' view of the conspiracy in this case.  It is not

20     true, Your Honor, to say that the end-payor plaintiffs made

21     no allegations that the market was conducive to a broad

22     conspiracy.  In fact, I would point Your Honor to pages 15

23     and 16 in the end-payors' complaint where we do make

24     allegations that the instrument panel clusters market has

25     high barriers to entry, that there is intraelacticity of

1    demand for instrument panel clusters in the market, both

2    market characteristics that support a broader influence of

3    conspiracy in this case.

4         But beyond that, Your Honor, what do we have?  We

5    have two guilty pleas by defendants in this action who pled

6    guilty directly to fixing the price of IPCs.  We have a third

7    defendant's participation in conspiratorial conduct in the

8    automotive parts industry in which, we point you to on pages

9    3 and 4 of our opposition brief, have been held by courts to

10   support a broader influence of conspiracy.  We have the

11   likely existence of a cooperating defendant in this case,

12   that's page 21 of the complaint.  And then we have provided

13   Your Honor numerous instances of conspiratorial conduct

14   involving all three defendants.

15        Your Honor, these are facts that are entirely

16   similar to those you saw in the wire harness case and support

17   the inference of a broader conspiracy here.  We are not bound

18   by the narrow conspiracies or the narrow allegations or

19   agreements in plea agreements, we have pointed you to support

20   for that.  We will stand on these facts as supporting the

21   conspiracy alleged.

22        Unless there are further questions on this point I

23   will turn the floor over to one of my colleagues.

24        THE COURT:  Okay.

25        MR. WILLIAMS:  Good afternoon, Your Honor.

1    Steve Williams for the end payors.

2            So we have divided up a few of these parts but we

3    will try to be brief.  Before I came I read the transcript

4    from the last argument, of course I read the order of the

5    Court, and while the argument was going on I tried to read

6    what counsel gave you, and I've got to say it looks a lot

7    like what they gave you last time.  And I was reading your

8    order as they were arguing this and I looked at, for example,

9    this intrastate nexus argument and you ruled on all of that

10   last time, every single one.  And all they are really saying

11   is you didn't specifically say your California plaintiff who

12   you're claiming damages for, quote, purchased in California.

13   Well, they did.  So it sounds like the argument really is

14   they want us to go back and amend to say that, and that seems

15   to me to be an utter waste.  Those are the claims and that's

16   what discovery is for.  Beyond that there is really little

17   new here from the argument last time.

18           THE COURT:  I was going to ask what is new in the

19   state claims -- in these claims?

20           MR. WILLIAMS:  In our claims, nothing, and in

21   reading all the papers I couldn't find anything different.

22   And in hearing the argument this morning the only thing I

23   heard different I think was that South Carolina has some case

24   that might address the Shady Grove issue.  For end payors we

25   are only affected by this to the extent that it deals with

```
 1    Montana, that's a South Carolina case so it doesn't affect
 2    Montana, and the Court already ruled on Montana last time.
 3    So with all respect for all of these notes and all of the
 4    papers and all the presentations, I can't find anything new
 5    or different as to the end-payor claims that would lead to
 6    any different result from the wire harness case.
 7              THE COURT:  Okay.  Thank you.
 8              MS. FISCHER:  May I address two points, Your Honor?
 9    Oh, I'm sorry.
10              MS. ROMANENKO:  Good morning, Your Honor.
11    Victoria Romanenko from Cuneo, Gilbert & LaDuca for the
12    dealership plaintiffs, and I am also splitting this oral
13    argument with Jonathan Cuneo, who I will invite up right
14    after my --
15              THE COURT:  Wait a minute.  How many of you are
16    doing this?  I mean, come on.
17              MS. ROMANENKO:  We will be very brief.
18              THE COURT:  Okay.
19              MS. ROMANENKO:  So to start with we heard some
20    criticisms of our complaint --
21              THE COURT:  Actually there was a lot of criticism.
22              MS. ROMANENKO:  There were many criticisms, and
23    what we heard was that defendants didn't understand our
24    claims, so here is a sample paragraph from our complaint.
25    This one concerns Landers.  Plaintiff Landers is an Arkansas
```

1   corporation with its principal place of business in

2   Little Rock, Arkansas.  Plaintiff Landers is an authorized

3   Toyota dealer who sells Toyota-brand vehicles containing

4   instrument panel clusters manufactured by one or more of the

5   defendants or their co-conspirators as well as instrument

6   panel clusters manufactured by one or more of the defendants

7   or their co-conspirators.  During the class period Landers

8   purchased vehicles containing instrument panel clusters

9   manufactured by one or more defendants or their conspirators.

10          They say we don't know what they bought.  Well, we

11  bought replacement IPCs and vehicles containing IPCs.  We are

12  authorized dealers of the OEMs.  We -- in our complaint --

13          THE COURT:  From whom did you buy them?

14          MS. ROMANENKO:  From whom did we buy?

15          THE COURT:  Yes.

16          MS. ROMANENKO:  Generally from the OEMs.  We are

17  authorized dealers of the OEMs, so we sell their product, we

18  sell their vehicles, we sell their replacement parts.  I

19  don't think that defendants are at all confused about what

20  our role is here or what we purchased.  We set out for every

21  plaintiff what kind of dealer they are and what it is that --

22  what OEM they are authorized to deal for, and the fact that

23  both replacement parts and vehicles are involved.

24          We also set forth in our complaint the OEMs that

25  the defendants supply.  Just to give you a quick example, we

1    say Denso's main customers include Honda, Toyota, General

2    Motors, Mercedes, BMW, Chrysler, Subaru, Mazda, Suzuki,

3    Mitsubishi, Nissan, Kia, Hyundai and Volvo among others.

4    That's a long list.  And we also list the OEMs for the two

5    others.  Each one of our dealers sells vehicles that are made

6    by an OEM that is supplied by one of these defendants.  We

7    have created a connection.  They cannot say that we didn't.

8         As far as the argument that oh, only certain OEMs

9    were affected by their conduct therefore if those OEMs are

10   not the ones that we bought from then we are not injured,

11   they made that argument last time too.

12        Ms. Sullivan stated, I think this is page 66 of the

13   transcript from December 6th, she said if you look at the

14   individuals who pled guilty you can see that the sales

15   departments they worked in were Honda, Toyota and Subaru.  It

16   is not plausible that a person who bought, let's say, a Chevy

17   was necessarily impacted by any of the defendants' behavior

18   that they pled guilty to.  This Court did not limit the wire

19   harness case to Honda, Toyota and Subaru.  This Court let us

20   take discovery.

21        So in this instance we respectfully request the

22   same thing, and I won't repeat what counsel said but it is

23   clear from a number of the other pleas that this is not any

24   sort of limited conspiracy.  Furukawa, who is a co-defendant

25   with Yazaki and Denso, pleaded to fixing prices to an

1    unlimited number of OEMs.  In OSS by my count, a case where

2    there are two German OEMs and five Japanese OEMs who have

3    been identified as victims, Yazaki's plea agreement doesn't

4    even state which OEMs were involved, it says certain.  That's

5    the same thing it said in wire.

6         To respond to what Ms. Fischer stated regarding our

7    allegations about the market, you can anticipate I'm going to

8    say they are not appreciably different from what we had in

9    the wire harness case.  We plead intraelacticity of demand,

10   high barriers to entry, market concentration.  In fact, we

11   say only a handful of manufacturers supply instrument panel

12   clusters to installation in vehicles sold in the U.S.

13   Certain OEMs purchase instrument panel clusters for use in

14   U.S. vehicles only from the three defendant groups.  It

15   cannot be said that we don't plead concentration, that we

16   have no allegations about market share.  We do plead the

17   allegations and, I think as Ms. Fischer mentioned, we state

18   that Denso is the world's largest IPC supplier.

19        Ms. Fischer stated okay, but this is not -- this is

20   only partially based on what is in our complaint, she stated

21   IPCs are specially designed for specific cars, that's in the

22   wire harness complaint too.  And our complaint doesn't say if

23   you design IPCs for Honda you can't do it for Chevy, but

24   that's something that is coming from outside, it is not in

25   the four corners of our complaint.

 1          Just one moment.  I'm almost finished here.

 2          One difference that we would like to draw Your

 3    Honor's attention to is that unlike in the wire harness

 4    complaint we have also alleged specific instances of

 5    collusion and you can -- I won't say what they are because it

 6    is confidential but I will just refer you to paragraphs 145

 7    through 151 of our complaint.  This complaint is even more

 8    specific and even stronger than our complaint in the wire

 9    harness case.  I think there was a mention of unjust

10    enrichment and I will just quickly cover it generally just to

11    dispel the notion that we didn't change our pleadings based

12    on attacks that were made in wire harness.  Actually, we did.

13    We stated in our complaints -- the dealership plaintiffs

14    stated in their complaints that we seek damages under the

15    unjust enrichment laws of the indirect purchaser states.  Can

16    you look at paragraph 275 --

17          THE COURT:  What law are you using for the unjust

18    enrichment?

19          MS. ROMANENKO:  The state law of the states where

20    we claim consumer-protection claims as well as antitrust

21    claims.  So we are not using the law of any state that

22    doesn't permit an indirect-purchaser action, we are limiting

23    our unjust-enrichment claims to those states where we also

24    have statutory claims.

25          THE COURT:  Have a consumer protection or --

1      MS. ROMANENKO:  And if you will indulge me for one

2   more second, I will point you to paragraph 275 of our

3   complaint because we heard the attacks and we wanted to be

4   certain that we modified accordingly.  So in paragraph 275 we

5   stated plaintiffs bring this claim under the laws of all

6   states listed in the second and third claims, and second and

7   third claims are the ones that list the antitrust statutes

8   and the consumer-protection statutes.

9      THE COURT:  Okay.  Anything else?

10      MS. ROMANENKO:  I believe that is it, and I'm going

11   to turn it over to John Cuneo.

12      MR. CUNEO:  I think my first comment, Your Honor,

13   will be welcome, and that is that in reviewing the papers

14   last night and listening to Ms. Fischer today the auto

15   dealers are prepared to withdraw the D.C. consumer

16   protection -- not the Antitrust Act claim but the Consumer

17   Protection Act claim that Ms. Fischer mentioned this morning.

18      Now, I'm also prepared if Your Honor wants to hear

19   it to argue and talk about the South Carolina class action

20   bar.  However, that has been previously decided by this

21   Court, we think it should adhere to its prior opinion.

22      And as a general matter in terms of unjust

23   enrichment, I would say I guess five words --

24      THE COURT:  She just argued.

25      MR. CUNEO:  Okay.  Cardizem by Judge Edmonds.  The

 1   Cardizem opinion discusses these issues thoroughly in and

 2   out.  The opinion has a very, very crisp understanding of the

 3   issues.  I would respectfully refer the Court to that.

 4          THE COURT:  All right.  Reply?

 5          MS. FISCHER:  Just a few quick points, Your Honor.

 6   I think I will start with unjust enrichment since we just

 7   heard about that.  The end payors in wire harnesses had

 8   already identified the states under which they brought claims

 9   but identifying the states alone is not enough and that's

10   because the states have such widely disparate

11   unjust-enrichment laws.  Perhaps Aftermarket Filters said it

12   best, there the court said finally in Count 2 plaintiff's

13   attempt to bring a national unjust-enrichment claim based on

14   the laws of all the 50 states, excluding Ohio and Indiana but

15   including Puerto Rico and D.C., given admitted differences in

16   the states' legal theories of unjust enrichment, it is

17   impossible for this claim to be brought as a nationwide class

18   and therefore claims must be brought under the specific laws

19   of each state.  The complaint fails to plead the required

20   factual basis of an unjust-enrichment claim on a state by

21   state basis, accordingly Count 2 is dismissed.

22          That's exactly what this Court already did in wire

23   harnesses, and we submit that the same exact result is

24   warranted here.

25          Secondly, obviously I didn't have a chance to

1    address Montana authority with respect to the Shady Grove

2    class-action bar but there is authority from within this

3    district, it is in a footnote in Packaged Ice.

4            THE COURT:  Wait a minute.  A footnote in what?

5            MS. FISCHER:  In Packaged Ice, in footnote 4 that

6    says although the court has already dismissed the Montana

7    claims on other grounds, after Shady Grove it would appear

8    likely that the Montana Unfair Trade Practices Act class bar

9    would continue to be enforced because it is contained

10   basically within the same paragraph of the statute that

11   creates the substantive rights, so the exact same Digital

12   Music analysis was applied there admittedly in dicta, Your

13   Honor, because the claim had already been dismissed on other

14   grounds.

15           In addition, I just want to touch on something that

16   Mr. Williams said as well as one of the auto dealer points.

17   None of our arguments against the auto dealers concern or

18   center upon some alleged failure to say where they bought

19   their cars or IPCs.  We fully acknowledge that the auto

20   dealers pled where and what they bought.  Those arguments

21   apply only to the end payors and are very, very critical in

22   assessing the interstate nexus arguments.  Mr. Williams

23   thinks it is a mere technicality that they didn't plead where

24   they bought but it is not, and I think it is a critical

25   omission.  They are just not entitled to an inference that

1    they bought the car or the instrument panel cluster in the

2    state where they reside, and let me explain why.

3          They allege a conspiracy that extends roughly nine

4    years.  They do not allege when they bought their cars.  Even

5    assuming it will be fair, and I don't think it would be fair,

6    but even assuming it would be fair to infer that a consumer

7    bought his car in the state in which he resides the fact that

8    an end payor lives somewhere now at the time that the

9    complaint was filed says nothing about where he was living at

10   the time that he bought his car or his repair part if he ever

11   bought one.

12         Secondly, Your Honor, a car is nothing like a

13   routine repeat purchase like groceries or gas that you could

14   expect a person to buy locally.  Instead you heard I think

15   Mr. Kohn say cars are, you know, infrequent buys, they are

16   big-ticket, infrequent purchases.  For that reason it is just

17   not uncommon for people to go out of state to take advantage

18   of either lower tax rates or better prices, and they are just

19   not entitled to a contrary inference.  They easily could have

20   pled this information, Your Honor.  They certainly know what

21   cars they bought, where they bought them and when.  None of

22   that information depends in the least on anything they needed

23   from defendants.  That was a deliberate choice and they

24   should be held to the consequences of that choice.

25         THE COURT:  Okay.

1          MS. FISCHER:  Thank you.

2          MR. GANGNES:  Your Honor, can I make a brief

3   comment?

4          THE COURT:  Sure.

5          MR. GANGNES:  Your Honor, Larry Gangnes from

6   Lane Powell for Furukawa.

7          I wanted to correct a possible misimpression on the

8   record.  Ms. Romanenko misspoke when she mentioned Furukawa

9   in the course of her argument about instrument panel

10  clusters.  Furukawa does not make and has not sold instrument

11  panel clusters to OEMs.  It's a defendant in the wire harness

12  cases but it's not a defendant in the IPC cases.

13         THE COURT:  Thank you.

14         MR. GANGNES:  Thank you.

15         THE COURT:  Without your notes directly on, it's

16  hard to keep track of who does what here, I tell you.

17         Okay.  Let's go on to the collective defendants'

18  motion to dismiss direct purchasers -- direct-purchaser

19  plaintiffs in the heater control panel.

20         MR. CHERRY:  Your Honor, again, I'm Steve Cherry

21  with Wilmer Hale.  I'm representing Denso, but for this

22  purpose I will be speaking for all of the defendants.

23         I will try not to repeat things that were said in

24  the earlier argument, there's some overlap obviously in the

25  legal arguments.

1          THE COURT:  Okay.

2          MR. CHERRY:  Okay.  Unlike ACAP, which we have just

3     described in the instrument panel cluster case, which despite

4     the disconnect with the conspiracy alleged at least supplied

5     instrument panel clusters to an actual auto manufacturer at

6     some point in its existence.  These two plaintiffs here never

7     made automobiles and they were never suppliers to any

8     automobile maker.  Instead, both, they are manufacturers of

9     motor homes, one of which like ACAP went out of the business

10    at some point.

11         They purport to assert claims against three

12    defendants, Sumitomo, Denso and Tokai Rika.  And as in wire

13    harnesses, they do rely on guilty pleas by certain of the

14    defendants, in this case Denso and Tokai Rika, but unlike in

15    wire harnesses where it has been noted there were pleas as to

16    certain OEMs, some of which were not identified, here we know

17    that both pleas go directly to Toyota, that's all there is.

18    There are two pleas solely for Toyota.

19         Based on that they allege that, well, then there

20    must have been a conspiracy that affects every sale of every

21    heater control panel to every buyer of every kind in the

22    United States.  There's just no facts to support that, Your

23    Honor.  There are again the two pleas about Toyota and

24    nothing else.  The facts that were essential to your decision

25    in bridging the gap between the disparate pleas and this

```
 1    notion of an overarching conspiracy in wire harnesses, those
 2    facts are just not present here.  There you relied very much
 3    on actual factual allegations about market concentration,
 4    about the market power of the defendants, and there was an
 5    actual effect on prices alleged.  There was an allegation
 6    that prices had gone up even though the cost of inputs had
 7    stayed the same, which they allege was unusual and suggestive
 8    of a conspiracy affecting prices across the board.
 9         None of that is here.  There is no allegation of
10    the market concentration of how many suppliers there are, of
11    what suppliers there are other than the defendants.  They
12    indicate that there are others but they don't say who they
13    are or what their market shares are.  They don't say what the
14    defendants' market shares are.  What they do say is on
15    information and belief the defendants and some unspecified
16    number of unspecified alleged co-conspirators may make up a
17    majority of the market.  Well, that's even worse than a
18    conclusory assertion, that's just plaintiffs' utter
19    speculation.  We don't know who these supposed alleged
20    co-conspirators are, how many they are, what their market
21    share is.  We can't respond to that.  I don't know who they
22    are talking about.
23         And so for all we know from what they have alleged
24    defendants may have a very small market share with no market
25    power at all and there may be dozens of competitors out there
```

1    competing fiercely for sales of HCPs.  There's no facts to

2    the contrary, there is no facts at all.

3              THE COURT:  I assume you know who those competitors

4    are?

5              MR. CHERRY:  I don't know who they are referring

6    to.  We know that there are a number of other competitors

7    that aren't named here, we don't know if they are alleged to

8    be our co-conspirators or not, and they don't say.  So those

9    facts that were in wire harnesses that were illustrated,

10   their charts and their diagrams, are completely absent here.

11             Again, they also alleged an effect on pricing.

12   Remember pricing going up with input staying the same, none

13   of that here.  We don't know if prices went up, stayed the

14   same or went down.  We don't know if inputs went up, stayed

15   the same, went down.  None of that is present here.

16             Another very important distinction in this case,

17   unlike wire harnesses, in wire harnesses they at least

18   alleged that they bought from the defendants.  Here all they

19   allege is they bought from the defendants or again some

20   unidentified alleged co-conspirator.  We don't even know not

21   only who they did business with among the defendants, we

22   don't know who they did business with at all.  Again, how are

23   we supposed to respond to that or assess that claim.  So

24   again, the key facts here that you found to be important in

25   wire harnesses just are completely missing here.

```
 1              The other thing is this notion of fungibility which

 2      is essential to their theory that a price to one would affect

 3      the price to all.  Again, heater control panels, actually

 4      like instrument panel clusters, are a highly customized

 5      product.  Just think of the various automobiles you have been

 6      in and how different the dashboards are, how complicated, you

 7      know, how high-end some are, how simple others are.  That's

 8      why they source these things three years ahead of time

 9      because it takes a lot of time to develop them.  That's why

10      the same OEM -- sorry, supplier when they are awarded keeps

11      the business over the life of the vehicle because there's a

12      lot of development to make these things.  So obviously some

13      very important differences between this case and wire

14      harnesses, Your Honor.

15              Thank you.

16              THE COURT:  Thank you.

17              MR. KOHN:  May it please the Court, Joseph Kohn for

18      the direct purchasers.

19              Your Honor, these are Rule 12 motions.  The

20      defendants have defenses, and we are starting to hear some of

21      them.  Your Honor heard at the wire harness hearing the same,

22      they have arguments and defenses as to the scope of the

23      conspiracy, the amount of damages, et cetera, but these are

24      not issues under Twombly.  I know there is a doctrine in the

25      bar and both plaintiffs and defendants and we have been on
```

1    both sides about firing a shot across the bow to put down a

2    marker to lay some of these arguments out there.  Our

3    complaint, paragraphs 71 and 72 of the HCP complaint, makes

4    the allegations that again the OEM bid prices become a price

5    that is used in the market.  It is the same argument that we

6    alleged in wire harnesses.  Paragraph 72, defendants engage

7    in a single price-fixing conspiracy involving HCPs that

8    impacted not only the multiple bids submitted to OEMs but

9    also the prices paid by all other direct purchasers of HCPs.

10   These plaintiffs are purchasers who are manufacturing

11   vehicles that are on the road.  They are direct purchasers.

12   They stand closer in the shoes of the -- they are more akin

13   to the OEMs than the supplier plaintiff direct purchasers who

14   are the proposed class representatives in wire harness and in

15   IPC.

16        Three defendants, two of the three have pled

17   guilty.  Again, I would submit a stronger factual -- for the

18   long class period.  I would submit a stronger factual record

19   than what we had in wire harness where we had a number of

20   defendants who hadn't been indicted, hadn't pled at all.

21        Your Honor had raised the issue this morning about

22   the Government's cooperation amnesty programs, and we can

23   draw conclusions or inferences with respect to that.  These

24   products are no more customized than our wire harness

25   products.  We have the same argument.  A wire harness in a

1   Toyota isn't going to fit into the Cadillac, the wiring

2   system around the side, that is not the issue, it is the

3   underlying plastic component that we contend that is a

4   commodity and whether you put a Mercedes knob on the front

5   you see for $50 or you put a Toyota knob on for $8, when you

6   look behind the dashboard the plastic components are the

7   same, that's what these folks have got together and rigged

8   the bids on, and that's again what the theory that is alleged

9   is the price in the market.

10          These are clearly direct purchasers, they purchased

11  throughout this time period.  Again, in Twombly the Supreme

12  Court said that plaintiffs' antitrust complaints have become

13  a formulaic recitation of agreement, collusion, and I think

14  there is a point where now six and-a-half years after Twombly

15  and we see where the body of the law is with respect to

16  cartel cases, with respect to guilty-plea cases, with respect

17  to plus-factor cases, which clearly these are, that with all

18  due respect to our colleagues in the defense bar, now the

19  Twombly motion has become a formulaic recitation, it is the

20  shot across the bow, but I think we are not in the age of

21  John Paul Jones anymore, we can move forward, we know what

22  those defenses are, we are not saying we win the case if we

23  win the Rule 12 motion.  They have defenses as to the class,

24  they have defenses as to the amount of damage, but clearly we

25  believe this complaint should be sustained.  Thank you.

1    MR. CHERRY:  Your Honor, can I just have one

2  minute?

3    THE COURT:  Sure.  Reply?

4    MR. CHERRY:  Again, I mean, I guess more than any

5  of the cases we have talked about, I mean, this really just

6  does come down to two pleas relating to Toyota and what he

7  pointed to, Mr. Kohn, on paragraph 71 having two pleas for

8  Toyota.  They say their defendants and their co-conspirators,

9  again, who we don't know who they are, knew and intended that

10  their actions would have a direct impact on prices sold to

11  all direct purchasers.  That's not a fact, that's just an

12  assertion.  You need facts to make that a reasonable

13  conclusion, and they are not in here.  There are facts

14  that --

15    THE COURT:  It just has to be plausible?

16    MR. CHERRY:  It has to be plausible, exactly, and

17  Your Honor did point to facts in wire harnesses that Your

18  Honor determined made that a plausible.  It is a leap of

19  faith and you concluded they filled in the gaps, they

20  connected the dots enough at least with these allegations

21  that the defendants controlled a highly concentrated market,

22  and actually showed an effect on prices across the board, not

23  just for the RFQ.  None of that is here.  There is none of

24  those facts, they are resting solely on the bald assertion.

25    Your Honor, that's exactly what Iqbal says you

```
 1    can't do.  This is identical to the -- it is very similar
 2    rather to the allegation made in Iqbal that the Supreme Court
 3    said that's not a fact, that's a conclusion, you have to have
 4    facts to support it.  And the Supreme Court has cautioned
 5    courts not to send these cases into massive discovery without
 6    requiring the plaintiffs to allege facts to support a claim.
 7    And there are guilty pleas here, we don't deny that, but we
 8    are never going to resolve whatever claims may exist
 9    underlying those pleas bogging down these cases with what are
10    unfounded claims that have no connection in fact.  And Your
11    Honor has raised that issue before, how are we ever going to
12    resolve this, how are we ever going to talk about settlement?
13    None of that is going to happen unless we take a reasonable
14    approach and require the plaintiffs to plead facts and start
15    trimming away this overbreadth here on these cases.
16            THE COURT:  Okay.  Thank you.
17            MR. CHERRY:  Thank you, Your Honor.
18            THE COURT:  All right.
19            MR. KOHN:  Your Honor, just one very brief point?
20            THE COURT:  Okay.
21            MR. KOHN:  With respect to the guilty pleas we
22    would point out that it is in the paper that the Tokai Rika
23    guilty plea also included the obstruction claim --
24            THE COURT:  Yes.
25            MR. KOHN:  -- beyond the Toyota claim.
```

1        And with respect to the settlement issue,

2   apparently, at least from my friends on the indirects, they

3   are moving in that direction with these complaints.

4        THE COURT: Wait a minute. With the settlement

5   issues they are moving --

6        MR. KOHN: Mr. Victor announced to the Court that

7   there was an agreement so Mr. Cherry has just said we'll

8   never have that -- that will never occur unless these

9   complaints are struck down and apparently that's not the

10  case.

11       THE COURT: All right. The collective motion to

12  dismiss the indirect plaintiffs?

13       MS. SULLIVAN: Good afternoon, Your Honor. I have

14  a slide deck that I would like to bring up.

15       THE COURT: May I have your appearance first?

16       MS. SULLIVAN: Marguerite Sullivan from Latham &

17  Watkins on behalf of the Sumitomo defendants.

18       I will be arguing for all defendants this motion

19  to -- in opposition to -- or motion to dismiss the indirect

20  purchasers' complaint, and I will be handling the Twombly

21  argument, the Article 3 standing argument and the antitrust

22  injury argument, and then my colleague, Kelsey McPherson,

23  will present the state-specific arguments.

24       Your Honor, I'm going to focus on four aspects of

25  this case that distinguish it from the wire harness case and

1    require a different result here.  The plaintiffs had

2    substantial discovery months before they filed the amended

3    complaints.  That was not the case in the wire harness case.

4    The specific conduct that they allege in the complaints is

5    consistent with the conspiracy that is described in the two

6    guilty pleas that Mr. Cherry just referenced.  That was not

7    the case in the wire harness complaints.  The guilty pleas

8    describe conduct directed at a single auto manufacturer, that

9    was not the case in the wire harness case.  And the

10   complaints do not allege that the defendants' share of the

11   HCP market suggest that an agreement among them would have

12   covered the entire market.

13          All of these differences require a different result

14   because despite plaintiffs' claim of an industry-wide global

15   heater control panel conspiracy, which is, by the way, the

16   same claim that they have made in every single one of these

17   cases, all 27 of them they make the same exact assertions,

18   the complaints in this case describe a conspiracy that

19   involved Toyota HCPs only, and that means that the complaints

20   don't satisfy Twombly and because the majority of the

21   indirect purchasers do not allege that they purchased Toyota

22   cars or HCPs they have not established Article 3 standing or

23   antitrust standing.

24          If Your Honor will turn to the second slide in the

25   packet that I sent up, this case is not the wire harness case

 1   and I'm going to walk through each of these aspects a little

 2   bit closer in more detail.  The first is that the Court in

 3   the wire harness case found that the allegations created a

 4   reasonable expectation that discovery would reveal evidence

 5   to support the industry-wide conspiracy that the plaintiffs

 6   alleged in that complaint, and that's in your

 7   indirect-purchaser order at page 13.  Here, however, the

 8   plaintiffs received substantial discovery before the

 9   complaint was filed.  They received more than 338,000 pages

10   from more than 23 custodians and many of the key documents

11   were translated.  330,000 of those pages came from Sumitomo

12   alone, and those were from 16 employees, and those documents

13   were produced seven months before plaintiffs filed their

14   amended complaints.

15          Denso produced an additional 8,000 pages from seven

16   custodians more than one month before the complaints were

17   filed, and since that time more than 50,000 additional pages

18   have been produced, so that's close to 400,000 pages from the

19   three primary alleged conspirators, more than 330,000 of

20   which were produced several months before the complaints were

21   filed.  So they had significant discovery to draft their

22   complaints and yet they allege no facts at all that support

23   their allegation that the HCP conspiracy was industry wide.

24          If you look at the second box, the wire harness

25   complaints described sort of broad conclusory allegations

Case 2:12-md-02311-SFC-RSW  ECF No. 659, PageID.9186  Filed 12/03/13  Page 149 of 178
Status Conference / Motion Hearing • November 13, 2013

149

1    about the conduct.  Here we actually have some specific

2    conduct that they have alleged, which up until this point has

3    only been filed with the Court under seal, so I'm not going

4    to refer to it in open court but I will direct the Court's

5    attention to the end-payor complaint at paragraphs 140

6    through 144, the auto-dealer complaint at paragraphs 154

7    through 157.  I will note that in the end-payor complaint the

8    allegation is that certain auto manufacturers -- that the

9    conduct targeted certain manufacturers and that's not

10   accurate, we will get to that when we talk about the guilty

11   pleas, but this specific conduct that they allege in these

12   paragraphs is important because it distinguishes this case

13   from the wire harness case and also from two of the cases

14   that Your Honor relied on in the wire harness decision, In

15   re: Packaged Ice and Polyurethane Foam.

16          In In re: Packaged Ice the guilty pleas described

17   conduct targeting the southeast Michigan market.  The

18   complaint, however, alleged a conspiracy that covered the

19   entire United States.  The defendants filed a motion to

20   dismiss on the grounds that the complaint's allegations were

21   not plausible because the guilty plea was focused on Michigan

22   and the Court rejected that argument because there were key

23   statements from key employees in that complaint that stated

24   that the conspiracy targeted the entire United States.

25          In Polyurethane Foam the Government investigations

1   were targeting certain defendants and those allegations --

2   there were allegations in the complaint that the Government

3   investigations targeted those certain defendants, and certain

4   other defendants filed a motion to dismiss on the grounds

5   that they were not named as a target in the Government's

6   investigations.  The Court rejected that argument and it

7   rejected the argument on the ground that there were multiple

8   witnesses described in the complaint that asserted that all

9   defendants were involved.  So in both of those cases, both of

10  which Your Honor relied on in the wire harness decision, the

11  courts relied on additional facts outside of the guilty

12  pleas.  Here there are additional facts outside of the guilty

13  pleas but they are entirely consistent with the guilty pleas,

14  they don't go beyond the scope of the guilty pleas.

15          So then if you look at the third row in the chart,

16  in the wire harness case the Court relied on the allegation

17  that guilty pleas because they were broad in part suggested

18  that the conduct was more broad than just a few OEMs.  There

19  were two guilty pleas in that case in particular that are

20  particularly relevant, one was described conduct directed at

21  automobile manufacturers, plural, and the other described

22  conduct directed at certain automobile manufacturers, also

23  plural.  Here, however, there are two guilty pleas and they

24  state -- one states that the conduct was directed at Toyota

25  Motor Corporation and Toyota Motor Engineering and

1    Manufacturing North America, and the other states that the
2    conduct was directed at a U.S. automobile manufacturer and
3    the employee pleas that relate to that particular defendant
4    make clear that that manufacturer was Toyota.

5         Ford's counsel earlier stated that the pleas
6    describe agreements to allocate OEM business, and Your Honor
7    asked Mr. Cherry about that, was there an agreement to
8    allocate -- you know, you take Toyota, we will take Honda?
9    That's nowhere in the pleas.  The Tokai Rika plea agreement,
10   which is at Exhibit D of the defendants' reply, states very
11   clearly what the conduct was that was covered by that plea
12   and it is entirely focused on Toyota supply, Toyota bids,
13   Toyota prices.  It has nothing to do with allocating business
14   among OEMs or between OEMs.

15        The Denso plea at page 6 describes the conduct for
16   that plea, and that talks about model-by-model specific
17   conduct.  So there is nowhere in any of these guilty pleas
18   support for this statement that there was some type of OEM
19   allocation agreement more broad than what is in the pleas
20   themselves.

21        As Mr. Cherry also described in the
22   indirect-purchasers' complaint in this case, the plaintiffs
23   do not allege that the defendants controlled the market as
24   they did in the wire harness case.  The end payors state that
25   the defendants dominated the market at page -- at paragraph

1    109 of their complaint, and the auto dealers state that a
2    handful of manufacturers supply HCPs for installation in
3    vehicles sold in the U.S. but they don't say what any
4    defendant's market share is or any facts at all that would
5    show that these particular defendants controlled the market
6    as they did in the wire harness case.

7         They also allege that the HCP market has high
8    barriers to entry and that there is interelasticity of
9    demand, but without knowing what each defendant's market
10   share is or whether there are other suppliers in the market
11   or how many other suppliers and whether those other suppliers
12   might have a significant market share, the allegations that
13   they have about high barriers to entry and interelasticity of
14   demand are meaningless.  The allegations here do not suggest
15   a conspiracy that was industry wide and that's a problem
16   because they have not only failed to satisfy Twombly but also
17   because their injury claims and thus their standing depend on
18   the conspiracy being as broad as they assert that it is.
19   They want the Court to infer that the conduct affected all
20   car brands.

21        If you will turn to the next slide you can see all
22   of the different brands that they reference in their
23   complaints, however 79 of the 88 plaintiffs do not allege
24   that they purchased Toyota cars.  Nine of the 40 auto dealers
25   allege that they bought Toyota cars, that's it, only nine,

1    not one of the end payors alleges that they bought a Toyota

2    car.

3              In the wire harness decision the Court stated that

4    to establish Article 3 standing plaintiffs must allege that

5    they suffered an injury that is concrete and particularized

6    and actual or imminent, and the injury must be fairly

7    traceable to the defendants' conduct.  That's the causation

8    element.  They haven't satisfied either here.

9              In the wire harness case we had a big discussion

10   with Your Honor about whether the indirect purchasers had

11   satisfied standing because they had sufficiently alleged the

12   traceability of an overcharge from the OEM down the chain.

13   We don't even need to get there in this case because it was

14   implicit in the Court's decision in the wire harness case

15   that the plaintiffs had actually purchased the product that

16   they plausibly alleged was price fixed, and that's not the

17   case here.  Most of the plaintiffs do not allege that they

18   purchased the only product that their complaint plausibly

19   suggests was subject to a price-fixing conspiracy.

20             They also don't allege any facts that suggest that

21   prices charged to Toyota influenced prices charged for HCPs

22   to other OEMs.  I expect that they will stand up and tell you

23   that that's what their theory is but they don't allege any

24   facts to support that theory whatsoever.  They rely heavily

25   on Optical Disk Drive in their briefing, and in that case the

1   Court rejected an argument that plaintiffs who didn't buy

2   Dell and HP computers lacked Article 3 standing because they

3   argued -- the defendants argued that the ODDs that were sold

4   to Dell and HP were the only ones impacted by the conspiracy

5   because the conspiracy targeted Dell and HP.  The Court

6   rejected that argument and there the conduct that was -- that

7   appeared in the complaint suggested that not only two OEMs,

8   Dell and HP, were targets but also that there were two others

9   that were targets.

10          Also there were allegations that Dell and HP had a

11  majority share of the ODD purchases for the personal computer

12  market and that in one year those two OEMs made up more than

13  50 percent of ODD purchases.  They also allege in that

14  complaint that the transactional date demonstrated that the

15  prices of ODDs sold to Dell and HP moved in lockstep with

16  prices of ODDs sold to other OEMs, and you don't have any of

17  those allegations here.  So based on the allegations in these

18  complaints it is not plausible that higher prices on Toyota's

19  HCPs influenced prices of HCPs sold to other auto

20  manufacturers.

21          For the same reasons that plaintiffs have not

22  satisfied Article 3 standing they have not sufficiently

23  alleged antitrust injury.  They fail under the first factor

24  of Associated General Contractors without even getting into

25  the others.  In the wire harness decision Your Honor stated

1   that in assessing whether a plaintiff suffered an antitrust

2   injury courts assess the relevant market.  The court in that

3   case determined that the relevant market was the wire harness

4   market, and it concluded that even though the plaintiffs may

5   not have participated in the wire harness market they had

6   sufficiently alleged that the car market was inextricably

7   intertwined with the wire harness market such that it was

8   plausible that their purchases of cars containing wire

9   harnesses caused them an injury, but here the relevant market

10   is the Toyota HCP market, and plaintiffs that did not

11   purchase Toyota cars did not participate in any market that

12   was inextricably intertwined with the Toyota HCP market even

13   arguably.

14        The Court does not need to revisit or reverse its

15   wire harness decision to dismiss the plaintiffs' complaint

16   here.  In fact, dismissing would be entirely consistent with

17   the wire harness decision because the facts and the

18   allegations that the Court relied on in that decision do not

19   appear here, and for that reason frankly not dismissing these

20   complaints would be contrary to the Court's analysis and

21   conclusions in wire harnesses.

22        Thank you, Your Honor.

23        THE COURT:  Okay.

24        MS. McPHERSON:  Your Honor, Kelsey McPherson --

25        THE COURT:  Are you doing the Article 3 or

1    antitrust?

2              MS. McPHERSON:  I am addressing the state claims.

3              THE COURT:  The state claims.  Okay.

4              MS. McPHERSON:  Good afternoon, Your Honor.  My

5    name is Kelsey McPherson and I'm with the firm Latham &

6    Watkins representing the Sumitomo defendants.

7              I am here today on behalf of all the defendants in

8    the HCP case, and I would like to address just a few of the

9    remaining state claims.

10             THE COURT:  Okay.  So you are not repeating

11   anything, the three parts, that plaintiff --

12             MS. McPHERSON:  I am not repeating anything that

13   Ms. Sullivan --

14             THE COURT:  I thought there was something else you

15   were going to add.

16             MS. McPHERSON:  No, and I know it has been a long

17   day so I plan to keep this brief and I'm going to try my best

18   to avoid duplicating the arguments that you heard earlier by

19   the IPC defendants.

20             We have selected -- I have selected a subset of

21   claims that I would like -- of state claims that I would like

22   to talk to you about today where dismissal is both necessary

23   under the case law and consistent with this Court's decision

24   in wire harness.

25             If the Court could please turn to slide four of the

Status Conference / Motion Hearing • November 13, 2013

```
 1    slide set that Ms. Sullivan provided, it is the last slide.
 2    I know that the state claims can get a bit unruly so we
 3    boiled this down to four categories of claims that fall into
 4    the subset.  So this slide is the one slide I will be talking
 5    about.  There are four categories of claims for which
 6    dismissal is both necessary under the case law and consistent
 7    with this Court's decision in the wire harness case.  The
 8    first are state claims that should be dismissed because state
 9    law bars class-action claims.  This applies to the auto
10    dealers' Illinois antitrust claim and South Carolina
11    consumer-protection claim.  I know this was already discussed
12    at length by the IPC defendants but I want to briefly note
13    that it applies as well to the HCP case.
14             In the wire harness case this Court dismissed the
15    Illinois antitrust claim on this basis, and while this Court
16    did not dismiss the South Carolina antitrust claim it was
17    because defendants failed to cite any post Shady Grove
18    authority.  In our reply the HCP defendants cite three such
19    cases, one that directly recognized Shady Grove and, two,
20    that upheld the ban on class actions after the Shady Grove
21    decision came down.  So as a result it would be consistent
22    with this Court's wire harness decision to dismiss the
23    South Carolina consumer-protection claim as well.
24             The second are state claims that should be
25    dismissed in part because they seek damages for conduct that
```

```
1   occurred before the state gave indirect purchasers the right
2   to recover for antitrust violations.  This applies to the
3   auto dealer end-to-end payors Utah and New Hampshire
4   antitrust claims.  In Utah and New Hampshire in 2006 and 2008
5   they both passed law retrospectively in 2006 and 2008 that
6   provided indirect purchasers with the right to recover under
7   the state antitrust laws.  The indirect plaintiffs in this
8   case seek damages to the -- prior to the enactment of those
9   laws.  In the wire harness case this Court refused to apply
10  these state laws retroactively.  Plaintiffs in the HCP case
11  purport to cite new class law that supports their argument
12  about retroactivity.  However, plaintiffs failed to cite to
13  any case in either state that actually interprets this
14  statute to apply retroactively.  Rather they seem to rely on
15  a general argument that these laws are procedural or remedial
16  in nature and not substantive.  They claim that these laws do
17  not create new legal consequences for antitrust violations.
18  However, plaintiffs are wrong.  These amendments affect
19  defendants' substantive rights.  They change the category of
20  claimants entitled to damages under the law.  They create
21  significant additional legal consequences for antitrust
22  violations such as those we are here for today, laws that in
23  large substantive rights cannot be applied retroactively.
24          The third are state consumer-protection claims that
25  auto dealers cannot bring as businesses.  This has been
```

 1    discussed as well.  I would just like to remind the Court as

 2    well that Massachusetts and Missouri state laws explicitly

 3    preclude businesses from bringing state consumer protection

 4    claims and this Court recognized the impact of that on the

 5    auto dealers' claim in the wire harness decision and they

 6    dismissed those consumer protection claims -- this Court

 7    dismissed those consumer protection claims.

 8          Auto dealers in this case have brought those claims

 9    again and they have also brought an additional D.C.

10    consumer-protection claim that suffers from the same fatal

11    flaw.  Again, this was discussed already by IPC defendants

12    and it is possible that plaintiffs plan to drop this claim,

13    but I would like to note that the auto dealers' HCP complaint

14    suffers from the same problem.  They are very clear that the

15    auto dealers bought HCPs for their repair and service

16    businesses and they sell vehicles and HCPs to customers.

17    D.C.'s consumer-protection statute protects only consumers

18    that purchase goods primarily for personal household or

19    family use.  It is clear that none of these

20    consumer-protection laws are meant to apply to the purchases

21    made by auto dealers and all three should be dismissed.

22          Fourth and finally are plaintiffs' unjust

23    enrichment claims.  This is the last category of documents

24    that fall into this subset that should be dismissed under the

25    existing case law including the wire harness case.  There are

1    numerous grounds upon which the Court could rely to dismiss

2    plaintiffs' unjust enrichment claims and all of those are

3    discussed thoroughly in our briefing and some of which were

4    discussed early today.  I would merely like to draw the

5    Court's attention to the fact that the plaintiff here, as

6    they did in the wire harness case, failed to identify the

7    unjust-enrichment laws of the particular jurisdictions under

8    which they bring their claim.

9         THE COURT:  They don't raise any standards?

10        MS. McPHERSON:  They don't raise any standards,

11   exactly.  It is almost verbatim the allegations brought minus

12   countable words brought in the wire harness claim, and so

13   plaintiffs' failure to plead that factual basis on a

14   state-by-state basis requires dismissal of all of their

15   unjust-enrichment claims.

16        THE COURT:  Okay.  Thank you.

17        MS. McPHERSON:  Thank you, Your Honor.

18        THE COURT:  Response?

19        MR. WILLIAMS:  Your Honor, Steve Williams again for

20   the end payors.  We have decided to try to consolidate this

21   and make it a little more quick given the hour.

22        There are some truly remarkable things said during

23   that argument like the right result would be to reverse what

24   you did in the wire harness case.  That's the wrong result.

25   We are here on a motion to dismiss.  There was an argument

```
 1    made or actually a quote by counsel for Sumitomo about the,
 2    quote, primary alleged conspirators.  They are admitted
 3    conspirators, they pled guilty.  And as we allege in the
 4    complaint of the only four defendants we named, because we
 5    only named four in this case, one is likely the applicant for
 6    amnesty because they blew the whistle on the others.  So we
 7    are not talking about speculation if these guys were in a
 8    conspiracy, we know they were, and any inferences are going
 9    to be drawn there go our way and not their way.  But we are
10    also here, Your Honor, in the biggest antitrust conspiracy in
11    the history of the world as far as the Department of Justice
12    is concerned.  They were here earlier, they are not here now,
13    and you asked them how much more is it, how big is it, and
14    they said we can't tell you.
15         THE COURT:  But he had a smirk on his face so I
16    know what he is saying.
17         MR. WILLIAMS:  And we can't ask them because of the
18    stay that is in place, right?
19         THE COURT:  Right.
20         MR. WILLIAMS:  But the argument that these guilty
21    pleaders are making to the Court is except for all purposes
22    that the guilty pleas define the scope of the conspiracy, and
23    you have already rejected that.  I said it last time I was
24    up, there is nothing new.  I'm looking at your decision in
25    wire harness, there is a heading, global nature of the
```

1    conspiracy, and the argument is the defendants say we didn't

2    plead to what they said we pled to and therefore you should

3    pare it back, you should limit it because it is not fair to

4    us.  And you said no because the law is universal, the scope

5    of a criminal guilty plea does not define the scope of a

6    civil case.  It is black and white.

7         THE COURT:  But one of the factors was the -- not

8    in the plea but the market-share argument, the question about

9    certain manufacturers in the plea?

10        MR. WILLIAMS:  I don't think it carries much weight

11   because, see, the market-share argument is frequently in

12   complaints and most what frequently is what we call a plus

13   factor, when you don't have a guilty plea, we have now this

14   Twombly standard in every case and automatically there is a

15   motion even if you pled guilty as you now know very well you

16   still move to dismiss and say it is still not plausible as to

17   me but it is a plus factor.  When you have already pled

18   guilty then I don't think it matters much what your market

19   share is, you have admitted you conspired in the market.  So

20   now what we are arguing about is should we be limited by what

21   it is we put in our plea agreement or not?

22        Now, we do allege in our complaint they dominated

23   the market.  I don't think we need to quibble with that

24   because, as I said, if they have already pled then we are not

25   debating did they do something wrong or not.  What we are

```
1    talking about is what is the scope of what they did, and we
2    don't know.  And, you know, they gave you their chart and
3    they said well, look, not only was the guilty plea narrow but
4    they got all of these documents from us so they should know,
5    but their guilty pleas also say they used code words and
6    covert means to hide what they did.  Well, we don't have
7    their code words and their covert means, we don't know.  So
8    just saying here is a dump of documents, we are not at the
9    end of discovery, we are at the beginning of the case, and
10   the problem is they are trying to circumscribe what the case
11   is about at the motion to dismiss, and that's not fair.
12          So we know we are talking right now about heating
13   control panels but we know we are talking about defendants
14   who in case after case, not just one case, case after case
15   engaged in the same conduct.  And we know not only do the
16   guilty pleas not circumscribe the scope of civil liability
17   but as the courts have also found, if you conspired in one
18   market it is plausible that you conspired in a related
19   market.  So really what this is down to is are the guilty
20   pleaders entitled to have you decide now and for all times
21   for this case that the scope of this conspiracy is only what
22   they pled to, or have we set forth enough to give us the
23   opportunity to determine whether or not it is broader or not.
24          THE COURT:  Broader than Toyota in this case.
25          MR. WILLIAMS:  Exactly, because we don't know, we
```

1   didn't have Ford here last time but now we do because now we

2   have heard it is broader. They don't get that inference. We

3   are entitled to an opportunity to go forward, and this is not

4   an instance where you have got someone who is way on the

5   outside saying how the heck did I end up here, I've got

6   nothing to do with Sumitomo and Yazaki or whoever they are in

7   in case because sometimes it is hard to keep them all

8   straight. It is just the four defendants, and there are

9   certainly sufficient facts in the complaint to keep them all

10  four in for purposes of plausibility. So then it is just a

11  discovery issue and then what we hear, and we hear in every

12  single case after Twombly, we are going to be subjected to

13  massive discovery if you let it go forward, it is unfair to

14  us.

15       Well, if the discovery is too much there are ways

16  to address that. There is the magistrate, and we can address

17  that, but it is the cart before the horse to say circumscribe

18  the plaintiffs' claims because then we will never get the

19  discovery and then they have essentially won a motion in

20  limine now at the motion to dismiss stage saying what's the

21  nature and scope of the conspiracy, and they are not entitled

22  to that now. There is too much smoke in the air here for

23  them to say trust us and then point the finger and blame us

24  for something on the plaintiffs' side.

25       In terms of the remaining parts of this, again, I

1    don't think we heard anything new or different from what we

2    heard the last time we were here or from what was in the

3    papers so I'm going to sit down.

4              THE COURT:  Okay.  Thank you.

5              MS. ROMANENKO:  Victoria Romanenko for dealership

6    plaintiffs.

7              So they said that we received discovery long before

8    we filed this complaint.  3.5 months is the amount of the

9    time between when the discovery plan in this case called for

10   defendants to make their production of some of their

11   documents to us and when we had to serve a translated

12   complaint on the defendants.  And as far as Sumitomo I think

13   they said seven months.  Seven months before the complaint

14   was when they produced a mix, I believe, of wire harness

15   documents and HCP documents.  I don't believe that we

16   received something that was just their HCP documents until

17   October of this year.  And even so, even if we had

18   everybody's documents for three and-a-half months before we

19   had to serve our translated complaint, they can't say that

20   that's enough time to review everything and synthesize every

21   possible instance of price fixing against every possible

22   affected OEM.  They simply cannot logically say that they can

23   point to that fact and say for this reason they should be

24   limited to the OEM that is described in a couple of

25   illustrative examples in their complaint.

1    And, Your Honor, as we told you in our papers, the

2    ODD court didn't do that, this Court didn't do that in wire

3    harness, and we don't think that it should be done in heater

4    control panels.  I think Ms. Sullivan actually covered it

5    when she described how in ODD the defendants stated well, the

6    vast majority of examples in your complaint relate to two

7    OEMs so let's limit this case; the Court didn't do that.  And

8    even if there were a couple more OEMs that the complaint

9    pointed to the Court still didn't limit it to a couple of

10   OEMs, the Court let the case proceed.

11       As far as market concentration, we do allege

12   concentration of the market in our complaint.

13       THE COURT:  Okay.

14       MS. ROMANENKO:  One more.  As far as the limited

15   nature of this case, as defendants try to put it, Mr. Gangnes

16   is correct his client, Furukawa, is not a defendant and was

17   not a defendant in instrument panel clusters, they were just

18   a defendant in wire harness with in this case Sumitomo and

19   Denso and Tokai Rika during the same time period engaging in

20   the same activity.  It is plausible that they fixed prices

21   and rigged bids to multiple OEMs in that case and did so in

22   this case too.  I also -- we attached this to our opposition

23   also and I will just say --

24       THE COURT:  Are you saying it is plausible because

25   they did it before so they probably did it now, or it is

1   plausible that they did it then?

2           MS. ROMANENKO:  They did it with regard to one

3   product so it is plausible they did it with regard to another

4   product in this very same MDL.  There is nothing that they

5   can point to in our complaint that says there is a reason why

6   they would only do it with regard to one OEM for this

7   product.

8           And just on unjust enrichment I think -- I think

9   the defense stated that our claims are the same, and I'm

10  going to tell Your Honor again that our claims are not the

11  same as they were in wire harness.  We clearly assert here in

12  paragraph 284 that we are bringing unjust-enrichment claims

13  under the laws of states under whose laws we are seeking

14  recovery under antitrust and consumer-protection statutes.

15          THE COURT:  Okay.  Thank you.  Any reply?

16          MS. SULLIVAN:  Just very briefly, Your Honor.

17          Your Honor, Mr. Williams stated that the plaintiffs

18  are entitled to an inference here to go forward and that's

19  true except that they have a burden at the pleading stage and

20  their burden is to allege facts that are sufficient to

21  plausibly suggest the conspiracy that they allege actually

22  happened, and they haven't met their burden.

23          The guilty pleas are relevant, that's true, but we

24  are not asking Your Honor to limit this case to the guilty

25  pleas.  We are asking Your Honor to take a look at the entire

1    complaint as a whole and when you do so we believe that you

2    will see that the complaint read as a whole suggests a

3    conspiracy targeting Toyota HCPs and that's it.  It does not

4    suggest a conspiracy involving all HCPs sold to all OEMs.

5           The other thing I would just want to add is that

6    Ford has not sued any of the defendants in the HCP case just

7    for the record.

8           THE COURT:  Thank you.  All right.  Last but not

9    least, Alps.

10          MR. CUNEO:  Your Honor, I wanted to --

11   Jonathan Cuneo, again, and I wanted to give you another piece

12   of good news, and that is --

13          THE COURT:  You just bear good news every time you

14   come up, don't you?

15          MR. CUNEO:  That the District of Columbia

16   consumer-protection claims, I speak for the dealers, we are

17   prepared to withdraw those.  We stand on our briefs on

18   Massachusetts and Missouri.

19          On the retroactivity front, pages 72 and 97 of our

20   brief, it is a souped-up new argument, and on the

21   class-action bar we say that's a class-certification problem

22   at most, it isn't as if you lose your individual claim, and

23   that's what we are talking about now.  So that, and on the

24   South Carolina, asked and answered by the Court.

25          Thank you.

1        THE COURT:  Thank you.  All right.

2        MS. MCPHERSON:  Your Honor, just one additional

3   thing on the state claims.  I just want to note that the one

4   additional sentence brought by end payors is not adequate

5   under this Court's ruling in wire harness to bring all of

6   their unjust-enrichment claims.  And the second is that

7   the -- to remind the Court that the new souped-up argument as

8   applied to retroactivity and neither do the plaintiffs state

9   or cite any case in which these actual statutes are applied

10  retroactively.

11       Thank you.

12       THE COURT:  We don't get to --

13       MS. ROMANENKO:  Just very, very quickly.  This is

14  obviously up to Your Honor, but I think if you look at their

15  motion to dismiss they did not seek to dismiss dealership

16  plaintiffs' claims in Massachusetts on the basis of the

17  business plaintiff rule that they stated here at oral

18  argument, so we obviously leave it up to you about how you

19  want to handle it but I don't think they raised it in their

20  motion and I don't think for that reason we responded to it

21  in our opposition.

22       THE COURT:  All right.

23       MS. McPHERSON:  I apologize, Your Honor.  I would

24  like to say that it was an inadvertent omission on our part

25  not to bring the Massachusetts consumer-protection argument.

1    I did bring it in my opening today to provide the defendants

2    with the opportunity to bring a new argument if they have one

3    as to why it shouldn't be dismissed, and I would respectfully

4    request the Court to dismiss that claim.

5             THE COURT:  The Court will look at it.  Okay.  This

6    is Alps.

7             MS. STORK:  Good afternoon, Your Honor.

8    Anita Stork on behalf of the Alps defendant, Alps Electric

9    Company Limited and Alps Electric North America.

10            I echo most of the previous people up here to say

11   that I will try to be as brief as possible given the hour.

12            Alps joins in all the previous motions brought by

13   the indirect purchasers -- by the defendants to dismiss both

14   indirect-purchaser complaints in the heater control panel

15   matters, but there is one additional compelling reason why

16   Alps should be dismissed and that's because plaintiffs do not

17   allege that Alps sold to Toyota, and Toyota is the only

18   manufacturer whose bids were subject to the alleged price

19   fixing.  None of the end payors and, as you have heard, the

20   vast majority of auto dealers allege that they purchase from

21   Toyota, and none of them allege that Alps sold to Toyota.

22            I want to reiterate again that this is not the

23   usual case where plaintiffs have some information, file a

24   complaint and then receive discovery.  There is a situation

25   where plaintiffs had the benefit of more than 338,000 pages

1   of discovery from 23 custodians, and as Mr. Williams said,

2   there is likely an amnesty applicant.  So in our view this

3   failure to plead these very crucial things makes it different

4   from the ordinary case where defendants haven't had

5   discovery.  Here they have had it and they should know, they

6   should be able to plead if they can plead that there is more

7   than one manufacturer that is the subject of this alleged

8   conspiracy, but they haven't, they have only alleged that

9   Toyota was the target of this price-fixing conspiracy.  If

10  they had information that Alps sold to Toyota they should

11  have alleged it so this does make it very different.

12          In our view again what they haven't pleaded is very

13  important.  They haven't pleaded -- they haven't alleged that

14  they purchased from Toyota, they haven't alleged that Alps

15  sold to Toyota, they haven't alleged any facts that suggest

16  that conduct directed at Toyota could have or did affect the

17  prices of HCPs sold to other OEMs.  There is no allegations

18  that there were allocations between the OEM manufacturers.

19  They haven't pleaded that Alps had any economic incentive to

20  join this conspiracy.  So for that additional reason we think

21  that the complaints fail as to Alps.

22          With respect to lack of Article 3 standing, we join

23  in those arguments and think that that lack of injury

24  pleaded, because only Toyota is alleged to have been the

25  target of this conspiracy and plaintiffs didn't purchase from

1    Toyota, is compounded when it comes to Alps because

2    plaintiffs again haven't even alleged that Alps sold HCPs to

3    Toyota.

4         We also think this means that plaintiffs don't have

5    antitrust standing because, as you have heard, plaintiffs

6    don't allege that they purchased a Toyota so they couldn't

7    have participated in the Toyota HCP market.  Alps doesn't

8    even participate, it is not alleged to have participated in

9    the Toyota HCP market, so for these additional reasons we

10   feel that Alps should be dismissed from the complaints.

11        THE COURT:  Okay.  Thank you.

12        MS. STORK:  Thank you, Your Honor.

13        MR. SELTZER:  Good afternoon, Your Honor.  I'm Marc

14   Seltzer of Susman Godfrey.  I have the unenviable position of

15   going last, so I will try to be very brief.

16        Let me make two points as succinctly as I can.

17   First of all, there is no question that we plausibly alleged

18   an HCP conspiracy based upon the guilty pleas and the market

19   facts that we have alleged including facts about prices going

20   up when costs are holding steady, that's in paragraph 100 of

21   our complaint.  Other market facts also support the

22   plausibility of the allegation of a conspiracy here.

23        The only question for Alps is have we alleged

24   enough to show that Alps was a participant in the conspiracy,

25   and I would invite the Court's attention particularly to

1    paragraphs 139 to 141 of our complaint where specific overt

2    acts committed by Alps and its co-conspirators are alleged in

3    detail.  I can't go into that detail because the filings are

4    under seal, but those facts provide direct evidence of

5    participation of conspiracy.  There is no inference that

6    needs to be drawn.  That's direct evidence that is pleaded.

7          So with respect to Alps there can be no question

8    that we have satisfied any pleading standard, particularly

9    where a plaintiff in an antitrust case like this isn't

10   required to plead any overt acts by any defendant in order to

11   make out a claim that will survive a motion to dismiss in a

12   12(b)(6).

13         Now, in its pleadings or its response to our

14   arguments Alps wants to quibble about its motives.  Why it

15   did --

16         THE COURT:  I'm sorry, what?

17         MR. SELTZER:  Alps wants to quibble about its

18   motives.  It argues -- it nitpicks about the evidence of its

19   overt acts.  Your Honor, the most plausible inference is that

20   Alps engaged in that conduct for its own game.  That's why it

21   did what it did.  That's on Alps' participation in the

22   conspiracy.  It would be unheard of, I have never seen it in

23   all of my years of practice, to have a complaint dismissed

24   where overt acts are specifically alleged against an

25   antitrust defendant and the complaint is not found able to

1    sustain -- be sustained on a motion to dismiss.

2            The next point, and you heard most of the argument,

3    again is reiteration that the complaint goes beyond Toyota as

4    an OEM that was a target of the conspiracy and therefore all

5    of the other consequences flow from the fact that they say

6    this is only a Toyota-specific case.  That's not our case.

7    They assume the fact to be proven and then make their

8    arguments.  They assume the predicate that it is only a

9    Toyota case and then say well, in that case there is no

10   Article 3 standing, you haven't established you are in the

11   right market.  All of those facts flow from that argument,

12   but that's not what we have alleged.  We have alleged that

13   there was conspiracy that affected other OEMs as well.  Now,

14   as Mr. Williams pointed out, do we know who they are, what

15   the circumstances were?  No, that has to await discovery.

16   But the pleading that alleges that other OEMs were victims of

17   this conspiratorial conduct is certainly plausible.

18            Now, why do I say that?  The defendants here had

19   multiple customers.  If you -- in paragraphs 93 through 96 of

20   the complaint their customers are alleged, including ones

21   that overlap with customers of Alps, Alps' primary customers

22   are Honda and GM, that overlaps with two of the other

23   defendants who also have them as primary but not exclusive

24   customers.  So the fact that they have all of these customers

25   speaks volumes to the plausibility of an inference that they

1    would have fixed prices with respect to the other customers.

2    After all, this was a ten-year conspiracy, that's what Denso

3    pleaded guilty to and that's what we have alleged.  It stands

4    to reason that during that ten-year period there would have

5    been price-fixing activity with respect to other OEMs.  Why

6    would they limit themself only to Toyota, they didn't like

7    Toyota?  That doesn't make any sense.  So the inference goes

8    in favor of the plaintiff at this stage of the proceedings.

9    We will take discovery and we will determine what facts can

10   be sustained and the defendants will have a chance to

11   challenge our case at summary judgment or at trial, but this

12   is not the time to parse the case into pieces based upon what

13   was agreed to with the Government with its guilty pleas.

14        As Your Honor noted in your prior decisions, guilty

15   pleas are negotiated documents.  They don't necessarily

16   reflect the breadth and scope of a conspiracy, it is what the

17   parties agreed to, and here they agreed to that was what

18   Denso was going to plead guilty and that's what Tokai Rika

19   was going to plead guilty to.  That doesn't mean that was the

20   extent of the conspiracy.  They seem to assume that has to be

21   the four corners whatever we can prove, but that's precisely

22   to the contrary of what the law is and what Your Honor ruled

23   in your June rulings in this case.  So, again, their argument

24   is based upon assuming the fact to be proven and then saying

25   from that flows all of these consequences.

1          The other point I would make again as a matter of

2     law on this issue, courts have recognized that where there

3     are conspiracies affecting related products that provides a

4     basis to infer conspiratorial activity in other of the

5     related products.  Judge Posner's decision in the

6     High-Fructose Corn Syrup case from the Seventh Circuit is a

7     leading case in that regard where he said it was reasonable

8     to infer a conspiracy in High Fructose Corn Syrup based upon

9     admitted conspiracies involving lysine and citric acid.  How

10    much more plausible is it to infer conspiracy with respect

11    not to a related product but to the same product with

12    customers that are overlapping customers of these

13    co-conspirators, two of whom have pled guilty and one

14    additional party is likely to be an admitted conspirator as

15    part of the Ex Pari process for the Department of Justice.

16         So, Your Honor, the allegations are plausible, a

17    motion to dismiss is not the time to cut the case down

18    without an evidentiary basis, and the allegations meet the

19    standard of Twombly and Iqbal at this juncture of the case.

20         The last thing I would say, Your Honor, on the

21    discovery issue, we've got no discovery from Alps, none,

22    zero.  Discovery is just beginning in this part of the case

23    so to suggest that this ought to be looked at as if we were

24    at the end of the road on discovery that completely

25    mischaracterizes the procedural posture of this case.

1            Unless Your Honor has any questions I have made the

2    points.  Thank you, Your Honor.

3            MS. STORK:  Just one minute to quickly respond to a

4    few of Mr. Seltzer's points.  One, it is certainly our

5    contention that if the Court takes a look at the paragraphs

6    that they were directed to look at that labeling Alps'

7    conduct as overt acts is a label and it is conclusory.

8    Plaintiffs have not alleged any facts that Alps had an

9    economic incentive to join into this conspiracy.

10           And finally they are just asking the Court to take

11   their conclusory word for it that other OEMs were affected.

12   They have had hundreds of thousands of pages of documents and

13   they still have not plausibly alleged anything beyond Toyota

14   and 12(b)(6) is all about facts and not conclusions.

15           Thank you, Your Honor.

16           THE COURT:  Thank you.  Okay.  The Court will issue

17   opinions on all of these.  Is there anything else?

18           (No response.)

19           THE COURT:  No.  All right.  Thank you for coming

20   in.  We will see you in February.  Happy holidays.

21           THE LAW CLERK:  All rise.  Court is adjourned.

22           (Proceedings concluded at 4:35 p.m.)

23                        _    _    _

24

25

1                           *CERTIFICATION*

2

3                    I, Robert L. Smith, Official Court Reporter of

4       the United States District Court, Eastern District of

5       Michigan, appointed pursuant to the provisions of Title 28,

6       United States Code, Section 753, do hereby certify that the

7       foregoing pages comprise a full, true and correct transcript

8       taken in the matter of In re: Autmotive Parts Antitrust

9       Litigation, Case No. 12-md-02311, on Wednesday,

10      November 13, 2013.

11

12

13                                  *s/Robert L. Smith*
                                    Robert L. Smith, RPR, CSR 5098
14                                  Federal Official Court Reporter
                                    United States District Court
15                                  Eastern District of Michigan

16

17

18      Date:  12/02/2013

19      Detroit, Michigan

20

21

22

23

24

25