# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In Re: **AUTOMOTIVE PARTS ANTITRUST LITIGATION** | : : : | **Master File No. 12-md-02311** |
|  | : : | **Honorable Marianne O. Battani** |
| **In Re: All Cases** | : : : |  |
| **THIS DOCUMENTS RELATES TO:** | : : |  |
| **All Actions** | : : |  |

## INDIRECT PURCHASER PLAINTIFFS' RESPONSE IN OPPOSITION TO DIRECT PURCHASER PLAINTIFFS' MOTION TO LIMIT UNIFORM SUBPOENA TO OEMS AND TO FORD MOTOR COMPANY'S RESPONSE TO THE PROPOSED OEM SUBPOENA[1]

---

[1] This responds to Direct Purchaser Plaintiffs' Motion to Limit Uniform Subpoena to OEMs (MDL Dkt. # 967) (filed 5/13/2015) ("DPPs' Motion" or "DPPs' Mot. at __.") and Ford Motor Company's Response to the Proposed OEM Subpoena (MDL Dkt. # 977) (filed 5/20/2015) ("Ford Response"). This response is filed on behalf of End-Payor Plaintiffs and the State of Florida.  Defendants will file a separate response.

# TABLE OF CONTENTS

**Page**

I.   BACKGROUND AND INTRODUCTION ....................................................................1

II.  ARGUMENT ...........................................................................................................5

    A.   Coordination on discovery does not preclude IPPs from seeking information relevant to their claims in the indirect purchaser actions..........................................5

    B.   DPPs have no standing whatsoever to object to the OEM Subpoena.....................5

    C.   DPPs' and Ford's objections to the OEM Subpoena have no merit .......................7

        1.   The requests seek information clearly relevant to IPPs' claims .................7

            a.   The Serving Parties do not need to show a "particularized need." ..................................................................11

        2.   The scope of the OEM Subpoena does not present an undue burden........12

            a.   The OEM Subpoena is deliberately comprehensive; scope will be negotiated with each OEM during meet and confer process..........................................................................................12

            b.   Only each OEM can speak to any potential burden it may face.........................................................................................14

        3.   Highly sensitive and/or proprietary information can be sufficiently protected under the Stipulated Protective Order........................................16

    D.   The information sought by the OEM Subpoena is not available from other parties or third-party sources ...............................................................................18

        1.   Information on the OEM link of the distribution chain cannot be obtained from other sources......................................................................18

        2.   Transactional data from Defendants, ADPs, and other non-OEM third-parties does not satisfy what the Serving Parties are seeking from the OEMs. ........................................................................................................20

            a.   Data from Defendants ..................................................................20

            b.   Data from ADPs...........................................................................20

            c.   Data from third-party data suppliers ...........................................21

E.    DPPs' and Ford's motions, if entertained, would prejudice the other parties in the MDL Action and do nothing but cause more delay ....................................22

III.    CONCLUSION ...............................................................................................................22

## STATEMENT OF THE ISSUES PRESENTED

### ISSUE NUMBER ONE

Should the Court allow relevant and permissible third-party discovery to proceed in the indirect purchaser actions, where direct purchaser plaintiffs are not parties to the indirect purchaser actions, and have no standing to object or limit the subpoena in any way in those actions?

|  |  |
|---|---|
| Indirect Purchaser Plaintiffs' Answer: | Yes |
| Defendants' Answer: | Yes |
| Direct Purchaser Plaintiffs' Answer | No |

### ISSUE NUMBER TWO

Should the Court disregard Ford's response at this time because its commentary does not pertain to any other OEM, the serving parties have not yet had an opportunity to meet and confer with Ford or any other OEM, and where Ford's objections are moot given the nature of using a comprehensive subpoena method for third-party discovery?

|  |  |
|---|---|
| Indirect Purchaser Plaintiffs' Answer: | Yes |
| Defendants' Answer: | Yes |
| Ford's Answer: | No |

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

**Cases**

*In re Aftermarket Filters*, 2010 U.S. Dist. LEXIS 105108 (N.D. Ill. Oct. 1, 2010)

*In re Auto. Parts Antitrust Litig.*, 2014 U.S. Dist. LEXIS 136403 (E.D. Mich. Sept. 25, 2014)

*Breaking Glass Pictures v. Doe*, 2014 U.S. Dist. LEXIS 14159 (S.D. Ohio Feb. 5, 2014)

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 137946 (N.D. Cal. Sept. 19, 2013)

*Donahoo v. Ohio Dep't of Youth Servs.*, 211 F.R.D. 303 (N.D. Ohio 2002)

*E 3 Biofuels, LLC v. Biothane Corp.*, 2013 U.S. Dist. LEXIS 100793 (S.D. Ohio July 18, 2013)

*Levitin v. Nationwide Mut. Ins. Co.*, 2012 U.S. Dist. LEXIS 177738

*Lewis v. ACB Bus. Servs.*, 135 F.3d 389 (6th Cir. 1998)

*McNaughton-McKay, Elec. Co. v. Linamar Corp.*, 2010 U.S. Dist. LEXIS 59275 (E.D. Mich. June 14, 2010)

*Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87 (S.D. Ohio 2013)

*Morris v. GMC*, 2010 U.S. Dist. LEXIS 22618 (E.D. Mich. Mar. 11, 2010)

*Nucorp, Inc. v. Does 1-24*, 2012 U.S. Dist. LEXIS 187547 (E.D. Mich. Oct. 18, 2012)

*In re Polyurethane Foam Antitrust Litig.*, 2014 U.S. Dist. LEXIS 161020 (N.D. Ohio Apr. 9, 2014)

*In re Potash Antitrust Litig.*, 162 F.R.D. 559 (D. Minn. 1995)

*In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006)

**Other Authorities**

Fed. R. Civ. P. 26

Fed. R. Civ. P. 45

MANUAL FOR COMPLEX LITIGATION § 21.14 (4th ed.)

Indirect Purchaser Plaintiffs respectfully submit this Response in Opposition to Direct Purchaser Plaintiffs' Motion to Limit Uniform Subpoenas to OEMs and in Opposition to Ford Motor Company's Response to the Proposed OEM Subpoena.

## I.    BACKGROUND AND INTRODUCTION

The cases that make up this MDL Action[2] stem from a multi-decade, worldwide conspiracy that the Department of Justice ("DOJ") has repeatedly characterized as having the largest impact to American consumers that it has ever uncovered – involving more than thirty implicated automotive parts and billions of dollars in United States commerce.  The criminal wrongdoing here is unprecedented.  To date, in the United States, thirty-five corporate Defendants have pled guilty, fifty-three individuals have been charged, and twenty-nine of those individuals have pled guilty (or have agreed to plead guilty).  Over $2.5 billion in criminal fines have been imposed.  In addition, a multitude of foreign investigations are ongoing, including by the Japanese Fair Trade Commission, and the European Commission.

In an effort to streamline third-party discovery in a case with such a massive scope, and to minimize the burden on third-party original equipment manufacturers ("OEMs") such as Toyota, Honda, Nissan, and Subaru, who were the focus of the Defendants' conspiratorial conduct, the Court directed the various groups of plaintiffs in the indirect purchaser actions ("IPPs")[3] and defendants in all indirect purchaser actions ("Defendants") (collectively the "Serving Parties") to coordinate to draft one, comprehensive subpoena ("OEM Subpoena") to be served on the OEMs.  The Serving Parties did just that – they spent substantial time and effort,

---

[2] "MDL Action" refers to and includes all cases coordinated in *In Re Automotive Parts Antitrust Litig.*, Master Case No. 12-md-02311.

[3] Plaintiffs in the indirect purchaser actions include:  End-Payor Plaintiffs; Auto Dealer Plaintiffs; Truck and Equipment Dealer Plaintiffs; and Public Entity Plaintiffs.

working together in a collegial manner to confer and consolidate their requests into one comprehensive document.[4]

The idea of IPPs and Defendants working together to minimize the burden on the OEM recipients was proposed by IPPs and Defendants, and endorsed by the Court in recognition of the fact that such discovery would be necessary in the indirect purchaser actions, and in recognition of the fact that all parties in this complex multidistrict litigation share the goal of creating efficiencies and avoiding waste. OEMs will benefit by receiving a subpoena that includes the requests of all Serving Parties in one document, by having the opportunity to meet and confer with all Serving Parties at one time, and by only having to search for and produce responsive information one time for all indirect purchaser actions. On the other hand, if a comprehensive subpoena is not used, each OEM might receive thirty-plus separate subpoenas, one for each part that is the subject of a separate action, each with its own particular timeframe, requests, and parties. Each OEM would then need to respond to each separate subpoena, meet and confer with the particular parties involved in each separate action (perhaps on many of the same issues), resolve any disputes for each separate action and, ultimately, search and produce piecemeal for each separate action.

The Court allowed direct purchaser plaintiffs ("DPPs") an inch to simply participate in the discussion regarding the OEM Subpoena.[5] Instead, they took a mile, attempting to improperly quash the OEM Subpoena, first, on April 28, 2015, with their letter brief to the Special Master,[6] and now, with their instant motion. Ford Motor Company ("Ford"), a party in its own direct action case regarding wire harness products against the Fujikura Defendants, and a

---

[4] *See* Exhibit A, hereto (OEM Subpoena).

[5] *See* Revised Order Regarding Subpoena to OEM (MDL Dkt. # 914) (filed 3/19/15).

[6] *See* Exhibit B, hereto (April 28, 2015, Letter from David Fink to Special Master Esshaki).

third-party OEM in the indirect purchaser actions, has also prematurely weighed in with its own response.

For the reasons set forth below, DPPs' and Ford's arguments have no merit and, if this process does not begin soon, the schedule set by Judge Battani will not be met.

***First***, regardless of what discovery may be allowed or not allowed in the direct purchaser actions, none of that has any bearing on third-party discovery that is appropriately sought *here*, in the indirect purchaser actions. While coordination may take place across actions for ease of discovery, the indirect purchaser actions have not been consolidated with, and remain distinct from, the direct purchaser actions for purposes of litigation and proof. The IPPs should be allowed to seek the relevant discovery for their own indirect purchaser actions, regardless of what issues may be at stake regarding discovery in the direct purchaser actions.

***Second***, DPPs have no standing whatsoever to block or limit Rule 45 subpoenas to be issued to third-party OEMs in the indirect purchaser actions. And, while Ford can raise concerns regarding its own subpoena (more appropriately raised after the OEM Subpoena is served), it cannot speak for any other OEM. Sixth Circuit law is very clear – ***absent a claim of privilege, proprietary interest or personal interest, the only party who can object to a subpoena is the actual subpoena recipient***. DPPs argue that the OEMs are "absent class members" in the direct purchaser actions and, therefore, that status somehow gives them grounds to object in the indirect purchaser actions. Yet, at best, the OEMs are *putative* class members of the direct purchaser classes, which the Court may or may not certify, and to which the OEMs may or may not opt out (as Ford has here). Counsel for the DPPs ("DPP Counsel") does not represent the OEMs in any action, let alone any of the indirect purchaser actions. DPPs are not even parties in two-thirds of

the cases in the MDL Action.  In addition, the OEMs are large, sophisticated entities with their own competent counsel that can negotiate or object to the OEM Subpoena, should they wish.

*Third*, even if the DPPs did have standing to object, their arguments would still fail.  The requests in the OEM Subpoena seek information that is relevant to class certification and damages in the indirect purchaser actions – information which is routinely sought and produced in indirect price-fixing actions.  As discussed, *infra*, at 8, DPPs have conceded that the information requested is central to the claims of IPPs.  DPPs' and Ford's attacks regarding scope and burden are even less persuasive.  Both miss the key point – that the Court ordered the Serving Parties to collaborate in putting together a comprehensive subpoena to include all indirect part actions and claims.  The process of using one subpoena for all indirect purchaser actions necessarily contemplates that the Serving Parties will meet and confer with each OEM to negotiate and minimize any concerns regarding scope or burden, and that some tailoring may need to be done to fit the subpoena to each OEM.  Only each OEM can speak to the scope of its business, data, and documents, or any burden that it may face.  Ford's Response illustrates that fact.  Furthermore, to the extent any OEM can show that the information sought involves its own highly sensitive or proprietary information, there is an iron-clad protective order in this MDL Action that provides sufficient safeguards.

*Fourth*, the information sought by the OEM Subpoena is not obtainable from any other parties or sources.  The OEMs are the main source for the information sought by the OEM Subpoena.  Partial transactional data from Defendants, Auto Dealer Plaintiffs ("ADPs"), and other third-parties are not substitutes for the information sought from the OEMs directly.

In sum, the proper step now is to serve the OEMs, and to allow the Serving Parties and the OEMs – the true parties in interest – to engage in meaningful negotiation, without delay.

Time is critical, and if this process does not begin soon, the schedule set by Judge Battani will not be met.  Accordingly, DPPs' Motion should be denied and Ford's concerns should be addressed through meet and confer with the Serving Parties once the OEM Subpoena has been served.

## II.     ARGUMENT

### A.     Coordination on discovery does not preclude IPPs from seeking information relevant to their claims in the indirect purchaser actions

DPPs cannot block relevant discovery in the indirect purchaser actions on grounds that the OEM Subpoena will be filed in "all actions."  DPPs argue that discovery in the IPP actions should be precluded (or, in the alternative, limited) because if the OEM Subpoena is filed in "all actions," information discovered in the indirect purchaser actions could be used against them in the direct purchaser actions.  DPPs' Mot. at 1.  Yet, DPPs are not even parties in two-thirds of the cases in the MDL Action.  And, whether any of the information sought by the subpoena can also be used for any purpose in any of the direct purchaser actions in the future is a separate question, and has no bearing on whether relevant and permissible discovery is allowable in the indirect purchaser actions.  Despite any coordination on discovery, the indirect purchaser actions are not consolidated with the direct purchaser actions for purposes of litigation and proof.  DPPs cannot block relevant third-party discovery that is relevant to the IPPs' claims.

### B.     DPPs have no standing whatsoever to object to the OEM Subpoena

DPPs have no standing to object to Rule 45 subpoenas to be issued to third-party OEMs in the separate, indirect purchaser actions, to which they are not a party.

As Sixth Circuit courts make abundantly clear, absent a personal, legally protected interest, when a subpoena is directed to a nonparty, only the party to whom the subpoena is directed has standing to object it.  *See*, *e.g.*, *Nucorp, Inc. v. Does 1-24*, 2012 U.S. Dist. LEXIS

187547, at \*16-17 (E.D. Mich. Oct. 18, 2012) (court refused to quash subpoena because, under the plain language of Rule 45, "[t]he law is clear, absent a claim of privilege, a party has no standing to challenge a subpoena to a nonparty.") (internal citations omitted); *Donahoo v. Ohio Dep't of Youth Servs.*, 211 F.R.D. 303, 306 (N.D. Ohio 2002) ("The party to whom the subpoena is directed is the only party with standing to oppose it.").

DPPs seem to argue they have standing to interfere in the indirect purchaser actions because the OEMs are "absent members" of the direct purchaser classes, and that status somehow confers representation by DPP Counsel over the OEMs in all actions.  DPPs' Mot. at 1. This argument is far off the mark.

DPP Counsel does not represent the OEMs in any of the direct purchaser actions, let alone any of the indirect purchaser actions.  At best, the OEMs are *putative* members of ten direct purchaser classes, which the Court may or may not certify, and to which the OEMs may or may not opt out (as Ford illustrates here).  *See In re Aftermarket Filters*, 2010 U.S. Dist. LEXIS 105108, at \*13 (N.D. Ill. Oct. 1, 2010) ("*Filters*") ("[third-party, OEM] subpoena recipients are not actually 'class members' [of the direct purchaser class] because no class has yet been certified… [s]ubpoena recipients are more accurately characterized as *putative* class members.") (emphasis in original).

Prior to certification, there is no attorney-client relationship between DPP Counsel and the OEMs.  *Id.* (citing ABA Formal Ethics Op. 07-445 at 3); *see also Morris v. GMC*, 2010 U.S. Dist. LEXIS 22618, at \*25 (E.D. Mich. Mar. 11, 2010) ("A client-lawyer relationship with a potential member of the class does not begin until the class has been certified and the time for opting out by a potential member of the class has expired.  If the client has neither a consensual relationship with the lawyer nor a legal substitute for consent, there is no representation.

- 6 -

Therefore, putative class members are not represented parties for purposes of the Model Rules prior to certification of the class and the expiration of the opt-out period.") (quoting ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 07-445, at 3 (2007)).[7]  Rather, the OEMs are all large, sophisticated companies, represented by their own in-house and outside counsel.  To the extent any OEM objects to the subpoena, it can speak for itself.  *Filters*, 2010 U.S. Dist. LEXIS 105108, at *16 (subpoena recipients, as large sophisticated companies, had the ability as well as the legal authority under Rule 45 to make their own objections).

Here, only each OEM has standing to object to its own subpoena.  The DPPs have no standing to speak for any of the OEMs, and Ford can only speak for itself.  Even if DPPs did have standing, however, their objections would still fail.

**C.    DPPs' and Ford's objections to the OEM Subpoena have no merit**

**1.    The requests seek information clearly relevant to IPPs' claims**

DPPs and Ford make various conclusory statements that the information sought in the OEM Subpoena is not relevant.  DPPs' Mot. at 4-5, 21; Ford Response at 8.  These statements ring hollow.

Relevance for discovery purposes is extremely broad.  *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 402 (6th Cir. 1998).  IPPs may obtain discovery regarding any non-privileged matter that is relevant to their claims (and Defendants to any of their defenses).  *See United States v. Blue Cross Blue Shield of Mich.*, 2012 U.S. Dist. LEXIS 141355, at *7 (E.D. Mich. Oct. 1, 2012) ("Relevant evidence" is "evidence having any tendency to make the existence of any fact that is

---

[7] Indeed, even after a class is certified, an ordinary attorney-client relationship between plaintiffs' counsel and the absent class members is not established until the end of the opt-out period.  *See*, *e.g.*, *In re Potash Antitrust Litig.*, 162 F.R.D. 559, 561, fn.3 (D. Minn. 1995) ("While we agree that a potential attorney-client relationship is formulated upon the certification of a class, 'it cannot truly be said that [counsel for the class] fully 'represents' prospective class members until it is determined that they are going to participate in the class action.'").

of consequence to the determination of the action to be more probable or less probable than it would be without the evidence."); *Nucorp*, 2012 U.S. Dist. LEXIS 187547, at *17-18 (relevancy standard "is commonly recognized as one that is necessarily broad in its scope in order 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case'").

To obtain certification of an indirect purchaser class, IPPs intend to show that direct purchasers paid an illegal overcharge as the result of the alleged conspiracy, and that the overcharge was passed through to IPPs by OEMs. *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, 2014 U.S. Dist. LEXIS 161020, at *145-90 (N.D. Ohio Apr. 9, 2014) ("*Polyurethane Foam*") (explaining the elements of proof in an indirect price-fixing action, including liability proof of the illegal overcharge and proof of common impact – that the illegal overcharge was passed on through distribution chain); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 137946, at *73-74 (N.D. Cal. Sept. 19, 2013) ("*CRT*") (explaining how indirect purchasers' expert found pass-through by analyzing the distribution chain); *Filters*, 2010 U.S. Dist. LEXIS 105108, at *13-14 (whether there is common proof that the alleged conspiracy had an impact on the prices charged to indirect purchasers is relevant to class certification).

DPPs acknowledge the relevance of upstream and downstream information to the indirect purchaser actions, as they must. *See* DPPs' Mot. at 1-2 (regarding upstream and downstream information: "[t]his information is intended entirely for use in the IPP cases to determine whether an illegal overcharge was passed through to each of the Indirect Purchaser classes"). Furthermore, in an email to Special Master Esshaki regarding similar subpoenas served by Defendants on third-party suppliers, requesting much of the same information as requested in the OEM Subpoena here, DPPs explained:

> Each of these subpoenas appears to address questions of fact regarding the extent to which alleged overcharges were or were not passed on to subsequent purchasers. While this information is not relevant to the claims of the Direct Purchaser Plaintiffs, *it is central to the claims of the End-Payors and the Auto Dealers (as well as any other indirect claimants)*. As such, we have every reason to expect that the End-Payors and Auto Dealers will be serving similar discovery requests on these suppliers.[8]

This Court has itself explained the relevance of the information sought to the indirect purchaser claims in this MDL Action. For example, in its opinion on the motion to dismiss the indirect purchaser action regarding occupant safety restraint systems, the Court explained what IPPs needed to sufficiently allege to sustain their action:

> Because ADPs [Auto Dealer Plaintiffs] and EPPs [End-Payor Plaintiffs] are indirect purchasers, their complaints must include two allegations: (1) Defendants overcharged the direct purchasers; and (2) some or all of the overcharge was passed on to them through each of the various intermediate levels of the distribution chain.[9]

Indeed, the type of information sought by the requests is routinely sought and produced by third-parties in indirect price-fixing cases. *See*, *e.g.*, *Polyurethane Foam*, 2014 U.S. Dist. LEXIS 161020, at *167-69 (to support class certification, indirect purchaser plaintiffs used third-party subpoenas to obtain cost and sales data for pass-through analysis); *Filters*, 2010 U.S. Dist. LEXIS 105108, at *14-16 (downstream discovery subpoenaed from numerous third-parties to prove pass through and "both sides of the dispute effectively acknowledge that the subpoena recipients have information that is relevant to [class] certification of an indirect purchaser class").

---

[8] *See* Exhibit C, hereto (Email from David Fink to Special Master Gene Esshaki on April 23, 2015 (5:13 p.m.) (emphasis added)).

[9] *In re Auto. Parts Antitrust Litig.*, 2014 U.S. Dist. LEXIS 136403, at *197 (E.D. Mich. Sept. 25, 2014) (Opinion and Order Granting in Part and Denying in Part Defendants' Collective Motion to Dismiss Indirect Purchaser Actions in Occupant Safety Restraint Systems Action).

Furthermore, to support class certification, IPPs expect that their experts will use data obtained from third-parties, to present a reliable method to prove common impact on all purchasers downstream from the direct sale.  *See*, *e.g.*, *Polyurethane Foam*, 2014 U.S. Dist. LEXIS 161020, at *167-69 (explaining how indirect purchasers' expert proved pass-through by supporting his regression model with data regarding prices paid by end-users from third-parties such as Home Depot, Lowe's, and Macy's); *CRT*, 2013 U.S. Dist. LEXIS 137946, at *81-91 ("Dr. Netz's studies include over forty data sets from twenty-nine different entities, for more than 131 million CRTs, in a data range spanning seven years and more than 100 million price and cost observations.").

DPPs generally do not dispute the relevance of the upstream and downstream data in the indirect purchaser actions, as they cannot.  While it is not the right time to resolve challenges to specific requests, DPPs identify categories of information that they say are "not relevant to any action," such as "manufacturing, pricing, and sales information," "collusion by Defendants," "productions to governmental authorities concerning auto parts investigations," and "conduct at issue in MDL."  DPPs' Mot. at 12.[10]  Objecting to these requests on relevance grounds is preposterous.  For example, "manufacturing, pricing and sales information" go right to the heart of IPPs' pass-on claims (Request No. 12).  It is hard to imagine how evidence of "collusion by Defendants" is irrelevant where more than thirty cases have been filed in which every single complaint alleges "collusion by Defendants" (Request Nos. 18, 27, and 31).  Likewise, information regarding, inventory levels, and expected sales or leases are factors relevant to

_____

[10] DPPs cite Request Nos.:  7 and 9 (re: financing of new vehicles); 10 (inventory levels); 11 (expected sales or leases); 12 (manufacturing, pricing, and sales information); 18 (collusion by defendants); 20 (OEMs systems for reporting sales); 25 (organizational charts); 26 (ESI systems used by each OEM); 27 (productions by OEMs to governmental entities regarding the auto parts investigations and actions); 31 (the conspiracy at issue in the MDL Action here); 35 (supplier participation in design of parts); and 36 (compilations of OEM-approved parts suppliers).

OEMs' pricing decisions (Request Nos. 10 and 11).  It is also relevant to understand which

suppliers sell to which OEMs and/or bid to OEMs for auto parts (Request No. 36).  Requests that

seek information on how parts are identified, data is stored, and general systems used by the

OEMs, are also relevant in that they help interpret and understand the data that may be produced

(Request Nos. 20, 26, and 35).  Productions to government entities regarding their investigation

of the auto parts conspiracy (Request No. 27) are by definition relevant, and also provide the

benefit of having been previously compiled by the OEMs, thus making this a request with little

burden.

> **a.  The Serving Parties do not need to show a "particularized need"**

To get around their lack of standing, DPPs cite a handful of cases holding that a court

may engage in a "particularized need" inquiry before permitting discovery directed at members

of a putative class.  DPPs' Mot. at 3 (citing *Polyurethane Foam*, 2014 U.S. Dist. LEXIS 27116,

at *7; *In re Skelaxin Antitrust Litig.*, 292 F.R.D. 544, 549 (E.D. Tenn. 2013); and *Groth v. Robert

Bosch Corp.*, 2008 U.S. Dist. LEXIS 52328, at *3 (W.D. Mich. July 9, 2008)).  Yet, as DPPs'

cases show, this rule does not apply to the third-party discovery sought by the OEM Subpoena

here.

As explained, *supra* at 3, the OEMs are not absent class members in the direct purchaser

action.  Even if they were, the particularized need rule simply does not apply.  The rule is

intended to ensure that defendants do not issue abusive discovery requests to absent class

members as a "tactic to take undue advantage of the class members or as a stratagem to reduce

the number of claimants." *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 341 (7th Cir. 1974)

(citing *Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971)).  The

classic example of an abusive request is where defendants ask to depose dozens of individual

putative class members, solely to inquire about commonality problems, with the goal of

pressuring class members to relinquish their claims.  *See Groth*, 2008 U.S. Dist. LEXIS 52328, at *3; *see also Clark*, 501 F.2d 324 (defendants sought to depose and obtain documents from 50 African-American retirees claiming housing discrimination with the thinly-veiled goal of harassing absent class members into providing affidavits conceding that they had not been harmed).  Here, there is no similarity to *Groth*.  The subpoenas here seek targeted categories of documents and data that are directly relevant to the Serving Parties' claims and defenses, and cannot be obtained from any other source.  There is no ulterior motive or harassment to pressure any putative class members to opt out.

However, even if the Court were to impose the "particularized need" rule, the OEM Subpoena easily passes the test, which requires only a "demonstration of need."  MANUAL FOR COMPLEX LITIGATION § 21.14 (4th ed.).  As explained in detail throughout this brief, the OEM Subpoena seeks information that is at the heart of resolving the claims of the Serving Parties, and information that only the OEMs possess.

      2.      **The scope of the OEM Subpoena does not present an undue burden**

            a.      **The OEM Subpoena is deliberately comprehensive; scope will be negotiated with each OEM during meet and confer process**

DPPs and Ford challenge the scope of the OEM Subpoena, claiming that it spans too many years and parts.  DPPs' Mot. at 10-11; Ford Response at 4.  Yet, the subpoena is necessarily inclusive and follows the Court's own goals to properly and efficiently manage this complex class action.[11]  For example, the DPPs and Ford attack the time period for the requests, 1992-present, as too broad, and Ford calls for a defined start and end date in each action.  *See* DPPs' Mot. at 11; Ford Response at 1, 5-7.  Yet, the time period is meant to be wide.  Discovery

---

[11] *See also Polyurethane Foam*, 2014 U.S. Dist. LEXIS 27116, at *8-9 (rejecting objections to overbreadth where similar downstream discovery was sought, noting that the "MDL is itself broad in the topics it addresses.").

is just beginning in most actions.  Some of the conspiratorial conduct may have started as early as 1992, and the impacts of the collusion may continue to the present day.  The time period is meant to cover the time period for all actions, not twenty-three years in each action, individually. Likewise, the DPPs and Ford both complain that the "subpoena sets forth thirty-six individual, multi-part requests which address at least fifty-six separate auto parts and at least twelve vehicle types." DPPs' Mot. at 11; Ford Response at 5.  Yet, when using a comprehensive subpoena, it is necessary to include parts for all actions.

Putting all parts and parties together in one comprehensive subpoena was the specific direction of the Court.  The type of bean counting that DPPs and Ford engage in here is not helpful.  Instead, it is simply a reflection of the fact that this case involves what the DOJ has repeatedly referred to as a criminal conspiracy with a greater impact on American consumers than any other criminal conspiracy that has ever been uncovered.[12]  For example, the DOJ has made the following statements concerning the DOJ's investigation of the automotive parts industry:

> "Americans paid more for their cars.  And American companies … were victims," Holder said of the investigation, which is still ongoing after several years.

*Washington Post*, Sept. 26, 2013 (Ex. D, hereto).

> "It's a very, very safe assumption that U.S. consumers paid more and sometimes significantly more, for their automobiles as a result of this conspiracy[.]"

Deputy Assistant Attorney General Brent Snyder, quoted by the *Associated Press*, May 25, 2014 (Ex. D, hereto).

> "It's still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever

---

[12] *See*, *e.g.*, Exhibit D, hereto (Collected DOJ press statements).

> encountered," [Deputy Assistant Attorney General Scott]
> Hammond said.  "I say (it is) the biggest with respect to the impact
> on U.S. businesses and consumers, and the number of companies
> and executives that are subject to the investigation."

*Reuters*, Feb. 15, 2013 (Ex. D, hereto).

And, while such a comprehensive approach has some challenges, surely, it is preferable
to the alternative, which would be to serve Ford and the other OEMs with thirty-plus separate
subpoenas, each regarding a separate set of parts, each with a different timeframe, each with
different parties involved, and each to which Ford would need to meet and confer, resolve any
disputes, and ultimately search and produce documents.

### b.    Only each OEM can speak to any potential burden it may face

DPPs claim the subpoenas impose an undue burden on third-parties in the indirect
purchaser actions, to which they are not a party.  DPPs' Mot. at 10-13.  Again, DPPs have no
standing to object to the OEM Subpoena as burdensome, or on any other grounds.  *See Breaking
Glass Pictures v. Doe*, 2014 U.S. Dist. LEXIS 14159, at *15 (S.D. Ohio Feb. 5, 2014)
("Defendant is not burdened by the subpoena because it is not he who is required to respond to
the subpoena."); *see also McNaughton-McKay, Elec. Co. v. Linamar Corp.*, 2010 U.S. Dist.
LEXIS 59275, at *9-10 (E.D. Mich. June 14, 2010) ("Defendant [which was not the recipient of
the subpoena] does not have standing to argue that Chrysler's compliance with the subpoena will
cause undue burden where Chrysler has not objected to the subpoena on this ground."); *Levitin v.
Nationwide Mut. Ins. Co.*, 2012 U.S. Dist. LEXIS 177738, at *14-15) (S.D. Ohio Dec. 14, 2012)
("Here, the subpoenas are directed to Plaintiff's prior employers.  Thus, only Plaintiff's prior
employers have standing to challenge the subpoenas on the ground that production of the

subpoenaed documents would pose an undue burden expense."). Here, the OEMs, not the DPPs, are the only ones that can object to any burden that they themselves may face.[13]

While Ford is in a position to speak to its own situation (albeit prematurely), Ford's arguments regarding burden are unavailing. Ford cites the inclusive time period and the many parts involved in the requests, as burdensome. Ford Response at 4-7. As explained, *supra* at 12, the time period and parts are deliberately inclusive to effectuate using a comprehensive subpoena method and issues regarding the scope of the subpoenas are best resolved through meet and confer, after the subpoenas are served. Ford also laments the expense it would face if it was required to produce the requested information, the large amount of data it would need to search its multiple databases, and the time-consuming nature and staffing it would need to respond to the OEM Subpoena. Ford Response at 4-7.

As a third-party that has been the target of the alleged conspiracy (as Ford acknowledges in its own direct action against the Fujikura Defendants), Ford has a duty to provide any information it may have on the alleged wrongdoing here. *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 460 (D. Kan. 2006) (quoting *Orleman v. Jumpking, Inc.*, 2000 U.S. Dist. LEXIS 11081, at *5 (D. Kan. July 11, 2000) (where information responsive to a discovery request is in a party's possession, "it is obligated to produce the information").

The process of using a comprehensive subpoena necessarily contemplates that there will be a period of meet and confer between the Serving Parties and each OEM, to tailor the requests to fit that OEM, to negotiate the requests, and to minimize any potential burden. As illustrated by Ford's response, only Ford can speak to its own situation, concerns about scope, or any

---

[13] DPPs admit the same. *See* DPPs' Mot. at 16 ("only the OEMs themselves can address the specific burdens, expense and their ability to provide the information sought through objections").

burden it may face.  While IPPs do not see any undue burden on Ford, the best and most effective way to deal with Ford's concerns is for the Serving Parties and Ford to meet and confer to see what issues can be resolved.  To the extent any of Ford's concerns cannot be resolved, that would be the right time for Ford to take any outstanding concerns to the Special Master or the Court, not now, before that process has even begun.  To address Ford's concerns now, would simply cause further undue delay.

### 3. Highly sensitive and/or proprietary information can be sufficiently protected under the Stipulated Protective Order

DPPs attack certain requests as seeking "closely-guarded and highly secret proprietary information, such as business plans and strategies, costs of production, pricing methods and financial data."  DPPs' Mot. at 12.  Yet, only each OEM knows what is contained in its own documents, and is the owner of any privilege or privacy right that may exist.  *Nucorp*, 2012 U.S. Dist. LEXIS 187547, at *16.

Ford raises its own concerns regarding its business documents, and cites to certain types of information as highly sensitive, such as information on "how Ford purchases auto parts and prices its vehicles, and Ford's overall business plans and strategies," and objects to requests that seek pricing and business information.  Ford Response at 3-4.  Ford claims that it would be damaging to its business to have to produce such information where its suppliers (Defendants) and its competitors (other OEMs) are also involved in this litigation.  *Id.* at 1, 3-4.  However, Ford does not present any viable excuse not to produce the relevant information sought, particularly given that it is a *party* and will necessarily be subject to such discovery in its own case.[14]

---

[14] The cases cited by Ford do nothing to further its arguments.  For example, in *Spartanburg*, the seeking party did not establish the relevance of the material sought and the protective order in place was not sufficient.  *Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus., Inc.*, 2005

A privacy interest is not a privilege, and provides no grounds for quashing a subpoena. *Nucorp*, 2012 U.S. Dist. LEXIS 187547, at *19.  Even if such privacy interests were at stake here (and we do not know that they are from Ford's comments), quashing the OEM Subpoena before it has been served is not the appropriate remedy.  *Id.* at *20.  Rather, a party must produce where there is an appropriate protective order in place.  *See*, *e.g.*, *Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87, 91 (S.D. Ohio 2013) (a non-party must produce information that it may believe to be highly sensitive or proprietary, where there is an appropriate protective order to provide the necessary safeguards); *E 3 Biofuels, LLC v. Biothane Corp.*, 2013 U.S. Dist. LEXIS 100793, at *3 (S.D. Ohio July 18, 2013) ("This court has routinely approved proposed protective orders seeking to protect both 'confidential' and 'highly confidential/attorney eyes only' material when, in addition to trade secret or other confidential research, development, or commercial information, particularly sensitive information of a similar nature may be disclosed through discovery and would cause competitive harm if publicly revealed.").

Here, the protective order in the MDL Action ("Stipulated Protective Order") has the appropriate safeguards.  *See* Exhibit E, hereto (Stipulated Protective Order).  The order lays out a detailed plan for designating confidential documents, including a designation for "HIGHLY CONFIDENTIAL --- OUTSIDE ATTORNEYS ONLY," for the very types of pricing and business documents that Ford claims it is concerned about, instructions on the strict confidentiality of such designated documents, and strict prohibitions on using such documents,

---

U.S. Dist. LEXIS 30594, at *5 (W.D. Mich. Aug. 24, 2005).  Likewise, in *Vitamins*, trade secrets were at issue and the court in *Vitamins* did not have enforcement power over the protective order.  *In re Vitamins Antitrust Litig.*, 267 F. Supp. 2d 738, 741-42 (S.D. Ohio 2003).  Here, the information sought is clearly relevant, not privileged, and the protective order is secure and enforceable.

instructions for filing under seal, among other things. *See Med. Ctr. at Elizabeth Place*, 294 F.R.D. at 95 (non-parties ordered to produce subpoenaed information they claimed to be commercially sensitive, including where production was to occur from competitors in the same field, where an appropriate protective order was in place, and documents could be designated "Highly Confidential – Attorneys' Eyes Only").

To the extent any OEM or Ford can show that its information is highly sensitive or proprietary, it can produce under the Stipulated Protective Order.

**D.    The information sought by the OEM Subpoena is not available from other parties or third-party sources**

**1.    Information on the OEM link of the distribution chain cannot be obtained from other sources**

DPPs' and Ford's contention that the information sought in the subpoenas is available from other sources, such as the ADPs and other third-party data providers is just plain wrong. As explained, *supra*, at 9, whether the alleged illegal overcharge was passed through to the indirect purchasers, and to what extent, is at the heart of proving IPPs' claims for class certification and damages. The OEMs are one of the main links in that distribution chain. No other party or third-party entity can provide the information to fill in the OEM link in the chain, and the information that each OEM alone may possess.

For example, only each OEM possesses information on its own request for quotation ("RFQ") process – whereby it requests quotations from its suppliers, and by which suppliers offer back a bid. Only each OEM knows who the suppliers are for each of its auto parts, the price that it expects to get back from its suppliers, the OEM's criteria for receiving bids and the

methods used for evaluating bids, the details of the bids offered, and the details behind any post-award adjustments to specifications, prices, and other terms and conditions of sale.[15]

Only the OEMs possess data and information regarding production costs and pricing of the vehicles they produce.[16]  This information is central to the regression analyses to be conducted by the Serving Parties' respective experts in connection with class certification motions.  Even Ford itself admits this information is not available from other sources.  *See* Ford Response at 3 ("Ford does not share [information concerning how it purchases auto parts and prices its vehicles, and Ford's overall business plans and strategies] with anyone outside of the company – let alone its auto parts suppliers and auto dealers.").

Only the OEMs possess complete information about which auto parts (that they purchase from Defendants and other suppliers) go into which vehicles they make and sell to their own customers.[17]  This information is not available from another source.

Only the OEMs possess information and data about which vehicles were sold to which customers, and on what terms.[18]  The ADPs may have limited information related to their own purchase information from OEMs, but that information does not cover the other half of the transaction (the sale from the OEM to the ADP), and does not provide any information regarding the decision-making and terms that were part of OEMs' sales to customers.  Furthermore, discovery from a limited number of ADPs is no substitute for discovery from the OEMs who have evidence that applies to all of the End-Payors.  In addition, some indirect purchasers (such as fleet purchasers), purchase vehicles directly from the OEMs, and did not go through an ADP

---

[15] This information is sought by Request Nos. 1, 2, 13, 14, 17, and 36.

[16] This information is sought by Request Nos. 4, 6, 13, 15, 16, 19, 24, and 28.

[17] This information is sought in Request No. 1.

[18] This information is sought in Request No. 4.

or truck or equipment dealer.  Therefore, only the OEMs would have data relating to those

purchasers.

> **2.** **Transactional data from Defendants, ADPs, and other non-OEM third-parties does not satisfy what the Serving Parties are seeking from the OEMs**

DPPs claim that some information sought by these subpoenas is duplicative because

some of it is already being produced by the Defendants and the ADPs, or is available from third-

party sources.  DPPs' Mot. at 13-15; Ford Response at 8-11.  DPPs and Ford grossly overstate

the availability and scope of this data, and fail to acknowledge its considerable shortcomings.

> **a.** **Data from Defendants**

To date, Defendants have produced data on their own sales to OEMs in a limited number

of actions.  The OEM Subpoena seeks data related to the other half of those transactions – the

purchase data (data related to the purchase of the auto parts by the OEMs from the Defendants),

and information surrounding the OEMs' purchasing decisions – which only the OEMs possess.

Data and information regarding purchases by OEMs from Defendants and other suppliers has not

been produced by any other party or third-party entity, nor could it be.

> **b.** **Data from ADPs**

DPPs contend that the ADPs are producing data sufficient to satisfy the requests.

However, ADPs appear to have very little data for the period of time in which information is

sought.  So far, a limited production of dealership data has been made from third-party sources,

covering a limited time period.  ADPs' data also reveals nothing about OEMs' sales to

distributors, fleet purchasers, or any dealership that is not a named plaintiff, not to mention sales

by those other dealerships.  Therefore, the data that has come or may come from ADPs does not

satisfy what it sought from the OEMs.

c.       **Data from third-party data suppliers**

DPPs suggest the data sought in the OEM Subpoena is available from third-party data suppliers.  DPPs' Mot. at 8-10.  That is not the case.  Defendants have sent subpoenas to third-party data providers, with very little success.  The third-party software providers CDK Global and Reynolds & Reynolds, have strongly objected to producing data, claiming that they have limited access to the individual computer systems that store the ADPs' data.  *See* The Reynolds & Reynolds Company's Motion to Quash Subpoena and For Protection, Dkt. # 259, in Case Nos. 2:12-cv-00102; 12:12-cv-00103, *All Dealership Actions*, *All End-Payor Actions* (filed 1/26/15); CDK Global Motion to Quash Subpoena, Dkt. # 271, in Case Nos. 2:12-cv-00102; 12:12-cv-00103, *All Dealership Actions*, *All End-Payor Actions* (filed 3/14/15).  Defendants have received cooperation from Dealertrack, but Dealertrack serves fewer auto dealers and has limited data covering a limited time period.

In sum, the data that has been produced to date by Defendants, ADPs, and third-party data source providers (so far, very little) and the partial data that may someday be produced, does not satisfy what is being sought by the OEM Subpoena.  And, even if some limited data is produced, the OEMs are still obligated to produce responsive information.  The rules of discovery do not permit parties to withhold material because the opponent either has or could discover it on their own.  *See* Fed. R. Civ. P. 26.  *See also Urethane*, 237 F.R.D. at 460, fn.10 (quoting *Orleman*, 2000 U.S. Dist. LEXIS 11081, at *15) ("where information responsive to a discovery request is in a party's possession, 'it is obligated to produce the information' whether or not the requesting party has obtained or could obtain the information from the alternative source").

**E.    DPPs' and Ford's motions, if entertained, would prejudice the other parties in the MDL Action and do nothing but cause more delay**

Aside from all the other reasons that DPPs and Ford should not be given a voice here, as a practical matter, it would be disastrous to the process of third-party discovery for the Court to entertain their arguments.  Not only would IPPs be prejudiced by not being able to obtain information relevant to support their claims in a timely fashion, or not at all, but all parties would be subjected to years of delay.  DPPs' and Ford's interference has already caused undue delay by slowing down the usual process of service by many months.  DPPs' and Ford's suggestions to try to gather up the small bits and pieces of data that have been produced and wait-and-see what may ultimately be produced in each is not workable and, of course, will not even yield the data sought by the OEM Subpoena.

Furthermore, by attempting to interfere with third-party discovery, DPPs and Ford are essentially attempting to pre-negotiate the OEM Subpoena before any of the true subpoena recipients – *the OEMs* – have even had a chance to receive it and respond.  Not to mention that the Serving Parties will need to go through this process twice, once with the DPPs and Ford, and then again with each OEM.  DPPs and Ford should not be allowed to hijack the rights of the OEMs to respond to their own subpoenas.  Nor should they be allowed to inappropriately derail third-party discovery off its normal course – and away from the true work that will be necessary to effectuate third-party discovery in the IPP cases – specifically, a meaningful meet and confer by the Serving Parties and the real parties in interest, the OEMs.

## III.    CONCLUSION

For the foregoing reasons, IPPs respectfully submit that DPPs' Motion be denied and that Ford's concerns be addressed through meet and confer with the Serving Parties, once it has been served.

DATED:  May 27, 2015                    Respectfully submitted,

> */s/ E. Powell Miller*
> E. Powell Miller (P39487)
> Adam T. Schnatz (P72049)
> **THE MILLER LAW FIRM, P.C.**
> 950 W. University Dr., Ste. 300
> Rochester, Michigan 48307
> Telephone:  (248) 841-2200
> Facsimile:  (248) 652-2852
> epm@millerlawpc.com
> ats@millerlawpc.com
>
> *Interim Liaison Counsel for the*
> *End-Payor Plaintiffs Classes*
>
> */s/ Steven N. Williams (w/ consent)*
> Steven N. Williams
> Adam J. Zapala
> Elizabeth Tran
> **COTCHETT, PITRE & McCARTHY, LLP**
> San Francisco Airport Office Center
> 840 Malcolm Road, Suite 200
> Burlingame, CA 94010
> Telephone: (650) 697-6000
> Facsimile: (650) 697-0577
> fdamrell@cpmlegal.com
> swilliams@cpmlegal.com
> azapala@cmplegal.com
> etran@cpmlegal.com
>
> Hollis Salzman
> Bernard Persky
> William V. Reiss
> **ROBINS KAPLAN LLP**
> 601 Lexington Avenue, Suite 3400
> New York, NY 10022
> Telephone: (212) 980-7400
> Facsimile: (212) 980-7499
> hsalzman@RobinsKaplan.com
> bpersky@RobinsKaplan.com
> wvreiss@RobinsKaplan.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, TX 75202
Telephone: (214) 754-1900
Facsimile: (214) 754-1933
toxford@susmangodfrey.com

*Interim Co-Lead Class Counsel for*
*End-Payor Plaintiffs*

*/s/ Timothy Fraser (w/ consent)*
Timothy Fraser
**OFFICE OF THE ATTORNEY GENERAL**
**STATE OF FLORIDA ANTITRUST**
**DIVISION**
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-9134
timothy.fraser@myfloridalegal.com

*Florida Attorney General*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | : | Master File No. 12-md-02311 |
|  | : | Honorable Marianne O. Battani |
| In Re:  All Cases | : |  |
| THIS DOCUMENTS RELATES TO: | : |  |
| All Actions | : |  |

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 27, 2015, I electronically filed Indirect Purchaser Plaintiffs'
Response in Opposition to Direct Purchaser Plaintiffs' Motion to Limit Uniform Subpoena to
OEMs and to Ford Motor Company's Response to the Proposed OEM Subpoena with the Clerk
of the Court using the ECF system which will send electronic notification of such filing upon all
registered counsel of record.

THE MILLER LAW FIRM, P.C.

By   _/s/ E. Powell Miller_
E. Powell Miller (P39487)
Adam T. Schnatz (P72049)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
*Interim Liaison Counsel for the Proposed End-*
*Payor Plaintiffs Classes*