# **EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311<br>Honorable Marianne O. Battani |
| In Re: ALL CASES | |
| THIS RELATES TO:<br>All Actions | |

**DECLARATION OF DR. EDWARD A. SNYDER IN SUPPORT OF DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS' MOTION TO LIMIT UNIFORM SUBPOENA TO OEMS**

I, Edward A. Snyder, declare as follows:

1. I am Dean of the Yale School of Management and the William S. Beinecke Professor of Economics and Management. Previously I was Dean of the Booth School of Business at the University of Chicago and the George Schultz Professor of Economics. I have personal knowledge of the facts set forth in this Declaration. I make this Declaration pursuant to 28 U.S.C. § 1746. I submit this Declaration in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion to Limit Uniform Subpoena to OEMs.

**Education and Work Experience**

2. I began my professional career in July 1978 with the Antitrust Division of the U.S. Department of Justice as a Staff Economist, working on a full- and part-time basis until 1984, working on antitrust investigations in a wide range of product markets involving manufacturers, service providers, distributors, and retailers. Since then I have worked in antitrust enforcement, conducted research on antitrust policy and business practices, taught courses in related areas, and consulted on antitrust matters.

3. I earned my M.A. in Public Policy and Ph.D. in Economics from the University of Chicago. My Ph.D. thesis focused on price-fixing and examined enforcement of Section 1 of the Sherman Act by the U.S. Department of Justice; this involved reviewing over 200 price-fixing conspiracies. I began my academic career in 1982 at the University of Michigan Business School and over time was promoted to Professor of Business Economics and Public Policy. My primary expertise is Industrial Organization, which is the field of economics that deals most directly with pricing and distribution of products, the interactions among competitors, contracting practices, and antitrust issues. My research draws on relevant theory, investigates real-world behavior, and is predominantly empirical in nature. I have conducted three scholarly projects on antitrust policy and enforcement with Thomas E. Kauper, Professor of Law at the University of Michigan Law School and former Assistant Attorney General in charge of the Antitrust Division, U.S. Department of Justice. I have been an Editor of the *Journal of Law and Economics*. From 2002 through 2010, I co-taught a course on major policy issues with Nobel Laureate Gary S. Becker and Clark Medalist Kevin M. Murphy.

4. I have analyzed economic and business issues in a rich variety of settings. I consider myself to be an expert on pricing practices, product distribution, vertical integration and

contracting, and industrial organization in general. I also consider myself to be an expert on allegations of price-fixing and collusive agreements, monopolization, other anti-competitive practices, and economic analysis relating to class certification matters.

**Assignment and Conclusions**

5.      I will begin by identifying types of Plaintiffs based on their general position in the overall distribution chain involving Wire Harness Products ("WHPs"), which are part of the In re Automotive Parts Multi-District Litigation.

6.      Direct Purchaser Plaintiffs allege that they and members of their proposed class purchased WHPs as defined by Plaintiffs directly from Defendants.[1] These Plaintiffs allege that they paid more for Defendants' WHPs than they would have paid absent the alleged illegal activities.[2] The differences between actual prices due to the alleged illegal activities and the prices but for the alleged illegal activities are referred to as alleged *overcharges*. The named Direct Purchaser Plaintiffs supply WHPs (or parts containing WHPs) to automobile Original Equipment Manufacturers ("OEMs"). The OEMs themselves often purchase WHPs directly from the Defendants and therefore are potential class members of the proposed Direct Purchaser Class. However, I understand that the only OEM named as a plaintiff in the Multi-District Litigation ("MDL") is Ford, which is suing only on its own behalf, and that at the present time no other OEMs are named plaintiffs in any of the complaints filed in the MDL.[3]

7.      Next, Auto Dealer Plaintiffs and Truck and Equipment Dealer Plaintiffs allege that they and the potential members of their proposed classes paid more for their new vehicles because the OEMs allegedly passed on the alleged overcharges on WHPs or parts embodying WHPs to them. These Plaintiffs further allege that they and members of their proposed classes absorbed the overcharges because they were unable to pass the overcharges on to their own customers. Restated, these Plaintiffs allege pass-on of alleged overcharges *to* them but an inability to pass on the overcharges *by* them to their downstream customers.

8.      At the bottom of the distribution chain, End Payor Plaintiffs allege that they and members of their proposed classes paid more for their new vehicles because the OEMs allegedly passed on the alleged overcharges to the auto dealers from whom the End Payors purchased their

---

[1] Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint, at ¶2, 2:12-cv-00101, ECF No. 103.

[2] *Id*. at ¶¶4, 138.

[3] *Id*. at ¶83.

vehicles, and the auto dealers in turn passed those overcharges on to them.

9. Plaintiffs in the City of Richmond case also allege that they, having purchased new vehicles on behalf of their five municipalities that incorporated WHPs supplied by Defendants, paid more for the new vehicles because the OEMs passed on the alleged overcharges to them – either indirectly through the dealers from whom they purchased or directly to the extent they made fleet purchases directly from the OEMs.

10. I have reviewed the template subpoena prepared by the Auto Dealer Plaintiffs, End Payor Plaintiffs, Truck and Equipment Dealer Plaintiffs, the City of Richmond, the State of Florida, and Defendants in the 30 different product tracks in the In re Automotive Parts MDL (the "OEM Subpoena"). I have been asked by counsel for defendants to evaluate whether the data, documents and information sought by the OEM Subpoena are needed to analyze certain issues associated with the Wire Harness Actions and other cases in the MDL. These issues to be analyzed include (i) whether and to what extent Direct Purchaser Plaintiffs and potential members of their proposed class actually paid more for certain auto parts sold to the Direct Purchaser Plaintiffs than they would have paid absent the alleged illegal activities; and (ii) whether and to what extent Auto Dealer Plaintiffs and/or End-Payor Plaintiffs – and potential members of their respective proposed classes – can demonstrate, through common evidence, that such overcharges were passed on to, and absorbed by, them when they purchased vehicles containing such parts.

11. I believe that the information sought by the OEM Subpoena is critical to evaluating whether and to what extent the conduct at issue in these cases resulted in payment of overcharges by Direct Purchaser Plaintiffs and/or OEMs. If the Direct Purchaser Plaintiffs and/or OEMs did pay more for WHPs or one or more of the other auto parts at issue in the MDL as a consequence of the conduct alleged in the various complaints, the information is also critical to determining whether any such overcharges were passed on by OEMs to Auto Dealers or other downstream purchasers.

**Specific Relevance of the OEM Data and Documents**

12. As alleged in the Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint, the prices of automotive wire harness products are typically the result of request for quotation ("RFQ") processes designed by the OEMs. (The Direct Purchasers make similar allegations in their other complaints, concerning different products.) As a result of the

OEMs' critical roles in both negotiating the prices paid for WHPs and setting the prices at which their vehicles are sold to dealers, OEMs possess data and records relevant to any economic analyses of whether the Plaintiffs – including Direct Purchaser Plaintiffs, Auto Dealer Plaintiffs, Truck and Equipment Dealer Plaintiffs, End-Payor Plaintiffs, and City of Richmond Plaintiffs – were impacted by the alleged misconduct with respect to a particular auto part and, if so, the extent of their damages. Obtaining OEM purchase data, input costs, and sales data is therefore an important step in assessing impact and damages not only to the proposed classes (and the individual plaintiffs asserting claims on their own behalf) in the Wire Harness Actions but also to the proposed classes (and individual plaintiffs) in the other product tracks.

13. Whether alleged overcharges existed, and, if so, whether and to what extent they were passed on (as opposed to being absorbed) at each stage in the chain of distribution may vary depending on several factors. Based on my preliminary analysis of distribution chains in the industry, I understand that OEMs purchase thousands of auto parts from many different manufacturers, including Defendants, and then combine them with still more parts and components produced in-house to manufacture new automobiles. These include WHPs (and other auto parts containing WHPs), other parts at issue in other cases in the MDL (and other auto parts containing those parts), and thousands of other parts not at issue in any of the cases in the MDL.

14. To establish whether plaintiffs were impacted by illegal overcharges and, if so, the extent of their damages, stemming from collusion with respect to WHPs requires answering two questions:

> First, was an overcharge paid by the relevant direct purchaser of the WHP and, if so, what was the amount?

> Second, to what extent (if any) was the overcharge passed on (rather than absorbed) by each entity "downstream" in the distribution chain when the allegedly affected product was sold through the distribution channels to downstream customers?

15. To answer these questions reliably with respect to WHPs (or any of the other products at issue) requires detailed data and information from entities at various levels of the distribution chains. Answering the first question regarding the existence and size of the overcharge for a particular WHP purchased by a Direct Purchaser from a Defendant requires data on the purchase of the WHP, including how that price was determined.

16. To answer these questions reliably for a particular WHP purchased by an Indirect

Purchaser (such as an Auto Dealer) requires answering both the first question about the overcharge and the "pass-on" question for that WHP purchased by a Direct Purchaser from a Defendant. The preferred method for this analysis involves matching (i) the "upstream" price paid by the Direct Purchaser, and (ii) the "downstream" price charged to the Direct Purchaser's customers. With such data, including other material terms associated with the upstream and downstream transactions,[4] one can proceed with an analysis of pass-on issues that also accounts for other considerations, e.g., changes in the costs of producing products containing WHPs.

17. I understand that the Direct Purchaser Plaintiffs have objected to several requests in the OEM Subpoena on relevance grounds. I have reviewed these requests and in my expert opinion the information requested is needed for core economic analysis. I note that Requests #1, 2, 13, 14, 17, and 36 seek information regarding the RFQ processes and how OEMs negotiated their purchase prices, including the OEM's target price for a particular part, the number and identity of suppliers submitting bids for a part and the suppliers' respective bids, the internal guidelines that OEMs used to evaluate and pick a winning bidder, and the motivations behind any post-award price and specification adjustments. Such information is relevant in determining how far apart supplier bids were and how many were submitted. This will be relevant to determining whether there was an overcharge, and if so, its size. This information is also relevant to determining the process by which the ultimate price was selected and, specifically, whether a Direct Purchaser Plaintiff purchased pursuant to a "directed buy" agreement with the OEMs, under which the OEM was the entity that negotiated the price of the product purchased by a separate entity. In those cases, the OEM would have the relevant data on how prices were determined rather than the Direct Purchaser Plaintiff.

18. Requests #4, 6, 13, 15, 16, 19, 24, and 28 seek information regarding OEM production costs, purchasing considerations for other parts, and pricing practices for each vehicle. The requested information, especially the total cost to manufacture a vehicle and how those costs changed over time, is relevant to analysis of pass on by OEMs to auto dealer (or other downstream purchasers). In addition, these requests will provide data on the factors that an OEM uses to set prices and how (and to what extent) those prices are related to input costs, the prices of competitors, or target prices. These data will be necessary to ensure that the economic

---

[4] The transaction prices may be affected by various terms and adjustments.

analysis required to assess impact and the extent of damages, if any, is based on an accurate analysis of the real world of OEMs procurement and pricing.

19. Request #1 seeks information regarding which vehicles contained a particular Defendant's part. This information will identify the potentially relevant vehicles containing affected products that were sold downstream to auto dealers, end payors, or other plaintiffs in this litigation. Such information is a prerequisite to determining whether (and to what extent) the amount paid for a particular vehicle could be affected by an alleged price fixing of a given automotive part.

20. Defendants' data will not provide the information needed for the relevant analyses. There are thousands of auto parts in each vehicle, as well as other costs of production that are not included in Defendants' data. Defendants also lack data on the OEMs' purchases of WHPs or other products at issue from non-defendants.

21. I have reviewed the data provided by Direct Purchaser Plaintiffs in the Wire Harness case and have found them to be inadequate in several respects. Some Direct Purchaser Plaintiffs have produced no data at all on their purchases or sales of WHPs (or products containing WHPs), and others produced data that provide a very incomplete picture of their purchases and sales during the relevant period. For example, data produced by South Star contain purchase transactions from defendants in 2003 and earlier, while all of their sales data are in 2009 and later. It is not possible to assess pass-through on defendants' parts when sales and purchases data are chronologically separated by at least 5 years. Moreover, none of the Direct Purchaser Plaintiffs is a major OEM; nor to my knowledge do any of them have data on purchases or sales by the major OEMs. From my review of the automotive parts industry supply chain, OEMs engage in significantly different sourcing practices than smaller companies such as the named Direct Purchaser Plaintiffs. The data provided by the Direct Purchaser Plaintiffs are simply inadequate for any assessment of whether and to what extent there were overcharges to OEMs, and whether and to what extent any such overcharges had an effect on the prices of vehicles sold by the OEMs.

22. I am aware of the categories of data that Auto Dealer Plaintiffs have provided to date and have agreed to (or been ordered to) provide in discovery in these cases. It is clear that those data will not include much of the information necessary to assess whether and to what extent the OEM incurred an overcharge in connection with the purchase of a WHP (or any other

particular auto part), and whether and to what extent the OEM passed on that overcharge to any particular auto dealer. Most critically, auto dealer data cannot include information on the cost of parts and materials and other manufacturing costs of any particular vehicle, which might allow experts to isolate the effect of price changes on a WHP or on any other particular part at issue in the MDL on vehicle prices. These data can only be obtained from the OEMs and represent a critical piece of evidence for calculating OEM pass-through, a key element to estimate impact and damages for (non-Direct Purchaser) plaintiff classes.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 27th day of May, 2015.

*[signature: Edward A. Snyder]*

Dr. Edward A. Snyder