REDACTED

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| All Cases | : : : : : : | |
| THIS DOCUMENT RELATES TO: All Dealership Actions | : : : : : : | |

## DEALERSHIP PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

Despite the Master's and the Court's repeated admonitions that discovery on Indirect Purchasers in general, and Dealership Plaintiffs specifically, must adhere to reasonable limits, Defendants have served a sprawling 30(b)(6) notice on Dealership Plaintiffs seeking testimony on an overbroad range of topics and requiring Dealership deponents to testify to issues that are no in way relevant to the question of whether Dealerships paid overcharges for their vehicles as a result of Defendants' criminal conspiracy—the only real question relevant specifically to the Dealership actions. Defendants' notice imposes extreme burdens on Dealerships and violates 30(b)(6)'s requirement that a noticing party "designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute.'" *Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656, 661 (D. Or. 2015) (quoting *Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006).

REDACTED

Dealership Plaintiffs therefore, by undersigned counsel, hereby respectfully move for a Protective Order imposing reasonable limitations on Defendants' notice.

Plaintiffs rely on the following brief in support of their motion.

In accordance with E.D. Mich. LR 7.1(a), counsel for Plaintiffs requested Defendants' concurrence in the relief sought herein.  Plaintiffs did not obtain Defendants' concurrence in their request.

Attached hereto as Exhibit 1 is a proposed order prepared for signature by the Master.

Dated:  November 24, 2015                    Respectfully submitted,

  _/s/_ Jonathan W. Cuneo
Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**Cuneo Gilbert & LaDuca, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
David McMullan
Brian Herrington
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095

ii

REDACTED

Telephone:  (662) 834-2488
Facsimile:  (662)834-2628
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com


Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:   (651) 312-6618
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for Dealership*
*Plaintiffs*

Gerard V. Mantese
Alex Blum
(Michigan Bar No. P34424)
**Mantese Honigman**
   **and Williamson, P.C.**
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 607-9200
gmantese@manteselaw.com
ablum@manteselaw.com

*Interim Liaison Counsel for Dealership*
*Plaintiffs*

iii

REDACTED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : | |
| | : | Master File No. 12-md-02311 |
| | : | Honorable Marianne O. Battani |
| In Re: All Cases | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| All Dealership Actions | : | |
| | : | |

## MEMORANDUM IN SUPPORT OF DEALERSHIP PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

REDACTED

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................ii

TABLE OF AUTHORITIES……………………………………………….........iv

CONCISE STATEMENT OF ISSUES PRESENTED…………………………………..vi

MOST APPROPRIATE AUTHORITIES……………………………………………vii


I.PRELIMINARY STATEMENT………………………………………………..........1

II.LEGAL STANDARD……………………………………………………………..3

   A.Proportionality...………………………………………………………………...3

   B.Protective Orders…………………………………………………………....…..4

   C.Rule 30(b)(6)…………………………………………………………………...5

III. ARGUMENT…………………………………………………………………....6

   A.The Noticed Topics Are Disproportionate and Unduly Burdensome……………….....6

     1.Defendants seek Deposition Testimony on Topics that Have Nothing  to Do with Dealership Plaintiffs' Purchases of Overpriced Vehicles  and Have No Relevance to Dealerships' Claims……………………………………………………………6

      a. Defendants Seek Testimony on a Broad Range of Topics that do Not Concern NewVehicles…………………………………………………………....6

      b.Testimony on Day-to-Day Operation of the Dealers………………………….9

     2.Noticed Topics Are Unreasonably Cumulative and Duplicative………………..12

     3.Notice Topics Improperly Seek Testimony on Legal Conclusions…………………..14

     4.Noticed Topics Are Overbroad………………………………………………….....14

   B.Specific Topics Are Patently Improper……………………………………………17

     1.Topic No. 1………………………………………………………………………17

     2.Topic No. 2…………………………………………………………………………17

     3. Topic No. 3………………………………………………………………….....17

     4. Topic No. 4………………………………………………………………...19

REDACTED

5. Topic No. 5……………………………………………………………………20

6. Topic No. 6……………………………………………………………………22

7. Topic No. 7…………………………………………………………………... 23

8. Topic No. 8……………………………………………………………………24

9. Topic No. 9……………………………………………………………………25

10. Topic No. 10…………………………………………………………………29

11. Topic Nos. 11 and 12…………………………………………………………30

    i. These Topics are Barred by the Rulings in this Case and Irrelevant ………...31

    ii. Requests for Employee Names are Wholly Improper………………………..37

    iii. Defendants have all of the information they could possibly need on dealership sales……………………………………………………………38

    iv. This Discovery Has No Relevance or Utility in This Case…………………39

12. Topic No. 13…………………………………………………………………..41

13. Topic No. 14…………………………………………………………………..44

14. Topic No. 15…………………………………………………………………..45

IV. CONCLUSION…………………………………………………………………48

REDACTED

## TABLE OF AUTHORITIES

### Other Authorities

*Adams v. Mills*, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932) ................................................ 8

*Apple Inc. v. Samsung Electronics Co.*, 2012 WL 1511901 (N.D. Cal. Jan. 27, 2012) ......... 16, 41

*Banks v. Office of the Senate Sergeant-at-Arms*, 222 F.R.D. 7 (D.D.C. 2004) ............................ 16

*Chattanooga Foundry* [*& Pipe Works v. Atlanta*, 203 U.S. 390, 27 S.Ct. 65 L.Ed. 241 (1906)] . 7, 26

*Convertino v. U.S. Dep't of Justice*, 2013 WL 153311 (E.D. Mich. Jan. 15, 2013) ...................... 5

*Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70 (D. Conn. 2010) ....................................... 4, 5, 12, 29

*EEOC v. The Boeing Co.*, 2007 WL 1146446 (D. Ariz. April 18, 2007) ......................... 11, 21, 22

*Freedman v. Weatherford Int'l Ltd.,* 2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014). .................. 11

*Goss Int'l Americas, Inc. v. Man Roland, Inc.*, 2006 WL 1134930 (D. N.H. April 28, 2006) ..... 14

*Gossar v. Soo Line R.R. Co.*, 2009 WL 3570335 (S.D. Ind. Oct. 27, 2009) ................................. 12

*Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) ............ 8

*In re Airline Ticket Com'n Antitrust Litig.*, 918 F. Supp. 283 (D. Minn. 1996) ........... 8, 22, 26, 33

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001) ........................... 7, 26, 40

*In re Cathode Ray Tube (CRT) Antitrust Litig.,* 2013 WL 5391159 (N.D. Cal. Sept. 19, 2013) 47, 48

*In re Independent Serv. Org. Antitrust Litig.*, 168 F.R.D. 651 (D. Kan. 1996) ............................ 5

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) .................................................... passim

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995) ............................................... 40

*In re Terazosin Hydrochloride*, 220 F.R.D. 672 (S.D. Fla. 2004) ............................................ 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6000154 (N.D. Cal. 2012) .................... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D.Cal. 2010) .................... 34, 48

*In re Visa/Mastermoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied sub nom* .................................................................... 34, 40, 48

*Joiner v. Choicepoint Servs., Inc.*, No. CIV 105CV321, 2006 WL 2669370 (W.D.N.C. Sept. 15, 2006) ......................................................................................................... 42

*JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 209 F.R.D. 361 (S.D.N.Y. 2002) ............... 14

*Martin v. Allstate Ins. Co.*, 292 F.R.D. 361, 363 (N.D. Tex. 2013) ........................................... 43

*Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656 (D. Or. 2015) ............................. 14, 20, 47

*Ocean Atl. Woodland Corp.*, 262 F. Supp. 2d at 927 (N.D. Ill. 2003) ........................................ 44

*Perry v. Best Lock Corp.*, 1999 WL 33494858 (S.D. Ind. Jan. 21, 1999) ................................... 44

*QBE Ins. Corp. v. Jorda Enters.*, 277 F.R.D. 676 (S.D Fla. 2012) ............................................... 5

*Reed v. Bennett*, 193 F.R.D. 689 (D. Kan. 2000) ................................................................. 15, 24

*Richardson v. Sexual Assault/Spouse Abuse Research Ctr., Inc.*, 270 F.R.D. 223 (D. Md. 2010) ........................................................................................................................ 42

*RM Deam Farms v. Helena Chemical Co.*, 2012 WL 169889 (E.D. Ark. Jan. 19, 2002) ........... 24

*Scales v. J.C. Bradford & Co.*, 925 F.2d 901 (6th Cir. 1991) ..................................................... 4

*Smithkline Beecham Corp. v. Apotex Corp.*, 2000 WL 116082 (N.D. Ill. Jan. 24, 2000) ........... 16

*Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524 (D. Kan. 2006) .................... 14

*Surles ex rel. Johnson v. Greyhound Lines*, 474 F.3d 288 (6th Cir. 2010) ................................... 4

*Tara Productions, Inc. v. Hollywood Gadgets, Inc.*, No. 09–61436–CIV, 2014 WL 1047411 (S.D. Fla. Mar. 18, 2014) ................................................................................................ 41

Tri–State Hosp. Supply Corp., 226 F.R.D. 118 (D.D.C.2005) ...................................................... 5

iv

REDACTED

*Trustees of Boston Univ. v. Everlight Electronics Co.*, 2014 WL 5786492 (D. Mass. Sept. 24, 2014) ............................................................................................................... 14
*United States v. District Council of New York City*, 1992 WL 208284 (S.D.N.Y. Aug. 18, 1992) ............................................................................................................................... 12
*Whiting v. Hogan*, No. 2013 WL 1047012 (D. Ariz. Mar. 14, 2013)......................................... 24
*Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087 (9th Cir.2010)................................ 35, 48

**Rules**

Fed. R. Civ. P. 23........................................................................................................................... 41
Fed. R. Civ. P. 26(b) ........................................................................................................... 2, 3, 5, 10
Fed. R. Civ. P. 26(c) ............................................................................................................. 3, 11, 35
Fed. R. Civ. P. 30(b)(6).......................................................................................................... passim
Fed. R. Civ. P. 30(b)(c)................................................................................................................... 1
Fed. R. Civ. P. 34........................................................................................................................... 38

**Other Authorities**

8 Charles Alan Wright & Arthur R. Miller, Federal Practice and
    Procedure § 2008.1 (3d ed. 2010) ........................................................................................ 3

ABA Section of Antitrust Law, Proving Antitrust Damages: Legal
    and Economic Issues, Ch. 6, "Overcharges" (1996).......................................................... 8, 28

REDACTED

## CONCISE STATEMENT OF ISSUES PRESENTED

1. Whether Defendants inappropriately noticed 30(b)(6) depositions of Dealership Plaintiffs seeking a plethora of irrelevant information ranging from Dealerships' sales of paint protection products, to Dealerships' overhead, to the Dealerships' participation in other class actions, to Dealerships' competitors' market shares, in direct violation of the Master's statement that 30(b)(6) depositions of Dealership Plaintiffs were to cover "a relatively limited area."

2. Whether Dealership Plaintiffs should be granted protection from Defendants' overbroad Interrogatories in light of the Master's granting Defendants one 30(b)(1) deposition and stating "you need to get a 30(b)(6) and then you need to get perhaps an owner," when such requests seek the names of every managerial employee involved in the sale of ancillary products that are not the new vehicles at issue in this case (warranties, insurance, etc.), during a fifteen-year period; every employee involved in entry of data into dealerships' databases, every employee involved in generating reports containing transactional data, every employee involved in creating back-ups during the fifteen-year period; every employee with any responsibility for vehicle sales or leasing during the fifteen-year period and every employee with responsibility for vehicle acquisition during the entire production period.

REDACTED

# MOST APPROPRIATE AUTHORITIES

## Orders

Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) (Filed 10/16/14)

## Cases

*Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70 (D. Conn. 2010)

*In re Airline Ticket Com'n Antitrust Litig.*, 918 F. Supp. 283 (D. Minn. 1996)

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001)

*In re Cardizem CD Antitrust Litig.* 200 F.R.D. 326 (E.D. Mich. April 3, 2001)

*EEOC v. The Boeing Co.*, 2007 WL 1146446 (D. Ariz. April 18, 2007)

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015)

*Martin v. Allstate Ins. Co.*, 292 F.R.D. 361, 363-64 (N.D. Tex. 2013)

*Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000)

*Surles ex rel. Johnson v. Greyhound Lines*, 474 F.3d 288 (6th Cir. 2010).

## Rules

Fed. R. Civ. P. 26(b)

Fed. R. Civ. P. 30(b)(6)

REDACTED

## I.   PRELIMINARY STATEMENT

As the Court stated at the January 28, 2015 status conference, "auto dealers don't buy cars by parts, they buy the car" therefore, the reasonable topics for a deposition would be "how much they paid for the car and where they purchased the car, that type of thing." January 28, 2015 Status Conference Transcript, at 24, attached as Ex. 2.  The court repeatedly stated at the January 28, 2015 status conference that Indirect Purchaser depositions should be strictly limited. *Id.* at 24, 26-28.

The Special Master also recognized, in October 2014, that Dealership discovery must be subject to reasonable limitations so as to be focused on the relevant issue of whether Dealerships paid inflated prices for their vehicles.  *See* October 16, 2014 Order, attached as Ex.3 (denying, *inter alia*, discovery on financing, purchasing strategies, and financial documents, in response to Dealerships' arguments that this information is "well outside of the information needed to defend against an allegation that Dealership Plaintiffs overpaid for their vehicles." *See* Case No. 2:12-cv-00102-MOB-MKM, (Doc # 195, page 8 of 16) (Filed 08/22/14). The Special Master similarly stated of 30(b)(6) depositions  that "this is going to be a relatively limited area" and "we do not need to put these people through a ten-hour day, and I'm going to rule that on that 30(b)(6) for those dealers you get seven hours for the defendants and one hour for the plaintiffs."  *See* Transcript from May 26 Telephonic Hearing, at 6-7, attached as Ex.4.

Despite this, Defendants declined to adhere to the Master's instructions that 30(b)(6) depositions of Dealerships cover "a relatively limited area"  and have served all-compassing 30(b)(c) notices on Plaintiffs covering everything from the location, pricing and market share of every competitor in the market over the course of over fifteen years, to Dealerships' sales of completely separate products like rust-proofing and  extended warranties, which are not the

REDACTED

vehicles that are the subjects of this case, to any and every class action any dealership has

participated in, to Dealerships' damages, which will be the subject of Dealerships' expert report

and have no place in a fact witness depositions.

None of these topics are what the Court and the Special Master reasonably contemplated

being part of an indirect purchaser 30(b)(6) deposition, which was supposed to have focused on

the vehicles Dealerships purchased, and none of the topics have anything to do with whether or

not the dealership paid an inflated price for its vehicles.

Further, in disregard of the Master's order, after extensive briefing, that Defendants shall

take "no more than one (1) deposition under Rule 30(b)(1)" of each Auto Dealer Plaintiff, Denso

requested Plaintiffs to provide it with names of every managerial employee involved in the sale

of ancillary products (such as warranties, insurance, and paint protection products) during a

fifteen-year period; every employee involved in entry of data into dealerships' databases, every

employee involved in generating reports containing transactional data, every employee involved

in creating back-ups during the fifteen-year period; every employee with any responsibility for

vehicle sales or leasing during the fifteen-year period and every employee with responsibility for

vehicle acquisition during the entire production period.   *Compare with* Auto Dealership and

End-Payor Deposition Protocol Order, 2:12-md-02311-MOB-MKM Doc # 1021, Paragraph III.B

(allowing Defendants one 30(b)(1) deponent).   *See* Dealership Responses to Denso's Third Set of

Interrogatories, Ex.5.

This list involves potentially a dozen or more employees, and in no way complies with

the Master's instruction that only one 30(b)(1) deposition be permitted of each Dealership

Plaintiff.  Not only are the individuals requested irrelevant to Dealerships' claims that they were

overcharged for their vehicles, but the request for them is pure burden and completely

2

REDACTED

inconsistent with the Master's statement during the deposition protocol hearing held earlier this year that "you need to get a 30(b)(6) and then you need to get perhaps an owner," May 6, 2015 Transcript, at 23, Ex .7.   Defendants' Interrogatories, seeking anyone ever involved in a downstream transaction is further violative of the parties' May 12 Stipulation, resolving Defendants' downstream discovery motion.  Plaintiffs sent Defendants correspondence explaining their position.  *See* Ex.6. Defendants have never responded.  Defendants have overreached in their burdensome, unfounded Interrogatories to Plaintiffs and Plaintiffs request protection from such Interrogatories.

## II.    LEGAL STANDARD

### A.    Proportionality

Rule 26(b)(2)(C) instructs courts to limit discovery to where "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii). Rule 26(b)(1), in turn, provides that discovery should be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[1]

In determining whether discovery is proportional, "the court will consider the specific facts of the case to make a common sense decision about whether or not the discovery in

_____

[1] The above quoted language reflects the recent amendments to Rule 26(b), effectively December 2015, which move the proportionality requirement, previously in Rule 26(b)(2)(C)(iii), to Rule 26(b)(1). The purpose of this change was to "restore[] the proportionality factors to their original place in defining the scope of discovery." Advisory Committee Notes 2015 to Federal Rule of Civil Procedure 26.

REDACTED

question goes too far." *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 73 (D. Conn. 2010); *see also Surles ex rel. Johnson v. Greyhound Lines*, 474 F.3d 288, 305 (6th Cir. 2010) ("[T]he Federal Rules of Civil Procedure instruct district courts to limit discovery where its 'burden or expense . . . outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.'" (quoting Fed. R. Civ. P. 26(b)(2)(C)(iii))).

Proportionality informs any dispute as to the proper limits of discovery; it is not a "separate and discrete grounds to limit discovery so much as indicia of proper use of discovery mechanisms." 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2008.1 (3d ed. 2010).

### B.      Protective Orders

Federal Rule of Civil Procedure 26(c) provides that this Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." "With regard to the 'undue burden and expense' provision, Rule 26(c) operates in tandem with the proportionality limits set forth in Rule 26(b)(2)." *Dongguk Univ.,* 270 F.R.D. at 73. Under Rule 26(c), a court may, among other things, issue an order providing "that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters." Fed. R. Civ. P. 26(c)(2)(4). The Sixth Circuit has noted that district courts have "wide discretion" in limiting discovery. *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 906 (6th Cir. 1991). Thus, this Court has the authority to limit the number and scope of Plaintiffs' proposed 30(b)(6) topics so as to render them more manageable, reasonable, and tailored to the claims at issue in these actions.

REDACTED

## C.    Rule 30(b)(6)

Rule 30(b)(6) permits a party to seek the testimony of a corporate representative concerning "information known or available to the organization" on a list of topics. Fed. R. Civ. P. 30(b)(6). "Under Rule 30(b)(6), a corporation has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf." *Convertino v. U.S. Dep't of Justice*, 2013 WL 153311, at *4 (E.D. Mich. Jan. 15, 2013). Moreover, the responding party's "duty to prepare a Rule 30(b)(6) witness goes beyond matters personally known to the designee or to matters in which the designated witness was personally involved," and "extends to matters reasonably known to the responding party." *QBE Ins. Corp. v. Jorda Enters*, 277 F.R.D. 676, 689 (S.D Fla. 2012).

The proportionality analysis is particularly important as to Rule 30(b)(6) depositions. Apart and aside from appearing and sitting for a Rule 30(b)(6), simply preparing for a Rule 30(b)(6) deposition can be extremely onerous, particularly where, as here, the requesting party seeks testimony on so many extremely broad topics. Thus, courts are particularly vigilant in protecting against Rule 30(b)(6) notices that unnecessarily intricate and unduly burdensome. *See Dongguk Univ.,* 270 F.R.D. at 73 (noting that, because a Rule 30(b)(6) deposition by "its nature can be time-consuming and inefficient," it is particularly important that the "be productive" (quoting *Tri–State Hosp. Supply Corp.*, 226 F.R.D. 118, 126 (D.D.C.2005)); *see also In re Independent Serv. Org. Antitrust Litig.*, 168 F.R.D. 651, 654 (D. Kan. 1996) (noting that even where a requesting party "has a right to discover the facts" at issue in a noticed topic, the topic is nonetheless inappropriate where it is "inefficient" and "unreasonable" to "discover those facts through a Rule 30(b)(6) deposition").

REDACTED

## III.    ARGUMENT

### A.    The Noticed Topics Are Disproportionate and Unduly Burdensome

In several respects, the Noticed Topics are disproportionate and unduly burdensome. They are (1) overbroad; (2) largely irrelevant; (3) improperly cumulative and duplicative of already provided discovery; and (4) seeking legal or expert conclusions rather than fact discovery.

### 1.    Defendants seek Deposition Testimony on Topics that Have Nothing to Do with Dealership Plaintiffs' Purchases of Overpriced Vehicles and Have No Relevance to Dealerships' Claims

A Rule  30(b)(6) deposition's scope is limited by Federal Rule Civil Procedure 26(b), which provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id*.

These actions concern Defendants' conspiracy to increase the prices of their auto parts and Dealers' overpayment for their vehicles as a result of Defendants' conduct. Defendants' Notices, however, are chock full of topics that are not relevant to the impact of the conspiracy on Defendants, and are therefore not likely to lead to admissible evidence. Examples of several types of irrelevant topics follow.

### a.    Defendants Seek Testimony on a Broad Range of Topics that do Not Concern New Vehicles

Defendants ignore the fact that Dealership Plaintiffs bring claims for overcharges paid for new vehicles and seek discovery on just about any and every other product offered by Dealerships as well as ancillary aspects of Dealerships' businesses on which the Special Master has already ruled Defendants may not obtain discovery.

REDACTED

In their motion to compel filed last year, Defendants sought information about a variety of peripheral issues, beyond the prices of the vehicles Plaintiffs purchased, such as financing, promotions and monthly payments. Case No. 2:12-cv-00102-MOB-MKM Doc # 183 (Filed 07/14/14).

The Master rejected these requests. For instance, the Master ruled that "Defendants' request for financing and promotional information relating to acquisition of Automotive Wire Harness Systems and vehicles is DENIED as this information is irrelevant, not likely to lead to the discovery of relevant information . . . ."  Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) (Filed 10/16/14) (October 16 Order), at 1. The Master similarly ruled that "Defendants' request for monthly payment information relating to acquisition of Automotive Wire Harness Systems and vehicles is DENIED as this information is irrelevant, not likely to lead to relevant information . . . ." *Id.* at 2.

It is clear that how payments are made, and what other potential sources of income dealerships have are not relevant to the sole issue of whether a dealership overpaid for the item it purchased from the OEM that is subject to Defendants' conspiracy—a new vehicle.

To determine the extent to which Defendants' criminal price-fixing resulted in the OEMs overcharging Dealers, the Court will measure the price of the vehicle Dealers paid against the price they would have paid absent Defendants' conspiracy. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 309-310 (E.D. Mich. 2001) (explaining that "[t]he typical measure of damages is the difference between the actual price and the presumed competitive price multiplied by the quantity purchased. This was the calculation that the Supreme Court approved in *Chattanooga Foundry* [*& Pipe Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906)]"

REDACTED

(quoting ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues,* Ch. 6, "Overcharges" at 172 (1996)).

Whether the dealership made or lost money in some other way does not come into this analysis. Defendants seek testimony on benefits Dealers receive from OEMs as a result of floor plan assistance, allowances from OEMs, incentives provided by OEMs, promotions, income made on financing, extra warranties, products such as rust protection and remote key entry. But these topics—and the many others like them—are simply irrelevant, because profits or savings garnered by Dealers by way of other streams of income cannot be used to offset or prevent Dealerships from being compensated for Defendants' criminal conduct. Nor do they bear on the calculation of damages on a particular overpriced vehicle. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (holding that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset," and rejecting defendants' "incorrect[] assum[ption] that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury") (citing *Adams v. Mills*, 286 U.S. 397, 407, 52 S.Ct. 589, 76 L.Ed. 1184 (1932) ("In contemplation of law the claim for damages arose at the time the extra charge was paid. Neither the fact of subsequent reimbursement by the plaintiffs from funds of the shippers nor the disposition which may hereafter be made of the damages recovered is of any concern to the wrongdoers." (citations omitted)); *and Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) ("[C]ourts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped...."); *In re Airline Ticket Com'n Antitrust Litig.*, 918 F. Supp. 283, 287 (D. Minn. 1996) (noting that "Defendants . . . may not establish an absence of antitrust injury simply by showing plaintiffs secured alternative revenue sources."); *In re TFT-LCD (Flat Panel) Antitrust*

8

REDACTED

*Litig.*, 2012 WL 6000154,at *3  (N.D. Cal. 2012) (holding Defendants accused of price-fixing conspiracy may not assert a mitigation defense against plaintiffs).

Dealerships are not claiming damages on anything other than the new vehicles they purchased: they are not claiming that they received insufficient or overly limited promotions or financing as a result of Defendants' conspiracy, or that the conspiracy affected the profits they made from warranties, rust proofing or financing. They are not claiming that there were effects on anything but the price of each vehicle as a result of Defendants' conspiracy—therefore this is the only item that is appropriately considered in the damage analysis.

As stated above, the Special Master has already held as much, denying Defendants' motion to compel on various ancillary topics.

Dealerships pointed this out in their opposition to Defendants' motion to modify the Master's order on depositions of Dealership Plaintiffs, imposing limits on the deposition testimony that could be taken of Dealers.  Dealership Plaintiffs' Opposition, at 14, Case No. 2:12-md-02311-MOB-MKM (Doc 1019) (Filed 6/29/2015). The Court clearly agreed, as it upheld the Master's order.

To be sure, if it were unduly burdensome to require the production of documents on these such ancillary topics, requiring Dealers' representatives to prepare for, and undergo Rule 30(b)(6) depositions on these topics is all the more so.

**b.    Testimony on Day-to-Day Operation of the Dealers**

In October 2014, the Special Master denied Defendants' discovery request seeking to probe every detail of Dealerships' daily operations.  For instance, the Master ruled that purchasing strategies were  "irrelevant, not likely to lead to the discovery of relevant information . . . ."  Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) (Filed 10/16/14) (October 16

9

REDACTED

Order), at 2.   The Master held that budgets and cost guidelines were "irrelevant, not likely to lead to relevant information." *Id.* The Master held that Dealership Plaintiffs' financial documents "that refer or relate to their acquisition or sale of a Wire Harness Product or product containing a Wire Harness Product, including but not limited to income statements, balance sheets, profit and loss statements, general ledgers, and tax returns" are "irrelevant, not likely to lead to relevant information." *Id.* at 2 (denying financial documents requested in Sumitomo's RFP No. 36). The Master held that employee compensation issues were irrelevant.  Dkt. No. 331 at 7 ("compensation, bonus and fringe benefits data of Dealer Plaintiffs' employees" is "not relevant nor likely to lead to relevant information"). The Master also denied Defendants' motion to compel franchise agreements.  *Id.* at 3.

It is clear that such details of the workings of Dealers' businesses have nothing to do with whether Defendants' criminal conduct resulted in Dealers paying an overcharge for their vehicles. Yet, despite this, Defendants seek testimony on various aspects of Dealers' day-to-day operations, such as "purchasing processes," "sales processes," "policies and procedures for creation and maintenance of documents," "products and services" offered, and general agreements with OEMs regarding purchasing processes, floor plan financing, allowances, sales, pricing and reserves, various costs, such as overhead, inspection fees, and delivery charges, participation in automobile clubs, promotions and details of pricing determinations.

Given that the Master has already recognized that discovery about any and all aspects of Dealerships' daily business functions is not appropriate and irrelevant to the limited issue of whether Dealerships purchased overpriced vehicles, these are not appropriate topics for a 30(b)(6) deposition.  There is no indication that a proper 30(b)(6) deposition can even be accomplished (and prepared for) on such broad-ranging topics, especially, the limited 30(b)(6)

REDACTED

deposition of an indirect purchaser, that was contemplated by the Master and the Court.  *See*

Transcript from May 26 Telephonic Hearing, at 6-7 (stating that "under the circumstances" "this

is going to be a relatively limited area").

### c.     Discovery on Discovery

Defendants also notice various topics concerning the Dealers' maintenance of and the

existence of various documents and data. (*See* Topic Nos. 5, 13.) Rule 26(b) permits discovery

on "any matter . . .  relevant to the *claim or defense* of any party." (emphasis added). So-called

"discovery on discovery" (that is, discovery on the discovery process itself) is relevant to neither

a claim nor a defense, and thus should be "closely scrutinized in light of the danger of extending

the already costly and time-consuming discovery process." *Freedman v. Weatherford Int'l Ltd.,*

2014 WL 4547039, at *2 (S.D.N.Y. Sept. 12, 2014). Indeed, such discovery-on-discovery is

routine disallowed. *See EEOC v. The Boeing Co.*, 2007 WL 1146446 at *3 (D. Ariz. April 18,

2007) (denying motion to compel 30(b)(6) deposition witness on "[t]he efforts Boeing undertook

to locate certain documents identified in plaintiff's request for production of documents" on the

ground that the topic was not relevant to a claim or defense under Rule 26(b)(1) and on the

ground that the topic sought to discovery defense counsel's legal theories).

Such discovery is considered inappropriate because it takes up the time allocated for the

deposition to discuss substantive topics.  Additionally, such discovery invades communications

between the attorney and client, undertaken to make productions to Defendants, and gets into the

attorney's work product.

This discovery is particularly concerning in this case, where the Court specifically put in

place a Supplemental Discovery Plan and a deadline for comprehensive discovery request

negotiations and motions to compel in order to move the case expeditiously towards the motions

11

REDACTED

for class certification. *See* Supplemental Discovery Plan, 2:12-cv-00100-MOB-MKM Doc # 224

Filed 05/23/14; Stipulated Order Regarding Discovery Plan, 2:12-cv-00100-MOB-MKM Doc #

232 (Filed 07/01/14) (negotiations on comprehensive requests to be completed by July 2, 2014;

Motions to compel due July 14, 2014); Order Regarding Briefing of Class Certification Motions

and Close of Discovery, Case No, 2:12-cv-00101-MOB-MKM Doc # 226 Filed 02/11/15 (class

certification motions due in 2016). Seeking to re-open the initial phases of document discovery

and to delay the progress of written discovery will seriously jeopardize the class certification

schedule put in place by the Court and the parties' ability to comply with it.

### 2.     Noticed Topics Are Unreasonably Cumulative and Duplicative

Rule 26(C)(1) prohibits discovery that is "unreasonably cumulative or duplicative." As is

explained above, Rule 30(b)(6) depositions are particularly burdensome on the responding party

and its representatives. Thus, courts routinely find "Rule 30(b)(6) notices to be unduly

burdensome which merely request the duplication of other information already obtained through

other discovery methods," or "[w]here the notice seeks information which could more easily be

obtained from another source." *Dongguk Univ.*, 270 F.R.D. at 74. For example, in *Dongguk*, the

court struck several topics where the responding party had already produced interrogatories

answering all relevant questions, or where the responding party had produced responsive

documents and "no 30(b)(6) witness that could provide information beyond the documents

already provided." *Id.* at 76; *see also Gossar v. Soo Line R.R. Co.,* 2009 WL 3570335, at *3,

(S.D. Ind. Oct. 27, 2009) (granting a protective order where "a 30(b)(6) deposition is not the

most convenient manner for discovering" the relevant issues); *United States v. District Council*

*of New York City*, 1992 WL 208284 (S.D.N.Y. Aug. 18, 1992) (rejecting defendant's motion to

compel Rule 30(b)(6) deposition on the grounds that discovering the topic at issue through

REDACTED

deposition was "highly inefficient and burdensome," particularly where the "relevant factual information" was "available in the documents provided").

Plaintiffs have invested significant time and expense into providing Defendants with nearly three-quarters of a million pages of documents, forty-seven data sets, and Interrogatory responses covering information regarding Dealerships' purchases and sales. ██████████

████████████████████████████████████████████████████████████

██████████████████████████████ that provides Defendants with everything they need to know to defend themselves against Dealerships' claims of purchasing overpriced vehicles, and then-some.

Yet, Defendants seek Rule 30(b)(6) testimony on an array of topics already covered by Plaintiffs' production. For example, Defendants seek detailed testimony on Dealerships' purchases and sales, the types of vehicles Dealerships have sold and Dealerships' data. But Defendants have already received thousands of pages of documents and data, concerning the details of these transactions, as well as interrogatory responses which speak to, among other things, ██████████████████████████████████████████████████████████

These transactional records speak for themselves, and as Defendants know, there is no basis for now noticing depositions on these issues, after Dealerships have taken considerable pains to provide this information via document and data discovery.  Nor would it be reasonable to force Dealership deponents to prepare to testify on thousands of individual transactions.  That type of discovery is much more appropriately carried out via document and data production, as Dealerships have done.

13

REDACTED

### 3.     Notice Topics Improperly Seek Testimony on Legal Conclusions

The Notice seeks testimony on, among other things, the "amount of damages" sustained by Dealers and the "basis for the allegations" in the relevant complaints (Topic Nos. 1-2). These topics concern legal questions in the province of attorneys and experts, not factual questions in the province of Rule 30(b)(6) witnesses.  Indeed, it is well established that "30(b)(6) depositions[] are designed to discover facts, not contentions or legal theories, which, to the extent discoverable at all prior to trial, must be discovered by other means." *JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 209 F.R.D. 361, 362 (S.D.N.Y. 2002); *see also Goss Int'l Americas, Inc. v. Man Roland, Inc.*, 2006 WL 1134930, at * 1 (D. N.H. April 28, 2006) (denying motion to compel 30(b)(6) testimony on the subject of patentee's claim positions because "claim construction is a question of law, and legal contentions are not a proper subject for factual discovery"); *Trustees of Boston Univ. v. Everlight Electronics Co.*, 2014 WL 5786492, at *4 (D. Mass. Sept. 24, 2014) ("A party may properly resist a Rule 30(b) (6) deposition on the grounds that the information sought is more appropriately discoverable through contention interrogatories and/or expert discovery.").

### 4.     Noticed Topics Are Overbroad

Rule 30(b)(6) requires that the party requesting the deposition "describe with reasonable particularity the matters for examination." Courts have interpreted this particularly requirement strictly, concluding that "'to allow the Rule to effectively function, the requesting party must take care to designate, *with painstaking specificity,* the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute.'" *Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656, 661 (D. Or. 2015) (quoting *Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006) (emphasis in *Memory Integrity*). The strictness with

14

REDACTED

which courts interpret Rule 30(b)(6) requirement stems from the fact that where the noticed party "cannot identify the outer limits of the areas of inquiry noticed, compliant designation is not feasible." *Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000).  Stated differently, "[a]n overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task. To avoid liability, the noticed party must designate persons knowledgeable in the areas of inquiry listed in the notice."  *Id.*

The Notice as written would require Dealers' representatives to be prepared to discuss nearly every facet of their business over more than fifteen years, including: every detail of their purchases of automobiles from, and relationships with, OEMs (Topics No. 9-10); every detail of their "transactional data" and sales of automobiles, including their methods of negotiation, as well as the details of each and every promotion, financing plan, and/or ancillary service offered to consumers by Dealers or OEMs to customers or by OEMs to Dealers (Topic Nos. 11, and 12); every detail concerning any variance in pricing and the reasons for those variances for each car sold (Topic No. 12)); every detail concerning the "purchasing process" and the persons in any way associated with that process (Topics Nos. 9(a) and 9(d))as well as the organizational structure of the Dealers (Topic No. 6). Indeed, the Notices go so far as to demand testimony on approximately 25 specific automobile sales, as well as every single "related document[], dat[um], and record[]" related to each sale. (Topic No. 15.)

These requests are far too broad for Dealers to fulfill their obligations under Rule 30(b)(6). No Dealer representative could, or should have to, prepare to testify as to the details of each piece of transaction datum it has produced, documenting thousands of transactions, often with over a hundred data points each (Topic No. 4), let alone dozens of other equally

15

REDACTED

burdensome topics. Under these circumstances, Defendants' notice is fundamentally

unreasonable:

> [T]he purpose served by Fed. R. Civ. P. 30(b)(6)—to require an organization to identify and designate a witness who is knowledgeable on the noticed topic, particularly where the noticing party is unable to itself identify an appropriate witness because that knowledge lies within the organization—does not extend to burdening the responding party with production and preparation of a witness on every facet of the litigation. This would render unworkable the obligation of the responding party to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter, as that task becomes less realistic and increasingly impossible as the number and breadth of noticed subject areas expand.

*Apple Inc. v. Samsung Electronics Co.*, 2012 WL 1511901, at *2 (N.D. Cal. Jan. 27, 2012)

(internal quotation marks and footnotes omitted) (finding a 30(b)(6) notice "facially excessive");

*see also Banks v. Office of the Senate Sergeant-at-Arms*, 222 F.R.D. 7 (D.D.C. 2004) (30(b)(6)

topics are insufficiently particular where they read "like an interrogatory or a section of a request

for production of documents"); *Smithkline Beecham Corp. v. Apotex Corp.*, 2000 WL 116082, at

*9 (N.D. Ill. Jan. 24, 2000) (explaining that "the recipient of a Rule 30(b)(6) request is not

required to have its counsel muster all of its factual evidence to prepare a witness to be able to

testify regarding a defense or claim"). The undue burden associated with attempting to prepare

corporate witnesses to testify meaningfully on such broad, open-ended topics warrants the

issuance of a protective order.

Moreover, as is explained below, the impropriety of such broad notices is compounded

by the fact that the majority of the topics on which testimony is sought are irrelevant to these

actions and improperly duplicative.

REDACTED

## B.    Specific Topics Are Patently Improper

### 1.    Topic No. 1

Topic No. 1 seeks testimony on "allegations in Dealership Plaintiffs' Class Action Complaint filed in this Litigation" related to "Defendants' conduct and any injury You sustained."  This topic is overbroad, in that it fails to set forth "*with painstaking specificity,* the particular subject areas that are intended to be questioned.'" *Memory Integrity, LLC*, 308 F.R.D. at 661.

Topic No. 1 is also improper. To the extent it seeks testimony on the legal and economic theories in the complaint, it is "not a proper subject for factual discovery such as a Rule 30(b)(6) deposition. *Trustees of Boston Univ.*, 2014 WL 5786492, at *4.  To the extent it seeks testimony on the factual bases for the complaints, it is well established that "the selection and compilation of facts [in a complaint] is at the heart of the work product doctrine," and Rule 30(b)(6) depositions cannot be used for this purpose. *Equal Employment Opportunity Commission v. HBE Corp.*, 157 F.R.D. 465 (E.D. Mo. 1994); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 2000 WL 116082, at *10 (N.D. Ill. Jan. 24, 2000) (holding that defendant's 30(b)(6) notice seeking testimony about the factual basis for plaintiff's claim "improperly infringes upon matters of attorney-client privilege [and]work product").  This topic seeks to invade attorney client communications as well as attorneys' work product and theories of the case. Further, this topic seeks a premature disclosure of the support underlying Dealerships' contentions and is thus akin to the contention request disallowed by the Master. October 16 Order, at 3.

### 2.    Topic No. 2

This topic seeks testimony on "[a]ny analysis or calculations You have performed or received" related to the amount of damages Dealers have incurred or passed on.  Defendants here

17

REDACTED

seek testimony on Dealers' legal theory of damages, and that is within the province of the

parties' experts. Moreover, as is explained above, it is well established that "30(b)(6)

depositions[] are designed to discover facts, not contentions or legal theories, which, to the

extent discoverable at all prior to trial, must be discovered by other means." *JPMorgan Chase*

*Bank*, 209 F.R.D. at 362. Defendants may not circumvent the schedule put into place for

production of the expert reports and instead seek premature discovery of plaintiffs' economic

theories.  Therefore, 30(b)(6) deposition testimony this topic should not be permitted.[2]

### 3. Topic No. 3

Defendants seek information on "[w]hether the invoices, OEM reports, DMS (or

equivalent) data, and OEM portal documents  that You have produced in this Litigation, and

any documents on which you relied in responding to any of Defendants' interrogatories were

routinely made and kept in the ordinary course of a regularly-conducted business activity, at or

near the time of the events they record, by a person or persons with knowledge, or from

information transmitted by a person with knowledge, and who reported such knowledge in the

regular course of business."  Defendants have advised they seek Plaintiffs to authenticate their

documents and agree that they are not hearsay.  Plaintiffs are willing to agree to this and believe

the parties have resolved this issue.

---

[2] Defendants will likely contend that they seek damages calculations undertaken by Dealers prior
to retaining counsel in these actions. But in the unlikely event that Dealers undertook their own
damages calculations before deciding to pursue these actions, such calculations are simply not
relevant to this Litigation.

REDACTED

### 4. Topic No. 4

Topic No. 4 seeks testimony on all "purchase, sales, and cost transactional data" each

Dealer has produced. 

There is no reasonable way to

prepare any deponent for such a deposition topic, and no possible way that a deponent entering a

deposition could be able to opine

Even more concerning is that the inclusion of this topic can be used by Defendants to

venture into and ask dozens of questions regarding any topic even tangentially related to one of

and the specifics of used car

sales over sixteen years—none of which have anything to do with the issue of whether

Dealerships overpaid for the vehicles they bought from OEMs.  This one topic has the ability to

take over the entire deposition, to the detriment of all other topics.

that will be used by Defendants'

experts to create a damage model, based on their own analysis and theories of the case. This is

not an issue on which Defendants are seeking any input from Plaintiffs. Indeed it is difficult to

understand why this was even included as a topic on Defendants' notice, nor have Defendants

provided any clarity in meet and confers.

REDACTED

As demonstrated above, this is not a topic that is, or ever could be, "designate[d], with painstaking specificity" nor does it have any utility in a 30(b)(6) deposition. *See Memory Integrity*, 308 F.R.D. at 661. That is why this discovery was produced in documentary form, rather than being reserved for testimonial discovery. The purpose of Plaintiffs' expending tens of thousands of dollars and numerous hours on data production was to provide Defendants with this information in most useable format—a spreadsheet for the use of Defendants' experts. The data is clear on its face and the fields are self-explanatory—indeed Defendants have never sent Dealerships any questions about the meaning of any fields. In any event, if Defendants have questions about the data, said questions can be provided and responded to via letter from Plaintiffs' counsel.

Plaintiffs note that this topic was not in Defendants' 30(b)(6) notice originally served on Plaintiffs, but was added in one of Defendants' numerous re-writes of their notice, following meet and confers between the parties.

In correspondence sent shortly before this motion was filed, Defendants agreed to attempt to address transactional data questions by letter. Dealership Plaintiffs are hopeful that the parties will reach resolution on this issue.

### 5. Topic No. 5

Topic No. 5 seeks testimony on "Your policies, procedures, and practices for creation and maintenance of invoices, deal files, DMS or equivalent electronic data, OEM reports, OEM portal documents, and data and/or documents reflecting incentive payments and other monies, credits, or offsets received from OEMs (*e.g.*, incentives, rebates, holdback, reserve, and/or other discounts) in connection with the purchase or sale of new vehicles, and an explanation of any gaps or absences in Your production of same."

20

REDACTED

First, as stated above, the Master has already declined Defendants' demands for discovery into every day-to-day function of Dealership Plaintiffs' businesses. *See* page 9, *supra*. This topic seeks everyday functions on an even more granular level than Defendants' motion to compel filed last year. Seeking to prepare a witness to testify on any and every policy, procedure or practice, carried out by any employee of the dealership, with regard to maintenance and creation of a variety of documents would be extraordinarily burdensome and it is not clear how such a preparation would even be carried out. Asking a witness to survey everyone in the dealership—from clerical employees to managers—who touches these documents to determine what they do with them (do they print them, do they save them electronically? Do they hand them over to administrative staff?) and where they are kept, is an impossible task, not to mention determining how such documents were maintained ten years ago.

Further, so-called "discovery on discovery," such as Topic No. 5, is irrelevant to any claim or defense, and there is no justification for this topic. *See The Boeing Co.,* 2007 WL 1146446 at *3 (denying motion to compel Rule 30(b)(6) testimony on "'[t]he efforts Boeing undertook to locate' certain documents identified in plaintiff's requests for production of documents" in part because "plaintiff does not explain why defendant's efforts to locate documents are relevant to a claim or defense in this case"). Moreover, allowing testimony on this topic would likely require the disclosure of attorney-client communications and/or attorney

REDACTED

client work product. *Id.* (noting that the efforts undertaken by the defendant to locate documents is also inappropriate to the extent it "seeks to discover defense counsel's legal theories regarding the manner in which defendant responded to plaintiff's requests").

Finally, it is not clear what is meant by any "other monies, credits or offsets." These are not documents that dealerships have agreed to produce, and, as stated above, such topics are not relevant to the inquiry of whether Dealership Plaintiffs sustained any antitrust injury. *See In re Nexium Antitrust Litig.*, 777 F.3d at 27 (holding that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset," and rejecting defendants' "incorrect[] assum[ption] that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury"); *In re Airline Ticket Com'n Antitrust Litig.*, 918 F. Supp. 283, 287 (D. Minn. 1996) (noting that "Defendants . . . may not establish an absence of antitrust injury simply by showing plaintiffs secured alternative revenue sources.").

### 6.    Topic No. 6

Topic No. 6 concerns Dealers' "organizational structure, the make and models of vehicles sold, products and services offered, and any changes over time, including as a result of mergers, acquisitions, the liquidation or winding down of Your business and the disposition of any major assets (including claims held by Your company), whether in connection with bankruptcy or other cessation of business operations."

These topics are all irrelevant to these actions. None has any bearing on whether Dealers were injured by Defendants. Nor do they speak to Dealers' adequacy as class representatives. Moreover, preparing to respond to this irrelevant topic would be a daunting task: a representative would have to be prepared to speak to not only the business's current corporate structure, but

REDACTED

also the details of previous mergers, acquisitions, and asset dispositions, as well as joint ventures and franchising agreements that are no longer operable.  In addition, Topic No. 6 is duplicative and needlessly cumulative. Dealers have already stated, through interrogatories, whether they have been debtors in bankruptcy proceedings. *See* Ex.8. Likewise, Dealers have provided interrogatory responses and initial disclosures on their ownership structures and the time periods when they sold particular brands and when they were in business. *See Id.*  In short, this topic serves no purpose other than needlessly forcing Dealers' to expend additional time and resources preparing for their depositions. Deposition testimony these matters should not be permitted.

### 7.    Topic No. 7

Defendants seek testimony on Dealers' competitors, "including but not limited to their locations, businesses, pricing of new vehicles, and market share." This topic is irrelevant to this case, cumulative, and unduly burdensome: to the extent any "pricing of new vehicles" from Dealers to end payors is relevant to this case (it is not), Dealers have already produced tens of thousands of pages of transactional data reflecting the prices charged by Dealers. This data is surely sufficient to demonstrate any pass on of Dealers' overcharge. It is therefore hard to understand why Dealers' representatives need undergo the burden of preparing for, and undergoing, questions regarding their competitors, many of which they will not be able to answer as they are not in possession of their competitors' sensitive business information.  And indeed, Defendant Sumitomo initially sought documents on "competitors' locations, descriptions of competitors' businesses, and competitors' pricing," only to abandon this request in later discovery. *Compare* 12-cv-00102, Dkt. No. 184, Ex. B ("Dealer's Responses to Sumitomo's First Set of Document Requests") at 39 (Sumitomo seeking, and Dealers' objecting to, discovery

REDACTED

on competitors) *with* May 12 Order and Stipulation 2:12-cv-00103-MOB-MKM, Doc # 312,

Filed 05/12/15 (not pursuing any competitor discovery).

Additionally, this topic is disproportionate and vastly overbroad. First, it calls for

Dealers' representatives to speak to, among other things, the pricing of every vehicle of each of

its competitors; the time and expense necessary to prepare Dealers' representatives to testify on

such a broad topic would be immense, and cannot possibly be justified in this instance, even if

Dealerships could credibly speak to the issues. Second, it seeks testimony not on a finite list of

topics, but topics "including but not limited to" those enumerated in Topic No. 7. *Reed*, 193

F.R.D. at 692 (a Rule 30(b)(6) notice indicating that the listed areas of inquiry would "include,

but not be limited to" the areas specifically enumerated in the notice are *per se* insufficiently

particular); *RM Deam Farms v. Helena Chemical Co.*, 2012 WL 169889, at *1 (E.D. Ark. Jan.

19, 2002) (30(b)(6) notice insufficiently particularly where "the testimony would include but not

be limited to items listed"); *Whiting v. Hogan*, No. 2013 WL 1047012, at *11 (D. Ariz. Mar. 14,

2013) (same).

Accordingly, Topic No. 7 should be stricken.

### 8.    Topic No. 8

Defendants request testimony on Dealers' knowledge of the marketplace for new

vehicles, including price trends for such products during the relevant period. Again, this

information was not pursued in the downstream discovery stipulation the parties ultimately

negotiated to resolve Defendants' request.  Defendants clearly understand it is irrelevant.

Further, this request is exceedingly broad, and by extension, equally burdensome: a Dealers'

"knowledge of the marketplace for new vehicles" is potentially infinite, and adequately

preparing to answer this question would require a representative to interview each and every

24

REDACTED

employee over the past two decades as to his or her knowledge of the new car marketplace. What's more, the topic is irrelevant to these actions, as a Dealers' knowledge of the marketplace for new cars simply has no impact on whether it was injured by Defendants' price fixing. Circumstantial information such as this, is not relevant or useful when Defendants already have

███████████████████████████████████████████████

### 9. Topic No. 9

Defendants' Topic No. 9 is extremely broad given that the Master already ruled, last year, that many of the attenuated topics on which Defendants moved to compel were not relevant to the litigation. Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) ("October 16 Order") (Filed 10/16/14).

As in their motion to compel, Defendants seek discovery on a variety of irrelevant issues that do not pertain to the question of whether Dealerships overpaid for their vehicles. For instance, once again, Defendants seek information on "factors that affected Dealership's costs" related to vehicle acquisition, such as floor plan support and allowances. However, it remains true that peripheral costs, that are not the price of the vehicles at issue in this case, are not relevant.

That is what the Master found when he denied the requests for "budgets and cost guidelines" as "irrelevant, not likely to lead to relevant information." October 16 Order, at 2. Similarly, the Master disagreed with Defendants' arguments that financing was a relevant acquisition cost, and found that it was "irrelevant, not likely to lead to relevant information." *Id.* *Compare with* Defendants' Reply, at 2, Case No. 2:12-cv-00102-MOB-MKM Doc # 199 (Filed 09/10/14).

REDACTED

That is because whatever the cost of financing or any other cost required to keep the dealership operating, it is separate and apart from the price the dealership paid for each price-fixed vehicle.  As a court in this district has explained "[t]he typical measure of damages is the difference between the actual price and the presumed competitive price multiplied by the quantity purchased. This was the calculation that the Supreme Court approved in *Chattanooga Foundry* [*& Pipe Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906) ]." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 309-310 (E.D. Mich. 2001) (explaining that (quoting ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues,* Ch. 6, "Overcharges" at 172 (1996)).

The variety of other factors Defendants want to impose on the analysis are not part of the damage determination, as set forth above.  Thus, "floor plan support" an aspect of floorplan financing and various allowances from OEMs are not the vehicle purchase price and not properly considered in a damage analysis.

Presumably Defendants seek to argue that any other benefit or aid the dealer received from the OEM should be subtracted from purchase price in order to come up with an analysis where the dealer is not damaged by their conspiracy, despite having paid an inflated price for its vehicles.  As stated above, attempts to argue that the effects of defendants' conduct have been offset by some other benefit or income are contrary to governing law.  *See In re Nexium Antitrust Litig.*, 777 F.3d at 27(holding that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset," and rejecting defendants' "incorrect[] assum[ption] that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury"); *In re Airline Ticket Com'n Antitrust Litig.*, 918 F. Supp. 283, 287 (D. Minn. 1996) (noting that "Defendants . . . may not establish an absence of

26

REDACTED

antitrust injury simply by showing plaintiffs secured alternative revenue sources."). Thus, other

income, or various costs required to operate the dealership, aside from vehicle purchaser price,

are not relevant. Subsection 9(b) of the notice seeking this ancillary information must be struck.

Defendants also seek a description of Dealerships' "purchasing process," Topic 9(d).

However, this is similar to Defendants' request for Dealerships' purchasing strategies denied as

"irrelevant, not likely to lead to the discovery of relevant information." October 16 Order, at 2.

Defendants are already receiving Dealerships' invoices and purchase prices—they will have the

results and documentation of all purchasing processes. It is difficult to understand what more

they would need.

Defendants also seek to force Dealership deponents to speculate as to how their

purchasing processes differ from or are similar to those of other dealerships, Topic 9(e). There is

no method for Dealerships to present a knowledgeable and fully accurate response, save for

interviewing every other dealership. Dealership Plaintiffs are not the proper deponents on this

topic and have no foundation to provide admissible testimony on this issue. If Defendants want

to compare the purchasing of different dealerships (and there are over forty who are plaintiffs in

this case), they can examine their invoices.

Also, Defendants seek the volume of the dealership's purchases, to the extent not

evidenced in documents or data produced. Topic 9(c). First, this request explicitly seeks to

circumvent the agreements Dealerships and Defendants made regarding production of documents

and data, and to expand discovery beyond what the parties agreed Dealerships would produce—

which was a huge amount of documents. Second, it requires Dealerships to seek to find

information and documents not produced to Defendants and glean what volumes were being

purchased so long ago, that they were not even contained in the invoices Dealerships produced to

27

REDACTED

Defendants. This is an unreasonable burden with no probative value. ████████

████████████████████████████████████████████████████████████████
████████████████████████████████

   Finally, despite having received Dealerships' initial disclosures identifying individuals at the Dealerships who would have information regarding Dealerships' purchases of new vehicles and the prices paid for them—and having used these Initial Disclosures in their arguments on the Deposition Protocol Order, Defendants include a topic in their notice seeking the names of any and all persons "responsible for negotiating vehicle purchases." Topic 9(a). This request seems superfluous, at best, given that Defendants have, after extensive argument, been given 1 30(b)(1) deponent. However, Dealerships are willing to provide an Interrogatory response stating the individual now employed at the dealership who was the principal individual responsible for the purchases of new vehicles during the class period.

   The topics described above are by and large irrelevant. Many of these sub-topics concern ancillary transactions between OEMs and Dealers—such as floor plan financing and allowances—that simply do not affect the extent of the overcharge on the vehicles themselves, and therefore do not affect the extent of Dealers' injuries; indeed, as is explained above, the Special Master has already held such ancillary transactions to be undiscoverable in this case. Other issues are irrelevant for the same reason: they do not speak to the existence, or extent, of antirust injury. For example, the details of the purchasing process, and the persons involved in the process, simply have no bearing on whether an overcharge was passed on from OEMs to Dealers; to the extent an overcharge is reflected in the purchase price, the documents speak for themselves. Nor does a Dealer's knowledge of its competitors' purchasing processes impact whether that Dealer suffered an overcharge.

REDACTED

To be sure, the prices Dealers paid for the vehicles *are* relevant to these actions. But Dealers have already provided tens of thousands pages of documents detailing the price they paid for their vehicles, and "no 30(b)(6) witness that could provide information beyond the documents already provided." *Dongguk Univ.*, 270 F.R.D. at 76.

If, for some reason, Defendants have questions regarding Dealerships' invoices, Dealership Plaintiffs will respond to those inquiries. However, Defendants' current Topic 9, as drafted is far too broad.

          10.    **Topic No. 10**

Defendants request testimony on "[t]he terms of any agreements with any OEM(s), if any, that influenced, governed, or controlled Your purchasing process; the incentives, rebates, refunds, holdback, reserve, allowances, and floor plan support offered or paid to You by an OEM or distributor; and Your pricing and/or sale of vehicles to customers."

The Master already determined that agreements with OEMs are not relevant and denied Defendants' request for franchise agreements. *See* Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) (Filed 10/16/14) (October 16 Order), at 1. Defendants try to slightly re-word their request to get at the type of discovery they were already denied. The fact of the matter is that the general requirements and the logistics of dealers' and OEMs' relationships are not relevant here, or at issue. This lawsuit is not a franchisor-franchisee dispute.



REDACTED

But asking Dealerships to review documentation they did not have to produce, to determine what agreements might have any effect on their functions or business is not reasonable, nor does it aid in answering the question of whether Dealerships were overcharged for their vehicles by Defendants—a question that should be answered by reviewing Dealerships' invoices and the OEMs' data.

### 11.    Topic Nos. 11 and 12

In Topics Nos. 11 and 12, Defendants seek testimony on various issues related to Dealers' sales and leases of new vehicles. These include, among others: persons responsible for sales and leases; the make, model, and year of vehicle sold; revenues, profits and margins on vehicles leased or sold, as well as profits on other aspects of dealerships' business concerning sale of products that are not new vehicles including financing, warranties, insurance, and products such as theft protection, rust proofing, and remote entry; various costs such as "overhead"; vehicle transfers between dealerships; Dealers' knowledge of similarities and differences between "the sales and leasing behavior" of Dealers and other automotive dealerships how Dealers determine prices to customers; employees responsible for pricing, reasons for variations in pricing to the thousands of customers who purchased vehicles from them; promotions, rebates, incentives, provided by a variety of entities including distributors or government entities to a variety of recipients including Dealers, salespeople or customers; trade-in assessment; participation in "automobile clubs"; "option packages" or "specials" by Dealers or OEMs; sales of non-vehicle products such as financing, service, insurance and various rust-proofing, VIN etching, paint protection or other additional products; and Dealers' knowledge of similarities and differences between Dealers' sales and leasing those of other dealerships.

REDACTED

### i.     These Topics are Barred by the Rulings in this Case and Irrelevant

These topics, as is already obvious from the extended list above, encompass many topics that the Master has indicated are irrelevant.  The Master has held that "compensation, bonus and fringe benefits data of Dealer Plaintiffs' employees" is "not relevant nor likely to lead to relevant information." No. 2:12-cv-00102-MOB-MKM Case No. Dkt. No. 331 at 7.  The Master has also held that costs are not relevant, stating that " budgets and cost guidelines" were "irrelevant, not likely to lead to relevant information" and denying financing information as "irrelevant, not likely to lead to relevant information", in response to Defendants' arguments that it is relevant to costs.  Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) (Filed 10/16/14) (October 16 Order), at 1-2.  The Master held that Plaintiffs' financial documents "that refer or relate to their acquisition or sale of a Wire Harness Product or product containing a Wire Harness Product, including but not limited to  . . . profit and loss statements, general ledgers . . ." are "irrelevant, not likely to lead to relevant information." *Id.* at 2.  These rulings in and of themselves must necessarily eliminate the vast majority of sub-topics in Topic No. 11 (costs, profits and revenues on vehicles, profits and revenues on non-vehicle products).  Request 11 also, for some reason, seeks information regarding Dealership transfers.  But the need for this information is never explained.  Dealerships paid inflated prices for their vehicles regardless of whether they ultimately traded them to another dealership for a different vehicle.  Such a trade does not eradicate the loss a dealership sustained when purchasing an overpriced vehicle.

The Master also ruled that financing was "irrelevant, not likely to lead to relevant information" *id.* at 2, and indicated during the parties' hearing that he intended to make this ruling with regard to both customer and dealership financing.  If ancillary aspects like financing are not relevant, then certainly products that are not the vehicle such as insurance, warranties,

31

REDACTED

rust-proofing, paint protection and other peripheral products are not relevant. This makes sense. These products are not products made by Defendants or products containing Defendants' price-fixed parts. They follow a different chain of distribution from the vehicles that are the subject of this lawsuit. These products are not required to operate a car (like a wire harness is) and many consumers do not even purchase them. They are not new vehicles and Plaintiffs are not claiming any damages for them. Similarly, the request for "option packages" containing these items is not relevant.

The Master similarly found that promotions were not relevant. Therefore this topic should be struck from Defendants' notice, and the Master should similarly determine that other peripheral issues such as incentives, rebates, etc. are also not relevant. These are ancillary aspects that are not alleged in Plaintiffs' complaint to have been affected by the conspiracy.

The inquiry in this case is whether the price of the vehicle was less competitive than it would have been had Defendants not engaged in a criminal conspiracy to fix the prices of automotive parts. The other inquiries Defendants try to introduce to muddy this simple question must fall away.

Further, as stated above, Defendants cannot argue that these other sources of income offset any injury, as such argument would be contrary to the prevailing law. *See In re Nexium Antitrust Litig.*, 777 F.3d at 27(holding that "antitrust injury occurs the moment the purchaser

REDACTED

incurs an overcharge, whether or not that injury is later offset," and rejecting defendants'
"incorrect[] assum[ption] that if a class member offsets an overcharge through later savings
attributable to the same or related transaction, there is no injury"); *In re Airline Ticket Com'n
Antitrust Litig.*, 918 F. Supp. 283, 287 (D. Minn. 1996) (noting that "Defendants . . . may not
establish an absence of antitrust injury simply by showing plaintiffs secured alternative revenue
sources."). ██████████████████████████████████████████ Thus, the
portions of Request No. 12 requesting information on these issues should be struck (Topics
12(d), (g) and (h)).

The remainder of the information sought is even more attenuated and irrelevant than the
subtopics subject to the Master's rulings. Defendants seek information regarding trade-ins. But
this is only one method of payment that is used by a consumer to pay for a vehicle. Regardless
of whether a portion of an inflated-priced vehicle was paid with a trade-in, the fact remains that
the overall price for the vehicle was too high. The ratio between the portion of the price satisfied
through cash versus a trade-in is not relevant and not at issue, therefore whether a customer
received a higher or lower valuation does not affect its total injury. Defendants moved to compel
against Dealership Plaintiffs, with regard to the method of payment they used to purchase their
vehicles. *See* Opposition to Motion to Compel, at 2, Case 2:12-cv-00102-MOB-MKM (Doc #
195) Filed 08/22/14 (opposing motion to compel on Sumitomo Request 1(g)( "the method of
payment"). The Master did not grant this request. This issue is not relevant.

REDACTED

Even more confounding is Defendants' inquiry regarding Dealers' participation in "any automobile clubs" "or programs" "such as Costco."  Whether the vehicle is sold through a buying club does not change whether the dealer overpaid for it.  The question of whether the dealer participates in the buying club, again does not change the analysis given that Dealerships are not arguing that their access to such clubs was somehow negatively affected by the conspiracy. Ultimately the vehicle ends up with the consumer, just as it would without the use of a buying club or program.

Both requests also ask Dealerships to speculate as to the sales and pricing practices and behaviors of other dealerships.  There is no way in which a Dealership Plaintiffs can obtain this information and can adequately prepare to provide this testimony, save for communicating with every other dealership in the country about every one of its pricing and sales practices and behaviors—and it is not even clear which practices and behaviors are included in this topic.

Even if it went to these great lengths, a Dealership Plaintiff would never know if it had accurate information that was suitable to provide under oath.  Dealership Plaintiffs have no foundation to testify about these issues and Dealership Plaintiffs are not the appropriate deponents to provide this testimony.  Further, differences in dealerships' sales practices and behaviors have no relevance here.  To the extent Defendants want to use such testimony to claim that each end-payor requires an individualized damage analysis, such analysis would not defeat class certification. "[T]he presence of individualized defenses . . . going only to damages are generally regarded as no barrier to class certification." *In re Visa/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 86 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied sub nom.*  As was stated in *TFT-LCD*, "damage calculations alone cannot defeat certification. '[T]he amount of damages is invariably an individual question and does not defeat class action treatment.'" *In re*

REDACTED

*TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 606 (N.D.Cal. 2010) (quoting *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir.2010)).

The same is true with regard to Defendants' request that Dealership Plaintiffs explain their new vehicle pricing and "variation[s] in pricing among customers." This is in no way relevant to the issue of whether a dealership overpaid for its purchases of vehicles ███████████ ███████████████████████████████████████████████████████████████. If perhaps Defendants had to speculate and extrapolate from other information to determine what prices were charged to consumers, they may need to obtain information about how pricing was determined, in order to generate some estimate of what a consumer might have paid ████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████.

This is the same issue as Defendants' request for Dealerships' purchasing strategies in their previous motion to compel. As Dealerships stated in their opposition to this request "It is difficult to understand why Defendants need Dealership Plaintiffs' purchasing strategies when they will receive all information showing what Dealership Plaintiffs actually paid for their vehicles—i.e. the results of any strategies Dealership Plaintiffs implemented." Opposition, at 5. Case No. 2:12-cv-00102-MOB-MKM, Doc # 195 (Filed 08/22/14). The Master agreed and denied the motion to compel this information as "irrelevant, not likely to lead to the discovery of relevant information." Case No. 2:12-cv-00102-MOB-MKM, Doc # 214, at 2.

Nor would this topic even be relevant to the pass-on analysis. Defendants will compare the price each Dealership paid for its vehicle with the price each consumer paid and apply a pass-on formula, as determined by their expert to determine the figure they allege has been passed on.

REDACTED

Similarly, no dealership employee can provide an adequate explanation for "variation[s]" in pricing among thousands of transactions covering up to a decade and a half-long time period. Defendants have the datasets. ████████████████████████ They can conduct their own analysis. A dealership employee can only guess, at best, why there are variations in the pricing. Most likely no employee will be able to remember any sales earlier than those occurring that week with any specificity, and Defendants will receive a wholly unsatisfying answer. At best, this is a topic that would be addressed by scholarly publications or end-payors themselves. Presumably Defendants want simply to show that each transaction is different. But again, given that the existence of individualized damage analyses does not defeat class certification, *see supra*, this inquiry is irrelevant.

As is explained above, discovery on dealership sales and pricing is entirely irrelevant to these actions, as they have no bearing on the existence, or extent, of the overcharge sustained by Dealers. And even if Defendants could utilize a "pass on" defense, this would render relevant only the price at which Dealers' vehicles were sold or leased. Just as in the upstream context, ancillary products are not relevant to these actions. Neither are Dealers' pricing process relevant, nor any potential factors affecting pricing, such as customer demographics relevant: to the extent Defendants are able to mount a "pass on" defense, it will be based not on how Dealers' prices were arrived at, but on the prices themselves.

Preparation to testify on this topic and determining how vehicle pricing was determined for each vehicle Dealerships sold over the course of over fifteen year would be incredibly burdensome, not to mention inaccurate. Dealerships do not believe there is any deponent who could reasonably speak to this topic.

REDACTED

### ii.      Requests for Employee Names are Wholly Improper

Topics 11 and 12 seek the names of any individuals responsible for sales or pricing, which information, as described above is not relevant to Dealerships' action.  These two sub-topics are duplicative of Denso's interrogatories, described at page 2, *supra*, which seek the name of every employee with responsibility for sales and leasing during a fifteen-year period as well as every employee responsible for the sale of non-vehicle products such as insurance, warranties, remote entry and paint protection during a fifteen-year period.  These individuals were never contemplated as deponents by the Master, who explicitly told Defendants "you need to get a 30(b)(6) and then you need to get perhaps an owner," May 6, 2015 Transcript, at 23.

Given that an employee not even dealing with new vehicles, and located in a completely different division of the dealership (the finance and insurance office) has no evidence to offer on whether vehicles were sold or purchased at inflated prices, there is no cause to contemplate such an employee as a deponent or to request that Dealership Plaintiffs gather the name of every employee who has ever had responsibility for the sale of these products over the course of fifteen years.  Defendants had no basis to request this information.

Nor do employees involved in consumer sales have any relevant information to offer on the issue of whether, in their purchases from OEMs, Dealerships overpaid for their vehicles. Further, given that Defendants already have Dealership Plaintiffs' data, and have agreed to resolve any questions regarding that data via letter, there is no cause for Dealerships to gather the name of every employee responsible for vehicle sales or leases in the last fifteen years or force them to take multiple days off of work to appear for a deposition.  There is no justification for such employees to be deposed for eight hours.  Such employees would have nothing to add to Defendants' understanding of the already robust data production they have received, and any

REDACTED

information they could offer would be circumstantial. There is no use for such information when the consumer data has already been provided to Defendants, in a format that speaks for itself.

Indeed, the purpose of making this data production to Defendants was to avoid additional burden on Dealership Plaintiffs. The parties agreed when they signed the May 12 Order resolving the downstream discovery issues that this order, "resolves Certain Defendants' Motion to Compel "Downstream" Discovery from Direct Purchaser and Auto Dealer Plaintiffs (Case No. 2:12-cv-00102, Doc 186)," which, among a number of other requests, sought the production of information in response to Sumitomo Interrogatory 6(f), which sought "the identity of each person, entity, or service involved in any negotiation for each sale and for each person, entity, or service identify their role in the transaction and their contact information (i.e. name, address, and telephone number)." Defendants, having come to this agreement, and having received an enormous amount of consideration in exchange for their agreement to resolve their downstream discovery motion cannot now go back on this promise and demand that Dealership Plaintiffs produce the information Defendants relinquished.

Defendants have simply sought to circumvent the Master's standing orders and their May 12 Agreement with their overbroad Interrogatories. This should not be permitted.

### iii. Defendants have all of the information they could possibly need on dealership sales



These document productions were made in order to

REDACTED

resolve the disputes over downstream discovery, which, as demonstrated by this brief, has the

potential to become a complete miasma. Defendants have in these documents and data 

Because these documents speak for themselves, any additional

discovery on them would be "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(C)(1).

Further, Dealerships produced Interrogatory responses to Defendants setting forth each

brand of vehicle they sold during the class period. Ex. 8. This should, along with the vast

amount of discovery Defendants seek from OEMs, provide Defendants with more than enough

of the information they need to put on their downstream discovery defense.[3]

### iv. This Discovery Has No Relevance or Utility in This Case

Defendants have still failed to explain why they require all of this detailed information on an

aspect of Dealership plaintiffs' businesses that has nothing to do with their purchases of vehicles

containing Defendants' price-fixed parts from OEMs. A court in this very district, whose

reasoning has been applied by this Court in deciding motions to dismiss, has declined to apply

the pass-on defense in an antitrust action. The court in *Cardizem*, presided over by Judge

Edmunds, declined to accept the pass-on defense in its class certification analysis, stating that:

---

[3] Defendants claim that some of this discovery is intended to cover periods for which there is no data or documents. This creates an even bigger and even less justified burden, requiring dealerships to search through information other than that which they specifically negotiated to produce in order to resolve Defendants' requests, find information responsive to the requested topics from ten years ago (i.e. the profit the dealership made on the sale of paint protection, on a 2002 Camry) commit it to memory, and arrive at the deposition prepared to opine on all of it. This completely undoes the utility of the compromise Dealerships reached with Defendants on documents and data.

REDACTED

> Defendants also argue that Plaintiffs' injury analysis must consider whether third-party payer class members failed to mitigate their damages or passed-on any overcharges they may have incurred as a result of Defendants illegal conduct. Despite Defendants' claims to the contrary, "the presence of individualized defenses, such as mitigation, going only to damages are generally regarded as no barrier to class certification." *In re Visa/Mastermoney Antitrust Litig.*, 192 F.R.D. at 86. "[T]he fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D. Minn. 1995)**.**
>
> *In re Cardizem CD Antitrust Litig.* 200 F.R.D. 326, 349 (E.D. Mich. April 3, 2001).

This is consistent with the statement of the court in *Nexium*, earlier this year, that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *Nexium Antitrust Litig.*, 777 F.3d at 27. The court rejecting defendants' "incorrect[] assum[ption] that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury." *Id.; See also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 697 (S.D. Fla. 2004) (holding that "[i]n an overcharge case, impact is shown through proof that: (1) Defendants charged more than they would have but-for their antitrust violation; and (2) class members *made some purchases* at the illegally inflated or stabilized price." (emphasis added)  and declining to accept Defendants' argument that class certification is impossible for intermediary plaintiffs because they "passed on all claimed overcharges to consumers, and therefore, cannot prove that they sustained any antitrust impact.").

The OEMs who have been subpoenaed agree that downstream discovery is irrelevant. *See* Kass Letter, at 6, Ex. 9 (stating that "the clear import of the Special Master's decisions is that downstream information that is not directly tied to component prices "is irrelevant, not likely to lead to the discovery of relevant information," and its production would be unduly "burdensome.").

REDACTED

Finally, Topic Nos. 11 and 12 are overbroad, unduly burdensome, and "facially excessive." *Apple*, 2012 WL 1511901, at *2. As written, the topics require Dealers' representatives to be prepared to testify on the pricing of each vehicle, each aftermarket product, and each financial, service, and insurance product; each promotion, incentive, and credit provided to any customer; the pricing practices for each vehicle; and the pricing and sales practices of their competitors. Given that Topic Nos. 11 and 12 are wholly irrelevant and/or cumulative of previously produced discovery, requiring Dealers' representatives to testify on such a dizzying array of downstream topics is unduly burdensome and wholly disproportionate.

In short, to the extent the downstream discovery at issue in Topic Nos. 11 and 12 are relevant to these actions, the facts of these transactions have already been provided ████████ ████████████████ Testimony on dealerships' sales business would not only be extremely onerous, but would also provide no additional relevant evidence.

### 12.     Topic No. 13

Topic No. 13 seeks testimony regarding Dealership Plaintiffs Dealers' Data Management System ("DMS") providers and what data they maintain. Defendants seek this information in order to circumvent Dealership Plaintiffs' counsel and improperly contact Dealership Plaintiffs' DMS providers in order to seek Dealership Plaintiffs' information from such DMS providers. The purpose of this request is to "do an ['[end-run[']] around the discovery rules that apply to a party." *Tara Productions, Inc. v. Hollywood Gadgets, Inc.*, No. 09–61436–CIV, 2014 WL 1047411, at *3 (S.D. Fla. Mar. 18, 2014), (citations omitted).

As Dealership counsel explained to Defendants, this issue has already been resolved and the Master has prohibited Defendants from circumventing Dealership counsel to contact Plaintiffs' software providers. *See* Order of Special Master Granting Dealership Plaintiffs'

Motion to Quash, Case No. 2:12-cv-00102-MOB-MKM, Doc # 373 (Filed 09/29/15) (Quashing subpoena to Dealership Plaintiffs' DMS provider).

This is because, as stated in Dealerships' briefs in support of their Motion to Quash Defendants' improper subpoenas, "a subpoena is not a proper means for obtaining documents previously sought through a Rule 34 production request." *Richardson v. Sexual Assault/Spouse Abuse Research Ctr., Inc.*, 270 F.R.D. 223, 226 (D. Md. 2010); *see also Joiner v. Choicepoint Servs., Inc.*, No. CIV 105CV321, 2006 WL 2669370, at *5 (W.D.N.C. Sept. 15, 2006) (Finding that "Plaintiff's subpoenas *duces tecum* requesting documents possessed exclusively by Defendant is merely an attempt to circumvent the established process for requesting documentation from a party opponent under Rule 34 of the Federal Rules of Civil Procedure."). As Dealership Plaintiffs further explained in their Motion, the parties entered into the May 12 Order and Stipulation resolving Defendants' outstanding downstream discovery requests. *See* Stipulation and Order Regarding Auto Dealer Plaintiffs' Production of Documents and Data, ¶ 8, Case No. 2:12-cv-00103-MOB-MKM Doc # 312 Filed 05/12/15. Defendants may not now circumvent the effects of that order by pursuing from Dealers' software providers data that belongs to Dealership Plaintiffs.

In any event, the two major DMS providers, CDK and Reynolds & Reynolds have already provided information about the data they maintain in their Motions to Quash, filed against Defendants earlier this year---motions Defendants quickly realized they would lose. *Non-Party CDK Global's Motion To Quash Subpoena*, 2:12-cv-00102, ECF No. 272 *and The Reynolds & Reynolds Company's Motion To Quash Subpoena And For Protection*, 2:12-cv-00102, ECF No. 259, attached as Exs. 10 and 11. ███████████████████

42

REDACTED

███████████████████████████████████████████████████

Further, there is no indication that a Dealership would have the detailed information

Defendants seek about DMS providers or that a Dealership deponent is the appropriate

individual to testify about the internal business practices of DMS providers. Again, this topic is

not plausibly relevant to a claim or defense. Rather, it is "discovery on discovery." This is an

improper topic for a Rule 30(b)(6) deposition. *See Martin v. Allstate Ins. Co.*, 292 F.R.D. 361,

363-64 (N.D. Tex. 2013) (granting defendant's protective order as to plaintiff's 30(b)(6) topic on

"Defendant's computer system," on the grounds that such 'Non-Merits Discovery' was

"overbroad and irrelevant").

Defendants' insistence on continuing to demand discovery concerning Dealerships' data

management systems in at least three different topics in their Notice is in conflict with the

Master's resolution of the data issues in the September 29 Order and Defendants' own statements

that they understood that Order brought finality to the data issues.

Despite having negotiated to resolve their downstream discovery requests, and having

received forty-seven data sets from Dealership plaintiffs, Defendants now refuse any resolution

of the data issues and continue to demand discovery on Dealership Plaintiffs' DMS data.

Defendants seek to subvert the rulings in this case. This is even further evident in Denso's

Interrogatories to Plaintiffs seeking the name of every employee who entered data into the DMS,

created reports or created or maintained the back-ups. There is absolutely no basis for seven-

hour depositions of such employees, to seek "discovery-on-discovery" on a topic that has no

relevance to Dealerships' claims and has already been resolved. This is certainly not what the

Master contemplated when, in specifically limiting depositions of indirect purchasers, he stated

REDACTED

with regard to Dealership depositions, "you need to get a 30(b)(6) and then you need to get perhaps an owner," May 6, 2015 Transcript, at 23.

### 13.    Topic No. 14

Topic 14 seeks "The facts, issues, and circumstances of any other class actions in which You have participated involving Your purchase or sale of new vehicles (including the front and/or back end of the transaction), including the nature of the claims and defenses, and the disposition of the action."  This topic is completely irrelevant: it is simply not feasible that testimony on completely different class actions, involving completely separate defendants and different circumstances, could relate to a claim, a defense to the claim that Dealerships paid inflated prices for their vehicles, or to Dealers' adequacy as class representatives. Defendants have even themselves argued that their own cases, within the same MDL, are not relevant to one another, despite involving overlapping Defendants and products.

In any event, Dealership Plaintiffs have served interrogatory responses setting forth the class actions in which they have been plaintiffs during the class period.  *See* Ex.12.

To the extent this topic seeks testimony on class actions in which Dealers were defendants, there seems to be no proper purpose for such an inquiry, except to harass Dealership Plaintiffs. Courts foreclose discovery when they perceive an improper motive or purpose behind broad discovery. *See Ocean Atl. Woodland Corp*., 262 F. Supp. 2d at 927 (N.D. Ill. 2003). Where, as here, the sought-after discovery "look like nothing more than a fishing expedition, or, more accurately, an exercise in swamp-dredging and muck-raking," entry of an order precluding it is warranted. *Accord Perry v. Best Lock Corp*., 1999 WL 33494858, at *3 (S.D. Ind. Jan. 21, 1999).

REDACTED

In any event, a dealership would not be the proper deponent to testify to the "issues, and circumstances of" other class actions. These issues would be in the purview of counsel, not the parties themselves. For instance, Defendants indicated they may want to know if a plaintiff participated in a class action where the class was not certified and if so, why. This is a legal question. Only an attorney could provide a comprehensive explanation of why a class was not certified under Fed. R. Civ. P. 23. To the extent a party is asked such a question, it would clearly impinge on attorney-client privilege and would, on that basis alone, be undiscoverable.

### 14.    Topic No. 15
1.    The following transactions and related documents, data, and records:



REDACTED



This topic seeks testimony on approximately 25 seemingly random automobile purchases and sales to Dealers' customers and any and all "related documents, data, and records."[4] Defendants' description declines to even set forth the documents Defendants wish to discuss and instead leaves the deponent to prepare to discuss any document that Defendants might decide is "related" to the transaction, from employment records, to a credit application. The documents at issue are not even limited to those Dealership Plaintiffs have produced to Defendants and no Bates Numbers are offered with any request.

First, to the extent this Topic seeks to require Plaintiffs to review documents that were not produced to Defendants, this is an improper circumvention of the parties' agreements on discovery limitations. Both parties specifically negotiated to produce certain documents and relinquish others. To seek to not only end-run this agreement by obtaining the information relinquished in discovery negotiations but to also force Plaintiffs to commit this information to

---

[4] The above is an example from one notice. Defendants list a different set of approximately 25 transactions in each notice.

REDACTED

memory, as Defendants do not have it in documentary form (which information could be hundreds of pages) is a wholly unreasonable burden and wholly inconsistent with the requirement that Defendants set forth their topics with "painstaking specificity" and avoid overburdening Plaintiffs. *See Memory Integrity*, 308 F.R.D. at 661.  This is certainly not the "limited" discovery the Court and the Master contemplated, nor is it relevant.

Nor is it reasonable to expect a 30(b)(6) deponent to speak to the details of twenty-five transactions some of which took place fifteen years ago (if deponents can even be found to speak to each transaction).  A vague recollection, assuming that is even possible, will have no more value than Defendants' simply reviewing the information they have already received regarding these transactions.

Further, given that there are thousands of transactions at issue for each Plaintiff, and tens of thousands of transactions at issue in this case, there is no indication that a discussion of 25 specific transactions per dealership will have any benefit in this litigation.

Even to the extent that information about individual transactions is relevant in the aggregate, the details of individual transactions are of little probative value and would have no effect on class certification. *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* 2013 WL 5391159, at *5 (N.D. Cal. Sept. 19, 2013) ("Defendants 'argument . . .  is essentially that [indirect purchaser plaintiffs] must be able to prove at the class certification stage that every single (or basically every single) class member was injured by Defendants' conduct. This contention is wrong. The Court's job at this stage is simple: determine whether [indirect purchaser plaintiffs] showed that there is a reasonable method for determining, on a classwide basis, the antitrust impact's effects on the class members."). "As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement." *Id.*

47

at 108-09. "[T]he presence of individualized defenses . . . going only to damages are generally

regarded as no barrier to class certification." *In re Visa/Mastermoney Antitrust Litig.*, 192 F.R.D.

68, 86 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied sub nom.*  As was stated

in *TFT-LCD*, "damage calculations alone cannot defeat certification. '[T]he amount of damages

is invariably an individual question and does not defeat class action treatment.'" *In re TFT-LCD*

*(Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 606 (N.D.Cal. 2010) (quoting *Yokoyama v.*

*Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir.2010)).  Dealership Plaintiffs made

these points to the Court and the Master in briefing on the issue of Dealership depositions and

both appear to have accepted Dealerships' arguments and accordingly agreed to limit Dealership

depositions, as previously requested.  Dealership Plaintiffs' Sur-Reply in Opposition to Motion

to Clarify, Case No. 2:12-md-02311-MOB-MKM, Doc. No. 935; Response to Motion to Modify

Rulings on Deposition Protocol, Case No. 2:12-md-02311-MOB-MKMDoc No. 1019.  Certainly

asking the dealership to go through twenty-five different transactions, one at a time, in one out of

fifteen topics, is not what the Court or the Master had in mind, when ordering "limited"

dealership depositions.

By comparison, the burden of preparing Dealer representatives to testify on the granular

details of specific transactions, if that is even possible, is immense. Indeed, as phrased, the topic

encapsulates any element of the selected sales, including the financing of the vehicle, any trade-

ins, leasing details and the personal and financial details of the purchasers.

## IV.    CONCLUSION

Without a protective order limiting Plaintiffs' 30(b)(6) deposition notice, Dealers will be

subject to the undue burden of preparing a witness for dozens of overly broad, predominantly

irrelevant, and substantially cumulative topics and sub-topics, without any measureable benefit.

48

REDACTED

In view of the good cause shown, Dealerships respectfully request that the Court issue a

protective order against Plaintiff's facially excessive Rule 30(b)(6) deposition notice and grant

Dealerships protection from Defendants' improper Interrogatories seeking to violate the Master's

ruling that each Defendant be allowed one 30(b)(1) deposition, most likely of an owner.

Dated:  November 24, 2015                     Respectfully submitted,


                                              _/s/ Jonathan W. Cuneo
                                              Jonathan W. Cuneo
                                              Joel Davidow
                                              Daniel Cohen
                                              Victoria Romanenko
                                              Evelyn Li
                                              **Cuneo Gilbert & LaDuca, LLP**
                                              507 C Street, N.E.
                                              Washington, DC 20002
                                              Telephone: (202) 789-3960
                                              jonc@cuneolaw.com
                                              joel@cuneolaw.com
                                              danielc@cuneolaw.com
                                              vicky@cuneolaw.com
                                              evelyn@cuneolaw.com

                                              Don Barrett
                                              David McMullan
                                              Brian Herrington
                                              **BARRETT LAW GROUP, P.A.**
                                              P.O. Box 927
                                              404 Court Square
                                              Lexington, MS 39095
                                              Telephone:  (662) 834-2488
                                              Facsimile:   (662)834-2628
                                              dbarrett@barrettlawgroup.com
                                              bherrington@barrettlawgroup.com
                                              dmcmullan@barrettlawgroup.com

                                              Shawn M. Raiter

REDACTED

**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:   (651) 312-6618
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for Dealership Plaintiffs*

Gerard V. Mantese
(Michigan Bar No. P34424)
**Mantese Honigman
   and Williamson, P.C.**
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 607-9200
gmantese@manteselaw.com

*Interim Liaison Counsel for Dealership Plaintiffs*

REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2015 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

_/s/ Jonathan W. Cuneo
Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**Cuneo Gilbert & LaDuca, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com