# EXHIBIT 27

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311<br>Honorable Marianne O. Battani |
| THIS DOCUMENT RELATES TO:<br>All Wire Harness Cases | 2:12-cv-00100-MOB-MKM |

### NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6) TO THE DENSO GROUP DEFENDANTS

PLEASE TAKE NOTICE, that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition of the Denso Group Defendants on November 17, 2015 at 9:00 a.m. at the offices of Fink + Associates Law, 535 Griswold Street, Suite 1000, Detroit, Michigan 48226, or such other date, time or place as is mutually agreed upon. The deposition will be taken by stenographic and/or videographic means before a notary public or other person duly authorized to administer oaths and will be continued until completed. You are invited to attend and participate as authorized by law.

Rule 30(b)(6) requires the Denso Group Defendants to produce one or more witnesses at the stated date, location and time who is or are aware of and prepared to testify about the Denso Group Defendants' knowledge of the topics set forth below. If the designated representative or representatives do not have such knowledge, he, she or they are required to acquire it through a reasonable investigation.

### DEFINITIONS

The following Definitions and Instructions apply to this Rule 30(b)(6) deposition notice:

142606

1. "Agreement" or "agreed" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more persons, together with all modifications and amendments thereto.

2. "Communication" means, without limitation, oral or written communication of any kind, all electronic communications, emails, facsimiles, telephone communications, correspondence, exchange of written or recorded information, or face-to-face meetings. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

3. "Defendant" means any company, organization, entity, or person presently named as a Defendant in this litigation, including, without limitation, any of its predecessors, successors, subsidiaries, departments, divisions and/or affiliates, or any organization or entity which Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any person acting or purporting to act on Defendant's behalf.

4. A "Defendant Group" means each group of Defendants represented by separate counsel (e.g., Yazaki, Sumitomo, Furukawa, DENSO, Fujikura, G.S. Electech, Asti, Mitsubishi Electric, Chiyoda, etc.).

5. "Employee" means, without limitation, any current or former officer, director, executive, manager, secretary, assistant, staff member, messenger, agent, or other person who is or was employed by a Defendant, or any other manufacturer or seller of Wire Harness Products, as defined in Definition No. 10, below.

6. "Enterprise Resource Planning" or "ERP" means business management software—often implemented as a suite of integrated applications—that companies use to collect, store, manage and interpret data. ERP systems are capable of tracking expenses, costs, manufacturing and production information, and the flow of products through the distribution chain. ERP systems also provide historical reports and forecasts on ongoing business activities, such as the completion of production plans, pricing, and profitability. ERP applications span across the various corporate departments, such as manufacturing, purchasing, sales, accounting, finance, and business planning. In this way, ERP systems facilitate information flow between corporate departments.

7. "OEM" means motor vehicle original equipment manufacturer.

8. "RFQ" means requests to purchase of any kind, including without limitation, invitations to bid or submit proposals, and formal requests for quotation.

9. "Trucks and Equipment" means medium-duty (Class 4, 5, 6, and 7) trucks, heavy-duty (Class 8) trucks, buses, commercial vehicles, construction equipment, mining equipment, agricultural equipment, railway vehicles, and other similar vehicles.

10. "Wire Harness Products" means and includes wire harnesses and the following related products: electrical wiring, lead wire assemblies, cable bond, wiring connectors, wiring terminals, high voltage wiring, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and speed sensor wire assemblies used in motor vehicles and Trucks and Equipment.

11. "You," "your" or "your company" mean the Defendant or Defendant Group that received this notice, its predecessors, successors, subsidiaries, departments, divisions and/or affiliates, including without limitation, any organization or entity which the responding Defendant or Defendant Group manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any person acting or purporting to act on behalf of the responding Defendant or Defendant Group.

12. The use of the singular herein also includes the plural, the masculine and the feminine, as appropriate in the context. The use of any tense of any verb shall include also within its meaning all other tenses of the verb.

## RELEVANT TIME PERIOD

1. The relevant time period is January 1, 1998 through the present.

## 30(B)(6) DEPOSITION TOPICS

1. All communications, coordination, collaboration and information exchanges with other manufacturers or sellers of Wire Harness Products regarding the following:
    (a) RFQs with respect to Wire Harness Products;
    (b) bids for Wire Harness Products;
    (c) requests or demands from customers for price reductions on Wire Harness Products, including but not limited to annual price reductions (APRs);
    (d) allocation of customers of Wire Harness Products; or
    (e) the market for, pricing and/or sales of Wire Harness Products.
This topic includes, but is not limited to, when and why the communications, coordination, collaboration and information exchanges began, the reasons therefore, and the nature thereof.

2. You and your competitors' markets, market shares and customers for Wire Harness Products, and plans or strategies for maintaining or increasing market share or obtaining new customers.

3. Types of wire harnesses and Wire Harness Products that you make.

4. Your ability to make different Wire Harness Products.

5. Pricing of Wire Harness Products to OEMs and non-OEMs, including without limitation, both actual prices charged and any pricing models or "rules of thumb" you use to estimate production costs or selling prices for Wire Harness Products, and the difference, if any, between the quote price and the production price.

6. Sales of Wire Harness Products to OEMs and non-OEMs.

7. Your organizational structure with respect to sales of Wire Harness Products, including but not limited to, the chain of reporting for Wire Harness Products and who has ultimate decision-making authority with respect to your prices for Wire Harness Products sold in the United States.

8. The RFQ process, including but not limited to, how responses to RFQs are prepared, the costs of preparing responses to RFQs, your decision-making process for whether to submit a bid in response to an RFQ, and how prices submitted in response to an RFQ are determined.

9. Wire Harness Products price changes.

10. Contracts to supply Wire Harness Products.

11. Tooling and design of Wire Harness Products.

12. Your competitors and competition in the Wire Harness Products market.

13. Joint ventures or other business relationships with competitors with respect to any Wire Harness Product.

14. Relationship between your Japanese and United States divisions, units, affiliates, or subsidiaries with respect to pricing or sales of Wire Harness Products.

15. Effect over time of communications, coordination, collaboration and information exchanges with other Wire Harness Products manufacturers or sellers on prices for Wire Harness Products.

16. With respect to all RFQs where you agreed with a competitor on which company would submit higher prices, which aspects of the RFQ response were adjusted by you or the competitor to arrive at the prices you or the competitor submitted to the customer.

17. With respect to all negotiations of price adjustments for Wire Harness Products (including but not limited to APRs and other price adjustments) in which you shared information with a competitor, or coordinated or agreed upon pricing with a competitor, the price effect of such information sharing, coordination or agreement.

18. Relationship between responses by you to RFQs, and the mass production prices, for one vehicle manufacturer for a particular vehicle model and: (a) different model years of the same model; (b) different vehicle models made by the same manufacturer; and (c) vehicles made by other manufacturers.

19. Relationship between responses to RFQs, and the mass production prices, for global models made in Japan (or another county besides the United States) and exported to the United States and the same model made in the United States.

20. Incidents and locations where competition resulted in Wire Harness Products' prices being lower than desired levels.

21. Agreements with other Wire Harness manufacturers or sellers regarding responses to RFQs (including declining to respond to an RFQ with a bid) or pricing of Wire Harness Products (including APRs and other price adjustments).

22. Relationship between responses to RFQs, and the mass production prices, in Japan and responses to RFQs, and the mass production prices, in the United States.

23. Relationship between responses to RFQs, and the mass production prices, for one vehicle manufacturer and responses to RFQs, and the mass production prices, for another vehicle manufacturer.

24. Relationship between Wire Harness Products prices in Japan and the United States.

25. The identities of all people who had knowledge of communications, coordination, collaboration or information exchanges regarding Wire Harness Products and how they learned about communications, coordination, collaboration or information exchanges.

26. Destruction, concealment, or alteration of documents relating to communications, coordination, collaboration or information exchanges with other manufacturers or sellers of Wire Harness Products.

27. Manufacturing process of Wire Harness Products, including but not limited to, whether you were at all times operating at full capacity to manufacture Wire Harness Products, and your ability to create additional capacity to manufacture Wire Harness Products.

28. Manufacturing process of Wire Harness Products, including types of tooling, capital equipment, facilities, and labor or management skills required to manufacture Wire Harness Products.

29. Any constraints your capacity or production capabilities put on your ability to bid for Wire Harness Products business, including without limitation whether you have sufficient capacity to build Wire Harness Products for the largest volume RFQs, whether you have sufficient global manufacturing presence to supply Wire Harness Products for global platforms, and, if you produce wire harnesses, whether your production capabilities restrict the types of wire harnesses for which you can bid (e.g., door harnesses vs. body harnesses).

30. Design, engineering, and manufacturing process interrelationships, including any computerized systems apart from ERP systems used to manage or track responses to RFQs,

designs and design modifications for work in process, or vehicle identification for which wire harnesses or Wire Harness Products are intended.

31. Any communications you have had with any Wire Harness Product direct purchaser regarding your collaboration or information exchanges with competitors concerning Wire Harness Products.[1]

32. Requests or demands by OEMs for lower prices for wire harness products or other modifications after revelation of the governmental raids or prosecutions.[2]

33. The similarities and differences between wire harnesses or Wire Harness Products for automobiles, on the one hand, and wire harnesses or Wire Harness Products for Trucks and Equipment, on the other, including the products themselves, the allocation of responsibility within your company for those products, the supplier and purchaser markets for those products, the development and engineering of those products, the pricing of those products, and the process for seeking and securing sales contracts for those products.

34. Your sales, profits, and costs of Wire Harness Products, including annual profits for each Wire Harness Product from 1999 to 2014.

35. The transactional sales, cost, and purchase data produced in response to Plaintiffs' Requests for Production, and the correspondence exchanged between you and Plaintiffs' counsel regarding specific questions about that data. This topic encompasses your data processing systems, programs and outputs which you used to record, store, compute, analyze or retrieve any information relating to the production, pricing, marketing, sale, distribution, profitability or inventory of Wire Harness Products. This topic also includes your systems for collecting data about production utilization, total production, procurement, costs, and sales, including any and all ERP systems. Finally, this topic includes a complete explanation of how to identify the characteristics associated with each Wire Harness Product in the data, including, but not limited to: the type of automotive part (e.g., wire harness, electronic control unit, connector, etc.), additional descriptive information about the part (including the type of wire harness and/or where the part is located in a vehicle), the vehicle make, the vehicle model, the vehicle model year, and the vehicle trim.

36. Your business planning process for wire harnesses and Wire Harness Products including: (a) the identity of internal business divisions or units involved in planning; (b) the process by which business forecasts and/or analyses were prepared for your company and industry-wide; (c) the methods by which you set production and inventory targets; (d) plans to expand or contract production capacity through the construction of or shut-down of manufacturing lines or facilities; and (e) your monitoring of supply or demand for wire harnesses and Wire Harness Products.

---

[1] Plaintiff Ford Motor Company ("Ford") does not join in the request for a witness to testify on this topic.

[2] Ford does not join in the request for a witness to testify on this topic.

142606                                                      6

37. Your collection and production of documents to any governmental entity in connection with any investigation into violations of antitrust or competition laws with respect to sales of Wire Harness Products, and in connection with responding to discovery requests served by Plaintiffs in the Wire Harness cases in the United States District Court for the Eastern District of Michigan.

38. All RFQs issued by Ford, including but not limited to: (a) your response to the Ford RFQ; (b) all communications, coordination, collaboration or information exchanges with other manufacturers or suppliers of Wire Harness Products concerning the Ford RFQ; and (c) the reasons why you decided to submit a bid or declined to submit a bid in response to the Ford RFQ.

39. Your internal communications, discussions and decisions concerning whether to pursue sales of Wire Harness Products to Ford or any other potential customer.


Date:  October 1, 2015

FINK + ASSOCIATES LAW

By: /s/ Darryl Bressack
David H. Fink (P28235)
Darryl Bressack (P67820)
38500 Woodward Ave, Suite 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
Fax: (248) 971-2600
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com


Interim Liaison Counsel for the Direct Purchasers and for purposes of this deposition notice on behalf of all other Plaintiff Groups

142606                              7

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2015, I served the foregoing paper upon all counsel of record via electronic mail.

                                          FINK + ASSOCIATES LAW

                                          By: /s/ Darryl Bressack
                                          Darryl Bressack (P67820)
                                          38500Woodward Ave., Suite350
                                          Bloomfield Hills, MI  48304
                                          Tel: (248) 971-2500
                                          Fax: (248) 971-2600
                                          dbressack@finkandassociateslaw.com

**142607**