# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311<br>Honorable Marianne O. Battani |
| In Re: WIRE HARNESS CASES | |
| THIS RELATES TO:<br>All End-Payor Actions | 2:12-cv-00103-MOB-MKM |

**DECLARATION OF PROFESSOR FIONA SCOTT MORTON IN SUPPORT
OF THE WIRE HARNESS DEFENDANTS' MOTION FOR LEAVE TO DEPOSE NON-
PARTY AUTOMOBILE DEALERS FROM WHICH END-PAYOR PLAINTIFFS
PURCHASED VEHICLES**

I, Fiona Scott Morton, declare as follows:

1. I am the Theodore Nierenberg Professor of Economics at the Yale School of Management, where I teach courses in the area of competitive strategy and conduct research into empirical industrial organization. I am also a Visiting Professor at the University of Edinburgh, a Senior Consultant at Charles River Associates, and a Research Associate at the National Bureau of Economic Research. I hold a Bachelor's degree in Economics from Yale and a Ph.D. in Economics from the Massachusetts Institute of Technology.

2. I have been a professor at Yale since 1999, during which time I have been the Senior Associate Dean for Faculty Development. Before becoming a Professor at Yale, I was an Assistant Professor of Economics and Strategy at the University of Chicago's Graduate School of Business. Before that, I was an Assistant Professor of Strategic Management at Stanford University's Graduate School of Business. From 2011 to 2012, I held the position of Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice. In this role, I supervised the economists in the Antitrust Division analyzing the cases that came before the Antitrust Division.

3. I have published more than 20 articles in peer-reviewed journals, including five articles on automotive retailing. Much of my work in this area has focused on internet retailing of new vehicles and on factors contributing to the relative bargaining power of dealers and vehicle buyers in individualized new vehicle price negotiations.

2

**Assignment**

4. I have been asked to offer my expert opinion on whether it is possible, using the types of data that Automotive Dealer and End Payor Plaintiffs have provided to the Defendants in this matter to assess the need for deposition testimony from the automotive dealers that sold or leased to End Payor Plaintiffs in determining whether any particular End Payor Plaintiff was harmed in purchasing his or her new vehicle(s) by Defendants' alleged conspiracy with respect to sales of wire harnesses (an automotive component).

**Overview of Assessing Whether End Payors Were Harmed by Alleged Conduct**

5. To determine if any particular End Payor was harmed by Defendants' alleged conduct, it is necessary to analyze product procurement and vehicle sales at each level of the supply chain on a transaction-by-transaction basis.

6. Two concepts are relevant in analyzing whether an alleged conspiracy caused any harm to a member of a proposed class: an overcharge, and pass on. An overcharge on a particular product refers to the difference between the price actually paid for that product and what that price would have been absent the alleged conduct. Pass-on refers to whether, and the extent to which, a purchaser passes on an overcharge to its customers, rather than absorbing the overcharge.

7. Whether any individual End Payor was harmed by Defendants' alleged conduct will depend on whether there were overcharges on wire harness products sold by

3

Defendants to direct purchasers, whether any of those overcharges were ultimately passed on to the End Payor through each of the relevant tiers of the supply chain when he or she purchased a finished vehicle in which the wire harness product were incorporated, and whether the End Payor was able to pass on that overcharge, e.g., to any subsequent purchaser of that vehicle.

8. The automotive parts supply chain is complicated and variable. An original equipment manufacturer ("OEM," typically an automotive manufacturer, such as Toyota or General Motors) obtains a part or part assembly from a direct supplier (sometimes referred to as a "Tier 1 supplier"). The Tier 1 supplier may manufacture a particular part itself or it, in turn, may obtain it from one of its suppliers (sometimes referred to as a "Tier 2 supplier"). In the present case, OEMs may in some instances have chosen to purchase wire harnesses directly from a defendant supplier, while in other instances, an OEM may have purchased wire harnesses directly from a non-defendant supplier. In still other instances, the OEM purchased wire harnesses from a non-defendant supplier who in turn purchased from either a defendant supplier or a non-defendant supplier. After installing the product in a new vehicle, the OEM typically then sells the vehicle to an automotive dealer, or to a distributor which in turn sells the vehicle to an automotive dealer. The automotive dealer then sells the vehicle containing the product to an individual End Payor.

9. To assess whether a particular End Payor was harmed by Defendants' alleged conduct, it is first necessary to determine whether the direct purchaser (generally

4

either a Tier 1 supplier or an OEM) incurred any overcharge. If the direct purchaser incurred an overcharge on the price it paid for any individual automotive part, it is next necessary to determine whether that higher cost affected the price at which the OEM sold the vehicle in which that part was incorporated, and, if it did, whether the overcharge was passed on through each succeeding level in the supply chain. For example, if I were asked to determine whether an overcharge on a sale of a wire harness product to a Tier 1 supplier harmed any particular End Payor, I would first consider whether that overcharge had any effect on the price at which the Tier 1 supplier sold the wire harness product, or assembly containing the wire harness product, to the OEM. If the Tier 1 supplier was able to pass on some of that overcharge to the OEM, I would next consider whether the higher price paid by the OEM ultimately affected the price at which the OEM sold the vehicle containing that wire harness product, or assembly containing that wire harness product, to its intermediate distributor or dealer. If the vehicle was sold to a distributor and some overcharge was passed on to the distributor, I would next consider whether the distributor passed on some portion of that higher cost by increasing the price it charged the automotive dealer when the dealer purchased the vehicle from the distributor. If the price the OEM or distributor charged the automotive dealer was higher due to the overcharge, I would consider whether the higher price paid by the dealer was then passed on to the End Payor when he or she purchased the vehicle from the dealer. In some cases, the End Payor may also be able to pass on some or all

5

of the overcharge, such as on a subsequent sale or trade-in of the vehicle. Each of these levels of distribution will require a separate analysis of the individual factors and circumstances that influenced the price at which the product was sold. If I found that the price at which the Tier 1 supplier sold the wire harness product or assembly containing the wire harness product was unaffected by the overcharge, or that the price at which the OEM sold the vehicle into which the wire harness product was incorporated was not affected by any price increase in the wire harness product or assembly that contained the wire harness product, or that the price paid by the dealer or the terms on which it sold the car was unaffected by the overcharge, then I would conclude that the End Payor was not harmed by the alleged misconduct.

**The Distinction Between Average Harm and Individual Harm**

10. Economists have used various methods to examine the aggregate harm caused by antitrust cartels. The aggregate harm to a proposed class is the sum of the individual harms that each of the members of the proposed class suffered, if any. Some economists have attempted to use average harm in estimating aggregate harm. The average harm per class member is the aggregate harm divided by the number of class members. The average harm to class members often is estimated using class-wide statistical regression models that compare the average price difference across all putative class members for an allegedly affected time period and an unaffected time period. However, such estimates of average harm may incorrectly treat normal price

6

differences as "harm" if, for example, the regression models do not adequately control for factors unrelated to the cartel that may have affected prices.

11. Average harm is not the same as individual harm even when average harm is properly measured. Individual harm is the harm suffered by any particular member of the class. Evidence and analysis of average harm do not speak to whether and to what extent any particular class member was harmed by the alleged conduct. Where the average or aggregate harm is greater than zero, it does not necessarily mean that all or nearly all class members were harmed, or that any particular class member was harmed.

12. In order to determine whether any particular End Payor suffered individual harm, it is essential to look to the details of the individual transaction between the dealer and the End Payor to determine how the individualized negotiation affected the terms on which the End Payor purchased the vehicle. The remainder of this affidavit will focus on methods of determining whether any overcharge passed on to a particular automotive dealer has been then passed on to an End Payor in a given transaction.

**Automotive Dealer Pricing to End Payors**

13. Unlike the way most consumer goods sold in the United States are priced, vehicle prices are individually negotiated, with otherwise identical vehicles even at the same automotive dealer often selling on different terms to different customers. Vehicle purchases are some of the most, if not the most, individualized sales transactions for

7

any consumer goods. The negotiated terms depend on both the terms the buyer and seller are willing to accept. Typically an automobile salesperson attempts to determine the consumer's valuation of the vehicle and then to sell the vehicle at that price. In such a negotiated transaction where prices are driven by individualized demand, small changes to the dealer's vehicle acquisition cost would be unlikely to affect the transaction price. In addition to being highly negotiated and individualized, a new vehicle purchase rarely involves just the nominal purchase price for the vehicle alone. Typically, the dealer and the customer will simultaneously negotiate the new vehicle price, the offsetting credit given on any trade-in, any purchases of aftermarket products, financing terms, and sales of extended warranties. The price of each of these additional products is driven by the demand for the product.

14. Whether an automotive dealer incurred an overcharge may depend not only on whether the invoice price that it paid for the vehicle was inflated but also on whether any such inflation was offset in some way by the OEM or distributor, such as through an increased incentive. Whether an inflated acquisition cost to the dealer in turn causes an individual new vehicle buyer to pay an inflated price for a vehicle depends on a wide variety of factors that inform the terms that the End Payor is willing to accept, those that the dealer is willing to accept, and the bargaining power of each of the parties. It is not possible to identify whether a dealer passed on any overcharge in a particular transaction by looking only at the nominal purchase price of the vehicle.

8

15. If it were established that a dealer's acquisition cost for a vehicle was inflated due to an overcharge higher up the supply chain, then I would consider a number of factors to determine whether that overcharge was passed on to a particular End Payor. A wide array of considerations affect the terms of sale that a dealer is willing to accept for a particular vehicle, and many of these factors bear on whether the dealer passed on an overcharge in a particular transaction. Below I will identify only a few of many possible factors that may affect whether an overcharge was passed on in a given transaction.

16. *Market demand:* Market demand for a particular vehicle model would be relevant in assessing pass on. Unexpected shocks to demand may occur at any time, and in these circumstances an automotive dealer's pricing practices for specific vehicle models may make it more or less likely for any of an alleged overcharge to be passed on to End Payors. For example, where demand for a vehicle model becomes high relative to supply, a dealer may expect to have multiple potential buyers for each of the limited number of vehicles of that model allocated to it by the distributor or OEM. But where a dealer instead holds out for the highest amount that its potential purchasers are willing to pay, based on supply and demand, that amount might be wholly independent of the dealer's acquisition cost. In such instances, the price required to match supply with demand is the same irrespective of the dealers' vehicle acquisition costs, and thus none of any alleged overcharge is passed on.

9

17. Similarly in instances in which a vehicle model is not selling well, and a dealer holds a considerable inventory of the slow-selling model in stock, the dealer may focus on finding the best terms upon which these vehicles will sell, regardless of the dealer's vehicle acquisition cost, in order to avoid the costs of holding inventory (such as finance payments on the vehicles in stock), and the lost opportunity costs of stocking more popular vehicles. In such a circumstance, the dealer may be unable to pass on any overcharge to the End Payor. In assessing whether an End Payor was harmed by an alleged overcharge, I would want to know how the dealer perceived market demand for the relevant vehicle model at the time of sale.

18. *Incentive programs:* The dealer's participation in an incentive program provided by an OEM or distributor, such as a "stair step" incentive program[1], also would be directly relevant in assessing whether a dealer passed on any overcharge in its acquisition cost. When a dealer is participating in an incentive program, the dealer may choose to negotiate the sale of a vehicle based on the availability of the incentive and its ability to meet the incentive program's sales criteria, rather than based on the profit margin over invoice price on the sale. The amount that the dealer is willing to accept in that circumstance may be heavily influenced by its ability to meet the target level of sales needed to earn an incentive payment rather than simply by reference to

---

[1] In a stair step incentive program, an OEM offers a dealer the opportunity to earn a fixed payment contingent on the dealer's ability to meet a defined sales objective (e.g. selling 100 new vehicles in a given month.)

10

the dealer's acquisition costs. In such a circumstance, the dealer may ultimately accept the same price and other terms of sale from the customer, regardless of whether the dealer's acquisition cost of the vehicle had been inflated by a passed-on overcharge. Under those circumstances, the dealer, and not the End Payor, will absorb any overcharge passed on from the OEM or distributor. If I were asked to provide an expert opinion on whether a particular End Payor paid an overcharge on a particular transaction, I would want to know whether the dealer was participating in an incentive program, the nature of that program, and the status of the dealer's progress towards earning that incentive at the time of the transaction.

19. *Bundled products and services*: As noted above, the purchase of a new vehicle often includes negotiations regarding a bundle of goods and services, apart from the nominal price of the vehicle. Different customers may purchase different bundles, and the amount charged for each additional product in the bundle is driven by demand for the product. Moreover, when individual consumers have strong preferences for part of the bundle, the dealer may price to take advantage of those preferences rather than pricing based on dealer costs. Accordingly, I would also want to consider the secondary revenue sources associated with the sale of the vehicle such as extended warranties, insurance, financing options, and aftermarket products, and what types of consumers value each. The dealer may ignore changes in cost of the vehicle because it expects that by completing the sale, it will earn additional revenue on those bundled

11

products. In such a circumstance, it is more likely that the dealer will not pass on any overcharge to the End Payor.

20. *Cash flow concerns*: I would likewise consider it relevant whether a dealer can afford to hold on to its overall inventory or if it has immediate cash needs. For example, I would expect a dealer that urgently needs to finance the purchase of new inventory or to raise funds in order to pay its employees to offer vehicles at prices that result in immediate sale irrespective of whether its acquisition costs were inflated. In these circumstances a dealer would be less likely to pass on an inflated acquisition cost to its customers because of its pressing need for cash.

21. *Unique pricing strategies*: Each automotive dealer is likely to have its own pricing strategies that may in some cases affect its ability to pass on an overcharge in its vehicle acquisition cost to an End Payor. For example, a dealer may have an internal policy of negotiating at prices rounding off to the nearest $100, which may have an effect on the ultimate purchase price. Under such circumstances, an increase in cost to the dealer would not necessarily be passed on to the End Payor. If I were asked to assess whether pass-on occurred on a particular transaction, I would therefore find it helpful to understand the dealer's pricing strategies.

22. *End Payor purchasing strategies:* A dealer is also inherently limited in its negotiations by what the buyer is willing to pay. A particular buyer may have a maximum price that he or she is willing or able to pay, such as where the buyer intends to pay in cash and has a fixed budget, or where a buyer is intending to finance

12

and can be approved for financing only to a certain amount. If I were asked to assess whether pass-on occurred on a particular transaction, I would find it helpful to know how the dealer perceived the buyer's ability and willingness to pay and how that information affected the dealer's negotiation strategy on that transaction.

**Sufficiency of Deal Files**

23. Counsel for Defendants in this action has provided me with three sets of documents that certain non-party automotive dealers produced to Defendants during discovery in the Automotive Parts MDL litigation. The majority of these documents are from "deal files," which I understand to be a set of documents that a dealer collects or generates in connection with a particular sale of a vehicle to a customer and thereafter maintains. Copies of these example file sets are attached as Exhibits A, B and C.

24. I have reviewed these example files and have concluded that while they contain important information, including certain essential terms of the transaction, they, by themselves, do not provide me with sufficient information to determine whether the particular transactions to which the files pertain resulted in pass-on from the dealer to the End Payor of any overcharge that may have been embedded in the dealer's acquisition cost of the vehicle in question. Among other things, the example file sets I have reviewed do not explain what incentive programs the dealer was participating in or the dealer's progress towards earning those incentives at the time of the transaction, how the dealer perceived market demand for the relevant model vehicle,

13

to what extent the dealer expected to make a profit on secondary revenue sources associated with the sale of the vehicle, what the dealer's inventory levels were at the time of the relevant transaction, whether the dealership had any immediate cash needs at that time, or what the dealer's pricing and negotiation strategies were at the time. I would also not expect to be able to obtain any of these types of information from the End Payor who purchased each vehicle, because these types of information are generally internal to the dealer's business operations. Deposition testimony is therefore essential to understanding the dealers' approach to the End Payors' purchases in order to ensure that the transactions can be analyzed correctly and reliably.

**Conclusion**

25. In conclusion, economic analyses of pass-on and potential damages at the End Payor level from alleged overcharges occurring many levels removed in the supply chain is a fact-driven exercise that requires an understanding of the various factors at play in the transaction. If depositions were taken of the End Payors but not of the automotive dealers from whom those End Payors acquired their vehicles, a substantial amount of significant information necessary to understand each of the transactions, and to assess whether or not any overcharge was passed on, would be omitted. Automotive dealers' deposition testimony is therefore crucial to conducting a proper economic analysis of the transactions at issue.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 29th day of October, 2015.

_____
Professor Fiona Scott Morton