# EXHIBIT L

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311<br>Honorable Marianne O. Battani |
| In Re: WIRE HARNESS CASES | |
| THIS RELATES TO:<br><br>End-Payor Actions | 2:12-cv-00103-MOB-MKM |

**DECLARATION OF JACK SAYER
IN SUPPORT OF THE WIRE HARNESS DEFENDANTS' MOTION
FOR LEAVE TO TAKE DEPOSITIONS OF NON-PARTY AUTOMOBILE
<u>DEALERS FROM WHICH END-PAYOR PLAINTIFFS PURCHASED VEHICLES</u>**

I, Jack Sayer, declare as follows:

**A.  Background and Experience**

1.  I have personal knowledge of the facts set forth in this Declaration. I make this Declaration pursuant to 28 U.S.C. § 1746. I submit this Declaration in Support of the Wire Harness Defendants' Motion For Leave to Take Depositions of Non-Party Automobile Dealers from Which End-Payor Plaintiffs Purchased Vehicles.

2.  I have substantial experience and expertise in the retail marketing and sale of vehicles by automobile dealerships to consumers and others. I also have substantial experience and expertise in the business operations and management of automobile dealerships.

3.  In the late 1960s, I began working at Z Frank Dealer Group, which was a retail auto dealer group based in Chicago, Illinois that included America's largest Chevrolet dealership. By 1972, I had become the President and Chief Operating Officer, and I continued to hold those positions until 1998. From 1998 to 2000, I was the Chief Operating Officer of Car Corporation of America, a used car megastore in the Washington DC area that was later acquired by CarMax. From 2000 to 2002, I worked as an Executive Manager at General Motors.

4.  From 2002 to present, I have served as the Managing Partner of Sayer Partners LLC. Sayer Partners is a consultancy for automobile dealerships providing, among other things, development and management processes for automobile dealerships in the retail and wholesale sectors.

5.  I am advised that Defendants are seeking to obtain deposition testimony from representatives of certain non-party auto dealers that sold or leased to an individual End Payor Plaintiff one or more of the vehicles that are the subject of that individual End Payor Plaintiff's claims in the Automotive Parts Antitrust Litigation. I am advised that Defendants seek to depose

1

these dealers in order to more fully understand the transactions in which End Payor Plaintiffs acquired these vehicles. I believe that testimony from a knowledgeable representative of the dealer that sold or leased a vehicle to an End Payor Plaintiff is critical to understanding how and why the particular amount paid by the End Payor to acquire the vehicle was determined and agreed upon.

**B.     Automotive Dealer Pricing is Complex and Individualized**

6.     There is significant variation in the terms on which consumers purchase new vehicles. These terms are individually negotiated. Two individual consumers may end up with very different terms, even if they purchased near-identical vehicles from the same dealer on the same day. The actual total amount paid for each automobile, including the nominal unit price, financing, and other terms, is determined by an individual negotiation between the dealer and the retail consumer. In addition to the purchase or lease of the base vehicle itself, the consumer and the dealer typically also negotiate the sale of the consumer's trade-in vehicle and the purchase of other products bundled into the same transaction, such as financing, aftermarket parts, extended warranties, and service packages. The actual total amount paid by the consumer for the purchase or lease of the new vehicle depends on both the terms an auto dealer is willing to accept and the terms that the consumer is willing to accept for the vehicle and any products and services bundled with it.

**7.**     The auto dealer's willingness to accept any particular set of terms, including a nominal price, for the sale or lease of a new vehicle depends on a number of different factors. Many of these factors that influence the auto dealer's negotiation and decision process are generally not known to the consumer, such as the terms and status of ongoing sales incentive programs being offered to the dealer by the relevant OEM, market demand for the particular

2

model or models of vehicle being considered by the consumer, the size and make-up of the dealer's inventory, and the dealer's own particular pricing and marketing strategies. The only way to ascertain which of these sorts of factors affected the terms that the dealer was willing to accept for the new vehicle, and how, would be to ask a knowledgeable representative of the auto dealer that was a party to the transaction.

8.  Auto dealers report limited information to OEMs about their individual transactions with retail consumers. While an auto dealer generally notifies the relevant OEM when a vehicle has been sold and provides the VIN number, an auto dealer generally does not provide an OEM with a detailed report about all the terms of the transaction or how that transaction was negotiated. In particular, the auto dealer does not report to the OEM the reasons why the auto dealer was willing to accept certain terms for a new vehicle transaction.

C.  **Information Not Recorded in Deal Files**

9.  When an auto dealer sells or leases a vehicle to a consumer, it typically creates and maintains a deal file or deal jacket that contains a set of documents regarding that particular transaction. Copies of some of the documents contained in the deal file, such as the vehicle purchase agreement, are typically provided to the consumer during the sale of the vehicle. Other documents that are typically or frequently included in the deal file are generally never seen by the consumer, such as the dealer's invoice for the purchase of the vehicle from the OEM and documents reflecting the dealer's estimated value of the consumer's trade-in (in contrast to the credit or allowance provided to the consumer for the trade-in), and other information that the dealer generally keeps confidential from the consumer.

10.  I have been advised that Defendants have received from a number of non-party auto dealers, in response to subpoenas for documents, some deal files and related documents

3

regarding particular sales or leases of new vehicles by non-party auto dealers to individual End Payor Plaintiffs. The Defendants have also provided me with three such sets of files, which I have reviewed. While deal files typically show some important information about the relevant transaction, they do not capture all the factors that often influence an automotive dealer's willingness to accept certain terms for a particular vehicle. Among other things, the deal files typically do not explain what the auto dealer's pricing strategies were at the time of the transaction, what incentive programs the dealer was participating in at that time, how the auto dealer perceived market demand for the relevant model vehicle, to what extent the auto dealer expected to make a profit on secondary revenue sources associated with the sale of the vehicle, what the auto dealer's inventory levels were at the time of the relevant transaction, or whether the dealer had any immediate cash needs at that time. As I will discuss below, each of these factors is relevant to understanding how and why an auto dealer and a consumer negotiated and agreed upon the terms of a particular purchase or lease transaction.

**D.     Specific Factors Affecting Automotive Dealer Pricing**

11.     As noted, auto dealers consider a wide array of factors in deciding the terms they are willing to accept for a particular vehicle and the bundle of products and/or services sold with it. Below I will identify only some of many possible examples, focusing on important considerations that are typically known only to the particular dealer involved in a specific transaction.

*Dealer Incentive Programs*

12.     OEMs and distributors often provide monthly incentive payments directly to the dealer that are designed to encourage increased sales volume at the auto dealer level. OEMs and distributors typically vary and customize these incentive programs for different times of the year,

4

different market conditions, and in different market segments, depending on their own goals, anticipated sales volume, performance, and other factors. These incentives may be tied to sales of certain models or can be based upon all sales of an OEM's vehicles.

13. Consumers are generally unaware of the OEM-to-dealer incentive programs that are ongoing when they purchase a new vehicle. These programs are also typically not recorded in the deal file, or other documents for any particular vehicle transaction. An OEM, meanwhile, might know what incentive programs were available on a given date, but does not know how a particular transaction fits into a dealer's overall strategy to maximize its earnings from the incentive program.

14. Dealer incentive programs create a strong incentive for an auto dealer to increase the number of vehicles it sells in a month, even if it must sell a vehicle at a significant discount (or even below the auto dealer's acquisition cost for the particular vehicle). Faced with the possibility of missing out on additional income, a dealer will be more likely to accept the highest offer a consumer is willing to pay for a vehicle, regardless of the dealer's acquisition cost.

15. OEMs and distributors offer different types of dealer incentive programs. A dealer may be given an individualized monthly sales quota where the dealer receives an incentive if it sells a certain number of vehicles in a month. The OEM may provide incentives to dealers and their staff based upon selling more vehicles than other dealers. An OEM or distributor might also create a stair step program where the dealer is told it will receive an incentive per vehicle that increases based upon the number of vehicles the dealer sells during a particular month or other pre-set time period.

16. As an example of a stair step program, an automotive dealer could be given monthly sales target steps of 30, 40, and 50 new vehicles with payouts of $0 per vehicle if 29 or

fewer vehicles are sold, $500 per vehicle if 30 to 39 or sold, $1,000 per vehicle if 40 to 49 are sold, and an even higher incentive per vehicle for sales of 50 or more vehicles. In this example, a dealer that sells 29 vehicles in the month would earn nothing under the program. A dealer that sold one more vehicle, 30, would earn $500 per vehicle for a total of $15,000.

17. Incentive programs are particularly likely to impact the terms of the purchase when the auto dealer is close to achieving a sales quota or a stair step quota. In the example above, the difference between selling only 35 vehicles and selling 40 vehicles would be worth $22,500. This incentive encourages dealers to focus on selling additional vehicles rather than maximizing their profit on individual sales.

*Dealer Holdback*

18. Dealer incentive programs are separate from dealer holdback payments an OEM makes to the auto dealer. The invoice price of each vehicle includes a dealer holdback amount that dealers rarely disclose to the customer. The holdback amount is typically a percentage of the invoice, such as 3%, but varies by each OEM. Once a quarter, the OEMs pay the holdback cost back to the auto dealer if that particular vehicle was sold by the auto dealer during the quarter.

19. The existence of holdback affects how dealers negotiate transactions. For example, holdback encourages some dealers to focus on sales volume rather than acquisition costs, because dealers know that even when they sell a particular vehicle at or slightly below invoice price they will make a profit on the transaction. Holdback also may give dealers greater flexibility to sell vehicles below invoice price when they are seeking to maximize their income from dealer incentive programs.

*Market Demand*

6

20.     The terms on which an auto dealer is willing to sell a new vehicle will also depend on the demand for that particular model in the area at that particular time. If a consumer is interested in purchasing a vehicle that is unpopular or not selling well, the dealer may be more willing to negotiate over those terms, including the nominal price of the vehicle. Since the dealer knows there is less of a chance that another consumer will visit the dealer and want to purchase that same vehicle, the dealer may focus on finding the highest amount that individual consumer is willing to pay instead of negotiating for a certain margin over the invoice cost of the vehicle.

21.     Likewise, where a particular model is popular and selling well in an area, the auto dealer may expect to have multiple potential buyers for that vehicle. The auto dealer may therefore be less willing to negotiate over the terms of the transaction, including the nominal price of the vehicle. Instead, the auto dealer may hold out for a consumer who is willing to purchase the vehicle at the highest price.

22.     The only way to ascertain how the local market demand for a particular model influenced the terms of the sales transaction, including the nominal price of the vehicle, would be to ask the auto dealer that sold or leased the vehicle. Information about the local demand for a particular model is typically not reflected in the deal file an auto dealer would keep for the transaction. The consumer who purchased the vehicle generally does not know whether a particular model was selling well or if the auto dealer's negotiation was influenced by demand for that vehicle. OEMs, likewise, do not track localized demand at the same level of granularity as individual dealers, nor do they know how a dealer factored localized demand into its negotiation of a particular transaction.

*Bundled Products and Services*

7

23. Consumers often purchase from the auto dealer other products and services bundled together with the sale of the new vehicle. These may include financing, insurance, warranties, service contracts, and add-on products. Auto dealers typically sell these products and services, and access potential profits arising from such sales, as part of a transaction in which a new automobile is sold or leased to a consumer. Auto dealers typically consider the entirety of the transaction—including both the vehicle sale or lease itself (the "front-end" of the transaction) and the sale of add-on products and services (the "back-end" of the transaction)—in determining whether the terms of the transaction are favorable to the auto dealer.

24. Auto dealers have higher nominal margins from these additional bundled products and services than they do on the sale or lease of the new vehicle itself. For that reason, auto dealers have an incentive to prioritize selling additional vehicles to obtain additional "back-end" profit from these additional products and services as opposed to maximizing their nominal "front-end" profit on the sale of the vehicle itself. Where the negotiation between the consumer and the dealer includes not only the nominal price of the vehicle, but also potential purchases of other bundled products and services, the dealer may decide to accept the consumer's best offer on the nominal vehicle price in order to obtain income on the transaction from sales of the additional bundled products and services. This may be true regardless of whether that nominal vehicle price bears any relationship to the invoice price or the MSRP for the vehicle. The auto dealer may even treat the sale or lease of the new vehicle as a "loss leader," accepting an offer below acquisition cost to stimulate the sales of more profitable products. In fact, in my experience, not only do auto dealers generally have better overall *margins* on their sales of additional bundled products and services compared to sales or leases of vehicles, but it is often the case (particularly for sales of new domestic vehicles and new, non-luxury imported vehicles)

8

that the *total amount* of a dealer's profit nominally attributed to the so-called back-end of a transaction is greater than the total amount of its profit (if any) nominally attributed to the sale or lease of the vehicle itself.

25.     Consumers generally do not know an auto dealer's respective nominal profit margins on the sale or lease of the vehicle and sales of other bundled products and services, nor do consumers know how the sales of such products and services influenced the dealer's approach to negotiating the transaction. Likewise, a particular deal file might reveal what bundled products and services were purchased with the vehicle, but it generally will not reveal how the dealer calculated its total profit margin on the transaction or whether and to what extent the prospect of the consumer purchasing those products and services influenced the dealer's willingness to negotiate over the terms of the sales transaction.

*Future Sales*

26.     Auto dealers also will often take into account, when negotiating a sale or lease of a new vehicle, the prospect of receiving additional revenue from the future repair work and other services that the consumer may later purchase from that same dealer. This is particularly true when an auto dealer is selling to a repeat customer or a customer who resides in close proximity to the dealership.

27.     For that reason, auto dealers have an incentive to accept the consumer's best offer so they can complete the sale and access additional income streams through future repair work and other services. Auto Dealers often have higher profit margins on future service and repair than on the initial vehicle sale or lease itself.

28.     Consumers generally do not know an auto dealer's profit margin on future repairs and service, nor do consumers know whether, or to what extent, the prospect of such future sales

9

influenced the dealer's approach to negotiating any particular transaction. Likewise a deal file regarding a consumer's purchase typically will not reveal whether and to what extent the dealer expected and took into account, at the time of the sale or lease transaction, the prospect of future revenues from future purchases and repairs and services for the vehicle.

*Inventory*

29. The size, make-up and age of an auto dealer's inventory of vehicles at the time of the sale or lease of a new vehicle can also impact the terms the dealer is willing to accept for that transaction. Most auto dealers do not pay cash to purchase new vehicles from an OEM. Instead, auto dealers generally finance the acquisition of their vehicle inventory through a floorplan lender. Auto dealers must make monthly finance payments to the floorplan lender for each new vehicle that remains unsold. When an auto dealer needs to clear older inventory from its lot, has an abundance of slower-selling vehicles, or anticipates receiving new model year vehicles, it may be more willing to accept a consumer's best offer to sell and move certain vehicles. The consumer's best offer may be unrelated to the auto dealer's invoice cost or the MSRP of the vehicle and may even be below the invoice cost.

30. Consumers generally do not have information about the auto dealer's inventory when they are purchasing a vehicle, nor does the deal file reflect this information. Meanwhile, an OEM may have some sense of a particular dealer's inventory, but generally does not know how those inventory levels affected the dealer's pricing strategy in general or on a particular transaction. The only way to attempt to ascertain whether and to what extent an automotive dealer's inventory management affected the terms the dealer was willing to accept for a particular vehicle, and the terms on which it ultimately sold or leased that vehicle, would be to ask the auto dealer that was a party to the transaction.

10

*Cash Flow Concerns*

31. An auto dealer's willingness to sell a particular vehicle based on particular terms may also depend on that dealer's cash flow at the time the transaction is negotiated. Dealers' cash flow needs change frequently, and they may have a greater need for available cash under certain circumstances. For example, the dealer may have a pressing need for cash to make finance payments on unsold vehicles, because it plans to open a new physical location or buy another dealership, or because it needs to meet payroll. A dealer's immediate cash needs could influence the amount the consumer pays for a vehicle. When cash needs are high, the dealer may be more willing to accept the consumer's best offer for a vehicle, rather than negotiating on the basis of its vehicle acquisition costs.

32. A dealer is the best source of information about whether and how cash flow concerns impacted the terms of a particular transaction. I would not expect a consumer to be aware of a particular auto dealer's financial needs, much less how those concerns impacted the terms of a particular transaction. I also would not expect such information to appear in a deal file.

*Unique Pricing and Marketing Strategies*

33. Each auto dealer has its own pricing and marketing strategies that could influence the terms on which the consumer purchases the vehicle. Some dealers may tend to negotiate with consumers by offering nominal prices that are based upon a margin over the acquisition cost of the vehicle. For example, if the acquisition cost of a vehicle was $20,125, the dealer might attempt to obtain a nominal price to a consumer of $22,125, or a $2,000 margin. Other auto dealers, however, may have an practice of quoting prices at rounded-off figures, e.g. rounding off to the nearest $100. These dealers, for example, would attempt to sell a vehicle with a

$20,125 acquisition cost at $22,100. Even if the acquisition cost of the vehicle was only $20,050, these dealers would still quote a rounded-off price at $22,100.

34. Each auto dealer also has its own strategy for negotiating a lower price with a consumer. Some dealers will offer discounts that are based on a percentage of the vehicle's acquisition cost. Other dealers will offer discounts that are whole numbers (e.g. $300, $500, or $99) not based upon the acquisition cost of the vehicle.

35. The terms on which a consumer ultimately purchases or leases a new vehicle will likely be influenced by the way in which an auto dealer prices, markets, and negotiates the sale of the vehicle. The consumer will likely not be aware of the unique pricing, marketing, and negotiating strategies of the auto dealer, nor will this information be recorded in the deal file for a consumer. The best source of this information would be testimony from a representative of the dealer.

*Consumer Purchasing Strategies*

36. As noted above, the negotiated terms on which a vehicle is sold or leased depend upon both the amount of consideration the auto dealer is willing to accept, and the amount the consumer is willing to pay, in connection with the transaction as a whole. The dealer is therefore limited in its negotiations by the amount that a buyer is both willing and able to pay for a specific vehicle. For example, a consumer may tell a dealer that the consumer has a maximum amount (in total or on a monthly basis) that he or she is willing to pay, or it may be clear from the consumer's credit history that the consumer has a maximum total or monthly payment he or she is able to afford. In fact, dealers' sales employees often begin an interaction with a potential customer by asking how much he or she is willing and able to spend on a monthly basis.

37. The auto dealer's knowledge of the consumer's ability and willingness to pay will influence how a dealer negotiates a transaction. For example, where the dealer knows the consumer's maximum purchase price, it may focus on negotiating the consumer up to that amount, rather than seeking a certain margin relative to acquisition costs. Where a dealer knows a consumer's maximum monthly payment, the dealer may work to structure the finances of the transaction so as to maximize the dealer's profit while hitting the customer's payment goals.

38. Although an individual consumer may know what factors he or she considered when purchasing a vehicle, that consumer does not know whether the automotive dealer's knowledge and understanding of those factors altered the auto dealer' pricing strategy in negotiating the transaction. The dealer is best situated to answer that question.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 28th day of October, 2015.

_Jack Sayer_
Jack Sayer