```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                           —   —   —

 4    IN RE AUTOMOTIVE PARTS           Master File 12-md-02311
      ANTITRUST LITIGATION
 5    _____  Hon. Marianne O. Battani

 6    IN RE OCCUPANT SAFETY SYSTEMS
      _____
 7

 8    THIS TRANSCRIPT RELATES TO:
                                       Case No. 15-12050
 9    RUSH TRUCKS

10    _____/

11                           MOTION TO STAY

12           BEFORE THE HONORABLE MARIANNE O. BATTANI
                     United States District Judge
13           Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
14                       Detroit, Michigan
                     Monday, December 14, 2015
15    APPEARANCES:

16     For the Plaintiffs:   J. MANLY PARKS
                             DUANE MORRIS, L.L.P.
17                           30 South 17th Street
                             Philadelphia, PA  19103
18                           (215) 979-1342

19

20

21

22

23

24        To obtain a copy of this official transcript, contact:
                  Robert L. Smith, Official Court Reporter
25            (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1   Appearances:  (Continued)

 2    For the Defendants:   HOWARD B. IWREY
                            CALE A. JOHNSON
 3                          DYKEMA GOSSETT, P.L.L.C.
                            39577 Woodward Avenue, Suite 300
 4                          Bloomfield Hills, MI  48304
                            (248) 203-0526
 5
                            MEREDITH JONES KINGSLEY
 6                          ALSTON & BIRD, L.L.P.
                            1201 West Peachtree Street
 7                          Atlanta, GA  30309
                            (404) 881-4793
 8
                            JOANNE GEHA SWANSON
 9                          KERR, RUSSELL & WEBER, P.L.C.
                            500 Woodward Avenue, Suite 2500
10                          Detroit, MI  48226
                            (313) 961-0200
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

Page

MOTION TO STAY FIRST AMENDED COMPLAINT

Motion by Mr. Iwrey................................. 5
Response by Mr. Parks.............................34
Reply by Mr. Iwrey...............................49

1    Detroit, Michigan

2    Monday, December 14, 2015

3    at about 1:50 p.m.

4                          —    —    —

5              (Court and Counsel present.)

6              THE LAW CLERK:  Please rise.

7              The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10             You may be seated.

11             THE COURT:  Good afternoon.

12             MR. IWREY:  Good afternoon.

13             MR. PARKS:  Good afternoon, Your Honor.

14             THE COURT:  Seems like someone is missing, doesn't

15   it?

16             MR. IWREY:  Many people.

17             THE COURT:  Many people.  Okay.  This is

18   Rush Trucks vs. TRW and AutoLiv.  Do you want to give me your

19   appearances first for the record.

20             MR. IWREY:  Your Honor, Howard Iwrey from Dykema on

21   behalf of ZF TRW defendants.

22             MR. JOHNSON:  Cale Johnson, also from Dykema, on

23   behalf of the ZF TRW defendants.

24             MS. KINGSLEY:  Meredith Kingsley of Alston & Bird

25   on behalf of the AutoLiv defendants.

1          MS. SWANSON:  Joanne Geha Swanson from Kerr,
2    Russell, Weber on behalf of the AutoLiv defendants.
3          MR. PARKS:  Your Honor, Manly Parks on behalf of
4    the Rush entities.
5          THE COURT:  All right.  Let's proceed.
6          MR. IWREY:  Thank you.
7          THE COURT:  Mr. Iwrey, I did read this all and I
8    received the supplemental authority too --
9          MR. IWREY:  Thank you, Your Honor.
10          THE COURT:  -- earlier this month.
11          MR. IWREY:  Thank you, Your Honor.  Your Honor,
12    Howard Iwrey speaking on behalf of ZF TRW and TRW
13    Deutschland.  I'm also speaking on behalf of moving party
14    AutoLiv.
15          I have prepared some slides which I'm projecting up
16    there, and if I could approach the Court I have copies for
17    you all?
18          THE COURT:  Okay.
19          MR. IWREY:  Your Honor, put simply, the punitive
20    class in the Rush complaint is part of the dealer settlement
21    classes for TRW and AutoLiv, which were preliminarily
22    approved months before the Rush complaint was filed and
23    finally approved by the Court on November 18th of this year.
24    These class settlements bar Rush from pursuing its own subset
25    class action.  The dealers settlement classes apply to all

1    automobile dealers that purchased new vehicles.
2              THE COURT:  Let me ask a question.
3              MR. IWREY:  Yes.
4              THE COURT:  The dealer settlement classes, when
5    they sent out the notices there were some 16,000 notices I
6    think you said?
7              MR. IWREY:  Yes, Your Honor, 16,000 were mailed and
8    over 100,000 were e-mailed.
9              THE COURT:  Were one of those to Rush?
10             MR. IWREY:  I can't tell you that, that was handled
11   by the settlement administrator for the dealers.  I'm
12   assuming one was sent to Rush.
13             THE COURT:  Just curious.  Okay.  Go ahead.
14             MR. IWREY:  Since Rush is listed, for example, as a
15   Ford dealer and there were Ford dealers on there.  The dealer
16   settlement notice also went to Freightliner dealers but that
17   was not disclosed by the dealers in its affidavit, I'm sure
18   they could answer.
19             THE COURT:  Okay.
20             MR. IWREY:  Rush's only argument in opposition to
21   our motion here is that the members of the punitive Rush
22   class are somehow not automobile dealers.  As I will discuss,
23   Your Honor, that argument frankly is nonsense for a number of
24   reasons.  First, it is completely inconsistent with the
25   Court's own definition of the term automobile dealers.

1  Second, Rush relies on a completely fabricated dividing line

2  based on vehicle weight to define what is and isn't an

3  automobile.  That magic dividing line has zero support in the

4  record.  Furthermore, as we will see, that dividing line

5  would have the absurd result of creating overlapping classes

6  because it would mean that Rush class members are in the

7  dealer settlement and members of the dealer settlements would

8  be in the Rush punitive class, and some dealers would

9  actually be nowhere, not even in this MDL, according to

10  Rush's definition.

11       Third and perhaps most confusingly, given its

12  contrary stance, Rush publicly portrays itself as an

13  automobile dealer.  Rush intentionally filed this action

14  within the In re: Automobile Parts Antitrust Litigation.  How

15  can it possibly say that its case has nothing to do with

16  automobiles or automobile dealers?  Subscribing to Rush's

17  view would threaten to throw a serious monkey wrench in

18  existing settlements and substantially hinder future

19  settlements in these cases and other parts cases.

20       I would like to take a few minutes to provide a bit

21  of background.  First, as you know, AutoLiv and TRW reached

22  separate settlement agreements with the dealer class on

23  May 30, 2014 and September 20, 2014.  As you can see in the

24  slide, in paragraph 10 of both settlement agreements the

25  settlement class was defined to include all automobile

1   dealers that purchased new vehicles containing occupant

2   safety systems, that's subclass two.

3           THE COURT:  But wouldn't that make sense that that

4   vehicle goes back to automobile dealers, automobile vehicles,

5   I mean, because you use one word and don't say automobile

6   vehicles?

7           MR. IWREY:  Automobile includes trucks, Your Honor,

8   and I will show you in the complaint why it includes trucks,

9   Your Honor.  As you will see in the next slide, these

10  definitions were taken from the dealers' consolidated amended

11  complaint.  In paragraph 90 of that complaint the dealers'

12  class -- punitive class was defined as all automobile dealers

13  that included vehicles or that had purchased vehicles

14  containing OSS.  If the dealers wanted to limit the

15  settlements to dealers of cars or SUVs or small trucks like

16  Rush claims they would not have used the broad term vehicles.

17  In fact, going back one slide, if you will, if they wanted

18  to -- back two.  If they want to exclude people from the

19  settlement, exclude types of vehicles, there is an exclusion

20  clause right here in this definition of the settlement class.

21          Instead, Your Honor, they use the broad term

22  vehicles but in addressing your question, Your Honor, the

23  dealers went a step further and explicitly defined the

24  vehicles to be all encompassing.  Note one on page 3 of the

25  complaint states that vehicles means any new vehicles

1    purchased by automobile dealers throughout the United States

2    including, but not limited to, sedans and most importantly

3    for this motion trucks and sport utility vehicles.  They did

4    not say large trucks, small trucks, they said trucks, and

5    trucks means trucks.  To imply a limitation here based on an

6    artificial dividing line contrary to the express language of

7    the agreement in the complaint is not permitted by Michigan

8    law.

9         The TRW and AutoLiv settlement classes were

10   preliminarily approved by Your Honor on July 8 and October 29

11   and a stay order was issued.  Just recently on December 7 the

12   Court granted final approval of these settlements and final

13   judgment dismissing all claims.  It is our position that the

14   Rush dealer plaintiffs and their proposed class are all

15   members of the classes that were approved in these

16   settlements, so their separate claims are now stayed and

17   precluded.

18        THE COURT:  What do you think is the effect that

19   the auto dealers didn't object when Rush came in and filed

20   their own suit and had their own lead counsel, why do you

21   think that happened?

22        MR. IWREY:  We weren't -- first of all, we were not

23   parties to the case at that time, number one.  Number two, as

24   you know, Your Honor, lots of arrangements are made between

25   different classes on the plaintiffs' side.

1    THE COURT:  Yeah, but this is more than an

2    arrangement, this is a formal filing of a pleading.

3    MR. IWREY:  I understand, and probably at that

4    time -- I can't -- I can't tell you why the dealer plaintiffs

5    did not object.  Certainly if I were there I would have

6    objected based on the settlements, but at that time OSS was

7    not part of the claim -- was not part of the Rush actions at

8    this time.

9    THE COURT:  Was not part of the Rush actions?

10   MR. IWREY:  OSS was not in there when the Rush

11   plaintiffs sought to be appointed as class counsel.

12   THE COURT:  Well, they filed for what, wire harness

13   and bearings?

14   MR. IWREY:  They filed first for wire harness --

15   MR. PARKS:  First for bearings.

16   MR. IWREY:  First for bearings, and then next for

17   wire harness, and then months and months later, approximately

18   11 months after preliminary approval of the settlements, they

19   filed for OSS, and it could be for the cases that have not

20   yet been settled and where classes have not been approved

21   they may be able to amend so the classes would be consistent

22   with each other, but because our settlement agreements were

23   signed and approved by Your Honor they are sort of fixed, so

24   for the other cases it may be just a matter of amending, but

25   for here where our classes were fixed the stay order and the

```
 1    preclusion order and the final settlement applies.
 2              THE COURT:  Well, wait a second.  The settlement
 3    classes were fixed in May and September?
 4              MR. IWREY:  When the settlement agreements were
 5    signed.
 6              THE COURT:  Right.  And after that -- wasn't it
 7    after that that Rush then filed their complaint?
 8              MR. IWREY:  No, after that Your Honor approved --
 9              THE COURT:  Oh, it was in August that they filed
10    their complaint, Rush filed?
11              MR. IWREY:  I think it was approximately June of
12    2015.
13              THE COURT:  I've got August of 2014, what was that?
14              MR. IWREY:  August of 2014 may have been wire
15    harness.
16              THE COURT:  Wire harness?
17              MR. IWREY:  Yeah.
18              THE COURT:  Rush filed wire harness?
19              MR. IWREY:  Yeah, but the complaint here --
20              MR. PARKS:  I believe we filed the complaint in OSS
21    on June 5th, 2015, and, Your Honor, I believe you are correct
22    that we filed probably bearings as the initial filing some
23    point in 2014, later 2014.
24              THE COURT:  Okay.
25              MR. PARKS:  And wire harness was shortly
```

1   thereafter.

2          THE COURT:  Okay.

3          MR. IWREY:  So frankly TRW and AutoLiv present

4   unique circumstances because the classes were fixed and also

5   preliminarily approved before Your Honor long before --

6   11 months before the complaints were filed by Rush in OSS, so

7   that's why it is somewhat unique.

8          The next item, I would like to look -- address

9   Rush's argument, it is only argument that they are not

10  automobile dealers.  First, let's look at your -- the Court's

11  own definition of the term automobile dealer.  On

12  September 23, 2015 Your Honor issued an order that authorized

13  the sending of a notice to an -- of a number of dealer

14  settlements, I recall there were around ten, including TRW

15  and AutoLiv.  The notice was submitted to the Court and sent

16  by the dealers, but it was issued in the name of this Court

17  as required by Rule 23.  That notice appears in docket entry

18  110 in Case No. 0602.  The notice was directed to, as you

19  will see in the highlights, dealers who during the time

20  periods -- the relevant time periods purchased a vehicle that

21  contained one or more of the following parts and that

22  includes OSS.

23          The notice specifically defined the term dealer and

24  automobile dealer as follows:  An entity or person authorized

25  to engage in the business of selling or dealing in new

1    vehicles at retail in the United States.  So their dealer is

2    specifically tied to vehicles and vehicles is used in the

3    broadest sense, so it would be any entity that sells any

4    vehicle.  There was no limitation about vehicle types, and

5    this is entirely consistent with our position that automobile

6    dealer was not intended to limit the persons or entities in

7    the dealer classes based on what vehicles they sell, rather

8    by definition an automobile dealer is a dealer of vehicles

9    particularly if you use the term automobile or automotive,

10   self-propelled or motorized vehicles.

11        In the Court's final approval order and in the

12   final fairness hearing Your Honor specifically noted that the

13   notices were, quote, in plain and easily understood language

14   and, quote, well informed the recipients of what was going

15   on.  I cite the approval order, again, in this case, 0602, at

16   paragraph 7, and the November 18th transcript at page 36.

17   Given this easily understood language it is obvious that any

18   entity that sold new vehicles was included in the settlement

19   class.

20        Now Rush concedes that what it is selling is

21   vehicles.  Rush is an entity and therefore by definition it

22   fits within the Court's definition of automobile dealers.

23        THE COURT:  Is it consistent with the auto dealers'

24   position?

25        MR. IWREY:  Not in the affidavit that was estimated

1   a year --

2           THE COURT:  Mr. Cuneo's affidavit?

3           MR. IWREY:  Mr. Cuneo's affidavit that was

4   submitted a year after the settlement agreements were

5   negotiated and certainly, I will get to that, certainly

6   inconsistent with the position that the automobile dealers

7   took in the settlement agreements and throughout the course

8   of litigation in this case.

9           THE COURT:  Okay.

10          MR. IWREY:  And used somewhat equivocal language as

11  I will note.

12          So what does Rush argue?  Now that we know how the

13  Court defined the term automobile dealers let's look at what

14  Rush argues is an automobile dealer.  Rush's punitive class

15  is defined of dealers of medium duty, that's class 4 -- not

16  classes in class action but class 4 through 7 medium-duty

17  trucks and heavy-duty class 8 trucks and other vehicles such

18  as buses, commercial vehicles, and then they exclude

19  automobiles, light trucks, vans, SUVs sold by automobile

20  dealers.

21          THE COURT:  Obviously they were trying to

22  distinguish themselves from the auto dealers?

23          MR. IWREY:  They were obviously trying cut themself

24  a piece of the pie in an already settled case.  It fails.

25  Rush wants the Court to believe that there is some magical

1  line between its class and the dealers; settlement class

2  based on size and types of vehicles purchased and sold.  This

3  is inconsistent with the dealer complaint.  As you recall in

4  footnote one it said any vehicles, and it said trucks.  It

5  didn't say large trucks, it didn't say small trucks, but all

6  trucks.  It is also inconsistent with the Court's definition.

7          Let's take a closer look at this --

8          THE COURT:  Did you provide information about these

9  trucks in discovery?

10          MR. IWREY:  Absolutely -- well, we didn't get to

11  the discovery because we settled, but in the cooperation

12  provision with the auto dealers and in the settlement

13  negotiations TRW provided data about all of its sales, not

14  limited to any vehicles, all of its sales.

15          So recall the dealer complaint talked about trucks

16  without any limitation, but what Rush claims is trucks really

17  only means certain trucks, more specifically Rush suggests

18  that the settlement classes in dealer complaints somehow

19  didn't include class 4, 5, 6, 7, 8 trucks.  Again, that

20  definition is nowhere in the record in the dealer case.

21          Let me put some more meat on the bones just to show

22  how implausible this distinction is.  The class numbers, that

23  is class 4, 5, 6, 7 and 8 referred to by Rush, are

24  established by the Federal Highway Administration and based

25  on something called gross vehicle weight rating, which means

1    the vehicle curb weight plus the cargo capacity.  So class 1

2    through 3 trucks are rated at 14,000 pounds and below; class

3    4 through 8 trucks are rated at 14,001 pounds and more.  So,

4    for example, a class 4 truck is 14,001 pounds to

5    16,000 pounds, a class 5 is 16,001 pounds through 19,500, and

6    so on.  So somehow there is this magical line of trucks at or

7    below 14,000 pounds which Rush says aren't trucks but are

8    automobiles, and those rated at class 4 and above 14,000

9    pounds that Rush says aren't automobiles.

10            THE COURT:  Do any of the named plaintiffs sell

11   these class 4 to 8 trucks?

12            MR. IWREY:  Yes, Your Honor -- any of the named

13   plaintiffs in which case?

14            THE COURT:  In the ADP case?

15            MR. IWREY:  Yes, Your Honor, absolutely.  We

16   provided you evidence of this, one of the named plaintiffs --

17            THE COURT:  You talked about one dealership up

18   here.

19            MR. IWREY:  That is a class member, a member of the

20   auto dealer class that sells class 8 Ford trucks rated at

21   37,000 pounds, and another dealer, a named dealer, this is

22   those that we know about, I would contend that most dealers

23   do sell class 4 and above trucks but the one we were able to

24   find out is Lee Summit, which is one of the largest named

25   plaintiffs, and Lee Summit happens to sell that's a

1    Dodge 5500 truck that is rated at 18,000 pounds, a class 4 --

2    excuse me, maybe a class 5.

3              MR. PARKS:  Class 5.

4              MR. IWREY:  It is a class 5 truck.  Thank you.

5    That is a named plaintiff that sells one of the trucks.

6              THE COURT:  And because they sell these trucks does

7    that mean necessarily they are included in the class?  I

8    mean, you know, you might have a class of Honda dealers but

9    the dealership might also sell -- I don't know --

10             MR. IWREY:  They sell --

11             THE COURT:  -- Toyotas.

12             MR. IWREY:  I'm sure Lee Summit sells all types of

13   vehicles as you will see; Chrysler, Dodge, Jeep and Ram.  The

14   problem is it defines it as dealers that sell vehicles.  If

15   you use Rush's definition, they are a truck dealer that sells

16   vehicles so they are in the Rush class if you use the dealer

17   definition, so the Rush line makes no sense, it is going to

18   have overlapping classes.  But more -- also just as critical,

19   this magic line, this 14,000 pound line, appears nowhere in

20   the dealer complaint and frankly nowhere else in the record.

21   Recall that the dealer complaint again says any new vehicles

22   including, but not limited to, trucks, that's all trucks.

23   The complaint talks about claims relating to trucks and

24   vehicles and we settled on these broad words which are

25   conclusive evidence of our intent under Michigan law.  We

1    would have rejected anything else.

2          And to talk about Mr. Cuneo's affidavit.  Your

3    Honor, I was there, I negotiated the TRW settlement.  There

4    was never any discussion of this magical 14,000 pound line,

5    there was never a discussion of the Federal Highway

6    Administration truck classes.  There was never a discussion

7    of truck weights.  There was no discussion of any limitation

8    about the types of vehicles or the types of dealers covered.

9    Again, we --

10          THE COURT:  You couldn't have discussed Rush

11   because you didn't know about it?

12          MR. IWREY:  We didn't know about it, that's exactly

13   right.  I will tell you if they -- I know, I deal in the

14   automotive industry all the time, I know what a vehicle is, I

15   know what an automobile is, they are very broad terms, and

16   what matters most are the words in those documents.  If they

17   came back and said no, we are only talking about small trucks

18   I would have said nothing doing.  So Rush can't come in after

19   the settlements are signed and approved by the Court and now

20   claim that the Court should provide a different magical line

21   definition that is nowhere stated in the record and

22   contrary --

23          THE COURT:  Wait a minute.  So if you included

24   everything and automobile dealers only included automobile

25   vehicles of less than a certain weight, so did you have a

1    meeting of the minds then?

2         MR. IWREY:  We absolutely did because the meeting

3    of the minds are expressed in the clear words.  The fact that

4    one party may have an irrational understanding after the

5    fact, but I will show you evidence that they didn't have that

6    understanding in contemporaneous positions that they took.

7    We did, in fact, have a meeting of the minds.  The Rush

8    dealer -- excuse me, the auto dealers, they have known about

9    this motion all the time, if they wanted to cradle our

10   settlement they would have came in and said there is no

11   meeting of the minds but they stood before your court -- the

12   Court last month and sought final approval.  And remember,

13   Your Honor, that provision that's specifically mentioned in

14   the judgment, the motion that we are arguing here today, so

15   the only thing that might matter is possibly more notice but

16   there was a meeting of the minds and it was finally approved

17   by the Court.

18        Rush's response I think concedes our point because

19   they cite at page 10 that defines the term automobiles as to

20   the term used in the OSS complaint at paragraph 2.  That

21   paragraph makes reference to, quote, automotive vehicles and

22   further defines the term vehicles to be all new vehicles

23   including, but not limited to, trucks.

24        Another reason why Rush's position is invalid is,

25   of course, the definition of the phrase automobile dealers

1    that was specified by the Court in the Court-issued notice,

2    again, that was submitted by the dealers.  Rush can't get

3    around this definition.  The Court's notice made --

4          THE COURT:  Wait a minute.  I want to go back to

5    that definition.

6          MR. IWREY:  Sure.

7          THE COURT:  Tell me again where you said that

8    definition is?

9          MR. IWREY:  It is slide number six.

10          THE COURT:  But when you were quoting you said

11    including -- I thought you said something about including

12    trucks?

13          MR. IWREY:  That was Rush's -- excuse me, that was

14    the dealers' definition in the dealer complaint and that is

15    paragraph 90 of the dealers' complaint, slide 4.

16          THE COURT:  Slide 4?

17          MR. IWREY:  Yes, including, but not limited to,

18    trucks.  Your Honor, seeing that it said any vehicles and

19    trucks there is no way that the dealers contend that there

20    was any limitation.  Again, when the dealers submitted the

21    definition, the plain English definition, to your court, they

22    didn't put any limitation on the term vehicles.

23          Rush attempts to define the word automobile out of

24    context and it is not supported by the dictionary termed

25    definition.  The phrase we are defining here is automobile

```
 1    dealer.  When used as an adjective automobile it is
 2    undisputed that the dictionaries define it as of or relating
 3    to self-propelled vehicles, that's consistent with our
 4    definition in this case.
 5              Rush cherry-picks noun definitions of automobile
 6    dealers but even if you believe those definitions they
 7    provide no support for the 14,000 pound dividing line and
 8    Rush cites no definition that says an automobile is something
 9    with a gross vehicle weight rating of 14,000 and above, that
10    it is a truck, and Rush's definition is not supported by the
11    record.
12              Now, even if we go beyond the record, and this is
13    really interesting, Your Honor.  If we go beyond the
14    record --
15              THE COURT:  Wait a minute.  When we go to those
16    definitions do we include other vehicles like --
17              MR. IWREY:  Motorized.
18              THE COURT:  Riding mowers, what do you call them?
19    Riding mowers, you know, those big things?
20              MR. IWREY:  That is a motorized self-propelled
21    vehicle but probably beside the point because those don't
22    really have seat belts or the steering wheels or air bags so
23    probably not an issue.
24              THE COURT:  Not in this instance.
25              MR. IWREY:  Right, same with mining equipment,
```

1    probably not an issue.  Obviously, you know, trucks are going

2    to be the big issue.

3          So let's look at how Rush portrays itself to the

4    public.  Let's look at Rush's annual report, this is its 2014

5    annual statement.  It says that its dealerships are motor

6    vehicle dealers and cites to the Automobile Dealers Day in

7    Court Act.  Looking at the Automobile Dealers Day in Court

8    Act the definition in that statute means any person,

9    partnership, corporation, association, et cetera --

10   continuing on -- engaged in the sale or distribution of

11   passenger cars, trucks or station wagons.  Definition

12   includes all trucks.  In fact, the Carole Kenworth truck case

13   that we cited in our initial brief holds that the very

14   largest class A trucks are, in fact, automobile dealers under

15   the act.

16         Rush in its response says the act doesn't mean that

17   trucks and equipment are automobiles, I'm quoting its

18   response, and I would agree with that, Your Honor, but that's

19   besides the point.  The act doesn't define the term

20   automobiles at all.  The term at issue here is automobile

21   dealers, not automobiles, and the act does define that term

22   to mean a person or entity that sells trucks, and that would

23   include the Rush punitive class.  So based on that definition

24   and based on the Rush annual report the class consists of

25   automobile dealers and are covered by settlement, but that's

```
 1   not all.
 2           Rush admits, and this is in discovery that was
 3   produced in the bearing case, and Mr. Parks is allowing me to
 4   read this for the record.  There was an interrogatory that
 5   asked to identify all trade and regular press that you read
 6   occasionally or routinely and any trade associations to which
 7   you belong.  Rush's answer:  Subject to the objections and
 8   general objections above, plaintiff states that Rush
 9   Enterprises, plaintiff's parent corporation, is a member of
10   the following organizations and receives publications
11   distributed by these organizations; Alabama Dealers
12   Association -- the Alabama Dealers Association of Alabama,
13   the Arizona Auto Dealers Association, Arizona Truck Dealers
14   Association, California New Car Dealers Association, Colorado
15   Automobile Dealers Association, Florida Automobile Dealers
16   Association, Georgia Automobile Dealers Association.  You get
17   the point, Your Honor, it lists over 20 automobile dealers'
18   associations and significantly it also lists the National
19   Automobile Dealers Association and the American Truck Dealers
20   Association.  The National Automobile Dealers Association and
21   these state associations represent as they claim dealers of
22   cars and trucks.  Cars and trucks are subsets of automobiles.
23           Rush tries to say that there is some significance
24   to its membership in the American Truck Dealers Association
25   and I agree, that's because the American Truck Dealers
```

1    Association is simply a subdivision within the American

2    Automobile Dealers Association.  Truck dealers are a

3    particular type of automobile dealers but they are still

4    automobile dealers, and as I mentioned before, Rush is a

5    member of the National Automobile Dealers Association.

6              Excuse me.  May I grab a drink, Your Honor?

7              THE COURT:  Yes.

8              MR. IWREY:  Thank you, Your Honor.

9              Rush submits the parole evidence in support -- in a

10   response in the form of the declaration by dealers' counsel.

11   This should not be considered given that the language of the

12   dealer and settlement agreements -- the dealer settlement

13   agreements is plain and ambiguous and does not permit Rush's

14   magical dividing line.  The law is quite clear that parole

15   evidence cannot be used to prove an intent different from the

16   plain meaning of the document, and recall, Your Honor, in

17   responding to the notice held specifically that that was

18   plain and easily understood English.  I will cite to

19   Burkhardt, B-U-R-K-H-A-R-D-T, vs. Bailey, 680 Northwest

20   Second 453, at 454, and Harbor Park Market vs. Gronda,

21   G-R-O-N-D-A, 743 Northwest Second 585, at 589.

22             Let's take a look specifically at the declaration.

23   It states that the dealers, quote, did not understand the

24   term automobile dealer in the AutoLiv and TRW settlement

25   agreements to include dealerships of, among other things,

 1    medium or heavy-duty trucks or the other vehicles.  That's

 2    really interesting language.  They said we didn't understand,

 3    they didn't say that automobile dealer doesn't include those

 4    but we didn't understand, and the declaration is contradicted

 5    by the evidence.

 6         First of all, the declaration is not

 7    contemporaneous evidence of what was intended when the dealer

 8    agreements were signed.  They were made a year after the

 9    settlement agreements were finalized, and apparently and

10    after our motion obviously and apparently only after some

11    behind the scene communication between dealers' counsel and

12    Rush's counsel.

13         Second, prior and subsequent communications to this

14    Court by dealers' counsel contradict this declaration.  First

15    of all, as you recall, the notice submitted to the Court for

16    the dealers' settlements did not have this magical line of

17    14,000 pounds or any limitation.  In fact, nothing anywhere

18    else in the record in the dealer case was this limitation set

19    forth.  You would think that if the dealers did not intend

20    their class to include these big class 4 trucks and above

21    they would have said it to the Court, they would have said it

22    to me, they would have said it to the other defendants, they

23    would have said it in their complaints or their settlement

24    agreements, or they would have said it in their notice, they

25    didn't say it anywhere.  To the contrary --

1          THE COURT:  But they didn't object to the truck and

2    equipment plaintiffs coming in as a punitive class, I mean --

3          MR. IWREY:  They didn't object.

4          THE COURT:  -- it seems like they recognized it?

5          MR. IWREY:  But the settlements weren't finalized

6    and again we weren't present and one never knows what goes on

7    among counsel, and it could be that -- you will notice, Your

8    Honor, also in the new complaints that --

9          THE COURT:  We talked about it at an MDL

10   conference.  I mean, I don't know how we can talk about this

11   and this didn't come up?

12         MR. IWREY:  Well, fortunately or unfortunately I

13   wasn't there, and the new complaints, and I am sure you will

14   see the amendments, the new complaints that are filed at

15   least by the end payors has some very specific definitions of

16   vehicles.  So I would expect now that this issue, this

17   limited issue involving TRW and AutoLiv, is brought up, there

18   may be some separation in the class, that separation can't

19   happen after a settlement agreement is signed and approved by

20   the Court, it is too late.

21         There have also been -- this is interesting, Your

22   Honor.  In our notice of supplemental authority that we

23   submitted two weeks ago the dealers did, in fact, represent

24   explicitly to the other defendants in this MDL that the types

25   of vehicles that are in the Rush case are included in the

1    dealer case.  They sent a letter on March 31st, 2014 to the

2    wire harness defendants.

3            THE COURT:  And that was the direct purchasers'

4    order?

5            MR. IWREY:  No, no, Your Honor, it wasn't.  On

6    March 31st that letter was signed by all counsel.

7            THE COURT:  Let me take a look at that.

8            MR. IWREY:  I think that's Exhibit Number 1 to our

9    notice of supplemental authority.  It was signed by all

10   counsel including dealers' counsel.  We could provide you --

11   here we go, if you look at the fourth page of that exhibit it

12   includes Mr. Moskovitz, who is the direct purchaser,

13   Mr. Williams, who as you know is the end payor, and

14   Shawn Raiter, who is the auto dealer.

15           THE COURT:  The fourth page of that?  Hold on.

16           MR. IWREY:  Exhibit A, I'm sorry.

17           THE COURT:  I have Exhibit A but I only have one.

18           MR. IWREY:  There is a redacted --

19           THE COURT:  I don't have the redacted.

20           MR. IWREY:  Okay.  I can show you.

21           THE COURT:  You can tell me, I believe you.

22           MR. IWREY:  At the bottom of the fourth page it has

23   the signature lines.

24           THE COURT:  So when it says in the letter, the

25   March 31st letter, the letter is sent on behalf of direct,

1    end payor and automobile plaintiffs?

2          MR. IWREY:  Yes.

3          THE COURT:  And you're saying each of them signed?

4          MR. IWREY:  Each of them signed, and it said that

5    plaintiffs' classes regard the case to cover products sold to

6    any vehicle manufacturers including, for example, the

7    producers of commercial trucks and recreational vehicles.  It

8    squarely rebuts and, in fact --

9          THE COURT:  Is there a separate definition of

10   commercial truck?

11         MR. IWREY:  I'm sure there are --

12         THE COURT:  I'm learning more about these than I

13   ever wanted to know but go ahead.

14         MR. IWREY:  I think the Court could use fewer

15   definitions of terms like vehicles and trucks, but commercial

16   trucks certainly means -- certainly includes the larger

17   trucks that are included in the Rush punitive class.  I can

18   also tell you that the discovery requests that were the

19   subject of this letter didn't talk about passenger cars and

20   light trucks, it said all documents relating to prices of

21   parts for motor vehicles, all documents relating to impact on

22   parts or prices for parts sold to motor vehicles or vehicles.

23   They were very broadly worded.  So contemporaneously they

24   were saying give us everything, that's what these cases

25   involve.  The later letter that we sent -- that we included

1    that also gave the statement that it is not limited to --

2    excuse me for one second.

3            THE COURT:  That's the one that is from the direct

4    purchasers?

5            MR. IWREY:  Yes, it said it is broader than

6    automobiles and includes wire harness products sold for

7    manufacture into any motor vehicle.  That was only signed by

8    the direct purchasers and Ford because at the time the

9    recipient of this letter had settled or at least preliminary

10   settled with the end payor and automobile dealers but it

11   still makes reference to the term class plaintiffs and class

12   plaintiffs as used in a prior letter includes everybody.  So

13   it is clear from both of these letters that there was no

14   restriction when it came time to defining what their case was

15   about back then.

16           Finally, Your Honor, not only is the Rush magic

17   dividing line not supported by the record or the extrinsic

18   evidence, when one looks at the facts it leads to absurd

19   results.  Rush says in its response that they are distinct

20   dealers and crafted its class to avoid overlaps.  This is

21   wrong.  As we've seen, the dealer class includes all trucks

22   and vehicles, so it is a hundred percent overlap.  Let's look

23   at the facts even if we look at this 14,000 pound dividing

24   line the overlap doesn't disappear.

25           Rush contends that a dealer that sells light trucks

 1   is an automobile dealer.  Well, guess what, here is what Rush

 2   says in its website.  When it comes to light- and medium-duty

 3   trucks no one matches the inventory of Rush Truck Centers.

 4   That's not all.  Rush heavily promotes the sales of the

 5   Ford F-150, a legendary vehicle around here, which is a

 6   light-duty class 2A truck that is rated at 14 -- much less

 7   than 14,000.  So even under Rush's magic dividing line Rush

 8   is, in fact, an automobile dealer.

 9        Now let's look at the flip side.  As we have seen,

10   the members of the dealer class sell class 4 through 8

11   medium- and heavy-duty trucks that are rated above 14,000

12   pounds, and this is the Lee Summit slide I showed you, and we

13   made reference to the Bob Maxey slide.  This is Bob Maxey, a

14   member of the dealer settlement class that is just up

15   Jefferson from this Court that sells a massive class 8 truck

16   rated at 37,000 pounds.  So what does this mean?  Under

17   Rush's own definition Rush and the members of its class are

18   within the settlement classes, and many members of the

19   settlement classes are within the Rush punitive class, that

20   makes no sense.

21        There is no sense for another reason.  Rush says at

22   page 15 of its brief that class 3 trucks are medium duty but

23   they are not a member of the Rush punitive class because the

24   Rush punitive class includes class 4 and above trucks.

25   According to Rush only light-duty trucks are covered by the

1    settlement agreements, so if you believe Rush's dividing line

2    definition dealers of class 3 trucks are not in this MDL at

3    all, they are nowhere.

4         Long before the cases were filed our settlement

5    classes were approved by the Court and the Court stayed all

6    further litigation.  There is simply no basis to carve out

7    these -- to carve out a new settlement class or a new

8    punitive class from a class that is already settled, and if

9    Rush thinks it is unfair they have the opportunity to opt

10   out.

11        So in summary, Your Honor, our position is

12   supported by the plain meaning of the dealer settlements and

13   the dealer complaints, 100 supported -- 100 percent supported

14   by the plain English definition of automobile dealer that was

15   approved and already set out to the Court and to thousands of

16   people, and our position is 100 percent supported by the

17   contemporaneous statements and actions by the Rush plaintiffs

18   and the dealers.

19        On the other hand, this 14,000 pound dividing line

20   has no support from the documents, no support from the

21   dictionary, no support from the statutes and dictates absurd

22   results with overlapping classes.

23        And there is another reason.  Your Honor, this

24   notice went out to 16,000 entities and 100,000 e-mails, it

25   says it covers entities that are authorized to engage in the

1    business of selling vehicles at retail.  Wouldn't anyone who

2    sells vehicles understand that they are covered by these

3    settlements?  Of course they would.  If you allow Rush to

4    carve out a class here you would open up other floodgates for

5    other self-defining classes.  For example, will there be a

6    new class of recreation vehicle dealers?  Would there be a

7    new class of off-road and utility vehicle dealers?  This

8    problem will not only impact OSS settlements but it would

9    potentially impact other parts cases including the 17 cases

10    that have already settled with the dealers.  It would cause

11    this already sprawling litigation to drag on longer and

12    greatly complicate future settlements.

13          We ask that the Court enforce the simple plain

14    English definition that it already sent out.  Its result is

15    dictated by the law, and for this reason we respectfully

16    request --

17          THE COURT:  Let me ask you?

18          MR. IWREY:  Sure.

19          THE COURT:  The 17 other cases that you are

20    referring to that have been settled --

21          MR. IWREY:  Yes.

22          THE COURT:  -- are you saying that if this Rush

23    class is recognized then in all of those parts Rush -- now

24    Rush is only sued in the three parts, right?

25          MR. IWREY:  Thus far.

1              THE COURT:  Thus far.

2              MR. PARKS:  Your Honor, we are now in six because

3    we filed a starters alternators complaint, if you count those

4    separately, and we filed a radiators, but you are correct in

5    the broader proposition.

6              THE COURT:  Okay.  So if there is some settlement

7    in one of these six parts, and I don't remember who settled

8    with who, but if there are settlements with one of these six

9    parts then now Rush can come in and say but we are not

10   included in that settlement?

11             MR. IWREY:  That's right.

12             THE COURT:  And --

13             MR. IWREY:  And it is not just Rush but they see

14   that you can carve out a settlement that says dealers of

15   vehicles and then motorcycle dealers, recreational vehicle

16   dealers, whatnot, and they will all come in.  That's why when

17   we negotiated this settlement we had the broad terms that

18   were used in the complaint.

19             THE COURT:  Okay.

20             MR. IWREY:  Thank you, Your Honor.

21             THE COURT:  Thank you.  Okay.  Mr. Parks, what do

22   you have to say about this?

23             MR. PARKS:  Something a little different I think,

24   Your Honor.

25             THE COURT:  Now for the other side.

 1          MR. PARKS:  Your Honor, maybe we should start where

 2  the prior discussion ended on the topic of absurd results,

 3  and I think that what is particularly absurd is the notion

 4  that a dealer of farm implements, of tractors, for example,

 5  would be somehow considered an automobile dealer.  Under no

 6  normal interpretation of the English language that I'm aware

 7  of could a dealer of tractors be an automobile dealer, yet

 8  that's precisely what the artificially broadened definitions

 9  being asserted by the movants here would suggest.  Similarly,

10  a construction equipment dealer, a dealer of excavators and

11  bulldozers and Bobcat type vehicles, never sold car one or

12  SUV one would, according to the movants here in their

13  definitions, be an automobile dealer.  That simply makes no

14  sense.  Those are explicitly part of our class.

15          There has been a lot of discussions about trucks

16  and whether trucks are automobiles or not, and I will turn to

17  that in a second, Your Honor, but there is no regard for the

18  fact that our case is trucks and equipment.  In fact, there

19  was a mention of off-road utility vehicles as some new

20  entrant that could come in and add itself to the litigation.

21  Well, I would say that the off-road utility vehicle segment

22  is already covered by our trucks and equipment definition so

23  I don't see that happening.  So I think when we start talking

24  about --

25          THE COURT:  Could your trucks be separated from

1    your heavy equipment?

2            MR. PARKS:  Well, there will be dealers of heavy

3    equipment and dealers of trucks and they typically will

4    operate under different dealer agreements which --

5            THE COURT:  But my question is could the dealers of

6    the trucks be included in the settlement and the dealers of

7    the heavy equipment not?

8            MR. PARKS:  Well, I don't think you could do that

9    because the definitions that the movants are suggesting are

10   such that if you accept them they are so broadly worded that

11   they would include tractors and construction equipment and

12   mining equipment and so forth.

13           A brief word about that, by the way.  To use the

14   word of the riding tractor and counsel's response for the

15   movants was well, there aren't seat belts.  Well, there are

16   passenger restraints in mining equipment, there are passenger

17   restraints in tractors, there are passenger restraints in

18   construction vehicles, so this is an issue.  They can't just

19   sidestep it by saying there aren't seat belts in riding

20   mowers, that may be true but that doesn't really address the

21   broader point.

22           THE COURT:  And were your dealers given notice, I

23   mean, was Rush --

24           MR. PARKS:  Yes, Your Honor, I have received no

25   word from in-house counsel at Rush that they received notice

1    of this settlement so as far as I know they have not.  It

2    certainly was not provided to us as counsel for Rush.  I can

3    speak to the Freightliner issue briefly because I am

4    generally aware.  Freightliner in addition to selling medium-

5    and heavy-duty trucks sells what you might consider a very

6    souped-up pickup truck, it kind of looks like a truck but it

7    has kind of been shrunken down to maybe a Hummer-size vehicle

8    but it is the front of a pickup truck, it looks like an

9    actual truck just a much smaller version, and it has a bed on

10   the back like a pickup truck.  I suspect that has a lot to do

11   with why those dealers received notice because Freightliner

12   sells these smaller trucks.

13         Now, one of the things Mr. Iwrey said, that he's

14   very familiar with the automotive industry and he's been

15   around it a long time, I have as well, and I know from my

16   work and he probably does too, that the reason -- I can say

17   the reason we drew the dividing line where we did is because

18   we were aware that the dealer agreements, for example, for

19   Ford, or various General Motor brands where the products

20   include -- products manufactured by the company include big

21   trucks and much smaller passenger vehicles they have

22   different dealer agreements for those products.  If you are a

23   Ford car dealer you have the ability to sell light trucks

24   under the dealer agreement.  You need a separate dealer

25   agreement to sell Ford commercial trucks, and that's why we

1    drew the line where we did because in our experience the

2    class 3 trucks, although classified by the Federal Highway

3    Safety folks as a medium-duty product, I know that you can

4    typically go get an F-350 pickup truck at a Ford dealer

5    that's not a Ford truck dealer.  So the reason we drew the

6    line where we did is more of a function of the reality and

7    the space that the dealer agreements for the types of brands

8    that sell bigger commercial vehicles and passenger type

9    vehicles, cars and light trucks, SUVs, passenger vans and

10   that sort of thing.

11         THE COURT:  When you drew that line and you came in

12   the case after some settlements, did you have contact with

13   other -- with the auto dealers plaintiffs and say we are

14   doing this -- we are taking over all the cases over whatever

15   thousand pounds, did that happen?

16         MR. PARKS:  We didn't say that because we weren't

17   taking them over.  No one -- the reason we filed their claims

18   was because no one had asserted these claims yet in any of

19   these cases.  We did alert the plaintiffs' counsel for the

20   automobile dealers that those cases will be filed.  And

21   somewhat surprisingly, if you believe that their case already

22   included us, they raised no objection to us filing those

23   complaints and indeed stood by and supported our motion to be

24   named as lead class counsel in bearings and have incorporated

25   us in the proceedings.  Now, that's not the typical behavior

1    of plaintiffs' class counsel who don't usually really like

2    people horning in on their claims and taking part of their

3    class away.

4          THE COURT:  Well, could it be that they had already

5    settled with these defendants and they then say oh, we have

6    an opportunity here to get a greater share of the pie, in

7    other words, we only have to distribute this amongst

8    passenger vehicles versus trucks.

9          MR. PARKS:  I can't speak to that motivation but I

10   can say this, Your Honor, it is very interesting, there are

11   settlements in wire harness, there are settlements in

12   bearings with the automobile dealer plaintiffs, they haven't

13   come forward to file a motion like this and say wait a

14   second, all of this stuff about these truck classes, we

15   already settled those cases.  Now, you would think they would

16   if they thought that their settlements which were basically

17   the same as the settlement here with the example same type

18   class definition, you would think those defendants would have

19   plenty of motivation to come forward and object, they didn't,

20   they didn't object to our motion to be appointed interim lead

21   class counsel for the truck and equipment dealer class, they

22   didn't object and say we need to move to stay this proceeding

23   in bearings and wire harnesses because we have already

24   settled those cases.  Interesting they not only didn't

25   object, they have actually filed motions, as Your Honor knows

 1   because you're presiding over them right now, they filed

 2   motions to dismiss our complaint not on the grounds that it

 3   was taken care of by a settlement but on the grounds that it

 4   was untimely, and if it was untimely it must not have been

 5   part of the complaint filed by the automobile dealer

 6   plaintiffs because if it had been part of that we would have

 7   been timely, right, because we would have been within that

 8   class and we would have been entitled to the benefit of

 9   tolling in those cases.  So we are really actually finding

10   ourself on both ends of this in a negative way; we are

11   receiving motions from wire harness defendants saying you are

12   not in time, and here we are having a motion saying I'm

13   sorry, your case is already part of a settlement that has

14   happened.  Now, we can't be both, I don't see how we can be

15   both.

16        THE COURT:  Well, I wonder about the auto dealers,

17   the other auto dealers, what they are saying about this

18   motion.  I mean, they should have -- it is going to impact

19   them one way or the other in the future.

20        MR. PARKS:  We know what they are saying about this

21   motion because they have gone on record with a declaration

22   from Mr. Cuneo and said that he didn't understand that the

23   settlement included truck dealers or heavy equipment dealers.

24        THE COURT:  Well, that bothers me, he didn't

25   understand that, he was counsel?

1      MR. PARKS:  He was, yes.

2      THE COURT:  This counsel says it is clear we

3  understood it, and I asked the question is there a meeting of

4  the minds, and if there is not a meeting of the minds do we

5  set aside this settlement?

6      MR. PARKS:  Well, Your Honor, I don't -- I can't

7  speak to that, but I can speak to the fact that I would argue

8  exactly 180 degrees the opposite of what moving counsel

9  argues here.  The case says that the settlement class is

10  automobile dealers.  There's a lot of discussion of what

11  vehicles they purchased, and that includes truck, but the

12  defining characteristic for the class is automobile dealers,

13  so what is an automobile dealer?  They go through a series of

14  definitional machinations to get to the point of saying an

15  automobile dealer is any dealer who sells any self-propelled

16  vehicle but that can't possibly be logical because that

17  includes tractor dealers, includes bulldozer dealers and

18  that --

19      THE COURT:  Well that --

20      MR. PARKS:  -- includes mining equipment dealers.

21      THE COURT:  That's very true, but in the letter of

22  March 31st, 2014 there is a note specifically that it should

23  include -- this is on the wire harness, wire harness products

24  sold to any motor vehicle manufacturer including, for

25  example, commercial trucks and recreational vehicles.  Why do

1    you need that clarification?

2         MR. PARKS:  There is, Your Honor, and I will

3    explain a couple things about it.  First of all, the letter

4    does come from Mr. Moskovitz' letterhead and obviously was

5    signed by representatives of the three different groups

6    referenced in the first paragraph.  I would note that when

7    counsel made his presentation, counsel for the movants, he

8    used the phrase plaintiffs' classes regard the case to

9    include.  I don't know if he was meaning to quote from the

10   letter but what the letter says is class plaintiffs reiterate

11   that the definition of wire harness products should include

12   wire harness products sold to any motor vehicle manufacturer

13   and so forth.

14        Now, here is the thing, when you have got a group

15   of plaintiffs writing and they have asserted slightly

16   different breadth of claims, we know the direct purchaser

17   plaintiffs are including commercial OEMs in the commercial

18   vehicle OEMS in their definition, I believe they have an RV

19   dealer as a class representative as well, so obviously the

20   direct purchaser plaintiffs are specifically motivated to see

21   that the wire harness discovery is broad enough to include

22   those types of -- or products for those types of vehicles.

23   The letter doesn't distinguish between those variations and

24   that's understandably so, it was a group letter and

25   inevitably you would default to the broadest definition and

1    that's also in honor of your Court's directive to the parties

2    to try to deal with discovery on a consolidated basis.

3         They could have perhaps more accurately said well,

4    the direct purchaser plaintiffs want it for commercial

5    products, the auto dealers they don't need that broadly, but

6    in a joint letter like this and in the scope of a discovery

7    discussion and in the context of a case like this you

8    typically don't start dividing it up that way, and there is

9    nothing about this letter that says anything about the auto

10   dealer plaintiffs asserting claims on behalf of some broader

11   group.

12        I would also point that this -- point out my point

13   is about the second letter from June 10th that doesn't

14   involve the auto dealers at all and still the same definition

15   comes up, and that I think goes to the point that really what

16   is going on here is that you have got parties like Ford which

17   makes big trucks and cars, you have got parties like the

18   direct purchaser plaintiffs who are asserting claims on

19   behalf of cars OEMs and truck OEMs and they are -- and RV

20   OEMs, and they are simply pointing out that they want

21   discovery of that breadth.  To try to read into that letter

22   and then have it control this whole outcome of this dispute

23   including what was in a totally separate settlement agreement

24   that the auto dealer plaintiffs were really admitting on this

25   letter on Mr. Moskovitz' letterhead and basically which

 1    defaults to the broadest common denominator of discovery

 2    being sought by the parties that that somehow now means that

 3    the auto dealer plaintiffs really aren't being forthright

 4    when they say we thought our case was only about auto

 5    dealers, not truck dealers, not heavy equipment dealers, not

 6    farm implement dealers.

 7        I just don't think that's a fair interpretation of

 8    the letters, and I think it is a real stretch.  And if

 9    anything, Your Honor, I would argue it shows how weak the

10    movant's position is that they have to point to a letter like

11    this which has really nothing to do with anything here and

12    argue that's the grand silver bullet.

13        THE COURT:  What about in the dealership

14    consolidated class complaint where it has a footnote about

15    vehicles meaning including, but not limited to, sedans,

16    trucks and sport utility vehicles?

17        MR. PARKS:  I think that the point that moving

18    counsel is not focusing on is the earlier part of that

19    sentence where it says any new vehicles purchased by

20    automobile dealers, so we understand that there will be some

21    dealers who primarily sell automobiles who also have

22    franchise agreements to sell larger trucks, and we have seen

23    some examples of that that have been handpicked by the moving

24    party, that's understandable.  Similarly, you will have some

25    folks like certain Rush entities, not all, but certain Rush

1    entities that although they sell overwhelmingly heavy- and

2    medium-duty trucks they also have dealer agreements that

3    allows them to sell light duty pickups.

4         THE COURT:  So Rush could be in the auto dealer

5    plaintiffs' case and in its own case for heavy --

6         MR. PARKS:  Correct, certain of the Rush entities

7    could be in the auto dealer case because they sell light-duty

8    pickups, but there are many or vast majority of entities in

9    this case on behalf of the plaintiffs, the Rush entities,

10   don't even sell light-duty pickups, they only sell medium-

11   and heavy-duty trucks.

12        THE COURT:  So when they come to class definition

13   we will come to this particular issue more specifically?

14        MR. PARKS:  I think that's right, Your Honor, I

15   think that's exactly right.  But I think that it can be

16   sorted out, these aren't irreconcilable by any means.  An

17   automobile dealer is to me a dealer that sells primarily or

18   overwhelmingly automobiles, that's a very commonsense

19   definition to me.  There is a distinct thing, a truck dealer,

20   they sell primarily overwhelmingly trucks, and Rush falls

21   into that category for sure.  Then there are equipment

22   dealers who none of the prior discussion involves really who

23   sell tractors; there aren't a lot of tractor dealers who are

24   also selling sedans, there aren't a lot of bulldozer dealers

25   selling sedans.

```
 1              THE COURT:  Are there other large truck dealers
 2    besides Rush, I mean, how many of those are there?
 3              MR. PARKS:  There are many, many, many.
 4              THE COURT:  There are many of them.
 5              MR. PARKS:  I mean, their brands alone we are
 6    talking about Mack, Volvo, Kenworth, Peterbilt,
 7    International, Freightliner, Hino, UD, Ford, GM, and the list
 8    goes on.
 9              THE COURT:  And when you come to your class
10    definition you would include all of these, Rush's --
11              MR. PARKS:  Absolutely, and we name them
12    specifically in our complaint on the truck side.
13              THE COURT:  Okay.
14              MR. PARKS:  So I would also just address briefly
15    the notice that has been pointed to.  This is slide 5 --
16    slide 6, and I would just say that the notice is really a
17    function of a description of what the settlement agreement
18    says.  As I understand what a notice does, it is simply
19    telling the world that there has been a settlement and
20    informing the world of the terms of that settlement.  Now, I
21    think first of all the settlement agreement language
22    controls.  The notice is an effort to describe that, but to
23    the extent the notice because people weren't aware of this
24    issue or weren't sensitive to it isn't carefully worded,
25    that's fine.  I would also take issue with the idea that
```

1    anyone who read this language would realize -- for example, a

2    tractor dealer would read this and say, you know what, I'm an

3    automobile dealer for the purposes of this settlement.

4    Frankly I think they wouldn't.

5         I would be interested to know if any tractor

6    dealers were provided notice of this settlement and heavy

7    equipment dealers were provided notice.  And I think -- we

8    see how that turns out and I suspect it will turn out that

9    they weren't and I think it will show, Your Honor, that that

10   is a pretty clear insight into the definition to why the

11   definition is being offered up to try to justify this after

12   the fact now by these sole moving parties despite all the

13   other settlements, similar language, no one else has come

14   forward, only the movants here have come forward to make

15   these arguments, and I think the definitions they offer lead

16   to these nonsensical results which show you that that can't

17   possibly be the right definition.

18        The final word I want to offer about the notice is

19   the timing of the notice.  What's interesting is that the

20   notice language postdates the filing of our complaint.  I

21   think it was represented that the notice was transmitted I

22   believe it was in September of 2015, our complaint was filed

23   in June, so in the interim between the settlement and the

24   notice our complaint is filed, and then a motive arrives for

25   the parties, particularly the defendants, to use some broader

 1    language in the notice than was actually in the settlement

 2    agreement.  Uh-oh, didn't think about the fact that there are

 3    these other guys out there, I better get a broader notice

 4    language, make it real subtle, and then argue after the fact

 5    that the settlement we signed, which doesn't have the same

 6    language as the notice has, is broad enough and we will try

 7    to bootstrap it back in.  So I think the timing is

 8    interesting with that.

 9         I would offer this final point.  The class here in

10    the settlement agreement and in the plaintiffs' complaint --

11    the auto dealer plaintiffs' complaint is defined as

12    automobile dealers.  Through the various definitional

13    variations or interpretations offered by the movants here,

14    they have essentially tried to transform that language,

15    automobile dealer to motor vehicle dealer, but that's not

16    what the settlement says, and that's not what the complaint

17    said.  The complaint talks about automobile dealers, and we

18    have to be dealing with automobile dealers.  This effort to

19    try to say that, well, the Auto Dealer Day in Court Act

20    defines automobile dealers a certain way, okay if we are here

21    on an Automobile Dealer Day in Court Act claim, which we are

22    not.

23         To say that the National Automobile Dealers

24    Association has a subdivision, the American Truck Dealers, if

25    anything I think that supports our point that the truck

1    dealers are considered separate from automobile dealers and

2    several states have a similar distinction, but the reality is

3    many states aren't really big enough and there are not enough

4    differences in terms of lobbying, which is why those

5    organizations exist, to create a separate subdivision for

6    trucks.  So in Georgia where Rush has a dealership but

7    doesn't sell any light-duty trucks at all, it is still a

8    member of the Georgia Automobile Dealers Association because

9    the lobbying done by that organization on behalf of auto

10   dealers often has an incidental benefit to truck dealers.

11            So there's a lot of simple and innocent and

12   sensible explanations for why these automobile dealer groups

13   include trucks within them, it is typically among other

14   things because there are many, many more automobile dealers

15   and they create the resources and the population for these

16   industry organizations to go, and membership is sort of

17   neither here nor there.  My firm was a member of the American

18   Truck Dealers Association as an exhibiter at conferences, and

19   we attended the National Automobile Dealers Association

20   conferences as well, and it doesn't mean we are an auto

21   dealer or a truck dealer.  So the membership point I think is

22   a complete red herring, and if anything the fact that there

23   is an ATD subdivision points out the distinction that exists

24   between truck dealers and automobile dealers.

25            If Your Honor has any further questions I will be

```
 1    happy to address them?

 2              THE COURT:  No.  Thank you.  All right.  Mr. Iwrey,

 3    reply briefly.

 4              MR. IWREY:  I will reply on five or six points.

 5    Number one, with respect to the letter I would like to submit

 6    to the Court the discovery request in wire harnesses that

 7    was, in fact, the subject of that request.

 8              THE COURT:  All right.

 9              MR. IWREY:  Let's read what the requests were.  If

10    you look at page 2 -- I'm sorry, page 3, all documents

11    relating to OEMs, sales to their -- OEM sales to their

12    customer of vehicles and wire harness products, that's

13    request number 12.  Request number 13, all documents relating

14    to the impact of wire harness prices on motor vehicle prices.

15    So Mr. Parks was saying that we want to say automobile means

16    motor vehicle dealers, we are not making it up, it is right

17    here in the dealers' own documents.

18              Secondly, Mr. Parks says that he wants a

19    commonsense definition of what automobile dealer, a

20    commonsense definition of automobiles.  They don't provide a

21    commonsense definition that supports their line between heavy

22    and medium duty and light duty, it is not there.  And, in

23    fact, if you want to look at the common sense this is what

24    the National Automobile Dealers Association say they are,

25    they were founded in 1917.  They represent 17,000 new car and
```

1    truck dealers.  Automobile means car and truck, which is

2    consistent with the complaint, which is consistent with the

3    settlement agreement.

4         Mr. Parks admits that there is, in fact,

5    substantial overlap between the class members of the

6    settlement classes and the Rush punitive class.  You can't

7    say we can deal with it, that means that the class is poorly

8    defined.  You can't deal with that overlap.

9         Mr. Parks states that the notice provision that was

10   issued by the Court postdates the filing of the Rush

11   complaints.  He misstates that it was submitted by defendants

12   to the Court.  Your Honor, it was submitted by the auto

13   dealer plaintiffs to this Court as part of the motion to

14   disseminate class notice, it was not submitted by the

15   defendants.  And, in fact, the fact that it postdates the

16   complaint means that the truck dealers were aware of this

17   issue and were aware of the Rush complaint.

18        The other issue Your Honor asked about, notice and

19   whether it went to Rush, if you look at the motion for final

20   approval of the dealer settlement agreement it was published

21   very widely in extremely widely read publications, for

22   example, Crain's Automotive News, Auto Dealer Monthly, it was

23   posted on the websites including those on the National Auto

24   Dealers Association.  Can I approach the Court?  When I was

25   looking about what the National Auto Dealers Association is I

 1    found an article.  Look at what's at the top of that article,

 2    it is a banner ad advertising the existence of the auto

 3    dealers' settlement.

 4         So I think the notice is probably okay and if there

 5    is an issue about notice then the Court can certainly provide

 6    a supplemental notice period.  We don't think it is necessary

 7    but if the Court rules in our favor it is a supplemental

 8    notice, it is a very easy process, there are commercially

 9    available lists, and it can be sent out and we can meet and

10    confer with the automobile dealer counsel and get it out

11    likely before the next time we see each other again after the

12    holidays.

13         THE COURT:  Again I want to ask why do you think

14    the auto dealers have not objected to Rush coming on those

15    parts?

16         MR. IWREY:  I can't answer that.  There is likely

17    something behind the scenes, and it is not necessarily their

18    job to object but I can tell you that we would have objected

19    because of our closed and finalized settlement had we been

20    given the opportunity.

21         And the only other comment I would make, Your

22    Honor, in terms of the meeting of the minds there has been a

23    meeting of the minds, it was expressed in the plain wording

24    of the documents, and that's why the Michigan law is quite

25    clear that you can't come in after the fact with parole

```
 1   evidence that said we really didn't mean that.  We have
 2   contemporaneous -- if you want to look at it there is
 3   contemporaneous evidence of exactly what they meant and it is
 4   in the March 31st letter, it is in the notice, and it is in
 5   the statements that are made in the complaint.  Thank you,
 6   Your Honor, and happy holidays everyone.
 7            THE COURT:  Thank you, thank you both, and all of
 8   you, and happy holidays to you.  The Court will issue an
 9   opinion.  I guess the bottom line is this whole motion was a
10   surprise after the settlement but the Court will look at it
11   and issue an opinion.
12            MR. IWREY:  As was the Rush complaint.
13            THE COURT:  As was, yes.
14            MR. IWREY:  Thank you.
15            THE COURT:  Okay.  Thank you very much.
16            THE LAW CLERK:  All rise.  Court is adjourned.
17            (Proceedings concluded at 3:07 p.m.)
18                       —    —    —
19
20
21
22
23
24
25
```

*CERTIFICATION*

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of In re Automotive Parts Antitrust Litigation, Case No. 12-02311, on Monday, December 14, 2015.


*s/Robert L. Smith*
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan


Date:  12/17/2015

Detroit, Michigan