# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : Master File No. 12-md-02311<br>: Honorable Marianne O. Battani<br>: Master Gene J. Esshaki |
| In Re: Instrument Panel Clusters | : 2:12-cv-00200 |
| In Re: Fuel Senders | : 2:12-cv-00300 |
| In Re: Heater Control Panels | : 2:12-cv-00400 |
| In Re: Alternators | : 2:13-cv-00700 |
| In Re: Windshield Wipers | : 2:13-cv-00900 |
| In Re: Radiators | : 2:13-cv-01000 |
| In Re: Starters | : 2:13-cv-01100 |
| In Re: Ignition Coils | 2:13-cv-01400 |
| In Re: Motor Generators | 2:13-cv-01500 |
| In Re: HID Ballasts | 2:13-cv-01700 |
| In Re: Inverters | 2:13-cv-01800 |
| In Re: Fuel Injection Systems | 2:13-cv-02200 |
| In Re: Power Window Motors | 2:13-cv-02300 |
| In Re: Automatic Fluid Transmission Warmers | 2:13-cv-02400 |
| In Re: Valve Timing Control Devices | 2:13-cv-02500 |
| In Re: Air Conditioning Systems | 2:13-cv-02700 |
| In Re: Windshield Washer Systems | 2:13-cv-02800 |
| In Re: Spark Plugs | 2:15-cv-03000 |

| | |
|---|---|
| THIS DOCUMENT RELATES TO:<br>ALL AUTOMOBILE DEALERSHIP<br>ACTIONS | CONSOLIDATED AMENDED<br>COMPLAINT |

Plaintiffs Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers");

Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); V.I.P. Motor Cars Ltd. ("Plaintiff

V.I.P."); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Panama City Automotive

Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"); Rainbow Chevrolet, Inc., d/b/a Cutter

Chevrolet ("Plaintiff Rainbow"); Stoebner Holdings, Inc. d/b/a Honda Windward ("Plaintiff

Windward"); McGrath Automotive Group, Inc. ("Plaintiff McGrath"); Green Team of Clay Center

Inc. ("Plaintiff Green Team"); Lee Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham

**REDACTED**

("Plaintiff Topsham"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"); Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"); Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda ("Plaintiff Ancona"); Landers McLarty Lee's Summit Mo, LLC d/b/a Lee's Summit Chrysler Dodge Jeep Ram and d/b/a Lee's Summit Nissan ("Plaintiff Lee's Summit"); Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"); Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Bill Pearce Honda ("Plaintiff Pearce"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir"); Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota"); Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville"); Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); Apex Motor Corporation ("Plaintiff Apex"); Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Ramey Motors, Inc. ("Plaintiff Ramey");

**REDACTED**

Thornhill Superstore, Inc., d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); and Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland") (collectively "Plaintiffs"), file this Consolidated Class Complaint on behalf of themselves and all others similarly situated (the "Classes" as defined below).

Plaintiffs, on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment, and allege as follows:

## NATURE OF ACTION

1.     This lawsuit is brought as  a proposed class against Defendants (all as defined below and named and unnamed co-conspirators, manufacturers and/or suppliers of certain automotive parts defined below) globally and in the United States for engaging in a long-running conspiracy to unlawfully fix, raise, maintain, and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for these automotive parts. In 2013, then-United States Attorney General Eric Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. business, and U.S. consumers. As a result of these conspiracies, Americans paid more for the cars."

2.     As the ringleader, DENSO (defined below) coordinated this multi-automotive part conspiracy involving most of the largest automotive parts suppliers in the world. Plaintiffs paid artificially inflated prices for cars containing certain automotive parts as a result of

**REDACTED**

anticompetitive and unlawful conduct by DENSO and its co-conspirators.  The automotive parts cartel consisted of the following defendant groups, which are described in further detail below:

     a.     DENSO Corp., DENSO International America, Inc., DENSO International Korea Corp., DENSO Korea Automotive Corp., DENSO Products & Services Americas, ASMO Co., Ltd., ASMO North America, LLC, ASMO Greenville of North Carolina, Inc., ASMO Manufacturing, Inc., and ASMO North Carolina Inc. (collectively, "**DENSO**");

     b.     Aisan Industry Co., Ltd., Aisan Corp. of America, Franklin Precision Industry, Inc., and Hyundam Industrial Co., Ltd. (collectively, "**Aisan**");

     c.     Aisin Seiki Co., Ltd. and Aisin Automotive Casting, LLC (together, "**Aisin Seiki**");

     d.     Alps Automotive, Inc., Alps Electric (North America), Inc., and Alps Electric Co., Ltd. (collectively, "**Alps**");

     e.     Calsonic Kansei Corp. and Calsonic Kansei North America, Inc. (together, "**Calsonic**");

     f.     Continental Automotive Systems, Inc., Continental Automotive Electronics, LLC, and Continental Automotive Korea Ltd. (collectively, "**Continental**");

     g.     Delphi Automotive LLP and Korea Delphi Automotive Systems Corp. (together, "**DELPHI**");

     h.     Diamond Electric Mfg. Co., Ltd. and Diamond Electric Mfg. Corp. (together, "**Diamond**");

     i.     Keihin Corp. and Keihin North America, Inc. (together, "**Keihin**");

**REDACTED**

j.  Koito Manufacturing Co., Ltd. and North American Lighting, Inc. (together, "**Koito**");

k.  MAHLE Behr GmbH & Co. KG and MAHLE Behr USA Inc. (together, "**Mahle Behr**");

l.  Mikuni America Corp. ("**Mikuni**");

m.  Mitsuba Corp. and American Mitsuba Corp. (together, "**Mitsuba**");

n.  Mitsubishi Electric Corp., Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc. (collectively, "**MELCO**");

o.  Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., and Mitsubishi Heavy Industries Climate Control, Inc. (collectively, "**Mitsubishi Heavy**");

p.  NGK Spark Plugs (U.S.A.) Holding, Inc., NGK Spark Plugs (USA) Inc., NGK Spark Plugs Co. Ltd., and NTK Technologies, Inc. (collectively, "**NGK**");

q.  Robert Bosch LLC and Robert Bosch GmbH (together, "**Bosch**");

r.  Sanden International (U.S.A.) Inc. ("**Sanden**");

s.  Showa Denko K.K. and Showa Aluminum Corp. of America (together, "**Showa Denko**");

t.  Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc., and II Stanley Co., Inc. (collectively, "**Stanley**");

u.  Tokai Rika Co., Ltd. and TRAM, Inc. (together, "**Tokai Rika**");

v.  Toyo Denso Co. Ltd. and Weastec, Inc. (together, "**Toyo Denso**"); and

**REDACTED**

w.     Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp. (collectively, "**Valeo**")

(all as defined below and, collectively, hereinafter "Defendants or co-conspirators").

3.     DENSO and its co-conspirators manufacture, market, and/or sell automotive parts throughout and into the United States. DENSO and its co-conspirators (both known and unknown) agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids, and allocate the market and customers in the United States, and in addition specifically engaged in conduct targeting *at least* the following automotive parts: Instrument Panel Clusters, Fuel Senders, Heater Control Panels, Alternators, Windshield Wiper Systems, Radiators, Starters, Ignition Coils, Motor Generators, HID Ballasts, Inverters, Fuel Injection Systems, Power Window Motors, Automatic Transmission Fluid Warmers, Valve Timing Control Devices, Air Conditioning Systems, Windshield Washer Systems, and Spark Plugs (collectively, "Automotive Parts") (*see* **Appendix A**). The following charts identify the Automotive Parts with the corresponding Defendants.

**REDACTED**

# Parts & Manufacturers



**Instrument Panel Clusters**
Continental • Denso • Nippon Seiki • Yazaki

**Fuel Senders**
Denso • Yazaki

**Automatic Transmission Fluid Warmers**
Calsonic Kansei • Denso • T.RAD

**Power Window Motors**
Denso • Mitsuba

**Motor Generators**
Denso • Hitachi

**Ignition Coils**
Denso • Diamond Electric • Hitachi • Melco • Toyo Denso

**Inverters**
Denso • Hitachi

**Fuel Injection Systems (Inc. Air Flow Meters & Electronic Throttle Bodies)**
Aisan • Bosch • Denso • Hitachi • Keihin Mikuni • Mitsuba • Melco

**Valve Timing Control Devices**
Aisin Seiki • Delphi • Denso • Hitachi • Mikuni • Melco

**Air-Conditioning Systems**
Denso • Calsonic Kansei • MAHLE BEHR Mitsubishi Heavy • Sanden Showa Denko • Valeo

**Heating Control Panels**
Alps • Denso • Sumitomo Tokai Rika

**Windshield Wipers**
Bosch • Denso • Mitsuba

**Windshield Washer Motors**
Denso • Mitsuba

**Spark Plugs**
Bosch • Denso • NGK

**High Intensity Discharge Ballasts**
Denso • Koito • Melco Stanley Electric

**Radiators**
Denso • Mitsuba • T.Rad Calsonic Kansei

**Starters**
Bosch • Denso • Hitachi Mitsuba • Melco

**Alternators**
Denso • Hitachi • Mitsuba • Melco Bosch

**REDACTED**

# Parts Index



1. Heating Control Panels
2. Windshield Wipers
3. Windshield Washer Motors
4. Spark Plugs /Oxygen Sensors/ Air Fuel Ratio Sensors
5. Air-Conditioning Systems
6. High Intensity Discharge Ballasts
7. Radiators
8. Starters
9. Alternators

10. Fuel Senders
11. Instrument Panel Clusters
12. Automatic Transmission Fluid Warmers
13. Power Window Motors
14. Motor Generators
15. Inverters
16. Ignition Coils
17. Valve Timing Control Devices
18. Fuel Injection Systems (Inc. Air Flow Meters & Electronic Throttle Bodies)



**REDACTED**



**REDACTED**



9.      Defendants' massive and long-running conspiracy to unlawfully fix, raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Automotive Parts. The following illustrations depict the massive conspiracy led by DENSO involving    dozens of the largest automotive suppliers in the world.

10.     Defendants conspired to avoid competing with each other on the basis of price and to avoid taking business from each other. Among the means by which Defendants and their co-conspirators carried out their conspiracy were:

**REDACTED**



**The Conspiracy**

**Everyone's involved.**

REDACTED

## The Conspiracy



## Denso's at the center.

11.     The vehicles affected by DENSO's conspiracy include some of the most popular cars sold throughout the world and in the United States from the late 1990s to the present. These cars include, but are not limited to:

REDACTED

**Toyota Camry**

**Toyota Corolla**




**Honda Accord**

**Honda Civic**




**Honda CR-V**

**Mazda 6**




**Kia Forte**

**Hyundai Genesis**

**REDACTED**





**Lexus RX350**

**Toyota Tundra**





**Toyota Sequoia**

**Toyota Yaris**





**REDACTED**

**Acura RDX**



**Subaru Legacy**



**Mitsubishi Galant**



**Subaru Grand Vitara**



12.    Plaintiffs seek to represent all automobile dealers in the United States who, during the period from and including June 1997 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period"), purchased a new four-wheeled passenger automobile, van, sports utility vehicle, crossover, or pick-up truck (collectively, "Vehicles") that included an Automotive Part manufactured by Defendants. For purposes of this Consolidated Complaint, "Automotive Part" means any automotive part made by DENSO or at least one other Defendant or co-conspirator and sold to an OEM, including, but not limited to, Toyota Motor

**REDACTED**

Corporation, Honda Motor Company, Ltd., American Honda Motor Company, Inc., Fuji Heavy Industries (Fuji Heavy Industries markets its vehicles under the "Subaru" brand), Mazda Motor Corporation, Mazda Motor of America, Inc., Mitsubishi Motors, Mitsubishi Motors North America, Daihatsu, Daewoo, Jaguar, Land Rover, Kia, Nissan Motor Company Ltd., Nissan North America, Inc., Suzuki Motor Corporation, Audi, Volkswagen, Volvo, Daimler, Isuzu, BMW, General Motors, Ford Motor Company, Chrysler Group, and Aston Martin. Defendants manufacture, market, and sell Automotive Parts throughout the world and in and into the United States.DENSO's conspiracy began no later than June 1997, and ended no earlier than February of 2010.



**REDACTED**



**REDACTED**



**REDACTED**



**REDACTED**



business.

REDACTED



**REDACTED**



REDACTED



REDACTED

**DENSO AND MITSUBA COLLUSION**

REDACTED



**REDACTED**



**REDACTED**



**REDACTED**

the KB and both for the JB engine.



**REDACTED**



REDACTED



REDACTED



**REDACTED**



REDACTED



**REDACTED**



**REDACTED**



**REDACTED**



**REDACTED**



**REDACTED**



REDACTED



82.     These are just a few examples of DENSO's role in the center of and as a principal organizer of this conspiracy. There are many more instances of which DENSO and its co-conspirators are aware and which will be the subject of discovery.

83.     The U.S. Department of Justice's ("DOJ") Antitrust Division is nearing the conclusion of a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry. As part of the criminal investigation, the DOJ has uncovered information about unlawful anticompetitive conduct in the market for automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry. These raids precipitated the orchestrated destruction of documents by many Defendants. This document destruction was directed by executives of Defendants, and has led to the loss of evidence reflecting the criminal conduct engaged in by Defendants.

84.     Set forth below are certain of the plea agreements by and criminal charges against Defendants and their executives in the United States.

**REDACTED**

85.     **DENSO Corporation** has pled guilty in the United States to violating the Sherman Antitrust Act, 15 U.S.C. §1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. DENSO conspired with each Defendant and co-conspirator named in this Consolidated Complaint.

86.     **Aisan Industry Co., Ltd**. has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. AISAN conspired with DENSO.

87.     **Aisin Seiki Co. Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. AISIN SEIKI conspired with DENSO.

88.     **Mitsubishi Electric Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to allocate the supply of Automotive Parts sold in the United States and elsewhere. MELCO conspired with DENSO.

89.     **Robert Bosch GmbH** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. §1, for its role in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. BOSCH conspired with DENSO.

90.     **Continental Automotive Electronics LLC** and **Continental Automotive Korea Ltd** have each pled guilty in the United States to charges of violating the Sherman Antitrust Act, 15 U.S.C. § 1, for their roles in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. CONTINENTAL conspired with DENSO.

**REDACTED**

91.    **Tokai Rika Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. TOKAI RIKA also pled guilty to violating 18 U.S.C. § 1519 by destroying and hiding evidence in order to conceal its wrongdoing, thus obstructing justice. TOKAI RIKA conspired with DENSO.

92.    **Diamond Electric Mfg. Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. DIAMOND ELECTRIC conspired with DENSO.

93.    **Koito Manufacturing Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. KOITO conspired with DENSO.

94.    **Mitsuba Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. MITSUBA also pled guilty to violating 18 U.S.C. § 1519 by destroying and hiding evidence in order to conceal its wrongdoing, thus obstructing justice. MITSUBA conspired with DENSO.

95.    **Stanley Electric Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. STANLEY conspired with DENSO.

96.    **Valeo Japan Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the

**REDACTED**

prices of Automotive Parts manufactured and sold in the United States and elsewhere. VALEO conspired with DENSO.

97. **Mitsubishi Heavy Industries, Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. MITSUBISHI HEAVY conspired with DENSO.

98. **Sanden Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. SANDEN conspired with DENSO.

99. **Hitachi Automotive Systems, Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. HITACHI conspired with DENSO.

100. **Nippon Seiki Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. NIPPON SEIKI conspired with DENSO.

101. **Panasonic Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. PANASONIC conspired with DENSO.

102. **T.RAD Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of

**REDACTED**

Automotive Parts manufactured and sold in the United States and elsewhere. T.RAD conspired with DENSO.

103. In addition to the corporate defendants described in the paragraphs above, the following employees of these companies have pled guilty to conduct relating to the conspiracy alleged in this Consolidated Complaint.

104. **Kazuaki Fujitani**, a DENSO employee and Japanese national, pled guilty in the United States to violating 18 U.S.C. § 1512(c)(1) by corruptly destroying and concealing records and documents with the intent to impair their integrity or availability for use in an official proceeding and agreed to serve one year and one day in a U.S. prison.

105. **Makoto Hattori**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 14 months in a U.S. prison and pay a $20,000 criminal fine.

106. **Satoru Horisaki**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $20,000 criminal fine.

107. **Norihiro Imai**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $20,000 criminal fine.

108. **Yuji Suzuki**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a

**REDACTED**

conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 16 months in a U.S. prison and pay a $20,000 criminal fine.

109.    **Hiroshi Watanabe**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

110.    **Tsuneaki Hanamura**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve two years in a U.S. prison and pay a $20,000 criminal fine.

111.    **Kazuhiko Kashimoto**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 14 months in a U.S. prison and pay a $20,000 criminal fine.

112.    **Ryoji Kawai**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve two years in a U.S. prison and pay a $20,000 criminal fine.

113.    **Shigeru Ogawa**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 15 months in a U.S. prison and pay a $20,000 criminal fine.

114.    **Toshio Sudo**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating

**REDACTED**

in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 14 months in a U.S. prison and pay a $20,000 criminal fine.

115. **Hisamitsu Takada**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 15 months in a U.S. prison and pay a $20,000 criminal fine.

116. **Shigehiko Ikenaga**, a DIAMOND employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $5,000 criminal fine.

117. **Tatsuo Ikenaga**, a DIAMOND employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 13 months in a U.S. prison and pay a $5,000 criminal fine.

118. **Kosei Tamura**, a T.RAD employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $20,000 criminal fine.

119. **Takashi Toyokuni**, a HITACHI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 15 months in a U.S. prison and pay a $20,000 criminal fine.

**REDACTED**

120.    **Kazumi Umahashi**, a MITSUBA employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 13 months in a U.S. prison and pay a $20,000 criminal fine.

121.    In addition to the individuals who have pled guilty or agreed to plead guilty in relation to the conspiracy alleged in this Consolidated Complaint as identified above, the following individuals have been indicted for conduct relating to the conspiracy alleged in this Consolidated Complaint.

122.    **Hitoshi Hirano**, a TOKAI RIKA employee and Japanese national, was indicted in the United States on May 22, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

123.    **Hiroyuki Komiya,** a MITSUBA employee and Japanese national, was indicted in the United States on February 5, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

124.    **Hirofumi Nakayama**, a MITSUBA employee and Japanese national, was indicted in the United States on February 5, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

125.    **Norio Teranishi,** an NGK employee and Japanese national, was indicted in the United States on May 21, 2015 on one count each of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

**REDACTED**

126.     **Hisashi Nakahishi,** an NGK employee and Japanese national, was indicted in the United States on May 21, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

127.     **Michitaka Sakuma,** a T.RAD employee and Japanese national, was indicted in the United States on May 14, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

128.     **Ken Funasaki,** a HITACHI employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

129.     **Kazunobu Tsunekawa,** a HITACHI employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

130.     **Tomiya Itakura,** a HITACHI employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

131.     **Atsushi Ueda ("UEDA"),** a MELCO employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

**REDACTED**

132.    **Minoru Kurisaki ("KURISAKI"),** a MELCO employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry. KURISAKI was also indicted on one count of Obstruction of Justice, for violating: 18 U.S.C. § 1512(c)(1) by corruptly destroying and concealing records, documents, or other documents with the intent to impair their integrity or availability for use in an official proceeding; 18 U.S.C. § 1512(b)(2)(B) for corruptly persuading or attempting to corruptly persuade other persons with intent to cause or induce those other persons to destroy or conceal records and documents with the intent to impair their integrity or availability for use in an official proceeding; and 18 U.S.C. § 1519 for destroying, concealing, or covering up any record, document, or tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department or agency of the United States.

133.    **Hideyuki Saito ("SAITO"),** a MELCO employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry. SAITO was also indicted on one count of Obstruction of Justice, by violating: 18 U.S.C. § 1512(c)(1) for corruptly destroying and concealing records, documents, or other documents with the intent to impair their integrity or availability for use in an official proceeding; 18 U.S.C. § 1512(b)(2)(B) for corruptly persuading or attempting to corruptly persuade other persons with intent to cause or induce those other persons to destroy or conceal records and documents with the intent to impair their integrity or availability for use in an official proceeding; and 18 U.S.C. § 1519 for destroying, concealing, or covering up any record, document, or tangible object with the intent to impede, obstruct, and

**REDACTED**

influence the investigation and proper administration of any matter within the jurisdiction of any department or agency of the United States.

### DEFENDANTS' CONSPIRACY CAUSED AMERICAN BUSINESSES AND AUTOMOBILE DEALERS TO PAY MORE THAN THEY SHOULD HAVE

134.    On September 26, 2013, then-United States Attorney General Eric Holder presented the DOJ's findings as of that date in the ongoing automotive parts investigation. He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automotive parts sold to U.S. car manufacturers." Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."

135.    The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct. The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.6 billion in criminal fines. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers. The Japanese Fair Trade Commission ("JFTC") and the Korean Fair Trade Commission ("KFTC") have also conducted investigations, levied fines, and made findings of collusion in the automotive parts industry.

136.    Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry and to fix, stabilize, and maintain the price of automotive parts sold to automobile manufacturers and automobile dealers

**REDACTED**

throughout the world and in the United States. The combination and conspiracy engaged in by Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment.

137.    Plaintiffs and class members paid higher prices for components of the Vehicles they bought.

138.    As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for automotive parts during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

139.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment, and seek to obtain restitution, recover damages and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

140.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state

**REDACTED**

different from Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

141.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

142.    This Court has *in personam* jurisdiction over Defendants because Defendants, either directly or through the ownership and/or control of their subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of automotive parts throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conducted business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

143.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

**REDACTED**

144.     The activities of Defendants and their co-conspirators directly targeted the United States' vehicle market and were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

145.     Automotive parts manufactured abroad by Defendants and sold for use in automobiles in the United States, or sold as parts integrated into automobiles which are imported and sold in the United States, are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any automotive parts are purchased in the United States, and such automotive parts do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

146.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for automotive parts, which conspiracy unreasonably restrained trade and adversely affected the market for automotive parts.

147.     Defendants' conspiracy and wrongdoing described herein adversely affected automobile dealers in the United States who purchased vehicles which included one or more Automotive Parts.

**REDACTED**

## PARTIES

### Plaintiffs

148.    Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Plaintiff Landers is an authorized Toyota, Scion dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Landers purchased and received the afore-mentioned Vehicles in Arkansas.

149.    Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California. Plaintiff Empire Nissan is an authorized Nissan dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Empire Nissan purchased and received the afore-mentioned Vehicles in California.

150.    Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California. Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff V.I.P. purchased and received the afore-mentioned Vehicles in California.

151.    Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized Nissan dealer. During the Class Period, Plaintiff Lee was an authorized Nissan, GMC, Pontiac, Oldsmobile, and Jeep dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators.  Plaintiff Lee purchased and received the afore-mentioned Vehicles in Florida.

152.    Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida. During the Class Period, Plaintiff John Lee was an authorized Nissan

**REDACTED**

dealer that purchased Vehicles containing Automotive Parts manufactured by the Defendants or their co-conspirators and/or their co-conspirators.  Plaintiff John Lee purchased and received the afore-mentioned Vehicles in Florida.

153.    Plaintiff Rainbow is a Hawaii corporation, with its principal place of business in Honolulu, Hawaii. Plaintiff Rainbow is an authorized Chevrolet dealer who, during the Class Period, purchased Vehicles containing Automotive Parts manufactured by the Defendants or their co-conspirators and/or their co-conspirators during the Class Period. Plaintiff Rainbow purchased and received the afore-mentioned Vehicles in Hawaii.

154.    Plaintiff Windward is a Hawaii corporation, with its principal place of business in Kaneohe, Hawaii. Plaintiff Windward is an authorized Honda dealer who purchased Vehicles containing Automotive Parts manufactured by Defendants or their co-conspirators during the Class Period. Plaintiff Windward purchased and received the afore-mentioned Vehicles in Hawaii.

155.    Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa. Plaintiff McGrath is an authorized Buick, Cadillac, Chevrolet, GMC, Pontiac, Chrysler, Jeep, Dodge, RAM, Kia, Mazda, and Volkswagen dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff McGrath purchased and received the afore-mentioned Vehicles in Iowa.

156.    Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas. Plaintiff Green Team is an authorized Jeep, Dodge, and Ram dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Green Team purchased and received the afore-mentioned Vehicles in Kansas.

**REDACTED**

157.    Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota and Scion dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Topsham purchased and received the afore-mentioned Vehicles in Maine.

158.    Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine. Plaintiff Lee Honda is an authorized Honda, Oldsmobile, Cadillac, and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lee Honda purchased and received the afore-mentioned Vehicles in Maine.

159.    Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff Commonwealth Motors purchased and received the afore-mentioned Vehicles in Massachusetts.

160.    Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Commonwealth Nissan purchased and received the afore-mentioned Vehicles in Massachusetts.

161.    Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff

**REDACTED**

Commonwealth Volkswagen purchased and received the afore-mentioned Vehicles in Massachusetts.

162.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hodges purchased and received the afore-mentioned Vehicles in Michigan.

163.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan. Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Patsy Lou purchased and received the afore-mentioned Vehicles in Michigan.

164.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore currently an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. During the Class Period, Plaintiff Superstore was an authorized Buick, Pontiac, GMC, and Hyundai dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators. Plaintiff Superstore bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Superstore purchased and received the afore-mentioned Vehicles in Minnesota.

165.     Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon Nissan is an authorized Nissan dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants

**REDACTED**

and/or their co-conspirators during the Class Period. Plaintiff Cannon Nissan purchased and received the afore-mentioned Vehicles in Mississippi.

166. Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is currently an authorized Ford dealer. During the Class Period, Plaintiff Hammett was an authorized Ford and Mercury dealer who bought Vehicles containing Automotive Parts manufactured by one or more Defendants and/or their co-conspirators. Plaintiff Hammett purchased and received the afore-mentioned Vehicles in Mississippi.

167. Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi. Plaintiff Johnson is an authorized Toyota dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Johnson purchased and received the afore-mentioned Vehicles in Mississippi.

168. Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas during the Class Period. Plaintiff Ancona was an authorized Honda dealer during the Class Period, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ancona purchased and received the afore-mentioned Vehicles in Kansas.

169. Plaintiff Lee's Summit is a Missouri corporation with its principal place of business in Lee's Summit, Missouri. Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep, RAM dealer and a Nissan dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Lee's Summit purchased and received the afore-mentioned Vehicles in Missouri.

**REDACTED**

170. Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska. Plaintiff Archer-Perdue is an authorized Suzuki dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Archer-Perdue purchased and received the afore-mentioned Vehicles in Nebraska.

171. Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska. Plaintiff Table Rock is an authorized Hyundai dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Table Rock purchased and received the afore-mentioned Vehicles in Nebraska.

172. Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period. Plaintiff Pearce was an authorized Honda dealer during the Class Period, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pearce purchased and received the afore-mentioned Vehicles in Nevada.

173. Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada. Plaintiff Champion is an authorized Chevrolet dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Champion purchased and received the afore-mentioned Vehicles in Nevada.

174. Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada. Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators

REDACTED

during the Class Period.  Plaintiff Don Weir purchased and received the afore-mentioned Vehicles in Nevada.

175.    Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico. Plaintiff Pitre is an authorized Buick, Hummer, Pontiac, and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pitre purchased and received the afore-mentioned Vehicles in New Mexico.

176.    Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York. During the Class Period, Plaintiff Hartley was an authorized Honda, Buick, and GM dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hartley purchased and received the afore-mentioned Vehicles in New York.

177.    Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York. Plaintiff Westfield is an authorized Dodge dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Westfield purchased and received the afore-mentioned Vehicles in New York.

178.    Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene was an authorized Chrysler, Dodge, Jeep, RAM, Plymouth, and Oldsmobile dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff John Greene purchased and received the afore-mentioned Vehicles in North Carolina.

**REDACTED**

179.    Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon. Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Chevrolet purchased and received the afore-mentioned Vehicles in Oregon.

180.    Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon. Plaintiff Capitol Toyota is an authorized Toyota and Scion dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Toyota purchased and received the afore-mentioned Vehicles in Oregon.

181.    Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee. Plaintiff Fayetteville is an authorized Toyota and Scion dealer who bought Vehicles containing Automotive Parts manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Fayetteville purchased and received the afore-mentioned Vehicles in Tennessee.

182.    Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah. Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Salt Lake Valley purchased and received the afore-mentioned Vehicles in Utah.

183.    Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah. Plaintiff Wade is an authorized Toyota dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Wade purchased and received the afore-mentioned Vehicles in Utah.

**REDACTED**

184.     Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Apex purchased and received the afore-mentioned Vehicles in Vermont.

185.     Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont. Plaintiff Shearer is an authorized Honda dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Shearer purchased and received the afore-mentioned Vehicles in Vermont.

186.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia. Plaintiff Ramey was an authorized Scion, Buick, Chevrolet, Pontiac, and Oldsmobile dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ramey purchased and received the afore-mentioned Vehicles in West Virginia.

187.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia. Plaintiff Thornhill was an authorized Chevrolet, Buick, Pontiac, and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Thornhill purchased and received the afore-mentioned Vehicles in West Virginia.

188.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. During the Class Period, Plaintiff Lakeland was an authorized Toyota, Scion, Honda, Mazda, and Subaru dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lakeland purchased and received the afore-mentioned Vehicles in Wisconsin.

**REDACTED**

## Defendants

### DENSO Defendants

189. Defendant **DENSO Corporation** is a corporation organized and existing under the laws of Japan. DENSO was a primary actor in designing and executing the conspiracy alleged herein. DENSO conspired to fix the prices of Automotive Parts sold to customers in the United States and elsewhere from at least as early as July 1998 until at least February of 2010. DENSO's co-conspirators include, but are not limited to, AISAN, AISIN SEIKI, MELCO, KEIHIN, MIKUNI, BEHR, BOSCH, CONTINENTAL, SHOWA, TOKAI RIKA, CALSONIC, ALPS, TOYO DENSO, DIAMOND ELECTRIC, KOITO, MITSUBA, STANLEY, NGK, NIPPON SEIKI, SUMITOMO, YAZAKI, T. RAD, HITACHI, and PANASONIC.

190. Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of, and wholly owned and/or controlled by, its parent, DENSO Corporation. DENSO International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the class period, DENSO International America, Inc.'s activities were under the direction and control of its parent DENSO Corporation.

191. Defendant DENSO International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. Defendant DENSO International Korea Corporation manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times

**REDACTED**

during the class period, DENSO International Korea Corporation's activities were under the direction and control of its parent, DENSO Corporation.

192.   DENSO Korea Automotive Corporation is a Korean corporation with its principal place in Changwon, South Korea.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  Denso Korea Automotive Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

193.   Defendant Denso Automotive Deutschland GmbH is a German company with its headquarters in Eching, Germany.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  DENSO Automotive Deutschland GmbH's President serves as one of DENSO Corporation's executive directors.  DENSO Automotive Deutschland GmbH – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Spark Plugs, Standard Oxygen Sensors, and Air Fuel Ratio Sensors that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Spark Plugs, Standard Oxygen Sensors, and Air Fuel Ratio Sensors to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

194.   Defendant ASMO Co., Ltd. is a Japanese corporation with its principal place of business in Shizuoka, Japan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. ASMO Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

**REDACTED**

At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

195.     Defendant ASMO North America, LLC is a Delaware corporation with its principal place of business in Statesville, North Carolina. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. ASMO North America, LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances. According to DENSO's website, ASMO North America, LLC is the "[r]egional headquarters for ASMO affiliates in North America" and "coordinates the business activities of all affiliates in North America."

196.     Defendant ASMO Manufacturing, Inc. is a Michigan corporation with its principal place of business in Battle Creek, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances. ASMO Manufacturing, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, ASMO Manufacturing, Inc.'s activities were under the direction and control of its parent DENSO Corporation.

197.     Defendant ASMO Greenville of North Carolina, Inc. is a North Carolina company with its principal place of business in Greenville, North Carolina. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. ASMO Greenville of North

REDACTED

Carolina, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

198. Unless otherwise specified, the Denso defendants listed above shall be collectively referred to herein as "DENSO."

199. DENSO agreed to and did conspire with each other Defendant named in this Consolidated Complaint to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. DENSO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**AISAN Defendants**

200. Defendant Aisan Industry Co., Ltd. is a Japanese corporation with its principal place of business in Obu, Japan. Aisan Industry Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

201. Defendant Franklin Precision Industry, Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky. Franklin Precision Industry, Inc. is a subsidiary of, and is wholly owned and/or controlled by, its parent, Aisan Industry Co., Ltd. Franklin Precision Industry, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its Japanese parent Aisan Industry Co., Ltd.

**REDACTED**

202. Defendant Aisan Corporation of America is an Illinois corporation with its principal place of business in Franklin, Tennessee. Aisan Corporation of America is a subsidiary of, and is wholly owned and/or controlled by, its parent, Aisan Industry Co., Ltd. Aisan Corporation of America manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its Japanese parent, Aisan Industry Co., Ltd.

203. Defendant Hyundam Industrial Co., Ltd. is a Korean corporation with its principal place of business in Asan-si, South Korea. Hyundam Industrial Co., Ltd. is a subsidiary of, and is wholly owned and or/controlled by, its parent, Aisan Industry Co., Ltd. Defendant Hyundam Industrial Co., Ltd. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its Japanese parent, Aisan Industry Co., Ltd.

204. Unless otherwise specified, the Aisan defendants listed above shall collectively referred to herein as "AISAN."

205. AISAN agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. AISAN agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**AISIN SEIKI Defendants**

**REDACTED**

206.     Defendant Aisin Seiki Co., Ltd. is a Japanese corporation with its principal place of business in Kariya, Japan. Defendant Aisan Seiki Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

207.     Defendant Aisin Automotive Casting, LLC is a Kentucky limited liability company with its principal place of business in London, Kentucky. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Aisin Seiki Co., Ltd. Aisin Automotive Casting, LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Aisin Automotive Casting, LLC were under the direction and control of its parent Aisin Seiki Co., Ltd.

208.     Unless otherwise specified, the Aisin Seiki defendants referred to above shall be collectively referred to herein as "AISIN SEIKI."

209.     AISIN SEIKI agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. AISIN SEIKI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**DELPHI Defendants**

210.     Defendant Delphi Automotive LLP is a public limited company incorporated under the laws of England and Wales with its principal place of business in Troy, Michigan.

**REDACTED**

Defendant Delphi Automotive LLP – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Valve Timing Control Devices that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Valve Timing Control Devices to Plaintiffs and class members.

211.    Defendant Korea Delphi Automotive Systems Corp. is a Korean corporation with its principal place of business in Daegu, South Korea. It is a subsidiary of and wholly owned and/or controlled by its parent, Delphi Automotive LLP. Korea Delphi Automotive Systems Corp. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Valve Timing Control Devices to Plaintiffs and class members. At all times during the Class Period.

212.    Defendant Delphi Powertrain Systems Korea Ltd. ("DPSK") is a limited liability company under the laws of South Korea, with its principal place of business in Changwon, South Korea.  It is a joint venture owned and/or controlled by Delphi Automotive LLP.  DPSK – directly and/or indirectly – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, DPSK's activities were under the control and direction of Delphi Automotive LLP, which controlled its policies, sales, and finances.

213.    Unless otherwise specified, the Delphi defendants referred to above shall be collectively referred to herein as "DELPHI."

214.    DELPHI agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

**REDACTED**

maintain the prices of Automotive Parts. DELPHI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers and coordinated responses to requests for price reductions made by its customers.

**MELCO Defendants**

215. Defendant Mitsubishi Electric Corporation ("MELCO") is a Japanese corporation with its principal place of business in Tokyo, Japan. MELCO —directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

216. Defendant Mitsubishi Electric US Holdings, Inc. is Delaware corporation with its principal place of business in Cypress, California. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Electric Corporation. Defendant Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Mitsubishi Electric Corporation.

217. Defendant Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Electric US Holdings, Inc. Mitsubishi Electric Automotive America, Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class

**REDACTED**

Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Mitsubishi Electric Corporation.

218.   Unless otherwise specified, the Mitsubishi defendants identified immediately above shall be referred to as "MELCO."

219.   MELCO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. MELCO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**KEIHIN Defendants**

220.   Defendant Keihin Corporation is a Japanese Corporation with its principal place of business in Tokyo, Japan. Keihin Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

221.   Defendant Keihin North America, Inc. is an Indiana corporation with its principal place of business in Anderson, Indiana. Keihin North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and or sold Automotive Parts throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the direction and control of its parent Keihin Corporation.

222.   Unless otherwise specified, the Keihin defendants are collectively referred to herein as "KEIHIN."

**REDACTED**

223.     KEIHIN agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. KEIHIN agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**MIKUNI Defendants**

224.     Defendant Mikuni Corporation is a Japanese Corporation with its principal place of business in Tokyo, Japan. Defendant Mikuni Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

225.     Defendant Mikuni American Corporation is a California corporation with its principal place of business in Northridge, California. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mikuni Corporation. Defendant Mikuni American Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Mikuni American Corporation's activities were under the direction and control of its parent Mikuni Corporation.

226.     Unless otherwise specified, the Mikuni defendants are collectively referred to herein as "MIKUNI."

227.     MIKUNI agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

**REDACTED**

maintain the prices of Automotive Parts. MIKUNI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

## BEHR Defendants

228.     Defendant MAHLE Behr GmbH & Co. KG ("BEHR") is a German corporation with its principal place of business in Stuttgart, Germany. In 2013, BEHR acquired the Air Conditioning Systems business of Behr GmbH & Co. KG, and, upon information and belief, assumed Behr's liabilities. As a result of the acquisition, BEHR – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

229.     Defendant MAHLE Behr USA Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, MAHLE Behr. MAHLE Behr USA Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

230.     Unless otherwise specified, the Behr defendants identified above shall be collectively referred to herein as "BEHR."

231.     BEHR agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of, and to fix, raise, and maintain the prices of, Automotive Parts. BEHR agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated

**REDACTED**

geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**BOSCH Defendants**

232. Defendant Robert Bosch GmbH is a German company with its headquarters in Stuttgart, Germany. Robert Bosch GmbH – directly and or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

233. Defendant Bosch Electrical Drives Co., Ltd. is a Korean company with its principal place of business in Sejong, South Korea. It is a subsidiary of, and is wholly owned by, Robert Bosch GmbH. Bosch Electrical Drives Co., Ltd. – directly and/or through its affiliates, which it wholly controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Robert Bosch GmbH.

234. Defendant Robert Bosch LLC is a Delaware company with its principal place of business in Farmington Hills, Michigan. It is an affiliate of, and is wholly controlled by, Bosch Electrical Drives Co., Ltd. Robert Bosch LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Periods. At all times during the Class Period, its activities in the United States were under the control and direction of Robert Bosch GmbH.

235. Unless otherwise specified, the Bosch defendants referred to above shall be collectively referred to herein as "BOSCH."

**REDACTED**

236.    BOSCH agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. BOSCH agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**CONTINENTAL Defendants**.

237.    Defendant Continental Automotive Electronics LLC is a Korean company with its principal place of business in Bugang-myeon, South Korea. Continental Automotive Electronics LLC – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

238.    Defendant Continental Automotive Korea Ltd. is a Korean company with its principal place of business in Seongnam-si, South Korea. It is an affiliate of, and wholly controlled by, Continental Automotive Electronics LLC. Continental Automotive Korea Ltd. – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Continental Automotive Korea Ltd. were controlled by its parent, Continental Automotive Electronics LLC.

239.    Defendant Continental Automotive Systems, Inc. is a Delaware company with its principal place of business in Auburn Hills, Michigan. It is an affiliate of, and is wholly controlled by, Continental Automotive Electronics LLC. Continental Automotive Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,

**REDACTED**

marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Continental Automotive Systems, Inc. were controlled by its parent, Continental Automotive Electronics LLC.

240.   Unless otherwise specified, the Continental defendants identified above shall be collectively referred to herein as "CONTINENTAL."

**SHOWA DENKO Defendants**

241.   Defendant Showa Denko K.K. is a Japanese company with its principal place of business in Tokyo, Japan. Showa Denko K.K. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

242.   Defendant Showa Aluminum Corporation of America is an Ohio corporation with its principal place of business in Mt. Sterling, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Showa Denko K.K. Defendant Showa Aluminum Corporation of America – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Showa Aluminum Corporation was under the direction and control of Showa Denko K.K.

243.   Unless otherwise specified, the Showa defendants identified above shall be collectively referred to herein as "SHOWA."

244.   SHOWA agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

**REDACTED**

maintain the prices of Automotive Parts. SHOWA agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**TOKAI RIKA Defendants**

245.    Defendant Tokai Rika Co., Ltd. is a Japanese company with its principal place of business in Toyota, Japan. Defendant Tokai Rika Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the class period.

246.    Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan Corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent Tokai Rika Co., Ltd. During the Class Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Tokai Rika Co., Ltd.

247.    Unless otherwise specified, the Tokai Rika defendants identified above shall be collectively referred to herein as "TOKAI RIKA."

248.    TOKAI RIKA agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. TOKAI RIKA agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers,

**REDACTED**

allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**CALSONIC Defendants**

249. Defendant Calsonic Kansei Corporation is a Japanese corporation with its principal place of business in Saitama, Japan. Defendant Calsonic Kansei Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

250. Defendant Calsonic Kansei North America, Inc. is a Delaware corporation with its principal place of business in Shelbyville, Tennessee. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Calsonic Kansei Corporation. Defendant Calsonic Kansei North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled– manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Calsonic Kansei North America, Inc. was under the direction and control of Calsonic Kansei Corporation.

251. Unless otherwise specified, the Calsonic defendants identified above shall be collectively referred to herein as "CALSONIC."

252. CALSONIC agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. CALSONIC agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**REDACTED**

**ALPS Defendants**

253.    Defendant Alps Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Alps Electric Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

254.    Defendant Alps Electric (North America), Inc. is a California corporation with its principal place of business in Campbell, California. It is a subsidiary of wholly owned and/or controlled by its parent, Alps Electric Co., Ltd. Defendant Alps Electric (North America), Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Alps Electric Co., Ltd.

255.    Defendant Alps Automotive Inc. is a Michigan corporation with its principal place of business in Auburn Hills, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Alps Electric Co., Ltd. Defendant Alps Automotive Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Alps Electric Co., Ltd.

256.    Unless otherwise specified, the Alps defendants identified above shall be collectively referred to herein as "ALPS."

257.    ALPS agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

**REDACTED**

maintain the prices of Automotive Parts. ALPS agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**TOYO DENSO Defendants**

258.  Toyo Denso Co. Ltd. is a Japanese Corporation with its principal place of business in Tokyo, Japan. Defendant Toyo Denso Co. Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

259.  Defendant Weastec Inc. is an Ohio corporation with its principal place of business in Hillsboro, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Toyo Denso Co. Ltd. Defendant Weastec, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Toyo Denso Co. Ltd.

260.  Unless otherwise specified, the Toyo Denso defendants identified above shall be collectively referred to herein as "TOYO DENSO."

261.  TOYO DENSO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. TOYO DENSO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers,

**REDACTED**

allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**DIAMOND ELECTRIC Defendants**

262.    Defendant Diamond Electric Mfg. Co., Ltd. is a Japanese company with its principal place of business in Osaka, Japan. Diamond Electric Mfg. Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

263.    Defendant Diamond Electric Mfg. Corporation is a Michigan corporation with its principal place of business in Dundee, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Diamond Electric Mfg. Co., Ltd. Diamond Electric Mfg. Corporation manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the direction and control of its parent Diamond Electric Mfg. Co., Ltd.

264.    Unless otherwise specified, the Diamond Electric defendants identified above shall be collectively referred to herein as "DIAMOND ELECTRIC."

265.    DIAMOND ELECTRIC agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. DIAMOND ELECTRIC agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**KOITO Defendants**

**REDACTED**

266. Defendant Koito Manufacturing Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Koito – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

267. Defendant North American Lighting, Inc. is a Michigan corporation with its principal place of business in Illinois. It is a subsidiary of, and is wholly-owned and/or controlled by, its parent, Koito Manufacturing Co., Ltd. North American Lighting, Inc. manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, North American Lighting, Inc. was under the direction and control of Koito Manufacturing Co., Ltd.

268. Unless otherwise specified, the Koito defendants identified above shall be collectively referred to herein as "KOITO."

269. KOITO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. KOITO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**MITSUBA Defendants**

270. Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan. Mitsuba – directly and/or through its subsidiaries, which it wholly owned

**REDACTED**

and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

271.    Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan. It is a subsidiary of, and is wholly-owned and/or controlled by, its parent, Mitsuba Corporation. American Mitsuba Corporation manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, American Mitsuba Corporation was under the direction and control of Mitsuba Corporation.

272.    Unless otherwise specified, the Mitsuba defendants identified above shall be collectively referred to herein as "MITSUBA."

273.    MITSUBA agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. MITSUBA agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**STANLEY Defendants**

274.    Defendant Stanley Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Stanley – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

275.    Defendant Stanley Electric U.S. Co., Inc. is an Ohio corporation with its principal place of business in Ohio. It is a subsidiary of, and is wholly-owned and/or controlled by, its

**REDACTED**

parent, Stanley Electric Co., Ltd. Stanley Electric U.S. Co., Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period Stanley Electric U.S. Co., Inc. was under the direction and control of Stanley Electric Co., Ltd.

276. Defendant II Stanley Co., Inc. is a Michigan corporation with its principal place of business in Michigan. It is a subsidiary of, and is wholly-owned and/or controlled by, its parent, Stanley Electric Co., Ltd. II Stanley Co., Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Stanley Electric U.S. Co., Inc. was under the direction and control of Stanley Electric Co., Ltd.

277. Unless otherwise specified, the Stanley defendants identified above shall be collectively referred to herein as "STANLEY."

278. STANLEY agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. STANLEY agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**NGK Defendants**

279. Defendant NGK Spark Plug Co., Ltd. is a Japanese corporation. NGK Spark Plug Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

**REDACTED**

280.    Defendant NGK Spark Plugs (U.S.A.), Inc. is a California corporation with its principal place of business in Wixom, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, NGK Spark Plug Co., Ltd. Defendant NGK Spark Plugs (U.S.A.), Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, the activities of NGK Spark Plugs (U.S.A.), Inc. were controlled by its parent NGK Spark Plug Co., Ltd.

281.    Unless otherwise specified, the NGK defendants identified above shall be collectively referred to herein as "NGK."

282.    NGK agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. NGK agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**VALEO Defendants**

283.    Valeo Japan Co., Ltd. is a Japanese corporation with its principal place of business in Gunma, Japan. Defendant Valeo Japan Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

284.    Defendant Valeo Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is an affiliate of, and is wholly controlled by, Valeo Japan Co., Ltd. Valeo Inc. – directly and/or through its subsidiaries, which it wholly owned and/or

**REDACTED**

controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

285.    Defendant Valeo Electrical Systems, Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Valeo Inc. Valeo Electrical Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

286.    Defendant Valeo Climate Control Corp. is a Delaware corporation with its principal place of business in Bingham Farms, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Valeo Electrical Systems, Inc. Valeo Climate Control Corp. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

287.    Defendant Valeo S.A. is a French société anonyme with its principal place of business in Paris, France. Valeo S.A. – directly and/or through its subsidiaries, which it wholly controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Air Conditioning Systems to Plaintiffs and Class members.

288.    Unless otherwise specified, the VALEO defendants identified above shall be collectively referred to herein as "VALEO."

289.    VALEO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. VALEO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated

**REDACTED**

geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**MITSUBISHI HEAVY Defendants**

290.    Defendant Mitsubishi Heavy Industries, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mitsubishi Heavy Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

291.    Defendant Mitsubishi Heavy Industries America, Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Heavy Industries, Ltd. Defendant Mitsubishi Heavy Industries America, Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

292.    Defendant Mitsubishi Heavy Industries Climate Control, Inc. is an Indiana corporation with its principal place of business in Franklin, Indiana. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Heavy Industries, Ltd. Defendant Mitsubishi Heavy Industries Climate Control, Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

293.    Unless otherwise specified, the MITSUBISHI HEAVY defendants identified above shall be collectively referred to herein as "MITSUBISHI HEAVY."

294.    MITSUBISHI HEAVY agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

**REDACTED**

maintain the prices of Automotive Parts. MITSUBISHI HEAVY agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**SANDEN Defendants**

295.    Sanden Automotive Components Corporation is a subsidiary and wholly owned and controlled by its parent, Sanden Holdings Corporation. Sanden Holdings Corporation is a holding company formed after the restructuring of the former Sanden Corporation. Sanden Corporation pled guilty to violations of the Sherman Act as set forth above. Sanden Automotive Components Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

296.    Sanden Automotive Climate Systems Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. It is a subsidiary of, and is wholly owned and controlled by, its parent, Sanden Holdings Corporation. Sanden Automotive Climate Systems Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

297.    Defendant Sanden International (U.S.A.) Inc. is a Texas corporation with its principal place of business in Wylie, Texas. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Sanden Corporation. Sanden International (U.S.A.) Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United Sates, including in this District, during the Class Period.


**REDACTED**

298.    Unless otherwise specified, the SANDEN defendants identified above shall be collectively referred to herein as "SANDEN."

299.    SANDEN agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. SANDEN agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**HITACHI Co-Conspirators**

300.    Hitachi Automotive Systems, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Hitachi Automotive Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

301.    Hitachi Automotive Systems Americas, Inc. is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky. Hitachi Automotive Systems Americas, Inc. is a subsidiary of and wholly owned and/or controlled by its parent, Hitachi Automotive Systems, Ltd. Hitachi Automotive Systems Americas, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its parent, Hitachi Automotive Systems, Ltd.

302.    Unless otherwise specified, the Hitachi co-conspirators identified above shall be collectively referred to herein as "HITACHI".

**REDACTED**

303.   HITACHI agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. HITACHI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers and coordinated responses to requests for price reductions made by its customers.

**NIPPON SEIKI Co-Conspirators**

304.   Nippon Seiki Co., Ltd. is a Japanese corporation with its principal place of business in Nagaoka, Japan. Nippon Seiki Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

305.   N.S. International, Ltd. is a California corporation with its principal place of business in Troy, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Nippon Seiki Co., Ltd. Defendant N.S. International, Ltd. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Nippon Seiki Co., Ltd.

306.   New Sabina Industries, Inc. is an Ohio corporation with its principal place of business in Sabina, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Nippon Seiki Co., Ltd. New Sabina Industries, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Nippon Seiki Co., Ltd.

**REDACTED**

307.   Unless otherwise specified, the Nippon Seiki co-conspirators identified above shall be collectively referred to herein as "NIPPON SEIKI."

308.   NIPPON SEIKI agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. NIPPON SEIKI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**PANASONIC Co-Conspirators**

309.   Panasonic Corporation is a Japanese company with its principal place of business in Osaka, Japan. Panasonic Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Parts Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

310.   Panasonic Corporation of North America is a Delaware corporation with its principal place of business in Secaucus, New Jersey. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Panasonic Corporation. Panasonic Corporation of North America manufactured, marketed and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Panasonic Corporation of North America was under the direction and control of Panasonic Corporation.

311.   Unless otherwise specified, the Panasonic co-conspirators identified above shall be collectively referred to herein as "PANASONIC."

**REDACTED**

312.     PANASONIC agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. PANASONIC agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers and coordinated responses to requests for price reductions made by its customers.

313.     Unless otherwise specified, when Plaintiffs refer to a corporate family or companies by a single name in the Consolidated Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know of, or care about, the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

**SUMITOMO Co-Conspirators**

314.     Sumitomo Electric Industries, Ltd. is a Japanese corporation. Sumitomo Electric Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

315.     Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant Sumitomo Electric Wintec America, Inc. manufactured, marketed and/or sold HCPs that were purchased throughout

**REDACTED**

the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

316.    Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Sumitomo Wiring Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Sumitomo Wiring Systems, Ltd. were under the direction and control of its parent Sumitomo Electric Industries, Ltd.

317.    Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky. Sumitomo Electric Wiring Systems, Inc. is a joint venture between Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Sumitomo Electric Wiring Systems, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its joint venture participant owners, both of whom are named defendants in this Consolidated Complaint.

318.    Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed, and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

**REDACTED**

319.   K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee. K&S Wiring Systems, Inc. is a subsidiary of, and is wholly owned and/or controlled by, its parent, Sumitomo Electric Industries, Ltd. K&S Wiring Systems, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Sumitomo Electric Industries, Ltd.

320.   The Sumitomo co-conspirators identified above shall be collectively referred to herein as "SUMITOMO."

321.   SUMITOMO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. SUMITOMO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**T.RAD Defendants**

322.   T. RAD Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. T. RAD Co, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed, and/or sold Automotive Parts throughout the United States, including in this District during the Class Period.

323.   Defendant T.RAD North America, Inc. is a Delaware corporation with its principal place of business in Hopkinsville, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, T.RAD Co., Ltd. Defendant T.RAD North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,

**REDACTED**

marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

324. T.RAD Co., Ltd. agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. T. RAD Co., Ltd. agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**YAZAKI Co-Conspirators**

325. Yazaki Corporation is a Japanese corporation. Yazaki – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts throughout the United States, including in this District, during the Class Period.

326. Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Yazaki Corporation. Yazaki North America Inc. manufactured, marketed and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Yazaki North America, Inc. was under the direction and control of Yazaki Corporation.

327. The Yazaki co-conspirators identified above shall be collectively referred to herein as "YAZAKI".

328. YAZAKI agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. YAZAKI agreed to and did refrain from competing

**REDACTED**

with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers.

**Defendants' Representatives who Attended Conspiratorial Meetings and Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family**

329.    In many instances of meetings and communications between and among Defendants in furtherance of their conspiracies alleged in this Complaint, Plaintiffs allege which corporate family was represented in a particular meeting or communications. This is because, as documents reviewed to this date demonstrate, the individual participants in the conspiratorial meetings and discussions did not distinguish between entities within a particular corporate family, referring to themselves or others, for example, merely as "DENSO," "HITACHI," "MITSUBA," or "YAZAKI." Indeed, the employees from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective U.S. subsidiaries. Further, because of their generic uses of Defendants' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts, nor did they distinguish between entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and U.S. affiliates. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in those meetings.

330.    Further, Defendants knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants would not have entered into the illegal agreements if affiliate companies could simply undercut the agreements reached.

**REDACTED**

Defendants acted as the principals of or agents for the other, unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.**Family**

331.     In many instances of meetings and communications between and among Defendants in furtherance of their conspiracies alleged in this Complaint, Plaintiffs allege which corporate family was represented in a particular meeting or communications. This is because, as documents reviewed to this date demonstrate, the individual participants in the conspiratorial meetings and discussions did not distinguish between entities within a particular corporate family, referring to themselves or others, for example, merely as "DENSO," "HITACHI," "MITSUBA," or "YAZAKI." Indeed, the employees from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective U.S. subsidiaries. Further, because of their generic uses of Defendants' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts, nor did they distinguish between entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and U.S. affiliates. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in those meetings.

332.     Further, Defendants knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants would not have entered into the illegal agreements if affiliate companies could simply undercut the agreements reached.

Defendants acted as the principals of or agents for the other, unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

**AGENTS AND CO-CONSPIRATORS**

**REDACTED**

333.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Consolidated Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

334.    Whenever in this Consolidated Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## MARKET ALLEGATIONS

### A.    The Automotive Parts Industry

335.    Defendants are the world's largest automotive parts suppliers. Each of them supplies Automotive Parts to OEMs and other customers, and all of them had a conscious commitment to join the conspiracy alleged in this Consolidated Complaint.

336.    Beginning at a time no later than July 1, 1998, Defendants began a conspiracy to fix, maintain, and raise prices for automotive parts sold to customers including, OEMs. which ultimately came to include, among others, Toyota Motor Corporation, Honda Motor Company, Ltd., American Honda Motor Company, Inc., Fuji Heavy Industries (Fuji Heavy Industries markets its vehicles under the "Subaru" brand), Mazda Motor Corporation, Mazda Motor of America, Inc., Mitsubishi Motors, Mitsubishi Motors North America, Daihatsu, Daewoo, Jaguar, Land Rover, Kia, Nissan Motor Company Ltd., Nissan North America, Inc., Suzuki Motor

**REDACTED**

Corporation, Audi, Volkswagen, Volvo, Daimler, Isuzu, BMW, General Motors, Ford Motor Company and Chrysler Group.

337.    The conspiracy was accomplished through several means.

338.    One of the primary means by which the conspiracy was effectuated was an agreement not to compete for certain customers. Among the terms used by Defendants when describing this means of effectuating the conspiracy were "respecting commercial rights" or "respecting incumbency." These terms meant that if one Defendant had an existing relationship with a customer, other Defendants agreed that they would not compete to take away that business from the Defendant which had the existing relationship. In some cases, certain Defendants would pretend to compete for a customer's business but would ensure that their proposals would be non-competitive so that the Defendant that had a pre-existing relationship could maintain its business.

339.    A second means by which the conspiracy was effectuated was by agreeing to pursue business only in certain geographic regions and not to compete in others. Thus, certain Defendants might agree, for example, to divide business to a customer so that one Defendant would win the customer's business in China in exchange for the other Defendant winning that customer's business in North America.

340.    A third means by which the conspiracy was effectuated was by agreeing to "rig bids" submitted in response to requests for quotation, or RFQs, submitted by automakers. These RFQs would typically seek proposals by Defendants to supply Automotive Parts for particular vehicles for particular model years. Thus, for example, Toyota might issue an RFQ to Defendants to supply certain automotive parts for a model year Camry. Those Defendants who won the business would then sell those parts on the terms agreed to Toyota for the life of that

**REDACTED**

model, typically four years. Defendants coordinated their responses to these RFQs in order to submit higher prices to the automakers than they would have in the absence of collusion.

341.   A fourth means by which the conspiracy was effectuated was by agreeing to coordinate responses made by automakers for reductions in prices. Periodically during the lifespan of a given vehicle, automakers would ask Defendants to provide reductions to the prices that were being charged for Automotive Parts. Instead of responding individually and competing, Defendants coordinated their responses so that they could maintain higher prices to the automakers than they would have if they had competed.

342.   A fifth means by which the conspiracy was effectuated was by agreeing to use code words, subterfuge, and clandestine meetings in order to avoid detection. This included efforts to destroy evidence of the conspiratorial conduct, for which some defendants have pled guilty to charges of obstruction of justice. It was also reflected in the common use of terms such as "delete after reading" in written documents, and in directions to discuss matters orally, rather than in writing, when discussing collusive conduct.

343.   OEMs purchase Automotive Parts directly from Defendants. Automotive Parts may also be purchased by component manufacturers who then supply such systems to OEMs. These component manufacturers are sometimes referred to as "Tier 1 Manufacturers." Tier 1 Manufacturers purchase Automotive Parts which are then incorporate into modules or parts of new motor vehicles.

344.   When purchasing Automotive Parts, OEMs sometimes issue Requests for Quotation, or RFQs, to automotive parts suppliers on a model-by-model basis for model specific parts. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years. Typically, the bidding process for a particular

**REDACTED**

model begins approximately three years prior to the start of production of a new model. OEMs

procure parts for U.S.-manufactured vehicles in the United States and elsewhere.

345.    Defendants and their co-conspirators supplied Automotive Parts to OEMs for

installation in vehicles manufactured and sold throughout the world, including in the United

States. Defendants and their co-conspirators manufactured Automotive Parts (a) in the United

States for installation in vehicles manufactured and sold in the United States, and (b) in other

countries, including Japan, for installation in vehicles manufactured in Japan and other countries,

some of which were then imported to and sold in the United States.

346.    Plaintiffs and members of the proposed Classes purchased Automotive Parts

indirectly from Defendants.  By way of example, an owner of a vehicle may indirectly purchase

one or more Automotive Parts from the Defendants as part of purchasing or leasing a new

vehicle.

**B.      The Structure and Characteristics of the Automotive Parts Market
         Facilitated the Conspiracy, and Defendants Took Advantage of This to Carry
         Out Their Conspiracy**

347.    The structure and other characteristics of the Automotive Parts market throughout

the world and in in the United States are conducive to a price-fixing agreement, and have made

collusion particularly attractive in this market. Specifically, the Automotive Parts market: (1) has

high barriers to entry; and (2) has inelasticity of demand.

**1.      The Automotive Parts Market Has High Barriers to Entry**

348.    A collusive arrangement that raises product prices above competitive levels

would, under basic economic principles, attract new entrants seeking to benefit from the supra-

competitive pricing. Where, however, there are significant barriers to entry, new entrants are less

likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

**REDACTED**

349. There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Parts market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

350. Defendants own multiple patents related to the manufacture of Automotive Parts. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

351. In addition, OEMs cannot change Automotive Parts suppliers randomly after a supplier is initially selected because the OEMs design the features of their vehicles so that the Automotive Parts they purchase for a vehicle are then integrated with the other components of the particular vehicle model. Thus, the design must be synergized by the Automotive Parts manufacturers and OEMs. It would be difficult for a new market entrant to do so.

**2. There is Inelasticity of Demand for new Automotive Parts**

352. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. Demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

353. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

**REDACTED**

354. Demand for Automotive Parts is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Automotive Parts as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### C. Government Investigations

355. A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada, and Japan, aimed at suppliers of Automotive Parts. A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts investigation would continue to widen, because the automotive industry as a whole comprises many sub-industries. He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

356. Some say that the probe originated in Europe as the result of several European OEMs coming together to bring a complaint to EC. The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

357. On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers. The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct. The DOJ has levied more than $2.6 billion in criminal fines against various automotive parts manufacturers.

358. The coordinated global government investigations include investigations by the United States, the EC, the JFTC, and the Korean Fair Trade Commission. These investigations have uncovered collusive conduct by Automotive Parts suppliers, including by many Defendants

**REDACTED**

named in this Consolidated Complaint, which employed the same means and targeted the same industry as is set forth in this Consolidated Complaint.

359.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena. "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

360.    The scheme drove up costs for consumers since the prices were illegally fixed on Automotive Parts that have risen in cost as vehicles have become more complex in recent years. Jim Gillette, an analyst with the firm HIS Automotive, estimated that the price-fixing of even a single Automotive Part alone cost automobile makers hundreds of millions of dollars.

### D.    Likely Existence of Cooperating Defendants

361.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

362.    At least one of the Defendants named in this Consolidated Complaint is an ACPERA "amnesty applicant" in this case.

**REDACTED**

## CLASS ACTION ALLEGATIONS

363.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the Class Period, purchased new Vehicles in the United States which included one or more Automotive Part(s) as a component part, which were manufactured or sold by any Defendant, any current or former subsidiary of a Defendant or any co-conspirator of a Defendant.

364.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts and Illinois.  The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States."  These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers in the Indirect Purchaser States that, during the Class Period, indirectly purchased new Vehicles in the Indirect Purchaser States which included one or more Automotive Part(s) as a component part, which were manufactured or sold by any Defendant, any current or former subsidiary of a Defendant or any co-conspirator of a Defendant.

365.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, persons who purchased

**REDACTED**

Automotive Parts directly, persons in the End-Payor Class, as defined in the End-payor complaint,, and any judicial officer or employee who presides over this case.

366. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

367. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Automotive Parts sold in the United States;

b) The identity of the participants of the alleged conspiracy;

c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d) Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

e) Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

f) Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

**REDACTED**

g) Whether the conduct of Defendants and their co-conspirators, as alleged in this Consolidated Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

h) The effect of the alleged conspiracy on the prices of Automotive Parts sold in the United States during the Class Period;

i) Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

j) Whether Defendants and their co-conspirators took steps to conceal the conspiracy's existence from Plaintiffs and the members of the Classes;

k) The appropriate injunctive and related equitable relief for the Nationwide Class; and

l) The appropriate class-wide measure of damages for the Damages Class.

368. Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Parts purchased indirectly from Defendants and/or their co-conspirators.

369. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

**REDACTED**

370.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

371.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

372.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

373.    Defendants' price-fixing conspiracy had the following effects, among others:

    a.    Price competition has been restrained or eliminated with respect to Automotive Parts;

    b.    The prices of Automotive Parts have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    c.    Indirect purchasers of Automotive Parts have been deprived of free and open competition;

**REDACTED**

     d.    Indirect purchasers of Automotive Parts paid artificially inflated, fixed, and stabilized prices.

374. During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Automotive Parts.

375. An increase in the prices of Automotive Parts caused an increase in the price of Vehicles during the Class Period.

376. Automotive Parts comprise a significant portion of the price of a Vehicle.

377. The markets for Automotive Parts and Vehicles are inextricably linked and intertwined because the market for Automotive Parts exists to serve the Vehicle market. Without the Vehicles, the Automotive Parts have little to no value because they have no independent utility. Indeed, the demand for Vehicles creates the demand for Automotive Parts. As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

378. Automotive Parts are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Parts follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Parts can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

379. Just as Automotive Parts can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Automotive Parts affect prices paid by indirect purchasers of new motor Vehicles containing Automotive Parts.

**REDACTED**

380. The inflated prices of Automotive Parts in new motor vehicles resulting from Defendants' and their co-conspirators' bid-rigging and price-fixing conspiracy have been borne by Dealership Plaintiffs and other class members.

381. The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Automotive Parts and, as a direct and foreseeable result, the price of new motor vehicles containing Automotive Parts. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Automotive Parts on prices for new motor Vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Automotive Parts affects changes in the price of new motor Vehicles. In such models, the price of Automotive Parts would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Automotive Parts impact the price of new motor Vehicles containing Automotive Parts while controlling for the impact of other price-determining factors.

382. The precise amount of the overcharge impacting the prices of new motor Vehicles containing Automotive Parts can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge borne by Dealership Plaintiffs. Thus, the economic harm to Plaintiffs and class members can be quantified.

**REDACTED**

383.    On February 15, 2013, Scott Hammond, then the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. I say the ***biggest with respect to the impact on U.S. businesses and consumers***, and the number of companies and executives that are subject to the investigation." (emphasis added).

384.    On September 26, 2013, then United States Attorney General Eric Holder presented the DOJ's recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Attorney General Holder also described how the conspiracies worked: "[c]ompany executives face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to." Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

385.    On May 25, 2014, news sources reported that Brent Snyder, a Deputy Assistant Attorney General in the Antitrust Division, said with respect to the automotive parts conspiracies, "[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of this conspiracy."

**REDACTED**

386.    By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Parts than they would have paid in the absence of Defendants' and their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**PLAINTIFFS' CLAIMS ARE NOT BARRED BY
THE STATUTE OF LIMITATIONS**

A.    **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims**

387.    Plaintiffs repeat and re-allege the allegations set forth above.

388.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until a date within four years of the filing date of this Consolidated Complaint.

389.    Plaintiffs and the members of the Classes are automobile dealers who purchased new Vehicles. They had no direct contact or interaction with Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Consolidated Complaint.

390.    No information in the public domain was available to the Plaintiffs and the members of the Classes within four years prior to the filing date of this Consolidated Complaint that revealed sufficient information to suggest that Defendants were involved in the conspiracy alleged herein. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendant's dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

**REDACTED**

391.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Consolidated Complaint.

**B.    Fraudulent Concealment Tolled the Statute of Limitations**

392.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until a date within four years of the filing date of this Consolidated Complaint.

393.    Before that time, Plaintiffs and the members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices for Automotive Parts throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the conspiracy alleged herein.

394.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. This conduct includes denying the conspiracy alleged in this Consolidated Complaint, and instead asserting that these Defendants engaged in a multitude of separate conspiracies that are not related to each other.

395.    Further, as former Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the automotive parts industry, "[i]n order to keep their illegal conduct secret, Defendants used code names and met in remote locations."

**REDACTED**

396. By their very nature, Defendants and their co-conspirators' anticompetitive conspiracy was self-concealing. Automotive Parts are not exempt from antitrust regulation, and thus, Plaintiffs reasonably considered the Automotive Parts industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Automotive Parts prices prior to four years before the filing date of this Consolidated Complaint.

397. Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

398. Throughout the course of the conspiracy, Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. The exact dates and times of these meetings are within the knowledge of Defendants. Further, as reflected in the obstruction of justice paragraphs above, Defendants took steps to destroy evidence of the collusion described herein.

399. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until a date within four years prior to the date of filing of this Consolidated Complaint.

**REDACTED**

400. For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

401. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

402. Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

403. The acts done by Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by officers, agents, employees, or representatives while actively engaged in the management of their affairs.

404. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Parts, thereby creating anticompetitive effects.

405. The anticompetitive acts were intentionally directed at the United States market for Automotive Parts and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Parts throughout the United States.

406. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Parts.

407. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Parts have been harmed by being forced to pay inflated, supracompetitive prices for Automotive Parts.

408. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and

**REDACTED**

conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

409. Defendants' and their co-conspirators' conspiracy had the following effects, among others:

    a.     Price competition in the market for Automotive Parts has been restrained, suppressed, and/or eliminated in the United States;

    b.     Prices for Automotive Parts sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    c.     Plaintiffs and members of the Nationwide Class who purchased Automotive Parts indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

410. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Parts purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

411. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

412. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**REDACTED**

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

413.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

414.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Automotive Parts in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

415.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the prices for Automotive Parts and to allocate customers for Automotive Parts in the United States.

416.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

a.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Parts at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Parts sold in the United States;

b.    allocating customers and markets for Automotive Parts in the United States in furtherance of their agreements; and

c.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

**REDACTED**

417. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices, and to allocate customers with respect to Automotive Parts.

418. Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

419. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

420. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

421. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

422. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

423. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

424. Defendants entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

**REDACTED**

425. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Parts at supracompetitive levels.

426. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Parts.

427. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Automotive Parts; and (2) Allocating among themselves the production of Automotive Parts.

428. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) Price competition in the sale of Automotive Parts has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Parts sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased vehicles containing Automotive Parts manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

429. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Parts than they otherwise would have paid in the absence of Defendants'

**REDACTED**

unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

430. Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

431. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, , including those who resided in the District of Columbia and/or purchased vehicles in the District of Colombia, were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts, including in the District of Colombia.

432. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

433. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

434. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

**REDACTED**

435. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

436. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

437. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

438. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

439. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.

440. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.

441. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the

**REDACTED**

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

442. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

443. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

444. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*[1]

445. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

446. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

447. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

---

[1] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action. Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

**REDACTED**

448. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

449. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

450. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

451. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

452. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

453. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of Damages Class have been injured in their business and property and are threatened with further injury.

454. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

**REDACTED**

455. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

456. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Maine; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

457. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

458. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

459. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

460. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

461. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the

**REDACTED**

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

462. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

463. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

464. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

465. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

466. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

467. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

468. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

469.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

470.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

471.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

472.     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

473.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

474.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

475.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

476.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and

**REDACTED**

eliminated throughout Nebraska; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

477.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

478.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

479.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

480.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

481.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

482.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

**REDACTED**

483.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

484.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

485.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

486.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

487.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

488.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

489.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs

**REDACTED**

and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

490. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

491. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

492. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

493. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

494. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

495. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

496. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Parts prices were raised, fixed, maintained,

**REDACTED**

and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts when they purchased vehicles containing Automotive Parts, or purchased products that were otherwise of lower quality than they would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

497. During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

498. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

499. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

500. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

501. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

**REDACTED**

and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

502. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

503. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

504. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, et. seq.

505. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

506. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

507. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

508. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

509.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

510.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

511.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

512.     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

513.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

514.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

515.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

**REDACTED**

516. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

517. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

518. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

519. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

520. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

521. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

**REDACTED**

522. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

523. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

524. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

525. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

526. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

527. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

528. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

529. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and

**REDACTED**

members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

530. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

531. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

532. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

533. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

534. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

535. Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

536. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Parts prices were raised, fixed, maintained,

**REDACTED**

and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

537.    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

538.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

539.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

540.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

541.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

542.    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

543.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

544. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

545. Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' and their co-conspirators' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Damages Class have paid more for Automotive Parts than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

546. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

547. Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

548. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

549. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**REDACTED**

550. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

551. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Parts were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

552. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

553. Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Parts.

554. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and purchasers.

555. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

556. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**REDACTED**

557.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

558.    During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

559.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

560.    Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

561.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

**REDACTED**

562. Defendants' acts or practices are unfair to purchasers of Automotive Parts (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code.

563. Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

564. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

565. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

566. The unlawful and unfair business practices of Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Automotive Parts (or vehicles containing them). Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

567. The conduct of Defendants as alleged in this Consolidated Complaint violates Section 17200 of the California Business and Professions Code.

568. As alleged in this Consolidated Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

**REDACTED**

569. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

570. Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

571. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and purchasers of vehicles.

572. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

573. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

574. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

575. Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Parts were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

**REDACTED**

576. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Parts. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Parts because they were unaware of the unlawful overcharge and because they had to purchase Automotive Parts in order to operate their vehicles. Defendants' conduct with regard to sales of Automotive Parts, including their illegal conspiracy to secretly fix the price of Automotive Parts at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs.

577. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Parts as set forth in N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles.

578. Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

579. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and vehicle purchasers.

**REDACTED**

580. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

581. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

582. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

583. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Parts were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

584. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

585. Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Parts, including in New York.

586. Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Automotive Parts were misled to believe that they

**REDACTED**

were paying a fair price for Automotive Parts or the price increases for Automotive Parts were for valid business reasons; and similarly situated purchasers were affected by Defendants' conspiracy.

587.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

588.    During the Class Period, Defendants, directly, or indirectly, and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Automotive Parts in New York.

589.    Defendants knew that their unlawful trade practices with respect to pricing Automotive Part would have a broad impact, causing class members who indirectly purchased Automotive Parts to be injured by paying more for Automotive Parts than they would have paid in the absence of Defendants' unlawful trade acts and practices.

590.    Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

591.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

592.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Parts were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

593.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injury to purchasers and broad adverse impact on the public at large, and harmed the public interest of

**REDACTED**

North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

594. Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts, including in North Carolina.

595. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers in North Carolina.

596. Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

597. During the Class Period, Defendants directly, or indirectly, and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Automotive Parts in North Carolina.

598. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

599. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

**REDACTED**

600.    Defendants' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Parts.

601.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

602.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

603.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.[2]

604.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

605.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Parts were sold, distributed, or obtained in Vermont.

606.    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Automotive Parts. Defendants owed a duty to disclose such facts, and considering the relative

---

[2] Plaintiffs include this claim for the purpose of preserving appellate rights.

**REDACTED**

lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their Automotive Parts prices were competitive and fair.

607. Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

608. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

609. Defendants' deception, including their omissions concerning the price of Automotive Parts, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Automotive Parts at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**REDACTED**

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

610.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

611.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, except California.  Plaintiffs also bring this claim under the laws of South Carolina, Missouri, Massachusetts, and Illinois on behalf of the Plaintiffs who have their primary places of business in those states and the class members in those three states.

612.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Parts.

613.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Automotive Parts.

614.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

615.    Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased vehicles containing Automotive Parts subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

**REDACTED**

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

616.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

617.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

     a.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

     b.    A *per se* violation of Section 1 of the Sherman Act;

     c.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

     d.    Acts of unjust enrichment by Defendants as set forth herein.

618.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

619.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

**REDACTED**

620.    Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

621.    Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

622.    Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Consolidated Complaint;

623.    Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

624.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**REDACTED**

DATED: December 18, 2015.

Respectfully submitted,

/s/ Jonathan W. Cuneo

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Yifei Li
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211

Gerard V. Mantese
(Michigan Bar No. P34424)
Alexander E. Blum
(Michigan Bar No. P74070)
Mantese Honigman P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
ablum@manteselaw.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker
Suite 801
St. Louis, MO 63101
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Thomas P. Thrash
Marcus Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201

**REDACTED**                    145

Telephone: (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL 32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com


Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

Telephone: (501) 374-1058
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

*Attorneys for Dealership Plaintiffs*

**REDACTED**

146