REDACTED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| In Re: All Cases | : : : : : : : : | |
| THIS DOCUMENT RELATES TO: All Dealership Actions | : : : : : | |

## REPLY IN SUPPORT OF DEALERSHIP PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

REDACTED

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………………… ii
TABLE OF AUTHORITIES……………………………………………………… iii
MOST APPROPRIATE AUTHORITIES…………………………………………… vi

I.    Preliminary Statement………………………………………………………… 1
II.   Defendants' Arguments That the Proposed Topics Are Relevant Are
      Unpersuasive……………………………………………………………….. 2

      A.  The Topics Concerning Ancillary Aspects of the Transactions and Offsets   2
      B.  The Topics Concerning Downstream Transactions……………………….. 8
      C.  The Topics Are Not Justified by Defendants' Incorrect Critique of
          "Insufficiency"…………………………………………………………….. 14

III.  The Noticed Topics Should Be Stricken………………………………………… 16
      A.  Topic No. 1……………………………………………………………… 16
      B.  Topic No. 4……………………………………………………………… 17
      C.  Topic No. 5……………………………………………………………… 19
      D.  Topic No. 6……………………………………………………………… 20
      E.  Topic Nos. 7 and 8……………………………………………………… 21
      F.  Topic No. 9……………………………………………………………… 22
      G.  Topic No. 10 …………………………………………………………… 24
      H.  Topic Nos. 11 and12……………………………………………………… 25
      I.  Topic No. 13…………………………………………………………….. 27
      J.  Topic No. 14…………………………………………………………….. 29
      K.  Topic No. 15…………………………………………………………….. 29

IV.   The Topics Are Overbroad, Unduly Burdensome, and Otherwise
      Disproportionate………………………………………………………………. 30
      A.  Defendants Misstate the Law Concerning, And Fail To Justify Duplicative
          Discovery………………………………………………………………….. 30
      B.  The Topics Are Overbroad……………………………………………… 32
      C.  The Topics Are Unduly Burdensome …………………………………… 34

V.    Defendants Mischaracterize Auto Dealers' Position…………………………….. 35

VI.   Conclusion ……………………………………………………………………. 36

REDACTED

## TABLE OF AUTHORITIES

**Cases:**

*Aikens v. Deluxe Financial Servs., Inc.*, 217 F.R.D. 533 (D. Kan. 2003)................ 34

*Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983).................... 7

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013)..................................... 16

*Carrera v. First Am. Home Buyers Prot. Co.*, No. 13CV1585-BAS JLB,
2014 WL 3695403 (S.D. Cal. July 23, 2014)............................................. 35

*Chattanooga Foundry* [*& Pipe Works v. Atlanta*, 203 U.S. 390
27 S.Ct. 65, 51 L.Ed. 241 (1906).................................................... 4, 13

*Clayworth v. Pfizer, Inc.*, 233 P.3d 1066 (Cal. 2010)................................... 11

*Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70 (D. Conn. 2010)........................... 32,35

*Fid. Mgmt. & Research Co. v. Actuate Corp.*, 275 F.R.D. 63 (D. Mass. 2011)......... 17

*Great Am. Ins. Co. of New York v. Vegas Const. Co.*, 251 F.R.D. 534 (D. Nev. 2008) 31

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968)................. 14

*Health Grades, Inc. v. MDx Medical, Inc.*, 2013 WL 1777575 (Apr. 25, 2013)........ 33

*India Brewing, Inc. v. Miller Brewing Co.*, 237 F.R.D. 190 (E.D. Wis. 2006).......... 19

*In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 4916723
 (E.D.N.Y. Nov. 24, 2010)............................................................ 14

*In re Airline Ticket Com'n Antitrust Litig.*, 918 F. Supp. 283 (D. Minn. 1996)........ 8,14

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001)................. *passim*

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, No. 11-00009-SLR,
2015 WL 6181748 (D. Del. Oct. 21, 2015)............................................. 7,8

*In re Honeywell Intern., Inc.*, 230 F.R.D. 293 (S.D.N.Y. 2003).......................... 19

*In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003)................... 8

*In re Methionine Antitrust Litig.*, 204 F.R.D. 161 (N.D. Cal. 2001)................... 9

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015)............................... 6,8,9

iii

REDACTED

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995)...........................   10

*In re TFT-LCD (Flat Panel)*, 2012 WL 6709621 (N.D. Cal. Dec. 26, 2012)...........   12

*In re Urethane Antitrust Litigation*, 237 F.R.D. 454 (D. Kan. 2006)....................   13

*In re Visa/Mastermoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000),
*aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied sub nom*.......................................   10

*In re Vitamins Antitrust Litig.*, 259 F. Supp. 2d 1 (D.D.C. 2003).........................   8,11

*In re Western Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973).......................   13

*In re Wholesale Grocery Products Antitrust Litigation*, No. 09-MD-2090 ADM/AJB,
2012 WL 3031085 (D. Minn. July 25, 2012)................................................................   21

*J.C. Bradford & Co.*, 925 F.2d 901 (6th Cir. 1991).............................................   36

*Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049 (7th Cir.2000)............................   33

*Martin v. Allstate Ins. Co.*, 292 F.R.D. 361 (N.D. Tex. 2013)............................   19,20

*Negotiated Data Sols. LLC v. Dell, Inc.*, No. C09-80012, 2009 WL 733876
(N.D. Cal. Mar. 17, 2009)..............................................................................................   20

*Paper Sys., Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629 (7th Cir.2002)..............   9

*Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633 (D. Minn. 2000)...................   33

*QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676 (S.D. Fla. 2012)................   33

*Richardson v. Rock City Mech. Co., LLC*, No. CV 3-09-0092, 2010 WL 711830 (M.D.
Tenn. Feb. 24, 2010)........................................................................................................   21

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015)...........................   16

*Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004)...................   30

*State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490 (Minn. 1996)..............   13

*United Techs. Motor Sys., Inc. v. Borg-Warner Auto., Inc.*, No. CIV.A. 97-71706, 1998
WL 1796257 (E.D. Mich. Sept. 4, 1998)......................................................................   33

*United States v. J.M. Taylor,* 166 F.R.D. 356 (M.D.N.C. 1996).........................   33

iv

REDACTED

**Rules:**

Fed. R. Civ. P. 26(b)(1)……………………………………………………………… 19

Fed. R. Civ. P. 26(b)(2)(C)(i)……………………………………………………… 32

Fed. R. Civ. P. 30(b)(6)……………………………………………………………… *Passim*


**Statutes:**

D.C. Code Ann. § 28-4509 (West)………………………………………………… 11,14

Minn. Stat. § 325D.57……………………………………………………………… 11

N.Y. Gen. Bus. Law § 340 (McKinney)………………………………………..... 11

S.D. Codified Laws § 37-1-33…………………………………………………... 11

Clayton Act, 15 U.S.C. § 15……………………………………………………….. 10

Sherman Antitrust Act, 15 U.S.C. § 1……………………………………....... 10


**Other Authorities:**

8 Charles Alan Wright & Arthur R. Miller, Federal Practice and 17
    Procedure § 2102 (3d ed. 2010)…………………………………………………

8 Charles Alan Wright & Arthur R. Miller, Federal Practice and 33
    Procedure § 2103 (3d ed. 2010)…………………………………………………

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal* 4
    *and Economic Issues*, Ch. 6, "Overcharges" (1996)………………………………

Craig M. Roen & Catherine O'Connor, *Don't Forget to Remember Everything:* 33
*The Trouble with Rule 30(b)(6) Depositions*, 45 U. Tol. L. Rev. 29 (2013)………….

Davis & Cramer, *Antitrust, Class Certification, and the Politics* 9
    *of Procedure*, 17 Geo. Mason L.Rev. 969 (2010)…………………………………………

REDACTED

# MOST APPROPRIATE AUTHORITIES

**Orders**

Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) (Filed 10/16/14)

**Cases**

*Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70 (D. Conn. 2010)

*In re Airline Ticket Com'n Antitrust Litig.*, 918 F. Supp. 283 (D. Minn. 1996)

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001)

*In re Cardizem CD Antitrust Litig.* 200 F.R.D. 326 (E.D. Mich. April 3, 2001)

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015)

**Rules**

Fed. R. Civ. P. 26(b)

Fed. R. Civ. P. 30(b)(6)

REDACTED

## I.    PRELIMINARY STATEMENT

Defendants' opposition to Auto Dealers' motion for protective completely fails to justify Defendants' overbroad and largely irrelevant Notice, which serves no purposes other than needlessly burdening Plaintiffs and serving as pretext for superfluous, additional depositions.

The main reason Plaintiffs and Defendants are engaging in this extended briefing is that the Defendants refuse to recognize the rulings in this case and the statements by the Court and Master regarding the appropriate boundaries for Indirect Purchaser depositions.  Defendants do not address and have no response to the Court's and the Master's statements regarding the appropriate topics for the Dealership depositions, such as "how much they paid for the car and where they purchased the car," and the necessarily "relatively limited" nature of those depositions for indirect purchasers like Dealerships. Transcript from May 26 Telephonic Hearing, at 6-7, attached as Ex.1; January 28, 2015 Status Conference Transcript, Ex.2. Nor do Defendants adhere to the rulings previously made by the Master on their discovery topics. Indeed, despite not having appealed these rulings, Defendants seek that the Master reverse his prior decisions, even going so far as to cite caselaw and make arguments the Master has previously rejected.

Indeed, last year, the next day after the Master issued his October 16 Order on their motion to compel, Defendants served third party dealerships with subpoenas seeking the same information they had just been told was not discoverable.  *Compare* October 16 Order (denying discovery of 1) financing, 2) monthly payments, 3) purchasing strategies and 4) financial documents) *with* Examples of Third Party Subpoenas, attached as Exs.3, 4 (seeking discovery of (1) financing information (Request No.1); (2) purchasing strategies (Request No. 4); and (3) financial documents (Request No. 1 & 2)).  This trend continues. Defendants persist in refusing

1

REDACTED

to comply with the boundaries set by prior rulings and seek discovery beyond the scope of what is relevant to Dealerships' claims that they were overcharged for the vehicles they purchased.

As for Defendants' Interrogatory No. 4, Defendants fail to show in their motion to compel or reply that they are entitled to the names of nearly a dozen dealership employees who have nothing to do with the dealerships' purchases of vehicles.  Defendants do not even try to address that issue in their opposition here.  The most Defendants say is that Dealerships cannot choose Defendants' 30(b)(1) deponents.  But of course, that is not what Dealerships are proposing.  Consistent with the provision in Fed. R. Civ. P. 30(b)(1) that the requested deponent be described in the notice, Dealerships have offered to have Defendants choose the type of employee they want to depose, describe that employee in their notice, and, if such an employee is a reasonable deponent, Dealerships will produce such deponent.  Defendants have provided no reason why this standard procedure should not work in this litigation.

## II.     Defendants' Arguments That the Proposed Topics Are Relevant Are Unpersuasive

### A.     The Topics Concerning Ancillary Aspects of the Transactions and Offsets

Defendants' arguments that they need discovery on all costs Dealerships incur in doing business and a variety of amounts that "flowed between the Auto dealer and the OEM" were already rejected last year. Order, Case No. 2:12-cv-00102-MOB-MKM (Doc # 214) (Filed 10/16/14) (October 16 Order).

Defendants refuse to accept the Master's 2014 Rulings, and seek reversal of these orders, despite not appealing them within the appropriate time period. Defendants start off by pointing to Dealerships' invoices (which Defendants have had for years, including before the October 2014 Order and before the briefing on that order commenced).

REDACTED

REDACTED



Further, in re-arguing this issue, Defendants ignore the formula for calculating damages in this District (and most districts), which is "the difference between the actual price and the presumed competitive price" of the product at issue. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 309-310 (E.D. Mich. 2001) (citing *Chattanooga Foundry* [*& Pipe Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906) *and* quoting ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues,* Ch. 6, "Overcharges" at 172 (1996)).

REDACTED



A request for this type of information has been rejected even by the OEMs, who stated in

a letter sent last week that:

[the requesting parties] have made no showing that the Defendants' conspiracies to fix
component prices had any bearing on financing charges. And like insurance markets, finance
markets are highly competitive and fragmented. In any event, the price of components such as
wire connectors and rubber parts are too tangential to have any significant effect on financing
rates. In your letter, you do not claim otherwise. Instead, you make the circular assertion that the
Parties are entitled to seek enforcement of the subpoena from "the finance and credit entities …
because they bear directly on … dealer and consumer financing terms." That, however, is not
sufficient to establish relevance of this information to this case or to justify such an unwarranted
fishing expedition.

Kass Letter from OEMs, dated December 18, at 4, attached as Ex.5.



REDACTED



t is "incorrect[]" to "assume that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury." *Nexium Antitrust Litig.*, 777 F.3d at 27.  Such offsets do not apply to a dealer's purchase.

In their attempt to attain reversal of the Master's finding that financing and other non-vehicle price aspects of the transaction are irrelevant to the issue of how much Dealerships overpaid for their vehicles, Defendants make the same argument and cite *the same case* already rejected in the Master's ruling on their motion to compel this information last year. *Compare* Defendants' opposition, at 13, citing *Bouldis v. U.S. Suzuki Motor Corp. with* Defendants' Reply in Support of Motion to Compel, citing *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1331 (6th Cir. 1983) at 3, in Case No. 2:12-cv-00102-MOB-MKM Doc # 199 <u>(Filed 09/10/14)</u> in response to which the Master ruled that the request for financing "is DENIED as this information is irrelevant, not likely to lead to the discovery of relevant information." October 16 Order, at 1.

The Master was right to rule the way he did.  Defendants' case deals with whether an action can be brought under the Sherman Act for a restraint on credit or allowances.  It does not

REDACTED

deal with the issue here—whether, when calculating whether there was an overcharge on a particular price, various other non-price terms like financing can be factored in to offset the overcharge. The answer is no. In any event, no one is alleging here, the allegations that were made in *Bouldis*, namely that the OEMs who make dealerships' new vehicles provide them with lines of credit or that the OEMs linked the payment of allowances to the quantity of vehicles the dealer agreed to buy, such that one would move in tandem with the other.

Defendants' citation to *Class 8* is also inapposite. The case involved not dealerships, but end-payors, who bought customized trucks, on which the financing and credit terms varied and were negotiated with the purchase of every vehicle. That is of course not alleged or argued with regard to Dealerships, who would not negotiate purchase of vehicles on a vehicle-by-vehicle basis as a consumer might and who,                                There are no allegations that any dealers might have received "special" or "preferred" financing or buy-back or trade-in terms on any specific vehicles. Further, in *Class 8*, the financing appears to have been provided by the OEMs themselves or their "captive" companies,

Nor is there any indication that the *Class 8* court considered the authority Dealerships have cited here, concerning the inapplicability of offsets to the overcharge determination.

In any event, the request to consider such ancillary terms has been rejected in other antitrust class actions. *See In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 190 (D.N.J. 2003) (rejecting the argument that financing terms, trade-in values for the customer's old car, a

REDACTED

myriad of optional features with which the car may be equipped, and varying levels of supply and demand between the different models would prevent class certification and noting that these factors do not bear on "the core issue of the fact of antitrust injury").

Defendants also claim that *Nexium* helps them, given the discussion of rebates in the opinion. This is because the Defendants in that case showed that rebates existed when the conspiracy was in effect, but presumably would not have existed had the conspiracy not been in effect, because the rebates applied to the branded drug, which was on the market, but apparently not the generic drug which was blocked from the market. Here, there is no allegation or argument at all that rebates were affected by the conspiracy, or that the conspiracy in any was targeted towards rebates. Similar to the example above, rebates would have existed in both the competitive market and the conspiratorial market, thus they would cancel out of the analysis, and the parties' experts would be left comparing the conspiratorial price to the competitive price of the vehicles, as stated in caselaw in this district.

Defendants also state that in *Airline Tickets*, certain contested discovery was allowed as a prophylactic. That is exactly what the nearly fifty sets of downstream data that Dealerships produced to Defendants are.

### B. The Topics Concerning Downstream Transactions

Defendants first cite to *Methonine*, which citation is of no moment. First, Defendants' statement of that case's holding is contrary to a statement in one of their own authorities, *Vitamins Antitrust Litigation*, that "[t]here is no mention that an indirect purchaser plaintiff must prove that it did not pass-on the overcharges to downstream indirect purchasers. As a result, this Court will not impose such a burden on Kellogg." *In re Vitamins Antitrust Litig.,* 259 F. Supp. 2d 1, 8 (D.D.C. 2003). Further, *Methonine*, a district court case decided almost fifteen years ago,

8

REDACTED

did not address a dispute between plaintiffs and defendants about whether the pass-on defense was applicable to the determination of whether an indirect purchaser was injured. In instances where there has been such a dispute, courts have stated that an injury occurs at the time of purchase and that the issue of whether a portion of the overcharge is at some later point in time is passed on to another buyer or otherwise recouped is not relevant to deciding whether a buyer was injured by paying an artificially inflated price at the time of purchase.

A Circuit court, earlier this year, made the determination that the co-payments insurance companies charged consumers (passed-on portions of the overcharge) should not come into play in deciding whether those companies were injured by being overcharged for the drug as result of Defendants' conspiracy, rejecting defendants' "incorrect[] assum[ption] that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015). The court thus stated "if a class member is overcharged, there is an injury," *id.* and "a class member suffered antitrust injury if that individual or entity was overcharged for Nexium during the class period," *Id.* at 26. The Court also explained that "'[p]aying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage.'" *Id.* at 27 (quoting Davis & Cramer, Antitrust, Class Certification, and the Politics of Procedure, 17 Geo. Mason L.Rev. 969, 984–85 (citing *Paper Sys., Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 633 (7th Cir.2002)).

Similarly, when asked to consider pass-on in its class certification analysis, the *Cardizem* court, in this District, rejected it. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 339. Judge Edmunds stated in her opinion in that case that proof of the fact of injury depended upon Plaintiffs' "prov[ing] that Defendants' illegal agreement caused all class members to pay a supra-

REDACTED

competitive price for Cardizem CD in the pre-entry period (fact of injury)." *Id.* at 339. There

was no pass-on analysis that entered into the determination of whether insurance companies, the

intermediate sellers in that case, suffered damages. The court stated "Plaintiffs assert that, prior

to the June 1999 entry of generic competition, all class members were injured because all were

forced to pay a supra-competitive or monopoly price for Cardizem CD." *Id.* at 340. The court

accepted Plaintiffs' proof of their overpayment at the time of purchase as establishing injury and

stated it was "not convinced that the language of the Michigan Antitrust Reform Act requires any

greater proof of injury than do § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and § 4 of the

Clayton Act, 15 U.S.C. § 15 (which provides that "any person who shall be injured in his

business or property by reason of anything forbidden in the antitrust laws may sue therefore ...

and shall recover threefold the damages by him sustained, and the cost of suit, including a

reasonable attorney's fee")." *Id.* at 346.

The court also stated that

> Defendants also argue that Plaintiffs' injury analysis must consider whether third-
> party payer class members failed to mitigate their damages or passed-on any
> overcharges they may have incurred as a result of Defendants illegal conduct.
> Despite Defendants' claims to the contrary, "the presence of individualized
> defenses, such as mitigation, going only to damages are generally regarded as no
> barrier to class certification." *In re Visa/Mastermoney Antitrust Litig.*, 192 F.R.D.
> at 86. "[T]he fact that the damages calculation may involve individualized
> analysis is not by itself sufficient to preclude certification when liability can be
> determined on a class-wide basis." *In re Potash Antitrust Litig.*, 159 F.R.D. at
> 697.

*Id.* at 347 (E.D. Mich. 2001). It thus declined to consider the issue of whether insurance

companies or health plans passed on their overcharges. *Id.*

Defendants also cite to seven state laws (out of the thirty under which Plaintiffs bring

their claims) and point to their mention of pass-on. But, as Defendants fail to mention in their

selective quotations, just about every one of those laws states only that pass-on may be asserted

REDACTED

"so as to avoid duplication of recovery of damages" and that the court will take steps to avoid

duplication including "the transfer and consolidation of all related actions." N.Y. Gen. Bus. Law

§ 340 (McKinney) *See e.g.* D.C. Code Ann. § 28-4509 (West).[2] Defendants do not and have not

expressed any concerns about duplicative damages or provide any declaration or other evidence

demonstrating that they are at risk for duplicative damages—all plaintiffs are before this Court in

coordinated actions. Instead, Defendants have stated that they wish to use the pass-on defense to

defeat class certification or show a lack of the fact of injury, so that no indirect purchasers may

recover. The statutes do not permit the use of pass-on for these purposes. The purpose of these

statutes was to make sure Defendants did not pay twice, not that they did not pay at all—these

statutes were not intended to be exculpatory. Defendants also cite to several state laws that

simply state that a court may employ measures to avoid duplication of damages. For instance,

the state statute of South Dakota asserts that duplication should be avoided "[i]n any *subsequent*

*action* arising from the same conduct." S.D. Codified Laws § 37-1-33 (emphasis added), *see also*

Minn. Stat. § 325D.57. This involves making certain that no purchaser comes along in a later

action seeking the same damages recovered in this litigation. A subsequent litigation is not a

---

[2] Defendants' claim that *Vitamins Antitrust Litigation* stands for the proposition that a pass-on defense is allowed in any state where indirect purchasers are permitted to recover actual damages is also incorrect. First, that opinion only cites to the Michigan Antitrust Act, and Defendants do not cite to any other law in their assertion regarding the meaning of the statutory language, as described *supra*. In any event, the *Cardizem* court rejected the idea of considering pass-on if Defendants did not present an on-point state court opinion calling for such a consideration. *Cardizem CD Antitrust Litig.*, 200 F.R.D. at 347 (stating that pass-on is an issue "Michigan courts have apparently not yet addressed"). Further, the term "actual damages" most likely refers to non-punitive damages or damages prior to trebling, not damages minus pass-on. Defendants also cite to *Clayworth v. Pfizer,* which states that "under the Cartwright Act as under federal law, that a pass-on defense generally may not be asserted. Instead, in an antitrust price-fixing case, the presumptive measure of damages is the amount of the overcharge paid by the plaintiff." *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010).

REDACTED

threat here, given that there is an order in place from the Judicial Panel on Multidistrict

Litigation coordinating all actions related to the *Automotive Parts* conspiracy, that no dealerships

have opted out of the dealership class action, and that statutes of limitations have begun to run.

Even if there were such a threat, it would be dealt with in the subsequent litigation, not here.[3]

      Further, the issue of damage duplication concerns not the fact of injury, but the ultimate

amount of damages. Thus, this provision is not applicable in proving whether a dealership was

injured when it purchased its vehicles or determining whether a dealership class meets the

requirements of class certification.  It only relates to apportionment of damages at the completion

of any litigations. Defendants do not require and may not use pass-on discovery to rebut the fact

of injury or to defeat class certification.  Thus, the enormous amount of discovery they demand

allegedly to prove pass-on in order to defeat a showing of injury or class certification is not

justified by these statutes and completely beside the point.

      Indeed, the Supreme Court of one of the states cited by Defendants rejected the pass-on

defense thusly:

> The argument that no injury has been suffered because costs were passed through
> one entity to customers, consumers, or other entities usually arises in antitrust
> cases. It has been uniformly rejected in the courts, primarily on the theory that *the
> injury is sustained as soon as the price, artificially raised for whatever reason,
> has been paid.* This pass through argument was first considered and rejected by
> the U.S. Supreme Court in a 1906 antitrust matter, where Justice Holmes
> wrote:[a] man is injured in his property when his property is diminished. * * *
> [W]hen a man is made poorer by an extravagant bill we do not regard his wealth
> as a unity, or the tort, if there is one, as directed against that unity as an object.

---

[3] This was the situation in in *TFT-LCD*, where the class litigation had already been settled when
certain resellers, not in a class action, brought suit to recover damages that had already been
distributed to consumers. *In re TFT-LCD (Flat Panel)*, 2012 WL 6709621 (N.D. Cal. Dec. 26,
2012).  This of course is not the situation here. *TFT-LCD* does not suggest that pass on can affect
a plaintiff's ability to prove common impact, or otherwise affect class certification.

REDACTED

> We do not go behind the person of the sufferer. We say that he has been
> defrauded or subjected to duress, or whatever it may be, and stop there.
> *Chattanooga Foundry v. Atlanta*, 203 U.S. 390, 399, 27 S.Ct. 65, 67, 51 L.Ed.
> 241 (1906).

*State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 496 (Minn. 1996) (emphasis added)

("it was the intent of the Minnesota legislature to abolish the availability of the pass through

defense by specific grants of standing within statutes designed to protect Minnesota citizens from

sharp commercial practice.").

In any event, if Defendants merely require downstream discovery to determine the figure

representing Dealerships' damages, this is an empirical inquiry, that can be determined from the

transaction data Dealerships have already provided to Defendants.

Defendants cite *In re Western Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973). But

that case supports Plaintiffs' position: the issue of pass through is irrelevant to injury, and can be

resolved through the apportionment of damages. *See id.* at 200 (explaining that "[p]roblems of

the apportionment of damages, as between an intermediary and an ultimate consumer, may be

treated after liability is established"); *see also id.* at 201.

Neither is *In re Urethane Antitrust Litigation*, 237 F.R.D. 454 (D. Kan. 2006) of any help

to Defendants. As other courts have subsequently noted, the decision to permit downstream

discovery there was "[a]gainst the tide of cases precluding discovery of 'downstream'

information." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 4916723, at *2

(E.D.N.Y. Nov. 24, 2010).

Defendants also claim to distinguish *Airline Ticket Commission*, as it cited *Hanover Shoe*

to support its reasoning, but have provided no authority that state laws cannot look to *Hanover

Shoe* for interpretation. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).

Indeed, most state laws assert that federal law should be applied in construing them. *See e.g.*

REDACTED

D.C. Code Ann. § 28-4515 (West) ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes.").

### C.   The Topics Are Not Justified By Defendants' Incorrect Critiques of "Insufficiency"

Defendants also argue that they need testimony on issues covered by the data and document production because the production was "insufficient." It is difficult to understand which "details" of the relevant transactions are missing. Nor do Defendants provide any information on this point. Indeed, in making their motions to compel these reports this spring, Defendants argued that they wanted OEM reports to cover time periods that may not be covered by data.

Defendants repeatedly claim that the documents and data do not explain how the final terms were arrived at. First, this is incorrect. Defendants receive information about the MSRP, and the final agreed price, including down payment, amount financed and financing terms. Second, Defendants do not say why such testimony is necessary. If, as Dealerships have repeatedly pointed out, discovery on dealerships' sales has no bearing on antitrust injury or

14

REDACTED

impact, and, at most goes to determining the numerical figure representing the total amount of damages, and if individualized damage issues cannot defeat class certification, the details of how every negotiation proceeded cannot be relevant. Finally, Defendants do not explain what possible testimony they might receive that would shed light on exactly how a salesperson and a consumer came to a deal on, for instance, one of the thousand vehicles that dealer sold in 2005. This is truly stretching the limits of recollection and competent testimony and imparts an untenable burden on the dealership (especially when the relevant salesperson may not even work at the dealership any longer). How will a salesperson recall his conversation with his manager from three months ago, much less nine years ago?

Finally, Defendants point to the Master's recent order granting the depositions of certain non-party dealers in the End Payor Actions arguing that "[i]t would be illogical" to allow those depositions to take place while denying such testimony here. Defs. Mem. at 19-20. Quite the contrary, there would be nothing illogical about it in the slightest: the permitted depositions were permitted in order to determine whether *End Payors* were overcharge for their vehicles and therefore suffered an antitrust injury.[4] For the same reason, the cases cited by Defendants for the proposition "that details of individual negotiations in vehicle sales are relevant to whether overcharge has been passed on to consumers" simply have no bearing on this case. Defs. Mem.

_____

[4] Moreover, in their depositions of third party dealers, Defendants will seek deposition testimony of the specific transactions at issue in the End Payor actions. *See* 2:12-cv-00103, Dkt. No. 371-1 (wherein Defendants argued that they need the requested depositions to determine "whether any alleged overcharge was passed on to that named EPP, especially considering the highly-individualized, context-specific factors that go into determining the terms of that new vehicle transaction"). Needless to say, the burden of preparing for and discussing the details of *a single* transaction is far different than that of preparing for and discussing each and every downstream transaction.

REDACTED

at 20. As is explained above, the relevant question is this case is whether Dealers overpaid for their vehicles, and not whether the Dealers negotiated prices with the End Payors. *See Cardizem*, 200 F.R.D. at 309.

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013), is also completely inapposite. There, the Court expressed a concern that certifying an insufficiently ascertainable class would deny a defendant its right to challenge class membership. *Id*. at 307. That holding— which incidentally, was rejected by the Sixth Circuit, *see Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) simply has no bearing on this case.

## III.    The Noticed Topics Should Be Stricken

### A.    Topic No. 1

Defendants suggest that a topic seeking the factual basis of an allegation is proper, because "[o]n its face, [it] seeks no information implicating either the attorney-client privilege or work product protections." Defs. Mem. at 31.[5] Not so. Topics seeking "to discover the *facts* which form the basis" of a claim are disfavored, because "asking a 30(b)(6) witness, usually a non-lawyer, to answer this type of questions after being prepared in the manner of 30(b)(6) witnesses makes it extremely difficult to distinguish between 'facts' (not protected) and the issue of why those facts have legal consequences, which usually has a work-product (lawyer's mental impressions) dimension. This problem is more acute since it is most likely that the lawyer was the source of the information which was provided to the 30(b)(6) witness so that

---

[5] Defendants groundlessly accuse Auto Dealers of "misleadingly omit[ting]" the fact that Defendants seek "the factual basis for" the allegations in the complaint." Defs. Mem. at 31. In fact, Auto Dealers' moving brief specifically explained why, "[t]o the extent it seeks testimony on the factual bases for the complaints," Topic No. 1 is impermissible. AD Mem. at 17.

REDACTED

he could answer the questions on behalf of the corporation and bind the corporation to those answers." *Fid. Mgmt. & Research Co. v. Actuate Corp.,* 275 F.R.D. 63, 64 (D. Mass. 2011); *see also* 8A Fed. Prac. & Proc. Civ. § 2102 (3d ed.) ("Questioning of a corporate representative pursuant to Rule 30(b)(6) about the facts underlying allegations in pleadings may present a particular problem verging on taking the deposition of counsel." (footnote omitted)).

Requiring Auto Dealers to prepare for and undergo questioning is therefore unduly burdensome: it serves no purpose other than filling up the allotted seven hours with irrelevant and harassing questions.

### B.    Topic No. 4

Instead of seeking to defend their unreasonable request that Plaintiffs testify to self-explanatory data, covering thousands of transactions, or simply accepting Plaintiffs' offer to respond to any data questions via letter, which would be the most appropriate way to address the detailed questions Defendants might have (and which Dealerships have already begun doing), Defendants once again re-write this topic. It is important to note that this topic was not even in their original notice. It appeared for the first time in Defendants' first revised notice.

Defendants now say that they want to know how each dataset was created, what information was intended to be captured and the data's uses. But Defendants know exactly what was intended to be captured and how the datasets were created because, as they have asserted in other briefs, they specifically negotiated the 200 fields of data that were to be captured (attached to the parties' May 2015 stipulation) as well as the creation of the datasets. Defendants, as they asserted in their numerous briefs on the issue, know well what the data is used for—to document

17

REDACTED

dealership's new vehicle transactions (just as a Defendants' transactional data is used to document its sales).

Further, Defendants know that Dealerships are small businesses who are not data experts, and would likely be unable to themselves accurately create the enormous data compilations Dealerships produced to Defendants. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ If forced to designate someone to respond to this topic, Dealerships would most likely have to choose and someone who would likely be unable to answer Defendants' questions to their satisfaction. Further, this request may require Dealerships to add to the deponent roster someone who would likely not otherwise be an appropriate deponent in this action (like an IT person) or to educate someone without an underlying understanding of the data.

No mention is made of what use Defendants intend to make of the information they seek with this request when the data production has already been made, and extensively litigated, by Defendants, which briefing resulted in a supplemental production from Plaintiffs (not to mention third-party subpoenas). Defendants have negotiated Dealerships' data production and have agreed that this production, along with the other documents Plaintiffs produced this summer and fall, resolved their comprehensive downstream discovery requests. If no production or negotiations had taken place yet, this request might be understandable. But, as it stands, there is no articulable use for this topic in Defendants' defenses against Dealerships' claims, and its existence is pure burden, when added to the extensive burdens Dealerships have undertaken.

For the same reasons as stated above, a full-day 30(b)(1) deposition of a dealership employee related to data, as contemplated by Defendants' Interrogatory 4, from which this motion also seeks protection, is inappropriate. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



### C.     Topic No. 5

Despite Defendants' claim to the contrary, there are innumerable cases concluding that discovery into a party's policies for maintaining various documents is irrelevant absent a concrete basis that spoliation or other discovery abuse has occurred. *See, e.g., Martin v. Allstate Ins. Co.*, 292 F.R.D. 361, 363-64 (N.D. Tex. 2013) (denying plaintiff's request for a 30(b)(6) deposition on document retention policies on the basis that the request was overly broad and irrelevant); *India Brewing, Inc. v. Miller Brewing Co.*, 237 F.R.D. 190 (E.D. Wis. 2006) (holding that because there was no evidence that defendant had destroyed documents pertinent to the case, plaintiff "failed to persuade the court that the document retention policy . . . is relevant to any claim or defense alleged in the pleadings"); *In re Honeywell Intern., Inc.*, 230 F.R.D. 293, 302 (S.D.N.Y. 2003)(denying plaintiff's request that non-party accounting firm produce its document retention policies because there was no concrete basis for the request).[6]

Defendants do not deny that they desire this discovery to pursue matters irrelevant to a "claim or defense." Fed. R. Civ. P. 26(b)(1). Instead, they assert that this testimony is warranted

---

[6] Nor does the fact that the "custody, condition, and location" of a document or thing *can* be discoverable alter this conclusion. Fed. R. Civ. P. 26(b)(1) (2015 advisory committee notes). As the Rule makes clear, such materials are discoverable only where they relate to a "claim or defense." Fed. R. Civ. P. 26(b)(1).

REDACTED

in order "to seek testimony concerning the significant temporal gaps and other deficiencies in Auto Dealers' production of documents and data." Defs.' Mem. at 34. In other words, Defendants intend to poke around, with the unfounded hope of unearthing some type of conduct to attack.

████████████████████████████████████

██████████████ is not concrete evidence of wrongdoing on the part of Auto Dealers or their counsel, and does not warrant an intrusive and irrelevant fishing expedition. Defs. Mem. at 34. Indeed, the fact that certain auto dealers were not able to produce some of the thousands of pages of document requested is neither surprising nor at all indicative of misconduct. *See Martin*, 292 F.R.D. at 363-64 (denying request for deposition on defendant's retention policy, because "[w]hile Plaintiff speculates that Defendant may have additional documentation that it has not produced, there is no evidence to support that supposition at this point").

### D. Topic No. 6

Defendants do not dispute that this topic is duplicative, *see* AD Mem. at 22-23, but instead argue that they are permitted to "us[e the] deposition to confirm interrogatory answers." Defs. Mem. at 35. But courts can, and often do, preclude Rule 30(b)(6) topics that needlessly duplicate other discovery. *See, e.g., Negotiated Data Sols. LLC v. Dell, Inc.*, No. C09-80012, 2009 WL 733876, at *4 (N.D. Cal. Mar. 17, 2009) ("This court is unpersuaded that NVIDIA should be put to the burden of producing designee(s) for a deposition merely to confirm what kinds of documents NVIDIA has or whether there is anything else to be produced."). And indeed, limiting such "confirmatory" discovery is particularly sensible here, where the Court has limited each deposition to seven hours, and has explained its view that the scope of these depositions should be narrow. January 28, 2015 Status Conference Transcript, at 24.

20

REDACTED

### E.    Topic Nos. 7 and 8

As Auto Dealers explain in their moving brief (and as Defendants fail to discuss in theirs), Topic No. 7 cannot possibly be prepared for because while it "includ[es]" specific subtopics, it is "not limited to" them. This in and of itself is a basis for striking Topic No. 7. *Richardson v. Rock City Mech. Co., LLC*, No. CV 3-09-0092, 2010 WL 711830, at *6 (M.D. Tenn. Feb. 24, 2010).

As for Topic No. 8, the fact that it seeks "Your knowledge" of the marketplace does not limit it in scope, despite Defendants' insistence to the contrary. The notice, by its very terms, requires far more: it explicitly defines "Your" to include *not only the Dealership itself*, but also, among others the "present and former . . . servants, employees, officers, directors, [and] representatives" of the Dealers. (emphasis added). Accordingly, to comply with the plain language of the Notice, Auto Dealers would be required to prepare a witness as to *all these persons* knowledge. Needless to say, the topic is overbroad and unduly burdensome.

Finally, Defendants' contention that Auto Dealers' testimony on their competitors and the marketplace is relevant to this action is simply unpersuasive. Assuming arguendo, that differences in local markets could affect class certification, Auto Dealers will have, at best, anecdotal evidence about their competitors and the marketplace.[7] The fact that Defendants

---

[7] Moreover, *In re Wholesale Grocery Products Antitrust Litigation*, No. 09-MD-2090 ADM/AJB, 2012 WL 3031085, at *10 (D. Minn. July 25, 2012), like other cases Defendants cite rationalizing their downstream topics, is plainly distinguishable. There, the question was whether competition among the upstream defendants (the wholesalers) affected the price paid downstream by the plaintiffs (the retailers). This is a fundamentally different question than whether competition *among plaintiffs* affects the prices they charge down the distribution chain. Notably, Defendants do not suggest that regional competition affected the prices charged by OEMs to Plaintiffs.

REDACTED

withdrew their requests for documents concerning Auto Dealers' competitors (*see* AD Mem. at 23) suggests that Defendants know this to be true.

### F.   Topic No. 9

As Defendants note from the outset, Dealerships have offered to compromise with Defendants the first subsection of this Topic, and sub-topic (c) in Denso's Interrogatory No. 4. Despite having already provided Denso with Initial Disclosures identifying the owners, comptrollers and managers who they believe possess information about Dealerships' vehicle acquisitions and the prices they paid, Dealerships are willing to also provide the name of the employee working at the dealership who was the principal person responsible for vehicle purchases during the class period.  This does not mean that Dealerships have limited the request to only advising Defendants of the person currently responsible for purchases.  Dealerships are willing to identify the individual at the dealership, who had primary responsibility for vehicle purchases during the largest portion possible of the class period.  What Dealerships seek to avoid is identifying individuals no longer employed at the dealerships, who may be difficult to track down, who may not remember the information Defendants seek, and who may not provide optimal testimony.  Dealerships believe this is a reasonable offer.

In their second sub-topic, Defendants continue to seek information not about the prices Dealerships paid for their vehicles, which Defendants have and about which Dealerships are prepared to testify, but about the costs associated with operating the dealership, such as financing.  Contrary to Defendants' statements, the Master has ruled on such issues.  *See* October 16 Order, at 1 (denying information on financing as "is irrelevant, not likely to lead to the discovery of relevant information."); *see also* October 16 Order, at 2 (denying request for monthly payment information as "irrelevant, not likely to lead to relevant information.").  The

22

REDACTED

October 16 Order did not hold this information to be relevant. Dealerships did agree in that order (though they were not compelled) to produce documents showing "net price paid," and "monetary incentives, discounts and rebates applied" to that price.

However, there is no basis to provide testimony on incentives, rebates or any other figures not applied to the price the dealership paid to the OEM.

Nor is there even any mention of the allowances set forth in Defendants' Topic 9 (which Defendants do not argue are applied to reduce the vehicle's purchase price) or financing support in the list of issues on which Dealerships agreed to provide discovery on October 16, 2014.



Defendants are also incorrect that the Master has ruled on the propriety of any of these topics in the context of third-party depositions. The issue of what the contents of third party depositions may be has just now been placed before the Master.

Defendants also continue to argue for requiring a dealership to testify to its volume of purchase, not in the data or documents. As stated previously, searching and learning such information when it is not even in the invoices or data is extremely burdensome and Defendants have demonstrated no need for it. Defendants have enough data and documents to create viable

economic models and extrapolate information they do not have, if need be.  For a dealership employee to try to figure out and then verbally testify to what volume of new vehicles it might have bought in 2000, a year for which it has no invoices, is speculative and not useful.  To the extent that a dealership must respond that it does not know the answer, it runs a risk of Defendants' filing a motion against it following the deposition.

As to Dealerships' purchasing processes, Dealerships offered in their briefing, as a compromise, to produce any documents used in responding to Interrogatory 12—they were not ordered to make this production and there was no finding as to the relevance of this information. In any event, it is not clear why this request is relevant. Defendants have the prices dealerships paid, and the terms of each purchase in the invoices Dealerships have produced. It is not clear what other aspects of the purchasing process there are to offer testimony on.

As to the final subsection of Defendants' topic, Dealerships have already explained that it is not reasonable to expect a dealership to know how its competitors conduct their purchasing. Again, this topic creates a risk that the deponent will have to respond that it does not know the answer, which has the potential to incur motion practice from Defendants.

### G.      Topic No. 10

As Auto Dealers explained in their moving brief, the logistics of Auto Dealer and OEMs relationship are not at issue in this case, and do not bear on the question of whether Auto Dealers paid an overcharge as a result of Defendants' conspiracy. Compelling Auto Dealers to prepare to testify on the various terms in these contracts is therefore disproportionate and unduly burdensome. This is why the Special Master denied Defendants' request for franchise agreements and initially found such agreements irrelevant; and it is why, presumably, Defendants have not renewed this request, despite the fact that they had leave to do so.

REDACTED

Moreover, agreements between OEMs and Dealers with respect to ancillary issues, such as "allowances" and "floor plan support" are not relevant because, as explained above and in Auto Dealers' moving brief, those ancillary issues are irrelevant to these actions.

### H.      Topic Nos. 11 and 12

Unsurprisingly, Defendants barely attempt to argue for their topics concerning consumer purchases of products that are not vehicles. This is understandable in light of the fact that such products are not relevant to any overpayment or lack thereof as to new vehicles.  As the OEMs stated themselves in rejecting Defendants' requests for insurance information:

> The Parties, however, have not presented any basis – let alone a good faith basis – for asserting that insurance prices or any other insurance-related non-monetary component of retail car purchases were affected by the Defendants' conspiracies to fix the prices of vehicle components. How, for example, is the price of a wire or a piece of rubber supposed to have altered the price that a consumer pays for insurance or changed the amount of coverage that the consumer obtains? Indeed, any argument that the conspiracies had such an effect would be preposterous in light of the highly competitive and fragmented market for insurance.

Kass Letter from OEMs, dated December 18, at 3-4.

Similarly, with regard to financing, the OEM stated that:

> [the requesting parties] have made no showing that the Defendants' conspiracies to fix component prices had any bearing on financing charges. And like insurance markets, finance markets are highly competitive and fragmented. In any event, the price of components such as wire connectors and rubber parts are too tangential to have any significant effect on financing rates. In your letter, you do not claim otherwise. Instead, you make the circular assertion that the Parties are entitled to seek enforcement of the subpoena from "the finance and credit entities … because they bear directly on … dealer and consumer financing terms." That, however, is not sufficient to establish relevance of this information to this case or to justify such an unwarranted fishing expedition.

Kass Letter from OEMs, dated December 18, at 4.

Defendants' request for testimony on and the names of managers responsible for selling these products (in their Interrogatory No. 4) and even more attenuated products like roadside

REDACTED

assistance and key replacement goes nowhere.  The most Defendants say is that sometimes these products are purchased together.  But does that mean if a plaintiff were to allege a conspiracy on the price of steak, the prices of A1 sauce and baked potatoes would need to be explored as well? Where is the logical conclusion in this ongoing chain?  If Defendants are arguing that a dealership would sacrifice profits on its big ticket item, the vehicle, in order to make some small amount on ancillary products or that a salesman would compromise his commission so that an F&I manager could make some money on ancillary products, such an assumption makes no economic sense and has no effect on damages in any event. Even if it did, it could be explored through the data. Regardless, given that this request has been all but dropped Dealerships do not intend to expend more time on it.

Defendants again argue that they should receive testimony on the costs of selling vehicles.  As stated earlier, such costs of operating the dealership, which are not (even the selling) price of a vehicle, cannot have any relevance. It is also clear that when the Master rejected discovery on costs like financing and general topics regarding costs, like cost guidelines, he was indicating that costs are not relevant.

Defendants also, again, point to Dealerships' agreement, set forth in the October 16 Order, to produce an incentives or rebates applied to the price Dealerships paid for a vehicle— these were not incentives or rebates to consumers. Instead this concerned documents to be produced in response to Sumitomo Request No. 1, which dealt with the dealership's purchase of its vehicles from its OEM.  There was no statement on downstream production in the October 16 Order. The same is true of the reference to "trade-in allowance"—Dealerships agreed to produce any trade-in allowance to dealerships applied to the price the dealership paid for the vehicle, if such an allowance existed.  This had nothing to do with a trade-in allowance to consumers,

REDACTED

which in any event is recorded in the data. Defendants say they want to know how trade-in credits are calculated, but what does this have to do with whether the entire price agreed to by the consumer (including the cash and the trade-in) was too high? And what does it have to do with determining the ultimate measure of damages?

Defendants also argue that they need depositions to understand the "how" of each transaction. But this has nothing to do with even measuring the damages that an End-Payor sustained. Defendants' request that a dealer verify whether or not it has information beyond its data to respond to their numerous topics imposes an additional, unnecessary burden on Dealerships which is not mitigated by Defendants' limitation. Checking whether Dealers have the information is nearly the same burden as gathering the information in the first place. There is no requirement that Dealerships' information cover the entire 15-year class period, just as Defendants have argued there is no requirement that they produce information to cover the entire class period. Each party must produce enough information to allow a reasonable analysis.

As to the inquiry about Dealerships' competitors, again the concern is that the deponent will not know the answer prompting more disputes from Defendants, and motion practice.

**I.    Topic No. 13**

In their response to Dealerships' detailed section on this topic (described in Defendants' notice as "your DMS providers,") Defendants still do not offer a reason for this request or explain how they intend to use information about Dealerships' DMS providers. This is because, as they stated during the parties' meet and confer, Defendants seek to directly contact the DMS providers themselves, contrary to the Master's Order Quashing their subpoenas. Given that they have identified only an improper purpose for this topic, it should be stricken.

REDACTED

The Master and Dealerships have already advised Defendants that, if a request needs to be made of the DMS providers, Dealership counsel can make it. Indeed, in compliance with the Master's September 29 Order, Dealerships subpoenaed three DMS providers and successfully obtained data, which they produced to Defendants, as a result of their subpoena.

In their response, when called upon to defend this topic, Defendants state that they have questions about the data. This is already addressed in Topic No. 4 (Your transactional data). If Defendants have questions about the data or DMS providers, these may be posed via letter, as Defendants seem to have largely agreed to do.

Defendants have no response to Dealerships' statement in their motion that if Defendants want information about issues like "the periods for which any DMS provider maintained data" they may review the DMS providers' filings and declarations on such topics, provided as part of their Motions to Quash.

Finally, Defendants seem to argue that the fact that the data residing with DMS providers belongs to Dealerships that means that Dealerships should know all of the DMS providers' internal practices. That is of course not the case, and Defendants have not shown otherwise.

### J. Topic No. 14

Defendants contend that "the nature of" any class actions in which Auto Dealers have been involved "could well be relevant to class certification issues here." Defs. Mem. at 42-43. Yet Defendants wholly fail to explain why Auto Dealers' testimony concerning "the nature of" claims in which Dealers were plaintiffs could possibly be relevant here, let alone the feasible relevant of claims in which Dealers were defendants.

28

REDACTED

Defendants also argue that whether Auto Dealers were ruled adequate and/or typical class representatives in prior class actions might be relevant here. Assuming arguendo this is so, Topic No. 14, as written, concerns "[t]he facts, issues, and circumstances" of any class actions, as well as their "disposition[s]." To the extent Defendants mean to suggest that this topic encompasses questions on the substance of any rulings on class certification, Auto Dealers disagree. In any event, Auto Dealers have already provided Defendants with information on other class actions in which they have been plaintiffs. AD Mem. at 44. A quick PACER search would reveal whether class certification has been ruled on, and what the bases of any such rulings were.[8]

### K.    Topic No.15

As Dealers previously explained, a topic that seeks testimony on 25 "transactions and related documents, data, and records" is woefully unspecific. No deponent could, or should be expected to, offer binding testimony on behalf of its entity on such any and all issue concerning all "documents, data, and records" related to a given vehicle sale. And indeed, even construed narrowly, the topic could allow for abuse.

Defendants claim that these requests are based on the deal files they seek.  The Master has already denied one such request for deal files.  Order, at 7, 2:12-cv-00102-MOB-MKM Doc # 331, Filed 08/03/15.  Nor is the request for such documents appropriate, given that Defendants stipulated in the May 12, 2015 Order that their motion for downstream discovery, which sought

---

[8] Defendants' argument that Auto Dealers' interrogatory responses were "stunningly vague," and therefore unhelpful in determining the answers to the issues about which testimony is now sought, is nonsense. Defs. Mem. at 43. Again, the information provided in that interrogatory allows Defendants to determine through PACER, in a matter of moments, any information concerning prior class actions that could possibly be relevant to these actions.

REDACTED

this information, was resolved by that Order, if already covered by the DMS data, which Defendants appear to admit it is.

Defendants have little to say in response to Dealers' point that—assuming arguendo downstream transactions could impact class certification at all—such anecdotal evidence as can be gleaned from a handful of such transactions would not feasibly impact the Court's Rule 23 analysis.[9] The fact that the court in *Robinson v. Texas Automobile Dealers Association*—in evaluating the certification of a class of *consumers*—referenced a "real-life example of a bottom-line negotiation" in passing hardly justifies this burdensome topic. 387 F.3d 416, 423 n.25.

## IV.   The Topics Are Overbroad, Unduly Burdensome, and Otherwise Disproportionate

### A.   Defendants Misstate the Law Concerning, And Fail To Justify Duplicative Discovery

Defendants claim that their topics focus on Dealerships' sales and purchases of vehicles but even that is incorrect.  Defendants seek testimony about Dealerships' data systems and providers, other class actions, and ancillary products such as roadside assistance and key replacement.  None of these are the vehicles that are the subject of this case. Nor is Defendants' assertion that they are seeking information about "practices and policies" relating to vehicles correct.  Defendants, on top of asking Plaintiffs to opine on everything ranging from their competitors, to their business relationships with OEMs, also ask Plaintiffs to go through twenty-

---

[9] Nor can any testimony stemming from these transactions be anything other than anecdotal, given that Defendants cherry picked the transactions that they anticipate will best suit their theory of the case, rather than randomly selecting transactions. *See* Defs. Mem. at 44 (explaining that the selected transactions are, in Defendants' estimation, "particularly relevant to the issues in this case").

REDACTED

five specific transactions and be prepared to testify on the over 100 pages of documents related to each transaction.

In their moving brief, Plaintiffs noted that for many of the topics about which Defendants seek testimony, Plaintiffs have produced data and documents that speak for themselves, and about which no testimony would be useful. Defendants cite to one case, *Great American Insurance*, for their claim that the nearly three-quarter million pages of documents and nearly fifty data sets Plaintiffs produced are not enough.  But that case is of no moment here.

There, the deponent did *not* move for a protective order and did not dispute any of the topics in the 30(b)(6), but instead appeared for the deposition unable to testify on the noticed topics. *Great Am. Ins. Co. of New York v. Vegas Const. Co.*, 251 F.R.D. 534, 536 (D. Nev. 2008).  Then, when the noticing party made a motion with regard to the faulty testimony, the deponent party stated that it had already produced responsive documents in another litigation. *Id.* at 537.  That is not the situation here.  Dealerships are moving for a protective order as to the topics to which they cannot reasonably testify because they do not want to arrive at a deposition unable to provide the requested testimony and create needless disputes with Defendants. Further, the deponent in *Great American* initially provided a 30(b)(6) deponent on all of the noticed topics, presumably agreeing that its 100,000 documents did not provide all of the relevant information or were not self-explanatory.  Here, Defendants do not effectively argue that they do not understand the nearly three-quarter of a million pages of documents and nearly fifty data sets produced, explain why these documents are insufficient to mount their defense, or explain how any reasonably available testimony could supplement the documents or fill in any gaps in the documents or data.  All discovery permitted by the Federal Rules, Rule 30(b)(6) is cabined by Rule 26(b)(2)(C)(i), which prohibits discovery that is "unreasonably cumulative or

REDACTED

duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." *See also Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 75 (D. Conn. 2010).

### B.    The Topics Are Overbroad

Defendants do not contest that the pass-on defense has been rejected in class certification analysis in this District or that no offset is available for the injury caused by their conduct. *Cardizem CD Antitrust; Nexium.* Confronted with Dealerships' motion, Defendants fall back on the argument that they are seeking this discovery for what they've claimed is a completely separate case, the End-Payor action. But Defendants have already sought and received large amounts of third-party discovery in that case, by claiming that they could not obtain the information they needed for that case from the Dealership Plaintiffs. *See Defendants' Memorandum Of Law In Opposition To Auto Dealers' And Dan Deery Motor Co.'s Motion For Protective Order And Motion To Quash*, 2:12-cv-00103, Doc 337, at 15 ("None of the named ADPs sold a vehicle to any of the EPPs, and none could testify about what occurred in the negotiation between any of the EPPs and the non-party auto dealers who sold them the vehicles on which their claims are based."). Defendants have the records of EPPs' vehicle purchases, close to a hundred depositions of EPPs and fifteen depositions of third-party dealers—more than most third-parties provide in litigations such as this. All of this is more than enough to make out Defendants' defenses against EPPs.

As Plaintiffs explained in their moving brief, the responsibility placed on a Rule 30(b)(6) witness is immense, and the consequences for failing to prepare to respond to the noticed topics—*as they are phrased in the notice itself*—can be severe. That is why it is the duty of the propounding party to carefully spell out the topics for which it seeks testimony. 8A Fed. Prac. &

REDACTED

Proc. Civ. § 2103 (3d ed.) (noting that a "starting point" in "guard[ing] against overreaching by the party seeking discovery" is "whether the party seeking discovery has adequately designated the subjects on which it wants information").[10]

Defendants seem to suggest that, even if their responses are overbroad, it is of no consequence, as Plaintiffs' representatives need only familiarize themselves with "all available information." Defs. Mem. at 30 (quoting *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012)). But absent a narrower Notice, this is cold comfort: all documents and current and former employees have all been held "reasonably available" to a Rule 30(b)(6). *See United Techs. Motor Sys., Inc. v. Borg-Warner Auto., Inc.*, No. CIV.A. 97-71706, 1998 WL 1796257, at *2 (E.D. Mich. Sept. 4, 1998) (noting that evidence may be "reasonably available" when it can be obtained "from documents, past employees, or other sources" (quoting *United States v. J.M. Taylor,* 166 F.R.D. 356, 361-62 (M.D.N.C. 1996)). But the fact that each Dealership employee over the past two decades is "available" does not, in this instance, render the burden of interviewing said employees any less undue. *See* Craig M. Roen & Catherine O'Connor, *Don't Forget to Remember Everything: The Trouble with Rule 30(b)(6) Depositions,*

---

[10] Defendants argue that there is no basis for interpreting the requirement of "painstaking specificity" on behalf of the propounding party, suggesting that application of this standard somehow conflicts with Rule 30(b)(6)'s "reasonable particularity" requirement. Quite the contrary, as the many courts that have adopted this formulation have noted, given the burden placed upon the recipient of a Rule 30(b)(6) notice, a notice simply cannot be "reasonable" unless it is "painstakingly specific." *See Kalis v.Colgate-Palmolive Co.*, 231 F.3d 1049 (citing *Prokosch v. Catalina Lighting, Inc*., 193 F.R.D. 633, 638 (D. Minn. 2000)) for the proposition the "[r]easonable particularity" requires the "requesting party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute"); *Health Grades, Inc. v. MDx Medical, Inc.*, 2013 WL 1777575, at *3 (Apr. 25, 2013) (explaining that a notice is "reasonably particularized" when "the particular subject areas" are "designate[d], with painstaking specificity" (citation omitted)).

REDACTED

45 U. Tol. L. Rev. 29, 39 (2013) (noting that, depending upon the breadth of a topic, "[c]ounsel and its client may spend weeks or months gathering and reviewing information responsive to the Rule 30(b)(6) deposition notice and still may not exhaust possible sources of information that the organization is expected to 'know'").

### C.    The Topics Are Unduly Burdensome

Defendants' contention that Auto Dealers' showing of undue burden is conclusory rings hollow. As Defendants themselves admit, no evidence of burden is needed—or would even be useful—where a Rule 30(b)(6) notice is facially overbroad. *Memo,* at 26. A discovery request is facially overbroad not simply where it contains many topics, but where it "requires the answering party to engage in mental gymnastics to determine what information may or may not be remotely responsive." *Aikens v. Deluxe Financial Servs., Inc.*, 217 F.R.D. 533, 538 (D. Kan. 2003) (internal quotation marks omitted).  In their moving brief (and again in this brief), Auto Dealers specifically and concretely demonstrate that the Noticed Topics are facially overbroad, and also that they are duplicative and cumulative of other discovery, irrelevant, and otherwise inefficient. This is exactly the type of specificity required by the courts. *See, Dongguk Univ.*, 270 F.R.D. at 74-75 (moving party's showing that the topic at issue was "unreasonably cumulative or duplicative and has already been obtained from some other source that is more convenient and less burdensome" was sufficiently "particular and specific" to warrant striking topic); *Carrera v. First Am. Home Buyers Prot. Co.*, No. 13CV1585-BAS JLB, 2014 WL 3695403, at *1 (S.D. Cal. July 23, 2014) (explaining that a movant can demonstrate undue burden meriting a protective order "by showing that the sought after discovery is irrelevant"). This Notice is all the more facially excessive when compared to the Court's view of what the contours of Dealers' depositions should be and the Master's statement that they should be "relatively limited."

34

REDACTED

## V. Defendants Mischaracterize Auto Dealers' Position

As Plaintiffs have explained to Defendants, they are perfectly willing to sit for Rule 30(b)(6) depositions, as long as the noticed topics are relevant to this action, reasonably described in the Notice, and not unduly burdensome and disproportionate.

Indeed, despite occupying pages of their brief attacking Dealers for fighting over their supposedly reasonable 30(b)(6) Notice, *id.*, Defendants continue to withdraw and modify noticed topics whose relevant and overbreadth is all but indefensible. *See* Defs. Mem. at 32 (withdrawing Topic No. 2).[11] Defendants initially served a notice on Dealerships with twenty-six topics and over thirty sub-topics on top of those. Defendants should have, in the first place, taken the time to craft a reasonably-tailored notice on Plaintiffs, instead of serving a request that Dealerships testify to what amounted to over fifty topics just to see how far Defendants could push the envelope. Defendants did not begin cutting any topics until Dealerships advised them they anticipated filing a motion for protection, with their last revision coming only three business days before the due date for Dealerships' motion.[12]

---

[11] Defendants' decision to drop this topic now belies their insistence that Plaintiffs are the ones acting in bad faith. The parties engaged in several meet and confers over the scope of the 30(b)(6) notice, and Plaintiff's counsel several times expressed the view to Defense counsel that Topic No. 2 was premature, irrelevant, and otherwise improper. Nonetheless, Defense counsel steadfastly refused to abandon Topic No. 2 during the meet and confer process. No wonder, then, that Plaintiffs have felt compelled to seek assistance from the Special Master in resolving discovery disputes with Defendants.

[12] Defendants insist that striking any of its Rule 30(b)(6) notice "would be a violation of due process and reversible error." Defs. Mem. at 10. This is a familiar refrain by Defendants, as histrionic and nonsensical here as it has been elsewhere. *See* Objections to, and Motion to Modify, Master Esskaki's June 18, 2015 Order, (arguing, unsuccessfully, that the disputed provisions in Master Esshaki's order "would violate defendants' due process rights if left intact"). Courts have "wide discretion" in limiting discovery, *Scales v. J.C. Bradford & Co.*, 925

REDACTED

Defendants also excoriate Plaintiffs' counsel for not being as willing as other parties to comply with Defendant's discovery requests. This is disingenuous, at best. While, as the Court has noted, Auto Dealers and End Payors *should be* similarly situated when it comes to the scope of discovery sought, they have not been: Defendants have sought, and have received, discovery from Dealership Plaintiffs in an amount that dwarfs that sought and received from End Payors. Dealerships have produced nearly three-quarters of a million pages; ████████████████

████████ The inability of the parties to reach consensus on the scope of discovery stems not from Plaintiffs' attempt to meet their obligations, but from Defendants' attempt to club Auto Dealers with overbroad discovery requests. The Master provided Defendants with one, seven hour 30(b)(6) deposition of each Auto Dealer, and the Court advised them they should inquire about topics such as "how much they paid for the car and where they purchased the car, that type of thing," January 28, 2015 Status Conference Transcript. In response, Defendants have served a Rule 30(b)(6) Notice covering a stunning array of topics, many of which could conceivably take up a seven hour deposition on their own. Denying Plaintiffs' motion would virtually guarantee that Defendants would be back here, hat in hand, seeking additional Rule 30(b)(6) depositions.

## II.    CONCLUSION

Dealerships respectfully request that the Court issue a protective order against Defendants' facially excessive Rule 30(b)(6) deposition notice and grant Dealerships protection from Defendants' improper Interrogatories.

---

F.2d 901, 906 (6th Cir. 1991), and Auto Dealers ask for nothing that is not well within the Special Master's discretion.

REDACTED

Dated:  December 23, 2015                    Respectfully submitted,


　./s/ Jonathan W. Cuneo
Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**Cuneo Gilbert & LaDuca, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com


Don Barrett
David McMullan
Brian Herrington
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone:  (662) 834-2488
Facsimile:   (662)834-2628
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com


Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:   (651) 312-6618
sraiter@larsonking.com


*Interim Co-Lead Class Counsel for Dealership
Plaintiffs*

37

REDACTED

Gerard V. Mantese
(Michigan Bar No. P34424)
**Mantese Honigman
and Williamson, P.C.**
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 607-9200
gmantese@manteselaw.com

*Interim Liaison Counsel for Dealership
Plaintiffs*

REDACTED

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2015 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

 <u>/s/</u> Jonathan W. Cuneo
Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**Cuneo Gilbert & LaDuca, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com
