**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION** | 12-md-02311 <br> Honorable Marianne O. Battani |
| **In Re: All Auto Parts Cases** | 2:12-MD-02311-MOB-MKM |
| **THIS DOCUMENT RELATES TO: ALL AUTO PARTS CASES** | **Oral Argument Requested** |

**DECLARATION OF STEVEN N. WILLIAMS IN SUPPORT OF THE PARTIES' JOINT MOTION TO COMPEL DISCOVERY FROM NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS**

I, STEVEN N. WILLIAMS, declare as follows:

1.  I am an attorney duly licensed to practice in the State of California and I am admitted to this Court.  I am a Partner with the law firm of Cotchett, Pitre & McCarthy, LLP and am interim co-lead counsel of record for the End Payor Plaintiffs ("EPPs") in the above-entitled action.  I make this Declaration pursuant to 28 U.S.C. § 1746.  I submit this Declaration in Support of Serving Parties' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers.  I have personal knowledge of the facts set forth in this Declaration, and, if called upon, I could and would competently testify thereto.

2.  Per Local Rule 7.1(a)(1), this Motion is made following a telephone conference and the exchange of multiple meet and confer letters between the Serving Parties and the Specified Subpoenaed Entities ("SSEs"), including a letter setting forth the Serving Parties' final effort at compromise, dated January 13, 2016.

3.  Beginning prior to the January 28, 2015 Status Conference and continuing until the April 14, 2015 deadline set by Special Master Esshaki, the Serving Parties met and conferred multiple times regarding the content for the uniform subpoena and exchanged numerous drafts and comments on drafts.  The final coordinated subpoena ("Subpoena") represents meaningful negotiations by counsel for all Plaintiff groups and all Defendants in each of the thirty two coordinated auto parts actions currently pending in the Eastern District of Michigan, Case No. 12-md-02311 ("Parties").

4.  Attached hereto as Exhibit A is a true and correct copy of the Subpoena served on the original equipment manufacturers and their affiliated entities (collectively, "OEMs") between late July and mid-August, 2015. The attached subpoena was served on Nissan North America, Inc. on August 17, 2015, but all subpoenas served on the SSEs mirror the requests therein, aside

1

from Request 37 (on which the Parties do not move), which was only made to a few specific entities.

5.   Attached hereto as Exhibit B is a list of subpoenaed entities that coordinated to form the Specified Subpoenaed Entities ("SSE") group, broken down by each category referenced in the Motion and the Parties' prior letters.

6.   Attached hereto as Exhibit C is a true and correct copy of the relevant pages of the transcript of the January 28, 2015 Status Conference and Motion Hearing, before Judge Battani in *In re Automotive Parts Antitrust Litig*. 12-md-2311 (E.D. Mich.), where coordination among the Parties was discussed and ordered.

7.   Attached hereto as Exhibit D is a true and correct copy of a letter sent by Direct Purchaser Plaintiffs to Special Master Esshaki, dated April 28, 2015.

8.   Attached hereto as Exhibit E is a true and correct copy of the relevant pages of the transcript of the May 6, 2015 Status Conference and Motion Hearings, before Special Master Esshaki in *In re Automotive Parts Antitrust Litig*. 12-md-2311 (E.D. Mich.), where the Special Master ruled that discovery could proceed.

9.   Between mid-July and mid-August 2015, the Parties served the Subpoena on the OEMs, including all of the SSEs.  Thereafter, in order to provide a simple, clear and expeditious process for the OEMs, the Parties coordinated to assign to each OEM specific attorneys (one defense attorney and one plaintiff attorney) to act as the principal points of contact for communications regarding the Subpoena.  These designated attorneys then sought to contact the various subpoenaed entities to both offer a brief extension for responses to the Subpoena and to set up meet and confers with each subpoenaed entity to discuss particularized OEM concerns and timelines for responses and production.

10. After service of the Subpoena, the Parties received responses and objections from various entities, including Subaru of Indiana Automotive, Inc., on Aug 20, 2015. A true and correct copy of these responses and objections is attached hereto as Exhibit F.

11. As of the end of August, 2015, the designated attorneys for the Parties had conducted introductory calls with most OEMs to generally discuss the Subpoena, and had scheduled numerous meet and confer calls with subpoenaed entities, which took place over the next few weeks.  For example, the Parties had calls with: Isuzu Finance on September 1, 2015; Subaru R&D on September 1, 2015; Subaru/Fuji Heavy Entities on Sept. 4, 2015; Volkswagen entities on September 8, 2015; Lotus on Sept. 17, 2015; Suzuki Manufacturing of America on September 10, 2015; Subaru of Indiana Automotive on September 14, 2015; Daimler Entities on September 15, 2015; Mazda Entities on September 17, 2015; Suzuki Motor of America on September 16, 2015; Aston Martin on September 18, 2015; Ford Motor Co. and Ford Motor Credit on September 22, 2015; and Isuzu Entities on September 23, 2015. However, despite best efforts by the Parties to engage the OEMs and to meaningfully meet and confer, there has been extended delay and, for a majority of the OEMs, a complete refusal to engage or negotiate with the Parties individually.

12. Despite the Parties' best efforts to engage with the OEMs, on September 1, 2015, Colin Kass, counsel for the Chrysler/Fiat entities, informed the Parties that he was speaking on behalf of "most" (but not all) of the subpoenaed entities, that they were joining together to negotiate as a group, and that the group he represented wanted to hold a "summit" with the Parties to address then-unspecified "global issues." Shortly thereafter, the Parties began receiving notices of cancellation of scheduled meet and confers from various OEMs, who stated that they would join in the group negotiations led by Mr. Kass.

13. On the October 2, 2015 summit call between the Parties and SSEs, the SSEs articulated several high-level concerns regarding the Subpoena, focusing primarily on scope. The SSEs also requested the Parties withdraw the Subpoena for multiple entities and stated they would not proceed with searching for or producing documents until they had an agreement by the Parties to cover or share costs or a court order that ordered reimbursement.

14. Substantial progress has been made for many of the OEMs that chose to negotiate individually with the Parties, rather than joining the SSE group, such as: the Parties narrowing requests, the Parties agreeing to hold in abeyance subpoenas for especially small entities, and some OEMs beginning production of documents.  For example, Isuzu has agreed to produce documents and data responsive to eight of the Parties' fourteen Narrowed Requests, and has already produced over 6,000 pages of documents to date, the first of what it informs will be many productions, and which includes its previously-made production to the DOJ by certain Isuzu entities.  In addition, Isuzu's finance entity has produced data, and Isuzu has agreed to discuss how its transactional data are stored and organized so that Isuzu and the Parties can reach an agreement on additional data productions in the near future.

15. Following the "summit' call, the SSEs and the Parties exchanged extensive correspondence, identified below, concerning the Subpoena.

16. Attached hereto as Exhibit G is a true and correct copy of a letter from Sheldon H. Klein, acting on behalf of the Parties, to Colin Kass, representing the SSEs, dated September 10, 2015.

17. Attached hereto as Exhibit H is a true and correct copy of a letter from Colin Kass, representing the SSEs, to Sheldon H. Klein, representing the Parties, dated September 17, 2015.

18. Attached hereto as Exhibit I is a true and correct copy of a letter from Colin Kass, representing the SSEs, to Ronnie S. Spiegel, representing the Parties, dated September 30, 2015.

19. Attached hereto as Exhibit J is a true and correct copy of a letter from Sheldon H. Klein, acting on behalf of the Parties, to Colin Kass, representing the SSEs, dated October 14, 2015.

20. Attached hereto as Exhibit K is a true and correct copy of a letter from Colin Kass, representing the SSEs, to Ronnie S. Spiegel, representing the Parties, dated October 29, 2015.

21. Attached hereto as Exhibit L is a true and correct copy of a letter from Sheldon H. Klein, acting on behalf of the Parties, to Colin Kass, representing the SSEs, dated November 24, 2015.

22. Attached hereto as Exhibit M is a true and correct copy of a letter from Colin Kass, representing the SSEs, to Sheldon H. Klein, representing the Parties, dated December 18, 2015.

23. Attached hereto as Exhibit N is a true and correct copy of an email from Heather Novison, on behalf of the Parties, to Colin Kass, representing the SSEs, dated December 24, 2015.

24. Attached hereto as Exhibit O is a true and correct copy of a letter from Colin Kass, representing the SSEs, to Sheldon H. Klein, representing the Parties, dated December 30, 2015.

25. Attached hereto as Exhibit P is a true and correct copy of a letter from Sheldon H. Klein, acting on behalf of the Parties, to Colin Kass, representing the SSEs, dated January 13, 2016.

26. Attached hereto as Exhibit Q is a true and correct copy of an email from David A. Munkittrick, on behalf of the SSEs, to Sheldon H. Klein, representing the Parties, dated January 13, 2016.

27. Attached hereto as Exhibit R is a true and correct copy of an email from Sheldon H. Klein, on behalf of the Parties, to David A. Munkittrick, representing the SSEs, dated January 14, 2016.

28. Attached hereto as Exhibit S is a true and correct copy of an email from Sheldon H. Klein, on behalf of the Parties, to David A. Munkittrick, representing the SSEs, dated January 17, 2016.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Detroit, Michigan on January 19, 2016.

Steven N. Williams

6

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  | : |
|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : |
| In Re:  All Cases | : : |
| THIS DOCUMENT RELATES TO: | : : |
| All Actions | : : : : : |

Master File No. 12-md-02311
Honorable Marianne O. Battani

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS**
**OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

TO:   Nissan North America, Inc.
        c/o LexisNexis Document Solutions, Inc.
        2908 Poston Ave
        Nashville, TN 37203-1312

☒ *Production:*  **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**See Attachments A and B**

| Place: | Cotchett Pitre & McCarthy, LLP 840 Malcolm Road Burlingame, CA 94010 | Date and Time: August 17, 2015, 9:00 a.m. |  |
|---|---|---|---|

☐ *Inspection of Premises:*  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | | Date and Time: | |
|--------|--|----------------|--|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

DATE:   July 16, 2015

DAVID J. WEAVER, CLERK OF COURT

OR

_____          _____
     *Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing End-Payor Plaintiffs, who issues or requests this subpoena, are:

Steve Williams
Cotchett Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: 650.697.6000
swilliams@cpmlegal.com

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

      ☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____; or

      ☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $_____.

My fees are   $_____   for travel and   $_____   for services for a total of   $_____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**(c) Place of Compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

    **(i)** is a party or a party's officer; or

    **(ii)** is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where
compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;

    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

    **(iv)** subjects a person to undue burden.

  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

    **(i)** expressly make the claim; and

  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

**ATTACHMENT A**

**DEFINITIONS**

1.     "All" also includes "each" and "any," and vice versa.

2.     "And" and "or" are to be considered both conjunctively and disjunctively, and "or" is understood to include and encompass "and," and vice versa.

3.     "Annual Price Reduction" or "APR" means annual or semi-annual price reductions or routine cost-downs applied to Components, including any long-term cost reduction initiatives.

4.     "Assembly" means a Vehicle part, module, or assembly in which a Component (as defined below) is a component, installed, or incorporated.

5.     "Component" means (as defined in Plaintiffs' various complaints) any of the following Vehicle parts (in bold):

    i.     **Wire Harness Systems**:  Wire Harness Systems comprise the "central nervous system" of a Vehicle and consist of the wires or cables and data circuits that run throughout the Vehicle.  To ensure safety and basic functions (*e.g.*, going, turning, and stopping), as well as to provide comfort and convenience, Vehicles are equipped with various electronics that operate using control signals running on electrical power supplied from the battery.  The Wire Harness System is the conduit for the transmission of these signals and electrical power.

        **a.     Wire Harness Products**

- **Electrical wiring**:  Electrical wiring is the wiring that runs throughout the Vehicle.

- **High voltage wiring**:  High voltage wiring is integral to Vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

- **Lead wire assemblies**:  Lead wire assemblies connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

- **Cable bonds**:  Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

- **Wiring connectors**:  Wiring connectors connect various types of wires in a Vehicle.

- **Wiring terminals**: Wiring terminals are the ends of a wire that provide a point of connection to external circuits.

- **Electrical control units**:  Electrical control units are embedded modules or systems that control one or more of the electrical systems or subsystems in a Vehicle. Vehicles are equipped with a large number of electronic control units which operate various functions and exchange large volumes of data with one another.

- **Relay boxes**:  Relay boxes are modules that hold the electrical switches that transit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit. Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

- **Junction blocks**:  Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

- **Power distributors**:  Power distributors serve to distribute power at varying levels to various electrical components.

- **Speed sensor wire assemblies**:  Speed sensor wire assemblies are installed on Vehicles with Antilock Brake Systems ("ABS"). The speed sensor wire assemblies connect a sensor on each tire to the ABS and carry electrical signals from the sensors to the ABS to instruct it when to engage.

- **Semiconductor devices:**  Semiconductor devices are used as a Component in an Electrical control unit or other part of a wire harness systems.

ii.  **Instrument Panel Clusters**: Instrument Panel Clusters are the mounted array of instruments and gauges housed in front of the driver of a Vehicle. They are also known as "meters."

iii.  **Fuel Senders**:  Fuel Senders reside in the fuel tank of a Vehicle and measure the amount of fuel in the tank.  Fuel Senders consist primarily of a float and a variable resistor.  The resistor measures the amount of pressure the float puts on a bar.  As the fuel goes down the float goes down with it.  As it dips, the electrical current in the variable resistor sends weaker electrical signals to the fuel gauge.  The gauge then drops, indicating that there is less fuel in the tank.

iv. **Heater Control Panels**:  Heater Control Panels are located in the center console of a Vehicle and incorporate switches that control the temperature of the interior environment of a Vehicle. The electronic Heater Control Panel product category is broken down into manual and automatic Heater Control Panels. Manual Heater Control Panels are known as low-grade while automatic Heater Control Panels are commonly referred to as high-grade.

v. **Bearings**:  Bearings are spherical balls, rounded joints, or rotating parts that bear friction and are constructed of steel, aluminum, platinum, stainless steel, etc.

vi. **Occupant Safety Systems**:  Occupant Safety Systems are generally comprised of the parts in a Vehicle that protect drivers and passengers from bodily harm. Occupant Safety Systems include seat belts, airbags, steering wheels or steering systems, and safety electronic systems.

- **Seat belts**:  Seat belts are safety strap restraints designed to secure an occupant in position in a Vehicle in the event of an accident.  A seat belt includes belt webbing, a buckle, a retractor, and hardware for installation in a Vehicle, and may also include a height adjuster, pretensioner, or other associated devices.

- **Airbags**:  Airbags are occupant restraints designed to control the movement of an occupant inside a Vehicle in case of an accident.  An airbag consists of fabric, an inflator, and an initiator to start the deployment, and may include an injection molded plastic cover or other associated devices.

- **Steering Wheels**:  Steering wheels aid in the control of a Vehicle.  A steering wheel may consist of a die-cast armature (frame) covered by molded polyurethane and finished with leather, wood trim, or plastic.

- **Safety electronic systems**:  Safety electronic systems are electronic systems that may help prevent accidents before they occur and/or that work with seat belts, airbags and steering wheels to mitigate the results of an accident.

vii. **Alternators**:  Alternators are devices that charge a Vehicle's battery and power a Vehicle's electrical system when its engine is running. If an Alternator is not working correctly, a battery will lose charge and all Vehicle electrical systems will stop working.  When an Alternator is not working, it is usually replaced rather than repaired.

viii.   **Anti-Vibration Rubber Parts**:  Anti-Vibration Rubber Parts are comprised primarily of rubber and metal and are installed in Vehicles to reduce engine and road vibration.  Anti-Vibration Rubber Parts are installed in suspension systems and engine mounts, as wells as other parts of a Vehicle.  A Vehicle can have numerous Anti-Vibration Rubber Parts.

ix.   **Windshield Wiper Systems**:  Windshield Wiper Systems are devices used to remove rain and debris from a Vehicle's windshield. Windshield Wiper Systems generally consist of an arm, pivoting at one end and with a long rubber blade attached to the other. The blade is swung back and forth over the glass, pushing water from its surface.

x.   **Radiators**:  Radiators, which include radiator fans, are devices that help to prevent Vehicles from overheating.  Radiators are a form of heat exchanger, usually filled with a combination of water and antifreeze, which extracts heat from inside the engine block and includes an electrical fan, which forces cooler outside air into the main portion of the radiator. The radiator indirectly exposes coolant, heated by traveling through the engine block, to cool air as the Vehicle moves.  Radiators are replaced when a Vehicle consistently overheats.

xi.   **Starters**:  Starters are devices powered by a Vehicle's battery to "turn over" and start the engine when the driver turns the ignition switch.

xii.   **Vehicle Lamps**:  Vehicle Lamps include headlamps and rear combination lamps.  A headlamp is a Vehicle Lamp installed in the front of a Vehicle that consists of lights such as headlights, a clearance lamp, and turn signals. A rear combination lamp is a Vehicle Lamp installed in the rear of a Vehicle that consists of lights such as a backup lamp, stop lamp, tail lights, and turn signals.

xiii.   **Switches**:  Switches include one or more of the following: (i) the steering wheel switch, which is installed in the steering wheel of a Vehicle and is operated by the driver of the Vehicle to control functions within the Vehicle; (ii) the turn switch, which is a lever switch installed behind the steering wheel of a Vehicle and is operated by the driver of the Vehicle to signal a left or right turn and control hi/lo beam selection; (iii) the wiper switch, which is a lever switch installed behind the steering wheel of a Vehicle and is operated by the driver of the Vehicle to activate the Vehicle's windshield wipers; (iv) the combination switch, which is a combination of the turn and wiper switches as one unit, sold together as a pair; and (v) the door courtesy switch, which is a switch installed in the door frame of a Vehicle that activates the courtesy lamp inside the Vehicle when the Vehicle door opens.

xiv.   **Ignition Coils**:  Ignition Coils are part of the fuel ignition system and release electric energy suddenly to ignite a fuel mixture.  There are

multiple types of ignition coils, such as coil on plug (including pencil style, single output, dual output, and dual output with integrated igniter), distributor-less ignition systems (including output side terminal, output top terminals, and output bolt-on cassette package), and distributor-based single coils (including single output epoxy filled and single output epoxy filled with ballast resistor).

xv.    **Motor Generators**:  Motor Generators are electric motors used to power electric drive systems that can also capture energy from the process of stopping a Vehicle to generate electricity through regenerative braking.

xvi.   **Steering Angle Sensors**:  A Steering Angle Sensor is installed on the steering column of a Vehicle and may be connected to, and part of, a combination switch.  It detects the angle of the Vehicle's wheels during turns and sends signals to the Vehicle stability control system, which maintains the Vehicle's stability during turns.

xvii.  **HID Ballasts**:  An HID Ballast is an electrical device that limits the amount of electrical current flowing to an HID headlamp, which would otherwise rise to destructive levels due to the HID headlamp's negative resistance.

xviii. **Inverters**:  Inverters provide power to motors by converting direct current ("DC") electricity from a Vehicle's battery to alternating current ("AC") electricity.

xix.   **Electronic Powered Steering Assemblies**:  Electronic Powered Steering Assemblies include electric power steering motors, provide electronic power to assist the driver to more easily steer the Vehicle. Electric Powered Steering Assemblies link the steering wheel to the tires, and include the column, intermediate shaft, and electronic control unit, among other parts, but do not include the steering wheel or tires.

xx.    **Air Flow Meters**:  Air Flow Meters measure the volume of air flowing into engines and are part of the engine management systems and Vehicle sensors segment of the Vehicle market.

xxi.   **Fan Motors**:  Fan Motors are small electric motors used to turn radiator (see above) cooling fans.

xxii.  **Fuel Injection Systems**:  Fuel Injection Systems admit fuel or a fuel/air mixture into engine cylinders and may include injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, throttle motors, airflow meters, engine control units, fuel pumps, fuel pump modules, manifold absolute pressure sensors ("MAP Sensors"), pressure regulators, pulsation dampers, purge control valves and other components sold as a unitary system.  Fuel Injection Systems can also be sold as part of a broader system, such as an engine management system.  Fuel

Injection Systems are part of the powertrain segment of the Vehicle market.

**b.     Fuel Injection Components**

- **Injectors**:  Injectors atomize a pre-determined amount of fuel and delivers the fuel spray toward the intake valve based on signals from the engine ECU.

- **Rail assemblies**:  Rail assemblies include the common rail system (sometimes abbreviated as "CRS"), which enables higher pressure and more precise fuel injection with its supply pump and common rail, which generates extremely high fuel pressure, and electrically controlled injectors. The common rail system is comprised of a supply pump, injectors, the engine ECU, and the rail itself.

- **Feed lines**

- **Electronic Throttle Bodies** (see below)

- **Throttle Motors**

- **Air Flow Meters** (see above)

- **Engine control units:** Engine control units are computers that send instructions to various actuators to create optimal operating conditions.  The Engine ECU receives signals from various sensors to determine the appropriate instructions to send to the actuators.

- **Fuel Pumps**:  Fuel pumps are part of the **Fuel Pump Module** (which also includes the fuel filter, pressure regulator, and fuel-sender gauge) and are installed in gasoline engine Vehicles.  Diesel engine Vehicles do not use the conventional fuel pump.  There is generally one fuel pump and one fuel pump module in the fuel injection system for gasoline engine Vehicles.  However, certain gasoline engine Vehicles (those with a direct injection system) use two types of pumps as part of their fuel injection systems.  The first is the standard Fuel Pump (referred to simply as the "fuel pump"), which pumps fuel up from the fuel tank and sends fuel to the engine.  All gasoline Vehicles use this standard "fuel pump."  The second pump, used in certain Vehicles, applies high pressure to the fuel. This type of pump is used only in Vehicles with a direct injection system.  For gasoline

engine Vehicles, this pump is called a "direct injection pump" or "high pressure (fuel) pump." For diesel engine Vehicles, the "pump up" function and the "apply high pressure" function are generally combined and there is just one pump, referred to as the (conventional) "diesel injection pump," or it may be called Supply Pump for common rail systems (other terms include "VE pump" or "rotary pump" and "PFR pump"). All diesel engine Vehicles use a direct injection system, which may be (1) a "diesel conventional direct injection (not "common rail")" or (2) "diesel high pressure direct injection (*i.e.*, "common rail")." In some cases, a supplemental "pump up" type of fuel pump is added to the diesel Vehicle—it is installed in the fuel tank.

- **Manifold Absolute Pressure Sensor**: The manifold absolute pressure sensor ("MAP sensor" or "MAPS") detects the pressure of air drawn into the engine cylinder. A MAP sensor may also be equipped with an air intake temperature sensor, which is called a T-MAP Sensor.

- **Pressure Regulator**: A Pressure Regulator is a valve that regulates the pressure of fuel. Usually, a pressure regulator is installed in the fuel tank next to a fuel pump. Pressure regulators are generally installed in Vehicles with a large amount of exhaust gas as well as Vehicles that have piping to return excess fuel from the pump to the gasoline tank. Pressure regulators are occasionally sourced as part of a fuel injection system.

- **Pulsation Damper**: A Pulsation Damper is a device used to control fuel pressure changes or pulsations caused by the opening and closing of the fuel injector. The dampener absorbs these pulsations and evens out fuel delivery.

- **Purge Control Valve**: A Purge Control Valve ("PCV") is part of the purge control system, which includes the PCV and the fuel tank inner pressure sensor. The PCV opens or closes as directed by the engine control unit to control the flow of fuel vapor from the canister to the engine.

xxiii. **Power Window Motors**: Power Window Motors are small electric motors used to raise and lower Vehicle windows.

xxiv. **Automatic Transmission Fluid Warmers**: Automatic Transmission Fluid Warmers are devices located in the engine compartment of a Vehicle that warm the automatic transmission fluid.

xxv. **Valve Timing Control Devices**:  Valve Timing Control devices control the timing of engine valves' operation, and include the VTC actuator and/or solenoid valve, and are part of the engine management system of the Vehicle market.

xxvi. **Electronic Throttle Bodies**:  Electronic Throttle Bodies control the amount of air flowing into a Vehicle's engine and are a main part of an electronic throttle control system.  (See above under Fuel Injection System.)

xxvii. **Air Conditioning Systems**:  Air Conditioning Systems are systems that cool the interior environment of a Vehicle and are part of the thermal segment of the Vehicle market.  Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following: compressors, condensers, control panels, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), sensors and associated hoses and pipes.

xxviii. **Windshield Washer Systems**:  Windshield Washer Systems are systems that help maintain the cleanliness of a Vehicle's windshields.  When a driver activates the windshield washer assembly, a pump provides pressure to enable washer fluid to flow through a nozzle and out onto the exterior of a Vehicle's windshield.  Windshield Washers include components such as the pump, hoses, nozzle and tank necessary to deliver washer fluid to Vehicle windows.

xxix. **Constant Velocity Joint Boot Products**:  Constant-Velocity-Joint Boot Products are composed of rubber or plastic, and are used to cover the constant-velocity-joints of a Vehicle to protect the joints from contaminants.

xxx. **Spark Plugs**: Spark Plugs are located in the engine and deliver high electric voltage from the ignition system to the combustion chamber of an internal combustion engine.

xxxi. **Oxygen Sensors**: Oxygen Sensors  are electronic sensors located before and after the catalytic converter in the exhaust system used to measure the amount of oxygen in the exhaust.  Oxygen Sensors provide signals or data to the automobile's engine management computer, which then adjusts the ratio of air/fuel injected into the engine to compensate for excess air or excess fuel.

xxxii. **Air Fuel Ratio Sensors**: Air Fuel Ratio Sensors are "wideband" oxygen sensors that enable more precise control of the air-to-fuel ratio injected into the engine. Air Fuel Ratio Sensors are therefore a type of Oxygen Sensors.

6.      "Auto Parts MDL" means all cases in the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division.

7.      "Communication" or "Communications" mean and include every disclosure, transfer, transmittal or exchange of information, whether orally or in writing or otherwise, face-to-face, by telephone, fax, mail, personal delivery, e-mail, telecommunication, or otherwise.

8.      "Customer" or "Customers" mean and include any entity or person who purchases or has purchased Vehicles from You containing a Component or Assembly, including but not limited to Vehicle dealers and fleet Customers.

9.      "Defendant" or "Defendants" mean and include all entities listed in Attachment C to this subpoena and their employees, officers, directors, agents, attorneys, affiliates, subsidiaries, joint ventures, successors, predecessors, or any person acting on their behalf.

10.      "Directed Buying" and "Directed Sourcing" mean the purchase or acquisition of a Component or Assembly by a manufacturer or supplier of Components or Assemblies at Your direction or by agreement with You, pursuant to terms negotiated by You or on Your behalf.

11.      "Document" or "Documents" mean and include all "writings," "recordings" or "photographs" as those terms are defined in Federal Rule of Civil Procedure 34 and Rule 1001 of the Federal Rules of Evidence.  Without limiting the generality of the foregoing, the term "Documents" includes both hard copy "Documents" as well as electronically stored data files including e-mail, instant messaging, shared network files and databases.  With respect to electronically stored data, "Documents" also includes, without limitation, any data on magnetic or optical storage media (*e.g.*, servers, storage area networks, hard drives, backup tapes, CDs, DVDs, thumb flash drives, floppy disks or any other type of portable storage device, etc.) stored as an "active" or backup file, in its native format.

12.      "Incentive" includes any rebate, coupon, discount, reward, bonus, spiff, or any other payment, deduction from price, allowance, or subsidy offered or provided to distributors, dealers, or consumers.

13.      "Limit Price" means a price for the purchase and sale of a Component or Assembly set by an OEM that a particular manufacturer or supplier of such Component or Assembly was asked to meet in order to sell such Component or Assembly to the OEM.

14.      "MSRP" means the manufacturer's suggested resale price.

15.      "OEM" means Vehicle original equipment manufacturer and its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, and their respective officers, directors, current and former employees, agents, representatives, attorneys, or anyone else acting or who has acted on its or their behalf.

16.      "Raw Material" means the raw materials and raw components contained in Components, including but not limited to, steel, aluminum, rubber, resin, and copper.

17.    The term "relating to" means, without limitation, the following concepts: analyzing, assessing, commenting, concerning, constituting, dealing with, discussing, describing, estimating, evaluating, evidencing, pertaining to, projecting, recording, referring to, reflecting, reporting, studying, surveying, summarizing, or otherwise involving, in whole or in part.

18.    "RFQ" means requests to purchase of any kind, including invitations to bid or submit proposals, requests to quote on development projects, and formal requests for quotation.

19.    "Studies" and/or "Analyses" mean and include all reports, memoranda, statistical compilations, slide presentations, reviews, audits and other types of written, printed, or electronic submissions of information.

20.    "Target Agreement(s)" means a contract or agreement between an OEM and a manufacturer or supplier of a Component or Assembly in which the OEM and manufacturer or supplier agree to jointly design and develop a Component or Assembly that meets a given set of performance, quality, price and delivery specifications, criteria or targets.

21.    "Target Price" means a price for the purchase and sale of a Component or Assembly set by an OEM that manufacturers or suppliers of such Component or Assembly were asked to meet, or the OEM's estimated, anticipated or expected price for the purchase and sale of a Component or Assembly (whether or not disclosed to actual or potential manufacturers or suppliers), including a price based on (a) the input and other costs of manufacturers or suppliers of such Component or Assembly, (b) a reasonable profit margin for such manufacturers or suppliers, (c) reductions in the price of such Component or Assembly as compared to the price of the product or a similar product that was purchased or acquired previously by the OEM, (d) post-RFQ price reductions (*e.g.*, cost-down pricing and Annual Price Reductions), (e) anticipated or expected manufacturing or production efficiencies, or (f) other factors.

22.    "Vehicle" means an automobile or other motor Vehicle that is principally used for transporting from one to eight passengers and is designed to operate primarily on roads, typically with two or four wheels, including sedans, sport-utility Vehicles, motorcycles, and pickup trucks. In addition, to the extent that any of the Requests seek documents with respect to Wire Harness Systems or Bearings.  Vehicle also includes medium-duty (Class 4, 5, 6, & 7) trucks, heavy-duty (Class 8) trucks, buses, commercial Vehicles, construction equipment, mining equipment, agricultural equipment, railway Vehicles, and other similar Vehicles.

23.    "VE Price" and "VA Price" mean the price that was offered to an OEM by a manufacturer or supplier, or that an OEM anticipated or expected to pay, for the purchase and sale of a product after anticipated or expected reductions in costs as a result of improvements in the engineering, design, or specifications of the product.

24.    "You," "Your," and "Your Company" mean the recipient of this subpoena and its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity that is or was subject to its management, direction, or control, together with its and their present and former directors, officers, employees, agents, representatives, or any Person acting or purporting to act on its behalf.

## INSTRUCTIONS

1.       Attached hereto is a copy of the Stipulation and Protective Order Governing Production and Exchange of Confidential Information, ECF No. 200, 2:12-md-02311-MOB-MKM (filed July 10, 2012), entered by the Court in the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division, that governs documents and information produced in the Auto Parts MDL.  You may designate documents for protection under the Protective Order.

2.       The relevant time period for each Request is 1992 through the present.

3.       To the extent documents or data relate to a particular Component or Assembly, they should be provided separately, along with any other documents relating to the same Component or Assembly.  Thus, the documents and data should not be commingled with documents and data relating to different Components or Assemblies.

You are requested to immediately meet and confer regarding the form and manner in which You will produce Documents stored electronically for the parties to avoid any unnecessary expense.

**REQUEST NO. 1:**     Data or documents (in the absence of data) sufficient to show the following information for each purchase by You or on Your behalf, of (a) a Component or (b) an Assembly for installation in a new Vehicle sold or leased in the U.S.:

a.       Date of purchase;

b.       Seller from whom the Component or Assembly was purchased, including name, address, and other identifiers;

c.       Manufacturer, name or description, part type, part number, and other identifiers of the Component or Assembly, including model, model year, and other identifiers of the Vehicle(s) in which the Component or Assembly was designed or intended to be installed, and quantity purchased (including measurement unit for quantity);

d.       Terms and conditions on which the Component or Assembly was purchased, including but not limited to:

(1)      Net price of the Component or Assembly (including currency and exchange rate, if applicable), and any adjustments to purchase price and

-11-

Incentives or allowances issued or applied at any time, including but not limited to, taxes, amortization and amortization schedule, installment payments, financing, rebates, lump sum or other discounts, refunds, credit for returns, and currency or input cost adjustments, and the manner in which provided, whether by unit or by total purchase;

(2)     Information sufficient to show:  (a) the total amount of money You paid, on a yearly basis, for each type of identified Component or Assembly that You purchased; and (b) the total number of units purchased for each type of identified Component or Assembly that You purchased; and

(3)     Shipping or freight costs, and by whom such costs were paid.

e.     "Ship-from" and vendor "pay-to" address(es) from which the Component or Assembly and invoice for it were shipped or sent, date(s) the Component or Assembly and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Component or Assembly and invoice were shipped or received, and date(s) the Component or Assembly and invoice were received;

f.     Information sufficient to track each Component or Assembly after it was installed in a Vehicle, including model, model platform, model year, model project or development code, vehicle identification number ("VIN"), and/or part number, and other identifiers of the specific Vehicle(s) in which the Component or Assembly was installed, and quantity or number of each Component and Assembly installed (including measurement unit for quantity or number);

-12-

g.      RFQ(s), if any, pursuant to which the Component or Assembly was procured, and the following information for each RFQ:

(1)      Names, designations, and/or other identifiers for the RFQ;

(2)      Entity issuing the RFQ and its address;

(3)      Name, address, and other identifiers of each potential supplier to whom the RFQ was sent and the date sent to each potential supplier;

(4)      Name or description, part number, and other identifiers for each Component or Assembly, and other product(s) (if any) that was the subject of the RFQ;

(5)      Model(s) or model platform(s), model year(s), model project or development code(s), and/or part number, and other identifiers of the Vehicle(s) for which the Component or Assembly was designed or intended;

(6)      Guidelines or instructions for responding to the RFQ, as set by You and communicated to any potential supplier, including rules relating to the initial bid price, number of responses, and response deadline, or any other Documents relating to Your bid solicitation criteria, Your bid submission system, or Your bid evaluation and selection process;

(7)      Terms of the RFQ, including supply period covered, design or specifications of the Component or Assembly, Directed Buying or Directed Sourcing (if any) of Components or Assemblies,

approved supplier(s) of Component(s) or Assemblies or subcomponents thereof, and any changes in such terms, design or specifications, including post-RFQ changes in terms, design, or specifications (*e.g.*, resulting from manufacturing improvements and APRs);

(8)     Responses to the RFQ from potential suppliers, including but not limited to, bids, cost and profit margin information or estimates, bill of materials, cost schedules or breakdowns, proposed changes in the design, manufacturing, materials, or specifications of the Component or Assembly and resulting price changes, and any lump sum or other discounts, rebates, allowances, Incentives, or other terms offered;

(9)     Cost model(s) or estimate(s), if any, developed, used, or considered with respect to potential suppliers;

(10)    Potential suppliers, if any, that provided on-site engineers or other personnel or services in connection with the Component or Assembly;

(11)    Target Price, Limit Price, or anticipated or expected purchase price for the Component or Assembly before and after the supplier was selected, after application of all anticipated or expected discounts, rebates, or other allowances or Incentives, and any revisions or changes to such prices;

(12)   VE Price or VA Price, if any, for the Component or Assembly, and any revisions thereto;

(13)   Revised prices or other terms offered by potential suppliers after their initial response to the RFQ;

(14)   The dates and topics of RFQ kickoff meetings, seminars, and other supplier meetings pertaining to each RFQ, the potential suppliers (and employees thereof) who attended each meeting, and changes, if any, to guidelines, instructions, terms, specifications, Target Price, Limit Price, anticipated or expected purchase price, VE Price or VA Price communicated to potential suppliers at each meeting;

(15)   Each supplier and the date it was selected to supply the Component or Assembly and the quantity each supplier was selected to supply;

(16)   Letters of intent, award letters, early sourcing agreements, statements of work, or similar documents regarding purchase of the Component or Assembly;

(17)   Any summary or recap of the RFQ and responses thereto, including but not limited to, each factor considered in deciding from which supplier(s) to purchase the Component or Assembly, and the reasons each potential supplier was selected or not selected to supply the Component or Assembly;

(18)   Any adjustments made after awards, including changes to price or the quantity allocated to each supplier; and

-15-

(19)    Documents, data, or Studies related to historical Component or
Assembly bid solicitations, offered bids or winning bids.

h.    Monetary components of the transaction beyond unit price (*e.g.*, sales tax,
shipping or delivery fees) or non-monetary components of, or Incentives for, the
purchase of the Component or Assembly, including but not limited to, (1) any
service, benefit, and/or product that You provided, or received, in connection with
the purchase of the Component or Assembly, including service agreements,
warranties, or installation, and (2) the value of each such service, benefit, or
product;

i.    For each Component or Assembly purchased by one of Your suppliers pursuant to
Directed Buying or Directed Sourcing, the price and terms of any such
arrangement, including the entity from which the supplier was directed to
purchase the Component or Assembly and at what price and terms;

j.    For each Component or Assembly that You purchased without soliciting
proposals, bids, or responses to an RFQ from more than one potential supplier, the
manufacturer and supplier of such Component or Assembly, its name or
description, part number, and other identifiers, and the reasons why each such
Component or Assembly was purchased without soliciting proposals, bids, or
responses to an RFQ;

k.    All information sought or obtained by You or on Your behalf concerning a market
or competitive price for the Component or Assembly, including but not limited to,
any market test conducted with respect to the Component or Assembly;

l.      All Documents relating to non-RFQ methods of procurement (*e.g.*, sole-sourcing), including but not limited to, benchmark or other informal bid or pre-bid pricing, price lists, price sheets, price reductions and reduction attempts, value engineering pricing, discounts, price changes, negotiations, bidding, contracts (resulting from other methods of procurement), or agreements (formal or informal) between You and any Defendant or other Components of Assemblies suppliers, and any correspondence relating to any negotiations or agreements made; and

m.     For each Component or Assembly purchased by You, Documents sufficient to describe, identify, and interpret all part numbers assigned, including the manufacturer's model number, any internal codes, product identifiers, or part numbers used by You.

**REQUEST NO. 2:**    Documents sufficient to show any target prices, bids, award prices, and subsequent price adjustments with respect to any RFQ for any Component or Assembly intended to be purchased by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

**REQUEST NO. 3:**    Documents sufficient to show Your agreements with suppliers for Components or Assemblies, including but not limited to any documents relating to and/or constituting Long Term Agreements, Master Purchase Agreements, Component Purchase Agreements, any preferred supplier or supplier partner agreements and Memoranda of Understanding applicable to any purchase of Components or Assemblies by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

**REQUEST NO. 4:**    Data or documents (in the absence of data) sufficient to show the following information for each new Vehicle sold by You or on Your behalf, that was

manufactured (a) in the U.S. for later sale or lease in the U.S. or (b) outside the U.S. for later sale or lease in the U.S.:

    a.    Purchaser (*e.g.*, Vehicle distributor, Vehicle dealer, or fleet purchaser) to whom the Vehicle was sold, including name, address, and other identifiers, and

    (1)    Date of sale;

    (2)    Model, model year, make, and other identifiers of the Vehicle, including VIN, and product identifier for each Vehicle sold;

    (3)    Terms and conditions of sale, including but not limited to:

    (a)    Your list or invoice price for the Vehicle (including currency and exchange rate, if applicable) to the purchaser;

    (b)    Net sale price paid by purchaser before taxes and after any adjustments to invoice price, such as dealer holdback and any other manufacturer or distributor subsidies, rebates, bonuses, allowances and Incentives issued or applied at any time;

    (c)    Adjustments to invoice price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, commissions, rebates, discounts, refunds, bonuses, advertising subsidies, floor-plan assistance, fuel allowance, dealer inspection charge, and/or other credits or debits, and the manner in which provided, whether by Vehicle or by total sale, and any adjustment identifiers;

    (d)    Dealer holdback and model changeover allowance, if any;

(e)     Amount paid at time of sale, and any remaining balance due, terms

of financing, if any, and duration of monthly or installment

payments;

(f)     Shipping or freight costs, and by whom such costs were paid;

(g)     Any credit associated with return or repair;

(h)     Unit price (MSRP and invoice);

(i)     Any offered and accepted price that is different from list;

(j)     Total sales price for the transaction; and

(k)     Any other terms and conditions of the sale.

(4)     Terms and conditions of floor plan financing, if any, for the purchase of

the Vehicle, including interest, fees and other charges paid by purchaser;

(5)     "Ship-from" and vendor "pay-to" address(es) from which the Vehicle and

invoice for it were shipped or sent to purchaser, date(s) the Vehicle and

invoice were shipped or sent, "ship-to/delivery" and customer

"bill/invoice-to" address(es) where the Vehicle and invoice were shipped

or received, and date(s) the Vehicle and invoice were received, and

location of sale;

(6)     Monetary components of the transaction beyond unit price (*e.g.*, financing,

sales tax, and fees) or non-monetary components of, or Incentives for, the

sale distinct from net sale price, including but not limited to, (a) any

service, benefit, and/or product You received, or provided, in connection

with the sale of the Vehicle, including service agreements, warranties,

installation, Vehicle options, and (b) the value of each such service,

benefit, or product;

(7)     Invoice date;

(8)     A transaction number, invoice number, purchase order number, or any

number used to link different records;

(9)     Receipts, invoices, bills of sale, purchase contracts, as well as any

product-specification requirements and purchase orders You have for

these transactions;

(10)    All other information included on invoices sent to any Customer during

the relevant period;

(11)    A description identifier for each Vehicle;

(12)    Manufacturer(s) and seller(s) of each Vehicle sold;

(13)    Quantity sold (units);

b.     Retail purchaser (*e.g.*, consumer, fleet purchaser, leasing company, or other

lessor), to whom the Vehicle was eventually sold or leased, including name,

address, and other identifiers, and

(1)     Date and place (including address) of sale or lease;

(2)     Terms and conditions of sale, including but not limited to:

(a)     MSRP and seller's (*e.g.*, Vehicle distributor or Vehicle dealer)

invoice price for the Vehicle;

(b)     Net sale price paid by purchaser (including currency and exchange

rate, if applicable) before taxes and after any adjustments to list

price and Incentives or allowances issued or applied at any time;

    (c)    Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of vehicle for which a trade-in allowance was provided

    (d)    Amount paid at time of sale, and any remaining balance due, terms of financing, and duration of monthly or installment payments; and

    (e)    Terms of any insurance or warranties provided or sold to the retail purchaser.

c.    For leases, name, address, and other identifiers of person or entity to whom the Vehicle was leased (*e.g.*, lessee), and:

    (1)    Date and place (including address) of lease;

    (2)    Terms and conditions of lease, including but not limited to:

    (a)    Term of lease;

    (b)    Capitalized cost of lease;

    (c)    Capitalized cost reduction or down payment, if any;

    (d)    Lessee's monthly or periodic lease payments;

    (e)    Money factor, or finance or interest rate;

    (f)    Depreciation and finance charges;

    (g)    Mileage allowance and any excess mileage charges;

    (h)    Deposits, and acquisition or inception, disposition, termination, or other fees or charges;

-21-

(i)     Actual and/or proposed residual or resale value of the Vehicle at conclusion of lease term;

(j)     List and/or negotiated amounts to be paid at inception of lease and conclusion of lease term;

(k)     Net amounts paid by lessee at inception of lease and at conclusion of lease term, including extraordinary damage to Vehicle and applicable excess mileage charges, before taxes and after any adjustments to such list and/or negotiated amounts;

(l)     Adjustments to list and negotiated amounts to be paid at inception of lease and conclusion of lease term, including but not limited to, taxes, rebates, discounts, refunds, or credits;

(m)     MSRP and seller's (*e.g.*, Vehicle distributor or Vehicle dealer) list price for the Vehicle;

(n)     Net sale price of the Vehicle before taxes and after any adjustments to list price and Incentives or allowances issued or applied at any time; and

(o)     Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of Vehicle for which a trade-in allowance was provided.

d.     Any payments, credits, distributor subsidies, rebates, bonuses, Incentives, allowances or consideration received by purchaser (*e.g.*, Vehicle distributor,

Vehicle dealer or fleet purchaser) in connection with financing, warranties, insurance, service agreements, or other services or products provided to or purchased by retail purchaser (*e.g.*, consumer, leasing company, or other lessor) or lessee of the Vehicle;

e.  Monetary components of the transaction beyond unit price (*e.g.*, financing, sales tax, and fees) or non-monetary components of, or Incentives, distributor subsidies, rebates, bonuses, or allowances for, the sale of the Vehicle to the retail purchaser (*e.g.*, consumer, leasing company, or other lessor) or lease of the Vehicle distinct from net sale price, including but not limited to (1) commissions, and any service, benefit, and/or product the purchaser (*e.g.*, Vehicle distributor or dealer), retail purchaser or lessee received, or provided, in connection with the sale or lease, including service agreements, or warranties, and (2) the value of each such service, benefit, or product;

f.  Repairs or recalls with respect to the Vehicle, nature of repair or recall, whether the Vehicle was returned, and amount of any associated payment, refund or credit;

g.  Address and other identifiers of the facility where the Vehicle was manufactured or assembled;

h.  Your actual, or if actual is not available, estimated, direct and indirect materials, manufacturing, marketing, distribution, selling, and other costs of goods sold for the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of (i) each Component and Assembly, (ii) each other part or component of the Vehicle, and (iii) management, labor, tooling, overhead, energy, materials, sales and marketing, leasing, freight, and research and development;

-23-

i.      Purchaser's (*e.g.*, Vehicle distributor's or Vehicle dealer's) actual, or if actual is not available, estimated, direct and indirect purchase, marketing, distribution, selling, leasing and other costs in connection with the purchase and sale or lease of the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of management, labor, commissions, real estate, financing, overhead, energy, and freight;

j.      Your gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements for the manufacture, sale and/or lease of the Vehicle, "cost plus" pricing, gross margin target percentages, job cost and margin reports, financial statements, and any financial Analyses performed by corporate finance personnel;

k.      Your income for each Vehicle for products or services sold by Your finance and insurance department or affiliate, including without limitation finance, insurance, service contracts, extended warranties, and GAP insurance (broken out by units, total dollars, finance income, insurance income, service-contract, extended warranty, and GAP insurance income); and

l.      Purchaser's (*e.g.*, Vehicle distributor's or dealer's) gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements for the purchase, sale to a retail purchaser (*e.g.*, consumer, leasing company, or other lessor) and any lease of the Vehicle.

**REQUEST NO. 5:**    Data or documents sufficient to show the following information, for each model (and each model year) for each new Vehicle sold or leased by You or on Your behalf for sale or lease in the U.S.:

a.      The start of production date;

b.      The year when You began selling the Vehicle;

c.      The year you stopped selling the Vehicle if You no longer sell it;

d.      Your schedule of base model invoice prices; and

e.      Your schedule of MSRP.

**REQUEST NO. 6:**    VIN databases that include complete specifications for every new Vehicle sold by You or on Your behalf for sale or lease in the U.S.

**REQUEST NO. 7:**    Documents identifying, for each year, the total number of new Vehicles sold in the U.S. that were financed, the total dollar amount of finance income earned, the total amount of finance reserve not yet earned, and the total amount of finance commission paid to Vehicle dealers.

**REQUEST NO. 8:**    Documents sufficient to show the chronological progress of the prices You charged to each Vehicle dealership for each Vehicle You sold to a Vehicle dealership in the U.S.

**REQUEST NO. 9:**    For all new Vehicles sold or leased by Your Customers in the U.S. containing a Component or Assembly installed by You, all Documents relating to finance, insurance, and service contract income (broken out by units, by total dollars, by finance income, by insurance income, and by service contract income) by month.

**REQUEST NO. 10:**   Monthly or periodic reports on Your inventory levels with respect to new Vehicles intended for sale or lease in the U.S.

**REQUEST NO. 11:**   Monthly or periodic composite trend reports and expense composite reports for specific expected Vehicle sales by You or on Your behalf for sale or lease in the U.S.

**REQUEST NO. 12:**  Documents, including number, code, or data dictionaries or similar documents, sufficient to disclose, identify, describe, and explain the (a) manufacturer, supplier, vendor, and customer numbers or codes; (b) product, component, and part numbers or codes; (c) model, model platform, VIN, model project or development, and model year numbers or codes; (d) RFQ and RFQ response numbers or codes; (e) plant or facility numbers or codes; (f) Target Price, Limit Price, VE Price or VA Price, or other price numbers or codes; (g) transaction types, including standard sales, credits, debits, returns, and other adjustments related to purchases, sales and any leases of Vehicles, Components, and Assemblies; (h) contract or agreement and invoice numbers or codes; and (i) data fields, that are reflected in data or documents produced in response to these Requests.

**REQUEST NO. 13:**  Documents sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for  determining, setting or revising Your and Your distributors' prices, including without limitation MSRP and dealer-invoice price and any Incentives relating to sales provided to dealers or consumers, for the sale of new Vehicles sold or leased in the U.S.

      a.      Your studies, analyses, research, or evaluations concerning the market(s) and competitive conditions for the manufacture and sale of Vehicles, including but not limited to, competitors, market shares, market definition(s), profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and surveys and/or research concerning the Vehicles, models, brands, and classes of Vehicles that You compete with, including price levels and price comparisons; and

b.      Your studies, analyses, research, or evaluations concerning how the cost of Components or Assemblies is calculated into, or otherwise impacts or influences, the ultimate price of the Vehicle to Purchasers.

**REQUEST NO. 14:**   Documents sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for (i) Your purchases of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., and (ii) Your decisions to select and/or not to select particular manufacturers and suppliers of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., including but not limited to:

a.      Your review and evaluation of potential manufacturers and suppliers and the Components and Assemblies they offer, including but not limited to, documents sufficient to show comparisons of the quality and/or technological capabilities of the potential suppliers and manufacturers;

b.      Your (1) issuance of RFQs, and (2) solicitation of proposals, bids, and responses to RFQs from potential manufacturers and suppliers of Components and Assemblies, including Your consideration, solicitation or use of Target Prices, Limit Prices, cost tables or schedules (*e.g.*, standards or directives regarding the amount a supplier may charge for subcomponents of Components or Assemblies or labor used in the assembly of Components or Assemblies), or the supplier's VE Prices or VA Prices;

c.      Your review and evaluation of (1) proposals, bids, and responses to RFQs, and (2) manufacturers and suppliers of Components and Assemblies, including Your consideration of (a) estimates of input and other costs and profit margins of manufacturers or suppliers, and (b) manufacturers' or suppliers' ability to meet

Target Prices, Limit Prices, anticipated or expected prices, Your cost tables or

schedules, or VE Prices or VA Prices for Components and Assemblies;

d.      Variations in Vehicle price or Incentives over time or with respect to different

geographic areas;

e.      Variations in Vehicle price or Incentives as affected by prices of particular

competitive models or trims;

f.      Variations in Vehicle price or Incentives as affected by levels of sales or

inventory;

g.      Any actual or proposed program or requirement (1) that potential manufacturers

and suppliers of Components and Assemblies (a) provide engineers or other

personnel or services on-site, or (b) provide or estimate their input and other costs

related to the manufacture and sale of Components and Assemblies that You are

considering purchasing or acquiring; or (2) that such input and other costs be

negotiated with, dictated by, and/or approved by You or on Your behalf;

h.      Your negotiation of (1) prices, terms, and conditions of sale, including any rebates,

discounts, off-invoice discounts, or other price concessions or Incentives required

from, or offered by, potential manufacturers or suppliers of Components and

Assemblies, or (2) changes in prices, terms, and conditions of sale, including post-

RFQ pricing (*e.g.*, cost-down pricing and Annual Price Reductions);

i.      Audits or reports of Your purchases of Components and Assemblies pursuant to

International Organization for Standardization ("ISO") rules or regulations; and

j.      Your provision or disclosure to actual or potential manufacturers or suppliers of

Components and Assemblies of information about prices or other terms and

conditions offered or charged by other actual or potential manufacturers or suppliers.

**REQUEST NO. 15:**  Documents sufficient to disclose, identify, describe, and explain any studies, reports, analyses, policies, procedures, research, or evaluations concerning the extent (if any) that changes in costs related to Your manufacture, sale and/or lease of new Vehicles in the U.S., including but not limited to, changes in the input costs of a Vehicle (*e.g.*, Raw Material prices or prices for Components and Assemblies) and changes in costs pursuant to Annual Price Reductions, are passed on to purchasers (*e.g.*, Vehicle distributors or Vehicle dealers), retail purchasers (*e.g.*, consumers, leasing companies, or other lessors), or lessees in the sale or lease prices of Vehicles, including whether and how much (1) You pass on changes in Your costs to purchasers from You (*e.g.*, Vehicle distributors or Vehicle dealers), and (2) such purchasers pass on changes in Your costs to their customers (*e.g.*, consumers, leasing companies, or lessees).

**REQUEST NO. 16:**  Studies, analyses, research or evaluations concerning: (1) the impact or effect of changes with respect to Your acquisition costs for any particular Components or Assemblies or any other inputs on prices to dealerships, MSRP or on the "street prices" (*e.g.*, retail or consumer prices of Vehicles) paid by final consumers for new Vehicles sold or leased in the U.S. and (2) how You or Your retailers (*e.g.*, Vehicle dealerships or Vehicle distributors) set or adjust the prices at which new Vehicles containing Components or Assemblies are sold or leased in the U.S.

**REQUEST NO. 17:**  All studies, analyses, research, evaluations, or trade association materials concerning the market(s) in which You or other purchasers of Components and Assemblies have acquired or potentially could have acquired any such Components or Assemblies from any suppliers of such Components or Assemblies for installation in new

Vehicles sold or leased in the U.S., including but not limited to studies, analyses, research, evaluations, and trade association materials concerning (a) the nature, scope, competitive conditions, degree of concentration, structure, or other significant aspects of any such market(s); or (b) the identity, size, relative market share, quality, reputation or other significant attributes of any of the participants (including both buyers and sellers) in any such market(s).

**REQUEST NO. 18:**  All documents relating to any comments, observations, suspicions, or suggestions that the market(s), market or competitive conditions, and market structure(s) for the manufacture, sale, or purchase of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., or for the manufacture, sale, purchase or lease of new Vehicles containing any such Components and/or Assemblies in the U.S. (a) may not be competitive, (b) may involve collusion between or among manufacturers and suppliers of Components and Assemblies, or (c) may involve collusion between or among any OEMs, distributors, or dealerships.

**REQUEST NO. 19:**  Documents sufficient to show Your internal transfer costs, pricing, or sales of Components and Assemblies for installation in new Vehicles sold or leased in the U.S. between or among divisions or entities within Your corporate family.

**REQUEST NO. 20:**  Documents sufficient to show and describe:  (a) what systems are in place for Vehicle dealers and Vehicle distributors to report new Vehicle purchases, sales, and leases in the U.S.; (b) what other information these systems track; and (c) whether each such system includes information on OEM-to-Vehicle dealer, OEM-to-Vehicle distributor, and/or OEM-to-consumer Incentives (*e.g.*, dealer cash, customer cash, holdback, rebates, etc.).

**REQUEST NO. 21:**  All monthly, annual, and other periodic reports concerning or reflecting purchases, leases, and/or sales of new Vehicles in the U.S. by each of Your Vehicle

dealerships or Vehicle distributors (*e.g.*, financial statements or dealer operating reports) and (b) all studies, analyses, or reports concerning the business performance of Your Vehicle dealerships or Vehicle distributors with respect to purchases, leases and/or sales of new Vehicles in the U.S. Both (a) and (b) should include, but not be limited to, such reports, studies and analyses concerning sales volume by make and model, prices at which dealers or distributors sold the Vehicles by make and model, and any other characteristics of those sales, as well as such dealerships' and distributors' financial results, throughput volumes, salesperson activity, market-share performance, and expected-opportunity performance.

**REQUEST NO. 22:**  All letters, memoranda, or other communications from You to all or any group of Your dealerships in the U.S. (*e.g.*, dealerships in a particular geographic region) announcing prices or changes in prices charged to the dealers for new Vehicles, setting prices or discounts, or explaining discounts or prices for new Vehicles charged or Incentives provided to the dealers (*e.g.*, why prices went up or went down, or how prices were arrived at), including price lists from the manufacturer for new Vehicles.

**REQUEST NO. 23:**  Documents sufficient to show: (1) Annual Price Reductions or "APRs" issued to each supplier or manufacturer of Components or Assemblies for installation in new Vehicles sold or leased in the U.S. for each APR negotiation period for each such Component or Assembly and the dates of such APR requests; (2) APRs, credits, money, or other consideration received from suppliers of Components or Assemblies in connection with any negotiated price reductions and the dates of receipt; (3) the impact and traceability of APRs and APR requests to particular Components or Assemblies, including but not limited to, the methods, policies, procedures, factors, and standards for (a) how You calculate and issue APR requests issued to suppliers and manufacturers of Components or Assemblies, (b) how and when You

account for or credit APRs received from suppliers, and (c) how and when any audit of

suppliers' costs impact Your APR requests; (4) any variation, and the reason for the variation,

between Your APR requests issued to each of the suppliers and manufacturers of a particular

Component or Assembly; and (5) Your long-term cost reduction initiatives, including but not

limited to, announcements, PowerPoint presentations, and supplier meetings containing

information about these initiatives.

**REQUEST NO. 24:**  Documents sufficient to show, for each model of new Vehicle

manufactured by You that is sold or leased in the United States, the models of Vehicles

manufactured by other OEMs that You consider to be competitors and how (if at all) You

considered the pricing by such other OEMs of such models in setting the price of the model

manufactured by You.

**REQUEST NO. 25:**  Organizational charts or other documents sufficient to identify

Your divisions, departments and managerial employees that have responsibility for: (a)

purchasing Components or Assemblies for installation in new Vehicles sold or leased in the U.S.,

(b) manufacturing new Vehicles sold or leased in the U.S., (c) pricing of new Vehicles sold or

leased in the U.S., and (d) sales and marketing of new Vehicles containing such Components

and/or Assemblies to Your Customers for sale or lease in the U.S.

**REQUEST NO. 26:**  For all produced data extracted from a larger data system, identify

(a) the software hosting the original data (including version number); (b) the process used to

extract the data; and (c) the specific queries used to extract the data.  For any data that has been

altered from the original form in which it was stored, produce the descriptions of any

manipulations to the data fields or values, any removed data, any data summarization performed

prior to production, and any other alternations that would be required to reproduce the data as originally stored.

**REQUEST NO. 27:**   All Documents and/or transactional data produced to any regulatory or governmental authority within or outside the United States as part of any investigation relating to Components or Assemblies for installation in new Vehicles sold or leased in the U.S.

**REQUEST NO. 28:**    All Documents, including but not limited to, any Studies and/or Analyses relating to Your suppliers' (including Defendants') pricing of Components or Assemblies sold to You for installation in new Vehicles sold or leased in the U.S., including Documents relating to prices and proposals submitted in response to RFQs and other requests for procurement or price changes.  Please include Documents relating to the relationship between the prices charged or submitted to You for Components or Assemblies and the prices charged or submitted to other Vehicle manufacturers, including for Components or Assemblies that are jointly sourced or for Vehicles that share platforms, share elements, are badge-engineered, or are made for different OEMs who are involved in joint ventures or projects.  Please also include Documents relating to the relationship or similarities between the prices charged or submitted for Components or Assemblies for different models or makes of Vehicles, including Vehicles You manufacture.

**REQUEST NO. 29:**   Any Documents or data You have provided to the J.D. Powers' Power Information Network (PIN) concerning new Vehicles sold or leased in the U.S., including but not limited to data that contains the Vehicle make, model and trim, transaction prices, costs, and transaction dates, financing details and trade-in information.

**REQUEST NO. 30:**  All Documents concerning any agreement or understanding that prices charged to one OEM for Components or Assemblies for installation in new Vehicles sold or leased in the U.S. will not be below or above prices charged to another OEM, or that prices for Components or Assemblies for installation in new Vehicles sold or leased in the U.S. must be at a particular competitive level.

**REQUEST NO. 31:**  All Documents relating to Your or other OEMs' negotiations or Communications with any of the Defendants or other Components or Assemblies suppliers in connection with Defendants' and other Components or Assemblies suppliers' conduct at issue in MDL No. 2311 and Documents Defendants or other Components or Assemblies suppliers provided to You or other OEMs, in connection with the facts described in any Plaintiffs' Complaints.

**REQUEST NO. 32:**  All Documents related to requests by You that Defendants or Your other suppliers decrease prices charged, submitted or provided for any Component or Assembly for installation in new Vehicles sold or leased in the U.S., and techniques used to accomplish these reductions.

**REQUEST NO. 33:**  Documents comparing the Components or Assemblies You purchase, or have purchased, for installation in new Vehicles sold or leased in the U.S. to Components or Assemblies other OEMs purchase or have purchased, as well as Components or Assemblies made by different suppliers.

**REQUEST NO. 34:**  For new Vehicles that were sold to Your Customers in the U.S. and financed by You (or any of Your related financing entities), Your disaggregated transactional data, including but not limited to the cost of each Vehicle, the dealer invoice price for each

Vehicle (*i.e.*, the invoice price to Your franchise-dealer Customer), and the final sales price for the Vehicle to the end-payor (*i.e.*, the ultimate consumer of the Vehicle).

**REQUEST NO. 35:**  Documents sufficient to show the extent to which suppliers participated in the design and engineering of Components and Assemblies to be incorporated in manufacturing new Vehicle models with respect to new Vehicles manufactured or sold in the U.S.

**REQUEST NO. 36:**  Documents sufficient to show the existence of lists or compilations of OEM-approved parts suppliers, to the extent they include suppliers of Components or Assemblies for installation in new Vehicles sold or leased in the U.S., the criteria for the inclusion of a supplier on such lists or compilations, the process by which OEMs approve suppliers to be added to such lists or compilations, and the lists or compilations themselves.

**REQUEST NO. 37:**  Documents sufficient to show the following with respect to any Defendant in which you possess, hold, or own, directly or indirectly, an ownership, equity, or other economic interest of 20% of more ("partly-owned companies"):

a.   Your direct and/or indirect ownership interest in the partly-owned company and any companies with which it is affiliated, including any parent corporations, from January 1, 2000 to the present.

b.   That the partly-owned company is part of your consolidated group for U.S. state, federal, or local tax purposes.

c.   Your payment of any U.S. state, federal, or local taxes on behalf of a partly-owned company.

d.   All corporate services and benefits of any kind (including information technology, human resources, finance, legal, etc.) you provided to or received from the partly-

owned company and any companies with which it is affiliated, including any parent corporations, from January 1, 2000 to the present.

# ATTACHMENT B

1.      In addition to data or documents with respect to each Component or Assembly purchased for installation in a new Vehicle covered by Requests Nos. 1, 2, 3, 14, 17, 18, 19, 23, 25(a), 25(d), 27, 28, 30, 32, 33, and 36 in Attachment A, also produce data or documents responsive to those Requests for each Component or Assembly purchased or sold by You as a replacement part (including spare, service, or repair part) in the U.S.

2.      Produce data or documents (in the absence of data) sufficient to show for each Component or Assembly You sold as a replacement part (including spare, service, or repair part) in the U.S.:

     a)   Purchaser to whom it was sold;

     b)   Date of sale;

     c)   Model, model year, make, part number and other identifiers for the Vehicles for which the Component or Assembly was intended for use;

     d)   Terms and conditions of sale, including unit price (MSRP and invoice) and net sales price paid by purchaser before taxes and after any Incentives or adjustments to price;

     e)   Address and other identifiers of the facility where the Component or Assembly was manufactured or assembled;

     f)   Shipping or freight costs, by whom such costs were paid, "ship-from/pay-to" and "bill/invoice-to" addresses from where the Component or Assembly were shipped, sent, or received, and the location of sale;

     g)   Any monetary components of the transaction beyond unit price (e.g., financing, sales tax, and fees) or non-monetary components of, or Incentives for, the sale distinct from net sale price;

- 1 -

h)  Receipts, invoices, bills of sale, purchase contracts, purchase orders, transaction numbers, and invoice numbers You have for these transactions;

i)  Quantity sold (units);

j)  Your gross profit, profit margin or level, and net profit, including profit-and-loss statements

3.  Produce documents sufficient to identify, describe, and explain how You set or revised Your prices, including without limitation MSRP and dealer-invoice price and any Incentives relating to sales provided to purchasers, for Components or Assemblies You sold as replacement parts (including spare, service, or repair part) in the U.S., as well as:

a)  Your studies, analyses, research, or evaluations concerning the market(s) and competitive conditions for the manufacture and sale of Components or Assemblies sold as replacement parts, including but not limited to competitors, prices offered by competitors, market shares, market definition(s), profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends.

ATTACHMENT C

**Defendants List**

- AB SKF
- Aisan Corporation of America
- Aisan Industry Co., Ltd.
- Aisin Automotive Casting, LLC
- Aisin Seiki Co., Ltd.
- Alps Automotive Inc.
- Alps Electric (North America), Inc
- Alps Electric Co., Ltd.
- American Furukawa, Inc.
- American Mitsuba Corporation
- American Showa, Inc.
- ASMO Co. Ltd.
- ASMO Greenville of North Carolina, Inc.
- ASMO Manufacturing, Inc.
- ASMO North America, LLC
- Asti Corporation
- Autoliv ASP, Inc.
- Autoliv B.V. & Co. KG
- Autoliv, Inc.
- Bosch Electrical Drives Co., Ltd
- Bridgestone APM Company
- Bridgestone Corporation
- Calsonic Kansei Corporation
- Calsonic Kansei North America, Inc.
- Chiyoda Manufacturing Corporation
- Chiyoda USA Corporation
- Continental Automotive Electronics LLC
- Continental Automotive Korea Ltd.
- Continental Automotive Systems, Inc.
- Delphi Automotive LLP
- Delphi Automotive Systems, LLC
- Delphi Furukawa Wiring Systems LLC
- Delphi Powertrain Systems Korea Ltd.
- DENSO Corp.
- DENSO International America Inc.

- DENSO Korea Automotive Corporation
- DENSO International Korea Corporation
- DENSO Products & Services Americas, Inc.
- Diamond Electric Mfg. Co., Ltd.
- Diamond Electric Mfg. Corporation
- DPH Holdings Corporation
- DTR Industries, Inc.
- Franklin Precision Industry, Inc.
- Fujikura America, Inc.
- Fujikura Automotive America, LLC
- Fujikura Ltd.
- Furukawa Electric Co., Ltd.
- Furukawa Wiring Systems America, Inc.
- G.S. Electech, Inc.
- G.S. Wiring Systems, Inc.
- G.S.W. Manufacturing Inc.
- Hitachi Automotive Systems America, Inc.
- Hitachi Automotive Systems, Ltd.
- Hitachi, Ltd.
- Hyundam Industrial Co., Ltd.
- Ichikoh Industries, Ltd.
- II Stanley Co.
- JTEKT Automotive North America, Inc.
- JTEKT Corporation
- K & S Wiring Systems, Inc.
- Keihin Corporation
- Keihin North America, Inc.
- Koito Manufacturing Co., Ltd.
- Korea Automotive Motor Corporation
- Koyo Corporation of U.S.A.
- Kyungshin-Lear Sales And Engineering LLC
- Lear Corp.
- Leoni AG
- Leoni Bordnetz-Systeme GMBH
- Leoni Kabel GmbH
- Leoni Wire Inc.
- Leoni Wiring Systems, Inc.
- Leonische Holding, Inc.

- Maruyasu Industries Co., Ltd.
- Mikuni American Corporation
- Mikuni Corporation
- Mitsuba Corporation
- Mitsubishi Electric Automotive America, Inc.
- Mitsubishi Electric Corporation
- Mitsubishi Electric US Holdings, Inc.
- Mitsubishi Heavy Industries America, Inc.
- Mitsubishi Heavy Industries Climate Control, Inc.
- Mitsubishi Heavy Industries, Ltd.
- N.S. International, Ltd.
- Nachi America Inc.
- Nachi-Fujikoshi Corp.
- New Sabina Industries
- NGK Spark Plugs (U.S.A) Holding, Inc.
- NGK Spark Plugs (USA) Inc.
- NGK Spark Plugs Co. Ltd.
- Nippon Seiki Co., Ltd.
- North American Lighting, Inc.
- NSK Americas, Inc.
- NSK Ltd.
- NTK Technologies, Inc.
- NTN Corporation
- NTN USA Corporation
- Panasonic Corporation
- Panasonic Corporation of North America
- Robert Bosch GmbH
- Robert Bosch LLC
- Schaeffler AG
- Schaeffler Group USA Inc.
- Showa Corporation
- SKF USA, Inc.
- Stanely Electric Co., Ltd.
- Stanley Electric U.S. Co., Inc.
- Sumitomo Electric Industries, Inc.
- Sumitomo Electric Wintec America, Inc.
- Sumitomo Electric Wiring Systems, Inc.
- Sumitomo Riko Company Limited (formerly Tokai Rubber Industries, Ltd.)

010485-11  792622 V1

- Sumitomo Wiring Systems (U.S.A.) Inc.
- Sumitomo Wiring Systems, Ltd.
- S-Y Systems Technologies America, LLC
- S-Y Systems Technologies Europe GmbH
- T.RAD Co., Ltd.
- T.RAD North America, Inc.
- Takata Corp.
- TG Missouri Corp.
- TK Holdings, Inc.
- Tokai Rika Co., Ltd.
- Toyo Automotive Parts (USA), Inc.
- Toyo Tire & Rubber Co., Ltd.
- Toyo Tire North America Manufacturing, Inc.
- Toyo Tire North America OE Sales LLC
- Toyoda Gosei Co., Ltd.
- Toyoda Gosei North America Corp.
- TRAD Co., Ltd.
- TRAM Inc. d/b/a Tokai Rika U.S.A. Inc.
- TRW Automotive Holdings Corp.
- TRW Deutschland Holding GmbH
- Valeo Climate Control Corp
- Valeo Electrical Systems, Inc.
- Valeo Inc.
- Valeo Japan Co., Ltd.
- Valeo S.A.
- Yamashita Rubber Co., Ltd.
- Yazaki Corporation
- Yazaki North America Inc.
- YUSA Corporation

010485-11  792622 V1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **IN RE: AUTOMOTIVE PARTS** : | |
| **ANTITRUST LITIGATION** : | **Master File No. 12-MD-02311** |
| : | |
| : | |
| : | |
| **PRODUCTS(S):** : | |
| : | |
| **WIRE HARNESS SYSTEMS** : | |
| : | |
| : | |
| **THIS DOCUMENT RELATES TO:** : | |
| : | |
| **All Actions** : | |
| : | |

## STIPULATION AND PROTECTIVE ORDER GOVERNING THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

WHEREAS, the Plaintiffs and Defendants in the Wire Harness Systems Direct Purchaser Actions, Automobile Dealer Actions, and End-Payor Actions may seek discovery of documents, information, or other materials that contain non-public, confidential, competitively sensitive, or proprietary information of another party or of a third party;

WHEREAS, the parties have stipulated and agreed to terms, and jointly moved this Court for entry of the following Protective Order, and the Court having found that, in light of the nature of the non-public, confidential, competitively-sensitive, proprietary information that may be sought in discovery, good cause exists for entry of the Protective Order,

IT IS ORDERED that this Protective Order ("Order") shall be entered pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and Local Rule 26.4 of the United States District Court for the Eastern District of Michigan limiting the disclosure and use of certain discovered information in connection with the prosecution or defense of:

 a. the consolidated direct and indirect purchaser Wire Harness Systems actions included in MDL No. 2311;

 b. any individual direct or indirect purchaser case included in MDL No. 2311;

 c. any case designated as a direct or indirect purchaser "tagalong" case to MDL No. 2311 or designated as a "related case" to any direct or indirect purchaser case in MDL No. 2311;

      d.      any subsequent cases which are subsequently transferred to this Court for coordinated proceedings with the cases included in MDL No. 2311; and

      e.      any appeals of the cases described in categories (a) through (d) above

(collectively the "Litigation").

1.      All information produced or discovered in this Litigation and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS ONLY" shall be used solely for the prosecution or defense of this Litigation, unless that information is or has become publicly available without a breach of the terms of this Order.

2.      To preserve the legitimate proprietary and privacy interests of sources of information, this Order establishes a procedure for disclosing Protected Information (defined in Paragraph 4 below) to the parties in this Litigation, imposes obligations on persons receiving Protected Information to protect it from unauthorized use or disclosure, and establishes a procedure for challenging confidentiality designations. This Order applies only to information furnished by parties and non-parties that is not otherwise publicly available.

3.      This Order shall govern all documents, the information contained therein, and all other information produced or disclosed during discovery in this Litigation whether revealed in a document, deposition, other testimony, multimedia audio/visual file such as a voice and video recording, discovery response or otherwise, including but not limited to any copies, notes, abstracts or summaries of the foregoing materials ("Discovery Material"), by any party or nonparty in this Litigation (the "Producing Party") to any other party (the "Receiving Party") when the foregoing materials are designated using the procedures set forth herein. This Order is binding upon the parties to this Litigation, as well as their respective attorneys, agents, representatives, officers and employees, and others as set forth in this Order. Nothing in this Order, however, prevents any use by a Producing Party of the Discovery Material that it produces.

4.      Subject to the protections provided in Rule 26 of the Federal Rules of Civil Procedure, this Order covers information that any Producing Party designates as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY" pursuant to Paragraph 5 (collectively referred to as "Protected Information"). In designating information as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY," a party will make such designation only as to that information that it in good faith believes contains information meeting the respective definitions set forth below.

5.      **<u>Confidentiality Designations.</u>**

      a.      The designation "CONFIDENTIAL" shall be limited to information that the Producing Party has determined, in good faith, contains non-public, confidential, proprietary or commercial information that is not readily ascertainable through lawful means by the public or the receiving party or is subject to privacy protection under federal, state, local, or any applicable foreign law ("Confidential Information").

   b. The designation "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY" shall be limited to information which a Producing Party believes to be highly sensitive and/or proprietary information, including but not limited to documents or information reflecting, containing, or derived from current confidential trade secrets, research, development, pricing, production, cost, marketing, or customer information, the disclosure of which, even limited to the restrictions placed on the information designated as "CONFIDENTIAL" under this Order, could compromise and/or jeopardize the Producing Party's competitive business interests ("Highly Confidential Information").

   c. Any party to this Litigation and any third party may designate as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY documents or information produced by another party or a third party if that Discovery Material (i) either originated from the designating party or third party (or was generated on the designating or third party's behalf), or (ii) contains the designating party's Confidential Information or Highly Confidential Information, in which case the designating party shall be deemed a Producing Party for purposes of this Order. Failure to designate any documents or information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY pursuant to this paragraph shall not constitute a waiver of any party's right to make such designation at a later time.

   6. **Means of Designating Protected Information**.

  Documents, material, or information may be designated CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY in the following ways:

   a. *Documents*. A Producing Party shall, if appropriate, designate specific, hard copy and non-natively produced electronic documents as (i) CONFIDENTIAL by marking the first page and each subsequent page of the produced copy or image of such document containing any Confidential Information with the legend "CONFIDENTIAL"; or as (ii) HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY by marking the first page and each subsequent page of the produced copy or image of such document containing any Highly Confidential Information with the legend "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY." All documents produced or disclosed during discovery in this Litigation shall be identified by Bates number and, to the extent practical, the appropriate designation shall be placed near the Bates number. The impracticality or inadvertent failure to designate each page of a document as CONFIDENTIAL or HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS ONLY pursuant to this paragraph shall not constitute a waiver of the confidential nature of the document or page(s).

   b. *Discovery Responses*. A Producing Party shall, if appropriate, designate discovery responses, including but not limited to interrogatory answers and responses to requests for admissions, as Confidential Information or Highly Confidential Information by placing the following legend on each page of the discovery responses containing Confidential or Highly Confidential Information: "CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER" and / or "CONTAINS HIGHLY CONFIDENTIAL INFORMATION

SUBJECT TO PROTECTIVE ORDER."

      c.    *Depositions*. In the case of depositions and the information contained in depositions (including exhibits), counsel for a Producing Party or witness shall designate portions of the transcript (including exhibits) which contain Confidential Information or Highly Confidential Information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY by making a statement to that effect on the record at the deposition or by letter within 30 days of receipt of the final deposition transcript or copy thereof (or written notification that the transcript is available). The entire deposition transcript (including exhibits) shall be treated as Highly Confidential Information under this Order until the expiration of the 30-day period for designation. The following legend shall be placed on the front of all versions of the original deposition transcript and each copy of the transcript containing Confidential Information or Highly Confidential Information: "CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER" or "CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER." If all or part of a videotaped deposition is designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY, the videocassette, other videotape container or DVD shall be labeled with the appropriate legend provided for in Paragraph 5.

      d.    *Computerized Material*. To the extent that information is produced in a form rendering it impractical to label (including electronically stored information produced on electronic, magnetic or other computer readable media), the Producing Party may designate such information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY by cover letter or by affixing to the media containing the Confidential Information or Highly Confidential Information a label containing the appropriate legend provided for in Paragraph 5 above. Whenever a Receiving Party reduces such computerized material designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY to hard-copy form, the Receiving Party shall mark the hard-copy form with the appropriate legend provided for in Paragraph 5 above. Whenever any Confidential or Highly Confidential computerized material is copied into another form, the Receiving Party shall also mark those forms with the appropriate legend provided for in Paragraph 5 above.

      e.    *Restricting Access*. To the extent that any Receiving Party or counsel for the Receiving Party creates, develops or otherwise establishes on any digital or analog machine-readable device, recording media, computers, discs, networks, or tapes, or maintains for review on any electronic system material that contains information designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY that Receiving Party and/or its counsel must take all necessary steps to ensure that access to the electronic system and/or the media containing such information is properly restricted to those persons who, by the terms of this Order, may have access to Confidential Information or Highly Confidential Information.

      f.    *Inspections*. Documents, materials, or other information to be inspected shall be treated as HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY during inspection. Such documents or other materials or information that are later duplicated by or for the Receiving Parties shall be stamped, if designated, CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY.

7.     **Filing of Protected Information**.

A party that seeks to file any pleading, motion, brief, memoranda or other paper that contains Confidential Information or Highly Confidential Information must comply with Civil Local Rule 5.3 and this Order shall serve as a stipulated order for the purposes of Civil Local Rule 5.3(b). All documents, materials, or other information containing Confidential Information or Highly Confidential Information that are filed with the Court shall be filed under seal according to the following procedures:

     a.     Consistent with Local Rule 5.3, only those portions of filings with the Court containing Confidential Information or Highly Confidential Information shall be filed under seal. Wherever possible, Confidential Information or Highly Confidential Information shall be filed electronically, in accordance with the Court's ECF procedures. Otherwise, Confidential Information or Highly Confidential Information filed under seal shall be placed in sealed envelopes labeled with the title to the appropriate case in this Litigation, the name of the pleading, the words "FILED UNDER SEAL," and a statement substantially in the following form:

> "This envelope is sealed pursuant to Order of the Court dated
> _____, 20__, and contains [Confidential Information or Highly
> Confidential Information] filed in this case by [name of Party] and
> is not to be opened or the contents thereof to be displayed or
> revealed to any non-Court personnel except by order of the Court."

Any pleading or other paper required to be filed under seal pursuant to this Paragraph shall also bear the legend "FILED UNDER SEAL" on the cover page of the document. The envelope shall not be opened without further order of the Court except by persons authorized to have access to Confidential Information or Highly Confidential Information pursuant to Paragraphs 9 and/or 10, as appropriate, who shall return the information to the Clerk in a sealed envelope. Regardless of whether a submission is filed under seal electronically or manually, a full copy of any such submission shall be provided directly to chambers, marked "Judge's Copy" and "Contains [Confidential Information or Highly Confidential Information] Subject to Protective Order" and may be opened by the presiding District Judge, his/her law clerks, and other Court personnel without further order of the Court. Further, subject to Paragraphs 9 and/or 10, as appropriate, a full copy of any such sealed submission shall be served upon counsel for the parties. Such service may be effected by e-mail.

     b.     If any party objects to identified portions of the materials remaining under seal, it shall state its objections in a faxed or electronically-delivered letter to the appropriate counsel of record. The interested parties shall promptly meet and confer to attempt to resolve those objections and, if they cannot be resolved, shall promptly tender those objections to the Court for resolution.

     c.     Each document manually filed under seal may be returned to the party which filed it (1) if no appeal is taken, within ninety days after a final judgment is rendered, or (2) if an appeal is taken, within thirty days after the mandate of the last reviewing court which

disposes of this Litigation in its entirety is filed. If the party that filed a sealed document fails to remove the document within the appropriate time frame, the Court may dispose of the document in accordance with Local Rule 5.3(e), or take any other action with respect to the document it deems appropriate.

       d.     Notwithstanding the foregoing, a party is not required to file a document under seal if the Confidential Information or Highly Confidential Information contained or reflected in the document was so designated solely by that party.

     8.     **Use of Protected Information**.

       a.     In no event shall Confidential or Highly Confidential Information be used for any business, competitive, personal, private, public, or other purpose, except as permitted by law.

       b.     Notwithstanding the foregoing, nothing in this Order shall be deemed to limit or restrict any Producing Party from using its own documents, materials, information, or its own Confidential Information or Highly Confidential Information for any purpose. The Producing Party may withdraw or modify any designation it has made.

       c.     The use of Confidential Information and/or Highly Confidential Information in hearings shall be subject to the following:

         i.     Subject to Paragraph 8(c)(ii), a party may refer to Confidential Information and/or Highly Confidential Information in public proceedings. The use of such information at trial shall be addressed in the final pre-trial Order, except that the words "CONFIDENTIAL" and "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY" shall be removed from documents before such documents are used at trial. The removal of those words shall not affect the protections afforded to the information itself.

         ii.     Any party that reasonably believes it will disclose Confidential Information and/or Highly Confidential Information in any public proceeding before the Court shall make its best efforts to inform the Court and the Producing Party at least five (5) business days in advance of actual disclosure but in any event with advance notice sufficient to allow the Producing Party to raise the issue with the Court, so that the Court can decide what precautions are necessary to protect the Producing Party's Confidential/Highly Confidential Information, including specifying how exhibits containing such information shall be filed to maintain their confidentiality, whether and how exhibits containing such information may be shown to witnesses or otherwise used in open court, and whether persons not identified in Paragraphs 9 or 10, as appropriate, shall be excluded from specific portions of the proceedings.

         iii.     The Producing Party may designate portions of transcripts of public proceedings as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY, but any such designations must be made within thirty (30) days of receipt of the final transcript. If the Producing Party is not a party to this Litigation, the party using the information must confer with the Producing Party regarding such designation consistent with this

paragraph.

       d.     Nothing in this Order shall bar or otherwise prevent any counsel from rendering advice to his or her client with respect to this Litigation and, in the course of rendering such advice, from relying upon his or her examination or knowledge of CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY information; provided that, however, in rendering such advice and in otherwise communicating with his or her client, such counsel shall not disclose the contents or source of any CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY information produced by another party to this Litigation to any person who is not authorized to receive such information under the provisions of this Order.

       9.     **Disclosure of Confidential Information.**

       a.     The attorneys of record are responsible for employing reasonable measures, consistent with this Order, to control access to, and distribution of information designated as CONFIDENTIAL pursuant to this Order.

       b.     Access to information designated as CONFIDENTIAL pursuant to this Order shall be limited to:

       i.     The Court or any other court exercising jurisdiction with respect to this Litigation, Court personnel, jurors, alternate jurors, and qualified persons (including necessary clerical personnel) who are engaged in recording, taking or transcribing testimony or argument at any deposition, hearing, trial or appeal in this Litigation;

       ii.     Mediators or other individuals engaged or consulted in settlement of all or part of this Litigation;

       iii.     Outside counsel for the parties in this Litigation (including members or associates of the counsel's firm) or members of the in-house legal department for the parties, as well as their paralegals, investigative, technical, secretarial, and clerical personnel who are engaged in assisting them in this Litigation;

       iv.     Outside photocopying, document storage, data processing, document review, graphic production, jury research or trial preparation services employed by the parties or their counsel to assist in this Litigation, including contract attorneys and paralegals retained to assist in this Litigation;

       v.     Any individual expert, consultant, or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for the individual expert, consultant, or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however that (a) the disclosure shall be made only to an individual expert, or to members, partners, employees or agents of an expert consulting firm as the expert consulting firm shall designate as the persons who will undertake the engagement on behalf of the expert consulting

firm (the "Designated Expert Personnel"); (b) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (c) the individual and/or a representative of each expert consulting firm sign the written assurance attached on Exhibit A on behalf of any Designated Expert Personnel associated with that firm; and (d) excluding any retention for this Litigation, the individual expert and each of the Designated Expert Personnel is neither a current nor former (within the past year from the date of this Order) employee of any party or any entity which directly competes with, or is a customer of or direct seller to, any of the Defendants;

        vi.    In addition to members of a party's in-house legal department, no more than three directors, officers or employees of a party charged with the responsibility for making decisions dealing directly with the resolution of this Litigation with respect to that party, provided that the requirements of Paragraph 11 of this Order are met;

        vii.    In the case of a party who is a natural person, that natural person, provided that the requirements of Paragraph 11 of this Order are met;

        viii.    Any person who (a) authored or is listed as a recipient of the particular material sought to be disclosed to that person); (b) was a custodian of the document; or (c) is a witness (1) to whom disclosure is reasonably necessary for this litigation and (2) who counsel in good faith believes has knowledge or awareness of the specific matters set forth in the confidential information or materials, but only as to the specific matter in which such person is referenced, discussed, mentioned, or reasonably thought to have specific knowledge; and

        ix.    Any other person to whom (a) the Producing Party agrees in writing or on the record in advance of the disclosure or (b) the Court directs should have access.

    10.    **Disclosure of Highly Confidential Information**.

        a.    The attorneys of record are responsible for employing reasonable measures, consistent with this Order, to control access to, and distribution of, information designated as HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY pursuant to this Order.

        b.    Access to information designated as HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY pursuant to this Order shall be limited to:

        i.    The persons identified in Paragraphs 9(b)(i)-(v), excluding members of the in-house legal department for the parties, as well as their paralegals, investigative, technical, secretarial, and clerical personnel.

        ii.    Any person who authored, received, or is reasonably believed in good faith to be referenced in or aware of or participated in the events referenced in the Highly Confidential Material;

        iii.    Any witness during the course of his or her testimony at a

deposition under the provisions of Fed. R. Civ. Proc. 26(b) in the above-captioned proceeding provided that the witness falls within 10(b)(i) or 10(b)(ii) or is an employee of the Producing Party or was an employee of the Producing Party at the time that the Highly Confidential Material was created, or the document is

being used to refresh the witness' recollection, or to impeach the witness, and subject further to deposing counsel's provision of the Highly Confidential Material to counsel attending the deposition before tendering it to a witness who is not an employee of the Producing Party or an employee of the Producing Party at the time the Highly Confidential Material was created, or an author or recipient of the document so that counsel for the party whose purportedly Highly Confidential Material is proposed to be shown to the above-referenced category of witness has sufficient time to object or take such other actions permitted by this Protective Order or law; and

       iv.    Any other person to whom (a) the Producing Party agrees in writing or on the record in advance of the disclosure or (b) the Court directs should have access.

11.    **Notification of Protective Order**.

       a.    Counsel for the respective parties shall be responsible for obtaining, prior to disclosure and as a condition thereof, the written agreement of any person to whom any Protected Information is disclosed (other than Court personnel, outside counsel for a party and their respective direct staff) to be bound by the terms of this Order. Such written agreement shall be in the form annexed hereto as Exhibit A. The originals of the Agreement shall be maintained by counsel for the party who obtained them until the final resolution of this Litigation. Upon a showing of good cause to the Court, copies of all executed Agreements shall be provided to the counsel for the party seeking disclosure of the Agreements within thirty (30) days of a court order requiring their production.

       b.    In the event information designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY is to be shown to a witness, at deposition, hearing, trial or otherwise, the witness shall be provided with a copy of this Order at the start of the examination, and shall be advised on the record that he or she will be subject to sanction, including contempt, for violating the terms of this Order. If the witness has refused to execute Exhibit A as required by this Order, the admonition in the immediately preceding sentence made on the record shall serve as a substitute for the execution of Exhibit A and shall permit examination of the witness on documents or other materials containing CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY information.

       c.    The prohibitions in this paragraph do not limit a Producing Party's ability to disclose its own Confidential or Highly Confidential Information.

12.    A party shall not be obligated to challenge the propriety of a Confidential Information or Highly Confidential Information designation at the time material so designated is produced, and a failure to do so shall not preclude a subsequent challenge thereto, provided, however, that any challenges must be made no later than the close of fact discovery. In the event a party objects to the designation of any material under this Order, the objecting party shall state

its objections in a letter to counsel for the designating party in this Litigation, identifying the challenged material by Bates number, on a document-by-document basis; provided, however, if the challenging party is challenging mass designations or designations of substantially identical types of documents, the challenging party need only provide an example of such designation and the basis for challenge, as well as an adequate description of the types of documents challenged, including the impacted ranges of Bates numbers. The notice by the party challenging the designation must also provide the specific bases for its challenge of the confidentiality designations. The interested parties thereafter shall meet and confer in good faith in an attempt to resolve any objection. If the objection is not resolved within fourteen (14) days of transmission of the initiating letter, the party objecting to the confidentiality designation may file with the Court, under the "Notice-Other" designation in ECF, a "Notice of Objection to Designation of Documents," which identifies the disputed documents by Bates number, challenged designation and proposed designation (if any).. Following the objecting party's filing of this Notice of Objection, the designating party shall have twelve (12) days to file its brief in support of its designation(s); the objecting party shall have seven (7) days thereafter to file its response and the designating party shall have seven (7) days thereafter to file its reply, if any. If a Notice of Objection is filed, the designating party has the burden of establishing that the designation is proper. If no brief is filed by the designating party supporting its designation, the material will be redesignated in the manner suggested by the objecting party in its Notice of Objection. If the designating party agrees to change the designation, the designating party shall send a written notice of the change in designation to all other parties. Any documents or other materials that have been designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY shall be treated in the manner designated until the Court rules that they should not be treated as Confidential Information or Highly Confidential Information, or the designating party agrees to change the designation.

13.     Nothing contained in this Order shall affect the right, if any, of any party or witness to make any other available objection or other response to discovery requests, including, without limitation, interrogatories, requests for admissions, requests for production of documents, or questions at a deposition. Nor shall this Order be construed as a waiver by any party of any right to withhold any Confidential Information or Highly Confidential Information as attorney work product or based on a legally cognizable privilege, or of any right that any party may have to assert any privilege at any stage of this Litigation.

14.     Within sixty (60) days after the final disposition of this Litigation, including all of the Direct Purchaser Actions, the Automobile Dealer Actions, and the End-Payor Actions, and including all appeals, a Receiving Party shall return all Confidential Information and Highly Confidential Information, including all copies of said materials, to counsel for the Producing Party or, in lieu thereof, the Receiving Party shall certify in writing that it has made reasonable efforts to destroy such materials. Counsel shall be entitled to retain pleadings and the exhibits thereto, affidavits, motions, briefs, or other papers filed with the Court, as well as any memoranda, notes, or other work product, even if they contain Confidential Information or Highly Confidential Information, so long as counsel protects that information consistent with the terms of this Order. A "final disposition" shall not include an order from the MDL Court directing that each individual case be returned to the district where it originated for trial.

15. **Correction of Designation and Clawback**.

a. A Producing Party that fails to designate Discovery Material as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY at the time of production shall be entitled to make a correction to its designation. Any correction and notice of the correction shall be made in writing, accompanied by substitute copies of each item of Discovery Material, appropriately designated. A Receiving Party has ten (10) days to object to the fact of a late designation. If no objection is interposed, then within ten (10) days of receipt of the substitute copies of the Discovery Material, the Receiving Party shall destroy or return to counsel for the Producing Party all copies of such mis-designated documents. If any objection is interposed, the parties shall meet and confer and, in the absence of an agreement, the Producing Party may file a motion for relief from the Court. Until the Court rules on such a motion, the disputed Discovery Material shall be treated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY in accordance with the designation made pursuant to paragraph 6 and this paragraph. The obligation to treat such material pursuant to a corrected designation shall run prospectively from the date of corrected designation. Individuals who reviewed the mis-designated Discovery Material prior to notice of the mis-designation by the Producing Party shall abide by the provisions of this Order with respect to all future use and disclosure of the mis-designated materials and any information contained in them.

b. If a Producing Party inadvertently produces any document, material, or other information in this Litigation that the Producing Party has a good faith basis to believe is privileged under the attorney-client or other privilege, or protected from discovery as work product (the "Privileged Material"), regardless of whether the information was designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS ONLY or neither of these at the time of disclosure:

i. The parties acknowledge and stipulate that the disclosure does not waive, in whole or part, the party's claim of privilege either as to the specific documents or information disclosed therein or as to any other documents or information relating thereto or on the same or related subject matter, in this or any other federal or state proceeding.

ii. The Producing Party may, upon discovery of the inadvertent production, request the return of the Privileged Material that was inadvertently disclosed. Upon receipt of such a request, the Receiving Party (a) shall promptly return or destroy the original and all copies of the Privileged Material, (b) destroy all summaries, notes, memoranda or other documents (or portions thereof) referring to or reflecting the contents of such Privileged Material, and (c) not use such documents containing Privileged Material for any purpose absent further order of the Court. In the event the Receiving Party objects to the return of the Privileged Material, the Receiving Party may move the Court, within ten (10) days of receiving the notice from the Producing Party, for an order compelling production of the Privileged Material. All materials related to the inadvertently produced Privileged Material and any related motion to compel, shall be treated as Highly Confidential Information pursuant to this Order, unless otherwise ordered by the Court. Whether or not the Receiving Party disputes the Privileged Material's protected status, if the Receiving Party disclosed the Privileged Material prior to a demand for its return, it shall promptly notify any persons with whom the Privileged Material

was shared and use reasonable efforts to collect and return all copies to the Producing Party and/or destroy all such copies, and certify in writing that it has exhausted its reasonable efforts to collect and return all copies.

                  c.     In the event that a party discovers that Protected Information it has received has been disclosed to someone not authorized under the terms of this Protective Order to receive such information, counsel of record for the party responsible for the unauthorized disclosure shall immediately give notice to counsel of record for the party who designated the information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY. If a party fails to treat documents designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY in the manner provided herein, that party will immediately take such steps as are necessary to have such items placed under seal and/or restored to their confidential status. Depending upon the circumstances, nothing contained herein shall limit the right of the Producing Party or designating party to seek relief against the party responsible for such disclosure.

        16.     This Order shall not apply to documents, materials, or information that are publicly available without a breach of the terms of this Order or that are obtained independently by the Receiving Party from a person lawfully in possession of those documents, materials, or information.

        17.     A party's compliance with the terms of this Order shall not operate as an admission that any particular document is or is not (a) confidential, (b) privileged, or (c) admissible in evidence at trial.

        18.     If any Receiving Party receives a subpoena from a person not a party to this Litigation for documents obtained from a Producing Party subject to this Order, the person subpoenaed must inform the subpoena's issuer of this Order, provide the subpoena's issuer with the copy of the Order, and give the Producing Party and, if different, the designating party, notice of the subpoena within the earlier of three (3) business days after its receipt of the subpoena or before it produces any documents in response to the subpoena, so that the Producing Party and, if different, the designating party, have an opportunity to object and/or file a motion to quash the subpoena or other similar filing prior to the production of any responsive material. In the absence of an objection or motion to quash the subpoena, or other similar filing, by the Producing Party or, if different, the designating party, or further court order, the party receiving the subpoena may produce documents, materials, or other information responsive to the subpoena.

        19.     This Order shall apply to non-parties who provide discovery, by deposition, production of documents, or otherwise, in this Litigation, if that non-party requests the protection of this Order as to its Confidential Information or Highly Confidential Information and complies with the provisions of this Order. A non-party who provides discovery in this Litigation, requests the protection of this Order, and complies with its terms will be deemed a Producing Party. A party taking discovery from a non-party must provide the non-party with a copy of this Protective Order when it first serves the non-party with a subpoena or other discovery request.

93207

20.     Upon final disposition of this Litigation, the provisions of this Order shall continue to be binding. This Court expressly retains jurisdiction over this Litigation for enforcement of the provisions of this Order following the final disposition of this Litigation.

21.     Until this Order is entered by the Court, any Discovery Material designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY that is produced in this Litigation shall be protected from disclosure pursuant to the terms of this Order as if entered by the Court. If any actions subject to this Order are transferred to another Court, the terms of this Order shall remain in full force and effect unless modified by written agreement of all parties or order of the Court.

22.     This Order is binding on all parties to this Litigation and on all non-parties who have been served with a copy of this Order, and shall remain in force and effect until modified, superseded, or terminated by consent of the parties or by order of the Court. This Order shall not prevent a party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders, or from agreeing to modifications of this Order, subject to approval of the Court.

23.     Nothing in this Order shall prevent a Producing Party or, if different, designating party from seeking further, greater, or lesser protection with respect to the use of any Confidential Information or Highly Confidential Information, or seeking to prevent Confidential Information or Highly Confidential Information from being provided to the persons described in Paragraphs 9 and 10 of this Order.

24.     The terms of this Order shall be binding upon all current and future parties to this Litigation and their counsel; any party appearing in the case following entry of this Order shall be deemed to have joined the case subject to its provisions. Within ten (10) days of (i) entry of an appearance by a new party to this Litigation, or (ii) notification of the filing in this District of a complaint that arises out of the same facts alleged in the Plaintiffs' Complaints, counsel for the Plaintiffs (in the case of a new party plaintiff) or counsel for the Defendants (in the case of a new party defendant) shall serve a copy of this Order on the new party's counsel who have filed an appearance.

25.     Nothing herein shall be construed as a determination by the Court, or as a consent or waiver by any foreign parent or affiliate of any party, that such a foreign parent or affiliate of any party is subject to personal jurisdiction in this Court or that discovery as to such foreign parent or affiliate of any party shall proceed pursuant to the Federal Rules of Civil Procedure.

26.     All time periods set forth in this Order shall be calculated according to Rule 6 of the Federal Rules of Civil Procedure, as then in effect.


Dated: July 10, 2012

IT IS SO ORDERED:



s/Marianne O. Battani
Hon. Marianne O. Battani
United States District Judge

### EXHIBIT A

On behalf of _____ [NAME OF ORGANIZATION] I, _____ [NAME OF INDIVIDUAL] hereby certify (i) my understanding that Discovery Material containing Confidential Information or Highly Confidential Information is being provided or otherwise disclosed to me pursuant to the terms and restrictions of the Stipulation and Protective Order Governing the Production and Exchange of Confidential Information ("Order") entered in *In re Automotive Parts Antitrust Litigation*, Master File No. 12-MD-2311, United States District Court, Eastern District of Michigan and (ii) that I have received and read the Order; and (iii) that I will provide a copy of and explain the terms of this Order to any personnel at _____ [NAME OF ORGANIZATION] who receive Discovery Material containing Confidential Information or Highly Confidential Information or who otherwise receive Confidential Information or Highly Confidential Information. I understand the terms of the Order, I agree to be fully bound by the Order, and I hereby submit to the jurisdiction of the Court for purposes of enforcement of the Order. I understand that violation of the Order may be punishable by contempt of Court.

Dated: _____          Signature: _____

                                     Name: _____

                                     Address: _____

# EXHIBIT B

**EXHIBIT B**

**List of SSE Entities**

- Aston Martin entities (Aston Martin Lagonda of North America, Inc.; Aston Martin Lagonda Limited)

- BMW entities (BMW of North America, LLC; BMW Manufacturing Co., LLC; BMW Financial Services NA, LLC; BMW (US) Holding Corp.; BMW Bank of North America; BMW Insurance Agency, Inc.; BMW US Capital, LLC; Designworks/USA, Inc.)

- Chrysler entities (FCA US LLC; Maserati N.A., Inc.; Fiat Finance North America, Inc.)

- Daimler entities (Daimler North America Corporation (MI); Daimler North America Corporation (NJ); Daimler Purchasing Coordination Corporation; Daimler Trucks North America LLC; Daimler Vans Manufacturing, LLC; Daimler Vans USA LLC; Freightliner Custom Chassis Corporation MB-Technology NA LLC; Mercedes-Benz Advanced Design of North America Inc.; Mercedes-Benz Credit Corporation; Mercedes-Benz Financial Services USA LLC; Mercedes-Benz Research & Development North America, Inc. (CA); Mercedes-Benz Research & Development North America, Inc. (MI); Mercedes-Benz U.S. International, Inc.; Mercedes-Benz USA, LLC; Mitsubishi Fuso Truck of America, Inc.; Thomas Built Buses, Inc.; Western Star Trucks Sales, Inc.).

- GM entities (General Motors Company; General Motors Financial Company, Inc.; General Motors Holdings LLC; General Motors LLC)

- Honda entities (American Honda Motor Co., Inc.; American Honda Finance Corp.; Honda Manufacturing of Indiana, LLC; Honda North America, Inc.; Honda of America Mfg., Inc.; Honda of South Carolina Mfg., Inc.; Honda Precision Parts of Georgia, LLC; Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Honda Transmission Manufacturing of America, Inc.)

- Hyundai / Kia entities (Hyundai Capital America; Hyundai Motor America; Hyundai Motor Manufacturing Alabama, LLC; Hyundai America Technical Center, Inc.; Kia Motors Manufacturing Georgia, Inc.; Kia Motors America, Inc.; Hyundai Autoever America, LLC)

- Jaguar Land Rover North America, LLC

- Mitsubishi entities (Mitsubishi Motors North America, Inc.; Mitsubishi Motors Credit of America, Inc.; Mitsubishi Motors R&D of America, Inc.)

- Nissan entities (Nissan North America, Inc.; Nissan Design America, Inc.; Nissan Technical Center North America, Inc.; Nissan Diesel America, Inc.; Nissan Motor Acceptance Corporation)

- Porsche Cars North America, Inc.

- Rolls-Royce Motor Cars NA, LLC

- Subaru entities (Subaru of America, Inc.; Subaru Leasing Corp.; Fuji Heavy Industries U.S.A., Inc.; Subaru of Indiana Automotive, Inc.)

- Toyota entities (Toyota Motor North America, Inc.; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Manufacturing Alabama, Inc.; Toyota Motor Manufacturing Indiana, Inc.; Toyota Motor Manufacturing Kentucky, Inc.; Toyota Motor Manufacturing Mississippi, Inc.; Toyota Motor Manufacturing Texas, Inc.; Toyota Motor Manufacturing West Virginia, Inc.; Toyota Logistics Services, Inc.; Calty Design Research, Inc.; Hino Motors Manufacturing U.S.A., Inc.)

- Volvo Cars of North America, LLC

- VW entities (Volkswagen Group of America, Inc., also d/b/a Audi of America LLC; Volkswagen Group of America Chattanooga Operations LLC; Volkswagen Credit Inc.; Automobili Lamborghini America LLC; Bentley Motors, Inc.)

## Core SSE Entities

- BMW entities (BMW of North America, LLC; BMW Manufacturing Co., LLC; BMW (US) Holding Corp.)

- Chrysler entities (FCA US LLC)

- Daimler entities (Daimler North America Corporation (MI); Daimler North America Corporation (NJ); Daimler Purchasing Coordination Corporation; Mercedes-Benz U.S. International, Inc.; Mercedes-Benz USA, LLC).

- GM entities (General Motors Company; General Motors Holdings LLC; General Motors LLC)

- Honda entities (American Honda Motor Co., Inc.; Honda Manufacturing of Indiana, LLC; Honda North America, Inc.; Honda of America Mfg., Inc.; Honda of South Carolina Mfg., Inc.; Honda Precision Parts of Georgia, LLC; Honda Transmission Manufacturing of America, Inc.)

- Hyundai / Kia entities (Hyundai Motor America; Hyundai Motor Manufacturing Alabama, LLC; Kia Motors Manufacturing Georgia, Inc.; Kia Motors America, Inc.; Hyundai Autoever America, LLC)

- Jaguar Land Rover North America, LLC

- Mitsubishi Motors North America, Inc.

- Nissan North America, Inc.

- Subaru entities (Subaru of America, Inc.; Subaru Leasing Corp.; Subaru of Indiana Automotive, Inc.)

- Toyota entities (Toyota Motor North America, Inc.; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Manufacturing Alabama, Inc.; Toyota Motor Manufacturing Indiana, Inc.; Toyota Motor Manufacturing Kentucky, Inc.; Toyota Motor Manufacturing Mississippi, Inc.; Toyota

Motor Manufacturing Texas, Inc.; Toyota Motor Manufacturing West Virginia, Inc.; Toyota Logistics Services, Inc.)

- Volvo Cars of North America, LLC
- VW entities (Volkswagen Group of America, Inc., also d/b/a Audi of America LLC; Volkswagen Group of America Chattanooga Operations LLC)

**Core SSEs Also Include the Following Truck and Equipment SSEs**

- Hino Motors Manufacturing U.S.A., Inc.; Nissan Diesel America, Inc.; Daimler Trucks North America LLC; Daimler Vans Manufacturing, LLC; Daimler Vans USA LLC; Freightliner Custom Chassis Corporation; Mitsubishi Fuso Truck of America, Inc.; Thomas Built Buses, Inc.; Western Star Trucks Sales, Inc.; and Fuji Heavy Industries U.S.A., Inc.

## Non-Core SSEs Entities

**Insurance SSEs**

- BMW Insurance Agency, Inc.

**Finance and Credit SSEs**

- Fiat Finance North America, Inc.; BMW Financial Services NA, LLC; General Motors Financial Company, Inc.; American Honda Finance Corp.; Mercedes-Benz Financial Services USA LLC; Mercedes-Benz Credit Corporation; Volkswagen Credit Inc.; Nissan Motor Acceptance Corporation; Hyundai Capital America; and Mitsubishi Motors Credit of America, Inc.

**Banking and Capital SSEs**

- BMW Bank of North America; BMW US Capital LLC; and Hyundai Capital America.

**Research and Development SSEs**

- Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Mercedes-Benz Research & Development North America, Inc. (CA); Mercedes-Benz Research & Development North America, Inc. (MI); Nissan Technical Center North America, Inc. (part of Nissan North America); Hyundai America Technical Center, Inc.; and Mitsubishi Motors R&D of America, Inc.

**Design SSEs**

- Designworks USA; Calty Design Research, Inc.; Nissan Design America, Inc. (part of Nissan North America); and Mercedes-Benz Advanced Design of North America Inc.; MB-Technology NA LLC.

# EXHIBIT C

1              UNITED STATES OF AMERICA

2            EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4                   —   —   —

5

IN RE:  AUTOMOTIVE PARTS          Master File No. 12-md-02311
6  ANTITRUST LITIGATION            Hon. Marianne O. Battani

7  _____/

8

                STATUS CONFERENCE / MOTION HEARINGS
9
          BEFORE THE HONORABLE MARIANNE O. BATTANI
10              United States District Judge
            Theodore Levin United States Courthouse
11              231 West Lafayette Boulevard
                    Detroit, Michigan
12              Wednesday, January 28, 2015

13  APPEARANCES:

14
    **Direct Purchaser Plaintiffs:**
15

16  WILLIAM G. CALDES
    **SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.**
17  1818 Market Street, Suite 2500
    Philadelphia, PA  19103
18  (215) 496-0300

19
    MANUEL J. DOMINGUEZ
20  **COHEN MILSTEIN**
    3507 Kyoto Gardens Drive, Suite 200
21  Palm Beach Gardens, FL  33410
    (561) 578-6850

22

23  DAVID H. FINK
    **FINK & ASSOCIATES LAW**
24  100 West Long Lake Road, Suite 111
    Bloomfield Hills, MI  48304
25  (248) 971-2500

```
 1   APPEARANCES:  (Continued)
     Direct Purchaser Plaintiffs:
 2
     GREGORY P. HANSEL
 3   PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
     One City Center
 4   Portland, ME  04112
     (207) 791-3000
 5

 6   WILLIAM E. HOESE
     KOHN, SWIFT & GRAF, P.C.
 7   One South Broad Street, Suite 2100
     Philadelphia, PA  19107
 8   (215) 238-1700

 9
     JONATHAN M. JAGHER
10   SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
     181 Market Street, Suite 2500
11   Philadelphia, PA  19103
     (215) 496-0300
12

13   STEVEN A. KANNER
     FREED, KANNER, LONDON & MILLEN, L.L.C.
14   2201 Waukegan Road, Suite 130
     Bannockburn, IL  60015
15   (224) 632-4502

16
     SARAH GIBBS LEIVICK
17   KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
     1633 Broadway
18   New York, NY  10019
     (212) 506-1765
19

20   MICHAEL MOSKOVITZ
     FREED, KANNER, LONDON & MILLEN, L.L.C.
21   2201 Waukegan Road, Suite 130
     Bannockburn, IL  60015
22   (224) 632-4502

23
     MATTHEW RUAN
24   COHEN MILSTEIN
     1100 New York Avenue NW, Suite 500 West
25   Washington, D.C.  20005
     (202) 408-4600
```

```
 1   APPEARANCES:  (Continued)
     Direct Purchaser Plaintiffs:
 2

 3   EUGENE A. SPECTOR
     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
 4   1818 Market Street, Suite 2500
     Philadelphia, PA  19103
 5   (215) 496-0300

 6

 7   JASON J. THOMPSON
     SOMMERS SCHWARTZ, P.C.
 8   2000 Town Center, Suite 900
     Southfield, MI  48075
 9   (248) 355-0300

10   RANDALL B. WEILL
     PRETI, FLAHERTY, BELIVEAU &
11   PACHIOS, L.L.P.
     One City Center
12   Portland, ME  04112
     (207) 791-3000
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:  (Continued)
      End-Payor Plaintiffs:
 2
      WARREN T. BURNS
 3    SUSMAN GODFREY, L.L.P.
      901 Main Street, Suite 5100
 4    Dallas, TX  75202
      (214) 754-1928
 5

 6    DAVID C. KURLANDER
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 7    601 Lexington Avenue, Suite 3400
      New York, NY  10022
 8    (212) 980-7400

 9
      OMAR OCHOA
10    SUSMAN GODFREY, L.L.P.
      901 Main Street, Suite 5100
11    Dallas, TX  75202
      (214) 754-1913
12

13    ADAM T. SCHNATZ
      THE MILLER LAW FIRM, P.C.
14    950 West University Drive, Suite 300
      Rochester, MI  48307
15    (248) 841-2200

16
      MARC M. SELTZER
17    SUSMAN GODFREY, L.L.P.
      190 Avenue of the Stars, Suite 950
18    Los Angeles, CA  90067
      (310) 789-3102
19

20    STEVEN N. WILLIAMS
      COTCHETT, PITRE & McCARTHY, L.L.P.
21    840 Malcolm Road
      Burlingame, CA  94010
22    (650) 697-6000

23

24

25
```

```
 1    APPEARANCES:  (Continued)
      Dealership Plaintiffs:
 2
      DON BARRETT
 3    BARRETT LAW OFFICES
      P.O. Drawer 987
 4    Lexington, MS  39095
      (601) 834-2376
 5

 6    JONATHAN W. CUNEO
      CUNEO, GILBERT & LaDUCA, L.L.P.
 7    507 C Street NE
      Washington, D.C.  20002
 8    (202) 789-3960

 9

10    JOHN KAKINUKI
      KAKINUKI LAW OFFICE, P.C.
      2 Civic Center Drive, #4222
11    San Rafael, CA  94913
      (415) 492-2011
12

13    BRENDAN FREY
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
14    1361 East Big Beaver Road
      Troy, MI  48083
15    (248) 457-9200

16
      GERARD V. MANTESE
17    MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
      1361 East Big Beaver Road
18    Troy, MI  48083
      (248) 457-9200
19

20    SHAWN M. RAITER
      LARSON KING, L.L.P.
21    30 East Seventh Street, Suite 2800
      Saint Paul, MN  55101
22    (651) 312-6500

23
      VICTORIA ROMANENKO
24    CUNEO, GILBERT & LaDUCA, L.L.P.
      507 C Street NE
25    Washington, D.C.  20002
      (202) 789-3960
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      ALDEN L. ATKINS
 3    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
 4    Washington, D.C.  20037
      (202) 639-6613
 5

 6    GARY K. AUGUST
      ZAUSMER, KAUFMAN, AUGUST & CALDWELL, P.C.
 7    31700 Middlebelt Road, Suite 150
      Farmington Hills, MI  48334
 8    (248) 851-4111

 9
      RICHARD D. BISIO
10    KEMP KLEIN LAW FIRM
      201 West Big Beaver Road, Suite 600
11    Troy, MI  48084
      (248) 528-1111
12

13    MICHAEL G. BRADY
      WARNER, NORCROSS & JUDD, L.L.P.
14    2000 Town Center, Suite 2700
      Southfield, MI  48075
15    (248) 784-5032

16
      LISA BROWN
17    DYKEMA GOSSETT, P.L.L.C.
      400 Renaissance Center
18    Detroit, MI  48243
      (313) 568-6943
19

20    JEREMY CALSYN
      CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
21    2000 Pennsylvania Avenue NW
      Washington, D.C.  20006
22    (202) 974-1500

23    PATRICK J. CAROME
      WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
24    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
25    (202) 663-6610
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      MATTHEW CELESTIN
 3    WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
      1875 Pennsylvania Avenue NW
 4    Washington, D.C.  20006
      (202) 663-6600
 5

 6    STEVEN F. CHERRY
      WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
 7    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
 8    (202) 663-6321

 9
      JAMES L. COOPER
10    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
11    Washington, D.C.  20004
      (202) 942-5000
12

13    MOLLY CRABTREE
      PORTER, WRIGHT, MORRIS & ARTHUR
14    41 South High Street, Ste. 2900
      Columbus, OH  43215
15    (614) 227-2015

16
      DAVID CROSS
17    CROWELL & MORING
      1001 Pennsylvania Avenue NW
18    Washington, D.C.  20004
      (202) 624-2774
19

20    KENNETH R. DAVIS, II
      LANE POWELL, P.C.
21    601 SW Second Avenue, Suite 2100
      Portland, OR  97204
22    (503) 778-2100

23
      DAVID P. DONOVAN
24    WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
      1875 Pennsylvania Avenue, NW
25    Washington, D.C.  20006
      (202) 663-6868
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     DAVID F. DuMOUCHEL
 3   BUTZEL LONG, P.C.
     150 West Jefferson Avenue
 4   Detroit, MI  48226
     (313) 225-7000
 5


 6   J. CLAYTON EVERETT, JR.
     MORGAN, LEWIS & BOCKIUS, L.L.P.
 7   1111 Pennsylvania Avenue NW
     Washington, D.C.  20004
 8   (202) 739-5860

 9

10   PETER M. FALKENSTEIN
     JAFFE, RAITT, HEUER & WEISS, P.C.
11   535 W. William, Suite 4005
     Ann Arbor, MI  48103
12   (734) 222-4776


13   MICHAEL FELDBERG
     ALLEN & OVERY, L.L.P.
14   1221 Avenue of the Americas
     New York, NY  10020
15   (212) 610-6360

16

17   DANIEL T. FENSKE
     JENNER & BLOCK
18   353 N. Clark Street
     Chicago, IL 60654-3456
19   (312) 222-9350


20   MICHELLE K. FISCHER
     JONES DAY
21   51 Louisiana Avenue NW
     Washington, D.C.  20001
22   (202) 879-4645

23

24   LARRY S. GANGNES
     LANE POWELL, P.C.
25   1420 Fifth Avenue, Suite 4100
     Seattle, Washington  98101
     (206) 223-7000
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     JASON R. GOURLEY
 3   BODMAN P.L.C.
     1901 St. Antoine Street, 6th Floor
 4   Detroit, MI  48226
     (313) 259-7777
 5

 6   FRED K. HERRMANN
     KERR, RUSSELL & WEBER, P.L.C.
 7   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
 8   (313) 961-0200

 9
     BROOK HOPKINS
10   WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
     1875 Pennsylvania Avenue, NW
11   Washington, D.C.  20006
     (202) 663-6868
12

13   WILLIAM R. JANSEN
     WARNER, NORCROSS & JUDD, L.L.P.
14   2000 Town Center, Suite 2700
     Southfield, MI  48075
15   (248) 784-5178

16
     FREDERICK JUCKNIESS
17   SCHIFF HARDIN, L.L.P.
     350 South Main Street, Suite 210
18   Ann Arbor, MI  48104
     (734) 222-1507
19

20   STEVEN M. KOWAL
     K&L GATES
21   70 West Madison Street, Suite 3100
     Chicago, IL  60602
22   (312) 372-1121

23
     FRANK LISS
24   ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
25   Washington, D.C. 20004
     (202) 942-5969
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      TIMOTHY J. LOWE
 3    McDONALD HOPKINS, P.L.C.
      39533 Woodward Avenue, Suite 318
 4    Bloomfield Hills, MI  48304
      (248) 220-1359
 5


 6    ERIC MAHR
      WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
 7    1875 Pennsylvania Avenue, NW
      Washington, D.C.  20006
 8    (202) 663-6099

 9
      JOHN M. MAJORAS
10    JONES DAY
      51 Louisiana Avenue NW
11    Washington, D.C.  20001
      (202) 879-3939
12

13    MICHELLE A. MANTINE
      REED SMITH, L.L.P.
14    225 Fifth Avenue, Suite 1200
      Pittsburgh, PA  15222
15    (412) 288-4268

16
      ANDREW S. MAROVITZ
17    MAYER BROWN, L.L.P.
      71 South Wacker Drive
18    Chicago, IL  60606
      (312) 701-7116
19

20    BRIAN M. MOORE
      DYKEMA GOSSETT, P.L.L.C.
21    39577 Woodward Avenue, Suite 300
      Bloomfield Hills, MI  48304
22    (248) 203-0772

23
      WILLIAM H. RAWSON
24    LATHAM & WATKINS, L.L.P.
      555 Eleventh Street NW, Suite 1000
25    Washington, D.C.  20004
      (202) 637-2200
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      ALEXANDER B. REICH
 3    CALFEE, HALTER & GRISWOLD, L.L.P.
      1405 East Sixth Street
 4    Cleveland, OH  44114
      (216) 622-8621
 5

 6    JOHN ROBERTI
      ALLEN & OVERY, L.L.P.
 7    1101 New York Avenue, NW
      Washington, D.C.  20005
 8    (212) 683-3682

 9    COURTNEY ROSEN
      SIDLEY AUSTIN, P.C.
10    1 South Dearborn Street
      Chicago, IL 60603
11    (312) 853-7669

12
      MICHAEL RUBIN
13    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
14    Washington, D.C.  20004
      (202) 942-5094
15

16    WM. PARKER SANDERS
      SMITH, GAMBRELL & RUSSELL, L.L.P.
17    Promenade Two, Suite 3100
      1230 Peachtree Street NE
18    Atlanta, GA  30309
      (404) 815-3684
19

20    LARRY J. SAYLOR
      MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
21    150 West Jefferson Avenue, Suite 2500
      Detroit, MI  48226
22    (313) 496-7986

23
      CRAIG SEEBALD
24    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
25    Washington, D.C.  20037
      (202) 639-6585
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      CHARLES SKLARSKY
 3    JENNER & BLOCK
      353 N. Clark Street
 4    Chicago, IL 60654-3456
      (312) 923-2904
 5

 6    JESSE T. SMALLWOOD
      WILLIAMS & CONNOLLY, L.L.P.
 7    725 Twelfth Street NW
      Washington, D.C.  2005
 8    (202) 434-5162

 9
      JASON STARLING
10    PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
      41 South High Street, Suites 2900
11    Columbus, OH  43215
      (614) 227-2147
12

13    ANITA STORK
      COVINGTON & BURLING, L.L.P.
14    One Front Street
      San Francisco, CA  94111
15    (415) 591-7050

16
      MARGUERITE M. SULLIVAN
17    LATHAM & WATKINS, L.L.P.
      555 Eleventh Street NW, Suite 1000
18    Washington, D.C.  20004
      (202) 637-2200
19

20    JOANNE GEHA SWANSON
      KERR, RUSSELL & WEBER, P.L.C.
21    500 Woodward Avenue, Suite 2500
      Detroit, MI  48226
22    (313) 961-0200

23
      MAUREEN T. TAYLOR
24    BROOKS, WILKINS, SHARKEY & TURCO
      401 South Old Woodward, Suite 400
25    Birmingham, MI  48009
      (248) 971-1721
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      MICHAEL F. TUBACH
 3    O'MELVENY & MYERS, L.L.P.
      Two Embarcadero Center, 28th Floor
 4    San Francisco, CA  94111
      (415) 984-8700
 5

 6    MICHAEL R. TURCO
      BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.
 7    401 South Old Woodward Avenue, Suite 400
      Birmingham, MI  48009
 8    (248) 971-1713

 9
      LINDSEY ROBINSON VAALA
10    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
11    Washington, D.C.  20037
      (202) 639-6585
12

13    ALISON WELCHER
      SHEAVMAN & STERLING
14    801 Pennsylvania Avenue, NW, Suite 900
      Washington, D.C.  20004
15    (202) 508-8112

16
      OTHER APPEARANCES:
17
      PATRICK F. MORRIS
18    MORRIS & MORRIS, L.L.C.
      4001 Kennett Pike, Suite 300
19    Wilmington, DE  19807
      (302) 426-0400
20

21    ROB NOBLIN
      GREEN & NOBLIN, P.C.
22    4500 East Pacific Coast Highway, Fourth Floor
      Long Beach, CA  90804
23    (562) 391-2487

24

25
```

```
 1  ║  APPEARANCES:  (Continued)

 2  ║  R. SCOTT PALMER
    ║  OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
 3  ║  The Capital, PL-01
    ║  Tallahassee, FL  32399
 4  ║  (850) 414-3300

 5

    ║  JAYE QUADROZZI
 6  ║  YOUNG & ASSOCIATES
    ║  27725 Stansbury Boulevard, Suite 125
 7  ║  Farmington Hills, MI  48334
    ║  (248) 353-8620

 8

 9  ║  LESLEY E. WEAVER
    ║  GREEN & NOBLIN, P.C.
10  ║  700 Larkspur Landing Circle, Suite 275
    ║  Larkspur, CA  94939
11  ║  (415) 477-6700

12

13  ║  Attorneys Present Via Telephone:

14  ║  ELIZABETH A. CATE
    ║  WINSTON & STRAWN, L.L.P.
15
    ║  J. MANLY PARKS
16  ║  DUANE MORRIS, L.L.P.

17  ║  HOLLIS L. SALZMAN
    ║  ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
18
    ║  A. PAUL VICTOR
19  ║  WINSTON & STRAWN, L.L.P.

20

21

22

23

24

25
```

TABLE OF CONTENTS

Page

STATUS CONFERENCE................................... 18

DEFENDANTS' JOINT MOTION TO DISMISS END PAYERS'
CONSOLIDATED CLASS ACTION COMPLAINT................ 62

DEFENDANTS' COLLECTIVE MOTION TO DISMISS CLASS
ACTION COMPONENTS OF THE PUBLIC ENTITIES'
COMPLAINT.......................................... 66

DEFENDANTS' MOTION TO DISMISS END PAYERS' AND
AUTO DEALERS' CONSOLIDATED AMENDED CLASS
ACTION COMPLAINTS.................................105

```
 1              MR. WILLIAMS:  Your Honor --
 2              THE COURT:  -- a lot of deps.
 3              MR. WILLIAMS:  Your Honor, that's a very important
 4    question, and I want to make a couple points first.  We are
 5    committed to doing this.  We need to do this.  In fact, we
 6    are the ones who reached out to them in the last month to
 7    have this discussion.  We don't need an arbitrary deadline
 8    imposed though because, as you just noted, this affects
 9    third-party OEMs not just in one case or two or three cases
10    but a lot of cases, it relates to my class, the auto dealers,
11    the directs, the City of Richmond and the new truck case, we
12    don't want to delay, we want to do it soon too because this
13    is critical for us but what we don't need is an arbitrary
14    make it happen in two weeks deadline, it is much too
15    important to the case and the schedule to have an arbitrary
16    deadline.
17              We will commit to engaging with them right away,
18    they have sent us a draft, we have a draft we can share with
19    them.  My suggestion though would be we have all worked very
20    well with Master Esshaki, if there is a problem that needs to
21    be brought up with the master we can do it that way but we
22    shouldn't set an arbitrary deadline of two weeks or anything
23    like that.
24              THE COURT:  Mr. Spector?
25              MR. SPECTOR:  Good morning, Your Honor.
```

1   Eugene Spector on behalf of direct purchasers.

2           I only wanted to say that we would like to

3   participate in this process of defining what is in the

4   subpoenas to the OEMs because that's the class that we

5   represent, and we would like to have some view as to what is

6   going on, what is going to be asked and maybe some input as

7   to what might be in the interest of the OEMs with regard to

8   that.  We are in regular contact with them in any event and

9   we would like to see what we can do to help move this process

10  along so it works for all of us.

11          THE COURT:  You can talk to counsel and participate

12  in that.  I don't think that's a problem.  You all have to

13  work together.

14          MS. SPECTOR:  We have, Your Honor.

15          THE COURT:  Mr. Cherry?

16          MR. SPECTOR:  Thank you.

17          MR. CHERRY:  Your Honor, again, we can coordinate

18  with the other defendants and try to do this in the most

19  efficient manner possible, but it is -- it will be very

20  difficult to do this one time with the OEMs because we are

21  talking about different products being purchased by them and

22  they do have different divisions and different product groups

23  that do that purchasing, it is not even the same people, it

24  may be different data in different places we are seeking.

25  The downstream data ought to all be the same, you know, the

1   cars coming from the auto manufacturers we can obtain that

2   one time and it will fit every case, but the purchasing may

3   be different and we can coordinate with the other defendants

4   to be efficient as possible and minimize that but --

5          THE COURT:  Well, I think that's all that can be

6   asked, if you can coordinate those parts that make sense I

7   think you can do that.  And, I mean, I wouldn't think you as

8   defendants would want to irritate your OEMs.

9          MR. CHERRY:  Exactly, Your Honor, exactly.  And the

10  idea of an arbitrary deadline, I think these things, as

11  Ms. Sullivan mentioned, our deposition protocol, which took

12  from February until now to get resolved, is this can't take

13  six months or no schedule is going to stick.  I think --

14         THE COURT:  Okay.  Let me --

15         MR. CHERRY:  -- whatever the deadline is we have 30

16  days, some period of time --

17         THE COURT:  Let me do this, I have given you

18  45 days on the other one, I will give you 45 days on this one

19  max.  If you can do it sooner, wonderful.  If you need to --

20  if that's not suitable then you have an issue and you will

21  have to bring that up before Mr. Esshaki.

22         MR. CHERRY:  Thank you, Your Honor.

23         MR. WILLIAMS:  Your Honor, I apologize but just to

24  clarify, 45 days to do what?  They -- I think that Mr. Cherry

25  was saying was 45 days to actually serve the discovery.

 1          THE COURT:  No, no, just to coordinate all of it.

 2          MR. WILLIAMS:  Certainly.  Thank you.

 3          THE COURT:  Okay.  Anything else on discovery or

 4  other protocols?

 5          (No response.)

 6          THE COURT:  Mr. Esshaki, anything else?

 7          MASTER ESSHAKI:  No, Your Honor, I have nothing

 8  further.

 9          THE COURT:  Okay.  Ms. Sullivan?

10          MS. SULLIVAN:  Yes, Your Honor.  Mr. Williams

11  mentioned the new truck dealer class complaint, and I just

12  want to confirm that all of these deadlines that Your Honor

13  is imposing will, in fact, apply to the truck dealer

14  plaintiffs as well.  I know that one of their lawyers

15  submitted a letter to Your Honor I believe yesterday

16  indicating that they expected that they would have different

17  deadlines and a different schedule, and we would like them to

18  be on the same schedule.  It is very important that they --

19          THE COURT:  But they won't have different deadlines

20  on what we are talking about now unless something comes up,

21  as I indicated for the later groups, that requires something

22  different but that's going to have to be brought specifically

23  to the Court's attention.

24          MS. SULLIVAN:  Thank you, Your Honor.

25          THE COURT:  Okay.  All right.  Let's go back to one

# EXHIBIT D



**FINK+**
**ASSOCIATES LAW**

April 28, 2015

Dear Special Master Esshaki:

During the January 28, 2015 Status Conference, Judge Battani directed that Direct Purchaser Plaintiffs (DPPs) be allowed to comment on a subpoena to Original Equipment Manufacturers (OEMs) that was being drafted by Defendants and Indirect Purchaser Plaintiffs (IPPs). On April 14, 2015, DPPs received a copy of the attached proposed subpoena (the "Uniform OEM Subpoena" or the "Subpoena").

DPPs have multiple concerns regarding the Subpoena's relevance, scope, and burden. As more fully explained below, the parties should not be allowed to issue and serve the Subpoena on the OEMs because it seeks information that is irrelevant in the Direct Purchaser actions, demands information that is available from the parties in the Indirect Purchaser actions, and is overbroad and unduly burdensome on its face. For these reasons, the DPPs request that issuance and service of the Uniform OEM Subpoena be prohibited until such time as the parties to the Indirect Purchaser actions can demonstrate the necessity of the specific information requested, and, if they are able to show that the information is necessary, the lack of less burdensome alternative sources for it.

### The Information Sought in the Uniform OEM Subpoena is not Relevant

In the Uniform OEM Subpoena, Defendants and IPPs seek from OEMs – absent class members in the DPP actions –extensive, detailed, and potentially non-existent information about purchases of multiple auto parts ("upstream" data) and sales of multiple finished vehicles ("downstream" data) from 1992 to the present. This information is not relevant to the DPPs' case. It is intended entirely for use in the IPP cases to determine whether an illegal overcharge was passed through to each of the Indirect Purchaser classes.

The Supreme Court has determined that "downstream" information concerning the sales of finished vehicles is not relevant to direct purchaser plaintiffs' antitrust claims, because a federal antitrust case may not be defended on the ground that direct purchasers passed on an illegal overcharge to their customers. *See Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 492-94 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 732 (1977).[1] For this reason, downstream discovery is generally prohibited in direct purchaser cases. *See, e.g., In re Aspartame Antitrust Litig.*, 2008 WL 2275528, *4 (E.D. Pa. April 8, 2008) ("courts have

---

[1] *See also County of Oakland v. City of Detroit,* 866 F.2d 839, 847-848 (6th Cir. 1989); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 552-554 (E.D. Tenn. 2013) (downstream discovery not relevant to DPPs' measure of damages or class certification).

consistently noted that this type of [downstream] discovery is not favored" in price fixing class actions); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 497-8 (M.D. Pa. 2005) (courts "generally proscribe downstream discovery" in price fixing cases); *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301 (D.D.C. 2000) (denying defendants' motion to compel production of downstream, financial and currency exchange rate data).

The OEMs are third parties with respect to the Indirect Purchaser actions and have no financial or other interest in their outcome.[2] Accordingly, they should be protected from the overbroad and unduly burdensome Subpoenas. *See* Fed.R.Civ.P. 45(d) (party issuing subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena"); *Luppino v. Mercedes-Benz Fin. Servs. USA, LLC*, 2013 U.S. Dist. LEXIS 61616, at *22 (E.D. Mich. April 11, 2013) ("In considering the scope of discovery, the court should balance a party's 'right to discovery' with the need to prevent 'fishing expeditions.' This is especially true with requests to non-parties."); *Lowe v. Vadlamudi*, 2012 U.S. Dist. LEXIS 127586, at *5 (E.D. Mich. Sept. 7, 2012) ("the burden of demonstrating relevance is on the party seeking discovery"); *Hansen Bev. Co. v. Innovation Ventures, LLC*, 2009 U.S. Dist. LEXIS 65358, at *2-3 (E.D. Mich. July 29, 2009) (a subpoenaed entity's status as a non-party is a significant factor in the undue burden analysis).

## Responsive Information Can be Obtained from Alternative Sources

Pursuant to Fed. R. Civ. P. 26(b)(2)(C)(i), a court must limit the frequency or extent of discovery otherwise allowed if it determines that:

(i)     the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

*See also* Fed. R. Civ. P. 45(e)(D) (referencing Fed. R. Civ. P. 26(b)(2)(C)(i) in connection with the requests for inaccessible ESI).

The information deemed relevant to the resolution of the Indirect Purchaser cases should be sought in the first instance from the parties to those cases, not from non-party OEMs who have no stake in the IPPs' claims. *See Hansen Bev.*, 2009 U.S. Dist. LEXIS 65358, at *5 (regarding subpoena to non-party, "in addition to being broad, these requests are obtainable from

---

[2] Even as absent members of the Direct Purchaser class, OEMs are protected from the very type of discovery now sought by Defendants and IPPs. *See, e.g., Groth v. Robert Bosch Corp.*, No. 1:07-cv-962, 2008 WL 2704709, at *1 (W.D. Mich. July 9, 2008) (discovery from absent class members not warranted as a matter of course and demonstration of "particularized need" is a prerequisite to discovery of them); *In re Polyurethane Foam Antitrust Litig.*, 2014 WL 764617, at *2 (N.D. Ohio Feb. 26, 2014) (endorsing "particularized need" rule); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 549 (E.D. Tenn. 2013) (defendants in multi-district litigation did not demonstrate particularized need for downstream discovery and data of unnamed members of *proposed* direct purchaser class simply because indirect purchaser plaintiffs were also before the court).



Plaintiff in a more direct, less burdensome, and more convenient fashion"). Indeed the parties to the Indirect Purchaser actions already possess much of the information sought.

First, Defendants, not non-party OEMs, are the best source for detailed information about purchases of auto parts. The Wire Harness Defendants have already produced transactional data and other information to all parties, including IPPs, which reflect Defendants' sales of those products to Direct Purchasers. *See Spartanburg Regional Healthcare System v. Hillenbrand Industries, Inc.,* No. 1:05-MC-107, 2005 WL 2045818 (W.D. Mich. Aug. 24, 2005) (antitrust case) (denying request to non-party for relevant information because the requested information was available from other sources such as the public domain through various for-profit business information services, as well as [non-party's] annual report, and therefore "significantly undermine[d] its claim of need"). On this basis alone, the information sought in Request Nos. 1 and 2 (relating to purchases of auto parts) is cumulative, duplicative, and available from Defendants.

Second, the Automobile Dealers themselves have indicated that their own "upstream" data regarding purchases of vehicles is functionally equivalent to "downstream" data from OEMs:

> 24. Most, if not all, of the needed data can be obtained from the OEMs and others that precede the automobile dealers in the supply chain. However, despite the likely redundancy between the "downstream" OEM data and the "upstream" Auto Dealer data,5 counsel has informed me that the Auto Dealers are willing to provide data from their files that contain information on the prices that they pay the OEMs.
> -----------
> 5 Dr. Snyder employs this distinction between "downstream" and "upstream" data. "Upstream" data are data that are related to purchases by a given level of the distribution chain and "downstream" data are data that are related to sales by a given level of the distribution chain. Snyder Declaration, ¶15.
>
> Dr. Snyder appears to recognize that the downstream data of one level of the distribution chain is related to the upstream data for the level below it. (Snyder Declaration, ¶19 ("the downstream data of a Direct Purchaser may be similar to the upstream data of an Auto Dealer (if the Auto Dealer purchased the WHP directly from the Direct Purchaser)")

Declaration of Dr. Philip B. Nelson in Opposition to Certain Defendants' Motion to Compel "Downstream" Discovery from Direct Purchaser and Auto Dealer Plaintiffs [Dkt. 196-1 in Case 102 (Auto Dealer Action)], ¶ 24 and note 5.

Third, in the *Wire Harness Cases, All Dealership Actions*, the Auto Dealer Plaintiffs have been ordered to produce certain detailed information regarding the acquisition of Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems, and ESI concerning vehicle purchases and sales. *See* Order on Certain Defendants' Motion to Compel, ECF No. 214 in Case No. 2:12-cv-00102, *Wire Harness Cases, All Dealership Actions* (Oct. 16,

2014); Stipulation and Order, ECF No. 251 in Case No. 2:12-cv-00102, *Wire Harness Cases, All Auto Dealer Actions* (Jan. 7, 2015).

Fourth, currently scheduled for argument on April 30, 2015, are multiple motions by Defendants, Automobile Dealer Plaintiffs, and third-party providers of Dealer Management Systems (DMS Providers) concerning Defendants' efforts to obtain the same downstream information that is requested in the Uniform OEM Subpoena.[3] The parties' submissions on these motions indicate that the Automobile Dealers themselves or their DMS Providers maintain or have access to extensive, detailed records regarding purchases of automotive vehicles, including purchase prices and other costs associated with the acquisition of these vehicles, which the Subpoenas seek. For example, the Declarations of Allen T. Levenson and Dr. Edward A. Snyder submitted in support of Defendants' Opposition to Dealer Plaintiffs' Cross Motion to Resolve Defendants' Motion to Compel Downstream Discovery and Outstanding Requests (Dkt. 306 in Case 102 (Auto Dealer Action) and Dkt. 308 in Case 103 (End Payor Action)) identify monthly "OEM Reports" prepared by automobile dealers and discuss the nature, scope, and significance of the purchase and sales information contained in those reports.

Additionally, Defendants and IPPs should seek this information from commercially available sources who are in the business of collecting and analyzing auto industry data, including J.D. Power,[4] R.L. Polk, and *Automotive News*.    *See Allen v. Howmedica Leibinger,GmbH*, 190 F.R.D. 518, 525 (W.D. Tenn. 1999) ("In the absence of some showing by Dr. Allen that the publicly available information regarding other surgical navigation technology producers is inadequate, the burden that production would place on [non-party medical device manufacturer] is unreasonable, particularly in light of [non-party manufacturer's] non-party status.").

For these reasons, the information sought in Request Nos. 1-2, 4-12, 17, 20-22, 24, 29-32, and 34 of the Uniform OEM Subpoena can and should be obtained – and, in fact, is currently

---

[3] Defendants are currently seeking the same information requested in the Uniform OEM Subpoena through motion practice in the *Auto Dealer* and *End-Payor* actions in the *Wire Harness Cases*. *See* Certain Defendants' Motion to Establish Schedule, ECF No. 283 in Case No. 2:12-cv-00102 and ECF No. 287 in Case No. 2:12-cv-00103, *Wire Harness Cases, All Auto Dealer Actions* and *All End-Payor Actions* (March 23, 2015) (motion to establish a schedule for Auto Dealer Plaintiffs to produce ESI concerning vehicle purchases and sales); Dealership Plaintiffs' Objections to Improper Subpoenas, ECF No. 295 in Case No. 12-cv-000103, *Wire Harness Cases, All End-Payor Actions,* Case (March 31, 2015) (non-party dealer management system providers' motions to quash currently pending); Dealership Plaintiffs' Mem. ISO Mot. to Resolve Defendants' Mot. to Compel Downstream Discovery and Outstanding Discovery Requests and Resp. to Defendants' Mot. to Set Schedule, p. 2, ECF No. 298 in 2:12-cv-00102 in *Wire Harness, All Dealership Actions* (also filed in 2:12-cv-00103) (proposal by Dealership Plaintiffs for resolution of certain matters, including the production of over one hundred fields of data concerning vehicle sales and costs).

[4] The Uniform OEM Subpoena even explicitly asks for information provided to the J.D. Powers' Power Information Network. *See* Request No. 29.



being sought – from parties to the Indirect Purchaser actions and from "more convenient, less burdensome, or less expensive" third party commercially available sources . Fed. R. Civ. P. 26(b)(2)(C)(i).

## The Uniform OEM Subpoena Is Unduly Burdensome and Overbroad

Rule 45 prohibits imposing an "undue burden" on a non-party and protects a non-party from "undue expense." Rule 45(d)(1). Accordingly, as the Sedona Conference advises, non-party requests must be narrowly focused to avoid mandatory cost shifting. *The Sedona Principles: 2d Ed.*, Comment 13.c. (June 2007). Here, the Uniform OEM Subpoena is overbroad and will impose extraordinary burdens upon each non-party OEM served. While only the OEMs themselves can address the specific burdens, expense, and their ability to provide the information sought through objections, the Subpoena, on its face, is objectionable.

First, the Uniform OEM Subpoena requires the search for and production of information dating back more than 23 years (to 1992). This far exceeds the scope of what is reasonable. As a general matter, ESI more than twenty years old will likely be either non-existent or will require the non-party OEMs to incur substantial burden to retrieve and recreate archival data systems and backup tapes that are no longer functioning or functional. *See Moore's Fed. Prac.* § 37A.35[3][a] (3d ed. 2014) ("Rule 26(b)(2)(B) creates a presumption that electronically stored information on backup tapes ordinarily need not be searched."). Non-ESI material would impose similar if not greater burdens to identify, review, and analyze for responsiveness. *See Am. Elec. Power Co. v. United States,* 191 F.R.D. 132, 136 (S.D. Ohio 1999) ("Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs against disclosure.").

Second, the Uniform OEM Subpoena identifies at least 56 separate parts that must be addressed for each of the 36 individual requests set forth in the subpoena. Compounded by the 23-year time period for which information is demanded, each OEM would be faced with a monumental task to identify, review, and produce responsive information. *Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir.1998) ("concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" in Rule 45 inquiry); *State Farm Mut. Auto. Ins. Co. v. Hawkins,* 2011 WL 595694 at *4 (E.D. Mich. Feb. 10, 2011) (Cleland, J.) (holding that subpoena was too broad because it was not "sufficiently tailored so as to avoid sweeping in a host of irrelevant, privileged, and otherwise inadmissible documents" and requiring the requesting party to "submit to the court a stipulated or proposed order modifying the subpoenas").

Third, many of the requests in the Uniform OEM Subpoena are vague and ambiguous, which directly contradicts this Court's guidance for ESI discovery. *See* Model Order, Principle 1.03, pp. 1-2 (pursuant to Fed. R. Civ. P. 26(b)(2)(C), "requests for production of ESI . . . should be reasonably targeted, clear, and as specific as practicable."). Indeed, it is even difficult to discern the discovery actually sought by many vague and ambiguous requests in the Subpoena, which seek data or documents "sufficient to show" or "sufficient to identify" particular information. *See, e.g.,* Request Nos. 1-5, 8, 12-15, 18-20, 23-24, 31, and 35-36. Such uncertainty invites disputes that will require the intervention of lawyers, and law firms, and the time and



expense invariably associated with both. *See* Fed.R.Civ.P. 45(c)(2)(B) (any court order to compel compliance with document subpoena "shall protect any person who is not a party or an officer of a party from significant expense" of compliance).

Fourth, many requests in the Uniform OEM Subpoena demand from non-party OEMs the production of closely-guarded and highly secret proprietary, downstream information, such as business plans and strategies, costs of production, pricing methods, and financial data. *See, e.g.,* Request Nos. 12-16, 19, 22-24, 28, 30, 32-34 (relating to analyses of costs and pricing). Even with the safeguards of the Protective Order in this case, non-parties should be protected from having to produce such burdensome discovery, especially where it is available from another source. *Ajuba Int'l, LLC v. Saharia*, No. 11-CV-12936, 2014 WL 4793846, at *2 (E.D. Mich. Sept. 25, 2014) (a "court may quash or modify a subpoena if it requires disclosure of a trade secret or other confidential research or disclosure of an unretained expert's opinion." citing Fed.R.Civ.P. 45(d)(3)(B)); *Spartanburg Regional Healthcare System v. Hillenbrand Industries, Inc.,* No. 1:05-MC-107, 2005 WL 2045818 (W.D. Mich. Aug. 24, 2005) (antitrust case) (holding that defendants' request to non-party for (1) "planning and competitive and strategic analysis;" (2) "data compilations and analyses;" (3) "actual or forecasted business and/or financial performance;" (4) sales revenue and market share; and (5) how [non-party] defines "the product markets in which [it] compete[s]" would subject non-party to "significant harm" because the documents requested would detail "sensitive and confidential aspects of Steelcase's business strategy.").

Fifth, many requests in the Uniform OEM Subpoena seek irrelevant information. *See, e.g.,* Request Nos. 7 and 9 (financing of new vehicles), 10 (inventory levels), 11 (expected sales or leases), 12 (manufacturing, pricing, and sales information), 18 (collusion by Defendants), 20 (reporting systems), 25 (organization charts), 26 (mechanics of ESI searches), 27 (productions to governmental authorities concerning auto parts investigations), 31 (conduct at issue in MDL 2311), 35 (supplier participation in OEM design of parts), 36 (compilations of OEM-approved parts suppliers). *Lowe v. Vadlamudi,* 2012 U.S. Dist. LEXIS 127586, at *10 (E.D. Mich. Sept. 7, 2012) (non-party not obligated to produce records that "contain[ed] a great deal of information that is utterly irrelevant to the plaintiff's claim" and that "likelihood that relevant information will be discovered is not sufficient to outweigh the substantial burden of producing such records"); *V Cars, LLC v. Israel Corp.,* No. CIV.A. 10-MC-50984, 2011 WL 900309 (E.D. Mich. Mar. 14, 2011) (Majzoub, M.J.) (quashing subpoena issued to non-party Chrysler that sought "any and all documents …related to any business ventures, projects, or any other dealings between Chrysler …and Chery Automobile Co., Ltd." because the requests were irrelevant to plaintiffs' claims that defendant interfered with and usurped a joint venture between plaintiff and Chery).

Sixth, the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions. See* Order on Certain Defendants' Motion to Compel, ECF No. 214 in Case No. 2:12-cv-00102, *Wire Harness Cases, All Dealership Actions* (Oct. 16, 2014) (denying requests for financing and promotional information, monthly payment information, purchasing strategies, financial documents, budgets and cost guidelines, various acquisition documents, dealer franchise agreements). These rulings should apply equally to the



Uniform OEM Subpoena, which targets non-parties, especially with respect to Request Nos. 1-4, 11, 13-17.

### No OEM Discovery Should Occur Before
### Alternative Sources of Information Are Secured

This Court's Model Order Relating to the Discovery of Electronically Stored Information (ESI) ("Model Order") recommends staging discovery and sampling. *See* Model Order, Principle 1.03, pp. 1-2 (E.D. Mich. Sept. 20, 2013). Thus, the Court should, if the non-party discovery is even deemed necessary, use staged discovery and sampling in connection with responses to the Uniform OEM Subpoena. *See also The Sedona Conference* [5] *Commentary on Non-Party Production & Rule 45 Subpoenas*, p. 6 (April 2008) ("Active or reasonably accessible data should be produced and reviewed prior to seeking data that may be unduly burdensome to produce."); *id.* ("The party and non-party subpoena recipients should consider initial testing or sample approaches, as per Fed. R. Civ. P. 34(a), in order to inform decisions concerning the volume and nature of responsive documents, the form of production, and cost."); *Sedona Conference Database Principles*, 15 The Sedona Conference Journal 171 (Fall 2014), Principle No. 1, Scope of Discovery, p. 199 (absent specific showing of need, requesting party entitled only to database fields that contain relevant information and give context to such information and not entire database or underlying database application or database engine), Principle No. 2. Accessibility and Proportionality, p. 205 (not all information in database may be equally accessible, parties should apply proportionality to each component of a database to determine the marginal value of the information to the litigation and the marginal cost of collecting and producing it); Principle No. 3, Use of Test Queries and Pilot Projects, p. 209 ("Parties should use objective information, such as that generated from test queries, pilot projects, and interviews with persons with relevant knowledge to ascertain the burden and benefits to collect and produce information stored in databases and to reach consensus on the scope of discovery.").

As noted above, much of the discovery sought by the Uniform OEM Subpoena is both cumulative and duplicative of information actually available from Defendants, Indirect Purchasers, or their DMS Providers, or is potentially available from commercial sources of automotive data. *See* Request Nos. 1 (purchases of Auto Parts), 2,19 (prices of Auto Parts), 4-12, 20-22 (sales or leases of vehicles). Therefore, at a minimum, the Uniform OEM Subpoena should be held in abeyance until the production of information available from Defendants and Auto Dealers, at which time the necessity, relevance, and scope of the Uniform OEM Subpoena

---

[5] Sedona Conference publications have been cited favorably by the Sixth Circuit and the Eastern District of Michigan. *See Laethem Equip. Co. v. Deere &Co.*, 261 F.R.D. 127, 146 (E. D. Mich. 2009); *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008); Model Order, p. 12 (judges, attorneys, and parties should consult Sedona Conference publications for education information regarding the discovery of ESI). Federal Judicial Center publications also refer favorably to Sedona Conference materials. *See* Barbara J. Rothstein, Ronald J. Hedges & Elizabeth C. Wiggins, *Managing Discovery of Electronic Information: A Pocket Guide for Judges, 2d Ed.* (Federal Judicial Center), 2012, at 32, 35 (Sedona Principles as management tool), available at http://www.fjc.gov/public/pdf.nsf/lookup/eldscpkt2d_eb.pdf/$file/eldscpkt2d_eb.pdf.



can be revisited. *MFS & Co. LLC., v. Caterpillar, Inc.,* No. 09–14063, 2012 WL 195510, (E.D. Mich. Jan. 24, 2012) (Rosen, C.J.) (modifying subpoena to exclude publicly available documents and requests that were duplicative of other requests in the same subpoena); *Kessler v. Palstar, Inc., No. 3:11–cv–35, 2011 WL 4036689 at \*2 (S.D. Ohio Sep. 9, 2011)* (holding that subpoena issued to non-party was "clearly duplicative of the document requests that were recently issued to [defendant]" and "[r]equiring a non-party to obtain the same documents requested from the Defendant is overly burdensome."); *Haworth Inc. v. Herman Miller, Inc.,* 998 F.2d 975, 978 (Fed. Cir. 1993) (upholding refusal to enforce subpoena issued to non-party where same documents were available from party opponent).

For the foregoing reasons, DPPs respectfully submit that the Court should prohibit the issuance and service of the Uniform OEM Subpoena until such time as the parties to the Indirect Purchaser actions can demonstrate the necessity of, and lack of less burdensome alternative sources for, the specific information sought from the non-party OEMs.

Respectfully,

FINK + ASSOCIATES LAW

_____

David H. Fink
*Interim Liaison Counsel*
*for the Direct Purchaser Plaintiffs*

Steven A. Kanner
William H. London
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500

Joseph C. Kohn
William E. Hoese
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700

Gregory P. Hansel
Randall B. Weill
PRETI, FLAHERTY, BELIVEAU
  & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000

Eugene A. Spector
SPECTOR ROSEMAN KODROFF
  & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300

*Interim Co-Lead Counsel for the Direct Purchaser Plaintiffs*

# EXHIBIT E

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3                       —    —    —

 4     IN RE:  AUTOMOTIVE PARTS
       ANTITRUST LITIGATION
 5                                     Case No. 12-md-02311
                   MDL NO. 2311
 6                                     Hon. Marianne O. Battani

 7
                   HEARING REGARDING DEPOSITION PROTOCOL
 8
                   BEFORE SPECIAL MASTER GENE J. ESSHAKI
 9             Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
10                       Detroit, Michigan
                       Wednesday, May 6, 2015
11


12


13     APPEARANCES:
       Direct Purchaser Plaintiffs:
14
       STEVEN A. KANNER
15     FREED, KANNER, LONDON & MILLEN, L.L.C.
       2201 Waukegan Road, Suite 130
16     Bannockburn, IL  60015
       (224) 632-4502
17


18     SARAH GIBBS LEIVICK
       KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
19     1633 Broadway
       New York, NY  10019
20     (212) 506-1765


21

       EUGENE A. SPECTOR
22     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
       1818 Market Street, Suite 2500
23     Philadelphia, PA  19103
       (215) 496-0300

24
```

To obtain a copy of this official transcript, contact:
Robert L. Smith, Official Court Reporter
(313) 964-3303 • rob_smith@mied.uscourts.gov

**APPEARANCES: (Continued)**
**End-Payor Plaintiffs:**

STEVEN N. WILLIAMS
**COTCHETT, PITRE & McCARTHY, L.L.P.**
840 Malcolm Road
Burlingame, CA  94010
(650) 697-6000


**Dealership Plaintiffs:**

SHAWN M. RAITER
**LARSON KING, L.L.P.**
30 East Seventh Street, Suite 2800
Saint Paul, MN  55101
(651) 312-6500

VICTORIA ROMANENKO
**CUNEO, GILBERT & LaDUCA, L.L.P.**
507 C Street NE
Washington, D.C.  20002
(202) 789-3960

ANDREW R. SPERL
**DUANE MORRIS, L.L.P.**
30 South 17th Street
Philadelphia, PA  19103
(215) 979-7385


**For the Defendants:**

STEVEN F. CHERRY
**WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.**
1875 Pennsylvania Avenue NW
Washington, D.C.  20006
(202) 663-6321

MARGUERITE M. SULLIVAN
**LATHAM & WATKINS, L.L.P.**
555 Eleventh Street NW, Suite 1000
Washington, D.C.  20004
(202) 637-2200



        (Listed appearances are only of attorneys making oral
        argument on the record before Special Master Esshaki.)

1   file on the same schedule.

2          MASTER ESSHAKI:  Are you suggesting that the

3   plaintiffs then file their objections in seven days, you file

4   your position in seven days, you file -- the defendants

5   respond in seven days?

6          MR. WILLIAMS:  The defendants and the indirect

7   plaintiffs.

8          MASTER ESSHAKI:  Right.

9          MR. CHERRY:  They will respond at the same time;

10  seven, seven, seven or --

11         MASTER ESSHAKI:  I think you want to respond to her

12  as well so it is seven, seven and seven.

13         MR. CHERRY:  And we will respond in 14 days.

14         MASTER ESSHAKI:  You will respond in 14 days from

15  the original filing, and seven days from Ford's filing.

16         MR. CHERRY:  Understood.

17         MASTER ESSHAKI:  Okay.

18         MS. LEIVICK:  So we will respond in 14 days.

19         MASTER ESSHAKI:  And remember, there's three days

20  for a reply.

21         MR. CHERRY:  Yes.  Thank you.

22         MASTER ESSHAKI:  To clarify it, the objections to

23  the OEM subpoenas are going to be filed in seven days, seven

24  days after that Ford is entitled to weigh in with their

25  position, seven days after that the defendants and the other

1    plaintiffs will file their response, three days after that

2    the objecting plaintiffs will file a reply.

3              MS. LEIVICK:  Thank you.

4              MASTER ESSHAKI:  Are you taking me to task again?

5              MS. SULLIVAN:  I have two more requests.  One is

6    that we submitted a wire harness deposition protocol just the

7    other day to you, and I would to like request that that be

8    entered today.

9              MASTER ESSHAKI:  I need to get some concurrence

10   from opposing counsel.

11             MR. WILLIAMS:  I would want to review that and --

12             MASTER ESSHAKI:  Frankly, I haven't looked at it.

13             MR. WILLIAMS:  If it is the one about us then the

14   one you submitted is not --

15             MS. SULLIVAN:  No, no, it's just wire harness.

16             MR. WILLIAMS:  I just want to make sure it is the

17   right one.

18             MASTER ESSHAKI:  I haven't looked at it myself, and

19   I don't know who it goes to, but I need whoever it is

20   directed to to -- is it a stipulated order?

21             MS. SULLIVAN:  Okay.  So let me ask this then, may

22   we have a deadline of seven days from today to propose or to

23   submit both the auto-dealer and end-payor protocol and the

24   wire harness protocol, to submit both for entry?

25             MR. WILLIAMS:  And I would modify that as follows,

# EXHIBIT F



LEGAL COUNSEL

One American Square │ Suite 2900 │ Indianapolis, IN 46282-0200

RECEIVED

AUG 20 2015

HAGENS BERMAN LLP

August 17, 2015

WRITER'S DIRECT NUMBER: (317) 236-2296
DIRECT FAX: (317) 592-4823
INTERNET: KIMBERLY.METZGER@ICEMILLER.COM

Jeniphr Breckenridge
Ronnie Spiegel
Hagens Berman Sobol Shapiro LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101

Jonathan W. Cuneo
Victoria Romanenko
Evelyn Li
Ben Elga
Cuneo Gilbert Laduca, LLP
507 C Street NE
Washington, DC 20002

*In Re: Automotive Parts Antitrust Litigation*
*Master File No. 12-md-02311*

Dear Jeniphr and Counsel:

Enclosed please find Subaru of Indiana Automotive, Inc.'s objections to your document production subpoena. I appreciate the enlargement of time to serve. Please feel free to call if you would like to discuss SIA's objections.

Very truly yours,

ICE MILLER LLP

Kimberly C. Metzger

KCM:slw
Enclosures

cc:    w/ enclosures
       Tom Mixdorf

I\5798523.1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : : | |
| In Re:  All Cases | : : | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| THIS DOCUMENT RELATES TO: All Actions | : : : : : : | |

## NON-PARTY SUBARU OF INDIANA AUTOMOTIVE, INC.'S OBJECTIONS TO REQUEST TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

Non-party Subaru Automotive of Indiana, Inc. ("SIA"), by counsel and pursuant to Rules 26, 34, and 45 of the Federal Rules of Civil Procedure, objects to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (including all Attachments, Definitions, Instructions, and Requests for Production) (collectively, the "Subpoena"), and states:

### GENERAL OBJECTIONS

1.      SIA objects to the Subpoena to the extent it purports to impose any obligations on SIA that are different from or in addition to the requirements of the Federal Rules of Civil Procedure, the Local Rules of any applicable Court, or Orders of any applicable Court.

2.      SIA objects to the terms **"Communication"** and **"Communications"** (Definition No. 7), **"Document"** and **"Documents"** (Definition No. 11), and **"You," "Your," and "Your Company"** (Definition No. 24) because they purport to impermissibly extend the scope of a

non-party's obligation to produce or permit inspection of documents, electronically stored information ("ESI"), and tangible things pursuant to a subpoena under Rules 26, 34, and 45. Specific objections include, but are not limited to, the following:

        a.     The terms would require SIA to produce documents, ESI, and tangible things beyond the scope of those permitted by Rule 34(a)(1)(A).

        b.     The terms would require SIA to produce documents, ESI, and tangible things outside of SIA's possession, custody, or control.  Fed.R.Civ.P. 34(a)(1).

        c.     The terms would require SIA to produce documents, ESI, and tangible things other than as kept in the ordinary course of SIA's business.  Fed.R.Civ.P. 34(b)(2)(E)(i).

        d.     The terms would require SIA to produce documents, ESI, and tangible things other than in the form in which SIA ordinarily maintains them, or in a reasonably usable form.  Fed.R.Civ.P. 34(b)(2)(E)(ii).

        e.     The terms would require SIA to produce ESI from sources not reasonably accessible to SIA because of undue burden or cost.  Fed.R.Civ.P. 26(b)(2)(B).

        f.     Federal Rule of Evidence 1001 does not apply to a non-party's obligation to respond to a document production subpoena.

3.     SIA objects to the term **"OEM"** because it purports to expand SIA's obligation to produce or permit inspection of documents, ESI, and tangible things under Rule 34.

4.     SIA objects to the term **"relating to"** because it is vague, overbroad, and purports to require the disclosure of attorney mental impressions and other work product.

5.     SIA objects to Instruction No. 2 because it is overbroad and unduly burdensome, and not reasonably limited in time.

6.      SIA objects to Instruction No. 3 because it is overbroad and unduly burdensome. This instruction is also objectionable under Rule 34(b)(2)(E)(i) and (ii) because it does not permit SIA to produce documents as SIA keeps them in the usual course of business, and does not permit SIA to produce ESI in a form in which it is ordinarily maintained or in a reasonably usable form.

7.      SIA objects to the Subpoena to the extent it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.  Fed.R.Civ.P. 26(b)(1).

8.      SIA objects to the Subpoena to the extent it is overbroad and unduly burdensome, and imposes undue burden and expense upon non-party SIA.  Compliance with the Subpoena, including its numerous subparts, would require SIA to dedicate thousands of employee hours and tens if not hundreds of dollars in expense.  Without limitation, SIA objects to the Subpoena because:

a.      The Subpoena would require SIA to produce electronically stored information from sources that are not reasonably accessible because of undue burden or cost.  Fed.R.Civ.P. 26(b)(2)(B)

b.      The Subpoena seeks information that is unreasonably cumulative or duplicative in light of the information SIA understands the parties have produced or will produce.  Fed.R.Civ.P. 26(b)(2)(C)(i).

c.      The Subpoena seeks information that can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA, including from the named parties in the litigation.  Fed.R.Civ.P. 26(b)(2)(C)(1)

d.       The parties seeking discovery have had ample opportunity to obtain the information sought by discovery to the parties and other non-parties in this action. Fed.R.Civ.P. 26(b)(2)(C)(ii).

e.       The burden or expense of the proposed discovery to non-party SIA outweighs its likely benefit, considering the needs of the case and the importance of the discovery in resolving the issues at stake in the action.  Fed.R.Civ.P. 26(b)(2)(C)(iii).

f.       The Subpoena requires non-party SIA to comply beyond the geographical limits specified in Rule 45(c)(2)(A).

g.       The parties and attorneys responsible for issuing and serving the Subpoena failed to take reasonable steps to avoid imposing undue burden and expense on non-party SIA.  Fed.R.Civ.P. 45(d)(1).

h.       The Subpoena requires non-party SIA to disclose privileged or other protected matter, when no exception applies.  Fed.R.Civ.P. 45(d)(3)(A)(iii).

i.       The Subpoena seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information.      Fed.R.Civ.P. 45(D)(3)(B)(i).

j.       The Subpoena requires SIA to produce documents, ESI, and tangible things beyond the scope of those permitted by Rule 34(a)(1)(A).

k.       The Subpoena requires SIA to produce documents, ESI, and tangible things outside of SIA's possession, custody, or control.  Fed.R.Civ.P. 34(a)(1).

l.       The Subpoena requires SIA to produce documents, ESI, and tangible things other than as kept in the ordinary course of SIA's business.  Fed.R.Civ.P. 34(b)(2)(E)(i).

- 4 -

m. The Subpoena requires SIA to produce documents, ESI, and tangible things other than in the form in which SIA ordinarily maintains them, or in a reasonably usable form. Fed.R.Civ.P. 34(b)(2)(E)(ii).

n. The Subpoena requires SIA to produce ESI from sources not reasonably accessible to SIA because of undue burden or cost. Fed.R.Civ.P. 26(b)(2)(B).

o. The Subpoena does not contain a reasonable temporal limitation.

9. SIA asserts each of these objections in response to every individual Request for Production and subpart as if fully set forth in individual responses.

10. These objections are not exhaustive or limiting, and SIA does not waive and reserves the right to assert further objections that may become apparent to SIA.

11. SIA reserves the right to modify or supplement any or all of its objections as additional information is obtained or becomes known to SIA.

## SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION

**REQUEST NO. 1:** Data or documents (in the absence of data) sufficient to show the following information for each purchase by You or on Your behalf, of (a) a Component or (b) an Assembly for installation in a new Vehicle sold or leased in the U.S.:

a. Date of purchase;

b. Seller from whom the Component or Assembly was purchased, including name, address, and other identifiers;

c. Manufacturer, name or description, part type, part number, and other identifiers of the Component or Assembly, including model, model year, and other identifiers of the Vehicle(s) in which the Component or Assembly was designed or intended to be installed, and quantity purchased (including measurement unit for quantity);

- 5 -

d.    Terms and conditions on which the Component or Assembly was purchased, including but not limited to:

    (1)    Net price of the Component or Assembly (including currency and exchange rate, if applicable), and any adjustments to purchase price and Incentives cm-allowances issued or applied at any time, including but not limited to, taxes, amortization and amortization schedule, installment payments, financing, rebates, lump sum or other discounts, refunds, credit for returns, and currency or input cost adjustments, and the manner in which provided, whether by unit or by total purchase;

    (2)    Information sufficient to show: (a) the total amount of money You paid, on a yearly basis, for each type of identified Component or Assembly that You purchased; and (b) the total number of units purchased for each type of identified Component or Assembly that You purchased; and

    (3)    Shipping or freight costs, and by whom such costs were paid.

e.    "Ship-from" and vendor "pay-to" address(es) from which the Component or Assembly and invoice for it were shipped or sent, date(s) the Component or Assembly and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Component or Assembly and invoice were shipped or received, and date(s) the Component or Assembly and invoice were received;

f.    Information sufficient to track each Component or Assembly after  was installed in a Vehicle; including model, model platform, model year, model project or development code, vehicle identification number ("VIN"), and/or part number,

and other identifiers of the specific Vehicle(s) in which the Component or Assembly was installed, and quantity or number of each Component and Assembly installed,(including measurement unit for quantity or number);

g.    RFQ(s), if any, pursuant to which the Component or Assembly was procured, and the following information for each RFQ:

(1)    Names, designations, and/or other identifiers for the RFQ;

(2)    Entity issuing the RFQ and its address;

(3)    Name, address, and other identifiers of each potential supplier to whom the RFQ was sent and the date sent to each potential supplier;

(4)    Name or description, part number, and other identifiers for each Component or Assembly, and other product(s) (if any) that was the subject of the RFQ;

(5)    Model(s) or model platform(s), model year(s), model project or development code(s), and/or part number, and other identifiers of the Vehicle(s) for which the Component or Assembly was designed or intended;

(6)    Guidelines or instructions for responding to the RFQ, as set by You and communicated to any potential supplier, including rules relating to the initial bid price, number of responses, and response deadline; or any other Documents relating to Your bid solicitation criteria, Your bid submission system, or Your bid evaluation and selection process;

(7)    Terms of the RFQ, including supply period covered, design or specifications of the Component or Assembly, Directed Buying or

Directed Sourcing (if any) of Components or Assemblies; approved supplier(s) of Component(s) or Assemblies or subcomponents thereof, and any changes in such terms, design or specifications, including post-RFQ changes-in terms, design, or specifications (*e.g.*, resulting from manufacturing improvements and APRs);

(8)    Responses to the RFQ from potential suppliers, including but not limited to, bids, cost and profit margin information or estimates, bill of materials, cost schedules or breakdowns, proposed changes in the design, manufacturing, materials, or specifications of the Component or Assembly and resulting price changes, and any lump sum or other discounts, rebates, allowances, Incentives, or other terms offered;

(9)    Cost model(s) or estimate(s),if any, developed, used, or considered with respect to potential suppliers;

(10)    Potential suppliers, if any, that provided on-site engineers or other personnel or services in connection with the Component or Assembly;

(11)    Target Price, Limit Price, or anticipated or expected purchase price for the Component or Assembly before and after the supplier was selected, after application of all anticipated or expected discounts, rebates, or other allowances or Incentives, and any revisions or changes to such prices;

(12)    VE Price or VA Price, if any, for the Component or Assembly, and any revisions thereto;

(13)    Revised prices or other terms offered by potential suppliers after their initial response to the RFQ;

(14)     The dates and topics of RFQ kickoff meetings, seminars, and other supplier meetings pertaining to each RFQ, the potential suppliers (and employees thereof),who attended each meeting, and changes, if any, to guidelines, instructions, terms, specifications; Target Price, Limit Price; anticipated or expected purchase price, VE Price or VA Price communicated to potential suppliers at each meeting;

(15)     Each supplier and the date it was selected to supply the Component or Assembly and the quantity each supplier was selected to supply;

(16)     Letters of intent, award letters, early sourcing agreements, statements of work; or similar documents regarding purchase of the Component or Assembly;

(17)     Any summary or recap of the RFQ and responses thereto, including but not limited to, each factor considered in deciding from which supplier(s) to purchase the Component or Assembly, and the reasons each potential supplier was selected or not selected to supply the Component or Assembly;

(18)     Any adjustments made after awards, including changes to price or the quantity allocated to each supplier; and

(19)     Documents, data, or Studies related to historical Component or Assembly bid solicitations, offered bids or winning bids.

h.     Monetary components of the transaction beyond unit price *(e.g.,* sales tax, shipping or delivery fees) or non-monetary components of, or Incentives for, the purchase of the Component or Assembly, including but not limited to, (1) any

- 9 -

service, benefit, and/or product that You provided, or received, in connection with the purchase of the Component or Assembly, including service agreements, warranties, or installation, and (2) the value of each such service, benefit, or product;

i.      For each Component or Assembly purchased by one of Your suppliers pursuant to Directed Buying or Directed Sourcing, the price and terms of any such arrangement, including the entity from which the supplier was directed to purchase the Component or Assembly and at what price and terms;

j.      For each Component or Assembly that You purchased without soliciting proposals, bids, or responses to an RFQ from more than one potential supplier, the manufacturer and supplier of such Component or Assembly, its name or description, part number, and other identifiers, and the reasons why each such Component or Assembly was purchased without soliciting proposals, bids, or responses to an RFQ;

k.      All information sought or obtained by You or on Your behalf concerning a market or competitive price for the Component or Assembly, including but not limited to, any market test conducted with respect to the Component or Assembly;

l.      All Documents relating to non-RFQ methods of procurement *(e.g.,* sole-sourcing), including but not limited to, benchmark or other informal bid or pre-bid pricing, price lists, price sheets, price reductions and reduction attempts, value engineering pricing, discounts, price changes, negotiations, bidding, contracts (resulting from other methods of procurement), or agreements (formal or informal),between You

and any Defendant or other Components or Assemblies suppliers, and any correspondence relating to any negotiations or agreements made; and

m.      For each Component or Assembly purchased by You, Documents sufficient to describe, identify, and interpret all part numbers assigned, including the manufacturer's model number, any internal codes, product identifiers, or part numbers used by You.

**RESPONSE:**      SIA objects to this Request, including all subparts.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions.*   Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information.   Fed.R.Civ.P. 45(D)(3)(B)(i).  Further, the Request seeks disclosure of privileged or other protected matter, particularly, matter protected by the attorney-client privilege.   Fed.R.Civ.P. 45(d)(3)(A)(iii).   Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response.  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA.  Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 2:**    Documents sufficient to show any target prices, bids, award prices; and subsequent price adjustments with respect to any RFQ for any Component or Assembly intended to be purchased by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

**RESPONSE:**      SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the

- 11 -

Subpoena places on SIA (No. 8). Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions*. Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i). Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 3:** Documents sufficient to show Your agreements with suppliers of Components or Assemblies, including but not limited to any documents relating to and/or constituting Long Term Agreements, Master Purchase Agreements, Component Purchase Agreements, any-preferred supplier or supplier partner agreements and Memoranda of Understanding-applicable to any purchase of Components or Assemblies by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

**RESPONSE:** SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions*. Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i). Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

- 12 -

**REQUEST NO. 4:**    Data or documents (in the absence, of data) sufficient to show the following information for each new Vehicle sold by You or on Your behalf, that was manufactured (a) in the U.S. for later sale or lease in the U.S. or (b) outside the U.S. for later sale or lease in the U.S.:

a.    Purchaser (*e.g.*, Vehicle distributor, Vehicle dealer, or fleet purchaser) to whom the Vehicle was sold, including name, address, and other identifiers, and

(1)    Date of sale;

(2)    Model, model year, make, and other identifiers of the Vehicle, including VIN, and product identifier for each Vehicle sold;

(3)    Terms and conditions of sale, including but not limited to:

(a)    Your list or invoice price for the Vehicle (including currency and exchange rate, if applicable) to the purchaser,

(b)    Net sale price paid by purchaser before taxes and after any adjustments to invoice price, such as dealer holdback and any other manufacturer or distributor subsidies, rebates, bonuses, allowances and Incentives issued or applied at any time;

(c)    Adjustments to invoice price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, commissions, rebates; discounts, refunds; bonuses, advertising subsidies, floor-plan assistance, fuel allowance, dealer inspection charge, and/or other credits or debits, and the manner in which provided, whether by Vehicle or by total sale, and any adjustment identifiers;

(d)     Dealer holdback and model changeover allowance, if any;

(e)     Amount paid at time of sale, and any remaining balance due, terms of financing, if any, and duration of monthly or installment payments;

(f)     Shipping or freight costs, and by whom such costs were paid;

(g)     Any credit associated with return or repair;

(h)     Unit price.(MSRP and invoice);

(i)     Any offered and accepted price that is different from list;

(j)     Total sales price for the transaction; and

(k)     Any other terms and conditions of the sale.

(4)     Terms and conditions of floor plan financing, if any, for the purchase of the Vehicle, including interest, fees and other charges paid by purchaser;

(5)     "Ship-from" and vendor "pay-to" address(es) from which the Vehicle and invoice for it were shipped or sent to purchaser, date(s) the Vehicle and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Vehicle and invoice were shipped or received, and date(s) the Vehicle and invoice were received, and location of sale;

(6)     Monetary components of the transaction beyond unit price (*e.g.*, financing, sales tax, and fees) or non-monetary components of, or Incentives for, the sale distinct from net sale price, including but not limited to, (a) any service; benefit, and/or product You received, or provided, in connection with the sale of the Vehicle, including service agreements, warranties,

- 14 -

installation, Vehicle options, and (b) the value of each such service, benefit, or product;

(7) Invoice date;

(8) A transaction number, invoice number, purchase order number, or any number used to link different records;

(9) Receipts, invoices, bills of sale, purchase contracts, as well as any product-specification requirements and purchase orders You have for these transactions;

(10) All other information included on invoices sent to any Customer during the relevant period;

(11) A description identifier for each Vehicle;

(12) Manufacturer(s).and seller(s) of each Vehicle sold;

(13) Quantity sold (units);

b. Retail purchaser *(e.g.,* consumer, fleet purchaser, leasing company, or other lessor), to whom the Vehicle was eventually sold or leased, including name, address, and other identifiers, and

(1) Date-and place (including address) of sale or lease;

(2) Terms and conditions of sale, including but not limited to:

(a) MSRP and seller's *(e.g.,* Vehicle distributor or Vehicle dealer) invoice price for the Vehicle;

(b) Net sale price paid by purchaser (including currency and exchange rate, if applicable).before taxes and after any adjustments to list price and Incentives or allowances issued or applied at any time;

- 15 -

(c)    Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of vehicle for which a trade-in allowance was provided;

(d)    Amount paid.at time of sale, and any remaining balance due, terms of financing, and duration of monthly or installment payments; and

(e)    Terms of any insurance or warranties provided or sold to the retail purchaser.

c.    For leases, name, address, and other identifiers of person or entity to whom the Vehicle was leased *(e.g.,* lessee), and:

(1)    Date and place (including address) of lease;

(2)    Terms and conditions of lease, including but not limited to:

(a)    Term of lease;

(b)    Capitalized cost of lease;

(c)    Capitalized cost-reduction or down payment, if any;

(d)    Lessee &monthly or periodic lease payments;

(e)    Money factor, or finance or interest rate;

(f)    Depreciation and finance charges;

(g)    Mileage-allowance and any excess mileage charges;

(h)    Deposits, and acquisition or inception, disposition, termination, or other fees or charges;

(i)     Actual and/or proposed residual or resale value of the Vehicle at conclusion of lease term;

(j)     List and/or negotiated amounts to be paid at inception of lease and conclusion-of lease term;

(k)     Net amounts paid by lessee at inception of lease and at conclusion of lease term, including extraordinary damage to Vehicle and applicable excess mileage charges, before taxes and after any adjustments to such list and/or negotiated amounts;

(l)     Adjustments to list and negotiated amounts to be paid at inception of lease and conclusion of lease term, including but not limited to, taxes, rebates, discounts, refunds, or credits;

(m)     MSRP and *(e.g.,* Vehicle distributor or Vehicle dealer) list price for the Vehicle;

(n)     Net sale price of the Vehicle before taxes and after any adjustments to list price and Incentives or allowances issued or applied at any time; and

(o)     Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of Vehicle for which a trade-in allowance was provided.

d.     Any payments, credits, distributor subsidies, rebates, bonuses, Incentives, allowances or consideration received by purchaser *(e.g.,* Vehicle distributor,

Vehicle dealer or fleet purchaser) in connection with financing, warranties, insurance, service agreements, or other services or products provided to or purchased by retail purchaser *(e.g.,* consumer, leasing company, or other lessor) or lessee of the Vehicle;

e.  Monetary components of the transaction beyond unit price *(e.g.,* financing, sales tax, and fees) or non-monetary components of, or Incentives, distributor subsidies, rebates, bonuses, or allowances for, the sale of the Vehicle to the retail purchaser *(e.g.,* consumer, leasing company, or other lessor) or lease of the Vehicle distinct from net sale price, including but not limited to.(1) commissions, and any service, benefit, and/or product the purchaser *(e.g.,* Vehicle distributor or dealer), retail purchaser or lessee received, or provided, in connection with the sale or lease, including service agreements, or warranties, and (2) the value of each such service, benefit, or product;

f.  Repairs or recalls with respect to the Vehicle, nature of repair or recall, whether the Vehicle was returned, and amount of any associated payment, refund or credit;

g.  Address and other identifiers of the facility where the Vehicle was manufactured or assembled;

h.  Your actual, or if actual is not available, estimated, direct and indirect materials, manufacturing, marketing, distribution, selling, and other costs of goods sold for the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of (i) each Component and Assembly, (ii) each other part or component of the Vehicle, and (iii) management, labor, tooling, overhead, energy, materials, sales and marketing, leasing, freight, and research and development;

- 18 -

i.     Purchaser's (*e.g.,* Vehicle distributor's or Vehicle dealer's) actual, or if actual is not available, estimated, direct and indirect purchase, marketing, distribution, selling, leasing and other costs in connection with the purchase and sale or lease of the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of management, labor, commissions, real estate, financing, overhead; energy, and freight;

j.     Your gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements for the manufacture, sale-and/or lease of the Vehicle, "cost plus" pricing, gross margin target percentages, job cost and margin reports, financial statements, and any financial Analyses performed by corporate finance personnel;

k.     Your income for each Vehicle for products or services sold by Your finance and insurance department or affiliate, including without limitation finance, insurance, service contracts, extended warranties, and GAP insurance (broken out by units, total dollars, finance income, insurance income, service-contract, extended warranty, and GAP insurance income); and

l.     Purchaser's (*e.g.,* Vehicle distributor's or dealer's) gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements for the purchase, sale to a retail purchaser (*e.g.,* consumer, teasing company, or other lessor) and any lease of the Vehicle.

**RESPONSE:**     SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, SIA understands that the Special

- 19 -

Master has already denied party discovery of similar categories of information in the *Dealership Actions*. Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i). Further, the Request seeks disclosure of privileged or other protected matter, particularly, matter protected by the attorney-client privilege. Fed.R.Civ.P. 45(d)(3)(A)(iii). Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 5:** Data or documents sufficient to show the following information, for each model (and each model year) for each new Vehicle sold or leased by You or on Your behalf for sale or lease in the U.S.:

    a.    The start of production date;

    b.    The year when You began selling the Vehicle;

    c.    The year you stopped selling the Vehicle if You no longer sell it;

    d.    Your schedule of base model invoice prices; and

    e.    Your schedule of MSRP.

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 6:**   VIN databases that include complete specifications for every new Vehicle sold by You or on Your behalf for sale or lease in the U.S.

**RESPONSE:**   SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the phrase "complete specifications" is vague and ambiguous, and it is impossible for SIA to formulate a response.  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA.  Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 7:**   Documents identifying, for each year, the total number-of new Vehicles sold in the U.S. that were financed, the total dollar amount of finance income earned, the total amount of finance reserve not yet earned, and the total amount of finance commission paid to Vehicle dealers.

**RESPONSE:**   SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.  Fed.R.Civ.P. 26(b)(1).  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA.  Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 8:**   Documents, sufficient to show the chronological progress of the prices You charged to each Vehicle dealership for each Vehicle You sold to a Vehicle dealership in the U.S.

**RESPONSE:**     SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the phrases "sufficient to show" and "chronological progress of the prices" are vague and ambiguous, and it is impossible for SIA to formulate a response.  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA.  Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 9:**     For all new Vehicles sold or leased by Your Customers in the U.S. containing a Component or Assembly installed by You, all Documents relating to finance, insurance, and service contract income(broken out by units, by total dollars, by finance income, by insurance income, and by service contract income) by month.

**RESPONSE:**     SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.  Fed.R.Civ.P. 26(b)(1).  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA.  Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 10:**  Monthly or periodic reports on Your inventory levels with respect to new Vehicles intended for sale or lease in the U.S.

**RESPONSE:**     SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.  Fed.R.Civ.P.

26(b)(1). Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 11:** Monthly or periodic composite-trend reports and expense composite reports for specific expected Vehicle sales by You or on Your-behalf for-sale or lease in the U S.

**RESPONSE:** SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions.* Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 12:** Documents, including number, code, or data dictionaries or similar documents, sufficient to disclose, identify, describe, and explain the (a) manufacturer, supplier, vendor, and customer numbers or codes; (b) product, component, and part numbers-or codes; (c) model, model' platform,, VIN, model project or development, and model year numbers or codes; (d) RFQ and RFQ response number or codes; (e) plant or facility numbers or codes; (f) Target Price, Limit Price, VE Price or VA Price, or-other price numbers or-codes; (g) transaction types, including standard sales, credits, debits, returns, and other adjustments related to purchases, sales and any leases of Vehicles, Components, and Assemblies; (h) contract or agreement and invoice

- 23 -

numbers or codes; and (i) data fields, that are reflected in data or documents produced in response to these Requests.

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Further the phrase "sufficient to disclose, identify, describe, and explain" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1). Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 13:** Documents sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for determining, setting, or revising Your and Your distributors' prices, including without limitation MSRP and dealer-invoice price and any Incentives relating to sales-provided to dealers or consumers, for the sale of new Vehicles sold or leased in the U.S.

    a.    Your studies, analyses, research, or evaluations concerning the market(s) and competitive conditions for the manufacture and sale of Vehicles; including but not limited to, competitors, market shares, market definition(s), profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and surveys and/or research concerning the Vehicles, models, brands, and

classes of Vehicles that You compete with, including price levels and price comparisons; and

b.      Your studies, analyses, research, or evaluations concerning how the cost of Components or Assemblies is calculated into, or otherwise impacts or influences, the ultimate price of the Vehicle to Purchasers.

**RESPONSE:**     SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions*. Further, the phrase "sufficient to disclose, identify, describe, and explain" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 14:** Documents sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for (i) Your purchases of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., and (ii) Your decisions to select and/or not to select particular manufacturers and suppliers of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., including but not limited.to:

a.      Your review and evaluation of potential manufacturers and suppliers and the Components and Assemblies they offer, Including but not limited to, documents sufficient to show comparisons of the quality and/or technological capabilities of the potential suppliers and manufacturers;

- 25 -

b.  Your (1) issuance of RFQs, and (2)solicitation of proposals, bids, and responses to RFQs from potential manufacturers and suppliers of Components and Assemblies, including Your consideration, solicitation or use of Target Prices, Limit Prices; cost tables or schedules (*e.g.*, standards or directives regarding the amount a supplier may charge for subcomponents of Components or Assemblies or labor used in the assembly of Components or Assemblies), or the supplier's VE Prices or VA Prices;

c.  Your review and evaluation of (1) proposals, bids, and responses to RFQs, and (2) manufacturer and suppliers of Components and Assemblies, including Your consideration of (a) estimates of input and other costs and profit margins of manufacturers or suppliers, and (b) manufacturers' or suppliers' ability to meet Target Prices, Limit Prices, anticipated or expected prices, Your cost tables or schedules, or VE Prices or VA Prices for Components and Assemblies;

d.  Variations in Vehicle price or Incentives over time or with respect to different geographic areas;

e.  Variations in Vehicle price or Incentives affected by prices of particular competitive models or trims;

f.  Variations in Vehicle price or Incentives as affected by levels of sales or inventory;

g.  Any actual or proposed program or-requirement (1) that potential manufacturers and suppliers of Components and Assemblies (a) provide engineers or other personnel or services on-site, or (b) provide or estimate their input and other costs related to the manufacture and sale of Components and Assemblies that You are

- 26 -

considering purchasing or acquiring; or (2) that such input and other costs.be negotiated with, dictated by, and/or approved by You or on Your behalf;

h. Your negotiation of (1) prices, terms, and conditions of sale, including any rebates, discounts, off-invoice discounts, mother price concessions or Incentives required from, or offered by, potential manufacturers or suppliers of Components and Assemblies, or (2) changes in prices, terms, and conditions of sale, including post-RFQ pricing (*e.g.*, cost-down pricing and Annual Price Reductions);

i. Audits or reports of Your purchases of Components and Assemblies pursuant to International Organization for Standardization ("ISO") rules or regulations; and

j. Your provision or disclosure to actual or-potential manufacturers or suppliers of Components and Assemblies of information about prices or other terms and conditions offered or charged by other actual or potential manufacturers or suppliers:

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions.* Further, the phrase "sufficient to disclose, identify, describe, and explain" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i). Further, the Request seeks disclosure of privileged or other protected matter, particularly, matter protected by the attorney-client privilege. Fed.R.Civ.P. 45(d)(3)(A)(iii).

**REQUEST NO. 15:** Documents sufficient to disclose, identify, describe, and explain any studies, reports, analyses, policies, procedures, research, or evaluations concerning the extent (if any) that changes in costs related to Your manufacture, sale and/or lease of new Vehicles in the U.S., including but not limited to, changes in the input costs of a Vehicle (*e.g.*, Raw Material prices or prices for Components and Assemblies) and changes in costs pursuant to Annual Price Reductions, are passed on to purchasers (*e.g.*, Vehicle distributors or Vehicle dealers), retail purchasers,(*e.g.*, consumers, leasing companies, or other lessors), or lessees in the sale or lease prices of Vehicles, including whether and how much (1) You pass on changes in Your costs to purchasers from You (*e.g.*, Vehicle distributors or Vehicle dealers), and (2) such purchasers pass on changes in Your costs to their customers (*e.g.*, consumers, leasing companies, or lessees).

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions.* Further, the phrase "sufficient to disclose, identify, describe, and explain" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 16:** Studies, analyses, research or evaluations concerning (1) the impact or effect of changes with respect to Your acquisition costs for any particular Components or Assemblies or any other inputs on prices to dealerships, MSRP or on the "street prices" (*e.g.*, retail or consumer prices of Vehicles) paid by final consumers for new Vehicles sold or leased in the U.S. and (2) how You or Your retailers (*e.g.*, Vehicle dealerships or Vehicle distributors) set

or adjust the prices at which new Vehicles containing Components or Assemblies are sold or leased' in the U.S.

**RESPONSE:**     SIA objects to this Request and all subparts.   SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions*.    Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information.  Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 17:**  All studies, analyses, research, evaluations, or trade association materials concerning the market(s) in which You or other purchasers of Components and Assemblies have acquired or potentially could have acquired any such Components or Assemblies from any suppliers of such Components or Assemblies for installation in new Vehicles sold or leased in the U.S., including but not limited to studies, analyses; research, evaluations, and trade association materials concerning (a) the nature, scope, competitive conditions, degree of concentration, structure, or other significant aspects of any such market(s); or (b) the-identity, size, relative market share, quality, reputation or other significant attributes of any of the participants (including both buyers and sellers) in any such market(s).

**RESPONSE:**     SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions.* Further, the phrase "potentially could have acquired" is vague and ambiguous, and it is impossible for SIA to formulate a response.  Further, the information sought can be obtained from some other

- 29 -

source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 18:**  All documents relating to any comments, observations; suspicions, or suggestions that the market(s), market or competitive conditions, and market structure(s) for the manufacture, sale, or purchase of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., or for the manufacture, sale, purchase or lease of new Vehicles containing any such Components and/or Assemblies in the U.S. (a) may not be competitive, (b) may involve collusion between or among manufacturers and suppliers of Components and Assemblies, or (c) may involve collusion between or among any OEMs, distributors, or dealerships.

**RESPONSE:**  SIA objects to this Request and all subparts.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1).

**REQUEST NO. 19:**  Documents sufficient to show Your internal transfer costs, pricing, or sales of Components and Assemblies for installation in new Vehicles sold or leased in the U.S. between or among divisions, or entities within Your corporate family.

**RESPONSE:**  SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response.  Further, the Request seeks

- 30 -

disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 20:** Documents sufficient to show and describe: (a) what systems are in place for Vehicle dealers and Vehicle distributors to report new Vehicle purchases, sales; and leases in the U.S.; (b) what other information these systems track; and (c) whether each such system includes information on OEM-to-Vehicle dealer, OEM-to-Vehicle distributor, and/or OEM-to-consumer Incentives (*e.g.*, dealer cash, customer cash, holdback, rebates, etc.).

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Further, the phrase "sufficient to show and describe" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 21:** All monthly, annual, and other periodic reports concerning or reflecting purchases, leases, and/or sales of new Vehicles in the U.S. by each of Your Vehicle dealerships or Vehicle distributors (*e.g.*, financial statements or dealer operating reports) and (b) all studies; analyses, or reports concerning the business performance of Your Vehicle dealerships or Vehicle distributors with respect to purchases, leases and/or sales of new Vehicles in the U.S. Both,(a) and (b) should include, but not be limited to, such reports, studies and analyses concerning sales volume by make and model, prices at which dealers or distributors sold the

- 31 -

Vehicles by make and model, and any other characteristics of those sales, as well as such dealerships' and distributors' financial results, throughput volumes, salesperson activity, market-share performance; and expected-opportunity performance.

**RESPONSE:**     SIA objects to this Request and all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the phrase "other characteristics of those sales" is vague and ambiguous, and it is impossible for SIA to response. Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 22:** All letters, memoranda, or other communications from You to all or any group of Your dealerships in the U:S. (*e.g.*, dealerships in a particular geographic region) announcing prices or changes in prices charged to the dealers for new Vehicles, setting prices or discounts, or explaining discounts or prices for new Vehicles charged or Incentives provided to the dealers (*e.g.*, why prices went up or went down, or how prices were arrived at), including price lists from the manufacturer for new Vehicles.

**RESPONSE:**     SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1). Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 23:** Documents sufficient to show: (1) Annual Price Reductions or "APRs" issued to each supplier or manufacturer of Components or Assemblies for installation in new Vehicles sold or leased in the U.S. for each APR negotiation period for each such Component or Assembly and the dates of such APR requests; (2) APRs, credits, money, or other consideration received from suppliers of Components or Assemblies in connection with any negotiated price reductions and the dates of receipt; (3) the impact and traceability of APRs and APR requests to particular Components or Assemblies, including but not limited to, the methods, policies, procedures, factors, and standards for (a) how You calculate and issue APR requests issued to suppliers and manufacturers of Components or Assemblies, (b) how and when You account for or credit APRs received from suppliers, and (c) how and when any audit of suppliers' costs impact Your APR requests; (4),any variation, and the reason for the variation, between Your APR requests issued to each of the suppliers and manufacturers of a particular Component or Assembly; and (5) Your long-term cost reduction initiatives, including but not limited to, announcements, PowerPoint presentations, and supplier meetings containing information about these initiatives.

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i). Further, the Request seeks disclosure of privileged or other protected matter, particularly, matter protected by the attorney-client privilege. Fed.R.Civ.P. 45(d)(3)(A)(iii).

- 33 -

**REQUEST NO. 24:**  Documents sufficient to show, for each model of new Vehicle manufactured by You that is sold or leased in the United States, the models of Vehicles manufactured by other OEMs that You consider to be competitors and how (if at all) You considered the pricing by such other OEMs of such models in setting the price of the model manufactured by You.

**RESPONSE:**  SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response.  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA.  Fed.R.Civ.P. 26(b)(2)(C)(1).  Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information.  Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 25:**  Organizational charts or other documents sufficient to identify Your divisions, departments and managerial employees that have responsibility for:   (a) purchasing Components or Assemblies for installation in new Vehicles sold or leased in the U.S., (b) manufacturing new Vehicles sold or leased in the U.S., (c).pricing of new Vehicles sold or leased in the U.S., and (d) sales and marketing of new Vehicles containing such Components and/or Assemblies to Your Customers for sale or lease in the U.S.

**RESPONSE:**  SIA objects to this Request, including all subparts.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1). Further, the phrase "sufficient to identify" is vague and ambiguous, and it is impossible for SIA to formulate a response.

**REQUEST NO. 26:** For all produced data extracted from a larger data system, identify (a) the software hosting the original data (including version number); (b) the process used to extract the data; and (c) the specific queries used to extract the data. For any data that has been altered from the original form in which it was stored, produce the descriptions of any manipulations to the data fields or values, any removed data, any data summarization performed prior to production, and any other alternations that would.be required to reproduce the data as originally stored.

**RESPONSE:** SIA objects to this Request and all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1).

**REQUEST NO. 27:** All Documents and/or transactional data produced to any regulatory governmental' authority within or outside the United States as part of any investigation relating to Components or Assemblies for installation in new Vehicles sold or leased in the U.S.

**RESPONSE:** SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P.

- 35 -

26(b)(1). Further, the information sought, if any, can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 28:** All Documents, including but not limited to, any Studies and/or Analyses relating to Your suppliers' (including Defendants') pricing of Components or Assemblies sold to You for installation in new Vehicles sold or leased in the U.S., including Documents relating to prices and proposals submitted in response to RFQs and other requests for procurement or price, changes. Please include Documents relating to the relationship between the prices charged or submitted to You for Components or Assemblies and the prices charged or submitted to other Vehicle manufacturers, including for Components or Assemblies that are jointly sourced or for Vehicles that share platforms; share elements, are badge-engineered, or are made for different OEMs who are involved in joint ventures or projects. Please also include Documents relating to the relationship or similarities between the prices charged or submitted for Components or Assemblies for different models or makes of Vehicles, including Vehicles You manufacture.

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 29:** Any Documents or data You have provided to the J.D. Powers' Power Information Network (PIN) concerning new Vehicles sold or leased in the U.S., including

but not limited to data that contains the Vehicle make, model and trim, transaction prices, costs, and transaction dates, financing detail and trade-in information.

**RESPONSE:**     SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

**REQUEST NO. 30:** All Documents concerning any agreement or understanding that prices charged to one OEM for Components or Assemblies for installation in new Vehicles sold or leased in the U.S. will not be below or above prices charged to another OEM, or that prices for Components or Assemblies for installation in new Vehicles sold or leased in the U.S. must beat a particular competitive level.

**RESPONSE:**     SIA objects to this Request.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).  Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information.  Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 31:** All Documents relating to Your or other OEMs' negotiations or Communications with any of the Defendants or other Components or Assemblies suppliers in connection with Defendants' and other Components or Assemblies suppliers' conduct at issue in

MDL No. 2311 and Documents Defendants or other Components or Assemblies suppliers provided to You or other OEMs, in connection with the facts described in any Plaintiffs' Complaints.

**RESPONSE:** SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1). Further, the Request seeks disclosure of privileged or other protected matter, particularly, matter protected by the attorney-client privilege. Fed.R.Civ.P. 45(d)(3)(A)(iii).

**REQUEST NO. 32:** All Documents related to requests by You that Defendants or Your other suppliers decrease prices charged, submitted or provided' for any Component or Assembly for installation in new Vehicles sold or leased in the U.S., and techniques used.to accomplish these reductions.

**RESPONSE:** SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1). Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 33:** Documents comparing the Components or Assemblies You purchase, or have purchased, for installation in new Vehicles sold or leased in the U.S. to Components or Assemblies other OEMs purchase or have purchased, as well as Components or Assemblies made by different suppliers.

**RESPONSE:**     SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).


**REQUEST NO. 34:** For new Vehicles that were sold to Your Customers in the U.S. and financed by You (or any of Your related financing entities), Your disaggregated transactional data, including but not limited to the cost of each Vehicle, the dealer invoice price for each Vehicle (*i.e.*, the invoice price to Your franchise-dealer Customer), and the final sales price for the Vehicle to the end-payor (*i.e.*, the ultimate consumer of the Vehicle).

**RESPONSE:**     SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1). Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

**REQUEST NO. 35:** Documents sufficient to show the extent to which suppliers participated in the design and engineering of Components and Assemblies-to be incorporated in manufacturing new Vehicle models with respect to new Vehicles manufactured or sold in the U.S.

**RESPONSE:** SIA objects to this Request. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response.

**REQUEST NO. 36:** Documents sufficient to show the existence of lists or compilations of OEM-approved parts suppliers, to the extent they include suppliers of Components or Assemblies for installation in new Vehicles sold or leased in the U.S., the criteria for the inclusion of a supplier on such, lists or compilations, the process by which OEMs approve suppliers to be added to such lists or compilations, and the lists or compilation themselves.

**RESPONSE:** SIA objects to this Request, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the Request seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response.

Attachment B Objections

SIA incorporates by reference its General Objections to the Requests in Attachment A to the Subpoena as if fully set forth here. SIA further states:

1) In addition to data or documents with respect to each Component or Assembly purchased for installation in a new Vehicle covered by Requests Nos. 1, 2, 3, 14, 17, 18, 19, 23, 25(a), 25(d), 27, 28, 30, 32, 33, and 36 in Attachment A, also produce data or documents responsive to those Requests for each Component or Assembly purchased or sold by You as a replacement part (including spare, service, or repair part) in the U.S.

**RESPONSE:** SIA objects to these Requests, including all subparts. SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, SIA incorporates by reference its objections to Requests Nos. 1, 2, 3, 14, 17, 18, 19, 23, 25(a), 25(d), 27, 28, 30, 32, 33, and 36 in Attachment A.

2) Produce data or documents,(in the absence of data) sufficient to show for each Component or Assembly You sold as a replacement part (including spare, service, or repair part) in the U.S.:

   a) Purchaser to whom it was sold;

   b) Date of sale;

   c) Model, model year, make, part number and other identifiers for the Vehicles for which the Component or Assembly was intended for use;

   d) Terms and conditions of sale, including unit price (MSRP and invoice), and net sales price paid by purchaser before taxes and after any Incentives or adjustments to price;

e)      Address and other identifiers of the facility where the Component or Assembly was manufactured or assembled;

f)      Shipping or freight costs, by whom such costs were paid, "ship-from/pay-to" and "bill/invoice-to" addresses' from where the Component or Assembly were shipped, sent, or received, and the location of sale;

g)      Any monetary components of the transaction beyond unit price (*e.g.*, financing, sales tax, and fees) or now-monetary components of, or Incentives for, the sale distinct from net sale price;

h)      Receipts; invoices, bills of sale, purchase contracts, purchase orders, transaction numbers, and invoice numbers You have for these transactions;

i)      Quantity sold (units);

j)      Your gross profit, profit margin or level, and net profit, including profit and, loss statements

**RESPONSE:**      SIA objects to this Request, including all subparts.  SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8).  Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions.*  Further, the phrase "sufficient to show" is vague and ambiguous, and it is impossible for SIA to formulate a response.  Further, the information sought can be obtained from some other source that is more convenient, less burdensome, or less expensive to non-party SIA. Fed.R.Civ.P. 26(b)(2)(C)(1).

3)      Produce documents sufficient to identify, describe, and explain how You set or revised Your prices, including without limitation MSRP and dealer-invoice price and any

- 2 -

Incentives relating to sales provided to purchasers, for Components or Assemblies You sold as replacement parts (including spare, service, or repair part) in the U.S., as well as:

      a)     Your studies; analyses, research, or evaluations concerning the market(s) and competitive conditions for the manufacture and sale of Components or Assemblies sold as replacement parts, including but not limited to competitors, prices offered by competitors, market shares, market definition(s), profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends.

**RESPONSE:**     SIA objects to this Request and all subparts.    SIA incorporates by reference its general objections, including but not limited to its objection to the undue burden and expense the Subpoena places on SIA (No. 8). Further, the phrase "identify, describe, and explain" is vague and ambiguous, and it is impossible for SIA to formulate a response. Further, SIA understands that the Special Master has already denied party discovery of similar categories of information in the *Dealership Actions.* Further, the Request seeks disclosure of non-party SIA's trade secret or other confidential research, development, or commercial information. Fed.R.Civ.P. 45(D)(3)(B)(i).

ICE MILLER LLP


_____
Kimberly C. Metzger
(317) 236-2290
Metzger@icemiller.com
Thomas E. Mixdorf
317) 236-5832
Thomas.Mixdorf@icemiller.com
Ice Miller LLP
One American Square, Suite 2900
Indianapolis, IN 46282
(317) 236-2100

Attorneys for Subaru of Indiana Automotive, Inc.


## CERTIFICATE OF SERVICE

I certify that the foregoing was served on the following attorneys by United States mail, postage prepaid and properly addressed, on August 17, 2015:

| | |
|---|---|
| Jeniphr Breckenridge<br>Ronnie Spiegel<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>1918 Eighth Ave., Suite 3300<br>Seattle, WA 98101<br>Tel. (206) 623-7292<br>Fax. (206) 623-0594<br>jeniphr@hbsslaw.com<br>ronnie@hbsslaw.com | Jonathan W. Cuneo<br>Victoria Romanenko<br>Evelyn Li<br>Ben Elga<br>CUNEO GILBERT LADUCA, LLP<br>507 C Street NE<br>Washington, DC 20002<br>Tel. (202) 789-3960<br>Fax. (202) 789-1813<br>JonC@cuneolaw.com<br>Vicky@cuneolaw.com<br>evelyn@cuneolaw.com<br>belga@cuneolaw.com |


_____
Kimberly C. Metzger


I\5784152.1

- 4 -

# EXHIBIT G



# BUTZEL LONG
### ATTORNEYS AND COUNSELORS

*a professional corporation*

**Sheldon H. Klein**
**248 258 1414**
klein@butzel.com

Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
T: 248 258 1616  F: 248 258 1439
**butzel.com**

September 10, 2015

Via first class mail and email (CKass@proskauer.com)

Colin Kass
Proskauer Rose LLP
1001 Pennsylvania Ave, N.W.
Suite 600 South
Washington, DC  20004-2533

*Re: In re Automotive Parts Antitrust Litigation (Master Case No. 2:12-md-02311)*

Dear Colin:

I am writing to follow up on your call of September 1, 2015 concerning the subpoenas issued to various original equipment manufacturers and affiliated entities ("OEMs") in the above litigation.  I write on behalf of all Defendants, Dealer Plaintiffs and End Purchaser Plaintiffs, and Public Entity Plaintiffs (collectively "Parties").

In your call, you indicated that you were calling on behalf of "most" of the subpoenaed OEMs (the "Coordinating OEMs") and requested that: (1) the Parties and the Coordinating OEMs arrange for a "summit" to discuss unspecified common issues; and (2) that the Parties agree to a common response date for the Coordinating OEMs.  We understand that you are acting as the liaison for the Coordinating OEMs, and assume that you will promptly communicate this letter to those other Coordinating OEMs.

As the Coordinating OEMs are aware, the Parties have been reaching out to all identified counsel for the various OEMs served to discuss reasonable extensions for written responses and objections, and to set a schedule for meet and confer and production.  The Parties have also been making best efforts to schedule initial meet and confer calls with OEM entities so that any questions and particular issues may be promptly addressed.

Ann Arbor    Bloomfield Hills    Detroit    Lansing    New York    Washington D.C.

*Alliance Offices*    Beijing    Shanghai    Mexico City    Monterrey    *Member Lex Mundi*    www.butzel.com

September 10, 2015

Although the Parties believe that the significant issues relating to the subpoenas are more productively addressed in conversations and negotiations with each OEM, the Parties are willing to accommodate Coordinating OEMs' request for a summit on the following terms:

1.  You identify the Coordinating OEMs on behalf of whom your proposal is made;

2.  The Coordinating OEMs identify in writing at least two days in advance of the summit the specific common issues to be addressed;

3.  The Coordinating OEMs agree to hold the summit no later than September 18, 2015.  In that regard, please identify three dates and times for a summit.  Since a number of the Parties are on the West Coast, please propose times between noon and 5 p.m. EDT. Also, please note that a number of counsel will be unavailable on September 14th and 15th.  Once we receive your proposed dates, we will determine as quickly as possible which of the dates are workable for the Parties; and

4.  The Coordinating OEMs agree to set a response and production schedule consistent with the discussion below.

While the Parties want to make every effort to accommodate the Coordinating OEMs' requests to address any common issues and questions, we hope that the Coordinating OEMs will consider that the Parties need to avoid unreasonable delay.  The data and documents sought by the subpoenas are necessary to the Parties' class certification briefing in the automotive wire harness cases and require extensive evaluation.

In addition, the Parties' agreement to address the Coordinating OEMs' request for a group summit or to address any common issues in a summit forum, does not relieve any Coordinating OEM of its obligation to respond to and/or comply with the subpoena, nor can the request for a summit be used as a reason for delay or to not go forward with setting a schedule.

A number of subpoenaed entities have already agreed to response and production dates.  Since we do not know the identity of the Coordinating OEMs, we do not know whether any of the Coordinating OEMs are among those who have already agreed to set dates.  Please note that the following proposal will not apply to any OEMs that have already agreed to set dates.

With the above understandings, the Parties are willing to hold the summit.  We ask that the Coordinating OEMs also agree to schedule proposed below:

September 30, 2015:  Written responses and objections due; and October 31, 2015:  Rolling production will begin.

The Parties also request that the Coordinating OEMs provide substantive responses on September 30th, and not merely use the extension to make "boilerplate" objections.  In

BUTZEL LONG

September 10, 2015

addition, we ask that the Coordinating Parties immediately continue or begin to meet and confer with the Parties on an individual basis to begin to address substantive issues or concerns, and to begin discussions including as to transactional data production and the scope of the requests.

We look forward to your prompt response.

Very truly yours,

Sheldon Klein

BUTZEL LONG

# EXHIBIT H

 Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

September 17, 2015

Colin Kass
Member of the Firm
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

*Via Email*

Sheldon H. Klein
Butzel Long
Stoneridge West; 41000 Woodward Avenue
Bloomfield Hills, MI 48304

Re: <em>In re Automotive Parts Antitrust Litigation</em> (Master Case No. 2:12-md-02311)

Dear Sheldon:

We write on behalf of the Specified Subpoenaed Entities[1] to further our discussions about enhancing the coordination between the Parties to the litigation and the Specified Subpoenaed Entities.

The breadth and scope of the "Uniform OEM Subpoena" is unprecedented.  By way of example, Request No. 1 alone spans over six pages and 150 categories of documents, data and

---

[1] The Specified Subpoenaed Entities consist of the following (i) Chrysler entities (FCA US LLC; Maserati N.A., Inc.; Fiat Finance North America, Inc.; and Chrysler Transport Inc.); (ii) Toyota entities (Toyota Motor North America, Inc.; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Manufacturing Alabama, Inc.; Toyota Motor Manufacturing Indiana, Inc.; Toyota Motor Manufacturing Kentucky, Inc.; Toyota Motor Manufacturing Mississippi, Inc.; Toyota Motor Manufacturing Texas, Inc.; Toyota Motor Manufacturing West Virginia, Inc.; Toyota Logistics Services, Inc.; and Calty Design Research, Inc.); (iii) BMW entities (BMW of North America, LLC, BMW Manufacturing Co., LLC, and BMW Financial Services NA LLC); (iv) Porsche Cars North America, Inc.; (v) Hyundai / Kia entities (Hyundai Capital America; Hyundai Motor America; Hyundai Motor Manufacturing Alabama, LLC; Hyundai-Kia America Technical Center, Inc.; Kia Motors Manufacturing Georgia, Inc.; Kia Motors America, Inc.); (vi) GM entities (General Motors Company, General Motors Financial Company, Inc., General Motors Holdings LLC, and General Motors LLC); (vii) VW entities (Volkswagen Group of America, Inc., also d/b/a Audi of America LLC; Volkswagen Group of America Chattanooga Operations LLC; Volkswagen Credit Inc.; Automobili Lamborghini America LLC; and Bentley Motors, Inc.); (viii) Nissan entities (Nissan North America, Inc.; Nissan Design America, Inc.; Nissan Technical Center North America, Inc.; Nissan Diesel America, Inc.; and Nissan Motor Acceptance Corporation); (ix) Honda entities (American Honda Motor Co., Inc.; American Honda Finance Corp.; Honda Manufacturing of Indiana, LLC; Honda North America, Inc.; Honda of America Mfg., Inc.; Honda of South Carolina Mfg., Inc.; Honda Precision Parts of Georgia, LLC; Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Honda Transmission Manufacturing of America, Inc.).

The Specified Subpoenaed Entities do not use the "OEM" terminology utilized by the Parties to the Litigation in serving the "Uniform OEM Subpoenas," as many of the entities served with these subpoenas are not OEMs and many are not involved in the manufacture, sale or distribution of automobiles.



Sheldon H. Klein
September 17, 2015
Page 2

information for a period covering over 23 years. Accordingly, as your September 10th letter points out, we believe that it would be productive to have a joint meet and confer (or "summit" meeting) to discuss the scope of the "Uniform OEM Subpoena," and to ensure that all *common* issues relating to the "Uniform OEM Subpoena" are identified, addressed, and if necessary, briefed, on an agreed-upon common schedule.

We take your point that there may be one or more issues that "are more productively addressed in [individual] negotiations with each OEM." We believe, however, that the great majority of issues are common to the Subpoenaed Entities, which is reflected by the identical subpoenas served on each Subpoenaed Entity without any effort to tailor the request to their specific business, the role of the company, if any, in the facts of the case, or the information already in the Parties' possession relating to such company.

Because many issues relating to the scope of the "Uniform OEM Subpoena" will be common to all or at least multiple Subpoenaed Entities, we should strive to identify those issues and address them at the outset. Although your letter seeks to impose certain conditions on this process, which we address below, it appears that the Parties are amenable to this process. Accordingly, the Specified Subpoenaed Entities propose holding a summit teleconference at 2:00 pm E.S.T. on Thursday, September 24, 2015.[2]

As you requested, we will prepare an agenda in advance of our initial summit meeting. At the same time, however, we request that the Parties be prepared to describe generally by Component the information already in the Parties' possession; the gaps in the discovery record that the Parties reasonably believe that they need the Specified Subpoenaed Entities to fill; the efforts that the Parties have undertaken (vis-à-vis each other) with regard to these issues; the relative importance of the information for purposes of litigating the case, and the "reasonable steps" the Parties are prepared to take to fulfill their obligation to avoid imposing the undue burden and expense upon the Specified Subpoenaed Entities that is otherwise imposed by the terms of the "Uniform OEM Subpoenas." In this regard, we are well aware of the prior discovery orders in the case. *E.g.*, ECF Nos. 214, 251, 313, 352, *In re Wire Harness Cases*, 2:12-cv-00102-MOB-MKM (E.D. Mich.). While we understand (but do not agree with) your desire to cover the waterfront with the OEM subpoena, we will also want to hear from the Parties as to whether more limited universes of information will suffice, and whether there will be

---

[2] Although we have strived to accommodate your request to hold the summit meeting by September 18th, that date is not workable for a number of Subpoenaed Entities. In any event, we do not believe that it is appropriate for the Parties to hold the subpoena response date, and coordination more generally, hostage to the Specified Subpoenaed Entities agreeing to hold the summit meeting with just one week's notice. In that regard, we note that plaintiffs waited *four weeks* to get back to the Subpoenaed Entities to discuss the timing and scope of the subpoenas, and an additional week to get back to us regarding our request for coordination. While your letter mentions the Parties' class certification briefing, that briefing is not scheduled to begin until *July 2016*. We do not fault the Parties for wanting to proceed deliberately and to ensure maximum coordination on their side, but we believe the same courtesy should extend to the Subpoenaed Entities.



Sheldon H. Klein
September 17, 2015
Page 3

recognition that certain Subpoenaed Entities simply do not possess such documents and/or information.

With respect to timing, you suggest that the Specified Subpoenaed Entities provide written responses and objections by September 30, 2015, and that such responses and objections reflect more than "boilerplate objections."  Certainly our ability to evaluate the substance of the requests will depend in large part on the information that the Parties can provide during our summit meeting(s).  The greater understanding we have of the Parties' needs, the greater will be our ability to develop a proposed scope of search (assuming that the Subpoenaed Entity has such documents or information) that accommodates those needs while minimizing both the burden to the Subpoenaed Entities and the reimbursement costs that the Parties will necessarily incur.  Accordingly, we believe that the timing of our objections and responses should be addressed at the end of the first summit meeting.[3]

Sincerely,

/s/ *Colin Kass*

Colin Kass

cc: Katherine Van Dyck (via e-mail, kvandyck@cuneolaw.com)

---

[3] Your letter also demands that rolling production of documents begins by October 31st.  In connection with discussing the scope of the subpoena, the Subpoenaed Entities will also be willing to discuss both the timing of any production(s) and, in keeping with Fed. R. Civ. P. 45, the reimbursement of the Specified Subpoenaed Entities' costs to prepare such productions.

# EXHIBIT I



Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

September 30, 2015

Colin Kass
Member of the Firm
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

**_Via E-Mail_**

Ronnie S. Spiegel
Hagens Berman Sobol Shapiro LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
ronnie@hbsslaw.com

Re: *In re Automotive Parts Antitrust Litigation* (Master Case No. 2:12-md-02311)

Dear Ronnie:

Please see enclosed a proposed agenda for the summit on Friday.

Sincerely,

/s/ *Colin Kass*

Colin Kass

Enclosure

cc:    Katherine Van Dyck (via e-mail, kvandyck@cuneolaw.com)
       Sheldon Klein (via e-mail, klein@butzel.com)



September 30, 2015

## <u>Agenda for October 2, 2015 "Summit" Meet & Confer</u>[1]

I.    **General Approach**

II.    **Non-OEM SSEs**[2]

III.    **Facial Overbreadth / Particularized Need**

IV.    **Reimbursement of Costs and Expenses**

V.    **Time Period / Scope**

VI.    **Custodians**

VII.    **Timing (if needed) of Formal Written Objections & Responses**.

---

[1] This is not meant to be a comprehensive list of all objections to the Subpoena, but rather highlights a number of issues that are appropriate for an initial discussion between the SSEs and the Parties. Any proposal set forth herein is non-binding, for discussion purposes only, and subject to a comprehensive agreement among the SSEs and the Parties. Any such proposal shall not be deemed an admission that such proposal (or discovery generally) is reasonable, proportional, or appropriate, but rather is being raised as a means for reaching an accommodation among the SSEs and the Parties. Each SSE reserves the right to object to the entire subpoena (or portions thereof) if no comprehensive agreement satisfactory to it can be reached. The SSEs also reserve the right to modify any proposal until a written agreement has been finalized.

[2] The non-OEM SSEs include, but may not be limited to, the following entities: (i) Chrysler Non-OEM SSEs (Maserati N.A., Inc.; Fiat Finance North America, Inc.; and Chrysler Transport Inc.); (ii) Toyota Non-OEM SSEs (Toyota Motor North America, Inc.; Toyota Motor Manufacturing Alabama, Inc.; Toyota Motor Manufacturing Indiana, Inc.; Toyota Motor Manufacturing Kentucky, Inc.; Toyota Motor Manufacturing Mississippi, Inc.; Toyota Motor Manufacturing Texas, Inc.; Toyota Motor Manufacturing West Virginia, Inc.; Toyota Logistics Services, Inc.; and Calty Design Research, Inc.); (iii) BMW Non-OEM SSEs (BMW of North America, LLC, BMW Manufacturing Co., LLC, BMW Financial Services NA LLC, BMW (US) Holding Corp., BMW Bank of North America, BMW Insurance Agency, Inc., BMW US Capital, LLC, Designworks/USA, Inc.); (iv) Porsche Cars North America, Inc.; (v) Hyundai / Kia Non-OEM SSEs (Hyundai Capital America; Hyundai Motor America; Hyundai Motor Manufacturing Alabama, LLC; Hyundai-Kia America Technical Center, Inc.; Kia Motors Manufacturing Georgia, Inc.; Kia Motors America, Inc.; Hyundai Autoever America, LLC); (vi) VW Non-OEM SSEs (Volkswagen Group of America, Inc., also d/b/a Audi of America LLC; Volkswagen Credit Inc.; Automobili Lamborghini America LLC; and Bentley Motors, Inc.); (vii) Nissan Non-OEM SSEs (Nissan Design America, Inc.; Nissan Technical Center North America, Inc.; Nissan Diesel America, Inc.; and Nissan Motor Acceptance Corporation); (viii) Honda Non-OEM SSEs (American Honda Finance Corp.; Honda North America, Inc.; Honda of South Carolina Mfg., Inc.; Honda Precision Parts of Georgia, LLC; Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Honda Transmission Manufacturing of America, Inc.); (ix) Rolls-Royce Motor Cars NA, LLC, (x) Jaguar Land Rover North America, LLC; (xi) Volvo Cars of North America, LLC; (xii) Subaru Non-OEM SSEs (Subaru of America, Inc.; Subaru Leasing Corp.; and Fuji Heavy Industries U.S.A., Inc.); (xiii) Aston Martin Lagonda of North America, Inc.

# EXHIBIT J



Ronnie S. Spiegel
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 EIGHTH AVENUE, SUITE 3300
SEATTLE, WA  98101
www.hbsslaw.com
**Direct (206) 268-9343**
**ronnie@hbsslaw.com**

October 14, 2015

**VIA EMAIL**

Colin Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Suite 600 South
Washington, DC 20004-2533

> **Re:**    *In re Automotive Parts Antitrust Litigation*
> *(Master Case No. 2:12-md-02311)*

Dear Colin:

**INTRODUCTION**

I am writing on behalf of the serving parties ("Parties")[1] to follow up on the issues raised by certain subpoena recipients that participated in the summit ("Summit Group") on October 2, 2015.[2]  At the summit, the Parties made best efforts to listen to the Summit Group's concerns and to understand the issues the Summit Group raised.  As quickly as possible, the Parties have worked together to come up with a proposed path forward for each issue, or to give the Summit Group our straightforward position, so that we can all move forward toward cooperation or toward quick identification of disputes for the Special Master to resolve.  Please see our proposals and responses below.[3]

Please note that not all Parties join in all requests discussed below.  The Defendants specifically object to the production of any documents in response to Request No. 31, as it seeks documents that would violate the settlement-communications privilege recognized in *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003) and *Allen Cnty. v. Reilly Indus.*, 197 F.R.D. 352, 354 (N.D. Ohio 2000).  Plaintiffs disagree with Defendants' assertion of privilege based on *State v. Little River Band of Ottowa Indians*, 2007 WL 851282, at *2 (W.D. Mich. 2007), which makes clear that these documents are not privileged.

---

[1] The Parties include:  End Payor Plaintiffs; Auto Dealer Plaintiffs; Truck and Equipment Dealer Plaintiffs; Public Entity Plaintiffs; and, Defendants in all actions.

[2] Please provide the Parties with a complete list of the entities and individuals that participated in the summit or that otherwise join in the group.

[3] The Parties tried to address all items as we understood them from the summit, but please let us know if there are any we missed, and we will do our best to provide you with a quick response.

Parties' Ltr. to Colin Kass
October 14, 2015
Page 2

## PROPOSED SOLUTIONS AND RESPONSES

**1.     Proposal regarding entities that have no responsive information**

The Summit Group asked the Parties to clarify our position on subpoenas served on entities that have no responsive information.  As we have been relaying through individual meet and confer with subpoena recipients over the past few months, we do not see any reason to pursue subpoenas for entities that have no responsive information.  We see this category as including entities that truly possess no responsive information, such as entities where another member of a corporate family has the information we seek, or where none of the requests applies to the particular entity served.

For entities that fit this category, the Parties have outlined the following process:

We ask that counsel provide us with a short explanation (one or two short paragraphs) of the entity's function and why it does not have any responsive information.  We ask that counsel also include a brochure or other summary document regarding the entity, to help us quickly confirm whether the entity fits this category.  If the Parties agree that the entity has no responsive information and fits this category, we ask that counsel submit a short, formal written response.  The subpoenaed entity would not need to respond or object to any of the subpoena requests, and the entity would reserve all objections.  The requests would be held in abeyance, with the reservation that should any further information on this entity ever come to light or information submitted prove untrue, the Parties would have an opportunity to revisit the subpoena.

**2.     Proposal regarding entities that only have a small amount of sales in the United States**

At this time, no subpoenas will be withdrawn on the basis of volume of sales in the United States, provided the subpoena recipient has responsive information.  However, the Parties are mindful of striking a balance between discovery of highly relevant information and minimizing burden for third parties in this process.  Accordingly, the Parties have provided a narrowed list of requests, to be tailored on an individual basis with each entity that wishes to further negotiate based on its small volume of sales.  In order to facilitate meaningful conversations, the Parties request that those entities that wish to further negotiate based on sales volume provide documentation establishing their vehicle sales volume in the United States, regardless of place of manufacture or assembly.

For the smaller entities, the Parties agree to the following narrowed list of requests: Request Nos. 1, 3, 4, 5, 8, 12, 13, 14 (in part), 15 (in part), 16 (in part) 21 (in part), 22, 23 (in part), 27, 28 (in part), and 33.  For automobiles, "smaller" is defined as those entities whose United States annual sales volume is less than 10,000 vehicles.  For trucks and equipment, the Truck and Equipment Dealer Plaintiffs are prepared to discuss appropriate criteria with the truck and equipment entities.

Parties' Ltr. to Colin Kass
October 14, 2015
Page 3

### 3. Proposal to narrow the time period

The Summit Group expressed concern over the breadth of the time period stated in the subpoena. As the Parties explained on the summit call, the subpoena was not meant to impose a time period of 1992 to present for each part action. Rather, to accomplish the Court's order of serving one, comprehensive subpoena, we needed to identify a date range inclusive of all actions. The Parties have always had every intention of sitting down with subpoena recipients to clarify and tailor the time period to each part action.

The Parties can agree to narrow the time period to the conspiracy period alleged in each particular action, as well as a "before and after" period in each action. The before period would reach back two years prior to the alleged conspiracy period start date in each action. In addition, for the before period, the Parties can agree to limit the requests to production of transactional data. The after period for requested documents should extend to the date the Parties and Summit Group members complete their negotiations on the subpoena. The after period for requested data should extend to the date when subpoenaed entities perform their data extraction. Please see Attachment A to this letter for case-by-case list of the alleged conspiracy periods.

### 4. Proposal to narrow requests for certain types of entities

From our conversation during the summit, the Parties' understanding is that for certain types of entities, such as the types of entities listed in the chart below, the Summit Group believes that its members should not have to respond to the subpoenas, or that subpoenas should be withdrawn.

The Parties see these entities in a different category than those entities that truly have no responsive information for any request (as discussed in Section 1 of this letter). However, we understand that for certain types of entities, a more limited number of requests will apply, and the Parties can agree to narrow requests for each type of entity as per the chart below.

In addition, with respect to the categories below, such entities would only need to respond to the narrowed list of requests if the information sought cannot be found at any of the main entities subpoenaed in the same corporate family (such as the manufacturing, sales, and distributor entities). Regarding the finance and credit entities, we can agree to further narrow these requests for transactional data to only summary transactional data and, for non-transactional data, to summary analyses, reports, and memos, and not focus on individual transactional documents.

| Type of Entity | Narrowed List of Requests |
|---|---|
| Finance and credit | Request Nos. 4(a)(3)(e), 4(a)(4), 4(a)(6), 4(b)(2)(d), 4(c), 4(c)(2)(e), 4(c)(2)(f), 4(d), 4(i), 4(k), 7, 9 (limited to summary transactional data or summary documents only), 21, 29, 34, and 37 (applies only to Honda and Nissan) |

Parties' Ltr. to Colin Kass
October 14, 2015
Page 4

| Type of Entity | Narrowed List of Requests |
|---|---|
| Insurance | Request Nos. 4(b)(2)(e), 4(d), 4(k), and 9 (limited to summary transactional data or summary documents only) |
| Design | Request Nos. 1(g)(6)-(8), 1(g)(17), 14(a), 27, 32, 33, 35, and 37 (applies only to Honda and Nissan) |
| Research & Development | Request Nos. 1(g)(6)-(9), 1(g)(17), 1(k), 1(j), 1(l), 4(h), 5, 8, 12 13, 14, 15, 16, 17, 23(3)(a), 24, 26, 27, 28, 33, 35, and 36 |
| Banking and Capital | Request Nos. 9 (limited to summary transactional data or summary documents only), 10, 11, 13(a-b), 14, 16, 17, 18, 19, 21, 33, 34, and 37 (applies only to Honda and Nissan) |

### 5.     Proposal for prioritization of requests for main entities

With respect to the main entities that are involved in procurement, manufacturing, assembly, sales, marketing, pricing, and distribution, the Parties are willing to prioritize the subpoena requests.  We ask that the "First Priority Requests" identified below be sequenced for initial production.  We understand that there may be requests which focus heavily on transactional data and, therefore, may be easier to produce than non-transactional data requests.  Each entity is in the best position to identify which categories may be transactional data or otherwise, and we hope to have individual discussions with each entity to better understand any burdens on production of non-transactional data.  Here is the sequenced list:

| Category | Request Nos. |
|---|---|
| First Priority Requests | Request Nos. 1, 2, 3, 4, 5, 8, 10, 12, 13, 14, 15, 16, 17, 21, 22, 23, 24, 26, 27, 28, 30, 31, 32, 33, 34, and 36 |
| Second Priority Requests | Request Nos. 6, 7, 9, 11, 18, 19, 20, 25, 29, 35, and 37 |

In addition, to the extent it would be less burdensome, the Parties can also agree to frontload production for cases that will come up first for class certification briefing, including wire harnesses, anti-vibration rubber parts, and bearings, all with class certification briefing dates in July and August 2016.  The Parties brought this up at the summit and met with resistance to this idea by the Summit Group.  As the Parties expressed during the summit, to the extent any entity keeps data or documents separately by part, and this would lessen the burden of responding, the offer still stands.

Parties' Ltr. to Colin Kass
October 14, 2015
Page 5

### 6. Response regarding costs

It is our understanding that the Summit Group is requesting that the Parties agree to pay all costs (or agree to share a large percentage of the costs) ahead of any conversations with the Parties regarding the types of information that any entity may have (or not have), whether that information is readily accessible or already gathered, and without any individual discussion of what burden any particular entity may face.

As the Parties expressed during the summit, we are not opposed to having a conversation with any entity on costs or to discuss where cost-sharing may be appropriate. However, we believe the issue of costs is particular to each entity, and can only occur after the Parties have an opportunity to understand what each particular entity may or may not have, and any burden it alone may face.

We do not believe it is reasonable for any entity to refuse to provide written responses or objections or to refuse to engage with us in conversation based on a demand for up-front costs. We request that each entity confirm with us the types of information it may already have gathered and to what extent, such as productions previously made to the DOJ, or information gathered for other purposes, such as settlement negotiations.

### 7. Response regarding whether the Parties are willing to limit the requests based on location of manufacture or assembly

Plaintiffs' allegations center on claims of a worldwide conspiracy, bid rigging, and allocation of markets in the various markets for auto parts, that impacted prices paid for those parts, and that were passed on to purchasers in the prices that they paid for automobiles and other vehicles. Plaintiffs' claims are not limited to automobiles and vehicles manufactured or assembled in the United States. Defendants take an opposite position, and will need to defend against those claims. Under the circumstances, the Parties believe the information and documents requested are relevant to our claims and anticipated defenses within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure, and the Parties cannot agree to limit discovery sought based on location of manufacture or assembly.

We understand that not every entity will have responsive information to all requests or possess data and documents from the foreign entities within their corporate family. In that regard, we are willing to discuss tailoring the subpoena with each entity, based on the types of information each entity may possess (in line with each particular entity's position and role in the overall corporate structure).

### 8. Status of replacement part claims

We are still trying to confirm the status of whether any party is seeking data and documents regarding replacement parts. Certain public entity plaintiffs have asserted replacement part claims for wire harness products. We will provide this information as soon as it can be confirmed.

Parties' Ltr. to Colin Kass
October 14, 2015
Page 6

## MOVING FORWARD

We hope that the each member of the Summit Group will consider the proposals in this letter, and that each will cooperate with us in moving forward with a schedule for providing written responses and objections, and for meaningful meet and confer.  We ask that each entity in the Summit Group confirm if it is willing to work with us in this regard.  To the extent that any entity in the Summit Group will continue to put off written responses and objections and does not agree to move forward, we ask that this be confirmed as well.

Please let us know your response as quickly as possible, so that we may know how to move forward and/or can set a plan for briefing any disputed issues with the Special Master. Please feel free to contact us with any questions or if we can provide any further information.

Very truly yours,

/s/ *Ronnie S. Spiegel*

Ronnie S. Spiegel

**ATTACHMENT A**

| Case | Alleged conspiracy period |
|---|---|
| Air Conditioning Systems | 5/1/1999-until conspiracy ceased |
| Alternators & Starters (both products) | 6/1/2000- until conspiracy ceased |
| Anti-Vibration Rubber Parts (AVRP) | 3/1/1996- until conspiracy ceased |
| ATF Warmers | 11/1/2002- until conspiracy ceased |
| Automotive Hoses | 5/1/2003- until conspiracy ceased |
| Bearings | 1/1/2000- until conspiracy ceased |
| Brake Hoses | 2/1/2004- until conspiracy ceased |
| Constant Velocity Joint Boot | 1/1/2006- until conspiracy ceased |
| Electric Power Steering Assemblies (EPSA) | 1/1/2000- until conspiracy ceased |
| Fan Motors | 1/1/2000- until conspiracy ceased |
| Fuel Injection Systems/Air Flow Meters/Electronic Throttle Bodies (all three products) | 1/1/2000- until conspiracy ceased |
| Fuel Senders | 1/1/2001-until conspiracy ceased |
| HD Ballasts | 7/1/1998- until conspiracy ceased |
| Heater Control Panels | 1/1/2000-until conspiracy ceased |
| Ignition Coils | 1/1/2000- until conspiracy ceased |
| Instrument Panel Clusters | 1/1/2001- until conspiracy ceased |
| Inverters | 1/1/2000- until conspiracy ceased |
| Lamps | 7/1/2002- until conspiracy ceased |
| Motor Generators | 1/1/2000- until conspiracy ceased |
| Occupant Safety Systems (OSS) | 1/1/2003- until conspiracy ceased |
| Power Window Motors | 1/1/2000- until conspiracy ceased |
| Radiators | 1/1/2000- until conspiracy ceased |
| Spark Plugs | 1/1/2000- until conspiracy ceased |
| Steering Angle Sensors | 9/1/2000- until conspiracy ceased |
| Switches | 1/1/2000- until conspiracy ceased |
| Valve Timing Control Devices | 1/1/2000- until conspiracy ceased |
| Windshield Washers | 1/1/2000- until conspiracy ceased |
| Windshield Wipers | 1/1/2000- until conspiracy ceased |
| Wire Harnesses | 1/1/1999- until conspiracy ceased |

# EXHIBIT K



Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

October 29, 2015

Colin Kass
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

*Via Email*

Ronnie S. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
ronnie@hbsslaw.com

Re: *In re Automotive Parts Antitrust Litig.*, 2:12-md-02311

Dear Ronnie:

We write on behalf of the Specified Subpoenaed Entities in response to your October 14th letter.[1]  We too share your desire to cooperate and to quickly identify issues on which we cannot agree.  To that end, as we explain below, we believe the Parties and the SSEs should work towards a master document that sets forth our agreements as to any common issues, and identifies those areas in which we have reached impasse.  We undertake to address each of the points raised during our October 2nd Summit Conference and your October 14th letter.[2]

1.      ***The Parties' Failure to Justify Their Overwhelmingly Broad Subpoena***

As we mentioned at the Summit Conference, we believe that the Subpoena is facially unenforceable.  We explained our concerns about the extraordinary breadth of the subpoena, the undue burdens it imposes, and the need to develop a workable approach for identifying what, if any, information the Parties truly need but either do not have, or cannot obtain from any source other than the SSEs.  The law protects recipients of the subpoena, as non-parties, from being forced to undertake burdensome and costly efforts to compile information that is likely duplicative and at best of marginal relevance.  The Parties have elsewhere in this litigation admitted that "a party that seeks discovery from an unnamed, or 'absent,' class member has the burden to show the necessity of the proposed discovery," which requires that party to "affirmatively show that there is a particularized need' for such discovery."  Dkt. 338, 12-cv-102.  We therefore asked before, during and after the Summit Conference that the Parties reevaluate the subpoena in light of these principles – and in particular that the Parties identify

---

[1] The SSEs participating in the October 2nd Summit Conference, and who join this letter, are listed on Exhibit A.

[2] Again, this is not a comprehensive discussion of all objections to and issues with the Subpoena, and we do not waive any objections some of us have already formally preserved through written objections, and any objections we may raise in future written responses to the Subpoena.



Page 2

what specific information they genuinely need at this point in the litigation, and do not have and cannot get elsewhere.

You have not done this. In response, the Parties have made no meaningful effort to revise the subpoena or reduce the immense burdens it imposes. Rather than identify the information already in the Parties' possession and the missing information for which the Parties have a particularized need and cannot get elsewhere, the Parties take the position that every scrap of paper or bit of data that relates to the purchase of parts or the sale of cars in America is fair game.[3] We clearly do not agree. The Parties' approach is not proportional or fair. Furthermore, it is not consistent with applicable law, or even the positions the Parties themselves have previously taken in this litigation.

More importantly, because the Parties have not tried to justify the scope and breadth of the subpoena, it is difficult to constructively discuss what, if any, information ought to be produced under the rule of proportionality. *See* Fed. R. Civ. P. 26(b)(1), effective Dec. 1, 2015 (emphasizing that the "scope of discovery" is limited to that which is "proportional to the needs of the case"). We trust that, as our discussions proceed, the Parties will be more forthcoming about the information they currently possess and the basis for any contention of a particularized need.

2. ***Non-OEM SSEs***

During the Summit Conference, we noted that over half of the at least 90 "OEM" subpoenas were not actually issued to an OEM. To address this concern, we proposed that the Parties hold these subpoenas in abeyance until the scope of the subpoenas had been negotiated with the OEM SSEs. By doing so, both the Parties and all SSEs will better understand the (revised) scope of each request, and can then make a more reasoned determination of whether discovery from the non-OEM SSEs is likely to materially advance the Parties' ability to litigate their case.

You appear to have rejected this proposal. Instead, you have created approximately six sub-classes of non-OEM SSEs and demanded full compliance with various requests for each. This approach is flawed because it imposes huge burdens before any determination of what the Parties truly need and can obtain under Rule 45. That said, we understand that the Parties have now withdrawn all but the following requests for certain non-OEM SSEs. That, however, does not reflect a genuine effort to narrow the scope of the subpoena to the non-OEM SSEs. The requests you eliminated, given the nature of the operations of the non-OEM SSEs, should not reasonably have been served on the non-OEM SSEs in the first place. The bulk of the burden for these entities lies in the remaining requests for which no concession has been made.

---

[3] Your letter notes that "not all Parties join in" your proposals. Apart from one discrepancy, however, you did not identify the specific positions of each Party. Each Party seeking enforcement of a subpoena, however, bears the burden of justifying the request. Accordingly, we need to know precisely which Party is seeking enforcement of each particular request and the basis on which that party seeks to establish a particularized need.



Page 3

| Type of Entity | Parties' Proposed Scope of Subpoena |
|---|---|
| Truck and Equipment SSEs | Unspecified |
| Finance and Credit | Request Nos. 4(a)(3)(e), 4(a)(4), 4(a)(6), 4(b)(2)(d), 4(c), 4(c)(2)(e), 4(c)(2)(f), 4(d), 4(i), 4(k), 7, 9 (limited to summary transactional data and summary documents), 21, 29, 34, and 37 (as to Honda and Nissan) |
| Insurance | Request Nos. 4(b)(2)(e), 4(d), 4(k), and 9 (limited to summary transactional data and summary documents) |
| Design | Request Nos. 1(g)(6)-(8), 1(g)(17), 14(a), 27, 32, 33, 35, and 37 (as to Honda and Nissan) |
| R&D | Request Nos. 1(g)(6)-(9), 1(g)(17), 1(k), 1(j), 1(l), 4(h), 5, 8, 12, 13, 14, 15, 16, 17, 23(3)(a), 24, 26, 27, 28, 33, 35, and 36 |
| Banking and Capital | Request Nos. 9 (limited to summary transactional data and summary documents), 10, 11, 13(a-b), 14, 16, 17, 18, 19, 21, 33, 34, and 37 (applies only to Honda and Nissan) |

As to these remaining requests, many issues still need to be addressed, some of which we discuss below. Until you provide further clarity concerning the scope of these requests, agreement would be premature. For example, if it turns out that downstream discovery should not include financing costs (which are wholly unconnected to component part costs), then it would be absurd for the finance and credit SSEs to search for any information. Nonetheless, the non-OEM SSEs will continue to participate in these discussions, and we can further address which, if any, of the requests should apply to them as we finalize the scope of each request.

**3.**    *Smaller SSEs*

The Parties suggested limiting the subpoena to "smaller entities" with limited sales volume to Request Nos. 1, 3, 4, 5, 8, 12, 13, 14 (in part), 15 (in part), 21 (in part), 22, 23 (in part), 27, 28 (in part), and 33.[4] These limitations do little to alleviate the burden on the smaller SSEs. More importantly, the Parties have not demonstrated how *any* discovery from such

---

[4] We note that you have not identified the "parts" of the various requests for which you seek only partial responses.



Page 4

smaller entities is relevant and justifies the significant burden the subpoena imposes. Any data or documents produced by such smaller SSEs would likely have zero impact on any statistical or regression models relevant to any issue in this case.

Plaintiffs define "smaller" SSEs as "entities whose United States annual sales volume is less than 10,000 vehicles." This constitutes less than 6/100ths of 1% of the 18 *million* annual car sales in the U.S — a level that by any reasonable standard would have to be regarded as remarkably trivial. If an OEM has less than 5% of the U.S. vehicle market, it is unlikely to have any impact on your statistical models or any relevant issue in the case. Thus, we intend to include in the category of "Small U.S. Sales Volume" any SSE with less than 5% market share. The subpoenas to the smaller SSEs should be withdrawn, or held in abeyance, unless and until the relevance and statistical impact of such discovery from them is demonstrated.

**4.      *Foreign OEMs***

You acknowledge in your letter that most domestic non-OEM SSEs do not have data or information from foreign entities within their corporate family. Accordingly, the SSEs will continue to construe the subpoena as limited to seeking information in the possession of the specific subpoenaed entity relating to the purchase of relevant components in the United States for vehicles sold to dealers in the United States.[5]

**5.      *Upstream Purchasing Data***

During the Summit Conference, we explained that the subpoena requested huge amounts of purchasing data covering over 55 component parts and well over 140 suppliers. During the call, ***the Parties conceded they already possess the purchasing information from each of these 140 suppliers***. Nonetheless, you claimed that you may need more – namely, information from unidentified, non-conspirator component suppliers. We explained, however, that the non-conspirator component suppliers are unlikely to constitute a substantial portion of the market and would not be an appropriate benchmark for any pricing model you may develop in the future.[6] At the end of the call, our understanding was that you were going to take this issue under advisement and revise your proposal. Your October 14th letter, however, is silent on the issue. This non-response does not further constructive conversation on this topic.[7]

---

[5] As noted below, because broad-based discovery of downstream (and other non-purchasing data) unrelated to the purchase of components is not relevant and is unduly burdensome, the domestic non-OEM SSEs that are unaffiliated with a *properly* served foreign OEM SSE would be unlikely to have discoverable information. Assuming you agree, we would be happy to provide you with a list of all such domestic non-OEM SSEs.

[6] It should be noted that, while the Parties suggested that they intended to present a damages model using the non-conspirator pricing data as a benchmark, they have not actually presented an economist affidavit attesting to this approach. Moreover, such an approach would not only be uncommon, it is likely to be flawed since the prices of non-conspirators could also be impacted by a conspiracy that raises overall market prices. In any event, to the extent that the Parties intend to use pricing information from non-conspirator suppliers, they should subpoena such non-conspirators to obtain this information.

[7] It should be noted that, elsewhere, the Parties have represented that they "produced over 16 million pages of documents," and have "produced data on their own sales to OEMs in a limited number of actions." Dkt. 331, 12-cv-



Page 5

6.  *Upstream RFP Documents*.

The Parties have also failed to demonstrate, or even address, a particularized need for upstream documents. As we explained during the Summit Conference, evidence of the existence of a conspiracy is in the hands of the alleged conspirators themselves. Documents relating to any RFP process, meetings or communications among the conspiring suppliers, and their joint (or independent) responses to such RFPs, are uniquely within their possession. If the Parties cannot prove or disprove the existence of the conspiracy through the information they already have, it is highly unlikely that the information in the SSEs' possession will change that fact. As there has been no particularized showing of need, it would be unfair, unduly burdensome, and against the concept of proportionality to force the SSEs to expend time, effort, and resources searching for that information.

In that regard, we note that the Direct Purchaser Plaintiffs – who must actually prove the conspiracy – have not joined the subpoena. Certainly, if they do not need it, the indirect purchasers and the twice-removed indirect purchasers don't either.

The defendants, likewise, have not identified any purchasing information that is uniquely in the possession of the SSEs that will materially impact their defenses. Because the defendants were intimately involved in the component selection process – and would have been in constant communication with the OEMs – they already have vast amounts of knowledge concerning each particular bid. Any additional production by the SSEs would be unreasonably cumulative or duplicative of the information already available to or in the possession of the Parties.[8]

Moreover, even if there was *some* specific piece of information that the Parties lack, that would not justify a demand that each OEM conduct a search for that information. Putting aside that such information is not material, such particularized information is inconsistent with the class nature of the proceedings. Likewise, the defendants are not entitled to engage in absent class member discovery in an effort to litigate such individual issues at the class stage.[9] This is precisely why "a party that seeks discovery from an unnamed, or 'absent,' class member has the burden to show the necessity of the proposed discovery," and therefore, why the law requires it to "affirmatively show that there is a particularized need' for such discovery." Dkt. 338, 12-cv-102.

---

102; Dkt. 979, 12-md-2311. Obviously, the defendants should finish their production of all their sales data in all relevant actions before any Party demands that the SSEs undertake that effort.

[8] Again, the Parties have not disclosed whether they have already searched for and produced to each other all the bidding information in their own files. Certainly, until that has been complete, it is at best premature to ask the OEMs to "fill gaps" that likely do not exist.

[9] The only information that defendants identified during the Summit Conference that they did not have (or did not comprehensively have) was so-called "target prices" for bids. The existence of a target price, however, does not speak to whether the defendants conspired or what prices would have been absent the conspiracy. Indeed, the very purpose of keeping a target price confidential is the expectation that a competitive bidding process will result in a price below the target. Moreover, the target price itself may be infected by a long-running conspiracy to the extent that target prices are based on historical pricing. In any event, regardless of the "relevance" of target prices, it does not justify the breathtaking scope of the searches your subpoena contemplates.



Page 6

**7.**    *Downstream Sales Data*.

The Parties have also failed to address the downstream discovery issues that we raised during the Summit Conference.  As noted, your subpoena seeks virtually every piece of information bearing on the value, pricing, or nature of the transaction for every vehicle sold in America over the last 20 years.  This facially overbroad request would be unreasonable in any event, but here all the more so given the absence of any demonstrable showing of relevance – under the Special Master's prior orders – because the requests are not limited to information directly discussing the impact of component costs on vehicle pricing.  As the Parties have acknowledged, "downstream data [has been] already determined to be non-discoverable by the Special Master" each time that he has been presented with the issue.  Dkt. 338, 12-cv-102.  For example, the Special Master has already quashed requests seeking:

- "Financing and promotional" information

- "Dealer purchasing" information

- Dealership budgets and cost guidelines

- Dealer compensation, bonus, and fringe benefits.

- Vehicle gross profit, profit margin, operating profit, projected profit, net profit, and/or profit-and-loss statements, and month and annual sales and financial report[s] provided to an OEM.

*See* Dkts. 338, 331, 352, 12-cv-102.  These orders all came in the context of *party discovery*, which is not subject to the same limitations as non-party discovery.  Moreover, the burden contemplated here is multitudes greater, since the subpoenas facially cover every vehicle sold in America over the last 20 years.

That aside, the clear import of the Special Master's decisions is that downstream information that is not directly tied to component prices "is irrelevant, not likely to lead to the discovery of relevant information," and its production would be unduly "burdensome."  *Id.*

The Parties have made no showing to the contrary.  And as we explained during the Summit Conference, the downstream discovery you seek is neither necessary to litigate the case, nor likely to be useful.  On the call, the Parties suggested that they would like this information to build a complex, bottoms-up model of vehicle pricing as it goes from a pile of disparate components, to production of a vehicle, to delivery on the dealer's lot, and to the passage of title to the end customer or finance company.  The Parties, however, have not shown why such a model is necessary to litigate the case, let alone that any such model could ever be constructed (and we doubt it could).

The speculation by Parties' counsel that this information might nonetheless be useful for this purpose ignores how economists normally calculate damages in antitrust cases.  Generally, they run regressions.  But regressions do not need to include every piece of information to



Page 7

generate reliable results.[10]  In addition, because many of the OEMs have different systems and different availability of data, the concept of a bottoms-up model would appear unworkable because of the inevitable huge gaps and inconsistent datasets among all the OEMs.  The Parties have not shown that their experts cannot control for various "downstream" related factors just as well using publicly available, macro-economic indicators (such as interest rates) as by granular, vehicle-specific information that may, or may not, be captured by the OEMs' data systems.

When we explained these issues during the Summit Conference, the Parties had no response.  Instead, you requested the opportunity to confer with your group.  In light of these concerns, and despite our position that downstream data is irrelevant, we had expected you to present a narrowed proposal for downstream discovery that was more manageable, directly tied to the Parties' need and the pricing of components (the issue in the case), and likely to yield a consistent data set.  Instead, you remained silent on the issue.  Again, that is not a sufficient response to permit constructive discussion of these issues.

**8.      *Replacement Parts***

During the Summit Conference, we noted that the Parties appeared to have withdrawn their claims relating to replacement parts.[11]  In response, you state that certain unidentified public entity plaintiffs have asserted claims relating to replacement parts for wire harnesses.  But you have not identified whether "any party is [still] seeking data and documents [from the SSEs] regarding replacement parts."  Accordingly, until otherwise notified, we will deem Exhibit B to the subpoena withdrawn.

**9.      *Time Period***

During the Summit Conference, we noted that the subpoena sought documents and data for every component at issue and every vehicle sold in the United States over a 22-year time period.  In response, you offered to narrow the subpoena to about ***18 years*** for most components and all vehicles.  This continues to be unreasonably burdensome, especially in light of the Parties' failure to identify the particular information they already possess and the information

---

[10] Standard econometric texts explain that absent concerns about omitted variable bias – which is not present here because there is no showing that a finance variable (for example) are ***both*** correlated with the component costs (the variable of interest) and prices (the dependent variable) – there is no need to include every variable that may impact the price of a vehicle.

[11] *See* Hrg. Tr. 21-22 (Dkt. 892, 12-md-2311) ("THE COURT: So if I understand you correctly, the auto dealers in the wire harness … have dropped the aftermarket – the replacement parts claims  … those parts of their cases, okay, but the end payers have not?  MS. SULLIVAN: No, the end payers have as well in the wire harness case.  THE COURT: Okay. MS. SULLIVAN: So the question is whether they have also withdrawn or are intending to withdraw those claims in the other auto parts cases other than wire harnesses.  ….  MR. WILLIAMS: Good morning, Your Honor. Steve Williams for the end payers. It is good to see you again.  What Ms. Sullivan has said is correct, and we did confirm that with her this morning, that we are not pursuing claims for replacement parts, we are pursuing claims for people who purchased automobiles -- vehicles with price-fixed parts in them.  ….  I apologize if I was not clear but, yes, what I said about pursuing claims for people who purchased or leased automobiles with the price-fixed parts in them applies across the board to all the cases we presently have filed. ***We are not pursuing damage claims for replacement parts, only parts. THE COURT: In any of the cases? MR. WILLIAMS: Correct.***")



Page 8

needed.  The Parties have already admitted that "document requests ... covering a period of some fifteen years ... obviously raise both burden and relevance concerns."  Dkt. 347, 12-cv-102.  The subpoenas themselves also facially violate the Court's Order governing ESI, which precludes "a party" from seeking information that was "created more than five (5) years before the filing of the lawsuit."  *See* Model Discovery Order, § 2.04(f)(2).  This Order expressly applies to all subpoenas issued under Rule 45, absent "agreement ... with the nonparty."  *Id.* § 3.04.  Here, the Parties have not shown good cause for requiring the SSEs to search for more dated information.  The model order strikes a balance between burdens and benefits, recognizing that many cases involve historical facts.[12]  Accordingly, if any production of information is required, the time period should be limited to the period between January 2007 and the date of the subpoena, if information for this period is shown to be relevant and unavailable from other sources.[13]

**10.**   *Prioritization*

In your letter, you divvy up the subpoena into "first priority requests" and "second priority requests."  While you acknowledge that you "are willing to prioritize the subpoena requests," you do not indicate what you mean by that.  While we understand that you are not withdrawing the second priority requests with prejudice, we assume that you mean that such requests will be held in abeyance indefinitely, that the Parties do not have a *present* intention of seeking compliance with such requests, and that the SSEs do not need to comply with them absent a showing of good cause by the Parties.  If that is not correct, please let us know.[14]

You have also proposed that the Parties prioritize transaction data over non-transactional data.  We agree that non-transactional data is extremely burdensome to produce and unlikely to generate material, non-duplicative information.  Accordingly, we agree that the non-transactional-data requests should be held in abeyance in the same way as your second priority requests.

Your letter also reiterates your offer to "frontload production for cases that will come up first for class certification briefing."  As we have explained, however, the Parties and the SSEs need to develop an overarching plan for compliance with the subpoena.  Producing in piecemeal fashion would not, as you assert, "lessen the burden of responding to the subpoena."  That said, we expect that as each request is negotiated, the Parties may find that a more limited universe of information will satisfy any need.  To the extent appropriate, we may consider whether to first

---

[12] Your letter requests that the SSEs produce transaction data for the "before" period.  But the fact that DOJ plea agreements were limited in time does not mean that the conspiracy arose at that time.  Indeed, both the plea agreements and the Complaints allege that the conspiracies began "*at least as early as*" the stated period.  Thus, the Parties have not established that there is a "before" period that is not infected by the conspiracies.  As such, there is no reason for the SSEs to search that far back in time.

[13] Unlike document requests issued to parties, subpoenas are not continuing in nature.  Accordingly, the end date for any document production will be the date of service of the subpoena.

[14] We also believe that the following requests should be included in the second priority list as well if not withdrawn altogether:  Request Nos. 11 (inventory), 22 (communications with dealers), and 27 (data produced to regulators).



Page 9

pull information for one or more component parts.  We will need to address this, however, on a request-by-request basis.

**11.**   *Costs*

During the Summit Conference (and before), the SSEs made it clear that we will not expend time, effort, and resources searching for or producing documents absent the Parties' agreement to fully reimburse our costs of compliance.  As you know, the Federal Rules require that any order compelling production "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  Fed. R. Civ. P. 45(d)(2)(B).  In response, you say you are "not opposed to having a conversation … on costs or to discuss where cost-sharing may be appropriate," but do not commit to actually pay for any costs.  Instead, you assert that you "do not believe it would be reasonable" for any SSE "to refuse to engage in a conversation [on the scope of the subpoena] based on a demand for up-front costs."

The reason we raised the issue of costs was to have a "conversation … on costs," not to avoid one.  Contrary to your assertion, the SSEs have not "request[ed] that the Parties agree to pay all costs … ahead of any conversations with the Parties regarding" the scope of the subpoena.[15]  Indeed, the SSEs have led the substantive discussion concerning the scope of the subpoena from the outset, as evidenced by the Summit Conference and the subsequent correspondence.   More to the point, your assertion that you are not opposed to having a "conversation on costs," without actually indicating your position on the issue, does not advance the ball.

From the outset, our position on costs has been clear: we are not prepared to *search for or produce* responsive documents absent an agreement on costs.  Addressing this topic now is necessary because many courts have held that a subpoenaed entity's right to reimbursement (as opposed to the amount of the reimbursement) must be established – either by agreement or court order – prior to producing documents.  *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 221 F.R.D. 423, 426 (D.N.J. 2004).  That is why we have requested that the Parties agree to reimburse the SSEs for all costs, including all out-of-pocket costs and all attorneys' fees, and provide fair compensation for any additional employee resources that must be devoted to this project.  You have acknowledged that you may have some obligation to reimburse the SSEs for certain costs, but you have not presented any counter-proposal.  We look forward to hearing one.[16]

---

[15] The Parties played the same game in their September 28th letter, suggesting that the "Parties cannot agree … to make payment of costs a condition of the summit."  But the whole idea of a Summit Conference was our idea, and – unlike the Parties – we never conditioned our participation in the meeting on anything.  Rather, we specifically requested the Summit Conference to gain a "greater understanding of the Parties' needs" so as to "minimize [the] costs that the Parties" will need to reimburse.  *See* Sept. 17, 2015 Ltr. to S. Klein.

[16] In your September 28th letter, you assert that "discussion of costs is particular to each entity."  We do not agree.  While certain costs may be unique to certain SSEs, the general principles governing the cost reimbursement are common.  Certainly, you cannot contend that this subpoena – perhaps one of the broadest ever served – would not impose a "significant expense."  And the identification of categories of reimbursable expenses similarly raises common issues.



Page 10

**12.** *Path Forward*

We understand that the Parties would like to "mov[e] forward with a schedule for providing written responses and objections." While we are happy to discuss such a schedule, we think the better path forward is for the Parties and SSEs to work towards a final summary document that sets forth the agreements of the parties and clearly delineates any areas for which the Parties have reached impasse.

While some SSEs have already served objections, we believe that serving further objections prior to resolution of the high-level common issues presented in this letter would be counter-productive and likely generate disputes that might be avoided through further discussion. It is difficult to object to requests that remain a moving target. The Parties have already modified the relevant time period, withdrawn certain requests for Non-OEM SSEs and smaller SSEs, withdrawn all requests in Exhibit B, and held in abeyance many other requests. Are we supposed to object to the requests as originally written, which are no longer operative? Or should we object to the requests as modified? Moreover, we suspect that, as the process moves forward, further compromises on the high-level issues raised in this letter can be reached. Until we reach closure on these issues, written objections are premature. That said, if the Parties demand that the remaining SSEs serve objections to the subpoena's requests as written, we will do so. We do not believe, however, that the service of objections and responses should curtail further joint discussion of common issues, many of which remain to be discussed.

One final but important note: As we previously explained, the Summit Conference was designed to identify certain high-level issues that needed to be addressed before getting into the weeds on specific requests, many of which are incredibly overbroad, bear no apparent relation to the Parties' needs, and give no consideration to the burden they impose on the SSEs. These high level issues – particularly relating to the scope of upstream and downstream discovery – need to be addressed before moving to the minutia of the wording of specific requests. Once these issues are resolved (or when the Parties have reached an impasse), we can discuss the remaining common concerns on a request-by-request basis, although we would hope that resolution of the high-level issues would moot many of the concerns about the specific wording of the requests.[17]

\*          \*          \*

---

[17] For instance, these common concerns likely include confidentiality and the scope of the protective order. Such common concerns would not preclude individual SSEs from asserting any objections to the subpoena at an appropriate time. To the extent certain SSEs have not yet served objections (based on the indefinite extensions the Parties granted at the outset), the SSEs remain open to discussing the timing of such objections.



Page 11

 We trust that the path forward that we have outlined above will enable the Parties to quickly reach compromise on the scope of the subpoena, or failing that, to clarify any areas of actual remaining dispute.  We look forward to your response.

 Sincerely,

 *Colin Kass*



Page 12

**<u>Exhibit A: SSE Entities</u>**

- Chrysler entities (FCA US LLC; Maserati N.A., Inc.; Fiat Finance North America, Inc.; Chrysler Transport Inc.)

- Toyota entities (Toyota Motor North America, Inc.; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Manufacturing Alabama, Inc.; Toyota Motor Manufacturing Indiana, Inc.; Toyota Motor Manufacturing Kentucky, Inc.; Toyota Motor Manufacturing Mississippi, Inc.; Toyota Motor Manufacturing Texas, Inc.; Toyota Motor Manufacturing West Virginia, Inc.; Toyota Logistics Services, Inc.; Calty Design Research, Inc.; Hino Motors Manufacturing U.S.A., Inc.)

- BMW entities (BMW of North America, LLC; BMW Manufacturing Co., LLC; BMW Financial Services NA, LLC; BMW (US) Holding Corp.; BMW Bank of North America; BMW Insurance Agency, Inc.; BMW US Capital, LLC; Designworks/USA, Inc.)

- Porsche Cars North America, Inc.

- Hyundai / Kia entities (Hyundai Capital America; Hyundai Motor America; Hyundai Motor Manufacturing Alabama, LLC; Hyundai America Technical Center, Inc.; Kia Motors Manufacturing Georgia, Inc.; Kia Motors America, Inc.; Hyundai Autoever America, LLC)

- GM entities (General Motors Company; General Motors Financial Company, Inc.; General Motors Holdings LLC; General Motors LLC)

- VW entities (Volkswagen Group of America, Inc., also d/b/a Audi of America LLC; Volkswagen Group of America Chattanooga Operations LLC; Volkswagen Credit Inc.; Automobili Lamborghini America LLC; Bentley Motors, Inc.)

- Nissan entities (Nissan North America, Inc.; Nissan Design America, Inc.; Nissan Technical Center North America, Inc.; Nissan Diesel America, Inc.; Nissan Motor Acceptance Corporation)

- Honda entities (American Honda Motor Co., Inc.; American Honda Finance Corp.; Honda Manufacturing of Indiana, LLC; Honda North America, Inc.; Honda of America Mfg., Inc.; Honda of South Carolina Mfg., Inc.; Honda Precision Parts of Georgia, LLC; Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Honda Transmission Manufacturing of America, Inc.)

- Rolls-Royce Motor Cars NA, LLC

- Jaguar Land Rover North America, LLC

Proskauer ≫

Page 13

- Volvo Cars of North America, LLC

- Subaru entities (Subaru of America, Inc.; Subaru Leasing Corp.; Fuji Heavy Industries U.S.A., Inc.; Subaru of Indiana Automotive, Inc.)

- Aston Martin entities (Aston Martin Lagonda of North America, Inc.; Aston Martin Lagonda Limited)

- Daimler entities (Daimler North America Corporation (MI); Daimler North America Corporation (NJ); Daimler Purchasing Coordination Corporation; Daimler Trucks North America LLC; Daimler Vans Manufacturing, LLC; Daimler Vans USA LLC; Freightliner Custom Chassis Corporation MB-Technology NA LLC; Mercedes-Benz Advanced Design of North America Inc.; Mercedes-Benz Credit Corporation; Mercedes-Benz Financial Services USA LLC; Mercedes-Benz Research & Development North America, Inc. (CA); Mercedes-Benz Research & Development North America, Inc. (MI); Mercedes-Benz U.S. International, Inc.; Mercedes-Benz USA, LLC; Mitsubishi Fuso Truck of America, Inc.; Thomas Built Buses, Inc.; Western Star Trucks Sales, Inc.)

# EXHIBIT L



**BUTZEL LONG**
ATTORNEYS AND COUNSELORS

*a professional corporation*

Sheldon H. Klein
**248 258 1414**
klein@butzel.com

Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
**T:** 248 258 1616  **F:** 248 258 1439
**butzel.com**

November 24, 2015

**VIA EMAIL**
Colin Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Suite 600 South
Washington, DC  20004-2533

Re:     *In re Automotive Parts Antitrust Litigation.*, 2:12-md-02311

Dear Colin:

We write on behalf of the Parties[1] in response to the Specified Subpoenaed Entities' (the "SSE"s)[2] letter dated October 29, 2015 (the "October Letter").   As you know, the class certification schedule in this litigation requires that opening briefs be filed within the next ten months for three separate part[3] cases (the "Lead Three" cases).   With this deadline in mind, the Parties have endeavored to significantly narrow the scope of the Subpoena[4] in an effort to reach a timely compromise and advance this process expeditiously.   Our proposal is narrowly tailored to seek information that is highly relevant to class certification while minimizing the burden imposed on the SSEs.   We ask that you carefully consider this proposal and engage us in a meaningful discussion regarding these matters so that we can proceed to a prompt resolution.

1.       **Prioritization**

The Parties, with input from their economic experts, have significantly narrowed the scope of the Subpoena.   Below please find a chart setting forth a narrowed set of requests the

---

[1] The serving parties, herein the "Parties," "we," or "our," include:  End Payor Plaintiffs (EPPs); Auto Dealer Plaintiffs (ADPs); Truck and Equipment Dealer Plaintiffs (TEDPs); the State of Florida; the State of Indiana; and Defendants in all actions.  However please note not all parties join all requests.
[2] The term "SSEs," "you," or "your," refers to those subpoenaed entities that joined the October Letter.
[3] Wire Harnesses, Bearings, and Anti-Vibrational Rubber Parts.
[4] The term "Subpoena" refers to those subpoenas served on the SSEs by the Parties across all product tracks within the MDL (No. 2:12-md-02311).

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

Parties consider essential in connection with upcoming class certification motions (the "Narrow Requests"). The Parties are willing to hold all other requests in abeyance.[5]

The information sought in the Narrow Requests includes both transactional and non-transactional data. We do not agree with your assertion that documents other than transactional data are "unlikely to produce material, non-duplicative information." October Letter, at 8. As explained in greater detail below, SSEs are "uniquely in possession" of key documents which are highly material to the Parties' claims and defenses.

Nevertheless, in order to significantly reduce the burden imposed by requests that seek non-transactional data,[6] we have expressly narrowed several of those requests so that, if it is less burdensome to the SSEs to do so, they may exclude information that is already in the Parties' possession. In addition, we reiterate our suggestion that, to the extent it is less burdensome to do so, SSEs first produce documents concerning procurement of parts concerning the parts at issue in the Lead Three cases, which will be considered for class certification in 2016.

| Narrow Requests | | |
|---|---|---|
| **Category** | **Example of Type of Information Sought** | **Narrow Requests** |
| Injury, if any, to OEMs<br><br>*This information is relevant to determining what overcharge, if any, was borne by OEMs.* | Pricing Decisions and Negotiations<br><br>*Parties seek information to determine how OEMs negotiate and affect the pricing of parts. Information potentially relevant to this inquiry includes, but is not limited to, information regarding the RFQ process for each part. For example, documents showing how a "target" price for an RFQ was determined; documents showing and describing the negotiation process for RFQs; documents showing the criteria for awarding an RFQ.* | 1(e)-(f)[7]; 1(g); 1(l); 14(c); 28 (last two sentences); 30; 33 (comparing the same components made by different suppliers) |

---

[5] The term "abeyance" in this letter means that the Parties would not seek further production except for substantial cause.

[6] Since we do not have specific information about the systems and practices of particular SSEs, we assume for present purposes that non-transactional information may be more burdensome to produce than transactional data. However, we believe that is a broad generalization that does not always apply. For example, we understand that some SSEs maintain RFPs, responses and related communications in electronic databases.

[7] References to subparts of requests incorporate the introductory clause(s).

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

| Injury, if any, to OEMs | Cost-down Reductions | 1(g) and 23(2) |
|---|---|---|
| *This information is relevant to determining what overcharge, if any, was borne by OEMs.* | *Parties seek information regarding cost reductions which occur after an RFQ is awarded. This information includes, but is not limited to, information regarding post award price changes, including due to design changes, changes in volume or production location, annual price reductions, long term cost-cutting initiatives, or any regular processes for adjusting post-RFQ pricing.* | |
| Injury, if any, to OEMs | Transactional Data (Purchases) | 1(a)-(d) |
| *This information is relevant to determining what overcharge, if any, was borne by OEMs.* | *Parties seek information to determine the net price paid (i.e., including the terms and conditions of each purchase) for parts by OEMs. Information which is potentially relevant to this inquiry includes, but is not limited to, any adjustment made to the purchase prices (e.g., rebates, credits, and discounts), taxes, financing, and shipping and freight costs.* | |
| Injury, if any, to OEMs | Agreements and Terms with Suppliers | 3 |
| *This information is relevant to determining what overcharge, if any, was borne by OEMs.* | *Parties seek documents showing agreements reached with parts suppliers. These documents may include, but are not limited to, Memoranda of Understanding, Master Purchasing Agreements, Component Purchasing Agreements, Long Term Agreements and Purchase Orders and standard Purchase Order terms and conditions, as they may be modified in particular instances.* | |
| Injury, if any, to ADPs and TEDPs | Transactional Data (Sales) | 4(a)1-2, 4(a)3(a)-(e);4(a)3(h), (j); 4(a)3(k); 4(a)4; 4(a)(7); 4(a)8; 4(a)(12) (if in |
| *This information is relevant to determining what alleged overcharge, if any, was borne by ADPs and TEDPs.* | *Parties seek information regarding terms of sale of OEM vehicles, including, but not limited to, the invoice price of a vehicle, any adjustments to the invoice price (e.g., rebates, credits, and discounts), taxes, floor plan financing, bill of materials and input costs, and shipping and freight costs. In addition,* | |

**BUTZEL LONG**

page 3

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

| | | |
|---|---|---|
| | *parties also seek information regarding OEMs' profit margins.* | data field); 4(a)13; 4(e); 4(j); and 5 |
| Injury, if any, to ADPs, TEDPs, and to End-Purchasers<br><br>*This information is relevant to determining what alleged overcharge, if any, was borne by ADPs, TEDPs, and End-Purchasers.* | Vehicle Pricing Practices<br><br>*Parties seek information regarding how OEMs price their vehicles.  Information which is potentially relevant to this inquiry includes, but is not limited to, policies regarding MSRP, "sticker" or invoice prices, documents showing the effect of competitors' vehicle pricing, documents showing whether, and if so how, changes in input costs affect MSRP, "sticker" or invoice prices.* | 1(f); 4(h); 13a; 15; and 22 |
| Injury, if any, to ADPs and TEDPs<br><br>*This information is relevant to determining what alleged overcharge, if any, was borne by ADPs and TEDPs.* | Effects of Component Parts Prices to Vehicles Prices<br><br>*Parties seek information which will enable them to track a component part after it is installed in a vehicle, and its effect, if any, on the price of the vehicle. Information which is potentially relevant to this request includes, but is not limited to, efforts to track each part after it has been installed in a vehicle.  In addition, any studies regarding how the cost of component parts is calculated, or otherwise influences, the ultimate price of a vehicle.*<br>*It is also important for our experts to be able to obtain data that links component parts to the vehicle or models in which they are installed.* | 1(m); 13b; and 16 |

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

| Injury, if any, to End Purchasers<br><br>*This information is relevant to determining what alleged overcharge, if any, was borne by End Purchasers.* | Sales to End-Purchasers<br><br>*Parties seek information regarding the terms of the sale of the new vehicles to End Purchasers. Information potentially relevant to this inquiry includes, but is not limited to, the terms and conditions of the sale of the vehicle (including, but not limited to, the nominal unit price of the vehicle, trade in credit versus trade in value, financing terms, rebates, add-ons, etc.).* | 4(b)1;<br>4(b) 2(a)-(e);<br>and<br>34 |
| Documents previously produced by SSEs to regulatory authorities<br><br>*This information, to the extent it is already compiled, would relieve any burden regarding new search and production for the same data.* | | 27 |
| Documents concerning discussions with Defendants and other suppliers regarding the conspiratorial conduct alleged in this MDL. | *Plaintiffs seek information regarding communications between OEMs and suppliers regarding the conduct alleged in this MDL to understand the conspiracy and how it affected and was viewed by the victims Defendants identified in their plea agreements.* | 31[8] |

---

[8] Defendants object to Request 31 on the ground that it seeks documents which Defendants believe are protected by the settlement-communications privilege.  *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003); *PVMI Int3d 976 (6th Cir. 2*, No. 13-14775, slip op. at 2 (E.D. Mich. June 22, 2015) (quoting *Graff v. Haverhill North Coke Co.*, 2012 WL 5495514, at *32 (S.D. Ohio Nov. 13, 2012)); *see also Snap-On Bus. Solutions, Inc. v. Hyundai Motor Am.*, 2011 WL 6957594, at *1 n.2 (N.D. Ohio Feb. 3, 2011).  Plaintiffs believe that the documents are not privileged and are discoverable.  *State v. Little River Band of Ottawa Indians*, 2007 WL 851282, at *2 (W.D. Mich. 2007); *see also Goodyear*, 332 F.3d at 980; *Transportation Alliance Bank, Inc. v. Arrow Trucking Co.*, 2011 WL 4964034, at * 1 (N.D. Oklahoma 2011).

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

### 2.     Non-manufacturing, or "Non-OEM," SSEs

The Narrow Requests no longer include most of the requests seeking information likely to be maintained by non-manufacturing SSEs. That said, only individual SSEs can speak to their own ability to provide the information sought in the Narrow Requests. At this point, we request that SSEs inform us which, if any, "non-OEM SSEs" are not in possession of any information responsive to the Narrow Requests. Should any "non-OEM SSE" certify that it does not have any such responsive information, requests to that SSE will be held in abeyance.

However, certain requests seeking information from finance and credit entities remain a priority for Defendants and End-Payors because they bear directly on Defendants' position regarding the impact of dealer and consumer financing terms on questions of impact and injury.

### 3.     Smaller OEMs

SSEs suggest that the Subpoena be withdrawn or held in abeyance for any OEM whose sales constitute less than 5% of the U.S. Vehicle Sales market. We cannot agree to an arbitrary 5% market share cut-off. 5% equates to approximately 750,000 vehicles per year, which is far from a "small" OEM. The U.S. Vehicle Sales market is highly competitive and most OEMs operating within that market do not have more than a 5% market share. *See*, *e.g.*, THE WALL STREET JOURNAL, http://online.wsj.com/mdc/public/page/2_3022-autosales.html#autosalesA (last visited Nov. 7, 2015). For example, in 2014, approximately thirty OEMs accounted for all U.S. Vehicle Sales. *See id.* Of those, twenty-four had less than a 5% market share. *See id.* Moreover, SSEs' proposal does not account for the fact that OEMs' market shares varied over the relevant time period.

An arbitrary 5% cut-off would also exclude OEMs highly relevant to this litigation. Under SSEs' proposal, the subpoenas served on all Subaru, Hyundai and Kia entities – which in the aggregate constitute more than 10% of the market – would have to be withdrawn or held in abeyance. *See id.* (indicating that in 2014 Hyundai had 4.4% market share; Kia had 3.6% market share; and Subaru had 3.2% market share). However, each of those OEMs is mentioned in at least one Department of Justice Press Release regarding the sale of price-fixed component parts. *See*, *e.g.*, The U.S. Dept. of Justice, http://www.justice.gov/archive/justice-news-archive.html (last visited Nov. 7, 2015).

Nevertheless, the Parties are mindful of striking a balance between the discovery of highly relevant information and minimizing burden for third parties. Accordingly, we propose holding in abeyance the subpoenas for the following SSEs: Rolls-Royce Motors Cars NA, LLC; and Maserati N.A., Inc.

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

**4.      Foreign OEMs**

The Parties do not agree that the Subpoena should be construed "as limited to seeking information in the possession of the specific subpoenaed entity relating to the purchase of relevant components in the United States for vehicles sold to dealers in the United States." October Letter, at 4.  In an effort to move forward in a productive and efficient manner, we agree that the Subpoena seeks only the production of documents and data that are within the SSEs' possession, custody and/or control, but we do not agree to exclude data or documents based on geographic location of part purchase, manufacture, assembly, or sale.

**5.      Purchasing Data**

Critical pieces of purchasing data are solely within the SSEs' possession and we reject any assertions to the contrary.  First, the Parties do not have access to SSEs' purchasing data from non-Defendant suppliers.  Second, component suppliers' data generally do not include the OEMs' part numbers, which are critical to any analysis of the transaction data.

In your letter, you state that "[non-defendant] suppliers are unlikely to constitute a substantial portion of the market and would not be an appropriate benchmark for any pricing model." October Letter, at 4.  This is incorrect.  In the case of certain relevant component parts, including among the Lead Three cases, certain parties believe there are OEMs that were not supplied by any of the named Defendants.  Likewise, we believe that there are suppliers for most of the relevant component parts that are not among the named Defendants.  In any event, we believe that the Parties' economic experts are in the best position to comment on whether non-Defendant suppliers can serve as an appropriate benchmark for any pricing model.  Furthermore, this requires analysis that cannot be done without looking at the underlying data − data uniquely in the possession of OEMs, including the SSEs.

Lastly, the Parties note that, at least with respect to transactional data, it is unlikely to be more burdensome for SSEs to produce information for both non-Defendant suppliers and Defendant suppliers together than to produce information for non-Defendant suppliers alone.  In fact, it is likely less burdensome to produce information for both Defendant and non-Defendant suppliers together given that efforts to narrow the production would not be necessary (*e.g.*, selective production, redaction, etc.).  SSEs should therefore agree to produce their purchasing data from both Defendant and non-Defendant suppliers.

**6.      RFQ Documents**

Request for quotation ("RFQ") documents and other documents evidencing SSEs' upstream purchases are highly relevant to this litigation and often "uniquely in your possession" (including, but not limited to, documents containing information regarding "target prices," internal discussions regarding an RFQ, the internal approval process for an RFQ, the number and

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

identity of suppliers receiving a given RFQ and submitting bids for a part in response, the internal guidelines that SSEs used to evaluate and pick a winning bidder, and the motivations behind any post-award price and specification adjustments). Such information is highly relevant to determining whether there was an overcharge, and, if so, its size.

You note that Direct Purchaser Plaintiffs ("DPPs") have not joined the Subpoena. First, DPPs are not parties in two-thirds of the product tracks in the MDL. Second, the fact that DPPs have not joined the Subpoena is irrelevant to the SSEs' obligations under the Subpoena. The information sought in the Subpoena is necessary for the litigation of the EPPs, ADPs, TEDPs, the State of Florida, and the State of Indiana's cases regardless of whether DPPs join the Subpoena or not. It is also critical to the defenses of Defendants across all parts cases.

Nevertheless, as stated above, the Parties are mindful of striking a balance between discovery of highly relevant information and minimizing the burden for the SSEs. Accordingly, to the extent it is less burdensome, the Parties are willing to accept an initial production of RFQ documents relevant to the Lead Three cases, which are scheduled to go through the class certification process first, *i.e.*, those related to the following three component parts: Wire Harness Products, Bearings, and Anti-Vibrational Rubber Parts. We are willing to discuss an appropriate staggered schedule for the production of RFQ documents with respect to all other component parts in light of the procedural postures of those cases.

## 7.    Sales Data

The Master has not ruled on production of sales data from OEMs. Retail-level sales data will be used by End-Payors to evaluate damages and by Defendants to assert a pass-on defense. Without detailed sales data, experts will not be able to effectively isolate the effects that a change in a particular component's price had on a vehicle's price from that of any other component at issue in the MDL. This is information of which only OEMs are in possession. SSEs' contention that experts can control various "downstream" related factors by using publicly available, macro-economic indicators ignores the nature of this MDL.

## 8.    Replacement Parts

All Plaintiffs have agreed that they will not pursue claims for replacement parts. Accordingly, we confirm that Exhibit B to the Subpoena is withdrawn.

## 9.    Time Period

The temporal scope of the Subpoena cannot be narrowed as you suggest. The Parties are bound by the allegations in the operative complaints describing the length of the conspiracy and therefore cannot agree to a narrower time period. In order to advance your argument, you rely on a Model Discovery Order that is not an order in this case. The Court has entered various Stipulations and Orders Regarding Production of Electronically Stored Information and Hard

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

Copy Documents in the parts cases in this MDL. *See* Stipulation and Order Regarding Production of Electronically Stored Information and Hard Copy Documents (12-cv-100; ECF No. 114) (Nov. 15, 2012); (12-cv-200; ECF No. 34) (Sept. 25, 2012); (12-cv-300; ECF No. 33) (Sept. 25, 2012); (12-cv-400; ECF No. 29) (Sept. 25, 2012); (12-cv-500; ECF No. 87) (Mar. 13, 2013); (12-cv-600, ECF No. 78) (Mar. 13, 2013). None of these orders preclude a party from seeking information created more than five years before the filing of the lawsuit. *See id.*

**10. Costs**

As the Parties have stated several times, most recently in our October 14, 2015 correspondence, we are available to discuss, with each SSE, whatever cost-sharing may be appropriate once each SSE has had an opportunity to determine what responsive information is in its possession and what reasonable costs will be associated with its production. However, none of the SSEs have presented the Parties with this information to date. Your assertion that our failure to indicate our position on this issue does not "advance the ball" is without merit, as we are unable to engage in a productive conversation about costs or present a proposal without the requisite information from each SSE. Notably, courts have held that it is the burden of subpoenaed entities to present a cost estimate before it can be determined whether the expense is significant enough to warrant cost-shifting. *See United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL 4513600 at *7 (E.D. Mich. October 1, 2012) (ordering the subpoenaed entities to provide detailed estimates of the reasonable costs that they will incur to comply with Plaintiff's subpoenas so that the Court can determine whether the costs are significant, and if they are, whether any amount should be shifted to Plaintiff). Your suggestion that we present a proposal at this time improperly shifts this burden, and the Parties are not in a position to do so until each SSE presents this cost-related information.

You also indicate that the SSEs "will not expend time, effort, and resources searching for or producing documents absent the Parties' agreement to fully reimburse [SSEs'] costs." October Letter, at 9. Your legal obligation to comply with the Subpoena and produce relevant information, however, is not conditioned on guaranteed reimbursement of cost. Cost-shifting can be granted by courts, but in doing so the courts take into consideration a variety of factors including, but not limited to, the subpoenaed entity's interest in the outcome of the case, whether the subpoenaed entity can more readily bear the cost of production, and whether the litigation is of public importance. *See id.*, at *3.

Therefore, your unwillingness to produce, or even search for, responsive documents absent an agreement on costs is unreasonable. The Parties' contribution to each SSE's costs will be highly dependent on the results of these searches and productions, and a variety of other factors that we cannot ascertain at this time.

In addition, to get a better understanding of what costs may be involved, and to attempt to minimize costs and burden, the Parties have requested that the SSEs confirm if they have made productions to the DOJ or any other regulatory authorities, and to confirm whether they will

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

provide those productions to the Parties.  The Parties again request that the SSEs provide this information.

To be clear, the Parties are not opposed to reimbursing SSEs' reasonable costs associated with production, following further discussions about the burden and resources required to collect and produce data and documents responsive to the Narrow Requests.  However, the case law does not permit SSEs to hold up further discussions or document production pending a final agreement with the Parties on cost-shifting.

**11.    Path Forward**

We request that you carefully review our proposal and reply with a document setting out areas of agreement and areas where we have reached impasse.

We look forward to your response.

Sincerely,

BUTZEL LONG

*/s/ Sheldon Klein*

Sheldon H. Klein

SHK:dll

cc (via email):  Counsel for all Parties

BUTZEL LONG

# EXHIBIT M

 Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

December 18, 2015

Colin Kass
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

***Via Email***

Sheldon H. Klein
Butzel Long
Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
klein@butzel.com

Re: *In re Automotive Parts Antitrust Litig.*, 2:12-md-02311

Dear Sheldon:

We write on behalf of the Specified Subpoenaed Entities ("SSE") in response to your November 24, 2015 letter.  As you requested, we have carefully considered your proposal.

Unfortunately, we do not agree that your proposal has "significantly narrowed the scope of the subpoena."  While you have withdrawn a number of duplicative and tangential requests, such modifications appear to be more window dressing than substantive limitations or compromises.[1]  For example, you have withdrawn Request (4)(a)(6), which asks for "monetary components of [downstream] transaction[s] beyond unit price," but you continue to seek identical information in Request 4(e).  Likewise, you withdrew Request 2, which seeks information about every RFP each OEM issued over the last 20 years, yet you continue to seek the same information in Request 1(g), which is even broader.  Most of the other requests you have withdrawn are similarly duplicative of other much broader requests you continue to assert.  More fundamentally, the Parties still fail to justify their requests, continue to seek information that is already in their possession, and continue to disregard the substantial burden the subpoena imposes on the SSEs, which are non-parties to the litigation.

Nonetheless, in the spirit of compromise, we present an offer of production below, which should satisfy the Parties' need for information consistent with the rule of proportionality.  In sum, contingent on reaching a comprehensive agreement on the scope of the subpoena and the payment of costs, and subject to the terms and details below, the OEM SSEs (as identified in footnote 17) are prepared to produce (i) reasonably-accessible transactional data (or the closest equivalent kept in the ordinary course of business) showing the specific components purchased

---

[1] Based on your October 14th and November 24th letters, we understand the following requests to be held in abeyance: 1(h)-(k); 2; 4(a)(3)(f)-(g), (i); 4(a)(5)-(6), (9)-(11); 4(c)-(d), (f)-(g), (i)-(l); 6-12; 14(a)-(b), (d)-(j); 17-21; 23(1), (3)-(5); 24-26; 28 (first sentence); 29; 32; 35; and Attachment B.



Page 2

from a reasonable number of non-Defendant component suppliers, to be negotiated with the Parties, for up to the last 10 years; and (ii) reasonably accessible information setting forth the MSRPs for select vehicles or categories of vehicle, to be negotiated with the Parties, that each OEM sold for up to the past 10 years, with the form and format of production to be determined. The SSEs that have made productions to the DOJ concerning the issues in this case will also produce to the parties the purchasing and MSRP data specified above that was part of any production to the DOJ.[2]

We trust that this offer will adequately address the Parties' needs. For completeness, however, we discuss the specific issues raised in our prior correspondence in greater detail.

1.     ***Non-OEM SSEs[3]***

As noted in our prior letter, over half of the subpoenaed SSEs are not OEMs. We suggested that the subpoena be held in abeyance as to such entities. In response, you assert that the Parties will only hold a subpoena in "abeyance" if the SSE "certif[ies] that it does not have any … responsive information." That is a non-sequitur. If an SSE does not have any responsive information, then you are not holding the subpoena in "abeyance," you are demanding and receiving full compliance with it.

Your letter also fails to address the fundamental issue the non-OEM SSEs raised: they have little, if any, information that is relevant or that justifies the substantial burden you seek to impose on them. As you know, the amendments to the Federal Rules of Civil Procedure became effective on December 1, 2015, and require the Parties to substantiate their requests under the rule of proportionality. The Parties have made no effort to satisfy this burden.

We understand the following requests to still be at issue for the non-OEM SSEs, and that all other requests related to these SSEs have now been withdrawn[4]:

| Type of Entity | Parties' "Narrowed Requests" |
|---|---|
| Truck and Equipment SSEs | ---- |

---

[2] Any offer of production made in this letter is expressly contingent on reaching a comprehensive agreement with the Parties concerning the scope of the subpoena, including issues such as the reimbursement of costs and the scope of the protective order. The SSEs reserve their right to object to, oppose, or quash any or all portions of the subpoena absent a comprehensive agreement.

[3] We note that a number of the non-OEM SSEs, including Chrysler Transport Inc., Toyota Logistics Services, Inc., Hyundai Autoever America, LLC, and Subaru Leasing Corp., do not fit into the six categories you identified in your October 14th letter. The subpoena should be held in abeyance for such entities. Absent a further showing of relevance and need, these non-OEM SSEs do not intend to search for and produce information in response to the subpoena.

[4] The chart reflects the intersection of the Parties' October 14th letter, which identifies the information then being requested for each types of non-OEM SSE, and the Parties' November 24th letter, which holds in abeyance certain of those requests.



Page 3

| Type of Entity | Parties' "Narrowed Requests" |
|---|---|
| Insurance | Request No. 4(b)(2)(e) |
| Finance and Credit | Request Nos. 4(a)(3)(e), 4(a)(4), 4(b)(2)(d), and 34 |
| Banking and Capital | Request 13(a-b), 14(c), 16, 33, and 34 |
| R&D | Request Nos. 1(g)(6)-(9), 1(g)(17), 1(l), 4(h), 5, 13, 14(c), 15, 16, 27, 28, and 33 |
| Design | Request Nos. 1(g)(6)-(8), 1(g)(17), 27, and 33 |

For clarity, we will discuss each type of non-OEM separately.

A.      Truck and Equipment SSEs[5]

In your October 14th letter, you noted that the Parties were "prepared to discuss appropriate criteria for the truck and equipment entities." Accordingly, we had understood our October 29th letter to be requesting the Parties to specifically identify which, if any, requests they are continuing to press. Your November 24th letter does not address this issue. Accordingly, unless we hear otherwise, the Truck and Equipment SSEs will deem the subpoena held in abeyance in its entirety.

B.      Insurance SSEs[6]

For the Insurance SSEs, the Parties continue to seek compliance with Request 4(b)(2)(e), which seeks "monetary components beyond unit price … and non-monetary components of … the sale [or lease]  to the retail purchaser distinct from net sale price."[7]   The Parties, however, have not presented any basis – let alone a good faith basis – for asserting that insurance prices or any other insurance-related non-monetary component of retail car purchases were affected by the Defendants' conspiracies to fix the prices of vehicle components. How, for example, is the price

---

[5] The Truck and Equipment SSEs include: Hino Motors Manufacturing U.S.A., Inc.; Nissan Diesel America, Inc. (sold to AB Volvo in 2006 and now known as UD Trucks Corp. – to our knowledge not a subpoenaed entity); Daimler Trucks North America LLC; Daimler Vans Manufacturing, LLC; Daimler Vans USA LLC; Freightliner Custom Chassis Corporation; Mitsubishi Fuso Truck of America, Inc.; Thomas Built Buses, Inc.; Western Star Trucks Sales, Inc.; and Fuji Heavy Industries U.S.A., Inc.

[6] The Insurance SSEs are limited to BMW Insurance Agency, Inc., which, as the Subpoenaing Parties were advised in August, is solely an insurance broker, selling affinity personal automobile liability insurance that is underwritten and provided by Liberty Mutual Insurance Company.  BMW Insurance Agency, Inc. does not determine the terms or pricing of the insurance policies it sells.

[7] We assume that this request has no relevance to the Auto Dealer Plaintiffs, Truck and Equipment Dealer Plaintiffs, and the Public Entity Plaintiffs, and thus, such plaintiffs are not seeking enforcement of the subpoena with respect to the Insurance SSEs.  If that is not correct, please let us know.



Page 4

of a wire or a piece of rubber supposed to have altered the price that a consumer pays for insurance or changed the amount of coverage that the consumer obtains? Indeed, any argument that the conspiracies had such an effect would be preposterous in light of the highly competitive and fragmented market for insurance. Thus, absent a sufficient showing that the conspiracy is likely to have had such an effect, the subpoena is overbroad and unenforceable. Accordingly, absent a further showing of relevance and need, the Insurance SSEs do not intend to search for and produce information in response to the subpoena.

    C.    <u>Finance and Credit SSEs</u>[8]

For the Finance SSEs, the parties seek compliance with four requests: 4(a)(3)(e); 4(a)(4); 4(b)(2)(d); and 34. Requests 4(a)(3)(e) and 4(a)(4) seek information regarding the sale of vehicles to dealers, including the amount the dealer paid at the time of purchase and the terms relating to the financing of the remainder. Request 4(b)(2)(d) seeks similar information but concerns financing offered by the finance and credit SSEs to the consumers. Request 34 is a blunderbuss request that seeks "all disaggregated transactional data," and does not mention, let alone specifically relate to, finance or credit.

As with the insurance requests, the SSEs have made no showing that the Defendants' conspiracies to fix component prices had any bearing on financing charges. And like insurance markets, finance markets are highly competitive and fragmented. In any event, the price of components such as wire connectors and rubber parts are too tangential to have any significant effect on financing rates. In your letter, you do not claim otherwise. Instead, you make the circular assertion that the Parties are entitled to seek enforcement of the subpoena from "the finance and credit entities … because they bear directly on … dealer and consumer financing terms." That, however, is not sufficient to establish relevance of this information to this case or to justify such an unwarranted fishing expedition. Accordingly, absent a further showing of relevance and need, the Finance and Credit SSEs do not intend to search for and produce information in response to the subpoena.[9]

---

[8] The Finance and Credit SSEs include: Fiat Finance North America, Inc.; BMW Financial Services NA, LLC; General Motors Financial Company, Inc.; American Honda Finance Corp.; Mercedes-Benz Financial Services USA LLC; Mercedes-Benz Credit Corporation; Volkswagen Credit Inc.; Nissan Motor Acceptance Corporation; Hyundai Capital America; and Mitsubishi Motors Credit of America, Inc.

[9] The Parties seek to blame the Defendants for some unspecified and undisclosed "position regarding the impact of dealer and consumer financing terms on questions of impact and injury." If the Defendants are indeed claiming that their conspiracy inflated (or deflated) financing terms, please provide a record cite for the contention and the evidence that supposedly supports it.



Page 5

D.    Banking and Capital SSEs[10]

For Banking and Capital SSEs, you seek compliance with six requests:  13(a), 13(b), 14(c), 16, 33, and 34.  None of these requests relate to banking or capital.  We are, therefore, at a loss as to why you believe that Banking and Capital entities are likely to have relevant information.  Request 13(a) seeks information relating to any policies for setting prices and studies concerning competition for vehicles.  Banking and Capital SSEs, however, do not set vehicle prices.  Request 13(b) seeks studies reflecting how the "cost of components … impacts or influences the ultimate price of the Vehicle to Purchases."  The Parties, however, have not made any showing that Banking and Capital SSEs have conducted studies concerning the impact, if any, of the price of wires, rubber parts, or other components on vehicle prices.  If you believe that such a study has been done by a Banking and Capital SSE, please state the basis for your belief and provide the supporting documentation.  Request 16 seeks the same information as Request 13(b) and is similarly without foundation.  Request 33 asks for documents comparing differences in components.  Please explain why you believe that a Banking and Capital SSE would have a study comparing Yazaki's wire harnesses to Fujikura's wire harnesses, or any component supplier's product to any other's.  Request 34 is the same blunderbuss request for all disaggregated transactional data discussed above.  As above, however, the Parties have made no showing that the Defendants' conspiracies impacted banking and capital terms.  Indeed, the components at issue involve ordinary-course purchases of materials, not large capital expenditures, such as manufacturing equipment, construction of manufacturing equipment, or dealer facilities.  Accordingly, absent a further showing of relevance and need, the Banking and Capital SSEs do not intend to search for and produce information in response to the subpoena.

E.    R&D SSEs[11]

For the R&D SSEs, the Parties seek compliance with 15 requests:  1(g)(6), 1(g)(7), 1(g)(8), 1(g)(9), 1(g)(17), 1(l), 4(h), 5, 13, 14(c), 15, 16, 27, 28, and 33.[12]  The Parties, however, have made no showing that any R&D SSE was involved in the selection of components.  How, for example, could R&D on battery technology for concept electric vehicles or R&D on

---

[10]  The Banking and Capital SSEs include: BMW Bank of North America; BMW US Capital LLC; and Hyundai Capital America.  As indicated in the text, many of the banking and Credit SSEs are not involved in the production, distribution, or sale of vehicles.  For example, as the Subpoenaing Parties were advised in August, BMW US Capital LLC sells capital instruments and maintains other operations that are akin to internal banking operations, and BMW Bank of North America is a bank in Utah that engages in traditional banking activities and does not deal directly with consumers with respect to loans and leasing of vehicles.

[11]  The R&D SSEs include: Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Mercedes-Benz Research & Development North America, Inc. (CA); Mercedes-Benz Research & Development North America, Inc. (MI); Nissan Technical Center North America, Inc. (part of Nissan North America); Hyundai America Technical Center, Inc.; and Mitsubishi Motors R&D of America, Inc.

[12]  The Parties seek compliance with Request 27, which seeks all information produced to any regulatory or government authority within or outside the United States as part of any investigation relating to components or Assemblies for installation in new vehicles sold or leased in the United States.  As we note below, this is request is not limited to documents related to the alleged conspiracies and is thus facially overbroad.



Page 6

autonomous vehicles be related to your case? It appears that you are equating the R&D SSEs with the OEMs themselves. Indeed, the fact that all the R&D entities you subpoenaed are affiliates of foreign OEMs (which have not been subpoenaed) raises questions of whether you are seeking an end-run around the Hague Convention. Regardless, if the Parties, in fact, worked with the R&D SSEs on specific RFPs that are the subject of the alleged conspiracies, that information would be in the Parties' possession. Thus, the Parties should be able to identify the specific RFPs at issue, the components at issue, and the specific R&D SSEs that were involved in that RFP. Until you provide such information, however, you have no basis for seeking discovery from an R&D SSE. Accordingly, absent a further showing of relevance and need, the R&D SSEs do not intend to search for and produce information in response to the subpoena.

    F.    <u>Design SSEs</u>[13]

For the Design SSEs, the Parties seek compliance with six requests: 1(g)(6), 1(g)(7), 1(g)(8), 1(g)(17), 27, and 33. As with the R&D SSEs, the Parties' subpoenas to Design SSEs appear to conflate the role of the Design SSE with the role of the OEM. The OEM is the entity that conducts the RFP, engages in pricing discussions with component manufacturers, and makes the determination of which supplier to use. While Design SSEs may play a role in determining the overall style of a vehicle, such SSEs are far removed from the component selection process. If Yazaki, for example, bid $300/vehicle for a wire harness and Fujikura bid $350, it is hard to believe that any Design SSE would even know about it, let alone interfere with the purchasers' decision. To the extent the Parties believe that the Design SSEs were involved in selecting specific component suppliers, then the Parties' own documents – particularly those from the Defendants – would reflect that. Accordingly, absent a further showing of relevance and need, the Design SSEs do not intend to search for and produce information in response to the subpoena.

    G.    <u>Domestic Distributor SSEs of Foreign OEMs</u>

The Parties only subpoenaed one very small foreign OEM, and the subpoena to that entity should be held in abeyance as discussed in subsection H below. In some instances, however, the Parties have issued subpoenas to the distributor SSEs that are affiliated with an unsubpoenaed foreign OEM. Such distributor SSEs do not select component suppliers or purchase components. They distribute vehicles to domestic dealers. As we explained, such

---

[13] The Design SSEs include: Designworks USA; Calty Design Research, Inc.; Nissan Design America, Inc. (part of Nissan North America); and Mercedes-Benz Advanced Design of North America Inc. While the Subpoenaing Parties appear to presume in their correspondence that all Design SSEs focus on vehicle and component design, that is not the case. For example, Designworks USA provides services to an array of companies and non-commercial entities, including the U.S. Olympic Bobsled Team, leading computer and technology companies, as well as BMW Group entities.

Similarly, MB-Technology NA LLC does not fit within any of the non-OEM SSE types, as it provides engineering and consulting services to a wide variety of industries – from the automotive industry to rail transport to aerospace. In order to provide some categorization for MB-Technology NA LLC, and because it is occasionally involved in the design of equipment and components, it is identified for purposes of this letter as a Design SSE.



Page 7

SSEs are unlikely to have relevant information. Nor can the issuance of a subpoena to these entities be used to end-run the Hague Convention. As your October 14th letter acknowledged, domestic non-OEM SSEs are unlikely to have control over the data or information from foreign entities within their corporate entities. As such, we believe that subpoenas issued to the Domestic Distributor SSEs of Foreign OEMs should be held in abeyance.

In response, you disagree that the subpoena should be "limited to seeking information in the possession of the specific subpoenaed entity relating to the purchase of relevant components in the United States for vehicles sold in the United States." You cite no authority, however, for the proposition that a subpoena on a domestic subsidiary of a foreign OEM can reach the foreign OEM's documents. Likewise, while you are unwilling to "exclude data or documents based on geographic location of part purchase, manufacture, assembly, or sale," you do not claim that the Domestic Distributor SSEs are involved in part purchases or component selection or pricing decisions. Nor do you claim that the Domestic Distributor SSEs are involved in the manufacture or assembly of vehicles. Put simply, there is no basis for seeking upstream purchasing information from the Domestic Distributor SSEs. Accordingly, absent a further showing concerning the identity of the specific upstream purchasing information you believe each Domestic Distributor SSE is likely to have, the Domestic Distributor SSEs do not intend to produce information concerning the upstream purchasing of components.

As for downstream sales information, the Domestic Distributor SSEs would only have information concerning the transfer of vehicles from foreign OEMs to the domestic distributor SSE, and then the sale of such vehicles to their dealer network. As to the former, internal transfer prices are wholly irrelevant to the issues in the case. As to the latter, the Parties are in somewhat of a box. If you contend that you have sufficient upstream purchasing information to make the production of downstream sales information from these Domestic Distributor SSEs relevant, then you don't need the upstream purchasing information you are requesting from the OEM SSEs. If you contend that you lack sufficient upstream purchasing information – and thus need such information from the OEM SSEs – then you don't need the downstream purchasing information from the Domestic Distributor SSEs, since you can't get the upstream purchasing information from the non-subpoenaed foreign OEMs.

In any event, as noted below, most of the downstream purchasing information the Parties seek is not relevant and unduly burdensome. That said, in the spirit of compromise, to the extent such information is readily-accessible in currently maintained databases, the Domestic Distributor SSEs (other than the Smaller SSEs) are prepared to produce information showing a schedule of MSRPs for each make and model of vehicle they sold to dealers in the United States for up to the last 10 years.[14]

---

[14] These Domestic Distributor SSEs include: Kia Motors America, Inc.; Hyundai Motor America; Nissan North America Inc.; and Mercedes-Benz USA, LLC. By this offer, we do not waive any objections to downstream discovery that some of us have already formally preserved through written objections, or any objections we may raise in the future.



Page 8

H.    Smaller SSEs

In your October 14th letter, the Parties proposed withdrawing the subpoena for OEMs with less than 10,000 annual vehicle sales. As we explained, however, this constitutes less than 6/100ths of 1% of the 18 million annual sales in the U.S. As we also noted, the Parties have not explained how, if at all, the omission of data from small OEMs, such as those with less than 5% market share, would impact any statistical or regression models relevant to any issue in this case. In response, you simply call the 5% threshold "arbitrary" and express a preference for your arbitrary 0.06% threshold instead. Based on this threshold, you agreed to hold in abeyance the subpoenas issued to Rolls-Royce Motors Cars NA, LLC and Maserati N.A., Inc.

We agree that there is no bright line as to where the cut-off should be for small OEMS, but at a minimum, subpoenas should be held in abeyance for SSEs with less than 3% of the U.S. vehicle sales market over the proposed production period. These entities fall below (and in some cases well below) the market share of the "highly relevant" SSEs you raised concerns about in your November 24 letter, and are likely to be within the range of the margin of error for any statistical model you purport to rely upon. Based on 2014 vehicle sales data assembled by Automotive News, these entities include the following SSEs whose sales all fall below one half of 1% of the U.S. automotive market: Bentley Motors Inc. (0.0%); Automobili Lamborghini America LLC (0.0%); Porsche Cars North America, Inc. (0.3%); Jaguar Land Rover North America LLC (0.1% for Jaguar and 0.3% for Land Rover); Aston Martin Lagonda of North America, Inc. and Aston Martin Lagonda Limited (0.0%)[15]; Volvo Cars of North America (0.3%); and Mitsubishi Motors North America, Inc. (0.5%) (Mitsubishi entities join as SSEs with this correspondence); as well as the following entities whose sales fall below the 3% threshold: Audi of America LLC (1.1%); Volkswagen of America, Inc. (2.2%); and BMW of North America, LLC and BMW (US) Holding Corp. (2.1% for BMW and 0.3% for MINI). These entities also include Subaru of Indiana Automotive, Inc. ("SIA"), whose sales fall well below 3% of the U.S. automotive market over the proposed production period.[16]

Also, with the exception of Aston Martin Lagonda Limited and SIA, we note that each of these entities is a non-OEM distributor SSE. As such, they are not involved in the purchase or pricing of components. Accordingly, absent a further showing of relevance and need, the Smaller SSEs identified above do not intend to search for and produce information in response to the subpoena.

---

[15] We note that Aston Martin and Lamborghini had lower 2014 sales than others for whom subpoenas were held in abeyance, and well below the 10,000 annual sales threshold initially proposed by the Parties. Indeed, Aston Martin was not even listed in the Wall Street Journal article cited in your November 24 letter as evidence of the respective entities' U.S. market share.

[16] Subaru of America, Inc. is also a Smaller SSE, as its market share was below 3% for the vast majority of the proposed production period (until late 2014).



Page 9

**2.    *OEM SSEs*[17]**

A.    <u>Upstream Purchasing Data</u>

As our October 29th letter noted, the Parties have conceded that they already possess the purchasing information from each of the defendant suppliers, which includes over 140 entities and covers over 55 components.  In response, you do not deny this.  Instead, in your November 24th letter you present two arguments to justify your demands.

*First*, you argue that the OEM SSEs ought to produce purchasing information already in the Parties' possession because you do not have the OEMs' internal part numbers.  This is unsound for a number of reasons.  As you know, when component suppliers bid for a specific RFP, they are bidding for a specific make and model of vehicle.  Accordingly, the Defendant suppliers should know – either exactly or to a close approximation – for which vehicles their components are used.  For example, if Yazaki won the bid for the wire harness of the Ford F-150, and it produced 200,000 wire harnesses for it in 2010, an OEM part number is completely unnecessary for the Parties or their experts to estimate the effects of the conspiracy on the price of the Ford F-150.  You do not deny this.  Instead, you simply assert that it should be just as easy to pull transactional data for the Defendant-suppliers as for the non-Defendant-suppliers.  That is not necessarily true.  The Parties' litigation-driven definition of relevant components does not align with the internal categories that different OEMs use.  Thus, for most SSEs, pulling information by supplier is easier than pulling information by component, and pulling information for a limited number of entities is easier than pulling information for a larger number.

*Second*, you argue that the "Parties do not have access to SSEs' purchasing data from non-Defendant suppliers."  As we noted, however, non-defendant suppliers are "unlikely to constitute a substantial portion of the market and would not be an appropriate benchmark for any pricing model."  As we explained, the pricing of non-defendant suppliers would also likely be affected by the conspiracy, since any such conspiracy would inflate the overall market prices for the components.  You offer no response.  Instead, you simply noted that there are unspecified OEMs that did not buy any relevant components from any Defendant.  Who are these OEMs?  What components do they encompass?  Certainly, the Defendants, who dominate their respective markets and who collectively participate in all or most RFPs, would know which OEMs

---

[17] The OEM SSEs that are prepared to produce documents as indicated in this letter include:  FCA US LLC; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Hyundai Motor Manufacturing Alabama, LLC; Kia Motors Manufacturing Georgia, Inc.; General Motors LLC; American Honda Motor Co., Inc.; Honda North America, Inc.; Honda Manufacturing of Indiana, LLC; Honda of America Mfg., Inc.; Daimler North America Corporation (MI); Daimler North America Corporation (NJ); and Daimler Purchasing Coordination Corporation.

SSEs who are involved in vehicle assembly, but for whom the subpoenas should be held in abeyance include: BMW Manufacturing Co., LLC, which operates an assembly plant in South Carolina primarily for the manufacture of vehicles for export (approximately 70% of its vehicles are exported and in 2014, its largest production year, vehicles destined for the U.S. market amounted to less than 7/10ths of 1% of U.S. vehicle sales); Mitsubishi Motors North America, Inc.; Subaru of Indiana Automotive, Inc.; and Aston Martin Lagonda (which manufactures vehicles in the United Kingdom and whose U.S. sales are extremely negligible as discussed in Section 1.H).



Page 10

purchase exclusively from non-Defendant suppliers and who these non-Defendant suppliers are. It is simply not appropriate to send the OEMs off on a wild goose chase in the hope that there are some non-Defendant suppliers that supplied some *subpoenaed* OEM and that the resulting data might be used as an appropriate benchmark.[18]

As noted, however, in the spirit of compromise, if the Parties agree to provide a list, by component, of the specific non-Defendant entities that supply each component (in the form attached as Exhibit A), the OEM SSEs are prepared to produce[19] – to the extent readily available from currently maintained purchasing databases – information for up to the last 10 years that identifies for each such entity: (i) the date of component purchase, (ii) the part description, (iii) the quantity purchased, and (iv) price paid. After the Parties produce the list identified in Exhibit A, the OEM SSEs will also individually confer with the Parties to determine whether the purchasing database contains other relevant fields that can be produced without requiring additional work.[20] This offer of production shall constitute a complete response to the requests seeking upstream purchasing transactional data.

### B.   Upstream Non-Transactional Documents Concerning Purchases or RFPs

In our October 29, 2015 letter, we explained that the parties have failed to demonstrate a particularized need for non-transactional purchasing data, such as documents relating to specific RFPs. In response, you simply assert that such documents are "highly relevant" because they may bear on which supplier won the bid. As you acknowledge, however, such documents are ***completely irrelevant*** to the issue of pass-through of any overcharges.[21]

As we noted, even as to the issue of the initial overcharge, the documents are of only marginal relevance at best. Such documents are completely irrelevant to the issue of whether the Defendants engaged in a conspiracy to fix prices. They are completely irrelevant to the issue of

---

[18] Your letter concedes that the Parties' economists have not determined that data from non-Defendant suppliers can serve as an appropriate benchmark. *See* November 24th Ltr. at 7 (noting that the "Parties' [undisclosed] economic experts are in the best position to comment on whether non-Defendant suppliers can serve as an appropriate benchmark," but claiming they cannot comment on this issue "without looking at the underlying data").

[19] This offer is subject to any applicable non-disclosure obligations. It also contemplates further meet and confers with individual OEMs as necessary depending on the burden presented to individual OEMs by the Parties' list of non-Defendant entities.

[20] Many of the items in Request 1, for example, would impose inordinate levels of burden. For example, Request 1(f) asks for information sufficient to track each component from shipment through installation and vehicle delivery, down to the specific vehicle sold. At least for many OEMs, compiling this information would require hundreds of person-hours.

[21] The Parties already possess much of the information they are requesting. For example, Request 3 seeks information sufficient to show any agreement with any supplier of a component. This is information that the Defendant suppliers already possess. Absent some showing that the few agreements with non-Defendant OEMs are needed to establish either the amount of the *Defendants'* overcharge or the amount of pass-through, the OEM SSEs do not intend to search for and produce information in response to Request No. 3. Likewise, to the extent a Defendant agreed to an MFN clause with an OEM (*see* Request No. 30), the Defendants would already have such information.



Page 11

the scope of the conspiracy and which RFPs the defendants coordinated on illegally.  Moreover, such RFP documents have little bearing on the amount of the overcharge.  As we explained, an OEM's "target prices" – the key piece of information the Parties say they don't have – do not speak to what the prices would have been absent the conspiracy, since the point of competition is to drive prices below the target and because a long-running conspiracy can affect target prices as much as final prices.  In addition, the Parties already have access to substantial information – both qualitative and quantitative – on the issue of the initial overcharge.  Qualitatively, the Defendants' own documents generally contain extensive discussion – indeed, often have a play-by-play – of the RFP process.  Thus, the reasons why a particular supplier won or lost an RFP should be clear from the information in the Parties' own possession.  Quantitatively, the Parties and their economists have substantial data that enables them to reasonably estimate the amount of the overcharge.

Indeed, the fact that the Direct Purchasers have expressed no interest in these types of documents suggests that such documents are not needed in order to litigate the issues in this case.  Your only response, that the SSEs' obligations under the subpoena are not dictated by whether the Direct Purchasers joined in the request, misses the point.  While the Parties' power to issue a subpoena may not be affected by how many issuing Parties there are, the fact that the Direct Purchasers – who have perhaps the greatest interest in establishing the amount of the overcharge – have declined to join in your request means that the information is not relevant and does not satisfy the rule of proportionality.

Finally, we note that searching for and producing documents relating to every RFP issued in the last 20 years covering virtually every vehicle manufactured in America (and potentially elsewhere) is incredibly burdensome, and would require searches of untold numbers of custodians.  Indeed, given the level of employee mobility within each OEM, just the investigation of which custodians ought to be searched, for which time periods, and which components would be an incredible and unprecedented burden.  Accordingly, absent a further showing and narrowing of these requests, the OEM SSEs will not search for non-transactional upstream purchasing information.[22]

C.    *Downstream Sales Information*

In our October 29th letter, we explained that the Parties had failed to address the issues we raised concerning downstream discovery, and your demand for virtually every piece of

---

[22] You characterize your demand that the OEM SSEs make rolling productions and engage in consecutive searches as an "offer to prioritize" your requests.  It is apparent, however, that your "proposal" is designed more to help the Parties meet their own case deadlines than to alleviate the SSEs' burden.  Indeed, as we previously explained on multiple occasions, your proposal would require successive searches for information and thus substantially increases the SSEs' burden.  Accordingly, the SSEs decline your offer for the third time.



Page 12

information bearing on the value, pricing, or nature of the transaction for every vehicle sold in America over the last 20 years.[23]

Specifically, we noted that your request conflicts with the existing discovery orders in this case. As the Parties themselves have noted, "downstream data [has been] already determined to be non-discoverable by the Special Master" each time the he has been presented with the issue. You do not deny this. Instead, you claim that you have the right to take another shot because the Special Master "has not [specifically] ruled on production of sales data *from OEMs*." While that may be correct as a matter of collateral estoppel, it does not justify your disregard of the clear import of the Special Master's decisions: that downstream information that is not directly tied to component prices "'is irrelevant, not likely to lead to the discovery of relevant information,' and its production would be unduly 'burdensome.'" Oct. 29th Ltr. at 6 (quoting Dkts. 338, 331, 352, 12-cv-102).

Your only claim of need is that "detailed sales data" is needed to isolate the effects of a change in a particular component's prices. But you provide no support for such a sweeping conclusion. As noted, there is no reason to believe that insurance prices, banking and capital prices, or finance and credit charges were in anyway impacted by the alleged conspiracy. There is, therefore, no need to obtain data on such issues in order to conduct a reliable regression to isolate the effects of the alleged conspiracy.[24]

Moreover, information about vehicle pricing is extremely competitively sensitive. As such, the OEM SSEs do not intend to produce a database containing vehicle prices for every vehicle they have sold over the last 20 years.

In the spirit of compromise, however, the OEM SSEs are prepared to produce a schedule of MSRPs for each make and model of vehicle sold for up to the last 10 years. Such information should suffice for the Parties' economists to determine the extent to which a particular component's prices affected vehicle sales prices.

D. ***Documents Produced to Regulatory Authorities***

Request 27 seeks all documents and data produced to any regulatory or government authority concerning any relevant component. This request is not limited to documents related to

---

[23] In our October 29th letter, we requested that the Parties hold in abeyance Request 22, which purports to require a burdensome custodian search for all pricing communications with any group of dealers. According to your chart of "narrowed" request, the Parties apparently rejected our proposal without explanation and continue to seek compliance with Request 22. Certainly, the production of such non-transactional information would add nothing to any downstream *transactional* data that may be produced. And to the extent such transactional data need not be produced because of burden, relevance, or otherwise, the same considerations would apply with greater force to Request 22. Accordingly, absent a further showing, the OEM SSEs will not search for non-transactional downstream purchasing information.

[24] Because information relating to finance charges is wholly irrelevant for reasons stated above, the OEM SSEs do not intend to produce their "disaggregated transactional data" for "financed" vehicles in response to Request 34 or otherwise.



Page 13

the alleged conspiracies. Thus, it is facially overbroad. It appears, however, that the Parties are most interested in documents, if any, that the SSEs produced to the DOJ in connection with the conspiracies at issue in this case. We expect that the Parties may have obtained this information from the DOJ, but if not, the SSEs who made such a production are prepared, as described above (*see supra* pg. 2), to make relevant portions of those productions available to the Parties, contingent on reaching a comprehensive agreement on the scope of the subpoena and protective order, the reimbursement of costs, and provided the DOJ has no objection to the production of such documents (*e.g.*, DOJ has stated its investigation is complete relating to a particular part or supplier).[25]

E.      ***Documents Relating to Settlement Discussions.***

Request 31 seeks all documents relating to any "negotiations or communications with any of the Defendants … in connection with … the facts described in any Plaintiffs' Complaints." The Parties, themselves, disagree on whether such a request is permissible. Regardless, to the extent Request 31 seeks communications with any Defendant, if it is discoverable, it may be obtained directly from the Defendants themselves. To the extent the request goes beyond such communications, such information would be unequivocally privileged. Accordingly, the SSEs do not intend to search for and produce information in response to Request 31.

**3.      *Costs***

As our October 29th letter explained, we do not intend to begin searching for and producing documents until an agreement on costs has been reached. We also requested that the Parties agree to reimburse the SSEs for all costs, including all out-of-pocket costs and all attorneys' fees, and provide fair compensation for any additional employee resources that must be devoted to this project. To the extent you have concerns about reimbursement generally or any categories of reimbursable expenses, we asked you to set forth your position and present a counter-proposal.

You declined. Instead, you claimed an inability to engage in a discussion on costs until after the SSEs present an estimate of the costs and expenses of compliance. But there is no way to estimate the costs of compliance until the scope of the subpoena is resolved. While we do not believe that this should prevent the parties from discussing generally the types of expenses that would be reimbursable, we cannot force you to participate in a discussion you are unwilling to have. Accordingly, we will place the discussions of costs on hold until after the scope of the subpoena has been resolved.

Your letter, however, suggests that the SSEs are required to begin searching for and producing documents prior to an agreement on costs. That is incorrect. Rule 45 specifically relieves subpoenaed parties from searching for and producing documents until after all objections have been resolved and the court has issued an order on costs. See Fed. R. Civ. P.

---

[25] SSEs' productions will be limited to any documents or data maintained in the ordinary course of business that were produced to the DOJ.



Page 14

45(d)(2) ("if an objection is made … the serving party may move for an order compelling production [and] these actions may be required only as directed in the order" after "protect[ing] a person … from significant expense.").  As we noted, some courts have actually held that non-parties waive their right to reimbursement if they produce documents without an agreement or order on costs.  You cite no case to the contrary.

**4.**     *Path Forward*

As noted in our October 29th letter, we believe that the Parties and the SSEs should work towards a master document that sets forth our agreements as to any common issues, and identifies those areas for which we have reached impasse.  We continue to believe that this is the best way to proceed, and we trust that the offers of production in this letter will go a long way towards reaching an agreeable compromise on all aspects of the subpoena.  We look forward to hearing from you.[26]

Sincerely,

*Colin Kass*

---

[26] As noted in our October 29th letter, the issues raised here is not a comprehensive discussion of all objections to and issues with the Subpoena, and we do not waive any objections some of us have already formally preserved through written objections, and any objections we may raise in the future.

## <u>Exhibit A</u>

**Component:**_____

| <u>Non-Defendant Entity</u> | <u>OEM Supplied / RFP Bid (if known)</u> |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

**Component:**_____

| **Non-Defendant Entity** | **OEM Supplied / RFP Bid (if known)** |
|---|---|
| | |
| | |
| | |
| | |

# EXHIBIT N

| | |
|---|---|
| **From:** | owner-oem_subpoenas@lists.susmangodfrey.com on behalf of Novison, Heather <Heather.Novison@weil.com> |
| **Sent:** | Thursday, December 24, 2015 12:17 PM |
| **To:** | ckass@proskauer.com |
| **Cc:** | OEM_subpoenas@lists.susmangodfrey.com |
| **Subject:** | In re Automotive Parts Antitrust Litigation (Master Case No. 2:12-md-02311) |

Dear Colin:

We are writing on behalf of the End Payor Plaintiffs (EPPs); Truck and Equipment Dealer Plaintiffs (TEDPs); the State of Florida; the State of Indiana; and Defendants (collectively, the "Moving Parties") in the Auto Parts actions.  We have carefully reviewed your letter of December 18, 2015, in which the subpoenaed entities refuse to produce virtually any of the documents and data sought in the OEM subpoenas.  Accordingly, we are at impasse, and the Moving Parties intend to move to compel the subpoenaed entities' compliance with the served subpoenas on or before January 15.  We propose the following schedule for opposition and reply:

Opposition: due February 5
Reply: due February 19

Thank you and happy holidays.



**Heather A. Novison**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
heather.novison@weil.com
+1 212 310 8864 Direct
+1 212 310 8007 Fax

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

This e-mail contains communication that may constitute attorney/client privileged information and/or attorney work product. If you received this message in error, please notify the sender and delete it immediately.

To unsubscribe from the OEM_SUBPOENAS list, click here

# EXHIBIT O



Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

December 30, 2015

Colin Kass
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

*__Via Email__*

Re: *In re Automotive Parts Antitrust Litig.*, 2:12-md-02311

Dear Counsel for the Moving Parties:

We write on behalf of the Specified Subpoenaed Entities in response to your Christmas Eve declaration of impasse, and your corresponding request for a briefing schedule for your anticipated motions to compel.

As an initial matter, we note that the Moving Parties have not satisfied their obligation to meet and confer in good faith, as required by, *inter alia*, Fed. R. Civ. P. 37(a)(1). The Parties failed to address *any* of the points raised in our December 18th letter and, by way of example:

- Refused to respond to the OEM SSE's offer of production, including their offer to produce purchasing information from identified non-Defendant suppliers.

- Refused to respond to the OEM SSE's and certain distributor SSE's offer of production concerning downstream information concerning vehicle MSRPs.

- Refused to meet and confer concerning the scope of requests issued to the Truck and Equipment SSEs.

- Refused to explain the basis for seeking financing and credit information, or other downstream information wholly unconnected to component costs.

- Refused to explain the basis for seeking discovery from financing and credit SSEs, banking and capital SSEs, R&D SSEs, and Design SSEs.

- Refused to meaningfully negotiate which of the "smaller SSEs" should be excluded. (In that regard, we note that the Parties have excluded Maserati and Rolls Royce, while still demanding – without explanation – discovery from many similar-sized or smaller SSEs).

- Refused to explain the basis for seeking discovery from domestic distributor affiliates of foreign OEMs, given the lack of jurisdiction over the foreign OEMs' information and the limited relevance of the distributor information.

- Refused to explain the basis for seeking discovery of settlement-related information.



Page 2

- Refused to engage in any discussion concerning the categories of costs that the Issuing Parties will reimburse, as required by Fed. R. Civ. P. 45(d)(2).

Prior to your declaration of impasse, we had believed that the process was working. The Parties made a number of changes to the subpoena which – while largely cosmetic – provided hope that a mutually-agreeable resolution could be reached concerning the scope of the subpoena.

Your unilateral decision to cut short these discussions by declaring impasse and moving to compel is unfortunate and premature. If you persist in this position, we seek two additional points of clarification. *First*, we ask that the Moving Parties identify the basis for their belief that it is appropriate to move to compel at this time, including the specific requests at issue, and the specific SSEs targeted for each such request. Have the Moving Parties not moved at all from their November 24th letter? Or are there specific requests and SSEs that will now be your focus? We would point out that certain of the SSEs have strong jurisdictional and Fed. R. Civ. P. 37 objections to motions being filed in the Eastern District of Michigan.

*Second*, we note that the Auto Dealer Plaintiffs have neither joined as "Moving Parties" nor responded to our December 18th letter. Have they now withdrawn as Issuing Parties? If not, we cannot agree to a briefing schedule until *all* the Issuing Parties have declared impasse or negotiations concerning the scope of the subpoena have been completed.

If the Auto Dealer Plaintiffs have withdrawn as Issuing Parties (or are no longer intending to further negotiate), and if the Moving Parties identify the specific requests forming the basis for their motions and the specific SSEs targeted for each such request, by January 4th, we will agree to the following briefing schedule with respect to any motions to compel to be filed against each of the entities you intend to pursue: Motions due by January 15th; Oppositions due by February 12th; Replies due by February 26th.[1]

Sincerely,

*Colin Kass*

---

[1] By agreeing to this schedule, the SSEs do not waive any objections, jurisdictional arguments (including the obligation for any motion to be filed in the district where compliance is sought), or any argument that the subpoena is invalid and unenforceable.

# EXHIBIT P



ATTORNEYS AND COUNSELORS

*a professional corporation*

**Sheldon H. Klein**
**248 258 1414**
klein@butzel.com

Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
**T:** 248 258 1616  **F:** 248 258 1439
**butzel.com**

January 13, 2016

**VIA EMAIL**

Colin Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Suite 600 South
Washington DC  20004-2533

> Re:   *In re Automotive Parts Antitrust Litigation*, 2:12-md-02311

Dear Colin:

We write on behalf of the Serving Parties[1] in response to the Specified Subpoenaed Entities' (the "SSE"s)[2] letter dated December 30, 2015 (the "December Letter").  We will not respond to every individual issue raised in your letter, beyond noting that we disagree with most of your characterizations.  Rather, we write in an effort to avoid motion practice, by providing a final offer setting forth those requests on which we currently intend to move to compel.

As an initial matter, the Parties have more than satisfied their obligations to meet and confer in good faith.  The Parties and the SSEs have met and conferred and exchanged multiple letters over several months embodying a number of compromise offers by the Parties, none of which were accepted by the SSEs.   In correspondence dated November 24, 2015, (the "November Letter"), the Serving Parties substantially cut back the scope of their requests and offered other meaningful concessions in an effort to accommodate the SSEs.  Despite this, the SSEs' most recent offer – to produce only two categories of information – is clearly inadequate

---

[1] The "Serving Parties," herein also the "Parties," "we," or "our," include: End Payor Plaintiffs (EPPs); Auto Dealer Plaintiffs (ADPs); Truck and Equipment Dealer Plaintiffs (TEDPs); the State of Florida; the State of Indiana; and Defendants in all actions.

[2] The term "SSEs," "you," or "your," refers to those subpoenaed entities that joined the December Letter (including, e.g., all entities listed in Exhibit A ("SSE Entities") to SSEs' letter dated October 29, 2015; the Parties include in the term SSE any subpoenaed entity that has indicated that it is coordinating as a member of the SSE group, even if not listed in foregoing Exhibit A).

Colin Kass
PROSKAUER ROSE LLP
January 13, 2016

and confirmed the lack of any meaningful effort by the SSEs to reach a mutually-acceptable resolution.  The Parties are under no obligation to continue the meet and confer process with SSEs, especially given how far apart the Parties' and SSEs' positions still are and in light of the schedules set by the Court in the Lead Three cases (*Wire Harnesses*, *Bearings*, and *Anti-Vibrational Rubber Parts*).

The Serving Parties currently intend to move to compel with respect to the following requests (the "Listed Requests"),[3] which are substantially narrowed from the original subpoena:

Serving Parties[4]:

- 1(a)-(g), (l), (m);
- 3;
- 4(a)(1)-(2); 4(a)(3)(a)-(e), (h), (k); 4(a)(4), (7), (8), (13); 4(b), (e), (h), (j);
- 5;
- 13;
- 14(c);
- 15;
- 16;
- 22;
- 23(2);
- 28;
- 30;
- 33; and
- 34.

EPPs, ADPs, and TEDPs Only[5]:

- 1(i);
- 14(a);
- 27; and
- 31.

The Parties' proposal includes other meaningful concessions.  First, while the Parties intend to move to compel discovery from the SSEs with respect to all of the auto parts at issue in the MDL litigation, they are amenable to prioritizing information relevant to the Lead Three parts cases, and would agree that the production of the materials related only to the remaining

---

[4] Not all Parties join all requests.
[5] Defendants reserve their rights on Request 27, and their position on Request 31 is set forth in the November 24, 2015 correspondence.

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
January 13, 2016

parts can be staggered for subsequent production. The Serving Parties also only intend to jointly move to compel discovery relevant to each auto part for the class periods alleged in the relevant operative complaints, and for two years prior for data only, up through December 31, 2014 for all documents, and up through the date of extraction for data only. *See* Serving Parties' October 14, 2015 letter, Attachment A.

The Parties do not currently plan to move to compel production from the following SSEs or their affiliates: Aston Martin, Bentley, Lamborghini, Maserati, and Rolls Royce. Further, there is no intention to move to compel production from insurance, finance and credit, banking and capital, R&D, or design entities, with the caveat that, where certain transactional purchase or sales data responsive to the Listed Requests exists only in the possession of any such entity, it must be produced.[6] With respect to SSEs involved in the manufacture of Trucks and Equipment, the Serving Parties seek the same prioritized requests and intend to move to compel on the same items as other SSEs.

Finally, your assertion that Rule 45 of the Federal Rules of Civil Procedure requires the Parties to do more than they have done up to this point with respect to cost-sharing discussions is incorrect. Serving Parties have consistently made it clear to SSEs that the Parties are available and willing to discuss cost-sharing once each SSE has had an opportunity to determine what responsive information is in its possession and what reasonable costs will be associated with its production. Again, it is the burden of the subpoenaed entities to present a cost estimate before it can be determined whether the expense is significant enough to warrant cost-shifting. *See United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL 4513600 at \*7 (E.D. Mich. October 1, 2012) (ordering the subpoenaed entities to provide detailed estimates of the reasonable costs that they will incur to comply with Plaintiff's subpoenas so that the Court can determine whether the costs are significant, and if they are, whether any amount should be shifted to Plaintiff). Despite this, to date none of the SSEs have presented the Parties with any cost estimate information, and therefore, the Parties have been unable to engage in a productive conversation about costs or present a proposal without the requisite information for each SSE.

It bears noting that Serving Parties in this case coordinated on the Subpoenas pursuant to the Court's specific order, that this discovery was specifically contemplated by the Court and that objections filed with the Court to service of the Subpoena were denied. The scope of this auto parts MDL is unprecedented and the amounts at issue in this case are extremely meaningful. OEMs, including SSEs, are solely in possession of data and documents highly relevant and important to the issues in the case, are large, sophisticated companies that routinely engage in and respond to litigation and discovery requests, and which have not — and cannot — make the

---

[6] Relevant Listed Requests (to the extent the information exists in data): (A) Request 1(a)-(g), (l), (m) (transactional data regarding purchases of auto part components); and (B) Request 4(a)(1)-(2); 4(a)(3)(a)-(e), (h), (j)-(k); 4(a)(4), (a)(7), (a)(8), (a)(13); 4(b); 4(e); Request 34 (transactional data regarding sales of automobiles). Further, we inquire whether, for the any of the requests set forth above, on page 2, the requested information would be solely in the possession of the Research and Development entities.

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
January 13, 2016

requisite showing that the burden or expense of this highly relevant and important discovery would outweigh its benefits.

Please let us know whether SSEs are willing to accept the reasonable compromise outlined above and to promptly begin production of the information in their possession, custody, and/or control responsive to the Listed Requests. In addition, to the extent there is any entity previously identified as part of the SSE group that no longer joins in the group's position (either in whole or in part), please let us know so that we may proceed accordingly.

We look forward to your response. In the absence of an agreement to produce on the Listed Requests, we plan to move to compel pursuant to Federal Rules of Civil Procedure 26 and 45 as outlined above on January 15th. We are amenable to agreeing to the modification of the briefing schedule proposed in your December Letter.

Sincerely,

BUTZEL LONG

*/s/ Sheldon Klein*

Sheldon H. Klein

cc (via email):   Counsel for the Parties

BUTZEL LONG

# EXHIBIT Q

**Klein, Sheldon**

| | |
|---|---|
| **From:** | Munkittrick, David A. [DMunkittrick@proskauer.com] |
| **Sent:** | Wednesday, January 13, 2016 7:22 PM |
| **To:** | Klein, Sheldon |
| **Cc:** | Kass, Colin |
| **Subject:** | RE: OEM subpoenas |

**Categories:**     Wire Harness

Sheldon,

We write on behalf of the SSEs.  The letter you sent today asserts that, unless the SSEs immediately and unconditionally agree to the Parties' latest proposal, in its entirety, the Parties will file motions to compel against unidentified SSEs in two days' time, i.e., by Friday, January 15th.  The SSEs do not believe that is sufficient time to respond to your latest proposal.

We do not understand why you would wait two weeks to respond to our last letter (in response to your premature declaration of impasse), which asked the Parties to identify the grounds for their proposed motion to compel, the specific SSEs against whom such a motion to compel would be brought, and the specific Parties who would be moving for relief.

Your delay has prejudiced the SSEs.  As you will recall, we had asked for a response by January 4th, so that we could appropriately consider any revised proposal the Parties may have and, for those SSEs who have not yet served formal objections (based on the Parties' previous grant of an indefinite extension), to prepare such objections or other responses based on the latest state of play.  By waiting two weeks to inform the SSEs of your position, you have not provided sufficient time for the SSEs to accomplish either task.  Accordingly, we suggest that the Parties hold off filing any motion to compel by at least one week, to at least January 22, and that the remainder of the proposed briefing schedule be similarly adjusted.

In the meantime, we ask that the Parties clarify your position concerning the Insurance, R&D, Design, Finance & Credit, and Banking & Capital SSEs.  As you will recall, in prior correspondence you limited the subpoena to one, fifteen, six, four, and six requests respectively.  Your current letter now states that you do not intend to move to compel against any of these SSEs unless information responsive to over twenty requests "exists only in the possession of any such SSE."  Such SSEs do not believe that any information relevant to this case is solely in the possession of such SSEs, and thus, we assume that the subpoena has been effectively withdrawn as to such entities.  If, however, you do intend to serve such entities with a motion to compel, please let us know which ones and the basis for any contention that responsive information is solely within their possession.

Best,

**David Munkittrick**
Attorney at Law

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3226
f  212.969.2900

dmunkittrick@proskauer.com

greenspaces
Please consider the environment before printing this email.

**From:** Klein, Sheldon [mailto:klein@butzel.com]
**Sent:** Wednesday, January 13, 2016 10:12 AM
**To:** Kass, Colin
**Subject:** OEM subpoenas

Colin – please see attached letter.  I assume you will distribute to other SSE counsel as you think appropriate.

Confidentiality Statement: This message, including attachments, may be confidential and legally privileged. If not for you, do not review, use or share it; notify us immediately and delete it. Thank you.

*********************************************************************************************
************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*********************************************************************************************
************************************************************

# EXHIBIT R

**Klein, Sheldon**

| | |
|---|---|
| **From:** | Klein, Sheldon |
| **Sent:** | Thursday, January 14, 2016 5:04 PM |
| **To:** | 'Munkittrick, David A.' |
| **Cc:** | Kass, Colin; Abeles, Scott M. |
| **Subject:** | RE: In re Automotive Parts Antitrust Litigation (Master Case No. 2:12-md-02311) |

David –

The Parties disagree with your characterization of the status and history of negotiation. We have spent 4 months attempting to work with the SSEs and made repeated and substantial concessions to narrow the scope of the subpoena, with no meaningful proposal from the SSEs. Accordingly, we are more than skeptical that a negotiated resolution is possible. And we do not believe it is necessary or appropriate to waste more time negotiating when doing so is unlikely to result in a resolution.

Nevertheless, the Parties are willing to allow the SSEs until noon on Tuesday, January 19 to respond, with corresponding adjustments to the previously proposed briefing schedule, in the event that a motion remains necessary.
Please advise as soon as possible whether the SSEs are willing to respond by Tuesday.

The parties will respond separately with respect to the final paragraph of your email.


**Sheldon Klein**
klein@butzel.com
Direct: 248.258.1414 | Mobile: 248.703.1008



Stoneridge West Bldg.
41000 Woodward Ave.
Bloomfield Hills, MI 48304
Office: 248.258.1616 | Fax: 248.258.1439
www.butzel.com
Michigan | New York | Washington, D.C.

A LexMundi Member
  

---

**From:** Munkittrick, David A. [mailto:DMunkittrick@proskauer.com]
**Sent:** Thursday, January 14, 2016 3:29 PM
**To:** Klein, Sheldon
**Cc:** Kass, Colin; Abeles, Scott M.
**Subject:** In re Automotive Parts Antitrust Litigation (Master Case No. 2:12-md-02311)

Sheldon,

Please see attached objections and responses to the subpoenas served on FCA US LLC, Maserati North America, Inc., and Fiat Chrysler Finance North America, Inc.

We note that the Issuing Parties have withdrawn the subpoena as to Maserati North America, Inc.  *See* Nov. 24, 2015 Ltr.; Jan. 13, 2016 Ltr.  We also note that the Issuing Parties are withdrawing the subpoenas to any finance, credit,

banking, or capital SSE unless such SSE solely possess certain transactional data. *See* Jan. 13, 2016 Ltr.  Fiat Chrysler Finance North America does not provide financing or credit to consumers, and thus, does not possess – let alone uniquely possess – transactional data relating to the sale of vehicles in the United States.  Rather, it performs cash management, investment, corporate finance services, and working capital financing for Fiat S.p.A Group companies in the North American region.  Accordingly, we understand that the Issuing Parties do not intend to enforce the subpoena as to Fiat Chrysler Finance North America.  Out of abundance of caution, however, we are serving objections on behalf of both Maserati North America and Fiat Chrysler Finance North America, Inc.

As for Chrysler Transport, Inc., it was a subsidiary of Chrysler LLC and on April 30, 2009 filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the United States Code, and was subsequently known as Old Carco Transport Inc.  Pursuant to a liquidation plan confirmed on April 23, 2010 and effective April 30, 2010, Old Carco Transport Inc. was dissolved.  Attempted service on Chrysler Transport Inc. was accordingly rejected on July 23, 2015.  Because Chrysler Transport Inc. was never served, never agreed to waive service, and has not entered an appearance in the case, we are not serving objections in response to the unserved subpoena.

Best,

**David Munkittrick**
Attorney at Law

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3226
f  212.969.2900

dmunkittrick@proskauer.com

greenspaces
Please consider the environment before printing this email.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT S

**Klein, Sheldon**

| | |
|---|---|
| **From:** | Klein, Sheldon |
| **Sent:** | Sunday, January 17, 2016 1:45 PM |
| **To:** | 'Munkittrick, David A.' |
| **Cc:** | 'Kass, Colin'; 'Abeles, Scott M.' |
| **Subject:** | RE: In re Automotive Parts Antitrust Litigation (Master Case No. 2:12-md-02311) |

David - Per my 1/14 email, below, I indicated that I would separately respond to the final paragraph og your 1/13 email. I am now doing so.

Your final paragraph states:

> *In the meantime, we ask that the Parties clarify your position concerning the Insurance, R&D, Design, Finance & Credit, and Banking & Capital SSEs. As you will recall, in prior correspondence you limited the subpoena to one, fifteen, six, four, and six requests respectively. Your current letter now states that you do not intend to move to compel against any of these SSEs unless information responsive to over twenty requests "exists only in the possession of any such SSE." Such SSEs do not believe that any information relevant to this case is solely in the possession of such SSEs, and thus, we assume that the subpoena has been effectively withdrawn as to such entities. If, however, you do intend to serve such entities with a motion to compel, please let us know which ones and the basis for any contention that responsive information is solely within their possession.*

Based on the SSE's representation that Insurance, R&D, Design, Finance & Credit, and Banking & Capital SSEs ("Non-Core SSEs") are not believed to have responsive information, the Parties will hold the subpoenas to those SSEs in abeyance, with the understanding that: (1) if any SSE subsequently learns that responsive information is in the exclusive control of a Non-Core SSE as to any of the requests on which the Parties now move to compel, it will promptly inform the Parties; (and 2) if the Parties are subsequently informed or otherwise have reason to believe that responsive information is in the exclusive possession of a Non-Core SSE, they may seek to enforce the subpoena.

Let me know if you have further questions.

**Sheldon Klein**
klein@butzel.com
Direct: 248.258.1414 | Mobile: 248.703.1008



Stoneridge West Bldg.
41000 Woodward Ave.
Bloomfield Hills, MI 48304
Office: 248.258.1616 | Fax: 248.258.1439
www.butzel.com
Michigan | New York | Washington, D.C.

A LexMundi Member

 

---

**From:** Klein, Sheldon
**Sent:** Thursday, January 14, 2016 5:04 PM
**To:** 'Munkittrick, David A.'

**Cc:** Kass, Colin; Abeles, Scott M.
**Subject:** RE: In re Automotive Parts Antitrust Litigation (Master Case No. 2:12-md-02311)

David –

The Parties disagree with your characterization of the status and history of negotiation. We have spent 4 months attempting to work with the SSEs and made repeated and substantial concessions to narrow the scope of the subpoena, with no meaningful proposal from the SSEs. Accordingly, we are more than skeptical that a negotiated resolution is possible. And we do not believe it is necessary or appropriate to waste more time negotiating when doing so is unlikely to result in a resolution.

Nevertheless, the Parties are willing to allow the SSEs until noon on Tuesday, January 19 to respond, with corresponding adjustments to the previously proposed briefing schedule, in the event that a motion remains necessary.
Please advise as soon as possible whether the SSEs are willing to respond by Tuesday.

The parties will respond separately with respect to the final paragraph of your email.


**Sheldon Klein**
klein@butzel.com
Direct: 248.258.1414 | Mobile: 248.703.1008



Stoneridge West Bldg.
41000 Woodward Ave.
Bloomfield Hills, MI 48304
Office: 248.258.1616  |  Fax: 248.258.1439
www.butzel.com
Michigan  |  New York  |  Washington, D.C.

A LexMundi Member

  

---

**From:** Munkittrick, David A. [mailto:DMunkittrick@proskauer.com]
**Sent:** Thursday, January 14, 2016 3:29 PM
**To:** Klein, Sheldon
**Cc:** Kass, Colin; Abeles, Scott M.
**Subject:** In re Automotive Parts Antitrust Litigation (Master Case No. 2:12-md-02311)

Sheldon,

Please see attached objections and responses to the subpoenas served on FCA US LLC, Maserati North America, Inc., and Fiat Chrysler Finance North America, Inc.

We note that the Issuing Parties have withdrawn the subpoena as to Maserati North America, Inc.  *See* Nov. 24, 2015 Ltr.; Jan. 13, 2016 Ltr.  We also note that the Issuing Parties are withdrawing the subpoenas to any finance, credit, banking, or capital SSE unless such SSE solely possess certain transactional data.  *See* Jan. 13, 2016 Ltr.  Fiat Chrysler Finance North America does not provide financing or credit to consumers, and thus, does not possess – let alone uniquely possess – transactional data relating to the sale of vehicles in the United States.  Rather, it performs cash management, investment, corporate finance services, and working capital financing for Fiat S.p.A Group companies in the North American region.  Accordingly, we understand that the Issuing Parties do not intend to enforce the subpoena as to Fiat Chrysler Finance North America.  Out of abundance of caution, however, we are serving objections on behalf of both Maserati North America and Fiat Chrysler Finance North America, Inc.

As for Chrysler Transport, Inc., it was a subsidiary of Chrysler LLC and on April 30, 2009 filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the United States Code, and was subsequently known as Old Carco Transport Inc.  Pursuant to a liquidation plan confirmed on April 23, 2010 and effective April 30, 2010, Old Carco Transport Inc. was dissolved.  Attempted service on Chrysler Transport Inc. was accordingly rejected on July 23, 2015.  Because Chrysler Transport Inc. was never served, never agreed to waive service, and has not entered an appearance in the case, we are not serving objections in response to the unserved subpoena.

Best,

**David Munkittrick**
Attorney at Law

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3226
f  212.969.2900

dmunkittrick@proskauer.com

greenspaces
Please consider the environment before printing this email.

*********************************************************************************************
*********************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*********************************************************************************************
*********************************************************************