# EXHIBIT 5



a professional corporation

**Sheldon H. Klein**
**248 258 1414**
klein@butzel.com

Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
**T:** 248 258 1616  **F:** 248 258 1439
**butzel.com**

November 24, 2015

**VIA EMAIL**
Colin Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Suite 600 South
Washington, DC  20004-2533

Re:  *In re Automotive Parts Antitrust Litigation.*, 2:12-md-02311

Dear Colin:

We write on behalf of the Parties[1] in response to the Specified Subpoenaed Entities' (the "SSE"s)[2] letter dated October 29, 2015 (the "October Letter").  As you know, the class certification schedule in this litigation requires that opening briefs be filed within the next ten months for three separate part[3] cases (the "Lead Three" cases).  With this deadline in mind, the Parties have endeavored to significantly narrow the scope of the Subpoena[4] in an effort to reach a timely compromise and advance this process expeditiously.  Our proposal is narrowly tailored to seek information that is highly relevant to class certification while minimizing the burden imposed on the SSEs.  We ask that you carefully consider this proposal and engage us in a meaningful discussion regarding these matters so that we can proceed to a prompt resolution.

**1.     Prioritization**

The Parties, with input from their economic experts, have significantly narrowed the scope of the Subpoena.  Below please find a chart setting forth a narrowed set of requests the

---

[1] The serving parties, herein the "Parties," "we," or "our," include:  End Payor Plaintiffs (EPPs); Auto Dealer Plaintiffs (ADPs); Truck and Equipment Dealer Plaintiffs (TEDPs); the State of Florida; the State of Indiana; and Defendants in all actions.  However please note not all parties join all requests.
[2] The term "SSEs," "you," or "your," refers to those subpoenaed entities that joined the October Letter.
[3] Wire Harnesses, Bearings, and Anti-Vibrational Rubber Parts.
[4] The term "Subpoena" refers to those subpoenas served on the SSEs by the Parties across all product tracks within the MDL (No. 2:12-md-02311).

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

Parties consider essential in connection with upcoming class certification motions (the "Narrow Requests"). The Parties are willing to hold all other requests in abeyance.[5]

The information sought in the Narrow Requests includes both transactional and non-transactional data. We do not agree with your assertion that documents other than transactional data are "unlikely to produce material, non-duplicative information." October Letter, at 8. As explained in greater detail below, SSEs are "uniquely in possession" of key documents which are highly material to the Parties' claims and defenses.

Nevertheless, in order to significantly reduce the burden imposed by requests that seek non-transactional data,[6] we have expressly narrowed several of those requests so that, if it is less burdensome to the SSEs to do so, they may exclude information that is already in the Parties' possession. In addition, we reiterate our suggestion that, to the extent it is less burdensome to do so, SSEs first produce documents concerning procurement of parts concerning the parts at issue in the Lead Three cases, which will be considered for class certification in 2016.

| Narrow Requests | | |
|---|---|---|
| **Category** | **Example of Type of Information Sought** | **Narrow Requests** |
| Injury, if any, to OEMs<br><br>*This information is relevant to determining what overcharge, if any, was borne by OEMs.* | Pricing Decisions and Negotiations<br><br>*Parties seek information to determine how OEMs negotiate and affect the pricing of parts. Information potentially relevant to this inquiry includes, but is not limited to, information regarding the RFQ process for each part. For example, documents showing how a "target" price for an RFQ was determined; documents showing and describing the negotiation process for RFQs; documents showing the criteria for awarding an RFQ.* | 1(e)-(f)[7]; 1(g); 1(l); 14(c); 28 (last two sentences); 30; 33 (comparing the same components made by different suppliers) |

---

[5] The term "abeyance" in this letter means that the Parties would not seek further production except for substantial cause.

[6] Since we do not have specific information about the systems and practices of particular SSEs, we assume for present purposes that non-transactional information may be more burdensome to produce than transactional data. However, we believe that is a broad generalization that does not always apply. For example, we understand that some SSEs maintain RFPs, responses and related communications in electronic databases.

[7] References to subparts of requests incorporate the introductory clause(s).

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

| | | |
|---|---|---|
| Injury, if any, to OEMs<br><br>*This information is relevant to determining what overcharge, if any, was borne by OEMs.* | Cost-down Reductions<br><br>*Parties seek information regarding cost reductions which occur after an RFQ is awarded. This information includes, but is not limited to, information regarding post award price changes, including due to design changes, changes in volume or production location, annual price reductions, long term cost-cutting initiatives, or any regular processes for adjusting post-RFQ pricing.* | 1(g) and 23(2) |
| Injury, if any, to OEMs<br><br>*This information is relevant to determining what overcharge, if any, was borne by OEMs.* | Transactional Data (Purchases)<br><br>*Parties seek information to determine the net price paid (i.e., including the terms and conditions of each purchase) for parts by OEMs. Information which is potentially relevant to this inquiry includes, but is not limited to, any adjustment made to the purchase prices (e.g., rebates, credits, and discounts), taxes, financing, and shipping and freight costs.* | 1(a)-(d) |
| Injury, if any, to OEMs<br><br>*This information is relevant to determining what overcharge, if any, was borne by OEMs.* | Agreements and Terms with Suppliers<br><br>*Parties seek documents showing agreements reached with parts suppliers. These documents may include, but are not limited to, Memoranda of Understanding, Master Purchasing Agreements, Component Purchasing Agreements, Long Term Agreements and Purchase Orders and standard Purchase Order terms and conditions, as they may be modified in particular instances.* | 3 |
| Injury, if any, to ADPs and TEDPs<br><br>*This information is relevant to determining what alleged overcharge, if any, was borne by ADPs and TEDPs.* | Transactional Data (Sales)<br><br>*Parties seek information regarding terms of sale of OEM vehicles, including, but not limited to, the invoice price of a vehicle, any adjustments to the invoice price (e.g., rebates, credits, and discounts), taxes, floor plan financing, bill of materials and input costs, and shipping and freight costs. In addition,* | 4(a)1-2, 4(a)3(a)-(e);4(a)3(h), (j); 4(a)3(k); 4(a)4; 4(a)(7); 4(a)8; 4(a)(12) (if in |

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

| | | |
|---|---|---|
| | parties also seek information regarding OEMs' profit margins. | data field); 4(a)13; 4(e); 4(j); and 5 |
| Injury, if any, to ADPs, TEDPs, and to End-Purchasers<br><br>*This information is relevant to determining what alleged overcharge, if any, was borne by ADPs, TEDPs, and End-Purchasers.* | Vehicle Pricing Practices<br><br>*Parties seek information regarding how OEMs price their vehicles. Information which is potentially relevant to this inquiry includes, but is not limited to, policies regarding MSRP, "sticker" or invoice prices, documents showing the effect of competitors' vehicle pricing, documents showing whether, and if so how, changes in input costs affect MSRP, "sticker" or invoice prices.* | 1(f); 4(h); 13a; 15; and 22 |
| Injury, if any, to ADPs and TEDPs<br><br>*This information is relevant to determining what alleged overcharge, if any, was borne by ADPs and TEDPs.* | Effects of Component Parts Prices to Vehicles Prices<br><br>*Parties seek information which will enable them to track a component part after it is installed in a vehicle, and its effect, if any, on the price of the vehicle. Information which is potentially relevant to this request includes, but is not limited to, efforts to track each part after it has been installed in a vehicle. In addition, any studies regarding how the cost of component parts is calculated, or otherwise influences, the ultimate price of a vehicle.*<br>*It is also important for our experts to be able to obtain data that links component parts to the vehicle or models in which they are installed.* | 1(m); 13b; and 16 |

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

| | | |
|---|---|---|
| Injury, if any, to End Purchasers<br><br>*This information is relevant to determining what alleged overcharge, if any, was borne by End Purchasers.* | Sales to End-Purchasers<br><br>*Parties seek information regarding the terms of the sale of the new vehicles to End Purchasers. Information potentially relevant to this inquiry includes, but is not limited to, the terms and conditions of the sale of the vehicle (including, but not limited to, the nominal unit price of the vehicle, trade in credit versus trade in value, financing terms, rebates, add-ons, etc.).* | 4(b)1;<br>4(b) 2(a)-(e);<br>and<br>34 |
| Documents previously produced by SSEs to regulatory authorities<br><br>*This information, to the extent it is already compiled, would relieve any burden regarding new search and production for the same data.* | | 27 |
| Documents concerning discussions with Defendants and other suppliers regarding the conspiratorial conduct alleged in this MDL. | *Plaintiffs seek information regarding communications between OEMs and suppliers regarding the conduct alleged in this MDL to understand the conspiracy and how it affected and was viewed by the victims Defendants identified in their plea agreements.* | 31[8] |

---

[8] Defendants object to Request 31 on the ground that it seeks documents which Defendants believe are protected by the settlement-communications privilege. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003); *PVMI Int3d 976 (6th Cir. 2*, No. 13-14775, slip op. at 2 (E.D. Mich. June 22, 2015) (quoting *Graff v. Haverhill North Coke Co.*, 2012 WL 5495514, at *32 (S.D. Ohio Nov. 13, 2012)); *see also Snap-On Bus. Solutions, Inc. v. Hyundai Motor Am.*, 2011 WL 6957594, at *1 n.2 (N.D. Ohio Feb. 3, 2011). Plaintiffs believe that the documents are not privileged and are discoverable. *State v. Little River Band of Ottawa Indians*, 2007 WL 851282, at *2 (W.D. Mich. 2007); *see also* G*oodyear*, 332 F.3d at 980; *Transportation Alliance Bank, Inc. v. Arrow Trucking Co.*, 2011 WL 4964034, at * 1 (N.D. Oklahoma 2011).

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

**2.      Non-manufacturing, or "Non-OEM," SSEs**

The Narrow Requests no longer include most of the requests seeking information likely to be maintained by non-manufacturing SSEs. That said, only individual SSEs can speak to their own ability to provide the information sought in the Narrow Requests. At this point, we request that SSEs inform us which, if any, "non-OEM SSEs" are not in possession of any information responsive to the Narrow Requests. Should any "non-OEM SSE" certify that it does not have any such responsive information, requests to that SSE will be held in abeyance.

However, certain requests seeking information from finance and credit entities remain a priority for Defendants and End-Payors because they bear directly on Defendants' position regarding the impact of dealer and consumer financing terms on questions of impact and injury.

**3.      Smaller OEMs**

SSEs suggest that the Subpoena be withdrawn or held in abeyance for any OEM whose sales constitute less than 5% of the U.S. Vehicle Sales market. We cannot agree to an arbitrary 5% market share cut-off. 5% equates to approximately 750,000 vehicles per year, which is far from a "small" OEM. The U.S. Vehicle Sales market is highly competitive and most OEMs operating within that market do not have more than a 5% market share. *See*, *e.g.*, THE WALL STREET JOURNAL, http://online.wsj.com/mdc/public/page/2_3022-autosales.html#autosalesA (last visited Nov. 7, 2015). For example, in 2014, approximately thirty OEMs accounted for all U.S. Vehicle Sales. *See id.* Of those, twenty-four had less than a 5% market share. *See id.* Moreover, SSEs' proposal does not account for the fact that OEMs' market shares varied over the relevant time period.

An arbitrary 5% cut-off would also exclude OEMs highly relevant to this litigation. Under SSEs' proposal, the subpoenas served on all Subaru, Hyundai and Kia entities – which in the aggregate constitute more than 10% of the market – would have to be withdrawn or held in abeyance. *See id.* (indicating that in 2014 Hyundai had 4.4% market share; Kia had 3.6% market share; and Subaru had 3.2% market share). However, each of those OEMs is mentioned in at least one Department of Justice Press Release regarding the sale of price-fixed component parts. *See, e.g.,* The U.S. Dept. of Justice, http://www.justice.gov/archive/justice-news-archive.html (last visited Nov. 7, 2015).

Nevertheless, the Parties are mindful of striking a balance between the discovery of highly relevant information and minimizing burden for third parties. Accordingly, we propose holding in abeyance the subpoenas for the following SSEs: Rolls-Royce Motors Cars NA, LLC; and Maserati N.A., Inc.

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

**4. Foreign OEMs**

The Parties do not agree that the Subpoena should be construed "as limited to seeking information in the possession of the specific subpoenaed entity relating to the purchase of relevant components in the United States for vehicles sold to dealers in the United States." October Letter, at 4. In an effort to move forward in a productive and efficient manner, we agree that the Subpoena seeks only the production of documents and data that are within the SSEs' possession, custody and/or control, but we do not agree to exclude data or documents based on geographic location of part purchase, manufacture, assembly, or sale.

**5. Purchasing Data**

Critical pieces of purchasing data are solely within the SSEs' possession and we reject any assertions to the contrary. First, the Parties do not have access to SSEs' purchasing data from non-Defendant suppliers. Second, component suppliers' data generally do not include the OEMs' part numbers, which are critical to any analysis of the transaction data.

In your letter, you state that "[non-defendant] suppliers are unlikely to constitute a substantial portion of the market and would not be an appropriate benchmark for any pricing model." October Letter, at 4. This is incorrect. In the case of certain relevant component parts, including among the Lead Three cases, certain parties believe there are OEMs that were not supplied by any of the named Defendants. Likewise, we believe that there are suppliers for most of the relevant component parts that are not among the named Defendants. In any event, we believe that the Parties' economic experts are in the best position to comment on whether non-Defendant suppliers can serve as an appropriate benchmark for any pricing model. Furthermore, this requires analysis that cannot be done without looking at the underlying data – data uniquely in the possession of OEMs, including the SSEs.

Lastly, the Parties note that, at least with respect to transactional data, it is unlikely to be more burdensome for SSEs to produce information for both non-Defendant suppliers and Defendant suppliers together than to produce information for non-Defendant suppliers alone. In fact, it is likely less burdensome to produce information for both Defendant and non-Defendant suppliers together given that efforts to narrow the production would not be necessary (*e.g.*, selective production, redaction, etc.). SSEs should therefore agree to produce their purchasing data from both Defendant and non-Defendant suppliers.

**6. RFQ Documents**

Request for quotation ("RFQ") documents and other documents evidencing SSEs' upstream purchases are highly relevant to this litigation and often "uniquely in your possession" (including, but not limited to, documents containing information regarding "target prices," internal discussions regarding an RFQ, the internal approval process for an RFQ, the number and

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

identity of suppliers receiving a given RFQ and submitting bids for a part in response, the internal guidelines that SSEs used to evaluate and pick a winning bidder, and the motivations behind any post-award price and specification adjustments). Such information is highly relevant to determining whether there was an overcharge, and, if so, its size.

You note that Direct Purchaser Plaintiffs ("DPPs") have not joined the Subpoena. First, DPPs are not parties in two-thirds of the product tracks in the MDL. Second, the fact that DPPs have not joined the Subpoena is irrelevant to the SSEs' obligations under the Subpoena. The information sought in the Subpoena is necessary for the litigation of the EPPs, ADPs, TEDPs, the State of Florida, and the State of Indiana's cases regardless of whether DPPs join the Subpoena or not. It is also critical to the defenses of Defendants across all parts cases.

Nevertheless, as stated above, the Parties are mindful of striking a balance between discovery of highly relevant information and minimizing the burden for the SSEs. Accordingly, to the extent it is less burdensome, the Parties are willing to accept an initial production of RFQ documents relevant to the Lead Three cases, which are scheduled to go through the class certification process first, *i.e.*, those related to the following three component parts: Wire Harness Products, Bearings, and Anti-Vibrational Rubber Parts. We are willing to discuss an appropriate staggered schedule for the production of RFQ documents with respect to all other component parts in light of the procedural postures of those cases.

**7.     Sales Data**

The Master has not ruled on production of sales data from OEMs. Retail-level sales data will be used by End-Payors to evaluate damages and by Defendants to assert a pass-on defense. Without detailed sales data, experts will not be able to effectively isolate the effects that a change in a particular component's price had on a vehicle's price from that of any other component at issue in the MDL. This is information of which only OEMs are in possession. SSEs' contention that experts can control various "downstream" related factors by using publicly available, macro-economic indicators ignores the nature of this MDL.

**8.     Replacement Parts**

All Plaintiffs have agreed that they will not pursue claims for replacement parts. Accordingly, we confirm that Exhibit B to the Subpoena is withdrawn.

**9.     Time Period**

The temporal scope of the Subpoena cannot be narrowed as you suggest. The Parties are bound by the allegations in the operative complaints describing the length of the conspiracy and therefore cannot agree to a narrower time period. In order to advance your argument, you rely on a Model Discovery Order that is not an order in this case. The Court has entered various Stipulations and Orders Regarding Production of Electronically Stored Information and Hard

BUTZEL LONG

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

Copy Documents in the parts cases in this MDL. *See* Stipulation and Order Regarding Production of Electronically Stored Information and Hard Copy Documents (12-cv-100; ECF No. 114) (Nov. 15, 2012); (12-cv-200; ECF No. 34) (Sept. 25, 2012); (12-cv-300; ECF No. 33) (Sept. 25, 2012); (12-cv-400; ECF No. 29) (Sept. 25, 2012); (12-cv-500; ECF No. 87) (Mar. 13, 2013); (12-cv-600, ECF No. 78) (Mar. 13, 2013). None of these orders preclude a party from seeking information created more than five years before the filing of the lawsuit. *See id.*

**10. Costs**

As the Parties have stated several times, most recently in our October 14, 2015 correspondence, we are available to discuss, with each SSE, whatever cost-sharing may be appropriate once each SSE has had an opportunity to determine what responsive information is in its possession and what reasonable costs will be associated with its production. However, none of the SSEs have presented the Parties with this information to date. Your assertion that our failure to indicate our position on this issue does not "advance the ball" is without merit, as we are unable to engage in a productive conversation about costs or present a proposal without the requisite information from each SSE. Notably, courts have held that it is the burden of subpoenaed entities to present a cost estimate before it can be determined whether the expense is significant enough to warrant cost-shifting. *See United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL 4513600 at *7 (E.D. Mich. October 1, 2012) (ordering the subpoenaed entities to provide detailed estimates of the reasonable costs that they will incur to comply with Plaintiff's subpoenas so that the Court can determine whether the costs are significant, and if they are, whether any amount should be shifted to Plaintiff). Your suggestion that we present a proposal at this time improperly shifts this burden, and the Parties are not in a position to do so until each SSE presents this cost-related information.

You also indicate that the SSEs "will not expend time, effort, and resources searching for or producing documents absent the Parties' agreement to fully reimburse [SSEs'] costs." October Letter, at 9. Your legal obligation to comply with the Subpoena and produce relevant information, however, is not conditioned on guaranteed reimbursement of cost. Cost-shifting can be granted by courts, but in doing so the courts take into consideration a variety of factors including, but not limited to, the subpoenaed entity's interest in the outcome of the case, whether the subpoenaed entity can more readily bear the cost of production, and whether the litigation is of public importance. *See id.*, at *3.

Therefore, your unwillingness to produce, or even search for, responsive documents absent an agreement on costs is unreasonable. The Parties' contribution to each SSE's costs will be highly dependent on the results of these searches and productions, and a variety of other factors that we cannot ascertain at this time.

In addition, to get a better understanding of what costs may be involved, and to attempt to minimize costs and burden, the Parties have requested that the SSEs confirm if they have made productions to the DOJ or any other regulatory authorities, and to confirm whether they will

Colin Kass
PROSKAUER ROSE LLP
November 24, 2015

provide those productions to the Parties. The Parties again request that the SSEs provide this information.

To be clear, the Parties are not opposed to reimbursing SSEs' reasonable costs associated with production, following further discussions about the burden and resources required to collect and produce data and documents responsive to the Narrow Requests. However, the case law does not permit SSEs to hold up further discussions or document production pending a final agreement with the Parties on cost-shifting.

**11.   Path Forward**

We request that you carefully review our proposal and reply with a document setting out areas of agreement and areas where we have reached impasse.

We look forward to your response.

                            Sincerely,

                            BUTZEL LONG

                            */s/ Sheldon Klein*

                            Sheldon H. Klein

SHK:dll

cc (via email):  Counsel for all Parties