# EXHIBIT 9

 Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

October 29, 2015

Colin Kass
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

*Via Email*

Ronnie S. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
ronnie@hbsslaw.com

Re: *In re Automotive Parts Antitrust Litig.*, 2:12-md-02311

Dear Ronnie:

We write on behalf of the Specified Subpoenaed Entities in response to your October 14th letter.[1] We too share your desire to cooperate and to quickly identify issues on which we cannot agree. To that end, as we explain below, we believe the Parties and the SSEs should work towards a master document that sets forth our agreements as to any common issues, and identifies those areas in which we have reached impasse. We undertake to address each of the points raised during our October 2nd Summit Conference and your October 14th letter.[2]

**1.**   *The Parties' Failure to Justify Their Overwhelmingly Broad Subpoena*

As we mentioned at the Summit Conference, we believe that the Subpoena is facially unenforceable. We explained our concerns about the extraordinary breadth of the subpoena, the undue burdens it imposes, and the need to develop a workable approach for identifying what, if any, information the Parties truly need but either do not have, or cannot obtain from any source other than the SSEs. The law protects recipients of the subpoena, as non-parties, from being forced to undertake burdensome and costly efforts to compile information that is likely duplicative and at best of marginal relevance. The Parties have elsewhere in this litigation admitted that "a party that seeks discovery from an unnamed, or 'absent,' class member has the burden to show the necessity of the proposed discovery," which requires that party to "affirmatively show that there is a particularized need' for such discovery." Dkt. 338, 12-cv-102. We therefore asked before, during and after the Summit Conference that the Parties reevaluate the subpoena in light of these principles – and in particular that the Parties identify

---

[1] The SSEs participating in the October 2nd Summit Conference, and who join this letter, are listed on Exhibit A.

[2] Again, this is not a comprehensive discussion of all objections to and issues with the Subpoena, and we do not waive any objections some of us have already formally preserved through written objections, and any objections we may raise in future written responses to the Subpoena.



Page 2

what specific information they genuinely need at this point in the litigation, and do not have and cannot get elsewhere.

You have not done this. In response, the Parties have made no meaningful effort to revise the subpoena or reduce the immense burdens it imposes. Rather than identify the information already in the Parties' possession and the missing information for which the Parties have a particularized need and cannot get elsewhere, the Parties take the position that every scrap of paper or bit of data that relates to the purchase of parts or the sale of cars in America is fair game.[3] We clearly do not agree. The Parties' approach is not proportional or fair. Furthermore, it is not consistent with applicable law, or even the positions the Parties themselves have previously taken in this litigation.

More importantly, because the Parties have not tried to justify the scope and breadth of the subpoena, it is difficult to constructively discuss what, if any, information ought to be produced under the rule of proportionality. *See* Fed. R. Civ. P. 26(b)(1), effective Dec. 1, 2015 (emphasizing that the "scope of discovery" is limited to that which is "proportional to the needs of the case"). We trust that, as our discussions proceed, the Parties will be more forthcoming about the information they currently possess and the basis for any contention of a particularized need.

**2.** *Non-OEM SSEs*

During the Summit Conference, we noted that over half of the at least 90 "OEM" subpoenas were not actually issued to an OEM. To address this concern, we proposed that the Parties hold these subpoenas in abeyance until the scope of the subpoenas had been negotiated with the OEM SSEs. By doing so, both the Parties and all SSEs will better understand the (revised) scope of each request, and can then make a more reasoned determination of whether discovery from the non-OEM SSEs is likely to materially advance the Parties' ability to litigate their case.

You appear to have rejected this proposal. Instead, you have created approximately six sub-classes of non-OEM SSEs and demanded full compliance with various requests for each. This approach is flawed because it imposes huge burdens before any determination of what the Parties truly need and can obtain under Rule 45. That said, we understand that the Parties have now withdrawn all but the following requests for certain non-OEM SSEs. That, however, does not reflect a genuine effort to narrow the scope of the subpoena to the non-OEM SSEs. The requests you eliminated, given the nature of the operations of the non-OEM SSEs, should not reasonably have been served on the non-OEM SSEs in the first place. The bulk of the burden for these entities lies in the remaining requests for which no concession has been made.

---

[3] Your letter notes that "not all Parties join in" your proposals. Apart from one discrepancy, however, you did not identify the specific positions of each Party. Each Party seeking enforcement of a subpoena, however, bears the burden of justifying the request. Accordingly, we need to know precisely which Party is seeking enforcement of each particular request and the basis on which that party seeks to establish a particularized need.



Page 3

| Type of Entity | Parties' Proposed Scope of Subpoena |
|---|---|
| Truck and Equipment SSEs | Unspecified |
| Finance and Credit | Request Nos. 4(a)(3)(e), 4(a)(4), 4(a)(6), 4(b)(2)(d), 4(c), 4(c)(2)(e), 4(c)(2)(f), 4(d), 4(i), 4(k), 7, 9 (limited to summary transactional data and summary documents), 21, 29, 34, and 37 (as to Honda and Nissan) |
| Insurance | Request Nos. 4(b)(2)(e), 4(d), 4(k), and 9 (limited to summary transactional data and summary documents) |
| Design | Request Nos. 1(g)(6)-(8), 1(g)(17), 14(a), 27, 32, 33, 35, and 37 (as to Honda and Nissan) |
| R&D | Request Nos. 1(g)(6)-(9), 1(g)(17), 1(k), 1(j), 1(l), 4(h), 5, 8, 12, 13, 14, 15, 16, 17, 23(3)(a), 24, 26, 27, 28, 33, 35, and 36 |
| Banking and Capital | Request Nos. 9 (limited to summary transactional data and summary documents), 10, 11, 13(a-b), 14, 16, 17, 18, 19, 21, 33, 34, and 37 (applies only to Honda and Nissan) |

As to these remaining requests, many issues still need to be addressed, some of which we discuss below. Until you provide further clarity concerning the scope of these requests, agreement would be premature. For example, if it turns out that downstream discovery should not include financing costs (which are wholly unconnected to component part costs), then it would be absurd for the finance and credit SSEs to search for any information. Nonetheless, the non-OEM SSEs will continue to participate in these discussions, and we can further address which, if any, of the requests should apply to them as we finalize the scope of each request.

3.  *Smaller SSEs*

The Parties suggested limiting the subpoena to "smaller entities" with limited sales volume to Request Nos. 1, 3, 4, 5, 8, 12, 13, 14 (in part), 15 (in part), 21 (in part), 22, 23 (in part), 27, 28 (in part), and 33.[4] These limitations do little to alleviate the burden on the smaller SSEs. More importantly, the Parties have not demonstrated how *any* discovery from such

---
[4] We note that you have not identified the "parts" of the various requests for which you seek only partial responses.



Page 4

smaller entities is relevant and justifies the significant burden the subpoena imposes. Any data or documents produced by such smaller SSEs would likely have zero impact on any statistical or regression models relevant to any issue in this case.

Plaintiffs define "smaller" SSEs as "entities whose United States annual sales volume is less than 10,000 vehicles." This constitutes less than 6/100ths of 1% of the 18 *million* annual car sales in the U.S — a level that by any reasonable standard would have to be regarded as remarkably trivial. If an OEM has less than 5% of the U.S. vehicle market, it is unlikely to have any impact on your statistical models or any relevant issue in the case. Thus, we intend to include in the category of "Small U.S. Sales Volume" any SSE with less than 5% market share. The subpoenas to the smaller SSEs should be withdrawn, or held in abeyance, unless and until the relevance and statistical impact of such discovery from them is demonstrated.

**4.**   *Foreign OEMs*

You acknowledge in your letter that most domestic non-OEM SSEs do not have data or information from foreign entities within their corporate family. Accordingly, the SSEs will continue to construe the subpoena as limited to seeking information in the possession of the specific subpoenaed entity relating to the purchase of relevant components in the United States for vehicles sold to dealers in the United States.[5]

**5.**   *Upstream Purchasing Data*

During the Summit Conference, we explained that the subpoena requested huge amounts of purchasing data covering over 55 component parts and well over 140 suppliers. During the call, *the Parties conceded they already possess the purchasing information from each of these 140 suppliers*. Nonetheless, you claimed that you may need more – namely, information from unidentified, non-conspirator component suppliers. We explained, however, that the non-conspirator component suppliers are unlikely to constitute a substantial portion of the market and would not be an appropriate benchmark for any pricing model you may develop in the future.[6] At the end of the call, our understanding was that you were going to take this issue under advisement and revise your proposal. Your October 14th letter, however, is silent on the issue. This non-response does not further constructive conversation on this topic.[7]

---

[5] As noted below, because broad-based discovery of downstream (and other non-purchasing data) unrelated to the purchase of components is not relevant and is unduly burdensome, the domestic non-OEM SSEs that are unaffiliated with a *properly* served foreign OEM SSE would be unlikely to have discoverable information. Assuming you agree, we would be happy to provide you with a list of all such domestic non-OEM SSEs.

[6] It should be noted that, while the Parties suggested that they intended to present a damages model using the non-conspirator pricing data as a benchmark, they have not actually presented an economist affidavit attesting to this approach. Moreover, such an approach would not only be uncommon, it is likely to be flawed since the prices of non-conspirators could also be impacted by a conspiracy that raises overall market prices. In any event, to the extent that the Parties intend to use pricing information from non-conspirator suppliers, they should subpoena such non-conspirators to obtain this information.

[7] It should be noted that, elsewhere, the Parties have represented that they "produced over 16 million pages of documents," and have "produced data on their own sales to OEMs in a limited number of actions." Dkt. 331, 12-cv-



Page 5

### 6. *Upstream RFP Documents*.

The Parties have also failed to demonstrate, or even address, a particularized need for upstream documents. As we explained during the Summit Conference, evidence of the existence of a conspiracy is in the hands of the alleged conspirators themselves. Documents relating to any RFP process, meetings or communications among the conspiring suppliers, and their joint (or independent) responses to such RFPs, are uniquely within their possession. If the Parties cannot prove or disprove the existence of the conspiracy through the information they already have, it is highly unlikely that the information in the SSEs' possession will change that fact. As there has been no particularized showing of need, it would be unfair, unduly burdensome, and against the concept of proportionality to force the SSEs to expend time, effort, and resources searching for that information.

In that regard, we note that the Direct Purchaser Plaintiffs – who must actually prove the conspiracy – have not joined the subpoena. Certainly, if they do not need it, the indirect purchasers and the twice-removed indirect purchasers don't either.

The defendants, likewise, have not identified any purchasing information that is uniquely in the possession of the SSEs that will materially impact their defenses. Because the defendants were intimately involved in the component selection process – and would have been in constant communication with the OEMs – they already have vast amounts of knowledge concerning each particular bid. Any additional production by the SSEs would be unreasonably cumulative or duplicative of the information already available to or in the possession of the Parties.[8]

Moreover, even if there was *some* specific piece of information that the Parties lack, that would not justify a demand that each OEM conduct a search for that information. Putting aside that such information is not material, such particularized information is inconsistent with the class nature of the proceedings. Likewise, the defendants are not entitled to engage in absent class member discovery in an effort to litigate such individual issues at the class stage.[9] This is precisely why "a party that seeks discovery from an unnamed, or 'absent,' class member has the burden to show the necessity of the proposed discovery," and therefore, why the law requires it to "affirmatively show that there is a particularized need' for such discovery." Dkt. 338, 12-cv-102.

---

102; Dkt. 979, 12-md-2311. Obviously, the defendants should finish their production of all their sales data in all relevant actions before any Party demands that the SSEs undertake that effort.

[8] Again, the Parties have not disclosed whether they have already searched for and produced to each other all the bidding information in their own files. Certainly, until that has been complete, it is at best premature to ask the OEMs to "fill gaps" that likely do not exist.

[9] The only information that defendants identified during the Summit Conference that they did not have (or did not comprehensively have) was so-called "target prices" for bids. The existence of a target price, however, does not speak to whether the defendants conspired or what prices would have been absent the conspiracy. Indeed, the very purpose of keeping a target price confidential is the expectation that a competitive bidding process will result in a price below the target. Moreover, the target price itself may be infected by a long-running conspiracy to the extent that target prices are based on historical pricing. In any event, regardless of the "relevance" of target prices, it does not justify the breathtaking scope of the searches your subpoena contemplates.



Page 6

### 7. *Downstream Sales Data*.

The Parties have also failed to address the downstream discovery issues that we raised during the Summit Conference. As noted, your subpoena seeks virtually every piece of information bearing on the value, pricing, or nature of the transaction for every vehicle sold in America over the last 20 years. This facially overbroad request would be unreasonable in any event, but here all the more so given the absence of any demonstrable showing of relevance – under the Special Master's prior orders – because the requests are not limited to information directly discussing the impact of component costs on vehicle pricing. As the Parties have acknowledged, "downstream data [has been] already determined to be non-discoverable by the Special Master" each time that he has been presented with the issue. Dkt. 338, 12-cv-102. For example, the Special Master has already quashed requests seeking:

- "Financing and promotional" information

- "Dealer purchasing" information

- Dealership budgets and cost guidelines

- Dealer compensation, bonus, and fringe benefits.

- Vehicle gross profit, profit margin, operating profit, projected profit, net profit, and/or profit-and-loss statements, and month and annual sales and financial report[s] provided to an OEM.

*See* Dkts. 338, 331, 352, 12-cv-102. These orders all came in the context of *party discovery*, which is not subject to the same limitations as non-party discovery. Moreover, the burden contemplated here is multitudes greater, since the subpoenas facially cover every vehicle sold in America over the last 20 years.

That aside, the clear import of the Special Master's decisions is that downstream information that is not directly tied to component prices "is irrelevant, not likely to lead to the discovery of relevant information," and its production would be unduly "burdensome." *Id*.

The Parties have made no showing to the contrary. And as we explained during the Summit Conference, the downstream discovery you seek is neither necessary to litigate the case, nor likely to be useful. On the call, the Parties suggested that they would like this information to build a complex, bottoms-up model of vehicle pricing as it goes from a pile of disparate components, to production of a vehicle, to delivery on the dealer's lot, and to the passage of title to the end customer or finance company. The Parties, however, have not shown why such a model is necessary to litigate the case, let alone that any such model could ever be constructed (and we doubt it could).

The speculation by Parties' counsel that this information might nonetheless be useful for this purpose ignores how economists normally calculate damages in antitrust cases. Generally, they run regressions. But regressions do not need to include every piece of information to



Page 7

generate reliable results.[10] In addition, because many of the OEMs have different systems and different availability of data, the concept of a bottoms-up model would appear unworkable because of the inevitable huge gaps and inconsistent datasets among all the OEMs. The Parties have not shown that their experts cannot control for various "downstream" related factors just as well using publicly available, macro-economic indicators (such as interest rates) as by granular, vehicle-specific information that may, or may not, be captured by the OEMs' data systems.

When we explained these issues during the Summit Conference, the Parties had no response. Instead, you requested the opportunity to confer with your group. In light of these concerns, and despite our position that downstream data is irrelevant, we had expected you to present a narrowed proposal for downstream discovery that was more manageable, directly tied to the Parties' need and the pricing of components (the issue in the case), and likely to yield a consistent data set. Instead, you remained silent on the issue. Again, that is not a sufficient response to permit constructive discussion of these issues.

**8.** *Replacement Parts*

During the Summit Conference, we noted that the Parties appeared to have withdrawn their claims relating to replacement parts.[11] In response, you state that certain unidentified public entity plaintiffs have asserted claims relating to replacement parts for wire harnesses. But you have not identified whether "any party is [still] seeking data and documents [from the SSEs] regarding replacement parts." Accordingly, until otherwise notified, we will deem Exhibit B to the subpoena withdrawn.

**9.** *Time Period*

During the Summit Conference, we noted that the subpoena sought documents and data for every component at issue and every vehicle sold in the United States over a 22-year time period. In response, you offered to narrow the subpoena to about *18 years* for most components and all vehicles. This continues to be unreasonably burdensome, especially in light of the Parties' failure to identify the particular information they already possess and the information

---

[10] Standard econometric texts explain that absent concerns about omitted variable bias – which is not present here because there is no showing that a finance variable (for example) are **both** correlated with the component costs (the variable of interest) and prices (the dependent variable) – there is no need to include every variable that may impact the price of a vehicle.

[11] *See* Hrg. Tr. 21-22 (Dkt. 892, 12-md-2311) ("THE COURT: So if I understand you correctly, the auto dealers in the wire harness … have dropped the aftermarket – the replacement parts claims … those parts of their cases, okay, but the end payers have not? MS. SULLIVAN: No, the end payers have as well in the wire harness case. THE COURT: Okay. MS. SULLIVAN: So the question is whether they have also withdrawn or are intending to withdraw those claims in the other auto parts cases other than wire harnesses. …. MR. WILLIAMS: Good morning, Your Honor. Steve Williams for the end payers. It is good to see you again. What Ms. Sullivan has said is correct, and we did confirm that with her this morning, that we are not pursuing claims for replacement parts, we are pursuing claims for people who purchased automobiles -- vehicles with price-fixed parts in them. …. I apologize if I was not clear but, yes, what I said about pursuing claims for people who purchased or leased automobiles with the price-fixed parts in them applies across the board to all the cases we presently have filed. ***We are not pursuing damage claims for replacement parts, only parts. THE COURT: In any of the cases? MR. WILLIAMS: Correct.***")



Page 8

needed. The Parties have already admitted that "document requests … covering a period of some fifteen years … obviously raise both burden and relevance concerns." Dkt. 347, 12-cv-102. The subpoenas themselves also facially violate the Court's Order governing ESI, which precludes "a party" from seeking information that was "created more than five (5) years before the filing of the lawsuit." *See* Model Discovery Order, § 2.04(f)(2). This Order expressly applies to all subpoenas issued under Rule 45, absent "agreement … with the nonparty." *Id.* § 3.04. Here, the Parties have not shown good cause for requiring the SSEs to search for more dated information. The model order strikes a balance between burdens and benefits, recognizing that many cases involve historical facts.[12] Accordingly, if any production of information is required, the time period should be limited to the period between January 2007 and the date of the subpoena, if information for this period is shown to be relevant and unavailable from other sources.[13]

**10.**     *Prioritization*

In your letter, you divvy up the subpoena into "first priority requests" and "second priority requests." While you acknowledge that you "are willing to prioritize the subpoena requests," you do not indicate what you mean by that. While we understand that you are not withdrawing the second priority requests with prejudice, we assume that you mean that such requests will be held in abeyance indefinitely, that the Parties do not have a *present* intention of seeking compliance with such requests, and that the SSEs do not need to comply with them absent a showing of good cause by the Parties. If that is not correct, please let us know.[14]

You have also proposed that the Parties prioritize transaction data over non-transactional data. We agree that non-transactional data is extremely burdensome to produce and unlikely to generate material, non-duplicative information. Accordingly, we agree that the non-transactional-data requests should be held in abeyance in the same way as your second priority requests.

Your letter also reiterates your offer to "frontload production for cases that will come up first for class certification briefing." As we have explained, however, the Parties and the SSEs need to develop an overarching plan for compliance with the subpoena. Producing in piecemeal fashion would not, as you assert, "lessen the burden of responding to the subpoena." That said, we expect that as each request is negotiated, the Parties may find that a more limited universe of information will satisfy any need. To the extent appropriate, we may consider whether to first

---

[12] Your letter requests that the SSEs produce transaction data for the "before" period. But the fact that DOJ plea agreements were limited in time does not mean that the conspiracy arose at that time. Indeed, both the plea agreements and the Complaints allege that the conspiracies began "*at least as early as*" the stated period. Thus, the Parties have not established that there is a "before" period that is not infected by the conspiracies. As such, there is no reason for the SSEs to search that far back in time.

[13] Unlike document requests issued to parties, subpoenas are not continuing in nature. Accordingly, the end date for any document production will be the date of service of the subpoena.

[14] We also believe that the following requests should be included in the second priority list as well if not withdrawn altogether: Request Nos. 11 (inventory), 22 (communications with dealers), and 27 (data produced to regulators).



Page 9

pull information for one or more component parts. We will need to address this, however, on a request-by-request basis.

**11.**  *Costs*

During the Summit Conference (and before), the SSEs made it clear that we will not expend time, effort, and resources searching for or producing documents absent the Parties' agreement to fully reimburse our costs of compliance. As you know, the Federal Rules require that any order compelling production "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(2)(B). In response, you say you are "not opposed to having a conversation … on costs or to discuss where cost-sharing may be appropriate," but do not commit to actually pay for any costs. Instead, you assert that you "do not believe it would be reasonable" for any SSE "to refuse to engage in a conversation [on the scope of the subpoena] based on a demand for up-front costs."

The reason we raised the issue of costs was to have a "conversation … on costs," not to avoid one. Contrary to your assertion, the SSEs have not "request[ed] that the Parties agree to pay all costs … ahead of any conversations with the Parties regarding" the scope of the subpoena.[15] Indeed, the SSEs have led the substantive discussion concerning the scope of the subpoena from the outset, as evidenced by the Summit Conference and the subsequent correspondence. More to the point, your assertion that you are not opposed to having a "conversation on costs," without actually indicating your position on the issue, does not advance the ball.

From the outset, our position on costs has been clear: we are not prepared to *search for or produce* responsive documents absent an agreement on costs. Addressing this topic now is necessary because many courts have held that a subpoenaed entity's right to reimbursement (as opposed to the amount of the reimbursement) must be established – either by agreement or court order – prior to producing documents. *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 221 F.R.D. 423, 426 (D.N.J. 2004). That is why we have requested that the Parties agree to reimburse the SSEs for all costs, including all out-of-pocket costs and all attorneys' fees, and provide fair compensation for any additional employee resources that must be devoted to this project. You have acknowledged that you may have some obligation to reimburse the SSEs for certain costs, but you have not presented any counter-proposal. We look forward to hearing one.[16]

---

[15] The Parties played the same game in their September 28th letter, suggesting that the "Parties cannot agree … to make payment of costs a condition of the summit." But the whole idea of a Summit Conference was our idea, and – unlike the Parties – we never conditioned our participation in the meeting on anything. Rather, we specifically requested the Summit Conference to gain a "greater understanding of the Parties' needs" so as to "minimize [the] costs that the Parties" will need to reimburse. *See* Sept. 17, 2015 Ltr. to S. Klein.

[16] In your September 28th letter, you assert that "discussion of costs is particular to each entity." We do not agree. While certain costs may be unique to certain SSEs, the general principles governing the cost reimbursement are common. Certainly, you cannot contend that this subpoena – perhaps one of the broadest ever served – would not impose a "significant expense." And the identification of categories of reimbursable expenses similarly raises common issues.



Page 10

**12.** *Path Forward*

We understand that the Parties would like to "mov[e] forward with a schedule for providing written responses and objections." While we are happy to discuss such a schedule, we think the better path forward is for the Parties and SSEs to work towards a final summary document that sets forth the agreements of the parties and clearly delineates any areas for which the Parties have reached impasse.

While some SSEs have already served objections, we believe that serving further objections prior to resolution of the high-level common issues presented in this letter would be counter-productive and likely generate disputes that might be avoided through further discussion. It is difficult to object to requests that remain a moving target. The Parties have already modified the relevant time period, withdrawn certain requests for Non-OEM SSEs and smaller SSEs, withdrawn all requests in Exhibit B, and held in abeyance many other requests. Are we supposed to object to the requests as originally written, which are no longer operative? Or should we object to the requests as modified? Moreover, we suspect that, as the process moves forward, further compromises on the high-level issues raised in this letter can also be reached. Until we reach closure on these issues, written objections are premature. That said, if the Parties demand that the remaining SSEs serve objections to the subpoena's requests as written, we will do so. We do not believe, however, that the service of objections and responses should curtail further joint discussion of common issues, many of which remain to be discussed.

One final but important note: As we previously explained, the Summit Conference was designed to identify certain high-level issues that needed to be addressed before getting into the weeds on specific requests, many of which are incredibly overbroad, bear no apparent relation to the Parties' needs, and give no consideration to the burden they impose on the SSEs. These high level issues – particularly relating to the scope of upstream and downstream discovery – need to be addressed before moving to the minutia of the wording of specific requests. Once these issues are resolved (or when the Parties have reached an impasse), we can discuss the remaining common concerns on a request-by-request basis, although we would hope that resolution of the high-level issues would moot many of the concerns about the specific wording of the requests.[17]

\*   \*   \*

---

[17] For instance, these common concerns likely include confidentiality and the scope of the protective order. Such common concerns would not preclude individual SSEs from asserting any objections to the subpoena at an appropriate time. To the extent certain SSEs have not yet served objections (based on the indefinite extensions the Parties granted at the outset), the SSEs remain open to discussing the timing of such objections.



Page 11

      We trust that the path forward that we have outlined above will enable the Parties to quickly reach compromise on the scope of the subpoena, or failing that, to clarify any areas of actual remaining dispute.  We look forward to your response.

                                      Sincerely,

                                      *Colin Kass*



Page 12

## Exhibit A: SSE Entities

- Chrysler entities (FCA US LLC; Maserati N.A., Inc.; Fiat Finance North America, Inc.; Chrysler Transport Inc.)

- Toyota entities (Toyota Motor North America, Inc.; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Manufacturing Alabama, Inc.; Toyota Motor Manufacturing Indiana, Inc.; Toyota Motor Manufacturing Kentucky, Inc.; Toyota Motor Manufacturing Mississippi, Inc.; Toyota Motor Manufacturing Texas, Inc.; Toyota Motor Manufacturing West Virginia, Inc.; Toyota Logistics Services, Inc.; Calty Design Research, Inc.; Hino Motors Manufacturing U.S.A., Inc.)

- BMW entities (BMW of North America, LLC; BMW Manufacturing Co., LLC; BMW Financial Services NA, LLC; BMW (US) Holding Corp.; BMW Bank of North America; BMW Insurance Agency, Inc.; BMW US Capital, LLC; Designworks/USA, Inc.)

- Porsche Cars North America, Inc.

- Hyundai / Kia entities (Hyundai Capital America; Hyundai Motor America; Hyundai Motor Manufacturing Alabama, LLC; Hyundai America Technical Center, Inc.; Kia Motors Manufacturing Georgia, Inc.; Kia Motors America, Inc.; Hyundai Autoever America, LLC)

- GM entities (General Motors Company; General Motors Financial Company, Inc.; General Motors Holdings LLC; General Motors LLC)

- VW entities (Volkswagen Group of America, Inc., also d/b/a Audi of America LLC; Volkswagen Group of America Chattanooga Operations LLC; Volkswagen Credit Inc.; Automobili Lamborghini America LLC; Bentley Motors, Inc.)

- Nissan entities (Nissan North America, Inc.; Nissan Design America, Inc.; Nissan Technical Center North America, Inc.; Nissan Diesel America, Inc.; Nissan Motor Acceptance Corporation)

- Honda entities (American Honda Motor Co., Inc.; American Honda Finance Corp.; Honda Manufacturing of Indiana, LLC; Honda North America, Inc.; Honda of America Mfg., Inc.; Honda of South Carolina Mfg., Inc.; Honda Precision Parts of Georgia, LLC; Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Honda Transmission Manufacturing of America, Inc.)

- Rolls-Royce Motor Cars NA, LLC

- Jaguar Land Rover North America, LLC

**Proskauer**

Page 13

- Volvo Cars of North America, LLC

- Subaru entities (Subaru of America, Inc.; Subaru Leasing Corp.; Fuji Heavy Industries U.S.A., Inc.; Subaru of Indiana Automotive, Inc.)

- Aston Martin entities (Aston Martin Lagonda of North America, Inc.; Aston Martin Lagonda Limited)

- Daimler entities (Daimler North America Corporation (MI); Daimler North America Corporation (NJ); Daimler Purchasing Coordination Corporation; Daimler Trucks North America LLC; Daimler Vans Manufacturing, LLC; Daimler Vans USA LLC; Freightliner Custom Chassis Corporation MB-Technology NA LLC; Mercedes-Benz Advanced Design of North America Inc.; Mercedes-Benz Credit Corporation; Mercedes-Benz Financial Services USA LLC; Mercedes-Benz Research & Development North America, Inc. (CA); Mercedes-Benz Research & Development North America, Inc. (MI); Mercedes-Benz U.S. International, Inc.; Mercedes-Benz USA, LLC; Mitsubishi Fuso Truck of America, Inc.; Thomas Built Buses, Inc.; Western Star Trucks Sales, Inc.)