# EXHIBIT 19

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No.: 12-md-02311 Honorable Marianne O. Battani Special Master Gene J. Esshaki |
| In Re: All Auto Parts Cases | 2:12-MD-02311-MOB-MKM |
| THIS DOCUMENT RELATES TO: ALL AUTO PARTS CASES | Oral Argument Requested |

### DECLARATION OF MICHAEL J. MCDONALD

I, Michael J. McDonald, declare under penalty of perjury as follows:

**I.     Qualifications**

1.      I am a Director at Berkeley Research Group, an economic and consulting firm.  I earned an M.A. and Ph.D. in Economics from George Mason University.  I have over twenty years of economic consulting experience.  Much of that experience is in the application of econometrics in analyzing the effects of alleged anticompetitive conduct.  This experience includes analyzing issues of impact, damages, and Class Certification in direct and indirect purchaser cases.  I have also published papers that involved the application of econometric analysis.

**II.     Assignment**

2.      I have been asked to determine the data necessary to provide econometric estimates of impact and damages in this matter.  In reaching my opinions in this matter, I have reviewed the motion to compel filed by the Parties in this case, which includes the subpoena at issue and related exhibits.  I have also reviewed the economist affidavits submitted by Dr.

1

Edward Snyder and Dr. Philip Nelson, which were not submitted in connection with the subpoena but which address certain issues related to what the Parties have referred to as "downstream" discovery. In sum, I have reviewed the following:

- The Parties' Motion to Compel Discovery From Non-Party Original Equipment Manufacturers and related exhibits

- Declaration of Allen T. Levenson, *In re: Wire Harness Cases*, April 19, 2015

- Declaration of Dr. Philip B. Nelson, *In re: Wire Harness Cases*, August 22, 2014

- Declaration of Dr. Edward A. Snyder, *In re: Wire Harness Cases*, July 11, 2014

- Declaration of Dr. Edward A. Snyder, *In re: Wire Harness Cases*, April 20, 2015

- Declaration of Dr. Edward A. Snyder, *In re: All Cases*, May 27, 2015

- Declaration of Kelly Lynch, *All Parts*, February 17, 2016

- Declaration of Michael Novak, *All Parts*, February 17, 2016

## III.   Summary of Opinions

3.   Based on analysis of the foregoing and my experience in antitrust matters involving questions of impact and damages at both the direct and indirect purchaser levels, I have reached the following conclusions.

A.   Much of the information sought by the subpoena is unnecessary to conduct a reliable estimate of impact and damages, including pass-through of damages to the various groups of plaintiffs in this case.

B.   To the extent there are class-wide damages, such damages (including both an estimate of the initial overcharge and of pass-through to dealers and end-payors) can be reasonably estimated from pricing information that is likely to be in the Parties' possession, either by itself or in conjunction with the SSE's offers of production.

4.   Below, I provide an overview of the methodology that can be reasonably used to calculate damages and impact. This is followed by a discussion of the information needed to conduct the analysis in accordance with this standard, generally-accepted methodology.

IV.     **Damages in Indirect Purchaser Antitrust Cases.**

5.      To determine damages in an indirect purchaser action, economists generally follow a two-step procedure.   First, an economist would seek to estimate the amount of the overcharge on the price-fixed components sold to the direct purchasers of those parts.  I refer to this as the "initial overcharge."   Second, the economist would seek to determine how that overcharge affected the prices that the direct purchaser charged to its own customers, which is typically referred to as the "pass-through."   That second step may need to be repeated if there are multiple levels of indirect purchasers.

*A.      Step 1: Estimating the Initial Overcharge.*

6.      The amount of the initial overcharge is the difference between the actual price charged to direct purchasers and the price that would have existed but-for the alleged unlawful conduct.  In estimating initial overcharges economists typically employ one of three methods: The benchmark method, the yardstick method, or the differences-in-differences method.  In each of these methods, economists use price data from a "control group" that was not affected by the alleged conduct to compare it with price data that was affected by the alleged conduct.   The primary difference among these methods is the choice of the "control group".

7.      The benchmark method is the most common method for estimating the initial overcharge.   The benchmark method uses a different time period not affected by the alleged conduct as a "control group" and analyzes how prices differed during the conspiracy period.

8.      The yardstick method is similar to the benchmark method, but rather than using a different time period as a control group, it uses a different but otherwise comparable product not affected by the alleged conduct as the "control group."   By analyzing how prices changed for the relevant product versus the control product, one can estimate the effect of the challenged conduct on prices.

3

9.      A less common approach that is still sometimes employed is called a "differences-in-differences analysis," which compares how prices changed during the conspiracy period versus outside the conspiracy period in both the price-fixed product and a control product.  The "differences-in-differences" approach requires both a time period free of the effects of the conduct and a product that is free of the effects of the conduct.  Thus, it combines features of both the benchmark and yardstick methods.

10.      Once an appropriate control group methodology is identified, economists typically use regression analysis to estimate the overcharge.  In the case of a benchmark analysis, a common approach by economists is to "regress" prices on a "dummy variable" that represents the alleged conspiracy time period and other variables that account for the movement in price over time such as cost, demand, and changes in competitive conditions.  Thus, in such a regression, the "price variable" would be the "dependent variable," and the "conspiracy variable" would be the "independent variable of interest."  Cost, demand, and changes in competitive conditions would be additional independent variables.  Similarly, in the case of the yardstick method, one would control for factors that account for differences in prices between the product allegedly affected by the conduct and the "control group" product not affected by the conduct.  In the differences-in-differences method, one would want to control for factors that cause the differences between the two product prices to vary over time.

11.      In specifying a regression, the economist must make a determination of which variables should be included in the regression.  It is very rare that a regression equation would include independent variables for every factor affecting price (or more technically, the movement in the dependent variable) because, usually, not all factors can be identified or measured.  As a result, virtually all regression equations generate error which is the variation in

4

the dependent variable that is not explained by the variation in the independent variables in the regression equation.  The presence or magnitude of the error, however, does not necessarily suggest that the estimated coefficient of the independent variable of interest (*e.g.*, the conspiracy dummy) is biased.  In fact, there is a metric, the R-squared statistic, which measures the extent to which the variation in the dependent variable is explained by the variation in the independent variables.  Economists recognize that the magnitude of the R-squared statistic or lack of error is not necessarily a determinant of whether the regression provides reliable or unbiased estimates.[1]

12.    Whether a regression generates unbiased estimates depends on whether the error is correlated with an independent variable included in the regression equation.  One circumstance under which the error is correlated with an independent variable is when an omitted variable is correlated with *both* the dependent variable (i.e., explains variation in the dependent variable such as the price of a product)[2] and an independent variable (e.g., a variable included in the regression model).  When this dual correlation is present, the bias caused by a variable omission is referred to as "omitted variable bias."  Absent such dual correlations, the omission of a variable will not result in bias.

13.    This can be shown mathematically with the following example.  Suppose that, in the actual world, the relationship between dependent variables and the independent variables are given by the following relationship:  $Y = \alpha_1 + \alpha_2 X + \alpha_3 Z$.  Let's further suppose that X and Z are correlated, such that $Z = a + \rho X + u$, where $\rho$ is the estimated coefficient  from the regression of Z on X.  (If $\rho = 0$, then there is no correlation between the two variables; if $\rho \neq 0$, the two variables are correlated).  Finally, let's suppose the economist does not have data on

---

[1] See Wooldridge, *Introductory Econometrics: A Modern Approach*, 5th Edition, 2013, p. 201.  In the case where there is a very low R-square, there may be reason for further investigation because the unexplained portion of the variation in the dependent variable may be unacceptably high.

[2] The estimated coefficient on the omitted variable is not equal to zero when included in the regression equation.

5

variable Z, and thus, runs the following regression:   $Y = \alpha_1^* + \alpha_2^* X + \epsilon$, where the "*" superscript denotes the estimated coefficient and $\epsilon$ is the error term.   Simple algebra demonstrates that the variable of interest, $\alpha_2^*$, is equal to $\alpha_2^* = \alpha_2 + \rho\alpha_3$.[3]  Thus, if X and Z are not correlated (i.e., $\rho = 0$), then $\alpha_2^* = \alpha_2$, meaning that the estimated coefficient for the variable of interest is an unbiased estimate of its true value.

14.     For this reason, even if the regression equation does not include all variables that may impact pricing when conducting a benchmark analysis, the regression can provide an unbiased estimate.   Specifically, one could obtain an unbiased coefficient estimate on the conspiracy variable, provided an omitted variable is not correlated with price and the conspiracy variable.[4]

15.     As this discussion shows, economists generally attempt to include the important factors (or suitable proxies for such factors) that theory suggests will explain the variation in the dependent variable (e.g., price) to avoid the potential for omitted variable bias, but the failure to include every factor will not necessarily bias the estimate of the initial overcharge absent specific types of correlations between the omitted variable and included variables.    In a benchmark analysis of this type, it is generally important to include variables that are correlated with the conspiracy variable, which itself is usually just a measure of a period of time.   This generally

---

[3] The amount of the bias depends on the degree of correlation between the included and the excluded variables ($\rho$ from above) and the degree of correlation between the excluded variable and the dependent variable ($\alpha_3$ from above).

[4] The above discussion focuses on an example with a single variable regression equation.   Where there are many independent variables, an omitted variable that is correlated with any independent variable, say the first independent variable, and the dependent variable can, in theory, bias the estimated coefficient of a second independent variable, even if the omitted variable is not itself correlated with the second independent variable.   This circumstance would arise if there are triple (or greater) correlations, rather than dual correlations.   The variable of interest is correlated with another independent variable that is correlated with an omitted variable that is also correlated with the dependent variable.

means that, in estimating overcharges, including important factors such as cost, demand, and changes in competition should generally be included in the regression to avoid biased estimates.

16.     But the necessary information and data to conduct such a benchmark analysis is just as likely to preside with the seller as the buyer in the market.   That is, the defendants (sellers) are just as likely to be able to provide this data and information as the SSEs (buyers).   In particular, defendants are just as likely to have data on an important factor that would cause prices to change and be correlated with the timing of the conspiracy, or other important factors.

### B.     Step 2:  Estimating Pass-Through

17.     After determining the initial overcharge, the next step in determining damages in indirect purchaser cases is to determine the extent, if any, to which the estimated overcharge is passed through at each stage of the distribution chain.   In this case, there are two stages in the distribution chain where a pass-through analysis is necessary:   (i) from the OEM to the dealer, and (ii) from the dealer to the end-payor.

18.     As with the initial overcharge, the extent of the pass-through is often determined by regression analysis, and thus, many of the same principles discussed above apply.   Specifically, in estimating pass-through at a given stage in the distribution chain, an economist would typically estimate the relationship between the seller's price of the product and seller's cost of the product.   Thus, for example, if a $100 change in the total cost of a vehicle tends to increase the seller's price by $50, then the pass-through in this case is $0.50 for every $1 dollar increase in cost or 50% of every $1 dollar increase in cost.

19.     The extent to which cost is passed through depends on a number of factors such as the degree of product differentiation, the degree of individualized negotiation, and the nature of competition in the market.   These factors may vary from one level of the distribution chain to

another.  For example, it is my understanding that by law OEMs must offer auto dealers the same pricing terms, and as a result there is no individualized price negotiation between OEMs and dealers.  On the other hand, consumers are free to negotiate prices with auto dealers.  As a result, economists would generally need to estimate pass-through at each stage of the distribution chain.

20.    At the first stage of pass-through, from the OEM to the dealer, the components at issue combine with many other inputs to create a finished vehicle.  Vehicles are differentiated products whose value is partly based on its configuration and attributes.  As a result, it is my understanding based on the Michael Novak declaration that the price of a vehicle is not the sum of the cost of the individual parts with a markup.  Instead, the price of a vehicle is based on the value dealers place on the vehicle, the level of competition, and the total cost of the vehicle.  To the extent a change in cost will cause an OEM to adjust prices, it will be the result from a change in the total cost, not a change in the cost of any individual component.  Thus, an equal change in the cost of one component compared to the cost of another component will have the same effect on cost and price.

21.    Under such circumstances, economist can estimate pass-through by estimating the relationship between price and total cost.  That is, the effect, if any, on the price of a car from a $1 increase in the total cost of the car would be the same regardless of whether the cost increase was due to a $1 increase in the cost of a wire-harness or a $1 increase in the cost of labor used to produce the car.  As such, a regression can be used to estimate pass-through by estimating the relationship between price and the total cost of the vehicle.

22.    Estimating pass-through based on the relationship between price and total cost has the advantage of modeling pass-through the same way actual pricing decisions are made by

OEMs. Nor would estimating pass-through on a component-by-component basis be feasible here, for two reasons. First, this case involves multiple components with largely similar conspiracy periods which could cause the cost of these components to be highly correlated. Under these circumstances, it would be difficult to isolate the amount of pass-through for one price-fixed part separate from another price-fixed part. Second, there may be many component cost variables that are highly correlated with each other because the parts are manufactured from the same inputs (e.g., metal and worker wages), again, making it difficult to isolate the effects of any single component cost on the price of a vehicle. Both of these above problems fall into the category of "multicollinearity" specification issues, which occurs when there is a high degree of correlation between variables in a regression making it difficult to estimate individual effects precisely because the variation in the individual variables is so similar.

23.    One way to avoid the problem of multicollinearity is to use a variable that is combination or composite of individual variables. Thus, detailed tracing of component parts through the supply chain can lead to less accurate results than the more general way of estimating pass-through based on the general relationship between total cost and price.

24.    For similar reasons as discussed above, it is not necessary to include all factors that affect the OEM's (or dealer's) vehicle price to generate unbiased estimates of pass-through. Just as it would be both difficult and rare to include every variable in the regression that may affect the price of the component at issue, it would also be difficult and rare to include every variable that may affect the OEM's (or dealer's) prices of vehicles. Even with the presence of omitted variables, one could still generate unbiased estimates of pass-through, provided there is

not a dual correlation between the omitted variable and the dependent variable (vehicle pricing) as well as the independent variable of interest (e.g., total cost of the vehicle).[5]

25.     In estimating pass-through for vehicles sold by multiple resellers (e.g., OEMs or dealers) to their respective customers, it is also important to consider the level of granularity needed to reliably estimate pass-through. While in some cases, it may be necessary to estimate pass-through for each product or reseller (or even each product of each reseller), in other cases it may not be necessary to do so.  The level of granularity of the analysis will depend on factors, such as the level of competition among resellers and potentially other factors that may affect pass-through.  For example, in the vehicle market, it may be that pass-through for makes and models within similar categories of vehicles (e.g., mid-size sedans, luxury vehicles, etc.) are similar because of the high degree of competition and consumers perceiving that cars within a category are close substitutes.

### C.     The Parties' Requests for Upstream Purchasing Information

26.     I understand that the subpoena seeks upstream purchasing information relating to certain component part categories, which encompass thousands of individual parts used in the manufacture of vehicles.  I further understand that (i) the defendants seek this information for purposes of estimating the initial overcharge (or rebutting the estimates presented by the plaintiffs) and for purposes of tracing the overcharge through the distribution chain to the dealers and end-payor plaintiffs; (ii) the Parties likely have information relating to their own sales of products, and thus, the OEMs purchases of the price-fixed components; and (iii) the OEM SSEs have offered to produce upstream purchasing information relating to their purchases of components from any identified non-defendant suppliers.

---

[5] As noted above, it is also possible that the correlation between an omitted variable and an independent variable other than cost could cause cost to be biased, if cost was correlated with this other variable.

27.    In light of the principles discussed above, below I discuss whether this information is sufficient for purposes of estimating either the initial overcharge or the applicable pass-through.

### D.    The Initial Overcharge Analysis

28.    The information in the Parties' possession and as supplemented by the OEM SSEs' offer of production is likely sufficient to estimate the initial overcharge.

29.    As an initial matter, it should be noted that it is my understanding that the direct purchasers, who I understand bear the burden of proving the initial overcharge (vis-à-vis defendants) have not sought additional upstream purchasing information from the OEMs. This would suggest that such information is not needed to estimate the initial overcharge.

30.    Moreover, as noted above, the defendants already possess the information necessary to perform a benchmark analysis, which compares the prices of the price-fixed components during the alleged conspiracy period to the prices of the same components sold by the same defendants outside of the alleged conspiracy period. Since defendants have information about their own sales (and thus, the OEMs purchases of component parts) they have sufficient information to estimate the initial overcharge.

31.    I understand that the Parties have suggested that they need the prices of non-defendant suppliers in order to estimate the initial overcharge. But, as noted, this is not true for any damages estimate based on the benchmark methodology. Nor is it necessary for a yardstick method or a differences-in-differences method, both of which require that the product or products selected as the control group be unaffected by the alleged conduct. To ensure such a requirement is satisfied, an economist would likely require the use of a product or products from

a different product market, not competing products sold by allegedly non-conspiring competitors.

32.     This is because products that compete with the cartelized products may also be affected by the cartel, even if the sellers are not part of the alleged conspiracy.  Cartels can cause an increase in the price of products that compete with the cartelized product because rivals follow the cartel's increase in prices with an increase in prices themselves.

33.     Using a product infected by the alleged conspiracy as a control group would tend to bias the estimated overcharge downward and possibly finding no effect when there was an effect of the conduct.  Consider the following example of the yardstick method.   A control group with a price of $100 that is not infected by the conspiracy and a different control group with a price of $105 that is infected by the alleged conspiracy.  Now, if the defendants' price during the conspiracy period was $110, then using the infected control group cuts the estimated overcharge in half, from 10% down to about 5%.  This is the reason why it is important not to use products whose pricing is likely infected by the conspiracy as a control group because they compete with the price-fixed products.

34.     In any event, even if an initial overcharge estimate could be reliably constructed based on sales by non-defendant suppliers, the Parties would be able to perform such an analysis based on the OEM SSE's offer of production, which includes an offer to produce component price information from identified non-defendant suppliers.

35.     In addition, the OEM SSE's upstream purchasing information is not necessary to estimate pass-through.  I understand that the Parties have argued that they need the OEM's purchasing information in order to obtain the OEM part number, which they claim they need to

trace a part to specific vehicles (via the VIN) as it goes through the manufacturing process and distribution chain for the finished vehicle.

36.    As an initial matter, it should be noted that the Kelly Lynch fact declaration makes clear that the Parties have the OEM part numbers in their own systems.[6] The Lynch fact declaration also makes clear that, even with the OEM part number, it would be infeasible to use that information to track that specific part to specific vehicles.[7] The Lynch fact declaration also makes clear that the Parties have substantial amounts of information concerning the models of vehicles they supply and the uses for which their parts are put.[8]

37.    More importantly, for reasons discussed above, upstream purchasing information is not needed to estimate the pass-through at either the OEM-to-dealer or the dealer-to-end-payor levels.    This is because tracing a component through the manufacturing process and the distribution chain for the finished good to estimate the pass-through on a specific component is unlikely to provide precise estimates and any model of pass-through based on such an approach would not reflect the way that prices are actually set in the real world.

**E.    The Parties' Requests for Downstream Sales Information**

38.    I understand that the Parties seek downstream sales information for every vehicle sold in the United States over the past 10 to 20 or so years.  For reasons that follow, such information is likely unnecessary to generate reliable estimates of pass-through.

**1.    Many Elements of Downstream Discovery Are Irrelevant**

39.    As an initial matter, many of the categories of downstream information are irrelevant to the question of estimating pass-through because a regression analysis of pass-

---

[6] See Declaration of Kelly Lynch, February 18, 2016.

[7] Id.

[8] Id.

through would likely be reliable and unbiased without such information.   This includes the following categories of information:

- Employee salesperson commissions
- Individual part costs
- Labor costs
- Management costs
- Tooling costs
- Energy costs
- Overhead costs
- Research and Development costs
- Shipping or freight costs
- Sales and Marketing costs
- Repair or recall of vehicles
- Income from finance, insurance, service contracts, extended warranties, and GAP insurance

40.     A number of these categories are individual cost components, which for reasons discussed above are unnecessary for the pass-through analysis.   For other categories, it is unlikely that these items are correlated with vehicle prices and costs.

### 2.     *The Parties Are Likely to Possess the Relevant Downstream Pricing Information.*

41.     I understand that the Parties have requested that the OEM SSEs produce both the invoice prices OEM charge dealers and prices dealers charge end-payors.   The Parties presumably want such information to estimate pass-through at both the OEM and dealer levels.

It is unnecessary for the OEM SSEs to produce this data because sufficient data is likely available from the plaintiff dealers.[9]

42.     The production of these data by OEM SSEs would be redundant for all the makes and models sold by plaintiff dealers.  It is my understanding that the plaintiff dealers sell approximately 30 makes (brands) of vehicles, encompassing almost all of the vehicle brands sold in the U.S. and including almost all the brands sold by the SSEs.  Indeed, there are very few, if any, brands that are not covered by the plaintiff dealers.[10]

43.     As to the first level of pass-through (i.e., from OEM to dealer), the data produced by the plaintiff dealers is likely to generate a robust price dataset.  This is in part because, as I understand it, state dealer protection laws require that the OEMs treat dealers in a non-discriminatory manner, meaning that the MSRPs, invoice prices, and other terms of pricing (including any dealer or consumer programs) would apply equally to each dealer in an OEM's dealer network.  Thus, under these circumstances, obtaining pricing data from additional dealers is unlikely to provide any additional meaningful information because it will be the same as the pricing terms already available from the plaintiff dealers.[11]

44.     Moreover, even if the datasets are missing information for certain makes or models, one could determine whether the pass-through on similar, competing makes or models provides a reasonable estimate by comparing pass-through for various makes and models where data is available.  For example, an analysis can be done to determine whether pass-through can

---

[9] It should be noted that the SSEs do not have access to the substantial information that the plaintiff dealers or other non-parties produced in this case.  Thus, the discussion above focuses on the information that would reasonably be expected to be contained in those databases.  As in most cases, however, omissions in the dataset would not be fatal to computing a reliable estimate of damages so long as the data that is included is a representative sample.

[10] It is also my understanding that the only SSE entities not included are Jaguar Land Rover, Mitsubishi, and Porsche which I understand each accounts for less than 1.0% of sales in the U.S.

[11] Further, I understand Ford is a party to this litigation.  One would assume Ford would have pricing information as it relates to dealers other than the plaintiff dealers which would allow one to test whether additional dealer pricing data has meaningful impact on pass-through.

be estimated at a more aggregated level (e.g., luxury, mid-size sedan) which would not require data for every make and model.[12]

45.     Even though it is unlikely that additional pricing data is needed, I understand that the OEM SSEs have offered to produce information concerning the MSRPs that they set for each vehicle model to supplement dealer invoice pricing if it is not available.  According to Michael Novak's fact declaration, the OEM first determines the MSRP based on factors that affect the demand for the vehicle and cost of the vehicle and then based on the MSRP determines the dealer invoice price as a discount off the MSRP.[13]  As such, to the extent that changes in costs of components affect vehicle costs, and to the extent vehicle costs affect vehicle prices, such effects should manifest themselves in the MSRP.   In addition, I also understand from the Novak declaration that the difference between MSRP and invoice price for a vehicle does not change with changes in the cost or other factors considered in the setting of price.[14]  That is, when there is a change, it will likely cause the same change in the MSRP and invoice price.  Under these circumstances, the effect of a given change in cost on the MSRP is likely to have a similar change in the invoice price paid by the dealer.  Indeed,  antitrust cases have been  premised on the notion that changes in list prices (here MSRP) can be a suitable basis for estimating damages as long as MSRP (list prices) is an important part of the price setting process.

46.     Under the circumstances described above, the use of MSRP to supplement for missing dealer invoice prices in the OEM pass-through analysis could provide a reliable estimate

---

[12] If the estimates of pass-through were to vary substantially across makes and models in the sample, then this would suggest the lack of commonality among class members.  On the other hand, if the estimates of pass-through are relatively common across makes and models, then there would be a basis to extrapolate pass-through for potentially missing makes and models.  Thus, it is likely that estimating the pass-through at either the OEM-to-dealer, or the dealer-to-end-payor level can be done using the pricing information from the dealer plaintiffs.

[13] See Declaration of Michael Novak, February 18, 2016.

[14] Id.

of pass-through. Even though there is a difference between the level of MSRP and invoice price, the factors that affect a change in the MSRP also affect a change in the invoice price.[15]  And, importantly the difference between MSRP and invoice price remains relatively constant and does not change with a change in cost or factors that may cause a change in the MSRP and the invoice price. For the reasons described above, one would not expect the difference between MSRP and the invoice price to generate a biased estimate of pass-through because it is unlikely to be correlated with cost or other factors that may be included the pass-through regression analysis.[16]

47.     Further, the dealers in this case have both the invoice prices and MSRP for various makes and models from which they can test whether the estimated pass-through is different when using the MSRP or invoice price. Specifically, for the same makes and models where they have both the MSRP and invoice price, one could estimate the pass-through coefficients separately based on the MSRP and invoice price. One could then compare whether the pass-through coefficients are substantially different based on the MSRP as compared to the invoice price. Because there are a large number of plaintiff dealers in this case, there should be sufficient invoice information to determine whether estimates of pass-through are materially different using the MSRP instead of the invoice price.

48.     In addition, with some 40 dealers in the case selling a wide range of models associated approximately 30 different brands – and many of them selling the same brand of vehicle – it should be possible to determine how the dealer's vehicle costs (e.g., the price the

---

[15] The level of the MSRP compared to the invoice price will not affect the estimate of pass-through provided the regression equation is properly specified. The estimated coefficient on cost will reflect how a change in cost causes a change in MSRP. The constant term in the regression will absorb the difference in the level between the MSRP and invoice price.

[16] Economists refer to the difference between the MSRP and the invoice price as "measurement error". Like omitted variables, the presence of measurement error does not necessarily cause bias. Whether measurement error causes bias is dependent on whether measurement error is correlated with an independent variable in the regression equation. If there is no such correlation, then there is no bias.

dealer pays) affect final prices. In negotiation markets, establishing pass-through on a class-wide basis using common evidence may not be possible – not because of the lack of data – but because each dealer approaches pricing in a unique way and negotiation with each customer is different. The variability that is demonstrated by the dealer plaintiffs' data should be sufficient to determine whether the dealer market is susceptible to a class-wide pass-through, or whether an average pass-through estimate (which can also be determined from the dealer plaintiff data) suffices.

### F. *Ancillary Services*

49. It is my understanding that parties have requested that the OEM SSEs produce data that is referred to as ancillary services data.[17] These are data of various incentives or allowances such as rebates, discounts, floor plan assistance, trade-in allowances, financing, credit, or warrantees. Presumably, the notion is that the OEM (or dealer) may want to pass on an overcharge or not include an overcharge on the price by changing allowances, rebates, or the price of a component such as financing to its dealers (or customers). As an initial matter, it is my understanding that plaintiff dealers have data on a wide range of such price components including financing, insurance, trade-in value, trade-in allowances, rebates, and various incentives.[18] In addition, the plaintiff dealers are the only party that knows for which transactions they took advantage of these types of offers extended by the OEMs and what offers they passed through to end user or offered to end users independent of the offers made by the OEMs. And, these data would provide the basis from which one would include this information in the pass-through analysis.

---

[17] I understand these items to include those data requested in 4.a.(3).(c)-(e), 4.a.(6), 4.d, and 4.e.

[18] See Declaration of Allen T. Levenson, April 19, 2015.

50.     Even if for some reason these records are not complete, there is no reason to assume that OEM SSEs' records would be more complete considering the dealers are the parties with the transaction-specific knowledge. In addition, there is a question as to whether missing these data could bias the pass-through estimate. It is not clear from the requests how the parties intend to incorporate these data in the pass-through analysis.

51.     But, whether it is to adjust the dealer's invoice price, transaction price or include as an independent variable, there is good reason to believe the omission of this data is unlikely to cause bias.[19] Based on the Novak declaration, it is my understanding ancillary services offerings are set independent of changes in cost and other factors that may affect dealer invoice prices.[20] That is, the ancillary services offerings are not increased or decreased as a result of changes in cost. Under these conditions, it is unlikely that changes in cost or other factors that affect the invoice price will be correlated with ancillary service offerings. As a result, it is unlikely the omission of ancillary services data would cause OEM-dealer pass-through estimates to be biased.

52.     Based on the same information provided in the Novak declaration, one would not expect the omission of ancillary services provided by OEMs to cause bias in the dealer-end payor pass-through analysis. Since it is unlikely there is a correlation between the dealer invoice price and ancillary services, one would not expect the omission of ancillary services as an independent variable would cause bias.[21]

---

[19] In the discussion that follows, the analysis of bias will be based on the assumption that these ancillary service data are to be included as independent variables. However, the conclusion does not change if one assumes there would be an adjustment to the dealer invoice price or transaction price because the difference between the adjusted price and the price without the adjustment will be the value of the ancillary consideration. Therefore, the measurement error will be equal to the value of an independent variable.

[20] See Michael Novak Declaration, February 18, 2016.

[21] There is a possibility that bias could occur because ancillary services is correlated with another variable in the regression equation and this variable is correlated with the dealer invoice price. However, this seems unlikely because these would likely be variables that capture local demand conditions which one would not expect to be correlated with an OEM's ancillary service offerings set for all dealers based on broader OEM incentives.

53.    It makes intuitive sense that ancillary service offering are unlikely to be correlated with changes in the dealer invoice price. An OEM or dealer could more directly pass-through a cost increase or avoid passing through a cost increase by directly changing the price of the vehicle, than by changing prices for ancillary goods and services (or other indirect components of prices), which may change the demand for such ancillary goods and services or change incentives with respect to the other components. That is, changing the price of ancillary goods and services could change the optimal mix of ancillary services and vehicle prices.

54.    In addition, as noted by Novak, the trade-in value for a vehicle and the pricing of services (such as extended warrantees, financing and insurance) that an OEM or dealer may provide is determined by the used car market and the market for such ancillary services.[22] Thus, the price that the dealer can likely profitably offer for a trade-in will be based largely on the competitive price for the used vehicle. The same is likely true for prices at which other services (such as extended warrantees, financing and credit) are offered, all of which likely have substitutes from non-dealer sources. As such, it would likely be difficult for an OEM or dealer to pass-through higher cost by offering lower trade-in values or raising the prices of other components instead of raising the price of the vehicle.

55.    In addition, for those makes and models where such ancillary service data is available, one could test whether including this data has a material effect on the estimate of pass-through. One could estimate pass-through with or without the inclusion of these data and compare the estimates of pass-through to determine whether the omission of these data causes bias.

---

[22] See Michael Novak Declaration, February 18, 2016.

### G.   Reasons Why Specific Categories of SSE Information Are Not Needed to Reliably Estimate Damages.

56.    I discussed above why the information in the parties' possession or as supplemented by the SSE's offers of production will likely provide sufficient price data to reliably estimate damages in this case.  I also discussed why the parties' broad requests for upstream purchasing information and downstream sales information was not necessary either to estimate the initial overcharge or the applicable pass-through.  In this section, I address certain specific requests made by the Parties.

### H.   Smaller SSE Information.

57.    I understand that the parties are seeking information about the sale of every vehicle sold in the United States over the past 20 years, aside from Maserati, Rolls Royce, Bentley, and Aston Martin.  There are many other small SSEs, which I understand are objecting to the production of information primarily on the basis of burden.  While I am not rendering any opinion on the issue of burden, I do not believe that requiring production from other small SSEs will likely increase the reliability of any damages estimate in this case.  As such, the incremental benefits of requiring production from such SSEs are minimal.

58.    As stated above, it is unlikely the initial overcharge and the pass-through analyses would require any additional price information from OEMs.  This would also apply to smaller SSEs as well.  In addition, the parties likely possess sufficient information to test whether smaller SSEs face materially different circumstances.  In the case of estimating the initial overcharge estimate, the defendants should have the pricing data associated with sales to these smaller SSEs.  I understand the dealer plaintiffs sell five of the eight small SSE brands.  Thus, to the extent any party wanted to test whether pricing dynamics are substantially different for those

21

brands as compared to larger OEM brands, the information to do that is already in the Parties' possession.

59.     Also, as noted above, because OEMs likely compete in highly competitive markets and models within a broader category may be viewed as close substitutes, the pass-through analysis and testing may indicate that estimates of pass-through for categories of vehicles (e.g., mid-size sedans) may be sufficient to reliably estimate damages.  Under these circumstances, it would be likely these smaller SSEs would be incorporated in one of these broader categories, and it would be unnecessary for these smaller SSEs to provide additional data.

### I.     Foreign Distributor SSEs of Non-Core OEMs.

60.     I understand that the parties are seeking information from a number of distributors who are affiliated with a non-subpoenaed foreign OEM.  I also understand that these distributors have represented that they are not involved in the purchase of components or the manufacture of vehicles, and that they lack control over upstream information relating to such purchases or manufacturing.  As such, it my understanding the only information these entities would possess relates to (i) the transfer price from the OEM to the distributor, and (ii) the downstream sales information from the distributor to the dealer.  Based on these representations, it is my view that requiring production of information from these entities is unlikely to provide any material benefit to the parties in estimating damages.  Since these distributors are not involved in the purchase of components subject to the alleged price fixing, they do not have any data that would contribute to the analysis of the initial part overcharge.  In addition, as discussed, the parties likely have sufficient pricing data to conduct both the OEM and dealer pass-through analysis.  Again, to the extent that the pass-through analysis indicates that the amount of pass-through does not vary

substantially across make and model, the estimated pass-through for the non-Core OEM makes and models may be estimated based on broader aggregates.

I declare under penalty of perjury that the foregoing is true and correct.

Michael J. McDonald

Dated: February 19, 2016