# EXHIBIT 26

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In Re: AUTOMOTIVE PARTS
ANTITRUST LITIGATION

                           :
                           :

ALL PARTS                      :    Case No.: 12-MD-02311
                           :    Honorable Marianne O. Battani
                           :

THIS RELATES TO: ALL CASES    :
                           :
                           :
                           :

**DECLARATION OF MICHAEL MASHBURN
IN SUPPORT OF THE SPECIFIED SUBPOENAED ENTITIES'
JOINT OPPOSITION TO THE PARTIES' MOTION TO COMPEL**

I, Michael Mashburn, hereby declare under penalty of perjury as follows:

        1.     I am employed as the Senior Manager for Finance and Controlling of Mercedes-Benz U.S. International, Inc. ("MBUSI"). I have been employed by MBUSI since 1996. In my current role, I am responsible for planning and budgeting. Unless otherwise noted, the facts set forth herein are based on my personal knowledge.

        2.     I have reviewed the subpoena served on MBUSI. I have also reviewed the Parties' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers ("Mot."). I understand the serving Parties seek information in response to the following requests: 1(a)-(g), (l), (m); 3; 4(a)(1)-(2); 4(a)(3)(a)-(e), (h), (k); 4(a)(4), (7), (8), (13); 4(b), (e), (h), (j); 5; 13; 14(c); 15; 16; 22; 23(2); 27; 28 (last 2 sentences); 30; 33; and 34. *See* Mot. at 2.[1]

---

[1] I also understand that certain Parties are seeking documents in response to Request 31, which seeks "all documents relating to negotiations or communications with defendants [and others]" relating to this lawsuit.

## I.     Overall Breadth of the Subpoena

3.     These requests are incredibly broad in both burden and scope.  While MBUSI has been subject to document requests and subpoenas in other cases from time-to-time, MBUSI has never been required to produce the sheer amount of information sought by this subpoena.  Its breadth is unprecedented.  Compliance with the requests is not feasible, and even if it were feasible, compliance would take many months, would require hundreds or thousands of employee hours, and would substantially interfere with our business duties and operations.

4.     To put the breadth of this subpoena in perspective, I estimate that complying with the subpoena *even as to a single component* would likely take many *hundreds* of hours of employee time.  This includes the hours – again, hundreds – it will take to (i) identify the specific parts at issue within each of our relevant purchasing, finance, engineering, and sales databases, (ii) craft reports and trace information from system to system; (iii) trace components through the supply chain to the end user purchase of a vehicle, which requires substantial investigative work by trained investigators; (iii) identify and interview relevant employees to determine location of any existing custodian information; and (iv) search for and produce responsive information. Multiplied by over 50 component parts or commodities, the demands imposed on MBUSI by the Parties quickly are unrealistic, if not impossible.

5.     This effort is not necessary to fill the gaps in the information likely possessed by the Parties themselves.  As discussed below, the Parties likely possess substantial information relating to the upstream purchase of price-fixed components.  As to the upstream information, for example, the defendants will possess purchasing information relating to the products they supplied, which would include any model for which one of them was a winning bidder.  They will also possess detailed information about the RFQ processes in which they participated, and

2

would – given the substantial information communicated to suppliers during this process – would have virtual play-by-play information regarding it.

6.    Nonetheless, I understand that MBUSI has proposed a reasonable alternative that should provide the Parties with information that they currently do not have in a substantially less burdensome manner. Under this proposal, MBUSI has agreed to produce certain transactional data for the last ten years relating to the purchase of components from non-defendant suppliers identified by the Parties. I also understand that Mercedes-Benz USA LLC ("MBUSA"), Daimler's distributor of Mercedes-Benz vehicles in the United States, has agreed to produce certain transaction data for the last ten years relating to the MSRP set by MBUSA on a model-by-model basis.

7.    Because most of these requests fall into two broad categories—upstream information relating to the purchase of components and downstream information relating to the sale of vehicles—I discuss each type of information in turn, noting where applicable (i) factors relating to the relevance of the requested information or lack thereof, (ii) the breadth of the request and the burden associated with it; and (iii) the reasons why MBUSI's proposal is a superior means of providing the parties will the vast bulk of the information they may need.

## II.    Confidential Information

8.    These requests also seek closely-guarded and highly secret proprietary information, such as business plans and strategies, costs of production, pricing methods and financial data. MBUSI has never before—in any litigation, and certainly not as a third-party—been compelled to produce this type of highly confidential information to such a large group of its suppliers and dealers. The damage that such disclosure would cause—on an industry-wide basis—simply cannot be overstated. It is ironic that the requesting parties, many of whom have

pled guilty to violating the antitrust laws, now want to collect the entire automotive industry's most sensitive pricing information going back almost a quarter century.

9.      The parties now seek information regarding pricing strategies that goes to the very core of Daimler's business.  For example, Request No. 13 seeks the production of "[d]ocuments sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for determining, setting or revising Your prices . . . ."  Similarly, Request No. 24 seeks "[d]ocuments sufficient to show, for each model of new Vehicle manufactured by You that is sold or leased in the United States, the models of Vehicles manufactured by other OEMs that You consider to be competitors and how (if at all) You considered the pricing by such other OEMs of such models in setting the price of the model manufactured by You." *See also* Requests Nos. 14(c), 15, 16, 28.

10.      MBUSI has taken significant efforts to maintain the confidentiality of this highly sensitive pricing information, much of which MBUSI considers to be protected trade secrets. MBUSI sharply limits access to certain pricing information, even to most employees of MBUSI who must use a proprietary system designed to protect the confidentiality of the information. Before any MBUSI employees can gain access to this highly confidential information, individualized approval is required from Daimler AG in Germany.

11.      Disclosure of this information to MBUSI's suppliers and competitors would cause unimaginable harm to its business.  Given the vast number of parties involved—indeed, Defendants constitute a significant portion of the suppliers in the global automotive industry— MBUSI's concerns about disclosure are not alleviated in any way by the protective order in this MDL.  Should this highly sensitive pricing information be produced, even under the highly

confidential designation, hundreds if not thousands of individuals would have access to MBUSI's highly-guarded pricing information.

### III.    Upstream Purchasing Information

12.    MBUSI manufacturers and assembles several different Mercedes-Benz vehicles for Daimler AG, an unsubpoened OEM based in Stuttgart, Germany. All negotiations for the purchase and supply of parts and assemblies for these vehicles are conducted by Daimler AG on MBUSI's behalf. The information relating to these purchases are all stored in Germany and are not in the possession of MBUSI. MBUSI has no involvement in these negotiations, nor does MBUSI have any involvement in the design or selection of these vehicle components.

13.    The Parties seek compliance with 35 requests (including subparts) relating to upstream purchasing information of the components at issue.[2] Given that the average vehicle has around 2,500 separate parts, most if not all of which are covered in the subpoena's definition of the term "component." Since the parties are seeking information relating to each of these components for every vehicle sold by Daimler in America over the last two decades, this could easily cover over *2.5 billion* different individual items.

### A.    Upstream Data

14.    At least 9 requests seek transactional data relating to the purchase of components.[3] As noted, these requests likely encompass billions of individual components, and scores of component classes. The subpoena identifies over 50 distinct components, each with its own definition.

---

[2] The upstream purchasing requests include 1(a), 1(b), 1(c), 1(d)(1), 1(d)(2), 1(d)(3), 1(e), 1(f), 1(g)(1), 1(g)(2), 1(g)(3), 1(g)(4), 1(g)(5), 1(g)(6), 1(g)(7), 1(g)(8), 1(g)(9), 1(g)(10), 1(g)(11), 1(g)(12), 1(g)(13), 1(g)(14), 1(g)(15), 1(g)(16), 1(g)(17), 1(g)(18), 1(g)(19), 1(l), 1(m), 3, 14(c), 23(2), 28 (last two sentences), 30, and 33.

[3] *See* Requests 1(a), 1(b), 1(c), 1(d)(1), 1(d)(2), 1(d)(3), 1(e), 1(f), 1(m).

15.     The classifications the parties have used for the lawsuit, however, do not line up with the classification system used by MBUSI in the ordinary course of business. Thus, before any extraction of relevant transactional data can be performed MBUSI would have to devote several hundreds of hours just mapping the requests (and the definition of relevant components) in the subpoena to the categorization used by MBUSI in its purchasing system.

16.     This process, however, is easier said than done. As a first step, MBUSI would first need to identify all the product codes at issue, which would first involve running reports for each of the 140 defendant entities. MBUSI would then need to review the reports to determine which product codes fell within the scope of the subpoena. Many of these, however, have changed over time and across legacy systems, so additional time would be needed to identify and align these codes and systems. MBUSI would then need to run reports on each product code, identifying any non-defendant supplier who supplied products for each such product code. MBUSI would then need to determine which, if any, additional product codes those non-defendant suppliers sold to MBUSI. Then, MBUSI would need to manually determine which of those additional codes fell within the definition of a relevant Component or Assembly. Then MBUSI would need to run those additional product codes to see if additional firms were selected. I estimate that this iterative approach would take at least two months of employee time.

17.     After this, MBUSI would still need to run reports to extract relevant purchasing information. This process is also more difficult than it seems, since it would require tracing component purchases across multiple systems, including purchasing databases and accounts payable databases. All told, I expect that obtaining upstream purchasing information—and ignoring the near impossible task of tracing that product through the manufacturing process and to delivery to the dealer—would take over 1000 hours of employee time.

18. To minimize the burden, I understand that MBUSI has offered to produce transactional information relating to parts sold by the non-defendant suppliers. This would substantially reduce MBUSI's burden because it would not need to independently create the identification of relevant competitors for each component. Presumably, the defendant suppliers in this case know who their competitors are. Most of the component product categories involve heavily concentrated industries.

19. By identifying the relevant entities, the complex and time-consumer iterative approach to identifying each supplier identified above can be largely avoided, and MBUSI can proceed to running reports for specifically identified non-defendant competitors.

20. Moreover, by limiting the reports to non-defendant suppliers, MBUSI limits the need to pull information–often from multiple systems–that is already in the Parties' possession. In that regard, it should be noted that the vast bulk of purchasing information should already be in the Parties' possession. Not only are the defendants among the largest suppliers of each component, they have all the purchasing information for any model of vehicle for which they are the designated component supplier. As such there should only be a handful of significant non-defendant competitors to search for, and collectively, such purchases should encompass just a small minority of purchases. I understand that the Parties have argued that, despite having information concerning the price, quantity, and costs of the parts they sold to MBUSI, they are still demanding that MBUSI undertake a search for such information because they lack the internal product codes or part numbers MBUSI uses. But as discussed above, just identifying the product code is a time intensive process. By itself, it is also a useless piece of information. It

7

only becomes useful if married up to information in other systems, a process which would take many additional hours of time.[4]

### B.   <u>Upstream Documents</u>

21.    At least 26 requests seek custodian documents relating to the purchase of components or assemblies.[5] In light of the (document and data) purchasing information that MBUSI has offered to produce or that is otherwise in the Parties' possession, such information is unlikely to provide significant additional benefit to the Parties and would impose an unreasonable and unrealistic burden on the MBUSI.

22.    <u>The Parties Already Have This Upstream Information.</u> The upstream purchasing documents generally concern information relating to the specific RFQs or agreements that MBUSI has issued over the past 20 years.[6] Each defendant supplier, however, is likely to have substantial information about the RFQs that MBUSI has issued and the agreements that MBUSI has entered into with such suppliers, regardless of whether the defendant supplier won the contract or simply participated in the RFQ. Specifically, the defendants would have information relating to RFQ designation (Request 1(g)(1)), the entity issuing the RFQ (Request 1(g)(2)), the names of the entities receiving the requests* (Request 1(g)(3)), part description (Request 1(g)(4)), car model (Request 1(g)(5)), instructions (Request 1(g)(6)), RFQ terms (Request 1(g)(7)), responses to the RFQ* (Request 1(g)(8)), on-site engineering services* (Request 1(g)(10)), VE or VA Price (Request 1(g)(12)), revised prices* (Request 1(g)(13)), dates of RFQ meetings (Request 1(g)(14)), winning supplier (Request 1(g)(15)), agreements/letters of intent*

---

[4] I note that it is also not true that the defendants lack internal OEM part numbers. The purchase orders and invoices MBUSI issues contain part number information. Thus, the defendant suppliers do have access to this information.

[5] Requests 1(g)(1-19), 1(l), 3, 14(c), 23(2), 28, 39, 33 seek upstream purchasing information.

[6] *See* Request 1(g), 3, 14(c), 23(2), 30. It should be noted that different RFQ systems have been in place during the relevant period and that legacy information may no longer be available or reasonably accessible.

8

(Request 1(g)(16)), adjustments (Request 1(g)(18). To the extent a defendant won an RFQ or otherwise sold parts to MBUSI, it would also have information relating to any resulting agreement** (Requests 1(l) and 3), price adjustments or reductions* (Request 23(2)), and MFN provisions* (Request 30).

23. Most of these items in the preceding paragraph are not supplier specific, and thus, the defendants would have information regardless of whether non-defendant suppliers participated in, or even won, the RFQ. For the few requests above (*i.e.*, those designated with a "*"), the defendants would have the information if at least one was a winning bidder (e.g., Requests 1(g)(13), 1(g)(16), 3, 23(2), and 30). The defendants' own documents would likely also contain information about the RFQ process overall since RFQ processes tend to occur over a significant period of time and involve the exchange of substantial information. Thus, it is unlikely that any defendant would remain in the dark about the identity of other significant competitors.

24. To the extent the defendants do not have information relating to certain RFQs or resulting agreements, such information is likely to exist in the transactional data (such as information relating to pricing). Again, to the extent a defendant was selected as a winning supplier, it would have information about any prices charged. In the event that a non-defendant supplier won a bid, the prices charged would similarly be reflected in the transactional data that MBUSI has offered to produce.

25. The Burden of Producing Upstream Documents is Substantial. Even if MBUSI possessed non-cumulative or duplicative purchasing information, searching for and producing such information would be a Herculean task. As an initial matter, the information is stored in Germany on computer systems and programs that MBUSI does not generally have access to in

9

the regular course of business.  In order to obtain this information, MBUSI would very likely have to send its employees to Germany to locate and extract this information from Daimler AG's systems.

26.     To produce such information, MBUSI would first need to identify the German employees of Daimler AG involved in the purchasing process.  Given the sheer number of parts at issue, and the length of time covered by the case, this would involve weeks' worth of effort, including interviews of employees and coordination with the HR department.  Importantly, however, even this effort is unlikely to bear substantial fruit, given the high level of turnover both at Daimler AG overall and in the specific buyer positions at issue.  Indeed, it would not be uncommon for there to be ten or more buyers involved with certain parts over the relevant period, not to mention managers and supervisors.  Multiplied by the number of parts at issue, it would be nearly impossible to identify a manageable universe of custodians.  And, even if a manageable universe of custodians could be identified, it is unrealistic to think that such information would continue to be maintained so long after an employee left the company or that position.

## IV.    **Downstream Purchasing Information**

27.     After MBUSI assembles vehicles that will be sold in the United States, it transfers title and possession of the vehicles directly to MBUSA, Daimler AG's U.S. distributor. MBUSI has no role in setting the MSRP or the invoice price paid by dealerships for any given vehicle.  MBUSI is not involved in any way in the sale, marketing, or distribution of the

vehicles.  Accordingly, MBUSI does not have any data or documents responsive to the requests for downstream information.[7]

28.    <u>Downstream Information Relating to MBUSI's Internal Operations</u>.    The subpoena seeks massive amounts of information relating to our internal operations, none of which was affected by any overcharge on the price-fixed components. For example, Request 14(j) seeks information concerning MBUSI's "gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements."  This information has no bearing on the prices that MBUSI pays for component parts (and, thus, it is not relevant to the initial overcharge).  Nor it is directly related to the prices that MBUSI charges to dealers (and, thus, it is not relevant to issues of pass-through).  This information is also highly confidential and closely guarded, especially for a public company such as ours.  Moreover, producing this information would require accessing additional information systems, adding to an already massive burden imposed by the subpoena.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of February, 2016 at Tuscaloosa, Alabama.



---

[7] The downstream sales requests include:  4(a)(1), 4(a)(2), 4(a)(3)(a), 4(a)(3)(b), 4(a)(3)(c), 4(a)(3)(d), 4(a)(3)(e), 4(a)(3)(h); 4(a)(3)(k); 4(a)(4); 4(a)(7), 4(a)(8), 4(a)(13), 4(b), 4(e), 4(h), 4(j), 5(a), 5(b), 5(c), 5(d), 5(e), 13(a), 13(b), 15, 16, 22, and 34.  These request includes, among other things, the date of vehicle sale, purchaser contact information, model, model year, VIN number, invoice price, invoice date, invoice number, sale price, price adjustments, dealer holdback, quantity sold, financing terms, MSRP, terms and conditions, transaction numbers, insurance terms, warranty terms, associated incentives payments or bonuses, direct and indirect cost of each vehicle, production dates, floor plan financing and terms, vehicle trade-ins, trade-in mileage, trade-in VIN, trade-in model, sales tax, fees, incentives, subsidies, rebates, bonuses, service agreements, fixed and variable cost of goods sold, cost of each part or component in the vehicle, overhead costs, manufacturing costs, marketing costs, distribution costs, gross profit, operating profit, and projected profit.  The subpoena also requests policies, procedures, standards, methods, standards, decision-making, guidelines, factors, and reasons for determining, setting or prices; studies, analyses, research, and evaluations of vehicle markets and competitive conditions; studies, reports, analyses, procedures, research, or evaluations concerning the extent if any that changes in costs relate to the manufacture, sale, and price of new vehicles; and it requests all communications with dealerships regarding price.

12