# EXHIBIT 53

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
In Re: AUTOMOTIVE PARTS :
ANTITRUST LITIGATION :
 :
―――――――――――――――――――― :
 :
ALL PARTS : Case No.: 12-MD-02311
 : Honorable Marianne O. Battani
―――――――――――――――――――― :
 :
THIS RELATES TO: ALL CASES :
 :
―――――――――――――――――――― :
 :
 :

**DECLARATION OF JORGEN WETERRINGS**

I, Jorgen Weterrings, declare under penalty of perjury as follows:

1. I am the Assistant General Counsel and Director of Legal Affairs – Product for Mitsubishi Motors North America, Inc. ("MMNA"). I have been employed by MMNA since 2002. In my current role, I am responsible for the management and handling of all product related legal issues in the United States, including regulatory affairs. The facts set forth herein are based either on my personal knowledge, my discussions with other persons, or other information or documentation available to me.

2. MMNA is a California corporation that is based and primarily transacts business in person in Cypress, California. MMNA is a wholly owned subsidiary of Mitsubishi Motors Corporation ("MMC") in Japan and is responsible for the distribution of Mitsubishi automobiles in the United States. MMNA currently employs approximately 300 people, who work in various locations across the country, and has approximately 380 independent dealerships nationwide. MMNA acquired a manufacturing division in 2003 based in Normal, Illinois. That assembly

plant ceased to produce vehicles on November 30, 2015, and will be completely closed as of May 31, 2016.

3. I have reviewed the subpoena served on MMNA in this matter (the "Subpoena"). A true and accurate copy of the Subpoena as served on MMNA is attached as Exhibit 1. On January 8, 2016, MMNA served a written objection that the Subpoena was facially invalid and reserved all other objections should the Subpoena be validly served. MMNA received no response to that letter. Also, to my understanding, MMC has not received a subpoena in this litigation.

4. I have also reviewed the Parties' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers. I understand the serving Parties seek information in response to the following requests: 1(a)-(g), (l), (m); 3; 4(a)(1)-(2); 4(a)(3)(a)-(e), (h), (k); 4(a)(4), (7), (8), (13); 4(b), (e), (h), (j); 5; 13; 14(c); 15; 16; 22; 23(2); 27; 28 (last two sentences); 30; 33; and 34. Also, some of the Parties filed a separate motion seeking responses to requests 27 and 31.

I.      **Overall Breadth of the Subpoena**

5. The requests in the Subpoena, even as narrowed, are incredibly broad in both burden and scope. While MMNA has been subject to document requests and subpoenas in other cases from time-to-time, we have never seen anything like this. Its breadth is unprecedented. Compliance with the requests would not only be impractical given the small size of and limited staffing at MMNA, but actual compliance would take many months and would substantially interfere with our business duties and operations. The unparalleled breadth and scope of the Subpoena crosses multiple fronts:

- The requests seek documents and information relating to MMNA's purchases of over 55 different components and assemblies from dozens of different suppliers;

2

- The requests seek documents and information dating back at least 20 years. .

- These requests cover virtually every vehicle that MMNA has sold over the past 20 years, which includes at least 23 models, each of which generally have 3-4 trim levels.

- The requests seeks detailed and burdensome financial information reflecting MMNA's gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit and loss statements for each of the Mitsubishi vehicles sold or leased in the United States for at least the past 20 years.

- The requests would require the involvement of many different employees from many different departments. Further, many of the employees with the most knowledge about the historic documents and information requested in the Subpoena are no longer with MMNA. As such, many of our current employees would have to acquire the knowledge necessary to respond to the requests, which makes the requests even more burdensome.

6. To put the breadth of this Subpoena in perspective, I estimate that complying with the Subpoena would likely take many *hundreds,* if not thousands, of hours of employee time.

7. Moreover, this unprecedented herculean effort is not necessary to fill the gaps in the information already likely possessed by the Parties themselves. As discussed below, the parties likely possess substantial information relating to both the upstream purchase of price-fixed components and the downstream information relating to the sale of vehicles.

8. As to the upstream information, for example, the defendants will possess purchasing information relating to the products they supplied, which would include any model for which one of them was a winning bidder. They will also possess detailed information about the RFQ processes in which they participated, and would – given the substantial information communicated to suppliers during this process –have virtual play-by-play information regarding it.

9. As to downstream information, the dealer plaintiffs are likely to have copious information concerning the prices charged for vehicles, and other aspects of the transactions

between dealers and end-payor customers. Since MMNA's dealings with its dealers generally follow uniform policies and practices throughout its dealer network, obtaining additional information relating to such transactions is unlikely to provide information that is material to the lawsuit.

10. Moreover, given Mitsubishi's small U.S. operation and relatively negligible share of the United States vehicle market, as discussed below, the parties need for any upstream or downstream information from MMNA is greatly outweighed by the substantial burden that would be placed on MMNA to try and comply with the Subpoena.

## II. Mitsibushi's Negligeble Market Share

11. MMNA's records reflect the following number of light vehicles sold in the United States in the past ten years with the respective total market share[1] for that year in parentheses:

    2015: 104,587 (0.60%)

    2014: 80,217 (0.49%)

    2013: 40,764 (0.26%)

    2012: 61,750 (0.43%)

    2011: 87,033 (0.68%)

    2010: 53,652 (0.46%)

    2009: 80,221 (0.77%)

    2008: 94,242 (0.71%)

    2007: 116,791 (0.73%)

    2006: 126,839 (0.77%)

---

[1] Calculated based upon total U.S. light vehicle sales from either Federal Reserve Economic Research or U.S. Automotive News.

This equates to an average of only 84,610 vehicles sold in the United States each year, representing significantly less than 1% of the total market (only 0.59% to be exact) during that timeframe.

12. In addition, over the past 10 years, the majority of the Mitsubishi vehicles sold in the United States were neither manufactured nor assembled by MMNA, but in fact were manufactured outside of the United States.

13. MMNA had only one assembly plant, which was located in Normal, Illinois ("Illinois Plant"). That plant ended its vehicle production on November 30, 2015 and is now in the final stages of a complete shutdown which will culminate in lights out on May 31, 2016.

14. The Illinois Plant's records reflect that it assembled only the following number of Mitsubishi light vehicles designated for sale in the United States in the past ten years:

**2015:** 40,077

**2014:** 31,905

**2013:** 29,116

**2012:** 22,537

**2011:** 32,306

**2010:** 21,812

**2009:** 14,307

**2008:** 43,931

**2007:** 63,992

**2006:** 78,159

The remaining Mitsubishi vehicles assembled at the Illinois Plant were exported for sale outside the United States. Accordingly, of the total 846,096 Mitsubishi light vehicles sold in the United

5

States in the past 10 years, only 44% were assembled in the United States. Since 1992, the Illinois Plant only assembled a total of 2,017,357 vehicles that were designated for sale in the U.S. (or just over 84,000 vehicles per year on average).

15. Even with this limited number of vehicles and limited market share, searching for and compiling what information MMNA does have on the assembly of these vehicles would be extremely burdensome especially given that the Illinois Plant is in final shut down.

### III. Upstream Purchasing Information

16. The Parties seek compliance with 35 requests (including subparts) relating to upstream purchasing information of the components at issue.[2] Specifically, the Subpoena requests upstream purchasing information relating to over 55 different parts and assemblies.

17. The upstream purchasing documents generally concern information relating to the specific RFQs or agreements that MMNA has issued over the past twenty (20) years.[3] Each defendant supplier, however, is likely to have substantial information about the RFQs and the agreements that MMNA has entered into with such suppliers, regardless of whether the defendant supplier won the contract or simply participated in the RFQ. Specifically, the defendants would have information relating to RFQ designation (Request 1(g)(1)), the entity issuing the RFQ (Request 1(g)(2)), the names of the entities receiving the requests (Request 1(g)(3)), part description (Request 1(g)(4)), car model (Request 1(g)(5)), instructions (Request 1(g)(6)), RFQ terms (Request 1(g)(7)), responses to the RFQ (Request 1(g)(8)), on-site engineering services (Request 1(g)(10)), VE or VA Price (Request 1(g)(12)), revised prices

---

[2] The upstream purchasing requests include 1(a), 1(b), 1(c), 1(d)(1), 1(d)(2), 1(d)(3), 1(e), 1(f), 1(g)(1), 1(g)(2), 1(g)(3), 1(g)(4), 1(g)(5), 1(g)(6), 1(g)(7), 1(g)(8), 1(g)(9), 1(g)(10), 1(g)(11), 1(g)(12), 1(g)(13), 1(g)(14), 1(g)(15), 1(g)(16), 1(g)(17), 1(g)(18), 1(g)(19), 1(l), 1(m), 3, 14(c), 23(2), 28 (1st two sentences), 30, and 33.

[3] See Request 1(g), 3, 14(c), 23(2), 30.

(Request 1(g)(13)), dates of RFQ meetings (Request 1(g)(14)), winning supplier (Request 1(g)(15)), agreements/letters of intent (Request 1(g)(16)), adjustments (Request 1(g)(18). To the extent a defendant won an RFQ or otherwise sold parts to MMNA, it would also have information relating to any resulting agreement (Requests 1(l) and 3), price adjustments or reductions (Request 23(2)), and MFN provisions (Request 30).

18. The only documentary information defendants may lack would concern MMNA's own internal evaluation of the RFQs and any target prices (Request 1(g)(11)).[4] Such information, however, is unlikely to be relevant to the question of whether the price of a particular component was impacted by an alleged price-fixing conspiracy. Internal target prices are only general pricing parameters MMNA uses for planning purposes. If the competitive price for a component is above or below a target price, it is the competitive price, not the target price that will govern how much MMNA pays for the component. Moreover, the target price is often influenced by historical costs for the same or similar products. And thus, any price fixing conspiracy that affects the price of a component is also likely to affect the target price. Thus, target prices do not have any bearing on either the existence of a conspiracy or the effect of such a conspiracy on prices.

19. MMNA does not have documents or data on the procurement of parts for the majority of Mitsubishi vehicles sold in the United States. First, it does not have any documents or data relating to any of the components or assemblies procured by MMC for the vehicles manufactured or assembled abroad and subsequently sold in the United States. And, although the Illinois Plant manufactured some vehicles that were subsequently sold in the United States, it

---

[4] Some information, such as cost estimates (see Request 1(g)(9)), evaluation of RFQs (see Request 14(c)), and RFQ summaries or recaps (see Request 1(g)(17)), may or may not have been shared with bidders. To the extent shared, the defendants would have such information. To the extent such information was not shared, it – like target prices – have no bearing on whether the defendants conspired or the impact of such a conspiracy on prices.

7

does not have documents and data on the procurement of all the parts that were installed in those vehicles. MMNA also does not have information on the price of the components that went into certain knock-down part kits the Illinois Plant acquired from MMC. Thus, MMNA would not have documents or data on the procurement for all of the parts for any of Mitsubishi vehicles sold in the United States.

## IV. Downstream Purchasing Information

20. The parties seek compliance with 28 requests relating to the (i) financial performance of MMNA; (ii) the manufacture, distribution, and sale of vehicles; and (iii) the resale of those vehicles by dealers.[5] Since each of these requests deal with post-component-purchasing activities, I refer to these requests as "downstream" requests.

### A. Downstream Information Relating to the MMNA's Internal Operations

21. The Subpoena seeks massive amounts of information relating to MMNA's internal operations, none of which were affected by any overcharge on the price-fixed components. For example, Request 14(j) seeks information concerning the MMNA's "gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements." This information has no bearing on the prices that MMNA's foreign OEM parent pays for component parts, or the limited parts that may have been acquired by the Illinois Plant

---

[5] The downstream sales requests include: 4(a)(1), 4(a)(2), 4(a)(3)(a), 4(a)(3)(b), 4(a)(3)(c), 4(a)(3)(d), 4(a)(3)(e), 4(a)(3)(h); 4(a)(3)(k); 4(a)(4); 4(a)(7), 4(a)(8), 4(a)(13), 4(b), 4(e), 4(h), 4(j), 5(a), 5(b), 5(c), 5(d), 5(e), 13(a), 13(b), 15, 16, 22, and 34. These request includes, among other things, the date of vehicle sale, purchaser contact information, model, model year, VIN number, invoice price, invoice date, invoice number, sale price, price adjustments, dealer holdback, quantity sold, financing terms, MSRP, terms and conditions, transaction numbers, insurance terms, warranty terms, associated incentives payments or bonuses, direct and indirect cost of each vehicle, production dates, floor plan financing and terms, vehicle trade-ins, trade-in mileage, trade-in VIN, trade-in model, sales tax, fees, incentives, subsidies, rebates, bonuses, service agreements, fixed and variable cost of goods sold, cost of each part or component in the vehicle, overhead costs, manufacturing costs, marketing costs, distribution costs, gross profit, operating profit, and projected profit. The Subpoena also requests policies, procedures, standards, methods, standards, decision-making, guidelines, factors, and reasons for determining, setting or prices; studies, analyses, research, and evaluations of vehicle markets and competitive conditions; studies, reports, analyses, procedures, research, or evaluations concerning the extent if any that changes in costs relate to the manufacture, sale, and price of new vehicles; and it requests all communications with dealerships regarding price.

(and, thus, it is not relevant to the initial overcharge). This information is also highly confidential and closely guarded. Moreover, producing this information would require accessing additional information systems, adding to an already massive burden imposed by the Subpoena.

22. Similarly, Request 14(h) seeks documents related to direct, indirect, and estimated manufacturing, marketing, distribution, selling, and other costs, both fixed and variable for each vehicle, including parts not at issue in the case, management costs, labor costs, tooling costs, energy costs, sales and marketing costs, leasing costs, and R&D costs. None of these are affected by the alleged price-fixing conspiracy. To the extent such information even exists in the form sought, or is even within MMNA's possession, custody, or control, trying to collect such information for MMNA, and for each vehicle, would require hundreds of hours of work, if not more.

23. Certain other requests seek information which appears geared toward an attempt to trace a particular price-fixed component to a specific vehicle. Undertaking a search for and production of such information is not necessary because the defendants would likely have substantial information about the models or platforms of vehicles that contain their parts. As part of the RFQ process, each supplier knows exactly what models are at play. Moreover, to the extent the part is customized for a specific vehicle – such as wire harnesses – the supplying defendant would know that as well.

### B. Downstream Information Relating to MMNA's Relations with Dealers

24. A number of requests focus on the relationship between MMNA and its dealers. As an initial matter, it should be noted that these requests seek information that should be in the possession of the dealer plaintiffs themselves. MMNA has consistent, fair, and non-discriminatory policies and practices for all its dealers. Moreover, it is inconceivable that

MMNA would treat one dealer differently from any other dealer based on the price of a part used to manufacture a vehicle. Thus, there is no reason why sufficient information – to the extent it is relevant – cannot be obtained from the dealer plaintiffs in this case.

25. Moreover, most of the information in these requests bears no relationship to the alleged overcharges on the price-fixed parts. Indeed, many requests are far removed from the price of the vehicle, let alone the price of component parts. For example, Request 4(a) seeks information related to non-price elements of relationship between MMNA and its dealers, including advertising subsidies, floor-plan assistance, fuel allowance, dealer inspection charges, and any other terms or conditions of retail sales by dealers – some of which may not even be in MMNA's possession, custody, or control. Request 4(a)(4) also seeks information relating to floor plan financing. Request 4(e) similarly seeks "monetary components" beyond unit price, such as for ancillary products and services, and the "value of each such [ancillary] service, benefit, or product." As above, the alleged conspiracies have no bearing on any of this. The relationship between a distributor and its dealers is complex and multi-faceted. There are many services that a dealer provides either to MMNA or to consumers for which MMNA will provide monetary compensation or subsidies. The price for a particular price-fixed part (for which the majority of information resides with MMC, not MMNA), however, would have no bearing on this company-dealer relationship, or on the value of these ancillary products and services. Any attempt to compile a database of all such ancillary products and services ever provided to any of its current or former dealers in the United States over the past twenty years would involve an immense undertaking.

26. Many of the requests that also appear to bear on the issue of price similarly have no relationship to the alleged component overcharges because they do not relate to specific

10

vehicles. As such, the costs of specific vehicles, or any changes in cost due to the alleged conspiracies on specific component parts, are unlikely to impact any of these pricing elements. This includes, for example, non-vehicle specific incentive programs, dealer holdbacks, manufacturer or distributor subsidies, rebates, bonuses, and allowances. Because such monetary components do not vary based on the cost of specific vehicles, they would not be affected by the alleged price-fixing conspiracy.

27. MMNA acts in coordination with MMC to set the price a dealer pays for a particular vehicle, but MMNA has no information on the price MMC paid for a particular component or assembly MMC procured, or how the price of a particular part of assembly may impact the price charged to the dealers.

28. Moreover, because MSRP, which is determined collaboratively by MMNA and MMC, is the starting point upon which prices to dealers are based, any analysis of the effects of component pricing on MSRP should be sufficient to determine the effects of the alleged conspiracy on the prices paid by dealers. Many factors are involved in the setting of MSRP, including the pricing of competing vehicles from other manufacturers, vehicle features, dealer profit margins, MMNA profit margins, and sales projections. The prices of specific components, however, are not considered in setting the MSRP or other vehicle prices. In fact, MMNA is not provided data regarding component pricing paid by MMC during the MSRP setting process. There is generally a single MSRP and single invoice price for each identical vehicle for all dealers in MMNA's network. Thus, the relationship between MSRP and invoice price for one dealer will be the same as the relationship between MSRP and invoice price for any other dealer. Information concerning both MSRP and invoice price will be in the possession of the dealer plaintiffs.

    **C.**     **Downstream Information Relating to Dealers' Relationships With Their Own Customers.**

29.     A number of the requests seek information concerning the relationship between dealers and their customers. This includes information about the final transaction price between the dealer and its customer, including trade-in allowances (and information about the used cars bought by the dealer), ancillary services, terms of any leases, terms of any warranties or insurance, and financing charges. But MMNA has no documents or data on the ultimate price a consumer pays a dealer for any given vehicle. This is information that is generally in the possession of the dealers themselves. Even if such information were available, none of this information has any bearing on component prices.

**V.**     **Facially-Overbroad Requests Seeking Wholly-Irrelevant Information**

30.     <u>Request 22</u>: Request 22 seeks all communications to any of MMNA's dealerships relating to prices or any incentive programs. Sufficient information concerning the prices charged to the dealers and offered incentive programs are already in the possession of the dealer plaintiffs. Moreover, because the dealer plaintiffs would have received any communications that MMNA would have sent to its dealers, such information is also likely in the dealer plaintiffs' possession.

31.     <u>Request 27</u>. Request 27 seeks all information submitted to any regulatory or governmental authority anywhere in the world over the last twenty (20) years. This is not limited to information submitted in connection with any alleged price-fixing. This would include safety, fuel economy, products liability, and other investigations that have no bearing on the issues in this case. Collecting this information would be incredibly burdensome and irrelevant to the issues as hand. Nonetheless, MMNA has not submitted any information to any regulatory or

governmental authority in the United States or abroad relating to the allegations of this conspiracy.

32. Request 31. Request 31 seeks MMNA's and MMC's negotiations or communications with any of the defendants or other component suppliers in connection with the defendants' conspiracy to fix prices for the component parts. MMNA has not had any specific communications with any suppliers regarding the price-fixing conspiracy at issue in this case. Moreover, MMNA would not be in possession, custody, or control of such communications, if any, between MMC and any defendants or other component suppliers.

33. Request 33. Request 33 seeks all documents comparing any component purchased by MMNA to either (i) components purchased by other OEMs, or (ii) components made by different suppliers. As to the former, such engineering-based documents have no bearing on whether there was a price fixing conspiracy in the case. The fact that one manufacturer uses a different supplier than MMNA has nothing to do with whether the suppliers that participated in an RFQ rigged their bids. As to the latter, the defendants would possess substantial information relating to the relative merits of their product versus their competitors, and to the extent relevant to a given RFQ, such information would likely have been communicated to them. Thus, there would be no reason to conduct a burdensome search of MMNA's files for information comparing and contrasting the attributes of each of the allegedly cartelized parts.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 18, 2016

_____
Jorgen Weterrings
Assistant General Counsel and Director of Legal Affairs – Product
Mitsubishi Motors North America, Inc.

# EXHIBIT 1

# Baker Hostetler

Baker&Hostetler LLP

Capitol Square, Suite 2100
65 East State Street
Columbus, OH 43215-4260

T 614.228.1541
F 614.462.2616
www.bakerlaw.com

Elizabeth A. McNellie
direct dial: 614.462.2651
emcnellie@bakerlaw.com

January 8, 2016

**VIA CERTIFIED US MAIL**

Mr. Steve Williams
Cotechett Pitre & McCarthy LLP
840 Malcolm Road
Burlingame, CA 94010

    Re:    *In Re: Automotive Parts Antitrust Litigation*, E.D. Mich. No. 12-md-02311 – Subpoenas to Mitsubishi entities

Dear Mr. Williams:

    As you may be aware, our firm has recently been retained to represent Mitsubishi Motors R & D of America, Inc., Mitsubishi Motors Credit of America, Inc., and Mitsubishi Motors North America, Inc. (collectively "Mitsubishi") with regard to the subpoenas (the "Subpoenas") served on them in the above-referenced matter. Each of the above Mitsubishi entities has joined in the global negotiations between the Specified Subpoenaed Entities and the Parties, which we believe to be ongoing.

    Regardless, Mitsubishi objects to the Subpoenas as facially invalid under Fed. R. Civ. P. 45(c)(2) because they require production of documents more than 100 miles from where Mitsubishi resides or regularly transacts business in person. In particular, Mitsubishi Motors Credit of America, Inc. and Mitsubishi Motors North America, Inc. have their place of business in Cypress, California, and Mitsubishi Motors R & D of America, Inc. has its place of business in Ann Arbor, Michigan, yet the Subpoenas purport to require production in Burlingame, California. As such, the Subpoenas are invalid. *See, e.g., Sandifer v. Hoyt Archery, Inc.*, No. 12-cv-322, 2014 U.S. Dist. LEXIS 97145, at *11-12 (M.D. La. July 17, 2014).

    Mitsubishi reserves all other objections, including objections that the subpoenas are overbroad, unduly burdensome, and not narrowly tailored, and

Mr. Steve Williams
January 8, 2016
Page 2

to seek reimbursement for any costs incurred complying with the Subpoenas, including attorneys' fees, should valid subpoenas be served upon it.

Sincerely,

Elizabeth A. McNellie

cc: (via electronic mail only)

Robert J. Tucker