# EXHIBIT 62

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------X

In Re: AUTOMOTIVE PARTS
ANTITRUST LITIGATION

ALL PARTS

THIS RELATES TO: ALL CASES

Case No.: 12-MD-02311
Honorable Marianne O. Battani

## DECLARATION OF R. CURTIS ALLEN IN SUPPORT OF SUBARU OF AMERICA, INC.'S OPPOSITION TO MOTION TO COMPEL

I, R. Curtis Allen, hereby declare under penalty of perjury as follows:

1. I am employed by Subaru of America, Inc. ("Subaru"), and my title is Vice President and Chief Financial Officer. In addition to various other matters related to or significantly impacting Subaru's finances, I am involved in and familiar with the method by which Subaru establishes vehicle pricing. I also am involved in and generally familiar with Subaru's financial arrangements with related entities and third parties, including the manufacturer of Subaru vehicles and the Subaru dealer network. Unless otherwise noted, the facts set forth herein are based on my personal knowledge.

2. I have reviewed the subpoena served on Subaru, and I understand that the serving Parties have filed a motion to compel responses to the following requests: 1(a)-(g), (l), (m); 3;

4(a)(1)-(2); 4(a)(3)(a)-(e), (h), (k); 4(a)(4), (7), (8), (13); 4(b), (e), (h), (j); 5; 13; 14(c); 15; 16; 22; 23(2); 27; 28 (last two sentences); 30; 33; and 34. *See* Op. Br. 2 n. 6.[1]

## I. Breadth of the Subpoena.

3. The subpoena seeks extensive data and information on transactions, communications and decisions made by Subaru since 1992, and with respect to virtually every vehicle that Subaru has sold since that time.

4. As a practical matter, compliance with the request simply is not feasible. Even if it were feasible, compliance would (1) take many months; (2) require hundreds or even thousands of employee hours; (3) substantially interfere with our business duties and operations; and (4) cost an extraordinary amount of money.

5. Because of the way Subaru sets vehicle prices, any attempt to trace an upstream charge for a vehicle component through the manufacturing process—in which Subaru plays no role—and then through the distributor and dealer networks to the consumer, would likely be impossible, and would not reflect how Subaru actually prices vehicles.

6. Additionally, Subaru does not track individual vehicle sale prices. That information resides with the dealers, who should have substantial information concerning the prices that Subaru charges for vehicles, and other aspects of the transactions between distributors and dealers, and between dealers and customers.

7. Nonetheless, I understand that Subaru has offered to provide certain transactional data for the last ten years relating to the MSRP set by Subaru on a model-by-model basis.

---

[1] I also understand that certain Parties are seeking documents in response to Request 31, which seeks "all documents relating to negotiations or communications with defendants [and others]" relating to this lawsuit.

## II. Subaru Does Not Possess Information Regarding Parts Purchased by the Manufacturers.

8. The Parties seek compliance with 35 requests (including subparts) relating to the upstream purchasing of component parts by the vehicle manufacturers.[2]

9. Subaru does not manufacture or assemble vehicles. Rather, it is a distributor for Subaru vehicles manufactured by (1) Fuji Heavy Industries Ltd., an unsubpoenaed manufacturer based in Tokyo, Japan, which manufactured the overwhelming majority of vehicles distributed by Subaru during the period covered by the subpoena, and (2) in some cases, Subaru of Indiana Automotive, Inc.

10. Subaru engages in the distribution of vehicles to U.S. dealerships and other independent distributors, and in marketing Subaru vehicles. Subaru does not design, select, source, acquire, or purchase parts or components for new vehicles. As a result, Subaru is generally not in possession of the upstream purchasing information sought by the Parties in their motion to compel.

## III. Downstream Information.

11. The parties seek compliance with 28 requests relating to the (i) financial performance of Subaru; (ii) the manufacture, distribution, and sale of vehicles; and (iii) the resale of those vehicles by dealers (collectively, "downstream information.").[3]

---

[2] The upstream purchasing requests include 1(a), 1(b), 1(c), 1(d)(1), 1(d)(2), 1(d)(3), 1(e), 1(f), 1(g)(1), 1(g)(2), 1(g)(3), 1(g)(4), 1(g)(5), 1(g)(6), 1(g)(7), 1(g)(8), 1(g)(9), 1(g)(10), 1(g)(11), 1(g)(12), 1(g)(13), 1(g)(14), 1(g)(15), 1(g)(16), 1(g)(17), 1(g)(18), 1(g)(19), 1(l), 1(m), 3, 14(c), 23(2), 28 (1st two sentences), 30, and 33.

[3] The downstream sales requests include: 4(a)(1), 4(a)(2), 4(a)(3)(a), 4(a)(3)(b), 4(a)(3)(c), 4(a)(3)(d), 4(a)(3)(e), 4(a)(3)(h); 4(a)(3)(k); 4(a)(4); 4(a)(7), 4(a)(8), 4(a)(13), 4(b), 4(e), 4(h), 4(j), 5(a), 5(b), 5(c), 5(d), 5(e), 13(a), 13(b), 15, 16, 22, and 34. These requests include, among other things, the date of vehicle sale, purchaser contact information, model, model year, VIN number, invoice price, invoice date, invoice number, sale price, price adjustments, dealer holdback, quantity sold, financing terms, MSRP, terms and conditions, transaction numbers, insurance terms, warranty terms, associated incentives payments or bonuses, direct and indirect cost of each vehicle, production dates, floor plan financing and terms, vehicle trade-ins, trade-in mileage, trade-in VIN, trade-in model, sales tax, fees, incentives, subsidies, rebates, bonuses, service agreements, fixed and variable cost of goods sold, cost

3

### A. Downstream Information Relating to Subaru's Internal Operations.

12. The subpoena seeks massive amounts of highly sensitive information relating to Subaru's internal operations. For example, Request 4(j) seeks information concerning Subaru's "gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements." This information, aside from being confidential and closely guarded, has no bearing on the vehicle prices that Subaru charges to dealers, and producing it would increase significantly the already massive burden demanded by the subpoena.

13. Similarly, Request 4(h) seeks documents related to direct, indirect, and estimated manufacturing, marketing, distribution, selling, and other costs, both fixed and variable for each vehicle, including parts not at issue in the case, management costs, labor costs, tooling costs, energy costs, sales and marketing costs, leasing costs, and R&D costs. Subaru does not manufacture or assemble vehicles, nor is it responsible for research and development. As to the remainder of these items, trying to collect this information, and for each vehicle, would require hundreds of hours of work and impose significant costs, without reflecting how Subaru prices its vehicles.

14. Certain other requests seek information related to an apparent attempt to trace a particular price-fixed component to a specific vehicle. There is no manageable way to do this for most vehicle parts, and even if it were possible, it would require hundreds of hours and impose significant costs.

---

of each part or component in the vehicle, overhead costs, manufacturing costs, marketing costs, distribution costs, gross profit, operating profit, and projected profit. The subpoena also requests policies, procedures, standards, methods, standards, decision-making, guidelines, factors, and reasons for determining, setting or prices; studies, analyses, research, and evaluations of vehicle markets and competitive conditions; studies, reports, analyses, procedures, research, or evaluations concerning the extent if any that changes in costs relate to the manufacture, sale, and price of new vehicles; and it requests all communications with dealerships regarding price.

### B. Downstream Information Relating to Subaru's Relations with Dealers.

15. A number of requests focus on the relationship between Subaru and its dealers. This information should be in the possession of the dealer plaintiffs. For example, Request 22 seeks all communications to any Subaru dealership relating to prices or incentive programs. The dealer plaintiffs would have received any communication that Subaru sent to its dealers, including communications regarding prices and incentive programs.

16. Additionally, many of these requests are unrelated to how Subaru prices vehicles. For example, Request 4(a) seeks information regarding advertising subsidies, floor-plan assistance, fuel allowance, dealer inspection charges, and any other terms or conditions of the sale. Request 4(a)(4) also seeks information relating to floor plan financing. Request 4(e) similarly seeks "monetary components" beyond unit price, such as for ancillary products and services, and the "value of each such [ancillary] service, benefit, or product." There are many services that a dealer provides either to Subaru or to consumers for which Subaru will provide monetary compensation or subsidies. The price that the vehicle manufacturer pays for a component part, however, is unrelated to Subaru's relationship with its dealers, or the value of these ancillary products and services. Further, any attempt to compile a database of all such ancillary products and services ever provided to any of Subaru's current or former dealers in the United States over the past twenty years or more would involve an immense, expensive, and likely impossible undertaking.

17. Many of the requests involve pricing elements that do not relate to specific vehicles. As such, the costs of specific vehicles, or any changes in cost due to the price of specific component parts, are unlikely to impact these pricing elements. This includes, for example, non-vehicle specific incentive programs, dealer holdbacks, manufacturer or distributor

5

subsidies, rebates, bonuses, and allowances. Because such monetary components do not vary based on the cost of specific vehicles, they would not be affected by the alleged price-fixing conspiracy.

18. As for the pricing of vehicles, the starting point is the MSRP. Many factors are involved in the setting of MSRP, including the prices of competing vehicles of other manufacturers, vehicle features, costs, and sales projections. The costs of basic manufacturing components, however, are not considered by Subaru in setting the MSRP or other vehicle prices. Once the MSRP is set, Subaru sets the invoice price for the vehicle. Subaru will have a single MSRP and single invoice price for each identical vehicle sold to its dealers. Thus, the relationship between MSRP and invoice price for one dealer will be the same as the relationship between MSRP and invoice price for any other dealer. Information concerning both MSRP and invoice price will be in the possession of the dealer plaintiffs in this case.

### C. Downstream Information Relating to Dealers' Relationships With Their Own Customers.

19. A number of the requests seek information concerning the relationship between dealers and their customers. This includes information about the final transaction price between the dealer and its customer, including trade-in allowances (and information about the used cars bought by the dealer), ancillary services, terms of any leases, terms of any warranties or insurance, and financing charges. This type of information generally is in the possession of the dealers themselves, and Subaru does not systematically track or analyze this information. For many requests, we simply do not possess the relevant information. Even if such information were available, none of this information has any bearing on component prices.

## IV. Regulatory Requests.

20. Request 27 seeks all information submitted to any regulatory or governmental authority anywhere in the world over the last 23 years. This is not limited to information submitted in connection with any alleged price-fixing. This would include safety, fuel economy, products liability, and other investigations that have no bearing on the issues in this case. Collecting this information would be incredibly burdensome and expensive.

## V. Subaru's Market Share.

21. According to data compiled by WardsAuto—which I understand and consider to be a reliable source of data used by the automotive and other industries—during the period covered by the subpoena, Subaru's market share averaged approximately 1.4% of the U.S. market. Prior to 2009, there was no year in which Subaru's U.S. market share exceeded 1.5%.

22. Despite that modest market share, the subpoena would require Subaru to search for and compile almost every piece of data on every Subaru vehicle sold over a period of more than 20 years.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18_ day of _February_, 2016 at _Cherry Hill, NJ_.

_/s/ [signature]_