**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION** | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| **In Re:  All Auto Parts Cases** | 2:12-MD-02311-MOB-MKM |
| **THIS DOCUMENT RELATES TO: ALL AUTO PARTS CASES** | **Oral Argument Requested** |

**DEFENDANTS' REPLY IN SUPPORT OF THE PARTIES' MOTION TO COMPEL**
**DISCOVERY FROM NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS**

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................ ii

PRELIMINARY STATEMENT ............................................................................... 1

PROCEDURAL BACKGROUND RESPONSE ........................................................ 4

ARGUMENT ........................................................................................................... 5

I.     The OEMs' Declarations Prove The Importance of the Materials that the Parties Have Requested ................................................................................................ 5

II.    The Material sought is central to the pending litigation ................................... 7

    A.    OEM Materials Relating to Purchasing Are Relevant to Class Certification, Liability and Damages ................................................... 7

    B.    OEM Materials Relating to Sales Are Relevant to Class Certification, Liability and Damages .......................................................................... 10

III.    The OEMs Do Not Satisfy Their Burden of Proving that the Requests are Disproportional to the Needs of the Case ...................................................... 14

    A.    The OEMs Do Not Meaningfully Dispute That Three of the Six Proportionality Factors Support Ordering the Discovery Sought ......... 14

    B.    The OEMs Fail to Show that the Other Proportionality Factors Support Quashing or Limiting the Subpoena ...................................................... 14

        i    The Parties' Relative Access to the Information ..................................... 14

        ii    The Importance of the Discovery ........................................................... 17

        iii    Whether The Burden of the Discovery Outweighs its Likely Benefit ................................................................................................... 17

IV.    The Arguments in the Separate OEM Briefs Are Largely Duplicative of the Joint Brief and Likewise Have No Merit ........................................................ 21

    A.    The Non-Core OEMs Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena ................................................. 21

    B.    The Smaller Entities Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena ................................................. 22

    C.    The Non-OEM Domestic Distributors Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena ......................... 22

    D.    The Truck and Equipment OEMs Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena ............................... 23

CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. F.B.I.*,
194 F.R.D. 316 (D.D.C. 2000)..............................................................................18

*In re Auto. Parts Antitrust Litig.,* No. 12-cv-102 (E.D. Mich. Aug. 24, 2015) .....................11, 13

*In re Auto. Parts Antitrust Litig.,* No. 12-md-02311 (E.D. Mich. Jan. 29, 2016)........11, 12, 13, 21

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998) ...................................................................9

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) ........................................................9

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
No. 11-00009, 2015 WL 6181748 (D. Del. Oct. 21, 2015)..............................11, 12

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013).........................................................9

*Deman Data Sys., LLC v. Schessel*,
4:13-mc-00520, 2014 WL 204248 (M.D. Pa. Jan. 16, 2014) ..................................20

*In re Dom. Drywall Antitrust Litig.*,
300 F.R.D. 234 (E.D. Pa. 2014)...........................................................20

*In re Exxon Valdez*,
142 F.R.D. 380 (D.D.C. 1992)...........................................................20

*Khami v. Ortho-McNeil-Janssen Pharm., Inc.*,
No. 09-CV-11464, 2011 WL 1045545 (E.D. Mich. Mar. 17, 2011) ......................19

*Lowe v. Vadlamudi*,
No. 08-10269, 2012 WL 3887177 (E.D. Mich. Sept. 7, 2012)..............................17

*Miller v. Fed. Express Corp.*,
186 F.R.D. 376 (W.D. Tenn. 1999) ...................................................10

*In re Mushroom Direct Purchaser Antitrust Litig.*,
No. 06-0620, 2015 U.S. Dist. Lexis 120892 (E.D. Pa. July 29, 2015)..............................11, 15

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................8

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
    215 F.R.D. 523 (E.D. Tex. 2003) ...................................................................................10, 11

*United States v. Blue Cross Blue Shield of Michigan*,
    No. 10-CV-14155, 2012 WL 4513600 (E.D. Mich. Oct. 1, 2012) ..........................................20

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ..............................................................................................11

**Statutes**

Fed. R. Civ. P. 45(d)(3)(A) ...................................................................................................23

Fed. R. Civ. P. 26(b)(l) .....................................................................................................14, 17

Fed. R. Civ. P. 23(b)(3) ...........................................................................................................6

**Other Materials**

ABA Section of Antitrust Law, *Antitrust Law Developments* (7th ed. 2012) ...........................8, 10

NADA Data, Annual Financial Profile of America's Franchised New-Car
    Dealerships, 1996-2014 Editions, https://www.nada.org/nadadata/ (last visited
    Mar. 8, 2016) ..........................................................................................................................15

The Timken Company, Annual Report (Form 10-K) (Feb. 24, 2016)
    http://www.sec.gov/Archives/edgar/data/98362/000009836216000097/tkr10k
    123115.htm ................................................................................................................................8

REDACTED

## PRELIMINARY STATEMENT

Defendants understand the OEMs' desire to avoid the burdens of discovery, and even more than in the usual case, Defendants are eager to work with the OEMs to minimize the burden.  After all, the OEMs are the Defendants' principal customers and Defendants work closely with OEMs.  It would make no sense for Defendants to impose burdens on the OEMs beyond those absolutely necessary for the fair and proper adjudication of the claims in the many cases in this MDL.  Defendants have accordingly repeatedly sought to negotiate with individual OEMs to reduce the burdens that those OEMs face in responding to these subpoenas; these negotiations could, for example, limit the number of custodians searched and use negotiated search terms.  And Defendants will be more than accommodating when it comes to sharing the OEMs' costs of complying with the subpoena.  Unfortunately, the OEMs have taken the approach of trying to avoid almost any discovery.  That result would impede the truth-seeking that is at the core of our litigation process and impair the ability of the finder of fact to do its job, a result that is neither fair to any of the Parties in this case nor reasonable given the crucial information in the sole possession of the OEMs.[1]

Far from demonstrating that the subpoenas are unreasonable and that *no* discovery is warranted, the OEMs' oppositions make abundantly clear that the OEMs, and *only* the OEMs, possess certain information that is *uniquely* probative to core issues in these cases.  Only the

---

[1] Defendants note that Plaintiffs have filed additional cases involving other parts since the subpoenas were issued last year.  *See* 2:15-cv-12893-MOB-MKM (Automotive Hoses); 2:15-cv-13000-MOB-MKM (Automotive Brake Hoses); 2:15-cv-14080-MOB-MKM (Shock Absorbers); 2:16-cv-10456-MOB-MKM (Body Sealings) and 2:16-cv-10461-MOB-MKM (Plastic Interior Trim Parts).  The OEMs' materials will be equally relevant in the later-filed cases.  Therefore, to minimize the burden on the OEMs and the need for serial discovery or motion practice, the Court may wish to rule that the subpoenas on the OEMs and its order on the present motions should be deemed to apply to the parts and defendants in these later cases. The timing of the OEMs' production with respect to these cases can be determined at a later time.

REDACTED

OEMs have materials that show how they decided (i) what prices to pay for the component parts at issue, and (ii) what prices to charge for the automobiles that incorporate those parts.  These are critically important to resolving fundamental issues in these lawsuits.  Whether the OEMs were overcharged for the parts at issue is an essential element in every one of these ~65 lawsuits. Similarly, in the indirect purchaser cases an essential element is whether the OEMs passed on any overcharge.  Notably, the OEMs have submitted declarations in opposition to this very motion saying that they did *not* pass on overcharges.  For example, the OEMs offer sworn statements ███████████████████████████████████████████████████

████████████████████████  ██  ███████████████████████████████

███████████████████████████████████████████████████

███████  If true, as Defendants believe it is, this fact would be dispositive of all of the indirect purchaser cases, as it demonstrates that any alleged overcharge on a vehicle component was not passed through to vehicle dealers or end payors.  Yet rather than conceding the obvious—that the Parties and the Court have a compelling reason to discover the facts in the OEMs' exclusive possession that would prove or disprove these assertions of no pass-on—the OEMs argue that evidence of lack of pass-on is irrelevant.

Similarly, the OEMs are uniquely in possession of facts relevant to class certification, including the extent to which their pricing decisions varied based on assessments of numerous particularized factors, such as the target niche and price-point for a vehicle, the expected or announced pricing for vehicles viewed as competitors, variations in global, national, regional, and local demand, as well as corporate objectives such as brand promotion, inventory clearance,

---

[2] "Joint Opp." refers to the SSEs' Joint Opposition to the Parties' Motion to Compel and "Joint Opp. Ex." refers to exhibits to that opposition.  An index to these exhibits is available at ECF No. 1227-1.

the desire to attract first-time buyers that might become loyal customers over decades, and other considerations.  The extent to which each automaker made different strategic decisions as circumstances warranted bears heavily on whether common or individual issues will predominate in these cases.

None of the OEMs' challenges to these straightforward conclusions withstand scrutiny, nor do any of the OEMs' other objections to the Subpoena.  The OEMs rely heavily on the novel assertion that the materials sought would be largely irrelevant—a position belied by both common sense and case law establishing otherwise.  Notably, the OEMs' relevance challenge is substantially predicated on speculative assertions (mostly made by the OEMs' hired expert) about ultimate disputed issues in these lawsuits.  For example, the OEMs speculate, without any empirical support, that discovery concerning non-defendant suppliers of the components at issue is not necessary because any conspiracy would have "infected" the overall market.  But whether these non-defendants' prices were "infected" (or, to the contrary, whether such suppliers acted as a constraint that prevented any allegedly conspiring defendants from achieving supra-competitive pricing) is a question of fact that requires an evaluation of the materials that the OEMs refuse to produce.  A third party's *ipse dixit* is simply not a basis for objecting to discovery of materials highly relevant to the disposition of an ultimate issue in litigation; those core determinations can only be made on a record supported by such materials.

Finally, the OEMs fail to demonstrate that the discovery sought is not proportional to the needs of the case, as required under recent amendments to the Federal Rules of Civil Procedure. The problem of burden, Defendants respectfully submit, would be more easily resolved on a case-by-case basis—taking into account the specific burdens faced by individual OEMs—once the broader outlines of permitted discovery are established.  In any event, given the likely benefit

REDACTED

of the information sought, and the tools available to the parties and Court to reduce any burdens once discovery is ordered, the OEMs simply have offered no overarching burden rationale to justify resisting the discovery sought here.  The Parties' motion should therefore be granted.

## PROCEDURAL BACKGROUND RESPONSE

The OEMs' characterization of the meet and confer process, including their insinuation that only the OEMs came to the table with a viable way forward, is not accurate.  Joint Opp. at 5-13.  The Parties' extensive efforts in this respect are detailed in their opening brief (at 5-12) and in the Williams Declaration (ECF No. 1186 ¶¶ 9-14) attached to that brief.  In short:

- Before the OEMs joined together to negotiate as a group, the Parties had already met and conferred with at least 13 subpoenaed entities.  Williams Decl. ¶ 11.

- After listening to the OEMs' concerns on an October 2, 2015 "summit" call, the Parties sent a letter on October 14, responding to each issue raised and offering to significantly narrow the scope of the Subpoena, to hold it in abeyance for certain entities, and to negotiate regarding cost sharing.  Williams Decl. Ex. J.

- Rather than meaningfully engaging, the OEMs' responded on October 29 by asserting that "the Subpoena is facially unenforceable" and that it was "difficult [for the OEMs] to constructively discuss what, *if any*, information ought to be produced."  Williams Decl. Ex. K at 1-2 (emphasis added).

- The Parties responded on November 24, noting that the OEMs were "uniquely in possession" of key documents and explaining in detail the relevance of the materials sought.  Williams Decl. Ex. L at 2.  The Parties further agreed to hold *nineteen* of the thirty-seven requests in the Subpoena in abeyance.  *Id*. at 2-5.

The offer that the OEMs proceeded to make in a December 18 letter—which they tout in their brief as a meaningful proposal—fell far short of reasonable.  The OEMs offered only partial production of limited transactional data on component purchases and a list of vehicle MSRPs.  Williams Decl. Ex. M at 1-2.  This did not come close to addressing the genuine needs of the Parties to obtain information exclusively in the hands of the OEMs.  In light of the distance remaining after nearly five months of negotiations, and with class certification deadlines approaching, the Parties reasonably declared an impasse.  Williams Decl. Ex. N.

REDACTED

## ARGUMENT

**I.    THE OEMS' DECLARATIONS PROVE THE IMPORTANCE OF THE MATERIALS THAT THE PARTIES HAVE REQUESTED**

The numerous declarations submitted by the OEMs demonstrate that they alone possess certain information that is highly relevant to key legal and factual issues in these cases.

One key issue is whether any overcharge resulting from an alleged conspiracy was passed on by OEMs when they sold vehicles containing those components.  If prices for the OEMs' vehicles were not sensitive to variations in component costs, that would be highly relevant to— indeed, dispositive of—this key issue in both the ADP and EPP cases.  The OEMs' declarations make assertions that go to the heart of this issue,



---

<sup>3</sup> *See also*

Allen (Subaru), Joint Opp. Ex. 62 ¶ 18 ("The costs of basic manufacturing components, however, are not considered by Subaru in setting the MSRP or other vehicle prices."); Schaeffer (BMW), Joint Opp. Ex. 21 ¶ 10 ("In determining the prices at which it sells vehicles to authorized BMW centers and MINI dealers, BMW NA does not consider the costs of components and assemblies, nor could it, because BMW NA does not have information concerning the costs of components and assemblies."); Weiner (Jaguar), Joint Opp. Ex. 47 ¶ 9 (making similar statements);                                              Weterings (Mitsubishi), Joint Opp. Ex. 53 ¶ 28 (same);

The OEMs' declarations also demonstrate that they have information relevant to important class certification issues, such as whether individual issues predominate over issues common to the putative classes. *See* Fed. R. Civ. P. 23(b)(3). The OEMs' declarations indicate that they possess evidence directly probative of that question. For example, they state that

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ *see also* Weterrings (Mitsubishi), Joint Opp. Ex. 53 ¶ 28 (making similar statements); ██████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ Weterrings (Mitsubishi), Joint Opp. Ex. 53 ¶ 25 (same).

As these declarations reflect, no one but the OEMs would be able to produce documents relating to, among other things, the factors that the OEMs consider, and do not consider, when

determining vehicle pricing.  In short, far from supporting quashing the Subpoena, the OEMs'
declarations illustrate the importance of enforcing it.

## II.     THE MATERIAL SOUGHT IS CENTRAL TO THE PENDING LITIGATION

The Parties explained in their opening brief how the materials they have sought from the
OEMs are highly relevant to determinative issues in this litigation, including issues of
overcharge, pass-through, and class certification.  Joint Mot.[4] at 14-16, 19-22, 25-27.  Nothing in
the OEMs' brief contradicts those explanations.  And, as demonstrated in the OEMs declarations,
information concerning the OEMs' (1) purchases of the components at issue, and (2) sales of
vehicles containing those components is not merely highly relevant, but in the OEMs' sole
possession.[5]

### A.     OEM Materials Relating to Purchasing Are Relevant to Class Certification, Liability and Damages

The OEMs resist production of materials relating to their purchasing of the parts at issue
in this litigation with conclusory high-level arguments.  But the details demonstrate they are
wrong.  The materials sought are precisely those that litigants and experts use in our adversary
system to establish facts or support opinions at the core of these cases.

---

[4] "Joint Mot." refers to the Parties' Motion to Compel Discovery from Non-Party Original
Equipment Manufacturers, ECF No. 1185.

[5] Much of the OEMs' argument in this respect rests on the testimony of their expert, Dr.
McDonald, who opines without experience in this case or familiarity with the data produced to
date, on highly disputed, ultimate issues in this case as if they were foregone conclusions.  This
in turn allows the circular argument that because of those foregone conclusions, no discovery
relating to those issues would be relevant. *See* Joint Opp. at 21, 25-26.  As explained, *see infra*,
that is wrong.  Plaintiffs in this case will bear the burden of attempting to create highly reliable
models that can be relied upon in assessing class certification and damages, and plaintiffs will
assess many factors in building their models.  And defendants will certainly mount attacks on
those models at the appropriate time.  It cannot be conclusively determined in advance which
factors may be salient to that process.  Defendants have submitted a report from Dr. Edward
Snyder that explains why Dr. McDonald is incorrect to opine conclusively about what is and is
not relevant before any review of the data.

*First*, the OEMs and their expert assert that materials relating to non-defendant suppliers of parts at issue can ***never*** be relevant because their prices would be "infected" by the conspiracy.  Joint Opp. at 21; Joint Opp. Ex. 19 ("McDonald Decl."), ¶¶ 31-33.  Not so.  ████

████████████████████████████████████████████████████████████

████     Reply Ex. 1, Declaration of Dr. Edward A. Snyder ("Snyder Decl.") ¶ 11.  To the contrary, ████████████████████████████████████████████

████████████████████████████████████████ *Id.*  Such an assessment might show that, far from there being any such "infection," non-defendant suppliers acted as a constraint that prevented Defendants from achieving any supra-competitive pricing, thereby foreclosing any claim of injury by the Plaintiffs.  For example, Timken – a non-defendant bearing supplier – is one of the market leaders in bearings.[6]  Timken data from the OEMs, and internal OEM assessments of Timken RFQ responses, are important to modeling bearing market dynamics, including the impact of Defendants' alleged conduct.  *See* Snyder Decl. ¶ 12 ███████████████████████████████████

███████████████████████████████████████  The way both parties test the others' arguments is by examining through "[t]he 'yardstick' approach . . . profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation."  *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996); *see also* "Calculation of Damages," ABA Section of Antitrust Law, *Antitrust Law Developments* (7th ed. 2012) at 786 (same).

*Second*, the OEMs improperly discount the importance of their internal RFQ evaluations. Joint Opp. at 23.  The OEMs' evaluation materials will help show how prices for parts were

---

[6] *See, e.g.,* The Timken Company, Annual Report (Form 10-K) (Feb. 24, 2016) at p. 6, http://www.sec.gov/Archives/edgar/data/98362/000009836216000097/tkr10k123115.htm.

determined, the factors affecting those prices, and explain price changes that are not attributable to the alleged concerted conduct by the Defendants.  These internal assessments would thus provide meaningful insight into which variables are significant to a proper pricing analysis.  As recognized by the OEMs' own economist, "[i]n specifying a regression, the economist must make a determination of which variables should be included in the regression."  McDonald Decl. ¶ 11.  Courts agree and reject models that do not account for salient factors.  *See, e.g., Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment.").

Further, whether Plaintiffs were injured depends on, among other things, the OEMs' method and manner of pricing components.  A fundamental threshold issue in each of these lawsuits is whether OEMs paid more for components sold by Defendants as a result of alleged conspiracies.  Plainly relevant are the OEMs' internal documents, reflecting how they assess and determine the prices they ultimately paid for those components.  For example, once an RFQ is awarded, there are typically years of redesign and renegotiation before any price is actually charged, a process that continues over the lifespan of the product.  Contrary to the OEMs' argument that only "data" can be relevant (Joint Opp. at 24), OEM documents regarding the drivers of such price changes and their ability to extract discounts from parts makers over the life of a product are directly relevant to assessing injury.  *See, e.g.*, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1434 (2013) (noting that an economic model that lacked context as to *why* overcharges were the result of the alleged wrong would not show antitrust harm common to the entire class); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001) ("The fact of injury

may be established by inference or circumstantial evidence.") (citing ABA Section of Antitrust Law, *Antitrust Law Developments* (7th ed. 2012) at 757); *see also* Snyder Decl. ¶ 10.

The value of the materials also extends to class certification.  The RFQ evaluation materials would reveal, among other things, (1) how OEMs set the target price for a component, (2) how that target price compares to the contracted price, (3) how the OEM decides which supplier to use, and (4) which suppliers the OEM perceives to be competitors.  This evidence may show, for example, that there is no common way to prove injury in light of all the individualized factors that go into the calculus.  *See, e.g., Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 215 F.R.D. 523, 531 (E.D. Tex. 2003) ("Because of the many individualized factors that established what each Plaintiff actually paid, it will be impossible to present evidence in a common manner as to the price each Plaintiff would have paid but for the alleged conspiracy.  Predominance and manageability may be destroyed solely by the complexity of determining damages when that determination does not lend itself to a mathematical calculation that can be applied to all the class members.").[7]

B.   **OEM Materials Relating to Sales Are Relevant to Class Certification, Liability and Damages**

The OEMs' challenges to the relevance of materials relating to vehicle sales are equally baseless.  The briefing leaves no question that the OEMs uniquely possess highly relevant information about how they determine the price of their vehicles, whether component costs affect the price of those vehicles, and other terms and conditions of vehicle sales.

---

[7] The OEMs' assertion that "[d]amages models do not need to be perfect" is not a defense to discovery.  Joint Opp. at 20.  Not only does this argument reflect the erroneous assumption – which pervades the OEMs' brief – that the only live issue is "damages," but the fact that courts can accept damages models that have holes (as the OEMs' cases show) does not mean that discovery aimed at filling those holes should be denied.  *See, e.g.*, *Miller v. Fed. Express Corp.*, 186 F.R.D. 376, 383 (W.D. Tenn. 1999) ("Relevancy for discovery purposes is extremely broad.  The information sought need not be admissible in court in order to be relevant.").

REDACTED

*First*, the OEMs' arguments as to the lack of relevance of sales materials are contradicted by their own declarations, which – as noted above – demonstrate that these materials are highly relevant to key issues in this case, such as whether an overcharge was passed on by the OEM. *See supra*, Section I.  The declarations also show that these materials are also highly relevant to whether these cases can proceed on a class basis, as the pricing approaches by different OEMs or as to different ADPs may show variations that foreclose class certification.  *See id.*[8]

*Second*, whatever the presumption regarding "downstream" materials (Joint Opp. at 27), the record shows that the Parties' evidence is insufficient here.  And, in any event, there is no such presumption.  *See, e.g.*, *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1192 (11th Cir. 2003) (overturning district court ruling that "downstream discovery" should be foreclosed and finding it relevant to class certification).  Indeed, the Special Master has entered several orders enforcing production of downstream discovery.  *See* 2:12-cv-00102, ECF No. 251 ¶¶ 4, 7; ECF No. 310 ¶¶ 1-6; ECF No. 330, at 4-5; ECF No. 332, at 2-3; 2:12-md-02311, ECF No. 1113, at 3-4; 2:12-cv-00102, ECF No. 374, at 2-4.[9]

*Third*, the OEMs argue incorrectly that information on various different aspects of their automobile pricing is not necessary to assess whether they had passed on any overcharge.  This

---

[8] The OEMs argue that where "public sources or party evidence . . . . is not sufficient because plaintiffs need to prove *individual* damages, there should be no class."  Joint Opp. at 27.  But a Court should not deny discovery relevant to class certification based on a discovery target's self-serving assertions about how the dispute should be resolved.

[9] Notably, in the *Air Cargo* decision cited by OEMs (*see* Joint Opp. at 25), the court refused to allow "downstream" discovery because the case involved *only direct purchasers.*  Such discovery is highly relevant to *indirect purchaser* cases, including the ADP and EPP cases, because indirect purchaser plaintiffs—unlike direct purchasers—must prove pass-through.  It is therefore unsurprising that the line of case law on which OEMs rely originated with the Supreme Court decision in *Hanover Shoe*, which held that defendants in *direct purchaser* lawsuits are not permitted to defend against claims under federal antitrust law by showing that the direct purchasers "passed on" the alleged overcharges to others down the supply chain.  That is of no moment as to either the ADP or EPP cases.

is based largely on Dr. McDonald's declaration which asserts, without support, that assessing

pass-through requires only two variables: (a) total cost to the OEMs of a vehicle; and (b) MSRP.

*See* McDonald Decl. ¶ 18. 

Snyder Decl. ¶ 15.

Snyder Decl. ¶¶ 12-18.

Snyder Decl. ¶ 17; *see In re Class 8 Transmission Indirect Purchaser Antitrust

Litig.*, No. 11-00009, 2015 WL 6181748, at *9 (D. Del. Oct. 21, 2015) ("what portion of the

alleged overcharge was passed on… cannot be determined simply by the overall purchase

price").[10]

     *Fourth*, identifying which end products contain a particular part is highly relevant to

whether any overcharge on that part was passed through, the scope of affected commerce, and

damages.  *See, e.g.*, *Class 8*, 2015 WL 6181748, at *9 (analysis of alleged overcharge requires

tracing the overcharge down the distribution chain, and noting that "determining what portion of

the alleged overcharge was passed on . . . cannot be determined simply by the overall purchase

price"); *see also* Snyder Decl. ¶ 16

---

[10] The OEMs assert that certain price-related items (*e.g.*, dealer incentives, holdbacks) are
unaffected by component costs, but these assertions – much like those made in the OEMs' fact
declarations – are not a defense to discovery aimed at assessing that very issue.  *See supra*,
Section I.



*Fifth*, information relating to fuel allowances, floor-plan assistance, dealer inspections, advertising, and growth incentive programs are similarly probative. The OEMs' argument to the contrary relies on Dr. McDonald's speculative assertion that none of these factors would "bias the estimate" of pass-through. *See* Joint Opp. at 28-29; McDonald Decl. ¶¶ 49-55. But the evidence the Parties seek from the OEMs is highly relevant to assessing whether or not that is in fact true. Snyder Decl. ¶ 16

In sum, the assertion that sales-related information is not relevant to the claims and defenses in this litigation simply cannot be squared with the issues to be litigated here. The real issue is how to collect and produce that information in a manner that fairly and adequately addresses questions of burden; and that issue, too, can be readily resolved.

---

[11] The OEMs assert that the Parties have agreed that they have all the information necessary to estimate damages and pass-through (Joint Opp. at 2); however, their only citation is to an unsupported statement made by the ADPs in a dispute with Defendants. *See Auto. Parts,* No. 12-md-02311 (E.D. Mich. Jan. 29, 2016), ECF No. 1197 at 3. Defendants corrected the record in response. *Id.* ("That is entirely baseless and untrue. Defendants have never agreed to any such thing, and tellingly Auto Dealers cite nothing in support of the existence of any such agreement.").

[12] The OEMs misconstrue the Court's prior ruling with respect to dealer pricing information. *See* Joint Opp. at 33. That ruling in fact allowed discovery of detailed information about the terms under which dealers purchased vehicles, including "net price paid … including but not limited to, list price, taxes, commissions, rebates, discounts, refunds, or credit for returns"; "[s]hipping or freight costs"; and "[m]onetary or non-monetary components of, or incentives for, the purchase distinct from net price, including … service agreements, warranties, or installation." *Auto. Parts,* No. 12-cv-102 (E.D. Mich. Aug. 24, 2015), ECF No. 338-1 at 5-6. This is precisely the kind of information that the OEMs claim is "wholly unrelated to component costs" yet has been recognized by this Court as properly subject to discovery.

### III.    THE OEMS DO NOT SATISFY THEIR BURDEN OF PROVING THAT THE REQUESTS ARE DISPROPORTIONAL TO THE NEEDS OF THE CASE

Under recent amendments to the Federal Rules, once a party who served a subpoena has shown the relevance of the materials sought, the subpoena recipient should be ordered to comply with the subpoena unless it satisfies the "heavy burden" of establishing that the discovery is not proportional to the needs of the case based on a consideration of six factors set forth in Rule 26(1).  Joint Mot. at 12.  The OEMs do not satisfy that burden here.  Rule 26(b)(1)'s proportionality factors all weigh in favor of ordering the discovery sought.

### A.    The OEMs Do Not Meaningfully Dispute That Three of the Six Proportionality Factors Support Ordering the Discovery Sought

The OEMs do not meaningfully dispute that three of the six Rule 26 factors – *i.e.*, importance of the issues at stake, amount in controversy, and resources of the party from whom discovery is sought – support granting the motion to compel.  *See* Joint Mot. at 28-31 (noting that, *inter alia*, this litigation involves numerous parties, the claims potentially impact millions of purchases and leases of vehicles worth billions of dollars over the last twenty years, and the OEMs are large, sophisticated corporations that are constantly involved in complex litigation); *see also* Joint Opp. at 5 (the OEMs include some of "the largest car makers in the world").

### B.    The OEMs Fail to Show that the Other Proportionality Factors Support Quashing or Limiting the Subpoena

The OEMs fail to show that any of the three remaining factors – *i.e.*, relative access to the information, the importance of the discovery, and whether the burden of the discovery outweighs the likely benefit – supports quashing or limiting the Subpoena.  *See* Joint Mot. at 29-32.

### i    The Parties' Relative Access to the Information

The Purchasing Requests.  The OEMs' claim that "[a]t least one Defendant participated in every RFQ at issue" does not show that Defendants have access to the purchasing materials at

issue.  Joint Opp. at 1.  It is indisputable that much of the material sought by the purchasing requests is held solely by the OEMs.  For example, Defendants do not have documents containing OEMs' target prices, internal communications regarding the negotiation and approval process for RFQs, the number and identity of suppliers submitting bids, the internal criteria used to evaluate suppliers, what OEMs know about parts pricing, or the motivations behind any post-award price and specification adjustments.  Indeed, even if every Defendant had perfect records for every RFQ of relevance (which is not the case), that would still not reflect the complete file for *any* RFQ, which can be found *only* in the hands of the OEMs.

The Sales Requests.  The OEMs' argument that the Parties can obtain the sales materials at issue from the ADPs is simply incorrect.  The OEMs' declarations make clear that they possess internal pricing material that would not be in the hands of any ADPs, including how MSRP and invoice price is set, the relationship between the two, and the role of component pricing in MSRP and invoice price.  *See supra*, Section I.

Moreover, there are only a relatively small number of named ADPs (approximately 40), while there are thousands of auto dealers nationwide that would be part of the class ADPs purport to represent.  The named ADPs thus represent *a small fraction of a percent* of all auto dealers, and there are significant gaps and inconsistencies in the data and information the named ADPs have produced.  The data obtained from the ADPs reflects only approximately 365,000 non-duplicative new car sales transactions over roughly a 16 year period.  According to the National Association of Auto Dealers, ~149 million new cars were sold in the states at issue in

this litigation between 1996 and 2014.[13] Thus, the existing data represents only ~0.024% of total

nationwide sales.[14]

The OEMs and Dr. McDonald are also incorrect in their presumption that because dealer

protection laws prohibit discrimination among dealers, these datasets can be extrapolated to

cover thousands of other dealers and nearly every vehicle in the nation. *See* Joint Opp. at 1-2.

Unsurprisingly, they cite absolutely no law or other authority for this proposition. Indeed, a

recent complaint filed by four Nissan dealers against Nissan North America alleges that some

dealers get substantial incentive payments not available to others. *See* Reply Ex. 2 ("The Illegal

Incentive Program provides preferred dealers with a significant advantage over their non-

preferred competitors."). Accordingly, the small population of data currently in the Parties'

possession cannot be presumed to be representative of thousands of other dealers in the nations.

Even if OEMs did offer all dealers identical initial pricing terms, incentives to auto

dealers are set by OEMs on an individualized basis based on various factors such as the dealer's

past performance. *See* Reply Ex. 3 ███████████████████████████

████████████████████████████████. Further, the Parties have

little data related to volume incentives granted by OEMs to the dealers, which have a significant

effect on vehicle pricing (*e.g.*, month-end incentives) and are important to pricing and pass-

---

[13] New car sales are approximated from the number of new vehicle registrations in the relevant states. *See* NADA Data, Annual Financial Profile of America's Franchised New-Car Dealerships, 1996-2014 Editions, https://www.nada.org/nadadata/ (last visited Mar. 8, 2016).

[14] The OEMs cite to *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 U.S. Dist. Lexis 120892 (E.D. Pa. July 29, 2015) to show that the court refused to disallow plaintiffs' expert's regression analysis which was based on data from 31% of class members representing 71% of the total sales volume. *See* Smaller SSE Opp. at 8. The amount of data currently in possession of the Parties is not even in the ballpark of what the parties had in that case: the Parties have data from *a small fraction of one percent* of class members (not 31%) representing *0.024%* of total sales volume (a far cry from 71%). Further, the fact that a court may sometimes allow an imperfect damages model does not mean the Court here should foreclose relevant discovery if it is available.

through analyses.  *See* Snyder Decl. ¶ 18; Reply Ex. 4 

Moreover, the OEMs' claims that MSRP

and invoice prices are all that is needed and that such pricing is "common" across the United

States (Joint Opp. at 30-31) is simply wrong.  *See* Snyder Decl. ¶¶ 18-19

### ii       The Importance of the Discovery

Considerations of the importance of the discovery sought also strongly support granting

the motion to compel.  As described *supra* in Sections I and II and in Dr. Snyder's declaration,

the discovery sought by the Subpoena's narrowed requests is highly relevant to determinations of

injury and initial overcharge (a factor the OEMs largely ignore), pass-through, damages, and

class certification.  *See also* Joint Mot. at 14-28.

### iii       Whether The Burden of the Discovery Outweighs its Likely Benefit

When examined in context with the nature of the cases at issue and the importance of the

discovery sought by the Subpoena, the OEMs' claims of burden do not weigh against granting

the motion to compel.  The proportionality and burden assessments contemplated by the Federal

Rules do not dictate that a large burden alone precludes compliance, but rather that any burden,

even if substantial, be weighed against the "likely benefit" of discovery.  *See* Fed. R. Civ. P.

26(b)(l); *Lowe v. Vadlamudi*, No. 08-10269, 2012 WL 3887177, at *2-3  (E.D. Mich. Sept. 7,

2012) (balancing the likely benefit of discovery and denying in part motion to quash).  This

factor strongly supports ordering the discovery sought here because (i) the "likely benefit" is

substantial and (ii) the OEMs' claims of burden are exaggerated and can be managed through

negotiations.

Indeed, the question of proportionality under Rule 26(b)(1) is not, as the OEMs suggest, one appropriately answered in one pass as to all OEMs. That approach, taken by the OEMs here, runs contrary to the language and purpose of the Rule 26 amendments. Instead, those amendments counsel towards a tailored approach—one that looks to the actual volume of material, cost, burden, and the parties' willingness to share or shift certain costs. Indeed, once the difficulties each OEM may individually face in searching for the information sought are considered (only now discussed for the first time in the OEM declarations), the parties can then discuss practical ways to minimize the burden and maximize the efficiency of this discovery.

Much of the burden on the OEMs can be limited through the use of reasonable custodian and search term limits. *See, e.g.*, *Alexander v. F.B.I.*, 194 F.R.D. 316, 330-36 (D.D.C. 2000) (limiting number of custodians and assessing objections to proposed search terms). Various OEM employee declarations describe the burden that would be imposed by searches for "unlimited custodial information." Joint Opp. at 2, 22-23; Joint Opp. Ex. 26 ¶ 26; ███████████

██████ While these burdens may exist if an unlimited search was ordered, this is *not* what Defendants seek. Rather, this situation cries out for individualized solutions, something the Parties have been willing to negotiate. But the OEMs have been unwilling to undertake such individualized negotiations, or even provide as much information as they have now submitted in their declarations. *See* Joint Opp. Ex. 9; Joint Opp. Ex. 11.

The Joint Opposition's emphasis on the burden in responding to all of the narrowed requests overstates the actual burden on any one OEM, and points up the reason these issues should be determined on an OEM-by-OEM basis. Many OEMs represent that they do not possess categories of information due to their limited business operations. Joint Opp. at 7 n.4, 9, 15-16. For example, certain OEM declarations state that a given entity does not engage in

certain functions covered by the Subpoena and thus does not possess information responsive to such requests.[15]  If that is the case, there is no attendant burden.

Similarly, several OEMs have informed the Parties that they do not possess certain information sought by the Subpoena or that any information is duplicative of that their held by their associated core entity.  For example, when several non-core Toyota and Hyundai/Kia entities informed the Parties that any responsive information held by them would be duplicative of that in possession of core-entities, the Parties offered to hold subpoenas to those non-core entities in abeyance.[16]  These declarations and negotiations demonstrate that the burden on each OEM can be significantly reduced by a reasonable assessment of what responsive information they actually possess, where it likely resides, the most cost-effective way to search for it, and whether it is duplicative of that which other associated core-entities are able to produce.[17]  But only if the OEMs provide the information necessary to conduct this assessment, which they have been unwilling to do in negotiations with the Parties to date.

Similarly, where an OEM has specific concerns regarding older data and information that is difficult to access (*e.g.*, hard-copy documents, materials on back-up tapes) a meet and confer negotiation is in order—not a flat refusal to produce.  Here, once again, the OEMs have not offered specific information to guide the meet and confer process regarding these types of documents.  *See, e.g.*, *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 09-CV-11464, 2011

---

[15] *E.g.*, Joint Opp. Ex. 22 ¶¶ 6, 7 (BMW MC does not engage in distribution, sale, marketing or financing functions and does not possess the majority of information sought in the subpoena); Joint Opp. Ex. 25 ¶ 5 (BMW counsel informed the Parties that five of the eight BMW entities subpoenaed did not maintain any of the information sought in the Subpoena); Joint Opp. Ex. 27 ¶¶ 4, 5 (MBUSA does not manufacture vehicles and is not involved in component pricing).

[16] *See* Reply Ex. 5 (Feb. 4, 2016 Letter from Parties to Hyundai/Kia Counsel); Reply Ex. 6 (Feb. 4, 2016 Letter from Toyota counsel to the Parties).

[17] *See, e.g.*, Joint Opp. Ex. 31 ¶ 4 (Fiat Finance does not possess information related to the purchase or parts or sales of vehicles not also found with FCA).

REDACTED

WL 1045545, at *3 (E.D. Mich. Mar. 17, 2011) (describing negotiations regarding limited

production of information from back-up tapes); Joint Opp. at 38.  The OEMs' concerns regarding

disclosure and competitive misuse of their confidential information can also be addressed.

Confidential information is routinely produced and sheltered by protective orders, particularly in

antitrust cases, and the OEMs point to no reason those measures would be insufficient here.  The

case law demonstrates that where parties have shown a need for the information, steps can be

taken to protect confidential information while ordering production.  *See, e.g., In re Dom.*

*Drywall Antitrust Litig.*, 300 F.R.D. 234, 246-47 (E.D. Pa. 2014) (ordering production of

information deemed confidential by subpoenaed third party); *Deman Data Sys., LLC v. Schessel*,

4:13-mc-00520, 2014 WL 204248, at *5-6 (M.D. Pa. Jan. 16, 2014) (instituting protective order

designating specific tiers of information as "attorneys' eyes only" and recognizing use of filing

under seal to protect against misuse of trade secrets).

 Finally, the OEMs' burden arguments are similarly susceptible to answer by cost-sharing.

While the OEMs provide no legal support for their assertion that the Parties should pay *all* of

their costs (Joint Opp. at 40), clear factors in existing case law provide guidance regarding how

to allocate them fairly.  That includes the subpoenaed entity's interest in the outcome of the case,

whether the subpoenaed entity can more readily bear the cost of production, and whether the

litigation is of public importance.  *United States v. Blue Cross Blue Shield of Michigan*, No. 10-

CV-14155, 2012 WL 4513600, at *7 (E.D. Mich. Oct. 1, 2012).  The Parties have repeatedly

asserted their willingness to share in the costs of compliance, and fully expect that the Court will

order a reasonable cost sharing plan in accordance with the above factors, which Courts routinely

do, even where the expense of compliance is significant.[18]  However, in order to determine an

appropriate cost sharing plan, the OEMs must provide estimates of the cost of compliance, which

only a select few of the OEMs have attempted to do.[19]

## IV.    THE ARGUMENTS IN THE SEPARATE OEM BRIEFS ARE LARGELY DUPLICATIVE OF THE JOINT BRIEF AND LIKEWISE HAVE NO MERIT

The arguments in the separate briefs filed by certain subsets of the Subpoena recipients

are largely duplicative of the arguments addressed above, and have no merit.  *See Auto Parts,*

No. 12-md-02311-MOB-MKM, ECF No. 1230 ("Non-Core Br."); ECF No. 1224 ("NODD

Br."); ECF No. 1226 ("TE SSE Br."); ECF No. 1223 ("Smaller SSE Br.").

### A.    The Non-Core OEMs Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena

The Non-Core OEMs argue that the Subpoena imposes an undue burden.  Non-Core Br.

at 7-11.  But the Parties have already agreed to hold the Subpoena in abeyance as to the Non-

Core OEMs, with the limited caveat that these entities produce transactional data in their

possession *if* none of their core affiliates have that data.  Joint Mot. at 34.  This caveat is intended

to limit the burden on these entities, and requires only a modicum of cooperation amongst

entities to do so, while still allowing the parties to the litigation to obtain essential data.

The Non-Core OEMs object to that caveat on the grounds that the other members of their

own corporate families are "distinct corporate entities, with their own priorities, privileges, and

protections" and thus they cannot say what information those entities possess or will produce.

---

[18] *See, e.g.*, *In re Exxon Valdez*, 142 F.R.D. 380, 382-84 (D.D.C. 1992) (ordering third party to bear 29 percent of the total cost of subpoena compliance, the percentage as the portion of the third party's income attributable to payments by the defendants); *see also* Joint Opp. Ex. 8; Joint Opp. Ex. 10 (correspondence regarding Parties' willingness to share costs).

[19] *E.g., compare* ███████████████████████████████ *with* Joint Opp. Ex. 26 ¶ 4 (compliance for one part would require "*hundreds* of hours of employee time"), ████████████████████████████████

21

Non-Core Br. at 12.  But this is a makeweight objection that can surely be overcome through a
meet-and-confer process in which each entity discloses what it does and does not possess.

### B.      The Smaller Entities Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena

The Smaller Subpoenaed Entities argue that they should be excused from compliance
with the Subpoena because they have a small market share: "less than 7.5% in total of the overall
U.S. vehicle market during the Subpoena period."  Smaller SSE Br. at 1, 7.  But 7.5% is a not
insignificant portion of the multi-billion dollar market.  Moreover, there is no rule of law that
exempts a party from having to produce relevant documents merely due to the size of its market
share.  And any burden issues can be dealt with in a practical way, as outlined above.

### C.      The Non-OEM Domestic Distributors Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena

The Non-OEM Domestic Distributors' brief is predicated solely on the erroneous
relevance objections addressed above (*see supra*, Section II).  NODD Br. at 6-7.  There is no
basis for treating these entities differently.  Indirect purchaser plaintiffs allege a sweeping global
conspiracy involving vehicles manufactured outside the U.S., precisely those that the Non-OEM
Domestic Distributors distribute.  ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████ the Non-OEM Domestic Distributors are such competitors and
thus possess information related to OEM pricing that is relevant to key issues of overcharge,
pass-through, and class certification.

### D. The Truck and Equipment OEMs Fail to Establish that They Should Be Relieved of Any Obligations Under the Subpoena

The TE SSEs do not advance any compelling argument why the Motion to Compel should be denied. The TE SSEs argue that the Parties fail to explain the relevance of the requests as to them. TE SSE Br. at 3. But the materials sought from the TE SSEs are relevant for the same reasons they are relevant with respect to the other OEMs. The fact that TE SSEs incorporate the components they purchase from defendants into trucks instead of automobiles does not alter the analysis as to the relevance of and need for the materials sought.

Finally, TE SSEs argue that individual component prices do not impact truck pricing, including because the trucks that they sell are highly customized and individually priced. TE SSE Br. at 3-4. As with similar statements made by other OEMs, these assertions only serve to highlight the importance of the materials sought. *See supra*, Section I (explaining that – if substantiated with evidence in responsive documents – these assertions would dispose of the indirect purchaser cases).[20]

### CONCLUSION

For all of the reasons set forth above and in the Parties' opening brief, the Parties' motion to compel discovery from the OEMs should be granted.

---

[20] The OEMs argue in a footnote that the Subpoena is invalid as to "certain" unidentified OEMs because it commands production more than 100 miles from where they reside. Joint Opp. at 18 n.15. The proper resolution of such an objection, if well taken, is to order compliance to be made within the 100 mile limit (an accommodation the Parties will happily provide). *See, e.g.*, Fed. R. Civ. P. 45(d)(3)(A) (court may "modify" a subpoena that violates the 100 mile rule); *R. Prasad Indus. v. Flat Irons Envtl. Sols. Corp.*, No. CV-12-08261, 2014 WL 2804276, at *8 (D. Ariz. June 20, 2014) ("[W]illingness [by the serving party] to accept the documents at [their office three miles from the subpoenaed entity] renders any argument pursuant to Rule 45(d)(3)(A)(ii) moot.").

REDACTED

Dated: March 11, 2016                       Respectfully submitted,

                                            **WEIL, GOTSHAL & MANGES LLP**

                                            */s/  Adam C. Hemlock*
                                            Adam C. Hemlock
                                            Steven A. Reiss
                                            Lara E. Veblen Trager
                                            Kajetan Rozga
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, New York 10153-0119
                                            Telephone:  (212) 310-8000
                                            Facsimile:  (212) 310-8007
                                            steven.reiss@weil.com
                                            adam.hemlock@weil.com
                                            lara.trager@weil.com
                                            kajetan.rozga@weil.com

                                            */s/  Frederick R. Juckniess* (w/consent)
                                            Frederick R. Juckniess
                                            **SCHIFF HARDIN LLP**
                                            350 South Main MI Street, Suite 210
                                            Ann Arbor, MI 48104
                                            (734) 222-1504
                                            fjuckniess@schiffhardin.com

                                            *Attorneys for Defendants Bridgestone*
                                            *Corporation and Bridgestone APM*
                                            *Company*

                                            **WEIL, GOTSHAL & MANGES LLP**

                                            */s/  Steve A. Reiss* (w/consent)
                                            Steven A. Reiss
                                            Adam C. Hemlock
                                            Lara E. Veblen Trager
                                            **WEIL, GOTSHAL & MANGES LLP**
                                            767 Fifth Avenue
                                            New York, New York 10153-0119
                                            Telephone:  (212) 310-8000
                                            Facsimile:  (212) 310-8007
                                            steven.reiss@weil.com
                                            adam.hemlock@weil.com
                                            lara.trager@weil.com

                                            Fred K. Herrmann
                                            Joanne G. Swanson
                                            Matthew L. Powell
                                            **KERR, RUSSELL AND WEBER PLC**
                                            500 Woodward Avenue
                                            Suite 2500
                                            Detroit, MI 48226

Tel. (313) 961-0200
Fax (313) 961-0388
fherrmann@kerr-russell.com
jswanson@kerr-russell.com
mpowell@kerr-russell.com

*Counsel for Defendants Calsonic Kansei*
*Corporation and Calsonic Kansei North*
*America, Inc.*

**BUTZEL LONG**

*/s/ Sheldon H. Klein (w/consent)*
Sheldon H. Klein (P41062)
David F. DuMouchel (P25658)
**BUTZEL LONG**
150 West Jefferson, Suite 100
Detroit, MI 48226
Tel.: (313) 225-7000
Fax: (313) 225-7080
sklein@butzel.com
dumouchd@butzel.com

W. Todd Miller
**BAKER & MILLER PLLC**
2401 Pennsylvania Ave., NW, Suite 300
Washington, DC 20037
Tel.: (202) 663-7820
Fax: (202) 663-7849
TMiller@bakerandmiller.com

*Attorneys for Defendants TRAM, Inc. and*
*Tokai Rika Co., Ltd.*

**WILMER CUTLER PICKERING HALE
AND DORR LLP**

*/s/ Steven F. Cherry* (w/ consent)
Steven F. Cherry
David P. Donovan
Brian C. Smith
**WILMER CUTLER PICKERING HALE
AND DORR LLP**
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
steven.cherry@wilmerhale.com

david.donovan@wilmerhale.com
brian.smith@wilmerhale.com

*Counsel for Defendants DENSO
Corporation, DENSO International
America, Inc., DENSO International Korea
Corporation, DENSO Korea Automotive
Corporation, DENSO Products & Services
Americas, ASMO Co., Ltd., ASMO North
America, LLC, ASMO Greenville of North
Carolina, Inc., ASMO Manufacturing, Inc.,
and ASMO North Carolina Inc.*

Steven M. Zarowny
General Counsel
DENSO International America, Inc.
24777 Denso Drive
Southfield, MI 48033
Telephone: (248) 372-8252
Fax:   (248) 213-2551
steve_zarowny@denso-diam.com

*Counsel for Defendant DENSO
International America, Inc.*

**LANE POWELL PC**

*/s/ Larry S. Gangnes* (w/consent)
Larry S. Gangnes
**LANE POWELL PC**
1420 Fifth Ave., Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Tel.: (206) 223-7000
Fax: (206) 223-7107
gangnesl@lanepowell.com

Craig D. Bachman
Kenneth R. Davis II
Darin M. Sands
Masayuki Yamaguchi
Peter D. Hawkes
**LANE POWELL PC**
601 SW Second Ave., Suite 2100
Portland, OR 97204-3158
Tel.: (503) 778-2100
Fax: (503) 778-2200

26

bachmanc@lanepowell.com
davisk@lanepowell.com
sandsd@lanepowell.com
yamaguchim@lanepowell.com
hawkesp@lanepowell.com

Richard D. Visio (P30246)
Ronald S. Nixon (P57117)
**KEMP KLEIN LAW FIRM**
201 W. Big Beaver, Suite 600
Troy, MI 48084
Tel.: (248) 528-1111
Fax: (248) 528-5129
richard.bisio@kkue.com
ron.nixon@kkue.com

*Attorneys for Defendants Furukawa Electric
Co., Ltd. and American Furukawa, Inc.*

**COVINGTON & BURLING LLP**

*/s/  Anita F. Stork*  (w/consent)
Anita F. Stork
Gretchen Hoff Varner
Cortlin H. Lannin
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111
Telephone:  (415) 591-6000
Fax:  (415) 955-6550
astork@cov.com
ghoffvarner@cov.com
clannin@cov.com

Michael J. Fanelli
Ashley E. Bass
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Fax: (202) 662-5383
mfanelli@cov.com
abass@cov.com

*Attorneys for Defendants Alps Electric
Co., Ltd.; Alps Electric (North America),
Inc.; and Alps Automotive, Inc.*

**BROOKS WILKINS SHARKEY & TURCO PLLC**

*/s/Maureen T. Taylor* (w/consent)
Herbert C. Donovan (P51939)
Maureen T. Taylor (P63547)
**BROOKS WILKINS SHARKEY & TURCO PLLC**
401 Old South Woodward, Suite 400
Birmingham, MI  48009
Telephone: (248) 971-1721
Fax: (248) 971-1801
taylor@bwst-law.com
donovan@bwst-law.com

*Attorneys for Defendants Alps Electric Co., Ltd.; Alps Electric (North America), Inc.; and Alps Automotive, Inc.*

**CALFEE, HALTER & GRISWOLD LLP**

*/s/  Ronald M. Mcmillan* (w/consent)
John J. Ekund (OH 0010895)
Maura L. Hughes (OH 0061929)
Ronald A. McMillan (OH 0072437)
Alexander B. Reich (OH 0084869)
**CALFEE, HALTER & GRISWOLD LLP**
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114-1607
(216) 622-8200 (Phone)
(216) 241-0816 (Fax)
jeklund@calfee.com
mhughes@calfee.com
rmcmillan@calfee.com
areich@calfee.com

*Counsel for Defendant Continental Automotive Systems, Inc., Continental Automotive Electronics, LLC and Continental Automotive Korea Ltd.*

**McDONALD HOPKINS PLC**

*/s/Timothy J. Lowe (w/consent)*
Timothy J. Lowe (P68669)
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI 48304
Telephone: (248) 220-1359

Fax: (248) 646-5075
tlowe@mcdonaldhopkins.com
*Attorneys for Defendants Diamond*
*Electric Mfg. Co., Ltd.,*
*Diamond Electric Mfg. Corp., Stanley*
*Electric Co., Ltd.,*
*Stanley Electric U.S. Co., Inc., and II*
*Stanley Co., Inc.*

**SIMPSON THACHER & BARTLETT LLP**

*/s/  Matthew J. Reilly* (w/consent)
Matthew J. Reilly
Abram J. Ellis
SIMPSON THACHER & BARTLETT
LLP
900 G Street, N.W.
Washington, D.C. 20001
Tel.: (202) 636-5500
Fax: (202) 636-5502
matt.reilly@stblaw.com
aellis@stblaw.com

George S. Wang
Shannon K. McGovern
SIMPSON THACHER & BARTLETT
LLP
425 Lexington Avenue
New York, N.Y. 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
gwang@stblaw.com
smcgovern@stblaw.com

*Attorneys for Defendants Diamond*
*Electric Mfg. Co., Ltd. and Diamond*
*Electric Mfg. Corp.*

**PORTER WRIGHT MORRIS & ARTHUR LLP**

*/s/ Donald M. Barnes* (w/consent)
Donald M. Barnes
Molly S. Crabtree
Jay L. Levine
Christopher C. Yook
PORTER WRIGHT MORRIS &
ARTHUR LLP
1900 K Street, NW, Ste. 1110
Washington, DC 20006

Tel.: (202) 778-3054
Fax: (202) 778-3063
dbarnes@porterwright.com
mcrabtree@porterwright.com
jlevine@porterwright.com
cyook@porterwright.com

*Counsel for Defendants G.S. Electech, Inc., G.S.W. Manufacturing, Inc., and G.S. Wiring Systems, Inc.*

**SHEARMAN & STERLING LLP**

*/s/  Heather L. Kafele* (w/consent)
Heather L. Kafele
Keith R. Palfin
**SHEARMAN & STERLING LLP**
401 9th Street, NW, Suite 800
Washington, DC 20004
Tel.: (202) 508-8097
Fax: (202) 508-8100
heather.kafele@shearman.com
keith.palfin@shearman.com

Brian M. Akkashian
**PAESANO AKKASHIAN, PC**
132 N. Old Woodward Avenue
Birmingham, MI 48009
Tel.: (248) 792-6886
bakkashian@paesanoakkashian.com

*Counsel for Defendants JTEKT Corporation and JTEKT Automotive North America, Inc.*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/  William M. Sullivan Jr.* (w/consent)
William M. Sullivan Jr.
Michael L. Sibarium
Jeetander T. Dulani
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 Seventeenth Street, N.W.
Washington, D.C. 20036-3006
Telephone: (202) 663-8000
Facsimile: (202) 663-8007
wsullivan@pillsburylaw.com
michael.sibarium@pillsburylaw.com
jeetander.dulani@pillsburylaw.com

*Counsel for Mikuni America Corporation*

**FARMER BROWNSTEIN JAEGER LLP**

*/s/ William S. Farmer* (w/consent)
William S. Farmer
David C. Brownstein
FARMER BROWNSTEIN JAEGER LLP
235 Montgomery Street, Suite 835
San Francisco, CA 94102
Tel.: (415) 795-2050
Fax: (415) 520-5678
wfarmer@fbj-law.com
dbrownstein@fbj-law.com

*Counsel for Defendants Mitsuba Corporation and American Mitsuba Corporation*

**FOLEY & LARDNER LLP**

*/s/ Scott T. Seabolt (w/consent)*
Scott T. Seabolt
Foley & Lardner LLP
One Detroit Center
500 Woodward Avenue
Suite 2700
Detroit, MI 48226-3489
P 313.234.7115
*Counsel for Defendants Mitsubishi Heavy Industries America, Inc. and Mitsubishi Heavy Industries ClimateControl, Inc.*

**LANE POWELL PC**

*/s/ Kenneth R. Davis* (w/consent)
Kenneth R. Davis II
Craig D. Bachman
Darin M. Sands
Masayuki Yamaguchi
**LANE POWELL PC**
ODS Tower
601 SW Second Ave., Suite 2100
Portland, OR 97204-3158
503-778-2100
503-778-2200 (facsimile)

31

davisk@lanepowell.com
bachmanc@lanepowell.com
sandsd@lanepowell.com

**LANE POWELL PC**

*/s/  Larry S. Gangnes* (w/consent)
Larry S. Gangnes
Connor B. Shively
**LANE POWELL PC**
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338
206-223-7000
206-223-7107 (facsimile)
gangnesl@lanepowell.com
shivelyc@lanepowell.com

*Counsel for Nachi America Inc. and*
*Nachi-Fujikoshi Corporation*

**CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**

*/s/  Jeremy J. Calsyn* (w/consent)
Jeremy J. Calsyn (DC Bar #467737)
Steven J. Kaiser (DC Bar #454251)
Teale Toweill (DC Bar #996061)
Carl Lawrence Malm (DC Bar #1104489)
**CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500 (Phone)
(202) 974-1999 (Facsimile)
jcalsyn@cgsh.com
skaiser@cgsh.com
ttoweill@cgsh.com
lmalm@cgsh.com

*Counsel for NSK Americas, Inc. and NSK*
*Ltd.*

**WINSTON & STRAWN LLP**

*/s/  Jeffrey L. Kessler* (w/consent)
Jeffrey L. Kessler
A. Paul Victor
Molly M. Donovan
Jeffrey J. Amato
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700

REDACTED

Facsimile: (212) 294-4700
jkessler@winston.com
pvictor@winston.com
mmdonovan@winston.com
jamato@winston.com

*Counsel for NTN Corporation and NTN USA Corporation*

**ALLEN & OVERY LLP**

*/s/  John Roberti* (w/consent)
John Roberti
Matthew Boucher
**ALLEN & OVERY LLP**
1101 New York Avenue NW
Washington, D.C. 20005
202-683-3800
john.roberti@allenovery.com
matthew.boucher@allenovery.com

Michael S. Feldberg
**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020
212-610-6360
michael.feldberg@allenovery.com

William R. Jansen (P36688)
Michael G. Brady (P57331)
WARNER NORCROSS & JUDD LLP
2000 Town Center, Suite 2700
Southfield, MI 48075-1318
248-784-5000
wjansen@wnj.com
mbrady@wnj.com

*Counsel for Defendants Robert Bosch LLC and Robert Bosch GmbH*

**ICE MILLER LLP**

/s/ Matthew L. Fornshell (w/ consent)
Matthew L. Fornshell
**ICE MILLER LLP**
250 West Street
Suite 700
Columbus, OH 43215
Telephone: (614) 462-1061
Facsimile: (614) 222-3692
Matthew.Fornshell@icemiller.com

REDACTED

*Counsel for Defendants Showa Corporation and American Showa Inc.*

**SIMPSON THACHER & BARTLETT LLP**

*/s/  Matthew J. Reilly* (w/consent)
Matthew J. Reilly
Abram J. Ellis
David T. Shogren
**SIMPSON THACHER & BARTLETT LLP**
1155 F Street, N.W.
Washington, D.C. 20004
Tel.: (202) 636-5500
Fax: (202) 636-5502
matt.reilly@stblaw.com
aellis@stblaw.com
dshogren@stblaw.com

George S. Wang
Shannon K. McGovern
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, N.Y. 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
gwang@stblaw.com
smcgovern@stblaw.com

*Attorneys for Defendants Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc., and II Stanley Co., Inc.*

**MILLER, CANFIELD, PADDOCK & STONE P.L.C.**

*/s/ Larry J. Saylor* (w/consent)
Larry J. Saylor
**MILLER, CANFIELD, PADDOCK & STONE P.L.C.**
150 W. Jefferson Avenue, Suite 2500
Detroit, MI 48226
Telephone: (313) 496-7986
Facsimile: (313) 496-8454
Saylor@MillerCanfield.com

*Counsel for Defendants Sumitomo Riko Company Limited and DTR Industries, Inc.*

REDACTED

**GIARMARCO, MULLINS & HORTON, P.C.**

*/s/ William H. Horton* (w/consent)
William H. Horton (P31567)
**GIARMARCO, MULLINS & HORTON, P.C.**
101 West Big Beaver Road, Tenth Floor
Troy, MI 48084-5280
Telephone: 248-457-7060
bhorton@gmhlaw.com

*Counsel for Defendants Sumitomo Electric Industries, Ltd.; Sumitomo Wiring Systems, Ltd.; Sumitomo Electric Wiring Systems, Inc. (incorporating K&S Wiring Systems, Inc.); and Sumitomo Wiring Systems (U.S.A.) Inc.*

**WILLIAMS & CONNOLLY LLP**

*/s/ David M. Zinn* (w/consent)
David M. Zinn
John E. Schmidtlein
Samuel Bryant Davidoff
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000
Fax: 202-434-5029
dzinn@wc.com
jschmidtlein@wc.com
sdavidoff@wc.com

*Counsel for Takata Corporation and TK Holdings, Inc.*

**HERTZ SCHRAM PC**

*/s/ Bradley J. Schram* (w/consent)
**HERTZ SCHRAM PC**
1760 S. Telegraph Rd., Suite 300
Bloomfield Hills, MI 48302
Tel.: (248) 335-5000
Fax: (248) 335-3346
bschram@hertzschram.com

*Counsel for Toyo Tire & Rubber Co., Ltd., Toyo Automotive Parts (USA), Inc., Toyo Tire North America Manufacturing*

*Inc., and Toyo Tire North America OE Sales LLC*

**BAKER BOTTS LLP**

*/s/  Randall J. Turk* (w/consent)
Randall J. Turk
John Taladay
Mark Miller
Heather Souder Choi
Sterling A. Marchand
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400
Phone: 202.639.7700
Fax: 202.639.7890
randy.turk@bakerbotts.com
john.taladay@bakerbotts.com
mark.miller@bakerbotts.com
heather.choi@bakerbotts.com
sterling.marchand@bakerbotts.com

*Counsel for Toyoda Gosei Co., Ltd., TG Missouri Corporation, and Toyoda Gosei North America Corporation*

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

*/s/  Brian Byrne* (w/consent)
Brian Byrne
Ryan M. Davis
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 974-1850
Facsimile: (202) 974-1999
bbyrne@cgsh.com
rmdavis@cgsh.com

*Counsel for Defendants Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp.*

**KERR, RUSSELL AND WEBER, PLC**
*/s/ Joanne Geha Swanson* (w/consent)
Joanne Geha Swanson (P33594)
Fred K. Herrmann (P49519)
500 Woodward Avenue, Suite 2500

Detroit, MI 48226
Telephone: (313) 961-0200
Facsimile: (313) 961-0388
fherrmann@kerr-russell.com
jswanson@kerr-russell.com

*Counsel for Defendants Yamashita Rubber Co., Ltd. and YUSA Corporation*
**WHITE & CASE LLP**

*/s/ Christopher M. Curran* (w/consent)
Christopher M. Curran
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

*Counsel for Defendant Maruyasu Industries Co., Ltd.*

**KERR, RUSSELL AND WEBER, PLC**
*/s/ Joanne Geha Swanson* (w/consent)
Joanne Geha Swanson (P33594)
Fred K. Herrmann (P49519)
500 Woodward Avenue, Suite 2500
Detroit, MI 48226
Telephone: (313) 961-0200
Facsimile: (313) 961-0388
fherrmann@kerr-russell.com
jswanson@kerr-russell.com

*Counsel for Defendants Fujikura Ltd. and Fujikura Automotive America LLC*

REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2016, I caused the Defendants' Reply in Support of the Parties' Motion to Compel Discovery From Non-Party Original Equipment Manufacturers to be served on the non-parties via FedEx. The foregoing materials were also electronically filed with the Clerk of the Court using the CM/ECF system, which will send notifications of such filings to the Parties' counsel of record.

Dated: March 11, 2016

*/s/ Cameron M. Bonk*
Cameron M. Bonk
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153