REDACTED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : Master File No. 2:12-md-02311<br>: Honorable Marianne O. Battani<br>: Special Master Gene J. Esshaki |
| ALL AUTOMOTIVE PARTS CASES | : ORAL ARGUMENT REQUESTED |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | : |

END-PAYOR PLAINTIFFS' REPLY IN SUPPORT OF THE
PARTIES' MOTION TO COMPEL DISCOVERY FROM
NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS

[REDACTED]

1

## TABLE OF CONTENTS

Page

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................................................... v

I.      INTRODUCTION ................................................................................................. 1

II.     THE SUBPOENA SHOULD BE UPHELD AND ENFORCED ...................................... 5

        A.      The Subpoena Is Not Facially Overbroad. ............................................... 5

        B.      The Parties Extensively Negotiated with the OEMs, and Offered
                Significant Compromises to the OEMs to No Avail. ............................. 6

III.    THE OEMS SHOULD BE ORDERED TO PRODUCE INFORMATION AND
        DOCUMENTS RESPONSIVE TO THE REMAINING REQUESTS ............................. 7

        A.      Downstream Data Are Highly Relevant to the EPPs' Claims, Class
                Certification, and Damages. .................................................................... 10

                1.      Downstream Data is Highly Relevant to Estimate Illegal
                        Overcharges and Pass Through. ................................................. 10

                2.      Downstream Data Will Support the EPPs' Experts' Pass Through
                        Studies. ........................................................................................ 10

        B.      Downstream Data is Routinely Sought and Produced in Indirect Purchaser
                Antitrust Actions. ................................................................................... 12

        C.      Transaction Level Data from OEMs and Distributors is Routinely Produced in
                Indirect Purchaser Antitrust Cases and Should be Produced Here
                ................................................................................................................ 13

        D.      Downstream Cost Data is Particularly Relevant to the EPPs. ............... 15

IV.     THE REQUESTS ARE PROPORTIONAL TO THIS MDL ACTION .......................... 16

        A.      This MDL is Unprecedented in Size and Scope. .................................... 16

        B.      Productions by OEMs Not in the OEM Group Are Progressing
                Effectively. ............................................................................................. 17

        C.      Many OEMs Have Already Gathered the Responsive Information Sought
                By the Parties, Which Further Undermines Their Claims of Supposed
                Undue Burden. ........................................................................................ 18

V.      THE DATA FROM DEFENDANTS AND AUTO DEALERS IS NOT
        SUFFICIENTTO EXCUSE THE OEMS FROM COMPLYING WITH THE
        SUBPOENA ........................................................................................................ 20

        A.      Access to Defendants' Data Does not Excuse the OEMs From Complying
                With the Subpoena .................................................................................. 21

        B.      Auto Dealers' Data is Not Sufficient in Relation to OEM's Data ........... 21

VI.     "SMALLER" OEMS MUST COMPLY WITH THE SUBPOENA AS WELL.............. 22

VII.    DISTRIBUTOR OEMS SHOULD COMPLY WITH THE SUBPOENA ...................... 23

VIII.   THE SUBPOENAS TO THE NON-CORE OEMS ARE HELD IN ABEYANCE ......... 25

IX.     THE PATH FORWARD ................................................................................................ 25

    A.     The Protective Order Entered by the Court Provides Sufficient Protections
        to Producing Parties and Non-Parties ................................................................. 25

    B.     EPPs' Position on Costs ...................................................................................... 27

X.      CONCLUSION ............................................................................................................ 28

TABLE OF AUTHORITIES

Page(s)

Cases

Blackmer v. United States,
284 U.S. 421 (1932) ................................................................................................. 1

Copperweld Corp. v. Independence Tube Corp.,
467 U.S. 752 (1984) ................................................................................................. 9

E 3 Biofuels, LLC v. Biothane Corp.,
2013 U.S. Dist. LEXIS 100793 (S.D. Ohio July 18, 2013) ..................................... 26

Fleisher v. Phoenix Life Insurance Co.,
2012 U.S. Dist. LEXIS 182698 (S.D.N.Y. Dec. 27, 2012) ...................................... 28

Helmert v. Butterball, LLC,
2010 U.S. Dist. LEXIS 60777 (D. Ark. May 27, 2010) ........................................... 28

In re Aftermarket Filters Antitrust Litigation,
2010 U.S. Dist. LEXIS 105108 (N.D. Ill. Oct. 1, 2010) .......................................... 18

In re Automotive Parts Antitrust Litig. (Wire Harnesses),
2013 U.S. Dist. LEXIS 80338 (E.D. Mich. June 6, 2013) ............................... 2, 7, 26

In re Automotive Parts Antitrust Litigation (In re Bearings),
Case No. 2:12-cv-00500-MOB-MKM, ECF No. 160 (E.D. Mich. Aug. 26, 2014) ................ 24

In re Bank of N.Y. Mellon Corp. Forex Transactions,
2014 U.S. Dist. LEXIS 88175 (S.D.N.Y. June 26, 2014) ........................................ 20

In re Cathode Ray Tube (CRT) Antitrust Litig.,
2013 U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013) ............................... passim

In re Optical Disk Drive (ODD) Antitrust Litig.,
2016 U.S. Dist. LEXIS 15899 (N.D. Cal. February 8, 2016) ................................. 4, 10, 14, 15

In re Polyurethane Foam Antitrust Litig.,
2014 U.S. Dist. LEXIS 161020 (N.D. Ohio Nov. 17, 2014) ............................. 10, 17

In re Static Random Access Memory (SRAM) Antitrust Litig.,
264 F.R.D. 603 (N.D. Cal. 2009) ..................................................................... 4, 8, 12, 15

In re TFT-LCD (Flat Panel) Antitrust Litig.,
267 F.R.D. 583 (N.D. Cal. Mar. 28, 2010) ....................................................... 4, 10, 11

In re Urethane Antitrust Litig.,
    237 F.R.D. 454 (D. Kansas 2006) ................................................................................. 12, 20

John B. v. Goetz,
    879 F.Supp. 2d 787 (M.D. Tenn. Jan. 28, 2010) .................................................. 28

Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners,
    294 F.R.D. 87 (S.D. Ohio 2013) ............................................................................... 26

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
    473 U.S. 614 (1985) ...................................................................................................... 9

Nucorp v. John Does 1-24,
    2012 U.S. Dist. LEXIS 187547 (E.D. Mich. Oct. 18, 2012) ................................. 26

Orleman v. Jumpking, Inc.,
    2000 U.S. Dist. LEXIS 11081 (D. Kan. July 11, 2000) ......................................... 20

United States v. Bryan,
    339 U.S. 323 (1950) ........................................................................................................ 1

Zubulake v. UBS Warburg LLC,
    217 F.R.D. 309 (S.D.N.Y. May 13, 2003) ......................................................... 27, 28

Other Authorities

8 J. Wigmore, Evidence, § 2192 (McNaughton Rev. 1961) ........................................... 1

Rules

Fed. R. Civ. P. 26(b)(1) .................................................................................................. 8, 16

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

Federal Rule of Civil Procedure 1

Federal Rule of Civil Procedure 26

In re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603 (N.D. Cal. 2009)

In re Static Random Access Memory (SRAM) Antitrust Litig., M:07-cv-01819-CW, ECF No. 939 (N.D. Cal. Jan. 19, 2010)

In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583 (N.D. Cal. Mar. 28, 2010)

In re Cathode Ray Tube (CRT) Antitrust Litig., 2013 U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013)

In re Optical Disk Drive Antitrust Litig., 2016 U.S. Dist. LEXIS 15899 (N.D. Cal. Feb. 8, 2016)

Jan. 20, 2016 Status Conf. Tr. 71:1-23 (order resetting class certification briefing schedules in Wire Harnesses, Bearings, and Anti-Vibration Rubber Parts).

REDACTED

End Payor Plaintiffs ("EPPs") respectfully submit this omnibus reply in further support of the Parties' ("Parties"[1]) motions to compel discovery from certain Original Equipment Manufacturers ("OEMs").[2]

## I.    INTRODUCTION

The undisputed facts of this case are that defendants engaged in a conspiracy to fix the prices of automotive parts sold to OEMs. This was a criminal antitrust conspiracy and the EPPs are victims of the crime, seeking to recover civil damages in this action[3]. The OEMs—witnesses to this crime—have evidence relevant and material to the claims being asserted by the EPPs. It has long been a principle of our judicial system that the public has a right to "every man's evidence." United States v. Bryan, 339 U.S. 323, 331 (1950); Blackmer v. United States, 284 U.S. 421, 438 (1932); 8 J. Wigmore, Evidence, § 2192 (McNaughton Rev. 1961).

For purposes of class certification and ultimately trial, EPPs must show the overcharge from Defendants to OEMs and then must show that every reseller in the chain passed on some or all of the alleged overcharge to demonstrate that the price of their vehicles were higher than they would have been due to the overcharge on the price-fixed automotive parts (see Figure 1). In re

_____

[1] The Parties consist of End Payor Plaintiffs, Automobile Dealer Plaintiffs, Truck and Equipment Dealer Plaintiffs, the State of Florida, the State of Indiana, and all Defendants in the In re Automotive Parts Antitrust Litig., Master File No. 2:12-md-02311-MOB-MKM (E.D. Mich.).

[2] This omnibus reply is in further support of The Parties' Motion to Compel Discovery From Non-Party Original Equipment Manufacturers, Master File No. 2:12-cv-02311, ECF No. 1184 (E.D. Mich. Jan. 19, 2016) ("MTC" or "Opening Brief") and Certain Parties' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers, No. 2:12-cv-02311, ECF No. 1216 (E.D. Mich. Jan. 19, 2016). While certain of these non-parties use nomenclature such as "Specified Subpoena Entity" or "SSE" to describe themselves, they are OEMs and shall be referred to as such in this brief.

[3] The plea agreements entered into between the United States Department of Justice ("DOJ") and guilty-pleading defendants provide that restitution to the victims, if any, will come through this civil litigation.

Automotive Parts Antitrust Litig. (Wire Harnesses), Case No. 2:12-cv-00102, 2013 U.S. Dist. LEXIS 80338, at *45 (E.D. Mich. June 6, 2013)Error! Bookmark not defined.. EPPs have a right to this evidence under the law to prove their claims as victims of what the DOJ has called the largest antitrust conspiracy it has ever seen in terms of impact on United States consumers and businesses. "DOJ Widens Probe Antitrust Probe Into Auto Parts Industry", LAW360 (February 15, 2013) ("Scott D. Hammond, deputy assistant attorney general in the DOJ's Antitrust Division, said the probe is broader than previously announced and could be the biggest of its kind . . '[it's still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered,' Hammond said Friday. "I say [it is] the biggest with respect to the impact on U.S. business and consumers, and the number of companies and executives that are subject to the investigation.").

Figure 1



EPPs' motion to compel was brought only after protracted and substantial efforts to meet and confer with the OEMs. Through a joint effort, EPPs, other Plaintiff Groups and Individual Plaintiffs, and Defendants worked together to craft a subpoena ("Subpoena") and to meet and confer with the recipients so that all could have access to the evidence necessary to the prosecution and defense of the claims here. Through meet-and-confer sessions, EPPs heard and heeded the legitimate concerns of all affected Parties including the OEMs, narrowed the scope of the Subpoena, and offered compromises to resolve these issues. Among these compromises was a proposal to accept initial production of documents and data related solely to the "Lead Three" cases that are currently scheduled for class certification motions later this year (Wire Harnesses, Bearings, and Anti-Vibrational Rubber Parts), and to stagger production of materials related solely to other parts cases. This proposal, like every proposal made by the Parties, was rejected. The OEMs have stood in the way and have offered no legitimate basis to block this discovery and to interfere with the Parties' ability to prove their claims and the Court's power to manage its docket.

While OEMs complain about the allegedly "immense proportions" of the Subpoena and its supposed "unprecedenc[e] in scope" and the "burdens it thrusts" upon them[4], the Subpoena is proportionately tailored to the scope of this multidistrict litigation. As set forth above, this case involves a massive, long-lasting worldwide conspiracy targeting automakers and ultimately consumers. These are not allegations – they are facts. After meeting and conferring, the Subpoena has been narrowed to 14 categories of information relevant to the claims and defenses presented by EPPs as a result of this conspiracy. Each of the remaining requests is relevant and material to the Parties' claims, defenses, class certification, and damages. Each of the remaining

---

[4] See ECF No. 1227 at 1.

requests is for the type of data and information routinely produced in indirect purchaser antitrust cases. See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603 (N.D. Cal. 2009); SRAM, M:07-cv-01819-CW, ECF No. 939 (N.D. Cal. Jan. 19, 2010); In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583 (N.D. Cal. Mar. 28, 2010); In re Cathode Ray Tube (CRT) Antitrust Litig., 2013 U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013); In re Optical Disk Drive (ODD) Antitrust Litig., 2016 U.S. Dist. LEXIS 15899 (N.D. Cal. February 8, 2016)Error! Bookmark not defined..

The OEMs' objection to providing EPPs' with the relevant data on the basis of "burden" is overstated and unsupported for multiple reasons. As set forth above, the scope of the information and data requested is commensurate with the scope of the conspiracy and the evidence relevant to the conspiracy and the claims. Each OEM family that was served with the Subpoena has been identified in guilty pleas, DOJ press releases, discovery in this case, proffers from cooperating defendants, or proffers from settling defendants has having been directly affected by the conspiracy. Supplemental Declaration of Steven N. Williams ("Supp. Williams Decl.") at ¶ 6. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ In addition, transactional data discovery is traditionally known to be less burdensome to collect and produce than other forms of discovery because it is usually extracted from live databases. Lastly, many, if not all of the OEMs have already compiled much of the information requested by the Subpoena, whether as part of their response to subpoenas issued by DOJ as part of its investigation or as part of their own efforts to pursue restitution for the overcharges that they suffered (and passed

on) as a result of the conspiracy. Thus, in light of the large scope of this case and the failure of the OEMs to substantiate their burden, the Subpoena should be enforced.

Nor should the Court accept the OEMs' argument that they – the immediate and first target of the conspiracy and the first link in the chain that Judge Battani has stated EPPs must to sustain their claims – should be exempt from discovery because Defendants or Automobile Dealer Plaintiffs have some, but certainly not all, of the relevant evidence. No other court in an indirect purchaser class action has ever made such a ruling. To do so would fly in the face of the law and common sense and would present an unjustified impediment to the right of EPPs to pursue the legal claims that their state legislatures have given them. As the Court in this case has already recognized, the OEMs are in possession of evidence to which EPPs are entitled to prosecute their claims, and the OEMs cannot evade their duty by pointing to the evidence in the hands of Defendants.

In sum, other than entities that perform only a specific function such as finance and credit entities ("Non-Core OEMs") for which the Parties have agreed to hold subpoenas in abeyance, there is no reason for any OEM to be excused from their obligation to comply with the Subpoena. Each of them has been identified as being a target of and affected by the conspiracy and, for that reason, each of them is in possession of relevant evidence.

Accordingly, the Parties' motions to compel should be granted in its entirety.

## II.    THE SUBPOENA SHOULD BE UPHELD AND ENFORCED

A.    The Subpoena Is Not Facially Overbroad.

The OEMS argue that the Subpoena is facially overbroad. ECF No. 1227 at 15-18. This is not so. The breadth of the Subpoena simply reflects the breadth of the conspiracy, both in its time frame and in relation to the commerce affected by the conspiracy.

B.      The Parties Extensively Negotiated with the OEMs, and Offered Significant
Compromises to the OEMs to No Avail.

The OEMs argue that the Subpoena should be quashed because the Parties did not use the

meet-and-confer process to reasonably limit the Subpoena. ECF No. 1227 at 16. That is not

correct. As set forth in the Opening Brief ("MTC"), the Parties have attempted in good faith to

address the OEMs' group demands over the past five months. Indeed, the Parties offered several

rounds of significant compromises – and received no offers of meaningful compromise in return.

The OEMs also mischaracterize the Parties' compromises as simply eliminating

duplicative requests, and claiming that the Parties' reductions were only "cosmetic." ECF No.

1227 at 8. This is an unfair and inaccurate portrayal of the Parties' narrowed requests; the

Parties' compromises were substantive and significant. Indeed, many categories of data and

documents that are frequently requested and produced in antitrust cases were trimmed in an

effort to reach a compromise. Supp. Williams Decl. at ¶ 7. Notwithstanding these compromises,

the OEMs remain unwilling to even minimally satisfy their obligations. The OEMs refuse to

produce any information whatsoever in many indisputably relevant categories of requests. For

example, OEMs have refused to provide any information regarding 1) their purchases of parts

from Defendants; 2) their sales of automobiles to Automobile Dealers (with the exception of a

basic schedule of 2006-2016 Manufacturers' Suggest Retail Prices ("MSRPs") for a limited

number of models – to be negotiated); 3) any retail-level data concerning sales of vehicles from

Automobile Dealers to EPPs; or 4) any data on costs, or any other data or documents related to

RFQs, contracts, and pricing of vehicles. See, e.g., ECF No. 1227-4 to 1227-17.[5] Each of these

---

[5] The manufacturing OEMs have conditionally agreed to produce only the following: (i)
transactional data reflecting components purchased from a "reasonable number" of non-
defendant suppliers (which the Parties are expected to somehow identify), and only for the
period 2006-2016; (ii) the MSRPs for select vehicles, "to be negotiated with the Parties," that
each OEM sold between 2006-2016 only; and (iii) the same purchasing and MSRP data from

categories is highly relevant and OEMs have no reasonable basis to deny production of this information.

Moreover, the OEMs' chart attempting to "compare" the requests that remain versus the requests that were withdrawn is misleading and does not accurately reflect the significant reduction in requests that were undertaken by the Parties. See ECF Nos. 1227 at 8-9, 1227-3. EPPs respectfully direct the Court to the EPPs' chart attached hereto as Appendix A, which more accurately depicts the numerous compromises offered by the Parties and the OEMs' staunchly unreasonable refusals. See also Supp. Williams Decl. at ¶ 2, Ex. A (EPPs' chart including the full text of the Parties' requests).

### III.    THE OEMS SHOULD BE ORDERED TO PRODUCE INFORMATION AND DOCUMENTS RESPONSIVE TO THE REMAINING REQUESTS

The OEMs argue that they should not have to comply with the Subpoena because the requested data is not "necessary" and does not have enough relevance to the claims and defenses of the Parties to justify the burden of search and production. ECF No. 1227 at 18-34. This argument should be rejected in its entirety. As set forth above, and as is plainly evident, an indirect purchaser in an antitrust case must show the illegal overcharge at the first level – i.e., from the price-fixer to the entity that purchases from the price-fixer – and then must show the pass-through of the overcharge through the chain of distribution. That is what this Court recognized in Wire Harnesses, Case No. 2:12-cv-00102, 2013 U.S. Dist. LEXIS 80338, at *45 (E.D. Mich. June 6, 2013), and it is the same rule that has applied in other indirect purchaser antitrust cases. See, e.g., CRT, 2013 U.S. Dist. LEXIS 137945 at *106 ("[P]laintiffs still have the burden of demonstrating that 'there is a reasonable method for determining on a class-wide basis

---

categories (i) and (ii) that were part of any OEM's production to the DOJ. See MTC at 10. Smaller OEMs, Distributors, and Non-Core OEMs all refuse to produce any information at all.

whether and to what extent that overcharge was passed on to each of the [indirect purchasers] at all levels of the distribution chain"); see also SRAM, 264 F.R.D. at 612-613 ("[t]he 'problem of proof in an indirect purchaser case is intrinsically more complex [than in a direct purchaser case], because the damage model must account for the actions of innocent intermediaries who allegedly passed on the overcharge.'" (quoting William H. Page, The Limits of State Indirect Purchaser Suites: Class Certification in the Shadow of Illinois Brick, 67 Antitrust L.J. 4, 12 (1999)).

The Parties are entitled to seek discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the Parties' relative access to relevant information, the Parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

The remaining requests all meet this standard, and compliance with the Subpoena should be ordered. There can be no doubt that the requested data and information are relevant to the EPPs' claims and the defendants' defenses. The remaining requests are proportional to the needs of the case, as EPPs are obligated and entitled to show the extent of the overcharge and that it was passed through the chain of distribution until it reached EPPs. There can be no doubt about the importance of the issues at stake in this action, as EPPs' claims arise from a massive, worldwide antitrust conspiracy which victimized American consumers and business and for which the only remedy for EPPs will come through this civil action. The antitrust laws provide for treble damages and joint and several liability in order to deter conduct which Congress and the state legislatures deemed a danger to a free and functioning economy. See, e.g., Mitsubishi

Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 635 (1985)**Error! Bookmark not defined.** ("The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators"), overruled on other grounds; see also Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)). The amount in controversy is substantial. Indeed, there have already been settlements in the EPP case of almost $225,000,000. Potential liability of the remaining Defendants is many times that number. There can be no question that OEMs have, and EPPs do not have, the relevant data. All of OEMs are well-heeled, large corporations with substantial in-house and outside counsel, and undoubtedly have more than ample resources to address the discovery at issue. These entities regularly engage in all manner of litigation, and searching for and producing documents and information is a routine exercise for them. The discovery is very important in resolving the issues of the first level overcharge and the pass through of those overcharges – issues that the Court has recognized EPPs will need to establish, and which EPPs cannot analyze and prove without access to the requested information and data from the OEMs. Finally, the OEMs have failed to show that the expense or burden of producing this information outweighs the EPPS' right to the information.

Nor are the OEMs' arguments that EPPs have not properly supported their motion because they have not submitted declarations from their experts well-taken. Counsel for EPPs have undertaken every step in this OEM-discovery process hand-in-hand with their experts and consultants. Further, counsel for EPPs have briefed and argued many class certification motions – including those in SRAM, CRT, TFT-LCD, and In re Flash Memory Antitrust Litigation – and will brief and argue those motions in this case. Counsel for EPPs are conversant with the law of class certification in indirect purchaser antitrust cases, the evidence, information and data that

they will need for that motion, and the showing that they have made in this motion is more than sufficient to carry their burden on this motion to compel.[6]

A.    Downstream Data Are Highly Relevant to the EPPs' Claims, Class Certification, and Damages.

Nearly all of the requests that remain seek downstream data and documents, such as transaction level purchase data, sales data, price data, and cost data. As explained in the Opening Brief, the types of downstream data sought by the Subpoena are all highly relevant to class certification and routinely granted in antitrust class action cases. MTC at 14-28.

1.    Downstream Data is Highly Relevant to Estimate Illegal Overcharges and Pass Through.

Downstream purchase level data will support the models used by EPPs' experts to estimate the alleged illegal overcharges. See, e.g., ODD, 2016 U.S. Dist. LEXIS 15899; In re Polyurethane Foam Antitrust Litig., 2014 U.S. Dist. LEXIS 161020, *152-169 (N.D. Ohio Nov. 17, 2014) ("Polyurethane Foam"); CRT, 2013 U.S. Dist. LEXIS 137945 at *119-131 (explaining the use of downstream data in indirect class certification economic analysis); Flat Panel, 267 F.R.D. at 602-603; SRAM, supra.

2.    Downstream Data Will Support the EPPs' Experts' Pass Through Studies.

Downstream transaction level purchases, sales, pricing, and cost data are important to prepare a pass-through analysis in order to establish the extent to which the overcharge was passed through the chain of distribution to EPPs. This type of data is routinely produced in indirect purchaser antitrust cases. See CRT, supra, 2013 U.S. Dist. LEXIS 137945 at *118-131; Flat Panel, 267 F.R.D. at 602-603 (same).

---

[6] EPPs note that the OEMs have proffered declarant Dr. McDonald as an economic expert on matters of class certification in price fixing cases, but in their own searches on LEXIS, EPPs have been unable to find any federal or state case in which Dr. McDonald was identified as a testifying expert, much less any antitrust case.

In the CRT indirect purchaser action, the Court explained how downstream data can be utilized in pass through studies:

> Dr. Netz conducted 40 empirical pass-through studies, using third-party data produced in response to plaintiffs' subpoenas as well as other data produced by defendants. … Three of Dr. Netz's pass-through studies were for sales of CRT products at Wal-Mart stores, and 37 of her pass-through studies either involved data provided by CRT distributors(2), used data provided by CRT product makers (5), used data provided by CRT product distributors (4), or used data provided by CRT product resellers (27), including 12 brick and mortar retailers such as Best Buy, Costco, Fry's, Office Max, Sam's Club and Wal-Mart, and 15 online retailers, such as Amazon, Buy.com, CDW, Dell, Gateway, PC Connection, PC Mall and Zones.

Id. at *116-120. Dr. Netz further explained the types of entities that provided data for her pass-through studies:

> The pass-through studies also contained large product distributors … including Ingram Micro and Tech Data, representing almost 4 million CRT products sold beginning in 1997 and ending in 2010. In addition, "[s]tudies for CRT monitor and television product manufacturers contain sales of over 37 million CRT products, beginning in 1995 and ending in 2009." And, Dr. Netz "conducted two studies for tube distributors, containing sales of 15 million tubes beginning in 1994 and ending in 2002." Combined, therefore, Dr. Netz's pass through studies "encompass over 131 million tubes and CRT product sold across all levels of the distribution chain."

Id. at *118-119, fn. 18.

In CRT, indirect purchaser plaintiffs' expert also incorporated data from multiple levels of the distribution channel, "including as many intermediate resellers as necessary to trace specific products through the entire distribution chain from the CRT manufacturer to the end consumer." Id. at *118. See also Flat Panel, Error! Bookmark not defined.267 F.R.D. at 601-606 (describing experts pass through studies and regressions using third-party downstream data in support of indirect purchaser class certification); Polyurethane Foam, 2014 U.S. Dist. LEXIS

161020 at *152-169 (describing the use of third-party downstream data for regressions to establish pass through and support indirect class certification); SRAM, M:07-cv-01819-CW, ECF No. 939 (N.D. Cal. Jan. 19, 2010) (explaining the various types of third-party downstream price, sales, cost, and product data used for pass through analysis and to support class certification). Supp. Williams Decl. (Ex. B).

**B.    Downstream Data is Routinely Sought and Produced in Indirect Purchaser Antitrust Actions.**

OEMs appear to suggest that EPPs' requests for downstream data are unusual or unnecessary by challenging the Parties for seeking downstream data at all.[7] ECF No. 1227 at 25-26. This is simply not the case. The exact same type of data sought by the Parties in their motion are frequently sought and produced in similar indirect purchaser price-fixing actions. For example, in SRAM, the Special Master ordered a non-party OEM to provide: 1) transaction level data regarding its purchases of SRAM from defendants, including transaction price, transaction type (i.e., purchase, return or exchange), and any rebate credits or discounts given; 2) product descriptions, product codes, and product SKU; 3) cost data for SRAM components and/or SRAM containing components in finished products, and total costs for such products over the

---

[7] Hedging all bets, the OEMs attempt to argue that downstream data is not discoverable at all in indirect purchaser actions. While it is true that courts generally prevent parties from seeking downstream data to support defenses in direct purchaser  actions, courts routinely allow downstream discovery in indirect purchaser actions where plaintiffs seek to prove pass through of an overcharge or where defendants are permitted by state law to assert a pass-on defense. See, e.g., In re Urethane Antitrust Litig., 237 F.R.D. 454, 463-464 (D. Kansas 2006) (refusing to compel downstream discovery to support direct purchaser claims, but noting that it was because the discovery was not sought by defendants to assert a pass-on defense) ("Urethane"). The OEMs incorrectly cite In re Vitamins Antitrust Litig., 198 F.R.D. 296 (D.D.C. 2000) ("Vitamins"), as an example of where discovery of downstream data was prohibited. ECF No. 1227 at 17. However, in Vitamins, defendants sought an order compelling plaintiffs (a mix of direct and indirect purchasers) to provide downstream sales documents to defend only against direct purchasers' claims regarding opt out damages, not to prove pass-through or to defend claims by indirect purchaser plaintiffs in the coordinated action. 198 F.R.D. at 302.

life of the product on a monthly basis, quarterly basis, or other reasonable time interval; and 4) sales data for finished products containing SRAM, specifically transaction level sales data for those products, including invoice number, date of sales transaction, product code, product SKU, geographic indicator of sale, transaction price, units sold, net dollar unit cost, transaction type (i.e., purchase, return or exchange), and any rebate, credits or discounts given. Order by Special Master Granting Indirect Purchaser Plaintiffs' Motion to Compel the Production of Documents from Third-Party Jabil Circuit, Inc., SRAM, No. ML07-cv-01819-CW, ECF No. 967 at 3-4 (N.D. Cal. Mar. 1, 2010) (attached to Supp. Williams Decl. as Ex. B; see also Polyurethane Foam, 2014 U.S. Dist. LEXIS 161020, at *167-169 (to support class certification, indirect purchaser plaintiffs used third-party subpoenas to obtain cost and sales data for pass-through analysis); Supp. Williams Decl. at ¶ 3, Ex. C (detailed description of documents sought and obtained in similar indirect purchaser actions). These are the same types of data the Parties are seeking here.

C.   **Transaction Level Data from OEMs and Distributors is Routinely Produced in Indirect Purchaser Antitrust Cases and Should be Produced Here**

The OEMs essentially refuse to produce any downstream data at all,[8] and argue that even if they did, the Parties do not need any "detailed" data for their class certification analyses. ECF No. 1227 at 24-34. This is incorrect and unreasonable. Aggregated data (i.e., data collected by year or by month) is not as useful as transaction-level data (i.e., specific transaction-by-transaction data) for the types of analyses that will be done by all Parties for purposes of class certification and trial. Starting with disaggregated data analysis allows the Parties to test the right level of aggregation for the particular question at hand at the beginning of the process. Testing of

---

[8] OEMs offer to produce a schedule of MSRP for a portion of the class periods (2006-2016), and subject to further limitations and negotiations with the Parties as to which models of vehicles sold by the OEMs will be included. MTC at 2. The Parties presume this would be aggregated data from its description.

this sort is appropriate in economic modeling, rather than making arbitrary assumptions that the timing of relevant business decisions (e.g., changing contract prices), occurs at a common and consistent frequency. Transaction prices also provide a better estimate of the actual pass-through rates than averaged price data (such as a schedule of MSRP). This is the best way for the Parties to feasibly use downstream pricing data to create econometric models to measure the pass-through of overcharges.

Further, based upon their experiences in prior cases – some with the same Defendants as in this case and the same defense counsel – EPPs expect Defendants to oppose class certification by attacking the completeness of the data which EPPs have used, and the robustness of their analyses and modeling. While EPPs do not seek every shred of data from OEMs, they do seek the data that is reasonably necessary and appropriate for a proper class certification analysis and from which they can rebut the challenges to be made by defendants and to show the Court that they can demonstrate, through class wide proof, the overcharge by defendants to the OEMs and the pass-through of that overcharge through the chain of distribution to the EPPs. See ODD, 2016 U.S. Dist. LEXIS 15899, *59 (N.D. Cal. 2016) ("…IPPs, unlike DPPs, have a two-fold burden in securing class certification in matters such as this. Not only must they show that all or nearly all of the original direct purchasers of ODDs bought at inflated prices, they must also show those overcharges were passed through all stages of the distribution chain"). EPPs have carefully considered the information and data that they need to make this showing, and have limited their requests to that information and data. If EPPs' experts are foreclosed from analyzing sufficient transaction level data, they will undoubtedly be subjected to various arguments by Defendants that they have taken short cuts, failed to consider relevant information,

or studied the data at too high – too aggregated[9] – a level of detail. See, e.g., CRT, 2013 U.S. Dist. LEXIS 137946, at *87-89 (the Court rejected Defendants' arguments attacking indirect purchaser's economic experts on the grounds that not enough transaction level data was analyzed).

D.      Downstream Cost Data is Particularly Relevant to the EPPs.

Downstream cost data is particularly relevant to EPPs to trace overcharges through the chain of distribution. See, e.g., SRAM, M:07-cv-01819-CW, ECF No. 967 (N.D. Cal. Mar. 1, 2010) (granting indirect purchaser plaintiffs' motion to compel cost data and other transaction level pricing and sales data from a non-party OEM, noting that it was clearly relevant to plaintiffs' claims). Supp. Williams Decl. at Ex. B. Defendants will argue that a multitude of factors could influence pricing and purchasing decisions. See, e.g., Defendants' Collective Motion to Dismiss the End-Payors' Corrected Consolidated Amended Class Action Complaint and the Automobile Dealers' Consolidated Class Complaint (Fuel Senders) at 25, Case No. 2:12-cv-00303, ECF No. 56 (Aug. 16, 2013). Supp. Williams Decl. at Ex. G. EPPs are entitled to sufficient information to demonstrate that they have analyzed enough of the relevant factors to demonstrate that the overcharge was caused by defendants' conduct as distinguished from other factors that influence pricing and purchasing decisions.

OEMs argue that the Parties do not need any detailed cost data, that gross cost data will suffice, and that the Parties should use publicly available data instead. The OEMs offer no legal support for this argument. The Parties are entitled to detailed cost data that itemizes the various input costs.

---

[9] See, e.g., ODD, 2015 U.S. Dist. LEXIS 15899, *58, noting that "the biggest dispute between the parties as to the appropriate mode of analysis lies in the degree to which the available data should be 'aggregated' or 'disaggregated'."

**IV.**     THE REQUESTS ARE PROPORTIONAL TO THIS MDL ACTION

The OEMs allege that even if the data and documents sought by the Subpoena are deemed relevant, they have no obligation to search for or produce this data because any "limited utility" of the data is offset by the supposed immense burdens they face. ECF No. 1227 at 18, 37-40. As discussed in the Opening Brief and as further explained below, in addition to the highly relevant nature of the information sought, every factor regarding proportionality directed by amended Rule 26(b)(1) is also met. MTC at 12-32.

A.     This MDL is Unprecedented in Size and Scope.

The cases that make up this multidistrict litigation stem from a multi-decade, worldwide conspiracy that the DOJ has repeatedly characterized as having the largest adverse impact on American consumers that it has ever uncovered. It implicates more than 30 automotive parts[10] and has affected billions of dollars in United States commerce. The level of criminal wrongdoing here is unprecedented, the number of Defendants involved is unprecedented, and the amount of damages is unprecedented. To date – in the United States alone – 38 corporate Defendants have pled guilty, 58 individuals have been charged, and 29 of those charged individuals have pled guilty or have agreed to plead guilty. Over $2.6 billion in criminal fines have been imposed. In addition, a series of foreign investigations, including proceedings brought by the Japanese Fair

---

[10] Plaintiffs have filed additional cases involving other parts since the subpoenas were issued last year. See Case No. 2:15-cv-12893 (Automotive Hoses); Case No. 2:15-cv-13000-MOB-MKM (Automotive Brake Hoses); Case No. 2:15-cv-14080-MOB-MKM (Shock Absorbers); Case No. 2:16-cv-10456-MOB-MKM (Body Sealings) and Case No. 2:16-cv-10461-MOB-MKM (Plastic Interior Trim Parts). The OEMs' materials will be equally relevant in the later-filed cases. Therefore, to minimize the burden on the OEMs and the need for serial discovery or motion practice, Court may wish to deem that the subpoenas on the OEMs and its order on the present motions should been deemed to apply to the parts and some or all Defendants in these later cases. The timing of the OEMs' production with respect to these cases can be determined at a later time.

Trade Commission and the European Commission, have resulted in additional massive fines against Defendants.

The Subpoena is reasonably proportional to the magnitude of this multidistrict litigation and the numerous cases, Parties, and parts involved. See Polyurethane Foam, 2014 U.S. Dist. LEXIS 27116, at *8-9 (W.D. Ohio Feb. 26, 2014) (refusing to quash subpoena where "MDL is itself broad in the topics it addresses").[11] This is a sprawling, precedent-setting litigation with OEMs who have all been explicitly named in the Defendants' guilty pleas with the DOJ and in Defendants' proffers as the largest direct victims of the conspiracy.

**B.    Productions by OEMs Not in the OEM Group Are Progressing Effectively.**

It is noteworthy that productions by OEMs (and their affiliated entities) that did not join the OEM group (and chose to cooperate in the normal course of third-party discovery), are progressing without any of the "burden" issues claimed by the OEMs. ██████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████ ████ ████████████

██████████████████████████████████

---

[11] The OEMs also argue that the time period for which documents are being sought is unprecedented; this is not true, and is simply a reflection of the facts of this case and the length of defendants' conspiracy. In CRT the time period for which non-parties produced data was over sixteen years. See, e.g., CRT, 2013 U.S. Dist. LEXIS 137945, at *118-119, fn. 18 (data from retailers "represented over 74 million CRT products sold to end users between 1994 and 2011").

[12] Honda maintains that its entities are part of the OEM group.

████████████████████████████████████ While burdens may differ to a reasonable extent for different OEM families, the OEMs' claims of undue burden are undermined in light of multiple OEMs demonstrating that they can comply with the Subpoena requests.

C.     Many OEMs Have Already Gathered the Responsive Information Sought By the Parties, Which Further Undermines Their Claims of Supposed Undue Burden.

The OEMs' claims of burden are rendered even less persuasive where many of the OEMs have already prepared and compiled much of the responsive information sought by the Subpoena for their production to the DOJ or in response to subpoenas from other regulators in the related auto parts investigations. See, e.g., In re Aftermarket Filters Antitrust Litigation, 2010 U.S. Dist. LEXIS 105108, *16 (N.D. Ill. Oct. 1, 2010) (noting that where third-Parties had previously collected and gathered the requested documents for indirect purchasers, the burden was low because the "subpoena recipients [could] presumably duplicate substantially what they produced in response to the earlier subpoenas").

████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



[14] EPPs have consulted with the DOJ which has confirmed that it does not object to production of previously made productions by OEMs to the DOJ other than any summary documents or memos that were specially prepared by the OEMs at the request of DOJ. Supp. Williams Decl. at ¶ 13.

At a minimum, the OEMs should identify the data and documents responsive to the Subpoena that they have already gathered and/or produced to the DOJ, other regulators, or for other purposes. These categories of data and documents should then be produced to the Parties because the OEMs cannot reasonably contend that doing so would impose any cognizable burden.[15]

## V.   THE DATA FROM DEFENDANTS AND AUTO DEALERS IS NOT SUFFICIENT TO EXCUSE THE OEMS FROM COMPLYING WITH THE SUBPOENA

OEMs argue that the Parties may only request that the OEMs fill specified gaps in their own existing data and productions. ECF No. 1227 at 1. This contention is contrary to established law. "[W]here information responsive to a discovery request is in a party's possession, 'it is obligated to produce the information' whether or not the requesting party has obtained or could obtain the information from an alternative source." Urethane, 237 F.R.D. at 460 (quoting Orleman v. Jumpking, Inc., 2000 U.S. Dist. LEXIS 11081, *5 (D. Kan. July 11, 2000).[16]

---

[15] OEMs claim that as victims of Defendants' conspiracies, having to comply with the Subpoena would victimize them twice: once by the conspiracy, and then again by the Subpoena. ECF No. 1227 at 14, fn. 12. This argument overlooks the fact that most, if not all, of the OEMs have likely already settled with – or are suing (as is Ford) – the defendants, and likely also passed the overcharges they paid down through the chain of distribution to EPPs.

[16] See also In re Bank of N.Y. Mellon Corp. Forex Transactions, 2014 U.S. Dist. LEXIS 88175, at *43-44 (S.D.N.Y. June 26, 2014) (rejecting third party's argument that documents sought by Defendants, including customer contracts, transaction cost analysis reports, and various emails sent to clients and other parties, should be obtained from parties in the case who may be in possession of them, and not from a third party).

A.    Access to Defendants' Data Does not Excuse the OEMs From Complying With the Subpoena

The OEMs claim that the Parties have all the information necessary from Defendants' productions to estimate overcharges and prove pass through. ECF No. 1227 at 1. This is inaccurate – Defendants' data is only one side of the story. Defendants' data must be analyzed with the OEMs' data to complete the picture and measure the first-level overcharge. Only having one side of the story does not illuminate the issue, and does nothing to show the responses and reactions of the OEMs, how they evaluated the overcharges, and how those overcharges then affected their pricing decisions and future automotive part sourcing decisions.

In addition, Defendants used code-words and schemes to hide and conceal their conduct, and some destroyed evidence. This is another reason why discovery from the OEMs is necessary and appropriate to permit EPPs to establish the overcharge to them. There are a number of areas where the OEMs' data would fill holes and gaps in Defendants' data, including the following deficiencies in Defendants' data: 1) a lack of sufficient data to cover the time periods alleged; 2) a lack of data regarding certain physical characteristics of the auto parts in relation to OEM sourcing decisions; and 3) a lack of product characteristics and vehicle information. Supp. Williams Decl. at ¶ 10. OEMs are in possession of evidence that will help address these deficiencies and enhance EPPs' experts' ability to provide an accurate estimate of the initial overcharge to direct purchasers. Id.

B.    Auto Dealers' Data is Not Sufficient in Relation to OEM's Data

The individual Automobile Dealer Plaintiffs are just a few of the thousands of automobile dealers in this country, and the information that they have is neither statistically significant for purpose of EPPs' analyses nor comparable to the much more complete information that the OEMs possess. In addition, while the OEMs suggest that Defendants or Automobile Dealers may

have inside knowledge and information regarding their overall operations, parts, and vehicle sales (ECF No. 1227 at 1), OEMs certainly have this information and there is no reason to force the EPPs to run down blind alleys when the information sought is in the possession of the OEMs. EPPs are entitled to seek what is needed to support their own claims and to not have said claims be impeded simply because other Parties supposedly may already know or possess certain information.

## VI.   "SMALLER" OEMS MUST COMPLY WITH THE SUBPOENA AS WELL

"Smaller" OEMs should comply with the Subpoena as well because the information they possess is as highly relevant as that possessed by the "larger" OEMs. The "Smaller" OEMs argue that due to their smaller market shares, they are 1) not proper subjects of the Subpoena, or 2) are of much lesser importance than the other, larger OEMs. ECF No. 1223 at 1. This argument is mistaken because the "Smaller" OEMs presumably have the same responsive information as would larger OEMs. The "Smaller" OEMs have all been named as first-level victims in the Defendants' guilty pleas with the DOJ or in Defendants' proffers.[17] For example, Fuji Heavy/Subaru was named in at least 11 of Defendants' guilty pleas with the DOJ. Supp. Williams Decl. at ¶ 11.

The "Smaller" OEMs additionally claim that their burden to comply with the Subpoena would somehow be much greater than the other, larger OEMs because they allegedly do not have large enough legal departments equipped to handle a reasonable search for responsive information. ECF No. 1223 at 11-12. This argument should, however, be analyzed in the proper context; although the "smaller" OEMs may claim to be "smaller" because perhaps, they may be

---

[17] While the "Smaller" OEMs claim they are no different than the small entities for which the Parties have agreed to hold the subpoenas in abeyance, those entities, such as Maserati, Bentley, Lamborghini and Rolls Royce, not only played a much more minimal role in terms of market share, and none were named in Defendants' guilty pleas with the DOJ or Defendants' proffers.

"smaller" than Defendant Toyota, they are still some of the largest automakers in the world including BMW, Jaguar Land Rover, Mitsubishi, Subaru, Volvo, and Volkswagen. It is implausible, at best, for them to suggest that their "small" size and relatively smaller legal department renders them incapable of properly completing responsive searches.

In fact, some, if not all of the "Smaller" OEMs, have already compiled and/or produced data and documents to the DOJ or other regulatory authorities in related auto parts investigations.[18] This data, at the very least, could be produced to the Parties with little to no burden at all. The "Smaller" OEMs cannot reasonably argue otherwise.

## VII.   DISTRIBUTOR OEMS SHOULD COMPLY WITH THE SUBPOENA

Distributor OEMs also should comply with the Subpoena because distributors are a critical link in the overall distribution chain in the automotive industry. Distributors sell finished vehicles made by their parent or affiliated manufacturing OEMs to automobile dealers, and are routinely subpoenaed in indirect purchaser actions to provide the same types of data as sought here for their level of the distribution chain. See, e.g., CRT, 2013 U.S. Dist. LEXIS 137945, at *117-120, fn. 18 (expert's pass through studies contained data from large product distributors such as Ingram Micro and Tech Data); see also Supp. Williams Decl. at ¶¶ 15-18 and Exs. D and E thereto (showing distributor entities served in other indirect purchaser antitrust actions)

While Distributors claim they do not have any purchase level data regarding purchases of auto parts or cost data for vehicles that are manufactured by the manufacturing entities in their corporate family (ECF No. 1224 at 3), they do not deny that they possess highly relevant data regarding their acquisition or purchase of finished vehicles from those manufacturing entities or

---

[18] See ECF No. 1222-22 at ¶18 (Re BMW Manufacturing USA confirmation of identification and production of data for DOJ); ECF No. 1227-61 at ¶15 (Subaru of Indiana Automotive, Inc. confirmed receipt of 5 subpoenas from DOJ).

regarding the sale of those vehicles to Automobile Dealers. Id. Data regarding the distributor entities' acquisitions or purchases of finished vehicles from manufacturing entities or regarding the sale of said vehicles to Automobile Dealers are directly relevant to measuring the pass-through at each step of the chain of distribution. Thus, this information is necessary in order to prove pass through of the overcharges to EPPs, as well as to properly evaluate damages.

The Distributors also inappropriately attempt to define themselves as purely "domestic," and claim they are not obligated to search for or to produce anything related to vehicles that may have been manufactured outside of the United States. ECF No. 1224 at 5. This argument is improper because the claims in this case include products manufactured outside the United States and imported into the United States. See In re Automotive Parts Antitrust Litigation (In re Bearings), Case No. 2:12-cv-00500-MOB-MKM, ECF No. 160 (E.D. Mich. Aug. 26, 2014). EPPs allege a worldwide conspiracy by Defendants that impacted prices paid by consumers who purchased vehicles in the United States. Furthermore, EPPs also claim that Defendants allocated customers and markets worldwide and rigged bids to OEMs worldwide in the various parts actions, all of which impacted prices paid by U.S. consumers. The Distributors are not purely "domestic" and information related to vehicles – including those that may have been manufactured outside of the United States – are critical to the EPPs in proving pass-through. Accordingly, the Distributors cannot refuse to produce data and information relating to automobiles manufactured outside the United States and imported into the United States. The Distributors should be compelled to provide the responsive information in their possession, custody or control, including information related to vehicles manufactured abroad because those vehicles are the same vehicles that ultimately damaged the EPPs in the United States.

## VIII.   THE SUBPOENAS TO THE NON-CORE OEMS ARE HELD IN ABEYANCE[19]

As explained in the Opening Brief, the Parties have subpoenaed different types of entities in an effort to compile sufficient data to cover the various categories of requests pertaining to each OEM family, including from Non-Core OEMs who may possess responsive information to certain subpoena requests.[20] While the Non-Core OEMs have filed an opposition (ECF No. 1230), the Parties have again compromised and agreed to hold in abeyance the Subpoenas to the Non-Core OEMs. Accordingly, the arguments by the Non-Core OEMs are now moot and the Parties will not address the issue here.

## IX.   THE PATH FORWARD

A.   The Protective Order Entered by the Court Provides Sufficient Protections to Producing Parties and Non-Parties

The OEMs claim that even if they do comply with the Subpoena, their information is proprietary, highly sensitive, and supposedly cannot be produced for fear of unwarranted or accidental disclosure. ECF No. 1227 at 39-40; ECF No. 1224 at 7. As discussed below, this argument is flawed because of the procedural safeguards that can be readily implemented. Courts in the Sixth Circuit have repeatedly and consistently held that a non-party must produce information that it may believe to be highly sensitive or proprietary where there is a protective order in place that can provide the necessary safeguards. See, e.g., E 3 Biofuels, LLC v. Biothane Corp., 2013 U.S. Dist. LEXIS 100793, at *3 (S.D. Ohio July 18, 2013) ("This court has routinely approved proposed protective orders seeking to protect both 'confidential' and 'highly

---

[19] Non-Core OEMs include insurance, finance and credit, banking and capital, and research and development, and design entities. See Williams Declaration as Exhibit B to Motion to Compel, document 1185.

[20] ████████████████████████████████████████████████████████████████
████████████████

confidential/attorney eyes only' material when, in addition to trade secret or other confidential research, development, or commercial information, particularly sensitive information of a similar nature may be disclosed through discovery and would cause competitive harm if publicly revealed."); Nucorp v. John Does 1-24, 2012 U.S. Dist. LEXIS 187547, at *19 (E.D. Mich. Oct. 18, 2012) (holding that a privacy interest is not a privilege, and provides no grounds for quashing a subpoena).

The protective order in Wire Harnesses ("Stipulated Protective Order") has the appropriate safeguards that puts to rest any of the OEMs' concerns.[21] See Supp. Williams. Dec. (Ex. H) (Wire Harness Stipulated Protective Order). The Stipulated Protective Order provides a detailed process for designating confidential documents, including but not limited to 1) a designation of "HIGHLY CONFIDENTIAL --- OUTSIDE ATTORNEYS ONLY" for the specific types of pricing and business documents that the OEMs claim to be concerned about; 2) instructions on the strict confidentiality of such designated documents; 3) strict prohibitions on using such designated documents; and 4) detailed instructions for filing under seal. See Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners, 294 F.R.D. 87, 95 (S.D. Ohio 2013) (where non-Parties were ordered to produce subpoenaed information they claimed to be commercially sensitive, including when production was to occur from competitors in the same field, an appropriate protective order was in place and documents could be designated "Highly Confidential – Attorneys' Eyes Only"). Any privacy or sensitivity concerns of the OEMs are addressed by the Stipulated Protective Order.

---

[21] Plaintiffs note that the protective orders in other automotive parts cases within this multidistrict litigation are substantially similar, if not, identical, to the protective order in Wire Harnesses.

B.      EPPs' Position on Costs

In EPPs' experience the costs of non-party discovery in indirect purchaser class actions are not typically shifted to the Parties – even in cases where huge companies such as Apple, Dell, Costco, and IBM have received and responded to subpoenas – and the OEMs here have not shown any reason why this case is any different. Supp. Williams Decl. (Exs. B, E, and F) (lists of third Parties subpoenaed in like cases). As previously stated supra, a number of OEMs have confirmed that they have already searched and compiled certain sets of data for the DOJ or otherwise. Therefore, the production of these data sets to the Parties would involve very little to burden at all. Indeed, the process could be as simple and minimally burdensome as sending a .zip file or copying an existing thumb drive for distribution purposes. It is implausible and unreasonable for OEMs to suggest otherwise. Even for data or documents that have not been previously gathered, the OEMs have not demonstrated that the costs will be "staggering" as they claim (MTC at 37).

Whether a production of documents is unduly burdensome often turns on whether it is kept in an accessible or inaccessible format, a distinction that corresponds closely to the expense of production. See Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 318 (S.D.N.Y. May 13, 2003). With respect to hard-copy documents, a document is accessible if it is readily available in a usable format and reasonably indexed.[22] Id. With respect to electronically stored information ("ESI"), "[i]n the world of electronic data, thanks to search engines, any data that is retained in a machine readable format is typically accessible." Id. at 318; see also John B. v. Goetz, 879 F.Supp. 2d 787, 883 (M.D. Tenn. Jan. 28, 2010) (quoting Scheindlin & Rabkin, Electronic

---

[22] Examples of hard copy documents that could be considered inaccessible may include (a) documents in storage in a difficult to reach place; (b) documents converted to microfiche; or (c) documents kept haphazardly, with no indexing system. Zubulake, 217 F.R.D. at 318. OEMs have not established that any of these instances exist here.

Discovery, 41 B.C. L. Rev.Error! Bookmark not defined. at 364 ("the average office computer could search all of the documents for specific words or combinations of words in [a] minute, perhaps less."); Helmert v. Butterball, LLC, 2010 U.S. Dist. LEXIS 60777, at *26-35 (D. Ark. May 27, 2010) (citing Zubulake, 217 F.R.D. at 324)) (a court should consider cost-shifting only when digital data is relatively inaccessible, such as on backup tapes).

The OEMs cite the volume of data and documents they would need to search as a reason why compliance with the Parties' Subpoena would be impossible. However, this assumes that higher volume equates to greater costs – which it does not. See Goetz, 879 F. Supp. 2d at 883 (finding that Defendants' opposing motion to compel unduly exaggerated the costs for their ESI collection and any privilege reviews of the ESI, and noting that courts have recognized computers' capabilities to perform select word searches on massive ESI in a matter of seconds).

Cost-shifting may be appropriate to restore data from an inaccessible format to an accessible format. However, that is not the case here because most, if not all, of the documents sought by the Parties are presumably stored electronically. Once the data exists in a searchable format, the data is considered easily accessible and cost-shifting generally does not apply. Zubulake, Error! Bookmark not defined.217 F.R.D. at 290 ("the responding party should always bear the cost of reviewing and producing electronic data once it has been converted to an accessible form"); Fleisher v. Phoenix Life Insurance Co., 2012 U.S. Dist. LEXIS 182698, *13 (S.D.N.Y. Dec. 27, 2012) (generally inappropriate to shift costs of discovery relating to review of privileged and confidential documents by quoting counsel).

## X.   CONCLUSION

For the foregoing reasons, the Parties' motions to compel should be granted and the Subpoena upheld.

Date: March 11, 2016                    Respectfully submitted,

/s/StevenN.Williams
Steven N. Williams
Demetrius X. Lambrinos
Elizabeth Tran
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
dlambrinos@cpmlegal.com
etran@cpmlegal.com

/s/HollisSalzman
Hollis Salzman
Bernard Persky
William V. Reiss
ROBINS KAPLAN LLP
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
BPersky@RobinsKaplan.com
WReiss@RobinsKaplan.com

/s/MarcM.Seltzer
Marc M. Seltzer
Steven G. Sklaver
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Omar Ochoa
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 5100
Dallas, TX 75202
Telephone: (214) 754-1900
Facsimile: (214)754-1933
toxford@susmangodfrey.com
oochoa@susmangodfrey.com

Chanler A. Langham
SUSMAN GODFREY L.L.P.

1000 Louisiana
Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
clangham@susmangodfrey.com

Interim Co-Lead Class Counsel for the Proposed
End-Payor Plaintiff Classes

/s/E.PowellMiller
E. Powell Miller
Devon P. Allard
THE MILLER LAW FIRM, P.C.
The Miller Law Firm, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
dpa@millerlawpc.com

Christopher T. Micheletti
Judith A. Zahid
Qianwei Fu
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
cmicheletti@zelle.com
jzahid@zelle.com
fu@zelle.com

Ronnie S. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
ronnie@hbsslaw.com

Interim Liaison Class Counsel for the Proposed
End-Payor Plaintiff Classes

CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2016, I caused the foregoing END-PAYOR PLAINTIFFS' REPLY IN SUPPORT OF THE PARTIES' MOTION TO COMPEL DISCOVERY FROM NONPARTY ORIGINAL EQUIPMENT MANUFACTURERS to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notifications of such filings to all counsel of record.


Dated: March 11, 2016                    /s/StevenN.Williams
                                         Steven N. Williams

REDACTED

APPENDIX  A

| Request No. | General Topic | Status |
| --- | --- | --- |
| 1 | Purchase of parts | SSEs refuse to search/produce |
| 1(a) | Purchase of parts | SSEs refuse to search/produce |
| 1(b) | Purchase of parts | SSEs refuse to search/produce |
| 1(c) | Purchase of parts | SSEs refuse to search/produce |
| 1(d) | Purchase of parts | SSEs refuse to search/produce |
| 1(d)(1) | Purchase of parts | SSEs refuse to search/produce |
| 1(d)(2) | Purchase of parts | SSEs refuse to search/produce |
| 1(d)(3) | Purchase of parts | SSEs refuse to search/produce |
| 1(e) | Purchase of parts | SSEs refuse to search/produce |
| 1(f) | Purchase of parts | SSEs refuse to search/produce |
| 1(g) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(1) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(2) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(3) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(4) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(5) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(6) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(7) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(8) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(9) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(10) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(11) | Purchase of parts | SSEs refuse to search/produce |

| Request No. | General Topic | Status |
|---|---|---|
| 1(g)(12) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(13) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(14) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(15) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(16) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(17) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(18) | Purchase of parts | SSEs refuse to search/produce |
| 1(g)(19) | Purchase of parts | SSEs refuse to search/produce |
| 1(h) | Purchase of parts | Withdrawn |
| 1(i) | Purchase of parts | Withdrawn |
| 1(j) | Purchase of parts | Withdrawn |
| 1(k) | Purchase of parts | Withdrawn |
| 1(l) | Purchase of parts | SSEs refuse to search/produce |
| 1(m) | Purchase of parts | SSEs refuse to search/produce |
| 2 | Pricing | Withdrawn |
| 3 | Contracts | SSEs refuse to search/produce |
| 4 | Sales of vehicles | SSEs refuse to search/produce |
| 4(a) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(1) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(2) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(3) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(3)(a) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(3)(b) | Sales of vehicles | SSEs refuse to search/produce |

| Request No. | General Topic | Status |
|---|---|---|
| 4(a)(3)(c) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(3)(d) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(3)(e) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(3)(f) | Sales of vehicles | Withdrawn |
| 4(a)(3)(g) | Sales of vehicles | Withdrawn |
| 4(a)(3)(h) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(3)(i) | Sales of vehicles | Withdrawn |
| 4(a)(3)(j) | Sales of vehicles | Withdrawn |
| 4(a)(3)(k) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(4) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(5) | Sales of vehicles | Withdrawn |
| 4(a)(6) | Sales of vehicles | Withdrawn |
| 4(a)(7) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(8) | Sales of vehicles | SSEs refuse to search/produce |
| 4(a)(9) | Sales of vehicles | Withdrawn |
| 4(a)(10) | Sales of vehicles | Withdrawn |
| 4(a)(11) | Sales of vehicles | Withdrawn |
| 4(a)(12) | Sales of vehicles | Withdrawn |
| 4(a)(13) | Sales of vehicles | SSEs refuse to search/produce |
| 4(b) | Sales of vehicles | SSEs refuse to search/produce |
| 4(b)(1) | Sales of vehicles | SSEs refuse to search/produce |
| 4(b)(2) | Sales of vehicles | SSEs refuse to search/produce |
| 4(b)(2)(a) | Sales of vehicles | SSEs refuse to search/produce |

3

| Request No. | General Topic | Status |
|---|---|---|
| 4(b)(2)(b) | Sales of vehicles | SSEs refuse to search/produce |
| 4(b)(2)(c) | Sales of vehicles | SSEs refuse to search/produce |
| 4(b)(2)(d) | Sales of vehicles | SSEs refuse to search/produce |
| 4(b)(2)(e) | Sales of vehicles | SSEs refuse to search/produce |
| 4(c) | Sales of vehicles | Withdrawn |
| 4(c)(1) | Sales of vehicles | Withdrawn |
| 4(c)(2) | Sales of vehicles | Withdrawn |
| 4(c)(2)(a) | Sales of vehicles | Withdrawn |
| 4(c)(2)(b) | Sales of vehicles | Withdrawn |
| 4(c)(2)(c) | Sales of vehicles | Withdrawn |
| 4(c)(2)(d) | Sales of vehicles | Withdrawn |
| 4(c)(2)(e) | Sales of vehicles | Withdrawn |
| 4(c)(2)(f) | Sales of vehicles | Withdrawn |
| 4(c)(2)(g) | Sales of vehicles | Withdrawn |
| 4(c)(2)(h) | Sales of vehicles | Withdrawn |
| 4(c)(2)(i) | Sales of vehicles | Withdrawn |
| 4(c)(2)(j) | Sales of vehicles | Withdrawn |
| 4(c)(2)(k) | Sales of vehicles | Withdrawn |
| 4(c)(2)(l) | Sales of vehicles | Withdrawn |
| 4(c)(2)(m) | Sales of vehicles | Withdrawn |
| 4(c)(2)(n) | Sales of vehicles | Withdrawn |
| 4(c)(2)(o) | Sales of vehicles | Withdrawn |
| 4(d) | Sales of vehicles | Withdrawn |

| Request No. | General Topic | Status |
|---|---|---|
| 4(e) | Sales of vehicles | SSEs refuse to search/produce |
| 4(f) | Sales of vehicles | Withdrawn |
| 4(g) | Sales of vehicles | Withdrawn |
| 4(h) | Sales of vehicles | SSEs refuse to search/produce |
| 4(i) | Sales of vehicles | Withdrawn |
| 4(j) | Sales of vehicles | SSEs refuse to search/produce |
| 4(l) | Sales of vehicles | Withdrawn |
| 5 | Sales of vehicles | SSEs refuse to search/produce |
| 5(a) | Sales of vehicles | SSEs refuse to search/produce |
| 5(b) | Sales of vehicles | SSEs refuse to search/produce |
| 5(c) | Sales of vehicles | SSEs refuse to search/produce |
| 5(d) | Sales of vehicles | SSEs refuse to search/produce |
| 5(e) | Schedule of MSRP | SSEs will produce (2006-2016) |
| 6 | VIN data | Withdrawn |
| 7 | Financing | Withdrawn |
| 8 | Pricing | Withdrawn |
| 9 | Financing | Withdrawn |
| 10 | Inventory levels | Withdrawn |
| 11 | Sales of vehicles | Withdrawn |
| 12 | Parts and vehicle codes | Withdrawn |
| 13 | Pricing | SSEs refuse to search/produce |
| 13(a) | Market research | SSEs refuse to search/produce |
| 13(b) | Costs and pricing | SSEs refuse to search/produce |

| Request No. | General Topic | Status |
|---|---|---|
| [14] | Parts purchasing | SSEs refuse to search/produce |
| 14(a) | Parts suppliers | Withdrawn |
| 14(b) | RFQs | Withdrawn |
| 14(c) | RFQs | SSEs refuse to search/produce |
| 14(d) | Pricing of vehicles | Withdrawn |
| 14(e) | Pricing of vehicles | Withdrawn |
| 14(f) | Pricing of vehicles | Withdrawn |
| 14(g) | Costs | Withdrawn |
| 14(h) | Pricing of vehicles | Withdrawn |
| 14(i) | Audits re parts purchases | Withdrawn |
| 14(j) | Supplier part pricing | Withdrawn |
| 15 | Costs, impact on price | SSEs refuse to search/produce |
| 16 | Costs, impact on price | SSEs refuse to search/produce |
| 17 | Trade association materials | Withdrawn |
| 18 | Market conditions | Withdrawn |
| 19 | Internal transfer costs | Withdrawn |
| 20 | Vehicle sales reporting | Withdrawn |
| 21 | Sales reporting | Withdrawn |
| 22 | OEM/dealer communication | SSEs refuse to search/produce |
| 23(2) | Annual price reductions | Partially withdrawn; SSEs refuse to search/produce on remainder |
| 24 | Competition from other OEMs | Withdrawn |
| 25 | Organizational charts | Withdrawn |
| 26 | Software and systems | Withdrawn |

| Request No. | General Topic | Status |
|---|---|---|
| 27 | DOJ productions | See supra |
| 28 | Joint sourcing of parts | Partially withdrawn; SSEs refuse to search/produce on remainder |
| 29 | JDPower (PIN) data | Withdrawn |
| 30 | Contract terms/MFN clauses | SSEs refuse to search/produce |
| 31 | Settlement negotiations | SSEs refuse to search/produce |
| 32 | Price decreases | Withdrawn |
| 33 | Part supplier comparison | SSEs refuse to search/produce |
| 34 | Financing | SSEs refuse to search/produce |