# EXHIBIT 8

 Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

December 18, 2015

Colin Kass
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

*Via Email*

Sheldon H. Klein
Butzel Long
Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
klein@butzel.com

Re: *In re Automotive Parts Antitrust Litig.*, 2:12-md-02311

Dear Sheldon:

We write on behalf of the Specified Subpoenaed Entities ("SSE") in response to your November 24, 2015 letter. As you requested, we have carefully considered your proposal.

Unfortunately, we do not agree that your proposal has "significantly narrowed the scope of the subpoena." While you have withdrawn a number of duplicative and tangential requests, such modifications appear to be more window dressing than substantive limitations or compromises.[1] For example, you have withdrawn Request (4)(a)(6), which asks for "monetary components of [downstream] transaction[s] beyond unit price," but you continue to seek identical information in Request 4(e). Likewise, you withdrew Request 2, which seeks information about every RFP each OEM issued over the last 20 years, yet you continue to seek the same information in Request 1(g), which is even broader. Most of the other requests you have withdrawn are similarly duplicative of other much broader requests you continue to assert. More fundamentally, the Parties still fail to justify their requests, continue to seek information that is already in their possession, and continue to disregard the substantial burden the subpoena imposes on the SSEs, which are non-parties to the litigation.

Nonetheless, in the spirit of compromise, we present an offer of production below, which should satisfy the Parties' need for information consistent with the rule of proportionality. In sum, contingent on reaching a comprehensive agreement on the scope of the subpoena and the payment of costs, and subject to the terms and details below, the OEM SSEs (as identified in footnote 17) are prepared to produce (i) reasonably-accessible transactional data (or the closest equivalent kept in the ordinary course of business) showing the specific components purchased

---

[1] Based on your October 14th and November 24th letters, we understand the following requests to be held in abeyance: 1(h)-(k); 2; 4(a)(3)(f)-(g), (i); 4(a)(5)-(6), (9)-(11); 4(c)-(d), (f)-(g), (i)-(l); 6-12; 14(a)-(b), (d)-(j); 17-21; 23(1), (3)-(5); 24-26; 28 (first sentence); 29; 32; 35; and Attachment B.



Page 2

from a reasonable number of non-Defendant component suppliers, to be negotiated with the Parties, for up to the last 10 years; and (ii) reasonably accessible information setting forth the MSRPs for select vehicles or categories of vehicle, to be negotiated with the Parties, that each OEM sold for up to the past 10 years, with the form and format of production to be determined. The SSEs that have made productions to the DOJ concerning the issues in this case will also produce to the parties the purchasing and MSRP data specified above that was part of any production to the DOJ.[2]

We trust that this offer will adequately address the Parties' needs. For completeness, however, we discuss the specific issues raised in our prior correspondence in greater detail.

**1.** *Non-OEM SSEs[3]*

As noted in our prior letter, over half of the subpoenaed SSEs are not OEMs. We suggested that the subpoena be held in abeyance as to such entities. In response, you assert that the Parties will only hold a subpoena in "abeyance" if the SSE "certif[ies] that it does not have any … responsive information." That is a non-sequitur. If an SSE does not have any responsive information, then you are not holding the subpoena in "abeyance," you are demanding and receiving full compliance with it.

Your letter also fails to address the fundamental issue the non-OEM SSEs raised: they have little, if any, information that is relevant or that justifies the substantial burden you seek to impose on them. As you know, the amendments to the Federal Rules of Civil Procedure became effective on December 1, 2015, and require the Parties to substantiate their requests under the rule of proportionality. The Parties have made no effort to satisfy this burden.

We understand the following requests to still be at issue for the non-OEM SSEs, and that all other requests related to these SSEs have now been withdrawn[4]:

| Type of Entity | Parties' "Narrowed Requests" |
|---|---|
| Truck and Equipment SSEs | ---- |

---

[2] Any offer of production made in this letter is expressly contingent on reaching a comprehensive agreement with the Parties concerning the scope of the subpoena, including issues such as the reimbursement of costs and the scope of the protective order. The SSEs reserve their right to object to, oppose, or quash any or all portions of the subpoena absent a comprehensive agreement.

[3] We note that a number of the non-OEM SSEs, including Chrysler Transport Inc., Toyota Logistics Services, Inc., Hyundai Autoever America, LLC, and Subaru Leasing Corp., do not fit into the six categories you identified in your October 14th letter. The subpoena should be held in abeyance for such entities. Absent a further showing of relevance and need, these non-OEM SSEs do not intend to search for and produce information in response to the subpoena.

[4] The chart reflects the intersection of the Parties' October 14th letter, which identifies the information then being requested for each types of non-OEM SSE, and the Parties' November 24th letter, which holds in abeyance certain of those requests.

**Proskauer**

Page 3

| Type of Entity | Parties' "Narrowed Requests" |
|---|---|
| Insurance | Request No. 4(b)(2)(e) |
| Finance and Credit | Request Nos. 4(a)(3)(e), 4(a)(4), 4(b)(2)(d), and 34 |
| Banking and Capital | Request 13(a-b), 14(c), 16, 33, and 34 |
| R&D | Request Nos. 1(g)(6)-(9), 1(g)(17), 1(l), 4(h), 5, 13, 14(c), 15, 16, 27, 28, and 33 |
| Design | Request Nos. 1(g)(6)-(8), 1(g)(17), 27, and 33 |

For clarity, we will discuss each type of non-OEM separately.

A.  <u>Truck and Equipment SSEs</u>[5]

In your October 14th letter, you noted that the Parties were "prepared to discuss appropriate criteria for the truck and equipment entities." Accordingly, we had understood our October 29th letter to be requesting the Parties to specifically identify which, if any, requests they are continuing to press. Your November 24th letter does not address this issue. Accordingly, unless we hear otherwise, the Truck and Equipment SSEs will deem the subpoena held in abeyance in its entirety.

B.  <u>Insurance SSEs</u>[6]

For the Insurance SSEs, the Parties continue to seek compliance with Request 4(b)(2)(e), which seeks "monetary components beyond unit price … and non-monetary components of … the sale [or lease] to the retail purchaser distinct from net sale price."[7] The Parties, however, have not presented any basis – let alone a good faith basis – for asserting that insurance prices or any other insurance-related non-monetary component of retail car purchases were affected by the Defendants' conspiracies to fix the prices of vehicle components. How, for example, is the price

---

[5] The Truck and Equipment SSEs include: Hino Motors Manufacturing U.S.A., Inc.; Nissan Diesel America, Inc. (sold to AB Volvo in 2006 and now known as UD Trucks Corp. – to our knowledge not a subpoenaed entity); Daimler Trucks North America LLC; Daimler Vans Manufacturing, LLC; Daimler Vans USA LLC; Freightliner Custom Chassis Corporation; Mitsubishi Fuso Truck of America, Inc.; Thomas Built Buses, Inc.; Western Star Trucks Sales, Inc.; and Fuji Heavy Industries U.S.A., Inc.

[6] The Insurance SSEs are limited to BMW Insurance Agency, Inc., which, as the Subpoenaing Parties were advised in August, is solely an insurance broker, selling affinity personal automobile liability insurance that is underwritten and provided by Liberty Mutual Insurance Company. BMW Insurance Agency, Inc. does not determine the terms or pricing of the insurance policies it sells.

[7] We assume that this request has no relevance to the Auto Dealer Plaintiffs, Truck and Equipment Dealer Plaintiffs, and the Public Entity Plaintiffs, and thus, such plaintiffs are not seeking enforcement of the subpoena with respect to the Insurance SSEs. If that is not correct, please let us know.



Page 4

of a wire or a piece of rubber supposed to have altered the price that a consumer pays for insurance or changed the amount of coverage that the consumer obtains? Indeed, any argument that the conspiracies had such an effect would be preposterous in light of the highly competitive and fragmented market for insurance. Thus, absent a sufficient showing that the conspiracy is likely to have had such an effect, the subpoena is overbroad and unenforceable. Accordingly, absent a further showing of relevance and need, the Insurance SSEs do not intend to search for and produce information in response to the subpoena.

      C.     <u>Finance and Credit SSEs</u>[8]

For the Finance SSEs, the parties seek compliance with four requests: 4(a)(3)(e); 4(a)(4); 4(b)(2)(d); and 34. Requests 4(a)(3)(e) and 4(a)(4) seek information regarding the sale of vehicles to dealers, including the amount the dealer paid at the time of purchase and the terms relating to the financing of the remainder. Request 4(b)(2)(d) seeks similar information but concerns financing offered by the finance and credit SSEs to the consumers. Request 34 is a blunderbuss request that seeks "all disaggregated transactional data," and does not mention, let alone specifically relate to, finance or credit.

As with the insurance requests, the SSEs have made no showing that the Defendants' conspiracies to fix component prices had any bearing on financing charges. And like insurance markets, finance markets are highly competitive and fragmented. In any event, the price of components such as wire connectors and rubber parts are too tangential to have any significant effect on financing rates. In your letter, you do not claim otherwise. Instead, you make the circular assertion that the Parties are entitled to seek enforcement of the subpoena from "the finance and credit entities … because they bear directly on … dealer and consumer financing terms." That, however, is not sufficient to establish relevance of this information to this case or to justify such an unwarranted fishing expedition. Accordingly, absent a further showing of relevance and need, the Finance and Credit SSEs do not intend to search for and produce information in response to the subpoena.[9]

---

[8] The Finance and Credit SSEs include: Fiat Finance North America, Inc.; BMW Financial Services NA, LLC; General Motors Financial Company, Inc.; American Honda Finance Corp.; Mercedes-Benz Financial Services USA LLC; Mercedes-Benz Credit Corporation; Volkswagen Credit Inc.; Nissan Motor Acceptance Corporation; Hyundai Capital America; and Mitsubishi Motors Credit of America, Inc.

[9] The Parties seek to blame the Defendants for some unspecified and undisclosed "position regarding the impact of dealer and consumer financing terms on questions of impact and injury." If the Defendants are indeed claiming that their conspiracy inflated (or deflated) financing terms, please provide a record cite for the contention and the evidence that supposedly supports it.



Page 5

        D.     <u>Banking and Capital SSEs</u>[10]

For Banking and Capital SSEs, you seek compliance with six requests: 13(a), 13(b), 14(c), 16, 33, and 34. None of these requests relate to banking or capital. We are, therefore, at a loss as to why you believe that Banking and Capital entities are likely to have relevant information. Request 13(a) seeks information relating to any policies for setting prices and studies concerning competition for vehicles. Banking and Capital SSEs, however, do not set vehicle prices. Request 13(b) seeks studies reflecting how the "cost of components … impacts or influences the ultimate price of the Vehicle to Purchases." The Parties, however, have not made any showing that Banking and Capital SSEs have conducted studies concerning the impact, if any, of the price of wires, rubber parts, or other components on vehicle prices. If you believe that such a study has been done by a Banking and Capital SSE, please state the basis for your belief and provide the supporting documentation. Request 16 seeks the same information as Request 13(b) and is similarly without foundation. Request 33 asks for documents comparing differences in components. Please explain why you believe that a Banking and Capital SSE would have a study comparing Yazaki's wire harnesses to Fujikura's wire harnesses, or any component supplier's product to any other's. Request 34 is the same blunderbuss request for all disaggregated transactional data discussed above. As above, however, the Parties have made no showing that the Defendants' conspiracies impacted banking and capital terms. Indeed, the components at issue involve ordinary-course purchases of materials, not large capital expenditures, such as manufacturing equipment, construction of manufacturing equipment, or dealer facilities. Accordingly, absent a further showing of relevance and need, the Banking and Capital SSEs do not intend to search for and produce information in response to the subpoena.

        E.     <u>R&D SSEs</u>[11]

For the R&D SSEs, the Parties seek compliance with 15 requests: 1(g)(6), 1(g)(7), 1(g)(8), 1(g)(9), 1(g)(17), 1(l), 4(h), 5, 13, 14(c), 15, 16, 27, 28, and 33.[12] The Parties, however, have made no showing that any R&D SSE was involved in the selection of components. How, for example, could R&D on battery technology for concept electric vehicles or R&D on

---

[10] The Banking and Capital SSEs include: BMW Bank of North America; BMW US Capital LLC; and Hyundai Capital America. As indicated in the text, many of the banking and Credit SSEs are not involved in the production, distribution, or sale of vehicles. For example, as the Subpoenaing Parties were advised in August, BMW US Capital LLC sells capital instruments and maintains other operations that are akin to internal banking operations, and BMW Bank of North America is a bank in Utah that engages in traditional banking activities and does not deal directly with consumers with respect to loans and leasing of vehicles.

[11] The R&D SSEs include: Honda R&D Americas, Inc.; Honda Research Institute USA, Inc.; Mercedes-Benz Research & Development North America, Inc. (CA); Mercedes-Benz Research & Development North America, Inc. (MI); Nissan Technical Center North America, Inc. (part of Nissan North America); Hyundai America Technical Center, Inc.; and Mitsubishi Motors R&D of America, Inc.

[12] The Parties seek compliance with Request 27, which seeks all information produced to any regulatory or government authority within or outside the United States as part of any investigation relating to components or Assemblies for installation in new vehicles sold or leased in the United States. As we note below, this is request is not limited to documents related to the alleged conspiracies and is thus facially overbroad.



Page 6

autonomous vehicles be related to your case? It appears that you are equating the R&D SSEs with the OEMs themselves. Indeed, the fact that all the R&D entities you subpoenaed are affiliates of foreign OEMs (which have not been subpoenaed) raises questions of whether you are seeking an end-run around the Hague Convention. Regardless, if the Parties, in fact, worked with the R&D SSEs on specific RFPs that are the subject of the alleged conspiracies, that information would be in the Parties' possession. Thus, the Parties should be able to identify the specific RFPs at issue, the components at issue, and the specific R&D SSEs that were involved in that RFP. Until you provide such information, however, you have no basis for seeking discovery from an R&D SSE. Accordingly, absent a further showing of relevance and need, the R&D SSEs do not intend to search for and produce information in response to the subpoena.

    F.    <u>Design SSEs</u>[13]

For the Design SSEs, the Parties seek compliance with six requests: 1(g)(6), 1(g)(7), 1(g)(8), 1(g)(17), 27, and 33. As with the R&D SSEs, the Parties' subpoenas to Design SSEs appear to conflate the role of the Design SSE with the role of the OEM. The OEM is the entity that conducts the RFP, engages in pricing discussions with component manufacturers, and makes the determination of which supplier to use. While Design SSEs may play a role in determining the overall style of a vehicle, such SSEs are far removed from the component selection process. If Yazaki, for example, bid $300/vehicle for a wire harness and Fujikura bid $350, it is hard to believe that any Design SSE would even know about it, let alone interfere with the purchasers' decision. To the extent the Parties believe that the Design SSEs were involved in selecting specific component suppliers, then the Parties' own documents – particularly those from the Defendants – would reflect that. Accordingly, absent a further showing of relevance and need, the Design SSEs do not intend to search for and produce information in response to the subpoena.

    G.    <u>Domestic Distributor SSEs of Foreign OEMs</u>

The Parties only subpoenaed one very small foreign OEM, and the subpoena to that entity should be held in abeyance as discussed in subsection H below. In some instances, however, the Parties have issued subpoenas to the distributor SSEs that are affiliated with an unsubpoenaed foreign OEM. Such distributor SSEs do not select component suppliers or purchase components. They distribute vehicles to domestic dealers. As we explained, such

---

[13] The Design SSEs include: Designworks USA; Calty Design Research, Inc.; Nissan Design America, Inc. (part of Nissan North America); and Mercedes-Benz Advanced Design of North America Inc. While the Subpoenaing Parties appear to presume in their correspondence that all Design SSEs focus on vehicle and component design, that is not the case. For example, Designworks USA provides services to an array of companies and non-commercial entities, including the U.S. Olympic Bobsled Team, leading computer and technology companies, as well as BMW Group entities.

Similarly, MB-Technology NA LLC does not fit within any of the non-OEM SSE types, as it provides engineering and consulting services to a wide variety of industries – from the automotive industry to rail transport to aerospace. In order to provide some categorization for MB-Technology NA LLC, and because it is occasionally involved in the design of equipment and components, it is identified for purposes of this letter as a Design SSE.

**Proskauer**

Page 7

SSEs are unlikely to have relevant information. Nor can the issuance of a subpoena to these entities be used to end-run the Hague Convention. As your October 14th letter acknowledged, domestic non-OEM SSEs are unlikely to have control over the data or information from foreign entities within their corporate entities. As such, we believe that subpoenas issued to the Domestic Distributor SSEs of Foreign OEMs should be held in abeyance.

In response, you disagree that the subpoena should be "limited to seeking information in the possession of the specific subpoenaed entity relating to the purchase of relevant components in the United States for vehicles sold in the United States." You cite no authority, however, for the proposition that a subpoena on a domestic subsidiary of a foreign OEM can reach the foreign OEM's documents. Likewise, while you are unwilling to "exclude data or documents based on geographic location of part purchase, manufacture, assembly, or sale," you do not claim that the Domestic Distributor SSEs are involved in part purchases or component selection or pricing decisions. Nor do you claim that the Domestic Distributor SSEs are involved in the manufacture or assembly of vehicles. Put simply, there is no basis for seeking upstream purchasing information from the Domestic Distributor SSEs. Accordingly, absent a further showing concerning the identity of the specific upstream purchasing information you believe each Domestic Distributor SSE is likely to have, the Domestic Distributor SSEs do not intend to produce information concerning the upstream purchasing of components.

As for downstream sales information, the Domestic Distributor SSEs would only have information concerning the transfer of vehicles from foreign OEMs to the domestic distributor SSE, and then the sale of such vehicles to their dealer network. As to the former, internal transfer prices are wholly irrelevant to the issues in the case. As to the latter, the Parties are in somewhat of a box. If you contend that you have sufficient upstream purchasing information to make the production of downstream sales information from these Domestic Distributor SSEs relevant, then you don't need the upstream purchasing information you are requesting from the OEM SSEs. If you contend that you lack sufficient upstream purchasing information – and thus need such information from the OEM SSEs – then you don't need the downstream purchasing information from the Domestic Distributor SSEs, since you can't get the upstream purchasing information from the non-subpoenaed foreign OEMs.

In any event, as noted below, most of the downstream purchasing information the Parties seek is not relevant and unduly burdensome. That said, in the spirit of compromise, to the extent such information is readily-accessible in currently maintained databases, the Domestic Distributor SSEs (other than the Smaller SSEs) are prepared to produce information showing a schedule of MSRPs for each make and model of vehicle they sold to dealers in the United States for up to the last 10 years.[14]

---

[14] These Domestic Distributor SSEs include: Kia Motors America, Inc.; Hyundai Motor America; Nissan North America Inc.; and Mercedes-Benz USA, LLC. By this offer, we do not waive any objections to downstream discovery that some of us have already formally preserved through written objections, or any objections we may raise in the future.



Page 8

      H.      <u>Smaller SSEs</u>

In your October 14th letter, the Parties proposed withdrawing the subpoena for OEMs with less than 10,000 annual vehicle sales. As we explained, however, this constitutes less than 6/100ths of 1% of the 18 million annual sales in the U.S. As we also noted, the Parties have not explained how, if at all, the omission of data from small OEMs, such as those with less than 5% market share, would impact any statistical or regression models relevant to any issue in this case. In response, you simply call the 5% threshold "arbitrary" and express a preference for your arbitrary 0.06% threshold instead. Based on this threshold, you agreed to hold in abeyance the subpoenas issued to Rolls-Royce Motors Cars NA, LLC and Maserati N.A., Inc.

We agree that there is no bright line as to where the cut-off should be for small OEMS, but at a minimum, subpoenas should be held in abeyance for SSEs with less than 3% of the U.S. vehicle sales market over the proposed production period. These entities fall below (and in some cases well below) the market share of the "highly relevant" SSEs you raised concerns about in your November 24 letter, and are likely to be within the range of the margin of error for any statistical model you purport to rely upon. Based on 2014 vehicle sales data assembled by Automotive News, these entities include the following SSEs whose sales all fall below one half of 1% of the U.S. automotive market: Bentley Motors Inc. (0.0%); Automobili Lamborghini America LLC (0.0%); Porsche Cars North America, Inc. (0.3%); Jaguar Land Rover North America LLC (0.1% for Jaguar and 0.3% for Land Rover); Aston Martin Lagonda of North America, Inc. and Aston Martin Lagonda Limited (0.0%)[15]; Volvo Cars of North America (0.3%); and Mitsubishi Motors North America, Inc. (0.5%) (Mitsubishi entities join as SSEs with this correspondence); as well as the following entities whose sales fall below the 3% threshold: Audi of America LLC (1.1%); Volkswagen of America, Inc. (2.2%); and BMW of North America, LLC and BMW (US) Holding Corp. (2.1% for BMW and 0.3% for MINI). These entities also include Subaru of Indiana Automotive, Inc. ("SIA"), whose sales fall well below 3% of the U.S. automotive market over the proposed production period.[16]

Also, with the exception of Aston Martin Lagonda Limited and SIA, we note that each of these entities is a non-OEM distributor SSE. As such, they are not involved in the purchase or pricing of components. Accordingly, absent a further showing of relevance and need, the Smaller SSEs identified above do not intend to search for and produce information in response to the subpoena.

---

[15] We note that Aston Martin and Lamborghini had lower 2014 sales than others for whom subpoenas were held in abeyance, and well below the 10,000 annual sales threshold initially proposed by the Parties. Indeed, Aston Martin was not even listed in the Wall Street Journal article cited in your November 24 letter as evidence of the respective entities' U.S. market share.

[16] Subaru of America, Inc. is also a Smaller SSE, as its market share was below 3% for the vast majority of the proposed production period (until late 2014).



Page 9

## 2. *OEM SSEs*[17]

### A. Upstream Purchasing Data

As our October 29th letter noted, the Parties have conceded that they already possess the purchasing information from each of the defendant suppliers, which includes over 140 entities and covers over 55 components. In response, you do not deny this. Instead, in your November 24th letter you present two arguments to justify your demands.

*First*, you argue that the OEM SSEs ought to produce purchasing information already in the Parties' possession because you do not have the OEMs' internal part numbers. This is unsound for a number of reasons. As you know, when component suppliers bid for a specific RFP, they are bidding for a specific make and model of vehicle. Accordingly, the Defendant suppliers should know – either exactly or to a close approximation – for which vehicles their components are used. For example, if Yazaki won the bid for the wire harness of the Ford F-150, and it produced 200,000 wire harnesses for it in 2010, an OEM part number is completely unnecessary for the Parties or their experts to estimate the effects of the conspiracy on the price of the Ford F-150. You do not deny this. Instead, you simply assert that it should be just as easy to pull transactional data for the Defendant-suppliers as for the non-Defendant-suppliers. That is not necessarily true. The Parties' litigation-driven definition of relevant components does not align with the internal categories that different OEMs use. Thus, for most SSEs, pulling information by supplier is easier than pulling information by component, and pulling information for a limited number of entities is easier than pulling information for a larger number.

*Second*, you argue that the "Parties do not have access to SSEs' purchasing data from non-Defendant suppliers." As we noted, however, non-defendant suppliers are "unlikely to constitute a substantial portion of the market and would not be an appropriate benchmark for any pricing model." As we explained, the pricing of non-defendant suppliers would also likely be affected by the conspiracy, since any such conspiracy would inflate the overall market prices for the components. You offer no response. Instead, you simply noted that there are unspecified OEMs that did not buy any relevant components from any Defendant. Who are these OEMs? What components do they encompass? Certainly, the Defendants, who dominate their respective markets and who collectively participate in all or most RFPs, would know which OEMs

---

[17] The OEM SSEs that are prepared to produce documents as indicated in this letter include: FCA US LLC; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Hyundai Motor Manufacturing Alabama, LLC; Kia Motors Manufacturing Georgia, Inc.; General Motors LLC; American Honda Motor Co., Inc.; Honda North America, Inc.; Honda Manufacturing of Indiana, LLC; Honda of America Mfg., Inc.; Daimler North America Corporation (MI); Daimler North America Corporation (NJ); and Daimler Purchasing Coordination Corporation.

SSEs who are involved in vehicle assembly, but for whom the subpoenas should be held in abeyance include: BMW Manufacturing Co., LLC, which operates an assembly plant in South Carolina primarily for the manufacture of vehicles for export (approximately 70% of its vehicles are exported and in 2014, its largest production year, vehicles destined for the U.S. market amounted to less than 7/10ths of 1% of U.S. vehicle sales); Mitsubishi Motors North America, Inc.; Subaru of Indiana Automotive, Inc.; and Aston Martin Lagonda (which manufactures vehicles in the United Kingdom and whose U.S. sales are extremely negligible as discussed in Section 1.H).



Page 10

purchase exclusively from non-Defendant suppliers and who these non-Defendant suppliers are. It is simply not appropriate to send the OEMs off on a wild goose chase in the hope that there are some non-Defendant suppliers that supplied some *subpoenaed* OEM and that the resulting data might be used as an appropriate benchmark.[18]

As noted, however, in the spirit of compromise, if the Parties agree to provide a list, by component, of the specific non-Defendant entities that supply each component (in the form attached as Exhibit A), the OEM SSEs are prepared to produce[19] – to the extent readily available from currently maintained purchasing databases – information for up to the last 10 years that identifies for each such entity: (i) the date of component purchase, (ii) the part description, (iii) the quantity purchased, and (iv) price paid. After the Parties produce the list identified in Exhibit A, the OEM SSEs will also individually confer with the Parties to determine whether the purchasing database contains other relevant fields that can be produced without requiring additional work.[20] This offer of production shall constitute a complete response to the requests seeking upstream purchasing transactional data.

### B. Upstream Non-Transactional Documents Concerning Purchases or RFPs

In our October 29, 2015 letter, we explained that the parties have failed to demonstrate a particularized need for non-transactional purchasing data, such as documents relating to specific RFPs. In response, you simply assert that such documents are "highly relevant" because they may bear on which supplier won the bid. As you acknowledge, however, such documents are ***completely irrelevant*** to the issue of pass-through of any overcharges.[21]

As we noted, even as to the issue of the initial overcharge, the documents are of only marginal relevance at best. Such documents are completely irrelevant to the issue of whether the Defendants engaged in a conspiracy to fix prices. They are completely irrelevant to the issue of

---

[18] Your letter concedes that the Parties' economists have not determined that data from non-Defendant suppliers can serve as an appropriate benchmark. *See* November 24th Ltr. at 7 (noting that the "Parties' [undisclosed] economic experts are in the best position to comment on whether non-Defendant suppliers can serve as an appropriate benchmark," but claiming they cannot comment on this issue "without looking at the underlying data").

[19] This offer is subject to any applicable non-disclosure obligations. It also contemplates further meet and confers with individual OEMs as necessary depending on the burden presented to individual OEMs by the Parties' list of non-Defendant entities.

[20] Many of the items in Request 1, for example, would impose inordinate levels of burden. For example, Request 1(f) asks for information sufficient to track each component from shipment through installation and vehicle delivery, down to the specific vehicle sold. At least for many OEMs, compiling this information would require hundreds of person-hours.

[21] The Parties already possess much of the information they are requesting. For example, Request 3 seeks information sufficient to show any agreement with any supplier of a component. This is information that the Defendant suppliers already possess. Absent some showing that the few agreements with non-Defendant OEMs are needed to establish either the amount of the *Defendants'* overcharge or the amount of pass-through, the OEM SSEs do not intend to search for and produce information in response to Request No. 3. Likewise, to the extent a Defendant agreed to an MFN clause with an OEM (*see* Request No. 30), the Defendants would already have such information.



Page 11

the scope of the conspiracy and which RFPs the defendants coordinated on illegally. Moreover, such RFP documents have little bearing on the amount of the overcharge. As we explained, an OEM's "target prices" – the key piece of information the Parties say they don't have – do not speak to what the prices would have been absent the conspiracy, since the point of competition is to drive prices below the target and because a long-running conspiracy can affect target prices as much as final prices. In addition, the Parties already have access to substantial information – both qualitative and quantitative – on the issue of the initial overcharge. Qualitatively, the Defendants' own documents generally contain extensive discussion – indeed, often have a play-by-play – of the RFP process. Thus, the reasons why a particular supplier won or lost an RFP should be clear from the information in the Parties' own possession. Quantitatively, the Parties and their economists have substantial data that enables them to reasonably estimate the amount of the overcharge.

Indeed, the fact that the Direct Purchasers have expressed no interest in these types of documents suggests that such documents are not needed in order to litigate the issues in this case. Your only response, that the SSEs' obligations under the subpoena are not dictated by whether the Direct Purchasers joined in the request, misses the point. While the Parties' power to issue a subpoena may not be affected by how many issuing Parties there are, the fact that the Direct Purchasers – who have perhaps the greatest interest in establishing the amount of the overcharge – have declined to join in your request means that the information is not relevant and does not satisfy the rule of proportionality.

Finally, we note that searching for and producing documents relating to every RFP issued in the last 20 years covering virtually every vehicle manufactured in America (and potentially elsewhere) is incredibly burdensome, and would require searches of untold numbers of custodians. Indeed, given the level of employee mobility within each OEM, just the investigation of which custodians ought to be searched, for which time periods, and which components would be an incredible and unprecedented burden. Accordingly, absent a further showing and narrowing of these requests, the OEM SSEs will not search for non-transactional upstream purchasing information.[22]

### C. *Downstream Sales Information*

In our October 29th letter, we explained that the Parties had failed to address the issues we raised concerning downstream discovery, and your demand for virtually every piece of

---

[22] You characterize your demand that the OEM SSEs make rolling productions and engage in consecutive searches as an "offer to prioritize" your requests. It is apparent, however, that your "proposal" is designed more to help the Parties meet their own case deadlines than to alleviate the SSEs' burden. Indeed, as we previously explained on multiple occasions, your proposal would require successive searches for information and thus substantially increases the SSEs' burden. Accordingly, the SSEs decline your offer for the third time.



Page 12

information bearing on the value, pricing, or nature of the transaction for every vehicle sold in America over the last 20 years.[23]

Specifically, we noted that your request conflicts with the existing discovery orders in this case. As the Parties themselves have noted, "downstream data [has been] already determined to be non-discoverable by the Special Master" each time the he has been presented with the issue. You do not deny this. Instead, you claim that you have the right to take another shot because the Special Master "has not [specifically] ruled on production of sales data *from OEMs*." While that may be correct as a matter of collateral estoppel, it does not justify your disregard of the clear import of the Special Master's decisions: that downstream information that is not directly tied to component prices "'is irrelevant, not likely to lead to the discovery of relevant information,' and its production would be unduly 'burdensome.'" Oct. 29th Ltr. at 6 (quoting Dkts. 338, 331, 352, 12-cv-102).

Your only claim of need is that "detailed sales data" is needed to isolate the effects of a change in a particular component's prices. But you provide no support for such a sweeping conclusion. As noted, there is no reason to believe that insurance prices, banking and capital prices, or finance and credit charges were in anyway impacted by the alleged conspiracy. There is, therefore, no need to obtain data on such issues in order to conduct a reliable regression to isolate the effects of the alleged conspiracy.[24]

Moreover, information about vehicle pricing is extremely competitively sensitive. As such, the OEM SSEs do not intend to produce a database containing vehicle prices for every vehicle they have sold over the last 20 years.

In the spirit of compromise, however, the OEM SSEs are prepared to produce a schedule of MSRPs for each make and model of vehicle sold for up to the last 10 years. Such information should suffice for the Parties' economists to determine the extent to which a particular component's prices affected vehicle sales prices.

D. *Documents Produced to Regulatory Authorities*

Request 27 seeks all documents and data produced to any regulatory or government authority concerning any relevant component. This request is not limited to documents related to

---

[23] In our October 29th letter, we requested that the Parties hold in abeyance Request 22, which purports to require a burdensome custodian search for all pricing communications with any group of dealers. According to your chart of "narrowed" request, the Parties apparently rejected our proposal without explanation and continue to seek compliance with Request 22. Certainly, the production of such non-transactional information would add nothing to any downstream *transactional* data that may be produced. And to the extent such transactional data need not be produced because of burden, relevance, or otherwise, the same considerations would apply with greater force to Request 22. Accordingly, absent a further showing, the OEM SSEs will not search for non-transactional downstream purchasing information.

[24] Because information relating to finance charges is wholly irrelevant for reasons stated above, the OEM SSEs do not intend to produce their "disaggregated transactional data" for "financed" vehicles in response to Request 34 or otherwise.



Page 13

the alleged conspiracies. Thus, it is facially overbroad. It appears, however, that the Parties are most interested in documents, if any, that the SSEs produced to the DOJ in connection with the conspiracies at issue in this case. We expect that the Parties may have obtained this information from the DOJ, but if not, the SSEs who made such a production are prepared, as described above (*see supra* pg. 2), to make relevant portions of those productions available to the Parties, contingent on reaching a comprehensive agreement on the scope of the subpoena and protective order, the reimbursement of costs, and provided the DOJ has no objection to the production of such documents (*e.g.*, DOJ has stated its investigation is complete relating to a particular part or supplier).[25]

  E.  *Documents Relating to Settlement Discussions.*

Request 31 seeks all documents relating to any "negotiations or communications with any of the Defendants … in connection with … the facts described in any Plaintiffs' Complaints." The Parties, themselves, disagree on whether such a request is permissible. Regardless, to the extent Request 31 seeks communications with any Defendant, if it is discoverable, it may be obtained directly from the Defendants themselves. To the extent the request goes beyond such communications, such information would be unequivocally privileged. Accordingly, the SSEs do not intend to search for and produce information in response to Request 31.

**3.**  *Costs*

As our October 29th letter explained, we do not intend to begin searching for and producing documents until an agreement on costs has been reached. We also requested that the Parties agree to reimburse the SSEs for all costs, including all out-of-pocket costs and all attorneys' fees, and provide fair compensation for any additional employee resources that must be devoted to this project. To the extent you have concerns about reimbursement generally or any categories of reimbursable expenses, we asked you to set forth your position and present a counter-proposal.

You declined. Instead, you claimed an inability to engage in a discussion on costs until after the SSEs present an estimate of the costs and expenses of compliance. But there is no way to estimate the costs of compliance until the scope of the subpoena is resolved. While we do not believe that this should prevent the parties from discussing generally the types of expenses that would be reimbursable, we cannot force you to participate in a discussion you are unwilling to have. Accordingly, we will place the discussions of costs on hold until after the scope of the subpoena has been resolved.

Your letter, however, suggests that the SSEs are required to begin searching for and producing documents prior to an agreement on costs. That is incorrect. Rule 45 specifically relieves subpoenaed parties from searching for and producing documents until after all objections have been resolved and the court has issued an order on costs. See Fed. R. Civ. P.

---

[25] SSEs' productions will be limited to any documents or data maintained in the ordinary course of business that were produced to the DOJ.



Page 14

45(d)(2) ("if an objection is made … the serving party may move for an order compelling production [and] these actions may be required only as directed in the order" after "protect[ing] a person … from significant expense."). As we noted, some courts have actually held that non-parties waive their right to reimbursement if they produce documents without an agreement or order on costs. You cite no case to the contrary.

**4.** *Path Forward*

As noted in our October 29th letter, we believe that the Parties and the SSEs should work towards a master document that sets forth our agreements as to any common issues, and identifies those areas for which we have reached impasse. We continue to believe that this is the best way to proceed, and we trust that the offers of production in this letter will go a long way towards reaching an agreeable compromise on all aspects of the subpoena. We look forward to hearing from you.[26]

Sincerely,

*Colin Kass*

---

[26] As noted in our October 29th letter, the issues raised here is not a comprehensive discussion of all objections to and issues with the Subpoena, and we do not waive any objections some of us have already formally preserved through written objections, and any objections we may raise in the future.

# **Exhibit A**

**Component:**_____

| **Non-Defendant Entity** | **OEM Supplied / RFP Bid (if known)** |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

2

**Component:**_____

| Non-Defendant Entity | OEM Supplied / RFP Bid (if known) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |