UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311<br>Hon. Marianne O. Battani |
| ALL PARTS | |
| THIS CASE RELATES TO:<br>ALL CASES | |

### AFFIDAVIT OF PAUL FALETE

STATE OF MICHIGAN    )
                     ) ss
COUNTY OF OAKLAND    )

The undersigned, Paul Falete, being duly sworn, deposes and says:

1. I am presently employed by Delphi Automotive Systems, LLC ("Delphi") as the Sales Director, Delphi Electrical Electronic Distribution Systems (DEEDS), North America. I make this Affidavit from my own personal knowledge and the same is true to the best of my knowledge, information and belief.

2. My responsibilities at Delphi include managing the Sales Function Group, approving all DEEDS quotation packages, developing and hiring talent, and developing processes for the customer business unit teams.

3. Since approximately January 2015, I have participated in meetings and conference calls regarding the voluminous requests from Furukawa and

other parties relating to Delphi's wire harness business.

4. In June 2015, I was made aware of a joint set of requests (Requests) from counsel representing Furukawa and certain plaintiffs (Tab # 01). I was also made aware early in 2016 that only counsel for Furukawa remained interested in collecting information sought by the Requests.

5. I participated in various meetings and calls regarding the Requests and was part of a team tasked with determining whether the information sought by the Requests was available, where it would be located, and the effort that would be required to collect and provide information responsive to the requests.

6. Due to the breadth and scope of the Requests, our team determined the following estimates for certain Requests:

   a. The Requests sought Delphi's transactional data concerning sales of wire harness products. The review of transactional data involves many terabytes of data of extremely confidential data. Delphi proposed extracting the data from 2006-2014 and assigning a knowledgeable Delphi employee to assist a 3rd party, selected by Furukawa subject to Delphi's approval, in its review of the data at a cost of $75.00 per hour.

   b. The Requests also sought monthly summary sales reports for sales of wire harness products. The timing and cost to search for, review, and produce sales summaries would take a knowledgeable Delphi employee approximately four weeks of work with a week of anticipated questions. We arrived at the formula of 160 hours x $75.00 = $12,000. This data contains highly proprietary information regarding Delphi's entire wire harness business.

   c. In addition, the Requests sought Delphi's internal management review

packages submitted to the Delphi Pricing Review Group (DPRG) for approval of bids in response to quotes for wire harness products. The timing and cost to search for, review, and produce DPRG packages would take a knowledgeable Delphi employee approximately two to four weeks of work. We arrived at the formula of 80/160 hours x $75.00 = $6,000/$12,000. The DPRG packages explain in great detail Delphi's internal pricing process, which is highly confidential.

   d. It was determined DPRG packages, as well as other information collected, would need to be reviewed for relevance and privilege by contract attorney reviewers hired by Delphi at a rate of $32.00 per hour (with no mark up on the rate to Furukawa).

   e. Delphi has no custody or control over some of the information sought by Furukawa.

7. The requests from Furukawa, *a competitor of Delphi*, seek highly confidential and privileged information regarding Delphi's entire wire harness business.

8. In addition, the undertaking of collecting, reviewing, processing and producing information responsive to these requests would be in addition to many Delphi employees' normal work responsibilities and would place a substantial and unreasonable burden on those assigned to this task.

Further deponent sayeth not.

_____
Paul Falete

Subscribed and sworn to before
me this 14th day of March, 2016.

MICHELLE A. MCGANN
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Apr 2, 2021
ACTING IN COUNTY OF OAKLAND

# Susman Godfrey L.L.P.

a registered limited liability partnership

SUITE 5100
901 MAIN STREET
DALLAS, TEXAS 75202-3775
(214) 754-1900
FAX (214) 754-1933
www.susmangodfrey.com

---

| | | | |
|---|---|---|---|
| Suite 5100 | Suite 950 | Suite 3800 | 15th Floor |
| 1000 Louisiana Street | 1901 Avenue of the Stars | 1201 Third Avenue | 560 Lexington Avenue |
| Houston, Texas 77002-5096 | Los Angeles, California 90067-6029 | Seattle, Washington 98101-3000 | New York, New York 10022-6828 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 | (212) 336-8330 |

Omar Ochoa
Direct Dial (214) 754-1913

E-Mail OOchoa@susmangodfrey.com

June 1, 2015

Larry S. Gangnes
Lane Powell PC
1420 Fifth Ave, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
GangnesL@LanePowell.com

Joseph E. Papelian
Delphi Legal – Litigation
5725 Delphi Drive
Troy, MI 48098
Joseph.E.Papelian@delphi.com

RE:   *In re Automotive Parts Antitrust Litigation*

Dear Sirs:

This is to follow up regarding the discovery requests given to Delphi on December 3, 2014 (the "Original Discovery Requests"). Based on discussions between Delphi and the Plaintiffs in the Automotive Parts Antitrust Litigation (the "Plaintiffs"), and the presentation provided by Delphi on February 5, 2015, the Plaintiffs have narrowed the discovery requests to the following:

(1) Sourcing Files:

- All documents included in sourcing files that are reasonably available and relate to Wire Harness Products sold from January 1, 1998 through the present. Based on information provided by Delphi, the sourcing files should include at least:

    (a) Internal management review packages submitted to the Delphi Price Review Group (the "DPRG") for approval of bids in

TAB 01

June 1, 2015
Page 2

    response to Requests for Quotes ("RFQs") for Wire Harness Products,

  (b) Requests for procurement from customers and quote packages sent to customers in response to procurement requests for Wire Harness Products, both for business Delphi did and did not win

  (c) Supplier agreements entered into for successful bids

  (d) Preferred supplier agreements, such as the Aligned Business Framework-related agreements.

  (e) Internal and external communications, including e-mails—

  (f) Financial and price ladder analyses, and

  (g) Documents related to APR requests and other discount requests

- If the above elements do not exist in sourcing files, please advise the parties. The parties request that these materials be produced from other sources to the extent they do not exist in sourcing files.

- Please also provide sufficient information to explain any fields used, codes used, methods used, or data contained in the sourcing files.

(2) Transactional Data and Documents:

- Transactional data that are kept in your SAP database (or other electronic databases if not available in SAP), are reasonably available, and concern your sales (or purchases from a contract manufacturer or supplier) of Wire Harness Products from January 1, 1996 through the present. To the extent available, each transaction record should include:

  (a) product type;

  (b) product description, including the model, make, and model year of the vehicle(s) for which the product was intended, geographic market for which the vehicle was intended, and whether the product was an original equipment or replacement part;

  (c) total sales amount;

  (d) quantity (units) (for each part number of Wire Harness Products sold and for each OEM model supplied, the quantity you sold your customers, including, but not limited to, OEMs and Tier 1,2 and 3 suppliers);

  (e) unit price (for each part number of Wire Harness Products sold and for each OEM model supplied, the prices you charged your customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers) and

June 1, 2015
Page 3

    the prices your customers paid for Wire Harness Products, including any discounts, rebates, other payments, or other incentives you made or provided to your customers);

(f) any costs (e.g., total cost, variable cost, materials cost, fixed cost, semi-variable cost, marginal cost, standard cost, research and development costs, engineering costs, plant and equipment investment for any plant or equipment used to produce the product) to you associated with the product;

(g) sales date;

(h) adjustments, including but not limited to, discounts, rebates, credits, and debits in the manner provided whether by product or by total sale;

(i) descriptions of such adjustments;

(j) currency and exchange rate;

(k) product identifier or code;

(l) part number for each product;

(m) monetary components of the transaction beyond unit price (i.e., sales tax, shipping or delivery fees);

(n) purchaser, including all Customer information, including, but not limited to, customer ID number, sold to name, sold-to address, and ship-to name and address (if not on invoice);

(o) purchaser invoice-to (including bill-to and sold-to) and ship-to information, including all purchaser address information;

(p) location(s) to which product and invoice were sent;

(q) the legal entity making the sale;

(r) location of sale;

(s) invoice number;

(t) all other information included on invoices issued during the relevant period;

(u) all information related to any return or refund; and

(v) all information related to rebates, discounts and free goods including information sufficient to tie them to sales transactions

(x) plant and capacity utilization rates for any plant you used to produce Wire Harness Products

June 1, 2015
Page 4

      (y) quantity of each part number of Wire Harness Products you produced from any plant you used to product Wire Harness Products

      (z) Revenues (gross and net of any discounts and rebates) for each part number of Wire Harness Products you produced and for each customer to whom you sold Wire Harness Products

      (aa) Cost tables you prepared for your own use or for the use of a customer or potential customer

(bb) Profits, losses, and margins (gross and net) for each type of Wire Harness Products you produced and for each customer for which you produced Wire Harness Products from any plant you used to produce Wire Harness Products;

(cc) Financial records (e.g., general ledger data, balance sheets, income statements) relating to your Wire Harness Products business;

(dd) Customer information, including, but not limited to customer number, products sold, quantity sold, net and gross price charged, sold-to name, and ship-to name and address, sales terms, ship to and sold to parent company, and identification of subsidiaries, affiliates, and joint ventures;

(ee) Average cost of producing each type of Wire Harness Product for each customer and for each model vehicle

(ff) Bids and other prices you submitted to your customers or potential customers (including, but not limited to, OEMs and Tier 1, 2, and 3 suppliers) to produce and supply Wire Harness Products

- Please also provide sufficient explanation of any fields used, codes used, methods used, or data contained in the transactional data requested above, including but not limited to, part decoders, customer code legends, or supplier code legends, adjustment code legends, or description code legends.

(3)    Strategic and Business Plans

- Your business plans and strategic plans that are reasonably available and that relate to Wire Harness Products sold from January 1, 1998 through the present. To the extent any business or strategic plan covers other automotive products in addition to Wire Harness Products, the Wire

June 1, 2015
Page 5

        Harness Product information can be separated and produced on its own provided that the information is self-contained and does not require referencing other product information for a full understanding of the Wire Harness Product business or strategic plan.

- Please also provide other information sufficient to explain any fields used, codes used, or data contained in the business or strategic plans.

(4) Documents regarding Delphi's pricing policies and the training and instruction provided to employees regarding bidding and setting prices submitted to OEMs and other purchasers or potential purchasers, as well as determining discounts and price reductions for Wire Harness Products, from January 1, 1998 through the present.

(5) Documents comparing Delphi to its competitors with regard to prices, Wire Harness Product features, costs, RFQ results and profits from January 1, 1998 through the present.

(6) Studies, reports, or analyses in Delphi's possession comparing the prices of Wire Harness Products to the prices of vehicles from January 1, 1998 through the present.

Sincerely,

Omar Ochoa