```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                          —    —    —

 4   IN RE:  AUTOMOTIVE PARTS         Master File No. 12-02311
     ANTITRUST LITIGATION
 5   _____    Hon. Marianne O. Battani

 6   ALL PARTS

 7   _____

 8
                            MOTION HEARINGS
 9
                 BEFORE THE HONORABLE MARIANNE O. BATTANI
10                     United States District Judge
                   Theodore Levin United States Courthouse
11                     231 West Lafayette Boulevard
                           Detroit, Michigan
12

13   APPEARANCES:

14
     Direct Purchaser Plaintiffs:
15
     DAVID H. FINK
16   FINK & ASSOCIATES LAW
     100 West Long Lake Road, Suite 111
17   Bloomfield Hills, MI  48304
     (248) 971-2500
18

19   GREGORY P. HANSEL
     PRETI, FLAHERTY, BELIVEAU &
20   PACHIOS, L.L.P.
     One City Center
21   Portland, ME  04112
     (207) 791-3000
22

23   EUGENE A. SPECTOR
     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
24   1818 Market Street, Suite 2500
     Philadelphia, PA  19103
25   (215) 496-0300
```

```
 1    APPEARANCES:   (Continued)

 2    End-Payor Plaintiffs:

 3    DEVON ALLARD
      THE MILLER LAW FIRM, P.C.
 4    950 West University Drive, Suite 300
      Rochester, MI  48307
 5    (248) 841-2200

 6
      JOYCE CHANG
 7    COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
 8    Burlingame, CA  94010
      (650) 697-6000
 9
10    WILLIAM V. REISS
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
11    601 Lexington Avenue, Suite 3400
      New York, NY  10022
12    (212) 980-7405

13
      ELIZABETH T. TRAN
14    COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
15    Burlingame, CA  94010
      (650) 697-6000
16
17    STEVEN N. WILLIAMS
      COTCHETT, PITRE & McCARTHY, L.L.P.
18    840 Malcolm Road
      Burlingame, CA  94010
19    (650) 697-6000

20
      Dealership Plaintiffs:
21
22    ALEXANDER E. BLUM
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
23    1361 East Big Beaver Road
      Troy, MI  48083
24    (248) 457-9200

25
```

```
 1

 2    APPEARANCES: (Continued)

 3    Dealership Plaintiffs:

 4    JONATHAN W. CUNEO
      CUNEO, GILBERT & LaDUCA, L.L.P.
 5    507 C Street NE
      Washington, D.C.  20002
 6    (202) 789-3960

 7

 8    GERARD V. MANTESE
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
 9    1361 East Big Beaver Road
      Troy, MI  48083
      (248) 457-9200
10

11    ANDREW R. SPERL
      DUANE MORRIS, L.L.P.
12    30 South 17th Street
      Philadelphia, PA  19103
13    (215) 979-7385

14    For the Defendants:

15    RACHEL ADCOX
      AXINN, VELTROP & HARKRIDER
16    950 F Street, NW
      Washington, D.C. 20004
17    (202) 912-4700

18

19    JEFFREY J. AMATO
      WINSTON & STRAWN, L.L.P.
20    200 Park Avenue
      New York, NY  10166
      (212) 294-4685
21

22    BRUCE ALLEN BAIRD
      COVINGTON & BURLING, L.L.P.
23    850 Tenth Street, NW
      Washington, D.C. 20001
24    (202) 662-5122

25
```

```
 1

 2    APPEARANCES: (Continued)

 3    For the Defendants:

 4    MICHAEL G. BRADY
      WARNER, NORCROSS & JUDD, L.L.P.
 5    2000 Town Center, Suite 2700
      Southfield, MI  48075
 6    (248) 784-5032

 7

 8    JEREMY CALSYN
      CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
 9    2000 Pennsylvania Avenue NW
      Washington, D.C.  20006
10    (202) 974-1500

11    PATRICK J. CAROME
      WILMER HALE
12    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
13    (202) 663-6610

14

15    STEVEN F. CHERRY
      WILMER HALE
16    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
17    (202) 663-6321

18    HEATHER SOUDER CHOI
      BAKER BOTTS, L.L.P.
19

20    MICHAEL R. DEZSI
      DETTMER & DEZI, P.L.L.C.
21    615 Griswold Street, Suite 1600
      Detroit, Michigan 48226
22    (313) 879-1206

23

24    DAVID P. DONOVAN
      WILMER HALE
      1875 Pennsylvania Avenue, NW
25    Washington, D.C.  20006
      (202) 663-6868
```

```
 1
 2    APPEARANCES: (Continued)
 3    For the Defendants:
 4    ABRAM ELLIS
      SIMPSON, THACHER & BARTLETT, L.L.P.
 5    1155 F Street, N.W.
      Washington, D.C. 20004
 6    (202) 636-5579
 7
 8    MICHAEL FELDBERG
      ALLEN & OVERY, L.L.P.
 9    1221 Avenue of the Americas
      New York, NY  10020
10    (212) 610-6360
11    DANIEL T. FENSKE
      JENNER & BLOCK
12    353 N. Clark Street
      Chicago, IL 60654-3456
13    (312) 222-9350
14
15    ADAM C. HEMLOCK
      WEIL, GOTSHAL & MANGES, L.L.P.
      767 Fifth Avenue
16    New York, NY  10153
      (212) 310-8281
17
18    MAURA L. HUGHES
      CALFEE, HALTER & GRISWOLD, L.L.P.
19    1405 East Sixth Street
      Cleveland, OH  44114
20    (216) 622-8335
21
      HOWARD B. IWREY
22    DYKEMA GOSSETT, P.L.L.C.
      39577 Woodward Avenue, Suite 300
23    Bloomfield Hills, MI  48304
      (248) 203-0526
24
25
```

```
 1

 2    APPEARANCES: (Continued)

 3    For the Defendants:

 4    FRANK LISS
      ARNOLD & PORTER, L.L.P.
 5    555 Twelfth Street NW
      Washington, D.C. 20004
 6    (202) 942-5969

 7

      SHELDON H. KLEIN
 8    BUTZEL LONG, P.C.
      41000 Woodward Avenue
 9    Bloomfield Hills, MI  48304
      (248) 258-1414
10

11    MARK MILLER
      BAKER BOTTS, L.L.P.
12

13    W. TODD MILLER
      BAKER & MILLER, P.L.L.C.
14    2401 Pennsylvania Avenue NW, Suite 300
      Washington, D.C.  20037
15    (202) 663-7822

16

      BRIAN M. MOORE
17    DYKEMA GOSSETT, P.L.L.C.
      39577 Woodward Avenue, Suite 300
18    Bloomfield Hills, MI  48304
      (248) 203-0772

19

20    GEORGE A. NICOUD, III
      GIBSON, DUNN & CRUTCHER, L.L.P.
21    555 Mission Street
      San Francisco, CA  94105
22    (415) 393-8200

23

      J. DAVID ROWE
24    DUBOIS, BRYANT & CAMPBELL
      303 Colorado, Suite 2300
25    Austin, TX 78701
      (512) 457-8000
```

1

2    APPEARANCES: (Continued)

3    **For the Defendants:**

4    CRAIG SEEBALD
     **VINSON & ELKINS, L.L.P.**
5    2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, D.C.  20037
6    (202) 639-6585

7

8    MICHAEL R. SHUMAKER
     **JONES DAY**
     51 Louisiana Avenue NW
9    Washington, D.C.  20001
     (202) 879-4676

10

11   MICHAEL LEONARD SIBARIUM
     **PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.**
12   1200 Seventeenth Street, NW
     Washington, D.C. 20036-3006
13   (202) 663-9202

14

     ANITA STORK
15   **COVINGTON & BURLING, L.L.P.**
     One Front Street
16   San Francisco, CA  94111
     (415) 591-7050

17

18   MARGUERITE M. SULLIVAN
     **LATHAM & WATKINS, L.L.P.**
19   555 Eleventh Street NW, Suite 1000
     Washington, D.C.  20004
20   (202) 637-2200

21

     JOANNE GEHA SWANSON
22   **KERR, RUSSELL & WEBER, P.L.C.**
     500 Woodward Avenue, Suite 2500
23   Detroit, MI  48226
     (313) 961-0200

24

25

```
 1
 2    APPEARANCES: (Continued)
 3    For the Defendants:
 4    JOHN TANSKI
      AXINN, VELTROP & HARKRIDER
 5    950 F Street, NW
      Washington, D.C. 20004
 6    (202) 912-4700
 7
      GEORGE WANG
 8    SIMPSON, THACHER & BARTLETT, L.L.P.
      1155 F Street, NW
 9    Washington, D.C. 20004
      (202) 636-5579
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          TABLE OF CONTENTS

 2                                                           Page

 3   Motion to Consolidate Claims and Amend
     Complaints.......................................12
 4

 5   Motion to Modify, and Objections to, Order of
     Special Master Denying Defendants Motion to
 6   Compel Documents From Rush Truck Plaintiffs.......98

 7

 8

 9

10

11

12

13   EXHIBITS:                                          Received
     (No exhibits offered)
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Detroit, Michigan
 2   Tuesday, March 15, 2016
 3   At about 10:04 a.m.
 4                         —    —    —
 5           (Court, Counsel and parties present.)
 6           THE CASE MANAGER:  Please rise.
 7           The United States District Court for the Eastern
 8   District of Michigan is now in session, the Honorable
 9   Marianne O. Battani presiding.
10           You may be seated.
11           The Court calls In Re: Automotive Parts Multiple
12   District Litigation, 12-2311.
13           THE COURT:  Good morning.
14           THE ATTORNEYS:  (Collectively) Good morning.
15           THE COURT:  I am surprised to see everybody here
16   but welcome.  Let's see.  Who is -- I guess we know who but
17   we will do appearances.  Let's do the first motion, the
18   motion to consolidate and amend.
19           MS. SULLIVAN:  Your Honor, Marguerite Sullivan from
20   Latham Watkins on behalf of Weastec.
21           Before Mr. Williams' begins his argument, I have
22   one housekeeping matter.
23           THE COURT:  All right.
24           MS. SULLIVAN:  The defendants have divided up the
25   argument among us, and so if we may we would like
```

1    Mr. Williams to make his argument, and then all of the

2    defendants can respond, and then he will have an opportunity

3    to reply to all of the arguments that we raise, if that's all

4    right with Your Honor?

5              THE COURT:  When you say all the defendants I just

6    want to make sure I have your defendant groups correct, all

7    right, so if you would go over that?

8              MS. SULLIVAN:  Of course.  Well, I represent

9    Weastec, and I will be speaking on behalf of all of the

10   defendants that are subject to this motion.

11             THE COURT:  You did the general motion, as I

12   recall?

13             MS. SULLIVAN:  Correct.  And then Anita Stork from

14   Covington Burlington will be speaking for Alps but on behalf

15   of all defendants on other issues, and then Mr. Cherry will

16   be speaking again on behalf of all defendants but on other

17   issues.  We have just divided it up by subject matter.

18             THE COURT:  All right.  That explains it so when

19   you get up I will take it.  Okay.

20             MS. SULLIVAN:  We also have a couple other people

21   that I did not include, Tom Miller will be arguing as well as

22   Bruce Baird.

23             THE COURT:  Now, one thing before we proceed, there

24   are some matters that were sealed.  Mr. Williams?

25             MR. WILLIAMS:  Good morning, Your Honor.

1    Steve Williams on behalf of the end payor plaintiffs, and I

2    believe that the auto dealers may be joining in the arguments

3    I make.

4          As to the question that the Court just asked, there

5    are some limited matters for which the only parties and

6    counsel who should be in the courtroom would be the

7    defendants, the end payor plaintiffs and the auto dealer

8    plaintiffs, and we would respectfully request for that

9    portion of the argument that the Court order anyone but those

10   parties to leave the courtroom.  I will address those points,

11   and then those parties can return.  I certainly can't say how

12   the defendants may approach it, but that is what we would ask

13   of the Court.

14         THE COURT:  All right.

15         MR. WILLIAMS:  Also, if I can inquire through the

16   Court of defense counsel to make sure I understand, I think I

17   do, that I will do my opening argument, and then I will

18   respond to all of the defense arguments after they are all

19   done, that is perfectly fine with me.  Okay.

20         THE COURT:  Okay.  In terms of time, I'm hoping

21   that you can do your argument in a half hour or less.

22         MR. WILLIAMS:  Certainly.

23         THE COURT:  And Defendants, even though you are

24   breaking it down by issue, you don't each get a half hour so

25   you will have to try to -- I don't know how many issues you

1    are breaking it down to but let's try to keep it obviously as

2    brief as we can.  The Court has read these pleadings, these

3    papers, and so we are ready to proceed.

4            MR. WILLIAMS:  Thank you, Your Honor.  Certainly, I

5    think given how much paper has been submitted I can give my

6    argument in well less than a half hour.

7            THE COURT:  When we get done with this we will be

8    able to grow a whole forest here, aren't we?

9            MR. WILLIAMS:  If I may then renew respectfully my

10   request to exclude anyone from the courtroom other than the

11   defendants who are parties to this motion, the auto dealers'

12   counsel and any auto dealers' representatives and the end

13   payor counsel and any end payor representative?

14           THE COURT:  All right.  I don't know that there is

15   anybody else here but we will -- is that right now then?

16           MR. WILLIAMS:  Please.  Thank you.

17           THE COURT:  Okay.  The directs will be leaving.

18   Okay.  Once you go through this sealed is there part of this

19   argument that they can come back in?

20           MR. WILLIAMS:  Yes, I anticipate this initial part

21   won't take too long.

22              (All parties not subject to this motion were

23               excused from the courtroom at 10:09 a.m.)

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Motion Hearings • March 15, 2016

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Motion Hearings • March 15, 2016

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16          (Courtroom was open to the public at 10:30 a.m.)

17          MR. WILLIAMS:  So as to the continuing allegations,

18 and those are the examples from essentially paragraph 40

19 through paragraph 81 are specific examples of each of these

20 companies going forth and carrying out the agreement that we

21 have alleged on the micro level.  So we have it on the macro

22 level and we have it in the micro level for a prolonged

23 period, and as we stated, Your Honor, these are

24 representative examples, we are not required in a complaint

25 to list every instance that we have of these discussions in

```
1    this collusion, but there are hundreds of them that we could
2    have, but we don't think that's what is required for the
3    purposes of this motion or for the purposes of a complaint.
4             And there are some suggestions in the briefing
5    that, well, you had a different allegation about us before,
6    it is not in there, you must have disavowed it.  No, we are
7    not disavowing anything that was in prior complaints.
8             THE COURT:  So you're saying there were separate
9    conspiracies and there is an overarching conspiracy, is that
10   what you're saying?
11            MR. WILLIAMS:  No, we are saying --
12            THE COURT:  You are disavowing what you had in your
13   other --
14            MR. WILLIAMS:  No.  What I mean to say is if you
15   read the briefing, as I did yesterday again, that some of the
16   individual defendant made, they will say in the prior
17   complaint you alleged against us you had these allegations
18   but now you just have this one or two so you are walking away
19   from what you allege before in terms of specific
20   communications, discussions and agreements, which we are not.
21   We are simply saying these are representative examples and
22   they show each member's participation in the conspiracy, and
23   we also say under the law of a civil conspiracy we don't have
24   to show that everyone knows who every other participant in
25   the conspiracy is.
```

 1          THE COURT:  So let's say we consolidate -- we

 2     amend, not consolidate, we amend and we allow this theory,

 3     and you proceed on this theory, it sounds like we have a

 4     whole new ball game here which would mean new complaints, new

 5     answers, new motions.  When do you think this case would

 6     proceed to class certification?

 7          MR. WILLIAMS:  Your Honor, we have submitted with

 8     our reply brief our proposed schedule, and it actually moves

 9     things along a lot faster than any other proposals that have

10     been made.  If the Court is familiar with the movie

11     Groundhog Day, the only other thing on the table is to keep

12     doing the same thing over and over again for seven or eight

13     or nine years.  What we have proposed is a schedule timed

14     from this Court's decision, if this Court were to grant the

15     motion for the briefing of any further motions directed at

16     the complaint, and frankly our view is if the Court were to

17     grant the motion we don't see why a motion to dismiss would

18     be necessary since again reading all of these briefs

19     yesterday every argument about implausibility and Twombly and

20     futility is already in there, but we have a proposed

21     schedule.  We then have a schedule that from the time the

22     Court issues its last decision in the three cases that are

23     going class certification we then file our motion to certify

24     this class, and we have a schedule to bring us to not only

25     when that motion is resolved but summary judgment and up to

```
 1    trial.  Our schedule --
 2            THE COURT:  Wouldn't you need discovery from all of
 3    these defendants that you have named that we haven't even
 4    gotten there yet?
 5            MR. WILLIAMS:  We would, but we don't see that as
 6    an insurmountable burden given what we have learned so far
 7    through cooperation and given our experiences in the other
 8    cases.  We are not novices to these companies anymore, we are
 9    not novices to their data or their information, and in other
10    ways we have advanced the case so that we can do this.  The
11    OEM discovery motion is set for a hearing next week.  The
12    auto dealers and the end payors are all being deposed once
13    for all cases.  So we think that this is a point at which it
14    makes most sense to do this because it can be done.  And as
15    to all the cases that are a part of this motion, nothing has
16    progressed substantially that any significant effort would be
17    lost, and there is a lot of discussion about, well, there is
18    an initial order, the initial order says very, very little.
19    Now would be the time to start discovery moving in these
20    cases together on the schedule that we have proposed and --
21            THE COURT:  As I recall, we have some cases that
22    aren't even served?
23            MR. WILLIAMS:  Well, what we have, Your Honor,
24    is --
25            THE COURT:  Some parts.
```

1        MR. WILLIAMS:  -- some foreign defendants who

2   insist on going through Hague process even though their

3   counsel sits in this court at every hearing, even though

4   their American subsidiaries are here at every hearing, even

5   though they are getting reports about the case, those are the

6   ones not served.  And I believe this Court ruled long ago at

7   the first hearing we were at you encouraged those to accept

8   service, that we weren't going to wait for you if we go

9   through the Hague, so that's no different now than it was

10  then, but as I said, their counsel are here and the subs are

11  here, so the parties are here in this Court and we can start

12  with discovery.

13        THE COURT:  And ultimately if we should go to trial

14  how would you do that?  We would rent Cobo Hall to start

15  with, then what would you do?

16        MR. WILLIAMS:  You would do it like any other

17  antitrust trial.  And to step back, we didn't create the

18  facts, the facts are what they are.

19        THE COURT:  I know you didn't create the facts, but

20  we have to deal with the facts.  Let's assume we have to

21  proceed to trial, how would you do that with all of these

22  defendants?

23        MR. WILLIAMS:  Your Honor, I think we would do it

24  as we would with any other trial.  If the consolidation is

25  admitted and the complaint is filed, those defendants left at

1    the time of trial would go to trial as part of a conspiracy.

2    Certainly some defendants might --

3            THE COURT:  Some defendants will settle, right,

4    because why would some little defendant take the chance of

5    being jointly and severally responsible for such a verdict if

6    there is a verdict?  And we have pleas so we know, with all

7    due respect to defendants, chances are if it gets to trial

8    that there would be some verdicts for defendants.

9            MR. WILLIAMS:  I would think there were, but I

10   think of cases like the LCD in the Northern District which

11   when it did go to trial, of the 15 defendants in the case

12   when it started there was one defendant left, that's who it

13   went to trial against, but we all have to prepare as if we go

14   to trial against every party who doesn't resolve their

15   claims.

16           THE COURT:  Okay.  Let's hear from defendants.

17   Ms. Sullivan?

18           MS. SULLIVAN:  Your Honor, I have some slides if I

19   may approach?

20           THE COURT:  Thank you.

21           MR. WILLIAMS:  Do you have additional copies,

22   please?

23           MS. SULLIVAN:  Good morning, Your Honor.

24           It would be futile and extremely prejudicial to

25   defendants to grant the end payors' and auto dealers' motion

1    for leave to file this amended complaint and to consolidate

2    these cases.

3         THE COURT:  Why, when they say it is going to be so

4    much easier?

5         MS. SULLIVAN:  It is not going to be easier, Your

6    Honor.  It will be a colossal disaster, but I think it is

7    important that I start by setting the stage to explain to you

8    exactly what this complaint is and what it is not.

9         The plaintiffs have filed more than 30 auto parts

10   cases, as you know, all consolidated in this MDL -- or

11   coordinated in the MDL, and the end payors and the auto

12   dealers are parties in all 30 of them.  The direct purchaser

13   plaintiffs, who have not --

14        THE COURT:  Before you go on let me just make

15   this -- ask you this question, which I think is fairly clear

16   but just to be sure, the Court under the rules has the right

17   to consolidate parts or trials as I go as we get to the end.

18   You don't disagree with that?

19        MS. SULLIVAN:  No, that's correct, Your Honor.

20        THE COURT:  And I don't think the plaintiffs

21   disagree with that, that there is that general authority.  So

22   now you're addressing what I think is the more important

23   thing, which is the amendment, the new theory, the

24   overarching theory?

25        MS. SULLIVAN:  That's correct.

1          THE COURT:  Okay.

2          MS. SULLIVAN:  So the direct purchaser plaintiffs

3    are not parties to these motions, and they have filed 15 of

4    these auto parts cases.  The truck dealer plaintiffs, who

5    also have not joined in these motions, have filed five of

6    these auto parts cases.  In most of these cases there is no

7    overlap at all between defendants.  Most of the defendants

8    are only in one or two of these cases.  The products that are

9    the subject of these cases are all extremely different, they

10   are -- they have no relationship whatsoever, they are

11   completely unrelated.  Other than the fact they all go into a

12   car, there is no relationship between them whatsoever.

13          So the EPPs and ADPs --

14          THE COURT:  But of the cases that they are arguing

15   here Denso is, in fact, a defendant in all of those parts?

16          MS. SULLIVAN:  That's correct.  Denso is the only

17   defendant that is a defendant in all of these parts cases.

18   They have basically chosen 18 of the parts cases and allege

19   that these 18, not the rest, but just these 18 are the

20   subject of this overarching single conspiracy that you just

21   heard about.

22          Now, I assumed when I heard their plan that they

23   really had something new and they were going to allege facts

24   that actually supported an industry-wide all auto parts

25   conspiracy, but that's not at all what this complaint is.

 1    The framework is different from the underlying individual

 2    complaints because they allege this single conspiracy but

 3    other than that this complaint is just a combination of those

 4    other underlying complaints.

 5         They basically took the facts from those

 6    complaints, they put them all in this one, they mixed them up

 7    so it looks like something more than it really is, and they

 8    changed the relevant product to automotive parts, that's how

 9    they define the product, and they define automotive parts as

10    including all 18 of these parts even though the majority of

11    the defendants did not make or sell most of those 18 parts.

12         And they have talked about -- or Mr. Williams

13    explained how it is new, the fact that they have just learned

14    about the Keiretsu system in Japan disbanding and that that

15    is what they allege gave rise to this single-overarching

16    conspiracy, but they knew about that in February of 2013

17    because the Wall Street Journal published an article about

18    it.  The Keiretsu system applies -- if it applies at all it

19    applies to Japanese OEMs, it doesn't explain at all how some

20    of the suppliers who supplied to GM or Hyundai Kia why they

21    would be involved in this alleged conspiracy.

22         The other thing that Mr. Williams just spent a long

23    time in his argument that they claim is new are these

24    high-level meetings between Denso, Hitachi and Mitsubishi.

25         THE COURT:  Just a minute.

1        MR. WILLIAMS:  I was just going to ask, I

2   apologize, if you are going into that that would raise the

3   same issues?

4        MS. SULLIVAN:  No, we are fine.  I don't plan to

5   get into it in detail.

6        THE COURT:  Okay.

7        MS. SULLIVAN:  My point is a -- a couple points

8   about this.  One is that these meetings didn't involve any

9   other defendants.  There is no allegation in the complaint

10  that any other defendant attended these meetings or even was

11  aware of them.  Mr. Williams --

12       THE COURT:  Wait a minute.  Any other defendants

13  then you've got Denso, MELCO, Hitachi and --

14       MS. SULLIVAN:  Correct.

15       THE COURT:  We know that --

16       MS. SULLIVAN:  That's it, those three.  Denso,

17  Hitachi and MELCO attended these meetings.

18       THE COURT:  From 2001 to 2009?

19       MS. SULLIVAN:  Correct, according to the complaint,

20  but there is no allegation that any other defendant that is

21  named in this complaint participated in those meetings or was

22  even aware of them.  Mr. Williams argued just now that those

23  three defendants controlled each of their Keiretsus, they

24  were at the top of their Keiretsus and therefore all of these

25  other defendants were under each of them.  Well, that's not

1    in the complaint, and again it doesn't explain why defendants

2    that sold parts to GM or non-Japanese OEMs would have

3    anything to do with any of this.

4         All of this is important I think because when the

5    plaintiffs asked you to consolidate all of these individual

6    parts cases back in 2014 you rejected the idea on a number of

7    grounds.  You were concerned about the delay that it would

8    cause, you were very concerned about the trial, which seems

9    you are still concerned about, and at the time you indicated

10   that the plaintiffs had not alleged an all parts conspiracy.

11        Your Honor, they still have not alleged any facts

12   that plausibly suggest that these suppliers of these 18 parts

13   got together and all agreed to fix prices and rig bids on all

14   18 of these parts.  They have conclusory allegations in their

15   complaint, and when the complaint is stripped of those

16   conclusory allegations you find nothing but communications

17   and contacts and even agreements, but those all relate to

18   specific parts that specific defendants made and sold.

19        Mr. Williams gave you the example of Continental

20   and Denso meeting together and agreeing.  That allegation or

21   those allegations specifically relate to one part, instrument

22   panel clusters, and they relate to one OEM, Hyundai Kia.

23   There is no allegation that Continental was aware of Hitachi,

24   Denso and MELCO's meetings to divide up the rest of the auto

25   parts market to the extent that there is such a market.

```
 1          The end payors' and auto dealers' claims are not
 2   plausible and we don't believe they would survive a motion to
 3   dismiss.  Thankfully you have given us a lot of guidance on
 4   what the Court believes is sufficient to survive a motion to
 5   dismiss in this case, and this complaint is very, very
 6   different.  So I want to explain why this complaint would be
 7   dismissed at the 12(b)(6) stage when the underlying
 8   complaints -- or many of them anyway were not dismissed.
 9          THE COURT:  Well, according to plaintiff you won't
10   need a 12(b)(6), right?  Didn't they say there wouldn't be
11   any other motions necessary if they did an amended complaint?
12          MS. SULLIVAN:  Oh, there would definitely be
13   motions to dismiss, Your Honor.  I can guarantee you that
14   everybody behind me on my left side --
15          THE COURT:  I thought there would be another side.
16          MS. SULLIVAN:  -- would want to file motions to
17   dismiss.
18          And I can also guarantee you that there would be
19   affidavits attached to those motions to dismiss that would
20   show Your Honor that these defendants did not make or sell
21   these parts, most of them, and did not compete against each
22   other.  So that's the first point.
23          In all of the other complaints that the Court
24   allowed to proceed to discovery there were allegations that
25   the defendants competed against each other for the parts that
```

1    were the subject of those -- of that complaint.

2            Second, in all of the other complaints there were

3    factual allegations that the defendants agreed to fix prices

4    and rig bids on those -- on that specific part that was the

5    subject of that complaint.

6            Third, the Court relied in part on the fact that

7    there were guilty pleas in those cases that addressed the

8    specific parts that were subject of the complaint.  That's

9    not the case here at all.  I know Your Honor has made it very

10   clear that this scope of a guilty plea is not the same

11   necessarily as the scope of the civil case, but you did rely

12   on those guilty pleas in those other cases quite heavily as

13   further support for the plausibility of the conspiracy that

14   was alleged.  We don't have those here, and, in fact, as you

15   pointed out, the government has made many statements that

16   indicate that the government concluded after many years of

17   investigation that these were separate conspiracies, not a

18   single one.

19           THE COURT:  But the government could charge that

20   they were separate conspiracies but they never directly said

21   anything about one overarching conspiracy, right?  I mean,

22   there is nothing that the government put out that would

23   either show or not show an overarching conspiracy?

24           MS. SULLIVAN:  Well, it is correct they charged

25   individual conspiracies but they have made statements.

1    Attorney General Eric Holder made a statement at a parts
2    conference in 2013 that this -- the conduct this
3    investigation uncovered involved more than a dozen separate
4    conspiracies aimed at the U.S. economy and these cartels
5    operated totally independently.  That was one statement.
6         The next step was from Assistant Attorney General
7    Bill Baer, which was actually sworn testimony at
8    congressional hearings on cartel prosecution, and he stated
9    those September charges involved more than a dozen separate
10   conspiracies.  The multiple conspiracies charged in September
11   affected U.S. automobiles in 14 states.  That was the
12   statement that was made under oath.
13        And then the final statement that we have
14   highlighted here was from Deputy Assistant Attorney General
15   Scott Hammond, and this was at an auto parts conference in
16   2013, and he stated there were more than a dozen separate
17   conspiracies each operating independently.
18        He then went on to say the detection of one auto
19   parts conspiracy has led to the discovery of other
20   conspiracies involving a new set of products, a new group of
21   conspirators, and a new list of victims.
22        THE COURT:  Thank you.
23        MS. SULLIVAN:  So let me touch on the first reason
24   why this complaint is so different from the others that the
25   Court has allowed to proceed to discovery.  Again, there are

```
 1   no factual allegations that these defendants competed for the
 2   sale of all of these 18 parts which the end payors and auto
 3   dealers have defined as automotive parts.  The end payors
 4   concede the horizontal conspiracies under the Sherman Act
 5   require agreements between competitors.  In their reply brief
 6   there is a statement that horizontal price fixing is any
 7   arrangement among competitors that interferes with the
 8   setting of price by free-market forces, but the facts alleged
 9   in this complaint suggest that the 23 defendants sold
10   different unrelated products, they didn't compete, and there
11   are no allegations that they even could have competed given
12   how different all of these products are.
13           In addition, in the 18 underlying complaints that
14   now the end payors are trying to bring into one, the
15   plaintiffs alleged high barriers to entry so they relied on
16   the fact that, for example, the HCP market, which is heater
17   control panels, the HCP market is a highly-concentrated
18   market, it has barriers to entry, and therefore a defendant
19   like Alps who didn't plead guilty but does make heater
20   control panels, it was more likely or more plausible that
21   that defendant also participated in the conspiracy despite
22   the lack of its guilty plea.  So it doesn't make any sense to
23   have an underlying market for heater control panels that is
24   difficult to get into.  If other suppliers can't get into it
25   how can they be competing as part of this broader auto parts
```

1     market?

2                THE COURT:  Or why would they?

3                MS. SULLIVAN:  Exactly.  They do include

4     boilerplate conclusory allegations that all defendants,

5     quote, manufactured, marketed and/or sold automotive parts,

6     so all 18 parts.  There are two problems with that conclusory

7     allegation.  One is that because it includes all 18 products

8     it is not a true statement for any defendant other than

9     Denso.  Second, the Court has twice rejected that very same

10    conclusory boilerplate allegation in two motions to dismiss

11    rulings in this case.  The first was in the truck and

12    equipment dealer case against Mitsubishi Electric.  There the

13    Court dismissed the claims for exactly this reason.  The

14    Court said that the collective acts that the plaintiffs had

15    alleged could not be attributed to MELCO defendant given the

16    fact that there was a lack of plausible allegation that

17    Mitsubishi Electric even competed in the truck and equipment

18    market.  There, as you may recall, the plaintiffs had alleged

19    that Mitsubishi Electric participated in the wire harness

20    conspiracy targeting truck and equipment manufacturers, and

21    the Court rejected the claim because there was no allegation

22    that MEC or Mitsubishi Electric had sold wire harnesses to

23    truck and equipment manufacturers.

24                There was a similar boilerplate allegation about

25    the fact that MEC sold those parts to truck and equipment

1    manufacturers, and the Court rejected it as boilerplate.

2         The same decision -- or the same result occurred in

3    the truck and equipment dealers' complaint against Fujikura,

4    Limited.  There the Court said TED plaintiffs' general

5    allegation that all defendants, which would include F-Co.,

6    manufacture and sell vehicle wire harness systems for truck

7    and equipment in the United States does not withstand the

8    declaration by F-Co. To show that it did not manufacture or

9    sell any wire harness that was installed in trucks and

10   equipment.

11        So the Court would likely reach the same result

12   here if we allowed this complaint to go forward and the

13   defendants filed motions to dismiss, which they would do.

14        The plaintiffs claim that all defendants competed

15   because they all sold to OEMs, but there are no facts to

16   support the fact that they did compete despite the fact that

17   they all sold to OEMs, they all sold different products to

18   OEMs that were completely unrelated to each other.

19        And the fact that the defendants didn't compete

20   renders the conspiracy allegations implausible.  There is a

21   conclusory allegation that the defendants refrain from

22   competing and allocated customers.  There are no facts to

23   support those allegations.  There are no facts in this

24   complaint that suggest that, as Mr. Williams argued, two

25   suppliers of two different parts agreed that they would not

1    supply each other's parts, that's not in this complaint, it

2    doesn't exist.  That's what distinguishes this case from the

3    Vitamins case which the end payors rely heavily on.  There

4    the plaintiffs alleged that the defendants participated in

5    meetings and agreed to allocate volumes of markets, sales of

6    the particular products, and effectively not to make products

7    that other vitamin manufacturers were making.  That doesn't

8    exist here.

9          Further, the allegation that the defendants rigged

10   bids is also completely implausible because, for example, a

11   supplier that makes windshield wipers doesn't even receive a

12   request for a quotation from an OEM for engine parts, so it

13   is not plausible that a windshield wiper manufacturer would

14   agree on bids to submit in response to an engine RFQ.

15         In the Ashland-Warren case in the Middle District

16   of Tennessee there is a great quote that says price fixing by

17   means of bid rigging is flatly impossible when the alleged

18   conspirators are also not competitors.  I believe the Court

19   recognized this fact when it dismissed the claims by the

20   truck and equipment dealers against Fujikura, Limited and

21   Mitsubishi Electric.

22         So the next way this complaint is completely

23   different from the other complaints that you have allowed to

24   proceed to discovery is the fact that there are not

25   allegations that the defendants all agreed to fix prices and

  1    rig bids on all 18 products, the automotive parts.  No one

  2    disputes that to allege a horizontal conspiracy claim

  3    plaintiffs must plausibly allege that each defendant had a

  4    conscious commitment to a common scheme to fix the prices of

  5    all of these parts sold to OEMs.  And in order to allege a

  6    conscious commitment to a common scheme the plaintiffs must

  7    allege that each defendant knowingly entered into this

  8    conspiracy.  In all the other complaints the plaintiffs

  9    allege facts that supported the allegation that the

 10    defendants agreed to fix prices and rig bids on the

 11    particular part that was an issue in this case.  There are no

 12    such allegations here.  Other than the boilerplate allegation

 13    that everybody agreed, the only factual allegations relate to

 14    specific parts.  For example, the Continental discussions

 15    with Denso, those relate to instrument panel clusters, that's

 16    it; no other parts were part of that discussion or that

 17    agreement.

 18         THE COURT:  There is nothing in the amended

 19    complaint to show an agreement to the common scheme?

 20         MS. SULLIVAN:  That's correct, that's correct.

 21    There is no allegation that shows that there was even as much

 22    as a communication relating to the common scheme let alone an

 23    agreement.  There is no allegation that shows that the

 24    defendants that are in one or two parts cases even knew other

 25    defendants who made different parts.  There's no allegation

1    that suggests that the defendants knew about, as I said, the

2    MELCO, Hitachi and Denso meetings.  There is no allegation

3    that explains why any defendant that makes a heater control

4    panel would have any incentive to join a conspiracy to rig

5    bids on ignition coils, a part that it has no relationship to

6    whatsoever.

7            So as a whole when you read this complaint it

8    describes a series of separate conspiracies.  As I said at

9    the outset, the allegations are mixed up so that it looks

10   like more than it is, but when you break it down it is a

11   series of separate conspiracies.

12           The Precision Associates case is directly on point.

13   There you had a number of defendants who were freight

14   forwarders and they had operations all around the world.  The

15   complaint alleged specific facts that they engaged in local

16   conspiracies, so there was a conspiracy in Europe to fix a

17   surcharge -- or to impose a surcharge there.  There was a

18   different conspiracy in Japan, a different in China depending

19   on a particular surcharge at issue.  Just as here, in that

20   case you had a defendant that was in all of these local

21   conspiracy, so effectively the Denso of this case, that was

22   in that case as well.  You also had a handful of other

23   overlapping defendants like we do here, but the Court

24   rejected the single conspiracy allegation because the local

25   conspiracies had applied to different routes, they had

1    different participants, they were entered into at different

2    times, and different meetings occurred that related to the

3    various conspiracies.

4          We have exactly the same situation here, these are

5    completely different parts, each agreement that is described

6    in this complaint with the exception of Denso has different

7    participants. There are different RFQs issued by different

8    OEMs at different times, and that's what the complaint shows,

9    that Continental and Denso, for example, were getting

10   together to talk about the instrument panel cluster RFQs that

11   Hyundai Kia issued, and there were different meetings during

12   which these agreements were reached.

13         The case for dismissal here is even greater than

14   there because there at least all the defendants were capable

15   of supplying the same product. We don't have that here.

16   There is no allegation that my client, Weastec, could have

17   supplied anything other than ignition coils. That's all that

18   Weastec has alleged to have supplied, and there is no

19   allegation that we could have done anything else.

20         Notably, this Court reached the same conclusion

21   when it dismissed the truck and equipment dealers' complaint

22   against Fujikura, Limited. There the truck dealers claimed

23   that the defendants that sold wire harnesses for cars were

24   the same as for trucks, and that these defendants engaged in

25   a single conspiracy to fix prices for both wire harnesses

1    that go into cars and wire harnesses that go into trucks.

2    You rejected that argument.  The Court explained that the

3    overlap in defendants, the overlap in OEMs and the overlap in

4    component parts did not create a single conspiracy.

5              Plaintiff said that it is enough that each

6    defendant conspired with Denso, but as I have said, the

7    allegations only show that each of those defendants that had

8    communications with Denso did so specifically about the

9    product that it sold.  There is no allegation that any

10   communication with Denso was about the entire 18 product

11   lists.

12             So the next reason why this complaint is different

13   from the other is lack of guilty pleas, and I won't spend

14   time on this because we have already gone over the government

15   statement, but I will say in the prior rulings that Your

16   Honor has issued, in every single one of them for the

17   parts-specific cases the Court relied on the guilty pleas

18   and, again, you indicated that the plaintiffs could allege

19   conspiracies that were broader than the guilty pleas but at

20   least there were guilty pleas, and that was one reason why

21   you -- the Court inferred that all the defendants had

22   participated in the conspiracies that is -- were alleged.

23   There is not a single guilty plea that covers all 18 parts,

24   not one.

25             THE COURT:  I just wonder about one thing, I don't

 1    know if you know this, and I didn't reread the pleas, but is

 2    there anything in the pleas, and maybe plaintiff would know

 3    this, is there anything in the pleas on the one part that

 4    they are pleading to, because they were all single parts

 5    except Denso, is there anything in the pleas that refer to

 6    the other parts at all; did they come up in the discussion

 7    when they were doing the colloquy?

 8              MS. SULLIVAN:  No.  In fact, Your Honor, that is a

 9    very good question because there, in fact, is nothing in the

10    pleas that describes this overall customer allocation scheme

11    or a part-by-part allocation scheme, and again that's very

12    different than the Vitamins case.  In the Vitamins case the

13    guilty pleas did describe product allocation, in other words,

14    the guilty pleas charged that the defendants got together and

15    agreed on the volumes that each would supply of the various

16    different vitamins that were covered as well as who was going

17    to sell which vitamin and in what geographic area.  We don't

18    have that in a single one of these pleas.

19              THE COURT:  Okay.

20              MS. SULLIVAN:  So finally in all of the decisions

21    that the Court has issued on motions to dismiss in the

22    underlying part-specific cases the Court has relied on the

23    allegations relating to market conditions.  As you may

24    recall, in each of those cases the plaintiffs alleged that

25    the individual product market was ripe for collusion.  It was

1    highly concentrated, there was interelasticity of demand and

2    high barriers to entry.  And here they make the same

3    allegations except the highly concentrated market, that's

4    left out of this complaint, but the others are there, and in

5    the reply brief the end payors and auto dealers made it clear

6    that they want the Court to infer this overarching conspiracy

7    based on the, quote, automotive parts market's structure and

8    characteristics which they say render the conspiracy more

9    plausible.

10           To be meaningful and certainly to be the basis for

11   an inference of an overarching conspiracy, the market

12   allegations have to be plausible and they are not even close.

13   So as I noted at the outset, there are 30 plus auto parts

14   cases but this complaint only covers 18 of them.  So what

15   about occupant safety systems, what about wire harnesses,

16   automotive lamps, automotive hoses, are they not also

17   automotive parts?  I think they are, but they are not

18   included.

19           The end payors and auto dealers claim that they

20   picked the parts that Denso makes but that doesn't really

21   make sense that you would have a market for that reason.  The

22   other defendants -- or some of the other defendants that are

23   also named as defendants in this case make other products

24   that are not included.  So if we take a look at the slide,

25   the red boxes are parts that are made by a handful of the

1    defendants; Tokai Rika, MELCO, Mitsuba, who where also

2    defendants in this case.  So it isn't plausible that there is

3    an automotive parts market that include the parts that Denso

4    makes but does not includes the parts that these other

5    defendants make, these other defendants that are alleged to

6    have participated in this very same single overarching

7    conspiracy.  Additionally, each of the underlying 18

8    part-specific complaints alleges its own distinct product

9    market, as do all of the complaints that are not in the blue

10   shaded area, so body ceilings over there on the left, the

11   body ceilings complaint contains an allegation that it has

12   its own distinct product market and, again, highly

13   concentrated, interelasticity of demand, barriers to entry,

14   all of which they claim in that complaint makes the

15   conspiracy allegations more plausible.

16          So what they are saying now is that the parts that

17   are not included in this all automotive parts market each

18   have their own distinct product markets but the 18 parts that

19   are part of the, quote/unquote, auto parts market do not.  It

20   is just not plausible.  And, as I said, it is also

21   inconsistent with the underlying 18 complaints.

22          So we believe that this complaint will not survive

23   motions to dismiss.  There will be many of them.  As I

24   indicated at the outset, I expect that the defendants -- many

25   of the defendants, 70 percent or more, are only in one or two

1   cases, those defendants will submit affidavits that show,

2   Your Honor, that they did not make or sell or even have the

3   ability to make or sell the vast majority of these 18

4   products.

5          In addition to futility, the 6th Circuit has made

6   very clear that when a party is prejudiced by an amendment

7   the amendment should not be allowed.  And two ways in which

8   the 6th Circuit has recognized a defendant can be prejudiced

9   is if the resolution of the case is delayed or the amendment

10  will require significant additional expense and burden, and

11  defendants in this case would be prejudiced in both ways.

12         First, it would take much longer for the cases to

13  be resolved.  The current structure looks like this, and it

14  is actually working.  I understand that this is a massive

15  case, it is one of the largest ever, but it is working, the

16  structure that the Court set in place five years ago.  The

17  first three cases have gone through amended complaints,

18  orders on motions to dismiss, new answers, discovery is

19  underway, those cases have been pending for four years now

20  and they are ready to start depositions, we just need that

21  deposition protocol entered, which Your Honor entered a

22  ruling on last week, and depositions are ready to begin in

23  those three cases.  And some of those cases are pretty small,

24  they have just a few defendants, the heater control panel

25  case, for example, only involves sales to one OEM, and we

1    believe that those can move fairly quickly.  There is no

2    reason to hold them back, they are ready to go through

3    depositions and head forward towards class certificate.

4        The next nine cases have all had rulings on motions

5    to dismiss, and the only thing that is stopping discovery

6    from happening in those cases are 26(f) conferences, which

7    the defendants have been pushing now for months and the end

8    payors and auto dealers have not wanted to proceed with those

9    conferences in large part I think because they planned to

10   file this motion, but those cases are ready to go.  So we

11   will be in discovery -- in full discovery in 12 cases any day

12   now basically.  An amended complaint would slow everything

13   done, all of these cases would have to wait for the other.

14   So the HCP and the fuel senders and instrument panel clusters

15   cases would have to wait for discovery on the remaining 15

16   when, as I said, they are far advanced and they are ready to

17   head towards class certificate once they complete depositions

18   in those cases.

19       Weastec, which is the company that I represent,

20   that is a defendant in the ignition coils case, right now it

21   is facing about 55 defendant depositions because there are

22   five defendants and -- I mean, the math is not exactly right

23   but about 55 depositions.  If we were pulled into this

24   massive amended case involving all of these parts there would

25   be nearly 800 depositions that Weastec would have to wait for

1    before any resolution, and Weastec has very good arguments,

2    Your Honor, for why it should not be in these cases at all.

3    Weastec had a vertical licensing agreement with Denso, and we

4    intend to show the Court that all of our communications with

5    Denso related to that licensing agreement, and we are

6    entirely lawful.  We don't want to have to wait for 800

7    depositions and millions of documents to be produced by all

8    of these other defendants to present that argument to the

9    Court.

10           And Mr. Williams indicated that the plaintiffs have

11   proposed a schedule that would resolve this 18-part case

12   faster than the others.  It is impossible to meet.  What they

13   are effectively proposing is that we resolve all of these

14   cases with almost 800 depositions, hundreds of millions of

15   documents, hundreds of millions of transactional data

16   entries, all within half of the time that it has taken to --

17   that it will take to get to class certification in the wire

18   harness case.  That is impossible, and this is even though we

19   have put procedures in place to streamline cases after wire

20   harness, and things are moving faster -- the cases are moving

21   faster in the current structure, but if you pull them all

22   into one it will slow everything down.

23           And the burden and expense that the defendants

24   would experience if this complaint was allowed to proceed is

25   extremely high.  As I have indicated, almost 80 percent -- I

 1    think I said 70 percent earlier.  More than 70 percent of the

 2    defendants in this amended complaint only made one part,

 3    maybe two parts, that's it.  And right now they are facing a

 4    relatively reasonable number of depositions, a relatively

 5    reasonable number of documents to be produced, and if they

 6    get dumped into this massive case their discovery expenses

 7    and burdens will multiply dramatically.

 8              THE COURT:  That would be true if -- I mean, as

 9    difficult as it would be for the defendants, if plaintiff

10    could show that they had, you know -- if their complaint was

11    plausible then you would have to do that.

12              MS. SULLIVAN:  That's correct, that's correct, and

13    that's why I focused on all of the reasons why this complaint

14    is not plausible and will not satisfy the standard that you

15    have set for the pleadings in this case because we need to be

16    darn sure that we have a legitimate complaint that plausibly

17    alleges a single conspiracy before we impose this burden and

18    expense on all of these defendants.

19              THE COURT:  Okay.  I agree.  Thank you.

20              MS. SULLIVAN:  Thank you, Your Honor.

21              THE COURT:  Thank you.

22              MS. STORK:  Good morning, Your Honor.  Anita Stork

23    on behalf of the defendant Alps Electric.

24              I will be fairly brief.  What I want to do is point

25    out some of the facts that are unique to Alps and its status

1    in these cases, which truly demonstrate that, one, the

2    plaintiffs have unduly delayed bringing this motion, and

3    that, two, it will be prejudicial.  And Your Honor mentioned

4    trial, which is something that I will address.

5            I want to just add one point to Ms. Sullivan's

6    argument about the discovery burden.  I do think that there

7    are defendants in this case that if it is consolidated we may

8    well attend each one of the depositions because we want facts

9    on the record to say to somebody that we never competed with

10   did you ever communicate with Alps?  Did you ever talk to

11   Alps about anything?  We want to get that on the record so we

12   can move for summary judgment to get out from alleged

13   liability for the making of these other parts and the

14   coordination on other parts that we did not even make.

15            THE COURT:  Okay.

16            MS. STORK:  To go back to Alps, Alps is similarly

17   situated to the Weastec group of defendants with whom -- for

18   whom Maggie -- Ms. Sullivan was arguing on behalf of.  Alps

19   is a defendant in only one case.  And the reason that this is

20   very important is that Alps has been a defendant for a long

21   period of time.  Alps has been a defendant in the HCP case

22   for three years.  It is a small case, it involves only three

23   other defendants, and Alps is unique among that group, they

24   did not plead guilty, two of the other defendants pleaded

25   guilty, and the other defendant is the likely amnesty

```
 1   applicant.

 2           Discovery in the HCP cases has been open for a year

 3   and a half, since July 2014.  So, first as to the delay,

 4   plaintiffs have inexcusably delayed in bringing this motion.

 5   And as the 6th Circuit has observed, a party must act with

 6   due diligence if it intends to take advantage of Rule 15's

 7   liberality when it comes to amended pleadings.  So

 8   plaintiffs' excuse for the delay, as you heard Mr. Williams

 9   say, is partially that a leniency applicant supposedly

10   dribbled out the facts they knew to come up with this amended

11   complaint with 18 parts, but that certainly rings hollow with

12   respect to HCPs because Sumitomo is the amnesty applicant in

13   heater control panels and plaintiffs have never argued or

14   asserted that there was any problem with the amount or the

15   timing of the cooperation that the heater control panel

16   leniency applicant gave them.  So when we go to the leniency

17   applicant in the other 17 cases who supposedly dribbled out

18   facts, there are no facts that are dribbled out concerning

19   Alps.

20           The plaintiffs' proposed amended complaint doesn't

21   add any new allegations against Alps.  As a matter of fact,

22   it shrinks the number of allegations from two specific

23   instances of conduct to one specific instance of conduct in

24   the proposed amended complaint, again, only focused on HCPs.

25   And the nothing new against Alps is consistent with the last
```

 1    three years that Alps has been a defendant in the HCP case.

 2    There has been more than 26 defendants that have pleaded

 3    guilty, at least 10 defendants that have settled that have

 4    provided cooperation and information to the plaintiffs, but

 5    yet there are no new allegations in the HCP case in these

 6    intervening three years, and Alps has not been added to

 7    another case.  And, again, most pertinent to the motion here

 8    today, there are no new allegations against Alps in the

 9    proposed amended complaint.

10         Plaintiffs also attempt to excuse their delay by

11    asserting that all the cases sought to be consolidated are at

12    the beginning of discovery.  It is just not true.  When it

13    comes to heater control panels, discovery has been open since

14    July 2014, several of the defendants gave their DOJ

15    productions in heater control panels to the plaintiffs

16    several years ago, and as Ms. Sullivan pointed out, discovery

17    has been ongoing in the heater control panel cases and

18    documents have been produced, several defendants have

19    produced documents.

20         And also as Ms. Sullivan pointed out, the parties

21    were on the edge of agreeing on discovery and class

22    certification schedules, which negotiations fell apart I

23    think because plaintiffs wanted to file this motion, but we

24    do have those initial orders pending before Your Honor that

25    the defendants in HCPs have submitted.

```
 1              I also want to touch really briefly on the
 2    prejudice issue at trial which you mentioned, Your Honor.
 3    Alps would suffer overwhelming prejudice through the possible
 4    confusion of issues at trial.  So as I have mentioned, as it
 5    stands right now Alps is a defendant in the HCP case only.
 6    That case would be a trial about the three remaining
 7    defendants, a single part, heater control panels, and a
 8    single OEM.  If the Court were to grant plaintiffs' motion
 9    the trial of this consolidated-amended complaint would have
10    almost two dozen defendants, six coconspirators, at least 45
11    parts, and multiple OEMs.  So there are no allegations that
12    Alps ever communicated with companies that it didn't compete
13    with, no allegations that Alps communicated with Mitsuba, why
14    would it because Alps doesn't make the parts that Mitsuba
15    makes, and we certainly didn't talk to them about parts that
16    we didn't make.  In this consolidated trial the jury is going
17    to hear -- will hear likely days, if not weeks, about
18    companies that Alps didn't compete with, Mitsuba, Kyoto, the
19    list goes on and on.  The jury will hear days, if not weeks,
20    of testimony about parts that Alps didn't make, doesn't make,
21    never submitted bids; ignition coils, radiators.  We just
22    think the likelihood of confusion for the jury to assign
23    specific evidence to specific defendants and claims would be
24    unduly prejudicial.
25              THE COURT:  Okay.
```

1        MS. STORK:  Thank you, Your Honor.

2        MR. BAIRD:  Good morning, Your Honor.

3        THE COURT:  Good morning.

4        MR. BAIRD:  I too will be brief.  I represent

5    Keihin.

6        THE COURT:  Your appearance?

7        MR. BAIRD:  Sorry, Your Honor.  Bruce Baird for

8    Keihin.  I represent Keihin in the end payor case only, and

9    Keihin North America in the end payor and auto dealers case.

10    I will call them both Keihin.

11        Just to remind Your Honor, Keihin is only in one

12    set of cases, the fuel injection system case.  They sell only

13    one type of product, and they sell -- uniquely they sell to

14    only one manufacturer, they have not pled guilty.  They are

15    not under investigation.  No other defendant in any of the

16    cases is as isolated from the many events in this vast

17    proposed complaint than Keihin.

18        So I have two points to make, Your Honor, as to why

19    as to Keihin the plaintiffs' motion should be denied as

20    futile.

21        First, is it plausible based on the factual

22    allegations in the complaint that Keihin competed with -- was

23    a competitor of the many companies in the complaint, and

24    Ms. Sullivan spoke to that quite a bit.  Keihin doesn't make

25    these parts, Keihin only makes the one set of parts, and

 1    Keihin only sells to one carmaker, to Honda, that's the only
 2    carmaker they are alleged to sell to.  And incidentally Honda
 3    is one company that Mr. Williams didn't mention.  His new
 4    allegations of these Keiretsus relate to Toyota, and they
 5    relate to Nissan, and they relate to Mitsubishi, they
 6    actually don't relate to Honda.  I suppose it is another
 7    Japanese automaker but that's the only thing we have.  Keihin
 8    did not compete with most of these companies and so it cannot
 9    have entered a horizontal price-fixing conspiracy with them.
10         The second point is based on the factual
11    allegations in the complaint, and Your Honor pointed this out
12    when Mr. Williams was up here, did Keihin agree, as in any
13    conspiracy, agree to enter into a conspiracy with most of
14    these companies which make parts Keihin is not alleged to
15    make and sell to carmakers Keihin is not alleged to sell to?
16    If not, Keihin can't have entered into this or any other
17    conspiracy.
18         It is not a question of illustrative examples.
19    There's really no facts and there can be no facts.  Indeed,
20    you can ask plaintiffs where in the complaint they have
21    pointed to facts that show that Keihin agreed to this big
22    conspiracy.
23         So, first point, in a little more detail I want --
24    I mean, I want to tell -- give an example, a homely example
25    which perhaps will have a point.  Again, you can't engage in

```
 1    horizontal price fixing if you don't compete.  So let's take
 2    the case of McDonald's, and let's take the case of a company
 3    that just sells to McDonald's its special sauce, that's the
 4    only thing they make, it is the only thing they can make, and
 5    they just sell to McDonald's, they sell the special sauce.
 6    There is one other company that sells this special sauce to
 7    McDonald's, and let's call that company D, but company D is a
 8    big company, they don't just make special sauce, they make
 9    hamburgers and buns and lettuce, and they compete with all
10    kinds of other companies that make hamburgers and buns and
11    lettuce, and they sell not only to McDonald's but also to
12    Burger King and to Wendy's, White Castle.  And as company D
13    sells these other products and competes with these other
14    companies and let's assume fixes these other prices with
15    these other companies, company K is not part of that.  I
16    mean, let's assume that company D and company K agree to fix
17    the price of special sauce, they did that but there is nobody
18    else that is part of that, but then company D has many other
19    things they sell, maybe other conspiracies that they might
20    enter into but company K is not part of that.  If anything,
21    company K would like the price of everything else McDonald's
22    buys to be lower so that they don't mind paying extra for the
23    special sauce.  They have no interest in the parts -- the
24    prices of these other things being higher.  They can make
25    those other things, they don't sell those other things, and
```

 1   they don't sell them to anybody but McDonald's.

 2          What would company K gain from that kind of

 3   conspiracy?  What incentive would it have to join?  How is it

 4   plausible that they join that kind of conspiracy?  It is not

 5   plausible because they don't compete.  So that's my first

 6   point, no competition means no conspiracy.

 7          It means no -- so now let's go with the second

 8   related point, Your Honor.  You need to actually agree, it is

 9   the essence of any conspiracy as Your Honor pointed out.  And

10   just as Keihin's isolated position means they do not compete

11   with most other companies, it also means it is implausible or

12   impossible for Keihin to agree with them.  Let me give you an

13   example of this.

14          Let's talk about a group of drug dealers in the

15   same neighborhood.  That's the way plaintiffs think of us

16   anyway, we are all drug dealers in the same neighborhood.

17   Let's say Columbus, Ohio, and this is a real case.  They are

18   alleged to be part of the same conspiracy because they are

19   alleged to have all agreed that no one else can sell drugs in

20   this neighborhood, we are the only ones that can sell.  Well,

21   that's not what the facts were in the case.  They were all

22   drug dealers.  They all sold in that neighborhood.  Some

23   agreed to each other, two or three at a time to do this or

24   that drug deal, but there was no evidence that they had all

25   agreed that no one else could sell in the neighborhood.  I'm

1    sure it was more efficient for the government to charge that

2    as one conspiracy.  They wanted to get all of these drug

3    dealers in the same case, so they charged them all with

4    agreement to keep everyone else out, and this is United

5    States against Gibbs, and I can hand Your Honor a copy.  We

6    just came up with this and have it, it is 182 F 3rd 408,

7    6th Circuit in 1999.  It is a basic conspiracy case, and it

8    is not an antitrust case, but you need agreement.

9         The 6th Circuit reversed these six drug dealers'

10   convictions for allegedly conspiring with other dealers to

11   control the distribution of drugs in the neighborhood because

12   there wasn't any evidence of that broad agreement.  And they

13   specifically said -- the 6th Circuit specifically said it was

14   not enough that they were all drug dealers, it was not enough

15   that they knew the others and may have had more limited

16   agreements with some of them, it was not enough they belonged

17   to the same neighborhood association, it is not enough that

18   some of them had records for selling drugs.  The evidence

19   just showed they all sold a lot of drugs and not that they

20   agreed to one overall conspiracy.

21        Of course, plaintiffs don't have to prove anything

22   at this stage but they have to allege, they need to make

23   factual allegations making it plausible that there was this

24   overall overarching agreement, not just between two or three

25   of the drug dealers like company K and company D, to sell

 1  drugs at a given moment, that might be a separate case but

 2  that's not the claim.  The claim is there is an agreement

 3  among everyone to control the distribution of drugs or to fix

 4  prices.  That's what they are alleging, and they don't have

 5  any proof of that.

 6        The claim is, as you heard it from Mr. Williams,

 7  anyone who agreed with Denso about anything is therefore

 8  agreeing with everybody about everything.  Your Honor, I

 9  submit if there was not enough to show that these Columbus,

10  Ohio drug dealers agreed to be bound by the same conspiracy

11  there's certainly no allegations here sufficient to make

12  plausible that single product, single customer, Keihin was

13  part of this huge conspiracy with all of these companies.

14        THE COURT:  Thank you.

15        MR. BAIRD:  That's my argument.  The only thing I

16  would say about prejudice, Your Honor has heard it all, is

17  that Gibbs, this same conspiracy case, the 6th Circuit warned

18  about the danger of prejudice in a big multi-defendant case

19  like this.  They were concerned that that's why these six

20  drug dealers had been convicted even though there was no

21  evidence because of the prejudice inherent in a case like

22  that.

23        The 6th Circuit again in Nixon warned about the

24  burdens in a huge antitrust class action in particular.

25        THE COURT:  All right.  Thank you.

```
 1          MR. BAIRD:  Thank you, Your Honor.

 2          THE COURT:  Mr. Cherry?

 3          MR. CHERRY:  Thank you, Your Honor.  I'm

 4   Steve Cherry.  I'm with the law firm Wilmer Hale, and I'm

 5   speaking on behalf of the Denso defendants.

 6          As Ms. Sullivan pointed out, the plaintiffs here

 7   have failed to allege facts to support an overarching

 8   conspiracy among these 23 defendants, involving these 18

 9   different auto parts.  And as Ms. Sullivan went through and

10   with the slides, this isn't just about pleas, this really

11   is -- the DOJ has been very up front about what they

12   concluded here after six years of investigation with a full

13   power of the government, the power of Grand Jury, they have

14   testified before Congress, and the DOJ has said they found

15   multiple separate independent conspiracies.  That's what we

16   have on the one hand.

17          On the other hand, we have the plaintiffs

18   presenting this proposed consolidated-amended complaint with

19   factual allegations of separate and independent conspiracies,

20   and then this conclusory assertion that somehow this is all

21   one overarching conspiracy, but there is not one factual

22   allegation to support it.

23          And the lack of facts here is stark especially when

24   you consider that at this point the plaintiffs admit that

25   they have had the benefit of the full cooperation of various
```

 1    leniency applicants that includes attorney proffers,

 2    documents, witness interviews.  They admit that they have

 3    received tens of millions of documents from the various

 4    defendants, documents they produced to the DOJ, documents in

 5    discovery.  Plaintiffs further admit they have received the

 6    full cooperation from at least six settling defendants, and

 7    they rely on that heavily here.  And yet with all of that

 8    discovery, with all of that vast amount of information, there

 9    is not one witness, not one document that says there was any

10    overarching conspiracy among these 18 defendants -- 23

11    defendants for these 18 products, not one.

12            Instead, plaintiffs merely combine allegations of

13    product-specific bid rigging between the suppliers who made

14    those products, and that's just as they allege in their

15    current complaints.  In fact, if you take those allegations

16    and you focus on the products at issue, which they have tried

17    to blur here, but if you focus on the products they all

18    come -- they are all consistent with 13 of their 18 current

19    complaints.  They take product-specific bid-rigging

20    allegations consistent with those 13 complaints, they have

21    mixed them all up so it is not so obvious, and they changed

22    the names in a few places from the product to auto parts,

23    which is what Mr. Williams tried to do in his argument here,

24    he used the term auto parts when it was really about

25    instrument panel clusters.  So there is no allegation of any

1    communication about any overarching conspiracy.  And as I

2    think others have pointed out here, notable here is there is

3    no allegation of any communication between two suppliers who

4    didn't make the same product.  You would think you would see

5    something like that if there was some overarching conspiracy

6    here, there isn't, not one, and there is nothing new in this

7    proposed consolidated amended complaint.

8            Mr. Williams pointed to two things which he says

9    are new and which he says supports this overarching

10   conspiracy.  One, he says that they have just learned through

11   their investigation that Carlos Ghosn, the Nissan CEO, came

12   in and broke up the Keiretsu system in the late '90s.  Well,

13   in fact, that's nothing new, everybody has known that for

14   years.  The Wall Street Journal had a feature article about

15   that in February 2013 which reported on that and blamed that

16   for all of these cases in the MDL.  There has been a lot of

17   discussion about that.  They didn't just find that all of a

18   sudden.

19           Second, and I would like to -- I'm sorry, I would

20   like to address something that --

21           THE COURT:  That was February of 2013 or 2014?

22           MR. CHERRY:  2013.  We can submit the article.  I

23   thought we were going to use a slide that showed it, but I'm

24   happy to submit the article.

25           I would like to address some of the facts that

1   Mr. Williams alluded to, so we may need people to leave.

2   Sorry.

3           THE COURT:  All right.  Direct purchasers are

4   leaving.

5           (All parties not subject to this motion were

6           excused from the courtroom at 11:32 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10          THE COURT:  Can we bring them in?

11          MR. CHERRY:  Okay.  Shall I wait or shall I keep

12     going?

13          THE COURT:  Let's get them in.

14          (Courtroom was open to the public at 11:39 a.m.)

15          THE COURT:  Okay.

16          MR. CHERRY:  I think pointed out by others, the

17     case they rely on here is Vitamins, starkly different.

18     Vitamins, the pleas were for vitamins.  Here the pleas were

19     for particular parts.  Vitamins on paragraph 93 of page 26 of

20     the complaint specifically goes through all the vitamins and

21     it says they all met to discuss these and it says the

22     conspiracy divided and allocated such market by region and by

23     vitamin, and that was implemented by the defendants and their

24     coconspirators and executives.  There's no allegation like

25     that in this complaint nor could it be made consistent with

 1    the Rule 11, nothing like that is alleged by anybody to have

 2    happened here, and that's the case they rely upon.

 3         Finally, we put forth in our opposition that we

 4    believe at this point the IPPs should be estopped from even

 5    making this sort of argument.  They have taken diametrically

 6    opposed positions on what the market is, how these markets

 7    work.  They have described in their complaints what is, in

 8    fact, true, that auto parts are very different products, that

 9    they do require different technology, different intellectual

10    property, different manufacturing facilities.  Different

11    types of companies make these very different products, and

12    they allege that because of that there are high barriers to

13    entry that prevent other companies from making those products

14    including defendants.

15         Now -- again that's very different from the

16    allegations in Vitamins, but now they are alleging, you know,

17    with no facts to support it, Mr. Williams is sort of

18    asserting here that there may have been some conspiracy for

19    the wiper maker not to make alternators or radiators.

20    There's no facts in the complaint to support that.  There is

21    nothing in any plea to support that.  They cannot allege that

22    in good faith.

23         And Your Honor has relied upon the allegations that

24    they have made in prior complaints, in denying motions to

25    dismiss, in approving settlements.  We have gone a long way

 1   with the case now based on those allegations.  We have spent

 2   a lot to defend those allegations.  Your Honor, again, has

 3   relied upon them.  To now throw that away and say no, we are

 4   taking an entirely different approach for whatever tactile

 5   reason we have at the moment.  I think the cases do say they

 6   are estopped from that, and I would refer to the Lorillard

 7   Tobacco case for that in particular.

 8            Finally, in terms of consolidation as others have

 9   alluded to, there would be huge prejudice here to the

10   defendants if consolidation and amendment were permitted in

11   terms of burden and cost on the defendants in terms of

12   discovery and motions practice and never mind this mega trial

13   that Your Honor has referred to as unfathomable if

14   consolidation were granted.  On the other hand, there is no

15   prejudice to the plaintiffs if Your Honor denies the motion.

16   We are in discovery on 12 of these products now, and they

17   seem to be wanting discovery.  We are in discovery.  If they

18   want discovery they should have agreed to have a 12(f)

19   conference when we have been asking for them since November.

20   We have been trying to move forward with discovery, and we

21   are getting resistance, and I think it was to support this

22   motion, so they could say things were not further along, but

23   we are in discovery now for 12 of these 18 products, and the

24   rest they haven't served and we haven't had motion practice.

25   We are ready to do that, we are ready to have motion practice

1    as soon as they complete service and we get a schedule.

2          And beyond that, they say they want to avoid

3    duplication and inconsistent rulings.  Well, that's the whole

4    point of the MDL.  That's why we are here.  We are working

5    hard to avoid duplication, and duplication only has to do

6    with 6 of the 23 defendants, the other 17 are only in one

7    case, there is no duplication.  And for the -- for the 6 that

8    are in more than one case, there are a few custodians, a few

9    witnesses that are really central to more than one case, and

10   where there is it is in the defendants' interest to work that

11   out and to coordinate and avoid duplication more than the

12   plaintiffs, and we are going to do that.  In fact, we

13   insisted on having language in the deposition protocols to

14   facilitate that.  So you don't need to totally disrupt the

15   current structure of the MDL to accomplish that, we have that

16   and we are doing that.

17          THE COURT:  Okay.

18          MR. CHERRY:  So that's my argument, Your Honor.

19   Thank you.

20          THE COURT:  Thank you.

21          MR. MILLER:  Your Honor, Todd Miller for the two

22   Tokai Rika defendants, and I will be extremely brief.

23          THE COURT:  Is it Miller?

24          MR. MILLER:  Miller, yes.

25          THE COURT:  Okay.

```
 1              MR. MILLER:  Two very quick points, Your Honor.
 2     The first is the statute of limitation, and this continues on
 3     with the futility arguments that you have been hearing.  As
 4     to the Tokai Rika defendants we were part of the original
 5     raid, and so you are presented with essentially the other
 6     side of the pancake that you have already been addressing,
 7     and that's one reason why I don't want to spend too much
 8     time.  You just most recently addressed this with the trucks
 9     case, and you dealt with it in a couple other of the parts
10     case.  So what you have got here is Tokai Rika was raided, as
11     you have said in the trucks case, that was a very well known
12     public event that happened in February of 2010, here it is
13     early 2016.  So Your Honor will face some serious statute of
14     limitations issues as to the Tokai Rika and perhaps other
15     defendants.  And really what it comes down to is the
16     plaintiffs have argued simply, well, fraudulent concealment.
17     Well, what has been fraudulently concealed?  Really nothing.
18     There are no new facts here that they have alleged that
19     weren't available to them before.  When you look at their
20     own -- the declaration or their complaint, there is nothing
21     really new there whatsoever.
22              Paragraph 402 of their complaint is the only place
23     where they allege anything about the affirmative acts of
24     concealment, and they tell us that these acts include denying
25     the conspiracy alleged and inserting that there were a
```

 1    multitude of separate conspiracies.  Well, as we know from
 2    the Carrier Corp. case from the 6th Circuit, that's just not
 3    sufficient, Your Honor.  So there is no fraudulent
 4    concealment that they can point to that would allow them to
 5    toll the statute of limitations and so they are left as to us
 6    with a very public event that should have triggered at least
 7    notice, and I do recognize that this is under state law so
 8    Your Honor would have to address that, but again your
 9    court -- this Court has faced that with the truck case, and
10    they are really left with nothing.
11         The second point that also goes to futility but
12    also touches upon prejudice is the notion that their
13    complaint wouldn't relate back under Rule 15, and the reason
14    is is that when you consider what they can do to relate back
15    they have to put us on notice that we could be called to
16    answer for the allegations in the amended pleading.  Well,
17    there is absolutely nothing that has gone on before now in
18    the heater control case, which is the only one relevant today
19    for Tokai Rika, that would allow us to know that somehow we
20    are going to be charged with a conspiracy that covers 17
21    parts that you now have repeatedly heard we don't make any of
22    those parts that are subject to this consolidated-amended
23    complaint.
24         So, again, you have the relation back notion that
25    sort of ties in with the statute of limitations, and you also

```
 1    have it prejudicial because now we are being subject to a
 2    bunch of litigation that we had no notice of essentially.  So
 3    with that I will just stop --
 4              THE COURT:  Thank you.
 5              MR. MILLER:  -- because Your Honor has dealt with
 6    these in the other cases and you've got this in our briefs.
 7              THE COURT:  Thank you, Mr. Miller.
 8              MR. MILLER:  Thank you.
 9              MR. WILLIAMS:  May I, Your Honor?
10              THE COURT:  Ready to proceed?
11              MR. WILLIAMS:  May I ask the Court if we could
12    again have those same people leave the courtroom for a
13    moment?
14              THE COURT:  Okay.  They are getting their exercise
15    today.
16              (All parties not subject to this motion were
17              excused from the courtroom at 11:48 a.m.)
18
19
20
21
22
23
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Motion Hearings • March 15, 2016

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Motion Hearings • March 15, 2016

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        THE COURT:  Yes, we are done, we are done.  Thank

22   you.

23        (Courtroom was open to the public at 12:12 p.m.)

24        THE COURT:  Mr. Williams, it is your motion so do

25   you want to say something in the end or --

```
 1            MR. WILLIAMS:  I don't want to push it.  I'm just
 2    going to say one last thing, which is I said what I said
 3    about the Keiretsus and the Tomoe-Kai.  I didn't step back or
 4    change anything.  I wasn't caught in anything.  I said the
 5    two relate but you need the real story of the Tomoe-Kai to
 6    explain how it fits and started this conspiracy.  Thank you,
 7    Your Honor.
 8            THE COURT:  All right.  We are done with that.  The
 9    Court will issue an opinion.
10            Now we have the direct purchasers.  Let's -- how
11    long do you anticipate or are you just agreeing with the
12    indirects?  Who is going to speak?
13            MR. WILLIAMS:  Actually --
14            MR. FINK:  It will be very brief.
15            MR. WILLIAMS:  I'm very sorry to say this, but one
16    last thing.  There is an argument about how the directs
17    didn't join this and they are not part of this motion.
18    That's got nothing to do with the merits of this motion
19    because we buy cars, they buy parts, so it really has nothing
20    to do with this motion.
21            MR. SPECTOR:  Good morning, Your Honor.
22    Eugene Spector on behalf of the direct purchasers.  We really
23    have no position on this motion.
24            THE COURT:  Okay.  That's what I want.
25            MR. SPECTOR:  Thank you.
```

```
 1              THE COURT:  All right.  I think that's -- yes,
 2    Counsel?
 3              MR. CAROME:  Your Honor, there is a discovery
 4    motion that you also set for hearing.
 5              THE COURT:  I know that.
 6              MR. CAROME:  Do you want to do that now or do you
 7    want to take a break?
 8              THE COURT:  No, we are going to take a short break
 9    before we do the discovery.  I just want to make sure while
10    everybody is here, is there anything else that anybody has
11    regarding this motion?
12              (No response.)
13              THE COURT:  Okay.  We are all set.  Let's just take
14    ten minutes and then we will resume.
15              THE LAW CLERK:  All rise.  Court is in recess.
16              (Court recessed at 12:14 p.m.)
17                            —   —   —
18              (At 12:25 p.m. Court reconvenes, Court, counsel and
19              all parties present.)
20              THE LAW CLERK:  All rise.  Court is again in
21    session.  You may be seated.
22              THE COURT:  Just one minute.  All right.  Back on
23    the record, and this is on defendants' objection to a motion
24    to modify the orders of the Special Master regarding
25    compelling documents from Rush Truck.
```

1    MR. CAROME:  Yes.  Thank you, Your Honor.  My name

2    is Patrick Carome from Wilmer Hale representing Denso.  I'm

3    presenting here on behalf of all of the defendants in the

4    trucks and equipment dealer actions within the wire harness

5    product track.

6        We are here, as you said, on the defendants'

7    objection to Special Master Esshaki's December 15th order

8    denying the defendants' motion to compel documents from Rush

9    Trucks.  When the Court noticed this motion to be heard it

10   specified that oral argument is limited to the pass -- to the

11   issue of passthrough.  That issue was the subject of a single

12   three-sentence paragraph in Master Esshaki's December 15th

13   order.  In that paragraph the Master recited one of the

14   arguments made by the defendants against two particular

15   discovery requests that sought some downstream documents,

16   documents related to downstream transactions or sales by the

17   truck dealers to their customers, and the rationale that

18   Master Esshaki recited from the arguments made by truck

19   dealers was that passthrough is not a defense as a matter of

20   law in the -- in this case, and they asserted a specific

21   reason for that and they said that's because there are no --

22   there's no class of end payor plaintiffs in this case.

23       So may in those -- in -- and the Master said he

24   agreed with that, and on that basis he denied those two

25   requests for production on grounds that -- of relevance over

 1   breadth and burden, but it is clearly the only argument he

 2   cited was the relevance of this and the availability of the

 3   legal defense of passthrough.

 4        So we have here essentially a ruling on a matter of

 5   law by the Special Master and on that basis restricting

 6   discovery.  So given this is clearly a ruling on a matter of

 7   law, the critical question, the availability of the

 8   passthrough defense to these defendants, the standard of

 9   review for this objection is certainly de novo.

10        This is a critically important issue not just for

11   the wire harness product track trucks and equipment case, but

12   there are five other Rush Trucks truck and equipment dealer

13   actions, and so essentially the Master has made a ruling that

14   could have a broad legal impact on -- across all six of those

15   cases, so it is very important that we get this legal issue

16   right now so that it doesn't affect discovery, which the

17   parties are attempting to coordinate as the Court wants to

18   coordinate across the six truck and equipment dealer cases.

19        The legal master -- the Special Master's ruling was

20   wrong for three reasons at least.  First, as a matter of law

21   the great majority of states that permit indirect purchaser

22   claims, the great majority of those states do not confine the

23   passthrough defense to circumstances in which there either is

24   a risk of claims being asserted by persons or entities or

25   further downstream or the fact -- or a fact of such claims

1    already having been asserted, so that just the legal

2    proposition, which obviously the Master relied upon, which is

3    no -- no end payor claimants means no passthrough defense,

4    that legal proposition is wrong at least for the great

5    majority of -- under the great majority of state laws that

6    are applicable here.  The passthrough defense is, indeed,

7    available regardless of whether or not there are downstream

8    claimants as well.

9         The second reason why this is wrong is that

10   contrary to what the Master assumed there are, in fact, many

11   claims that have already been filed and asserted by

12   end payors of trucks and equipment, and there is even more so

13   a substantial prospect of many more such claims by end payors

14   of truck and equipment being filed in the future.

15        Third -- the third basic reason why the ruling is

16   wrong is that the plaintiffs themselves, the truck and

17   dealer -- truck and equipment dealer plaintiffs themself have

18   alleged in their current complaint that they absorbed and did

19   not pass through a substantial portion of the alleged

20   overcharges, and therefore by the very terms of the complaint

21   that we are defending against the plaintiffs have put at

22   issue the fact of whether or not they absorbed versus passed

23   on any overcharge that they have reached, and so the

24   complaint itself makes this discovery highly relevant and the

25   passthrough defense relevant.

```
 1          So let me first -- we've discussed at some length
 2   in the briefs the law, this is obviously state law, about
 3   when the passthrough defense is available to indirect
 4   purchasers.  One case that we cite is the J & R Ventures case
 5   out of Wisconsin.  That court discussing Wisconsin law I
 6   think aptly summed up the principle at work here.  It would
 7   in that court's words, quote, create anomaly, closed quote,
 8   and be, quote, blatantly unfair, closed quote, to allow
 9   indirect purchasers to use pass on offensively to create the
10   basis for their claim but at the same time deny defendants to
11   rely on pass on or passthrough defensively, and that just, as
12   the court there said, would be highly unfair to allow one
13   side to use pass on to make their claim but to deny the
14   defendants to use pass on as a way of limiting either
15   showing -- if the entire amount of any alleged overcharge was
16   passed on and there was no absorption by the truck dealers
17   then they have no claim at all, there is no injury and/or --
18   so that's one way the pass-on defense can work, or it can
19   work to limit damages by subtracting from the amount of
20   damages that they can recover.
21          So ironically that J & R Venture case from
22   Wisconsin was decided by the very same judge who previously
23   had decided one of the cases that the truck and equipment
24   dealers principally rely upon in their briefs for why pass on
25   should not be available as a defense here.  They will -- you
```

Motion Hearings • March 15, 2016

1    will see in their briefs they heavily rely on a case by the

2    name of K & S Pharmacies, and ten years later that very same

3    judge when she got to the J & R Ventures case recognized that

4    that decision was wrong to the extent that it was a general

5    statement of law, and she said that -- the unavailability of

6    pass-on defense as a matter of Wisconsin law was only with

7    respect to claims by direct purchasers.  And so one of their

8    two main cases that they rely upon actually was undone much

9    more recently by the very same judge who said, no, the

10   pass-on defense is available without regard to whether there

11   is downstream claimants.

12           There are six states, and we laid them out in our

13   brief, that specifically have pass-on statutes providing the

14   availability of the passthrough defense to indirect -- to --

15   against claims by indirect purchasers, and at least five of

16   those six state statutes make clear that that pass-on defense

17   is available as a general matter regardless of whether or not

18   there are pending claims by further downstream claimants, and

19   those statutes do generally also refer to the goal of

20   avoiding duplicative recovery but it doesn't tie the

21   availability of the passthrough defense to there being

22   currently pending downstream claims by further downstream

23   claimants.

24           So ultimately when you boil down all of their --

25   and actually then there are 11 states where the -- that have

 1    statutes which allow claims by indirect purchasers and

 2    specify -- usually the language is they specify that the

 3    plaintiff may recover either actual damages or damages

 4    sustained, and while there aren't judicial decisions

 5    interpreting those provisions in all states, there are

 6    multiple court decisions which have held those kinds of

 7    statutes, the actual damages statutes, or the damages

 8    sustained statutes, do implicitly recognize the passthrough

 9    defense.

10         THE COURT:  You would need the passthrough in order

11    to determine if there were these actual damages --

12         MR. CAROME:  Exactly, both to determine impact and

13    to -- and for quantification of damages, and often the

14    plaintiffs in these cases argue, well, if anything goes to

15    damages you shouldn't get discovery on it now.  In fact, this

16    Court has set up in all of the cases a unified -- it hasn't

17    bifurcated discovery between class-related matters and

18    merits-related matters, so this is our one and only

19    opportunity to do damage-related discovery in the Rush Truck

20    case, and we are not going to get another chance to do it

21    later.  So even if it only related --

22         THE COURT:  Or you could argue for class cert --

23    well, plaintiff has to show damages.

24         MR. CAROME:  That's right.  Well, of course they

25    have to, of course they have to, but I'm saying they say

1    well, sometimes damages -- amount of damages at least they

2    would say well, that's for later after class cert.  Well, it

3    is not for later for purpose of discovery, we need it now

4    because we are doing discovery for all purposes now.

5            So in the face of all the case law and statutes

6    that we have referred to the plaintiffs ultimately cite only

7    two cases questioning or restricting when an indirect -- when

8    a defendant in an indirect purchaser case can -- is denied

9    the passthrough defense.  There is the Clayworth case in

10   California, and the California Supreme Court did hold that

11   the passthrough defense is available only where there is a

12   risk, not an actuality but a risk of claims that may be filed

13   by claimants at different levels of multiple layer

14   distribution chains.  So at least as to California, yes, we

15   need to -- to have -- the passthrough defense defendants do

16   need to show a risk that there are going to be claims by end

17   payors of trucks and equipment, and I will get to that in a

18   minute.

19           The other case that they cite is the Kansas case,

20   Cox vs. Hoffman, which denied a passthrough defense to a

21   defendant in an indirect claim, but that case related to a

22   completely different statute in Kansas, it allowed the

23   plaintiff to recover the full consideration paid when there

24   was an overcharge, so not just the overcharge but the full

25   consideration paid and so passthrough wouldn't make sense in

1    those circumstances.  That Kansas statute was repealed before

2    these cases were brought and so that Cox case has absolutely

3    no application here because Kansas now has a statute much

4    like the others where the damages are limited to actual

5    damages and so passthrough is by definition under current

6    Kansas law here.  So at most they have shown there is one

7    state, California, where the pose -- where the question of

8    whether there is going to be end payor claims has any bearing

9    at all.

10           Okay.  The second reason why Master Esshaki's

11   ruling is wrong as a matter of law is that he was wrong to

12   assume that there are not claims either pending already or on

13   the horizon with respect to end payors of truck and

14   equipment, and so even under the California test we prevail

15   in passthrough being -- the passthrough defense being

16   available because here, in fact, there are claims already

17   pending by end payors of trucks and equipment and there

18   certainly are a very substantial prospect of additional

19   claims coming forward.

20           What am I talking about?  Well, first of all, the

21   State of Indiana has -- in this MDL in the wire harness track

22   has sued on behalf of the state and its political

23   subdivisions.  The scope of that suit is described in

24   paragraph 5 of Indiana's complaint as encompassing what that

25   complaint describes as -- defines as automotive wire harness

1    systems which are defined as things used or installed in

2    automotive vehicles and motor vehicles or simply vehicles

3    without any limitation to passenger cars.  So we already have

4    a case pending in this court where there are end payors of

5    trucks and equipment asserting a claim.  Obviously one of the

6    main things that the State of Indiana and its government

7    entities, cities and the like, purchase things like fire

8    trucks, sanitation trucks, garbage trucks, all manner of

9    trucks that they purchase.

10           So there was a second claim in this MDL again in

11   the wire harness case that was -- that involved claims for --

12   by end payors of trucks and equipment, that was the public

13   entities claim brought by City of Richmond and four other

14   municipalities around the country which -- now, the class

15   aspect of that case was dismissed but then there was a

16   settlement with four of the five remaining cities around the

17   country, and the complaint in the City of Richmond case

18   asserted claims with respect to -- I'm quoting from the

19   complaint, automotive wire harness systems installed in

20   automobiles, trucks and other vehicles.  So that was a case

21   about trucks, there was a settlement, there was monetary

22   payment.  The complaint in the City of Richmond case alleged

23   in particular that those cities had purchased vehicles for

24   heavy industrial uses such as fire departments, public works

25   departments, water and waste departments, building

1    departments and airport functions, so there were a lot of

2    trucks at issue there.  The named plaintiffs settled out for

3    money, and there's no reason to expect there aren't going to

4    be similar claims like that coming forward.

5         Importantly, settlements of claims count as -- even

6    under the California approach of requiring either risk or

7    actual downstream claims, those settlements would account as

8    showing a risk of duplicative recovery.

9         The State of Mississippi has recently filed a suit,

10   the Attorney General of Mississippi, for wire harness

11   products in state court in Mississippi.  That's a suit on

12   behalf of the state and its citizens Parens Patriae.  The

13   suit repeatedly asserts that it pertains to automotive wire

14   harnesses that were components of automobiles and other

15   vehicles, so that suit by its term is a suit by end payors of

16   trucks and equipment, other vehicles other than automobiles.

17   And it defines automobile wire harness systems as being,

18   quote, employed in a wide range of products including

19   commercial and individual automobiles, farm vehicles and

20   other vehicles.  So we clearly have another case by end

21   payors of trucks and equipment already pending in

22   Mississippi.

23        THE COURT:  When does that case get here, do you

24   think?

25        MR. CAROME:  Pardon me?

1        THE COURT:  When would that case get here?

2        MR. CAROME:  It is in state court, Your Honor.  I'm

3   not sure that it ever will.

4        The State of Florida --

5        THE COURT:  It will once they start looking at it.

6        MR. CAROME:  We will see.

7        The State of Florida in this MDL in the bearings

8   case, not wire harness but in the bearings case, the State of

9   Florida has sued on behalf of its state, the State of Florida

10  and its governmental entities, and on behalf of businesses

11  and individuals -- individual consumers within Florida.  The

12  scope of that suit encompasses what is defined as bearings

13  vehicles which are defined as, quote, vehicles into which

14  bearings were installed.  And so there is no limitation in

15  the State of Florida case pending before you to just

16  passenger cars.  It is -- that case by its terms defines a

17  much broader scope of vehicles, so there is another end payor

18  of trucks and equipment bringing suit.

19       The State of California in this MDL -- the State of

20  California has filed suits in five product tracks including

21  two, alternators and starters, in which the trucks and

22  equipment dealers have also brought claims.

23       The AG's suit pending before this Court on behalf

24  of California and its state agencies, and it -- that

25  complaint alleges specifically, quote, plaintiffs purchased a

1    substantial volume of automobiles and trucks, another end

2    payor of trucks.  And so this is really actually just the tip

3    of the iceberg what has been filed.

4         The Attorney General of several states, including

5    California, Florida, Washington and Utah, have reached out to

6    one or more of the defendants in the wire harness cases for

7    tolling agreement, tolling the statute of limitations to

8    preserve their ability to bring claims.  And a number of

9    defendants, including my client, Denso, have signed such

10   tolling agreements with some of those Attorney Generals.

11        Indeed, even though the California Attorney General

12   has not yet filed a suit in the wire harness products track,

13   representatives of the California Attorney General's Office

14   have been attending depositions of defendants in these cases.

15   Now, as I said, there is going to be -- there is likely to be

16   unfortunately a significant number of additional states

17   coming forward, that's exactly what happened in the LCD case,

18   another large antitrust MDL.  There were, I believe, 14

19   different states ultimately came forward in those cases to

20   file claims, so we are going to have a substantial number of

21   claims by government entities, government entities have

22   already alleged that they are purchasers of trucks and

23   equipment, end payor purchasers of those, so we will have no

24   shortage of those unfortunately.  So there is -- actually we

25   already have such claims, and there is a risk of more claims

 1    coming down the pike.

 2          In fact, we have looked at Rush Trucks' data, its

 3    own purchase and sale data has been produced to defendants,

 4    and actually we see that within that data Rush Trucks has

 5    itself sold trucks and equipment to at least three of the

 6    states that have secured tolling agreements from defendants.

 7    In California there are Rush Truck sales to Los Angeles, San

 8    Diego Fire Department, and City of Bakersfield.  In Florida,

 9    the Rush Trucks' data shows there are sales by Rush Trucks to

10    the City of St. Petersburg.  In Utah, data shows that there

11    have been sales by Rush Trucks to the Salt Like City

12    corporation, the Salt Lake City Public Utility Department,

13    the Salt Lake City School District, which obviously would

14    include a purchaser of buses, which are not passenger

15    vehicles.

16          They would also show purchases by cities in other

17    states in which Rush Trucks or truck dealers are bringing

18    claims.  There are -- Rush Trucks' data shows that the City

19    of Phoenix in Arizona have purchased trucks from Rush Trucks.

20    Albuquerque, New Mexico, Charlotte, North Carolina,

21    Nashville, Tennessee.  There are tons of trucks being sold to

22    government entities.  Government entities are still -- there

23    is a substantial prospect they are going to come forward and

24    in some cases they already have.

25          So, in addition, there are large purchasers of

```
 1    trucks -- private purchasers of trucks and equipment who may
 2    well still come forward and bring claims not as a matter
 3    of -- just on their own behalf without being classes or they
 4    may opt out of the class, and so the -- there is -- there is
 5    a substantial prospect even from private entities of future
 6    claims by end payors of trucks and equipment.  So even if
 7    there was some need -- even if the passthrough defense did
 8    depend on a risk of duplicative liability to end payors, we
 9    have got that in spades here.
10           Lastly, just another -- just another point, even in
11    cases where the passthrough defense is not available, courts
12    have held that discovery regarding downstream activities by
13    the plaintiff even in direct purchaser cases for example are
14    relevant to class certification issues including adequacy and
15    typicality, there can be circumstances where the way that a
16    particular plaintiff sold vehicles.  Say if it always sold
17    them for a certain percentage above acquisition cost -- well,
18    actually in those cases that plaintiff was arguably
19    benefiting from any overcharge and would not be an adequate
20    or typical class representative.  So even if you had to get
21    past all the law that says we are entitled to the passthrough
22    defense, the discovery here would be important and relevant
23    so --
24           THE COURT:  Let me ask you this question, it is
25    going to a different subject -- well, not a different
```

1   subject, but in looking at what you are asking for in

2   discovery it does look like -- to answer the questions that

3   you have asked and to get the information that you seek, it

4   looks like you are asking for everything.  I guess my

5   question to you is what are you not asking for of Rush

6   Trucks?

7           MR. CAROME:  I don't think we are asking for

8   everything by any means, Your Honor.  I would say this, I

9   think what this objection is really about is correcting a

10  legal error made by the Special Master.  I think if there are

11  questions -- and he ruled that this discovery was simply off

12  the table entirely as a blanket matter.

13          THE COURT:  Well, let's say it is on the table, how

14  can we limit it?  It just seems -- I'm looking ahead, so if I

15  should rule that it is on the table, how do we do this in a

16  way that doesn't -- that isn't burdensome?  I know we haven't

17  gotten to that -- we haven't talked about that issue but I

18  can't help but think about it as you speak.

19          MR. CAROME:  I would suggest that if Your Honor

20  does what I think it should do and reverse Master Esshaki on

21  this legal ruling that you suggest that he mediate a

22  discussion between the defendants' counsel and Rush Trucks'

23  counsel to see if we can work out boundaries that will solve

24  any overbreadth concern.

25          THE COURT:  Okay.  Thank you.

1    MR. CAROME:  Thank you.

2    THE COURT:  Thank you very much.  Plaintiff?

3    MR. SPERL:  Good afternoon, Your Honor.  May it

4 please the Court, my name is Andrew Sperl with Duane Morris.

5 I represent the truck and equipment dealer plaintiffs.

6    I'm going to address the issues in the same order

7 they were presented by the defendants, but before I get into

8 that I would like to indicate our agreement with the point

9 that Your Honor made, which is that these requests are

10 extremely broad, extremely expansive as they are written, and

11 I know that the order setting the hearing directed us not to

12 necessarily get into burden and overbreadth arguments but

13 those are very real concerns.

14    I would point out two things in relation to that.

15 One is that in determining whether requests are appropriate,

16 relevance is balanced with burden and so that is why the

17 marginal relevance of some of these requests, the marginal

18 relevance of this downstream discovery is important.  And

19 secondly, to keep in mind, and we have gone into this in the

20 brief so I'm not going to read off the list of requests for

21 which we have agreed to produce documents because those are

22 in our briefing and you can see that we have agreed to

23 produce substantial discovery, particularly on our pricing,

24 which I think is some of the downstream discovery that the

25 defendants are interested in.

```
 1            And as defendants just acknowledged, we have
 2   produced transactional data.  In fact, I may be getting the
 3   timing mixed up but I think that data production is even more
 4   fulsome than it was when the briefing was started.  We have
 5   produced our entire unredacted database of purchases and
 6   sales of trucks during the period that we maintained that,
 7   which goes back -- I don't remember the exact date but it
 8   goes back a number of years.
 9            So to the extent that defendants need data to run
10   regressions to calculate things like damages or passthrough,
11   they have that data.  To the extent that they need to test
12   the theory about whether or not we are selling product at
13   some markup over our costs, you know, they have that data,
14   they have documents that relate to our pricing, and so this
15   discussion about these requests, and I will turn to the
16   passthrough issue that Your Honor directed us to focus on,
17   but I did want to put that in the proper context before I get
18   into those legal issues.
19            Dealing first with the legal issue of whether or
20   not downstream discovery as a matter of law is discoverable
21   in a case like this.  I would submit that, first of all, as
22   Your Honor is aware, these are state law claims for which we
23   are seeking damages and as such this is a state law issue,
24   whether or not there is a passthrough defense and whether or
25   not plaintiffs need to affirmatively prove a lack of
```

1    passthrough in order to show antitrust injury under those

2    state laws.

3            THE COURT:  So you do agree that it is a legal

4    issue and therefore a de novo consideration by this Court?

5            MR. SPERL:  Your Honor, on the one hand I would say

6    under the rule, Rule 53 -- I don't have the sub point that

7    governs this, issues are divided or issues are denoted

8    procedural issues, and we have cited case law that says

9    discovery issues are procedural issues, and I don't believe

10   in their reply the defense have cited case law identifying

11   discovery issues as other procedural issues, and so other --

12           THE COURT:  Well, what the defense is is a legal

13   issue, not a procedural issue, right?

14           MR. SPERL:  Right, and that --

15           THE COURT:  When you get down to it, I know what

16   you want but that particular issue seems to me to really

17   weigh heavily on the legal side rather than a procedure.

18           MR. SPERL:  Your Honor, we are cognizant of the

19   importance of that legal issue, and I would submit that under

20   a de novo review of that particular legal issue that we would

21   prevail on that as well even under de novo review.  And I

22   would, and I think Your Honor recognizes this, that the

23   issues of burden and overbreadth in the other determinations

24   that the Special Master made, those would clearly be

25   discretionary -- abuse of discretion standard.

 1          With regards to the legal issues, the fact is these

 2    are state law claims and the issue of the passthrough defense

 3    is going to be a state law issue, and there is very little

 4    authoritative case law interpreting the statutes of these

 5    states.  For instances we just heard about a Wisconsin trial

 6    court decision where holding a particular way, you know,

 7    those decisions -- even decisions of other federal courts

 8    trying to construe state law are not binding and

 9    authoritative here.  And, in fact, other than the California

10    decision, the Clayworth decision, which I understand is only

11    authoritative with respect to California law, I'm not aware

12    of any other state high court decision that construes these

13    state statutes.  And so what we are asking Your Honor to do

14    in this case is to look at this competing authority, and

15    there is competing authority which both sides have cited, and

16    to pick what is the better rule and to pick what is the most

17    well reasoned rule because certainly for a lot of states it

18    is an issue of first impression and even for the other states

19    there is not authoritative case law.

20          THE COURT:  What if I accept the different state

21    rules, I mean, because the state made the determination, what

22    do we do then?  Would it be if we accept that California

23    allows this do we allow discovery on cases from California?

24    I mean, do we distinguish where people purchased their

25    vehicles, do we do it that way?

```
 1              MR. SPERL:  Well --
 2              THE COURT:  Or do we just come up with a common
 3    rule for all states?
 4              MR. SPERL:  Well, first of all, Your Honor, if I
 5    could say just to clarify, I think the only way the states
 6    have spoken on this are either state court decisions, which I
 7    have just talked about, there are not very many authoritative
 8    state court decisions, and in the words of the statutes
 9    themselves.  Regarding your question what do we do, for
10    instance, if we decide that in California as the Clayworth
11    court decided, and there shouldn't be any dispute on what
12    California law is because of that decision, what if we
13    decided in California there is no passthrough defense, but in
14    some other state if Your Honor were to come to the conclusion
15    that there is the possibility of a passthrough defense, even
16    whereas I would submit here there is nothing other than a
17    speculative chance of duplicative recovery, that may be a
18    situation where possibly we could confine discovery to a
19    particular state, there might be a way to do that.  You know,
20    I think that even confined to a particular state to a
21    particular dealership you would still run into the overburden
22    and overbreadth arguments.  But as matter of law, I think you
23    could say discovery relevant to truck and equipment sales in
24    such and such state, and then we would have to work out the
25    mess of how to conduct that discovery and whether even that
```

 1    request so limited is overly broad and unduly burdensome.

 2          As I mentioned, to the extent the states have

 3    spoken about this at all, it is in lower court decisions, it

 4    is in the Clayworth decision and in the words of the statutes

 5    themselves.  Defendants have suggested in their briefing that

 6    under the words of the statutes there is always going to be a

 7    passthrough defense provided because, first of all, some

 8    statutes use terms like actual damage or damages sustained.

 9    I would argue, first of all, in the absence of state law

10    construing what those words mean, there is not an

11    authoritative source for you to look at, and again you have

12    to look at the better rule.

13          If you look at Hanover Shoe, I believe that the

14    federal antitrust statute refers to damages sustained, and in

15    that case of course the court held that antitrust injury was

16    suffered at the time the overcharge was paid by the direct

17    purchasers.  I realize that this is a different situation

18    because following Hanover Shoe came Illinois Brick, which was

19    the solution to this problem we have of how is it that a

20    passthrough defense isn't available and yet the indirect

21    purchasers can also have a cause of action.

22          The Supreme Court solved that in a particular way

23    in Illinois Brick, that doesn't mean that's the only way that

24    has to be solved, and if you look at the Clayworth decision

25    it acknowledges that fact and acknowledges that you can have

1    a rule that recognizes as in Hanover Shoe the antitrust

2    injury is suffered at the time of the overcharge but still

3    provide for an indirect purchaser cause of action and yet

4    somehow prevent the risk of duplicative recovery.  Clayworth

5    didn't go into all the details about how to prevent the risk

6    of duplicative recovery, but it acknowledges where there is a

7    real risk of duplicative recovery then a passthrough defense

8    would be allowed.

9         Before I move on I would also like to note, one of

10   the reasons we rely so heavily upon Clayworth, besides the

11   fact that it is the only authoritative state court decision

12   that I'm aware of, when I say that I say that from the state

13   high court, is that it is a particularly well-reasoned

14   decision, it goes into the rationale of its decision, the

15   policy considerations.  One of the points that we have heard

16   from defendants in their briefing is that to allow what we

17   are proposing would be fundamentally unfair because you could

18   have indirect purchasers recovering some sort of windfall by

19   being able to claim for damages, but even if those damages

20   were passed on to a nonparty, you know, someone lower in the

21   distribution chain, I would submit there is a competing

22   policy consideration.

23        The purpose of the antitrust statutes is to promote

24   competition, it is to punish violations of those statutes, it

25   is to disgorge wrongfully gotten profits that were made in

 1   violation of those statutes.  So if you are presented with a

 2   risk on the one hand of a plaintiff, a victim of the

 3   antitrust conspiracy, recovering more or on the other hand

 4   defendants not being liable for the full damages that they

 5   have caused, I will submit that the policy of the antitrust

 6   laws would favor erring on the side of over recovery to go

 7   promote its aims.

 8              I mentioned that there are two ways that states

 9   have spoken on this.  One is through limited judicial

10   decisions, the other is through the text of the statues

11   themself beside those statutes that refer to actual damages,

12   damages sustained, which, by the way, I would note damages

13   sustained is the language from the Cartwright Act as well.

14   In addition to that language in the statutes, some statutes

15   do provide for by statute a passthrough defense, but in every

16   one of those statutes which defendants have identified, and

17   those are the only ones I am aware of it, it says to the

18   effect of -- there's language that says to prevent

19   duplicative recovery.  That language would be mere surplusage

20   in all of these statutes if that defense were always

21   available where there is no risk of duplicative recovery.  I

22   will also note that in those states where there are such

23   statutes, those are the same states in which defendants are

24   arguing that plaintiffs have to show a lack of passthrough

25   initially to show that there has been actual damages.  Those

 1   states also use the terms actual damages in their statutes.

 2   If that were true it will be unnecessary to have a separate

 3   defense for passthrough in those states, and the entire

 4   language of the passthrough defense in those states would be

 5   your surplusage.

 6          Your Honor, the defense have also suggested that in

 7   this case there is actually the possibility of duplicative

 8   recovery, and I believe that in defendants' brief they were

 9   focused on Mississippi and Indiana.  There were a couple of

10   other sources and complaint mentioned in argument that I

11   haven't studied as carefully.  We have described in our brief

12   why the Mississippi and the Indiana claims do not create a

13   real risk of duplicative discovery.  I would note in general

14   with respect to this argument a few things.  First of all,

15   where there are references to automotive wire harness, to

16   automotive vehicles, I would suggest that those do not refer

17   to the types of heavy trucks and heavy equipment that are

18   sold by the dealers in our punitive class.  We were careful

19   in tailoring our complaint to make it clear what it was that

20   we were complaining about.  And the fact that I don't believe

21   that these entities are actually pursuing those claims I

22   think is also evidenced by the fact that they haven't sought

23   out as far as I know discovery specific to trucks and

24   equipment.

25          As far as I know, and I am careful with this

1    representation because, as I mentioned, I haven't studied all

2    of these complaints, I don't -- I'm not aware of allegations

3    in those complaints that are specific to the market for

4    trucks and equipment as we have alleged in those complaints

5    that we currently have before this Court.  And the fact of

6    the matter is, as defendants made the point on the earlier

7    motion today and as they argued in their motion to have our

8    cases dismissed, they would argue that there has been some

9    knowledge around the edges at least of this conspiracy for a

10   while and no one has filed claims other than these few,

11   which, as I have mentioned, are distinguishable.  There is

12   not the rush of claims having been filed for our particular

13   class, most of the claims that they have filed have been

14   automobile claims.  And I would suggest that under Clayworth

15   it is not enough that there merely be some speculative

16   chance, it has to be a real possibility of duplicative

17   recovery for there to be a passthrough defense.

18        In their briefing defendants also suggested that

19   documents responsive to the requests at issue are relevant

20   for other issues other than establishing a passthrough

21   defense or damages.  However, if you look at their briefing

22   there is really only one specific example that they have

23   given of why this may be relevant, and that is on the issue

24   of adequacy.  Defendants have suggested that perhaps Rush

25   Trucks may be differently situated than other plaintiffs and

 1   have a conflict with other plaintiffs in the punitive class

 2   because we somehow benefited, for instance, by not having

 3   to -- by selling our goods at some markup over the cost that

 4   we paid for them and that would situate us differently.

 5        Going back to my initial point, we have given

 6   defendants and agreed to produce more than enough information

 7   to test that limited theory.  We have given them all of our

 8   data, we have given them documents, we have agreed to produce

 9   documents that relate to pricing, so if that's the only

10   theory, and as I read their papers that is the only specific

11   theory that I know of other than passthrough, why this

12   information is relevant, they have that.

13        THE COURT:  What information exactly did you give

14   them, the price and what else, what other documents?

15        MR. SPERL:  So our database is -- we have two

16   databases that our client maintains, and as you know there

17   are multiple individual plaintiffs that are all affiliated

18   with one parent company and the parent company maintains the

19   database that they all use, just as background.  There is one

20   database that has information on acquisitions of trucks, and

21   there is another database that has information on sales of

22   trucks.  I don't have all of the fields for those databases

23   in front of me, but there are price terms in the databases,

24   there are other financial terms, certain types of discounts

25   from the OEM, there is a field in there for that.  There's

1   probably hundreds of fields in the databases not all of which

2   necessarily are going to be relevant, but we have provided

3   defendants with complete and unredacted versions of that.

4         With regard to documents --

5         THE COURT:  What other documents would you have?  I

6   know this is going to the first part but I'm just curious as

7   to what would you have --

8         MR. SPERL:  Well --

9         THE COURT:  -- that you are not giving?

10        MR. SPERL:  On the one hand I will let defendants

11  speak more for themselves in terms of what they think they

12  need to prove.  Documents which would be in the category of

13  things that are being sought which are overly broad would be

14  things like -- I believe one of the requests at issue relates

15  to all documents relating to RFQs.

16        THE COURT:  To what?

17        MR. SPERL:  RFQs, so request for quotation, maybe

18  RFPs, request for proposals.

19        THE COURT:  Okay.

20        MR. SPERL:  But the definition of relatedness and

21  the definition of RFQ are so broad that if any customer sent

22  an e-mail to any of our salespeople and said I'm interested

23  in buying a truck, you know, that's related to an RFQ, could

24  you give me a price on X, and we have to go through all of

25  the e-mails of all of our salespeople one by one to get that.

 1   So, I mean, that's in the category of things we would object

 2   to.

 3            I would also note, and I suspect this is because

 4   the Special Master maybe didn't apply this rationale to

 5   request 8, but I think request 8 would be in the same

 6   category, which is basically all the communications we have

 7   had with our customers.

 8            Examples of documents which we would have and which

 9   we have agreed to produce, those are set out in our brief.  I

10   don't remember all the categories, I know a lot of them

11   related to pricing I believe but in our brief is a

12   bullet-point list -- a couple of lists of the requests for

13   which we have agreed to provide responsive documents.

14            THE COURT:  Okay.  Thank you.

15            MR. SPERL:  Thank you.

16            THE COURT:  Response?

17            MR. CAROME:  Just a couple of very brief points,

18   Your Honor.

19            First, I hear plaintiffs relying solely on this one

20   case in one state, California.  Just so it is very clear what

21   the rule is there, I will read a quote from that case.

22   The -- so even in California under Clayworth the question is

23   not whether claims by downstream claimants have already been

24   filed, which is apparently what the Special Master assumed,

25   but whether there is, quote, a risk that they may be filed.

1    Exactly where a risk remains that multiple purchasers may

2    sue, the bar on consideration of pass-on evidence must

3    necessarily be lifted.  That's even under their best -- under

4    their very best case, and that's only for one state.  And so

5    I didn't hear much to suggest that there is not going to be a

6    flood of additional suits by AGs including suits for trucks

7    and equipment.

8              In the LCD panel case the Attorneys General -- none

9    of the Attorneys General even stepped forward to file suits

10   until after a class certification decision had not just been

11   made but subject to an interlocutory appeal and affirmed by

12   the 9th Circuit.  It was after that point, four years into

13   the case, that the first AG stepped forward in those cases

14   and ultimately --

15             THE COURT:  Really, I didn't realize that.

16             MR. CAROME:  Ultimately there were 14 states that

17   stepped forward after that point in time.  So we are at a

18   quite early stage actually when it comes to the Attorney

19   General, so it is very likely -- as I have said, there have

20   been a number of Attorney Generals reaching out to defendants

21   for tolling agreements and the like, so there is more than a

22   substantial risk of suits by -- which would present the

23   problem of duplicative recovery even if that were the rule,

24   which as far as we hear here today that's really only the

25   case in California.

1          We are at the discovery stage in this case.  It

2     would be a very dangerous thing for this Court to narrow

3     discovery now and build into not just the wire harness'

4     trucks and equipment case but all of the trucks and equipment

5     cases what would become a reversible error down the road if

6     this discovery were denied.  And so clearly the safe course

7     to keep this case on track to avoid doing a lot work and then

8     having to redo it again because the discovery was unduly

9     narrow at the front end, the safe and smart thing to do is to

10    allow this discovery and not rely on this erroneous legal

11    ruling.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.  Okay.  I think that takes

14    care of it.  The Court will issue an opinion on this

15    hopefully soon.

16          Is there anything else while you are here?

17          (No response.)

18          THE COURT:  No.  All right.  We will see you at the

19    meeting in May.

20          MR. CAROME:  Thank you very much, Your Honor.

21          MR. SPERL:  Thank you, Your Honor.

22          THE LAW CLERK:  All rise.  Court is adjourned.

23          (Proceedings concluded at 1:16 p.m.)

24                      _    _    _

25

```
 1                              CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4   the United States District Court, Eastern District of

 5   Michigan, appointed pursuant to the provisions of Title 28,

 6   United States Code, Section 753, do hereby certify that the

 7   foregoing pages comprise a full, true and correct transcript

 8   taken in the matter of Automotive Parts Antitrust Litigation,

 9   Case No. 12-02311, on Tuesday, March 15, 2016.

10

11

12                              s/Robert L. Smith
                                Robert L. Smith, RPR, CSR 5098
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17   Date:  03/24/2016

18   Detroit, Michigan

19

20

21

22

23

24

25
```