REDACTED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311<br>Honorable Marianne O. Battani |
| In Re: WIRE HARNESS CASES | |
| THIS RELATES TO:<br>All Wire Harness Cases | 2:12-cv-00100-MOB-MKM |

**DECLARATION OF LARRY S. GANGNES IN SUPPORT OF CERTAIN DEFENDANTS' OPPOSITION TO DELPHI AUTOMOTIVE SYSTEMS, LLC'S MOTION FOR PROTECTIVE ORDER AND CROSS-MOTION TO COMPEL DELPHI CONNECTION SYSTEMS US, INC.'S AND DELPHI AUTOMOTIVE SYSTEMS, LLC'S COMPLIANCE WITH SUBPOENAS**

REDACTED

I, Larry S. Gangnes, declare as follows:

1. I am one of the attorneys representing Defendants Furukawa Electric Co., Ltd. and American Furukawa, Inc. (collectively, the "Furukawa Defendants") in this litigation. I have personal knowledge of the facts set forth in this Declaration and am competent to testify thereto. I make this Declaration pursuant to 28 U.S.C. § 1746 and submit it in support of Certain Defendants' Opposition to Delphi Automotive Systems, LLC's Motion for Protective Order and Certain Defendants' Cross-Motion to Compel Delphi Automotive Systems, LLC's and Delphi Connection Systems US, Inc.'s Compliance with Subpoenas.

2. Delphi Automotive Systems, LLC ("Delphi"), like the Defendants in this litigation, is a supplier of certain Wire Harness Products, as that term is defined in Plaintiffs' complaints, to automaker Original Equipment Manufacturers ("OEM") and others. (*See* Direct Purchasers' Consolidated Amended Class Action Complaint, No. 2:12-md-02311-MOB, ECF No. 86, ¶¶ 23-27, 101; Automobile Dealers' Consolidated Class Action Complaint, No. 2:12-md-02311-MOB, ECF No. 85, ¶¶ 86-90, 144 ("Delphi was the third largest maker of Automotive Wire Harness Systems [in the world] as of 2009.").) Delphi also regularly purchases certain Wire Harness Products manufactured or sold by others—including Defendants.

3. Delphi is a large and sophisticated multi-national company with substantial assets and resources. The most recent 10-K filed by Delphi's parent company, Delphi Automotive PLC, is available on its website (http://investor.delphi.com/investors/financial-information). The 10-K states:

> We are a leading global vehicle components manufacturer and provide electrical and electronic, powertrain and active safety technology solutions to the global automotive and commercial vehicle markets. We are one of the largest vehicle component manufacturers, and our customers include all 25 of the largest automotive original equipment manufacturers ("OEMs") in the world. We operate 126 major manufacturing facilities and 14 major technical centers

709315.0013/6628270.3

utilizing a regional service model that enables us to efficiently and effectively serve our global customers from low cost countries. We have a presence in 44 countries and have over 19,000 scientists, engineers and technicians focused on developing market relevant product solutions for our customers.

The 10-K discloses that Delphi Automotive PLC had $15 billion in sales revenue in each of the last three years, including net sales revenue of $15.165 billion in 2015, with U.S. sales of more than $5.5 billion; 2015 operating income of $1.723 billion; and $859 million in cash and equivalents as of December 31, 2015, with property, plant and equipment in the U.S. valued at almost $900 million (net of accumulated depreciation). Delphi Automotive PLC's Electrical/Electronic Architecture segment designs, manufactures and sells certain Wire Harness Products, among other vehicle electrical and electronic components. According to the 10-K, this segment had net sales revenue of $8.18 billion and adjusted operating income of $1.095 billion in 2015.

4. Delphi and several of its affiliates were previously named as defendants in the Direct Purchaser Plaintiff and Automobile Dealer Plaintiff Actions, but those Plaintiff groups voluntarily dismissed their claims against the Delphi-affiliated entities without prejudice in mid-2012. (*See* Notices of Voluntary Dismissal, No. 2:12-md-02311-MOB-MKM, ECF Nos. 130, 133.)

5. Shortly before those dismissals, I spoke with Delphi's in-house counsel, Joseph Papelian, and advised him that the remaining Defendants would likely need discovery from Delphi. Mr. Papelian indicated that he should be the point of contact for such inquiries. On April 8, 2014, I sent an email to Mr. Papelian asking to discuss Defendants' discovery requests with him. My email is attached hereto as Exhibit A.

6. Before speaking with Mr. Papelian, I reviewed his May 21, 2012 letter to Plaintiffs' counsel (copied to Defendants' counsel) regarding Delphi's production of documents

2

relating to its manufacture and sale of Wire Harness Products to the U.S. Department of Justice ("DoJ") in connection with its investigation. I forwarded Mr. Papelian's May 21, 2012 letter to him in an April 15, 2014 email, and in a telephone call the next day he and I discussed the documents Delphi had produced to DoJ ("DoJ Documents"), Delphi's agreement to provide its DoJ Documents to Plaintiffs in this litigation, and the additional documents Plaintiffs were requesting from DoJ. He confirmed that Delphi's production of documents to DoJ was quite limited because Delphi had been instructed by DoJ to suspend its production long before it was completed, as stated in his May 21, 2012 letter. My April 15, 2014 email and Mr. Papelian's May 21, 2012 letter to Plaintiffs' counsel are attached hereto as Exhibit B.

7. After learning about the limited scope of Delphi's DoJ Document production and speaking with Defendants' experts, I forwarded a set of document and data requests to Delphi on behalf of Defendants in an email to Mr. Papelian on April 22, 2014, which is attached hereto as Exhibit C.

8. I sent Mr. Papelian an email on May 16, 2014, summarizing what I understood from him were the data and documents Delphi had agreed to produce to Plaintiffs, as follows: (a) Delphi's DoJ Documents and documents requested in DoJ's subpoena that had not been produced when DoJ told Delphi to cease production; (b) documents regarding the Delphi/Furukawa joint venture; (c) a summary list of RFQ bids that Delphi or Delphi/Furukawa had submitted to Toyota, including the dates, bid prices, and whether Delphi or Delphi/Furukawa won or lost the bid; (d) a summary list of approximately 18 Delphi or Delphi/Furukawa "programs" with Toyota on which Delphi submitted bids, including fields showing how Delphi's bids were put together; and (e) Excel files on several Delphi bids to Toyota that include all supporting documents and data, such as bills of material (cable, wire harness final assembly,

3

copper, labor, etc.) costs and other items making up the bid, all of which Delphi had designated as "Highly Confidential" under the Stipulated Protective Order entered in this litigation. My May 16, 2014 email is attached hereto as Exhibit D.

9. I sent Mr. Papelian another email on May 19, 2014 with a revised set of document and data requests on behalf of Defendants for discussion at a May 23 conference call with him and some of his colleagues at Delphi. During the May 23, 2014 conference call, Mr. Papelian advised that Delphi's Electrical/Electronic Architecture Systems division includes its Delphi Packard subsidiary, which manufactures the wire harnesses sold by Delphi to nearly every OEM around the world, from 18-20 in Europe, North America, Japan, and Korea, with sales to China as well. We discussed some of the document and data requests I had sent him on May 19. Among other things, I was told that ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

10. During the May 23, 2014 conference call, Mr. Papelian instructed that Delphi's DoJ Documents and the documents Delphi had produced to Plaintiffs be produced to Defendants as well. I confirmed that Defendants would treat the documents in accordance with the Stipulated Protective Order and the designations Delphi had given the documents. I also agreed to talk to Defendants' experts, defense counsel, and coordinate with Plaintiffs' counsel in an

effort to further narrow the parties' requests for additional documents and data to be provided by Delphi.

11. Following the May 23, 2014 conference call, I spoke again with Defendants' experts and in an effort to narrow Defendants' requests, and then posed the following questions to Mr. Papelian in a June 3, 2014 email:

> First, in determining the extent to which the geographic scope of our requests for Delphi's wire harness products sales information can be limited, [we] would like to know in general the percent of Delphi's wire harness products sales by region (North America, Europe, Japan, etc.) over the time period for which Delphi has such data. Second, [we] would like to know the percent of sales per OEM over that period in determining whether the requests can be limited to certain OEMs. Third, [we] would like to know the percent of Delphi's purchases of wire harness products from defendants over that period in determining whether Request No. 5 can be limited in some way.

However, Delphi never provided the information requested. I also advised Mr. Papelian that I had reached out to Lead and Liaison Counsel for Auto Dealer Plaintiffs and End-Payor Plaintiffs about coordinating discovery from Delphi but had been unsuccessful, and offered to contact the Plaintiffs' counsel with whom he had been speaking about Plaintiffs' discovery requests to Delphi. My May 19, 2014 email with Defendants' revised data and documents requests and June 3, 2014 email are attached hereto as Exhibit E.

12. On August 15, 2014, my partner, Ken Davis, and I spoke with Billy London and Will Reiss, counsel for Direct Purchaser Plaintiffs, who had sent a set of discovery requests to Delphi and Mr. Papelian. In an August 23, 2014 email, I advised Mr. Papelian that Defendants were reviewing Plaintiffs' proposed discovery requests in order to present Delphi with a single set of requests acceptable to all parties. Over the next several months, counsel for Plaintiffs and I exchanged proposed discovery requests. In a November 19, 2014 email, I advised Mr. Papelian that counsel for each Plaintiff group had agreed on a set of document and data requests to Delphi,

5

REDACTED

which were broader than, and thus included, the documents and data requested by Defendants, and that Victoria Romanenko, counsel for Auto Dealer Plaintiffs, would be forwarding Plaintiffs' requests to him. On December 4, 2014, Ms. Romanenko sent Mr. Papelian an email with Plaintiffs' requests. My August 23 and November 19, 2014 emails and Ms. Romanenko's December 4, 2014 email and Plaintiffs' requests are attached hereto as Exhibit F.

13. At Mr. Papelian's suggestion, he and other Delphi representatives met in person with counsel for both Plaintiffs and Defendants at Delphi's offices in Troy, Michigan on February 5, 2015, to provide background on Delphi's Wire Harness Products business for the purpose of guiding the discussion on the scope of further voluntary production of data and documents from Delphi. Doug Gruber, Vice President of Delphi's Packard or "Wiring Products" Division, which is one of five Delphi divisions, gave a PowerPoint presentation explaining the Delphi Price Review Group ("DPRG") process, ███████████████████ ███████████████████████████████. Plaintiffs' and Defendants' counsel agreed to treat the materials presented and discussion as "Highly Confidential" under the Protective Order.

14. Mr. Gruber said that the wire harness business is very competitive, that Delphi had just released its latest quarterly and annual results for 2014, and that ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

6

[REDACTED]. A January 13, 2015 email from Mr. Papelian to Plaintiffs' and Defendants' counsel suggesting the February 5 meeting and a January 21, 2015 email from his assistant confirming the date of the presentation at Delphi's offices are attached hereto as Exhibit G.

15. I requested a copy of Mr. Gruber's PowerPoint presentation in a February 12, 2015 email, and Mr. Papelian replied on February 23 that Delphi would review this request "once we reach agreement on the scope of discovery." My February 12, 2015 email, and Mr. Papelian's February 23 reply are attached hereto as Exhibit H.

16. On June 1, 2015, Omar Ochoa, counsel for End-Payor Plaintiffs, sent Mr. Papelian an email attaching a letter setting out Plaintiffs' discovery requests to Delphi. In a June 8, 2015 email, I advised Mr. Papelian that Defendants had no requests to add to Plaintiffs'. Mr. Ochoa followed up with another email to Mr. Papelian on June 22, 2015 asking for a response to his letter because Mr. Papelian had not replied. Mr. Ochoa's June 1 and 22, 2015 emails and my June 8, 2015 email are attached hereto as Exhibit I.

17. Mr. Papelian eventually replied to Mr. Ochoa in an email on July 30, 2015. He said that Delphi would conduct a reasonable search for and produce responsive documents,

including (a) Delphi's DPRG packages from 2000-2014, (b) purchase orders, (c) KE30 monthly reports containing transaction data from 2006-2014, (d) Delphi's five-year revenue plan, and (e) documents regarding Delphi's policies and training with respect to bidding and setting prices. His email also attached a sample KE30 monthly report (which does not appear to include any data or information that would require a review for privilege or other substantive concerns). However, although Mr. Ochoa's June 1, 2015 letter had sought data and documents concerning Delphi's purchases and sales of "Wire Harness Products," as defined in the requests forwarded by Ms. Romanenko on December 4, 2014, from all suppliers and to all customers, Mr. Papelian's email limited Delphi's proposed response to "wire harness sales" to a limited group of OEMs (General Motors, Ford, Chrysler, Daimler, Toyota, Honda and Nissan) without explanation except that these OEMS purportedly "represented[ed] Delphi's main customers for wire harness sales." Mr. Papelian's July 30, 2015 email is attached hereto as Exhibit J.

18. Following a conference call with Mr. Ochoa, me, and others on September 28, 2015, Mr. Papelian sent Mr. Ochoa an email confirming that Delphi had conducted a search, limited to the documents it had collected in response to the DoJ subpoena that were stored in a computer server, and found approximately 28,000 documents responsive to the terms "DPRG" and/or "Divisional Pricing Review Group" for the period prior to 2011. He estimated that it would take a Delphi employee two days to conduct such a search for documents post-2011. He also asked if the parties were interested in retaining a third-party vendor to access Delphi's SAP database and extract the requested data and confirmed that Delphi would to attempt to provide definitions for the categories of documents within the database. Finally, he confirmed that Delphi would create a list identifying the custodians of the documents it produced to DoJ. Mr. Papelian's September 28, 2015 email is attached hereto as Exhibit K.

19. After discussing the data issues with Defendants' experts, I followed up on Mr. Papelian's September 28, 2015 email and a subsequent conference call on October 12, 2015, with an October 28, 2015 email asking him for additional information about Delphi's KE30 monthly sales transaction reports and Delphi's SAP database. Mr. Papelian responded on December 4, 2015 with an email providing certain information about KE30 monthly sales transaction reports and Delphi's SAP database. Although he had agreed during our October 12 call to consult with his colleagues as to whether Delphi would permit a third-party vendor to look at its SAP data base for purposes of estimating what it would cost for that vendor to extract the data, his email admitted that neither he nor Delphi had done so. My October 28, 2015 email and Mr. Papelian's December 4, 2015 reply are attached hereto as Exhibit L.

20. On December 14, 2015, Stephanie Fine, one of the attorneys for the Fujikura Defendants, and I spoke with Mr. Papelian and proposed a two-stage process for obtaining discovery from Delphi. At Mr. Papelian's request, I summarized Defendant's proposal in a December 14 email. First, Defendants would obtain an estimate of the costs of extracting Delphi's transactional data regarding its purchases and sales of Wire Harness Products (as defined in plaintiffs' consolidated complaints), including the monthly KE30 summary sales reports, using a third-party vendor. In this regard, I also advised him that we had located a vendor, Ben Zenick, co-founder of Zencos Consulting (www.zencos.com) in Cary, North Carolina, who was familiar with SAP databases and could give us such a cost estimate. The second proposed discovery stage was production of Delphi's electronic and other documents, including the categories of documents described in Mr. Papelian's July 30 email, invoices from a Delphi database, and any documents Delphi has concerning purchases of Wire Harness Products from, or sales of such Products to, the Direct Purchaser Plaintiffs (or their successors). However,

Defendants requested that Delphi provide a more definitive estimate of the costs associated with the review and production of such documents before committing to pay such costs. My December 14, 2015 email is attached hereto as Exhibit M.

21. On January 22, 2016, Mr. Papelian hosted a conference call with me and counsel for Direct Purchaser Plaintiffs and Auto Dealer Plaintiffs. Following the call, he sent an email detailing the "action items" for Delphi, including advising whether Delphi would allow a third-party vendor to extract its SAP data, and determining the timing and cost to search, review, and produce the KE30 monthly sales summaries, DPRG packages, and invoices. I responded in a January 24, 2016 email clarifying that Defendants were seeking discovery regarding Delphi's purchases and sales of Wire Harness Products, not just wire harnesses, and noting Mr. Papelian's statement that Delphi would bear the costs of searching for DPRG packages for the period 2010-2014. Mr. Papelian's January 22, 2016 email and my January 24, 20165 email response are attached hereto as Exhibit N.

22. Mr. Papelian replied in a January 29, 2016 email that Delphi would not produce data and documents regarding Wire Harness Products, only wire harnesses. He further stated that Delphi's agreement to create a list of document custodians for its DoJ Documents and produce its purchase orders, five-year revenue plans, and documents regarding its DPRG process and policies and training with respect to bidding and setting prices, was conditioned on "closure on all open issues." Mr. Papelian's January 29, 2016 email is attached hereto as Exhibit O.

23. Plaintiffs had been conspicuously silent about the discovery they wanted from Delphi during this exchange of emails with Mr. Papelian. In a January 25, 2016 telephone call, Omar Ochoa advised me that End-Payor Plaintiffs did not want to pay any of the costs and expenses required to obtain discovery from Delphi. On January 29, 2016, I spoke by telephone

with Jon Cuneo, who advised that Auto Dealer Plaintiffs likewise did not want to pay any of the costs and expenses associated with obtaining discovery from Delphi. In a February 5, 2016 telephone call, Billy London advised me that Direct Purchaser Plaintiffs were only interested in obtaining Delphi's data. Unlike Plaintiffs, Defendants have never refused to pay any of the costs incurred by Delphi in producing data and documents requested in the Subpoenas.

24. Surprisingly, scarcely more than a week after Mr. Papelian's January 29 email, and apparently buoyed by Plaintiffs' sudden disinterest in obtaining discovery from Delphi (with the possible exception of its data), Delphi abruptly executed an about-face on the discovery it had offered to produce during nearly two years of negotiations. In a February 8, 2016 email, Mr. Papelian stated that Delphi's "final proposal" was to produce transactional data only for certain limited categories of Wire Harness Products—wire harnesses—and that it would allow Mr. Zenick and Zencos Consulting access to Delphi's SAP database for this purpose at Defendants' expense. Mr. Papelian stated that Delphi's "final proposal" superseded all previous discussions. "In other words, Delphi does not agree to provide the remainder of the information outlined in the various telephone calls and emails regarding this subject." In a February 11, 2016, email from Mr. Papelian, Delphi reneged on its "final proposal," stating that neither Zencos Consulting nor any third party vendor would be allowed access to Delphi's data and that Delphi would only extract data relating to wire harnesses, again at Defendants' expense. Mr. Papelian's February 8 and 11, 2016 emails are attached hereto as Exhibit P.

25. Faced with Delphi's sudden lack of cooperation, I sent an email to Mr. Papelian on February 16, 2016, advising that Delphi's withdrawal of all of the discovery it had offered to provide as recently as January 22 without explanation, except for transactional data relating to wire harnesses, did not provide Defendants with the discovery they need. As a result, the

Furukawa Defendants would be forced to serve Delphi with the enclosed Subpoena to obtain the necessary discovery. Nevertheless, Defendants still preferred to reach agreement with Delphi, if possible, on the documents and data it would produce informally without a Subpoena, and I was available to discuss ways in which the Requests could be refined to reduce the burden and expense to Delphi. My February 16, 2016, email is attached herein as Exhibit Q.

26. When Mr. Papelian failed to respond, the Furukawa Defendants prepared a Notice of Intent to Serve Subpoenas, which I sent to Mr. Papelian in a February 19, 2016 email. In that email, I renewed my offer to discuss ways in which the Requests in the Subpoenas could be refined to reduce any burden and expense to Delphi. My February 19, 2016, email is attached herein as Exhibit R.

27. The Subpoenas were served on Delphi Automotive Systems, LLC and Delphi Connection Systems US, Inc. on February 23, 2016. Delphi Connection Systems US, Inc. has neither moved against the Subpoena nor objected to it within the 14 days permitted by Fed. R. Civ. P. 45(d)(2). The Notice of Intent and the Subpoenas, and a February 23, 2016 email from Stephanie Morgan of Nationwide Process Service, Inc. confirming service of the Subpoenas on that date, are attached hereto as Exhibit S.

28. The next day, I sent Mr. Papelian an email advising that Defendants were still interested in minimizing the time and expense to Delphi in producing its data by retaining Mr. Zenick and Zencos Consulting to do it. I advised Mr. Papelian that Mr. Zenick did not believe that he would have to install any "third-party software" in Delphi's SAP database since it is likely he would be able to use existing Delphi tools to extract the requested data. Mr. Papelian did not respond to this offer. My February 23, 2016, email is attached hereto as Exhibit T.

29. On March 10, 2016, Mr. Papelian responded to the Subpoenas with an email to me, demanding that the Furukawa Defendants either (a) accept the proposal in his February 11, 2016 email under which Delphi would produce its 2006-2014 SAP transactional data relating only to wire harnesses, with the Furukawa Defendants obligated to reimburse all of Delphi's expenses, or (b) withdraw the Subpoena. I responded in a March 11, 2016 email, renewing my offer to discuss "ways in which the time and expense to Delphi of producing the data and documents requested can be minimized or mitigated, as well as a schedule for production of Delphi's data and documents that accomplishes those ends, including a reasonable extension of the March 14, 2016, Subpoena compliance date and a phased, rolling production of data and documents, along with a cost-sharing agreement." In particular, I requested "a meaningful meet/confer with you at your earliest convenience so that we may be informed of whatever objections Delphi may have to the Requests in the Subpoena and discuss ways in which any such objections may be accommodated and resolved." Mr. Papelian's March 10, 2016 email and my March 11, 2016 email are attached hereto as Exhibit U.

30. Counsel for the Fujikura Defendants had a similar, difficult experience in obtaining a limited set of Delphi documents relating to a single RFQ—Ford's CD4 RFQ—and these requests did not relate to this class action litigation, but rather to separate claims against the Fujikura Defendants asserted only by Ford Motor Company. Laura Taylor Cofer, one of the attorneys for the Fujikura Defendants, sent Mr. Papelian a letter request for these documents in a June 8, 2015 email. When Ms. Cofer had no response from Mr. Papelian after follow-up emails on August 30 and October 20, she was forced to threaten serving a subpoena on Delphi in a November 30, 2016 email. Mr. Papelian finally responded in a December 4, 2016 email. Mike Rubin, another attorney for the Fujikura Defendants, replied to Mr. Papelian the same day

13

questioning Mr. Papelian's earlier estimate that it would cost $100,000 for the contract attorneys hired by Delphi to review the documents requested by the Fujikura Defendants and that the review would take two months. Mr. Rubin estimated that the 2,700 documents (7,500 pages) Delphi had gathered regarding the CD4 RFQ would take a single reviewer two weeks to review at a cost of $2,160. In a December 14 email, Mr. Papelian agreed with Mr. Rubin's estimate but said that he wanted to further delay producing the requested documents until Delphi had reached agreement on Defendants' requests. Mr. Rubin replied on January 5, 2016 that the Fujikura Defendants had "run out of time" and threatened a second time to draft and serve a subpoena on Delphi. Mr. Papelian's assistant, Barbara Frantangelo, responded in an email the next day that a subpoena would not be necessary and that Delphi agreed with Mr. Rubin's cost and time estimates and would begin review and production of the documents requested by the Fujikura Defendants. Ms. Cofer's June 8, August 30, October 20, and November 30, 2015 emails; Mr. Papelian's December 4 and 14, 2015 emails; Mr. Rubin's December 4, 2015 and January 5, 2016 emails, and the January 6, 2016 email from Ms. Frantangelo are attached hereto as Exhibit V.

31. Following a January 7, 2016 call with Mr. Rubin, Mr. Papelian stated in an email of the same date that Delphi would begin review of the 2,700 CD4 documents on January 11. In the end, that review took but two weeks and Delphi's cost of reviewing and producing the documents requested by the Fujikura Defendants informally in lieu of a subpoena was $1,426, according to a January 25, 2016 email from Ms. Frantangelo. Mr. Papelian's January 7, 2016 email and Ms. Frantangelo's January 25, 2016 email are attached hereto as Exhibit W.

32. Delphi has never questioned the relevance of the discovery sought in the Subpoenas. That is so because the data and documents the Subpoenas seek from Delphi, a non-

14

REDACTED

Defendant supplier of Wire Harness Products, concerning Delphi's sales of such Products are potentially relevant to a "benchmark" or "yardstick" analysis of analysis of alleged overcharges (if any) by Defendants and whether there is a common method for determining any resulting impact on the putative Plaintiff classes and damages, and to class certification. A "benchmark" or "yardstick" analysis may compare Defendants' prices and margins with the prices and margins of another supplier such as Delphi that Plaintiffs have implicitly conceded was not part of the alleged conspiracy. For example, Delphi's DPRG packages (Request No. 4 of the Subpoenas) reflect Delphi's analysis of market conditions and explain how Delphi arrived at the prices it charged. Similarly, Delphi's Five-Year Revenue Plans (Request No. 7) reflect Delphi's analysis of the wire harness market and its expectations for how much business it could win, and at what prices. Documents regarding Delphi's pricing and bidding policies (Request No. 9) may also reflect Delphi's understanding of the market and Delphi's place in it *vis-à-vis* its competitors.

33. I have reviewed selected documents from those Delphi produced to the Fujikura Defendants concerning Ford's Global CD4 RFQ. These documents show ████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████. These documents are potentially relevant to a "benchmark" or "yardstick" analysis of impact and overcharges, if any, and determining whether impact and Plaintiffs' damages can be measured using a common methodology and, if so, what the amount of those damages is.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 31st day of March, 2016.

/s/Larry S. Gangnes<br>
Larry S. Gangnes

REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2016, I caused the foregoing **DECLARATION OF LARRY S. GANGNES IN SUPPORT OF CERTAIN DEFENDANTS' OPPOSITION TO DELPHI AUTOMOTIVE SYSTEMS, LLC'S MOTION FOR PROTECTIVE ORDER AND CROSS-MOTION TO COMPEL DELPHI CONNECTION SYSTEMS US, INC.'S AND DELPHI AUTOMOTIVE SYSTEMS, LLC'S COMPLIANCE WITH SUBPOENA** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

                                                  /s/*Larry S. Gangnes*
                                                  Larry S. Gangnes