# Exhibit A

**Gangnes, Larry**

| | |
|---|---|
| **From:** | Gangnes, Larry |
| **Sent:** | Tuesday, April 08, 2014 2:08 PM |
| **To:** | 'Papelian, Joseph E' |
| **Cc:** | Davis, Kenneth R. |
| **Subject:** | Wire Harness MDL |

Joe,

Greetings!  We were surprised to see that the City of Richmond's class action complaint filed in February named Dephi as a defendant.  However, the City also named Furukawa Wiring Systems America, Inc. as a defendant even though it has been defunct since Sept. 2011 and was voluntarily dismissed by the W/H MDL plaintiffs as a result.  We understand that the City will likewise be dismissing FWSA and those other defendants dismissed by the W/H MDL plaintiffs, hopefully including Delphi.

You may recall that when last we spoke shortly before Delphi was dismissed from the W/H MDL, we discussed the likelihood that the remaining defendants would need discovery from Delphi, and you suggested that I contact you on this issue.  That time has come.  Is there a convenient time for me to call and bring you up to date?

Regards.  Larry

**Larry Gangnes**

 **LANE POWELL**
ATTORNEYS & COUNSELORS

Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

1

Exhibit B

## Gangnes, Larry

| | |
|---|---|
| **From:** | Gangnes, Larry |
| **Sent:** | Tuesday, April 15, 2014 6:27 PM |
| **To:** | 'Papelian, Joseph E' |
| **Cc:** | Davis, Kenneth R. |
| **Subject:** | Document Requests to Delphi |
| **Attachments:** | Ltr - Williams 05-21-12 Response.pdf |

Joe, we are working to prepare a set of document and data requests to Delphi. Do you have a moment tomorrow or Thursday to talk briefly with me about Delphi's production of documents to DoJ and what the plaintiffs have received and are requesting now? This information will help us tailor defendants' requests. Please let me know when it would be convenient to talk.

Regards.

**Larry Gangnes**



Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

**From:** Howarth, Anne Marie [mailto:anne.marie.howarth@delphi.com] **On Behalf Of** Papelian, Joseph E
**Sent:** Monday, May 21, 2012 1:39 PM
**To:** swilliams@cpmlegal.com
**Cc:** Anita F. Stork; Bernard Persky; Britt M. Miller; David F. DuMouchel; David H. Fink; Don Barrett; Donald M. Barnes; E. Powell Miller; Gary R. Carney; Gerard V. Mantese; Gregory P. Hansel; James L Cooper; Jonathan W. Cuneo; Joseph C. Kohn; Joseph W Cotchett; Kennth A Gallo; Gangnes, Larry; Marc M. Seltzer; Marguerite Sullivan (marguerite.sullivan@lw.com); Michael Tubach; Michelle K. Fischer; Shawn M. Raiter; Steven A. Kanner; Steven F. Cherry; W. Parker Sanders
**Subject:** Response to May 16th Letter

*Forwarding on behalf of Joseph E. Papelian.*

Please let me know if I can be of further assistance.

Anne Marie Howarth
Delphi Legal - Litigation
Delphi Corporation
5725 Delphi Drive, MC 483-400-554
Troy, MI 48098-2815
(248) 813-2544, Fax (248) 813-2599
anne.marie.howarth@delphi.com

1

The information contained in this communication is confidential and is intended only for the use of the individual or entity for whom it is addressed. If you are not the intended recipient or the agent or employee responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of information in this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please immediately notify us by return e-mail, permanently delete any electronic copies of this communication and destroy any paper copies.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



*Joseph E. Papelian*
*Deputy General Counsel – Litigation*
Telephone: 248-813-2535
Facsimile: 248-813-3251

May 21, 2012

Steve N. Williams
Cotchett, Pitre & McCarthy
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010

Dear Mr. Williams:

This responds to your letter of May 16, 2012.

In May 2010, a Grand Jury Subpoena ("Subpoena") for documents was served at the Troy Center where Delphi Automotive Systems, LLC is located (5725 Delphi Drive Troy, Michigan). The Subpoena called for the production of documents related to the "Automotive Power and Data Network."

We began producing documents to the Department of Justice ("DOJ") in September 2010 and continued to make periodic productions thereafter. In May 2011, I met with representatives of the DOJ to discuss Delphi's status and our document production. As a result of that meeting, the DOJ directed Delphi to suspend any further document productions. In December 2011 (after the class action cases had been filed), the DOJ reaffirmed the direction it provided in May 2011.

The documents were produced to the DOJ in a Concordance load file format. The ESI fields included in the document productions were:

| Custodian | From | DateLastMod |
|-----------|------|-------------|
| BegDoc# | To | DateRcvd |
| EndDoc# | CC | Filesize |
| PgCount | BCC | Title |
| ParentID | Subject | ApplicationName |
| Attachmt | DateSent | EDSource |
| AttRange | TimeSent | Paragraph |
| Prprties | DateCreated | MD5Hash |

Very truly yours,

Joseph E. Papelian

cc: All Defense Counsel
Counsel for Auto Dealers
Gary R. Carney, Esq.

Counsel for Direct Purchasers
Counsel for End-Payors
Kenneth A. Gallo, Esq.

**Troy Offices and Customer Center 5725 Delphi Drive Troy, Michigan 48098-2815 USA**

Exhibit C

**Gangnes, Larry**

| | |
|---|---|
| **From:** | Gangnes, Larry |
| **Sent:** | Tuesday, April 22, 2014 12:12 PM |
| **To:** | 'Papelian, Joseph E' |
| **Cc:** | Davis, Kenneth R. |
| **Subject:** | Delphi Data/Document Requests |
| **Attachments:** | 5986002_5.pdf |

Joe,

As promised, enclosed please find a set of requests describing the data and documents defendants in the Wire Harness MDL respectfully request from Delphi to assist in their defense of plaintiffs' claims. We are available at your convenience to discuss how defendants can minimize the burden and expense to Delphi of providing us the information we need and the data and documents plaintiffs are seeking. To that end, we look forward to hearing from you after you have had a chance to review our requests.

Regards. Larry

**Larry Gangnes**



Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

1

## DOCUMENT REQUESTS

**REQUEST NO. 1:** Documents and/or data sufficient to show the following information for each sale by You or on Your behalf of (a) a Wire Harness Product or (b) an automobile part in which a Wire Harness Product was installed or a component thereof (*e.g.*, door, seat, roof, rear view mirror or other part) (collectively, "Auto Part") either (i) in the United States or (ii) outside the United States for later sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

    a.    The date of the sale;

    b.    The person (such as an OEM, automobile dealership, or auto parts distributor) to whom the Auto Part was sold, and such person's address;

    c.    The name or a description of the Auto Part sold, the quantity sold (including measurement unit for quantity, amount or number), part number, and any other product identifiers;

    d.    The terms and conditions on which the Auto Part was sold, including but not limited to:

        (i)    the sale price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to:

            1.    rebates, discounts, or other allowances, whether issued or applied at time of the sale, or sometime prior or subsequent thereto; and

            2.    amount paid at the time of the sale, and terms and duration of any monthly or installment payments;

        (ii)    shipping or freight costs, and by whom such costs were paid;

e.    The "ship-from" and vendor "pay-to" address(es) from which the Auto Part and invoice for them were shipped or sent, the date(s) on which the Auto Part and invoice were shipped or sent, the "ship-to/delivery" and customer "bill/invoice-to" address(es) to which the Auto Part and invoice were shipped or sent, and the date(s) the Auto Part and invoice were received;

f.    The RFQ(s), if any, as a result of which the Auto Part was sold;

g.    Any repairs, returns, or refunds with respect to the Auto Part sold, whether the Auto Part was returned, and the amount of any associated refund or credit;

h.    Any monetary or non-monetary components or incentives for the transaction beyond unit price, including but not limited to, financing, taxes, fees, and any service, benefit, and/or product (other than the Auto Parts sold themselves), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

i.    The identity and a description of each Wire Harness Product purchased or acquired by You or on Your behalf that was installed in, a component of, or Bundled with, the Auto Part sold, and the purchase price and manufacturer or supplier of each such Wire Harness Product, including but not limited to:

(i)    part number and any other identifiers of each such Wire Harness Product and the Auto Part in which it was installed, a component of, or Bundled with;

(ii)    quantity, amount, and number of each such Wire Harness Product that was contained in, a component of, or Bundled with, the Auto Part sold (including measurement unit for quantity, amount, or number);

2

  (iii)  vendor number or any other identifiers of the manufacturer or supplier of each such Wire Harness Product;

  (iv)  purchase price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to, any rebates, discounts, or other allowances, whether issued or applied at time of the sale, or sometime prior or subsequent thereto, and;

  (v)  information allowing You to trace or track each such Wire Harness Product after it was installed in, or Bundled with, the Auto Part sold;

j.  The specific product(s) (*i.e.*, the specific automobile(s)) for which the Auto Part sold was designed and/or in which it was intended to be installed, including but not limited to:

  (i)  for automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

  (ii)  for other products, a description of the product and any product identifiers;

k.  For each Auto Part sold, the actual and/or estimated direct and indirect materials, manufacturing, marketing, distribution, selling and other costs of goods sold, both fixed and variable, direct and indirect, including but not limited to, the direct and indirect costs of (i) each Wire Harness Product, (ii) each other component of the Auto Part sold, and (iii) administration, management, labor, tooling, overhead, energy, materials, sales and marketing, freight, and research and development;

l.  Each contract or agreement concerning the sale of the Auto Parts sold, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions;

3

m.    For Auto Parts that were sold pursuant to a Direct Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person that directed the purchaser to purchase or acquire the Auto Parts sold and at what price and terms; and

n.    The identity of any Auto Parts that were sold without the purchaser soliciting proposals, bids, or responses to an RFQ from more than one potential manufacturer or supplier of such Auto Parts;

o.    Your sales revenue, gross profit, profit margin or level, operating profit, projected profit, net profit, cash flow, EBITDA, and profit-and-loss statements for the sale of each of Auto Part sold;

p.    Organization chart(s) sufficient to identify the persons who were involved in the pricing and sale of the Auto Parts sold; and

q.    Documents sufficient to identify, describe, explain, and understand (i) any manufacturer, supplier, vendor, and customer numbers or codes; (ii) product, component, and part numbers or codes; (iii) vehicle, brand, model, model platform, and model year numbers or codes; (iv) RFQ and RFQ response numbers or codes; (v) plant or facility numbers or codes; (vi) contract or agreement and invoice numbers or codes; (vii) data fields that are reflected in data produced in response to this Request; and (viii) number, code, or data dictionaries, or similar documents.

4

**REQUEST NO. 2:**  Documents and/or data sufficient to show Your policies, practices, procedures, methods, models, formulas, guidelines, and factors used or considered in evaluating, deciding whether to respond, and preparing responses to, RFQs and other solicitations for the sale of Auto Parts, including but not limited to:

a.  Any centrally-stored file(s) regarding Your methods, models, formulas, guidelines, and factors used or considered in preparing responses to RFQs and other solicitations for the sale of Auto Parts, including but not limited to, Your DPRG procedure, method or process;

b.  Any centrally-stored file(s) regarding RFQs, solicitations to bid, RFQ responses, bids, proposals, and negotiations for the sale of Auto Parts;

c.  For each RFQ for the sale of an Auto Part You received or responded to:

(i)  date the RFQ was issued or sent;

(ii)  name, designation, number or other identifiers for the RFQ;

(iii)  person issuing the RFQ and its address;

(iv)  persons to whom the RFQ was issued or sent, and the address of each such person;

(v)  name or a description of each Auto Part that was the subject of the RFQ, and part numbers and any other identifiers of each such Auto Part;

(vi)  specific product(s) (*i.e.*, the specific automobile(s)) in which the Auto Part was designed or intended to be installed, including but not limited to:

(a)  for automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

5

(b) for other products, a description of the product, and part numbers and any product identifiers;

(vii) terms of the RFQ, including the design or specifications of the Auto Part (including any changes in such terms, design, or specifications and including the schematics or drawings for the part, product, or vehicle);

(viii) responses to the RFQ submitted by You or on Your behalf, including but not limited to bids, cost and profit margin information or estimates, proposed changes in the design or specifications of the Auto Part that was the subject of the RFQ, and any discounts, rebates, or other allowances, incentives, or other terms offered;

(ix) whether You were selected to manufacture or supply the Auto Part that was the subject of the RFQ, and if so, information allowing You to trace, track or link the RFQ with the Auto Part sold, and if not, the name of the person selected (if known) and the reasons You were not selected (if known);

(x) whether on-site engineers or other personnel or engineering services were provided by You or on Your behalf in connection with the Auto Part that was the subject of the RFQ, the nature and extent of such services, and the address where such personnel or services were provided; and

(xi) Limit Price, Target Price, or VE Price, if any, for the Auto Part, after application of all anticipated or expected discounts, rebates, or other allowances, and any revisions or changes to such price over time;

6

d.      Any communications between You and a competing manufacturer or supplier regarding an RFQ, solicitation to bid, RFQ response, bid, proposal, or negotiations for the sale of Auto Parts.

**REQUEST NO. 3:**  Documents concerning proposed or actual post-RFQ prices (*e.g.*, cost-down pricing and annual or semi-annual price reductions) for the sale of Auto Parts, and Your policies, methods, formulas, or factors used in negotiating, determining, setting, computing, quoting, or accepting such post-RFQ prices for the sale of Auto Parts.

**REQUEST NO. 4:**  Documents  sufficient to show the policies, methods, formulas, or factors used in determining, setting, computing, quoting, or modifying the prices of Wire Harness Products or Auto Parts sold by You, including but not limited to, documents concerning rebates, discounts, off-invoice discounts, credits, allowances, promotional or incentive payments, or other price concessions, and any proposed or actual changes in such policies, methods, formulas, or factors and the reasons for such changes.

**REQUEST NO. 5:**  Documents and/or data sufficient to show the following information concerning each purchase or acquisition by You or on Your behalf of a Wire Harness Product (i) in the United States or (ii) outside the United States for sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

a.      The date of the purchase or acquisition;

b.      The person from whom the Wire Harness Product was purchased or acquired, any identifiers of such person, and such person's address;

7

c.  The name or a description of the Wire Harness Product purchased or acquired, the quantity purchased or acquired (including measurement unit for quantity, amount or number), and part number and any other product identifiers;

d.  The terms and conditions on which the Wire Harness Product was purchased or acquired, including but not limited to:

   (i)  The purchase price (including currency and exchange rate, if applicable) and all adjustments to price, including but not limited to,

      1.  any rebates, discounts, or other incentives or allowances, whether issued or applied at time of purchase or acquisition or sometime prior or subsequent thereto;

      2.  amount paid at the time of the purchase or acquisition, and the terms and duration of any monthly or installment payments;

   (ii)  shipping or freight costs, and by whom such costs were paid;

e.  The "ship-from" and vendor "pay-to" address(es) from which the Wire Harness Product and invoice for it were shipped or sent, the date(s) the Wire Harness Product and invoice were shipped or sent, the "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Wire Harness Product and invoice were received, and the date(s) the Wire Harness Product and invoice were received;

f.  Any repairs, returns, or refunds with respect to the Wire Harness Product purchased or acquired, whether the Wire Harness Product was returned, and the amount of any associated refund or credit;

g.  Any monetary or non-monetary components or incentives for the transaction beyond unit price, including but not limited to, financing, taxes, fees, and any

service, benefit, and/or product (other than the Wire Harness Product itself), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

h.    The specific product(s) (*i.e.*, the specific Auto Part(s) or automobile(s)) for which the Wire Harness Product was designed and/or in which it was intended to be installed, including but not limited to:

    (i)    for automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

    (ii)    for other products, a description of the product and any product identifiers;

i.    Each contract or agreement concerning the purchase or acquisition of the Wire Harness Product, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions;

j.    For Wire Harness Products that were purchased or acquired pursuant to a Direct Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person that You to purchase or acquire the Wire Harness Product and at what price and terms; and

k.    Documents sufficient to identify, describe, explain, and understand (i) any manufacturer, supplier, vendor, and customer numbers or codes; (ii) product, component, and part numbers or codes; (iii) vehicle, brand, model, model platform, VIN, and model year numbers or codes; (iv) plant or facility numbers or codes; (v) Limit Price, Target Price, or other price numbers or codes; (vi) contract or agreement and invoice numbers or codes; (vii) data fields that are reflected in

data produced in response to this Request, and (viii) number, code, or data dictionaries, or similar documents.

**REQUEST NO. 6:**   Documents concerning the market(s), market or competitive conditions, and market structure(s) for the (a) manufacture and sale of Wire Harness Products and (b) purchase of Wire Harness Products, including but not limited to, competitors, market shares, profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and customer and consumer surveys and/or research concerning:

a.  market shares or market concentrations of the (i) manufacturers and suppliers of Wire Harness Products and (ii) purchasers of Wire Harness Products, as well as any variations in these shares or concentrations;

b.  separate markets for different types of Wire Harness Products (*i.e.*, automotive wire harnesses and ECUs); and

c.  market shares or market concentrations and conditions at each level in the various distribution chains for Wire Harness Products, including but not limited to the distribution chain for resale of Wire Harness Products as replacement or repair parts.

**REQUEST NO. 7:**   All documents that were provided or produced by You or on Your behalf to, or received from, the United States Department of Justice or any state agency related to any grand jury or other investigation, request for information, or proceeding involving Wire Harness Products, including, but not limited to, all subpoenas, document requests, proffers, transcripts, testimony, witness statements, and responses to requests for information.

709315.0013/5986002.5

**REQUEST NO. 8:**  All documents concerning each communication or agreement by You or on Your behalf with any plaintiff or plaintiff's counsel in the Wire Harness MDL, including but not limited to, all documents, including transactional data, that are produced or provided to counsel for any plaintiff in the Wire Harness MDL by You or on Your behalf.

11

## DEFINITIONS

1.      "Automobile" means a motor vehicle that is principally used for transporting from one to eight passengers and is designed to operate primarily on roads, typically with four wheels, including sedans, pickup trucks, and sport utility vehicles, but excluding motorcycles, all-terrain vehicles, buses, and commercial trucks.

2.      "Bundled" means bound, grouped, aggregated, manufactured or produced together.

3.      "Directed Sourcing Arrangement" means a transaction for the acquisition of a Wire Harness Product or a product containing a Wire Harness Product that was engaged in by You or on Your behalf with a supplier of Wire Harness Products or products containing a Wire Harness Product, pursuant to terms negotiated by another person or entity for You or on Your behalf.

4.      "Limit Price" is the price set by an OEM or on behalf of an OEM to purchase or acquire a Wire Harness Product or other product from a manufacturer or supplier that the manufacturer or supplier is or was asked to meet.

5.      "OEM" means an automobile original equipment manufacturer and the OEM's respective officers, directors, current and former employees, agents, representatives, attorneys, or anyone else acting or who has acted on its behalf.

6.      "Person" shall mean natural persons, proprietorships, corporations, public corporations, municipal corporations, the federal government and all departments and agencies thereof, state governments, local governments, other governmental agencies, political subdivisions, partnerships, groups, associations, organizations, or other entities, regardless of form.

7.      "RFQ" means requests to purchase of any kind, including invitations to bid or submit proposals, and formal requests for quotation.

8.      "Target Price" is an OEM's anticipated or expected price for the purchase or acquisition of a product, whether or not disclosed to actual or potential manufacturers or suppliers of the product in an RFQ or otherwise, including a price based on (a) the input and other costs of the manufacturer or supplier of the product, (b) a reasonable profit margin for the manufacturer or supplier, (c) reductions in the price of the product as compared to the price of the product or a similar product that was purchased or acquired previously by the OEM or on its behalf, (d) post-RFQ price reductions (*e.g.*, cost-down pricing and annual or semi-annual price reductions), (e) anticipated or expected manufacturing or production efficiencies, or (f) other factors.

9.      "VE Price" is the price that was offered by a manufacturer or supplier, or that an OEM anticipated or expected to pay, for the purchase or acquisition of a product after anticipated or expected reductions over time as a result of improvements in the engineering, design, or specifications of the product.

12

10.    "Wire Harness MDL" means the Class Cases, Miscellaneous Cases, and Individual Cases that are associated now or in the future with the Wire Harness Lead Case, Case No. 2:12-cv-00100, which is part of the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division.

11.    "Wire Harness Product(s)" means automotive wire harness electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in automobiles, and the following components of such wire harnesses:   automotive electrical wiring, automotive wire harnesses, automotive wiring connectors, automotive wiring terminals, cable bonds, electronic control units "ECUs," fuse boxes, high voltage wiring, junction blocks, lead wire assemblies, power distributors, relay boxes, and speed sensor wire assemblies.

12.    "You," "Your," and "Your Company" mean Delphi Automotive Systems LLP and its predecessors, successors, and present and former subsidiaries, departments, divisions, and/or affiliates, including without limitation Delphi Corporation, DPH Holdings Corporation, Delphi Furukawa Wiring Systems LLC, and any organization or entity that is or was subject to its or their management, direction, or control, together with its and their present and former directors, officers, employees, agents, representatives, or any Person acting or purporting to act on its behalf.

## INSTRUCTIONS

1.    Documents originating in paper or other hard copy format should be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files.   TIFF files shall be produced in single-page format along with image load files (.DII file and .OPT file and .LFP file).   All documents are to be provided with multi-page searchable text (.TXT) files. These text files and image load files should indicate page breaks to the extent possible, as well as Production Number Begin, Production Number End, Production Attachment Range Number Begin, Production Attachment Range Number End, and Production Document Page Count.   As well, each TIFF image should be branded with the applicable Bates number and confidentiality designation.

2.    Electronic document files that were or are created in Microsoft Excel, Microsoft Access, and similar applications, shall be produced in their native format.   The following metadata fields shall be produced with each such document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

13

3.    For electronic document files, including without limitation Microsoft Word, PowerPoint, Adobe, or PDF, and files from similar applications ("Electronically Stored Document Application Files"), production shall take the form of single-page TIFF images with cross-referenced image and load data files showing document breaks and formatted for Concordance and for loading into Opticon.  The following metadata fields shall be produced for each document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

4.    Emails also should be produced as single-page TIFF files according to the same protocols outlined above with respect to Electronically Stored Document Application Files, except that for emails the following metadata shall be produced:

- Beginning and Ending Bates Numbers
- Beginning and Ending Bates Ranges (including attachments)
- Date Sent in MM/DD/YY format
- Time Sent in 24 hour format
- Date Received
- Time Received
- Title/Subject
- To, From, CC, and BCC fields
- Attachment
- Text of Email
- Folder
- Custodian

Where an email has an attachment, each attachment should be produced immediately following the email to which it was attached.

5.    The relevant time period for each Request is (i) January 1, 1998 through and including October 31, 2011, excepting data extracted from electronic databases or data summaries for which the relevant time period is January 1, 1996 through and including December 31, 2013.

14