Exhibit D

## Gangnes, Larry

| | |
|---|---|
| **From:** | Gangnes, Larry |
| **Sent:** | Friday, May 16, 2014 12:32 PM |
| **To:** | 'Papelian, Joseph E' |
| **Cc:** | Davis, Kenneth R. |
| **Subject:** | RE: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes |

Joe,

It would be helpful in preparing for our call next Friday if I had more detail regarding what Delphi has agreed to provide plaintiffs. As I understand it, Delphi will be producing the following documents and data to plaintiffs (and thus to defendants as well):

1.  The documents Delphi produced to the DoJ (about 50,000-60,000 pages) and the documents requested in DoJ's subpoena to Delphi that had not been produced when DoJ told Delphi to cease production.

2.  Documents regarding the Delphi/Furukawa joint venture.

3.  RFQ summary that lists the bids Delphi or Delphi/Furukawa submitted to Toyota, including the dates, bid prices, and whether Delphi or Delphi/Furukawa won or lost the bid.

4.  A list of approximately 18 Delphi or Delphi/Furukawa "programs" with Toyota on which Delphi submitted bids, including fields showing how Delphi's bids were put together.

5.  Excel files on several Delphi bids to Toyota that include all supporting documents and data, such as bills of material, cable, wire harness final assembly, copper, labor, etc. costs and other items making up the bid.

Please let me know if I got this right, and send me the DoJ subpoena to Delphi and any agreements limiting what Delphi produced to DoJ and/or will be producing to plaintiffs. This information will be helpful to me in reviewing the extent to which Delphi will be producing documents and data responsive to the written requests I forwarded to you earlier.

Thanks for your help.

Regards. Larry

---

**From:** Yeager, Judy [mailto:Judy.Yeager@delphi.com] **On Behalf Of** Papelian, Joseph E
**Sent:** Thursday, May 15, 2014 10:16 AM
**To:** Gangnes, Larry
**Subject:** RE: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes

Larry:
Any flexibility with changing this to an early AM meeting (your time)? 7:30 am PDT?
Regards,

Judy Yeager

Delphi Legal – Litigation
5725 Delphi Drive
MC: 483.400.554
Troy MI 48098
judy.yeager@delphi.com
1.248.813.2106 (Office)
1.248.813.1122 (Fax)

-----Original Appointment-----
**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Thursday, May 15, 2014 1:14 PM
**To:** Yeager, Judy
**Subject:** Accepted: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes
**When:** Wednesday, May 21, 2014 2:00 PM-3:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Conf. Call; 248.729.0531, Conference ID: 248.289.05, J. Papelian, Host

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
*************************************************************************************
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
*************************************************************************************

Exhibit E

**Gangnes, Larry**

| | |
|---|---|
| **From:** | Gangnes, Larry |
| **Sent:** | Tuesday, June 03, 2014 9:37 AM |
| **To:** | 'Papelian, Joseph E' |
| **Cc:** | Davis, Kenneth R. |
| **Subject:** | FW: Delphi Requests: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes |
| **Attachments:** | 5986002_6.docx |

Joe,

Many thanks again to you and your team for the time spent talking with me on May 23. Since then, as promised, I have discussed how we can narrow our document/data requests to Delphi with our economists. To that end, they have several questions. First, in determining the extent to which the geographic scope of our requests for Delphi's wire harness products sales information can be limited, they would like to know in general the percent of Delphi's wire harness products sales by region (North America, Europe, Japan, etc.) over the time period for which Delphi has such data. Second, they would like to know the percent of sales per OEM over that period in determining whether the requests can be limited to certain OEMs. Third, they would like to know the percent of Delphi's purchases of wire harness products from defendants over that period in determining whether Request No. 5 can be limited in some way.

Finally, as promised, I have reached out generally to Lead and Liaison Counsel for Auto Dealers and End-Payors about coordinating discovery from non-parties such as Delphi but have been rebuffed. If you can tell me with whom you have been speaking from plaintiffs about plaintiffs' discovery requests to Delphi, I will reach out to that person specifically and try to establish a dialog.

Thanks again and I look forward to speaking with you again Friday, June 13, at 11:00 a.m. ET.

Regards. Larry

**Larry Gangnes**



Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

---

**From:** Gangnes, Larry
**Sent:** Monday, May 19, 2014 1:17 PM
**To:** 'Papelian, Joseph E'
**Cc:** Davis, Kenneth R.
**Subject:** Delphi Requests: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes

Joe, enclosed please find a revised set of Requests for use during our telephone conversation Friday. Let me know if you have any questions or comments in the interim.

Regards. Larry

## DOCUMENT REQUESTS

**REQUEST NO. 1:**  Data or documents (in the absence of data) sufficient to show the following information for each sale by You or on Your behalf of (a) a Wire Harness Product ("WHP") or (b) an automobile part in which a WHP was installed or a component thereof (*e.g.*, door, seat, roof, rear view mirror or other part) (collectively, "Auto Part") either (i) in the United States or (ii) outside the United States for later sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

a. Date of the sale;

b. Person (such as an OEM, automobile dealership, or auto parts distributor) to whom the Auto Part was sold, and such person's address;

c. Name or a description of the Auto Part sold, the quantity sold (including measurement unit for quantity, amount or number), part number, and any other product identifiers;

d. Terms and conditions on which the Auto Part was sold, including but not limited to:

 (i) Sale price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to:

  1. Rebates, discounts, or other allowances; and

  2. Amount paid at time of sale, and terms and duration of any monthly or installment payments;

 (ii) Shipping or freight costs, and by whom such costs were paid;

e. "Ship-from" and vendor "pay-to" address(es) from which the Auto Part and invoice for them were shipped or sent, date(s) on which the Auto Part and invoice

1

were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) to which the Auto Part and invoice were shipped or sent, and date(s) the Auto Part and invoice were received;

f.   RFQ(s), if any, as a result of which the Auto Part was sold;

g.   Any repairs, returns, or refunds with respect to the Auto Part sold, whether the Auto Part was returned, and the amount of any associated refund or credit;

h.   Monetary or non-monetary components or incentives for the sale beyond unit price, including any service, benefit, and/or product (other than the Auto Parts sold themselves), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

i.   Identity and a description of each WHP purchased or acquired by You or on Your behalf that was installed in, a component of, or Bundled with, the Auto Part sold, and the purchase price and manufacturer or supplier of each such WHP, including but not limited to:

   (i)   Part number and any other identifiers of each such WHP and the Auto Part in which it was installed, a component of, or Bundled with;

   (ii)   Quantity, amount, and number of each such WHP that was contained in, a component of, or Bundled with, the Auto Part sold (including measurement unit for quantity, amount, or number);

   (iii)   Vendor number or any other identifiers of the manufacturer or supplier of each such WHP;

2

    (iv)    Purchase price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to, rebates, discounts, or other allowances, and;

    (v)    Information allowing You to trace or track each such WHP after it was installed in, or Bundled with, the Auto Part sold;

j.    The specific product(s) (*i.e.*, the specific automobile(s)) for which the Auto Part sold was designed and/or intended, including but not limited to:

    (i)    For automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

    (ii)    For other products, a description of the product and any product identifiers;

k.    For each Auto Part sold, the actual and/or estimated direct and indirect materials, manufacturing, marketing, distribution, selling and other costs of goods sold, both fixed and variable, direct and indirect, including but not limited to, the direct and indirect costs of (i) each WHP, (ii) each other component of the Auto Part sold, and (iii) administration, management, labor, tooling, overhead, energy, materials, sales and marketing, freight, and research and development;

l.    Each contract or agreement concerning the sale of the Auto Parts sold, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions;

m.    For Auto Parts that were sold pursuant to a Directed Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person

3

that directed the purchaser to purchase or acquire the Auto Parts sold and at what price and terms; and

n.      Identity of any Auto Parts that were sold without the purchaser soliciting proposals, bids, or responses to an RFQ from more than one potential manufacturer or supplier of such Auto Parts; and

o.      Your sales revenue, gross profit, profit margin or level, operating profit, projected profit, net profit, cash flow, EBITDA, and profit-and-loss statements for the sale of each of Auto Part sold.

**REQUEST NO. 2:** Data or documents (in the absence of data) sufficient to show Your policies, practices, procedures, methods, models, formulas, guidelines, and factors used or considered in evaluating, deciding whether to respond, and preparing responses to, RFQs and other solicitations for the sale of Auto Parts, including but not limited to:

a.      Centrally-stored file(s) regarding Your methods, models, formulas, guidelines, and factors used or considered in preparing responses to RFQs and other solicitations for the sale of Auto Parts, including but not limited to, Your DPRG procedure, method or process;

b.      Centrally-stored file(s) regarding RFQs, solicitations to bid, RFQ responses, bids, proposals, and negotiations for the sale of Auto Parts;

c.      For each RFQ for the sale of an Auto Part You received or responded to:

(i)      Date the RFQ was issued or sent;

(ii)     Name, designation, number or other identifiers for the RFQ;

(iii)    Person issuing the RFQ and its address;

4

(iv)    Persons to whom the RFQ was issued or sent, and the address of each such person;

(v)     Name or a description of each Auto Part that was the subject of the RFQ, and part numbers and any other identifiers of each such Auto Part;

(vi)    Specific product(s) (*i.e.*, the specific automobile(s)) for which the Auto Part was designed or intended, including but not limited to:

    (a)    For automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

    (b)    For other products, a description of the product, and part numbers and any product identifiers;

(vii)   Terms of the RFQ, including the design or specifications of the Auto Part (including any changes in such terms, design, or specifications, or in the schematics or drawings for the part, product, or vehicle);

(viii)  Responses to the RFQ submitted by You or on Your behalf, including but not limited to bids, cost and profit margin information or estimates, proposed changes in the design or specifications of the Auto Part that was the subject of the RFQ, and any discounts, rebates, or other allowances, incentives, or other terms offered;

(ix)    Whether You were selected to manufacture or supply the Auto Part that was the subject of the RFQ, and if so, information allowing You to trace, track or link the RFQ with the Auto Part sold, and if not, the name of the person selected (if known) and the reasons You were not selected (if known);

5

(x)     Whether on-site engineers or other personnel or engineering services were provided by You or on Your behalf in connection with the Auto Part that was the subject of the RFQ, the nature and extent of such services, and the address where such personnel or services were provided; and

(xi)    Limit Price, Target Price, or VE Price, if any, for the Auto Part, after application of all anticipated or expected discounts, rebates, or other allowances, and any revisions or changes to such price over time;

d.     Any communications between You and a competing manufacturer or supplier regarding an RFQ, solicitation to bid, RFQ response, bid, proposal, or negotiations for the sale of Auto Parts.

**REQUEST NO. 3:**  Documents concerning proposed or actual post-RFQ prices (*e.g.*, cost-down pricing and annual or semi-annual price reductions) for the sale of Auto Parts, and Your policies, methods, formulas, or factors used in negotiating, determining, setting, computing, quoting, or accepting such post-RFQ prices for the sale of Auto Parts.

**REQUEST NO. 4:**  Documents  sufficient to show the policies, methods, formulas, or factors used in determining, setting, computing, quoting, or modifying the prices of WHPs or Auto Parts sold by You, including but not limited to, documents concerning rebates, discounts, off-invoice discounts, credits, allowances, promotional or incentive payments, or other price concessions, and any proposed or actual changes in such policies, methods, formulas, or factors and the reasons for such changes.

**REQUEST NO. 5:**  Data or documents (in the absence of data) sufficient to show the following information concerning each purchase or acquisition by You or on Your behalf of a

WHP (i) in the United States or (ii) outside the United States for sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

    a.    Date of the purchase or acquisition;

    b.    Person from whom the WHP was purchased or acquired, any identifiers of such person, and such person's address;

    c.    Name or a description of the WHP purchased or acquired, the quantity purchased or acquired (including measurement unit for quantity, amount or number), and part number and any other product identifiers;

    d.    Terms and conditions on which the WHP was purchased or acquired, including but not limited to:

        (i)    Purchase price (including currency and exchange rate, if applicable) and all adjustments to price, including but not limited to,

            1.    Rebates, discounts, or other incentives or allowances; and

            2.    Amount paid at the time of the purchase or acquisition, and the terms and duration of any monthly or installment payments;

        (ii)    Shipping or freight costs, and by whom such costs were paid;

    e.    "Ship-from" and vendor "pay-to" address(es) from which the WHP and invoice for it were shipped or sent, date(s) the WHP and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the WHP and invoice were received, and date(s) the WHP and invoice were received;

    f.    Repairs, returns, or refunds with respect to the WHP purchased or acquired, whether the WHP was returned, and amount of any associated refund or credit;

g.  Monetary or non-monetary components or incentives for the purchase beyond unit price, including any service, benefit, and/or product (other than the WHP itself), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

h.  The specific product(s) (*i.e.*, the specific Auto Part(s) or automobile(s)) for which the WHP was designed and/or intended, including but not limited to:

    (i)  for automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

    (ii)  for other products, a description of the product and any product identifiers;

i.  Each contract or agreement concerning the purchase or acquisition of the WHP, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions; and

j.  For WHPs that were purchased or acquired pursuant to a Directed Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person that You to purchase or acquire the WHP and at what price and terms.

**REQUEST NO. 6:**  Documents (to the extent not produced in response to Request Nos. 1-5), including number, code, or data dictionaries or similar documents, sufficient to identify, describe, and explain the (i) manufacturer, supplier, vendor, and customer numbers or codes; (ii) product, component, and part numbers or codes; (iii) model, model platform, VIN, and model year numbers or codes; (iv) RFQ and RFQ response numbers or codes; (v) plant or facility numbers or codes; (vi) Limit Price, Target Price, VE Price, or other price numbers or

codes; (vii) contract or agreement and invoice numbers or codes; and (viii) data fields, that are reflected in data or documents produced in response to Request Nos. 1-5.

**REQUEST NO. 7:**   Documents concerning the market(s), market or competitive conditions, and market structure(s) for the (a) manufacture and sale of WHPs and (b) purchase of WHPs, including but not limited to, competitors, market shares, profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and customer and consumer surveys and/or research concerning:

    a.    market shares or market concentrations of the (i) manufacturers and suppliers of WHPs and (ii) purchasers of WHPs, as well as any variations in these shares or concentrations;

    b.    separate markets for different types of WHPs (*i.e.*, automotive wire harnesses and ECUs); and

    c.    market shares or market concentrations and conditions at each level in the various distribution chains for WHPs, including but not limited to the distribution chain for resale of WHPs as replacement or repair parts.

**REQUEST NO. 8:**   All documents concerning each communication or agreement by You or on Your behalf with any plaintiff or plaintiff's counsel in the Wire Harness MDL, including but not limited to, all documents, including transactional data, that are produced or provided to counsel for any plaintiff in the Wire Harness MDL by You or on Your behalf.

709315.0013/5986002.6

## DEFINITIONS

1.     "Automobile" means a motor vehicle that is principally used for transporting from one to eight passengers and is designed to operate primarily on roads, typically with four wheels, including sedans, pickup trucks, and sport utility vehicles, but excluding motorcycles, all-terrain vehicles, buses, and commercial trucks.

2.     "Bundled" means bound, grouped, aggregated, manufactured or produced together.

3.     "Directed Sourcing Arrangement" means a transaction for the acquisition of a Wire Harness Product or a product containing a Wire Harness Product that was engaged in by You or on Your behalf with a supplier of Wire Harness Products or products containing a Wire Harness Product, pursuant to terms negotiated by another person or entity for You or on Your behalf.

4.     "Limit Price" is the price set by an OEM or on behalf of an OEM to purchase or acquire a Wire Harness Product or other product from a manufacturer or supplier that the manufacturer or supplier is or was asked to meet.

5.     "OEM" means an automobile original equipment manufacturer and the OEM's respective officers, directors, current and former employees, agents, representatives, attorneys, or anyone else acting or who has acted on its behalf.

6.     "Person" shall mean natural persons, proprietorships, corporations, public corporations, municipal corporations, the federal government and all departments and agencies thereof, state governments, local governments, other governmental agencies, political subdivisions, partnerships, groups, associations, organizations, or other entities, regardless of form.

7.     "RFQ" means requests to purchase of any kind, including invitations to bid or submit proposals, and formal requests for quotation.

8.     "Target Price" is an OEM's anticipated or expected price for the purchase or acquisition of a product, whether or not disclosed to actual or potential manufacturers or suppliers of the product in an RFQ or otherwise, including a price based on (a) the input and other costs of the manufacturer or supplier of the product, (b) a reasonable profit margin for the manufacturer or supplier, (c) reductions in the price of the product as compared to the price of the product or a similar product that was purchased or acquired previously by the OEM or on its behalf, (d) post-RFQ price reductions (*e.g.*, cost-down pricing and annual or semi-annual price reductions), (e) anticipated or expected manufacturing or production efficiencies, or (f) other factors.

9.     "VE Price" is the price that was offered by a manufacturer or supplier, or that an OEM anticipated or expected to pay, for the purchase or acquisition of a product after anticipated or expected reductions over time as a result of improvements in the engineering, design, or specifications of the product.

10

10. "Wire Harness MDL" means the Class Cases, Miscellaneous Cases, and Individual Cases that are associated now or in the future with the Wire Harness Lead Case, Case No. 2:12-cv-00100, which is part of the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division.

11. "Wire Harness Product(s)" means automotive wire harness electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in automobiles, and the following components of such wire harnesses: automotive electrical wiring, automotive wire harnesses, automotive wiring connectors, automotive wiring terminals, cable bonds, electronic control units "ECUs," fuse boxes, high voltage wiring, junction blocks, lead wire assemblies, power distributors, relay boxes, and speed sensor wire assemblies.

12. "You," "Your," and "Your Company" mean Delphi Automotive Systems LLP and its predecessors, successors, and present and former subsidiaries, departments, divisions, and/or affiliates, including without limitation Delphi Corporation, DPH Holdings Corporation, Delphi Furukawa Wiring Systems LLC, and any organization or entity that is or was subject to its or their management, direction, or control, together with its and their present and former directors, officers, employees, agents, representatives, or any Person acting or purporting to act on its behalf.

## INSTRUCTIONS

1. Documents originating in paper or other hard copy format should be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files. TIFF files shall be produced in single-page format along with image load files (.DII file and .OPT file and .LFP file). All documents are to be provided with multi-page searchable text (.TXT) files. These text files and image load files should indicate page breaks to the extent possible, as well as Production Number Begin, Production Number End, Production Attachment Range Number Begin, Production Attachment Range Number End, and Production Document Page Count. As well, each TIFF image should be branded with the applicable Bates number and confidentiality designation.

2. Electronic document files that were or are created in Microsoft Excel, Microsoft Access, and similar applications, shall be produced in their native format. The following metadata fields shall be produced with each such document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

3.     For electronic document files, including without limitation Microsoft Word, PowerPoint, Adobe, or PDF, and files from similar applications ("Electronically Stored Document Application Files"), production shall take the form of single-page TIFF images with cross-referenced image and load data files showing document breaks and formatted for Concordance and for loading into Opticon.  The following metadata fields shall be produced for each document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

4.     Emails also should be produced as single-page TIFF files according to the same protocols outlined above with respect to Electronically Stored Document Application Files, except that for emails the following metadata shall be produced:

- Beginning and Ending Bates Numbers
- Beginning and Ending Bates Ranges (including attachments)
- Date Sent in MM/DD/YY format
- Time Sent in 24 hour format
- Date Received
- Time Received
- Title/Subject
- To, From, CC, and BCC fields
- Attachment
- Text of Email
- Folder
- Custodian

Where an email has an attachment, each attachment should be produced immediately following the email to which it was attached.

5.     The relevant time period for each Request is (i) January 1, 1998 through and including October 31, 2011, excepting data extracted from electronic databases or data summaries for which the relevant time period is January 1, 1996 through and including December 31, 2013.

Exhibit F

## Gangnes, Larry

| | |
|---|---|
| **From:** | Vicky Romanenko <Vicky@cuneolaw.com> |
| **Sent:** | Thursday, December 04, 2014 5:11 PM |
| **To:** | Papelian, Joseph E; Gangnes, Larry |
| **Cc:** | Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K; ssklaver@SusmanGodfrey.com |
| **Subject:** | RE: Delphi |
| **Attachments:** | 6115010_1_ (clean).pdf |

Joe,

Attached please find the requests.

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Friday, November 21, 2014 12:00 PM
**To:** Vicky Romanenko; Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K
**Subject:** RE: Delphi

Thank you,

Joe

**From:** Vicky Romanenko [mailto:Vicky@cuneolaw.com]
**Sent:** Friday, November 21, 2014 11:54 AM
**To:** Papelian, Joseph E; Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K
**Subject:** RE: Delphi

Joe,

We will send you the requests.

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Friday, November 21, 2014 11:39 AM
**To:** Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Vicky Romanenko; Frantangelo, Barbara K
**Subject:** RE: Delphi

Larry:

Thank you for your email. I have not yet heard from Billy London or Vicky Romanenko. I will be in the office on Monday, but off the rest of the Thanksgiving week.

Joe

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Wednesday, November 19, 2014 7:15 PM
**To:** Papelian, Joseph E

1

**Cc:** Davis, Kenneth R.; William H. London; <u>wreiss@rkmc.com</u>; Frantangelo, Barbara K; Vicky Romanenko
**Subject:** Delphi

Joe,

Here is the latest. Counsel for each group of plaintiffs have agreed on a set of document and data requests to Delphi. Vicky Romanenko, one of the counsel for the auto dealer plaintiffs, will be sending those requests to you on behalf of all plaintiffs. Plaintiffs' requests include the documents and data requested by defendants.

Regards. Larry

**From:** Gangnes, Larry
**Sent:** Tuesday, October 28, 2014 8:23 AM
**To:** 'Papelian, Joseph E'
**Cc:** Davis, Kenneth R.; William H. London; <u>wreiss@rkmc.com</u>; Frantangelo, Barbara K
**Subject:** RE: Delphi

Joe, sorry for the delay in bringing this to a close. We have exchanged proposed requests with plaintiffs and are waiting to hear back from them. We will keep you posted.

Regards. Larry

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Monday, August 25, 2014 6:03 AM
**To:** Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; <u>wreiss@rkmc.com</u>; Frantangelo, Barbara K
**Subject:** RE: Delphi

Larry:

Thank you for the update. We look forward to speaking with you in September.

Joe

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Saturday, August 23, 2014 5:04 PM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; William H. London; <u>wreiss@rkmc.com</u>
**Subject:** Delphi

Joe,

Greetings. I have returned from my sabbatical, and Ken Davis and I had a telephone call on August 15 with plaintiffs' counsel, Billy London and Will Reiss, who have since forwarded to us plaintiffs' proposed document requests to Delphi. Defendants are in the process of reviewing plaintiffs' requests with a view to presenting Delphi with a single set of requests from all parties.

However, I have unexpectedly been called to England next week, so we will not be able to get back to you until after the Labor Day weekend. I apologize for the delay but we are working toward minimizing the burden and expense to Delphi by coordinating plaintiffs' and defendants' requests to Delphi, as you requested.

Let us know if you have any questions or comments in the interim.

Regards.

**Larry Gangnes**



Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
*********************************************************************************
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
*********************************************************************************

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
*********************************************************************************
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
*********************************************************************************

The information contained in this message may be attorney-client or work-product privileged and should be treated as confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, destroying the original message and any copies.

*****************************************************************************
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
*****************************************************************************

## SCHEDULE OF TOPICS FOR DOCUMENT REQUEST

1. Cost and sales information (in data and documents) concerning:

   (a) Engineering and research and development costs associated with Wire Harness Products (organized by month, quarter, or year and/or by OEM and/or by make-model), and specification or identification of the amount of such costs, if any, directly reimbursed by a third-party;

   (b) Plant and equipment investment for any plant you used to produce Wire Harness Products (by plant or product location), and specification or identification of the amount of that investment, if any, owned by parties other than Delphi (e.g., tooling owned by costumers);

   (c) Plant capacity and utilization rates for any plant you used to produce Wire Harness Products;

   (d) Quantity of each part number of Wire Harness Products you produced from any plant you used to produce Wire Harness Products, by plant or product location;

   (e) Revenues (gross and net of any discounts, rebates, and returns) for each part number of Wire Harness Products you produced and for each customer to whom you sold Wire Harness Products from any plant you used to produce Wire Harness Products, by production location and country of sale;

   (f) Costs of manufacturing, marketing,  distributing and selling Wire Harness Products, including raw materials, labor, manufacturing and general overhead, freight, warranty, and any other fixed and variable costs of producing Wire Harness Products, organized by month, quarter, or year, and including such cost information available at the most disaggregated level kept in the ordinary course of business, such as costs broken down by or to a specific automobile make-model;

   (g) Cost tables you prepared for your own use or for the use of a customer or potential customer.

   (h) Any user manuals, training materials, or database table maps for the use of your databases/software that keep track of any of the information above.

2. Documents relating to the setting, determination, formulation and charging of prices for Wire Harness Products, including pricing policies, processes, factors and formulas, training and instruction materials for your employees involved with pricing, including annual price reductions and communications regarding the same.

3. All documents relating to any RFQs, post-RFQ pricing or price reduction attempts, negotiations, bidding, contracts (resulting from RFQs and other methods of procurement), or agreements (formal or informal) between you and any defendant, as well as any other documents relating to the procurement by, purchase or supply of Wire Harness Products, to your customers or potential customers including, but not limited to, any price lists or price sheets from you or any defendant, any executed or draft contracts or agreements, and any correspondence relating to negotiations or agreements made.

4.  Documents and data relating to responses to RFQs and any other procurement requests from customers or potential customers for Wire Harness Products, that were formulated, assembled or determined by You, including all bids (e.g., submissions in response to RFQs) and any other prices submitted to your customers or potential customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers) to produce and supply Wire Harness Products;

5.  Your strategic, business and marketing plans, and planning analyses relating to or covering Wire Harness Products.

6.  Documents relating to comparisons of your Wire Harness Products business with those of your competitors, including comparisons of profits, products, costs and prices.

7.  Documents concerning the relationship between prices of Wire Harness Product and prices of new vehicles.

8.  Documents concerning the relationship between prices of automobile inputs and prices of new vehicles.

9.  Documents concerning the relationship between the cost of manufacturing vehicles and prices of new vehicles.

10. Documents relating to your procurement contracts with OEMs and Tier 1, 2, and 3 suppliers.

11. All Documents, including studies and analyses, showing the relationship between prices charged or bids submitted to different OEMs, for Wire Harness Products, through RFQs and any other procurement process, including Documents concerning the use of base prices.

12. All Documents including studies and analyses, showing the relationship between prices charged or submitted, for Wire Harness Products, for different vehicle models, made by the same OEM, through RFQs and any other procurement process, including Documents concerning the use of base prices.

13. Documents and data related to profits, losses and margins on Wire Harness Products, including profit and loss statements, balance sheets, and cash flow statements (audited and unaudited). The profit and margin information produced should be at the most disaggregated level kept in the ordinary course of business, such as profit and margin data broken down by or to a specific automobile make-model. Documents and data should be for each part number of Wire Harness Products you produced and for each customer to whom you sold Wire Harness Products from any plant you used to produce Wire Harness Products, by production location and country of sale;

14. Documents related to comparability of wire harnesses made for different vehicles and by different manufacturers.

15. Documents sufficient to describe and identify, for each Wire Harness Product sold by you, all part numbers assigned, OEM model number and year, product identifiers such as product descriptions and product characteristics, and any other internal codes.

16. Documents requested by the DOJ, but not produced by Delphi because of stand-down letter.

17. Transactional data and documents

   (a) All transactional data and documents relating to your sales of Wire Harness Products, including but not limited to, for each transaction, the following: (a) product type; (b) product description, including the model, make, and model year of the vehicle(s) for which the product was intended, and whether the product was an original equipment or replacement part; (c) total sales amount; (d) quantity (units) (for each part number of Wire Harness Products sold and for each OEM model supplied, the quantity you sold your customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers), including any discounts, rebates, other payments, or other incentives you made or provided to your customers); (e) unit price (including For each part number of Wire Harness Products sold and for each OEM model supplied, the prices you charged your customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers) and the prices your customers paid for Wire Harness Products, including any discounts, rebates, or other payments you made to your customers; (f) any costs (e.g., total cost, variable cost, materials cost, fixed cost, semi-variable cost, marginal cost, standard cost) to you associated with the product; (g) sales date; (h) adjustments, including but not limited to, discounts, rebates, credits, and debits in the manner provided whether by product or by total sale; (i) descriptions of such adjustments; (j) currency and exchange rate; (k) product identifier or code; (l) part number for each product; (m) monetary components of the transaction beyond unit price (i.e., sales tax, shipping or delivery fees); (n) purchaser, including all Customer information, including, but not limited to, customer ID number, sold-to name, sold-to address, and ship-to name and address (if not on invoice); (o) purchaser invoice-to (including bill-to and sold-to) and ship-to information, including all purchaser address information; (p) location(s) to which product and invoice were sent; (q) the legal entity making the sale; (r) location of sale; (s) invoice number; (t) all other information included on invoices issued during the relevant period; (u) all information related to any return or refund; and (v) all information related to rebates, discounts and free goods including information sufficient to tie them to sales transactions.

   (b) All transactional data relating to your purchases of Wire Harness Products (e.g., from a contract manufacturer or supplier), including but not limited to, for each transaction, the

following:  (a) product type; (b) product description, including the model, make, and model year of the vehicle(s) for which the product was intended, and whether the product was an original equipment or replacement part; (c) total purchase amount; (d) quantity (units); (e) unit price; (f) purchase date; (g) adjustments, including but not limited to, discounts, rebates, credits, and debits in the manner provided whether by product or by total purchase; (h) descriptions of such adjustments; (i) currency and exchange rate; (j) product identifier or code; (k) part number for each product; (m) monetary components of the transaction beyond unit price (i.e., sales tax, shipping or delivery fees); (n) vendor; (o) vendor pay-to and ship-from information, including all vendor address information; (p) location(s) at which product and invoice were received; (q) the legal entity making the purchase; (r) location of purchase; (s) invoice number; (t) all other information included on invoices issued during the relevant period; (u) all information related to any return or refund; and (v) all information related to rebates, discounts and free goods including information sufficient to tie them to purchase transactions.

(c) Documents sufficient to explain any fields used, codes used, methods used, or data contained in the transactional data requested above, including but not limited to, part de-coders, customer code legends, or supplier code legends, adjustment code legends, or description code legends.

Temporal, product and geographical scope: same as agreed upon by the parties in connection with Plaintiffs' document requests.

## **DEFINITIONS**

The following Definitions apply to these Requests:

1.        "And" and "or" are interchangeable. "And" is understood to include and encompass "or," and vice versa.

2.        "Communication" means, without limitation, oral or written communication of any kind, all electronic communications, emails, facsimiles, telephone communications, correspondence, exchange of written or recorded information, or face-to-face meetings. The phrase "communication between" is

defined to include instances where one party addresses the other party but the other
party does not necessarily respond.

3.        "Defendant" means any company, organization, entity or person presently
or subsequently named as a Defendant in this litigation, including, without limitation,
any of its predecessors, successors, subsidiaries, departments, divisions and/or
affiliates, or entities, who manufactured Wire Harness Products during the relevant
period, that it acquired or merged with during the relevant period, or any organization
or entity which a Defendant manages or controls, together with all present and former
directors, officers, employees, agents, representatives, or any person acting or
purporting to act on a Defendant's behalf.

4.        "Document" shall be broadly interpreted as used in Rule 34(a) of the
Federal Rules of Civil Procedure and applies equally to hard copy and electronically
stored information. The term "document" includes, without limitation, the original
and all non-identical copies of all written or printed items, including, without
limitation, letters, correspondence, memoranda, legal pleadings, calendars, diaries,
day planners, card files or Rolodex files, expense reports, travel records, lists,
outlines, summaries, records of telephone conversations, telegrams, facsimiles, notes,
reports, data, data compilations, data analyses, compilations, notebooks, work papers,
graphs, charts, spreadsheets, blueprints, books, pamphlets, brochures, circulars,
manuals, instructions, ledgers, drawings, sketches, photographs, videotapes,
audiotapes, film and sound reproductions, emails, internal or external website
content, compact discs, computer files and disks, sales, advertising and promotional
literature, agreements, contracts, stored recordings, minutes or other recordings of

meetings, all written or graphic representations of any kind, and all mechanical or electronic data, records or representations of any kind. The term "Document" includes ESI.

5.        "Electronically stored information" or "ESI" has the same full meaning as provided by Federal Rules of Civil Procedure 26 and 34 and includes, without limitation, the following: (a) structured and unstructured data, as those terms are defined in The Sedona Conference Glossary, available at www.thesedonaconference.org/publications: (b) activity listings of electronic mail receipts and/or transmittals; (c) output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messaging programs and applications (e.g., AOL Instant Messenger™, BlackBerry Messenger™, iChat and iCloud), text-messaging programs or applications, or bulletin board programs, operating and backup systems, source code, PRF files, PRY files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a backup file or system, a deleted file or system, or file fragment; (d) any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, or in any other vehicle for digital data storage or transmittal, such as, but not limited to, desktop computers; servers and other network computers; backup tapes or systems; laptop computers; tablets (e.g., iPads); home or personal computers used for business purposes; cellphones, smartphones, personal digital assistants, or similar devices running mobile operating systems, including such devices owned by Your Employees and used in any way for business purposes; external storage devices (such

as "keychain" drives) and file folder tabs; or containers and labels appended to or relating to any physical storage device associated with each original or copy of all documents requested herein; (e) any and all items stored on voice-mail systems, websites, company intranet sites, chat rooms and social networking websites (e.g., Facebook, LinkedIn, and social websites listed at http://en.wikipedia.org/wiki/List of social networking websites); and (f) any and all data, data compilations, and data analyses.

6.      "Employee" means, without limitation, any current or former officer, director, executive, manager, secretary, assistant, staff member, messenger, agent or other person who is or was employed by a Defendant, or any other manufacturer or seller of Wire Harness Products, as defined below.

7.      "Including" is used to emphasize certain types of documents requested and should not be construed as limiting the request in any way.

8.      "Meeting" means, without limitation, any assembly, convocation, encounter, or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

9.      "OEM" means original equipment manufacturer, including motor vehicle manufacturers.

10.      "Relating to," "referring to," "regarding" or "with respect to" mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting,

studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

11.    "RFQ" means requests to purchase of any kind, including without limitation invitations to bid or submit proposals, and formal requests for quotation.

12.    "Wire Harness Products" means and includes wire harnesses and the following products: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, high voltage wiring, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and speed sensor wire assemblies used in motor vehicles.

13.    "You," "your" or "your company" mean the responding party, its predecessors, successors, subsidiaries, departments, divisions, affiliates and/or any entities the responding party has acquired or that have merged with the responding party, to the extent such acquired or merging entities made Wire Harness Products during the relevant period, including without limitation, any organization or entity which the responding party manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any person acting or purporting to act on behalf of the responding party.

14.    The use of the singular herein also includes the plural, the masculine and the feminine, as appropriate in the context. The use of any tense of any verb shall include also within its meaning all other tenses of the verb.

15.    "Original equipment part" means a part sold to be installed in a vehicle when it is manufactured, rather than as a replacement.

## INSTRUCTIONS

1.         In producing documents, please furnish all documents in your possession, custody or control, regardless of the physical location of such documents or whether such documents are possessed directly by you or your directors, officers, agents, employees, representatives, accountants, outside consultants, subsidiaries, managing agents, affiliates, investigators, or by your attorneys or their employees, agents or investigators.

2.         Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure and the Stipulation and Order Regarding Production of Electronically Stored Information and Hard Copy Documents (the "ESI Stipulation") (Dkt. No. 110), all documents should be produced in the same order as they are kept or maintained by you in the ordinary course of your business.

3.         Documents should be produced in such fashion as to identify the parent, subsidiary, affiliate and the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found (i.e., the document custodian) and the business address of each document custodian.

4.         Pursuant to the ESI Stipulation, documents attached to one another should not be separated. If any portion of any document is responsive to any portion of a Request, the entire document should be produced.

5.         If any document responsive to any of these Requests is privileged, and the document or any portion of the document requested is withheld based on a claim

of privilege pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, or based on any other statute or reason, provide a statement of the claim of privilege and all facts relied upon in support of that claim as required by the Federal Rules of Civil Procedure, including the following information: (a) the reason for withholding the document; (b) the date(s) of the document; (c) the type of document (i.e., email, letter, report); (d) the general subject matter of the document (such description shall not be considered a waiver of your claimed privilege); (e) the present location of the document; (f) the identity of all the persons involved with the document (i.e., all authors and recipients); and (g) the number or numbers of these Requests to which each such document is responsive.

6.      Each document requested herein should be produced in its entirety and without deletion, redaction, or excision, except as qualified by Instruction No. 5, above, regardless of whether you consider the entire document or only part of it to be relevant or responsive to any Requests. All redacted documents must be produced in accordance with the ESI Stipulation.  Any redactions to documents produced should be identified in accordance with Instruction No. 5, above.

7.      Please provide an index or other means (such as a source log) to determine which files came from which office and/or which person.

8.      When responding to these Requests, if your response references documents You previously produced, please identify the previously produced documents by Bates number.