UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS | ) | 12-md-02311 |
| ANTITRUST LITIGATION | ) | Hon. Marianne O. Battani |
| _____ | ) | |
| | ) | |
| ALL PARTS | ) | |
| _____ | ) | |
| | ) | |
| THIS CASE RELATES TO: | ) | |
| ALL CASES | ) | |
| _____ | ) | |

DECLARATION OF JOSEPH E. PAPELIAN

I, Joseph E. Papelian, declare as follows:

1.  I represent Delphi Automotive Systems, LLC and Delphi Connection
    Systems US, Inc.  I have personal knowledge of the facts set forth in this
    Declaration and am competent to testify thereto.  I make this Declaration
    pursuant to 28 U.S.C. § 1746 and submit it in support of Delphi's Reply
    Brief.

2.  For over two years, I have communicated with Larry Gangnes, counsel for
    Furukawa, in person, by email and through telephone conferences to discuss
    Furukawa's broad scope of document requests.

3.  On May 16, 2014, Mr. Gangnes provided me with an email summarizing
    what he believed to be information Delphi "has agreed to provide plaintiffs"
    and then followed up with another email on May 19, 2014 with a revised set
    of document and data requests (Exhibit 01).

4. On May 23, 2014, I and selected Delphi employees participated in a call with Mr. Gangnes.  As a result of this call, Delphi agreed to provide Mr. Gangnes a copy of the documents produced to the DOJ and a sample invoice.  Delphi did **not** agree to produce any additional information.

5. On June 26, 2014, I received yet another document request from Mr. Gangnes (Exhibit 02).  During a telephone conference on June 30, 2014, I advised it would not be an easy task to provide a breakdown of wire harness sales, but that we could provide a sample spreadsheet with 300,000 lines items for just Toyota in the U.S.  I also advised Mr. Gangnes that he was asking for a huge amount of data using different versions of software.  During that call, Mr. Gangnes said Delphi should hold off on producing any data at this time.

6. Other than an email from Mr. Gangnes in October 2014 apologizing for the delay, there was silence from Furukawa for almost six months.  On December 4, 2014, plaintiffs' counsel sent an email to Delphi and Furukawa attaching a very broad set of document requests (Exhibit 03).

7. On December 9, 2014, I responded to the email, stating the requests were very broad and it would be a huge effort for Delphi to respond (Exhibit 04).  At that time, I proposed a call to discuss limitations.

8. Delphi hosted a meeting for plaintiffs' counsel and Mr. Gangnes (collectively "Counsel") at its Troy Offices on February 5, 2015 to provide background on its wire harness business.  At that meeting, a key wire harness executive provided Counsel with a detailed presentation of Delphi's pricing process and answered exhaustive questions posed by Counsel.  But because of the sensitive information contained in Delphi's presentation, a copy was not provided to the participants.

9. After the meeting, I received a request from Mr. Gangnes for a copy of the

PowerPoint presented at the meeting. I responded that we would review the request once an agreement was reached on the scope of the discovery.

10. Four months passed with no contact from Counsel until June 1, 2015 when I received another overly broad set of document requests from plaintiffs' counsel (Requests) (Exhibit 05).  Although Counsel had consistently discussed limiting the discovery requests posed to Delphi, these Requests were just as broad.  A week later I received an email from Mr. Gangnes stating Furukawa had no discovery requests to add to plaintiffs' requests (Exhibit 06).

11. On June 30, 2015, I met internally with knowledgeable Delphi employees to review the documents requests from Counsel and to determine what Delphi would be potentially able to produce.

12. Although Mr. Gangnes' Declaration states I "eventually replied to Mr. Ochoa [plaintiffs' counsel] in an email on July 30, 2015," he is incorrect.  I responded to Counsel on June 30, 2015, the same day of the Delphi internal meeting, advising we had reviewed their discovery requests and by late July expected to have more information on what was available and a rough estimate of time needed to collect and process the documents (Exhibit 07).

13. On July 30, 2015, I sent an email to Counsel, responding to each of their document requests with an estimate of what Delphi could potentially search for and produce (Exhibit 08).  Attached to that email was a sample sales summary spreadsheet.  In that same email, I also stated:  "We anticipate the collection of documents will take approximately two months, with an additional month to review, process and produce responsive documents. The cost to Delphi for collecting the documents is estimated at $100,000. The cost for the review will be based on the number of documents collected. As I mentioned during our call, we retain contract attorneys for a nominal

fee to review the documents, and we will forward these costs on to you.  We would need a retainer to start this effort."

14. On September 10, 2015, during a call with Counsel, I was advised that Counsel believed Delphi should bear the entire cost of searching for and producing all documents.

15. On September 12, 2015, I sent an email to Counsel, advising the reimbursement of costs was a critical issue and until the issue was resolved, Delphi would expend no further efforts in response to the Requests (Exhibit 09).

16. That same day, Counsel responded to my email, stating they believed it was premature to discuss costs of discovery until they had a good understanding of the scope of the search and production (Exhibit 10).  Counsel suggested we continue with our discussions so they could become better informed about who should bear the costs.  In the spirit of cooperation, I agreed to continue discussions.

17. On September 28, 2015, I sent an email to Counsel related to a preliminary search Delphi had conducted on documents that were initially collected in response to the DOJ subpoena, but not yet reviewed due to the instruction from the DOJ in May 2011 to stand down and produce no additional documents (Exhibit 11).  I informed Counsel that, for post-2011 DPRG documents, we "anticipate 3-4 weeks to search for DPRG presentations post-2011.  Although the actual search should only take 2 days, we would need a month to ensure the Delphi representative can conduct the search along with his normal work responsibilities."

18. On December 14, 2015, I received yet another request from Mr. Gangnes, proposing a particular outside vendor to review Delphi's SAP data (Exhibit 12). That email also included even more requests that had not previously

been discussed or identified.

19. On January 22, 2016, I hosted a conference call with counsel and followed up with an email summarizing the call (Exhibit 13). On January 24, 2016, Mr. Gangnes responded to my email, for the first time identifying "wire harness products" as defined in plaintiffs' complaints (Exhibit 14). Delphi is not a party to this litigation and as such should not be held to the same definition as used in this litigation. Delphi's definition of "wire harness" is sufficient to respond to Counsels' requests (*see* Declaration of Paul Falete, Exhibit D to Delphi's Reply).

20. In January 2015, I learned plaintiffs' counsel were no longer interested in obtaining documents from Delphi. Mr. Gangnes states in his Declaration that Delphi was "apparently buoyed by Plaintiffs' sudden disinterest" and "executed an about-face on the discovery." This is simply not true. Delphi had been discussing discovery requests with Counsel for **over two years**. Instead of the promised limitations, the requests continued to grow and become more complex. Delphi had participated in numerous phone calls, provided sample information, and held in-person meetings with knowledgeable Delphi individuals so counsel could ask questions and gather information to narrow their requests.

21. Due to the lack of limitations, clarification or any movement forward regarding the discovery requests, I emailed Mr. Gangnes on February 8, 2016, and followed up with a clarification email on February 11 (Exhibit 15). I reminded him Delphi is not a party to this litigation and is in fact a victim. I explained Delphi has a business to run and that his voluminous document requests would detract significantly from time spent running the business. I provided Mr. Gangnes with a final proposal in an effort to reach a compromise: Delphi would allow Furukawa's proposed vendor to review

Delphi's 2006 – 2014 SAP transactional data for wire harnesses.  Also, that Delphi would provide a representative to be available to the vendor for guidance at a rate of $75 per hour (to be paid by Furukawa).  I also stated this proposal superseded all previous discussions.

22. Mr. Gangnes did not agree to Delphi's final proposal, and subsequently issued the subpoenas which are the subject of the Motions before this Court.

I declare under penalty of perjury under the laws of the United States that he foregoing is true and correct.

Executed this 7th day of April, 2016

_____/s/Joseph E. Papelian_____
Joseph E. Papelian

EXHIBIT 01

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Monday, May 19, 2014 4:17 PM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.
**Subject:** Delphi Requests: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes

Joe, enclosed please find a revised set of Requests for use during our telephone conversation Friday.  Let me know if you have any questions or comments in the interim.

Regards.  Larry

---

**From:** Gangnes, Larry
**Sent:** Friday, May 16, 2014 4:33 PM
**To:** 'Papelian, Joseph E'
**Cc:** Davis, Kenneth R.
**Subject:** RE: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes

Joe, in lieu of a copy of the DoJ subpoena, a summary of the types and categories of documents and data Delphi will be producing to plaintiffs in that regard will suffice.  Is there a time next week before the Friday call that you could provide me some more detail by phone?

Thanks.  Larry

---

**From:** Gangnes, Larry
**Sent:** Friday, May 16, 2014 12:32 PM
**To:** 'Papelian, Joseph E'
**Cc:** Davis, Kenneth R.
**Subject:** RE: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes

Joe,

It would be helpful in preparing for our call next Friday if I had more detail regarding what Delphi has agreed to provide plaintiffs.  As I understand it, Delphi will be producing the following documents and data to plaintiffs (and thus to defendants as well):

1.      The documents Delphi produced to the DoJ (about 50,000-60,000 pages) and the documents requested in DoJ's subpoena to Delphi that had not been produced when DoJ told Delphi to cease production.

2.      Documents regarding the Delphi/Furukawa joint venture.

3.      RFQ summary that lists the bids Delphi or Delphi/Furukawa submitted to Toyota, including the dates, bid prices, and whether Delphi or Delphi/Furukawa won or lost the bid.

4.      A list of approximately 18 Delphi or Delphi/Furukawa "programs" with Toyota on which Delphi submitted bids, including fields showing how Delphi's bids were put together.

5.      Excel files on several Delphi bids to Toyota that include all supporting documents and data, such as bills of material, cable, wire harness final assembly, copper, labor, etc. costs and other items making up the bid.

Please let me know if I got this right, and send me the DoJ subpoena to Delphi and any agreements limiting what Delphi produced to DoJ and/or will be producing to plaintiffs.  This information will be helpful to me in reviewing the extent to which Delphi will be producing documents and data responsive to the written requests I forwarded to you earlier.

Thanks for your help.

Regards.  Larry

---

**From:** Yeager, Judy [mailto:Judy.Yeager@delphi.com] **On Behalf Of** Papelian, Joseph E
**Sent:** Thursday, May 15, 2014 10:16 AM
**To:** Gangnes, Larry
**Subject:** RE: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes

Larry:
Any flexibility with changing this to an early AM meeting (your time).  7:30 am PDT?
Regards,


Judy Yeager
Delphi Legal – Litigation
5725 Delphi Drive
MC: 483.400.554
Troy MI  48098
judy.yeager@delphi.com
1.248.813.2106 (Office)
1.248.813.1122 (Fax)

-----Original Appointment-----
**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Thursday, May 15, 2014 1:14 PM
**To:** Yeager, Judy
**Subject:** Accepted: Conf. Call; Wire Harness, J. Papelian, B. Frantangelo, R. Ward, D. Unrue, Larry Gangnes

**When:** Wednesday, May 21, 2014 2:00 PM-3:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Conf. Call; 248.729.0531, Conference ID: 248.289.05, J. Papelian, Host

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
*************************************************************************************************
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
*************************************************************************************************

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** Data or documents (in the absence of data) sufficient to show the following information for each sale by You or on Your behalf of (a) a Wire Harness Product ("WHP") or (b) an automobile part in which a WHP was installed or a component thereof (*e.g.*, door, seat, roof, rear view mirror or other part) (collectively, "Auto Part") either (i) in the United States or (ii) outside the United States for later sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

    a.    Date of the sale;

    b.    Person (such as an OEM, automobile dealership, or auto parts distributor) to whom the Auto Part was sold, and such person's address;

    c.    Name or a description of the Auto Part sold, the quantity sold (including measurement unit for quantity, amount or number), part number, and any other product identifiers;

    d.    Terms and conditions on which the Auto Part was sold, including but not limited to:

        (i)    Sale price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to:

            1.    Rebates, discounts, or other allowances; and

            2.    Amount paid at time of sale, and terms and duration of any monthly or installment payments;

        (ii)    Shipping or freight costs, and by whom such costs were paid;

    e.    "Ship-from" and vendor "pay-to" address(es) from which the Auto Part and invoice for them were shipped or sent, date(s) on which the Auto Part and invoice

1

were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) to which the Auto Part and invoice were shipped or sent, and date(s) the Auto Part and invoice were received;

f.      RFQ(s), if any, as a result of which the Auto Part was sold;

g.      Any repairs, returns, or refunds with respect to the Auto Part sold, whether the Auto Part was returned, and the amount of any associated refund or credit;

h.      Monetary or non-monetary components or incentives for the sale beyond unit price, including any service, benefit, and/or product (other than the Auto Parts sold themselves), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

i.      Identity and a description of each WHP purchased or acquired by You or on Your behalf that was installed in, a component of, or Bundled with, the Auto Part sold, and the purchase price and manufacturer or supplier of each such WHP, including but not limited to:

    (i)     Part number and any other identifiers of each such WHP and the Auto Part in which it was installed, a component of, or Bundled with;

    (ii)    Quantity, amount, and number of each such WHP that was contained in, a component of, or Bundled with, the Auto Part sold (including measurement unit for quantity, amount, or number);

    (iii)   Vendor number or any other identifiers of the manufacturer or supplier of each such WHP;

2

(iv)     Purchase price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to, rebates, discounts, or other allowances, and;

(v)     Information allowing You to trace or track each such WHP after it was installed in, or Bundled with, the Auto Part sold;

j.     The specific product(s) (*i.e.*, the specific automobile(s)) for which the Auto Part sold was designed and/or intended, including but not limited to:

(i)     For automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

(ii)     For other products, a description of the product and any product identifiers;

k.     For each Auto Part sold, the actual and/or estimated direct and indirect materials, manufacturing, marketing, distribution, selling and other costs of goods sold, both fixed and variable, direct and indirect, including but not limited to, the direct and indirect costs of (i) each WHP, (ii) each other component of the Auto Part sold, and (iii) administration, management, labor, tooling, overhead, energy, materials, sales and marketing, freight, and research and development;

l.     Each contract or agreement concerning the sale of the Auto Parts sold, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions;

m.     For Auto Parts that were sold pursuant to a Directed Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person

3

that directed the purchaser to purchase or acquire the Auto Parts sold and at what price and terms; and

n.   Identity of any Auto Parts that were sold without the purchaser soliciting proposals, bids, or responses to an RFQ from more than one potential manufacturer or supplier of such Auto Parts; and

o.   Your sales revenue, gross profit, profit margin or level, operating profit, projected profit, net profit, cash flow, EBITDA, and profit-and-loss statements for the sale of each of Auto Part sold.

**REQUEST NO. 2:**  Data or documents (in the absence of data) sufficient to show Your policies, practices, procedures, methods, models, formulas, guidelines, and factors used or considered in evaluating, deciding whether to respond, and preparing responses to, RFQs and other solicitations for the sale of Auto Parts, including but not limited to:

a.   Centrally-stored file(s) regarding Your methods, models, formulas, guidelines, and factors used or considered in preparing responses to RFQs and other solicitations for the sale of Auto Parts, including but not limited to, Your DPRG procedure, method or process;

b.   Centrally-stored file(s) regarding RFQs, solicitations to bid, RFQ responses, bids, proposals, and negotiations for the sale of Auto Parts;

c.   For each RFQ for the sale of an Auto Part You received or responded to:

   (i)     Date the RFQ was issued or sent;

   (ii)    Name, designation, number or other identifiers for the RFQ;

   (iii)   Person issuing the RFQ and its address;

4

(iv)     Persons to whom the RFQ was issued or sent, and the address of each such person;

(v)      Name or a description of each Auto Part that was the subject of the RFQ, and part numbers and any other identifiers of each such Auto Part;

(vi)     Specific product(s) (*i.e.*, the specific automobile(s)) for which the Auto Part was designed or intended, including but not limited to:

　　　　(a)     For automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

　　　　(b)     For other products, a description of the product, and part numbers and any product identifiers;

(vii)    Terms of the RFQ, including the design or specifications of the Auto Part (including any changes in such terms, design, or specifications, or in the schematics or drawings for the part, product, or vehicle);

(viii)   Responses to the RFQ submitted by You or on Your behalf, including but not limited to bids, cost and profit margin information or estimates, proposed changes in the design or specifications of the Auto Part that was the subject of the RFQ, and any discounts, rebates, or other allowances, incentives, or other terms offered;

(ix)     Whether You were selected to manufacture or supply the Auto Part that was the subject of the RFQ, and if so, information allowing You to trace, track or link the RFQ with the Auto Part sold, and if not, the name of the person selected (if known) and the reasons You were not selected (if known);

5

(x)     Whether on-site engineers or other personnel or engineering services were provided by You or on Your behalf in connection with the Auto Part that was the subject of the RFQ, the nature and extent of such services, and the address where such personnel or services were provided; and

(xi)    Limit Price, Target Price, or VE Price, if any, for the Auto Part, after application of all anticipated or expected discounts, rebates, or other allowances, and any revisions or changes to such price over time;

d.      Any communications between You and a competing manufacturer or supplier regarding an RFQ, solicitation to bid, RFQ response, bid, proposal, or negotiations for the sale of Auto Parts.

**REQUEST NO. 3:**  Documents concerning proposed or actual post-RFQ prices (*e.g.*, cost-down pricing and annual or semi-annual price reductions) for the sale of Auto Parts, and Your policies, methods, formulas, or factors used in negotiating, determining, setting, computing, quoting, or accepting such post-RFQ prices for the sale of Auto Parts.

**REQUEST NO. 4:**  Documents  sufficient to show the policies, methods, formulas, or factors used in determining, setting, computing, quoting, or modifying the prices of WHPs or Auto Parts sold by You, including but not limited to, documents concerning rebates, discounts, off-invoice discounts, credits, allowances, promotional or incentive payments, or other price concessions, and any proposed or actual changes in such policies, methods, formulas, or factors and the reasons for such changes.

**REQUEST NO. 5:**  Data or documents (in the absence of data) sufficient to show the following information concerning each purchase or acquisition by You or on Your behalf of a

6

WHP (i) in the United States or (ii) outside the United States for sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

    a.    Date of the purchase or acquisition;

    b.    Person from whom the WHP was purchased or acquired, any identifiers of such person, and such person's address;

    c.    Name or a description of the WHP purchased or acquired, the quantity purchased or acquired (including measurement unit for quantity, amount or number), and part number and any other product identifiers;

    d.    Terms and conditions on which the WHP was purchased or acquired, including but not limited to:

        (i)    Purchase price (including currency and exchange rate, if applicable) and all adjustments to price, including but not limited to,

            1.    Rebates, discounts, or other incentives or allowances; and

            2.    Amount paid at the time of the purchase or acquisition, and the terms and duration of any monthly or installment payments;

        (ii)    Shipping or freight costs, and by whom such costs were paid;

    e.    "Ship-from" and vendor "pay-to" address(es) from which the WHP and invoice for it were shipped or sent, date(s) the WHP and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the WHP and invoice were received, and date(s) the WHP and invoice were received;

    f.    Repairs, returns, or refunds with respect to the WHP purchased or acquired, whether the WHP was returned, and amount of any associated refund or credit;

g.      Monetary or non-monetary components or incentives for the purchase beyond unit price, including any service, benefit, and/or product (other than the WHP itself), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

h.      The specific product(s) (*i.e.*, the specific Auto Part(s) or automobile(s)) for which the WHP was designed and/or intended, including but not limited to:

(i)      for automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

(ii)      for other products, a description of the product and any product identifiers;

i.      Each contract or agreement concerning the purchase or acquisition of the WHP, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions; and

j.      For WHPs that were purchased or acquired pursuant to a Directed Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person that You to purchase or acquire the WHP and at what price and terms.

**REQUEST NO. 6:**  Documents (to the extent not produced in response to Request Nos. 1-5), including number, code, or data dictionaries or similar documents, sufficient to identify, describe, and explain the (i) manufacturer, supplier, vendor, and customer numbers or codes; (ii) product, component, and part numbers or codes; (iii) model, model platform, VIN, and model year numbers or codes; (iv) RFQ and RFQ response numbers or codes; (v) plant or facility numbers or codes; (vi) Limit Price, Target Price, VE Price, or other price numbers or

709315.0013/5986002.6

codes; (vii) contract or agreement and invoice numbers or codes; and (viii) data fields, that are reflected in data or documents produced in response to Request Nos. 1-5.

**REQUEST NO. 7:**   Documents concerning the market(s), market or competitive conditions, and market structure(s) for the (a) manufacture and sale of WHPs and (b) purchase of WHPs, including but not limited to, competitors, market shares, profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and customer and consumer surveys and/or research concerning:

a.   market shares or market concentrations of the (i) manufacturers and suppliers of WHPs and (ii) purchasers of WHPs, as well as any variations in these shares or concentrations;

b.   separate markets for different types of WHPs (*i.e.*, automotive wire harnesses and ECUs); and

c.   market shares or market concentrations and conditions at each level in the various distribution chains for WHPs, including but not limited to the distribution chain for resale of WHPs as replacement or repair parts.

**REQUEST NO. 8:**   All documents concerning each communication or agreement by You or on Your behalf with any plaintiff or plaintiff's counsel in the Wire Harness MDL, including but not limited to, all documents, including transactional data, that are produced or provided to counsel for any plaintiff in the Wire Harness MDL by You or on Your behalf.

9

## DEFINITIONS

1.      "Automobile" means a motor vehicle that is principally used for transporting from one to eight passengers and is designed to operate primarily on roads, typically with four wheels, including sedans, pickup trucks, and sport utility vehicles, but excluding motorcycles, all-terrain vehicles, buses, and commercial trucks.

2.      "Bundled" means bound, grouped, aggregated, manufactured or produced together.

3.      "Directed Sourcing Arrangement" means a transaction for the acquisition of a Wire Harness Product or a product containing a Wire Harness Product that was engaged in by You or on Your behalf with a supplier of Wire Harness Products or products containing a Wire Harness Product, pursuant to terms negotiated by another person or entity for You or on Your behalf.

4.      "Limit Price" is the price set by an OEM or on behalf of an OEM to purchase or acquire a Wire Harness Product or other product from a manufacturer or supplier that the manufacturer or supplier is or was asked to meet.

5.      "OEM" means an automobile original equipment manufacturer and the OEM's respective officers, directors, current and former employees, agents, representatives, attorneys, or anyone else acting or who has acted on its behalf.

6.      "Person" shall mean natural persons, proprietorships, corporations, public corporations, municipal corporations, the federal government and all departments and agencies thereof, state governments, local governments, other governmental agencies, political subdivisions, partnerships, groups, associations, organizations, or other entities, regardless of form.

7.      "RFQ" means requests to purchase of any kind, including invitations to bid or submit proposals, and formal requests for quotation.

8.      "Target Price" is an OEM's anticipated or expected price for the purchase or acquisition of a product, whether or not disclosed to actual or potential manufacturers or suppliers of the product in an RFQ or otherwise, including a price based on (a) the input and other costs of the manufacturer or supplier of the product, (b) a reasonable profit margin for the manufacturer or supplier, (c) reductions in the price of the product as compared to the price of the product or a similar product that was purchased or acquired previously by the OEM or on its behalf, (d) post-RFQ price reductions (*e.g.*, cost-down pricing and annual or semi-annual price reductions), (e) anticipated or expected manufacturing or production efficiencies, or (f) other factors.

9.      "VE Price" is the price that was offered by a manufacturer or supplier, or that an OEM anticipated or expected to pay, for the purchase or acquisition of a product after anticipated or expected reductions over time as a result of improvements in the engineering, design, or specifications of the product.

10

10.     "Wire Harness MDL" means the Class Cases, Miscellaneous Cases, and Individual Cases that are associated now or in the future with the Wire Harness Lead Case, Case No. 2:12-cv-00100, which is part of the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division.

11.     "Wire Harness Product(s)" means automotive wire harness electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in automobiles, and the following components of such wire harnesses:  automotive electrical wiring, automotive wire harnesses, automotive wiring connectors, automotive wiring terminals, cable bonds, electronic control units "ECUs," fuse boxes, high voltage wiring, junction blocks, lead wire assemblies, power distributors, relay boxes, and speed sensor wire assemblies.

12.     "You," "Your," and "Your Company" mean Delphi Automotive Systems LLP and its predecessors, successors, and present and former subsidiaries, departments, divisions, and/or affiliates, including without limitation Delphi Corporation, DPH Holdings Corporation, Delphi Furukawa Wiring Systems LLC, and any organization or entity that is or was subject to its or their management, direction, or control, together with its and their present and former directors, officers, employees, agents, representatives, or any Person acting or purporting to act on its behalf.

## INSTRUCTIONS

1.     Documents originating in paper or other hard copy format should be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files.  TIFF files shall be produced in single-page format along with image load files (.DII file and .OPT file and .LFP file).  All documents are to be provided with multi-page searchable text (.TXT) files.  These text files and image load files should indicate page breaks to the extent possible, as well as Production Number Begin, Production Number End, Production Attachment Range Number Begin, Production Attachment Range Number End, and Production Document Page Count.  As well, each TIFF image should be branded with the applicable Bates number and confidentiality designation.

2.     Electronic document files that were or are created in Microsoft Excel, Microsoft Access, and similar applications, shall be produced in their native format.  The following metadata fields shall be produced with each such document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

11

3.      For electronic document files, including without limitation Microsoft Word, PowerPoint, Adobe, or PDF, and files from similar applications ("Electronically Stored Document Application Files"), production shall take the form of single-page TIFF images with cross-referenced image and load data files showing document breaks and formatted for Concordance and for loading into Opticon.  The following metadata fields shall be produced for each document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

4.      Emails also should be produced as single-page TIFF files according to the same protocols outlined above with respect to Electronically Stored Document Application Files, except that for emails the following metadata shall be produced:

- Beginning and Ending Bates Numbers
- Beginning and Ending Bates Ranges (including attachments)
- Date Sent in MM/DD/YY format
- Time Sent in 24 hour format
- Date Received
- Time Received
- Title/Subject
- To, From, CC, and BCC fields
- Attachment
- Text of Email
- Folder
- Custodian

Where an email has an attachment, each attachment should be produced immediately following the email to which it was attached.

5.      The relevant time period for each Request is (i) January 1, 1998 through and including October 31, 2011, excepting data extracted from electronic databases or data summaries for which the relevant time period is January 1, 1996 through and including December 31, 2013.

12

# EXHIBIT 02

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Monday, June 30, 2014 11:02 AM
**To:** Papelian, Joseph E
**Subject:** FW: Delphi Requests

**From:** Gangnes, Larry
**Sent:** Thursday, June 26, 2014 4:55 PM
**To:** 'Papelian, Joseph E'
**Cc:** Davis, Kenneth R.
**Subject:** Delphi Requests

Joe,

Billy London and I won't be able to touch base until tomorrow, but I promised to send you a summary of the documents and data (primarily data) that the Wire Harness defendants are requesting from Delphi.

Enclosed please find the revised Requests I sent you on May 19.  Based on our subsequent discussions and the receipt of additional information requested herein, we are prepared to narrow the Requests further.

First what in general terms were the percent of Delphi's wire harness product ("WHP") sales by region (North America, Europe, Japan, etc.) over the time period 2000-2013?  This will help us narrow the geographic scope of the Requests.

Second, what in general terms were the percent of Delphi's WHP sales per OEM over that time period.  This will help us narrow the scope of the Requests to certain OEMs.

Finally, I have not received the sample Delphi invoice.  This will help us understand what data is stored in Delphi's sales database.

With that preface, here is a summary of the data and documents we are seeking:

1. Sales data for WHPs Delphi sold to certain OEMs [Request Nos. 1(a)-(e) except freight], and bill of materials and cost records for each shipment [Request No. 1(k)], including vehicle models for which the WHPs were designed [Request No. 1(j)] and sales for which there was no RFQ [Request No. 1(n)].

   Can Delphi provide WHP sales data by OEM regardless of shipment location?

   Does Delphi ship WHPs to Japanese OEMs from locations other than North America and Japan?

1

I understand that freight costs are not included on the invoice, but are such costs captured elsewhere in Delphi's data? And are returns and refunds [Request No. 1(g)] captured in Delphi's data?

I also understand that there are no Delphi discounts or allowances [Request No. 1(d)], and directed sourcing is common (every OEM pre-selects connectors) [Request No. 1(m)], but that info is found in the RFQs.

2. Summary of WHP RFQs to certain, including bid prices, OEM, vehicle model, and whether Delphi won the bidding [Request No. 2(c)].

I understand Delphi has already prepared such a list for bids to Toyota.

3. XL spreadsheets of RFQ bids submitted to certain OEMs [Request No. 2(b)].

Delphi has offered to produce two XL files. I understand that these files have large amounts of data, but that is not a problem for us.

4. Guidebook or summary of Delphi DPRG system (system for preparing RFQ bids and establishing Delphi minimum or floor price) [Request Nos. 2(a), 3].

You were looking into whether Delphi has such a guidebook or summary.

5. Purchase data regarding Delphi's purchases of WHPs in North America or elsewhere that are used or distributed by Delphi in North America [Request Nos. 5(a)-(e)], including vehicle models for the WHPs were designed [Request No. 5(h)].

Delphi is checking on what data is available.

6. Data dictionaries or databases describing data fields, including OEM, vendor, and customer numbers or codes; product, component, and part numbers or codes; model, model platform, and model year numbers or codes; RFQ and RFQ response numbers or codes [Request No. 6].

I understand that (i) Delphi does not have a "data dictionary" per se that identifies OEM part numbers and manufacturer, supplier, vendor and customer numbers or codes; (ii) every OEM has a different part number system and Delphi's part numbers are different from the OEMs'; (iii) Delphi's engineering department database has a part number description of Delphi's part numbers; (iv) Delphi's invoices may include both the Delphi part number, the OEM part number, and a brief description of the WHP such as "harness seat jumper wire"; and (v) the engineering database links to the OEM part number and drawing. Obviously, our experts will need some way to make sense of the data fields, including part numbers.

I hope to be able to determine the extent to which plaintiffs' requests differ from defendants after my conversation with Billy London tomorrow. Let me know if you have any questions or comments before our next call Monday at 11:00 a.m. ET.

Regards. Larry

**Larry Gangnes**



Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402

Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

---

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.

# DOCUMENT REQUESTS

**REQUEST NO. 1:**  Data or documents (in the absence of data) sufficient to show the following information for each sale by You or on Your behalf of (a) a Wire Harness Product ("WHP") or (b) an automobile part in which a WHP was installed or a component thereof (*e.g.*, door, seat, roof, rear view mirror or other part) (collectively, "Auto Part") either (i) in the United States or (ii) outside the United States for later sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

a.      Date of the sale;

b.      Person (such as an OEM, automobile dealership, or auto parts distributor) to whom the Auto Part was sold, and such person's address;

c.      Name or a description of the Auto Part sold, the quantity sold (including measurement unit for quantity, amount or number), part number, and any other product identifiers;

d.      Terms and conditions on which the Auto Part was sold, including but not limited to:

(i)      Sale price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to:

1.      Rebates, discounts, or other allowances; and

2.      Amount paid at time of sale, and terms and duration of any monthly or installment payments;

(ii)      Shipping or freight costs, and by whom such costs were paid;

e.      "Ship-from" and vendor "pay-to" address(es) from which the Auto Part and invoice for them were shipped or sent, date(s) on which the Auto Part and invoice

1

were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) to which the Auto Part and invoice were shipped or sent, and date(s) the Auto Part and invoice were received;

f.   RFQ(s), if any, as a result of which the Auto Part was sold;

g.   Any repairs, returns, or refunds with respect to the Auto Part sold, whether the Auto Part was returned, and the amount of any associated refund or credit;

h.   Monetary or non-monetary components or incentives for the sale beyond unit price, including any service, benefit, and/or product (other than the Auto Parts sold themselves), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

i.   Identity and a description of each WHP purchased or acquired by You or on Your behalf that was installed in, a component of, or Bundled with, the Auto Part sold, and the purchase price and manufacturer or supplier of each such WHP, including but not limited to:

   (i)   Part number and any other identifiers of each such WHP and the Auto Part in which it was installed, a component of, or Bundled with;

   (ii)   Quantity, amount, and number of each such WHP that was contained in, a component of, or Bundled with, the Auto Part sold (including measurement unit for quantity, amount, or number);

   (iii)   Vendor number or any other identifiers of the manufacturer or supplier of each such WHP;

        (iv)    Purchase price (including currency and exchange rate, if applicable), and any adjustments to price, including but not limited to, rebates, discounts, or other allowances, and;

        (v)    Information allowing You to trace or track each such WHP after it was installed in, or Bundled with, the Auto Part sold;

j.    The specific product(s) (*i.e.*, the specific automobile(s)) for which the Auto Part sold was designed and/or intended, including but not limited to:

        (i)    For automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

        (ii)    For other products, a description of the product and any product identifiers;

k.    For each Auto Part sold, the actual and/or estimated direct and indirect materials, manufacturing, marketing, distribution, selling and other costs of goods sold, both fixed and variable, direct and indirect, including but not limited to, the direct and indirect costs of (i) each WHP, (ii) each other component of the Auto Part sold, and (iii) administration, management, labor, tooling, overhead, energy, materials, sales and marketing, freight, and research and development;

l.    Each contract or agreement concerning the sale of the Auto Parts sold, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions;

m.    For Auto Parts that were sold pursuant to a Directed Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person

that directed the purchaser to purchase or acquire the Auto Parts sold and at what price and terms; and

n.      Identity of any Auto Parts that were sold without the purchaser soliciting proposals, bids, or responses to an RFQ from more than one potential manufacturer or supplier of such Auto Parts; and

o.      Your sales revenue, gross profit, profit margin or level, operating profit, projected profit, net profit, cash flow, EBITDA, and profit-and-loss statements for the sale of each of Auto Part sold.

**REQUEST NO. 2:**  Data or documents (in the absence of data) sufficient to show Your policies, practices, procedures, methods, models, formulas, guidelines, and factors used or considered in evaluating, deciding whether to respond, and preparing responses to, RFQs and other solicitations for the sale of Auto Parts, including but not limited to:

a.      Centrally-stored file(s) regarding Your methods, models, formulas, guidelines, and factors used or considered in preparing responses to RFQs and other solicitations for the sale of Auto Parts, including but not limited to, Your DPRG procedure, method or process;

b.      Centrally-stored file(s) regarding RFQs, solicitations to bid, RFQ responses, bids, proposals, and negotiations for the sale of Auto Parts;

c.      For each RFQ for the sale of an Auto Part You received or responded to:

(i)      Date the RFQ was issued or sent;

(ii)     Name, designation, number or other identifiers for the RFQ;

(iii)    Person issuing the RFQ and its address;

4

(iv)     Persons to whom the RFQ was issued or sent, and the address of each such person;

(v)      Name or a description of each Auto Part that was the subject of the RFQ, and part numbers and any other identifiers of each such Auto Part;

(vi)     Specific product(s) (*i.e.*, the specific automobile(s)) for which the Auto Part was designed or intended, including but not limited to:

(a)      For automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

(b)      For other products, a description of the product, and part numbers and any product identifiers;

(vii)    Terms of the RFQ, including the design or specifications of the Auto Part (including any changes in such terms, design, or specifications, or in the schematics or drawings for the part, product, or vehicle);

(viii)   Responses to the RFQ submitted by You or on Your behalf, including but not limited to bids, cost and profit margin information or estimates, proposed changes in the design or specifications of the Auto Part that was the subject of the RFQ, and any discounts, rebates, or other allowances, incentives, or other terms offered;

(ix)     Whether You were selected to manufacture or supply the Auto Part that was the subject of the RFQ, and if so, information allowing You to trace, track or link the RFQ with the Auto Part sold, and if not, the name of the person selected (if known) and the reasons You were not selected (if known);

709315.0013/5986002.6

(x)     Whether on-site engineers or other personnel or engineering services were provided by You or on Your behalf in connection with the Auto Part that was the subject of the RFQ, the nature and extent of such services, and the address where such personnel or services were provided; and

(xi)    Limit Price, Target Price, or VE Price, if any, for the Auto Part, after application of all anticipated or expected discounts, rebates, or other allowances, and any revisions or changes to such price over time;

d.      Any communications between You and a competing manufacturer or supplier regarding an RFQ, solicitation to bid, RFQ response, bid, proposal, or negotiations for the sale of Auto Parts.

**REQUEST NO. 3:**  Documents concerning proposed or actual post-RFQ prices (*e.g.*, cost-down pricing and annual or semi-annual price reductions) for the sale of Auto Parts, and Your policies, methods, formulas, or factors used in negotiating, determining, setting, computing, quoting, or accepting such post-RFQ prices for the sale of Auto Parts.

**REQUEST NO. 4:**  Documents  sufficient to show the policies, methods, formulas, or factors used in determining, setting, computing, quoting, or modifying the prices of WHPs or Auto Parts sold by You, including but not limited to, documents concerning rebates, discounts, off-invoice discounts, credits, allowances, promotional or incentive payments, or other price concessions, and any proposed or actual changes in such policies, methods, formulas, or factors and the reasons for such changes.

**REQUEST NO. 5:**  Data or documents (in the absence of data) sufficient to show the following information concerning each purchase or acquisition by You or on Your behalf of a

6

WHP (i) in the United States or (ii) outside the United States for sale in the United States or for installation in a product (*e.g.*, an automobile) sold in the United States:

   a.   Date of the purchase or acquisition;

   b.   Person from whom the WHP was purchased or acquired, any identifiers of such person, and such person's address;

   c.   Name or a description of the WHP purchased or acquired, the quantity purchased or acquired (including measurement unit for quantity, amount or number), and part number and any other product identifiers;

   d.   Terms and conditions on which the WHP was purchased or acquired, including but not limited to:

      (i)   Purchase price (including currency and exchange rate, if applicable) and all adjustments to price, including but not limited to,

         1.   Rebates, discounts, or other incentives or allowances; and

         2.   Amount paid at the time of the purchase or acquisition, and the terms and duration of any monthly or installment payments;

      (ii)   Shipping or freight costs, and by whom such costs were paid;

   e.   "Ship-from" and vendor "pay-to" address(es) from which the WHP and invoice for it were shipped or sent, date(s) the WHP and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the WHP and invoice were received, and date(s) the WHP and invoice were received;

   f.   Repairs, returns, or refunds with respect to the WHP purchased or acquired, whether the WHP was returned, and amount of any associated refund or credit;

g.  Monetary or non-monetary components or incentives for the purchase beyond unit price, including any service, benefit, and/or product (other than the WHP itself), including but not limited to, service agreements, warranties, installation, and the value of each such service, benefit, or product;

h.  The specific product(s) (*i.e.*, the specific Auto Part(s) or automobile(s)) for which the WHP was designed and/or intended, including but not limited to:

(i)  for automobiles, the brand(s) and model(s) or model platform(s), model year(s), and any other product identifiers; and

(ii)  for other products, a description of the product and any product identifiers;

i.  Each contract or agreement concerning the purchase or acquisition of the WHP, including but not limited to "cost plus" contracts or contracts with exclusive dealing or "most favored nations" provisions; and

j.  For WHPs that were purchased or acquired pursuant to a Directed Sourcing Arrangement, the price and terms of any such Directed Sourcing Arrangement, including the person that You to purchase or acquire the WHP and at what price and terms.

**REQUEST NO. 6:**  Documents (to the extent not produced in response to Request Nos. 1-5), including number, code, or data dictionaries or similar documents, sufficient to identify, describe, and explain the (i) manufacturer, supplier, vendor, and customer numbers or codes; (ii) product, component, and part numbers or codes; (iii) model, model platform, VIN, and model year numbers or codes; (iv) RFQ and RFQ response numbers or codes; (v) plant or facility numbers or codes; (vi) Limit Price, Target Price, VE Price, or other price numbers or

8

codes; (vii) contract or agreement and invoice numbers or codes; and (viii) data fields, that are reflected in data or documents produced in response to Request Nos. 1-5.

**REQUEST NO. 7:**   Documents concerning the market(s), market or competitive conditions, and market structure(s) for the (a) manufacture and sale of WHPs and (b) purchase of WHPs, including but not limited to, competitors, market shares, profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and customer and consumer surveys and/or research concerning:

a.     market shares or market concentrations of the (i) manufacturers and suppliers of WHPs and (ii) purchasers of WHPs, as well as any variations in these shares or concentrations;

b.     separate markets for different types of WHPs (*i.e.*, automotive wire harnesses and ECUs); and

c.     market shares or market concentrations and conditions at each level in the various distribution chains for WHPs, including but not limited to the distribution chain for resale of WHPs as replacement or repair parts.

**REQUEST NO. 8:**   All documents concerning each communication or agreement by You or on Your behalf with any plaintiff or plaintiff's counsel in the Wire Harness MDL, including but not limited to, all documents, including transactional data, that are produced or provided to counsel for any plaintiff in the Wire Harness MDL by You or on Your behalf.

9

## DEFINITIONS

1.      "Automobile" means a motor vehicle that is principally used for transporting from one to eight passengers and is designed to operate primarily on roads, typically with four wheels, including sedans, pickup trucks, and sport utility vehicles, but excluding motorcycles, all-terrain vehicles, buses, and commercial trucks.

2.      "Bundled" means bound, grouped, aggregated, manufactured or produced together.

3.      "Directed Sourcing Arrangement" means a transaction for the acquisition of a Wire Harness Product or a product containing a Wire Harness Product that was engaged in by You or on Your behalf with a supplier of Wire Harness Products or products containing a Wire Harness Product, pursuant to terms negotiated by another person or entity for You or on Your behalf.

4.      "Limit Price" is the price set by an OEM or on behalf of an OEM to purchase or acquire a Wire Harness Product or other product from a manufacturer or supplier that the manufacturer or supplier is or was asked to meet.

5.      "OEM" means an automobile original equipment manufacturer and the OEM's respective officers, directors, current and former employees, agents, representatives, attorneys, or anyone else acting or who has acted on its behalf.

6.      "Person" shall mean natural persons, proprietorships, corporations, public corporations, municipal corporations, the federal government and all departments and agencies thereof, state governments, local governments, other governmental agencies, political subdivisions, partnerships, groups, associations, organizations, or other entities, regardless of form.

7.      "RFQ" means requests to purchase of any kind, including invitations to bid or submit proposals, and formal requests for quotation.

8.      "Target Price" is an OEM's anticipated or expected price for the purchase or acquisition of a product, whether or not disclosed to actual or potential manufacturers or suppliers of the product in an RFQ or otherwise, including a price based on (a) the input and other costs of the manufacturer or supplier of the product, (b) a reasonable profit margin for the manufacturer or supplier, (c) reductions in the price of the product as compared to the price of the product or a similar product that was purchased or acquired previously by the OEM or on its behalf, (d) post-RFQ price reductions (*e.g.*, cost-down pricing and annual or semi-annual price reductions), (e) anticipated or expected manufacturing or production efficiencies, or (f) other factors.

9.      "VE Price" is the price that was offered by a manufacturer or supplier, or that an OEM anticipated or expected to pay, for the purchase or acquisition of a product after anticipated or expected reductions over time as a result of improvements in the engineering, design, or specifications of the product.

10

10. "Wire Harness MDL" means the Class Cases, Miscellaneous Cases, and Individual Cases that are associated now or in the future with the Wire Harness Lead Case, Case No. 2:12-cv-00100, which is part of the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division.

11. "Wire Harness Product(s)" means automotive wire harness electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in automobiles, and the following components of such wire harnesses: automotive electrical wiring, automotive wire harnesses, automotive wiring connectors, automotive wiring terminals, cable bonds, electronic control units "ECUs," fuse boxes, high voltage wiring, junction blocks, lead wire assemblies, power distributors, relay boxes, and speed sensor wire assemblies.

12. "You," "Your," and "Your Company" mean Delphi Automotive Systems LLP and its predecessors, successors, and present and former subsidiaries, departments, divisions, and/or affiliates, including without limitation Delphi Corporation, DPH Holdings Corporation, Delphi Furukawa Wiring Systems LLC, and any organization or entity that is or was subject to its or their management, direction, or control, together with its and their present and former directors, officers, employees, agents, representatives, or any Person acting or purporting to act on its behalf.

## INSTRUCTIONS

1. Documents originating in paper or other hard copy format should be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files. TIFF files shall be produced in single-page format along with image load files (.DII file and .OPT file and .LFP file). All documents are to be provided with multi-page searchable text (.TXT) files. These text files and image load files should indicate page breaks to the extent possible, as well as Production Number Begin, Production Number End, Production Attachment Range Number Begin, Production Attachment Range Number End, and Production Document Page Count. As well, each TIFF image should be branded with the applicable Bates number and confidentiality designation.

2. Electronic document files that were or are created in Microsoft Excel, Microsoft Access, and similar applications, shall be produced in their native format. The following metadata fields shall be produced with each such document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

11

3.      For electronic document files, including without limitation Microsoft Word, PowerPoint, Adobe, or PDF, and files from similar applications ("Electronically Stored Document Application Files"), production shall take the form of single-page TIFF images with cross-referenced image and load data files showing document breaks and formatted for Concordance and for loading into Opticon.  The following metadata fields shall be produced for each document:

- Application/Doc Type
- Beginning and Ending Bates Numbers
- Title
- Author
- Date Created
- Date Last Modified
- Date Last Printed
- Text of Document
- Folder/Path
- Custodian

4.      Emails also should be produced as single-page TIFF files according to the same protocols outlined above with respect to Electronically Stored Document Application Files, except that for emails the following metadata shall be produced:

- Beginning and Ending Bates Numbers
- Beginning and Ending Bates Ranges (including attachments)
- Date Sent in MM/DD/YY format
- Time Sent in 24 hour format
- Date Received
- Time Received
- Title/Subject
- To, From, CC, and BCC fields
- Attachment
- Text of Email
- Folder
- Custodian

Where an email has an attachment, each attachment should be produced immediately following the email to which it was attached.

5.      The relevant time period for each Request is (i) January 1, 1998 through and including October 31, 2011, excepting data extracted from electronic databases or data summaries for which the relevant time period is January 1, 1996 through and including December 31, 2013.

# EXHIBIT 03

| | |
|---|---|
| **From:** | Vicky Romanenko <Vicky@cuneolaw.com> |
| **Sent:** | Thursday, December 04, 2014 8:11 PM |
| **To:** | Papelian, Joseph E; Gangnes, Larry |
| **Cc:** | Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K; ssklaver@SusmanGodfrey.com |
| **Subject:** | RE: Delphi |
| **Attachments:** | 6115010_1_ (clean).pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Joe,

Attached please find the requests.

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Friday, November 21, 2014 12:00 PM
**To:** Vicky Romanenko; Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K
**Subject:** RE: Delphi

Thank you,

Joe

**From:** Vicky Romanenko [mailto:Vicky@cuneolaw.com]
**Sent:** Friday, November 21, 2014 11:54 AM
**To:** Papelian, Joseph E; Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K
**Subject:** RE: Delphi

Joe,

We will send you the requests.

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Friday, November 21, 2014 11:39 AM
**To:** Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Vicky Romanenko; Frantangelo, Barbara K
**Subject:** RE: Delphi

Larry:

Thank you  for your email.  I have not yet heard from Billy London or Vicky Romanenko.  I will be in the office on Monday, but off the rest of the Thanksgiving week.

Joe

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Wednesday, November 19, 2014 7:15 PM
**To:** Papelian, Joseph E

**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Vicky Romanenko
**Subject:** Delphi

Joe,

Here is the latest. Counsel for each group of plaintiffs have agreed on a set of document and data requests to Delphi. Vicky Romanenko, one of the counsel for the auto dealer plaintiffs, will be sending those requests to you on behalf of all plaintiffs. Plaintiffs' requests include the documents and data requested by defendants.

Regards. Larry

---

**From:** Gangnes, Larry
**Sent:** Tuesday, October 28, 2014 8:23 AM
**To:** 'Papelian, Joseph E'
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K
**Subject:** RE: Delphi

Joe, sorry for the delay in bringing this to a close. We have exchanged proposed requests with plaintiffs and are waiting to hear back from them. We will keep you posted.

Regards. Larry

---

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Monday, August 25, 2014 6:03 AM
**To:** Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K
**Subject:** RE: Delphi

Larry:

Thank you for the update. We look forward to speaking with you in September.

Joe

---

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Saturday, August 23, 2014 5:04 PM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com
**Subject:** Delphi

Joe,

Greetings. I have returned from my sabbatical, and Ken Davis and I had a telephone call on August 15 with plaintiffs' counsel, Billy London and Will Reiss, who have since forwarded to us plaintiffs' proposed document requests to Delphi. Defendants are in the process of reviewing plaintiffs' requests with a view to presenting Delphi with a single set of requests from all parties.

However, I have unexpectedly been called to England next week, so we will not be able to get back to you until after the Labor Day weekend. I apologize for the delay but we are working toward minimizing the burden and expense to Delphi by coordinating plaintiffs' and defendants' requests to Delphi, as you requested.

Let us know if you have any questions or comments in the interim.

Regards.

**Larry Gangnes**



Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

---

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this message may be attorney-client or work-product privileged and should be treated as confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, destroying the original message and any copies.

**************************************************************************************

Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

**************************************************************************************

<u>SCHEDULE OF TOPICS FOR DOCUMENT REQUEST</u>

1.  Cost and sales information (in data and documents) concerning:

    (a) Engineering and research and development costs associated with Wire Harness Products (organized by month, quarter, or year and/or by OEM and/or by make-model), and specification or identification of the amount of such costs, if any, directly reimbursed by a third-party;

    (b) Plant and equipment investment for any plant you used to produce Wire Harness Products (by plant or product location), and specification or identification of the amount of that investment, if any, owned by parties other than Delphi (e.g., tooling owned by costumers);

    (c) Plant capacity and utilization rates for any plant you used to produce Wire Harness Products;

    (d) Quantity of each part number of Wire Harness Products you produced from any plant you used to produce Wire Harness Products, by plant or product location;

    (e) Revenues (gross and net of any discounts, rebates, and returns) for each part number of Wire Harness Products you produced and for each customer to whom you sold Wire Harness Products from any plant you used to produce Wire Harness Products, by production location and country of sale;

    (f) Costs of manufacturing, marketing,  distributing and selling Wire Harness Products, including raw materials, labor, manufacturing and general overhead, freight, warranty, and any other fixed and variable costs of producing Wire Harness Products, organized by month, quarter, or year, and including such cost information available at the most disaggregated level kept in the ordinary course of business, such as costs broken down by or to a specific automobile make-model;

    (g) Cost tables you prepared for your own use or for the use of a customer or potential customer.

    (h) Any user manuals, training materials, or database table maps for the use of your databases/software that keep track of any of the information above.

2.  Documents relating to the setting, determination, formulation and charging of prices for Wire Harness Products, including pricing policies, processes, factors and formulas, training and instruction materials for your employees involved with pricing, including annual price reductions and communications regarding the same.

3.  All documents relating to any RFQs, post-RFQ pricing or price reduction attempts, negotiations, bidding, contracts (resulting from RFQs and other methods of procurement), or agreements (formal or informal) between you and any defendant, as well as any other documents relating to the procurement by, purchase or supply of Wire Harness Products, to your customers or potential customers including, but not limited to, any price lists or price sheets from you or any defendant, any executed or draft contracts or agreements, and any correspondence relating to negotiations or agreements made.

4. Documents and data relating to responses to RFQs and any other procurement requests from customers or potential customers for Wire Harness Products, that were formulated, assembled or determined by You, including all bids (e.g., submissions in response to RFQs) and any other prices submitted to your customers or potential customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers) to produce and supply Wire Harness Products;

5. Your strategic, business and marketing plans, and planning analyses relating to or covering Wire Harness Products.

6. Documents relating to comparisons of your Wire Harness Products business with those of your competitors, including comparisons of profits, products, costs and prices.

7. Documents concerning the relationship between prices of Wire Harness Product and prices of new vehicles.

8. Documents concerning the relationship between prices of automobile inputs and prices of new vehicles.

9. Documents concerning the relationship between the cost of manufacturing vehicles and prices of new vehicles.

10. Documents relating to your procurement contracts with OEMs and Tier 1, 2, and 3 suppliers.

11. All Documents, including studies and analyses, showing the relationship between prices charged or bids submitted to different OEMs, for Wire Harness Products, through RFQs and any other procurement process, including Documents concerning the use of base prices.

12. All Documents including studies and analyses, showing the relationship between prices charged or submitted, for Wire Harness Products, for different vehicle models, made by the same OEM, through RFQs and any other procurement process, including Documents concerning the use of base prices.

13. Documents and data related to profits, losses and margins on Wire Harness Products, including profit and loss statements, balance sheets, and cash flow statements (audited and unaudited). The profit and margin information produced should be at the most disaggregated level kept in the ordinary course of business, such as profit and margin data broken down by or to a specific automobile make-model. Documents and data should be for each part number of Wire Harness Products you produced and for each customer to whom you sold Wire Harness Products from any plant you used to produce Wire Harness Products, by production location and country of sale;

14. Documents related to comparability of wire harnesses made for different vehicles and by different manufacturers.

15. Documents sufficient to describe and identify, for each Wire Harness Product sold by you, all part numbers assigned, OEM model number and year, product identifiers such as product descriptions and product characteristics, and any other internal codes.

16. Documents requested by the DOJ, but not produced by Delphi because of stand-down letter.

17. Transactional data and documents

(a) All transactional data and documents relating to your sales of Wire Harness Products, including but not limited to, for each transaction, the following: (a) product type; (b) product description, including the model, make, and model year of the vehicle(s) for which the product was intended, and whether the product was an original equipment or replacement part; (c) total sales amount; (d) quantity (units) (for each part number of Wire Harness Products sold and for each OEM model supplied, the quantity you sold your customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers), including any discounts, rebates, other payments, or other incentives you made or provided to your customers); (e) unit price (including For each part number of Wire Harness Products sold and for each OEM model supplied, the prices you charged your customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers) and the prices your customers paid for Wire Harness Products, including any discounts, rebates, or other payments you made to your customers; (f) any costs (e.g., total cost, variable cost, materials cost, fixed cost, semi-variable cost, marginal cost, standard cost) to you associated with the product; (g) sales date; (h) adjustments, including but not limited to, discounts, rebates, credits, and debits in the manner provided whether by product or by total sale; (i) descriptions of such adjustments; (j) currency and exchange rate; (k) product identifier or code; (l) part number for each product; (m) monetary components of the transaction beyond unit price (i.e., sales tax, shipping or delivery fees); (n) purchaser, including all Customer information, including, but not limited to, customer ID number, sold-to name, sold-to address, and ship-to name and address (if not on invoice); (o) purchaser invoice-to (including bill-to and sold-to) and ship-to information, including all purchaser address information; (p) location(s) to which product and invoice were sent; (q) the legal entity making the sale; (r) location of sale; (s) invoice number; (t) all other information included on invoices issued during the relevant period; (u) all information related to any return or refund; and (v) all information related to rebates, discounts and free goods including information sufficient to tie them to sales transactions.

(b) All transactional data relating to your purchases of Wire Harness Products (e.g., from a contract manufacturer or supplier), including but not limited to, for each transaction, the

following: (a) product type; (b) product description, including the model, make, and model year of the vehicle(s) for which the product was intended, and whether the product was an original equipment or replacement part; (c) total purchase amount; (d) quantity (units); (e) unit price; (f) purchase date; (g) adjustments, including but not limited to, discounts, rebates, credits, and debits in the manner provided whether by product or by total purchase; (h) descriptions of such adjustments; (i) currency and exchange rate; (j) product identifier or code; (k) part number for each product; (m) monetary components of the transaction beyond unit price (i.e., sales tax, shipping or delivery fees); (n) vendor; (o) vendor pay-to and ship-from information, including all vendor address information; (p) location(s) at which product and invoice were received; (q) the legal entity making the purchase; (r) location of purchase; (s) invoice number; (t) all other information included on invoices issued during the relevant period; (u) all information related to any return or refund; and (v) all information related to rebates, discounts and free goods including information sufficient to tie them to purchase transactions.

(c) Documents sufficient to explain any fields used, codes used, methods used, or data contained in the transactional data requested above, including but not limited to, part de-coders, customer code legends, or supplier code legends, adjustment code legends, or description code legends.

Temporal, product and geographical scope: same as agreed upon by the parties in connection with Plaintiffs' document requests.

## **DEFINITIONS**

The following Definitions apply to these Requests:

1.     "And" and "or" are interchangeable. "And" is understood to include and

encompass "or," and vice versa.

2.     "Communication" means, without limitation, oral or written

communication of any kind, all electronic communications, emails, facsimiles,

telephone communications, correspondence, exchange of written or recorded

information, or face-to-face meetings. The phrase "communication between" is

defined to include instances where one party addresses the other party but the other party does not necessarily respond.

3.      "Defendant" means any company, organization, entity or person presently or subsequently named as a Defendant in this litigation, including, without limitation, any of its predecessors, successors, subsidiaries, departments, divisions and/or affiliates, or entities, who manufactured Wire Harness Products during the relevant period, that it acquired or merged with during the relevant period, or any organization or entity which a Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any person acting or purporting to act on a Defendant's behalf.

4.      "Document" shall be broadly interpreted as used in Rule 34(a) of the Federal Rules of Civil Procedure and applies equally to hard copy and electronically stored information. The term "document" includes, without limitation, the original and all non-identical copies of all written or printed items, including, without limitation, letters, correspondence, memoranda, legal pleadings, calendars, diaries, day planners, card files or Rolodex files, expense reports, travel records, lists, outlines, summaries, records of telephone conversations, telegrams, facsimiles, notes, reports, data, data compilations, data analyses, compilations, notebooks, work papers, graphs, charts, spreadsheets, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings, sketches, photographs, videotapes, audiotapes, film and sound reproductions, emails, internal or external website content, compact discs, computer files and disks, sales, advertising and promotional literature, agreements, contracts, stored recordings, minutes or other recordings of

meetings, all written or graphic representations of any kind, and all mechanical or electronic data, records or representations of any kind. The term "Document" includes ESI.

5.         "Electronically stored information" or "ESI" has the same full meaning as provided by Federal Rules of Civil Procedure 26 and 34 and includes, without limitation, the following: (a) structured and unstructured data, as those terms are defined in The Sedona Conference Glossary, available at www.thesedonaconference.org/publications: (b) activity listings of electronic mail receipts and/or transmittals; (c) output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, instant messaging programs and applications (e.g., AOL Instant Messenger™, BlackBerry Messenger™, iChat and iCloud), text-messaging programs or applications, or bulletin board programs, operating and backup systems, source code, PRF files, PRY files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a backup file or system, a deleted file or system, or file fragment; (d) any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, or in any other vehicle for digital data storage or transmittal, such as, but not limited to, desktop computers; servers and other network computers; backup tapes or systems; laptop computers; tablets (e.g., iPads); home or personal computers used for business purposes; cellphones, smartphones, personal digital assistants, or similar devices running mobile operating systems, including such devices owned by Your Employees and used in any way for business purposes; external storage devices (such

as "keychain" drives) and file folder tabs; or containers and labels appended to or relating to any physical storage device associated with each original or copy of all documents requested herein; (e) any and all items stored on voice-mail systems, websites, company intranet sites, chat rooms and social networking websites (e.g., Facebook, LinkedIn, and social websites listed at http://en.wikipedia.org/wiki/List of social networking websites); and (f) any and all data, data compilations, and data analyses.

6.       "Employee" means, without limitation, any current or former officer, director, executive, manager, secretary, assistant, staff member, messenger, agent or other person who is or was employed by a Defendant, or any other manufacturer or seller of Wire Harness Products, as defined below.

7.       "Including" is used to emphasize certain types of documents requested and should not be construed as limiting the request in any way.

8.       "Meeting" means, without limitation, any assembly, convocation, encounter, or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

9.       "OEM" means original equipment manufacturer, including motor vehicle manufacturers.

10.       "Relating to," "referring to," "regarding" or "with respect to" mean, without limitation, the following concepts: concerning, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting,

studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

11.      "RFQ" means requests to purchase of any kind, including without limitation invitations to bid or submit proposals, and formal requests for quotation.

12.      "Wire Harness Products" means and includes wire harnesses and the following products: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, high voltage wiring, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and speed sensor wire assemblies used in motor vehicles.

13.      "You," "your" or "your company" mean the responding party, its predecessors, successors, subsidiaries, departments, divisions, affiliates and/or any entities the responding party has acquired or that have merged with the responding party, to the extent such acquired or merging entities made Wire Harness Products during the relevant period, including without limitation, any organization or entity which the responding party manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any person acting or purporting to act on behalf of the responding party.

14.      The use of the singular herein also includes the plural, the masculine and the feminine, as appropriate in the context. The use of any tense of any verb shall include also within its meaning all other tenses of the verb.

15.      "Original equipment part" means a part sold to be installed in a vehicle when it is manufactured, rather than as a replacement.

**INSTRUCTIONS**

1.    In producing documents, please furnish all documents in your possession, custody or control, regardless of the physical location of such documents or whether such documents are possessed directly by you or your directors, officers, agents, employees, representatives, accountants, outside consultants, subsidiaries, managing agents, affiliates, investigators, or by your attorneys or their employees, agents or investigators.

2.    Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure and the Stipulation and Order Regarding Production of Electronically Stored Information and Hard Copy Documents (the "ESI Stipulation") (Dkt. No. 110), all documents should be produced in the same order as they are kept or maintained by you in the ordinary course of your business.

3.    Documents should be produced in such fashion as to identify the parent, subsidiary, affiliate and the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found (i.e., the document custodian) and the business address of each document custodian.

4.    Pursuant to the ESI Stipulation, documents attached to one another should not be separated. If any portion of any document is responsive to any portion of a Request, the entire document should be produced.

5.    If any document responsive to any of these Requests is privileged, and the document or any portion of the document requested is withheld based on a claim

of privilege pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, or based on any other statute or reason, provide a statement of the claim of privilege and all facts relied upon in support of that claim as required by the Federal Rules of Civil Procedure, including the following information: (a) the reason for withholding the document; (b) the date(s) of the document; (c) the type of document (i.e., email, letter, report); (d) the general subject matter of the document (such description shall not be considered a waiver of your claimed privilege); (e) the present location of the document; (f) the identity of all the persons involved with the document (i.e., all authors and recipients); and (g) the number or numbers of these Requests to which each such document is responsive.

6.          Each document requested herein should be produced in its entirety and without deletion, redaction, or excision, except as qualified by Instruction No. 5, above, regardless of whether you consider the entire document or only part of it to be relevant or responsive to any Requests. All redacted documents must be produced in accordance with the ESI Stipulation.  Any redactions to documents produced should be identified in accordance with Instruction No. 5, above.

7.          Please provide an index or other means (such as a source log) to determine which files came from which office and/or which person.

8.          When responding to these Requests, if your response references documents You previously produced, please identify the previously produced documents by Bates number.

# EXHIBIT 04

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Tuesday, December 09, 2014 10:52 AM |
| **To:** | Vicky Romanenko; Gangnes, Larry; Yeager, Judy |
| **Cc:** | Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; ssklaver@SusmanGodfrey.com |
| **Subject:** | RE: Delphi |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Vicky:

We are in receipt of your very broad wish list of documents.  As you can imagine this would be a huge effort for Delphi to address.  I suggest a conference call soon so we can discuss limitations.  I've copied Judy Yeager, my AdMin, asking she schedule a one-hour call with those on this email.  Judy – please include Robert Ward of Packard.

Vicky – please let Judy know if there are others you want on the call, and whether everyone on this email needs to be on the call.

Thank you,

Joe

**From:** Vicky Romanenko [mailto:Vicky@cuneolaw.com]
**Sent:** Thursday, December 04, 2014 8:11 PM
**To:** Papelian, Joseph E; Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K; ssklaver@SusmanGodfrey.com
**Subject:** RE: Delphi

Joe,

Attached please find the requests.

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Friday, November 21, 2014 12:00 PM
**To:** Vicky Romanenko; Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K
**Subject:** RE: Delphi

Thank you,

Joe

**From:** Vicky Romanenko [mailto:Vicky@cuneolaw.com]
**Sent:** Friday, November 21, 2014 11:54 AM
**To:** Papelian, Joseph E; Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Frantangelo, Barbara K
**Subject:** RE: Delphi

Joe,

We will send you the requests.

---

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Friday, November 21, 2014 11:39 AM
**To:** Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Vicky Romanenko; Frantangelo, Barbara K
**Subject:** RE: Delphi

Larry:

Thank you  for your email.  I have not yet heard from Billy London or Vicky Romanenko.  I will be in the office on Monday, but off the rest of the Thanksgiving week.

Joe

---

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Wednesday, November 19, 2014 7:15 PM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K; Vicky Romanenko
**Subject:** Delphi

Joe,

Here is the latest.  Counsel for each group of plaintiffs have agreed on a set of document and data requests to Delphi.  Vicky Romanenko, one of the counsel for the auto dealer plaintiffs, will be sending those requests to you on behalf of all plaintiffs.  Plaintiffs' requests include the documents and data requested by defendants.

Regards.  Larry

---

**From:** Gangnes, Larry
**Sent:** Tuesday, October 28, 2014 8:23 AM
**To:** 'Papelian, Joseph E'
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K
**Subject:** RE: Delphi

Joe, sorry for the delay in bringing this to a close.  We have exchanged proposed requests with plaintiffs and are waiting to hear back from them.  We will keep you posted.

Regards.  Larry

---

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Monday, August 25, 2014 6:03 AM
**To:** Gangnes, Larry
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com; Frantangelo, Barbara K
**Subject:** RE: Delphi

Larry:

Thank you for the update.  We look forward to speaking with you in September.

Joe

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Saturday, August 23, 2014 5:04 PM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; William H. London; wreiss@rkmc.com
**Subject:** Delphi

Joe,

Greetings.  I have returned from my sabbatical, and Ken Davis and I had a telephone call on August 15 with plaintiffs' counsel, Billy London and Will Reiss, who have since forwarded to us plaintiffs' proposed document requests to Delphi.  Defendants are in the process of reviewing plaintiffs' requests with a view to presenting Delphi with a single set of requests from all parties.

However, I have unexpectedly been called to England next week, so we will not be able to get back to you until after the Labor Day weekend.  I apologize for the delay but we are working toward minimizing the burden and expense to Delphi by coordinating plaintiffs' and defendants' requests to Delphi, as you requested.

Let us know if you have any questions or comments in the interim.

Regards.


**Larry Gangnes**



Shareholder, Bio | vCard
Lane Powell PC
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
Direct: 206.223.7036
Cell: 206.779.6745
www.lanepowell.com

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
*******************************************************************************
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
*******************************************************************************

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

Please be advised that, if this communication includes federal tax advice, it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for "covered opinions" or we have informed you that those standards do not apply to this communication.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this message may be attorney-client or work-product privileged and should be treated as confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, destroying the original message and any copies.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EXHIBIT 05

**From:** Omar Ochoa [mailto:OOchoa@susmangodfrey.com]
**Sent:** Monday, June 01, 2015 11:59 AM
**To:** Papelian, Joseph E
**Cc:** Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry
**Subject:** Auto Parts - Follow Up Discovery Requests to Delphi

Joe,

Please see the attached letter following up on our discovery requests to Delphi and let me know if you have any questions. Thank you.

**Omar Ochoa | Susman Godfrey LLP**
Office: 214.754.1913  Mobile: 956.500.3362
901 Main St. | Suite 5100 | Dallas, Texas 75202
**HOUSTON  ●  DALLAS  ●  LOS ANGELES  ●  SEATTLE  ●  NEW YORK**
oochoa@susmangodfrey.com | Biography Page

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

1

## Susman Godfrey L.L.P.

a registered limited liability partnership
SUITE 5100
901 MAIN STREET
DALLAS, TEXAS 75202-3775
(214) 754-1900
FAX (214) 754-1933
www.susmangodfrey.com

———————

| Suite 5100 | Suite 950 | Suite 3800 | 15th Floor |
|---|---|---|---|
| 1000 Louisiana Street | 1901 Avenue of the Stars | 1201 Third Avenue | 560 Lexington Avenue |
| Houston, Texas 77002-5096 | Los Angeles, California 90067-6029 | Seattle, Washington 98101-3000 | New York, New York 10022-6828 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 | (212) 336-8330 |

Omar Ochoa
Direct Dial (214) 754-1913

E-Mail OOchoa@susmangodfrey.com

June 1, 2015

Larry S. Gangnes
Lane Powell PC
1420 Fifth Ave, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
GangnesL@LanePowell.com

Joseph E. Papelian
Delphi Legal – Litigation
5725 Delphi Drive
Troy, MI 48098
Joseph.E.Papelian@delphi.com

RE:     *In re Automotive Parts Antitrust Litigation*

Dear Sirs:

    This is to follow up regarding the discovery requests given to Delphi on December 3, 2014 (the "Original Discovery Requests"). Based on discussions between Delphi and the Plaintiffs in the Automotive Parts Antitrust Litigation (the "Plaintiffs"), and the presentation provided by Delphi on February 5, 2015, the Plaintiffs have narrowed the discovery requests to the following:

(1) Sourcing Files:

- All documents included in sourcing files that are reasonably available and relate to Wire Harness Products sold from January 1, 1998 through the present. Based on information provided by Delphi, the sourcing files should include at least:

    (a) Internal management review packages submitted to the Delphi Price Review Group (the "DPRG") for approval of bids in

June 1, 2015
Page 2

response to Requests for Quotes ("RFQs") for Wire Harness Products,

(b) Requests for procurement from customers and quote packages sent to customers in response to procurement requests for Wire Harness Products, both for business Delphi did and did not win

(c) Supplier agreements entered into for successful bids

(d) Preferred supplier agreements, such as the Aligned Business Framework-related agreements.

(e) Internal and external communications, including e-mails—

(f) Financial and price ladder analyses, and

(g) Documents related to APR requests and other discount requests

- If the above elements do not exist in sourcing files, please advise the parties. The parties request that these materials be produced from other sources to the extent they do not exist in sourcing files.

- Please also provide sufficient information to explain any fields used, codes used, methods used, or data contained in the sourcing files.

(2) Transactional Data and Documents:

- Transactional data that are kept in your SAP database (or other electronic databases if not available in SAP), are reasonably available, and concern your sales (or purchases from a contract manufacturer or supplier) of Wire Harness Products from January 1, 1996 through the present. To the extent available, each transaction record should include:

  (a) product type;

  (b) product description, including the model, make, and model year of the vehicle(s) for which the product was intended, geographic market for which the vehicle was intended, and whether the product was an original equipment or replacement part;

  (c) total sales amount;

  (d) quantity (units) (for each part number of Wire Harness Products sold and for each OEM model supplied, the quantity you sold your customers, including, but not limited to, OEMs and Tier 1,2 and 3 suppliers);

  (e) unit price (for each part number of Wire Harness Products sold and for each OEM model supplied, the prices you charged your customers (including, but not limited to, OEMs and Tier 1,2 and 3 suppliers) and

June 1, 2015
Page 3

the prices your customers paid for Wire Harness Products, including any discounts, rebates, other payments, or other incentives you made or provided to your customers);

(f) any costs (e.g., total cost, variable cost, materials cost, fixed cost, semi-variable cost, marginal cost, standard cost, research and development costs, engineering costs, plant and equipment investment for any plant or equipment used to produce the product) to you associated with the product;

(g) sales date;

(h) adjustments, including but not limited to, discounts, rebates, credits, and debits in the manner provided whether by product or by total sale;

(i) descriptions of such adjustments;

(j) currency and exchange rate;

(k) product identifier or code;

(l) part number for each product;

(m) monetary components of the transaction beyond unit price (i.e., sales tax, shipping or delivery fees);

(n) purchaser, including all Customer information, including, but not limited to, customer ID number, sold to name, sold-to address, and ship-to name and address (if not on invoice);

(o) purchaser invoice-to (including bill-to and sold-to) and ship-to information, including all purchaser address information;

(p) location(s) to which product and invoice were sent;

(q) the legal entity making the sale;

(r) location of sale;

(s) invoice number;

(t) all other information included on invoices issued during the relevant period;

(u) all information related to any return or refund; and

(v) all information related to rebates, discounts and free goods including information sufficient to tie them to sales transactions

(x) plant and capacity utilization rates for any plant you used to produce Wire Harness Products

June 1, 2015
Page 4

(y) quantity of each part number of Wire Harness Products you produced from any plant you used to product Wire Harness Products

(z) Revenues (gross and net of any discounts and rebates) for each part number of Wire Harness Products you produced and for each customer to whom you sold Wire Harness Products

(aa) Cost tables you prepared for your own use or for the use of a customer or potential customer

(bb) Profits, losses, and margins (gross and net) for each type of Wire Harness Products you produced and for each customer for which you produced Wire Harness Products from any plant you used to produce Wire Harness Products;

(cc) Financial records (e.g., general ledger data, balance sheets, income statements) relating to your Wire Harness Products business;

(dd) Customer information, including, but not limited to customer number, products sold, quantity sold, net and gross price charged, sold-to name, and ship-to name and address, sales terms, ship to and sold to parent company, and identification of subsidiaries, affiliates, and joint ventures;

(ee) Average cost of producing each type of Wire Harness Product for each customer and for each model vehicle

(ff) Bids and other prices you submitted to your customers or potential customers (including, but not limited to, OEMs and Tier 1, 2, and 3 suppliers) to produce and supply Wire Harness Products

- Please also provide sufficient explanation of any fields used, codes used, methods used, or data contained in the transactional data requested above, including but not limited to, part decoders, customer code legends, or supplier code legends, adjustment code legends, or description code legends.

(3)     Strategic and Business Plans

- Your business plans and strategic plans that are reasonably available and that relate to Wire Harness Products sold from January 1, 1998 through the present. To the extent any business or strategic plan covers other automotive products in addition to Wire Harness Products, the Wire

June 1, 2015
Page 5

Harness Product information can be separated and produced on its own provided that the information is self-contained and does not require referencing other product information for a full understanding of the Wire Harness Product business or strategic plan.

- Please also provide other information sufficient to explain any fields used, codes used, or data contained in the business or strategic plans.

(4)     Documents regarding Delphi's pricing policies and the training and instruction provided to employees regarding bidding and setting prices submitted to OEMs and other purchasers or potential purchasers, as well as determining discounts and price reductions for Wire Harness Products, from January 1, 1998 through the present.

(5)     Documents comparing Delphi to its competitors with regard to prices, Wire Harness Product features, costs, RFQ results and profits from January 1, 1998 through the present.

(6)     Studies, reports, or analyses in Delphi's possession comparing the prices of Wire Harness Products to the prices of vehicles from January 1, 1998 through the present.

Sincerely,

Omar Ochoa

# EXHIBIT 06

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Monday, June 08, 2015 1:44 PM
**To:** Omar Ochoa; Papelian, Joseph E
**Cc:** Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Davis, Kenneth R.
**Subject:** RE: Auto Parts - Follow Up Discovery Requests to Delphi

Omar & Joe,

This is to advise you that the Defendants in the Wire Harness class actions have no discovery requests to Delphi to add to plaintiffs' requests.  We understand that Fujikura has a few limited requests it will be raising with Delphi in connection with the separate action filed by Ford.

Regards.

**Larry Gangnes | Lane Powell PC**
**Shareholder** | Bio | vCard
1420 Fifth Avenue, Suite 4200
P.O. Box 91302 | Seattle, WA 98111-9402
Direct: 206.223.7036 | Mobile: 206.779.6745
GangnesL@LanePowell.com | www.lanepowell.com

**From:** Omar Ochoa [mailto:OOchoa@susmangodfrey.com]
**Sent:** Monday, June 01, 2015 8:59 AM
**To:** Papelian, Joseph E
**Cc:** Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry
**Subject:** Auto Parts - Follow Up Discovery Requests to Delphi

Joe,

Please see the attached letter following up on our discovery requests to Delphi and let me know if you have any questions. Thank you.

**Omar Ochoa | Susman Godfrey LLP**
Office: 214.754.1913  Mobile: 956.500.3362
901 Main St. | Suite 5100 | Dallas, Texas 75202
**HOUSTON  ●  DALLAS  ●  LOS ANGELES  ●  SEATTLE  ●  NEW YORK**
oochoa@susmangodfrey.com | Biography Page

1

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

# EXHIBIT 07

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Tuesday, June 30, 2015 1:36 PM |
| **To:** | Omar Ochoa |
| **Cc:** | Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry; Frantangelo, Barbara K |
| **Subject:** | Auto Parts - Follow Up Discovery Requests to Delphi (Wire Harness) |
| **Attachments:** | Auto Parts - Discovery Follow up Letter to Delphi.pdf; June 8, 2015 Letter to Delphi.pdf |

We met with representatives from Delphi's wire harness business this morning and reviewed the discovery requests received from Susman Godfrey and Arnold & Porter (a copy of each is attached). We expect to have more information on what documents are available and a rough estimate of the time needed to collect and process these documents in late July. I've asked Judy Yeager to schedule a meeting with you the week of July 27, 2015. Please let Judy know who will participate from your group so she can schedule the call.

Thanks,

Joe

**From:** Omar Ochoa [mailto:OOchoa@susmangodfrey.com]
**Sent:** Monday, June 01, 2015 11:59 AM
**To:** Papelian, Joseph E
**Cc:** Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry
**Subject:** Auto Parts - Follow Up Discovery Requests to Delphi

Joe,

Please see the attached letter following up on our discovery requests to Delphi and let me know if you have any questions. Thank you.

**Omar Ochoa | Susman Godfrey LLP**
Office: 214.754.1913  Mobile: 956.500.3362
901 Main St. | Suite 5100 | Dallas, Texas 75202
**HOUSTON  ●  DALLAS  ●  LOS ANGELES  ●  SEATTLE  ●  NEW YORK**
oochoa@susmangodfrey.com | Biography Page

This e-mail may contain privileged and confidential information. If you received this message in error, please notify the sender and delete it immediately.

# EXHIBIT 08

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Thursday, July 30, 2015 1:53 PM |
| **To:** | Omar Ochoa |
| **Cc:** | Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry; Frantangelo, Barbara K |
| **Subject:** | Wire Harness Auto Parts - Response to Discovery Requests |
| **Attachments:** | KE30 Example.xlsx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

I write in response to Omar Ochoa's letter of June 1, 2015, and as a follow up to the telephone conversation Barbara Frantangelo and I had with you on July 24, 2015.  As we discussed, Delphi will conduct a reasonable search for responsive documents related to wire harness sales where they would most likely be located.  Our responses will be limited to the following OEMS:  General Motors, Ford, Fiat Chrysler, Daimler, Toyota, Honda and Nissan.  These companies represent Delphi's main customers for wire harness sales.  Your requests are noted below with ur responses below each request.

1.  Sourcing Files:

- All documents included in sourcing files that are reasonably available and related to Wire Harness Products sold from January 1, 1998 through the
  present. Based on information provided by Delphi, the sourcing files should include at least:

    **We believe the majority of the requested information would be included in the DPRG packages.  Delphi should have comprehensive DPRG packages for 2011 – 2014, and we agreed to search our records for additional DPRG packages from 2000 – 2010.**

    a)  Internal management review packages submitted to the Delphi Price Review Group (the "DPRG") for approval of bids in response to Requests for Quotes ("RFQs") for Wire Harness Products.

    **This information should be included in the DPRG packages.**

    b)  Requests for procurement from customers and quote packages sent to customers in response to procurement requests for Wire Harness Products, both for business Delphi did and did not win.

    **This information should be included in the DPRG packages.**

    c)  Supplier agreements entered into for successful bids.

    **Delphi will search for responsive Purchase Orders.**

    d)  Preferred supplier agreements, such as the Aligned Business Framework-related agreements.

1

**This information would be retained by Delphi's customers.**

e)  Internal and external communications, including e-mails.

**Responsive emails should be included in the DPRG packages.**

f)  Financial and price ladder analyses.

**This information should be included in the DPRG packages.**

g)  Documents related to APR requests and other discount request.

**This information should be included in the DPRG packages.**

- If the above elements do not exist in sourcing files, please advise the parties. The parties request that these materials be produced from other sources to the extent they do not exist in sourcing files.

    **This information would be retained by Delphi's customers.**

- Please also provide sufficient information to explain any fields used, codes used, methods used, or data contained in the sourcing files

2.  Transactional Data and Documents:

    **As we discussed, Delphi began using the SAP program in approximately 2006.  Delphi agrees to provide spreadsheets containing transaction data from 2006 – 2014.  Attached to this email is a sample "KE30" report, which contains the following fields:**

    **Customer**
    **Customer Name**
    **Ship-to**
    **Ship-to party**
    **Product**
    **Product Description**
    **Product Hierarchy**
    **Product Hierarchy**
    **Profit Ctr**
    **Plant**
    **Plant Name**
    **Sales Revenue**
    **PKG Amortized**
    **Retro-billing**
    **Total Net Sales**
    **Sales Quantities**
    **Std. Direct Labor**

**Std.Mfg.O/H-Fixed**
**Std. Direct Material**
**Allied Material**
**Ext Proc/Sub-contract**
**Mexico VA - 1**
**Mexico VA - 2**
**Cost of Sales**
**GROSS FACTORY PROFIT**
**MEMO   Avg Sales Price**
**Total Material**

3.   Strategic and Business Plans

- Your business plans and strategic plans that are reasonably available and that relate to Wire Harness Products sold from January 1, 1998 through the present.  To the extent any business or strategic plan covers other automotive products in addition to Wire Harness Products, the Wire Harness Product Information can be separated and produced on its own provided that the information is self-contained and does not require referencing other product information for a full understanding of the Wire Harness Product business or strategic plan.

> **We believe the information contained in Delphi's 5-Year Revenue Plan, which consists of specific programs by customer, will sufficiently respond to this request and will produce same.**

4.   Documents regarding Delphi's pricing policies and the training and instruction provided to employees regarding bidding and setting prices submitted to OEMs and other purchasers or potential purchasers, as well as determining discounts and price reductions for Wire Harness Products, from January 1, 1998 through the present.

> **Delphi will search for and produce responsive documents, including documents relating to Delphi's Delegation of Authority policy, training materials regarding antitrust, Delphi's Code of Conduct, and the DPRG process.**

5.   Documents comparing Delphi to its competitors with regard to prices, Wire Harness Product features costs, RFQ results and profits from January 1, 1998 through the present.

> **This information should be included in the DPRG packages.**

6.   Studies, reports, or analyses in Delphi's possession comparing the prices of Wire Harness Products to the prices of vehicles from January 1, 1998 through the present.

> **Delphi does not have any material related to this request.**

We anticipate the collection of documents will take approximately two months, with an additional month to review, process and produce responsive documents.  The cost to Delphi for collecting the documents is

estimated at $100,000.  The cost for the review will be based on the number of documents collected.  As I mentioned during our call, we retain contract attorneys for a nominal fee to review the documents, and we will forward these costs on to you.  We would need a retainer to start this effort.

We look forward to your response.  Please call if you have any questions.

Thank you,

Joe
248 813-2535

---

**From:** Omar Ochoa [mailto:OOchoa@susmangodfrey.com]
**Sent:** Monday, June 01, 2015 11:59 AM
**To:** Papelian, Joseph E
**Cc:** Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry
**Subject:** Auto Parts - Follow Up Discovery Requests to Delphi

Joe,

Please see the attached letter following up on our discovery requests to Delphi and let me know if you have any questions. Thank you.

**Omar Ochoa | Susman Godfrey LLP**
Office: 214.754.1913  Mobile: 956.500.3362
901 Main St. | Suite 5100 | Dallas, Texas 75202
**HOUSTON  ●  DALLAS  ●  LOS ANGELES  ●  SEATTLE  ●  NEW YORK**
oochoa@susmangodfrey.com | Biography Page

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

EXHIBIT 09

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Saturday, September 12, 2015 7:35 AM |
| **To:** | Omar Ochoa |
| **Cc:** | Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry; Frantangelo, Barbara K; Yeager, Judy |
| **Subject:** | Wire Harness Auto Parts - Follow-up To 09/10/15 Call (Response to Discovery Requests) |
| **Importance:** | High |

Omar:

This follows our call on 09/10/15 and my 07/30/15 email below.  Near the conclusion of our call it became clear we disagreed about who should bear the costs associated with our search, collection, review and production of documents in response to your requests.  This is a critical issue we noted at the end of my 07/30/15 email, which is repeated below:

> We anticipate the collection of documents will take approximately two months, with an additional month to review, process and produce responsive documents.  The cost to Delphi for collecting the documents is estimated at $100,000.  The cost for the review will be based on the number of documents collected.  As I mentioned during our call, we retain contract attorneys for a nominal fee to review the documents, and we will forward these costs on to you.  We would need a retainer to start this effort.

Inexplicably you were silent on this point until I raised it in our call last Thursday.  Until this issue is resolved, Delphi will expend no further efforts in response to the parties' request for documents and information.  As such, I see no need for our follow-up call scheduled for September 14.

Please call if you have any questions.

Thank you,

Joe
248 813-2535

---

**From:** Papelian, Joseph E
**Sent:** Thursday, July 30, 2015 1:52 PM
**To:** 'Omar Ochoa'
**Cc:** Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry; Frantangelo, Barbara K
**Subject:** Wire Harness Auto Parts - Response to Discovery Requests

I write in response to Omar Ochoa's letter of June 1, 2015, and as a follow up to the telephone conversation Barbara Frantangelo and I had with you on July 24, 2015.  As we discussed, Delphi will conduct a reasonable search for responsive documents related to wire harness sales where they would most likely be located.  Our responses will be limited to the following OEMS:  General Motors, Ford, Fiat Chrysler, Daimler, Toyota, Honda and Nissan.  These companies represent Delphi's main customers for wire harness sales.  Your requests are noted below with ur responses below each request.

1.  Sourcing Files:

- All documents included in sourcing files that are reasonably available and related to Wire Harness Products sold from January 1, 1998 through the present. Based on information provided by Delphi, the sourcing files should include at least:

  **We believe the majority of the requested information would be included in the DPRG packages. Delphi should have comprehensive DPRG packages for 2011 – 2014, and we agreed to search our records for additional DPRG packages from 2000 – 2010.**

  a) Internal management review packages submitted to the Delphi Price Review Group (the "DPRG") for approval of bids in response to Requests for Quotes ("RFQs") for Wire Harness Products.

     **This information should be included in the DPRG packages.**

  b) Requests for procurement from customers and quote packages sent to customers in response to procurement requests for Wire Harness Products, both for business Delphi did and did not win.

     **This information should be included in the DPRG packages.**

  c) Supplier agreements entered into for successful bids.

     **Delphi will search for responsive Purchase Orders.**

  d) Preferred supplier agreements, such as the Aligned Business Framework-related agreements.

     **This information would be retained by Delphi's customers.**

  e) Internal and external communications, including e-mails.

     **Responsive emails should be included in the DPRG packages.**

  f) Financial and price ladder analyses.

     **This information should be included in the DPRG packages.**

  g) Documents related to APR requests and other discount request.

     **This information should be included in the DPRG packages.**

- If the above elements do not exist in sourcing files, please advise the parties. The parties request that these materials be produced from other sources to the extent they do not exist in sourcing files.

  **This information would be retained by Delphi's customers.**

- Please also provide sufficient information to explain any fields used, codes used, methods used, or data contained in the sourcing files

2.  Transactional Data and Documents:

    **As we discussed, Delphi began using the SAP program in approximately 2006.  Delphi agrees to provide spreadsheets containing transaction data from 2006 – 2014.  Attached to this email is a sample "KE30" report, which contains the following fields:**

    **Customer**
    **Customer Name**
    **Ship-to**
    **Ship-to party**
    **Product**
    **Product Description**
    **Product Hierarchy**
    **Product Hierarchy**
    **Profit Ctr**
    **Plant**
    **Plant Name**
    **Sales Revenue**
    **PKG Amortized**
    **Retro-billing**
    **Total Net Sales**
    **Sales Quantities**
    **Std. Direct Labor**
    **Std.Mfg.O/H-Fixed**
    **Std. Direct Material**
    **Allied Material**
    **Ext Proc/Sub-contract**
    **Mexico VA - 1**
    **Mexico VA - 2**
    **Cost of Sales**
    **GROSS FACTORY PROFIT**
    **MEMO   Avg Sales Price**
    **Total Material**

3.  Strategic and Business Plans

- Your business plans and strategic plans that are reasonably available and that relate to Wire Harness Products sold from January 1, 1998 through the present.  To the extent any business or strategic plan covers other automotive products in addition to Wire Harness Products, the Wire Harness Product Information can be separated and produced on its own provided that the information is self-contained and does not require referencing other product information for a full understanding of the Wire Harness Product business or strategic plan.

3

We believe the information contained in Delphi's 5-Year Revenue Plan, which consists of specific programs by customer, will sufficiently respond to this request and will produce same.

4.  Documents regarding Delphi's pricing policies and the training and instruction provided to employees regarding bidding and setting prices submitted to OEMs and other purchasers or potential purchasers, as well as determining discounts and price reductions for Wire Harness Products, from January 1, 1998 through the present.

> **Delphi will search for and produce responsive documents, including documents relating to Delphi's Delegation of Authority policy, training materials regarding antitrust, Delphi's Code of Conduct, and the DPRG process.**

5.  Documents comparing Delphi to its competitors with regard to prices, Wire Harness Product features costs, RFQ results and profits from January 1, 1998 through the present.

> **This information should be included in the DPRG packages.**

6.  Studies, reports, or analyses in Delphi's possession comparing the prices of Wire Harness Products to the prices of vehicles from January 1, 1998 through the present.

> **Delphi does not have any material related to this request.**

We anticipate the collection of documents will take approximately two months, with an additional month to review, process and produce responsive documents.  The cost to Delphi for collecting the documents is estimated at $100,000.  The cost for the review will be based on the number of documents collected.  As I mentioned during our call, we retain contract attorneys for a nominal fee to review the documents, and we will forward these costs on to you.  We would need a retainer to start this effort.

We look forward to your response.  Please call if you have any questions.

Thank you,

Joe
248 813-2535

---

**From:** Omar Ochoa [mailto:OOchoa@susmangodfrey.com]
**Sent:** Monday, June 01, 2015 11:59 AM
**To:** Papelian, Joseph E
**Cc:** Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry
**Subject:** Auto Parts - Follow Up Discovery Requests to Delphi

Joe,

Please see the attached letter following up on our discovery requests to Delphi and let me know if you have any questions. Thank you.

**Omar Ochoa | Susman Godfrey LLP**
Office: 214.754.1913  Mobile: 956.500.3362
901 Main St. | Suite 5100 | Dallas, Texas 75202
**HOUSTON ● DALLAS ● LOS ANGELES ● SEATTLE ● NEW YORK**
oochoa@susmangodfrey.com | Biography Page

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

# EXHIBIT 10

| | |
|---|---|
| **From:** | Omar Ochoa <OOchoa@susmangodfrey.com> |
| **Sent:** | Saturday, September 12, 2015 5:34 PM |
| **To:** | Papelian, Joseph E |
| **Cc:** | Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry; Frantangelo, Barbara K; Yeager, Judy |
| **Subject:** | RE: Wire Harness Auto Parts - Follow-up To 09/10/15 Call (Response to Discovery Requests) |

Joe,

Thanks for the email. It seems premature to talk about costs of the discovery until we have a good understanding of the scope of the search and production. I understood at the end of our most recent call that getting more specifics was the goal of Mondays call. Can we please keep that call as scheduled so we can determine the search and production specifics? That will better inform a discussion of who should bear those costs and at what percentage. Thank you.

-------- Original message --------
From: "Papelian, Joseph E" <joseph.e.papelian@delphi.com>
Date: 09/12/2015 6:35 AM (GMT-06:00)
To: Omar Ochoa <OOchoa@susmangodfrey.com>
Cc: Vicky Romanenko <Vicky@cuneolaw.com>, "'blondon@fklmlaw.com' (blondon@fklmlaw.com)"
<blondon@fklmlaw.com>, Demetrius Lambrinos <DLambrinos@cpmlegal.com>, Steve Williams
<SWilliams@cpmlegal.com>, "Gangnes, Larry" <GangnesL@LanePowell.com>, "Frantangelo, Barbara K"
<barbara.k.frantangelo@delphi.com>, "Yeager, Judy" <Judy.Yeager@delphi.com>
Subject: Wire Harness Auto Parts - Follow-up To 09/10/15 Call (Response to Discovery Requests)

Omar:

This follows our call on 09/10/15 and my 07/30/15 email below.  Near the conclusion of our call it became clear we disagreed about who should bear the costs associated with our search, collection, review and production of documents in response to your requests.  This is a critical issue we noted at the end of my 07/30/15 email, which is repeated below:
We anticipate the collection of documents will take approximately two months, with an additional month to review, process and produce responsive documents.  The cost to Delphi for collecting the documents is estimated at $100,000.  The cost for the review will be based on the number of documents collected.  As I mentioned during our call, we retain contract attorneys for a nominal fee to review the documents, and we will forward these costs on to you.  We would need a retainer to start this effort.

Inexplicably you were silent on this point until I raised it in our call last Thursday.  Until this issue is resolved, Delphi will expend no further efforts in response to the parties' request for documents and information.  As such, I see no need for our follow-up call scheduled for September 14.

Please call if you have any questions.

Thank you,

Joe
248 813-2535


From: Papelian, Joseph E

Sent: Thursday, July 30, 2015 1:52 PM
To: 'Omar Ochoa'
Cc: Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams
Gangnes, Larry; Frantangelo, Barbara K
Subject: Wire Harness Auto Parts - Response to Discovery Requests

I write in response to Omar Ochoa's letter of June 1, 2015, and as a follow up to the telephone conversation Barbara Frantangelo and I had with you on July 24, 2015.  As we discussed, Delphi will conduct a reasonable search for responsive documents related to wire harness sales where they would most likely be located.  Our responses will be limited to the following OEMS:  General Motors, Ford, Fiat Chrysler, Daimler, Toyota, Honda and Nissan.  These companies represent Delphi's main customers for wire harness sales.  Your requests are noted below with ur responses below each request.


1.    Sourcing Files:


·     All documents included in sourcing files that are reasonably available and related to Wire Harness Products sold from January 1, 1998 through the present.  Based on information provided by Delphi, the sourcing files should include at least:

We believe the majority of the requested information would be included in the DPRG packages.  Delphi should have comprehensive DPRG packages for 2011 – 2014, and we agreed to search our records for additional DPRG packages from 2000 – 2010.


a)    Internal management review packages submitted to the Delphi Price Review Group (the "DPRG") for approval of bids in response  to Requests  for Quotes ("RFQs'·)  for Wire  Harness Products.


This information should be included in the DPRG packages.


b)    Requests for procurement from customers and quote packages sent to customers in response to procurement requests for Wire Harness Products, both for business Delphi did and did not win.


This information should be included in the DPRG packages.


c)     Supplier agreements entered into for successful bids.


Delphi will search for responsive Purchase Orders.


d)    Preferred supplier  agreements,  such  as the Aligned Business Framework-related agreements.


This information would be retained by Delphi's customers.

2

e)    Internal and external communications, including e-mails.

Responsive emails should be included in the DPRG packages.

f)    Financial and price ladder analyses.

This information should be included in the DPRG packages.

g)    Documents related to APR requests and other discount request.

This information should be included in the DPRG packages.

·    If the above elements do not exist in sourcing files, please advise the parties. The parties request that these materials be produced from other sources to the extent they do not exist in sourcing files.

This information would be retained by Delphi's customers.

·    Please also provide sufficient information to explain any fields used, codes used, methods used, or data contained in the sourcing files

2.    Transactional Data and Documents:

As we discussed, Delphi began using the SAP program in approximately 2006.  Delphi agrees to provide spreadsheets containing transaction data from 2006 – 2014.  Attached to this email is a sample "KE30" report, which contains the following fields:

Customer
Customer Name
Ship-to
Ship-to party
Product
Product Description
Product Hierarchy
Product Hierarchy

Profit Ctr
Plant
Plant Name
Sales Revenue
PKG Amortized
Retro-billing
Total Net Sales
Sales Quantities
Std. Direct Labor
Std.Mfg.O/H-Fixed
Std. Direct Material
Allied Material
Ext Proc/Sub-contract
Mexico VA - 1
Mexico VA - 2
Cost of Sales
GROSS FACTORY PROFIT
MEMO   Avg Sales Price
Total Material

3.    Strategic and Business Plans

·    Your business plans and strategic plans that are reasonably available and that relate to Wire Harness Products sold from January 1, 1998 through the present.  To the extent any business or strategic plan covers other automotive products in addition to Wire Harness Products, the Wire Harness Product Information can be separated and produced on its own provided that the information is self-contained and does not require referencing other product information for a full understanding of the Wire Harness Product business or strategic plan.

We believe the information contained in Delphi's 5-Year Revenue Plan, which consists of specific programs by customer, will sufficiently respond to this request and will produce same.

4.    Documents regarding Delphi 's pricing policies and the training and instruction provided to employees regarding bidding and setting prices submitted to OEMs and other purchasers or potential  purchasers,  as well as determining discounts and price reductions for Wire Harness Products, from January  1, 1998 through the present.

Delphi will search for and produce responsive documents, including documents relating to Delphi's Delegation of Authority policy, training materials regarding antitrust, Delphi's Code of Conduct, and the DPRG process.

5.    Documents comparing Delphi to its competitors with regard to prices, Wire Harness Product features costs, RFQ results and profits from January 1, 1998 through the present.

This information should be included in the DPRG packages.


6.    Studies, reports, or analyses in Delphi's possession comparing the prices of Wire Harness Products to the prices of vehicles from January 1, 1998 through the present.



Delphi does not have any material related to this request.


We anticipate the collection of documents will take approximately two months, with an additional month to review, process and produce responsive documents.  The cost to Delphi for collecting the documents is estimated at $100,000.  The cost for the review will be based on the number of documents collected.  As I mentioned during our call, we retain contract attorneys for a nominal fee to review the documents, and we will forward these costs on to you.  We would need a retainer to start this effort.

We look forward to your response.  Please call if you have any questions.

Thank you,

Joe
248 813-2535


From: Omar Ochoa [mailto:OOchoa@susmangodfrey.com]
Sent: Monday, June 01, 2015 11:59 AM
To: Papelian, Joseph E
Cc: Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com<mailto:blondon@fklmlaw.com>); Demetrius Lambrinos; Steve Williams; Gangnes, Larry
Subject: Auto Parts - Follow Up Discovery Requests to Delphi

Joe,

Please see the attached letter following up on our discovery requests to Delphi and let me know if you have any questions. Thank you.

Omar Ochoa | Susman Godfrey LLP
Office: 214.754.1913  Mobile: 956.500.3362
901 Main St. | Suite 5100 | Dallas, Texas 75202 HOUSTON • DALLAS • LOS ANGELES • SEATTLE • NEW YORK oochoa@susmangodfrey.com<mailto:oochoa@susmangodfrey.com> | Biography Page<http://www.susmangodfrey.com/Attorneys/Omar-Ochoa>

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

*********************************************************************** Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
***********************************************************************

# EXHIBIT 11

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Monday, September 28, 2015 1:30 PM |
| **To:** | Omar Ochoa |
| **Cc:** | Vicky Romanenko; 'blondon@fklmlaw.com' (blondon@fklmlaw.com); Demetrius Lambrinos; Steve Williams; Gangnes, Larry; Frantangelo, Barbara K; Yeager, Judy |
| **Subject:** | Wire Harness Auto Parts - Follow-up To 09/28/15 Call (Response to Discovery Requests) |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Omar:

This follows our call this afternoon regarding the Wire Harness Discovery Requests.  In addition to you, Larry Ganges was also on the call.  On the call from Delphi were Barbara Frantangelo, David Foren, Paul Falete, Shishir Gupta, and me.

Item # 1:  Sourcing Files – DPRG Packages

•      Pre-2011:  As we discussed, we conducted a search of the documents collected in response to the DOJ subpoena.  There are approximately 28,000 documents responsive to the terms "DPRG" and/or "Divisional Pricing Review Group," which will need to be reviewed by contract attorneys for privilege and responsiveness.

•      Post-2011:  We anticipate 3-4 weeks to search for DPRG presentations post-2011.  Although the actual search should only take 2 days, we would need a month to ensure the Delphi representative can conduct the search along with his normal work responsibilities.

Item # 2:  Transactional Data

•      Pre-2006:  This information is stored on a database maintained by General Motors.  Although our IT group advised there is a low probability the data still exists, Delphi agreed to reach out to GM and make the inquiry for responsive data.

•      Post-2006:  The SAP database Delphi has access to is limited to the United States (with perhaps some information from Mexico), since each country maintains its own SAP database.  It was discussed that downloading the data to Excel is difficult.  We discussed the possibility of a third party access to the SAP database.  Any third party would have to be approved by Delphi and agree to specific confidentiality / confidential provisions to protect Delphi's data.  Please let me know if you are interested in discussing this further.  Delphi agreed to attempt to provide definitions for the categories of documents within the database.

Item # 3:  Miscellaneous

•      It was agreed Delphi would create a list identifying the custodians of the documents produced to the DOJ in the wire harness matter.

•      Delphi will attempt to provide the costs incurred for producing documents to the DOJ.

By copy of this email to Judy Yeager I'm asking she scheduled a follow-up call We will schedule a follow up call on October 12 around noon.

Please call if you have any questions.

Joe

248 813-2535

# EXHIBIT 12

| | |
|---|---|
| **From:** | Gangnes, Larry <GangnesL@LanePowell.com> |
| **Sent:** | Monday, December 14, 2015 10:25 PM |
| **To:** | Papelian, Joseph E |
| **Cc:** | Davis, Kenneth R.; Frantangelo, Barbara K; Fine, Stephanie |
| **Subject:** | Wire Harness Defendants' Discovery Requests to Delphi |
| **Attachments:** | Wire Harness Auto Parts - Response to Discovery Requests; Wire Harness Auto Parts - Follow-up To 09/28/15 Call (Response to Discovery Requests); Response to Gangnes re: Wire Harness |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Joe,

Thanks for speaking with me and Stephanie Fine this morning.  Our proposal for moving forward with the Wire Harness Defendants' discovery requests to Delphi is summarized below, as you requested.

As discussed, we would like to proceed in two stages.  First, we would like to get an estimate of the costs to retain a third-party vendor to extract Delphi's transactional data regarding its purchases of Wire Harness Products ("WHPs") (as defined in plaintiffs' consolidated complaints) from its suppliers and sales of such Products to all OEM and other customers for whatever time periods Delphi maintains such data, as described in your July 30, September 28, and December 4 emails (attached).  This production would include the monthly KE30 summary sales reports, a sample of which was attached to your July 30 email.  Please let us know the time periods for which Delphi has the KE30 sales reports, including prior to 2006.  You also agreed to see whether Delphi has a monthly summary of its purchases of WHPs.  Finally, please explain the note in the spreadsheet attached to your December 4 email to the effect that:  "SAP data for DEEDS did not start until 2008 and was not completed until Nov 2009 – will have partial data until that time."

As I mentioned, we have located a vendor familiar with SAP databases that is available to extract Delphi's transactional data – Zencos Consulting (www.zencos.com) in Cary, North Carolina.  We have spoken with Ben Zenick, Zencos' co-founder and COO (bzenick@zencos.com; 919-459-4600 x 103; mobile: 919-524-4524), about obtaining a cost estimate for this project.  To that end, Mr. Zenick will be contacting you for information about the scope of work.  Once we have a cost estimate from Zencos, Defendants will be in a position then to decide whether and how best to proceed with production of the data.

The second discovery stage concerns the production of Delphi's electronic and other documents.  In this regard, we request that Delphi produce the categories of documents described in your July 30 email (attached).  In addition, we understand from our May 23, 2014 telephone conference with you and some of your Delphi colleagues that Delphi can print invoices from a database or produce the database.  You agreed to find out for us the time periods for which Delphi has invoices for its sales of WHPs.  Finally, we would request that Delphi produce any documents it has concerning purchases of WHPs from, or sales of WHPs to, the following Direct Purchaser Plaintiffs (or successors):

1. Mexican Industries in Michigan, Inc., a now bankrupt Michigan corporation with its principal place of business in Detroit, Michigan;

1

2. Paesano Connecting Systems, Inc., a Pennsylvania corporation with its principal place of business in Ridgway, Pennsylvania;

3. Craft-Co Enterprises, Inc., a Mississippi corporation with its principal place of business in Brandon, Mississippi;

4. Findlay Industries, Inc., an Ohio corporation with its principal place of business in Findlay, Ohio;

5. Cesar-Scott, Inc., a Texas corporation with its principal place of business in El Paso, Texas;

6. Martinez Manufacturing, Inc. ("Martinez"), an Illinois corporation with its principal place of business in Cary, Illinois;

7. Thermtrol Corporation, the successor to Martinez, an Ohio corporation with its principal place of business in North Canton, Ohio;

8. South Star Corporation, a Virginia corporation with its principal place of business in Elliston, Virginia; and

9. ACAP, L.L.C., f/k/a Aguirre, Collins & Aikman Plastics, LLC, a defunct Michigan limited liability company formerly with its principal place of business in Michigan.

We understand that Delphi proposes to hire contract document reviewers to review Delphi's production to remove any privileged documents.  We also understand from your September 28 email that Delphi has already conducted a search for its DPRG packages for the period prior to 2011 and located about 28,000 responsive documents for such a review.

Again, we would like to see if we and Delphi can come up with a more definitive estimate of the costs of reviewing and producing such documents before Defendants decide to proceed and commit to paying such costs.  We are hopeful that the costs will not approach the $100,000 you estimated earlier.

To that end, we believe that the costs Delphi incurs in reviewing the 2,700 documents (7,500 pages) it has located regarding Ford's CD4 RFQ will be informative.  One of the Defendants has already asked Delphi to proceed with that production.  Once we know the costs of reviewing and producing the CD4 documents, Defendants and Delphi will be in a better position to estimate the costs of reviewing and producing the other documents described above, and Defendants will be able to decide whether and how best to proceed with production of those documents.

Finally, we should mention a few more caveats.  First, our experience with WHP databases has been that there are always follow-up questions about the data and data fields produced.  We would like to be able to pose such questions to Delphi informally and get answers.  Second, Defendants would like to obtain a declaration from the appropriate person(s) at Delphi confirming that the data and documents produced are business records within the meaning of FRE 803(6).  Third, you agreed in your September 28 email to provide us with a list identifying the custodians of the documents produced to the DoJ (which documents have been produced to both Plaintiffs and Defendants).  Please provide us with this list identifying the custodians and the Bates number ranges of the documents produced from their files.  Fourth, based on review of the DPRG packages produced, Defendants would like to reserve their rights to make further narrow, targeted requests for additional documents, if necessary, such as documents relating to a specific RFQ.

We will also be sending this email to Plaintiffs' counsel in an effort to see whether they wish to participate and whether they have any additional requests.

Thank you again for your attention to this matter. We look forward to hearing from you and moving forward.

Regards. Larry

**Larry Gangnes | Lane Powell PC**
**Shareholder** | Bio | vCard
1420 Fifth Avenue, Suite 4200
P.O. Box 91302 | Seattle, WA 98111-9402
Direct: 206.223.7036 | Mobile: 206.779.6745
GangnesL@LanePowell.com | www.lanepowell.com

---

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

# EXHIBIT 13

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Friday, January 22, 2016 3:35 PM |
| **To:** | Larry Gangnes (gangnesl@lanepowell.com); William H. "Billy" London (blondon@fklmlaw.com); Evelyn Li (evelyn@cuneolaw.com) |
| **Cc:** | Frantangelo, Barbara K; Yeager, Judy |
| **Subject:** | Antitrust Wire Harness - Discovery Requests |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Larry, Billy and Evelyn:

This email follows the conference call this afternoon attended by:  Larry Gangnes (counsel for Furukawa), Billy London (counsel for Direct Purchasers) and Evelyn Li (counsel for Auto Dealers); and Barb Frantangelo and me on behalf of Delphi Automotive Systems, LLC (Delphi). This was one of several calls we have had over the last several months pertaining to documents you have requested from Delphi in the pending Wire Harness antitrust case before Judge Battani (Case No. 12-md-02311).  As you know, Delphi is **not** a party, and failing an agreement you will need to issue a third party subpoena if you want discovery from Delphi.

Here are the action items we noted from our call today:  Please note this information relates to Wire Harness documents / data in North America only.

1.  Delphi to advise whether they have received approval from Finance to allow a 3rd party vendor to review and download 2006 – 2014 SAP data.

2.  Delphi to determine the timing and cost to review and produce the 2006 – 2014 SAP data in-house.

3.  Delphi to determine the timing and cost to search for, review and produce KE30 sales summaries and, if they exist, similar purchase summaries, for 2006 – 2014.

4.  Delphi to determine the timing and cost to search for, review, and produce DPRG packages from 2010 – 2014.

5.  Delphi to determine the period of time for which it has relevant invoices, as well as the timing and cost to search for, review, and produce such documents.  I mentioned we have a sample invoice that we will provide to you if an overall agreement is reached.

6.  Delphi to respond regarding purchases or sales of Wire Harnesses to the nine (9) companies identified in Larry Gangnes' 12/14/15 email.

7.  Delphi to advise whether it is willing to provide declarations from the business people as to the authenticity of its documents as business records.

8.  Delphi to advise whether it is willing to provide a list of custodians for the documents it produced to the DOJ.

9.  Larry Gangnes to provide Delphi the contact information for Colin Kass, counsel for GM in the Wire Harness matter.

10. Larry Gangnes to provide available dates for a follow-up call the week of February 1, 2016, understanding we are not available the morning of February 5, 2016.  Please coordinate the date with Judy Yeager, who is copied on this email.

1

Thank you,

Joe Papelian
248 813-2535

# EXHIBIT 14

| | |
|---|---|
| **From:** | Gangnes, Larry <GangnesL@LanePowell.com> |
| **Sent:** | Sunday, January 24, 2016 11:50 PM |
| **To:** | Papelian, Joseph E |
| **Cc:** | blondon@fklmlaw.com; evelyn@cuneolaw.com; oochoa@susmangodfrey.com; Davis, Kenneth R.; Frantangelo, Barbara K; Yeager, Judy |
| **Subject:** | Discovery Requests to Delphi |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Joe,

Thank you for your email and for speaking with us on Friday.  Please see my clarifying comments in italics in your email below.  Please note also that we are still seeking the other categories of documents mentioned in your July 30, 2015 email, including Delphi's 5-year revenue plans for whatever period such plans exist up to December 31, 2014.

As requested, please be advised that the lead spokesperson for the OEMs has been Colin Kass.  His contact info is:

PROSKAUER ROSE LLP

1001 Pennsylvania Avenue, N.W.

Suite 600 South

Washington, DC 20004-2533

202.416.6890

ckass@proskauer.com

Finally, later this week I will provide dates and times for our follow-up call during the week of Feb. 1.

Regards.

**Larry Gangnes | Lane Powell PC**
**Shareholder** | Bio | vCard
1420 Fifth Avenue, Suite 4200
P.O. Box 91302 | Seattle, WA 98111-9402
Direct: 206.223.7036 | Mobile: 206.779.6745
GangnesL@LanePowell.com | www.lanepowell.com

---

**From:** Papelian, Joseph E [mailto:joseph.e.papelian@delphi.com]
**Sent:** Friday, January 22, 2016 12:35 PM
**To:** Gangnes, Larry; blondon@fklmlaw.com; evelyn@cuneolaw.com
**Cc:** Frantangelo, Barbara K; Yeager, Judy
**Subject:** Antitrust Wire Harness - Discovery Requests

Larry, Billy and Evelyn:

This email follows the conference call this afternoon attended by:  Larry Gangnes (counsel for Furukawa), Billy London (counsel for Direct Purchasers) and Evelyn Li (counsel for Auto Dealers); and Barb Frantangelo and

1

me on behalf of Delphi Automotive Systems, LLC (Delphi). This was one of several calls we have had over the last several months pertaining to documents you have requested from Delphi in the pending Wire Harness antitrust case before Judge Battani (Case No. 12-md-02311).  As you know, Delphi is **not** a party, and failing an agreement you will need to issue a third party subpoena if you want discovery from Delphi.

Here are the action items we noted from our call today:  Please note this information relates to Wire Harness documents / data in North America only.

1. Delphi to advise whether they have received approval from Finance to allow a 3rd party vendor to review and download 2006 – 2014 SAP data. *– meaning transactional data for all purchases and sales of Wire Harness Products (as defined in plaintiffs' complaints) for whatever period such data exists up to December 31, 2014.*

2. Delphi to determine the timing and cost to review and produce the 2006 – 2014 SAP data in-house. *– same as above.*

3. Delphi to determine the timing and cost to search for, review and produce KE30 sales summaries and, if they exist, similar purchase summaries, for 2006 – 2014. *-- meaning monthly KE30 summaries of all sales of Wire Harness Products for whatever period such summaries exist or can be generated up to December 31, 2014, and similar summaries of monthly purchases of Wire Harness Products, if they exist or can be generated.*

4. Delphi to determine the timing and cost to search for, review, and produce DPRG packages from 2010 – 2014. *–meaning DPRG packages pertaining to (a) all RFQ responses or bids for the sale of Wire Harness Products or (b) other sales of Wire Harness Products, including sales made on a sole sourcing basis.  In our January 19 call, you said that Delphi would conduct this search at no cost to the parties.  We understand from your Oct. 28, 2015 email to Omar Ochoa that Delphi has already conducted a search for such DPRG packages for the period prior to 2011 and located 28,000 documents.*

5. Delphi to determine the period of time for which it has relevant invoices, as well as the timing and cost to search for, review, and produce such documents.  I mentioned we have a sample invoice that we will provide to you if an overall agreement is reached. *– meaning invoices for all sales of Wire Harness Products for whatever period they exist up to December 31, 2014.*

6. Delphi to respond regarding purchases or sales of Wire Harness[es] *Products* to the nine (9) companies identified in Larry Gangnes' 12/14/15 email.

7. Delphi to advise whether it is willing to provide declarations from the business people as to the authenticity of its documents as business records.

8. Delphi to advise whether it is willing to provide a list of custodians for the documents it produced to the DOJ.  *Please note that you agreed to provide such a list in your Oct. 28 email.*

9. Larry Gangnes to provide Delphi the contact information for Colin Kass, counsel for GM in the Wire Harness matter.  *See email above.*

10. Larry Gangnes to provide available dates for a follow-up call the week of February 1, 2016, understanding we are not available the morning of February 5, 2016.  Please coordinate the date with Judy Yeager, who is copied on this email.

Thank you,

Joe Papelian
248 813-2535

*********************************************************************************
Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.
*********************************************************************************

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

# EXHIBIT 15

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Monday, February 08, 2016 12:41 PM |
| **To:** | Gangnes, Larry |
| **Cc:** | Davis, Kenneth R.; Frantangelo, Barbara K; 'Fine, Stephanie'; blondon@fklmlaw.com; evelyn@cuneolaw.com; Davis, Kenneth R. |
| **Subject:** | Wire Harness Defendants' Discovery Requests to Delphi |
| | |
| **Importance:** | High |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Larry:

This is a follow-up to our telephone call this morning. I want to remind you that Delphi is **not** a party to this case. In fact, it is a victim! We have a business to run and your voluminous document requests would detract significantly from time spent running the business. The following is our final proposal in an effort to reach a compromise and supersedes all previous discussions. In other words, Delphi does not agree to provide the remainder of information outlined in the various telephone calls and emails regarding this subject.

1. Delphi agrees to allow Ben Zenick of Zencos Consulting with access to Delphi's SAP transactional data as it relates to wire harnesses from 2006 - 2014. You will pay all costs and fees associated with Zencos Consulting.

2. Delphi's definition of "Wire Harness" is as follows: automotive wire harnesses, speed sensor wire assemblies, automotive electrical wiring, lead wire assemblies and high voltage wiring.

3. A Delphi representative will be made available to Mr. Zenick for guidance and questions, at a rate of $75 per hour, which you agree to pay.

4. Mr. Zenick's review of the data will be scheduled at the convenience of Delphi and its representative.

If you agree with this proposal we will draft a Confidentiality Agreement and forward it to you for your review.

Thank you,

Joe Papelian
248 813-2535

---

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Monday, February 08, 2016 11:52 AM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; Frantangelo, Barbara K; 'Fine, Stephanie'; blondon@fklmlaw.com; evelyn@cuneolaw.com; Davis, Kenneth R.
**Subject:** RE: Wire Harness Defendants' Discovery Requests to Delphi

Joe,

As mentioned in my Dec. 14 email below, defendants' data vendor is Ben Zenick, co-founder and COO of Zencos Consulting (www.zencos.com) in Cary, North Carolina (bzenick@zencos.com; 919-459-4600 x 103;

1

mobile: 919-524-4524.  I understand that you will be advising us whether Delphi will approve Mr. Zenick and Zencos working with Delphi to extract Delphi's transactional data from its SAP database under an appropriate confidentiality agreement.

Regards.

**Larry Gangnes | Lane Powell PC**
**Shareholder** | Bio | vCard
1420 Fifth Avenue, Suite 4200
P.O. Box 91302 | Seattle, WA 98111-9402
Direct: 206.223.7036 | Mobile: 206.779.6745
GangnesL@LanePowell.com | www.lanepowell.com

**From:** Gangnes, Larry
**Sent:** Monday, December 14, 2015 7:25 PM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; barbara.k.frantangelo@delphi.com; Fine, Stephanie
**Subject:** Wire Harness Defendants' Discovery Requests to Delphi

Joe,

Thanks for speaking with me and Stephanie Fine this morning.  Our proposal for moving forward with the Wire Harness Defendants' discovery requests to Delphi is summarized below, as you requested.

As discussed, we would like to proceed in two stages.  First, we would like to get an estimate of the costs to retain a third-party vendor to extract Delphi's transactional data regarding its purchases of Wire Harness Products ("WHPs") (as defined in plaintiffs' consolidated complaints) from its suppliers and sales of such Products to all OEM and other customers for whatever time periods Delphi maintains such data, as described in your July 30, September 28, and December 4 emails (attached).  This production would include the monthly KE30 summary sales reports, a sample of which was attached to your July 30 email.  Please let us know the time periods for which Delphi has the KE30 sales reports, including prior to 2006.  You also agreed to see whether Delphi has a monthly summary of its purchases of WHPs.  Finally, please explain the note in the spreadsheet attached to your December 4 email to the effect that:  "SAP data for DEEDS did not start until 2008 and was not completed until Nov 2009 – will have partial data until that time."

As I mentioned, we have located a vendor familiar with SAP databases that is available to extract Delphi's transactional data – Zencos Consulting (www.zencos.com) in Cary, North Carolina.  We have spoken with Ben Zenick, Zencos' co-founder and COO (bzenick@zencos.com; 919-459-4600 x 103; mobile: 919-524-4524), about obtaining a cost estimate for this project.  To that end, Mr. Zenick will be contacting you for information about the scope of work.  Once we have a cost estimate from Zencos, Defendants will be in a position then to decide whether and how best to proceed with production of the data.

The second discovery stage concerns the production of Delphi's electronic and other documents.  In this regard, we request that Delphi produce the categories of documents described in your July 30 email (attached).  In addition, we understand from our May 23, 2014 telephone conference with you and some of your Delphi colleagues that Delphi can print invoices from a database or produce the database.  You agreed to find out for us the time periods for which Delphi has invoices for its sales of WHPs.  Finally, we would request

that Delphi produce any documents it has concerning purchases of WHPs from, or sales of WHPs to, the following Direct Purchaser Plaintiffs (or successors):

1. Mexican Industries in Michigan, Inc., a now bankrupt Michigan corporation with its principal place of business in Detroit, Michigan;

2. Paesano Connecting Systems, Inc., a Pennsylvania corporation with its principal place of business in Ridgway, Pennsylvania;

3. Craft-Co Enterprises, Inc., a Mississippi corporation with its principal place of business in Brandon, Mississippi;

4. Findlay Industries, Inc., an Ohio corporation with its principal place of business in Findlay, Ohio;

5. Cesar-Scott, Inc., a Texas corporation with its principal place of business in El Paso, Texas;

6. Martinez Manufacturing, Inc. ("Martinez"), an Illinois corporation with its principal place of business in Cary, Illinois;

7. Thermtrol Corporation, the successor to Martinez, an Ohio corporation with its principal place of business in North Canton, Ohio;

8. South Star Corporation, a Virginia corporation with its principal place of business in Elliston, Virginia; and

9. ACAP, L.L.C., f/k/a Aguirre, Collins & Aikman Plastics, LLC, a defunct Michigan limited liability company formerly with its principal place of business in Michigan.

We understand that Delphi proposes to hire contract document reviewers to review Delphi's production to remove any privileged documents. We also understand from your September 28 email that Delphi has already conducted a search for its DPRG packages for the period prior to 2011 and located about 28,000 responsive documents for such a review.

Again, we would like to see if we and Delphi can come up with a more definitive estimate of the costs of reviewing and producing such documents before Defendants decide to proceed and commit to paying such costs.  We are hopeful that the costs will not approach the $100,000 you estimated earlier.

To that end, we believe that the costs Delphi incurs in reviewing the 2,700 documents (7,500 pages) it has located regarding Ford's CD4 RFQ will be informative.  One of the Defendants has already asked Delphi to proceed with that production.  Once we know the costs of reviewing and producing the CD4 documents, Defendants and Delphi will be in a better position to estimate the costs of reviewing and producing the other documents described above, and Defendants will be able to decide whether and how best to proceed with production of those documents.

Finally, we should mention a few more caveats.  First, our experience with WHP databases has been that there are always follow-up questions about the data and data fields produced.  We would like to be able to pose such questions to Delphi informally and get answers.  Second, Defendants would like to obtain a declaration from the appropriate person(s) at Delphi confirming that the data and documents produced are business records within the meaning of FRE 803(6).  Third, you agreed in your September 28 email to provide us with a list identifying the custodians of the documents produced to the DoJ (which documents have been produced to both Plaintiffs and Defendants).  Please provide us with this list identifying the custodians and the Bates number ranges of the documents produced from their files.  Fourth, based on review of the DPRG packages produced, Defendants would like to reserve their rights to make further narrow, targeted requests for additional documents, if necessary, such as documents relating to a specific RFQ.

We will also be sending this email to Plaintiffs' counsel in an effort to see whether they wish to participate and whether they have any additional requests.

Thank you again for your attention to this matter.  We look forward to hearing from you and moving forward.

Regards.  Larry

**Larry Gangnes** | **Lane Powell PC**
**Shareholder** | Bio | vCard
1420 Fifth Avenue, Suite 4200
P.O. Box 91302 | Seattle, WA 98111-9402
Direct: 206.223.7036 | Mobile: 206.779.6745
GangnesL@LanePowell.com | www.lanepowell.com

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.

| | |
|---|---|
| **From:** | Papelian, Joseph E |
| **Sent:** | Thursday, February 11, 2016 10:08 AM |
| **To:** | Gangnes, Larry |
| **Cc:** | Davis, Kenneth R.; Frantangelo, Barbara K; 'Fine, Stephanie'; blondon@fklmlaw.com; evelyn@cuneolaw.com; Davis, Kenneth R. |
| **Subject:** | Wire Harness Defendants' Discovery Requests to Delphi - Clarification |
| | |
| **Importance:** | High |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Larry:

Larry:

I write to clarify my email below.

If we reach an agreement, Delphi will extract the 2006 – 2014 SAP data as it relates to wire harnesses, and then share that data with the 3rd party for review.  We are not in a position to allow a 3rd party to extract data directly from SAP or install any 3rd party software for this purpose.

Thank you,

Joe Papelian
248 813-2535

**From:** Papelian, Joseph E
**Sent:** Monday, February 08, 2016 12:41 PM
**To:** 'Gangnes, Larry'
**Cc:** Davis, Kenneth R.; Frantangelo, Barbara K; 'Fine, Stephanie'; blondon@fklmlaw.com; evelyn@cuneolaw.com; Davis, Kenneth R.
**Subject:** Wire Harness Defendants' Discovery Requests to Delphi
**Importance:** High

Larry:

This is a follow-up to our telephone call this morning.  I want to remind you that Delphi is **not** a party to this case.  In fact, it is a victim!  We have a business to run and your voluminous document requests would detract significantly from time spent running the business.  The following is our final proposal in an effort to reach a compromise and supersedes all previous discussions.  In other words, Delphi does not agree to provide the remainder of information outlined in the various telephone calls and emails regarding this subject.

1. Delphi agrees to allow Ben Zenick of Zencos Consulting with access to Delphi's SAP transactional data as it relates to wire harnesses from 2006 - 2014.  You will pay all costs and fees associated with Zencos Consulting.

2. Delphi's definition of "Wire Harness" is as follows:  automotive wire harnesses, speed sensor wire assemblies, automotive electrical wiring, lead wire assemblies and high voltage wiring.

1

3.  A Delphi representative will be made available to Mr. Zenick for guidance and questions, at a rate of $75 per hour, which you agree to pay.

4.  Mr. Zenick's review of the data will be scheduled at the convenience of Delphi and its representative.

If you agree with this proposal we will draft a Confidentiality Agreement and forward it to you for your review.

Thank you,

Joe Papelian
248 813-2535

---

**From:** Gangnes, Larry [mailto:GangnesL@LanePowell.com]
**Sent:** Monday, February 08, 2016 11:52 AM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; Frantangelo, Barbara K; 'Fine, Stephanie'; blondon@fklmlaw.com; evelyn@cuneolaw.com; Davis, Kenneth R.
**Subject:** RE: Wire Harness Defendants' Discovery Requests to Delphi

Joe,

As mentioned in my Dec. 14 email below, defendants' data vendor is Ben Zenick, co-founder and COO of Zencos Consulting (www.zencos.com) in Cary, North Carolina (bzenick@zencos.com; 919-459-4600 x 103; mobile: 919-524-4524.  I understand that you will be advising us whether Delphi will approve Mr. Zenick and Zencos working with Delphi to extract Delphi's transactional data from its SAP database under an appropriate confidentiality agreement.

Regards.

**Larry Gangnes | Lane Powell PC**
**Shareholder** | Bio | vCard
1420 Fifth Avenue, Suite 4200
P.O. Box 91302 | Seattle, WA 98111-9402
Direct: 206.223.7036 | Mobile: 206.779.6745
GangnesL@LanePowell.com | www.lanepowell.com

---

**From:** Gangnes, Larry
**Sent:** Monday, December 14, 2015 7:25 PM
**To:** Papelian, Joseph E
**Cc:** Davis, Kenneth R.; barbara.k.frantangelo@delphi.com; Fine, Stephanie
**Subject:** Wire Harness Defendants' Discovery Requests to Delphi

Joe,

Thanks for speaking with me and Stephanie Fine this morning.  Our proposal for moving forward with the Wire Harness Defendants' discovery requests to Delphi is summarized below, as you requested.

As discussed, we would like to proceed in two stages.  First, we would like to get an estimate of the costs to retain a third-party vendor to extract Delphi's transactional data regarding its purchases of Wire Harness

Products ("WHPs") (as defined in plaintiffs' consolidated complaints) from its suppliers and sales of such Products to all OEM and other customers for whatever time periods Delphi maintains such data, as described in your July 30, September 28, and December 4 emails (attached).  This production would include the monthly KE30 summary sales reports, a sample of which was attached to your July 30 email.  Please let us know the time periods for which Delphi has the KE30 sales reports, including prior to 2006.  You also agreed to see whether Delphi has a monthly summary of its purchases of WHPs.  Finally, please explain the note in the spreadsheet attached to your December 4 email to the effect that:  "SAP data for DEEDS did not start until 2008 and was not completed until Nov 2009 – will have partial data until that time."

As I mentioned, we have located a vendor familiar with SAP databases that is available to extract Delphi's transactional data – Zencos Consulting (www.zencos.com) in Cary, North Carolina.  We have spoken with Ben Zenick, Zencos' co-founder and COO (bzenick@zencos.com; 919-459-4600 x 103; mobile: 919-524-4524), about obtaining a cost estimate for this project.  To that end, Mr. Zenick will be contacting you for information about the scope of work.  Once we have a cost estimate from Zencos, Defendants will be in a position then to decide whether and how best to proceed with production of the data.

The second discovery stage concerns the production of Delphi's electronic and other documents.  In this regard, we request that Delphi produce the categories of documents described in your July 30 email (attached).  In addition, we understand from our May 23, 2014 telephone conference with you and some of your Delphi colleagues that Delphi can print invoices from a database or produce the database.  You agreed to find out for us the time periods for which Delphi has invoices for its sales of WHPs.  Finally, we would request that Delphi produce any documents it has concerning purchases of WHPs from, or sales of WHPs to, the following Direct Purchaser Plaintiffs (or successors):

1.  Mexican Industries in Michigan, Inc., a now bankrupt Michigan corporation with its principal place of business in Detroit, Michigan;

2.  Paesano Connecting Systems, Inc., a Pennsylvania corporation with its principal place of business in Ridgway, Pennsylvania;

3.  Craft-Co Enterprises, Inc., a Mississippi corporation with its principal place of business in Brandon, Mississippi;

4.  Findlay Industries, Inc., an Ohio corporation with its principal place of business in Findlay, Ohio;

5.  Cesar-Scott, Inc., a Texas corporation with its principal place of business in El Paso, Texas;

6.  Martinez Manufacturing, Inc. ("Martinez"), an Illinois corporation with its principal place of business in Cary, Illinois;

7. Thermtrol Corporation, the successor to Martinez, an Ohio corporation with its principal place of business in North Canton, Ohio;

8. South Star Corporation, a Virginia corporation with its principal place of business in Elliston, Virginia; and

9. ACAP, L.L.C., f/k/a Aguirre, Collins & Aikman Plastics, LLC, a defunct Michigan limited liability company formerly with its principal place of business in Michigan.

We understand that Delphi proposes to hire contract document reviewers to review Delphi's production to remove any privileged documents. We also understand from your September 28 email that Delphi has already conducted a search for its DPRG packages for the period prior to 2011 and located about 28,000 responsive documents for such a review.

Again, we would like to see if we and Delphi can come up with a more definitive estimate of the costs of reviewing and producing such documents before Defendants decide to proceed and commit to paying such costs. We are hopeful that the costs will not approach the $100,000 you estimated earlier.

To that end, we believe that the costs Delphi incurs in reviewing the 2,700 documents (7,500 pages) it has located regarding Ford's CD4 RFQ will be informative. One of the Defendants has already asked Delphi to proceed with that production. Once we know the costs of reviewing and producing the CD4 documents, Defendants and Delphi will be in a better position to estimate the costs of reviewing and producing the other documents described above, and Defendants will be able to decide whether and how best to proceed with production of those documents.

Finally, we should mention a few more caveats. First, our experience with WHP databases has been that there are always follow-up questions about the data and data fields produced. We would like to be able to pose such questions to Delphi informally and get answers. Second, Defendants would like to obtain a declaration from the appropriate person(s) at Delphi confirming that the data and documents produced are business records within the meaning of FRE 803(6). Third, you agreed in your September 28 email to provide us with a list identifying the custodians of the documents produced to the DoJ (which documents have been produced to both Plaintiffs and Defendants). Please provide us with this list identifying the custodians and the Bates number ranges of the documents produced from their files. Fourth, based on review of the DPRG packages produced, Defendants would like to reserve their rights to make further narrow, targeted requests for additional documents, if necessary, such as documents relating to a specific RFQ.

We will also be sending this email to Plaintiffs' counsel in an effort to see whether they wish to participate and whether they have any additional requests.

Thank you again for your attention to this matter. We look forward to hearing from you and moving forward.

Regards. Larry

**Larry Gangnes | Lane Powell PC**
**Shareholder** | Bio | vCard
1420 Fifth Avenue, Suite 4200
P.O. Box 91302 | Seattle, WA 98111-9402
Direct: 206.223.7036 | Mobile: 206.779.6745
GangnesL@LanePowell.com | www.lanepowell.com

_____

This message is private or privileged. If you are not the person for whom this message is intended, please delete it and notify me immediately, and please do not copy or send this message to anyone else.