# EXHIBIT 4

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

PATRICIA JARRELL;
DAVID AND CORTNEY SCRAGG;
ANTHONY AND MICHELLE TOLER; and
ROBERT AND DONNA ANDERSON, individually,
and on behalf of all other similarly situated;

    Plaintiffs,

v.                                                     Civil Action No. 03-C-1762
                                                       Judge Charles E. King

THORNHILL SUPERSTORE, INC., a West
Virginia corporation; WALLY L. THORNHILL, individually,
GEORGE R. "BUTCH" NISBET, JR., individually, and
EUGENE NEAL, individually,

    Defendants.

## AFFIDAVIT

STATE OF WEST VIRGINIA
COUNTY OF LOGAN

        COMES NOW the affiant, George R. "Butch" Nisbet, Jr., and states and avers as follows:

1.     I am an adult over the age of 18.

2.     I am Vice-President of Thornhill Superstore, Inc. I primarily function as general sales manager. Also, I head the Finance & Insurance Department of the dealership.

3.     I have worked in the automobile sales industry for approximately twenty-four (24) years and have negotiated thousands of consumer automobile purchases.

4.     Usually, when negotiating a deal with a customer, Thornhill appraises the customers' trade-in vehicle at the outset to determine an "actual cash value" of the vehicle, assuming the customer wishes to trade their present vehicle.

5.     To calculate a customer's deal, Thornhill Superstore, Inc. uses the "one dollar over

invoice price" and subtracts the "actual cash value" of the customer's trade-in vehicle to establish a "trade difference" figure.

6. Generally, the "actual cash value" is the subjective value placed on a vehicle being traded and which will hopefully also allow Thornhill to make a profit on the later sale of the vehicle by a trade-in consumer.

7. Once this "trade difference" figure is agreed upon with the customer, this figure does not change through the finance and insurance process unless negotiations take place and a new difference figure is agreed upon between Thornhill and the customer.

8. Many customers who seek to trade-in their current vehicle for a new vehicle are "upside down" in their current vehicle. In other words, the customer owes more on the trade-in vehicle than the vehicles "actual cash value" on the date of the sales transaction. Under these circumstances, the customer is said to have "negative equity" in the trade-in vehicle.

9. Over the years, most lending institutions with whom Thornhill Superstore, Inc. does business would not allow Thornhill to show "negative equity" on the Purchase Agreement until recently. To comply with the lending institutions' wishes, the retail cash price of the new vehicle and the "trade-allowance" on the trade-in vehicle are adjusted up in a corresponding amount so that the customer's "negative equity" is incorporated into the "trade allowance."

10. The "trade allowance" shown for a vehicle being traded-in is different from the vehicle's "actual cash value." The "trade allowance" figure does incorporate, in

part, the agreed upon "actual cash value" of the trade-in vehicle, and when applicable, the trade-in vehicle's negative equity. Generally, the "trade allowance" is simply that shown figure which would be consistent with the new vehicle's shown cash price and the "trade difference" agreed to between Thornhill and the customer.

11. The increase in the "trade allowance" shows the presence of "equity" in the traded-in vehicle without affecting the amount of money needed to borrow from the lending institution. The lending institutions do not object to and are fully aware of this practice. This practice is commonly done throughout the automobile sales industry.

12. Even when the customer does not have "negative equity" in their trade-in vehicle, Thornhill will often use the retail cash price on the Motor Vehicle Purchase Agreement as lending institutions are accustomed to seeing that figure on the contract. However, the customer's "trade allowance" is adjusted accordingly so that the agreed-upon difference figure does not change. Consequently, the amount the customer borrows from the bank does not change as long as the cash price and "trade allowance" remain consistent with the agreed to "trade difference."

13. Patricia Jarrell purchased a Chevy Blazer from Thornhill Superstore, Inc. on October 19, 2000. The invoice price of the Blazer was $26,986.48.

14. An actual cash value of $4,847.48 was initially assigned to Ms. Jarrell's trade-in vehicle.

15. The "one dollar over invoice price" on the new vehicle ($26,987.48) minus the

          actual cash value of the trade-in vehicle ($4847.48) equals a difference of $22,140.00.

16.    However, Ms. Jarrell was able to negotiate a better deal. After negotiations, Ms. Jarrell was able to obtain another $250 for her trade-in vehicle. Thus, the "one dollar over invoice price" ($26,987.48) minus the negotiated "actual cash value" of the trade-in vehicle ($5,097.48) equals the final agreed-upon difference of $21,890.00. This agreed-upon "trade difference" is shown on the Motor Vehicle Purchase Agreement.

17.    Lending institutions are accustomed to seeing the retail cash price on the Motor Vehicle Purchase Agreement. Thus, the retail cash price of Ms. Jarrell's new vehicle is listed as $29,440.00 on the Purchase Agreement, $2,452.52 over the "one dollar over invoice price." In order to maintain the exact agreed-upon difference negotiated by Ms. Jarrell, Ms. Jarrell's "trade allowance" is shown as $7,550.00, $2,452.52 over the negotiated "actual cash value" of the trade-in vehicle. Thus, the cash price less the trade allowance on the Purchase Agreement equals $21,890.00, the exact difference between the "one dollar over invoice price" and the negotiated "actual cash value" of Ms. Jarrell's trade-in vehicle. Therefore, Ms. Jarrell paid the exact price that she agreed to pay for her new vehicle on October 19, 2000.

18.    David and Cortney Scragg purchased a Chevrolet Truck from Thornhill Superstore, Inc. on February 1, 2000. The invoice price on the truck was $24,720.49.

19.    An actual cash value of $13,000.00 was initially assigned to the Scraggs' trade-in vehicle. The Scraggs also received a $500 manufacturer's rebate.

4

20. The "one dollar over invoice price" on the new vehicle ($24,721.49) minus the "actual cash value" of the trade-in vehicle ($13,000.00) and the $500 rebate equals a difference of $11,221.49.

21. However, the Scraggs were able to negotiate a better deal. After negotiations, the Scraggs were able to obtain another $300.49 for their trade-in vehicle. The "one dollar over invoice price" ($24,721.49) minus the negotiated "actual cash value" of the trade-in ($13,300.49) and the $500 manufacturer's rebate equals the final agreed-upon difference of $10,921.00. This difference plus the $500 rebate equals the $11,421.00 "trade difference" which is shown on the Motor Vehicle Purchase Agreement.

22. The retail cash price of the Scraggs' new vehicle is listed as $27,921.00 on the Purchase Agreement, $3,007.72 over the "one dollar over invoice price." In order to maintain the exact agreed-upon difference negotiated by the Scraggs, the Scraggs' "trade allowance" is shown as $16,500.00, $3,007.72 over the "actual cash value" of the trade-in vehicle. Thus, the cash price less the "trade allowance" on the Purchase Agreement equals $11,421.00, the exact difference between the "one dollar over invoice price" and the "actual cash value," plus the manufacturer's rebate, of the Scraggs' trade-in vehicle. Therefore, the Scraggs paid the exact price that she agreed to pay for their new vehicle on February 1, 2000.

23. Anthony and Michelle Toler purchased a 2000 Pontiac Transport from Thornhill Superstore, Inc. on April 3, 2000. The invoice price on the Transport was $24,912.28.

5

24. An actual cash value of $12,000 was initially assigned to the Toler's trade-in vehicle.

25. The "one dollar over invoice price" on the new vehicle ($24,913.28) minus the "actual cash value" of the trade-in vehicle ($12,000.00) equals a difference of $12,913.28.

26. However, the Tolers were able to negotiate a better deal. After negotiations, the Tolers received another $193.28 for their trade-in vehicle. The "one dollar over invoice price" ($24,913.28) minus the negotiated "actual cash value" of the trade-in ($12,193.28) equals the final agreed upon "trade difference" of $12,720.00. This figure is shown on the Motor Vehicle Purchase Agreement.

27. The retail cash price of the Tolers' new vehicle is listed as $27,170.00 on the Purchase Agreement, $2,256.72 over the "one dollar over invoice price." In order to maintain the exact agreed-upon difference negotiated by the Tolers, the Tolers' "trade allowance" is shown as $14,450.00, $2,256.72 over the negotiated "actual cash value" of the trade-in vehicle. Thus, the cash price less the "trade allowance" on the Purchase Agreement equals $12,720.00, the exact difference between the "one dollar over invoice price" and the negotiated "actual cash value" of the Tolers' trade-in vehicle. Therefore, the Tolers paid the exact price that they agreed to pay for her new vehicle on April 3, 2000.

28. Robert and Donna Anderson purchased a 1999 Oldsmobile Alero on September 23, 1999. The invoice price of the Alero was $17,386.73.

29. An actual cash value of $15,422.73 was initially assigned to the Andersons' trade-in

vehicle. The Andersons also initially elected to receive a $750 manufacturer's rebate.

30. The "one dollar over invoice price" on the new vehicle ($17,387.73) minus the "actual cash value" of the trade-in vehicle ($15,422.73) and the $750 manufacturer's rebate equals a difference of $1,215.00.

31. However, the Andersons were able to negotiate a better deal. After negotiations, the Andersons elected an interest rate of 2.9% instead of the $750 manufacturer's rebate. Also, the Andersons negotiated to receive a rear trunk spoiler for their new Alero. Additionally, through the negotiation process, the Andersons received an additional $1,299.50 for their trade-in vehicle. Thus, the "one dollar over invoice price" ($17,387.73) minus the negotiated "actual cash value" ($16,722.23) equals the final agreed-upon "trade difference" of $665.50. This figure is shown on the Motor Vehicle Purchase Agreement.

32. The retail cash price of the Andersons' new vehicle is listed as $18,965.00 on the Purchase Agreement, $1,577.27 over the "one dollar over invoice price." In order to maintain the exact agreed-upon difference negotiated by the Andersons, the Andresons' "trade allowance" is shown as $18,299.50, $1,577.27 over the negotiated "actual cash value" of the trade-in vehicle. Thus, the cash price less the "trade allowance" on the Purchase Agreement equals $665.50, the exact difference between the "one dollar over invoice price" and the negotiated "actual cash value" of the Andersons' trade-in vehicle. Therefore, the Andersons paid the exact price that they agreed to pay for her new vehicle on September 23, 1999.

33. Because the agreed upon "trade difference" was consistently maintained from the verbal agreement to the written agreement between Thornhill and Patricia Jarrell, David and Cortney Scragg, Anthony and Michelle Toler, and Robert and Donna Anderson, the plaintiffs' loan amount was in no way affected. Please see attached Exhibits G and H for an example of how the customer's loan amount is not affected by the adjustment to the cash price and "trade allowance" on the Motor Vehicle Purchase Agreement to incorporate the customer's "negative equity."

**FURTHER THE AFFIANT SAYETH NAUGHT.**

_____
GEORGE R. "BUTCH" NISBET, JR.

STATE OF WEST VIRGINIA
COUNTY OF LOGAN

I, Eloise T. Messer, a Notary Public in and for the State of West Virginia, Logan County, do hereby certify that GEORGE R. "BUTCH" NISBET, JR., whose name is signed to the foregoing hereto annexed Affidavit has this 27th day of April, 2004, acknowledged the same before me in my said county and state.

My commission expires: 06-14-09

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ELOISE TAYLOR-MESSER
P. O. BOX 652
LOGAN, WV 25601-0652
My Commission Expires June 14, 2009

Eloise Taylor-Messer
NOTARY PUBLIC

8