# EXHIBIT 5

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**FILED**

2006 NOV -9 PM 3: 15

CATHY S. GATSON CLERK
KANAWHA CO. CIRCUIT COURT

PATRICIA JARRELL;
DAVID AND CORTNEY SCRAGG; individually,
and on behalf of all others similarly situated,

Plaintiffs,

v.                                    CIVIL ACTION NO.: 03-C-1762

THORNHILL SUPERSTORE, INC., a West Virginia corporation;
WALLY L. THORNHILL, individually; GEORGE
R. "BUTCH" NESBIT, JR., individually; and EUGENE
NEAL, individually,

Defendants.

## MEMORANDUM OPINION AND JUDGMENT ORDER

Pending is resolution of, and ruling on, Plaintiffs' Motion For Recovery of Reasonable

of Attorneys Fees and Costs With Integrated Memorandum In Support (also referred to as

"Fee Petition"). The Fee Petition was heard before the Court on October 10, 2006, at which

time Plaintiffs appeared by counsel, William L. Bands and Tim J. Yianne, Bell & Bands, PLLC,

and Defendants appeared by counsel Cy A. Hill, Pullin, Fowler & Flanagan, PLLC.

At said hearing, the Court heard the arguments of the parties and took Plaintiffs' Fee

Petition under consideration, directing the parties to first attempt to resolve any disputes

regarding the amount of Plaintiffs' attorney fees and costs motion by mediation. The Court

now understands that mediation was undertaken by the parties as directed, on Friday,

October 20, 2006, but was unsuccessful.

Therefore, the Court, having considered the entirety of the record, including the parties' memoranda, exhibits and oral arguments of counsel, makes the following findings of fact and conclusions of law in regard to Plaintiffs' pending Motion For Recovery of Reasonable of Attorneys Fees and Costs With Integrated Memorandum in Support:

## I.     FINDINGS OF FACT

1.      Plaintiffs filed this class action on or about July 18, 2003, pursuant to the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W.Va. Code § 46A-1-101, et seq., for damages and to enjoin and redress alleged deceptive acts and/or practices employed by the Defendants in consumer transactions involving the purchase of a new motor vehicle for family, household, or personal use.

2.      The putative Class consisted of all individuals who purchased a new motor vehicle from the Defendants and paid more than "one dollar over dealer invoice," beginning on the date Defendants began their "one dollar over dealer invoice" advertising through the elimination of the same in 2005.

3.      More specifically, Plaintiffs alleged that beginning in 1999 and continuing through 2005, Defendants guaranteed that all new motor vehicles, including new cars and trucks, were priced and sold to consumers at "one dollar over dealer invoice price." Defendants did so by engaging in an ongoing radio, television, and newspaper advertising campaign (collectively "advertisements").     The advertisements were devised and implemented by the Defendants.

2

4.    It was alleged the advertisements reflected a company policy and business strategy of Defendants to guarantee every new vehicle would be sold at "one dollar over dealer invoice price." Plaintiffs further alleged that Defendants did not sell new vehicles to Plaintiffs at "one dollar over dealer invoice." Instead, Plaintiffs alleged they and others were overcharged for their new vehicles because the purchase price of their vehicles exceeded "one dollar over dealer invoice."

5.    To rectify this allegedly unlawful pattern and practice, Plaintiffs, on behalf of themselves and the Class, brought this action seeking damages and injunctive and equitable relief requiring Defendants to cease and desist in the deceptive and misleading advertisements and/or provide documentation including, but not limited, to the Defendants' invoice price on each vehicle, which would allow consumers to verify if they were in fact purchasing their new vehicle at "one dollar over dealer invoice price."

6.    On or about October 16, 2003, Plaintiffs filed their Motion for Summary Judgment and Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment. In their Motion, Plaintiffs argued they were charged in excess of "one dollar over invoice price."

7.    On or about October 20, 2003, Plaintiffs were forced to file a Motion to Compel responses to previously-served discovery seeking, among other things, the production of the purchase agreements and dealer invoices for each new vehicle sold at Thornhill since the inception of the "one dollar over invoice" pricing scheme.

3

8.     In addition, on or about October 20, 2003, Plaintiffs filed their Motion for Class Certification and Memorandum of Law in Support.

9.     The aforesaid three Motions were scheduled to be heard on October 27, 2003. However, with respect to the Motion to Compel, the parties were able to reach an agreement without any ruling by the Court. In fact, Defendant Thornhill Superstore agreed to produce the purchase agreement and invoice document for each new vehicle sold at Thornhill since the inception of the "one dollar over invoice" pricing scheme. The hearing on the Motion for Summary Judgment and Motion for Class Certification was continued.

10.     On or about April 29, 2004, Defendants filed their Response to Plaintiffs' Motion for Summary Judgment. In response, Defendants maintained that the Plaintiffs did not suffer an ascertainable loss under the WVCCPA because Plaintiffs paid the exact price that they agreed upon for their respective purchases at Thornhill. In so maintaining this position, Defendants advanced three defenses: (1) an "actual cash value" ("ACV") was initially assigned to each trade-in by Defendants, and the ACV for each trade-in was subsequently adjusted upward through "negotiations," the adjustment being necessary to cover any negative equity in the deal, i.e. to cover that the assessed ACV assigned by Defendants was less than the amount actually owed on the vehicle; (2) lending institutions would not allow Thornhill to show negative equity in a transaction involving a trade-in vehicle; and (3) lending institutions were accustomed to seeing the retail cash price of a vehicle listed on purchase agreements.

4

11.     In support of their Response, Defendants attached two Affidavits. Defendant George R. "Butch" Nisbet, Jr. stated in his Affidavit that "Over the years, most lending institutions with whom Thornhill Superstore, Inc., does business would not allow Thornhill to show 'negative equity' on the Purchase Agreement until recently. To comply with the lending institutions' wishes, the retail cash price of the new vehicle and the 'trade-allowance' on the trade-in vehicle are adjusted up in a corresponding amount so that the customer's 'negative equity' is incorporated into the 'trade allowance.'" See Affidavit of George R. "Butch" Nisbet, Jr., ¶ 9, dated April 27, 2004.

12.     Likewise, Defendant Eugene Neal stated in his Affidavit that "Over the years, most lending institutions with whom Thornhill Superstore, Inc. does business would not allow Thornhill to show 'negative equity' on the Purchase Agreement until recently. To comply with the lending institutions' wishes, the retail cash price of the new vehicle and the 'trade-allowance' on the trade-in vehicle are adjusted up in a corresponding amount so that the customer's 'negative equity' is incorporated into the 'trade allowance.'" See Affidavit of Eugene Neal, ¶ 9, dated April 27, 2004.

13.     On or about July 13, 2004, Plaintiffs filed their Reply to Defendants' Response to Motion for Summary Judgment. In their Reply, Plaintiffs argued: (1) Defendants failed to produce any documentation verifying the ACV figures quoted by Defendants, and in fact were phantom figures fabricated by Defendants to get around their "one dollar over invoice" advertising; (2) none of the named Plaintiffs had negative equity or were "upside down" on their trade-in so there was no justifiable reason to inflate the Plaintiffs' trade allowances and

5

retail cash prices to hide negative equity; and (3) Defendants failed to produce any documentation from any lending institution to substantiate the claim that "lending institutions are accustomed to seeing the retail cash price of the vehicle."

14. On July 15, 2004, the Court conducted a hearing on Plaintiffs' Motion for Class Certification, and on August 25, 2004, the Court entered the Order certifying the matter as a class action.

15. On or about March 9, 2005, Defendants served Answers to Plaintiffs' Second Set of Request for Admissions. In Request for Admission No. 7, Plaintiffs requested: "Please admit that you have failed to set up the computer program and system being employed at the Thornhill dealership on the sale of new motor vehicles, which are purportedly sold at $1 over invoice, to show the true invoice price of the vehicle on the motor vehicle purchase agreement, plus the $1 charge to the same thereby accurately reflecting the advertised $1 over invoice price." In response, Defendants state: "Deny. Thornhill maintains that the Motor Vehicle Purchase Agreements accurately reflect a purchase price of one dollar over invoice. However, when a customer has negative equity in a trade-in vehicle, the sales price must be changed to reflect the financing of the negative equity." Id.

16. Also in regard to the same set of discovery, in Request for Admission No. 8, Plaintiffs requested: "Please admit that a theory of your defense is that Thornhill inflates the values of trade allowances to hide negative equity, and correspondingly inflates the retail cash price of vehicles, which Thornhill claims are actually sold at $1 over invoice." In

6

response, Defendants stated: "Objection to the use of the words "inflates" and "hide." However, please see response to No. 7 above. Furthermore, lending institutions do not object and are fully aware of this practice. This practice is commonly done throughout the automobile sales industry." Id.

17. On or about October 24, 2005, Plaintiffs were forced to file a Motion to Compel Discovery and for Attorneys Fees and Costs. In particular, Plaintiffs requested that Defendant Thornhill Superstore supplement its prior responses in tendering an updated set of all purchase agreements and dealer invoices for all new vehicles sold at the Thornhill dealership during the time period in question.

18. On January 11, 2006, the Court conducted a hearing as to Plaintiffs' Motion to Compel updated information. At the hearing, the Court ruled that Defendant Thornhill Superstore had to supplement prior discovery responses and provide an updated set of purchase agreements and dealer invoices for all new vehicles sold at the Thornhill dealership during the applicable time period. The Court also awarded Plaintiffs attorney fees and costs because it did not find merit with Defendant Thornhill Superstore's objections to supplementing the documents.

19. On January 23, 2006, the Court entered an Order requiring Defendant Thornhill Superstore to supplement the purchase agreements and dealer invoices for all new vehicles sold at the Thornhill dealership, which had not otherwise been produced, within 30 days from entry of the Order.

7

20. On or about March 13, 2006, nearly two months later, Plaintiffs filed a Motion for Sanctions for Violation of Discovery Order because Defendant Thornhill Superstore failed to comply with the 30-day deadline imposed by the Order entered on January 23, 2006.

21. On or about March 20, 2006, Plaintiffs were forced to file a Motion to Compel seeking, *inter alia*, the production of Defendants' financial statements, to which, on or about March 29, 2006, Defendants filed their response to the aforesaid Motion to Compel and also a Motion for Protective Order.

22. On or about April 4, 2006, Plaintiffs filed their Reply in support of the aforesaid Motion to Compel and their Response to the Motion for Protective Order.

23. On May 10, 2006, the Court entered an Order requiring Defendant Thornhill Superstore to pay sanctions of $100.00 for each day it was in violation of the Order entered on January 23, 2006, which required service of all updated information within thirty days.

24. On July 26, 2006, Plaintiffs deposed Thomas J. Hern. Mr. Hern is an automobile industry standards' experts that Defendants retained in this matter to offer testimony that Defendants honored their "one dollar over dealer invoice" pricing scheme in the Plaintiffs' respective transactions. Although negative equity was not present in any of the named Plaintiffs' transactions, Mr. Hern testified that various terms of a transaction have to be structured so that lenders will agree to finance the vehicle purchase. See Deposition Transcript of Thomas J. Hern, at pg. 37. Despite his testimony in this regard, Mr. Hern testified he was unaware of any written policies or directives from lenders (including GMAC which financed Plaintiff Jarrell and the Scragg Plaintiffs' vehicles) and provided to

8

Defendants which required negative equity to be hidden, concealed or buried. Id. at 56. Instead, he indicated that it was a just "dirty little secret" in the past eight years between lenders and dealerships that negative equity had to be "buried" in the transaction. Id. at 54. Notably, when Mr. Hern read Defendant Nesbit's deposition about the Defendants' business practice of burying negative equity, Mr. Hern immediately called Defense counsel to make sure Defendants had stopped such a practice. Id. at 65.

25. On or about August 1, 2006, Plaintiffs deposed Patrick W. Vollendorf, also retained by Defendants in this matter to offer testimony that Defendants honored their "one dollar over dealer invoice" pricing scheme in the Plaintiffs' respective transactions. However, Mr. Vollendorf admitted that it would be prudent for Defendants to show each consumer the dealer invoice so a consumer could confirm he or she was receiving the "one dollar over dealer invoice" price. See Deposition Transcript of Patrick W. Vollendorf at 31. In terms of disclosure of the "one dollar over dealer invoice" price to Plaintiff Jarrell and the Scragg Plaintiffs, Mr. Vollendorf testified that the purchase agreements did not disclose such invoice price. Id. at 19-21, 24-25. Similarly, he also admitted that he could not take the purchase agreements and demonstrate that Plaintiffs received "one dollar over dealer invoice" price. Id. at 27-28. Further, he could not offer any explanation as to why it was not disclosed. Id. at 19-21, 24-25. Indeed, in his 21 years of consulting in the automotive field, he had never seen a business practice where transactions were structured in the manner used by Defendants. Id. at 33.

9

26.     The deposition testimony of Mr. Hern and Mr. Vollendorf were directly contrary to the aforesaid Defendants' Responses to Requests for Admission Nos. 7 and 8, in that Defendants' experts' testimony totally refuted the defenses that the invoice price was clearly disclosed and that negative equity could not be shown on the vehicle documents.

27.     On or about August 3, 2006, the Court verbally advised the parties' counsel that it was granting the Plaintiffs' Motion to Compel disclosure of Defendants' financial statements.

28.     On August 9, 2006, Plaintiffs' counsel received information responsive to a subpoena served on GMAC requesting that it produce GMAC's policies and directives governing the disclosure of negative equity. According to pleadings filed by Plaintiffs, the information consisted of three bulletins dated September 28, 1998; July 18, 2003; and May 18, 2005. The 2005 bulletin stated "Negative trade equity must be properly disclosed" and "The cash selling price must never be inflated to include the amount of negative trade equity." The 2003 bulletin stated "GMAC agrees to purchase retail installment" contracts that finance negative equity in various states, including West Virginia. The 1998 bulletin stated "a negative trade allowance can appear on the contract provided there is an adequate cash down payment/rebate to offset that amount." None of the bulletins advised dealerships, including Defendants, to hide, conceal, or bury negative equity in a transaction.

29.     GMAC is one of the primary lenders with which Defendants work to obtain financing on vehicles sold to Defendants' customers, and the Defendants began their "one dollar over dealer invoice" pricing scheme in 1999, so there is no credible defense that

10

GMAC required Defendants to structure deals to hide, conceal, or bury negative equity. To the contrary, the bulletins make it clear that negative equity could be financed and should be shown.

30. The Court also notes that throughout this litigation, Plaintiffs repeatedly requested that Defendants provide documents they have received from any lenders, including GMAC, concerning the disclosure of negative equity, but Defendants failed to produce any such information.

31. Accordingly, on August 11, 2006, Plaintiffs filed a Motion for Sanctions Arising from Defendants' Vexatious and Frivolous Defense, as well as a Supplemental Memorandum of Law in Support of their previously-filed Motion for Summary Judgment on the issues of the concealment of negative equity and the disclosure of the invoice price, based on the testimony elicited from Defendants' experts Mr. Hern and Mr. Vollendorf.

32. The aforesaid Motions were noticed for hearing on August 21, 2006. However, these Motions, seeking punishment for Defendants' use of vexatious and frivolous defenses, and judgment on the same, were not heard, as the parties and Defendants' insurance carriers successfully mediated this action on August 16, 2006.

33. Prior to mediation, also on August 11, 2006, Plaintiffs received the Defendants' financial statements, and in turn provided those to their expert economist, Oliver Wood, Ph.D., who reviewed Defendants' financial records and determined there were inadequate assets to cover the potential liability for damages awarded against Defendants, which could possibly exceed $11,000,000.00.

11

34.    With these factors in mind, the parties entered mediation on August 16, 2006, with the Honorable Retired Judge Andrew MacQueen serving as Mediator, at which time the Class consisted of 4,503 members. After three years of highly contested litigation, affected significantly by Defendants discovery tactics and their pursuit of what Plaintiffs allege, and what appear to be, vexatious and frivolous defenses, and also the ongoing efforts and communications by Plaintiffs' counsel to attempt to resolve the matter, including numerous letters to Defense counsel, the parties agreed on the following settlement terms:

A. The defendants agree that they have ended the business practice of "structuring" negative equity which is the subject of this litigation which has resulted in the certified class of approx[imately] 4503 class members who have alleged overcharges between 1999 and 2005 in excess of $11,000,000;

B. Defendants have agreed to disclose negative equity as required by various lending institutions. This does not apply to sub-prime customers;

C. In exchange, the defendants agree to make available to the 4503 class members, a $400 off, fully transferable coupon, good for 7 years from date of court approval, to be used at either Thornhill dealership;

D. Defendants agree to pay class representatives (Jarrell and Scraggs) the sum of $1,500 cash each for their services as class representatives in this matter;

E. Defendants agree[] that they will not argue that Plaintiffs did not prevail in this contested litigation over three years. The defendants agree that substantial value and benefits are provided by the settlement, and plaintiffs are entitled to recover reasonable attorney's fees and costs, to be determined by the Court. The Defendants do not waive any rights as to what constitutes reasonable fees and costs;

F. The parties and their counsel agree to move expeditiously to bring these matters before the [C]ourt for approval and the settlement reached at mediation is conditioned upon Court approval.

See Mediation Settlement Agreement.     (Emphasis added).

35.    In addition, while this litigation was ongoing, but prior to settlement, Defendants had already ceased and desisted their "one dollar over invoice" ad campaign and pricing scheme, and thus issues regarding the practice of employing the same, including the disclosure of evidence of the actual invoice price, were not a specific element of mediation.

36.    By the very terms of the Settlement Agreement, Defendants agreed that Plaintiffs prevailed in this action, and Defendants also agreed that this action has resulted "substantial value and benefits" to the Plaintiffs' and Class. Defendants further entered into a contract to pay Plaintiffs' reasonable attorney fees and costs, separately and over and above the other monetized value and benefits of the Settlement Agreement, in a manner and amount to be determined by the Court, and to move to that end expeditiously.

37.    On or about September 7, 2006, Plaintiffs filed and served a Notice of Hearing setting the Settlement Agreement for a Fairness Hearing, and also setting a Hearing on Plaintiffs' Motion For Recovery of Reasonable of Attorneys Fees and Costs, both to be heard on October 10, 2006.

38.    Subsequent to the Mediation, and during this time period leading to the October 10, 2006, Hearing on Plaintiffs' Motion For Recovery of Reasonable of Attorneys Fees and Costs, Plaintiffs' counsel repeatedly communicated with Defense counsel in an effort to resolve the attorney fee issue short of hearing, agreeing to accept the full amount of available insurance coverage, basing this request on, *inter alia*, a general percentage of the

13

perceived estimated/approximated monetized value of the settlement, but Defendants refused these settlement overtures.

39. Accordingly, on or about October 3, 2006, Plaintiffs filed and served their Motion for Recovery of Reasonable Attorneys Fees and Costs with Integrated Memorandum in Support.

40. During the time period following settlement but preceding the October 10, 2006, Hearing, Notice of the Proposed Settlement and Fairness Hearing was sent to all Class Members and also published in various newspapers. As of the date of the Hearing, Plaintiffs' had received notice from twenty-two (22) Class members that they wished to opt-out of the Class and the settlement.

41. Defendants did not file a Response to Plaintiffs' Motion for Recovery of Reasonable Fees and Costs prior to the Hearing of October 10, 2006, but did file at the Hearing a motion to continue the same as it pertained to Plaintiffs' Motion for Recovery of Reasonable Attorneys Fees and Costs.

42. At said hearing, no Class members appeared to object to the settlement terms, and after oral argument and presentation by the parties, including Plaintiffs and Defendants, the Court approved the settlement and all components, finding it to be fair and reasonable under the circumstances, and then, *inter alia*, denied Defendants' motion to continue the fee portion of the Hearing.

43. Both in oral argument and presentation on the issue of settlement approval and subsequently on the issue of fees and costs, Plaintiffs reiterated to the Court the

14

monetized value of the settlement as set forth in the Fee Petition, and further informed the

Court of the total revised monetized value of the settlement based on the twenty-two (22)

former Class members choosing to opt-out of the Class. Thus, as of the October 10, 2006,

hearing, the total monetized value of the settlement was as follows:

a.    $1,500.00 to each class representative, for a total of $3,000.00;

b.    4,481 coupons valued at $400.00, for total coupon value of $1,792,400.00;

c.    Injunctive relief in the form of Defendants' agreement to cease the practice of
      structuring transactions to conceal negative equity, which would be violative
      in each instance of the West Virginia Consumer Credit and Protection Act, and
      which can be reduced to a quantifiable monetized value. This quantifiable
      monetized value is based on the projection that the Defendants would sell at
      least the same number of vehicles, 5,403, between 2006 and 2012 that they
      sold during the six years preceding, in which they employed the practice of
      structuring transactions to conceal negative equity in conjunction with the $1
      over invoice pricing campaign, and thus be prevented from committing at
      least an additional 4,503 violations during that future time period, which in
      turn, based on available statutory damages of $200.00 and civil penalties of
      $1,000.00 pursuant to, respectively, W.Va. Code § 46A-6-106(1) and W.Va.
      Code § 46A-5-101(1) for each violation, less the 22 opt-outs, results in an
      overall monetized value of 4481 multiplied by $1,200.00, for a total
      monetized value of the injunctive relief of $5,377,200;

d.    Based on the foregoing, Plaintiffs' position was that the settlement had a total
      monetized value of $7,172,600.

44.   In turn, Plaintiffs presented argument and authority supporting an award of

fees based on a percentage of the total monetized value of the settlement, or a percentage

of $7,172,600, and requested, commensurate with their fee agreement with Plaintiffs, a fee

award of one-third (1/3) of the total monetized value of the settlement, or $2,390,866.00,

plus approximately $17,000.00 in costs, for a total award of $2,407,866. The Plaintiffs

15

also presented the Court with a lesser percentage figure of twenty percent (20%), or $1,434,520.00 plus approximately $17,000.00 in costs, for a total of $1,451,520.00.

45. Alternatively, although not argued at the Hearing, Plaintiffs presented written argument, in the event the Court decided in its discretion to disallow the award requested on the basis of a percentage of the monetized value of the settlement, seeking a lodestar award with multiplier, plus costs, but Plaintiffs made clear they were at the time of the Hearing seeking a ruling on their fee request based on a percentage of the monetized value of the settlement, and expressly reserved the right to supplement their Motion with the necessary documentation and analysis should the Court rule to award fees based solely on a lodestar calculation and related factors.

46. Further, in support of the monetized value of the settlement, including the quantifiable value the injunctive relief obtained, Plaintiffs offered the Declaration of Oliver Wood, Jr., Ph.D., an expert economist who has testified in numerous Federal and state courts and who presently serves as Distinguished Professor Emeritus at the University of South Carolina. Specifically, Dr. Wood's Declaration set forth the monetized value of the injunctive relief as set forth hereinabove, although based on the initial Class total of 4,503.

47. At the Hearing of October 10, 2006, Defendants presented argument solely attacking the Plaintiffs' request based on a percentage of the monetized value of the settlement, arguing that only the lodestar calculation could be employed. Defendants were silent at that time as to the Plaintiffs' position on the monetized value of the settlement, including the value of the injunctive relief, and in fact were joint-movants for settlement

16

approval, the first issue raised at the hearing of October 10, 2006, discussion and argument on which included Plaintiffs' argument on the monetized value of the settlement, including the quantifiable value of the injunctive relief.

48. The Court held ruling on the Plaintiffs' Motion for Recovery of Reasonable Fees and Costs in abeyance, directing the parties to mediation on the issue.

49. On or about October 12, 2006, Defendants filed their Response and Opposition to Plaintiff' Motion for Recovery of Reasonable Attorney Fees and Costs, in which they argued that the lodestar calculation, along with employment of the 12 Pitrolo factors and no multiplier, is the only method by which fees can be calculated and awarded in this case, and also argued that the coupon and injunctive relief components of their settlement with Plaintiffs, which Defendants contractually agreed provided "substantial value and benefits," could not be valued or quantified as any such components' value was speculative at best, and thus there was no method by which a monetized value could be placed on the settlement, and in turn no constructive common fund on which to base a percentage fee award.

50. Defendants provided no expert opinion to counter the opinions of Dr. Wood, nor did they provide any method, calculation or analysis to place a monetized value on the settlement which the Defendants themselves agreed provided "substantial value and benefits."

51. Between the October 10, 2006, Hearing and mediating the fee issue, Plaintiffs received notice from an additional 22 opt-outs, further reducing the Class slightly,

to 4,459, and thus the aforesaid calculations previously presented by Plaintiff were modified

as follows:

    a.    $1,500.00 to each class representative, for a total of $3,000.00;

    b.    4,459 coupons valued at $400.00, for total coupon value of $1,783,600.00;

    c.    Injunctive relief as aforesaid with a modified, overall monetized value of 4,459 multiplied by $1,200.00, for a total monetized value of the injunctive relief of $5,350,800.00;

    d.    Based on the foregoing, Plaintiffs' position at the time of mediation was that the settlement now has a total monetized value of $7,137,400.00.

    52.    Plaintiffs and Defendants attempted to mediate this fee dispute on October

20, 2006, but were unsuccessful.

## II.    CONCLUSIONS OF LAW

1.    Under the Mediation Settlement Agreement, there is no dispute that Defendants have agreed to pay reasonable attorneys fees and costs to be determined by the Court. In fact, under the terms of the Mediation Settlement Agreement, Defendants are contractually bound to pay reasonable attorneys fees and costs. Moreover, in a class action such as this, "a court has wide discretion to award attorneys' fees and costs." McFoy v. Amerigas, Inc., 295 S.E.2d 16, 24, 170 W.Va. 526, 533 (1982).

2.    Generally, in the United States, parties to a lawsuit usually bear their own expenses, regardless of which party prevails. This is sometimes called the "American Rule." See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616,

44 L.Ed.2d 141 (1975). However, the WVCCPA, under which Plaintiffs proceeded, includes statutory fee-shifting provisions which allow a prevailing party to obtain reasonable attorneys fees and costs expended in the prosecution of an action, and therefore, provides an exception to the "American Rule."

3.      Courts may also make an exception to the "American Rule" based on equitable doctrines, such as the "common fund" or "equitable fund" doctrine, generally found in class actions. Under common fund principles, when a case results in the creation of a common fund for the benefit of the plaintiff class, the common fund doctrine allows plaintiffs' attorneys to petition the court to recover its fees and costs out of, or based on, the fund.

4.      Here, the dispute between the parties centers upon whether the Court's determination should be based on a lodestar calculation or a percentage of monetized value of the "fund" created for the benefit of the Class. As discussed hereinbelow, the Court notes that the determination under either method results in a similar fees award to Plaintiffs' counsel. Notably, the Mediation Settlement Agreement does not limit this Court's wide discretion in determining the fees.

5.      Generally speaking, under West Virginia law, a trial court applies the "lodestar" method to determine reasonable fees and costs pursuant to a fee-shifting statute. The lodestar consists of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate, which may be adjusted up or down, based on 12 pertinent factors. See Rice v. Mike Ferrell Ford, Inc., 184 W.Va. 757, 760-762, 403 S.E.2d

19

774, 777-779 (1991). The 12 factors are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Syl. Pt. 4, Aetna Cas. Sur. Co. v. Pitrolo, 342 S.E.2d 156, 176 W.Va. 190 (1986); see also Casteel v. Consolidated Coal Company, 181 W.Va. 501, 383 S.E.2d 305 (1989); Bishop Coal v. Salyers, 181 W.Va. 71, 380 S.E.2d 238 (1989); Rice at 760-762, 403 S.E.2d at 777-779 (1991). Also, under certain circumstances, a contingency enhancement or "multiplier" is available to enhance the lodestar to compensate for the risk of loss. Syl. Pt. 4, in part, Heldreth v. Rahimian, 2006 WL 385784 (W.Va. 2006).

6. However, it appears the West Virginia Supreme Court of Appeals has not addressed which method a trial court must apply in a hybrid situation such as exists in this case, where statutory fee-shifting would be available, but a common fund or like corpus is also created. Federal courts have generally concluded that common fund principles govern where a fee-shifting case settles before judgment. See Staton v. Boeing Co., 327 F.3d 938, 967-68 (9th Cir.2003); Brytus v. Spang & Co., 203 F.3d 238, 246-47 (3d Cir.2000); Florin v. Nationsbank, 34 F.3d 560, 564 (7th Cir.1994); Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1327 (2d Cir.1990); see also Alan Hirsch & Diane Sheehey, Fed. Judicial Ctr.,

20

<u>Awarding Attorneys' Fees and Managing Fee Litigation</u> 69, 75 (2005) (stating that "a common fund award is not necessarily precluded in such a case," and "[n]o courts have held to the contrary").

7. Here, because this is a fee-shifting case that settled before judgment with the creation of essentially a "common fund" with significant monetized value, the Court concludes that common fund principles should be applied to determine the attorney fee award.

8. There are generally two methods of calculating attorney fees under a common fund settlement: (1) lodestar, and (2) percentage of fund. Again, the lodestar method requires the court to determine the number of hours reasonably expended multiplied by a reasonable hourly rate for attorneys of similar skill within that geographic area. Under a common fund settlement using the lodestar method, "[c]ourts in their discretion may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys." <u>Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 121 (2d Cir. 2005).

9. Under the percentage of fund method "the court shapes the counsel fee based on what it determines is a reasonable percentage of the fund recovered for those benefited by the litigation." <u>In re Thirteen Appeal Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.</u>, 56 F.3d 295, 305 (1st Cir. 1995) (noting that, "[c]ontrary to popular belief it is the lodestar method, not the [percentage of fund] method, that breaks from precedent.")(citation omitted); <u>see Blum v. Stenson</u>, 465 U.S. 886, 900 n. 16, 104 S.Ct.

1541, 79 L.Ed.2d 891 (describing the common fund doctrine as the calculation of a "reasonable fee...based on a percentage of the fund bestowed on the class."). The percentage of recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered, or the monetized value of the relief obtained, for the class.

10. In awarding fees based upon a percentage of recovery, the Court must determine: (1) the total monetized value of the settlement; and (2) the actual percentage (%) of the fund to award in fees.

11. In this regard, Plaintiffs take the position the settlement has a total monetized value of $7,137,400.00, which encompasses the collective coupon value of $1,783,600.00; $3,000.00 to Class representatives; and injunctive relief value of $5,350,800.00. The Court notes that the value of the injunctive relief was determined by a forensic economist, Oliver Wood, Ph.D., prior to the opt-outs and has been adjusted by Plaintiffs to reflect the slight reduction occasioned by the 44 opt-outs.

12. Conversely, Defendants have attacked the Declaration of Dr. Wood as being "baseless, faulty, and highly speculative," and they further claim it is not feasible to place a monetary value on the injunctive relief because it does not involve any measurable benefit to the instant Class members. However, Defendants argue this despite agreeing in the Settlement Mediation Agreement that "substantial value and benefits are provided by the settlement;" despite standing silent on the Plaintiffs' calculation of the settlement's monetized value when the Court took up the issues of settlement approval and attorney fees

at the hearing of October 10, 2006; and despite otherwise failing to offer any alternative criteria or evidence to measure the monetized value of the settlement.

13.     In considering the value of injunctive relief obtained by Plaintiffs as part of the settlement, the Court notes that the United States Supreme Court of Appeals has concluded that "with claims for injunctive relief, it is well established that the amount in controversy [for purposes of 28 U.S.C. § 1332] is measured by the value of the litigation." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 347 (1997). Similarly, the Fourth Circuit Court of Appeals has concluded the value of injunctive relief is properly judged from its monetary impact to either party. See, e.g., Government Employees Ins. Co. v. Lally, 327 F.2d 568, 569 (4th Cir. 1964)("the amount in controversy is the pecuniary result to either party which that judgment would produce" and expressly referencing its use of "[t]he test of value to either party'"). Thus, a reasonable measure of criteria has been judicially established to value injunctive relief.

14.     Here, the Supreme Court and Fourth Circuit's methods for valuing injunctive relief are instructive because the injunctive relief obtained by Plaintiffs' counsel is an important element of the settlement, and should be considered in awarding fees. See In re Visa Check/Mastermoney Antitrust Litig., 297 F.Supp.2d 503, 525 (E.D.N.Y. 2003) (concluding that a common fund settlement with injunctive relief valued between $25 and $87 billion by class counsel's experts was a substantial benefit that factored into the fee award). In this regard, Dr. Wood opined that "the injunctive relief obtained by Plaintiffs' counsel has an ascertainable value of at least $5,403,600," although that number predated

the opt-outs and accordingly now, as stated hereinabove, is actually $5,350,800.00. <u>See</u> <u>Declaration of Oliver Wood, PhD., ¶ 19.</u>

15.    In doing so, consistent with the Supreme Court and Fourth Circuit's methods of valuing injunctive relief, Dr. Wood's method is based upon the value of statutory damages that would have been available against the Defendants if Defendants had not agreed to correct their business practices. Therefore, contrary to Defendants' attacks on Dr. Wood's Declaration, the injunctive relief obtained by Plaintiffs is a measurable benefit, which must be considered in the fees determination.

16.    The Court is satisfied, and therefore concludes, that the total monetized value of the injunctive portion of the settlement is $5,350,800.00. Likewise, for much the same reason, the Court is satisfied that the value of the coupon component of the settlement is $1,783,600.00. That totals $7,134,400.00, and with the $3,000.00 paid to the Class representatives, the Court finds the total monetized value of the settlement is $7,137,400.00.

17.    The Court now turns to the determination of what would be a fair and reasonable percentage of the total monetized value of the settlement to award as attorney fees in a case such as this. It has become virtually routine for courts to use between 20% and 33% as the "benchmark" for a percentage fee award. <u>See, e.g., In re Coordinated</u> <u>Pretrial Proceedings in Petroleum Prod. Antitrust Litig.</u>, 109 F.3d 602, 607 (9th Cir. 1997) ("common fund fees commonly range from 20% to 30% of the fund created, and . . . 25 percent has been a proper benchmark figure."); <u>In re Rite Aid Corp. Sec. Litig.</u>, 146

24

F.Supp.2d 706, 735 (E.D.Pa. 2001) (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71% with a median value that "turns out to be one-third"); In re Shell Oil Refinery, 155 F.R.D. 552, 571 (E.D. La. 1993) (fees in most common fund cases range from 20% to 30% of the fund).

  18. Here, the Court concludes that it has the discretion to award a percentage of total monetized value of the settlement, and will do so, and further concludes that Plaintiffs' counsel is entitled to 20% of monetized value created for the benefit of the Class. Indeed, although West Virginia jurisprudence has not addressed whether the lodestar or percentage of fund method should be applied where a common fund has been created, other courts have held that the percentage of fund method is appropriate where, as in this case, the defendant agrees to separately pay reasonable attorneys fees and costs as part of a class action settlement agreement in addition to the total monetized value of the "fund" created for the class. See Johnston v. Commercial Mortgage, 83 F.3d 241 (8th Cir. 1996) (awarding percentage of fund attorneys fee award where the terms of the class settlement agreements provided members of the class cash "rebates" and injunctive relief changing defendants' future practices because the direct payment of attorney fees by defendants should not be a barrier to the use of the percentage of the benefit analysis.); In re General Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d 768 (3d Cir. 1995)(concluding that a percentage of fund recovery would be appropriate where the settlement provided members of the class a redeemable certificate because 'a defendant is interested only in disposing of the total claim asserted against it; ... the allocation between the class payment and the attorneys' fees is of

little or no interest to the defense.') Id. (citation omitted); Wing v. Asarco Inc., 114 F.3d 986 (9th Cir. 1997) (applying the percentage method in conjunction with the lodestar-plus-multiplier method as a way to determine the fairness of the latter in a case involving a monetized value corpus as opposed to an actual cash "common fund.")

19.     The Court underscores that the Mediation Settlement Agreement between the parties does not limit the Court's discretion as to which method to apply to determine attorney fees and costs. Similar to the arrangement in Johnston, General Motors, and Wing for the payment of fees, the Mediation Settlement Agreement in this case states:

> Defendants agree[] that they will not argue that Plaintiffs did not prevail in this contested litigation over three years. The defendants agree that substantial value and benefits are provided by the settlement, and plaintiffs are entitled to recover reasonable attorney's fees and costs, to be determined by the Court.

See Mediation Settlement Agreement. (Emphasis added).

20.     Likewise, Johnston, General Motors, and Wing clearly indicate that a court may award attorneys fees based upon a percentage of fund where in essence the entire settlement amount comes from the same source. Accordingly, since the Defendants have agreed to pay reasonable attorneys fees and costs separate and apart from the settlement fund benefiting the Class, and the entire settlement amount comes from the same source, the Court has discretion to apply the percentage method.

21.     Further, General Motors and Wing indicate that where the benefit to the class can easily be monetized it should be thought of as having created a "constructive common fund." In re General Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d at 820; Wing, 114 F.3d

at 989. In the case at bar, the settlement coupons and cash payments alone represent a monetized value for the Class of $1,786,600.00. In addition, the injunctive relief obtained is valued at $5,350,800.00. Accordingly, as this Court has held hereinabove, the total monetized value of the benefits provided in this settlement is $7,137,400.00. Thus, the Court has discretion to deem the Class settlement as a "constructive common fund" and, in turn, award a percentage of the value created for the benefit of the Class, paid by Defendants directly to Plaintiffs' counsel over and above the "constructive common fund" as per the Mediation Settlement Agreement.

22.     Lastly, even though the Court is satisfied that a common fund and/or "constructive common fund" has in fact been created, General Motors further holds that courts have the inherent management powers to award fees and costs to lead counsel based upon common fund principles in cases that do not actually generate a common fund. Here, despite any argument that an actual, totally liquid, common fund has not been created, this Court has the inherent management powers to apply the percentage of fund method in the case at bar based on the total monetized value of the settlement recovery and/or relief.

23.     Accordingly, the Court concludes that Plaintiffs' counsel is entitled to 20% of the $7,137,400.00 monetized value created for the benefit of the Class for a total fee award of $1,427,480.00 plus all costs incurred in the prosecution of the action.

24.     In concluding that application of the percentage of fund method is the appropriate method to determine the attorney fees award in this Court, the Court is mindful

of West Virginia's use of the lodestar calculation and application of the 12 <u>Pitrolo</u> factors to determine reasonable fees and costs, but is also mindful that it is unaware of any West Virginia case such as this where a class action settlement in a case brought pursuant to a fee-shifting statute results in a common fund or the like from which to determine a percentage-based fee award. However, the Court notes that other courts have frequently employed the lodestar method as a crosscheck to help ensure the overall reasonableness of the percentage-based fee award. See <u>In re Bristol-Myers Squib Sec. Litig.</u>, 361 F.Supp.2d 229, 233 (S.D.N.Y. 2005). When used merely as a cross-check, the hours documented by counsel need not be thoroughly scrutinized. <u>Id.</u>

25.    Moreover, in conducting the lodestar crosscheck, courts have discretion to apply a risk multiplier when using the lodestar method in a common fund case. See <u>Wing</u>, supra; <u>see also In re Wash. Pub. Power Supply Sys. Sec. Litig.</u>, 19 F.3d 1291, 1299 (9th Cir.1994) ("[<u>The City of Burlington v. Dague</u>, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)] rationale for barring risk multipliers in statutory fee cases does not operate to bar risk multipliers in common fund cases."). Multipliers are used to account for the cost, delay and risks inherent in advancing fees; the complexity of the case; and the size of the monetized value of the recovery.

26.    Here, the Court will apply the lodestar crosscheck with an appropriate multiplier to determine the reasonableness of the Court's award of fees to Plaintiffs' counsel under the percentage of fund method. The billing records submitted under seal by Plaintiffs' counsel reflect an initial lodestar of approximately $236,544.75 based on approximately

1,138.60 total hours at rates of $275/hour for partners, $190/hour for associates, and $100/hour for paralegals. When considering the initial lodestar; various factors of the 12-factor test to evaluate the lodestar; and application of an appropriate multiplier, the Court is satisfied that the following lodestar crosscheck analysis demonstrates that the fees awarded to Plaintiffs' counsel under the percentage of fund method are reasonable.

A. Analysis of Various Factors of 12-Factor Test

27.    As a preliminary matter, it must be noted that not every one of the twelve factors must be considered in determining the reasonableness of an attorney fees award. Casteel, at 312, 181 S.E.2d at 508. Accordingly, the Court analyzes the factors that it believes are most important in performing this analysis and cross-check to further gauge the reasonableness of the fee award made herein.

i.    Time and Labor Required.

28.    Plaintiffs' counsel has submitted to the Court under seal detailed billing records identifying the tasks performed, the dates of performance, the number of hours spent on each task, and the name of the attorney who completed each task. The billing records also detailed the costs incurred by Plaintiffs' counsel. The Court has reviewed the detailed billing records as well as the lengthy procedural history of the case. Based on this review, the Court concludes that the time and labor expended by Plaintiffs' counsel in the prosecution of the class action to be reasonable. Moreover, as discussed hereinabove, key defenses raised in this case were in fact completely refuted by Defendants' own experts,

29

said depositions taken during the summer of 2006, well after Defendants raised these defenses and after maintaining the viability of these defenses over the entire course of this litigation. Needless to say, Defendants continued reliance on baseless defenses caused more time to be expended in the litigation by all concerned. Further, as discussed hereinbelow, the issues raised in this class action case required significant development regarding the business practices of the Defendants.

       ii.     Novelty and Difficulty of the Questions.

      29.     The Court recognizes that the prosecution of class actions generally requires more time and effort on the attorney's part. The Court also recognizes that this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, but counsel should not be penalized for undertaking such a case. Plaintiffs' counsel was presented with novel and difficult issues in seeking class certification, and also complex issues in dealing with the Defendants' business practices, pricing scheme, and the defenses raised, which proved to be meritless, if not frivolous. The Court concludes this factor weighs in favor of approving the fee request.

       iii.     Skill Requisite to Perform the Legal Service Properly.

      30.     The Court notes that serving as class counsel in a consumer fraud class action requires specialized skill and knowledge. Indeed, the task of seeking class certification alone requires considerable skill, knowledge and analysis of the law. The Court

has reviewed Plaintiffs' counsel overall work product in prosecution of the class action and is satisfied with Plaintiffs' counsel's efforts on behalf of the Class.

    iv.    Preclusion of Other Employment by the Attorney Due to Acceptance of the Case.

    31.    This action was filed on July 18, 2003, and a review of the procedural history shows that Plaintiffs' counsel has devoted a great deal of time to prosecute the case due to the complexity of the claims as well as the aggressive and complicated, albeit meritless, defenses asserted by Defendants. The Court believes that Plaintiffs' counsel has been precluded from undertaking other employment, at least in part that employment being based on hourly fees paid directly by clients, so this factor weighs in favor of approving the fee request.

    v.    Customary Fee.

    32.    The Court recognizes that the customary fee for similar work in the community should be considered under this factor. The Court further recognizes that various types of legal work command differing scales of compensation. The Court concludes that the hourly rates of $275 for partners/$190 for associations/$100 for paralegals submitted by Plaintiffs' counsel are reasonable when considering the customary fee for similar work in the community and the complexity of the issues and legal work performed by Plaintiffs' counsel, and further notes that these hourly rates have previously been awarded to Plaintiffs' counsel in other similar matters.

vi. Whether the Fee Is Fixed or Contingent.

33. In considering whether the fee is fixed or contingent, the court notes the criterion is not what the parties agreed, but what is reasonable. See Clark v. American Marin Corp., 320 F.Supp. 709, 711 (E.D.La. 1970) aff'd, 437 F.2d 959 (5th Cir. 1971). Plaintiffs' counsel took the case under a contingent fee arrangement where Plaintiffs were not required to advance any fees or costs in prosecution of the case. Rather, Plaintiffs' counsel bore the risk of nonpayment if the case was unsuccessful. The Court concludes this factor weighs in favor of fee approval.

vii. Amount Involved and the Results Obtained.

34. As stated herein, the total monetized value of the settlement, broken down by component, is as follows:

a. $1,500.00 to each class representative, for a total of $3,000.00;

b. 4,459 coupons valued at $400.00, for total coupon value of $1,783,600.00;

c. Injunctive with a modified, overall monetized value of 4,459 multiplied by $1,200.00, for a total monetized value of the injunctive relief of $5,350,800.00;

d. Total monetized value of $7,137,400.00.

The Court further notes that the coupons in question are fully transferable and are valid for a period of seven (7) years. Therefore, the Court concludes this factor has been met.

viii.   Experience, Reputation, and Ability of the Attorneys.

35.   The Court notes Plaintiffs' counsel is highly experienced in the areas addressed in this litigation, with Bell & Bands having represented consumers in similar matters, as well as having defended automobile dealerships and manufacturers in consumer cases where no conflict has been present. Accordingly, the Court is satisfied with the experience, reputation, and abilities of Plaintiffs' counsel.

ix.   Undesirability of the case.

36.   Plaintiffs' counsel was confronted with the time-consuming tasks of conducting class discovery and attempting to obtain class certification, as well as combating the defenses raised in regard to Defendants' business practices, yet had no assurances that the time expended would be fruitful, due to Defendants' financial ability to pay the full measure of damages.   Further, fairly early in the action, issues were raised regarding Defendants' insurance coverage.  Specifically, one of Defendants' insurers, MIC Property and Casualty Insurance Corporation, filed a Third-Party declaratory action asking the Court to declare that the policies did not cover the claims alleged in the Complaint. Accordingly, Plaintiffs' prosecuted this case on behalf of the Class since 2003 without any payment, without any assurance of success, and facing Defendants with insufficient assets to pay the full measure of potential damages, and possibly without insurance coverage.   The Court concludes the undesirability of the case weighs in favor of approving the fee request.

B.    Analysis of Multiplier Factors

37.    The Court now turns to the issue of applying a multiplier to the lodestar, and will analyze the factors involved in that determination.

i.    Cost, Delay and Risk Inherent in Advancing Fees.

38.    In prosecution of class action over the past three years, Plaintiffs' counsel has incurred approximately $236,544.75 in attorney fees and $16,812.72 in costs. Plaintiffs' counsel took the case under a 1/3 contingent fee arrangement where Plaintiffs were not required to advance any fees or costs in prosecution of the case. Plaintiffs' counsel solely bore the risk and burden of nonpayment if the case was unsuccessful.

39.    In fact, as stated hereinabove, fairly early in the action, issues were raised regarding Defendants' insurance coverage. Specifically, one of Defendants' insurers, MIC Property and Casualty Insurance Corporation, filed a Third-Party declaratory action asking the Court to declare that the policies did not cover the claims alleged in the Complaint. Accordingly, once again it must be reiterated that Plaintiffs' counsel has prosecuted this case on behalf of the Class since 2003 without any payment, without any assurance of success, and facing Defendants with insufficient assets to pay the full measure of potential damages, and possibly without insurance coverage. The Court concludes this factor justifies an upward adjustment of the lodestar through the use of a multiplier.

ii.    Complexity of Case.

40.    As noted, class actions by their very nature are more complicated than ordinary litigation. The task of seeking class certification alone requires considerable skill,

34

knowledge and analysis of the law. Further, class counsel has considerable more burdens because of the binding nature of class actions on class members.

41. In addition to the inherent complexity of prosecuting this class action, Plaintiffs' counsel has been confronted with complex defenses. As stated, Defendants have maintained throughout the litigation that the Plaintiffs have not suffered an ascertainable loss under the WVCCPA because Plaintiffs paid the exact price that they agreed upon for their respective purchases at Thornhill Superstore, Inc. In so maintaining, Defendants advanced three defenses: (1) an "actual cash value" ("ACV") was initially assigned to each trade-in by Defendants, and the ACV for each trade-in was subsequently adjusted upward through negotiations; (2) lending institutions will not allow Thornhill to show negative equity on a vehicle being trade-in; and (3) lending institutions are accustomed to seeing the retail cash price of a vehicle listed on purchase agreements.

42. To overcome these defenses, Plaintiffs' counsel had to analyze Defendants' business operations, including the policies and procedures on arranging financing. As a check on the legality of Defendants' business operations, Plaintiffs' counsel had to analyze dealership industry standards in the United States as to arranging financing and properly completing transactional documents attendant to financing. In turn, Plaintiffs' counsel had to analyze lending industry standards as to loan criteria that must be met to approve consumer loans. In so doing, Plaintiffs' counsel aggressively pursued discovery from Defendants as to business operations and subpoenaed information from various lending institutions. Plaintiffs' counsel also had to take depositions of industry standards experts,

retained in defense, who in fact apparently refuted the Defendants' case. This was also the case in regard to the GMAC bulletins, which were obtained only after and inordinately hard-fought discovery process.

43. As stated, Plaintiffs' counsel received, on August 9, 2006, information responsive to a subpoena served on GMAC asking that it produce GMAC's policies and directives governing the disclosure of negative equity. These GMAC bulletins clearly demonstrated negative equity could be disclosed in a transaction. Accordingly, it is clear that Defendants raised defenses that had no basis in fact or business practice, yet further complicated and drew out this action by continuing to assert the same. This factor weighs in favor of an upward adjustment of the lodestar.

    iii.    Size of Recovery.

44. As stated, the total monetized value of the settlement, after reducing the original Class of 4,503 members by the 44 original members opting out of the Class settlement, is as follows:

    a.    $1,500.00 to each class representative, for a total of $3,000.00;

    b.    4,459 coupons valued at $400.00, for total coupon value of $1,783,600.00;

    c.    Injunctive with a modified, overall monetized value of 4,459 multiplied by $1,200.00, for a total monetized value of the injunctive relief of $5,350,800.00;

    d.    Total monetized value of $7,137,400.00.

45. Moreover, it must be noted that Plaintiffs' counsel, in their successful prosecution of this action, also succeeded in changing Defendants' business practices, as

36

reflected in the terms of the Class settlement, wherein, despite the defenses asserted throughout this action, Defendants agreed to cease structuring negative equity and to disclose negative equity to consumers where applicable. Moreover, Defendants ceased their "one dollar over invoice" sales campaign and pricing scheme. The Court concludes this factor justifies an upward adjustment of the lodestar through the use of a multiplier.

46.     Accordingly, in light of the foregoing analysis regarding the 12 Pitrolo factors as well as those factors involved in determining whether to apply a multiplier, the Court finds it appropriate to apply a multiplier to the initial lodestar to increase the same for purposes of performing the lodestar cross-check to determine the reasonableness of the fee awarded herein, that being 20% of the total monetized value of the settlement. The Court finds a multiplier of 6 to be reasonable under the foregoing analysis of this case and what has transpired therein since its July 2003 filing.

47.     In sum, a multiplier of 6 applied to the initial lodestar amount set forth herein of $236,544.75 approximates the Court's fee award of 20% of the total monetized value of the settlement, or $1,427,480.00, and thus the Court is satisfied with the reasonableness of its 20% of fee award made herein based on the percentage of the total monetized value, or "percentage of the fund," method employed by other courts in cases such as this.

## V. RULINGS

Based on the foregoing, the Court applies the percentage of the total monetized value of the settlement, or percentage of the fund, method to award Plaintiffs' counsel a total fee award of $1,427,480.00, which represents 20% of the total monetized value of the settlement, or common fund or benefit to the Class, of $7,137,400.00, plus costs to date in the amount of $16,812.72, for a total award of $1,444,292.70.

Objections are noted of counsel as to those matters adverse to their respective interests.

The Clerk is directed to send a certified copy of this Order to all counsel of record upon entry and filing of the same.

Enter this Order the ___9th___ day of _____Nov._____, 2006.

_____

Honorable Charles E. King, Jr.

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS ___1st___
DAY OF ___March___ ___2016___
_____ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

PREPARED BY:

_____

Harry F. Bell, Jr. (WV Bar No. 297)
William L. Bands (WV Bar No. 6048)
Tim J. Yianne (WV Bar No. 8623)
BELL & BANDS PLLC
P. O. Box 1723
Charleston, WV 25326
(304) 345-1700
(304) 345-1715 Facsimile

11/13/06
R Martin, H Bell,
J Brown, J Polak

38