# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**COPY**

**RONALD P. BARKER and JUDY BARKER**
individually and on behalf of
all others similarly situated,
   Plaintiffs,

vs.                                    **Cause No. 2:02-1-255**

**THORNHILL PONTIAC-BUICK-GMC, INC.**
a West Virginia corporation,
and/or **THORNHILL SUPERSTORE, INC.**
a West Virginia corporation,
   Defendant.

vs.
**SPECTRUM SERVICES, INC.**
   Third-Party Defendant.


### VIDEO DEPOSITION OF GEORGE RICHARD NISBET, JR.

### MAY 15, 2003

### PULLIN, FOWLER & FLANAGAN
### 707 VIRGINIA STREET EAST, SUITE 1000
### CHARLESTON, WEST VIRGINIA

### 2:50 P.M.



PLAINTIFF'S
EXHIBIT
A

5/15/03    Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

**2**

## APPEARANCES

On Behalf of the Plaintiff:

   William L. Bands, Esq.
   Ftemkos J. Yianne, Esq.
   Bell & Bands, PLLC
   30 Capitol Street
   Post Office Box 1723
   Charleston, West Virginia  25326-1723

On Behalf of the Defendant:

   Johnnie E. Brown, Esq.
   Pullin Fowler & Flanagan, PLLC
   707 Virginia Street East
   Suite 1000
   Charleston, West Virginia  25301

On Behalf of the Third-Party Defendant:

   Charles S. Piccirillo, Esq.
   Shaffer & Shaffer
   Post Office Box 38
   Madison, West Virginia  25130

**3**

## INDEX

Witness                    By Mr. Bands
George R. Nisbet, Jr.            4

Exhibit                          Marked
Deposition Exhibit No. 1           5
Deposition Exhibit No. 2         146

Reporter's Certificate           150

**4**

PROCEEDINGS

1
2    VIDEOGRAPHER:     We're now on the --
3  the video record in the matter of Ronald P. Barker and
4  Judy Barker versus Thornhill Pontiac-Buick-GMC,
5  Incorporated, and/or Thornhill Superstore, Incorporated,
6  versus Spectrum Services.
7          My name is Emily Goodwin.  I'm a legal
8  video specialist from Katz Consulting Group located at
9  1031 Quarrier Street in Charleston.  I'm not related to
10 any of the parties to this action or to counsel of
11 record, nor do I have a financial interest in this
12 action.
13         Today is May 15, 2003, the time is 2:50.
14 This deposition is taking place at Pullin Knopf Fowler &
15 Flanagan, located at 707 Virginia Street, East.  The
16 witness today is George Nisbet.  Would counsel please
17 identify themselves for the record?
18         MR. BANDS:     William Bands and Tim
19 Yianne for the Plaintiffs.
20         MR. PICCIRILLO:   Charlie Piccirillo for
21 the Third-Party Defendant, Spectrum Services.
22         MR. BROWN:     Johnnie Brown for
23 Thornhill Superstore.
24         VIDEOGRAPHER:     Will the court

**5**

1  reporter please swear the witness?
2        WHEREUPON,
3          GEORGE RICHARD NISBET JR.,
4    WAS CALLED AS A WITNESS, DULY SWORN, AND
5    TESTIFIED AS FOLLOWS:)
6          EXAMINATION
7   BY MR. BANDS:
8      Q    Could you please state your full name for
9  the record?
10     A   George Richard Nisbet, Jr.
11     Q   And you are known as Butch?
12     A   Known as Butch.
13         MR. BANDS:     Before we get started,
14 anything substantively, we'll check this real quick, just
15 the Subpoena Duces Tecum.  Have it marked as Exhibit 1.
16         (WHEREUPON, the document referred
17         to was marked for identification
18         purposes as Deposition Exhibit No.
19         1, and is attached hereto.)
20         MR. BANDS:     And I'll speak with
21 counsel about this.  Item No. 1 is the original file
22 concerning the transaction.  "Any correspondence or any
23 other documents between the Defendants and Spectrum
24 Services since the inception of the program at Thornhill

5/15/03    Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

**6**

1  to date."
2  So that looks to be a compound request
3  with the original file in the transaction which you've
4  provided, Johnnie, Mr. Brown, rather, with the caveat
5  that it excludes the profit hold back sheet, and that's
6  the subject of a pending motion which we've already
7  discussed; correct?
8  MR. BROWN:    That's correct.
9  MR. BANDS:    And as far as
10  "correspondence and documents between Thornhill
11  Superstore or Thornhill Buick -- Pontiac-Buick-GMC, Inc.
12  and Spectrum Services since the inception of the Full
13  Circle Benefit Program to date," we've, I believe,
14  addressed that in Mr. Thornhill's deposition.
15  MR. BROWN:    That is correct.
16  Those documents that were produced in Mr. Thornhill's
17  deposition would be responsive -- responsive to this.
18  MR. BANDS:    Okay. Number 2,
19  "George 'Butch' Nisbet's financial statements and tax
20  returns for the year he began selling and/or promoting
21  the program up to the current date, and also monthly
22  financial statements of Thornhill to GM."
23  And that, those items are either the
24  subject of pending motions or have been ruled upon?

**7**

1  MR. BROWN:    Yes. I believe Judge
2  -- Magistrate Stanley said that we did not have to
3  produce the individual tax returns and financial
4  statements, and the monthly financial statements of
5  Thornhill are subject to a pending motion before Judge
6  Hallanan at this time.
7  MR. BANDS:    And are the -- and
8  referring to co-counsel, are the subject personal
9  financial records that Judge Hallanan ruled were not to
10  be produced, are they a subject of an objection to her
11  order? Are you aware of that? Did we object to her
12  order in regard to individual financial information?
13  MR. YIANNE:    No.
14  MR. BANDS:    Just to make sure
15  we're complete. Number 3, "a complete and legible copy
16  of any and all commission checks, rebate checks, 1099's,
17  commission or refund calculation sheets for the benefit
18  of Mr. Nisbet personally and as an officer of the
19  defendant company," bearing in mind that at least the
20  1099's have addressed the -- the other financial
21  information, I believe, we covered.
22  But the 1099's, we discussed with you
23  previously with regard to Mr. Thornhill. 1099's for
24  commissions or payments from Spectrum from the sale of

**8**

1  the Full Circle Benefits Program. And it's my
2  understanding that you're attempting to locate those?
3  MR. BROWN:    No. Actually, I was
4  able to get Mr. Nisbet's --
5  MR. BANDS:    Okay.
6  MR. BROWN:    -- yesterday and
7  actually for the years, I have copies of documents from
8  2002, 2001, and 1997 and the accountant was able to give
9  me the figures for '98, '99, and 2000.
10  For some reason, he could not locate the
11  actual 1099. I have this information right here. I know
12  it's subject to a protective order, a -- confidentiality
13  agreements. I guess -- I don't know how we want to
14  handle that if we'd get into this on the record here.
15  Sealing a portion of the testimony.
16  MR. BANDS:    Why don't we play that
17  one by ear --
18  MR. BROWN:    Okay.
19  MR. BANDS:    -- and see how we want
20  to do it. It won't be something that will come up in the
21  immediate beginning of the deposition. So, we might as
22  well just see how we want to exchange that information,
23  and --
24  Number 4, "any training materials

**9**

1  Defendants may have received from any agents,
2  representatives or employees of the Spectrum Full Circle
3  Benefits Program. I think we've addressed that.
4  MR. BROWN:    Yes. And Mr.
5  Thornhill, as far as I know, there are no documents or
6  videos or anything that we have responsive to that.
7  MR. BANDS:    Okay.
8  MR. BROWN:    And the same answer
9  for Number 5.
10  MR. BANDS:    And Number 5 would
11  speak to Universal Underwriters?
12  MR. BROWN:    Correct.
13  BY MR. BANDS:
14  Q  Training materials. Mr. Nisbet, I'm
15  going to go through some ground rules and just other
16  items, housekeeping items, with regard to depositions.
17  But first of all, this is fresh in my
18  mind and we have this before us. I do want to ask you if
19  you have knowledge of any -- primarily, I would say,
20  probably F&I training materials and/or materials on the
21  sales marketing and promotion of the Spectrum Full Circle
22  Benefits Program from Spectrum Services, Inc.?
23  Those would be any videotapes, binders,
24  memos, documents, notebooks, flyers, any tangible object

5/15/03     Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

**10**

1  whatsoever that refers to training of Thornhill personnel
2  including yourself and/or Mr. Thornhill on the marketing
3  of this Full Circle Benefit Program.
4      A    The only tangible thing that we have is
5  the actual package itself, which is the Full Circle
6  Benefit package was the only thing we have. There are no
7  videotapes, no notebooks, no written polices and
8  procedures. But that is the only tangible thing we have.
9      Q    Okay. I would also ask the same
10 question, without having to go through the whole litany
11 of what I'm looking for as far as anything tangible, the
12 same question for anything from Universal Underwriters
13 with regard to the F&I Department and practices,
14 procedures and those kinds of things that are undertaken
15 at the dealership under, I assume, your guidance?
16     A    Don't -- don't have any visual aids or
17 videotape aids or anything.
18     Q    Any books or anything that anybody has
19 ever provided to anyone that works for you about
20 training?
21     A    I'm sure we've had some books. We have
22 had some people that have gone to training classes and
23 they have received books and, you know, as far as
24 training and those type of things.

**11**

1      But we don't have anything that we keep
2  on a permanent record as far as a, you know, as a video
3  copy or a book as far as the F&I training.
4      Q    Okay. It's possible that either Mr.
5  Barker, Mr. Painter, Mr. Stowers or Mr. Mounts or other
6  people who have worked in F&I and/or sales at the
7  dealership may have some of these documents or booklets
8  or anything in their possession at work or at home; is
9  that possible?
10     A    Could have some training materials from
11 possible training, yes.
12     Q    Okay. I would ask that -- if you could
13 check on that for me, please? And let your counsel know.
14 Can I see Exhibit No. 1 from Mr. Thornhill please?
15         MR. PICCIRILLO:    Bill, I want to break
16 in, but just for clarity. Is he saying that there are
17 training materials from Universal or from their F&I
18 people or from Spectrum?
19         MR. BANDS:    He -- he -- with
20 Spectrum, he said that they have nothing but the
21 materials.
22         MR. PICCIRILLO:    Okay. That's all.
23         MR. BANDS:    And by materials, I
24 mean the --

**12**

1          MR. PICCIRILLO:    So these other things
2  are from someone else?
3          MR. BANDS:       Yes, yes.
4          MR. BROWN:       Yes. And I don't even
5  think he was talking about Universal. Just to be clear,
6  I don't think he was talking about the Universal.
7          THE WITNESS:       To clarify the things
8  we have, we have not had any training with Universal.
9  Most of the training that we have had has been with a
10 Finance and Insurance specialist who is now the Midwest
11 Agency.
12     BY MR. BANDS:
13     Q    Okay. And that's what I was going to get
14 to.
15     A    We've gone through the training with
16 them. Also, we've had GMAC training.
17     Q    Okay.
18     A    You know, training as well.
19     Q    All right.
20     A    So it's been from various sources.
21     Q    Okay. So we have, essentially, no
22 training materials, as we discussed, from Spectrum. None
23 from Universal. There may be some from GMAC.
24     A    Possibly.

**13**

1      Q    Possibly. And there may be some from
2  Debbie Copeland's company. What's the name of that
3  company?
4      A    It is now Midwest. It was Finance and
5  Insurance Specialists. It's now Midwest Agency.
6      Q    Okay. What about training materials from
7  any other organization such as AFIP or anything like
8  that?
9      A    We -- AFIP is something that we have done
10 after this particular case. We have our -- several
11 people that are AFIP certified now, and they would
12 probably have some materials.
13         I'm sure they would have some materials
14 from AFIP, which was administered by a GMAC
15 representative.
16     Q    Okay. And if you will check on that and
17 please let counsel know, I would appreciate it. Any
18 other organizations that have provided you or anyone at
19 your dealership with any training on the topic of F&I
20 transactions, sales and promotions of optional goods and
21 services, financing, disclosures, proper preparation of
22 documents, anything that in any way relates to the F&I
23 Department?
24     A    I think we've pretty well covered most of

5/15/03 Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

14

1 them. Of course, you know, there could be a few more,
2 but I think most of the information we have is directly
3 from Debbie Copeland.
4    Q    Okay. And/or AFIP?
5    A    And/or AFIP.
6    Q    Do you have any training materials, such
7 as what we've just discussed, that speak to F&I practices
8 that were provided to you by Frank Baer of Commercial
9 Insurance Services while he still handled your insurance
10 accounts and prior to his being put on retainer by the
11 dealership?
12    A    I couldn't answer if I have anything
13 directly. I know we have used some tools that Mr. Baer
14 has provided for us.
15        He was instrumental in helping us to
16 develop the -- I think the optional form that we use for
17 the -- for the Full Circle Benefit Program.
18        There are a few things that he has helped
19 us to develop, but I can't sit here and tell you exactly
20 which things came from him and which things that haven't.
21 But he has been helpful in helping -- making sure that we
22 have the proper tools to do the proper disclosures and --
23    Q    And you're referring to the acceptance
24 letter?

15

1    A    Yes.
2    Q    The Full Circle acceptance letter?
3    A    Yeah, the optional --
4    Q    Do you know if that was developed -- do
5 you know when that was developed?
6    A    I can't remember. Shortly, when it --
7 just speculation. I can't give you an exact time. I
8 think it was after -- there was a case involved with Joey
9 Holland and we wanted to make sure that we were doing
10 things correctly.
11        So we enlisted Mr. Baer to make sure that
12 we were doing everything properly. We wanted to make
13 sure we were doing everything properly, and he thought it
14 was a good idea that even though that the form had been
15 approved and had the optional language on the bottom,
16 that we even did a separate form to show that it was
17 optional. And it was at that time, I can't remember the
18 exact date, that we initiated that form.
19    Q    What company, insurance company, did Mr.
20 Baer essentially represent as a broker or an agent when
21 he was acting as the insurance agent for the dealership?
22    A    I can't remember. Mr. Thornhill handles
23 all the, you know, the acquiring of the insurance. We
24 discuss it and if I'm not mistaking, it was Commercial.

16

1 I think it was Commercial Insurance, but I don't have the
2 exact specifics on that.
3    Q    So you wouldn't have any knowledge when
4 that insurance coverage ceased for the dealership?
5    A    I can't remember the exact year.
6    Q    And were you involved in retaining Mr.
7 Baer as counsel for the dealership?
8    A    Mr. Thornhill does that, but he runs it
9 by me, and I was aware that he was retained, yes, sir.
10    Q    Approximately how long ago was that? How
11 many months, years --
12    A    Possibly --
13    Q    -- if you can't remember a date?
14    A    Possibly two years ago. Two, two and a
15 half years ago that he was retained to look over things.
16    Q    All right. Well, I already got ahead of
17 myself and started asking you some questions before we
18 went through the ground rules.
19        I haven't met you before. My name's Bill
20 Bands. As you know, myself and my associate here, Tim
21 Yianne, represent the Plaintiffs in this case.
22        I'm sure you're very much aware of what
23 the case is about. This is a deposition, your
24 deposition. It is essentially an interview under oath

17

1 when we get to find out information about the
2 dealership's practices, about the transaction involving
3 my clients. Essentially about -- just about anything and
4 everything subject to some limitations.
5        If at any time you don't understand a
6 question that I ask, I want you to please ask me to
7 rephrase it. If there is a portion of a question you
8 don't understand and you can be more precise and tell me
9 what you don't understand, I would ask that you do that
10 as well.
11        Otherwise, when the record's being taken,
12 there's going to be a question and an answer and the
13 record and everybody who reads it, is going to assume
14 that your answer is responsive to my question.
15        And so just to make sure we're clear, I
16 want to make sure that you understand the question, I
17 understand the answer, et cetera. Fair enough?
18    A    Yes, sir.
19    Q    Okay. Second ground rule, if you want to
20 call it that, is I noticed you were nodding your head.
21 That's fine to a certain extent as we go on, but when you
22 give an answer, you need to give it verbally.
23    A    Yes, sir.
24    Q    So that it's in the record. Be it yes,

5/15/03   Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

18

1  no, whatever, it needs to be verbal. If you need a break
2  at any point in time, you know, let your attorney know.
3  And if we're at a point where we can stop and it's good
4  to stop, we will do so.
5        I will remind you that during all breaks,
6  though, you're still under oath. It's as if you never
7  left the room. Do you understand those ground rules
8  okay?
9     A   Yes, sir.
10    Q   No problem with them?
11    A   No problem whatsoever.
12    Q   Okay. Have you ever given a deposition
13 before?
14    A   No, sir.
15    Q   Did you ever give a deposition at all in
16 any cases that were brought against the dealership?
17    A   No, sir.
18    Q   Any cases where Mr. Neal or Mr. Thornhill
19 may have given a deposition?
20    A   No, sir.
21    Q   This is your very first one?
22    A   Very first deposition.
23    Q   Okay. Well, I've already told you the
24 purpose of it. What's your address, both mailing and

19

1  physical?
2     A   My mailing address is P. O. Box 272,
3  Stollings, S-T-O-L-L-I-N-G-S, West Virginia 25646. My
4  physical address is 81 Stollings Hill Road, Stollings,
5  West Virginia 25646.
6     Q   And how long have you lived at that
7  address?
8     A   Approximately seven years.
9     Q   When did you start working for Thornhill?
10    A   Jan --
11    Q   Or you became part owner? Either one.
12    A   Well, I started working for Thornhill
13 January of 1996, and I became part owner -- I hate to say
14 I don't remember the exact date, but it was approximately
15 two years later, I think.
16    Q   In 1998?
17    A   '98, yes.
18    Q   So you've lived at this address for the
19 duration of your association --
20    A   Yes.
21    Q   -- with the Thornhill dealership?
22    A   Yes, sir.
23    Q   Are you married?
24    A   Yes, sir.

20

1     Q   And what's your wife's name?
2     A   My wife's name is Alyse, A-L-Y-S-E,
3  Nisbet.
4     Q   And how long have you been married?
5     A   Been married October the 5th, 1996.
6     Q   Is this a first marriage?
7     A   Second marriage.
8     Q   And what was the name of your first wife?
9     A   Joyce Nisbet.
10    Q   Okay. What were both of their maiden
11 names?
12    A   Joyce Marie Hager and Alyse Byrd.
13    Q   How long were you married to Joyce?
14    A   I hate to say I can't remember exactly.
15 A little over a year.
16    Q   All right. Was there a -- approximately
17 how much time elapsed between the first and second
18 marriage?
19    A   Six years.
20    Q   Does Joyce still reside in West Virginia?
21    A   As far as I know, yes.
22    Q   Do you know if she resides in the Logan
23 area?
24    A   As far as I know, yes.

21

1     Q   All right. But you don't have any idea
2  of her address?
3     A   I don't know an exact address. I think
4  Chapmanville. I think her kids attend the Chapmanville
5  schools.
6     Q   Okay. Do you and Alyse have any
7  children?
8     A   I have a stepdaughter. Alyse has a
9  daughter.
10    Q   Okay.
11    A   She'll be 20 years old May the 21st, next
12 week.
13    Q   What's her name?
14    A   Her name is Ashley Nicole Byrd.
15    Q   Does she reside with you in Stollings?
16    A   No. No, she doesn't.
17    Q   Does she live in the Logan area?
18    A   No.
19    Q   Where does she live?
20    A   She's living in Summersville.
21    Q   Okay. Does Alyse work outside the home?
22    A   Not any more.
23    Q   When she did work, if you could tell me
24 when she stopped working and what she did.

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362  (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

22

1    A    She was an R -- she's been an RN since
2  roughly 1984. Worked at, most recently, the last 12, 13,
3  14 years at Logan General Hospital as an RN in intensive
4  care and critical care unit.
5            And as of January 18th, she's no longer
6  working. She had a couple strokes in January and is not
7  working.
8    Q    I'm sorry to hear that. You began with
9  Thornhill in 1996. What was your job title when you
10 began with Thornhill?
11   A    Sales -- sales -- general sales manager,
12 sales manager.
13   Q    Okay. And when you say "general sales
14 manager" and "sales manager," a general manager -- my
15 understanding of that is a general manager essentially is
16 -- oversees the entire dealership for the owner or with
17 -- working with the owner, and the sales manager would
18 work beneath the general manager. Did you wear a general
19 manager hat and then also handle all the sales?
20   A    I said general sales manager, which is
21 just a fancy name for little better than a sales manager.
22   Q    Okay.
23   A    But I basically handled the sales. I had
24 nothing to do with the service department what so --

23

1  whatsoever. I handled new and used sales department is
2  what I was hired to do --
3    Q    Okay.
4    A    -- in '96.
5    Q    And where -- from -- where did you work
6  before you came on board at Thornhill?
7    A    Worked for Mike Ferrell Ford. Worked for
8  Mike Ferrell, for Mike Ferrell companies for
9  approximately 12 years prior.
10   Q    And in what kind of capacity did you work
11 for Mike Ferrell for those 12 years?
12   A    I was sales manager. It was Nissan
13 facility and then -- and also worked in the finance
14 department at the Ford facility and eventually became the
15 general sales manager of the Ford dealership.
16   Q    Okay. Prior to going to work for Mike
17 Ferrell, where did you work?
18   A    I worked for Riverside Motor Company in
19 Madison, West Virginia in 19 -- for approximately two
20 years, '83 and '84, as finance manager.
21   Q    Okay.
22   A    And prior to that, I started in the
23 automotive industry -- just to go ahead and complete the
24 history for you.

24

1    Q    The easiest way to do it, probably.
2    A    I started 24 years ago just about to the
3  tee. I went to Rushton Motor Company, Mr. Larry LaFon.
4  I asked him for a job washing cars so I could make a
5  little pocket money to go to school.
6            And he told me to put my good clothes on
7  and come on in, he'd teach me how to sell cars. So I
8  started in the automotive industry 24 years ago in '79,
9  and that's what I've been doing ever since with the
10 exception of basically going to Marshall University and
11 getting my degree.
12   Q    Okay. We're going to get to your
13 education here in a second. So for the entire --
14 basically, the entire duration that you've worked in the
15 automotive business, 24 years, it's all been in the sales
16 end?
17   A    It's all been in the sales end.
18   Q    Okay. Now, when you say that all your
19 employment has been in the sale end, does that include as
20 well F&I activities and responsibilities?
21   A    Correct.
22   Q    Okay. So you began -- when you began in
23 the automotive industry and started to cut your teeth, if
24 you will, as a salesperson and learning the -- learning

25

1  the sales end of the business, at that point in time, did
2  you also start to learn the F&I end, too?
3            Or, at what point over the last 24 years
4  did you first begin to work in F&I?
5    A    It might be easier for me just to start
6  chronologically and give you a little history, if that
7  might be the best way to go.
8            I started in '79, like I said, as sales.
9  Mr. -- when I worked for Mr. LaFon at Rushton Motors. He
10 since -- so I was in sales. I learned sales.
11           He then formed L & S Chevrolet Olds, and
12 I moved from Rushton Motors to L & S Chevrolet and
13 continued in sales. This was basically summer employment
14 because I was attending Marshall University at the time.
15           When I was in my senior year at Marshall,
16 I was contacted by Riverside Motor Company, the year I
17 was supposed to graduate, in March. They hired me as a
18 finance manager, which was my first event as finance
19 manager, and I think that was in 1983. It could have
20 been '84, but I think it was '83 that I started.
21           I worked there approximately two years in
22 finance. Like I said, that was in March. I was supposed
23 to graduate in May when I started. After I left there,
24 after two years, I went back to one semester. I got my

**Garrett Reporting Service**

P.O. Box 20200, Charleston, West Virginia 25362  (304-346-0460)

*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

26

1  degree and then I went straight to work for Mike Ferrell
2  Nissan.
3           I was sales manager at Mike Ferrell
4  Nissan for approximately two years, being '86, '85, '86,
5  '86 -- '85 and '86, I think it was. And then in '87,
6  part of a -- middle of '87, I moved to the Ford Store,
7  and I reinitiated the finance department at the Ford
8  Store.
9           Approximately three or four years to the
10 -- 'til around 1990. And then in and around 1990, I
11 became general sales manager and was general sales
12 manager from there until 1995 when I since went to
13 Honeycutt at the time, January of '96.
14    Q    Okay. And when you were general sales
15 manager, did the F&I department fall under your --
16    A    Yes.
17    Q    -- leadership?
18    A    Yes.
19    Q    So essentially, after you began in F&I as
20 the manager, in I believe you said about '80 -- was it
21 '83?
22    A    '83, '84.
23    Q    At the dealership you identified. A lot
24 of dealerships. It's hard to keep them straight. Since

27

1  that time, you've kind of worked both sales and F&I
2  together?
3     A    Yes, sir.
4     Q    Okay. And when you went on board at
5  Honeycutt and then Thornhill as a sales manager, the F&I
6  department was under your guidance?
7     A    Yes, sir.
8     Q    And if I understand it correctly, then
9  you would be the head of F&I at the Thornhill dealership
10 since it's been in existence?
11    A    Yes.
12    Q    The Thorn -- as a Thornhill dealership?
13    A    Yes, sir.
14    Q    Not the, not the --
15    A    Yes, sir.
16    Q    -- various incarnations. Okay. Where'd
17 you go to high school?
18    A    Logan High School.
19    Q    And what year did you graduate?
20    A    1979.
21    Q    Okay. Did you start at Marshall
22 immediately after Logan High School?
23    A    Left Logan High School and immediately
24 went to Marshall University.

28

1     Q    And so I guess you were there until '83?
2  Is that what you said?
3     A    Yeah.
4     Q    That you were supposed to graduate in
5  '83?
6     A    I was supposed to graduate in '83. I was
7  -- yes, I was there '80, '81, '82, '83, and then I went
8  back and graduated in '86.
9     Q    Okay. Class of '86?
10    A    Class of '86.
11    Q    We have something in common. What did
12 you study at Marshall?
13    A    Business Management.
14    Q    Any minors?
15    A    No.
16    Q    What's your date of birth?
17    A    April 9th, 1961.
18    Q    Okay. We talked to Mr. Thornhill about
19 the affiliations of the dealership with NADA and other
20 organizations.
21           In fact, I believe that he told me about
22 the NADA, but not, obviously, the West Virginia trade
23 organization.
24           Are there any other associations,

29

1  national or state or local, that the Thornhill dealership
2  and/or you yourself belong to?
3     A    The only ones I think would be the West
4  Virginia Automobile and Truck Dealers Association. Of
5  course, NADA, and then, of course, we recently had the
6  association with AFIP with the certification there.
7     Q    Okay. Mr. Thornhill and I kind of went
8  round a little bit trying to figure out what AFIP meant.
9  But is it Association of F&I Professionals or --
10    A    Association of Finance and Insurance
11 Professionals.
12    Q    Okay. Where's that based?
13    A    I'm not sure exactly where it's based. I
14 know, I think the gentleman that actually, the -- GMAC
15 has talked to is on the west coast. I wouldn't know
16 exactly where.
17    Q    Okay. And there was a name that we had
18 of someone from GMAC who was responsible for getting you
19 guys involved in AFIP and actually put on the course.
20 What was his name?
21    A    Bill Darisol.
22    Q    Bill Darisol. And is he a zone employee
23 for GMAC?
24    A    He is a GM -- I can't get into specifics

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

30

1  of it, but my understanding is he is a GMAC employee, but
2  he is the zone or regional representative, which is
3  actually the dealer contact.
4      Q    Okay. So he's basically for this
5  geographic area. He has the dealer relations?
6      A    Dealer contact, dealer relations, yes.
7      Q    Okay. Does he have any -- does he have
8  any warranty responsibilities or service
9  responsibilities?
10     A    I don't know what their exact
11 responsibilities are. I mean, he is involved with all
12 facets of, you know, of GMAC. He's our contact for
13 warranties, for financing, for, you know, training, for
14 --
15     Q    Okay.
16     A    You know, for everything.
17     Q    All right. Are you familiar with the
18 NADA code of ethics?
19     A    No, sir.
20     Q    Okay. We talked to Mr. Thornhill about
21 that and he was, and said that the dealership subscribed
22 to it. But based on your response, I would take it that
23 he hasn't shared that information with you?
24     A    I have the code of ethics, but I'm not

31

1  going to say -- I couldn't repeat them to you --
2      Q    Okay.
3      A    -- so I don't want to, you know, I'm
4  under oath. I don't want to sit here and make you think
5  that I know the Code of Ethics.
6      Q    Okay.
7      A    So I'm not going to.
8      Q    We probably have a copy here somewhere.
9  Well, pass on that. Are there -- have there been any
10 meetings, conferences or are there any written
11 guidelines, policies or procedures that you are aware of
12 that have been gone over with you by Mr. Thornhill and/or
13 that you've developed with Mr. Thornhill or adopted with
14 Mr. Thornhill and passed on to the employees that speak
15 to ethics in business practices, sales of automobiles,
16 sales of F&I products?
17     A    No written things that I'm aware of at
18 this time. I know, you know, we do have discussions in
19 our meetings on, you know, how we want things done and
20 that we want things done, you know, done properly.
21     But as far as actually a written code of
22 ethics or anything that has been handed down or passed
23 out, I can't recall of anything.
24     Q    What's your present title with the

32

1  dealership?
2      A    My present title is Vice President. My
3  function is basically as general sales manager.
4      Q    Okay. And if I understand the structure
5  correctly, also you own 25 percent of the business;
6  correct?
7      A    Yes, sir.
8      Q    Okay.
9      A    Owe on 25 percent of the business, I
10 should say.
11     Q    I'm sorry?
12     A    Got to earn the end. I owe on 25 percent
13 of the business.
14     Q    Okay. As far as your title as general
15 sales manager, it's my understanding that if we were to
16 look at a corporate structure that essentially Gene Neal
17 works directly under you?
18     A    Yes, sir.
19     Q    And that Gene Neal is the sales manager?
20     A    Correct.
21     Q    And that there are some duties that the
22 two of you share depending on whether someone's out of
23 the dealership or whether or not someone's busy with
24 something else or on vacation or whatever.

33

1      But that he works under you in a linear
2  fashion, but there are some of the duties that you share?
3      A    Yes. We are pretty much on equal, you
4  know, on equal footing. The main difference is the fact
5  that I do, you know, in participating in the ownership of
6  the dealership with 25 percent. As far as our functions,
7  we're pretty much on the same, you know, on the same
8  level.
9      Q    Okay.
10     A    We pretty much perform the same
11 functions.
12     Q    And then under the two of you, you have
13 sales, which are strictly the guys who sell the vehicles?
14     A    Correct.
15     Q    And you have the F&I department?
16     A    Correct.
17     Q    And in the F&I department, we have Mr.
18 Painter and Greg Barker. Jeff Mounts does some of it,
19 but he also is the specialist for special financing, and
20 Hank Stowers for the used car lot in Boone County.
21     A    Yes. Not at the current time. Mr.
22 Stowers and Mr. Painter are no longer with us.
23     Q    Oh, okay. Okay. How many people are
24 employed in the F&I department right now under you and

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362  (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

34

1  Mr. Neal?
2      A   Mr. Barker and Mr. Mounts.
3      Q   Okay. Anyone else?
4      A   No. That would be the only, only F&I.
5  The only other person who would handle any F&I and who is
6  licensed in F&I would be Everett Frazier, who will handle
7  some disclosure.
8      Q   Okay. Now is Mr. Frazier primarily a
9  salesman?
10     A   Mr. Frazier is basically -- he is an
11 administrative assistant to Mr. Thornhill and Mr. Neal
12 and myself.
13     Q   Okay. And he can fill in an F&I when
14 need be, then?
15     A   Yes.
16     Q   And you said licensed in F&I. Tell me
17 about licensure in the field of F&I.
18     A   You have to be licensed by the State of
19 West Virginia as far as being -- as far as the life and
20 disability insurance, and he is licensed.
21         He is currently, they're currently
22 getting him signed up for the AFIP training. But he has
23 been trained to do the disclosures and knows all the
24 proper documentation and disclosures to fully disclose a

35

1  deal.
2      Q   Okay. And that's as far as the life and
3  health insurance; right?
4      A   As far -- no. We've got him trained as
5  far as everything.
6      Q   Okay.
7      A   We won't just let anybody do that. We've
8  got to have somebody --
9      Q   And you all have trained him?
10     A   We have trained him and he has also been
11 -- I say we have trained. He's also sat down with Ms.
12 Copeland and gone through that as well.
13     Q   Okay. Does Mr. Mounts still handle
14 special financing?
15     A   Yes, sir.
16     Q   And if Mr. Mounts is kind of splitting
17 special financing duties and general F&I duties, does
18 that mean that Mr. Barker is kind of carrying a lion's
19 share of the F&I duties --
20     A   Yes, sir.
21     Q   -- when you and/or Mr. Neal and/or Mr.
22 Frazier aren't chipping in to help?
23     A   Yes, sir.
24     Q   But in essence, as far as people who can

36

1  handle the FI end in a deal, you basically have five
2  people at this point in time; is that correct?
3      A   Mr. Neal and myself and Mr. Barker, and
4  Mr. Mounts and Mr. Frazier, yes.
5      Q   As far as desking duties, Mr. Thornhill
6  has told us that that primarily falls to you with Mr.
7  Neal filling that role as well?
8      A   Correct.
9      Q   And if I understand the procedure
10 correctly, in a transaction, the salesman will
11 effectively greet the customer on the lot, talk to them
12 about vehicles that they want, handle the customer
13 contact, bring them in and have them fill out some
14 initial information on job status, the vehicle they want,
15 any trade they might want to make, information like that.
16         And then it goes to desking, which would
17 be you or Mr. Neal, to basically run the hard figures and
18 see what you can do --
19     A   Correct.
20     Q   -- to help them out? And then once
21 there's some sort of agreement reached after negotiating
22 the deal, which -- in which the desking person can
23 actually be involved along or instead of a salesperson,
24 after that it goes to F&I for preparation of documents.

37

1  And that's where optional services and products are
2  discussed with the consumer?
3      A   Correct.
4      Q   Okay. In regard to desking duties, when
5  a customer has a car that they want to trade, I assume
6  that the first thing that's done is that document or that
7  information is provided on the application document,
8  which, you know, we'll get to this. I don't even have it
9  handy, but where on the back it's folded over partially
10 and you do the four square analysis. Do you understand
11 what I'm talking about?
12     A   Uh-huh.
13     Q   What's the formal name of that document?
14 Not the four square rear but the --
15     A   Sales worksheet.
16     Q   Sales worksheet. Okay. I didn't know if
17 there was a formal name other than a worksheet. Once
18 that information is provided on that, how does the
19 dealership determine the status of that account on a
20 trade?
21         Does the desking person actually, with
22 permission of the customer, call the lender to find out
23 how much is owed on the vehicle using the VIN, which I
24 assume's given on the form. Or how does that work?

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)
*Mary J. Gagnon, CCR*

38

1   A   You're talking about the payoff on the
2 vehicle --
3   Q   Yes.
4   A   -- that they want to trade? Yeah. With
5 the VIN number and the permission of the compan -- of the
6 customer, we can call and find out what the payoff is
7 with their Social Security number, VIN number and
8 sometimes, you know, they'll give us the account number
9 if they have it.
10   Q   Okay. And on the worksheet, the front of
11 the worksheet's filled out by the salesperson; right?
12   A   Correct. Yes, sir.
13   Q   Before they come to desking?
14   A   Correct. Yes, sir.
15   Q   Okay. Once they come to desking, I'm
16 assuming they come up and they tell you that you've got
17 an up on the lot and here's the worksheet. What's the
18 first thing the desking person does?
19   A   Well, the first thing you do is just look
20 to see what you have and if you have, you know, a vehicle
21 that's going to be traded in, you would go out and make
22 an appraisal on the, you know, on the trade-in.
23       And, you know, you'd just -- would
24 initially start inputting the information into the, into

39

1 the computer and then you would do your appraisal and
2 then you would put your figures on the back for the
3 customer to -- I mean, for the salesperson to present to
4 the customer.
5   Q   Okay. When you're presented with the
6 worksheet and you said you get some -- get the
7 information, does that mean that you take the worksheet
8 and the first thing that you do is appraise the vehicle?
9       Or do you initially make the call to the
10 lender or go online or however you do it, to determine
11 whether there's any equity in the trade?
12   A   It could be either way. There's no set
13 policy or procedure. There's times where the first thing
14 you will do will be to get the payoff. There's times
15 where the first thing you will do will be get the
16 appraisal.
17       If you have three or four that are
18 working, and you have three or four appraisals to do,
19 you'll walk out and do all of the appraisals at one time,
20 and then they'll get the payoffs. There's not set, you
21 know, no set way for a deal to go every time.
22   Q   Okay. And there's no written policy or
23 procedure --
24   A   No, no written policy, yeah.

40

1   Q   Protocol --
2   A   Yeah.
3   Q   -- or anything like that?
4   A   No, there's nothing that says the
5 appraisal has to be done first or that there has to be a
6 payoff value before you get an appraisal. It's just, you
7 know, whatever's convenient at the time.
8   Q   And you said you go out and do the
9 appraisal. So I take it the first step in the appraisal
10 is actually a visual inspection of the vehicle?
11   A   Correct.
12   Q   And what are you looking for when you do
13 that visual inspection?
14   A   You look at the visual inspection. You're
15 looking at the condition of the car, general condition of
16 the car. The mileage. All of the equipment.
17       You know, they make several different
18 models of the car. You want to make sure you're looking
19 to see whether it's a GS an LS or an SS or, you know,
20 what it could be.
21       You look at the condition of the tires.
22 You'll look to see if there's any paint, you know, paint
23 work. The general cleanliness of it. You know, just a
24 general appraisal to try to determine a value of it.

41

1   Q   Okay. Does anyone test drive it?
2   A   Yes.
3   Q   Does the appraiser test drive it?
4   A   Sometimes the appraiser will test drive
5 it. Most of the time the salesperson will test drive it.
6   Q   Okay. And I assume, then, you know,
7 whoever's doing the appraisal, just asks the salesperson
8 "Is it running okay?"
9   A   Yeah. Is it running okay? Were there
10 any lights on? Check engine lights? Did all the, you
11 know, power windows function properly? You know, did it
12 pull to the right, pull to the left? Did it have a miss?
13 Did the four wheel drive work?
14   Q   Okay. After the visual inspection and
15 the test drive, what's the next step in the appraisal
16 process?
17   A   Well, the next step, you know, is we will
18 -- we will try to -- we will determine a, the best we
19 can, a market value, actual market value of the vehicle.
20   Q   Okay.
21   A   Through the use of NADA books, Black
22 books, you know, whatever resources we have available.
23 Auction sheets. Whatever resources we have available to
24 determine a value.

5/15/03     Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

42

1    Q    Okay. And if there's a differing value
2  and, or even slightly in the NADA versus the Black book
3  versus your knowledge of the market via auction sheets,
4  you just average those or?
5    A    You -- there's not set way. It's a mind
6  thing. I mean, it's kind of like estimate -- I mean, I
7  always -- estimating a, you know, a contracting job.
8  It's whatever you think that it's going, you know, that
9  it's worth. Whatever you think you can get out it.
10          There's no -- Black book doesn't buy
11  cars. NADA doesn't buy cars. So, I mean, you just, it's
12  a personal opinion.
13    Q    Arbitrary decision you make, general --
14    A    Yeah. Just arbitrary. There's no
15  average. No, you know, no set way. Everything has got
16  its own -- it just comes with years of experience.
17    Q    Okay. And the value that you, or the
18  number that you come up with at that point in time,
19  that's -- I can't remember the term you used. Fair
20  market --
21    A    ACV.
22    Q    -- value?
23    A    ACV.
24    Q    Actual cash value?

43

1    A    Cash value.
2    Q    Okay. And there's a difference between
3  ACV and fair market value, isn't there?
4    A    Difference in the wording, but actually
5  it all comes to the same thing. I mean, it depend. You
6  can word it --
7    Q    Okay.
8    A    You can make it sound however you want
9  to, but ACV, actual cash value, wholesale value, fair
10  market value. A lot of different terms used.
11    Q    And then there's a retail value that
12  should be in excess of the actual cash value?
13    A    Sure. Absolutely.
14    Q    So once you assess the fair market value
15  or the value that's going to be assessed to the car, is
16  that when you -- if you've done that first, is that when
17  you -- then when you check and see what the payoff is?
18    A    Not necessarily. Sometimes we don't, we
19  won't get a payoff after -- after we give them figures.
20  I mean, the payoff could be given -- we'd like, we would
21  like to have the payoff at that time, but it, we don't
22  always get it. The payoff is not the most important. At
23  that time, you calculate your deal.
24    Q    Okay.

44

1    A    At that time, at that time, you calculate
2  your one dollar over invoice minus the value you've
3  determined and then determine your difference figure.
4  And then if --
5    Q    Okay. And when you say calculating the
6  deal, that's when you essentially use the four square?
7    A    That's when we use the four square
8  approach, yes.
9    Q    Okay. On the reverse side of the
10  worksheet?
11    A    On the reverse side, yeah. We fold the,
12  fold the worksheet over and we will do the four square on
13  the reverse side.
14    Q    And it's my understanding that when you
15  have, when you're selling at the one dollar over invoice,
16  if there's negative equity in the vehicle, then
17  essentially, the trade allowance will be inflated over
18  actual cash value and the price of the vehicle will be
19  inflated in an equal amount so that there's kind of a
20  wash before you determine what's actually going to go on
21  the sales contract?
22    A    Yeah. The difference figure doesn't
23  change at all.
24    Q    Okay.

45

1    A    But those numbers will be -- yes.
2    Q    And that's when you present the numbers
3  to the, the consumer and you agree on them with the four
4  square?
5    A    With the four square.
6    Q    Okay.
7    A    Correct.
8    Q    And I think you told me that sometimes
9  that four square is done before you obtain a payoff?
10    A    Sometimes it's done before we obtain a
11  payoff, yes.
12    Q    Okay. So, I'm curious. How is it that
13  when you're giving the customer the numbers on the deal,
14  if you're going to be adjusting the, going to be
15  adjusting the trade allowance and adjusting the cash
16  price of the vehicle, you don't know how much to adjust
17  that until after you've obtained payoff. So how do you
18  work the work four square with the customer?
19    A    We don't adjust -- that's adjusted in,
20  those figures are adjusted in finance after the deal's
21  agreed upon. Because we trade on the difference figure
22  from the dollar over invoice figure less the ACV and the
23  difference figure doesn't change. So those figures are
24  adjusted in the finance department.

5/15/03   Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

46

1    Q    So the deal is then going to be cut based
2  on -- the deal is going to be cut.  The basis of the deal
3  is presented to the consumer, and what they're going to
4  agree on is not necessarily their trade-in allowance, not
5  necessarily the cash value or the cash price of the
6  vehicle, but it's going to be the difference between what
7  the ACV is and the, the one dollar over invoice price; is
8  that correct?
9    A    Restate your question.  You said the
10  deal's going to be cut.  I don't know what you mean by
11  cut.
12    Q    Well --
13    A    You mean --
14    Q    You told me --
15    A    -- accepted or --
16    Q    -- the difference doesn't change between
17  -- you say you're selling the vehicle based on -- and
18  correct me if I'm wrong, but this is what I understood
19  you to say.
20       You're selling the vehicle based on the
21  difference between the actual cash value and the one
22  dollar over invoice.  That those are the numbers you're
23  presenting.
24       But those won't change regardless of any

47

1  adjustment for negative equity in the trade allowance and
2  in the cash price of the vehicle.  Do you follow me?
3    A    Yes, sir.
4    Q    Okay.  And that the four square is where
5  you're actually presenting those numbers to the consumer
6  and they're going to determine whether or not they want
7  to make that deal?
8    A    Correct.
9    Q    Okay.  So in essence, when they determine
10  whether or not they're going to make that deal using the
11  four square, it's possible that the cash price of the
12  vehicle is going to be more than the cash price of the
13  vehicle on the four square, and thus possibly increase
14  their monthly payments?
15    A    It depends how you want to say, in a
16  word.  It costs the customer nothing at all to adjust the
17  figures for the financing.  That is done in the finance
18  department.  The figures do not change as far as what the
19  customer is paying whatsoever.
20       I mean, there's a lot of word tracks
21  there, but, you know, you're -- that is taken to the
22  finance based on what we agreed on and it doesn't cost
23  the customer anything on how those numbers are put
24  together.

48

1       Those are required by the bank in order
2  to show -- I'm assuming you're talking about the negative
3  equity --
4    Q    Uh-huh.
5    A    -- is what your, you know, is what your
6  focus is.  But, you know, it doesn't cost the customer
7  anything to show the figures based on the negative
8  equity.  They will come out exactly the same, and we're
9  required to do that by the banks.  They will not allow us
10  to show negative equity on a contract.
11    Q    Is that all the lenders you work with?
12    A    No, sir.
13    Q    None of them will let you show negative
14  equity?
15    A    I don't want to say that none of them
16  will let us show negative equity.  Most of them require
17  us not to show negative equity.  I'm sure we have a few
18  that will allow us to show negative equity.
19       But as a general policy, just so that we
20  don't make a stake -- mistake, we will try to adjust them
21  all not to show negative equity.
22    Q    Which ones won't allow you to show
23  negative equity?
24    A    I can't give you the specifics on that.

49

1  You know, I would be guessing.  And I, you know, I can't
2  give you the specifics.
3    Q    How many lenders do you work with?
4    A    We've got approximately ten lenders.
5    Q    Okay.  Well, we know you got Huntington
6  Banks.
7    A    Uh-huh.
8    Q    BB&T.
9    A    Uh-huh.
10    Q    One Valley?  That's BB&T now.
11    A    That's BB&T.
12    Q    Bank One.
13    A    Do you want me -- I can probably give you
14  a list.  GMAC.
15    Q    Yeah, please.
16    A    Huntington Banks.  BB&T.  Bank One.
17  Fifth Third.  M&T.  Arcadia.  WFS.  Americredit.
18  Household Finance.  That's approximately ten.  I'm sure
19  there's a few more --
20    Q    Okay.
21    A    -- out there.
22    Q    Americredit's primarily --
23    A    Sub.
24    Q    -- high risk, isn't it?

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

---

**50**

1     A   Yes. High risk. Sub prime.
2     Q   What are the other ones that are sub
3 prime?
4     A   Household, Bank One.
5     Q   Well, is Bank One -- Bank One does the
6 regular financing and sub prime, don't they?
7     A   Not with us.
8     Q   Okay.
9     A   Not, as far as I know, not in the state
10 of West Virginia.
11     Q   Well, how did that list -- I mean you
12 guys sell a lot of cars and you've only got ten lenders.
13 Which ones have told Thornhill you can't finance negative
14 equity or show it in a deal?
15     A   I can't give you exact list of which
16 ones. I mean, I can give you assumptions. I know that
17 there's some out there. But I know that we've -- we have
18 been told that so we adjust them.
19     I don't want to sit and make an error in
20 telling you which ones. I could research and give you --
21 and get the information as to which ones won't allow it,
22 but it, you know, it's most of them.
23     Q   And you said "we've been told." Who has
24 told you?

---

**51**

1     A   Our buyers at the indirect centers. They
2 will not cash our contract if we send -- we have had
3 contracts sent back to us because they showed negative
4 equity and they would not cash or accept a contract with
5 negative equity.
6     Q   And the buyers at the indirect centers,
7 is that some sort of an intermediate step between you and
8 the lender?
9     A   Yes. That is our contact at the lender.
10     Q   Oh, okay. So essentially, it's your
11 testimony that negative equity can't be financed without
12 adjusting the deal to show something other than what the
13 actual values of the deal are?
14     A   That was putting words --
15     MR. BROWN:   Let me -- hold on.
16 Hold on. Hold on. Let me object, because I think you're
17 misstating what he said.
18     BY MR. BANDS:
19     Q   Okay. Go ahead.
20     A   That's what I was going to say. You're
21 putting words in my mouth that I don't like, there. I
22 didn't say that equity could not be financed.
23     You know, I stated that some banks will
24 not let us, you know, would not let us finance it. And I

---

**52**

1 didn't want to get into the particulars.
2     Q   Well --
3     A   And I did not state that, make --
4     Q   Now when you say you don't want to get
5 into particulars, do you mean you don't want to tell me
6 more details on that arrangement or -- or details on the
7 directives you've been given by the lenders?
8     Or you don't want to give me the lenders?
9 Or you can't give them to me? You can't remember them as
10 you sit here? What do you mean you don't want to get
11 into details?
12     A   I'd be more than happy to give them to
13 you, but I can't. I mean, it's not something that I have
14 up here in my head. I mean, I'd be more than happy to
15 get you the information on which lenders I've got. I'd
16 be more than happy to get you a detailed list who will
17 take negative equity and who won't.
18     Q   Okay.
19     A   I'd be more than happy to provide you
20 with that information, but I can't sit here and tell you
21 for sure 100 percent which ones will and which ones
22 won't.
23     Q   Okay. And, but the bottom line is, for
24 the dealership, that while some may and some won't, you

---

**53**

1 guys across the board do your deals that way just so you
2 won't slip up and possibly send a negative equity deal to
3 someone who won't accept it?
4     A   Correct.
5     Q   Okay. I'm going to shift gears here just
6 a little bit. What, what optional services or products
7 does the dealership currently sell?
8     A   Currently, we sell life insurance, life
9 and disability insurance, gap, extended service contract,
10 Full Circle Benefit Program, etch or theft deterrent.
11     Q   Got the systems package?
12     A   Yes. Yeah.
13     Q   Is that how that's identified?
14     A   Yeah.
15     Q   Do you -- are you still selling that or
16 do you just still have that on the books but you don't
17 actually actively try to market it?
18     A   We're still selling it.
19     Q   Okay.
20     A   Yeah.
21     Q   Because we've been told that you don't
22 sell it.
23     A   Okay. We've been selling it. We just
24 reimplemented it and we just took a new, we just started

---

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

54

1  a new etch program and we, you know, we sold quite a few
2  in the last, last week.
3         Q.   Okay.  When did you implement it?
4         A.   I think it started, I can't remember the
5  exact date.  It's approximately a week ago.  We just
6  redid every, we just did every car on the lot.  Put the
7  theft on every car on the lot and we just, we just
8  implemented the program.
9         Q.   And what third party administers or
10 provides that program?
11        A.   Midwest.
12        Q.   Okay.  And those are all products, then,
13 that as part of the deal that we talked about, kind of
14 giving the evolution of the deal, those are sold at the
15 back end by the F&I department when they're actually
16 doing the paperwork and closing the deal?
17        A.   Correct.
18        Q.   Okay.  Back to desking, when you're
19 desking and you got the worksheet and you got the four
20 square, and you come up with whatever the person's
21 agreeable to and, essentially, and correct me if I'm
22 wrong, you're basically telling me that they're agreeable
23 to whatever the difference in trade value, that they're
24 -- or the actual cash value and the one dollar over

55

1  invoice.
2            That's, in essence, what they're going to
3  have to pay out-of-pocket or finance over and above their
4  trade; right?
5         A.   Restate the question so I fully
6  understand what you're wanting from me.
7         Q.   I think what you've told me is that the
8  -- when you're doing your four square worksheet and you
9  are at the desking stage, that once the four squares are
10 drawn out and the pages folded back and the salesperson
11 and/or the desking person is using that to negotiate with
12 the customer, the important figures are the value of the
13 trade that's assessed during appraisal --
14        A.   Correct.
15        Q.   -- and the one dollar over invoice cost
16 of the vehicle.  And then the difference between those
17 two numbers is essentially what they're going to pay out-
18 of-pocket over and above their trade, absent any extras
19 they may buy in F&I?
20        A.   Correct.
21        Q.   Okay.
22           MR. BROWN:      Well, and what they
23 may owe on the car.
24           BY MR. BANDS:

56

1         Q.   Yeah, if they're upside down.
2         A.   Tax, title, license, you know, pay off.
3         Q.   Well, if they're upside down, that's the
4  adjustment and what you're telling me is that if they're
5  upside down, it doesn't really make a difference because
6  it's going to be adjusted for and that still that
7  difference, it's not going to change regardless of what
8  it says on the sales contract with the trade allowance
9  and the price of the vehicle.
10        A.   Once the -- yeah.  The difference doesn't
11 change.
12        Q.   Okay.  At what point is the invoice price
13 of the vehicle shared with the consumer?
14        A.   At most points, it's disclosed right --
15 it depends on when they ask for it.  At most points, it's
16 disclosed right up, right at the beginning.
17           A lot of times, we'll show both ways.  I
18 think on the Barker case, in particular, we showed the
19 retail and the dollar over invoice and sometimes it'll be
20 disclosed a little later in the, in the process.
21        Q.   Okay.  So it can be disclosed after the
22 four square?
23        A.   It can be disclosed after the four
24 square.

57

1         Q.   Were you the desking manager on the
2  Barker invoice, on the Barker transaction?
3         A.   On one of them, I think I was.  On the
4  van deal.
5         Q.   The May 22nd, 2000?
6         A.   I don't have the date.
7         Q.   The first one?
8         A.   I think it was the first one, yes, sir.
9         Q.   Okay.  That's how I identify it.  The
10 first one or the second one.  So that's, maybe it's
11 easier that way.
12           There's also something on -- well,
13 there's the checklist.  The deal checklist.
14        A.   Uh-huh.
15        Q.   Based on what you're telling me, it
16 sounds like the dealer checklist, which is to accompany
17 the file at the close of the deal and which is used
18 throughout the transaction process to make sure all of
19 the steps are followed or marked out if they're not
20 applicable, that there are some -- even though that's
21 checklist is completed at the F&I stage, that there are
22 some activities preceding the F&I stage that are
23 addressed on the checklist.  Do you understand my
24 question?

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

58

1      A    The checklist is more for after the --
2   after the deal to make sure that all the proper
3   documentation and everything's done. It's an F&I
4   checklist --
5      Q    Okay.
6      A    -- is what it is.
7      Q    Okay. So F&I uses that after the deal is
8   closed to make sure that when they go through their
9   paperwork, they've got everything they need?
10     A    Yes.
11     Q    Okay. And on that checklist, it makes a
12  reference to the invoice letter?
13     A    Correct.
14     Q    An item on an invoice letter. Okay.
15  When I asked you about the -- when the invoice price is
16  provided, you said at the beginning of the process. Did
17  you mean when they're first being talked to on the lot or
18  at the beginning of the desking process?
19     A    It could be at the -- they could be on
20  the lot. It could be at the beginning. It could be in
21  the desking process. It could be disclosed in the
22  finance department.
23     Q    Okay. So it could, that invoice could
24  actually be disclosed in the finance department after

59

1   you've already gone through the four square analysis and
2   figures have been agreed to?
3      A    Correct.
4      Q    If a customer walks onto your lot and
5   they see, you know, a nice, new vehicle that they're
6   interested in. They want to know how much it is or get a
7   feel for it. They go over. They look at the vehicle.
8   Are there stickers in the window?
9      A    Yes, sir.
10     Q    Okay. Now the sticker that is in the
11  window for a new vehicle at your lot, what -- what is
12  that sticker? Is that a sticker that has everything
13  included in the vehicle and an MSRP on it?
14     A    Correct.
15     Q    Okay. So it doesn't have anything about
16  the invoice price on the sticker?
17     A    No, sir. That's provided by General
18  Motors. That's the MSRP.
19     Q    Okay. And so those are -- those are put
20  on the vehicle either prior to or during transit before
21  you guys get them?
22     A    Yes, sir.
23     Q    Do you put anything on the vehicle in any
24  way to show what the actual invoice was?

60

1      A    No, sir.
2      Q    So I have no way of knowing, if I'm a
3   customer, what the actual dollar over invoice cost of
4   that vehicle will be until possibly I've already gone
5   through the whole process and reached F&I?
6      A    Correct.
7      Q    And that's when it's time to execute the
8   documents?
9      A    Correct.
10     Q    Approximately how many documents are
11  there in the average transaction, assuming it involves a
12  trade?
13     A    I'd have to count. If I was -- I've
14  heard 40, 35 or 40.
15     Q    Does that sound about right to you?
16     A    That could be very close, yes.
17     Q    Okay. Do you know about how many
18  vehicles you sell a day?
19     A    It depends on the, it depends on the day
20  and depends on the year. I mean, it --
21     Q    Yeah. It could vary?
22     A    It could vary.
23     Q    How long's the average F&I closing?
24     A    Approximately one hour. Forty-five

61

1   minutes to one hour.
2      Q    Why don't you, from the -- let's back up
3   to desking when the four square and worksheet procedure
4   is taking place, and somebody says, "Yeah. I want this
5   vehicle. Let's move to the next stage."
6           Is there anything else that happens at
7   desking? At the desking stage?
8      A    No.
9      Q    So, and at that point, the salesman has
10  no further contact?
11     A    At that time, the salesperson turns it
12  over to a finance manager.
13     Q    Okay. And in the, in the interim in
14  desking, it can be the desking and/or the salesperson
15  involved?
16     A    Correct.
17     Q    And it's possible that a customer will
18  never even meet or speak to the desking manager?
19     A    Correct.
20     Q    And once that decision's made, the
21  salesperson takes the customer to the door, glass office,
22  there's the F&I guy, and essentially says, "Here's a
23  customer. We've agreed to buy this vehicle, agreed to
24  sell him this vehicle. Take it over at the F&I stage."?

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

62

1    A   Yeah.
2    Q   Okay.
3    A   It's similar. I mean, the way it will
4  work is the salesperson will actually take the
5  information to the finance manager and provide him with
6  all the information and the finance manager will
7  generally tell him when he's ready for the customer.
8    Q   Okay. What information does the salesman
9  take in to the Finance Manager?
10   A   He'll take, you know, all the mileage,
11 the insurance information, the registration card. You
12 know, all the things that are needed to complete the
13 deal.
14   Q   That's on the trade?
15   A   Yeah. Copy, well a copy of -- on the
16 new. You need miles on the one he's buying.
17   Q   Okay.
18   A   If there's a trade on that one,
19 registration card on the trade. You need the insurance
20 information. All the information that's, you know, just
21 needed to complete the deal.
22   Q   Well, that information is the particular
23 registration and physical characteristic information of
24 the trade and/or the new vehicle. What other information

63

1  does the salesman give to the F&I?
2    A   Credit application.
3    Q   Okay. And I assume that the credit
4  application is filled out by the customer while they're
5  in the desking stage?
6    A   The salesperson will take the credit
7  application, yes.
8    Q   Okay. And that's a document that's in
9  addition to the worksheet information?
10   A   In addition to the worksheet. That can
11 be taken during the desking stage, after the desking
12 stage, you know, it's various times.
13       You know, everything's different.
14 There's no, you know, no set thing to where you have to
15 have a credit application to get figures or, you know, it
16 sometimes can be taken first. Sometimes can be taken
17 last. Sometimes can be taken in the middle.
18   Q   Okay.
19   A   No set.
20   Q   So sometimes the credit application would
21 just be done at the F&I stage?
22   A   Yes, correct.
23   Q   So the commencement of the whole F&I
24 stage is delivery of odometer statements, other things

64

1  like that. Possibly a credit app, but if the credit app
2  isn't done, that's going to be done at the F&I stage.
3  Walk me through the F&I stage.
4    A   Generally, the F&I stage, generally the
5  credit application is done prior to the F&I stage. The
6  credit application is taken in and then the customer is
7  taken into the finance office.
8        Into the finance office, and the finance
9  manager will discuss the financial arrangements with the
10 customer. He'll make available all the different
11 programs that we have. The extended service contracts,
12 the life insurance, the life and disability, the gap
13 protection and the etch.
14       They'll discuss all the programs and
15 present it to it and make all the arrangements, agreeing
16 on terms and rate and monthly payment and what protection
17 packages that the customer wants. And they will agree.
18       Once they agree upon a term and
19 everything's agreed upon, then they will print and
20 disclose all the documents.
21   Q   Okay. So, for instance, a financing
22 agreement isn't presented to the customer essentially in
23 its final form or near final form until it comes time to
24 execute the document?

65

1    A   That's agreed upon -- agreed upon between
2  the customer and the finance manager.
3    Q   Verbally, but they don't actually see a
4  copy of the contract until it's time to sign?
5    A   Not anymore. We don't, we were, we were
6  under -- we had to do that before. We had to present
7  them a copy of the contract, but we don't have to do that
8  anymore.
9        Now, we were presenting them with a copy
10 of the contract before we actually executed the
11 documents, but we don't have to actually present them
12 with that copy of the contract anymore. I think that law
13 was repealed.
14   Q   Okay. And that's a dealer requirement?
15   A   I'm not sure of the name of it. We
16 depend on --
17       MR. BROWN:   The Polk case.
18       THE WITNESS:   Yeah. We depend on
19 our attorneys and associations to tell us when we have to
20 do that. The one we were told to do that, we did provide
21 them with a, you know, with a contract prior to look at.
22       BY MR. BANDS:
23   Q   Okay.
24   A   We no longer do that.

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362  (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

66

```
1    Q   Okay.  At what point did you stop doing
2  it?
3    A   Probably, probably after everybody else
4  finally told us two or three times that they didn't.  And
5  I think Johnnie's the one that told us we could finally
6  quit doing that.  And that was probably two months ago?
7  Two or three months ago.  I would guess.
8    Q   Okay.  Okay.  Most people, if they're
9  going to purchase one of the optional products or
10 services, be it a extended service contract or one of the
11 insurance life, life, health, disability, or gap or even
12 the Full Circle Benefits Program, they're going to
13 finance those items as part of their entire deal, aren't
14 they?  Isn't that what you generally see?
15   A   In most cases, yes.
16   Q   I mean, if they're financing the vehicle,
17 they're not going to pay cash for the contract; right?
18   A   In most cases, right.  They would get it
19 involved in the financing.
20   Q   Or an insurance.
21   A   Correct.
22   Q   Well, how can you come to an agreement or
23 even a suggestion as to credit terms, you know, monthly
24 payments, interest rate, total payment, anything like
```

67

```
1  that, how can you come to that agreement before you've
2  already presented the options and people have made a
3  decision by -- how can you present credit terms that are
4  at least partially dependent on some of these amounts
5  before you go over these products?
6    MR. BROWN:    Let me just state an
7  objection that your use of the word "credit terms" might
8  be a little ambiguous.
9    MR. BANDS:    Well, then how --
10   MR. BROWN:    Because the rate would
11 not change, obviously.
12   MR. BANDS:    Okay.
13   MR. BROWN:    Just, I want to be
14 careful there.  That has a lot of implications.
15   BY MR. BANDS:
16   Q   This, what I'm asking, I guess, is the --
17 when you told me the, kind of the order of what's going
18 to go on in F&I, the first thing you told me about was
19 that you go over the credit terms.
20       And then you said, "Then we present, you
21 know, the various other products we have and we see if
22 there's an agreement on that.  And then we reach a deal
23 or we don't.  And then all the documents are printed up
24 and executed."  Is that what you -- that's what you told
```

68

```
1  me?
2    A   Correct.  Yeah.
3    Q   Okay.  And I guess my question is, if
4  there are -- if there are aspects of the credit terms
5  that may be affected by the purchase of an optional
6  service or product depending on the cost of that product,
7  how can you come to an agreement on terms before you know
8  whether or not they want to buy that product?
9    A   It's discussed with the customer how that
10 product will affect their monthly payment based on the
11 term.  I mean, they will be given several different --
12   Q   Okay.
13   A   -- you know, options.  They will, you
14 know, what protection services, you know, what protection
15 packages that they would desire to purchase.  And they
16 will, you know, inform them what that will do to their
17 term and monthly payment.
18       You know, they will come to an agreement.
19 It's just basically negotiating.  And, you know, once it
20 will, you know, the customer will say, you know, "Well,
21 what is my payment with the extended service contract and
22 the gap on 66 months?"  I mean, you know --
23   Q   Okay.
24   A   -- it's just common negotiating and, you
```

69

```
1  know, the customer will agree upon that, you know, that
2  term and that payment.  He may say, "Well, what is it on
3  66?" or "What is it on 72?  What would it be if I would
4  go on, you know, on 60?"  It just --
5    Q   Well, so in essence, it's not a, it's not
6  a segmented process?  It's "We're going to sit down.
7  We're going to talk credit terms here, products.  This is
8  how they may change."
9        There's not a -- an agreement as to
10 credit terms before you get into optional services or
11 products?
12   A   Correct.
13   Q   Okay.
14   A   Correct.  It's all discussed at one, at
15 one time.
16   Q   Okay.
17       MR. BROWN:    Let me just state an
18 objection that credit terms, that hasn't been defined yet
19 and I'm afraid that just using that word loosely may be
20 ambiguous.
21   BY MR. BANDS:
22   Q   Okay.  Well, we'll back up.  I'll just
23 ask you.  What numbers do people have to agree with
24 insofar as financing when they're walking through the F&I
```

5/15/03    Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

---

70

1 process and a deal at Thornhill?
2         I assume that they have to come up with,
3 first of all, they need to know what their monthly
4 payment is.
5     A    (Witness nods affirmatively.)
6     Q    Number of, number of monthly payments.
7     A    (Witness nods affirmatively.)
8     Q    The interest rate; correct?
9     A    Uh-huh.
10     Q    Okay.  And let the record show that
11 you've nodded your head as I've said these, so you're
12 agreeing with me?  Because remember, we need a verbal
13 response.
14     A    Sure.  I'm listening to your -- trying to
15 fully understand your question before I answer --
16     Q    Well, I'm just making sure --
17     A    -- because I'm not an attorney, I want to
18 make sure I --
19     Q    Well, you know --
20     A    -- fully understand.
21     Q    -- based on counsel's objection of the
22 ambiguity of the term, I just want to make sure that you
23 and I are on the same page as what credit terms mean.
24         MR. BROWN:     Bill, if it helps, I

---

71

1 don't think the interest rate changes.
2         MR. BANDS:     Okay.
3         MR. BROWN:     I agree with that.  I
4 just don't want there to be some implication that
5 depending on whether or not you buy a product, you get a
6 -- somehow your credit rates or credit terms change and
7 all the implications that go with that.  I -- that's all
8 I was trying to make sure of.
9         BY MR. BANDS:
10     Q    Okay.  Well, then on terms, I mean
11 essentially, it's the four to five boxes across the top
12 of a financing agreement, and the box directly below it
13 which is going to give you your payment schedule.  And
14 when I say the five boxes, I mean where there's a --
15     A    Federal disclosure boxes --
16     Q    Federal disclosure --
17     A    -- that's what you're talking about.
18     Q    Percentage rate, amount financed.  You
19 tell me.
20     A    You've kind of got me.  I mean, I almost
21 would like to start over with where -- I don't understand
22 where you'll trying to take me or --
23     Q    I'm not trying to take you anywhere.
24     A    Okay.

---

72

1     Q    I'm just trying to get through this
2 sequence of events and --
3     A    Okay.
4     Q    -- you know, to better understand what's
5 going on in the F&I process.
6     A    Better understanding the process of what
7 goes in.  They will make, when they go in to the, after
8 the desking of the deal, they're turned over to the
9 finance department.  And that's where the financial
10 arrangements are made, are made on the deal.
11         I mean, it's basically as though as we
12 act as an agent for the bank.  It would be just like
13 going to the bank and making a home loan.  You know,
14 "Well, what's my payment going to be?"
15         "Well, how many months do you want to
16 go?"
17         "I want to know what would it be on ten
18 years?  What would it be on 15 years?"
19         I know we're not talking about mortgage.
20 But I mean, it would be customer -- what, you know, the
21 first question and in most cases is "What's my payment?"
22         Okay.  How many months, you know, "How
23 many months do you want to go?  Here's the protection
24 packages that I have.  How do you want" -- you know, can

---

73

1 figure this several different ways.  "Let me go over this
2 with you," you know.  And, "Let's structure this the way,
3 you know, you want it."
4         They'll go over the packages and the
5 customer will say, "Well, what is the payment on 60
6 months with, you know, the extended service contract and
7 the, you know, and the gap?"
8         They will completely go through until
9 they, you know, until the customer is in total agreement
10 and fully understands everything.
11         That negotiation process could take, you
12 know, ten, fifteen minutes or it could be, you know,
13 several minutes.  He could want to go into detail.  You
14 know, much depends on how much detail they want to go
15 into on, you know, all the different combinations.
16         Some of them will pretty well know, you
17 know, when they come in.  They've bought cars before and
18 they say, "When I buy my cars, I buy the extended service
19 contract.  I won't buy it without life and disability.
20 You know, that's the way I want it."
21         Some will say, "Well, I'm not sure.  What
22 is, you know, gap insurance?"  But all those will be
23 discussed and the customer will determine what he wants
24 and what term he wants.  And then once that's agreed

---

**Garrett Reporting Service**

P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)

*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

**74**

1   upon, then all the documents will be executed and, you
2   know, and fully disclosed.
3            Q    Okay.  And when you use the term
4   financial arrangements.  I use the term credit terms,
5   that may be, that may be our meeting of the minds, I
6   think.
7            That we're talking essentially about the
8   numbers that the customer is obligating himself to as far
9   as monthly payments.  You know, percentage rates, total
10  he's going to have to pay, the cost of credit, you know
11  what his finance --
12           A    Right.
13           Q    -- charge is.
14           A    The cost of the extra products.
15  Everything.
16           MR BANDS:      Just for a second.  I
17  need to get some water.  I've got a --
18           MR. BROWN:      Yeah.  That'd be
19  great.
20           MR. BANDS:      So you want to take
21  just a little break?
22           MR. BROWN:      Yeah.
23           (WHEREUPON, a recess was taken,
24           after which the following

**75**

1            proceedings were had.)
2   VIDEOGRAPHER:      We're back on --
3   BY MR. BANDS:
4            Q    Mr. Nisbet, I think we --
5   VIDEOGRAPHER:      I'm sorry.  We're back
6   on the video record.  This is Tape 2 of the video
7   deposition of George Nisbet.
8            BY MR. BANDS:
9            Q    Mr. Nisbet, we were, I believe, right
10  when we left for the break, you were finishing up telling
11  me kind of the procedures of what goes on in the F&I end
12  of the deal.
13           And essentially, then I think we kind of
14  had a little misunderstanding, but we basically came to
15  agreement and boiled it all down that there's some give
16  and take in the process and negotiation and certain
17  financing arrangements, or I called them credit terms are
18  discussed and various options are explored with regard to
19  the financing based on whether or not they want to
20  consider optional products.
21           And then ultimately, an agreement is
22  struck and then the deal documents are printed off and
23  signed; is that correct?
24           A    Yeah.  Deal documents are, the deal is

**76**

1   executed and consummated.
2            Q    Okay.  Just to back up a little bit.  We
3   were talking about the appraisal process and the ACV
4   that's assigned to the trade.  Where do you document the
5   ACV in the, in the -- in the deal file?
6            A    It's not documented in the deal file.
7            Q    Okay.  Where is it documented?
8            A    It's documented -- the sales manager, the
9   deal desker will actually have it documented and put the
10  deal down and he'll put it in.  It'll be put in the deal
11  after the deal is closed and brought back to him to
12  close.
13           Occasionally, it will be written on an
14  appraisal sheet.  Sales managers do it different, but
15  there's not a, you know, not, it's not always on a --
16  not a written statement.
17           Q    Okay.  Well, just to back up so to make
18  sure I understand, once the appraisal's done, there can
19  be an appraisal sheet?
20           A    Yes.
21           Q    Okay.  Is there a policy of the
22  dealership for completing appraisal sheets?
23           A    Yes.  Appraisal sheet's supposed to be
24  completed.

**77**

1            Q    Okay.  And that's for anybody doing an
2   appraisal?  Any of the desk personnel?
3            A    Yeah.  It's for the salespeople that
4   actually fill out the sheet and they hand it to the desk
5   for the appraisal.
6            Q    Okay.  Well now, just to back up a
7   second.  When I'm talking about appraisal sheet, I'm
8   talking about some sort of a written document that's
9   going to indicate what you found during your appraisal,
10  what you ultimately come to as a final ACV.  Is that your
11  understanding of the appraisal sheet?
12           A    The appraisal sheet is the information
13  that, you know, that, that is on the car.  The miles, the
14  engine, and, and that type of thing, yes.
15           Q    Okay.  And then ultimately then, is an
16  ACV put on that appraisal sheet?
17           A    Everyone does it different.  Mr. Neal
18  will generally put his appraisal on the appraisal sheet.
19  I generally don't.  I generally just keep mine in my head
20  and will do it in my head.
21           Q    Okay.
22           A    And not write it down.  So everyone does
23  it different.
24           Q    So when you're calling in an appraisal

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362   (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03   Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

78

1  sheet, it's more or less a document that gathers
2  information that goes into the appraisal, but it's not
3  actually something that shows what the appraised value
4  was?
5      A   Correct.
6      Q   And Mr. Neal sometimes writes them down.
7  Your practice generally isn't to?
8      A   Yeah. I generally don't write them down.
9  And I, I think he generally does write them down.
10     Q   Okay. And then you mentioned that we
11 walk through the process and, you know, the appraisal
12 figure in, in your case would be in your head. Mr. Neal
13 has it written down.
14         But in any event, it's used as at least
15 an important figure to figure out where the deal is going
16 to go and how it's going to come out for the consumer.
17         Then you mentioned that at the end, you
18 got kind of ahead of me. At the end, it is documented
19 and put in the deal file at the end?
20     A   Correct.
21     Q   Okay. Tell me about that. How does that
22 work?
23     A   Well, the appraisal can change, you know,
24 throughout the deal. I mean, you know, as you negotiate.

79

1  Let's say for example, just to use examples. Let's say
2  I've got an ACV at $5,000.00 and you're trading in your
3  vehicle and you think it's worth, you know, worth more
4  than that.
5          I mean, I may decide in the deal to, you
6  know, that instead of putting five grand in your car,
7  that I'm going to put 55 hundred in it.
8          Or if, you know, it might determine that
9  I'm going to have to put six grand in your car to put,
10 you know, to put the deal down. That's why I don't
11 necessarily write it down.
12         But whatever that figure is, is what will
13 go, you know, what will go in. There's a place in the
14 computer when we do our close-out sheet that you put the
15 ACV in.
16     Q   Okay. And that's on the Reynolds and
17 Reynolds program?
18     A   Yes. Correct.
19     Q   Okay. And that ACV may be the value that
20 you assigned initially. It may be something that was
21 negotiated up by the consumer?
22     A   The value at the end of the deal that,
23 that the sales manager has determined the car to be
24 worth. The actual cash value of the car.

80

1      Q   Okay. When that used vehicle that's
2  traded in is booked into the general ledger of the firm,
3  or of the -- well, the firm or the company of the
4  dealership, what's it booked in at?
5          Is it booked in at the ACV that's put on
6  the form at the end? Or is it booked in at what you guys
7  actually think it's worth?
8      A   It's booked in at the four, the figure
9  that's put in at the end is what it's booked in at the
10 firm.
11     Q   Okay. So if you look at a vehicle and
12 you say it's worth 15,000, and they ultimately negotiate
13 you to go to sixteen, and you assign that ACV, you don't
14 necessarily make another $1,000.00 trade allowance. You
15 actually change the ACV number?
16     A   Correct.
17     Q   Okay. And that's what's booked in
18 regardless of what you felt it was worth at the
19 beginning?
20     A   Correct.
21     Q   Okay.
22     A   That can, figure can vary sometimes. I
23 might be negotiated up to sixteen. I may not book the
24 whole thing at sixteen. I may show it at fifteen-five to

81

1  show a, you know, to show a little bit of a, you know, a
2  little bit of a loss. It's just whatever you have to do
3  to close the deal.
4      Q   Now when the ACV is put into the -- I
5  can't remember what you called it. When it's entered
6  into the computer.
7      A   Close-out.
8      Q   Close-out. Okay. Now when you say
9  close-out, is that a close-out form or is that a close-
10 out activity or a group of activities or -- define for me
11 what you mean by close-out.
12     A   Close-out is where the deal is actually
13 closed in the computer and it transfers all the numbers
14 to the accounting system. And then the, you know, the
15 bookkeeper will actually -- puts the vehicle, the trade-
16 in in inventory and takes the vehicle you sold out of
17 inventory and puts all of the numbers in there to where
18 the accountants can do what they need to do with it.
19     Q   Okay. And that close-out, then, is
20 something that, that is undertaken after execution of the
21 sales agreement and the financing agreement and the
22 myriad of other documents that go into the deal?
23     A   Correct.
24     Q   Is there a computer print-out of that

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362   (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

82

1  close-out worksheet or form that goes -- a hard copy goes
2  into the deal file?
3      A    Correct.
4      Q    Okay.  Excuse me.  And that's where the
5  ultimate ACV is going to be documented?
6      A    Correct.
7      Q    And if the ACV didn't change from the
8  initial appraisal all the way through the process, that's
9  also going to be the appraised value?
10     A    The ACV appraised values and --
11     Q    Okay.
12     A    -- all the --
13     Q    But we've already, we've established that
14 your initial appraisal sometimes may differ if you decide
15 it's important for the deal and you want to dicker with
16 the customer?
17     A    Sure.
18     Q    Okay.  So at the front end when you do an
19 appraisal, is there any document of the initial ACV
20 that's assigned to the vehicle?
21     A    As I answered the question before, Mr.
22 Neal sometimes will document his, but I generally don't
23 document mine, to repeat the same answer.
24     Q    Okay.  Well, so then at the end of the

83

1  deal when that ultimate ACV is entered and it's printed
2  out, the only record, either in the computer or in
3  writing, assuming somebody like Mr. Neal didn't write it
4  down, of what you guys felt that vehicle was worth
5  initially, is -- let me rephrase that.  I kind of got
6  lost.  I apologize.
7           At the very end, when you hit the close-
8  out screen and you print that off, that ACV is the
9  ultimate ACV.
10          So if, in effect, you appraise the
11 vehicle at less and then negotiated the ACV higher, there
12 may be absolutely no record of what your appraisal was at
13 the beginning?
14     A    I don't understand exactly where you're
15 going.  If it was less and then it may be higher.
16     Q    Okay.
17     A    I mean, it's one figure.  It's not less
18 or higher.  It's what -- the ACV, the appraisal, is what
19 it is.  It's not less or higher.
20     Q    Yeah, but it changes as you told me;
21 right?  It's possible for it to change?
22     A    But it's not what it is or what it was.
23 What it finishes up is what the actual ACV -- we
24 determine, you know, what we determine the actual ACV.  I

84

1  don't understand your question exactly.
2      Q    Okay.  Well, when -- at the beginning of
3  the deal --
4      A    Uh-huh.
5      Q    -- when the appraisal's done, the what we
6  call the appraisal sheet when we were talking before,
7  that doesn't ultimately have an appraisal on it but has
8  the information about the vehicle.
9           That's given to the desking manager.  He
10 looks at the vehicle.  Salesman may test drive it.
11 There's a discussion and then an ACV is assigned.  It's
12 the result of the appraisal?
13     A    Correct.
14     Q    Right?  Then, as the negotiating
15 procedure progresses, you've told me that it's possible
16 the consumer may say, "Well, I think it's worth sixteen,"
17 and you'll decide to give him that.  And then you will
18 change the ACV to reflect the amount that you're going to
19 give him for it.
20     A    Correct.
21     Q    Okay.  And ultimately that final ACV,
22 whether it's negotiated up from the initial appraisal or
23 whether it stayed the same, is what is ultimately
24 reflected in the deal file?

85

1      A    Correct.
2      Q    Okay.  So if, in fact, it is a -- it is
3  negotiated up, the ACV is negotiated up, there's no
4  record of your initial evaluation of the vehicle unless
5  somebody actually wrote it down at that time?
6      A    Correct.
7      Q    Okay.  And so in essence, there's really
8  no record of the initial appraisals anywhere unless it's
9  a circumstance where someone like, well you said Mr.
10 Neal, he'll write it down?
11     A    Correct.
12     Q    Ultimately when everything shakes out and
13 you look at a deal or you examine, you know, the
14 performance on a deal and the ACV's entered into the
15 general ledger on the deal or on a group of deals, how
16 can you go back and determine how well you did on the
17 deal if you've actually backed off your initial valuation
18 of the vehicle based on make, model, year, mileage, NADA
19 information, Blue Book information, your own personal
20 information from auctions and your own experience that
21 goes in the initial valuation?
22          I mean, how can you tell how well you did
23 on the deal?  Because if you're actually going to give
24 him more and book it in more, you don't know that --

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

86

1       MR. BROWN:        I think I'm going to
2  have to object to that question.
3       MR. BANDS:       Am I rambling? Am I
4  rambling late in the day? Tongue tied? Even I can get a
5  smile out of Charlie on that one. I should have stopped
6  when I was ahead.
7       MR. PICCIRILLO:      Off the record.
8            (WHEREUPON, a discussion
9            was had off the record.)
10  BY MR. BANDS:
11      Q    Let's -- I guess what I'm asking is --
12      A    What's the stock market doing today? Is
13  it up or down?
14      MR. BROWN:       I think he's trying to
15  make a point.
16  BY MR. BANDS:
17      Q    I know. I know. I guess what I was
18  asking is, if you don't have a record of the initial
19  appraisal, which is what you feel to be the actual worth
20  of the vehicle, and then you turn around -- if you think
21  it's worth fifteen, and you ultimately have an ACV of
22  sixteen, and you sell it for eighteen.
23           Well, with your ACV booked in, you've
24  only made a profit of two. But based on your valuation,

87

1  you made a profit of three. So how can you go back and
2  correct, track that if there's no appraisal record?
3      A    You can't really track it. But just to
4  kind of -- I'll give you an answer to your question. How
5  do I hold account, how's the, what's the accountability
6  of that, I guess, is the basics of your question.
7           Am I understanding? Where's the
8  accountability of the raising the appraisal? How do you
9  know how you did? Am I understanding what your question
10  is?
11      Q    Yeah. I mean, and I recognize and I'll
12  say before you, before you say that that, that you know,
13  I understand you carried it around in your head --
14      A    Right.
15      Q    -- during the course of that deal, but
16  you do a lot of deals. And if it came to the time that
17  you have to go back and say "Huh?"
18      A    The accountability of that is there's two
19  people in the dealership that are paid based on how that
20  car does; okay? And that is Mr. Neal and myself. So the
21  accountability is there.
22           We know at the end of every month, you
23  know, whether we, you know, how we've done at rating
24  these cars. There's times where we will look and we'll

88

1  sure say, "Boy, we wish wouldn't have put that extra
2  $1,000.00 in that car."
3           Matter of fact, we wished even the figure
4  -- that they wouldn't have bought at the figure we did
5  because we sometimes will lose $2,000.00 on that car.
6           But, you know, you'll look at the overall
7  package, you know, and putting money in a car is like
8  buying stock. You have no idea. I mean today, you have
9  zero percents and, you know, you put in one car what you
10  think the value is today.
11           I mean, you know, it's just like that
12  stock. I can, you know, I can -- that tells me what
13  they're going to pay for that share of stock today, but I
14  have no guarantee tomorrow if that stock's going to go up
15  or that stock's going to go down.
16      Q    Okay.
17      A    So I mean, that, again, that's, you know,
18  to give you the best assumption or the best explanation
19  of, you know, you know, that value fluctuates daily.
20           I can take the same car to the same
21  auction five different weeks and it would bring, and it
22  could bring five different figures with a wide variance.
23      Q    Okay. Well then, what you said is at the
24  end of the month, you and Mr. Neal will -- and I'll ask

89

1  you that. Do you do that when you see what -- do you get
2  paid once a month?
3      A    We get paid once a month, yes.
4      Q    Okay. And when you do that, I assume
5  that that is either for the proceeding 15th to the 15th
6  or the preceding month because it'd be awful hard to cut
7  you a check on the first or the 31st for all the
8  performance up to there, or how does it work?
9      A    Calendar month. And then we pay
10  generally on the 8th, 9th -- 7th, 8th, and 9th or 10th --
11      Q    Okay. Okay.
12      A    -- for the previous calendar month.
13      Q    And then, I take it that you and Mr.
14  Neal, because of your responsibilities as sales managers
15  and the way you're paid, you guys are both paid on
16  percentage of gross sales; right?
17      A    Correct.
18      Q    And that's for the vehicles, for the back
19  end products, everything?
20      A    Correct.
21      MR. BROWN:       I think you said gross
22  sales. It might be gross profit.
23  BY MR. BANDS:
24      Q    Gross profit.

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

90

1    A    Gross profit, correct.
2    Q    Thank you. So the two of you will, in
3  effect, have a sales manager meeting and that's one way
4  that you gauge the performance of the sales department
5  and the F&I department is how much you make?
6    A    Yeah.
7    Q    Okay.
8    A    We'll put it up on a, you know, on a
9  daily basis to see how we're doing on, you know, on used
10  cars. To see, you know -- well, we'll look at wholesale
11  to see how we're doing on wholesale units. We'll monitor
12  the age of the units. A lot of, you know, a lot of
13  facets of the business.
14    Q    Okay.
15    A    You know, I could talk for a long time
16  on, you know, everything that's involved.
17    Q    Yeah. Well, and to go back to your
18  example, if you have a down month and you say, "Boy, I
19  wish I hadn't given the extra thousand on that deal," or
20  "I wish I hadn't valued the vehicle at that."
21         Back to my original question, if there's
22  no written record and it's a month later, how do you know
23  that you gave them the additional thousand on that if
24  there's no record of what your initial appraisal was? Or

91

1  do you remember?
2    A    You remember some. You don't remember
3  them all.
4    Q    Okay.
5    A    I mean, you know, but you have a general
6  idea of what the market is and you know, you can pretty
7  well tell on -- I mean, it's just a, it's a car guy
8  thing. It's a car mentality.
9         You know what the value of the car is.
10  What cars you stretch on. If you stretch on a car,
11  you've got that car out there, you know you stretched in,
12  on that car.
13         When you sell it, you know, you know,
14  that if you got -- were able to get a little more to get
15  out of it or if you took a little bit of a loss on it,
16  you know -- you know you stretched on it. It's just a,
17  you know, it's a thing. Like I say, I compare it a lot
18  to the stock market for lack of a better comparison.
19    Q    Okay. Those meetings between you and Mr.
20  Neal, I mean, are they like a formal scheduled meeting
21  that once a month you guys are going to sit down and go
22  over the figures? Or is it just, you know, "Hey Gene.
23  How'd you do this month? I did this," and --
24    A    We both pull the report every day.

92

1    Q    Okay.
2    A    I mean, it's, you know, I don't care what
3  kind of business you're in. You're going to have some
4  sort of, you know, it's not going to be, we're not going
5  to wake up all of the sudden on -- after the first of the
6  month and look and wonder how we did this month. I mean,
7  you know, I could -- we can tell you pretty close to, you
8  know, to where we're at.
9    Q    Okay.
10    A    Then the reports are there. I mean, and
11  it's something we do, you know, we work together and we
12  discuss it on a daily and it's not formal. It's just in
13  a, you know.
14    Q    Okay. Well, with your one dollar over
15  invoice pricing structure, that's one dollar over the
16  invoice price that you get, you paid for it. But then
17  there's also the three percent hold back?
18    A    Correct.
19    Q    Okay. So that's essentially the profit
20  on the sale of the vehicle? Not the back end items?
21  Just the sale of the vehicle?
22    A    Correct.
23    Q    Okay.
24         MR. BROWN:    Well, there's

93

1  financing, too, on that, Bill.
2         MR. BANDS:        Well, I was going to
3  get to --
4         MR. BROWN:        Okay. Okay.
5  BY MR. BANDS:
6    Q    And, and, and so, and then I also take it
7  that as far as what goes in the gross profits from which
8  you and Mr. Neal are paid are the sale of the back end
9  items?
10    A    Correct.
11    Q    Income from financing both the vehicle
12  and the back end items?
13    A    Correct.
14    Q    Used car sales?
15    A    Correct.
16    Q    And similar back end items. The
17  financing, benefits from the used cars?
18    A    Correct.
19    Q    The sales. I assume because you have a
20  percentage of the dealership, you're also paid based on
21  service?
22    A    No, sir.
23    Q    You don't get anything out of service?
24    A    No, sir.

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

94

1    Q    Okay. Does -- Mr. Neal doesn't, either?
2    A    No, sir.
3    Q    Okay. Well, did that pretty much
4    encompass the, the income generating activities of the,
5    the dealership that goes into your bottom line
6    personally?
7    A    Paid on the gross profit of the new car
8    and the used car departments.
9    Q    Okay. Okay. That tells me how you
10   obviously assess. You and Mr. Neal assess essentially,
11   at least in part, your job performance and how the
12   department's doing. How do you assess the performance of
13   the individuals that work for you in sales and F&I?
14   A    Well, that's -- I mean, it's see, I can
15   pull a report every month and see, you know, can
16   basically look at their payday and see what they made to
17   see, you know, how they're doing.
18        And I can pull up a report on each, you
19   know, on each person. On each deal. I can break it down
20   any way I want to break it down and analyze just about
21   anything I want to analyze.
22   Q    Okay.
23   A    So, I mean, all the information is there.
24   Q    You check that?

95

1    A    Yeah. Sure.
2    Q    Stay on top of it?
3    A    Sure. I mean, you know, I mean, you
4    know.
5    Q    Yeah. I mean, it's running a business.
6    A    I don't care if you're running a
7    McDonald's, you know who's doing good and who's not.
8    Q    Okay. Do you do regular performance
9    reviews of the F&I people?
10   A    I wouldn't call it formal reviews, but we
11   have, you know, regular discussions and formal
12   discussions as though Mr. Neal and I have. We have
13   informal discussions with, you know, with finance.
14   Q    Okay. And how is finance paid?
15   A    Finance --
16   Q    Do the F&I guys, they make a, do they
17   make a salary at all or is it straight commission?
18   A    Straight commission.
19   Q    Okay. And it's a commission obviously on
20   the financing and the back end percentage, the back end
21   commissions on those products. Are they paid based on a
22   percentage of the gross sales from the motor vehicles?
23   A    No, sir. They're paid on the gross
24   profit of the finance department.

96

1    Q    Just the F&I department?
2    A    Yes. Just the F&I department.
3    Q    Okay. Salespeople. They're paid based
4    on a percentage of the gross sales of the vehicles;
5    right?
6    A    Let me just -- rather than you try to dig
7    into it --
8    Q    Yeah.
9    A    -- let me just --
10   Q    Lay out here.
11   A    Let me make it a lot easier for you.
12   Q    Make it easier.
13   A    Let me just give it you. On the new car
14   department, the salesperson is paid a percentage of the
15   entire gross profit of the deal.
16   Q    Okay.
17   A    Meaning the proceeds from the sale of the
18   car and the proceeds from the sale of the financed
19   income. That percentage is 11, 12 or 13 percent
20   depending on how many vehicles they sell. That is on the
21   new car department, with a minimum deal of $150.00 and
22   sometimes there will be SPIFs on older units or left over
23   units. We may, you know, or something that we have
24   plenty of, we may say we may give you a guarantee of 200

97

1    or 250.
2    Q    And that was a spiff? Just that, and I
3    don't mean to interrupt, but a spiff is either a lump sum
4    based on each unit sold or a bonus based on if you sell
5    five of our --
6    A    It could be structured --
7    Q    -- year end models?
8    A    -- several different ways, right.
9    Several different ways. On the used cars, they are paid
10   25 percent on the proceeds of the vehicle sale only.
11   Q    Okay. Okay. So on the used car sales,
12   then, they don't get anything from financing --
13   A    No.
14   Q    -- or back end option --
15   A    No. No good.
16   Q    -- or purchased? Okay. If you want to
17   assess the performance of one of your F&I people, what
18   are the factors that you look at to determine whether or
19   not they've had a good month?
20   A    You basically look at the total amount of
21   income that they've produced, and you can look at it from
22   a lot of different angles.
23        You can look at it from a per retail
24   unit. You, you can look at penetration. There's a lot

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362  (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

---

98

1 of different things. The basic thing I look at is the
2 total, the total income that they've produced in their
3 department.
4       Q.   Okay.
5       A.   Because there's a lot of factors.
6       Q.   Yeah.
7       A.   You know, you'll have company deals
8 where, you know, the companies are paying cash. You
9 know, if you get a lot of people that are paying cash,
10 you're not going to produce as much back side profit as
11 if you have a bunch of people that are, you know, that
12 are financing. So there's a lot of variables.
13            You just kind of look at it and you just
14 kind of get a feel for it. After 20 some years, you get
15 a feel for how they're, you know, for how they're doing.
16 You don't have to do a lot of, a lot of research.
17       Q.   Well, in the F&I department, you'll agree
18 with me that obviously, a key component of the money
19 generating activity of that is the sale of the optional
20 services and products?
21       A.   Oh, absolutely.
22       Q.   Okay.
23       A.   That's the whole purpose of the finance
24 department is to sell as many of those products as they

99

1 can sell.
2       Q.   Okay. And do you monitor the penetration
3 of each, each product? Excuse me. Overall and for each
4 individual F&I person?
5       A.   I don't monitor. I don't keep a specific
6 list of it. I don't always pull it up. If I have a --
7 sometimes I'll go back and try to pinpoint what the
8 penetration is if I think I'm having a little problem
9 with a product, but I don't keep a, you know, a specific
10 record.
11            It's all there. I look at it. I pull a
12 report that has everything on it that doesn't give me
13 penetration levels, and I just kind of glance at it to
14 see, and I can tell by glancing at it.
15       Q.   Okay. And the F&I guys are paid a
16 percentage of the gross profit for their department. Say
17 one particular F&I person has just made a killing over
18 the course of a year or a month, and they're still paid a
19 percentage, but you and Gene are paid directly based on
20 those percentages, and Mr. Thornhill is getting a part of
21 those percentages.
22            Is there ever a time where you look at
23 them and say "Even though you're being paid a percentage
24 of what you sell, you had such a good month, we're going

100

1 to give you a bonus."?
2       A.   I can't really recall any time we've done
3 that. We will, you know, they're, they've got pretty
4 good aggressive pay plan and I don't think there's been
5 any time where we've actually bonused them for extra
6 production.
7       Q.   Any incentive plan whatsoever over and
8 above the pay structure that where they get a percentage
9 of the profit from their department?
10       A.   There's probably been a few, but very
11 few. They vary. They don't -- I mean, all the spiff
12 type things we do is get more sales oriented. Because
13 we've got good pay plans for sales managers and finance
14 managers and those pretty much stand on their own.
15       Q.   Okay.
16       A.   We don't need much prodding with extra
17 SPIFs to do our job. That is more as a tool to get your
18 front line people to go out and work a little harder for
19 you.
20       Q.   So essentially you see, just check and
21 see what that department's made. And you know the people
22 who worked there?
23       A.   Sure.
24       Q.   And what if one's selling 75 percent and

101

1 the other is selling 25 percent? Do you get on the 25
2 percent guy to get his sales up?
3       A.   You work on them to try to pick them up,
4 yeah. I mean, you just kind of, you talk to him and find
5 out why. Sometimes, you know, he's had a bad month.
6 Sometimes, you know, maybe he's had a new baby at home
7 and his mind's not on the job. Maybe he's got divorced
8 and he's, you know, going through a divorce.
9            A lot of different things can, can
10 happen, I mean, in any kind of work you do. Sometimes
11 you're on. Sometimes you're off. But if you look at the
12 whole thing and how the whole thing's going.
13       Q.   Have you ever had to let anybody go
14 because they essentially weren't producing enough in the
15 F&I department?
16       A.   I don't know that I've let anybody go. I
17 think they've -- most of them have probably left before
18 they knew they were going to get let go.
19       Q.   Okay. We mentioned that Mac Painter's no
20 longer there?
21       A.   Yeah.
22       Q.   And when did he, when did he leave?
23       A.   Last -- I'm not sure of the date. It was
24 last Friday, I believe.

---

**Garrett Reporting Service**

P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)

*Mary J. Gagnon, CCR*

5/15/03     Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

102

1      Q    Okay.  Why did he leave?  Was he let go
2  or did he leave of his own volition?
3      A    No.  He left on his own.  He took,
4  assumed another position at another dealership.
5      Q    Okay.  And what was the other gentlemen
6  that had left out of the five that we went through?
7      A    Mr. Stowers.
8      Q    Hank Stowers?
9      A    Yeah.
10     Q    Okay.  And when did he leave?
11     A    He left probably two and half, two months
12 ago.
13     Q    Okay.
14     A    And he assumed another position at
15 another dealership.
16     Q    Okay.  They assumed positions in
17 dealerships locally down there?
18     A    Yeah.
19     Q    Competitors?
20     A    Yeah.
21     Q    Okay.  Hank Stowers at the time, was he
22 the -- he was the sales manager or the F&I person or both
23 at the used car lot; right?
24     A    The Danville location, correct.

103

1      Q    And that Danville location in Boone
2  County, that's under the corporate --
3      A    Correct.
4      Q    -- structure of Thornhill; right?
5      A    Correct.  Correct.
6      Q    Just to talk a little bit about the Full
7  Circle Program.  You've kind of given me the anatomy of a
8  deal.  The process from when somebody comes on the lot to
9  when they, when they, when they close.
10          Just backing up real quick to when they
11 close and before it's closed out on the computer.  Once
12 they sign the documents, and you say that there's a bunch
13 of them, anywhere from 35 to 40, what documents do they
14 get copies of?
15     A    I'd need to get a copy of the -- probably
16 go through a whole thing to exactly, to see exactly what
17 it would be.  They get copies of the contracts.
18          I mean, it would take me a while.  I
19 mean, if you want me to structure a deal, if I could have
20 been prepared, I could have brought a deal packet and
21 done that for you.
22          But they get copies of the trans --
23 depends on whether they put a temporary tag or transfer a
24 license.  They get a copy of the bill of sale.  They get

104

1  a copy of the contract.  A copy of the We Owe.  They get
2  copies of any, you know, any of the products that they,
3  you know, that they buy as far as the life and disability
4  policies, extended service contracts, gap, you know.
5  Whether it be etch, whether it, you know, Full Circle
6  Benefit, the We Owes.
7      Q    Is there a We Owe in every deal?
8      A    Yes, sir.
9      Q    So --
10     A    Let me say this.  There's supposed to be
11 a We Owe in every deal.  That if, you know, there might
12 be one that might slide through, but there's supposed to
13 be a We Owe in every deal.
14     Q    And if there's a We Owe and it's
15 essentially marked N/A across the board, is that simply
16 because you want to make sure that there's something in
17 the file that memorializes the fact that there's nothing
18 else to be done on the deal?  You have a We Owe and you
19 say "Essentially, we don't owe you anything"?
20     A    Yeah.  I want to make sure.  What I want
21 to do is make sure that I've got all the agreements.
22 That there's no unspoken agreements between the customer
23 and the salesperson that says "You know, well, I'm going
24 to, you know, I'll get you a set of floor mats for this

105

1  car."
2      Q    Okay.
3      A    Or, you know, "I'll change your tape
4  player out to a CD player."  That way, if there's
5  anything that's, you know, that should be left nothing
6  unspoken.  Anything, you know, a customer shouldn't take
7  anything unspoken, and the salesperson shouldn't do
8  anything that, you know, to consummate and make sure any
9  agreements that, you know, that are made, are there and
10 in writing.
11     Q    Okay.  So in essence, a We Owe is more
12 for purposes of documenting the fact that the deal's
13 closed and nothing's owed.  It's more common when it's
14 done like that than it is for actually "We do owe you a
15 set of floor mats"?
16     A    I wouldn't know with -- probably more
17 common, but it'll say "We Owe a bed liner."  "We owe a
18 set of floor mats."  "We owe a tank of gas and a wash
19 job," you know.
20     Q    Okay.
21     A    "We owe," you know, whatever we may owe.
22 I mean there's, you know, a lot of things that are
23 documented.  We owe nothing but good service.
24     Q    Okay.  And so copies of obviously the

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362  (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

106

1  purchase agreement?
2      A   Uh-huh.
3      Q   The financing agreement?
4      A   Uh-huh.
5      Q   For Full Circle, a copy of the Spectrum
6  registration form?
7      A   Right.
8      Q   Copies of applications which also have
9  certain policy terms usually for the life and health and
10  disability insurance; right?
11      A   Right.
12      Q   Sometimes copies of -- well, sometimes
13  the extended warranties, extended service contracts
14  incorporate applications and terms together so they'll
15  get a copy of that.
16      A   I don't know what, because I don't, like
17  incorporated?
18      Q   Well, on the face of an extended
19  warranty, there may be not just an application for it and
20  signing it and saying we want it, but it also has the
21  terms, you know, the duration and --
22      A   Right.
23      Q   -- you know, because usually you get
24  something with it or have to read the back if there are

107

1  exclusions, but -- but they get a copy of that; right?
2      A   Yeah.  I just got to watch myself and
3  stay alert and try to listen to you.
4      Q   I'm not trying to trip you up.  Now, if
5  some -- there are also waivers that you have them sign?
6      A   Correct.
7      Q   If I don't want life and health or credit
8  disability, credit life, I sign a waiver that says I was
9  offered that and I don't want it?
10      A   Right.
11      Q   Okay.  And same for -- do you have them
12  for extended service contracts?
13      A   Uh-huh.
14      Q   Have them for gap?
15      A   Uh-huh.
16      Q   Have them for the theft assistance
17  program?
18      A   I don't think they have one for the theft
19  assistance.
20      Q   Okay.  And you don't have a waiver form
21  for the Full Circle Program?
22      A   I don't think so.
23      Q   Okay.  Why isn't there a waiver for the
24  Full Circle Program?

108

1      A   I don't know.
2      Q   Did you have any input into the decision
3  to have an acceptance form as opposed to a waiver form?
4      A   Those were set up -- I mean, that's the
5  way it was set up.  We were told we had to do waivers on
6  insurance products like, you know, life insurance,
7  disability insurance.  I know, I guess rebateable
8  products.  Products that are rebateable, is the way I
9  understand it.
10      But that's the way it was set up in our
11  finance training.  And it was never mentioned to have a,
12  you know, a waiver form signed on the -- on the Full
13  Circle Benefit .
14      Q   Okay.  Well, though, when you talk about
15  rebateable, you're meaning that if, if a consumer -- if
16  it's a service contract and it's non-transferrable and
17  they pass away or if they default or if some occurrence
18  takes place where that premium is not completely used for
19  the duration of the term, then there's a refund that's
20  ultimately going to be given to the lender; right?
21      A   It depends.  It could be given to the
22  lender if the vehicle's paid off, traded in and paid off.
23  If that lender's paid off, it could be to the --
24      Q   To the customer?

109

1      A   To the customer, yes.
2      Q   Okay.  And so, for basically the
3  insurance coverages and the extended warranties, because
4  they have specific durations and terms, in the event of
5  some sort of breach of the agreement or event that stops
6  the consumer from paying off the obligation, there's a
7  refund of the unused portion to either the consumer or
8  the lender?
9      A   Correct.
10      Q   And that's obviously not the case with
11  the Full Circle Benefit Program?
12      A   Correct.
13      Q   That's called a soft ad; right?  Is that
14  the term?
15      A   That's your term.  I'd, I would, I would
16  agree with that term, a soft ad.
17      Q   Okay.  And the theft assistance program
18  would probably be a soft ad, too?
19      A   We'd consider that a soft ad as well.
20      Q   It's essentially, it's a one time payment
21  for a product or a benefit.  Not something where you have
22  a contractual obligation over a --
23      A   Correct.
24      Q   -- certain period of time?

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362  (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03   Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

**110**

1  A   Correct.
2  Q   Okay. Do any of your lenders refuse to
3  finance soft ads?
4  A   No.
5  Q   Okay. For instance, does Huntington
6  Banks tell you "Because we're" -- "if this person
7  defaults, we're not going to get our money or our unused
8  portion back on the Full Circle Program"? You know, "We
9  won't finance it"?
10  A   I haven't had any problems like that
11  whatsoever.
12  Q   Okay. What about GMAC?
13  A   I haven't had no problem whatsoever.
14  Q   When you're doing the -- closing the deal
15  with all the documents in the end of the F&I process, is
16  there a standard order of presentation of the documents?
17  A   That depends on the finance manager. We
18  have, you know, one, I think, will take it and do it in
19  the same order every time.
20      But there is no standard required order
21  that they're, you know, that they're done in. So I
22  would, I wouldn't sit here and tell you that there is a
23  definite order, you know. Each individual person will
24  kind of develop their own, you know, ways to do things.

**111**

1  Q   Okay.
2  A   Their own order that they print it in.
3  They will, you know, have their forms and, you know, in
4  order that they desire to print them, and --
5  Q   Okay. So it's possible that the
6  financing agreement and the sales contract may very well
7  be the last documents presented for execution by the
8  consumer?
9  A   Yes. It's possible.
10  Q   Conversely, they could be the first ones?
11  A   Could be the first.
12  Q   Okay. Do you see any importance
13  whatsoever in presenting the documents in a certain
14  order?
15  A   No, sir.
16  Q   You told me that as part of the F&I
17  process as what someone may say terms as someone else may
18  say financing arrangements are concerned, that those are
19  kind of dickered and talked about in conjunction with
20  presentation of optional products. You'd --
21  A   Correct, yes.
22  Q   Okay. And I may, I word it a little
23  differently than when we talked before.
24  A   I didn't know if that was a question or

**112**

1  you were rephrasing something.
2  Q   Well, I was kind of getting there.
3  A   I don't answer if it's not a question.
4  Q   It's late in the day. It's late in the
5  day for me, too. Is there any particular order before
6  the documents are created that somebody in your F&I
7  department starts presenting and talking about optional
8  services or products?
9  A   There is no specific order. I mean,
10  every, each one of them's going to do it, their thing.
11  They're going to discuss all the options and make
12  everything available to them. And they're, you know,
13  they're going to work out with the customer what the, you
14  know, what they want to do.
15  Q   Okay.
16  A   I mean, it's not cut and, you know, it's
17  not cut and dry. I mean, it's, you know, it's
18  negotiating. It's not a, you know, that it's going to be
19  laid out in a, you know, in a certain order each, you
20  know, they will do it differently. They're two different
21  people.
22  Q   Okay.
23  A   It'd be kind of like asking not to be --
24  but is every deposition the same questions asked in the

**113**

1  same order? I mean, I'm not -- don't take me off color
2  there.
3  Q   Oh no, no offense taken at all. In the
4  -- well, you mentioned negotiating at that, at that point
5  of the deal. Many of the optional service and products
6  are negotiable, aren't they?
7  A   Correct. They're all negotiable.
8  Q   And that's because extended service
9  contract you're getting for X amount, a certain price,
10  and you probably have some sort of a guideline or set a
11  price.
12      But if somebody decides they don't want
13  to pay that for an extended service contract, they can
14  negotiate you down on that, can't they?
15  A   Yes, sir.
16  Q   Okay. The same with the insurance
17  premiums or life and health?
18  A   No, sir.
19  Q   Is that -- you can't negotiate that?
20  A   No.
21  Q   Okay. Full Circle?
22  A   No.
23  Q   That's a non-negotiable price?
24  A   Non-negotiable.

5/15/03    Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

114

1    Q    Okay. The anti-theft deterrence
2    products?
3    A    I would assume at this point, it's non-
4    negotiable. We've never, I've never negotiated it, no.
5    Q    How about gap?
6    A    Gap is negotiable.
7    Q    So when you're going over -- how about
8    you personally, when you're doing the F&I on a deal?
9    What order do you like to go in, if you have one, when
10   you start talking about the optional services or
11   products?
12   A    What I like to do when I go over it, is I
13   just, I explain all the products to them and I ask them
14   what, you know, I explain to them what each of the
15   products are and ask them which products that they would
16   like for me to calculate into their payments.
17           And then I ask them how, you know, how
18   many months they want to calculate their payment on. And
19   then I will, you know, give them the, you know, the term
20   and the rate and the payment with the products that
21   they've chosen.
22   Q    Okay. Are there any products that you
23   place more emphasis on than others?
24   A    To answer the question, there's probably

115

1    times where you do place more emphasis on one product
2    than the other. I mean, it, it varies.
3    Q    Okay. And that would probably be, and
4    correct me if I'm wrong, but it'd probably be some of the
5    -- the service contract and insurance products because
6    they're going to have a higher, higher cost?
7    A    It depends on what the customer's needs
8    are.
9    Q    Okay.
10   A    You know. I mean, if you've got a
11   customer that's driving quite a bit of mileage and all
12   that, then you're going, you know, then you're going to
13   really, you know, you might put more emphasis on the, you
14   know, extended, on the extended service contract.
15   Q    Okay.
16   A    If you've got, you know, somebody with,
17   with a lot of kids, you know, may put more emphasis on
18   the, you know, the life and disability, you know,
19   benefits. I mean, you --
20   Q    Okay. Where in the mix would the Full
21   Circle Program come in, usually?
22   A    The Full Circle Program is something I
23   always put a lot of emphasis on because I think it's, you
24   know, a very good program as far as customer retention.

116

1    Q    Okay.
2    A    You know, to keep people in our
3    dealership and our service department. That it provides
4    very good benefits for them and that is very beneficial
5    to them at, you know, such a small price.
6    Q    Okay. As far as the Full Circle Benefits
7    Program is concerned, when you present that, tell me how
8    you do it. I mean, what's the logistics? What's the --
9    your common SOP if you've got one.
10           MR. BROWN:    Are you talking about
11   him personally or --
12           MR. BANDS:    Yeah, yeah.
13           MR. BROWN:    Okay. Okay.
14   BY MR. BANDS:
15   Q    Yeah, because ultimately, I mean, like
16   you've told me --
17   A    Sure.
18   Q    -- different people do it different ways.
19   A    Sure. Right.
20   Q    And you're the first person I talked to
21   other than Gene Neal three months ago who actually is
22   involved in F&I, so.
23   A    Well, I presented it as, you know, what
24   we've got available is the Full Circle Benefit Program.

117

1    But I actually call it Spectrum Auto Pack, is what I
2    actually call it.
3            I have since become, started calling it
4    Full Circle Benefit Program more recently, since it's had
5    such a distasteful name here recently with all the
6    mailings.
7            But I present it as, you know, as a -- as
8    a service package where you're going to have coupons for
9    the service department that's going to give you discounts
10   on your oil changes, tire rotations, brake jobs, front
11   end alignments and that there is $600.00 worth of coupons
12   that are going to, you know, that you can take use of in
13   the service department.
14           Also, you've got some tire hazard
15   warranties and some hotel clubs and roadside, you know,
16   assistance service.
17           And I also, you know, tell them that it's
18   a great way to, you know, to have your service done here
19   and all your records here and all kept on the computer.
20           And then I also explain to them that it's
21   a great program for us as well because Spectrum calls all
22   of our customers, whether you're in sales or service, and
23   will ask a survey to make sure that, you know, to make
24   sure that you were treated properly, and that we can, you

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

---

118

1  know, analyze those surveys to make sure that everybody's
2  being taken care of in the way that we would like for
3  them to be taken care of.
4      Q    Okay.
5      A    And, you know, tell them and explain to
6  them the cost of them is just $141.50 plus tax, which is
7  $149.99 and it's only going to make your monthly payment
8  go up, you know, whatever it is. Three bucks or so.
9      Q    Now, do you have any idea -- and I take
10 it you've sat on other F&I deals with other people?
11     A    Yeah. Occasionally.
12     Q    In fact, that's part of your
13 responsibility to make sure that they're doing their job
14 right is to occasionally monitor what they're doing in
15 closing a deal?
16     A    Sure.
17     Q    Have you imparted upon your F&I people
18 the importance of walking through the entire Full Circle
19 Benefits Program like you just told me?
20     A    Absolutely.
21     Q    Okay. And do they do that on a regular
22 basis?
23     A    Yep. Yeah.
24     Q    And you know that for a fact?

---

119

1      A    Yes, sir.
2      Q    Do you watch each and every deal?
3      A    No, sir.
4      Q    Then how do you know that they're doing
5  it?
6      A    Well, I'm, you know, I know on the deals
7  that they're, you know, that they're doing it. And I,
8  you know, from their conversations with them. And I know
9  from talking, you know, to customers that they're going
10 over it with them.
11         And, you know, I guess if you want to say
12 for a fact, no, if I'm not setting there watching them.
13 You know, probably need to clarify that. But I fully
14 trust my people and I, you know, I know through my
15 conversation with them, you know, what I understand and I
16 also check with the customers occasionally. Will
17 interview a customer to find out, you know, was
18 everything explained and all that. And I get nothing but
19 good, good reports.
20     Q    When you say you interview a customer,
21 what, what, what -- tell me about that. Do you have some
22 sort of a procedure where, in addition to the Spectrum
23 call back, you guys will do quality control follow-up
24 calls?

---

120

1      A    Don't have a set procedure. But
2  occasionally I will talk to somebody, you know. I go out
3  and thank a lot of customers. I do the commercials.
4  People know who I am and, you know, a lot of times I will
5  go out and, you know, I say, "I'm Butch Nisbet. I just
6  want to thank you for the business. Want to make sure
7  you were treated okay. You're going to be getting a
8  survey in the mail from General Motors. Would, you know,
9  would like to think that you can check everything
10 completely satisfied."
11         And I'll just sit down and talk to them
12 and say, you know, "Was everything, you know, was
13 everything explained to you? Did," you know "Was all of
14 the, all of the, you know, everything explained to you in
15 the finance office? Was the extended warranty made
16 available? And the Spectrum Auto Pack made available?
17 And the gap?"
18         And, you know, "Yeah, he went over and
19 explained all of that to me." And, you know, "Well,
20 you, did you, well, like to put that on there?"
21         You know, just kind of a general exit
22 interview. Not something I do all the time. But I do
23 that as a general, you know, that's my, one of my big
24 fortes is I'm the one that does the commercial and I'm

---

121

1  there and I'm available. And they see me in the showroom
2  and I shake their hand.
3          And, you know, and I kind of do that
4  little exit interview. I don't do it daily. Sometimes
5  I'll do several a week and sometimes I may go a couple
6  weeks and not do any.
7      Q    Okay. Your computer system. Do you know
8  anything about how that's set up?
9      A    Uh-huh.
10     Q    Okay. What kind of programs does
11 Reynolds and Reynolds have in place in your computer
12 system for the creation of your purchase agreements?
13     A    Set it up however we want it set up. I
14 mean, I don't understand what you're --
15     Q    Well, for instance, if someone sits down
16 at a keyboard to prepare a purchase agreement, and they
17 key in a stock number of a vehicle, what, what's the list
18 amount of that vehicle going to be on the computer?
19     A    MSRP.
20     Q    Okay. Is there any reason why it's MSRP
21 as opposed to inputting the invoice? But you do input
22 the invoice price; right?
23     A    The invoice. Yes, the invoice. It's all
24 in there. Both the M, both the MSRP. The M, they're

---

5/15/03   Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

122

1 both, all the figures are in there. They're in the
2 computer when you pull a deal up.
3    Q    Okay. That's when you, you're pulling
4 something up.
5    A    Yeah.
6    Q    But what about when you're, when you're
7 using the keyboard, your cursor, everything, to actually
8 set up the computer to print a contract?
9    A    Uh-huh. Whatever, whatever number we
10 enter in there is what will print on the contract.
11    Q    Okay. Okay. So when you say "whatever
12 number we enter in there," if it brings up the MSRP, if
13 it brings up the invoice plus a dollar, if it brings up a
14 blank and lets you fill it in, I mean, how does it work?
15 If it's, if it's all in there. We've been told that
16 there are prompts that you actually use to --
17    A    Yeah. You can prompt it to say anything.
18 I mean, everything is prompted. I mean, it's just like
19 you go through a computer screen. I mean, anything it
20 asks you.
21         I mean, you just put in what you want to
22 put in. I mean, basically, you'll put in a price. You
23 put in term. You put in payments. You put in do you
24 want life insurance? Do you want disability? If you

123

1 want a gap, you put a gap figure in. If you want a
2 warranty, you put a warranty figure in.
3         You, you know, you got to determine what
4 your interest rate is. You've got, you know, the screen
5 is all there. You've got four or five screens and you
6 have, you know, and you've got a deal screen, and you put
7 all that information in to determine the payment.
8         I mean, you've got to, you know, to plug
9 the, you know, whenever you agree on that, whatever
10 you've agreed upon is what you'll put in there.
11    Q    Okay. And what you're telling me is when
12 you're actually putting the numbers in on a deal screen
13 to try and determine -- when you're running the numbers?
14    A    Right.
15    Q    Is that -- okay. Well, I'm talking about
16 numbers have been run. People have been told about
17 optional products. They've agreed to terms or financing
18 conditions or, you know, the financing arrangements.
19         When it comes time to print that, that
20 purchase agreement, that's what I'm talking about. I
21 mean, when it comes time to -- is there a special screen
22 that brings up, in effect, an exemplar of a purchase
23 agreement and you can point and click or fill things out?
24 Or does it give you fields or how's it work?

124

1    A    No. There's a general screen with the
2 fields and that's what I was saying. We plug in the
3 fields, you know, the amount of the extended service
4 contract. The amount of the gap. Whether they want
5 life. Whether they want life or disability.
6         I mean, we put all the information in. I
7 mean, once you've negotiated this, whatever you, you
8 know, whatever the customer's agreed to, that's what in,
9 I mean, that's what in there.
10    Q    And that's on the sales document, the
11 sales agreement, the purchase agreement?
12    A    Yeah.
13    Q    Okay. I guess what I'm back to, though,
14 is when you have the actual cash price in the upper right
15 hand corner and when you call up that screen to create
16 that final document, are you inputting a stock number?
17    A    No. You've already input the, you put,
18 input the stock number. Yeah, you input the stock number
19 when you start the deal.
20    Q    Okay. But that's back when you start the
21 deal. I'm talking about when you're, you're, you're at
22 -- when you're right at that point where the, someone at
23 F&I's creating that document to print it off to be signed
24 at the end of the F&I process.

125

1    A    It's, I mean, I don't understand where
2 you're -- I mean, all the information, whatever you've
3 agreed to is what's on there. I mean, I don't know where
4 you're -- what.
5         I don't understand the answer that you're
6 wanting. But everything that's been agreed to, whether
7 warranties, price, if they, you know, I don't know if you
8 want to get back to the negative equity thing, but if
9 they've adjusted it.
10         I mean, whatever they've adjusted it to.
11 Whatever they put in there is what's going to print on
12 that form.
13    MR. BROWN:    I normally don't do
14 this, but since it's late in the day, I think there's
15 fields they fill in. Fields with information. And then
16 I think they can just select the type of document to be
17 printed. Put that form in.
18    THE WITNESS:    Yeah.
19    MR. BROWN:    The computer
20 automatically does it for them.
21    MR. BANDS:    And believe it or not,
22 I actually, I was going to get to that. That was my next
23 topic.
24    MR. BROWN:    Okay. I'm sorry. I'm

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362   (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03    Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

126

1 sorry.
2 BY MR. BANDS:
3     Q    No, no, no. I appreciate your short cut
4 because I was there, going to say, well, you know, is it
5 -- do you just chose a document after you put your
6 information in?
7     A    Yeah. We've got a, we've got a screen.
8 You've got a, you know, a screen that's got all the
9 fields in it. Then you've got a customer information
10 screen which has their name and address. Whether it's
11 going to be in both names, telephone numbers and all of
12 that.
13        Then you've got a vehicle screen that
14 will have the, you know, the vehicle identification
15 number and the miles, the color and the trim. And then
16 you have a screen that has the trade-in information.
17 Then you have a screen that has the insurance
18 information. Then you just select your documents and it
19 pulls --
20     Q    Okay.
21     A    -- from what, you know.
22     Q    So if I select a document for the
23 purchase agreement, and I just hit a button. That
24 automatically then comes up and gives me effectively a

127

1 completed purchase agreement based on the information
2 that's already been put in?
3     A    Yeah. Based on what we've negotiated and
4 put in there, you know.
5     Q    Okay.
6     A    In other words, when we calculate our
7 payment, I mean, you know, let's say that, that you're
8 the customer and, you know, and you tell me, "I want to
9 go 60 months and I want the life and disability at eight
10 and a half percent and the payments 375 a month."
11        You know, and that's what I've got in
12 there, that's what it's going to be. You know, based off
13 of those, you know, those figures.
14     Q    Okay. Now on your system when you're
15 actually putting in the information before you reach the
16 point where you point and click or hit a document that
17 you want to complete.
18        You have prompts that ask you if you want
19 this or that or input this information or that
20 information. Is, are the -- I'll just, for the Full
21 Circle Benefits entry, how's that prompt read?
22        Is it a Y/N prompt or is it a prompt that
23 has Full Circle already on there and you have to ask
24 somebody to take it off, or is it a blank and you have to

128

1 put it on?
2     A    When we pull the program up?
3     Q    Yes.
4     A    You're talking about? It's on there.
5 All the products are on there.
6     Q    Okay.
7     A    And then we take them off or add them on
8 based on as we want to.
9     Q    Okay. But initially, at the initial
10 stage, all of the products are there?
11     A    But that -- well, we have -- that's,
12 they're there, but we haven't discussed them with the
13 customer. They're not there for the customer. They're
14 there for our --
15     Q    Yeah.
16     A    -- for our benefit.
17     Q    Yeah.
18     A    I mean to, to explain the situation,
19 they're there, we ask, you know, "Do you want this?"
20 Then we either, you know, yes, it's in or yes, it's out.
21 Then we ask that, yes, it's in or yes, it's out. But,
22 you know, when we pull them in, all the products are in
23 there.
24     Q    Yeah.

129

1     A    But I also have 60 months in there. I
2 also have today's date even though they may buy it
3 tomorrow. I also have today's date in there. I also
4 have to put a term. I also have 45 days to the, you
5 know, to the first payment. They may want 30 or 60. I
6 mean, there's anything to speed up the process. I, you
7 know, I put in there.
8     Q    But the bottom line is for some of these,
9 either be it for monthly payments or for optional
10 products or whatever, there's a preset format, if you
11 will, in there that lists all those things and that you
12 have to take them out, not put them in?
13     A    Sure. Yeah.
14     Q    Okay.
15     A    But just to give you an example, to
16 expand, I mean, someone may -- when you're discussing
17 extended warranty, you can't, you know, you have four,
18 five, six, seven year warranties from 60, 75 to 100,000
19 miles. I mean, you know, you have to put that on
20 whatever, you know, whatever you want.
21     Q    Okay.
22     A    Some people just like life insurance.
23 There's single life, joint life, life and disability. I
24 mean, you know, you have to put it on what they, you

5/15/03    Deposition of GEORGE R. NISBET, JR.

Ronald & Judy Barker vs.

Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

134

1    Q    And that's you and Wally together, or --
2    A    No.  That was Randall and, I mean, it was
3  set -- Randall and Wally.  It was set.  And Spectrum.
4         I was, I don't -- it was, it's been at
5  $141.50 just about the whole time I've been there.
6    Q    Okay.  Wally, was Wally already there
7  when you went?
8    A    We went together.
9    Q    Okay.
10   A    Wally went as 50 percent owner --
11   Q    Okay.
12   A    -- and I went, I went as sales manager.
13   Q    Okay.  Did you guys arrange it that way?
14  Was it kind of like a package deal from the get go or was
15  that just coincidental?
16   A    Well, it was kind of, I mean, the way it
17  was, I didn't even know Wally had, I mean, I had no idea
18  Wally was, Wally had worked a deal or Wally was buying
19  half of it.
20        He called me and he said he wanted to
21  talk to me, and he told me he was buying half of it and
22  wanted me to come and be the sales manager.  And he said,
23  you know, hopefully, if everything worked right, one day
24  he'd, you know, he'd like to make me partner.  And so

135

1  happened it worked out.
2    Q    Had you all worked together before?
3    A    No.  Not -- had never worked for Wally.
4  We were just, we grew up together.
5    Q    Okay.
6    A    Knew each other.
7    Q    Okay.  And he knew that you had the sales
8  experience?
9    A    Yeah.  He had the service experience and
10 I had the sales experience.
11   Q    Okay.  So, after you went to work there
12 then, it changed from approximately 120 something you say
13 to the $141.50 plus sales tax?
14   A    Yes.
15   Q    And at that time, Wally had 50 percent of
16 the dealership?
17   A    Yeah.
18   Q    Okay.  When you went to work there as
19 sales manager and Wally went to work there as 50 percent
20 owner, how was the -- how was the pay structure insofar
21 as compensation from the sale of Full Circle Benefits set
22 up?
23   A    I can't remember exactly.  I could get
24 those exact documents for you.  Lilly Maize would have

136

1  that to give it to you exactly.  But I've been paid on
2  Spectrum since I've been there.
3    Q    Okay.  Yeah, I'd assume so.
4    A    I can't remember then.  Yeah.  I can't
5  remember if it was $10.00 or $20.00.  I'm thinking it
6  was, it was, I think it was $20.00 that I was getting
7  then.
8    Q    Okay.  Did that change or go up when the
9  price moved from 120 something to $149.99, inclusive of
10 tax?
11   A    I think the price went up at $141.50 when
12 we came on board, I think is when it went up.  I think it
13 was already, you know, that they set, I think the whole
14 time I've been there that the price has been $141.50.  I
15 think when I started, that they, that's when they
16 restructured it to one, you know, to $141.50.
17   Q    Okay.  So but right before you went
18 there, it was 120?
19   A    It was 120 something, yeah.
20   Q    In that --
21   A    And they were --
22   Q    In that time frame.
23   A    Yeah.
24   Q    Because earlier you told me it may have

137

1  been 120 something when you started?
2    A    Yeah.  Right.  I mean, it was, it was
3  within, I mean, within that same month that I started
4  that they, that they had, that they had done that.
5    Q    Why'd they decide to raise that?
6    A    I don't know.  I think that's what
7  several of the places were charging at the time.  I mean,
8  I didn't have much to do with really setting up the, you
9  know, the price and the structure of it.
10   Q    The structure now, as I understand it, is
11 that obviously $8.49 goes to the state for sales tax.
12 $101.50 goes to Spectrum.
13   A    Uh-huh.
14   Q    Out of the initial $149.99.  The
15 remainder is divided between Gene Neal, who gets $5.00?
16   A    Right.  I get 25 and the service gets 10.
17   Q    That's where I was going.  Okay.  Then
18 out of the $101.50 that goes to Spectrum, Spectrum only
19 keeps 44.
20   A    I get 10 and Wally gets -- I'm not sure
21 what the figure is he gets.  But I know he gets --
22   Q    $47.50?
23   A    $47.50 sounds right.
24   Q    And then a sum, 20 or 40, whatever, a sum

**Garrett Reporting Service**

P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)

*Mary J. Gagnon, CCR*

5/15/03 Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

**138**

1 goes to the service department?
2　A　Yeah.
3　Q　Okay. Is that similar to the allocations
4 when you guys went there?
5　A　Yeah. I think it's been the same
6 allocation pretty much the, you know, very similar the
7 whole time.
8　Q　Okay. So the 44, the $44.00 that
9 ultimately Spectrum keeps, it would be your belief that
10 that sum is exactly the same, $44.00, that they were
11 keeping out of each deal back in '96?
12　A　Something. I mean, I can't tell you
13 exactly, you know, exactly what it was, but I would, you
14 know, very close. It might have been a dollar or two
15 difference, but it would've been very close.
16　Q　And I think you said Lilly Charles would
17 have all these documents?
18　A　She could tell you exactly. Yes, she's,
19 she's the -- she's good.
20　Q　Okay.
21　A　She'll give you all the specifics.
22　Q　Okay.
23　A　Anything you'd need.
24　Q　She's the business manager?

**139**

1　A　Uh-huh. She's the office manager,
2 business manager.
3　Q　All right. Well, I realize you guys are
4 an S Corporation and profits, losses pass through, et
5 cetera, et cetera, et cetera.
6　　　Is there any reason why you get part of
7 your money directly out of the $149.99 and then you get
8 an additional sum sent back to you from Spectrum?
9　A　Yeah. When I was just sales manager, I
10 was receiving, I wanted -- I can't remember why, but I
11 wanted part of it up front. I wanted a part of it,
12 someway or another. I can't remember if I got $10.00
13 from Spectrum and 10 at the store.
14　　　And then, but I never changed the part
15 that I got from Spectrum. I think when I was sales -- I
16 don't know why that it was that way. I can't really
17 remember.
18　　　But I think we set it up to where I got
19 10, it was like cash in the hand. And then, you know, 10
20 I got from, from Spectrum. And we just never changed
21 that.
22　Q　Ultimately the charge that Spectrum
23 imposes on you guys out of each deal is 44 bucks; right?
24　A　As far as I know, yes.

**140**

1　Q　Is there any reason why out of the
2 $149.99 Spectrum, $8.49 goes to state. Spectrum gets 44,
3 and then you guys just divvy up what's left?
4　A　No, sir. I don't understand what your
5 question -- why, you know.
6　Q　Well, it would seem to me to be a lot
7 simpler than having an extra step to the process that
8 Spectrum's going to kick money back to you after they get
9 their $101.50, when in fact all they're really charging
10 for the product and service that they provide is $44.00.
11　　　MR. BROWN:　Let me object to the
12 use of the term kick-back.
13　　　MR. BANDS:　Return.
14　　　MR. BROWN:　I think that has --
15　BY MR. BANDS:
16　Q　I'll adopt the change.
17　A　The only thing I know is it's the way,
18 the way it was done. I mean, I know the previous owner
19 that, you know, talking to Mr. Honeycutt, that he told me
20 that, you know, that he always gave that check to his
21 wife. I don't know if it was a good thing for, you know,
22 the check to be coming home for him to have the wife or
23 why it was done that way.
24　　　I mean, that would be a question that

**141**

1 would have to be asked of, you know, whoever set it up.
2 I didn't set it up to have it, you know, to have it come
3 that way. That was just the way it was set up with
4 Spectrum.
5　Q　Okay. On the coupon program, when does
6 the effective date of the coupon limit the use of the
7 coupon? I mean, what, what's the policy on the mileage
8 intervals that are printed on the coupons?
9　A　You know, the mileage intervals are, you
10 know, are printed. It's, I think, it's from zero to
11 99,000 or 100,000 miles. But we tell people, you know,
12 we don't worry about what the mileage says. That we'll,
13 you know, we'll honor it. If you've got the coupons,
14 we'll honor them.
15　　　Because, you know, they're not tailor
16 made for used cars to start. If a used car has got 20 or
17 30,000 miles on it, it doesn't start from there.
18　　　So we just tell them, you know, as long
19 as you've got, you know, you've got the coupon, we'll,
20 you know, we'll honor it. We're not going to worry about
21 what the mileage says on it.
22　Q　Okay.
23　A　You know, we'll give you full, you know,
24 full benefit or full use of the, you know, the coupons in

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362　(304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03   Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

142

1 the book.
2      Q      Okay. So the, the mileage at the time of
3 purchase actually is treated as zero for coupon purposes?
4      A      Right.
5      Q      Regardless of --
6      A      The coupons books are printed up --
7      Q      -- the actual mileage?
8      A      -- the same way every time. They're not
9 tailor made with the mileage on them.
10     Q      Okay. What if I have a coupon book and
11 I'm still within a certain mileage interval that would be
12 applicable to that coupon and I'm on coupon 5, and I want
13 to skip ahead to coupons that may be more lucrative or
14 give me a better deal on whatever I need done, but
15 they're way outside my present mileage interval. Will
16 you honor that coupon?
17     A      Now, we're getting into, I mean, your
18 ifs. I mean, I don't know exactly how to answer your
19 question. You'd have to have the coupon and I'd have to
20 see an exact situation to give you, you know, an answer.
21           I'd have to know what coupon is it that
22 you're wanting to use versus this one. But if the oil
23 change coupons are all the same and the same discount, it
24 doesn't matter to me if you use the third one or the

143

1 fifth one or the sixth one or, you know, but if, you
2 know, but if you -- it depends on the whole situation.
3           I mean, chances are, you know, we're
4 going to do whatever, you know, but I don't want to just
5 give you an answer not knowing. You know, that's a wide
6 open question. You're not giving me enough specifics to
7 say a yes to.
8      Q      So, well, I guess what you're telling me,
9 though, that there may be circumstances where the mileage
10 intervals and the amounts of the coupons will make a
11 difference insofar as whether you honor them?
12     A      No. I'm not really telling you. I mean,
13 I'd have to know more specifics to -- I mean, I don't
14 really understand exactly what your question. I'm going
15 to do what's going to benefit you, the customer, the
16 most.
17     Q      Okay. Those coupons aren't good during
18 specials, though, right?
19     A      There are some specials which we discount
20 it down below. You can either use the coupon or the
21 special, whichever is, you know, whichever is best.
22     Q      It doesn't say that on the coupon,
23 though, does it? The coupon says that it's not good
24 during any specials.

144

1      A      I'd have to look at it and see.
2      Q      Okay.
3      A      I mean, there's very --
4           MR. BANDS:      I don't know. Do we
5 have a copy of the coupon book? That's just marketing
6 materials.
7           MR. YIANNE:      Here's a copy.
8           MR. BANDS:      They did copy the
9 coupon book. What time is it?
10          MR. BROWN:      It's almost 5:30.
11          MR. BANDS:      Well, 5:30 was when we
12 were going to decide whether we were going to go longer
13 or not. I don't care.
14          MR. PICCIRILLO:    If you can finish, I
15 don't care.
16          MR. BANDS:      I mean, I'm at a
17 stopping point, and we can go probably all night with
18 this stuff if, I mean, it's --
19          MR. BROWN:      Well, if you're at a
20 stopping point, we've obviously got to come back, anyway.
21 We're not going to get done.
22          MR. BAND:      I mean, yeah. We
23 weren't going to --
24          MR. BROWN:      Okay.

145

1          MR. BANDS:      I mean, it's not --
2 I'm not done. I'm not close to being done.
3          MR. BROWN:      Okay.
4          MR. BANDS:      So, I mean, I just
5 remember you saying 5:30 that you all --
6          MR. BROWN:      That's fine.
7          MR. BANDS:      Is that okay?
8          MR. BROWN:      We can stop now. I
9 don't have any problem with that.
10          MR. BANDS:      I mean, I just --
11 because we started late and it's going to take me longer
12 than I thought.
13          MR. BROWN:      Okay.
14          THE WITNESS:      Whatever you all want
15 to do is fine with me.
16          MR. BROWN:      Why don't we just
17 continue the deposition?
18          MR. BANDS:      That's fine. Like we
19 did with Wally.
20          MR. BROWN:      Yeah.
21          MR. BANDS:      Why don't we have Kim
22 just give you a buzz tomorrow about some dates? I know,
23 I know you can't do it tomorrow. You've already told me
24 that.

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia 25362   (304-346-0460)
*Mary J. Gagnon, CCR*

5/15/03   Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

146

1    MR. BROWN:    Yeah.
2    MR. PICCIRILLO:    We want to go off?
3    MR. BROWN:    Yeah.  Let's go off.
4  Let's go off the video.  I'm sorry.
5    MR. BANDS:    I'm sorry.
6    VIDEOGRAPHER:    This concludes Day One
7  of the video deposition of George Nisbet. Going off the
8  record at 5:28.
9    (WITNESS STANDS ASIDE.)
10    MR. BANDS:    Just back on the
11  record briefly to memorialize that counsel have agreed to
12  introduce into the record the May 22nd, 2000 purchase
13  agreement which was, we believe at this time to have been
14  marked as Exhibit 2, but was not addressed in the
15  deposition per se.  Was not discussed with Mr. Nisbet or
16  Mr. Nisbet was not questioned on it.
17    So for housekeeping purposes, we are
18  simply putting it into the record.  And it's my
19  understanding that counsel has no objection to that.
20    MR. BROWN:    No objection.
21    (WHEREUPON, the document
22    referred to was marked for
23    identification purposes as
24    Deposition Exhibit No. 2,

147

1    and is attached hereto.)
2    (WHEREUPON, the video deposition
3    was adjourned at 5:28 p.m.)

148

SIGNATURE PAGE
I have read the foregoing transcript which
contains a correct record of answers made by me to the
questions therein recorded, or as amended in the
attached list of corrections.

_____    _____
    Date                    Name
STATE OF _____ ,
COUNTY OF _____ , to wit:
    Sworn to before me this _____ day of
_____ , 2003.
    My commission expires _____.

_____
    Notary Public

149

E R R A T A   S H E E T
The following changes and/or corrections are
suggested for the deposition of DONNA MARIE GORDON
taken on May   , 2003.
Page No.   Line No.    Correction      Reason

5/15/03   Deposition of GEORGE R. NISBET, JR.
Ronald & Judy Barker vs.
Thornhill Pontiac-Buick-GMC, Inc., vs. Spectrum Services, Inc.

150

## REPORTER'S CERTIFICATE

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, to-wit:

I, Mary J. Gagnon, Certified Court
Reporter and Notary Public within and for the State of
West Virginia, duly commissioned and qualified, do
hereby certify that the foregoing deposition of GEORGE
R. NISBET, JR. was duly taken by and before me, under
the West Virginia Rules of Civil Procedure, at the time
and place and for the purpose specified in the caption
thereof; the said witness having been duly sworn by me
to testify the whole truth and nothing but the truth
concerning the matter in controversy.

I do certify that the said deposition
was correctly taken by me by means of the Stenomask;
that the same was transcribed by me, and that the said
transcript is a true record of the testimony given by
said witness.

I further certify that I am not
connected by blood or marriage with any of the parties
to this action, am not a relative or employee or
attorney or counsel of any of the parties, nor am I a

151

relative or employee of such attorney or counsel, or
financially interested in the action, or interested,
directly or indirectly, in the matter in controversy.

Given under my hand this 23rd day of May,
2003.


_Mary J Gagnon_
Mary J. Gagnon, CCR
Notary Public

My commission expires December 7, 2010.

NOTARY PUBLIC
STATE OF WEST VIRGINIA
MARY J. GAGNON
13 Cottonwood Dr.
Elkview, WV 25071
My Commission Expires Dec. 7, 2010

**Garrett Reporting Service**
P.O. Box 20200, Charleston, West Virginia  25362   (304-346-0460)
_Mary J. Gagnon, CCR_