```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                          —    —    —

 4
       IN RE:  AUTOMOTIVE PARTS          Case No. 12-02311
 5     ANTITRUST LITIGATION
                                         Hon. Marianne O. Battani
 6     _____/

 7

 8                STATUS CONFERENCE / MOTION HEARING

 9           BEFORE THE HONORABLE MARIANNE O. BATTANI
                   United States District Judge
10            Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
11                       Detroit, Michigan
                    Wednesday, May 11, 2016
12

13

      APPEARANCES:
14
      Direct Purchaser Plaintiffs:
15
      DOUGLAS ABRAHAMS
16    KOHN, SWIFT & GRAF, P.C.
      One South Broad Street, Suite 2100
17    Philadelphia, PA  19107
      (215) 238-1700
18

19    THOMAS C. BRIGHT
      GOLD, BENNET, CERA & SIDENER, L.L.P.
20    595 Market Street, Suite 2300
      San Francisco, CA  94105
21    (415) 777-2230

22

23

24

25
```

```
 1 ┃ APPEARANCES: (Continued)

 2 ┃ Direct Purchaser Plaintiffs:

 3 ┃ WILLIAM G. CALDES
   ┃ SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
 4 ┃ 1818 Market Street, Suite 2500
   ┃ Philadelphia, PA  19103
 5 ┃ (215) 496-0300

 6 ┃
   ┃ DAVID H. FINK
 7 ┃ FINK & ASSOCIATES LAW
   ┃ 38500 Woodward Avenue, Suite 350
 8 ┃ Bloomfield Hills, MI  48304
   ┃ (248) 971-2500
 9 ┃

10 ┃ NATHAN FINK
   ┃ FINK & ASSOCIATES LAW
11 ┃ 38500 Woodward Avenue, Suite 350
   ┃ Bloomfield Hills, MI  48304
12 ┃ (248) 971-2500

13 ┃
   ┃ GREGORY P. HANSEL
14 ┃ PRETI, FLAHERTY, BELIVEAU &
   ┃ PACHIOS, L.L.P.
15 ┃ One City Center
   ┃ Portland, ME  04112
16 ┃ (207) 791-3000

17 ┃
   ┃ WILLIAM E. HOESE
18 ┃ KOHN, SWIFT & GRAF, P.C.
   ┃ One South Broad Street, Suite 2100
19 ┃ Philadelphia, PA  19107
   ┃ (215) 238-1700
20 ┃

21 ┃ JONATHAN M. JAGHER
   ┃ SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
22 ┃ 181 Market Street, Suite 2500
   ┃ Philadelphia, PA  19103
23 ┃ (215) 496-0300

24 ┃

25 ┃
```

```
 1  │  APPEARANCES: (Continued)

 2  │  Direct Purchaser Plaintiffs:

 3  │  STEVEN A. KANNER
    │  FREED, KANNER, LONDON & MILLEN, L.L.C.
 4  │  2201 Waukegan Road, Suite 130
    │  Bannockburn, IL  60015
 5  │  (224) 632-4502

 6  │
    │
 7  │  SARAH GIBBS LEIVICK
    │  KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
 8  │  1633 Broadway
    │  New York, NY  10019
 9  │  (212) 506-1765

10  │  MICHAEL S. SMITH
    │  PRETI, FLAHERTY, BELIVEAU &
11  │  PACHIOS, L.L.P.
    │  One City Center
12  │  Portland, ME  04112
    │  (207) 791-3000
13  │

14  │  EUGENE A. SPECTOR
    │  SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
15  │  1818 Market Street, Suite 2500
    │  Philadelphia, PA  19103
16  │  (215) 496-0300

17  │
    │  JASON J. THOMPSON
18  │  SOMMERS SCHWARTZ, P.C.
    │  One Town Square, 17th Floor
19  │  Southfield, MI  48076
    │  (248) 355-0300
20  │

21  │  RANDALL B. WEILL
    │  PRETI, FLAHERTY, BELIVEAU &
22  │  PACHIOS, L.L.P.
    │  One City Center
23  │  Portland, ME  04112
    │  (207) 791-3000
24  │

25  │
```

```
 1     APPEARANCES: (Continued)

 2     End-Payor Plaintiffs:

 3     DEVON ALLARD
       THE MILLER LAW FIRM, P.C.
 4     950 West University Drive, Suite 300
       Rochester, MI  48307
 5     (248) 841-2200

 6

       JOYCE CHANGE
 7     COTCHETT, PITRE & McCARTHY, L.L.P.
       840 Malcolm Road
 8     Burlingame, CA  94010
       (650) 697-6000
 9

10     BERNARD PERSKY
       ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
11     601 Lexington Avenue, Suite 3400
       New York, NY  10022
12     (212) 9980-7404

13

       WILLIAM V. REISS
14     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
       601 Lexington Avenue, Suite 3400
15     New York, NY  10022
       (212) 980-7405
16

17     HOLLIS L. SALZMAN
       ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
18     601 Lexington Avenue, Suite 3400
       New York, NY  10022
19     (212) 980-7405

20

       MARC M. SELTZER
21     SUSMAN GODFREY, L.L.P
       190 Avenue of the Stars, Suite 950
22     Los Angeles, CA  90067
       (310) 789-3102
23

24

25
```

```
 1    APPEARANCES: (Continued)

 2    End-Payor Plaintiffs:

 3    ELIZABETH T. TRAN
      COTCHETT, PITRE & McCARTHY, L.L.P.
 4    840 Malcolm Road
      Burlingame, CA  94010
 5    (650) 697-6000

 6
      STEVEN N. WILLIAMS
 7    COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
 8    Burlingame, CA  94010
      (650) 697-6000
 9
      Dealership Plaintiffs:
10
      DON BARRETT
11    BARRETT LAW OFFICES
      P.O. Drawer 987
12    Lexington, MS  39095
      (601) 834-2376
13

14    ALEXANDER E. BLUM
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
15    1361 East Big Beaver Road
      Troy, MI  48083
16    (248) 457-9200

17
      JONATHAN W. CUNEO
18    CUNEO, GILBERT & LaDUCA, L.L.P.
      507 C Street NE
19    Washington, D.C.  20002
      (202) 789-3960
20

21    GERARD V. MANTESE
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
22    1361 East Big Beaver Road
      Troy, MI  48083
23    (248) 457-9200

24

25
```

```
 1    APPEARANCES: (Continued)

 2    Dealership Plaintiffs:

 3    J. MANLY PARKS
      DUANE MORRIS, L.L.P.
 4    30 South 17th Street
      Philadelphia, PA  19103
 5    (215) 979-1342

 6
      VICTORIA ROMANENKO
 7    CUNEO, GILBERT & LaDUCA, L.L.P.
      507 C Street NE
 8    Washington, D.C.  20002
      (202) 789-3960
 9

10    For the Defendants:

11    JEFFREY J. AMATO
      WINSTON & STRAWN, L.L.P.
12    200 Park Avenue
      New York, NY  10166
13    (212) 294-4685

14
      ALDEN L. ATKINS
15    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
16    Washington, D.C.  20037
      (202) 639-6613
17

18    DONALD M. BARNES
      PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
19    1919 Pennsylvania Avenue, NW, Suite 500
      Washington, D.C.  20006
20    (202) 778-.3056

21
      JOHN A. BARNSTEAD
22    BARNES & THORNBURG, L.L.P.
      11 South Meridian Street
23    Indianapolis, IN 46204-3535
      (317) 236-1313

24

25
```

1  APPEARANCES: (Continued)

2  **For the Defendants:**

3  HEIDI BRADLEY
   **LANE POWELL, P.C.**
4  1420 Fifth Avenue, Suite 4100
   Seattle, Washington  98101
5  (206) 223-7000

6

7  DAVID BROWNSTEIN
   **FARMER, BROWNSTEIN & JAEGER, L.L.P.**
   235 Montgomery Street, Suite 835
8  San Francisco, CA 94104
   (415) 962-2873

9

10 JEREMY CALSYN
   **CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.**
11 2000 Pennsylvania Avenue NW
   Washington, D.C.  20006
12 (202) 974-1500

13

14 PATRICK J. CAROME
   **WILMER HALE**
   1875 Pennsylvania Avenue NW
15 Washington, D.C.  20006
   (202) 663-6610

16

17 STEVEN F. CHERRY
   **WILMER HALE**
18 1875 Pennsylvania Avenue NW
   Washington, D.C.  20006
19 (202) 663-6321

20

   MICHAEL R. DEZSI
21 **DETTMER & DEZI, P.L.L.C.**
   615 Griswold Street, Suite 1600
22 Detroit, Michigan 48226
   (313) 879-1206

23

24

25

```
 1   APPEARANCES: (Continued)

 2   For the Defendants:

 3   DAVID P. DONOVAN
     WILMER HALE
 4   1875 Pennsylvania Avenue, NW
     Washington, D.C.  20006
 5   (202) 663-6868

 6

     JEETANDER DULANI
 7   PILLBURY, WINTHROP, SHAW, PITMAN, L.L.P.
     1200 Seventeenth Street,NW
 8   Washington, D.C. 20036
     (202) 663.8383
 9

10   ABRAM ELLIS
     SIMPSON, THACHER & BARTLETT, L.L.P.
11   1155 F Street, N.W.
     Washington, D.C. 20004
12   (202) 636-5579

13

     J. CLAYTON EVERETT, JR.
14   MORGAN, LEWIS & BOCKIUS, L.L.P.
     1111 Pennsylvania Avenue NW
15   Washington, D.C.  20004
     (202) 739-5860
16

17   PETER M. FALKENSTEIN
     JAFFE, RAITT, HEUER & WEISS, P.C.
18   535 W. William, Suite 4005
     Ann arbor, MI  48103
19   (734) 222-4776

20

     DANIEL T. FENSKE
21   JENNER & BLOCK
     353 N. Clark Street
22   Chicago, IL 60654-3456
     (312) 222-9350

23

24

25
```

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    MICHELLE K. FISCHER
      JONES DAY
 4    51 Louisiana Avenue NW
      Washington, D.C.  20001
 5    (202) 879-4645

 6
      MICHAEL J. FANELLI
 7    COVINGTON & BURLING, L.L.P.
      1201 Pennsylvania Avenue NW
 8    Washington, D.C.  20004
      (202) 662-5383
 9

10    MARK. A. FORD
      WILMER HALE
11    60 State Street
      Boston, MA 02109
12    (617) 526-6423

13
      LARRY S. GANGNES
14    LANE POWELL, P.C.
      1420 Fifth Avenue, Suite 4100
15    Seattle, Washington  98101
      (206) 223-7000
16

17    DAVID C. GIARDINA
      SIDNEY AUSTIN, L.L.P.
18    One South Dearborn Street
      Chicago, IL  60603
19    (312) 853-4155

20
      ADAM C. HEMLOCK
21    WEIL, GOTSHAL & MANGES, L.L.P.
      767 Fifth Avenue
22    New York, NY  10153
      (212) 310-8281
23

24

25
```

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    FRED K. HERRMANN
      KERR, RUSSELL & WEBER, P.L.C.
 4    500 Woodward Avenue, Suite 2500
      Detroit, MI  48226
 5    (313) 961-0200

 6
      HOWARD B. IWREY
 7    DYKEMA GOSSETT, P.L.L.C.
      39577 Woodward Avenue, Suite 300
 8    Bloomfield Hills, MI  48304
      (248) 203-0526
 9

10    WILLIAM R. JANSEN
      WARNER, NORCROSS & JUDD, L.L.P.
11    2000 Town Center, Suite 2700
      Southfield, MI  48075
12    (248) 784-5178

13
      HEATHER LAMBERG KAFELE
14    SHEARMAN & STERLING, L.L.P.
      801 Pennsylvania Avenue, NW
15    Washington, D.C.  20004
      (202) 508-8097
16

17    TIMOTHY J. LOWE
      McDONALD HOPKINS, P.L.C.
18    39533 Woodward Avenue, Suite 318
      Bloomfield Hills, MI  48304
19    (248) 220-1359

20
      JEFFREY L. KESSLER
21    WINSTON & STRAWN, L.L.P.
      200 Park Avenue
22    New York, NY  10166
      (212) 294-4655

23

24

25
```

```
 1   APPEARANCES: (Continued)

 2   For the Defendants:

 3   MEREDITH JONES KINGSLEY
     ALSTON & BIRD, L.L.P.
 4   1201 West Peachtree Street
     Atlanta, GA  30309
 5   (404) 881-4793

 6

 7   SHELDON H. KLEIN
     BUTZEL LONG, P.C.
 8   41000 Woodward Avenue
     Bloomfield Hills, MI  48304
 9   (248) 258-1414

10   PETER KONTIO
     ALSTON & BIRD, L.L.P.
11   1201 West Peachtree Street
     Atlanta, GA  30309
12   (404) 881-7000

13

14   FRANKLIN LISS
     ARNOLD & PORTER, L.L.P.
15   555 Twelfth Street NW
     Washington, D.C.  20004
16   (202) 942-5000

17   MICHELLE A. MANTINE
     REED SMITH, L.L.P.
18   225 Fifth Avenue, Suite 1200
     Pittsburgh, PA  15222
19   (412) 288-4268

20   ANDREW S. MAROVITZ
     MAYER BROWN, L.L.P.
21   71 South Wacker Drive
     Chicago, IL  60606
22   (312) 701-7116

23

24   MARK MILLER
     BAKER BOTTS, L.L.P.
25
```

```
 1   APPEARANCES: (Continued)

 2   For the Defendants:

 3   BRIAN M. MOORE
     DYKEMA GOSSETT, P.L.L.C.
 4   39577 Woodward Avenue, Suite 300
     Bloomfield Hills, MI  48304
 5   (248) 203-0772

 6

 7   RONALD NIXON
     KEMP KLEIN LAW FIRM
     201 West Big Beaver Road, Suite 600
 8   Troy, MI  48084
     (248) 528-1111
 9

10   ERIK RAVEN-HANSEN
     ALLEN & OVERY, L.L.P.
11   1101 New York Avenue, NW
     Washington, D.C.  20005
12   (202) 683 3861

13

14   ALEXANDER B. REICH
     CALFEE, HALTER & GRISWOLD, L.L.P.
     1405 East Sixth Street
15   Cleveland, OH  44114
     (216) 622-8621
16

17   J. DAVID ROWE
     DUBOIS, BRYANT & CAMPBELL
18   303 Colorado, Suite 2300
     Austin, TX 78701
19   (512) 457-8000

20

21   MICHAEL RUBIN
     ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
22   Washington, D.C.  20004
     (202) 942-5094
23

24

25
```

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    WM. PARKER SANDERS
      SMITH, GAMBRELL & RUSSELL, L.L.P.
 4    Promenade Two, Suite 3100
      1230 Peachtree Street NE
 5    Atlanta, GA  30309
      (404) 815-3684
 6

 7    LARRY J. SAYLOR
      MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
 8    150 West Jefferson Avenue, Suite 2500
      Detroit, MI  48226
 9    (313) 496-7986

10

      SCOTT T. SEABOLT
11    SEABOLT LAW FIRM
      17199 N. Laurel Park Drive, Suite 215
12    Livonia, MI  48152
      (248) 717-1302
13

14    PETER L. SIMMONS
      FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, L.L.P.
15    One New York Plaza
      New York, NY  10004
16    (212) 859-8455

17

      CHARLES SKLARSKY
18    JENNER & BLOCK
      353 N. Clark Street
19    Chicago, IL 60654-3456
      (312) 923-2904
20

21    ANITA STORK
      COVINGTON & BURLING, L.L.P.
22    One Front Street
      San Francisco, CA  94111
23    (415) 591-7050

24

25
```

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    MARGUERITE M. SULLIVAN
      LATHAM & WATKINS, L.L.P.
 4    555 Eleventh Street NW, Suite 1000
      Washington, D.C.  20004
 5    (202) 637-2200

 6

 7    JOANNE GEHA SWANSON
      KERR, RUSSELL & WEBER, P.L.C.
      500 Woodward Avenue, Suite 2500
 8    Detroit, MI  48226
      (313) 961-0200

 9

10    JOHN TALADAY
      BAKER BOTTS, L.L.P.
11    1299 Pennsylvania Avenue NW
      Washington, D.C.  20001
12    (202) 639-7909

13

14    JOHN TANSKI
      AXINN, VELTROP & HARKRIDER
      950 F Street, NW
15    Washington, D.C. 20004
      (202) 912-4700

16

17    LARA TRAGER
      WEIL, GOTSHAL & MANGES, L.L.P.
18    767 Fifth Avenue
      New York, NY  10153
19    (212) 310-8281

20

21    MICHAEL F. TUBACH
      O'MELVENY & MYERS, L.L.P.
      Two Embarcadero Center, 28th Floor
22    San Francisco, CA  94111
      (415) 984-8700

23

24

25
```

1    APPEARANCES: (Continued)

2    **For the Defendants:**

3    LINDSEY ROBINSON VAALA
     **VINSON & ELKINS, L.L.P.**
4    2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, D.C.  20037
5    (202) 639-6585

6

7    WILLIAM J. VIGEN
     **WILLIAMS & CONNOLLY, L.L.P.**
     725 Twelfth Street, N.W.
8    Washington, D.C.  20005
     (202) 434-5868

9

10   OTHER APPEARANCES:

11   R. SCOTT PALMER
     **OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA**
12   The Capital, PL-01
     Tallahassee, FL  32399
13   (850) 414-3300

14

15

16

17

18

19

20

21

22

23

24

25

 1   TABLE OF CONTENTS

 2   MATTER                                              PAGE

3   Report of the Master...............................18

 4   Electronic Filing Protocol.........................21

 5   Status of Settlements..............................24

 6   Class Certification Schedules......................32

 7   Defendants' Motion for Entry of Scheduling orders...59

 8   Auto Dealer Plaintiffs' and End Payors'
     Motion for Preliminary Approval of Settlement
 9   with Mitsubishi Electric...........................68

10   Denso's Motion for Judgment on the Pleadings
     as to Truck and Equipment Dealers..................69

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Detroit, Michigan
 2    Wednesday, May 11, 2016
 3    at about 10:00 a.m.
 4                        —    —    —
 5          (Court and Counsel present.)
 6          THE CASE MANAGER:  Please rise.
 7          The United States District Court for the Eastern
 8    District of Michigan is now in session, the Honorable
 9    Marianne O. Battani presiding.
10          All persons having business therein, draw near,
11    give attention, you shall be heard.
12          God save these United States and this Honorable
13    Court.
14          Please be seated.
15          The Court calls Case No. 12-md-02311, In Re:
16    Automotive Parts Antitrust Litigation.
17          THE COURT:  Good morning.
18          ATTORNEYS:  (Collectively)  Good morning.
19          THE COURT:  I have to say, you make such an
20    impressive group.  I can't tell you what it is like to come
21    out and see all of you sitting here.
22          Okay.  Welcome.  We have a number of things.  It
23    looks like a full docket today.
24          The first thing on the -- well, before I do that
25    first thing, I want to thank Greg -- where is Greg Hansel?
```

1    Thank you again for doing the agenda.

2              MR. HANSEL:  You are welcome, Judge.

3              THE COURT:  I appreciate that.

4              Okay.  Report of the Master.

5              MASTER ESSHAKI:  Yes, Your Honor.  Thank you very

6    much.

7              Just a very few quick opening comments.  I have had

8    an opportunity to chat with the Judge about the process and

9    the procedures.  Based upon my last interaction with you,

10   mediation is difficult in this case primarily because the

11   parties have met and conferred at least three, sometimes six,

12   times to try to whittle down their issues, so when the matter

13   comes to me the parties' positions are well entrenched.  And

14   in our last meetings I spent approximately five hours on two

15   matters and couldn't get either side to budge.  So I am more

16   than willing to engage in a mediation on any motion that

17   anybody feels a mediation would be helpful for.  However,

18   sometimes we simply have to acknowledge that we are at the

19   point where a mediated resolution of a motion just isn't

20   possible.  You have negotiated, negotiated, and negotiated

21   and we can't budge any more, so I want you to keep that in

22   mind.  If we don't engage in a mediation it is because we are

23   really at loggerheads.  And a lot of cases, for example, the

24   case that I have today, do I lift the seal on the transcript?

25   That's not a mediating issue, that's an either/or issue, so

1    we are just going to go forward and argue that and take a

2    ruling on that.

3            Secondly, I am asking all of you, please, when we

4    meet come forward with suggestions that you may have on how

5    to resolve a dispute.  Coming in and saying I must have this

6    and the other side saying you are not getting any of it

7    doesn't produce any results and forces a ruling in which one

8    side or the other, probably both, are going to be very

9    disappointed, but I'm looking for the reasonable people to

10   stand up in this courtroom and come up and say I have a

11   suggestion for how we can address this dispute, and I am

12   willing to take any suggestions any of the parties may have

13   on how to resolve a dispute.  So I'm looking for these

14   reasonable people to rise to the top on both sides, and you

15   can even designate somebody on either side and say you be

16   Mr. Reasonable, Ms. Reasonable, and when we are in the heat

17   of the argument you come up and say may I suggest, I will be

18   glad to take your suggestions because I claim no superiority

19   in these cases.

20           So I'm looking for suggestions, I'm looking for

21   offers of compromise, and I'm also looking for the following:

22   In the last motion for the subpoena for the OEMs it was

23   disclosed to me that we're talking about 1.5 billion

24   documents being requested, at least that's the allegation.

25   You cannot -- you cannot expect to get 1.5 billion documents,

1    at least not in one fell swoop.  So one of the areas I would

2    like you to focus on is how do you eat an 800-pound elephant,

3    and the answer is one bite at a time.  So if you can say all

4    right, we agree that for right now we will take this subset

5    of the documents and get the other side to agree, see what

6    those look like, and then come back and say we will take this

7    subset, the other side agrees we will see what those look

8    like, so if we take it in steps we can attack and concur this

9    1.5 billion pound elephant.  So, please, think about how we

10   can approach your motions on a step-by-step basis as opposed

11   to all or nothing.

12          I regret that we are going to have a hearing again

13   on Friday.  The agenda is so full today that we simply

14   couldn't fit the Delphi case on.  Counsel for Delphi was out

15   of the country or out of the state today and could not

16   participate, so we moved his to Friday.

17          The Judge has some suggestions which she is going

18   to address with you on how we can prevent cramming our

19   dockets together.

20          And keep in mind that if you want to participate in

21   the hearings we can have you participate by conference calls.

22          So, Judge, that's the extent of what I have.

23          THE COURT:  Okay.  Thank you.  Anybody have any

24   questions for the Master?

25          (No response.)

```
 1          THE COURT:  All right.  The next issue is we have
 2     been getting tons of misfiled pleadings and papers and
 3     documents.  It has created quite a difficult situation for my
 4     sole courtroom clerk who does all of the entries so we were
 5     going to do this a couple different ways, and Molly was going
 6     to address, but I'm going to rather do this, and I have
 7     discussed this with Molly because she is going to put this
 8     on, but on June 27th at 2:00 we are going to have a little
 9     training session for how to file in this case.  This is not
10     for you because I don't think -- well, maybe you do but I
11     doubt it, any one of you actually do the filing.  I'm talking
12     literally about getting it on the docket kind of thing.  I
13     want everyone to have a representative.  Now, you could group
14     together, I mean, this would be a great idea, you group
15     together and you have one person who is your hit clerk for
16     filing so if there's questions or anything the rest of you
17     can call that person.
18          The defendants, rather than having all of you, if
19     you want to form a group -- you can do it any way you want,
20     you could send somebody from each defendant or you could form
21     a group and say we are going to have this person be our hit
22     filling person.  We get a lot of phone calls and of course
23     most of them come up around the time of our meetings, and it
24     is not that we don't want to talk to you and answer your
25     questions and ultimately we may have to but I want you to
```

1    have a hit person first, and probably many of your staff will

2    be very happy to have this type of thing, so we are going to

3    -- right now, I mean, I didn't think this would ever be

4    necessary but as we just expand in these parts it is

5    ridiculous and we have to do something, and so we are going

6    to do a training session, so June 27th at 2:00.  All right.

7            Again, I repeat, this is not for you unless you are

8    doing your own filing.  Please do not feel that you should

9    come because you should not, or you have to come because you

10   do not, you may come of course, but I am not anticipating

11   that.  I truly want to work with -- I don't know who you have

12   do this, paralegals, secretaries, clerks, I don't know what

13   the position is, but whatever that is within your firm I

14   would like that person to come or, as I said, a group of you

15   can get together and have a representative, that's probably

16   even more practical, to be honest, but I am leaving that up

17   to you, but you all have to have somebody that is your point

18   person for the protocol for electronic filing.

19           I am not doing this because I don't know how to do

20   it, so this is not me, this is going to be people who really

21   know how to do these kind of things.

22           Okay.  The next thing is that we had a situation

23   where we had the hoses and the automotive hoses which are

24   given the same part number.  It is automotive hoses and

25   automotive brake hoses I think were the two ones.  Is that

1    correct, Molly, those two?

2            THE LAW CLERK:  Yes.

3            THE COURT:  And now according to the protocol when

4    the Court assigns any new number the parties have 21 days to

5    file an objection to the Court's designation because that's

6    what we developed, and that really wasn't followed but it was

7    brought to my attention and I want to clarify this.

8            I don't know who's involved in this here, the hose

9    and brake hoses, who want the separate numbers?

10           Okay.  Greg, do you want to come up to the podium?

11           MR. HANSEL:  Greg Hansel for the direct purchasers,

12   Your Honor.

13           I believe automotive hoses and automotive brake

14   hoses should be separate case numbers.

15           THE COURT:  Okay.  Separate parts?

16           MR. HANSEL:  Separate parts.  I believe the hoses

17   are mostly rubber and the brake hoses are mostly metal and

18   they are different that way.

19           THE COURT:  Okay.

20           MR. HANSEL:  But in any event I think they are

21   separate DOJ investigations and it would be appropriate for

22   them to be separate parts.

23           THE COURT:  Are they separate defendants?

24           MR. HANSEL:  Yes.

25           THE COURT:  They are.  Okay.  Would anybody be --

1    object to us renumbering this?

2              (No response.)

3              THE COURT:  Okay.  We will renumber that and

4    separate them and give them each part.  Again, I have no

5    problem when these come in with similar names and the clerk

6    looks at them they get the same number, so if this happens

7    again please be right on it and say no, I want a separate

8    number, or maybe even when you are filing attach a letter,

9    you know, saying this isn't part of whatever is close to it

10   or something like that.  So this is not a problem, we will

11   take care of that, okay, and refile.

12             All right.  Status of settlements.  Who wants to

13   report on that?  Okay.

14             MR. BARRETT:  May it please the Court, Your Honor,

15   I'm Don Barrett for the auto dealers, and Hollis Salzman for

16   the end payors.

17             Here is our current report on settlement activity.

18   Your Honor, as you know, it has finally approved settlements

19   for just under $250 million and the claims processes are

20   ongoing as to those.  As Your Honor also knows, the auto

21   dealers and the end payors working together have settled

22   MELCO for a little over 84 and-a-half million dollars and

23   those motions for preliminary approval are pending I think

24   since April 14th.

25             We are pleased to report to Your Honor today that

1    we have reached nine other settlements in principle, and what

2    that means is we are still swapping settlement agreements

3    back and forth getting the -- working on the languages, there

4    is no particular problem with any of them, it is just -- it

5    just takes a while with the defendants being in Japan.  We

6    are sure that we will be filing motions for preliminary

7    approval on most of those and in the very near future.

8         Your Honor, counting the Sumitomo settlement which

9    you approved preliminary back in January, the auto dealers

10   and the end payors have another $251 million of settlements

11   for which we will be seeking preliminary approval some time

12   in the near future, and at least for the auto dealers we hope

13   to get -- do them all at one time and get final approval with

14   one notice sometime in the fall.

15        Your Honor, we will also say, and I don't think I'm

16   being overly optimistic, that that's -- that $251 million is

17   a minimum number.  We are in realistic negotiations with ten

18   other defendants, and we are piddling around with another

19   four defendants who have not gotten serious yet but probably

20   will, and the current settlement number of $251 million could

21   easily double or maybe more than that in the not too distant

22   future.

23        The parties appreciate very much the Court giving

24   us a forward direction in this case but also giving us elbow

25   room to get these cases resolved in an equitable way.

```
 1              Let me add in closing that there are 15 defendants
 2    who we have reached out to inviting a settlement discussion
 3    only to be ignored, and the indirect purchaser plaintiffs
 4    would jointly suggest to these people that the steam whistle
 5    that they hear is the train leaving the station.  Thank you,
 6    Your Honor.
 7              THE COURT:  Okay.  Ms. Salzman, anything that you
 8    wanted to add to that?
 9              MS. SALZMAN:  I have nothing to add.  That fully
10    described it.  Thank you.
11              MR. KANNER.  Good morning, Your Honor.
12    Steve Kanner on behalf of the direct purchaser plaintiffs.
13              We have two settlements that we would advise the
14    Court of both with respect to wire harness.  The first is
15    Tokai Rika, and that is in its final stages where parties are
16    doing the -- dotting the Is and crossing the Ts on the
17    agreements.  And another matter which is now executed and is,
18    in fact, funds transferred is that for GS Electeck and so
19    that -- with the process of that we are concluding those two
20    cases.  We will present these along with some others we
21    expect to be coming in the future, and it seems to make sense
22    for judicial economy to aggregate those motions for
23    preliminary approval, and other discussions go on.
24              Thank you very much, Your Honor.
25              THE COURT:  Okay.  Thank you.
```

1    MR. PARKS: Good morning, Your Honor. Manly Parks

2  on behalf of the truck and equipment dealer plaintiffs.

3    I'm pleased to report that we have arrived at four

4  settlements, two of which are in the wire harness matter, one

5  is with the GS Electeck defendants, we are in the process of

6  documenting that settlement. Another is with Tokai Rika and

7  that is documented and we'll be filing a combined motion for

8  preliminary approval in the near future on those.

9    In occupant safety systems we have executed a

10  settlement agreement with the AutoLiv defendants, and we have

11  arrived at a final settlement with the TRW defendants and are

12  in the process of documenting that and hope to be presenting

13  a combined motion for preliminary approval on those shortly

14  as well.

15    THE COURT: Thank you. Sounds good. Okay. I'm

16  glad to hear about this. It is very, very good.

17    That does raise another question that I want to

18  throw out to you that follows but isn't on the agenda. I

19  have struggled in each of the settlements with a fair and

20  reasonable attorney fee. I think as we get more and more of

21  these settlements, as some of the settlements get larger we

22  need to do something -- I need to do something about these

23  attorney fees to keep them within the realm of reason. I

24  don't know what it is called, to me I think of it as a

25  teeter-totter, as the settlements go up the percentages have

```
 1   to come down -- or may come down.  And I do believe that
 2   rather than going through this in every settlement we need to
 3   have some discussion about what's appropriate, what's
 4   reasonable, not that you aren't all worth millions of dollars
 5   because you are, you are doing a tremendous job, and I'm not
 6   questioning the job, I'm questioning how we resolve this.  It
 7   doesn't really have anything to do with the defendants but it
 8   is a question that the Court wants to resolve now.
 9          So what I would like to do, and I'm open to listen
10   to your suggestions because I want your input, and I'm not
11   saying it may not be that we would just continue at an X
12   percentage, you know, of the recovery, I don't know.  I just
13   think that when we add this all up it may come to a point
14   that it is simply not reasonable.  So I want to give you an
15   opportunity to give me some input on attorney fees in
16   general.  The defendants may do that too, although, you know,
17   you may say none, I don't know, but if you wish you can do
18   that, you certainly don't have to, but I am very interested
19   in plaintiffs' opinions of ways of determining what is a
20   reasonable attorney fee.
21          I have been reading a bit -- starting to read a bit
22   about these cases and I certainly know of some cases where
23   they are extremely large, other cases where the percentages
24   are brought down because of the size of the recovery, but I
25   think it would be better to take care of this right now at
```

```
 1    the beginning.  I know we have already awarded two attorney
 2    fees, and we have one more up today.
 3           So what I'm going to ask you to do if you choose is
 4    to give the Court your opinions by way of a brief, your
 5    suggestions as to how this can be handled by way of a brief,
 6    your input if it should be, you know, a sliding scale and
 7    there are charts involved, if the settlement is worth X
 8    dollars, et cetera.  And I would like to do that -- I've got
 9    June 1st but this is already the middle of May.  How much
10    time do you think you need, a month?  Anybody want to speak
11    to what you want?  I know I'm throwing this out at you.
12           MR. HANSEL:  Perhaps 30 days.
13           THE COURT:  Would that be good?
14           MR. WILLIAMS:  That's fine, Your Honor.
15           MR. BARRETT:  30 days is fine.
16           THE COURT:  Okay.  Let's take a look.  Okay.
17    June 11th is a Saturday.  Let's say -- I don't like anything
18    due on a Monday so let's say June 14th.  I don't care how you
19    do it.  I don't care if you want to get together and some of
20    you do one brief, it is totally up to you.  I'm just looking
21    for input as to attorneys' fees in a case of this magnitude.
22    Okay.  Any questions by anybody?
23           (No response.)
24           THE COURT:  Okay.
25           MR. KANNER:  Your Honor, Steve Kanner again.
```

```
 1          THE COURT:  Yes, Mr. Kanner.
 2          MR. KANNER:  Did Your Honor contemplate just making
 3   a decision on the papers that we file, or did Your Honor want
 4   to have a conversation, as it were, where we can talk about
 5   the various alternatives because that may be of some value?
 6          THE COURT:  Thank you.  You know, it may very well
 7   be that I would like a conversation.  I haven't really
 8   thought about this, it just came to me this week that I need
 9   to have -- I have to have a standard, I have to make sure
10   people are all treated in all classes fairly but yet I have
11   to look at that upper limit and see what's reasonable.
12          MR. HANSEL:  Greg Hansel for direct purchasers,
13   Your Honor.  One other comment.
14          Normally attorney fees would be a matter for a
15   group of class of plaintiffs and the class members and class
16   counsel and then, of course, class members have the right to
17   get separate counsel to object to attorney fees if they wish.
18   But at least in my limited experience it would normally not
19   be appropriate for the defendants to weigh in on the
20   plaintiffs' attorney fees, and if the defendants were going
21   to weigh in on the plaintiffs' attorney fees, I don't want to
22   cause -- ruffle any feathers here, Your Honor, but that might
23   conceivably open the doors what are the defendants' attorney
24   fees and how those compare to the plaintiffs' attorney fees,
25   and I just don't think the defendants want to go there but if
```

1    they do, you know, we would certainly think that some

2    comparison might be of value if that's a door the defendants

3    wish to open, but I would suggest we not do that, Your Honor,

4    respectfully.

5         THE COURT:  Defendants have any thoughts?  I don't

6    know if any of you want to weigh in on it.

7         MR. TUBACH:  Good morning, Your Honor.

8    Michael Tubach on behalf of the Leoni defendants.

9         I do think the defendants may have some interest,

10   not so much in what the size of the attorney fees is, but in

11   making sure that any settlements the defendants do reach are

12   not held up in being finalized as a result of what the Court

13   may want to do with attorney fees.  I think that would be a

14   legitimate defense interest.

15        THE COURT:  Well, I don't think settlements would

16   be held up because of attorney fees, the settlement amount is

17   the settlement amount, it is just how much of that goes to

18   the attorneys, and we know what the max would be because

19   that's always in the notice.

20        MR. TUBACH:  As long as the Court wasn't

21   contemplating holding up finalizing settlements and --

22        THE COURT:  No, no, no, not in the least.

23        MR. TUBACH:  Thank you.

24        MR. KANNER:  Your Honor, I believe that's why the

25   Court suggested that we resolve this now rather than down the

```
 1    road so that shouldn't be a concern.

 2              THE COURT:  Right.

 3              MR. KANNER:  Thank you.

 4              THE COURT:  Right, right.  Okay.  I am looking to

 5    plaintiffs to see what they are doing, I don't think you have

 6    to worry about the defendants' input, but I'm not going to

 7    bar anybody if they have some comment.  And I will consider

 8    the suggestion that we have an oral -- not argument but a

 9    discussion about attorney fees.  If we do I may just put it

10    on the agenda for the next meeting.  Okay.

11              All right.  And I have something about the agendas

12    but let's follow the docket and when we get to the agenda we

13    will talk about that.

14              The next issue is for the motions for extension of

15    class certification.  And let me indicate to you -- just one

16    minute.  I want to tell you I know that we have not yet -- we

17    have bearings but wire harness and anti-vibration rubber

18    parts there's no response yet from the defendants unless it

19    was just filed, and we had so many filings today it could be,

20    but I don't have any response that I have read, but I think

21    the wire harness, the bearings and anti-vibration rubber

22    parts pretty much should be in the same discussion as to the

23    extension of the class schedule, at least that's how I see

24    it.  So even though I don't have the briefs or -- excuse me,

25    responses, I realize that, but I think we can discuss it
```

 1    today.  I don't think it is anything that we need to delay.

 2    So, Defendants, you would have an opportunity to speak to

 3    this.  And you may proceed, Plaintiffs.

 4          MS. TRAN:  Good morning, Your Honor.

 5    Elizabeth Tran with Cotchett, Pitre, McCarthy for the

 6    end payor plaintiffs.

 7          As you mentioned, neither the wire harness nor AVRP

 8    defendants have filed opps.  End payors haven't filed replies

 9    either, and we were planning to reply to all three briefs in

10    one reply, which would be due I believe on May 23rd, and we

11    are hoping to set a hearing date sometime in early June to

12    have this discussion rather than do it today.

13          THE COURT:  No, let's do it today.  Let's do it

14    today.  Why not?

15          MS. TRAN:  Okay.

16          THE COURT:  You are ready to do it, aren't you?

17          MS. TRAN:  Sure.

18          THE COURT:  I thought so.  Go ahead.

19          MS. TRAN:  So this extension motion is similar to

20    the last one we submitted in December that the Court granted

21    in January in that both motions seek an extension of four

22    months and are based on the landscape of non-party OEM

23    discovery.  They differ, however, because four months ago the

24    OEMs were refusing to produce data and documents, and today

25    they are refusing to submit to 30(b)(6) depositions

1    concerning their responsive data and documents as well as the

2    cost of accessing, searching for and producing the data.

3            Now, Master Esshaki ordered these depositions at a

4    hearing on March 24th when it became clear that the OEMs were

5    not conversant enough with their own data and documents to

6    permit Master Esshaki to rule on the motion to compel OEM

7    discovery that the parties filed, so this interim step in the

8    resolution of the motion to compel, that is taking 30(b)(6)

9    depositions of the main OEM groups, Toyota, Honda, Nissan,

10   Subaru, et cetera, will cause no less than four months of

11   delay in the resolution of the motion to compel and the

12   ultimate production of OEM discovery, but this interim step

13   taking depositions is necessary because it will allow us to

14   figure out what the OEMs have, they are not even sure what

15   they have.  It will allow Master Esshaki to properly rule on

16   the motion to compel, and it will allow end payors to

17   eventually get this evidence that we need from OEMs that are

18   relevant to us showing overcharge and passthrough of such an

19   overcharge from defendants to OEMs to auto dealers to

20   end payors, so it is critical evidence that we need.

21           And we sincerely believe that because the OEMs have

22   now objected to Master Esshaki's order on the depositions

23   that it will add some time and delay, and then the deposition

24   needs to happen and then --

25           THE COURT:  Let me just interrupt you there because

1    you looked at that, that there -- the fact that there are

2    objections to the Master's ruling, and I have set a hearing

3    date for those objections, so here is another date that you

4    don't have, June 23rd at 2:00.

5           MS. TRAN:  June 23rd?

6           THE COURT:  Yes.  I did that because I think we

7    need to move along so I'm trying to set it so you would know

8    it now, so you can consider that in your argument.

9           MS. TRAN:  Sure.  So assuming you make a ruling on

10   June 23rd, depositions would begin immediately.

11   Master Esshaki has allotted 45 days for them, so that would

12   take us through the middle of August.  And let's assume

13   Master Esshaki decides to enforce the subpoena against the

14   OEMs, the OEMs would then have to produce this discovery.  It

15   would take them let's say ideally a month, so that would take

16   you to mid September, and then our experts -- our plaintiffs'

17   experts would have to analyze, review, put together their

18   reports, we would have to draft our motion for class

19   certification.  So the November 4th deadline for class cert

20   in wire harness just is simply not workable in light of the

21   time line.

22          And I think we mentioned in our brief that our

23   experts in an ideal world would like six months.  We know the

24   Court may not grant that, but that's the time they need and

25   sometimes we don't even know what the OEMs' data and

```
 1    documents look like, you know, sometimes you have to put it
 2    in a format that is workable for experts, and we are also
 3    writing this brief, so we think asking for another four
 4    months in light of these depositions probably taking place is
 5    perfectly reasonable.
 6              THE COURT:  Okay.  Thank you.
 7              MS. TRAN:  Thank you.
 8              MR. SPECTOR:  Good morning, Your Honor.
 9    Gene Spector on behalf of the direct purchaser plaintiffs.
10              THE COURT:  Good morning.
11              MR. SPECTOR:  We too have asked for an extension of
12    time but only in the bearings case on the class certification
13    schedule.  We do that for a couple of reasons.  One, we want
14    to stay on the same schedule keeping the cases together so
15    that whatever briefing schedule the end payors have is the
16    same for us.
17              THE COURT:  Yes.
18              MR. SPECTOR:  And the other reason is we had
19    produced to us on the last day of document production that
20    was due, which was March 31st, 63.6 million pages.
21              THE COURT:  That's nothing compared to 1.5 billion.
22    If you can't handle that --
23              MR. SPECTOR:  We don't have to worry about handling
24    the 1.5 billion, we are not working on the OEM stuff.
25              All kidding aside, we started this process with
```

```
 1    discovery requests in the fall, negotiated a deal, worked
 2    through with the idea that we would get a rolling production.
 3    We got a rolling production.  Up until March 30th we had
 4    7 million or so documents -- or pages of documents as part of
 5    that production, and then on the last day the production was
 6    due it became tenfold that, it became over 70 million pages
 7    of documents for us to review.  It can't be done in the time
 8    that is allotted, not reasonable and depositions being taken.
 9            Under those circumstances, Your Honor, we thought
10    that an extension for the additional four months as requested
11    by the end payors and the auto dealers made sense and would
12    work for us as well.
13            THE COURT:  Okay.  Thank you.
14            MR. SPECTOR:  Thank you, Your Honor.
15            MR. PARKS:  Good morning, Manly Parks for the truck
16    and equipment dealer plaintiffs again.
17            I would simply note that we are in the similar
18    position to the auto dealer and end payor plaintiffs.  We
19    have the same passthrough issues.  The OEM discovery is
20    essential to proceeding.  Our experts have the same
21    challenges that the other indirect purchaser plaintiff
22    experts have, and consequently, of course, we want to stay on
23    the same schedule, so we have joined with their motion.
24            THE COURT:  Okay.  It is this OEM discovery that is
25    really messing all of this up, the scheduling.
```

 1          MR. PARKS:  And certainly in bearings the

 2    production issues are significant for us as well.

 3          THE COURT:  Yes.  Okay.  Good morning, Mr. Cuneo.

 4          MR. CUNEO:  Good morning, Your Honor.

 5    Jonathan Cuneo for the auto dealers.

 6          We would like to stay on the same schedule as

 7    everyone else.  Ms. Tran ably set forth the reasons that we

 8    joined that motion.

 9          THE COURT:  Okay.  I plan to keep all of you on the

10    same schedule, so whatever that schedule you all are going to

11    be on it.

12          MR. CUNEO:  But in any event, I thought that the

13    presentation that Mr. Barrett made early this morning showed

14    that at least the settlement train is moving along well, the

15    case is moving along well.  This is just a -- doing a class

16    certification motion without the OEM data is like playing

17    Hamlet without the Prince of Denmark.  I mean, it is

18    something that our experts need and I think that point has

19    been made, but I just want to reiterate it.  Thank you, Your

20    Honor.

21          THE COURT:  All right.  Thank you.  Defendants?

22          MR. CHERRY:  Thank you, Your Honor.  Steve Cherry

23    representing the Denso defendants, and speaking on behalf of

24    wire harness defendants.

25          We are concerned about another extension.  You

 1    know, we had all agreed to a July 1st filing date.  At the

 2    last hearing Your Honor agreed to a four-month extension but

 3    noted that others should not be expected, and yet here we are

 4    at the very next hearing asking for another four months.  You

 5    put them together it is eight months, it is almost another

 6    year basically.  Our case was filed in October of 2011, and

 7    with this extension they are asking for a hearing on class

 8    cert in January 2018, it would be almost seven years -- six

 9    and-a-half years since before the filing before we ever even

10    get to a hearing.  We are concerned that there is just going

11    to be seriatim requests for an extension here.

12          And we also believe that, you know, we did submit

13    in our last opposition, we haven't had a chance -- our filing

14    date hasn't come yet for this motion.

15          THE COURT:  Right, I understand.

16          MR. CHERRY:  But in our last one we laid out some

17    of the chronology here, and we believe there really were

18    years of delay here before there were any efforts by the

19    plaintiffs to get this discovery, and the defendants pushed

20    and pushed to try to get them to do so and they really would

21    not engage on this, and at some point we think that should be

22    acknowledged.

23          We also do worry that there just hasn't been enough

24    urgency in pursuing this.  I mean, we have worked together

25    and we tried to work together collegially but things do drag

1    on, and we think that there needs to be a fire lit under

2    people's feet here, and sticking to a schedule does that.

3             And there are OEMs here who are not being

4    obstructive, who have said that they are willing to produce

5    documents.  Ford is one, Mazda is one, there are others that

6    were not subject to these motions before the Special Master,

7    and there doesn't seem to have been much effort to follow up

8    on that.  They seem to be willing to produce and the

9    plaintiffs aren't really going after that.  So we think

10   sticking to the schedule will incentivize people to pursue

11   what they need and to get this done in time.

12            The other thing is, you know, the motions are due

13   in November right now, and that's six months away, and it is

14   premature to say what can be done in the next six months.

15   And rather than delay things we think these Rule 30(b)(6)

16   motions will actually help to expedite things because they

17   will -- the whole point of them we believe is to get some

18   initial discovery about how the OEMs do their procurement,

19   how they price vehicles and to really target our discovery

20   and to get what we need, as the Special Master suggested, in

21   a more expeditious way, that's the whole point, and we think

22   they will be very helpful for that rather than just cause

23   delay.  But in any event, as Ms. Tran said, we do think they

24   are essential and that they will be helpful.

25            The other thing we would just point out is that --

```
 1    I don't know if you have been reading yet what the OEMs have
 2    been filing, and we have gotten dozens of declarations from
 3    all of these OEMs, from their CFOs and the people responsible
 4    for pricing vehicles, who are all swearing under oath that
 5    any overcharge on any of these components would have had no
 6    impact whatsoever on how they priced vehicles, and that
 7    therefore this discovery is unnecessary.  Now, I don't know
 8    if we agree it is unnecessary but certainly we should take
 9    that into account.  I mean, we could very well just be
10    delaying the inevitable here.  If, in fact, that holds up,
11    class certification should be denied.  I mean, the downstream
12    claims fail --
13            THE COURT:  But the OEMs say there is nothing to
14    pass on and they can't prove it, and that's a problem.
15            MR. CHERRY:  That's what they say and they are all
16    saying it under oath, I mean, we shouldn't take that lightly.
17    And so if that's true, that may truncate what is needed here.
18            THE COURT:  Okay.
19            MR. CHERRY:  Thank you, Your Honor.
20            THE COURT:  Thank you, Mr. Cherry.
21            MR. KESSLER:  Good morning, Your Honor.
22    Jeffery Kessler for the bearings defendants.
23            THE COURT:  Yes.
24            MR. KESSLER:  We share much of the concerns of the
25    wire harness defendants, and I do think it is significant
```

1    that plaintiffs' counsel started out by saying this was
2    similar to the motion at the last conference.  It is
3    virtually identical to the motion at the last conference.
4    And what our -- and you will remember we had a dialogue about
5    whether the last motion was premature because they didn't
6    really know what they wanted to, and isn't it better to let
7    the schedule play out and then see what we really need.
8    Well, here we are again, and we heard again they don't know
9    exactly what they need or what is going to be produced.  And
10   our concern, Your Honor, is that we are trying to take this
11   massive proceeding, I know Your Honor is working very hard,
12   and find a way to get to a point of resolution.  And our
13   concern is that if we keep granting these requests to extend
14   there is no pressure.  Okay.  I mean, frankly, and again I'm
15   not trying to be critical, but they have a massive team of
16   people here.
17          The fact that there are OEMs who are willing to
18   produce documents now, which there are, and they have done
19   nothing to pursue that is troubling.  The fact that, you
20   know, depositions have been offered in bearings, for example,
21   none of yet have been scheduled because they don't pursue
22   that.  And my fear, Your Honor, and I listened carefully to
23   all the comments, especially by Mr. Cuneo, is there is this
24   feeling that putting off the day of reckoning is very much in
25   plaintiffs' interest because every four months is massive

1   additional defense costs for the other side and frankly they

2   wear us out, and, you know, they get us to a point where

3   companies who believe, for example, that the OEMs are right,

4   that there is no passthrough at all, okay, which is what all

5   the OEMs are saying, which means these cases should be

6   denied, nonetheless feel well, if they are paying a million

7   dollars a month in defense fees because of massive discovery

8   costs then maybe they have to give up.  And the idea of keep

9   extending that schedule so that, you know, again as we said,

10  you have one case that will now have class certification

11  eight years after it's filed, which I think may be the

12  longest in recent memory.  Okay.  Think of all the cases

13  sitting behind us.

14          THE COURT:  I have.

15          MR. KESSLER:  And so, Your Honor, what we are

16  really saying is we think you should hold all of our feet to

17  the fire.  We heard from the direct plaintiffs that they are

18  complaining that we produced $53 million -- 53 million

19  documents.  They would like $53 million but we produced

20  documents.

21          THE COURT:  Tell me this, would it be cheaper to

22  pay the $56 million or produce the documents?

23          MR. KESSLER:  Right, right.  So --

24          MR. FINK:  Answer the Judge.

25          MR. KESSLER:  So the answer to that is they filed

```
 1    what we thought were extremely overbroad requests, and we
 2    told them that in our various meet and confers, and they
 3    insisted on a massive number of custodians, which we told
 4    them were too many, more than they needed, but we ended up
 5    where we ended up, and at enormous costs each of the bearing
 6    defendants managed to comply with the schedule that the Court
 7    ordered because we didn't want class certification to be put
 8    off so we incurred all of this cost to produce it, and then
 9    there the response we got is well, gee, we didn't really
10    think you were going to give us all of these documents.  And
11    I would note that virtually none of them are necessary for
12    class certification, that's the other point of this.
13            Most of this massive discovery is of e-mails and
14    other things and things like that which may be eventually
15    relevant to liability issues, you know, on terms of meetings
16    with competitors and things, but they all have already had
17    DOJ documents for years, as Your Honor knows.  That was more
18    than enough what they would need for class certification in
19    terms of the scope of the conspiracy, they have had all of
20    the DOJ documents for years, all of this is add on.  All they
21    really need for the class cert, they do need the data and
22    that's in part what we are discussing with the OEMs,
23    et cetera, but the idea that they should be given more time
24    because at 53 million liability documents that have to be
25    studied doesn't make any sense in terms of class
```

1    certification except as another reason for delay.

2         So our suggestion, Your Honor, is to don't do

3    anything right now on the schedule, you know, just let it be,

4    let's see what happens with these OEMs.  Perhaps Your Honor

5    can find a way to shorten the schedule.  For example, it may

6    be it is not necessarily required, this is a deposition, that

7    all of these depositions be stayed pending your ruling.  It

8    would be good, for example, if we could schedule all the OEM

9    depositions now subject to your ruling in June.  In other

10   words, why should the OEMs be able to sit there and say we

11   are not even going to discuss schedules until after Your

12   Honor rules?  If Your Honor rules against then we will cancel

13   the schedule.

14        There are things that can be done to move this

15   upright now, get everything in place with the OEMs, and we

16   don't know why it then takes 45 days.  It is then -- it is

17   true the magistrate has given them 45 days but there aren't

18   45 OEMs.  They could double track depositions.  You know, why

19   can't all the OEM depositions be done in 30 days?  In other

20   words, the more pressure you put on us -- what I found for

21   lawyers, and I have been practicing maybe too long but a long

22   time, is the more time you give us we will fill it.  Okay.

23   And if you tell us that this is the deadline we will moan but

24   we will meet it.

25        A young lawyer once asked me how do you know that

```
 1    you are done preparing for trial?  Well, the trial starts.
 2    Okay.  And that's really what this is.  And so I urge you
 3    don't give out any extensions now.  If they really need it
 4    when we get closer to this after we deal with these OEMs,
 5    lets them do that.  And by the way, let them come in with
 6    expert declarations that explain exactly what they need and
 7    why they would need more time.  It shouldn't just be counsel
 8    coming up and saying well, our experts need six months.  Why
 9    did their experts need six months?  I have done cases where
10    the experts have done it in three months.  I mean, again, it
11    is sort of like the vacuum of time will fill up.  So I know
12    Your Honor will rule wisely on this but I think the best
13    thing now would be just let it be, that would be my
14    suggestion.  Thank you.
15              THE COURT:  Okay.
16              MR. HEMLOCK:  Your Honor, Adam Hemlock, Weil,
17    Gotshal & Manges, on behalf of the Bridgestone defendants.
18              I want to add briefly, I have been heavily involved
19    in the process for OEM discovery, and one point I would note
20    is that two of the major OEMs have already in light of the
21    pressure that Special Master Esshaki started to put on them
22    to disclose what information they have and how burdensome it
23    would be and so on have started in some way to cooperate.
24    And so echoing Mr. Kessler's point, the pressure is helpful
25    not just with respect to us but with respect to the OEMs as
```

 1    well to get them moving to cooperate with the serving

 2    parties.

 3            Nissan has agreed to have a conversation with us

 4    about the depositions and is not standing on its objection,

 5    they have already started to discuss with us the schedule and

 6    how to move forward in that regard.

 7            And Honda frankly has agreed to discuss production

 8    of documents.  Although they put in an objection, we do have

 9    a parallel track with them to discuss what documents and data

10    they have and a reasonable time line for producing some

11    reasonable volume of documents.

12            So I think if Your Honor would continue to put

13    pressure on all of the parties, continue as Mr. Kessler

14    suggested, it would be good for everyone.

15            On behalf of the AVP defendants I would say we

16    agree completely that any extension at this point is

17    premature, we should continue to move forward, see how things

18    are going and go from there.  Thank you.

19            THE COURT:  Thank you.  Ms. Tran?

20            MS. TRAN:  Elizabeth Tran for the end payor

21    plaintiffs again.

22            First of all, we wanted to bring this motion at the

23    earliest opportunity that we could.  And when Special

24    Master Esshaki ordered these depositions we immediately

25    realized that we would need more time, and that's why we are

1    bringing it to you today.  You and I discussed the time line

2    when I first came up here, and we wouldn't be able to get

3    documents until September, class certification in November

4    and December just is not feasible, that's two months, and we

5    are not even sure if the OEMs would be able to produce what

6    we need in a month.  I mean, even with -- when -- we have

7    been negotiating with defendants for their own transactional

8    data, it has taken them months and month to give this to us.

9         I would like to address some points that Mr. Cherry

10   raised.  All defendants in this room concede that this

11   evidence that the OEMs have is important to us, and it is

12   especially important to the indirect plaintiffs who have to

13   show the overcharge and passthrough at each stage of the

14   chain of distribution.  We are talking about the first class

15   certification motion in this case.  You mentioned at the last

16   status conference it is important, it will set the tone for

17   the next 30 class certification motions, we need to do it

18   right and the only way we can do it right is if we have all

19   the information.

20        Mr. Cherry mentions that some OEMs are -- have been

21   complying.  The reason why they have been sort of complying

22   is we were the ones that brokered the deals for the OEMs to

23   cooperate.  And the reason for this delay is, you know,

24   attributable to defendants as well.  Defendants were the ones

25   who agreed to give the OEMs more time to respond to the

```
 1    motion to compel.

 2            As to Mr. Cherry's point that OEMs submitted

 3    declarations that said there was no overcharge.  Well, we are

 4    the plaintiffs, we should have our own opportunity to prove

 5    the claims we set forth.  This is our class certification

 6    motion, and we want to be able to do it with full evidence

 7    and the way we want to do it.  You know, even though OEMs

 8    submitted declarations they are not relevant to what we are

 9    going to set forth in our class certification motion, which

10    we haven't even filed yet.

11            We don't think defendants are burdened by another

12    four-month extension.  We think they are opposing this motion

13    as a tactical advantage.  We want to do it right and it may

14    require more time.  There is -- I can't even fathom any sort

15    of burden on their clients for having to wait another four

16    months.

17            And I just wanted to note that only a few OEMs have

18    agreed to comply.  Our complaints have said that the major

19    affected OEMs are Toyota, Honda, Nissan, Subaru, not all of

20    them are complying.  So even though some of them have -- we

21    put pressure on some of them, we need the cooperation from

22    all of them.

23            THE COURT:  Okay.  That's sufficient.

24            MS. TRAN:  All right.

25            THE COURT:  Thank you.  Okay.  Counsel --
```

1    Mr. Spector and then Mr. Cuneo.

2         MR. SPECTOR:  Your Honor, very briefly.

3    Mr. Kessler makes the point that time is a vacuum that fills,

4    that if you give us time we will fill it -- fill up that time

5    whether we need it or not.  Apparently the bearings

6    defendants took the vacuum of time and filled it with a

7    last-minute production of 63.6 million, not 53 million but

8    63.6 million, pages of documents.  It took them that long

9    apparently to find all of the relevant documents because they

10   wouldn't have produced irrelevant documents, and they expect

11   us to be able to deal with that what took them six or seven

12   months to put together in three months so that we can take

13   depositions and get it down.  It is not appropriate.

14        I don't know of any depositions in the bearings

15   case that the defendants have agreed to.  30(b)(6) notices

16   were served and objected to but none have been scheduled, no

17   offers of depositions have been agreed to, there is nothing

18   along those lines yet, but we have served those discovery

19   requests, so it is not that we are sitting on our hands and

20   trying to let this go by, we are dealing with it as we can

21   and as appropriate, and it would be much better, I think,

22   Your Honor, if we had this extension.

23        And just as another point, the next item on the

24   agenda is a discovery schedule, and we have reached an

25   agreement with the defendants on that in the bearings case so

```
 1    that discovery will now -- depositions can be taken up until
 2    March 20th of 2017.
 3              THE COURT:  Okay.
 4              MR. SPECTOR:  Okay.
 5              THE COURT:  Thank you.
 6              MR. CUNEO:  Buried in the middle of Mr. Kessler's
 7    presentation, which are always entertaining, were four words,
 8    they need the data.  That's correct, we need the data, that's
 9    absolutely essential.  And this really, Your Honor, is one
10    data set of the OEMs that with some modification will be used
11    in every class certification motion from now until the end of
12    the case.  It is a single speed bump that is in the road.
13    And so it is not as if -- and I will say this, that it will
14    directly affect the quality of the class certification
15    motions before the Court.  Given the importance and the size
16    of the litigation I think it is in the Court's interest to
17    have the first motions be extremely high quality based on
18    full information, and that's the basis of our request.
19              Thank you.
20              THE COURT:  Okay.
21              MR. PARKS:  Your Honor, very briefly.  With respect
22    to the issues of the OEM discovery, from our perspective, the
23    truck and equipment dealers, we don't think we can deal with
24    this in terms of the Hondas and the Toyotas of the world
25    because our case involves in many instances other OEMs, so I
```

 1    don't think it is fair to point to Honda, for example, and

 2    say well, they are talking and maybe if we had Toyota on

 3    board or some other major carmaker then that's a solution

 4    because that's not a solution for us because we are

 5    interested in John Deere and Case New Holland and Peterbilt

 6    and International Navistar and Isuzu trucks and Hino and

 7    other truck brands that are important in our case, and those

 8    issues don't get solved by productions from carmakers for us.

 9    So I don't want that to get lost in the discussion that it is

10    not just as if we pick a couple major car OEMs and get them

11    moving along on the OEM discovery that that solves this issue

12    because it doesn't for us.

13              THE COURT:  Okay.

14              MR. PARKS:  Thank you.

15              THE COURT:  Let me ask plaintiffs because I have

16    not read the objections so, but the objections, as I

17    understand it from what was said, go to the realm that there

18    was no passthrough, that the OEMs are saying we didn't pass

19    through, correct?  That's -- I mean, one of the objections.

20    Okay.

21              Then I take it defendant -- yeah, come forward and

22    you can answer this.  So plaintiffs need to have all of this

23    discovery, they need to prove passthrough or else you don't

24    have a case, right?

25              MR. WILLIAMS:  Yes.

```
 1          THE COURT:  So you need this discovery in order to
 2   counter what is being claimed by the OEMs and the defendants?
 3          MR. WILLIAMS:  Your Honor, Steve Williams for the
 4   end payors.
 5          I will characterize it as what is being claimed by
 6   the defendants.  The defendants claim either there is no
 7   passthrough or we can't demonstrate the passthrough.
 8          As to the declarations that the OEMs have
 9   submitted, what's important about that I think procedurally
10   is they are submitting them in order to avoid having to
11   produce discovery.  They have a reason to say the things they
12   are saying, they are very careful lawyerly declarations that
13   represent we shouldn't have to produce anything to you
14   because it is not going to show what you think it is going to
15   show.  We have reason to believe that's not true.
16          THE COURT:  That's the only part I wanted to know.
17          MR. WILLIAMS:  Thank you.
18          THE COURT:  Thank you.  And I think that is
19   something the Court wants to look at.  In order to be very
20   honest, to hear that tells me that there is a very -- you
21   have something that you want to say first?
22          MS. McKEEVER:  Sorry, Judge Battani.
23   Susan McKeever from Bush, Seyferth & Paige.  We represent
24   Chrysler, and I was just sort of sitting in back.
25          I don't know if it is appropriate for me to say
```

1    anything, but I just wanted to point out that we felt there

2    were a couple of misrepresentations that were put on the

3    record with regard to the OEMs' conduct, and I just wanted to

4    speak to that if you wanted to hear that.

5             THE COURT:  No, I don't.  You are not a direct

6    party, and it is really not necessary at this point.  Thank

7    you.

8             MS. McKEEVER:  Thank you so much.

9             THE COURT:  I'm sure that there would be objections

10   to a lot of things that are said from one side or the other

11   but I'm not even going to go there.

12            Okay.  I really thought this could go faster as

13   I -- when I started this.  I mean, this has increased

14   exponentially, and I could see reasons for delay.  I am

15   perhaps now more than before in reading simply the pleadings

16   that you submitted I think that there is a need for this

17   extra time with the OEMs, part of their opposition is there

18   is no passthrough, and I think that is a critical issue here

19   for plaintiffs.  I don't think at this point we need to

20   simply take the affidavits and say the case is over.  I want

21   to hear it all.

22            And I do believe with the objections -- I went

23   through this schedule to see if there is a way of kind of

24   crunching it, but I believe with the objections and with the

25   hearings that the Master has set and the objections and the

 1    review that we have set, it just takes time.  I mean, if
 2    somebody would have told me in the beginning this is how long
 3    it would take I would say you are nuts, I won't let that
 4    happen, but I really believe at this point that the four
 5    months are probably in the scheme of the whole thing
 6    necessary.
 7             Certainly I do believe, and I went back and looked
 8    at all the motions filed, et cetera, that the plaintiffs are
 9    not being dilatory and that they really had no control over
10    the OEMs filing, I don't believe, at least I haven't heard
11    that, of filing these objections so they could not continue.
12    I think -- I don't remember who said it, but I think it
13    really is a good idea continue scheduling things, schedule
14    them so that once these motions are done you are ready to go.
15    You don't have to then, you know, if you get a ruling in June
16    you don't have to then wait until August, because people are
17    on vacation, et cetera, et cetera, you will have the dates,
18    so I'm going to tell you to schedule the depositions so they
19    are ready to go.
20             And it seems to me also that with the massive
21    amount of documents that were submitted in the last round, I
22    think that was in March, that does also show that there are
23    other things out there and it is going to take time.  I mean,
24    no matter how many people plaintiff have working on it, it is
25    just going to take time.  So we are going to give it one more

 1    shot, one more with the delay.

 2            Let me go over some of these dates though that you

 3    have given.  I see that now what we are talking about is the

 4    motions to be filed, and these are in order, wire harness,

 5    bearing and anti-vibration rubber, so they are March 3rd,

 6    March 20th, April 10th of 2017.  The wire harness -- the

 7    responses are 21 days after the filing, so the first one is

 8    March 24th for the wire harness, et cetera.

 9            MR. CHERRY:  Your Honor, that's the plaintiffs'

10    expert being made available.

11            THE COURT:  I'm sorry, it is the plaintiffs'

12    expert, yes, you are right.  Yes, it is the plaintiffs'

13    expert being made available so that's March 24th, and that's

14    in wire harness.  The response is June 28th.  And the

15    defendants' experts being made available by July 19th, 2017.

16    You will, as you have been doing, set these dates in advance

17    so that you don't have to wait until the last minute to try

18    to schedule these depositions.  The reply will be

19    October 26th for wire harness, November 16th for bearings,

20    and December 11th for the anti-vibration rubber parts.

21            I am going to move up the hearing dates however.

22    The hearing date in the wire harness will be December 5th of

23    2017, and in the bearings it will be January 11th, and in the

24    anti-vibration rubber parts it will be January 18th, 2018.

25            I have a greater appreciation for why the DOJ took

1    so long in doing its work with this.  Okay.  Those are the

2    dates.

3            The next one is the dates in the non-expert

4    depositions.  Did you resolve that?

5            MR. SPECTOR:  Gene Spector on behalf of direct

6    purchasers.

7            Yes, we did.  We have negotiated a resolution of

8    that, it will be formalized over the next few days, and we

9    will submit a stipulation to the Court, but the date that we

10   have agreed upon is March 20th, 2017 in the bearings case.

11           THE COURT:  Okay.  All right.  Thank you.

12           MR. SPECTOR:  Thank you.

13           THE COURT:  All right.  So now we go on to the date

14   for the next status conference.  I think we have it scheduled

15   for September 14th at 10:00.  I'm going to change the time

16   line for submitting requests for agenda and the proposed

17   agendas, I would like them a little bit earlier.  So for

18   September the request for agenda items will be sent out on

19   August 17th, and the proposed agenda items will be e-mailed

20   to Kay on August 22nd, and the agenda will be filed

21   August 30th.  That's moving it up a week, that's all, because

22   we are finding we need a little more time here.

23           Now, the next thing is the scheduling of the

24   subsequent status conference, and what we are going to do is

25   move the status conferences up because I think there's too

1    much of a delay, there's too much going on now, so we need to

2    move them up.  I'm going to set the next status conference

3    for November 16th -- not the next one, excuse me, the one

4    after September, so it will be two months, November 16th.

5    Anybody have -- is there anything going on in the world right

6    now that we know of that would interfere with that?

7              (No response.)

8              THE COURT:  No.  Okay.

9              MR. FINK:  Judge, they will be counting the votes

10   still.

11             THE COURT:  I -- no comment.

12             Now, I would like to also address the Master's

13   motions because I know now there are some for Friday and so

14   we have that delay and some of you may have to stay over or

15   go home and come back.  I talked to Mr. Esshaki, and for

16   November we were thinking of reserving -- having you reserve

17   November 15th for any motions before the Master you know that

18   would be heard at that time, I'm not speaking of other

19   motions, but that way there it is reserved, I don't know that

20   you will need it but if you do then hopefully that will save

21   you a trip or have less time that you have to spend here.

22             Anybody have any comments on that or any problems

23   with that?

24             (No response.)

25             THE COURT:  Mr. Esshaki, is that about right, the

```
 1    day before would be okay?
 2              MASTER ESSHAKI:  Absolutely, Your Honor, perfect.
 3              THE COURT:  Okay.  With that, are there any other
 4    matters that we need to consider before we get into motions?
 5    Anybody have any matters outside of motions?
 6              (No response.)
 7              THE COURT:  Okay.  Molly reminds me that we also,
 8    in looking ahead and trying to keep moving, have set another
 9    date.  So there is November 16th for the status conference,
10    and then we set the next one for January 25th.  It is a
11    little bit in advance but at least you will be able to
12    schedule.  All right.  November 16th.  January 25th.
13              Gene, we did not discuss a date for your motions on
14    that.  If you want to do it the day before?
15              MASTER ESSHAKI:  The day before would be perfect,
16    Your Honor.
17              THE COURT:  So January 24th for the Master's
18    motions.  Okay.  Anything else?
19              (No response.)
20              THE COURT:  All right.  The next matter is the
21    defendants' motion for entry of a scheduling order for class
22    certification.  Here we go again in our next parts, or do you
23    want to say -- what was the word, tranche?
24              MR. CHERRY:  The plaintiffs used the word tranche,
25    tranche one, and we are willing to accept that for purposes
```

1    of this motion.

2           THE COURT:  Okay.

3           MR. CHERRY:  So, yes, so the issue at this point is

4    these cases are sort of next in line.  They have been in

5    discovery for between a year and two years, some period of

6    time.  We have been producing documents for a while.  It is

7    really time to set a schedule for them.  And so I think we

8    did have actually quite a bit of meet and confer between the

9    parties between July and October about this, and then things

10   sort of broke down when they decided to pursue this motion to

11   consolidate and amend, and Your Honor has denied that now, so

12   we wanted to address this.

13          I believe the parties are pretty much in agreement

14   that any class certification motions for this sort of tranche

15   one should follow your ruling in the first three cases so we

16   can be guided by what you do there and address those motions.

17          THE COURT:  I agree.

18          MR. CHERRY:  Good.

19          THE COURT:  And let me tell you along that line, as

20   we had this prior schedule we just did, I think the oral

21   argument was the end of January, January 29th on the last

22   one.  We are going to say, I hope to be able to do this, that

23   we will get that opinion out in two months, March, so we are

24   ready to talk about really the beginning of April as the

25   start date.

1    MR. CHERRY:  Good.  Okay.  Well, the parties, what
2    we had contemplated in the orders we submitted to Your Honor
3    would be that these would begin being filed within basically
4    five months of that ruling so that the experts can --
5    everyone can tailor those motions to what you do in those
6    three decisions, and then after that that they would be filed
7    on 45-day intervals and that would give --
8        THE COURT:  Wait a minute.  Back up again.  You
9    said that you would give how much time after the ruling?
10       MR. CHERRY:  Well, the plaintiffs had initially
11   asked for six months.
12       THE COURT:  Right.
13       MR. CHERRY:  We tried to pare that down to five.  I
14   mean, if Your Honor wanted us to do that in a shorter period
15   of time I'm sure we could do that, but the idea was there
16   would be some amount of time needed to get the benefit of
17   what Your Honor does and to take that into account.  We
18   couldn't file the next day.  Well, the plaintiffs would speak
19   to how much time they need, but they initially asked for six
20   months and we --
21       THE COURT:  Why would you need six months to file
22   after the ruling?
23       MR. CHERRY:  I would let them address that.  I
24   mean, we didn't oppose it but we did negotiate it down to
25   five because we had some concern about it as well, but I'm

```
1    sure they can address that and talk about how much time they
2    need before filing.
3              Our concern really was more that there is a stagger
4    with each brief so that there aren't three or four motions
5    hitting you on the same day and the parties, those of us who
6    are in multiple cases trying to do it on the same day.  I
7    think Your Honor has previously indicated that you didn't
8    want these motions -- class cert motions on the same day, and
9    that's why you had staggered wire harness and bearings and
10   AVRP.
11             THE COURT:  Well, I did because those were the
12   first ones and I needed that time, but now we are getting
13   into the next phase.
14             MR. CHERRY:  Uh-huh.
15             THE COURT:  You know, we can't have all that much
16   time or we will be here until turn of the century.
17             MR. CHERRY:  Well, again, we were willing to do it
18   on a shorter time frame, and I think the parties had
19   negotiated that down to a 45-day stagger, but I think some
20   distance between the motions would be helpful to everyone.  I
21   think, you know, 30, 45 days we can certainly live with but I
22   think that would be better than having everything filed on
23   the same day where you have very different circumstances for
24   each of these cases, and you have both of the plaintiffs and
25   some defendants who are in all of these cases trying to
```

1    submit multiple reports and multiple motions all on the same

2    day, that having some separation would allow each of these to

3    be given its due consideration.

4         THE COURT:  Okay.

5         MR. CHERRY:  So we seem to be in agreement on that.

6    The main dispute our understanding is really just the order

7    of those cases.  I won't speak to occupant safety system, we

8    are not in that case, but for heater control panels and fuel

9    senders and instrument panel clusters those three cases were

10   all filed on the exact same day so there is no priority in

11   terms of their filing, but they are very different cases.

12        The fuel senders case there is literally a handful

13   of sales, roughly a million -- a few million dollars worth of

14   sales by each of the defendants in that case to one OEM.  It

15   is a very simple case.  It can be resolved -- and our view

16   that ought to be up front, we shouldn't have that wait for a

17   more complicated case.

18        Heater control panels, the same thing, it is one

19   OEM, it is a handful -- it is more sales than fuel senders

20   but it is one OEM.

21        The third case, instrument panel clusters, there's

22   a number of OEMs involved, a greater number of sales, there

23   is a focus in Japan, there is a focus in Korea, it is a more

24   complicated case, it is going to take more time, more

25   discovery.  In our view is you ought to front load the easier

1    cases, get them resolved while you are completing your

2    discovery on the more complicated case.

3            THE COURT:  What about the occupant safety that you

4    are not in?

5            MR. CHERRY:  Our understanding is that they

6    preferred to be towards the end of the line.  Some of

7    those -- the participants in that case the defendants have

8    been newly added to the case and they are not as far along in

9    discovery.  We take no position on that.  If -- we don't

10   object to them, you know, going after our cases, however Your

11   Honor wants to deal with that.

12           THE COURT:  Okay.

13           MR. CHERRY:  So anyway, our understanding is the

14   real dispute is the order, we favor the order I just laid out

15   and for the reasons I laid out.

16           THE COURT:  Okay.

17           MR. CHERRY:  Thank you, Your Honor.

18           MR. REISS:  Good morning, Your Honor.  Will Riese

19   for the end payor plaintiffs.

20           I think Mr. Cherry has accurately stated what the

21   dispute is.  Let me, if I could, just first address your

22   concern about why we think we need five months or sufficient

23   time after wire harness.  As your Court indicated, these will

24   be separate class certification motions but certainly there

25   will be issues that will be addressed in the first class

 1    certification orders that may be relevant to the subsequent

 2    cases with respect to class certification, so our experts as

 3    well as we will need additional time, certainly not an

 4    exorbitant amount of time but sufficient time to be able to

 5    address what, if any, concerns that you raised in wire

 6    harness and be able to get that on file in sufficient time,

 7    and we think a four- or five-month interval will provide us

 8    with sufficient time.

 9         Now, in terms of the actual cases themself, we

10    agree with Mr. Cherry, a staggered schedule, whether that be

11    30 or 45 days, whatever the Court deems sufficient we are

12    okay with.

13         We do take issue with the order which Mr. Cherry

14    has proposed the cases go forward.  As Mr. Cherry indicated,

15    these cases were bought at the same time.  We are in a

16    similar situation in terms of discovery and where we are in

17    discovery, and, frankly, Your Honor, these are our motions,

18    we have the burden of demonstrating class certification.  And

19    to the extent it doesn't prejudice defendants, and it

20    certainly doesn't here, we should be able to choose the order

21    in which they go forward.  I mean, Mr. Cherry has made

22    allusions that some cases are more complicated than others.

23    Your Honor, we feel we are in position to be able to file

24    class certification, we are moving forward with discovery, so

25    it is not as if one case is going to take longer or be more

1    difficult than another case, we are prepared to move forward

2    with those cases.

3           If I could just tell you the order that we would

4    like to go forward with.  We would like to move forward with

5    instrument panel clusters as the first case, followed by fuel

6    senders, then heater control panels, and then occupant safety

7    systems is the last case.  So unless Your Honor has any

8    questions, that is all I have?  Thank you.

9           THE COURT:  Okay.

10          MR. SPECTOR:  Your Honor, Gene Spector on behalf of

11   the direct purchasers again.

12          We agree with the schedule proposed in terms of

13   order by the end payors.  We think that's a more appropriate

14   way to handle these.

15          THE COURT:  All right.

16          MR. SPECTOR:  Thank you.

17          THE COURT:  The Court -- I'm going to put this down

18   to four months, I think five or six months is too long, so

19   four months from -- I'm going to say four months from

20   April 1st, so that's May, June, July, August 1st, would that

21   be right?  Let me just take a look at the calendar here.

22   Okay.  The first one will be filed by August 1st.  And I am

23   going to take the order, with all due respect to defendants,

24   it is plaintiff that has the burden so I think they should

25   have the choice of what to file.  I don't care which part you

1  file first, but I think you gave me instrument panels first?

2         MR. SPECTOR:  Yes.

3         THE COURT:  Okay.  So let's take August 1st for

4  instrument panels.  Then the question becomes how many days

5  between parts, and I think we need to do it in a fairly close

6  order, I don't think we can go as far apart as we have in the

7  past.  So I'm going to say for part two, which is fuel

8  senders, the second one, I will give you 30 days so that

9  would be September -- let me just take a look.  We will do

10  it -- I will give you until September 5th.  Then the next

11  part is the heater control panels, and I'm going to shorten

12  this one to three weeks, so that would be October 3rd.  Then

13  the last one, occupant safety systems, I'm going to do in a

14  week because you have all of this other time, so let's say

15  October 10th.

16         MR. FINK:  Your Honor, just that last -- that one

17  week break is going to be very tight for us if we are working

18  on both of those.  If it is at all possible to get a little

19  more time?

20         THE COURT:  Okay.  October 17th, I will give you

21  two weeks.  Okay.  August 1st, so that's the most time so you

22  can all look at the opinions, September 5th, October 3rd,

23  October 17th, and the order is instrument panels, fuel

24  senders, heater control panels, occupant safety system.

25         MR. REISS:  One additional point.  In defendants'

1    motion they also proposed a discovery schedule.  We are

2    proceeding with discovery.  We frankly, Your Honor, have not

3    met and conferred on the discovery schedule, I think we are

4    very close, but with the Court's indulgence I would suggest

5    that if you would provide us with two weeks we will submit a

6    joint schedule that will iron out whatever small differences

7    we have.

8         THE COURT:  I do have your close of discovery but I

9    will give you two weeks to work that out.

10        MR. REISS:  Thank you.

11        THE COURT:  So that would be May 25th.

12        Okay.  The next item, which I don't know that you

13   have requested a hearing, I didn't think so, but if you want

14   to speak to that, that's the auto dealer plaintiffs' and

15   end payors' motion for preliminary approval of the Mitsubishi

16   settlement.

17        MR. WILLIAMS:  Thank you, Your Honor.

18   Steve Williams for the end payors, and Don Barrett for the

19   auto dealers.

20        I don't think we felt we needed a hearing.  We

21   simply wanted to ask the Court if it had any questions of us

22   about these settlements.  If not, that we would ask that

23   preliminary approval be granted.

24        We have filed earlier this week a breakdown for

25   each case of the amount that is attributable in each case.

1          THE COURT:  Right.

2          MR. WILLIAMS:  I'm prepared to go through --

3          THE COURT:  You do have the allocation.

4          MR. WILLIAMS:  Yes, Your Honor.  I'm prepared to go

5     through the factors for preliminary approval if the Court

6     would like?  They are similar to what we have done before.

7          The last thing I would add at this time, as

8     Mr. Barrett and Ms. Salzman referred to earlier, there are

9     nine additional settlements coming and it is our hope in a

10    relatively short time we would be presenting to the Court a

11    notice program to disseminate notice to those classes of all

12    of those settlements, and hopefully we can get that to you

13    pretty soon.

14         THE COURT:  Okay.  Mr. Barrett, you agree with

15    that?

16         MR. BARRETT:  I agree with everything he said.  The

17    auto dealers have not filed an allocation plan yet, we are a

18    day or two behind, and we will have that filed within

19    48 hours I'm sure, Your Honor.

20         THE COURT:  Okay.  Thank you.

21         MR. WILLIAMS:  Thank you, Your Honor.

22         THE COURT:  Okay.  The next motion is by Denso,

23    this is as to the truck and equipment dealers, right?

24         MR. DONOVAN:  Yes, Your Honor.  This is a motion

25    for judgment on the pleadings.  David Donovan on behalf of

1    Denso.

2         Your Honor, simply put, the same defects that

3    caused the Court to dismiss the Rush Truck plaintiffs' claims

4    against MELCO compel judgment on the pleadings for

5    effectively identical claims they have against Denso.  Like

6    MELCO, Denso's plea was only with respect to passenger

7    vehicles, not trucks.  Like MELCO, Denso is generally alleged

8    to have sold vehicle wire harness systems, and specifically

9    electronic control units or ECUs, just like MELCO.  In fact,

10   unlike MELCO, the ECU referenced in the amended complaint

11   with respect to Denso is the body ECU.  Like MELCO, truck and

12   equipment plaintiffs offer no specific allegation that Denso

13   sold any vehicle wire harness products including ECUs.

14        THE COURT:  Well, there was that issue, are these

15   body ECUs the part of the wire harness system?

16        MR. DONOVAN:  The only part that Denso makes that

17   is arguably relevant to vehicle wire harness system products

18   as defined in the amended complaint, just like MELCO, is the

19   body ECU.  That's what MELCO argued.  In fact, the allegation

20   against MELCO was that MELCO makes electronic control units,

21   there is no reference to body ECUs with respect to MELCO.

22   With respect to Denso, the only ECU specifically referenced

23   in the complaint is the body ECU.  But either way it doesn't

24   matter because neither -- MELCO made the argument that

25   notwithstanding that they make other ECUs, the body ECU is

1    the only ECU relevant to the vehicle wire harness system and

2    they don't sell that to trucks and equipment.  The same

3    argument pertains for Denso.  Like MELCO, Denso is not

4    alleged to sell any ECU for trucks and equipment in the

5    United States.

6            Now, the truck and equipment plaintiffs acknowledge

7    in their opposition that the Court dismissed their claims

8    against MELCO because, quote, truck and equipment plaintiffs

9    do not specifically allege that MELCO supplies body ECUs for

10   use in trucks and equipment.  That, in fact, is what the

11   Court held.

12           THE COURT:  Right.

13           MR. DONOVAN:  Truck plaintiffs argue in their

14   opposition that somehow Denso and MELCO are distinct for two

15   specific reasons.  In fact, my colleague over breakfast this

16   morning suggested I just get up and read Your Honor's

17   decision on the MELCO motion and just put Denso in every spot

18   where it said MELCO because it is exactly the same.  But the

19   truck and equipment plaintiffs have helpfully I think in

20   their opposition identified two respects in which they say

21   the claims against Denso are somehow distinct, and they are

22   demonstrably wrong in both respects.

23           First they say, in contrast, and I'm quoting here,

24   Your Honor, in contrast to their allegations against MELCO,

25   truck and equipment plaintiffs allege that Denso

1  manufactured, marketed and/or sold vehicle wire harness

2  systems that were purchased throughout the United States,

3  including in this district during the class period.  They say

4  that's different.  They say that's what they allege about

5  Denso at paragraphs 47 and 48.  In fact, that's exactly what

6  they allege about MELCO.  In paragraphs 74 to 75, MELCO,

7  quote, manufactured, marketed and/or sold vehicle wire

8  harness systems that were purchased throughout the

9  United States, including in this district, during the class

10  period.  The allegations are exactly the same.

11          THE COURT:  Did they define the wire harness

12  differently?

13          MR. DONOVAN:  No.  The definition of vehicle wire

14  harness products is the same with respect to all the parties

15  in the case.

16          The specific allegation about MELCO is what MELCO

17  argued in their motion was insufficient to state a claim and,

18  in fact, that very allegation is quoted in the Court's

19  decision granting MELCO's motion to dismiss.

20          So when truck and equipment plaintiffs argue at

21  page 5 that unlike their allegations about MELCO, truck and

22  equipment plaintiffs allege that Denso sold vehicle wire

23  harness systems generally, that's simply not true.  The

24  allegations are literally verbatim with respect to Denso and

25  MELCO.  Compare paragraphs 47 and 48 with paragraphs 74 and

1    75, they are exactly the same.

2          Now, the second of their two attempted distinctions

3    fares no better.  That's also at page 5 of their opposition.

4    There they argue -- the truck and equipment plaintiffs argue

5    that unlike MELCO they allege that Denso, quote, supplied

6    OEMs that exclusively manufacture trucks and equipment, and

7    they cite paragraph 110 of the complaint where they point out

8    that they allege that, and I'm quoting, Denso supplies

9    Freightliner International Truck, Volvo Trucks and other

10   OEMs.  Again, that is almost exactly what they alleged about

11   MELCO at paragraph 77 where they alleged that MELCO sells

12   auto parts to Freightliner, International Trucks, Volvo

13   Trucks and others.

14         The only distinction between the allegations about

15   MELCO and the allegations about Denso, if it even matters, is

16   that the truck plaintiffs were, in fact, more specific about

17   MELCO then they were about Denso, alleging in paragraph 77

18   that MELCO was selling alternators and starters to truck

19   makers.  With respect to Denso in paragraph 110, they were

20   very careful not to allege what Denso sold the truck makers

21   at all.  In neither case, neither with respect to MELCO or

22   with respect to Denso, did the truck makers allege any facts

23   that either MELCO or Denso sold vehicle wire harness systems

24   to truck makers, nor could they have so alleged in good

25   faith.

1      As the Court held in dismissing the claims against

2  MELCO, allegations about government investigations and guilty

3  pleas for sales to auto manufacturers are insufficient to tie

4  Denso to a conspiracy affecting truck makers.  As the Court

5  observed, all the plea agreements referenced in the amended

6  complaint relate to wire harness products for passenger

7  vehicles.

8      THE COURT:  None of the plea agreements

9  mentioned --

10     MR. DONOVAN:  There is no reference to trucks,

11  nothing.  As the Court recognized, the guilty pleas here at

12  best demonstrate anti-competitive conduct in a different

13  market.  And as the Court held in dismissing MELCO, a

14  defendant's conduct relevant to the passenger vehicle

15  conspiracy does not establish the defendant's involvement in

16  the truck and equipment conspiracy.

17     And there is nothing else in the amended complaint

18  to plausibly tie Denso to a conspiracy affecting vehicle wire

19  harness systems for trucks and equipment.

20     THE COURT:  Isn't there some discovery issue that

21  the Master is going to deal with on Monday on this?

22     MR. DONOVAN:  Well, there is a discovery demand by

23  the Rush Truck plaintiffs for a 30(b)(6) deposition, and I am

24  happy to address that right now.  It is -- we submitted a

25  declaration, and it is undisputed, that Denso does not make

 1    body ECUs for trucks and equipment.  We have Mr. Kobayashi's

 2    declaration that we submitted, it is at paragraphs 8 and 9 of

 3    his declaration where he says -- and he's been deposed.  He

 4    says Denso sells body ECUs to three OEMs, Toyota, FHI and GM,

 5    for use in passenger vehicles in the United States.  All of

 6    those body ECUs are used in passenger vehicles and light

 7    trucks.  Denso has not sold body ECUs to any of these

 8    manufacturers for use in trucks and equipment as defined in

 9    plaintiffs' complaint.  Mr. Kobayashi's declaration, as I

10    say, has been conducted.

11         The truck and equipment plaintiffs have had almost

12    a year to take discovery if they thought discovery was

13    warranted to challenge Denso's assertion that -- and MELCO's

14    assertion, which the Court accepted for purposes of granting

15    their motion to dismiss, that the only ECU relevant in this

16    case are body ECUs.

17         THE COURT:  You didn't make a motion to dismiss,

18    did you?

19         MR. DONOVAN:  We did not, Your Honor.  We have been

20    clear since June 1st that we were limiting our discovery of

21    2015 with respect to Rush Trucks, that we were limiting our

22    discovery to body ECUs.  And in fact, Your Honor, for years

23    before that we were clear to the auto dealer plaintiffs and

24    the end payor plaintiffs and the direct purchaser plaintiffs

25    that we were limiting our discovery responses,

1    interrogatories and document requests, to body ECUs.  Nobody

2    took issue with that.

3           Rush Trucks was a little late to the party, they

4    filed their first complaint I believe in late 2014, and their

5    amended complaint in spring of 2015.  And again we were

6    immediately clear to them both in providing them with the

7    discovery responses we had produced earlier to the other

8    plaintiffs and then in responding to the truck dealers' own

9    discovery requests we were objecting to any discovery on any

10   ECUs other than body ECUs, some of which were at issue in

11   other tracks in this MDL, none of which have anything to do

12   with vehicle wire harness systems.

13          And, in fact, two weeks after we specifically told

14   Rush Trucks we were standing in that position, MELCO moved to

15   dismiss, making the very same argument that although they

16   make other ECUs the only ECUs relevant to this case are body

17   ECUs.  And there can't -- just to cut off one argument that I

18   think is implied in their opposition, there can't be a

19   good-faith argument that the plaintiffs thought that the only

20   ECUs that MELCO made were body ECUs.  If you Google MELCO and

21   ECU you get a page of hits for all the other ECUs that MELCO

22   makes, and we provided citations in our motion to the

23   publicly available pages on MELCO's own website about all the

24   other ECUs that MELCO makes.

25          In fact, Your Honor, if MELCO was taking the

1    position that the only ECU they made were body ECUs they

2    would have said that.  They didn't say that.  Instead they

3    said the only ECU that we make that could possibly be

4    relevant to this case is the body ECU, and they said we don't

5    sell those for trucks and there is no allegation that we do.

6    Denso again is identically situated there, Your Honor,

7    exactly the same circumstance.

8            Moreover, Your Honor, as the Court held last month

9    in denying the motion to consolidate and amend, there can't

10   be a conspiracy as a matter of law with respect to products

11   not alleged to be made by any of the other parties to the

12   alleged conspiracy.  Although Denso and MELCO make and sell

13   some of the same ECUs, body ECUs -- including body ECUs, all

14   the claims against MELCO are gone, MELCO is out of the case,

15   and the truck and equipment plaintiffs allege nothing about

16   any ECU made by any other defendant in this case that Denso

17   makes.  So Denso could not have participated in a conspiracy

18   with the other remaining defendants with respect to ECUs

19   those defendants are not alleged to have made.

20           Just to close up an issue of discovery, Your Honor,

21   not only did we make it clear to them last June what our

22   position was but under the Court's scheduling orders, as we

23   made clear to the Rush Trucks plaintiffs, they had 30 days to

24   raise an issue with us if they were challenging our position

25   that the only ECUs relevant here are body ECUs, they didn't

1    do that.  They had 15 days beyond that window to file a

2    motion with the Special Master challenging that position, and

3    they didn't do that.  In the meantime, we have virtually

4    completed our document discovery just of body ECUs.  We have

5    answered all the interrogatories just about body ECUs.  We

6    produced a half dozen witnesses for 30(b)(1) depositions who

7    they're fact witnesses, they could be asked any question that

8    the plaintiffs chose effectively as long as it is not covered

9    by the DOJ stay.  And the truck plaintiffs, notwithstanding

10   their position that a year after they have known what

11   limitations we were imposing on discovery, essentially asked

12   nobody anything of any relevance.  The only -- in fact, the

13   few witnesses who were asked anything at all as soon as the

14   witness testified that, yeah, we don't sell body ECUs to

15   truck makers, Rush Trucks said they had no further questions.

16          So it is clear that the plaintiffs have had ample

17   opportunity to find out something about this issue if they

18   really cared, but with respect to the motion for judgment on

19   the pleadings, Your Honor, that issue shouldn't matter.

20   MELCO and Denso are exactly the same situated.  A motion for

21   judgment on the pleadings is resolved on the same standard as

22   a motion to dismiss.  Based upon the Court's ruling about

23   MELCO's -- on MELCO's motion to dismiss based on MELCO's

24   argument about what is alleged in the complaint and the

25   insufficiency of those allegations, and the Court's rulings

 1    that are identical allegations with respect to MELCO as they

 2    are to Denso fail to state a claim, then I think, Your Honor,

 3    the conclusion is unavoidable that the same outcome should

 4    pertain here and the claims against Denso also should be

 5    dismissed.

 6              THE COURT:  Thank you.  All right.  Mr. Parks?

 7              MR. PARKS:  Thank you, Your Honor.

 8              I think the issue on this motion comes down to a

 9    relatively simple point.  The second point that Mr. Donovan

10    mentioned where he said the MELCO allegation was virtually

11    the same as the allegation with respect to Denso, it is the

12    virtually part that I think reveals the distinction.  You

13    will remember in the MELCO situation you concluded that we

14    hadn't connected the dots, which is to say we said MELCO sold

15    ECUs and that MELCO sold auto parts to certain vehicle

16    makers, and he said we didn't allege that they sold the wire

17    harness systems to truck and equipment makers.  Here -- and

18    he mentioned in his statement, Mr. Donovan mentioned, that we

19    specifically alleged in a general sense that MELCO sold auto

20    parts to these truck OEMs.  Here we said that Denso supplied

21    these truck and equipment OEMs.  Supplied them with what?  We

22    didn't generally plead auto parts, that's all we could plead

23    in good faith there because we didn't have more information.

24    Here we have asserted that they supplied them.  What they

25    supplied them with was the vehicle wire harness systems.  So

1     you don't have the general allegation of auto parts, we are

2     talking specifically about the subject of the complaint, the

3     wire harness systems.

4            And it is clear --

5            THE COURT:  Which you defined to include --

6            MR. PARKS:  Which are defined in the complaint to

7     include not just body ECUs but all ECUs.  Now, the body ECU,

8     all ECU issues I will come to in a minute because that's

9     another important point, and it is the subject, Your Honor

10    rightly notes, of a discovery issue which, by the way, we

11    raised before Denso filed this motion.  So this motion I

12    think is an attempt to jump over the discovery issue and get

13    out of the case without having to give discovery on non-body

14    ECUs.  And we are only at this point asking for discovery on

15    a 30(b)(6) witness to testify about the topics in 30(b)(6)

16    notice as they relate to non-body ECUs.  So we are not asking

17    for every document under the sun yet.  We want to understand

18    what is Denso's business in the non-body ECU segment with

19    respect to truck and equipment dealers so we can determine

20    from that point what additional discovery is warranted, if

21    any, which we think is the appropriate way to proceed rather

22    than asking for every document under the sun.  We think a

23    30(b)(6) deposition on this topic isn't that burdensome, will

24    be a limited amount of time, and will allow us to discover a

25    lot of important information about the non-body ECU issue

1    which, if you go by the plain language of our complaint, is

2    part of our case.

3            Now, Denso likes to say, well, we don't think it is

4    part of the case but we are masters of our own complaint and

5    we say it is part of the case.

6            Now, on the issue of the guilty pleas, the fact

7    that there is no reference to the trucks in guilty pleas is

8    not a significant fact here.  It is certainly not a

9    significant fact at this stage in the case.  There is no

10   reference to trucks in guilty pleas with respect to other

11   wire harness defendants yet we have collected remarkable

12   evidence of conspiratorial activity with respect to them.  So

13   that doesn't mean there was no conspiracy, that just means

14   that the government decided they didn't want to focus in on a

15   small segment of the truck and equipment world when they

16   could go after the big wild game rhinoceros of the auto world

17   which is much bigger in terms of volume of commerce.  That's

18   an understandable determination by the U.S. enforcement

19   authorities, the world enforcement authorities, but it

20   doesn't mean there wasn't conduct and, in fact, we know there

21   was conduct.

22           On the issue of body ECUs versus non-body ECUs, our

23   point there is very simple.  We don't dispute Denso's

24   representations which were made under oath, we have no reason

25   to contest them that they did not make body ECUs for truck

1    and equipment use.  That's fine.  But that doesn't end the

2    inquiry because our complaint specified all ECUs, not limited

3    to body ECUs.  And Denso has taken the position well, the

4    only type of ECU that could possibly be relevant to wire

5    harnesses is body ECUs, they haven't -- in a notable

6    distinction from some of the things they have done with other

7    declarations they haven't offered a declaration on that

8    point, and so it is really just advocacy in a brief to say

9    that, and more importantly it wouldn't matter because we are

10   going by the allegations in our complaint and our complaint

11   says we are talking about all ECUs, not limited to some

12   subset that Denso would like to limit it to for obvious

13   reasons because if we limit it that way then we don't have a

14   claim against them because they didn't make body ECUs for

15   trucks and equipment.

16          And that I think is -- and that essentially is the

17   issue in the discovery dispute on the 30(b)(6) deposition

18   witness.

19          Now, they mentioned they didn't file a motion to

20   dismiss.  Well, they did because they joined in the group

21   motion to dismiss, they didn't file a distinct motion to

22   dismiss on this issue, so just to clarify that point.

23          THE COURT:  Okay.

24          MR. PARKS:  But they did file a motion to dismiss

25   with all the defendants generally.

1        The other point I would note is that although there
2   was this issue raised in MELCO's motion to dismiss about body
3   ECUs versus non-body ECUs, Your Honor didn't decide the
4   case -- or didn't decide that motion on the basis of that
5   distinction at all.  Your Honor decided that motion on the
6   failure to connect the dots issue which, again, we don't have
7   here because we have taken the position that MELCO -- or that
8   Denso did sell non-body ECUs for truck and equipment use.
9   They have had the opportunity to deny having done so, they
10  haven't denied that.  They haven't submitted a declaration
11  saying, hey, you know what, we didn't sell non-body ECUs for
12  truck and equipment use, they have limited their declaration
13  in that respect and, Your Honor, I think that's quite telling
14  under these circumstances.
15       So I do think there is an important distinction
16  here in the end between what happened with MELCO where there
17  wasn't a connection of the dots because of the general auto
18  parts allegation we had to make because we didn't have more
19  specific information and the allegation we made here which
20  relates to the wire harness systems, and in this case what we
21  are talking about really when you boil it down is non-body
22  ECUs.
23           THE COURT:  Okay.
24           MR. PARKS:  Thank you.
25           THE COURT:  Mr. Donovan?

```
 1            MR. DONOVAN:  Real briefly, Your Honor.
 2            I will address a couple of things he said but first
 3   I would like to address what he didn't say.  I didn't hear
 4   any argument about how the Court's decision on MELCO's motion
 5   is distinct at all from the argument we are making here
 6   today.  The only thing I heard was, again, this assertion
 7   that they have made a general allegation that Denso supplied
 8   vehicle wire harness systems to trucks and equipment, and
 9   that's where I started the argument, Your Honor.  The
10   allegation about MELCO is word-for-word identical to the
11   allegation in the complaint about Denso, that both of them
12   are alleged to have generally sold -- manufactured, marketed
13   and/or sold vehicle wire harness systems purchased throughout
14   the United States.  It is the same allegation, there is no
15   difference, it is literally word for word.
16            One problem here with their overarching argument is
17   that they seem to be attempting by the back door to do what
18   Your Honor just denied the plaintiffs' requests to do, in
19   other words, to sweep all of these cases into one.  ECUs are
20   specifically at issue in at least one other case, and we know
21   ECUs are in many of the other parts in many of the other
22   cases.  Now, unless all of a sudden this case is going to
23   become every case in the MDL simply because headlights are
24   attached to wires, and heaters are attached to wires, and the
25   DVD players are attached to wires, and there is an ECU in the
```

1    headlights and there is an ECU in the air conditioner, and

2    there is an ECU in the DVD player, where does this case stop?

3           MELCO argued that body ECUs are the only ECUs

4    relevant to vehicle wire harness systems.  They didn't deny

5    that they made other ECUs, they couldn't have, everyone knows

6    they made lots of other ECUs.  They made that argument.

7    Plaintiffs did not challenge it in any respect because they

8    knew -- either they knew or they weren't prepared to fight

9    about it, but the Court's ruling dismissing the claims

10   against MELCO necessarily require the finding that the only

11   ECUs relevant in this case are body ECUs because the

12   allegations against MELCO doesn't even use the word body

13   ECUs.  MELCO, the allegations are, electronic control units,

14   were specifically alleged to have sold electronic control

15   units to Fuji Heavy Industries.

16          The only thing about ECUs in this complaint about

17   Denso is that we pled guilty to body ECUs, and that's the

18   only reason that Denso has ever been in this case is because

19   of body ECUs because one of our co-defendants sold body ECUs,

20   two of them perhaps.  We don't make any of these other parts

21   that are in the wire harness system case, it is just body

22   ECUs.  We never sold body ECUs to truck and equipment makers,

23   he's not disputing that today.  We submitted a declaration if

24   you need to turn this into a summary judgment motion, Your

25   Honor, but I don't think there is any reason to turn this

 1    into a summary judgment motion.  I think under the law of the

 2    case principle, Your Honor necessarily had to accept MELCO's

 3    proposition that the only ECUs relevant here are body ECUs

 4    because if you don't accept that proposition the claims

 5    against MELCO could not have been dismissed.

 6          I think that's all I've got unless Your Honor has

 7    questions?

 8                THE COURT:  Okay.  Thank you.

 9                MR. PARKS:  Your Honor, very briefly, if I could,

10    two points?

11                THE COURT:  One minute.

12                MR. PARKS:  I might need less than that.

13                THE COURT:  Okay.

14                MR. PARKS:  First of all, to the extent that

15    Denso's position is that there are ECUs at issue in other

16    cases and non-body ECUs really don't belong in the wire

17    harness case, that's a category question.  That's not a basis

18    to throw our claims out, that may be a basis to say well, the

19    way we have chopped these things up for administrative

20    purposes your claims about non-body ECUs should be in another

21    case or in several other cases, but not you don't get to

22    bring them at all.  That would be number one.

23          Number two, very briefly, Mr. Donovan mentioned in

24    his initial argument about the claims against MELCO are gone

25    so there's no conspiratorial issue because there are no other

```
 1    defendants left.  Just because the claims against MELCO are
 2    gone doesn't mean there's no conspiracy involving other
 3    entities.  In fact, you will remember that with MELCO one of
 4    their contentions was that there was an entity in which MELCO
 5    had an interest that sold body ECUs during the relevant
 6    period, but that entity had been wound up, I think it was a
 7    joint venture, and we couldn't pursue a claim against MELCO
 8    because they were only a minority owner in that joint venture
 9    that did sell body ECUs and other types of ECUs for trucks
10    and equipment.
11          So I would just say I don't think that really
12    addresses the question whether there is a conspiracy or not
13    and, of course, we are entitled with joint and several
14    liability to bring a claim against one defendant only if we
15    chose.
16          THE COURT:  Okay.  Thank you.  Our next group is
17    the bearings.  There was one other one that was just filed --
18    why don't we take a break right now.  Let's take ten minutes.
19    So if he could get out and get back in here I would
20    appreciate it.  Thank you.
21          THE LAW CLERK:  All rise.  Court is in recess.
22          (Court recessed at 11:51 a.m.)
23                        —   —   —
24          (Court reconvened at 12:13 p.m.; Court, Counsel and
25          all parties present.)
```

1        THE LAW CLERK:  All rise.  Court is in session.

2    You may be seated.

3        THE COURT:  Well, after 30 years as a judge I know

4    it is impossible to take a ten-minute break, it just doesn't

5    happen.  Okay.

6        The next thing, I would like to discuss this

7    because we have the three motions on the bearings, but we

8    also have two other motions on the bearings that are coming

9    up that we have to -- I understand they will be briefed fully

10   by the end of June I believe.  Given the time, and the Master

11   has something, I want to know if you want to wait until -- to

12   hear them all at some future date.  Can I have some input on

13   that?

14       MS. BRADLEY:  Your Honor, defendants are inclined

15   to agree to wait and have all of the motions argued together

16   once they are all fully briefed.

17       THE COURT:  Okay.  Could I have your name.

18       MS. BRADLEY:  I'm sorry.  I'm Heidi Bradley on

19   behalf of the Nachi defendants.

20       THE COURT:  Okay.  Thank you.  Plaintiffs?

21       MR. HOESE:  Your Honor, William Hoese, H-O-E-S-E,

22   for the direct purchaser plaintiffs.

23       May it please the Court, we have taken a position

24   that the Nachi motion was filed in December, the Koyo motion,

25   the Schaeffler motions were filed shortly thereafter.  The

```
 1   issues are -- the legal issues are identical for all of these

 2   motions, and we are prepared to argue the three that are

 3   pending in front of Your Honor today, and we think that

 4   whatever Your Honor does in connection with these may provide

 5   guidance with respect to the later ones so that it would

 6   actually be efficient to do the three that are before Your

 7   Honor today and then --

 8             THE COURT:  Actually I was going to hold these

 9   three anyway until I heard the other two.  I think I need to

10   hear them all together.

11             MR. HOESE:  All right, Your Honor.  I will sit

12   down.

13             THE COURT:  So given that, and plaintiff would have

14   to come back for the next argument so it would be defendant

15   who would be inconvenienced, the different defendants, some

16   of you may have to come back, I don't know.

17             All right.  I'm going to put these all off until

18   the next -- until -- we will get a date as soon as we can

19   after the 28th.

20             Molly, we will have to look at that and send the

21   notice because we haven't looked at a date for that one I

22   don't believe.

23             So we will look at a date and then send you the

24   date, okay, for all of you.

25             MR. HOESE:  Thank you, Your Honor.
```

```
 1              MR. GAGNES:  Thank you, Your Honor.

 2              THE COURT:  All right.  Then we have -- what's

 3    next?  Oh, Mr. Esshaki, these are your motions.

 4              MASTER ESSHAKI:  Yes, Your Honor.

 5              THE COURT:  Okay.  Then we have these motions, and

 6    then we will go this afternoon, we have a settlement to

 7    approve and we have some objectors who I believe are coming

 8    in but I don't know that they are coming in.  Some have been

 9    withdrawn and then refiled and -- well, there is an argument

10    on that too so we will get to that.

11              Okay.  At this point then I will leave and leave

12    this up to the Master.  We will resume for those of you who

13    are involved with the settlement this afternoon -- what time

14    is that scheduled for?

15              MR. WILLIAMS:  3:00.

16              MR. IWREY:  3:00.

17              THE COURT:  Okay.  Thank you.  Good luck.

18              THE LAW CLERK:  All rise.  Court is in recess.

19              (Court recessed at 12:17 p.m.)

20                            _   _   _

21

22

23

24

25
```

*CERTIFICATION*

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of In Re: Automotive Parts Antitrust Litigation, Case No. 12-02311, on Wednesday, May 11, 2016.


*s/Robert L. Smith*
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan


Date:  05/19/2016

Detroit, Michigan