IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Hon. Marianne O. Battani |

ALL PARTS

THIS DOCUMENT RELATES TO:

ALL AUTOMOBILE DEALER ACTIONS

## DECLARATION OF ARTHUR R. MILLER IN SUPPORT OF AUTOMOBILE DEALER PLAINTIFFS' SUBMISSION REGARDING ATTORNEYS' FEES

COMES NOW Arthur R. Miller who states as follows:

### Professional Qualifications

1.     I am a University Professor of Law at the New York University School of Law. I graduated from Harvard Law School, magna cum laude, in 1958 and practiced law in New York City until 1962. Since then, I have taught full time at the University of Minnesota (1962-1965), the University of Michigan (1965-1972), the Harvard Law School (1972-2007) and the New York University School of Law (2007-present). I have taught the basic first year course in Civil Procedure for more than fifty years and advanced courses and seminars in complex litigation, class actions, as well as copyright in almost all of those years and sports law in recent years. For more than two years, I also have been the Dean of the NYU Tisch Institute of Sports Management, Media and Business and the Director of the NYU Sports and Society Program.

1

2. I am the author or co-author of more than forty books and treatises, including *Federal Practice and Procedure*, the leading multi-volume treatise on practice in the Federal Courts, and *New York Civil Practice*, a leading multi-volume treatise on New York practice. I also am the author or co-author of at least 30 law review and other articles on a range of issues, including United States constitutional law, federal court litigation, civil procedure, transnational procedure, intellectual property, privacy, and technology issues.

3. With regard to attorneys' fees, I was requested in or about 1976 by the Federal Judicial Center to study and prepare a comprehensive monograph on all aspects of attorneys' fee awards in the federal courts. The result of that work was published in or about 1978 by the Center and made available to judges and lawyers; it has been utilized by many state and federal courts. I was later asked by Chief Judge Aldisert of the United States Court of Appeals for the Third Circuit to serve as the Reporter for a special Task Force consisting of distinguished judges and practitioners. Our charge was to survey and analyze federal court fee award practices under various judicial methodologies, particularly the then-prevalent lodestar method. The group's work produced a document, *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, October 8, 1985, reprinted at 108 F.R.D. 237 (1985), which has been cited frequently and has been instrumental in guiding many state and federal courts to continue or return to their use of percentage fee awards or to abandon the lodestar method or to use the lodestar method as a cross-check on a proposed percentage award.

4. I also have served as a member of the Special Advisory Group to the Chief Justice of the United States on Federal Civil Litigation (by appointment of Chief Justice Burger), as the reporter and then as a member of the Advisory Committee on Civil Rules of

the Judicial Conference of the United States (by appointment of Chief Justice Burger and by reappointment of Chief Justice Rehnquist), as reporter for the Third Circuit Attorneys' Fee Study, as reporter of the Advisory Group on Civil Justice of the United States District Court for the District of Massachusetts, as special consultant to the original Manual for Complex Litigation, as a member of the American Bar Association Special Committee on Complex and Multidistrict Litigation, and as a member of numerous other professional committees and organizations. I also was the reporter for the American Law Institute's Complex Litigation Project, which led to the adoption and publication by the Institute of *Complex Litigation: Statutory Recommendations and Analysis with Reporter's Study* (1994) and also served as a Special Advisor to the American Law Institute's Special Project on Aggregation in Litigation.

5. I was one of the draftsmen of the Uniform Interstate and International Procedure Act. I have testified before numerous United States Senate and House of Representatives subcommittees on constitutional, procedural, privacy, and other issues.

6. Throughout my years in academe, I have maintained my contacts with the Bench and the practicing Bar in order to understand the actual operation and functioning of the civil justice system. In that connection, I have participated in countless judicial conferences in the various federal Circuit Courts of Appeal and in educational programs conducted by the Federal Judicial Center and by state judicial organizations and national and state bar associations as a lecturer or a discussion leader on a wide variety of subjects, including many on class actions and complex litigation.

7. In addition, I have appeared as a lawyer or as an expert in approximately 100 class actions and complex cases in state and federal courts throughout the country, on behalf

3

of both plaintiffs and defendants, with regard to various issues including the propriety of class certification, the fairness, reasonableness, and adequacy of settlements, attorneys' fees, subject matter and personal jurisdiction, discovery, choice of law, preemption, jury trial, and appealability. Those cases have involved a range of substantive contexts, such as mass disasters, product defects, toxic substances, antitrust, security frauds, consumer deception, consumer financing, insurance matters, RICO, copyright, mail fraud, and wire fraud. This experience has included oral argument before the United States Supreme Court, all of the United States Courts of Appeals, numerous United States District Courts, and a number of state trial and appellate courts.

8.     I also have been the host of several television programs that have received a variety of awards for promoting public understanding of the law, including several from the American Bar Association. My complete resume, including a list of all of my significant publications, is attached. I am being compensated at my usual hourly rate for my professional services in this litigation.

## Background and Assignment

9.     This Declaration is submitted at the request of the Interim Co-Lead Counsel for the Automobile Dealership Plaintiffs in this antitrust litigation: Jon Cuneo (Cuneo Gilbert & LaDuca), Shawn Raiter (Larson • King), and Don Barrett (Barrett Law Group). I understand that the Court has requested submissions from the Plaintiffs' groups in this litigation about prospective attorneys' fee awards for settlements or judgments reached as this litigation continues.

10.    I have been asked to review the results already reached in this litigation, the attorneys' fee awards already granted, and the general background of fee awards in complex litigation. I will then offer some opinions that I hope will be helpful to the Court in addressing its request for input about future fee awards.

11.    In summary, I believe that the Court should not set a predetermined scale of percentages for future attorneys' fee awards in this litigation at this time. It is my opinion that prior to awarding or setting fee percentages, the Court should have specific information about the merits of the individual settlements, the time and expense involved to achieve those results, the merits and defenses of the particular claims, and the other information generally addressed by District Courts when considering fees in a Rule 23 class action settlement. I also believe that a decreasing scale of fee percentage is not appropriate simply because the size of the settlements may prove to be large, something that is unknown at this time.

12.    In assessing these attorneys' fee issues for the Auto Dealers, I have reviewed the following materials related to this litigation as well as certain other documents:

- Auto Dealers' Memorandum in Support of Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards

- Declaration of Shawn M. Raiter in Support of Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards

- Order dated 12/07/15 Regarding Auto Dealers' Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards

**Common Benefit Doctrine**

5

13. I now turn to a description of the applicable legal principles, and then apply them to the Auto Dealers and this litigation.

14. The common benefit doctrine unquestionably applies in this context. The doctrine, which was recognized by the United States Supreme Court in the Nineteenth Century and almost a century before the promulgation of the critical 1966 revision of Rule 23 ensures that those who do work – in this case, class counsel – that create a recovery for others are entitled to fair recompense and compensation for their efforts from the beneficiaries of those efforts, a point underscored by the contingent, protracted, and risky nature of the work undertaken in litigation such as this.

15. The jurisprudence concerning common benefit recoveries by contingent fee lawyers is fairly extensive and has become very sophisticated and nuanced. By virtue of years of refinement, practical experience, and academic and judicial consideration (some of which I have been involved with, most notably, the Report of the Task Force to Study Court Awarded Attorneys' Fees in Class Actions established by the United States Court of Appeals for the Third Circuit) certain principles have become well established.

16. Most significantly, the interest of all involved – the parties, particularly claimants, but even defendants and the court system – are most efficiently, equitably, and effectively advanced by awarding common benefit attorneys in an amount based upon a percentage of the recovery obtained and made available to claimants. Alternative measures, such as looking to hours employed and billing rates (the short-lived "lodestar" method) is defective and undesirable because it places plaintiffs and their counsel at cross purposes by creating a disincentive for plaintiffs' counsel to litigate efficiently and to settle cases until

6

they had put many hours into the matter, encouraging excessive billing and unproductive and unnecessary activities by counsel, and, in some cases, causing plaintiffs' counsel to engage in practices that often do not further the resolution of the litigation and occasionally are professionally inappropriate.

17.     A lodestar approach, both practically and philosophically, may tend to defer settlement and interfere with the natural case resolution dynamic and the system's need for efficiency. In many situations it encourages attorneys, who knew they will be compensated under a lodestar method, to postpone settlement until they have "gotten their hours in." The result is judicial diseconomy, the misalignment of the interests of counsel and client, and the propagation of a process viewed as being counterintuitive to everything the litigation system is trying to accomplish through its encouragement of early disposition of litigation. The administration of the lodestar methodology also has proven time consuming for judges whose efforts are better directed to other matters.

18.     The percentage method of awarding attorneys' fees puts the lawyer and the client on a plane of common direction; and from an efficiency and rationality perspective, lines up the interests of clients and lawyers by trying to replicate the legal marketplace and, in part, to construct a contractual relationship between attorney and client. In my experience of testifying and lawyering regarding fee matters, in a contingency fee damage case, whether mass tort, product defect, or otherwise, the marketplace contingency fee contract generally would set fees at one-third of the recovery, 40 percent of the recovery, and in some cases involving high risk or extensive activity even a larger portion of the recovery.

7

19.     Since the publication of the 1985 Third Circuit Task Force Report there has been something in the nature of a revolution across the country in fee award methodology with a clear majority of Circuit Courts of Appeals, a majority of the federal District Courts in all Circuits, and a vast majority of the state courts, returning to and revalidating the longstanding percentage approach to awarding attorneys' fees for common benefit work that antedated the emergence (and short tenure) of the lodestar method.

20.     Since the 1985 Report of the Third Circuit Task Force the lodestar approach has been rejected by the vast majority of courts in the country or at most used as a "cross-check" on the proposed percentage. Not surprisingly, it has come to be recognized that the lodestar method "is a source of many problems and has been widely condemned." Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 Texas L. Rev. 865, 67 (1992). The Third Circuit Task Force described the lodestar method as a "cumbersome, enervating and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar" and criticized it for being "insufficiently objective," for "encouraging lawyers to engage in duplicative and unjustified work, [to] inflate their 'normal' billing rate[s], and [to] include fictitious hours," for "creat[ing] a disincentive for early settlement of cases," and for being confusing and unpredictable. Report of Third Circuit Task Force, *Court Awarded Attorney Fees*, 8-20 (Oct. 8, 1985), reprinted at 108 F.R.D. 237, 241-258 (1985).

21.     The Federal Courts Study Committee reiterated these complaints, stating that the lodestar method "unduly burdens judges" by forcing them to act as regulators and by encouraging litigation over alleged fee-padding. *Report of the Federal Courts Study Committee* 104

(April 2, 1990). The *Manual for Complex Litigation* (Fourth) (2004) ("Manual"), which distills the experience federal judges have managing difficult cases, states that "[i]n practice, the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result" and "creates inherent incentive to prolong the litigation until sufficient hours have been expended." *Manual*, § 14.121. As an alternative to the lodestar method, the Federal Courts Study Committee recommended that judges explore the possibility "of basing fee awards . . . on a percentage of the recovery obtained." *Report of the Federal Courts Study Committee*, at 105. The Third Circuit Judicial Conference, *Update on Third Circuit Fee Task Force Report on Court Awarded Attorneys Fees* 10 (Sept. 13, 1991) (quoted in Alba Conte, *Attorney Fee Awards* § 2.7 (3d ed.)), made the same recommendation the following year, stating that:

> [t]he percentage method clearly has a number of advantages, including that it is relatively objective, can be easily administered by the courts, will simplify the fee setting process, and will not place a possible premium on running the hourly meter. It better aligns the financial interest of the client with that of the lawyer. It uses economic based incentives, rather than court-imposed, after-the-fact controls to regulate fees.

22. This appraisal has been widely endorsed by courts. For example, in *Kirchoff v. Flynn*, 786 F.2d 320, 325-326 (7th Cir. 1986), which was not a class action, the Seventh Circuit (a leading proponent of calibrating fee awards so that they reflect the marketplace for legal services) wrote that the percentage method "automatically aligns interests of lawyer and client, rewards exceptional success, and penalizes failure." *See also In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F.-Supp. 445, 457-460 (E.D. Pa. 1995) (criticizing the lodestar method, and stating a preference for fee awards to be established at outset of litigation to

9

"infuse simplicity, certainty, and fairness into the attorneys' fee process"); *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 337 n.1 (5th Cir. 1978) (criticizing lodestar method).

23.     Every leading scholar of the economics of litigation who has studied the matter also has condemned the lodestar approach. As summarized by highly regarded Professor John C. Coffee, Jr., the percentage method is the *only* reasonable way to measure fees:

> If one wishes to economize on the judicial time that is today invested in monitoring class and derivative litigation, the highest priority should be given to those reforms that restrict collusion and are essentially self-policing. The percentage of the recovery fee award formula is such a "deregulatory" reform because it relies on incentives rather than costly monitoring. Ultimately, this "deregulatory" approach is the only alternative.

Coffee, *Understanding the Plaintiffs' Attorney: The Implications of Economic Theory for Private Enforcement of the Law through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 724-725 (1986). *See also* Macy & Miller, *The Plaintiffs' Attorney Role in Class Action and Derivative Litigation, Economic Analysis and Recommendations for Reform*, 58 U. of Chi. L. Rev. 1, 4, 59-61 (1991); Silver, *supra*, at 868ff. (citing authorities).

24.     The Court's first fee award to the Auto Dealer counsel in this litigation employed the percentage method and, in doing so, applied the approach used by other courts in the Sixth Circuit. *See Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *16 (E.D. Mich. Dec. 13, 2011); *In re Delphi Corp. Sec. Derivative & ERISA Litig.*, 248 F.R.D. 483, 502 (E.D. Mich. 2008); *In re Cardinal Health Inc. Sec. Litigs.*, 528 F. Supp. 2d 752, 760 (S.D. Ohio 2007) (the Sixth Circuit has "explicitly approved the percentage approach in common fund cases"); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 2:12-CV-83, 2014 WL 2946459, at

*1 (E.D. Tenn. Jun. 30, 2014) ("the lodestar method is cumbersome; the percentage-of-the-fund approach more accurately reflects the result achieved; and the percentage-of-the-fund approach has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or 'churn' cases.") (citations omitted). In my opinion the Court should continue to do so as the remaining aspects of this litigation are resolved.

### Percentage Amount

25.    In their first fee petition, Co-Lead Counsel for the Auto Dealers sought an award of one-third of the common benefit fund after certain expenses had been deducted. This resulted in a fee request, which the Court approved, of approximately 31 percent of the total benefits generated for Auto Dealers in those settlements. When a lodestar cross-check was applied, the award amounted to a negative multiplier of the Auto Dealer counsel's lodestar accrued to that time. There were no objections to the fee award requested by Co-Lead Counsel for the Auto Dealers. Based on what I have learned about this litigation, I believe a 31 percent award was completely proper.

26.    As I will discuss below, the Court's first award to the Auto Dealers was appropriate and, if justified by the terms of future settlements and the work required to obtain those settlements, it would be reasonable for future fee awards.

27.    In 1996, the Federal Judicial Center studied all class actions resolved or settled over a two-year period in four selected federal district courts (the Eastern District of Pennsylvania, the Northern District of California, the Southern District of Florida, and the Northern District of Illinois). These districts were chosen because each had substantial experience with, and a high volume of, class actions. The Study found: "Median rates

11

ranged from 27% to 30%. Most fee awards in the study were 20% and 40% of the gross monetary settlement."

28. The results of other empirical studies have led to similar conclusions. The Eisenberg and Miller study of class actions noted a "remarkable uniformity in [fee] awards between roughly 30% to 33% of the settlement amount" *See* Theodore Eisenberg and Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27, 33 (2004); *see also* Alba Conte & Herbert Newberg, *Newberg on Class Actions* §14:6 at 551 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

29. District courts in the Sixth Circuit have frequently awarded one-third of the common fund or more. *In re Prandin Direct Purchaser Antitrust Litig.*, No. 2:10-CV-12141-AC-DAS, 2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) (awarding one-third of the fund); *In re Skelaxin*, 2014 WL 2946459 (E.D. Tenn. June 30, 2014); *In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208, 2013 WL 2155387, at *8 (E.D. Tenn. May 17, 2013) (one-third fee from settlements totaling $158.6 million); *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011); *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d, 521, 528 (E.D. Ky. 2010); *Bessey v. Packerland Plainwell, Inc.*, No. 4:06-CV-95, 2007 WL 3173972, at *4 (W.D. Mich. Oct. 26, 2007); *In re Delphi*, 248 F.R.D. at 502-03 (E.D. Mich. Jan. 11, 2008) ; *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, No. 2:03-MD-1565, 2009 WL 1473975 (S.D. Ohio, May 27, 2009); *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 503 (E.D. Mich. 2000). Some district courts have found the range to be as high as 50 per cent of

the common fund. *In re Telectronics Pacing Sys., Inc.*, 137 F.-Supp.-2d 1029, 1046 (S.D. Ohio 2001); *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F. Supp. 148, 150 (S.D. Ohio 1986).

30. District courts in other circuits also have issued similar awards. *See Standard Iron Works v. Arcelormittal*, No. 08 C 5214 2014 WL 77815572, at *1 (N.D. Ill. Oct. 22, 2014) (attorneys' fee award of one-third of $163.9 million settlement); *In re Fasteners Antitrust Litig.*, No. CIV.A. 08-MD-1912, 2014 WL 296954, *7 (E.D. Pa. Jan. 27, 2014) ("Co-Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions."); *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318 RDB, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (one-third fee from $163.5 million fund); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 748-52 (E.D. Pa. 2013) (noting that "in the last two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees" and awarding one-third fee from $150 million fund); *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) (awarding one-third fee from $90 million settlement fund); *In re Ready-Mixed Concrete Antitrust Litig.*, No. 1:05-CV-00979-SEB, 2010 WL 3282591, at *3 (S.D. Ind. Aug. 17, 2010) (approving one-third fee); *Williams v. Sprint/United Mgmt. Co*, No. CIV.03-2200-JWL, 2007 WL 2694029, at *6 (D. Kan., Sept. 11, 2007)(awarding fees equal to 35 per cent of $57 million common fund); *Lewis v. Wal-Mart Stores, Inc.*, No. 02-CV-0944 CVE FHM, 2006 WL 3505851, at *1 (N.D. Okla., Dec. 4, 2006) (awarding one-third of the settlement fund and noting that a "one-third [fee] is relatively standard in lawsuits that settle before trial."); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 635 (W.D. Ky. 2006) ("[A] one-third fee from a common fund case has been found to be typical by several courts.') (citations omitted), *aff'd*,

534 F.3d 508 (6th Cir. 2008); *In re AremisSoft Corp., Sec., Litig.*, 210 F.R.D. 109, 134 (D.N.J. 2002) ("Scores of cases exist where fees were awarded in the one-third to one-half of the settlement fund.") (citations omitted); *Moore v. United States*, 63 Fed. Cl. 781, 787 (2005) ("one-third is a typical recovery").

### Percentage Reductions for Large Settlements

31.     I understand that the Court has requested input about the attorneys' fee award percentages for future settlements (or possible adjudications) in this litigation. In making such a request, the Court is carrying out its duty to monitor the future fee requests carefully and I am pleased to offer some suggestions about that process.

32.     In providing this input, I have been mindful of the nature of the settlements previously reached by the Auto Dealers and the completely positive reaction from the class members to those settlements. The settlements provide cash-only benefits to new car dealerships. The settlements do not include a *cy pres* component and all money available after the payment of costs and attorneys' fees will be distributed to eligible class members through allocation plans devised by a court-approved Allocation Consultant.

33.     There were no objections to the Auto Dealer settlements, which is remarkable in today's class action environment. The absence of objections from the class indicates the reasonableness of the fee. I also understand that a very significant percentage of the eligible new car dealerships submitted claims in the first round of Auto Dealer settlements approved by the Court, a very positive factor in terms of class action policy.

34.     I have reviewed the transcript of the hearing in which the Court requested input about the idea that a decreased percentage of attorneys' fees should be applied as the

total settlement amount grows for each set of Plaintiffs in this litigation. I am aware of the argument that fee recoveries should decline as the size of the fund increases above a certain point. These are sometimes referred to as "mega fund" settlements. In my view, the Court should not take this approach for the following reasons:

(a)     In today's world, recovery of even hundreds of millions of dollars on a claim intensely litigated for over many years at great risk should not properly be categorized as a "mega fund" for purposes of determining what is a proper fee award. That is far too simplistic. The only rational basis for reducing percentages at the top ends of very high recoveries is the avoidance of a windfall because a case had relatively little risk or counsel invested comparatively modest time and effort or perhaps because the case was simply a tag-along to prior determinations that "paved the way." Given the lengthy and contentious litigation currently before the Court, this litigation does not have the potential to create windfall for counsel. I therefore believe that the so-called "mega fund" approach is not appropriate, especially as it relates to the Auto Dealers;

(b)     There is no rule of law in the Sixth Circuit, or elsewhere, requiring that a trial court reduce fee petitions simply because there is a large settlement or award. The cases I have cited all involve substantial amounts of money, but usually result in percentage recoveries similar to or larger than what the Auto Dealers have sought.

(c)     The size of the settlement should, logically and pragmatically, not be an indicator of whether a percentage common benefit fee is appropriate since it is not an index of the risks assumed by the attorneys or the quality of the results achieved by the tenacious and dedicated efforts of counsel for the benefit of the claimants. In numerous cases there

have been large settlements in which the fees awarded are in the 30% to 36% range. *See, e.g.,* *In re Combustion, Inc.,* 968 F. Supp. 1116, 1133, 1142 (W.D. La. 1997) (awarding fee of 36 per cent and noting that "50 percent of the fund is the upper limit on a reasonable fee award from a common fund . . . . [D]istrict courts in the Fifth Circuit have awarded percentages of approximately one-third contingency fee"); *In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir. 2002) (fee of 36%); *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1292-94 (11th Cir. 1999); *In re Vitamins Antitrust Litig.,* No. MDL 1285, 2001 WL 34312839, at *10 (D.D.C. 2001) (awarding 33.33% of $359 million antitrust recovery, which is "within the fifteen to forty-five percent range established in other cases"); *In re Ampicillin Antitrust Litig.,* 526 F. Supp. 494, 498 (D.D.C. 1981) (awarding a fee of 45 percent). This is so even when the recoveries approach or exceed $100 million. *See, e.g., In re Thirteen Appeals Arising Out of the San Juan Dupont Fire Litig.,* 56 F.3d 295 (1st Cir. 1995) (30.0% of $220 million); *McCoy v. Health Net, Inc.,* 569 F. Supp. 2d 448 (D.N.J. 2008) ($69,720,000, or about 32.4%, of a class action settlement recovery of $215,000,000); *In re Relafen Antitrust Litig.,* 231 F.R.D. 52 (D. Mass. 2005) [Doc. No. 459] (33.33% of $67 million indirect purchaser settlement); *In re Lupron Marketing and Sales Practices Litig.,* No. 01-10861-RGS (D. Mass. Aug. 17, 2005) [Doc. No. 455] (30.00% of $90 million settlement); *In re Relafen Antitrust Litig.,* 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) (33.33% of $175 million direct purchaser settlement); *In re Linerboard Antitrust Litig.,* No. CIV.A. 98-5055, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004) (awarding $60 million in fees – 30% of the $202 million settlement fund); *In re Buspirone Patent,* No. 1-MD-1413, slip op. at 41-43 (S.D.N.Y. Apr. 17, 2003) (33.33% of $220 million); *In re Combusion, Inc.,* 968 F. Supp. 1116 (W.D. La. 1997) (36% of $125 million

settlement fund); *In re Coordinated Pretrial Proceedings in Petroleum Products Litigation*, No. MDL-150 AWT (C.D. Cal.), 1994 WL 675265 (30% of $140 million); *Kurzweil v. Phillip Morris Co., Inc.*, Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) (30% of $124 million settlement fund).[1]

(d)     There is something of a trend recently away from reducing the fee percentage when there is a very large recovery. Many courts consider it a disincentive to plaintiffs to push harder or litigation longer to obtain the largest recovery they can for their clients. Examples are: *In re Linerboard*, 2004 WL 1221350 (granting a flat 30% fee based on a recovery of $202 million; finding that ". . . the sliding scale approach is economically unsound;" and agreeing with the Seventh Circuit that "reducing fees for large awards is economically irrational"); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa.

---

[1] The fullest analysis of fee awards in securities class actions has been conducted by the National Economic Research Associates, a highly regarded economics consulting firm. *See* Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja & Denise N. Martin, *Recent Trends III: What Explains Settlements in Shareholder Class Actions?* (NERA, June, 1995) (hereinafter "NERA Study"). Using data from 656 shareholder class actions that were settled, dismissed, or resolved by a jury verdict between January 1991 and December 1994, the NERA Study reached a number of findings based on data that is both more current and more reliable than that underlying other class action studies. On the central question of attorneys' fees, this study reports that "[r]egardless of case size, fees average approximately 32 percent of the settlement." NERA Study at 7.

Another study of attorney fee awards, prepared by Vincent O'Brien of the Law & Economics Consulting Center, covered securities fraud cases from April 1988 through September 1996 and collected data from some 1280 securities class action cases. *See* Vincent E. O'Brien, *A Study of Class Action Securities Fraud Cases, 1988-1996* (the "O'Brien Study"). It found that the average fee awarded to plaintiffs' counsel in securities cases amounted to 32% of the settlement fund (which was up from the 29% level that was the average from April 1988 to March 1993). The O'Brien Study also reported that some other studies (whose methodology it questioned) have found the average fee award to be as high as 40% of the settlement fund. (*See* O'Brien Study, Part III, page 2.)

2000) (awarding a flat fee of 30% of a $111 million common fund and finding that diminishing fee percentages on increasing recoveries "tends to penalize attorneys who recover large settlements"); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (awarding a 31.33 % fee of a recovery of $1,065 billion, and holding: "While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit in *Camden*, the whole purpose of which is to align the interests of the Class Counsel and the Class by awarding counsel in proportion to the results obtained . . ."); and *In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) (reversing as economically irrational a fee award that applied the reduced rate to the entire recovery, not just portion above "megafund" benchmark); and

(e)     Decreasing percentages as awards increase is a disincentive for plaintiffs' counsel to obtain the highest possible recovery and fails to recognized the unique skills (and sometimes the standing) of lawyers who are gifted negotiators or willing to "go the extra mile" in the settlement dynamic. Indeed, it makes more sense to increase fee percentages as the awards increase; certainly in a negotiated situation, common sense indicates it is far easier to recover the first dollar than the last dollar – and that probably also is true of judicial and jury awards as well.

35.     It is extremely important to take into account the risks and front end investment assumed by the Auto Dealers' counsel, their willingness to put their own financial resources (to-date millions of dollars in expenses) on the line with absolutely no guarantee of reimbursement, let alone receipt of any fee for their services. It is this element

of risk that is particularly critical in a case of this magnitude and complexity in which expenditures of time, money, and other resources obviously are much greater than in cases of more modest dimension. These magnified risks should be reflected in the fee award when counsels' efforts produce significant benefits for the class.

36.    I also would point out that in setting the fee percentage, the Court also should be cognizant of the affect judicial awards of fees may have on the incentives and predilections of members of the profession who are asked to litigate cases like those before the Court, and recognize the importance of there being competent plaintiffs' counsel available to represent and protect the next class of citizens in the next class action. Unless marketplace compensation is provided for competent attorneys, the professional talent will pursue other professional avenues. This is a matter of access to justice. There is an obvious truth: The vast majority of Americans and small business entities simply cannot afford to pay for representation on an hourly basis especially in extremely difficult antitrust cases such as this one that require the expenditure of enormous resources to explore the facts and retain the relevant experts that are needed to understand a complex and technical matter and therefore, in order to ensure our courts are open to all Americans, the fee award system must protect the contingency fee process especially when important public policies are at stake as is true in this litigation. Similarly, lawyers often cannot assume the incredible risks and make the enormous resource commitments on behalf of individual businesses; they must aggregate claims as was done in this litigation.

37.    In my opinion, the amount of recovery achieved for the Auto Dealers in these settlements does not yet reached "mega fund" status. The history of this litigation has

shown that the Auto Dealer class representatives, and third-party automobile dealerships, have been the major focus of the Defendants' discovery efforts. The procedural history of this litigation shows that class counsel for the Auto Dealers have achieved remarkable results by overcoming numerous obstacles, including the relentless discovery and motion practice engaged in by the Defendants. These realities militate in favor of a fee percentage at the top of the appropriate range. Nothing suggests that the Court is faced with a "windfall" at this stage.

## Summary of Options

38.    In my opinion, the Court should continue to consider the settlements reached in this litigation on a case-by-case basis. Whether a settlement percentage becomes unreasonable for a particular settlement, and therefore should be lowered, depends on the details of that settlement. When confronting this issue, courts often compare the degree of positive multiplication of the lodestar to the proposed percentage. In their first fee award, the Auto Dealers received a negative multiplier so it is reasonable for the Court to consider the overall multiplier received by the Auto Dealers counsel as additional settlements are presented.

39.    The negative .70 lodestar multiplier thus far awarded to the Auto Dealers is much lower than the positive multipliers typically approved by other district courts in the Sixth Circuit. *See, e.g., In re Cardinal Health*, 528 F. Supp. 2d at 767-68 (S.D. Ohio 2007) (approving multiplier of 6, and observing that "[m]ost courts agree that the typical lodestar multiplier" on a large class action "ranges from 1.3 to 4.5"); *In re Prandin*, 2015 WL 1396473, at *4 (E.D. Mich. Jan. 20, 2015)(3.01 multiplier).

40. Other courts have awarded positive multipliers that often reach double digits. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (charting attorney's fees awards and multipliers in common fund cases of $50-$200 million from 1996-2001, and noting "a range of 0.6-19.6 with most (20 of 24, or 83%) from 1.0-4.0 and a bare majority (13 of 24, or 54%) in the 1.5-3.0 range"); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926, at *28 (E.D. Pa. May 19, 2005) (awarding a fee which lodestar cross-checked at higher than 15, but which was reasonable given the overwhelming acceptance by the class); *Conley v. Sears Roebuck and Co.*, 222 B.R. 181 (D. Mass 1998) (awarding multiplier of 8.9).

41. It is my opinion that the Court should continue to review and consider the settlements reached by the Auto Dealers as they are presented and, in doing so, should continue to take into account both the percentage of the fund being requested as fees and the overall lodestar multiplier—as applied to the entire litigation—that counsel for the Auto Dealers would receive at the requested percentage. Lowering the percentage at this juncture seems to me to be premature and will continue to be unless the multiplier becomes significantly positive. I respectfully submit that the Court should not award a lesser percentage to counsel for the Auto Dealers even if the aggregate amount of the settlements becomes large for this type of antitrust litigation.

Executed this 10th day of June, 2016.

Arthur R. Miller