# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | : Master File No. 12-md-02311<br>: Hon. Marianne O. Battani<br>: |
| ALL PARTS | |
| THIS DOCUMENT RELATES TO: | :<br>: |
| ALL AUTOMOBILE DEALER ACTIONS | :<br>: |

## DECLARATION OF FRANK J. KELLY IN SUPPORT OF AUTOMOBILE DEALER PLAINTIFFS' SUBMISSION REGARDING ATTORNEYS' FEES

I, Frank J. Kelley, have personal knowledge of the following facts, and, if sworn as a witness, I would be competent to testify to the facts stated below:

### Introduction

1.      In my view, there is no higher calling than public service, especially for a lawyer, working "to help my fellow men find better lives in this world." That is why I have devoted most of my professional life to public service, including 37 years as the Attorney General of Michigan. As I note in the Preface to my recently published book, *The People's Lawyer: The Life and Times of Frank J. Kelly, the Nation's Longest-Serving Attorney General*, "I was able to transform the office [of state attorney general] from a passive defender of lawsuits against the state to an active and muscular crusader for the rights of citizens."

2.      From the very beginning of my career as attorney general, what made a powerful impact on me was the fact that the common man (and common woman) were getting scammed in

an ever increasing number of ways.  Indeed, it was far more likely that an individual would be cheated or defrauded in a consumer transaction than to be a victim of a crime.  Therefore, one of the chief aims of my administration was to implement adequate safeguards to ensure that the people of the state of Michigan were protected from the predatory practices of businesses in a variety of industries.

3.      In order to accomplish this goal, I found that it was most effective to mobilize efforts in both the public and private sectors, as the corporations and industries we were up against lacked little in the way of funding or long-established, symbiotic relationships with various state and local government officials.  As I note in my book, it was early on in my career that "I learned that class-action suits were often an extremely effective way to win victories for consumers."

4.      And to ensure that the class action remains a viable enforcement mechanism, the attorneys who take on the sometimes Herculean task of holding corporations liable for the wrongs they have committed must be adequately compensated.  Because of the dollars and special interests at stake, it is a foregone conclusion that the corporations will have assembled a team of top level attorneys from some of the country's largest and most powerful firms.

5.      Thus the compensation paid to the plaintiff's bar must be sufficient to attract outstanding members of the profession and to ensure that they have the resources necessary to take on and successfully maintain such cases.  That compensation must also take into account the high level of risk involved in the prosecution of large-scale class actions and the substantial outlay of resources that is required.

**Professional Qualifications**

6.      After receiving my undergraduate and law degrees from the University of Detroit, I became a lawyer in private practice in Alpena, Michigan, and later received an appointment as Alpena city attorney. I then had the privilege in 1961 of being appointed as Attorney General by Governor John Swainson to fill the vacancy left when Paul L. Adams became a Justice of the Michigan Supreme Court.

7.      I was elected as Michigan's Attorney General for 10 consecutive terms before my retirement from the position in 1999. My successor was Jennifer Granholm, one of my many protégés who would go on to become governor of Michigan. Other protégés who began their career in my office include, among others Carl Levin, James Blanchard, Lawrence Glazer, Bob Carr, and Dennis Hertel, to name a few. Judge Glazer, in particular, was kind enough to publicly state, "[Kelley] was a great role model, and great mentor as well, for all of us who were interested in a career in the public sector."

8.      I am proud to have been a close adviser to both Governor Blanchard and Governor Granholm, the 45th and 47th governors of Michigan respectively.

9.      During my tenure as the longest serving state attorney general in U.S. history, I worked with five distinguished governors and numerous members of Congress inluding Sens. Ted Kennedy and Philip Hart – the latter being perhaps the Twentieth Century's greatest Senate champion of antitrust and consumer rights legislation and for whom the Hart Senate building is named – as well as John F. Kennedy and Robert Kennedy, another proactive attorney general, who provided invaluable guidance and inspiration.

10.      Perhaps my most satisfying and lasting achievement was the establishment of one of the first, if not the first, consumer protection division in the United States, headed by the

3

brilliant Maxine Boord Virtue. Without any sort of historical precedent to guide us, our division was forced to chart its own course. In retrospect, I believe we did a highly credible job of it.

11.     We prosecuted consumer fraud wherever we found it, regardless of the special interests or the established powers involved. We successfully prosecuted and shut down an illegal meat-packing facility near Holland Michigan, effectively ended the operations of "Tin Men" in the State of Michigan, obtained substantial compensation for purchasers of Oldsmobile's infamous Chevrolet-made V-8 "Rocket" engines, and cracked down on public utilities charging exorbitant rates, which were in part based on unnecessary and high-priced projects such as the Midland nuclear power plant, a project we scuttled in the 1980s. We "were taking on the establishment in ways they had never been challenged before."

12.     As a result of these and other successes, I was asked annually to appear on the NBC show "Dateline" to discuss issues such as item pricing, mortgage fraud, and deceptive advertising and marketing practices. My attorney general's office also gained statewide attention for combatting abuses committed by banks and insurance companies, including unlawful interest rates and rate increases. The attorney general's office was finally, on my watch, acting as attorney for the people.

13.     Prior to his career as a major documentary filmmaker, Michael Moore, in his Flint-based newspaper the *Michigan Voice*, offered the following, "Frank J. Kelley has, as Michigan's Attorney General, been a leading advocate for consumers' and workers' rights. He has been relentless in his opposition to…attempts by giant utilities to force rate payers to pick up the tab for failed projects. His record as a consumer advocate and environmentalist remains unmatched by any other attorney general in the nation."

14.     The current Attorney General, Bill Schuette, offered the following: "Frank Kelley etched consumer protection into the DNA of every attorney general who follows him."

15.     However, consumer protection does not come cheap; it demands a substantial outlay of resources along with sufficient manpower to investigate and prosecute the cases that are brought.  This relative dearth of available attorneys posed one of the chief obstacles to mounting a successful attack on the establishment. As the office had hitherto been mostly a passive institution serving as little more than the governor's and legislature's attorney, the office lacked the resources and manpower for the proactive role I envisioned.  Within the first years of my administration I lobbied the legislature to double the number of assistant attorneys general.

16.     Throughout my career, I worked hard to obtain legislative approval of additional funds and resources to maintain the office's cutting edge position on consumer affairs, civil rights, and the environment.  During my tenure the size of the Michigan Attorney General's Office tripled, from 84 lawyers in 1962 to 301 attorneys when I retired in 1998.

17.      Our endeavor was to put these new resources to effective use, and the successes recounted above would not have been possible without the support and commitment of this state's legislature, as well as the active assistance of the plaintiffs' bar.  Together we were able to hold corporations accountable for harms inflicted on state citizens.  *See*, David B. Wilkins, Harvard Law School, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of "Substitute" Attorneys General*, Harvard Law School Public Law & Legal Theory Working Paper Series Paper No. 11-11 (2010).

18.     The most notable success of this cooperation of attorneys from the public and private sectors was the Tobacco Litigation which resulted in a $12 billion settlement for the state of Michigan, the largest in the state's history.   In holding companies responsible for massive

5

injury to the public, I learned that it is essential to have private lawyers work alongside public lawyers to conduct what is called "the people's business."

19.     In the tobacco cases, as well as others, my office pioneered class action lawsuits in which private attorneys have become an increasingly important part of the work of many attorney general offices throughout the nation.  Moreover, in prosecuting these actions, many of my successors have also followed another of my innovations: bringing in private attorneys to either supplement or supplant government lawyers in handling some or all of the work being done on the matter.

20.     Thus, in the Tobacco Litigation, I brought in two prominent plaintiff class action law firms – Scruggs, Millette, Lawson, Bozeman & Dent from Pascaloula Mississippi and Ness, Motley, Loadholt, Richardson & Poole from Charleston South Carolina—to be "Special Assistant Attorneys General" to work alongside three lawyers from my newly created Environmental Division in prosecuting the case.

21.     The resources of any attorney general's office – including Michigan's – while substantial, are limited.  Every day, attorneys general must pick and choose which violations to enforce and how much emphasis to give particular cases.  Wrongdoing, fraud and abuse are, unfortunately not in short supply in the United States, and in the global economy.  It seems there are never enough public resources to go around.

22.     As a result of my long tenure as Attorney General, I appreciate that strong antitrust laws are an important consumer protection and are the foundation of the nation's free market economy.  Although at the time of its founding, the consumer protection division was denounced by some in our state government as "communism," the net effect of the division's various campaigns has been to promote competition and the open market by ensuring that

6

consumer's get what they pay for and by prohibiting businesses from using their superior economic clout to unlawfully restrict competition and drive up prices.  I stated in my book, well before my involvement in this matter, "we have to prevent the power of corporations from strangling our democracy.  This is a bigger threat [today], in my opinion, than it has ever been."

23.    I have given my life to public service and I have agreed to provide an opinion for this Court to consider on how to award the attorneys' fees in this case.  I am being compensated for my opinion but that is not my incentive for my willingness to provide guidance on this important issue facing the Court.  I believe that attorney compensation arrangements are a critical factor that is of great policy concern when Plaintiffs' attorneys decide whether to undertake cases that ultimately benefit the public.

### Relevant Facts and Law

24.    I submit this Declaration at the request of the Interim Co-Lead Counsel for the Automobile Dealership Plaintiffs in this litigation:  Jon Cuneo (Cuneo Gilbert & LaDuca), Shawn Raiter (Larson • King), and Don Barrett (Barrett Law Group) and for Interim Liaison Counsel, Gerard Mantese (Mantese Honigman, P.C.), for the purpose of assisting the Court as to prospective attorneys' fee awards for settlements or judgments reached as this litigation continues.

25.    I have been asked to review the results already reached in this litigation, the attorneys' fee awards already granted, and the general background of fee awards in complex litigation.  I will then offer some opinions that I hope will be helpful to the Court in addressing its request for input about future fee awards.

26.    I bring to this task the unique understanding of someone who, like counsel for the auto dealers in this case, initiated some of the largest cases and class actions in the country and

against a farrago of consumer cheats, giant merchants, banks that were abusing the interest laws, and utilities charging exorbitant rates; these were cases where there was little or no precedent, where our attorneys were pitted against some of the most highly skilled defense attorneys in the country.

27.    Against this backdrop I have personally reviewed the facts contained in Plaintiffs' numerous complaints; Defendants' Motions to Dismiss and Plaintiffs' Responses; hearing transcripts and Orders from Judge Battani regarding settlement; Auto-Dealer's Attorneys' Fee Applications; and Proposed Settlement by Auto-Dealer Attorneys who have sought as attorneys' fees a percentage of recovery based on a significant positive result for their clients.

28.    I personally spearheaded one of the most well-known examples of the use of state anti-trust laws in the prosecution of the tobacco cases, which ultimately led to the Master Tobacco Settlement Agreement ("MSA").  Just as counsel for the auto dealers have done in the instant case, we used various state consumer protection and anti-trust laws to obtain reimbursement for Medicaid funds that the states had expended in treating tobacco-related illnesses.  Through MSA, we obtained over $200 billion nationally, with approximately $12 billion going to Michigan.  However, it was only through the cooperation of the states' attorneys general and a vigorous private bar that we were able to achieve this multi-billion settlement.

29.    As the Sixth Circuit opined in *Gascho v. Global Fitness Holdings, LLC*, --- F.3d ---, 2016 WL 2802473 (6th Cir. May 13, 2016), in today's climate of government cutbacks and deadlock, of vast importance to law enforcement agencies across the country are the "private law enforcement regimes that free public sector resources. If we are to encourage these positive societal effects, class counsel must be adequately compensated—even when significant

8

compensation to class members is out of reach (such as when contact information is unavailable, or when individual claims are very small). An inflexible, categorical rule neglects these additional considerations." *Id.* at *15.

30.    As I wrote in my book, class action lawsuits are often extremely effective ways to win victories for consumers. That applies to business as well. However, in cases such as that currently before this Court, the substantial risk and significant outlay of resources with no promise of return must be reflected in the compensation awarded to the attorneys prosecuting this case.

31.    They should also be compensated for the significant value they have added above and beyond the Federal government's fines and prison sentences. Like the auto dealer plaintiffs, in most of the matters cited above, they did not "discover" the wrongdoing but were provided tips which we followed up on, investigated and ultimately prosecuted. It is one thing to know that a fraud is taking place, it is quite another to hold the wrongdoers liable for the injuries they have caused and to ensure that the victims are appropriately compensated.

32.    The work done by the Federal government in this case was but a taking off point. But for the hard work over the course of more than four years, engaging in rigorous discovery and motion practice with some of the most outstanding class action defense attorneys in the country, the actual victims of the auto parts price-fixing would not have received a penny. Instead, every auto dealer that files a claim, and I understand this to be a substantial portion of the dealers across the relevant states, stand to receive a very substantial recovery.

33.    Additionally, counsel for the auto dealers has successfully maneuvered to litigate what was initially a single case over a single auto part but which has, in the four years since the initial complaint was filed, mushroomed into over 30 cases involving as many parts, against

numerous Defendants located across the globe.  That the attorneys for the auto dealers were nimble and creative enough to accomplish this seemingly impossible feat is, in itself, a testament to their great skill and their complete dedication to these cases.

34.    Finally, due to the auto dealer's counsel courageous efforts in forcefully litigating this case, they were able to obtain cooperation from numerous defendants that provided information that went far beyond anything that the Department of Justice has disclosed. Specifically, auto dealer counsel obtained evidence that some of the conspiracies revolving around a particular part were in fact part of larger conspiracies.  This achievement will not only help to ensure that their clients are compensated for the injuries they sustained, but goes beyond to provide a significant benefit to the general public.

35.    The cases before this Court are extremely complicated. The price-fixing and bid rigging does not exist at the consumer or dealer level, instead, this case involves a vast number of price-fixes and bid rigs of "upstream parts."  Thus, unlike direct purchasers, dealers must bear the burden of showing through very complicated and expensive econometric analysis that damages were passed on to them. As the court has noted, this "tracing" process is complicated and expensive.

36.    Additional complications – by no means insubstantial – are that many of the bid rigs took place in foreign countries – particularly in Japan – and many of the key documents are in the Japanese language and, many of the witnesses are Japanese speakers.   These are significant complications in this case and are additional reasons that support a percentage fee approval.

37.    As I previously stated, the auto cases are also extremely well and vigorously defended.  The defense firms – virtually all familiar names to experienced members of the bar –

are some of the most respected and experienced antitrust counsel in the country with virtually limitless budgets. Here, the defendants were ably represented by a score of separate law firms, many of which are nationally prominent. The ability of plaintiffs' counsel to recover an initial settlement valued for the Class in the face of such formidable legal opposition provides further evidence of the quality of the Plaintiffs' counsel legal work.

38.     The one-third contingency requested by Class Counsel in this case is more than reasonable and is comparable to other fee awards granted in common fund cases. *E.g., In re Allstar Inns Securities Litigation,* No. 88 Civ. 9282, 1991 WL 352491 (PKL) (S.D.N.Y. Nov. 20, 1991) (awarding 35%); *Bello v. Integrated Resources, Inc.,* [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95731 (S.D.N.Y.1990) (awarding 30%); *In re Gulf Oil/Cities Service Tender Offer Litigation*, 142 F.R.D. 588 (S.D. New York 1992) (awarding 30%). Second, this is not a case in which Plaintiffs' counsel can be "cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill." *Id.* at 597. They achieved the result on their own. Third, class counsel consistently made skillful, resourceful and diligent efforts in the face of an insurmountable defense. Plaintiffs' counsel invested time and money in this case, and deserve proper and substantial compensation for this effort.

## Conclusions

39.     It is my opinion that there were serious questions of law and fact in this complex anti-trust case, placing the ultimate outcome in doubt, which further supports approval of at least a 33 and 1/3 percent fee. Based on my review of the various pleadings in this matter, it is clear that throughout the litigation and various settlement negotiations, the parties held contrary legal

and factual positions on a number of complex and highly technical issues of anti-trust law in which the Defendants raised numerous defenses to the Class's claims. And, to date, the Defendants deny any liability for any acts or omissions arising out of those claims. If this case proceeds to trial the outcome of these complex issues will be uncertain until their ultimate resolution by the Court or a jury, thus placing substantial risk on counsel for the auto dealers who, by that time, will have spent the greater part of a decade litigating this case. Accordingly, it is my view that the compensation request of plaintiff's counsel in this case is fair and just.

40.     My opinion is also based on the fact that there are substantial and immediate benefits achieved for the Class in any current or future settlement that significantly outweigh the risk, uncertainty and expense of further litigation. Like the other settlements in this case, the current settlements were conducted at arms-length and represents a fair, reasonable and adequate agreement. Furthermore, because counsel for the auto dealers structured the settlement so that all funds would be immediately distributed to affected dealers, the entire value of the settlement fund will be realized. It is my humble opinion that counsel for the auto dealers have achieved a truly remarkable result.

FURTHER AFFIANT SAYETH NOT.

Frank J. Kelley

Subscribed and sworn before me
this 8 day of June , 2016

Renee Brunette

Notary Public
My commission expires on 3/16/2019
Acting in the County of Ingham Co.

RENEE N BRUNETTE
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF CLINTON
My Commission Expires March 16, 2019
Acting in the County of Ingham Co.

12