## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 2:12-md-02311<br>Honorable Marianne O. Battani<br>Magistrate Judge Mona K. Majzoub |
| ALL PARTS | |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**DECLARATION OF STEVEN N. WILLIAMS IN SUPPORT OF THE PARTIES' RENEWED MOTION TO COMPEL DISCOVERY FROM CERTAIN NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS AND THEIR AFFILIATED ENTITIES**

I, STEVEN N. WILLIAMS, declare as follows:

1. I am an attorney duly licensed to practice in the State of California and I am admitted to this Court. I am a Partner with the law firm of Cotchett, Pitre & McCarthy, LLP and am Interim Co-Lead Counsel of record for the End Payor Plaintiffs ("EPPs") in the above-entitled action. I make this Declaration pursuant to 28 U.S.C. § 1746 in support of the Parties' Renewed Motion to Compel Discovery From Non-Party Original Equipment Manufacturers and their Affiliated Entities. I have personal knowledge of the facts set forth in this declaration and, if called upon, I could and would competently testify thereto.

2. The Parties[1] are unaware of any indirect purchaser antitrust case that has not involved the production of the same types of purchase, cost, pricing and sales information from intermediaries in the chain of distribution. In cases involving computers, cell phones, gaming systems, televisions, and other products, entities of the same size and magnitude as those here, such as Apple, IBM, Microsoft, Best Buy, Dell, and many others, have produced the very same types of information being sought here without incident, delay, or unreasonable demands.

3. Since the 30(b)(6) depositions of the OEM entities that are the subject of this Motion (the "Six Lead OEMs")[2] began, the Parties have made best efforts to negotiate with the

---

[1] The "Parties" joining in this renewed motion include End-Payor Plaintiffs ("EPPs"), Truck and Equipment Dealer Plaintiffs, the State of Florida, the State of Indiana, and certain Defendants in *In re Automotive Parts Antitrust Litigation*, Master File No. 2:12- md-02311 (E.D. Mich.). Not all Defendants join this motion with respect to all OEMs. *See* ECF No. 1185 at Attachment A.

[2] The Six Lead OEMs (subject to this renewed motion) include the following entities: FCA USA LLC ("FCA"); General Motors Company, General Motors Holdings LLC, General Motors LLC (collectively "GM"); American Honda Motor Company, Inc., Honda Manufacturing of Indiana LLC, Honda North America, Inc., Honda of America Mfg., Inc., Honda of South Carolina Mfg., Inc., Honda Precision Parts of Georgia, LLC, Honda R&D Americas, Inc., Honda Research Institute USA, Inc., Honda Transmission Manufacturing of America, Inc. (collectively, "Honda"); Nissan Design America, Inc., Nissan Diesel America, Inc., Nissan North America, Inc., Nissan Technical Center North America, Inc. (collectively, "Nissan"); Subaru of America,

Six Lead OEMs and to work toward a mutual resolution. The Parties have provided each of the Six Lead OEMs with a narrowed list of requests (the "Narrowed List") and have further specified what types of data and documents they seek in those categories, where this information could be gleaned from 30(b)(6) testimony and meet and confer communications. The Parties believe that they have made substantial progress with certain of the Six Lead OEMs and that a resolution might be reached with those OEMs at, or prior to, the mediation scheduled for November 15, 2016.

4. After Rule 30(b)(6) depositions were allowed to proceed by the Court on June 23, 2016 as to the Six Lead OEMs, the Parties began working to schedule depositions with the Six Lead OEMs. *See* Objections to Rule 30(b)(6) Depositions Hrg. Tr., Master File No. 2:12-md-02311, ECF No. 1405 (July 1, 2016).

5. After serving Rule 45 deposition subpoenas and a uniform detailed outline of questions on each entity for the Six Lead OEMs subject to Judge Battani's ruling, the Parties worked together to coordinate and take depositions of each entity, except the Honda entities, for which depositions were postponed pending the outcome of ongoing meet and confer negotiations.

6. The depositions of the FCA, GM, Nissan, Subaru, and Toyota entities occurred between August 16, 2016 and October 18, 2016, and the last day of deposition for Honda will take place on November 10, 2016. The 30(b)(6) depositions took place on the following dates: FCA (August 30, 2016 and September 20, 2016); GM (August 25, 2016 and October 18, 2016); Nissan (August 31, 2016 and September 1, 2016); Subaru (August 16, 2016 and August 18,

---

Inc., Subaru of Indiana Automotive, Inc. (collectively, "Subaru"); Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Sales, U.S.A., Inc. (collectively, "Toyota").

2016) Toyota (September 20, 2016 and September 22, 2016) and Honda (November 3, 2016 with another day to follow on November 10, 2016).

7.      The depositions enabled the Parties to gain a better understanding of what relevant data and documents responsive to the document Subpoena are in each entity's possession, how the information is kept, and a general idea of the burdens associated with the Six Lead OEMs' search for and production of relevant data and documents.

8.      Shortly after each deposition concluded, the Parties began reaching out to the Six Lead OEMs to schedule meet and confers, and to offer the Narrowed List. The Narrowed List[3] of requests contained the following requests:

- **Purchase and Procurement:**

    o   Purchasing data for defendant[4] and non-defendant suppliers (starting with the lead three parts if less burdensome);

    o   Data, or documents in the absence of data, reflecting annual price reductions ("APRs") or other price adjustments in isolation from other price elements for all parts, as well as communications/negotiations concerning such adjustments, from select sources;

    o   Request for Quotation ("RFQ") files and all documents associated with each RFQ to the extent reasonably available (e.g., award justification memo); and

---

[3] In negotiating with the Six Lead OEMs over the past few months, the Parties have offered to prioritize production for the "Lead Three Cases," which includes *Wire Harnesses*, *Bearings*, and *Anti-Vibrational Rubber Parts*. In light of the settlements between the Parties and all *Wire Harnesses* Defendants in the indirect purchaser actions, EPPs, TEDPs, the State of Florida, and the State of Indiana agree to drop the requests for information which solely relates to the *Wire Harnesses* action or to wire harness parts. The EPPs, TEDPs, the State of Florida and the State of Indiana do so without prejudice and reserve their rights to seek this information in the event any of the settlements are not finally approved or upheld on appeal. The Parties continue to offer to prioritize their requests as to *Bearings* and *Anti-Vibrational Rubber Parts*. Certain Defendants in the *Wire Harness* case take the position that production, and determination of the scope of discovery, as to wire harness parts should be deferred until after their pending motions for summary judgment in the direct purchaser action have been resolved.

[4] *See* Exhibit C attached hereto (full list of defendant-suppliers across the various parts cases).

- o   Agreements with auto parts suppliers (including master agreements).

- **Cost and Pricing Data and Documents:**

  - o   VIN level cost data or, if not tracked at a VIN level, cost data at the least aggregated level this information is tracked, or the most detailed level available for each year, make, model and trim combination, including costs for any options or accessories;

  - o   Data, or documents in the absence of data, sufficient to track each part after it was installed into a vehicle, including model year, VIN, part number;

  - o   Documents from central files and from a small number of custodian's files related to pricing, including back-up materials for internal determinations, internal evaluations, studies, manuals and instructions; and

  - o   Selection from limited number of custodians or central files of internal studies and reports on vehicle cost, vehicle price, the vehicle market, analyses of invoice prices or MSRP, factors that affect cost and any relationship between cost and price.

- **Sales:**

  - o   Data, or documents in the absence of data, sufficient to show the following information for each model (and model year) for each new vehicle sold by the OEM: start of production date, year when sales began, year when sales ended, schedule of base model prices, schedule of MSRP (MSRP for all standard models offered, including base and other standard trim packages), and amounts paid by dealers to the OEMs, including but not limited to, invoice price, dealer invoice price, or factory invoice price;

  - o   Sales data reflecting sales to auto dealers and end-purchasers (including off-invoice payments, incentives, rebates, etc.). If data reflecting off-invoice payments, incentives, rebates, etc. are not available, we request a schedule of off-invoice payments, incentives, rebates, etc. by model that were offered to dealers and end-purchasers; and

  - o   Selection of letters to dealerships announcing invoice and MSRP prices for new models.

- **Other:**

  - o   For all categories requested above, we seek all data and documents that are within your possession, custody, or control, regardless of whether that information came from your own files or the files of a foreign entity or other entity within your corporate family, however we limit the requests to data or documents that pertain only to vehicles sold in the United States regardless of where they were manufactured.

4

9. On October 10, 2016 Special Master Esshaki held a teleconference with counsel for the Parties and for the Six Lead OEMs. The Special Master determined that renewed briefing would be submitted to the Special Master on November 7, 2016, short statements in opposition by the Six Lead OEMs shall be filed on November 11, 2016, and mediation shall be held before the Special Master on November 15, 2016. To the extent the mediation is not successful, the Six Lead OEMs' responses to the Motion will be due on November 22, 2016. The Parties' replies shall be due on December 2, 2016, and hearing will be held before the Special Master on December 9, 2016. The Special Master also stated that for any categories of data and documents where the Parties and the Six Lead OEMs could reach agreement, production should begin immediately. The Special Master noted there would be an expedited appeal schedule for Objections to Judge Battani if necessary. The Parties have worked diligently to substantially complete meet and confer negotiations with each of the Six Lead OEMs and will continue to do so.

10. At no point did the Special Master or Judge Battani indicate that the process of the discovery-on-discovery depositions or the meet and confer process should be conditioned on resolving cost-shifting issues, nor did any OEM ever indicate to the Special Master or Judge Battani that efforts to reach agreement on the scope of the OEM subpoenas would be conditioned on first resolving the subject of cost-shifting.

11. The data and documents sought through this motion are all highly relevant to the claims and defenses of some or all of the Parties. The Parties are seeking only the most important categories of documents related to purchase and procurement of the auto parts at issue, vehicle costs, vehicle pricing, and vehicle sales.

12. In a number of categories in the Narrowed List, some of the Six Lead OEMs have offered data and documents in the categories requested but have asked if the Parties would accept a sampling of years within the composite time period requested (1993-2016), rather than the full period for which data and documents may be available. *See* Exhibit A attached hereto for a full list of the cases and time periods at issue. For example, one OEM inquired as to whether six years (either consecutive or chosen one-by-one) could be sufficient. Although the Parties seek to make compromises if appropriate, and understand that in some cases information does not exist for certain years or is not reasonably accessible, where an entity has the data and/or documents in its possession for the time period sought and that information is reasonably accessible, the Parties continue to request that it be produced.

13. End-Payor Plaintiffs ("EPPs") state that production of documents for the entire period at issue in these cases is very important to the pass-through analysis for each parts case. EPPs' experts will use the data and documents from OEMs to show impact over the time period when price-fixing is alleged to have taken place, rather than calculating impact for a relatively arbitrary year and then extrapolating from that analysis. Furthermore, EPPs are aware of the challenges that defendants typically raise in these types of cases at class certification– which commonly include challenges to the sufficiency of the data sets analyzed and the reliability of the methods employed. Defendants in these cases often attack the time period used for the pass-through analysis and attempt to point out gaps in coverage for a portion of the alleged class period. EPPs face the high burdens of rigorous analysis of class certification issues and the need for a damage model to fit the facts of the case as required by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). Therefore, EPPs would be remiss if they did not attempt to obtain as fulsome a

set as is possible from the OEMs to conduct their pass-through analyses, to the extent that information is available.

14. Similarly, certain OEMs have offered data and documents for only certain vehicle model years rather than the fuller set of data or documents requested. Complaints in these cases allege that one of the primary means of effectuating the conspiracy at issue in these cases was bid-rigging. The allegations include that Defendants specifically targeted certain vehicles and reached agreements as to the prices they would charge OEMs for the parts that were components of those vehicles. Therefore, to prove liability, impact, pass-through of overcharges, and damages, discovery relating to the actual vehicles that were targeted is highly relevant. Nevertheless, the Parties are considering whether to accept a selected set of models (sufficient to cover each vehicle segment) if they receive that information for all model years for which data and documents may be available.

15. Some of the Six Lead OEMs admit that they have accessible, highly relevant information in their possession, such as vehicle pricing information, but refuse to produce it on grounds that their business documents are too highly sensitive to provide it to the Parties, even under the strict protective order that is in place. The protective order in the MDL Action ("Stipulated Protective Order") has the appropriate safeguards. A copy of the Stipulated Protective Order is available on the Master Docket. *See* Stipulation and Protective Order Governing the Production and Exchange of Confidential Information, Master File No. 2:12-md-02311, ECF No. 200 (July 10, 2012).

16. To the extent any OEM fears producing information it believes to be sensitive, highly confidential or proprietary, it can produce under the Stipulated Protective Order. In addition, the Parties are willing to discuss what additional assurances OEMs may need to go

forward with production, such as further description of how the data and documents would be transferred and kept amongst the Parties or assurances about security measures of databases.

17. The Parties have repeatedly expressed their willingness to discuss appropriate cost-sharing with the Six Lead OEMs (and others) once there has been an opportunity to determine what responsive information exists, and what burdens may be associated with production. In the Parties' experience, the costs of non-party discovery in indirect purchaser class actions is not typically shifted to the Parties – even in large cases where huge companies such as Apple, Dell, Costco, and IBM, have responded to subpoenas.GM and FCA, however, take the unreasonable blanket position that just by fact of being served with the Subpoena, the Parties must pay all costs related to compliance, attorneys' fees, and employee time and, barring such agreement from the Parties, they will not even begin to search for responsive information. Furthermore, they have improperly relied upon the cost-shifting issue as a basis not to engage meaningfully in the meet and confer process.

18. In the Parties' experience, the costs of non-party discovery in indirect purchaser class actions is not typically shifted to the Parties—even in large cases where huge companies such as Apple, Dell, Costco, and IBM, have responded to subpoenas.

19. In addition to demanding that the Parties pay all costs, some of the Six Lead OEMs demand that the Parties pay all of their attorneys' fees associated with their compliance with the Subpoena, and even all of their fees for the 30(b)(6) depositions.

20. On September 2, 2016, the Parties and Six Lead OEMs filed the Serving Parties and OEM Groups' Joint Motion for Entry of Order, Master File No. 2:12-md-02311, ECF No. 1453 (Sept. 2, 2016), regarding 30(b)(6) depositions of the Six Lead OEMs. The Parties and the Six Lead OEMs' proposed orders differed as to the extent to which the Parties should be required

to pay the Six Lead OEMs' costs and attorneys' fees related to the depositions. Neither the Parties nor the Six Lead OEMs' proposed versions of the Order implementing Judge Battani's rulings at the June 23, 2016 hearing have been entered.

21. In *In re Lithium Ion Batteries Antitrust Litigation* ("*LIBs*"), No. 4:13-md-02420-YGR, ECF No. 1530 (N.D. Cal. Oct. 13, 2016), Magistrate Judge Ryu ordered third party Robert Bosch tool Corporation ("Bosch") to "produce purchase and sales data for 1/1/2010 through 12/31/2011." Bosch argued, as the OEMs do here, that this information was too burdensome to produce and that the Plaintiffs did not need it. *LIBs*, 4:13-md-02420-YGR, ECF No. 1362. The court rejected both arguments and ordered production of the requested data. *See* Exhibit B, attached hereto (enclosing the relevant filings and Order).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 7th day of November 2016 at Burlingame, California.

                                        */s/ Steven N. Williams*
                                        Steven N. Williams