# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In Re: AUTOMOTIVE PARTS
ANTITRUST LITIGATION

ALL PARTS

Case No.: 12-MD-02311
Honorable Marianne O. Battani

THIS RELATES TO: ALL CASES

## DECLARATION OF KELLY LYNCH IN SUPPORT OF FCA US LLC's OPPOSITION TO THE PARTIES' MOTION TO COMPEL

I, Kelly Lynch, hereby declare under penalty of perjury as follows:

1. I am employed as Purchasing Director at FCA US LLC, formerly known as Chrysler Group LLC ("FCA"). I have been employed by FCA, or its predecessor or related entities for approximately 28 years. In my current role, I am responsible for purchasing and supplier quality processes and methods. Unless otherwise noted, the facts set forth herein are based on my personal knowledge.

2. I have reviewed the subpoena served on FCA. I have also reviewed the Parties' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers ("Op. Br."). I understand the serving Parties seek information in response to the following requests: 1(a)-(g), (l), (m); 3; 4(a)(1)-(2); 4(a)(3)(a)-(e), (h), (k); 4(a)(4), (7), (8), (13); 4(b), (e), (h), (j); 5; 13; 14(c); 15; 16; 22; 23(2); 27; 28 (last two sentences); 30; 33; and 34. *See* Op. Br. 2 n. 6.[1]

---

[1] I also understand that certain Parties are seeking documents in response to Request 31, which seeks "all documents relating to negotiations or communications with defendants [and others]" relating to this lawsuit.

## I. Overall Breadth of the Subpoena

3. The requests fall into two broad categories: upstream information relating to the purchase of components and downstream information relating to the sale of vehicles. I discuss upstream information here.

4. These requests are breathtaking in both burden and scope. While we have been subject to document requests and subpoenas in other cases from time-to-time, we have never been seen anything like this. Its breadth is staggering. Compliance with the requests is not feasible, and even if it were feasible, compliance would take many months, would require thousands of employee hours, and would substantially interfere with our business duties and operations. The unparalleled breadth and scope of the subpoena cross multiple fronts:

- Breadth of Time Period. For most components, the Parties seek information for at least the past eighteen years, and from as early as 1994.

- Breadth of Components. The subpoena defines "Component" to include nearly 60 different components, many of which themselves are comprised of numerous individual parts. Instrument Panel Clusters, air conditioning systems, and windshield washer systems, for example, each contain many individual parts. In total, the subpoena covers millions of individual parts over 18 years.

- Breadth of Number of Suppliers. The subpoena calls for information relating to, not only the 140 defendant suppliers, but also every single supplier FCA purchased from over the last eighteen years.

- Breadth of Vehicles. These requests cover virtually every vehicle that FCA has sold over the past eighteen years. Request No. 4 alone spans over seven pages of requests for virtually every conceivable piece of information on "each new Vehicle sold by You or on Your behalf."

- Breadth of Types of Financial Information Sought. The Parties do not simply seek price information of parts purchased by FCA. The Requests span, for example, applicable currency and exchange rates, price adjustments, incentives or allowances, taxes, amortization, installment payments, financing, rebates, discounts, refunds, credits, cost adjustments, and shipping or delivery fees.

2

- <u>Breadth of Employees Covered</u>. Purchasing-related Requests for just one component could implicate over ten or twenty current positions, each of which has changed numerous times over the past eighteen years. The Requests also span multiple departments, and would involve employees from purchasing to engineering to sales to incentives.

- <u>Breadth of Information Systems Covered</u>. The data requested by the subpoena is not housed in a single all-encompassing database. Rather, complying with these requests would require developing specific queries and reports for numerous information systems on the purchasing side, including webRFQ, e-BOM, COMPASS, CAP (Corporate Accounts Payable), CHIERS, CHAMPS, GPSIS, FastCAR, PentaSap, and the CN system. None of these systems were designed to provide the scope and breadth of data requested by the subpoena with a single query. Rather, as detailed below, numerous individual queries would need to be conducted and cross-referenced across multiple systems to ensure we are collecting the correct information in a useable manner. Moreover, many of these information systems have also undergone significant change over the subpoena period and may only exist in microfiche. Therefore, accessing such information from legacy systems presents additional challenges and burden.

5. To put the breadth of this subpoena in perspective, I estimate that complying with the subpoena *even as to a single component* would likely take many *hundreds* of hours of employee time. This includes the hours it will take to (i) identify the specific parts at issue within each of our relevant purchasing, finance, engineering, and sales databases, (ii) craft reports and trace information from system to system; (iii) trace components through the supply chain to the end user purchase of a vehicle, which requires substantial investigative work by trained investigators; (iv) identify and interview relevant employees to determine location of any existing custodian information; and (v) search for and produce responsive information. Multiplied by the nearly 60 component parts, the demands imposed on FCA by the Parties are quickly unrealistic, if not impossible.

6. The effort required by the subpoena is not necessary to fill the gaps in the information likely possessed by the Parties themselves. As discussed below and in the Declaration of Michael Novak, the parties likely possess substantial information relating to both

3

the upstream purchase of price-fixed components and the downstream information relating to the sale of vehicles. As to the upstream information, for example, the defendants will possess purchasing information relating to the products they supplied, which would include any model for which one of them was a winning bidder. They will also possess detailed information about the RFQ processes in which they participated and would have virtual play-by-play information regarding it.

7. Nonetheless, I understand that FCA has proposed a reasonable alternative that should provide the Parties with the upstream information that they currently do not have in a substantially less burdensome manner. Under this proposal, FCA has agreed to produce certain transactional data for the last ten years relating to the purchase of components from non-defendant suppliers identified by the Parties.[2] Below, I explain (i) factors relating to the relevance of the requested information or lack thereof, (ii) the breadth of the requests and the burden associated with them; and (iii) the reasons why FCA's proposal as to upstream discovery is a superior means of providing the parties will the vast bulk of the information they may need.

## II. FCA Does Not Trace Parts From Purchase to Vehicle

8. Certain requests seek information which appears geared toward an attempt to trace a particular price-fixed component by part number to a specific vehicle by VIN.[3] While there are a select few parts, relating to specific safety components, for which such tracing can be done with substantial effort, FCA has no process in place to do this for other parts. In effect, we would have to run a process akin to implementing a recall for each of the thousands of parts at

---

[2] This offer includes the following data fields, to the extent reasonably available: (i) the date of component purchase, (ii) the part description, (iii) the quantity purchased, and (iv) price paid.

[3] *See* for example, request 1(f).

4

issue in this case. This would be the equivalent of an 18-year company-wide recall investigation on steroids. It would require hundreds, if not thousands, of hours of investigation time to identify by VIN number the specific vehicles that contain each part, and for many parts would require manually searching CAD engineering diagrams for each vehicle.

9. Such a process is not necessary because the defendants would likely have substantial information about the models or platforms of vehicles that contain their parts. As part of the RFQ process, for instance, each supplier knows exactly what models are at play. Where a part is common across models or platforms, the defendant could use the OEM part number and/or the ship-to manufacturing location to determine which vehicles were produced using each part.

10. In that regard, I note that the defendant suppliers do have information concerning the OEM part numbers and have incorporated such part numbers into their purchasing and invoice systems. Vehicle line and part number information is also provided to suppliers during the RFQ process in source package documents and contracts. Each purchase order issued to a supplier includes FCA's part number, part description, and unit price, among other pieces of information. FCA requires its suppliers to provide an invoice – called an "Assigned Shipping Notice" or "ASN" – that includes FCA's part number, plant number, shipping information, part description, and quantity, among other information. Indeed, suppliers could not get paid for their parts unless the ASN (and related paperwork) they issue reflected such OEM part codes. Moreover, to the extent the part is customized for a specific vehicle – such as wire harnesses – the supplying defendant would know that as well.

5

### III. Upstream Purchasing Information

11. The Parties seek compliance with 35 requests (including subparts) relating to upstream purchasing information of the components at issue.[4] Specifically, the subpoena requests upstream purchasing information relating to nearly 60 categories of components, comprising thousands of individual parts, many of which are custom designed for specific vehicles. Since the parties are seeking information relating to each of these components for every vehicle sold in America over the last two decades, this could easily cover over a million individual items.

12. Because the subpoena seeks upstream purchasing information about both documents and data, each of which presents challenges, I will discuss the difficulties of complying with the subpoena as to each.

#### A. Upstream Data

13. At least nine requests seek transactional data relating to the purchase of components.[5] As noted, these requests likely encompass millions of individual parts.

14. The component definitions and classifications the parties used for the subpoena do not line up with the classification system used by FCA in the ordinary course of business. Thus, before any extraction of relevant transactional data can be performed we would have to devote several hundreds of hours to map the requests (and the definition of relevant components) in the subpoena to the categorizations used by FCA in its purchasing systems.

---

[4] The upstream purchasing requests include 1(a), 1(b), 1(c), 1(d)(1), 1(d)(2), 1(d)(3), 1(e), 1(f), 1(g)(1), 1(g)(2), 1(g)(3), 1(g)(4), 1(g)(5), 1(g)(6), 1(g)(7), 1(g)(8), 1(g)(9), 1(g)(10), 1(g)(11), 1(g)(12), 1(g)(13), 1(g)(14), 1(g)(15), 1(g)(16), 1(g)(17), 1(g)(18), 1(g)(19), 1(l), 1(m), 3, 14(c), 23(2), 28 (first two sentences), 30, and 33.

[5] *See* Requests 1(a), 1(b), 1(c), 1(d)(1), 1(d)(2), 1(d)(3), 1(e), 1(f), 1(m).

15. This process is easier said than done. As a first step, we would first need to identify all the product codes at issue, which would involve running reports for each of the 140 defendant entities. We would then need to review the resulting reports to determine which product codes fell within the scope of the subpoena. Many of these, however, have changed over time and across legacy systems (some of which we no longer have access to), so additional time would be needed to identify and align these codes and systems. We would then need to run reports on each subject product code, identifying any non-defendant supplier who supplied products for each such product code. We would then need to determine which, if any, additional product codes those non-defendant suppliers sold to FCA. Then, we would need to manually determine which of those additional codes fell within the definition of a relevant Component or Assembly. Then we would need to run those additional product codes to see if any additional firms were selected. I estimate that this iterative process would take at least three full weeks of employee time to complete.

16. After this, we would need to match supplier codes with each identified supplier, and then run reports to extract relevant purchasing information. This process is also more difficult than it seems, since it would require tracing component purchases across multiple systems, including purchasing databases, webRFQ, and accounts payable databases. For instance, once all of the subject product codes are identified as described above, we would need to run those product codes through our purchasing system to generate a report including the part description, date of purchase, quantity purchased, and price paid (the information already in defendant suppliers' records). RFQ information is in completely separate databases, many of which are legacy systems that may not be maintained or reasonably accessible, and engineering details would be in still another database. All told, I expect that obtaining upstream purchasing

7

information, ignoring the near impossible task of tracing a product through the manufacturing process and to delivery to the dealer, and ignoring any difficulty in tracing information back in time through legacy systems, would take several hundred hours of employee time just for one component.

17. To minimize the burden, I understand that FCA has offered to produce transactional information relating to parts sold by the non-defendant suppliers.[6] This would substantially reduce FCA's burden because we would not need to create from whole cloth the identification of relevant competitors or product codes for each component, as we could run queries by supplier in the first instance. The defendant suppliers in this case should know who their competitors are. Most of the component product categories involve heavily concentrated industries. For example, in wire harnesses, FCA only bought from approximately four suppliers over the last 10 years, three of which were defendants.

18. By identifying the relevant entities to start, the complex and time-consuming iterative approach to identifying each supplier described above can be largely avoided, and FCA could proceed to running reports for specifically identified non-defendant competitors.

19. Moreover, by limiting the reports to non-defendant suppliers, we limit the need to pull information – often from multiple systems – that is already in the Parties' possession. In that regard, it should be noted that the vast bulk of purchasing information should already be in the Parties' possession. Not only are the defendants among the largest suppliers of each component, they have all the purchasing information for any model of vehicle for which they are

---

[6] Specifically, FCA has offered to produce information showing (i) the date of component purchase, (ii) the part description, (iii) the quantity purchased, and (iv) price paid for any non-defendant entity the Parties identify as a relevant competitor. FCA has also agreed to confer with the Parties as to additional fields of information in our purchasing database as to such non-defendant entities.

8

the designated component supplier. As such, there should only be a handful of significant non-defendant competitors to search for, and collectively, such purchases should encompass just a small minority of purchases.

20. I understand that the Parties have argued that, despite having information concerning the price, quantity, and costs of the parts they sold to FCA, they are still demanding that FCA undertake a search for such information because the lack the internal product codes or part numbers FCA uses. But as discussed above, just identifying the product code is an extremely time intensive process by itself, and a product code or part number is also of little to no use. As noted, defendant suppliers have this information. They are required to include FCA's part numbers in the ASNs they issue, and each purchase order reflects FCA's part numbers.

### B. Upstream Documents

21. At least 26 requests seek custodian documents relating to the purchase of components or assemblies.[7] In light of the purchasing information that FCA has offered to produce or that is otherwise in the Parties' possession, such information is unlikely to provide significant additional benefit to the Parties and would impose an unreasonable and unrealistic burden on FCA.

22. <u>Upstream Documents Are of Limited Utility.</u> The upstream purchasing documents generally concern information relating to the specific RFQs or agreements that FCA has issued over the past eighteen years.[8] Each defendant supplier, however, is likely to have

---

[7] Requests 1(g)(1-19), 1(l), 3, 14(c), 23(2), 28, 39, 33 seek upstream purchasing information.

[8] *See* Requests 1(g), 3, 14(c), 23(2), 30. It should be noted that different RFQ systems have been in place during the relevant period and that legacy information may no longer be available or reasonably accessible.

9

substantial information about the RFQs that FCA has issued and the agreements that FCA has entered into with such suppliers, regardless of whether the defendant supplier won the contract or simply participated in the RFQ. Specifically, the defendants would have information relating to RFQ identifiers (Request 1(g)(1)), the entity issuing the RFQ (Request 1(g)(2)), the names of the entities receiving the requests (Request 1(g)(3)), part description (Request 1(g)(4)), vehicle model (Request 1(g)(5)), instructions (Request 1(g)(6)), RFQ terms (Request 1(g)(7)), responses to the RFQ (Request 1(g)(8)), on-site engineering services (Request 1(g)(10)), VE or VA Price (Request 1(g)(12)), revised prices* (Request 1(g)(13)), dates of RFQ meetings (Request 1(g)(14)), winning supplier* (Request 1(g)(15)), agreements/letters of intent* (Request 1(g)(16)), post-award adjustments* (Request 1(g)(18)).[9]

    23. Most of these items in the preceding paragraph are not supplier specific, and thus, the defendants would have information regardless of whether non-defendant suppliers participated in, or even won, the RFQ. For the few requests above (i.e., those designated with a "*"), the defendants would have the information if at least one was a winning bidder (e.g., Requests 1(g)(13), 1(g)(15), 1(g)(16), 1(g)(18), 3, 23(2), and 30). To the extent a defendant won an RFQ or otherwise sold parts to FCA, it would also have information relating to any resulting agreement (Requests 1(l) and 3), price adjustments or reductions (Request 23(2)), and most-favored-nation provisions (Request 30).

    24. The defendants' own documents would likely also contain information about the RFQ process. Thus, it is unlikely that any defendant would remain in the dark about the identity of other significant competitors.

---

[9] As to post-award price adjustment information, I note that compiling just that information would alone implicate millions of records.

25. To the extent the defendants do not have information relating to certain RFQs or resulting agreements, such information is likely to exist in the transactional data (such as information relating to pricing). In the event that a non-defendant supplier won a bid, the prices charged would similarly be reflected in the transactional data that FCA has offered to produce.

26. The only documentary information defendants may lack would concern FCA's internal evaluation of the RFQs and any target prices (Request 1(g)(11)).[10] Such information, however, is unlikely to be relevant to the question of whether the price of a particular component was impacted by an alleged price-fixing conspiracy. Internal target prices are general pricing parameters FCA uses for planning purposes, and they are replaced as soon as an actual purchase price is set. If the competitive price for a component is above or below a target price, it is that price, not the target price, that will govern how much FCA pays for the component. Moreover, the target price is often influenced by historical prices for the same or similar products. And thus, any price fixing conspiracy that affects the price of a component is also likely to affect the target price. Thus, target prices do not have any bearing on either the existence of a conspiracy or the effect of such a conspiracy on prices.

27. <u>The Burden of Producing Upstream Documents is Substantial</u>. Even if FCA possessed non-cumulative or duplicative purchasing documents, searching for and producing such documents would be a Herculean task. To produce such information, we would first need to identify the employees involved in the purchasing process. Given the sheer number of parts at issue, and the length of time covered by the case, this would involve weeks' worth of effort,

---

[10] Some information, such as cost estimates (see Request 1(g)(9)), evaluation of RFQs (see Request 14(c)), and RFQ summaries or recaps (see Request 1(g)(17)), may or may not have been shared with bidders. To the extent shared, the defendants would have such information. To the extent such information was not shared, it – like target prices – does not have any relation to whether the defendants conspired or the impact of such a conspiracy on prices.

11

including interviews of employees and coordination with the HR department. Importantly, however, even this effort is unlikely to be fruitful given the high level of turnover both at FCA generally and in the specific buyer positions at issue. Indeed, it would not be uncommon for there to be four, five, six or more buyers involved with certain parts over the relevant period, not to mention managers and supervisors. Multiplied by the number of parts at issue, it would be nearly impossible to identify a manageable universe of custodians. And, even if a manageable universe of custodians could be identified, it is unrealistic to think that such information would continue to be maintained long after an employee left FCA or that position.

## IV. Facially-Overbroad Requests Seeking Irrelevant Information

28. In addition to the irrelevant requests described above, certain requests are so overbroad as to seek information completely unrelated to whether defendants conspired on the pricing of component parts. These include Requests 27 and 33.

29. <u>Request 27</u>. Request 27 seeks all information ever submitted to any regulatory or governmental authority anywhere in the world over the last eighteen years. On its face, this request is not limited to information submitted in connection with any alleged price-fixing. Instead, it would include safety, fuel economy, products liability, and other investigations that have no bearing on the issues in this case. Collecting such an immense amount of irrelevant information would be incredibly burdensome.

30. <u>Request 33</u>. Request 33 seeks all documents comparing any component purchased by FCA to either (i) components purchased by other OEMs, or (ii) components made by different suppliers. As to the former, FCA does not have insight into the specific parts or suppliers of other OEMs. If such technical engineering-based documents did exist, they would have no bearing on whether there was a price fixing conspiracy. The fact that one manufacturer,

12

say Ford, uses a different supplier than FCA has nothing to do with whether the suppliers that participated in an RFQ in fact rigged their bids. As to the latter, the defendants would possess substantial information relating to the relative merits of their product versus their competitors, and to the extent relevant to a given RFQ, such information would likely have been communicated to them. Thus, there would be no reason to conduct a burdensome search of FCA's files for information comparing and contrasting the attributes of the millions of parts covered by the subpoena.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of February, 2016 at Auburn Hills, MI.

_____
Kelly Lynch

13