# EXHIBIT 6

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
In Re: AUTOMOTIVE PARTS                            :
ANTITRUST LITIGATION                               :
_____         :
:
ALL PARTS                                          :     Case No.: 12-MD-02311
_____         :     Honorable Marianne O. Battani
:
THIS RELATES TO: ALL CASES                         :
_____         :
:
:

### DECLARATION OF MICHAEL NOVAK IN SUPPORT OF FCA US LLC's OPPOSITION TO THE PARTIES' MOTIONS TO COMPEL

I, Michael Novak, hereby declare under penalty of perjury as follows:

1.     I am employed as Vice President, Controlling at FCA US LLC, formerly known as Chrysler Group LLC ("FCA"). I have been employed by FCA for approximately 33 years. In my current role, I am responsible for financial controlling and financial reporting activities for FCA and the NAFTA region for FCA Group. Unless otherwise noted, the facts set forth herein are based on my personal knowledge.

2.     I have reviewed the subpoena served on FCA. I have also reviewed the Parties' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers ("Op. Br."). I understand the serving Parties seek information in response to the following requests: 1(a)-(g), (l), (m); 3; 4(a)(1)-(2); 4(a)(3)(a)-(e), (h), (k); 4(a)(4), (7), (8), (13); 4(b), (e), (h), (j); 5; 13; 14(c); 15; 16; 22; 23(2); 27; 28 (last two sentences); 30; 33; and 34. *See* Op. Br. 2 n. 6.[1]

_____

[1] I also understand that certain Parties are seeking documents in response to Request 31, which seeks "all documents relating to negotiations or communications with defendants [and others]" relating to this lawsuit.

## I.    Overall Breadth of the Subpoena

3.    The requests fall into two broad categories: upstream information relating to the purchase of components and downstream information relating to the sale of vehicles. I discuss downstream information here.

4.    These requests are incredibly broad in both burden and scope. While we have been subject to document requests and subpoenas in other cases from time to time, I have never seen anything like this. Its breadth is unprecedented. Compliance with the requests is not feasible, and even if it were feasible, compliance would take many months, would require thousands of employee hours, and would substantially interfere with our business duties and operations. The unparalleled breadth and scope of the subpoena crosses multiple fronts:

- Breadth of Time Period.  For most requests, the Parties seek information for at least the past eighteen years, and from as early as 1994.

- Breadth of Vehicles.  These requests cover virtually every vehicle that FCA has sold over the past eighteen years. Request No. 4 alone spans over seven pages of requests for virtually every conceivable piece of information on "each new Vehicle sold by You or on Your behalf." This amounts to tens of millions of vehicles.

- Breadth of Types of Financial Information Sought.  The Parties do not simply seek price information of parts and vehicles. The Requests span, for example, applicable currency and exchange rates, incentives or allowances, taxes, installment payments, financing, rebates, discounts, refunds, credits, cost adjustments, shipping or delivery fees, invoice price, dealer holdback, subsidies, rebates, bonuses, commissions, advertising subsidies, floor-plan assistance, fuel allowance, dealer inspection charges, model changeover allowance, MSRP, insurance, manufacturing costs, marketing costs, distribution costs, selling costs, labor costs, tooling costs, overhead costs, energy costs, leasing costs, freight costs, research and development costs, gross profit, profit margin, operating profit, projected profit, and net profit.

- Breadth of Financial and Market Analyses Sought.  The requests seek every study or analysis FCA has ever done or obtained about its business over the past eighteen years. Request 13, for example, asks all "studies, analyses, research, or evaluations concerning the markets and competitive conditions for the manufacture and sale of Vehicles." Request 4(j) calls for "any financial analyses performed by corporate finance personnel" whatsoever.

- • **Breadth of Employees Covered.** On downstream information alone, the Requests span multiple departments, and would involve employees from engineering to manufacturing to sales to incentives.

- • **Breadth of Information Systems Covered.** Complying with the downstream requests would require developing specific queries and reports for various separate information systems, including but not limited to e-BOM, Compass, CAP, IDL (Incentives Design and Launch), UPIC-IDSS (Incentive Decision Support System), NVDR (New Vehicle Delivery Reporting), VOE (Vehicle Order Edit), VCPS (Vehicle Component Pricing System), PCS (Product Cost System), CVI (Central Vehicle Invoicing), PSAP, engineering, sales industry reporting ("SIR"), and DB2. These systems were not all designed to be aligned as a group; thus, additional effort would be required to make sense of the information obtained to ensure we are collecting the correct information in a useable manner. Moreover, many of these information systems have also undergone significant change over the subpoena period, and many may exist only in tape files, if at all. Therefore, accessing such information from legacy systems presents additional challenges and burden.

5.    To put the breadth of this subpoena in perspective, I estimate that complying with the downstream portions of the subpoena would likely take many *thousands* of hours of employee time. This includes the time it will take to (i) identify the specific vehicles at issue within each of our relevant purchasing, finance, engineering, and sales databases, (ii) craft reports and trace information from system to system, even though these systems were not all designed to be aligned as a group; (iii) trace components through the supply chain to the end user purchase of a vehicle, which requires substantial investigative work by trained investigators; (iv) identify and interview relevant employees to determine location of any existing custodian information; and (v) search for and produce responsive information. Multiplied by the nearly 60 component parts, the demands imposed on FCA by the subpoena are quickly unrealistic, if not impossible.

6.    This effort is not necessary to fill the gaps in the information likely possessed by the Parties. As discussed below and in the Declaration of Kelly Lynch, the parties likely possess substantial information relating to both the upstream purchase of price-fixed components and the

3

downstream information relating to the sale of vehicles. As to downstream information, because of the way we set vehicle prices, any attempt to trace an overcharge on a price-fixed component through the manufacturing process and then through the dealer network to the end-user customer would likely be impossible and would not reflect how FCA sets prices in the actual world. Moreover, the dealer plaintiffs are likely to have copious information concerning the prices that FCA charges for vehicles, and other aspects of the transactions between dealers and OEMs and between dealers and end-payor customers. Since FCA's transactions with its dealers generally follow uniform policies and practices throughout our dealer network which results in all dealers receiving the same invoice price, obtaining additional information relating to such transactions is unlikely to provide information that is material to the lawsuit.

7.      Nonetheless, I understand that FCA has proposed a reasonable alternative that should provide the Parties with sufficient downstream information in a substantially less burdensome manner. Under this proposal, FCA has agreed to produce the MSRP set by FCA on a model-by-model basis. Below, I explain (i) factors relating to the relevance of the requested information or lack thereof, (ii) the breadth of the requests and the burden associated with them; and (iii) the reasons why FCA's proposal is a superior means of providing the parties will the information they may need.

## II.      **Downstream Purchasing Information**

8.      The parties seek compliance with 28 requests relating to the (i) financial performance of FCA; (ii) the manufacture, distribution, and sale of vehicles; and (iii) the resale of those vehicles by dealers.[2] Since each of these requests deal with post-component-purchasing activities, I refer to these requests as "downstream" requests.

---

[2] The downstream sales requests include: 4(a)(1), 4(a)(2), 4(a)(3)(a), 4(a)(3)(b), 4(a)(3)(c), 4(a)(3)(d), 4(a)(3)(e), 4(a)(3)(h); 4(a)(3)(k); 4(a)(4); 4(a)(7), 4(a)(8), 4(a)(13), 4(b), 4(e), 4(h), 4(j), 5(a), 5(b), 5(c), 5(d), 5(e), 13(a), 13(b),

## A.    Downstream Information Relating to FCA's Internal Operations

9.    The subpoena seeks massive amounts of information relating to our internal operations, none of which are related to whether defendants conspired to price-fix components. For example, Request 4(j) seeks information concerning FCA's "gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements."  This information has no bearing on whether defendants conspired to price-fix components (and, thus, it is not relevant to the initial overcharge). Nor is it directly related to how FCA determines prices that it charges dealers.  This information is also highly confidential and closely guarded, especially for a public company such as ours.  Moreover, as noted above, producing this information would require accessing several information systems, adding to an already massive burden imposed by the subpoena.

10.    Similarly, Request 4(h) seeks documents related to direct, indirect, and estimated manufacturing, marketing, distribution, selling, and other costs, both fixed and variable for each vehicle, including parts not at issue in the case, management costs, labor costs, tooling costs, energy costs, sales and marketing costs, leasing costs, and R&D costs.  None of these would be affected by the cost of a component part, and so are unrelated to the alleged price-fixing. Moreover, FCA's pricing is not cost-plus.  In other words, the price of a vehicle is not the sum of its parts plus a mark-up, but rather is market driven.  Accordingly, as discussed below, the

15, 16, 22, and 34.  These requests include, among other things, the date of vehicle sale, purchaser contact information, model, model year, VIN number, invoice price, invoice date, invoice number, sale price, price adjustments, dealer holdback, quantity sold, financing terms, MSRP, terms and conditions, transaction numbers, insurance terms, warranty terms, associated incentives payments or bonuses, direct and indirect cost of each vehicle, production dates, floor plan financing and terms, vehicle trade-ins, trade-in mileage, trade-in VIN, trade-in model, sales tax, fees, incentives, subsidies, rebates, bonuses, service agreements, fixed and variable cost of goods sold, cost of each part or component in the vehicle, overhead costs, manufacturing costs, marketing costs, distribution costs, gross profit, operating profit, and projected profit.  The subpoena also requests policies, procedures, standards, methods, decision-making, guidelines, factors, and reasons for determining or setting prices; studies, analyses, research, and evaluations of vehicle markets and competitive conditions; studies, reports, analyses, procedures, research, or evaluations concerning the extent if any that changes in costs relate to the manufacture, sale, and price of new vehicles; and it requests all communications with dealerships regarding price.

5

information in Request 4(h) is not related to how FCA sets the final MSRP of a vehicle. To the extent such information even exists in the form sought, trying to collect such information for FCA, and for each vehicle and manufacturing plant, would require hundreds of hours of work.

## B.   Downstream Information Relating to FCA's Relations with Dealers

11.   A number of requests focus on the relationship between FCA and its dealers. As an initial matter, I note that these requests seek information that should be in the possession of the dealer plaintiffs themselves. FCA has consistent, fair, and non-discriminatory policies and practices for all its dealers. It is inconceivable that FCA would treat one dealer differently from any other dealer based on an increase in the cost of the vehicle as a result of the price of a part used to manufacture a vehicle or the change in any other cost component. All dealers are charged the same invoice price. Thus, there is no reason why sufficient information – to the extent it is relevant – cannot be obtained from the dealer plaintiffs in this case.

12.   Moreover, most of the information in these requests bears no relationship to the overcharges on the price-fixed parts. Indeed, many requests are far removed from the price of the vehicle, let alone the price of component parts. For example, Request 4(a) seeks information related to non-price elements of relationship between FCA and its dealers, including advertising subsidies, floor-plan assistance, fuel allowance, dealer inspection charges, and any other terms or conditions of the sale. Request 4(e) similarly seeks "monetary components" beyond unit price, such as for ancillary products and services, and the "value of each such [ancillary] service, benefit, or product." As above, none of this has any relation to the cost of the alleged price fixed parts.   Information in Requests 4(a) and 4(e) are determined by the demand conditions in the market place and not in response to an increase or decrease in the cost of a vehicle as a result of the price of a part or other cost components.

6

13. The relationship between a car manufacturer and its dealers is complex and multi-faceted. There are many services that a dealer provides either to the company or to consumers for which FCA will provide monetary compensation or subsidies. The price that FCA pays for a price-fixed part or any cost change, however, would have no bearing on this company-dealer relationship, or on the value of these ancillary products and services. Financing terms, for example, are set by lending institutions, and have no relation to the cost of a vehicle or other factors that impact dealer invoice prices. Any attempt to compile a database of all such ancillary products and services ever provided to any of FCA's current or former dealers in the United States over the past eighteen years would involve an immense and unprecedented undertaking.

14. Many of the requests that may appear to bear on the issue of price also have no relationship to the alleged component overcharges because they do not relate to the cost of the vehicle. These include, for example, non-vehicle specific incentive programs, dealer holdbacks, manufacturer or distributor subsidies, rebates, bonuses, and allowances. Because such monetary components do not vary based on the cost of the vehicle, let alone the cost of specific component parts, they are not related to the alleged price-fixing conspiracy. An increase or decrease in the cost of the vehicle, or any changes in cost due to the alleged conspiracies on specific component parts, would not impact any of these ancillary pricing elements.

15. As for the actual pricing of vehicles, the starting point is MSRP. Because the MSRP is the price from which other elements are based, such as supplemental floorplan charges and dealer holdback, any analysis of the effects of cost on MSRP should be sufficient to determine the effects of the alleged conspiracy on the prices paid by dealers. Many factors are involved in the setting of MSRP, including the prices of competing vehicles of other manufacturers, vehicle features, costs, and sales projections.

7

16.     The price of any individual component, however, is not a factor in setting the MSRP. Once the MSRP is set, FCA sets the invoice price for the vehicle. The relationship between MSRP and invoice price for a vehicle is not dependent on the cost of that vehicle. That is, a change in the MSRP will cause a similar change in the invoice price. Each identical vehicle will have a single MSRP and single invoice price for all dealers. Thus, the relationship between MSRP and invoice price for one dealer will be the same as the relationship between MSRP and invoice price for any other dealer. This information concerning both MSRP and invoice price will be in the possession of the dealer plaintiffs in the case.

## C.     **Downstream Information Relating to Dealers' Relationships With Their Own Customers.**

17.     A number of the requests seek information concerning the relationship between dealers and their customers. This includes information about the final transaction price between the dealer and its customer, including trade-in allowances (and information about the used cars bought by the dealer), ancillary services, terms of any leases, terms of any warranties or insurance, and financing charges. This is information that is generally in the exclusive possession of the dealers. To the extent that FCA has such information, it is only where the dealer reports that information to us. For many requests, we simply do not possess the relevant information. This would include the following requests: Request 4(b)(2)(b), (c), (d), (e). Even if such information were available, none of this information has any relation to the cost of the vehicle or its component prices. Moreover, searching systems to determine any information that FCA has on any vehicle sold by any of its dealers would impose a substantial burden.

18.     The Burden of Producing Downstream Information is Substantial. Given the unprecedented volume of information requested by the subpoena, it would take months of employee time across multiple departments to collect. For example, the detailed incentive

8

information requested by the subpoena has never been compiled for more than one year at a time. It would take significant effort and investigation just to determine whether such information could be manageably compiled for the eighteen years requested by the subpoena. The same investigation would need to be conducted for our invoicing, accounting, and SIR systems, among others, to cover the breadth of information the subpoena requests. Though we have never undertaken a search like that contemplated by the subpoena, I estimate it would take tens of thousands hours of employee time to investigate and collect all of the requested information. Moreover, as not all systems were designed to align as a group, the months it would likely take to investigate and compile the requested information ignores the additional effort required to make sense of the information obtained to ensure information is collected in a usable manner.

## III. Facially-Overbroad Requests Seeking Wholly-Irrelevant Information

19. In addition to the irrelevant Requests described above, certain requests are so overbroad as to seek information completely unrelated to whether defendants conspired or to the pricing of component parts. These include Requests 13(a), 22 and 27.

20. Request 13(a): Request 13 seeks all "studies, analyses, research, or evaluations concerning the market(s) and competitive conditions for the manufacture and sale of Vehicles." This is not limited to studies or research relating to component prices or even vehicle prices, but encompasses documents about any competitive dynamic whatsoever. Moreover, FCA generally does not conduct broad market studies itself – studies like this are publicly available from entities like JD Power.

21. Request 4(j): Request 4(j) calls for "any financial Analyses performed by corporate finance personnel." FCA finance personnel conduct an incredible amount of financial analysis on a daily basis about any number of things, most of which have nothing to do with

9

specific component prices or the price of specific vehicles. This request alone calls for every analysis done in the past eighteen years throughout the entirety of FCA's operations. It would take numerous employees weeks to search for, collect, and compile all such analyses to the extent they still exist.

22.    Request 22: Request 22 seeks all communications to any of FCA's dealerships relating to prices or any incentive programs. Because FCA sets common MSRPs and invoices and because its incentive programs are reasonable and non-discriminatory, sufficient information concerning FCA's prices and programs are already in the possession of the dealer plaintiffs. Moreover, because the dealer plaintiffs would have received any communications that FCA sent to its dealers, such information is also likely in the dealer plaintiffs' possession. Just identifying a manageable universe of custodians for such communications is nearly impossible. It would entail identifying each Chrysler employee that communicated with Chrysler's over 2,000 dealerships nationwide that existed at any time over the past eighteen years. Then we would need to work with HR and conduct interviews to identify each employee's predecessors over the past eighteen years. Given the turnover at FCA, this effort is unlikely to be of any benefit. It is simply not realistic that such communications would be maintained long after employees left their positions or the company.

23.    Request 27. Request 27 seeks all information ever submitted to any regulatory or governmental authority anywhere in the world over the last eighteen years. On its face, this request is not limited to information submitted in connection with any alleged price-fixing. Instead, it would include safety, fuel economy, products liability, and other investigations that have no bearing on the issues in this case. Collecting such an immense amount of irrelevant information would be incredibly burdensome.

10

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of FeB., 2016 at 1:15 pm.

Michael Novak

11