# EXHIBIT 8



Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 600 South   Washington, DC 20004-2533

October 23, 2016

Colin Kass
d 202.416.6890
f 202.416.6899
ckass@proskauer.com
www.proskauer.com

_**Via Email**_

Qianwei Fu
Zelle LLP
Counsel for EPPs

Evelyn Li
Cuneo Gilbert & LaDuca LLP
Counsel for ADPs

Sheldon Klein
Butzel Long
Counsel for Defendants

Re: *In re Automotive Parts Antitrust Litig.*, 2:12-md-02311

Dear Qianwei, Evelyn, and Sheldon:

We have considered the Parties' October 13th "renewed proposal" to FCA US LLC ("FCA").[1]

We too would like to see resolution of the issues arising from the Parties' subpoena and motion to compel.  However, despite our requests from the very beginning of the meet and confer process over a year ago, the Parties still have taken no steps towards meeting their obligation under the Rules to show a substantial need for any of the requested information.  You have not identified gaps in the record that you need discovery from FCA to fill.  Rather, your letter simply lists blanket requests for every document and piece of data from every system mentioned in the depositions of Michael Novak and Kelly Lynch.  The renewed proposal, consequently, does not alleviate the undue burden described in the Novak and Lynch declarations.

Still, we detail an offer of production below that, while still imposing significant burden on FCA, reasonably addresses the Parties' needs.  As before, our offer is contingent on reaching an agreement as to costs, including attorneys' fees and fair compensation for employee resources

---

[1] Your reservation of "all relevant information that remains subject to the motion to compel" indicates that your October 13th letter may not truly be a revised proposal, but we nonetheless take your letter to encapsulate the Parties' current requests for production.  We will treat all other requests as withdrawn.



Page 2

and time (at each employee's actual or effective hourly rate).[2]

## 1.    Purchasing Data

You request "purchase data reflecting FCA's purchases of Components or Assemblies from defendant and non-defendant suppliers." As Mr. Lynch stated, collecting the purchasing data by component or assembly would take hundreds of employee hours *per component*. Lynch Decl. ¶ 5. This is because the components defined in the subpoena do not all line up with the FCA's internal classifications. *Id.* ¶ 14. Consequently, it would take several hundred hours of employee time just to map the subpoena's component definitions to the categorizations used by FCA. *Id.* ¶¶ 14-16. Mr. Lynch reiterated this burden at deposition. Lynch Tr. at 139-40, 143-44, 197 ("[W]e estimated that just for any given one commodity group as has been identified in the subpoena it would take several weeks of one person's dedicated time to do that mapping … We don't have the staff on hand to do a lot of that manual work …."). Your continued request for purchasing information by component is thus the definition of undue burden.

There is a way to partially reduce the undue burden. As the Lynch Declaration notes, producing purchasing data by supplier would partially "reduce FCA's burden because we would not need to create from whole cloth the identification of relevant competitors or product codes for each component, as we could run queries by supplier in the first instance." Lynch Decl. ¶¶ 17-18.

Accordingly, if the parties agree that it would fulfill FCA's obligations with regard to purchasing data, FCA would agree to search active purchasing data in the PentaSAP and COMPASS systems for suppliers by name, listed in Attachment C to the subpoena.[3] As Mr. Lynch testified, active purchasing data is available from approximately 2001.[4] Lynch Tr. at 26-27. This data would include, to the extent available, information identifying the supplier, part, quantity, price, and manufacturing and shipping locations.

---

[2] All offers of production are contingent on reaching a global agreement concerning compliance with the subpoena, including costs. FCA expressly reserves its right to assert – as it has and will continue to do so – that (i) the Parties have propounded an overbroad subpoena in violation of their obligations under Rule 45, (ii) the Parties have failed to meet and confer in good faith, (iii) the Parties have failed to establish substantial need for the information they seek, especially in light of all of the information they already possess; (iv) the Parties' subpoena – and each request (including any modified requests) – fall outside the scope of permissible discovery under the Rule of Proportionality, and (v) any other ground or objection asserted by FCA in connection with the subpoena. As with any proposed agreement, FCA will deem any non-acceptance of the proposal made herein as a rejection of the offer, leaving FCA free to revert to any prior position.

[3] We have reproduced the list as an Appendix to this letter.

[4] We do not agree to search for or produce archived data, to the extent it exists, which is substantially more difficult and burdensome to access. The Parties have not made any showing of a substantial need that outweighs the added burden of retrieving backup tapes and discs. *Kleen Prods., LLC v. Packaging Corp. of Am.*, 2012 WL 4498465 at *18 (N.D. Ill. 2012) ("Courts generally agree that backup tapes are presumptively inaccessible."); The Sedona Conference, "Commentary on Non-Party Production & Rule 45 Subpoenas" (April 2008) (even where parties "offer to bear the costs of production," courts have "quashed subpoenas requesting data on backup tapes, characterizing the restoration … as an undue burden.").



Page 3

We note that this information and data is also in defendants' possession. Lynch Decl. ¶ 19, Lynch Tr. at 138-39, 204 ("They know what their purchase orders are because they got them from us."). Furthermore, the process would still involve collection and review of huge amounts of data, and would require at least four to six weeks. This is time taken away from FCA employees' actual job functions and imposes a substantial burden. Lynch Tr. at 187-88 ("[O]ur jobs day-to-day are not to do this. … If we have to put them to work, the buyers, for example, to find some of this information or to help us with quality control, that means they're not doing something else. … [It's] a significant burden.").

## 2. RFQ Data

Your letter requests, essentially, every document from every system "associated with each RFQ" that FCA has ever conducted. That is not a reasonable request designed to minimize the burden on FCA, a third party, and it does not identify information for which the Parties have a substantial need. Fed. R. Civ. P. 45(d). Moreover, pulling RFQ records by commodity would impose the same debilitating burden, discussed above, of mapping the Parties' component definitions to FCA's internal systems. Lynch Tr. at 140-44. In any case, most if not all, of FCA's RFQ data is already available to the parties. *Id.* at 72-74, 139, 190 (suppliers know "what they gave us in terms of an RFQ because they had to submit that to us" and RFQ information would be with "[e]ither the winning supplier or any supplier who participated in that request for quote for any given part number or series of part numbers").

Nonetheless, if the parties agree that it would fulfill FCA's obligations with regard to RFQ information and all non-data purchasing information, FCA would agree to produce RFQ data that is reasonably available in webRFQ for suppliers, searched by name, listed in Attachment C to the subpoena. This data includes, to the extent available, the RFQ, supplier quote, supplier identification, payment term, part information, and price information. This data is available from approximately 2003. Lynch Tr. at 74-75.

The other RFQ-related documents and systems you request are (i) irrelevant; (ii) unreasonably cumulative or duplicative of webRFQ; and/or (iii) do not satisfy any substantial need of the Parties.

- Award Letters: Mr. Lynch testified that award letters are used rarely. Tr. at 103, 105. Just identifying the scores of possible custodians for each component over the past 20 years who might have issued an award letter would be an incredibly burdensome task, particularly given the high level of turnover in buyer positions. Lynch Decl. ¶ 27; Lynch Tr. at 193. The few such letters that might exist would be unnecessarily duplicative and cumulative, given FCA's offer to produce purchasing data that by definition identifies the winning bidders. Lynch Tr. at 122-23 ("webRFQ feeds PentaSAP" with who was selected).

- Target Prices: As Mr. Lynch testified, target prices are generated by part. Tr. at 97. Searching for and compiling records with target prices would consequently require the burdensome mapping process described above. In addition to the



Page 4

undue burden, target prices are irrelevant to any pass-through analysis or even to whether Defendants conspired to fix prices.  *See* Lynch Decl. ¶ 26.  The parties do not dispute that.  What matters in the case is actual prices at which an RFQ was awarded, which FCA offers to produce through webRFQ, PentaSAP, and COMPASS.

- Source Packages: Each source package is a voluminous collection of documents and data (*see* Lynch Tr. at 71-72) that, because of the way they are stored, would need to be reformatted to be useful.  This is an extremely time consuming task.  Furthermore, any relevant information in a source package is available in the offered webRFQ data, as source packages are used to generate an RFQ.  Lynch Tr. at 71-72, 100 (an RFQ includes whether a supplier "accept[s] the roles and responsibility document that's outlined in the source package.  All of that stuff is within webRFQ.").  Furthermore, the parties should already have access to source packages sent to defendant suppliers.  Lynch Tr. at 73.

- Sourcing Recommendations:  Searching for and producing sourcing recommendations would be unduly burdensome and duplicative for a number of reasons.  First, they are not all centrally located, so a search would involve the near-impossible task described above of identifying 20 years' worth of possible custodians and repositories.  Lynch Tr. at 80 ("that's part of our problem … a lot of people did things a lot differently … there was not consistency across those commodities …"); Lynch Decl. ¶ 27.  Second, "a lot of that information that's in those sourcing recommendations is in webRFQ," which FCA has offered to produce.  *Id.*  Third, FCA's internal recommendations are not relevant to the issues of pass-through, conspiracy, or overcharge.  Lynch Decl. ¶ 26.

- External balanced Scorecards ("EBSC"):  These evaluations are not only irrelevant but already available to the Parties.  As Mr. Lynch testified, suppliers "can see their scorecard any time they want so they know where they stand in terms of these metrics."  Tr. at 97, 205-06.  As explained, these kinds of evaluations are irrelevant to the pass-through and overcharge issues in the case.  Lynch Decl. ¶ 26.

**3.     Cost Data**

The Parties ask for all cost data located anywhere in any of FCA's various systems identified by Mr. Novak.  That is not a reasonable request, and does not reflect "steps to avoid imposing undue burden or expense."  Fed. R. Civ. P. 45(d)(1).

Nonetheless, if the parties agree that it would fulfill FCA's obligations with regard to cost information, FCA would agree to conduct a targeted search (i.e., non-custodial search) for centrally-located, reasonably-accessible model-level corporate Product Cost Studies described by Mr. Novak, from 2011 model year to December 31, 2014.  Novak Tr. at 110-11, 127-28 ("an annual process where we develop what is referred to as a Product Cost Study that says for …



Page 5

these [models] …. A snapshot of parts and associated purchase order cost numbers at a point in time."). This is more than sufficient for a pass-through analysis, the only issue to which cost information is relevant. As Dr. McDonald explained, proving pass-through just requires estimating the relationship between price and *gross* cost. McDonald Decl. at ¶¶ 20-21.

The remaining cost-related requests in your letter are unduly burdensome and unreasonably cumulative. VIN-level cost data in VAMR is extremely burdensome to retrieve, and is unnecessary to a pass-through analysis. It takes about three weeks to compile just 15 reports from VAMR in a usable format. Multiplied by the approximately two million vehicles sold each year over 20 years, the Parties' request is quickly unworkable. Furthermore, the Parties have presented no need, let alone a substantial need, for VIN-level data. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, at *4 (N.D. Cal. 2012) ("[p]laintiffs need not identify the overcharge on each and every panel sold to direct purchase, and they need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser."). FCA's offer to produce Product Cost Studies is more than sufficient for purposes of this case.

**4.     Downstream Pricing Information**

The Parties request all documents relating to MSRP and invoice prices in every system Mr. Novak mentioned at deposition. Such a multi-system search is unreasonably duplicative and cumulative, and unduly burdensome.

You request MSRP data from VCPS, though Mr. Novak testified VCPS "is a function, not a system." Tr. at 115. As you note, VCPS price information goes to the Price File, which is used by the Central Vehicle Invoicing ("CVI") system. You also request data from CVI, despite Mr. Novak's testimony that CVI is "an old mainframe system" with no "reporting functionality." Tr. at 33, 145. CVI keeps data in raw format, and as Mr. Novak testified, attempting to recreate historical invoices from CVI would not be accurate because "if I were to rerun [an] invoice for a VIN that was originally invoiced six months ago, it would use *today's* pricing." Tr. at 144. It is also a burdensome process – seven years of invoices would take over 500 hours to recreate. In any event, the Parties have no need for inaccurate recreations of historical invoices, as plaintiff dealers would have actual invoices in their possession. *Id.* at 45.

Nonetheless, if the parties agree that it would fulfill FCA's obligations with regard to downstream pricing information, FCA would agree to produce code guides, which are available from around model year 2007. As Mr. Novak testified, "code guides" contain MSRP and invoice price at the model and trim level. Novak Tr. at 71. This offer still entails significant burden – FCA estimates compiling all such code guides will require over 50 hours of employee time. Additionally, FCA is willing to produce Product Committee PowerPoint presentations contained in the EMMS system, which are available from about September 2009. Novak Tr. at 51-53. As Mr. Novak testified, these contain "the planned price position for … new offering[s], given how the competition … is currently priced in the marketplace." Tr. at 51.

This offer of code guides and Product Committee PowerPoints is more than sufficient to meet the Parties' pass-through analysis needs. The additional downstream data and documents



Page 6

you request are unnecessary, cumulative, and would impose an undue burden.  The requests would essentially involve a corporate-wide search for every cost or price study or data compilation ever done over the past 20 years.  For instance, you do not need letters to dealers showing MSRP, as plaintiff dealers will have those, and MSRP information will be included in the code guides.

**5.      Remaining Requests**

Price Adjustments: You requested CIP price adjustments recorded in FAM.  These price adjustments would be reflected in the PentaSAP and COMPASS purchasing data that FCA has offered to produce.  Lynch Tr. at 67, 133, 138 ("Q. If there were price adjustments, would that be reflected in the COMPASS or PentaSAP databases? A. Yes.").  FCA accordingly does not agree to produce CIP data, as it is unreasonably duplicative and unduly burdensome.

Supplier Agreements:  Relevant payment terms are reflected in webRFQ, COMPASS, and PentaSAP.  Furthermore, defendant suppliers will have any such agreements in their own records.  The Parties have not shown a substantial need for such duplicative discovery.

Part to VIN Tracing: The parties continue to request data that "track[s] each part after it was installed into a vehicle."  As FCA has repeatedly advised, this kind of data does not exist.  Lynch Decl. ¶ 8 ("FCA has no process in place to do this [tracing] … we would have to run a process akin to implementing a recall for each of the thousands of parts at issue in this case … equivalent of an 18-year company-wide recall investigation on steroids"); Lynch Tr. at 173 ("Our purchasing systems don't do that.  To the best of my knowledge, I'm not aware that we can say that exact part went into that VIN."); Novak Tr. at 124 (VIN- and part-level information is retained for only "three days" to track inventory).  Nor is this kind of information necessary to a pass-through analysis.

Incentives:  We note that the dealer plaintiffs do not join in this request.  They recognize the irrelevance of incentive and other off-invoice payment information – it has nothing to do with invoice or MSRP pricing or with pass through.  Novak Decl. ¶ 14.  There is no reason to impose the burden of searching for such ancillary, irrelevant data.  *Id.* ¶ 18.

**6.      FCA's Offer of Production**

To recap, contingent on the Parties' agreement that this constitutes complete compliance with the subpoena and your agreement to pay for FCA's costs (including reasonable attorneys' fees and compensation for employee time and resources), FCA will offer to search for and produce, subject to any limitations or caveats noted above, the following data and documents:

1.      Reasonably available active purchasing data, from approximately 2001 to the present, from the PentaSAP and COMPASS systems for the suppliers, searched by name, listed in Attachment C to the subpoena;

Proskauer»

Page 7

2.    RFQ data reasonably available in the webRFQ system, from approximately 2003 to the present, for the suppliers, searched by name, listed in Attachment C to the subpoena;

3.    Reasonably available Product Cost Studies, from approximately model year 2011 to December 31, 2014;

4.    Reasonably available Code Guides containing MSRP and invoice price at the model and trim levels, from approximately model year 2007 to December 31, 2014.

5.    Reasonably available Product Committee PowerPoint presentations, from approximately September 2009 to December 31, 2014.

We believe this represents a substantial and generous offer that balances the undue burden the Parties' requests impose with any need the Parties still have despite the voluminous party discovery available to them.  We reiterate, however, that this offer imposes significant burdens on FCA and interruption to the day-to-day responsibilities of its employees. Accordingly, if you agree with the proposal, we do not intend to begin searching for or producing documents until an agreement as to costs has been reached.

We look forward to discussing at our meet and confer.

Sincerely,

*Colin Kass*

**Proskauer »**

Page 8

## APPENDIX

- AB SKF
- Aisan Corporation of America
- Aisan Industry Co., Ltd.
- Aisin Automotive Casting, LLC
- Aisin Seiki Co., Ltd.
- Alps Automotive Inc.
- Alps Electric (North America), Inc.
- Alps Electric Co., Ltd.
- American Furukawa, Inc.
- American Mitsuba Corporation
- American Showa, Inc.
- ASMO Co. Ltd.
- ASMO Greenville of North Carolina, Inc.
- ASMO Manufacturing, Inc.
- ASMO North America, LLC
- Asti Corporation
- Autoliv ASP, Inc.
- Autoliv B.V. & Co. KG
- Autoliv, Inc.
- Bosch Electrical Drives Co., Ltd
- Bridgestone APM Company
- Bridgestone Corporation
- Calsonic Kansei Corporation
- Calsonic Kansei North America, Inc.
- Chiyoda Manufacturing Corporation
- Chiyoda USA Corporation
- Continental Automotive Electronics LLC
- Continental Automotive Korea Ltd.
- Continental Automotive Systems, Inc.
- Delphi Automotive LLP
- Delphi Automotive Systems, LLC
- Delphi Furukawa Wiring Systems LLC
- Delphi Powertrain Systems Korea Ltd.
- DENSO Corp.
- DENSO Corp.
- DENSO International America Inc.
- DENSO Korea Automotive Corporation
- DENSO International Korea Corporation

- DENSO Products & Services Americas, Inc.
- Diamond Electric Mfg. Co., Ltd.
- Diamond Electric Mfg. Corporation
- DPH Holdings Corporation
- DTR Industries, Inc.
- Franklin Precision Industry, Inc.
- Fujikura America, Inc.
- Fujikura Automotive America, LLC
- Fujikura Ltd.
- Furukawa Electric Co., Ltd.
- Furukawa Wiring Systems America, Inc.
- G.S. Electech, Inc.
- G.S. Wiring Systems, Inc.
- G.S.W. Manufacturing Inc.
- Hitachi Automotive Systems America, Inc.
- Hitachi Automotive Systems, Ltd.
- Hitachi, Ltd.
- Hyundam Industrial Co., Ltd.
- Ichikoh Industries, Ltd.
- II Stanley Co.
- JTEKT Automotive North America, Inc.
- JTEKT Corporation
- K & S Wiring Systems, Inc.
- Keihin Corporation
- Keihin North America, Inc.
- Koito Manufacturing Co., Ltd.
- Korea Automotive Motor Corporation
- Koyo Corporation of U.S.A.
- Kyungshin-Lear Sales And Engineering LLC
- Lear Corp.
- Leoni AG
- Leoni Bordnetz-Systeme GMBH
- Leoni Kabel GmbH
- Leoni Wire Inc.
- Leoni Wiring Systems, Inc.
- Leonische Holding, Inc.
- Maruyasu Industries Co., Ltd.

**Proskauer》**

Page 9

- Mikuni American Corporation
- Mikuni Corporation
- Mitsuba Corporation
- Mitsubishi Electric Automotive America, Inc.
- Mitsubishi Electric Corporation
- Mitsubishi Electric US Holdings, Inc.
- Mitsubishi Heavy Industries America, Inc.
- Mitsubishi Heavy Industries Climate Control, Inc.
- Mitsubishi Heavy Industries, Ltd.
- N.S. International, Ltd.
- Nachi America Inc.
- Nachi-Fujikoshi Corp.
- New Sabina Industries
- NGK Spark Plugs (U.S.A) Holding, Inc.
- NGK Spark Plugs (USA) Inc.
- NGK Spark Plugs Co. Ltd.
- Nippon Seiki Co., Ltd.
- North American Lighting, Inc.
- NSK Americas, Inc.
- NSK Ltd.
- NTK Technologies, Inc.
- NTN Corporation
- NTN USA Corporation
- Panasonic Corporation
- Panasonic Corporation of North America
- Robert Bosch GmbH
- Robert Bosch LLC
- Schaeffler AG
- Schaeffler Group USA Inc.
- Showa Corporation
- SKF USA, Inc.
- Stanely Electric Co., Ltd.
- Stanley Electric U.S. Co., Inc.
- Sumitomo Electric Industries, Inc.
- Sumitomo Electric Wintec America, Inc.
- Sumitomo Electric Wiring Systems, Inc.
- Sumitomo Riko Company Limited (formerly Tokai Rubber Industries, Ltd.)
- Sumitomo Wiring Systems (U.S.A.) Inc.
- Sumitomo Wiring Systems, Ltd.
- S-Y Systems Technologies America, LLC
- S-Y Systems Technologies Europe GmbH
- T.RAD Co., Ltd.
- T.RAD North America, Inc.
- Takata Corp.
- TG Missouri Corp.
- TK Holdings, Inc.
- Tokai Rika Co., Ltd.
- Toyo Automotive Parts (USA), Inc.
- Toyo Tire & Rubber Co., Ltd.
- Toyo Tire North America Manufacturing, Inc.
- Toyo Tire North America OE Sales LLC
- Toyoda Gosei Co., Ltd.
- Toyoda Gosei North America Corp.
- TRAD Co., Ltd.
- TRAM Inc. d/b/a Tokai Rika U.S.A. Inc.
- TRW Automotive Holdings Corp.
- TRW Deutschland Holding GmbH
- Valeo Climate Control Corp.
- Valeo Electrical Systems, Inc.
- Valeo Inc.
- Valeo Japan Co., Ltd.
- Valeo S.A.
- Yamashita Rubber Co., Ltd.
- Yazaki Corporation
- Yazaki North America Inc.
- YUSA Corporation