# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In Re: **AUTOMOTIVE PARTS ANTITRUST LITIGATION** | ) ) ) ) | Master File No.: 12-md-02311 Honorable Marianne O. Battani Special Master Gene J. Esshaki |
|  | ) |  |
| In Re: **All Auto Parts Cases** | ) | 2:12-MD-02311-MOB-MKM |
|  | ) |  |
| **THIS DOCUMENT RELATES TO: ALL AUTO PARTS CASES** | ) ) ) | **Oral Argument Requested** |

# THE SPECIFIED SUBPOENAED ENTITIES'
# JOINT OPPOSITION TO THE PARTIES' MOTIONS TO COMPEL

## ISSUES PRESENTED[1]

1.      Whether a subpoena issued to nearly 100 non-party OEMs or non-OEM affiliates (the "Specified Subpoenaed Entities" or "SSEs") should be reasonably tailored to fill material gaps in the massive discovery record already compiled.

2.      Whether Rule 45's obligation to "avoid imposing an undue burden or expense" on non-parties imposes a heightened obligation on the Parties to negotiate subpoena compliance in good faith beyond determining that the SSEs "did not obtain concurrence in the relief sought," and if so, whether, the Parties failed to satisfy this obligation.

3.      Whether the Subpoena, even as cosmetically modified, flunks the rule of proportionality because it seeks information of marginal incremental benefit and is unprecedented in its scope and the burdens it visits upon the SSEs.

4.      Whether the offer of production by certain SSEs – including (i) reasonably accessible upstream purchasing data involving a negotiated group of non-Defendant suppliers across 59 separate parts groups; (ii) downstream MSRP data for any vehicle model affected by the alleged conspiracies; and (iii) all such information produced to the Department of Justice – suffices to discharge the SSEs' obligations under Fed. R. Civ. P. 45.

5.      Whether the Plaintiffs' demands for internal and external settlement-related communications with Defendants are beyond the scope of permissible discovery, especially where – as here – some SSEs are potential opt-out plaintiffs in this very matter.

---

[1] Unless otherwise noted, all emphasis added and internal citations and quotation marks omitted.  All references to exhibits are to materials attached to the Declaration of Scott M. Abeles.  For space reasons, because many SSEs face similar issues, citations to one SSE fact declaration should be considered illustrative, not comprehensive.

## TABLE OF CONTENTS

I.     Introduction ........................................................................................................... 1

II.    Procedural Background ......................................................................................... 5

       A.     Faced With an Overwhelming Subpoena, the SSEs Promptly Engage
              the Parties to Identify Material Gaps that Can Be Reasonably Filled. ................... 5

       B.     The Parties Refuse to Identify the Gaps in the Record Following the
              Summit. ................................................................................................................. 7

       C.     The Parties Offer Only Cosmetic Changes to the Subpoena. ............................... 8

       D.     Faced With an Impossibly Overbroad Subpoena and the Parties'
              Refusal to Tailor It to Fill Material Record Gaps, the SSEs Present
              their Own Proposal. ............................................................................................ 10

       E.     The Parties Refuse to Respond to the Offering SSEs' Proposal in
              Favor of a Christmas Eve Declaration of Impasse ............................................ 12

III.   Standard of Review ............................................................................................ 13

IV.    The Subpoena Should Be Quashed in Its Entirety ............................................ 15

V.     The Subpoena Violates the Rule of Proportionality ......................................... 18

       A.     The Upstream Purchasing Requests Are Unnecessary and Incredibly
              Burdensome. ....................................................................................................... 18

              1.     Unspecified Imperfections in the Defendants' Purchasing Data .............. 19

              2.     OEM Part Numbers .................................................................................. 20

              3.     Non-Defendant Supplier Purchasing Data ............................................... 21

              4.     External RFQ Information and Sales Agreements .................................... 22

              5.     Internal OEM RFQ Evaluations .............................................................. 23

       B.     The Downstream Sales Requests Are Unnecessary and Incredibly
              Burdensome. ....................................................................................................... 24

              1.     Information Supposedly Needed to Trace the Part through the
                     Manufacturing and Retail Chains to the Ultimate Customer .................... 25

              2.     Downstream Vehicle Pricing Information Unrelated to
                     Component Pricing .................................................................................. 26

                     a.     Ancillary Information Relating to the Financial
                            Relationship Between the OEM and the Dealer ............................ 28

                     b.     Vehicle Pricing Information ......................................................... 30

   c. "Soft" Information Concerning Factors Unrelated to the Component Pricing .......................................................................32

  3. Downstream Dealer Pricing Information Unrelated to Component Pricing .........................................................................32

 C. Plaintiffs' Miscellaneous Requests Are Unnecessary, Irrelevant or Privileged. ......................................................................................34

  1. Request 27:  Government/Regulator Documents ......................................34

  2. Request 31:  Settlement Documents .........................................................35

   a. Internal Settlement Deliberation Documents................................35

   b. External Settlement Communication Documents..........................37

VI. In the Alternative, the Court Should Sharply Limit the Scope of Any Search Ordered, Access to the Materials Produced, and Expense the SSEs Must Bear .............37

VII. Conclusion .............................................................................................................40

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

Fed. R. Civ. P. 45……………………………………………………………………*passim*

*Concord Boat Corp. v. Brunswick Corp.*,
     169 F.R.D. 44 (S.D.N.Y. 1996)……………………………………………...15, 16

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*,
     332 F.3d 976 (6th Cir. 2003)……………………….…………………………35, 36, 37

*In re Cathode Ray Tube Antitrust Litig.*,
     2013 WL 5428139 (N.D. Cal. 2013)…………………………………….……..4, 20, 27

*In re OSB Antitrust Litig.*,
     2006 WL 8403357 (W.D.N.C. 2006)…………………………………...……..*passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
     2012 WL 555090 (N.D. Cal. 2012)…………………………………………….....4, 26

*In re Vitamins Antitrust Litig.*,
     198 F.R.D. 296 (D.D.C. 2000)…………………………………………….…..*passim*

*Laethem Equip. Co. v. Deere and Co.*,
     2007 WL 2873981 (E.D. Mich. 2007)…………………………………….………..14

*Moon v. SCP Pool Corp.*,
     232 F.R.D. 633 (C.D. Cal. 2005)…………………………………….………………3, 16

# FULL TABLE OF AUTHORITIES

CASES

*Alexander v. F.B.I.*,
    194 F.R.D. 316 (D.D.C. 2000) ..................................................................... 14

*Bouldis v. U.S. Suzuki Motor Corp.*,
    711 F.2d 1319 (6th Cir. 1983) .................................................................... 29

*Chevron Corp. v. Snaider*,
    78 F. Supp. 3d 1327 (D. Colo. 2015) ......................................................... 37

*Concord Boat Corp. v. Brunswick Corp.*,
    169 F.R.D. 44 (S.D.N.Y. 1996) ........................................................... 15, 16

*Covey Oil Co. v. Continental Oil Co.*,
    340 F.2d 993 (10th Cir. 1965) .................................................................... 19

*Cusumano v. Microsoft Corp.*,
    162 F.3d 708 (1st Cir. 1998) ...................................................................... 13

*F.T.C. v. Mylan Labs., Inc.*,
    62 F. Supp. 2d 25 (D.D.C. 1999) ............................................................... 21

*Falise v. Am. Tobacco Co.*,
    258 F. Supp. 2d 63 (E.D.N.Y. 2000) ......................................................... 20

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*,
    332 F.3d 976 (6th Cir. 2003) ......................................................... 35, 36, 37

*Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ............................................................... 27

*Groth v. Robert Bosch Corp.*,
    2008 WL 2704709 (W.D. Mich. 2008) ...................................................... 14

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ................................................................................... 27

*HT S.R.L. v. Velasco*,
    2015 WL 5120980 (D.D.C. 2015) ............................................................. 18

*In re Air Cargo Ship Servs. Antitrust Litig.*,
    2010 WL 4916723 (E.D.N.Y. 2010) .......................................................... 25

*In re Automotive Refinishing Paint Antitrust Litig.*,
  2006 WL 1479819 (E.D. Pa. 2006) ........................................................ 4

*In re Beef Indus. Antitrust Litig.*,
  600 F.2d 1148 (5th Cir. 1979) ........................................................ 21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2013 WL 5428139 (N.D. Cal. 2013) .............................................. 4, 20, 27

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
  2015 WL 6181748 (D. Del. 2015) ........................................................ 29

*In re Dom. Drywall Antitrust Litig.*,
  300 F.R.D. 234 (E.D. Pa. 2014) ........................................................ 39

*In re Electric Weld Steel Tubing Antitrust Litig.*,
  512 F. Supp. 81 (N.D. Ill. 1981) ........................................................ 16

*In re Milk Prods. Antitrust Litig.*,
  84 F. Supp. 2d 1016 (D. Minn. 1997) ................................................ 35

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  2012 WL 298480 (E.D. Pa. 2012) ........................................................ 19

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  2015 WL 5765415 (E.D. Pa. 2015) ........................................................ 20

*In re OSB Antitrust Litig.*,
  2006 WL 8403357 (W.D.N.C. 2006) .............................................. *passim*

*In re Petroleum Prods Antitrust Litig.*,
  691 F.2d 1335 (9th Cir. 1982) ........................................................ 21

*In re Photochromic Lens Antitrust Litig.*,
  279 F.R.D. 620 (M.D. Fla. 2012) ........................................................ 28

*In re Polypropylene Carpet Antitrust Litig.*,
  93 F. Supp. 2d 1348 (N.D. Ga. 2000) ................................................ 25

*In re Polyurethane Foam Antitrust Litig.*,
  2014 WL 6461355 (N.D. Ohio 2014) ................................................ 27

*In re Processed Egg Products Antitrust Litig.*,
  2015 WL 7067790 (E.D. Pa. 2015) .............................................. 21, 30

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
　　292 F.R.D. 544 (E.D. Tenn. 2013)...................................................................... 28

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
　　264 F.R.D. 603 (N.D. Cal. 2009)....................................................................... 27

*In re Subpoenas to Plains All Am. Pipeline, L.P.*,
　　2014 WL 204447 (S.D. Tex. 2014) ................................................................... 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
　　267 F.R.D. 583 (N.D. Cal. 2010)....................................................................... 27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　　2012 WL 555090 (N.D. Cal. 2012) ............................................................. 4, 26

*In re Vitamins Antitrust Litig.*,
　　198 F.R.D. 296 (D.D.C. 2000)................................................................. *passim*

*In re Vitamins Antitrust Litig.*,
　　267 F. Supp. 2d 738 (S.D. Ohio 2003) ....................................................... 18, 40

*Kessler v. Palstar, Inc.*,
　　2011 WL 4036689 (S.D. Ohio 2011)................................................................... 4

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
　　2012 WL 4498465 (N. D. Ill. 2012) .................................................................. 38

*Laethem Equip. Co. v. Deere and Co.*,
　　2007 WL 2873981 (E.D. Mich. 2007)................................................................ 14

*Lowe v. Vadlamudi*,
　　2012 WL 2887177 (E.D. Mich. 2012) ............................................................... 14

*McCabe v. Ernst & Young, LLP*,
　　221 F.R.D. 423 (D.N.J. 2004)............................................................................ 13

*Mid–West Paper Prods. Co. v. Continental Group Inc.*,
　　596 F.2d 573 (3d Cir. 1979)............................................................................... 21

*Moon v. SCP Pool Corp.*,
　　232 F.R.D. 633 (C.D. Cal. 2005) ................................................................... 3, 16

*Orchestrate HR, Inc. v. Trombetta*,
　　2014 WL 772859 (N.D. Tex. 2014).................................................................... 18

*Richmond Health Facilities-Madison, LP v. Clouse*,
    473 S.W.3d 79 (Ky. 2015) ................................................................................. 36

*Stamps.com Inc. v. Endicia, Inc.*,
    437 Fed. Appx. 897 (Fed. Cir. 2011) ............................................................... 10

*State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.*,
    2007 WL 2993840 (E.D.N.Y. Oct. 10, 2007) ................................................... 19

*State v. Little River Band of Ottowa Indians*,
    2007 WL 851282 (W.D. Mich. 2007) ............................................................... 36

*Taylor v. Universal Auto Group I, Inc.*,
    2015 WL 1810316 (S.D. Ohio 2015) ............................................................... 14

*Travelers Indem. Co. v. Metro Life Ins. Co.*,
    228 F.R.D. 111 (D. Conn. 2005) ..................................................................... 28

*U.S. v. Blue Cross Blue Shield of Mich.*,
    2012 WL 4513600 (E.D. Mich. 2012) ............................................................. 14

*U.S. v. Columbia Broad. Sys., Inc.*,
    666 F.2d 364 (9th Cir. 1982) .......................................................................... 14

*U.S.v. Campbell*,
    279 F.3d 392 (6th Cir. 2002) .......................................................................... 10

*Usov v. Lazar*,
    2014 WL 4354691 (S.D.N.Y. 2014) ............................................................... 18

*Woods v. SouthernCare, Inc.*,
    303 F.R.D. 405 (N.D. Ala. 2014) ................................................................... 18

**STATUTES & RULES**

28 U.S.C. § 1407 ................................................................................................ 17

Fed. R. Civ. P. 6 ................................................................................................ 10

Fed. R. Civ. P. 23 .............................................................................................. 27

Fed. R. Civ. P. 26 ......................................................................................... *passim*

Fed. R. Civ. P. 45 ......................................................................................... *passim*

Fed. R. Crim. P. 6 ............................................................................................. 35

# I.     INTRODUCTION

Before the Court is a subpoena of immense proportions.  Unprecedented in scope and the burdens it thrusts upon its almost 100 recipients, it covers nearly *every* vehicle sold in America over the last twenty years and demands a forensic tracing of thousands of individual parts throughout the supply chain.  The burden of compliance can hardly be imagined or described.  But even were compliance feasible, doing so would be for naught.[2]

The Parties already have a tremendous wealth of information at their fingertips.  From the Defendants – the dominant suppliers of the parts at issue – they have comprehensive "upstream" information about sales made to every direct purchaser, including the OEMs.  At least one Defendant participated in every RFQ at issue and signed almost every relevant sales agreement.  They know to a certainty – or at least to a close approximation – which vehicles used their parts.  The Parties also have intimate details about the procurement process, with the Defendants in just *one* component class (wire harnesses) having produced over ***16 million pages*** of documents.

From the Dealer Plaintiffs, the Parties have the other side of the coin – "downstream" information – about vehicle sales to dealers, and then to the dealers' customers.  Their databases cover almost *every* make and model now subpoenaed, which comprise over ***95%*** of the vehicles on the road.  This is not just a random sample of 40 dealers, it is a robust dataset.  Because dealer protection laws prohibit discrimination among dealers, these datasets – which include MSRPs,

---

[2] Exhibit 1 identifies the SSEs submitting or joining each opposition brief.  For convenience, we use the following naming conventions:  ***OEMs*** – entities that produce new vehicles; ***Domestic Distributors*** – distributors of (usually) non-subpoenaed foreign OEMs; ***Core SSEs*** – OEMs and Domestic Distributor SSEs; ***Non-Core SSEs*** – SSEs other than Core SSEs, *e.g.*, finance and credit or R&D SSEs; ***Truck & Equipment SSEs*** – OEM SSEs that produce trucks and equipment; ***Smaller SSEs*** – Core SSEs with less than 3% market share over the proposed period; ***Offering SSEs*** – Core SSEs (other than the Smaller SSEs and the Truck & Equipment SSEs) that have made an offer of production as set forth in their December 18th Letter.  *See* Ex. 11.

invoice prices, and more than one hundred additional fields – can be extrapolated to cover thousands of other dealers and nearly every vehicle in the nation.

The Parties have not identified any material gaps in their massive discovery record.  To the contrary, they told the Court last month that:

> "[A]ll parties have accepted that they will perform their analyses on the **large** amount of data that **has been produced**, and … the data provided is **more than enough** to create a **viable model and to extrapolate** regarding the period for which data is missing." 12-cv-2311 Dkt. 1194, at 7.

Though they have what they need to reasonably estimate damages and pass-through, the Parties seek more.  The SSEs, they hope, will have some mythical, mega-database that matches component purchases to vehicle sales as the components worked their way from a box on the factory floor to their placement in a new vehicle sitting in the driveway of each proud new car owner.  This hope fuels their demand for such a database or the building blocks needed to create it.  But the model they imagine building is unlike any constructed before: one built from the "bottoms-up" that includes every facet of part pricing, OEM pricing, and dealer pricing, no matter how tangential or unrelated to the conspiracies alleged.

That is not how damages models work.  And even if it were, gathering the information needed to construct such a model would be nearly impossible.  There is no mythical database.  And providing its building blocks would require many SSEs to each devote hundreds or thousands of hours of investigative work to the endeavor, if they even have the information.  *E.g.* Exs. 32 at ¶¶ 5-6; 46 at ¶ 7; 50 at ¶ 13; 75 at ¶ 23.  It would be "the equivalent of an 18-year company-wide recall investigation on steroids," as one declarant notes, requiring the research and investigation needed to trace not just one part through the supply chain, but thousands.  Ex. 29 at ¶ 8.  Databases never intended to jibe would need to be aligned and married.  This is on top of the Parties' demands for virtually unlimited custodial information covering the purchasing and

sales practices of each SSE family for the last two decades. Such demands could implicate hundreds of custodians, each of whom would need to be identified and searched. *E.g.* Exs. 26 at ¶ 26; 66 at ¶ 8; 71 at ¶ 21.[3]

The staggering burdens the Subpoena portends should not be imposed. *First,* the Subpoena is facially overbroad and the Parties have not "take[n] reasonable steps" to limit it. Fed. R. Civ. P. 45(d)(1); *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 636 (C.D. Cal. 2005) (quashing subpoena that was "overbroad on its face and exceeds the bounds of fair discovery").

Throughout the meet and confer process, the SSEs asked the Parties to describe the information they already had in hand and to identify the material gaps in the record so that the SSEs could help fill them at a manageable burden. The Parties rejected this, saying they had no obligation to avoid duplicative discovery. Other than a few cosmetic changes – consisting almost entirely of eliminating duplicative requests – they made no effort to narrow the Subpoena, compromise, or negotiate. Even when the Offering SSEs presented a proposal – one that systematically discussed each category of information sought, identified the information the Parties likely possessed, evaluated the need for additional discovery, and considered the contributions that the SSEs could reasonably make – the Parties did not engage. Two weeks after receipt, on Christmas Eve, the Parties sent a one-paragraph declaration of "impasse." There was no reasoned evaluation of the SSEs' proposal. No discussion of any shortcomings. No identification of additional gaps in the record. No counter-offer. Just a demand for a briefing schedule. Such conduct does not satisfy the Parties' obligation to "avoid imposing undue burden or expense" on non-parties. Fed. R. Civ. P. 45(d)(1).

---

[3] The burden for each SSE will obviously differ. Some Non-Core SSEs may have lesser burdens than larger SSEs, but also have less relevant, non-cumulative information. Thus, the Subpoena still fails the rule of proportionality.

*Second,* beyond its facial impropriety, the discovery sought is disproportionate to the needs of the case, especially in light of the huge volume of information the Parties possess.

- The upstream discovery of the transactions, bidding contests, and agreements involving Defendants is "clearly duplicative," and therefore beyond the scope of Rule 45. *Kessler v. Palstar, Inc.*, 2011 WL 4036689, *2 (S.D. Ohio 2011). The non-duplicative upstream discovery – like purchasing data of small non-defendant suppliers, confidential and proprietary internal evaluation materials, and market analyses – is of marginal relevance. *In re OSB Antitrust Litig.*, 2006 WL 8403357, *3 (W.D.N.C. 2006) (quashing requests for "information regarding vendors who are not defendants"); *In re Automotive Refinishing Paint Antitrust Litig.*, 2006 WL 1479819, *7 (E.D. Pa. 2006) (quashing requests for information about "market conditions and competitive landscape").

- As for downstream discovery, the substantial Dealer Plaintiff databases – containing tens of thousands of OEM-dealer transactions – are sufficient to create a reliable model of pass-through. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5428139, *9 (N.D. Cal. 2013) (pass-through does not require expert to "analyze[] every sale at the transaction level"). There is no need to trace components from the factory to the driveway, or to "control" for non-price elements of dealer transactions – like floor plan financing – that were not affected by the alleged conspiracies. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, *4 (N.D. Cal. 2012) ("[p]laintiffs need not identify the overcharge on each and every panel sold to direct purchasers, and they need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser"); 12-cv-102 Dkts. 338, 331, 352 (deeming requests for similar information "irrelevant").

To support their position, the SSEs have done what the Parties have not: retained an economist, Dr. Michael McDonald, who has submitted a declaration explaining how damages – from the initial overcharge to pass-through at each level – can be estimated using information already in the record. Ex. 19. The SSEs have also submitted numerous detailed fact declarations to demonstrate the oppressive burdens imposed by the Subpoena, and the reasons why compliance is infeasible or unnecessary. These declarations show that compliance, where possible, will require thousands of hours of employees' time, the diversion of resources from important functions, and significant expense. *See generally* Exs. 21-76; *see also* Ex. 56 (declaration of Ph.D. economist with years of experience with Nissan's systems).

4

But even the burden understates the perils of ordering production.  The Subpoena –
especially its demand for internal evaluation materials and cost information – seeks some of the
most competitively sensitive information each SSE possesses.  In that regard, the SSEs echo the
sentiments so well expressed by Ford when it previously addressed these same issues:

> "Ford has never before, ***in any litigation***, been compelled to produce this type of
> highly confidential information to such a large group of its suppliers and dealers,
> and the damage that such disclosure would cause – on an ***industry-wide basis*** –
> simply cannot be overstated."  12-md-2311, Dkt. 977, at 1.

That concern is multiplied by the thirty-plus brands subject to this motion.

In the end, the Court faces a simple choice.  It can do what no court has done before by
requiring compliance with an impossible subpoena, imposing immense expense on the SSEs, and
potentially causing them irreparable injury with their suppliers and customers.  Or it can enforce
the rules that require non-party subpoenas to be carefully crafted to fill material voids in the
record.  The latter choice requires that the Parties' motion be denied.

## II.     PROCEDURAL BACKGROUND

### A.     *Faced With an Overwhelming Subpoena, the SSEs Promptly Engage the Parties to Identify Material Gaps that Can Be Reasonably Filled.*

The SSEs perform a range of functions in the automotive industry, from selling insurance
to financing deals, to research, development, and design.  Of course, some SSEs build and sell
cars or trucks, but many do not.  Among those that do, the SSEs range from the largest car
makers in the world to ones with less than one-half of one percent of U.S. vehicle sales.

Notwithstanding their diversity, the SSEs – now nearly 100 of them – each received the
same subpoena, with the same breathtaking scope.  By way of example, Request No. 1 alone
spans over six pages and 150 categories of documents, data and information. Ex. 2.  It seeks
every shred of information about the millions of parts the SSEs have purchased since George H.
W. Bush – the ***first*** President Bush – was in office.  If this Request, by itself, were served on just

one of the larger OEMs, the Subpoena's scope would surely rank among the most ambitious in history. Coupling it with Request 4 – which seeks similar information about the millions of cars or trucks the SSEs have sold in that time – plus ***thirty-four*** more requests leaves little doubt that, as served, the Subpoena sought more information than any that had preceded it.

The SSEs joined together when they recognized "that the great majority of issues" the Subpoena raised were "common to the[m]." Ex. 5 at 2. For reasons never disclosed, however, the Parties preferred a cumbersome and expensive process in which "the significant issues relating to the subpoenas" would be "addressed in conversations and negotiations with ***each*** OEM." Ex. 4 at 2. Judge Battani recognized the superiority of the SSEs' approach by noting (in response to the Parties' *ex parte* complaints) that the SSEs' coordination "probably [was] very smart." *See* 12-md-2311, Dkt. 1204, at 70.

From the outset, the SSEs drove the meet and confer process forward. They proposed, coordinated, and led a global summit conference to detail their common concerns to the Parties; described each SSE with particularity so that the Parties would understand which of them might have relevant information, and which would not; and provided the bases for the Parties to begin to narrow their Subpoena. Throughout, the SSE group proved cooperative, cohesive, and quick. *See* Ex. 17 (summarizing process).

From the summit forward, the SSEs tried focusing the Parties on a set of fundamental questions. Specifically, the SSEs asked the Parties to "be prepared to describe generally by Component the information already in the Parties' possession; the gaps in the discovery record that the Parties reasonably believe that they need the [SSEs] to fill; the efforts the Parties have undertaken (vis-à-vis each other) with regard to these issues; [and] the relative importance of the information for purposes of litigating the case." Ex. 5 at 2. After all, the Defendants stand on

one side of nearly every "upstream" transaction at issue, and the Auto Dealer Plaintiffs stand on one side of thousands of "downstream" transactions. Accordingly, the discovery already in the record, and any gaps, were rightly addressed first.

During the summit, the Parties admitted that they had purchasing information from each of the Defendants, which includes over 140 entities and covers over 59 components categories. Ex. 9 at 4. But they did not otherwise identify the information they lacked – beyond some non-defendant supplier information – or focus on the gaps that the SSEs could reasonably fill. Instead, the Parties asked for time to regroup, saying they would take the SSEs' concerns under advisement and respond with their next negotiating position.

## B.    *The Parties Refuse to Identify the Gaps in the Record Following the Summit.*

Two weeks later, the Parties sent a letter that failed to *address* most of the SSEs' concerns. The Parties declined to modify the Subpoena *at all* as to those entities they now call the "Core SSEs," contending that they must comply with it as written. *See* Ex. 8 at 4 (demanding a complete or phased production of all responsive information). They also refused to discuss the wealth of information they already possess.[4]

Their silence was curious, as their many discovery motions in this case reflect a substantial record. The Wire Harness Defendants alone had "produced over 16 million pages of documents." 12-cv-102, Dkt. 331 at 2. The Dealer Plaintiffs had "produced data sets for each

---

[4] The Parties "offered" to allow a phased production, which they now tout as a meaningful compromise. It is not. This offer only serves the Parties' interests in meeting their deadlines in the three lead cases; it does not reduce the SSEs' burden. As the SSEs explained, a phased production would increase burden by requiring multiple searches. The Parties' "compromises" for Non-Core SSEs were similarly illusory. *First,* they offered to hold the Subpoena in abeyance for SSEs that assured them they have no responsive information. *See* Ex. 8 at 2. Aside from the fact that such entities should not have been subpoenaed in the first place, there is no difference between holding such a subpoena in abeyance and demanding full compliance with it. In any event, given the Subpoena's breadth, the representation demanded is difficult (if not impossible) to make, especially without first expending great time and resources. *Second,* the Parties offered to limit the Subpoena to 16 requests for any OEM with a market share less (Continued…)

Dealership Plaintiff in operation, containing over 100 fields of data, close to three-quarters of a million pages of documents and additional interrogatory and video productions." 12-cv-102, Dkt. 384 at 1. In addition, more than forty "*nonparty* automobile dealer data sets containing very detailed transaction specific information" have been produced. 12-cv-103, Dkt. 386 at 6. The record reflects "tens of thousands of individual sales and invoices showing tens of thousands of individual purchases." 12-md-2311, Dkt. 1194 at 14.

### C. The Parties Offer Only Cosmetic Changes to the Subpoena.

Faced with the Parties' failure to respond to the issues raised at the summit conference, the SSEs tried again, setting forth in writing the reasons why the information sought was overbroad, irrelevant, and largely duplicative. *See* Ex. 9.

After almost four weeks of silence, the Parties responded on Thanksgiving Eve with their one and only offer to modify the Subpoena as to the Core SSEs. Ex. 10. While they now congratulate themselves for having "substantially narrowed" the Subpoena's scope, their concessions did not reduce the burden one iota. P. Br. 1. Though the number of subparts declined, the Subpoena's *substance* remained the same. As shown in Exhibit 3, the remaining requests duplicated 24 "eliminated" requests and substantially duplicated 13 more. Other eliminated requests were so removed from the case that the Parties never tried to justify them.

This excerpt from Exhibit 3 gives a flavor of the minimal changes associated with the Parties' one and only offer of compromise to date:

| Withdrawn Request | Remaining Request |
|---|---|
| Request 1(h) seeks information relating "sales tax," "incentives," "shipping," and any other "service, benefit and/or product … received" | Request 1(d) seeks information relating to "taxes", "incentives," "shipping" and other "consideration received" |

than 6/100ths of 1%, but those requests are among the ***most burdensome***. *Id.* Thus, the Parties' October 14th letter made ***no substantive modifications***.

| Withdrawn Request | Remaining Request |
|---|---|
| Request 1(i) seeks information relating to "directed buying of components" | Request 1(g)(7) seeks information about "directed buying" |
| Request 1(j) seeks information about components purchased "without … an RFQ" | Request 1(l) seeks information relating to "non-RFQ methods of procurement" |
| Request 2 seeks information relating to "target prices" | Request 1(g) seeks information relating to target prices |
| Request 4(a)(6) seeks information relating to "monetary components" of the transaction | Request 4(c) seeks information relating to "monetary components" of the transaction |
| Request 4(a)(11) seeks "identifier information" for each vehicle | Request 4(a)(2) seeks "identifiers for the vehicle" |
| Request 4(d) seeks information relating to dealer "subsidies, rebates, bonuses, incentives, and allowances" | Request 4(e) seeks information relating to "incentives, … subsidies, rebates, bonuses, or allowances" |

In any event, by any measure, the Subpoena remained vastly overbroad. It still sought 19 years' worth of information relating to every vehicle sold in America, and from 13 to 19 years' worth of information about the 59 classes of components at issue (some of which encompass hundreds of individual parts). And it still demanded basically every piece of information (including transactional *and* custodial information) about vehicles and parts from the conception of a model to delivery to the consumer. To give the Court a sense of the unreasonable burden the Parties seek to impose, the SSEs' *fifty-six* declarations describe the Subpoena's incredible breadth and the virtual ***impossibility*** of complying with it. *See* Exs. 21-76.

Burden aside, the Parties did not justify their continued demands. For example, the Parties conceded that they have information about the parts the Defendants sold. They claimed to lack only OEM part numbers, supposedly needed to trace each component from the manufacturing plant to the consumer's driveway. But the SSEs explained why such tracing is neither feasible nor necessary to establish overcharge or pass-through. Ex. 11 at 6-7, 9. If they still wanted to try, though, they could use discovery from the Defendants to do so. As the SSEs explained, when bidding for specific RFQs, the Defendants are told which vehicles will contain their parts. For example, if Yazaki won the bid for the wire harness of the Ford F-150, and it

produced 200,000 wire harnesses for that model in 2010, the OEM part number provides little if any additional substantive information. Ex. 11 at 9. The Parties never responded.[5]

The Parties also failed to support their requests for downstream information. Their lone justification was that they *may* want to *consider* building a complex, bottoms-up model of vehicle pricing as it goes from a pile of components, to production of a vehicle, to delivery on the dealer's lot, and finally to the passage of title to the end customer or finance company. Ex. 9 at 6-7. The SSEs explained that such a model, if it could even be constructed, was unnecessary. *Id.* In antitrust cases, economists often run regressions to calculate damages. *Id.* But regressions rarely, if ever, include every piece of information, and they do not need to do so to generate reliable results. They only need to include variables whose omission would *bias* the results (a situation that arises only under certain, stringent conditions). *See* Ex. 19 at ¶¶ 12-14. Moreover, because SSEs have different systems and availability of data, there would be gaps and inconsistencies in the datasets that would render a bottoms-up model unworkable. Ex. 9 at 7.[6]

> **D.** **Faced With an Impossibly Overbroad Subpoena and the Parties' Refusal to Tailor It to Fill Material Record Gaps, the SSEs Present their Own Proposal.**

Shortly after the Parties' Thanksgiving Eve letter, the SSEs crafted their own solution by making a genuine proposal that satisfied the Parties' claimed, material needs. As to upstream

---

[5] The Parties are also wrong that the Defendants lack OEM part numbers, since that is part of the Defendants' invoicing and processing system. *See, e.g.,* Exs. 29 ¶ 10; 49 at ¶ 20.

[6] In prior motion practice not involving the SSEs, the Parties submitted dueling expert declarations concerning the need for upstream and downstream information. *Compare* 12-cv-102 Dkt. 187 (Snyder Decl. I) and 12-md-2311 Dkt. 984-1 (Snyder Decl. II) (advocating for more data) *with* 12-cv-102 Dkt. 196-1 (Nelson Decl.) (noting that most information Snyder seeks is either "redundant" or unnecessary). The most recent Snyder affidavit was submitted in May of last year, when the discovery record was far less mature than now. Notably, the Parties failed to submit any economist statement during the meet-and-confer process (despite the SSEs' invitation to do so, *see* Ex. 9 at 4 n.6), or in support of this motion. They have therefore waived their right to rely on one. *See* Fed. R. Civ. P. 6(c)(2) ("Any affidavit supporting a motion must be served with the motion."); *U.S.v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002) (party "cannot raise new issues in a reply brief"); *Stamps.com Inc. v. Endicia, Inc.*, 437 Fed. Appx. 897, 908-09 (Fed. Cir. 2011) (affirming district court's striking of expert declarations offered for first time on reply).

data, to address the Parties' claim that they lacked *non-Defendant supplier* data,[7] the larger OEM

SSEs offered to produce such reasonably-accessible transactional data for up to the last 10 years,

including (i) the date of purchase; (ii) the part description; (iii) the quantity purchased; (iv) the

price; and (v) other fields to be determined following a further meet and confer.  Ex. 11 at 9-10.[8]

As to downstream data, the SSEs recognized that, if component costs affected vehicle

price at all, they would most directly affect the MSRP.  Thus, the Offering SSEs proposed

producing a schedule of their MSRPs for the last 10 years.  This information, alone or in

conjunction with the data produced by the dozens of party and non-party dealers, would be more

than sufficient to estimate pass-through.  As to the remaining downstream information – relating

to financing and credit, or warranty and insurance, or other ancillary topics – the SSEs

maintained their objection, consistent with standard-economic analytical needs and this Court's

prior rulings concerning the lack of relevance of such information.  *See, e.g.,* 12-cv-102, Dkts.

338, 331, 352 (denying discovery seeking ancillary transactional information from dealers).

The SSEs also suggested further streamlining the Subpoena.  *First*, they requested that

the smaller SSEs be excused from the burden of production, suggesting that 3% market share

was a reasonable cut-off, as data from relatively small SSEs would be unlikely to change a pass-

---

[7] The SSEs were, and remain, skeptical of this information's value since "non-Defendant suppliers are unlikely to constitute a substantial portion of the market and would not be an appropriate benchmark" because their prices "would also likely be affected by the conspiracy."  *See* Ex. 11 at 9.  As Dr. McDonald explains, non-defendant supplier data would only be relevant to the overcharge determination if the Parties' economists constructed a "yardstick" model using those suppliers as the yardstick.  Ex. 19 at ¶ 31.  But economists do not use non-conspiring suppliers as yardsticks because the "market" price would still be infected by the conspiracy.  *Id.* at ¶¶ 32-33.  Instead, they usually construct before-and-after benchmark models, which would require *only* the Defendants' data.  *Id.* at ¶ 30.  Given this fact, it is not surprising that, as the Parties conceded, their experts have *not* determined that non-Defendant supplier data could be used as an appropriate benchmark.  Ex. 11 at 10 (citing Ex. 10).

[8] The Parties chide the OEMs for asking the Parties to identify non-defendant suppliers they want researched, professing ignorance as to who they might be.  P. Br. 10.  But someone has to identify these entities, since as the SSE's explained, "pulling information by supplier is easier than pulling information by component."  Ex. 11 at 9; *see also* Ex. 29 at ¶¶ 17-18.  Because Defendants know who they compete with, they are best able to identify the relevant non-Defendant suppliers and, as Parties, should bear the burden of doing so.

through regression's results.  The Parties' offered no meaningful response; they just noted that the Small SSEs have recognizable names.  *See* Ex. 11 at 8; Ex. 12 at 6.[9]  *Second*, the SSEs requested that "Non-Core SSEs" – the insurance, design, and other corporate siblings of subpoenaed or non-subpoenaed OEMs – be excused from production, as the Parties made no showing of relevance as to them.  Ex. 11 at 2-8.  Finally, the SSEs said that the offer of production was contingent on reaching an agreement on reimbursable costs.  *Id.* at 13.

Taken together, the SSE's offer would have completed the datasets needed for any reasonable damages analysis.  As such, it represented a genuine path forward and, at a minimum, a suitable starting point for further negotiation.

### E.     The Parties Refuse to Respond to the Offering SSEs' Proposal in Favor of a Christmas Eve Declaration of Impasse.

The Parties responded to the SSEs' eighteen-page letter with a one paragraph Christmas Eve declaration of "impasse."  Ex. 12.  In doing so, the Parties:

- Refused to respond to the Offering SSEs' proposal to produce certain information from the designated non-Defendant suppliers;

- Refused to respond to the Offering SSEs' proposal to produce a schedule of vehicle MSRPs;

- Refused to meet and confer concerning the scope of the requests to the Truck and Equipment SSEs;

- Refused to explain the basis for seeking downstream information facially unconnected to component pricing, such as financing and credit information;

- Refused to explain the basis for seeking discovery from Smaller SSEs, Non-Core SSEs, or Domestic Distributors SSEs;

- Refused to provide a basis for discovery of settlement-related information; and

---

[9] Among the entities still subject to the Subpoena are domestic distributors or affiliates associated with the following brands: Porsche, Jaguar Land Rover, Volvo, Mitsubishi, Audi, BMW, Volkswagen, and Subaru (together, the "Smaller SSEs").  Each has an estimated market share below 3%, as reported by the Parties.  The Smaller SSEs have submitted a separate brief providing additional reasons why the motion to compel should be denied.

- Refused to engage in any discussion concerning the categories of cost that the Parties would reimburse.  *See* Ex. 11 at 13-14; *see also* Ex. 9 at 9.[10]

Nonetheless, the SSEs again tried to reengage the Parties, noting that ceasing communications would violate the Parties' obligation to meet and confer in good faith.  Ex. 13.  The Parties had also failed to identify the requests they intended to enforce or the entities subject to their forthcoming motion.  Two weeks later the Parties reaffirmed their refusals to negotiate further, informing the SSEs that they were sticking with their first and only offer made over two months prior.  Ex. 14.  Even as to the Non-Core SSEs, they offered to hold the Subpoena in abeyance only if those entities "assured" them that they had no responsive information or that another entity in their "corporate family" would produce the exact same information, rendering the concession illusory.  *See* Ex. 18.

## III.     STANDARD OF REVIEW

A party issuing a subpoena must take reasonable steps not to impose undue burden on recipients.  Fed. R. Civ. P. 45(d).  In assessing undue burden, non-party status is entitled to special consideration. *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("parties to a law suit must accept [discovery's] travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations"). That consideration extends equally

---

[10] The Parties repeatedly misrepresent the SSEs' position on costs.  They first claimed that the SSEs refused to "engage in a conversation" about the Subpoena's scope without an agreement on costs, which the SSEs twice corrected. *See* Ex. 8 at 5 (misrepresenting SSE position); Ex. 9 at 9 (correcting misrepresentation); Ex. 10 at 9 (misrepresenting SSE position); Ex. 11 at 13-14 (correcting misrepresentation). The Parties now assert that "[t]he SSEs' final position … was that they would not begin searching for any documents until the Court ***issued an order*** on costs, showing that these SSEs likely never had any intention of reaching a resolution without court intervention."  P. Br. 11; *see also* 12-md-2311, Dkt. 1204, at 53 (wrongly telling Court that "for the key OEMs across the board their position right now is you are not getting a thing from us without an order").  What the SSEs actually said was that "we do not intend to begin searching for and producing documents until an ***agreement*** on costs has been reached."  Ex. 11 at 13.  While the SSEs noted that "Rule 45 specifically relieves" the SSEs from taking such actions "until after all objections have been resolved and the court has issued an order on costs," this merely rebutted the frivolous argument that the SSEs were obligated to begin searching prior to any assurance of reimbursement.  *See* Ex. 9 at 9 (*citing McCabe v. Ernst & Young, LLP*, 221 F.R.D. 423, 426 (D.N.J. 2004)).

to companies large and small. *See U.S. v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 372 (9th Cir. 1982) ("Absent some compelling justification, even large nonparty corporations … should not be compelled to subsidize the defense of other large corporations."). These considerations are magnified when competitively sensitive discovery is demanded. *Laethem Equip. Co. v. Deere and Co.*, 2007 WL 2873981, at \*3-5 (E.D. Mich. 2007); Fed. R. Civ. P. 45(d)(3)(B)(i).[11]

If the Court determines that the information is not so competitively sensitive as to warrant quashing on that basis, it may order production *only* if the issuing party "shows a **substantial need** for the … material that **cannot be otherwise met** without undue burden." Fed. R. Civ. P. 45(d)(3)(C). In making that determination, the Court must "balance the potential value of the information to the party seeking it against the cost, effort, and expense to be incurred by the person or party producing it." *Lowe v. Vadlamudi*, 2012 WL 2887177, at \*2 (E.D. Mich. 2012). In doing so, the Court should be mindful that the recent amendment to Rule 26 is intended to "encourage judges to be more aggressive in identifying and discouraging discovery overuse." *See* Fed. R. Civ. P. 26(b)(l), 2015 Advisory Committee Notes.[12]

---

[11] The Parties' citations to cases where a non-party's burden was light are readily distinguishable. *See* P. Br. 12-13. In *U.S. v. Blue Cross Blue Shield of Mich.*, 2012 WL 4513600, at \*6 (E.D. Mich. 2012), the burden was only the time it would take to review documents for "responsiveness and privilege." In *Taylor v. Universal Auto Group I, Inc.*, 2015 WL 1810316, at \*6 (S.D. Ohio 2015), the non-party offered just a "mere assertion" of burden. In *In re Subpoenas to Plains All Am. Pipeline, L.P.*, 2014 WL 204447, at \*5 (S.D. Tex. 2014), the court found that "dep prep" time was not an undue burden. In *Alexander v. F.B.I.*, 194 F.R.D. 316, 330 (D.D.C. 2000), the court significantly cut back the number of custodians and search terms requested based on a declaration that full compliance "would cost approximately $1,051,482 and would take in excess of ten weeks to complete."

[12] The SSEs are litigating this motion based on the "rule of proportionality," as applied to non-parties. That said, many Core SSEs are "absent class members" in the direct purchaser cases, and as such, the Parties must show a "particularized need" for their requests. *Groth v. Robert Bosch Corp.*, 2008 WL 2704709, at \*1 (W.D. Mich. 2008). Because the rule of proportionality defeats the Parties' motion, the Court need not apply the special rules governing absent class member discovery. It warrants mentioning, however, that many SSEs are victims of the alleged conspiracies and therefore risk being victimized twice: once by the conspiracy and again by the Subpoena.

## IV.    THE SUBPOENA SHOULD BE QUASHED IN ITS ENTIRETY

The Subpoena should be quashed because it is facially overbroad and the Parties have failed to take adequate steps to avoid imposing an undue burden on the SSEs.  It is not the Court's obligation to blue-pencil a facially overbroad subpoena.  That is what the meet-and-confer process is for.  *See Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53-54 (S.D.N.Y. 1996) (refusing to "redraft the subpoena" in light of its facial overbreadth). As this Court has emphasized, the value of the meet and confer process is that it compels "negotiations" to "narrow the scope of the subpoena" to "***highly*** critical and relevant" information.  12-cv-2311, Dkt. 992 at 5.  That did not happen here because the Parties did not attempt to make it happen.

The Parties acknowledge that "[a] facially overbroad subpoena is unduly burdensome … and cannot be enforced."  12-cv-102, Dkt. 338 at 28.  Thus, if an overbroad subpoena has been issued, the Parties can satisfy their obligation to "avoid imposing undue burden or expense" only by *reasonably* limiting it through the meet and confer process.  Fed. R. Civ. P. 45(d)(1). This obligation requires more than a mere certification that the Parties "requested, but did not obtain, concurrence in the relief sought."  *See* P. Mot. to Compel, at 2.  In normal party disputes, the lack of acquiescence to the moving party's demands might suffice.  But Rule 45 affirmatively requires parties to "***take steps***" to avoid imposing an undue burden on non-parties.  Fed. R. Civ. P. 45(d)(1).  Thus the Parties must show, not just a genuine dispute, but that their offers of compromise, if accepted, would avoid undue burden on the SSEs.

They cannot do that here.  The Parties do not deny that the Subpoena is unprecedented, seeking virtually every document relating to the purchase of thousands of components and the sale of millions of vehicles.  Even as cosmetically modified, it seeks nearly ***ninety*** categories of documents for time periods ranging from ***twelve to twenty-two years***. This would cover: (i) every

part the OEMs have purchased for decades; (ii) every vehicle they have built; (iii) every vehicle
they have sold; and (iv) every vehicle their customers, in turn, have sold.

The Parties did not use the meet-and-confer process to reasonably limit the Subpoena.
They came to the process only reluctantly (presumably, in favor of their "divide and conquer"
strategy) and continually refused to engage in a discussion about the record and their true needs,
all while making misleading *ex parte* statements to the Court about the SSEs' supposed
intransigence. *See* 12-cv-102, Dkt. 396 at 4-6; *see also* 12-md-2311, Dkt. 1204, at 47, 52-54.
The few cosmetic changes in their ***one*** offer did nothing to alleviate the SSEs' burden. And, in
response to the Offering SSEs' detailed proposal, the Parties responded with a flat declaration of
impasse, not a counter-offer.

Aside from process, the Subpoena cannot be enforced because it remains facially
overbroad. Courts routinely quash narrower subpoenas. For example, in *Concord Boat*, a
subpoena seeking "virtually every document in Merrill Lynch's files nationwide for the past ten
years relating to any aspect of" a single one of its client's business was "overbroad on its face."
169 F.R.D. at 50. In *In re Electric Weld Steel Tubing Antitrust Litig.,* 512 F. Supp. 81, 84 (N.D.
Ill. 1981), a price fixing case, the court deemed facially infirm a subpoena that "cover[ed]
virtually every document in [a non-party's] files for the past twenty years relating to its
operations in" just one area, "welded steel tubing." *See also Moon*, 232 F.R.D. at 637-38
(requests seeking "documents over a ten year or greater period relating to defendant and
nonparty KSA regarding pool winter covers" are "overbroad on [their] face and exceed[ ] the
bounds of fair discovery").

There is no merit to the Parties' contention that, because this case is "unprecedented," the
SSEs' burden should also be unprecedented. The rule of proportionality is not suspended just

because this case involves many conspiracies.  To the contrary, the massive scope of this case means that the Court should be more vigilant – not less – in enforcing the Federal Rules' discovery limits, lest the case become increasingly unmanageable.[13]

In that regard, another case from the recent past, "unprecedented" in its time, is illuminating.  In the 1990's, the DOJ uncovered "the most pervasive and harmful criminal antitrust conspiracy" in history to that point: the Vitamins cartel.   That cartel gave rise to the "largest fine ever imposed in any Department of Justice proceeding under any statute," the "largest civil settlement ever in a class-action antitrust case," and "by far the largest [settlement] ever made under state indirect-purchaser antitrust laws."[14]

In the main proceeding, the *Vitamins* defendants issued requests to **party** direct purchasers that "encompass[ed] thousands of different products sold by plaintiffs, and literally every document relating to the businesses of the plaintiffs selling those products."  *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 298-99 (D.D.C. 2000).  Those defendants argued, as the Parties do here, that the information was needed for the indirect purchaser case, if not for the direct purchaser case consolidated with it.  Judge Hogan, overseeing the MDL, found "no applicable case law holding that this individualized downstream data is producible," and sustained the Special Master's denial of defendants' motion to compel.  *Id.* at 300.  In a related proceeding, the Southern District of Ohio evaluated a subpoena served by a *Vitamins* defendant that sought records "detailing the unit-by-unit composition of each vitamin product" sold by the non-party,

---

[13] The notion that consolidation into an MDL can *increase* costs contradicts the purpose set forth in the MDL process's enabling statute: to "promote the just and efficient conduct of [multi-district] actions."  28 U.S.C. § 1407.

[14] *See* http://www.justice.gov/atr/selected-criminal-cases-antitrust-division; D. Barbosa, *$1.1 Billion To Settle Suit on Vitamins,* New York Times (November 4, 1999), at http://www.nytimes.com/1999/11/04/business/1.1-billion-to-settle-suit-on-vitamins.html; J. Connor, *Global Price Fixing: Our Customers are the Enemy*, at 469. (Springer Science & Business Media, 2013).

all the non-party's costs, and all of its prices, and quashed it. *In re Vitamins Antitrust Litig.*, 267

F. Supp. 2d 738, 739 (S.D. Ohio 2003). There is no daylight between the *Vitamins* requests and

the ones at issue here.

Accordingly, the subpoena should be quashed in its entirety.[15]

## V.     THE SUBPOENA VIOLATES THE RULE OF PROPORTIONALITY

Setting aside its facial overbreadth and the Party's failure to sufficiently meet and confer,

the Court should quash the Subpoena because of its limited utility and immense burden.

### A.     *The Upstream Purchasing Requests Are Unnecessary and Incredibly Burdensome.*

Over 12 requests seek upstream purchasing information.[16]  These requests, however,

cannot be viewed in isolation; they must be considered against the information the Parties

already possess.  The Parties do not deny that they already have the Defendants' sales

information (and thus the OEMs' purchasing information) concerning the parts at issue. They

have, for example, all the purchasing data, sales agreements, bidding documents (RFQs), and

communications with the OEMs concerning such parts.  The Parties do not address this or claim

that the prohibition against duplicative discovery does not apply to them. *See Orchestrate HR,*

*Inc. v. Trombetta*, 2014 WL 772859, *4 (N.D. Tex. 2014) (denying requests for "all contracts

between non-parties and Defendant" because "Defendant … should also be in possession of

those documents."); Fed. R. Civ. P. 26(b)(2)(C)(i) ("the court ***must*** limit … duplicative"

---

[15] The Subpoena is also facially invalid for certain SSEs, as described in certain fact declarations, because it commands production beyond "100 miles of where the [producing] person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). Because there are no exceptions to rule, such subpoenas must be quashed. *See, e.g., HT S.R.L. v. Velasco*, 2015 WL 5120980, *13 (D.D.C. 2015); *Woods v. SouthernCare, Inc.*, 303 F.R.D. 405, 406-08 (N.D. Ala. 2014); *Usov v. Lazar*, 2014 WL 4354691, *16 (S.D.N.Y. 2014).

[16] *See* Requests 1(a) (date of part purchase), 1(b) (supplier), 1(c) (manufacturer), 1(d) (supplier agreement terms and conditions, including (i) price, (ii) price and units, and (iii) shipping costs), 1(e) (shipping info), 1(f) (part number), (Continued…)

discovery); Fed. R. Civ. P. 45(d)(3)(C) (court "may … order … production" only "if the serving

party … shows a **substantial need** … that **cannot otherwise be met**.").[17]

      In their brief, the Parties now claim that there are five gaps justifying a pull of the

purchasing information requested, duplicative or not.  These "gaps" are not meaningful, and

none precludes the Parties from estimating damages.  It bears emphasis that upstream

information goes only to the issue of the initial overcharge by the Defendants, not the issue of

pass-through.  Therefore, the fact that the direct purchaser plaintiffs have *not* sought any of this

information from the SSEs is a strong indication that it is not needed to prove the overcharge.  A

careful review of the five purported gaps demonstrates why that is so.

      **1.**        **Unspecified Imperfections in the Defendants' Purchasing Data**

      The Parties first assert that the Defendants' sales databases are not perfect and may

contain some unspecified gaps in terms of "product characteristics" or "time periods."  P. Br. 17.

Aside from the fact that Defendants manufacture these parts (and so are best positioned to speak

to their "characteristics"), the Parties do not specify what these gaps are.  *OSB*, 2006 WL

8403357, at *3 (burden rests on requesting party to show why information about purchases from

"Defendants can[not] be obtained from the Defendants themselves").  Nor do they show that the

---

1(g) (RFQ info), 1(l) (non-RFQ purchasing info), 1(m) (part numbers), 3 (supplier agreements); 23 (supplier agreements relating to annular price reductions); 30 (supplier agreements relating to MFNs).

[17] The Parties misplace reliance on cases ostensibly permitting "overlapping discovery." P. Br. 30.  In *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *4 (E.D. Pa. 2012), the court favorably cited the requirement that a party "exhaust[] its efforts to seek production of these types of [confidential] materials from" the other party, but found that the issuing party made a sufficient showing that it could not "obtain the requested information from other sources."  In *State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.*, 2007 WL 2993840, at *1 (E.D.N.Y. Oct. 10, 2007), the court noted that it was "unlikely that the moving defendants would, in fact, possess all the documents sought by plaintiff in the subpoenas."  In *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d 993, 998 (10th Cir. 1965) – an otherwise overruled case that preceded significant revisions to the discovery rules by decades – the *dicta* that "a person may not avoid a subpoena by saying that the evidence sought from him is obtainable from another" was followed by the observation that not all the evidence demanded there was so obtainable.  *Id.*

purported gaps are material, or that the SSEs could plug the gaps by turning over their own (likely imperfect) purchasing databases. To the contrary, the Parties recently explained:

> "[A]ll parties have accepted that they will perform their analyses on the large amount of data that has been produced, and that … the data provided is ***more than enough*** to create a ***viable model and to extrapolate*** regarding the period for which data is missing, if needed." 12-cv-311, Dkt. 1194, at 7.

In any event, imperfections in a database are not grounds for demanding production of a largely duplicative database from non-parties.  Damages models do not need to be perfect.  *See, e.g.*, *Falise v. Am. Tobacco Co.*, 258 F. Supp. 2d 63, 67 (E.D.N.Y. 2000) ("[m]odels are not the real world; rather, such models are a reasoned and educated attempt to describe reality … The process is not like a Pythagorean demonstration of a mathematical truth that can be revealed indisputably"); *see also CRT,* 2013 WL 5428139, at *9 ("it is simply wrong to say that an expert's analysis is inadmissible unless it analyzes every sale at the transaction level"). Perceived gaps in data only matter if they give rise to "seriously biased results."  *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5765415, at *12-14 (E.D. Pa. 2015); Ex. 19 at ¶ 15. There is no evidence, or claim, that this is the case here.

## 2.    OEM Part Numbers[18]

The Parties argue that they lack OEM part numbers, which they say they need to trace each component part as it travels from the plant to the driveway.  P. Br. 17, 30.  As explained below, there is ***no*** need for such tracing, since that is not how damages models are normally constructed.  Moreover, the Parties already have OEM part numbers, as they generally appear on invoices or electronic transmittals the Defendants issue to get paid (and elsewhere).[19]  *See, e.g.,*

---

[18] See Requests 1(f), 1(m).

[19] Because the Parties do not speak to whether they actually possess OEM part numbers, they also do not claim that the OEMs are in a special position to compile that information for the Parties' benefit.  But even if that were the case, it would not warrant requiring the OEMs to undertake the burden of producing it.  *See OSB*, 2006 WL (Continued…)

Exs. 26 at ¶ 22 & n.4; 29 at ¶¶ 10, 20. The Parties have not submitted fact declarations to the
contrary. In any event, OEM part numbers are not necessary to determine which vehicles
contain the Defendants' parts. Defendants know which vehicles contain their parts because
when they bid for a specific RFQ, they are bidding to provide parts for a specific vehicle or
program. *Id.*

### 3. Non-Defendant Supplier Purchasing Data

The Parties next argue that they need purchasing data relating to non-Defendant
suppliers. P. Br. 8. Compelling such information requires a particularized showing of relevance.
*See OSB*, 2006 WL 8403357, at *3 (quashing request for "Lowe's purchase of OSB from various
vendors" because "Plaintiffs have not established that information regarding vendors who are not
defendants in the underlying action would be relevant to the lawsuit").

As the SSEs (and now Dr. McDonald) have explained, non-defendant supplier data
cannot be used as a yardstick to estimate damages because any conspiracy would also inflate
their prices. Ex. 9 at 4 n.6; Ex. 11 at 9; Ex. 19 at ¶¶ 31-33. Courts recognize that where
defendants dominate the market, the prices of conspiring suppliers can create an "umbrella" that
infects the prices of non-conspiring suppliers. *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148,
1166 (5th Cir. 1979). Thus, most courts preclude damages theories that require analysis of the
impact of a conspiracy on non-conspirator prices. *See In re Petroleum Prods Antitrust Litig.*,
691 F.2d 1335 (9th Cir. 1982), *Mid–West Paper Prods. Co. v. Continental Group Inc.*, 596 F.2d
573 (3d Cir. 1979); *F.T.C. v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999).[20]

---

8403357, at *3 (the fact that a non-party's "information may be in ***preferred format*** for the Plaintiffs … does not
[alone] justify transfer of expense to a third party.").

[20] Plaintiffs cite *In re Processed Egg Products Antitrust Litig.*, 2015 WL 7067790, at *23 (E.D. Pa. 2015), for the
unremarkable proposition that economists use "benchmarks." *See* P. Br. 16. But this does not mean that it is
appropriate to use non-conspiring suppliers operating in the *same* market as a benchmark. Indeed, in *Eggs*, the
(Continued…)

Of note, the Parties have not demonstrated, via economist affidavit or otherwise, that they intend to create a "non-conspirator based" yardstick model. But if they wanted to try, certain Offering SSEs have offered to provide non-Defendant purchasing information. Ex. 11 at 10. The Parties acknowledge this offer, but quibble with whether the Parties or those Offering SSEs should be tasked with identifying the non-Defendant suppliers that must be researched. P. Br. 10. For many SSEs, it would take hundreds of hours of work to generate a list of non-Defendant entities. *E.g.* Ex. 29 at ¶ 15. Meanwhile, Defendants' business people likely know who their competitors are off the top of their head. *Id.* at ¶ 17. It is not too much to ask them to tell us.

### 4. External RFQ Information and Sales Agreements[21]

The Parties contend that they need custodian and database information relating to each RFQ. But because the Defendants necessarily have information about the RFQs in which they participated, they necessarily know which models were subject to the RFQ, the RFQ's terms, information in the RFQ bid package, their responses to the RFQ, communications they had with an OEM related to the RFQ, and for winning bidders, any letters of intent, agreements, and subsequent price adjustments. Because the Defendants dominate their respective markets, they have likely been invited to participate in all or almost all relevant RFQs. And because the DOJ investigations centered on the same bidding activities at issue here, these materials would certainly be encompassed in the "over **16 million** pages of documents" Defendants have already

---

defendants argued that customers on a cost-plus contract would be immune from the effects of the conspiracy. The Court rejected this argument because the conspiracy "likely became 'baked into' [the contract ] prices," thus "artificially inflat[ing] baseline pricing." *Id.* As Dr. McDonald explains, the conspiracies' effects are likely baked into the prices charged by non-conspiring suppliers who participate in the same markets. Ex. 19 at ¶¶ 31-33.

[21] *See* Request 1(g)(1) (RFQ name); 1(g)(2) (OEM name); 1(g)(3) (RFQ part description); 1(g)(5) (RFQ model); 1(g)(6) (RFQ instructions); 1(g)(7) (RFQ terms); 1(g)(8) (RFQ responses); 1(g)(9) (engineering services provided by the supplier); 1(g)(12) (VE price or VA price); 1(g)(13) (revised bids); 1(g)(14) (dates of supplier meetings); 1(g)(15) (winning bidder); 1(g)(16) (letters of intent); 1(g)(18) (post-award adjustments).

produced.  *See* 12-cv-102, Dkt. 331 at 2.  Thus, the Parties have sufficient information about each significant RFQ at issue in the case.  *See OSB*, 2006 WL 8403357, at *3.

The Defendants do not deny that they have all or almost all of this information, choosing instead to remain silent on the issue.  *See* P. Br. 15-16.  Without professing to have looked through the Defendants' RFQ-related data, Plaintiffs rely on a claim that an unnamed Defendant or Defendants admitted that "they are not in possession of a full dataset."  *See id.* at 18.  But again they do not identify any actual gaps or explain why those gaps would undermine their ability to prove their case.  Indeed, RFQ information has nothing to do with the issue of pass-through.  And the fact that the direct purchaser plaintiffs have not sought it strongly supports the sufficiency of the existing record for purposes of proving the initial overcharge.

### 5.    Internal OEM RFQ Evaluations[22]

The Parties also seek a massive custodian search of all documents relating to the internal evaluation of component pricing for each of the 59 relevant components categories.  Given the number of buyers over the last 20 years, this search could involve scores, or potentially hundreds, of custodians from many of the SSEs.  Yet there is no need for ***any*** of this information.

Internal evaluation material is extremely sensitive and irrelevant to the issue of pass-through.  It is also irrelevant to whether the Defendants conspired to fix prices, or the scope of the conspiracy.  As conspirators, that is information uniquely in the Defendants' possession.  Nor would internal evaluation material bear on the amount of the overcharge.  In proving damages, economists rely on data, not custodian searches of RFQ evaluation materials.

---

[22] *See* Requests 1(g)(6) (bid evaluation documents); 1(g)(9) (cost models), 1(g)(11) (target prices); 1(g)(17) (RFQ summaries); 1(g)(19) (pricing studies); 1(l) (non-RFQ methods of procurement); 14(c) (evaluation of RFQs); 15 (cost analyses); 28 (analysis of pricing or RFQ responses); 33 (comparisons of different component suppliers).

The Defendants offer only two reasons why such materials may have some relevance. *First*, they argue that internal target prices or cost models could be used to show that the OEMs were unaffected.  This is unnecessary because what matters is the price at which the RFQ was awarded relative to the "competitive" price, not an internally-set "target" price.  The competitive price can be above or below the target.  And because the target price is often influenced by historical prices, it too may be infected by long-running conspiracy.  *E.g.* Ex. 29 at ¶ 26.

*Second*, Defendants assert that these materials will show why one supplier was chosen over another.  But the Defendants' own documents will also contain an extensive discussion – indeed, often a play-by-play – of the RFQ process.  There is no need to impose the burden of searching hundreds of custodians for such marginally-relevant information.[23]

## B.     The Downstream Sales Requests Are Unnecessary and Incredibly Burdensome.

Pointing to their need to establish pass-through, the Parties seek information that is downstream from the actual purchase of the price-fixed components.  Specifically, they seek three broad categories of information in order to: (i) trace the component as it travels through the vehicle manufacturing and retail distribution chain; (ii) analyze exogenous factors that may influence vehicle pricing, whether or not related to the cartelized components; and (iii) consider the factors that may affect the dealers' negotiations with consumers.  This downstream discovery is unnecessary, duplicative, or cumulative of the record, incredibly burdensome to compile, and highly commercially sensitive.

---

[23] The Parties include Request 4(h) in their footnote identifying the requests seeking discovery of "parts purchases." To the extent Request 4(h) seeks information about the parts at issue, that information is fully covered by the other requests.  To the extent it seeks information about components that are ***not at issue in this case*** (or other unrelated "costs"), the request is facially overbroad, beyond the scope of this case, and wholly irrelevant.

1. **Information Supposedly Needed to Trace the Part through the Manufacturing and Retail Chains to the Ultimate Customer**[24]

The Defendants and the End-Payors envision creating a damages model that takes each individual cartelized component, traces it through the vehicle manufacturing and retail distribution chains, matches it with every factor that may influence prices or costs at every step along the way, and spits out a pass-through rate for every part in every vehicle sitting in every driveway, garage, or parking lot in America. That is neither realistic nor necessary.

Downstream information is relevant for one purpose: estimating pass-through from the OEM to the dealer, and then to the customer. *See In re Air Cargo Ship Servs. Antitrust Litig.*, 2010 WL 4916723, *2 (E.D.N.Y. 2010) (information relating to a "purchaser's prices, sales, costs, and profits" are presumptively "irrelevant and therefore beyond the scope of permissible discovery" as they do not speak to whether a direct purchaser was overcharged). But estimating pass-through does not require tracing the actual component through the manufacturing and retail distribution chains. As Dr. McDonald explains, where multiple components are used to produce a finished good, proving pass-through just requires estimating the relationship between price and *gross* cost. Ex. 19 at ¶¶ 20-21.[25] Once this is known, determining damages simply requires multiplying the part-specific initial overcharge times the *generic* pass-through rate.[26]

---

[24] This relates to Requests: 1(f) (tracking information), 4(a)(2) (VIN identifier information), 4(h) (detailed component, labor, and other costs), 4(j) (OEM profits and financial statements).

[25] As discussed below, the SSEs strongly oppose producing gross cost data because it is **extremely** commercially sensitive. Fed. R. Civ. P. 45(d)(3)(B)(i). Proxies, based on publicly available information, ought to suffice. *Vitamins*, 198 F.R.D. at 299-300 (denying motion to compel direct purchaser data where party failed to show "publicly available data and sales data [from] defendants" was insufficient); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1368 (N.D. Ga. 2000) (the law "does not support the proposition that econometricians who wish to testify as experts in federal court must choose firm-specific data over industry-wide indices when such data is available"). In any event, because the Parties have refused to engage in any discussion concerning their *actual* needs for information, this Court should not require production of this information.

[26] Technically, an indirect purchaser's damages is governed by the following equation: $D_{part} = Overcharge_{part} * PassthroughRate$. The $PassthroughRate$ is not part-specific, but rather involves a (Continued…)

Detailed downstream information is not needed. As the *Flat Panel LCD* court explained, "[p]laintiffs need not identify the overcharge on each and every panel sold to direct purchase, and they need not trace that specific overcharge through the manufacturing and retail chains to the ultimate purchaser." *Flat Panel*, 2012 WL 555090, at *4. The Dealer Plaintiffs acknowledge this, as they seek just a "narrower subset" of "basic" information, none of which relates to parts tracing. P. Br. 24. Though the Defendants and End-Payors argue otherwise, they have not submitted an expert declaration as support.

Even if such information were relevant, using part numbers to trace a specific part through the manufacturing and retail chains is infeasible. *See* Ex. 19 at ¶ 22. It would be like conducting a massive recall for each and every part at issue, when even one recall entails great effort. Ex. 29 at ¶ 8. Each OEM would have to research multiple systems that were never intended to operate together, and then manually investigate which vehicles used which part numbers. Ex. 26 at ¶¶ 15-18; 32 at ¶¶ 13-17, 21; 49 at ¶¶ 9-10. *Id.* In contrast, if the Defendants really wanted to trace parts from warehouse to consumer, their own knowledge of the models for which they are bidding suffices.

## 2. Downstream Vehicle Pricing Information Unrelated to Component Pricing

The Parties also seek microscopic detail concerning the relationships between OEMs, distributors, and dealers. But the phrase "pass-through" is not a talisman for unlimited downstream discovery. *Vitamins* is again instructive. There, defendants sought "downstream data" to evaluate "the amount of overcharges passed on by the direct purchasers to the indirect purchasers." *Vitamins*, 198 F.R.D. at 299. The court observed that "no court has **ever** allowed

---

general estimate of the relationship between gross manufacturing cost and prices. None of the downstream tracing information the Parties seek is relevant to any of these parameters.

production of individualized downstream data and certainly there are other antitrust cases in which direct and indirect purchasers were named together as parties." *Id.* at 301. Thus, "the proposition that there are indirect purchasers in this case … is not sufficient to carry defendants' burden of showing that that the information ought to be produced." *Id.*

The presumptive non-discoverability of downstream information flows directly from the need to maintain the manageability of indirect purchaser cases. In *Hanover Shoe*, the Supreme Court rejected indirect purchaser claims under federal law largely because of concerns about manageability. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). Federal courts may still entertain state-law indirect purchaser class claims, but only if they are manageable. Fed. R. Civ. P. 23(b)(3). Where pass-through can be estimated from public sources or party evidence, this requirement may be met. But if that information is not sufficient because plaintiffs need to prove *individual* damages, there should be no class. Either way, there is no need to force third-parties to fill any downstream informational void. *See Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 505 (N.D. Cal. 2008) (case is "unmanageable and unsuitable for class action treatment" if "the only way to fully assess pass-through … [is] to conduct a wholesaler-by-wholesaler and reseller-by-reseller investigation.").[27]

---

[27] The cases that the Parties cite do not support their contention that non-party discovery ought to be broad in indirect purchaser cases. P. Br. 22-23. In *In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *59 (N.D. Ohio 2014), the indirect plaintiffs received a tiny amount of data from retailers – "35,000 useable observations of the *[retail] prices paid*," which is basic transactional data, not sensitive, detailed internal data. In *In re TFT-LCD (Flat Panel) Antitrust Litig.* 267 F.R.D. 583, 602-03 (N.D. Cal. 2010), the indirect plaintiffs' expert conducted "pass-through studies" using "transaction data produced by some *defendants*" and "price data from … a third-party *market research firm*." No mention is made of more sensitive data from non-party OEMs. In *CRT*, the indirect plaintiffs' expert's "pass-through studies" were built on "transaction-level data" from third parties. In prior briefing discussing these very cases, the EPPs correctly observed that "while discovery was taken of certain intermediaries in the sales chains, *nearly all of those entities were parties* to the actions. In addition, the discovery of those intermediaries was generally on a *macro level – not individual transaction level*…" 12-cv-103, Dkt. 386 at 3 (distinguishing *CRT* and *Flat Panel*). Finally, in *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613-14 (N.D. Cal. 2009), the defendants not only conceded that tracing components through OEMs' bills of materials was "not accurate," the court held that plaintiffs' "structural model can be used regardless of whether component cost information is available" and that the economist's "use of averaged and aggregated data is (Continued…)

Even if it were relevant, the Parties have downstream information from the 40 dealer
plaintiffs and other non-parties, which comprises every element of the OEM/distributor/dealer
relationship.  Absent a showing of insufficiency, discovery is rightly denied.  *See In re
Photochromic Lens Antitrust Litig.*, 279 F.R.D. 620, 625 (M.D. Fla. 2012) (denying downstream
discovery where parties failed to explain "why discovery from the Indirect Purchaser Plaintiffs is
insufficient"); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 555 (E.D. Tenn.
2013) (denying downstream discovery where defendants and indirect purchasers had this
information or could "obtain" a sufficient proxy from quasi-public sources).[28]

      a.    <u>Ancillary Information Relating to the Financial Relationship
Between the OEM and the Dealer</u>

The Defendants and End-Payors demand virtually all information concerning the
multifaceted relationship between each OEM or distributor and its dealers, hardly any of which
deals with vehicle prices and none of which deals with component prices.  For example, they
seek information relating to fuel allowances, floor-plan assistance, dealer inspections,
advertising, and growth incentive programs.  The Dealer plaintiffs – those with the closest
connection with OEM and distributors – recognize the irrelevance of this information.  They
seek only a "narrower subset" of it relating to "basic purchasing information."  P. Br. 24.

---

not fatal to" the models. This is consistent with the SSEs' declarations, which note that (i) tracing is unnecessary;
and (ii) if it were, the Defendants have sufficient information about vehicles that incorporate their parts.

[28] The End-Payors argue that, for vehicles financed by an OEM, they just "seek" a database that contains "costs of
vehicles, the dealer invoice, the MSRP and final sales price, *all in one, matched dataset*."  P. Br. 24 (emphasis in
original).  There is no such magical database. *E.g.* Exs. 56 at ¶ 6; 72 at ¶ 4. Nor does Rule 45 require non-parties to
create such a database for the Parties' benefit, especially given it's the infeasibility of doing so and lack of utility of
any such database.  Most importantly, if the End-Payors really wanted such a database, they can construct one from
the Defendants' purchasing data and the Dealer plaintiffs' transactional records.  *See Travelers Indem. Co. v. Metro
Life Ins. Co.*, 228 F.R.D. 111, 114 (D. Conn. 2005) ("onus' is on the party to create database from available
information even if doing so would be a "very burdensome task" and non-party could create it more easily).

The Defendants and End-Payors offer no reason for their broader demands beyond the conclusory assertion that it is "important to determining whether any overcharges … affected … Dealers and End-Payors."  *Id.* at 20.  Aside from the insufficiency of their showing, these Parties misunderstand how regressions work.  As Dr. McDonald explains, the need to control for a factor in a damages estimate involves an econometric concept called "omitted variable bias."  As its name suggests, omitting a variable – such as floor-plan assistance – is not a problem unless it is likely to *bias* the estimate of pass-through.  But an omitted variable only causes bias if a strict *dual* correlation condition is met:  correlation with (i) the variable of interest (here gross cost) ***and*** (ii) the dependent variable (MSRP or vehicle pricing).  Ex. 19 at ¶ 12.

Here, none of the ancillary information the Parties seek has the potential to bias the pass-through estimate.  As the SSEs' declarations make clear, dealers provide many services, and OEMs and distributors provide many financial benefits to incentivize or partially subsidize these services.  But none of these relate to, or rise or fall with, cost.  Thus, such information does not need to be included in a pass-through regression.

The cases cited by the Parties do not support their contention that such information is discoverable here.  *See* P. Br. 20-21 (citing *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1331 (6th Cir. 1983) and *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 2015 WL 6181748 (D. Del. 2015)).  Neither concerned price fixing, pass-through, or even discovery disputes.  But more critically, in each case, the information sought was inextricably linked to the alleged violation.  Specifically, in *Bouldis*, the plaintiff alleged that the defendant unlawfully ***tied*** together motorcycle sales and credit.  Obviously, credit information would be relevant there.  In *Class 8*, the plaintiff alleged that the defendant used large rebates to exclude a rival.  Obviously, rebate information would be relevant there.  Here, the Parties only seek ancillary information to

control for *exogenous* variables, not because any of that information was targeted by, or bound up in, the alleged conspiracies.[29]

> b.  Vehicle Pricing Information[30]

The Parties claim to need OEM records to estimate pass-through because they contain "not only the invoice price, but also information regarding price adjustments, discounts, holdbacks, incentives, and financing costs."  P. Br. 20.  But they have all, or almost all, of the information they could want concerning MSRP, invoice pricing, and other vehicle pricing information because the 40 Dealer plaintiffs – and a number of non-party Dealer Management System providers – have produced this information.

Although the Parties did not disclose this in their brief, they have entered into two Stipulations to ensure that the Dealer plaintiffs provide all potentially relevant information about their transactions.  12-cv-102, Dkts. 251, 310.  In announcing the second stipulation, the Dealer plaintiffs informed the Court that "the stipulation that you … see today provides [the Defendants] with all – over 200 fields of transactional information, basically everything they have asked from us."  12-md-2311, Dkt. 965 at 18.  In September, the Special Master ordered the Dealers to further supplement this database with "data for any fields in any of the 43 datasets that did not contain data, covering all brands sold by any particular dealer."  12-cv-102, Dkt. 384 at 9, 12-cv-102, Dkt. 374 at 2-4.  The Parties now have information concerning at least the following brands, which cover virtually all of the SSEs.

---

[29] Defendants also misplace reliance on the *Eggs* case.  *See* P. Br. 15.  That case did not involve a discovery dispute. The court simply noted that the plaintiffs' model controlled for "various exogenous factors."  *Eggs,* 2015 WL 7067790, at \*14.  Those "exogenous factors," however, related to the ***defendants'*** own costs (not their customers' costs) and came from an analysis of the "***Defendants' transactional data''*** (not non-public, non-party data).  *Id.* In any event, exogenous factors only need to be included if their omission results in bias, which is not the case here.

[30] This relates to Request 4(a).

| Brand | MSRP Prices | Invoice Prices | Other (Irrelevant) Pricing Information |
|---|---|---|---|
| **GM Entities** (Buick, Cadillac, Chevrolet, GM, Hummer, Pontiac, Oldsmobile) | ✓ | ✓ | ✓ |
| **Ford Entities** (Ford, Mercury, Plymouth) | ✓ | ✓ | ✓ |
| **Chrysler Entities** (Chrysler, Fiat, Dodge, Jeep, Ram) | ✓ | ✓ | ✓ |
| **Toyota Entities** (Toyota, Scion, Lexis) | ✓ | ✓ | ✓ |
| **Honda Entities** (Honda, Acura) | ✓ | ✓ | ✓ |
| **Nissan Entities** (Nissan, Infiniti) | ✓ | ✓ | ✓ |
| **Hyundai/Kia Entities** | ✓ | ✓ | ✓ |
| **Suzuki Entities** | ✓ | ✓ | ✓ |
| **BMW Entities** (BMW, MINI) | ✓ | ✓ | ✓ |
| **Daimler/Mercedes Entities** | ✓ | ✓ | ✓ |
| **Volvo** | ✓ | ✓ | ✓ |
| **Volkswagen Entities** (VW, Audi, Porsche) | ✓ | ✓ | ✓ |

As SSE declarations explain, given dealer franchise laws, MSRP and invoice prices are common for given vehicles throughout the United States. *E.g.* Exs. 44 at ¶ 6; 70 at ¶ 7. As the declarations further show, MSRP is the starting point for setting invoice prices, and most other price-related terms (such as dealer incentives, holdbacks, etc.) are either not model specific or are unrelated to component costs. *E.g.* Exs. 32 at ¶ 24; 45 at ¶ 5; 55 at ¶¶ 5, 28; 66 at ¶ 3; 75 at ¶ 21. Thus, once the Parties have information about a given make and model from one dealer, they have sufficient information to conduct a pass-through analysis for that make and model for all dealers nationwide. Ex. 19 at ¶ 43. In any event, if any information is missing, the Offering

SSEs proposed to produce a schedule of MSRPs, the detail of which would be negotiated with the Parties during the meet-and-confer.[31]

                c.    <u>"Soft" Information Concerning Factors Unrelated to the Component Pricing</u>

The Parties also seek custodian information concerning dealer prices and pricing strategy. For example, Request 22 seeks all pricing communications sent to the dealers. But the Dealer Plaintiffs would have received those. The information in those communications would also be captured in the Dealers' pricing data. Similarly, the Parties seek pricing strategy information, perhaps in hopes of finding some document that speculates on the relationship between a piece of rubber, for example, and the price of vehicles. As noted, the Parties' suggestion that they can trace a cartelized component through the manufacturing and retail chains is fanciful. But if there were a connection, it would show up in the pricing data the Parties have. Thus, there is no need for the OEMs to undertake a massive custodian search for pricing strategies spanning 20 years.

        **3.**      **Downstream Dealer Pricing Information Unrelated to Component Pricing**[32]

This case also involves pass-through from the dealers to the consumer. The Defendants argue that they are entitled to information that bears on the dealers' prices to consumers. As an initial matter, the indirect purchasers have disclaimed the need for such data, noting that "downstream discovery is not relevant" because the "allocation proceeding" eliminates the possibility of "duplicative recovery" from the Defendants. 12-cv-102, Dkt. 196 at 1-4. Because the Defendants have no dog in the fight as to how an overcharge is *allocated* between two levels

---

[31] MSRPs are responsive to Requests 4(a)(3)(h), 5(e).

[32] This relates to Requests 4(b)(1) (retail purchaser info), 4(b)(2)(a) (MSRP and invoice price), 4(b)(2)(b) (net price), 4(b)(2)(c) (price adjustments, including for trade-ins), 4(b)(2)(d) (financing terms), 4(b)(2)(e) (insurance and warranty info), 4(e) (other monetary considerations), 16 (studies about "street prices"), 34 (financing databases).

of indirect purchasers, the indirect purchasers' representation that they do not need this level of detail is sufficient to deny its production.

Moreover, as the Special Master is aware, the Auto Dealers use Dealer Management Systems that generally track information relating to transactions between dealers and end-consumers. Thus, these requests are not appropriately directed to the SSEs. And even if an SSE (indirectly) touches any aspect of the dealer/consumer transaction, there has been no showing that component prices are likely to affect such attenuated aspects of the consumer transaction.

Most importantly, the Parties already possess this information. The Subpoena seeks information relating to the "net sale price" paid by consumers to dealers, including trade-in values, financing, insurance, warranties, and other "monetary components" of transactions. As the Dealer productions cover over 30 brands and thousands of models, they should be sufficient.

As for the prices of *unrelated* products and services – like trade-ins, warranty services, insurance, or financing – such information is wholly unrelated to component costs, and thus irrelevant. In the party context, this Court has deemed such discovery "***irrelevant, not likely to lead to the discovery of relevant information***," and its production unduly "burdensome." 12-cv-102, Dkts. 338, 331, 352 (denying Defendants' requests for dealer "financing and promotional" information, "dealer purchasing information," "dealership budgets and cost guidelines," "dealer compensation, bonus, and fringe benefits," "vehicle gross profit, profit margin, operating profit margin, projected profit, net profit, profit-and-loss statements, and monthly and annual sales and financial reports provided to an OEM").

There is no reason to revisit that ruling. The Parties present no basis for asserting that the prices for vehicle insurance – which are governed by the insurance market, not, *e.g.,* the wire harness market – could be impacted by a cartel that increases the price of a wire connector. *See*

Ex. 11 at 12; Ex. 19 at ¶¶ 49-55.  The same is true of extended warranties (*i.e.*, repair insurance), financings and credit, trade-in value, etc., the prices for which are governed by their respective downstream markets, not the markets for upstream components.  *Id.*

The Parties do not claim otherwise.  Defendants alone speculate that if the overcharge was passed on to "two dealers," one might raise the price of the vehicle while the other may cook the books by offering a below-market price for the customer's trade-in.  P. Br. 26-27. Defendants further speculate that some dealers may play similar shell games with "floor plan financing" and other terms.  *Id.*  But they have not supported their speculation with evidence. This Court rejected a similar fishing expedition when it denied discovery into "Dealers' purchasing strategies" because it was "not likely to lead to the discovery of relevant information."  12-cv-102, Dkt. 214.  Moreover, the comprehensive *data* from over 40 Dealer Plaintiffs suffices to analyze supposed accounting differences among the dealers, if they exist.

### C.   Plaintiffs' Miscellaneous Requests Are Unnecessary, Irrelevant or Privileged.

The discussion above covers the bulk of the requests.  But two more requests were the subject of a separate motion to compel ("Certain Parties Motion to Compel" or "C.P. Br."), which we address in turn.

#### 1.   Request 27:  Government/Regulator Documents

Request 27 seeks all documents provided to "any regulatory or governmental authority" as "part of any investigation" relating to any of the parts at issue.  This request, therefore, covers documents relating to antitrust investigations by competition authorities, *and* documents concerning issues such as safety, the environment, fuel efficiency and other unrelated matters. As to non-DOJ documents, we assume this was a drafting mistake, since Plaintiffs' brief does not mention those.  As to DOJ documents, the Offering SSEs have proposed producing DOJ documents that would otherwise be responsive to the upstream and downstream information they

offered to produce, if the DOJ permits. Documents outside these parameters are unlikely to be relevant or necessary, given the record, and quite likely to be highly competitively sensitive. The Parties refused to discuss this offer and failed to make any counter-offer.[33]

### 2.    Request 31:  Settlement Documents

Request 31 deals with two categories of information:  internal settlement deliberations by the SSEs, and external communications with the Defendants and others.  Neither is discoverable.

#### a.    Internal Settlement Deliberation Documents

The Plaintiffs make no effort to conceal their desire to discover the "internal communications within each one of the SSEs regarding the [settlement] discussion SSEs had with Defendants." C.P. Br. 13.  They cite no case entitling them to such clearly privileged information.  Since attorneys would be involved in any such communications, this information would invariably be protected by the attorney-client privilege.  These communications, and associated analyses, are also non-discoverable core work product.  *See* Fed. R. Civ. P. 26(b)(3)(A) ("a party may not discover documents … prepared in anticipation of litigation.").

Moreover, even if those privileges did not apply, the Sixth Circuit recognizes a distinct "settlement privilege," even in the context of external communications.  *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 982-83 (6th Cir. 2003).  This "settlement

---

[33] To the extent that further production is required, the SSEs believe Request 27 should be limited to ordinary-course business documents, and not communications, witness statements, summaries, or other materials prepared specifically for any DOJ grand jury investigation.  Such investigations are entitled to secrecy and are immune from discovery.  *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1026-27 (D. Minn. 1997).  Consistent with this Court's prior order, the SSEs also believe Request 27 should be limited to information concerning Defendants who have pled guilty or been indicted. *See* 13-cv-2203, Dkt. 159, at 8 (quashing discovery from non-charged Defendant); Fed. R. Crim. P. 6(e) (protecting from disclosure grand jury materials related to uncharged parties and conduct).

privilege is … necessary" to avoid "undesirable results" and to further the "strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations." *Id.*[34]

Seeking to side-step the core protections applicable to *internal* deliberations, Plaintiffs address only the *Goodyear* settlement privilege applicable to *external* communications. But neither of their attempts to distinguish *Goodyear* is persuasive. *First*, they say that *Goodyear* only applies if the Defendants are liars, claiming *Goodyear* turned on a finding that "the statements at issue were likely to be untrue." C.P. Br. 13. *Goodyear* turned on no such thing. Thus, the space Plaintiffs devote to professing the honesty of Defendants they otherwise accuse of secret bid-rigging has no bearing on the privilege question. *Id.* *Second*, they argue that the settlement privilege does not apply because the SSEs have not yet filed a case. *Id.* But that is irrelevant as to *internal* communications, as Rule 26(b)(3) expressly protects documents prepared in "anticipation of litigation," and the attorney-client privilege applies regardless. As to external communications, the fact that SSEs are putative class members who will soon need to make opt-out decisions is sufficient to trigger the *Goodyear* protections.[35]

---

[34] The Plaintiffs suggest that because the Sixth Circuit stated that privileges "should be judged on a case-by-case basis and weighed against the public interest" that district courts should *re-weigh* a privilege against the public interest in every case presented. C.P. Br. 13 (quoting *Goodyear*). That is wrong. The Sixth Circuit has done that weighing and its holding applies across-the-board. *Goodyear*, 332 F.3d at 908 ("we believe *a* settlement privilege serves a sufficiently important public interest, and therefore should be recognized"). As another court explained, "[t]he quoted language from *Goodyear Tire* is referring to the recognition of *new* privileges, not the construction of *existing* ones." *Richmond Health Facilities-Madison, LP v. Clouse*, 473 S.W.3d 79, 90 (Ky. 2015).

[35] Plaintiffs misplace reliance on *State v. Little River Band of Ottawa Indians*, 2007 WL 851282, at *2 (W.D. Mich. 2007). *First*, that case did not involve internal deliberations. *Second*, the communications did not relate to absent class members' participation in putative class actions that had already been filed. Thus, in the unlikely event that the Sixth Circuit were to dispense with the well-settled "anticipation of litigation" standard for purposes of "settlement privilege," the *Little River* standard would be satisfied here. Finally, that case concerned a letter sent to the Governor of Michigan, with no indicia of settlement negotiations or litigation attached to it; here, the request specifically seeks settlement materials involving actual absent class members (and potential opt-outs) in a *pending* case.

b.      External Settlement Communication Documents

Request 31 also seeks two categories of external communications.  *First*, it seeks documents the Defendants provided to the SSEs in an effort to settle the case.  Such documents are covered by the *Goodyear* settlement privilege.  But even if they were not, the "Defendants in this litigation have agreed to produce documents in response" to an identical request.  C.P. Br. 11-12.  Thus, if Plaintiffs want to know "how the Defendants explained the conspiracy to their major customers," they only need to review those documents.  *Id*.  The Plaintiffs' only argument for requiring production of the same from the SSEs is that there may be documents the Defendants "did not retain."  *Id*.  But unfounded speculation of spoliation is not a basis for duplicative discovery from the SSEs.

*Second*, Request 31 seeks communications about the case between the SSEs and non-Defendant suppliers.  Such information is not relevant, if it even exists.  Gossip about this case has no bearing on the truth or falsity of any allegation.  *Chevron Corp. v. Snaider*, 78 F. Supp. 3d 1327, 1345 (D. Colo. 2015) (non-party communications about, but "not linked" to, the case "constitute pure fishing expeditions"); *Goodyear*, 332 F.3d at 982-83 (settlement "negotiation communications" are legally "irrelevant").

## VI.  IN THE ALTERNATIVE, THE COURT SHOULD SHARPLY LIMIT THE SCOPE OF ANY SEARCH ORDERED, ACCESS TO THE MATERIALS PRODUCED, AND EXPENSE THE SSEs MUST BEAR

The SSEs' declarations confirm the obvious: compliance with the Subpoena, where possible, would impose a staggering burden and great expense on the SSEs, and place their highly confidential information in jeopardy.  Accordingly, if the Court grants the Parties' motion in any respect, the Court should order a further meet and confer to work out the details.  Compliance should also be limited to the collection, review, and production of reasonably accessible materials from a discrete universe of locations and/or individuals, and from only those

SSEs who have documents and data that are truly necessary. Appropriate security measures, to be negotiated by the Parties and SSEs and approved by the Court, should be required. In addition, the costs of compliance should be shifted onto the Parties.

Rule 45 requires serving parties "to avoid imposing undue … expense" on a complying entity, and directs courts "to protect" such entities "from significant expense resulting from the inspection, copying, testing, or sampling commanded." Fed. R. Civ. P. 45(d). In this day and age, the first step in limiting expense is the restricting of production to reasonably accessible ESI. The 2006 amendments to Rule 45 make this the default. *See* Fed. R. Civ. P. 45, comments to 2006 amendments ("Rule 45(d)(1)(D) is added to provide that the responding person need not provide discovery of electronically stored information from sources the party identifies as not reasonably accessible unless the court orders such discovery for good cause.").

"Old" data, like much of what is demanded here, is presumptively "not reasonably accessible." *Kleen Prods., LLC v. Packaging Corp. of Am.*, 2012 WL 4498465 at *18 (N. D. Ill. 2012) ("Courts generally agree that backup tapes are presumptively inaccessible."). Even where parties "offer to bear the costs of production," courts have "quashed subpoenas requesting data on backup tapes, characterizing the restoration … as an undue burden." The Sedona Conference, "Commentary on Non-Party Production & Rule 45 Subpoenas" (April 2008).

Non-transactional documents impose an equal, if not greater burden than transactional documents, as they are frequently not centralized and, if available, require location-by-location search and retrieval. The sheer amount of non-transactional documents sought, over a time period that itself experienced ever-shifting technological change as to networks and storage make the search for these materials extraordinarily burdensome. The DOJ undertook the work of proving an agreement among Defendants, which, in the context of hard-core price fixing, is all

that is needed to show liability. Thus, the analyses the Parties need to conduct are almost exclusively empirical, leaving little or no role for non-transactional documents to play.

Paper documents impose their own unique burdens. These are frequently off-loaded to warehouses, so searching can impose physical strain on complying parties, in addition to hassle and expense. Even when they reside on-site, compliance can require the search of drawers, filing cabinets, desks, closets, central files, and more. There is often no rhyme or reason explaining what one employee saves (*e.g.* everything) versus another (*e.g.* nothing). Once collected, the documents have to be boxed, shipped to a vendor, scanned, OCR'd, shipped back to corporate headquarters, unpacked, and placed in their original locations, on a document-by-document basis. Once OCR'd, they will have to be processed and reviewed for responsiveness. As these documents will often duplicate electronic versions, and because, as noted, they are unlikely to play a role in the analyses of liability or damages, there is no reason for them to be searched.

In addition, as we have emphasized, the database of industry-wide trade secrets the Parties contemplate constructing presents grave dangers to the well-being of the SSEs. The Federal Rules direct courts to issue orders "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specific way." Fed. R. Civ. P. 26(c)(1)(G). The typical "trade secret" or "confidential" material is multiplied here by the number of entities, and then multiplied again because it could allow for the misuse of information against an industry, versus a firm, or firms. In such cases, the extreme sensitivity of the information supports quashing a subpoena on sensitivity grounds alone. *See In re Dom. Drywall Antitrust Litig.*, 300 F.R.D. 234, 246 (E.D. Pa. 2014) ("a nonparty may hold such a strong interest in withholding certain material that a court will not compel the nonparty to comply with a subpoena, even when a strong need for the information has been demonstrated")

(quashing, in part, non-party subpoena on this ground); *Vitamins*, 267 F. Supp. 2d at 739, 741-42 (quashing requests for "unit-by-unit" costs and details, which "constitutes trade secrets, and [] these trade secrets are the lifeblood of [non-party's] financial well-being").

If the Court orders production of highly sensitive materials, it should recognize that it is doing so in an environment in which companies that may reasonably be presumed to be as or more secure than the typical law firm or economics house – like banks, or tech firms – have been victimized by sophisticated hackers.   Protective Orders do not help in such scenarios. Accordingly, new security measures should be required.  These should include, at a minimum, the review and approval of security protocols by a security firm unaffiliated with the Parties, strict limitations on access to the most sensitive data to one approved person per party, logs reflecting access to the materials, the review and approval of any materials containing SSE data that may be placed on the public record, and sanctions for the violation of these protocols.

Finally, the Parties should reimburse all costs and fees for compliance to the SSEs.  Their main complaint about this has been that the SSEs have not presented individualized bills of particulars for their review and approval.  But the Subpoena breaks new ground; no SSE is aware of a Subpoena that has required such coordination, analyses, and expense. Although many SSE declarants present estimates of the time and expense compliance would require, it would be unfair to require them to bear it without some certainty regarding reimbursement.  Accordingly, the right result would be an order requiring the Parties to cover 100% of compliance.  If – contrary to all indications – the information the Parties seek is so valuable to them, they should be willing to pay for the full costs of retrieval.  Their reluctance to do is itself telling, but it is no excuse for avoiding the reimbursement obligations that Rule 45 imposes on them.

## VII.   CONCLUSION

For the foregoing reasons, the Parties' motions to compel should be denied.

Dated: February 19, 2016    Respectfully submitted:

## On Behalf of the Chrysler Entities

/s *Cheryl A. Bush*
Cheryl A. Bush (P73031)
Susan McKeever (P73533)
BUSH SEYFERTH & PAIGE PLLC
3001 W. Big Beaver Road, Suite 600
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com

/s *Colin R. Kass*
Colin R. Kass (admission pending)
Scott M. Abeles (admission pending)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416.6800
ckass@proskauer.com
sabeles@proskauer.com

David A. Munkittrick
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969.3000
dmunkittrick@proskauer.com

*Attorneys for FCA US LLC and Fiat Chrysler Finance North America, Inc.*

## On Behalf of the BMW Entities

/s *Richard E. Kruger*
Richard E. Kruger (P57142)
JAFFE, RAITT, HEUER & WEISS, P.C.
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351.3000
rkruger@jaffelaw.com

/s *Daniel S. Savrin*
Daniel S. Savrin
Nathaniel Bruhn
MORGAN LEWIS
One Federal Street
Boston, MA 02110-1726
(617) 951.8674
daniel.savrin@morganlewis.com
nathaniel.bruhn@morganlewis.com

*Attorneys for BMW of North America, LLC; BMW Manufacturing Co., LLC; BMW Financial Services NA, LLC; BMW (US) Holding Corp.; BMW Bank of North America; BMW Insurance Agency, Inc.; BMW US Capital, LLC; and Designworks/USA, Inc.*

**On Behalf of the Daimler Entities**

/s *Dominic Surprenant*
Dominic Surprenant
Nithin Kumar
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443.3000
dominicsurprenant@quinnemanuel.com

*Attorneys for Daimler North America Corp. (MI); Daimler North America Corp. (NJ); Daimler Purchasing Coordination Corp.; Daimler Trucks North America LLC; Daimler Vans Manufacturing, LLC; Daimler Vans USA LLC; Freightliner Custom Chassis Corp.; Mercedes-Benz Advanced Design of North America Inc.; Mercedes-Benz Credit Corp.; Mercedes- Benz Financial Services USA LLC; Mercedes- Benz Research & Development North America, Inc. (CA); Mercedes-Benz Research & Development North America, Inc. (MI); Mercedes-Benz U.S. International, Inc.; Mercedes- Benz USA, LLC; Mitsubishi Fuso Truck of America, Inc.; Thomas Built Buses, Inc.; and Western Star Trucks Sales, Inc.*

**On Behalf of the GM Entities**

/s *Stephen R. Neuwirth*
Stephen R. Neuwirth
Adam B. Wolfson
Richard Vagas
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
stephenneuwirth@quinnemanuel.com

*Attorneys for General Motors Company; General Motors Financial Company, Inc.; General Motors Holdings LLC; and General Motors LLC*

**On Behalf of the Hino Entity**

/s *S. Thomas Wienner*
S. Thomas Wienner (P29233)
WIENNER & GOULD, P.C.
950 W. University Dr., Ste. 350
Rochester, MI  48307
(248) 841.9400
twienner@wiennergould.com

*Attorneys for Hino Motors Manufacturing U.S.A., Inc.*

**On Behalf of the Honda Entities**

/s *Daniel Purcell*
Daniel Purcell
Justina Sessions
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA  94111-1809
(415) 676.2293
dpurcell@kvn.com
jsessions@kvn.com

*Attorneys for American Honda Motor Co., Inc.; American Honda Finance Corp.; Honda
Manufacturing of Indiana, LLC; Honda North America, Inc.; Honda of America Mfg., Inc.;
Honda of South Carolina Mfg., Inc.; Honda Precision Parts of Georgia, LLC; Honda R&D
Americas, Inc.; Honda Research Institute USA, Inc.; and Honda Transmission Manufacturing of
America, Inc.*

**On Behalf of the Hyundai/Kia Entities**

/s *Meredith Jones Kingsley*
Meredith Jones Kingsley
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-4793
meredith.kingsley@alston.com

*Attorney for Hyundai Motor Manufacturing
Alabama, LLC; Hyundai America Technical
Center, Inc.; and Kia Motors Manufacturing
Georgia, Inc.*

/s *Shon Morgan*
Shon Morgan
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
shonmorgan@quinnemanuel.com

*Attorneys for Hyundai Motor America; and
Hyundai AutoEver America, LLC*

/s *Susan R. Peck*
Susan R. Peck (Application for Admission
Submitted and Pending)
Jessica Avery (Application for Admission
Submitted and Pending)
LEE, HONG, DEGERMAN, KANG & WAIMEY
3501 Jamboree Road, Suite 6000
Newport Beach, California 92660
(949) 250-9954
susan.peck@lhlaw.com

*Attorneys for Kia Motors America, Inc.; and Hyundai Capital America*

**On Behalf of the Jaguar Land Rover Entity**

/s *Daniel S. Savrin*
Daniel S. Savrin
Nathaniel Bruhn
MORGAN LEWIS
One Federal Street
Boston, MA  02110-1726
(617) 951.8674
daniel.savrin@morganlewis.com
nathaniel.bruhn@morganlewis.com

*Attorneys for Jaguar Land Rover North America, LLC*

**On Behalf of the Mitsubishi Entities**

/s *Elizabeth A. McNellie*
Elizabeth A. McNellie
Robert J. Tucker (co-signing under L.R. 83.20)
BAKER & HOSTETLER LLP
65 East State Street, Suite 2100
Columbus, OH 43215
(614) 228.1541
emcnellie@bakerlaw.com
rtucker@bakerlaw.com

*Attorneys for Mitsubishi Motors North America, Inc.; Mitsubishi Motors Credit of America, Inc.; and Mitsubishi Motors R&D of America, Inc.*

**On Behalf of the Nissan Entities**

/s *Catalina J. Sugayan*
Catalina J. Sugayan
Anthony J. Anscombe (Admission Pending)
SEDGWICK LLP
One North Wacker Drive, Suite 4200
Chicago, IL 60606
(312) 641.9050
Catalina.sugayan@sedgwicklaw.com
anthony.anscombe@sedgwicklaw.com

*Attorneys for Nissan North America, Inc.; Nissan Design America, Inc. (part of NNA); Nissan Technical Center North America, Inc. (part of NNA); Nissan Diesel America, Inc.(part of NNA); and Nissan Motor Acceptance Corp.*

**On Behalf of the Porsche Entity**

/s *Audra A. Dial*
Audra A. Dial (*admitted for MDL only*)
William D. Meyer (*admitted for MDL only*)
KILPATRICK TOWNSEND & STOCKTON LLP
Suite 2800, 1100 Peachtree Street NE
Atlanta, GA  30309-4528
(404) 815-6500
adial@kilpatricktownsend.com
bmeyer@kilpatricktownsend.com

*Attorneys for Porsche Cars North America, Inc.*

**On Behalf of the Subaru Entities**

/s Thomas E. Mixdorf
Thomas E. Mixdorf
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN 46282-0200
(317) 236.5832
Thomas.mixdorf@icemiller.com

*Attorneys for Subaru of Indiana Automotive, Inc.*

/s Neal Walters
Neal Walters
Michael R. Carroll
BALLARD SPAHR LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1163
(856) 761.3452
carrollm@ballardspahr.com

*Attorneys for Subaru of America, Inc.; Subaru Leasing Corp.; and Fuji Heavy Industries U.S.A., Inc.*

**On Behalf of the Toyota Entities**

/s Thomas P. Branigan
Thomas P. Branigan (P41774)
BOWMAN AND BROOKE LLP
41000 Woodward Avenue, Ste. 200 East
Bloomfield Hills, MI 48304
(248) 205.3300
tom.branigan@bowmanandbrooke.com

/s Michael Schaper
Michael Schaper (admission pending)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909.6737
mschaper@debevoise.com

*Attorneys for Toyota Motor North America, Inc.; Toyota Motor Sales, USA, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc.; Toyota Motor Manufacturing Alabama, Inc.; Toyota Motor Manufacturing Indiana, Inc.; Toyota Motor Manufacturing Kentucky, Inc.; Toyota Motor Manufacturing Mississippi, Inc.; Toyota Motor Manufacturing Texas, Inc.; Toyota Motor Manufacturing West Virginia, Inc.; Toyota Logistics Services, Inc.; and Calty Design Research, Inc.*

**On Behalf of the Volvo Entity**

/s *Daniel S. Savrin*
Daniel S. Savrin
Nathaniel Bruhn
MORGAN LEWIS
One Federal Street
Boston, MA  02110-1726
(617) 951.8674
daniel.savrin@morganlewis.com
nathaniel.bruhn@morganlewis.com

*Attorneys for Volvo Cars of North America, LLC*

**On Behalf of the VW Entities**

/s *Paul T. Collins*
Paul T. Collins
NELSON MULLINS RILEY &
SCARBOROUGH LLP
Meridian, 17th Floor
1320 Main Street, Columbia, SC 29201
(803) 255.9747
Paul.Collins@nelsonmullins.com

/s *Timothy J. Fitzgibbon*
Timothy J. Fitzgibbon
NELSON MULLINS RILEY &
SCARBOROUGH LLP
101 Constitution Avenue, N.W., Suite 900
Washington, D.C. 20001
(202) 712.2812
Tim.Fitzgibbon@nelsonmullins.com

*Attorneys for Volkswagen Group of America, Inc., d/b/a Volkswagen of America and d/b/a Audi of America; Volkswagen Group of America Chattanooga Operations, LLC; Volkswagen Credit Inc.*