**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 Honorable Marianne O. Battani |

**IN Re:  All Cases**

**THIS DOCUMENT RELATES TO:**
**All Actions**

## NISSAN NORTH AMERICA'S OPPOSITION TO THE PARTIES' RENEWED MOTION TO COMPEL DISCOVERY

## [REDACTED]

83993481v2

## ISSUES PRESENTED

1) Should the Court deny the Parties' renewed Motion to Compel where the Parties' massively overbroad subpoena, even as limited by the renewed motion, still seeks to impose extraordinary burdens on non-party Nissan North America, Inc. (NNA), and the Parties have not shown that their need for information justifies the enormous burdens the subpoena will impose?

   Answer:  Yes

2) If the Court grants the Parties' motion, should it only do so in part, and use its supervisory powers to permit only the lest burdensome, least expensive discovery needed to allow the Parties to brief class certification in the two lead cases, Anti-Vibration Rubber and Bearings, while holding all other discovery in abeyance?

   Answer:  Yes

3) If the Court grants any of the Parties' Motion, should it require the Parties to bear all of the costs incurred by NNA in complying with the subpoena?

   Answer:  Yes

**[REDACTED]**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................1

II.     PROCEDURAL BACKGROUND.........................................................................3

    A.   The Original Subpoena and Original Motion to Compel........................................3

    B.   NNA's Cooperative Approach to Narrowing Issues .............................................3

    C.   Renewed Efforts to Meet and Confer To Limit the Scope of Production ..............5

III.    THE SCOPE, BURDEN AND EXPENSE OF PRODUCTION, EVEN AS TO
    THE NARROWED REQUESTS, REMAINS ENORMOUS AND
    UNJUSTIFIED ......................................................................................................6

    A.   The Burden of the Subpoena As Originally Requested, and As Modified,
        Is Enormous ..........................................................................................................6

        1.   The Original Subpoena Was Grossly Overbroad and Did Not
            Reasonably Limit the Burden On NNA......................................................6

        2.   Production of the Materials Sought by the Parties' Renewed
            Motion to Compel Will Still Be Extremely Burdensome,
            Expensive and Disruptive to NNA's Business ...........................................7

    B.   The Burden and Expense Of Production Can Be Reduced, Although Not
        Eliminated, By Careful Management, Sequencing and The Use of
        Sampling .............................................................................................................12

IV.     RULE 45 REQUIRES THAT THE COURT QUASH OR MODIFY THE
    SUBPOENA TO AVOID IMPOSING UNDUE BURDEN AND EXPENSE ON
    NISSAN ..............................................................................................................13

    A.   Rules 45 and 26 Limit the Parties' Entitlement to NNA's Documents and
        Data.....................................................................................................................13

    B.   The Subpoena Should Be Quashed in Its Entirety Because It Is Grossly
        Burdensome and Unnecessarily Seeks the Production of Extraordinarily
        Sensitive Commercial Information ......................................................................14

    C.   In the Alternative, the Court Should Order the Production of a Subset of
        the Materials the Parties Are Seeking, And Defer Any Further Orders of
        Production ...........................................................................................................17

        1.   The Court Should Tightly Sequence Discovery and Restrict NNA's
            Production to Only Those Materials Needed for Class Certification
            in the Two Lead Cases...............................................................................17

        2.   NNA's Evidentiary Submissions Suggest Easy Ways to Limit
            Production to Reduce Expense, Eliminate Waste and Reduce the
            Risk of Loss of Confidentiality................................................................19

**[REDACTED]**

V.    THE PARTIES SHOULD BE REQUIRED TO REIMBURSE NISSAN FOR
      ALL COSTS INCURRED IN CONNECTION WITH PRODUCTION .........................20

      A.    Rule 45 Requires the Court Protect NNA from Significant Expense....................20

      B.    The Parties' Arguments Against Cost Shifting Are Factually Wrong and
            Legally Unfounded ................................................................................22

      C.    Full Cost Shifting Is the Only Fair Outcome ........................................................23

VI.   CONCLUSION.......................................................................................................24

**[REDACTED]**

**TABLE OF AUTHORITIES**

**Cases**

*Am. Elec. Power Co., Inc. v United States*, 191 F.R.D. 132 (S.D. Ohio 1999) ...............................15

*Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44 (S.D.N.Y. 1996)....................................16

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ...............................................................................18

*Ellington Timber Co. v. Great N. Ry. Co.*, 424 F.2d 497 (9th Cir. 1970)....................................19

*Hampton Pugh Co. v. Monsanto Co.*, No. CV-00-N-1307-W, slip op.
   (N.D. Ala. Nov. 1, 2002) ...........................................................................................................19

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001)..........................................20

*In re Electric Weld Steel Tubing Antitrust Litig.*, 512 F. Supp. 81 (N.D. Ill. 1981)......................16

*In re Mesa Power Group, LLC*, 878 F.Supp.2d 1296 (S.D. Fla. 2012)............................................23

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996)..........................19

*In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, slip op.
   (M.D. Penn. Apr. 15, 2004) .......................................................................................................19

*In re Subpoena of American Nurses Ass'n*, 290 F.R.D. 60 (D. Md. 2013).....................................23

*In re Urethane Antitrust Litig.*, No. 04-MD-01616-JWL, slip op. (D. Kan. Feb. 4, 2005) ..............19

*In re Visa Check/Master Money Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001)........................20

*In re Vitamins Antitrust Litig.*, 198 F.R.D. 296 (D.D.C. 2000) ......................................................17

*In re Vitamins Antitrust Litig.*, 267 F. Supp. 2d 738 (S.D. Ohio 2003)............................................17

*Kean v. Van Dyken*, 2006 WL 374502 (W.D. Mich. 2006)..........................................................25

*KK Motors, Inc. v Brunswick Corp.*, No. 98 CIV. 2307 (JRT/RLE), 1999 WL 246808
   (D. Minn. Feb. 23, 1999) ...........................................................................................................19

*Legal Voice v. Stormans, Inc.*, 738 F.3d 1178 (9th Cir. 2013) ...........................................22,23

*Linder v. Calero-Portocarrero*, 251 F.3d 178 (D.C. Cir. 2001)........................................22,23

*Lowe v. Vadlamudi*, 2012 U.S. Dist. LEXIS 127586 (E.D. Mich. 2012)..........................................15

**[REDACTED]**

*Miami-Dade County v. Johnson Controls, Inc.*, 2011 U.S. Dist. Lexis 43243
(S.D. Fla. 2011)........................................................................................................23

*Moon v. SCP Pool Corp.*, 232 F.R.D. 633 (C.D. Cal. 2005)..........................................16

*Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783 (6th Cir. 2005) ...................................19

*Rodriguez v. Banco Cent.*, 102 FRD 897 (D. P.R.1984) ................................................19

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933) .....................19

*Smith v. Pendergrass*, 2003 WL 21919182 (N.D. Ind. 2003) ........................................22

*Sonoma County Ass'n of Ret. Emp. v. Sonoma County*, 2015 WL 10767718
(S.D.N.Y. 2015)........................................................................................................23

*Sound Security, Inc. v. Sonitrol Corp.*, 2009 U.S. Dist. LEXIS 59630
(W.D. Wash. 2009)....................................................................................................23

*Spears v. City of Indianapolis, et al.*, 74 F.3d 153 (7th Cir. 1996)....................................23

*United States v. Blue Cross Blue Shield of Mich.*, 2012 U.S. Dist. LEXIS 146403
(E.D. Mich. 2012) ...............................................................................................14,15

*United States v. Columbia Broadcasting System, Inc.*, 666 F.2d 364 (9th Cir. 1981).......................24

*Vivid Techs, Inc. v. Am. Sci. & Eng., Inc.* 200 F.3d 795 (Fed. Cir. 1999) ........................18

*Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566 (11th Cir. 1992).....................19

*Williams v. City of Dallas*, 178 F.R.D. 103 (N.D. Tex. 1998)..........................................23

**Rules**

FRCP 1 .............................................................................................................................1

FRCP 26(b)(1) .................................................................................................................1

FRCP 45..................................................................................................................*passim*

**Statute**

28 U.S.C. § 1920................................................................................................................25

**[REDACTED]**

## I.   INTRODUCTION

The Parties renewed motion should be denied.  The Parties have subpoenaed Nissan North America, Inc. ("NNA") pursuant to Rule 45, which provides that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  The scope of discovery permitted under Rule 45 is limited by Rule 26(b)(1):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, *and whether the burden or expense of the proposed discovery outweighs its likely benefit.*

Fed. R. Civ. P. 26(b)(1) (emphasis added).   It is fundamental that Rules 26 and 45, like all other Federal Rules of Civil Procedure, must be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

The Parties' Motion to Compel turns these mandates on their heads.  The Parties seek to impose a huge and unnecessary financial burden on NNA, which already has been repeatedly victimized by Defendants' cartel activities.  The Parties now would have NNA finance their search for something that NNA already has demonstrated does not exist – evidence that NNA passed on to third party purchasers the over-charges inflicted on NNA by the cartel Defendants.  They ask this Court to compel dozens of NNA employees to abandon their regular jobs and to spend months (if not years) searching for and processing  millions of pages of documents and terabytes of data spanning over two decades of Nissan's global business.

**[REDACTED]**

The discovery sought by this motion is unnecessary.  The Defendants already know exactly how many parts they sold to NNA, and their exact cost.  The only purported basis for seeking additional information from NNA is, as set forth in the Declaration of Defendants' economists, to arm themselves for their attack on Plaintiffs' damage model.[1]  NNA, however, should not bear the cost of this scorched-earth attack on a damage model necessitated by the Defendants' conduct.

The Plaintiffs stand in no better shoes.  Plaintiffs brought lawsuits based on the fanciful theory that NNA somehow passed on the cartel overcharges.  The Auto Dealer Plaintiffs (ADPs) advised the Court in January 2016 that they already had sufficient information for a viable damage model.[2]  Therefore, they have no basis for joining this Motion.  As for the End Payor Plaintiffs (EPPs), NNA should not be required to finance their damage model.   It is their lawsuit.  They should pay for it.

Under these circumstances, this Court should deny the Motion to Compel.[3]  In the alternative the Court should order only the least disruptive, least burdensome, and least expensive production (with all costs to be borne by the Parties) that will allow Parties to brief class certification in the lead two cases – Anti-Vibration Rubber (AVR) and Bearings.  This Court should hold any further production in abeyance until the Court has ruled on the most critical issue in the MDL: whether the ADPs and the EPPs offer competent expert proof that they paid more for their vehicles because of the price fixing conspiracy.  NNA's witnesses have confirmed that NNA did _not_ pass the costs of these parts on to its customers.  Unless the EPPs and ADPs can prove otherwise, any additional

---

[1] D.E. #1246, #2.

[2] D.E. #1194 at 7.

[3] NNA does not oppose the request of the Parties still involved in the Wire Harness case to hold discovery as to Wire Harness in abeyance.  If Wire Harness discovery again becomes an issue, it should be denied and/or conditioned on the terms set forth herein.  NNA further opposes the motion of certain Parties to compel a response to Request for Production No. 31, for reasons set forth in the SSE's original opposition.  This request seeks irrelevant and inadmissible evidence, and would impose further unnecessary burdens on NNA.

[REDACTED]

production by NNA for other parts, or for later stages of the AVR and Bearings litigation, will waste time, money, and effort.

This Court has full authority under Rule 45(d)(3)(C) to protect NNA from the harm that the Parties seek to inflict. This Court can quash the subpoena, modify it, impose conditions and, perhaps most importantly here, "ensure that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(c)(3)(C)(ii). At the low end, a narrow production will likely cost NNA in the range of $250,000 in hard costs, not to mention the lost time of its employees. A full production of the materials sought by the Parties' motion would likely fall in the range of $5,000,000-$7,000,000. Requiring the Parties to pay NNA's costs should motivate them to seek no more than they need.

## II.     PROCEDURAL BACKGROUND

### A.     The Original Subpoena and Original Motion to Compel

This dispute began when the Parties served their original subpoena upon nearly one hundred non-party entities, including the Nissan entities.[4] In their Joint Opposition to the Parties' original motion to compel, NNA and the other OEMs correctly characterized the Parties' original request as surely the most wildly overbroad subpoena in legal history. It sought production of every conceivable shred of information, for dozens of parts, on tens of millions of vehicles, over a span of more than 25 years. The OEMs' Joint Opposition to Motion to Compel, D.E. # 1227, pp. 5-13, recounts this procedural history, and NNA incorporates the Joint Opposition fully by reference.

### B.     NNA's Cooperative Approach to Narrowing Issues

At the hearing on March 24, 2016, the Special Master concluded that he lacked sufficient information about "whether and/or to what extent" he should order discovery from the OEMs. (D.E.

---

[4] The original subpoena identified several "Nissan" entities which NNA has either sold (Nissan Trucks), or which are simply business units within NNA (Nissan Design, Nissan Technical Center NA Inc., Nissan Diesel). The Parties also sought information from Nissan Motor Acceptance Corp (NMAC) but, per Court order, finance affiliates of the OEMs have been excused from responding to the subpoena at this time.

**[REDACTED]**

#1294, p. 2) The Special Master therefore ordered the OEMs, including NNA, to produce 30(b)(6) witnesses to testify on five topics: 1) transactional purchase data; 2) the procurement process, supplier selection and price reductions; 3) vehicle cost data and other cost information; 4) vehicle pricing; and 5) transactional sales data. (See D.E. #1294, pp. 6-7)  The Special Master expressed hope that these depositions would lead to the narrowing of differences and thus reduce the burdens of production.

NNA took the Special Master's instructions seriously.  In mid-April 2016, NNA reached out to the Parties to discuss a framework for helping them understand NNA's business, documents and data. (Anscombe Decl. ¶3)  Even as the OEMs were objecting to the deposition order, NNA did not object to the concept of allowing its employees to educate the Parties about its business, and the types of documents and data that might respond to their requests. (*Id*. ¶3)  Indeed, even before Judge Battani ruled on the OEMs' appeal of the Special Master's original deposition ruling, NNA provided the Parties with some basic information and started preparing witnesses to furnish more detailed information. (*Id*. ¶3) NNA supported the Special Master's view that decisions on the scope of production should be informed and, to the extent possible, furthered by informal efforts at resolution.

On August 31 and September 1, 2016, NNA produced five 30(b)(6) witnesses to testify on the topics as refined by Judge Battani's order in open court on June 23, 2016.  In preparation for their testimony, NNA's witnesses and their direct reports devoted over 300 hours to research, investigation, and preparation to address the issues set forth in the 30(b)(6) deposition outline that Judge Battani ordered the Parties to supply.  (Anscombe Decl., ¶6)

NNA's witnesses described a number of structured and unstructured sources of data and documents responsive to the Parties' requests.  Key testimony can be summarized as follows:

**[REDACTED]**



**C.**     **Renewed Efforts to Meet and Confer To Limit the Scope of Production**

Following the completion of the depositions, NNA did not insist on an agreement on costs as a predicate to discussions aimed at resolving this discovery dispute.  (Anscombe Decl.¶8)   On its own initiative, on September 8, 2016, NNA invited the Parties to submit a list of exemplar documents that they might wish to see in deciding what they truly needed. (*Id.* ¶7)  On September 30, 2016, the Parties responded by requesting approximately 54 categories of items.  (*Id.* ¶10)

**[REDACTED]**

Thereafter, over the course of October, 2016, this list grew to encompass approximately 84 categories. (*Id.* ¶12)

Unfortunately, even as NNA and the Parties were attempting to narrow the requests in an effort to reduce the burden, the Parties, on October 10, 2016, sought an order setting their motion to compel for renewed briefing. NNA expressed concern that the proposed schedule would not permit sufficient time for negotiations to conclude. (*Id.* ¶11)

Over the last three weeks of October, 2016, NNA's custodians collected and produced nearly 1,000 pages of exemplars across multiple requested categories. Since November 7, 2016, NNA has been focused on the mediation and preparing to oppose this motion.

Lastly, the Parties paint with a broad brush in assigning blame to all OEMs for the length of time it has taken for this discovery process. NNA's negotiations over the last six months have been cordial, cooperative, and sincere. At all times, it has acted in good faith and diligently worked toward compromise. Unfortunately, the demands by the Parties remain hugely burdensome.

## III.   THE SCOPE, BURDEN AND EXPENSE OF PRODUCTION, EVEN AS TO THE NARROWED REQUESTS, REMAINS ENORMOUS AND UNJUSTIFIED

### A.   The Burden of the Subpoena As Originally Requested, and As Modified, Is Enormous

#### 1.   *The Original Subpoena Was Grossly Overbroad and Did Not Reasonably Limit the Burden On NNA*

In defense of the Parties' original motion, NNA supplied two extensive declarations attesting to the over breadth of the subpoena and the intractable burdens it would impose. (Ex. E to Anscombe Decl. (Rao Decl.), Ex. F to Anscombe Decl. (Oehmke Decl)). ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**[REDACTED]**

2.  *Production of the Materials Sought by the Parties' Renewed Motion to Compel Will Still Be Extremely Burdensome, Expensive and Disruptive to NNA's Business*

The Parties have narrowed their requests as a result of information provided by NNA's Rule 30(b)(6) witnesses, NNA's provision of exemplars, and the meet-and-confer process. This has not been an easy process. The deposition testimony of NNA's Rule 30(b)(6) witnesses reflected the great complexity of NNA's business operations, its data and document systems. Unfortunately, the exchange of information has not led to sufficiently focused requests:

**Purchasing and Procurement Information**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**B.**    **The Burden and Expense Of Production Can Be Reduced, Although Not Eliminated, By Careful Management, Sequencing and The Use of Sampling**

NNA's evidentiary showings amply demonstrate that the Parties still seek far more information than they truly need, that full production of these items could cost millions of dollars, could take years to produce, and would pull NNA personnel away from the full time jobs they are paid to do.  NNA's evidence also suggests several ways in which the Parties could reduce the burdens on NNA:

**[REDACTED]**



Even taking these proactive steps, the cost for NNA to produce information for the lead two parts is likely to total over $250,000, and impose substantial burdens on NNA personnel. Without these proactive steps, the expenses will likely run into the range of $5,000,000 to $7,000,000.

## IV.   RULE 45 REQUIRES THAT THE COURT QUASH OR MODIFY THE SUBPOENA TO AVOID IMPOSING UNDUE BURDEN AND EXPENSE ON NISSAN

### A.   Rules 45 and 26 Limit the Parties' Entitlement to NNA's Documents and Data

The Parties' subpoena to NNA under Rule 45 is subject to the same discovery limitations as those set out in Rule 26. *United States v. Blue Cross Blue Shield of Mich.,* 2012 U.S. Dist. LEXIS 146403, *6 (E.D. Mich. 2012). Rule 45(d)(1) mandates that the Parties "must take reasonable steps to avoid imposing undue burden or expense" on NNA in responding to the subpoena. If they fail to

**[REDACTED]**

do so, this court "must enforce this duty and impose an appropriate sanction," which may include "reasonable attorney's fees." To determine whether a burden is undue, a court must balance the potential value of the information to the party seeking it against the cost, effort, and expense to be incurred by the person producing it. *Id.*; *Lowe v. Vadlamudi*, 2012 U.S. Dist. LEXIS 127586, *2 (E.D. Mich. 2012). Competing factors in making this determination include "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Id.*; *Am. Elec. Power Co., Inc. v. United States,* 191 F.R.D. 132, 136 (S.D. Ohio 1999).

The status of a person as a non-party to the litigation is a factor which weighs against disclosure. *Lowe,* 2012 U.S. Dist. LEXIS 127586 at *2; *Am. Elec. Power Co.*, 191 F.R.D. at 136. The court may entirely quash or modify the subpoena based, *inter alia,* on a finding that the subpoena seeks disclosure of privileged or otherwise protected matter, including "a trade secret or other confidential research, development, or commercial information," or that it subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A)-(B). Where the non-party target has demonstrated that a subpoena seeks confidential commercial information, the court may order production only where the party "shows a *substantial* need for the . . . material that cannot be otherwise met without undue hardship; and ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(C) (emphasis added).

**B.** **The Subpoena Should Be Quashed in Its Entirety Because It Is Grossly Burdensome and Unnecessarily Seeks the Production of Extraordinarily Sensitive Commercial Information**

The Parties offer little more than lip service to the Rule 45 test requiring balancing of need against burden, instead treating NNA as if it were a party to this litigation. The Parties simply assert – without responding to any of NNA's contrary arguments – that the materials they seek are relevant,

[REDACTED]

and that relevance should be the end of the matter.  Indeed, they claim, such material is "routinely produced in indirect purchaser antitrust actions . . . without any fanfare, protest, or requests for cost reimbursement."  Renewed Motion to Compel, p. 13.

The Parties are mistaken, as NNA and the other OEMs demonstrated in conjunction with the original motion to compel.  For example, in *Concord Boat Corp. v. Brunswick Corp.*, 169  F.R.D. 44, 50 (S.D.N.Y. 1996), a subpoena seeking "documents relating to every transaction undertaken" between the two relevant parties during a period of ten years was held "overbroad on its face."  In *In re Electric Weld Steel Tubing Antitrust Litig.*, 512 F. Supp. 81, 84 (N.D. Ill. 1981), a price fixing case, the court deemed a subpoena improper where it "cover[ed] virtually every document in [a non-party's] files from the past twenty years relating to its operations in . . . welded steel tubing." Similarly, in *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637-38 (C.D. Cal. 2005), the Court held that a subpoena to a nonparty seeking all documents for a 10 year period regarding pool winter covers was "overbroad on [its] face and exceed[s] the bounds of fair discovery."  The Court further held that since the transactions at issue all related to the defendant, the plaintiffs should be required to obtain the documents from parties to the litigation rather than nonparties (a limitation which the Parties have disregarded here).

Nor does the size of this litigation justify the burden on NNA which would be involved in complying with the Parties' requests.  In the 1990s, the vitamins cartel was described as "the most pervasive and harmful criminal antitrust conspiracy" in history, resulting in enormous fines and "by far the largest [settlement] ever made under state indirect-purchaser laws."  The defendants issued requests to third party direct purchasers quite similar to those the Parties are pursuing here, seeking "literally every document relating to the businesses of the plaintiffs" with respect to a host of different products.  Like the Parties do here, the defendants insisted that the information was needed

**[REDACTED]**

for the indirect purchaser case.  The court held that there was "no applicable case law holding that this individualized downstream data is producible," and sustained the Special Master's denial of defendants' motion to compel.  *In re Vitamins Antitrust Litig.,* 198 F.R.D. 296, 300 (D.D.C. 2000).

In a related proceeding, the Southern District of Ohio evaluated and quashed a subpoena served by a *Vitamins* defendant seeking records "detailing the unit-by-unit composition of each vitamin product" sold by the non-party, all the non-party's costs, and all of its prices.  *In re Vitamins Antitrust Litig.,* 267 F. Supp. 2d 738, 739 (S.D. Ohio. 2003).

NNA and the other OEMs have already shown in considerable detail that, even for information that has some degree of relevance, the Parties' requests are duplicative of materials the Parties already have, and are unnecessary to construct a viable damages model.  Joint Opposition to Motion to Compel, pp. 18-28.

Rule 45's protections for confidential information also weigh against production.  The Parties – again disregarding their obligations under Rule 45 to minimize the impact on NNA of their subpoena – shrug off NNA's confidentiality rights, arguing that regardless of how sensitive the material sought, "prohibition of discovery is not appropriate," and that nothing more than the protective order already in place is necessary to safeguard NNA's interests.  (Renewed Motion to Compel, pp. 17-18.)

The Parties are mistaken.  The plain language of Rule 45 authorizes courts to quash subpoenas based on a showing that they call for the production of trade secrets or commercially sensitive materials.  Fed. R. Civ. P. 45(d)(3)(A)(iii).  The Rule also allows the court to impose whatever conditions and safeguards it considers in its discretion to be necessary to protect NNA's legitimate interests.  Fed. R. Civ. P. 45(d)(3)(C).  The Parties can overcome those interests only by showing "a substantial need . . . that cannot be otherwise met without undue hardship."  *Id.*  They

**[REDACTED]**

have not, and cannot, do so with respect to most of the cost tracking and other commercially sensitive data they seek.

The document requests remain extremely overbroad, and full compliance for all parts would likely cost NNA multiple millions of dollars.  The Parties' renewed motion should be denied.

C.     **In the Alternative, the Court Should Order the Production of a Subset of the Materials the Parties Are Seeking, And Defer Any Further Orders of Production**

1.     *The Court Should Tightly Sequence Discovery and Restrict NNA's Production to Only Those Materials Needed for Class Certification in the Two Lead Cases*

If the Court does not deny the Parties' renewed motion outright, is should tightly restrict NNA's productions to meet the needs of specific cases, at specific times, while holding other productions in abeyance.  The Parties' current and most urgent need relates to their impending deadline for briefing class certification in the lead two cases: AVR and Bearings.  Any ruling on the renewed motion should focus on these lead cases only, only to the extent needed for class certification, and defer all other decisions.

Rules 1, 26 and 45 provide ample authority for NNA's suggested approach of phased discovery, which allows the district court to "manage the discovery process to facilitate prompt and efficient resolution of the lawsuit." *Britton*, 523 U.S. at 599.  *See also Vivid Techs., Inc. v. Am. Sci. & Eng., Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999) ("When a particular issue may be dispositive, the court may stay discovery concerning other issues until the critical issue is resolved").  Phased discovery "permit[s] deferral of costly and possibly unnecessary discovery proceeding pending resolution of potentially dispositive preliminary issues." *Ellington Timber Co., v. Great N. Ry. Co.*, 424 F.2d 497, 499 (9th Cir. 1970); *see also Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 694 (1933) (phased discovery furthers the fundamental "principle of judicial parsimony").

**[REDACTED]**

Limiting discovery, pre-certification, to that necessary for deciding class certification is especially important, as it "make[s] early class determination practicable" and "best serve[s] the ends of fairness and efficiency." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570-71 (11th Cir. 1992); *See also Rodriguez v. Banco Cent.*, 102 FRD 897, 902-903 (D. P.R. 1984)(it is "preferable" to make a class determination before substantial discovery on the merits has been conducted.)  Phased discovery is often employed in antitrust class actions.  *See, e.g., In re Urethane Antitrust Litig.*, No. 04-MD-01616-JWL, slip op. at 2 (D. Kan. Feb. 4, 2005) (ordering that after class certification is decided, a magistrate judge will oversee merits discovery); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, slip op. at 1 (M.D. Penn. Apr. 15, 2004) (limiting discovery to class certification issues until any motion for class certification is resolved by the court); *Hampton Pugh Co. v. Monsanto Co.*, No. CV-00-N-1307-W, slip op. at 1 (N.D. Ala. Nov. 1, 2002) (limiting discovery to class certification issues); *KK Motors, Inc. v. Brunswick Corp.*, No. 98 CIV. 2307 (JRT/RLE), 1999 WL 246808, at *5 (D. Minn. Feb. 23, 1999); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 500 (S.D.N.Y. 1996) (same).

Here, the Parties are not required to have fully completed damage models or calculations at the time of class certification.  Rather, they need only show that they have a reliable method by which to prove class wide damages in a manner consistent with their theory of liability.  *See, e.g.*, *Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 791 (6th Cir. 2005) ("A plaintiff need not calculate a specific damage figure so long as he proposes an acceptable method for calculating damages."); *see also In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 138-39 (2d Cir.2001); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 348 (E.D. Mich. 2001) ("Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action.")  Consequently, the

**[REDACTED]**

Parties' only need, at this time, is for those materials required to determine if the Plaintiffs can present a reliable damage model to support class certification.

Additional considerations of efficiency favor NNA's recommended approach.  For example, should NNA's production relating to AVR and Bearings demonstrate that the EPPs and ADPs cannot prove the existence of a pass-through, all other discovery from NNA would be moot.

>  2.  *NNA's Evidentiary Submissions Suggest Easy Ways to Limit Production to Reduce Expense, Eliminate Waste and Reduce the Risk of Loss of Confidentiality*

**[REDACTED]**



## V. THE PARTIES SHOULD BE REQUIRED TO REIMBURSE NISSAN FOR ALL COSTS INCURRED IN CONNECTION WITH PRODUCTION

### A. Rule 45 Requires the Court Protect NNA from Significant Expense

Because NNA is not a party to this litigation, Rule 45 provides that any order compelling production **"must"** protect NNA "from significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(2)(B)(ii) (emphasis added). This language was added to Rule 45 to protect nonparties "against significant expense resulting from involuntary assistance to the court." Fed. R. Civ. P. 45 (Advisory Committee Notes, 1991 Amendment, Subdivision (c)). Once costs are determined to be "significant," shifting the costs of compliance to the requesting parties is *mandatory. Legal Voice v. Stormans, Inc.*, 738 F.3d 1178, 1184-85 (9th Cir. 2013); *Linder v. Calero-Portocarrero,* 251 F.3d 178, 182 (D.C. Cir. 2001).

Indeed, the policy of Rule 45 is to ensure that the costs of discovery reside with the litigants, not third parties:

**[REDACTED]**

> [R]equiring each individual subpoenaed to shoulder the rather significant cost of paying for the virtual mountain of documentary evidence the Plaintiff seeks would certainly subject them to a significant expense or an undue burden. *After all, the entire tenor of Fed. R. Civ. P. 45 is to prohibit a party from simply shifting his significant litigation expenses to a non-party (citation), yet this is precisely what the Plaintiff is attempting to do in this case.*

*Smith v. Pendergrass*, 2003 WL 21919182, *4 (N.D. Ind. 2003) (emphasis added).

The cost of the streamlined production described above is still estimated to NNA roughly $250,000 *out of pocket* (and it would incur much greater expenses if the Court were to require more or all of what the Parties seek). Courts have held that cost estimates less than one-tenth that high qualify as "significant" enough to trigger cost-shifting under Rule 45. *Id.* ($14,000-$16,000 estimate); *Legal Voice v. Stormans Inc., et al.,* 738 F.3d 1178, 1185 (9th Cir. 2013) ("[W]e have no trouble concluding that $20,000 is 'significant.'"); *Linder v. Calero-Portocarrero,* 251 F.3d 178, 182 (D.C. Cir. 2001) ($200,000 estimate); *In re Subpoena of American Nurses Ass'n*, 290 F.R.D. 60, 67 (D. Md. 2013) (≈$55,000 estimate); *Sound Security, Inc. v. Sonitrol Corp.*, 2009 U.S. Dist. LEXIS 59630, *1 (W.D. Wash. 2009) ($60,000 estimate); *Williams v. City of Dallas,* 178 F.R.D. 103, 113 (N.D. Tex. 1998 ) ($9,000 estimate).

Case law further supports NNA's request to receive 100% of its costs. *See, e.g., Spears v. City of Indianapolis, et al.,* 74 F.3d 153, 158 (7th Cir. 1996) (affirming trial court order requiring party to reimburse third party for all costs associated with subpoena, noting that the "wealth of materials sought" and the "whiff of a fishing expedition apparent" provided a "sound basis for the court to order reimbursement…."); *Legal Voice*, 738 F.3d at 1184 (remanding to District Court with instructions to "shift enough of the cost of compliance to render the remainder non-significant."); *Sonoma County Ass'n of Ret. Emp. V. Sonoma County*, 2015 WL 10767718 at *2 (S.D.N.Y. 2015) (awarding third party "all costs of reviewing and producing the documents…[including ] the

**[REDACTED]**

attorneys' costs"; "attorneys' costs" included, *inter alia*, costs incurred in successfully resisting motion to compel, because the requesting party "failed its Rule 45 duty to avoid imposing undue burden…and initially refused to pay…reasonable costs…"); *In re Subpoena of American Nurses Ass'n*, 290 F.R.D. at 76 (awarding costs for discovery production, including to-be-determined portion of reasonable attorneys' fees.); *In re Mesa Power Group, LLC*, 878 F.Supp.2d 1296, 1307 (S.D. Fla. 2012) (requiring third party to produce certain documents, but holding that "the monetary costs for the identification and production of responsive data or documents shall be borne by [subpoenaing party]"); *Miami- Dade County v. Johnson Controls, Inc.*, 2011 U.S. Dist. Lexis 43243 at *10-*12(S.D. Fla. 2011) (requiring the subpoenaing party to reimburse third-party subpoena recipient "at the regular hourly salary rate for each employee who is reasonably and necessarily involved in the production of the requested documents").

**B.    The Parties' Arguments Against Cost Shifting Are Factually Wrong and Legally Unfounded**

The Parties offer two arguments to avoid or minimize cost-shifting.  Both lack merit.

First, they argue that Nissan has a pecuniary interest in the outcome of the litigation, and therefore should bear a greater financial burden.  The Parties are incorrect.  NNA has a pecuniary stake in the litigation.  It is not a member of any certified class of Direct Purchaser Plaintiffs (DPPs), and the "pass through" issues are utterly irrelevant to any claim that NNA might pursue.  NNA has negotiated its own cost recoveries for AVR and Bearings, and the materials sought by the EPPs and ADPs relating to "pass through" have no relationship to NNA's own legal claims.

Second, they argue that Nissan is a large corporation, and thus able to pay.  But there is no "rich company" defense to cost shifting under Rule 45.  Moreover, many of the Defendants are

**[REDACTED]**

extremely large companies, and the EPPs and ADPs are represented by some of the largest and well-funded class action firms in the United States.

The Parties' arguments were addressed and rejected in *United States v. Columbia Broadcasting System, Inc.,* 666 F.2d 364 (9th Cir. 1981). There, the court reversed an order denying reimbursement for non-party motion picture studios' cost of compliance with certain subpoenas. The government argued that the studios had an interest in the litigation since they stood to benefit from the enforcement action. The Ninth Circuit held that it did not matter. "No matter how interested the studios allegedly were, they were nevertheless powerless to dictate the scope of the Government's case or the network's defense." *Id.* at 372. Nor was the studios' healthy financial standing sufficient reason to impose substantial costs on them from a litigation to which they were not a party: "Absent some compelling justification, even large non-party corporations like the studios should not be compelled to subsidize the defense of other large corporations."

### C.    Full Cost Shifting Is the Only Fair Outcome

To the extent this Court orders any production, the Parties should pay for it. NNA did not ask to be involved in this litigation. Unlike the litigants, it has no recourse to recoup the expenses of its subpoena production. Under 28 U.S.C. §1920, whichever of the Parties prevails at trial or on summary judgment has a right to recover at least some of the expenses incurred in connection with NNA's production. NNA, by contrast, has no protection beyond Rule 45 itself. And, even with full cost shifting, subpoena compliance is still a losing proposition for NNA. NNA will never recoup the productivity costs inflicted by taking its employees away from their normal jobs.

Finally, an order shifting 100% of the costs to the Parties would likely have a very strong impact in guiding just how much burden they wish to impose on NNA:

**[REDACTED]**

> When nonparties are forced to pay the costs of discovery, the requesting party has no incentive to deter it from engaging in fishing expeditions for marginally relevant material.  Requesters forced to internalize the cost of discovery will be more inclined to make narrowly tailored requests reflecting a reasonable balance between the likely relevance of the evidence that will be discovered and the costs of compliance.

*Kean v. Van Dyken*, 2006 WL 374502, *5 (W.D. Mich. 2006).

## VI.    CONCLUSION

The Parties' Renewed Motion to Compel will again victimize Nissan by forcing it to absorb potentially enormous costs resulting from the Defendants' criminal conduct.  NNA requests that this Court deny the Parties' motion, or in the alternative, limit NNA's obligations as outlined above. If the Court requires NNA to make any production, Rule 45, case law and simple fairness dictate that the Parties, not NNA, should pay for the costs of production.

DATED:  November 22, 2016                    Respectfully Submitted,

NISSAN NORTH AMERICA, INC.


By:   /s/Anthony J. Anscombe
        *One of Their Attorneys*

**SEDGWICK LLP**
  Anthony Anscombe
  anthony.anscombe@sedgwicklaw.com
  One North Wacker Drive, Suite 4200
  Chicago, IL  60606-2841
  Telephone:  312-641-9050
  Facsimile:   312-641-9530