**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : | Case No.: 12-MD-02311 |
| _____ | : : | Honorable Marianne O. Battani |
|  | : | Magistrate Judge Mona K. Majzoub |
| ALL PARTS | : : |  |
| _____ | : | Special Master Gene J. Esshaki |
|  | : |  |
| THIS RELATES TO: ALL CASES | : |  |
| _____ | : |  |

**NON-PARTY SUBARU OF INDIANA AUTOMOTIVE, INC.'S BRIEF IN OPPOSITION TO THE PARTIES' RENEWED MOTION TO COMPEL DISCOVERY FROM CERTAIN NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS AND THEIR AFFILIATED ENTITIES**

On July 20, 2015, certain parties to MDL 2311 ("Serving Parties") served Subaru of Indiana Automotive, Inc. ("SIA") with what the Special Master later described as likely the largest document production subpoena ("Subpoena") in the history of the United States federal court system. The subpoena in its original form sought, and the serving parties' "narrowed" requests continue to seek, detailed information and data on 56 specific automotive parts and all vehicles SIA has manufactured from 1992-2014. Within thirty (30) days of receiving the subpoena, SIA served objections to breadth, burden, and expense that various parties and even the Court anticipated before the subpoena was ever served. These objections continue, unchanged, today. In the intervening fifteen (15) months – with only a three-person in-house legal staff – has been forced to retain outside counsel and divert the time and attention of employees with multiple job functions (none of which involve litigation) to advance its

acknowledged "vital interest" (ECF No. 992 at 5) in limiting the burden and expense of complying with a monumentally broad subpoena SIA had no part in negotiating.

SIA is now before the Court on the Serving Parties' renewed motion to compel SIA's production "on a narrowed scope of the discovery sought by the uniform subpoena." (*Parties' Notice of Motion and Renewed Motion to Compel Discovery From Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities* ("Renewed MTC") (ECF No. 1495), at 2). While the Serving Parties' "narrowed list of requests" to SIA remain unduly burdensome, unduly expensive, and disproportionate to the needs of the case in critical respects discussed below, the fact that the Serving Parties claim to have narrowed the Subpoena's scope, admit they did so in an attempt to "respect and minimize any possible burdens" on recipients (including SIA), *but only made these purported concessions after more than a year of litigation* regarding burdens SIA raised within thirty (30) days of receiving the Subpoena, is telling and supports an award of attorney fees related to SIA's protection of its "vital interest" in ensuring any production burdens and expenses are reasonable and proportionate.

## I.    ABOUT SIA

SIA is a Midwestern automobile manufacturer and assembler located in Lafayette, Indiana. (*Declaration of Douglas R. Meyer In Support of Subaru of Indiana Automotive, Inc.'s Opposition to Motion to Compel* ("Meyer Decl.") (ECF No. 1227-44) ¶1). SIA is a wholly-owned subsidiary of Fuji Heavy Industries Ltd., located in Japan. (Meyer Decl. ¶ 2). Subaru produces the Legacy®, Outback®, and Impreza® models of Subaru vehicles for the North American market. (Meyer Decl. ¶¶ 4-7). SIA has never sold vehicles to automobile dealers; rather, SIA has sold 100% of the Subaru vehicles it produces for the United Staets market to Subaru of America, Inc. (SOA). (Meyer Decl. ¶ 6).

The U.S. market share for SIA-manufactured vehicles is very small compared to that for vehicles manufactured by the other SSEs. According to *Wall Street Journal* data, which SIA's Senior Manager and General Counsel Douglas R. Meyer considers to be reliable and authoritative, SOA's U.S. market share for imported (from Fuji Heavy Industries, Inc.) *and* domestic (from SIA) Subaru cars and light trucks remained at or below 1.5% until near year-end, 2008. (Meyer Decl. ¶¶ 9-12 and Ex. A). It did not rise above 3.0% until near year-end 2013; therefore, the U.S. market share for Subaru vehicles assembled by SIA is considerably less. (Meyer Decl. ¶¶ 11-12).

Although the Serving Parties repeatedly attempt to conflate SIA's size and litigation capabilities with those of the other SSEs, SIA is, simply, far from similarly situated. SIA is not "constantly involved in complex litigation," does not have a "large legal department[]," and is not "well equipped to respond to discovery requests" – as the Serving Parties have asserted in their briefing. (Meyer Decl. ¶ 15). Apart from five (5) non-party subpoenas received from the Department of Justice related to the alleged conspiracy at issue in these lawsuits, SIA has never been involved in "complex litigation" involving more than a nominal discovery burden. *Id.* SIA's legal department consists of three (3) attorneys, one of whom is the company's Senior Executive Vice President and does not generally participate in legal matters. (Meyer Decl. ¶ 15). The other two attorneys have wide-ranging responsibilities for all legal issues at SIA, including contract, employment, environmental, and employee benefit matters. *Id.* They also serve in a variety of other managerial roles that consume a substantial portion of their time. *Id.* Everyone at SIA multi-tasks.

Responding to this document production subpoena, even to the extent the Serving Parties have "narrowed" it (discussed below), will require a significant diversion of valuable and limited

human resources, and will significantly disrupt SIA's business. In their renewed motion to compel, the Serving Parties repeatedly assert that SIA "has not identified any specific burden in producing" certain requested documents. (ECF No. 1495, Ex. F (Declaration of Angela A. Smedley ("Smedley Decl."), ¶¶ 19, 22, 25, 28). To the contrary, SIA deponents testified to burden at their August 2016 depositions. For example, many of the Serving Parties' requests center on purchasing and procurement documents. Timothy DeLong, SIA's Senior Manager, Purchasing, testified that neither he nor any of the 60 people he supervises – including buyers and supplier management personnel – perform legal tasks in their day-to-day work. (Smedley Decl. Ex. A (Deposition of Timothy DeLong ("DeLong Dep.) 123:24-125:21). What they do is multi-task: Tim and his supervisees perform multiple roles and functions "[e]very day" to keep SIA running. (DeLong Dep. 125:5-8). Tim testified:

> Q: Would it be fair to say that in order to run the reports that have been referenced by counsel earlier or to otherwise fulfill the obligations or purported obligations under the subpoena, you and the individuals that you support would be required to be diverted from your day-to-day responsibilities in order to do that?
>
> [objection]
>
> A: We would have to be taken away from our daily activity, yes.
>
> Q: So while you may not have calculated or participated in calculating the number of actual man hours it would take to do various tasks, is it fair to say that the burden on you and your group would be significant just in terms of diversion of your time and attention from other things?
>
> [objection]
>
> A: Yeah. Currently, our staff is working anywhere from 10- to 12-hour days, including myself, so yeah, additional burden would – I'm not sure how we would handle that.

(DeLong Dep. 125:22-126:19). Likewise, SIA deponent David Rausch, SIA's Vice President of Finance, testified that neither he nor the 18 people he supervises have any day-to-day litigation

responsibilities (Smedley Decl. Ex. B (*Deposition of David Rausch*) ("Rausch Dep.") 52:19-54:4).

In short, SIA's size, value, and complexity of operations are not comparable to those of "Apple and Dell" and "some of the world's largest laptop and television makers" (Renewed MTC at 14-15) – or even to those of the other "Six Lead OEMs." The other entities' litigation capabilities and relative burdens are simply not imputable to SIA.

## II.    SIA HAS NOT "OBSTRUCTED THE MEET AND CONFER PROCESS"

The Serving Parties state that the subpoena recipients (presumably, including SIA) did not "substantively agree[] to meet and confer" a year ago and therefore "obstructed the meet and confer process." (Renewed MTC at 22). The Serving Parties raise this issue in the context of cost-shifting and entitlement to attorney fees, but the statements bear correction overall. The *Specified Subpoenaed Entities' Joint Opposition to the Parties' Motions to Compel* ("Joint Opposition") (ECF No. 1227) extensively documents the subpoena recipients' ("SSE") efforts, in which SIA participated, to engage the Serving Parties and present a proposal.

The SSEs drove the meet-and-confer process from the outset by proposing, coordinating, and leading a global summit conference in October 2015 to detail common concerns, describe each SSE with particularity, and provide the bases for the Serving Parties to begin to narrow the Subpoena. (Joint Opposition at 6). The Court recognized the superiority of this approach by noting, in response to the Serving Parties, that the SSEs' coordination "probably [was] very smart." (ECF No. 1204 at 70). The SSEs attempted to focus the Serving Parties on foundation issues such as the information already in their possession, the gaps in the record they reasonably believed they need the SSEs to fill, the efforts they have undertaken with each other to address these issues, and the relative importance of the information. *Id*. The Serving Parties declined to

modify the Subpoena as to the "Core SSEs" (of which SIA is one) or to address the information already in their possession. *Id*. at 7 and Ex. 8.

In light of this failure to respond, the SSEs again contacted the Serving Parties and described again how the information sought was overbroad, irrelevant, and largely duplicative. *Id*. at 8 and Ex. 9. Waiting almost four (4) weeks, the Parties responded the day before Thanksgiving with a purported offer to "substantially narrow[]" the Subpoena's scope. *Id*. and Ex. 10. As the SSEs detailed in their Joint Opposition, this offer did nothing to reduce the burden on the SSEs. *Id*. at 8-10 and Exs. 10-11.

At this point, SIA's position diverged in some respects from that of the larger SSEs. Several of the smaller SSEs, including SIA, proposed that the Serving Parties hold the Subpoena in abeyance as to them because the larger OEM SSEs offered to produce certain reasonably-accessible transactional data for up to the last ten (10) years, and omitting the smaller SSEs' data would not impact any statistical or regression models relevant to any issue in this case. *Id.* Ex. 11. The Serving Parties offered no meaningful response, and just noted that the smaller SSEs have recognizable names. *Id*. Exs. 11-12. The Serving Parties responded to this proposal with a short declaration of "impasse" on Christmas Eve. *Id*. Ex. 12. The SSEs tried again to engage the Serving Parties (*id*. Ex. 13), who responded two weeks later by reaffirming their refusal to further negotiate. *Id*. Ex. 14. The Serving Parties' original motion to compel compliance with the Subpoena (ECF No. 1185) followed on January 19, 2016.

SIA has cooperated (and, in fact, initiated) the most recent meet-and-confer process. In compliance with Judge Battani's June 23, 2016 oral order that Rule 30(b)(6) "discovery-on-discovery" depositions go forward, SIA produced two company witnesses for deposition on August 16, 2016, after negotiating dates with the Serving Parties. To aid the Serving Parties in

focusing their volume, location, and burden inquiries and make best use of the witnesses' and counsel's time, SIA prepared and produced at the depositions a detailed "Outline of 30(b)(6) Topics" addressing the volume, location, and burden associated with SIA's transactional purchase data, data and documents regarding procurement of auto parts, and cost data and other cost information, mirroring the topics the Serving Parties provided SIA. (Smedley Decl. Ex. C).

On October 13, 2016 – two months after the SIA deposition and following the Special Master's mandate for further attorney conferences on the scope of discovery – SIA's counsel contacted counsel for the Serving Parties to begin the meet-and-confer process "as soon as possible." (Exhibit 1). SIA emphasized that it needed to "receive a proposal from the serving Parties, informed by the SIA [Rule 30(b)(6) depositions], that narrows the scope of the subpoena" far enough in advance of the attorney conference to be able to evaluate it, discuss it with SIA, and make a meaningful response. *Id.* SIA's counsel also informed the Serving Parties that SIA had not received transcripts from its Rule 30(b)(6) depositions. *Id.* SIA received the Serving Parties' "narrowed list of the types of transactional data and documents the Serving Parties seek from SIA in light of the information provided by [SIA's] corporate designees …." (Smedley Decl. Ex. D). The Serving parties and SIA engaged in attorney conferences on October 24, 2016 and October 28, 2016. (Smedley Decl. ¶¶ 4-5). On October 31, 2016, SIA made a conditional offer of production addressing the topics in Serving Parties' October 14, 2016 letter. (Smedley Decl. Ex. E).

In sum, SIA has participated robustly in the meet-and-confer process from the beginning, and the Serving Parties' cannot say otherwise by claiming SIA's participation was not "substantive" (i.e., that SIA did not immediately begin to negotiate which documents it should produce, *versus* whether it should produce documents at all).

7

### III.    SIA's AND THE SERVING PARTIES' CURRENT POSTURE

SIA, along with the other smaller SSEs, produced expert testimony stating that:

5. The subpoenaed entities at issue in this analysis (the "Smaller SSEs"), both individually and in the aggregate, make up a very small percentage of the U.S. vehicle sales market. The inclusion of the relatively few sales of vehicles among the Smaller SSEs would likely have no measurable influence upon the aggregate measures from the regression models designed to measure the impact of the alleged over-pricing of automobile parts on retail prices and sales of vehicles. Inclusion of the Smaller SSEs' data represents a quite modest expansion of sample sizes for analysis at the cost of significant data collection and processing efforts on the part of the Smaller SSEs and analysts, bringing with it additional complexities for statistical interpretation. The cost of the additional complexity, even just to the end-user of the data, almost certainly outweighs the incremental benefit of expanding the sample size by a few percentage points.

(Declaration of Donald R. House, Sr. (ECF No. 1223-1)). Nonetheless, SIA has made a significant offer of production that fairly comports with the "narrowed" requests in the Serving Parties' October 14, 2016 letter. Note that counsel for the Serving Parties has represented that the documents requested in its October 14, 2016 letter are the outer universe of what they seek from SIA; therefore, the Court's consideration should be limited to this request (*see* Smedley Decl. ¶ 4 ("At SIA's request, the Serving Parties indicated a willingness to agree that the details of the October 14 letter reflected their good faith effort to identify the full scope of documents and data the Serving Parties sought from SIA.")).

### IV.    SIA'S CONDITIONAL OFFER OF PRODUCTION

SIA has revised its October 31, 2016 conditional offer, and provided the terms of the revised conditional offer to the Serving Parties on November 11, 2016. The conditions set forth in SIA's October 31, 2016 letter continue to apply. Neither the original nor the revised conditional offer is an admission, concession, or representation regarding burden. Rather, they represent business decisions made by SIA in an effort to avoid further cost and expense.

The Serving Parties have represented to SIA that the documents specifically sought in the October 14 letter are not staged or tiered production, but are all that will be sought based on the Serving Parties' good faith understanding of the facts and circumstances at this time. (Smedley Decl. Ex. H).

SIA and the Serving Parties have participated in telephonic attorney conferences and exchanged letters in an effort to reduce areas of disagreement. It appears that SIA and the Serving Parties are close to accord, and that the remaining significant areas of disagreement are (1) custodian searches/production, (2) production of documents other than those residing on active, "live" databases; and (3) costs and attorney fees.

**Purchase and Procurement Data**

1. **Request:** "data, or documents in the absence of data, reflecting SIA's purchase of auto parts from Defendant and non-Defendant suppliers for installation in new Vehicles sold or leased in the United States, identifying the following for each auto part: part number, part name, supplier code, and part price."

2. **Specific documents requested:**

   a. "purchase price information maintained in SIA's Pricemaster database and the Accounts Payable/BA database"

SIA has conditionally offered to produce electronic "[r]eports generated by SIA supplier code and SIA part number from the Pricemaster database showing historical pricing data (SIA part number; SIA part name; SIA supplier code; prices SIA paid; price changes (including engineering changes))" (Smedley Decl. Ex. E). These reports are available from the live Pricemaster database from 2000 to present (DeLong Dep. 47:15-17). SIA and the Parties would have to agree upon a list of SIA part numbers and SIA vendor codes on which to search; format would be Excel spreadsheets. SIA has never before produced its entire Pricemaster and the time, effort, and expense this would take cannot be known until the task is actually underway. Because valuable IT resources would have to be diverted, the potential for business disruption is high and the process will not be instantaneous or even quick. The best current estimate SIA can make is approximately six (6) weeks, depending on IT time and business needs.

Any existing Pricemaster data from 1989-2000 are available only on backup tapes (DeLong Dep. 47:18-25). SIA did not include these data in its conditional offer because of the undue burden production would impose. Only one (1) of SIA's fifteen (15) IT personnel supports the Purchasing department, and SIA would have to divert that individual from daily

responsibilities to search for, recover, and produce the reports (Smedley Decl. Ex. C), ¶B(1)). This burden is particularly high because there is no information in the Pricemaster database not already in the possession of suppliers who participated in SIA's bidding process (DeLong Dep. 209:17-23).

The Parties mistakenly conflate purchase orders (or "purchase order data") with the other data available in Pricemaster (Smedley Decl. ¶15). Purchase orders are actually a "subset" of Pricemaster (DeLong 197:11-20); however, SIA did not begin keeping discrete purchase orders electronically until approximately November 2010. SIA conditionally offered to produce "Purchase orders – Available electronically in the Pricemaster database beginning November 2010, by supplier and part number" (Smedley Decl. Ex. E, p. 2).

Discrete purchase orders are not available in electronic form before approximately November 2010. SIA did not include these data in its conditional offer because of the undue burden production would involve. To produce "purchase order data" from November 1989 to approximately November 2010, SIA would have to manually extract each individual SIA part number and engineering change. If the price changed X number of times, the same number of individual prints would be necessary. For example *Wire Harness* parts would impose a particularly onerous burden because the price changed often. This effort would be disproportionate to any Serving Party need because the purchase orders SIA maintains are no different from those already in suppliers' possession (DeLong Dep. 206:11-16). Further, the prices reflected on purchase orders would be duplicative of the Pricemaster data SIA has conditionally offered to produce.

      b.  "[A]ccounts payable monthly statements organized by supplier and part … dating back to 1989."

SIA has conditionally offered to produce these documents, from live databases only, if SIA and the Serving Parties can agree on a time period for which the production will be made (Smedley Decl. Ex. E, p. 2).

      c.  "[T]he supplier information located in SIA's Vendor Master database."

SIA did not include this information in its conditional offer because it is readily available from sources other than SIA. This database contains nothing more than "basic information" for SIA's approved vendors ("addresses, things of that nature") (DeLong Dep. 34:8-10). It is essentially a directory, is routinely overwritten so as to reflect only current approved vendors, and does not identify the parts or components for which individual suppliers are approved (DeLong Dep. 34:11-13).

      d.  "[M]aster supplier agreements in paper copy dating back to 1989."

Master supplier agreements lay out terms and conditions – the "overall document of how to do business with SIA …." (DeLong Dep. 57:3-14). They do not contain information on parts or prices. (DeLong Dep. 57:15-21). Master supply agreements may contain generic provisions such as the effect of proposed price revisions by seller, "most favored nation" clauses, and *force*

*majeure* clauses; however, these documents exist only in paper form. SIA is willing to show the Serving Parties a copy of its most recent master supplier agreement to determine whether the Serving Parties and SIA can resolve this issue.

  e.  "[B]ills of lading, or shipping notices, for "Japan parts" sent to SIA and sourced from its parent company, Fuji Heavy Industries ("FHI"), and any related information reflecting the cost to SIA for those parts."

The bills of lading, or shipping notices, for parts SIA purchases from FHI (aka "Japan parts") do not contain cost or price information. (Smedley Decl. Ex. H, p. 6). SIA did not include these bills of lading in its conditional offer of production because they are irrelevant. However, the Pricemaster data SIA has conditionally offered to produce will include Japan data to the extent FHI is a vendor (note, however, that the Purchase Order portion of the conditionally-proposed Pricemaster production will not include Japan/FHI information). Bills of lading/shipping notices for FHI-sourced parts will therefore be redundant and irrelevant.

## Annual Price Reduction Data

1.  **Request:** "data, or documents in the absence of data, reflecting APR information for parts, and other price adjustments in isolation from other price elements, as well as documents reflecting communications or negotiations concerning such adjustments."

2.  **Response:**

SIA's conditional production offer included "[r]eports generated by SIA supplier code or SIA part number from the Pricemaster database showing historical pricing data (SIA part number, SIA part name; SIA supplier code; prices SIA paid; **price changes (including engineering changes)**)" (Smedley Decl. Ex. E, p. 2). As noted above, these reports are available from the live Pricemaster database from 2000 to present (DeLong Dep. 47:15-17). SIA and the Parties would have to agree upon a list of SIA part numbers and vendor codes on which to search. SIA would generate these reports as in the ordinary course of business.

Any existing Pricemaster data from 1989-2000 are available only on backup tapes (DeLong Dep. 47:18-25). SIA did not include these data in its conditional offer because of the undue burden production would impose. Only one (1) of SIA's fifteen (15) IT personnel supports the Purchasing department, and SIA would have to divert that individual from daily responsibilities to search for, recover, and produce the reports (Ex. 1858, ¶B(1)). This burden is particularly high because there is **no** information in the Pricemaster database not already in the possession of suppliers who participated in SIA's bidding process (DeLong Dep. 209:17-23).

**Revised response:** Price change information in Pricemaster contains cost change information, APR information, and commodity price change information. SIA's revised conditional offer is: "[r]eports generated by SIA supplier code or SIA part number from the Pricemaster databased showing historical pricing data, including SIA part number; SIA part name; SIA supplier code; prices SIA paid; price changes, including engineering changes (old

price, new price, price effective date, reason code for the change); APRs; and commodity price changes.

    **3.  Specific documents requested:**

        a.  "documents reflecting negotiations between SIA and its suppliers over APR and other price adjustments"

SIA has excluded custodial documents from its conditional offer of production because of undue burden. SIA currently has 24 Buyers in the procurement section of its purchasing department (DeLong Dep. 14:4-6). Buyers are assigned by supplier (DeLong Dep. 40:1-5). Once a buyer accesses a supplier's price quote, the Buyer begins negotiations with the supplier (DeLong Dep. 40:24-41:18). Information comes back to the Buyer individually, in either electronic or hard copy form (DeLong Dep. 41:22-42:5). There is no central repository for this information; it is siloed between the Buyer and the supplier. (DeLong Dep. 42:13-17). In order to discover what information, documents, and data exist regarding negotiations, SIA would have to approach each individual Buyer and find out what is available on the Buyer's individual computer and hard-copy files.

From 2013-present, Buyers may have saved their individual documents to the company directory (the U:drive) (DeLong Dep. 42:18-44:19). Purchasing contains approximately 75 top-level folders, each of which contains many more subfolders, perhaps as many as several hundred subfolders each. An unknown number of these folders and subfolders contain supplier information. Folders would have to be checked, manually and individually, for information on each part. Custodial documents before 2013 are exclusively in paper form, and SIA would need to search individual files and folders manually. To the extent documents and data exist, SIA retains them for seven (7) years (DeLong Dep. 43:8-17).

        b.  "price adjustment data in addition to reports"

To the extent this requests custodial files, see 3(a) above.

## RFQ Data

    **1.  Request:** "documents related to SIA's requests for quotation ("RFQs"), bids submitted to SIA by suppliers, buyer negotiations with suppliers, approval documents, and award nomination sheets. This includes nomination sheets, scope of requirement documents, target price documents, purchasing strategy documents, RFQ packets, RFQ responses (including "no quote" responses), buyer market analyses, supplier-supplied cost tables, supplier selection packets, award letters, part-specific purchase orders, terms sheets, engineering changes, and cost change data testified to by SIA's designee"

    **2.  Specific documents requested:**

        a.  "SIA's RFQ database contains information, dating back to 2007, which SIA sent to suppliers when requesting quotations for the production of a particular part"

SIA's process for selecting suppliers begins with sending nominated suppliers a request for quotation/scope of work (RFQ/SOR), known as the "concept," by email or via scanned version. The concept contains the target price. Suppliers are not required to use the concept to prepare a quote. The suppliers respond with a quote to the SIA buyer via U.S. mail or email. Buyers then review the quote and begin negotiating with suppliers. After a supplier is selected, SIA issues an initial drawing and engineering change summary ("ECS") for each part. The selected supplier is notified that it has an RFQ and is requested to download the drawing and ECS. The supplier then submits a quote through the RFQ system (buyers cannot submit quotes for suppliers), which stores that information in tables. When SIA approves the quote, the RFQ system feeds it as piece-price data to Pricemaster.

b.   "hard copy RFQ negotiation records"

Supplier selection packets are exclusively hard copy and are stored in boxes in a 40'x20' wire "cage" in SIA's purchasing department. The cage contains 300-400 boxes sorted by part number and segregated by vehicle model. SIA "hardly ever" has occasion to access documents in the "cage." A single SIA employee is responsible for storing documents in the cage, and she is not tasked with keeping them in a particular order. Rather, she just "put[s] them in the box and get[s] them out of the cabinets." Documents are "[r]arely" requested from the cage: SIA deponent Timothy DeLong testified he could not recall when someone last asked. (DeLong Dep. 85:20-91:20).

SIA's conditional offer of production specifically excluded hard copy documents because of the burden involved in locating, preparing, and reviewing them for responsiveness and production.

**3.  SIA's response:**

SIA conditionally offered to produce "[d]ates received and nominated supplier names for the past two (2) vehicle models." This will encompass a period of approximately five (5) years. Electronic retention of nomination sheets is a relatively new process for SIA, in place for the past two vehicle models.

SIA also conditionally offered to produce "[a]ward letters – these are available electronically for the past four (4) models." This will encompass a period from 2009 forward. Again, electronic retention of award letters is a new process for SIA during this time.

**4.  SIA's revised response:**

RFQ response information is part of the larger RFQ database. SIA will amend its conditional offer of production to include raw RFQ data, from 2007 forward, for two parts categories: wire harness, and anti-vibrational rubber. SIA and the Serving Parties will have to agree on the SIA part numbers that comprise these categories. SIA has no parts with "bearings" in the description. SIA anticipates it will take approximately 6 weeks to produce RFQ data for these two parts categories. One SIA employee, Angela Krueger, will be diverted from her regular

job responsibilities to work on this task, and SIA may need to hire temporary staff for certain administrative functions.

**VIN-Level Cost Data**

1. **Request:** "Vehicle Identification Number (VIN)-level cost data or, if not tracked at VIN level, cost data reflecting the least aggregated level at which this information is maintained, or the most detailed level available for each Vehicle year, make, model and trim combination, including costs for any options or accessories, and certain specified aggregations of such data."

2. **Specific documents requested:**

   a. "bills of materials"
   b. "general ledger information dating back to 1998 for each Vehicle model"
   c. "Excel-based monthly financial statements … dating back to 1997
   d. "aggregated monthly accounts payable information for each parts vendor"
   e. "weekly estimates and authorizations from production control"

3. **SIA's response:**

   SIA offered to produce "[e]stimates and authorizations documents showing SIA part number and rolling, 13-week forecast; 2-year retention period" (Smedley Decl. Ex. E, p. 5). These documents do not contain pricing information.

4. **Serving Parties' reply:**

   a. In their November 4, 2016 letter, the Serving Parties expressed concern for the 2-year "estimates and authorizations" period. These electronic documents are on a rolling two-year retention period. They are no longer printed to hard-copy, and the Materials group does not retain them. Production Control is unaware of "any other records containing the same information from the relevant time period."

   b. The Serving Parties also pushed back on VIN-level cost data, stating it is "apparent" that VIN-level cost data can be derived from "bills of materials … read in conjunction with the parts master list …." (Smedley Decl. Ex. H, p. 6). SIA simply does not have cost data at the VIN level.  The deposition from Mr. Rausch at pages 11-12 and 20-22 does not represent that SIA has cost data at the VIN level.

5. **SIA's revised response:**

   Subject to the conditions in its October 31, 2016 letter (Smedley Decl. Ex. C), SIA will produce the following:

a. Bills of materials for the two most current vehicle models. It is SIA's ordinary practice to overwrite historical bills of materials with current, so documents no longer exist for earlier vehicle models. As SIA has never before produced these documents, the burden and timeframe are currently unknown and will not be known until production begins.

b. General ledger information dating back to 1998 for each Vehicle model. As SIA has never before produced these documents, the burden and timeframe are currently unknown and will not be known until production begins.

c. Excel-based monthly financial statements dating back to 1997. As SIA has never before produced these documents, the burden and timeframe are currently unknown and will not be known until production begins.

d. Aggregated monthly accounts payable information for each parts vendor. As SIA has never before produced these documents, the burden and timeframe are currently unknown and will not be known until production begins. However, SIA anticipates that these data will be particularly burdensome and time-consuming to produce.

e. Estimates and authorizations documents showing SIA part number and rolling, 13-week forecast; 2-year retention period" (10/31/16 letter, p. 5). This does not contain pricing information.

This information is particularly competitively sensitive and SIA will need to engage the Serving Parties in further discussion about additional protections beyond the existing Protective Order.

**Vehicle Sales Data**

1. **Request:** "[S]ales data, or documents in the absence of data, reflecting SIA's sales to auto dealers or distributors (including off-invoice payments and incentives)."

2. **Specific documents requested:** "[C]opies of sales invoices dating back to 2007 … sent to SOA on a weekly basis for the vehicles manufactured by SIA and shipped to SOA for distribution."

3. **SIA's response:**

SIA did not originally offer to produce these documents. However, SIA revises its conditional offer to include existing electronic sales invoices. This information is particularly competitively sensitive and SIA will need to engage the Serving Parties in further discussion about additional protections beyond the existing Protective Order.

## V.   THE COURT SHOULD PROTECT NON-PARTY SIA FROM UNDUE BURDEN AND EXPENSE

A party issuing a subpoena must take reasonable steps not to impose undue burden on recipients. Fed. R. Civ. P. 45(d). Non-party status is entitled to special consideration when assessing burden. *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("parties to a law suit must accept [discovery's] travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations"). If the parties do not take such reasonable steps, the Court "must" impose appropriate sanctions, which may include "lost earnings and reasonable attorneys' fees." *Id*.  As Magistrate Stafford of the Southern Division recently noted in recommending denial of a motion to compel compliance with a document production subpoena:

> Rule 45 requires a party serving a subpoena on a nonparty to 'take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. This court is required to enforce that duty, and must quash or modify a subpoena that would subject the nonparty to an undue burden. [Recipient's] nonparty status is a relevant factor, as Rule 45 is intended to prohibit parties from shifting their significant litigation expenses to nonparties.

*In re Subpoena to Schrader-Bridgeport Int'l, Inc.*, Misc. Case No. 16-50611, Case No. 3:14-cv-01226-MAD-DEP, 2016 WL 6662471, *1 (E.D. Mich. Aug. 26, 2016) (internal citations and quotations omitted).

The *Schrader-Bridgeport*, subpoena sought only fifteen categories of documents over a five-year time period (*id*.), considerably fewer documents and a substantially shorter time period than those at issue here. Further, the subpoena proponent "somewhat narrowed" the requests after an attorney conference. *Id*. Nonetheless, the court found the subpoena was "still exhaustive" and therefore would impose an undue burden on the nonparty recipient. *Id*. Addressing breadth, the court noted that the recipient "would have to comb through its electronic and physical files

16

for the fifteen separate categories of broadly defined 'documents.'" *Id*. at *2. The court also found the five-year time period relevant to burden. *Id*. Significantly, the court reasoned that "instead of describing documents with particularity … [the proponent] casted [sic] an unacceptably wide net." *Id*. In sum, the court found the proponent had "altogether failed" to fulfill its duty to avoid imposing undue burden or expense on the non-party recipient. *Id*.

Here, as in *Schrader-Bridgeport*, the Serving Parties' "narrowed" requests remain exhaustive, even after extensive meet-and-confer proceedings.

## VI. THE BURDEN AND EXPENSE ASSOCIATED WITH PRODUCING BUYERS' CUSTODIAL DOCUMENTS WOULD BE DISPROPORTIONATE TO THE ANTICIPATED RESULTS, CONSIDERING THE *AD HOC* NATURE OF BUYERS' DOCUMENT CREATION AND RETENTION

SIA's conditional offer was, and remains, for production of documents from active databases or other electronic repositories only. (Smedley Decl. Ex. C, p. 1). This remains a "significant area of disagreement" for the Serving Parties. (Smedley Decl. Ex. H, p. 2). The Serving Parties seek custodial documents related to SIA Buyers' "RFQ negotiation." *Id*. However, searching the Buyers' custodial files is unlikely to consistently yield relevant, responsive information.

SIA currently employs twenty-four (24) Buyers. (DeLong Dep. 39:22-25). A Buyer enters negotiations with a seller after receiving a Buyer's price quotation. (DeLong Dep. 40:24-41:10). SIA has no set form or format for receiving or documenting information received from sellers. (DeLong Dep. 41:22-42:1). Buyers could receive the information electronically or by hard copy, or – more likely – the information would be oral because the negotiations occur on-site. (DeLong Dep. 42:2-5; 83:15-19). The process of creating and retaining documents related to the RFQ process is *ad hoc* by Buyer. (DeLong Dep. 42:6-17). In order to determine whether and what relevant, responsive information is available, SIA would have to individually query each

current Buyer. (DeLong Dep. 42:18-25). This does not take into account Buyers no longer with

the company: SIA keeps this documentation, to the extent it ever existed, for seven (7) years.

(DeLong Dep. 43:1-17). Documents for Buyers no longer with the company would be stored on

SIA's U:drive *if* the Buyer him- or herself put it there, or in SIA's document "cage." (DeLong

Dep. 43:22-44:25; 82:25-83:4). SIA does not instruct the Buyers to store their "working

documents" (everything but the quote itself) on the U:drive; this is at the individual Buyer's

discretion. (DeLong Dep. 44:20-25). SIA would have to determine this for each individual

Buyer. (DeLong Dep. 45:1-9). Further, documents stored in the "cage" may be boxed by part, by

supplier, or even by Buyer if the Buyer has his or her own box. (DeLong Dep. 87:2-13).

In summary, SIA cannot ensure it has records of all negotiations between its Buyers and

parts sellers; any relevant, responsive documents would be "by Buyer," *ad hoc* as to content, and

would be at best an incomplete record of the negotiations. (DeLong Dep. 81:13-18; 82:13-24).

The burden and expense associated with performing custodial searches for RFQ information will

not justify the anticipated results, and because creation and maintenance of documents is *ad hoc*

by Buyer in the first place, even a sampling process would be unlikely to yield results that could

be extrapolated.

## VII.    THE COURT SHOULD AWARD SIA ATTORNEY FEES ASSOCIATED WITH RESISTING THE MONUMENTALLY BROAD SUBPOENA, AND ANY COMPLIANCE WITH NARROWED REQUESTS

Non-parties are entitled to recover the costs of complying with document production

subpoenas. In fact, a court "must" enforce the issuer's duty to avoid imposing undue burden, and

"must" impose appropriate sanctions – including lost earnings and reasonable attorney fees – if

the issuer fails to comply. Fed.R.Civ.P. 45(d)(1); *see also Hi-Lex Controls Inc. v. Blue Cross &*

*Blue Shield of Michigan*, Nos. 11-12557, 11-12565, 2013 WL 309147 at *1 (E.D. Mich. Jan. 25,

2013) (shifting costs away from non-party); *United States v. Blue Cross Blue Shield of Michigan*, Civil Action No. 10-CV-14155, 2012 WL 4838987 at *1 (E.D. Mich. Oct. 11, 2012) (shifting costs to protect non-party). Here, the Serving Parties purport to "narrow" the Subpoena's scope, but only at the midnight hour *after* SIA expended time and resources, and was forced to retain outside counsel, to protect its acknowledged "vital interest" in avoiding undue burden and expense. This effort included participating in extensive meet-and-confer sessions, working on briefing opposing the two motions to compel, retaining and working with two (2) experts, preparing and producing two company witnesses for Rule 30(b)(6) "discovery-on-discovery" depositions, participating in mediation, and other associated tasks involving in-house counsel, outside counsel, and SIA employees. If the Serving Parties had made substantial efforts to narrow the scope of the Subpoena when the SSEs initiated the "global summit" more than one year ago, much of the expense for which SIA seeks recovery could have been avoided.

The Serving Parties dismiss SIA's self-protective efforts by flipping the consequences of their own actions in serving and, for more than a year, refusing to narrow the Subpoena's scope. To be sure, the Serving Parties were on notice *before they served the Subpoena* that OEM recipients would react to it precisely as SIA did. (ECF Nos. 967 (*Direct Purchaser Plaintiffs' Motion to Limit Uniform Subpoena to OEMs*), 977 (*Ford Motor Company's Response to the Proposed Subpoena*), 992 (*Special Master's Order Regarding Direct Purchaser Plaintiffs' Motion to Limit Subpoena to OEMs*)). Still, they proceeded to serve the Subpoena within weeks of the Special Master's order, with precisely the anticipated result: SIA's fight to protect a vital interest. The Serving Parties claim SIA's pain was "self-imposed." (Renewed MTC at 22-23).

The Court should reject the Serving Parties' efforts and award SIA its costs (including SIA employees' wages) and reasonable attorney fees associated with resisting the original Subpoena and complying with any narrowed requests.

Dated: November 22, 2016

Respectfully submitted,

ICE MILLER LLP

/s/ Thomas E. Mixdorf
Thomas E. Mixdorf
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN  46282-0200
Thomas.Mixdorf@icemiller.com
Telephone:  (317) 236-5832
Facsimile:  (317) 592-4708

*Attorney for Subaru of Indiana Automotive, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 22, 2016, I caused a copy of the foregoing *Non-party Subaru of Indiana Automotive, Inc.'s Response In Opposition to the Parties' Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities* to be electronically filed via the Court's ECF system, which will serve notification of such filing to all counsel of record for the Parties.

/s/ Thomas E. Mixdorf
Thomas E. Mixdorf
