# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| **IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION** | **CASE NO. 12-MD-02311 HON. MARIANNE O. BATTANI** |
| **In Re:  OCCUPANT SAFETY SYSTEMS CASES** | |
| **THIS RELATES TO: ALL DIRECT PURCHASER ACTIONS** | **2:12-CV-00601-MOB-MKM** |

## NON-PARTY HONDA'S OPPOSITION TO THE PARTIES' MOTION TO COMPEL FURTHER SUBPOENA RESPONSES

Daniel Purcell
Justina Sessions
Ian Kanig
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
dpurcell@kvn.com
jsessions@kvn.com
ikanig@kvn.com

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  PROCEDURAL HISTORY ...................................................................................3

    A.  Honda's Meet-and-Confer Efforts After the Initial Motion to Compel..................3

    B.  Honda's Rule 30(b)(6) Depositions ................................................................6

    C.  The Parties' Renewed Motion to Compel........................................................7

III.  LEGAL STANDARD..............................................................................................7

IV.  ARGUMENT .........................................................................................................10

    A.  Honda Has Produced or Offered to Produce Most Responsive Documents..........11

        1.  Upstream Parts-Purchasing Data ............................................................11

        2.  RFQs and Related Documents ................................................................12

        3.  Annual Price Reductions and Related Communications ..........................12

        4.  Supplier Agreements................................................................................13

        5.  VIN-Level Cost Data ..............................................................................13

        6.  Internal Pricing........................................................................................15

        7.  Downstream Vehicle Sales Data..............................................................15

    B.  Further Demands for Upstream Materials Are Overbroad and Duplicative..........16

    C.  Searching Individual Employees' Files Is Unduly Burdensome ..........................19

    D.  Cost-Shifting Is Appropriate...........................................................................20

    E.  Plaintiffs Separately Request Privileged Documents .........................................23

        1.  Internal Settlement Deliberation Documents............................................23

        2.  External Settlement Communication Documents......................................24

V.  CONCLUSION........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Chevron Corp. v. Snaider*
   78 F. Supp. 3d 1327 (D. Colo. 2015) ........................................................................25

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*
   332 F.3d 976 (6th Cir. 2003) ............................................................................24, 25

*Hendricks v. Total Quality Logistics, LLC*
   275 F.R.D. 251 (S.D. Ohio 2011) ................................................................8, 16, 17

*Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*
   294 F.R.D. 87 (S.D. Ohio 2013) ..................................................................................8

*State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*
   315 F.R.D. 220 (E.D. Mich. 2016) ............................................................................7

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*
   474 F.3d 288 (6th Cir. 2007) ..............................................................................8, 19

*United States v. Blue Cross Blue Shield of Mich.*
   No. 10-CV-14155, 2012 WL 4513600 (E.D. Mich. Oct. 1, 2012) .................9, 10, 21

*United States v. Blue Cross Blue Shield of Mich.*
   No. 10-CV-14155, Dkt. No. 222 at 6 (E.D. Mich. Oct. 11, 2012) .................9, 21, 22

**Federal Rules**

Fed. R. Civ. P. 26 ..................................................................................7, 8, 20, 23, 24

Fed. R. Civ. P. 30 ....................................................................................4, 5, 6, 15, 17

Fed. R. Civ. P. 45 ........................................................................................7, 8, 9, 16, 19

## I.    INTRODUCTION

Honda[1] has already produced or offered to produce all information necessary for the Serving Parties to litigate the lead three indirect-purchaser actions.  These materials include purchasing data, supplier agreements, part-cost data, pricing documents, and downstream sales data at both the dealer and retail level.

Specifically, Honda has already produced or (subject to cost-shifting) has offered to produce:

- **Aggregate parts-purchase data** for wire harnesses, AVR parts, bearings, electronic control units, heater control panels, instrument panel clusters, fuse boxes, relay boxes, junction blocks, power distributors, wiring connectors and terminals, lead wire assemblies, cable bond, anti-lock brake skid sensors and wires, switches, occupant detection sensors, cable reels, oil pressure switches and sensors, fuel senders and gauges, switches, steering angle sensors, seat belts, spark plugs, radiators, and windshield wipers/washers;

- **Individual quotation data** (including adjustments to quotation prices) for wire harnesses, AVR parts, and bearings;

- **Transactional purchase data** from Honda's accounting system reflecting actual payments made to Honda's bearings and AVR parts suppliers, for the period that such data is online (i.e., three years);

- **Cost Correlation Summaries** for bearings and AVR parts;

---

[1] "Honda" collectively refers to the following entities: (1) American Honda Motor Company, Inc. ("AHM"); (2) American Honda Finance Corp.; (3) Honda Manufacturing of Indiana, LLC; (4) Honda North America, Inc. ("HNA"); (5) Honda of America Manufacturing, Inc.; (6) Honda of South Carolina Manufacturing, Inc.; (7) Honda Precision Parts of Georgia, LLC; (8) Honda R&D Americas, Inc.; (9) Honda Research Institute USA, Inc.; and (10) Honda Transmission Manufacturing of America, Inc.

1126487

- **Rebates** (i.e., non-part-specific payments) from Honda's bearings and AVR parts suppliers for the past three years and earlier if such data can be retrieved;

- **Maker Layout Evaluation Forms** (the forms Honda uses to evaluate supplier bids and compare and award part-supply business) for wire harnesses, AVR parts, bearings, electronic control units, heater control panels, instrument panel clusters, fuse boxes, relay boxes, junction blocks, power distributors, wiring connectors and terminals, lead wire assemblies, cable bond, anti-lock brake skid sensors and wires, switches, occupant detection sensors, cable reels, oil pressure switches and sensors, fuel senders and gauges, switches, steering angle sensors, seat belts, spark plugs, radiators, and windshield wipers/washers;

- **Maker Layout Evaluation Forms** for bearings and AVR parts to the extent not already produced (i.e., Honda has agreed to make a supplemental search for such documents);

- **Operations and procedure documents** detailing the process by which Honda evaluates suppliers and their bids;

- Detailed data on the prior-to-mass-production price and supplier of every single component in every Honda major model for the past ten years;

- **"Cost by Ship"** reports that purchasing provides to accounting prior to mass production, reflecting the total anticipated outsource cost for a vehicle;

- **Honda's purchasing contracts** with wire harness, bearings, and AVR parts suppliers;

- **Quarterly cost quotations** for all vehicles manufactured in North America for the entire subpoena period. These cost quotations reflect the price at which the manufacturing plant sells all vehicles to AHM (the sole distributor of Honda vehicles in North America). The manufacturing cost consists of (i) component costs; (ii) labor costs; and (iii) a fixed markup;

2

- **Schedule of all MSRP, dealer-invoice, and related prices** for all vehicles sold in North America since 2000.  Honda's MSRP and dealer-invoice price information is also publicly available;

- **VIN-level transactional data** on (i) purchase by AHM from Honda factories and (ii) sale from AHM to dealers for all vehicles sold in the United States;

- The data that Honda's dealers voluntarily provide from their dealer management systems regarding the terms of new vehicle sales, provided the dealers consent to Honda's production of that information; and

- Descriptions of all incentive programs for which Honda has been able to locate information.

The Court should reject the Serving Parties' remaining demands in light of this already massive production.  Their demands for additional materials are unnecessary, duplicative, and would multiply the already significant burden that Honda has endured in producing materials.  Accordingly, Honda requests that the Court deny the Motion to Compel or, at a minimum, order cost-shifting so that the Serving Parties bear some of the burdens associated with their unreasonable requests.

## II.   PROCEDURAL HISTORY

### A.   Honda's Meet-and-Confer Efforts After the Initial Motion to Compel.

Since the Special Master's hearing on the initial motion to compel, Honda has genuinely tried to resolve this discovery dispute without additional judicial intervention.  Prior to that hearing, Honda had already produced Honda produced

the DOJ Materials it had always agreed to produce. Declaration of Justina K. Sessions ("Sessions Decl.") ¶ 3 & Exs. A-C. The DOJ Materials included upstream parts-purchase data and maker layout evaluation forms ("MLEFs") for 21 different components. *Id.* ¶ 3. In total, the DOJ Materials consisted of over 700 pages, including native data. *Id*. ¶ 3. Around the same time, Honda also voluntarily produced MSRP and dealer-invoice prices, as well as related prices (such as holdback and D&H) and samples of dealer-pricing announcements for all US-sold vehicles for approximately the past 10 years. *Id.* ¶ 4.

On June 22, 2016, Honda unilaterally made the Serving Parties an additional, voluntary offer of production. *Id*. Ex. E. Specifically, Honda offered to produce aggregate "cost-by-ship" part cost data as well as the quarterly quotations that manufacturing provides to AHM. *Id.* This material would provide the necessary upstream information to calculate Honda's aggregate component costs. The cost-by-ship data are the information that Honda uses to price its vehicles. And the quarterly quotation documents reflect the all aggregate component, labor, and fixed markup costs. Additionally, Honda informed the Serving Parties that it had extensively searched for summary documents regarding price-setting, but did not locate any. *Id.* But in the interest of resolving the issue as quickly as possible, Honda offered to provide a Rule 30(b)(6) witness to testify regarding the process by which it sets MSRP and dealer-invoice prices (which it did). *Id.* Similarly, Honda

informed the Serving Parties that all data that it has regarding retail prices was duplicative of what the Serving Parties had received. *Id.* The Serving Parties never responded meaningfully to Honda's June 22 offer.

On August 30, 2016, Honda sent another message to the Serving Parties, again voluntarily expanding its offer of production. *Id.* Ex. F. Honda now also offered to produce backup to the cost-by-ship data for every major model change for the past 10 years. This backup data includes every supplier and every part in the vehicle. Honda also offered to produce the operations and procedure documents governing Honda's use of Maker Layout Evaluation Forms ("MLEFs"). *Id.* The MLEF operations and procedure documents permitted the Serving Parties to understand exactly how Honda compares suppliers and their bids. On September 12, 2016, Honda sent the Serving Parties a follow-up email. *Id.* Ex. G.

The Serving Parties then requested a meet-and-confer call for October 13, 2016. *Id.* Ex. I. After the call, the Serving Parties shared for the first time with Honda a revised list of requests.

In light of this development, Honda and the Serving Parties had another lengthy call on October 17, 2016. *Id.* ¶ 8. The Serving Parties asked many questions that Honda had already answered several times and questions that are answered on Honda's website (*e.g.*, historical models and model years, production and sales numbers). *Id.*

## B.      Honda's Rule 30(b)(6) Depositions

On November 3, 2016, the Serving Parties took the Rule 30(b)(6) deposition of Mark Willoughby, Division Manager of North American Purchasing at HNA. Sessions Decl., Ex. M (Willoughby Dep.). Mr. Willoughby testified about Honda's upstream transactional purchase data, the parts-procurement process, and vehicle manufacturing costs.  He provided information about how Honda solicits suppliers, buys parts, and organizes the process.  *Id.* at 19:13-44:7.  And when asked about the burden that Honda would incur if asked to retrieve and produce materials related to the parts-procurement process, he explained that the databases housing that information were "amazingly huge."  *Id.* at 71:19-72:8, 77:12-18.

On November 10, 2016, the Serving Parties took the Rule 30(b)(6) deposition of Barron Umemoto, Manager of the Pricing and Cross Brand Group for AHM. Sessions Decl., Ex. N (Umemoto Dep.).  Mr. Umemoto testified that Honda's MSRP and dealer-invoice values are calculated largely through competitive pricing information, not individual part pricing.  *E.g.*, *id.* at 72:21-73:21; 99:5-101:8. Similarly, he testified that the price of different trim options depended primarily on competitive pricing information and consumer choice.  *Id.* at 19:14-23.  With respect to the Serving Parties' request for information that would allow them to track particular parts through the supply and manufacturing chain, Mr. Umemoto testified that he did now know of any such documents.  *Id.* at 98:17-23.  For these reasons,

6

Mr. Umemoto made clear that the production of further parts-procurement materials would not help the Serving Parties determine pass-through costs (or the lack thereof).

### C.     The Parties' Renewed Motion to Compel

The Serving Parties filed the instant, renewed Motion to Compel on November 7, 2016.  Dkt. No. 1496.  In a Honda-specific declaration, the Serving Parties clarify that they are still seeking broad categories of documents stretching back over 20 years.  Dkt. No. 1495-3 ("Trager Decl.").

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs document subpoenas.  While subpoenaing parties may seek to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," production requests must be "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1); *see also State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*, 315 F.R.D. 220, 222 (E.D. Mich. 2016) ("A subpoena to a third party under Rule 45 is subject to the same discovery limitations as those set out in Rule 26.").  When determining whether a subpoena's request is proportional, courts must consider: (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the

discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.  Fed. R. Civ. P. 26(b)(1).

Rule 45 provides two additional limits on the scope of a subpoena.  *First*, a subpoenaed party is not obligated to respond to a request that seeks irrelevant information or is overbroad.  *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011).  The burden of showing irrelevance or overbreadth varies depends on whether the disputed request is facially defective.  "If the discovery sought appears relevant on its face, the party resisting the discovery has the burden to establish the lack of relevance but when relevancy is not apparent on the face of the request, the party seeking the discovery has the burden to show the relevancy of the request."  *Id.* (citations omitted).

*Second*, a subpoenaing party "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) ("District courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce.").  "Where, as here, discovery is sought from a non party, the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non party."  *Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87, 92 (S.D. Ohio 2013).  Where a

party violates these guidelines and serves an unduly burdensome subpoena, Rule 45(c)(1) provides that "[t]he issuing court must enforce [the subpoena-issuing party's duty to avoid imposing an undue burden] and impose an appropriate sanction-which may include lost earnings and reasonable attorney's fees-on a party or attorney who fails to comply." "This section of Rule 45 was added to protect nonparties 'against significant expense resulting from involuntary assistance to the court.'" Order Granting Plaintiff's Motions to Compel, *United States v. Blue Cross Blue Shield of Mich.*, No. 10-CV-14155, Dkt. No. 222 at 6 (E.D. Mich. Oct. 11, 2012) ("*Blue Cross II*") (quoting Fed. R. Civ. P. 45, advisory committee notes, 1991 amendment, subdivision (c)).

To determine whether the burden on a non-party is undue, courts ask (1) if compliance with the subpoena imposes an expense on the nonparty, and (2) if so, whether that expense is "significant." *United States v. Blue Cross Blue Shield of Mich.*, No. 10-CV-14155, 2012 WL 4513600, at *7 (E.D. Mich. Oct. 1, 2012) ("*Blue Cross I*") (citation omitted). If the cost is significant, "the court must protect the nonparty by requiring the party seeking discovery to bear at least enough of the expense to render the remainder non-significant. *Id.* (citation and marks omitted). "To determine how much cost to shift from the nonparty, the court must balance the equities of the particular case, including [1] whether the putative nonparty actually has an interest in the outcome of the case, [2] whether it can more readily bear its

cost than the requesting party; and [3] whether the litigation is of public importance."
*Id.* (citation omitted).

## IV.   ARGUMENT

The Serving Parties' renewed motion to compel further subpoena responses should be denied in the first instance.  As shown by the Serving Parties' Honda-specific declaration regarding its outstanding demands, Honda has produced or offered to produce sufficient information to satisfy the Serving Parties' litigation needs and, in fact, almost all the information the Parties seek to compel.  The Serving Parties' remaining requests seek irrelevant, unnecessary, or duplicative information, especially with regard to further upstream parts-procurement information.

To the extent that the Court believes further productions are relevant, they would constitute an undue burden.  Those burdens would be particularly arduous if the Court orders individual custodian searches and/or the retrieval, extraction, and review of archived materials.  To the extent further production is ordered, Honda requests substantial, equitable cost-shifting to help alleviate both the cost and time injuries that it will incur if ordered to make those productions.

Finally, Honda also continues to oppose Plaintiffs' now-renewed, separate motion to compel the production of confidential settlement communications that are plainly privileged.

1126487

### A.   Honda Has Produced or Offered to Produce Most Responsive Documents

Since the Special Master heard the initial motion to compel, Honda has met and conferred with the Serving Parties on at least five occasions and has produced two Rule 30(b)(6) corporate designees for deposition. to determine what materials they need to litigate the indirect purchaser action.  In light of the Serving Parties' current requests, Honda's productions and standing offers to produce are more than sufficient to meet the Serving Parties' needs.

### 1.   Upstream Parts-Purchasing Data

First, the Serving Parties demand further upstream part-purchasing data for both Defendant and non-Defendant suppliers from January 1, 1993 through the date of extraction.  Trager Decl. ¶ 6 & n.5.  But the Serving Parties recognize that Honda has only three years of accounts-payable data readily available; the rest is archived and not currently reasonably accessible.  *Id.* ¶ 7.  The Serving Parties also concede that Honda's existing productions have provided extensive purchasing data and that Honda has offered to produce a great deal more.  *Id.* ¶ 8 (noting that Honda has produced all purchasing data for wire harnesses, as well as substantial data for bearings and AVRPs); *id.* ¶ 9 (admitting that Honda is willing to produce even more data from its supplier price quotation database as well as its vendor codes correlating to individual part purchasing).  It is therefore unclear what additional parts-purchasing documents the Serving Parties are actually seeking.

1126487

### 2.   RFQs and Related Documents

Second, the Serving Parties request the entirety of Honda's RFQs and all "associated" documents from January 1, 1993 through the date of extraction.  *Id.* ¶¶ 10-14.   On its face, this request includes every Honda internal and external purchasing document created in the past 20 years.  It also appears to ignore the comprehensive information that they have or Honda has offered.  The defendants already have Honda's RFQs because Honda issues a blanket RFQ for each model, and many defendants have received such RFQs.  Declaration of Mark Willoughby ("Willoughby Decl.") ¶ 4(ii).  Honda has agreed to produce data on all quotations actually received for wire harnesses, bearings, and AVR parts.  And, Honda has already produced—and will do a supplemental search for—the MLEF spreadsheets that Honda actually uses to record, compare, and evaluate supplier RFQ responses. Honda has also offered to produce all of the supplier strategy documents for bearings and AVR parts that the Serving Parties demanded for the first time in the renewed motion to compel.  Sessions Decl., Ex. L.  Honda's extensive offer of production reveals this extremely broad request to be nothing more than a speculative, unjustified fishing expedition.

### 3.   Annual Price Reductions and Related Communications

Third, the Serving Parties seek production of all annual price reductions for all parts and all communications and negotiations regarding those APRs from

12

1126487

January 1, 1993 through the date of extraction. But Honda has offered to produce data reflecting quotation prices and adjustments to quotation prices for bearings and AVR part suppliers for the past ten years. Sessions Decl., Ex. D. Honda has also offered to produce all rebates from its bearings and AVR parts suppliers for the past three years and even earlier, if retrievable. *Id.* These documents contain all the data the Serving Parties seek.

### 4.   Supplier Agreements

Fourth, the Serving Parties seek all of Honda's agreements with auto parts suppliers. *Id.* ¶¶ 20-21. Again, there seems to be no real dispute here. Honda made this production on November 16, 2016. *Id.* ¶ 5 & Ex. D.

### 5.   VIN-Level Cost Data

Fifth, the Serving Parties demand all "VIN-level cost data (or the least-aggregated level of information tracked) for all years, makes, models, and trim combinations, including options and accessories, from January 1, 1993 to December 31, 2014." But Honda cannot provide VIN-level pre-production data because vehicles have no VIN prior to production. Instead, Honda has already produced its detailed cost simulation system ("CSS") data for every major model for the past 10 years. Trager Decl. ¶ 23; Sessions Decl. ¶ 5, Ex. D. That information includes every part in the vehicle, its supplier, and its cost before mass production. *Id.* Honda also offered to produce its cost-by-ship data, which provides the total anticipated

13

outsource cost for every vehicle, "as far back in time as the information is readily accessible." *Id.*, Ex. E.  And Honda will produce its cost correlation summaries, as the Serving Parties note, for bearings and AVR parts to the extent that such documents can be located after a reasonably diligent search. *Id.* Ex. L.[2]  With respect to production costs, Honda has produced quarterly manufacturing price quotations. *Id.* ¶ 5 & Ex. D.

Notwithstanding this extensive offer, the Serving Parties demand "VIN-level" cost data.  Their request for post-production VIN-level costs data is unnecessary and duplicative because manufacturing costs do not vary VIN-to-VIN.  Honda has produced information from which the Serving Parties can discern the cost of every vehicle Honda has manufactured in the US since 1998.  Nonetheless, Honda has offered to produce VIN-level transactional data on purchases by AHM from the factories and the sales from AHM to dealers provided the Serving Parties are willing to compensate Honda for the time required to generate this duplicative data.  *See* Sessions Decl. Ex. K, L.  This data would take approximately 60 hours to generate for the past year and an additional 8 hours for every additional year of data.  *Id.*; *see also* Sessions Decl. ¶ 7.

---

[2] The only upstream cost-related data that Honda has not agreed to produce is from its cost management system ("CMS"), because that data is already located in Honda's E-Quote database, which Honda has agreed to produce separately.  Willoughby Decl. ¶ 3(iv).

14

### 6.    Internal Pricing

Sixth, the Serving Parties demand unidentified information relating to Honda's vehicle pricing, including internal determinations, evaluations, studies, manuals, and instructions, from January 1, 1995 to December 31, 2014.  Trager Decl. ¶ 30.  Honda has already explained that no documents exist that "summarize" the pricing process.  *Id.* ¶ 33; Sessions Decl., Ex. E.  The Serving Parties have taken the Rule 30(b)(6) deposition of Honda's corporate designee on pricing and vehicle sales, Mr. Umemoto.  Mr. Umemoto fully explained Honda's internal pricing policies. Moreover, since taking Mr. Umemoto's deposition on November 10, 2016, the Serving Parties have failed to supplement their motion to compel with any specific demands regarding pricing documents.

### 7.    Downstream Vehicle Sales Data

Seventh, the Serving Parties demand production of all downstream vehicle sales information.  Trager Decl. ¶ 35.  This request includes, "for each model (and model year) for each new vehicle sold, the start of production date, year when sales began, year when sales ended, schedule of base model prices, schedule of MSRP, MSRP for all standard models offered, including base and other standard trim packages, and amounts paid by distributors and dealers to the OEMs, including but not limited to, invoice price, dealer invoice price, or factory invoice price."  *Id.*  But as the Serving Parties expressly acknowledge, Honda has already produced MSRP

15

and dealer-invoice data to the Serving Parties, much of which is publicly available anyway. *Id.* ¶ 39; Sessions Decl. ¶ 4.[3]  In the same downstream vein, the Serving Parties also move to compel sales data reflecting sales to distributors (to whom Honda does not sell) vehicle dealers and end-purchasers, including off-invoice payments, incentives, rebates, and data reflecting actual payments of any off-invoice payments, incentives, rebates. *Id.* ¶ 36.  Again, the Serving Parties fail to account for Honda's existing offers of production.  Honda has already offered to produce data regarding sales to dealers (subject to cost-shifting) and the limited data it has on end payor purchases. *See, e.g.* Sessions Decl. Ex. L.

## B.     Further Demands for Upstream Materials Are Overbroad and Duplicative.

A subpoenaed party is not obligated to respond to a request that seeks irrelevant information or is overbroad. *Hendricks*, 275 F.R.D. at 253.  It is true that where subpoena requests are facially relevant, the initial burden of showing irrelevance or overbreadth lies with the party resisting the discovery. *See id.*  But Honda's Rule 30(b)(6) deponents have now testified that the additional documents the Parties seek by this renewed motion are either irrelevant to their litigation needs or duplicative of what the Serving Parties already possess.  The Parties have failed

---

[3] The Serving Parties claim that the fact that this MSRP information is publicly available "demonstrates the limited substance" of Honda's offer of production, but Honda submits that this means the Serving Parties are unreasonably unwilling to help alleviate its production burden by looking for identical, free information in violation of Rule 45(d)(1). See Trager Decl. ¶ 39 & n.18.

16

to rebut this showing with any evidence.  Accordingly, Honda requests that the Special Master deny the Parties' motion to compel in full.

Honda's  designee on internal pricing, Mr. Umemoto, testified that Honda does not possess any documents that the Parties could use to calculate pass-through injury to end payors on a part-by-part basis.  Mr. Umemoto explained that Honda's MSRP and dealer-invoice values are calculated largely by evaluating competitive pricing information, not individual part pricing.  *Id*. at 72:21-73:21; *see also id.* at 13:2-22;  15:5-16:4;  16:24-17:20;  57:12-58:8;  *see also*  Dkt. No. 1229-5  ¶ 5 ("Umemoto Decl.").  The same is true of different trim options.  *Id.* at 19:14-23.

Furthermore, to the extent that part pricing did affect Honda's vehicle pricing to dealers, Honda did not have any documents that would allow the Parties to isolate one part's cost effect from the aggregate cost effect of all parts.  To that end, Mr. Umemoto attested that: "When [Honda] considers manufacturing costs, it generally considers them in the aggregate.  The prices of individual components are not separately factored into [Honda]'s final prices for a vehicle model."  *Id.*  This testimony supplements the expert opinion of the OEMs' antitrust economist, Dr. McDonald, who opined that the Parties would not be able to calculate indirect pass-through injury on a part-by-part basis because there were multiple conspiracies running at once.  Dkt. No. 1227-20 ¶ 22.  And even if there was some correlation between individual part pricing and Honda's vehicle pricing, Honda has no "data or

17

communications that would enable one to trace a change in the price of an individual component to a change in [Honda's] MSRP or dealer-invoice price for a vehicle model." Umemoto Decl. ¶¶ 3-6; Umemoto Dep. at 98:17-23.

Additionally, the Serving Parties' request for each individual RFQ that Honda issued during the entire Subpoena period is abusive and duplicative. *See* Trager Decl. ¶¶ 10-14. Mark Willoughby, Division Manager of North American Purchasing at HNA, testified that Honda's Purchasing Department uses a "blanket RFQ" for each model. Willoughby Dep. 56:3-11; *accord* Willoughby Decl. ¶ 4(ii). Any Defendant that supplied parts to Honda would already have Honda's RFQ within its possession. Willoughby Decl. ¶ 4(ii).

For these reasons, any demand for further upstream data that is predicated on the premise that the Parties are going to construct a part-by-part analysis of pass-through injury is specious. There is no correlation between Honda's internal pricing and the upstream part procurement process on the basis of an individual component and no documents that could track that injury on a component-by-component basis. Furthermore, Defendants already have all RFQ materials within their possession. Accordingly, the Special Master should deny the Parties' motion to compel further upstream documents as overbroad and duplicative.

## C.      Searching Individual Employees' Files Is Unduly Burdensome

The Special Master should outright deny the Serving Parties' requests for

Honda to search, review, and produce the files of individual custodians as well as its

database of RFQs.  *See* Fed. R. Civ. P. 45(d)(1) (serving party has duty to avoid

unduly burdensome subpoena requests); *see also Surles*, 474 F.3d at 305 (courts

have discretion to disallow such requests).

The Serving Parties demand that Honda search and review individual

employees' files for "pricing data, including back-up materials for internal

determinations, internal evaluations, studies, manuals and instructions."  Trager

Decl. ¶ 30.  But Mark Willoughby, Division Manager of North American Purchasing

at HNA, attests that individual employees' files are unlikely to contain any relevant

pricing documents.  Willoughby Decl. ¶¶ 1, 4(i).  The reason is that employees in

the North American Purchasing Department who buy parts normally negotiate with

suppliers face-to-face or over the phone.  *Id.* ¶ 4(i).  Additionally, suppliers provide

their price quotations through Honda's E-Quote portal, so individual buyers at

Honda would not have significant non-duplicative information.  *Id.*

Furthermore, performing these individual searches would be "extremely

burdensome."  *Id.*  First, Honda would have to reverse-engineer a list of all the

buyers who worked on bearings or AVR parts during the Subpoena's time period.

*Id.*  This information is not maintained in a readily accessible form and, instead,

19

Honda would have to piece the historical information together from their employees' memory and discussions with other employees. *Id.* Second, after identifying the potentially relevant personnel, Honda would have to locate them and interview them to determine where they might have kept documents. Those sources (potentially hard drives, hard-copy document, and email files) would then need to be copied and reviewed individually.

Given the fact that individual employees' files are unlikely to contain any relevant documents and the extreme burden that Honda would incur in searching those files, the Serving Parties' request for such searches constitute an undue burden. And in light of Honda's substantial productions and standing offers to produce documents in response to each of the Serving Parties' revised requests, requiring Honda to search individual employees' files would violate Rule 26(b)'s proportionality requirement. The burden of searching and reviewing these materials categorically outweighs their probativeness. The Serving Parties have all the Honda data they need to construct their economic analyses.

### D.    Cost-Shifting Is Appropriate.

Honda requests equitable cost-shifting, both for the significant effort it has already undertaken to respond to the Subpoena, as well as for any additional materials that the Court might order produced. To that end, Honda and the Parties agree that *Blue Cross*, 2012 WL 4513600 at *7, states the controlling test for cost-

shifting in this District.[4]  Courts make two findings to determine if cost shifting is appropriate: (1) whether compliance with the subpoena imposes an expense on the nonparty, and (2) if so, whether that expense is "significant."  *Id.*

In this case, there is no real question that Honda has and would incur significant costs complying with the Subpoena.  The Parties themselves have admitted that Honda's "massive" burden requires cost-shifting.  Dkt. No. 1227-7 at 2.  Honda's attorneys have already performed over 400 hours of work in connection with the Subpoena and Motion to Compel.  Sessions Decl. Ex. 6.  Mr. Willoughby's declaration outlines the hundreds of hours Honda employees will spend locating and generating the information Honda has agreed to produce.  *See* Willoughby Decl. ¶ 3.

Honda proposes that the Serving Parties reimburse Honda $100 per hour of Honda employee time and $500 per hour of attorney time required for compliance with the Serving Parties requests, and that the Serving Parties pay Honda's actual costs of copying, hosting, and creating productions.  For point of reference, in *Blue Cross II*, the court found that subpoena compliance costs as minimal as $14,720 and

---

[4] Honda notes, however, that when the court in *Blue Cross* stated that this rebuttal burden is "particularly heavy," *id.* at *6, it meant that "the nonparty cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance with the subpoena," *id.*

21

$16,127 were significant enough to warrant cost-shifting. *Blue Cross II*, Dkt. No. 222 at 6. The burden here is already orders of magnitude larger.

Honda submits that the Serving Parties should bear the costs of compliance with their Subpoena. Honda arrived at that outcome by weighing: "[1] whether the putative nonparty actually has an interest in the outcome of the case, [2] whether it can more readily bear its cost than the requesting party; and [3] whether the litigation is of public importance." *Id.* First, although the Parties have attempted to characterize Honda as a party to this litigation by virtue of the fact that Honda is an absent class member in the direct purchaser action, nothing is further from the truth. Honda has absolutely no monetary stake in the outcome of the indirect purchaser action. It is not relying on discovery from this action. Indeed, apart from responding to this Subpoena, Honda has played no role in this action and, in fact, is one of the largest victims of the conspiracies at issue in this case. Second, there is no evidence in the record showing that Honda can bear the burden of the Subpoena "more readily" than the Parties. Defendants are also large companies, and the Serving Parties have created the massive burdens by refusing to narrow their requests. The Serving Parties have no incentive to be reasonable if Honda must bear all the costs they seek to impose. And third, Honda admits that this litigation is of public importance, but Honda has taken the public's interest seriously by agreeing to

22

produce a mountain of data and documents already.  Shifting costs to the Serving Parties is more than equitable under this test.

### E.     Plaintiffs Separately Request Privileged Documents

Subpoena Request No. 31 deals with two categories of information: internal settlement deliberations by the SSEs, and external communications with the Defendants and others.  The Court should deny the Plaintiffs' separate motion to compel confidential settlement communications as privileged.

### 1.     Internal Settlement Deliberation Documents

The Plaintiffs make no effort to conceal their desire to discover the "internal communications within each one of the SSEs regarding the [settlement] discussion SSEs had with Defendants."  They cite no case entitling them to such clearly privileged information.  Since attorneys would be involved in any such communications, this information would invariably be protected by the attorney-client privilege.  These communications, and associated analyses, are also non-discoverable core work product.  *See* Fed. R. Civ. P. 26(b)(3)(A) ("a party may not discover documents … prepared in anticipation of litigation.").  Moreover, even if those privileges did not apply, the Sixth Circuit recognizes a distinct "settlement privilege," even in the context of external communications.  *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 982-83 (6th Cir. 2003).  This "settlement privilege is . . . necessary" to avoid "undesirable results" and to further

23

the "strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations." *Id.*

Seeking to side-step the core protections applicable to internal deliberations, Plaintiffs address only the *Goodyear* settlement privilege applicable to external communications.    But neither of their attempts to distinguish *Goodyear* is persuasive.  First, they say that Goodyear only applies if the Defendants are liars, claiming *Goodyear* turned on a finding that "the statements at issue were likely to be untrue." C.P. Br. 13.  This is invented; *Goodyear* turned on no such thing.

Second, they argue that the settlement privilege does not apply because the SSEs have not yet filed a case.  *Id.*  But that is irrelevant, as Rule 26(b)(3) expressly protects documents prepared in "anticipation of litigation," and the attorney-client privilege applies regardless.  The fact that SSEs are putative class members who will soon need to make opt-out decisions is sufficient to trigger the *Goodyear* protections.

## 2.    External Settlement Communication Documents

Request 31 also seeks two categories of external communications.  First, it seeks documents the Defendants provided to the SSEs in an effort to settle the case. Such documents are covered by the *Goodyear* settlement privilege.  But even if they were not, the "Defendants in this litigation have agreed to produce documents in response" to an identical request.  C.P. Br. 11-12.  Thus, if Plaintiffs want to know "how the Defendants explained the conspiracy to their major customers," they only

need to review those documents. *Id.* The Plaintiffs' only argument for requiring production of the same from the SSEs is that there may be documents the Defendants "did not retain." *Id.* But unfounded speculation of spoliation is not a basis for duplicative discovery from the SSEs.

Second, Request 31 seeks communications about the case between the SSEs and non- Defendant suppliers. Such information is not relevant, if it even exists. Gossip about this case has no bearing on the truth or falsity of any allegation. *Chevron Corp. v. Snaider*, 78 F. Supp. 3d 1327, 1345 (D. Colo. 2015); *Goodyear*, 332 F.3d at 982-83.

## V.   CONCLUSION

For these reasons, Honda respectfully requests that the Court deny the Motion to Compel and order cost-shifting for Honda's compliance with the Subpoena.

1126487

Dated:  November 22, 2016

   /s/ Ronald C. Wernette, Jr.
Ronald C. Wernette, Jr.
THE WERNETTE LAW FIRM,  PLLC
1877 Orchard Lake Rd. Suite 102
Sylvan Lake MI 48320
Telephone:     248 977 3142
Facsimile:      248 977 3380
ron.wernette@wernettelawfirm.com

   /s/ Daniel Purcell
Daniel Purcell
Justina Sessions
Ian Kanig
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188
dpurcell@kvn.com
jsessions@kvn.com
iankanig@kvn.com

*Attorneys for Non-Party Honda*

26

1126487