# EXHIBIT L



633 Battery Street
San Francisco, CA 94111-1809

415 391 5400
kvn.com

**Daniel Purcell**
(415) 773-6697
dpurcell@kvn.com

November 11, 2016

**VIA EMAIL PDF**
**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS EYES ONLY**

Special Master Gene J. Esshaki

Re:   *In Re Automotive Parts Antitrust Litigation*, Master File No. 12-MD-02311 (E.D. Mich.)

Dear Special Master Esshaki:

Honda has made an extensive offer of production that would provide the serving parties with the core data and information that they seek. As detailed further below, Honda has produced or offered to produce documents and data in each of the categories that the serving parties describe in their declaration. But the serving parties have insisted on demanding additional documents beyond this, including materials that are duplicative and at best marginally relevant to any issue in this case. The serving parties' demands exceed the bounds of what is properly requested in a Rule 45 subpoena to a non-party, and when viewed as a whole would impose unreasonable burdens on Honda, requiring Honda to devote weeks of valuable employee time to document collection and production.

Because this letter is intended only to be a brief summary of Honda's position, Honda will not respond to each argument and demand in the serving parties' motions and the Honda-specific Trager Declaration. Honda disagrees with the serving parties' characterizations of the law (including regarding relevance and cost-shifting) and their attempt to suggest that Honda has been anything but open and cooperative. As discussed below, Honda has proactively tried to engage the serving parties for months now but has met with an outright refusal to meaningfully narrow the scope of production.

Honda also disagrees with the serving parties' legally mistaken contention that the usual third-party discovery rules and protections do not apply here because Honda is an absent class member in the direct-purchaser cases. The serving parties' requests for vast amounts of information regarding vehicle pricing, costs, and downstream transactions is not relevant to any claims Honda might have as a direct purchaser and primary victim of the parts conspiracies. Further, Honda continues to oppose the serving parties' motion to compel regarding Document Request No. 31, which seeks privileged and non-discoverable settlement communications. In the event these issues cannot be resolved at mediation, Honda will provide further detail in its formal opposition to the motions to compel. Honda understands the purpose of this letter to be to provide the Special Master with information that will make the upcoming mediation session more productive—not to submit every piece of information that the Special Master needs to rule on the renewed motions to compel.

1124472.01

Special Master Esshaki  HIGHLY CONFIDENTIAL – OUTSIDE
November 11, 2016  ATTORNEYS EYES ONLY
Page 2

A. **Honda's extensive meet-and-confer efforts.**

Honda has been conferring with the serving parties for many months concerning the document subpoenas to Honda.

- On June 22, 2016, Honda's counsel sent Ronnie Speigel and Jeniphr Breckenridge a message, discussing Honda's several conversations with the serving parties before that date, answering questions about Honda's data, and making an offer of production. The serving parties never responded definitively to that offer.

- On August 30, 2016, Honda sent another detailed message, answering the follow-up questions that the serving parties had posed on our various calls and expanding Honda's offer of production. The serving parties never responded definitively to that offer, either.

- On September 12, 2016, Honda followed up on and clarified points in its August 30 offer.

- The parties next asked for a meet and confer on October 13, 2016, and Honda obliged. The October 13 conversation lasted over an hour, in part because several of the people on the phone were not familiar with the information Honda previously provided regarding its documents and data, and because the serving parties had not shared with Honda their list of purportedly narrowed categories of information that they were seeking.

- On October 17, 2016, the parties then had another lengthy call, during which the serving parties asked several more follow up questions (including questions that are answered on Honda's website, such as MSRP and year and location of manufacture). And, although Honda had been asking for months whether there were any deposition topics that were unnecessary in light of Honda's extensive answers to the serving parties' questions and offer of production, the serving parties insisted that Honda make a proposal regarding what deposition-on-data-availability topics seemed unnecessary.

Although Honda has explained (several times) the types of cost data that it maintains and has made an offer of production, the serving parties nonetheless insist that they must take a deposition on unspecified "cost" discovery-on-discovery topics. Honda believes such a deposition is unnecessary and, moreover, Honda cannot adequately prepare a witness to provide testimony, because the serving parties have refused to identify the specific topics on which they believe they lack information.

B. **Honda's production to date and offer of further production.**

Honda is in the process of making a comprehensive and extensive production. In three separate productions dated January 29, 2016, March 22, 2016, and April 6, 2016, Honda produced the materials it had produced to the Department of Justice.[1] This includes Honda has already

---

[1] Honda made the majority of its DOJ-related productions before the mediation and hearing on

1124472.01

Special Master Esshaki                                   HIGHLY CONFIDENTIAL – OUTSIDE
November 11, 2016                                        ATTORNEYS EYES ONLY
Page 3

produced a significant volume of parts-purchase data and Maker Layout Evaluation Forms (or "MLEFs," the Honda documents that compare suppliers and their bids) for wire harnesses, electronic control units, heater control panels, instrument panel clusters, fuse boxes, relay boxes, junction blocks, power distributors, wiring connectors and terminals, lead wire assemblies, cable bond, anti-lock brake skid sensors and wires, switches, occupant detection sensors, cable reels, oil pressure switches and sensors, fuel senders and gauges, switches, steering angle sensors, seat belts, spark plugs, radiators, AVR parts, windshield wipers/washers, and bearings. As a supplement to this already-extensive production, Honda has already produced or has offered to produce the following:

- "Cost by Ship" reports that purchasing provides to accounting and manufacturing prior to mass production. This data includes the total anticipated outsource cost for a vehicle.

- Detailed cost simulation system (CSS) data for every Honda major model for the past 10 years. This CSS data includes every single component in the vehicle, the supplier, and the cost prior to mass production.

- Honda's purchasing contracts with bearings and AVR parts suppliers, to the extent they could be located after a reasonably diligent search. Thus, there appears to be no dispute—and no need to move to compel—regarding Honda's contracts and paragraphs 20 and 21 of the Trager Declaration.[2]

- Operations and procedure documents governing Honda's use of MLEFs (including the criteria on which Honda evaluates suppliers and their bids).

- Quarterly cost quotations for all vehicles manufactured in North America for the entire subpoena period. As Honda's counsel has repeatedly explained, these cost quotations reflect the price at which the manufacturing plant sells all vehicles to American Honda Motor Company, Inc. (the sole distributor of Honda vehicles in North America). The manufacturing cost consists of (i) component costs; (ii) labor costs; and (iii) a fixed markup. Honda has repeatedly told the serving parties that it does not maintain manufacturing cost data (or component cost data) on a VIN-by-VIN basis. Thus, Honda does not understand what additional data the serving parties seek with respect to non-component costs and do not understand the basis for the renewed motion to compel "cost data." *See* Trager Decl. ¶¶ 22-29.

---

the serving parties' initial motion to compel, and thus well before the Special Master's ruling on that motion ordering the OEMs to produce such documents.

[2] The serving parties' statement that "the parties will consider accepting Honda's form MPA as well as a sampling of readily accessible contracts with Honda's suppliers from the period," Trager Decl. ¶ 21, is curious, given that Honda has already told the serving parties during meet-and-confer discussions that it will produce the contracts.

1124472.01

Special Master Esshaki  HIGHLY CONFIDENTIAL – OUTSIDE
November 11, 2016  ATTORNEYS EYES ONLY
Page 4

- Schedule of all MSRP, dealer-invoice, and related prices for all vehicles sold in North America since 2000. Additional MSRP and dealer-invoice price information is publicly available. Thus, there appears to be no dispute—and no need to move to compel—regarding the demand in paragraph 35 of the Trager Declaration.

- The data that Honda's dealers voluntarily provide from their DMS systems regarding the terms of new vehicle sales, provided the dealers consent to Honda's production of that information.

- Description of all incentive programs for which Honda has been able to locate information.

Honda has reserved the right to seek costs and attorneys' fees associated with such productions.

Further, in response to the additional requests articulated for the first time in the serving parties' renewed motion to compel, Honda is also willing to produce the following on the condition that the serving parties pay Honda's costs (including reasonable compensation for Honda employees' time) and attorneys' fees associated with creating, collecting, reviewing, and/or producing the following materials:

- Cost Correlation Summaries for bearings and AVR parts, to the extent such documents can be located after a reasonably diligent search of the shared drive that the serving parties identified. *See* Trager Decl. ¶ 27.

- Transactional purchase data from Honda's accounting system reflecting actual payments made to Honda's bearings and AVR parts suppliers, for the period that such data is online (i.e., three years);[3]

- Data reflecting quotation prices and adjustments to quotation prices (including the reason for such price changes) for Honda's bearings and AVR parts suppliers, for the past 10 years (*i.e.* E-Quote data). As this E-Quote data is fed into the cost management system (CMS), there is no need to compel Honda to produce the same data from the CMS database as well. *Cf.* Trager Decl. ¶¶ 19, 23.

- Rebates (i.e., non-part-specific payments) from Honda's bearings and AVR parts suppliers for the past three years and earlier if such data can be retrieved.

---

[3] The serving parties claim that they requested, but have not received, samples and/or Bates number examples of E-Quote reports reflecting price adjustments. Trager Decl. ¶ 16. That is not true. Indeed, the serving parties marked such documents as exhibits at Mr. Willoughby's deposition. Willoughby Depo. Exs. 2166-2168; *id.* at 201-04 (witness identifies such exhibits on the record as spreadsheets showing downloads of E-Quote data).

1124472.01

Special Master Esshaki  HIGHLY CONFIDENTIAL – OUTSIDE
November 11, 2016  ATTORNEYS EYES ONLY
Page 5

- MLEFs for bearings and AVR parts, to the extent not already produced.[4] These forms include information on all quotations received for a particular part, as well as Honda's comparison and evaluation of suppliers.

- Supplier strategy documents for bearings and AVR parts suppliers, to the extent any such documents exist and can be located after a reasonably diligent search. *See* Trager Decl. ¶ 14.

- VIN-level transactional data on (i) purchase by AHM from factory; and (ii) sale from AHM to dealer for all vehicles sold in the United States. Honda has informed the serving parties that it would take approximately 60 hours of Honda-employee time to generate this data for the past year, and an additional 8 hours for every additional year of data.

    Honda does not believe this production is necessary or warranted given that Honda's charges to its dealers for a particular model (i) do not vary from VIN-to-VIN; (ii) are already in the dealers' possession; and (iii) are of no additional value given Honda's production of dealer-invoice prices and associated data (*e.g.*, D&H) and incentives. Nonetheless, Honda can produce this information if the serving parties want it badly enough to pay for it.

C. **Remaining disputes between the serving parties and Honda.**

As the serving parties continue to demand extremely broad categories of documents and data, including documents and data that Honda has already produced or offered to produce, Honda cannot determine what actual disputes remain. It appears, however, that the parties will need to discuss at least the following issues at the upcoming mediation:

1. **Individual custodian searches**

Honda maintains its objection to the serving parties' demands for custodial (*i.e.*, individual-by-individual) searches for procurement or price-setting documents. As Honda's witnesses explained at deposition, these searches are highly unlikely to reveal relevant documents. For example, Honda's parts buyers normally negotiate with suppliers over the phone or face to face. The serving parties nonetheless demand that Honda search individual buyers' hard drives, email, and paper files in the hope of finding a needle in a haystack. The burden of these searches—including the cost of having an attorney perform a document collection interview, retrieving and copying the potentially relevant materials, reviewing all these materials (for both responsiveness and privilege), and producing them—vastly outweighs the potential that these searches might uncover a stray relevant document or two.

---

[4] Honda believes that it has already produced all MLEFs for bearings and AVR parts that could be located after a reasonably diligent search. Honda is willing to double-check that production to search for any additional MLEFs that may inadvertently have been omitted.

1124472.01

Special Master Esshaki          HIGHLY CONFIDENTIAL – OUTSIDE
November 11, 2016              ATTORNEYS EYES ONLY
Page 6

2. **Archived data**

As a starting point, the Federal Rules of Civil Procedure do not require Honda to produce data that is not reasonably accessible, including from archives. *See* Fed. R. Civ. Proc. 26(b)(2)(B). The serving parties' declaration attempts to create the false impression that restoring archived data is a simple matter of copying a few discs and turning them over to the serving parties. That is obviously wrong. Honda must review every document that it produces for privilege and confidentiality, among other issues, and no litigant could risk the wholesale waiver of attorney-client privileges or work product immunity that would follow if it simply turned over its document archives to a third party. Even if discs or tapes that might potentially contain responsive data archives were located, those archives would then need to be restored and each restored document reviewed prior to production—a process that would take many hours and cost Honda many thousands of dollars.

3. **Individual RFQs**

The serving parties move to compel production of every single RFQ issued during the subpoena period. This request is unreasonable and unduly burdensome, and fails to take account of the information that the serving parties obtained during the Honda depositions. Honda's procurement witness testified that Honda issues one blanket RFQ for each model. *See* Willoughby Depo. at 52. As the defendant group includes a significant number of Honda suppliers, these RFQs are most likely already in the possession of the serving parties. The serving parties have made no attempt to evaluate what materials they have and articulate what additional materials they truly need and why. Instead, they are insisting on compliance with this redundant, blunderbuss request for all RFQs issued at any time.

Honda looks forward to addressing these remaining issues at mediation, and hopefully—with the Special Master's assistance—reaching a reasonable compromise that can avoid the need for further motion practice.

Sincerely,

Daniel Purcell

DEP:jlw

cc: Counsel for the Serving Parties

1124472.01