```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

 3                      —    —    —

 4   IN RE:  AUTOMOTIVE WIRE HARNESS
     SYSTEMS ANTITRUST                Case No. 12-md-02311
 5
                  MDL NO. 2311
 6   _____/

 7

       STATUS CONFERENCE, MOTION HEARINGS, FINAL APPROVAL HEARING
 8
                BEFORE THE HONORABLE MARIANNE O. BATTANI
 9                  United States District Judge
                Theodore Levin United States Courthouse
10                  231 West Lafayette Boulevard
                         Detroit, Michigan
11                  Wednesday, November 16, 2016

12
     APPEARANCES:
13
     Direct Purchaser Plaintiffs:
14
     DAVID H. FINK
15   FINK & ASSOCIATES LAW
     100 West Long Lake Road, Suite 111
16   Bloomfield Hills, MI  48304
     (248) 971-2500
17

18   NATHAN FINK
     FINK & ASSOCIATES LAW
19   100 West Long Lake Road, Suite 111
     Bloomfield Hills, MI  48304
20   (248) 971-2500

21
     GREGORY P. HANSEL
22   PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
     One City Center
23   Portland, ME  04112
     (207) 791-3000

24

25
```

```
 1    APPEARANCES: (Continued)

 2    Direct Purchaser Plaintiffs:

 3    STEVEN A. KANNER
      FREED, KANNER, LONDON & MILLEN, L.L.C.
 4    2201 Waukegan Road, Suite 130
      Bannockburn, IL  60015
 5    (224) 632-4502

 6
      EUGENE A. SPECTOR
 7    SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
      1818 Market Street, Suite 2500
 8    Philadelphia, PA  19103
      (215) 496-0300
 9
10    RANDALL B. WEILL
      PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
11    One City Center
      Portland, ME  04112
12    (207) 791-3000

13    End-Payor Plaintiffs:

14    DEVON ALLARD
      THE MILLER LAW FIRM, P.C.
15    950 West University Drive, Suite 300
      Rochester, MI  48307
16    (248) 841-2200

17
      JOYCE CHANG
18    COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
19    Burlingame, CA  94010
      (650) 697-6000
20
21    ROD M. JOHNSTON
      SOMMERS SCHWARTZ
22    1 Towne Square, Suite 1700
      Southfield, MI 48076
23    (248) 236-5752

24

25
```

```
 1    APPEARANCES: (Continued)

 2    End-Payor Plaintiffs:

 3    OMAR OCHOA
      SUSMAN GODFREY, L.L.P.
 4    901 Main Street, Suite 5100
      Dallas, TX  75202
 5    (214) 754-1913

 6

 7    WILLIAM V. REISS
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
      601 Lexington Avenue, Suite 3400
 8    New York, NY  10022
      (212) 980-7405
 9

10    HOLLIS L. SALZMAN
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
11    601 Lexington Avenue, Suite 3400
      New York, NY  10022
12    (212) 980-7405

13

14    ELIZABETH T. TRAN
      COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
15    Burlingame, CA  94010
      (650) 697-6000

16


17    Dealership Plaintiffs:

18    DON BARRETT
      BARRETT LAW OFFICES
19    P.O. Drawer 927
      Lexington, MS  39095
20    (601) 834-2376

21
      ALEXANDER E. BLUM
22    MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
      1361 East Big Beaver Road
23    Troy, MI  48083
      (248) 457-9200

24


25
```

```
 1    APPEARANCES:  (Continued)

 2    Dealership Plaintiffs:

 3    JONATHAN W. CUNEO
      CUNEO, GILBERT & LaDUCA, L.L.P.
 4    507 C Street NE
      Washington, D.C.  20002
 5    (202) 789-3960

 6

 7    KATHRYN EISENSTEIN
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
 8    1361 East Big Beaver Road
      Troy, MI  48083
 9    (248) 457-9200

10    JOHN KAKINUKI
      KAKINUKI LAW OFFICE, P.C.
11    2 Civic Center Drive, #4222
      San Rafael, CA  94913
12    (415) 492-2011

13

14    KENTON KNOP
      KAKINUKI LAW OFFICE, P.C.
15    2 Civic Center Drive, #4222
      San Rafael, CA  94913
16    (415) 492-2011

17    EVELYN LI
      CUNEO, GILBERT & LaDUCA, L.L.P.
18    507 C Street NE
      Washington, D.C.  20002
19    (202) 789-3960

20

21    SEAN P. McCONNELL
      DUANE MORRIS, L.L.P.
22    30 South 17th Street
      Philadelphia, PA  19103
23    (215) 979-1342

24    J. MANLY PARKS
      DUANE MORRIS, L.L.P.
25    30 South 17th Street
      Philadelphia, PA  19103
      (215) 979-1342
```

```
 1    APPEARANCES:  (Continued)

 2    Dealership Plaintiffs:

 3    SHAWN M. RAITER
      LARSON KING, L.L.P.
 4    30 East Seventh Street, Suite 2800
      Saint Paul, MN  55101
 5    (651) 312-6500

 6
      VICTORIA ROMANENKO
 7    CUNEO, GILBERT & LaDUCA, L.L.P.
      507 C Street NE
 8    Washington, D.C.  20002
      (202) 789-3960
 9

10    WILLIAM SHOTZBARGER
      DUANE MORRIS, L.L.P.
11    30 South 17th Street
      Philadelphia, PA  19103
12    (215) 979-7385

13
      ANDREW R. SPERL
14    DUANE MORRIS, L.L.P.
      30 South 17th Street
15    Philadelphia, PA  19103
      (215) 979-7385
16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3    DAN V. ARTAEV
      THE MIKE COX LAW FIRM, P.L.L.C.
 4    17430 Laurel Park Drive North, Suite 120E
      Livonia, MI 48152
 5    (734) 591-4002

 6

 7    ALDEN L. ATKINS
      VINSON & ELKINS, L.L.P.
 8    2200 Pennsylvania Avenue NW, Suite 500 West
      Washington, D.C.  20037
 9    (202) 639-6613


10    DONALD M. BARNES
      PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
11    1919 Pennsylvania Avenue, NW, Suite 500
      Washington, D.C.  20006
12    (202) 778-.3056

13

14    EMILY BLACKBURN
      ARNOLD & PORTER, L.L.P.
15    555 Twelfth Street NW
      Washington, D.C.  20004
16    (202) 942-5000


17    MATT BOUCHER
      ALLEN & OVERY, L.L.P.
18    1221 Avenue of the Americas
      New York, NY  10020
19    (212) 610-6360

20
      MICHAEL G. BRADY
21    WARNER, NORCROSS & JUDD, L.L.P.
      2000 Town Center, Suite 2700
22    Southfield, MI  48075
      (248) 784-5032
23

24

25
```

```
 1    APPEARANCES:   (Continued)

 2    For the Defendants:

 3    JEREMY CALSYN
      CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
 4    2000 Pennsylvania Avenue NW
      Washington, D.C.  20006
 5    (202) 974-1500

 6
      PATRICK J. CAROME
 7    WILMER HALE
      1875 Pennsylvania Avenue NW
 8    Washington, D.C.  20006
      (202) 663-6610
 9

10    STEVEN F. CHERRY
      WILMER HALE
11    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
12    (202) 663-6321

13
      MICHAEL R. DEZSI
14    DETTMER & DEZSI, P.L.L.C.
      615 Griswold Street, Suite 1600
15    Detroit, Michigan 48226
      (313) 879-1206
16

17    BRANDON W. DUKE
      WINSTON & STRAWN, L.L.P.
18    1111 Louisiana Street, 25th Floor
      Houston, TX  77002
19    (713) 651-2600

20
      ABRAM ELLIS
21    SIMPSON, THACHER & BARTLETT, L.L.P.
      1155 F Street, N.W.
22    Washington, D.C. 20004
      (202) 636-5579
23

24

25
```

```
 1  | APPEARANCES:  (Continued)
 2  | For the Defendants:
 3  | J. CLAYTON EVERETT, JR.
    | MORGAN, LEWIS & BOCKIUS, L.L.P.
 4  | 1111 Pennsylvania Avenue NW
    | Washington, D.C.  20004
 5  | (202) 739-5860
 6  |
 7  | PETER M. FALKENSTEIN
    | JAFFE, RAITT, HEUER & WEISS, P.C.
    | 535 W. William, Suite 4005
 8  | Ann arbor, MI  48103
    | (734) 222-4776
 9  |
10  | KEVIN FEE
    | SIDLEY AUSTIN, L.L.P.
11  | One South Dearborn Street
    | Chicago, IL  60603
12  | (312) 853-4155
13  |
14  | MICHAEL FELDBERG
    | ALLEN & OVERY, L.L.P.
    | 1221 Avenue of the Americas
15  | New York, NY  10020
    | (212) 610-6360
16  |
17  | DANIEL T. FENSKE
    | JENNER & BLOCK
18  | 353 N. Clark Street
    | Chicago, IL 60654-3456
19  | (312) 222-9350
20  |
    | MARK. A. FORD
21  | WILMER HALE
    | 60 State Street
22  | Boston, MA 02109
    | (617) 526-6423
23  |
24  |
25  |
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3    ANITA G. FOX
      FRASER TREBILCOCK
 4    124 W. Allegan Street, Suite 1000
      Lansing, MI 48933
 5    (517) 482-5800

 6
      NICHOLAS GAGLIO
 7    AXINN, VELTROP & HARKRIDER L.L.P.
      114 West 47th Street
 8    New York, NY 10036
      (212) 728.2200
 9

10    LARRY S. GANGNES
      LANE POWELL, P.C.
11    1420 Fifth Avenue, Suite 4100
      Seattle, Washington  98101
12    (206) 223-7000

13
      DAVID C. GIARDINA
14    SIDLEY AUSTIN, L.L.P.
      One South Dearborn Street
15    Chicago, IL  60603
      (312) 853-4155

16

17    ADAM C. HEMLOCK
      WEIL, GOTSHAL & MANGES, L.L.P.
18    767 Fifth Avenue
      New York, NY  10153
19    (212) 310-8281

20
      FRED K. HERRMANN
21    KERR, RUSSELL & WEBER, P.L.C.
      500 Woodward Avenue, Suite 2500
22    Detroit, MI  48226
      (313) 961-0200

23
      HOWARD B. IWREY
24    DYKEMA GOSSETT, P.L.L.C.
      39577 Woodward Avenue, Suite 300
25    Bloomfield Hills, MI  48304
      (248) 203-0526
```

```
 1    APPEARANCES:   (Continued)

 2    For the Defendants:

 3    CORTLIN LANNINI
      COVINGTON & BURLING, L.L.P.
 4    One Front Street
      San Francisco, CA  94111
 5    (415) 591-7050

 6

      FRANK LISS
 7    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
 8    Washington, D.C. 20004
      (202) 942-5969
 9

10    BRADLEY R. LOVE
      BARNES & THORNBURG, L.L.P.
11    11 South Meridian Street
      Indianapolis, IN 46204
12    (317) 261-7896

13

      TIMOTHY J. LOWE
14    McDONALD HOPKINS, P.L.C.
      39533 Woodward Avenue, Suite 318
15    Bloomfield Hills, MI  48304
      (248) 220-1359
16

17    SHELDON H. KLEIN
      BUTZEL LONG, P.C.
18    41000 Woodward Avenue
      Bloomfield Hills, MI  48304
19    (248) 258-1414

20

      MICHELLE A. MANTINE
21    REED SMITH, L.L.P.
      225 Fifth Avenue, Suite 1200
22    Pittsburgh, PA  15222
      (412) 288-4268
23

      ALLYSON M. MALTAS
24    LATHAM & WATKINS, L.L.P.
      555 Eleventh Street NW, Suite 1000
25    Washington, D.C.  20004
      (202) 637-2200
```

```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:

 3   RONALD M. McMILLAN
     CALFEE, HALTER & GRISWOLD, L.L.P.
 4   1405 East Sixth Street
     Cleveland, OH  44114
 5   (216) 622-8621

 6

 7   STEFAN M. MEISNER
     MCDERMOTT WILL & EMERY
     500 North Capitol Street, NW
 8   Washington, D.C. 20001
     (202) 756-8000
 9

10   BRIAN M. MOORE
     DYKEMA GOSSETT, P.L.L.C.
11   39577 Woodward Avenue, Suite 300
     Bloomfield Hills, MI  48304
12   (248) 203-0772

13

     GEORGE A. NICOUD, III
14   GIBSON, DUNN & CRUTCHER, L.L.P.
     555 Mission Street
15   San Francisco, CA  94105
     (415) 393-8200
16

17   RONALD NIXON
     KEMP KLEIN LAW FIRM
18   201 West Big Beaver Road, Suite 600
     Troy, MI  48084
19   (248) 528-1111

20
     STEVEN REISS
21   WEIL, GOTSHAL & MANGAS L.L.P.
     767 Fifth Avenue
22   New York, NY 10153
     (212) 310-8174

23
     J. DAVID ROWE
24   DUBOIS, BRYANT & CAMPBELL
     303 Colorado, Suite 2300
25   Austin, TX 78701
     (512) 457-8000
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3   KAJETAN ROZGA
     WEIL, GOTSHAL & MANGES L.L.P.
 4   767 Fifth Ave,  STE. 3360
     New York, NY 10153
 5   (212) 310-8518

 6
     MICHAEL RUBIN
 7   ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
 8   Washington, D.C.  20004
     (202) 942-5094
 9

10   LARRY J. SAYLOR
     MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
11   150 West Jefferson Avenue, Suite 2500
     Detroit, MI  48226
12   (313) 496-7986

13
     SCOTT T. SEABOLT
14   SEABOLT LAW FIRM
     17199 N. Laurel Park Drive, Suite 215
15   Livonia, MI  48152
     (248) 717-1302
16

17   MICHAEL LEONARD SIBARIUM
     PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.
18   1200 Seventeenth Street, NW
     Washington, D.C. 20036-3006
19   (202) 663-9202

20
     PETER L. SIMMONS
21   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, L.L.P.
     One New York Plaza
22   New York, NY  10004
     (212) 859-8455
23
     CHARLES SKLARSKY
24   JENNER & BLOCK
     353 N. Clark Street
25   Chicago, IL 60654-3456
     (312) 923-2904
```

1    APPEARANCES:   (Continued)

2    **For the Defendants:**

3    ANGELA A. SMEDLEY
     **WINSTON & STRAWN, L.L.P.**
4    200 Park Avenue
     New York, NY  10166
5    (212) 294-4743

6

7    STEPHEN J. SQUERI
     **JONES DAY**
     901 Lakeside Avenue
8    Cleveland, OH  44114
     (216) 586-3939

9

10   JOANNE GEHA SWANSON
     **KERR, RUSSELL & WEBER, P.L.C.**
11   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
12   (313) 961-0200

13

14   LARA TRAGER
     **WEIL, GOTSHAL & MANGES, L.L.P.**
     767 Fifth Avenue
15   New York, NY  10153
     (212) 310-8281

16

17   MICHAEL F. TUBACH
     **O'MELVENY & MYERS, L.L.P.**
18   Two Embarcadero Center, 28th Floor
     San Francisco, CA  94111
19   (415) 984-8700

20

21   LINDSEY ROBINSON VAALA
     **VINSON & ELKINS, L.L.P.**
     2200 Pennsylvania Avenue NW, Suite 500 West
22   Washington, D.C.  20037
     (202) 639-6585

23

     A. PAUL VICTOR
24   **WINSTON & STRAWN, L.L.P.**
     200 Park Avenue
25   New York, NY  10166
     (212) 294-4655

```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:

 3   WILLIAM J. VIGEN
     WILLIAMS & CONNOLLY, L.L.P.
 4   725 Twelfth Street, N.W.
     Washington, D.C.  20005
 5   (202) 434-5868

 6   OTHER APPEARANCES:

 7   ANN M. BYRD
     GREENBERG TRAURIG, L.L.P
 8   3333 Piedmont Road NE, 25th Floor
     Atlanta, GA  30305
 9   (678) 553-2100

10

     TIMOTHY FRASER
11   OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
     The Capital, PL-01
12   Tallahassee, FL  32399
     (850) 414-3733
13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

MATTER                                                          PAGE

Report of Master....................................16

Status Report in MDL 2311...........................18

Multiple Actions as it relates to
Class Certification Briefing Schedule...............42

Motion Hearings:
Radiators...........................................54
Shock Absorbers.....................................96

Final Approval Hearing
In re:  Automobile Dealership Actions..............109

1    Detroit, Michigan

2    Wednesday, November 16, 2016

3    at about 10:09 a.m.

4                        —    —    —

5            (Court and Counsel present.)

6            THE LAW CLERK:  Please rise.

7            The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10            You may be seated.

11            The Court calls MDL 12-md- 02311, In Re:

12   Automotive Parts Antitrust Litigation.

13            THE COURT:  Good morning.

14            THE ATTORNEYS:  Good morning, Your Honor.

15            THE COURT:  Welcome everybody.  I'm glad that in

16   this November date that our weather has held out for you.

17   Okay.

18            So looking at the agenda, the very first thing we

19   have is the report of the Master.  Mr. Esshaki.

20            MASTER ESSHAKI:  Yes.  Thank you very much, Your

21   Honor.

22            I'm really pleased to report that the major topic

23   we have been dealing with in the last six weeks or so is the

24   document production by the original equipment manufacturers,

25   and there is currently pending -- the Court may recall that

1    we -- the Court allowed discovery on discovery so that the

2    parties could learn about the document retention systems that

3    were in existence at the OEMs.

4           That being done, the parties have met and

5    conferred, they have differences, and we have set

6    December 9th for a hearing on the serving parties' renewed

7    motion to compel against the original equipment

8    manufacturers.

9           Yesterday we met for nine hours.  Unfortunately we

10   were a bit aggressive in thinking we could get all of the

11   OEMs through that period, that one day, but I am -- we did

12   meet and we resolved the disputes between the serving parties

13   and Toyota, we resolved the dispute between the serving

14   parties and Subaru of America, we came close to and I'm

15   convinced in the next couple of weeks we will resolve the

16   disputes between the serving parties and Subaru of Indiana,

17   we resolved the disputes between the serving parties and

18   Nissan.

19          We have yet to address Honda, General Motors and

20   Fiat Chrysler America.  We have scheduled another day-long

21   mediation for December 8th, the day before the hearing, at

22   which I'm hopeful that we could make progress in resolving

23   those, perhaps avoiding the hearing or at least narrowing

24   down the issues that have to be -- that have to be heard that

25   day.

1          I would be remiss if I didn't tell the Court that
2     the attorneys, over 20 of them that were in that room
3     yesterday, worked from 9:00 to 6:00 without lunch and
4     accomplished, in my mind, a great deal in resolving those
5     disputes, so my hat is off to all of them.
6          Thank you.
7          THE COURT:  Okay.  Sounds like cruel and unusual
8     punishment or torture.  I don't know.  All right.  Is there
9     anything else, Gene, that you want to report on?
10         MASTER ESSHAKI:  No, Your Honor.  I think that's
11    it.
12         THE COURT:  Okay.  The next item is the status
13    report.  I want to -- and part of the status report is the
14    status of settlements.  And, let's see, where is Mr. Hansel?
15         MR. HANSEL:  Good morning, Your Honor.
16         THE COURT:  Thank you for preparing the report.
17         MR. HANSEL:  You're welcome.  My partner,
18    Randall Weill, brought it home this time.
19         THE COURT:  Okay.  I have a couple of other things
20    that I would like but I don't know that this needs to be
21    filed, and that is in the report either adding columns or
22    doing a separate listing on the settlements.  I would like
23    the amount of the settlement, the attorney fee requested, and
24    the attorney fee awarded, which would be a partial attorney
25    fee in some of these, and also the remaining defendants.  And

1    I say you could just do that for me as opposed to the record,

2    I don't know that you want to have a specific document with

3    settlements on the record, or if you care, I don't know

4    what --

5            MR. HANSEL:  Well, the status report is sent to

6    chambers and it is not filed on PACER, so if that -- we could

7    just add -- we could beef up the settlement section of the

8    status report to include those items.

9            THE COURT:  That would be great.

10           MASTER ESSHAKI:  Your Honor, may I ask to receive a

11   copy of that as well?

12           THE COURT:  Yes.  Would you please send a copy of

13   that also to the Master?

14           MR. HANSEL:  Yes, we will do that.

15           MASTER ESSHAKI:  Thank you.

16           THE COURT:  Thank you.  This is a great help and I

17   appreciate it.  Thank you very much.

18           All right.  The next item -- oh, while we are on

19   settlements, I don't want anybody to panic but I am thinking,

20   and I will discuss this in January, of at this point

21   appointing a settlement master.  He or she may need others to

22   assist, I don't know, but this is something that I will

23   discuss with you in January, but I think we talked a little

24   bit about settlements last time and meetings when people

25   didn't want to meet.  I think we need to move forward, and my

```
 1    thinking -- I know and I appreciate all of the work that
 2    Mr. Esshaki has done with the -- with this discovery issue
 3    with the OEMs but I don't know, I'm just ready to take a shot
 4    at this, so keep that in mind.
 5            Yes?
 6            MS. SALZMAN:  Do you want a report on the
 7    settlements since the last status conference?
 8            THE COURT:  What is going to be in the settlement
 9    report, wouldn't they be in that?
10            MS. SALZMAN:  Yes, that would be in there.
11            THE COURT:  Yes.
12            MS. SALZMAN:  Okay.
13            THE COURT:  I think you've done wonders on what you
14    have already accomplished in terms of the settlements, this
15    is not to negate that so --
16            MR. PARKS:  We do have --
17            THE COURT:  Would you put your appearance on first.
18            MR. PARKS:  I'm sorry.  Manly Parks for the truck
19    and equipment dealers from Duane Morris.
20            We do have a couple additional settlements to
21    report that are not on the chart in the status conference
22    because they have happened since then.  We can put those on
23    the record or not, it is up to Your Honor.
24            THE COURT:  Well, let's put them on the record now
25    so we all know what they are, why don't we do that, and the
```

1   same thing if you have --

2          MS. SALZMAN:  I misunderstood, I thought you meant

3   would they be in the next report.  There are some that have

4   not yet been disclosed to the Court but we could disclose

5   those as well.

6          THE COURT:  Right.  Mr. Parks.

7          MR. PARKS:  Yes.  Thank you, Your Honor.

8          We are pleased to report settlements in the

9   bearings case that are now documented and we will be filing a

10  motion for preliminary approval early next week.  These are

11  settlements involving the truck and equipment dealers and

12  Schaeffler, NTN and JTEKT.

13         THE COURT:  And JTEKT.  Okay.

14         MR. PARKS:  Thank you.

15         THE COURT:  Thank you.

16         MS. SALZMAN:  Good morning, Your Honor.  Hollis

17  Salzman for the end payors.

18         We previously disclosed the settlement with JTEKT,

19  Your Honor recently preliminarily approved that settlement.

20  We also have --

21         THE COURT:  Is this in the bearings or what are

22  we --

23         MS. SALZMAN:  That is in bearings, Your Honor, and

24  one other part but mostly bearings.  And then there is

25  Yamashita Rubber, which we have a motion for preliminary

1    approval pending with Your Honor.  We also have two other

2    settlements both in the bearings case, that is the NTN and

3    SKF -- with the SKF defendants, and those we hope to have

4    presented to Your Honor in short order.

5            We also have about a half dozen other settlements

6    that are very close to being completely settled, we are just

7    finishing up the paperwork, and at that time we would

8    disclose them to the Court.

9            THE COURT:  Thank you.

10           MS. SALZMAN:  Thank you.

11           MR. BARRETT:  Ms. Salzman said we, she meant the

12   end payors and the auto dealers, and there is one I think she

13   didn't mention that is this brand.

14           THE COURT:  Put your appearance on the record

15   first.

16           MR. BARRETT:  My name is Don Barrett for the auto

17   dealers.

18           There is one that was not mentioned, this is brand

19   new, Yamada, it has been settled as well.

20           MR. KANNER:  Good morning, Your Honor.

21           THE COURT:  Good morning.

22           MR. KANNER:  Steve Kanner on behalf of direct

23   purchaser plaintiffs.

24           In addition to the settlements we previously

25   announced, I could advise Your Honor with respect to the wire

```
 1   harness cases we have settlements in the drafting stages with

 2   three additional defendants, and are actively negotiating

 3   with two of the three remaining defendants.

 4              THE COURT:  Okay.  So the wire harness cases are --

 5   with the indirects are just about done, right?

 6              MR. KANNER:  I believe so, Your Honor, but I will

 7   let counsel for the wire harness --

 8              MS. SALZMAN:  Yes, Your Honor, that's correct.

 9              THE COURT:  That's why I wanted a list of who was

10   left.

11              MS. SALZMAN:  We will get you that information.

12              THE COURT:  Okay.  Thank you.

13              MR. KANNER:  So with respect to the direct

14   purchaser plaintiffs, we have settlements and/or are

15   negotiating with all but one of the defendants in wire

16   harness.

17              THE COURT:  All right.

18              MR. KANNER:  With respect to the other cases we

19   have multiple negotiations in place, some settlements, that

20   are reaching the agreement in principle stage, and I'm

21   pleased to say we will be able to present those hopefully by

22   the next status hearing, so there is movement and it is

23   positive.

24              THE COURT:  Thank you.

25              MR. KANNER:  Thank you.
```

1      THE COURT:  All right.  Anybody else have anything

2  on settlements?

3          (No response.)

4      THE COURT:  Okay.

5      MR. KOHN:  Your Honor, just one other matter?

6      THE COURT:  Counsel?

7      MR. KOHN:  Joseph Kohn also for the direct

8  purchasers.

9          Just requesting the Court, we did file a

10  preliminary approval motion just about a week ago,

11  November 9th, with respect to a settlement with the Fujikura

12  defendants, it is by stipulation, we don't want to reargue

13  the matter here, it has been thoroughly briefed, but we

14  request the Court to enter the preliminary approval order

15  with respect to that settlement.

16      THE COURT:  Okay.  I thought I would remember all

17  of these but, you know, now without looking at paper and

18  having it written down I don't venture to say anything

19  because I don't want to get my parts mixed up.

20          All right.  The next item was the Court's expert or

21  technical advisor as you call it.  Who prepared --

22  Ms. Salzman?

23      MS. SALZMAN:  Yes.  It was a joint effort among the

24  plaintiff groups.

25      THE COURT:  Okay.  I very much appreciate this,

```
 1    I'll tell you that I am not going to do it at this time.
 2              MS. SALZMAN:  Okay.
 3              THE COURT:  I have looked at it and it is not what
 4    I had envisioned, and I want to wait on it, but I do want to
 5    address a little bit on the attorney fees.  I'm sorry, I
 6    don't have the documents here so you will have to look at
 7    those of you who have settled, and I remember the last one --
 8    one or two we did like 10 percent.
 9              MS. SALZMAN:  Well, you gave us a partial award on
10    our fee request of 10 percent.  We had requested more than
11    that, I believe we requested 30 percent, and I apologize, I
12    don't have those papers with me today.
13              THE COURT:  As I said, I don't want to mention who
14    is who without --
15              MS. SALZMAN:  Yes, but that's just for the
16    end payors.  The dealers and the auto dealers and the truck
17    dealers have a different story.
18              THE COURT:  Right.  But in further consideration of
19    this I have decided to do this until I make the final
20    percentage and that is to give you 20 percent.  So those of
21    you, like the end payors who got 10 percent, you could file
22    your motion for an additional or an order for the Court to
23    sign for the additional 10 percent, so that you would have
24    20, because when I go through it I am not doing less than
25    20 percent, that I know, so I shouldn't have done that
```

1   10 percent, I should have --

2           MS. SALZMAN:  Okay.  Thank you.

3           THE COURT:  -- considered that, and since I'm quite

4   positive about that percentage, I am not saying that's the

5   end percentage, it may very well be, I don't know where I'm

6   going from here.

7           MS. SALZMAN:  Okay.

8           THE COURT:  But I know the minimum is the

9   20 percent and so --

10          MS. SALZMAN:  You would like us to prepare an order

11  and present it to the Court?

12          THE COURT:  Yes, yes, for those of you that I --

13  think it is just the end payors but I could be wrong.

14          MS. SALZMAN:  Right now I believe it is the end

15  payor motion that is pending with the 10 percent.

16          THE COURT:  Okay.

17          MS. SALZMAN:  Yes.

18          THE COURT:  Because we will do the 20 percent as

19  the partial, it may be the final, I don't know, but --

20          MS. SALZMAN:  Understood.

21          THE COURT:  -- we will do at least the 20 percent

22  as the partial attorney fee.

23          MS. SALZMAN:  Okay.

24          THE COURT:  And then we will deal with the other

25  fees on the cases as the motions later on.

1           MS. SALZMAN:  Very good.  Thank you.

2           THE COURT:  Okay.

3           MR. HANSEL:  Thank you, Your Honor.  The direct

4    purchasers do not have a motion for attorney fees pending

5    right now but, as the Court is aware, all of the class

6    plaintiffs have submitted their respective briefs outlining

7    their proposed approach for the Court, you know, on future

8    fee applications.

9           THE COURT:  Okay.

10          MR. HANSEL:  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you.  I appreciate

12   all of that work, I -- believe it or not it was very helpful

13   for me to come to this decision, but I'm not going to -- I

14   don't think it is going to be worth the money -- the expense

15   of doing that.

16          All right.  Oh, I know what else.  I haven't gotten

17   attorney fees reports from you, plaintiffs, your hourly --

18          MR. FINK:  We are not in this for fees, Your Honor.

19          THE COURT:  Oh, gosh, and I have been worried about

20   this.

21          MS. SALZMAN:  Your Honor, were you talking about

22   the time reports?

23          THE COURT:  The time reports.

24          MS. SALZMAN:  That is something -- since we

25   recently filed the fee petition which listed all of our

```
 1    hourly reports, we didn't know if the Court wanted us to
 2    continue to give you interim reports.  The interim reports,
 3    as you know from our correspondence, include what we call
 4    unvetted time, the time that has not been reviewed by the
 5    co-leads.  Going forward from the last fee petition we can
 6    submit to you the vetted time so you have a good idea of, you
 7    know, on a quarterly basis is basically when we have been
 8    submitting to you, and we could pick that up again if you
 9    would like, but I think the reports would be more -- will be
10    more realistic because it will have the vetted time.
11            THE COURT:  That would be fine.
12            MS. SALZMAN:  Just so you know, they may look a
13    little different than the time that was previously reported.
14            THE COURT:  I was looking because as you know there
15    is that Barton issues -- I think that's his name.
16            MS. SALZMAN:  The objector?
17            THE COURT:  The attorney who wants a greater fee.
18            MS. SALZMAN:  Oh, that's not in the end payor case.
19            THE COURT:  No, no.  It drew me back to the
20    attorney fees to look at them, and I think that's in the auto
21    dealers' case.
22            MS. SALZMAN:  It is.
23            THE COURT:  So I kind of want to look at --
24            MS. SALZMAN:  So is a quarterly basis still okay
25    with Your Honor?
```

1          THE COURT:  Yes, that's fine.

2          MR. PARKS:  Your Honor, Manly Parks for the truck

3     and equipment dealers.

4          Would you -- we have not been doing reports of that

5     nature until now.  Is that something that you would like us

6     to begin in our cases as well?

7          THE COURT:  I would because it may be become

8     necessary later.

9          MR. PARKS:  Is the January status conference

10    appropriate, or would you like us to file that within a week

11    or so after today?

12         THE COURT:  You don't have to do it within a week

13    or so after today, but I would like it well before -- at

14    least the beginning of January, the sooner the better.

15         MR. PARKS:  And with respect to all cases we are

16    in?

17         THE COURT:  Yes.

18         MR. PARKS:  Okay.

19         THE COURT:  Yes.  The next --

20         MR. FINK:  Your Honor, I'm sorry.

21         THE COURT:  Yes, Mr. Fink.

22         MR. FINK:  How would you like the direct purchaser

23    plaintiffs to approach this, would you like us to --

24         THE COURT:  The same way.

25         MR. FINK:  Okay.

1          THE COURT:  Follow the lead of the end payors and

2     we will do it that way, okay?

3          MR. FINK:  Okay.

4          THE COURT:  Can you do it by -- soon?

5          MR. FINK:  Yes, absolutely.  And, Your Honor, there

6     was a reference, and I just want to be clear about this,

7     Ms. Salzman referenced the distinction between fully-vetted

8     fees and those fees that are based on our original data that

9     is entered and may not be the ultimate fees that we submit.

10    We are going to be more on the edge of the pre-vetted fees,

11    if you will, because we have not submitted fee petitions for

12    most of our time.

13         THE COURT:  That's fine.  Okay.  Thank you.  You do

14    want a fee?

15         MR. FINK:  Well, Your Honor, you know that's why my

16    son is in the courtroom, they wanted to make sure I didn't

17    come here and I didn't want a fee.

18         THE COURT:  Thank you.

19         MR. FINK:  Thanks, Nate.

20         THE COURT:  I know you can't say you are in it for

21    the money but why would you be here?  I mean, the defendants

22    have to be here.

23         MR. KANNER:  Your Honor --

24         THE COURT:  It is strictly for the plaintiffs.

25         MR. KANNER:  -- I'm happy to dispense with anything

1    he just said.

2        THE COURT:  Okay.  All right.  Oh, the next item is

3    compliance with Shane vs. Blue Cross.  Since we last met

4    we've got a new case that we have to specifically deal with,

5    and I want to hear what you have to say but, you know, we

6    have had a rash of erroneous filings where people are filing

7    sealed things without marking them sealed.  You know, Kay had

8    300 and some e-mails the other day, we woke up the

9    administrator in the middle of the night and the marshal.

10   This can't go on, this can't go on.  So I'm saying to all of

11   you, and we will discuss the sealing, you've got to be more

12   careful.  And even though you make an error there are ways to

13   address that, and one of those ways is not in the middle of

14   the night to call the court.  That's above and beyond what

15   needs to happen here.  Okay.

16       MR. CHERRY:  Thank you, Your Honor.  Steve Cherry

17   from Wilmer Hale representing the Denso defendants and

18   speaking for the defendants.

19       We have worked with the parties, the defendants,

20   the plaintiffs, to come up with a process to deal with the

21   issues raised by Shane Group, and have discussed how to deal

22   with both future filings and how to deal with the filings

23   that have already been made.

24       And for future filings we have discussed a process

25   where things if something has been designated as confidential

```
 1    or highly confid3ential by a party or a third -- a nonparty,

 2    they would be filed tentatively under seal for 30 days and

 3    that would allow whoever has an interest in that information

 4    to come in and justify why some portion of it can be under

 5    seal, otherwise the seal lifts.

 6              THE COURT:  Okay.  30 days sealed?

 7              MR. CHERRY:  30 days.

 8              MS. SALZMAN:  Well, we are working on the details

 9    now.  The defendants provided the plaintiff groups with a

10    proposal, unfortunately with the timing we were preparing for

11    the hearing but we are going to turn our attention to that

12    and just look at the nuances in the language, and we hope to

13    have something to submit to Your Honor I would say soon,

14    hopefully before the holidays, if not Thanksgiving shortly

15    after I would think, that's for the prospective documents.

16    And then --

17              MR. CHERRY:  I was going say for the --

18              MR. KANNER:  Go ahead and finish up.

19              MR. CHERRY:  For the things that have been filed,

20    the defendants have gone through all of the things that have

21    been filed by them or by the plaintiffs that include the

22    defendants' information, and have weeded that down to a

23    relatively small number of documents that require some

24    continued redaction.  We think that we have come to some

25    understanding on much of the information, I think the
```

1 complaints where there are redactions of factual allegations

2 for the most part -- I think there may be an issue with the

3 bearings complaint but other than that we would agree can be

4 unsealed with the exception of individuals' names, people who

5 haven't been indited or anything whose name may appear in a

6 complaint just for their privacy interest, but the factual

7 allegations would be available to punitive class members to

8 see what the case is about.

9      THE COURT:  Do you see now in light of the Blue

10 Cross Blue Shield case, do we -- about attaching an

11 explanation as to why it is sealed or a reason for the

12 sealing is I think we need to --

13      MR. CHERRY:  Exactly, and the going-forward process

14 would require more than simply saying it was designated by

15 the producing party.  You need to explain why it is

16 confidential.

17      THE COURT:  I mean, the last thing I want after we

18 go through all of this is to have it come back because of

19 sealed documents.

20      MR. CHERRY:  Exactly.  Well, and that's why we

21 provided -- we have discussed a process where we would have

22 this 30 days because the person filing it may not be their

23 information and if it is -- let's say it's an OEM's

24 information, they ought to have the ability to come in and

25 say why it is confidential.  I mean, if it is your

1    information in your motion you can do that but somebody else

2    may have more to say about it.

3            THE COURT:  Right.  I think the defendants have a

4    lot to say -- I mean, may have a lot to say.

5            MS. SALZMAN:  I think the parties are -- our goal

6    is to have as limited amount of information under seal before

7    the Court as possible.

8            MR. CHERRY:  Right.  So I think where we are

9    landing on this is the complaints, dispositive motions would

10   have ultimately we would hope nothing but individuals' names

11   redacted, and there are a small number of documents that were

12   attached to filings that are internal company documents that

13   require some redactions here where there's sensitive business

14   information, and we -- the defendants have gone through that,

15   we are delivering proposed redactions to the plaintiffs, they

16   can review, hopefully we will come to agreement and can

17   present something to Your Honor in the form of a motion

18   explaining why these things should be redacted, not just

19   agreeing, and hopefully that will resolve it.

20           THE COURT:  Anything else?

21           MR. KANNER:  Yes, Your Honor.  There are some

22   procedures that are -- that we have been talking about for

23   how to address the -- and the burden for sealing a document.

24   The party seeking that document to be sealed within that

25   30-day period has obviously the burden of explaining why.

```
 1    There are some -- I have some question in mind about who
 2    ought to be hearing those various motions.  There are some
 3    suggestions that it be Your Honor, and I wanted to ask the
 4    Court for thoughts on this whether you would prefer to hear
 5    them or whether the Special Master should hear them.
 6    Obviously he's not being worked hard enough in this case, I'm
 7    kidding.
 8            MASTER ESSHAKI:  I can take it, bring it on.
 9            MR. KANNER:  It seems to me for purposes of
10    judicial economy we should bring these matters to the Special
11    Master, otherwise I could see your schedule being crowded
12    with multiple motions and parties coming in and explaining
13    why, and ultimately the Special Master makes a recommendation
14    which is, of course, subject to your final determination, so
15    it seems to me for purposes of judicial economy we ought to
16    take that approach.
17            There is a second -- I'm sorry.
18            THE COURT:  You want me to respond to that?
19            MR. KANNER:  Yes.  We would like some direction
20    from you on that.
21            THE COURT:  Okay.  Gene, you are here so if you
22    think you can take this on I think it probably would be good
23    for the Special Master to do it because he's dealing with
24    these documents and with the discovery and I think might be
25    in a good spot to do it.
```

1          MASTER ESSHAKI:  Gladly.

2          THE COURT:  Is that reasonable?

3          MASTER ESSHAKI:  Yes, Your Honor, gladly.

4          THE COURT:  Okay.  All right.

5          MR. KANNER:  And I think part of that discussion

6    needs to address the distinction between substantive issues

7    and documents that really are -- that go, for example, to the

8    heart of the conspiracy; guilty pleas, internal documents of

9    the companies that address specifically those issues, we

10   think ought not to be sealed.  However, the documents or the

11   materials that Mr. Cherry just referred to, names of

12   individuals, I think that's right.

13         MS. SALZMAN:  I don't think we need to address the

14   specifics here today, we don't have the documents and --

15         MR. KANNER:  No, but I'm just giving our

16   observations of what makes sense.

17          Secondly, there is distinction between those types

18   of materials which would seek to be sealed that are

19   substantive and those which are really discovery issues, and

20   I think there is less of a requirement under Shane that a

21   privately held company would need -- can make a

22   justification, a good argument, for sealing certain business

23   operating documents that have no bearing on the determination

24   of the liability and are of no moment to class members or

25   objectors determining whether they should, in fact, proceed

1    with an objection or being fully advised in the case.

2           MR. CHERRY:  Your Honor, I think we should deal

3    with these issues in the context of real documents as we go

4    forward.

5           THE COURT:  I think so too, and I think as long as

6    Mr. Cherry or other defense counsel is there, you know, I

7    think it will be worked out depending on the individual

8    documents.

9           Ms. Romanenko?

10          MS. ROMANENKO:  Your Honor, I agree with Mr. Kanner

11   and, you know, we will work with the others to work out the

12   specifics, but we do want to make a distinction between what

13   Shane referred to as substantive documents and discovery,

14   right.  So what Shane stated is that the public interest is

15   focused on conduct giving rise to the case, so the facts of

16   the conspiracy, right, because that's what an objector would

17   want to look at or a potential opt out to see if they want to

18   object or opt out.  What they don't want to see is

19   information about how somebody stores their files or how they

20   calculate some payment that comes in, that's information that

21   our clients need.

22          THE COURT:  Okay.  I'm not ruling on any general

23   thing right now.  You will work out your orders, and I am so

24   glad to see that you have come to this resolution, it just

25   reaffirms in my mind how good you are, and I thank you.

1          MS. SALZMAN:  We have gotten to know each other

2     over the years.

3          MR. KANNER:  Thank you very much.

4          THE COURT:  I don't see any black eyes yet so we

5     are okay.

6          The other thing is in the transcripts, the Court

7     cannot seal something without a motion, I need to have it on

8     the record to seal, or a statement to seal if you are here in

9     court, and if you make an error and you want something sealed

10    you have to file a motion, it cannot be done automatically by

11    anybody, the clerk or anyone else, there has to be a record

12    of this.  You would title your motion emergency motion to

13    seal so that we know we need to deal with it right away, but

14    that's what you have to do.

15         And when you are in court, and I know we have gone

16    through this a couple of times already, when you are in court

17    and you want something sealed you have to say stop and say

18    seal this and give your reason because we have to know the

19    reason now for these things and then -- I guess we kind of

20    always had to know the reason but it has been made clearer

21    that we need a reason, and then at the end when you are done

22    with the sealed discussion or name or whatever it is then

23    say, you know, end of seal or done because I can't have -- I

24    cannot have the reporter going through and looking for

25    statements which he thinks fits a category that you said and

1    seal them and we can't do that without showing everybody

2    anyway because maybe had it been brought up publicly there

3    would be some question, it is not enough to say this is

4    confidential, there has to be some basic reason.  So I know

5    this is difficult when you are arguing, I know it is

6    difficult, but I am going to tell you if you don't say -- at

7    least stop us and say this is confidential it is not going to

8    be sealed without a motion for everybody to see.

9            Ms. Romanenko?

10           MS. ROMANENKO:  Your Honor, just to clarify, as I

11   think you mentioned, sometimes it is when speaking

12   extemporaneously and engaging in a conversation --

13           THE COURT:  It is difficult.

14           MS. ROMANENKO:  -- you don't think to stop yourself

15   to deal with that issue.

16           THE COURT:  Yes, it is difficult.

17           MS. ROMANENKO:  Is it possible in the event that

18   something was missed to file a motion like we discussed

19   requesting certain portions to be redacted with an

20   explanation of why they need to be redacted?  What I'm

21   thinking of is a process like what's in the protective

22   orders, I'm looking at paragraphs 8-C-3 of the AVRP

23   protective order just as an example that says the producing

24   party may designate portions of transcripts of public

25   proceedings as confidential or highly confidential, outside

1    of attorneys' eyes only, but any such designation must be

2    made within 30 days of receipt of the final transcript.

3              So what I'm wondering is whether pursuant to that

4    provision we can make a motion after the hearing and say we

5    are requesting that -- we said these sentences, they were

6    highly confidential, we are requesting that they be sealed

7    from the public?

8              THE COURT:  Because.

9              MS. ROMANENKO:  Because, yes, yes, absolutely.

10             THE COURT:  Yes, but I have a question about that

11   30 days.  I mean, the final transcript is filed so you have

12   it for 30 days, and then -- but the only -- I mean, it is

13   public at that point if somebody wants to give it away,

14   right?

15             MS. ROMANENKO:  I think there is --

16             THE COURT:  It is not on the docket free, right?

17             MS. ROMANENKO:  So if we decrease the period does

18   that make it more workable, if we were to make it seven days

19   or something like that?  My understanding was that there

20   was --

21             THE COURT:  It is not workable for me, it is for

22   you, it is out there for 30 days, that's all I am saying,

23   that's a good amount of time.

24             MS. ROMANENKO:  My understanding was that there was

25   some period of time between when it was sent out to the

```
 1   attorneys and when it was put up on the docket?  No, that's
 2   not the case.
 3          THE COURT:  See, it is not going to be sent to you
 4   in advance to look at it, you order the transcript, this is
 5   the transcript.
 6          MS. ROMANENKO:  Understood.
 7          THE COURT:  So you don't get it in advance.  Now
 8   you have it and then now you can follow the protocol of the
 9   30 days for a motion.
10          MS. ROMANENKO:  Okay.  Thank you.
11          THE COURT:  Ms. Salzman?
12          MS. SALZMAN:  That's something we can talk -- we
13   can talk about the transcript sealing and perhaps put that in
14   the --
15          THE COURT:  That would be a good thing to consider
16   also, yes.
17          MR. KANNER:  I agree, Your Honor.
18          THE COURT:  Okay.  I just want to stress the fact
19   that it is really beyond anybody's control to say okay, now
20   this is confidential, it is struck; you've got to do it in
21   writing with your reasons or here on the record.  Again, I
22   state, I know it is difficult but we can handle it.  Okay.
23          And this is kind of like preaching to the choir,
24   because I think most of you know this, but if you go on my
25   page or whatever on the court docket you will see the
```

```
 1    instructions as to the training on how to do it, and that
 2    might change with whatever you all come up with.
 3            All right.  Next item, bearings, anti-vibration
 4    rubber parts and OSS -- what's OSS, I don't even remember --
 5    occupant safety systems.  Okay.
 6            MS. TRAN:  Good morning, Your Honor.
 7    Elizabeth Tran for the end payor plaintiffs.
 8            The agenda item is a little misleading.  My
 9    understanding is that no plaintiff group intends to address
10    occupant safety systems this morning.  All plaintiff groups,
11    however, seek to discuss their respective motions for an
12    extension to file class certification motions in bearings and
13    AVRP as part of this agenda item.
14            THE COURT:  Wait a minute.  Extension of class
15    action motions?
16            MS. TRAN:  Class certification motions.
17            THE COURT:  Class cert motions.  Yes.
18            MS. TRAN:  As this Court is aware, end payors filed
19    a motion for extension of five months in bearings and AVRP on
20    November 2nd due to ongoing delay with OEM discovery.  The
21    bearings defendants do not oppose this motion but the AVRP
22    defendants do.  At this point end payors' motion isn't fully
23    briefed yet, I believe the DPP motion isn't fully briefed yet
24    either, but I'm happy to argue the motion today if the Court
25    wishes given that this is a critical and urgent issue in
```

```
 1    light of class certification motions being due three to four
 2    months from now.
 3              THE COURT:  No, I don't and I won't need argument
 4    on it.  I would like the replies, I would like the full
 5    briefing on it.  This is a critical issue and I think I know
 6    where you are going given the discovery that needs to be done
 7    yet and I assume that's the basis of your motion.  I have not
 8    read the motion yet.
 9              MS. TRAN:  That's correct.
10              THE COURT:  But it doesn't take a star to know
11    where you are going with it, and so I will let you know that
12    in -- at the January meeting I will be prepared to rule on
13    the deadlines for those.  I know it is pushing it close to
14    what you -- when is your first -- is it March?
15              MS. TRAN:  It is March 20th.
16              THE COURT:  Yeah, we are getting close.
17              MS. TRAN:  I am -- just given the OEM discovery
18    resolution time line I don't believe that that would be
19    resolved until early February at the earliest, and so if
20    class certification in bearings is March 20th that gives us
21    less than two months.
22              THE COURT:  Okay.  We will see what happens, and I
23    want to know how much time is really needed so be prepared in
24    January, I want to know actual times, how long it is going to
25    take to get this information.
```

1          And I will tell you another thing, I want to

2     consider by then whether or not I will use a settlement

3     master and whether or not I want to stay while that master is

4     working.  Just food for thought for the future.

5          MS. TRAN:  Okay.  So we will be prepared to argue

6     it in January.

7          THE COURT:  Yes.  Thank you very much.

8          MR. PARKS:  Your Honor, just briefly on this issue.

9     I would only note that and remind the Court that because of

10    the order of the OEM discovery process with the auto -- the

11    major auto OEMs at the front end and the fact that a number

12    of the truck and equipment OEMs are essentially at the back

13    of the line, we have filed a supplement and joinder to the

14    motions asking for an extension, we have asked for a little

15    extra time, six additional months instead of five.  And I

16    just wanted to remind the Court of the status of the OEM

17    discovery as it relates to the truck and equipment OEMs

18    because if we are on the same schedule as everyone else and

19    our OEMs are at the back of the line, as it were, in terms of

20    OEM discovery we have as a practical matter less time than

21    the auto folks do to get that information and process it and

22    make use of it.  I just wanted to remind the Court of that

23    reality.  Thank you.

24         THE COURT:  Thank you.

25         MR. SPECTOR:  Good morning.

1    THE COURT:  You know, it is possible too that we do

2  this motion before the January conference for extension of

3  time, that's also possible.

4    MR. SPECTOR:  Good morning, Your Honor.

5  Eugene Spector on behalf of direct-purchaser plaintiffs.

6    THE COURT:  Good morning, Mr. Spector.

7    MR. SPECTOR:  We too have a motion pending, the

8  response to our motion was filed I believe Monday evening, we

9  have a reply that we will file, and so --

10    THE COURT:  On this issue?

11    MR. SPECTOR:  On the issues of extension of time,

12  we have filed a motion seeking an extension of five months as

13  well, in fact, we filed it before the end payor plaintiffs

14  did, based upon the discovery issues that we have.  I am not

15  going to argue that right now, Your Honor, as you said we

16  have put it off until it is fully briefed.

17    But I did want to mention that with regard to the

18  AVRP case we filed an AVRP case yesterday so we are not

19  looking to be anywhere close to the same schedule that is

20  already in place for the EPPs, but we also don't want ours to

21  in any way to delay what's going on there.  I just wanted to

22  advise the Court.

23    THE COURT:  You filed a case yesterday?

24    MS. SPECTOR:  Yesterday, I believe, yes.

25    THE COURT:  We had a new part too yesterday or --

1        MS. SPECTOR:  There are other parts, right, but

2   this is not by us yesterday, only AVRP yesterday.

3        THE COURT:  Only AVRP.

4        MR. SPECTOR:  Thank you.

5        THE COURT:  This case kind of has a life of its

6   own, doesn't it?  It just keeps going on.  I mean -- okay.  I

7   mean, if we are thinking five- or six-month extensions then

8   we are talking -- I'm thinking out loud here, we are talking

9   August, September for the filing of the class cert, and then

10  by response and hearing we are talking another year or so

11  before we may have a class cert -- a certified class or a

12  non-certified class, which we are all interested in finding

13  out.

14       MR. HEMLOCK:  Your Honor, Adam Hemlock, Weil

15  Gotshal on behalf of the Bridgestone defendants.

16       I would point out as Special Master Esshaki noted,

17  the OEM process is moving along pretty well, and I think your

18  idea of waiting is a good one only because there may be some

19  movement in that regard in the next month or so that that may

20  be relevant for you to consider when you make your decision.

21       THE COURT:  Yes.  I would like to see where the

22  movement goes before I have the OEM -- the non-party OEMs

23  start producing.  I understand this is a very expensive

24  project and very time consuming and very voluminous.

25       MR. HEMLOCK:  We are doing our best to avoid that

1    but we will see how it goes.

2              THE COURT:  Okay.

3              MS. TRAN:  Your Honor, I just wanted to mention

4    that in Section 4 of the end payor motion for extension we

5    mapped out the deadlines under our proposal and we have the

6    hearing on class certification in June 2018.

7              THE COURT:  June 2018?

8              MS. TRAN:  Yes.

9              THE COURT:  '16, '17, '18.  Okay.  You know, I'm on

10   senior status and I do want to see this done.  Okay.

11             Then the next thing we have is the date for the

12   next conference.  I was thinking June 7th as opposed to May.

13   Is there -- anybody have any -- we have two dates, May 24th

14   and June 7th.  Ms. Salzman, you looked very funny at that.

15   I'm just wondering?

16             MS. SALZMAN:  My daughter is graduating from middle

17   school, not to be selfish in a roomful of people and --

18             THE COURT:  Well, we do have graduations to deal

19   with and that's -- now, a lot of them were moved up to May

20   and that's why we said maybe not May, maybe June, so maybe --

21             MS. SALZMAN:  June 9th I could make it home for

22   that.

23             THE COURT:  Okay.  All right.

24             MS. SALZMAN:  Thank you for considering that.

25             MASTER ESSHAKI:  Your Honor, may we reserve the 6th

1    for Master motion hearings?

2         THE COURT:  Absolutely.  Let's say June 7th and

3    June 6th for the Master's hearings.

4         MR. FINK:  Tuesday, June 7th -- oh, I'm in the

5    wrong year.

6         THE COURT:  You will not get any fees if you can't

7    keep track of the year.

8         MR. FINK:  Okay.  I have to go.  Thanks, though.

9         THE COURT:  Is there any other matters anyone wants

10   to bring up before we go to motion?

11        MR. CHERRY:  Yes, Your Honor.

12        THE COURT:  Mr. Cherry.

13        MR. CHERRY:  Two matters.  We have a motion to

14   dismiss in oxygen sensors and spark plugs that we need a

15   hearing date for -- we would like to request a hearing date.

16   I think there was some discussion of December 8th or

17   December 6th but frankly whatever day works for Your Honor.

18        MR. FINK:  We had talked among the parties that

19   December 8th worked, but yesterday Master Esshaki set aside

20   December 8th as a date to continue the OEM discussions, so I

21   think December 6th works for all of the parties, that's if

22   the Court decides that it wants to hear oral argument on

23   those motions.

24        MR. CHERRY:  Well, we would certainly request oral

25   argument, Your Honor.

1     THE COURT:  Is it requested?

2     MR. CHERRY:  Yes, Your Honor.

3     THE COURT:  That date is really booked.  Let me go

4  back and see if there is anything in the morning.

5     MR. CHERRY:  Your Honor, we would like to have it

6  heard as soon as possible but if there were no dates before

7  January 25th we could --

8     THE COURT:  No, we can find a date, I just have to

9  search it out.  How about December 13th, that's a Tuesday?

10     MR. FINK:  Your Honor, the Court had said -- if I

11  heard correctly the Court -- I think I heard the Court

12  indicating that there was a problem with the 8th on the

13  Court's calendar, was the 6th a possibility?  The week of the

14  13th I was expecting to be out of town but if --

15     THE COURT:  Okay.  Let me see.  You know what, the

16  6th is a possibility.  I have a trial scheduled that I think

17  is going to be adjourned, I'm about 90 percent sure, so let's

18  set it for 10:00 --

19     MR. CHERRY:  Thank you, Your Honor.

20     MR. FINK:  Great, Your Honor.

21     THE COURT:  -- on the 6th.

22     MR. CHERRY:  And, Your Honor, one other item.  So

23  for the Denso defendants we filed a motion for summary

24  judgment yesterday and we would like to get a briefing

25  schedule in place so as to have that argued on January 25th,

1     it is an 11- or 12-page motion, we think it is a very simple

2     straightforward motion.

3              THE COURT:  11 or 12 pages?

4              MR. CHERRY:  Yes.  We have proposed as long as a

5     month for opposition, that would give us time to do a reply

6     and Your Honor to have three or four weeks to consider it

7     before the hearing, but we have tried to get agreement on a

8     briefing schedule and haven't been able to do so.

9              THE COURT:  You want it on January 22nd or 24th?

10             MR. CHERRY:  The 25th when we are here for the

11    status conference.

12             MR. SPECTOR:  We have a somewhat different view,

13    Your Honor.

14             THE COURT:  Which is?

15             MS. SPECTOR:  We believe the summary judgment

16    motion involves many of the same issues that we are going to

17    see at class certification.  And I haven't read the summary

18    judgment motion, it was filed I think late Monday.

19             MR. CHERRY:  It was filed Monday, it is 11 pages, I

20    can read it for you but --

21             MS. SPECTOR:  Well, that would be very nice of you,

22    would you read it to me?  I certainly want the inflection.

23             THE COURT:  So class cert motions are only going to

24    be 11 or 12 pages?

25             MS. SPECTOR:  I only wish, Your Honor.  Under the

1    right circumstances that probably could be the case but the

2    way the law has evolved I'm afraid that's gone.

3            We view the issues, at least based on the motion

4    that we saw the other day on discovery with the OEMs in which

5    Denso has asked that certain discovery of the OEMs be delayed

6    pending resolution of their motion for summary judgment on

7    the basis that their motion for summary judgment is going to

8    involve fundamentally two arguments; one, that there is no

9    proof of a conspiracy that involves -- an overall conspiracy

10   that involves wire harness products, number one.  And number

11   two, because of that since none of the named plaintiffs have

12   purchased ECUs, which are the only thing that Denso sells

13   here, therefore that case can't proceed, it basically should

14   be dismissed.

15           We believe that there is going to be evidence that

16   we are going to be able to show of the overall conspiracy.  I

17   mean, just off the top of my head Denso pled guilty to

18   participating in the conspiracy with regard to ECUs, Yazaki

19   pled guilty to a conspiracy involving wire harness products

20   that included ECUs, so at least factually there may be some

21   question, and under those circumstances it seems to me that

22   we are going to be overlapping in a number of issues, for

23   example, adequacy and typicality I'm sure the argument is

24   going to be made in exactly the same way that these class

25   plaintiffs are inadequate because they didn't buy ECUs, so it

1    just seems to me, Your Honor, with that overlap and when you

2    add to that the fact that if the motion for summary judgment

3    is denied, and I know Mr. Cherry doesn't think that's

4    possible, but if the motion for summary judgment is denied

5    then there is going to be a delay in the wire harness class

6    certification process because he's going to want to have his

7    discovery of the OEMs, which will add two or three or four

8    months to that process.

9         So it struck me, Your Honor, that the easiest way

10   to handle this and the most efficient way to handle this is

11   to put the summary judgment motion on the same schedule as

12   the class certification motion, that way we move them all

13   along at the same time, any discovery that would have to be

14   done will be done and we can get all of those issues resolved

15   in one fell swoop.

16        MR. CHERRY:  Your Honor, if I could respond to

17   that?  There is no evidence of an overarching conspiracy.

18   They have responded in their request for admission, we have

19   asked them is there evidence that Denso participated in a

20   conspiracy for this product or that product or that product

21   or that product.  It all comes down to body ECUs.  The only

22   evidence as to Denso is as to the sale of body ECUs, which we

23   did plead to for sales to Toyota, that's it.  And there is no

24   evidence we ever conspired with anybody on any of these other

25   products.  Discovery is long since over.  We have produced

1    our documents -- DOJ documents in 2012, produced our priority

2    documents last year in September, they have completed

3    their -- all of the document production, they have completed

4    their depositions, there is no evidence of the type of --

5    13-part conspiracy they have alleged, so it all comes down to

6    body ECUs and nobody here bought an ECU from anybody ever.

7              THE COURT:  Okay.  We are kind of arguing the

8    motion here.

9              MR. CHERRY:  Right.

10             THE COURT:  I don't want to hear the motion, I want

11   to do the briefing.  I will take the briefing on the normal

12   schedule.

13             MR. CHERRY:  Yes, Your Honor.

14             THE COURT:  And I will issue an opinion if you

15   don't want to come in and argue it.  If we can't get it on in

16   January because of schedule then we can't, we have lots of

17   motions coming up in January so I can't promise you your

18   motion is going to be on, if not we can set another date.

19             MR. CHERRY:  We would certainly appreciate an

20   argument on it.  We also think -- coming back to the OEM

21   discovery, what we have proposed is we think it is a

22   reasonable approach, and I know you didn't want to address

23   scheduling, but if this -- if we prevail on this motion we

24   don't need OEM discovery on those 13 products which the OEMs

25   have said is going to be very burdensome, and so all the more

1    reason to decide this motion.  If we prevail we can avoid all

2    of that discovery on these third parties.  Thank you, Your

3    Honor.

4            THE COURT:  Okay.

5            MR. SPECTOR:  Thank you, Your Honor.

6            MASTER ESSHAKI:  Your Honor, may I have one moment?

7            THE COURT:  Yes.

8            MASTER ESSHAKI:  Mr. Cherry, with respect to what

9    we discussed yesterday regarding the Denso stipulation --

10   proposed stipulation about deferring discovery, would you

11   please reduce that into a proposed order, circulate it, and I

12   will put it on the agenda for the December 9th hearing?

13           MR. CHERRY:  I will.  Thank you.

14           MASTER ESSHAKI:  Thank you.

15           THE COURT:  Great.  Okay.  Anything else?

16           (No response.)

17           THE COURT:  Nothing else.  Okay.  Then we will

18   begin our motion hearings.

19           All right.  This is the first one, radiators, T.Rad

20   defendants?  There you are.

21           MR. SIMMONS:  Here I am.  Good morning, Your Honor.

22   Peter Simmons from Fried Frank for the T.Rad defendants.

23           And the plan is I'm going to take the lead for all

24   the defendants on the joint motion, and then Mr. Hemlock has

25   a separate motion for just the Calsonic defendants that we

1    will deal with afterwards.

2         So there are three fundamental problems with the

3    truck dealers' radiators complaints.  The first is a Twombly

4    problem which affects the entire complaint, which is

5    basically there is no basis alleged factually to infer a

6    conspiracy relating to radiators for trucks.  The second

7    point is a statute of limitation problem, which if you

8    dismiss on Twombly grounds you don't need to get to, but if

9    you were to find them, we would suggest you shouldn't, but if

10   you were to find that they can plausibly infer a truck

11   radiators' conspiracy from the passenger car radiators'

12   conspiracy then their claim is untimely because that

13   inference could have been drawn no later than July 2011 when

14   there was ample publicity about the radiators' antitrust

15   investigation.

16        And then the third point I want to address is a

17   standing point which affects part but not all of the claims

18   but nonetheless would materially streamline the claims in the

19   case.  And while you normally think of standing being a

20   threshold issue that should go first, here I think you only

21   need to get to it if they get past Twombly because Twombly

22   would get rid of all of the claims and the standing point

23   only addresses some so I'm going to do it counterintuitively

24   and do standing at the end.

25             THE COURT:  Okay.

1          MR. SIMMONS:  The truck plaintiffs' complaint here

2     essentially rests on nothing more than a propensity

3     inference.  They say that the defendants, including my

4     clients, pled guilty to a conspiracy relating to passenger

5     car radiators, or there are class claims that have been

6     allowed for the end payors and the auto dealers regarding

7     passenger car radiators or there are governmental

8     investigations relating to passenger car radiators, in other

9     words, these defendants are bad people, and therefore they

10    must also be engaged in a conspiracy regarding truck and

11    equipment radiators, but there are no facts pled in the

12    complaint from which that inference can plausibly be made.

13         Now, notably this is already their amended

14    complaint because we made this argument in a motion to

15    dismiss the first complaint, they were on notice of it, they

16    amended the complaint and they didn't fix any of this.  They

17    knew they had to try and they couldn't do it.  And same for

18    some window dressing, all they are alleging is that we

19    conspired regarding car radiators and we also make truck

20    radiators.  All right.  So what?  Cars have wheels.

21         THE COURT:  What is the similarity between a truck

22    radiator and a car radiator?

23         MR. SIMMONS:  I'm sorry?

24         THE COURT:  The similarity between a truck radiator

25    and a car radiator?

1  MR. SIMMONS:  There is a similarity.  I mean, cars

2  have wheels, trucks have wheels, they're both on roads, but a

3  car is not a truck and you can't just infer that because

4  there was a conspiracy as to one product that there must have

5  been a conspiracy as to the other product.  They don't allege

6  any facts, they don't allege any communications, there is no

7  specificity, there is no who, what, when, where.  They don't

8  say Mr. X or Ms. Y did the following on the following date,

9  so there are no facts about any communication regarding truck

10  radiators.  They don't identify a single bid or RFQ for truck

11  radiators that was allegedly rigged.  They don't identify a

12  single governmental investigation affecting these defendants

13  relating to truck radiators.  They offer nothing but the

14  naked assertion, on information and belief, by the way, that

15  the same employees were involved but with no specificity as

16  to who, what, when, where.

17  Now, the Court has twice rejected the truck

18  plaintiffs' claims that a truck-related conspiracy can be

19  inferred just from the existence of a passenger car

20  conspiracy.  There were two orders that you issued on

21  December 30th, 2015 in the wire harness case; one dismissed

22  the truck plaintiff claims against Mitsubishi Electric that

23  rested on nothing more than a criminal plea regarding parts

24  for passenger cars, and then separately you said you had no

25  jurisdiction over Fujikura because the U.S. guilty plea and

1    the Japanese FTC -- the JFTC order both related to only

2    passenger vehicles and did not support an inference of

3    similar conduct regarding parts for trucks.

4          In both decisions the allegations of the complaint

5    that you quoted in your opinions are almost identical to what

6    they are alleging in their amended complaint against us here.

7    The Court was very clear, while the truck dealers' complaint,

8    quote, contains specific allegations about antitrust conduct

9    in the passenger vehicle market, quote, a defendant's conduct

10   relevant to the passenger vehicle conspiracy does not

11   establish the defendant's involvement in the trucks and

12   equipment conspiracy.

13         The same is true here.  Similarly you said that the

14   plea -- the criminal pleas and the governmental orders

15   relating solely to passenger cars and that don't mention

16   trucks or equipment do not suffice to establish a

17   truck-related conspiracy even when coupled with what the

18   Court called general allegations that the defendants

19   manufacture and sell the disputed product.  Again, absolutely

20   analogous to what we are dealing with here.  None of the

21   pleas, none of cease and desist orders, none of the consent

22   decrees in the U.S. or elsewhere against any of these

23   defendants says one word about the trucks, and the mere fact

24   that cars and trucks both have radiators is not a basis to

25   infer that the conspiracy repeated in the truck context.

 1          As we pointed out in our opening brief, you know,

 2     refrigerators have radiators but you can't infer a

 3     refrigerator conspiracy from the fact that there was a

 4     passenger car conspiracy.

 5          THE COURT:  But they do allege -- the TED

 6     plaintiffs do allege that you communicated and conspired.

 7          MR. SIMMONS:  In just those words, the defendants

 8     communicated with no specificity.  That's not sufficient

 9     under Twombly to meet the factual test to plausibly draw the

10     inference.  Merely offering the bald conclusion, essentially

11     tracking the elements of the claim, that the defendants

12     conspired, the defendants communicated, the defendants rigged

13     bids, if that's all they had to do Twombly is meaningless.

14     They are basically just offering naked conclusions to track

15     the elements of the cause of action.

16          And, you know, when the Court denied the end payor

17     and auto dealers' motion for leave to file their

18     consolidated-amended complaint the Court rejected the idea

19     that there was a single-overarching conspiracy and said

20     you've got to take it product by product.  The same logic

21     applies here; you can't just assume because the defendants

22     made radiators for cars and radiators for trucks that

23     everything that the defendants made was the subject of a

24     conspiracy just because the passenger car radiator was.

25          And all the rest in their complaint frankly is just

1    a lot of noise words, it is either limited to passenger cars

2    or it is in that category we were just discussing of wholly

3    conclusory nonspecific allegations.  So they will do things

4    like list by name every truck company that we allegedly sell

5    radiators to and then they just say so there must have been

6    communications about those bids.  Again, a naked conclusion,

7    no facts, nothing that actually supports a logical inference.

8              THE COURT:  You want dates or some indication of a

9    meeting or something more specific?

10             MR. SIMMONS:  Something.  So we submit, Your Honor,

11   that under Twombly that's not sufficient and, you know, just

12   saying we sell car radiators to companies that also make

13   trucks doesn't establish a truck radiators conspiracy, and,

14   as we said, the Court has already rejected this several

15   times.

16             While we note that in the end payor and auto dealer

17   cases the Court did uphold some pleading against the Twombly

18   challenge, and we dealt with this at pages 19 and 20 of our

19   brief, those all contained far more detail than the truck

20   plaintiffs' complaint does here as to the who, what, when,

21   where.  None of those cases where you upheld it against the

22   Twombly challenge was a truck complaint, and critically that

23   also means that because those were passenger car complaints

24   they were also amply supported by the criminal pleas, the

25   JFTC consent decrees, the cease and desist orders, again, the

1    things that the truck plaintiffs here don't have.

2            So that in a nutshell is the Twombly problem, it is

3    an overarching problem, and they don't just get to say you

4    were a bad guy once, you sell other products, you must have

5    been a bad guy again, and that's really all this complaint

6    says.

7            THE COURT:  Okay.

8            MR. SIMMONS:  Moving on to statute of limitations,

9    we pointed out as the Court previously recognized that there

10   was publicity starting in 2010 about antitrust investigations

11   there into wire harnesses, and by July of 2011 there was

12   publicity that the antitrust investigations had spread to

13   radiators.  The plaintiffs don't dispute those dates and

14   events in their opposition.

15           It is also undisputed that their state law claims

16   are governed by three- and four-year statute of limitations

17   and that their complaint wasn't filed until November of 2015,

18   more than four years after the publicity about the radiators

19   investigation.

20           THE COURT:  The publicity was in July of 2011?

21           MR. SIMMONS:  2011 as to radiators, earlier as to

22   the other parts, but specifically as to radiator, what they

23   are suing over, July of 2011.  So they said we had no way to

24   know from that news coverage that those raids and

25   investigations might affect trucks, those were all about

1    cars.  Well, that, of course, is our Twombly point that you
2    can't infer one from the other.  So if you agree with them
3    that you can't infer bad acts about trucks from what they did
4    about cars, well, then they have just made my first argument
5    for me, maybe they are fine on limitations but then they are
6    out of luck on Twombly.  Conversely, if you think they can
7    overcome Twombly and it is proper to infer a truck conspiracy
8    from the mere fact of a passenger car conspiracy, and, of
9    course, we don't think that you should, then their claim is
10   time barred because they were on notice of the facts that
11   they say allowed them to infer the truck conspiracy.  So one
12   way or the other this case has to be dismissed.
13          Now, the Court's ruling in wire harness trucks, and
14   this is the third opinion you issued December 30th of last
15   year, is not to the contrary.  There the Court gave the truck
16   plaintiffs a pass on the statute of limitations defense and
17   said the case can survive motion to dismiss on Twombly
18   grounds because the facts giving rise to an inference of a
19   conspiracy in that case came to light later, but were then
20   strung together in the complaint with requisite specificity
21   to support the inference.
22          But here at the time -- rather there at the time
23   the facts first became known in that case there was no basis
24   to infer.  The critical difference here is that they don't
25   allege anything new that they learned and that came to light

1    after July 2011 relating to our conduct about truck

2    radiators.  They point to paragraphs 186 and 187 of their

3    complaint where they say that the JFTC announcement in March

4    of 2013 in the European Commission announcement of March of

5    2014 were the first notice they had that a conspiracy

6    supposedly extended to trucks but, of course, as they further

7    admit, those related to bearings, not radiators.

8         So they again make our point for us two paragraphs

9    later in 189 of their complaint, they say although there was

10   disclosure of certain facts indicating that the government

11   investigation involved price fixing for automotive parts, and

12   they italicize automotive, no indication that the public

13   domain was available, that parts for trucks and equipment,

14   again italicized, were involved in the conspiracy being

15   investigated.  Again, this goes back to our you can't have

16   your cake and eat it too argument.  Either there is no way

17   you can draw the inference from cars to trucks or if you drew

18   the inference then they are out of luck on statute of

19   limitations.  In other words --

20        THE COURT:  So the two dates that you really are

21   arguing about are the July 2011 date and then the March --

22   the plaintiffs want the March 2013 date?

23        MR. SIMMONS:  Correct, but they point to nothing

24   that they learned relating to truck radiators since July of

25   2011.  The difference between this and the wire harness case,

1    and in the wire harness you said well, in retrospect at the

2    time the conduct was in the newspapers there was nothing

3    there that necessarily said the conspiracy affected trucks,

4    subsequent facts have come to light that now allow them to

5    string together a complaint that survives Twombly based on

6    the incremental facts they have learned later but they have

7    now put in their complaint.  But here they didn't do that,

8    here they said we had no idea back then and we have nothing

9    new to offer you now since we have learned since then.

10             So if it wasn't sufficient on statute of limitation

11   grounds then they have nothing that helps them on the Twombly

12   point here, and if on the other hand they say oh, no, we can

13   just draw the inference because you are bad guys and you

14   engage in all of this conduct and truck radiators and car

15   radiators, well, they are all just radiators, well, that

16   inference again should have been drawn in July of 2011, so

17   they can't have it both ways, either on Twombly or on

18   limitations this complaint should be tossed.

19             THE COURT:  Okay.  How about the standing issue?

20             MR. SIMMONS:  So turning to standing, it really is

21   a gating issue, it is jurisdictional, and the Court is

22   allowed, indeed required, to consider relevant facts.  We put

23   in voluminous evidence as part of our motion from the

24   plaintiffs' own witness at the 30(b)(6) deposition and from

25   their own website showing they do not trade in equipment.

 1   These are dealers in truck, not in equipment.  They define

 2   their class as truck and equipment but it is really two very

 3   different buckets.  Trucks are trucks.  Equipment they define

 4   as everything from bulldozers to tractors to railway cars to

 5   mining equipment, and you know what, they don't sell any of

 6   it, and they don't dispute that in their papers.  We put in

 7   all of the evidence that says they don't sell it, they don't

 8   buy it, they don't trade in it, and they didn't dispute any

 9   of that.

10           Instead what they are asking the Court to give now

11   is what I will call a lawyer's equivalent of a homework pass,

12   please excuse us from having to do this now, Judge, we will

13   just deal with it later at class cert after we've taken lots

14   of discovery.  But they don't have a right to sue about

15   equipment, and to put the defendants to the burden and

16   expense of all of that discovery for products that they don't

17   trade in and when no relief they seek to obtain will make one

18   iota of difference to them.  This is what we called in our

19   brief the roving policeman theory; it doesn't affect me but I

20   know someone who may have been affected so let me go pursue

21   this claim and we'll deal with it later.

22           They don't have a right to enforce the antitrust

23   laws about product that they never bought and sold and that

24   affects other people.  That's an interesting job for DOJ or

25   state Attorney Generals but not for private litigants.  A

1    private litigant has to show injury, in fact, to himself, and

2    we cited a litany of cases at page 11 of our brief for that

3    proposition that, you know, you can't sue about products that

4    you didn't buy and where you weren't injured.

5            And other than arguing let's just kick the can, we

6    will come back to this at class cert, and we will come back

7    to this at class cert and we will come back to that in a

8    second, their only defense really is to point to the

9    6th Circuit decision in Fallick.  Now, Fallick, of course,

10   reiterated that individual standing is a prerequisite and

11   that you don't gain standing merely by saying I'm suing on

12   behalf of a class.  But Fallick involved a factually very

13   different situation, it involved several health insurance

14   plans from the same insurance carrier with the same language

15   that was interpreted the same way.  The plaintiff was covered

16   by one policy but not all three, and the 6th Circuit said

17   that's okay, he has a concrete injury of his own and those on

18   whose behalf he seeks to sue have the exact same injury

19   relating to the exact same policy language interpreted the

20   exact same way, and it focused on that uniformity of the

21   policies and the uniformity of the conduct to get there.

22           So that's more like the end payor plaintiffs here

23   saying, you know, we bought Ford and GM and Honda cars and

24   can also sue for the same part incorporated in a Toyota car.

25           THE COURT:  Would you slow down?

1          MR. SIMMONS:  I'm sorry.  I'm from New York, I talk

2     fast.

3          THE COURT:  I recognize that.

4          MR. SIMMONS:  So the truck dealers are not just

5     saying, you know, we sell Peterbilt trucks and we want to sue

6     for the same part in Volvo trucks, we are not challenging

7     standing for that.  They are saying in effect we want to sue

8     about those radiators for the refrigerators that I mentioned

9     earlier, only here it is radiators in bulldozers and tractors

10    and railway cars and mining equipment, and that's a far cry

11    from what the Court of Appeals countenanced in Fallick.  It

12    is not -- these are not uniform products, you know, any more

13    than you can say that an Intel processer chip is incorporated

14    in a smart phone and in a laptop and so I bought a laptop but

15    I want to sue about smart phones; it doesn't work that way.

16         So what about their argument let's just kick the

17    can and defer this all to class cert?  No, you can't do that.

18    Phallic makes the point that a potential class representative

19    cannot acquire standing by virtue of class action, that is

20    expressly held at 162 F.3rd at 423.

21         You don't get to just come in here, put the

22    defendants to the trouble of discovery and say well, we will

23    figure out later if anyone has really been hurt.  The damage

24    is done, it is done to us.  They don't get to put us through

25    years of discovery and motion practice on the grounds that

1    don't worry, we will put out a newspaper ad and mail notices

2    out in a couple of years and we will find someone that this

3    case really matters to.  That's not how standing works.  It

4    is a threshold requirement for a reason so even if somehow

5    the claim were to withstand Twombly and the statute of

6    limitations, which we don't think it should, the claims

7    relating to the equipment, anything other than trucks must be

8    dismissed.

9         Other than that, Your Honor, we did make some

10   additional points in our brief relating to particular

11   problems on particular state statutes, that's set out in the

12   brief and I'm not going to spend time rehashing that this

13   morning.

14        THE COURT:  So if you had a piece of farm equipment

15   that had a radiator in it, would that person not have the

16   same damages as a truck with a radiator?

17        MR. SIMMONS:  It is a different product so if they

18   had a dealer in farm equipment and if they could show with

19   the requisite Twombly specificity some other party could come

20   in and say we actually bought and sold farm equipment, we are

21   harmed, but they don't buy and sell farm equipment anymore

22   than they buy and sell refrigerators.

23        THE COURT:  Okay.

24        MR. SIMMONS:  And just because a radiator is in one

25   doesn't mean they have roving license to bring suit.

1          THE COURT:  Okay.  Thank you.  Response?

2          MR. McCONNELL:  Good morning, Your Honor.

3    Shawn McConnell from Duane Morris on behalf of truck and

4    equipment plaintiffs.

5          THE COURT:  Good morning.

6          MR. McCONNELL:  Good morning.  So I will start in

7    the same order that defense counsel went this morning and

8    address the Twombly issue.  It sounds like that defendants

9    would like to impose upon plaintiffs in this case a fraud

10   particularity pleading standard that is just not the case on

11   a 12(b)(6) motion.  Also defendants try to cherry-pick

12   individual allegations and target those specific allegations

13   as not meeting the pleading standard rather than looking at

14   the entire complaint in its whole.  And when you look at the

15   entire complaint in the whole you have all defendant entities

16   have pled guilty to fixing the prices of radiators, and we

17   have several dozen of allegations that all of the defendant

18   entities have sold radiators to --

19         THE COURT:  To cars, they pled guilty to the cars?

20         MR. McCONNELL:  That's right, Your Honor, to

21   vehicles.  And we are -- we have dozens of allegations that

22   those sales from the defendant entities to OEMs included

23   overlapping OEMs that sell to both trucks and equipment and

24   to cars including some OEMs that just deal in trucks and

25   equipment.  So even though the guilty pleas only touched on

1    radiators to automobiles, these are the predominate

2    manufacturers of radiators for trucks and equipment and cars,

3    and when you look at the market conditions that are alleged

4    in the complaint then the opportunity to collude and how the

5    RFQ process works and the communications between defendants

6    it would be illogical for defendants who are selling

7    radiators to cars to not also use those car prices as a key

8    to what they ultimately charge for radiators that are used in

9    trucks and equipment.

10        If the trucks and equipment radiators were priced

11   differently than the prices of the radiators that were sold

12   to cars, the overlapping OEMs that sell both car radiators

13   and truck equipment radiators would be able to discover the

14   conspiracy.  So it doesn't make sense that the radiators that

15   were sold to truck and equipment would not be inextricably

16   intertwined with the radiators that were sold but to trucks

17   and equipment dealers.

18        THE COURT:  And they are the same product, we

19   aren't talking about --

20        MR. McCONNELL:  Yes, we are talking about

21   radiators.  They prevent vehicles from overheating.  Now, of

22   course, there are different types and grades of radiators; if

23   it is a small car versus a lawn mower or a tractor or a Mack

24   truck, of those there are different grades, but the product

25   at issue in this case is a radiator that prevents motor

Status Conference, Motion Hearing, Final Approval Hearing - November 16, 2016

**71**

 1    vehicles from overheating.

 2          THE COURT:  Okay.  The statute of limitations

 3    issue?

 4          MR. McCONNELL:  Yes, Your Honor.  As this Court has

 5    already applied the analysis that the plausibility standard

 6    of 12(b)(6) is quite different than the standard for tolling

 7    the statute of limitations.  And in this case, just like the

 8    previous decision by Your Honor, the truck and equipment

 9    plaintiffs were not on notice that there was a -- that the

10    conspiracy had spread to the -- to parts for trucks and

11    equipment until March of 2013, and despite the argument by

12    defense counsel that there is no new information in truck and

13    equipment dealers' amended complaint there's dozen of

14    allegations that include facts that were discovered during

15    proffers.

16          THE COURT:  Okay.  But in 2011 you would know about

17    the radiators in the cars and the automobiles, right?

18          MR. McCONNELL:  That's correct.  There were a lot

19    of investigations and a lot of guilty pleas and a lot of

20    press releases involving a lot of parts before March of 2013

21    that involved a lot of parts that are also used in trucks and

22    equipment.

23          THE COURT:  Given your last argument, why would you

24    not then assume it was in cars?  That's what you just said

25    before.

1        MR. McCONNELL:  Yes, Your Honor, the truck and

2   equipment --

3        THE COURT:  Why not assume it is in trucks?  I'm

4   sorry.

5        MR. McCONNELL:  Because the truck and equipment

6   plaintiffs had no ability to investigate or understand that

7   the conspiracy spread as far as trucks and equipment, that

8   was not clear until the March 2013 press release that the

9   bearings case had actually involved parts that were also sold

10  to equipment manufacturers.

11       THE COURT:  But I don't understand this because you

12  knew -- you knew the radiators were sold to automobiles, and

13  in your first Twombly argument you say they go in

14  automobiles, it would be ridiculous to think if they are

15  fixing the price for automobiles they wouldn't fix the price

16  for trucks and equipment.

17       MR. McCONNELL:  Well, a lot of that information is

18  learned when you look at the overall market conditions and

19  when you discover the proper information on which OEMs were

20  buying radiators from these individual defendants, and that

21  information, which defendants were involved, and the overlap

22  into trucks and equipment parts was not known until March of

23  2013.

24       THE COURT:  And some of your plaintiffs buy -- some

25  of your plaintiffs buy farm equipment, is that --

1          MR. McCONNELL:  Well, I will address that in the

2     standing argument.

3          THE COURT:  All right.  Go ahead on this.

4          MR. McCONNELL:  So as far as standing, Your Honor,

5     the product at issue here, as we discussed already, is

6     radiators, and under the test of Lujan and Fallick in the

7     6th Circuit we allege that defendants conspired to fix the

8     price of radiators, and that artificially inflated price of

9     radiators caused all of the lines of truck and equipment that

10    were purchased by plaintiffs to be artificially increased and

11    inflated as in direct purchasers.  And so regardless of

12    whether or not they bought every single line of truck and

13    equipment in plaintiffs' class definition, that's a question

14    for Rule 23 as this Court has made clear several times that

15    for purposes of Article 3 standing you just need to allege

16    injury in fact, causation and redressibility, and defendants

17    do not seriously contest that the plaintiffs were injured in

18    this case by the inflated price of radiators, they merely say

19    you didn't buy every single line of truck and equipment that

20    meet your class definition, which is a decision for Rule 23.

21         THE COURT:  Why would farm equipment be added to

22    trucks, why would that not be different?

23         MR. McCONNELL:  Well, all radiators are slightly

24    different, Your Honor, but they all provide the same

25    functions to vehicles, they prevent them from overheating

1    but --

2          THE COURT:  Why not trucks, farm equipment,

3    refrigerators?

4          MR. McCONNELL:  Well, refrigerators aren't vehicles

5    so the definition of truck and equipment dealer class are

6    truck and equipment vehicles, so they are vehicles that have

7    wheels essentially and move, whether it is a backhoe or a

8    crane or a Mack truck or a lawn mower or agricultural

9    equipment or railcars, they are all vehicles that have wheels

10   and can get from one place to another as opposed to a

11   refrigerator, which I'm not familiar with one that has wheels

12   and can move but --

13         THE COURT:  I wasn't familiar whether it had a

14   radiators but go ahead.  Standing, let's talk about that.

15         MR. McCONNELL:  Well, I just was addressing the

16   standing argument that if you look at Fallick, which the

17   defendants cite, and there you have a plaintiff that brought

18   suit on ERISA plans because of a general practice within

19   several ERISA plans that he contested.  He was not a member

20   of all of those various plans obviously because you can only

21   have one medical benefit plan, but the Court allowed him to

22   sue on the basis of all of those plans because of one

23   particular practice within those plans that were consistent.

24         And here it is really the same thing, you have

25   radiators that we allege were super competitively priced by

1    defendants that affected all of the lines of truck and

2    equipment, so because the truck and equipment dealers were

3    injured, in fact, by the super competitively priced radiators

4    and it meets the Lujan test that they were all injured, and

5    then we did decide Rule 23 at a later stage whether the class

6    definition is appropriate.

7            THE COURT:  Okay.  Thank you.  Brief reply?

8            MR. SIMMONS:  Very brief, Your Honor.

9            On the facts, not only as I mentioned, did we take

10   issue with this in response to their first complaint they

11   didn't fix it, but it is notable that the truck dealers

12   settled with Denso earlier in this year that included

13   cooperation, which included documents, and they filed the

14   amended complaint here in May and added no factual

15   information even though materials were available to them.

16   That's an interesting juxtaposition to say what the auto

17   dealers' and end payor plaintiffs' complaints look like, so

18   they had access to information, didn't put it, which means

19   presumably they don't have it.

20           Secondly, you can't just say a radiator is a

21   radiator and anything a radiator goes into should be within

22   their class.  I mean, that again is like saying anything that

23   has a processer chip, whether it is a TV or a phone or a

24   laptop, you know, it is one uniform class.  These are

25   different products and they sold in different ways to

1   different people, and their allegation, gee, we had no idea

2   how this market worked, we couldn't figure out.  They have

3   been players in this market for years, they have dealerships

4   across the country, and the OEMs have public information out

5   there regarding what they make and what they sell and that's

6   also been out there for years.  So this notion that nothing

7   has been available to them and it has all just occurred to

8   them suddenly just don't hold water, Your Honor.  Thank you.

9           THE COURT:  Thank you very much.

10          MR. McCONNELL:  Your Honor, just five seconds, if I

11  may?  I would just like to direct the Court to the dozens of

12  allegations learned in the proffer in the amended complaint

13  that was information learned after March 2013 that assisted

14  truck and equipment dealers with the radiators' complaint.

15          THE COURT:  Okay.  All right.  The Court will issue

16  an opinion.

17          The next motion is the Calsonic North America.

18          MR. HEMLOCK:  Good morning, Your Honor.

19  Adam Hemlock, Weil, Gotshal & Manges, on behalf of the two

20  Calsonic defendants.

21          There are two motions to dismiss, one on behalf of

22  CKC, that's the Japanese parent entity, they are moving to

23  dismiss for lack of personal jurisdiction, and then CKNA or

24  CK North America is the U.S. subsidiary, and they are moving

25  to dismiss on Twombly grounds.

Status Conference, Motion Hearing, Final Approval Hearing - November 16, 2016

77

```
 1              THE COURT:  Okay.
 2              MR. HEMLOCK:  With the Court's permission, Your
 3   Honor, I would propose to argue both of those motions at once
 4   as many of the facts at issue overlap?
 5              THE COURT:  That makes sense.
 6              MR. HEMLOCK:  Thank you.  So, Your Honor, with
 7   respect to the motion to dismiss on personal jurisdiction
 8   grounds, the complaint should be dismissed for three main
 9   reasons.
10              First, this Court has dismissed seven other
11   complaints with the same operative facts and, indeed, in
12   certain circumstances the facts here are even better than in
13   those other cases.
14              Second, for all the reasons that Mr. Simmons noted,
15   the complaint lacks the requisite facts, the complaint is
16   filled with general allegations, conclusions, lumped
17   allegations, boilerplate claims but no facts that are
18   required under Twombly to assert personal jurisdiction.
19              And finally, there are two declarations that were
20   submitted by employees of each of CKNA and CKC, and they are
21   very clear.  As to CKC, it is a Japanese company incorporated
22   in Japan with its principal place of business in Japan, it is
23   therefore at home in Japan.  It has never manufactured
24   radiators for trucks and equipment in the United States, and
25   it does not control where its customers sell their trucks and
```

1    equipment.

2           As to CKNA, it has never, ever manufactured or sold

3    radiators for trucks and equipment, and it is not controlled

4    day to day by CKC, the corporate formalities have been

5    observed.

6           For those reasons the complaint should be

7    dismissed, but let me go through those bases in a bit more

8    detail.

9           THE COURT:  Okay.

10          MR. HEMLOCK:  Again, the Court has dismissed seven

11   similar complaints in similar circumstances where there was a

12   foreign company that did not sell the product in question in

13   the U.S. and that is the touchstone.

14          For example, in Fujikura, which Mr. Simmons

15   mentioned, the key facts are the same.  CK never manufactured

16   or sold radiators for trucks and equipment in the U.S., the

17   subsidiary never manufactured or sold them ever, and the

18   cease and desist order from the Japan Fair Trade Commission

19   related only to automobile radiators and did not mention

20   trucks, and let me just focus on that cease and desist order

21   for a moment because the plaintiffs obviously make something

22   of that.

23          In 2012, over four years ago, the JFTC fined

24   Calsonic, not CKNA but just the Japanese parent, with respect

25   to auto radiators only, no reference to trucks and equipment,

1     with respect to one OEM, and that was Subaru, which is a part

2     of the Fugi Heavy conglomerate.

3            Now, the plaintiffs allege that Subaru and Fugi

4     Heavy is one of the automobile OEMs that also make TNE, well,

5     maybe that is true but they don't allege that any of them

6     ever purchased or sold Fugi Heavy trucks or equipment and

7     none of them claim to be an authorized dealer of Fugi Heavy

8     trucks and equipment.

9            More importantly, at no time has CKC or CKNA ever

10    pled guilty or been charged or indicted in the United States,

11    and I note, Your Honor, that it has been four years since the

12    JFTC's fine and still in the United States no plea and no

13    indictment, and I think that's quite telling as to the

14    plausibility of their claims and whether personal

15    jurisdiction should be asserted here.

16           And this is in contrast, Your Honor, to the

17    Fujikura case where Fujikura had pled guilty in the United

18    States and nevertheless this Court found that there was no

19    personal jurisdiction.  Fujikura also had been fined in

20    Japan.

21           And it is notable, Your Honor, in the opposition

22    brief from the plaintiffs they make no mention of the

23    Fujikura case, and I understand that because there is no way

24    for them to get around it.

25           Now, in addition to Fujikura, Schaeffler, Delphi

1    Korea, Leoni AG, SY Europe, AB SKF and Ichiko all were

2    dismissed on the same ground.

3           The plaintiffs cite the Showa decision with respect

4    to power steering assemblies, but the meaningful difference

5    there is Showa pled guilty in the United States and, in fact,

6    as part of those papers admitted to having had meetings in

7    the United States.  That's obviously a major distinction from

8    our facts and our facts lead to a dismissal on personal

9    jurisdiction grounds.

10          Second, Your Honor, the key here is facts, not

11   general allegations and conclusions.  I won't repeat what

12   Mr. Simmons said, but we support and agree with everything

13   that he said in that regard.  Some of their allegations, not

14   facts but allegations, may be true but they don't support

15   personal jurisdiction.  For example, they say CKC owns CKNA

16   and CKNA manufactured and sold radiators in the United

17   States.  Well, we don't dispute that but that doesn't do

18   anything.  They don't allege any of the breaches of corporate

19   formalities that's required for an alter ego theory, none

20   whatsoever, all they say is that there is ownership, so the

21   mere ownership does nothing for them.

22          Second, this Court held that allegations relating

23   to automobile parts are not probative of whether there is

24   personal jurisdiction with respect to trucks, that's in the

25   Fujikura decision, this Court said an inference favorable to

1   TED plaintiffs does not arise because Fujikura failed to move

2   for dismissal on the basis of personal jurisdiction in the

3   other component parts cases.  The other cases involved

4   automobiles, not trucks and equipment.

5           And, indeed, I think in certain circumstances, Your

6   Honor, the opposition brief frankly stretches the facts a

7   little bit to the point where they might be misleading.  For

8   example, the plaintiffs say CKC admitted that it either

9   directly or through one of its affiliates did business or has

10  done business in the United States.  Okay.  That's what they

11  claim.  Now, what do they use to support that?  They use

12  CKC's answer in the ADP case, and what did we say in that

13  answer?  We said certain of CKC's affiliates have done some

14  business within certain jurisdictions in the United States.

15  Okay.  That says nothing about what CKC has done, it says

16  that CKC's affiliates have done something, but they rely on

17  it to claim that CKC did business in the United States, and I

18  frankly think that's misleading.

19          Now, with the above in mind let me briefly run

20  through the two tests.  General personal jurisdiction, there

21  clearly is none, CKC is not home here.

22          On specific personnel jurisdiction, we have the

23  three elements from Southern Machinery.  First, there is

24  purposeful availment and that requires a substantial

25  connection to the U.S., that the defendant expressly aims its

1    conduct at the U.S. and the brunt of the harm is felt in the

2    U.S.

3              THE COURT:  The most that CKC would have is that

4    some of its radiators ended up in vehicles here in the United

5    States?

6              MR. HEMLOCK:  Could be but --

7              THE COURT:  They have no control over it --

8              MR. HEMLOCK:  Exactly, Your Honor.

9              THE COURT:  -- is that what you are arguing?

10             MR. HEMLOCK:  Yes.  Thank you.  And that's set

11   forth in the two declarations that were attached.

12             They arise from the requirement, requires

13   substantial connection between plaintiffs' claims and in

14   forum activities but clearly there has to be some in forum

15   activities pled before there is a substantial connection, and

16   they don't plead those here.  They focus on the ownership of

17   CKNA but, as I said, that doesn't get them anywhere.

18             Finally, jurisdiction needs to be reasonable.  With

19   the above two points I think it is clear jurisdiction would

20   be wholly unreasonable.

21             Let me briefly address the declarations because the

22   opposition brief makes a point about them.  This Court has

23   relied on such declarations in the past.  Both in Ichiko and

24   SY Europe this Court dismissed on personal jurisdiction

25   grounds and relied on declarations and did not order

 1    jurisdictional discovery in any auto parts case that we are

 2    aware of.

 3            Now, they cite In Re:  Cardizem for the point that

 4    if there is a conflict between the declarations and something

 5    else then you can't rely on declarations, but In Re:

 6    Cardizem is just the general denial of jurisdictional facts.

 7    Our declarations that we put in are affirmative, they are

 8    very clear, they are very concise, exactly what are the

 9    reasons why jurisdiction is not warranted in this case, and

10    the plaintiffs' complaint does not offer anything to the

11    contrary.

12            So let me now turn, Your Honor, to the motion to

13    dismiss for CKNA on Twombly grounds.  There is not a single

14    supporting fact pled indicating that CKNA sold radiators to

15    any TED customers and in particular to these TED customers,

16    and that's not surprising because as you see in the

17    declaration CKNA never made or sold these products.  They

18    have to allege facts demonstrating that CKNA sold the

19    products, that plaintiffs' class members purchased them with

20    CKNA radiators installed and that CKNA participated in an

21    unlawful agreement.  Again, they have had the Ex Para

22    cooperation documents for some time now and they clearly were

23    not able to use any of them to demonstrate that CKNA had any

24    role in a conspiracy at all for that matter regarding trucks

25    and equipment.

1          Now, the JFTC fine paid by CKC is not relevant

2     again because it was only CKC, it was only Japan, it was only

3     Japanese laws, and it is not something they can rely on.

4     Your Honor said in the MELCO decision, a defendant's conduct

5     relevant to the passenger vehicle conspiracy does not

6     establish the defendant's involvement in the trucks and

7     equipment conspiracy.  So CKNA has no involvement in any

8     conspiracy but certainly not in one involving trucks and

9     equipment.

10          Here, Your Honor, we see some more contortions in

11     their pleadings that we think are a bit misleading.

12     Paragraph 67 of their complaint says truck and equipment

13     OEMs, many of which are large manufacturers such as, and they

14     list a bunch of them, purchased radiators directly from parts

15     suppliers, such as defendants, during the conspiracy period.

16     You see that paragraph very carefully avoids pleading clearly

17     that these plaintiffs bought trucks and equipment with CKNA's

18     radiators in them, and how could they because CKNA never made

19     those products.

20          This case has been litigated for years, Your Honor,

21     there has been lots of opportunities for these plaintiffs to

22     find some facts, whether in the public record or otherwise,

23     and if you look at the complaint those facts are clearly not

24     in there.

25          They had an opportunity in their opposition brief,

1 and if you look, Your Honor, at their opp brief there are two

2 pages where they seem to highlight their greatest hits, what

3 they think are their best shot at demonstrating that this

4 motion should be denied, and if you look closely at each one

5 of those they really fall by the wayside, they are not

6 enough.

7   Now, our motion we believe should be granted

8 without any supporting facts. We think just looking at the

9 complaint is enough. But if the Court does not agree, then

10 we would ask that it convert it into a motion for summary

11 judgment pursuant to Rule 12(b). Mr. Mike Lane, one of the

12 top executives at CKNA, who has been with the company since

13 1985, has stated under oath that CKNA never made these

14 products.

15   Plaintiffs claim three things, that that

16 declaration is not comprehensive, it is vague, and it is

17 untested. First of all, the declaration is exactly what

18 their complaint should be, direct and to the point, it is not

19 remotely vague, it says very clearly we have never made or

20 sold these products. There is no other way to say that as

21 succinct as that. We don't need pages and pages of

22 extraneous material to try to make our point, which is what

23 the trucks and equipment plaintiffs' complaint does.

24 Frankly, the longer the complaint the more you wonder whether

25 it should satisfy Twombly because if they really had the

1    facts to assert their claim they would put it right up front
2    and they would make it short and succinct.
3           Second, it is completely comprehensive.  Nothing
4    more can be said on point about whether they make this
5    product.
6           And, third, there is nothing to test.  It is a
7    declaration under oath that plaintiffs have put forward no
8    facts to the contrary.
9           In the MELCO case this Court said the collective
10   acts cannot be attributed to MELCO defendants given the lack
11   of a plausible allegation that MELCO even competed in the
12   trucks and equipment market, and that principle applies here,
13   Your Honor.
14          Now, the plaintiffs say they deserve full
15   discovery, and they put in a declaration from Mr. Parks with
16   a really big list of what they want.  You know what this list
17   looks like?  It looks like a request for documents that we
18   would get at the start of an antitrust case.  They want to
19   litigate the whole case on this one specific issue, and that
20   is not appropriate, it is very clear we deserve summary
21   judgment just based on the papers or if you admit that
22   declaration that the declaration should be sufficient.
23          That's all I have.  Thank you.
24          THE COURT:  Thank you.  Response?
25          MR. McCONNELL:  Hello again, Your Honor.

1    Shawn McConnell from Duane Morris on behalf of the truck and

2    equipment plaintiffs.

3              First, with respect to --

4              THE COURT:  What did CKC do here in the United

5    States?

6              MR. McCONNELL:  Well, plaintiffs allege that CKC is

7    a Japanese company that targets its business to North America

8    and China and other places around the world, and --

9              THE COURT:  But how does it do that?

10             MR. McCONNELL:  It does it through the sale of

11   radiators and other parts.

12             THE COURT:  Do they sell radiators here in the

13   United States?

14             MR. McCONNELL:  Yes.

15             THE COURT:  How, through whom?

16             MR. McCONNELL:  I believe through CKNA, its

17   subsidiary.

18             THE COURT:  It manufactures them in Japan, and you

19   are saying sends them to CKNA here, not in vehicles but

20   just --

21             MR. McCONNELL:  Well, at this time, Your Honor, it

22   would be foolish of me to say that I know how CKNA's business

23   works at the pleading stage, but what we allege is that CKC

24   targets the United States and for purposeful availment the

25   question is the context with the forum state by CKC, not with

1    the individual plaintiffs, or whether or not the radiators

2    from truck and equipment specifically got to plaintiff truck

3    dealers, which we will argue that they knew that they would

4    end up in the United States.  But for purposeful availment

5    the test is whether CKC itself as a company targeted the

6    United States, and not whether these specific products ended

7    up in the United States.  The test is not looking from the

8    plaintiffs' perspective but for the defendants' contacts with

9    the forum.  We allege in our complaint that CKC targeted the

10   United States, does business in the United States, for

11   radiators and other products, and we think that's sufficient

12   for --

13           THE COURT:  But what I want to make sure is you are

14   saying for radiators and other products, but right now

15   talking about radiators, you are saying that CKC, as you

16   allege in your complaint -- or you allege in your complaint,

17   that they targeted the United States for radiators, not as

18   for CKC sold its radiators in Japan --

19           MR. McCONNELL:  Well, that would be --

20           THE COURT:  -- put into vehicles which were then

21   sent to the United States?

22           MR. McCONNELL:  Yes, Your Honor.  That would be

23   under the arise to or relate to causation element of the

24   specific personal jurisdiction test that as part of the RFP

25   or RFQ process in Japan CKC, even though they declare in

```
 1   their declaration from the CKC employee that they did not
 2   control where the radiators for truck and equipment ended up,
 3   they had knowledge of where they would end up and they knew
 4   that those -- this is an indirect purchaser case so
 5   regardless they admit that they sold radiators, they pled
 6   guilty to fixing the price of radiators in Japan, and they
 7   sold radiators for truck and equipment in Japan, and we
 8   allege that through the RFQ process and RFP process that they
 9   knew that those products would ultimately end up in the
10   United States.
11        And as far as reasonableness, the third factor for
12   specific personal jurisdiction, you know, as defendants point
13   out for radiators for automobiles CKC is before this Court
14   and they sell -- they admit in their answer that they sell
15   radiators for automobiles in the United States, so it would
16   not be unreasonable given their context with the forum for
17   them to be --
18             THE COURT:  You mean CKNA?
19             MR. McCONNELL:  CKC, Your Honor.
20             THE COURT:  CKC admits that they sold radiators --
21   I'm sorry.  I missed what you just said.
22             MR. McCONNELL:  CKC is a defendant in the radiators
23   case for automobiles before Your Honor.
24             THE COURT:  Right.
25             MR. McCONNELL:  So they have already -- they are
```

1   already before the Court because they have sold radiators for

2   automobiles so they are before this Court, this Court has

3   jurisdiction, so as far as whether it would be reasonable

4   whether they would foresee that they would be hailed into

5   this forum, it is entirely reasonable given their involvement

6   in radiators for automobiles in this case.

7          Next -- well, just really quickly on the personal

8   jurisdiction issue.  Defendants, you know, cite Fujikura but

9   it is important to note for the record that Fujikura was a

10  case where there had already been six months of discovery

11  produced by all defendants including Fujikura itself.  There

12  were millions of pages of documents, transactional data,

13  discovery responses, interrogatories, and there was an

14  opportunity in Fujikura for truck and equipment plaintiffs to

15  modify their complaint based on the information learned from

16  discovery in that case.

17         Here discovery hasn't gotten off the ground yet,

18  and so even though they provide -- defendants provide

19  declarations we have not been able to test those

20  declarations, we have not been able to determine the veracity

21  of those declarations.  And in Fujikura the declarations,

22  including a VP of sales and marketing and a VP of finance and

23  accounting, where here you have an attorney or legal staffer

24  and somebody involved in HR so it is unclear how they would

25  know whether the radiators that were involved in sales to

1    truck and equipment dealers in Japan would end up in the

2    United States, so I think that's an important distinction for

3    giving plaintiffs limited jurisdictional discovery if the

4    Court wishes to do so because they have not yet had the

5    opportunity.

6             THE COURT:  Okay.

7             MR. McCONNELL:  With respect to defendant CKNA's

8    Twombly argument, they focus mostly on the MELCO decision,

9    the Mitsubishi MEC case, but it is important to distinguish

10   that case, that's not the same operative facts as in this

11   complaint.

12            As Your Honor knows in the MEC decision, MEC sold

13   one type of wire harness, a body unit, to Fugi Heavy

14   Industries, which is an OEM that does deal in both

15   automobiles and trucks and equipment, but there was no

16   allegation that MEC sold that wire harness to trucks and

17   equipment, just that it sold to Fugi.  And the only guilty

18   pleas with respect to MEC in that case were with respect to

19   alternators and starters and I believe maybe ignition coils,

20   so they did not at all relate to wire harnesses.  So the

21   Court said that you can't loop in wire harnesses for trucks

22   and equipment just because they sell one wire harness, they

23   have never pled guilty to anything that has to do with wire

24   harnesses and they only sold one type of wire harness to an

25   OEM that may or may not have sold trucks and equipment but

```
 1    you didn't specifically allege that MEC sold wire harnesses

 2    to trucks and equipment.

 3              But here in this case we do specifically allege

 4    that CKNA has conspired with Mitsuba and T.Rad to fix the

 5    prices of radiators sold to trucks and equipment, and we

 6    provide dozen of examples of the types of OEMs that CKNA has

 7    sold to that include OEMs that sell specifically to truck and

 8    equipment dealers rather than both automobile dealers --

 9    automobiles and trucks and equipment, so it is easily

10    distinguishable --

11              THE COURT:  Wait a minute.  That CKNA sold to?

12              MR. McCONNELL:  Yes.

13              THE COURT:  Got it.

14              MR. McCONNELL:  We make several factual allegations

15    in our complaint that specific defendants --

16              THE COURT:  Right.

17              MR. McCONNELL:  Now in both the first motion Your

18    Honor heard and in this last motion, you know, we hear that

19    well, there's just defendant groups generally or

20    cherry-picking individual allegations but there are dozens of

21    allegations naming each individual defendant, their role in

22    meeting together, their opportunity to meet together, their

23    guilty pleas which all affected radiators, the relationship

24    between the radiators for automobiles and the market

25    conditions that made them relate to radiators for trucks and
```

1   equipment and the opportunity to collude and the sales that

2   these defendants made to OEMs that sold to trucks and

3   equipment.

4           So we think that there are several factual

5   allegations, they are much more detailed when you look at the

6   complaint as a whole and the market conditions and the fact

7   that these three entities at issue in this case are the

8   predominant sellers of radiators for automobiles and trucks

9   and equipment.  And if they were fixing prices for

10  automobiles this Court has held that just because the guilty

11  pleas are only specific to automobiles does not mean that

12  that limits it and that forecloses the boundaries of the

13  guilty pleas of the conspiracy, that it would make sense that

14  it would extend to trucks and equipment.

15          THE COURT:  It is plausible.

16          MR. McCONNELL:  It adds the inference of

17  plausibility, yes, Your Honor, with -- these are the same

18  facts that the Court has found sufficient for bearings and

19  wire harness cases.

20          And just to follow up on the Rule 56(d) motion for

21  defendants' declaration, again, they rely on Fujikura, which

22  the Court did not afford the opportunity to take limited

23  jurisdictional discovery or any discovery to contest the

24  declarations and convert it to a Rule 56 motion but, again,

25  unlike Fujikura, plaintiffs have not had any discovery at

1    this point, there has been no interrogatories responses, no

2    documents, no transactional data, we are not in a position --

3    we haven't had six months to parse through information to the

4    benefit of truck and equipment dealers to convert this to a

5    Rule 56 motion.

6           And we just think that it is unclear, given two

7    declarations that have not been impeached by someone in the

8    legal department and someone in HR, whereas we specifically

9    allege that two employees worked for both CKNA and CKC by

10   name in our complaint but neither of those two employees

11   provided declarations in this case, but we have a declaration

12   from a legal staffer and from an HR person that we would like

13   to test the veracity of those declarations and get limited

14   discovery if the Court so chooses to convert this to a

15   Rule 56(d) motion.

16          THE COURT:  Okay.  Thank you.

17          MR. HEMLOCK:  Briefly, Your Honor?

18          THE COURT:  Yes, brief reply.

19          MR. HEMLOCK:  Just a few quick points.  First of

20   all, in the Ichiko decision, Your Honor said merely placing

21   product into the stream of commerce without more is not a

22   purposeful act directed at the forum.  They allege that there

23   was direction but they allege no facts, and that's something

24   that they said many times, counsel said allege, allege,

25   allege.  It is easy to allege but you need something beyond.

1        They point out MELCO, in MELCO he mentioned that

2   there was a plea.  We have no plea in the United States with

3   respect to either of these two defendants, so the MELCO case

4   is even stronger for us than it was for MELCO itself.

5        Counsel points out that the U.S. declarant was an

6   HR representative.  He is, I will tell the Court, one of the

7   top executives at CKNA.  He has been there since 1985, he's

8   involved in all aspects of the business, and he conducted, of

9   course, appropriate diligence before putting in that

10  declaration.

11       Finally, with respect to Fujikura and six months of

12  discovery, the point of Fujikura, Your Honor, is not that

13  after six months of discovery this Court was able to

14  determine whether there was personal jurisdiction.  It is

15  that that Court held the principles regarding when personal

16  jurisdiction is appropriate.  The fact that there was

17  discovery is frankly irrelevant to the holding of that case,

18  and the same principles, the same theories apply in this

19  case, so jurisdiction is not warranted here and the fact that

20  there has been no discovery should not matter at all.  Thank

21  you.

22       THE COURT:  Okay.  Thank you.  I think we are up to

23  6-B, which is the defendants' collective motion to dismiss

24  end payor plaintiffs.

25       MR. LOVE:  Good morning, Your Honor.  Brad Love of

 1    Barnes & Thornburg representing the KYB defendants.  You will
 2    notice it is a rather barren defense side in this case.  We
 3    are the only defendant group in the shock absorbers action.
 4         I'm going to try to be as brief as possible since I
 5    think this is the last thing on the agenda.  Our motion --
 6    the state law claims have been resolved on the collective
 7    motion to dismiss, you entered the stipulation recently
 8    addressing those issues, so all that remains are the Twombly
 9    and standing arguments that we have raised in our motion, and
10    those certainly overlap.  The key issue that we believe
11    distinguishes this case from other motions to dismiss in the
12    auto parts case is that there are no allegations of a
13    conspiracy or even sales involving U.S. OEMs or European OEMs
14    or anything other than six Japanese OEMs.
15         If you look at plaintiffs -- both the auto dealer
16    plaintiffs' and the end payor plaintiffs' complaints against
17    the KYB defendants, you will see no mention of GM, no mention
18    of Ford, no mention of Chrysler, these are only complaints
19    that mention the six Japanese OEMs that were also mentioned
20    in KYB's plea agreement with the Department of Justice, those
21    are Honda, Subaru, Toyota, Kawasaki, Nissan and Suzuki, and
22    that really especially in the case where there are no other
23    named defendants, no allegations of sales to other OEMs, that
24    impacts directly the plausibility of plaintiffs' claims in
25    this case.

1          The main issue we want to focus on is the fact that

2    they haven't alleged that they purchased even the brands of

3    cars that are allegedly impacted here.  They allege they

4    purchased shock absorbers indirectly, the ADPs allege they

5    purchased automotive parts but we will assume, as they

6    suggested, that was meant to reference shock absorbers, but

7    the bottom line is neither allege that they purchased the

8    brands of automobiles at issue.  In fact, 14 of the ADPs

9    actually specifically allege that they were not authorized to

10   purchase new vehicles from any of those six OEMs to which

11   they say we are impacted by the conspiracy or where there are

12   any allegations that KYB sold them shock absorbers.

13          The issue is heightened in this case, and I think

14   another key distinction from the prior motions that we would

15   want to focus your attention on especially in light of

16   plaintiffs' opposition brief is the Court's order regarding

17   the plausibility of an industry-wide conspiracy earlier this

18   year in response to plaintiffs' motion to amend and

19   consolidate 18 different part cases involving Denso and other

20   defendants.  Obviously KYB was not involved in that, KYB only

21   sells shock absorbers, that's all the allegations are in the

22   complaint, that's all that could be in the complaint, and the

23   Court in that April order addressed the plausibility of the

24   industry-wide conspiracy allegations.

25          There aren't really industry-wide allegations of

1    conspiracy in plaintiffs' complaints against KYB.  However,

2    they rely on the fact that there are allegations of

3    industry-wide conspiracy in their opposition to suggest that

4    even if KYB or other defendants that are alleged to have

5    conspired with KYB didn't sell to non-Japanese OEMs you could

6    infer such sales from allegations of an industry-wide

7    conspiracy.  We would say certainly that's not the case where

8    KYB only sold shock absorbers, and we would also say that

9    your Court's -- that Your Honor's ruling in April --

10             THE COURT:  Only sold the shock absorbers to whom?

11             MR. LOVE:  Only sold shock absorbers to the six

12   OEMs that have been identified in the complaint.  The only

13   allegation is that KYB sold shock absorbers to Subaru, Honda,

14   Kawasaki, Nissan, Suzuki and Toyota.

15             THE COURT:  All the Japanese companies in Japan?

16             MR. LOVE:  All the Japanese companies, either the

17   U.S. subsidiaries or in Japan, but certainly not to U.S.

18   automakers like GM, Chrysler, Ford or European automakers,

19   those just aren't at issue in plaintiffs' complaint and they

20   aren't at issue in the conspiracy that has been claimed here.

21             And then as far as the industry-wide contact, in

22   your order you said that even where there are allegations of

23   communications between defendants selling different parts and

24   defendants that sold multiple parts, which isn't the case

25   here, those allegations of an industry-wide conspiracy, a

1    multi-part mega conspiracy were implausible, and that bears

2    on the rationale that plaintiffs seek to have the Court adopt

3    in denying this motion to dismiss, which is we don't have to

4    allege specific purchases of brands of cars to which KYB or

5    other defendants sold shock absorbers, we just have to allege

6    that there is this big overarching conspiracy and that should

7    be sufficient.

8          We would say certainly under Twombly those are not

9    specific factual allegations that are found anywhere in their

10   complaint, and that would not be sufficient to show that the

11   auto dealer plaintiffs or the end payor plaintiffs here

12   actually purchased vehicles that were impacted by the

13   conspiracy or contains shock absorbers manufactured or sold

14   by the KYB defendants.

15         I mentioned the auto dealer plaintiffs allege they

16   do not sell the brands of cars at issue here.  In some cases

17   some do allege they sold the brands of cars at issue.  The

18   end payor plaintiffs don't even allege, I think as in prior

19   cases, what brands of automobiles they purchased, that's

20   after obviously a significant amount of time here for these

21   plaintiffs to have identified what purchases are at issue to

22   support their claims.

23         And the other issue that I think distinguishes this

24   case is there is no allegation that KYB dominated the market

25   or controlled all the market or that other defendants with

1     whom KYB conspired controlled the market.  I think there is

2     an allegation that KYB had a roughly 20 percent market share,

3     that's certainly not sufficient for a factual inference that

4     every automobile purchased by the auto dealer plaintiffs or

5     the end payor plaintiffs would have been impacted, especially

6     when they do not allege the brand of automobiles that are at

7     issue.

8              I would say that we point to specific authority in

9     our brief that at the pleading stage plaintiffs are required

10    to specifically allege that they purchased products impacted

11    by the conspiracy, we would say in this case those are

12    specific brands of vehicles or vehicles that are likely to

13    have contained shock absorbers sold by the defendants or

14    alleged co-conspirators.

15             Here the only brands that have been identified are

16    by the ADPs, some do, some don't, and certainly the EPPs

17    claim they don't have to allege anything we think is clearly

18    contradicted by the Magnesium Oxide decision from the

19    District of New Jersey that we cite, and the Apple iPhone

20    litigation for the Northern District of California, both of

21    which say plaintiffs must identify the specific products they

22    purchased and that those products were impacted by the

23    conspiracy when they are asserting these sorts of indirect

24    claims.

25             This Court noted in the occupant safety systems

1   case that plaintiffs there did allege the specific brands of

2   cars that they purchased, and that those brands were the same

3   brands, same OEMs to whom the defendants in that case sold

4   the occupant safety systems.  Here there are no such

5   allegations, and I will note that plaintiffs rely it appears

6   on the Optical Disk Drive case out of the Northern District

7   of California for the claim that they don't have to identify

8   that link between KYB sales to Japanese OEMs and their

9   purchases of GMs or Fords or Chryslers.  We would say that

10  that's clearly not addressed in that case, it does not

11  address the pleading standard for indirect purchases under

12  Twombly, and it certainly doesn't say that they don't have to

13  plausibly allege that there is some link between these U.S.

14  automobile purchases and the alleged Japanese OEM sales at

15  issue.

16        The last point I will make is in plaintiffs'

17  opposition they identify some new claims that appear nowhere

18  in their complaint.

19        THE COURT:  To modify their complaint, is that --

20        MR. LOVE:  Yeah, they are not permitted to do that,

21  that is our position.  We cite obviously the 6th Circuit

22  authority on that, and we haven't seen a motion to amend or a

23  new complaint.  Auto dealer plaintiffs suggest that they

24  might seek leave to amend, it is unclear what the end payor

25  plaintiffs wish to do.  We would note that both of those new

1    claims don't really alter the analysis even if they were

2    accepted, but obviously we don't believe that you can amend

3    your complaint on an opposition to a motion to dismiss.

4              THE COURT:  Good try though.

5              MR. LOVE:  Thank you.

6              THE COURT:  Response?

7              MR. OCHOA:  Good afternoon, Your Honor.  Omar Ochoa

8    on behalf of the end payor plaintiffs and the auto dealer

9    plaintiffs as well.  Ms. Evelyn Li might come up and say a

10   few words on behalf of the auto dealers as well in case I

11   mess up along the way.

12             THE COURT:  You won't, don't worry about it.

13             MR. OCHOA:  Thanks.  This shock absorber's case is

14   the 33rd case in this MDL as noted in the lead case number.

15   And with respect to the framework of the allegations in the

16   end payors' complaint and the auto dealers' complaint, these

17   complaints are not substantially different from the 32

18   complaints that have preceded it.  The complaints arose from

19   a broader criminal investigation into price fixing and bid

20   rigging in the auto parts industry.  The named defendant,

21   KYB, pled guilty and agreed to pay a $62 million fine for its

22   participation in the conspiracy.

23             Footnote six in our response brief, Your Honor,

24   cites many of the cases where this Court denied the same

25   arguments made today.  Defendants' motion and their reply

1  particularly attempt to finely parse some of the words and

2  phrases in the complaints to create perceived differences in

3  this complaint versus the others.  I'm happy to address any

4  of those particular parsings if the Court is interested, but

5  otherwise I intend to really just point out for the Court

6  that the arguments raised by the defendants today are not

7  unique and they are very similar to the arguments that have

8  been previously dismissed by this Court.

9        There's a few arguments that I would like to touch

10  on, Your Honor?

11        THE COURT:  You may.

12        MR. OCHOA:  The first is that the defendants cannot

13  simply limit the complaints to the OEMs that were identified

14  in the complaints.  Those OEMs that were identified were

15  simply listed because those were the OEMs that were included

16  in KYB's guilty plea, they were not intended to limit the

17  scope of the conspiracy and Your Honor has previously ruled

18  in the past already that OEMs included in these guilty pleas

19  do not alter or limit the scope of the conspiracy.

20        THE COURT:  I think I ruled also you can't be

21  limited by the plea -- the scope can't be limited by the

22  plea.

23        MR. OCHOA:  Yes.

24        THE COURT:  Not only as to the OEMs.

25        MR. OCHOA:  That's right, Your Honor, and again we

 1    cite cases for that in our brief.  There's also this notion

 2    that the plaintiffs are required to plead the specific

 3    vehicles that they purchased, but that's also simply not true

 4    and has already has been dismissed by this Court in the HID

 5    Ballast case.

 6            The product at issue is shock absorbers, and it was

 7    expressly pleaded by the plaintiffs here that they purchased

 8    vehicles containing these shock absorbers that were affected

 9    by the conspiracy.  The plaintiffs again allege a broad

10    conspiracy that affected the entire shock absorbers' market,

11    and these allegations are in line with again the complaints

12    that have already been approved in the past by the Court.

13            There was at the end a mention that there were

14    additional or new allegations in our response brief.  We do

15    not agree with that reading of our response brief.

16            THE COURT:  You are not moving to amend your

17    complaint?

18            MR. OCHOA:  No, we are not, we are not doing that

19    today, Your Honor.  We don't add any new allegations, we

20    simply stand on the allegations that were presented in the

21    complaints, and ask that Your Honor review those because

22    those have been approved by this Court repeatedly in the

23    past.

24            THE COURT:  Okay.  Thank you.

25            MR. LOVE:  Just briefly, Your Honor.

1        THE COURT:  Response.

2        MR. LOVE:  A couple points that I want to briefly

3   address, Your Honor.

4        The plaintiffs said we finely parsed the pleadings,

5   and as was suggested, please do look at the complaint, there

6   are no other OEMs mentioned with respect to shock absorbers

7   beside the six that we identified.

8        THE COURT:  But you do agree those six were the

9   ones mentioned, I think you even said that in your argument.

10       MR. LOVE:  Yes, those were the ones mentioned in

11  the complaint and those were the ones mentioned in the plea,

12  and that's why the argument that they could have pled

13  something beyond the guilty plea in this case is really a red

14  herring, there is no allegations beyond the guilty plea here.

15  So whether they could have done it or not doesn't matter,

16  they didn't do it, they should be limited to what they

17  actually allege in their complaint, and certainly we are glad

18  to hear they aren't seeking to have the allegations in their

19  opposition incorporated into it.  Thank you very much.

20       THE COURT:  Thank you.  All right.  The Court will

21  issue an opinion on these motions.  I think that's it for

22  this part of the case.  We do have a fairness hearing I think

23  coming up at 1:30.  Okay.  Anything else?

24       MR. FINK:  Your Honor, I'm sorry, there is one

25  other matter.  Mr. Cherry is working with us on this, on the

1    motion for summary judgment, the Court -- that we talked

2    about earlier that was filed on Monday, we are having -- we

3    are not able to agree on a briefing issue so I will stand

4    aside and let Mr. Spector sound more professional.

5            MR. SPECTOR:  Impossible.  Your Honor --

6            THE COURT:  Mr. Spector.

7            MR. SPECTOR:  -- we have been offered a month in

8    terms of response time.  That is, under the circumstance, not

9    enough.  We are going to have to in response to this very

10   simple motion, that happens to be dispositive, respond and

11   establish evidence that we have of the overall conspiracy

12   that we have alleged because, as I understand the motion, it

13   is our failure to prove that that is the basis for the

14   motion.  That's going to take us going through the materials

15   that we were going through for class certification on a

16   schedule that instead of being due on March 3rd would now be

17   due sometime before March 3rd.

18           Mr. Cherry would like it to be due December 14th.

19   We would like it to be due, taking into account that it

20   really disrupts the schedule that we had in place and the

21   manner in which we were proceeding on that basis in terms of

22   factual analysis and putting that into coherent presentation.

23   We would like to have at least until January 14th for that

24   purpose -- or January 16th, I think the 14th I believe is a

25   Saturday, so the 16th is a Monday, to give us an opportunity

1   to get through those facts and put them together coherently.

2   It is going to be the same things that we have to do for

3   summary judgment, it is almost like two bites at the same

4   apple, but that's why we ask for that amount of time, Your

5   Honor.

6          MR. CHERRY:  Your Honor, if I may respond?  The

7   motion, again, it is 11 or 12 pages, it is what is the

8   evidence as to Denso.  And they have had our documents,

9   almost all of them, for four years, they have had the

10  additional documents for over a year, they have completed

11  depositions.  Every deposition was about the same thing over

12  and over again, Denso sales of body ECUs to either of two

13  OEMs, that was it, that's all the evidence as to Denso.

14         And at this point we are entitled to summary

15  judgment.  There are no facts linking Denso to any 13 part

16  conspiracy, linking to any part purchased by any direct

17  purchaser plaintiff, and discovery is now long since closed

18  and it is time to deal with this and get wire harnesses off

19  of the docket.  And they don't need two months -- they have

20  already responded to our request for admission.  We served

21  request for admission.  Do you have any evidence -- do you

22  admit or deny that you have evidence that Denso conspired on

23  wire harnesses?  They admitted no evidence.  On relay boxes

24  they admitted no evidence, on down the line except for body

25  ECUs.  There is no need to deal with all of this.

1        THE COURT:  Okay.

2        MS. SPECTOR:  If I may, Your Honor?

3        THE COURT:  Briefly.

4        MS. SPECTOR:  Just very briefly.  The question is

5   not what is the evidence against Denso alone, the question is

6   what is the evidence of an overall conspiracy with regard to

7   wire harness products, and that involves the analysis of not

8   just Denso's dockets and depositions but the analysis of the

9   documents and depositions of all of the defendants.

10        THE COURT:  Okay.

11        MR. SPECTOR:  All 11 of them.

12        MR. CHERRY:  Again, it only matters --

13        THE COURT:  All right.  Enough, enough.

14        MR. CHERRY:  -- it is our motion.

15        THE COURT:  You may have until January 16th.

16        MR. SPECTOR:  Thank you, Your Honor.

17        THE COURT:  It is a dispositive motion, if you are

18   granted you are done, it will probably because of your time

19   to respond -- to reply, excuse me, won't be done for that

20   hearing in January, but as I indicated before, you can

21   request in your motion that it be set specifically at another

22   time and we can do it at another hearing.

23        MR. CHERRY:  That's fine.  I assume we'll be able

24   to agree on a date for reply but otherwise --

25        MR. SPECTOR:  I assume.

1          MR. CHERRY:  We will request a hearing, Your Honor.

2          MR. SPECTOR:  Thank you, Your Honor.

3          THE COURT:  Now, before everybody leaves is there

4    anything else?

5          (No response.)

6          THE COURT:  All right.  I wish you all happy

7    Thanksgiving, have a good healthy time.

8          THE LAW CLERK:  All rise.  Court is in recess.

9          (Proceedings adjourned at 12:23 p.m.)

10                        —   —   —

11          (At 1:49 p.m. Court reconvenes, Court and counsel

12          present.)

13          THE LAW CLERK:  Please rise.

14          The United States District Court for the Eastern

15    District of Michigan is again in session, the Honorable

16    Marianne O. Battani presiding.

17          You may be seated.

18          THE COURT:  Good afternoon.  Sorry to keep you

19    waiting.  Okay.

20          MR. RAITER:  Good afternoon, Your Honor.

21    Shawn Raiter for the auto dealers.

22          As you know, we are here on the auto dealers'

23    motion for final approval of a collection of settlements.  We

24    also essentially have three main issues or motions.  The

25    first is the final approval of the settlements.

1      THE COURT:  Let's do that first, and we can get to

2  the others.

3      MR. RAITER:  And along with that, the plans of

4  allocation that we submitted with that brief, and then we've

5  got attorney fees and costs, and then we have this separate

6  motion that we made to set aside a potential of funds for

7  potential future service awards, so we are not asking for any

8  service awards or incentive awards out of this round of

9  settlements, we made a separate motion asking for leave to

10  allow us to set some money aside for a future round of

11  potential requests for those awards, so I will get to that on

12  its merits.

13      The final approval of the settlements, Your Honor,

14  you have been through this a number of times, I don't think

15  we need to go through all of the factors and the subfactors

16  for Rule 23 settlement or settlements in this case.  Here we

17  have ten defendant groups that have reached settlements with

18  the auto dealers, it represents 28 different parts, 37

19  different settlement classes, approximate value -- monetary

20  value of $125 million, it is $124 million and some change.

21  These, like the first round of auto dealer settlements, are

22  no reversion, lump sum settlements, they come with

23  substantial cooperation from each of the settling defendant

24  groups, that brings the total number of dollars in auto

25  dealer settlements to approximately $184 million.

1          So we carried out the notice plan that the Court

2    granted leave for us to carry out.  We used Gilardi &

3    Company, again, which you had approved as the notice

4    consultant and notice provider.  We followed pretty much the

5    same notice plan as we did in the first group of settlements.

6    We direct mailed notices to those dealerships for which we

7    had what we believe to be addresses, and that was about

8    15,000 dealerships, about 100,000 e-mails were sent to e-mail

9    addresses associated with new car dealerships in the included

10   states, which would be the indirect purchaser states and the

11   District of Columbia.

12          There were various online notice efforts through

13   things like Facebook, Twitter, and then also publications in

14   various auto industry or auto dealership publications.  The

15   notice consultant indicates that in their opinion the notice

16   reached approximately 95 percent of the new car dealerships

17   potentially eligible in the included states.  The defendants

18   on their own submit their CAFA notice, which is the notice to

19   the state and federal agencies or authorities, of the

20   settlement and they do that and are sure -- they have an

21   incentive to do that because we want the release that comes

22   with having properly done that.

23          As I will talk about in a minute here, there was an

24   issue about supplementation of some of these notices for some

25   of these defendants, and out of an abundance of caution we

1    want to time your final approval or the effectiveness of the

2    final approval to 90 days from the date of those

3    supplementations, and the proposed order that we provided to

4    you accounts for that, so we can talk about that when we get

5    into the merits of this, but all of the defendants have

6    provided the CAFA notice and the clock is either ticking or

7    has already run on the 90-day period for some of them.

8         So the next thing you look at, of course, in a

9    settlement like this is assuming that you find that the

10   notice was adequate and met Rule 23 Constitutional

11   requirements is the class member reaction.  We are fortunate

12   again to have no objections to these settlements.  We did not

13   get a request to appear at these -- or at this final fairness

14   hearing.  We have not received any comments about the merits

15   of the settlements or any of the requests that we have made

16   for attorney fees, for the incentive award set aside, for

17   reimbursement of cost and disbursements.  No one commented

18   about the merits of the settlement, no one commented about

19   the CAFA notice or the Rule 23 notice process.

20        THE COURT:  We had some opt outs though.

21        MR. RAITER:  We did have some opt outs and before

22   we go there I want to remind the Court, and I don't think you

23   need to be reminded too much, but our class of clients or

24   class members are all represented by counsel, many of them

25   have in-house counsel, some of them are publicly traded

1    companies with an in-house general counsel office with

2    multiple lawyers, but every new car dealership that we have

3    ever been in contact with has attorneys who do their work on

4    a day-to-day basis.  So when we look at the fact that we

5    don't have any objections we think it is remarkable, we think

6    it speaks very highly of the terms of the settlements, the

7    work that we've done, and the reasonableness of the

8    settlements themselves and of the requests that we have been

9    making for reimbursement of fees or expenses.

10         We did have opt outs this time, the first of which

11   was the group that opted out of the first round of auto

12   dealer settlements, Group One Automotive, they had initially

13   opted out in the first round but then they elected to opt

14   back in by the time we were in front of you for final

15   fairness.

16         THE COURT:  One of them had several hundred

17   dealerships.

18         MR. RAITER:  Collectively there was four groups

19   that had opted out in this round, they are all represented by

20   the same three law firms.  What happens here, Your Honor, is

21   they get solicited in antitrust settlements, and this is not

22   a unique situation.  If you were to go to some of the web

23   sites of these law firms they say that they specialize in

24   representing opt-out clients in antitrust and securities and

25   other litigation.

1        THE COURT:  Tell me in real life what that means.

2   I mean, they preserve their right to get a greater share of

3   the pot, is that basically --

4        MR. RAITER:  They preserve their right -- they

5   believe they are going to do better by opting out and

6   asserting their own claims against these defendants, and they

7   are going to make more money in doing so.  As class counsel

8   who has been involved in this litigation for dealerships for

9   five years, having been on the receiving end of much of the

10  discovery of some of these folks sitting here in the jury

11  box, we don't think that that is very likely, we think it is

12  not a good idea for them to opt out, but that's the play if

13  that is what they are doing.

14       Now, there are those opt outs in any class action

15  settlement that are essentially conscientious objectors, they

16  just say I don't want to be any part of this, I don't want to

17  make a claim, I don't believe in this, blah, blah, blah, I

18  want out.  We don't have any reason to know or not know

19  whether any of these dealerships are in that category, but we

20  do know that the four major groups that opted out with the

21  total of about as many as 269 locations in the included

22  states or maybe just under 200, depending on how you look at

23  it, some of them, for example, their name says so and so

24  collision center, doesn't sound like a new car dealership to

25  us.  Some of them are again in the name use the word used

 1   dealerships or used cars, probably not a class member, but

 2   nonetheless they have their name on a list wanting to opt

 3   out.

 4           THE COURT:  But let's just say some did it because

 5   they wanted more money and they are a legitimate business.

 6           MR. RAITER:  Uh-huh.

 7           THE COURT:  I'm just curious because the defendants

 8   have settled and I'm assuming they settled hoping they would

 9   take care of everything and now have these opt outs, so what

10   happens, do they have separate cases?  I have never

11   followed -- I haven't had a class where I have had opt outs.

12           MR. RAITER:  So they may well bring another case

13   themselves, they may well approach these defense lawyers to

14   say we have these claims and we represent these dealerships

15   and we want to negotiate with you and negotiate some other

16   deal.  In many class settlements you have what people call a

17   blow provision or a provision that allows the settlements to

18   be voided if a certain number of the class members opt out,

19   so if more than X percent opt out the settlement at the

20   defendants' election usually can be voided.  I have never

21   seen a settlement voided even when the opt out number has

22   been exceeded so usually, and the defense lawyers can speak

23   for themselves, there is some expectation that you may have

24   to deal with some number of opt outs.

25           Our settlements here that are before you right now,

1    most of them do not have any opt-out provision, some of them

2    have a provision that if more than 10 percent of the class

3    members filed a claim -- excuse me, elected to opt out that

4    they would get a credit back against some of the money that

5    they had paid toward these settlements, but the number here

6    doesn't get anywhere near any of those numbers.  So either

7    some of the settlement agreements have nothing on this topic

8    or some have a payback but we don't believe that's going to

9    be triggered in any sense.

10           So despite that, Your Honor, we estimate that the

11   number of dealership locations that opted out is somewhere

12   one percent or less of the total class members in the

13   included states.  Again, there is case law, although we

14   didn't provide it to you in the brief, there is case law

15   where sometimes nearly 50 percent of the class opts out and

16   the Court still finds it to be a fair and reasonable

17   settlement.  So this is an issue that -- part of what we want

18   to do, we want everybody in the class, we think it is in

19   their best interest quite frankly for them to remain in the

20   settlement class and to participate because we think we have

21   made a claim process that is easy and efficient, that is

22   repetitive, that once they make their claim they don't have

23   to keep submitting, it should be something that they would be

24   interested in doing.

25           One of the dealership groups, the Asberry Group, we

1    spoke with because we have been working with them processing

2    their claims in the first group of dealership settlements, so

3    we have been in contact with many of these dealerships groups

4    and they are processing claims in round one, and that

5    particular dealership indicated well, I'm not quite sure yet

6    what I'm getting in round one so when I see that I may want

7    to participate in round two, I may want to come back in.  And

8    given what happened last time when group one realized that

9    they were the only opt out they wanted back in because they

10   realized they couldn't litigate on their own.

11            We think if one or more of these groups decide to

12   come back into the settlements that the others likely will

13   follow.  The proposed order we have submitted to you

14   contemplates that someone could elect to come back into the

15   settlements anytime until the claim deadline or just before

16   the claim deadline in April of 2017, so we have built in the

17   opportunity here for these folks to say I want to change my

18   mind, even after hopefully you have ordered and granted final

19   approval they still will have a chance to come back in.

20            We are very close to being in a position to

21   actually pay the claims that were submitted in the first

22   group of auto dealer settlements.  The only thing that we

23   will be waiting on are the allocation plans we have submitted

24   to you with this motion.  So we were still revising some of

25   the allocation plans.  The ones that are before you today,

 1    some are new parts that you have never seen an allocation

 2    plan on before, some are allocation plans that we have

 3    submitted to the Court but which you have not yet ruled on,

 4    or some are allocation plans that you did rule on but we have

 5    now amended in some way largely reducing the amount of

 6    reserve for wire harness.  For example, we were holding

 7    40 percent in reserve, we now would only like to hold 20

 8    because we are getting to the end of the proffers, we think

 9    we know what the affected models are.  And then for some of

10    those that have been amended we have also learned more about

11    the models and the makes and we have a better feel for who

12    really should get what given the information we have received

13    and cooperation.

14            So once we have that order hopefully, again, I

15    don't want to be presumptuous, but assuming that you grant

16    the approval of those allocation plans the group -- the first

17    group of auto dealer settlements should be going to payment

18    very shortly.

19            THE COURT:  Really?

20            MR. RAITER:  They have calculated, we have been

21    working on the deficiencies, some dealers submit things and

22    they don't submit everything that they need to and you have

23    to go back and say do it within this number of days, do this

24    and do that, and at some point they either do it or they

25    don't, if they don't then they are not going to be paid, but

1    we are at that point where we are ready to disburse.

2           THE COURT:  How many claims have you basically

3    received roughly?

4           MR. RAITER:  It is more than 3,000.  It depends on

5    how you define claims because some dealership groups who may

6    have 20 locations submit one claim.

7           THE COURT:  Okay.

8           MR. RAITER:  Some submit them dealership by

9    dealership, so it is a little bit unclear how many rooftops

10   are in that but it is more than 3,000 claims, which is really

11   quite a remarkable -- it is a high claim rate, it is a high

12   participation rate.  Some of these dealerships, remember,

13   while they are going to be eligible class members they are

14   also out of business so if someone did want to bring a claim

15   for a dealership that went out of the business sometime

16   during the class period they could do so, it is just the

17   likelihood of someone doing that is not high, and you are

18   going to see a little lower participation for that reason.

19          So if you look at the class member reaction we

20   believe again it is very, very positive, it is very strong,

21   that's one of your really main factors here you are looking

22   at, you are looking at the relief provided, the risks and the

23   merits of the claims and the defenses and then the class

24   member reaction really ultimately are your three main

25   focuses.  And if we go through all of those I think, like the

1    first round of settlements that you approved for the auto

2    dealers, these are quite good settlements, they were the

3    result of very hard fought litigation.

4         I think as you can see from some of the defendants

5    that are here these were some of the defendants who had at

6    one time or another taken the lead in offensive discovery

7    against dealerships, motion practice against the dealerships,

8    so it was hard fought litigation, we think the results are

9    good.  It is always a compromise, it is hard to tell here in

10   some sense what the exact damages are without the modeling

11   being done by all the experts quite yet, but we believe based

12   on affected commerce, the particular circumstances of each

13   defendant, whether they pled guilty, whether they didn't

14   plead guilty, where they fall in terms of cooperation, and

15   all of those things play into what fine they paid here play

16   into the calculus that we used to find a reasonable

17   settlement range for each settlement.

18        As you know, we allocate these by part because in

19   theory each part is a different class, so not in theory

20   that's how we presented them, we believe that each part for

21   each defendant is a different class and we allocate the

22   amounts paid by part again generally based on the amount of

23   affected commerce for that particular part with that

24   particular defendant.

25        That was what I had prepared to talk about on the

1    fairness and reasonableness of the settlements.  You know the

2    Rule 23 factors.  We think these are fair, reasonable and

3    adequate, and we would ask the Court to approve them on their

4    merits for that reason.

5           THE COURT:  All right.

6           MR. RAITER:  If you have questions I'm happy to

7    talk about that.

8           THE COURT:  No.  Does anybody have anything else to

9    say before I rule on fairness?

10          (No response.)

11          THE COURT:  No.  Okay.  Let me rule on that and

12   then because the next thing you are getting into are the

13   allocations and the fees.

14          MR. RAITER:  Yes.

15          THE COURT:  I don't want to repeat everything you

16   said, but for the record, of course, we are here on the auto

17   dealer plaintiffs' motion for final approval with -- let's

18   see, we had ten groups of defendants, 28 classes -- no.

19          MR. RAITER:  There's 37.

20          THE COURT:  37 classes.  How many parts?

21          MR. RAITER:  28.

22          THE COURT:  It was 28 parts.  Okay.  The settling

23   defendants are Denso, Valeo, MELCO, Sumitomo Rico, NSK,

24   Schaeffler, Sumitomo, Omron, Leoni and Furukawa.  And the

25   settlement amount is approximately $125 million, a few

1    dollars less than that.  There are no objections.  There were

2    the four dealership groups that have been mentioned and opted

3    out.  And approximately 99 percent of the dealerships remain

4    in the class.

5              First of all, there was notice provided to the

6    automotive dealerships.  I believe from the pleadings that

7    there were -- all of the states that were involved there were

8    notifications provided for the states, and Gilardi & Company

9    sent notice in the mail to approximately 15,000 potential

10   class members.  In addition, there were some 100,000 e-mails

11   sent to addresses associated with automotive dealerships that

12   purchased new vehicles and parts.  Finally, there was

13   publication in the Ward's Auto World, Automotive News and

14   Auto Dealer Monthly and digital media.  I think it is

15   interesting because from the election we can tell how much

16   the digital and social media has an impact, and that was used

17   in these notices.

18             No objections have been made to 37 some different

19   settlement classes.  And the Court does note and wants to

20   stress that we do know -- I do know, as has been mentioned

21   today, that these dealerships, a lot of them, if not -- well,

22   I know all of those that filed claims but there would be some

23   dealerships who may not have attorneys but I think most of

24   them you said do have attorneys and you have been dealing

25   with attorneys so we know that they have advice on their end,

1  and no class member is here today and has indicated that they

2  wish to speak.  So that was -- that was a very telling

3  prospect.

4          The Court finds that the settlement is fair,

5  reasonable and adequate.  We have put the terms of the

6  settlement on the record.  And the Court has to consider a

7  number of factors, and that is looking at the likelihood of

8  success.  Well, we know success is never guaranteed.  These

9  cases have been vigorously defended but clearly there's a

10  likelihood of success but it is an absolute unknown, so the

11  Court finds that is in favor of the settlement.

12          Certainly the complexity of this is well known.  As

13  with any antitrust case, they are extremely complex, they are

14  expensive, and they go on forever, and this case, of course,

15  we are not at forever yet but we are getting there, it is

16  some four or five years.

17          The judgment of counsel that the settlement is in

18  the best interest of the class is very significant to the

19  Court, and the Court gives it great weight.  As I have

20  indicated in the past, counsel is competent, extremely

21  learned and the Court does depend on it for -- on counsel for

22  their expertise.

23          The class members, there were some opt outs as

24  expected but the reaction by the members has been overall

25  positive -- has been positive.  There were no objections.

1    These negotiations were done at arm's length, all the

2    respective parties being represented.  It is certainly in the

3    public interest to settle complex litigation such as this.

4         So the Court needs to then go on with the proper --

5    was the notice proper, and I think I referred to that already

6    as to what was done to the notice -- for the notice, and I

7    think it, of course, is appropriate and sufficient.

8         The settlement class should be certified pursuant

9    to Rule 23 for purposes of effectuating the settlement

10   certainly.  Now, there are a lot of settlement classes in

11   this particular case but they all bear the factors that are

12   required under Rule 23 and satisfy the same.  There is

13   certainly numerosity where the numbers would be impractical

14   to do it individually.  We know the number of notices that

15   were sent out in the number of entities being -- did we say

16   over 1,500 dealerships at one point or 2,500, something like

17   that?

18              MR. RAITER:  15,000.

19              THE COURT:  15,000.

20              MR. RAITER:  But probably more than that.

21              THE COURT:  Okay.  Certainly there is a question of

22   law or fact common to this class.  It arises out of the same

23   operative facts involving conspiracy.  The typicality is

24   there.  The claims of the representative parties are typical

25   of the claims of the class.  The adequacy of representation,

1    the Court has already referenced the attorneys being very

2    learned in this and the class was well represented by counsel

3    and, in addition, the individual plaintiff representatives

4    adequately protect -- adequately represented the class.

5         The Court then turns to the provisions of Rule 23

6    after doing this, 23(a), the 23(b)(3) that the class

7    plaintiffs, as I have just indicated, demonstrate the common

8    questions predominate over questions affecting only

9    individual class members. The class involves this global

10   conspiracy from which the proposed settlement class members'

11   injuries arise. The single conspiracy theory suggests the

12   existence of issues relative to the scope of the conspiracy,

13   the market impact, the aggregate amount of damages as a

14   result of the antitrust violations. Evidence shows that a

15   violation as to one settlement class member is common to the

16   class and will provide the violation to all.

17        Finally, a class action is a superior method to

18   adjudicate these claims that have been centralized here in

19   this Court. So the Court does then appoint the settlement

20   class and -- the class counsel, excuse me, and the class

21   representatives. I believe that's the entirety of it at this

22   point, we haven't talked about the plan of allocation.

23        MR. RAITER: Thank you, Your Honor. As I

24   indicated, the order that we have proposed to you, the

25   omnibus order, has self-effectuating timing of the ruling as

```
 1   to certain of the defendants so that we are absolutely sure
 2   that the 90-day CAFA period has run.  So essentially you are
 3   saying I find the settlements for those defendants to be
 4   fair, reasonable and adequate under the circumstances.
 5   However, if we get some kind of an inquiry from a state
 6   Attorney General or some other public authority before those
 7   90 days run, you certainly have the ability to consider
 8   whatever those entities would have to offer.  We don't
 9   believe that's going to happen, we don't think it is likely,
10   but just to be sure to make sure that we have complete
11   finality and compliance with the CAFA requirements the
12   proposed order has that built into it.
13            THE COURT:  And then the 90 days would begin, as I
14   understand it, from the date the Court signs the order?
15            MR. RAITER:  No.
16            THE COURT:  Or the date --
17            MR. RAITER:  The 90 days begin to run when they
18   provide the CAFA notice.
19            THE COURT:  I thought that they did that.
20            MR. RAITER:  They did that except some of them
21   supplemented and gave additional information, and so to be
22   confident that that supplementation didn't start a new
23   90 days running we have put some timing factors in your order
24   to be sure that they have a full 90 days from the date of the
25   last supplementation to be heard.  Again, no one has come
```

1    forward yet, we don't think they are going to, but just to be

2    absolutely clear that's how the order reads in addition to

3    what Your Honor has just read into the record, and the

4    defendants --

5           THE COURT:  And I have -- let me just say the

6    order -- I thought the order was very well written, it

7    followed the basic outline of what we had before, but it

8    included a lot of detail, I like that, it was very well done.

9    And I would want you to submit -- or I have this proposed

10   order, I don't have what it is on the docket, I want to make

11   sure it is the right order that I enter so --

12          MR. RAITER:  Yes.

13          THE COURT:  -- if you would just submit the order

14   or tell Kay what the number is --

15          MR. RAITER:  We will do.

16          THE COURT:  -- the docket number so I can make sure

17   it is right?

18          MR. RAITER:  We'll do.  There was also a question

19   or two -- defense counsel has had the chance to review this

20   and provide some comments.  There was a question about

21   whether we had Washington, D.C. in the included states in the

22   actual order that was delivered to the Court, I believe we

23   have double checked that it was, but if for some reason we

24   have a clerical issue or two we will submit that in the new

25   proposed order.  I don't believe that we will but -- in fact,

 1    I remember last time I think we had the same issue where we

 2    had a case file number that wasn't right and we cleaned up a

 3    few things after the hearing, but we will make sure that you

 4    have the right order in hand.

 5            The other thing that we did in the first round of

 6    auto dealer settlements, and we have done it again here, is

 7    that each of the defendants -- or the defendant groups will

 8    have their own final judgment so you have this omnibus order

 9    that you have in front of you that goes through all the

10    factors and makes the findings and conclusions, but then for

11    each defendant group we had final judgments that again have

12    been negotiated and edited by defense counsel, they have

13    signed off on them.  We submitted the first group with this

14    motion, the first group that are eligible under the 90-day

15    rule right now for entry of judgment.  Those that have not

16    yet reached the time period, and it is set out in your

17    proposed order, we did not submit those final judgments but

18    we will submit them to you when the 90 days runs for each one

19    of them to be absolutely sure they don't get issued or

20    entered before the 90 days, we don't want to give anybody any

21    arguments that they would not otherwise have.  So that's the

22    plan, I think everybody has agreed to that, and if they don't

23    somebody can certainly speak up.

24            THE COURT:  Okay.  Assuming this is the plan, I

25    just want to make sure that we don't mess up the plan here,

1    so I want to have either something in writing saying enter

2    this order on this date, here is the stack of orders and they

3    don't go in until -- or you don't submit them until the date

4    they are --

5         MR. RAITER:  Right, and we thought about that, and

6    that's why we thought we won't submit them that way we don't

7    have you or your staff having to put it on the calendar and

8    figure out did we get it out at the right time.  This way it

9    really just can't be issued before, and so we won't give it

10   to you before therefore it can't be entered, so that seems to

11   be the easiest way to handle it.  That's just for a handful

12   of the defendants and the other roughly half or so will have

13   those judgments that have already been submitted as part of

14   the proposed order to Your Honor.  Again, we will confirm

15   that you've got the right ones.

16        THE COURT:  When you submit it to Kay, in your

17   e-mail make sure that you put down what you just said to me

18   so she doesn't say that has already been entered in that

19   case.

20        MR. RAITER:  Yes, we'll do.

21        So the next motion, Your Honor, was reimbursement

22   of attorney fees, costs, expenses.  Again, we have been

23   through this process before.  Because you had previously

24   granted a future litigation fund of approximately

25   $2.9 million we incurred about another $450,000 of

 1    out-of-pocket expenses that would be associated with these

 2    settlements, and we seek reimbursement of those.

 3            We also have asked you for leave to set aside eight

 4    percent of the gross settlement funds here for a future

 5    litigation fund, that's $9.978 million, it is obviously a

 6    large amount of money.  We have thus far spent approximately

 7    $5 million, the auto dealers have, in expenses.  We are

 8    entering a time in the litigation where the costs will

 9    increase exponentially and it is really part of the expert

10    work that needs to be done for class certification -- or that

11    will be done for certification.  The economist experts in

12    these cases literally cost millions of dollars to run the

13    modeling, to do their work to form the opinions they need to

14    form in order to support our claims, not only the liability

15    claims but also the fact that these claims could be asserted

16    and maintained on a class-wide basis.

17            So the request is for eight percent of the gross

18    settlement funds, $9.978 million, again, to be set aside in

19    the litigation funds only to be used for costs related to

20    parts at issue in these settlements.  Anything that would be

21    remaining thereafter would go into the claim process; if it

22    turns out that money is not spent it would then be

23    redistributed to the dealerships that have made claims in

24    these settlements, so we have made that request in this

25    motion as well.

1        We have requested attorney fees as we did last

2    time, we requested these on a common benefit basis.  We did

3    so, again, suggesting that you award fees after deducting the

4    cost of notice and administration, which here is

5    approximately $300,000, it is a little less than the first

6    round because we have some efficiency going forward on the

7    claim side of things, and then also after the deduction of

8    the litigation set aside or the litigation fund so that the

9    fees would not come out of the fund or the notice costs.

10       As we did in the first round of settlements, we

11   proposed to you one-third of what remains after those

12   deductions, that would equate to a fee of $38,299,035.  If

13   you go at it a different way and just look at what percentage

14   is that of the gross funds, that would be 30.6 percent of the

15   gross settlement funds.  By way of reference, in the first

16   settlement group of the auto dealers the fee award was

17   31.38 percent of the gross award.  Your Honor has raised this

18   fee issue and obviously is paying attention and thinking

19   about it.  When you had asked all of the groups previously

20   for input about how to approach fees and what is reasonable

21   and how we do this the auto dealers submitted declarations

22   from Professor Arthur Miller and also former Attorney General

23   Frank Kelly talking about the common benefit approach and

24   whether you should apply a declining percentage as the

25   settlements go up or not, and talks -- our declarations also

1    talk about the reasonable fee range percentages.

2          When you make this approach in the 6th Circuit you

3    have got the option to apply a Loadstar crosscheck.  We

4    submitted summary records to you for that purpose.  You

5    certainly can rely on summary records and we have given you

6    authority for that.  The attorneys representing the auto

7    dealers have invested approximately 77,000 hours of attorney

8    time and approximately 11,000 hours of paralegal time.  If

9    you apply what would be the usual rates charged by these

10   lawyers, because we have lawyers across the country, some in

11   Washington, D.C., some in other places that are more or less

12   expensive than maybe the normal rates in Michigan, at usual

13   rates our Loadstar on that time would be $48,406,000.

14         To give you another way to look at it, we

15   recalculated Loadstar using what we call normalized rates,

16   essentially we blended rates of partners, associates,

17   paralegals and of counsel, and if we apply those normalized

18   rates, which at the highest end had a rate of $675 an hour

19   for partners, $375 an hour for associates, $200 an hour for

20   paralegal, $450 an hour for of counsel, the Loadstar using

21   those normalized rates would be $41,136,000.  So when you

22   look at the Loadstar multiplier either way what we did is you

23   already granted us approximately $18.5 million for the work

24   we have done from start to finish.  The numbers I just gave

25   you are from start to finish of the litigation for the parts

 1    at issue in these settlements.

 2          So we put those two together, so we thought instead

 3    of doing this one by one what was our Loadstar multiplier on

 4    the first round, what's on the second, we are viewing it as

 5    an entire litigation.  So the two requested fees, the fee

 6    that I just mentioned, the $38 million plus the $18.5 that

 7    you have already granted, would total $56,800,000, so that

 8    would be for time spent to date -- excuse me, that would be

 9    for the group of settlements before you today.  If you apply

10    the Loadstar calculus to the two different methods that I

11    just mentioned using normal rates and using normalized rates,

12    at normalized rates that would be a 1.38 multiplier, at

13    customary rates it would be a lower multiplier, 1.17.  This

14    is always within Your Honor's discretion.

15          We have cited case law to you that says the

16    cardinal case, for example, that mentions the normal range of

17    multiplier is 1.3 to 4.5.  The Prandin case there was a 3.0

18    multiplier granted.  This Court when you awarded the direct

19    purchasers their first round of fees the multiplier was 2.09.

20    Regardless of how you look at our fee request here, we are

21    well under 2, we are under 1.5 as of the current time.

22          The time that we submitted to you was through

23    September of 2016, September 1st, 2016.  Obviously we

24    continue to work and we have a lot more work to do.  We have

25    other settlements coming.  What we don't know really is will

 1    our multiplier or our kind of fees go up or will they go

 2    down, we don't know at this point.  We will certainly be

 3    before you again at some point for a fee request but it may

 4    be at some point that we start doing more work than the

 5    fees -- excuse me, than the settlements are supporting and

 6    our multiplier will go down but, again, it is hard to say at

 7    this point.

 8            When you look at the fee request, we go back to

 9    this idea that we don't have any objection to the fee

10    request.  Certainly there are lawyers out there who were

11    paying attention to this and certainly could have commented

12    or dealerships could have commented but they have not because

13    we think it is a reasonable fee request under the

14    circumstances.

15            Unless you have questions about that I don't have

16    anything else to add on the fee request.

17            THE COURT:  I indicated this morning what I was

18    doing on the fee requests was granting the 20 percent of the

19    common fund after deductions for costs, and I will do the

20    same here as a preliminary attorney fee, it may be the final,

21    I don't know yet where this is going, but I think that you

22    should have the 20 percent to deal with right now.

23            And in terms of the eight percent for the future

24    litigation fund, I think that's reasonable given the costs of

25    what's going on here.

1        What was the other, 2.9?

2        MR. RAITER:  2.9 is what you had awarded as a prior

3   litigation fund.

4        THE COURT:  In the prior case.

5        MR. RAITER:  The out-of-pocket request for this

6   group is approximately $450,000 in costs that were not paid

7   out of that litigation fund because they were newer, separate

8   parts.

9        THE COURT:  And the Court will grant those.

10       MR. RAITER:  Okay.  I have one question for you

11  about the interim award and it is probably logistics and

12  probably something we can work out here, but we will need to

13  likely make sure that we have set aside whatever difference

14  there is between the 20 percent you award and the request

15  that we made, and it really is of no consequence until we are

16  ready to pay claims.

17       THE COURT:  Well, that's true, and what about in

18  the first settlement where you say you are almost ready to

19  pay claims?

20       MR. RAITER:  Right, that's almost a year it took us

21  to get there.  Now, luckily this second go around it should

22  be much easier because we have claim forms in, we don't have

23  as much work to do, we have -- the claim administrator has

24  the computer program set up to process claims and calculate

25  claims but, again, because this is kind of a pari-mutuel

1    setting where we are going to need to know what the amount is

2    to actually pay out, there may be a time where if you haven't

3    yet decided what the fee award is, the final fee award, we

4    will certainly let you know that, that we are ready to pay

5    claims, and it seems to me right now at least that the best

6    approach would be for us to be sure we have money set aside

7    such that if we were to get another fee award from you it is

8    sitting there and it is not being used to pay claims or --

9         THE COURT:  When will you start paying claims --

10        MR. RAITER:  For --

11        THE COURT:  -- on the first --

12        MR. RAITER:  For the first group of settlements,

13   from the time you approve those plans of allocation, we hope

14   in less than a month, ballpark of about a month.

15        THE COURT:  Really?

16        MR. RAITER:  Yes.  There has been a lot work done,

17   and if you remember the way we set this up and we set it up

18   in the notice for the second group of settlements, we set it

19   up in a way that if a dealership has already submitted a

20   claim that is valid, in other words, they did everything they

21   were supposed to do, they don't have to submit another claim

22   in round two because we have the information about their

23   dealership, we have the information about the vehicles or

24   parts that they acquired during the class periods, and unless

25   they want to supplement that for some reason they can simply

1    stand on their prior claim submissions, so we hopefully made

2    it easy for them to say yes, just go ahead with round number

3    two.

4           So once we get round one done, round two should be

5    easier.  We will certainly get new claims we expect from new

6    dealerships who did not participate in group one but

7    processing those and getting them through deficiency status

8    and getting them ready to pay should hopefully, knock on

9    wood, take less time than the first round did.

10          THE COURT:  So you are going to pay the first round

11   before you get this round, or you are not going to do --

12          MR. RAITER:  Yes.  When you say pay so, I mean,

13   there are really two different groups of settlements, they

14   are freestanding, that first group is nearly ready to pay,

15   and once we get in this process, we have the allocation plans

16   in place, we would be ready to pay.  Keep in mind, for some

17   of the parts at issue in this group of settlements we don't

18   have allocation plans yet because we don't have enough

19   information we think for the allocation consultant to develop

20   those plans, so there will be some time but the process is in

21   place, we have most of the dealerships in the system, we have

22   the ability to calculate those claims set up hopefully, but

23   we are still receiving cooperation from some of the settling

24   defendants and that cooperation really often provides the

25   information that is used to allocate within the plans of

1    allocation but, yes, generally speaking, the first round of

2    settlement payments should be made 30 to 60 days at the most

3    whereas here we will be in a claim process at that point on

4    round number two, we will still be gathering information for

5    allocation plans, but when we are ready to come back to you

6    with the rest of the allocation plans we need for round two

7    we will do that and then be in a position to actually

8    distribute the money.

9            THE COURT:  Okay.

10           MR. RAITER:  So, Your Honor, I believe the only

11   other issue before you is a separate motion that we made,

12   which was to set aside money for potential service awards

13   coming from this group of settlements.

14           THE COURT:  Okay.  Before we get into that, I

15   neglected to mention on the attorney fee, you know, we

16   have -- I have a motion pending from --

17           MR. RAITER:  The Barton Law Office.

18           THE COURT:  The Barton law firm.  I don't assume

19   Mr. Barton is here, is he?

20           (No response.)

21           MR. RAITER:  We did not see him.

22           THE COURT:  Yeah, and I said there was no oral

23   argument on it so we will proceed, but my question is you

24   have a plan to distribute attorney fees to everyone including

25   Mr. Barton, I'm assuming?

1        MR. RAITER:  Yes.

2        THE COURT:  Because he is asking for a fee before

3   he has even gotten his allotment, so to speak; is that

4   correct?

5        MR. RAITER:  That is correct.  We, of course, have

6   a little different view on what he's asking for.  However,

7   when you awarded the first round of fees, lead counsel, as is

8   commonly done in litigation like this, allocates the fees

9   amongst the lawyers who did the work that generated the fees.

10  There is always discretion and judgment within that process

11  about who did what, what was reasonable, what was valuable to

12  the litigation.

13       THE COURT:  I understand that, and I don't want to

14  get into argument on that motion because he's not here.

15       MR. RAITER:  So we planned to follow the same

16  approach here for round two, and until we had a fee award

17  part of us on our side said we are not even sure what the fee

18  award is so I'm not sure how we can analyze what you are

19  asking for.  We have an agreement with Mr. Barton's law

20  office that we believe controls what his fee would be.  He is

21  asking for more based on additional work that he claims that

22  he did.  We certainly intend to in good faith work that out

23  and hopefully come to a resolution, but he filed --

24       THE COURT:  How many other attorneys do you have

25  that are working on these parts?

1    MR. RAITER:  Our group is not nearly as large as

2    the end payors and even the directs.  If you look at firms

3    that have relationships with some of these dealerships, so

4    they are essentially -- they are dealerships' personal

5    counsel, they would be referring counsel if you look at it as

6    a personal injury setting, so a couple dozen total but this

7    is the only one we have this kind of an issue with right now,

8    and we hope to deal with it and hopefully it won't be before

9    you in any sense.

10    THE COURT:  Okay.

11    MR. RAITER:  But it is not like we are telling him

12    you don't get a fee or you don't get anything, it will be

13    something that we will use our best judgment on.

14    THE COURT:  Well, I have indicated to him -- or my

15    staff has because he called to be on the agenda and we said

16    no, and the Court will deal with it by way of responding in

17    writing as to whether or not he can file the motion which

18    has, in fact, already been filed.

19    MR. RAITER:  Yeah, and we didn't respond to the

20    merits, as you know, substantively we have not responded.  So

21    if Your Honor allows the motion we would want a chance to be

22    heard on it.  The concern we have is it is a slippery slope

23    of --

24    THE COURT:  Yeah, don't go there, no, we are not

25    going there.

1          MR. RAITER:  Thank you.  So the last point, Your

2    Honor, is this set aside for potential future service awards.

3    This is a large group of settlements and quite a bit of

4    money, and the work continues for dealerships.  We thought

5    though in light of Shane in particular that really said you

6    need to make a more detailed submission if you want a service

7    award, that delaying such a submission here made sense

8    because we still have work to do for these dealers, we are

9    not exactly sure what that entails yet, and rather than let

10   this large group of settlements pass without anything being

11   paid to these dealers for incentive awards we thought we

12   should set some money aside which, again, would be the same

13   idea that it would be in a separate fund.  If it doesn't get

14   awarded by you in the future for whatever reason it will

15   revert back into claim processing and claim payment but we,

16   in our view as lead counsel for these dealerships, believe

17   that an additional award may be justified.  You made awards

18   in round one, and we believe that in round two there may well

19   be justification for making such an award, we are not sure

20   how much it is, and we would need to document it properly for

21   you in light of Shane, and we thought that having more time

22   to do that made sense so the --

23          THE COURT:  You want to set aside now to hold until

24   this is resolved?

25          MR. RAITER:  Correct.

1            THE COURT:  And was that 8 or 9 million?

2            MR. RAITER:  No, no, that was 1.5 percent, so it

3    was about a million -- hold on.  It was $1,875,000.

4            THE COURT:  1.875.

5            MR. RAITER:  And if it turns out Your Honor awards

6    something less than that or nothing then we would put that

7    back into the pool, so we are not spending it, we just want

8    to be sure that these settlements don't go by and there

9    hasn't been some potential way for dealerships to come back

10   and say we continue to do work, we continue to believe we are

11   entitled to another award.  It is a large group of

12   settlements and we just wanted to be sure that was --

13           THE COURT:  I think that's fair.

14           MR. RAITER:  -- reserved.

15           THE COURT:  I think that's fair.  So you can set

16   aside that and you can set aside the additional attorney fee.

17           MR. RAITER:  Great.

18           THE COURT:  I do have a question now on the plan of

19   allocation.

20           MR. RAITER:  Yes.

21           THE COURT:  You are going to be submitting plans;

22   is that correct?

23           MR. RAITER:  We did with this motion.

24           THE COURT:  This one has a plan, yes, but I thought

25   you were indicating that you were submitting other plans of

1    allocation?

2           MR. RAITER:  So what you have before you with this

3    motion are plans for 18 parts, some of which are still parts

4    related to the first group of settlements, some of those

5    parts, of course, cross over into group two of settlements.

6    So wire harness, we have wire harness settlements in group

7    one and we have them in group two, so you have an updated

8    wire harness plan of allocation in the materials we

9    submitted.

10          There are some new parts that you have not seen a

11   plan yet for that we submitted with this motion, but there

12   are still some parts at issue in these settlements that we do

13   not have enough information yet to submit plans of

14   allocations for these parts in this group of settlements.

15          THE COURT:  Okay.  And they would be done by this

16   same group?

17          MR. RAITER:  Yes, by Mr. Rosenthal.  And, again,

18   what we need really to be -- what we think to be fair to

19   people is to have as much information as we can about what

20   particular makes and models, years, were specifically

21   affected or specifically targeted as part of this process.

22   So until we get cooperation that these defendants have agreed

23   to provide on certain parts we don't believe we have enough

24   information to submit a plan of allocation that makes sense

25   yet for certain parts.  So the plans that you have before you

1    would close out the parts in our first group of settlements,

2    some of those plans apply to parts that are at issue in group

3    two of settlements but we don't have the final plans for

4    certain other parts in group two.  We certainly want to work

5    on that as quickly as we can in order to get those approved

6    so that we would be ready to allocate or pay claims in group

7    number two as quickly as possible.

8              THE COURT:  Okay.  So the plan here is approved.

9    The Court read it, I certainly can't say mathematically I can

10   approve it because I can't do that -- know that process and

11   that -- I guess it is more like an algorithm that is being

12   used, but certainly the Rosenthal Group has great expertise

13   in this and along with the expertise of counsel, and in

14   reading it the Court finds that it is a fair and reasonable

15   plan, and I would anticipate that the ones that are coming in

16   will follow the same protocol basically.

17             MR. RAITER:  Thank you, Your Honor.  I don't have

18   anything further.

19             THE COURT:  Does anybody have anything else on the

20   settlements?  Any of the defendants want to make any comment?

21             (No response.)

22             THE COURT:  No.  All right.  Thank you very much.

23   And, again, have a happy holiday.

24             THE LAW CLERK:  All rise.  Court is adjourned.

25             (Proceedings concluded at 2:42 p.m.)

1

2                          CERTIFICATION

3

4          I, Robert L. Smith, Official Court Reporter of

5   the United States District Court, Eastern District of

6   Michigan, appointed pursuant to the provisions of Title 28,

7   United States Code, Section 753, do hereby certify that the

8   foregoing pages comprise a full, true and correct transcript

9   taken in the matter of Case No. 12-md-2311, on Wednesday,

10  November 16, 2016.

11

12

13                          _s/Robert L. Smith_____
                            Robert L. Smith, RPR, CSR 5098
14                          Federal Official Court Reporter
                            United States District Court
15                          Eastern District of Michigan

16

17

18  Date:  12/06/2016

19  Detroit, Michigan

20

21

22

23

24

25