# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| **IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION** | Master File No. 12-MD-02311<br>HON. MARIANNE O. BATTANI |
| In Re: ALL AUTO PARTS CASES | |
| THIS DOCUMENT RELATES TO:<br>ALL AUTO PARTS CASES | |

### NON-PARTY HONDA'S OBJECTIONS TO SPECIAL MASTER'S ORDER REGARDING HONDA DISCOVERY DATED JANUARY 19, 2017 (D.I. 1607)

Daniel Purcell
Justina Sessions
Ian Kanig
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
dpurcell@kvn.com
jsessions@kvn.com
ikanig@kvn.com

Ronald C. Wernette, Jr.
THE WERNETTE LAW FIRM, PLLC
1877 Orchard Lake Rd, Suite 102
Sylvan Lake, MI 48320
Telephone: 248 977 3142
Facsimile: 248 977 3380
ron.wernette@wernettelawfirm.com

Dated: February 2, 2017

## ISSUE PRESENTED

1.    Should Honda be compelled to produce estimated-part-cost data for minor vehicle model changes when Honda has already agreed to produce actual-part-cost data for all vehicle models and estimated-part-cost data for major model changes?

1144049

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND ....................................................................................................................2

    A. Honda's Document and Data Production ............................................................2

    B. The Parties' Renewed Motion to Compel............................................................4

    C. The Disputed CSS Data ........................................................................................5

    D. The Special Master's Ruling on CSS Data ..........................................................5

III. LEGAL STANDARD...........................................................................................................6

    A. Standard of Review..............................................................................................6

    B. Legal Standards Governing Subpoenas to Non-Parties.......................................6

IV. ARGUMENT........................................................................................................................8

    A. Mid-model CSS data is marginally, if at all, relevant in light of the other data Honda has agreed to produce. ......................................................................8

    B. At a minimum, the Serving Parties should be required to pay the full cost of Honda's production of mid-model CSS data.......................................................9

V. CONCLUSION....................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Hendricks v. Total Quality Logistics, LLC*
  275 F.R.D. 251 (S.D. Ohio 2011) ............................................................................................. 7

*Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*
  294 F.R.D. 87 (S.D. Ohio 2013) ............................................................................................... 7

*State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*
  315 F.R.D. 220 (E.D. Mich. 2016) ........................................................................................... 6

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*
  474 F.3d 288 (6th Cir. 2007) .................................................................................................... 7

*United States v. Blue Cross Blue Shield of Mich.*
  No. 10-cv-14155, 2012 WL 4513600 (E.D. Mich. Oct. 1, 2012) .......................................... 7, 8

**Federal Rules**

Federal Rule of Civil Procedure 26 .......................................................................................... 2, 6, 8

Federal Rule of Civil Procedure 45 .......................................................................................... 6, 7, 9

Federal Rule of Civil Procedure 53 ................................................................................................. 6

i

**I.     INTRODUCTION**

The Special Master's ruling ordering Honda to produce exhaustive, part-by-part *estimated* cost data for all Honda minor model changes over the past ten years should be reversed because the ruling fails to balance the Serving Parties' (unasserted) marginal need for these data against the burden to Honda.[1]  Honda has already produced these data for each major model change, which is the production stage at which Honda makes the vast majority of design and supplier changes.  Honda has also agreed to produce full reports of suppliers' actual quotations to Honda and full reports of Honda's *actual* part costs.  These data encompass any new quotations made in response to mid-model design changes and, thus, fill any "gaps" that the Serving Parties speculate might exist with respect to mid-model changes.  Indeed, the data Honda has agreed to produce give the Serving Parties exhaustive information about the actual cost of every single North-American sourced part that went into every single North American-manufactured vehicle for the past ten years.  The Serving Parties themselves admitted during the hearing before the Special Master that they were "close to agreeing that we don't need" the minor model change cost data.  They later reneged on this position, but they were right the first time.  There is no need—let alone a need that outweighs the burden to Honda—for Honda to generate additional reports of estimated part costs during intermediate model years.

Honda has never sought to avoid a reasonable document production in this case.  Indeed, Honda had agreed to produce much of the materials that the Serving Parties demanded before the Serving Parties even filed their renewed motion to compel.[2]  And, as the Serving Parties' own correspondence to the Special Master demonstrates, Honda agreed to produce most of the remaining disputed documents before the Special Master held his hearing on the motion to compel.  Thus, most of what the Special Master "ordered" Honda to produce Honda had already

---

[1] The Special Master's ruling at issue in these Objections is Docket Entry No. 1607.

[2] Honda has filed objections to the Special Master's separate order compelling Honda to produce extensive information regarding Honda's all-terrain-vehicle and side-by-side business.  *See* D.I. 1624.

1

agreed to. To that end, even prior to the renewed motion to compel Honda had already spent over 400 hours of attorney and employee time investigating, compiling, and producing documents and data relating to Honda's automobile business.[3] Honda's compliance with the non-appealed portions of the Special Master's order will require at least another 450 hours of Honda employee time—not including coordination and review by counsel.[4]

Federal Rule of Civil Procedure 26 requires the Court to weigh the Serving Parties' alleged need for discovery against the burdens imposed. But the Special Master failed to perform any part of this balancing. He failed to acknowledge, let alone weigh, the massive burden that the order of production places on Honda. His analysis simply took the Serving Parties at their word as to their bare assertion that they needed the mid-model data, but there is nothing in the record explaining or substantiating that supposed need. For these reasons, Honda should not be compelled to produce mid-model estimated-part-cost data.

## II.   BACKGROUND

### A.   Honda's Document and Data Production

Honda has already produced or has agreed to produce an enormous amount of material relating to each step in Honda's purchasing, manufacturing, and sales chain. Specifically, Honda has already produced or agreed to produce:

- **Aggregated parts-purchase data** for wire harnesses, AVR parts, bearings, electronic control units, heater control panels, instrument panel clusters, fuse boxes, relay boxes, junction blocks, power distributors, wiring connectors and terminals, lead wire assemblies, cable bond, anti-lock brake skid sensors and wires, switches, occupant detection sensors, cable reels, oil pressure switches and sensors, fuel senders and gauges, switches, steering angle sensors, seat belts, spark plugs, radiators, and windshield wipers/washers;

- **Individual part quotation data** (including adjustments to quotation prices) from Honda's E-Quote database for AVR parts and bearings;

---

[3] *See* Declaration of Justina K. Sessions, D.I. 1533-2, ¶ 6.
[4] *See id.* ¶ 7; Declaration of Mark Willoughby, D.I. 1533-1 ¶¶ 3-4.

2

1144049

- **Accounts payable data** from Honda's accounting system reflecting actual payments made to Honda's bearings and AVR parts suppliers;

- **Rebates** (i.e., non-part-specific payments) from Honda's bearings and AVR parts suppliers for the past three years and earlier if such data can be retrieved;

- **Cost Correlation Summaries** for bearings and AVR parts;

- **Maker Layout Evaluation Forms** (the forms Honda uses to evaluate supplier bids and compare and award part-supply business) for wire harnesses, AVR parts, bearings, electronic control units, heater control panels, instrument panel clusters, fuse boxes, relay boxes, junction blocks, power distributors, wiring connectors and terminals, lead wire assemblies, cable bond, anti-lock brake skid sensors and wires, switches, occupant detection sensors, cable reels, oil pressure switches and sensors, fuel senders and gauges, switches, steering angle sensors, seat belts, spark plugs, radiators, and windshield wipers/washers;

- **Maker Layout Evaluation Forms** for bearings and AVR parts to the extent not already produced (i.e., Honda has agreed to make a supplemental search for such documents);

- **Communications, notes, and other similar documents relating to negotiations** from two individual custodians responsible for sourcing AVR parts and bearings;

- **Candidate lists** for relevant parts;

- **Operations and procedure documents** detailing the process by which Honda evaluates suppliers and their bids;

- **Detailed data on the estimated prior-to-mass-production price and supplier** from Honda's Cost Simulation System of every single component in a vehicle ("CSS data") for major model changes for the past ten years;

- **"Cost by Ship"** reports that purchasing provides to accounting prior to mass production, reflecting the total anticipated outsource cost for a vehicle. The Cost by Ship documents are generated from CSS data;

- **Bills of material** generated from Honda's Cost Management System ("CMS system");

- **Honda's purchasing contracts** with wire harness, bearings, and AVR parts suppliers;

- **Quarterly cost quotations** for all vehicles manufactured in North America for the entire subpoena period. These cost quotations reflect the price at which the

3

   manufacturing plant sells all vehicles to AHM (the sole distributor of Honda vehicles in North America). The manufacturing cost consists of (i) component costs; (ii) labor costs; and (iii) a fixed markup;

- **Schedule of all MSRP, dealer-invoice, and related prices** for all vehicles sold in North America since 2000. Honda's MSRP and dealer-invoice price information is also publicly available;

- **Pricing "checkpoint" presentations** for all full model changes of Honda Civics, Accords, Odysseys, Pilots, and CRVs. There are approximately eleven such presentations for each major model.

- **VIN-level transactional data** on (i) purchase by AHM from Honda factories and (ii) sale from AHM to dealers for all vehicles sold in the United States;

- **Transactional data on sales from dealers to consumers** that Honda's dealers voluntarily provide from their dealer management systems regarding the terms of new vehicle sales, provided the dealers consent to Honda's production of that information; and

- **Descriptions of all incentive programs** for which Honda has been able to locate information.

B.  The Parties' Renewed Motion to Compel

The Renewed Motion to Compel states the following with respect to CSS data:

"The Parties seek certain information regarding both part costs and other costs associated with Honda's production and sale of vehicles including, but not limited to, labor costs, costs of raw materials (e.g. plastic, steel, and rubber), costs of features or options installed in a vehicle, and freight or shipping costs for the full relevant time period." Renewed Mtn. to Compel, Trager Decl. Ex. C (D.I. 1495-3) ¶ 23. They reasoned that Honda's 30(b)(6) witness "testified that information responsive to these requests can be found in Honda's CSS ("Cost Simulation System") and CMS systems . . . The Parties seek all live data for both the CSS and CMS systems." *Id.* ¶ 24. In their reply brief they acknowledged that Honda had already produced CSS data for major model changes but "[t]he Parties, however, continue to seek CSS data for mid-model changes/updates." Reply re Renewed Mtn. to Compel, Trager Decl. Ex. C (D.I. 1549-3) ¶ 20.

### C. The Disputed CSS Data

Honda's CSS system contains information on estimated part costs before a model goes in to mass production. Deposition of Mark Willoughby (attached as Exhibit A to Declaration of Justina K. Sessions) at 33:18-22. Honda uses CSS to forecast what the cost of a new model would be. *Id.* 73:1-7. Other data reflects actual part costs. *See, e.g., id.* Honda uses the CSS data to create a "cost by ship" document reflecting the total unit cost for a model. *Id.* 134:5-135:19. The cost by ship will show the cost for each variation of trim level and export destination. *Id.* 137:12-23. Honda generates costs by ship documents for full model changes and for some minor model changes. Other than the cost by ship, Honda does not generate CSS data reports in the ordinary course of business. Thus, the reports that the Serving Parties demand must be generated for this litigation by running queries in the database. *Id.* 162:20-164:11.

On November 16, 2016, Honda produced CSS data for each major model change back to 2005. The data include a part number, part name, supplier name, and unit price. The report consists of twenty-one different spreadsheets each containing approximately 2,000 individual part line items. Minor model change data would be many multiples larger than the major-model report.

Honda makes nearly all of it design and supplier changes during major-model (or full-model) changeovers. Any time that Honda changes a part's design or supplier—whether during a major model change, minor model change, or other time—Honda issues a new quotation, and suppliers' responses will be reflected in Honda's E-Quote data. Willoughby Dep. at 200:24-201:19.

### D. The Special Master's Ruling on CSS Data

Serving Parties had not decided whether they actually wanted CSS data for mid-model changes by the time the Special Master held the hearing. Sanden's counsel (who was taking the lead for the Serving Parties on Honda-related issues) represented that "Honda has already produced data from full model changes. In the outline we gave you there is an open issue as to whether we want or need data from mid-model changes, and the requesting parties are close to

agreeing that we don't need the mid-model changes but the counsel for EPPs are checking on one thing literally at this moment, so if we can give it another minute then we can report on that." Dec. 9, 2016 Hr'g Tr. (D.I. 1572) at 79:4-11. Counsel for the EPPs returned later and stated that "we have not received the confirmation that we, end payors, can forego it" and proposed that the end-payors submit a supplemental paper and that the Special Master would rule on it. *Id.* 96:3-22. On December 19, 2016, the Serving Parties told the Special Master that "The Parties seek mid-model reports because some part sourcing can change during a model refresh cycle, as do actual part prices." Dec. 19, 2016 email from Rowe to Esshaki (attached as Exhibit B to Declaration of Justina K. Sessions). Honda reiterated its prior objections. The Special Master ruled that "data for mid-year changes shall be produced." Dec. 28, 2016 email from Esshaki to Sessions and Rowe (attached as Exhibit C to Declaration of Justina K. Sessions).

### III.    LEGAL STANDARD

#### A.    Standard of Review

Federal Rule of Civil Procedure 53(f) provides that the Court must decide *de novo* all findings of fact and conclusions of law made or recommended by a special master. Fed. R. Civ. P. 53(f)(3), (f)(4).

#### B.    Legal Standards Governing Subpoenas to Non-Parties

Federal Rule of Civil Procedure 45 governs document subpoenas. While subpoenaing parties may seek to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," production requests must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *see also State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic, P.C.*, 315 F.R.D. 220, 222 (E.D. Mich. 2016) ("A subpoena to a third party under Rule 45 is subject to the same discovery limitations as those set out in Rule 26."). When determining whether a subpoena's request is proportional, courts must consider: (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the

discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.  Fed. R. Civ. P. 26(b)(1).

Rule 45 provides two additional limits on the scope of a subpoena.  *First*, a subpoenaed party is not obligated to respond to a request that seeks irrelevant information or is overbroad. *See Hendricks v. Total Quality Logistics, LLC,* 275 F.R.D. 251, 253 (S.D. Ohio 2011).  The burden of showing irrelevance or overbreadth varies depends on whether the disputed request is facially defective.  "If the discovery sought appears relevant on its face, the party resisting the discovery has the burden to establish the lack of relevance but when relevancy is not apparent on the face of the request, the party seeking the discovery has the burden to show the relevancy of the request." *Id.* (citations omitted) (internal quotations omitted).

*Second*, a subpoenaing party "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1); s*ee also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) ("[D]istrict courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce.").  "Where, as here, discovery is sought from a non party, the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non party." *Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87, 92 (S.D. Ohio 2013).  Where a party violates these guidelines and serves an unduly burdensome subpoena, Rule 45(c)(1) provides that "[t]he issuing court *must* enforce [the subpoena-issuing party's duty to avoid imposing an undue burden] and impose an appropriate sanction-which *may* include lost earnings and reasonable attorney's fees- on a party or attorney who fails to comply. This section of Rule 45 was added to protect nonparties 'against significant expense resulting from involuntary assistance to the court.'" Order Granting Plaintiff's Motions to Compel, Blue Cross II, No. 10-cv-4155**,** 2012 WL 4838987, at *2 (quoting Fed. R. Civ. P. 45, advisory committee notes, 1991 amendment, subdivision (c)).

7

To determine whether the burden on a non-party is undue, courts ask (1) if compliance with the subpoena imposes an expense on the nonparty, and (2) if so, whether that expense is "significant." *United States v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14155, 2012 WL 4513600, at *7 (E.D. Mich. Oct. 1, 2012) ("Blue Cross I"). If the cost is significant, "the court must protect the nonparty by requiring the party seeking discovery to bear at least enough of the expense to render the remainder non-significant. *Id.* (internal quotations omitted). "To determine how much cost to shift from the nonparty, the court must balance the equities of the particular case, including [1] whether the putative nonparty actually has an interest in the outcome of the case, [2] whether it can more readily bear its cost than the requesting party; and [3] whether the litigation is of public importance." *Id.* (internal quotations omitted).

IV.     ARGUMENT

    A.     **Mid-model CSS data is marginally, if at all, relevant in light of the other data Honda has agreed to produce.**

The Special Master failed to consider "whether the burden or expense of the proposed discovery outweighs its likely benefit," as Rule 26(b)(1) requires. His ruling makes no mention of either the benefits or the burdens. Indeed, he declined to ask the Serving Parties why they reversed course after being "close to agreeing that we don't need the mid-model" data, or to require them to explain exactly why they needed the data or what impact, if any, the absence of such data would have on their ability to prepare their case. Based on the record, the Serving Parties' demand for intermediate-model CSS data fails the Rule 26 test on the merits because they have articulated no need for this data whatsoever—let alone a need that would justify the additional burden and expense to Honda.

The Serving Parties demanded all CSS data because they contend it is responsive to their request for "certain information regarding both part costs and other costs associated with Honda's production and sale of vehicles including, but not limited to, labor costs, costs of raw materials (e.g. plastic, steel, and rubber), costs of features or options installed in a vehicle, and freight or shipping costs for the full relevant time period." Renewed Mtn. to Compel, Trager

8

Decl. Ex. C (D.I. 1495-3) ¶ 23. But the CSS data does not provide any of this information. The CSS data provides *estimated* part costs, but not *actual* part costs. Honda's actual costs are reflected in the E-Quote and Accounts Payable data that Honda has agreed to produce. Those productions will include exhaustive data regarding the actual amounts that suppliers quoted to Honda and that Honda paid for all parts—not just parts at the time of major or minor model changes. Willoughby Dep. at 73:1-7. The Serving Parties have articulated absolutely no need for minor-model CSS data in addition to what they will already receive.

Further, the CSS data does not include any information regarding "costs of raw materials (e.g. plastic, steel, and rubber), costs of features or options installed in a vehicle, and freight or shipping costs for the full relevant time period." Thus, their demand for minor-model CSS data does not square with the demand made in their renewed motion to compel.

If there were any doubt that the Serving Parties did not truly need minor-model CSS data, their own conduct at the Special Master's hearing confirms it. At the time of the hearing, "the requesting parties [were] close to agreeing that we don't need the mid-model changes but the counsel for EPPs are checking on one thing literally at this moment, so if we can give it another minute then we can report on that." Dec. 9, 2016 Hr'g Tr. (D.I. 1572) at 79:4-11. But a month or so later they nonetheless decided to demand it, "because some part sourcing can change during a model refresh cycle, as do actual part prices." Dec. 19, 2016 email from Rowe to Esshaki. The EPPs' hypothetical musing that "part sourcing can change" is not a sufficient basis to impose an additional large discovery burden on Honda. Moreover, as explained above, the changes that EPPs are concerned about are also reflected in other data that they have or will receive.

**B.      At a minimum, the Serving Parties should be required to pay the full cost of Honda's production of mid-model CSS data.**

The Special Master declined to order full cost-shifting for Honda's document and data productions. Honda has joined in the OEMs' common appeal on the cost-shifting issue. *See* D.I. 1602. Full cost-shifting is especially necessary with respect to the CSS data. The Serving

9

Parties have utterly failed to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Demanding data that many within the Serving Parties group believed and admitted in Court that they didn't need to prepare their case is a textbook example of the overreaching in third-party discovery that Rule 45 prohibits and deems sanctionable.

## V.   CONCLUSION

For these reasons, Honda respectfully request that the Court vacate the portion of the Special Master's order compelling Honda to produce CSS data relating to mid-model changes, and deny the Serving Parties' request for such data.

Dated:  February 2, 2017

Respectfully submitted,

THE WERNETTE LAW FIRM, PLLC

  /s/ Ronald C. Wernette, Jr.
RONALD C. WERNETTE, JR.
1877 Orchard Lake Road, Suite 102 Sylvan Lake, MI  48320 Telephone: 248-953-5803
Facsimile: 248-977-3380

Attorneys for Non-Party HONDA

KEKER & VAN NEST LLP

s/ Daniel Purcell
DANIEL PURCELL
JUSTINA SESSIONS
IAN A. KANIG
633 Battery Street
San Francisco, CA 94111-1809 Telephone: 415 391 5400
Facsimile:  415 397 7188

Attorneys for Non-Party HONDA

1144049

**CERTIFICATE OF SERVICE**

      I hereby certify that on February 2, 2017, I caused a true and correct copy of **NON-PARTY HONDA'S OBJECTIONS TO SPECIAL MASTER'S ORDER REGARDING HONDA DISCOVERY DATED JANUARY 19, 2017 (D.I. 1607)** to be filed and served electronically via the CM/ECF system. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system.

                      Respectfully submitted,

                      THE WERNETTE LAW FIRM, PLLC

By:   /s/ Ronald C. Wernette, Jr.
        RONALD C. WERNETTE, JR.
        1877 Orchard Lake Road, Suite 102
        Sylvan Lake MI 48320
        Telephone: 248-977-3142
        Facsimile: 248-977-3380

Dated: February 2, 2017                Attorneys for Non-Party Honda

ii

1144049