# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | |
| In Re: All Cases | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| THIS DOCUMENT RELATES TO: All Actions | |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS**
**OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

TO:  Nissan North America, Inc.
    c/o LexisNexis Document Solutions, Inc.
    2908 Poston Ave
    Nashville, TN 37203-1312

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**See Attachments A and B**

| Place: | Cotchett Pitre & McCarthy, LLP 840 Malcolm Road Burlingame, CA 94010 | Date and Time: August 17, 2015, 9:00 a.m. | |
|---|---|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

-1-

| Place: | Date and Time: |
|--------|----------------|
|        |                |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

DATE:

DAVID J. WEAVER, CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing End-Payor Plaintiffs, who issues or requests this subpoena, are:

Steve Williams
Cotchett Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: 650.697.6000
swilliams@cpmlegal.com

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

    ☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $_____ .

My fees are   $_____     for travel and   $_____     for services for a total of    $_____

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**(c) Place of Compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where
compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

## ATTACHMENT A

## DEFINITIONS

1.    "All" also includes "each" and "any," and vice versa.

2.    "And" and "or" are to be considered both conjunctively and disjunctively, and "or" is understood to include and encompass "and," and vice versa.

3.    "Annual Price Reduction" or "APR" means annual or semi-annual price reductions or routine cost-downs applied to Components, including any long-term cost reduction initiatives.

4.    "Assembly" means a Vehicle part, module, or assembly in which a Component (as defined below) is a component, installed, or incorporated.

5.    "Component" means (as defined in Plaintiffs' various complaints) any of the following Vehicle parts (in bold):

   i.    **Wire Harness Systems**:  Wire Harness Systems comprise the "central nervous system" of a Vehicle and consist of the wires or cables and data circuits that run throughout the Vehicle.  To ensure safety and basic functions (*e.g.*, going, turning, and stopping), as well as to provide comfort and convenience, Vehicles are equipped with various electronics that operate using control signals running on electrical power supplied from the battery.  The Wire Harness System is the conduit for the transmission of these signals and electrical power.

   a.    **Wire Harness Products**

   - **Electrical wiring**:  Electrical wiring is the wiring that runs throughout the Vehicle.

   - **High voltage wiring**:  High voltage wiring is integral to Vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

   - **Lead wire assemblies**:  Lead wire assemblies connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

   - **Cable bonds**:  Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

   - **Wiring connectors**:  Wiring connectors connect various types of wires in a Vehicle.

- **Wiring terminals**: Wiring terminals are the ends of a wire that provide a point of connection to external circuits.

- **Electrical control units**: Electrical control units are embedded modules or systems that control one or more of the electrical systems or subsystems in a Vehicle. Vehicles are equipped with a large number of electronic control units which operate various functions and exchange large volumes of data with one another.

- **Relay boxes**: Relay boxes are modules that hold the electrical switches that transit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit. Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

- **Junction blocks**: Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

- **Power distributors**: Power distributors serve to distribute power at varying levels to various electrical components.

- **Speed sensor wire assemblies**: Speed sensor wire assemblies are installed on Vehicles with Antilock Brake Systems ("ABS"). The speed sensor wire assemblies connect a sensor on each tire to the ABS and carry electrical signals from the sensors to the ABS to instruct it when to engage.

- **Semiconductor devices**: Semiconductor devices are used as a Component in an Electrical control unit or other part of a wire harness systems.

ii. **Instrument Panel Clusters**: Instrument Panel Clusters are the mounted array of instruments and gauges housed in front of the driver of a Vehicle. They are also known as "meters."

iii. **Fuel Senders**: Fuel Senders reside in the fuel tank of a Vehicle and measure the amount of fuel in the tank. Fuel Senders consist primarily of a float and a variable resistor. The resistor measures the amount of pressure the float puts on a bar. As the fuel goes down the float goes down with it. As it dips, the electrical current in the variable resistor sends weaker electrical signals to the fuel gauge. The gauge then drops, indicating that there is less fuel in the tank.

iv. **Heater Control Panels**: Heater Control Panels are located in the center console of a Vehicle and incorporate switches that control the temperature of the interior environment of a Vehicle. The electronic Heater Control Panel product category is broken down into manual and automatic Heater Control Panels. Manual Heater Control Panels are known as low-grade while automatic Heater Control Panels are commonly referred to as high-grade.

v. **Bearings**: Bearings are spherical balls, rounded joints, or rotating parts that bear friction and are constructed of steel, aluminum, platinum, stainless steel, etc.

vi. **Occupant Safety Systems**: Occupant Safety Systems are generally comprised of the parts in a Vehicle that protect drivers and passengers from bodily harm. Occupant Safety Systems include seat belts, airbags, steering wheels or steering systems, and safety electronic systems.

- **Seat belts**: Seat belts are safety strap restraints designed to secure an occupant in position in a Vehicle in the event of an accident. A seat belt includes belt webbing, a buckle, a retractor, and hardware for installation in a Vehicle, and may also include a height adjuster, pretensioner, or other associated devices.

- **Airbags**: Airbags are occupant restraints designed to control the movement of an occupant inside a Vehicle in case of an accident. An airbag consists of fabric, an inflator, and an initiator to start the deployment, and may include an injection molded plastic cover or other associated devices.

- **Steering Wheels**: Steering wheels aid in the control of a Vehicle. A steering wheel may consist of a die-cast armature (frame) covered by molded polyurethane and finished with leather, wood trim, or plastic.

- **Safety electronic systems**: Safety electronic systems are electronic systems that may help prevent accidents before they occur and/or that work with seat belts, airbags and steering wheels to mitigate the results of an accident.

vii. **Alternators**: Alternators are devices that charge a Vehicle's battery and power a Vehicle's electrical system when its engine is running. If an Alternator is not working correctly, a battery will lose charge and all Vehicle electrical systems will stop working. When an Alternator is not working, it is usually replaced rather than repaired.

viii.   **Anti-Vibration Rubber Parts**: Anti-Vibration Rubber Parts are comprised primarily of rubber and metal and are installed in Vehicles to reduce engine and road vibration. Anti-Vibration Rubber Parts are installed in suspension systems and engine mounts, as wells as other parts of a Vehicle. A Vehicle can have numerous Anti-Vibration Rubber Parts.

ix.     **Windshield Wiper Systems**: Windshield Wiper Systems are devices used to remove rain and debris from a Vehicle's windshield. Windshield Wiper Systems generally consist of an arm, pivoting at one end and with a long rubber blade attached to the other. The blade is swung back and forth over the glass, pushing water from its surface.

x.      **Radiators**: Radiators, which include radiator fans, are devices that help to prevent Vehicles from overheating. Radiators are a form of heat exchanger, usually filled with a combination of water and antifreeze, which extracts heat from inside the engine block and includes an electrical fan, which forces cooler outside air into the main portion of the radiator. The radiator indirectly exposes coolant, heated by traveling through the engine block, to cool air as the Vehicle moves. Radiators are replaced when a Vehicle consistently overheats.

xi.     **Starters**: Starters are devices powered by a Vehicle's battery to "turn over" and start the engine when the driver turns the ignition switch.

xii.    **Vehicle Lamps**: Vehicle Lamps include headlamps and rear combination lamps. A headlamp is a Vehicle Lamp installed in the front of a Vehicle that consists of lights such as headlights, a clearance lamp, and turn signals. A rear combination lamp is a Vehicle Lamp installed in the rear of a Vehicle that consists of lights such as a backup lamp, stop lamp, tail lights, and turn signals.

xiii.   **Switches**: Switches include one or more of the following: (i) the steering wheel switch, which is installed in the steering wheel of a Vehicle and is operated by the driver of the Vehicle to control functions within the Vehicle; (ii) the turn switch, which is a lever switch installed behind the steering wheel of a Vehicle and is operated by the driver of the Vehicle to signal a left or right turn and control hi/lo beam selection; (iii) the wiper switch, which is a lever switch installed behind the steering wheel of a Vehicle and is operated by the driver of the Vehicle to activate the Vehicle's windshield wipers; (iv) the combination switch, which is a combination of the turn and wiper switches as one unit, sold together as a pair; and (v) the door courtesy switch, which is a switch installed in the door frame of a Vehicle that activates the courtesy lamp inside the Vehicle when the Vehicle door opens.

xiv.    **Ignition Coils**: Ignition Coils are part of the fuel ignition system and release electric energy suddenly to ignite a fuel mixture. There are

-4-

multiple types of ignition coils, such as coil on plug (including pencil style, single output, dual output, and dual output with integrated igniter), distributor-less ignition systems (including output side terminal, output top terminals, and output bolt-on cassette package), and distributor-based single coils (including single output epoxy filled and single output epoxy filled with ballast resistor).

xv.  **Motor Generators**:  Motor Generators are electric motors used to power electric drive systems that can also capture energy from the process of stopping a Vehicle to generate electricity through regenerative braking.

xvi.  **Steering Angle Sensors**:  A Steering Angle Sensor is installed on the steering column of a Vehicle and may be connected to, and part of, a combination switch.  It detects the angle of the Vehicle's wheels during turns and sends signals to the Vehicle stability control system, which maintains the Vehicle's stability during turns.

xvii.  **HID Ballasts**:  An HID Ballast is an electrical device that limits the amount of electrical current flowing to an HID headlamp, which would otherwise rise to destructive levels due to the HID headlamp's negative resistance.

xviii.  **Inverters**:  Inverters provide power to motors by converting direct current ("DC") electricity from a Vehicle's battery to alternating current ("AC") electricity.

xix.  **Electronic Powered Steering Assemblies**:  Electronic Powered Steering Assemblies include electric power steering motors, provide electronic power to assist the driver to more easily steer the Vehicle. Electric Powered Steering Assemblies link the steering wheel to the tires, and include the column, intermediate shaft, and electronic control unit, among other parts, but do not include the steering wheel or tires.

xx.  **Air Flow Meters**:  Air Flow Meters measure the volume of air flowing into engines and are part of the engine management systems and Vehicle sensors segment of the Vehicle market.

xxi.  **Fan Motors**:  Fan Motors are small electric motors used to turn radiator (see above) cooling fans.

xxii.  **Fuel Injection Systems**:  Fuel Injection Systems admit fuel or a fuel/air mixture into engine cylinders and may include injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, throttle motors, airflow meters, engine control units, fuel pumps, fuel pump modules, manifold absolute pressure sensors ("MAP Sensors"), pressure regulators, pulsation dampers, purge control valves and other components sold as a unitary system. Fuel Injection Systems can also be sold as part of a broader system, such as an engine management system.  Fuel

Injection Systems are part of the powertrain segment of the Vehicle market.

b.      **Fuel Injection Components**

- **Injectors**: Injectors atomize a pre-determined amount of fuel and delivers the fuel spray toward the intake valve based on signals from the engine ECU.

- **Rail assemblies**: Rail assemblies include the common rail system (sometimes abbreviated as "CRS"), which enables higher pressure and more precise fuel injection with its supply pump and common rail, which generates extremely high fuel pressure, and electrically controlled injectors. The common rail system is comprised of a supply pump, injectors, the engine ECU, and the rail itself.

- **Feed lines**

- **Electronic Throttle Bodies** (see below)

- **Throttle Motors**

- **Air Flow Meters** (see above)

- **Engine control units:** Engine control units are computers that send instructions to various actuators to create optimal operating conditions. The Engine ECU receives signals from various sensors to determine the appropriate instructions to send to the actuators.

- **Fuel Pumps**: Fuel pumps are part of the **Fuel Pump Module** (which also includes the fuel filter, pressure regulator, and fuel-sender gauge) and are installed in gasoline engine Vehicles. Diesel engine Vehicles do not use the conventional fuel pump. There is generally one fuel pump and one fuel pump module in the fuel injection system for gasoline engine Vehicles. However, certain gasoline engine Vehicles (those with a direct injection system) use two types of pumps as part of their fuel injection systems. The first is the standard Fuel Pump (referred to simply as the "fuel pump"), which pumps fuel up from the fuel tank and sends fuel to the engine. All gasoline Vehicles use this standard "fuel pump." The second pump, used in certain Vehicles, applies high pressure to the fuel. This type of pump is used only in Vehicles with a direct injection system. For gasoline

engine Vehicles, this pump is called a "direct injection pump" or "high pressure (fuel) pump." For diesel engine Vehicles, the "pump up" function and the "apply high pressure" function are generally combined and there is just one pump, referred to as the (conventional) "diesel injection pump," or it may be called Supply Pump for common rail systems (other terms include "VE pump" or "rotary pump" and "PFR pump"). All diesel engine Vehicles use a direct injection system, which may be (1) a "diesel conventional direct injection (not "common rail")" or (2) "diesel high pressure direct injection (*i.e.*, "common rail")." In some cases, a supplemental "pump up" type of fuel pump is added to the diesel Vehicle—it is installed in the fuel tank.

- **Manifold Absolute Pressure Sensor**: The manifold absolute pressure sensor ("MAP sensor" or "MAPS") detects the pressure of air drawn into the engine cylinder. A MAP sensor may also be equipped with an air intake temperature sensor, which is called a T-MAP Sensor.

- **Pressure Regulator**: A Pressure Regulator is a valve that regulates the pressure of fuel. Usually, a pressure regulator is installed in the fuel tank next to a fuel pump. Pressure regulators are generally installed in Vehicles with a large amount of exhaust gas as well as Vehicles that have piping to return excess fuel from the pump to the gasoline tank. Pressure regulators are occasionally sourced as part of a fuel injection system.

- **Pulsation Damper**: A Pulsation Damper is a device used to control fuel pressure changes or pulsations caused by the opening and closing of the fuel injector. The dampener absorbs these pulsations and evens out fuel delivery.

- **Purge Control Valve**: A Purge Control Valve ("PCV") is part of the purge control system, which includes the PCV and the fuel tank inner pressure sensor. The PCV opens or closes as directed by the engine control unit to control the flow of fuel vapor from the canister to the engine.

xxiii. **Power Window Motors**: Power Window Motors are small electric motors used to raise and lower Vehicle windows.

xxiv. **Automatic Transmission Fluid Warmers**: Automatic Transmission Fluid Warmers are devices located in the engine compartment of a Vehicle that warm the automatic transmission fluid.

xxv.   **Valve Timing Control Devices**:  Valve Timing Control devices control the timing of engine valves' operation, and include the VTC actuator and/or solenoid valve, and are part of the engine management system of the Vehicle market.

xxvi.   **Electronic Throttle Bodies**:  Electronic Throttle Bodies control the amount of air flowing into a Vehicle's engine and are a main part of an electronic throttle control system.  (See above under Fuel Injection System.)

xxvii.   **Air Conditioning Systems**:  Air Conditioning Systems are systems that cool the interior environment of a Vehicle and are part of the thermal segment of the Vehicle market.  Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following: compressors, condensers, control panels, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), sensors and associated hoses and pipes.

xxviii.   **Windshield Washer Systems**:  Windshield Washer Systems are systems that help maintain the cleanliness of a Vehicle's windshields.  When a driver activates the windshield washer assembly, a pump provides pressure to enable washer fluid to flow through a nozzle and out onto the exterior of a Vehicle's windshield.  Windshield Washers include components such as the pump, hoses, nozzle and tank necessary to deliver washer fluid to Vehicle windows.

xxix.   **Constant Velocity Joint Boot Products**:  Constant-Velocity-Joint Boot Products are composed of rubber or plastic, and are used to cover the constant-velocity-joints of a Vehicle to protect the joints from contaminants.

xxx.   **Spark Plugs**:  Spark Plugs are located in the engine and deliver high electric voltage from the ignition system to the combustion chamber of an internal combustion engine.

xxxi.   **Oxygen Sensors**:  Oxygen Sensors  are electronic sensors located before and after the catalytic converter in the exhaust system used to measure the amount of oxygen in the exhaust.  Oxygen Sensors provide signals or data to the automobile's engine management computer, which then adjusts the ratio of air/fuel injected into the engine to compensate for excess air or excess fuel.

xxxii.   **Air Fuel Ratio Sensors**:  Air Fuel Ratio Sensors are "wideband" oxygen sensors that enable more precise control of the air-to-fuel ratio injected into the engine. Air Fuel Ratio Sensors are therefore a type of Oxygen Sensors.

6.     "Auto Parts MDL" means all cases in the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division.

7.     "Communication" or "Communications" mean and include every disclosure, transfer, transmittal or exchange of information, whether orally or in writing or otherwise, face-to-face, by telephone, fax, mail, personal delivery, e-mail, telecommunication, or otherwise.

8.     "Customer" or "Customers" mean and include any entity or person who purchases or has purchased Vehicles from You containing a Component or Assembly, including but not limited to Vehicle dealers and fleet Customers.

9.     "Defendant" or "Defendants" mean and include all entities listed in Attachment C to this subpoena and their employees, officers, directors, agents, attorneys, affiliates, subsidiaries, joint ventures, successors, predecessors, or any person acting on their behalf.

10.    "Directed Buying" and "Directed Sourcing" mean the purchase or acquisition of a Component or Assembly by a manufacturer or supplier of Components or Assemblies at Your direction or by agreement with You, pursuant to terms negotiated by You or on Your behalf.

11.    "Document" or "Documents" mean and include all "writings," "recordings" or "photographs" as those terms are defined in Federal Rule of Civil Procedure 34 and Rule 1001 of the Federal Rules of Evidence.  Without limiting the generality of the foregoing, the term "Documents" includes both hard copy "Documents" as well as electronically stored data files including e-mail, instant messaging, shared network files and databases.  With respect to electronically stored data, "Documents" also includes, without limitation, any data on magnetic or optical storage media (*e.g.*, servers, storage area networks, hard drives, backup tapes, CDs, DVDs, thumb flash drives, floppy disks or any other type of portable storage device, etc.) stored as an "active" or backup file, in its native format.

12.    "Incentive" includes any rebate, coupon, discount, reward, bonus, spiff, or any other payment, deduction from price, allowance, or subsidy offered or provided to distributors, dealers, or consumers.

13.    "Limit Price" means a price for the purchase and sale of a Component or Assembly set by an OEM that a particular manufacturer or supplier of such Component or Assembly was asked to meet in order to sell such Component or Assembly to the OEM.

14.    "MSRP" means the manufacturer's suggested resale price.

15.    "OEM" means Vehicle original equipment manufacturer and its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, and their respective officers, directors, current and former employees, agents, representatives, attorneys, or anyone else acting or who has acted on its or their behalf.

16.    "Raw Material" means the raw materials and raw components contained in Components, including but not limited to, steel, aluminum, rubber, resin, and copper.

17. The term "relating to" means, without limitation, the following concepts: analyzing, assessing, commenting, concerning, constituting, dealing with, discussing, describing, estimating, evaluating, evidencing, pertaining to, projecting, recording, referring to, reflecting, reporting, studying, surveying, summarizing, or otherwise involving, in whole or in part.

18. "RFQ" means requests to purchase of any kind, including invitations to bid or submit proposals, requests to quote on development projects, and formal requests for quotation.

19. "Studies" and/or "Analyses" mean and include all reports, memoranda, statistical compilations, slide presentations, reviews, audits and other types of written, printed, or electronic submissions of information.

20. "Target Agreement(s)" means a contract or agreement between an OEM and a manufacturer or supplier of a Component or Assembly in which the OEM and manufacturer or supplier agree to jointly design and develop a Component or Assembly that meets a given set of performance, quality, price and delivery specifications, criteria or targets.

21. "Target Price" means a price for the purchase and sale of a Component or Assembly set by an OEM that manufacturers or suppliers of such Component or Assembly were asked to meet, or the OEM's estimated, anticipated or expected price for the purchase and sale of a Component or Assembly (whether or not disclosed to actual or potential manufacturers or suppliers), including a price based on (a) the input and other costs of manufacturers or suppliers of such Component or Assembly, (b) a reasonable profit margin for such manufacturers or suppliers, (c) reductions in the price of such Component or Assembly as compared to the price of the product or a similar product that was purchased or acquired previously by the OEM, (d) post-RFQ price reductions (*e.g.*, cost-down pricing and Annual Price Reductions), (e) anticipated or expected manufacturing or production efficiencies, or (f) other factors.

22. "Vehicle" means an automobile or other motor Vehicle that is principally used for transporting from one to eight passengers and is designed to operate primarily on roads, typically with two or four wheels, including sedans, sport-utility Vehicles, motorcycles, and pickup trucks. In addition, to the extent that any of the Requests seek documents with respect to Wire Harness Systems or Bearings. Vehicle also includes medium-duty (Class 4, 5, 6, & 7) trucks, heavy-duty (Class 8) trucks, buses, commercial Vehicles, construction equipment, mining equipment, agricultural equipment, railway Vehicles, and other similar Vehicles.

23. "VE Price" and "VA Price" mean the price that was offered to an OEM by a manufacturer or supplier, or that an OEM anticipated or expected to pay, for the purchase and sale of a product after anticipated or expected reductions in costs as a result of improvements in the engineering, design, or specifications of the product.

24. "You," "Your," and "Your Company" mean the recipient of this subpoena and its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity that is or was subject to its management, direction, or control, together with its and their present and former directors, officers, employees, agents, representatives, or any Person acting or purporting to act on its behalf.

## INSTRUCTIONS

1.      Attached hereto is a copy of the Stipulation and Protective Order Governing Production and Exchange of Confidential Information, ECF No. 200, 2:12-md-02311-MOB-MKM (filed July 10, 2012), entered by the Court in the master case *In re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311, pending in the U.S. District Court for the Eastern District of Michigan, Southern Division, that governs documents and information produced in the Auto Parts MDL.  You may designate documents for protection under the Protective Order.

2.      The relevant time period for each Request is 1992 through the present.

3.      To the extent documents or data relate to a particular Component or Assembly, they should be provided separately, along with any other documents relating to the same Component or Assembly.  Thus, the documents and data should not be commingled with documents and data relating to different Components or Assemblies.

You are requested to immediately meet and confer regarding the form and manner in which You will produce Documents stored electronically for the parties to avoid any unnecessary expense.

**REQUEST NO. 1:**   Data or documents (in the absence of data) sufficient to show the following information for each purchase by You or on Your behalf, of (a) a Component or (b) an Assembly for installation in a new Vehicle sold or leased in the U.S.:

a.      Date of purchase;

b.      Seller from whom the Component or Assembly was purchased, including name, address, and other identifiers;

c.      Manufacturer, name or description, part type, part number, and other identifiers of the Component or Assembly, including model, model year, and other identifiers of the Vehicle(s) in which the Component or Assembly was designed or intended to be installed, and quantity purchased (including measurement unit for quantity);

d.      Terms and conditions on which the Component or Assembly was purchased, including but not limited to:

(1)      Net price of the Component or Assembly (including currency and exchange rate, if applicable), and any adjustments to purchase price and

Incentives or allowances issued or applied at any time, including but not limited to, taxes, amortization and amortization schedule, installment payments, financing, rebates, lump sum or other discounts, refunds, credit for returns, and currency or input cost adjustments, and the manner in which provided, whether by unit or by total purchase;

(2)    Information sufficient to show: (a) the total amount of money You paid, on a yearly basis, for each type of identified Component or Assembly that You purchased; and (b) the total number of units purchased for each type of identified Component or Assembly that You purchased; and

(3)    Shipping or freight costs, and by whom such costs were paid.

e.    "Ship-from" and vendor "pay-to" address(es) from which the Component or Assembly and invoice for it were shipped or sent, date(s) the Component or Assembly and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Component or Assembly and invoice were shipped or received, and date(s) the Component or Assembly and invoice were received;

f.    Information sufficient to track each Component or Assembly after it was installed in a Vehicle, including model, model platform, model year, model project or development code, vehicle identification number ("VIN"), and/or part number, and other identifiers of the specific Vehicle(s) in which the Component or Assembly was installed, and quantity or number of each Component and Assembly installed (including measurement unit for quantity or number);

g.    RFQ(s), if any, pursuant to which the Component or Assembly was procured, and the following information for each RFQ:

    (1)    Names, designations, and/or other identifiers for the RFQ;

    (2)    Entity issuing the RFQ and its address;

    (3)    Name, address, and other identifiers of each potential supplier to whom the RFQ was sent and the date sent to each potential supplier;

    (4)    Name or description, part number, and other identifiers for each Component or Assembly, and other product(s) (if any) that was the subject of the RFQ;

    (5)    Model(s) or model platform(s), model year(s), model project or development code(s), and/or part number, and other identifiers of the Vehicle(s) for which the Component or Assembly was designed or intended;

    (6)    Guidelines or instructions for responding to the RFQ, as set by You and communicated to any potential supplier, including rules relating to the initial bid price, number of responses, and response deadline, or any other Documents relating to Your bid solicitation criteria, Your bid submission system, or Your bid evaluation and selection process;

    (7)    Terms of the RFQ, including supply period covered, design or specifications of the Component or Assembly, Directed Buying or Directed Sourcing (if any) of Components or Assemblies,

approved supplier(s) of Component(s) or Assemblies or subcomponents thereof, and any changes in such terms, design or specifications, including post-RFQ changes in terms, design, or specifications (*e.g.*, resulting from manufacturing improvements and APRs);

(8)     Responses to the RFQ from potential suppliers, including but not limited to, bids, cost and profit margin information or estimates, bill of materials, cost schedules or breakdowns, proposed changes in the design, manufacturing, materials, or specifications of the Component or Assembly and resulting price changes, and any lump sum or other discounts, rebates, allowances, Incentives, or other terms offered;

(9)     Cost model(s) or estimate(s), if any, developed, used, or considered with respect to potential suppliers;

(10)    Potential suppliers, if any, that provided on-site engineers or other personnel or services in connection with the Component or Assembly;

(11)    Target Price, Limit Price, or anticipated or expected purchase price for the Component or Assembly before and after the supplier was selected, after application of all anticipated or expected discounts, rebates, or other allowances or Incentives, and any revisions or changes to such prices;

(12)   VE Price or VA Price, if any, for the Component or Assembly, and any revisions thereto;

(13)   Revised prices or other terms offered by potential suppliers after their initial response to the RFQ;

(14)   The dates and topics of RFQ kickoff meetings, seminars, and other supplier meetings pertaining to each RFQ, the potential suppliers (and employees thereof) who attended each meeting, and changes, if any, to guidelines, instructions, terms, specifications, Target Price, Limit Price, anticipated or expected purchase price, VE Price or VA Price communicated to potential suppliers at each meeting;

(15)   Each supplier and the date it was selected to supply the Component or Assembly and the quantity each supplier was selected to supply;

(16)   Letters of intent, award letters, early sourcing agreements, statements of work, or similar documents regarding purchase of the Component or Assembly;

(17)   Any summary or recap of the RFQ and responses thereto, including but not limited to, each factor considered in deciding from which supplier(s) to purchase the Component or Assembly, and the reasons each potential supplier was selected or not selected to supply the Component or Assembly;

(18)   Any adjustments made after awards, including changes to price or the quantity allocated to each supplier; and

(19)     Documents, data, or Studies related to historical Component or

Assembly bid solicitations, offered bids or winning bids.

h.     Monetary components of the transaction beyond unit price (*e.g.*, sales tax,

shipping or delivery fees) or non-monetary components of, or Incentives for, the

purchase of the Component or Assembly, including but not limited to, (1) any

service, benefit, and/or product that You provided, or received, in connection with

the purchase of the Component or Assembly, including service agreements,

warranties, or installation, and (2) the value of each such service, benefit, or

product;

i.     For each Component or Assembly purchased by one of Your suppliers pursuant to

Directed Buying or Directed Sourcing, the price and terms of any such

arrangement, including the entity from which the supplier was directed to

purchase the Component or Assembly and at what price and terms;

j.     For each Component or Assembly that You purchased without soliciting

proposals, bids, or responses to an RFQ from more than one potential supplier, the

manufacturer and supplier of such Component or Assembly, its name or

description, part number, and other identifiers, and the reasons why each such

Component or Assembly was purchased without soliciting proposals, bids, or

responses to an RFQ;

k.     All information sought or obtained by You or on Your behalf concerning a market

or competitive price for the Component or Assembly, including but not limited to,

any market test conducted with respect to the Component or Assembly;

l.     All Documents relating to non-RFQ methods of procurement (*e.g.*, sole-sourcing), including but not limited to, benchmark or other informal bid or pre-bid pricing, price lists, price sheets, price reductions and reduction attempts, value engineering pricing, discounts, price changes, negotiations, bidding, contracts (resulting from other methods of procurement), or agreements (formal or informal) between You and any Defendant or other Components of Assemblies suppliers, and any correspondence relating to any negotiations or agreements made; and

m.     For each Component or Assembly purchased by You, Documents sufficient to describe, identify, and interpret all part numbers assigned, including the manufacturer's model number, any internal codes, product identifiers, or part numbers used by You.

**REQUEST NO. 2:**     Documents sufficient to show any target prices, bids, award prices, and subsequent price adjustments with respect to any RFQ for any Component or Assembly intended to be purchased by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

**REQUEST NO. 3:**     Documents sufficient to show Your agreements with suppliers for Components or Assemblies, including but not limited to any documents relating to and/or constituting Long Term Agreements, Master Purchase Agreements, Component Purchase Agreements, any preferred supplier or supplier partner agreements and Memoranda of Understanding applicable to any purchase of Components or Assemblies by You or on Your behalf for installation in a new Vehicle sold or leased in the U.S.

**REQUEST NO. 4:**     Data or documents (in the absence of data) sufficient to show the following information for each new Vehicle sold by You or on Your behalf, that was

-17-

manufactured (a) in the U.S. for later sale or lease in the U.S. or (b) outside the U.S. for later sale or lease in the U.S.:

    a.    Purchaser (*e.g.*, Vehicle distributor, Vehicle dealer, or fleet purchaser) to whom the Vehicle was sold, including name, address, and other identifiers, and

    (1)    Date of sale;

    (2)    Model, model year, make, and other identifiers of the Vehicle, including VIN, and product identifier for each Vehicle sold;

    (3)    Terms and conditions of sale, including but not limited to:

        (a)    Your list or invoice price for the Vehicle (including currency and exchange rate, if applicable) to the purchaser;

        (b)    Net sale price paid by purchaser before taxes and after any adjustments to invoice price, such as dealer holdback and any other manufacturer or distributor subsidies, rebates, bonuses, allowances and Incentives issued or applied at any time;

        (c)    Adjustments to invoice price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, commissions, rebates, discounts, refunds, bonuses, advertising subsidies, floor-plan assistance, fuel allowance, dealer inspection charge, and/or other credits or debits, and the manner in which provided, whether by Vehicle or by total sale, and any adjustment identifiers;

        (d)    Dealer holdback and model changeover allowance, if any;

(e)     Amount paid at time of sale, and any remaining balance due, terms of financing, if any, and duration of monthly or installment payments;

(f)     Shipping or freight costs, and by whom such costs were paid;

(g)     Any credit associated with return or repair;

(h)     Unit price (MSRP and invoice);

(i)     Any offered and accepted price that is different from list;

(j)     Total sales price for the transaction; and

(k)     Any other terms and conditions of the sale.

(4)     Terms and conditions of floor plan financing, if any, for the purchase of the Vehicle, including interest, fees and other charges paid by purchaser;

(5)     "Ship-from" and vendor "pay-to" address(es) from which the Vehicle and invoice for it were shipped or sent to purchaser, date(s) the Vehicle and invoice were shipped or sent, "ship-to/delivery" and customer "bill/invoice-to" address(es) where the Vehicle and invoice were shipped or received, and date(s) the Vehicle and invoice were received, and location of sale;

(6)     Monetary components of the transaction beyond unit price (*e.g.*, financing, sales tax, and fees) or non-monetary components of, or Incentives for, the sale distinct from net sale price, including but not limited to, (a) any service, benefit, and/or product You received, or provided, in connection with the sale of the Vehicle, including service agreements, warranties,

installation, Vehicle options, and (b) the value of each such service,

benefit, or product;

(7)     Invoice date;

(8)     A transaction number, invoice number, purchase order number, or any

number used to link different records;

(9)     Receipts, invoices, bills of sale, purchase contracts, as well as any

product-specification requirements and purchase orders You have for

these transactions;

(10)    All other information included on invoices sent to any Customer during

the relevant period;

(11)    A description identifier for each Vehicle;

(12)    Manufacturer(s) and seller(s) of each Vehicle sold;

(13)    Quantity sold (units);

b.     Retail purchaser (*e.g.*, consumer, fleet purchaser, leasing company, or other

lessor), to whom the Vehicle was eventually sold or leased, including name,

address, and other identifiers, and

(1)     Date and place (including address) of sale or lease;

(2)     Terms and conditions of sale, including but not limited to:

(a)     MSRP and seller's (*e.g.*, Vehicle distributor or Vehicle dealer)

invoice price for the Vehicle;

(b)     Net sale price paid by purchaser (including currency and exchange

rate, if applicable) before taxes and after any adjustments to list

price and Incentives or allowances issued or applied at any time;

      (c)      Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of vehicle for which a trade-in allowance was provided

      (d)      Amount paid at time of sale, and any remaining balance due, terms of financing, and duration of monthly or installment payments; and

      (e)      Terms of any insurance or warranties provided or sold to the retail purchaser.

c.      For leases, name, address, and other identifiers of person or entity to whom the Vehicle was leased (*e.g.*, lessee), and:

(1)      Date and place (including address) of lease;

(2)      Terms and conditions of lease, including but not limited to:

      (a)      Term of lease;

      (b)      Capitalized cost of lease;

      (c)      Capitalized cost reduction or down payment, if any;

      (d)      Lessee's monthly or periodic lease payments;

      (e)      Money factor, or finance or interest rate;

      (f)      Depreciation and finance charges;

      (g)      Mileage allowance and any excess mileage charges;

      (h)      Deposits, and acquisition or inception, disposition, termination, or other fees or charges;

(i)     Actual and/or proposed residual or resale value of the Vehicle at conclusion of lease term;

(j)     List and/or negotiated amounts to be paid at inception of lease and conclusion of lease term;

(k)     Net amounts paid by lessee at inception of lease and at conclusion of lease term, including extraordinary damage to Vehicle and applicable excess mileage charges, before taxes and after any adjustments to such list and/or negotiated amounts;

(l)     Adjustments to list and negotiated amounts to be paid at inception of lease and conclusion of lease term, including but not limited to, taxes, rebates, discounts, refunds, or credits;

(m)     MSRP and seller's (*e.g.*, Vehicle distributor or Vehicle dealer) list price for the Vehicle;

(n)     Net sale price of the Vehicle before taxes and after any adjustments to list price and Incentives or allowances issued or applied at any time; and

(o)     Adjustments to list price and Incentives or allowances issued or applied at any time, including but not limited to, taxes, rebates, discounts, refunds, credits, or allowances for vehicle trade-ins, and OEM and model, model year, VIN, and other identifiers, and mileage of Vehicle for which a trade-in allowance was provided.

d.     Any payments, credits, distributor subsidies, rebates, bonuses, Incentives, allowances or consideration received by purchaser (*e.g.*, Vehicle distributor,

Vehicle dealer or fleet purchaser) in connection with financing, warranties, insurance, service agreements, or other services or products provided to or purchased by retail purchaser (*e.g.*, consumer, leasing company, or other lessor) or lessee of the Vehicle;

e.     Monetary components of the transaction beyond unit price (*e.g.*, financing, sales tax, and fees) or non-monetary components of, or Incentives, distributor subsidies, rebates, bonuses, or allowances for, the sale of the Vehicle to the retail purchaser (*e.g.*, consumer, leasing company, or other lessor) or lease of the Vehicle distinct from net sale price, including but not limited to (1) commissions, and any service, benefit, and/or product the purchaser (*e.g.*, Vehicle distributor or dealer), retail purchaser or lessee received, or provided, in connection with the sale or lease, including service agreements, or warranties, and (2) the value of each such service, benefit, or product;

f.     Repairs or recalls with respect to the Vehicle, nature of repair or recall, whether the Vehicle was returned, and amount of any associated payment, refund or credit;

g.     Address and other identifiers of the facility where the Vehicle was manufactured or assembled;

h.     Your actual, or if actual is not available, estimated, direct and indirect materials, manufacturing, marketing, distribution, selling, and other costs of goods sold for the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of (i) each Component and Assembly, (ii) each other part or component of the Vehicle, and (iii) management, labor, tooling, overhead, energy, materials, sales and marketing, leasing, freight, and research and development;

     i.      Purchaser's (*e.g.*, Vehicle distributor's or Vehicle dealer's) actual, or if actual is not available, estimated, direct and indirect purchase, marketing, distribution, selling, leasing and other costs in connection with the purchase and sale or lease of the Vehicle, both fixed and variable, including but not limited to, direct and indirect costs of management, labor, commissions, real estate, financing, overhead, energy, and freight;

     j.      Your gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements for the manufacture, sale and/or lease of the Vehicle, "cost plus" pricing, gross margin target percentages, job cost and margin reports, financial statements, and any financial Analyses performed by corporate finance personnel;

     k.      Your income for each Vehicle for products or services sold by Your finance and insurance department or affiliate, including without limitation finance, insurance, service contracts, extended warranties, and GAP insurance (broken out by units, total dollars, finance income, insurance income, service-contract, extended warranty, and GAP insurance income); and

     l.      Purchaser's (*e.g.*, Vehicle distributor's or dealer's) gross profit, profit margin or level, operating profit, projected profit, net profit, and/or profit-and-loss statements for the purchase, sale to a retail purchaser (*e.g.*, consumer, leasing company, or other lessor) and any lease of the Vehicle.

**REQUEST NO. 5:**    Data or documents sufficient to show the following information, for each model (and each model year) for each new Vehicle sold or leased by You or on Your behalf for sale or lease in the U.S.:

a. The start of production date;

b. The year when You began selling the Vehicle;

c. The year you stopped selling the Vehicle if You no longer sell it;

d. Your schedule of base model invoice prices; and

e. Your schedule of MSRP.

**REQUEST NO. 6:**    VIN databases that include complete specifications for every new Vehicle sold by You or on Your behalf for sale or lease in the U.S.

**REQUEST NO. 7:**    Documents identifying, for each year, the total number of new Vehicles sold in the U.S. that were financed, the total dollar amount of finance income earned, the total amount of finance reserve not yet earned, and the total amount of finance commission paid to Vehicle dealers.

**REQUEST NO. 8:**    Documents sufficient to show the chronological progress of the prices You charged to each Vehicle dealership for each Vehicle You sold to a Vehicle dealership in the U.S.

**REQUEST NO. 9:**    For all new Vehicles sold or leased by Your Customers in the U.S. containing a Component or Assembly installed by You, all Documents relating to finance, insurance, and service contract income (broken out by units, by total dollars, by finance income, by insurance income, and by service contract income) by month.

**REQUEST NO. 10:**    Monthly or periodic reports on Your inventory levels with respect to new Vehicles intended for sale or lease in the U.S.

**REQUEST NO. 11:**    Monthly or periodic composite trend reports and expense composite reports for specific expected Vehicle sales by You or on Your behalf for sale or lease in the U.S.

**REQUEST NO. 12:**  Documents, including number, code, or data dictionaries or similar documents, sufficient to disclose, identify, describe, and explain the (a) manufacturer, supplier, vendor, and customer numbers or codes; (b) product, component, and part numbers or codes; (c) model, model platform, VIN, model project or development, and model year numbers or codes; (d) RFQ and RFQ response numbers or codes; (e) plant or facility numbers or codes; (f) Target Price, Limit Price, VE Price or VA Price, or other price numbers or codes; (g) transaction types, including standard sales, credits, debits, returns, and other adjustments related to purchases, sales and any leases of Vehicles, Components, and Assemblies; (h) contract or agreement and invoice numbers or codes; and (i) data fields, that are reflected in data or documents produced in response to these Requests.

**REQUEST NO. 13:**  Documents sufficient to disclose, identify, describe, and explain the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons for  determining, setting or revising Your and Your distributors' prices, including without limitation MSRP and dealer-invoice price and any Incentives relating to sales provided to dealers or consumers, for the sale of new Vehicles sold or leased in the U.S.

      a.     Your studies, analyses, research, or evaluations concerning the market(s) and competitive conditions for the manufacture and sale of Vehicles, including but not limited to, competitors, market shares, market definition(s), profitability, availability of supply, demand conditions, pricing trends, cost conditions, or sales trends, and surveys and/or research concerning the Vehicles, models, brands, and classes of Vehicles that You compete with, including price levels and price comparisons; and

   b.      Your studies, analyses, research, or evaluations concerning how the cost of
           Components or Assemblies is calculated into, or otherwise impacts or influences,
           the ultimate price of the Vehicle to Purchasers.

   **REQUEST NO. 14:**   Documents sufficient to disclose, identify, describe, and explain
the policies, procedures, methods, standards, decision-making, guidelines, factors, and reasons
for (i) Your purchases of Components and Assemblies for installation in new Vehicles sold or
leased in the U.S., and (ii) Your decisions to select and/or not to select particular manufacturers
and suppliers of Components and Assemblies for installation in new Vehicles sold or leased in
the U.S., including but not limited to:

   a.      Your review and evaluation of potential manufacturers and suppliers and the
           Components and Assemblies they offer, including but not limited to, documents
           sufficient to show comparisons of the quality and/or technological capabilities of
           the potential suppliers and manufacturers;

   b.      Your (1) issuance of RFQs, and (2) solicitation of proposals, bids, and responses
           to RFQs from potential manufacturers and suppliers of Components and
           Assemblies, including Your consideration, solicitation or use of Target Prices,
           Limit Prices, cost tables or schedules (*e.g.*, standards or directives regarding the
           amount a supplier may charge for subcomponents of Components or Assemblies
           or labor used in the assembly of Components or Assemblies), or the supplier's VE
           Prices or VA Prices;

   c.      Your review and evaluation of (1) proposals, bids, and responses to RFQs, and
           (2) manufacturers and suppliers of Components and Assemblies, including Your
           consideration of (a) estimates of input and other costs and profit margins of
           manufacturers or suppliers, and (b) manufacturers' or suppliers' ability to meet

Target Prices, Limit Prices, anticipated or expected prices, Your cost tables or schedules, or VE Prices or VA Prices for Components and Assemblies;

d.   Variations in Vehicle price or Incentives over time or with respect to different geographic areas;

e.   Variations in Vehicle price or Incentives as affected by prices of particular competitive models or trims;

f.   Variations in Vehicle price or Incentives as affected by levels of sales or inventory;

g.   Any actual or proposed program or requirement (1) that potential manufacturers and suppliers of Components and Assemblies (a) provide engineers or other personnel or services on-site, or (b) provide or estimate their input and other costs related to the manufacture and sale of Components and Assemblies that You are considering purchasing or acquiring; or (2) that such input and other costs be negotiated with, dictated by, and/or approved by You or on Your behalf;

h.   Your negotiation of (1) prices, terms, and conditions of sale, including any rebates, discounts, off-invoice discounts, or other price concessions or Incentives required from, or offered by, potential manufacturers or suppliers of Components and Assemblies, or (2) changes in prices, terms, and conditions of sale, including post-RFQ pricing (*e.g.*, cost-down pricing and Annual Price Reductions);

i.   Audits or reports of Your purchases of Components and Assemblies pursuant to International Organization for Standardization ("ISO") rules or regulations; and

j.   Your provision or disclosure to actual or potential manufacturers or suppliers of Components and Assemblies of information about prices or other terms and

conditions offered or charged by other actual or potential manufacturers or suppliers.

**REQUEST NO. 15:**  Documents sufficient to disclose, identify, describe, and explain any studies, reports, analyses, policies, procedures, research, or evaluations concerning the extent (if any) that changes in costs related to Your manufacture, sale and/or lease of new Vehicles in the U.S., including but not limited to, changes in the input costs of a Vehicle (*e.g.*, Raw Material prices or prices for Components and Assemblies) and changes in costs pursuant to Annual Price Reductions, are passed on to purchasers (*e.g.*, Vehicle distributors or Vehicle dealers), retail purchasers (*e.g.*, consumers, leasing companies, or other lessors), or lessees in the sale or lease prices of Vehicles, including whether and how much (1) You pass on changes in Your costs to purchasers from You (*e.g.*, Vehicle distributors or Vehicle dealers), and (2) such purchasers pass on changes in Your costs to their customers (*e.g.*, consumers, leasing companies, or lessees).

**REQUEST NO. 16:**  Studies, analyses, research or evaluations concerning: (1) the impact or effect of changes with respect to Your acquisition costs for any particular Components or Assemblies or any other inputs on prices to dealerships, MSRP or on the "street prices" (*e.g.*, retail or consumer prices of Vehicles) paid by final consumers for new Vehicles sold or leased in the U.S. and (2) how You or Your retailers (*e.g.*, Vehicle dealerships or Vehicle distributors) set or adjust the prices at which new Vehicles containing Components or Assemblies are sold or leased in the U.S.

**REQUEST NO. 17:**  All studies, analyses, research, evaluations, or trade association materials concerning the market(s) in which You or other purchasers of Components and Assemblies have acquired or potentially could have acquired any such Components or Assemblies from any suppliers of such Components or Assemblies for installation in new

Vehicles sold or leased in the U.S., including but not limited to studies, analyses, research, evaluations, and trade association materials concerning (a) the nature, scope, competitive conditions, degree of concentration, structure, or other significant aspects of any such market(s); or (b) the identity, size, relative market share, quality, reputation or other significant attributes of any of the participants (including both buyers and sellers) in any such market(s).

**REQUEST NO. 18:**  All documents relating to any comments, observations, suspicions, or suggestions that the market(s), market or competitive conditions, and market structure(s) for the manufacture, sale, or purchase of Components and Assemblies for installation in new Vehicles sold or leased in the U.S., or for the manufacture, sale, purchase or lease of new Vehicles containing any such Components and/or Assemblies in the U.S. (a) may not be competitive, (b) may involve collusion between or among manufacturers and suppliers of Components and Assemblies, or (c) may involve collusion between or among any OEMs, distributors, or dealerships.

**REQUEST NO. 19:**  Documents sufficient to show Your internal transfer costs, pricing, or sales of Components and Assemblies for installation in new Vehicles sold or leased in the U.S. between or among divisions or entities within Your corporate family.

**REQUEST NO. 20:**  Documents sufficient to show and describe:  (a) what systems are in place for Vehicle dealers and Vehicle distributors to report new Vehicle purchases, sales, and leases in the U.S.; (b) what other information these systems track; and (c) whether each such system includes information on OEM-to-Vehicle dealer, OEM-to-Vehicle distributor, and/or OEM-to-consumer Incentives (*e.g.*, dealer cash, customer cash, holdback, rebates, etc.).

**REQUEST NO. 21:**  All monthly, annual, and other periodic reports concerning or reflecting purchases, leases, and/or sales of new Vehicles in the U.S. by each of Your Vehicle

dealerships or Vehicle distributors (*e.g.*, financial statements or dealer operating reports) and (b) all studies, analyses, or reports concerning the business performance of Your Vehicle dealerships or Vehicle distributors with respect to purchases, leases and/or sales of new Vehicles in the U.S. Both (a) and (b) should include, but not be limited to, such reports, studies and analyses concerning sales volume by make and model, prices at which dealers or distributors sold the Vehicles by make and model, and any other characteristics of those sales, as well as such dealerships' and distributors' financial results, throughput volumes, salesperson activity, market-share performance, and expected-opportunity performance.

**REQUEST NO. 22:** All letters, memoranda, or other communications from You to all or any group of Your dealerships in the U.S. (*e.g.*, dealerships in a particular geographic region) announcing prices or changes in prices charged to the dealers for new Vehicles, setting prices or discounts, or explaining discounts or prices for new Vehicles charged or Incentives provided to the dealers (*e.g.*, why prices went up or went down, or how prices were arrived at), including price lists from the manufacturer for new Vehicles.

**REQUEST NO. 23:** Documents sufficient to show: (1) Annual Price Reductions or "APRs" issued to each supplier or manufacturer of Components or Assemblies for installation in new Vehicles sold or leased in the U.S. for each APR negotiation period for each such Component or Assembly and the dates of such APR requests; (2) APRs, credits, money, or other consideration received from suppliers of Components or Assemblies in connection with any negotiated price reductions and the dates of receipt; (3) the impact and traceability of APRs and APR requests to particular Components or Assemblies, including but not limited to, the methods, policies, procedures, factors, and standards for (a) how You calculate and issue APR requests issued to suppliers and manufacturers of Components or Assemblies, (b) how and when You

account for or credit APRs received from suppliers, and (c) how and when any audit of suppliers' costs impact Your APR requests; (4) any variation, and the reason for the variation, between Your APR requests issued to each of the suppliers and manufacturers of a particular Component or Assembly; and (5) Your long-term cost reduction initiatives, including but not limited to, announcements, PowerPoint presentations, and supplier meetings containing information about these initiatives.

**REQUEST NO. 24:**  Documents sufficient to show, for each model of new Vehicle manufactured by You that is sold or leased in the United States, the models of Vehicles manufactured by other OEMs that You consider to be competitors and how (if at all) You considered the pricing by such other OEMs of such models in setting the price of the model manufactured by You.

**REQUEST NO. 25:**  Organizational charts or other documents sufficient to identify Your divisions, departments and managerial employees that have responsibility for: (a) purchasing Components or Assemblies for installation in new Vehicles sold or leased in the U.S., (b) manufacturing new Vehicles sold or leased in the U.S., (c) pricing of new Vehicles sold or leased in the U.S., and (d) sales and marketing of new Vehicles containing such Components and/or Assemblies to Your Customers for sale or lease in the U.S.

**REQUEST NO. 26:**  For all produced data extracted from a larger data system, identify (a) the software hosting the original data (including version number); (b) the process used to extract the data; and (c) the specific queries used to extract the data.  For any data that has been altered from the original form in which it was stored, produce the descriptions of any manipulations to the data fields or values, any removed data, any data summarization performed

prior to production, and any other alternations that would be required to reproduce the data as originally stored.

**REQUEST NO. 27:** All Documents and/or transactional data produced to any regulatory or governmental authority within or outside the United States as part of any investigation relating to Components or Assemblies for installation in new Vehicles sold or leased in the U.S.

**REQUEST NO. 28:** All Documents, including but not limited to, any Studies and/or Analyses relating to Your suppliers' (including Defendants') pricing of Components or Assemblies sold to You for installation in new Vehicles sold or leased in the U.S., including Documents relating to prices and proposals submitted in response to RFQs and other requests for procurement or price changes. Please include Documents relating to the relationship between the prices charged or submitted to You for Components or Assemblies and the prices charged or submitted to other Vehicle manufacturers, including for Components or Assemblies that are jointly sourced or for Vehicles that share platforms, share elements, are badge-engineered, or are made for different OEMs who are involved in joint ventures or projects. Please also include Documents relating to the relationship or similarities between the prices charged or submitted for Components or Assemblies for different models or makes of Vehicles, including Vehicles You manufacture.

**REQUEST NO. 29:** Any Documents or data You have provided to the J.D. Powers' Power Information Network (PIN) concerning new Vehicles sold or leased in the U.S., including but not limited to data that contains the Vehicle make, model and trim, transaction prices, costs, and transaction dates, financing details and trade-in information.

**REQUEST NO. 30:**  All Documents concerning any agreement or understanding that prices charged to one OEM for Components or Assemblies for installation in new Vehicles sold or leased in the U.S. will not be below or above prices charged to another OEM, or that prices for Components or Assemblies for installation in new Vehicles sold or leased in the U.S. must be at a particular competitive level.

**REQUEST NO. 31:**  All Documents relating to Your or other OEMs' negotiations or Communications with any of the Defendants or other Components or Assemblies suppliers in connection with Defendants' and other Components or Assemblies suppliers' conduct at issue in MDL No. 2311 and Documents Defendants or other Components or Assemblies suppliers provided to You or other OEMs, in connection with the facts described in any Plaintiffs' Complaints.

**REQUEST NO. 32:**  All Documents related to requests by You that Defendants or Your other suppliers decrease prices charged, submitted or provided for any Component or Assembly for installation in new Vehicles sold or leased in the U.S., and techniques used to accomplish these reductions.

**REQUEST NO. 33:**  Documents comparing the Components or Assemblies You purchase, or have purchased, for installation in new Vehicles sold or leased in the U.S. to Components or Assemblies other OEMs purchase or have purchased, as well as Components or Assemblies made by different suppliers.

**REQUEST NO. 34:**  For new Vehicles that were sold to Your Customers in the U.S. and financed by You (or any of Your related financing entities), Your disaggregated transactional data, including but not limited to the cost of each Vehicle, the dealer invoice price for each

Vehicle (*i.e.*, the invoice price to Your franchise-dealer Customer), and the final sales price for the Vehicle to the end-payor (*i.e.*, the ultimate consumer of the Vehicle).

**REQUEST NO. 35:** Documents sufficient to show the extent to which suppliers participated in the design and engineering of Components and Assemblies to be incorporated in manufacturing new Vehicle models with respect to new Vehicles manufactured or sold in the U.S.

**REQUEST NO. 36:** Documents sufficient to show the existence of lists or compilations of OEM-approved parts suppliers, to the extent they include suppliers of Components or Assemblies for installation in new Vehicles sold or leased in the U.S., the criteria for the inclusion of a supplier on such lists or compilations, the process by which OEMs approve suppliers to be added to such lists or compilations, and the lists or compilations themselves.

**REQUEST NO. 37:** Documents sufficient to show the following with respect to any Defendant in which you possess, hold, or own, directly or indirectly, an ownership, equity, or other economic interest of 20% of more ("partly-owned companies"):

a. Your direct and/or indirect ownership interest in the partly-owned company and any companies with which it is affiliated, including any parent corporations, from January 1, 2000 to the present.

b. That the partly-owned company is part of your consolidated group for U.S. state, federal, or local tax purposes.

c. Your payment of any U.S. state, federal, or local taxes on behalf of a partly-owned company.

d. All corporate services and benefits of any kind (including information technology, human resources, finance, legal, etc.) you provided to or received from the partly-

owned company and any companies with which it is affiliated, including any parent corporations, from January 1, 2000 to the present.

## ATTACHMENT B

1.    In addition to data or documents with respect to each Component or Assembly purchased for installation in a new Vehicle covered by Requests Nos. 1, 2, 3, 14, 17, 18, 19, 23, 25(a), 25(d), 27, 28, 30, 32, 33, and 36 in Attachment A, also produce data or documents responsive to those Requests for each Component or Assembly purchased or sold by You as a replacement part (including spare, service, or repair part) in the U.S.

2.    Produce data or documents (in the absence of data) sufficient to show for each Component or Assembly You sold as a replacement part (including spare, service, or repair part) in the U.S.:

      a)   Purchaser to whom it was sold;

      b)   Date of sale;

      c)   Model, model year, make, part number and other identifiers for the Vehicles for which the Component or Assembly was intended for use;

      d)   Terms and conditions of sale, including unit price (MSRP and invoice) and net sales price paid by purchaser before taxes and after any Incentives or adjustments to price;

      e)   Address and other identifiers of the facility where the Component or Assembly was manufactured or assembled;

      f)   Shipping or freight costs, by whom such costs were paid, "ship-from/pay-to" and "bill/invoice-to" addresses from where the Component or Assembly were shipped, sent, or received, and the location of sale;

      g)   Any monetary components of the transaction beyond unit price (e.g., financing, sales tax, and fees) or non-monetary components of, or Incentives for, the sale distinct from net sale price;

010485-11 792632 V1

h)  Receipts, invoices, bills of sale, purchase contracts, purchase orders,

transaction numbers, and invoice numbers You have for these transactions;

i)  Quantity sold (units);

j)  Your gross profit, profit margin or level, and net profit, including profit-and-

loss statements

3.  Produce documents sufficient to identify, describe, and explain how You set or

revised Your prices, including without limitation MSRP and dealer-invoice price and any

Incentives relating to sales provided to purchasers, for Components or Assemblies You sold as

replacement parts (including spare, service, or repair part) in the U.S., as well as:

a)  Your studies, analyses, research, or evaluations concerning the market(s)

and competitive conditions for the manufacture and sale of Components or

Assemblies sold as replacement parts, including but not limited to competitors,

prices offered by competitors, market shares, market definition(s), profitability,

availability of supply, demand conditions, pricing trends, cost conditions, or sales

trends.

**ATTACHMENT C**

**Defendants List**

- AB SKF
- Aisan Corporation of America
- Aisan Industry Co., Ltd.
- Aisin Automotive Casting, LLC
- Aisin Seiki Co., Ltd.
- Alps Automotive Inc.
- Alps Electric (North America), Inc
- Alps Electric Co., Ltd.
- American Furukawa, Inc.
- American Mitsuba Corporation
- American Showa, Inc.
- ASMO Co. Ltd.
- ASMO Greenville of North Carolina, Inc.
- ASMO Manufacturing, Inc.
- ASMO North America, LLC
- Asti Corporation
- Autoliv ASP, Inc.
- Autoliv B.V. & Co. KG
- Autoliv, Inc.
- Bosch Electrical Drives Co., Ltd
- Bridgestone APM Company
- Bridgestone Corporation
- Calsonic Kansei Corporation
- Calsonic Kansei North America, Inc.
- Chiyoda Manufacturing Corporation
- Chiyoda USA Corporation
- Continental Automotive Electronics LLC
- Continental Automotive Korea Ltd.
- Continental Automotive Systems, Inc.
- Delphi Automotive LLP
- Delphi Automotive Systems, LLC
- Delphi Furukawa Wiring Systems LLC
- Delphi Powertrain Systems Korea Ltd.
- DENSO Corp.
- DENSO International America Inc.

- DENSO Korea Automotive Corporation
- DENSO International Korea Corporation
- DENSO Products & Services Americas, Inc.
- Diamond Electric Mfg. Co., Ltd.
- Diamond Electric Mfg. Corporation
- DPH Holdings Corporation
- DTR Industries, Inc.
- Franklin Precision Industry, Inc.
- Fujikura America, Inc.
- Fujikura Automotive America, LLC
- Fujikura Ltd.
- Furukawa Electric Co., Ltd.
- Furukawa Wiring Systems America, Inc.
- G.S. Electech, Inc.
- G.S. Wiring Systems, Inc.
- G.S.W. Manufacturing Inc.
- Hitachi Automotive Systems America, Inc.
- Hitachi Automotive Systems, Ltd.
- Hitachi, Ltd.
- Hyundam Industrial Co., Ltd.
- Ichikoh Industries, Ltd.
- II Stanley Co.
- JTEKT Automotive North America, Inc.
- JTEKT Corporation
- K & S Wiring Systems, Inc.
- Keihin Corporation
- Keihin North America, Inc.
- Koito Manufacturing Co., Ltd.
- Korea Automotive Motor Corporation
- Koyo Corporation of U.S.A.
- Kyungshin-Lear Sales And Engineering LLC
- Lear Corp.
- Leoni AG
- Leoni Bordnetz-Systeme GMBH
- Leoni Kabel GmbH
- Leoni Wire Inc.
- Leoni Wiring Systems, Inc.
- Leonische Holding, Inc.

- 2 -

- Maruyasu Industries Co., Ltd.
- Mikuni American Corporation
- Mikuni Corporation
- Mitsuba Corporation
- Mitsubishi Electric Automotive America, Inc.
- Mitsubishi Electric Corporation
- Mitsubishi Electric US Holdings, Inc.
- Mitsubishi Heavy Industries America, Inc.
- Mitsubishi Heavy Industries Climate Control, Inc.
- Mitsubishi Heavy Industries, Ltd.
- N.S. International, Ltd.
- Nachi America Inc.
- Nachi-Fujikoshi Corp.
- New Sabina Industries
- NGK Spark Plugs (U.S.A) Holding, Inc.
- NGK Spark Plugs (USA) Inc.
- NGK Spark Plugs Co. Ltd.
- Nippon Seiki Co., Ltd.
- North American Lighting, Inc.
- NSK Americas, Inc.
- NSK Ltd.
- NTK Technologies, Inc.
- NTN Corporation
- NTN USA Corporation
- Panasonic Corporation
- Panasonic Corporation of North America
- Robert Bosch GmbH
- Robert Bosch LLC
- Schaeffler AG
- Schaeffler Group USA Inc.
- Showa Corporation
- SKF USA, Inc.
- Stanely Electric Co., Ltd.
- Stanley Electric U.S. Co., Inc.
- Sumitomo Electric Industries, Inc.
- Sumitomo Electric Wintec America, Inc.
- Sumitomo Electric Wiring Systems, Inc.
- Sumitomo Riko Company Limited (formerly Tokai Rubber Industries, Ltd.)

- Sumitomo Wiring Systems (U.S.A.) Inc.
- Sumitomo Wiring Systems, Ltd.
- S-Y Systems Technologies America, LLC
- S-Y Systems Technologies Europe GmbH
- T.RAD Co., Ltd.
- T.RAD North America, Inc.
- Takata Corp.
- TG Missouri Corp.
- TK Holdings, Inc.
- Tokai Rika Co., Ltd.
- Toyo Automotive Parts (USA), Inc.
- Toyo Tire & Rubber Co., Ltd.
- Toyo Tire North America Manufacturing, Inc.
- Toyo Tire North America OE Sales LLC
- Toyoda Gosei Co., Ltd.
- Toyoda Gosei North America Corp.
- TRAD Co., Ltd.
- TRAM Inc. d/b/a Tokai Rika U.S.A. Inc.
- TRW Automotive Holdings Corp.
- TRW Deutschland Holding GmbH
- Valeo Climate Control Corp
- Valeo Electrical Systems, Inc.
- Valeo Inc.
- Valeo Japan Co., Ltd.
- Valeo S.A.
- Yamashita Rubber Co., Ltd.
- Yazaki Corporation
- Yazaki North America Inc.
- YUSA Corporation

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : : | **Master File No. 12-MD-02311** |
| PRODUCTS(S): WIRE HARNESS SYSTEMS | : : : : : | |
| THIS DOCUMENT RELATES TO: All Actions | : : : : | |

## STIPULATION AND PROTECTIVE ORDER GOVERNING THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

WHEREAS, the Plaintiffs and Defendants in the Wire Harness Systems Direct Purchaser Actions, Automobile Dealer Actions, and End-Payor Actions may seek discovery of documents, information, or other materials that contain non-public, confidential, competitively sensitive, or proprietary information of another party or of a third party;

WHEREAS, the parties have stipulated and agreed to terms, and jointly moved this Court for entry of the following Protective Order, and the Court having found that, in light of the nature of the non-public, confidential, competitively-sensitive, proprietary information that may be sought in discovery, good cause exists for entry of the Protective Order,

IT IS ORDERED that this Protective Order ("Order") shall be entered pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and Local Rule 26.4 of the United States District Court for the Eastern District of Michigan limiting the disclosure and use of certain discovered information in connection with the prosecution or defense of:

    a.    the consolidated direct and indirect purchaser Wire Harness Systems actions included in MDL No. 2311;

    b.    any individual direct or indirect purchaser case included in MDL No. 2311;

    c.    any case designated as a direct or indirect purchaser "tagalong" case to MDL No. 2311 or designated as a "related case" to any direct or indirect purchaser case in MDL No. 2311;

93207

d. any subsequent cases which are subsequently transferred to this Court for coordinated proceedings with the cases included in MDL No. 2311; and

e. any appeals of the cases described in categories (a) through (d) above

(collectively the "Litigation").

1. All information produced or discovered in this Litigation and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS ONLY" shall be used solely for the prosecution or defense of this Litigation, unless that information is or has become publicly available without a breach of the terms of this Order.

2. To preserve the legitimate proprietary and privacy interests of sources of information, this Order establishes a procedure for disclosing Protected Information (defined in Paragraph 4 below) to the parties in this Litigation, imposes obligations on persons receiving Protected Information to protect it from unauthorized use or disclosure, and establishes a procedure for challenging confidentiality designations. This Order applies only to information furnished by parties and non-parties that is not otherwise publicly available.

3. This Order shall govern all documents, the information contained therein, and all other information produced or disclosed during discovery in this Litigation whether revealed in a document, deposition, other testimony, multimedia audio/visual file such as a voice and video recording, discovery response or otherwise, including but not limited to any copies, notes, abstracts or summaries of the foregoing materials ("Discovery Material"), by any party or nonparty in this Litigation (the "Producing Party") to any other party (the "Receiving Party") when the foregoing materials are designated using the procedures set forth herein. This Order is binding upon the parties to this Litigation, as well as their respective attorneys, agents, representatives, officers and employees, and others as set forth in this Order. Nothing in this Order, however, prevents any use by a Producing Party of the Discovery Material that it produces.

4. Subject to the protections provided in Rule 26 of the Federal Rules of Civil Procedure, this Order covers information that any Producing Party designates as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY" pursuant to Paragraph 5 (collectively referred to as "Protected Information"). In designating information as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY," a party will make such designation only as to that information that it in good faith believes contains information meeting the respective definitions set forth below.

5. **Confidentiality Designations.**

a. The designation "CONFIDENTIAL" shall be limited to information that the Producing Party has determined, in good faith, contains non-public, confidential, proprietary or commercial information that is not readily ascertainable through lawful means by the public or the receiving party or is subject to privacy protection under federal, state, local, or any applicable foreign law ("Confidential Information").

2

b.     The designation "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY" shall be limited to information which a Producing Party believes to be highly sensitive and/or proprietary information, including but not limited to documents or information reflecting, containing, or derived from current confidential trade secrets, research, development, pricing, production, cost, marketing, or customer information, the disclosure of which, even limited to the restrictions placed on the information designated as "CONFIDENTIAL" under this Order, could compromise and/or jeopardize the Producing Party's competitive business interests ("Highly Confidential Information").

c.     Any party to this Litigation and any third party may designate as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY documents or information produced by another party or a third party if that Discovery Material (i) either originated from the designating party or third party (or was generated on the designating or third party's behalf), or (ii) contains the designating party's Confidential Information or Highly Confidential Information, in which case the designating party shall be deemed a Producing Party for purposes of this Order. Failure to designate any documents or information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY pursuant to this paragraph shall not constitute a waiver of any party's right to make such designation at a later time.

6.     **Means of Designating Protected Information**.

Documents, material, or information may be designated CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY in the following ways:

a.     *Documents*. A Producing Party shall, if appropriate, designate specific, hard copy and non-natively produced electronic documents as (i) CONFIDENTIAL by marking the first page and each subsequent page of the produced copy or image of such document containing any Confidential Information with the legend "CONFIDENTIAL"; or as (ii) HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY by marking the first page and each subsequent page of the produced copy or image of such document containing any Highly Confidential Information with the legend "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY." All documents produced or disclosed during discovery in this Litigation shall be identified by Bates number and, to the extent practical, the appropriate designation shall be placed near the Bates number. The impracticality or inadvertent failure to designate each page of a document as CONFIDENTIAL or HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS ONLY pursuant to this paragraph shall not constitute a waiver of the confidential nature of the document or page(s).

b.     *Discovery Responses*. A Producing Party shall, if appropriate, designate discovery responses, including but not limited to interrogatory answers and responses to requests for admissions, as Confidential Information or Highly Confidential Information by placing the following legend on each page of the discovery responses containing Confidential or Highly Confidential Information: "CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER" and / or "CONTAINS HIGHLY CONFIDENTIAL INFORMATION

SUBJECT TO PROTECTIVE ORDER."

        c.     *Depositions*. In the case of depositions and the information contained in depositions (including exhibits), counsel for a Producing Party or witness shall designate portions of the transcript (including exhibits) which contain Confidential Information or Highly Confidential Information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY by making a statement to that effect on the record at the deposition or by letter within 30 days of receipt of the final deposition transcript or copy thereof (or written notification that the transcript is available). The entire deposition transcript (including exhibits) shall be treated as Highly Confidential Information under this Order until the expiration of the 30-day period for designation. The following legend shall be placed on the front of all versions of the original deposition transcript and each copy of the transcript containing Confidential Information or Highly Confidential Information: "CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER" or "CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER." If all or part of a videotaped deposition is designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL— OUTSIDE ATTORNEYS ONLY, the videocassette, other videotape container or DVD shall be labeled with the appropriate legend provided for in Paragraph 5.

        d.     *Computerized Material*. To the extent that information is produced in a form rendering it impractical to label (including electronically stored information produced on electronic, magnetic or other computer readable media), the Producing Party may designate such information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY by cover letter or by affixing to the media containing the Confidential Information or Highly Confidential Information a label containing the appropriate legend provided for in Paragraph 5 above. Whenever a Receiving Party reduces such computerized material designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY to hard-copy form, the Receiving Party shall mark the hard-copy form with the appropriate legend provided for in Paragraph 5 above. Whenever any Confidential or Highly Confidential computerized material is copied into another form, the Receiving Party shall also mark those forms with the appropriate legend provided for in Paragraph 5 above.

        e.     *Restricting Access*. To the extent that any Receiving Party or counsel for the Receiving Party creates, develops or otherwise establishes on any digital or analog machine-readable device, recording media, computers, discs, networks, or tapes, or maintains for review on any electronic system material that contains information designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY that Receiving Party and/or its counsel must take all necessary steps to ensure that access to the electronic system and/or the media containing such information is properly restricted to those persons who, by the terms of this Order, may have access to Confidential Information or Highly Confidential Information.

        f.     *Inspections*. Documents, materials, or other information to be inspected shall be treated as HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY during inspection. Such documents or other materials or information that are later duplicated by or for the Receiving Parties shall be stamped, if designated, CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY.

7. **Filing of Protected Information**.

A party that seeks to file any pleading, motion, brief, memoranda or other paper that contains Confidential Information or Highly Confidential Information must comply with Civil Local Rule 5.3 and this Order shall serve as a stipulated order for the purposes of Civil Local Rule 5.3(b). All documents, materials, or other information containing Confidential Information or Highly Confidential Information that are filed with the Court shall be filed under seal according to the following procedures:

a. Consistent with Local Rule 5.3, only those portions of filings with the Court containing Confidential Information or Highly Confidential Information shall be filed under seal. Wherever possible, Confidential Information or Highly Confidential Information shall be filed electronically, in accordance with the Court's ECF procedures. Otherwise, Confidential Information or Highly Confidential Information filed under seal shall be placed in sealed envelopes labeled with the title to the appropriate case in this Litigation, the name of the pleading, the words "FILED UNDER SEAL," and a statement substantially in the following form:

> "This envelope is sealed pursuant to Order of the Court dated
> _____, 20__, and contains [Confidential Information or Highly
> Confidential Information] filed in this case by [name of Party] and
> is not to be opened or the contents thereof to be displayed or
> revealed to any non-Court personnel except by order of the Court."

Any pleading or other paper required to be filed under seal pursuant to this Paragraph shall also bear the legend "FILED UNDER SEAL" on the cover page of the document. The envelope shall not be opened without further order of the Court except by persons authorized to have access to Confidential Information or Highly Confidential Information pursuant to Paragraphs 9 and/or 10, as appropriate, who shall return the information to the Clerk in a sealed envelope. Regardless of whether a submission is filed under seal electronically or manually, a full copy of any such submission shall be provided directly to chambers, marked "Judge's Copy" and "Contains [Confidential Information or Highly Confidential Information] Subject to Protective Order" and may be opened by the presiding District Judge, his/her law clerks, and other Court personnel without further order of the Court. Further, subject to Paragraphs 9 and/or 10, as appropriate, a full copy of any such sealed submission shall be served upon counsel for the parties. Such service may be effected by e-mail.

b. If any party objects to identified portions of the materials remaining under seal, it shall state its objections in a faxed or electronically-delivered letter to the appropriate counsel of record. The interested parties shall promptly meet and confer to attempt to resolve those objections and, if they cannot be resolved, shall promptly tender those objections to the Court for resolution.

c. Each document manually filed under seal may be returned to the party which filed it (1) if no appeal is taken, within ninety days after a final judgment is rendered, or (2) if an appeal is taken, within thirty days after the mandate of the last reviewing court which

disposes of this Litigation in its entirety is filed. If the party that filed a sealed document fails to remove the document within the appropriate time frame, the Court may dispose of the document in accordance with Local Rule 5.3(e), or take any other action with respect to the document it deems appropriate.

   d. Notwithstanding the foregoing, a party is not required to file a document under seal if the Confidential Information or Highly Confidential Information contained or reflected in the document was so designated solely by that party.

   8. **Use of Protected Information**.

   a. In no event shall Confidential or Highly Confidential Information be used for any business, competitive, personal, private, public, or other purpose, except as permitted by law.

   b. Notwithstanding the foregoing, nothing in this Order shall be deemed to limit or restrict any Producing Party from using its own documents, materials, information, or its own Confidential Information or Highly Confidential Information for any purpose. The Producing Party may withdraw or modify any designation it has made.

   c. The use of Confidential Information and/or Highly Confidential Information in hearings shall be subject to the following:

   i. Subject to Paragraph 8(c)(ii), a party may refer to Confidential Information and/or Highly Confidential Information in public proceedings. The use of such information at trial shall be addressed in the final pre-trial Order, except that the words "CONFIDENTIAL" and "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY" shall be removed from documents before such documents are used at trial. The removal of those words shall not affect the protections afforded to the information itself.

   ii. Any party that reasonably believes it will disclose Confidential Information and/or Highly Confidential Information in any public proceeding before the Court shall make its best efforts to inform the Court and the Producing Party at least five (5) business days in advance of actual disclosure but in any event with advance notice sufficient to allow the Producing Party to raise the issue with the Court, so that the Court can decide what precautions are necessary to protect the Producing Party's Confidential/Highly Confidential Information, including specifying how exhibits containing such information shall be filed to maintain their confidentiality, whether and how exhibits containing such information may be shown to witnesses or otherwise used in open court, and whether persons not identified in Paragraphs 9 or 10, as appropriate, shall be excluded from specific portions of the proceedings.

   iii. The Producing Party may designate portions of transcripts of public proceedings as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY, but any such designations must be made within thirty (30) days of receipt of the final transcript. If the Producing Party is not a party to this Litigation, the party using the information must confer with the Producing Party regarding such designation consistent with this

93207            6

paragraph.

        d.      Nothing in this Order shall bar or otherwise prevent any counsel from rendering advice to his or her client with respect to this Litigation and, in the course of rendering such advice, from relying upon his or her examination or knowledge of CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY information; provided that, however, in rendering such advice and in otherwise communicating with his or her client, such counsel shall not disclose the contents or source of any CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY information produced by another party to this Litigation to any person who is not authorized to receive such information under the provisions of this Order.

       9.    **Disclosure of Confidential Information.**

        a.      The attorneys of record are responsible for employing reasonable measures, consistent with this Order, to control access to, and distribution of information designated as CONFIDENTIAL pursuant to this Order.

        b.      Access to information designated as CONFIDENTIAL pursuant to this Order shall be limited to:

        i.      The Court or any other court exercising jurisdiction with respect to this Litigation, Court personnel, jurors, alternate jurors, and qualified persons (including necessary clerical personnel) who are engaged in recording, taking or transcribing testimony or argument at any deposition, hearing, trial or appeal in this Litigation;

        ii.      Mediators or other individuals engaged or consulted in settlement of all or part of this Litigation;

        iii.      Outside counsel for the parties in this Litigation (including members or associates of the counsel's firm) or members of the in-house legal department for the parties, as well as their paralegals, investigative, technical, secretarial, and clerical personnel who are engaged in assisting them in this Litigation;

        iv.      Outside photocopying, document storage, data processing, document review, graphic production, jury research or trial preparation services employed by the parties or their counsel to assist in this Litigation, including contract attorneys and paralegals retained to assist in this Litigation;

        v.      Any individual expert, consultant, or expert consulting firm retained by counsel of record in connection with this Litigation to the extent necessary for the individual expert, consultant, or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Litigation, provided, however that (a) the disclosure shall be made only to an individual expert, or to members, partners, employees or agents of an expert consulting firm as the expert consulting firm shall designate as the persons who will undertake the engagement on behalf of the expert consulting

firm (the "Designated Expert Personnel"); (b) the individual expert or Designated Expert Personnel use the information solely in connection with this Litigation; (c) the individual and/or a representative of each expert consulting firm sign the written assurance attached on Exhibit A on behalf of any Designated Expert Personnel associated with that firm; and (d) excluding any retention for this Litigation, the individual expert and each of the Designated Expert Personnel is neither a current nor former (within the past year from the date of this Order) employee of any party or any entity which directly competes with, or is a customer of or direct seller to, any of the Defendants;

    vi. In addition to members of a party's in-house legal department, no more than three directors, officers or employees of a party charged with the responsibility for making decisions dealing directly with the resolution of this Litigation with respect to that party, provided that the requirements of Paragraph 11 of this Order are met;

    vii. In the case of a party who is a natural person, that natural person, provided that the requirements of Paragraph 11 of this Order are met;

    viii. Any person who (a) authored or is listed as a recipient of the particular material sought to be disclosed to that person); (b) was a custodian of the document; or (c) is a witness (1) to whom disclosure is reasonably necessary for this litigation and (2) who counsel in good faith believes has knowledge or awareness of the specific matters set forth in the confidential information or materials, but only as to the specific matter in which such person is referenced, discussed, mentioned, or reasonably thought to have specific knowledge; and

    ix. Any other person to whom (a) the Producing Party agrees in writing or on the record in advance of the disclosure or (b) the Court directs should have access.

  10. **Disclosure of Highly Confidential Information**.

    a. The attorneys of record are responsible for employing reasonable measures, consistent with this Order, to control access to, and distribution of, information designated as HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY pursuant to this Order.

    b. Access to information designated as HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY pursuant to this Order shall be limited to:

    i. The persons identified in Paragraphs 9(b)(i)-(v), excluding members of the in-house legal department for the parties, as well as their paralegals, investigative, technical, secretarial, and clerical personnel.

    ii. Any person who authored, received, or is reasonably believed in good faith to be referenced in or aware of or participated in the events referenced in the Highly Confidential Material;

    iii. Any witness during the course of his or her testimony at a

deposition under the provisions of Fed. R. Civ. Proc. 26(b) in the above-captioned proceeding provided that the witness falls within 10(b)(i) or 10(b)(ii) or is an employee of the Producing Party or was an employee of the Producing Party at the time that the Highly Confidential Material was created, or the document is

being used to refresh the witness' recollection, or to impeach the witness, and subject further to deposing counsel's provision of the Highly Confidential Material to counsel attending the deposition before tendering it to a witness who is not an employee of the Producing Party or an employee of the Producing Party at the time the Highly Confidential Material was created, or an author or recipient of the document so that counsel for the party whose purportedly Highly Confidential Material is proposed to be shown to the above-referenced category of witness has sufficient time to object or take such other actions permitted by this Protective Order or law; and

        iv.    Any other person to whom (a) the Producing Party agrees in writing or on the record in advance of the disclosure or (b) the Court directs should have access.

11.    **Notification of Protective Order**.

        a.    Counsel for the respective parties shall be responsible for obtaining, prior to disclosure and as a condition thereof, the written agreement of any person to whom any Protected Information is disclosed (other than Court personnel, outside counsel for a party and their respective direct staff) to be bound by the terms of this Order. Such written agreement shall be in the form annexed hereto as Exhibit A. The originals of the Agreement shall be maintained by counsel for the party who obtained them until the final resolution of this Litigation. Upon a showing of good cause to the Court, copies of all executed Agreements shall be provided to the counsel for the party seeking disclosure of the Agreements within thirty (30) days of a court order requiring their production.

        b.    In the event information designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY is to be shown to a witness, at deposition, hearing, trial or otherwise, the witness shall be provided with a copy of this Order at the start of the examination, and shall be advised on the record that he or she will be subject to sanction, including contempt, for violating the terms of this Order. If the witness has refused to execute Exhibit A as required by this Order, the admonition in the immediately preceding sentence made on the record shall serve as a substitute for the execution of Exhibit A and shall permit examination of the witness on documents or other materials containing CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY information.

        c.    The prohibitions in this paragraph do not limit a Producing Party's ability to disclose its own Confidential or Highly Confidential Information.

12.    A party shall not be obligated to challenge the propriety of a Confidential Information or Highly Confidential Information designation at the time material so designated is produced, and a failure to do so shall not preclude a subsequent challenge thereto, provided, however, that any challenges must be made no later than the close of fact discovery. In the event a party objects to the designation of any material under this Order, the objecting party shall state

its objections in a letter to counsel for the designating party in this Litigation, identifying the challenged material by Bates number, on a document-by-document basis; provided, however, if the challenging party is challenging mass designations or designations of substantially identical types of documents, the challenging party need only provide an example of such designation and the basis for challenge, as well as an adequate description of the types of documents challenged, including the impacted ranges of Bates numbers. The notice by the party challenging the designation must also provide the specific bases for its challenge of the confidentiality designations. The interested parties thereafter shall meet and confer in good faith in an attempt to resolve any objection. If the objection is not resolved within fourteen (14) days of transmission of the initiating letter, the party objecting to the confidentiality designation may file with the Court, under the "Notice-Other" designation in ECF, a "Notice of Objection to Designation of Documents," which identifies the disputed documents by Bates number, challenged designation and proposed designation (if any).. Following the objecting party's filing of this Notice of Objection, the designating party shall have twelve (12) days to file its brief in support of its designation(s); the objecting party shall have seven (7) days thereafter to file its response and the designating party shall have seven (7) days thereafter to file its reply, if any. If a Notice of Objection is filed, the designating party has the burden of establishing that the designation is proper. If no brief is filed by the designating party supporting its designation, the material will be redesignated in the manner suggested by the objecting party in its Notice of Objection. If the designating party agrees to change the designation, the designating party shall send a written notice of the change in designation to all other parties. Any documents or other materials that have been designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL— OUTSIDE ATTORNEYS ONLY shall be treated in the manner designated until the Court rules that they should not be treated as Confidential Information or Highly Confidential Information, or the designating party agrees to change the designation.

13.     Nothing contained in this Order shall affect the right, if any, of any party or witness to make any other available objection or other response to discovery requests, including, without limitation, interrogatories, requests for admissions, requests for production of documents, or questions at a deposition. Nor shall this Order be construed as a waiver by any party of any right to withhold any Confidential Information or Highly Confidential Information as attorney work product or based on a legally cognizable privilege, or of any right that any party may have to assert any privilege at any stage of this Litigation.

14.     Within sixty (60) days after the final disposition of this Litigation, including all of the Direct Purchaser Actions, the Automobile Dealer Actions, and the End-Payor Actions, and including all appeals, a Receiving Party shall return all Confidential Information and Highly Confidential Information, including all copies of said materials, to counsel for the Producing Party or, in lieu thereof, the Receiving Party shall certify in writing that it has made reasonable efforts to destroy such materials. Counsel shall be entitled to retain pleadings and the exhibits thereto, affidavits, motions, briefs, or other papers filed with the Court, as well as any memoranda, notes, or other work product, even if they contain Confidential Information or Highly Confidential Information, so long as counsel protects that information consistent with the terms of this Order. A "final disposition" shall not include an order from the MDL Court directing that each individual case be returned to the district where it originated for trial.

15.    **Correction of Designation and Clawback.**

  a. A Producing Party that fails to designate Discovery Material as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY at the time of production shall be entitled to make a correction to its designation. Any correction and notice of the correction shall be made in writing, accompanied by substitute copies of each item of Discovery Material, appropriately designated. A Receiving Party has ten (10) days to object to the fact of a late designation. If no objection is interposed, then within ten (10) days of receipt of the substitute copies of the Discovery Material, the Receiving Party shall destroy or return to counsel for the Producing Party all copies of such mis-designated documents. If any objection is interposed, the parties shall meet and confer and, in the absence of an agreement, the Producing Party may file a motion for relief from the Court. Until the Court rules on such a motion, the disputed Discovery Material shall be treated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY in accordance with the designation made pursuant to paragraph 6 and this paragraph. The obligation to treat such material pursuant to a corrected designation shall run prospectively from the date of corrected designation. Individuals who reviewed the mis-designated Discovery Material prior to notice of the mis-designation by the Producing Party shall abide by the provisions of this Order with respect to all future use and disclosure of the mis-designated materials and any information contained in them.

  b. If a Producing Party inadvertently produces any document, material, or other information in this Litigation that the Producing Party has a good faith basis to believe is privileged under the attorney-client or other privilege, or protected from discovery as work product (the "Privileged Material"), regardless of whether the information was designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS ONLY or neither of these at the time of disclosure:

  i. The parties acknowledge and stipulate that the disclosure does not waive, in whole or part, the party's claim of privilege either as to the specific documents or information disclosed therein or as to any other documents or information relating thereto or on the same or related subject matter, in this or any other federal or state proceeding.

  ii. The Producing Party may, upon discovery of the inadvertent production, request the return of the Privileged Material that was inadvertently disclosed. Upon receipt of such a request, the Receiving Party (a) shall promptly return or destroy the original and all copies of the Privileged Material, (b) destroy all summaries, notes, memoranda or other documents (or portions thereof) referring to or reflecting the contents of such Privileged Material, and (c) not use such documents containing Privileged Material for any purpose absent further order of the Court. In the event the Receiving Party objects to the return of the Privileged Material, the Receiving Party may move the Court, within ten (10) days of receiving the notice from the Producing Party, for an order compelling production of the Privileged Material. All materials related to the inadvertently produced Privileged Material and any related motion to compel, shall be treated as Highly Confidential Information pursuant to this Order, unless otherwise ordered by the Court. Whether or not the Receiving Party disputes the Privileged Material's protected status, if the Receiving Party disclosed the Privileged Material prior to a demand for its return, it shall promptly notify any persons with whom the Privileged Material

was shared and use reasonable efforts to collect and return all copies to the Producing Party and/or destroy all such copies, and certify in writing that it has exhausted its reasonable efforts to collect and return all copies.

        c.     In the event that a party discovers that Protected Information it has received has been disclosed to someone not authorized under the terms of this Protective Order to receive such information, counsel of record for the party responsible for the unauthorized disclosure shall immediately give notice to counsel of record for the party who designated the information as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY. If a party fails to treat documents designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY in the manner provided herein, that party will immediately take such steps as are necessary to have such items placed under seal and/or restored to their confidential status. Depending upon the circumstances, nothing contained herein shall limit the right of the Producing Party or designating party to seek relief against the party responsible for such disclosure.

        16.     This Order shall not apply to documents, materials, or information that are publicly available without a breach of the terms of this Order or that are obtained independently by the Receiving Party from a person lawfully in possession of those documents, materials, or information.

        17.     A party's compliance with the terms of this Order shall not operate as an admission that any particular document is or is not (a) confidential, (b) privileged, or (c) admissible in evidence at trial.

        18.     If any Receiving Party receives a subpoena from a person not a party to this Litigation for documents obtained from a Producing Party subject to this Order, the person subpoenaed must inform the subpoena's issuer of this Order, provide the subpoena's issuer with the copy of the Order, and give the Producing Party and, if different, the designating party, notice of the subpoena within the earlier of three (3) business days after its receipt of the subpoena or before it produces any documents in response to the subpoena, so that the Producing Party and, if different, the designating party, have an opportunity to object and/or file a motion to quash the subpoena or other similar filing prior to the production of any responsive material. In the absence of an objection or motion to quash the subpoena, or other similar filing, by the Producing Party or, if different, the designating party, or further court order, the party receiving the subpoena may produce documents, materials, or other information responsive to the subpoena.

        19.     This Order shall apply to non-parties who provide discovery, by deposition, production of documents, or otherwise, in this Litigation, if that non-party requests the protection of this Order as to its Confidential Information or Highly Confidential Information and complies with the provisions of this Order. A non-party who provides discovery in this Litigation, requests the protection of this Order, and complies with its terms will be deemed a Producing Party. A party taking discovery from a non-party must provide the non-party with a copy of this Protective Order when it first serves the non-party with a subpoena or other discovery request.

20.     Upon final disposition of this Litigation, the provisions of this Order shall continue to be binding. This Court expressly retains jurisdiction over this Litigation for enforcement of the provisions of this Order following the final disposition of this Litigation.

21.     Until this Order is entered by the Court, any Discovery Material designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS ONLY that is produced in this Litigation shall be protected from disclosure pursuant to the terms of this Order as if entered by the Court. If any actions subject to this Order are transferred to another Court, the terms of this Order shall remain in full force and effect unless modified by written agreement of all parties or order of the Court.

22.     This Order is binding on all parties to this Litigation and on all non-parties who have been served with a copy of this Order, and shall remain in force and effect until modified, superseded, or terminated by consent of the parties or by order of the Court. This Order shall not prevent a party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders, or from agreeing to modifications of this Order, subject to approval of the Court.

23.     Nothing in this Order shall prevent a Producing Party or, if different, designating party from seeking further, greater, or lesser protection with respect to the use of any Confidential Information or Highly Confidential Information, or seeking to prevent Confidential Information or Highly Confidential Information from being provided to the persons described in Paragraphs 9 and 10 of this Order.

24.     The terms of this Order shall be binding upon all current and future parties to this Litigation and their counsel; any party appearing in the case following entry of this Order shall be deemed to have joined the case subject to its provisions. Within ten (10) days of (i) entry of an appearance by a new party to this Litigation, or (ii) notification of the filing in this District of a complaint that arises out of the same facts alleged in the Plaintiffs' Complaints, counsel for the Plaintiffs (in the case of a new party plaintiff) or counsel for the Defendants (in the case of a new party defendant) shall serve a copy of this Order on the new party's counsel who have filed an appearance.

25.     Nothing herein shall be construed as a determination by the Court, or as a consent or waiver by any foreign parent or affiliate of any party, that such a foreign parent or affiliate of any party is subject to personal jurisdiction in this Court or that discovery as to such foreign parent or affiliate of any party shall proceed pursuant to the Federal Rules of Civil Procedure.

26.     All time periods set forth in this Order shall be calculated according to Rule 6 of the Federal Rules of Civil Procedure, as then in effect.

Dated: <u>July 10, 2012</u>

IT IS SO ORDERED:

<u>s/Marianne O. Battani</u>
Hon. Marianne O. Battani
United States District Judge

## EXHIBIT A

      On behalf of _____ [NAME OF ORGANIZATION] I, _____ [NAME OF INDIVIDUAL] hereby certify (i) my understanding that Discovery Material containing Confidential Information or Highly Confidential Information is being provided or otherwise disclosed to me pursuant to the terms and restrictions of the Stipulation and Protective Order Governing the Production and Exchange of Confidential Information ("Order") entered in *In re Automotive Parts Antitrust Litigation*, Master File No. 12-MD-2311, United States District Court, Eastern District of Michigan and (ii) that I have received and read the Order; and (iii) that I will provide a copy of and explain the terms of this Order to any personnel at _____ [NAME OF ORGANIZATION] who receive Discovery Material containing Confidential Information or Highly Confidential Information or who otherwise receive Confidential Information or Highly Confidential Information. I understand the terms of the Order, I agree to be fully bound by the Order, and I hereby submit to the jurisdiction of the Court for purposes of enforcement of the Order. I understand that violation of the Order may be punishable by contempt of Court.

Dated: _____          Signature: _____

                                                 Name: _____

                                                 Address: _____