```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                            —   —   —

 4     IN RE:  AUTOMOTIVE WIRE HARNESS
       SYSTEMS ANTITRUST
 5
                      MDL NO. 2311
 6     _____/

 7
                  STATUS CONFERENCE / MOTION HEARINGS
 8
                BEFORE THE HONORABLE MARIANNE O. BATTANI
 9                  United States District Judge
                Theodore Levin United States Courthouse
10                  231 West Lafayette Boulevard
                         Detroit, Michigan
11

12     APPEARANCES:

13
       Direct Purchaser Plaintiffs:
14
       DOUGLAS ABRAHAMS
15     KOHN, SWIFT & GRAF, P.C.
       One South Broad Street, Suite 2100
16     Philadelphia, PA  19107
       (215) 238-1700
17

18     WILLIAM G. CALDES
       SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
19     1818 Market Street, Suite 2500
       Philadelphia, PA  19103
20     (215) 496-0300

21
       DAVID H. FINK
22     FINK & ASSOCIATES LAW
       100 West Long Lake Road, Suite 111
23     Bloomfield Hills, MI  48304
       (248) 971-2500
24

25
```

```
 1    APPEARANCES:  (Continued)

 2    Direct Purchaser Plaintiffs:

 3    NATHAN FINK
      FINK & ASSOCIATES LAW
 4    100 West Long Lake Road, Suite 111
      Bloomfield Hills, MI  48304
 5    (248) 971-2500

 6
      GREGORY P. HANSEL
 7    PRETI, FLAHERTY, BELIVEAU &
      PACHIOS, L.L.P.
 8    One City Center
      Portland, ME  04112
 9    (207) 791-3000

10
      WILLIAM E. HOESE
11    KOHN, SWIFT & GRAF, P.C.
      One South Broad Street, Suite 2100
12    Philadelphia, PA  19107
      (215) 238-1700
13

14    ROD M. JOHNSTON
      SOMMERS SCHWARTZ
15    1 Towne Square, Suite 1700
      Southfield, MI 48076
16    (248) 236-5752

17
      STEVEN A. KANNER
18    FREED, KANNER, LONDON & MILLEN, L.L.C.
      2201 Waukegan Road, Suite 130
19    Bannockburn, IL  60015
      (224) 632-4502
20

21    RANDALL B. WEILL
      PRETI, FLAHERTY, BELIVEAU &
22    PACHIOS, L.L.P.
      One City Center
23    Portland, ME  04112
      (207) 791-3000
24

25
```

```
 1    APPEARANCES:  (Continued)

 2    End-Payor Plaintiffs:

 3    MAHDE ABDALLAH
      THE MILLER LAW FIRM, P.C.
 4    950 West University Drive, Suite 300
      Rochester, MI  48307
 5    (248) 841-2200

 6
      JILL S. CASSELMAN
 7    ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
      601 Lexington Avenue, Suite 3400
 8    New York, NY  10022
      (212) 980-7400
 9
10    JOYCE CHANG
      COTCHETT, PITRE & McCARTHY, L.L.P.
11    840 Malcolm Road
      Burlingame, CA  94010
12    (650) 697-6000

13
      BRIAN ETZEL
14    THE MILLER LAW FIRM, P.C.
      950 West University Drive, Suite 300
15    Rochester, MI  48307
      (248) 841-2200
16
17    OMAR OCHOA
      SUSMAN GODFREY, L.L.P.
18    901 Main Street, Suite 5100
      Dallas, TX  75202
19    (214) 754-1913

20
      WILLIAM V. REISS
21    ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
      601 Lexington Avenue, Suite 3400
22    New York, NY  10022
      (212) 980-7405
23

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   End-Payor Plaintiffs:

 3   HOLLIS L. SALZMAN
     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 4   601 Lexington Avenue, Suite 3400
     New York, NY  10022
 5   (212) 980-7405

 6
     MARC M. SELTZER
 7   SUSMAN GODFREY, L.L.P
     190 Avenue of the Stars, Suite 950
 8   Los Angeles, CA  90067
     (310) 789-3102
 9

10   ELIZABETH T. TRAN
     COTCHETT, PITRE & McCARTHY, L.L.P.
11   840 Malcolm Road
     Burlingame, CA  94010
12   (650) 697-6000

13
     STEVEN N. WILLIAMS
14   COTCHETT, PITRE & McCARTHY, L.L.P.
     840 Malcolm Road
15   Burlingame, CA  94010
     (650) 697-6000
16
     Dealership Plaintiffs:
17
     DON BARRETT
18   BARRETT LAW OFFICES
     P.O. Drawer 927
19   Lexington, MS  39095
     (601) 834-2376
20

21   ALEXANDER E. BLUM
     MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
22   1361 East Big Beaver Road
     Troy, MI  48083
23   (248) 457-9200

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   Dealership Plaintiffs:

 3
     JONATHAN W. CUNEO
 4   CUNEO, GILBERT & LaDUCA, L.L.P.
     507 C Street NE
 5   Washington, D.C.  20002
     (202) 789-3960
 6

 7   JOHN KAKINUKI
     KAKINUKI LAW OFFICE, P.C.
 8   2 Civic Center Drive, #4222
     San Rafael, CA  94913
 9   (415) 492-2011

10
     EVELYN LI
11   CUNEO, GILBERT & LaDUCA, L.L.P.
     507 C Street NE
12   Washington, D.C.  20002
     (202) 789-3960
13

14   GERARD V. MANTESE
     MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
15   1361 East Big Beaver Road
     Troy, MI  48083
16   (248) 457-9200

17
     VICTORIA ROMANENKO
18   CUNEO, GILBERT & LaDUCA, L.L.P.
     507 C Street NE
19   Washington, D.C.  20002
     (202) 789-3960
20

21   WILLIAM SHOTZBARGER
     DUANE MORRIS, L.L.P.
22   30 South 17th Street
     Philadelphia, PA  19103
23   (215) 979-7385

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3    JEFFREY J. AMATO
      WINSTON & STRAWN, L.L.P.
 4    200 Park Avenue
      New York, NY  10166
 5    (212) 294-4685

 6
      KRISTA ANDERSON
 7    WILLIAMS & CONNOLLY, L.L.P.
      725 Twelfth Street NW
 8    Washington, D.C.  2005
      (202) 434-5648
 9
10    ALDEN L. ATKINS
      VINSON & ELKINS, L.L.P.
11    2200 Pennsylvania Avenue NW, Suite 500 West
      Washington, D.C.  20037
12    (202) 639-6613

13
      EMILY BLACKBURN
14    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
15    Washington, D.C.  20004
      (202) 942-5000
16
17    MATT BOUCHER
      ALLEN & OVERY, L.L.P.
18    1221 Avenue of the Americas
      New York, NY  10020
19    (212) 610-6360

20
      MICHAEL G. BRADY
21    WARNER, NORCROSS & JUDD, L.L.P.
      2000 Town Center, Suite 2700
22    Southfield, MI  48075
      (248) 784-5032
23

24

25
```

```
1  ║  APPEARANCES:  (Continued)

2  ║  For the Defendants:

3  ║  DAVID BROWNSTEIN
      FARMER, BROWNSTEIN & JAEGER, L.L.P.
4  ║  235 Montgomery Street, Suite 835
      San Francisco, CA  94104
5  ║  (415) 962-2873

6  ║

7  ║  JEREMY CALSYN
      CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
8  ║  2000 Pennsylvania Avenue NW
      Washington, D.C.  20006
9  ║  (202) 974-1500

10 ║  STEVEN F. CHERRY
      WILMER HALE
11 ║  1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
12 ║  (202) 663-6321

13 ║

14 ║  MOLLY CRABTREE
      PORTER, WRIGHT, MORRIS & ARTHUR
15 ║  41 South High Street, Suite 2900
      Columbus, OH  43215
16 ║  (614) 227-2015

17 ║  DANIEL CRAIG
      SIDLEY AUSTIN, L.L.P.
18 ║  One South Dearborn Street
      Chicago, IL  60603
19 ║  (312) 853-4155

20 ║  KENNETH R. DAVIS, II
21 ║  LANE POWELL, P.C.
      601 SW Second Avenue, Suite 2100
22 ║  Portland, OR  97204
      (503) 778-2100
23 ║

24 ║

25 ║
```

```
 1    APPEARANCES:   (Continued)

 2    For the Defendants:

 3    MICHAEL R. DEZSI
      DETTMER & DEZSI, P.L.L.C.
 4    615 Griswold Street, Suite 1600
      Detroit, Michigan 48226
 5    (313) 879-1206

 6

 7    DAVID P. DONOVAN
      WILMER HALE
 8    1875 Pennsylvania Avenue, NW
      Washington, D.C.  20006
 9    (202) 663-6868

10    JEETANDER T. DULANI
      PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.
11    1200 Seventeenth Street, NW
      Washington, D.C. 20036-3006
12    (202) 663-9202

13

14    ABRAM ELLIS
      SIMPSON, THACHER & BARTLETT, L.L.P.
15    1155 F Street, N.W.
      Washington, D.C. 20004
16    (202) 636-5579

17    J. CLAYTON EVERETT, JR.
      MORGAN, LEWIS & BOCKIUS, L.L.P.
18    1111 Pennsylvania Avenue NW
      Washington, D.C.  20004
19    (202) 739-5860

20

21    PETER M. FALKENSTEIN
      JAFFE, RAITT, HEUER & WEISS, P.C.
22    535 W. William, Suite 4005
      Ann arbor, MI  48103
23    (734) 222-4776

24

25
```

Case 2:12-md-02311-SFC-RSW   ECF No. 1674, PageID.31149   Filed 02/16/17   Page 9 of 201
Status Conference / Motion Hearings - January 25, 2017

9

```
 1    APPEARANCES:   (Continued)

 2    For the Defendants:

 3    MICHAEL FELDBERG
      ALLEN & OVERY, L.L.P.
 4    1221 Avenue of the Americas
      New York, NY  10020
 5    (212) 610-6360

 6

      DANIEL T. FENSKE
 7    JENNER & BLOCK
      353 N. Clark Street
 8    Chicago, IL 60654-3456
      (312) 222-9350

 9

10    DAVID FITZMAURICE
      WEIL, GOTSHAL & MANGES L.L.P.
11    767 Fifth Ave,  STE. 3360
      New York, NY 10153
12    (212) 310-8233

13

      LARRY S. GANGNES
14    LANE POWELL, P.C.
      1420 Fifth Avenue, Suite 4100
15    Seattle, Washington  98101
      (206) 223-7000

16

17    JASON R. GOURLEY
      BODMAN P.L.C.
18    1901 Street Antoine Street, 6th Floor
      Detroit, MI  48226
19    (313) 259-7777

20

      ADAM C. HEMLOCK
21    WEIL, GOTSHAL & MANGES, L.L.P.
      767 Fifth Avenue
22    New York, NY  10153
      (212) 310-8281

23

24

25
```

```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:

 3   ELLEN MAXWELL-HOFFMAN
     BOWLES RICE
 4   600 Quarrier Street
     Charleston, WV 25325
 5   (304) 343-2867

 6

 7   HOWARD B. IWREY
     DYKEMA GOSSETT, P.L.L.C.
     39577 Woodward Avenue, Suite 300
 8   Bloomfield Hills, MI  48304
     (248) 203-0526
 9

10   HEATHER LAMBERG KAFELE
     SHEARMAN & STERLING, L.L.P.
11   801 Pennsylvania Avenue, NW
     Washington, D.C.  20004
12   (202) 508-8097

13

14   FRANK LISS
     ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
15   Washington, D.C. 20004
     (202) 942-5969
16

17   BRADLEY R. LOVE
     BARNES & THORNBURG, L.L.P.
18   11 South Meridian Street
     Indianapolis, IN 46204
19   (317) 261-7896

20

21   TIMOTHY J. LOWE
     McDONALD HOPKINS, P.L.C.
     39533 Woodward Avenue, Suite 318
22   Bloomfield Hills, MI  48304
     (248) 220-1359
23

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3    SHELDON H. KLEIN
      BUTZEL LONG, P.C.
 4    41000 Woodward Avenue
      Bloomfield Hills, MI  48304
 5    (248) 258-1414

 6
      FRANKLIN LISS
 7    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
 8    Washington, D.C.  20004
      (202) 942-5000
 9
10    MICHELLE A. MANTINE
      REED SMITH, L.L.P.
11    225 Fifth Avenue, Suite 1200
      Pittsburgh, PA  15222
12    (412) 288-4268

13
      RONALD M. McMILLAN
14    CALFEE, HALTER & GRISWOLD, L.L.P.
      1405 East Sixth Street
15    Cleveland, OH  44114
      (216) 622-8621
16
17    STEFAN M. MEISNER
      MCDERMOTT WILL & EMERY
18    500 North Capitol Street, NW
      Washington, D.C. 20001
19    (202) 756-8000

20
      BRIAN M. MOORE
21    DYKEMA GOSSETT, P.L.L.C.
      39577 Woodward Avenue, Suite 300
22    Bloomfield Hills, MI  48304
      (248) 203-0772
23

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3   GEORGE A. NICOUD, III
     GIBSON, DUNN & CRUTCHER, L.L.P.
 4   555 Mission Street
     San Francisco, CA  94105
 5   (415) 393-8200

 6

 7   RONALD NIXON
     KEMP KLEIN LAW FIRM
     201 West Big Beaver Road, Suite 600
 8   Troy, MI  48084
     (248) 528-1111
 9

10   MATTHEW L. POWELL
     KERR, RUSSELL & WEBER, P.L.C.
11   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
12   (313) 961-0200

13

14   STEVEN REISS
     WEIL, GOTSHAL & MANGAS L.L.P.
     767 Fifth Avenue
15   New York, NY 10153
     (212) 310-8174
16

17   J. DAVID ROWE
     DUBOIS, BRYANT & CAMPBELL
18   303 Colorado, Suite 2300
     Austin, TX 78701
19   (512) 457-8000

20

21   MICHAEL RUBIN
     ARNOLD & PORTER, L.L.P.
     601 Massachussetts Ave., NW
22   Washington, D.C.  20001
     (202) 942-5000
23

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3   LARRY J. SAYLOR
     MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
 4   150 West Jefferson Avenue, Suite 2500
     Detroit, MI  48226
 5   (313) 496-7986

 6
     SCOTT T. SEABOLT
 7   SEABOLT LAW FIRM
     17199 N. Laurel Park Drive, Suite 215
 8   Livonia, MI  48152
     (248) 717-1302
 9
10   CRAIG SEEBALD
     VINSON & ELKINS, L.L.P.
11   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, D.C.  20037
12   (202) 639-6585

13
     CHARLES SKLARSKY
14   JENNER & BLOCK
     353 N. Clark Street
15   Chicago, IL 60654-3456
     (312) 923-2904
16
17   STEPHEN J. SQUERI
     JONES DAY
18   901 Lakeside Avenue
     Cleveland, OH  44114
19   (216) 586-3939

20
     ANITA STORK
21   COVINGTON & BURLING, L.L.P.
     One Front Street
22   San Francisco, CA  94111
     (415) 591-7050
23

24

25
```

1     APPEARANCES:   (Continued)

2     **For the Defendants:**

3
      MARGUERITE M. SULLIVAN
4     **LATHAM & WATKINS, L.L.P.**
      555 Eleventh Street NW, Suite 1000
5     Washington, D.C.  20004
      (202) 637-2200
6

7     JOANNE GEHA SWANSON
      **KERR, RUSSELL & WEBER, P.L.C.**
8     500 Woodward Avenue, Suite 2500
      Detroit, MI  48226
9     (313) 961-0200

10

11    JOHN TANSKI
      **AXINN, VELTROP & HARKRIDER**
      950 F Street, NW
12    Washington, D.C. 20004
      (202) 912-4700
13

14    LARA TRAGER
      **WEIL, GOTSHAL & MANGES, L.L.P.**
15    767 Fifth Avenue
      New York, NY  10153
16    (212) 310-8281

17

18    MICHAEL F. TUBACH
      **O'MELVENY & MYERS, L.L.P.**
      Two Embarcadero Center, 28th Floor
19    San Francisco, CA  94111
      (415) 984-8700
20

21    LINDSEY ROBINSON VAALA
      **VINSON & ELKINS, L.L.P.**
22    2200 Pennsylvania Avenue NW, Suite 500 West
      Washington, D.C.  20037
23    (202) 639-6585

24

25

```
 1    APPEARANCES:  (Continued)

 2    OTHER APPEARANCES:

 3    TIMOTHY FRASER
      OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
 4    The Capital, PL-01
      Tallahassee, FL  32399
 5    (850) 414-3733

 6
      NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS:
 7

 8    ELLIOT H. SCHERKER
      GREENBERG TRAURIG, L.L.P
 9    3333 Piedmont Road NE, 25th Floor
      Atlanta, GA  30305
10    (678) 553-2100

11
      DOMINIC SURPRENANT
12    QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.
      865 South Figueroa Street, 10th Floor
13    Los Angeles, CA  90017
      (213) 443-3000
14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

Page

STAY OF DISCOVERY.................................. 37

MOTIONS TO DISMISS
RE: GREEN TOKAI................................... 88
RE: NISHIKAWA.....................................102
RE: MERITOR.......................................123

MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT
RE: GS ELECTECK AND Tokai RIKA....................147

MOTIONS TO DISMISS
RE: FAURECIA EMISSIONS............................157
RE: FAURECIA SA...................................175
RE: BOSAL INDUSTRIES..............................181

MOTION TO AMEND...................................198

```
 1   Detroit, Michigan
 2   Wednesday, January 25, 2017
 3   at about 10:00 a.m.
 4                        —   —   —
 5           (Court and Counsel present.)
 6           THE CASE MANAGER:  Please rise.
 7           The United States District Court for the Eastern
 8   District of Michigan is now in session, the Honorable
 9   Marianne O. Battani presiding.
10           You may be seated.
11           The Court calls Case No. 12-md-02311,
12   In Re: Antitrust Litigation.
13           THE COURT:  Good morning, everyone.
14           THE ATTORNEYS:  (Collectively)  Good morning.
15           THE COURT:  Looks like we have a full house here
16   today.  Okay.
17           Let's start.  Mr. Esshaki, I think you are first on
18   the agenda.
19           MASTER ESSHAKI:  Yes.  Thank you very much, Your
20   Honor.
21           I just wanted to comment that we, with respect to
22   the motions to compel production of documents from the
23   original equipment manufacturers, went to extraordinary
24   lengths to craft the orders that ultimately were entered.
25           And I wanted to let everyone know, I have never
```

 1    seen a process like that before where a plaintiff assigned a

 2    plaintiff's counsel and the defense assigned a counsel, they

 3    became a team to negotiate with a designated OEM.  They

 4    negotiated and negotiated in good faith and then came back to

 5    me with matters that they could not resolve, and then through

 6    I think three days, long days of mediation, we were able to

 7    get that resolved.  I -- I was absolutely astonished at the

 8    cooperation that existed not just between the opposing

 9    counsels but also counsel for the OEMs.  And it was a lot of

10    hard work, there was a lot of professionalism that was

11    exhibited by everyone, and I was absolutely amazed at what we

12    were able to accomplish.

13           Now, I am also convinced that everybody will be

14    appealing, but that's okay.

15           Secondly, I mentioned this in an e-mail, the next

16    status -- my next motion hearing date is March the 21st.

17    I -- I am required to participate in a mandatory continuing

18    education program in order to maintain my certification with

19    our Supreme Court as a mediator, so I would like to move the

20    motion date from March 21st to March 23rd, the day after the

21    status conference.  So please make a note of that and

22    we'll -- I will have my assistant send out a notice well in

23    advance.

24           But we're -- we are moving along on our motions,

25    Your Honor.  We had two of them yesterday that we have

1  resolved, orders will be entered today, and I think I've got

2  a handful of motions on the -- in the jury room right now

3  that will be coming up again.  So everyone's working

4  cooperatively and I think they are getting some results.

5  Thank you.

6          THE COURT:  Very good.  Thank you.

7          Okay.  So everybody knows the motion hearing date

8  for the Master will be the day after instead of the day

9  before at the March -- March status conference.

10          All right.  The status report, the -- who did the

11  status report now?

12          MR. HANSEL:  I -- I did it with Randall Weill, my

13  partner.

14          THE COURT:  Thank you.  I -- Mr. Hansel.  I think

15  that this is -- it is wonderful, I appreciate it.  I like the

16  status of the settlements being added to it, it makes it very

17  helpful to the Court.

18          The only problem that I had on -- well, for

19  instance, on the status of service, just as a comment to your

20  clerk who actually does the typing, or unless you do it, I

21  don't know, but where you list the -- the bar for the part,

22  it is so dark you can't see the name of the part; in fact, I

23  didn't even realize it was in there.  So if you could change

24  the coloring on that.

25          MR. HANSEL:  We will fix that.

1        THE COURT:  Okay.

2        MR. WEILL:  Your Honor, and could I add that this

3   would never have been possible without the cooperation of all

4   counsel here.  It was a gentlemanly, cooperative event and

5   collaborative event, and we are the focus of the comments but

6   everyone else was very, very helpful in doing this.

7        THE COURT:  Okay.  Thank you.  Thank everybody

8   because it is certainly helpful to the Court to have that

9   summary and it's a good balance and check on our records.

10  Thank you.

11       Okay.  The settlements, the Court has reviewed what

12  was in the report.  Do you want to make some comments on it,

13  anybody?  Go ahead.

14       MR. BARRETT:  Good morning, Your Honor.  I'm

15  Don Barrett for auto dealer plaintiffs.

16       I would like to make just a short report.

17       THE COURT:  Okay.

18       MR. BARRETT:  In the 39 cases which are currently

19  pending before Your Honor, there are 67 defendant families,

20  defendant groups.  Of these 67 defendant families, the auto

21  dealers and the end payors working together have settled with

22  36 of them, and Ford just within the last few days.

23       Of the 31 defendant families remaining, we have

24  four mediations that are agreed to and scheduled, the first

25  one of those beginning next week.

1          And then of the remaining 27 defendant families, we

2     are in on-going settlement discussions with 17 of them, and

3     we are at least moderately optimistic that we can be

4     successful in at least most of those.

5          There are nine defendants who have blown us off,

6     refused to respond to us.

7          And finally, there is one and only one defendant

8     that we have not yet reached out to because we only started

9     learning about this company's involvement ten days ago or so.

10         So we are making progress.  However --

11         THE COURT:  Mr. Barrett, can I ask you before you

12    go on --

13         MR. BARRETT:  Yes, ma'am.

14         THE COURT:  -- of the 39 parts that you are talking

15    about --

16         MR. BARRETT:  Yes, ma'am.

17         THE COURT:  -- I noted, of course, that some of

18    them just came in last year.  How far, how far down that

19    list?

20         MR. BARRETT:  I have that right here.  The wire

21    harness -- the wire harness defendants, was a bunch of them,

22    that -- that -- wire harness is completely settled.  Fuel

23    senders are completely settled.  Bearings as of very, very

24    recently is completely settled, and we are happy to announce

25    that to the Court.

1        THE COURT:  That must be relatively brand new,

2    right?

3        MR. BARRETT:  Yes, ma'am.  And when I say settled,

4    some of them we are still working on the language of the

5    settlement agreements, but they haven't been presented for

6    preliminary approval but they will, surely they will be in --

7    in -- pretty quickly.

8        THE COURT:  Okay.

9        MR. BARRETT:  Motor generators is finished.

10   Steering angle sensors is finished.  Inverters is finished.

11   Airflow meters is finished.  Electronic throttle bodies is

12   finished.  Interior trim products is finished.  Alternators

13   is finished as well.  And several others, like IPCs, there is

14   only one defendant remaining.  Heater control panels there is

15   only one defendant remaining.  Ignition coils, one defendant.

16   HID ballast, one defendant.  So -- fan motors, one defendant.

17   So we have a lot of them that are on the cusp of being done,

18   and -- and we are in discussions with most of these single

19   remaining defendants.

20       THE COURT:  And you, I know, represent auto

21   dealers.  Are you -- are these also resolved with the

22   end payors?  I noticed most of them went together but --

23       MR. BARRETT:  I don't speak for the end payors, but

24   yes.

25       THE COURT:  I see we are going to get an update

1    right now.

2              MS. SALZMAN:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MS. SALZMAN:  Hollis Salzman.

5              Yes, this is the same -- virtually the same

6    statistics for the end payor class as well.

7              THE COURT:  Thank you.

8              MR. BARRETT:  Your Honor, we understand that --

9    that -- that you are considering -- considering naming a

10   mediator and --

11             THE COURT:  Well, wait a minute.  Now, that's -- we

12   are -- we can go right into that now because that's the next

13   issue, but let's finish up with the settlements.

14             MR. BARRETT:  Oh, okay.  All right.  Thank you.

15             THE COURT:  Okay.

16             MR. KANNER:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. KANNER:  Steve Kanner on behalf of direct

19   purchaser plaintiffs.

20             We do have a number of settlements which are

21   pending.  I believe Your Honor has the motion for preliminary

22   approval for Yazaki and Chiyoda, those are combined, and for

23   Sumitomo.  Sumitomo's contains wire harness and heater

24   control panels.  Yazaki includes wire harness, instrument

25   panel clusters and fuel senders.

```
 1            Addition -- in addition, I think you have already
 2   granted the preliminary approval motion for Furukawa, again
 3   on wire harness.
 4            And I will announce, but somewhat vaguely, and you
 5   will understand why, that we are close to an agreement in
 6   principle with yet another defendant both in wire harness and
 7   multiple cases, and by the time of the next status appearing,
 8   I expect the motion for preliminary approval will be on file.
 9            And that leaves us with just --
10            THE COURT:  That what?
11            MR. KANNER:  That leaves us with just -- will leave
12   us with just a couple two defendants in wire harness.  We are
13   talking with multiple defendants in the bearings cases.  We
14   haven't scheduled any mediation.  However, we will leave that
15   to the next point of discussion, Your Honor.
16            THE COURT:  Okay.
17            MR. KANNER:  Thank you very much.
18            THE COURT:  Thank you.
19            Yes, sir.
20            MR. SHOTZBARGER:  Good morning, Your Honor.
21   William Shotzbarger on behalf of the truck and equipment
22   dealer plaintiffs.
23            THE COURT:  Okay.
24            MR. SHOTZBARGER:  As far as the status of our
25   settlements, we are only in six cases.  Wire harnesses is
```

1    completely settled.

2         The next case is bearings.  We are happy to report

3    that we have reached a settlement with SKF USA.  That brings

4    us to four out of the six bearings defendant families that

5    are settled.

6         The next case, occupant safety systems, we have one

7    defendant family left.

8         And then we are also in the radiators, starters and

9    alternators cases.

10        But that is the extent of our involvement in these

11   cases, and we are happy to report that new settlement that

12   did not appear in the status report.

13        THE COURT:  Thank you.  Thank you.

14        Okay.  Let's -- let's talk now about court-ordered

15   facilitation, and I am not -- I'm not talking about the fact

16   that the Court is going to say who does the facilitation.  I

17   would like for you to do that if we get to that point, for

18   you to make suggestions.  But you are doing -- you are doing

19   well on a lot of these.  I think the indirects, of course,

20   are -- are moving along.

21        But I am very interested now -- and I -- I will

22   first listen to what you have, but I'm -- I'm telling you I'm

23   very interested in seeing what can happen now actually while

24   we are in this process of class cert and, most importantly,

25   the OEM discovery.  So let me hear what you have to say and

1   then we will talk about it.

2           All right.  Mr. Hansel, are you speaking or Mr.

3   Barrett, who's going -- I guess Mr. Barrett's got the mic

4   first, so go ahead.

5           MR. BARRETT:  Your Honor, very briefly, as the

6   Court knows, we first suggested -- the auto dealers first

7   suggested this back in September.  We continue to support

8   that idea.  One, the numbers.  We have worked hard and we do

9   work hard, and -- and it is all I do is this case, and I work

10  10 to 12 hours a day on it, and we have managed to settle 36

11  and -- but that's been what, five years?  What does that

12  mean?  Another -- for the remaining 30 or 40 percent, does

13  that mean another three years?  And all lawyers to some

14  degree are procrastinators.  Having judicial intervention in

15  the form of mediation ordered and overseen by Your Honor will

16  hold everybody's feet to the fire, the plaintiffs and

17  defendants alike.  And that's -- so we support it.

18          THE COURT:  Okay.  So you support this.  Okay.

19          MR. HANSEL:  Your Honor, Greg Hansel for the direct

20  purchasers.

21          After the Court placed this agenda item on the

22  agenda, the direct purchasers, the end payors, the auto

23  dealers and the truck and equipment dealers got together to

24  discuss whether we could make a common comment on this agenda

25  item for the Court, and I'm here to try to deliver that on --

1    on behalf of the four class plaintiff groups.

2             First, we want to thank the Court for helping this

3    process along.  The Court has -- has promoted settlement from

4    early on, and I think all the parties appreciate that.

5             We have a list of suggested court-appointed

6    facilitators that we would like to share with the Court since

7    that was an agenda item.  We came up with this list for the

8    Court's consideration.  I will list the four names on our

9    list.

10            THE COURT:  All right.

11            MR. HANSEL:  Chief Judge Gerald Rosen.

12            THE COURT:  Oh, he's done this month, isn't he?

13            MR. HANSEL:  I understand he's --

14            THE COURT:  He's done the end of January.

15            MR. HANSEL:  -- he's expected to retire.

16            THE COURT:  Okay.  He had his party so I know, yes,

17   this would be -- he's done.  Okay.

18            MR. HANSEL:  We have not discussed this list with

19   the defendants, just for the Court's information, yeah.

20            THE COURT:  Okay.

21            MR. HANSEL:  Ken Feinberg, who is a well-known

22   mediator and has been involved in this case for some parties

23   successfully.  Former Judge Daniel Weinstein has also been

24   involved.  And former U.S. Magistrate Judge Mort Denlow is

25   well known to many of the attorneys in the case; he's from

1    Chicago.

2           THE COURT:   Okay.   I'm not familiar with him.

3           MR. HANSEL:   In addition to the names, the class

4    plaintiffs had three other comments, really suggestions to

5    the Court, requests of how this might be structured to

6    promote settlement best.

7           First, as the Court is aware, there has been

8    significant success in bilateral negotiations without a

9    mediator.  So if negotiating parties agree to negotiate

10   directly without a mediator, we suggest they be permitted to

11   do so.  But if one of the parties to the negotiation

12   concludes that it is either not moving forward or the

13   negotiations are at an impasse, we would suggest that that

14   party be able to report that to the court-appointed mediator,

15   and then the mediator would -- would mediate from then on

16   that particular matter.  That's our first suggestion.

17          The second one is that if the parties have already

18   agreed on a mediator, that they be permitted to continue to

19   work with the agreed mediator.  As Mr. Barrett said a few

20   moments ago, there are several mediations scheduled already

21   with mediators that have been agreed to by the plaintiffs and

22   the defendants in certain matters.  So why -- you know, if it

23   ain't broke, don't fix it.  That sounds like it is on a good

24   track.

25          And then finally, in light of the numerous parts

1    and parties here, if -- if a court-appointed facilitator

2    feels that it would be helpful to expedite settlement to

3    appoint other JAMS mediators to support the effort because it

4    is so far-flung, that we suggest that the court-appointed

5    facilitator be empowered to do that.

6              Thank you, Your Honor.

7              THE COURT:  Okay.

8              MR. REISS:  Good morning, Your Honor.

9              THE COURT:  I'm glad to hear the other side now.

10   Okay.

11             MR. REISS:  Yes.  Steve Reiss.  I represent

12   Bridgestone defendants in the AVRP case and the Calsonic

13   Kansei defendants in the radiators and air conditioning and

14   ATF warmer cases.

15             Your Honor, I -- I will just agree.  I am not sure

16   I am authorized to speak on behalf of all of the defendants.

17   I think a number of the defendants have the -- the views that

18   I'm -- I'm about to express, and -- and -- and they are

19   really in agreement with what Your Honor has said and a

20   couple of the things that Mr. Hansel just said, which is,

21   one, if there are going to be mediations, we do think it

22   critical that the parties be able to, if they can agree,

23   choose their own mediator.  My experience, if both sides have

24   confidence in a mediator, that is a very, very important

25   factor in helping the success of the mediator.  And Your

 1    Honor has indicated that, Mr. Hansel has suggested that, and

 2    we would certainly agree if there are going to be mediations,

 3    the parties should certainly be able to appoint their

 4    mediator if they are able to do that.

 5         THE COURT:  Okay.

 6         MR. NICOUD:  Good morning, Your Honor.  Tre Nicoud.

 7    I represent the Mitsuba defendants who are defendants in nine

 8    different groups of cases.

 9         So like Mr. Reiss, I don't think I'm authorized to

10    speak for other defendants, but we also largely agree with

11    what was just said.  I think the only slight modification

12    that I would propose is there may be circumstances where

13    sequencing of which group of plaintiffs of the process goes

14    forward.  It may make sense that one goes forwards rather

15    than the other.

16         I have certainly had other cases where, after

17    discussions with opposing counsel, we both conclude, frankly,

18    that now is not the right time to involve a mediator.

19    Something needs to happen in the case for both sides to have

20    a better view of how things should go forward.  And while we

21    are certainly happy, if we are ordered, to participate in the

22    mediation process, we will certainly do that.  But in those

23    types of circumstances, frankly, where the parties need a

24    development in the case in order to better inform their

25    views, it helps to have the case go forward and not be

 1    ordered to go do something that, frankly, has an extremely

 2    low chance of success and may even be a waste of the

 3    mediator's times.

 4             But -- but that would be the only caveat I would

 5    offer.  Everything else I thought made perfect sense.

 6             THE COURT:  Okay.  Thank you.

 7             Any of the other defendants have any other

 8    comments?

 9             (No response.)

10             THE COURT:  No.  Okay.  No comment, Mr. Cherry?

11             MR. REISS:  Well, now that you've asked.

12             MR. CHERRY:  Your Honor, I was trying --

13             THE COURT:  It makes me nervous when you're quiet.

14             MR. CHERRY:  I think, you know, if Your Honor feels

15    strongly that the parties ought to attempt mediation, you

16    know, we can agree to do that.  I think, as Mr. Hansel

17    pointed out though, I think the parties ought to try to have

18    discussions on their own and see if a mediator is necessary

19    and, if necessary, try to agree on a mediator on their own.

20    We from our own experience have found that for mediation to

21    be successful, it is really important for the parties to have

22    a say in who the mediator is and for the parties, and

23    particularly the parties themselves, the clients, to have

24    confidence in a mediator, and so I think it is important that

25    we chose our own.  Thank you.

1          THE COURT:  Did you consider who you wanted?  I

2     mean if you are going to choose your own, who are you going

3     to choose?

4          MR. CHERRY:  Well, Your Honor, I think there are

5     mediators that have been used by the parties in getting some

6     of the settlements to date.  They may include some of the

7     ones that were mentioned.  I think there are others that we

8     are familiar with.  We weren't aware that -- that the

9     plaintiffs were going to be submitting a list.  I think if

10    you wanted a few names from the defendants, we could do that

11    by tomorrow or this evening, but we -- we weren't prepared to

12    submit that.

13         THE COURT:  Okay.

14         MR. CHERRY:  Thank you.

15         THE COURT:  Any other defendant?  Any other

16    comments from plaintiffs?

17         (No response.)

18         THE COURT:  Okay.  Well, I'm very pleased to hear

19    that some of you have used mediators or facilitators.  Those

20    words are used differently in different parts of the country

21    and in different circumstances.  I call it a facilitative

22    mediation, not anything near where you are dictated or you

23    have penalties or any of those kind of things, but that you,

24    both sides, have an opportunity to present to a person, or

25    there may be multiple mediators for different parties, that

 1    you have an opportunity to present your case and work out a
 2    resolution.
 3          I think it is very critical here.  I feel very
 4    strongly because I know all of the pleadings may not be in.
 5    I can't remember how much of it I read.  Like on the -- there
 6    were just objections to the OEMs.  That's a massive
 7    undertaking, that's a massive undertaking.  And if you are
 8    going to settle this case, I think it -- you know, I'm going
 9    to have that go on, we are going to continue with our
10    hearings I believe, but -- but I think that if there is a way
11    of resolving it first, we have to do everything to explore
12    what there is out there to try and resolve the case.
13          I want -- I think there can be multiple
14    facilitators, and I have absolutely no problem, those of you
15    who are using facilitators, and I think one facilitator
16    probably would not be able to resolve this and he or she
17    would have to bring in other people.  But to me, it needs to
18    be organized.  I know we have, you know, so many different
19    parts and they are out there floating, but -- and the
20    indirects are doing very -- I think are doing very well, and
21    I don't want to interfere with what is going on with the
22    indirects, I want you to continue to do what you are doing.
23    As to the directs, I'm hearing -- you know, I know that we
24    have a settlement today and we have some -- some more in the
25    works, so you are also moving along.

1        I guess for both sides, I mean for both parties, I

2   just want you to do it faster, I want you to do it now, and I

3   think that somebody has to be in control of that.  I think we

4   need a master facilitator.  So I would like to appoint a

5   facilitator who would take over all of the facilitation with

6   these provisos:

7        That that facilitator get himself or herself

8   advised as to what all of the parties are doing.  And if you

9   are using other facilitators and have used them, I want you

10  to continue.  This would be the multiple -- the other

11  facilitator.  I want you to consider and continue with that.

12  So this master facilitator would not only be the facilitator,

13  he would kind of be the administrator of facilitations so --

14  so that he can keep track, or she -- I think I only have four

15  female -- four males' names -- but so that he can keep track

16  of what is going on and see if there needs to be a further

17  push in the facilitation.  And so he really would be over all

18  of the facilitation, though I'm going to ask him to -- to

19  focus more right now on the directs so that the plaintiffs --

20  the indirects could continue with who they have.

21        Now, who is this going to be?  Defendant says they

22  haven't had time.  I have four names.  I know -- the four

23  names from plaintiff, let me just comment on those.  I don't

24  know Mort Denlow.  I know Dan Wein -- by reputation only, Ken

25  Feinberg and Dan Weinstine (sic) and -- Weinstein.  They have

1    great reputations, they've done extremely well.  They charge

2    a lot of money.  I'm -- I'm concerned about trying to keep

3    the cost down.  I mean even though you have a lot of money,

4    you've got a lot of people, we have a lot of -- of people to

5    take that money from what we have already in our settlements.

6         So I would like -- I mean, this will be up to you

7    if you want to do this.  Judge Rosen is starting out.  I --

8    if you decide on Judge Rosen, I am not the one to decide

9    on -- on the payment of any of these people, do you

10   understand?  You are going to have to decide how much -- if

11   you come to an impasse, obviously I will have to do that, but

12   I prefer not to get involved in -- in that.

13        Judge Rosen is just starting out, so you may work

14   very, very hard, I have no idea.  You said he's going with --

15   or maybe I heard this.  Somebody mentioned JAMS, and I -- I

16   think that's who Judge Rosen is going with, or I read about

17   that in the paper.  I don't know anything about that group

18   either so that's something that you have to consider.  But I

19   want to do this now, I want to do it now.

20        So I don't know whether any of these people or

21   other people that defendants may have would be willing to

22   take on this job, so I would like to give you some time to

23   discuss this today, today.  So let's just go on with the rest

24   of the agenda and then we are going to come back to this, and

25   I'm going to give you time because I -- I'm so serious about

```
 1    this, I want it to move forward, so whoever gets it, whoever
 2    this would be, let's do it today.
 3              All right.  The next item is the stay of discovery.
 4    Does anybody have any comments on that?
 5              MR. REISS:  Yes, Your Honor.
 6              THE COURT:  A lot of people.  We have a whole
 7    presentation here.  I don't know if you are for or against.
 8              MR. REISS:  Against.
 9              THE COURT:  My inkling is not to stay anything
10    because I want to move this along.
11              MR. REISS:  No, Your Honor.  And let me start by
12    saying I'm here as counsel for Bridgestone in the AVRP case.
13              THE COURT:  Who is your other client, Mr. Reiss?
14              MR. REISS:  Calsonic Kansei; they are in later
15    cases.
16              But I'm here, I'm standing here for Bridgestone in
17    the AVRP case, and I'm also -- also authorized to tell the
18    Court that the views that I'm going to express also are the
19    views of the remaining defendant in the EPP and ADP cases and
20    the AVRP case.
21              And just to lay the big picture, Your Honor, as
22    Your Honor has pointed out, all of the defendants in the
23    other two lead three cases have settled the indirect
24    purchaser cases, so the wire harness case and the bearings
25    case are completely settled with respect to the indirect
```

 1    purchasers, not with the direct purchasers but the indirect

 2    purchasers.

 3              That means that the AVRP case is the lead case with

 4    respect to the indirect purchaser actions.  And as I said,

 5    there are two of the four defendants in that case.

 6    Bridgestone and Toyo are the remaining defendants.  And I

 7    think it is important to give the Court the whole picture of

 8    where we are in those cases and -- and how frankly

 9    dysfunctional in those case -- in -- in the AVRP case, I'm

10    not speaking for any other case, in the AVRP case, how

11    dysfunctional a stay would be.

12              And just some very brief overview points.

13              THE COURT:  Okay.  You are saying how dysfunctional

14    it would be?

15              MR. REISS:  Yes.

16              THE COURT:  Okay.

17              MR. REISS:  Just, as the Court well knows, the

18    burden of the indirect purchasers is to prove that the AVRP

19    defendants caused an overcharge on AVRP to the OEMs, and

20    second, that any overcharge that the OEM suffered, if there

21    was one, was passed on throughout the manufacturing process

22    where the AVRPs are combined with about 30,000 other parts,

23    and then through the sales process where there in this Court

24    are two levels of indirect purchasers passed onto, first, the

25    ADPs, and second, from the ADPs to the EPPs, and this is

1    critical, Your Honor.

2              On the current record, and it is an extensive

3    record, on the current record before this Court, the AVRP

4    defendants sold only to Japanese OEMs:  Toyota, Nissan, Honda

5    and Subaru.

6              THE COURT:  Okay.  But we are not here on a motion

7    to --

8              MR. REISS:  No, no, no, Your Honor, but this --

9    this explains the discovery situation.  Right now there is no

10   evidence of pass-on with -- between -- by the Japanese OEMs,

11   and here is how we know that.  Here is what the Japanese OEMs

12   have each said in sworn declarations submitted to this Court.

13             Toyota, the prices of specific auto parts are not

14   considered in setting the MSRP.

15             Honda -- Your Honor, Tre asked -- I don't know if

16   this has to be highly confidential.  These -- I honestly

17   don't know the answer to that and --

18             MS. ROMANENKO:  Your Honor, I think the OEMs who

19   gave a deposition would take issue with their statements

20   being made public.

21             MR. REISS:  These were declarations submitted in

22   pleadings, but I guess we could look at that.

23             MS. ROMANENKO:  I think the declarations were also

24   designated as highly confidential.

25             THE COURT:  So what do you want to say?

1 　　　　　MR. REISS:  Well, I -- I -- I think we can mark

2 this -- I don't know if the Court wants to see if there is

3 anyone in the audience who should not be in the audience.

4 　　　　　THE COURT:  Is there anyone here who is not an

5 attorney on this case or associate?  Well, we've got a couple

6 of bystanders here.  Okay.  Three of you.

7 　　　　　What is highly confidential about this?

8 　　　　　MR. REISS:  I don't know, Your Honor.

9 　　　　　MR. NICOUD:  Your Honor, Tre Nicoud for the Mitsuba

10 defendants.

11 　　　　　I raise this only because, as you will hear in

12 connection with objections and appeals regarding some of the

13 OEM discovery orders, the OEMs are very sensitive about their

14 information, and I want to strive that we are respectful of

15 their claims of confidentiality.  I may not agree with them,

16 but unless we have challenged them formally, I want to honor

17 their claims, and I -- my recollection is that these were

18 designated highly confidential by them.

19 　　　　　MS. SALZMAN:  So, Your Honor, so I think that, you

20 know, all of the parties that have signed the confidentiality

21 agreement are -- are responsible for keeping this information

22 not disclosed to the public at this time.  So putting aside

23 the fact whether this is appropriate argument on the motion

24 to stay, which is -- I don't think it is, I don't feel

25 comfortable having non-lawyers in the case present while

1    non-parties' statements may be disclosed, whether appropriate

2    or not.

3          THE COURT:  All right.  While we are talking about

4    the OEMs' statements, since I haven't ruled on them and since

5    there is much in the OEMs that is, the Court is aware, highly

6    confidential, I'm going to ask those people who are not

7    attorneys on the case to step out while we have this --

8          MR. REISS:  This part, Your Honor, will be

9    literally 30 seconds.

10         THE COURT:  Thirty seconds, okay.  Don't go too

11   far.

12         And on the record, this is confidential.  It should

13   be marked as such, this portion right now.  Okay.

14         (Non-designated parties were excused from the

15         courtroom for the following confidential

16         proceedings:



Status Conference / Motion Hearings - January 25, 2017



Status Conference / Motion Hearings - January 25, 2017





18        (Confidential proceedings concluded; previously

19        excused parties re-entered the courtroom.)

20        THE COURT:  We will go back on the public record

21   now.

22        MR. REISS:  So, Your Honor, we are in the middle of

23   an extraordinary, extensive, time-consuming process on OEM

24   discovery.  The OEMs have produced their DOJ materials and

25   the OEMs have started collecting their documents and data for

1       production.

2               And I will tell Your Honor, with respect to the

3       OEMs involved in the AVRP case, none of those four Japanese

4       OEMs have objected to the scope of production.  Okay.  So

5       they haven't -- there may be issues about who -- who pays

6       what costs and there may be some confidentiality issues, and

7       I understand that, but none of those four Japanese OEMs have

8       objected to the scope of the productions.  And --

9               THE COURT:  So is that going forward?  Will you get

10      that information then from those four?

11              MR. REISS:  I believe we will, I believe we will.

12              And here -- here I think is the critical point

13      here.  So this is like we spent two years training, working

14      hard, doing all sorts of things.  We finally get to the meet,

15      we finally get in the stadium, we're finally all positioned

16      at the starting blocks.  After those two years of hard, hard

17      training and work, you can't call off the race just about

18      when the gun is about to go off, and here is why we can't.

19              Obtaining the OEM productions and -- and closing

20      discovery with respect to the OEMs would first, as our view,

21      I'm sure the plaintiffs will differ but we need the evidence,

22      it is going to support the OEMs' specific motions for summary

23      judgment, which we are confident we will be able to make, if

24      only Nissan's sake.

25              And second -- and I think this is really important

1   for the Court given the Court's desire to move these cases

2   and, if possible, settle these cases.  Candidly, this

3   discovery -- staying discovery, staying this discovery is not

4   going to help certain clients settle because they will say,

5   well, the OEMs all say they didn't pass on any overcharges.

6   Even if there were overcharges, they all say they didn't pass

7   on any overcharges.  Doesn't that mean that we win the IPP

8   cases?  Yes, that's a fair question, Your Honor, that's a

9   fair question.  And those of us who have clients who are

10  raising those questions have to answer them.  And it is not a

11  good answer for us to say, well, you know, that may be, but

12  we are going to take a indefinite time out to see if we can

13  settle these cases.  I think Your Honor is much, much more

14  likely to accomplish your goal of achieving and prompting

15  settlements, if they are possible, by continuing discovery.

16          And now just -- just there's some equities here

17  too, and I think the next slide is important.  Again, now,

18  this is just for the AVRP defendants.  We have been through

19  for the last several years massive discovery, massive

20  discovery.  We have had three years of fact discovery.  We've

21  produced -- Bridgestone has produced almost 9 million pages

22  of documents.  There have been other -- other millions of

23  documents produced by the other defendants.  There have been

24  over 200 -- 200 depositions taken with respect to the AVRP

25  case.

1    And our discovery is almost complete.  We have
2    completed the production of core documents, we have responded
3    to numerous, numerous, numerous interrogatories and requests
4    for admissions, and all of the notice depositions in this --
5    of the defendants have been either completed or scheduled.
6    And, Your Honor, I will tell you, as I stand here today,
7    there is a deposition in my office in New York of a
8    Bridgestone employee who has travelled from Japan to be
9    deposed with two other Bridgestone litigants.  That is taking
10    place literally as we speak.  So there is -- we are 95-plus
11    percent through massive discovery in the AVRP case.
12    Next slide.  And -- and here is why, Your Honor --
13    I have to say this -- staying discovery now creates an
14    imbalanced record, not fair to us.  Why do I say that?  Well,
15    all of the pending discovery issues are issues about
16    defendants' discovery, frankly, of the -- of the ADPs, right?
17    We have an outstanding motion on general ledger DMS data, and
18    I think Your Honor will recall, I think, that I argued that
19    motion in October.  That -- that is fully briefed and it's
20    pending.
21    There are motions with respect to rebates and
22    incentives and also deal files.  The wire harness defendants
23    have made that motion.  Your Honor ruled it moot because the
24    IPP cases were all settled in wire harnesses.  We've refiled
25    that request because it relates to all of our cases, so that

1    motion is pending.

2         And finally, we filed a motion to compel an answer

3    to interrogatories we have asked the ADPs concerning their

4    data preservation.  We have a very good-faith basis for

5    believing that as we speak at least some, if not many, maybe

6    even all, of the ADPs are not taking steps to preserve their

7    DMS data that we think is critical.  And if that's true, to

8    stay discovery, we have an ongoing issue of losing data that

9    we think is important, maybe critical to our case.

10        So that's why in the AVRP case, we think it is

11   essential that the OEM discovery goes forward.  We think it

12   essential that the discovery be completed so that we can have

13   more informed, more intelligent conversations with our

14   clients about settlement.  I think it will help settlement.

15        And I must say, Your Honor, finally, I -- that it

16   is -- we are in an odd situation to begin with in discussing

17   a stay because no party has moved for a stay; certainly the

18   defendants haven't and the plaintiffs haven't.  Now, they may

19   have reason to stay, they may say, oh, we think it is a good

20   idea, maybe they will not say that, but no party has moved

21   for a stay, certainly not in the AVRP case.

22        So I say, Your Honor, for all of those reasons, we

23   think a stay of discovery with respect to AVRP would be

24   counterproductive both in terms of the massive efforts that

25   the parties have made and been subjected to so far and,

1   frankly, might even be kind of counterproductive in terms of

2   achieving the Court's goal of seeing if we can reach a

3   settlement resolution.  Thank you.

4           THE COURT:  Okay.  Thank you.

5           MR. CHERRY:  Your Honor, Steve Cherry from Wilmer

6   Hale representing the Denso defendants.

7           And we also oppose any type of stay.  I would point

8   out two issues.  One, in wire harnesses, we are even further

9   along.  We completed discovery last September.  We have

10  summary judgment motions pending.  We have agreed that our

11  reply brief, the Denso reply brief, would be filed

12  February 13th.  We would hope that we could have it argued

13  shortly after that, maybe late February, early March, and we

14  think that will dispose of the case, and that should not be

15  stayed for anything.

16          And we also have -- six of the cases against us are

17  subject to binding arbitration agreements, and there are two

18  motions before Your Honor.  One is an agreed-upon stipulation

19  to dismiss one of the cases because it is subject to

20  arbitration.  Another was opposed and we have argued that and

21  are waiting for a disposition.  And there are four others we

22  need to discuss and maybe we can tee them up by consent,

23  maybe we'll have an opposed motion, but we should go forward

24  with that.

25          THE COURT:  Okay.

1          MR. CHERRY:  Thank you, Your Honor.

2          MS. KAFELE:  Good morning, Your Honor, Heather

3    Kafele on behalf of the JTEKT defendants, and I'm also

4    speaking on behalf of the bearings defendants as well.

5          I just wanted to -- we also oppose a stay of

6    discovery.  I wanted to point out a few unique issues in our

7    case that are going on.  First of all, as I think you heard

8    before, all -- there are six defendants in our case.  We have

9    all settled the EPP and ADP cases.

10         Nobody, none -- none of the defendants have settled

11   the DPP cases.  We have currently a schedule in place.

12   Discovery is going to end on March 20th.  Plaintiffs are

13   going -- or the DPPs are going to be filing their class cert

14   brief on March 20th.  That means that by the time we come

15   here next time to see you, Your Honor, at the status

16   conference, we are going to have the first class cert motion

17   on file after five-plus years.  There is a lot of work that's

18   gone in to get to that point.

19         And if you remember, I think it was in November,

20   the DPPs actually came before you and said we want to extend

21   our class cert schedule five months, we need more time, there

22   is so much to do, so many documents, so much discovery.  And

23   Your Honor decided that issue just on December 19th, a little

24   more than a month ago, and said no, no, no, I'm going to keep

25   you to the schedule, we are not going have any more

1    extensions of deadlines already set.  And I think -- and

2    what's happened, that's kept the -- the wheels running.  A

3    lot has been going on and those deadlines are really

4    effective.

5          Just to give you some insight, Your Honor, as to

6    what's been happening, the bearings defendants have produced

7    100 million pages of documents.  Twenty depositions have

8    already occurred of the parties, 40 more are scheduled in the

9    next seven weeks.  That's a deposition a day I think.  Thirty

10   of those 40 people are flying in from Japan overseas, there's

11   tickets bought, executives have cleared their schedules,

12   there are translators hired.  It is complicated.  Putting the

13   brakes on that right now, Your Honor, is going to

14   significantly prejudice us, the defendants, and, frankly, I

15   think the plaintiffs as well.  All of that work is going --

16   it's not like we can stop it, restart it in a few months.  It

17   is complicated.

18         And I also think there is a bigger point too.

19   There is a lot of momentum in our case right now, and that

20   momentum, even by a pause in putting things on ice for a

21   short period of time, is going to change.  And I think that

22   momentum is really what you are looking for, whether it is to

23   get a decision made or it is to facilitate settlement.  And I

24   would just urge you to keep those deadlines going because it

25   is working, it is working.  And we're -- you know, it has

1    been five years.  Our clients are eager to get a decision or

2    to get more insight into this, and the only way to do it is

3    by keep -- keep the process going, Your Honor.

4              THE COURT:  All right.  Thank you.

5              MS. STORK:  Good morning, Your Honor.  I'm

6    Anita Stork and I represent the Keihin defendants in one of

7    the later filed cases, the fuel injection system cases, which

8    were filed number 22 in sequence.

9              Keihin also strongly opposes a stay of discovery.

10   If, as one of the plaintiffs' lawyers from the DPP side said,

11   you want to hold people's feet to the fire to achieve a

12   settlement, it should be in parallel, we strongly think, with

13   discovery moving forward because there are just many clients

14   who just don't see the need to get serious about settlement

15   and, quite frankly, can't even assess the risk of moving

16   forward with the case versus settling until there is

17   discovery.

18             There is also equity issues.  The plaintiffs are

19   alleging conduct that took place ten years ago.  Couple that

20   with the fact that the fuel injection systems case has been

21   pending for two years, you've got a 12-year gap.  Witnesses'

22   memories fade, witnesses become available (sic).  Keihin did

23   not plead guilty, they strongly want to contest liability.

24   And they, the clients, are very strong of the opinion that

25   they have got a due process right to litigate this case and

1    try it if necessary in a reasonable period of time.

2           We have no objection to court-ordered mediation,

3    but we do think that in order for it to be most effective,

4    there needs to be parallel discovery going on to really and

5    truly hold people's feet to the fire.

6           THE COURT:  Okay.  I'm taking defendants as saying

7    they don't want any stay.  Did I hear that right?  Okay.

8           Do you have anything that hasn't been said?

9           MR. NICOUD:  Your Honor, Tre Nicoud again for the

10   Mitsuba defendants.

11          One, I would want to make sure that, at least for

12   us, we reinforce our strong opposition to this stay is not

13   linked in any way and does not in any way suggest opposition

14   to working with facilitative mediation or whatever process.

15          THE COURT:  Okay.  Good.

16          MR. NICOUD:  Those are -- those are separate

17   issues.  But -- but we are -- really are strongly opposed to

18   a stay.  And like Ms. Stork who spoke on behalf of the Keihin

19   defendants, we are a little differently situated than those

20   defendants who have been in some of the earlier cases.  For

21   us, what is as big an issue as anything else is we aren't

22   being given the opportunity to adjudicate our defenses.  We

23   have effectively been living under a stay for three years.

24   Unlike the other cases where lots has been going on, we are

25   just waiting at the station; we haven't even gotten on a

1    train yet.  And the -- what we really, really would hate to

2    see and what would prejudice unfairly is to have these cases

3    stop and not be moving forward.

4              THE COURT:  All right.  Thank you.

5              Mr. Fink.

6              MR. FINK:  As long as there is no more -- no more

7    defendants who want to say no.

8              Your Honor, this is a very interesting question and

9    we start, I think, with the issue of what is the -- the

10   purpose of the -- of a discovery stay or another kind of

11   stay.  And we are presuming that the purpose is to facilitate

12   settlement and to control costs so that funds can go toward

13   the effort towards settlement and efforts can go toward

14   settlement rather, and we think that's laudable.

15             That said, there are certain things the defendants

16   have said that we agree with completely, particularly with

17   respect to bearings.  It is absolutely correct that for the

18   next several weeks we have a massive amount of discovery that

19   is scheduled, by cooperation, but an awful lot of effort is

20   necessary to get to that point.  A lot of expenses are

21   incurred that can't be refunded and can't be avoided and

22   would end up being duplicated.  If -- if a stay was entered

23   now, we would have to incur those costs again.  And those

24   costs aren't simply the financial costs, although those are

25   significant, and the travel arrangements, et cetera, but you

1   have the -- the amount of time that was involved to

2   coordinate all the schedules that had to be coordinated,

3   and -- and that's going to be going at a very fast pace for

4   the next several weeks, and we -- we really are in complete

5   agreement.

6          It is also important to us because in the bearings

7   case, this is our opportunity to get some information that's

8   very important to us as plaintiffs, as the direct purchaser

9   plaintiffs, to -- to learn some things that we think will

10  actually help us get to settlement.

11         That said, there are circumstances and there are no

12  doubt are circumstances in the current cases where a stay of

13  certain aspects of the case could and likely would promote a

14  resolution of the case, promote settlement of the case.

15         And -- and one thing we would suggest is if the

16  Court, in fact, is going to select a settlement master, that

17  settlement master will be -- after he or she gets an

18  understanding of -- of the massive number of issues that are

19  involved here, that settlement master would probably be in

20  the best position to recommend to the Court what type of stay

21  or what type of matters could be stayed that would promote

22  settlement.  We have the problem of the law of unintended

23  consequences, and certain of these issues, if we -- a stay

24  today of discovery or a broad stay might actually interfere

25  with settlement rather than promote it and add costs rather

1    than reduce them.

2         Now, there is another issue though that we -- that

3    nobody has raised or talked about.  I guess it is because

4    the -- the agenda says discovery stay on it.  There is

5    another type of stay that, in fact, we think could be -- the

6    direct purchaser plaintiffs, and I speak only for the direct

7    purchaser plaintiffs --

8         THE COURT:  Bar you from filing any more cases?

9         MR. KANNER:  Let's not get carried away, Your

10   Honor.

11        MR. FINK:  Got so close, Your Honor, so close.

12        The direct purchaser plaintiffs -- I have no good

13   comeback to that.  The direct -- the direct -- the direct

14   purchaser plaintiffs would point out to the Court that very

15   frequently the way that settlement is facilitated is by the

16   continuation of certain uncertainty and risk for both

17   parties.

18        So, for example, and it is not just an example

19   because it gets right to the heart of what we are looking at,

20   there are pending dispositive motions in the wire harness

21   case.  One party will win, presumably win, and one party will

22   presumably lose.  That uncertainty -- or lose in part and win

23   in part.  The presence of that uncertainty creates an

24   opportunity for settlement, it always does.

25        And so later today when we talk about the

1    scheduling of those particular motions, we are actually going

2    to suggest that perhaps those motions or consideration of

3    those motions should be stayed during the settlement process

4    to the extent that it is coordinated by a settlement master

5    who may well then say to the Court, no, no, no, it is time to

6    move forward with this, let's go ahead with these motions.

7           But for now, we are concerned that we may lose a

8    settlement opportunity if dispositive motions are decided.

9    And there are other motions pending in a couple of other

10   cases.  We don't think they should be decided during the time

11   that these -- that the Court wants to have that process.

12          I would also point out that we -- as we heard from

13   counsel in the bearings case, there is a tremendous amount of

14   work that is going to be necessary between now and March 20th

15   for the filing by the direct purchaser plaintiffs of the

16   motion for class certification.  And much as we have all

17   looked forward to that, once we file that motion, if that is

18   then held in abeyance during settlement discussions, the

19   defendants get a tremendous opportunity and a tremendous

20   advantage because they can use that time to sit on that

21   motion, work on that motion while we are in a closet in some

22   room negotiating with a facilitator.

23          So, Your Honor, I -- I -- excuse the shift in

24   perspective here from the question that was asked by the

25   Court, which was about -- of course about discovery,

1   regarding discovery.  At least with bearings, I think we have

2   unanimity on this side of the bench on -- on the bearings

3   question, but -- discovery question, but we would present --

4   and we have not discussed with any of the defendants the --

5   the possibility of holding any of the pending motions in

6   abeyance.  It really came to us as we were sitting here and

7   discussing this today.  So I don't know what the defendants'

8   position would be on that.  But we hope the Court would

9   consider that we think the stay of those -- of any pending

10  dispositive motions if a matter is in mediation would be a

11  very constructive step.

12          And on the other hand, as far as discovery, we are

13  very concerned about bearings discovery.

14          THE COURT:  Okay.

15          MR. FINK:  Thank you, Your Honor.  I don't speak

16  for the indirects.

17          MS. SALZMAN:  Good morning, Your Honor.

18          On behalf of the end payors, the end payors would

19  not like to see a stay in the case and for a couple of

20  reasons.  Number one is we are going to be very focused in

21  the coming months on mediating the cases, hopefully resolving

22  the cases with defendants.  We need that discovery, number

23  one, to be on equal footing with the defendants to know the

24  strengths and weaknesses of our case so that when we get into

25  the mediation, we can negotiate based upon the real evidence

1    in the case, and that is especially true for the later filed

2    cases where we have virtually no discovery yet from those

3    defendants.

4           And the second is a more practical reason is

5    everyone does better under pressure, and if you take that

6    pressure off the parties, it -- it may disturb the -- the

7    process.

8           A possible -- if the Court is looking for some

9    relief on discovery, a possibility would be to stay the OEM

10   discovery, these are non-parties, allow the -- allow the

11   actual parties to this -- this case continue with the party

12   discovery, try to mediate and settle, and then see what we

13   need from the OEMs without, you know, continuing with that

14   discovery.  Perhaps Your Honor would like to resolve the

15   motions and then stay the discovery given that it is fresh in

16   everyone's mind at this point, but that is just an option

17   that I throw out there.

18          THE COURT:  Okay.

19          MS. SALZMAN:  And then just finally, I would be

20   remiss in not saying that Mr. Reiss said that perhaps we

21   would disagree with his assertions on the passthrough based

22   on OEM affidavits, those affidavits that were submitted

23   solely for the purpose of narrowing discovery.  So I just

24   want to say of course we do disagree with that and we have

25   evidence and experts that would say otherwise.  Thank you.

```
 1              THE COURT:  All right.  You know, let -- let me
 2    just indicate to you, I put this stay of discovery on here in
 3    anticipation of somebody, once we discussed facilitation,
 4    bringing it up and I wanted everybody to be prepared to -- to
 5    do it.  I did not mean to imply, because as I said in the
 6    beginning of this discussion, that there would be a stay.  I
 7    just want to know what your opinion is.  I can always be
 8    convinced one way or the other.  I'm not, you know, in favor
 9    of a stay either, so --
10              MR. FINK:  In that case, Your Honor, never mind.
11              MS. SALZMAN:  Thank you.
12              THE COURT:  Okay.
13              MS. ROMANENKO:  Good morning, Your Honor.
14    Victoria Romanenko for the dealership plaintiffs.
15              Your Honor, the dealership plaintiffs do agree that
16    a stay of discovery is the most appropriate process in order
17    to facilitate settlement discussions.  Some of the defendants
18    and I guess a few of the plaintiffs have said while we need
19    more discovery, we need to learn more about the case, the
20    indirect purchasers, including the auto dealers, have settled
21    with defendants in the earlier cases and in the later cases,
22    the majority of cases, the majority of defendants, in fact.
23              The stage of the case hasn't been a problem.
24    We've -- we've settled -- we settled with one big defendant
25    in 2014.  You know, all of these other defendants have
```

```
 1    managed to settle the case based on everything they have

 2    learned so far from the last three and a half years of

 3    discovery: the hundreds of depositions and the millions of

 4    pages of documents, including DOJ documents and plaintiff

 5    documents that have been produced so far.  So we don't see

 6    why it is a problem somehow for these other defendants, the

 7    minority of defendants, to settle the case at this juncture

 8    after we have been going for five and a half years and have

 9    expended all of these millions of dollars when it was not a

10    problem for their predecessor.

11              I think the real question -- the real question

12    isn't can we get a little more here, can we get a little more

13    there.  If we do another year of this, are we going to -- is

14    a light going to go off and we're going to say Eureka, 60

15    million, we are done?  The real question is what are the

16    terms on which the parties are willing to settle?  The real

17    issue is getting the parties into a room together, and we

18    think that a discovery stay in conjunction with facilitative

19    mediation will do that.  The nature of litigators is they

20    want to keep fighting, they want to keep arguing, they want

21    to see what else they can get, what -- what -- what point can

22    I grab here, what piece of discovery can I grab there?

23              THE COURT:  Not that they want to keep billing?

24              MS. ROMANENKO:  I -- I think as far as this case is

25    concerned, they -- they seem to want to keep going.  But, you
```

1    know, I think -- I think keeping discovery going of course

2    enures to that.  There are -- everybody is going to be

3    focused on discovery fights if we keep discovery going, and

4    they are going to say why should I settle now when maybe in a

5    year I can have a big discovery victory and that that will

6    somehow knock it down millions of dollars for me?  And

7    that's -- you know, that process can go on, it could go on

8    for ten years.  If this case were permitted to do so, I think

9    it could do so.

10           I think if Your Honor is interested in seeing

11   settlement and seeing some real progress towards it, if --

12   taking a shot at it, using our mediator's time to our

13   advantage, I think we need to give it our full attention.  I

14   think we need a stay in place.

15           Mr. Reiss and some of the other folks talked about

16   everything that has happened so far.  We have had many rounds

17   of mediation, we have had hundreds of depositions, we have

18   had folks preparing for depositions to fly out.  Yes, that's

19   consumed a lot of resources, and we are on the cusp of an

20   expenditure of a lot more, especially if we -- this OEM

21   discovery is supposed to get going, especially if we keep

22   going with the -- more -- more depositions, more productions.

23           Your Honor has an opportunity to conserve party

24   resources, non-party resources and judicial resources.  At

25   this juncture Your Honor has the ability to decide that tens

1    of millions of dollars in five years is enough at least to

2    temporarily see if we can focus our attention on reaching

3    settlements rather than continuing to fight to see what other

4    points we can grab.

5            And, Your Honor, I'm sure you're -- you are

6    familiar with the law on this, but just to give you a very

7    quick review of what --

8            THE COURT:  Probably not.  Go ahead.

9            MS. ROMANENKO:  -- of what we found, but for

10   instance, as stated in the case Nellcor Puritan Bennet vs.

11   CIS Medical Systems and here in the Eastern District of

12   Michigan, courts have inherent power to manage their dockets

13   and stay proceedings.  And there have been a number of courts

14   within the Eastern District of Michigan that have -- and

15   within the Sixth Circuit that have exercised their authority

16   to stay discovery while the parties negotiate a settlement or

17   worked on mediation.

18           So just to give you a few examples, Continental --

19           THE COURT:  No, no, I know I have authority to do

20   that.

21           MS. ROMANENKO:  Okay.

22           THE COURT:  I'm not concerned with that.  Thank

23   you.

24           MS. ROMANENKO:  Okay.  So --

25           THE COURT:  Anyway, by the time you appeal, this

1    will all be --

2         MS. ROMANENKO:  So there -- there -- there -- there

3    have been a number of cases where -- where judges, other

4    judges within this district have done the same thing because

5    it is -- they go hand in hand.  It is customary, if the judge

6    wants the parties to get serious about trying to settle the

7    case, to stay discovery so that they will focus their efforts

8    on that.

9         And just a few examples are Continental Casualty

10   Company vs. Harsha here in the Eastern District, Judge Berg

11   imposed a stay while the parties conducted mediation.

12   Giasson Aerospace vs. RCO Engineering, also in this district,

13   Judge Cleland stayed discovery while the parties conducted

14   settlement negotiations.  Cequent Performance Products vs.

15   Hopkins, also here in the Eastern District, Judge Leitman

16   stayed discovery while the parties engaged in mediation.  SMA

17   Portfolio Owners vs. Corporex, a case within the Sixth

18   Circuit, Judge Bunning stayed discovery for six months

19   pending court-ordered mediation, so similar situation to

20   here.

21        And what a lot of these courts have recognized is

22   that a stay is an important tool for facilitating that

23   mediation and focusing the parties' efforts on resolving the

24   case.  A discovery stay removes all of these other

25   distractions.  You know, we heard I think from some folks

1    that we need to be working on our class cert motion or, you

2    know, we need to be briefing this motion to compel that is

3    has come in, so that's going to be focused on that litigation

4    instead of focusing on settlement.

5            And the point, the -- the message that a discovery

6    stay sends is we want you to focus on settlement, especially

7    because if the process works how it is supposed to work, and

8    it sounds like everyone believes that it will work, it is

9    going to render all of that discovery moot, all of that hard

10   work, all of those hours and hours.  So why would the parties

11   expend all of this time and money fighting motions to compel,

12   filing motions to compel, serving new discovery requests,

13   loading productions, reviewing productions, doing predictive

14   coding, redacting productions, having privilege log fights,

15   why would they do that when the case might resolve and render

16   all of that moot?  The point is we want to conserve party and

17   judicial resources if there is not going to be any point in

18   taking on all of this additional discovery and discovery

19   fights.

20           And the other thing is, I think as we talked about

21   a little bit earlier, the discovery stay is a very important

22   mechanism for removing the parties from their adversarial

23   positions so that they can work cooperatively.  Right now we

24   are -- we're in the middle of litigation discovery fights.

25   The parties are -- are positioned to fight, not to

1   necessarily say -- you know, as I think as Mr. Reiss said,

2   not -- not to say forget it, let's talk about settlement.

3        In addition, I think as we have heard both from the

4   OEMs and some of the parties, there are a number of documents

5   that are extremely sensitive, that are -- that -- that folks

6   are very concerned about having produced.  If we have a stay

7   of discovery, if we say we are not going to work on that now,

8   we are going to work on mediation, that business risk can be

9   averted.

10        THE COURT:  Okay.

11        MS. ROMANENKO:  So -- and Your Honor, we're not --

12   no one's trying to avoid discovery.  We think there has been

13   a lot of discovery in this MDL.  Discovery has been going for

14   three and a half years, and that is about three to six --

15   three to six times the six to 12 months that Your Honor's

16   practice guidelines say should be devoted to a complex case.

17        So I think we have had more than enough discovery.

18   Anybody can think of more information that they might want,

19   but do we need it?  No.  I think the majority of the

20   settlements have demonstrated that we don't need it.  There

21   have been hundreds of depositions taken already, there have

22   been millions of pages produced.  The fact that the majority

23   of defendants in this case have settled and the increasing

24   number of mediations scheduled indicates to us that there

25   will be settlements that are going to moot the discovery

1    efforts, so the burden of engaging in all of these

2    productions should not be incurred.

3              THE COURT:  All right.  Thank you.

4              MS. ROMANENKO:  Thank you.

5              MR. REISS:  Your Honor, three quick points.  First,

6    it is obvious that the overwhelming consensus of the parties

7    other than the ADPs is not to stay discovery, and my strong

8    suspicion is the cases that -- in the cases that

9    Ms. Romanenko read off to you, I suspect the parties did not

10   oppose a stay; here they do.

11             Second, with respect to Ms. Salzman's comments, it

12   would make no sense to let all discovery go forward other

13   than the OEM discovery because that's certainly something

14   that the defendants for very good reason view as critical.

15             And finally, I think that this slide says it all.

16   Ms. Romanenko says, well, we don't need any more discovery.

17   Well, this slide says exactly why we do need more discovery,

18   and this is the snapshot of why ADPs don't want any more

19   discovery.  It is all discovery we want from them that they

20   don't want to produce for pretty understandable reasons.

21             THE COURT:  Okay.  Are you going give us copies of

22   this?  Are you going to give us copies of this?

23             MR. REISS:  Yes, I did, Your Honor.

24             THE COURT:  Okay.

25             MR. REISS:  Thank you.

 1          THE COURT:  I don't need it.  I just wanted to make

 2    sure you had.  Okay.

 3          MR. SHOTZBARGER:  William Shotzbarger on behalf of

 4    the truck and equipment dealer plaintiffs.

 5          We certainly see both sides.  You know, the auto

 6    dealers are proponents of the stay.  Those arguments resonate

 7    with us as well as the directs and the defendants and the

 8    end payors as well.  I think we as the truck dealers would be

 9    for the stay.

10          THE COURT:  Okay.

11          MR. SHOTZBARGER:  Thank you.

12          THE COURT:  I don't need a lot more.  I'm ready to

13    rule.

14          MR. NICOUD:  Your Honor, all -- all I would like to

15    do is -- and again, Tre Nicoud for the Mitsuba defendants.

16          Ms. Romanenko was citing some cases to you.  I

17    would like to just reference one other for you.  It is the

18    Sixth Circuit considering a petition for a writ of mandamus

19    and vacating a district court's entry of a stay.  And in

20    language that we think is particularly applicable to

21    defendants in the later filed cases and to Mitsuba, in our

22    many cases where we have been waiting, what the Sixth Circuit

23    said in finding that entry of a stay was an abuse of

24    discussion is that a court must tread carefully in granting a

25    stay of proceedings since a party has a right to

 1    determination of its rights and liabilities without undue

 2    delay, and that's 565 F.2d 393, and I will search for the

 3    page reference.  But I would urge the Court to consider

 4    that -- that case as well as the ones Ms. Romanenko cited.

 5            MS. KAFELE:  Your Honor, Heather Kafele on behalf

 6    of the bearings defendants.

 7            One very quick point.  It sounds like on the DPP

 8    bearings case, the parties are in agreement that discovery

 9    should be stayed.  I just wanted to respond to the one point

10    about the idea of -- or not stayed, sorry.  Gosh, oh my God.

11            THE COURT:  You are changing your position there.

12            MS. KAFELE:  Oh, no.  I just wanted to make sure

13    they were listening and it worked.  Okay.

14            MR. REISS:  Half the people fainted so you got --

15    you got your reaction.

16            MS. KAFELE:  I'm not getting appointed again by my

17    group.  Okay.

18            Well, anyway, I wanted to respond to the suggestion

19    that we let discovery go but we somehow hold in abeyance the

20    class cert motion and the idea that the discovery is going to

21    keep pressure on and we don't need to do the motion and await

22    a decision.  I would say it is exactly the opposite, Your

23    Honor.  The idea that you are -- you're -- not just that

24    you're doing discovery for the sake of discovery but that you

25    are going to actually have the risk of a decision, that

 1    decision and that risk of the decision and the idea that it

 2    might be eminent next year, that is what is going to create

 3    the motivation.

 4          So taking that off the table, I don't want to do

 5    discovery just for the sake of discovery.  I want to actually

 6    get some clarity or feel like I'm going to have the risk of

 7    that clarity.  That's what I take back to my clients.  So I

 8    would just suggest that that idea is going to be -- have the

 9    opposite effect.

10          The last point is, you know, Rule 23(c) does give

11    us a right to not just file a class cert brief but to get a

12    decision in a -- you know, early as practical.  It is five

13    years going.  Holding that in abeyance any longer is just

14    not -- not warranted.

15          MR. CHERRY:  Your Honor, just to pick up on one

16    other point that was made by the direct purchaser plaintiffs.

17    As -- as I made clear, Denso and the other defendants in the

18    wire harness case oppose any stay and, in particular, as to

19    pending substantive motions.  We completed -- we went through

20    everything in this case.  We spent a lot of time and --

21          THE COURT:  Yes, we have -- we have already said it

22    so let's not keep going.

23          MR. CHERRY:  Yes.  And we -- we really would like

24    to get a decision on our motion.

25          THE COURT:  Okay.  Thank you.

 1          MS. ROMANENKO:  Just to respond specifically to the

 2    three motions that Mr. Reiss had up on the screen, the

 3    majority of those were filed Monday night right on the eve of

 4    discovery.  So why was there this flurry?  Because they knew

 5    that Your Honor wanted to talk about the stay, not because

 6    there is any urgency.  The -- the one set of requests --

 7    actually both sets of requests were -- were served a while

 8    ago.  Impasse had been reached weeks ago on even the most

 9    recent ones.

10          So I think what we will get if we keep going with

11    discovery is 30 cases worth of defendants wanting to do

12    duplicative motions; maybe I will win, maybe I will get

13    something.  So I think it is going to enure to more fighting,

14    not to focus on the mediation.

15          THE COURT:  Okay.

16          MR. KANNER:  Your Honor, Steve Kanner for direct

17    purchaser plaintiffs.

18          And a final word on the issue of --

19          THE COURT:  You get the final word.

20          MR. KANNER:  Oh, I'm going to try at least.  It is

21    a rare -- it's a rare event.

22          The reality is a well-known judge in Philadelphia

23    upon beginning of trial in a case sent us out for mediation,

24    and as plaintiffs we wanted to know why; we were ready to

25    roll.  The judge said the sword of Damocles only works when

 1    it is still hanging above your head; once it's come down,

 2    there is very little incentive.  And that's what I will leave

 3    you on.

 4          THE COURT:  Okay.  All right.  Very interesting

 5    discussion, and no, I don't have a motion before me to rule

 6    on.

 7          But in considering this, and I have given it much

 8    thought, this case is so -- I can't even imagine how you all

 9    keep track of what you and your clients are doing.  I just

10    see so many wheels going at one time.  I appreciate the

11    discovery that is set up and how it might be interfered with

12    if the Court stays it.

13          I haven't been convinced.  I think there are good

14    arguments why to stay discovery, there are, but I'm not

15    convinced that in this particular case, and I certainly

16    recognize my authority to do it, but in this particular case

17    I am not going to interfere with the discovery.  We are going

18    to proceed on all of the timelines that we have.  There will

19    be a master appointed and working with you.  There may come a

20    time when there will be a motion for a stay because of where

21    you are with -- with the facilitator.  So at this point I am

22    not going to enter any stays.  We are going to continue on

23    the same timeline that we have.

24          And I want to know, who is reading those 100

25    million pieces of paper?

```
 1              MASTER ESSHAKI:  Your Honor, I read a lot of them.
 2              THE COURT:  You are.  Let's talk about the hearing
 3   dates for objections.  We have three of them.  The objections
 4   to the Master's order compelling production of the documents,
 5   that's the OEMs, I think the due date for that just passed as
 6   I've seen it, January 18th, and that's what's down here,
 7   yeah, it's January 18th, and the order granting the motion
 8   for Delphi compliance with the subpoena, and the TED
 9   objection to the order granting in part defendants' motion.
10   Okay.
11              MR. WILLIAMS:  Your Honor, Steve Williams on behalf
12   of the end payors.
13              I'm only here to address the first item which
14   concerns the OEM discovery, and if I could add a little bit
15   more to it.  Since the agenda went in, I believe that about
16   ten orders have been entered, and as to those ten orders,
17   there are a few objections.  All briefing on those should be
18   completed no later than February 20th.  That was as to the
19   last order concerning Honda.
20              We have been in touch with some of the OEMs.  We
21   understand that they would be available on the next status
22   conference we have with Your Honor, which I believe is on the
23   22nd of March.  I'm not speaking for defendants and they may
24   want an earlier date, but it does seem to me, unless any of
25   the OEM counsel here in the room have any updated
```

1  information, that at least we know that date would work for a
2  hearing as to all of the OEM objections that may come in.
3  And I should say none of the plaintiffs have objected to any
4  of those orders.
5          THE COURT:  Okay.  Thank you.
6          MR. HEMLOCK:  Good morning, Your Honor.
7  Adam Hemlock, Weil, Gotshal & Manges, on behalf of the
8  Bridgestone defendants.
9          Regarding the OEM discovery, we believe
10 Mr. Williams is correct that the briefing will be completed
11 by February 20th.  We would respectfully ask for an earlier
12 hearing date.  It may not make a huge difference, but as we
13 discussed earlier and as you heard, the process is going on
14 so long, we think that the OEM discovery is critical.  The
15 sooner that we can resolve the ongoing disputes and just get
16 the production going, the better.  We would be happy to
17 confer with the other parties and the OEMs to figure out a
18 date that works, but something in between February 20th and
19 the next status conference we think would be useful.  It may
20 be, you know, a meaningful number of issues to address as
21 well and it might be worthwhile to do that at a separate
22 hearing.
23         THE COURT:  You know what?  I'm going to read these
24 OEMs.  I don't think I need oral argument.  If after reading
25 them I think I do need oral argument, then I will give you a

 1    date and we'll set -- or we will coordinate with you, of

 2    course, so you could have the OEMs here, but at this point I

 3    think they are just going it be done on briefs.

 4              MR. HEMLOCK:  Okay.  Thank you, Your Honor.

 5              THE COURT:  Okay.  Anything else?

 6              MR. GANGNES:  Your Honor, Larry Gangnes speaking on

 7    behalf of the Furukawa defendants this morning.

 8              With respect to the hearing date on Delphi's

 9    objections to the Master's order, the subpoena that is the

10    subject of that order was issued on July 29.  The Master's

11    order enforcing it was entered on October 24, 2016.  The

12    briefing was completed on Delphi's objections on November 14,

13    2016.  We think the Court can decide the objections on the

14    basis of the briefing, but if the Court wants to have a

15    hearing, we would suggest that it be held at the next status

16    conference on March 22nd.

17              THE COURT:  Okay.  We will notify you if there is

18    going to be a hearing at the status conference.  Otherwise it

19    will just be done on briefs.

20              MR. GANGNES:  Thank you, Your Honor.

21              THE COURT:  Okay.  Thank you very much.

22              Any problem with TED?

23              MR. SHOTZBARGER:  Your Honor, with regard to

24    item 3, the truck and equipment dealer plaintiffs' objection

25    to the Special Master's order, we spoke with the defendants

```
 1    and we wrote to Ms. Doaks last week that both sides are
 2    willing to submit that dispute on the papers.
 3              THE COURT:  Thank you very much.  Okay.
 4              Then let's go back because -- oops, all right.  Are
 5    we done with the hearing date on the objections?  You weren't
 6    going to speak to that.
 7              Okay.  I want to go back to the status of the
 8    sealing orders and compliance with Shane.  Mr. Cherry?
 9              MR. CHERRY:  Yes.  So, Your Honor, the parties have
10    exchanged drafts of proposed stipulations to try to deal with
11    the issue.  We are very close.  We hope to talk early next
12    week and hopefully come to a conclusion.  And we have
13    discussed perhaps agreeing to a date, I think you said
14    February 10th --
15              MR. SELTZER:  Yes, yes.
16              MR. CHERRY:  -- where if we haven't come to a
17    resolution, we would just submit our -- whatever areas of
18    dispute there are to the Court for a decision.
19              THE COURT:  Okay.
20              MR. SELTZER:  And yes, Your Honor, we would submit
21    a joint stipulation setting forth any positions of the
22    parties if there is anything left unresolved to be decided,
23    and we would submit that either to Your Honor or to Special
24    Master Esshaki, whichever you think is best.
25              THE COURT:  Okay.
```

1          MR. CHERRY:  And Your Honor, it will address how to

2    deal with materials that have already been filed as well as

3    materials going forward, although the parties have been

4    dealing with this.  I know the defendants will be filing

5    motions here very shortly dealing with materials already

6    filed and what should or should not remain sealed and laying

7    out the basis for it.  And I -- I would note that things that

8    have been filed recently have been on motion, you know,

9    laying out the basis for Your Honor's decisions.

10          THE COURT:  Okay.

11          MR. SELTZER:  And the matters to be unsealed, for

12   example, include various of the complaints that were filed in

13   large -- they will be unsealed in large part.

14          THE COURT:  All right.  I -- I think you can

15   give -- if you have a problem, submit those directly to the

16   Court.  I'm anxious to get this part of it done and an order

17   entered.

18          MR. CHERRY:  Thank you, Your honor.

19          MR. SELTZER:  Very well, Your Honor.

20          MS. SULLIVAN:  Good morning, Your Honor.

21   Marguerite Sullivan from Latham & Watkins on behalf of the

22   Sumitomo defendants.

23          As Mr. Cherry noted, certain of the wire harness

24   defendants plan to file a motion to seal previously filed

25   materials, and we have -- we will agree to unseal the vast

```
 1    majority of the materials that have already been filed under

 2    seal, but there are a select number of documents that we

 3    would like to move to keep under seal.  And we would like the

 4    Court's guidance with respect to a subset of those materials

 5    which are the documents for which we are only requesting

 6    partial sealing.  What we would like to do is submit proposed

 7    redactions to the Court for in-camera review rather than

 8    filing them again on the public docket.

 9              THE COURT:  I think that would be fine.

10              MS. SULLIVAN:  If that is acceptable.  Thank you,

11    Your Honor.

12              THE COURT:  I think that would be fine, just so

13    they're already there anyway.

14              MS. SULLIVAN:  Thank you.

15              THE COURT:  Okay.  All right.  Now we are going to

16    the wire harness.  Okay.

17              MR. CHERRY:  Your Honor, we -- it is our motion.

18              MR. FINK:  Yeah, it's your motion, speak first.

19              MR. CHERRY:  We -- we would just -- we just --

20              THE COURT:  You are just asking for a hearing date,

21    right?

22              MR. CHERRY:  That's all.  And -- and, Your Honor,

23    we have discussed and agreed that we would submit our reply

24    brief before February 13th, and so really anytime after that.

25              THE COURT:  Can we do it after the -- after the
```

1   status conference on the 22nd?

2           MR. FINK:  That -- that's what we would propose,

3   Your Honor.  I'm sorry, that's -- that's what -- that we were

4   going to go propose.

5           MR. CHERRY:  We are happy to do it at the status

6   conference, we are happy to do it sooner.  There is just a

7   particular week where my son is getting married I would ask

8   that we not do it, but the status conference would be fine.

9           MR. FINK:  Your Honor, I would like the record to

10  reflect that I was not invited to that wedding, and that day

11  works perfectly for me.

12          MR. REISS:  Everyone else here was.

13          THE COURT:  Sorry, Mr. Fink.  All right.  Let's --

14  let's put it on March 22nd.  I think that's an appropriate

15  date.  Sometimes we get a lot of motions and maybe we would

16  have to move it up, but we will call you for your son's

17  wedding date.

18          MR. CHERRY:  Thank you, Your Honor.

19          THE COURT:  Okay.  All right.  But right now we

20  will plan on -- on March 22nd.

21          Furukawa's?

22          MR. GANGNES:  Your Honor, Larry Gangnes again for

23  the Furukawa defendants.

24          We've spoken with Mr. Fink, and the Court may

25  recall that you just entered a stipulated order --

1          THE COURT:  I did.

2          MR. GANGNES:  -- providing that the

3     direct-purchaser plaintiffs' opposition to Furukawa's motion

4     for summary judgment will be filed on March 1.

5          We suggest then that at the March 22 status

6     conference we again talk with the Court about a hearing date

7     for that motion after we have seen the opposition and we have

8     a date for Furukawa's reply brief.

9          MR. FINK:  Assuming they still want to go forward

10    with the motion after they see our response.

11         THE COURT:  Okay.  We don't have a date for the

12    reply.  I was going to set it in the middle of March in order

13    to get it on, but if you want to wait, you could have more

14    time for the reply.

15         MR. GANGNES:  Yes.  They've had -- they will have

16    had three months to respond to our motion.  We would like to

17    at least to see what they come up with on their opposition

18    before we establish a date for the reply.

19         THE COURT:  Okay.  Let's -- let's put that on for

20    the next agenda then, okay, in March.

21         MR. GANGNES:  Thank you, Your Honor.

22         THE COURT:  So we will need a reply date and

23    hearing date --

24         MR. FINK:  Thank you, Your Honor.

25         THE COURT:  -- if the reply is not filed by then.

1          MR. FINK:  We will try to agree on a reply date

2     before that date.

3          THE COURT:  Okay.  All right.  The next status

4     conference is March 22nd, and then the one after that is

5     June 7th at 10:00.  I take it those dates are still okay?

6     And then I was thinking of setting -- not during the summer,

7     of course, but the September conference, September 13th,

8     Wednesday, September 13th.  Is there anything going on then

9     or any date?

10          (No response.)

11          MASTER ESSHAKI:  With my motion hearing on the

12     12th, Your Honor?

13          THE COURT:  Yes.  I don't know if you all heard

14     that.  Then Mr. Esshaki's motion date will be the day before

15     that, the 12th.

16          Okay.  All right.  Then we're ready to start our

17     motion hearing but let's take a break.  I want you to talk

18     about facilitators while you are on break, make good use of

19     this.  We will take 20 minutes.

20          MS. STORK:  Your Honor, Anita Stork.

21          Is the Court contemplating having another group

22     discussion about the facilitator sometime later today?

23     Because if so, there are a number of counsel here that are

24     not involved in the motions to be argued later, and so for

25     that group of counsel, it would definitely be much more

```
 1    convenient to have the facilitation discussion, if we are to
 2    do that as a group, before oral argument.
 3              THE COURT:  Okay.  We will do it when we resume,
 4    all right, before the motions.  Do you think you need more
 5    time?  Let's talk about this because, you know, we could
 6    break -- we could break for lunch and come back in an hour if
 7    you need an hour.
 8              MR. HANSEL:  Your Honor, I assume the defendants
 9    may want to confer among themselves and then confer with the
10    plaintiffs, but I think it makes sense to do it before lunch
11    if possible.
12              THE COURT:  I would like to.
13              MR. HANSEL:  People have flights.
14              MR. REISS:  Your Honor, I -- I -- I -- I agree with
15    that, with -- with Mr. Hansel.  I would -- I would think if
16    you give us 20 -- 20 minutes, I mean we are going to have to
17    corral a lot of folks to talk about this, but I think maybe
18    we can use that 20 minutes --
19              THE COURT:  See what you can do.
20              MR. REISS:  Yeah.
21              THE COURT:  Let's see what happens.  We will meet
22    again in a few minutes.
23              THE LAW CLERK:  All rise.  Court is in recess.
24              (Court recessed at 11:36 a.m.)
25                        —   —   —
```

```
 1              (Court reconvened at 11:58 a.m.; Court, Counsel and

 2              all parties present.)

 3              THE LAW CLERK:  All rise.  Court is again in

 4    session.

 5              THE COURT:  Okay.  You want to discuss the master?

 6    Who is going to do that?  Mr. Cherry?

 7              MR. CHERRY:  Yes, Your Honor.  So --

 8              THE COURT:  Mr. Seltzer, Mr. Hansel, everybody is

 9    up here.  All right.

10              MR. SELTZER:  Yes.

11              MR. CHERRY:  So we had some concern that we

12    didn't -- we haven't had an opportunity to discuss names with

13    our clients or to do some research on them or to check on

14    their availability.  And so what we have discussed among the

15    parties is, and I think we agree, to come back to Your

16    Honor -- to -- to submit by a week from today either an

17    agreed-upon name or some -- our counter-suggestions for Your

18    Honor to choose.  We think that if we work together on this,

19    we can come to an agreement on someone that we would like --

20    that we would mutually like to use as a facilitator.

21              MR. SELTZER:  And, Your Honor, for the plaintiffs,

22    we would agree to that procedure.  If -- if for some reason

23    we can't agree upon a particular individual to be the

24    proposed facilitator, then we would submit alternatives for

25    Your Honor's consideration.
```

1    MR. HANSEL:  I would only add, Your Honor --

2  Greg Hansel for the direct purchasers -- that the person who

3  you select or on whom we may agree would -- would be sort of

4  the settlement master or facilitator but would also be able

5  to permit the parties to -- to mediate with other mediators

6  who they may agree on.

7    THE COURT:  I -- I think that that's exactly right.

8  He's to -- to permit the parties to proceed with the

9  facilitators that they have already been using, and he's also

10  to be able to pull in another -- other facilitators as he

11  sees necessary with the consent of the parties or else

12  brought before the Court.

13    Was there one other thing that we were thinking?

14    MR. REISS:  Your Honor, the one thing I would add

15  to what Mr. Cherry said is we will do our best to check on

16  the availability of these people.

17    THE COURT:  Well, I was just going ask you that.  I

18  want you to contact them -- there's two things: one, their

19  availability, and I'm talking about immediate.  I don't --

20  I'm -- not a month from now.

21    MR. REISS:  No, no, no.  I think as part of the

22  process we envision, it would be exactly that, Your Honor.

23    THE COURT:  Okay.

24    MR. CHERRY:  Immediately and continuing.

25    THE COURT:  So I will give you one week to submit

1     the name, but I would anticipate appointing that person

2     that -- the day I get it.  And I want you to determine the --

3     the fees.  I don't want to get into -- I don't know what they

4     are; I mean I hear stories.  But I have not appointed

5     somebody like that so I don't want to get into --

6               MR. HANSEL:  We should be able to get a volume

7     discount, Your Honor.

8               THE COURT:  You should.

9               MR. SELTZER:  I -- I think we can work it out, Your

10    Honor.  We -- we have been very successful in reaching

11    agreement on fees of the mediators that the parties have

12    selected in the past.

13              THE COURT:  Okay.  So you will discuss that and

14    then put that in -- either you select one person and so

15    that's all I need to know, or you put the little resumés and

16    what everybody's fees are, et cetera in the -- the list.  I

17    am hoping that you can come up with a person to -- for the

18    Court.

19              MR. HANSEL:  Thanks, Your Honor.

20              THE COURT:  So this is -- this is Wednesday, so by

21    next Wednesday, that's February 1st, right, that would be a

22    good way to start the month.  Okay.  All right.  Thank you

23    very much.

24              MR. HANSEL:  Thank you.

25              THE COURT:  Thank you.

1    MR. CHERRY:  And -- and -- and, Your Honor, I --
2  one additional point.  Just going back to the date of the
3  hearing on the summary judgment motion in the wire harnesses
4  case, we had -- Your Honor had set it on the -- March 22nd.
5    THE COURT:  Right.
6    MR. CHERRY:  It actually occurred to me my son's
7  wedding is that Saturday, that weekend, the 18th.  And I
8  wondered, given the time for prep, if it might be possible to
9  do it the following week.  And I know Mr. Fink has agreed to
10  that, that that worked for him if it works for Your Honor.
11    MR. FINK:  Yes.  And it was just a coincidence that
12  I then got invited to the wedding.
13    THE COURT:  Let me -- let me see what that week is.
14    MR. CHERRY:  So the week of the 27th I guess, Your
15  Honor.
16    THE COURT:  Okay.  The 22nd is the --
17    THE LAW CLERK:  The 27th, the week of the 27th.
18    THE COURT:  Yeah, okay.  Thank you.  Have to see
19  what else we have here.
20    (Brief pause)
21    We don't have a trial that date, so let -- let --
22  how about March 28th at 10:00?
23    MR. CHERRY:  That -- that -- that's -- that would
24  be fine with us, Your Honor.
25    THE COURT:  Okay.

```
 1          MR. FINK:  That works for us too.

 2          MR. CHERRY:  10:00 a.m.  Thank you, Your Honor.

 3          MR. FINK:  Thank you, Your Honor.

 4          THE COURT:  Okay.  All right.  With that, I think

 5   we are ready to go into our motions.  Anybody who wants to

 6   leave can leave, except me.

 7          (Brief pause)

 8          Okay.  We have a 2:00 wire harness, but I think the

 9   next thing is the body sealing products, number one, D-1,

10   defendant Green Tokai.

11          MR. SHOTZBARGER:  Your Honor, if I may just raise

12   one point before we commence the motion hearings.

13          THE COURT:  Okay.

14          MR. SHOTZBARGER:  For the truck and equipment

15   dealers, as it stands as of this morning, we are the only

16   indirect plaintiff left in the bearings case.  The end payor

17   plaintiffs previously filed a motion to extend the class cert

18   deadlines.  The truck and equipment dealers joined in that

19   motion.  I understand that Your Honor issued an order that is

20   tough to -- tough to read and tough to understand in that it

21   refers to the end payors' class cert deadline.  However, the

22   truck and equipment dealers' deadline is not specifically

23   addressed.  That order is at dash-503 ECF No. 230.

24          And so I would just like to raise the truck and

25   equipment dealers' request to extend the class cert deadline
```

```
 1   in the bearings case.  I have spoken with the two bearings
 2   defendants that are left in that -- in our case.  They do not
 3   oppose the request.  And in light of the status of OEM
 4   discovery as it stands now, not only are objections still
 5   being lodged, productions really have not fully begun.
 6            In addition to that, the way it shook out is that
 7   the truck and equipment OEMs are kind of at the back of the
 8   queue in that we went ahead with the lead six, but out of
 9   those lead six, really only Honda and GM manufacture vehicles
10   that are part of the truck and equipment dealers' case.
11            THE COURT:  Why don't you file your own motion that
12   so I could study it before I rule on it.
13            MR. SHOTZBARGER:  Will do.  Thank you.
14            THE COURT:  Okay.  Thank you.
15            Are we ready?
16            MR. LOVE:  Body sealings.
17            THE COURT:  Yes.  May I have your appearance,
18   please?
19            MR. LOVE:  Yes.  This is Brad Love of Barnes &
20   Thornburg on behalf of Defendant Green Tokai Company in the
21   body sealings case.
22            We filed the -- one of the motions to dismiss
23   that's on the agenda for the hearing today.  I -- I believe
24   that the Nishikawa defendants joined that motion as well, but
25   I will be arguing it for Green Tokai today.
```

 1          The -- the basis --

 2          THE COURT:  Let me ask you a question.  Does Green

 3   in the Green Tokai name have anything to do with

 4   environmental issues?

 5          MR. LOVE:  Actually no.  It is a former Cleveland

 6   Brown-turned-auto-supplier entrepreneur, Ernie Green, who

 7   played in the NFL for a while and then got into the -- the

 8   auto parts market, and it was originally a joint company

 9   formed by Ernie Green and a Japanese supplier.

10          THE COURT:  Thank you.  I was just curious.

11          MR. LOVE:  So the -- the basis for Green Tokai's

12   motion in the body sealings case is that there is no

13   plausible link between plaintiffs' purchases, and this is

14   specifically the indirect purchaser plaintiffs, the auto

15   dealers and the end payors, and the alleged conspiracy in

16   their complaint with respect to body sealings.  Plaintiffs in

17   both of their complaints have alleged that the defendants and

18   any named alleged co-conspirators, unnamed or named, sold to

19   only three Japanese-based OEMs:  Honda, Subaru and Toyota.

20   And there are no allegations in the complaints that the

21   plaintiffs purchased automobiles manufactured by those

22   Japanese-based OEMs, and there is no allegations that any of

23   the defendants or alleged co-conspirators sold to other --

24   sold body sealings to other OEMs, either U.S. based, European

25   based, Japanese based, besides Honda, Subaru and Toyota.  So

1    therefore, there is not a sufficient basis for the plaintiffs

2    to --

3            THE COURT:  You talking about brand of vehicle?

4            MR. LOVE:  Yeah, brand of vehicle, OEM,

5    manufacturer of vehicle.  There is not a sufficient basis for

6    the -- the plaintiffs -- the inference that they seek, which

7    is that every new vehicle sold in the U.S. manufactured by

8    every OEM was somehow impacted by this body sealings

9    conspiracy that has been alleged in the complaints.

10           The -- the -- the four tactics that plaintiffs take

11   in their opposition to avoid this conclusion are first to

12   ignore the actual allegations in the complaint and this

13   Court's prior rulings on the motions to consolidate and

14   suggest that they somehow alleged an industrywide conspiracy

15   that affected all OEMs, and that simply is not the case and

16   is inconsistent with the prior rulings in these consolidated

17   cases.

18           Second, they incorrectly claim that their

19   allegations are the same as those that this Court has found

20   sufficient in other claimed conspiracies involving other

21   suppliers, other OEMs, and other facts that are not alleged

22   in -- in their complaint, and -- and that's certainly not the

23   case for -- for the reasons we laid out in our briefing and I

24   will summarize briefly here.

25           THE COURT:  You -- you also talked about how 16 of

1    them weren't authorized to purchase from the OEMs.  What are
2    you talking about there?  Sixteen --
3            MR. LOVE:  The -- some of the ADPs, yes.  There are
4    16 of the auto dealer plaintiffs --
5            THE COURT:  Right.
6            MR. LOVE:  -- who specifically allege that they are
7    not dealers that can purchase from Honda, Subaru or Toyota,
8    and therefore the -- the facts as alleged actually disprove
9    any link between their purchases and the -- the conspiracy
10   allegations; not just the conspiracy allegations in the
11   complaint but the allegations as to who the defendants and
12   alleged co-conspirators sold body sealings to.  Again, there
13   is no allegation in either complaint that defendants or the
14   alleged co-conspirators sold to any U.S.-based OEMs or
15   European-based OEMs like GM, Ford, Chrysler, Fiat,
16   Volkswagen.  The -- the only allegations are with respect to
17   Honda, Subaru and Toyota.
18           The third tactic they take, which I think can be
19   quickly dismissed with, is suggesting that they aren't --
20   they aren't required to allege that they purchased vehicles
21   manufactured by the defendants or their co-conspirators'
22   customers or otherwise impacted by the specific conspiracy
23   they have alleged in this case.  They don't cite any
24   authority for that.  And the authority that we put forward in
25   our briefs clearly states that that link is -- is required

 1    both under Twombly to have a plausible claim and a basis for

 2    the claim and under Article III standing.

 3            And lastly, fourth, they put forward this straw man

 4    argument that Green Tokai is relying on matters outside of

 5    their pleadings with respect to this motion.  It is very

 6    clear from our briefing that we only rely on our pleadings,

 7    that's all we cite; we don't submit any of the consolidated

 8    discovery.  So that is just a complete non-sequitur with

 9    respect to this motion.

10            Turning back to the claim of an industrywide

11    conspiracy, I want to address that in a little more detail

12    just because I think it is so important to the disposition of

13    this motion.  Throughout their opposition plaintiffs

14    repeatedly claim that they have alleged this industrywide

15    conspiracy affecting all OEMs as they put it.  That's --

16    there are no cites to their complaint, there is nothing in

17    their complaint that make those allegations, and as I

18    previously mentioned, Your Honor has found those claims

19    implausible in the prior cases.  So not only are there no

20    facts to support it, the law in this case and new decisions

21    that came out in April of last year state that those such

22    claims are implausible.

23            Specifically I'm going to quote from Your Honor's

24    ruling in the instrument panel clusters case which applied to

25    numerous other cases, Docket 202-162 at page 9, specifically

1    finding that much broader allegations in those proposed

2    consolidated complaints support the DOJ's assessment that the

3    conspiracies are multiple, separate and product specific.

4         And there is no basis, certainly based on the

5    complaints that the indirect purchaser plaintiffs have put

6    forward, for a different conclusion here.  There are no

7    allegations of deals between makers of different component

8    parts, no inference of knowledge, no allegations that there

9    was any competition on different parts between the defendants

10   in this case, and those are all the factors that determine

11   that such a industrywide conspiracy was implausible on the

12   motion to consolidate.

13        I -- I also note that plaintiffs don't identify any

14   specific factual allegations in their complaints in their

15   opposition.  Instead they rely on the vagueness with which

16   they have pled the allegations in their complaint.  They say

17   that because they have prefaced certain facts with language

18   like for example or such as or et cetera, rather than

19   including additional facts, because they have said it very

20   vaguely and left themselves some wiggle room, that they

21   somehow pled something broader, and that -- that simply

22   doesn't stand under Twombly.  Under Twombly, plaintiffs'

23   claims must be evaluated based on the specific facts alleged,

24   not based on whether plaintiffs have somehow artfully crafted

25   their complaints with enough ambiguity to leave open the

1    possibility that there are additional facts.

2          And then we have to look to the four corners of the

3    complaint, and that's really the -- the key difference

4    between this motion and the prior motions in these cases.

5    Here only allegations are with respect to Honda, Subaru and

6    Toyota and that's with respect to any defendants or alleged

7    co-conspirators.  Those are the only sales that have been put

8    forward, the only customers that have been identified.

9    Unlike occupant safety systems on which plaintiffs rely,

10   there is no allegation that defendants dominated the market

11   and there is no allegations of any sales to non-Japanese

12   OEMs.

13         THE COURT:  We have one guilty plea though in this

14   body part, right, Nishi --

15         MR. LOVE:  Correct, yes.

16         THE COURT:  Nishikawa?

17         MR. LOVE:  Yeah, Green Tokai is -- is actively

18   defending itself in the District Court for the Southern

19   District of Ohio in Cincinnati.  A trial date has not been

20   set, but -- but certainly contesting the -- the allegations

21   put forward by the government there.  I can let Nishikawa

22   speak to any guilty pleas that have come in in that criminal

23   matter.

24         And the -- the -- the assumption that they can

25   somehow leave open the possibility of additional facts, you

1   know, this is, as -- as plaintiffs point out, the 34th case

2   that has come up in these MDL proceedings.  If there was some

3   sort of valid basis for a wide-ranging conspiracy impacting

4   every OEM as the plaintiffs have alleged, they would have

5   found it by now, but they have put no such evidence or

6   specific factual allegations in their complaint, you know,

7   eight years in, five years in to this proceeding, against my

8   client, Defendant Green Tokai.  And therefore, under Twombly

9   and the Article III requirements, they are missing the link

10  that would connect their purchases to any allegations of

11  sales by my -- my client, Green Tokai, or other defendants or

12  alleged co-conspirators in the case.

13          THE COURT:  Isn't -- isn't it plausible though, I

14  mean -- this isn't a summary judgment.  Isn't it plausible

15  that there is a component-wide conspiracy here?  I mean we do

16  have a -- a plea.

17          MR. LOVE:  I -- I -- I would agree that I think you

18  are right to separate out the question of a component-wide

19  conspiracy versus an -- the industry-wide conspiracy that

20  plaintiffs appear to be relying on because that's been found

21  to be implausible already and there's certainly no facts to

22  support it.

23          With respect to the component-wide conspiracy, that

24  is not what plaintiffs have alleged in their complaint.  I

25  think one of the clearest examples is paragraph 89 of the EPP

1    complaint, and even there they -- they attempt to identify

2    what they are talking about with OEMs and how OEMs purchase

3    directly from defendants.  They -- they incorrectly state in

4    their opposition brief that that paragraph supports the claim

5    that the OEMs also purchase from tier one suppliers.  If you

6    look at that paragraph, paragraph 89 of the EPP complaint, it

7    has no such allegation.  But even with respect to the direct

8    purchases that they identify in that paragraph, the only

9    three OEMs identified are these three Japanese-based OEMs and

10   that is Honda, Subaru and Toyota.

11           THE COURT:  The only three what?  I'm sorry.

12           MR. LOVE:  The only three OEMs they identify as

13   directly purchasing from any defendant or co-conspirator in

14   paragraph 89 is Honda, Subaru and Toyota.  And again, they

15   couch that with language such as or et cetera, but those are

16   the only specific factual allegations made in the complaint.

17   And Twombly requires, for plausibility, specific facts to be

18   alleged, not just basing your claims on for example or et

19   cetera or including but not limited to.  The -- the actual

20   facts you are alleging have to be put forward in the

21   complaint and that is what is required.

22           THE COURT:  Well, but we know if somebody

23   conspires, they had to conspire with someone.  There can't

24   just be one part -- one manufacturer in the -- in the part,

25   right, or there wouldn't be a conspiracy?

1        MR. LOVE:  Oh, correct.  Plaintiffs have again

2    brought claims against Nishikawa defendants and Defendant

3    Green Tokai and they -- they also allege unnamed

4    co-conspirators.  But again, grouping all of those together,

5    the only direct or indirect sales that plaintiffs identify in

6    their complaint, the only purchasers of these allegedly

7    impacted parts or potentially impacted parts are three

8    Japanese OEMs, and that's Honda, Subaru and Toyota.

9        THE COURT:  Okay.  Response?

10        MS. TRAN:  Good morning, Your Honor.  May it please

11    the Court, my name is Elizabeth Tran for the end payor

12    plaintiffs.  I will be responding to Mr. Love's argument on

13    behalf of the end payors as well as the auto dealers.

14        As an initial matter, contrary to Green Tokai's

15    representation, its motion to dismiss fails to raise any new

16    arguments in auto parts.  Its two main arguments, one, that

17    plaintiffs haven't alleged enough specifics pursuant to

18    Twombly, and two, that plaintiffs haven't sufficiently linked

19    defendants' conduct to plaintiffs' injury, has been

20    repeatedly rejected by this Court in this litigation.

21        Body sealings, as Mr. Love mentioned, is the 34th

22    case in auto parts.  It is no different than the 33 cases

23    that precede it.  Body sealings arises out of same DOJ

24    criminal investigation into illegal price fixing and bid

25    rigging in the auto part industry.  Green Tokai, its

 1    corporate parent and its corporate parent's executives were

 2    all indicted by a green jury -- grand jury for participating

 3    in the body sealings conspiracy.  Green Tokai's

 4    co-conspirator, Nishikawa, paid $130 million in criminal

 5    fines and pled guilty.  Three of its executives were also

 6    indicted.

 7         This Court has heard this fact pattern ad infinitum

 8    over the last five years and has rejected motions to dismiss

 9    in light of allegations regarding market conditions, guilty

10    pleas, investigations.  Green Tokai just simply has not

11    offered anything unique for the Court to reach a different

12    outcome here.

13         The Court shouldn't deviate from its prior motion

14    to dismiss orders for a couple of reasons.  Plaintiffs have

15    plausibly alleged that they indirectly purchased body

16    sealings from defendants.  Each of the complaints at issue

17    are over 100 --

18         THE COURT:  From these specific defendants?

19         MS. TRAN:  Excuse me?

20         THE COURT:  From these specific defendants, these

21    three defendants that they're -- not defendants --

22    manufacturers?  Excuse me.  They purchased the body -- the

23    body parts -- the body parts, oh my God.

24         MS. TRAN:  Body sealings.

25         THE COURT:  Yeah, from these defendants, and it is

1    the claim, I mean plaintiff is -- defendant is claiming, but

2    you don't say you purchased -- your plaintiffs purchased any

3    of the vehicles with these parts, right?  I mean isn't that

4    part of your --

5            MS. TRAN:  That's correct, though plaintiffs aren't

6    required to identify specific defendants that supplied body

7    sealings in their vehicles, if I understand the Court's

8    point.  Defendants are jointly and severally liable for the

9    conduct of their co-conspirators.  So plaintiffs' injury is

10   not limited to just the vehicles they purchased, at least

11   containing body sealings supplied by Nishikawa or Green

12   Tokai.

13           The complaints allege that the conspiracy goes

14   beyond the two defendant groups in the case.  The complaints

15   allege that there are as yet unnamed co-conspirators and also

16   an ACPERA applicant.  Discovery will probably reveal

17   additional defendants from which plaintiffs indirectly

18   purchased body sealings.

19           THE COURT:  Okay.  What -- what's the primary thing

20   that you believe, that you believe defendant is saying

21   distinguishes this case from the 30-some parts that went

22   before it?

23           MS. TRAN:  I think Mr. Love's point is that

24   plaintiffs here have only alleged that affected OEMs include

25   Toyota, Honda and Subaru.  That's not, in fact, what we

 1    allege.  We said that those three OEMs affected -- were

 2    affected by the conspiracies, but we didn't limit it to those

 3    three.  Those three OEMs were identified in the Nishikawa

 4    Rubber plea agreement, but plaintiffs have alleged that all

 5    OEMs could be potentially affected, and this is supported by

 6    our allegation that we are seeking to represent all persons

 7    and entities who purchased or leased vehicles containing body

 8    sealings manufactured or sold by defendants, their

 9    subsidiaries or co-conspirators during the period.

10         The ADP complaint I believe also alleges that GM,

11    Toyota and Ford purchased body sealings from defendants but

12    again didn't limit it to just these three OEMs; they were

13    just examples.

14         At this point in the case though there hasn't been

15    discovery.  This case is still subject to a stay.  The

16    information we have is based on our own investigation as well

17    as the DOJ criminal investigation.

18         THE COURT:  But could be -- you said could be

19    potentially affected.  That's really not the standard; it is

20    the plausibility.

21         MS. TRAN:  I apologize.  We did, in fact, allege

22    that all OEMs were affected by the conspiracy, and we do

23    believe that discovery, once it is permitted, would show that

24    all OEMs were affected.

25         And I -- I think given the -- the -- the broad and

 1    large scope of the DOJ investigation, the fact that this body

 2    sealings conspiracy started in January 2000, the fact that it

 3    involves American companies as well as Japanese companies,

 4    that it could -- the conspiracy could very well, you know,

 5    affect every OEM out there.

 6              THE COURT:  All right.  Thank you.

 7              MS. TRAN:  Thank you.

 8              THE COURT:  Reply, briefly?

 9              MR. LOVE:  Very briefly.  Just a couple brief

10    points, Your Honor.

11              There was a question and answer where plaintiffs

12    claim that they aren't required to identify the specific

13    products that they -- they purchased that were impacted by

14    the conspiracy.  Again, I note that there is no authority

15    in -- in plaintiffs' opposition for this claim, and that we

16    rely on both the Apple iPhone Antitrust Litigation, which

17    holds the plaintiffs can't rely on an assumption of impact

18    from a purchase of a related product where they haven't

19    specifically alleged that they purchased a product that was

20    impacted by the conspiracy, and the Magnesium Oxide Antitrust

21    Litigation -- again, these are both in our -- our briefing --

22    which says you cannot assume that every product in a diverse

23    market was impacted when conspiracy allegations related to

24    specific products.

25              THE COURT:  What percentage of the market does your

1    client have on this part?

2         MR. LOVE:  I -- I -- I have no idea, Your Honor.  I

3    know there are a number of manufacturers of these rubber

4    sealing products, and that's certainly an ongoing

5    investigation with respect to the criminal matter that is

6    indicated is proceeding where we also represent Green Tokai.

7         The -- the -- the other point I wanted to make just

8    briefly, plaintiffs stated again that they didn't limit it to

9    just three OEMs, and I -- I previously mentioned paragraph 89

10   of the EPP's complaint, which is the only paragraph they cite

11   in their opposition to -- to support this claim, and it says

12   for vehicles, the OEMs, mostly large automotive manufacturers

13   such as Honda, Toyota, Subaru, et cetera, purchased body

14   sealings directly from defendants, period.  That is all it

15   says.  It mentions no other OEMs.  It doesn't say they are

16   alleging that there were sales or impacted OEMs other than

17   these three.  It -- it is just a general description that

18   these are three of the OEMs that purchased body sealings

19   directly from the defendants.  There's -- there's no

20   allegation of impact beyond these three Japanese OEMs.

21        THE COURT:  Okay.  Thank you very much.

22        All right.  Let's hear from Nishikawa.

23        MR. TANSKI:  Thank you, Your Honor, and good

24   afternoon.  My name is John Tanski from Axinn.  I represent

25   the Nishikawa defendants.

 1        May I proceed, Your Honor?

 2        THE COURT:  You may.

 3        MR. TANSKI:  So, Your Honor, you just heard from

 4   Mr. Love, and he had a sort of broad motion attacking some of

 5   the antitrust theories that, you know, apply across a number

 6   of different states.  We have the opposite, we have a very

 7   narrow motion.  We are attacking two unjust enrichment claims

 8   that are pled under the laws of two specific states, Illinois

 9   and South Carolina.  And our argument in a nutshell is this:

10   In both of those states there is a specific legislative

11   prohibition on indirect purchasers bringing antitrust claims

12   as a class action.

13        THE COURT:  So unjust enrichment is, as you say, an

14   end run around this?

15        MR. TANSKI:  That's our argument, Your Honor.  And

16   the counter-argument from the plaintiffs that you are going

17   to hear is very similar to the one you just heard, which is

18   you have decided this issue before.

19        And so what I would like to do, first off, Your

20   Honor, if I may, is to just go through the many decisions

21   that you've made and I think show you what issues have come

22   before you with respect to unjust enrichment claims and then

23   explain why you haven't seen the specific state authorities

24   that we are citing, and those state authorities should cause

25   you to give a different outcome here than has been the

 1    outcome in some of the other cases.

 2             THE COURT:  All right.

 3             MR. TANSKI:  So the first case that the plaintiffs

 4    have cited is a 2013 opinion that you rendered in the wire

 5    harness case.  Now, in that case the plaintiffs hadn't

 6    specified the states under which they were proceeding with

 7    their unjust enrichment claims, and so the defendants just

 8    said, you know, you can't -- you can't do that, you need to

 9    specify states, and you agreed with that.  Your ruling was

10    I'm dismissing unjust enrichment, there is no general federal

11    common law of unjust enrichment so the plaintiffs need to

12    plead specific states.  Necessarily there was no discussion

13    there of South Carolina law or Illinois law or any other

14    state law.

15             The next set of opinions they cite are from 2014,

16    and those were in fuel senders, heater control panels,

17    instrument panel clusters, bearings and occupant safety

18    systems.  At this point the plaintiffs had specified all the

19    states under which they were proceeding, and the defendants

20    moved to dismiss basically for pleading deficiencies, saying,

21    you know, you hadn't adequately alleged harm and things like

22    that.  And Your Honor very conveniently in those opinions put

23    a summary paragraph at the beginning that said these are the

24    things that the defendants are raising that I'm going to

25    decide, and we have quoted those in our reply brief and cited

1    them for you so I won't quote them here.  But suffice it to

2    say there wasn't an allegation or an argument in any of those

3    cases that there is a specific statutory bar and therefore

4    you can't proceed with these specific claims.

5         So they then cite a 2014 opinion from a

6    consolidated motion brought by AVRP and a number of other

7    defendants.  Now, in that instance there actually was --

8    there were a bunch of state law-specific arguments, it was a

9    long brief, and at the end there were three pages where the

10   defendants said for all the reasons we have given you, you

11   should dismiss the antitrust and consumer protection claims

12   in all of these states, and then you should get rid of the

13   unjust enrichment claims too because unjust enrichment claims

14   can't stand alone.

15        And you rejected that argument and you relied on a

16   case from this district called In Re: Cardizem.  And In Re:

17   Cardizem states what we would call the general rule, and the

18   general rule is just because a statutory claim fails, that

19   doesn't necessarily mean that the unjust enrichment claim

20   must also fail.  I think the word they used in Cardizem was

21   often, courts often award common law or equitable remedies

22   even when another claim is not successful.  And you said the

23   defendants haven't shown me any reason to depart from that

24   holding.

25        Now, what they had cited to you because they were

1   attacking a number of different state law claims was not any

2   specific state authority; they had cited out of circuit MDL

3   opinions.  And you said I'm not persuaded, I'm going to

4   follow what I think Cardizem says as the general rule.

5           So the last case I want to talk to you about from

6   your prior holdings is actually not one the plaintiffs have

7   cited but it is one we cited in our briefs, and I think it is

8   the closest that any defendant has come to the argument we

9   are making today.  And that was a decision you rendered, I

10  think it was December 30th, 2015, in one of the direct

11  purchaser plaintiff cases on a motion by the wire harness

12  defendants.  They didn't address Illinois law but they did

13  address South Carolina law, and they said -- they pointed out

14  that South Carolina bars class actions for consumer

15  protection and antitrust claims.  And they said, well, you

16  know, it would be an end run around that public policy for

17  you to allow the unjust enrichment claims to proceed, and in

18  support of that, they cited three MDL opinions from out of

19  this circuit that had not previously been cited.  And your

20  opinion disagreed.  You said I recognize there are three new

21  opinions you've cited, but none of them persuades me to

22  disregard Cardizem and the holding that I have made that, you

23  know, generally these things are allowed to proceed.

24          So our submission here, Your Honor, is these prior

25  cases had many, many issues and necessarily couldn't focus

1    very much on specific states and specifically South Carolina

2    and Illinois.  And what we have tried to do is to give you

3    specific state law authority that you can follow rather than

4    the general rule in Cardizem in making your eerie guess about

5    what the Supreme Courts in Illinois and South Carolina would

6    hold about whether an unjust enrichment claim is permitted.

7          So what are those state court precedents that we

8    are citing?  It's three cases.  The first one is called

9    Laughlin; that's from the Illinois Supreme Court.  And in

10   Laughlin, there was an argument, it was brought by hospitals

11   alleging price discrimination.  And in that case the Illinois

12   Supreme Court looked and said, you know, the Illinois

13   Antitrust Act doesn't allow for a price discrimination claim.

14   The Illinois legislation considered that and rejected it, and

15   therefore we are not going to allow the Illinois Antitrust

16   Act claim to proceed.

17         And then they went on and looked at a consumer

18   protection claim and said we are not going to allow this to

19   proceed either.  The word they used was incongruous.  It

20   would be incongruous to hold that the legislature acted to

21   prohibit plaintiffs from bringing a certain kind of claim but

22   would allow them to bring essentially the same claim based on

23   the same facts with another label, and so they dismissed --

24         THE COURT:  And not pled in the alternative, these

25   are not alternative claims?

```
 1            MR. TANSKI:  Well, I think -- so you are going I
 2    think, Your Honor, to Skelaxin and its interpretation of
 3    Cardizem, that Cardizem was really looking at alternatives,
 4    and I think Laughlin approaches the issue differently.  And
 5    we cited a case from the Northern District of Illinois called
 6    Siegel which I think really explains the distinction well.
 7    The -- the principle in Cardizem, in Skelaxin, in Siegel is
 8    if you have an antitrust claim that is theoretically
 9    available, you can also plead an alternative, whether it is
10    unjust enrichment or consumer protection, and you might go
11    through and at the end it might fail for some reason,
12    insufficient proof or something like that, and it wouldn't
13    contradict public policy for the plaintiff, if he or she or
14    they can prove their claims, to then recover an unjust
15    enrichment.
16            And I think Laughlin is looking at something
17    different and Laughlin is saying when you have a specific
18    statutory bar, then we are not going to allow you to plead in
19    the alternative because the legislature has made a decision
20    and has expressed the public policy of the state to say we
21    don't want those types of claims to be litigated under our
22    law, and, to use Laughlin's word, it would be incongruous,
23    when the legislature has specifically said no antitrust
24    claim, to say, well, we'll just do the very same thing and
25    call it unjust enrichment.  So that -- that's the principle
```

1    that we derive from Laughlin.

2            And there is a case we have cited from South

3    Carolina called Hambrick that was very much the same

4    situation.  In Hambrick there was an allegation that a

5    mortgage company had engaged in the unauthorized practice of

6    law because they had charged as part of closing costs legal

7    fees but they hadn't used a lawyer.

8            Now, the South Carolina legislature had

9    specifically delegated to the South Carolina Supreme Court

10   the regulation of the practice of law, and South Carolina

11   Supreme Court said there is no private right of action for

12   that, it's -- that's not our public policy, that's not how we

13   want to regulate the practice of law.

14           So the Hambrick case went up to the South Carolina

15   appellate court.  The appellate court said you can't have a

16   claim for unauthorized practice, and these other derivative

17   claims, including unjust enrichment, have to fail also

18   because otherwise it would controvert the public policy that

19   the Supreme Court had expressed.

20           So we -- we think, again, you know, that stands for

21   the legal proposition that we are urging here, which is South

22   Carolina and Illinois have said no to indirect purchaser

23   class action claims like the ones that are brought here, and

24   therefore the unjust enrichment claim must also fail.

25           We've cited one more state law case which is called

1   Dema from the South Carolina Supreme Court.  Now, that was an
2   opportunity that the Supreme Court had to reject Hambrick,
3   and one of the parties went up and said you shouldn't follow
4   Hambrick, you should follow an Eighth Circuit case that we
5   think, you know, decided the issue differently.  And the
6   South Carolina Supreme Court didn't do that.  It discussed
7   Hambrick and then it said even if Hambrick weren't
8   controlling, the plaintiff's claim fails for another reason
9   because they didn't adequately allege harm.
10          And I think the plaintiffs put a lot of emphasis on
11  that and they say, well, the South Carolina Supreme Court
12  didn't approve Hambrick.  And I don't think we need to
13  disagree with that to point out that they had a chance to
14  reject it and they didn't.  And so the best indication of how
15  a South Carolina court would rule on this case comes from
16  Hambrick, and Your Honor should follow Hambrick in South
17  Carolina, Laughlin in Illinois, and hold that these claims
18  are barred.
19          And I think, Your Honor, that I've -- I've covered
20  the other point I wanted to make in response to your question
21  about alternative pleading.
22          THE COURT:  Right.
23          MR. TANSKI:  And what I would do is just draw a
24  line and say, you know, on one side of the line you've got
25  Cardizem, you've got Skelaxin, you've got Siegel, cases where

 1    the antitrust claim could exist, and therefore alternative

 2    pleading was appropriate.  On the other side of the line

 3    you've got Laughlin, you've got Hambrick and you've got this

 4    case where the statutory claims can't exist and therefore the

 5    unjust enrichment claims can't exist either.

 6            THE COURT:  Okay.

 7            MR. TANSKI:  Thank you, Your Honor.

 8            THE COURT:  Thank you.  Very good.

 9            MS. LI:  Good morning, Your Honor.  My name is

10    Evelyn Li.  I'm with the Cuneo, Gilbert & LaDuka law firm.

11            THE COURT:  Could you speak up please?

12            MS. LI:  My name is Evelyn Li.  I represent

13    automobile dealer plaintiffs.  I'm with the law firm Cuneo,

14    Gilbert & LaDuka.

15            First of all, I would like to address the argument

16    that Nishikawa defendants just made.  This is important

17    argument because they claim that being the defendants in this

18    34th case in this MDL, they have found new authorities on an

19    old argument.  This is truly an old argument; it is not new

20    as Nishikawa counsel just claimed.  For example, defendants

21    in anti-vibration rubber parts, radiators, switches, motor

22    generators, HID ballasts, electronic power steering

23    assemblies, fan motors, power window motors, windshield

24    washer systems, windshield wiper systems, inverters, fuel

25    injection systems, valve timing control devices, constant --

1  constant velocity joint boots have all argued that, I quote

2  here, the Court also should dismiss AD's unjust enrichment

3  claims under the laws of any states for which the court

4  dismisses AD's statutory antitrust and consumer protection

5  claims.  This parallel outcome is required because ADs cannot

6  use parasitic unjust enrichment claims to recover on failed

7  statutory antitrust and consumer protection claims.  This is

8  exactly the argument the Nishikawa defendants are bringing up

9  here.

10          This old argument has been rejected again and again

11  by Your Honor in your opinions.  For example, in response to

12  that argument I just mentioned and all of these cases I just

13  mentioned, Your Honor ruled that, I quote here, defendants

14  challenge IPP's unjust enrichment claims on various grounds

15  but argue three new cases require dismissal of ADP's unjust

16  enrichment claims in those states where the antitrust and

17  consumer protection claims have been dismissed.  None of the

18  authorities cited overrule In Re: Cardizem CD antitrust

19  litigation which the Court relied upon in its previous

20  decisions in the 12-2311 litigation.  Accordingly, the Court

21  denies defendants' request.

22          In fact, the Nishikawa defendants agree that this

23  issue that they bring up in this motion has been briefed and

24  argued many times, has been decided by this Court

25  consistently in our favor.  It is clear that the question of

 1    whether indirect-purchaser plaintiffs can make unjust

 2    enrichment claims under the state laws of those states where

 3    plaintiffs do not have statutory claims has been answered by

 4    this Court many times, and the answer is yes.

 5           THE COURT:  But we do have here specific cases in

 6    both Illinois and South Carolina that discuss their -- their

 7    laws that bar these actions.

 8           MS. LI:  Yes, Your Honor.  I think that's a --

 9    that's a very good question and I am going to respond to

10    their citations to those so-called new authorities but I want

11    to make sure that Your Honor -- Your Honor understands that

12    their argument is an old argument.  And I'll -- I'll go into

13    those cases they cite in detail, but I want to first talk

14    about what the plaintiffs believe to be the controlling

15    authorities here.

16           We disagree that any of the cases they cited from

17    state courts from Illinois or South Carolina are the

18    controlling authorities here.  We still believe and we

19    respectfully submit that this Court should follow what it has

20    done in the past and find that In Re: Cardizem and Skelaxin

21    are the controlling authorities.  In Cardizem the court

22    clearly pointed out that courts often award equitable

23    remedies under common law claims for unjust enrichment claims

24    in circumstances where claims based upon contracts or

25    other --

1           THE COURT:  Could you slow down a little bit

2      please?

3           MS. LI:  Sorry.

4           The Cardizem court pointed out that courts often

5      award equitable remedies under common law claims for unjust

6      enrichment in circumstances where claims based upon contracts

7      or other state law violations prove unsuccessful.

8           This means that in our situation here where our

9      antitrust and consumer protection statutory claims were

10     proved unsuccessful, we can proceed with our common law claim

11     and unjust enrichment.

12          In Skelaxin the court's ruling made it even more

13     clear that the argument that the Nishikawa defendants are

14     making here should be rejected.  Just like the defendants in

15     Skelaxin -- the defendants in Skelaxin argue the -- the same

16     as the Nishikawa defendants argue here.  They say plaintiffs

17     are precluded from asserting unjust enrichment claims because

18     the claims are merely a means of circumventing state

19     antitrust and consumer protection laws, and the Skelaxin

20     court considered that argument and rejected it because it

21     followed Cardizem.

22          Again, this is clearly -- this is clear enough, but

23     I just want to emphasize that we are seeking recovery under

24     the common laws of states that allow indirect purchasers to

25     recover.  Neither South Carolina nor Illinois prohibit

1    indirect purchaser actions, so allowing our unjust enrichment

2    claim to proceed under those states' laws does not conflict

3    with any prohibition on indirect purchaser actions.

4         The elements of unjust enrichment are different

5    than the elements of those statutory claims, and both us and

6    the defendants have analyzed and evaluated these elements of

7    unjust enrichment claims in each state in our past briefs and

8    this Court has decided in our favor many times in the past.

9    So it is incorrect for the Nishikawa defendants to say that

10   we are simply changing the label on our unjust enrichment

11   claims.  Our clients are injured here because they overpaid

12   for their vehicles.

13        The Nishikawa defendants also tried very hard to

14   distinguish their argument from the argument that was made by

15   the defendants in Cardizem.  However, they failed to do so.

16   I will give you an example.  The -- in the -- in Cardizem the

17   defendants argue that plaintiffs' unjust enrichment claims

18   are dependent upon the allegations supporting their state law

19   antitrust claims and thus suffer from the same flaws that

20   preclude plaintiffs from stating an antitrust claim, and --

21   and that argument is rejected by the Cardizem court.

22        Here the Nishikawa defendants state in their motion

23   at page 4 the unjust enrichment claims expressly depend on

24   the unlawful conduct pled in support of the antitrust and

25   consumer protection claims.  This is -- this is exactly the

 1    same argument the Cardizem defendants made, and it should be

 2    rejected by this Court.

 3            Now, let's -- let's move on to the authorities Your

 4    Honor was asking about.  They say they found new authorities,

 5    but none of these -- none of these cases were decided even

 6    within the last year.

 7            They also completely ignore the fact that many of

 8    their so-called new authorities have appeared in earlier

 9    briefings in this case.  Some were even cited to by this

10    Court in its opinions.  I will give you an example.  Let's

11    talk about the case they just mentioned, the Dema case from

12    the -- an opinion issued by the Supreme Court in South

13    Carolina in 2009.  In fuel senders, heater control panels,

14    instrumental clusters -- instrument -- instrument panel

15    clusters, this Court cited to Dema and found that Dema was a

16    case that supports our unjust enrichment claims in South

17    Carolina and not a case that helps defendants' argument.

18            For example, in fuel senders, Your Honor quoted

19    from Dema:  Under South Carolina law, a party may be unjustly

20    enriched when it has and retains benefit or money which in

21    justice and equity belong to another.  And Your Honor ruled

22    that at a pleading stage the Court finds the allegations

23    satisfy the elements of South Carolina law for plaintiffs'

24    unjust enrichment claims in South Carolina, so Dema is not a

25    new authority.

1           It is worth noting here that the Dema case is one

2    of Nishikawa defendants' most important new authority that

3    they rely on in this motion.   Because Your Honor has already

4    considered this authority to be an authority that's helpful

5    for our position, for our unjust enrichment claim, Your Honor

6    should not change her mind now.

7           And another thing to bring up is that we think it

8    is most likely the defendants in the first 33 cases have

9    already looked at all of these so-called new authorities in

10   the past, and they decided not to mention these authorities

11   in support of the same argument that the Nishikawa defendants

12   are making here, perhaps because they didn't think these

13   authorities support that old argument.

14          I will give you two obvious examples.   The Martis

15   case and the Laughlin case that counsel just mentioned, they

16   rely upon these two cases heavily in this motion.   However,

17   these cases were cited by defendants in the past cases in

18   this litigation.   For example, in heater control panels,

19   instrument panel clusters, OSS bearings and fuel senders,

20   defendants cited to Laughlin in support of their argument.

21   The Martis case was also cited by defendants in OSS bearings

22   and fuel senders.

23          So they are not new cases, they are not new

24   authorities.   So clearly it is incorrect for the Nishikawa

25   defendants to say that Martis or Laughlin or Dema are new

1    authorities that no one else has looked at or considered

2    before; they are not.  And there is no basis to ask Your

3    Honor to change her ruling on these old authorities when

4    there is -- when there is no new authorities on old issue.

5          Besides, another problem with the authorities that

6    the -- the Nishikawa defendants cited in their motion is that

7    they either misquoted the statements made in their new

8    authorities or cited to cases where the issue of unjust

9    enrichment was not even before the court, or they have quoted

10   speculative statement by courts where the courts simply

11   discussed how they might rule, if they were to rule, on the

12   issue of unjust enrichment.  The Nishikawa defendants, in

13   fact, do not have cases from the highest court in Illinois or

14   South Carolina that say if plaintiffs do not have statutory

15   claims, they cannot bring common law unjust enrichment --

16   unjust enrichment claims.

17         THE COURT:  Okay.

18         MS. LI:  So I think counsel mentioned -- for

19   Illinois, counsel mentioned the Laughlin case.  We can go

20   into a little more detail in that case because I think Your

21   Honor is interested to know more about what that court

22   actually said.  So in Laughlin, as I mentioned before, this

23   is not even new authority.  It is mentioned in the briefs,

24   in -- in defendants' briefs in HCP, IPC, OSS bearings and --

25         THE COURT:  Slow -- slow down.

1          MS. LI:   Sorry.   This case has been mentioned

2     before in defendants' briefs in H -- HCP, IPC, OSS bearings

3     and fuel senders.

4          This -- this case misses the point completely as in

5     this whole -- in this whole opinion, it doesn't even mention

6     unjust enrichment.   Defendants argue that in this case the

7     Court simply held that -- I'm sorry, defendants agree that in

8     this case the Court held that a statute should be interpreted

9     according to intent, that -- that's all.   There is no --

10    there's no discussion on unjust enrichment as the word is not

11    even mentioned.

12         But there -- there is no statute at issue in our

13    case here as we are talking about unjust -- common law unjust

14    enrichment claims.   We, the IPPs, the indirect purchaser

15    plaintiffs, are not seeking recovery under a statute

16    provision for our unjust enrichment claims.   We are seeking

17    recovery under the common laws of Illinois and South

18    Carolina.

19         That is why, when assessing whether the unjust

20    enrichment claims may go forward, Your Honor looked to In

21    Re: Cardizem which states that courts often award equitable

22    remedies on their common law claims for unjust enrichment in

23    circumstances where claims based upon contracts or other

24    state law violations prove unsuccessful.

25         THE COURT:   Okay.   I'm going to have to have you

1    wind up now, okay?

2         MS. LI:   Okay.  So I'll just -- I will briefly

3    address the other authorities that Your Honor were inquiring

4    about.  So the Hambrick case, I think it is another authority

5    that defense counsel relied heavily upon.  Give me a second

6    here.

7         So plaintiffs in that case allege that defendants

8    was unjustly enriched only because it violated the rules

9    against unauthorized practice of law.  In our situation,

10   whether or not defendants' actions violated state law,

11   plaintiffs would have overpaid for their vehicles as a result

12   of defendants' conduct.  Plaintiffs suffered because they

13   overpaid, not because defendants broke the law.  Plaintiffs'

14   case is completely different from that in Hambrick.

15        Further, Hambrick does not hold that common law

16   claims barred where plaintiffs chose not to bring statutory

17   claims due to a class action bar, it does not hold that.  It

18   holds instead that plaintiffs cannot recover in unjust

19   enrichment for an offense where the injury is based on the

20   unauthorized practice of law because there is no private

21   action, there is no private action based on that fact, based

22   on the unauthorized practice of law.

23        Here in our case there -- there are numerous

24   private rights of actions for overpayment for plaintiffs' --

25   for plaintiffs' vehicles.  Plaintiffs are not barred from

1   bringing private cases for overpaying for their cars.   South

2   Carolina -- South Carolina law contains no such prohibition.

3   The court in Hambrick simply stated that it cannot create a

4   private cause of action for unauthorized practice of law, but

5   in our case this is different because our client have

6   monetary damages.   The Supreme Court of South Carolina also

7   declined to adopt the ruling in Hambrick as the governing law

8   in South Carolina.   So citing to Hambrick does not help their

9   argument.

10          THE COURT:   Okay.   Thank you.

11          MS. LI:   Thank you.

12          THE COURT:   Brief reply.

13          MR. TANSKI:   Thank you, Your Honor.

14          And before I begin, does the Court have any

15   questions it would specifically like to --

16          THE COURT:   Now, why should I change the rulings

17   that I have made before?

18          MR. TANSKI:   Well, I think, Your Honor, before you

19   have been willing to look at issues again when arguments and

20   authorities that you haven't previously considered have come

21   before you.   You actually have a very nice quote, saying the

22   Court is not going to elevate law of the case over its duty

23   to defer to state law.   And so when we have read your prior

24   opinions, we have seen you saying I recognize In Re: Cardizem

25   as a general rule, and if you want to convince me to change

1    my mind, you need to show me specific state law authority

2    that I should follow instead. And we submit respectfully

3    that we have done that and that you should follow the

4    Laughlin case and the Hambrick case.

5            And, you know, Counsel tried to make some factual

6    distinctions in those cases. I wouldn't say that those are

7    completely on all fours exactly the same facts here. I think

8    they are similar cases, and I think more importantly that

9    they state a legal principle and the legal principle is what

10   you should follow, which is when the legislature expresses

11   public policy by barring a certain claim, it doesn't really

12   matter what label is attached to it, the legislature doesn't

13   want that kind of claim to go forward.

14           And what they have done here is they have brought

15   an indirect purchaser class action claim for, as -- as

16   counsel kept saying, you know, my clients overpaid for their

17   vehicles. Why did they overpay? Well, if you look at their

18   complaint, they say they overpaid because there was an

19   antitrust conspiracy. You can't bring those claims in

20   Illinois or South Carolina, it is against public policy to do

21   that as an indirect purchaser in a class action, and it

22   shouldn't matter if you call it unjust enrichment.

23           THE COURT: Okay.

24           MR. TANSKI: Thank you, Your Honor.

25           THE COURT: Thank you very much. All right. I

 1    think we will go for one more motion and then we are going to

 2    have to break for lunch.   This is Meritor's motion?

 3              MR. SAYLOR:  Yes, Your Honor.

 4              THE COURT:  I want you to stick to a ten-minute

 5    timeline, okay?

 6              MR. SAYLOR:  I will do my best, Your Honor.  Larry

 7    Saylor for -- representing Meritor from Miller Canfield.

 8          The exhaust system cases are very different from

 9    any of the other auto parts cases that have come before this

10    Court for one important reason:  That none of the defendants

11    in the exhaust system cases have pled guilty to any antitrust

12    violation.

13          But even more importantly from my standpoint, Your

14    Honor, is that Meritor is unlike any other defendant in any

15    auto parts case for one very important reason:  That Meritor

16    sold, completely exited the exhaust --

17              THE COURT:  It totally sold the exhaust systems in

18    2006?

19              MR. SAYLOR:  2007.

20              THE COURT:  2007.

21              MR. SAYLOR:  That is correct, Your Honor.

22              THE COURT:  And it filed its public reports to that

23    effect?

24              MR. SAYLOR:  That is correct, Your Honor.  Filed

25    8-Ks with the SEC, so it was a publicly announced sale.  The

```
 1   plaintiffs acknowledge this, both sets of plaintiffs
 2   acknowledge this sale in their complaints.  And there is no
 3   allegation anywhere in the complaints that Meritor retained
 4   any contact, any control over that business, any -- received
 5   any benefit from that business after the sale.
 6          So the first point that I want to make, Your Honor,
 7   is that Meritor by that sale, by that publicly announced
 8   sale, withdrew as a matter of law from any antitrust
 9   conspiracy that is alleged in this case, and as a result,
10   Meritor is not liable for any alleged acts of its
11   co-conspirators after the date of that withdrawal, so those
12   claims should be dismissed.
13          The law is clear, Your Honor, that a defendant
14   withdraws from an alleged conspiracy when it engages in
15   actions that are inconsistent with the conspiracy and makes a
16   reasonable effort to announce that to its co-conspirators.
17   It isn't necessary for the plaintiff to -- or -- or for the
18   defendant to disclose the alleged scheme to the authorities
19   or to -- or to potential plaintiffs.  That's clear from the
20   United States Gypsum case and many others.  The Eleventh
21   Circuit in Morton's Market and cases following it like Drug
22   Mart and Precision Associates hold very clearly that the
23   complete withdrawal from a business that is alleged to be
24   part of a conspiracy constitutes withdrawal as a matter of
25   law and terminates the liability of the withdrawing defendant
```

1    at that point.

2         The plaintiffs point out that withdrawal is an

3    affirmative defense, and they are right about that, but the

4    cases are also very clear, as we've pointed out in our

5    briefs, that dismissal is proper where an affirmative defense

6    is apparent on the face of the complaint, as it is here.

7         With nothing else, the plaintiffs turn to rank

8    unpleaded speculation.  They -- they argue that it is

9    possible that Meritor retained some contact, some control

10   over this business, received some benefit over -- or from

11   this business after its sale.  And they cite cases where the

12   defendant incompletely sold a business; cases where payments

13   to the defendants were contingent on the future revenues of

14   the business case; a case where the defendant remained the

15   major stockholder of the business; a case where the defendant

16   retained inventory and continued to sell the inventory and

17   continued to license technology to its alleged

18   co-conspirators.

19        But none of those things are alleged here and none

20   of them could be alleged here because that would be directly

21   contrary to the Meritor's public SEC filings, which this

22   Court can and should take account of in ruling on a motion to

23   dismiss.  Those filings make it clear that Meritor completely

24   exited the business in 2007 for a liquidated price and

25   retained only assets that are used in its other businesses.

```
 1            Plaintiffs also argue that Meritor would be free to
 2   re-enter the exhaust system business because it had a
 3   non-compete that expired in 2012, but plaintiffs don't make
 4   any allegation that Meritor has made any plans or has any
 5   intention of re-entering that business even though the
 6   non-compete has long since expired.  It would be just as
 7   illogical for the plaintiff to seek relief from a company
 8   that you or I formed yesterday that has never engaged in the
 9   exhaust system business because it might in the future.  So
10   plaintiffs' claims again Meritor based on conduct after it
11   exited the exhaust system business should be dismissed.
12            The second point that I want to make is this:  That
13   plaintiffs' damage claims against Meritor based on conduct
14   occurring before the sale of the exhaust system business are
15   barred by the statutes of limitations.  It is well settled
16   that withdrawal -- that -- that a defendant's withdrawal from
17   a conspiracy starts the statutes running as to that defendant
18   as of the time of the withdrawal.  And all of the statutes
19   here in all the states are between two and six years.  The
20   statute under the Clayton Act is four years, as -- as are
21   many of the state statutes.  It has been almost nine years
22   and over eight years.
23            THE COURT:  But the argument of when the statute
24   was started and --
25            MR. SAYLOR:  Your Honor, we -- the -- there --
```

 1    they have a -- they have really two arguments.  One is an

 2    argument of fraudulent concealment, and then they have

 3    another argument that they call the -- the discovery rule.

 4    And I will show the Court that those two rules really are one

 5    in the same rule in this circuit and in the states.  The

 6    Court -- this Court in -- let's see, this Court in wire

 7    harness and in fuel senders recognized that the states --

 8    some of the states apply a discovery rule that is essentially

 9    the same as the federal fraudulent concealment rule that

10    requires as a predicate either a fraud-based claim or an

11    antitrust claim plus allegations of fraudulent concealment.

12         The Sixth Circuit has held very consistently in

13    Akron Presform, Pinney Dock and Dayco and then most recently

14    in the Carrier case, all of which we have cited, that because

15    fraudulent concealment is an avoidance of the statute of

16    limitations and because statutes of limitations are favored

17    in the law, statutes of repose are favored, that the party

18    seeking the benefit of fraudulent concealment has to -- has

19    the burden of establishing it, and that under Rule 9(b),

20    fraud, as the Court well knows, needs to be pled with

21    particularity.

22         So it is clear from this Court's rulings in fuel

23    senders, from the Sixth Circuit's rulings in Carrier and

24    Pinney Dock and many other opinions, Judge Duggan's rulings

25    in dry cleaning, Judge Cox in refrigerant compressors, that

1    fraudulent concealment requires affirmative conduct that is
2    separate from and in addition to the underlying alleged
3    antitrust conspiracy.  It isn't enough to allege mere
4    silence.  It isn't enough to allege unwillingness to reveal
5    wrongful conduct or -- or even secret meetings.
6            Carrier makes it clear as well that conclusory
7    allegations of fraudulent concealment aren't enough, and all
8    the plaintiffs have here are conclusory allegations, and I
9    will quote their complaint.  They say that defendants met and
10   communicated in secret to conceal their conspiracy.  It --
11   it -- really, that allegation could not be more conclusory or
12   more devoid of facts.  And nowhere in plaintiffs' complaint
13   do they identify the place of any meeting, the -- the -- the
14   substance of any meeting and so on.  It's -- there's no --
15   they -- they don't allege, unlike in this Court's opinion in
16   fuel senders, that the defendants engaged in any particular
17   communications to monitor the conspiracy, that they used code
18   words, code names, any of that, none of that is alleged here.
19   So for that reason, the -- their reliance on wire simply
20   doesn't -- doesn't get them there.
21           They -- their conclusory allegation that the
22   alleged conspiracy is self-concealing also doesn't toll the
23   statute in the Sixth Circuit.  In Pinney Dock the Sixth
24   Circuit expressly held that an antitrust conspiracy is not
25   self-concealing and that the plaintiffs have to plead and

1    prove specific acts of concealment, and then Judge Duggan

2    followed and applied the Pinney Dock ruling in -- in dry

3    cleaning.  In -- in scrap metal, a most -- a more recent

4    Sixth Circuit case that has been mis-cited by the plaintiffs,

5    the Sixth Circuit reiterated that antitrust conspiracies are

6    not self-concealing.

7         So -- so plaintiffs have to allege fraudulent

8    concealment, acts of fraudulent concealment, specific acts

9    over and above the conspiracy, and here they simply haven't

10   done that.

11        They also argue that fraudulent concealment against

12   Meritor could be proven by reference to acts of other

13   conspirators, other alleged co-conspirators.  Of course, the

14   plaintiffs here haven't alleged fraudulent concealment

15   against any of the exhaust system defendants adequately.

16        But even if they had, the -- the Riddell case that

17   plaintiffs themselves cite holds that only affirmative acts

18   of concealment that are essential to the alleged conspiracy

19   can be attributed to other alleged co-conspirators.  And

20   because concealment isn't -- fraud and concealment are not

21   essential elements of the conspiracy that is alleged against

22   Meritor, Riddell would not allow any acts of any other

23   co-conspirators to be attributed to Meritor.

24        As -- as I've mentioned, the discovery rule, the

25   plaintiffs argue that the discovery rule somehow now trumps

1   fraudulent concealment, allows the plaintiffs to jump

2   directly past fraudulent concealment, don't have to allege

3   that anymore, don't have to prove it anymore, they can go

4   directly to the question of whether plaintiffs were diligent.

5            That flies in the face of all of the Sixth Circuit

6   opinions, all of which have held that fraudulent concealment

7   has to be pled with particularity.  Plaintiffs now say it

8   doesn't have to be pled at all.  That's -- that's simply

9   wrong, Your Honor, as a matter -- in the -- a matter of law,

10   certainly in the Sixth Circuit.  They cite one outlying

11   Seventh Circuit opinion that -- that does not represent

12   the -- as -- as the plaintiffs characterize it, does not

13   represent the law in -- in this circuit.

14            The third -- third point -- and -- and so for those

15   reasons, the -- the claims against Meritor based on conduct

16   prior to the sale of the business are barred by the statute

17   of limitations and should be dismissed.

18            The third point I want to make that is unique to

19   Meritor is this:  That plaintiffs' claims for injunctive

20   relief against Meritor don't state a claim on which relief

21   can be granted, and plaintiffs lack standing under Article

22   III because they haven't pled and, indeed, really can't plead

23   or prove a real immediate and cognizable danger of -- of --

24   of a recurrent violation by Meritor.  Meritor is no longer in

25   the business.  They don't allege -- they would have to

1   allege, at a minimum, that Meritor had some intent to get

2   back in the business.  Secondly, that plaintiffs would

3   directly or indirectly once again purchase exhaust systems

4   manufactured by Meritor.  And thirdly, that Meritor was

5   likely to again engage in some alleged conspiracy to fix

6   prices or rig bids in the exhaust system business.  And --

7   and plaintiffs haven't pled any of those things and really

8   can't plead any of those things based on the fact that

9   Meritor has -- has fully exited from the business.

10          So the -- the -- the Sixth Circuit opinion in

11  Rosen, the Supreme Court's opinion in Whitmore, the

12  Sixth Circuit's opinions in Day -- in Dayco and the Tenth

13  Circuit in B-S Steel all hold in the court that -- that

14  injunctive relief is inappropriate and that the claims for

15  injunctive relief should be dismissed in circumstances like

16  these.

17          The fourth and final point, Your Honor, that I want

18  to make is --

19          THE COURT:  Make it quick.  Your time is up.

20          MR. SAYLOR:  I will rely on our brief and -- and

21  arguments of our co-defendants, but that is that

22  plaintiffs' -- plaintiffs' conspiracy allegations against

23  Meritor are -- are inadequate under -- under Twombly and

24  Iqbal.

25          THE COURT:  Thank you.

1        MR. SAYLOR:  Thank you, Your Honor.

2        THE COURT:  Response?

3        MR. REISS:  Good morning, Your Honor.  Will Reiss

4   for the end payor plaintiffs, and I'm also going to be

5   speaking for the auto dealer plaintiffs.

6        And I know earlier there was another Reiss who

7   spoke, and this case is confusing enough, so some of us on

8   the plaintiffs' side refer to the other Reiss as the evil

9   Reiss, and I encourage you to do the same.  He's not here now

10  to defend himself so I figured I would -- no, I have told him

11  that as well.

12       But I just want to --

13       THE COURT:  Let's -- let's start with the

14  injunctive relief and get rid of that.  If they are not in

15  business, what are you -- what is your irreparable harm --

16       MR. REISS:  Well, so the injunctive claim is

17  depend --

18       THE COURT:  -- to business in this area?

19       MR. REISS:  -- is dependent upon their argument

20  that they withdrew from the conspiracy, and that, in fact,

21  is, for the reasons I would like to discuss, is a fact

22  question.

23       So if they did not truly withdraw from the

24  conspiracy, and case law is clear that just the mere sale of

25  the business alone does not constitute withdrawal as a matter

```
 1   of law absent a developed factual record, so if there is some
 2   suggestion -- and we --
 3          THE COURT:  They filed reports, they are done, they
 4   are out of this business.  Who -- what are they going to
 5   conspire?
 6          MR. REISS:  But -- but, Your Honor, there is case
 7   law that -- that -- that -- that says that they have an
 8   obligation not to just to show that they actually sold the
 9   business but that they actually completely and totally
10   severed all ties.  So we cite the case --
11          THE COURT:  How do they do that?  How do they do
12   that when they are not in business?
13          MR. REISS:  So -- so, first of all, the -- the --
14   the burden is on -- on them.  This is an affirmative defense.
15   And yes, they cite case law for the proposition that when an
16   affirmative defense is clear on its face, yes, the Court can
17   rule as a matter of law.  But there are a number of cases out
18   there, and we -- we cite to the Lithium Ion Batteries case,
19   there is also the CRT's case, where the Court has said, look,
20   the -- the -- the mere sale of the business without more
21   doesn't constitute withdrawal.  You need to demonstrate as a
22   defendant that, again, you severed all ties, that you didn't
23   have an economic interest in the business.
24          So in the Lithium case, for instance, this was on
25   summary judgment.  And by the way, all the cases cited by --
```

1    by the defendant is -- is -- are summary judgment cases with

2    one exception, and I will -- I will distinguish that one

3    exception.  But in the Lithium case, there was evidence that

4    the -- the defendant still retains some sort of an interest

5    in the business.  I think it -- it retains some -- some

6    inventory and was selling some excess inventory after the

7    sale of the business.  It retained its intellectual property

8    right and it also retained some additional assets.

9           Now, if you look at Meritor's financial

10   disclosures, A, it's a -- it's a statement saying that it

11   sold the business, but, B, they attach an asset purchase

12   agreement.  In that asset purchase agreement there is a

13   section that says assets that are excluded from the

14   transaction.  Okay.  And -- and -- and there are a number of

15   assets.  There is intellectual property, just like in -- in

16   the Lithium case where the Court said that wasn't sufficient

17   on a motion to dismiss.  There are other asset terms that

18   are -- are undefined.  They refer to a disclosure statement

19   which is not attached to the financial statements.  We looked

20   for it to see if we could find it, whether it was publicly

21   filed; it wasn't.

22          So there is -- there is a large question about

23   what, in fact, was excluded from the sale, what was retained,

24   what benefits did they derive from the conspiracy, did they

25   continue to participate in -- in trade associations.  That

1    was another finding that the Court held in Lithium, that --

2    that the -- the defendant was still involved in trade

3    associations.

4         And, again, I -- I -- I can't emphasize enough,

5    Your Honor, that the burden is on the defendant, it is an

6    affirmative defense.  So the -- you know, again, if it's on

7    its face clear that they withdrew from the business, then

8    that's one thing.  But -- but the mere sale alone -- and

9    there is not one case that -- that -- that Meritor cites to

10   that stands for the proposition that just selling a business

11   without more, as a matter of law, without a developed factual

12   record constitutes withdrawal.

13        They cite to this Morton's Market opinion; that's

14   an Eleventh Circuit decision.  That was decided after years

15   of discovery on a factual record where the Court concluded

16   definitively based on the facts that there was no evidence

17   that the defendant in that case failed to actually sever

18   itself completely and totally from the business.  And all the

19   cases hold that, that, again, you have to sever yourself

20   completely and totally from the business, with the burden on

21   the defendant.

22        Now, maybe there will be as simple at some point as

23   the defendant submitting a declaration that it did this, but

24   we, at a minimum, should be entitled to some discovery to

25   determine what were these assets that were excluded; you

 1    know, what -- what, if any, interest did they have in -- in

 2    competing in other jurisdictions?

 3         My colleague alluded -- alluded to there was a

 4    non-compete clause that was negotiated in the asset purchase

 5    agreement, but it explicitly provides that Meritor can

 6    reenter the business.  It also excluded certain

 7    jurisdictions, so they can actually -- and I'm not sure

 8    whether they have, but they -- they can reenter the business

 9    and -- or continue to compete in the business in other

10    jurisdictions.

11         So without answering these questions and without

12    being permitted some modicum of discovery, you know, we just

13    can't know what, if any, financial interest they have and

14    what they are -- they are continuing to do.

15         THE COURT:  They have a non-compete agreement?

16         MR. REISS:  They had a non-compete agreement and it

17    provided that from the date they entered into the agreement,

18    I believe for three years they could not reenter the United

19    States market; it may have been five years for the United

20    States and three years for Europe.  But that -- that deadline

21    has long past so they are now free to reenter those markets.

22    And as I mentioned, there were certain geographic regions

23    that were excluded, so that they may be maintaining and

24    competing in those regions and maybe they'll receive some

25    consideration from that.

1        There are also permitted I think under the
2   agreement to maintain an ownership of, I think, ten percent
3   or less in some companies, so they may have joint ventures
4   out there.
5        So they may, again, still be deriving some benefit
6   from the conspiracy.
7        And -- and I just want to cite to the one case that
8   they cite for the proposition that this can actually be
9   decided on a motion to dismiss.  It is this Precision
10  Associates case in the Eastern District of New York, and that
11  case is wholly inapposite to the facts here.  That case
12  didn't involve a sale of a business.  So unlike here, the
13  defendant actually turned itself in.  It went to the
14  authorities, it -- it ratted out the other defendants, and it
15  was actually working affirmatively against the -- the -- the
16  co-conspirators.
17       And nonetheless, the plaintiffs in that case
18  pleaded that the defendant was still continuing to
19  participate in the conspiracy notwithstanding the fact that
20  it had turned itself in, and the Court said, well, that's not
21  plausible, those allegations aren't plausible.  And moreover,
22  the Court found that the plaintiffs didn't have any
23  allegations suggesting that the conspiracy continued after
24  the defendant turned itself in.  But that's a very different
25  question than whether just selling a portion of your business

```
 1   where you are -- you are retaining some assets actually
 2   constitutes a withdrawal.
 3          And again I would refer the Court to the Lithium
 4   case, to the CRT case which denied a nearly identical motion
 5   to dismiss.  And again the judge said how am I supposed to
 6   determine this on a motion to dismiss without the benefit of
 7   discovery when all of these questions are unanswered,
 8   because, again, the defendant has the burden of demonstrating
 9   that it severed all ties from -- from the conspiracy.
10          THE COURT:  Okay.  Thank you.
11          MR. REISS:  Just turning briefly to -- to some of
12   the other issues, fraudulent concealment.  So even if -- if
13   Meritor's defense is -- is somehow successful, that they, in
14   fact, did withdraw from the conspiracy in 2007, and, again, I
15   would submit that's a fact question, as Meritor concedes, we
16   plead fraudulent concealment; we also plead the discovery
17   rule.
18          And it is notable that under the discovery rule,
19   Meritor doesn't even challenge those allegations or at least
20   they didn't in their principal motion to dismiss.  And so we
21   cite authority that where you don't raise this issue in your
22   principle brief, it is waived.  They do raise it for the
23   first time in their reply brief.  We didn't have an
24   opportunity to respond to that because it was first raised in
25   their reply brief, but -- but I will just briefly address it.
```

 1            I mean this Court has found that the discovery rule

 2    is applicable in a number of the -- the relevant state

 3    statutes that we plead, and it's -- it's -- it's very telling

 4    that Meritor doesn't cite to a single one of the state

 5    antitrust and consumer protection statutes that we cite where

 6    the discovery rule applies, they don't try to distinguish

 7    that.

 8            Instead, what they say is that the Court somehow

 9    conflated a -- a fraudulent concealment standard along with

10    the discovery rule, and that -- that just defies logic.  A,

11    it is contrary to the language of the state statutes, which

12    again Meritor doesn't even try to distinguish, and, B, it

13    would render the discovery rule superfluous because if a

14    discovery rule imposed a fraudulent concealment standard, it

15    would be no different than fraudulent conceal -- concealment,

16    which clearly it is not.

17            And then the -- the last group of cases that --

18    that Meritor tries to distinguish is they make this rather

19    odd argument that the discovery rule is -- is inapplicable to

20    federal damages claims, but we don't assert any federal

21    damages claims.  And your Court has held in -- in prior

22    opinions, in the wire harness opinion that -- that clearly

23    the discovery rule under state laws is different than federal

24    law.

25            But even if federal antitrust damage laws somehow

1    governed, and it doesn't in this case, we cite to the -- the

2    Copper opinion, which is a Seventh Circuit opinion, which

3    found that the discovery rule does, in fact, govern federal

4    antitrust claims.  So any way you slice it, our discovery

5    rule allegations are sufficient.

6            And then just briefly with respect to -- to

7    fraudulent concealment, it is -- it is the same old

8    allegations -- same old arguments that you have heard, you

9    know, multiple times.  I mean you have a defendant who is

10   challenging whether, in fact, we show that there was an

11   affirmative act of concealment.  And we allege, Your Honor,

12   and we actually cite on -- on page 12 of our brief, to four

13   different opinions in which you have ruled on this identical

14   issue.  You found that -- that allegations of code names,

15   which we allege, of monitoring the conspiracy, which we

16   allege, and of -- of representations that the bids were

17   competitive and weren't secret, that those were all

18   sufficient to adequately allege fraudulent concealment.

19           And -- and all of these cases that defendants are

20   citing, these are cases that have already been brought before

21   Your Honor, the Pinney Dock case, the Carrier case, which

22   basically said that plaintiffs need only allege some trick or

23   contrivance.  And you even found that is a very low burden,

24   it's a very small standard, particularly on a motion to

25   dismiss where we don't have the benefit of discovery, we

1    don't have the benefit of all that.

2        And so to -- to answer your initial question about

3    injunctive relief, unless we have a determinative conclusion

4    that they exited the conspiracy in 2007, which we don't,

5    which is -- should not be addressed, at least without the

6    benefit of limited discovery, we can't determine whether our

7    injunctive relief claim fails.

8        And I -- I just -- I know you have a long day, so I

9    do want to briefly address one last issue, and you are going

10    hear this from a lot of the exhaust system defendants, that

11    this case is somehow very different than -- than all the

12    other cases because there is no guilty pleas.

13        Well, we allege a lot of specifics here.  I mean we

14    have got an amnesty applicant, Tenneco, who admitted that it

15    had received conditional leniency from the government.  In

16    order to do that, Tenneco had to admit to wrongdoing, had to

17    admit that there was an active conspiracy involving exhaust

18    systems, which is the product at issue.  And -- and by

19    definition, a conspiracy involves one -- more than one

20    defendant, right?

21        So we allege market conditions sufficient to a

22    conspiracy.  This is again something the Court has -- has

23    noted bolsters our plausibility.  We allege illustrative

24    examples including examples related to Meritor involving its

25    conspiratorial conduct.  You know, we -- we go above and

1    beyond.

2              And -- and, you know, these illustrative examples,

3    Your Honor, are not typical in antitrust cases, and we talk

4    about this in our brief.  You know, the average antitrust

5    case, because defendants are very sophisticated, you don't

6    have smoking guns, you don't have evidence of agreements or

7    communications, but here we do have this.  And I'm not going

8    to ask you to clear the courtroom so we can get into our

9    illustrative examples, but suffice it to say that we allege

10   the identity in many instances of the employees involved, the

11   communications that took place and the locations that took

12   place, and that's -- that's more than sufficient to satisfy

13   that burden.

14             Thank you, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             Reply?

17             MR. SAYLOR:  Thank you, Your Honor.  Very, very

18   briefly.

19             Plaintiffs allege in their complaint that Meritor

20   sold its exhaust system business.  There is no allegation

21   anywhere in the complaints that Meritor's sale of the

22   business was anything less than complete.  And the 8-K that

23   SEC filed or that -- that Meritor filed with the SEC makes it

24   very clear, and we cite in our briefs the relevant sections

25   of that disclosure, that Meritor retained only assets that

 1    are used in its only -- in its other business, only

 2    intellectual property and assets that are used elsewhere in

 3    its businesses.

 4           There is nothing in that statement and nothing in

 5    the complaint that would indicate that Meritor did anything

 6    less than completely exit this business in 2007.  Anything

 7    more than that is pure unpleaded speculation, and it is

 8    unfair to keep Meritor in this case under those

 9    circumstances.

10           The Precision Associates case that we cited and

11    that --

12           THE COURT:  So let me just get this straight.  So

13    in order to prove that you had withdrawn by this sale, you

14    filed these SEC papers, and plaintiff is saying you have the

15    burden to show that you have totally withdrawn.  But does it

16    flip, would they have the burden to show that, what, you lied

17    on these SEC papers?

18           MR. SAYLOR:  Well, Your Honor, the -- the -- the

19    8-K form is, and we have cited a number of cases that hold,

20    relevant and -- and admissible.  And -- and even though this

21    is a motion to dismiss, that being a public government

22    document can be considered and should be considered by the

23    Court in ruling on this -- on this motion.

24           Secondly, if you -- if you -- if Your Honor reviews

25    the relevant sections of that document, which we cite in our

```
 1   brief, it shows without any ambiguity that Meritor sold this
 2   business lock, stock and barrel and has no continuing
 3   involvement in that business.
 4          THE COURT:  Right.  But that's why I'm asking, does
 5   it then flip the burden back to -- not back to but to
 6   plaintiff to show that this was some fraudulent document?
 7          MR. SAYLOR:  Your Honor, what -- what the cases
 8   hold is that a public document like the 8-K form is
 9   considered to be part of the pleadings.  So here we have a --
10   we have withdrawal, which is evident from the face of the
11   pleadings between plaintiffs' allegation, unqualified
12   allegation that Meritor sold the business and the -- and the
13   disclosures in the 8-K that there weren't any strings
14   attached to that sale.
15          THE COURT:  But they have had no -- no discovery?
16          MR. SAYLOR:  That -- that is correct, Your Honor.
17   But -- but if we -- if we take all of that together as the
18   plaintiffs' pleading, there is nothing -- there no reason for
19   discovery.  Meritor exited the business in 2007 and the
20   claims go away.
21          THE COURT:  Okay.
22          MR. SAYLOR:  With respect to the discovery rule,
23   the -- the Copper case that -- that counsel referenced stands
24   alone.  That's the only antitrust case we have seen anywhere
25   in the country that -- that uses sort of an unqualified
```

1    discovery rule that says that fraudulent concealment no

2    longer matters.

3           This -- this Court's own opinions in wire harness

4    and fuel senders make it clear that the discovery rule as

5    applied in the states and -- and -- and of course in this

6    circuit through Pinney Dock is essentially the same as

7    fraudulent concealment, there is very little difference; they

8    both depend on fraud.  And Pinney Dock made it clear that

9    where -- that antitrust claims don't -- are not fraud based,

10   they are not fraud claims.  So therefore fraud, if it is

11   going to be alleged, has -- the plaintiffs have the burden on

12   that and they have to plead and prove fraud with

13   particularity.

14           THE COURT:  Okay.

15           MR. SAYLOR:  Thank you, Your Honor.

16           THE COURT:  Thank you very much.  All right.

17           MR. REISS:  Your Honor, with -- with the Court's

18   indulgence, may I make just one -- one quick point?

19           I just -- just want to be clear about this.  I

20   think I alluded this -- to this earlier, but I want to make

21   it clear that the -- the asset purchase agreement that

22   Counsel alluded to does not on its face demonstrate that --

23   that Meritor sold all of its business.  It explicitly

24   excludes assets from the sale.  And, again, without the

25   benefit of additional documents, it is difficult to determine

1    what those assets were, but specifically intellectual

2    property was -- was -- was excluded.  Specifically some other

3    assets that are undefined, and as I mentioned before, refer

4    to disclosure statements that we don't have the benefit of,

5    and I -- I -- counsel is -- is not denying that.  In fact, in

6    their -- in their motion to dismiss, they even concede that

7    they sold substantially all of the business.

8            So even on the face of the documents, we are not --

9    we are not asking the Court to just suppose or allow us to go

10   on some sort of a fishing expedition.  There is a clear

11   suggestion from the asset purchase agreement that's attached

12   to their financial filings that they didn't sell all of the

13   assets associated with the business.

14           THE COURT:  Okay.

15           MR. REISS:  Thank you.

16           MR. SAYLOR:  Your Honor, if I can have 30 -- 30

17   seconds.

18           The -- we've cited in our reply brief the

19   sections -- in a -- in a footnote the sections of the 8-K

20   that show that -- and -- and the sections of the asset

21   purchase agreement that show that the assets that were

22   retained are only assets used by Meritor in its other

23   businesses.

24           THE COURT:  Okay.

25           MR. SAYLOR:  Thank you, Your Honor.

1          THE COURT:  Thank you very much.

2          All right.  We will take a half an hour break.

3          THE LAW CLERK:  All rise.  Court is in recess.

4          (Court recessed at 1:28 p.m.)

5                          —   —   —

6          (Court reconvened at 2:07 p.m.; Court, Counsel and

7          all parties present.)

8          THE LAW CLERK:  All rise.  Court is back in

9    session.

10         THE COURT:  You may be seated.

11         All right.  This is the motion for final approval

12   of the proposed settlement with GS Electeck by the DPPs.

13         MR. KANNER:  It is, Your Honor.  It is my

14   motion with GE -- excuse me.  Steve Kanner on behalf of

15   direct purchaser plaintiffs.  Excuse me.

16         And it is a combined motion for GS Electeck and

17   Tokai Rika.

18         THE COURT:  Okay.

19         MR. KANNER:  And if -- with the Court's permission,

20   I will speak for a few minutes and then I will be happy to

21   answer any questions the Court may have.

22         THE COURT:  Is there anybody here objecting to this

23   motion?  I know you have received no written objection.

24         MR. KANNER:  That's correct.

25         THE COURT:  Anybody in the courtroom objecting?

1                    (No response.)

2              THE COURT:  All right.  Mr. Kanner, you may

3     proceed.

4              MR. KANNER:  With that, I will proceed with a

5     little bit of litigation history and then describe the actual

6     settlements.

7              Wire harness cases began, as Your Honor knows, in

8     2011 at the end of the year.  Your Honor appointed the four

9     co-lead firms -- firms for the plaintiffs' group as co-lead

10    counsel and named Mr. Fink as liaison counsel in March of

11    2012.  You consolidated the matter in the spring of that

12    year, and the first consolidated complaint for our group was

13    filed in May of 2012, and that was filed -- followed, of

14    course, by several amended consolidated complaints.

15             The defendants filed multiple motions to dismiss

16    beginning in July of 2012.  The motions were all subsequently

17    denied in June of 2013.

18             The direct purchaser plaintiffs filed our second

19    consolidated complaint, amended complaint adding GS Electeck

20    in August of 2014.  GS Electeck answered the complaint

21    denying allegations in December of 2014.  We also included

22    Tokai Rika in that version, and with similar responses.

23             The settlement with GS Electeck was reached on

24    April 26th of 2016, and with Tokai Rika on July 5th, also of

25    2016.

1    As the Court knows, we had reached some interim

2    settlements prior to that with Lear in the amount of

3    4.75 million for which the Court granted final approval in

4    2014.

5    The direct-purchaser plaintiffs also reached

6    settlements with the Fujikura defendants in November of 2016

7    in the amount of $9.5 million.  I believe you have approved

8    preliminarily that settlement and we'll be moving for final

9    approval in conjunction with the other cases.

10   And of course Your Honor is aware of the recent

11   settlements with Yazaki for $212 million, Sumitomo for

12   $25 million, and Chiyoda for 1.15 million.

13   With respect to the settlements at hand, the

14   settlements that are before the Court today were obtained

15   through the diligence and hard work of counsel on both sides

16   of the V.  The negotiations were indeed at arm's length by

17   experienced counsel who made decisions recognizing the

18   inherent uncertainties of law and facts along with the

19   related risks of this highly complex litigation.  Plaintiffs'

20   counsel determined that the dollar value coupled with the

21   defendants' cooperation provided ample justification as the

22   consideration for these settlements.

23   With respect to the proposed notice of settlement,

24   it is a joint notice, as Your Honor is aware.  Following

25   preliminary approval, 3,874 individual copies of the combined

 1    notice of proposed settlement were mailed to all potential

 2    class members, and that's the number after de-duping.

 3            In addition, summary notice of the proposed

 4    settlement with today's hearing date was published in one

 5    edition of the Automotive News and in the national edition of

 6    the Wall Street Journal on November 21st of 2016.

 7            Additionally, copies of notice were and are

 8    currently posted online at the autopartsantitrust

 9    litigation.com; that's our website for these cases.  The

10    declaration of our product manager with Epic Class Action and

11    Claims Solution, Guy Thompson, which is attached, of course,

12    to our -- to counsel's report on dissemination of notice,

13    reflects that as of January 10th, 2017 there were 2,985

14    unique visits to the settlement website and 797 unique visits

15    to the wire harness section.

16            Finally, both -- counsel for both GS Electeck and

17    Tokai Rika have advised us they have fulfilled their

18    obligations under KAFA, disseminating notice of the requisite

19    notices to the appropriate federal and state officials on

20    September 23rd, 2016 for GSE, and September 27th, 2016 for

21    Tokai Rika.

22            There are two primary components to the

23    consideration for settlement.  First are the amounts.  The

24    settlement with GS Electeck is $3.1 million, the Tokai Rika

25    settlement is for $800,000.  The amounts are not reduced by

1   the one opt-out, just to the Tokai Rika settlement.  And

2   accordingly, the total for these admittedly smaller

3   defendants with a correspondingly small affected volume of

4   commerce is $3.9 million.

5       The second material benefit to the class is the

6   cooperation element for both defendants.  The nature and

7   extent of the cooperation is set forth more fully in our

8   papers.  Additional cooperation from the defendants has and

9   will continue to provide information in pursuing the

10  remaining non-defendants, and that -- that group of remaining

11  non-defendants is shrinking steadily.

12      A word about the size, Your Honor.  Some of the

13  wire harness defendants in this case, as you know, are very

14  significant-sized companies.  They are international entities

15  with sales in the billions of dollars.  Some of the

16  defendants are much smaller with affected volumes of commerce

17  in single or barely double digits.  The defendants in this

18  particular settlement are in the -- in that latter category

19  with respect to wire harness sales.

20      With requests -- with respect to requests for

21  exclusion, as the Court knows, the largest members of the

22  class are extraordinarily sophisticated OEMs with equally

23  sophisticated counsel.

24      Here the class members include OEMs in a large

25  number of companies in the supply chain.  Of those class

 1    members, only one domestic OEM, Ford, chose to opt out, only

 2    from the Tokai Rika settlement.  It is not entirely

 3    surprising since Ford is actually -- has obviously carried on

 4    its own action against the various defendants.  Accordingly,

 5    again, the total amount -- gesundheit -- the total of the

 6    settlements is $3.9 million for the two.

 7            And finally, of course, there have been no

 8    objections.  No one appeared today on behalf of any objectors

 9    and none have -- no objection been received by counsel.

10            So today, Your Honor, we are asking you to enter

11    three orders.  The first relates to the stipulated form of

12    final judgment with respect to the GS Electeck entities.  The

13    second is also a stipulated form of final judgment with

14    respect to the Tokai Rika entities.  And the third is an

15    order granting direct purchasers' request for authorization

16    to use some of the funds from the combined settlement for

17    purposes of current and future litigation expenses, although

18    as I understand, it is no longer future litigation expense,

19    that these are expenses that have been incurred thus far.

20            Concluding, Your Honor, the direct purchaser

21    counsel believe that the two settlements before Your Honor

22    today meet the requirements of Rule 23(a) in terms of

23    commonality, numerosity, typicality and adequacy, and that

24    they are appropriate for certification as settlement classes

25    in that common legal and factual questions predominate and

1     that a class action is, in fact, superior to any other method

2     of adjudication.

3              I'd be pleased to answer any questions the Court

4     has.

5              THE COURT:  I have no questions.

6              MR. KANNER:  Thank you, Your Honor.

7              THE COURT:  Thank you.

8              Does the defendant have anything?

9              UNIDENTIFIED ATTORNEY:  No, Your Honor.

10             THE COURT:  Okay.  All right.  The Court has --

11             MR. KANNER:  Your Honor, do you have copies of all

12    the proposed orders?  I have extra copies.

13             THE COURT:  I do not here, but I think what they

14    should do is go through Kay so that they can be signed and

15    then disseminated or filed in the appropriate --

16             MR. KANNER:  We'll make sure that takes place.

17    Thank you very much, Your Honor.

18             THE COURT:  I would -- I do just want to do a brief

19    summary for the record here.  I have read it, I find it's --

20    the first issue was, is the proposed settlement fair,

21    reasonable and adequate?  And we know it is for $3.9 million.

22             And the Court has to weigh a number of factors, and

23    those factors include things as likelihood of success, and we

24    have gone through this many times before on the likelihood of

25    success.  Plaintiffs, of course, are very optimistic, but

 1   success is never guaranteed.  The Court finds that the

 2   defendant acknowledges that it has risks also.  And so

 3   therefore this result is fair to both sides.

 4          The complexity, expense and duration of continued

 5   litigation, we already know how long, it has been referenced

 6   by counsel, the litigation has gone on.  Certainly it is very

 7   complex and it is immensely expensive.  So certainly it

 8   eliminates any future delays, future extensive expenses

 9   except for the distribution, and assures a substantial

10   payment of the settlement class.

11          Judgment -- the judgment of counsel here and the

12   amount of discovery, we know that substantial discovery has

13   been done, we talk about it every meeting, so I don't need to

14   go into that.

15          And the experience of counsel, counsel is well

16   versed in these matters, well experienced in these matters,

17   and the Court relies heavily on counsel, particularly after

18   the year -- years of dealing with counsel.

19          In terms of the reaction of class members, we know

20   there has been no objections after well over 3,000 notices

21   went out.  This was accomplished at arm's-length negotiation.

22   I think all together, the Court finds that these factors are

23   more than sufficient to show that this was a fair and

24   adequate resolution.

25          The notice -- I do have the report of the notice

```
 1   that was filed by the class counsel on dissemination, and I
 2   find that the notice was disseminated in a reasonable manner
 3   to all class members or proposed class members in as
 4   reasonable a manner as could be both by direct mail and by
 5   internet and advertisement.
 6          The class should be certified.  It was
 7   preliminarily certified.  It should be certified pursuant to
 8   Rule 23.  Certainly it is a very numerous class, over 3,800
 9   direct purchaser entities.
10          The questions of law and fact are common to the
11   class.  Antitrust price-fixing conspiracy cases by their
12   nature deal with common legal and factual issues about the
13   existence, scope and effect of the conspiracy.
14          Typicality, the proposed class representatives can
15   satisfy the prerequisite if the claim arises out of the same
16   event or practice.  And here typicality is satisfied because
17   the direct-purchaser plaintiffs' injuries arise from the same
18   wrong that is allegedly -- that is allegedly enjoining the
19   class as a whole.
20          Adequacy of representation, there is adequacy of
21   representation by both the named plaintiffs the Court finds
22   and also -- and I say it is adequate because the plaintiffs
23   all have the same common factual dispute -- dispute here, and
24   the representative parties will fairly and adequately protect
25   the interest of the class.
```

1            And the direct purchasers' representations are

2    through counsel.  The Court has already referenced the

3    qualifications of counsel and I believe that the whole class

4    would be adequately represented by them.

5            The Court determines that these claims involve the

6    single conspiracy from which the settlement class members

7    arise, and the evidence shows the violation occurred as to --

8    a violation that occurs as to one settlement class member

9    shows a violation that occurs to all and is common to all.

10           The Court finds that the class action is a superior

11   method here to determine this, these cases, because the

12   interest of the members of the class in individually -- in

13   individually controlling the prosecution of separate actions,

14   that protects that, and the extent and nature of other

15   litigation about the controversy by members of the class, and

16   the desirability of concentrating the -- the litigation in a

17   particular forum, and also the difficulties likely to be

18   encountered in management of the class action.

19           And considering all of these factors in

20   centralizing, with the case centralized in this Court, the

21   Court finds that this is a very efficient way of handling

22   this class, this group of plaintiffs.

23           The Court also notes that the parties are asking

24   for 20 percent, which at first sounded like a lot, but then

25   when you look at the size of the settlement, that's 780,000.

1     And from what the Court notes by examining the records in

2     this case of the expenses and fees, which are not at issue

3     here, but in terms of the expenses, finds that to be a

4     reasonable amount and the Court will award that for expenses.

5     Obviously, Counsel, correct, any balance on that goes into

6     the pot for the plaintiffs, right?

7              MR. KANNER:  That's correct, Your Honor.

8              THE COURT:  Thank you.  So the Court does approve

9     the final settlement and certifies the class and class

10    counsel and grants the request for the litigation costs.

11             Okay.  I think that's it.  If you submit the

12    orders, the Court will sign them.

13             MR. KANNER:  Thank you very much, Your Honor.

14             THE COURT:  Thank you.

15             Okay.  The next matter is -- I don't know how to

16    pronounce this -- Faurecia Emissions USA's motion to dismiss.

17    That is 6-C-3 on the agenda.  All right.  Counsel?

18             MR. IWREY:  Good afternoon, Your Honor.

19    Howard Iwrey from Dykema on behalf of Faurecia Emissions

20    Control Technologies, USA, LLC.  Fortunately I will refer to

21    them here as FECT, F-E-C-T.

22             Before I begin, we will be dealing with information

23    that's -- was deemed highly confidential and sealed in the

24    complaint.  I will try to just limit it to the years they

25    were operating and not identify people or meetings.

1      THE COURT:  If you do and it's confidential, you're

2  going to have to say that --

3      MR. IWREY:  Right.

4      THE COURT:  -- it's confidential, and we can excuse

5  anybody in the courtroom as long as you let me --

6      MR. IWREY:  Well, if it is okay with plaintiffs who

7  marked it confidential, I will only refer to the years.

8      UNIDENTIFIED ATTORNEY:  Okay.

9      MR. IWREY:  And does anyone from Tenneco object to

10  just providing the years?

11      UNIDENTIFIED ATTORNEY:  No.

12      MR. IWREY:  Okay.  Well, that makes life easier.

13      THE COURT:  Okay.

14      MR. IWREY:  Thank you.

15      A brief introduction is appropriate.  FECT is an

16  indirect subsidiary of Faurecia USA.  There is but one lonely

17  allegation against FECT in the complaint, and it states in

18  pertinent part that FECT made and sold exhaust systems.

19  Plaintiffs have failed to plausibly connect FECT to the

20  alleged conspiracy and therefore FECT should be dismissed.

21      A key point I will address here is that the only

22  factual allegations regarding conspiratorial activities

23  discuss conduct that occurred between 1998 and 2006.  The

24  problem for plaintiffs here is that FECT was formed in March

25  of 2007.  Therefore, FECT could not have possibly

1    participated in the alleged conspiracy or even competed in

2    the market during that time.

3            Another key point I will address here, and you have

4    heard this line before, Your Honor, this case is unlike any

5    of the other cases in the MDL.

6            THE COURT:  They are all so unique.

7            MR. IWREY:  They are -- everybody is special,

8    everybody is unique.  But our uniqueness here is something

9    that you hinted on in the argument with Green Tokai.  And

10   that difference is, unlike any of the other cases, there has

11   not been a guilty plea anywhere by FECT, by any Faurecia

12   entity, by any other defendant, or by any executive of any

13   defendant, and this holds true not only for the parts at

14   issue here, exhaust systems, but any other product.  So no

15   plea, nowhere, no party, no part.

16           These key defects likely explain two other things

17   that have transpired:  First, after our motion to dismiss was

18   filed, plaintiffs moved to amend the complaint to add

19   additional Faurecia entities.

20           Second, plaintiffs filed a whopping three-page

21   response here.  That also may be a unique fact.  Their

22   response was three pages, Your Honor.  Plaintiffs obviously

23   recognize that FECT is not a part -- a proper party.

24           And that's why we are asking you to dismiss FECT

25   now.  Then we can move on to consider the amendment, the

1    proposed amendment that is, and, if appropriate, test the

2    sufficiency against the three new Faurecia entities.

3          Now I would like to jump into more detail. First,

4    the Sixth Circuit in Carrier requires that plaintiffs must

5    specify how each defendant was involved in the alleged

6    conspiracy. As noted, the only allegation discussing FECT at

7    all was that it made and sold exhaust systems, but that's not

8    sufficient as a matter of law.

9          Second, the factual allegations on their face that

10   they call illustrative examples actually show that we

11   couldn't have participated in the conspiracy.

12         Now, let's assume, contrary to the case law, that

13   these allegations that just discuss Faurecia, without

14   identifying what Faurecia entity, but let's set that aside

15   and let's assume that they can get away with that. Even if

16   we credit those allegations against FECT, the only conduct

17   they discussed was 1998 through 2006. And, again, it is

18   beyond dispute that FECT did not exist until March of 2007.

19   So based on those factual allegations, it was literally

20   impossible that FECT could have participated in the alleged

21   conspiracy or obviously that FECT competed in the market or

22   even made or sold exhaust systems.

23         This sounds strikingly familiar because, Your

24   Honor, in MELCO and Fujikura America in their motions to

25   dismiss -- and in those cases I would add there were guilty

1   pleas -- but the Court dismissed those two parties because

2   they didn't compete in the market at the time of the alleged

3   wrongful activities.  FECT is in that exact same position and

4   should similarly be dismissed.

5          Now, let's see how plaintiffs respond to this fatal

6   defect in their three-page response.  They argue, well, these

7   factual allegations are just illustrative but not exhaustive

8   examples.  But of we -- as we have shown, these illustrative

9   examples on their face show that FECT could not have

10  participated.

11         What the plaintiffs are asking you to do, Your

12  Honor, is interesting.  They are assume -- they are asking

13  you to assume facts that are out there about the alleged

14  conspiracy that they have not pleaded.  In other words, they

15  want the Court to take their word that something else out

16  there exists on FECT, but they are not going to tell anybody.

17  That's even worse than those alternative facts we've heard

18  about over the weekend.  These are not alternative facts -- I

19  had to get it in -- these are not alternative facts; these

20  are non-facts.

21         Plaintiffs cite to no law supporting their theory

22  that allegations about other companies' actions should be

23  enough to plead a conspiracy that is unlimited in scope,

24  unlimited in the number of participants and unlimited in

25  length.

1     While this Court has previously held it wouldn't

2  limit the scope of a conspiracy set forth in a guilty plea,

3  it has not said that, in the absence of a guilty plea, a

4  party is entitled to the inference of a virtual limitless

5  conspiracy based on these illustrative examples.  If

6  plaintiffs can get away with this pleading ploy, they would

7  have a clear example -- incentive not to allege relative

8  facts, toss off a few factual allegations, call them

9  illustrative examples, and then rope in virtually everyone in

10 the industry.

11     So, Your Honor, in light of the fact that the

12 illustrative examples, the only factual allegations in the

13 complaint show that FECT could not possibly have participated

14 in the conspiracy, the only conclusion you can draw is that

15 there are no allegations showing that FECT participated and

16 it should be dismissed.

17     There is even further reason to dismiss FECT.  The

18 proposed amended complaints that were submitted by EPPs and

19 dealers were submitted with a motion to amend that was filed

20 after our present motion to dismiss was filed.  The proposed

21 amendment, however, does not make any further allegations

22 about FECT's role even after plaintiffs knew about the

23 defect.  Plaintiffs specifically admit in the motion to amend

24 that the proposed -- proposed amended complaints do not

25 contain substantive allegations that are relevant to the

1   present defendants.  Now, if plaintiffs have any substantive

2   allegations out there against FECT waiting in the wings that

3   would cure this defect, clearly they would have raised them

4   in the proposed amendment.  They didn't.

5          There is yet another reason.  As you heard earlier,

6   plaintiffs specifically alleged in the complaint in a

7   footnote that they have received confidential information

8   about the alleged conspiracy, and on page 24 of the response

9   to the Faurecia SA motion, plaintiffs state that the leniency

10  applicant was their source.

11         Now, after having the benefit of access to the

12  leniency applicant, all plaintiff alleged about FECT is that

13  it made and sold exhaust systems.  If plaintiffs had factual

14  allegations implicating FECT, they would have included them

15  in the original complaint or, at the very least, in the

16  proposed amended complaint that was submitted after our

17  motion.  They did not, and this is further reason for the

18  Court not to take the word or speculate that there are these

19  unpleaded factual allegations out there.

20         And finally that leads to my last point.  What

21  makes this case again unique is that there is no guilty plea

22  to prop up plaintiffs' conclusory and insufficient

23  allegations.  We point out at page 3 of our motion to dismiss

24  that the presence of a guilty plea by at least one party has

25  been essential to all of this Court's prior opinions holding

1    that alleged conspiracies were at least plausible.  The Court

2    has noted time and time again that it will look beyond the

3    allegations standing alone to the guilty pleas because those

4    guilty pleas demonstrate an express agreement.  We do not

5    have that here.  There is no guilty plea to assume an express

6    agreement or permit the Court to look beyond the factual

7    allegations, and as noted, the only factual allegations show

8    that FECT is entitled to dismissal.

9         And I would like to read from Your Honor's opinion

10   granting MELCO's motion to dismiss because it really

11   summarizes this approach.  The Court has allowed other

12   plaintiffs' classes to proceed against defendants in light of

13   allegations of guilty pleas against other suppliers in the

14   same market.

15        It has allowed plaintiff classes to proceed against

16   defendants in light of guilty pleas specific to a particular

17   country when the same product market was involved as well as

18   an overlap of defendants.

19        It has allowed plaintiff classes to proceed against

20   defendants involving products other than the limited product

21   involvement specified in the guilty plea.

22        And that's from your December 30th, 2015 opinion,

23   docketed at 93 in Case No. 14-14451.

24        Here, as you know, we have none of these

25   situations; no plea by no defendant, no part, nowhere.

1           And I would also add the following:  No executive

2    of FECT or any other defendant has pleaded guilty to any

3    conspiracy involving any part in the U.S. or anywhere else.

4    No parent subsidiary or affiliate has pleaded guilty.  And

5    the three Faurecia entities that plaintiffs propose to add in

6    their amended complaint have similarly not pleaded guilty to

7    any conspiracy.

8           And what do plaintiffs say in their three-page

9    response brief about this point?  Absolutely nothing.  And as

10   Mr. Reiss stood here just a few minutes ago and said, if you

11   don't argue it in your principal brief, you have waived the

12   claim.  They completely ignored it.

13          So as far as FECT is concerned, there is no -- the

14   only factual allegation about FECT was that it made and sold

15   exhaust systems.  Plaintiffs' complaint has to live and die

16   on its factual allegations that it has made, and these

17   illustrative examples of factual allegations prove that FECT

18   should be dismissed.

19          And finally I would like to address the last point

20   where plaintiffs plead that the presence of a motion to amend

21   should somehow stop you from deciding this motion here today.

22   The proposed amendment does not cure any of these defects; it

23   only adds three additional parties.  The plaintiffs admit

24   that there is no substantive allegations.  So regardless of

25   whether the Court ultimately permits this amendment, the

 1    claims against FECT should be dismissed here today.

 2            And as we noted in our opposition to the motion to

 3    amend, FECT has no opposition to allowing the amendment so

 4    long as FECT as well as Faurecia SA are dismissed.  And it

 5    was improper of plaintiffs to wrongfully accuse of us

 6    improperly opposing the amendment because what we said is we

 7    will allow you to amend so long as we have the opportunity to

 8    test the pleading against the three added defendants, but

 9    you've got to dismiss FECT and Faurecia SA because you have

10    no claims against them.

11            And therefore we specifically request that FECT be

12    dismissed with prejudice at this time and then we'll move on

13    to the amendment.

14            THE COURT:  All right.

15            MR. IWREY:  Thank you, Your Honor.

16            THE COURT:  Response?

17            MS. CASSELMAN:  Good afternoon, Your Honor.  My

18    name is Jill Casselman.  I'm with Robins Kaplan, and I

19    represent the end payor plaintiffs.

20            THE COURT:  How do you spell your last name?

21            MS. CASSELMAN:  C-A-S-S-E-L-M-A-N.

22            THE COURT:  Okay.

23            MS. CASSELMAN:  And for purposes of the motion, I'm

24    arguing on behalf of auto dealers as well.

25            MR. IWREY:  Could you speak up a little bit or

1    closer to the mic?

2         MS. CASSELMAN:  Sure.

3         MR. IWREY:  Thank you.

4         MS. CASSELMAN:  Just hold on, I want to move

5    forward.  Is this okay?

6         MR. IWREY:  Yeah, thanks.

7         MS. CASSELMAN:  FECT USA is asking this Court to

8    impose an impermissibly high standard on a motion to dismiss,

9    and they are doing it based on an unfairly narrow reading of

10   the complaints.  To survive a motion to dismiss, a plaintiff

11   need not specifically allege which defendants participated in

12   which action in support of their claims, they needn't include

13   a list of examples of illegal conduct throughout the

14   conspiracy period, and they needn't allege guilty pleas.

15        The motion to dismiss standard is, and has always

16   for all of the motions we have been hearing today and

17   previously been, whether we have plausibly alleged that FECT

18   USA participated in the conspiracy, and we have done that.

19   We have done that in a manner that this Court has repeatedly

20   affirmed is acceptable on a motion to dismiss by alleging

21   market factors such as high barriers to entry into the

22   market, inelasticity of demand, high concentration, and

23   et cetera.  And we have alleged the existence of an amnesty

24   applicant, Tenneco, which has come forward to the authorities

25   and said I participated in this conspiracy with someone,

1    which is --

2          THE COURT:  And though they have not pled guilty,

3    they have to admit guilt, right, to be an amnesty defendant?

4          MS. CASSELMAN:  Correct, they have to admit that

5    they participated in a -- in a price-fixing cartel of the

6    exhaust systems with somebody.  And I say with somebody

7    because we have illustrative examples of who those somebodies

8    are, and those are in our complaint and they're confidential

9    so I won't go into sufficient -- into much detail.  But we

10   also have these illustrative examples which cover, as counsel

11   said, a certain period of time through 2006.

12         Now, as I understand it --

13         THE COURT:  That wasn't established until 2007, so

14   how do you tie them in?

15         MS. CASSELMAN:  Correct.  So the main point of this

16   argument is there is no conspiracy after the date of the

17   illustrative examples.  That's not what we allege at all, and

18   a fair reading of our complaint in which we allege an ongoing

19   conspiracy makes it clear that we are not saying at -- as of

20   the date of the last example, everybody disbanded and went

21   home.  They absolutely continued to participate.  And we have

22   alleged that Faurecia -- Faurecia and FECT USA participated

23   in the conspiracy throughout the conspiracy period on -- on

24   an ongoing basis.  And those illustrative examples are simply

25   the examples we were able to put forward without the benefit

```
 1    of formal discovery.

 2          And there is no -- there is no case that -- that

 3    defendants have cited that says that an illustrative example

 4    is narrowing of what your complaint -- your complaint

 5    alleges.  Our complaint fairly alleges an ongoing-basis

 6    conspiracy which absolutely includes the post-2007 period

 7    when FECT USA was formed.  And --

 8          THE COURT:  Do you have any facts to support that

 9    or just the fact that -- just the fact that they produced a

10    product that was involved in the conspiracy by your

11    illustrative examples prior to that?

12          MS. CASSELMAN:  Yes.  So I -- our position is that

13    we have to live by our complaint.  We do live and die by our

14    complaint but luckily not by defendants' characterizations of

15    our complaint in which we have alleged an ongoing conspiracy

16    with participation of the Faurecia Group.

17          And we also have alleged at paragraph 74 of the EPP

18    complaint and I believe paragraph 58 of the ADP complaint

19    that one or more employees or agents of entities within that

20    corporation -- corporate family engaged in conspiratorial

21    acts on behalf of every company in that family, and that the

22    participants entered into agreements on behalf of their

23    respective corporate families, and that the participants did

24    not always know the corporate affiliation of their

25    counterparts nor did they distinguish between the entities in
```

1   the corporate family.

2        So when you take our complaint as a whole, all of

3   these allegations together, which is where we disagree with

4   Faurecia who is trying to pick them apart into specific

5   allegations where we named FECT USA, we have alleged a

6   plausible conspiracy that began at the beginning and went

7   well past 2007 in which Faurecia participated, and we believe

8   that includes Faurecia -- FECT USA employees who may have

9   been participating in another part of the Faurecia Group

10  prior to 2007, but they were probably -- we allege they were

11  participating after on behalf of FECT, FECT USA.

12       And just a quick point about the length of our

13  opposition brief, Your Honor.  I don't know if you've heard

14  the saying, you know, if you give me a week I can give you a

15  ten-page brief; you give me two weeks, I can give you a

16  five-page brief.  Brevity is a -- brevity is a virtue.  We --

17  we got the points in quickly.  But I think that the point

18  here is that we are not trying to say we have all of the

19  benefits of discovery and we know exactly the who, what,

20  where and when, but we don't need to say that on a motion to

21  dismiss.  We just have to allege a con -- a conspiracy that

22  is plausible that this entity participated in.

23       I believe that our -- our allegations regarding the

24  Faurecia Group and defendants generally, which are, you know,

25  hundreds of mentions of defendants and Faurecia which FECT

1   USA would like the Court to discard, are absolutely relevant.

2   We are supposed to be able to plead in an efficient manner

3   the claims against all of the defendants.  And, you know, I

4   personally find these complaints to be long.  Can you imagine

5   how much longer they would be if we had to list out every

6   single entity that we are pursuing in every paragraph in

7   which we are alleging something?

8           THE COURT:  You said that or implied that because

9   they were part of the -- the defendant group, you know, if

10  one person does it, the whole group does it, is that what you

11  are saying?

12          MS. CASSELMAN:  Well, in paragraph 74 of the EPP

13  complaint and paragraph 58 of the ADP complaint, we allege

14  that the employees that participated did so on behalf of the

15  entire group because they have shared interests, but we also

16  alleged that the counterparts in the other companies that

17  they are meeting with didn't necessarily know their

18  affiliation.  And so at this time we don't know, even based

19  on the benefits of amnesty applicant information, whether or

20  not Faurecia Group entities were employees of FECT USA or

21  whether at Faurecia SA.  There -- there is some stuff that

22  discovery needs to bear out.  And so for this time, our

23  allegations, fairly read, taken as a whole, do make it

24  plausible that FECT USA participated in the post-2000 time

25  period or 2000 and post.

```
 1              So I think that the -- the point is we don't have
 2    all of the information, but the Court has not required more
 3    than we have alleged in prior motions to dismiss.  As one
 4    example, in the bearings case, which I believe Mr. Iwrey is
 5    familiar with, his client, SKF USA, moved to dismiss saying
 6    that you have only alleged participation by the parent
 7    entity.
 8              And in denying that motion to dismiss, this Court
 9    said the plaintiffs do not need to detail specific conduct of
10    subsidiaries so long as the allegations as a whole create an
11    inference that the subsidiaries participated.  And I believe
12    that's what we have done here, and the -- the allegations and
13    the narrow reading of the complaints to suggest otherwise is
14    not the standard on a motion to dismiss.
15              THE COURT:  Okay.  What -- when was the amnesty
16    applicant, with did he apply for amnesty?
17              MS. CASSELMAN:  Your Honor, let me see.  I don't
18    know that date off of the top of my head.  I'd be happy to
19    look that up.
20              THE COURT:  We know in November of 2014 it reported
21    it publicly.
22              MS. CASSELMAN:  So I would imagine sometime prior
23    to that.  I don't know.
24              THE COURT:  Okay.
25              MS. CASSELMAN:  Okay.  Thank you, Your Honor.
```

 1          MR. IWREY:  May I respond, Your Honor?

 2          THE COURT:  Mr. Iwrey, yes.

 3          MR. IWREY:  Thank you.

 4          First of all, in the SKF case, there were guilty

 5   pleas by parties, number one.

 6          Number two, SKF, in fact, existed at the time of

 7   the alleged behavior.  Here, in stark contrast, the only

 8   facts that are alleged were before FECT even existed.

 9          I will address short -- the -- briefly the

10   allegation in paragraph 74:  You don't have to allege the

11   specific if you allege the corporate family.

12          First of all, I would cite the TFT LCD case, 586 F.

13   Supp. 2d 1109, saying the general allegations as to all

14   defendants or Japanese defendants or a single corporate

15   entity are insufficient, number one.  Number two, even if

16   they were sufficient, the only factual allegations about the

17   family were 1998 through 2006.  So paragraph 74 doesn't get

18   plaintiff over the hump.

19          A couple things --

20          THE COURT:  Don't they say it continues, it goes

21   on?

22          MR. IWREY:  I will address that, Your Honor.  They

23   say it continues.  I believe they said -- the dealer said it

24   ends when it ended, when it stopped, and the play -- the end

25   payors, they continue to the present time.

 1          But there is no factual allegations of a couple

 2    things.  They make the conclusory allegation that the conduct

 3    may have continued for some unknown time, but this does not

 4    plausibly allege -- if you look at the word continued, it

 5    doesn't allege that they joined any conspiracy.  We know that

 6    FECT didn't join the conspiracy that was the only conspiracy

 7    they allege, 1998 through 2006, because FECT didn't exist.

 8    They also do not allege anything about FECT joining the

 9    conspiracy after it came into existence in March 2007.  So

10    there are no allegations anywhere in the complaint tying FECT

11    to the alleged conspiracy, and the only factual allegations

12    disprove that FECT could have participated.

13          THE COURT:  Thank you.

14          MR. IWREY:  Oh, and finally the leniency applicant,

15    Your Honor, could I address that?

16          THE COURT:  Yes.

17          MR. IWREY:  As Mr. Reiss noted, plaintiffs did not

18    raise the leniency applicant point in their response brief.

19    We appreciated the brevity.  They did not raise the point,

20    they have waived that argument.

21          And in any event, there is absolutely no law

22    supporting this unasserted argument that a court should look

23    beyond the pleading if there is a leniency applicant.  And,

24    in fact, we find just the opposite in In Re: Capacitors case.

25    In addressing the significance of the leniency applicant, the

1    Court in that case expressly held that a leniency applicant

2    was not the equivalent of a guilty plea and indeed was,

3    quote, a nonfactor in the court's analysis.

4           Thank you very much.

5           THE COURT:  Thank you.  All right.

6           The next one is the Faurecia SA's motion to

7    dismiss.

8           MR. CALSYN:  Faurecia SA, yes.

9           Good afternoon, Your Honor.  My name is Jeremy

10   Calsyn from Cleary Gottlieb for Faurecia SA.

11          I find brevity to be a virtue so I am going to be I

12   think very quick today because I think our motion on personal

13   jurisdiction is a lot like and very close to other motions

14   you have seen before and granted.

15          I am going to just rest on the papers on the

16   12(b)(6) issues.  I think those have been addressed well in

17   the papers and a lot of the issues were just discussed.  So

18   rather than -- and for the sake of efficiency, I will just

19   focus on the personal jurisdiction issues.

20          So just quickly, the -- the Court has repeatedly

21   dismissed complaints against foreign holding companies that

22   do not manufacture or sell products in the United States, and

23   that's exactly what Faurecia SA is here.  Faurecia SA is a

24   holding company, it is based in France.  It's been -- never

25   been incorporated in the U.S., it has never had a principal

 1    place of business in the U.S., never had offices, a phone

 2    number, an address in the U.S., and it has never paid taxes

 3    in the U.S.

 4         This is exactly like the case where -- the case --

 5    the -- the -- the decisions you issued in the bearings case

 6    for AB SK -- SKF and for Schaeffler AG and the Leoni AG case

 7    in wire harnesses where you had a holding company not active

 8    in the U.S., doesn't participate in the marketplace that is

 9    at issue here, doesn't really sell products; it just holds

10    subsidiaries.

11         So I think here this should be, you know,

12    relatively easy given that you've considered these issues

13    over the last five years while I have been here.

14         THE COURT:  All right.

15         MR. CALSYN:  I think the only -- you know, the only

16    other question is whether we have a subsidiary in the U.S.

17    that's an alter ego of Faurecia SA.  And I think here, you

18    know, FECT is the defendant in the complaint that we have

19    looked at here.  FECT, as we have submitted in the

20    declarations with our brief, FECT runs its own operations,

21    runs its own business.  There is no reason to believe that

22    it's an alter ego.

23         You know, there are some cases that the plaintiffs

24    have cited, and I think in one -- in -- in their opposition

25    they say that, you know, where there is no declaration

1  supporting the -- the factual statements from the -- from the

2  defendant, you should -- you should deny the motion.  But

3  here we did actually put in the declarations, so I will just

4  point to those declarations.

5      So that's brief.  Thank you, Your Honor.

6      THE COURT:  Thank you.  Response?

7      MR. OCHOA:  Yes, Your Honor.  Omar Ochoa on behalf

8  of the end payors and auto dealers.

9      The -- the issue for jurisdiction is not as

10  straightforward as my colleague would say to the Court.  It

11  is actually different from the decisions that this Court has

12  issued regarding holding companies.  So the --

13      THE COURT:  How so?

14      MR. OCHOA:  -- the allegation in our complaint,

15  right, is that Faurecia SA manufactured, marketed, sold

16  exhaust systems in the U.S., either directly or indirectly

17  through its subsidiaries.

18      The -- the response to this from Faurecia SA is

19  basically twofold:  One, it is a holding company that doesn't

20  manufacture or sell parts so it shouldn't be a defendant.

21  And two, Faurecia SA is independent from FECT, right, the

22  U.S. subsidiary that we just discussed right now that was

23  created in 2007.  That's its basis for saying why they are

24  similar to previous holding companies that have been

25  dismissed or where the Court has granted motions to dismiss.

```
 1              But the problem is the twofold.  One, the fact that
 2   Faurecia SA is a holding company doesn't preclude the Court
 3   from finding it has personal jurisdiction over it.  The
 4   Court -- this Court and others have found personal
 5   jurisdiction over holding companies where the holding company
 6   acted on its own or through subsidiaries that it controlled.
 7   We cited a couple cases as examples for this.
 8              THE COURT:  Which subsidiaries does it control?
 9              MR. OCHOA:  Excuse me?
10              THE COURT:  Which subsidiaries does it control?
11              MR. OCHOA:  So this is -- so this is where -- where
12   we get to.  In the -- in the previous instances, the holding
13   companies gave affidavits to the Court saying we don't
14   market, sell the -- the product at issue in the United States
15   and we don't have control over the subsidiary that's also
16   named in the complaint.
17              They have done that again in this case, but as was
18   mentioned earlier, FECT didn't come into existence until
19   2007.  So there is a period of time, 1998 basically up until
20   2007, there are other subsidiaries, there are other people
21   who are controlling operations in the United States.  They
22   haven't defined, explained their relationship to those
23   subsidiaries or those U.S. operations.
24              And the information that end payors and auto
25   dealers introduced shows -- in our response briefing shows
```

1    that the Faurecia's -- the group's operations in the U.S. are

2    extensive.  They have manufacturing facilities in Troy,

3    Michigan, in Louisville, Kentucky.  They were telling their

4    shareholders from 2002 to 2006 that their sales of exhaust

5    systems were growing in the United States.

6          THE COURT:  Well, you have those -- those

7    defendants but what about this one?  Let's talk more

8    specifically about the SA.

9          MR. OCHOA:  Right.  So -- so -- so I guess the

10   point here is that Faurecia SA has not rebutted the

11   allegation, all right, that they sold, manufactured, marketed

12   exhaust systems through their -- through themselves or

13   through their subsidiaries from the period of time before

14   FECT.  All right.  They have given no explanation whatsoever

15   what their relationship was to operations in the U.S. prior

16   to the existence of FECT.  And so in that regard, they have

17   not rebutted plaintiffs' allegations, and because they

18   haven't rebutted those, those must stand and the personal --

19   and the -- the factual allegations do support personal

20   jurisdiction in that regard.

21         So, again, the -- the fact that, from the

22   information we presented, that there have been extensive

23   operations in the U.S. prior to FECT, there is no explanation

24   from Faurecia SA what that relationship was, end payors'

25   allegations stand that they sold exhaust systems directly or

```
 1    indirectly through those subsidiaries prior to FECT.
 2              THE COURT:  Okay.  Thank you.
 3              MR. OCHOA:  Thank you, Your Honor.
 4              THE COURT:  Reply?
 5              MR. CALSYN:  Thank you, Your Honor.
 6              Just two points.  I think Mr. Iwrey referenced the
 7    point about you have to be more specific than just talking
 8    about the group or the defendants or even one -- one entity
 9    generally, and I think that's also the response here.
10              Second, there is really no -- there's no
11    allegations in the complaint about these other entities.  If
12    we knew who the other entities were, we'd look at it, we'd --
13    we'd investigate, we'd see if we can write the same
14    declaration, but we know -- we know where the allegations are
15    and that's what we have addressed here.
16              I don't think there should be -- I don't think I --
17    I know of a case or know of a case here in this case, in --
18    in our auto parts matter, where you have had to go through
19    every subsidiary, every entity that exists.  I think in the
20    past you have -- you have respected the corporate structures,
21    and I think here we are just like those cases where the
22    motions have been granted before.
23              THE COURT:  Okay.
24              MR. CALSYN:  Thank you.
25              THE COURT:  Thank you.
```

1        The next one is Bosal.

2        MR. DE WAARD:  Good afternoon, Your Honor.  Ron

3   DeWaard of the Varnum firm for Bosal Industries Georgia, Inc.

4        We do plan to go into in my argument a fair amount

5   about the illustrative example, at least in two particular

6   programs; well, the only two programs that are alleged in

7   connection with Bosal.  And so I do think it -- it definitely

8   will raise the issue of the confidential information, so it

9   is probably appropriate that the courtroom would be cleared

10  except for the defendants in this particular case.

11       THE COURT:  Do we have anybody in here?  Well,

12  you're in the case.

13       UNIDENTIFIED PERSON:  Referring to the auto parts

14  case?

15       MR. DE WAARD:  No, the case that is alleged against

16  Tenneco and Faurecia, Bosal and Meritor.

17       (Non-designated parties were excused from the

18       courtroom for the following confidential

19       proceedings:

20       ████████████████████

21       ██████████████████████████████████

22  ████████████████████████████████████████████

23  ██████████████████████████████████████████

24  █████████████████████████████████████████

25  █████████████████████████████████████████



Status Conference / Motion Hearings - January 25, 2017



Status Conference / Motion Hearings - January 25, 2017







Status Conference / Motion Hearings - January 25, 2017





Status Conference / Motion Hearings - January 25, 2017





Status Conference / Motion Hearings - January 25, 2017













Status Conference / Motion Hearings - January 25, 2017



Status Conference / Motion Hearings - January 25, 2017



Status Conference / Motion Hearings - January 25, 2017





1    

2

3

4

5

6

7

8

9

10          THE COURT:  All right.  Thank you very much.  We

11   will see you in March.

12          THE LAW CLERK:  All rise.  Court is adjourned.

13          (Proceedings concluded at 3:26 p.m.)

14                      —   —   —

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                          CERTIFICATION
 3
 4          I, Robert L. Smith, Official Court Reporter of
 5   the United States District Court, Eastern District of
 6   Michigan, do hereby certify that the foregoing pages comprise
 7   a full, true and correct transcript taken in the matter of
 8   Automotive Parts Antitrust Litigation, Case No. 12-2311, on
 9   Wednesday, January 25, 2017.
10
11                            s/Robert L. Smith
                              Robert L. Smith, CSR 5098
12                            Federal Official Court Reporter
                              United States District Court
13                            Eastern District of Michigan
14
15
16   Date:  02/16/2017
17   Detroit, Michigan
18
19
20
21
22
23
24
25
```