REDACTED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : | Master File No. 12-md-02311 |
| | | Honorable Marianne O. Battani |
| In Re: All Parts | : : : : : : : | |
| THIS DOCUMENT RELATES TO: | : : : | |
| All Actions | : : | |

## RESPONSE REGARDING PROPOSED PUBLIC DISCLOSURE OF HONDA DEALERS' SENSITIVE COMMERCIAL DATA

REDACTED

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

CONCISE STATEMENT OF ISSUES PRESENTED................................................................ v

MOST APPROPRIATE AUTHORITIES ................................................................................ vi

PRELIMINARY STATEMENT .............................................................................................. 1

BACKGROUND ................................................................................................................... 1

    I.    EPPS ALREADY AGREED TO THE LEVEL OF PROTECTION DEALERSHIPS REQUEST, FOR OEM DATA SHOWING "PRICING FOR A SPECIFIC VEHICLE." ................................................................................................................ 5

    II.   THIRD-PARTIES' PRIVACY RIGHTS IN SENSITIVE COMMERCIAL DATA OVERCOME THE PRESUMPTION OF PUBLIC ACCESS...................................... 10

    III.  SENSITIVE BUSINESS AND FINANCIAL INFORMATION IS APPROPRIATELY SEALED.................................................................................................... 13

CONCLUSION.................................................................................................... 25

REDACTED

# TABLE OF AUTHORITIES

## Cases

*Alexander Interactive, Inc. v. Adorama, Inc.,* No. 12 CIV. 6608 PKC JCF, 2014 WL 4346174 (S.D.N.Y. Sept. 2, 2014) .................................................................................................... 13

*Application of Newsday, Inc.*, 895 F.2d 74 (2d Cir. 1990) ........................................................ 11

*ArcelorMittal Cleveland Inc. v. Jewell Coke Co., L.P.*, No. 1:10-CV-00362, 2010 WL 5230862 (N.D. Ohio Dec. 16, 2010) ....................................................................................... 9, 10, 15, 20

*Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848 (S.D. Ohio 2000)................................ 22

*Barkley v. Pizza Hut of Am., Inc.,* No. 614CV376ORL37DAB, 2015 WL 5915817 (M.D. Fla. Oct. 8, 2015).................................................................................................................. 16, 27

*Boards of Trustees of Ohio Laborers' Fringe Ben. Programs v. A2 Servs., LLC*, No. 2:13-CV-476, 2013 WL 5723069 (S.D. Ohio Oct. 18, 2013) ........................................................ 10, 15

*Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165 (6th Cir. 1983) .......... 9, 14, 21, 28

*Capitol Comm'n, Inc. v. Capitol Ministries*, No. 5:11-CV-00214-BO, 2013 WL 5369421 (E.D.N.C. Sept. 24,  2013) ................................................................................................ 17

*Compuware Corp. v. Serena Software Int'l, Inc.*, 77 F. Supp. 2d 816 (E.D. Mich. 1999) ........... 25

*Congoo, LLC v. Revcontent, LLC,* No. CV 16-401 (MAS), 2016 WL 3751613 (D.N.J. July 13, 2016) .................................................................................................................................. 16

*Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152 (S.D.N.Y. 2015) ..................... 12

*E.E.O.C. v. Abbott Labs.*, No. 10-C-833, 2012 WL 3842460 (E.D. Wis. Sept. 5, 2012) ....... 18, 20

*Flagg ex rel. Bond v. City of Detroit*, 268 F.R.D. 279 (E.D. Mich. 2010) .................................. 20

*Formax Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-C-0298, 2013 WL 2452703 (E.D. Wis. June 5, 2013) ................................................................................................................ 15, 21

*France Telecom S.A. v. Marvell Semiconductor Inc.,* No. 12-CV-04967-WHO, 2014 WL 4965995 (N.D. Cal. Oct. 3, 2014) ....................................................................................... 22

*Goodman v. Fuller,* 960 F.2d 149 (6th Cir. 1992) ..................................................................... 14

*Haskins v. First Am. Title Ins. Co.*, No. CV 10-5044 (RMB/JS), 2013 WL 12155641 (D.N.J. Nov. 20, 2013) ........................................................................................................ 16, 20, 27

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, No. 12-CV-03844-JST, 2015 WL 984121 (N.D. Cal. Mar. 4, 2015) ...................................................................................... 12

*In re Se. Milk Antitrust Litig.*, 666 F. Supp. 2d 908 (E.D. Tenn. 2009).................................. 11, 28

REDACTED

*In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-CV-194, 2014 WL 994383 (E.D. Tenn. Mar. 11, 2014) ................................................................................................................. 12

*Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F. Supp. 2d 432 (D. Conn. 2005) ................... 13

*Mars, Inc. v. JCM Am. Corp.*, No. CIV.05 3165 RBK, 2007 WL 496816 (D.N.J. Feb. 13, 2007) ................................................................................................................................... 16, 20

*Metcalf v. Yale Univ.*, No. 15-CV-1696 (VAB), 2017 WL 627423 (D. Conn. Feb. 15, 2017) .... 10

*Morawski v. Lightstorm Entm't, Inc.*, No. CV1110294MMMJCGX, 2013 WL 12122289 (C.D. Cal. Jan. 14, 2013) ........................................................................................................... 16

*NetJets Ass'n of Shared Aircraft Pilots v. NetJets, Inc.*, No. 2:14-CV-2487, 2016 WL 5349793 (S.D. Ohio Sept. 23, 2016) ...................................................................................... 15, 20, 28

*Paulson v. Holder,* No. CIV. 11-326-ART, 2012 WL 2919310 (E.D. Ky. July 17, 2012) ......... 12

*Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th Cir. 2016) ....... passim

*Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 95 F. Supp. 3d 860 (D. Md. 2015) ............. 12

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, No. CV 09-1531-PHX-JAT, 2011 WL 6182346 (D. Ariz. Dec. 13, 2011) .................................................................................. 17, 20

*United States v. Amodeo,* 71 F.3d 1044 (2d Cir. 1995) .................................................. 10, 11, 13

*United States v. Nallani*, No. 11-CR-20365, 2016 WL 4138227 (E.D. Mich. Aug. 3, 2016) 11, 28

*Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc.,* No. 11CV3633-LTS-MHD, 2015 WL 1573325 (S.D.N.Y. Apr. 9, 2015) .............................................................................. 12

REDACTED

## CONCISE STATEMENT OF ISSUES PRESENTED

Whether sensitive commercial data concerning prices paid to dealerships for specific vehicles, the profits dealerships made on those specific vehicles, the terms on which those specific vehicles were sold, and consumer characteristics associated with each vehicle purchase should be treated as Highly Confidential and redacted from public filings, when "the privacy interests of innocent third parties" should "weigh heavily" on a court's decision regarding sealing and redaction, when "information [that] is proprietary and would harm its [the redacting party's] business interests if released" needs to be redacted, and when public disclosure of such data could severally harm Honda dealerships' businesses, ████████████████████████████████ ████████████████████████████?

REDACTED

# MOST APPROPRIATE AUTHORITIES

## Orders

Special Master's Order Regarding the Production of Certain Vehicle Pricing Information, Case No. 2:12-md-02311-MOB-MKM, Doc # 1579 (Filed 12/29/16)

## Cases

*ArcelorMittal Cleveland Inc. v. Jewell Coke Co., L.P.*, No. 1:10-CV-00362, 2010 WL 5230862 (N.D. Ohio Dec. 16, 2010)

*Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165 (6th Cir. 1983)

*E.E.O.C. v. Abbott Labs.*, No. 10-C-833, 2012 WL 3842460 (E.D. Wis. Sept. 5, 2012)

*Formax Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-C-0298, 2013 WL 2452703 (E.D. Wis. June 5, 2013)

*Haskins v. First Am. Title Ins. Co.*, No. CV 10-5044 (RMB/JS), 2013 WL 12155641 (D.N.J. Nov. 20, 2013)

*NetJets Ass'n of Shared Aircraft Pilots v. NetJets, Inc.*, No. 2:14-CV-2487, 2016 WL 5349793 (S.D. Ohio Sept. 23, 2016)

*In re Se. Milk Antitrust Litig.*, 666 F. Supp. 2d 908 (E.D. Tenn. 2009)

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, No. CV 09-1531-PHX-JAT, 2011 WL 6182346 (D. Ariz. Dec. 13, 2011)

*United States v. Amodeo,* 71 F.3d 1044 (2d Cir. 1995)

*United States v. Nallani*, No. 11-CR-20365, 2016 WL 4138227 (E.D. Mich. Aug. 3, 2016)

REDACTED

## PRELIMINARY STATEMENT

Certain dealerships[1] have made a simple and modest request, frequently made and heeded in this litigation. Namely, that sensitive Honda dealership data, showing specific prices, paid for specific vehicles, as recently as last year, simply be treated with the respect typically shown to such data.

End-Payors have expended a months' worth of emails, a telephonic hearing, and a 17-page brief fighting that simple request, despite having already agreed to provide the same treatment to the same categories of data from the OEMs.

End-Payors' statement is only joined by a few Defendants (two of which are represented by the same firm)—the minority of the parties who served the subpoena.  No dealership entity joins the statement, nor did most of the Defendants join it either. The signature pages of the statement list more lawyers than businesses. This is not surprising. Almost no business could support the extreme position EPPs are taking, which is sure to injure hundreds of dealerships and compromise sensitive business data.

The dealerships' request is simple: that certain specific categories of vehicle-specific data be subject to narrowly-tailored redactions, in publicly filed documents, as has been done for many commercially sensitive pieces of information produced by third parties before.  This request is supported by the caselaw, and by the history of proceedings in this action.  It is time to implement these simple protections and end this dispute.

## BACKGROUND

These issues, which should have been resolved long ago, have a long history. When the parties first began meeting and conferring with Honda regarding a production to be made pursuant to the subpoena, Honda explained that it possessed some data from its dealers, namely

---

[1] Waikem Honda, Earnhardt Honda and Honda of San Marcos.

1

REDACTED

██████████████████████████████████████████████████████████

████████████████████████████████████████, *See* 2:12-md-02311-MOB-MKM, Doc No.

1500, Ex. C (Filed 11/07/16). Further, this would be largely data for purchases not made by End-Payor

plaintiffs, for vehicle purchases from dealerships that had nothing to do with any End-Payor Plaintiffs—

End-Payor Plaintiffs had already obtained records for their purchases from over a hundred dealers, who

were previously subpoenaed and burdened to provide EPP discovery.

██████████████████████████████████████████████████████

████████████████████████████ Non-Party Honda's Opposition To The Parties' Motion To

Compel Further Subpoena Responses, 2:12-md-02311-MOB-MKM, Doc No. 1533, at 3 (Filed 11/22/16).

EPPs did not undertake to obtain these dealers' consent, therefore, the issue was not resolved, and went to

mediation. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

Therefore, contrary to EPPs' assertion, there was no ruling on relevance, nor were there any

rulings on concerns about sensitivity of the data████████████████████████████████████████

████████████████████████ Page 3 of Ex. A to Order Regarding Honda Discovery, 2:12-md-02311-

MOB-MKM, Doc No. 1607 (Filed 01/19/17)████████████████████████████████

████████████████████

Honda sent letters to its dealerships. But it appears not all Honda dealerships received letters. For

instance, a number of Dealership Plaintiffs, who are or were recently Honda dealerships, did not receive

the letter from American Honda.

Further, the letter did not contain certain information regarding the production.████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

2

REDACTED



In addition, there is no indication that Honda advised its dealers that all of this sensitive business data would potentially become public and █████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████ Again, had all of this been made clear, many more dealerships would likely have added their objections.  No dealership would find it acceptable to have its business threatened in this way.

Once certain objections came in, the majority of which simply requested that this highly sensitive commercial information that belonged to dealerships simply be treated as highly confidential, as many of the documents and data produced in this case have been, and filed under seal, Dealership Counsel, who received these letters, emailed the Master and the other parties requesting that such treatment be implemented, thinking that the matter would be quickly resolved. The Master attempted to immediately

3

resolve the issue, back on February 13, 2017, by asking the parties to work out an order to address the dealerships' concerns. *See* Ex.2, Master's email from Feb. 13, 2017. End-Payors stated they would respond, but did not. *Id.* Therefore, Dealership counsel again raised this issue four days later. *See* Ex.3, Dealership Counsel email of Feb. 17, 2017. End-Payors, instead of agreeing to work out an order, rejected the Master's request to do so and instead made the same arguments regarding the *Shane* case that they made in their filing, and stated that they wished to submit the issue directly to the Court, rather than the Master. *See* Ex.4, EPP email from February 17, 2017.

Dealership Counsel pointed out that all that was being requested was treatment similar to what End-Payors had already agreed to provide, less than two months prior, for pricing data coming from OEMs concerning particular vehicle sales, set forth in the Special Master's Order Regarding the Production of Certain Vehicle Pricing Information, Case No. 2:12-md-02311-MOB-MKM, Doc # 1579 (Filed 12/29/16). ADP Email of February 18, 2017 Ex.5. That order requires that OEM data showing prices for specific vehicles be produced as HIGHLY CONFIDENTIAL–EXPERTS' EYES ONLY (and not even *shown* to attorneys, or anyone aside from experts) and that "[m]aterials derived from and/or otherwise based on the OEM Vehicle Pricing Data shall be designated 'HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY and given the protections set forth for documents bearing that designation in the Protective Orders." *Id.* at para. II(B)(1)-(2), II(B)(5). The definition of "OEM Vehicle Pricing Data" in that Order is "VIN level transactional data reflecting an OEM's pricing for a specific vehicle." *Id.* at I(F). This is the same data as the Dealership DMS data at issue here—pricing data for specific vehicles. ███████████████████████ ████████████████████████████████████████████████ ███████████████████ Thus, Dealership Counsel expected that this dispute would be resolved quickly and easily, with an agreement to treat the same types of data from OEMs and dealerships, in the same way.

REDACTED

The Master, for his part, explained the matter was before him and once again asked Dealership Counsel to draft an order implementing the necessary confidentiality protections and asked Dealership counsel and End-Payors to meet and confer regarding that draft. *See* Exs. 4, and 6, Master emails of February 17 and 20, 2017. Dealership counsel sent EPP counsel the draft on Thursday, February 23, and EPPs advised that they were not available to meet and confer until Tuesday the next week. Neither before the meet and confer, nor after, nor during did the EPPs propose any edits to the short and simple draft circulated by Dealership Counsel, which stated that the data would be designated Highly Confidential, treated pursuant to the Highly Confidential protections in the Protective Order, and filed under seal.

Instead, End-Payors suggested that the dealerships who owned this data, as confirmed by Honda, would not be permitted to make the confidentiality designations *at all*. They then abruptly suggested that they would submit the dispute to the Master (without negotiating a briefing schedule with Dealership counsel), but did nothing for several days, so Dealership Counsel again raised the issue with the Master and requested an order simply to treat this data with an appropriate level of confidentiality. *See* Dealership Counsel Email of March 2, 2017, attached as Ex.7.

The Master requested Dealership Counsel to submit a motion for the relief they were seeking. Master Email of March 2, 2017, attached as Ex.8. Dealership counsel agreed to do so, but EPP counsel objected to this solution as well, and continuing to resist attempts at resolution, demanded a telephonic hearing. End-Payor Email of March 2, 2017, attached as Ex.9. Finally, after a combative hearing, where every reasonable accommodation requested by Dealership Counsel was opposed, EPPs submitted a 17-page brief, nearly a month after Dealership Counsel first raised these issues. The End-Payor brief fails to respond to a number of the issues raised by dealerships and does not substantively advance the discussion.

## I.      EPPS ALREADY AGREED TO THE LEVEL OF PROTECTION DEALERSHIPS REQUEST, FOR OEM DATA SHOWING "PRICING FOR A SPECIFIC VEHICLE."

End-Payors' resistance to agreeing to the simple confidentiality order the Master requested Dealership Counsel to draft makes no sense and is entirely inconsistent with the EPPs' agreement to treat

5

REDACTED

the same type of data from OEMs with an even higher degree of confidentiality.  On December 29, 2016, one-and-a-half months before dealerships raised their confidentiality concerns, the Special Master entered the Order Regarding the Production of Certain Vehicle Pricing Information, Case No. 2:12-md-02311-MOB-MKM, Doc # 1579 (Filed 12/29/16). This order was proposed by EPPs and Defendants and agreed to by the OEMs. The order requires that OEM data showing prices paid for vehicles be produced as HIGHLY CONFIDENTIAL–EXPERTS' EYES ONLY and not even shown to attorneys in the action, or anyone aside from experts. It also requires that "[m]aterials derived from and/or otherwise based on the OEM Vehicle Pricing Data shall be designated 'HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY and given the protections set forth for documents bearing that designation in the Protective Orders," which includes filing under seal. *Id.* at para. II(B)(1)-(2), II(B)(5). The definition of "OEM Vehicle Pricing Data" in that Order is "VIN level transactional data reflecting an OEM's *pricing for a specific vehicle*." *Id.* at I(F) (emphasis added). Similarly, the pricing data EPPs seek now is data reflecting a dealership's pricing for specific vehicles. This is transaction-specific data for specific dealership sales, just like the OEM transaction-specific data for certain vehicle sales. EPPs themselves refer to the dealership data as "transaction-level sales data" EPP Stmt., at 3—that is the exact kind of data they agreed to protect from public disclosure in the Pricing Order.

Given that End-Payors already agreed to this treatment for data showing "pricing for a specific vehicle" which is exactly what the dealer DMS data shows, there is no basis to refuse to provide that same treatment to dealerships.  The only imaginable reason why End-Payors have refused is that they view OEMs as more powerful stakeholders than the small business dealerships.

End-Payors, as a red herring, repeatedly reference and claim to distinguish the General Motors crown jewel documents, which are not the OEM vehicle pricing *data* described above, to which dealerships are comparing their own pricing data. 2:12-md-02311-MOB-MKM Doc # 1575-1 (Filed 12/29/16) (GM Order, Ex. A). Dealerships are not referencing or comparing GM's crown jewel

REDACTED

documents to the dealers' pricing data. Dealerships are referencing the OEM *data* showing "pricing for a specific vehicle" which is only to be provided to experts and never filed except under seal. Dealerships are not asking for the treatment that crown jewel documents receive (filing only in camera, limited copies made, etc.). As one of the Defendants who signed the EPP brief stated to the Master on December 9, the documents and price data "are really two categories." Dec. 9 Hrg Trans. at 37:22, attached as Ex.1. As defense counsel explained ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

Dec. 9 Hrg Trans. at 37:24-25, 38:1-3 attached as Ex.1. It is this second category that Dealerships are referring to and that is analogous to Dealerships' data, but not distinguished in End-Payors' brief, which only focuses on the documents. Dealerships are not talking about documents. Dealerships are discussing *data* and asking for treatment that like the OEM data is receiving, because both sets of data refer to prices for specific vehicles and are therefore extremely sensitive.

EPPs never responded to this argument, neither in the emails nor in their 17-page brief—nor can they raise an answer in their reply given that they failed to do so in their principal brief, which is the only brief to which dealerships are permitted to respond. Instead of responding, they simply try to hide the ball and shift focus to a different production that has nothing to do with the argument dealerships are making.

End-Payors will not respond to the argument regarding the already-established treatment for OEM data showing "pricing for a specific vehicle" because that they have no good answer. They cannot justify disparate treatment for the same kind of data. This data concerning "pricing for a specific vehicle" is data that they already stipulated to treat as Highly Confidential, and not to be filed publicly.

In any event, even if dealerships' pricing data were to be compared to GM's crown jewel documents, the comparison would still come out in favor of giving dealerships' data the protections they have requested. ████████████████████████████████████████████████████████

REDACTED

Nor does EPPs' argument about the sealing order entered pursuant to *Shane* make sense, in light of their agreement to treat data showing "pricing for a specific vehicle" as Highly Confidential for the duration of the litigation and to provide it with the protections set forth in the Protective Orders. End-Payors claim the Master cannot decide, at the outset of production, based on the sensitivity of the data being provided, that certain data must not be filed publicly. But that is exactly what the Master did, with their agreement, with regard to OEM pricing data. *See* Order Regarding the Production of Certain Vehicle Pricing Information, Case No. 2:12-md-02311-MOB-MKM, Doc # 1579 (Filed 12/29/16). The Master ordered, only one-and-a-half months before the dealerships raised their confidentiality issues, that OEM pricing data showing "pricing for a specific vehicle" could only be submitted to experts and that even information derived from that data would have to be given all of the protections for Highly Confidential data required by the Protective Orders, which includes being filed under seal.  The Master entered an order submitted to him by EPPs and Defendants, with input from OEMs—the same thing the dealerships requested. The Master ordered that all OEMs' documents concerning vehicle pricing, not just GM's, be filed only in camera. Order Regarding the Production of Certain Vehicle Pricing Information, at ¶II(C)(5). EPPs' defense, based only on distinguishing GM, but no other OEMs, goes nowhere.

All of this was ordered before there were any filings made that included this material—indeed the confidential treatment was a condition of production.  This was a prospective compromise made to address the OEMs' concerns about the production of such sensitive materials.  This is exactly what the dealerships are requesting.

These Orders were entered six months after *Shane* was decided, in June 2016, and months after the September Status Conference where the Court raised the *Shane* issue. No one has argued that they were in violation of *Shane*. And that is because they are not. The fact of the matter is that the Court and the

REDACTED

Master may both carve out certain types of data and documents and order the parties to treat them as highly confidential and file them under seal, in camera or subject to even greater protections. The Court and the Master have significant latitude to manage their dockets and protect certain compelling interests. *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1177 (6th Cir. 1983). One such set of interests is the commercial concerns of third parties whose business documents and data are being produced in a litigation where they are not involved and will not be available to actively monitor their use. When sensitive data is produced from a third party, it must be protected from public disclosure.

Indeed, a number of courts have ordered confidential treatment and sealing at the time they have ordered production, as part of the production compromise, to address the opposing parties' confidentiality concerns. It makes logical sense to address these issues at the outset, rather than waiting until the sensitive information is compromised in a filing, especially when the sealed items concern just specific categories of data. For instance, in *ArcelorMittal*, a case within the Sixth Circuit, decided after *Shane*, the court ordered that "confidential business information" that was "related to the finances" of the defendant and whose disclosure would "disadvantage Jewell [the defendant] in future contract negotiations" must be filed under seal, when included in any future filings, stating "if any these documents are to be used to support future motions, the Court grants permission for them to be filed under seal." *ArcelorMittal Cleveland Inc. v. Jewell Coke Co., L.P.*, No. 1:10-CV-00362, 2010 WL 5230862, at *3 (N.D. Ohio Dec. 16, 2010); *See also Boards of Trustees of Ohio Laborers' Fringe Ben. Programs v. A2 Servs., LLC*, No. 2:13-CV-476, 2013 WL 5723069, at *3 (S.D. Ohio Oct. 18, 2013) (case within the Sixth Circuit, where the court, when calling for production of "pricing data, client contacts, customer information, contractual relationships with third parties and extremely sensitive confidential business information" allowed such information to be redacted in future filings). A similar decision was made in a case decided this year. *Metcalf v. Yale Univ.*, No. 15-CV-1696 (VAB), 2017 WL 627423, at *7 (D. Conn. Feb. 15, 2017) (when

REDACTED

ordering production, also ordering "if any of the parties wish to include documents produced under this

Order as part of any future filing submitted to the Court, the documents should be filed under seal.")

## II.     THIRD-PARTIES' PRIVACY RIGHTS IN SENSITIVE COMMERCIAL DATA OVERCOME THE PRESUMPTION OF PUBLIC ACCESS

As one circuit court has stated, "[t]he privacy interests of innocent third parties ... should weigh

heavily in a court's balancing equation." *United States v. Amodeo,* 71 F.3d 1044, 1050 (2d Cir. 1995)

(quoting *Gardner v. Newsday, Inc. (In re Newsday, Inc.)*, 895 F.2d 74, 79–80 (2d Cir.) (quoting *United

States v. Biaggi (In re New York Times Co.)*, 828 F.2d 110, 116 (2d Cir.1987), *cert. denied*, 485 U.S.

977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988) (citation omitted)), *cert. denied*, 496 U.S. 931, 110 S.Ct.

2631, 110 L.Ed.2d 651 (1990)).  The court explained that "[s]uch interests . . . are a venerable common

law exception to the presumption of access." *Amodeo*, 71 F.3d at 1051. The court held that "[f]inancial

records of a wholly owned business" are the types of records for which the factors would weigh "heavily

against access." *Id. See also Application of Newsday, Inc.*, 895 F.2d 74, 80 (2d Cir. 1990) (upholding

redaction of references to innocent third parties).

The Eastern District of Michigan has echoed this view, in a decision issued last year, several

months after the *Shane* decision, stating "the privacy interests of innocent third parties as well as those of

defendants that may be harmed by disclosure . . . should weigh heavily in a court's balancing equation in

determining what portions of motion papers in question should remain sealed or should be redacted."

*United States v. Nallani*, No. 11-CR-20365, 2016 WL 4138227, at *2 (E.D. Mich. Aug. 3, 2016)

(quoting *United States v. Silver*, No. 15-cr-00093, 2016 WL 1572993, at *5-7 (S.D.N.Y. Apr. 14, 2016)

(citing *Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987))). It is clear that *Shane* did not

alter Sixth Circuit courts' concern for the privacy rights of third parties.

As another court within the Sixth Circuit explained, "the Sixth Circuit has enumerated several

interests which might justify the application of the exception [to the presumption of access] . . .

10

REDACTED

[including] privacy rights of participants or third parties." *In re Se. Milk Antitrust Litig.*, 666 F. Supp. 2d 908, 915 (E.D. Tenn. 2009). The court explained that:

> Third parties who were not responsible for the initiation of the litigation are protected by the terms of the protective order. As recognized by the Sixth Circuit, these individuals possess a justifiable expectation of privacy that their names and financial records not be revealed to the public, and their interests in privacy are sufficiently compelling to justify non-disclosure.

*Id.* (internal quotations and citations omitted).

Another Court, within the Sixth Circuit, also ordered that a third-party's document, attached as an exhibit to a declaration, sealed. *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-CV-194, 2014 WL 994383, at *3 (E.D. Tenn. Mar. 11, 2014). *See also Paulson v. Holder,* No. CIV. 11-326-ART, 2012 WL 2919310, at *5 (E.D. Ky. July 17, 2012) (sealing portion of summary judgment briefing containing information about third parties).

In *Dodona*, the court held that the privacy interests in third parties' pricing information overcame the presumption of public access. *Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152, 156 (S.D.N.Y. 2015). *See also Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc.,* No. 11CV3633-LTS-MHD, 2015 WL 1573325, at *6 (S.D.N.Y. Apr. 9, 2015), *appeal dismissed* (June 18, 2015), *aff'd sub nom. Worldwide Home Prod., Inc. v. Time, Inc.,* 626 F. App'x 1009 (Fed. Cir. 2015) (granting redactions to protect third party pricing information); *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 95 F. Supp. 3d 860, 884 (D. Md. 2015) (commercially sensitive information about relationships with third parties redacted).

Similarly, in *Icon-IP*, the court agreed to seal exhibits containing a third-party's sensitive business information and payments to third parties and ordered sealing to avoid "an invasion of the third party's privacy." *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, No. 12-CV-03844-JST, 2015 WL 984121, at *2, *3 (N.D. Cal. Mar. 4, 2015); *see also Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F. Supp. 2d 432, 441 (D. Conn. 2005) (sealing information about third parties). *See also Alexander*

11

REDACTED

*Interactive, Inc. v. Adorama, Inc.,* No. 12 CIV. 6608 PKC JCF, 2014 WL 4346174, at *3 (S.D.N.Y. Sept. 2, 2014) (granting third party's motion to seal its pricing information that would be submitted in the future in connection with a motion).

Here, particularly, these third-party dealerships' privacy interests in their own commercial data that goes to the heart of their businesses—████████████████████████████████ ████████████████████████████—should be taken into account.  These third parties are not plaintiffs in the case, nor is there is no indication that any of them sold anything to any of the End-Payors in the case (indeed, End-Payors already procured their sale records from a group of third-party dealerships). A number of them, like Waikem Honda, are not even in Indirect Purchaser states, meaning that they cannot recover any damages as part of this action, that they likely did not sell to any class members and that their sales cannot be even be considered as part of any pass-on inquiry.

Further, these dealerships are completely "innocent third parties" who had no involvement in the automotive parts conspiracy.  *Shane* recognizes the importance of protecting the information of such third parties, favorably citing to *Amodeo, supra. See Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 308 (6th Cir. 2016) ("the privacy interests of innocent third parties should weigh heavily in a court's balancing equation.").  These third party dealerships, who did not even deal with the Defendants whose behavior precipitated the conspiracy, and therefore the litigation, have nothing to do with, as *Shane* put it, "the conduct giving rise to the case" which is the information on which "the public's interest is focused" and which a court needs to consider making publicly available. *Shane*, 825 F.3d at 305. Thus, there is no public interest in these third parties' information.

Some of these third party dealerships (who are in non-indirect purchaser states) will get absolutely no payments from this litigation. They will only obtain severe injury to their businesses and the extreme burden of having to monitor the use of their data in filings by fifty parties (all Defendants and all Plaintiffs) and have to file perhaps dozens of motions to seal that data each time it appears in someone's

12

REDACTED

filing. This is a completely disproportionate burden and it is exactly what the courts, including the Sixth

Circuit, intended to guard against.

## III.   SENSITIVE BUSINESS AND FINANCIAL INFORMATION IS APPROPRIATELY SEALED

As the Sixth Circuit has stated, "the decision as to access is one best left to the sound discretion of

the trial court." *Brown & Williamson*, 710 F.2d at 1177 and "every court has supervisory power over its

own records and files." *Id.* As the Sixth Circuit stated in *Brown & Williamson*, the Sixth Circuit case

*Shane* relies on, certain interests, including "certain privacy rights of participants or third parties" provide

exceptions to the presumptive right of access to court filings. *Id.* at 1179. "[A] court may seal sensitive

portions of a judicial record to protect legitimate privacy interests . . . ." *Goodman v. Fuller,* 960 F.2d 149

(6th Cir. 1992).

Not only do courts place a high priority on protecting the privacy interests of third parties, they

have also repeatedly expressed the importance of protecting sensitive commercial information, such as

that being sought by End-Payors. For instance, in *NetJets*, a case within the Sixth Circuit decided after

*Shane*, one of the parties argued that *Shane* required unsealing redacted information in a motion to

enforce a settlement. *NetJets Ass'n of Shared Aircraft Pilots v. NetJets, Inc.*, No. 2:14-CV-2487, 2016 WL

5349793, at *2 (S.D. Ohio Sept. 23, 2016). The court rejected that argument, stating "Plaintiff's argument

asks too much of the authority on which it relies." *Id.* at *2. The court explained that information from the

motion had been properly redacted because the "information is proprietary and would harm its [the

redacting party's] business interests if released." *Id.*

Similarly, in *ArcelorMittal*, also within the Sixth Circuit, also decided after *Shane*, the court

ordered that "confidential business information" that was "related to the finances" of the defendant and

whose disclosure would "disadvantage Jewell [the defendant] in future contract negotiations" must be

filed under seal, when included in any filings. *ArcelorMittal*, 2010 WL 5230862, at *3; *See also Boards of*

*Trustees of Ohio Laborers' Fringe Ben. Programs*, 2013 WL 5723069, at *3 (case within the Sixth

REDACTED

Circuit, where the court, when calling for the production of "pricing data, client contacts, customer

information, contractual relationships with third parties and extremely sensitive confidential business

information" allowed such information to be redacted in filings).

In *Formax*, the court held that "documents containing sensitive pricing information, sales figures,

sales dollar amounts, profit and loss data, and other financial records not normally made known to the

public may be properly filed under seal." *Formax Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-C-

0298, 2013 WL 2452703, at *1 (E.D. Wis. June 5, 2013) (citing *E.E.O.C. v. Abbott Laboratories*, 10–C–

833, 2012 WL 3842460, at *2 (E.D.Wis. Sept. 5, 2012)); *see also Barkley v. Pizza Hut of Am., Inc.,* No.

614CV376ORL37DAB, 2015 WL 5915817, at *3 (M.D. Fla. Oct. 8, 2015) (granting request to seal and

redact from class certification motion competitively sensitive information that could hurt the requesting

party's business operations if not sealed).

Similarly, in *Haskins*, the court agreed to allow redactions and sealing of portions of class

certification opposition and reply briefs, which contained private financial information, confidential and

commercially sensitive information and information that could cause harm to one party's "legitimate

business interests and competitive position." *Haskins v. First Am. Title Ins. Co.*, No. CV 10-5044

(RMB/JS), 2013 WL 12155641, at *2 (D.N.J. Nov. 20, 2013). "The protection of proprietary business

information . . . is a compelling reason to permit the filing of documents under seal." *Morawski v.

Lightstorm Entm't, Inc*., No. CV1110294MMMJCGX, 2013 WL 12122289, at *2 (C.D. Cal. Jan. 14,

2013). In *Mars v. JCM*, the court explained that "Courts generally protect materials" containing

"'commercial information' to prevent harm to a litigant's standing in the marketplace." *Mars, Inc. v. JCM

Am. Corp.*, No. CIV.05 3165 RBK, 2007 WL 496816, at *2 (D.N.J. Feb. 13, 2007). The court thus ruled

that it was appropriate to seal information whose disclosure would hinder the plaintiff's "ability to

negotiate effectively favorable terms on which it is willing to condition future sales and/or acquisitions"

and held that Mars should not have to sacrifice its negotiating position. *Id. See also Congoo, LLC v.

14

REDACTED

*Revcontent, LLC,* No. CV 16-401 (MAS), 2016 WL 3751613, at *1-*2 (D.N.J. July 13, 2016) (sealing

confidential business information related to interactions with clients and internal business information and

stating that disclosure of this information "could allow public insight into the business and operations of

Plaintiff and/or Defendant and would case same commercial harm, and give competitors an unfair

advantage."); *Capitol Comm'n, Inc. v. Capitol Ministries*, No. 5:11-CV-00214-BO, 2013 WL 5369421, at

*1 (E.D.N.C. Sept. 24, 2013) (granting request to seal confidential financial information).

In a situation just like this, a litigant successfully argued for the sealing of "product-specific

pricing" like the prices for specific vehicles at issue here. The court granted the request, stating:

> TriQuint argues that disclosure of its pricing information would harm its competitive
> standing because it negotiates product-specific pricing directly with customers and
> disclosure of such information would harm TriQuint's bargaining position and would give
> competitors the ability to directly undercut TriQuint and unfairly win additional business.
> Because TriQuint would be harmed if this information were revealed to the public and
> only a limited amount of information will be kept from the public, the Court finds that
> TriQuint has shown compelling reasons to seal certain information regarding its pricing
> from disclosure.

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, No. CV 09-1531-PHX-JAT, 2011 WL 6182346, at *6

(D. Ariz. Dec. 13, 2011). The court explained that "disclosing confidential business dealings with third

parties, certain customer and pricing information" could harm the producing party's "competitive

standing." *Id.* at *4. Similarly, in *EEOC v. Abbott Labs*, the court explained that

> The subject documents identify specific sales dollar amounts and pricing information for
> Abbott customers that are under ongoing contracts. (See Conrad Aff. ¶¶ 4–5.) The sales
> data . . . reflects confidential pricing on Abbott products negotiated with each of Abbott's
> customers in Ziegler's former territory. (Id. at ¶¶ 4, 6.) Public disclosure of the sales
> figures could be used by competitors to outbid Abbott in future negotiations with Abbott's
> customers, (id. at ¶¶ 6–7), and the loss of business from disclosure of such information
> would create a significant harm to Abbott in the form of lost customers and lost revenue.
> (Id.) Abbott has established that the information is of ongoing relevance and could be used
> by competitors to damage Abbott in the marketplace.

*E.E.O.C. v. Abbott Labs.*, No. 10-C-833, 2012 WL 3842460, at *2 (E.D. Wis. Sept. 5, 2012).

Here, of course the dealership data about the ███████████████████████

███████████████████████████████████████████████████████ easily

REDACTED

meets the test for highly sensitive commercial information, whose disclosure would cause serious harm to

dealerships.

REDACTED

*Flagg ex rel. Bond v. City of Detroit*, 268 F.R.D. 279, 301 (E.D. Mich. 2010)

(preventing disclosure of information that could harm the reputations and privacy interests of non-parties).

This information is highly sensitive,

REDACTED

███████████████████████████████████████████████████

██████████████████████  This satisfies the standard for sealing commercially sensitive information.

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

As in *NetJets*, the sensitive, specific information at issue here would harm Honda dealerships' businesses if released and, as in *ArcelorMittal* and *Mars*, it would disadvantage Honda dealers in future negotiations and as in *Haskins*, the data's public dissemination could cause harm to dealers' "legitimate business interests and competitive position." Just as in *Formax*, the information here contains "sensitive pricing information, sales figures, sales dollar amounts, [and] profit" data. Thus, just as in those cases, and the many others cited here, the Honda dealers' DMS data should not be filed publicly but should instead be redacted from any public filings.

As demonstrated by the caselaw set forth thus far, which calls for sealing third-parties' information, as well as a variety of sensitive financial and commercial information, including pricing, sales and profits information, like that at issue here, End-Payors are incorrect that only a trade secret or privilege will justify sealing in a situation like this—these are just two of the *possible* justifications for sealing-the same is made clear in the case *Shane* quotes. The main thing *Shane* said in its distinguishing statement was that a number of the entities at issue in that case were involved in the conspiratorial conduct, which is not the case here. As one of the cases cited by *Shane*, which did not limit sealing rights

18

REDACTED

in the way EPPs propose, states, "privacy rights of participants or third parties" provide valid reasons to seal certain portions of filings. *Brown & Williamson*, 710 F.2d at 1179. This Court has itself sealed numerous filings containing sensitive business information that was not contended to constitute trade secrets or privileged information. *See* Order Granting Motion to Seal, Case No. 2:12-cv-00502-MOB-MKM, Doc. No. 209 (Filed 11/4/2016) (sealing excerpts of depositions attached to motion concerning hearing on discovery objection concerning dealership business practices); Order Granting Motion to Seal, Case No. 2:12-md-02311-MOB-MKM, Doc. No. 1574 (12/28/2016) (granting motion to file letter brief and declaration in response to motion to compel under seal that contained sensitive business information).

Even if the information had to be a trade secret to be sealed, this highly sensitive data meets the test as well. As stated in *Avery v. Dennison*, an Ohio case, within the Sixth Circuit, a trade secret is:

> [a]ny business information or plans, financial information or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic values from its disclosure or use. (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000). As *Avery* indicated, "financial information," including "pricing information" and "price files" qualify for treatment as trade secrets. *Id., see also France Telecom S.A. v. Marvell Semiconductor Inc.,* No. 12-CV-04967-WHO, 2014 WL 4965995, at *1 (N.D. Cal. Oct. 3, 2014) (pricing terms and pricing data constitute trade secrets). *Avery* also explained that given that the information was subject to password protections, provided with limited distribution among employees, and kept in a database with limited access, it met the criteria of efforts reasonable under the circumstances to maintain its secrecy. *Avery*, 118 F. Supp. 2d at 854.

The dealerships' DMS data clearly meets the above criteria. In addition to the above explanations of the extreme harm that would befall the dealerships if this data were to be released ████████████

REDACTED



REDACTED

███████████████████████████████████████████████████

The criteria for trade secret treatment are more than met. End-Payors make several unsupported statements either with no cite or with a cite only to the Williams declaration, which represents neither the views or realities of a dealership nor those of Honda, but instead simply what End-Payor counsel believes might be true, without any particular basis. This does not provide a valid basis to deny dealerships' confidentiality requests.

For instance, End-Payors confusingly claim that dealerships' data is provided to "a variety of DMS vendors." It is never made clear what "DMS vendors" End-Payors are referring to. ████████████ ███████████████████████ just like every Defendant information about whose has data has been designated Highly Confidential uses certain data system software to store its data, in its own offices. This is not provision of the data to a third party—these are the dealerships' systems.

In fact, the Master already recognized that DMS providers are not third parties who can themselves possess dealerships' data, when he found that Defendants may not go around automobile dealerships and subpoena their DMS providers, which are functioning in service of the dealerships and providing software to house data belonging to the dealerships. Order Granting ADP Motion to Quash, 2:12-cv-00102-MOB-MKM, Doc # 373 (Filed 09/29/15). For this reason, ████████████████████

███████████████████████████████████████████████████

REDACTED

 and

that neither treats the data as their own, thus their possession of it has no impact on the trade secret

analysis.  Simply using a software provider, as any business does, or providing data to a related corporate

entity does not take away the data's trade secret status, nor do End-payors cite any caselaw that would

support such a claim. Indeed, if that were true, nothing would qualify for trade secret status. Indeed, as the

caselaw concerning trade secrets makes clear, "[o]ne need not make every conceivable effort to assure

secrecy." *Compuware Corp. v. Serena Software Int'l, Inc.*, 77 F. Supp. 2d 816, 822 (E.D. Mich. 1999).

Disclosure of secret information to a government agency, like the Copyright Office, did not deprive the

requesting party of trade secret status and the court ruled it was not "dispositive." *Id.* The same is true for

private disclosure to a government agency, like the DMV EPPs speculatively mention. Neither the fact

that dealerships agreed to provide the data to Honda, who is expected to maintain its confidentiality, nor

the fact that they use certain software to house their data, like any business, nor providing certain portions

of the information to a government agency is *public* disclosure.

It makes no difference that the one

consumer who purchased a particular vehicle knows the price he paid for that vehicle. EPPs are not

subpoenaing every new vehicle purchaser. Further, every consumer does not share his price with the

whole world,

Nor is there any public compilation of the prices thousands of consumers have paid for specific

vehicles—indeed if there were, EPPs would not need to subpoena this data. The public release of that data

REDACTED

is what would result in the harm dealerships would suffer. There is no caselaw cited by End-Payors stating that showing information to a few individuals will strip it of trade secret status, and that is, of course, not the law.

End-Payors cite but one case, *Lithium Ion Batteries*, that was not decided anywhere in the Sixth Circuit and does not even mention *Shane*, or any Sixth Circuit law, for that matter, █████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

████████████████ here, the auto dealerships do not seek a ruling as to Honda's entire production, but merely seek Highly Confidential treatment of several specific categories of data that Honda has identified it intends to provide from dealerships' data management systems, that have readily been demonstrated to be sensitive commercial data that is subject to sealing, under the standards articulated above, and that belong to a category of data, "pricing for a specific vehicle," that the Master has already deemed subject to sealing and Highly Confidential treatment. Order Regarding the Production of Certain Vehicle Pricing Information, Case No. 2:12-md-02311-MOB-MKM, Doc # 1579 (Filed 12/29/16), ¶¶ (II)(B)(1)-(2), (5).

## IV. END-PAYORS MISAPPLY *SHANE*

The court in *Shane* stated that it was "the conduct giving rise to the case"—namely the antitrust violations on which the case is based—on which "the public's interest is focused" and which a court needs to consider making publicly available. *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305 (6th Cir. 2016). Third-party dealerships' data on sales made ████████████ and not made to any End-Payor Plaintiffs, have nothing to do with the conspiracy and the conduct giving rise to the violations at issue here. These third-party dealerships did not carry out the bid-rigging or price-fixing that was involved in this conspiracy and did not deal with the Defendants. So their information cannot possibly fall within the universe of information *Shane* was concerned with.

REDACTED

The *Shane* court was specifically concerned with a report that was explicitly attested to be the basis for the settlement agreement. *Shane*, at 302 (the parties sealed "an expert report upon which the parties based a settlement agreement"). There is no such document here, at all, much less such a document involving the data of these third-party dealerships. The parties do not base their settlements in this case on some particular pleading filed in the docket, as the parties in *Shane* did.

Dealerships and End-Payor have settled with most of the Defendants in this litigation, before this data was ever produced, so none of those settlements rely on this data.  And there is no reason to believe that settlements with the remaining Defendants will in any way substantively rely on this particular data, which is just for the last six years, for one OEM, involves sales not made to End-Payor Plaintiffs, and includes sales not even made to class members who can recover monetary damages (as many of these dealerships are in non-indirect purchaser states).  End-Payors' speculation that maybe there will be a filing at some unknown point in the future that uses this information is just that, and provides no valid basis to require all of this sensitive information to be publicly disclosed and to harm all of these dealerships. In any event, if there is such a filing, there is no reason any settlement agreement would be based on that filing-- and no indication that this Court cannot seal the small, tailored portion of that filing that relates to these innocent third-parties' data, as numerous other courts have done before.

Indeed, sealing innocent third-parties' information has routinely been allowed, as has been sealing commercial, financial, pricing and profits information.  This information has been sealed in class certification and other filings. *Barkley*, 2015 WL 5915817, at *3; *Haskins*, 2013 WL 12155641, at *2.

*Shane* did not purport to change the law, but instead only stated that it was enforcing existing law, which holds that "certain privacy rights of participants or third parties" provide exceptions to the presumptive right of access to court filings.  *Brown & Williamson*, 710 F.2d at 1177. *Shane* did not change the fact that the privacy rights of third parties "are sufficiently compelling to justify non-disclosure" and that "the privacy interests of innocent third parties" should "weigh heavily" on a court's

REDACTED

decision regarding sealing and redaction. *See Milk*, 666 F. Supp. 2d at 915; *Nallani*, 2016 WL 4138227, at *2 (decided *after Shane*). Nor did it the change the fact that "information [that] is proprietary and would harm its [the redacting party's] business interests if released" needs to be redacted. *NetJets*, 2016 WL 5349793, at *2 (post-*Shane* decision).  *Shane* did not eradicate all of the protections available to third-parties and for sensitive commercial data and certainly did not articulate any intent to do so.

It is also noteworthy that these dealerships are not asking to redact anything and everything to be produced in a large document production or to redact the majority of the substantive filings in the docket, as in *Shane*. They are asking only to redact specific, already known pieces of data.[2]  This data will likely constitute an extremely small portion of any filing it is used in, and its redaction will be narrowly tailored to redact only the minor portions of filings that will concern that data. This is not a request to redact whole swaths of documents, or even an entire report, as was done in *Shane*. This request is nothing like the situation in *Shane* and *Shane* cannot, and should not, be used to abrogate the rights of these parties.

 The parties already know what the data is. Its use in a filing will not change that. There is no reason to wait to make the sealing determination at every *seriatim* filing, for already known data. There is no basis not to require now that this data be redacted from public filings. The alternative would impose an unreasonable burden on these dealerships to monitor each filing in this docket and file repetitive motions to seal every single time this data is used in a filing.  This is an uncalled for and pointless burden.

## CONCLUSION

Dealerships respectfully request that the Master order the DMS data taken from Honda dealers to be designed Highly Confidential, treated consistent with the protections set forth for Highly Confidential information in the Protective Orders and to be filed under seal, if it used in publicly filed documents.

---

[2] As an aside, EPPs claim that they do not know what will be produced in Honda's data, but they also spend considerable time contending that they do know what will be in the data production, and making arguments about what will not be in the production. *See e.g.* Williams Decl., at ¶8.  They cannot have it both ways. The parties do, in fact, know, as EPPs admit, what the data will consist of and to claim otherwise is incorrect.

REDACTED

Dated: April 14, 2017                    Respectfully submitted,


                                         /s/ Jonathan W. Cuneo
                                         Jonathan W. Cuneo
                                         Joel Davidow
                                         Daniel Cohen
                                         Victoria Romanenko
                                         Evelyn Li
                                         Blaine Finely
                                         **Cuneo Gilbert & LaDuca, LLP**
                                         4725 Wisconsin Ave NW, Ste. 200
                                         Washington, DC 20016
                                         Telephone: (202) 789-3960
                                         jonc@cuneolaw.com
                                         joel@cuneolaw.com
                                         danielc@cuneolaw.com
                                         vicky@cuneolaw.com
                                         evelyn@cuneolaw.com
                                         bfinley@cuneolaw.com

                                         Don Barrett
                                         David McMullan
                                         **BARRETT LAW GROUP, P.A.**
                                         P.O. Box 927
                                         404 Court Square
                                         Lexington, MS 39095
                                         Telephone: (662) 834-2488
                                         Facsimile:  (662)834-2628
                                         dbarrett@barrettlawgroup.com
                                         dmcmullan@barrettlawgroup.com

                                         Shawn M. Raiter
                                         **LARSON · KING, LLP**
                                         2800 Wells Fargo Place
                                         30 East Seventh Street
                                         St. Paul, MN 55101
                                         Telephone: (651) 312-6500
                                         Facsimile:  (651) 312-6618
                                         sraiter@larsonking.com

                                         *Interim Co-Lead Class Counsel for Dealership Plaintiffs*

                                         Gerard V. Mantese
                                         (Michigan Bar No. P34424)

26

REDACTED

**Mantese Honigman
 and Williamson, P.C.**
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 607-9200
gmantese@manteselaw.com

*Interim Liaison Counsel for Dealership Plaintiffs*

Brian Herrington
**Herrington Law, PA**
PO Box 3260
Ridgeland, MS 39158
601.376.9331
brian@herringtonlawpa.com

*Counsel for Dealership Plaintiffs*

27

REDACTED

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

<u> /s/ Jonathan W. Cuneo</u>
Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**Cuneo Gilbert & LaDuca, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com