Fairness Hearing & Motion to Dismiss • August 8, 2017

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                            —    —    —

    _____
 4                                    )
    IN RE: AUTOMOTIVE PARTS           )    Master File No. 12-02311
 5  ANTITRUST LITIGATION              )    Hon. Marianne O. Battani
    _____   )
 6                                    )
    IN RE: All Wire Harness Cases     )
 7  and Anti-Vibration Rubber Parts   )
    _____   )
 8

 9              FAIRNESS HEARING & MOTION TO DISMISS

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                   United States District Judge
11           Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
12                      Detroit, Michigan
                    Tuesday, August 8, 2017
13

14  APPEARANCES:

15   For the Plaintiffs:   DAVID H. FINK
                           FINK & ASSOCIATES LAW
16                         100 West Long Lake Road, Suite 111
                           Bloomfield Hills, MI  48304
17                         (248) 971-2500

18
                           NATHAN FINK
19                         FINK & ASSOCIATES LAW
                           100 West Long Lake Road, Suite 111
20                         Bloomfield Hills, MI  48304
                           (248) 971-2500
21

22                         GREGORY P. HANSEL
                           PRETI, FLAHERTY, BELIVEAU & PACHIOS,
23                         L.L.P.
                           One City Center
24                         Portland, ME  04112
                           (207) 791-3000
25
```

```
 1      APPEARANCES:
        For the Plaintiffs:    STEVEN A. KANNER
 2                             FREED, KANNER, LONDON & MILLEN, L.L.C.
                               2201 Waukegan Road, Suite 130
 3                             Bannockburn, IL  60015
                               (224) 632-4502
 4

 5                             JOSEPH C. KOHN
                               KOHN, SWIFT & GRAF, P.C.
 6                             One South Broad Street, Suite 2100
                               Philadelphia, PA  19107
 7                             (215) 238-1700

 8
                               EUGENE A. SPECTOR
 9                             SPECTOR, ROSEMAN, KODROFF & WILLIS,
                               P.C.
10                             1818 Market Street, Suite 2500
                               Philadelphia, PA  19103
11                             (215) 496-0300

12
        For the Defendants:    DAVID FITZMAURICE
13                             WEIL, GOTSHAL & MANGES L.L.P.
                               767 Fifth Ave,  STE. 3360
14                             New York, NY 10153
                               (212) 310-8233
15

16                             DAVID C. GIARDINA
                               SIDLEY AUSTIN, L.L.P.
17                             One South Dearborn Street
                               Chicago, IL  60603
18                             (312) 853-4155

19
                               MEGAN HAVSTAD
20                             O'MELVENY & MYERS, L.L.P.
                               Two Embarcadero Center, 28th Floor
21                             San Francisco, CA  94111
                               (415) 984-8700
22

23                             HOWARD B. IWREY
                               DYKEMA GOSSETT, P.L.L.C.
24                             39577 Woodward Avenue, Suite 300
                               Bloomfield Hills, MI  48304
25                             (248) 203-0526
```

```
 1    APPEARANCES:
      For the Defendants:    STEVEN REISS
 2                           WEIL, GOTSHAL & MANGAS L.L.P.
                             767 Fifth Avenue
 3                           New York, NY 10153
                             (212) 310-8174
 4

 5                           MICHAEL RUBIN
                             ARNOLD & PORTER, L.L.P.
 6                           555 Twelfth Street NW
                             Washington, D.C.  20004
 7                           (202) 942-5094

 8
                             MARGUERITE M. SULLIVAN
 9                           LATHAM & WATKINS, L.L.P.
                             555 Eleventh Street NW, Suite 1000
10                           Washington, D.C.  20004
                             (202) 637-2200
11

12                           ZACHARY D. TROTTER
                             JONES DAY
13                           901 Lakeside Avenue
                             Cleveland, OH  44114
14                           (216) 586-3939

15
      Also Present:          DEVON ALLARD
16
                             ALEXANDER BLOOM
17
                             JOSEPH FISCHER
18
                             JORDAN SEGAL
19

20

21

22

23

24        To obtain a copy of this official transcript, contact:
              Robert L. Smith, Official Court Reporter
25             (313) 964-3303 • rob_smith@mied.uscourts.gov
```

TABLE OF CONTENTS

MATTER                                                    PAGE

Fairness Hearing.................................. 9

Award of Attorney Fees............................26

Motion to Dismiss.................................52

```
 1    Detroit, Michigan

 2    Tuesday, August 8, 2017

 3    at about 10:04 a.m.

 4                        —   —   —

 5                   (Court and Counsel present.)

 6            THE CASE MANAGER:  All rise.

 7            The United States District Court for the Eastern

 8    District of Michigan is now in session.  The Honorable

 9    Marianne O. Battani presiding.

10            Please be seated.

11            The Court calls Case No. 12-101 and 14-13773,

12    In Re: Wire Harness, direct purchasers.

13            THE COURT:  Good morning.

14            THE ATTORNEYS:  (Collectively) Good morning, Your

15    Honor.

16            THE COURT:  All right.  The first motion we have is

17    the attorney fees.  Do you want to do the other one?

18            MR. KANNER:  Well, Your Honor, I just thought we

19    should --

20            THE COURT:  Do the fairness hearing first?

21            MR. KANNER:  -- put the horse before the cart.

22            THE COURT:  I forgot about the fairness hearing.

23            MR. KANNER:  Okay.  We will do it quickly.

24            THE COURT:  Okay.

25            MR. KANNER:  Good morning, Your Honor.
```

```
 1    Steve Kanner from the Freed, Kanner, London & Millen firm, on
 2    behalf of direct-purchaser plaintiffs.
 3             Before we start there is a small but not
 4    insignificant housekeeping matter I wanted to bring to the
 5    attention of the Court.  Last -- well, sometime yesterday,
 6    I'm not sure exactly what time, Your Honor, we filed the
 7    settlement class counsel report of distribution of settlement
 8    funds in the OSS case, the occupant safety system case.
 9             THE COURT:  Just one minute while I pull that up.
10    Thank you.
11             MR. KANNER:  I'm pleased to inform the Court that
12    all of the checks that were made in payment of claims have
13    been now cashed including --
14             THE COURT:  Really, all of them?
15             MR. KANNER:  Including the last one for $4.
16             THE COURT:  Okay.
17             MR. KANNER:  The total amount of those checks was
18    $28,272,586.86.
19             THE COURT:  I guess the direct purchasers are a
20    much more manageable group.
21             MR. KANNER:  There is that reality, but I thought
22    it was important for Your Honor to know that those funds are
23    paid.  And one of the things that we will be talking about
24    today is our plan of allocation for the funds in this case,
25    and perhaps I can start off by saying on today's agenda, at
```

 1    least insofar as I'm going to handle, we are here for final

 2    approval for your determination of whether these cases are

 3    appropriate for final approval on five wire harness

 4    settlements, and it is my pleasure to address the Court with

 5    respect to those matters and those which naturally flow from

 6    the final approval of the settlements, that would include the

 7    proposed order and final judgment releasing the defendants

 8    and an order approving the proposed plan for distribution.

 9             THE COURT:  Okay.  And that order is to release the

10    defendants at this time, not waiting as we have in others?

11             MR. KANNER:  Exactly.  And if Your Honor deems

12    appropriate to grant final approval on those settlements,

13    those five settlements, my colleague, Greg Hansel, seated at

14    the table, will present the purchaser plaintiffs' motion for

15    award of attorney fees, litigation costs, expenses, and

16    requests for incentive awards for the class representatives.

17             THE COURT:  Okay.  And before you continue,

18    Mr. Kanner, I think I would like to have the appearances of

19    the rest on the record so I know who is seated out here.

20             MR. KANNER:  Certainly, Your Honor.

21             MR. FINK:  David Fink appearing on behalf of the

22    direct-purchaser plaintiffs.

23             MR. HANSEL:  Good morning, Your Honor.  Greg Hansel

24    for the direct-purchaser plaintiffs.

25             MR. SPECTOR:  Good morning, Your Honor.

1    Eugene Spector on behalf of direct-purchaser plaintiffs.

2             MR. KOHN:  Good morning, Your Honor.  Joseph Kohn

3    for direct purchaser.

4             MR. KANNER:  And I think I have already introduced

5    myself for the record, Your Honor.

6             THE COURT:  Now the other side.

7             MS. SULLIVAN:  Good morning, Your Honor.

8    Marguerite Sullivan on behalf of the Sumitomo defendants.

9             MS. HAVSTAD:  Good morning.  Megan Havstad on

10   behalf of the Leoni defendants.

11            MR. TROTTER:  Good morning, Your Honor.

12   Zach Trotter on behalf of the Yazaki defendants.

13            MR. RUBIN:  Good morning, Your Honor.  Mike Rubin

14   on behalf of the Fujikura defendants.

15            THE COURT:  And I have one more, David Giardina?

16            MR. GIARDINA:  Yes, Your Honor.  That's actually

17   for the next motion.

18            THE COURT:  For the next case.  Okay.  All right.

19            MR. KANNER:  Thank you, Your Honor.

20            THE COURT:  You may proceed.

21            MR. KANNER:  So as I mentioned today, we are going

22   to talk about the settlements with Chiyoda, Fujikura, Leoni,

23   Sumitomo, and the Yazaki defendants.  And, of course, their

24   names are more fully set forth in the pleadings, there are

25   various entities, but for the purposes of today's hearing I'm

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33181   Page 9 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

9

1    simply going to refer to them that way if it is all right

2    with the Court?

3           I would also like to ask your indulgence in terms

4    of addressing these settlements collectively simply because

5    their -- the basis for approval is identical on each

6    settlement, the settlements are -- while they are of

7    different amounts, they are essentially the same; there is

8    consideration by way of dollars paid to the class and

9    cooperation, and I think it would be efficient time-wise if I

10   go through them collectively.

11          THE COURT:  I think that's --

12          MR. KANNER:  Unless you have individual questions.

13          THE COURT:  Yes, I think that's a great idea.

14          MR. KANNER:  Great.  I had a feeling that would be

15   the case but I thought it would be better to ask first.

16          So a little bit of the history on the litigation,

17   if I can for the record.  The Court appointed the four firms

18   identifying themselves a moment ago at counsels' table as

19   interim co-lead counsel for the direct purchaser class, and

20   Mr. Fink's firm as liaison counsel back in March of 2012.

21   The cases were filed, as I recall, late I believe December of

22   2011.  So we have run the course certainly with the wire

23   harness case.

24          Your Honor consolidated the matter in the spring of

25   that year, and the first consolidated complaint -- the first

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33182   Page 10 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

10

1    of several was filed in May of 2012.

2         The defendants filed -- multiple defendants filed

3    motions to dismiss in July of 2012, and I believe those

4    motions were all subsequently denied in June of 2013.

5         As the Court knows, the first of the settlements

6    introduced in this case was that with Lear Corporation for

7    4.75 million which Your Honor granted final approval of in

8    January of 2014.

9         In April and July of 2014 we reached several other

10   settlements with smaller defendants; GS Electech for

11   3.1 million, 800,000 with Tokai Rika, and Your Honor granted

12   final approval to those settlements in February of this year.

13        The direct-purchaser plaintiffs then reached a

14   settlement with the Fujikura defendants in November of 2016

15   in the amount of $9.5 million, and in the ensuing months we

16   negotiated additional settlements with Yazaki for $212

17   million, Sumitomo for $25 million, Leoni for $1 million, and

18   Chiyoda for $1.15 million.

19        In each of the settlements the defendants agreed to

20   cooperate with the direct-purchaser plaintiffs in our efforts

21   to further prosecute the case which included document

22   production, attorney proffers, and access to witnesses along

23   with those witnesses potential testimony at trial.

24        Your Honor granted our motions for preliminary

25   approval of these five settlements in October, I believe

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33183  Page 11 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

11

 1    October 21st of 2016.

 2          And the last bit of news in terms of the history, I

 3    would report to the Court in the past few months that the

 4    direct-purchaser plaintiffs have reached an agreement in

 5    principle with the MELCO defendants, and that's a total of, I

 6    believe, seven cases, one of which is wire harness which is

 7    why I am mentioning it today.  I think we have worked out

 8    most of the details, and the settlement papers should be

 9    prepared, it is my earnest hope that we have them here by the

10    next status hearing, so that would be a total of seven

11    additional cases, one wire harness case and six additional

12    product cases.

13          With those -- with the settlement which should be

14    forthcoming from MELCO, we have only two defendants left in

15    the wire harness case, one with a rather small market share,

16    and that is Denso, at least the small market share with

17    respect to wire harness, not in other products, and the other

18    with a more significant -- much more significant market

19    share, and that would be Furukawa.

20          THE COURT:  It would be what?

21          MR. KANNER:  Furukawa.  I think from a capsule of

22    history that brings us up to the current time, Your Honor.

23          With respect to the agreements, certainly they are

24    very typical in many respects but I do want to address

25    something up front and make sure it is clear.  As Your Honor

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33184  Page 12 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

12

1    is aware, several of those settlements were made subject to

2    certain conditions which provided that the value of a given

3    settlement could be reduced by a proportionate share of

4    certain OEMs opting out, or ultimately what is more typical a

5    cap -- I'm sorry, what is known as a blow provision, in other

6    words, they could be rescinded if X percent of the class

7    opted out.  Two of those -- two of the smaller settlements

8    have that provision.  Neither of those caps have been reached

9    with respect to opt-outs so those settlements will go as in.

10   With respect to the other three I will address those and give

11   you the details.  And I would also add that the relation --

12   the specific details of those is listed on Exhibits 2 and 3

13   to the dissemination of proposed settlement reports with

14   Chiyoda, Fujikura, Leoni, Sumitomo, and Yazaki.  Our brief in

15   support of final approval describes in detail those

16   settlements that are subject to the reduction, and those

17   would be Fujikura, Sumitomo, and Yazaki.

18           I would also add that the notices that went out,

19   and we will talk about the service of those notices, also

20   includes this information.

21           So the total face value of the settlements before

22   Your Honor today is $249,151,000.  When combined with the

23   earlier settlements, that total is $257,801,000.  The total

24   settlement value of these five settlements after reduction

25   for OEM opt-outs is 94.086 million.  When adding to the value

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33185  Page 13 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

13

1    of the earlier settlements, what we are talking about today

2    in terms of total value of the settlements to date are

3    $102,736,000.

4          We believe, Your Honor, and I'm not going to

5    reiterate what's in the briefs, but we firmly believe that

6    the settlement requirements for being fair, reasonable, and

7    adequate are met in this case.  They were obtained through

8    diligence and hard work by counsel on both sides of the

9    equation -- of the table rather.

10          Each case the negotiations were arm's length by

11   experienced counsel who made decisions recognizing the

12   inherent uncertainties of both law and facts with the related

13   risks and costs of what is clearly highly complex litigation.

14          Plaintiffs' counsel determined in each of these

15   five cases that the dollar value coupled with the cooperation

16   element, provided ample justification and consideration to

17   enter the settlements.  In the course of the litigation over

18   ten million independent documents from both the defendants,

19   primarily the defendants, many of which were in Japanese, and

20   the class representatives were reviewed and analyzed.

21          The direct-purchaser plaintiffs sometimes on our

22   own, occasionally working with the end-payor groups and the

23   auto-dealer groups, took over 50 depositions in this case,

24   many of which required the use of Japanese interpreters.  Add

25   to those another 10 to 12 depositions by defendants of our

1    class representatives, most of which were multi-day

2    processes.  You are looking at over 60 some odd depositions.

3         As Your Honor knows, the wire harness cases saw an

4    extremely active motions practice earlier in the case, and

5    that was a significant expenditure of time and effort on both

6    sides.  When the time was right after discovery in the course

7    of depositions we had extensive multiple discussions with

8    defense counsel regarding the possibility of settlement and

9    all of those which led to where we are today.

10        The cooperation element is important in that the

11   direct-purchaser group will continue to prosecute these cases

12   diligently against the remaining two defendants.

13        Accordingly, we think it is fair for Your Honor to

14   conclude that counsels' decision to reach these settlements

15   on those bases was fair.

16        With respect to the notice, following preliminary

17   approval and pursuant to the notice dissemination order Your

18   Honor entered on May 19th of 2017, 7,472 individual copies of

19   the notice of proposed settlement were mailed to all

20   potential settlement class members identified by the

21   defendants' own records.  In addition, a summary notice of

22   proposed settlement with today's hearing date was published

23   in one edition of the Automotive News on May 29th of this

24   year, and in the national edition of the Wall Street Journal

25   the following day.  Copies of the notice were and are

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33187  Page 15 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

15

 1   currently posted online at the

 2   autopartsantitrustlitigation.com website.  The declaration of

 3   Nicole Hammond, who is the managing director of Epic Class

 4   Action and Claims Solution, is attached as Exhibit 1 to

 5   settlement counsels' report on dissemination of notice of

 6   proposed settlements, and that reflects that as of July 14th

 7   of this year there were at least 3,803 page views to the

 8   settlement website and 958 unique visits to the wire harness

 9   settlement section.

10          Finally, counsel for each of the settling

11   defendants today have advised us that they have fulfilled

12   their respective obligations under the class action fairness

13   act, and they disseminated the requisite notices to the

14   appropriate federal and state officials.  I can go through

15   the dates, I don't think it is necessary.

16          THE COURT:  No.

17          MR. KANNER:  But each one has verified that has

18   taken place.

19          So as to the actual consideration for the

20   settlement, there are two factors as I mentioned earlier, the

21   amounts that each defendant paid and the cooperation element

22   from both defendants.  The nature and the extent of both of

23   those elements are discussed in our moving papers and

24   included in each of the respective settlement agreements.

25          Let's talk for a moment about the request for

1   exclusion from the class.  As the Court knows, the largest

2   members of the class are the OEMs, and when I say large, I'm

3   talking about market sales -- market purchases.  Numerically

4   they are just a few but they are large in the sense of what

5   they mean to the class.  They are represented by highly

6   competent in-house and outside counsel.  Here the class

7   members include both the OEMs and a significant -- the

8   numerical side of it approximately 20 to 25 percent of all

9   purchases by OEMs are through directed purchases by tier one

10  and tier two entities.  In other words, the OEM will tell

11  company A we are going to need X number of thousands of these

12  parts, you buy them, you perform your value-added service and

13  then sell them to us.  Those entities actually are the direct

14  purchasers because they pay for it, and so those entities are

15  a large part of this class, and they are an important part.

16       Of the OEMs many have chosen to obtain resolution

17  of their claims independent of the class.  Thus far the OEMs

18  participate, even in these wire harness settlements, they

19  participate in some and opt out of others.  Certain OEMs,

20  certain domestic OEMs are the primary purchasers from Yazaki,

21  GM, and Chrysler, for example -- or Chrysler-Fiat, they opted

22  out but they stayed in the other settlements, so it is an

23  interesting way of looking at it.  They are highly qualified,

24  they make their own choices, and the fact that they opt out

25  of some but stay in others indicate that they do have a

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33189   Page 17 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

17

1  preference for class treatment when it best suits their

2  needs, and that's their job to do whatever is best for the

3  corporation at any given point in time.

4       I would -- speaking for a moment of that, Ford, for

5  example, has not participated in any of the class

6  settlements, they have filed their own wire harness case, so

7  they are clearly taking their own path.

8       Now, I will say this, that we believe our efforts

9  in this case did provide a material benefit to the OEMs.

10  Certainly with the domestic OEMs we had regularly scheduled

11  meetings to update them and to brief them on the status of

12  the case.  At the early stages of the case when both the --

13  I'm sorry, when both the end-payor plaintiffs and the

14  defendants sought discovery we coordinated with the OEMs and

15  provided them material assistance.  So whether they

16  participated in all these settlements or not, we are

17  confident that we actually added to their knowledge and

18  appreciation of where the case was at any given point in

19  time.

20       With respect to objections, there were none in this

21  case.  And I think under the theory of class members vote

22  with their feet, the vast majority of class members did

23  remain in the class.

24       Finally, Your Honor, the direct-purchaser counsel

25  believe that the request for final approval of these

1   settlements do meet the requirements of Rules 23(a) and 23(b)

2   in terms of commonality, numerosity, typicality, and

3   adequacy.  We firmly believe that the settlements are fair,

4   reasonable, and adequate.  And we finally argue that class

5   interests are best served by an order of final approval.

6        If you have any questions I'm pleased to answer

7   them, Your Honor.

8        THE COURT:  No, un-un.  Does anybody have any

9   comments to this?

10       (No response.)

11       MR. KANNER:  We should also, Your Honor -- Your

12  Honor should also inquire of the courtroom if there are any

13  objectors present today.

14       THE COURT:  Right.  Are there any objectors?

15       (No response.)

16       THE COURT:  They all look suspiciously like

17  attorneys.

18       MR. KANNER:  Far more dangerous than objectors.

19       THE COURT:  All right.  Thank you.

20       MR. KANNER:  Thank you, Your Honor.

21       THE COURT:  All right.  We have the

22  direct-purchaser plaintiffs' motion to final approval of the

23  settlements with Chiyoda, Fujikura, Leoni, Sumitomo, and

24  Yazaki, and in total -- the amounts were put on the record,

25  I'm not going to repeat the amounts for each of the

1    individual defendants, the total being $249,151,000, and it

2    relates to all of the direct purchase actions in the wire

3    harness case against the settling defendants.

4         The background of this case is well known to the

5    Court and it has been put on the record this morning, and the

6    Court -- the Court also notes that the settlement here

7    provides to the direct purchasers of the wire harness, there

8    was notice, it provided preliminarily for notice and the

9    notice was given as stated on the record, and a summary

10   notice of the settlement was also published in the

11   Wall Street Journal and the -- what was that,

12   Automotive News?

13        MR. KANNER:  Yes.

14        THE COURT:  And there were no objections.  Clearly

15   there are no objectors here today.  There are no objections

16   received by counsel.  And so the Court notes that there were,

17   however, exclusions from the class and those counsel

18   referenced and they are specifically noted in the papers.

19        Is the proposed settlement fair, reasonable, and

20   adequate?  And the Court says yes, this is -- from looking at

21   everything that we have in this direct purchaser action it is

22   a reasonable compromise.  Nobody knows, of course, what it

23   would be had it gone to trial, but it is a reasonable

24   compromise in light of the liability, the damages, and the

25   procedural uncertainties of the parties.  In addition to the

 1   cash payment, the settling defendants are required to give

 2   cooperation to the plaintiffs for the remain -- against the

 3   remaining defendants.

 4        In exchange for the payment and cooperation the

 5   direct plaintiffs -- the direct-purchaser plaintiffs agree to

 6   release the settling defendants from the present antitrust

 7   claim.  And I do want to note that there are provisions in

 8   each of these for some reduction in the settlement amount if

 9   certain criteria are not met.  And the side agreements show

10   that Fujikura retained the right to reduce the amount of

11   settlements by -- as much as but not more than 95,000 and to

12   withdrawal from the settlement in the event of valid and

13   timely requests for exclusion by members of the Fujikura

14   settlement class, and each of them had such a provision, I'm

15   not going to put on the record each of these provisions.

16        As a result of the opt-out requests, the Yazaki

17   settlement was reduced to $57,110,240.20, and the Fujikura

18   amount was reduced from 9,500,000 to 9,405,000.  Chiyoda,

19   Leoni, and Sumitomo were not reduced due to opt-outs, and the

20   amount of the total settlement of these five, combined with

21   the previous settlements, total I believe counsel said

22   $102,736,240.10.

23        The settling defendants' sales remain in the case

24   as a potential basis for joint and several liability and

25   damages against others current or future defendants in the

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33193  Page 21 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

21

1  litigation.  Let me say current, I'm not going to say future

2  because --

3           MR. KANNER:  I think you are safe with that, Your

4  Honor.

5           THE COURT:  Okay.  Rule 23(e) requires court

6  approval of the settlement, and under 23(e)(2) the settlement

7  must be fair, reasonable, and adequate, and the Court

8  considers a number of factors in determining whether it is

9  fair, reasonable, and adequate like the likelihood of success

10 on the merits, weight against the -- weight against the

11 amount and form of the relief offered, the complexity,

12 expense, and likely duration of further litigation, the

13 opinions of class counsel and class representatives, the

14 amount of discovery engaged in, the reaction of absent class

15 members, the risk of fraud, collusion and lastly the public

16 interest.

17          And review and approval of the class settlement

18 involves a two-step process, preliminary approval, which we

19 have done, of course, and the final approval.  Clearly here

20 there is a likely -- in weighing the likelihood of success on

21 the merits against the relief offered the ultimate question

22 is whether the interest of the class as a whole are better

23 served if litigation is resolved by settlement rather than

24 pursued, and even though direct-purchaser plaintiffs are

25 optimistic or is -- are -- certainly appear to be optimistic,

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33194   Page 22 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

22

 1    success is not guaranteed.

 2          Some defendants have vigorously defended the case,

 3    and DPPs acknowledge the risk that defendants may prevail

 4    with respect to certain legal or factual issues.  The

 5    settlement class counsel believe the settlement is an

 6    excellent result.

 7          The complexity, expense, and duration of continued

 8    litigation.  I couldn't help but note that you said the first

 9    consolidated case was filed in May of 2012.

10          MR. KANNER:  2012.

11          THE COURT:  That it has already been five years.

12    It has flown by, hasn't it?  So we know that it takes a long

13    time, and if this were to go to trial, I would hesitate to

14    even imagine when that would be.  But the case is all -- this

15    specific antitrust case, I want to say all antitrust cases,

16    but specifically this one is particularly complex and so this

17    iffyness is resolved with this settlement.

18          In deciding whether the proposed settlement

19    warrants approval, the Court considers the judgment of

20    counsel and the presence of good-faith bargaining.  I know

21    that all of these companies, these defendants, have competent

22    and as I have seen excellent counsel in representing them,

23    and clearly the plaintiffs have excellent counsel in

24    representing them.  So as I watch this, these negotiations

25    occurred at arm's length, and the Court gives much credit to

 1 counsel to come up with an amount, and I respect the amount

 2 that counsel has indicated for this settlement.  There has

 3 been substantial recovery to give them guidance as to

 4 what the -- as to the facts here, and the information that

 5 they got through discovery allowed the evaluation of the

 6 strengths and weaknesses of the cases.  And also here in

 7 looking at the reaction of class members, we know that there

 8 are a number of opt-outs which I think is to be expected but

 9 there are not objections to the settlement.

10         Okay.  There's arm's length negotiations, I think I

11 already covered that.

12         The public interest is certainly served by the

13 settlement of complex litigation.  It conserves judicial

14 resources because these suits are so notoriously difficult

15 and unpredictable.

16         And in terms of the notice the Court has also

17 referenced the notice that was given in this case, and I

18 think it was notice that was given in a reasonable manner.

19 The rule does not require actual notice nor does it require

20 individual mailed notice, though there was individual mailed

21 notice in this particular settlement.

22         I believe specifically here it is 4,472 potential

23 class members were directly mailed so the Court does approve

24 the proposed distribution.  I believe it is fair, reasonable,

25 and adequate, and the notice was appropriate.  The settlement

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33196  Page 24 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

24

1   class is certified pursuant to Rule 23 for purposes of

2   effectuating the proposed settlement.

3        There certainly is numerosity as we have already

4   indicated that notices were mailed to over 7,400 direct

5   purchasers.  There's commonality; there's questions of law

6   and facts common to the class, and that is whether the

7   defendants engaged in a combination and conspiracy amongst

8   themselves to fix, raise, and maintain or stabilize the price

9   of wire harnesses.  There's typicality; the claims of the

10  representatives are typical of all of the claims of the

11  class.  The injuries here arise from the same wrong that is

12  alleged against -- or alleged as to injuring the class as a

13  whole.  And the representative parties, and I do say that the

14  Court has appointed interim counsel and I do appoint them as

15  the counsel for the class.

16       The Court notes under Rule 23(b)(3) that that is

17  satisfied here.  That class plaintiffs demonstrate that

18  common questions predominate over questions affecting only

19  individual members, and that the class resolution is superior

20  to other methods.

21       Therefore the Court finds that it approves the

22  settlement and distribution and certifies the settlement

23  class for purposes of the class settlement.  Okay.

24       I believe there is also in this case, I think I

25  mentioned this in the beginning, where you want a judgment

```
 1    against these defendants --
 2             MR. KANNER:  No, it is actually a judgment release,
 3    it is an order releasing --
 4             THE COURT:  Releasing the defendants.
 5             MR. KANNER:  And I have extra copies if Your Honor
 6    needs them.
 7             THE COURT:  Okay.  You could give those to the
 8    clerk to enter later, but the Court will sign those releases.
 9    Anything else?  Any defendant want to say anything on this?
10             (No response.)
11             THE COURT:  Okay.  Mr. Hansel?
12             MR. HANSEL:  May it please the Court, good morning,
13    Your Honor.  Greg Hansel for the direct-purchaser plaintiffs.
14             Direct-purchaser plaintiffs' counsel have filed
15    their motion for an award of attorney fees, reimbursement of
16    litigation expenses, future payments of litigation expenses,
17    and incentive awards.  And I'm here to make a brief
18    presentation without repeating everything that is in our
19    brief and the attachments.
20             THE COURT:  Okay.  I don't want to throw you off,
21    but can we go to the incentive awards for a minute?
22             MR. HANSEL:  Absolutely.
23             THE COURT:  They are $50,000, right, to each?
24             MR. HANSEL:  That's what we are requesting, Your
25    Honor, yes.  And if I may explain --
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33198  Page 26 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

26

```
 1              THE COURT:  Go ahead.
 2              MR. HANSEL:  -- the basis of that?
 3              THE COURT:  Yes.
 4              MR. HANSEL:  Incentive awards or service awards, as
 5   they are often called, are within the discretion of the
 6   Court.  We noted that the Court granted incentive awards of
 7   $50,000 each to the auto-dealer plaintiffs, and we --
 8              THE COURT:  You know, I knew much more about the
 9   auto-dealer plaintiffs and know a lot about what end-payor
10   plaintiffs are too now, and we did hear from Mr. Kanner,
11   that's true, about some of the things, the depositions that
12   the direct plaintiffs have given, but what else?
13              MR. HANSEL:  Let me tell the Court some of the
14   things that the direct-purchaser class representatives have
15   done.  So beginning in 2011 with the first filed
16   direct-purchaser action of Martinez Manufacturing, and there
17   are now seven proposed class representatives of the
18   direct-purchaser class, and each one of them has done several
19   onerous tasks over the last five to six years since they
20   joined the case as named plaintiffs and proposed class
21   representatives and put themselves out there to stand up for
22   the class and try to create a recovery for themselves and the
23   whole class.  So they have worked with counsel to investigate
24   the case.
25              I don't believe any of the direct-purchaser
```

1    counsels profess to be car guys or car gals in terms of

2    having a deep knowledge of the automotive industry or auto

3    parts in particular, so our clients have provided an

4    invaluable service by educating us as their attorneys about

5    how the industry works.  And as the Court is well aware,

6    being here in Detroit, it is a unique, large, and complex

7    industry, there is a lot of history, and we learned a lot

8    about it from them even before we filed the first complaint.

9         Once the complaints were filed and then they were

10   asked and did step up to provide disclosures -- Rule 26

11   disclosures, to respond to interrogatories and requests for

12   production producing for our review, for counsels' review,

13   over a million pages of documents as well as transactional

14   data which we reviewed and where appropriate produced to the

15   defendants in response to their requests for production.

16   They worked with us on interrogatory answers, and we

17   interviewed them at length.  We asked them about their

18   computer systems, we asked them to retain documents that they

19   might otherwise have discarded.  For example, Craft-co, down

20   in Jackson, Mississippi, has 104 boxes of documents that they

21   have been keeping for six years in a storage unit, and we

22   have scanned all of those and they have explained the

23   documents to us, and where responsive we have produced them

24   to the defendants.

25        Then it was time for depositions, and that was a

1    very large undertaking for them.  Some of them sat for

2    multi-day depositions.  I think Mr. Kanner said approximately

3    11 depositions of named plaintiffs were taken.  There were

4    often multiple days of prep in person and on the phone

5    working with exhibits, and then finally sitting for

6    depositions for two or three days of the defendants in the

7    defendants' very thorough fashion of taking depositions.

8    They reviewed the deposition transcripts for errata.  They

9    have also monitored and been kept apprised of the litigation

10   throughout.  We have kept them up to speed giving them status

11   reports periodically.  And whenever there was a proposed

12   settlement we went to each of the seven and asked them --

13   made a recommendation to them about why we felt each

14   settlement was fair, reasonable, and adequate for the class.

15   They were never promised or guaranteed any incentive awards.

16        In this case also the incentive awards are small

17   compared to the recoveries of the class as a whole.  I guess

18   one good example is in the OSS case, 28 million in checks

19   cashed, and in that case we have not requested incentive

20   awards yet, but in the wire harness -- in these wire harness

21   settlements with 102.7 million of settlements before the

22   Court today on our motion for fees, costs, and incentive

23   awards there will be very substantial payouts, so it is not a

24   case where you have an incentive award that's been requested

25   that would dwarf the payments being made to class members.

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33201  Page 29 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

29

```
 1          So class representatives didn't have to do this,
 2   they were willing to do it.  They were interested in helping
 3   to create a recovery for the class, including themselves, in
 4   their pro rata participation based on their purchasers in the
 5   recovery.  They come from different walks of life, different
 6   types of businesses.  They are -- generally speaking in the
 7   wire harness case they are tier purchasers who bought wire
 8   harness products, including whole wire harnesses, and other
 9   types of products within the definition of wire harness
10   products in the complaint to usually incorporate into some
11   kind of a module or a system and then sell it into the
12   manufacturing supply chain to make new motor vehicles, new
13   automobiles.
14          So some of them were directed purchasers directed
15   by automotive OEMs to purchase wire harness products from
16   certain defendants at a price negotiated through an RFQ
17   process by the OEMs, others bought the parts without being
18   directed but they bought the parts from defendants directly
19   and then incorporated them into systems and sold them
20   eventually to auto manufacturers.
21          So the -- and they will stay the course as well.
22   One never knows the future but to my knowledge none of them
23   have backed out or gotten cold feet about doing this work,
24   and they are with us for the long haul as far as I know.
25          And, you know, we are now continuing this
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33202  Page 30 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

30

1   litigation against Denso and Furukawa, and we are going full

2   bore as always.  And we have advised our clients to be

3   prepared to testify at trial and to prepare for trial in

4   advance of that if needed.  They understand that there will

5   be a motion for class certification in which -- which will be

6   contested and in which we will be asking the Court to appoint

7   them as representatives of a litigation class as

8   distinguished from a settlement class.

9          So frankly we are pleased with their service to the

10  class and we think they are deserving of $50,000 each for

11  serving as class representatives and achieving this result of

12  $102 million settlement.

13          THE COURT:  How did you arrive at the $50,000?

14          MR. HANSEL:  We looked at other cases in this area

15  of law, I believe we cite some cases in our brief that

16  establish a precedent for different amounts, some of them are

17  similar to this $50,000 amount, I don't have the chapter and

18  verse, they are in our brief, and we did take note as I

19  mentioned at the outset of the Court's award with respect to

20  the auto dealers who likewise have provided a lot of

21  discovery and, you know, been the subject of discovery issues

22  throughout the case.  So we think that the service they

23  performed is deserving.

24          THE COURT:  Okay.

25          MR. HANSEL:  I would also like to note, Your Honor,

1    that yesterday we submitted via ECF utility a revised

2    proposed order on this motion, and I also have copies.  I

3    believe that Nat Fink delivered copies to the clerk this

4    morning, hard copies, but I also have -- here we go.  I also

5    have extras.

6           So that is -- our original proposed order on

7    attorney fees and costs and incentive awards was sort of a

8    bare bone's order.  This one tracks previous orders entered

9    by the Court including some of the specific language and case

10   cites that Your Honor has referenced in the -- in awarding

11   fees in the occupant safety systems case to direct

12   purchasers, and just in July in awarding fees to the

13   end-payor counsel.  We tracked a lot of that same language

14   because we thought that was a precedent the Court had set and

15   the Court was comfortable with that type of language.

16          Of course, we do not presume -- this is only a

17   proposed order, we do not presume to ask the Court to enter

18   it as is, and the ECF utility is a submission of the document

19   in Word format so, of course, it is convenient for the Court

20   to make whatever changes the Court sees fit, but we hope it

21   is convenient and will assist the Court in reaching a

22   conclusion on the fee issue based on the Court's previous

23   rulings.

24          So with that, I will just jump right into --

25   probably the greatest factor in an award of attorney fees is

```
 1    what is the result, and direct-purchaser plaintiffs' counsel
 2    submit we have achieved a great result in this case with
 3    settlements of 102.7 million after the opt-out reductions, so
 4    that is the final number for these eight settlements.  There
 5    were just 11 groups of opt outs out of the 74 -- 172 class
 6    members to whom notice was mailed.  There were no objections
 7    to the settlements or to the fees.  So in short we believe we
 8    have achieved a great result plus we have also got the
 9    cooperation of the settling defendants against the
10    non-settling defendants who remain.
11           This result was hard won.  The Court has alluded to
12    the complexity not just of antitrust class actions in general
13    but of this one in particular.  And we start -- we start each
14    case with the philosophy that the case will be tried.  This
15    is full-bore litigation.  We don't pull any punches and
16    neither do the defendants as the Court is well aware.  Motion
17    practice has been and continues to be hard fought in this
18    case.  The case is ongoing.
19           Discovery was extraordinarily complex with over
20    10 million documents produced by the defendants, many in
21    Japanese, and over 50 depositions of the defendants mostly in
22    Japanese language, as well as the plaintiffs' depositions.
23    It is a global conspiracy that we are litigating about, so we
24    have to get a handle on all aspects of it around the world.
25           We have great respect for our opposing counsel, big
```

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33205   Page 33 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

33

 1    law counsel, and we've been litigating against some of the

 2    largest auto parts manufacturers in the world, each of them

 3    putting up a vigorous defense.

 4          We have worked extensively with experts and that

 5    has been a major component of our efforts, and the experts --

 6    and we are ready to get back on that horse with the experts

 7    for the motion for class certification when that comes.

 8    Analyzing antitrust impact and damages are complex economic

 9    and legal issues, and we have done that work.

10          There is another aspect of the wire harness case

11    that explains why it was -- has been -- this settlement has

12    been so hard won and has come at such a large cost of time

13    and expenses but time in particular.  This is the first -- as

14    the Court knows, this is the first case in the MDL, the wire

15    harness case, and I would compare it to a first child in a

16    family.  The first child, for better or for worse, gets the

17    brunt of the parenting and kind of becomes an example for

18    what -- for the kids who come next.  The wire harness case

19    has created templates for all of the other auto parts that

20    have followed beginning with things like case-management

21    orders, deposition protocols, initial discovery plans,

22    supplemental discovery plans, protective orders all heavily

23    negotiated, but now that they are in place in the wire

24    harness case it's much easier to reach agreement in the other

25    parts, but all of that time was necessarily and appropriately

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33206   Page 34 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

34

1    incurred by plaintiffs' counsel and defense counsel in the

2    wire harness case just because it was the first case.

3          The same is true of motion practice.  As the Court

4    has noted, since the Court has ruled on so many legal issues

5    on motions to dismiss in the wire harness case the Court can

6    address those same issues in a more streamlined fashion in

7    the next series of auto parts.  But, again, think of the

8    amount of time the Court spent on the wire harness, perhaps

9    vastly disproportionate to the other auto parts that come

10   later and for good reason.  It sets a precedent for these

11   other auto parts, and we hope that it would permit the rest

12   of the parts to go faster.

13         Also wire harness is by volume of commerce, amount

14   of criminal fines and amount of settlements are one of the

15   largest auto parts, so for that reason it justified an

16   outsize effort compared to some of the other auto parts, and

17   plaintiffs' counsel ran the full gauntlet of issues in the

18   wire harness case.

19         We are requesting a 30 percent fee of the

20   settlement amount.  About a year ago, at the Court's request,

21   all of the class plaintiffs submitted briefs -- what I would

22   call generic briefs on attorney fees to the Court in an

23   effort to, I believe, for the Court to become educated and to

24   achieve consistency across these parts, to have guidance on

25   how to rule on fees in these auto parts cases.  A year later

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33207   Page 35 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

35

 1  I think it is fair to say that Your Honor is probably one of

 2  the more experienced judges in dealing with fee issues in

 3  antitrust class actions.  So at the Court's request, direct

 4  purchasers submitted a brief in June 2016 which we then

 5  argued or presented at a status conference, along with the

 6  other plaintiffs.  And I just want to say that the approach

 7  that we have taken in this motion is the same approach we

 8  said we would take in that brief.  We suggested a standard

 9  baseline percentage of 30 percent but that the Court retain

10  flexibility to take into account the unique circumstances of

11  each recovery, whether it be by settlement or trial in

12  tailoring an award of attorney fees to each part and each

13  recovery.

14           The example we gave then holds true now; that wire

15  harness presents a different case than the occupant safety

16  system settlements that the Court addressed with us before.

17  In that case --

18           THE COURT:  You received a 25 percent award of --

19           MR. HANSEL:  That's correct, Your Honor, which was

20  about a 2.1 multiplier I believe it was, and in this case if

21  the Court grants our request for a 30 percent attorney fee,

22  it would be a 38 percent multiplier of our lodestar, in other

23  words, it would be a negative multiple.  It would be less

24  than 40 percent of the value of our time in the case, so

25  that's a big difference.

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33208   Page 36 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

36

1          The percent of the fund method, which we recommend,

2   and which the Court has followed to date in the auto parts

3   cases, is the appropriate method in this case.  It conserves

4   judicial resources, it aligns the interest of counsel with

5   the interest of the class, its typical in this type of

6   litigation, and we cite a large number of cases to support

7   that in our brief.

8          In fact, the Court has in the -- in this MDL

9   awarded higher percentages in some instances.  In an auto

10  dealer's fee order and a truck and equipment dealer fee order

11  the Court awarded a third.  The Court awarded the direct

12  purchasers 25 percent in the occupant safety system case.  So

13  the Court has been above and below the 30 percent figure in

14  different matters for valid reasons.

15         Nothing in this case warrants a lower percentage

16  than 30 percent.  It is a great result in a complex and

17  challenging case.  It is a large recovery, but not a recovery

18  or multiplier so large as to support a lower percentage or to

19  create a windfall for counsel.  If the Court considers the

20  so-called mega fund precedent, 102 million is considered sort

21  of the low end of mega fund.  Even in cases with recoveries

22  well over 100 million, many courts have awarded 30 percent as

23  an attorney fee as we cite in our brief.

24         So the lodestar crosscheck reveals there is no

25  windfall here.  The value of time submitted in Exhibit 6 to

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33209  Page 37 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

37

1    our motion is $81,407,770 which works out to 38 percent of

2    the requested 30 percent fee.

3           Counsel deserve to be awarded for taking on a risky

4    case.  We have been at this for several years and made a huge

5    investment in time and money.  The way contingent fee

6    litigation works the winning cases are suppose to pay for the

7    losers.

8           We also request that the Court, as the Court did in

9    OSS, apply the 30 percent percentage before deducting costs

10   because we have recovered the costs for the class and that's

11   a benefit.  First, counsel advanced the costs and then

12   recovered them for the class creating a benefit for the

13   class.

14          The Sixth Circuit factors also support the fee, and

15   I've covered most of those already but just to tick through

16   them, the benefit to the class, the lodestar crosscheck, the

17   risk of non-recovery, which the Court commented on earlier,

18   the stake that society has in awarding attorneys who win

19   valuable benefits for a class and vindicate important public

20   policies.  In this case, the Department of Justice expressly

21   did not seek restitution for the victims but we did.  The

22   complexity of the litigation and the skill and experience of

23   counsel on both sides.

24          We also ask the Court to reiterate that lead

25   counsel are authorized to allocate the fee among the team of

1    32 law firms who have contributed to this recovery.

2         With respect to costs, we request reimbursement of

3    costs that class counsel have paid in the amount of

4    2.1 million, and those do not include any costs that were

5    paid from previous settlements.

6         We also ask the Court to award ten percent of the

7    settlement amount with a cap of 7.5 million for future

8    payment of litigation expenses, and I would like to explain

9    that in a little more detail.  There are really two

10   components to the future payment of litigation expenses that

11   we are requesting, the 7.5 million.

12        First, I want to note that the ten percent amount

13   with the cap is consistent with what the Court has done in

14   other cases in this MDL; allocated some portion of recoveries

15   to be used to litigate against non-settling defendants

16   because of the substantial costs involved, so the 7.5 million

17   we are requesting, and we may not use all of it, we may not

18   need to, we will not incur it if it is not necessary and

19   appropriate.  It consists of two components, one is expenses

20   that we have incurred and we either have been billed or

21   expect to be billed soon by our vendors, in particular we

22   have economic experts, econometricians, we have discovery

23   vendors such as court reporting firms, videographers,

24   interpreters, and then we also have a substantial expense for

25   document management which includes storage, analytics, and

1   licenses for attorney review and coding of documents in

2   different languages.

3           So we have --

4           THE COURT:  What's the total amount again on that

5   expenses?

6           MR. HANSEL:  The future payment of litigation

7   expense is 7.5 million out of the 102.

8           THE COURT:  Okay.

9           MR. HANSEL:  And so the incurred but unpaid

10  expenses are about 1.7 million, which would leave an

11  additional 5.8 to use for expenses incurred in the future.

12          We've already discussed the incentive awards so I

13  won't repeat that.  As the Court knows, we've submitted the

14  proposed order.

15          So in conclusion, Your Honor, direct-purchaser

16  counsel submit that the 30 percent request is fair and

17  reasonable to the class, fair and reasonable to class

18  counsel.  The proposed order touches on the key elements that

19  I have addressed.  And this order is now before the Court --

20  this proposed order is now before the Court together with the

21  other orders that have been submitted on the final approval.

22  We have great respect for the Court's deliberative process

23  and appreciation for all the work the Court has done in

24  managing this case and making rulings.  We hope the Court can

25  expedite this ruling.

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33212  Page 40 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

40

 1          My managing partner comes by my office on a regular

 2   basis and says Greg, that $102 million settlement is great

 3   but when are we going to get paid?  And the joke in the

 4   office is he asks me for an update every 20 minutes.  But

 5   anyway, we do appreciate the Court's attention to this.  If

 6   there are any more questions I'm happy to address them.

 7          THE COURT:  No.

 8          MR. HANSEL:  Thank you, Your Honor.

 9          MR. KANNER:  Your Honor, if I might?

10          THE COURT:  Yes.

11          MR. KANNER:  Steve Kanner again.

12          With respect to the incentive awards or the service

13   awards, as you were asking Mr. Hansel those questions I

14   remember some of the answers that our clients gave under

15   deposition to the question how much time did you spend

16   preparing for this deposition, we are not talking about their

17   time in the case, but just for the 30(b)(6), 30(b)(1)

18   deposition, and one of the clients matter of factually looked

19   at defense counsel and said well over 100 hours.  And I think

20   that gives Your Honor a concept or an idea of just how

21   seriously the class representatives of this case took their

22   role in representing the class.  And I, for one, as a lawyer

23   was thrilled to see in this case just how seriously our class

24   representatives took their responsibilities.  I just want to

25   leave that note with Your Honor.

```
1              THE COURT:  Thank you.

2              MR. KANNER:  Thank you.

3              THE COURT:  All right.  The Court has reviewed this

4    motion for an award of attorney fees, litigation cost and

5    expenses and incentive awards to the class reps.  We know

6    right now that we have a settlement amount after the opt-out

7    provisions of $102.7 million.  The Court certainly believes

8    it should award reimbursement for the costs and expenses,

9    that goes without saying.  The only dispute that I have is

10   the fact that I think it should come off the total award

11   before we determine attorney fees.  I have done this in every

12   case, I think it's both a sharing in the costs with the

13   persons who will recover the money, and it also leads to

14   being as conservative I think as one can in expending costs.

15   And given the size of this recovery I think it is a

16   reasonable way to deal with the costs for the reasons that

17   I've set forth and given that there is enough money to do

18   this up front.

19              So the Court will award the costs.  The Court will

20   also set aside -- I believe it was ten percent you asked for,

21   ten percent of the settlement fund for ongoing expenses.

22              MR. HANSEL:  It was capped at 7.5.

23              THE COURT:  Yeah, $7.5 million.

24              In terms of the incentive payments to the class

25   reps, I asked questions about that because I think we needed
```

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33214   Page 42 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

42

```
 1   a little bit more information on the record to confirm this.
 2   I think we have used $50,000 before.  I think that it is
 3   reasonable to use the 50,000 now.  The Court is aware that
 4   the wire harness case, of course, was and is the first case
 5   that was filed here, and I believe that there was -- that it
 6   is a case that is a predicate for all of the other cases that
 7   we have, and I think the work at the beginning was quite
 8   extensive just to establish -- I want to say a simple
 9   protocol but I don't mean simple protocol, it is not simple,
10   but to establish the protocol that we are going to use for
11   this case.
12           And looking at what it is said that the -- that the
13   individual, I believe, seven class representatives of the
14   direct purchasers did, they were charged with the task of
15   answering the interrogatories or assisting in the answering
16   of the interrogatories, to provide the -- in order to provide
17   the Rule 26 disclosures, and they -- it was said here today
18   they prepared or produced over a million pages of documents,
19   they had their depositions taken which were extensive, plus
20   the amount of time that was just mentioned that individual
21   plaintiffs said they had spent in preparation, they reviewed
22   all of the depositions, they agreed to testify at trial, and
23   I think that they were -- they were the standard for
24   plaintiffs because they were the first and what they did had
25   to be looked at by every other plaintiff in this litigation,
```

 1    so the Court will award the $50,000 to the class

 2    representatives.

 3            The attorney fees I believe is the next item, and

 4    the Court has struggled, as you know, with these attorneys

 5    fees to try to be fair.  I at one time I would like to say

 6    let's just give the percentage and another time I say oh, no,

 7    that needs to be modified.  And the Court -- the appellate

 8    courts instruct us that we have to look at a number of

 9    factors in determining these fees.  We know now that there is

10    either the percentage of the fund approach or the lodestar

11    approach.  This Court has taken the approach in the other

12    cases of a percentage of the fund with a crosscheck by the

13    lodestar, and the Court notes that it has the discretion in

14    determining how to determine these attorney fees.

15            Counsel has given the Court in the past general

16    briefs just on attorney fees, and I note a number of factors

17    here that were considered, and I also note the various cases

18    that have been cited by the plaintiffs in these briefs, and

19    these attorney fees percentages go all over the place for

20    various reasons.  We know, of course -- I guess we always

21    look at a third and that was established way back when in

22    personal injury cases, and I think that's kind of where -- it

23    has to be where this was picked up and then it went down a

24    little bit as the cases such as this had such high recovery

25    rates that the courts search all the time for what is a fair

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33216  Page 44 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

44

 1    and reasonable attorney fee and not a -- what is it called --

 2    a windfall to the attorneys.  Of course, any windfall to the

 3    attorneys would be at the expense of the litigants because

 4    that is that much less that they have to share in.  But there

 5    are six factors that have to be considered, and that is the

 6    value of the benefit rendered to the parties, the society's

 7    stake in awarding attorney fees, and that's in order to

 8    maintain some incentive to continue these cases, that if you

 9    see a wrong, you know, you can -- you can actually address it

10    because you will be compensated if you are successful.

11         The services were undertaken of course on a

12    contingency fee basis, and I want to say in this case I think

13    undertaking the services on a contingency fee basis is

14    probably the only way this could have gone as a practical

15    matter, but it also creates a great risk for the attorneys

16    involved because of the expenses that they have to put out

17    and may never recover, and when we are talking about million

18    of dollars of expenses, not including attorney time, we are

19    talking about a significant sum of money, so there is a great

20    risk here.

21         The Court also looks at the professional skill and

22    standing of counsel, and I've said this before and I continue

23    to say, I think we have extremely competent attorneys who

24    have proven their abilities to handle these types of cases,

25    who have engaged in settlements in such a reasonable and fair

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33217   Page 45 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

45

```
 1    arm's length manner, their skill and reputation in the

 2    community is well known, so there is a significant value to

 3    their services, and so here I think all of the criteria have

 4    been met.

 5         I understand that the attorneys have filed -- I've

 6    got this written down here, have filed that they spent in

 7    combined hours on this case 179,636.2 combined hours.  Who

 8    did the 0.2?

 9         MR. FINK:  Your Honor (indicating) --

10         THE COURT:  Yeah, okay.  When multiplied by the

11    appropriate hourly rates it is 81,407 -- 81,407,770.  The

12    Court has reviewed, I wish to state, the hourly rates for the

13    various individuals.  The hourly rates which I as a civil

14    servant has always struggled with recognize what the hourly

15    rates are in the legal community today for this type of

16    litigation, and in recognizing this I recognize the value of

17    the plaintiffs' attorneys work at this $81 million figure.

18         The amount requested, however, now, of course, we

19    are discussing the crosscheck yields a negative multiplier of

20    0.95, so --

21         MR. HANSEL:  Your Honor, if I may just --

22         THE COURT:  Yes.

23         MR. HANSEL:  -- make a short statement on that?

24         That would have been the multiplier if there had

25    been no opt outs and the settlements had been in the
```

Fairness Hearing & Motion to Dismiss • August 8, 2017

1    $257 million range of the original settlement amounts before

2    the opt-out reductions, and the multiplier now that the

3    opt-out reductions have taken the value of the total

4    settlements to 102.7 million --

5           THE COURT:  Uh-huh.

6           MR. HANSEL:  -- is 0.38.

7           THE COURT:  Yes, I've got that, 0.38, so you are

8    saying that you are getting less than 40 percent of the

9    value?

10          MR. HANSEL:  Correct, Your Honor, requesting less

11   than the 40 percent.

12          THE COURT:  Yeah, I have here assuming no opt outs

13   but for the opt outs, but I wanted to look at it as a whole

14   to see how it crosschecks, and I think it is notable that the

15   crosscheck is in that range.

16          To me to look at the hours using the hourly rate is

17   a task that is tremendous plus I don't think it can be well

18   scrutinized.  There is so much work here, who's to say you

19   spent an hour and you should have only spent ten minutes on a

20   document?  I mean, obviously big things -- glaring things

21   come out, but I think with the hourly rate it is just too

22   hard to control, and obviously you are selected for your

23   expertise and your standing in the community, along with that

24   comes your honesty and your integrity in doing these hours.

25   So I assume without detailed investigation or hiring others,

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33219  Page 47 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

47

 1    as I am aware in some cases is done, hiring accountants, et

 2    cetera, to review hourly work, the Court is accepting what

 3    you are saying but I still have the understanding that it is

 4    hard to define an hour so to speak.

 5         Interestingly enough I have a new clerk who -- I

 6    had a clerk who is new to the legal profession and is doing

 7    hourly rates, and it is like can I get up for a cup of

 8    coffee?  I don't think so.  I mean, it seems a little

 9    extreme.  So I see this as showing that the hourly rate is

10    not a perfect way but it does give us as crosscheck.

11         So the Court in determining the percentage at --

12    you are asking for 30 percent as you know I have in the last

13    case you had gave you 25 percent, and the others I have given

14    some 30 or a third, and I have limited the rest to 20 percent

15    pending the outcome of this litigation so I can see where are

16    we going when we have the whole thing done, but I think that

17    this wire harness case is deserving of the 30 percent

18    attorney fee.  As I said before, I think it is the predicate,

19    it established the procedures and protocol for the rest of

20    the parts, and I think it is a fee that is well earned in

21    this massive litigation.  So the Court will award the

22    30 percent of the attorney fee, but it is to be taken after

23    the distribution for costs and expenses.

24         All right.  Did I forget anything, Mr. Hansel?

25         MR. HANSEL:  One clarification?

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33220   Page 48 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

48

```
 1              THE COURT:  Yes.
 2              MR. HANSEL:  Your Honor, I believe the Court has
 3   also given counsel an incentive to be as efficient as
 4   possible with the use of that 7.5 million, so I think what we
 5   would do, given the Court's ruling, would be, first, we would
 6   deduct the 2.1 million of reimbursed costs, we don't apply
 7   the 30 percent fee to that.
 8              THE COURT:  Right.
 9              MR. HANSEL:  Then we would deduct the 7.5 million
10   for future payments of litigation costs and not apply the
11   30 percent to that.
12              THE COURT:  At this time.
13              MR. HANSEL:  At this time, but if we don't use it
14   all we would apply the 30 percent to the remainder?
15              THE COURT:  Correct.
16              MR. HANSEL:  Thank you, Your Honor.
17              THE COURT:  Thank you.  Thank you for clarifying
18   that.  Anything else?
19              (No response.)
20              THE COURT:  All right.  Would you present an order
21   consistent with this ruling?
22              MR. HANSEL:  We have, Your Honor, and that's the
23   one that I believe the clerk handed you up at the beginning
24   which we submitted yesterday via ECF utility.
25              THE COURT:  Okay.
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33221  Page 49 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

49

```
 1            MR. HANSEL:  I do have extra copies but it is the
 2    same thing, if you would like, Your Honor?
 3            THE COURT:  And you have taken the costs off?
 4            MR. HANSEL:  I guess I need to modify that.  I'm
 5    sorry, I apologize.
 6            THE COURT:  Okay.
 7            MR. HANSEL:  I do need to modify that.  We will
 8    submit that today, Your Honor.
 9            THE COURT:  Very good.
10            MR. HANSEL:  Thank you.
11            THE COURT:  You can take that to your partner and
12    tell him there's money coming.
13            MR. HANSEL:  We will do, Your Honor.  Thank you.
14            THE COURT:  All right.  Now we have the motion --
15    excuse me, there was one other thing.  There was the
16    allocation to fees to others, and I did not mention that.  I
17    believe counsel has the right, pursuant to the Court's order,
18    to allocate the fees, and I maintain that.  I, of course,
19    always have the right to review if there is an objection but
20    I think you should allocate the fees at this point.
21            MR. HANSEL:  Thank you, Your Honor.
22            MR. KANNER:  Thank you, Your Honor.
23            THE COURT:  All right.  This is the
24    anti-vibrational rubber part defendants' collective motion to
25    dismiss the direct purchasers' complaint.  Appearances,
```

1    please.

2         MR. REISS:  Yes, Your Honor.  Steve Reiss, of Weil,

3    for the Bridgestone defendants.

4         MR. FITZMAURICE:  David Fitzmaurice, on behalf of

5    Weil, also for the Bridgestone defendants.

6         MR. GIARDINA:  David Giardina, from Sidley Austin,

7    for the Toyo defendants.

8         MR. RUBIN:  Michael Rubin, of Arnold & Porter, for

9    the Yamasa defendants.

10        MR. ROZGA:  Kyle Rozga, from Weil, for the

11   Bridgestone defendants.

12        THE COURT:  Okay.

13        MR. FINK:  David Fink will be arguing for the

14   plaintiffs.

15        THE COURT:  All right.

16        MR. REISS:  Your Honor, I think we are trying to

17   hook up to a PowerPoint so it may take us five minutes.

18        THE COURT:  We will take a five-minute break.

19        THE LAW CLERK:  All rise.  Court is in recess.

20        (Court recessed at 11:26 a.m.)

21                      _   _   _

22        (Court reconvened at 11:35 a.m.; Court, Counsel and

23        all parties present.)

24        THE LAW CLERK:  All rise.  Court is in session.

25   You may be seated.

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33223 Page 51 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

51

```
 1            THE COURT:  All right.  Mr. Reiss.

 2            MR. REISS:  Thank you, Your Honor.  We've given the

 3   plaintiffs a hard copy of the PowerPoint.  If Your Honor

 4   wants one?

 5            THE COURT:  Yes, please.

 6            MR. REISS:  Your Honor, this is a motion to -- the

 7   AVRP defendants' motion to dismiss the direct purchasers'

 8   complaint.  It is a bit unusual because, in fact, the direct

 9   purchasers' complaint isn't really a direct purchasers'

10   complaint.  In fact, it is probably not even a legitimate

11   indirect purchasers' complaint as we will explain.

12            And I think just briefly, Your Honor, to give you a

13   little bit of history here, Your Honor is definitely very

14   well acquainted with the fact that the AVRP case is one of

15   the three leading cases along with wire harness, bearings and

16   the bearings cases.  The AVRP case is with respect to the

17   indirect cases, both the ADPs and EPPs, are largely at this

18   point not finally but they are -- they is substantial

19   progress on the settlement front, that's what I will tell

20   you.  Nothing has come before this Court but because of their

21   position in these cases there has been a lot of progress, and

22   if you see, Your Honor, the EPP complaint was filed on

23   June 13th, 2014, the ADP complaint was filed shortly

24   thereafter on June 21st, 2014.  Discovery in the indirect

25   purchaser complaints is complete, over, done.
```

```
 1              The -- I will say supposed, because it is a
 2    supposed, the direct purchasers' complaint in this case was
 3    filed on November 15th, 2016.  Why is that significant?  It
 4    is significant because the statute of limitations would have
 5    run on November 16th, 2016 because the latest date that the
 6    plaintiffs' acknowledge that they were on notice was
 7    November 16th, 2012.  So by their own admission the last
 8    possible date they could have filed the direct purchaser
 9    complaint was November 16th, 2016, and they filed on
10    November 15th, 2016.  And, Your Honor, that explains a lot
11    about the nature of this supposed -- supposed direct
12    purchaser case.
13              This complaint is not like any other -- remotely
14    like any other direct purchaser case in the auto parts case,
15    not like one other direct purchaser case.  First, all of the
16    other direct purchaser complaints the plaintiffs are
17    corporate entities, they actually bought more than one AVRP
18    part.  Here the plaintiffs are simply individuals.
19              Second, in every other direct purchaser case the
20    plaintiffs allege, they at least allege that the parts were
21    made by the defendants.  Plaintiffs do not even allege that
22    the parts were made --
23              THE COURT:  Would you pull that microphone away?
24              MR. REISS:  I'm sorry, Your Honor.
25              The plaintiffs do not even allege that the parts
```

1    they bought were made by the defendants in this case.

2          Third, plaintiffs -- in all the other DPP

3    complaints the plaintiffs allege that they purchased parts

4    directly from defendants, you would expect that, it is a

5    direct purchaser case.  In this case the plaintiffs concede

6    that they did not purchase the AVRPs directly from

7    defendants.

8          The fourth major difference, in every other direct

9    purchaser complaint the plaintiffs identify the entity, they

10   at least identify who sold them the part or the car.

11   Plaintiffs do not identify the entity that sold them the

12   AVRPs in this case.

13         And finally, the fifth major difference from every

14   other direct purchaser complaint, the proposed class

15   definition in every other direct purchaser case includes only

16   purchases directly from defendants, that's what you would

17   expect in a direct purchaser case.  Here the proposed class

18   definition includes purchases from, quote, entities of which

19   defendants are the ultimate parent.  You've never seen that

20   in any other direct purchaser case.

21         Now, when I say this case is clearly not a direct

22   purchaser case it looks mostly like the other indirect

23   purchaser cases and, for example, the complaint in this case

24   has overlapping allegations with the indirect purchaser

25   complaints in this case about such things as the nature of

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33226  Page 54 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

54

      1     the AVRP conspiracy, the AVRP manufacturing process, the OEM

      2     purchasing process, and the nature of replacement parts.  And

      3     we have just -- just to show Your Honor how similar this

      4     complaint is to the indirect purchaser complaints, from the

      5     ADP -- and this is from the auto dealers' complaint in this

      6     case, the auto dealers allege concerning replacement parts

      7     when repairing a damaged vehicle or where the vehicle's AVRPs

      8     are defective, plaintiffs and other auto dealers indirectly

      9     purchase replacement AVRPs from defendants.  By the way,

     10     replacement AVRPs are what is involved in this case, that's

     11     what this -- that's what these plaintiffs supposedly,

     12     supposedly bought.

     13             In the EPP complaint, the EPPs allege AVRPs are

     14     also installed in motor vehicles to replace worn out,

     15     defective or damaged AVRPs.  The exact same allegation, the

     16     exact same allegation in the supposed direct purchaser

     17     complaint in this case.

     18             Now, we've raised not just 12(b)(6) -- not just a

     19     12(b)(6) challenge, we've raised a 12(b)(1) challenge to this

     20     Court's jurisdiction because of the unique deficiencies in

     21     this complaint, and 12(b)(1) is a very different ball game,

     22     Your Honor, than 12(b)(6).  I know the Court is familiar with

     23     that.

     24             Flowing from the Supreme Court's decision in the

     25     Lujan case, which has been repeatedly cited in the

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33227  Page 55 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

55

1    Sixth Circuit, the Phillips vs. DeJuan case is just one of

2    them, in order to show standing, as Lujan says, the

3    irreducible Constitutional minimum of standing contains three

4    elements, and it is the plaintiffs' burden to show these, to

5    show these.  First, an injury in fact meaning an invasion of

6    a legally protected interest that is, A, concrete and

7    particularized, and B, actual or imminent, and here is the

8    critical part, not conjectural or hypothetical, and we are

9    going to see why that criteria isn't met here.

10           Second, a causal connection between the injury and

11   conduct complaint of, i.e., the injury complained of must be

12   fairly traceable to the challenged action of the defendant

13   and not the result of the independent action of some third

14   party not before the Court, and we are going to show why

15   that's a problem here as well.

16           Now, we believe based purely on the face of the

17   complaint the plaintiffs have failed to demonstrate that they

18   have Constitutional standing.  The only standing allegation

19   in the complaint is quoted here:  Plaintiffs purchased

20   anti-vibration rubber parts directly from an entity of which

21   one of the defendants is the ultimate parent during the class

22   period.  That's their allegation.

23           There is no allegation that the defendants made

24   those AVRPs.  There is no allegation that the defendants sold

25   AVRPs to individual consumers.  There is no allegation about

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33228  Page 56 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

56

 1  how the plaintiffs purchased the AVRPs.  There is no

 2  allegation that plaintiffs -- and there is somewhat

 3  remarkable -- they don't even allege that they purchased the

 4  AVRPs from a Firestone store, which is the only conceivable

 5  basis that they could bring this -- well, they have no

 6  conceivable basis on which these plaintiffs can bring a

 7  complaint but it is the only conceivable place they could

 8  possibly have gotten.

 9        THE COURT:  Because none of the other defendants

10  sell to individuals?

11        MR. REISS:  Absolutely not, none of the other three

12  defendants have retail outlets in the United States at all.

13  So the Firestone stores are the only possible source of this

14  purchase, and they don't even allege they bought them from

15  the Firestone stores.  Okay.  That kind of speculative

16  standing is totally unprecedented in these auto parts cases.

17        And -- and this is important, Your Honor -- based

18  on the uncontroverted factual record before the Court, and

19  the Court has before it five declarations, three from the

20  other three defendants and two from Bridgestone, plaintiffs

21  have failed to demonstrate that they have Constitutional

22  standing, and here's how this analysis has to go.  Under

23  Sixth Circuit law, and this is where there is a factual

24  attack on the subject matter jurisdiction alleged in the

25  complaint, no presumption -- no presumptive truthfulness

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33229  Page 57 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

57

```
 1    applies to the allegations.  It is not like a 12(b)(6).  When
 2    a factual attack raises -- when a factual attack raises a
 3    factual controversy, the district court must weigh the
 4    conflicting evidence to arrive at the factual predicate that
 5    subject matter does or does not exist.  That's the
 6    Sixth Circuit Getek case which they cite.
 7            As I noted, we submitted five unrebutted factual
 8    declarations showing that the defendants -- none of the
 9    defendants sell AVRPs to individual consumers.  Plaintiffs
10    have not submitted any evidence to rebut those declarations,
11    and they did not even move for jurisdictional discovery, so
12    that's it.  That's the record on jurisdiction.  We are done.
13    The game has been played and it is over and that is the
14    record the Court must rule on.  The existing factual record
15    is uncontroverted and dispositive.  There is no federal
16    jurisdiction here.
17            Now, what is that uncontroverted factual record in
18    a little bit more detail?  First, none of the defendants sell
19    AVRPs to retail customers.  Defendants only sell AVRPs only
20    to the OEMs and their suppliers; tier ones, maybe tier twos.
21    Bridgestone defendants and Bridgestone defendants are the
22    ultimate owners of most Firestone repair stores.  There's
23    actually a period in which some of those stores were
24    franchises, are the only defendants with a retail operation
25    in the United States, none of the other three defendants have
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33230  Page 58 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

58

1    retail operations in the United States.  Bridgestone

2    defendants do not sell AVRPs to Firestone repair stores, they

3    do not do that.

4          The other defendants obviously did not sell AVRPs

5    to the Firestone repair stores.  Once Bridgestone defendants

6    sell their AVRPs to OEMs and their suppliers, they have no

7    knowledge or control over any subsequent sales by the OEMs or

8    suppliers to those AVRPs, none.  Whatever those OEMs do or

9    the tier ones with those AVRPs, Bridgestone has nothing to do

10   with it.

11         Sixth, the Firestone repair stores purchase their

12   AVRPs from auto dealers and distributors, auto dealers and

13   distributors, not any Bridgestone entity, and those auto

14   dealers and distributors are entirely unrelated to the

15   Bridgestone defendants or any other defendant.  Firestone

16   repair shops do not purchase their AVRPs from any defendant.

17         And finally, the Firestone repair stores actually

18   sell AVRPs made by many different manufacturers including a

19   number of manufacturers that are not defendants in this case.

20         All right.  So that is why, just in summary,

21   plaintiffs can't establish Constitutional standing.  There's

22   none, and the factual record is closed on that, and that's

23   the end of the case.

24         But there is even more -- there is more, I don't

25   think the Court has to go beyond that, but there is still

  1   more because we figured we would get it all out at once.  It

  2   is absolutely clear that if anything, and I say if anything,

  3   these plaintiffs are at most -- at most indirect purchasers

  4   so they clearly lack antitrust standing separate from

  5   Constitutional standing, right?  You've got Constitutional

  6   standing, they've lacked that, and now they separately lack

  7   antitrust standing under Illinois Brick.  As I know the Court

  8   is very familiar, under Illinois Brick only direct purchasers

  9   can bring a damage case under the Sherman Act, right?

 10   Indirect purchasers can't, that's why all of the indirect

 11   purchaser cases before Your Honor, the ADDs, the EPPs, are

 12   all brought under state law because they can't seek damages

 13   under the Sherman Act.

 14          The complaint alleges that plaintiffs purchased

 15   AVRPs from an entity other than the defendants, their

 16   indirect purchasers, and here is what they allege; plaintiffs

 17   purchased anti-vibration rubber parts directly from an entity

 18   of which one of the defendants is the ultimate parent during

 19   the class period.  That's not a direct purchase, that's an

 20   indirect purchase.  They concede that their indirect

 21   purchasers so they are clearly out barred by Illinois Brick

 22   unless an exception applies, and the exception that they rely

 23   on is a very narrow exception that has never been found to

 24   apply by the Sixth Circuit, never, and it is the ownership or

 25   control exception, and it is set forth in the Sixth Circuit's

 1    decision in the Jewish Hospital case, and that exception only

 2    applies when a direct purchaser is owned or controlled by the

 3    defendant such that their, quote, has effectively been only

 4    one sale.

 5          So if a manufacturer is selling for -- to its

 6    wholly-owned distributor and that wholly-owned distributor

 7    makes a sale, the sale from the manufacturer to the

 8    wholly-owned distributor is not considered -- that that is

 9    considered one entity and the sale by the wholly-owned

10    distributor then becomes the first sale.  That's the only

11    time that exception applies, it doesn't apply here, and it

12    has never been applied by the Sixth Circuit.

13          The plaintiffs allege no facts, none, supporting

14    the ownership control exception, so even if they wanted to

15    take advantage of it they made no allegations capable of

16    taking advantage of that exception which frankly they

17    couldn't in any event.  And the factual record dispositively

18    proves that the ownership control exception does not apply

19    because there are multiple, not just one or two, there are

20    multiple intervening sales to independent entities unrelated

21    to Bridgestone.  Okay.  So the notion that there is a sale

22    between completely controlled and owned entities and that

23    doesn't count doesn't apply here because as we will see in a

24    minute there are multiple sales to entities wholly unrelated

25    to Bridgestone before you ever get to the Firestone stores.

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33233 Page 61 of
Fairness Hearing & Motion to Dismiss • August 8, 2017
111

61

1    On the left-hand side, Your Honor, is what the
2  plaintiffs speculate is the sales chain; Bridgestone Corp. to
3  Bridgestone Americas to Bridgestone retail operations, that's
4  the Firestone stores, to retail consumers.  Unfortunately
5  that's completely factually incorrect as we have established
6  with undisputed, unrefuted affidavits.  The actual -- the
7  actual facts are the following:  Bridgestone defendants or
8  any other defendant sells through arms length transactions to
9  OEMs and their tier one suppliers.  By the way, that sale
10  that ends the only exception to Illinois Brick, there is a
11  sale to an independent entity.
12    It gets worse though because the OEMs and their
13  tier one suppliers, again through arm's length transactions
14  to unrelated customers, sell the parts to the auto dealers
15  and auto parts distributors.  So now you have at least two
16  sales to entities wholly unrelated to Bridgestone or any
17  other defendant, and those auto dealers or parts
18  distributors, and there may be other layers in between there,
19  they are the ones who sell to the Bridgestone stores.  So the
20  Bridgestone stores are buying these parts from entities that
21  have nothing, nothing to do with Bridgestone, and those --
22  the Bridgestone and Firestone stores are aware of the
23  plaintiffs in this case supposedly, although they don't
24  allege it, supposedly got their single items of AVRP.
25    This is important, Your Honor, because the

Fairness Hearing & Motion to Dismiss • August 8, 2017

1    plaintiffs themselves do not contest that there are

2    intervening sales to any dependent non-Bridgestone entities.

3    If you look at Mr. Hansel's affidavit, his declaration in

4    support of the Rule 56(d) discovery, he basically says

5    that -- he contests -- he says we are not sure whether

6    Bridgestone owns the Firestone stores but he does not contest

7    the undisputed Ohira declaration that says Bridgestone only

8    sells AVRP to OEMs and tier one suppliers.  There is nothing

9    in Mr. Hansel's affidavit that questions that fact, and that

10   fact dispositively proves that the defendants -- I'm sorry,

11   that the plaintiffs lack antitrust standing under

12   Illinois Brick.  Again, dispositive, end of the case.

13          Now, and I don't think we ever have to get here,

14   Your Honor, but just to show just how -- you know, at some

15   level I have to give the plaintiffs' counsel credit for their

16   creativity, right.  They couldn't get a real plaintiff here,

17   they couldn't get a real direct purchaser, the day before

18   they get something the best they could do, and they try to --

19   you know, they try to gin up a complaint.

20          But with respect to the class allegations, this

21   complaint in and of itself has such incredible structural

22   problems that even beyond the 12(b)(1) jurisdictional issue

23   and the 12(b)(6) antitrust standing issue, you can never have

24   a class the way they proposed it.  Their proposed class is

25   all direct purchasers of anti-vibrational rubber parts

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33235  Page 63 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

63

1    excluding the defendants and their past, present parents,

2    subsidiaries, affiliates and joint ventures in the

3    United States from any of the defendants or their controlled

4    subsidiaries, affiliates, joint ventures or entities of which

5    they are the ultimate parent during the class period.  As I

6    have noted, Your Honor, there is no other class that's like

7    this.

8            And here is the problem with the class as they have

9    defined it.  Now we will just use an example.  Take

10   Bridgestone who sells anti-vibration rubber parts for the

11   2006 Toyota Camry, they sell those parts to Toyota.  Toyota

12   is indisputably their direct purchaser, that's who bought the

13   parts from Bridgestone.  Toyota sells these AVRP parts to its

14   dealership.  The dealership is an indirect purchaser, and

15   they are part of the auto dealer indirect purchaser class

16   actions.  Those folks are taken care of in that case.

17           The dealerships then sell the parts, because they

18   do, to auto parts distributors, yet a second transaction

19   unrelated to Bridgestone, and those auto parts distributors

20   they are indirect purchasers, and they are probably covered

21   by the other indirect purchaser actions including the EPP

22   actions.  The auto parts distributors sell parts to

23   Firestone, totally independent from Bridgestone, have nothing

24   to do with Bridgestone.  Firestone is actually itself an

25   indirect purchaser.  They are the indirect purchaser number

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33236  Page 64 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

64

 1    three.  They then sell the part, single part, to the supposed

 2    direct purchasers in this case who are the indirect

 3    purchasers number four.  Notice the inherent and unavoidable

 4    conflict that exists because of the plaintiffs' class

 5    definition.

 6           Toyota is a direct purchaser, the direct purchaser,

 7    but under their definition the supposed direct purchaser

 8    plaintiff in this case, really an indirect purchaser at best,

 9    is also a direct purchaser.  There is an inter-class conflict

10    here, and it exists because of their class definition, they

11    can't avoid it.  You can't certify a class on that basis.

12           And the notion that those four tier indirect

13    purchasers could be adequate class representatives for

14    Toyota, the OEMs, the tier ones, Your Honor, belies

15    credulity, it can't possibly be the case even apart from the

16    inherent conflict that their class definition compels.

17           Thank you, Your Honor.  I may have a rebuttal.

18           THE COURT:  Response?

19           MR. FINK:  Thank you, Your Honor.  David Fink on

20    behalf of the plaintiffs.

21           Actually I would like to ask for a courtesy from

22    defendants; if you wouldn't mind, I'm going to go through

23    your PowerPoint, so if you would just put up the first page

24    of the PowerPoint.

25           Before we get to this, Your Honor, I thought it

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33237  Page 65 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

65

```
 1    would be helpful to just go in the same order they went in,
 2    and we can cover the issues.
 3              THE COURT:  I agree.
 4              MR. FINK:  But before we get there I want to stay a
 5    couple things as an overview related to this argument, and
 6    that is what we just heard was very persuasive and would be a
 7    terrific closing argument, and I look forward to hearing it
 8    as a closing argument several years from now when this case
 9    comes up for trial.  But for now we have to keep in mind that
10    we are at the very outset of the case, we are at the pleading
11    stage, we are nowhere near the point at which most of the
12    arguments you heard can or should be considered by the Court.
13              In one sense -- and I'm going get to that
14    PowerPoint and go through it, but in one sense this case is
15    really very simple, the argument is very simple, and the
16    motion, I hesitate to say this, but isn't that interesting
17    because what we have here is a case in which we have pled
18    that certain named plaintiffs each purchased a price-fixed
19    product, in this case it was the anti-vibration rubber parts,
20    but each plaintiff purchased a price-fixed product and we
21    allege directly from a participant in the conspiracy.  And
22    now it is --
23              THE COURT:  Who did they purchase it from?
24              MR. FINK:  They purchased it from an entity wholly
25    owned --
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33238  Page 66 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

66

1            THE COURT:  Who?

2            MR. FINK:  Well, Your Honor, they were purchased --

3     counsel is incorrect when he says the only possibility is

4     Firestone.

5            THE COURT:  No, I'm just curious, I want to know

6     what do your plaintiffs say who did they purchase it from?

7            MR. FINK:  They were purchased from a couple of

8     different stores, there's Firestone retail stores but there

9     is also Tires Plus retail stores and Wheel Works, those three

10    types of retailers are all identified by Bridgestone as being

11    part of their integrated family.  Bridgestone prides itself

12    publicly on being a fully-integrated company from the

13    Indonesian rubber fields to the service store in your

14    backyard, and that's how they present themselves.

15           THE COURT:  Do they own tire -- is Tire Plus an

16    independent -- excuse me, a subsidiary owned by --

17           MR. FINK:  Perfect question, Your Honor.  What they

18    are, and it is fascinating because in their briefs they

19    referred to this attenuated connection, they talk about it as

20    indirect, in their -- in the affidavits they use the word

21    indirect a lot, but here's what is indirect:  Firestone owns

22    a company that owns a company that owns the tire stores.

23    There's nobody else involved.  Bridgestone, Bridgestone,

24    Bridgestone, Firestone, it is that simple.  It's not

25    complicated, there aren't other parties involved.  It is

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33239  Page 67 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

67

1    all -- they can't deny it, they won't try to deny it.  The

2    ultimate owner, and that's the term that we use, we refer

3    to -- again, I was saying before that they purchase a

4    price-fixed product directly from a participant or an entity

5    owned by a participant.  The ultimate parent is Bridgestone.

6         Now, interestingly enough, Your Honor, what's

7    fascinating about this is we didn't plead any of that, we

8    pled what we had to plead, it is notice pleading, we pled

9    what we had to plead.  There is no heightened pleading

10   requirement for antitrust but we pled what we had to plead,

11   and we pled that they purchased from an entity whose ultimate

12   parent is a defendant.  We never used the word Firestone.

13   And yet they do their whole presentation, they argue their

14   whole brief, they knew exactly what we were talking about,

15   there was never any question.

16        Now they got a little confused because they said it

17   could only be Firestone, but they haven't done apparently all

18   of their homework and didn't realize that their company

19   actually owns three different -- it is on their website but

20   the company owns three different types of retail stores.

21        THE COURT:  What's on their website?

22        MR. FINK:  That there are three different types,

23   the Firestone Complete Auto Care, Tires Plus and Wheel Works,

24   the different brand names.

25        THE COURT:  That they own?

```
 1          MR. FINK:  They own, yes.  Ultimately -- ultimately
 2   Bridgestone owns.
 3          THE COURT:  I'm a little worried about this
 4   ultimate so I'm trying to get through that.
 5          MR. FINK:  Good, then I should be more clear.
 6   Bridgestone Corporation, and they acknowledge this in their
 7   affidavits, the Ohira affidavit, which is Exhibit A,
 8   Bridgestone owns -- wholly owns an entity that they call
 9   BAPM, Bridgestone APM Company.  And they do -- there is a lot
10   of fun in the way that they plead, they kept telling you
11   defendants never sell directly.  Well, that's true the
12   defendants that are named don't, it is the party they own
13   that does.
14          They say, for example, in the Ohira affidavit at
15   paragraph 8, BAPM and BSJ has never sold anti-vibration
16   rubber parts to retail stores, et cetera, et cetera, but they
17   don't tell us who does.  They know presumably but they never
18   tell us who does, but we don't have to prove that.  What we
19   have to prove is a member of the conspiracy or someone owned
20   by a member of the conspiracy has sold directly to a
21   plaintiff a price-fixed part that was fixed through the
22   conspiracy.
23          Now, there's plenty of proof from here to there, we
24   may not be able to prove our case, but we pled our case and
25   that's what matters.  So I --
```

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33241   Page 69 of
Fairness Hearing & Motion to Dismiss • August 8, 2017
111

69

```
 1              THE COURT:  What about -- what about what they say,
 2    and if I'm going ahead of you just let me know because I know
 3    you are going to go over this, but the diagram, I am
 4    interested in the diagram, which is kind of at the end of
 5    their --
 6              MR. FINK:  Do you want to jump ahead to that, Your
 7    Honor?  I mean --
 8              THE COURT:  Well, because you are saying that
 9    Bridgestone owns BAPM.
10              MR. FINK:  That's correct, and they --
11              THE COURT:  And that it is not contested.
12              MR. FINK:  -- don't deny that.
13              Your Honor, here is what is interesting, our
14    diagram on the left they call plaintiffs' speculation, and,
15    in fact, they have a footnote where they call us out because
16    the last item is retail consumers as though we are saying
17    that Bridgestone owns the retail consumers.  Hardly the case.
18    Bridgestone BSJ owns Bridgestone Americas, Inc.
19    Bridgestone Americas, Inc. owns Bridgestone retail
20    operations.  I apologize earlier when I was running through
21    the breakdown I stopped at that point, I should have
22    continued.  You see, Bridgestone retail operations, which is
23    also BSRO is usually the abbreviation or BSRO/Firestone is
24    the abbreviation people have been using, that entity, that
25    third entity, owns all of the these -- we don't know if they
```

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33242   Page 70 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

70

1    are all because they say there are some franchises but

2    there's 2,200 stores in the United States, that's what they

3    say on their website, they've got 2,200, 2,200 stores.  And

4    then they say in their pleadings well, some of them might be

5    franchises.  Well, maybe some are and the proofs could turn

6    out that we didn't -- that one of our clients didn't purchase

7    from an entity owned by Firestone, but that's a proof, that's

8    not a pleading issue, that's a proof issue.

9        Now, what they -- this is fascinating because this

10   chart says plaintiffs' speculation and then on the right it

11   says factual record.  Well, that's a great title except it is

12   not true because the only record that exists here that they

13   claim they have is two things, one, their affidavits which

14   are inconsistent internally and I'm going to talk about that,

15   that's why the factual record is not clear at all.

16       And the second thing is, and they never acknowledge

17   this, but we attach nine exhibits to our response and those

18   exhibits almost all are Firestone or Bridgestone documents in

19   which they very clearly talk about the integrated --

20   Exhibit 1, they talk about BSRO, and again that's that

21   reference, BSRO is headquartered in Bloomington, Illinois,

22   operates the largest network of company-owned automotive

23   service providers in the world, nearly 2,200 tire and vehicle

24   service centers across the United States including Firestone

25   Complete Auto Care, Tires Plus and Wheel Works.

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33243  Page 71 of
Fairness Hearing & Motion to Dismiss • August 8, 2017
1111

71

```
 1            THE COURT:  Slow down, please, so we can --
 2            MR. FINK:  I'm sorry, and I want to particularly
 3   apologize to Rob.  I will be more careful when I read.
 4            So in our first exhibit we point out that they
 5   publicly acknowledge that ownership.  Other exhibits explain
 6   that vertically the group's operations extend through the
 7   supply chain from upstream where raw materials are produced
 8   inhouse to downstream retail networks.
 9            And the third exhibit -- again, these are their
10   documents taken off of the internet -- Bridgestone will
11   emphasize uniformity in all resources held within Bridgestone
12   and strengthen and effectively utilize vertical integration.
13   That's the term over and over again, vertical integration,
14   from the rubber fields to your car.
15            They say in Exhibit 4 the Bridgestone group is one
16   of the most vertically integrated companies in the tire
17   industry internally producing many of the raw and
18   intermediate materials used in the development and
19   manufacturing of its strategic tire products.
20            They talk about the Indonesian rubber fields.  I
21   didn't make that up, I was just amused by it.
22            Their corporate social responsibility report in
23   2012 included the Bridgestone group is characterized by not
24   only the vertical -- horizontal expansion of its global
25   operations but also the vertical integration -- I'm sorry,
```

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33244 Page 72 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

72

 1  the vertical expansion of the supply chain that extends from

 2  the natural rubber farms that lie upstream to the sales

 3  channel network downstream.  Vertical expansion confirms one

 4  of the groups' most important competitive advantages by

 5  fostering innovation through the utilization of knowledge and

 6  expertise at all levels of the operation.

 7          And then some words from the chairman and CEO and

 8  president, which is Exhibit 7.  In my view, he says, vertical

 9  integration remains one of our greatest operational

10  strengths.

11          Now, Your Honor, don't misunderstand us, that's not

12  what our whole case is about but that's how we found this,

13  that's how we learned that there were retail operations owned

14  by the defendant -- at least one of the defendants selling

15  direct to consumers.

16          Now they try to play some games and mince words

17  here and there.  For example, there is an affidavit from a

18  fellow named Jerry Schuster, who is -- they say is employed

19  by BSRO or Firestone.  And one of the things that he tells us

20  is that Firestone stores occasionally -- I'm sorry, I have to

21  back up.  He starts to say in paragraph 6 of his affidavit

22  Firestone stores do not sell anti-vibration rubber parts to

23  retail consumers over the counter.  That's pretty definitive,

24  that would suggest we couldn't possibly have a case, except

25  that he goes on to say Firestone stores occasionally, as

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33245  Page 73 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

73

```
 1    though that makes a difference, occasionally purchase
 2    anti-vibration rubber parts to install in a retail consumer's
 3    vehicle as a replacement part.  So, in other words, what he
 4    said was we won't sell them to you over the counter --
 5              THE COURT REPORTER:  Slow down, please.
 6              MR. FINK:  I'm sorry.
 7              We won't sell them to you over the counter, but
 8    what we will do is we will sell them and install them in your
 9    car for you with a labor charge and a parts charge.  We have
10    all been there, we have all seen it.  And all we are saying
11    is the parts charge was inflated as part of this conspiracy,
12    that's all this is about.
13              THE COURT:  What about the other defendants, not
14    Bridgestone?
15              MR. FINK:  Right, the other defendants are parties
16    to the price-fixing conspiracy.  If one party decided to set
17    high prices and the others didn't cooperate the competition
18    would bring the prices down.  So they all pled -- I shouldn't
19    say they all have, I'm not positive about that, but there
20    have been several guilty pleas and there clearly is a global
21    conspiracy to fix the prices of anti-vibration rubber parts.
22              Bridgestone gets special attention in this because
23    they had previously plead guilty to a different price-fixing
24    complaint and failed to notify the Justice Department about
25    this other price fixing they were doing, and that's why they
```

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33246 Page 74 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

74

1    got such an enormous fine in this case, over $400 million.

2    But as far as the other defendants, they had to work together

3    because it is just that, it is a cartel where the parties in

4    the cartel have to all work together, and they are most if

5    not all of the market for, or suppliers of, internationally

6    of anti-vibration rubber parts.

7         So they are on the hook because their co-defendant

8    sold these products directly.  By the way, this applies to

9    virtually all the cases.  You won't find that there is a

10   plaintiff for every defendant, but there is a conspiracy that

11   ties every defendant to every plaintiff, so that's how the

12   others are responsible.

13        Your Honor, back to this chart.  On this chart they

14   claim that there is a -- that this is the factual record, so

15   let's go to the next page.  Can you show the next page -- oh,

16   oh, wait, I'm sorry, before we do that.  Real quickly what

17   they are showing here, what they say they are showing here is

18   see Bridgestone is still here and the retail operations are

19   still here, but they say in the middle there must -- there

20   absolutely must have been a sale to a third party who then

21   sold to another third party but it is speculation, they don't

22   know that.  They say that but they don't know that.

23        So next screen, if you don't mind calling up the

24   next one in your exhibit, because this is how they were

25   proving it out, it might be helpful to look at it that way.

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33247  Page 75 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

75

 1   On the right is Mr. Ohira's affidavit, the fellow I was just

 2   referring to before, but it is almost as interesting to see

 3   what he says as what he doesn't say.  For example, he says

 4   BAPM and BSJ manufacture anti-vibration rubber parts and sell

 5   those parts to certain OEMs in their suppliers, period.

 6   Okay.  That's what that says.  But it doesn't say

 7   exclusively.

 8        And -- sorry, excuse the noise.  You will see a

 9   fascinating contrast because when you look at the affidavits,

10   here, here is another one, the affidavit, it is Exhibit C of

11   their motion, is a declaration of an individual with Toyo

12   Automotive Parts.  Now in his affidavit, paragraph 7 says to

13   the extent that anti-vibration rubber parts are sold by Toyo

14   for repair or replacement -- I'm sorry, for repair or

15   replacement, they are sold exclusively to the OEMs and their

16   tier one suppliers located in North America.

17        The lawyers were as careful as they can be, and I

18   respect that, they had to be careful, but they couldn't get

19   Mr. Ohira to sign the declaration that said exclusively.

20   They were able to get Mr. Saki to do it, different company.

21        Now, Your Honor, this affidavit says in bold,

22   strong and definite, BAPM and BSJ have never sold

23   anti-vibration rubber parts to retail consumers.  That's

24   true, we never said they did, but what he doesn't say is that

25   BSRO Firestone have never sold anti-vibration rubber parts to

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33248 Page 76 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

76

```
 1    retail consumers and he doesn't say it because it isn't true,
 2    it just isn't true.
 3          So the -- what's here -- what's posted there isn't
 4    quite as interesting as what is missing there.  So, for
 5    example, paragraph 10 of his affidavit, which they don't
 6    offer you, but obviously they have presented it to the Court
 7    previously, says BAPM does not own, operate, or control any
 8    retail stores, repair shops or other entities that may sell
 9    anti-vibration rubber parts to retail consumers.  Note the
10    use of may, they use that a lot even though their website
11    says they sell these things.
12          By the way, that was the next two exhibits which I
13    didn't go, Exhibits 8 and 9 are advertisements essentially
14    talking about how they sell bushings, which are
15    anti-vibration rubber parts.  But even in their affidavit
16    they only say they may sell them, but what is fascinating is
17    he says BAPM does not but, of course, he can't say BSRO
18    Firestone does not, they do.
19          Now, here is the basic concept, Your Honor, and the
20    reason this is so fundamentally important, and they miss the
21    point completely.  They talk about control, and that there is
22    no Sixth Circuit case that has ever found control as the
23    exception.  We are not arguing strictly control, we're
24    talking about ownership.  And the only case that they cite,
25    the case by the way that says that no Sixth Circuit case has
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33249  Page 77 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

77

1    found control was a case decided across the hall from here in

2    a courtroom that I spent far too many hours with Judge Cox,

3    and I don't mean to be unfair to Judge Cox, he spent too many

4    hours with me too, but it was the Refrigerant Compressors

5    antitrust litigation, that's the case they cite.  Now, we had

6    a class case but in the class case GE opted out.

7         So the case they cite to the Court for their

8    control argument is GE coming to -- with their claim after

9    they opted out and Dan Voss, one of the defendants in this

10   case, arguing GE purchased a very large volume of refrigerant

11   compressors and most were purchased directly by GE but some

12   purchases that GE claimed they should get credit for that GE

13   was trying to collect damages for, some of those purchases

14   were by an entity that GE did not own.  GE said they

15   controlled the entity.

16        And what Judge Cox explained in his opinion was GE

17   owned less than 49 percent of the company, or maybe it was

18   49, less than 50 percent of the company, GE had a director or

19   two on the board of directors, but GE didn't provide

20   substantial allegations to prove that they really controlled

21   this third-party purchaser so that GE should get credit for

22   their purchasers.  That's not this case.  That's a control

23   case.  We are dealing with 100 percent ownership case.

24        And now to get back to how it works.  Let's say I

25   am a price-fixing corporation.  Corporations can be people

 1    now, right?  So I'm a price-fixing corporation.  I enter into

 2    a conspiracy with three other price-fixing corporations but I

 3    don't want to get caught with the direct purchasers so what I

 4    do is I create company B.  Company B is wholly owned by me.

 5    The price fixers are all in my company A, but company B is

 6    this new company I've created, and company B handles all of

 7    the sales of my price-fixed product.  I own them but they are

 8    not me.

 9           So by interposing a corporate entity between me and

10    the purchaser I am able -- at least based on their argument,

11    I would be able to sidestep the entire direct purchasing

12    exposure.  I would be able to claim Illinois Brick, and

13    that's why Illinois Brick had an exception, and it said it

14    right in there that there was an exception for controlled or

15    owned companies whose ownership or control supersedes the

16    market.  And that's what this is about, it is about

17    superseding the marketplace.

18           So there is no subtlety here though, Your Honor, we

19    know we have some facts to prove, we have some evidence to

20    present, we have a lot of discovery to do because they don't

21    even know internally where they stand, and we have a lot of

22    information to get, but that's way down the road, that's not

23    here.

24           So I would like to go to the beginning of this, if

25    we could.  If you don't mind go to the first one -- you can

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33251   Page 79 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

79

1   go to the date one.  Okay.

2          Your Honor, before I became a fancy, sophisticated

3   antitrust class-action lawyer I used to just be a personal

4   injury lawyer occasionally, and I've been in a lot of

5   courtrooms and I know this Court has also where a lot of

6   people --

7          THE COURT:  No, I've only been in my own.

8          MR. FINK:  Well, I've been in those too.  I don't

9   think I've ever heard anybody argue an almost statute of

10  limitations claim.  What we are being told is the statute was

11  going to run on November 16th, it's probably true, I don't

12  know, the statute was going to run on November 16th and so we

13  filed on November 15th, ergo weak claim.

14         Your Honor, some of best claims I've ever had was

15  filed the day before the statute ran, and it's not an

16  accident either.  You build your case, you get as much

17  information as you can, you do your best, and you get the

18  very best plaintiff that you can but then you file before the

19  statute runs.  Where I come from being told that you file the

20  day before the statute runs is a compliment, it's not an

21  insult, but my feelings notwithstanding, this doesn't mean

22  anything at all.

23         And what else doesn't mean anything at all is that

24  the end-payor plaintiffs and the auto-dealer plaintiffs filed

25  sooner, and there's no subtlety, there's no mystery.  You

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33252   Page 80 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

80

```
 1    want to get a plaintiff -- an end-payor plaintiff, throw a
 2    rock at any street and you are going to hit one.  The auto
 3    dealers, it is the same plaintiffs in all the cases.  What
 4    happens for the direct purchasers is we need to find someone
 5    who directly purchased from one of the participants in the
 6    conspiracy and in some instances it's easier than in others.
 7              In this case the question isn't why did we file
 8    when we did, the question is when we filed what did we file,
 9    and did we meet the legal requirements.
10              So let's go to the next page, I don't remember what
11    it is but let's go to the next page.  Okay.
12              Now this is really fascinating, Your Honor.  I know
13    the Court listens closely and so I'm sure the Court heard
14    this repeatedly, at the end of so many of the things that
15    learned counsel said was the phrase in the auto parts cases.
16    This is unprecedented in the auto parts cases.  This has
17    never been before done in the auto parts cases.  What you
18    don't find in their brief is very much case law, and the
19    reason you don't find very much case law is there isn't case
20    law to support some of the unusual allegations that they
21    make.
22              So right here they say in the other DPP complaints
23    the plaintiffs are corporate entities but in ours the
24    plaintiffs are individuals.  So what.  They either are or are
25    not direct purchasers, it is that simple.  It doesn't matter
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33253  Page 81 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

81

1    if they are corporations, non-profits or individuals or

2    governments, they happen to be individuals.

3              In all other DPP complaints the plaintiffs allege

4    that parts were made by the defendants.  In here it says we

5    do not allege that the AVRPs were made by the defendants.

6    There is nothing that says that the products that you price

7    fixed you had to make, and even if it did we've made our

8    allegations.

9              Now, as far as this is concerned I do want to point

10   one other thing out though, their briefs make it clear that

11   they don't know who made the AVRPs, and it is important,

12   there is a reason.  The AVRPs are indistinguishable one from

13   another, that is the manufacturer is indistinguishable one

14   from another, you can't brand them or at least they don't

15   brand them, that's why price fixing works, and that's why

16   price fixing is necessary.  If these weren't commodity

17   products that are fungible and easily changed from one

18   company to another, you can't even tell what company it is,

19   the price fix wouldn't work.  Price fixing -- it wouldn't be

20   necessary, I mean, because you set a price, someone just

21   undercuts you, they keep undercutting you, so that's why they

22   had to -- why they had to conspire to fix the prices.  They

23   can't tell us, and they say right in there it would take

24   substantial discovery to figure out, I don't know the exact

25   page, but it would take substantial discovery to figure out

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33254 Page 82 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

82

1    whose product was actually sold by what they call the

2    Firestone stores.  Again, it is not just Firestone but we

3    will accept Firestone.

4         Now, I love this, plaintiffs concede -- they say in

5    the others plaintiffs allege they purchased parts directly

6    from defendants and then they say plaintiffs concede they did

7    not purchase AVRPs directly from defendants.  No, we

8    purchased them from a direct subsidiary of a defendant.  It

9    is the ultimate parent of the party that we -- of the party

10   that we purchased the product from.  This isn't new law, it

11   is not interesting law, it is very straightforward.

12        And incidentally we quote from several class

13   definitions in various cases, some in this building, the

14   Packaged Ice case for example, but we cite from several

15   different cases where the class definition includes purchases

16   from defendants, their subsidiaries, et cetera, et cetera,

17   that aren't wholly owned.  So this isn't -- this doesn't

18   change anything except we know we've got some proof issues

19   that we don't have in the other cases which we will prove.

20        Plaintiffs identify the entities that sold them

21   their parts.  Well, that isn't actually true.  They say all

22   other DPP complaints do that, they don't do that, some of

23   them had, some of them didn't.  And, in fact, in the heater

24   control panels case this Court looked at the allegations

25   because in that case defendants came in and said you've got

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33255 Page 83 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

83

1    to be more specific about where you've purchased it, who you

2    purchased it from, et cetera, and the Court said no, there is

3    no heightened pleading requirement in antitrust, you pled

4    that you purchased it, you pled that you purchased it from a

5    participant in the conspiracy, you don't have to tell us who.

6    The time will come when we will have to say who or we won't

7    win the case.

8            Oh, then, yeah, the last one is the proposed class

9    definition which I just talked about, which our definition

10   includes entities which defendants are the ultimate parent.

11           I am not sure, by the way, that we are not going to

12   ask for that when we come with class definitions in other

13   cases.  The fact that you put a definition in the complaint

14   doesn't constrain you by it -- to it, and my best guess is

15   that when we come in in any other parts where we actually are

16   going to be seeking class certification sooner my guess is we

17   will add some language to that effect.

18           Okay.  Can I see the next page?

19           Well, I won't waste a lot of time on this page,

20   Your Honor, because it just sort of cries out for so what.

21   The indirect -- by the way, the indirect purchaser complaints

22   initially included some of these types of purchases and then

23   they took them out as I understand, it is not relevant to

24   what's going on here, but it makes no difference if our

25   allegations are overlapping, they are our allegations.  We

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33256  Page 84 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

84

 1   could have filed an identical complaint.  We've all seen

 2   them; you just take them off the shelf, there's plenty of

 3   complaints.  We didn't do that, but they managed to find two

 4   or three specific allegations that are the same in the

 5   indirect complaint and the direct complaint, and while it is

 6   a kind of a interesting rhetorical point it means absolutely

 7   nothing here.  The only question here is did we state that we

 8   have a plaintiff who directly purchased a price-fixed product

 9   from somebody who was either a member of the conspiracy or

10   the ultimate -- or whose ultimate parent is a member of the

11   conspiracy.

12            Let me get myself oriented here with the next page.

13            Oh, okay, that was just the introductory stuff.  So

14   let's get down to the theories.  And this is really interest

15   before we even get there, Your Honor, and that is -- I know I

16   said it wasn't interesting but I get interested when we start

17   arguing.  This is a Rule 56 motion in search of a shortcut.

18   They have brought it as four Rule 12 motions; 12(b)(1), which

19   we are going to talk about first, the 12(b)(6), the 12(d),

20   and the 12(f).  And they try desperately to shoehorn -- at

21   the pleading stage to shoehorn this case into one of these

22   areas where the Court should dismiss based on pleadings, but

23   this isn't a case that should be dismissed on the pleadings,

24   it doesn't work; there are disputed facts, there are disputed

25   issues, but let's get there.

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33257  Page 85 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

85

 1          Okay.  The next page I think is an introductory

 2   thing.  Okay.  So I will like to see the next page.

 3          This -- the first legal theory is 12(b)(1), and

 4   under 12(b)(1) they talk about what our burden is.  And if

 5   you don't mind we can go to the next page, it will be easier

 6   to me, and we may come back.  Okay.  I'm sorry, one more page

 7   and then we will come back.  One more page.  I'm sorry.

 8          Your Honor, they cite the Gentak case.  That's a

 9   very important case.

10          You can go back to the first one in the section.

11          Gentak was decided by Judge Guy, and he set forth

12   some very clear principles for the Sixth Circuit for 12(b)(1)

13   motions.  And the overriding principle, and I'm going to --

14   this is not a direct quote, it may not even be a proper

15   paraphrase, but the overriding principle is that these are

16   the exception, not the rule.  Generally speaking 12(b)(1) is

17   not how we address the cases at the outset, and here's why.

18   There are two ways -- two different ways, according to

19   Judge Guy, that you can address jurisdiction, one is facial

20   and the other is factual.  As far as the facial argument, it

21   is really comparable to a 12(b)(6) although it's said that

22   12(b)(6) is more easily applied, and that is do they plead

23   jurisdiction, and if we don't plead jurisdiction we're out.

24          So if we had filed this case -- well, I can't think

25   of a good example here because we belong in federal court,

Case 2:12-md-02311-MOB-MKM ECF No. 1800 filed 08/23/17 PageID.33258 Page 86 of
Fairness Hearing & Motion to Dismiss • August 8, 2017

86

1    but if you file a case and you don't make any allegations

2    that meet federal jurisdiction you can get out facially under

3    12(b)(1).  But importantly, very importantly, if you bring a

4    factual claim -- if your 12(b)(1) claim is factual, then

5    Judge Guy explained that a district court engages in a

6    factual inquiry regarding the complaint's allegations only

7    when the facts necessary to sustain jurisdiction do not

8    implicate the merits of the case, and that's exactly this

9    situation.

10          Their claim is that we can't win on the merits and

11   therefore there is no jurisdiction, and Judge Guy was very

12   clear in saying you don't mix the two up, if it is really

13   about the merits of the case, if that's the factual issue,

14   then you've got to steer clear.  And the exception -- the

15   only exception that he made to that was if something was

16   clearly immaterial, made solely for the purpose of obtaining

17   jurisdiction or wholly unsubstantiated and frivolous.

18          But let's go back first though to facial, the

19   facial attack.  This Court has really addressed that already.

20   I refer to the heater control panels' case, it is not the

21   only one but it is the one I read most recently.  In the

22   heater control panels' case the plaintiffs allege simply that

23   they purchased heater control panels directly from one or

24   more of the defendants and the defendants' conspiracy

25   impacted the prices that they paid for the heater control

1     panels.  This Court found that that was enough, that that set

2     out a satisfactory basis for the case to go forward.

3          And I quoted from it already off the top of my head

4     a few minutes ago so I'm not going to repeat too much, but

5     what was important was that the Court said there here

6     direct-purchaser plaintiffs alleged that will they purchased

7     heater control panels directly from one or more defendants

8     and/or their co-conspirators during the relevant time period

9     and they have satisfied their pleading burden.  Very straight

10    forward.

11         We pled a little more than that in this case, but

12    they claim -- they say -- and now back to their PowerPoint,

13    the only standing allegation is that plaintiffs purchased

14    AVRPs directory from an entity which one of their defendants

15    is the ultimate parent.  That's right, that's all we had to

16    say.  We said a lot more but that's all we had to say.  They

17    say there is no allegation that they made the AVRPs; there is

18    no requirement that we say that they made them.  They say

19    there is no allegation that we sold them to individual

20    consumers; no, the defendants didn't sell them to individual

21    consumers, the company they owned, one of them owned did.

22    They say there is no allegation about how we purchased the

23    AVRPs; that exact issue was addressed in heater control

24    panels and the Court said you don't have to tell us exactly

25    how you purchased it, not yet, eventually you will have to

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33260   Page 88 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

88

 1    but not yet.  No allegation that they even purchased them

 2    from the Firestone repair store; and that was the one that

 3    gave me sort of a smile because they may not have been from a

 4    Firestone repair store, it might have been from Tires Plus,

 5    it might have been from Wheel Works, but we did say it was

 6    from somebody that's owned by one of you, and it is the old

 7    story somebody had a guilty conscious because we never said

 8    who it was and Bridgestone got up and said it is not us, it

 9    is not us, but it is them.

10         And we didn't know when we filed that Toyo doesn't

11    own any entity that owns any entity that owns tire stores,

12    apparently they don't but Bridgestone does, and that was

13    exactly where our plaintiffs went.

14         I've got to point out the last line, it says such a

15    speculative standing allegation is -- bold letters --

16    unprecedented -- small letters -- in the auto parts cases.

17    It doesn't mean anything that it is unprecedented in the auto

18    parts cases, that's just fun to hear.  What it matters is if

19    it were unprecedented in antitrust law and it is not

20    unprecedented in antitrust law.  Complaints much thinner than

21    this get past the early stages.

22         Okay.  Can I see the next screen?

23         MR. REISS:  We're going to start billing you for

24    this.

25         MR. FINK:  That's not a problem, that's not a

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33261  Page 89 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

89

 1    problem, but I would like you to tell me exactly what the

 2    code is so I can use it.

 3            Okay.  They say based on the uncontroverted factual

 4    record we failed to demonstrate that we have Constitutional

 5    standing.  Well, you can say uncontroverted, they say it in

 6    their pleadings a couple times, but it is very controverted.

 7    As I've talked about the attachments I wasn't really planning

 8    on going through all nine of them, but as I talk about the

 9    attachments you can see it is controverted and it is

10    controverted internally in some of their affidavits.  Okay.

11            They say under Sixth Circuit law -- well, you know,

12    I've already -- I can spend a little time on it but it

13    doesn't make any sense because that's the Gentak case, which

14    I do want the Court to look at.  The closer the Court looks

15    at the Gentak case the happier we will be because Gentak

16    tells you 12(b)(1) is not the place to have this case go

17    away.

18            They say they've submitted five -- I love this.

19    They have submitted five factual declarations showing that

20    they do not sell AVRPs to individual consumers.  That's

21    right, but what they don't say is no entity of which they are

22    the ultimate parent sells AVRPs to individual consumers, and

23    the reason they don't is because they can't because it is

24    true that they do.

25            They say we didn't submit factual evidence and we

 1   didn't move for limited jurisdiction.  We don't need any

 2   discovery, we don't need jurisdictional discovery.  The facts

 3   here are clear enough that at least we got past jurisdiction.

 4   And to say it is uncontroverted again, it is controverted

 5   internally.

 6          I won't waste the Court's time or the time of the

 7   people behind me who have started coughing more by going

 8   through every detail.  I will tell you that in our brief we

 9   dissect these affidavits a little bit and point out there are

10   so many inconsistencies but it is not just the

11   inconsistencies, it is the missing pieces, it is the things

12   that aren't said.  They don't tell us really where the

13   products are from.  They don't tell us who really

14   manufactured the products that were sold because they say

15   they don't know, but they also say -- and I guess I will

16   quote from my single favorite in that regard, I believe it

17   was in the Schuster affidavit, yes, the Schuster affidavit.

18   Okay.

19          In the Schuster affidavit, which is their

20   Exhibit E, paragraph 7, talks about -- it says the car

21   dealerships, distributors, et cetera, and/or other third

22   parties, there's a great term, this is supposed to be the

23   ultimate evidence.  So and/or other third parties from whom a

24   Firestone store may purchase.  Again, they don't say they do

25   or they can't or they don't, they just say they may purchase

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33263   Page 91 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

91

 1    an anti-vibration part, sell auto parts that are manufactured

 2    by many different auto parts suppliers including they say --

 3    he says entities that are not defendants in this action, and

 4    that's true because the Firestone stores aren't defendants in

 5    this action.

 6            This is my -- this is the line, I promised you

 7    something I enjoyed.  Sorry.  Thus, he says, it is highly

 8    possible that an anti-vibration rubber part that a Firestone

 9    store purchases and installs in a retail consumer's vehicle

10    was not manufactured by BAPM, BSJ or any other defendant in

11    this action.  Based on them telling us in their one

12    affidavit -- only two of these affidavits are actually

13    Bridgestone people, but in this one affidavit they tell us

14    that it is highly possible that we are wrong.  I think that's

15    a little like the weather when they say mostly cloudily that

16    means it's partly sunny.  So if it is highly possible I think

17    it is mostly likely the other side.  We don't know.  They are

18    not telling us.  They can't tell us because there hasn't been

19    any discovery.  This is the pleading stage.

20            Can we go on to the next?  I will move a little bit

21    more quickly although I won't talk a little bit more quickly.

22            Okay.  Again, the same issues, they are saying that

23    they don't sell -- the Bridgestone named defendants don't

24    sell AVRPs to Bridgestone repair stores.  They don't tell us

25    whether they sell them to BSRO, they don't tell us whether

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33264   Page 92 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

92

1    BSRO sells directly because that's not a named defendant.

2            They say they have no knowledge or control over any

3    subsequent sales.  Well, here is the problem.  They talk

4    about this grand integration that they have from rubber

5    plantation to your car.  Well, are we really supposed to

6    believe and do we have to believe their assertion that once a

7    third party gets in the middle we are done and we are suppose

8    to believe that with 2,200 tire stores -- almost 2,200 tire

9    stores in the United States that they manufacture a product,

10   sell it to a third party at arm's length, let that third

11   party mark it up to their wholly-owned subsidiary, make a

12   profit, and then sell it to a consumer.  That's not

13   plausible.

14           Discovery will tell us what's right.  Discovery

15   will tell us whether they are telling the truth on their

16   website, whether they are telling the truth in their public

17   disclosures or whether they are telling the partial truth at

18   least in these affidavits but we need discovery for that, it

19   is way down the road.

20           Okay.  Let's go on to the next one.  Okay.  Good.

21   Now -- we can go to the next page.

22           Now we are talking about Illinois Brick, and this

23   is their 12(b)(6) motion on Illinois Brick.  Well, the

24   problem with their 12(b)(6) motion on Illinois Brick is that

25   we plead it right, they just don't like our facts and that

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33265  Page 93 of
1111
Fairness Hearing & Motion to Dismiss • August 8, 2017

93

 1   doesn't make for 12(b)(6).  They say the complaint alleges

 2   that we purchased AVRPs from an entity other than defendants,

 3   and they seem to believe that that means the story is over,

 4   but it's not.  They say we concede that we are indirect

 5   purchasers, not at all.  What we concede is that we took

 6   their corporate structure, accepted it and bought from one of

 7   the defendants three corporate levels separated but

 8   100 percent ownership at every level.  They could put ten

 9   more levels in between there and it wouldn't make it any

10   difference.  You still have a defendant who wholly owns a

11   party, and that party that they wholly own is selling

12   price-fixed products to consumers.  That's all we argue, and

13   that's not indirect, that's direct.

14          Can we see the next page?

15          This we've talked about already I think and so I

16   want spend a lot of time on it because this is the ownership

17   or control, and in answer to the Court's early questions I

18   explained that they have just turned it on its head.  It is

19   not just control, we actually are dealing with 100 percent

20   ownership.  100 percent ownership is 100 percent control.  We

21   don't have to prove anything out.  The case they cite -- the

22   only case they cite was based upon the GE situation where

23   they didn't prove out that they had control as a purchaser,

24   they didn't control the other entity, that's all, that's not

25   our situation.

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33266  Page 94 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

94

 1          The next one, please.

 2          Okay.  And we've talked about this page already

 3   again.  Here the issue on this page is that the factual

 4   record is not what they claim it to be, it is not as simple

 5   as they say.  We've got some very important questions.  But

 6   one thing that's not a question is did the entity at the top

 7   own the entity at the bottom, and did the entity at the

 8   bottom -- and was the entity at the top part of the

 9   conspiracy?  They were.  And as the entity at the bottom did

10   they sell it to third parties.

11          Now they are going to try to prove intervening

12   sales and they might succeed, but they haven't yet.  And the

13   fact is that we are allowed to challenge their witnesses who

14   give these mealy mouth -- and I respect counsel, I'm talking

15   about the witnesses, they give some mealy-mouthed

16   inconsistent -- and I'm sure they would be more consistent if

17   the lawyers could have persuaded them, but their affidavits

18   never get to the point.  They never say that none of

19   Bridgestone's products were sold out of Firestone stores to

20   ultimate consumers.  They don't say it because they can't say

21   it because it is isn't true.  Excuse the double negative.

22          It is true that Bridgestone products were sold in

23   Firestone stores, in Tires Plus stores, in Wheel Works

24   stores, and they were sold to ultimate consumers.  Now they

25   may argue later, well, the prices weren't fixed to them, we

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33267   Page 95 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

95

```
 1    only fixed them to other -- well, fine, we will have another

 2    argument about that but they have to get their first, and we

 3    have a right to go through the proofs to get there.

 4            Can I see the next page?  Well, we have talked

 5    about this already, I won't --

 6            THE COURT:  Okay.  We've got to move on.

 7            MR. FINK:  Good.  Okay.

 8            THE COURT:  I am going to give you a minute to sum

 9    up.

10            MR. FINK:  Can I see the next page?  This way I

11    will be sure I've covered everything, and it really doesn't

12    take much long -- oh, it definitely doesn't take much longer.

13    Okay.

14            Here you talk about trying to shoehorn something

15    into the wrong rule.  This they call a motion to strike.

16    Your Honor, as we all know, in a motion to strike we expect

17    to hear somebody talk about redundant, immaterial,

18    scandalous.  None of that is here.  All they are saying is

19    they don't think we've got a good class rep.

20            Can we see the next screen?

21            They don't like our class rep.  Your Honor, it's

22    not time for a Rule 23 consideration.  It's not time for a

23    Rule 56 consideration.  But their emphasis again is they look

24    at our class definition and they say this expanded --

25            THE COURT REPORTER:  I'm sorry.  Slow down.
```

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33268  Page 96 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

96

```
 1              MR. FINK:  I'm sorry.  God, Rob, and I think of you

 2      as a friend.

 3              This expanded proposed class definition is

 4      unprecedented in the auto parts cases and is only in the AVRP

 5      case.  That's right, we didn't -- we didn't use this

 6      definition on the other pleadings.  It doesn't matter, it

 7      means absolutely nothing.

 8              Can we go to the next screen?

 9              Because the fact is when the time comes -- and I

10      don't need this, we will skip this and we will get done.

11      When the time comes the Court will have to decide what a

12      reasonable class definition is, and there might even be

13      inconsistencies in the class and the Court might change the

14      definition because of it, but in the end -- is there another

15      screen after this?

16              MR. REISS:  Un-un.

17              MR. FINK:  Okay.  In the end the determination of

18      whether or not our class representatives are typical of the

19      class or whether representation will be adequate is a very

20      difficult and important decision the Court will make, and

21      they've said to us here and in the pleadings that, well,

22      these individuals they are so different from the OEMs.  Your

23      Honor, if I had picked an OEM as my plaintiff or if we had an

24      OEM as our plaintiff they would say but this OEM is in

25      Michigan, and the other OEMs are in California, so they are
```

1    atypical.  There's always a reason, and the reason that

2    happens is this is a classic case where the defendants take

3    the role of the fox who's telling the Court how to protect

4    the chicken coop.  And all we are saying is give us a chance,

5    we will prove our case out, and when the time comes we will

6    show you why our class representatives are typical.  And by

7    the way, the reason they are typical is because like every

8    other member of the class they purchased a price-fixed

9    product directly from a defendant or an entity that

10   ultimately is owned by a defendant, and that will make them

11   typical and that will also make them adequate representatives

12   of the class, but you talk about premature, we are nowhere

13   near that consideration.

14          So, Your Honor, I didn't realize I had gone so long

15   and I apologize, and I thank the Court for its indulgence.

16          THE COURT:  Okay.  Thank you.

17          MR. REISS:  Briefly, Your Honor.  Since they used

18   my slides I'm going to use their water, if I can.

19          MR. FINK:  We would have poured it for you in

20   advance.

21          MR. REISS:  Your Honor, I will try to be pretty

22   brief.  I didn't think it was possible but Mr. Fink has made

23   it clear that their case is even worse than we thought

24   because it is not -- it is not the Firestone stores

25   supposedly, I now understand why they didn't allege who they

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33270  Page 98 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

98

 1    purchased from, it is now Tires Plus and Wheels Works which

 2    are somewhere even further down the chain that they

 3    supposedly purchased from.  So I think that Mr. Fink's

 4    argument makes it absolutely clear why this case has to be

 5    dismissed.

 6         Let me start with one thing that Mr. Fink said and

 7    I agree with.  He said that the plaintiffs don't need

 8    jurisdictional discovery --

 9         THE COURT:  Step back from that microphone or move

10    it back.

11         MR. REISS:  I'm sorry, Your Honor.

12         THE COURT:  He said plaintiffs what?

13         MR. REISS:  He said the plaintiffs don't need

14    jurisdictional discovery.  We'll take that.  Now it is

15    absolutely clear on the record that they are not seeking

16    jurisdictional discovery.  Okay.  And why is that so

17    critical?  By the way, we offered to bring in these affiants

18    in the event they wanted to examine them or question them.

19    They say well, we don't really believe them or they used

20    weasel words, and I'm going to show how none of that is

21    right, but we offered to bring in these declarants, they

22    didn't ask for it, and now Mr. Fink says we don't need

23    jurisdictional discovery, and that's because, Your Honor,

24    these affidavits are so dispositive on both 12(b)(1) and

25    12(b)(6) that were these affiants here, it would be clear, as

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33271   Page 99 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

99

1   it should be now, what the Court has to do.

2          Now, the plaintiffs, and this is clear from

3   Mr. Fink's argument, they do not even allege -- and by the

4   way, we are on 12(b)(1), I know they keep on wanting to make

5   this just about pleadings, it is not just about pleadings.

6   12(b)(1) the Court has to make factual findings, has to, has

7   to under Sixth Circuit law.  They do not allege and they have

8   absolutely no basis for alleging that they actually purchased

9   a part made by any of the defendants.  They don't allege

10  that.  How can they have standing when they don't even allege

11  they purchased a part made by one of the defendants?  They

12  are no different from a person on the street.  They are no

13  different from a person who bought some Hutchinson AVRP.

14  They are no different.  They have absolutely no standing.

15  They can't make the most fundamental claim that a plaintiff

16  has to make which is I bought the product that might be

17  effected by an antitrust conspiracy, and they have admitted

18  in this Court that they can't even make that allegation.

19         Now, the other thing they absolutely do not

20  contest, and let's go back to the chart slide, this is very

21  important, Your Honor.  They do not contest at all that the

22  sales from Bridgestone -- defendant Bridgestone sells only,

23  only, to OEMs and tier ones, and tier ones they sell to auto

24  dealers and parts suppliers, and that is absolutely clear

25  from the affidavits.  They try to poo-poo Mr. Ohira's

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33272   Page 100 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

100

 1    affidavit.

 2              Let's go to the slide, David, where Mr. Ohira's

 3    affidavit is.

 4              THE COURT:  Well, they say he doesn't say

 5    exclusively.

 6              MR. REISS:  Well, Your Honor, I would ask them if

 7    he came in here and said exclusively would they agree to

 8    dismiss the case, because he would say that.  Look at

 9    paragraph 5, he says -- by the way I would ask him that, if

10    he says exclusively are you going to agree to dismiss the

11    case?

12              BAPM, and this is Mr. Ohira, who, by the way, is

13    the president and CEO of BAPM, the U.S. company that makes

14    the AVRP parts.  He had previously been for five years the

15    manager of AVRP Strategy globally in Japan at Bridgestone

16    Japan so he knows a lot, and he has been at Bridgestone for

17    30 years, he knows everything about the AVRP business.

18              He says BAPM and BSJ manufacture anti-vibration

19    rubber parts and sell those parts to certain OEMs and their

20    suppliers.  BAPM and BSJ have absolutely no involvement in,

21    knowledge of, or control over any subsequent sale of

22    anti-vibration rubber parts.  And, Your Honor, Bridgestone's

23    business is selling thousands, tens of thousands, millions of

24    anti-vibration rubber parts.  They don't sell groups of five,

25    ten parts to stores, that's not their business.  You know,

```
 1   Mr. Fink said well, they are a vertically integrated
 2   operation.  They are vertically integrated in the sense they
 3   have raw materials that they put into tires and stuff, it has
 4   nothing to do with how they sell their ultimate product down
 5   the chain.
 6              Even more importantly, and Mr. Fink didn't point to
 7   paragraph 8 from Mr. Ohira's declaration, BAPM and BSJ have
 8   never sold anti-vibration rubber parts to retail stores,
 9   repairs shops or other entities that may sell anti-vibration
10   rubber parts to retail consumers including, but not limited
11   to, Bridgestone Retail Operations, LLC d/b/a Firestone
12   Complete Auto Care.  Okay.  So that's absolutely clear that
13   Bridgestone does not sell.  Mr. Fink says, well, I don't
14   believe them.  Well, Your Honor, it's too bad, it's not
15   enough, this is a sworn declaration.  The fact that he
16   doesn't believe it is meaningless.
17              On top of that, let's look at Mr. Schuster's
18   declaration.  I don't think we have it on the screen but,
19   Your Honor, very, very important, Mr. Fink quoted paragraph 6
20   of Mr. Schuster's declaration.  Mr. Schuster is in charge of
21   purchasing for the Bridgestone retail operations, he's the
22   manager of purchasing.  Mr. Fink quoted the first two
23   sentences of paragraph 6, and it is important, Your Honor.
24   He quoted the sentences that said Firestone stores do not
25   sell anti-vibration rubber parts to retail consumers over the
```

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33274   Page 102 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

102

1    counter.  He thought that was somehow meaningful.  Firestone

2    stores occasionally purchase anti-vibration rubber parts to

3    install in a retail consumer's vehicle as a replacement part.

4           Here's the sentences that Mr. Fink did not read in

5    the declaration, paragraph 6.  In these instances Firestone

6    stores purchase anti-vibration rubber parts from car

7    dealerships, distributors, e.g., after-market part suppliers

8    and other third parties.  Firestone stores do not purchase

9    anti-vibration rubber parts from Bridgestone, BAPM Company,

10   that's BAPM, BSJ, or any other defendant in this action.

11          Absolutely clear Bridgestone does not sell to these

12   stores and these stores do not purchase from Bridgestone,

13   uncontroverted factual record, they say they don't need

14   jurisdictional discovery, I agree, the case is over.

15          Now, finally, Your Honor, we have some rebuttal

16   slides, a couple.  I promise I will be brief.  Mr. Fink said

17   well, you know, there's Sixth Circuit law that says where the

18   factual issue that goes to the merits of the claim and the

19   jurisdictional issues are the same, you take jurisdiction and

20   let the case go ahead.  The problem is that principle doesn't

21   apply here.  Okay.  The issue here that we are claiming is

22   jurisdictional that they can't meet --

23          THE LAW CLERK:  Do you have the rebuttal slides?

24          THE COURT:  No.

25          MR. REISS:  Oh, I'm sorry.  I apologize.  Are we

1   okay?

2           The jurisdictional issue that they -- the

3   jurisdictional issue and the merits issue here are not the

4   same.  The merits issue is simply whether plaintiffs

5   purchased -- directly purchased an anti-vibration rubber part

6   that was covered or affected by antitrust conspiracy, that's

7   the merits issue.

8           The fundamental fact that the plaintiffs can't meet

9   here, which is jurisdictional, is whether plaintiffs directly

10  purchased an AVRP part made by the defendants, and they've

11  already admitted that they don't know.  That fundamental fact

12  is jurisdictional and doesn't overlap with the merits issue

13  of whether a potential -- a part potentially made -- a part

14  made by the defendants was affected by the conspiracy.

15          Now, they cite a couple of Sixth Circuit cases and

16  those cases made clear the distinction that I've just made.

17          In Gentak the question of whether the plaintiffs

18  purchased the product, Sherwin Williams paint, was not at

19  issue, the issue was whether paint was a, quote, consumer

20  product under the Magnuson-Moss Act, that was the merits

21  issue, but the plaintiffs didn't come in and say we don't

22  know if we purchased Sherwin Williams paint, they said we

23  purchased the relevant product, and the question was what the

24  legal significance of that product was.

25          In Moore vs. Lafayette, another Sixth Circuit case,

1    the defendant's hiring of the plaintiff was not in doubt, all

2    right, and the plaintiff, as the Sixth Circuit noted, that

3    the MTA hired plaintiff in 1971 to handle all group life

4    disability and workers' compensation insurance for MTA and

5    its members.  What was an issue was whether the plaintiffs

6    was an employee for ERISA purposes.

7         So in these Sixth Circuit cases the fundamental

8    fact that even let the plaintiff walk into the courthouse

9    door was not an issue.  In Gentak they purchased

10   Sherwin Williams Paint and in Moore the person was hired by

11   the company that he was claiming ERISA benefits from.

12        Here the plaintiffs can't even say they bought a

13   part made by defendant.  That's fundamental.  They are no

14   different from anybody else on the street.

15        Now, I think it is clear and I do think Mr. Fink's

16   argument did make clear that effectively their whole point is

17   well, we have alleged that we are direct purchasers, that's

18   enough, that's it.  We said the magic word, Sherman Act,

19   direct purchaser, don't look at anything else, Your Honor.

20   Well, Your Honor, we do think that this complaint is -- falls

21   into the category that Mr. Fink acknowledged that even aside

22   from the 12(b)(1) finding the Court has to make on the facts

23   on its face we have a problem with this complaint.  And they

24   admit, and this is the law, that you can have a 12(b)(1)

25   challenge where the plaintiffs' claims are clearly immaterial

Case 2:12-md-02311-MOB-MKM  ECF No. 1800  filed 08/23/17  PageID.33277  Page 105 of
1111
Fairness Hearing & Motion to Dismiss • August 8, 2017

105

 1  made solely for the purpose of obtaining jurisdiction or are

 2  wholly unsubstantiated and frivolous.

 3       Your Honor, I think that describes this complaint.

 4  These are at best -- at best -- at very best wholly distant

 5  indirect purchaser claims, wholly distance.  The notion that

 6  they are direct purchaser claims, and I understand Mr. Fink's

 7  pleading with the Court, just accept the pleadings, Your

 8  Honor, just like other direct purchaser claims.  No, it's

 9  not.  They are clearly trying to shoehorn a blatantly

10  unmeritorious case into federal jurisdiction, and the Court

11  should not countenance it.  Thank you, Your Honor.

12       THE COURT:  Thank you.

13       MR. RUBIN:  Your Honor, may I be heard?  You asked

14  a question on other defendants, and on behalf of Yamasa I

15  would like to answer that.

16       THE COURT:  Yes.

17       MR. RUBIN:  And I think that's a key question, Your

18  Honor.  Again, for the record, Mike Rubin for Yamasa.

19       All of plaintiffs' arguments, all the facts that

20  were asserted here, and the speculation about this, that,

21  where it came from, it was a Bridgestone part sold directly

22  through this chain notwithstanding affidavits to the contrary

23  and then eventually making it to the plaintiffs.  First off,

24  all of those facts are not in the complaint, so you can throw

25  away all the affidavits, you can throw away everything else,

 1   and just look at the complaint under a normal 12(b)(6)

 2   standard and they lose.  And here is why they lose, because

 3   all of those arguments depend upon an assumption that these

 4   plaintiffs when they took their car in for replacement for

 5   repair, the parts that were put in there were made by

 6   Bridgestone.  What if they weren't?  First off, they don't

 7   allege in their complaints they were made by Bridgestone,

 8   they don't allege they were made by any defendant, they don't

 9   allege anything, they just say they bought AVRP parts.  Could

10   have been parts made by a whole other set of companies that

11   are not sitting here, they are not part of any of this.  It

12   could have been made by my client, Yamasa.  Let's assume they

13   were.

14           Well, Yamasa sells to Honda, Honda sells to auto

15   dealers, auto dealers to distributors, distributors then sell

16   to Firestone or one of the other retail shops.  In no way and

17   in no circumstances is that ever a direct purchase, that's a

18   fundamental fact that needed to be -- if they really do

19   believe that their clients purchased Bridgestone parts, which

20   he refused to say, he refused to say which store they

21   actually purchased it from, but that was a key point, they

22   can't say whose parts they purchased.  They speculate that it

23   could maybe have been a Bridgestone part but speculation is

24   not a basis for a complaint for subject matter jurisdiction

25   or for a 12(b)(6), and because it is missing from the

Case 2:12-md-02311-MOB-MKM   ECF No. 1800   filed 08/23/17   PageID.33279   Page 107 of
111
Fairness Hearing & Motion to Dismiss • August 8, 2017

107

```
 1    complaint it kills their complaint and it renders it an

 2    indirect purchaser case.

 3         The other piece that he said over and over again

 4    was all we have to allege is a price-fixed part, they

 5    purchased a price-fixed part.  Again, look at the complaint,

 6    the complaint says they purchased a part.  They left out, as

 7    he noted, careful lawyers that they are, accusing us of being

 8    careful lawyers, but in their complaint they left out the

 9    notion that they purchased price-fixed parts because they

10    don't even know that.  It is a wholly speculative chain that

11    they have set up that is in oral argument here and in their

12    opposition that is missing from their complaint.

13         And what about the other defendants?  Well, if it

14    was my client's parts, assume they were even price fixed, the

15    only way they get to these plaintiffs is through Honda,

16    through auto dealers, through distributors, and all through

17    there that is not a direct purchase.  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         MR. FINK:  Anybody else arguing?

20         (No response.)

21         MR. FINK:  Your Honor, I will be very brief.

22         Super fast in terms of the rebuttal, all I would

23    ask is that the Court actually read the list of the supposed

24    wholly unsubstantial and frivolous claims including that it

25    was filed the day before the statute ran and these are
```

1    individual consumers.  Again, these aren't things that bar

2    your claim.

3            In the heater control panels case, the defendants

4    had objected that we didn't plead what prices were paid or

5    from whom the purchasers were made, and the Court said you

6    don't have to do that at this stage, and that's the key to

7    the answer to what we just heard.  At this stage of the

8    proceedings we don't have to plead who made the product, what

9    we plead and what we have pled is this is part of a global

10   conspiracy to fix prices.  Now, once they fix prices -- and

11   our experts will ultimately explain, that in order to keep

12   the prices fixed what you need to do is make sure that you

13   are not creating your own competition down below and so these

14   parts are marked up with a fixed markup.  Now discovery will

15   show us exactly what it is, we don't know right now, but we

16   will find out because these folks are legitimately in the

17   business of making a profit, they are not just giving out

18   anti-vibration rubber parts at these locations.

19           So at this stage in the proceedings we have alleged

20   everything we need to allege to establish.  Apparently there

21   was a suggestion that we didn't say there was price fixing,

22   maybe not in the single paragraph that said what they

23   purchased, but all through the complaint we explained the

24   price fixing, how it occurred, and we absolutely allege that

25   these are price-fixed products, and I don't know how anyone

1    can read it otherwise.

2         And also, again, just to get back, there is no

3    heightened pleading requirement and because there is no

4    heightened pleading requirement there is no need for us to

5    provide every excruciating detail.  Frankly, I think our

6    complaint is a little longer than it should be.

7         That said, the last thing I want to comment on is

8    we had a quote from the Schuster affidavit which Mr. Schuster

9    makes a reference that there were no sales -- or no purchases

10   from the other defendants, interesting again, the other

11   defendants, but it doesn't say or from any wholly owned

12   subsidiaries of the those defendants.  They are very careful,

13   as they should be, in their choice of words.

14        At this stage, at the pleading stage, we simply had

15   to make out a claim, establish federal jurisdiction for that

16   claim, and then we'll go forward and we will have a lot of

17   fun with a lot more interesting issues.

18        Thank you, Your Honor.

19        THE COURT:  Do you have anything else that you want

20   to say?

21        MR. REISS:  I appreciate your patience.  I think we

22   are good.  We thank you for your attention, Your Honor.

23        THE COURT:  Okay.  Thank you very much.  The Court

24   will issue an opinion.

25        THE ATTORNEYS:  (Collectively) Thank you, Your

Fairness Hearing & Motion to Dismiss • August 8, 2017

```
 1    Honor.

 2              THE LAW CLERK:  All rise.  Court is adjourned.

 3              (Proceedings concluded at 1:12 p.m.)

 4                        —    —    —

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              *CERTIFICATION*

2

3                    I, Robert L. Smith, Official Court Reporter of

4       the United States District Court, Eastern District of

5       Michigan, appointed pursuant to the provisions of Title 28,

6       United States Code, Section 753, do hereby certify that the

7       foregoing pages comprise a full, true and correct transcript

8       taken in the matter of In re:  Automotive Parts Antitrust

9       Litigation, Case No. 12-02311, on Tuesday, August 8, 2017.

10

11

12                              *s/Robert L. Smith*
                                Robert L. Smith, RPR, CSR 5098
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17      Date:  08/23/2017

18      Detroit, Michigan

19

20

21

22

23

24

25