**[REDACTED]**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No.:  12-md-02311<br>Honorable Marianne O. Battani<br>Special Master Gene J. Esshaki |
| In Re: All Auto Parts Cases | 2:12-MD-02311-MOB-MKM |
| THIS DOCUMENT RELATES TO:<br>ALL AUTO PARTS CASES | Oral Argument Requested |

## GENERAL MOTORS' OBJECTION TO SPECIAL MASTER'S ORDERS COMPELLING PRODUCTION OF CERTAIN CONFIDENTIAL COMMERCIAL, TRADE SECRET <u>PRICING DOCUMENTS</u>

**[REDACTED]**

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Laborers Pension Trust Fund-Detroit & Vicinity v. CRS Poured Concrete Walls, Inc.*,
   **2006 WL 3804912 (E.D. Mich. Dec. 22, 2006)**

*Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus., Inc.*,
   **2005 WL 2045818 (W.D. Mich. Aug. 24, 2005)**

*Universal Del., Inc. v. Comdata Network, Inc.*,
   **2011 WL 1085180 (M.D. Tenn. Mar. 21, 2011)**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................1

II.     LEGAL STANDARD GOVERNING REVIEW OF SPECIAL MASTERS'
        ORDERS..............................................................................................................3

III.    RELEVANT BACKGROUND ............................................................................3

        A.    GM's Pricing Methodology Documents....................................................3

        B.    Procedural History Leading to the Special Master's Order Regarding
              GM's Pricing Documents ........................................................................5

IV.     ARGUMENT ......................................................................................................10

        A.    Legal Standard .......................................................................................10

        B.    GM Has Shown that the Documents are Confidential Commercial
              Information and/or Trade Secrets and that GM Would Be Harmed by
              Their Disclosure....................................................................................11

        C.    The Serving Parties Have Not Shown that the GM Pricing Methodology
              Documents are Necessary in Light of the Discovery GM Has Provided to
              Date .......................................................................................................14

        D.    The Potential Harm to GM from Disclosure Drastically Outweighs any
              Need for the Documents .........................................................................18

        E.    The Special Master Should Have Fashioned Additional Protections to
              Thwart Potentially Harmful Disclosures ...............................................19

V.      CONCLUSION...................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## Cases

*Dow Corning Corp. v. Jie Xiao,*
   283 F.R.D. 353 (E.D. Mich. 2012) ....................................................................14

*Inventor Holdings, LLC v. Wal-Mart Stores Inc.,*
   2014 WL 4370320 (D. Del. Aug. 27, 2014) ......................................................20

*Jagex Ltd. v. Impulse Software,*
   273 F.R.D. 357 (D. Mass. 2011) .......................................................................20

*Laborers Pension Trust Fund-Detroit & Vicinity v. CRS Poured Concrete Walls, Inc.,*
   2006 WL 3804912 (E.D. Mich. Dec. 22, 2006) ........................................9, 13, 17

*Leader Technologies Inc. v. Facebook Inc.,*
   2009 WL 3021168 (D. Del. Sept. 4, 2009) ...................................................20, 21

*MSC. Software Corp. v. Altair Eng'g, Inc.,*
   2016 WL 6677936 (E.D. Mich. Nov. 14, 2016) .................................................2

*Rensselaer Polytechnic Inst. v. Apple Inc.,*
   2014 WL 1871866 (N.D.N.Y. May 8, 2014) ......................................................20

*Spartanburg Reg'l Healthcare Sys.,*
   2005 WL 2571943 (W.D. Mich. Oct. 12, 2005) .........................................9, 12, 13

*Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus., Inc.,*
   2005 WL 2045818 (W.D. Mich. Aug. 24, 2005) ...................................... *passim*

*Universal Del., Inc. v. Comdata Network, Inc.,*
   2011 WL 1085180 (M.D. Tenn. Mar. 21, 2011) ...................................... *passim*

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 53(f) ...................................................................................... 2-3

Fed. R. Civ. P. 26 ...............................................................................................9

Fed. R. Civ. P. 45 ...............................................................................................9

[REDACTED]

## I.    INTRODUCTION

Third party General Motors, LLC ("GM") appreciates that the Special Master has negotiated an extraordinarily complex set of issues regarding what he himself called "the largest subpoena in the country." Wolfson Decl. Ex. E, Transcript of Motion Hearings, ECF No. 1572 ("Hearing Transcript") 26:6-7. Even as one of the primary victims of the alleged conspiracies, GM has participated in good faith throughout this process and agreed to divert many high-level workers, as well as significant time and resources, to produce an enormous amount of documents and data the Serving Parties[1] claim to need. This appeal does not seek to undermine the efforts of all parties to date nor the service the Special Master has provided.

Nevertheless, the Special Master *has* erred, most fundamentally with respect to GM's internal documents regarding the nuts-and-bolts of its ultra-confidential pricing methodology. At the December 9, 2016 hearing on the Serving Parties' motions to compel, the Special Master recognized how extraordinarily sensitive these materials are, and how devastating it would be for them to fall into the wrong hands. Yet, the Special Master ordered their production out of the explicit concern that the Parties would otherwise be unable to address pass through in the indirect purchaser cases. Hearing Transcript 50:3-24.

But the law on this point is clear, and it requires protecting GM (and the other OEMs) from further production. When a third party demonstrates that materials litigants seek via subpoena are of the highest confidentiality—the so-called "crown jewels," as they have been

---

[1]   "Serving Parties" is defined by reference to the "Parties" that filed The Parties' Notice of Motion and Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities on November 7, 2016, ECF No. 1500. (Wolfson Decl., Ex. F.) The "Parties" that joined in that Renewed Motion were: "End-Payor Plaintiffs ("EPPs"), Truck and Equipment Dealer Plaintiffs ("TEDPs"), the State of Florida, the State of Indiana, and certain Defendants in *In re Automotive Parts Antitrust Litigation*, Master File No. 2:12- md-02311 (E.D. Mich.)." *Id.* at 1.

**[REDACTED]**

described in these proceedings—the litigants cannot compel such materials' production without showing absolute need. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ Nor have the Serving Parties explained why, given the substance and amount of discovery they will receive, they absolutely must obtain GM's most confidential documents.  It was therefore error to compel GM to produce these "crown jewel" materials.[2]

For these reasons, which are discussed more fully below, GM respectfully requests that the Court overturn in part the Special Master's (1) Order Regarding Discovery from Non-Party Original Equipment Manufacturer General Motors; and (2) Order Regarding the Parties'

---

[2] The Special Master also erred with respect to compelling production of certain communications between Defendants and OEMs in settlement discussions, as well as any settlement agreements the OEMs may have entered into with any auto parts supplier.  GM intends to object once an order memorializing this aspect of the Special Master's ruling has been issued.

Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities; as well as overturn in full the Special Master's (3) Order Regarding the Production of Certain Vehicle Pricing Information of Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities.

## II.   LEGAL STANDARD GOVERNING REVIEW OF SPECIAL MASTERS' ORDERS

Federal Rule of Civil Procedure 53 "establishes the standard of review for a district court in reviewing findings of fact and conclusions of law made or recommended by a Special Master." *MSC. Software Corp. v. Altair Eng'g, Inc.*, 2016 WL 6677936, at *2 (E.D. Mich. Nov. 14, 2016) (citing Rule 53(f)(3)).  That rule provides that "[t]he court must decide de novo all objections to findings of fact made or recommended by a master," Fed. R. Civ. P. 53(f)(3), and that "[t]he court must decide de novo all objections to conclusions of law made or recommended by a master," Fed. R. Civ. P. 53(f)(4).  Accordingly, with the exception of procedural rules, Fed. R. Civ. P. 53(f)(5), the Court owes no deference to the Special Master.  Here, where the Special Master not only made erroneous conclusions of law but also failed to make the necessary findings of fact to support his ruling, the Special Master's determination should be rejected on a de novo basis.

## III.   RELEVANT BACKGROUND

### A.   GM's Pricing Methodology Documents

When they first served the subpoena in late 2015, the Serving Parties requested literally every pricing document that GM and the other major OEMs created regarding all car models for the past twenty years.  (The subpoena also sought all supply documents, all cost documents, all sales documents, and virtually every other category of document and data reflecting the financial aspects of each OEM's business.  The OEMs have spent more than a year simply trimming the

3

subpoena down to a remotely reasonable scope.)

[REDACTED]



### B. Procedural History Leading to the Special Master's Order Regarding GM's Pricing Documents

On November 7, 2016, the Serving Parties—which include the auto part suppliers that victimized GM and the other OEMs for billions of dollars in damages, as well as GM's customers (auto dealers)—filed a Renewed Motion to Compel Discovery from several non-party OEMs, including GM.  *See* ECF Nos. 1495, 1500 (Wolfson Decl., Ex. F).

Given the highly confidential nature of these materials, GM opposed, pointing out that these materials are its "crown jewels" and, under applicable law, a third party cannot be forced to produce documents of the highest commercial

---

[3]  "GM Order" refers to the Order Regarding Discovery from Non-Party Original Equipment Manufacturer General Motors, ECF No. 1575;

sensitivity where the parties have demonstrated no substantial need for them in light of other materials or testimony provided pursuant to subpoena. ███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████

In reply, the Serving Parties differed on the necessity of these documents. Defendants largely conceded that GM's pricing documents were unnecessary. *See* Wolfson Decl., Ex. I (The Parties' Joint Reply to Certain Non-Parties' Oppositions to the Parties' Renewed Motion to Compel Discovery, ECF Nos. 1548, 1549) ("Reply") at 23 ("Defendants assert that the OEMs themselves are best positioned to opine on whether there is a relationship between parts prices and car prices, and that they have indicated the absence of any such link in their declarations and deposition testimony."). The EPPs, on the other hand, contended without basis that the unspecified pricing methodology documents would contradict GM's and other OEMs' testimony, and that these documents would thus help prove pass-through damages. *Id.* at 22. Regarding the commercial sensitivity of these documents, the Serving Parties claimed that "real-world harm" in the event of disclosure is "hard to imagine;" that the protective order the Special Master proposed to protect pricing methodology documents was "iron clad;" and that similar information has been produced in other cases. *Id.* at 32-33.

The Special Master heard argument on the Serving Parties' motion to compel on December 9, 2016. At that time, the Special Master admitted that GM and the other OEMs had

demonstrated the extreme confidentiality attendant to their pricing methodologies; but, he ultimately ruled for the Serving Parties on this issue (among others) because he did not want to foreclose pass through-related arguments. Hearing Transcript 50:3-8. He also admitted, however, that he had been prepared to deny the motion entirely with regard to these materials, given the showing GM and the other OEMs made regarding the harm they will suffer if these materials are ever disclosed to the wrong party. *Id.*

Following this hearing, the Special Master asked the Serving Parties and OEMs to draft an order embodying his rulings



General Motors Exhibit A at 3-4 ("GM Pricing Methodology Documents"). Also on December 29, 2016, the Special Master issued a separate order regarding the production of "OEM Vehicle Pricing Documents" from several OEMs. *See* Special Master's Order Regarding the Production of Certain Vehicle Pricing Information of Certain Non-Party Original Equipment Manufacturers and their Affiliated Entities, ECF No. 1579 ("Pricing Information Order") at 4, 6.[4]

GM objects to the entire Pricing Information Order; but, even if it were not the incorrect result overall, the manner by which it ostensibly safeguards against inadvertent or improper disclosure of the OEM Vehicle Pricing Documents is still inadequate. For example, the

---

[4] The Pricing Information Order refers to certain pricing methodology documents generally as "OEM Vehicle Pricing Documents," while the GM documents that fall into that category ▮ (Continued…)

documents were to be produced on encrypted, password protected portable media, and they were to be "downloaded and viewed only on free-standing computers that are not connected to the internet, and that are accessible to the Serving Parties only in-person at one of the Custodian Firms." *Id.* at 6-7. However, the Pricing Information Order also creates an exception that swallows the safeguarding rules: the parties or experts may make copies of the OEM Vehicle Pricing Documents if "reasonably necessary for purposes of this litigation," and these copies may be "transferred." *Id.* at 8.[5] Thus, despite seeming unanimous agreement among the parties and Special Master that the OEM Vehicle Pricing Documents deserve special safeguards for protection from wide or improper disclosure, the Pricing Information Order does not effectively provide such safeguards because it permits OEM Vehicle Pricing Documents to be freely copied and transferred, so long as the Serving Parties believe it is "reasonably necessary."[6]

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are referred to herein as "GM Pricing Methodology Documents."

[5] For example, the Pricing Information Order provides that the OEM Vehicle Pricing Documents must (1) be received and maintained at a single firm for End-Pay Plaintiffs, a single firm for Auto Dealer Plaintiffs, a single firm for Truck and Equipment Dealer Plaintiffs, and a "single law firm for Defendants in each of the Auto Part Cases;" (2) "be downloaded and viewed only on free-standing computers that are not connected to the internet;" (3) "be produced by the OEMs to the Serving Parties on portable media (e.g., thumb drives or disks) or other electronic means and shall be encrypted [and] password protected." Pricing Information Order at 6-7. However, the Pricing Information Order does not make clear whether these restrictions apply to "copies" of the OEM Vehicle Pricing Documents that are permissibly made (because they are "reasonably necessary for purposes of [the] litigation") and "transferred." Pricing Information Order at 8.

[6] Notably, a primary reason offered at the hearing to allow copies of pricing *data* outside of a single location—that the Serving Parties' experts would need significant time to work with the data to complete their regression analyses (*see* Hearing Transcript 48:4-12)—has no force here. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Serving Parties argued that having the OEM Vehicle Pricing Documents available only in one place, with no copies available, would be "unrealistic" because of the travel needed "if [the parties] needed to double check a document to make sure it is accurate when it is cited in a brief and a representation to the Court as to the substance of those documents." *See* Hearing Transcript at 52:21-53:1. Thus, the (Continued…)

[REDACTED]

Similarly, the Special Master's Order permits industry experts to review the GM Pricing Methodology Documents even though GM and the other OEMs repeatedly explained why industry insiders should *not* be able to review this information, and how devastating it would be to GM if such information were revealed to those individuals. Once such materials are reviewed, it is not realistic to assume it would be possible for industry insiders to just forget or prevent such materials from having any impact on future engagements they undertake regarding the automotive industry. Further fundamental safeguards that were rejected by the Special Master are addressed in Section IV.E. below.

On January 4, 2017,[7] the Special Master entered a more general order on the Serving Parties' motion to compel. *See* Special Master's Order Regarding the Parties' Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufactures and Their Affiliated Entities, ECF No. 1584 ("General Motion to Compel Order"). This order appears to reference the Pricing Information Order as follows:

> As specified in the additional OEM Vehicle Pricing Information Confidentiality Order issued contemporaneously with this Order, the OEMs shall produce certain designated vehicle pricing methodology information subject to the terms of the protective orders in the Auto Parts Cases, as well as the additional OEM Vehicle Pricing Information Confidentiality Order issued contemporaneously with this Order.

General Motion to Compel Order at 6. The General Motion to Compel Order also referenced the OEM-specific orders, stating that they were being issued "contemporaneously" with it. *Id.* at 4.

---

Serving Parties in effect argue that the inconvenience of having an attorney available in a certain location to check citations to the GM Pricing Methodology Documents on certain key dates outweighs the tremendous commercial risk GM would face by having countless copies of those documents scattered among various offices across the country. This position should be rejected.

[7]  The ECF filing date of this order was January 4, 2017; the order internally bears the date of January 3, 2017.

## IV.    ARGUMENT

Because GM has demonstrated confidentiality and potential harm, while the Serving Parties have not (and cannot) demonstrate that the documents are necessary to their litigation, GM should be protected from disclosing the GM Pricing Methodology Documents. Even if the Serving Parties could show necessity, the appropriate result is the same because the risk of harm to GM from disclosure of its most sensitive trade secrets and confidential commercial information far outweighs any necessity the Serving Parties might demonstrate.

### A.    Legal Standard

Under Federal Rules of Civil Procedures 26 and 45, a three-step analysis determines whether a third party should be protected from producing subpoenaed trade secret or confidential commercial information. *See Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus., Inc.*, 2005 WL 2045818, at *2 (W.D. Mich. Aug. 24, 2005), *aff'd*, 2005 WL 2571943 (W.D. Mich. Oct. 12, 2005); *Laborers Pension Trust Fund-Detroit & Vicinity v. CRS Poured Concrete Walls, Inc.*, 2006 WL 3804912, at *7 (E.D. Mich. Dec. 22, 2006); *Universal Del., Inc. v. Comdata Network, Inc.*, 2011 WL 1085180, at *2 (M.D. Tenn. Mar. 21, 2011). First, the subpoenaed party bears the burden of showing that the information is confidential and that "its disclosure might be harmful." *Laborers Pension Trust Fund*, 2006 WL 3804912, at *7; s*ee Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2045818, at *2. Affidavits from the employees of the subpoenaed party, the nature of the requested documents, or both, may satisfy this burden. *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2045818, at *3; *Universal Del.*, 2011 WL 1085180, at *4. If the subpoenaed party makes this showing, the second step requires the requesting party to show that the information at issue is both relevant and necessary to the litigation. *Laborers Pension Trust Fund*, 2006 WL 3804912, at *7. The question of "necessity" includes consideration of whether the information may be obtained by other, less burdensome

means.  *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2045818, at *5.  Finally, if the requesting

party demonstrates relevance and necessity, the potential harm to the subpoenaed party must be

weighed against the requesting party's need for the information.  *Id.* at *3.

> **B.      GM Has Shown that the Documents are Confidential Commercial Information and/or Trade Secrets and that GM Would Be Harmed by Their Disclosure**



"Confidential or trade secret status may be established by

affidavit."  *Universal Del.*, 2011 WL 1085180, at *4; *see Spartanburg Reg'l Healthcare Sys.*,

2005 WL 2045818, at *3.

*See Spartanburg Reg'l Healthcare Sys.*,

2005 WL 2045818, at *3 ("To require the affiants to provide more detail would necessitate that they divulge the very sort of information which they are attempting to protect . . . .").



*See Universal Del.*, 2011 WL 1085180, at *4 (finding that "the confidential nature of the information sought is self-evident" in part because "a request for strategic information and how one competes in the marketplace is 'confidential by its very nature'") (citation omitted); *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2045818, at *3 (finding that it was "apparent from the very nature of the requests at issue" that, among other categories of documents, "planning and competitive and strategic analysis" constituted "confidential business information," where the subpoenaed party's affiant stated that disclosure would allow the requesting party to "know precisely our business strategy, including our most sensitive pricing information, and it would allow [the requesting party] to undermine our competitive position" and that "[t]hey could target our existing and future business as they chose to do so. Knowing our price structure, they could undercut us at will.").

GM has shown significant potential harm from the disclosure of the GM Pricing Methodology Documents for the reasons stated above.

[REDACTED]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ *Spartanburg Reg'l Healthcare Sys.*,

2005 WL 2045818, at *4 (finding production to competitor "would subject [subpoenaed party] to

significant harm" where requested documents "detail[ed] sensitive and confidential aspects of

[the subpoenaed party's] business strategy") *aff'd*, 2005 WL 2571943, at *2 (W.D. Mich. Oct.

12, 2005) ("Much of the business strategic planning and pricing strategy done by [the

subpoenaed party] would be effectively ruined if disclosed.  Given the typical investment of a

corporation in such information, and the ripple effects of disclosure upon competition and sales,

disclosure would be at the very least extremely costly to" the subpoenaed party.).

Finally, under these circumstances, a protective order would not ameliorate the harm to

GM that disclosure of these documents would cause.  First, the documents are so extremely

commercially sensitive that a mere protective order does not offer sufficient protection,

especially in light of the possibility of improper disclosure.  *See Universal Del.*, 2011 WL

1085180, at *4-7 (holding that existing protective order would not provide sufficient protection

given the high sensitivity of the information and the "constant danger inherent in disclosure of

confidential information pursuant to a Protective Order") (citations and internal quotation marks

omitted).  The "'wise course is to nip any potential economic harm' by quashing [the] subpoena

instead of relying on [the] protective order where, among other things, [the] request was for trade

secrets which were the 'lifeblood' of the non-party's well-being and some defendants were direct

competitors of nonparty."  *See id.* (citing and quoting *In re Vitamins Antitrust Litig.*, 267 F.

Supp. 2d 738, 740–41 (S.D. Ohio 2003)).  Second, the Serving Parties include GM's suppliers

and customers.  The fact that disclosure to precisely these parties would harm GM weighs

[REDACTED]

against a finding that a protective order would be sufficient. Restricting disclosure to the parties' outside counsel does not meaningfully limit potential harm because the substance of the documents would likely be revealed more broadly as the parties' outside counsel litigated over the documents' contents. ███████████; *Universal Del.*, 2011 WL 1085180, at *7. Third, the Serving Parties have already indicated that they will likely litigate the contents and meaning of the GM Pricing Methodology Documents. *See* Reply at 23. Thus, there is a serious risk that the contents of the GM Pricing Methodology Documents will be disclosed during the course of litigation, at least in substance, and thus a protective order would not sufficiently protect these highly sensitive documents. *See Laborers Pension Trust Fund*, WL 3804912, at *7 (denying motion to compel where counsel for subpoenaed party "registered his position that an attorney eyes only protective order would be impractical, because defendant(s) will want to use the information and it will appear in briefs"); *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2571943, at *2 (holding that "a protective order would not be effective in preventing harm" because, among other things, "the information would, most likely, become public during the . . . proceedings").

C.    **The Serving Parties Have Not Shown that the GM Pricing Methodology Documents are Necessary in Light of the Discovery GM Has Provided to Date**

Because the Serving Parties have not and cannot establish that the GM Pricing Methodology Documents are necessary and relevant, their motion to compel production of these documents should be denied. *See Laborers Pension Trust Fund*, 2006 WL 3804912, at *2 ("If proof of relevancy or need is not established, discovery should be denied.") (citation omitted); *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2045818, at *4 (holding that, upon showing of confidentiality and potential harm by subpoenaed party, requesting party "must establish that the requested information is relevant and that its production is necessary"). The Serving Parties

14

agree that they bear the burden of showing the necessity of the GM Pricing Methodology Documents. *See* Reply at 9 (referencing the Serving Parties' "burden of demonstrating the relevance of this information and the need for this information").

Proving necessity requires demonstrating both that the discovery is required in the context of the claims asserted in the underlying litigation and that the information sought is not sufficiently available through other sources. *See Dow Corning Corp. v. Jie Xiao*, 283 F.R.D. 353, 359 (E.D. Mich. 2012) (concluding that necessity in the context of discovery of trade secrets means either "absolutely required" or "logically required" and stating: "For courts following Dean Wigmore, 'necessary' is synonymous with 'indispensable'—'disclosure of legitimate trade secrets will not be required except to the extent that it appears to be indispensable for ascertainment of the truth.' . . . Other courts, however, have equated 'necessary' with 'essential,' thus holding 'that the inquiries must relate to an essential element of the party's case.'") (citations omitted); *Universal Del.*, 2011 WL 1085180, at *4 ("Necessity, for purposes of Rule 45(c)(3)[, now Rule 45(d)(3)], entails an inquiry into whether there are other means to obtain the information and whether obtaining the information through those means would be unduly burdensome."); *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2045818, at *5 ("The fact that the requested information may be obtained from other sources greatly diminishes the argument that [the requesting party] *needs* to obtain discovery of [the subpoenaed entity's] confidential business records.").

The Serving Parties fail on both fronts: they do not carry their burden to show either that the GM Pricing Methodology Documents are required to make out their case or that the information sought is not available by other means. First, Serving Parties have not shown that the claims asserted in their litigation require production of the documents at issue. The

[REDACTED]

Defendants appear to concede that the documents are not necessary, Reply at 24, while the EPPs offer only speculative, conclusory statements that do not sufficiently establish that their case requires production of the GM Pricing Methodology Documents. *See* Reply at 23-24. Specifically, in discussing relevance or need, the EPPs assert that they "anticipate," without any further support, "that evidence and analysis will show that OEMs do not simply absorb overcharges without incorporating them into the price of their products." Reply at 23. The EPPs' offer of sheer, unfounded speculation in the face of all of the evidence – ██████████ ████████████████████████████████████████████████████████████████ – cannot justify a fishing expedition through GM's most highly confidential documents. The EPPs also claim "that pass-through is an empirical issue, shown through analyses of data and documents," and they assert that "documents regarding price-setting will allow EPPs to understand the role of cost in price-setting and to make inferences regarding how a cost change, such as the alleged overcharges stemming from the alleged bid rigging and/or APR coordination, will impact price." *Id.* These broad allegations regarding a connection between non-GM-specific "documents" and pass through at most establish tangential relevance; they do not establish that the GM Pricing Methodology Documents are ***required*** to make out any of the EPPs' claims. The EPPs have thus far attempted to elide the applicable law's distinction between ***relevance*** and ***necessity***. The Serving Parties bear the burden to separately show both, and they have not established the need for the GM Pricing Methodology Documents.

Second, the Serving Parties have not met their burden to show that there are insufficient "other means to obtain the information" sought via the GM Pricing Methodology Documents. *Universal Del.*, 2011 WL 1085180, at *4. To the extent that the Serving Parties contend that the GM Pricing Methodology documents are relevant to pass through for GM vehicles, this

[REDACTED]

information is available through other, less burdensome means. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ The Serving

Parties have never shown how this wealth of data is insufficient to evaluate pass-through issues.

The discovery the Serving Parties now seek—the extremely commercially sensitive GM Pricing

Methodology Documents addressing GM's most secret internal information—is thus duplicative

and unnecessary.

In *Spartanburg Regional Healthcare System*, an alleged monopolist issued a third-party

subpoena to its competitor on certain products for, among other things, "[b]usiness planning and

competitive and strategic analysis documents," including documents regarding prices.   The

alleged monopolist asserted that this information was "relevant to demonstrate the existence of competition for the sale" of the products. *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 2045818, at *4. The court held that the requested documents were not necessary. It explained:

> While *factual* information regarding the market for in-room furniture products (e.g., information regarding the nature of [the subpoenaed party's] in-room furniture products or the price at which [it] has offered such products to actual or potential purchasers), *may* be relevant, [the requesting party] instead seeks to obtain confidential information regarding the *thought processes* by which [the subpoenaed party] develops, prices, and markets its products. The Court discerns no legitimate use for such information and [the requesting party] has presented no authority suggesting otherwise.

*Id.* (emphasis in original). Similarly, while **factual** information about prices charged by suppliers, GM, and dealers may be relevant to pass-through issues, "the **thought processes** by which [GM] . . . prices . . . its products" are not necessary or relevant here. *See id.*; *see also Universal Del.*, 2011 WL 1085180, at *2, *7 (holding that, in an action under sections 1 and 2 of the Sherman Act, need was established for documents showing "[t]he identities and number of the trucking fleet customers that [the subpoenaed third party] has won in head to head competition with" the requesting party because that information bears on competition and potential monopolization in the market, but the requesting party had "not established a strong need" to obtain documents regarding "the reasons that [the subpoenaed party] won [certain] customers' business"). Because the Serving Parties have not established a need for the GM Pricing Methodology Documents, the motion to compel them should be denied.

**D.    The Potential Harm to GM from Disclosure Drastically Outweighs any Need for the Documents**

Even if the Court were to determine that the Serving Parties have met the significant burden to prove that the documents sought are necessary, which they have not, that necessity alone cannot justify production. Because the potential harm to GM from the disclosure of the GM Pricing Methodology Documents outweighs any potential need for the documents, the

discovery of the documents should not be awarded. *See Laborers Pension Trust Fund*, 2006 WL 3804912, at *7 (explaining that, if a trade secret and harm is first shown, then necessity and relevance are shown, the "[c]ourt then must balance the need for the disclosure against the injury that would result from that disclosure"). ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ Thus, the potential harm GM faces from disclosure far outweighs the Serving Parties' need, warranting denial of the Serving Parties' motion to compel the GM Pricing Methodology Documents.

**E.     The Special Master Should Have Fashioned Additional Protections to Thwart Potentially Harmful Disclosures**

For all the reasons above, the GM Pricing Methodology Documents should not be produced, but to the extent that production is ordered, additional protections should be put in place to maintain the confidentiality of the produced documents. At the December 9 hearing, GM and the Special Master discussed the extraordinary protections required before GM could produce the GM Pricing Methodology Documents in any form. As counsel emphasized at the hearing, disclosing the GM Pricing Methodology Documents to outside counsel in this case would reveal the documents to far more people than are aware of the information at GM. Hearing Transcript at 46:11-20. The Special Master acknowledged that GM had demonstrated the extreme confidentiality of its pricing methodologies, and indicated that he considered denying the Defendants' motion given GM's showing of the harm it would suffer upon disclosure. Hearing Transcript at 50:3-8. And after nevertheless ordering the production, the Special Master specifically invited counsel for GM to "appeal the order to Judge Battani and see if she believes that [ ] additional security is necessary." *Id.* at 50:17-23.

GM respectfully submits that additional security is necessary to attempt to protect GM from the enormous harm it would suffer if the documents were widely disseminated. Specifically, GM believes that the GM Pricing Methodology Documents should only be viewable at GM's counsel's offices in Detroit on a secure, non-networked computer. Federal courts have fashioned protective orders that similarly limit access to extremely confidential, electronically-stored information, often source code, when they have found the need to keep the information confidential paramount. *See Jagex Ltd. v. Impulse Software*, 273 F.R.D. 357, 358-59 (D. Mass. 2011) (fashioning protective order where produced source code was only available for "inspection on a secure, non-networked computer in the District of Massachusetts at outside counsel's office for the producing party.")[8]; *Inventor Holdings, LLC v. Wal-Mart Stores Inc.*, 2014 WL 4370320, at *3 (D. Del. Aug. 27, 2014) ("The jointly-proposed protective order [ ] provides undisputed language that a 'single electronic copy' of source code 'shall be provided on a stand-alone computer (i.e., not connected to a network or the internet) in a secure room,' available for inspection."); *Rensselaer Polytechnic Inst. v. Apple Inc.*, 2014 WL 1871866, at *1 (N.D.N.Y. May 8, 2014) ("The protective order placed strict parameters on plaintiffs' review of

---

[8] The defendants in *Jagex* objected to the plaintiff's initial proposal of only allowing inspection at counsel's office in the United Kingdom (they did not object to maintaining the source code on a non-networked computer) because defendants' lead counsel was located in Florida. *Id.* at 358-59. The court agreed that "[r]equiring defendants' counsel to travel to the United Kingdom to view the source code[ ] constitutes an unreasonable burden." *Id.* at 360. However, because counsel for plaintiff and counsel for defendant both had offices in Massachusetts, and because the case was pending in Massachusetts, the court determined that Massachusetts was an appropriate location to view the documents. *Id.* With regard to the instant matter, all cases at issue have been consolidated in Detroit. Consistent with *Jagex*, GM is willing to offer any GM Pricing Methodology Documents for inspection on a secure, non-networked computer in Detroit to the extent they are ordered produced. The burden alleged by the Serving Parties here, namely "the thought that if they needed to double check a document to make sure it is accurate when it is cited in a brief and a representation to the Court as to the substance of those documents, they (Continued…)

Apple source code, requiring that such materials be made available for inspection at Apple's offices, under supervision, on secured, stand-alone computers."); *Leader Technologies Inc. v. Facebook Inc.*, 2009 WL 3021168, at *4 n.4 (D. Del. Sept. 4, 2009) ("Under the terms of the Protective Order . . . . Leader will only be permitted to review Facebook's source code at a location of Facebook's choosing, at which Facebook will provide a non-networked, stand-alone, password-protected computer terminal for Leader's use. Only a single electronic copy of the source code will be made available to Leader's examiners. Leader may only designate as examiners two of its outside counsel and two of its experts[.]"). At present, the Special Master's order fails to provide these safeguards, despite the Serving Parties' agreement that extraordinary safeguards are warranted.[9] While the order ostensibly provides that productions will be "downloaded and viewed only on free-standing computers that are not connected to the internet, and that are accessible to the Serving Parties only in-person at one of the Custodian Firms," Pricing Information Order at 6-7, the protection is ineffective because the in-person reviewers may make copies of the OEM Vehicle Pricing Documents if "reasonably necessary for purposes of this litigation," and these copies may be "transferred." *Id.* at 8. This standard is both too vague and too lenient to sufficiently protect such ultra-sensitive documents. The confidentiality of the GM Pricing Methodology Documents should not be determined by counsel's view of their necessity to the litigation, ██████████████████████████████████

████████████████████████████████ Should the Court confirm the Special

---

have to go call GM, get on a plane, fly over there," Hearing Transcript at 52:20-53:1, is merely illusory and does not outweigh GM's need to protect the pricing documents from disclosure.
[9] The Special Master himself stated at the hearing that GM's proposal was "a significant improvement" over his proposed protections, and asked counsel for the Serving Parties if he had "any problems with having the data maintained at the offices of an OEM-designated agent such as their lawyer or in one of the GM offices?" 42:24-43:4.

[REDACTED]

Master's order to produce any GM Pricing Methodology Documents, the Court should restrict the inspection of those documents to a secure, non-networked computer maintained by GM in order to protect GM from the substantial harm it could suffer from disclosure.[10]

Further, to the extent GM must ultimately produce the GM Pricing Methodology Documents, GM respectfully requests that the Court modify the Pricing Information Order to reflect the OEMs' requested safeguards included in the OEMs' draft order regarding pricing information submitted to the Special Master, Wolfson Declaration Exhibit D ("OEM Proposed Order")[11], as well as the additional safeguard of maintaining documents solely at a secure, non-networked location in Detroit. The OEM Proposed Order included additional confidentiality safeguards that were not adopted into the Pricing Information Order. Among other things, the OEM Proposed Order would provide reasonable protection against industry insiders accessing the confidential material at issue by preventing "industry" experts from reviewing the pricing methodology documents and by giving the OEMs seven days to object to an expert before that expert begins receiving and reviewing OEM vehicle pricing data. That protection is consistent with the purpose of the Pricing Information Order, namely to prevent those in the industry from accessing the non-party OEMs' highly confidential pricing methodology. The OEM Proposed Order also would provide consistency with respect to access to any confidential materials that may be quoted, referred to, or attached to court filings. These additional safeguards – including GM's proposed restriction limiting access to the GM Pricing Methodology Documents to secured, non-networked computers - are consistent with the purpose of the Pricing Information

---

[10] Toyota joins in seeking to restrict inspection of Pricing Information to a secure, non-networked computer maintained by the OEM.

[11] Toyota, Nissan, Honda, and FCA join in seeking to modify the Pricing Information Order to reflect the additional safeguards the OEMs requested with the OEM Proposed Order.

**[REDACTED]**

Order to protect these extraordinarily sensitive materials from improper disclosure.  Therefore, the Pricing Information Order should be modified to include such safeguards.

## V.    CONCLUSION

For the foregoing reasons, GM respectfully requests that the Court overturn in part the Special Master's (1) Order Regarding Discovery from Non-Party Original Equipment Manufacturer General Motors; and (2) Order Regarding the Parties' Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities, as well as overturn in full (3) the Special Master's Order Regarding the Production of Certain Vehicle Pricing Information of Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities.

DATED:  January 12, 2017          By:  */s/ Adam B. Wolfson*
                                                Adam B. Wolfson

                                                **QUINN EMANUEL URQUHART
                                                    & SULLIVAN, LLP**
                                                865 S. Figueroa St., 10th Floor
                                                Los Angeles, CA  90017
                                                Tel:  213-443-3000
                                                Fax:  213-443-3100
                                                adamwolfson@quinnemanuel.com

                                                *Attorney for General Motors LLC, General Motors
                                                Company, General Motors Financial Company, Inc., and
                                                General Motors Holdings LLC*

**[REDACTED]**

## CERTIFICATE OF SERVICE

I, Adam Wolfson, hereby certify that on January 12, 2017, I caused a true and correct

copy of **GENERAL MOTORS' OBJECTION TO SPECIAL MASTER'S ORDERS**

**COMPELLING PRODUCTION OF CERTAIN CONFIDENTIAL COMMERCIAL,**

**TRADE SECRET PRICING DOCUMENTS**, to be served upon all registered counsel of

record via the Court's CM/ECF system.


DATED:  January 12, 2017                By:  /s/ Adam Wolfson
                                        Adam Wolfson
                                        **QUINN EMANUEL URQUHART & SULLIVAN,**
                                        **LLP**
                                        865 S. Figueroa St., 10th Floor
                                        Los Angeles, California 90017
                                        Tel:  213 443 3000
                                        Fax:  213 443 3100
                                        adamwolfson@quinnemanuel.com


                                        *Attorney for General Motors LLC, General Motors*
                                        *Company, General Motors Financial Company, Inc., and*
                                        *General Motors Holdings LLC*

24

[REDACTED]

## <u>CERTIFICATE OF SERVICE</u>

I, Adam Wolfson, hereby certify that on September 21, 2017, I caused a true and correct

copy of **[REDACTED] GENERAL MOTORS' OBJECTION TO SPECIAL MASTER'S**

**ORDERS COMPELLING PRODUCTION OF CERTAIN CONFIDENTIAL**

**COMMERCIAL, TRADE SECRET PRICING DOCUMENTS**, to be served upon all

registered counsel of record via the Court's CM/ECF system.


DATED:  September 21, 2017        By:  /s/ Adam Wolfson
                                     Adam Wolfson
                                     **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
                                     865 S. Figueroa St., 10th Floor
                                     Los Angeles, California 90017
                                     Tel:  213 443 3000
                                     Fax:  213 443 3100
                                     adamwolfson@quinnemanuel.com


                                     *Attorney for General Motors LLC, General Motors Company, General Motors Financial Company, Inc., and General Motors Holdings LLC*