# EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION

 3                      —   —   —

 4   IN RE: AUTOMOTIVE PARTS          Case No. 12-2311
     ANTITRUST LITIGATION
 5                                    Hon. Marianne O. Battani

 6   _____    _____

 7   THIS RELATES TO:

 8   In Re:  Wire Harness                2:12-cv-00101
     In Re:  Instrument Panel clusters   2:12-cv-00201
 9   In Re:  Fuel Senders                2:12-cv-00301
     In Re:  Heater Control Panels       2:12-cv-00401
10   In Re:  Alternators                 2:12-cv-00701
     In Re:  Windshield Wipers systems   2:12-cv-00901
11   In Re:  Starters                    2:12-cv-01101
     In Re:  Ignition Coils              2:12-cv-01401
12   In Re:  Fuel injection Systems      2:12-cv-02201
     In Re:  Power Window Motors         2:12-cv-02301
13   In Re:  Air Conditioning Systems    2:12-cv-02701
     In Re:  Windshield Washer Systems   2:12-cv-02801
14   In Re:  Spark Plugs                 2:12-cv-03001
     In Re:  Oxygen Sensors              2:12-cv-03101
15
     _____,
16

17
                      MOTION HEARINGS
18
             BEFORE SPECIAL MASTER GENE ESSHAKI
19          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
20                    Detroit, Michigan
                 Friday, December 9, 2016
21

22

23

24
           To obtain a copy of this official transcript, contact:
25              Robert L. Smith, Official Court Reporter
                (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1   APPEARANCES:

 2                       VICTORIA ROMANENKO
                         CUNEO, GILBERT & LaDUCA, L.L.P.
 3

 4                       STEVEN N. WILLIAMS
                         COTCHETT, PITRE & McCARTHY, L.L.P.
 5

 6                       STEVEN F. CHERRY
                         WILMER, CUTLER, PICKERING, HALE and
 7                       DORR, L.L.P.

 8

 9                       DANIEL T. FENSKE
                         JENNER & BLOCK

10

11                       COLIN R. KASS
                         PROSKAUER ROSE, L.L.P.

12

13                       ADAM C. HEMLOCK
                         WEIL, GOTSHAL & MANGES, L.L.P.

14

15                       ADAM WOLFSON
                         QUINN, EMANUEL, URQUHART, OLIVER &
16                       SULLIVAN, L.L.P.

17                       ABRAM ELLIS
                         SIMPSON, THACHER & BARTLETT, L.L.P.
18

19                       SHELDON H. KLEIN
                         BUTZEL LONG, P.C.
20

21                       JEFFREY J. AMATO
                         WINSTON & STRAWN, L.L.P.
22

23                       J. DAVID ROWE
                         DUBOIS, BRYANT & CAMPBELL
24

25                       ANGELA A. SMEDLEY
                         WINSTON & STRAWN, L.L.P.
```

```
 1    APPEARANCES: (Cont.)    WILLIAM SHOTZBARGER
                              DUANE MORRIS, L.L.P.
 2

 3                            MICHAEL SHAPER
                              DEBEVOISE & PLIMPTON
 4

 5                            E. PAUL CAULEY
                              SEDGWICK LAW
 6

 7                            KIMBERLY C. METZGER
                              ICE MILLER, LLP
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

TABLE OF CONTENTS

2      MATTER                                              PAGE

3      Renewed Motion to Compel Discovery................... 6

4      Denso's Motion regarding Discovery...................17

5      Motion to Compel Enforcement of Subpoenas............24

6      Motion to Compel Production of Documents.............67

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Friday, December 9, 2016

3    at about 9:16 a.m.

4                        —    —    —

5              (Special Master and Counsel present.)

6              SPECIAL MASTER ESSHAKI:   Good morning everybody.

7         The first matter on the docket this morning is the

8    plaintiffs' motions to compel -- strike that.  This is In

9    Re:  Automotive Parts Antitrust Litigation, Master File

10   No. 12-md-02311.  The first matter on the docket this morning

11   is plaintiffs' motion to compel, item number 1187 and 1188,

12   entitled the parties' renewed motion to compel discovery from

13   certain non-original equipment manufacturers, and this

14   concerns what I like to refer to as the request 31.  This is

15   a motion by the plaintiffs to ask the original equipment

16   manufacturers to disclose to them certain information sought

17   under request 31.

18         I indicated to a lot of the people that I met with

19   yesterday that I have had an opportunity to review at length

20   the motion, the response, the reply and, in fact, even

21   reviewed the case law with respect to this motion, so I do

22   not see a need for oral argument.

23         Does anyone out there feel a burning desire to

24   present something, oral argument on this case, or can we

25   simply -- can I proceed with my ruling?

1              (No response.)

2              SPECIAL MASTER ESSHAKI:  All right.  Seeing no

3    indication I'm going to proceed with my ruling.  Let me just

4    start out discussing the plaintiffs' motion.  On January 19th

5    of this year, in addition to the joint motion to compel filed

6    against the OEMs, plaintiffs filed an additional motion to

7    compel.  That motion sought production of documents subject

8    to request 31 in the serving party's subpoena, which

9    requested communications between the OEMs and the vehicle

10   parts suppliers, including defendants, regarding the

11   conspiracy and documents provided to the OEMs by vehicle

12   parts suppliers, including defendants, concerning the

13   conspiracy.

14              On March 24th, 2016 the motion was presented to me

15   and I held it in abeyance preferring instead to address the

16   OEMs' original -- a motion to compel from the OEMs.  The

17   defendants objected to this motion to produce documents

18   claiming that subject to settlement privilege, and they cited

19   the case of Goodyear Tire and Rubber vs. Child's Power

20   Supply, decision of 6th Circuit, our own Judge Suhrheinrich,

21   establishing a privilege that protects all communications

22   made in furtherance of settlement regardless of whether the

23   communications are informal or done under the auspices of the

24   Court.

25              Plaintiffs make the argument that in that case the

1    parties had not yet sued, and therefore -- there was a case

2    pending but in this case there was no case pending and

3    therefore the settlement privilege should not apply.

4        They also argue that defendants cannot assert a

5    settlement privilege over the communications between --

6    because the OEMs never filed a case.  Defendants come back

7    and assert that there is no need for a case to be pending for

8    the privilege to apply.  There are some additional cases that

9    have developed after Goodyear.

10       It was surprising to me that in the case law that

11   has been cited, some as close as the Western District of

12   Michigan, which is our sister district in this state, that

13   many district courts are failing to follow the dictates of

14   Goodyear Tire, are finding ways to distinguish the case from

15   their particular case, and other district courts are simply

16   ignoring it and calling it bad law.  I have not seen so many

17   cases challenging the rulings of an appellate court.

18       But some of the issues that I think all the parties

19   can agree upon are -- not issues but the rulings, evidentiary

20   privileges have to be narrowly construed.  Privileges are

21   exceptions to demand -- for everyman's evidence and are not

22   likely created nor expansively construed for they are in

23   derogation for the search of truth; United States vs. Nixon.

24       Even under Goodyear Tire a settlement agreement is

25   not subject to exclusion based upon privilege.  That's a

1    Western District case, Connan vs. Lake Superior and Ishpeming

2    Railroad Company.  Settlement privilege extends only to

3    underlying discussions made during settlement negotiations

4    and not to the occurrence of settlement talks, the terms of

5    any settlement, or the settlement agreement itself; Ohio

6    Consumer Council vs. Puco.

7         Settlement privileges protect settlement

8    negotiations from discovery but does not extend beyond actual

9    negotiations to the terms of the final settlement agreement.

10        I am not going to go through the facts of Goodyear,

11   everyone knows the facts.  I am -- I am in a bit of a

12   quandary because Rule 48, which the privilege is based upon,

13   indicates that settlement negotiations -- evidence of

14   settlement negotiations are not admissible.  However, in the

15   discovery rule we know clearly that admissibility is not a

16   precondition to discovery, relevance is all that is

17   necessary.

18        In Goodyear, however, the Court indicated that

19   despite the clear language of Rule 408 that settlement

20   discussions are not admissible, the Court did, in fact,

21   create a new settlement privilege, and this Court, being

22   United States District Court for the Eastern District of

23   Michigan, and myself being the Master of Judge Battani --

24   strike that -- being Judge Battani's -- being the -- being a

25   master appointed by Judge Battani to address this case is

Hearing before the Special Master - December 9, 2016

1    compelled to follow Goodyear.

2            As a consequence, I must hold that request

3    number 31 to the extent that it requests evidence of

4    settlement negotiations between the defendants and the

5    original equipment manufacturers will not be enforced, those

6    discussions and the evidence concerning those discussions are

7    barred.  However, in my view the discussions that occurred at

8    the initial meetings where the defendants disclosed to the

9    original equipment manufacturers the existence of a

10   conspiracy, the nature, the scope and the duration of this

11   conspiracy, the parts that may have been involved in the

12   conspiracy are not settlement negotiations, they are a

13   prelude to settlement negotiations, they are disclosing the

14   wrongful acts, and settlement negotiations occurred after

15   that disclosure.

16           So to the extent that request 31 seeks information

17   concerning the initial meetings where the disclosures of the

18   conspiracy, the scope, the nature, the extent and the

19   duration and the number of parts were involved or discussed

20   they are not privileged.  Additionally, I think even under

21   Goodyear the final settlement agreements that may have been

22   reached between the parties are not subject to settlement

23   privilege, so to that extent I am denying in part and

24   granting in part the plaintiffs' request to enforce rule

25   number 31.

1    The next matter on our agenda today is the -- I'm

2  sorry.

3    MS. ROMANENKO:  Just a quick point.

4    SPECIAL MASTER ESSHAKI:  Please identify yourself.

5    MS. ROMANENKO:  Victoria Romanenko for dealership

6  plaintiffs.

7    Your Honor, I wanted to clarify, the request also

8  sought documents exchanged between the OEMs and suppliers,

9  suppliers in general, not just defendants, concerning the

10  conspiracy as well as internal discussions and discussions

11  with non-defendant suppliers regarding the conspiracy.  It is

12  our understanding that these were not settlement discussions.

13    SPECIAL MASTER ESSHAKI:  I'm afraid I can't make

14  that conclusion.  Documents that were exchanged between the

15  parties -- once -- once the conspiracy has been identified,

16  once the wrong has been described, anything after that is

17  settlement negotiations.  So that if the defendants were to

18  come back and say here is a spreadsheet describing all of the

19  parts involved, describing the markups that we imposed, how

20  long they went, where the parts were sold, what vehicles they

21  went into, are, in fact, settlement negotiations.

22    Similarly, if the OEMs are responding with their

23  own analyses of the damages that they calculate based upon

24  the information that was conveyed to them, again, those are

25  settlement negotiations and/or work products that are not

Hearing before the Special Master - December 9, 2016

```
 1    going to be subject to disclosures.

 2            Your second point was?

 3            MS. ROMANENKO:  So my second point was internal

 4    discussions within the OEM as well as discussions between

 5    OEMs and non-defendant suppliers, ones that didn't

 6    participate in the conspiracy.

 7            SPECIAL MASTER ESSHAKI:  Between defendants and

 8    non-OEM suppliers?

 9            MS. ROMANENKO:  Between OEMs and non-defendant

10    suppliers.

11            SPECIAL MASTER ESSHAKI:  Again, I'm going to fall

12    back on my ruling without knowing what this type of

13    information is.  If it is disclosing the wrongful conduct,

14    the scope, the duration, the extent, those are not

15    privileged.  If there are discussions that occurred regarding

16    here is a spreadsheet that shows what we think the damages

17    are and discussions occur internally at the OEMs saying this

18    is our analysis and this is how we should respond, I believe

19    those would be settlement negotiations, privileged and/or

20    work-product privilege, so once the dispute has been

21    identified the privilege in my mind attaches.

22            With respect to non-parties, I think the same thing

23    occurs, if a non-party -- a non-defendant comes in and says

24    to General Motors we have learned that this conspiracy

25    developed within our organization or we participated within
```

```
 1   this conspiracy, describes it to General Motors, how long it
 2   went, what parts were involved, so on and so forth, not
 3   privilege.  A settlement document with that non-party and
 4   General Motors, not privilege.  Anything between those two,
 5   privileged.
 6           MS. ROMANENKO:  Okay.  Understood.  I understand
 7   Snap-on states that a discussion about the ongoing business
 8   relationship --
 9           SPECIAL MASTER ESSHAKI:  Yes, I know, and while I
10   find Snap-on to be very attractive and to be an exceptional
11   decision that is issued by a special master, somebody of that
12   low character in the judicial system, it is not controlling,
13   we are required to follow Goodyear.
14           MS. ROMANENKO:  Okay.  Understood.  Thank you.
15           SPECIAL MASTER ESSHAKI:  Would you please prepare
16   an order and would you share it with defendants, and once it
17   is approved send it back to me for entry and be sure to
18   include magic language about the appeal rights?
19           MS. ROMANENKO:  As soon as we've got the transcript
20   available we will prepare an order and circulate it.
21           SPECIAL MASTER ESSHAKI:  All right.  Thank you.
22           MS. ROMANENKO:  Thank you.
23           MR. FENSKE:  Master, may I be heard?
24           SPECIAL MASTER ESSHAKI:  Please, identify yourself
25   counsel.
```

Hearing before the Special Master - December 9, 2016

13

1        MR. FENSKE:  Dan Fenske for Mitsubishi Electric for

2    the defendants.

3        I just wanted to clarify one aspect of your ruling,

4    particularly on the settlement agreement point.  Is Your

5    Honor ruling simply that the settlement agreements are not

6    privileged or are you actually compelling production?

7        SPECIAL MASTER ESSHAKI:  I'm compelling production.

8        MR. FENSKE:  Your Honor, as to that point our

9    position is if you read the plaintiffs' motion, in the motion

10    they don't ask for settlement agreements anywhere in the

11    initial motion, so our position -- we didn't address it in

12    our response brief because we didn't believe that's what they

13    were seeking, so our position is respectively that they

14    waived their motion only as to settlement agreements.

15        SPECIAL MASTER ESSHAKI:  Ms. Romanenko?

16        MS. ROMANENKO:  Your Honor, we disagree.  We

17    requested all communications and negotiations between the

18    OEMs and suppliers concerning the conspiracy.  A settlement

19    agreement is very clearly a communication between OEMs and

20    suppliers concerning the conspiracy.  Defendants very clearly

21    knew that settlement agreements were at issue because in

22    their own cases that they cited, including Conlin, including

23    Snap-on, the Court decided -- or the Master decided that

24    settlement agreements were produceable.  These were clearly

25    at issue, they clearly knew that this was going on, and if

**14**

1    they had anything further to say about it they would have

2    said it.

3            And I also will note that I think Your Honor even

4    mentioned that at the mediation, so if they had any further

5    points to make they could have made them in this follow-up

6    briefing that just occurred.

7            SPECIAL MASTER ESSHAKI:  Give me a moment, please,

8    Counsel.

9            MR. FENSKE:  Of course.

10           SPECIAL MASTER ESSHAKI:  Okay.  I can see how you

11   can take the position that the request 31 was limited to

12   communications between the OEMs and any defendants or other

13   part suppliers in connection with the facts described in

14   plaintiffs' complaint.  In the interest of saving time, I'm

15   going to order that the settlement agreements be produced.

16   You can appeal that to Judge Battani.

17           MR. FENSKE:  Okay.  Your Honor, just before we move

18   on, we didn't brief this because it wasn't brought up in the

19   opening brief.  However, we have basic relevance objections

20   to the production of settlement agreements at least as to the

21   moving plaintiffs' cases.  The -- there are some case law

22   that says that settlement agreements are sometimes at some

23   point in the case relevant when the settlement agreement is

24   with an absent class member, for example.  That would only be

25   relevant to the DPP cases, Your Honor.  The DPPs have not

1   moved to compel production of these settlement agreements, so

2   we have a basic just relevance objection to their production.

3   I don't believe I have heard any discussion as to why the

4   settlement agreement itself would even be relevant to the

5   moving plaintiffs' cases.

6           In addition, I just want to note that the

7   production of these settlement agreements would potentially

8   chill future settlements between OEMs and the defendants.  As

9   Goodyear notes, confidentiality is a critical component to

10  achieving a settlement.  And the plaintiffs noted in their

11  briefing that no OEMs have filed the case but they never

12  asked themselves why, and the likely reason why, of course,

13  is the OEMs and the defendants are resolving their cases.

14  They have been relying on Goodyear and they have been relying

15  on the general respect that courts have for the

16  confidentiality of settlement agreements that they only be

17  produced, the actual settlement agreement, at the point which

18  they are necessary in a case and not until then.

19          So I would ask Your Honor to be mindful of that and

20  respectfully ask Your Honor not to compel production of the

21  settlement agreements, instead let the defendants and the

22  plaintiffs discuss their potential relevance because we don't

23  know what the relevance of the actual agreement might be as

24  opposed to the briefing focused on which were the

25  communications, and then we can bring it before Your Honor if

Hearing before the Special Master - December 9, 2016

1    there is a further dispute.

2         SPECIAL MASTER ESSHAKI:  Again, my response would

3    be that in the interest of time, because time is of the

4    essence today in this case, I am going to order that the

5    settlement documents be produced.  There are two options; one

6    is you can engage in negotiations with the plaintiffs to see

7    if they are willing to negotiate something less than full

8    production of the settlement agreements or all of the

9    settlement agreements between now and the time that the

10   matter is presented before Judge Battani, or you can take the

11   entire matter before Judge Battani on the relevancy of the

12   settlement production and my order that they be produced.

13        MR. FENSKE:  All right.  Just so the record is

14   clear, our position would be because they didn't open it

15   in -- or address settlement agreements in their opening brief

16   that they waived their right to seek those, so the record is

17   clear on that.  Thank you, Your Honor.

18        SPECIAL MASTER ESSHAKI:  I don't see that would

19   prevent them from serving a subpoena tomorrow asking for

20   them, that's why I am saying it is in the interest of saving

21   time.

22        MR. FENSKE:  Thank you.

23        SPECIAL MASTER ESSHAKI:  Thank you.  Okay.  The

24   next issue that we have on our agenda today is Denso's motion

25   regarding discovery with respect to the original equipment

Hearing before the Special Master - December 9, 2016

1    manufacturers.

2         And, Mr. Cherry, would you simply come up and state

3    the nature of this motion and the relief requested.

4         MR. CHERRY:  Yes, Your Honor.  So our position is

5    sort of twofold.  One is for the wire harness's case, at this

6    point we have settled with the indirect purchasers so we have

7    no need for downstream discovery and we've made that clear,

8    and for upstream part-specific discovery in wire harnesses we

9    have a summary judgment motion pending and if that motion is

10   granted, and we are hopeful it will be, then we have no need

11   for upstream discovery.  So we believe it is in everybody's

12   interest to hold upstream part-specific discovery for wire

13   harness products in abeyance until the Court rules on that

14   summary judgment motion.  Hopefully we will never need it and

15   no one will have been put to an unnecessary burden.

16        For subsequent cases, and the next case for us

17   would be the instrument panel cluster case and we have some

18   after that, those -- a couple of those are just starting

19   discovery, others haven't yet, and so it is unclear what we

20   will need.  We may find ourselves in the same situation that

21   we are in for wire harness products.  So our position is for

22   subsequent cases that upstream part-specific discovery in

23   those cases should be staged -- staggered so that it is

24   addressed when the particular case is starting to move

25   forward and people have a better idea of specifically what's

1    needed for those cases.

2          Now, that also has the added benefit of freeing

3    everyone to focus on the lead two cases, getting those

4    productions done as quickly as possible.  They -- those have

5    class certification schedules that keep getting delayed, and

6    hopefully by focusing on those two products the next

7    scheduling, if they are extended, could stick and those can

8    move forward.

9          I believe our -- well, what we refer to as

10   staggered discovery in these other cases will be well

11   informed by the discovery in those lead two cases and that

12   may form sort of a template for what's produced, but we also

13   ask for the ability, first of all, to be informed by their

14   experience, maybe we will find that we can do with less given

15   what happens in those cases hopefully, but we may also find

16   that there is some additional targeted discovery about a

17   particular RFQ, something of that nature, that's needed for

18   our direct purchaser case in a particular product that we

19   would want the ability to ask for, not be foreclosed from

20   doing that.

21         That's the relief that we seek, Your Honor.

22         SPECIAL MASTER ESSHAKI:  So basically what you are

23   asking is for a standstill in part -- Denso's requesting a

24   standstill on upstream discovery from the OEMs because they

25   have -- first, they have resolved the downstreams and,

1    secondly, because as to the direct purchaser plaintiffs where

2    there may be some additional upstream discovery that is

3    necessary you have filed motions for summary judgments that

4    are currently pending and if they rule in your favor -- the

5    judge rules in your favor the discovery won't be necessary at

6    all.

7              MR. CHERRY:  That's exactly right for wire harness.

8              SPECIAL MASTER ESSHAKI:  But you also want to

9    reserve your right that if the judge rules against you, you

10   are not foreclosed to go back and get that information nor to

11   seek that information if you find it necessary with respect

12   to other cases?

13             MR. CHERRY:  Exactly, Your Honor.

14             SPECIAL MASTER ESSHAKI:  All right.  Do I have any

15   objection?  Mr. Williams?

16             MR. WILLIAMS:  Good morning, Your Honor.

17   Steve Williams for indirect purchasers.

18             I don't know if it is an objection so much, but we

19   find ourselves in a different position from Denso because

20   Denso having resolved the indirect purchaser cases has no

21   need for this discovery whatsoever.  We in our motion, as the

22   Court is aware, have agreed to focus on the first two cases

23   that have the initial class certification schedules, but I

24   think the difference is, as I hear Mr. Cherry's argument, it

25   is a deferral to put everything on hold, and I think for

1  us --

2          SPECIAL MASTER ESSHAKI:  As to Denso only.

3          MR. WILLIAMS:  As to Denso only, and if that's so

4  that's fine, we simply don't want the resolution of Denso's

5  motion to have the effect of then saying as to the indirect

6  purchasers, who do have schedules and do have cases ongoing

7  and do have needs for discovery, that we should be limited

8  after the productions in the first two cases from then in a

9  timely manner being able to receive the productions in the

10 later cases, so it is just a nuance.

11         SPECIAL MASTER ESSHAKI:  Put those concerns aside,

12 sir.

13         MR. WILLIAMS:  Thank you.

14         MR. CHERRY:  May I say something?

15         SPECIAL MASTER ESSHAKI:  Sure.

16         MR. CHERRY:  I think this addresses Mr. Williams'

17 concern, maybe this is where you are headed, is at your

18 request, you know, and when we filed a motion we initially

19 proposed an order which would hold discovery in these

20 subsequent cases in abeyance and stagger it as a matter of

21 formality.

22         I think the last time we were before you you asked

23 for a proposed order that was more along the line of a

24 compromise, which we submitted I think on November 30th, and

25 I think that addresses Mr. Williams' concern.

Hearing before the Special Master - December 9, 2016

21

1    SPECIAL MASTER ESSHAKI:  Just one minute.  Does

2    that, Mr. Williams, have you seen that order and does it

3    address your concerns?

4    MR. WILLIAMS:  I have, and I think it does.  I

5    would like if I could have an opportunity to confirm that

6    after we finish all the proceedings today, and if I do have

7    an objection or a concern I will address the Court and the

8    OEMs.

9    SPECIAL MASTER ESSHAKI:  I would like it to be

10   clear that with respect to the order it only concerns Denso,

11   it has no impact whatsoever on any of the other -- of the

12   plaintiffs in this matter, nor will it impair any of their

13   discovery from the OEMs.

14   MR. WILLIAMS:  Thank you, Your Honor.

15   SPECIAL MASTER ESSHAKI:  So let's take another

16   close look at the draft order, but I have to hear from

17   Mr. Kass, who is waiting anxiously in the corner.  You are

18   not done, sir.  Mr. Kass.

19   MR. KASS:  Thank you, Your Honor.  For the record,

20   it is Colin Kass for FCA.

21   I just -- I don't have a problem with Denso not

22   wanting to share in the costs if they are not going to

23   receive the discovery, and that's fine.  The one thing I want

24   to make clear, at least from our perspective, is the concept

25   of phase discovery generally raises some issues.  It may, in

Hearing before the Special Master - December 9, 2016

1    fact, just split up the burden over time, but when the Court

2    is considering the burden of the subpoena that's being asked

3    it has to consider all of the parts that are being requested

4    under the entire subpoena, and it can't just say for, you

5    know, because the burden today is only limited to one part

6    the subpoena is reasonable without considering the fact that

7    tomorrow they might ask for another part and another part and

8    another part.

9         So Denso's reservation of rights to come back later

10   in time doesn't obviate the overall burden with the subpoena,

11   and I just want to make it clear that we would continue to

12   object to the entire subpoena at this point based on the full

13   scope of what they are asking for and that it would be the

14   continuing objection when and if Denso ever comes back later

15   in time to seek additional documents from us, particularly if

16   by waiting Denso has increased the burden.  If their timing

17   is somewhat different than any other party it could have the

18   potential of increasing the burden which would provide an

19   additional basis for objection.  So the pure reservation of

20   rights that Denso's seeking and a standstill agreement that

21   if they were to get that could, in fact, end up prejudicing

22   at least FCA so we would be concerned about that.

23        SPECIAL MASTER ESSHAKI:  Mr. Kass, by the same

24   token, as I see this, Denso is taking a risk that by

25   deferring now they may require information within a much

Hearing before the Special Master - December 9, 2016

**23**

1    shorter time frame and producing that information in that

2    much shorter time frame may be more costly, so they are

3    bearing that risk.

4         MR. KASS:  As long as it is clear that they are

5    bearing the risk and they can't rely on an order for

6    standstill that they are put back into the position of today

7    in the future when circumstances may change and the burdens

8    may change in the future.

9         SPECIAL MASTER ESSHAKI:  On the other hand, if

10   circumstances haven't changed and the burden hasn't changed

11   then there is no prejudice to putting them back in the

12   position, you will have to prove that.

13        MR. KASS:  If there is no prejudice there is no

14   prejudice.

15        SPECIAL MASTER ESSHAKI:  Thank you, Mr. Kass.

16        Acceptable, Mr. Cherry?

17        MR. CHERRY:  Yes, Your Honor.  In fact, our

18   proposed compromise order that you requested has a specific

19   provision that this is not -- this doesn't prejudice either

20   our ability to ask for some additional targeted discovery,

21   their ability to oppose that discovery and, of course, you

22   know, this issue I think that Mr. Kass raises is really only

23   for -- would only come up for additional discovery, otherwise

24   I would think, particularly if Mr. Williams has gone forward

25   with his discovery, it would simply be a matter of us asking

Hearing before the Special Master - December 9, 2016

1    to receive some of that and paying for it at that point.

2            SPECIAL MASTER ESSHAKI:  And does your -- Furukawa

3    has joined in this motion.  Are they seeking the same relief?

4            MR. CHERRY:  They are.

5            SPECIAL MASTER ESSHAKI:  They want the same

6    standstill order?

7            MR. CHERRY:  Yes.

8            SPECIAL MASTER ESSHAKI:  And the order does extend

9    to them?

10            MR. CHERRY:  Yes.

11            SPECIAL MASTER ESSHAKI:  I didn't bring it, I

12    apologize.

13            MR. CHERRY:  It does, and they are only in the wire

14    harness case.

15            SPECIAL MASTER ESSHAKI:  Excellent.  That would be

16    fine, sir.  Send the order back to Mr. Williams, let him have

17    an opportunity to take a look at it, include the magic

18    language about appeals, and I will have it signed and

19    entered.

20            MR. CHERRY:  Thank you, Your Honor.

21            SPECIAL MASTER ESSHAKI:  Okay.  I have to find my

22    next outline please.  All right.

23            The next matter on our agenda is the motion to

24    compel enforcement of the subpoena filed by the parties

25    against the original equipment manufacturers, and the history

Hearing before the Special Master - December 9, 2016

1    of this motion is that it was originally brought to me in

2    approximately March of this year.  At that time I attempted

3    to conduct some mediations and negotiations between the

4    parties and the original equipment manufacturers, and simply

5    fell short.  I fell short because the issues were so large,

6    the subpoena was so large, the number of parties were so

7    numerous, that I could not make progress towards a settled or

8    mediated solution.

9          But during the course of my discussions it became

10   very clear to me that the parties and I believe many of the

11   counsel that were representing the original equipment

12   manufacturers were uneducated as to the data retention

13   systems that were being employed at each of the original

14   equipment manufacturers, and every time a question was asked

15   of a -- one of the parties to OEMs, do you maintain this, the

16   response was I don't know, is this readily accessible, and

17   the response was I don't know.

18         So as a consequence I determined in March that it

19   was best if the parties were given an opportunity to conduct

20   30(b)(6) depositions of the OEM systems employees, the

21   employees of the OEMS that had the greatest knowledge of the

22   systems that were in place and the systems that are now

23   off-line or in storage, in order to get a better

24   understanding of what was -- what data was being maintained

25   by the OEMs, how readily and reasonably accessible the data

Hearing before the Special Master - December 9, 2016

1    was, and whether that data could be produced at a reasonable
2    price.
3            The subpoena at that time, I was informed, involved
4    approximately 1.5 billion documents, and I indicated I was
5    not going to enforce a subpoena for 1.5 billion documents and
6    go down in history as the person who enforced the largest
7    subpoena in the country.
8            The parties, in my estimation, have worked
9    diligently. I'm absolutely impressed with how the parties
10   have met and conferred over and over again in the interest of
11   reducing the scope of the subpoena, relieving the burden it
12   places upon the OEMs and yet obtaining what is essentially
13   critical information, the lifeblood -- that is the lifeblood
14   of this case.
15           In November I convened a second mediation after the
16   30(b)(6) depositions were concluded, and at that time it was
17   clear to me that counsel for the parties had a very good
18   grasp on the individual document retention systems that were
19   employed at each of the OEMs, and that counsel for the OEMs
20   had a much more improved understanding with respect to their
21   respective clients' document retention systems so that an
22   educated discussion about what documents are available, how
23   readily accessible are they, how far back do they go, was in
24   my mind quite fruitful.
25           So we conducted approximately nine hours of

1    mediation during a session in November and, again, I overshot

2    my target because there were still so much -- still so many

3    issues to address that while I had scheduled each OEM for a

4    session regretfully I could only get to three or four of them

5    and I had to turn some away.

6         So yesterday we conducted another approximately

7    nine hours of mediation, and I started with the OEMs that I

8    was forced to turn away in November because of a lack of

9    time, and we had some fruitful negotiations yesterday.  It is

10   my intention today to provide everybody with a preliminary

11   ruling and to then separate the OEMs and address them one by

12   one outside of the other OEMs with representatives of the

13   moving parties.

14        So that being the case I want you to understand the

15   following:  Approximately 18 months ago the parties,

16   consisting of defendant end payor plaintiffs, truck and

17   equipment dealer plaintiffs and the States of Florida and

18   Indiana, filed their request for a subpoena against a number

19   of original equipment manufacturers.  These OEMs allegedly

20   purchased parts for use in their automobile manufacturing

21   processing that were allegedly subject to a conspiracy to

22   inflate, fix and sustain over time inappropriate and unlawful

23   pricing for their parts.

24        The original subpoena directed to the OEMs was all

25   encompassing and breathtaking in the scope.  For 18 months

Hearing before the Special Master - December 9, 2016

1    the OEMs have engaged -- OEMs and the parties have engaged in

2    numerous meet and confer sessions to narrow the scope of the

3    subpoena.  This matter was brought before me to enforce the

4    subpoena in approximately March of this year.  During the

5    March mediation session and hearing I determined that there

6    was insufficient information available as to the type of data

7    that was maintained by the OEMs, whether it was readily and

8    reasonably accessible and how and where the data was

9    maintained.

10           As a consequence I ordered that the OEMs produce

11   30(b)(6) witnesses to testify as to their respective data

12   storage processes, the location of the data, the systems upon

13   which the data was stored, and how easily could they access

14   and produce pursuant to the subpoena.  My order was appealed

15   and properly altered by Judge Battani but the 30(b)(6)

16   depositions were, in fact, in the end ordered in the

17   appropriate manner.

18           The 30(b)(6) depositions have now been completed

19   and from the filings in this case it is clear that the

20   parties and counsel for the OEMs have a much clearer

21   understanding of the data maintenance and storage processes

22   at each of the OEMs.  The parties assert that they have

23   significantly narrowed the data being requested from the OEMs

24   while the OEMs argue that the subpoena is still crushingly

25   overly burdensome to them.  The parties no longer seek

1 upstream discovery as to wire harness cases at this time

2 because of the resolution of the cases between the indirect

3 purchase plaintiffs and defendants.  Additional upstream

4 discovery may be required in an event that Denso's motion for

5 summary disposition is ultimately denied by the Court as I

6 have just ruled.

7    The parties have also suggested staggering upstream

8 data production and beginning with two lead cases, bearings

9 and anti-vibrational rubber parts.  The parties have also

10 narrowed the subpoena by limiting the documents requested

11 from non-defendant suppliers to a limited list of three to

12 perhaps five non-defendant suppliers per part cases, and from

13 my discussions yesterday I think that number is even lower.

14    Additionally, because of the assertions by the OEMs

15 of the unique and individualized burdens associated with

16 collecting and producing vehicle costs and pricing data

17 involving a large number of vehicle models, the parties have

18 agreed with certain OEMs to limit their request for this type

19 of information to a limited number of vehicle models and

20 model years, and this is being done by an OEM by OEM basis

21 which I will address when I address each OEM.  The parties

22 have reached individual concessions with many of the OEMs to

23 lighten the burden of the subpoena.

24    Recently the parties have offered to pay one half

25 of each OEM's cost of collection and production of data and

Hearing before the Special Master - December 9, 2016

1    documents that are not readily accessible and where the OEMs

2    have articulated a clear burden.  The offer does not include

3    reimbursement for any attorney fees.

4         Courts have been instructed to avoid the imposition

5    of substantial burdens to a non-party subject to a discovery

6    subpoena, and must determine that the data requested is

7    proportionate to the needs of the case at hand.  This is

8    coming directly from the parties' brief.  For more than two

9    years in this case more than 100 law firms have made an

10   unprecedented collaborative effort to pursue discovery in a

11   way that would satisfy the varying needs of multiple groups

12   of plaintiffs and more than 100 defendants across dozens of

13   complex antitrust actions involving 40 different parts while

14   attempting to minimize the burden on the entities served.

15        This case is unprecedented in scope, and as a

16   consequence even the revised and reduced-down subpoena as

17   further reduced by our discussions of yesterday is still

18   unprecedented in scope.

19        In weighing all of the factors that the courts are

20   instructed to look at in determining whether a subpoena is

21   reasonable, proportionate, and does not impose an undue

22   burden upon a third party, in this case the one factor that

23   outweighs all others is the size of the case, the public

24   interest at stake, and the necessity to attempt to right a

25   significant economic wrong.

1    It is alleged that millions of residents of the

2  United States over a 20-plus-year period purchased

3  automobiles containing parts manufactured by defendants that

4  were price fixed and consequently paid more for their

5  automobiles than they should have paid had the price not been

6  fixed.

7    It is estimated that approximately 75 million

8  vehicles and accordingly 75 million individual purchasers

9  have been damaged by this alleged conspiracy, and the remedy

10  for that damage has to be paramount in determining

11  proportionality, burden and cost shifting.

12    From the presentations of the parties and the OEMs,

13  it is clear that no two OEMs maintain their upstream or

14  downstream data in an identical or even a similar manner.  By

15  way of example, some OEMs destroy all RFQs after a bid has

16  been received, others maintain their RFQs.  Some OEMs

17  maintain live data going back a limited number of years and

18  store accessible data for a limited number of more years and

19  have unaccessible data going back even more years.

20    Any order compelling production will have to be

21  tailored by the parties and the OEMs to reflect the reality

22  of the data-storage systems maintained by a particular OEM.

23  That was the purpose of our last two mediation sessions, and

24  that is what's going to occur at the conclusion of my

25  discussion this morning.

Hearing before the Special Master - December 9, 2016

32

1      Based upon the foregoing, I am going to grant the

2  parties' motion to compel discovery from the original

3  equipment manufacturers pursuant to the previously served

4  subpoena subject to the following:  The subpoena will not

5  extend to documents in the possession of wholesale individual

6  custodians.  The parties are free to negotiate custodial

7  searches at a level one or two or a small handful but to say

8  that we want the custodians of all documents that are the

9  employees of General Motors to search their files will not be

10  ordered.

11      Next, the subpoena will only extend to documents

12  and data on currently live data stored systems and any

13  predecessor system that are easily accessible and reasonably

14  available for the production of data by the OEMs.

15  Additionally, the OEMs will not be required to produce any

16  data that does not exist in category number two above, that

17  is, existing live systems or readily accessible predecessor

18  systems such as information not readily accessible and data

19  that cannot be produced in a reportable form because the

20  system upon which it is stored cannot create reports.

21      The OEMs do not have to rewrite code, create new

22  systems to transfer their stored data in order to put it into

23  a reportable format.

24      I'm going to skip the next point because it deals

25  with staggering, and I think we have had -- we have reached

1    an agreement on staggering in the last couple days.  With

2    respect to downstream information, it is not a staggering

3    issue, staggering is upstream only, it is dealing with ball

4    bearings and anti-vibrational rubber parts.  There is no way

5    to downstream -- to stagger downstream, downstream data, as

6    ultimately agreed upon, is going to have to be produced

7    across all parts at one time.

8         The information from the OEMs regarding incentives

9    and rebates shall only be produced after a ruling of -- by

10   Judge Battani on the appeal of the undersigned order denying

11   such information on the grounds of relevancy.  That order is

12   currently pending.  If the Judge indicates that my ruling was

13   incorrect, that information falls within the confines of the

14   subpoena, and it should be produced -- will be produced.

15        I find the wholesale suggestions by Nissan and I

16   think General Motors of phase discovery involving production

17   of exemplars of potential documents, inquisition by the

18   parties as to the exemplars themselves, filling in one or two

19   exemplars, and permitting the parties to see what they look

20   like and then going forward with additional document

21   production, while it may be a logical and intelligent way to

22   generate the data being requested, we simply don't have the

23   time left to engage in that type of process.  It will be --

24   it will double or triple the time necessary to complete this

25   process, and accordingly that suggestion is rejected.

1    We have also had extensive discussions on what has

2    been determined or called the crown jewel information.  The

3    crown jewel information has been described to me as the

4    pricing information, data processes employed by the original

5    equipment manufacturers to establish their vehicle prices.

6    The original equipment manufacturers have indicated these are

7    the crown jewels, only a handful of people in the entire

8    world know about this information, know how prices are

9    established, and it would be extremely damaging to the

10   original equipment manufacturers if their pricing information

11   should get into the hands of a competitor or become part of

12   the realm of public knowledge.

13   I understand how critical this information is and

14   at the same time I understand how important it is to the --

15   at least to the plaintiffs' part of the parties moving to

16   have this information in order to establish their passthrough

17   analysis.  I am going to accept the plaintiffs' suggested

18   additional confidential and security provisions.  There is a

19   confidentiality agreement order in place in this case that

20   will remain in place, but in addition as to this confidential

21   information that information will be loaded down by the OEMs

22   to a thumb drive, to a disk or to some other data storage

23   instrument and it will be designated expert eyes only.  All

24   such information may only be viewed by the parties' experts

25   in a freestanding computer, one that is not connected to the

 1   Internet or otherwise accessible by any source outside of the

 2   expert's own office.  I envision that the experts -- the

 3   parties will prepare a specific additional confidentiality

 4   order governing this type of data that will be signed by

 5   every expert that receives the data.

 6        If the experts are required to make a copy of the

 7   data in order to manipulate it, all such copies shall be

 8   simultaneously recorded under a sworn log which will record

 9   the name of the person making the copy, the time and date the

10   copy was made, whether this is copy number one, two, three,

11   and how the copy was maintained; was it maintained on an

12   additional freestanding computer, was it knocked off to

13   another disk, was it put onto another thumb drive.

14        When this case concludes, the original disks and

15   thumb drives or any other data holding system, as well as

16   each and every copy that was made by each and every expert,

17   will be returned to the original equipment manufacturers with

18   an affidavit indicating that all copies have been returned,

19   the additional security order has been fully maintained by

20   the experts, and no person outside of the expert's office has

21   had access to any of the data.

22        As to the attorneys for the parties, they are

23   prohibited from reviewing the data on the thumb drives or the

24   disks or the copies of the thumb drives or the disks that are

25   made by their experts.  They may only review and discuss the

1   output of the expert's inspection.  They can query the

2   expert's reports, they can query the expert's results, but

3   they cannot query any of the substantive data that the

4   experts have received concerning these crown jewel -- this

5   crown jewel information.

6          There has been a significant argument posed by the

7   original equipment manufacturers as to cost sharing.  This

8   argument has already been -- has bubbled up to the top in

9   front of Judge Battani, and she has indicated on two

10  occasions I believe her views on this.  The first indication

11  was that at a minimum, vis-á-vis the 30(b)(6) depositions,

12  the parties are going to bear at least half the cost of those

13  depositions.  She has also stated, and she may have stated

14  this first, that the parties requesting the data are the

15  parties that have to pay for the data.

16         In taking those as my leads, I have determined as

17  follows:  As to the 30(b)(6) depositions previously conducted

18  by the parties, the cost of such depositions, including

19  outside legal fees incurred in preparing witnesses to

20  testify, shall be borne 60 percent by the parties.  As to

21  document production costs in connection with compliance with

22  the subpoena, the parties shall bear 70 percent of all

23  production costs incurred by the employees -- excuse me,

24  incurred by the employees of the OEMs, this will include

25  employee time, outside services, and reproduction costs.

```
 1    Excluded from this latter cost sharing is the payment of any

 2    legal fees incurred by the OEMs for either in-house or

 3    outside counsel in connection with the production of

 4    documents ordered under the subpoena.

 5           That is the conclusion of my general ruling, and

 6    what I would like to do is take a ten-minute break, and then

 7    we staggered yesterday which of the OEMs were going -- I

 8    think Nissan was going to come last but I don't remember.  We

 9    also had -- I believe Hyundai was going to be second to the

10    last.  I don't remember who the first, second, third -- do we

11    have any order that we have agreed upon or that would be

12    logical, please?

13           Identify yourself, sir.

14           MR. HEMLOCK:  Adam Hemlock, Weil, Gotshal & Manges,

15    on behalf of Bridgestone and Calsonic defendants.

16           May I ask for one point of clarification in your

17    order?

18           SPECIAL MASTER ESSHAKI:  Yes.

19           MR. HEMLOCK:  With regard to the pricing documents,

20    the documents and data that the OEMs hold relating to the

21    pricing of vehicles, in my mind, Your Honor, there are really

22    two categories there, one are what I think of as more

23    documents, for example, memos, PowerPoints, documents with

24    words.  We understand that the OEMs are in possession of

25    documents where they describe how they set the prices, what
```

Hearing before the Special Master - December 9, 2016

38

1    factor are involved and so on.  Separate and apart from that,

2    Your Honor, there is pricing data, in other words, numbers,

3    spreadsheets, databases of that nature.  My understanding,

4    Your Honor, had been that the -- I believe the proposal from

5    the serving parties as to how to provide the data to the

6    experts and the economists for them to analyze, that was

7    limited to the data.

8         The documents regarding what I will call the

9    narrative documents, how they set prices, PowerPoints, memos,

10   those are documents that necessarily the lawyers need to have

11   because it relates to the legal issues in the case about how

12   they set prices and what the arguments are for and against

13   and so on.  With respect to those, I would kindly ask that

14   Your Honor clarify that the outside lawyers, not in-house

15   lawyers and certainly not businesspeople, be permitted to

16   review those.  They would not be -- they otherwise would not

17   be helpful to the serving parties at all.

18        SPECIAL MASTER ESSHAKI:  My concern is the number

19   of outside attorneys representing the parties that would have

20   access to this information.  If it is -- we are talking 100

21   lawyers I am not inclined to do that.  I understand and

22   appreciate the sensitivity and highly, highly critical nature

23   of this data, so I need to have some sort of suggestion as to

24   a limitation on outside counsel carving out this portion, how

25   many outside counsel will have access to it.

1      MR. HEMLOCK:  Sure.

2      SPECIAL MASTER ESSHAKI:  It may be that you can

3  designate a team.

4      MR. HEMLOCK:  Sure.  I have one idea just even to

5  start.  As you know, we have 39 cases, 40 cases, we have all

6  lost track.  There is no reason why the 40th case today needs

7  to see that information.  Most of these cases are nowhere

8  close to being in discovery, many of them don't even have a

9  protective order or a discovery plan yet, so at a minimum, I

10  mean, if we look at -- in my mind you have the lead two

11  cases, this is only downstream, so wire harness lawyers don't

12  need to look at this, we've got bearings and anti-vibrational

13  parts, the lawyers there certainly need to look at it and we

14  could arrange perhaps for some limited number to see those

15  documents.  Then we've got the tranche one cases, the cases

16  that are right behind, and I believe those are just starting

17  discovery.  I think some of them have a plan, or if they

18  don't they are just about to have one entered and, again,

19  those lawyers would shortly have to look at those.  But as to

20  the ones later on we could figure out some arrangement I

21  think.

22      SPECIAL MASTER ESSHAKI:  I think I need to hear --

23  Mr. Williams, do you have something to say?

24      MR. WILLIAMS:  I do, Your Honor.  Very briefly.

25  Thank you for giving us your ruling, and I want to

Hearing before the Special Master - December 9, 2016

1   consider -- I understand the points counsel is making, and I

2   share some of those concerns but I want some time to think

3   how this would apply.

4        The point I wanted to make now is as to what we

5   call the crown jewel pricing documents.  I believe this is

6   only General Motors' issue, the other OEMs have not asked for

7   that level of protection, so I would like to ask for a

8   clarification as to --

9        SPECIAL MASTER ESSHAKI:  I think I heard quite

10  clearly yesterday Nissan asked for it, I may have been

11  mistaken but I thought Fiat Chrysler America asked for it.

12       MR. KASS:  Your Honor --

13       SPECIAL MASTER ESSHAKI:  Colin Kass, please.

14       MR. KASS:  Colin Kass.

15       Just for the record, at least in the offers of

16  production and the discussions we have had, they have not

17  actually pursued that because it is custodian information

18  from Chrysler so it may not be an issue as to Chrysler.  To

19  the extent that it could conceivably be ordered, even though

20  we believe it has not been waived, we certainly would need

21  substantial protection along the lines of what GM is asking

22  for.

23       SPECIAL MASTER ESSHAKI:  Well, Mr. Kass, you raise

24  a fine point.  I did not intend to mean that wholesale

25  custodian searches, which I have prohibited under my ruling,

Hearing before the Special Master - December 9, 2016

 1   would prevent the production of pricing information.  I could

 2   see how you could interpret it that way, but just because the

 3   pricing information happens to be in the hands of a custodian

 4   doesn't protect it from disclosure, I'm going to protect it

 5   in another way.

 6           MR. KASS:  It wasn't part of your order that drove

 7   this, it was part of the negotiations between the parties and

 8   Chrysler, that category of documents with information had

 9   dropped out a long time ago.

10           SPECIAL MASTER ESSHAKI:  All right.  I am more than

11   willing to deal with this on an OEM by OEM basis, but I want

12   to hear what an OEM has to say.

13           Counsel, please identify yourself for the record.

14           MR. WOLFSON:  Adam Wolfson, Quinn Emanuel on behalf

15   of General Motors, Special Master.

16           The issue of confidentiality, I know we briefed

17   that and I understand the Special Master's order to the

18   extent that we can address it I think we need to with

19   Judge Battani but I understand that for now.

20           One point though that I would like to identify with

21   respect to the confidentiality procedures that you mentioned

22   is this idea of putting these materials onto a thumb drive

23   and then delivering it to the experts is that is the typical

24   nowadays.  We have thumb drives that are encrypted, password

25   protected.

Hearing before the Special Master - December 9, 2016

```
 1        SPECIAL MASTER ESSHAKI:  You are absolutely right,
 2   the thumb drive needs to be encrypted, it needs to be
 3   password protected.  I forgot to add that.  Thank you,
 4   Counsel.
 5        MR. WOLFSON:  But -- but my experience in other
 6   cases where there is hypersensitive materials such as source
 7   code for programs for companies where there may be -- well,
 8   if that source code gets out it is a very critical breach for
 9   that company.  The way that these materials are handled for
10   these heightened protections is that they are kept onsite in
11   a location controlled by the party whose information it is.
12   So it would be on a computer, not connected to the Internet,
13   all of those protections, but at, for example, to use General
14   Motors, one of their outside counsel's office here in Detroit
15   and parties that want to come review the materials can --
16        SPECIAL MASTER ESSHAKI:  Experts that want to come.
17        MR. WOLFSON:  Experts, exactly.  They can come in,
18   they have to schedule their time, if they want to make copies
19   it is logged, and there is version control within that is
20   controlled by the party producing that so there is less
21   chance of proliferation.  So I respect the order, we will
22   probably have to appeal it, but in terms of the protections
23   granted we would ask for that clarification.
24        SPECIAL MASTER ESSHAKI:  Mr. Wolfson, I happen to
25   think that that is a significant improvement on my
```

Hearing before the Special Master - December 9, 2016

1    suggestion.

2           Mr. Williams, do you have any problems with having

3    the data maintained at the offices of an OEM-designated agent

4    such as their lawyer or in one of the GM offices?

5           MR. WILLIAMS:  Your Honor, I do think it creates an

6    additional burden.  I think what you have proposed is an

7    extraordinarily high level of protection that limits access

8    of this to virtually no one involved in the case.  If now our

9    people have to travel to someone else's offices I would

10   object to that, and if that's going to happen then I would

11   want to know they have access to that whenever they want it,

12   they don't have to go through hurdles, the expenses if they

13   need to travel to these locations around the country to look

14   at this, I don't think that should then be borne by us

15   because I think the procedures that Your Honor has put in

16   place sufficiently protect the information, and I don't think

17   it is fair to the parties for critical information in the

18   case to have us needing to make phone calls, get on planes,

19   travel and sit in their office with someone watching what we

20   are doing while we are looking at this information.

21          This is key information to a disputed factual issue

22   in the case that even with the protections you have put in

23   place those using this, and at this point under Your Honor's

24   order just the experts, they need the ability to actually

25   work with it in a normal manner, not as if they are visiting

44

1    a prisoner in a jail.

2            SPECIAL MASTER ESSHAKI:  Mr. Hemlock, how many

3    prisoners have you visited in a jail?

4            MR. HEMLOCK:  None yet but I am working on it.

5            SPECIAL MASTER ESSHAKI:  I have, sir, it is not a

6    comfortable site.

7            MR. HEMLOCK:  I am sure.  I have an idea, and I'm

8    going to credit Mr. Cherry with this.  What if Your Honor,

9    forgive me, I have not had a chance to discuss it with

10   plaintiffs yet so I can't say it is acceptable to them, what

11   if we did the following:  On the plaintiffs' side only one

12   firm were to be the custodian of the documents to be produced

13   by the OEMs.  In other words, for each plaintiffs' group --

14           SPECIAL MASTER ESSHAKI:  You're off of the security

15   issue now, all right.

16           MR. HEMLOCK:  No.  I'm trying -- I'm back to

17   limiting the number of eyes on the documents.

18           SPECIAL MASTER ESSHAKI:  No.  I want to address

19   Mr. Wolfson's recent suggestion that the thumb drive, we'll

20   call it, that is encrypted, password protected, would be

21   maintained at the offices of a General Motors' attorney, how

22   do you react to that?

23           MR. HEMLOCK:  I don't think it is doable, I agree

24   with Mr. Williams.  In the heat of preparing for class

25   certification and looking at documents, I'm sure Your Honor

1    has been there, it is just not realistic for us to have to

2    travel to another office, look at documents, take notes on

3    them.  It would meaningfully impede the serving parties'

4    efforts to adjudicate the case, but my idea --

5         SPECIAL MASTER ESSHAKI:  Please, would you stop

6    right there.

7         Anyone else want to address Mr. Wolfson's

8    suggestion to revise my security proposal?  Yes.  Counsel,

9    come forward and state your name.

10        MR. ELLIS:  Abram Ellis for certain defendants in

11   later-filed cases.

12        One issue that was not raised by Mr. Williams or

13   Mr. Hemlock but is crucially important is ensuring that for

14   any data that is held on those -- at those sites can be

15   manipulated by the right programs and be analyzed and

16   assessed in the appropriate way, and in addition to the

17   imposition of burdens associated with just the logistical

18   aspects is making sure they can do whatever they want with

19   the data on a computer that is not theirs and a system that

20   is not theirs.

21        SPECIAL MASTER ESSHAKI:  I understand.  Anyone else

22   need to speak on this issue?

23        MR. WILLIAMS:  I apologize because I'm going to

24   actually repeat what he said but he's exactly right.  This

25   proposal actually would prevent our experts from being able

Hearing before the Special Master - December 9, 2016

1    to do what they have to do, period.  If the stuff is resident

2    on their system much of this data is going to have to be put

3    into programs and used for computer modeling and regression

4    analyses.  We can't go to General Motors' office and use

5    their computers to do that, it just can't be done.

6            SPECIAL MASTER ESSHAKI:  Mr. Wolfson.

7            MR. WOLFSON:  Just offering a practical from

8    experience in cases where we have had very, very large cases

9    with multiple experts, Apple, Samsung, you know, some of the

10   largest cases in recent litigation history, this is how it is

11   done for hypersensitive materials.  And this -- for us, this

12   is very, very critical information and we do want to be able

13   to control it.  To the extent that there are copies that need

14   to be made, that they want to be made that are logged, we

15   believe that is doable, but to the extent that there are just

16   going to be thumb drives -- for the first case there are ten

17   defendants as I understand from yesterday plus all plaintiff

18   groups, that would be thumb drives to each law firm, and,

19   again, I mean, just in this room alone right now that's more

20   than people at General Motors that have access.

21           SPECIAL MASTER ESSHAKI:  I think we are confusing

22   what I would call the crown jewel data from other pricing

23   data, so let's try to just focus on the crown jewels data.

24           Let me ask you this, Mr. Wolfson, calling on your

25   experience in these cases, if an expert witness were to come

1    to your office with his own laptop and you inspect it and can

2    confirm that it is not Internet accessible and that no one

3    can get into that laptop, would you then envision he could

4    use the thumb drive as opposed to having him come to your

5    office and having to use a laptop that is at the office of

6    one of your attorneys?

7         MR. WOLFSON:  So the problem --

8         SPECIAL MASTER ESSHAKI:  That guarantees there is

9    no manipulation programs -- data manipulation problems before

10   they start the search.

11        MR. WOLFSON:  Right, and then all work is done on

12   site?

13        SPECIAL MASTER ESSHAKI:  All work is done on site.

14        MR. WOLFSON:  And the data is not taken away?

15        SPECIAL MASTER ESSHAKI:  Data is not taken away.

16        MR. WOLFSON:  I think that that's more doable, and

17   the devil is in the detail on how we would set up the

18   protective order on this, but something along those lines I

19   think is better than having the data go out, be put on to

20   these systems, it may be perfectly fine on the thumb drive

21   itself but then put on these expert systems that are then

22   presumably going to be hooked into some sort of either

23   internal network or accessible to an outside network, so I do

24   think --

25        SPECIAL MASTER ESSHAKI:  No.  My original proposal

Hearing before the Special Master - December 9, 2016

1    was they were standalone computers, no Internet access, no

2    access whatsoever from the outside into that computer.

3              Mr. Williams.

4              MR. WILLIAMS:  A couple of points, Your Honor.  I

5    do have grave concerns about the proposal being offered by

6    General Motors.  I don't want to differentiate the data

7    issues from what Mr. Hemlock described as the documents with

8    words issue because on the data issues there is no doubt in

9    my mind that it is simply not possible to do what's being

10   suggested, that we go do their office, bring a laptop and do

11   the type of regression analyses with very complex computer

12   models that have to be done in this case, it can't be done.

13             Secondly, I would ask through the court, to the

14   extent counsel is saying this is done routinely in cases, I

15   can certainly represent it has not been done in any of my

16   cases, I'm pretty sure it has not been done in any of the

17   cases defendants are in.  If we could be told what those

18   cases are, were they antitrust cases with regression analyses

19   being performed on vast amounts of data or were they very

20   different types of cases where those types of concerns

21   weren't present because I think that's going to inform this

22   analysis, but I can represent to the Court nothing like this

23   has been done in any of the antitrust cases that I have been

24   involved in.

25             SPECIAL MASTER ESSHAKI:  Mr. Hemlock.

```
 1          MR. HEMLOCK:  I agree completely.  The other point
 2   I would make, Your Honor, is that the work that's done with
 3   this data it is not a question of just a day or two of just
 4   tinkering with it and coming up with a report.  I mean,
 5   experts work with this stuff for weeks.  We would have people
 6   camped out at General Motors for weeks on end, and I agree it
 7   is not doable.
 8          Let me, if I may, make a proposal that I think may
 9   balance all of this and may be useful.  On the data I think
10   we should continue with Your Honor's proposal.  Now, counsel
11   for GM pointed out that there may be multiple defendants and
12   thus multiple experts.  I can tell you in the
13   anti-vibrational part case we have four defendants but we
14   have one expert who would look at this, maybe two, but I bet
15   we could come to some resolution on the number of experts
16   that need to see this information per parts case.
17          Two, again, most of these cases don't have experts
18   yet, they don't even have discovery yet, so we are not going
19   to be sending the data out to a million different people.  On
20   the documents, again, Mr. Cherry had a very good idea, what
21   if on the plaintiffs' side one firm from each plaintiffs'
22   group, one EPP, one DPP firm, et cetera, got access -- I
23   guess the DPPs wouldn't need it.
24          SPECIAL MASTER ESSHAKI:  Mr. Hemlock, please, what
25   I would like to do is finish on the data side first.
```

Hearing before the Special Master - December 9, 2016

50

```
 1              MR. HEMLOCK:  Okay.  So I think I have made my
 2   point.
 3              SPECIAL MASTER ESSHAKI:  You have made your point.
 4   Let me just say the following:  I have been struggling with
 5   this for a month.  I know how critical, how confidential, how
 6   damaging the release of this -- of the crown jewel
 7   information can be to the OEMs, and my initial inclination
 8   was to deny it in total.  However, I also concluded that if I
 9   denied it in total there was a significant, if not a
10   substantial, likelihood that I would destroy the passthrough
11   arguments that the parties could make or contest, and that's
12   why I wanted to give the parties the data because, as I said,
13   the overwhelming issue in my mind is the size of the
14   conspiracy, the damage that has been done to 75 million
15   automobile purchasers that has to be redressed, that's why I
16   decided to give the data.
17              Mr. Wolfson, I'm going to give the data as I
18   originally indicated without your suggestion, and you can
19   present that suggestion when you appeal the order to
20   Judge Battani and see if she believes that necessary --
21   additional security is necessary.  But I want to clarify,
22   when I said thumb drive or disk, it was encrypted, password
23   protected, experts' eyes only.  All right.  We have concluded
24   that now, so let's talk about the documents.
25              MR. HEMLOCK:  Thank you.
```

Hearing before the Special Master - December 9, 2016

**51**

```
 1            SPECIAL MASTER ESSHAKI:  Your suggestion on the

 2   documents.

 3            MR. HEMLOCK:  My suggestion on the documents would

 4   be one firm on the plaintiffs' side, one firm per plaintiffs'

 5   group, and, again, I haven't reviewed this with Mr. Williams

 6   so he will tell me if he agrees.  On the defendants' side I

 7   would say for each part case perhaps only one defense firm

 8   has physical possession of the documents, and to the extent

 9   that members of the other firms want to come look at it, take

10   notes, et cetera, they could do so, but realistically in each

11   parts case one firm could probably take the lead on briefing

12   that aspect of class cert, that aspect of other parts of the

13   case, and thus you would really have significantly fewer

14   firms and eyeballs on the documents themself.

15            SPECIAL MASTER ESSHAKI:  Mr. Williams, you just

16   heard this proposal?

17            MR. WILLIAMS:  I have heard the proposal and I

18   support it.  I think it alleviates the concern on the

19   document side that this goes to a disputed factual issue that

20   is central to the case, and if the attorneys are not

21   permitted to have access to the information to evaluate it we

22   won't be able to prove or disprove those issues that are so

23   central to whether or not these cost increases were, in fact,

24   passed through to the 75 million people who purchased these

25   cars.
```

1        SPECIAL MASTER ESSHAKI:  I understand that.

2   Mr. Wolfson, a comment on this?

3        MR. WOLFSON:  Your Honor, I think that this is

4   actually even more appropriate for the on-premises suggestion

5   that I made.  These are the documents that actually described

6   the methodology used by the OEMs.  These are the documents

7   where if they get out they are understood by a layperson,

8   whereas the data is something more that even while still

9   extremely sensitive is something that requires a bit more

10  analysis.  If the attorneys would like to look at these

11  documents and review them as they are put together and

12  assembled, I think this would be appropriate to review on

13  premises, controlled on an Internet-less computer at a

14  General Motors' attorney's office or at some other OEM's

15  office wherever they keep their data -- or their documents.

16       SPECIAL MASTER ESSHAKI:  Mr. Hemlock, instead of

17  Ms. Romanenko having to come visit Mr. Williams' office,

18  Ms. Romanenko would have to go to the attorney for General

19  Motors in Detroit.

20       MR. HEMLOCK:  Again, Your Honor, the realities of

21  litigation, of briefing cases, of multiple parties working

22  together and coordinating, the thought that if they needed to

23  double check a document to make sure it is accurate when it

24  is cited in a brief and a representation to the Court as to

25  the substance of those documents, they have to go call GM,

Hearing before the Special Master - December 9, 2016

53

```
 1    get on a plane, fly over there, to me it is unrealistic.
 2             SPECIAL MASTER ESSHAKI:  Mr. Williams, I assume you
 3    agree?
 4             MR. WILLIAMS:  I do, Your Honor.
 5             SPECIAL MASTER ESSHAKI:  That's sufficient.
 6             MR. WILLIAMS:  Thank you.  Thank you.
 7             SPECIAL MASTER ESSHAKI:  A bright man knows when to
 8    agree with another bright man, I guess.
 9             All right.  I am going to accept the parties' most
10    recent suggestion as to this one as well.  I do understand
11    that it could present an insurmountable task, especially for
12    people that are in San Francisco or in California, if they
13    need to check a particular document and they have to fly to
14    Detroit to check a one- or two-page document in order to
15    finish off the writing of their cert brief, it is -- it does
16    present a very significant burden.
17             I am going to accept the proposal to designate one
18    firm as the keeper of the documents.  That firm will execute
19    an affidavit indicating that they have received the
20    documents.  They will agree not to copy the documents unless
21    it is necessary for them to do studies, in which event they
22    will keep a strict record of every copy that is made, who it
23    was made by, the date and time it was made.  It can only --
24    now, is this going to be -- I'm assuming it is not going to
25    be hard copy, it will be some sort of electronic documents.
```

Hearing before the Special Master - December 9, 2016

1    MR. HEMLOCK: I guess that depends. I think while

2  certainly our preference would be to produce it

3  electronically but we would take the appropriate precautions

4  anyway.

5    SPECIAL MASTER ESSHAKI: If it is electronically it

6  is going to be again thumb drive or disk, encrypted, password

7  protected. A log must be maintained of every attorney who

8  accesses the data, the name of the attorney, the party they

9  represent, the date, the time, the length that they accessed

10  the data, and that if it is electronically produced via thumb

11  drive or disk it has to be on a freestanding computer that is

12  not connected to the Internet, that no one else can enter --

13  you know, can enter into that computer except when they are

14  sitting at the desk with that computer.

15    Mr. Wolfson, again, it is a very worthy suggestion

16  and I suggest you give it to the Judge for her consideration,

17  but I'm dealing with the practicalities of it; you can't put

18  somebody on a plane and say go check document number 1237 for

19  this section, it is not doable, so I will give as much

20  protection as I possibly can.

21    Mr. Williams?

22    MR. WILLIAMS: Thank you, Your Honor. One point

23  briefly I just want to note, which is we understand the

24  limitations that Your Honor is imposing at this point. At

25  some time these documents might become subject to either

```
 1    briefing in the Court or testimony in the Court, and I just
 2    want to note at that time the parties and the producing
 3    parties should address it then and present proposals to how
 4    to address this so that this isn't a matter of this is how
 5    this will be kept forever because there might come a time at
 6    which this becomes central testimony at the trial of this
 7    case.
 8            SPECIAL MASTER ESSHAKI:  We may be having
 9    confidential hearings, I understand.
10            Ms. Romanenko.
11            MS. ROMANENKO:  Your Honor, just a quick
12    clarification.  I had understood that Mr. Hemlock had
13    proposed that it be one firm for defendants and one firm for
14    each plaintiff group, one firm for EPPs, one firm for ADPs,
15    one firm for DPPs that would get a copy of these documents.
16    I just want to make sure that understanding is correct?
17            SPECIAL MASTER ESSHAKI:  Is that clear, sir?  That
18    understanding is good.  I would --
19            MR. WILLIAMS:  Did you say DPPs?
20            MS. ROMANENKO:  I did say DPPs.
21            MR. HEMLOCK:  Not DPPs.
22            SPECIAL MASTER ESSHAKI:  Not DPPs.
23            MS. ROMANENKO:  Than ADPs and --
24            SPECIAL MASTER ESSHAKI:  Okay.  I need a volunteer
25    to draft this most recent order.  Mr. Hemlock, thank you very
```

1    much.

2            So what I'm looking for is literally three orders.

3    One is the general order that I just recited, two is the

4    special secured, confidential crown jewel order involving the

5    crown jewel data that's being given to experts, and the third

6    is the special secured document data pricing information that

7    is going to be held by a limited number of attorneys in the

8    case.  All three of those have to contain provisions that

9    permit the appeal to Judge Battani.

10           All right.  Can we take ten minutes to give our

11   court reporter a break?  Yes, sir?

12           MS. ROMANENKO:  Your Honor, I'm more than happy --

13           SPECIAL MASTER ESSHAKI:  Mr. Nissan is what I

14   recall your name.

15           MR. CAULEY:  Paul Cauley, Your Honor.

16           I am not against court reporters having breaks or

17   anybody having breaks, but I did want to be heard on one

18   minor aspect of the general order on cost shifting which I

19   did not hear addressed and would like to bring to the Court's

20   attention.  I am more than happy to do it before or after the

21   break.

22           SPECIAL MASTER ESSHAKI:  You certainly may.  Let's

23   do it right now because I would like to close this up right

24   now.  Let me just suggest, sir, as you get older you are

25   going to find the need for breaks become more and more

1    paramount.

2          MR. CAULEY:  Judge, I'm sorry, I am already there.

3          SPECIAL MASTER ESSHAKI:  Yes, sir.  Please identify

4    yourself again.

5          MR. CAULEY:  Paul Cauley on behalf of Nissan, Your

6    Honor.

7          In your cost shifting order I know that you

8    addressed the 30(b)(6) depositions, you addressed all of the

9    production costs that would be incurred by employees of the

10   OEMs, and you also addressed the issue of legal fees in

11   conjunction with that.

12         You will recall from many of our discussions and

13   some of the things that Nissan has indicated a willingness or

14   that it could do to generate some of this data to try to get

15   it in a position that we can give it to the parties will

16   involve us having to actually retain consultants.

17         SPECIAL MASTER ESSHAKI:  Sir, I did say -- I did

18   say outside services.

19         MR. CAULEY:  So --

20         SPECIAL MASTER ESSHAKI:  If you have to retain

21   people to assist you to gather the data off of your systems

22   or whatever it may be, yes, that falls within the confines of

23   the 70 percent as well as the reproduction cost or the

24   regeneration cost itself.

25         MR. CAULEY:  We certainly understand your ruling.

Hearing before the Special Master - December 9, 2016

58

 1   That aspect we would certainly argue should be 100 percent

 2   since we are having to come out of pocket for that, but we

 3   understand the ruling.

 4         SPECIAL MASTER ESSHAKI:  Thank you very much, sir.

 5   I appreciate it.  Not quite done, Robert.

 6         Ms. Metzger, please identify yourself.

 7         MS. METZGER:  Kimberly Metzger for Subaru of

 8   Indiana.

 9         One issue that we would like to address with regard

10   to cost shifting is the cost associated with narrowing the

11   scope of the subpoena, so the preproduction costs, employee

12   labor time, that sort of thing, outside of the scope of the

13   30(b)(6) depositions because they were other of those types

14   of -- as noted in our brief, our responsive brief, there were

15   other costs that Subaru at least incurred in narrowing the

16   scope of the subpoena.  I'm sure the parties will call it

17   resisting the subpoena, but it is actually within the scope

18   of 45(d) where the court must enforce the duty to narrowly

19   prescribe the subpoena and to avoid imposing undue burden and

20   expense.

21         So for the cost that Subaru incurred from the

22   beginning of the subpoena when we received the subpoena back

23   in 2015 up until the present time of getting to the point

24   where the scope is the somewhat narrowed still, as you

25   recognize, overly or largely burdensome, what are we going to

1    do about those costs?

2         SPECIAL MASTER ESSHAKI:  Any thought on that from

3    the moving parties?

4         MR. WILLIAMS:  Yes, Your Honor.  We object to that.

5         SPECIAL MASTER ESSHAKI:  Mr. Williams.

6         MR. WILLIAMS:  Those costs -- first of all, the

7    Court has recited the history of this matter, the 18 months

8    that we spent from the start of this in this courtroom when

9    Judge Battani directed us to work together, and this is

10   something unprecedented in my experience that we have worked

11   together in this manner, we reached out and we tried to talk

12   with these OEMs.  We didn't know what they had, and as Your

13   Honor has noted, when we came to see you in March most of

14   them didn't know what they had, so we couldn't have been

15   expected to have drafted a precise focused subpoena that

16   understood what, for example, SIA had because we had no

17   ability to know that.

18        When we served it we did it based upon the best

19   analysis and the best understanding we had, and we invited

20   them to talk with us to help us understand.  And in our view,

21   and we don't have to recite it, it doesn't have to be

22   decided, but we think it took an extraordinary long time to

23   have what should have been more straightforward discussions

24   about what they do and don't have, and we don't think that it

25   is fair to then say they should be paid the time they spent

1    to do what normally is done in meet and confer, and what we

2    invited and asked them to do in the meet and confer.

3            SPECIAL MASTER ESSHAKI:  Mr. Williams, thank you.

4            Ms. Metzger, please, you can bring it up with

5    Judge Battani on appeal.

6            MS. METZGER:  It is not a foreclosed issue?

7            SPECIAL MASTER ESSHAKI:  It is foreclosed but she

8    has the right to reverse me.  It is not -- those costs are

9    not going to be allocated or shifted in any manner to the

10   moving parties, the legal fees incurred in connection with

11   the attempt to narrow down the subpoena.  Only -- I have only

12   addressed the 30(b)(6) deposition costs which included legal

13   fees at 60 percent, and I have only addressed the cost of the

14   productions on a go-forward basis which includes employee

15   time, outside services, reproduction costs, but not including

16   legal fees and in-house or outside, at 70 percent, so that is

17   not being included.

18           MS. METZGER:  Just to be clear in case I wasn't,

19   the argument I was making was not for outside counsel fees,

20   it was for actual costs incurred by the parties.

21           SPECIAL MASTER ESSHAKI:  I understand, I

22   understand.  So if you want to put that in your challenge to

23   my order, that's perfectly fine, I should have included it

24   and did not.

25           MS. METZGER:  Thank you.

Hearing before the Special Master - December 9, 2016

61

```
 1              SPECIAL MASTER ESSHAKI:  I abused my discretion.
 2              All right.  We will come back about 11:00.  Shall
 3      we start with General Motors?  They were first on our list
 4      yesterday.
 5              MR. WILLIAMS:  I think that's fine.  I would like
 6      to ask one question to clarify though.  During this break I
 7      think it would benefit the parties if we could just review
 8      the order and see if there's any of the issues you raised
 9      that we might want to speak to you about very briefly.
10              SPECIAL MASTER ESSHAKI:  How much more time?
11              MR. WILLIAMS:  I think the ten minutes will still
12      work.
13              SPECIAL MASTER ESSHAKI:  Let's reconvene at 11:15.
14      All right.
15              (At 10:48 a.m., brief recess.)
16                        —   —   —
17              (At 11:16 a.m. proceedings reconvene.)
18              SPECIAL MASTER ESSHAKI:  Back on the record with
19      respect to the matter we just heard.  I understand there are
20      some questions that need clarification.  Mr. Williams?
21              MR. WILLIAMS:  Yes, Your Honor.  Thank you.  There
22      are a couple points we want to clarify.
23              The first one we are going to talk about concerns
24      the cost issues.  First, as to your ruling that the parties
25      would bear a certain percentage of the cost of the
```

Hearing before the Special Master - December 9, 2016

1    depositions, of the 30(b)(6) depositions, we wanted to ask to

2    clarify, what does that extend to?

3            SPECIAL MASTER ESSHAKI:  That includes --

4            MR. WILLIAMS:  Is that the actual deposition or --

5            SPECIAL MASTER ESSHAKI:  That includes the employee

6    time for participating and it includes obviously the

7    transcripts, and it includes the legal fees incurred in

8    preparing the witness to testify at 60 percent.

9            MR. WILLIAMS:  Your Honor's ruling all fees

10   incurred to prepare the witness to testify and counsels'

11   attendance at the deposition?

12           SPECIAL MASTER ESSHAKI:  Yes.

13           MR. WILLIAMS:  Okay.  The second aspect of this,

14   and this relates both to what you just described as well as

15   cost of production, we believe it would be appropriate that

16   the parties have an opportunity to review --

17           SPECIAL MASTER ESSHAKI:  Counsel, did I say that

18   was outside legal fees, I believe?  Let me just check my

19   notes on the 30(b)(6) deps.  I didn't say but I meant that to

20   be outside legal fees.

21           MR. WILLIAMS:  Thank you.

22           SPECIAL MASTER ESSHAKI:  Outside counsel fees.

23           MR. WILLIAMS:  The parties request as to both this

24   and as to the vendors' cost that we should have an

25   opportunity to review --

1    SPECIAL MASTER ESSHAKI:  The reasonableness.

2    MR. WILLIAMS:  -- the reasonableness and comment on

3    those, rather than simply submitting a bill.

4    And then a related point as to the vendors and

5    production cost, to the extent this has not yet been done, in

6    all the cases IPP reviewed in preparing for today where this

7    issue has come up, the serving party if costs were shifted

8    had some opportunity to evaluate proposals and have input

9    into what was done and how it was done, and we think in this

10   instance all of our firms routinely retain the same types of

11   discovery vendors that the OEMs will probably be seeking.  We

12   would like the opportunity before any contracts are signed to

13   be part of that process because it might be, for example, if

14   they all need to do it we can secure one vendor to do it for

15   all of them at a cost savings, and we think we should be

16   given that opportunity.

17   SPECIAL MASTER ESSHAKI:  That's reasonable, and I

18   will accept that, and when we draft the order please insert

19   that.  When I referenced the fees and costs of the 30(b)(6)

20   deps or the fees and costs of the production I mean the

21   reasonable fees and costs, and I agree that if there are

22   going to be outside vendor contracts issued that you have the

23   right to participate in establishing the reasonableness of

24   those fees, and also with respect to the charges for internal

25   employees you need to be advised in advance.

```
 1            MR. WILLIAMS:  Thank you, Your Honor.

 2            SPECIAL MASTER ESSHAKI:  Anyone else have an issue?

 3    Yes, sir, please identify yourself for the record.

 4            MR. ELLIS:  Abram Ellis on behalf of Standard

 5    Electric and the Diamond Electric defendants.

 6            One point of clarification, Your Honor, on the

 7    extra confidentiality protections you have granted the OEMs.

 8    We certainly don't want to take any action, assuming you are

 9    not suggesting that the protective order that is already in

10    place is insufficient to cover, for example, the parties' own

11    confidentiality.  We, of course, have produced sensitive

12    documents, the plaintiffs have and plaintiffs will be

13    producing sensitive documents, the defendants and we are all

14    comfortable, of course, with the protective order in place.

15    In light of that, some of the OEMS have already been

16    producing documents pursuant to the protective order, and our

17    operating assumption is that those documents have sufficient

18    protection already and that those categories of documents

19    that have already been produced are not in need of this extra

20    protection.

21            SPECIAL MASTER ESSHAKI:  You are absolutely

22    correct.  This is a, quote, crown jewel extra security

23    precaution for the pricing information.

24            MR. ELLIS:  Thank you.

25            SPECIAL MASTER ESSHAKI:  Mr. Wolfson?
```

1    MR. WOLFSON:  Thank you, Special Master.

2         Just on this provision about the input into what

3    document vendors the OEMs chose, I just want to make sure

4    that we have the ability to choose the vendor of our choice.

5    There are some vendors that may not be involved in this case

6    but the OEMs use on a regular basis, but the parties can have

7    some input perhaps into the pricing for that or just say we

8    think it is reasonable or unreasonable.

9         SPECIAL MASTER ESSHAKI:  You will have the ultimate

10   say-so, on the other hand if they can beat the price with a

11   reputable company then you have to match the price because

12   I'm sure General Motors can command the lowest price in town

13   on document reproduction.

14        MR. WOLFSON:  Just want to make sure we have that

15   authority.

16        SPECIAL MASTER ESSHAKI:  Is that acceptable,

17   Mr. Williams?

18        MR. WILLIAMS:  Yes, Your Honor.

19        SPECIAL MASTER ESSHAKI:  You are doing the orders,

20   Mr. Hemlock, you are doing the orders, three of them?

21        MR. HEMLOCK:  I don't know that we --

22        SPECIAL MASTER ESSHAKI:  Well, yes, three orders.

23        MR. HEMLOCK:  Yes.  We were going to take on two of

24   them.  We will figure it out, Your Honor.

25        SPECIAL MASTER ESSHAKI:  Ms. Romanenko is doing 31?

Hearing before the Special Master - December 9, 2016

```
1         MS. ROMANENKO:  Correct.

2         SPECIAL MASTER ESSHAKI:  And I asked you to do,

3    one, the general order, two, the crown jewel order, and,

4    three, the data order.

5         MR. HEMLOCK:  We will get them.

6         SPECIAL MASTER ESSHAKI:  Okay.  You can enlist

7    someone to assist you.

8         MR. WILLIAMS:  Thank you.

9         SPECIAL MASTER ESSHAKI:  Yes, Ms. Romanenko.

10        MS. ROMANENKO:  Your Honor, just on request

11   number 31, I want to very quickly address the issue of timing

12   of production.  We would like to request 30 days, we think

13   that's more time than, for instance, sometimes defendants

14   have requested while moving to compel against dealerships.

15        SPECIAL MASTER ESSHAKI:  It will be fine to give it

16   to you for 30 days, absolutely, but I can anticipate you are

17   going to be arguing this in January before Judge Battani.

18        MS. ROMANENKO:  Thank you.

19        SPECIAL MASTER ESSHAKI:  All right.  Can we now

20   take the parties and adjourn into the jury room and have our

21   court reporter join us.

22        (At 11:22 a.m., brief recess.)

23                    —   —   —

24        (At 11:26 a.m. proceedings reconvene.)

25        SPECIAL MASTER ESSHAKI:  This is a continuation of
```

Hearing before the Special Master - December 9, 2016

67

```
 1    our motion hearing on the parties' motions to compel
 2    production of documents from the original equipment
 3    manufacturers.
 4          I have made an overarching ruling on this motion,
 5    and now we are going to address on an OEM-by-OEM basis a
 6    particular order involving that OEM and the moving parties.
 7    These discussions grew out of the mediation sessions that
 8    occurred yesterday, and in some instances back in November.
 9          So who would like to -- we are starting with
10    General Motors.  Who would like to start with General Motors?
11    I have in front of me an outline of category of documents and
12    the positions of the parties.
13          Sir, please identify yourself.
14          MR. KLEIN:  Sheldon Klein, counsel for Tokai Rika
15    parties, and here speaking on behalf of the defendants and
16    other parties.
17          SPECIAL MASTER ESSHAKI:  Okay.
18          MR. KLEIN:  I'm glad to report we have an agreement
19    on all terms.  After discussing on the term sheet or whatever
20    we are going to call the document there was one open issue,
21    but I spoke with Mr. Wolfson after your ruling this morning
22    and he believes, and I concur, that that issue was
23    essentially resolved in light of your issues -- in light of
24    your ruling.  I don't know if you want us to read this into
25    the record or --
```

Hearing before the Special Master - December 9, 2016

68

1          SPECIAL MASTER ESSHAKI:  No, no.  Mr. Wolfson

2     though is anxious to speak.

3          MR. WOLFSON:  Yes, just one issue on that.  The

4     profitability summary reviews are the pricing methodology

5     documents, and this is -- sorry, I wanted to address one

6     issue with that.

7          The -- they are not centrally kept, they are kept I

8     believe the testimony established by a custodian, so I think

9     what we need to work out is how we go about finding them if,

10    as again, with respect to the order, if Judge Battani upholds

11    that portion of the order that we have to produce them.

12         SPECIAL MASTER ESSHAKI:  All right.  Let me ask

13    this in order so that we don't have to read this into the

14    record, can we submit this as an exhibit to the record and

15    have it marked confidential, is that acceptable?  That way we

16    will know what it is and the Judge will know what it is, and

17    if there is any dispute it is in the record.  Acceptable,

18    Mr. Klein?

19         MR. KLEIN:  Acceptable to me.

20         SPECIAL MASTER ESSHAKI:  Mr. Wolfson?

21         MR. WOLFSON:  Yes, Your Honor -- or Special Master.

22         SPECIAL MASTER ESSHAKI:  Any other issues you may

23    have, sir?

24         MR. WOLFSON:  That the profitability summary

25    reviews were the only open issue from what I understand.

Hearing before the Special Master - December 9, 2016

1          SPECIAL MASTER ESSHAKI:  Mr. Williams?

2          MR. WILLIAMS:  Well, I have a very small

3     housekeeping point.  Judge Battani has been very concerned

4     that we follow the appropriate procedures for sealing, so I

5     think we will work with you to submit to Judge Battani the

6     findings she will need to make so she can seal the record.

7          MR. KLEIN:  And just for clarity, it will be on

8     page 2 of what was submitted to you, and you will see that

9     for --

10          SPECIAL MASTER ESSHAKI:  We will refer to this as

11     General Motors' Exhibit A.

12          MR. KLEIN.  Okay.  You will see that for each of

13     the boxes we indicate what's agreed, what's not agreed.  What

14     wasn't agreed as of the time we printed up this document is

15     the profitability summary reviews, but I want to make clear

16     that that also -- it is also the monthly pricing review decs,

17     and it is based on your ruling as to the protocol for

18     producing the crown jewels, that's the basis on which we now

19     conclude that it is -- that it is resolved.  Is that fair?

20          MR. WOLFSON:  As to the substance but what I

21     understood is the -- from the ruling that we can't have

22     wholesale custodian searches and that we would negotiate at

23     most a handful, so to the extent that we would do so in order

24     to find these decs that I think is the area of open

25     discussion remaining.

1    MR. KLEIN:  Understood.  That's consistent with the

2  order this morning so --

3    SPECIAL MASTER ESSHAKI:  All right.  Counsel, I

4  appreciate your good work.

5    MR. WOLFSON:  Thank you.

6    SPECIAL MASTER ESSHAKI:  Thank you very much.

7    MR. WOLFSON:  Thank you Special Master.

8    SPECIAL MASTER ESSHAKI:  Do we have any other

9  wholesale agreements that we can take and get off of this

10  docket, or are there contested ones only?

11    MR. HEMLOCK:  Your Honor, I think with respect to a

12  couple of the OEMs we had discussed yesterday the notion of

13  not seeking a ruling today but rather waiting until next week

14  and if we couldn't wrap up the agreement we would put in very

15  brief letter statements.

16    SPECIAL MASTER ESSHAKI:  Correct.

17    MR. HEMLOCK:  So that I think is the case with

18  respect to Toyota and Honda, if I am right.  Any others?  No.

19  So in that regard I don't know how you want to proceed

20  with --

21    SPECIAL MASTER ESSHAKI:  How do we stand with

22  Nissan?

23    MR. ELLIS:  Your Honor, if we were given a few

24  minutes to confer with Nissan's counsel I suspect we will get

25  close to -- we will know if we are at a baked deal or not.

```
 1              SPECIAL MASTER ESSHAKI:  Okay.  Counsel, please

 2    identify yourself.

 3              MR. ELLIS:  I'm sorry.  Abram Ellis, counsel for

 4    Standard Electric and Diamond Electric.

 5              SPECIAL MASTER ESSHAKI:  Do you want to go into the

 6    jury room and ask the Nissan counsel to meet you in the

 7    hallway and --

 8              MR. ELLIS:  I will do that.

 9              SPECIAL MASTER ESSHAKI:  So we will defer on Nissan

10    at this point.  We had an agreement with respect to

11    Honda North America as a result of the November mediation,

12    correct?

13              MR. HEMLOCK:  Well --

14              SPECIAL MASTER ESSHAKI:  We did.

15              MR. HEMLOCK:  I think we thought we maybe did or

16    the parties thought so, but as is sometimes the case I think

17    looking at it more closely some issues arose but, again, I do

18    think that with Honda my colleague --

19              SPECIAL MASTER ESSHAKI:  Counsel, I said Honda

20    North America, not Honda Indiana of America.

21              MR. HEMLOCK:  Oh, I'm sorry --

22              MS. METZGER:  It is Subaru of --

23              SPECIAL MASTER ESSHAKI:  I'm so sorry.  My fault.

24              MR. HEMLOCK:  Subaru of America we are done.

25              SPECIAL MASTER ESSHAKI:  And we are moving towards
```

Hearing before the Special Master - December 9, 2016

1    an order?

2            MR. HEMLOCK:  On Subaru of America I believe that's

3    the case.

4            MR. AMATO:  Subaru of Indiana.  I'm Jeffery Amato.

5            SPECIAL MASTER ESSHAKI:  Mr. Amato, yes, I'm aware

6    that Subaru of Indiana is here and they need to be addressed,

7    but in November as a result of the mediation we reached I

8    believe an agreement with Subaru of America.

9            MR. AMATO:  That's right, and I don't think that

10   their counsel --

11           SPECIAL MASTER ESSHAKI:  They are not even here,

12   but I'm asking -- inquiring are we working towards an order

13   on them?

14           MR. AMATO:  Yes, we can submit it.

15           SPECIAL MASTER ESSHAKI:  Okay.  All right.

16           MR. HEMLOCK:  So in light of that I don't know if

17   Chrysler might be the next appropriate --

18           SPECIAL MASTER ESSHAKI:  Yes.  So you told me that

19   Nissan is going to need a few more minutes and you told me

20   that it is Honda and Toyota that may have an open issue and

21   we will get to a letter format if we have to.

22           MR. HEMLOCK:  Exactly.

23           SPECIAL MASTER ESSHAKI:  Okay.  Can somebody ask

24   the representative of Honda to please join us?

25           Mr. Hemlock, I did not mean to make you my errand

Hearing before the Special Master - December 9, 2016

1    boy.  I apologize.

2            MR. HEMLOCK:  I have done worse.

3            SPECIAL MASTER ESSHAKI:  I can't tell you how many

4    cups of coffee I made as an associate.  In those days we had

5    percolating pots too.

6            MR. HEMLOCK:  I can't tell you how many I drank.

7            SPECIAL MASTER ESSHAKI:  Counsel, please identify

8    yourself.

9            MR. PURCELL:  Yes, sir.  Dan Purcell from Keker &

10   VanNest for the Honda entities.

11           SPECIAL MASTER ESSHAKI:  And do we have an outline?

12           MR. ROWE:  Yes, Your Honor.  David Rowe for Sanden

13   International USA on behalf of the requesting parties to

14   address the Honda issues.

15           SPECIAL MASTER ESSHAKI:  Okay.  Do we have a copy

16   of an outline for me?

17           MR. ROWE:  We do, Your Honor.  And to get

18   Mr. Purcell up to speed, because I don't think he was in the

19   courtroom a few minutes ago, we discussed, Dan, attaching

20   these outline notes to the record so that it will be more

21   clear what the parties are agreeing on.

22           SPECIAL MASTER ESSHAKI:  But only as a sealed

23   exhibit and we know we have to go through the hoops to make

24   them a sealed exhibit.

25           MR. PURCELL:  That's fine.  I mean, I do think that

Hearing before the Special Master - December 9, 2016

1   what was agreed by the parties in the course of mediation, I

2   assume Your Honor is going to -- Special Master is going to

3   essentially make that part of a written order directing Honda

4   and the other OEMs to comply with what was agreed.

5           SPECIAL MASTER ESSHAKI:  I am expecting that the

6   parties will draft an order as to each specific OEM, that the

7   OEM will sign off on the order at least as to form, I will

8   have the order entered and we will have to again I believe

9   make it subject to confidentiality, seal it, and then it will

10  be subject to your right to appeal or the moving party's

11  right to appeal.

12          MR. PURCELL:  That was one thing I wanted to check

13  on and it sounds like that that's -- we are all on the same

14  page, that it will be appealable.  My client is a little

15  uncomfortable with something that's agreed to in mediation

16  and sort of losing the force of an appeal, we don't want to

17  be waiving our right to appeal something to Judge Battani

18  just because it was an accommodation that we reached in

19  mediation.

20          MR. ROWE:  We are okay making it into a form of an

21  order compelling Honda to produce documents subject to the

22  agreements we have reached in a compromised effort, and, Dan,

23  to give you -- Mr. Purcell, to give you some additional

24  comfort, my idea of attaching the outline to the record is

25  simply to inform the parties' ability to draft the final

Hearing before the Special Master - December 9, 2016

1    order.  I don't envision this as some sort of formal

2    stipulation at this point that we would necessary be stuck

3    with.

4            SPECIAL MASTER ESSHAKI:  I understand that it is

5    not a formal stipulation that either side is stuck with, but

6    having participated in the mediations yesterday from my

7    perspective it is my decision, I'm exercising my discretion,

8    to adopt that as my order.

9            Mr. Williams?

10           MR. WILLIAMS:  I apologize if the response to your

11   question was pending.  I would like to ask counsel for Honda

12   through the Court, to the extent an agreement was reached in

13   mediation that would have provided more than the Special

14   Master ruled today, if you could advise, does that mean you

15   will maintain the agreement you made in the mediation with

16   us?

17           MR. PURCELL:  We are not expecting to be appealing

18   something that we have agreed to, it is just a question of

19   mediation is a little bit different context from a contested

20   motion and so I assume that both sides would retain their

21   right to appeal any aspects of the Court's order.

22           MR. WILLIAMS:  Thank you, Counsel.

23           SPECIAL MASTER ESSHAKI:  All right.  Counsel, you

24   have an outline for me?

25           MR. ROWE:  I do, Your Honor.  And based on further

1    discussions with Mr. Purcell this morning I believe it will

2    be prudent to note just a few changes to the written outline

3    that I had given to you, also in light of the rulings that

4    you issued this morning.

5         Looking at -- do we need to mark that as an

6    exhibit?

7         SPECIAL MASTER ESSHAKI:  We are going to call this

8    FCA -- no, Honda Exhibit A but it is not going to go into the

9    record physically until the sealing has been completed.

10        MR. ROWE:  Okay.  Understood.  In an attempt to be

11   a little more clear then, referring to Honda Exhibit A, on

12   page 1, the first category under purchase and procurement

13   documents --

14        SPECIAL MASTER ESSHAKI:  Yes.

15        MR. ROWE:  -- discussing the transactional purchase

16   data, and you will see that Honda had agreed that either has

17   or will produce its -- what it considered its live accounts

18   payable data and it estimated it had about three years worth.

19        In light of the Court's ruling this morning that

20   legacy systems that had reasonably accessible data would also

21   be produced, Honda will be producing older data from those

22   legacy systems to the extent that it can reasonable restore

23   and produce that data.

24        Did I get that right, Mr. Purcell?

25        MR. PURCELL:  You did.

1      MR. ROWE:  And the next category under the APR

2  related documents?

3      SPECIAL MASTER ESSHAKI:  Yes.

4      MR. ROWE:  Actually it would be the rebate

5  information.

6      SPECIAL MASTER ESSHAKI:  Yes.

7      MR. PURCELL:  I think that's included in the APR

8  related document section of the chart.

9      MR. ROWE:  Yes.

10      SPECIAL MASTER ESSHAKI:  It is the first box, Honda

11  will produce live data showing rebates paid to Honda by AVRP

12  and bearing suppliers.

13      MR. ROWE:  Yes.  And we had said that there was an

14  open item on whether Honda could access older data.

15  Mr. Purcell reports that Honda's older data would fall within

16  the category of your order announced this morning that does

17  not have to be produced, and so I just wanted to get that on

18  the record to note that that's no longer an open item.

19      SPECIAL MASTER ESSHAKI:  Very good.  Thank you.

20      MR. ROWE:  There is also reference to a database,

21  the cost management system database.  We had said it was an

22  open item where Honda was going to give us a representative

23  sample, and then the requesting parties would look at that

24  representative sample and determine whether they needed more

25  data from that database.  Honda is representing that the data

Hearing before the Special Master - December 9, 2016

78

1    that is in the CMS database is duplicative of the e-quote

2    database.

3         SPECIAL MASTER ESSHAKI:  I heard that yesterday.

4         MR. ROWE:  Except for -- perhaps for some bills of

5    material that would be in the CMS database that are not in

6    the e-quote database.  Having had that discussion with

7    Mr. Purcell this morning, speaking only for

8    Sanden International, I don't think we need the CMS database

9    but just because of logistics I haven't had a chance to speak

10   with the other serving parties, and not to get us too

11   sidelined but if we could spend 30 seconds to see if we can

12   make an agreement on that or if we need to leave it as an

13   open item, that would be helpful.

14        SPECIAL MASTER ESSHAKI:  Off the record?  Do you

15   want to go talk to them?

16        (An off-the-record discussion was held at

17        11:42 a.m.)

18        SPECIAL MASTER ESSHAKI:  Counsel, back on the

19   record.

20        MR. PURCELL:  Yes.  So we have reached an

21   accommodation on the CMS database.  The non-duplicative part

22   of that database, which is the bill of materials, the parties

23   are going to get us a list of models for which they want a

24   bill of materials and Honda will produce a bill of material

25   for those models from the CMS database.

Hearing before the Special Master - December 9, 2016

```
 1              SPECIAL MASTER ESSHAKI:  All right.  Any other

 2    issues?

 3              MR. ROWE:  There is an open item on the CSS

 4    database, the cost simulation system.  Honda has already

 5    produced data from full model changes.  In the outline we

 6    gave you there is an open issue as to whether we want or need

 7    data from mid-model changes, and the requesting parties are

 8    close to agreeing that we don't need the mid-model changes

 9    but the counsel for EPPs are checking on one thing literally

10    at this moment, so if we can give it another minute then we

11    can report on that.

12              SPECIAL MASTER ESSHAKI:  We can go back off the

13    record.

14              MR. PURCELL:  Well, actually there are a couple

15    issues we can address while we wait for that.

16              SPECIAL MASTER ESSHAKI:  Sure.

17              MR. PURCELL:  So we heard Your Honor's comments and

18    rulings in the discussion this morning about the crown jewel

19    pricing information.  For Honda this is the share drive we

20    were talking about yesterday which has the pricing milestone

21    documents, and yesterday we had agreed as a compromise to

22    produce the pricing milestone documents for the latest

23    full-model change I guess for the Civic or the Accord, one or

24    the other, it is in my notes.  We would be willing to produce

25    the pricing milestone documents for full-model changes to the
```

Hearing before the Special Master - December 9, 2016

1    extent that we have it, but we would like to draw the line

2    there.

3            We would like to not produce the rest of the share

4    drive which contains a whole bunch of other irrelevant

5    documents related to design changes, that also has some more

6    trivial documents related to the mid-model changes where they

7    are really not revisiting very much about the model and

8    really not changing the price other than to account for

9    inflation and things like that.

10            SPECIAL MASTER ESSHAKI:  Counsel?

11            MR. ROWE:  Again, speaking only for Sanden because

12    I haven't had a chance to speak to the other requesting

13    parties, we are okay with that proposal except we would add

14    another request; there was the vehicle invoice breakdown

15    document that Mr. Yumenoto testified to in his deposition, so

16    our proposal would be --

17            THE COURT REPORTER:  I'm sorry.  The name --

18            MR. PURCELL:  It is Y-U-M-E-N-O-T-O.

19            SPECIAL MASTER ESSHAKI:  Please, just to make sure

20    the record is clear, start this over.

21            MR. ROWE:  Yes, Your Honor.  So, again, speaking

22    for Sanden International, because I haven't had a chance to

23    speak to my colleagues, Sanden would be okay with accepting

24    Honda's proposal for the PowerPoints for all of the models,

25    full model changes on all of the checkpoints along the way,

1    plus we would also ask for a document that Barren Yumenoto

2    described as a vehicle invoice breakdown, which is some sort

3    of spreadsheet, so if we could get both of those Sanden would

4    be happy but we need to check with my other colleagues to see

5    if that's a deal that the requesting parties can make as a

6    whole.

7           SPECIAL MASTER ESSHAKI:  Can you live with that?

8           MR. PURCELL:  I think it depends on the extent to

9    which they are going to ask for additional things.  I would

10   hate to open the door and then have a truckload of cattle

11   barge through it, that is something we can consider.

12          SPECIAL MASTER ESSHAKI:  Other issue.

13          MR. PURCELL:  It is a bad metaphor, I know.

14          So there was a mention in the chart of additional

15   30(b)(6) depositions, we don't think that's appropriate or

16   necessary, we don't think that they have identified any other

17   cost documents or data that they need or that could exist

18   beyond what we have already agreed to produce, which is

19   basically America Honda's purchasing data when it buys the

20   car from the factory and then the sales data when it sells

21   cars to the dealer, that's at the VIN level, we have agreed

22   to produce that.  So in the absence of any real showing or

23   even articulation of other information that they need beyond

24   that, a 30(b)(6) depo doesn't seem appropriate to us.

25          MR. ROWE:  The requesting parties as of yesterday

Hearing before the Special Master - December 9, 2016

82

1    still were listing this as an open item, and I don't have

2    anything else to report to you on that.

3                    SPECIAL MASTER ESSHAKI:  All right.

4                    MR. PURCELL:  And one more thing, and I think this

5    is going to take the sting out of the disagreement we had

6    yesterday about the information that the dealer self reported

7    to us.  Again, I don't think this is anywhere near a complete

8    data set, but in a minority of cases dealers do self report

9    sales data to Honda.  I am told that that really doesn't have

10   personal identifying information such as the name of the

11   purchaser, the address, it really is just the model and the

12   sales price, and there may be a VIN associated.  If that's

13   the case, if the Court orders us to do that we would produce

14   that.  Our dealers very much don't want us to so we do object

15   to that, but we understand if the Court orders us to do it we

16   will, and it doesn't seem like we will need to redact any

17   personal information.

18                   SPECIAL MASTER ESSHAKI:  You have put a smile on

19   Ms. Romanenko's face.

20                   Ms. Romanenko.

21                   MS. ROMANENKO:  Your Honor, yesterday you mentioned

22   giving us a short period for dealerships to object if they

23   did not want the data to be produced, so I think that would

24   be appropriate.

25                   MR. PURCELL:  I didn't mean to forget about that,

1    we would like to have ten days or some reasonable period of

2    time to notify our dealers and give them a chance to speak

3    up.

4            SPECIAL MASTER ESSHAKI:  Counsel, with respect to

5    this one, before we get to Mr. Williams, which is produce the

6    dealer reported data, does not contain personal information,

7    provide the dealer ten days notice to object and be heard on

8    that?

9            MR. ROWE:  Yes, that's fine with the requesting

10   party.

11           SPECIAL MASTER ESSHAKI:  Mr. Williams?

12           MR. WILLIAMS:  Sorry to belabor it, I think I would

13   agree as for the order, but if it doesn't have this

14   information that is asserted to be subject to protection then

15   if I could just inquire what is it that they are being given

16   an opportunity to object to?  Information is being produced

17   by the OEMs that is pursuant to a protective order so I don't

18   know what it is that we are protecting now.

19           MR. PURCELL:  We have contractual relationships

20   with and obligations to our dealers.  Our dealers consider

21   this to be extremely private and confidential information for

22   reasons of their own.  They are not here other than through

23   counsel that represents a small minority of them.  We don't

24   want to run afoul of any contractual obligation or just

25   frankly dealer relationship obligations, and it seems like a

1   very modest request to get a small period of objection.  If

2   Mr. Williams is right and there is not any personal

3   identification information, the dealers probably won't object

4   or the objection would be overruled and the material would be

5   produced.

6           MR. WILLIAMS:  Okay.

7           SPECIAL MASTER ESSHAKI:  Let's give them the right

8   to object, sir.  Anything else?

9           MR. PURCELL:  I think other than the one open issue

10  that's it -- or the one remaining issue to be --

11          SPECIAL MASTER ESSHAKI:  Well, I think there were

12  three; the one that they were discussing in the hallway and

13  two more you identified that was acceptable to your client

14  but you had to check and --

15          MR. PURCELL:  Right.  I was referring to the one

16  that Ms. Smedley was checking on where we don't know yet

17  whether there is a dispute, the mid-model changes.

18          SPECIAL MASTER ESSHAKI:  Counsel, please identify

19  yourself.

20          MR. SHOTZBARGER:  Williams Shotzbarger for the

21  truck and equipment dealer plaintiffs.

22          One bigger open issue, at least from our

23  perspective, is the issue of all-terrain vehicles and

24  side-by-side vehicles that are manufactured and/or sold by

25  Honda.  I'm willing to argue that now while we wait on

Hearing before the Special Master - December 9, 2016

1    clarification as to the other issues.

2             SPECIAL MASTER ESSHAKI:  I want to see if I have an

3    agreement here first.

4             MR. SHOTZBARGER:  Sure.

5             MR. WILLIAMS:  I'm not sure if it is my turn, but

6    if I could comment on the outstanding item, this is what we

7    are told to this point, we can't agree to give it up, we are

8    going to verify if we have access to different ways that

9    would give us the ability to agree to that but we are not

10   able to do that yet, so we can't agree to eliminate the VIN

11   models.

12             MR. SHOTZBARGER:  Did you say can?

13             MR. WILLIAMS:  Cannot agree to eliminate the VIN

14   models but we are trying to see if we may be able to through

15   other means accommodate that request.

16             SPECIAL MASTER ESSHAKI:  And how long do we think

17   it will take to identify that?

18             MR. WILLIAMS:  About 10 or 15 minutes.

19             SPECIAL MASTER ESSHAKI:  All right.  Why don't we

20   just sit down, maybe I need to hear from truck and equipment

21   dealers, and then we'll come back if we have it.  If we don't

22   then we will go -- I saw counsel who was negotiating with

23   Nissan come back in the courtroom and he was smiling so I

24   don't know if he's got indigestion or if we have reached an

25   agreement.

Hearing before the Special Master - December 9, 2016

1    MR. ELLIS:  They are not mutually exclusive, but we

2  need -- we'll be ready in about 30 minutes Your Honor.

3    SPECIAL MASTER ESSHAKI:  Okay.  Very good.  Okay.

4  Let's talk to the truck and equipment dealers.  Identify

5  yourself again, Counsel.

6    MR. SHOTZBARGER:  Williams Shotzbarger of

7  Duane Morris for the truck and equipment dealers.

8    Special Master, we request that Special Master

9  order that all-terrain vehicles and side-by-side vehicles

10  that are manufactured and sold by Honda sold in the United

11  States are relevant to our cases, and that you order the

12  production of documents with regard to those vehicles.

13  Throughout the meet-and-confer process Honda has refused to

14  acknowledge that these vehicles are part of our cases, the

15  parties are at an impasse and this is ripe for decision by

16  you today.

17    SPECIAL MASTER ESSHAKI:  Are they within the

18  definition of the parts or the vehicles involved in the

19  complaints?

20    MR. SHOTZBARGER:  It is our position that they are.

21  That definition within the subpoena, the definition of

22  vehicle, it appears in paragraph number 22, it specifically

23  mentions agricultural equipment, and that phrase appears --

24  in addition to the subpoena in the definition of vehicle that

25  phrase appears in our wire harnesses, bearings and occupant

Hearing before the Special Master - December 9, 2016

1    safety systems complaints.  Further than that, in our

2    radiators and starters and alternators complaint we

3    specifically say agricultural equipment including ATVs

4    designed and/or marketed for agricultural use.  And if I may

5    approach, I have a picture which I would like to mark.

6              SPECIAL MASTER ESSHAKI:  Please do.

7              MR. SHOTZBARGER:  I'd like to mark this as Honda

8    Exhibit B.

9              SPECIAL MASTER ESSHAKI:  Okay.

10             Special Master, this is a picture of a

11   side-by-side, the 2015 Honda Pioneer.  This image was taken

12   off of -- you can see at the bottom hondanews.com, that's an

13   official Honda website where they release press releases and

14   images such as this one used for marketing and otherwise how

15   they can sell these vehicles.

16             Now, just so the record is clear, this vehicle

17   appears to be in a barn, there are bales of hay next to it,

18   and it is pretty clear in the back of it that Honda is

19   marketing these vehicles to farmers, to ranchers, to all

20   kinds of people who although the vehicle is not specifically

21   on a road that's in the definition of vehicle, the definition

22   of vehicle in the subpoena specifically says agricultural

23   equipment.

24             We have tried to meet and confer with Honda on this

25   issue, we wrote them a letter and we never got a formal

Hearing before the Special Master - December 9, 2016

1    response, we brought this up on calls.  We do not have any

2    information about the burden associated with Honda's

3    production of these vehicles.  What we do know is that they

4    are sold by America Honda Motor Company, they are subject to

5    the subpoena, they are the only Honda entity that sells

6    vehicles in the United States, so we know they are the ones

7    selling these vehicles, and because truck and equipment

8    dealers are a serving party to the subpoena we would

9    respectfully request that you order the production of

10   documents and data related to Honda sale of these vehicles in

11   the United States.

12          SPECIAL MASTER ESSHAKI:  I heard you say three

13   times agricultural all-terrain vehicles?

14          MR. SHOTZBARGER:  Agricultural equipment.

15          SPECIAL MASTER ESSHAKI:  This does not involve

16   recreational all-terrain vehicles?

17          MR. SHOTZBARGER:  We would submit it does, and

18   similarly to these side-by-sides, there are also marketing

19   materials where we have seen the all-terrain vehicles are

20   marketed to ranchers and to farmers.  I recall a discussion

21   the parties had last night about this issue, and certain

22   serving parties have these vehicles to get around their farms

23   and ranches.

24          SPECIAL MASTER ESSHAKI:  You see the commercial of

25   the all-terrain vehicles where people go off-roading in an

Hearing before the Special Master - December 9, 2016

1    ATV.  Is that included in your request?

2              MR. SHOTZBARGER:  It is.

3              SPECIAL MASTER ESSHAKI:  Are those vehicles being

4    produced and sold by Honda?

5              MR. SHOTZBARGER:  Yes, that's within our request.

6    We would submit that those vehicles are also used on farms

7    and ranches.  These vehicles, like we said in our radiators

8    complaint, our starters and alternators complaint, they are

9    designed and/or marketed for agricultural use, and I think

10   this exhibit is just one instance of that that clearly shows

11   that Honda does market these vehicles for those uses.

12             SPECIAL MASTER ESSHAKI:  Mr. Purcell.

13             MR. PURCELL:  So starting with the definition of

14   vehicle in the subpoena, which is controlling here, the first

15   sentence talks about vehicles that are made for use on the

16   road, that would exclude ATVs and side-by-sides.  The second

17   sentence of the vehicle definition talks about certain

18   specific categories of vehicles and then has a catchall, and

19   other similar vehicles at the end of it, and I think that's

20   what counsel is relying on but, of course, Your Honor is

21   right, most ATVs and side-by-sides are not made intended use

22   for agricultural purposes, they are used for recreational

23   purposes.  There is certainly nothing in the subpoena that

24   relates to recreational vehicles or would bring those

25   vehicles within the scope of the subpoena, and it would be

Hearing before the Special Master - December 9, 2016

90

1   pretty difficult for Honda to disentangle which ATVs are used

2   for recreational purposes versus agricultural purposes.

3   Honda doesn't know that.  Honda certainly also markets these

4   vehicles for recreational purposes, that's what people

5   typically think of when they think of ATVs.

6          A little bit about the burden and about the

7   significance of this data.  The burden on Honda here is

8   significant because these vehicles are managed and the data

9   about their manufacture is kept in a different Honda

10  facility.  It is not kept in Ohio with North American

11  purchasing, it is kept, I believe, in North Carolina at a

12  separate Honda facility so you are dealing with different

13  personnels, different systems, and it would be an entirely

14  new process to try to investigate those systems and how they

15  are maintained, and really this is a de minimus amount of

16  commerce.  Honda has sold 4 million ATVs and side-by-sides

17  since 1989, so we are not talking about something that is

18  going to be driving any economic analysis here, this is

19  really a rounding error in terms of any regression and in

20  terms of any calculation of passthrough or damages.

21         So we think as far as striking a balance between

22  the substantial efforts Honda has already undertaken to

23  produce a reasonable amount of documents and the burden on

24  Honda, we think that in striking that balance the request for

25  ATV and side-by-side information should be denied.

Hearing before the Special Master - December 9, 2016

91

    1            SPECIAL MASTER ESSHAKI:  Counsel, are you in the
    2    anti-vibrational rubber parts and bearing cases?
    3            MR. SHOTZBARGER:  We are in bearings, we are not in
    4    anti-vibrational rubber parts.
    5            SPECIAL MASTER ESSHAKI:  All right.  Your response?
    6            MR. SHOTZBARGER:  First, with regard to the
    7    definition, counsel is right, we are relying on that catchall
    8    that comes at the end, other such vehicles, that's one.
    9    However, like I had said, agricultural equipment is
   10    specifically within the definition in paragraph 22 in the
   11    subpoena.
   12            Second, with regard to the burden, this is the
   13    first time I have ever heard from Honda regarding the burden.
   14    We have been trying to meet and confer with them, we sent
   15    them letters, we never got responses.  We got one
   16    one-paragraph e-mail saying that it wasn't within the
   17    definition.  So to the extent that Honda wants to argue about
   18    burden today, I would submit that that should be excluded
   19    from Your Honor's consideration because this is the first
   20    time we've even gotten this information from Honda that they
   21    should have been giving us throughout the several, several
   22    months stemming from when we were here in March and when we
   23    are here today.
   24            Third, with regard to the allegation that this is
   25    de minimus, the truck and equipment dealer plaintiffs, we

Hearing before the Special Master - December 9, 2016

```
1    have evidence that these vehicles were affected by the

2    conspiracies that are at issue in these parts cases, so we

3    would submit that regardless of how many we brought claims on

4    behalf of these affected dealers who are injured and damaged

5    and so therefore they could not be more relevant to our

6    cases, that's why we specifically put ATVs in our complaint

7    and side-by-sides because we know that they are relevant.

8               SPECIAL MASTER ESSHAKI:  All right.  Thank you very

9    much, Counsel.

10              Again, I'm in a position where I have to exercise

11   discretion, and I'm going to exercise discretion in favor of

12   ordering discovery for the ATVs, agricultural and

13   recreational.  So, Counsel, I'm going to need you to prepare

14   a special order on that and you can piggyback on the existing

15   Honda order that simply says that with respect to this order

16   it has been extended to agricultural and recreational

17   vehicles.

18              MR. SHOTZBARGER:  Just one clarification, ATVs and

19   side-by-sides?

20              SPECIAL MASTER ESSHAKI:  And side-by-sides, yes.

21   Thank you.

22              MR. SHOTZBARGER:  Thank you.

23              SPECIAL MASTER ESSHAKI:  Counsel?

24              MR. ROWE:  Your Honor, very quickly, we were

25   discussing whether we can cut a deal on taking for pricing
```

Hearing before the Special Master - December 9, 2016

93

 1   the checkpoint PowerPoint slides.  Not all of my colleagues

 2   are prepared to do that, so we want to leave it as is in the

 3   chart where it is an open item and we will get samples and

 4   then come back and let Honda know --

 5        SPECIAL MASTER ESSHAKI:  All right.  I'm going to

 6   need a closing date on that where if it is not -- just like

 7   we were suggesting for some of the other parties, we have

 8   some open issues, we can't simply leave the issues open, I'm

 9   going to need a closing date, and if you have not resolved it

10   by that date certain what I am suggesting and requesting, you

11   don't have to adhere to my request, is that you give me a

12   short letter on the open issue that has not been resolved and

13   I will resolve it by a -- on the papers as opposed to coming

14   back for a hearing.  Is that acceptable?

15        MR. ROWE:  That's acceptable.

16        SPECIAL MASTER ESSHAKI:  Honda?

17        MR. PURCELL:  One issue I see with that, Your

18   Honor, because these are the crown jewel information that we

19   have been talking about that is going to be subject to this

20   restrictive production, it is not clear to me how counsel are

21   going to evaluate this information and whether it is

22   significant enough and certainly how long will that take.  I

23   mean, there is the appeals process, and I don't know whether

24   this information is going to be produced as far as set that

25   date certain that I think we all agree it would be a good

Hearing before the Special Master - December 9, 2016

1    thing to get this wrapped up.

2         SPECIAL MASTER ESSHAKI:  Well, let me suggest that

3    what I am hearing is that with respect to the moving parties

4    there is not an agreement on whether this information should

5    be -- the information should be substituted -- the

6    agreed-upon information should be substituted across the line

7    of the moving parties, so I would assume that you are either

8    going to be able to get agreement or not within ten days, and

9    that I could have something in my hands within ten days

10   describing for me what the issue is and I can resolve it in

11   writing before you get to Judge Battani, which I think will

12   occur probably the middle of January.

13        MR. PURCELL:  From my perspective, given the detail

14   that the witness went into at the deposition about these

15   documents and what's in them and how they do trace the

16   evolution of MSRP and any impact that cost has on the

17   evolution of MSRP, that seems reasonable to me.  If the

18   holdup is the production of these, and I always forget what

19   they are called, the vehicle --

20        MR. ROWE:  Vehicle invoice breakdown.

21        MR. PURCELL:  Correct, that's something I could

22   take a minute and confer with counsel about if that's the

23   holdup.  If they are looking for something beyond that Honda

24   would object to that, so I think we would need a ruling on

25   that.

1      MR. ROWE:  The moving parties are just asking for

2  representative samples of the checkpoint PowerPoints and

3  representative samples of the vehicle invoice breakdown so

4  that -- and the goal, honestly, Your Honor, is to confirm for

5  ourselves that this would be sufficient information and we

6  won't need anything else, and we think that we can do that

7  analysis within the ten days that you've proposed.

8      MR. PURCELL:  The question I have is how are these

9  documents going to be produced in light of Your Honor's not

10 yet entered but oral order about security measures taken for

11 price-setting documents?

12     SPECIAL MASTER ESSHAKI:  Suggestions on that?

13     MR. ROWE:  Well, I believe we were going to

14 nominate firms, and so we could just have -- we would speed

15 up our nomination of the firms, and then Honda would produce

16 directly to those select firms.

17     MR. WILLIAMS:  So treated as if the order that you

18 said you would enter had been entered.

19     SPECIAL MASTER ESSHAKI:  Had been entered.  All

20 right.

21     MR. PURCELL:  We can do that.  Are there other

22 issues that are still hanging here with Honda?

23     MR. ROWE:  From our perspective everything is as

24 reflected in the outline.

25     SPECIAL MASTER ESSHAKI:  Define our, who is our?

Hearing before the Special Master - December 9, 2016

```
 1          MR. ROWE:  The moving parties.

 2          SPECIAL MASTER ESSHAKI:  Thank you.

 3          MR. WILLIAMS:  With one caveat.  As to the

 4  mid-model question that came up during the discussion, we

 5  have not received the confirmation that we, end payors, can

 6  forego it, so I would say if we can add that, I think we can

 7  answer very soon.  If ten days is when you would like it to

 8  be resolved and submitted to you by, that's fine, we could

 9  probably do it sooner, but at least as of right now --

10          SPECIAL MASTER ESSHAKI:  I would like you to do it

11  as soon as possible.

12          MR. WILLIAMS:  What I proposed would be by next

13  Wednesday we will tell you our position and see if we can

14  reach an agreement, if not we will submit the one pager,

15  whatever it is going to be, and ask you to rule on it.

16          SPECIAL MASTER ESSHAKI:  I don't want to be

17  Mr. Cratchit and Christmas Eve standing over the books with a

18  candle reading your arguments.

19          MR. WILLIAMS:  Nor do we want be you to be.  Next

20  Wednesday we will close that out, and suggest by next Friday

21  if we have to submit something to you we will submit it to

22  you.

23          SPECIAL MASTER ESSHAKI:  Have we finished all of

24  the issues on Honda?

25          MR. ROWE:  Yes.
```

Hearing before the Special Master - December 9, 2016

1      SPECIAL MASTER ESSHAKI:  You will prepare the

2  necessary document, the order, get approval, obviously this

3  has to occur after that last hanging issue is resolved?

4      MR. ROWE:  Yes.

5      SPECIAL MASTER ESSHAKI:  All right.  Send it to

6  Honda for their approval, include the magic language on the

7  appeal rights.

8      All right.  Who is next in the box?

9      MR. HEMLOCK:  Chrysler or Subaru.

10      SPECIAL MASTER ESSHAKI:  All right.  Young lady,

11  would you mind asking the representative of Subaru to join

12  us.

13      I think Nissan is looking for their opposing party.

14  I saw counsel for Nissan just gesturing in the window.

15      While we are waiting I will tell you a true story.

16  I was handling a really complex arbitration in my office, and

17  we had a very, very fine firm from Mississippi that was

18  defending the case.  We had gone through seven days of

19  hearings and was right about this time of year, and the

20  claimant's counsel was a local firm, very well established,

21  somebody who is in this case, and we closed the hearing for

22  that day, day number seven, and I walked back to my office

23  and on my desk is a holiday basket from the plaintiffs' law

24  firm.

25      So I debated for a couple minutes.  Counsel had not

```
 1    yet left, and so I gathered them all back into the hearing
 2    room and said, look, I have to disclose this to you, I just
 3    went back to my desk, I found this holiday basket on my desk
 4    from claimant's counsel, and I said I want you to know all I
 5    do is I take that basket and put it into our social room, any
 6    of our employees can have whatever is in there that they
 7    want, but I wanted that disclosure made.  The firm from
 8    Mississippi said well, sir, you are going to be surprised at
 9    the size of our basket tomorrow.
10              All right.  Subaru.
11              MS. METZGER:  Good afternoon, Your Honor.
12              SPECIAL MASTER ESSHAKI:  An outline, please.
13              MS. METZGER:  Yes.
14              SPECIAL MASTER ESSHAKI:  Thank you.  Again, this
15    outline will be attached as Exhibit A, Subaru Exhibit A -- it
16    is actually, to be more precise, Subaru Indiana America.
17              MS. METZGER:  Subaru of Indiana America --
18              SPECIAL MASTER ESSHAKI:  Subaru of Indiana America
19    Exhibit A.
20              MS. METZGER:  Subaru of Indiana Automotive, Inc.  I
21    was thinking of our other --
22              SPECIAL MASTER ESSHAKI:  All right.  It will only
23    become attached when you go through the requirements for
24    sealing it, but this will be our record of what has been
25    agreed to.
```

Hearing before the Special Master - December 9, 2016

1          Now, please identify yourself for the record.

2          MS. METZGER:  Kimberly Metzger for Subaru.

3          MS. SMEDLEY:  Angela Smedley for the NTN defendants

4     but appearing on behalf of servicing parties.

5          SPECIAL MASTER ESSHAKI:  Can you tell me what is

6     the status of your negotiations with respect to a resolution

7     of this dispute?

8          MS. SMEDLEY:  We believe we have resolved all open

9     issues at this point.

10          MS. METZGER:  Yes.

11          MS. SMEDLEY:  So we wanted to put the terms into

12     the record.  One, just --

13          SPECIAL MASTER ESSHAKI:  I really don't think you

14     need to if we are going to put Exhibit A in.

15          MS. SMEDLEY:  We've just covered just a few little

16     nits that we will --

17          SPECIAL MASTER ESSHAKI:  That changes Exhibit A.

18          MS. SMEDLEY:  Yes, just a couple small things, we

19     will resubmit this to you this afternoon.

20          MS. METZGER:  There is one issue, Special Master,

21     on which we need some clarification, and that's on the rebate

22     information.

23          SPECIAL MASTER ESSHAKI:  Yes.

24          MS. METZGER:  That's reflected on page 2, it is the

25     first full box.  We are understanding that that is, per your

1    earlier order, is being held in abeyance pending the order to

2    issue at a future date.

3            SPECIAL MASTER ESSHAKI:  That is correct.

4            MS. METZGER:  So we would remove reference to the

5    rebate information.

6            MS. SMEDLEY:  I think I will add some language

7    about the pending appeal.

8            SPECIAL MASTER ESSHAKI:  Yes, feel free.

9            MS. SMEDLEY:  Instead of taking it out altogether.

10           MR. WILLIAMS:  Steve Williams for the end payors.

11           A question of clarification because this was what I

12    raised earlier, if a party agreed to provide something I had

13    not construed your ruling as being a means to then take that

14    back because you might have a different ruling.  So I just

15    want to clarify, is that Subaru's position that you are now

16    walking back from that offer?

17           MS. METZGER:  No, we are not walking back from it.

18    First of all, this was a point of discussion that was still

19    open as of yesterday, and then the Special Master made his

20    order which he made applicable to all of the orders that

21    were -- not the orders but the agreements which were to come,

22    so we understood that this was applicable in the same way

23    that it was to every other agreement that would issue.

24           MS. SMEDLEY:  So, yes, we did not consider this an

25    open issue but we did understand that you had to go back to

Hearing before the Special Master - December 9, 2016

1    find out how exactly you would locate information in the

2    vendor -- in the database.

3           MS. METZGER:  Well, we did agree -- my recollection

4    of what we agreed to is to find out how the SAP database was

5    structured and what information could be gleaned, but per our

6    earlier order we explained that there is not price level data

7    in there and it may not be possible to discern what is the

8    actual rebate information within that database.

9           SPECIAL MASTER ESSHAKI:  I am going to apologize

10   because I believe I have caused some confusion here about my

11   intent.  I believe what's on appeal before Judge Battani is

12   the issue of OEM rebates to automobile dealer plaintiffs.

13          MS. METZGER:  That was my misunderstanding then.

14          SPECIAL MASTER ESSHAKI:  The issue of rebates

15   received by the OEMs from the suppliers is not the same

16   issue.

17          MS. METZGER:  If that's not what the subject of the

18   agreement was or the pending order --

19          SPECIAL MASTER ESSHAKI:  No, I want that clear, if

20   at the end of the year the supplier is sending a check back

21   to the OEM, it is what we used to call the 3/2/1 process,

22   three percent first year, two percent second year, one

23   percent third year, price reductions, that is not what I

24   intended my ruling to be.  The ruling that I was referencing

25   that says you can't have this information only goes to the

1    OEM rebates that flow through the dealers.

2           MS. METZGER:  That's not an issue in our situation.

3           SPECIAL MASTER ESSHAKI:  That's not an issue, and

4    that's why I wanted this clarified, that rebates that flow

5    from the suppliers to the OEMs are discoverable despite the

6    fact that there is this appeal going on on the auto dealers

7    rebate issue.

8           MS. METZGER:  Understood.

9           SPECIAL MASTER ESSHAKI:  Okay.

10          MS. METZGER:  So we are still trying to resolve

11   with our person at Subaru what this data will look like and

12   what's actually available, so if we could put some language

13   in there to reflect that ongoing discussion with Subaru, we

14   are not trying to not produce it if we have it but it has to

15   be some form that's useable.

16          SPECIAL MASTER ESSHAKI:  Understood.  What I would

17   recommend we do is I will give you -- how many days to

18   complete this, to draft --

19          MS. METZGER:  Our gentleman is on vacation today,

20   he's back on Monday and hopefully --

21          SPECIAL MASTER ESSHAKI:  Can we get something done

22   by Wednesday of next week?

23          MS. METZGER:  Yes.

24          SPECIAL MASTER ESSHAKI:  And if there is a dispute

25   you can bring it back to me in letter format and I will issue

Hearing before the Special Master - December 9, 2016

103

```
1    a ruling based upon the letters, is that acceptable, because
2    we don't have -- I don't want to bring you back for another
3    hearing -- briefing and hearing.
4              MS. METZGER:  Sure.
5              MS. SMEDLEY:  Thank you for your clarification on
6    the --
7              SPECIAL MASTER ESSHAKI:  Sorry that I misled not
8    just you but everybody, it just struck me.  Thank you.
9              MS. METZGER:  Could I ask for some clarification
10   too, Your Honor?  What the actual issue is going -- how you
11   are going -- are you issuing an order?
12             SPECIAL MASTER ESSHAKI:  I'm asking counsel for the
13   moving parties to draft an order that comports with this with
14   adding the caveat that you said you need to get clarified by
15   next Wednesday perhaps, submit it to you, if you approve it
16   it will come back to me, it will be electronically entered,
17   and it has to have the magic language that either side has
18   the right to appeal to Judge Battani.
19             MS. METZGER:  The concern that we have with the
20   order issuing is that this agreement is the result of
21   negotiations at mediation, and if an order issues then we've
22   got a different layer of obligation than we would with a
23   negotiated mediated resolution, and the concern is that if an
24   order issues instead of an agreement then that's not what we
25   understand the result of the mediation to be.
```

1      MS. SMEDLEY:  I don't think we expect it would

2   effect compliance with --

3      SPECIAL MASTER ESSHAKI:  Are you suggesting that

4   you are prepared to enter into a stipulated -- a confidential

5   stipulated order with this attached as Exhibit A?

6      MS. METZGER:  We are prepared to enter into an

7   agreement with the parties to do what we say here without

8   concessions from --

9      SPECIAL MASTER ESSHAKI:  Waiving the appeal rights?

10      MS. METZGER:  Without waiving appeal rights -- I'm

11   sorry.

12      SPECIAL MASTER ESSHAKI:  I don't understand how you

13   enter into an agreement -- mediated agreement and still

14   retain your appeal rights?

15      MS. METZGER:  We intend to do what we say here in

16   the agreement, but if an order issues then we've got a

17   different set of obligations and could be read to have

18   waived, for example, that they made a showing of good cause

19   for some of this if a dispute arises in the future with

20   regard to another case, that's our concern is that an order

21   is different from a mediated -- in our view, from a mediated

22   settlement or mediated agreement.

23      SPECIAL MASTER ESSHAKI:  I would like to open this

24   up for other comment please.

25      MS. SMEDLEY:  I think that's similar to this

Hearing before the Special Master - December 9, 2016

```
 1    document, we could indicate that this is pursuant to the

 2    parties' agreement, I think that's how we start most of the

 3    agreed-upon provisions.

 4         SPECIAL MASTER ESSHAKI:  But without an order how

 5    do you get to appeal?

 6         MS. SMEDLEY:  And have an order but indicate that

 7    you are ordering this pursuant to an agreement between the

 8    parties.  Does that address your concern?

 9         MS. METZGER:  The concern we have, and perhaps I

10    didn't state this correctly, the concern we have is that if

11    an order issues it could be read as a concession by Subaru

12    that there has been a showing of good cause for this type of

13    information if issues arise with regard to future cases.  We

14    don't anticipate this is going to affect anything that we do

15    here because we intend to comply with this agreement, but the

16    force and effect of an order in our opinion is different from

17    the force and effect of a mediated agreement between us as

18    regards to what might happen in the future.

19         SPECIAL MASTER ESSHAKI:  Sir.

20         MR. HEMLOCK:  Adam Hemlock on behalf of the

21    Bridgestone defendants.

22         I feel very strongly we need an order for all of

23    these cases for a couple of reasons.  One, there needs to be

24    consistency; two, there needs to be certainty that these

25    things are going to get done, and I just worry that the
```

Hearing before the Special Master - December 9, 2016

```
 1  distinction between an agreement and an order will somehow

 2  raise -- I don't believe there is any bad faith on Subaru's

 3  counsel, but I just worry that there is something we are

 4  going to miss that an agreement doesn't catch that an order

 5  does catch.

 6           SPECIAL MASTER ESSHAKI:  All right.

 7           MR. HEMLOCK:  As to reservation of rights I would

 8  assume that could be addressed somehow.

 9           SPECIAL MASTER ESSHAKI:  I think counsel has

10  suggested a way out of this dilemma, which is to draft an

11  order that says this order is the result of a mediated

12  agreement and the parties are reserving their rights to

13  appeal this order and they're -- the agreement is extending

14  only to the issues that have been presented for this

15  mediation.

16           MS. METZGER:  That makes sense, that would be

17  acceptable.

18           SPECIAL MASTER ESSHAKI:  But no precedential

19  effect?

20           MS. METZGER:  Absolutely.

21           MS. SMEDLEY:  Agree.  Sure.

22           SPECIAL MASTER ESSHAKI:  Are we done?

23           MS. METZGER:  Yes.

24           SPECIAL MASTER ESSHAKI:  Counsel, thank you both,

25  you've been very cooperative.
```

Hearing before the Special Master - December 9, 2016

1          MS. METZGER:  I'm sorry.  We did address a couple

2   wording changes, are you planning on making those?

3          MS. SMEDLEY:  Yes, these are the ones I'm going to

4   make and we will resubmit.

5          MS. METZGER:  They are not substantive, just

6   wording changes.  Thank you very much.

7          SPECIAL MASTER ESSHAKI:  Thank you very much.

8          Nissan.

9          MR. ELLIS:  I believe they are ready.  Let me grab

10  them from the jury room.

11         SPECIAL MASTER ESSHAKI:  Very good.

12         MR. ELLIS:  They need a few more minutes.

13         SPECIAL MASTER ESSHAKI:  Should we then start the

14  outliers with the open issues, Chrysler?

15         Please identify yourself for the record, sir.

16         MR. KLEIN:  Sheldon Klein on behalf of the Tokai

17  Rika defendants and speaking for the parties.

18         If I may, I'm going to submit to you a copy of an

19  FCA document, although it is a little more complicated than

20  the earlier ones, and I realize I left myself without one so

21  if I could return to the table for a moment?

22         SPECIAL MASTER ESSHAKI:  In fact, I understand that

23  you left all of them back at the hotel room, sir.  You were

24  charged with the duty of making copies, which you did, but no

25  one told you that you had to bring them.

Hearing before the Special Master - December 9, 2016

 1          MR. KLEIN:  Well, that's actually more true than

 2     you realize.

 3          SPECIAL MASTER ESSHAKI:  Thank you for your good

 4     work, sir.

 5          MR. KLEIN:  Special Master, I just handed to you a

 6     copy of a term sheet with respect to FCA, it is the version

 7     that -- I submitted a version to FCA roughly 9:00 last night,

 8     they came back with modifications.  We haven't really had

 9     time to work through it.  Their modifications are not

10     acceptable in a number of respects, and I am going to suggest

11     a way forward especially in light of the fact that we have a

12     time cutoff but also because there is thorny issues and then

13     I will try to give a brief explanation of what the nature of

14     our concern is, and finally I will add to the extent that we

15     get into downstream issues Mr. Williams will be speaking to

16     them rather than myself.

17          The basic nature of what is causing heartburn for

18     the parties here is that we submitted a term sheet, and

19     unfortunately I didn't bring a copy of that with me.  We

20     submitted a term sheet that to the best of my ability tried

21     to specifically describe what we understood was agreed to

22     during the mediation yesterday.

23          By way of example, we would specify they will

24     produce data from such-and-such system between years X and Y.

25     What came back to us is -- this is repeated over and over in

1    FCA's version of the term sheet, the parties accept FCA's

2    offer of production, which is defined as what was contained

3    in a series of letters plus their briefs, and by silence

4    excluding what was agreed to yesterday in the mediation.

5         You know, the concern is, A, it apparently doesn't

6    include what was agreed to or what we understood was agreed

7    to yesterday in the mediation, and, B, it leaves us to fight

8    down the road piecing together letters going back over 18 --

9    or 15 months now, and various briefs to figure out what it is

10    that they are agreeing to.

11         So we can't accept -- I don't know if their offer

12    of production, you know, what it consists of or how it

13    differs or doesn't differ from the specific parameters that

14    we understood was agreed to yesterday.  Frankly, I think

15    especially in light of time considerations, we aren't going

16    to parse through this today, I mean, I'm glad to go at it but

17    I do suspect at the end of the day the best use of all of our

18    time, very much including yours, is to talk afterward amongst

19    the parties and then go to the letter brief submission on a

20    fairly tight schedule if we are unable to work that out.

21         MR. KASS:  Colin Kass for FCA.

22         I just wanted to respond to that briefly.  We did

23    use the language, you know, the parties accept FCA's offer of

24    production with respect to whatever category it was.  Our

25    offer of production hasn't changed, it is in the briefs, and

Hearing before the Special Master - December 9, 2016

**110**

```
 1   it is what we agreed to yesterday.  I don't believe there was
 2   really anything that we've agreed to that's not reflected on
 3   this.  We are happy to work with them to -- if they want to
 4   put the offer of production to one particular place, a new
 5   place, we are happy to work with them on that, it is just
 6   that they were sort of making representations as to
 7   specifically what we were going to do that didn't
 8   necessarily -- you know, we just didn't have the time to
 9   determine whether there were some language in there that was
10   not consistent with what we had previously agreed.  And my
11   understanding from the meet and confer yesterday was by and
12   large we either reached agreement as to everything on the
13   offer of production, except as to the areas that were of
14   disagreement, most of which were not resolved yesterday, and
15   that was reflected also on this term sheet.
16            So that's our position as to the term sheet.  I
17   think it is largely reflective of where the parties stand,
18   and -- but I'm happy to work with them to work on additional
19   or different language, if they would like.
20            SPECIAL MASTER ESSHAKI:  Mr. Williams.
21            MR. WILLIAMS:  Your Honor, Steve Williams for the
22   end payors.
23            I have a slightly different perspective.  I think
24   you've ruled on the motion, that will go to Judge Battani.
25   It doesn't seem like we have any agreement here, and it seems
```

```
 1    that your order on the motion is the governing document at

 2    this point.

 3           I should say, and I'm willing to have any further

 4    discussion during that process but I feel that you have

 5    ruled, we will submit an order, and the next step is going to

 6    be intentional objections to that order.

 7           SPECIAL MASTER ESSHAKI:  Mr. Kass?

 8           MR. KASS:  Your Honor, I mean, if they are now

 9    withdrawing their entire -- their entire position going back

10    to the subpoena as written, that's their position.  If your

11    order is basically enforcing the subpoena as they've written

12    it or even as they've claimed to have narrowed it but still

13    covers everything without all the discussions that we have

14    had, if that is, in fact, your order, I didn't understand

15    that to be your order, I expected there to be a FCA specific

16    order, but if that is and that obviously would be what we

17    would have to appeal, but it seems like the parties have made

18    a lot of progress and if they want to go back to square one

19    that's their choice, but then they have to realize that going

20    back to square one means that there is an unenforceable

21    subpoena on its face.

22           SPECIAL MASTER ESSHAKI:  The difficulty that I'm

23    facing is that I think as identified by Mr. Klein, I can't

24    tell from this outline what has been accepted and what has

25    been rejected because the outline simply says -- the first
```

Hearing before the Special Master - December 9, 2016

```
 1    entry, transactional purchase data for defendant and

 2    non-defendant suppliers, the parties accept FCA's offer of

 3    production with regard to transactional purchase data.  FCA

 4    will make reasonable inquiry as to whether supplier searches

 5    can be done by DUNS number.  I don't know what FCA offer of

 6    production with regard to transactional purchase data is, and

 7    apparently from Mr. Klein it is contained in a series of

 8    e-mails or correspondence.

 9         MR. KASS:  It really isn't.  We put that into our

10    opposition belief, we explained exactly what our offer of

11    production was, and we addressed each of the items in dispute

12    at the time.  So with respect to that -- with respect to that

13    one, it is exactly what we discussed yesterday, it is exactly

14    what is in our brief, which is they give us a list of

15    suppliers, we will pull purchasing information by suppliers,

16    and that was, in fact, the agreement and we've laid that out.

17         The only reason we referenced the other

18    correspondence was because it was attached to the brief, but

19    I think we have adequately summarized it, and I don't think

20    there is any real dispute as to the parties with regard to

21    that.

22         SPECIAL MASTER ESSHAKI:  Let me say this, this

23    outline is less than adequate.  Okay.  It is less than

24    adequate.  I cannot tell what -- I fully expected to have an

25    outline that said these are the issues that have been agreed
```

Hearing before the Special Master - December 9, 2016

1    upon, Chrysler is going to produce -- Fiat Chrysler of

2    America is going to produce this information from this system

3    for this period of time for these model years.  Fiat Chrysler

4    of America is going to produce annual price reductions for

5    all of their vehicles during this period of time, and if

6    there was a dispute then the disputed issue is X, and the

7    parties' position is one, and FCA's position is two.

8            That is not what we have here.  This is -- there is

9    no way that I can discern any agreement, and I know we

10   reached a number of agreements in our discussions yesterday,

11   but I can't discern from this outline what they are, and

12   frankly when we started out I had a scrivener saying would

13   you please keep a record of what the agreements were so we

14   can put them into this outline, and I did not take detailed

15   notes.

16           So, Mr. Klein, how do you suggest we get around

17   this?  Let me make a suggestion to you to put it this way:  I

18   am suggesting that within ten days I will give -- I will give

19   the parties and Fiat Chrysler America ten days to come up

20   with a mediated agreement, the terms of a mediated agreement

21   as a result of our discussions yesterday based upon the

22   record that was kept of those discussions yesterday, and I --

23   then identify for me specifically agreed items, disagreed

24   items, positions of the respective parties on the contested

25   items.

Hearing before the Special Master - December 9, 2016

1    MR. KLEIN:  Thank you, Your Honor.

2    SPECIAL MASTER ESSHAKI:  Is that acceptable?

3    MR. KLEIN:  That's acceptable to us.

4    SPECIAL MASTER ESSHAKI:  Mr. Kass?

5    MR. KASS:  The only issue is I think we can make

6    progress on the disagreed items because we have laid them out

7    right here.  I mean, the disagreed items are laid out with

8    pretty specific detail, and there is no reason why I don't

9    think we can -- we can get through them.  That was our

10   understanding of what today, was that we were going to go

11   through the points.  So the first disputed items are on

12   page 2, the RFQ relation information, the target prices and

13   the sourcing recommendation.

14   SPECIAL MASTER ESSHAKI:  Well I look at page 1, the

15   first entry.

16   MR. KASS:  The first entry is agreed to

17   effectively.

18   SPECIAL MASTER ESSHAKI:  My notes says not agreed.

19   MR. KASS:  Not agreed and then it says none, there

20   is no disagreement is the point.

21   SPECIAL MASTER ESSHAKI:  Mr. Klein?

22   MR. KLEIN:  I don't know if there is a disagreement

23   because I don't know what the offer of production is, and

24   certainly I don't think that we have an ability to enforce a

25   subpoena based on a vague notion of an offer of production,

1    and certainly, you know, in the time allowed we didn't have

2    an opportunity to go back to -- if, in fact, their position

3    is we didn't move an inch on anything yesterday and we would

4    go back to the brief and that was still their position

5    period, I certainly haven't had an opportunity to flyspeck

6    against the specific agreements that I tried to document.

7            MR. KASS:  So I get that they may have concerns and

8    they may think that we actually moved somewhere yesterday as

9    to item 1, but I thought we went into yesterday with an

10   agreement or at least an understanding as to the first item,

11   and there was no further disputes.  The only issue that came

12   up was the DUNS -- whether we would search for DUNS

13   information and that's reflected here that says we would, in

14   fact, inquire into that issue.

15           So there might be some questions about -- I

16   understand they have questions with how the language would

17   work in the final agreement, but the areas of dispute -- at

18   least the major areas of dispute that we discussed yesterday

19   are reflected in this, and there is no reason why we can't

20   resolve those issue.

21           MR. KLEIN:  If you want to hear I'm prepared to

22   discuss target pricing, sourcing recommendations and samples

23   of nonstandard agreements, which were with respect to

24   upstream data the three areas that I understood we continued

25   to have a dispute.  I will take guidance from you.

Hearing before the Special Master - December 9, 2016

116

1     SPECIAL MASTER ESSHAKI:  We just had time

2  constraints that this cannot be done here in court.  I had

3  thought we made significant progress yesterday towards a

4  complete resolution between the moving parties and FCA on

5  what was and was not going to be produced, and as I said, I

6  didn't take detailed notes, but we had a scrivener taking

7  notes on that.  What I am suggesting is that perhaps those

8  notes be transcribed and distributed to the parties and to

9  FCA's counsel and you take ten days and you reach that

10  agreement, and you come back to me only with specific items

11  that are in dispute and set forth your respective positions

12  on the dispute, and I will resolve it on the paperwork.

13     MR. KASS:  Your Honor, we can do that.  I do

14  believe the areas of dispute will be the ones that are listed

15  here on this term sheet, those are the ones that -- as we

16  were discussing yesterday, there were items where after the

17  parties represented their positions you said that's a

18  holdover for today, so those are the ones that are reflected

19  on this chart.

20     MR. KLEIN:  You are proposing --

21     SPECIAL MASTER ESSHAKI:  I heard both of you accept

22  my proposal.

23     MR. KLEIN:  Yes.

24     SPECIAL MASTER ESSHAKI:  Thank you very much,

25  gentlemen.  I do appreciate your hard work.  Ten days.

1          Nissan is finally ready?

2          MR. ELLIS:  I will check again, Your Honor.

3          SPECIAL MASTER ESSHAKI:  They asked me to let them

4    go first so they could get on a plane.

5          MR. ELLIS:  I liked where we were two hours ago.

6          SPECIAL MASTER ESSHAKI:  Let's see if they are

7    ready.

8          MR. ELLIS:  They are still not ready, Your Honor.

9          SPECIAL MASTER ESSHAKI:  Toyota.

10         MR. HEMLOCK:  Toyota.

11         SPECIAL MASTER ESSHAKI:  Thank you, Mr. Hemlock.

12         MR. HEMLOCK:  Thank you.

13         SPECIAL MASTER ESSHAKI:  Please identify yourself

14   for the record.

15         MR. HEMLOCK:  Adam Hemlock, Your Honor, Weil,

16   Gotshal & Manges, on behalf of the Bridgestone and Calsonic

17   defendants.

18         MR. SCHAPER:  Michael Schaper, Your Honor, from

19   Debevoise & Plimpton on behalf of the Toyota parties.

20         SPECIAL MASTER ESSHAKI:  Excellent.  Counsel, we

21   have had an opportunity to confer during our mediation

22   session yesterday, and I understand some discussions

23   continued last night, and as I recall this was one of those

24   situations where we might have to carve out some issues, hold

25   them on the side until we can get some answers, and now what

Hearing before the Special Master - December 9, 2016

```
 1    I have been presented was what I'm going to describe as
 2    Exhibit A to the motion to compel from Toyota.  It will not
 3    be a part of the record unless and until it has been properly
 4    sealed, but for our purposes it will further our discussion.
 5            All right.  Let's discuss how much agreement, what
 6    do we have in agreement, where do we have disputes on
 7    Exhibit A.
 8            MR. HEMLOCK:  Sure.  Thank you, Your Honor.  The
 9    short answer is we have agreement on most of the issues.
10            Just very briefly, with respect to the RFQ files
11    there is that work database system that contains data
12    relating to RFQs.  We have agreement on certain aspects of
13    what would be the production from that database.  Where we
14    don't have agreement is the number of years of data that
15    would be produced.  The parties are seeking ten years of work
16    data and Toyota has offered six, those six years to be chosen
17    by the parties within the readily available range of data.
18    We continue to negotiate on that, we will continue to work
19    that through with Mr. Schaper and try to reach a resolution.
20            The next category where we have continued
21    disagreement is with respect to parts tracking.  This is the
22    data related to tracking parts into particular vehicles.
23    Here Toyota has provided certain samples of information to
24    us, and the serving parties are looking at those samples and
25    trying to determine whether they are sufficient, so that ball
```

1    is in our court, and we hope to get back to Toyota shortly on

2    whether that data is sufficient.  If it is not, we will

3    continue to seek production of other categories of documents.

4    Toyota, of course, reserves its right to oppose those

5    efforts.

6              MR. SCHAPER:  The one thing I would add to that,

7    Your Honor, is that our view is that the sample information

8    that we have provided to the parties, along with the

9    additional information that we expect to produce together,

10   will allow the parties to track parts through the process, so

11   it is all of the information together that should allow them

12   to do that.  We understand that they are still considering

13   that, and we reserve our right to oppose if they make

14   additional requests.

15             SPECIAL MASTER ESSHAKI:  Understood.

16             MR. HEMLOCK:  Thank you.  The third area is with

17   respect to sales data, this is data with respect to sales of

18   vehicles.  Again, we have reached agreement on which database

19   and certain fields in the database.  The dispute concerns the

20   number of years of data to be produced.  The parties are

21   seeking 12 years of data from that database, this is the NVS

22   database, and Toyota has offered six.  We will continue to

23   actively meet and confer on that one.

24             The last issue, Your Honor, is a bit of an umbrella

25   one, it affects several of the points -- several of the

1     categories of documents.  Toyota has raised a concern that

2     any production by it of data relating to submissions of

3     quotes by non-defendant suppliers would raise certain

4     contractual confidentiality concerns.  And Toyota has said

5     that -- I will let Toyota characterize it themselves, but

6     they basically said they need to get consent or would like to

7     obtain consent from those suppliers.  We understand, of

8     course, that there are agreements that have confidentiality

9     provisions and we don't mean to be insensitive to those.

10    However, we believe that should be in a sense a formality if

11    Toyota wishes to provide notice to them, an opportunity to be

12    heard, of course we understand that, we are willing to wait a

13    little bit of time for them to do that, but we don't believe

14    that that issue should be a barrier to compliance with any

15    order and should not hold the process up.

16          MR. SCHAPER:  Your Honor, as the defendants well

17    know, our agreements with all of our suppliers require Toyota

18    to hold their confidential information confidential, and that

19    would include the prices that we pay them for auto parts,

20    their RFQ submissions, so what we have told the parties is we

21    are willing to endeavor to get consent but if we don't have

22    consent our terms and conditions require that we cannot

23    produce their confidential information absent a

24    non-appealable court order.  And presumably the parties,

25    particularly the defendants, our suppliers, would want the

1   same treatment afforded to them; if in some other case they

2   were non-defendants they wouldn't want us breaching our

3   obligations of confidentiality, so we think this is important

4   to Toyota in terms of how it deals with its suppliers, in

5   this case the non-defendant suppliers.

6         SPECIAL MASTER ESSHAKI:  My view is more than

7   willing to accept whatever supplier consents Toyota can

8   obtain in a reasonable period of time, but I would also order

9   that the agreements be produced provided that Toyota must

10  notify its supplier and provide them with a minimum of ten

11  days notice that this has been ordered to let the suppliers

12  file any objections that they may have.

13        MR. HEMLOCK:  Your Honor, may I clarify, when you

14  say the agreement to be produced, are you referring -- the --

15        SPECIAL MASTER ESSHAKI:  The information.

16        MR. HEMLOCK:  The discovery we are seeking?

17        SPECIAL MASTER ESSHAKI:  Right, right, but they

18  have to have ten days to object.

19        MR. HEMLOCK:  Okay.

20        SPECIAL MASTER ESSHAKI:  If it is a supplier's

21  confidential information and Toyota obviously has an

22  obligation to maintain that information confidential, but it

23  is the suppliers that have the confidentiality right so they

24  are the ones that have to come back in and assert it.

25        MR. HEMLOCK:  When you say ten days minimum, but

Hearing before the Special Master - December 9, 2016

1    could we also set a maximum?  In other words, I think we

2    would need some prompt certainty as to whether any of them

3    are going to oppose, and then we would have to deal with that

4    very quickly.

5              MR. SCHAPER:  The one thing I would say about that,

6    Your Honor, is it is actually not entirely clear which

7    non-defendant suppliers will show up in the data pulls that

8    we are agreeing to and hopefully will agree to going forward.

9    My understanding is that there were approximately 18

10   non-defendant suppliers in the two lead parts cases for

11   Toyota, and I don't know standing here today whether all of

12   them will be in the RFQ pull or the pull of transactional

13   purchase data.  So I think there is a little bit of a cart

14   and a horse issue whether we go out and try to get all of

15   them even if their confidential information may not

16   ultimately be produced, or whether we wait to see what is

17   actually in the data and then get the consents.

18             SPECIAL MASTER ESSHAKI:  Mr. Hemlock?

19             MR. HEMLOCK:  I guess perhaps what I would propose

20   then is we -- Toyota should perhaps proceed with the internal

21   process of going through the search which results in the

22   names and identities of the non-defendant suppliers that

23   would be at issue.  If they -- at that point we obviously

24   will continue to confer with Toyota's counsel on this issue,

25   but I would think they would then promptly notify them.  If

123

1    the order could reflect that they would have a certain number

2    of days within which they have the right to object and if

3    they don't then they have waived that right and create some

4    quick opportunity for them to raise it and we will deal with

5    it promptly at that point.

6         MR. SCHAPER:  One concern I have, Your Honor, IS

7    that our agreement with suppliers says that we have the

8    ability to produce information if there is a non-appealable

9    order in place.  I don't know as I stand here today whether

10   any of the non-defendant suppliers will.

11        SPECIAL MASTER ESSHAKI:  I will assert that right.

12        MR. SCHAPER:  Will assert that right so --

13        SPECIAL MASTER ESSHAKI:  We have to wait for a

14   chair to be filled on the Supreme Court before we are going

15   to get that.

16        MR. SCHAPER:  I don't know how hotly contested this

17   would be at the high court, but it may be that non-defendant

18   suppliers in the window when they have to come to court would

19   raise that issue and they may raise that issue with us when

20   we seek to consent, so I just want to make sure the parties

21   and the Special Master are aware of that.

22        SPECIAL MASTER ESSHAKI:  I'm sure there is some

23   case law out there that says if there is relevant information

24   in the hands of a third party, just because the third party

25   has a confidentiality agreement with a fourth party doesn't

1    insulate that information from the needs of party litigants

2    in an ongoing lawsuit.  So whether it is a non-appealable

3    order or not it's for the Court to determine whether that is

4    going to be binding.

5            So please draft an order, sir, Mr. Hemlock, working

6    as much language as you can to agree upon, allow the

7    suppliers to Toyota an opportunity to object, and if they do

8    we will have to object, we'll have to deal with it when they

9    do, but I sort of have a feeling when you are talking about

10   this type of information, the confidentiality provision, the

11   protective order that currently exists, I don't see a

12   supplier coming in here arguing at least in good faith that

13   we have a confidential agreement with Toyota, they can't

14   produce this unless there is a non-appealable order from a

15   court.  I think Judge Battani can issue an order and that

16   will be fully effective.

17           MR. SCHAPER:  Your Honor, may I just ask you and

18   perhaps Mr. Hemlock, what is envisioned in terms of the

19   remaining areas of dispute?  Toyota is willing to and happy

20   to continue to meet and confer.

21           SPECIAL MASTER ESSHAKI:  I am thinking I want a

22   resolution in ten days, and if I don't I want a letter

23   telling me what the issues are that are still in contention,

24   the respective positions on those issues of the parties, and

25   the parties' respective remedies that they want -- the

1    rulings that they want.

2            MR. SCHAPER:  Understood.

3            SPECIAL MASTER ESSHAKI:  And I will do it on the

4    letters, I will rule on the papers.

5            MR. HEMLOCK:  That's fine, Your Honor.  Thank you.

6            MR. SCHAPER:  Thank you.

7            SPECIAL MASTER ESSHAKI:  Guess what I'm going to

8    ask?

9            MR. ELLIS:  Let me check again.

10           SPECIAL MASTER ESSHAKI:  Remind them, they wanted

11   to be first.

12           MR. ELLIS:  I think we are there, Your Honor.

13           SPECIAL MASTER ESSHAKI:  Excellent.

14           MR. ELLIS:  Abram Ellis on behalf of the Stanley

15   Electric defendants and the Diamond Electric defendants, from

16   Simpson, Thacher & Bartlett.

17           MR. CAULEY:  Paul Cauley on behalf of Nissan North

18   America, Inc., with the Sedgwick law firm.

19           SPECIAL MASTER ESSHAKI:  All right.  Gentlemen, you

20   have an outline for me?

21           MR. ELLIS:  We do, Your Honor.

22           SPECIAL MASTER ESSHAKI:  We are going to -- again,

23   this is going to be referenced as Nissan North America's

24   Exhibit A to this motion, but it will not be admitted unless

25   and until the appropriate procedures for sealing it have been

1    agreed upon and followed.

2          Can you tell me the status of the negotiations

3    between the parties?

4          MR. ELLIS:  I will go and you can correct anything

5    that I miss.  I think we are there with respect to almost

6    everything.  There are a limited number of open items, and

7    I'm happy to walk through those quickly.

8          SPECIAL MASTER ESSHAKI:  All right.

9          MR. ELLIS:  The first is for several categories of

10   documents and data the parties have not yet reached an

11   agreement on, which models and which model years will be

12   provided for in those productions.  Nissan has offered three,

13   the parties have requested nine or ten, but we just have not

14   had time to narrow that list down, and if we don't reach

15   agreement on that issue we will be prepared to brief it in a

16   letter brief without oral argument in a time consistent with

17   your schedule.

18         SPECIAL MASTER ESSHAKI:  Very good.

19         MR. CAULEY:  That's agreed.  We will continue to

20   talk in good faith, and if we cannot reach agreement we will

21   go with the letter brief schedule that has been discussed.

22         SPECIAL MASTER ESSHAKI:  Ten days.

23         MR. ELLIS:  Another open item is the availability

24   of -- the reasonable availability of data from the 2004 to

25   2008 period for the downstream sales data.  It is housed --

1    my understanding is that it is housed in a different system

2    and will require some different efforts to restore the 2004

3    to 2008 data, and the parties are still in discussions on

4    that topic but if we don't reach resolution we will be

5    prepared to letter brief that issue as well.

6             SPECIAL MASTER ESSHAKI:  Excellent.

7             MR. CAULEY:  Agreed.

8             MR. ELLIS:  The last small open issue is whether

9    Nissan will be producing a schedule of MSRPs.  In the shuffle

10   it is not clear whether that information has been agreed to

11   be produced or not, we are going to discuss that further, and

12   if we need to seek that request we will brief it on the same

13   schedule.

14            SPECIAL MASTER ESSHAKI:  All right.

15            MR. CAULEY:  Agreed.

16            SPECIAL MASTER ESSHAKI:  We will have these issues

17   resolved in ten days.  If you are resolved in ten days you

18   submit a proposed order; if they are not resolved, submit the

19   open issues, the parties' respective position on those

20   issues, and the parties' respective conclusions vis-à-vis

21   relief or no relief on those issues.

22            MR. ELLIS:  The only clarifying note I would add,

23   Your Honor, is there was one wordsmithing edit to something

24   on your copy that we will replace with a copy that I have.

25            SPECIAL MASTER ESSHAKI:  My copy --

Hearing before the Special Master - December 9, 2016

```
 1            MR. ELLIS:  It is handwritten but that way it will
 2   make it into the final.
 3            MR. CAULEY:  That's fine.  Obviously, Your Honor, I
 4   would note with regard to the referenced exhibit that at
 5   least the agreed items here is the result of mediation and
 6   negotiations in formal between the parties, and from our
 7   perspective that then moots the plaintiffs' motion as to
 8   specific items.
 9            MR. ELLIS:  The only point I would add in response
10   to that is it is our understanding that you do plan to issue
11   an order that will attach as an exhibit these agreements.
12            SPECIAL MASTER ESSHAKI:  I plan to issue an order
13   that -- a Nissan order that will attach that agreement, it
14   needs to be sealed, and you have to draft it.
15            MR. ELLIS:  Understood, Your Honor.
16            SPECIAL MASTER ESSHAKI:  Get permission from
17   counsel as well.
18            MR. ELLIS:  Understood.
19            SPECIAL MASTER ESSHAKI:  All right.
20            MR. CAULEY:  Yes.
21            SPECIAL MASTER ESSHAKI:  I think we are done.  Let
22   me simply say, I am most appreciative for the hard work that
23   everybody has done in this case.  I only regret that
24   Judge Battani cannot see how hard you all have worked on this
25   motion, and it is a significant motion.  I think in the
```

Hearing before the Special Master - December 9, 2016

**129**

```
 1   history of the country it ranks as one of the most

 2   significant motions, and I know this has all been good-faith

 3   professionalism and you are all to be complimented for it.

 4   Thank you, thank you very much.

 5              MR. WILLIAMS:  Thank you, Your Honor.

 6              SPECIAL MASTER ESSHAKI:  Happy holidays everybody.

 7              (Proceedings concluded at 1:03 p.m.)

 8                       —    —    —

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4    the United States District Court, Eastern District of

 5    Michigan, appointed pursuant to the provisions of Title 28,

 6    United States Code, Section 753, do hereby certify that the

 7    foregoing pages comprise a full, true and correct transcript

 8    taken in the matter of Automotive Parts Antitrust Litigation,

 9    Case No. 12-2311, on Friday, December 9, 2016.

10

11

12                             s/Robert L. Smith
                               _____
                               Robert L. Smith, RPR, CSR 5098
13                             Federal Official Court Reporter
                               United States District Court
14                             Eastern District of Michigan

15

16

17    Date:  12/22/2016

18    Detroit, Michigan

19

20

21

22

23

24

25
```