# EXHIBIT I

[REDACTED]

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  | : |  |
| --- | --- | --- |
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : | Master File No. 2:12-md-02311 |
|  | : | Honorable Marianne O. Battani |
|  | : |  |
| ALL PARTS | : |  |
|  | : |  |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : |  |
|  | : |  |

# THE PARTIES' JOINT REPLY TO CERTAIN NON-PARTIES' OPPOSITIONS TO THE PARTIES' RENEWED MOTION TO COMPEL DISCOVERY

# [REDACTED]

[REDACTED]

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................................................2

II.    THE NARROWED LIST AND THE PARTIES' COMPROMISES.................................5

     A.     The Parties Substantially Narrowed the Subpoena's Requests in Their January 19, 2016 Motion to Compel and Further Narrowed Them in Their Renewed Motion..5

     B.     The Parties Now Offer Further Compromises to Lessen the Burden on the OEMs 6

          1.     The Parties Are No Longer Seeking Discovery in the *Wire Harnesses* Case...........................................................................................................6

          2.     The Parties Have Agreed to Stagger Production of Upstream Data and Documents to Begin With Information Relevant to the Lead Two Cases (*Bearings* and *AVRP*)...................................................................................6

          3.     For Upstream Discovery, Where Necessary, the Parties Have Agreed to Limit the Number of Non-Defendant Suppliers for Whom Information is Sought to Only a Few Per Parts Cases ........................................................7

          4.     The Parties Have Agreed to Limit Their Requests for Certain Categories of Downstream Information to Specific Models .........................................7

          5.     The Parties Have Agreed to Make Additional Concessions for Each OEM...................................................................................................7

          6.     The Parties Agree to Pay Half of the OEMs' Costs in Collecting and Producing Information that is not Readily Accessible Subject to the Parties' Ability to Assess what Discovery They Seek in Light of Costs.....8

III.    LEGAL STANDARD...................................................................................................8

     A.     OEMs Have a Duty to Cooperate with the Parties and to Comply with the Subpoena.................................................................................................10

          1.     An OEM's status as a nonparty does not excuse it from cooperation or compliance, especially because OEMs are so deeply tied to these cases ..10

          1.     Each OEM has a duty to be forthright and cooperate with the Parties to help them understand the status of the information sought and any burdens that may exist, and to produce all relevant and reasonably accessible information...............................................................................................11

[REDACTED]

B. Although not Required, the Parties Have Shown a Substantial Need for this Highly Relevant Information Uniquely in the Possession of the OEMs ..............13

IV. RELEVANCE OF THE INFORMATION REQUESTED.................................................14

A. Purchase and Procurement Data and Documents are Highly Relevant ................15

1. Transactional purchase data........................................................................15

2. Annual Price Reduction ("APR") data .....................................................15

3. RFQ-related data and documents...............................................................16

4. Contract and master purchase agreements ................................................17

5. Information on Defendant and non-defendant suppliers should be produced to the fullest extent possible.......................................................17

6. Information on RFQs should be produced to the fullest extent possible...18

B. Cost Data and Documents.......................................................................................19

1. VIN-level cost data (transaction-level cost data).....................................19

C. Pricing Data and Documents .................................................................................21

1. Manufacturer Sales Retail Price (MSRP) .................................................21

2. Pricing documents.......................................................................................21

D. Sales data and documents.......................................................................................24

1. Transactional sales data (OEMs to dealers, distributors, and fleet customers)......................................................................................................24

2. Transactional sales data (dealers to end-purchasers)................................24

3. Information on incentives and rebates from OEMs to dealers and end-purchasers....................................................................................................25

4. Parts tracking documents ...........................................................................27

E. The Importance of Covering as Much of the Alleged Time Periods as Possible ..27

F. The Positions of the Parties in the Direct Purchaser Cases has no Bearing on What Information is Relevant in the Indirect Purchaser Actions .....................................28

G. The Parties should not be limited to only filling in gaps in the record .................29

[REDACTED]

|  |  | 1. | Purchase and Procurement Requests | 30 |
|  |  | 2. | Pricing and Sales Requests | 30 |
| V. |  | RESPONSE TO NISSAN'S "PHASED DISCOVERY" APPROACH | | 31 |
| VI. |  | CONFIDENTIALITY | | 32 |
|  | A. | The Protective Order is Sufficient to Protect Even the Most Sensitive Information | | 32 |
|  | B. | The Parties Offer Further Assurances, Which Should Cure Any Concerns | | 33 |
| VII. |  | THE PARTIES' POSITION ON COST SHARING AND ATTORNEYS' FEES | | 34 |
|  | A. | Payment of Costs to Nonparties is not Automatic | | 34 |
|  |  | 1. | Costs must be significant | 35 |
|  |  | 2. | Cost-sharing is not appropriate where a nonparty has an interest in the litigation | 35 |
|  |  | 3. | Where the OEMs have the ability to pay costs, cost-sharing is less warranted | 36 |
|  |  | 4. | Where a matter is of great public importance, cost-sharing is less warranted | 37 |
|  | B. | The Parties Should not Have to Share Costs that are Unreasonable | | 37 |
|  | C. | The Parties Should not Have to Share Costs for Information that is Readily Accessible | | 38 |
|  | D. | The OEMs' Demand for Attorneys' Fees is Inappropriate and Unreasonable | | 39 |
| VIII. |  | CONCLUSION | | 43 |

[REDACTED]

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. FBI*,
　194 F.R.D. 316 (D.D.C. 2000) .................................................................. 10

*Alyeska Pipeline Service Co. v. Wilderness Society*,
　421 U.S. 240 (1975) ................................................................................ 40

*Behrend v. Comcast Corp.*,
　248 F.R.D. 84 (D. Mass. 2008) ......................................................... 35, 38

*Bell Inc. v. GE Lighting, LLC*,
　2014 WL 1630754 (W.D.Va. April 23, 2014) .................................... 39, 42

*Cornell v. Columbus McKinnon Corp.*,
　2015 WL 4747260 (N.D. Ca. Aug. 11, 2015) .................................... 10, 37

*Covey Oil Co. v. Cont'l Oil Co.*,
　340 F.2d 993 (10th Cir. 1965) .............................................................. 29

*Dow Chem. Co. v. Reinhard*,
　2008 WL 1968302 (S.D.N.Y. Apr. 29, 2008) ........................................ 10

*G & E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC*,
　2016 WL 1258458 (D.D.C. March 30, 2016) ..................................... 38, 40

*Georgia-Pacific LLC v. Am. Intern. Specialty Lines Ins.*,
　278 F.R.D. 187 (S.D. Ohio Jan. 29, 2010) ........................................... 43

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div. Inc.*,
　2007 U.S. Dist. LEXIS 53217 (D. Kan. July 20, 2007) .......................... 41

*In re Am. Hous. Found.*,
　2013 WL 2422706 (U.S. Bankr. N.D. Tex. June 4, 2013) ...................... 40

*In re Am. Nurses Ass'n*,
　643 Fed. Appx. 310 (4th Cir. 2016) ...................................................... 41

*In re Auto. Refinishing Paint Antitrust Litig.*,
　229 F.R.D. 482 (E.D. Pa. 2005) ........................................................... 41

*In re Cathode Ray Tube* (*CRT*) *Antitrust Litig.*,
　2013 U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013) ..................... 14

**[REDACTED]**

*In re Domestic Drywall Antitrust Litig.*,
   2014 U.S. Dist. LEXIS 67762 (E.D. Pa. 2014) .................................................... 24

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ...................................................... 21

*In re First Am. Corp.*,
   184 F.R.D. 234 (S.D.N.Y. 1998) ......................................................................... 36

*In re Law Firms of McCourts & McGrigor Donald*,
   2001 WL 345233 (S.D.N.Y. April 9, 2001) ......................................................... 43

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 4:13-md-02420-YGR, MDL No. 2420 (N.D. Cal.) (ECF 1553, filed Oct. 31, 2016) ....... 21

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   2012 WL 298480 (E.D. Pa. Jan. 31, 2012) ............................................. 24, 29, 33

*In re Optical Disk Drive Antitrust Litig.*,
   2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ......................................................... 20

*In re Static Random Access Memory* (*SRAM*) *Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009).......................................................................... 14

*In re Static Random Access Memory* (*SRAM*) *Antitrust Litig.*,
   No. ML07-cv-0819-CW, ECF No. 967 (N.D. Cal. Mar. 1, 2010)................... 15, 26, 32

*In re Subpoena of Am. Nurses Ass'n*,
   290 F.R.D. 60 (D. Md. 2013)............................................................................... 43

*In re TFT-LCD* (*Flat Panel*) *Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010)......................................................................... 21

*In re Urethane Antitrust Litig.*,
   237 F.R.D. 454 (D. Kan. 2006)............................................................................ 30

*In re Vitamins Antitrust Litig.*,
   198 F.R.D. 296 (D.D.C. 2000)............................................................................. 19

*In re Vitamins Antitrust Litig.*,
   267 F. Supp. 2d 738 (S.D. Ohio 2003) ............................................................... 33

*In re Wire Harnesses Antitrust Litig.*,
   2013 U.S. Dist. LEXIS 80338 (E.D. Mich. June 6, 2013)................................... 14

*Insulate Am. v. Masco Corp.*,
   227 F.R.D. 427 (W.D.N.C. 2005)........................................................................ 33

**[REDACTED]**

*Kean v. VanDyken*,
   2006 WL 374501 (W.D. Mich. 2006) ................................................................ 42

*Kisser v. Coal. For Religious Freedom*,
   1995 WL 590169 (E.D. Pa. 1995) ...................................................................... 42

*Lefta Assocs. v. Hurley*,
   2011 WL 1793265 (M.D. Pa. May 11, 2011) ..................................................... 41

*Linder v. Calero-Portocarrero*,
   251 F.3d 178 (D.C. Cir. 2001) ........................................................................... 35

*Maximum Human Performance, LLC v. Sigma-Tau Healthscience, LLC*,
   2013 WL 4537790 (D.N.J. Aug. 27, 2013) ................................................. 11, 40

*Mgmt. Compensation Group Lee, Inc. v. Oklahoma State Univ.*,
   2011 WL 5326262 (W.D. Okla. Nov. 3, 2011) ................................................... 40

*Orleman v. Jumpking, Inc.*,
   2000 WL 1114849 (D. Kan. July 11, 2000) ....................................................... 30

*Pac. Gas & Elec. Co. v. Lynch*,
   2002 WL 32812098 (N.D. Cal. 2002) ................................................................. 43

*Polyurethane Foam*,
   2014 U.S. Dist. LEXIS 27116 (W.D. Ohio Feb. 26, 2014) ................................. 9

*Sonoma County Ass'n of Ret. Emp. v. Sonoma County*,
   2015 WL 10767718 (S.D.N.Y. Oct. 6, 2015) ..................................................... 43

*Sound Security, Inc. v. Sonitrol Corp.*,
   2009 U.S. Dist. LEXIS 59630 (W.D. Wash. June 26, 2009) .............................. 36

*Sound Security, Inc. v. Sonitrol Corp.*,
   2009 WL 1835653, at *2-3 (W.D. Wash. June 26, 2009) ................................... 42

*Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus., Inc.*,
   2005 WL 2045818 (W.D. Mich. Aug. 24, 2005) ................................................ 33

*State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.*,
   2007 WL 2993840 (E.D.N.Y. Oct. 10, 2007) ..................................................... 29

*Steward Health Care Sys. LLC v. Blue Cross & Blue Shield of R.I.*,
   2016 U.S. Dist. LEXIS 154313 (E.D. Pa. Nov. 4, 2016) .................................... 41

*Stormans Inc. v. Selecky*,
   2015 WL 224914 (W.D. Wash. Jan. 15, 2015) ................................................... 41

**[REDACTED]**

*Sun Capital Partners*, *Inc. v. Twin City Fire Ins. Co.*,
    2016 U.S. Dist. LEXIS 58208 (S.D. Fla. Apr. 26, 2016) ...................................... 36

*U.S. v. CBS*, *Inc.*,
    103 F.R.D. 365 (C.D. Cal. 1984) .............................................................. 40

*Ultimate Timing, LLC v. Simms*,
    2010 WL 378436 (S.D. Ind. Feb. 1, 2010) ............................................... 33

*United States v. Blue Cross Blue Shield of Mich.*,
    2012 WL 4513600 (E.D. Mich. Oct. 1, 2012) ......................................... 13

*United States v. Blue Cross Blue Shield of Michigan*,
    2012 U.S. Dist. LEXIS 146403 (E.D. Mich. Oct. 11, 2012) ........................... passim

*United States v. Columbia Broad. Sys.*, *Inc.*,
    666 F.2d 364 (9th Cir. 1982) .................................................................. 42

*Universal Del.*, *Inc. v. Comdata Network*, *Inc.*,
    2011 WL 1085180 (M.D. Tenn. Mar. 21, 2011) ..................................... 33

*US Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
    2012 WL 5395249 (S.D.N.Y. Nov. 5, 2012) .......................................... 42

*Western Ben. Solutions, LLC v. Gustin*,
    2012 WL 4417190 (D. Idaho Sept. 24, 2012) ....................................... 42

*Western Convenience Stores, Inc. v. Suncor Energy Inc.*,
    2014 WL 1257762 (D. Colo. Mar. 27, 2014) ........................................ 39

*Williams v. City of Dallas*,
    178 F.R.D. 103 (N.D. Tex. 1998) ..................................................... 35, 42

*Zubulake v. UBS Warburg, LLC*,
    217 F.R.D. 309 (S.D.N.Y. 2003) ......................................................... 39

**Rules**
Federal Rules of Civil Procedure
    Rule 26(b)(1) ........................................................................................ 10
    Rule 30(b)(6) ................................................................................... 11, 23
    Rule 45 ..................................................................................... 38, 41, 42
    Rule 45(d)(1) ...................................................................................... 41
    Rule 45(e)(1)(D) ................................................................................. 39

[REDACTED]

The Parties[1] respectfully submit this Joint Reply to certain nonparties' (the "OEMs")[2] oppositions to the Parties' Renewed Motion to Compel Discovery from Certain Nonparty Original Equipment Manufacturers and Their Affiliated Entities ("Renewed Motion").[3] This joint reply is supported by the Supplemental Declaration of Steven N. Williams ("Williams Supp. Decl."), and six individual declarations filed herewith.

---

[1] The "Parties" joining in this reply include End-Payor Plaintiffs ("EPPs"), Truck and Equipment Dealer Plaintiffs ("TEDPs"), the State of Florida, the State of Indiana (collectively, "Plaintiffs"), and certain non-settled Defendants in all indirect parts cases in *Automotive Parts Antitrust Litigation*, No. 2:12- md-02311-MOB-MKM (E.D. Mich.). Not all undersigned Defendants join this motion with respect to all OEMs. *See* ECF No. 1185 at Attachment A.

[2] The OEMs (subject to this renewed motion) include the following entities: FCA USA LLC ("FCA"); General Motors Company, General Motors Holdings LLC, General Motors LLC; American Honda Motor Company, Inc., Honda Manufacturing of Indiana LLC, Honda North America, Inc., Honda of America Mfg., Inc., Honda of South Carolina Mfg., Inc., Honda Precision Parts of Georgia, LLC, Honda R&D Americas, Inc., Honda Research Institute USA, Inc., Honda Transmission Manufacturing of America, Inc.; Nissan Design America, Inc., Nissan Diesel America, Inc., Nissan North America, Inc., Nissan Technical Center North America, Inc.; Subaru of Indiana Automotive, Inc.; Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Sales, U.S.A., Inc. Since the Parties' opening brief was filed, the Parties have resolved all discovery disputes with Subaru of America, Inc. ("SOA") and have withdrawn the Renewed Motion as to SOA.

[3] *See* The Parties Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufacturers and their Affiliated Entities, 2:12-md-02311-MOB-MKM (E.D. Mich. Nov. 22, 2016), ECF No. 1495 ("Renewed Motion" or "ECF No. 1495"). *See also* Non-Party FCA US LLC's Opposition to the Parties' Renewed Motions to Compel, 2:12-md-02311-MOB-MKM (E.D. Mich. Nov. 22, 2016), ECF No. 1519 ("FCA Opp"); General Motors' Opposition to the Parties' Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities, 2:12-md-02311-MOB-MKM (E.D. Mich. Nov. 22, 2016), ECF No. 1535 ("GM Opp"); Non-Party Honda's Opposition to the Parties' Motion to Compel Further Subpoena Responses, 2:12-md-02311-MOB-MKM (E.D. Mich. Nov. 22, 2016), ECF No. 1533 ("Honda Opp"); Nissan North America's Opposition to the Parties' Renewed Motion to Compel Discovery, 2:12-md-02311-MOB-MKM (E.D. Mich. Nov. 22, 2016), ECF No. 1524 ("Nissan Opp"); Non-Party Subaru of Indiana Automotive, Inc.'s Brief in Opposition to the Parties' Renewed Motion to Compel Discovery from Certain Non-Party Original Equipment Manufacturers and Their Affiliated Entities, 2:12-md-02311-MOB-MKM (E.D. Mich. Nov. 22, 2016), ECF No. 1527 ("SIA Opp"); Toyota's Response to the Parties' Renewed Motion to Compel, 2:12-md-02311-MOB-MKM (E.D. Mich. Nov. 22, 2016), ECF No. 1528 ("Toyota Brief").

[REDACTED]

# I.      INTRODUCTION

After a year and a half of deep cuts and compromises by the Parties, the uniform subpoena ("Subpoena") now stands at bare bones. The Parties have made every effort to lessen the burden on the OEMs and, as a result, the Subpoena is now a substantially narrowed list of requests (the "Narrowed List"). The Narrowed List contains only highly relevant discovery for class certification and to support the Parties' claims and defenses. Some of the OEMs have made meaningful offers of production, and the Parties remain hopeful that resolutions can soon be reached with those entities. Other OEMs claim that they have made substantial offers of production but, in reality, their offers do not begin to cover the categories for which discovery is sought or omit key categories entirely.[4] The OEMs continue to refuse production in certain categories (either in full or in part) but fail to substantiate their claims of burden, relevance, or sensitivity. The failure to provide such substantiality merits the grant of the Parties' Renewed Motion.

The OEMs suggest that this is the largest MDL in history (encompassing forty separate groups of parts cases, each large in its own right). Assuming this is correct – which is not a given – this point actually supports the Parties' Renewed Motion. In light of the size of this proceeding and claims at stake, the OEMs cannot credibly argue that the limited discovery sought is disproportional to the needs of the multitude of cases in this MDL. While the MDL is certainly large and complex, there have been many other large and complex cases in the history of the United States Judiciary, cases that have involved many parties and vast amounts of party and nonparty discovery. The size of MDL is simply a function of the alleged underlying conduct giving rise to these cases, and that conduct was directed at the OEMs. The discovery being sought is a reflection of the relevant issues in these cases. Given those facts, the OEMs have failed to show why they –

---

[4] The particular status of negotiations between the Parties and each OEM is discussed in the six individual declarations, submitted herewith.

[REDACTED]

unlike non-parties in possession of relevant evidence in other cases – should either be excused from producing relevant evidence, or should have all of their costs and attorneys' fees paid by the Parties.

The Subpoena is now a streamlined list of only the most highly relevant requests. On the upstream purchase and procurement categories, where information will be produced by part or by supplier, the OEMs currently are being asked to produce information only in two parts cases at this time – *Bearings* and *Anti-Vibrational Rubber Parts* ("*AVRP*") (collectively, the "Lead Two Cases"). For all other categories of information (including vehicle costs, pricing, and sales), information will be produced by vehicle. ***This means that each OEM is being asked to produce only one set of information on downstream discovery – one time – to satisfy production in all forty groups of parts actions; therefore, for most categories on the Narrowed List, there is no incremental burden at all.*** In addition to cutting the list of requests and prioritizing for the first two parts in upstream categories, for a number of categories (where information is sought by vehicle), the Parties have also offered to limit their requests to certain model years (for the life cycles of those specific models). Finally, the Parties in the Lead Two Cases have agreed to forego custodial files for upstream discovery – a material concession that addresses an area of burden on which the OEMs had been particularly focused. This approach substantially limits the scope of the discovery being sought from the OEMs.

The categories on the Narrowed List are all highly relevant. The OEMs and their hired experts offer conclusory statements, characterizing the requested information as unnecessary. However, these statements fly in the face of nearly every indirect price-fixing case on record in which this information is routinely requested, produced, and analyzed in class certification decisions. There is no basis to withhold production on relevancy grounds.

**[REDACTED]**

The OEMs' arguments regarding confidentiality also fail. To the extent any OEM can show that its highly sensitive or proprietary information would be subject to production, the protective orders in these cases (the "Protective Orders") are more than sufficient. In fact, Defendants in the various parts actions have been safely producing similar competitively sensitive information under the Protective Orders in party discovery since party discovery began. While not necessary, the Parties are willing to go one step further to offer certain additional assurances to the OEMs regarding how their information will be handled and used, which will sufficiently address all of the OEMs' concerns.

Even where the OEMs claim that they have responsive information (and even where there is no burden associated with production of that information), they refuse production unless the Parties pay 100 percent of their costs and all of their attorneys' fees. There is no basis under the Federal Rules of Civil Procedure ("Rules") or case law for the OEMs' position. Cost-sharing is appropriate only in certain circumstances, where costs are significant, and after a balancing of factors. Here, the relevant factors weigh against cost-sharing because the OEMs are deeply tied to these cases; they are some of the most profitable companies in the world and are already believed to have settled their own claims against some Defendants for millions of dollars; and this MDL is of great public importance. There is especially no support for the notion that some of the largest global manufacturers, with large sophisticated legal departments, should have any attorneys' fees reimbursed. The Supreme Court has articulated the American Rule which plainly precludes such reimbursement. To accept the OEMs' unreasonable demands on costs and attorneys' fees would be unprecedented. It would go against the case law of this circuit (and nationwide) – and send a message that any nonparty, just by virtue of having been served with a subpoena, should be fully compensated for simply doing their duty to cooperate and comply with the judicial process. To

[REDACTED]

accept the OEMs' demand for costs and fees associated with *opposing* the Subpoena would be even more problematic because it would provide future nonparties with every incentive to frustrate the judicial process as much as possible.

For these reasons, the Parties' Renewed Motion should be granted.

## II.    THE NARROWED LIST AND THE PARTIES' COMPROMISES

The Parties have significantly narrowed their requests to the OEMs from the original 37 requests presented in the Subpoena. The Parties' Narrowed List seeks only the information most relevant to the Parties' litigation of the claims at issue in these actions. The Parties seek only purchase data, procurement data, and limited central procurement documents, cost data, pricing documents, and sales data,[5] information that is highly relevant to the Parties' cases. The Narrowed List represents a considerable effort among the Parties to cut down their discovery requests to the OEMs to the information most vital to class certification, damages, determination of overcharge, and their experts' pass-through analyses.

### A.    The Parties Substantially Narrowed the Subpoena's Requests in Their January 19, 2016 Motion to Compel and Further Narrowed Them in Their Renewed Motion

In addition to the narrowing that took place throughout the meet-and-confer process leading up to the Parties' original motion to compel in January 2016, the list of requests in the Parties' January 19 Motion[6] was considerably narrower than the scope of the original Subpoena served during the summer of 2015. The Parties moved to compel on only 14 of the 37 requests in the Subpoena, and further eliminated multiple subparts of many of those 14 requests.[7] Contrary to

---

[5] *See* ECF No. 1495 at 8-10.

[6] The Parties Joint Motion to Compel Discovery from Non-Party Original Equipment Manufacturers, 2:12-md-02311-MOB-MKM, ECF No. 1185, at 2 (E.D. Mich. Jan. 19, 2016) ("ECF No. 1185" or "January 19 Motion").

[7] *Id.*

**[REDACTED]**

the OEMs' assertions, the eliminated requests were significant, and were not duplicative of the requests that the Parties included in the January 19 Motion.

> **B.** **The Parties Now Offer Further Compromises to Lessen the Burden on the OEMs**

> > **1.** **The Parties Are No Longer Seeking Discovery in the *Wire Harnesses* Case**

As noted in the Parties' Renewed Motion, and in light of the settlements between the Indirect Purchaser Plaintiffs and Defendants in the *Wire Harnesses* cases, the Parties are no longer seeking upstream discovery related to Wire Harnesses at this time.[8] Several OEMs have indicated that searching for data and documents related to Wire Harnesses would have been particularly onerous given that these components comprise many individual parts. Therefore, this compromise significantly lessens the burdens on the OEMs.

> > **2.** **The Parties Have Agreed to Stagger Production of Upstream Data and Documents to Begin With Information Relevant to the Lead Two Cases (*Bearings* and *AVRP*)**

The Parties have agreed to limit the OEMs' initial productions of upstream data and documents to those relevant to the *Bearings* and *AVRP* cases, with productions related to other cases to follow later, as needed. The Parties' willingness to limit upstream discovery to only two groups of parts cases out of 40 lessens the OEMs' burdens considerably. Further, as noted in the Denso Motion, it is possible that upstream discovery relevant to certain other cases may never be needed or may be further limited.[9]

---

[8] *See also* DENSO Defendants' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers, No. 2:12-cv-00101-MOB-MKM, ECF No. 323 (E.D. Mich. Nov. 7, 2016) ("Denso Motion").

[9] *See id*. at ii (arguing that upstream discovery relevant to the *Wire Harnesses* case be held in abeyance until "it can be determined that such discovery is in fact necessary").

[REDACTED]

**3. For Upstream Discovery, Where Necessary, the Parties Have Agreed to Limit the Number of Non-Defendant Suppliers for Whom Information is Sought to Only a Few Per Parts Cases**

For certain OEMs, and based upon the unique and individualized burdens they have articulated, the Parties have agreed to narrow their requests for transactional purchase data and RFQ data to purchases from Defendant suppliers and a limited list of three to five non-defendant suppliers per parts case. Certain OEMs have informed the Parties that it is most efficient to pull their upstream data based on supplier name or code, rather than by component or commodity code, given that the part definitions in the Parties' cases do not always match up with the part names used by the OEMs. In consideration of the burden that these OEMs have articulated, the Parties have agreed to provide a limited list of non-defendant suppliers in each parts case for which these OEMs will pull upstream data.[10] This concession meaningfully lessens the burden of producing upstream data for these OEMs.

**4. The Parties Have Agreed to Limit Their Requests for Certain Categories of Downstream Information to Specific Models**

For certain OEMs that have articulated unique and individualized burdens associated with collecting and producing vehicle cost and pricing data associated with a large number of vehicle models, the Parties have agreed to limit their requests for these types of information to a limited number of vehicle models and model years. This compromise significantly reduces the burdens of these OEMs.

**5. The Parties Have Agreed to Make Additional Concessions for Each OEM**

In negotiations with the OEMs since the filing of the Renewed Motion, the Parties have offered many additional concessions, in the interest of reaching agreement and lessening the

---

[10] The Parties will require reasonable input from these OEMs regarding the selection of these suppliers (e.g., input regarding the OEMs' largest suppliers of the relevant parts).

[REDACTED]

burden on the OEMs, based on each OEM's individual circumstances. Many of these compromises

are detailed in the OEM-specific declarations accompanying this brief, were discussed at the

mediation before the Special Master, or in meet-and-confer discussions, and include the following:

the Parties in the Lead Two Cases agree not to pursue upstream custodial files related to RFQs or

procurement, sparing the OEMs the burden of an extensive custodial collection at this time. The

Parties continue to seek minimal custodial files related to vehicle pricing.

> **6.    The Parties Agree to Pay Half of the OEMs' Costs in Collecting and Producing Information that is not Readily Accessible Subject to the Parties' Ability to Assess what Discovery They Seek in Light of Costs**

Regarding the OEMs' costs of compliance, the Parties agree to pay half of each OEM's

costs of collection and production for data and documents that are not readily accessible and where

the OEMs have articulated a clear burden. The Parties' offer is subject to the OEMs providing

sufficient information in advance of collection regarding their costs of production for information

that is not reasonably accessible, and the Parties' ability to determine what discovery to seek in

light of the OEMs' anticipated costs. The Parties make this offer to share costs notwithstanding

that the OEMs do not have the right to in these circumstances. The Parties do not offer

reimbursements for any attorneys' fees.

## III.    LEGAL STANDARD

The Subpoena, which has been narrowed substantially by the Parties since it was served

nearly a year and a half ago, is indisputably proportionate to the needs of these cases. For nearly

two years, more than a hundred law firms have made an unprecedented collaborative effort to

pursue this key discovery in a way that would satisfy the varying needs of multiple groups of

Plaintiffs and more than a hundred Defendants across dozens of complex antitrust actions

involving 40 different parts, while minimizing the burdens on the entities served. As the OEMs

**[REDACTED]**

themselves have recognized, *Auto Parts* is unprecedented in scope.[11] This litigation potentially impacts millions of consumers throughout the country and implicates hundreds of millions of purchases and leases of vehicles worth billions of dollars over the last twenty years. The Court should not lose sight of the fact that much of this Subpoena is intended to cover the requests of *all* Parties across *all* parts cases.

Although the scope of the Subpoena is reasonably proportional to the magnitude of this litigation,[12] the Parties have nonetheless spent a massive amount of time working with each other and with the OEMs to make meaningful concessions and further narrow the categories of discovery being sought. The Parties have also made extensive efforts to balance their own individual needs with each OEM's unique circumstances, including developing customized proposals for each OEM in light of the information revealed at the 30(b)(6) depositions regarding the availability of the requested materials as well as any burdens and costs associated with production.

While the Parties have made substantial concessions to accommodate the OEMs, there is simply no way around the fact that the OEMs possess, and in many cases are in sole possession of, certain information that is highly relevant to core issues in these cases. The Parties have satisfied their burden of demonstrating the relevance of this information and the need for this information to address injury, class certification, and damages.[13] While the OEMs bear the "heavy burden" of showing that the discovery is not proportional once relevance is established, the Parties have gone the extra mile to demonstrate that the Rule 26 proportionality factors weigh entirely in

---

[11] *See*, *e.g.*, GM Opp. at 1. (acknowledging that this is "likely the largest set of antitrust conspiracies ever….").

[12] *See Polyurethane Foam*, 2014 U.S. Dist. LEXIS 27116, at *8-9 (W.D. Ohio Feb. 26, 2014) (refusing to quash subpoena where "MDL is itself broad in the topics it addresses").

[13] *See*, *e.g.*, January 19 Motion.

[REDACTED]

favor of enforcing the Subpoena.[14] In response, the OEMs have failed to show why this discovery should not be permitted, let alone provide any reasonable basis for their bald assertions that the Subpoena should be quashed.[15]

### A. OEMs Have a Duty to Cooperate with the Parties and to Comply with the Subpoena

#### 1. An OEM's status as a nonparty does not excuse it from cooperation or compliance, especially because OEMs are so deeply tied to these cases

The OEMs' status as nonparties does not relieve them of their obligations to comply with the Parties' narrowly tailored Subpoena. Rather, a subpoena to a nonparty under Rule 45 is governed by the same standards as Rule 26, which states that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). This is especially true where, as here, the subpoenaed entities have a strong interest in and are deeply tied to the outcome of the litigation. *See*, *e.g.*, *Dow Chem. Co. v. Reinhard*, 2008 WL 1968302, at *2 (S.D.N.Y. Apr. 29, 2008) (recognizing that the Rules are intended to protect the "quintessential, innocent, disinterested bystander" who has no stake in the litigation).

Courts are also more likely to enforce a subpoena and less likely to grant cost-shifting where the nonparty stands to benefit from the disposition of the instant litigation, has a long-standing relationship with the requesting party, and/or was substantially involved in the underlying transaction and could have anticipated that it would reasonably spawn litigation.[16]

---

[14] *Id*. at Section II; *Alexander v. FBI*, 194 F.R.D. 316, 325-26 (D.D.C. 2000).

[15] *See*, *e.g.*, FCA Opp. at 7 ("the subpoena should be quashed in its entirety for violating Rule 45 and failing Rule 26's rule of proportionality…."); Nissan Opp, at 14 ("The Subpoena Should Be Quashed in Its Entirety Because It Is Grossly Burdensome….").

[16] *See*, *e.g.*, *Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260, at *3 (N.D. Ca. Aug. 11, 2015) ("[Nonparty's] direct stake in the outcome of this case—namely, the prospect of recouping more than its cost of compliance—effectively renders the discovery expenses involved here far less 'significant' to [nonparty]."); *Maximum Human Performance v. Sigma-Tau*

**[REDACTED]**

The OEMs are potential members of the Direct Purchaser Plaintiff ("DPP") classes, and many are believed to have settled their claims with certain Defendants in this litigation for substantial payments. The OEMs also clearly have a long-standing relationship with Defendants (as Defendants' customers), with ADPs and TEDPs (the primary customers of the OEMs)[17], and with the EPPs (who purchase billions of dollars of the OEMs' vehicles). These considerations weigh heavily against any argument that the OEMs are entitled to entirely avoid discovery, as they have claimed.

> **1.** **Each OEM has a duty to be forthright and cooperate with the Parties to help them understand the status of the information sought and any burdens that may exist, and to produce all relevant and reasonably accessible information**

The discovery-on-discovery Rule 30(b)(6) depositions ordered by the Court were a direct consequence of the OEMs' failure to disclose during the lengthy meet-and-confer process what relevant data and documents they have, where they are located, and what burdens exist to collect and produce these highly relevant materials.[18] Assertions by the OEMs that the Court's

---

*Healthscience*, 2013 WL 4537790, at *4 (D.N.J. Aug. 27, 2013) (granting motion to compel the production of discovery and denying counsel fees, finding that nonparty was interested because plaintiff had been its customer for ten or more years); *United States v. Blue Cross Blue Shield of Michigan*, 2012 U.S. Dist. LEXIS 146403, at *9-10 (E.D. Mich. Oct. 11, 2012) (finding that when nonparty hospitals entered into agreements with defendant, they were aware of particular clauses and could have anticipated they could spawn litigation).

[17] Out of the six OEMs that sat for Rule 30(b)(6) depositions, only Honda and GM manufacture vehicles relevant to TEDPs' five pending parts cases. Still, only GM has recognized this; Honda refuses.

[18] *See* Mot. Hrg. Tr. (Special Master Esshaki), Master File No. 2:12-md-02311, ECF No. 1270 (Mar. 25, 2016) ("I reached the conclusion that there simply isn't sufficient information before me today to make a reasonable decision…" and "the best course of conduct would be to conduct some 30(b)(6) depositions of the OEMs in order to better understand what information is available, reasonably accessible, and the costs and burden that would be incurred in having to generate that information…."); *see also* Hrg. Tr. (Judge Battani), Master File No. 2:12-md-02311, ECF No. 1405 (July 1, 2016) (ordering that the 30(b)(6) depositions on discovery go forward as to the OEMs).

[REDACTED]

unwillingness to decide the motion originally was a result of the Parties' failure to satisfy their

burden of persuasion are wrong and unsupported by the record. *See* FCA Opp. at 4.

Through the meet-and-confer process and 30(b)(6) depositions, the Parties learned that in

some cases it may not be possible for an OEM to produce a complete set of documents and data

requested by the Parties for the full time period because the information is either inaccessible, no

longer exists for particular years, or would impose undue burdens to search for and collect. The

Parties understand these potential limitations and continue to limit their requests to *reasonably*

*accessible* data and documents in the OEMs' possession for the time period sought.

Nevertheless, the OEMs have a continuing duty to be forthright and cooperative with the

Parties so that agreements can be reached and these cases can finally move forward with the

information necessary to resolve key issues. The OEMs cannot now use these depositions against

the Parties by flipping them into burden arguments or by attempting to foreclose the Parties from

asking additional follow-up questions.[19] After all, the meet-and-confer process is the proper forum

for these types of questions, which could have and should have been answered by the OEMs during

the initial round of meet-and-confer communications. While the Parties made every effort to solicit

as much information as possible during these depositions, and incurred significant burdens and

costs themselves in connection with doing so, they should in no way be limited to the questions

asked during the depositions if further information is necessary to advance negotiations.

---

[19] *See*, *e.g.*, Toyota Opp. at 5 ("On the call, the Parties asked many additional questions.... The
Parties did not explain why they chose not to ask those questions in their 14 hours of depositions.");
Subaru Opp. at 19 (arguing that SIA was forced to retain outside counsel in connection with
preparing and producing two witnesses for Rule 30(b)(6) discovery-on-discovery depositions).

[REDACTED]

## B.   Although not Required, the Parties Have Shown a Substantial Need for this Highly Relevant Information Uniquely in the Possession of the OEMs

Certain of the OEMs argue that they should not be required to produce this highly relevant discovery because the Parties have not shown "substantial need" for it.[20] As an initial matter, neither the Rules nor the relevant case law requires a showing of a substantial need. Where a court finds that the information and documents are relevant, the nonparty "bear[s] a particularly heavy burden in showing that [the] subpoena[] impose[s] an undue burden" and that the discovery should not be permitted. *See United States v. Blue Cross Blue Shield of Mich.*, 2012 WL 4513600, at *6 (E.D. Mich. Oct. 1, 2012); *Alexander*, 194 F.R.D. at 325-26. The OEMs have failed to meet this burden.

Even if the Parties did have the burden to show a substantial need, this burden was satisfied by the Parties' showing that the OEMs are the only sources of certain information that is central to the subject matter of these lawsuits.[21] For example, documents and data related to the OEMs' purchases of parts and sales of vehicles as well as prices and factors affecting those prices are highly relevant to determining the existence or absence of any overcharge and whether any such overcharge was passed on to dealers and consumers.

The OEMs are also uniquely in possession of many facts relevant to class certification, including whether or not their pricing decisions were across the board, or whether they varied based on assessments of numerous particularized factors, such as the target market for a vehicle, the expected or announced pricing for vehicles viewed as competitors, variations in global,

---

[20] *See*, *e.g.*, FCA Opp. at 7 ("The parties make no mention…of substantial need for any of their requests beyond what FCA US has offered."); Nissan Opp. at 14 (arguing against the production of certain highly relevant categories of information on the grounds that the Parties have not shown a substantial need for the information).

[21] At least one of the OEMs has implicitly conceded that this discovery is important to the resolution of these cases. *See*, *e.g.*, GM Opp. at 3 ("GM is ready to begin production of materials that will substantially advance the various class actions . . .").

[REDACTED]

national, regional, and local demand, and corporate objectives such as brand promotion, inventory clearance, the desire to attract first-time buyers that might become loyal customers over decades, among other considerations. The issue of whether or not each OEM made different strategic decisions as circumstances warranted bears heavily on whether common or individual issues will predominate in these cases.

## IV.   RELEVANCE OF THE INFORMATION REQUESTED

Plaintiffs will have the burden to show whether class certification is appropriate and to meet the requirements of Rule 23. To prevail, Plaintiffs will need to show an overcharge in each parts action and will need to set forth workable methodologies to show there was harm to class members on a common basis. Plaintiffs will analyze data from OEMs and will attempt to trace whether any alleged overcharge in each parts action was passed through to purchasers at each level of the distribution chain (all the way through to end-purchasers). *In re Wire Harnesses Antitrust Litig.*, 2013 U.S. Dist. LEXIS 80338, at *45 (E.D. Mich. June 6, 2013).[22] Defendants will perform their own analyses, will seek to argue against Plaintiffs' proposed methodologies, and may dispute the sufficiency of the data and documents used to support those methodologies. The categories on the Narrowed List specifically target the information necessary for the Parties' experts to support their respective arguments at class certification, and for or against liability and damages. Accordingly, the Parties request that the OEMs be ordered to produce responsive information in these categories as set forth herein.

---

[22] *See also*, *e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 137945, at *106 (N.D. Cal. June 20, 2013) ("[P]laintiffs still have the burden of demonstrating that 'there is a reasonable method for determining on a class-wide basis whether and to what extent the overcharge was passed on to each of the [indirect purchasers] at all levels of the distribution chain"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 612-613 (N.D. Cal. 2009) ("[t]he 'problem of proof in an indirect purchaser case is intrinsically more complex [than in a direct purchaser case], because the damage model must account for the actions of … intermediaries who allegedly passed on the overcharge.'") (citations omitted).

[REDACTED]

## A.    Purchase and Procurement Data and Documents are Highly Relevant

### 1.    Transactional purchase data

Transactional purchase data is highly relevant to these cases in that it will form the dataset used to measure any alleged overcharge and pass-through in each parts action. Williams Supp. Decl. at ¶ 2. It is also important in that it may contain additional information that would not be contained in any parts sales information that may come from Defendants, such as identification of the particular type of part used by an OEM (*e.g.*, a "wheel bearing" versus just a "bearing") and specific information on a part characteristics (*e.g.*, size, type, usage, etc.). *Id*. These types of information may also assist in allowing Plaintiffs to trace the cost of a particular part into a particular vehicle model, make, and trim level, to the extent possible, for the purpose of developing a model to demonstrate impact, overcharge, and pass through to class members. *Id*. The information will also greatly help cover gaps in the time period for which defendants' purchase data is either incomplete or does not exist. *Id*.

Transactional purchase data is routinely sought and produced in indirect purchaser price-fixing cases and produced by nonparty entities, including OEMs. *See*, *e.g.*, *In re Static Random Access Memory* (*SRAM*) *Antitrust Litig*. at 3-4, No. ML07-cv-0819-CW, ECF No. 967 (N.D. Cal. Mar. 1, 2010) (Order by Special Master Granting Indirect Purchaser Plaintiffs' Motion to Compel Production of Documents from Third-Party Jabil Circuit, Inc.) (hereinafter "*SRAM MTC Order*") (ordering wide production of transactional purchase data).

### 2.    Annual Price Reduction ("APR") data

APR data is highly relevant. To measure an overcharge on a part, it is important to know any adjustments that may have been made to a part's purchase price (and what price was actually paid for a part, after any adjustments), and the rationale for any adjustments. Williams Supp. Decl. at ¶ 3. EPPs allege collusion by Defendants on APRs. EPPs allege that Defendants met regularly

15

[REDACTED]

to discuss coordination of their APR negotiation strategies with OEMs. *Id*. Data related to APRs is highly relevant to EPPs' conspiracy claims related to APRs and Plaintiffs assert it will show whether Defendants participated in the alleged conduct. *Id*. Defendants seek APR information to attempt to demonstrate the absence of any APR conspiracy, the absence of any injury to Plaintiffs, and that any damages were minimal.

### 3.   RFQ-related data and documents

These cases involve allegations of bid-rigging, and information regarding the bids offered by Defendant suppliers goes directly to the heart and substance of such claims. Williams Supp. Decl. at ¶ 4. Accordingly, the substance of what bids were offered and accepted is highly relevant to EPPs' claims. *Id*. The OEMs' RFQ-related data and documents show the specific bids submitted by each supplier. *Id*. It is important for the Parties to be able to compare the bids of Defendant suppliers (alleged to have participated in the bid-rigging) to non-defendant suppliers (not alleged to have participated in the bid rigging), and the RFQ information sought from the OEMs will allow Plaintiffs to most effectively do so. *Id*.

EPPs seek this data to be able to counter Defendants' anticipated argument that while they may have conspired, the bid-rigging conspiracy was ultimately ineffective (*i.e.*, that Defendants did not actually follow through with their plans as to how they agreed to bid or the collusion did not affect the ultimate price paid by the OEMs). *Id*. The bid data will show what bids Defendants actually submitted and help to confirm whether the alleged bid-rigging activity took place, and the relationship between the prices bid and ultimately paid. *Id*.

Defendants also seek this discovery to support their arguments that the RFQ processes were highly competitive, that many competitors are not alleged to have colluded, and that the nature of the process may have made it impossible to overcharge the OEMs. In addition to what bids were offered and accepted, the OEMs' RFQ materials will also include highly relevant information such

[REDACTED]

as how OEMs set their target prices for a component, how those target prices compare to the contracted prices, the price and non-price factors considered by an OEM in making purchasing decisions, and any buyer evaluations of purchasing decisions. Defendants maintain that this information is relevant to determining whether an OEM was overcharged, and whether any such overcharge was passed on to Plaintiffs. Defendants further maintain that this information is relevant to class certification, as it may be used to argue Defendants' position that there is no common way to prove injury in light of the individualized factors that go into the RFQ process.[23]

### 4. Contract and master purchase agreements

Certain Parties continue to seek limited, highly relevant data in this category.[24] EPPs do not continue to pursue this information.

### 5. Information on Defendant and non-defendant suppliers should be produced to the fullest extent possible

███████████████████████████████████

███████████████████████████████

███████████████████████ FCA Opp. at 16-17; Honda Opp. at 14-19; Nissan Opp. at 8-10; SIA Opp. at 8. Having information on all Defendant suppliers is important on a number of levels. Williams Supp. Decl. at ¶ 5. Regarding transactional purchase data and APRs, having information on all defendant suppliers is important to establish whether each Defendant supplier's parts prices reflect an overcharge. *Id*. Regarding RFQ-data and documents, having information from all Defendant suppliers will be important to EPPs' analyses of whether bid-rigging took place in connection with various RFQs because it will allow for comparing and

---

[23] EPPs do not continue to seek any information related to target prices.
[24] EPPs do not continue to pursue this information.

[REDACTED]

contrasting all bids that were offered, and to a better understanding of the outcomes of the various RFQs. *Id.*

Similarly, it is important to have information on at least a few non-defendant suppliers in each parts case. *Id.* To best determine whether Defendants rigged bids, it is important to have information on bids that were not alleged to be rigged as a benchmark. *Id.* Information on bids from non-defendant suppliers will provide such a benchmark. *Id.*

Defendants also wish to use information on non-defendant suppliers to attempt to demonstrate the absence of any overcharge, and the absence of any conspiracy.

It is routine for parties to seek, and nonparty original equipment manufacturers to produce, a full set of information from defendant suppliers and information from non-defendant suppliers. *See* Renewed Motion at 13-15, n.32. The OEMs should produce the requested supplier information in full in this case as well.

**6.      Information on RFQs should be produced to the fullest extent possible**

Most of the OEMs have agreed to produce some RFQ-related data and documents, but some OEMs seek to unduly limit their production – in some cases even of reasonably accessible materials or live data – to certain years, certain parts, or a certain number of suppliers or parts. FCA Opp. at 16-17; Honda Opp. at 8-10; SIA Opp. at 8. These OEMs argue that the Parties need only a sampling of this information. *Id.* There are important reasons, however, why a fuller set of RFQ information should be produced, to the extent it is available and reasonably accessible. As explained above, these cases allege bid-rigging and, therefore, RFQ-related information goes to the heart of Plaintiffs' burden to prove their claims and to show to what extent, and on which parts, bid-rigging took place. Williams Supp. Decl. at ¶ 6. The Parties seek as full a set as possible to be able to prove or disprove of alleged bid rigging across as many parts and RFQs as possible, and across the time period relevant to the case. *Id.*

Case 2:12-md-02311-MOB-MKM    Doc # 548   filed 12/02/16   Pg 27 of 63   Pg ID 2589

[REDACTED]

Where the OEMs have responsive information on purchase and procurement data, they should be ordered to produce it without unduly restricting the number of suppliers or limiting the set that may be available.

### B.    Cost Data and Documents

#### 1.    VIN-level cost data (transaction-level cost data)

Certain OEMs have challenged the Parties' request to obtain VIN-level cost data as unnecessary.[25] Obtaining VIN-level cost data is important for several reasons. The goal for Plaintiffs in every indirect price-fixing case is to perform the most accurate measure of pass-through as possible. Williams Supp. Decl. at ¶ 7. VIN-level data is ideal in that respect, in that it provides a view of costs without any averaging (*i.e.*, it shows data for one vehicle rather than across a number of vehicles). *Id*. Defendants in indirect price-fixing actions routinely challenge plaintiffs' analyses of cost data. *Id.* Plaintiffs believe that performing a pass-through analysis with VIN-level data will make Plaintiffs' experts' analyses less susceptible to such an attack at class certification. *Id*.

In some cases, OEMs may not maintain VIN-level cost data. *Id*. Where that may be the case, the next best choice would be to obtain the least aggregated data available that provides a measure of total costs for specific vehicle models. *Id*. Ideally, any aggregated data would not be more aggregated than by year, make, model, and trim level. *Id*. Again, Plaintiffs' goal is to perform the most accurate cost and price measuring as possible and to best protect any analyses from Defendants' expected attacks. *Id*.

---

[25] *See* FCA Opp. at 13. FCA places misplaced reliance on *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 298-99 (D.D.C. 2000), in claiming that courts do not allow or require production of individualized downstream data. In that case, defendants sought an order compelling plaintiffs (a mix of direct and indirect purchasers) to provide downstream sales documents to defend only against direct purchasers' claims regarding opt out damages, not to prove pass-through or to defend claims by indirect purchaser plaintiffs in the coordinated action. *Id*. at 302.

**[REDACTED]**

Certain OEMs argue that Plaintiffs do not need any VIN-level cost data because they do not need to show the overcharge on each vehicle or trace that overcharge to each end-consumer.[26] While Plaintiffs agree that it is not necessary to show the overcharge on each vehicle nor to trace the overcharge to each end-consumer, that is not the reason why Plaintiffs believe this discovery is necessary. Williams Supp. Decl. at ¶ 8. Seeking VIN-level cost data (or the least aggregated data) is routine for plaintiffs in indirect price-fixing cases and is used to show overcharge and pass-through on a class-wide basis sufficient to meet the "rigorous analysis" standard applicable under Rule 23. *Id.* Plaintiff believe that if they did not seek and analyze this data, they would be challenged by Defendants for not doing so. *Id.*; *see*, *e.g.*, *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *10 (N.D. Cal. Feb. 8, 2016) (addressing defendants' criticism that the indirect purchaser plaintiffs' expert failed to look at sufficient relevant categories of data and/or improperly aggregated data in ways that conceal the potential existence of ODD sales in which there was no pass-through); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *21, n.32 (S.D.N.Y. Mar. 28, 2014) (holding as moot defendant's charge that the plaintiff expert's model impermissibly aggregated data by using four-week average prices for e-books rather than transaction prices, as the expert "subsequently offered a damages model based on individual transaction prices"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D. Cal.

---

[26] *See*, *e.g.*, FCA Opp. at 13 (citing ECF No. 1227-20, Declaration of Dr. McDonald)("an economic analysis of pass-through just requires estimating the relationship between price and gross cost, not input-by-input [cost]"). The OEMs' articulation of the standard is oversimplified, and many courts require much more than this to certify an indirect purchaser antitrust case. While some cases have adopted a less-stringent standard at class certification, *e.g.*, *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 320-21 (E.D. Mich. 2001) ("The courts have routinely observed that the inability to show injury as to a few does not defeat class certification…") (citation omitted), other courts require much more from plaintiffs seeking to certify an indirect purchaser class and it would be inappropriate for EPPs to forego evidence they believe is necessary given the challenges that they know Defendants will make.

[REDACTED]

2010) (addressing defendants' criticism that IPP expert used average prices and third-party data
from a market research company in her analysis, rather than disaggregated "more precise"
transactional data). *See also* Notice of Motion and Motion to Exclude the Proposed Expert
Testimony of Dr. Edward E. Leamer in *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-
02420-YGR, MDL No. 2420 (N.D. Cal.) (ECF 1553, filed Oct. 31, 2016) (argument advanced by
defendants that the IPP expert's regression analysis failed to account for all pricing variations and
omitted crucial variables, thus rendering his methodology unreliable). Because of the anticipated
challenges from Defendants, Plaintiffs seek production of this transaction-level information to the
extent it exists, or the next least-aggregated information available.

Where an OEM does not have VIN-level cost information, the Parties can agree to accept
information on total cost. The Parties request that this information be provided to the fullest extent
as is available.

    **C.**    **Pricing Data and Documents**

        **1.**    **Manufacturer Sales Retail Price (MSRP)**

██████████████████████████████████████████████████████

███████████████████████████ FCA Opp. at 22; Honda Opp. at 7; Toyota Brief at 3. While MSRP
schedules are helpful, they cannot be accepted in lieu of documents regarding how vehicle prices
are set and what actual sales prices were. Williams Supp. Decl. at ¶ 9.

        **2.**    **Pricing documents**

Some OEMs refuse to produce any documents regarding how they set the prices of their
vehicles – perhaps, the most important category of information sought by the Parties – on grounds
of relevance. FCA Opp. at 17-18; Honda Opp. at 22-23███

██████████████████████████████████████████████████████

███████████████████████████████████ Honda Opp. at 18-20; Nissan Opp. at 8-12.

[REDACTED]

### EPPs' Statement

Certain OEMs make statements that they do not factor in input costs when setting prices and, therefore, the Parties do not need any documents related to price-setting of their vehicles, because changes in individual parts costs would not have been passed on.

At most this is a disputed point, and one on which the OEMs are seeking to deprive the Parties of evidence. EPPs believe that OEMs' assertions in opposing discovery are not correct, and that economists will testify that input costs necessarily relate to the price of finished products. Williams Supp. Decl. at ¶ 9. EPPs also anticipate that evidence and analysis will show that OEMs do not simply absorb overcharges without incorporating them into the price of their products. *Id*. In addition, if OEMs price by looking at what their competitors are doing – and their competitors are likewise subject to price-fixing of automotive parts – all of their prices will be affected. *Id*. Furthermore, EPPs' position is that pass-through is an empirical issue, shown through analyses of data and documents, not by testimonial statements made with the intention of avoiding discovery. *Id*. For example, documents regarding price-setting will allow EPPs to understand the role of cost in price-setting and to make inferences regarding how a cost change, such as the alleged overcharges stemming from the alleged bid rigging and/or APR coordination, will impact price. *Id*. EPPs should have every opportunity to measure pass-through and conduct their analyses, as is routine in these types of cases, and should not be deprived of this highly relevant data in their effort to do so. *Id*.[27]

---

[27] Furthermore, the OEMs may not be completely neutral in their positions regarding the relationship between costs, pricing and pass through. It is EPPs' position that the OEMs have a vested interest in the outcome of this litigation and may not be neutral in making these statements. Supp. Williams Decl. at ¶ 10. EPPs believe that an OEM that has not settled its claims with defendants may not want to admit (or keep vague) the fact that it passed on the higher costs of

[REDACTED]

Furthermore, the Court's order permitting the 30(b)(6) depositions prohibited substantive questioning, thus preventing either Plaintiffs or Defendants from exploring these points through cross-examination. *Id*. At best, this is a disputed factual issue which the Parties have not yet been able to explore through discovery.

**<u>Defendants' Statement</u>**

Defendants assert that the OEMs themselves are best positioned to opine on whether there is a relationship between parts prices and car prices, and that they have indicated the absence of any such link in their declarations and deposition testimony. Furthermore, there are myriad reasons why a price increase on a part would not result in a price increase for a vehicle. Manufacturers routinely absorb small price increases rather than constantly adjusting prices in response to every cost change. Defendants believe that, with respect to the various parts at issue in the many cases in the MDL, many vehicles sold in the United States may not have been affected by any anticompetitive conduct, and thus the prices of these vehicles were set at competitive levels unaffected by the collusion alleged in a particular case. All competing OEMs were thus required to offer equally competitive prices for their vehicles. This competition would thus require that an OEM absorb any overcharge, rather than attempt to pass it on. Defendants believe that the OEMs' discovery will support these positions.

Price-setting documents are commonly sought and produced in price-fixing cases. *See*, *e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *3 (E.D. Pa. Jan. 31, 2012)

---

parts in the prices it charged to its own customers, because that would lessen its own prospects for recovery from Defendants. *Id*. As to those OEMs who have settled, they have made their position clear that they refuse to disclose that fact. *Id.*

[REDACTED]

(parties sought nonparty's documents "relating to or reflecting the process by which Your selling prices for Mushrooms were determined during the period 1999-2008"); *In re Domestic Drywall Antitrust Litig.*, 2014 U.S. Dist. LEXIS 67762, at *13 (E.D. Pa. 2014) (party sought reports and investigative notes that were the only contemporaneous communications about pricing decisions).

### D. Sales data and documents

As explained, *infra*, to prove their claims, EPPs' burden will include showing how the alleged overcharge in each parts case was passed on through every level of the distribution chain. Accordingly, the OEMs should be ordered to produce the categories of sales data and documents requested, to the fullest extent possible, and for every level of sale for which they have this information in their possession.

#### 1. Transactional sales data (OEMs to dealers, distributors, and fleet customers)

1. Understanding the prices charged by OEMs to their customers (dealers, distributors, and fleet customers) is an important step in showing pass-through, if any, for that link in the distribution chain, and will be important to expert pass-through analysis. Williams Supp. Decl. at ¶ 11. Sales data regarding sales from dealers to end-consumers is also important to show pass-through, if any, at that level of the chain. *Id.* This information is routinely sought in similar indirect price-fixing cases. *See, e.g., In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *3; *In re Domestic Drywall Antitrust Litig.*, 2014 U.S. Dist. LEXIS 67762, at *13.

#### 2. Transactional sales data (dealers to end-purchasers)

For the same reasons, EPPs seek information on sales from dealers and distributors to end-purchasers.[28] Williams Supp. Decl. at ¶ 11. ███████████████████████

---

[28] The OEMs are the best source of this information as they would have it in a central repository and in most complete form. Supp. Williams Decl. at ¶ 12.

[REDACTED]

████████████████████████ FCA Opp. at 21-22; Honda Opp. at 18; Nissan Opp. at 11-12;

Toyota Brief at 9-10. This information is an important piece of EPPs' pass-through analyses, and

is routinely sought and analyzed in indirect price-fixing cases. *See*, *e.g.*, SRAM MTC Order, at 3-

4 (ordering sales data for finished products containing SRAM, specifically transaction-level sales

data, including invoice number, date of sales transaction, product code, product SKU, geographic

indicator of sale, transaction price, units sold, net dollar unit cost, and transaction type (*e.g.*,

purchase, return or exchange).

### 3. Information on incentives and rebates from OEMs to dealers and end-purchasers

████████████████████████████████████████████████████████

██████████████████████████████ FCA Opp. at 67-68; Honda Opp. at 16; Nissan

Opp. at 10; Toyota Brief at 13-23. Several OEMs do not dispute the relevance of this information

and do not object to the production of data and/or documents related to incentives and rebates and

have included such in their offers of production. This information is important because it allows

the Parties to understand the net prices of vehicle transactions from OEMs to dealers and from

dealers to end-consumers. Williams Supp. Decl. at ¶ 12. Dealer transactional sales data does not

necessarily include information on incentives or rebates that were offered by the OEM directly to

the end-purchaser. *Id*. For example, if the dealer sales data includes a vehicle sale to an end-

purchaser customer for $25,000, but the OEM offers a $1,000 rebate to that end-purchaser, the net

price is really $24,000, not $25,000 (which is what may appear as the dealer's price to that end-

purchaser). *Id*.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**[REDACTED]**

 The OEMs' process for pricing vehicles, including the factors that they consider and do not consider when setting vehicle prices, is a critical aspect of this litigation. Thus, information regarding incentives and rebates, which is clearly and closely intertwined with the vehicle pricing process, is highly relevant and must be produced to the Parties.

[29]

This information is routinely produced in indirect price-fixing cases. *See, e.g., SRAM MTC Order*, at 3-4 (ordering production of full transaction-level sales data, including any rebate, credits, or discounts given).

Having the information requested on incentives and rebates will allow the Parties' experts to factor these adjustments into their analyses and will provide for the most accurate understanding of prices paid. Williams Supp. Decl. at ¶ 12.

---

[29] Nissan Opp. at 20. In party discovery, Defendants moved to compel information related to incentives and rebates from ADPs. *See* Defendants' Motion to Enforce the October 16, 2014 and May 12, 2015 Orders and to Compel Auto Dealers to Produce Certain Vehicle-Specific Acquisition and Sale Records, Docket No. 2:12-cv-00102, ECF 427 (Feb. 12, 2016). While the Special Master denied Defendants' motion, *see* Order of Special Master Denying Defendants' Motion, Docket No. 2:12-cv-00102, ECF 459 (April 19, 2016), Defendants' objection to that order is pending before the Court. *See* Defendants' Objection to, and Motion to Modify, the Special Master's Order, Docket No. 2:12-cv-00102, ECF 467 (May 3, 2016). The Parties do not agree that this dispute provides any basis for OEMs to withhold information related to OEMs' incentives or rebates offered to dealers and/or end-purchasers here.

[REDACTED]

### 4. Parts tracking documents

Parts tracking discovery is important to class certification analysis for a variety of reasons. First, Defendant sales data rarely indicates for which vehicle a part is intended (as that information would largely be in the hands of OEMs). Williams Supp. Decl. at ¶ 13. The OEMs may have different part numbers than Defendants, and parts tracking information would allow the Parties to match up this information. *Id*. Second, an OEM's parts tracking documents will show if a part purchased by an OEM is used in multiple vehicles. Defendants may not have this information. *Id*. Because Plaintiffs allege bid rigging at the vehicle model level, it is important to be able to trace a part to the model(s) into which it was incorporated. *Id*.

Finally, parts tracking information will also provide information important to EPPs' class certification arguments on ascertainability. *Id*. At class certification, Defendants will likely challenge EPPs' ability to identify which parts went into which vehicles (and thereby challenge which purchasers of vehicles should be in the class).

### E. The Importance of Covering as Much of the Alleged Time Periods as Possible



.[30] FCA Opp. at 63; Honda Opp. at 14; SIA Opp. at 9; Toyota Opp. at 18; Nissan Opp. at 19-20. *Id*. The Parties request information that will cover as much of the time period as reasonably possible for several important reasons.

First, where EPPs allege the conspiracy occurred during a certain time period, it defies common sense not to seek to cover as much of that alleged period as possible. Williams Supp.

---

[30] *See* FCA Opp. at 9 (questioning why the Parties need additional years of RFQ-related data)

[REDACTED]

Decl. at ¶ 14. Second, EPPs will analyze pass-through over time, and will seek to show, on a common basis, that all class members were harmed over that time period. *Id*. Seeking only a small subset of years or picking years one-by-one does not tell the full story. *Id*.[31] And, gaps in time invite challenges by Defendants. *Id*.

Defendants seek this data to demonstrate the absence of any conspiracy or damages, including by comparing sales inside and outside of the alleged conspiracy periods.

### F.   The Positions of the Parties in the Direct Purchaser Cases has no Bearing on What Information is Relevant in the Indirect Purchaser Actions

FCA invokes Denso's Motion to stay upstream OEM discovery at this time in *Wire Harnesses* case to argue that the parties lack substantial need for OEM discovery (FCA Opp. at 7-8), but the argument fails. Denso's Motion does not contend that the discovery sought is not relevant or needed. To the contrary, Denso's Motion specifically notes that it no longer needs downstream discovery because it has reached settlements with all Indirect Purchaser Plaintiffs, states that it still has a potential need for upstream discovery and reserves the right to seek it and argues only that the upstream discovery can wait until the Court decides its summary judgment motion that Denso recently filed in the *Wire Harnesses* direct purchaser action. Denso Motion at i-ii, 1, 4-7. In other words, Denso's motion *acknowledges* the relevance and need for upstream OEM discovery and merely reflects one Defendant's litigation strategy of postponing discovery until it can litigate its summary judgment motion. Denso's decision not to join the Parties' motion similarly reflects its own individual litigation strategy, and does not show a lack of substantial need. Moreover, EPPs believe that if Denso's approach were adopted, it would simply introduce

---

[31] For example, looking at a subset of an alleged class period is not always indicative of the entire period. For example, in 2008/2009, the auto industry was deeply impacted by the recession. This resulted in changes to demand, prices, and the number of vehicles sold. If one were to look only at that period or a subset (such as 2007-2001), the data may not be as clear or meaningful, as if viewed in the context of a larger time period. Supp. Williams Decl. at ¶ 14.

[REDACTED]

massive new delay in a set of cases with no indication whatsoever that its planned motion might be successful and without regard to all the other Parties, which need to proceed with discovery in accordance with the case schedules mandated by the Court.[32] *See* Williams Supp. Decl. at ¶ 15.

### G. The Parties should not be limited to only filling in gaps in the record

Certain OEMs argue that the Parties are only entitled to seek discovery to fill specified gaps in their own existing data and documents exchanged through party discovery.[33] This assertion is contrary to established law, as "nothing in the Federal Rules of Civil Procedure requires a litigant to rely solely on discovery obtained from an adversary instead of utilizing subpoenas." *State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.*, 2007 WL 2993840, at*1 (E.D.N.Y. Oct. 10, 2007); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *4 ("A plaintiff seeking to discover information from a third-party is not required to compel defendants to produce potentially overlapping information before seeking any third-party discovery."); *Covey Oil Co. v. Cont'l Oil Co.*, 340 F.2d 993, 998 (10th Cir. 1965) ("[A] person may not avoid a subpoena by saying that the evidence sought from him is obtainable from another.").[34] Although not required to do so, the

---

[32] FCA's reliance on the DPPs' decision not to join in the subpoena or motion to compel, FCA Opp. at 8 n.5, is similarly unavailing. The DPPs have no basis or need to seek downstream discovery, and their decision not to join the subpoena or motion is irrelevant.

[33] *See, e.g.*, FCA Opp. at 1 ("The parties have not identified any material gaps in their discovery record"); Honda Opp. at 16 ("the additional documents the Parties seek by this renewed motion are…duplicative of what the Serving Parties already possess."); Nissan Opp. at 16 ("the Parties' requests are duplicative of materials the Parties already have . . .").

[34] *See also In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 460 (D. Kan. 2006) (quoting *Orleman v. Jumpking, Inc.*, 2000 WL 1114849, at *5 (D. Kan. July 11, 2000) ("[W]here information responsive to a discovery request is in a party's possession, 'it is obligated to produce the information' whether or not the requesting party has obtained or could obtain the information from an alternative source.")); *In re Bank of N.Y. Mellon Corp. Forex Transactions*, 2014 U.S. Dist. LEXIS 88175, at *43-44 (S.D.N.Y. June 26, 2014) (rejecting third party's argument that documents sought by Defendants, including customer contracts, transaction cost analysis reports, and various emails sent to clients and other parties, should be obtained from parties in the case who may be in possession of them, and not from a third party).

[REDACTED]

Parties have made a reasonable effort to narrow the scope of their requests to seek information that
is solely in possession of the OEMs and cannot otherwise be obtained by the Parties.

### 1.   Purchase and Procurement Requests

It is indisputable that much of the material sought by the purchasing requests is held solely
by the OEMs. The assertion by certain OEMs that the Defendants possess comprehensive upstream
information about sales made to every direct purchaser and all RFQ materials is false.[35] Defendants
do not have documents containing information such as OEMs' target prices, internal
communications regarding the negotiation and approval process for RFQs, the number and identity
of suppliers submitting bids, the internal criteria used to evaluate suppliers, the factors that OEMs
consider when selecting their suppliers, or the motivations behind any post-award price and
specification adjustments. The Parties also seek certain identifiers, such as OEMs' internal part
numbers and VIN numbers to link component parts to the vehicle or models in which they are
installed. Purchase data, OEMs' internal part numbers, and the particular vehicle models
associated with each purchase are necessary to track the parts and vehicles through the chain of
distribution and to determine the effects, if any, of the alleged anticompetitive conduct on prices
and other terms of sale.

### 2.   Pricing and Sales Requests

The OEMs' assertion that the Parties have not identified any material gaps in their
discovery record with respect to downstream information related to vehicle sales is also inaccurate.
*See, e.g,* FCA Opp. at 1. ███████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

---

[35] *See* FCA Opp. at 1; *see also* Honda Opp. at 18.

**[REDACTED]**

████████████████████████████████████████████████████ [36]

Moreover, there are only a relatively small number of named ADPs (less than 40), or TEDPs (less than 30), while there are thousands of auto dealers nationwide that would be part of the class that ADPs and TEDPs purport to represent. The named ADPs and TEDPs thus represent only a small fraction of a percent of all vehicle dealers, and there are inherent gaps and inconsistencies in the data and information that the ADPs and TEDPs have produced. As a result, the information maintained by the dealers is neither statistically significant nor comparable to the much more complete information the OEMs possess.

## V. RESPONSE TO NISSAN'S "PHASED DISCOVERY" APPROACH

████████████████████████████████████████████████

████████████████████████████████████ Nissan Opp. at 17-19.
The Parties do not disagree insofar as the focus right now should be on the Lead Two Cases, with the understanding that the approach will inform discovery as to the later parts cases. On the upstream side, where information may be kept by part, the Parties have already agreed to stagger what is sought to prioritize only the Lead Two Cases.

Furthermore, while seeking information from OEMs on the upstream side may be part-specific and a staggering approach makes sense, the information on the downstream side (most cost, pricing, and sales data categories) is kept on a vehicle-basis – which means the OEMs can produce one set of information for all parts actions in one fell swoop. [37]

---

[36] *See* Defendants' Reply in Support of the Parties' Motion to Compel Discovery from Non-Party Original Equipment Manufacturers, Master File No. 2:12-md-02311, ECF 1246 (March 11, 2016) at Section I.

[37] Nissan suggests that if plaintiffs are not be able to establish pass through in the Lead Two Cases, then all other discovery in later cases would be moot. Nissan Opp. at 19. Defendants believe that this may be the case, depending upon the evidence. EPPs maintain that even if pass-through is not established in the Lead Two Cases, that fact would have no bearing on other cases. Each case is separate, alleging an illegal overcharge and pass through of that overcharge with respect to

[REDACTED]

Likewise, to limit the productions to only what is necessary for class certification – and then have to possibly go back Nissan for those items not related to class certification, as Nissan suggests, would add to burden, not reduce it.[38] The Parties do not see a benefit or cost savings to the OEMs to search and produce repeatedly in the same categories for different stages of the litigation.

## VI.   CONFIDENTIALITY

### A.   The Protective Order is Sufficient to Protect Even the Most Sensitive Information

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████.[39] The OEMs maintain this argument even though there is an iron-clad protective order in place, and despite the fact that this type of information is commonly produced by OEMs in other cases, under similar protective orders. *See SRAM MTC* Order at 2 (granting indirect purchaser's motion to compel OEM's purchase, cost, and pricing data, noting: "Courts in this District and elsewhere have found that existing protective orders, such as the one in place here, afford adequate security for the production of commercially-sensitive information."); *see also* January 19 Motion at 13-15 (citing cases). Notably, Defendants have been safely producing competitive information from their own files under the Protective Order here, since party discovery began. Williams Supp. Decl. at ¶ 16.

Furthermore, it is hard to imagine how any information, even in the rare event of an inadvertent disclosure, could actually result in real-world harm to any OEM's present-day

---

each separate part. While these cases are coordinated for purposes of making discovery easier on the OEMs, each case is separate, and will independently need to meet the requirements of Rule 23.
    [38] Nissan Opp. at 18.
    [39] FCA Opp. at 15, 19, 22, 22, 152; Honda Opp. at 11, 19-23; SIA Opp. at 15; Toyota Brief at 8, 14, 22-23; GM Opp. at 4-5; Nissan Opp. at 10.

[REDACTED]

business, especially where the information produced would relate to business information dating back years or decades. *See*, *e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298840, at *5 (rejecting nonparty's confidentiality arguments to shield information relating to its process for setting its selling prices, where that information was between four and fourteen years old, and where no real world harm could be identified in the current-day marketplace).[40]

### B.   The Parties Offer Further Assurances, Which Should Cure Any Concerns

While the Parties believe the Protective Orders are more than sufficient to ensure safe production, the Parties are willing to go one step further to provide additional assurances to OEMs, which should alleviate all concerns. The Parties can agree to receive information from OEMs on thumb drives or disks, on which the content can be encrypted and password protected. The Parties can agree to share certain information only with their experts, who will commit that they will

---

[40] The cases cited by the OEMs present very different facts and do not shield them from production given the relevance of the discovery sought here and the effective and enforceable Protective Order that already exists. *See*, *e.g.*, *Universal Del.*, *Inc. v. Comdata Network*, *Inc.*, 2011 WL 1085180 (M.D. Tenn. Mar. 21, 2011) (quashing small portion of a second subpoena issued to non-party, after previously denying the non-party's motion to quash the first subpoena on the ground that it sought confidential trade secret information, because the requesting party failed to show relevance and need for that portion of the discovery sought); *Spartanburg Reg'l Healthcare Sys. v. Hillenbrand Indus.*, *Inc.*, 2005 WL 2045818, at *4-5 (W.D. Mich. Aug. 24, 2005) (quashing subpoena because the requesting party failed to show relevance or need or any legitimate use for the information requested, the information could be obtained from other sources, including public sources, and the non-party had no standing to protect its interests under the existing protective order issued in a distant forum); *Ultimate Timing*, *LLC v. Simms*, 2010 WL 378436 (S.D. Ind. Feb. 1, 2010) (quashing subpoena as too broad and unduly burdensome with no indication that any protective order existed to protect confidentiality); *Insulate Am. v. Masco Corp.*, 227 F.R.D. 427, 433-34 (W.D.N.C. 2005) (quashing subpoena in part because it appeared that non-party had no relevant documents, requesting party failed to show need, and requesting party itself had criticized existing protective order as "meaningless as a safeguard"); *In re Vitamins Antitrust Litig.*, 267 F. Supp. 2d 738, 741-43 (S.D. Ohio 2003) (quashing subpoena as premature in advance of a decision on a pending motion to dismiss that would render irrelevant the information sought, but offering to take a "fresh look" at the arguments upon denial of the motion, and citing four combined reasons, including that the court lacked enforcement power over the extant protective order and thus was unable to protect non-party in the event of a violation). At most, these cases indicate that relevance and need should be weighed along with confidentiality concerns, and Serving Parties have demonstrated relevance and need in their Motion and this reply.

[REDACTED]

access this information using only a secure server, not connected to the internet. Counsel for the Parties can agree to review only the output/opinions, and work product of the experts, and can agree to not view or have access to any raw data produced. Notably, the Parties and one OEM came to agreement on this point with the guidance of the Special Master. There is no reason that the same additional assurances would not be sufficient here.

## VII.    THE PARTIES' POSITION ON COST SHARING AND ATTORNEYS' FEES

The OEMs demand that the Parties pay 100 percent of their costs for production and compliance with the subpoenas, as well as attorneys' fees. These demands are unreasonable and are contrary to governing law. To order the Parties to pay 100 percent of costs and all attorneys' fees would be unprecedented and would send a message nationwide that a nonparty should automatically be paid for its cooperation and compliance, just by having been served with a Rule 45 subpoena. As set forth below, cost-sharing may not be warranted at all. Nevertheless, in the spirit of resolving this discovery dispute, the Parties offer to pay 50 percent of the OEMs' reasonable costs of collecting and producing any discovery that may not be readily accessible. This offer is subject to the OEMs providing sufficient information in advance of collection regarding their costs of production for information that is not reasonably accessible and the Parties' ability to determine what discovery to seek in light of the OEMs' anticipated costs.

### A.    Payment of Costs to Nonparties is not Automatic

A nonparty is not entitled to cost-sharing merely because it was served with a subpoena. *See United States v. Blue Cross Blue Shield of Mich.*, 2012 U.S. Dist. LEXIS 146403, at *6. Rather, costs must be significant, and courts consider whether a nonparty has an interest in the outcome of the litigation, whether a nonparty can readily bear the costs of compliance, and whether the litigation is of public importance, when determining to what extent cost-sharing may be appropriate, if at all. *See id.* at *8-9 (shifting only 15 percent of costs where non-parties had interest

[REDACTED]

in outcome of case and could readily bear costs, and antitrust claims at issue were a matter of public importance).[41] 

*See* Motion at 19-20; Honda Opp. at 20-21; SIA Opp. at 18-19; Toyota Opp. at 18; GM Opp. at 6; Nissan Opp. at 13-14. Under *Blue Cross*, however, cost-shifting is not appropriate here at all.

### 1. Costs must be significant

The OEMs argue that their costs are significant. Honda Opp. at 24-25; Nissan Opp. at 2. "Significant costs" is a relative term. *See*, *e.g.*, *Blue Cross*, 2012 U.S. Dist. LEXIS 146403, at *8-9 (finding $14,720 significant); *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) (finding $200,000 significant); *Williams v. City of Dallas*, 178 F.R.D. 103, 113 (N.D. Tex. 1998) (finding $9,000 significant); *Sound Security, Inc. v. Sonitrol Corp.*, 2009 U.S. Dist. LEXIS 59630 (W.D. Wash. June 26, 2009) (finding $60,000 significant). Even if the OEMs' costs are found to be significant, the *Blue Cross* balancing test weighs against shifting those costs to the Parties.

### 2. Cost-sharing is not appropriate where a nonparty has an interest in the litigation

Where a nonparty is not a classic, disinterested party, cost-sharing is less warranted. *Blue Cross*, 2012 U.S. Dist. LEXIS 146403, at *11-12; *see also Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, 2016 U.S. Dist. LEXIS 58208, *22-26 (S.D. Fla. Apr. 26, 2016) (quotations and citations omitted) ("When a party from whom documents are sought is not a classic disinterested nonparty, the court can order the nonparty to produce the documents at its own expense").

---

[41] *See also Behrend v. Comcast Corp.*, 248 F.R.D. 84 (D. Mass. 2008) (refusing to shift costs upon finding that non-party had interest in outcome of litigation, non-party was capable of bearing costs, and case involving antitrust claims was important to cable industry and the public).

[REDACTED]

Here, the OEMs claim they are detached, non-interested nonparties to this litigation. Honda Opp. at 25; Nissan Opp. at 22. This is utterly false. They are intimately linked to this litigation. At the same time they claim to be non-interested, they also claim to be the largest victims of the alleged conspiracies and to have suffered the most harm.[42] The OEMs are the largest customers of defendants, and the ADPs are, in turn, the largest customers of the OEMs. They stand in the middle of the distribution chain between the Plaintiffs and Defendants (and in the middle of any pass-through analysis), and are parties to the purchase and sale transactions at issue. *See In re First Am. Corp.*, 184 F.R.D. 234, 241-242 (S.D.N.Y. 1998) (shifting only 35 percent of costs to plaintiff where nonparty was involved in transactions underlying litigation as well as separate related litigation and case involved strong public interest). In parts cases with claims brought by the putative direct purchaser classes, the OEMs are members of the putative classes. Further, some OEMs have settled their claims with at least some Defendants for sums running, in the aggregate, to many millions of dollars.

If they have not yet settled their claims they may be considering whether to settle their claims or to bring their own direct action case, as Ford has already. The OEMs are deeply tied to these litigations and their outcomes and, therefore, cost-sharing is less warranted.

### 3. Where the OEMs have the ability to pay costs, cost-sharing is less warranted

The OEMs claim that just because they are "rich" does not mean they should have to pay costs.[43] Nissan Opp. at 22. However, courts are clear that subpoena recipients with meaningful revenue may not shift the cost of any subpoena compliance. *See Blue Cross*, 2012 U.S. Dist.

---

[42] Honda Opp. at 25.

[43] While facially implausible, that argument also ignores the fact that shifting costs in this matter ultimately depletes the recovery to counsels' clients, the class members who purchased vehicles with price-fixed parts.

[REDACTED]

LEXIS 146403, at *10-12 (ordering that only 15 percent of cost of production would be shifted based in part on finding that nonparty hospitals could readily bear costs of production because one had annual gross revenues of $1.1 billion and assets of more than $590 million and the other had 4,000 employees and 500 physicians). *See also Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260, at *4-5 (denying FedEx's entire cost-shifting request of $227,597 in attorneys' fees based on finding that they were not significant because of FedEx's size and its status as a Fortune 500 company). The cases cited by the OEMs are unpersuasive. The OEMs are huge companies that routinely litigate and respond to discovery, and that can easily bear the costs of complying with the subpoenas, making cost-shifting much less warranted.

### 4. Where a matter is of great public importance, cost-sharing is less warranted

Cost-sharing is less warranted where a case is a matter of public importance, as here. *Blue Cross*, 2012 U.S. Dist. LEXIS 146403, at *11-12. ██████████████

████████████████████████████████████████████

████████████ GM Opp. at 24. These civil class actions are of no less public importance than the governmental actions. *See Behrend*, 248 F.R.D. at 86-87 (rejecting nonparty's argument that antitrust case was not of public importance because it was class action). The outcome of this MDL is clearly a public concern as it is one of the largest MDLs in history, concerning nearly every person who purchased a vehicle in the United States in the last 20-plus years.

### B. The Parties Should not Have to Share Costs that are Unreasonable

Even when a court finds that a nonparty's costs are significant within the meaning of Rule 45 and that some cost-shifting is in order, it is critical that only *reasonable expenses* are shifted. *G & E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC*, 2016 WL 1258458, at *3 (D.D.C. March 30, 2016). "This understanding—that only reasonable expenses qualify under rule 45—has

**[REDACTED]**

been adopted by a significant number of courts across the country." *Id*. (citing cases from multiple

circuits and district courts). This rule follows from the fact that "[a]n unreasonable expense, even

undertaken in some sense as a response to a subpoena, does not result from that subpoena," and

therefore does not qualify for cost-shifting under Rule 45. *Id*.

      **C.**    **The Parties Should not Have to Share Costs for Information that is Readily
Accessible**

███████████████████████████████████████████████████████

███████████████ Nissan Opp. at 23; FCA Opp. at 18; Toyota Brief at 18; Honda Opp. at 21-

22. Rule 45 specifically addresses a nonparty's obligations with respect to electronically stored

information (ESI) and distinguishes between readily accessible and inaccessible ESI:

> *Inaccessible Electronically Stored Information*. The person
> responding need not provide discovery of electronically stored
> information from sources that the person identifies as not reasonably
> accessible because of undue burden or cost. On motion to compel
> discovery or for a protective order, the person responding must show
> that the information is not reasonably accessible because of undue
> burden or cost.

Fed. R. Civ. P. 45(e)(1)(D). Even if the nonparty makes such a showing, the court may still order

discovery of the inaccessible ESI for good cause shown. *Id*. Rule 45 requires that non-parties

produce reasonably accessible ESI without cost-shifting. *See Bell Inc. v. GE Lighting, LLC*, 2014

WL 1630754, at *10 (W.D.Va. April 23, 2014) (nonparty was not entitled to cost-shifting for

production of accessible ESI in its possession); *Western Convenience Stores, Inc. v. Suncor Energy

Inc.*, 2014 WL 1257762 (D. Colo. Mar. 27, 2014) (declining to shift costs to serving party for

discovery including data on active computer system).

      In *Bell*, the court cited the thorough analysis of accessible and inaccessible ESI in *Zubulake

v. UBS Warburg, LLC*, 217 F.R.D. 309, 318-319 (S.D.N.Y. 2003), and that analysis is particularly

relevant here. Accessible ESI includes (1) "active, online data;" (2) "near-line data," which

[REDACTED]

typically consists of removable storage media such as optical disks that can be readily inserted into a device for reading and writing data; and (3) "offline storage/archives," which are removable media that are not typically needed for access and require manual intervention to access, but nevertheless does not require elaborate restoration to be usable. *Id.* at 318-320. By contrast, inaccessible ESI includes (4) "backup tapes," which are high-capacity storage media on which data is compressed and not organized for retrieval and thus requires expensive restoration to be usable; and (5) "erased, fragmented or damaged data," which is not at issue here. Much of the data that the Parties seek is accessible data—*i.e.*, active, online data, near-line data, or data in offline storage or archives—and not inaccessible data on backup tapes. Cost-shifting is not appropriate for any ESI other than inaccessible data on backup tapes.

### D. The OEMs' Demand for Attorneys' Fees is Inappropriate and Unreasonable

The OEMs seek cost-shifting for attorneys' fees but fail to support their position under the relevant law. The American Rule, established by the Supreme Court, states that litigants pay their own attorneys' fees absent statute or enforceable contract. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975). The American Rule has been extended to cases involving nonparties, including nonparties that were subpoenaed to produce documents and deposition testimony for use in antitrust suits. *See*, *e.g.*, *U.S. v. CBS*, *Inc.*, 103 F.R.D. 365, 374 (C.D. Cal. 1984) (citing *Alyeska* for the proposition that the Supreme Court "has foreclosed the ability of this Court to award fees," and denying reimbursement of counsel fees for counsel's review of documents, representation at depositions, negotiations of protective orders and other matters with party counsel, and to otherwise protect the nonparty witnesses' interests).

Multiple courts have held that attorneys' fees incurred in connection with responding to a subpoena including, but not limited to, reviewing documents for privilege, confidentiality or relevance, or defending depositions, are not generally reimbursable. *See*, *e.g.*, *Mgmt.*

[REDACTED]

*Compensation Group Lee, Inc. v. Oklahoma State Univ.*, 2011 WL 5326262, at \*4 (W.D. Okla. Nov. 3, 2011) (rejecting fee-shifting request for time spent by a nonparty's in-house counsel to review documents); *In re Am. Hous. Found.*, 2013 WL 2422706, at \*2 (U.S. Bankr. N.D. Tex. June 4, 2013) (rejecting fee-shifting for a nonparty's attorney's fees incurred to "review all aspects of its compliance and … to sit through and 'defend' a deposition," and fees "for services that benefit the nonparty"); *G & E*, 2016 WL 1258458, at \*6 (finding that the third party's attorneys' fees for its laborious document review process were not compensable); *Maximum Human Performance, LLC v. Sigma-Tau Healthscience, LLC*, 2013 WL 4537790, at \*4 (D.N.J. Aug. 27, 2013) (denying the third party's request for cost-shifting for "its own counsel fees incurred in complying with the subpoena"); *Steward Health Care Sys. LLC v. Blue Cross & Blue Shield of R.I.*, 2016 U.S. Dist. LEXIS 154313, at \*11 (E.D. Pa. Nov. 4, 2016) (denying recovery of attorneys' fees incurred in connection with privilege, confidentiality, and relevance review).

The court in *Steward Health*, stated that a privilege and confidentiality review only benefits the nonparty, and accordingly, are not expenses that may be shifted by the court under Rule 45. That court rejected an argument that a relevance review benefitted the requesting party. *Id.* at 12-13 (citing *Lefta Assocs. v. Hurley*, 2011 WL 1793265, at \*4 (M.D. Pa. May 11, 2011) and *In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482, 496 (E.D. Pa. 2005)).

Further, a nonparty's attorneys' fees incurred in connection with litigating issues related to the subpoena, including whether attorneys' fees should be shifted, are also not reimbursable compliance expenses. *See*, *e.g.*, *Stormans Inc. v. Selecky*, 2015 WL 224914, at \*5 (W.D. Wash. Jan. 15, 2015); *see also In re Am. Nurses Ass'n*, 643 Fed. Appx. 310, 314-315 (4th Cir. 2016) (rejecting shifting of attorneys' fees incurred in pursuing motion to shift those fees and holding

[REDACTED]

that "shifting of attorneys' fees is only appropriate where the attorneys' fees are actually necessary to a nonparty complying with a discovery order").

Finally, any award of attorneys' fees would simply be inappropriate where, as here, the expenses have been incurred as a result of the nonparties' delay in complying with the subpoena. *See*, *e.g.*, *Heartland Surgical Specialty Hosp.*, *LLC v. Midwest Div. Inc.*, 2007 U.S. Dist. LEXIS 53217, at *50-52 (D. Kan. July 20, 2007) (declining to award attorneys' fees under Rule 45(d)(1) after noting that "a significant part of the delay and expense concerning these subpoenas was self-imposed by [the non-parties] refusing to comply with subpoenas and requiring briefing by the parties.").

Even if a nonparty's attorneys' fees can in certain instances theoretically be considered to be reimbursable costs under Rule 45, courts deciding whether to shift such costs to the serving parties nevertheless apply the same balancing test as enunciated in *Blue Cross*. *See Blue Cross*, 2012 U.S. Dist. LEXIS 146403, at *11. As reflected in the cases cited by the OEMs themselves, courts look at the nonparty's interest in the case, the nonparty's ability to bear the costs, and the public importance of the case, and frequently decline to shift the nonparty's attorneys' fees. *See Bell Inc. v. GE Lighting*, *LLC*, 2014 WL 1630754, at *12-15 (W.D.Va. April 23, 2014) (applying that analysis and refusing to shift expense of reviewing individual documents generated by searches for relevance, privilege, and protected material); *US Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 2012 WL 5395249, at *4 (S.D.N.Y. Nov. 5, 2012) (applying that analysis and shifting "search, collection, and production costs associated with compliance with the subpoenas," but refusing to shift nonparty's costs of reviewing documents for privilege); *Sound Security*, *Inc. v. Sonitrol Corp.*, 2009 WL 1835653, at *2-3 (W.D. Wash. June 26, 2009) (applying that analysis and finding that nonparty was required to bear its own attorneys' fees when it voluntarily

[REDACTED]

authorized its attorney to review documents for privilege). For the same reasons that these factors

weigh against cost shifting, discussed above, they also weigh against any shifting of attorneys'

fees.

None of the cases cited by the OEMs provide grounds for the shifting of attorneys' fees, as

they are clearly distinguishable from the facts of this case.[44] Specifically, most of the cases cited

by the OEMs involved a nonparty with no stake in the litigation (unlike the Opposing OEMs), a

nonparty that could not bear the costs as readily as the serving party (unlike the Opposing OEMs),

a case that is not of public importance (unlike the present set of antitrust cases), or all three of

those factors. *See, e.g.*, *Sonoma County Ass'n of Ret. Emp. v. Sonoma County*, 2015 WL 10767718

(S.D.N.Y. Oct. 6, 2015) (nonparty had no stake in the litigation, and even then the court cut the

fee request nearly in half); *In re Subpoena of Am. Nurses Ass'n*, 290 F.R.D. 60, 77 (D. Md. 2013)

(nonparty had no interest in case and could not more readily bear costs than requesting party, and

case was not of public importance); *Georgia-Pacific LLC v. Am. Intern. Specialty Lines Ins.*, 278

F.R.D. 187, 190 (S.D. Ohio Jan. 29, 2010) (nonparty had no interest in the case and was not more

readily able to bear costs of production than serving party, and case was not of public importance);

*Pac. Gas & Elec. Co. v. Lynch*, 2002 WL 32812098 (N.D. Cal. 2002) (nonparty had no interest in

case and could not more readily bear costs than serving party, and attorney's fees were not

---

[44] The other cases cited by the OEMs are also distinguishable for other reasons. *See Western Ben. Solutions, LLC v. Gustin*, 2012 WL 4417190 (D. Idaho Sept. 24, 2012) (applies Idaho's version of Rule 45, which has different language than its federal counterpart); *Kean v. VanDyken*, 2006 WL 374501 (W.D. Mich. 2006) (involves a pro se prisoner's request to issue subpoenas and not actual reimbursement of costs under Rule 45); *Williams v. City of Dallas*, 178 F.R.D. 103, 112-113 (N.D. Tex. 1998) (relies on the rules that were in force before Rule 45 was substantially amended in 1991); *United States v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 372 (9th Cir. 1982) (relies on the rule prior to 1991 and does not specify what expenses should be reimbursed because the record on appeal was insufficient); *Kisser v. Coal. For Religious Freedom*, 1995 WL 590169 (E.D. Pa. 1995) (involved *de minimis* cost-shifting of $1,666).

[REDACTED]

specifically at issue); *In re Law Firms of McCourts & McGrigor Donald*, 2001 WL 345233, at *2 (S.D.N.Y. April 9, 2001) (non-parties were deemed analogous to innocent bystanders and were not better able to bear costs).

Above and beyond what is required by law, the Parties have offered to pay 50 percent of the OEMs' reasonable compliance costs.[45] Given that the OEMs are deeply tied to this litigation, are massive corporations with annual gross revenues in the billions of dollars and have the ability pay their own costs, and the great public importance of these litigations, it would set a harmful precedent in this circuit and nationwide if 100 percent of OEMs' costs and attorneys' fees were awarded for their mere compliance and cooperation with the judicial process.

## VIII. CONCLUSION

For the foregoing reasons, the Parties respectfully request that the Court grant the Parties' Renewed Motion.

Dated: December 2, 2016        Respectfully submitted,

*E. Powell Miller*
Devon P. Allard
**THE MILLER LAW FIRM, P.C.**
The Miller Law Firm, P.C.
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
epm@millerlawpc.com
dpa@millerlawpc.com

*Interim Liaison Counsel for the Proposed End-Payor Plaintiff Classes*

Steven N. Williams
Elizabeth Tran
Demetrius X. Lambrinos

---

[45] The Parties' offer is subject to the OEMs providing sufficient information regarding their costs of production for information that is not reasonably accessible and the Parties' ability to determine what discovery to seek in light of the OEMs' costs.

[REDACTED]

**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
etran@cpmlegal.com
dlambrinos@cpmlegal.com

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS KAPLAN LLP**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
BPersky@RobinsKaplan.com
WReiss@RobinsKaplan.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Chanler Langham
Omar Ochoa
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
toxford@susmangodfrey.com
clangham@susmangodfrey.com
oochoa@susmangodfrey.com

*Interim Co-Lead Class Counsel for the Proposed
End-Payor Plaintiff Classes*

**[REDACTED]**

*/s/ J. Manly Parks*
Wayne A. Mack
J. Manly Parks
Andrew R. Sperl
**DUANE MORRIS LLP**
30 S. 17th Street
Philadelphia, PA 19103
Phone: (215) 979-1000
Fax: (215) 979-1020

*Counsel for Truck and Equipment
Dealer Plaintiffs*

**WEIL, GOTSHAL & MANGES LLP**

*/s/ Adam C. Hemlock* (w/consent)
Adam C. Hemlock
Steven A. Reiss
Lara E. Veblen Trager
Kajetan Rozga
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
steven.reiss@weil.com
adam.hemlock@weil.com
lara.trager@weil.com
kajetan.rozga@weil.com

*/s/ Frederick R. Juckniess* (w/consent)
Frederick R. Juckniess
**SCHIFF HARDIN LLP**
350 South Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1504
fjuckniess@schiffhardin.com

*Attorneys for Defendants Bridgestone
Corporation and Bridgestone APM Company*

**WEIL, GOTSHAL & MANGES LLP**

*/s/ Steve A. Reiss* (w/consent)

**[REDACTED]**

Steven A. Reiss
Adam C. Hemlock
Lara E. Veblen Trager
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
steven.reiss@weil.com
adam.hemlock@weil.com
lara.trager@weil.com
Fred K. Herrmann
Joanne G. Swanson
Matthew L. Powell

**KERR, RUSSELL AND WEBER PLC**
500 Woodward Avenue
Suite 2500
Detroit, MI 48226
Tel. (313) 961-0200
Fax (313) 961-0388
fherrmann@kerr-russell.com
jswanson@kerr-russell.com
mpowell@kerr-russell.com

*Counsel for Defendants Calsonic Kansei
Corporation and Calsonic Kansei North
America, Inc.*

**BUTZEL LONG**

*/s/ Sheldon H. Klein (w/consent)*
Sheldon H. Klein (P41062)
David F. DuMouchel (P25658)
**BUTZEL LONG**
150 West Jefferson, Suite 100
Detroit, MI 48226
Tel.: (313) 225-7000
Fax: (313) 225-7080
sklein@butzel.com
dumouchd@butzel.com

W. Todd Miller
**BAKER & MILLER PLLC**
2401 Pennsylvania Ave., NW, Suite 300
Washington, DC 20037

[REDACTED]

Tel.: (202) 663-7820
Fax: (202) 663-7849
TMiller@bakerandmiller.com

*Attorneys for Defendants TRAM, Inc. and Tokai Rika Co., Ltd.*

**COVINGTON & BURLING LLP**

*/s/ Anita F. Stork* (w/consent)
Anita F. Stork
Gretchen Hoff Varner
Cortlin H. Lannin
**COVINGTON & BURLING LLP**
One Front Street, 35th Floor
San Francisco, CA 94111
Telephone: (415) 591-6000
Fax: (415) 955-6550
astork@cov.com
ghoffvarner@cov.com
clannin@cov.com

Michael J. Fanelli
Ashley E. Bass
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Fax: (202) 662-5383
mfanelli@cov.com
abass@cov.com

*Attorneys for Defendants Alps Electric Co., Ltd.; Alps Electric (North America), Inc.; and Alps Automotive, Inc.*

**BROOKS WILKINS SHARKEY & TURCO PLLC**

*/s/Maureen T. Taylor* (w/consent)
Herbert C. Donovan (P51939)
Maureen T. Taylor (P63547)
**BROOKS WILKINS SHARKEY & TURCO PLLC**
401 Old South Woodward, Suite 400

**[REDACTED]**

Birmingham, MI 48009
Telephone: (248) 971-1721
Fax: (248) 971-1801
taylor@bwst-law.com
donovan@bwst-law.com

*Attorneys for Defendants Alps Electric
Co., Ltd.; Alps Electric (North America),
Inc.; and Alps Automotive, Inc.*

**SIMPSON THACHER & BARTLETT
LLP**

/s/ *George S. Wang* (w/consent)
George S. Wang
Shannon K. McGovern
**SIMPSON THACHER & BARTLETT
LLP**
425 Lexington Avenue
New York, N.Y. 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
gwang@stblaw.com
smcgovern@stblaw.com

Abram J. Ellis
**SIMPSON THACHER & BARTLETT
LLP**
900 G Street, N.W.
Washington, D.C. 20001
Tel.: (202) 636-5500
Fax: (202) 636-5502
aellis@stblaw.com

*Attorneys for Defendants Diamond
Electric Mfg. Co., Ltd. and Diamond
Electric Mfg. Corp.*

**SIMPSON THACHER & BARTLETT
LLP**

/s/ *George S. Wang* (w/consent)
George S. Wang
Shannon K. McGovern
**SIMPSON THACHER & BARTLETT
LLP**

[REDACTED]

425 Lexington Avenue
New York, N.Y. 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
gwang@stblaw.com
smcgovern@stblaw.com

Abram J. Ellis
**SIMPSON THACHER & BARTLETT LLP**
900 G Street, N.W.
Washington, D.C. 20001
Tel.: (202) 636-5500
Fax: (202) 636-5502
aellis@stblaw.com

*Attorneys for Defendants Stanley Electric
Co., Ltd., Stanley Electric U.S. Co., Inc.,
and II Stanley Co., Inc.*

**PILLSBURY WINTHROP SHAW
PITTMAN LLP**

/s/ William M. Sullivan Jr. (w/consent)
William M. Sullivan Jr.
Michael L. Sibarium
Jeetander T. Dulani
**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
1200 Seventeenth Street, N.W.
Washington, D.C. 20036-3006
Telephone: (202) 663-8000
Facsimile: (202) 663-8007
wsullivan@pillsburylaw.com
michael.sibarium@pillsburylaw.com
jeetander.dulani@pillsburylaw.com

*Counsel for Mikuni Corporation and
Mikuni America Corporation*

**FARMER BROWNSTEIN JAEGER LLP**

*/s/ William S. Farmer* (w/consent)
William S. Farmer
David C. Brownstein

[REDACTED]

**FARMER BROWNSTEIN JAEGER LLP**
235 Montgomery Street, Suite 835
San Francisco, CA 94102
Tel.: (415) 795-2050
Fax: (415) 520-5678
wfarmer@fbj-law.com
dbrownstein@fbj-law.com

*Counsel for Defendants Mitsuba*
*Corporation and American Mitsuba*
*Corporation*

**SEABOLT LAW FIRM**

*/s/ Scott T. Seabolt (w/consent)*
Scott T. Seabolt
**SEABOLT LAW FIRM**
17199 N. Laurel Park Dr., Ste. 215
Livonia, Michigan 48152
248-717-1302
sseabolt@seaboltpc.com

*Counsel for Defendants Mitsubishi*
*Heavy Industries America, Inc. and*
*Mitsubishi Heavy Industries ClimateControl, Inc.*

**LANE POWELL PC**

*/s/ Kenneth R. Davis (w/consent)*
Kenneth R. Davis II
Craig D. Bachman
Darin M. Sands
Masayuki Yamaguchi
**LANE POWELL PC**
ODS Tower
601 SW Second Ave., Suite 2100
Portland, OR 97204-3158
503-778-2100
503-778-2200 (facsimile)
davisk@lanepowell.com
bachmanc@lanepowell.com
sandsd@lanepowell.com

**LANE POWELL PC**

*/s/ Larry S. Gangnes (w/consent)*

50

[REDACTED]

Larry S. Gangnes
Connor B. Shively
**LANE POWELL PC**
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338
206-223-7000
206-223-7107 (facsimile)
gangnesl@lanepowell.com
shivelyc@lanepowell.com

*Counsel for Nachi America Inc.*
*and Nachi-Fujikoshi Corporation*

**WINSTON & STRAWN LLP**

*/s/ Jeffrey L. Kessler* (w/consent) Jeffrey L. Kessler
Jeffrey L. Kessler
A. Paul Victor
Molly M. Donovan
Jeffrey J. Amato
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jkessler@winston.com
pvictor@winston.com
mmdonovan@winston.com
jamato@winston.com

**KERR, RUSSELL AND WEBER, PLC**
Fred K. Herrmann
500 Woodward Avenue, Suite 2500
Detroit, MI 48226
Tel. (313) 961-0200
fherrmann@kerr-russell.com

*Counsel for NTN Corporation and*
*NTN USA Corporation*

**ALLEN & OVERY LLP**

*/s/ John Roberti* (w/consent)
John Roberti
Matthew Boucher
**ALLEN & OVERY LLP**

51

[REDACTED]

1101 New York Avenue NW
Washington, D.C. 20005
202-683-3800
john.roberti@allenovery.com
matthew.boucher@allenovery.com

Michael S. Feldberg
**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020
212-610-6360
michael.feldberg@allenovery.com

William R. Jansen (P36688)
Michael G. Brady (P57331)
**WARNER NORCROSS & JUDD LLP**
2000 Town Center, Suite 2700
Southfield, MI 48075-1318
248-784-5000
wjansen@wnj.com
mbrady@wnj.com

*Counsel for Defendants Robert Bosch
LLC and Robert Bosch GmbH*

**MILLER, CANFIELD, PADDOCK &
STONE P.L.C.**

*/s/ Larry J. Saylor* (w/consent)
Larry J. Saylor
**MILLER, CANFIELD, PADDOCK &
STONE P.L.C.**
150 W. Jefferson Avenue, Suite 2500
Detroit, MI 48226
Telephone: (313) 496-7986
Facsimile: (313) 496-8454
Saylor@MillerCanfield.com

*Counsel for Defendants Sumitomo Riko
Company Limited and DTR Industries, Inc.*

**WILLIAMS & CONNOLLY LLP**

*/s/ David M. Zinn* (w/consent)
David M. Zinn
John E. Schmidtlein

[REDACTED]

Samuel Bryant Davidoff
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000
Fax: 202-434-5029
dzinn@wc.com
jschmidtlein@wc.com
sdavidoff@wc.com

*Counsel for Takata Corporation and
TK Holdings*, *Inc.*

**HERTZ SCHRAM PC**

*/s/ Bradley J. Schram* (w/consent)
**HERTZ SCHRAM PC**
1760 S. Telegraph Rd., Suite 300
Bloomfield Hills, MI 48302
Tel.: (248) 335-5000
Fax: (248) 335-3346
bschram@hertzschram.com

*Counsel for Toyo Tire & Rubber Co.*, *Ltd.*,
*Toyo Automotive Parts* (*USA*), *Inc.*, *Toyo
Tire North America Manufacturing Inc.*,
*and Toyo Tire North America OE Sales LLC*

**BAKER BOTTS LLP**

*/s/ Randall J. Turk* (w/consent)
Randall J. Turk
John Taladay
Mark Miller
Heather Souder Choi
Sterling A. Marchand
**BAKER BOTTS LLP**
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400
Phone: 202.639.7700
Fax: 202.639.7890
randy.turk@bakerbotts.com
john.taladay@bakerbotts.com
mark.miller@bakerbotts.com
heather.choi@bakerbotts.com
sterling.marchand@bakerbotts.com

**[REDACTED]**

*Counsel for Toyoda Gosei Co., Ltd.,*
*TG Missouri Corporation, and Toyoda*
*Gosei North America Corporation*

**WHITE & CASE LLP**

*/s/ Christopher M. Curran* (w/consent)
Christopher M. Curran
**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

*Counsel for Defendant Maruyasu*
*Industries Co., Ltd.*

**KERR, RUSSELL AND WEBER,**
**PLC**
*/s/ Joanne Geha Swanson* (w/consent)
Joanne Geha Swanson (P33594)
Fred K. Herrmann (P49519)
500 Woodward Avenue, Suite 2500
Detroit, MI 48226
Telephone: (313) 961-0200
Facsimile: (313) 961-0388
fherrmann@kerr-russell.com
jswanson@kerr-russell.com

*Counsel for Defendants Fujikura Ltd. and*
*Fujikura Automotive America LLC*

**[REDACTED]**

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2016 I caused the foregoing THE PARTIES' JOINT

REPLY TO CERTAIN NON-PARTIES' OPPOSITIONS TO THE PARTIES' RENEWED

MOTION TO COMPEL DISCOVERY to be electronically filed with the Clerk of the Court using

the CM/ECF system, which will send notification of such filing to all counsel of record.


*/s/ E. Powell Miller*
E. Powell Miller

Case 2:12-md-02311-SFC-RSW ECF No. 1818-10, PageID.33836 Filed 09/21/17 Page 65 of 71

Case 2:12-md-02311-MOB-MKM Doc # 548-1 Filed 02/02/16 Pg 1 of 1 Pg ID 2?

**EXHIBIT A**
**REPLY DECLARATION OF SHELDON H. KLEIN IN**
**SUPPORT OF THE PARTIES' RENEWED MOTION TO**
**COMPEL DISCOVERY FROM NON-PARTY ORIGINAL**
**EQUIPMENT MANUFACTURERS, AND IN**
**PARTICULAR FCA US LLC**

**FILED UNDER SEAL**

**EXHIBIT B**
**SUPPLEMENTAL DECLARATION OF SHELDON H.**
**KLEIN IN SUPPORT OF THE**
**PARTIES' REPLY TO NON-PARTY ORIGINAL**
**EQUIPMENT MANUFACTURER**
**GENERAL MOTORS' OPPOSITION TO THE PARTIES'**
**RENEWED MOTION TO**
**COMPEL DISCOVERY**

**FILED UNDER SEAL**

**EXHIBIT C**
**DECLARATION OF LARA E. VEBLEN TRAGER IN SUPPORT OF THE PARTIES'**
**JOINT REPLY TO CERTAIN NON-PARTIES' OPPOSITIONS TO THE PARTIES'**
**RENEWED MOTION TO COMPEL DISCOVERY, AND IN PARTICULAR**
**AMERICAN HONDA MOTOR COMPANY, INC., HONDA NORTH AMERICA, INC.,**
**HONDA OF AMERICA MANUFACTURING, INC., HONDA PRECISION PARTS OF**
**GEORGIA, LLC, HONDA MANUFACTURING OF INDIANA, LLC, HONDA OF**
**SOUTH CAROLINA MANUFACTURING, INC., HONDA R&D AMERICAS, INC.,**
**HONDA RESEARCH INSTITUTE USA, INC., AND HONDA TRANSMISSION**
**MANUFACTURING OF AMERICA, INC. (HONDA)**

**FILED UNDER SEAL**

**EXHIBIT D**
**DECLARATION OF ABRAM J. ELLIS IN SUPPORT OF THE PARTIES' JOINT REPLY TO CERTAIN NON-PARTIES' OPPOSITIONS TO THE PARTIES' RENEWED MOTION TO COMPEL DISCOVERY FROM NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS, AND IN PARTICULAR NISSAN NORTH AMERICA**

**FILED UNDER SEAL**

**EXHIBIT E**
**DECLARATION OF ANGELA A. SMEDLEY IN**
**SUPPORT OF THE PARTIES' JOINT REPLY TO**
**CERTAIN NON-PARTIES' OPPOSITIONS TO THE**
**PARTIES' RENEWED MOTION TO COMPEL**
**DISCOVERY, AND PARTICULARLY SUBARU OF**
**INDIANA AUTOMOTIVE, INC.**

**FILED UNDER SEAL**

**EXHIBIT F**
**DECLARATION OF ADAM C. HEMLOCK IN SUPPORT**
**OF THE PARTIES'**
**JOINT REPLY TO CERTAIN NON-PARTIES'**
**OPPOSITIONS TO THE PARTIES'**
**RENEWED MOTION TO COMPEL DISCOVERY**

**FILED UNDER SEAL**

**EXHIBIT G**
**DECLARATION OF STEVEN N. WILLIAMS IN SUPPORT OF THE PARTIES' JOINT REPLY TO CERTAIN NON-PARTIES' OPPOSITIONS TO THE PARTIES' RENEWED MOTION TO COMPEL DISCOVERY**

**FILED UNDER SEAL**