```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION

 3                      —   —   —

 4   _____
                                      )
 5   IN RE: AUTOMOTIVE PARTS          )   Master File No. 12-02311
     ANTITRUST LITIGATION             )   Hon. Marianne O. Battani
 6   _____)
                                      )
 7   GEICO CORPORATION, et al.,       )
                                      )
 8              Plaintiffs,           )
                                      )   Case No. 16-13189
 9        vs.                         )
                                      )   Hon. Marianne O. Battani
10   AUTOLIV, INC., et al.,           )
                                      )
11              Defendants.           )
     _____)

12
           DEFENDANTS' COLLECTIVE MOTION TO DISMISS
13            GEICO'S SECOND-AMENDED COMPLAINT
                         and
14   DEFENDANTS LEAR CORPORATION and KYUNGSHIN-LEAR SALES &
              ENGINEERING, LLC'S MOTION TO DISMISS
15

16       BEFORE THE HONORABLE MARIANNE O. BATTANI
              United States District Judge
17       Theodore Levin United States Courthouse
              231 West Lafayette Boulevard
18                 Detroit, Michigan
              Thursday, November 9, 2017
19

20

21

22

23

24
         To obtain a copy of this official transcript, contact:
25           Robert L. Smith, Official Court Reporter
               (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:    DAN W. GOLDFINE
                            LEWIS, ROCA, ROTHGERBER, CHRISTIE, LLP
 3                          201 E. Washington Street, Suite 1200
                            Phoenix, AZ 85004
 4                          (602) 262-5392

 5
                            DIANE R. HAZEL
 6                          LEWIS, ROCA, ROTHGERBER, CHRISTIE, LLP
                            1200 17th Street, Suite 3000
 7                          Denver, CO 80202
                            (303) 628-9545
 8

 9                          REBECCA J. CASSELL
                            MYERS & MYERS PLLC
10                          915 N. Michigan Ave., Suite 200
                            Howell, MI 48843
11                          (517) 540-1700

12
     For the Defendants:    JEFFREY J. AMATO
13                          WINSTON & STRAWN, L.L.P.
                            200 Park Avenue
14                          New York, NY  10166
                            (212) 294-4685
15

16                          HOWARD B. IWREY
                            DYKEMA GOSSETT, P.L.L.C.
17                          39577 Woodward Avenue, Suite 300
                            Bloomfield Hills, MI  48304
18                          (248) 203-0526

19
                            MEREDITH JONES KINGSLEY
20                          ALSTON & BIRD, L.L.P.
                            1201 West Peachtree Street
21                          Atlanta, GA  30309
                            (404) 881-4793
22

23                          ALDEN L. ATKINS
                            VINSON & ELKINS, L.L.P.
24                          2200 Pennsylvania Avenue NW,
                            Suite 500 West
25                          Washington, D.C.  20037
                            (202) 639-6613
```

```
 1    APPEARANCES:

 2
      For the Defendants:    PETER M. FALKENSTEIN
 3                           JAFFE, RAITT, HEUER & WEISS, P.C.
                             535 W. William, Suite 4005
 4                           Ann Arbor, MI  48103
                             (734) 222-4776
 5

 6                           ANDREW S. MAROVITZ
                             MAYER BROWN, L.L.P.
 7                           71 South Wacker Drive
                             Chicago, IL  60606
 8                           (312) 701-7116

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

MATTER                                                          PAGE

Defendants' Collective Motion to Dismiss GEICO's
Second-Amended Complaint........................... 6

Lear and Kyungshin-Lear's Motion to Dismiss.........82

```
 1    Detroit, Michigan
 2    Thursday, November 9, 2017
 3    at about 1:40 p.m.
 4                        —   —   —
 5            (Court and Counsel present.)
 6            THE CASE MANAGER:  Please rise.
 7        The United States District Court for the Eastern
 8    District of Michigan is now in session, the Honorable
 9    Marianne O. Battani presiding.
10            You may be seated.
11        The Court calls Case No. 16-cv-13189, GEICO
12    Corporation vs. AutoLiv, Incorporated, et al.
13            THE COURT:  Good afternoon.  Let's do appearances.
14    We will start with the plaintiff.
15            MR. GOLDFINE:  On behalf of the GEICO plaintiffs,
16    Dan Goldfine from the law firm of Lewis, Roca, Rothgerber,
17    Christie in Phoenix.  I'm joined here by my colleague, Diane
18    Hazel, from our Denver office.
19            MS. CASSELL:  And Rebecca Cassell from Myers &
20    Myers, on behalf of the GEICO plaintiffs directly against
21    their claims against TRW defendants and as local counsel for
22    the remaining claims.
23            THE COURT:  Okay.  Thank you.  You notice how this
24    case is a little mixed up; plaintiffs are on that side and
25    defendants always sit over here.
```

```
 1              MR. AMATO:  Good afternoon, Your Honor.
 2    Jeffery Amato from Winston and Strawn.  I represent the
 3    Panasonic defendants.
 4              MR. IWREY:  Good afternoon, Your Honor.  Howard
 5    Iwrey from Dykema representing the ZF TRW defendants.
 6              UNIDENTIFIED ATTORNEY:  Your Honor, Meredith
 7    Kingsley from Alston and Bird representing the AutoLiv
 8    defendants.
 9              MR. ATKINS:  Alden Atkins from Vinson and Elkins.
10    I represent Hitachi Automotive.
11              MR. MAROVITZ:  Good afternoon, Your Honor.
12    Andy Marovitz for Lear.
13              MR. FALKENSTEIN:  Peter Falkenstein from Jaffe
14    Raitt for Kyungshin-Lear Sales and Engineering.
15              THE COURT:  Okay.  Let's start -- hold on.  Okay.
16    Let's start with the collective motion to dismiss in GEICO
17    vs. AutoLiv, et al.  Who is going to argue?  Okay.
18    Mr. Amato.
19              MR. AMATO:  Good afternoon, Your Honor.  If it
20    pleases the Court, the way we would like to proceed is I will
21    be primarily addressing the joint arguments on standing, and
22    my colleague Alden Atkins will be addressing the release
23    arguments, and then plaintiffs will reply to those, and then
24    if we could have time for the Lear defendants and Andy to
25    address those after our joint argument.
```

1        THE COURT:  Okay.

2        MR. AMATO:  Thank you.  Now, what we thought would

3   be helpful for the Court is to compare and contrast the GEICO

4   case from all the other indirect purchaser complaints in the

5   MDL, and to explain how this case, if allowed to proceed,

6   opens up a whole new level of indirect claims for this MDL.

7        Now, GEICO claims to be a putative member of the

8   EPP litigation and settlement classes and rests on this

9   contention when seeking to establish standing for their

10  claims, but GEICO's claims differ significantly from the

11  individual class plaintiffs who purchased or leased new

12  vehicles containing automotive parts.  Now, that's no

13  surprise because GEICO is an insurance company.  They are

14  nothing like the direct purchasers of auto parts, the

15  automobile and truck dealerships, and the purchasers of new

16  vehicles who have pursued claims in this MDL.

17       It is a company that provides financial protection

18  against vehicle damages in exchange for premiums it sets and

19  calculates based on a number of factors, including, one would

20  presume, the studying of the pricing of auto parts in order

21  for GEICO to make a profit.

22       And these are the critical differences: GEICO's

23  claims are primarily derivative in nature.  They are seeking

24  damages when they did not actually purchase anything

25  manufactured by the defendants.  And more significantly,

1    those insurance payments were made to or on behalf of its

2    policyholders for used vehicles, a completely different type

3    of end product that this Court has never encountered in the

4    MDL.

5         Now, we are going to be focusing on the three types

6    of claims that GEICO makes.  Those are the total loss claims

7    for cars that have been wrecked and GEICO has made payment to

8    its policyholders; there are reimbursement claims where GEICO

9    has paid policyholders for claims made for repaired parts or

10   claims -- reimbursement claims to repair shops; and then

11   finally there are repair claims where GEICO alleges it

12   actually purchased its own replacement parts.  And then -- so

13   before I go into how these claims all lack standing for

14   GEICO, I would like to put the case into context with the MDL

15   and to show how this is generally an expansion of it.

16        Now, the first thing I would like to do is talk

17   about how GEICO has improperly grouped all of the defendants

18   in this case together that are unrelated into a single

19   action.  They brought together all of these parts and

20   defendants, and the only thing connecting them is the fact

21   that they were some of the first parties to settle in the

22   indirect purchasers actions.  For example, you will see my

23   client up there, Panasonic, made steering angle sensors, high

24   intensity discharge ballasts and switches, and none of our

25   co-defendants are in this case, and we settled that case two

1    years ago.

2          Now, GEICO conceded in its opposition that its

3    allegations in the complaint were not intended to allege an

4    overarching conspiracy among all the defendants, and we

5    submit that that admission is sufficient to dismiss this

6    complaint because there are allegations in there that do

7    allege that we should be held jointly and severally liable.

8    But regardless of whether the complaint alleges one

9    overarching conspiracy or 16 separate conspiracies, bringing

10   this as one consolidated act is improper.  This Court has

11   already rejected the consolidation approach and called it

12   highly prejudicial to group together these unrelated cases,

13   and GEICO has also flouted the rules of procedure of the

14   Court that you have established, Your Honor, in efficiently

15   running this MDL by separating each part case and grouping

16   the defendants that were related to each other and sold the

17   same products.

18          THE COURT:  Only because I can't imagine how it

19   would go.  I'm anxious to hear plaintiff's point of view as

20   to how you would possibly handle this together the way it is

21   set out right now in this complaint.

22          MR. AMATO:  Your Honor, we are as curious, and what

23   we envision is that as the cases unfold and GEICO brings

24   additional actions against settling defendants, there is

25   already a GEICO two out there, that what will happen as this

```
 1   case goes forward is that the defendants who have settled

 2   cases in the later actions may actually have to start

 3   discovery before the defendants that did not settle, and

 4   that, of course, is not something that would encourage

 5   settlements in this MDL.

 6            THE COURT:  You said there is already a GEICO two

 7   out there?

 8            MR. AMATO:  Yes, Your Honor.

 9            THE COURT:  Are you talking about another case?

10            MR. AMATO:  There is another case brought by GEICO

11   against the second wave of settlements, and we suspect as the

12   waves of settlements come in there will be additional cases,

13   but I don't want to speak on behalf of them, of course.

14            THE COURT:  When was that filed, do you have any

15   idea?  Ask plaintiff if you know.

16            MR. AMATO:  I think it was filed in the spring.

17            MR. GOLDFINE:  Your Honor, if I may.  I'm sorry,

18   Jeff Goldfine.

19            THE COURT:  Yes.

20            MR. GOLDFINE:  April of 2017, you know, they were

21   triggered out for the opt-out dates and essentially required

22   us to file the case.

23            THE COURT:  I honestly don't remember that.  Jim,

24   do you know that you have another case?

25            THE LAW CLERK:  No, I do not, Judge.  I do now.
```

1          THE COURT:  You do know.  There's probably more.

2          THE LAW CLERK:  I might have seen it somewhere,

3    but --

4          THE COURT:  I'm sorry.

5          MR. AMATO:  Thank you, Your Honor.  The only

6    sensible approach we would say if this case goes forward,

7    which we will argue it shouldn't, is to have GEICO file in

8    the separate actions as the other auto dealers opt-outs have

9    done and bring cases individually against the groups of

10   defendants involved in each conspiracy.

11          Now, I want to move on from that and go to another

12   way that GEICO's case could be similar to the other ones in

13   the MDL.  Now, in their opposition they claim to have

14   purchased vehicles and replacement parts for its own use, so

15   GEICO's own use, and we will call that the fleet purchases,

16   but that claim is not alleged anywhere in the complaint.

17   Okay.  There is no mention of fleet purchases.  There is no

18   mention of vehicles purchased on GEICO's behalf.  GEICO's

19   sole claim involves purchases of auto parts, claims on

20   reimbursements it's made to its insureds for auto parts and

21   to repair professionals, and for payments made on wrecked

22   vehicles, total loss vehicles.  And so you cannot bring

23   claims if you haven't brought them in your complaint.  GEICO

24   is a sophisticated litigant, sophisticated insurance company,

25   and those arguments in its opposition cannot be used to prop

 1   up its standing in this matter.

 2          A third way that this case is similar to the others

 3   is that GEICO is bringing claims in all jurisdictions

 4   possible, all the repealer jurisdictions and the ones with

 5   consumer protection and unjust enrichment claims.

 6          Now, for the class plaintiffs, they resided or

 7   almost resided in all the jurisdictions, there was some

 8   litigation over that, but GEICO doesn't reside in every

 9   jurisdiction.  The GEICO here represents where GEICO does

10   reside, and critically you will see that GEICO resides in

11   Texas where there aren't antitrust claims.  And if GEICO were

12   given the inference where they could only bring antitrust

13   claims in the states where it will be resident in, I think

14   that would be only two jurisdictions where antitrust claims

15   are allowed.

16          And the problem here is that GEICO's complaint does

17   not allege any payments in any particular state.  There is no

18   specificity.  The complaint just makes naked assertions of

19   injuries in each state, not payments, not purchases.  We have

20   no idea where the payments were made, to who, or for what.

21          Now, in its opposition GEICO argues that it is a

22   national insurer that adjusted claims and issued policies in

23   all 51 states -- 51 jurisdictions.  But, again, this is not

24   pleaded anywhere in the second-amended complaint, and notably

25   silent even in the opposition is where the payments were made

1    from or to.  GEICO did not explain how or which of its

2    entities made what payments where, and those are affirmative

3    allegations they need to establish standing.

4          In the Court's other decisions in the class

5    indirect purchasers ones on standing, the Court inferred

6    standing based upon the place of residency, and, Your Honor,

7    you also allowed certain claims to move forward deferring

8    standing to the class determination, and because GEICO is not

9    a class plaintiff, it is time to decide those issues now and

10   there is no need to wait until a class determination.

11         So now, if I may, if there's no questions on those

12   things, I would like to move to the differences in GEICO's

13   claim.

14         THE COURT:  Before you -- can you go back to your

15   last slide, the one with the star on it, what is that again?

16         MR. AMATO:  The star, that's the District of

17   Columbia where certain GEICO entities are either incorporated

18   or have their primary place of business.

19         THE COURT:  Okay.  So it is Texas and the District

20   of Columbia.

21         MR. AMATO:  Nebraska and Maryland.

22         THE COURT:  The four of them.  All right.

23         MR. GOLDFINE:  Your Honor, if I may chime in, I

24   suspect that's actually -- the star is Maryland where our

25   corporate headquarters are.

1    THE COURT:  Oh, I'm going to mark that down because

2  I think that makes more sense, the corporate headquarters.

3    MR. AMATO:  Sure, that's fine.

4    THE COURT:  Although you did say that GEICO is from

5  Texas?

6    MR. AMATO:  There is a certain GEICO entity that's

7  incorporated in Texas, also in Nebraska, Maryland, and D.C.

8    THE COURT:  Right.  Okay.

9    MR. AMATO:  I will just point out that the

10  complaint does not parse out which plaintiffs incurred what

11  injuries or what payments were made from where and to whom,

12  and that's the real issue here that we need to know in order

13  to assess whether there has been injuries and claims that can

14  go forward on a constitutional standing basis in each of the

15  states.

16    THE COURT:  I didn't mean to interrupt you.  I just

17  thought that might have been something special that you were

18  trying to point out and I missed it.

19    MR. AMATO:  Thank you, Your Honor.

20    So one type of claim that GEICO brings is the total

21  loss payments.  Now, these are dramatically different from

22  all the claims that have been brought in this MDL, and they

23  differ significantly from the end payors that GEICO says that

24  they are very similar to.  Indeed, the claims they are making

25  here are on transactions that are not even purchases of the

```
 1    alleged fixed products.  The claims involve losses --
 2    payments that GEICO has made, which are insurance payouts, to
 3    its policyholders for a used automobile that has been
 4    involved in a wreck, and the costs -- and when the costs of
 5    the repair exceeds a certain threshold, which I understand is
 6    either determined by state law or by GEICO, and so the used
 7    vehicle is no longer salvageable and the policyholder
 8    receives a payment for the value of the car after
 9    depreciation, and in this scenario GEICO simply cuts the
10    check to the policyholder for the value of the car.
11              Two problems with this first standing.  First, it's
12    the first time in this MDL that we are encountering used
13    vehicles, and it is used vehicles because all of GEICO's
14    policyholders are end payors who purchased a new vehicle but
15    now own a used vehicle.  And it is not only unprecedented for
16    this MDL to bring such claims, but we are not aware of a
17    single case, and I don't believe GEICO cites any, where a
18    user downstream from the end -- the indirect purchaser is
19    able to bring antitrust claims on used products.
20              And in Compressors II there is a good example and
21    analogy cited where the Court noted it would be wrong to
22    grant standing to the purchaser of a used bicycle when that
23    purchaser asserts that the purchase price of the twice-sold
24    bicycle was inflated due to a price-fixing conspiracy of the
25    rubber manufacturer whose product was used to manufacture the
```

 1    tires of the bike, and really it is the same exact scenario

 2    here.

 3          The auto parts manufacturer sold parts for new

 4    cars.  Once purchased, that vehicle goes through numerous

 5    channels; it could be sold again; it could be involved in an

 6    accident and have replacement parts in it; it could be driven

 7    for years, and when it is totalled in a wreck they receive a

 8    check for it.  It's very difficult to fathom how there is a

 9    connection between the part that was sold perhaps ten years

10    ago and the insurance claim that is made on a depreciated

11    car.

12          Now, the second problem is that the total loss

13    claim is not based on any actual purchase.  Now, GEICO tries

14    to get around this by contending in its opposition that the

15    purchase of an auto part is irrelevant to standing, but it is

16    not irrelevant.  As is this Court held in wire harnesses and

17    bearings, and I will give you one citation, that's the

18    50 F.Supp. 3rd, 836 for the bearings decision, Your Honor

19    held that to satisfy standing required allegations that the

20    indirect purchaser actually purchased indirectly from a

21    defendant the alleged price-fixed product, and that there

22    were allegations that there was an overcharge on that

23    product.  And the purchase is required so that you could

24    trace the pass on down the chain to the purchaser.  Now, here

25    GEICO alleges overcharges but no purchases, just a tangential

1    effect on the value.

2         Now, this is what Your Honor found satisfied

3    standing for the end payors in bearings and fuel senders, and

4    that's a straight path from the auto part manufacturers

5    selling parts to the OEMs incorporated into cars that go to

6    dealerships and then to consumers.

7         But if you go back to the total loss payments, it

8    is just a mess.  There's so many different factors.  There's

9    no way of telling how a small cost change in an auto part of

10   $10, let's say, could somehow filter down the chain and

11   affect GEICO to pay its policyholders more when that car is

12   wrecked in an accident.  And when that wreck occurs, if GEICO

13   is basing its total loss value on the cost of the parts, it

14   would have already calculated the alleged overcharge auto

15   part in its calculation of how much premium to charge its

16   policyholders in the risk it was assuming that that

17   policyholder's car would be involved in a wreck.

18        So allowing such attenuated claims to survive here

19   would fly in the face of the AGC's limiting principles.  Now,

20   there already have been three layers of claims in this case:

21   the direct purchasers, the auto and truck dealers, and the

22   purchase of new vehicles.  Now, if GEICO's claim are allowed

23   to proceed, it would potentially give rise to a whole new

24   slew of claims in this MDL for transactions tangentially

25   connected to used vehicles, used car dealerships, used

1    purchasers, passengers in taxis paying higher fees, financial
2    institutions offering financing for vehicles.
3            Associated General Contractors calls for courts to
4    draw a line when the claims become too attenuated and remote
5    from the alleged harm, and this is where this Court should
6    draw the line because once the end payor purchases that new
7    vehicle, there is no telling what happens to that product.
8            There is one thing we do know that happens to the
9    product.  The minute that car drives off of the lot,
10   estimates show that it loses ten percent of its value.  Now,
11   that may not be the right percentage, and it is probably
12   going to vary, but we all know once you drive a new car off
13   the lot, it is not the same, the value has been lost, but we
14   all love the new car smell so we pay for it.
15           Now, this is where we say we should draw the line.
16   And it is really telling, the ten percent figure, because
17   GEICO alleges that the overcharge here was approximately ten
18   percent.  They say they have economists who could calculate
19   higher percentages, but it is ten percent.  So the moment
20   that car drives off the lot, those claims become
21   significantly more speculative and difficult to establish.
22           And as you go down the chain, obviously the
23   depreciation is going to vary widely among makes and models
24   due to factors that have nothing to do with the cost of the
25   auto parts: the popularity of the vehicle, supply, condition

1    of the vehicle, and numerous other factors, all of which

2    complicate the standing analysis that's required to bring

3    antitrust claims.

4         THE COURT:  And wouldn't the end payor auto owner

5    recover under the settlements --

6         MR. AMATO:  Yes, Your Honor.

7         THE COURT:  -- for the parts?

8         MR. AMATO:  Yes, they did.

9         THE COURT:  So are we talking subrogation right

10   here versus antitrust?

11        MR. AMATO:  Well, the claims that GEICO is bringing

12   are not subrogation claims.

13        THE COURT:  I know that they say that.

14        MR. AMATO:  We contend they are, but these are our

15   direct claims, and they could have been, and Mr. Atkins will

16   address subrogation in the context of release, but --

17        THE COURT:  We will talk about that later if we are

18   going to get there.

19        MR. AMATO:  Thank you, Your Honor.

20        And before we get to the actual payment of repair

21   parts and the potential for duplicative recovery that you

22   raise, I will just go over briefly the reimbursement payments

23   which are similarly subject to the same arguments and plagued

24   with standing problems because here again GEICO did not

25   purchase the auto parts at issue and thus cannot have

 1   constitutional standing.  When GEICO makes a reimbursement
 2   payment to the policyholder, GEICO sets a value for that
 3   payment under its insurance contracts and policies along with
 4   associated deductibles that it gets from the policyholders.
 5   It is not based on the cost that the defendants charged the
 6   OEMs when it initially sold or even aftermarket products that
 7   the defendants may sell into the stream of commerce.
 8           THE COURT:  Well, wouldn't the aftermarket come
 9   into play because they are paying more for it now?
10           MR. AMATO:  It does come into play, Your Honor.
11           THE COURT:  If there is this antitrust violation.
12           MR. AMATO:  Yes, it does come into play but it is a
13   different market because there are a slew of other
14   manufacturers of replacement parts who are not alleged to
15   have been involved in any auto parts conspiracy and they
16   introduce their parts, repair parts into the market stream,
17   and when GEICO makes reimbursement payments to either the
18   claimant or to the repair shop, we don't know whether the
19   claimant pockets the money and decides not to repair the
20   vehicle or whether the repair shop decides to go get an
21   aftermarket product at a cheaper price and thus not
22   triggering any purchase of an auto part from a defendant
23   alleged to have conspired to inflate the price.
24           THE COURT:  What difference does it make if the end
25   payor decides to pocket the money?

 1          MR. AMATO:  Well, in that instance there has been

 2    no purchase of an alleged price-fixed product and GEICO's --

 3    the value that GEICO is paying its insurance claimant is not

 4    based off of a list price that the defendants have issued,

 5    it's based upon the value of its risk and -- the balancing of

 6    its risk and its premiums paid by the policyholder, and so

 7    there is no causal connection between the alleged overcharge

 8    of that product filtering down to the repair shop that

 9    ultimately doesn't even install it into the insured's

10    vehicle.  It is very attenuated and complicated.

11          Now, if we could go to the next slide.  This is the

12    repair payments, and this may be somewhat closer to the

13    claims in this MDL, but here the critical defect is that when

14    GEICO alleges it purchased super-competitive auto parts that

15    were super-competitive prices, GEICO does not state in its

16    complaint that the parts were actually manufactured or sold

17    by the defendants or any of the co-conspirators, so we have

18    no way of knowing whose products GEICO was purchasing.

19          Now, GEICO is, as I said, a sophisticated insurance

20    company and litigant, and it would have pled those facts if

21    it were known to them because they know that this is critical

22    to establishing standing that the parts have to come from the

23    defendants alleged to have been in conspiracy, and there are

24    other sources of replacement parts, the market is flooded

25    with them, I will attest to that.  And if GEICO does not know

1    where the parts came from that were purchased, it has no

2    standing to bring claims in this action.

3         Now, GEICO's claims are also conclusory and bare as

4    to, you know, who they purchased from and what quantities.

5    It is just a broad allegation that these are the amounts that

6    were purchased over the span of time, so there is no way to

7    tell whether they could meet the factors in the AGC test.

8         But there is one factor that we do know a lot about

9    and that's duplicative recovery, and the factor here is the

10   risk of duplicative recovery, but here it is not a risk, it

11   is actual.  The end payors have already settled and paid for

12   any overcharges that have been paid for any overcharges on

13   the replacement parts that they may have received.  GEICO is

14   just seeking a double recovery, which for them would be a

15   windfall because they've received premiums and deductibles

16   from their policyholders.

17        Now, this Court has recognized that indirect

18   purchaser claims can result in double recovery, for example,

19   for the auto dealers and the end payors, but it is a risk of

20   double recovery there.  In those cases the end payors and

21   automobile dealers need to prove what was passed down to

22   them, and so in that economic analysis there may be overlap

23   where there could be a risk of double recovery.  But here

24   GEICO is seeking to step into the shoes of policyholders and

25   receive what the end payors received, and that's duplicative

1       recovery that weighs against a finding of standing.

2               Finally, I just say that GEICO is not even a

3       participant in the market -- in this new marketplace that has

4       been opened up in this MDL for used vehicles, they don't even

5       participate in that market.  They are in the market for

6       automotive policyholders, and this supply and demand for them

7       is not linked to the cost of the parts but the cost of the

8       insurance and GEICO's ability to maintain profit margins with

9       the premiums and deductibles it sets and determines in

10      studying the market.

11              So opening this case up to such attenuated and

12      distant claims such as insurance ones brought on used

13      vehicles and aftermarket auto parts for repairs would be an

14      unprecedented step not just for this MDL but for antitrust

15      law in general as these are all derivative claims, and anyone

16      tangentially connected to the commerce of vehicles could then

17      try to assert similar claims.  We could have repair shops

18      and, as I said before, used car dealerships, and they would

19      see their own opportunity.  And that's the reason why these

20      claims are too remote and AGC says that we should dismiss

21      them for lack of standing.

22              Unless Your Honor has further questions, I'm going

23      to pass it off to my colleague.

24              THE COURT:  All right.  Thank you.

25              MR. AMATO:  Thank you.

1           MR. ATKINS:  Good afternoon, Your Honor.  As I

2   said, I'm Alden Atkins representing Hitachi Automotive, and I

3   will be speaking about the settlement and release.

4           I might add that there are obviously others issues

5   that are raised by our papers, including the statute of

6   limitations and the state-by-state analysis.  We didn't think

7   that it would be particularly the best use of our time to

8   make -- to go through all of those today, but, of course, if

9   the Court has any questions, then we are prepared to answer

10  any questions that you might have on those.

11          THE COURT:  No, it is sufficient in your pleading.

12          MR. ATKINS:  Okay.

13          THE COURT:  Thank you.

14          MR. ATKINS:  The other thing I would like to point

15  out is that Mr. Iwrey tells me that, in fact, there is a

16  GEICO three case that's out there.  It doesn't involve my

17  client so I don't know about it.  But I think what you can

18  see is that as there are waves of settlements, we can

19  anticipate that there will be more waves of GEICO claims

20  related not by all of the participants in a particular part

21  but related only by the fact that it is the timing of when

22  defendants settled.

23          So let me go to the --

24          MR. GOLDFINE:  Excuse me.

25          THE COURT:  Just a minute.

1          MR. GOLDFINE:  At the risk of my silence affirming

2     that fact, I'm not aware of a GEICO three case.  I won't

3     dispute the fact that --

4          MR. IWREY:  There will be.

5          MR. ATKINS:  Oh, I'm sorry.  I misunderstood when

6     Mr. Iwrey and I were doing hand signs to one another.

7          THE COURT:  There may or may not be.

8          MR. ATKINS:  I apologize.

9          THE COURT:  Okay.  If plaintiff didn't file it, I

10    am going to assume that it does not yet exist.  Okay.  Go

11    ahead.

12          MR. ATKINS:  So this is a roadmap of the points

13    that we have with respect to the fact that these claims have

14    been settled and released.  I'm not going read this to you,

15    but at the end of the day I would like you to reach three

16    conclusions.  The first is that the defendants have paid

17    princely sums of money to settle claims with the indirect

18    purchasers, with the end payors, and in doing so, we wanted

19    to buy final peace.  We wrote our release, and we will talk

20    about this in a moment, we wrote our releases in ways to

21    cover everyone who could claim through the end payors because

22    we wanted the release that we were paying a lot of money for.

23    That's point number one.

24          Point number two is that, as we will see, GEICO has

25    not properly asserted a claim for subrogation, and, in fact,

1    it would be futile -- futile to allow them to amend their

2    complaint to try to assert such a claim.

3          Pointed number three, if these claims were allowed

4    to go forward, it would become extraordinarily difficult for

5    remaining defendants to settle claims with the end payors

6    because what GEICO is telling you to tell us is that the we, the

7    defendants, should assume that because insurance is

8    ubiquitous, because so many auto repair claims are paid by an

9    insurance company, we should assume that the end payors

10   sitting across the table from us when we try to negotiate a

11   settlement, we should assume that they do not own the claims

12   they are litigating and we should assume they do not own the

13   claims that we think we are settling because somewhere out

14   there there may be an insurance company like GEICO that will

15   pop up later and claim ownership of the claims.  And if we --

16   if the end payors can't give the defendants confidence that

17   they are, in fact, settling those claims, it will become

18   extraordinarily difficult for settlements in the future.

19         Let's go to the next slide, please.

20         So, as I said, my first point is that the

21   defendants paid a great deal of money, in my client's case

22   $47.6 million, to the end payors.  And we wrote our releases

23   to protect ourselves from these types of claims.  Up at the

24   top we have the language from the Hitachi Automotive release

25   which expressly includes insurers of the end payors.  Then we

 1   have the T. Rad one beneath that, same thing, insurers.

 2          Now, I'm not here to tell you that all of the

 3   settlements in this first wave of GEICO cases refer to

 4   insurers.

 5          Let's go to the next page.

 6          They still incorporate the concept of making sure

 7   that derivative claims are covered by the release.  Here is

 8   the Lear and KL Sales release, and you will see it refers to

 9   purchasers, that would be purchasers of the claim, successors

10   and assigns of the claims.  So we wrote our releases to

11   protect ourselves from these types of claims.

12          Next slide, please.

13          GEICO has not asserted a claim as a subrogor and it

14   cannot do so.  It should not be given leave to amend because

15   it will be futile.  The first thing, this isn't on my slide,

16   but of the 250 paragraphs of their complaint, I think their

17   second amended -- now, of course, we are on the third version

18   of their complaint, some 120-plus pages, the word subrogation

19   does not appear.  I did a search for it this morning.  Nor

20   does the word subrogation, subrogor, none of those words are

21   found anywhere in the complaint.  And GEICO, of course, is a

22   sophisticated entity, this is their business.  If they were

23   properly asserting a claim, you would think they would say

24   so.

25          They have not identified a single claim where they

     1    have rights as a subrogor.  All we have is generalized

     2    language.  And, in fact, that's important because subrogation

     3    is dependent on the facts and the circumstances of each

     4    claim.  In fact, you will look at the cases that we cited to

     5    you, and the first thing that they do is they analyze, well,

     6    what state law applies to this claim for subrogation.  One of

     7    the cases we cited to you, I think it is called Preferred

     8    Risk Mutual, says that there is significant disagreement

     9    among courts about the rights of a subrogor to assert a claim

    10    against a tortfeasor, and it lays out the different rules

    11    that that court found when looking at different states.  Some

    12    states, for example, Michigan, allows subrogation claims in

    13    only very limited and precise sets of circumstances because

    14    it is a no-fault statute, and the reason that you have a

    15    no-fault statute is you are trying to avoid all of the cost

    16    of people fighting over the money so you limit subrogation,

    17    and they haven't alleged a single fact or a single claim to

    18    allow you or to allow us to determine what state law would

    19    apply so we could look at that state law and determine

    20    whether, in fact, they have and can assert a legitimate claim

    21    for subrogation.

    22            I might also add that subrogation can be a matter

    23    of contract.  Insurance policies often include provisions or

    24    may include provisions about subrogation or it may include an

    25    assignment of a claim.  After all, if the person whose car is

1   repaired is not the insured but is a claimant against the

2   insurance company, they don't have an insurance policy that

3   governs their right but they may sign something like an

4   assignment of claim. Now, of course, as we saw, assignment

5   is covered by our releases. So it is also a function of

6   contract.

7           And what GEICO has not done is they have not

8   alleged a single fact -- and forget the fact that they don't

9   allege -- use the word subrogor -- they have not alleged any

10  facts sufficient to determine if it has a plausible claim for

11  subrogation. They haven't identified a single end payor

12  whose claims they claim to have succeeded to. So we haven't

13  had any identification of applicable state law, we haven't

14  looked at -- we can't look at whether they have satisfied the

15  claims under that state's law to assert a subrogation claim

16  or whether that state might allow it against a tortfeasor.

17  There are no facts about the claims it's paid or about the

18  policies or assignments.

19          Another point to consider here is that GEICO is

20  seeking treble damages. That would be a windfall because a

21  subrogor's claims are limited to the amount it has paid. So

22  that's why this case that we cited to you, the Allstate case,

23  says that a subrogor cannot assert a claim for punitive

24  damages because when it paid the claim to its insured or to

25  the claimant, it didn't pay punitive damages. So, in fact,

1    we know that GEICO is asserting claims to which it has no

2    right to assert, which it has no right to assert as a

3    subrogor.

4         And then Mr. Amato touched on this but it is

5    important in the context of subrogation.  There cannot be a

6    subrogation claim where the insured or the claimant decides

7    not to repair their car and does not buy a part.  The

8    subrogor's rights -- the subrogor steps into the shoes where

9    they are a subrogor, they step into the shoes of the insured,

10   and their rights are no greater than those of the insured.

11   And if I am the insured and I did not buy an alternator or I

12   did not buy a starter or I did not buy any one of the other

13   parts at issue in this -- in the MDL, then I could not assert

14   a claim, an antitrust claim that there was an overcharge for

15   that part, and since the insured does not have that claim,

16   the subrogor cannot have that claim either.

17        In any event, as a subrogor, even if it is a

18   subrogor, GEICO's claims were released.  I showed you the

19   language of the releases often that expressly refer to

20   insurers, even the ones that are more broad to describe

21   derivative claims.  I might add that GEICO was obviously

22   aware of the settlements and it did not object.  It did not

23   object to the breadth of the releases.  It could have come

24   in, but now we have had notice, you had a fairness hearing,

25   invited anyone who wanted to object to the settlements to

```
 1    come in, and you have entered a final judgment in each of

 2    these cases approving the terms of the settlements and the

 3    releases.

 4            Now, point B here, a release is valid as to a

 5    subrogor if the defendant is unaware of the insurer's claims

 6    as a subrogor, and I think that we and GEICO agree on that,

 7    is where is the knowledge?  And what I will explain to you, I

 8    hope, I hope I will persuade you, is that as between GEICO

 9    and the settling defendants, it ought to be GEICO to come

10    forward and to tell us that it has a claim and that we should

11    be alert to it.  And that's because we've got -- these claims

12    involve millions and millions of potential claimants and we

13    can't possibly know who their insurers are.  But GEICO on the

14    other hand, they have their records showing what repairs, who

15    they paid for what, and so they are in the better position to

16    know who the -- who the -- whose claims they might assert

17    subrogation claims for.  Otherwise you would have to have us

18    as the defendants let our fingers do the walking through the

19    Yellow Pages and try to figure out every possible insurance

20    company and every possible one of the indirect purchaser

21    states and somehow try to figure out who might be out there

22    that conceivably could come later and assert a subrogation

23    claim.

24            Next slide.

25            So that's why GEICO is in the best position and
```

 1     should bear the burden of coming forward.  And, in fact, one
 2     of the cases that we cited to you, I believe it is the Aetna
 3     case, says that in a situation where nobody took any steps
 4     regarding notification, the defendant took -- the settling
 5     defendant did not take steps and the insurer claiming
 6     subrogation did not take steps, the court said the burden
 7     should be on the insurance company because it knows about the
 8     claim, it's in the best position to provide notice.  And, in
 9     fact, the burden should be on them because it facilitates a
10     settlement because, as I said, if they really can assert
11     these claims, it is really hard to settle indirect purchaser
12     claims, but if they come forward, at least the settling
13     parties will have some idea that the subrogor is out there
14     and figure out that there is some way -- try to figure out a
15     way to address the risks associated with the subrogor.  So it
16     facilitates settlement to put the burden on them.
17              And, of course, what I care significantly about is
18     double payment.  We have paid to settle these claims, we have
19     paid for it, and now GEICO is asking us to pay a second time.
20              Now, as I said at the beginning -- let's go back to
21     the slide before -- the possibility of insurance companies
22     should not be sufficient to put us on notice.  As I said in
23     my third point at the beginning was their argument is that we
24     should -- because insurance is so ubiquitous, we should
25     assume that an end payor has an insurance policy and there

1    may be a subrogor out there so we should assume that the

2    EPPs -- at least some significant portion of the EPPs may not

3    own the claims that they are asserting in the MDL, and we

4    should assume that when we settle with the EPPs that none of

5    them, or at least the majority of them, don't have the right

6    or the ability to settle those claims, and that cannot and

7    should not be the rule because it would make it

8    extraordinarily difficult for us to -- for any of these

9    claims to be settled.

10              Let's move on.

11              Now, GEICO's answer is they opted out and so all of

12   these claims about releases don't apply to them.  An EPP, an

13   end payor individual who opts out, their claims aren't

14   released.  And I agree with GEICO when they say that an end

15   payor who opts out, the claim that that end payor may have

16   had not been released and the end payor is free to litigate

17   that, and they say we opted out and therefore these arguments

18   about release don't apply to GEICO.

19              Well, the first point, of course, is that none of

20   those end payors opted out so we have to rely upon GEICO's

21   letter purporting to opt out.  Its letter, and I invite you

22   to look at it, I have a copy of it, but I invite you to look

23   at their opt-out letter.  Their opt-out letter is just a very

24   generic letter that says we, GEICO, have paid for hundreds of

25   thousands of parts and we opt them out.  That's all it says.

 1  But in our settlement agreement, Hitachi Automotive,

 2  paragraph 29B, an opt-out, to be effective, the member of the

 3  settlement classes must state his, her, or its full name,

 4  address, and telephone number.  And, in fact, for the

 5  notices, and this is the notice that now applies to all of

 6  the defendants here in the room today, the notice that the

 7  end payors submitted to you and which you approved for

 8  circulation to the class went beyond that.  We've got a

 9  little screen shot down here at bottom, this is from page 15

10  of the notice.  It says your letter must -- this is the

11  opt-out letter -- your letter must also include name,

12  address, and telephone number, but it also says you have to

13  include documents reflecting your purchase or lease of a new

14  eligible vehicle and/or purchase of the applicable

15  replacement part.  It should include the date of the

16  purchase, the make and model year of the vehicle, the state

17  where it was purchased, the amount paid, and various

18  documentation showing that they have -- that they have this

19  claim that is being opt out -- opted out.

20       Now, why is that important?  The reason it is

21  important is because it puts every one of us on notice of who

22  is -- who has opted out of the class and who can assert a

23  claim and who is not bound by the settlement or release.  And

24  by the way, it also tells this settlement administrator which

25  claims it should not pay if it is submitted.  And it is

1   important not only for name, address, and telephone number,

2   of course that's essential information, but it could be that

3   I as an end payor, I own two or three cars, maybe I -- maybe

4   one of them or two of them is covered by the classes, and by

5   providing the detailed information about the vehicle we know

6   exactly which vehicle are not part of the settled class, and

7   the claims administrator knows which claims not to pay.  But

8   as it stands now, GEICO's letter doesn't tell us who any of

9   these people are.

10          By the way, let me add, as Mr. Amato told you,

11   their complaint does not refer to fleet purchases, what they

12   describe as fleet purchases for GEICO, so that's not part of

13   complaint, but their brief tries to bring fleet purchases in.

14          I might also add that their opt-out letter is not

15   sufficient as to the fleet purchases because it hasn't

16   identified any of these vehicles that are part of the -- that

17   are part of the fleet, so that's why it would be futile to

18   allow them to amend their complaint to include fleet

19   purchases because those are not opted out of this case.

20          And so the opt-out notices don't tell us anything

21   about the claims where it asserts subrogation rights.

22   There's at least one of cases that we have cited to you, I

23   think it is the Steamfitters case, where an insurance company

24   was suing tobacco companies and they expressly disclaimed

25   that they were asserting subrogation rights, and the court

1   said I'm pretty sure the reason they are doing it is because

2   it is so hard to identify each one of those, which they would

3   have to do if it was a subrogation case, but GEICO has not

4   done that.

5        So as a result, we don't know which claimants have

6   supposedly opted out of the class through GEICO, and as I

7   said, the settlement administrator does not know which ones

8   have opted out.

9        A couple of other points.  This is one that

10  Mr. Amato touched on.  As the defendants have pointed out,

11  what GEICO wants is for to us pay twice for these claims.

12  Their answer is, wait a minute, indirect purchaser states

13  have adopted as a policy that that's sufficient, that it is

14  okay to require a defendant to pay twice.  Now, we have cited

15  to you provisions of state law where they actually require a

16  court to apportion between the different levels of the

17  distribution chain to avoid double payment, but more

18  importantly, those are different transactions.  The direct

19  purchasers are purchasing in one transaction, the dealers are

20  purchasing in another transaction, the end payors are

21  purchasing in a different transaction.  Okay.  Or if the end

22  payor buys a replacement part, that's a separate transaction.

23       But what GEICO is trying to recover double payment

24  for is the very same transaction that they -- the end payor

25  has paid and which is compensated by the settlement.  Okay.

1        Now, GEICO claims that they've been prejudiced, but
2   they can recover from their insureds and their claimants when
3   there is a subrogation claim as is often the case with the
4   cases that we have cited to you, they can seek reimbursement
5   from their insured or the claimant.  Of course, it depends on
6   the individual state law, depends on the policy, depends on
7   the assignment facts which aren't alleged in the complaint,
8   but it is a standard rule of insurance that they can seek to
9   recoup from their insureds the payments that have been made.
10       Now, finally, GEICO says it will suffer plain legal
11  prejudice if this is allowed to go forward, and they have
12  cited some cases which say that a person who is not a party
13  to a settlement can still challenge it on the ground that it
14  would cause them plain legal prejudice, and I agree, there
15  are cases which say that.  Now, by the way, not one of the
16  cases that GEICO cited actually finds that there is
17  sufficient plain legal prejudice because the bar is so very,
18  very high to prove that.
19       But more importantly or just as importantly, the
20  time for them to have asserted that has long passed.  The
21  time for them to assert that was before you entered a final
22  judgment which applies to the insurers, which applies to the
23  successors and assigns, that was the opportunity.  And if
24  they thought that they had -- that they would have suffered
25  plain legal prejudice, they could have come to you and asked

```
 1    you to set aside the settlements.  And if the settlements are
 2    set aside, well, then we start over again.  Of course, it
 3    becomes more difficult to settle, but we would start over
 4    again at that point.  But they didn't do it, we have final
 5    judgments, and the argument the claim has been waived.
 6            So as I said, Your Honor, at the beginning, I hope
 7    that you will draw three conclusions: we paid lots and lots
 8    of money to obtain peace in these cases; two, they have not
 9    asserted a proper claim for subrogation and it woulod be
10    futile to allow them to amend their complaint to try to do
11    that; and third, if these claims are allowed to go forward,
12    I'm afraid it will be many years that this -- even more years
13    that this case will be going forward.  Thank you.
14            THE COURT:  I'd hate to see it end.  Okay.
15            Mr. Goldfine.
16            MR. GOLDFINE:  Thank you, Your Honor.
17            THE COURT:  I want you to answer the first question
18    that I started with which had to do with how would you handle
19    this case?
20            MR. GOLDFINE:  Well, I think, you know, we thought
21    about that a little bit.  We would focus on primarily the
22    facts as they would apply to GEICO.  GEICO is essentially a
23    single set of plaintiffs.  And then we would focus out and
24    establish each conspiracy.  We suspect liability will be
25    relatively straightforward by the time that discovery takes
```

1    place.  And then we will have an expert who identifies as to

2    each conspiracy and as to the defendants involved in each

3    conspiracy what the overcharges were as to GEICO.

4          So, you know, GEICO is a plaintiff and, you know,

5    the common practice, it can define the case it wants to

6    pursue, but as a straightforward --

7          THE COURT:  Well, it can't join parties that --

8          MR. GOLDFINE:  This is not a joinder, Your Honor;

9    this is our naming of the complaint.  And that's the problem

10   with the defendants' argument is that they are focusing on

11   Rule 42.  So we have named them and we can -- we can define

12   the complaint as it.  It meets the Rule 20 basis, which is a

13   logical relationship, and the logical relationship is that

14   all of their conspiracies were directed at GEICO, directed at

15   causing GEICO harm in this particular instance.

16         We don't believe it will have any effect on the

17   defendants, and the defendants haven't shown, and frankly it

18   is not proper for this motion to dismiss, haven't shown any

19   prejudice that would occur that's different than the

20   prejudice that would occur from having to try it separately.

21         So I'm happy to address it more, but we've given

22   some thought to that issue.

23         THE COURT:  You really haven't answered it.  How do

24   you handle a case of this nature with all of these

25   defendants, very few who overlap, in one case?  You have

1      discovery that will be different for each one of these

2      defendants, you will have summary judgment motions, 12(b)

3      motions for each one of these defendants.

4                  MR. GOLDFINE:  As I understand how we would try --

5                  THE COURT:  How many attorneys do you have?

6                  MR. GOLDFINE:  GEICO can supply enough attorneys to

7      address summary judgment and try this case, whether it is me,

8      Ms. Hazel, Ms. Cassell or others, that's not going to be an

9      issue with respect to whether or not we need to provide

10     enough to try the case.

11                  Again, the heart and soul of the case will be how

12     did these defendants victimize GEICO, and I will walk through

13     that during our argument here.  And proving the conspiracies,

14     as I understand it, and we have been working on learning the

15     conspiracies with cooperating settling defendants and others,

16     we will be able to establish it on a conspiracy-by-conspiracy

17     basis, and, you know, under -- as I understand Rule 20, Rule

18     20 allows us to put those claims together.

19                  Okay.  I appreciate defense counsel's --

20                  THE COURT:  Give me the wording of Rule 20 again

21     while you're here.

22                  MR. GOLDFINE:  If I may add some gloss to the

23     wording of the rule, the Supreme Court has said that the same

24     occurrence's transaction standard is controlled by a

25     flexibility standard and is controlled by logical -- by a

1    logical relationship between the claims.  That we have here.

2    You know, it is basically --

3          THE COURT:  What is the logical relationship

4    between the claims?

5          MR. GOLDFINE:  Well, the first and foremost logical

6    relationship is the same victim of the claims, and the same

7    victim is GEICO.

8          The second logical relationship as I understand,

9    and we are still learning about how these claims -- these

10   conspiracies work, is that by the very nature of these

11   conspiracies, that the agreement was that the incumbent

12   would -- that the part -- that the conspirators would respect

13   the incumbent's rights, that there would be comp bidding, and

14   that the price would be fixed.  That was done on a

15   request-for-a-proposal basis on part after part after part

16   after part.  That's a very similar situation across different

17   parts as I understand the conspiracies as I have been

18   informed, as I can determine.

19         I don't begin to know what these individual

20   defendants know about what their clients did to conspire or

21   these defendants know about what their clients did to

22   conspire, but they have not proffered anything to this Court

23   to suggest that it is anything different than that.

24         THE COURT:  But, I mean, for each part you have to

25   show that there has been this agreement to fix prices and

```
 1    it's not enough that they each had an agreement.  I mean, it
 2    is -- it is independent, one is independent of the other.
 3           MR. GOLDFINE:  On a part-by-part conspiracy basis
 4    as alleged here.  I agree with you, we will have to go
 5    through each conspiracy and we will have prove that there is
 6    an agreement, we will have to prove that we were injured by
 7    that agreement, and we will have to prove an amount of the
 8    overcharges suffered by GEICO.  Absolutely agree with that,
 9    Your Honor.
10           Again, we believe that they belong and most
11    efficiently belong for this Court and for GEICO and frankly
12    for most of the overlapping defendants in one case.  But if
13    that's not, I mean, we can split it up and file what would be
14    in this thing 16 separate cases, you know, and incur the cost
15    and expenses and the translation costs of serving 16 separate
16    cases.
17           But under the rule, the logical relationship test,
18    which has been the law of this Circuit and the Supreme Court
19    for the last 50 years, is there a logical relationship --
20    and, again, the Supreme Court has made it clear you should
21    apply it flexibly -- is there a logical relationship between
22    the claims?  There is.  It starts and begins with the victim
23    is the same, and -- but we also believe that the inherent
24    nature of the claims, if you take it from the jury's
25    standpoint, the jury's education as to how these claims
```

1    worked and how these conspiracies worked, it will be a system

2    to have it all in one case.  You know, the remedy is to have

3    us replead it, and if that's the Court's desire, I don't

4    think that's the most efficient way --

5            THE COURT:  Well, I would like to see you stay

6    together but I'm having difficulty with putting it together.

7            MR. GOLDFINE:  I didn't hear that last --

8            THE COURT:  I said it would be nice for you to stay

9    together and hear one case.  I'm just having difficulty -- I

10   mean, you see the rule a little different I guess than I see

11   the rule.

12           MR. GOLDFINE:  Well, I mean, I think what this

13   Court previously addressed was, you know, joinder post-cases

14   being filed, and in that case there was a legitimate concern

15   about prejudice and existing prejudice from ongoing discovery

16   in the cases that exist.

17           We don't have that here.  This is the beginning,

18   from -- look, what was made clear here today, the defendants

19   think that everything begun when we filed the complaint.

20   Even though the classes defined GEICO technically in the

21   class, they think it all began then, and so there is no

22   prejudice at this point.

23           The Court has all of the powers in the world to

24   make sure that there is no prejudice that occurs.  If they

25   need a severance at trial, the Court can do that.  Discovery

1    can move forward on different tracks if that's necessary, if

2    the Court decides it.  And so summary judgment motions, I

3    suspect I would prefer them not on all on the same day, but I

4    suspect we could get -- we could figure out a schedule to

5    accommodate summary judgment motions in a way that's

6    reasonable for the calendar.

7            I will say that all of those issues would apply to

8    GEICO if we split them up.

9            THE COURT:  Yes, they all apply to GEICO, right?

10           MR. GOLDFINE:  If they split up into 16 separate

11   cases, so...

12           THE COURT:  Okay.

13           MR. GOLDFINE:  Okay.  The motion -- because the

14   defendants' argument flipped back and forth between different

15   arguments and frankly addressed a whole series of arguments

16   that they had not made in their papers, I'm going to walk

17   through our arguments and I'm going to focus on the ones that

18   are auto insurer specific, Your Honor.

19           THE COURT:  Okay.

20           MR. GOLDFINE:  If you have any -- I don't need to

21   tell you this -- if you have any questions, I'm happy to

22   answer them.  If you think I'm going down a direction that

23   you don't want me to address and would rather have me focus

24   on something else, I'm happy to do that as well, Your Honor.

25           The motions before this Court are largely rehashes,

1    largely rehashes of motions filed when GEICO was part of the

2    various indirect payor parts cases.  As those classes were

3    defined in these cases, with rare exceptions, the defendants

4    offer no reason for this Court to change its opinions earlier

5    in the MDL.  I mean, when you go through the motion here, you

6    know, I don't have a percentage on page number, but it is

7    pretty close to 85 percent of the arguments are rehashes of

8    the earlier arguments without explanation as why it would be

9    different for GEICO.

10              The rare exceptions only serve to highlight why

11   defendants' motion to dismiss arguments fail and why in this

12   case GEICO has Article III and antitrust standing and frankly

13   the manufactured release arguments don't hold any water.

14   GEICO has valid direct claims as a payor for replacement

15   parts.  It has valid direct claims as a car owner alleged in

16   paragraph 165 for the parts it purchased for itself.  Even

17   their screen, which they have taken down their signal, even

18   their screen put up the allegation in paragraph 165 that

19   starts -- they didn't highlight it in red -- GEICO purchased

20   auto parts.

21              THE COURT:  Are you talking about auto parts for

22   your fleet?  They complain that you haven't mentioned

23   anything about your own fleet of cars.

24              MR. GOLDFINE:  Okay.  They complain that they

25   haven't had notice of the fleet but they fully understand at

 1    this point that it is about the fleet.  The allegation says

 2    we purchase parts.  We don't purchase parts for our insureds,

 3    we pay for parts for the insureds, we pay the body shops in

 4    most cases, and I will walk through that paradigm.  The

 5    allegation is pretty clear.  Again, if they need us to tell

 6    us -- tell them in an amended complaint that we have a fleet

 7    of roughly, you know, roughly 6,000 to 7,000 cars, we will

 8    tell them that we have a fleet of roughly 6,000 to 7,000

 9    cars.  During the class period it is more, so the -- or

10    during the relevant period it is more.

11            With the Court's indulgence I will address

12    Article III standing, the antitrust standing, and antitrust

13    issues, the manufactured release argument, unjust enrichment,

14    and I think we have addressed the purported misjoinder

15    arguments but I will take a look at my notes when I get there

16    and make sure I have covered the things we need to cover.

17    Ms. Hazel will address the consumer protection issues, and

18    later today I guess Lear is arguing and she will address the

19    separate motions to dismiss.

20            Again, as I said, I want to try to focus on what's

21    truly new to this Court.  When we point out that this Court

22    has already ruled on the issue, we will note whether the

23    defendants had offered anything new, any reason for this

24    Court to change its earlier opinions.  The reality is that in

25    almost all instances they don't.  Yes, GEICO is in a slightly

1        distinctive position for nearly all instances and I will

2        explain this distinction is a distinction without a

3        difference.

4                 Where there are rare exceptions that there are

5        differences, the differences tend to favor that GEICO should

6        have standing in these cases and have a claim to pursue.

7                 One side note, we have amended the complaint here

8        prior to the first motion to dismiss that's argued to address

9        the specific -- let me rephrase it.  We amended an order so

10       that it comported with and respected this Court's opinions.

11       We believe that we are completely consistent, and while the

12       defendants have raised dozen upon dozen of arguments in their

13       motion papers, including many arguments already rejected by

14       the Court, I don't believe the defendants' claim that the

15       second-amended complaint contradicts any earlier ruling from

16       this Court.

17                On Article III standing, the test is relatively

18       simple.  The test doesn't focus on purchase of product, it

19       doesn't focus on whether the product is going there.  The

20       test is clear, as stated in -- Your Honor, may I ask, do you

21       want me to give the pin cites or not?

22                THE COURT:  No, you don't have to do that.

23                MR. GOLDFINE:  Okay.  In bearings, fuel senders,

24       wire harnesses, several of your cases have addressed this

25       issue, it is a two-prong test.  The defendants overcharged

Case 2:12-md-02311-SFC-RSW   ECF No. 1843, PageID.34169   Filed 11/28/17   Page 48 of 107
*Motions to Dismiss • November 9, 2017*

48

1    the direct purchasers and there is an allegation that some or

2    all of the defendants' overcharges were passed on to GEICO.

3    In paragraphs 164, 165, 168 of the complaint, the

4    second-amended complaint, we lay that out in more than

5    sufficient detail.  The connective tissue is alleged in

6    paragraph 164.  This is, for the most part, a pleading issue.

7    This Court's reasoning in the wire harness case applies.

8            The defendants have cited no authority requiring

9    allegations of the detailed mechanics of the passthrough

10   process to plead injury-in-fact and causation for purposes of

11   constitutional standing to survive a Rule 12(b)(6) motion you

12   stated -- you held.  To the contrary, you held the cases

13   cited by defendants are procedurally distinguishable in that

14   the issue of the passthrough process was being considered at

15   class certification or in this case summary judgment stage.

16   Well, frankly, the parade of horribles about whether they've

17   paid a particular insured or not can be done at damages in

18   this particular case.  They will know who they have paid.  I

19   will discuss the -- I'm going discuss the release and why

20   their argument about the release is frankly baseless, but

21   they will know who they've paid and if they are entitled to a

22   reduction and offset, this Court can handle that in the

23   damages stage of the case.

24           As to GEICO's claims, the defendants do raise a

25   couple new issues.  One is the insurance paradigm, and with

```
 1    all due respect to Mr. Amato, it's both a little bit more
 2    complex and a little bit more direct payor situation than he
 3    believes to occur.  So I will address it in more detail in
 4    the context of antitrust standing, but why GEICO is the most
 5    efficient -- as to why GEICO is the most efficient antitrust
 6    plaintiff, the insurance paradigm that GEICO pays for
 7    replacement parts but doesn't take title only serves to
 8    establish Article III standing because as the case law
 9    discusses, standing for insurers observes whether some or all
10    of the defendants' overcharges were passed on to the insurer,
11    in this case GEICO.  They concede that and they concede that
12    the overcharge was passed on but argue that we had to
13    purchase the part.
14            The case law cited in all briefs recognize
15    Article III standing for insurers when insurers pay for the
16    price-fixed product or service.  And I'm going to talk a
17    little bit about the healthcare insurer standing.  They
18    reference one case in that setting.
19            In the healthcare setting, insurers have
20    Article III standing when they pay for illegally inflated
21    prices for healthcare services.  Of course the healthcare
22    insurers are not recipients of those services, but they have
23    standing in the case law under Article III for paying the --
24    because they have to pay the overcharge.  That's the position
25    that GEICO is in.
```

1          It is not whether the part passes through, it is
2     not whether it is purchased.  It is whether the overcharge,
3     as stated in this Court, stated elsewhere, it is whether the
4     overcharge passes through.

5          I will add that even if the Court requires purchase
6     of the parts, we do purchase the parts, we purchase the parts
7     for our fleets, we have alleged that at second-amended
8     complaint paragraphs 17 through 25 and 59 through 125.  GEICO
9     purchased parts for its vehicles for notice purposes.  Again,
10    defendants understood about GEICO's fleet, they certainly
11    understand and have notice about GEICO's fleet at this point
12    in time, and to the extent that the Court believes that we
13    have to cure that pleading defect, we can easily cure that
14    pleading defect if it is a pleading defect at all.

15         A couple of others issues on standing.  They talk
16    about as to each state.  So GEICO as alleged and in fact
17    true, GEICO has business in each of the 50 states plus the
18    District of Columbia.  The defendants conceded that point.
19    They want to, however, ignore the entirety of the complaint
20    and ignore the fact that GEICO has adjusters and insurers and
21    GEICO pays for replacement parts in every state and the
22    District of Columbia.  GEICO has alleged that it pays
23    state-specific overcharges and that GEICO transacts business
24    in each of the pertinent states.  That's at second-amended
25    complaint, paragraphs 202 through 227.

 1          Defendants misstate that the degree of connective

 2    tissue between the overcharging the direct purchaser passes

 3    on and what GEICO has is somehow a proximate cause standard.

 4    There is no case that supports that.  The standard is the

 5    fairly traceable, which we allege in paragraphs 164, 165 and

 6    168.  The cases that the defendants cite, the Smith vs. Wyeth

 7    case, they talk about the purchase of a different product

 8    than the one that is fixed.  In the Los Gatos case they talk

 9    about the overcharge was not passed on.

10          So in sum regarding Article III that the presence

11    of GEICO's fleet gives GEICO Article III standing, that's not

12    contested in their briefs at all.  What they contest is this

13    technical, you know, did you mention the word fleet in there.

14    Well, I mean, to the extent that we say we purchased parts,

15    paragraph 165 was absolutely clear as day.

16          In the context of the insurance paradigm,

17    defendants overcharge by illegally inflating prices on parts

18    and replacement parts, and when GEICO pays for the

19    replacement parts or total losses, defendants illegally

20    inflated overcharge, frankly more all than some, were passed

21    on to GEICO.

22          I want to talk more specifically about the

23    insurance paradigm, and I will talk about the antitrust

24    standing context and the AGC factors, Your Honor.  For about

25    80 percent of the illegally inflated price products involving

1    the parts purchases, they are subject to the insurance

2    paradigm.  The vast majority of those parts GEICO pays the

3    body shop directly for and does not reimburse its insureds or

4    claimants.

5            In that paradigm there is an accident, and I'm

6    going to go back and just walk through the process.  There is

7    an accident, the car is brought to a body shop.  The body

8    shop's adjuster or estimator and GEICO's adjuster meet to

9    discuss which parts, among other things, I mean, they have to

10   repair other things, but which parts should be on the final

11   estimate long before the shop ever orders the part.  The

12   final estimate will have the retail price on the part that

13   GEICO will pay the shop.  The retail price is already

14   illegally inflated by the defendants' agreement not to

15   compete by their price fixing, by the customer allocation, by

16   the rigging of the OEMs' request for proposal or quotation,

17   but the body shop doesn't care because that illegally

18   inflated retail price includes a percentage commission or

19   perk that amounts to the body shop's profits on each and

20   every part.

21           Extremely salient to -- is the fact that the body

22   shop's commission or perk is larger, its profits are more the

23   higher the defendants illegally inflated the price.

24   Consequently, the body shops made more as a result of the

25   defendants' illegal price-fixing customer allocation and

1    rigging of request for proposal.  GEICO is a much more

2    efficient enforcer, suffered the antitrust injury that the

3    AGC factors focus on and is a much better setting.

4           A smaller percentage involves reimbursing the

5    insureds where the insureds pays the body shop.  You know,

6    that may be what they are referring to in the subrogation

7    setting.  Reimbursements to insureds and body shops involve a

8    much smaller amount of instances where GEICO -- than when

9    GEICO pays the body shop, but the paradigm is similar and the

10   incentives are also misaligned favoring GEICO.

11          In this paradigm there is an accident again, the

12   car is brought to the body shop.  The body shop's estimator

13   or adjuster and GEICO's adjustor meet to discuss which parts,

14   among other things, should be on the final estimate.  That

15   final estimate will have a retail price of the part that

16   GEICO will pay for -- will pay.  That retail price is already

17   illegally inflated again by the defendant's illegal

18   price-fixing, customer allocation and rigging the OEMs' --

19   the OEMs' request for proposal.  I apologize.

20          For insured and claimants paying the body shop per

21   the estimate, GEICO reimburses 100 cents on the dollar for

22   that part at the retail price that's already illegally

23   inflated.  To insureds and complainants, they end up with the

24   same position regardless of whether the parts price was

25   illegally inflated or not and lack any incentives to enforce

 1     the antitrust laws.

 2            Mr. Amato I believe referenced one scenario where

 3     the car doesn't get purchased, and I have to admit as an

 4     antitrust lawyer, somebody who has done this for 30 years,

 5     where the part isn't purchased, that's a very interesting

 6     scenario, it happens infrequently, but given the size of

 7     GEICO it is not complete -- it is not immaterial.  That

 8     sequence, as Mr. Amato pointed out, is the sequence where the

 9     first part still goes and the part and the estimate is made

10     and a price is given, but the owner of the car decides not to

11     fix the part, and we still send the check, we still paid the

12     illegally inflated prices, we sent the check.  The insured

13     ends up quite a bit ahead in that particular circumstance and

14     GEICO still suffers the detriment.  Now, we believe that

15     sounds in antitrust -- and when I talk about unjust

16     enrichment, we believe that firmly sounds an unjust

17     enrichment.

18            One other aspect in the antitrust standing issue

19     here is there's a locked -- as the Court has recognized

20     already in some of its opinions with respect to replacement

21     parts, there's a locked-in effect.  So if we take a 2009

22     request for proposal and that was rigged according to the

23     allegations that the Court has to take as true, the 2009 will

24     relate to a model year car that's two or three years in the

25     future, 2011, 2012.  That model year in the 2009 request for

1    proposal will relate to however long that model year lasts.

2    And, you know, what I understand -- again, I'm not as

3    knowledgeable as these defendants counsel because I'm not

4    privy to their clients, but my understanding and what the

5    trade magazines suggest is that's four to six years.  So if

6    we are looking at the 2009, we are looking at the 2012 model,

7    we are into 2016.  On top of that, GEICO's average insured's

8    cars are seven years old.  So GEICO's again looking back

9    seven years but ultimately looking forward as well seven

10   years.

11              The way we understand the conspiracy to work and

12   the fact that it doesn't get fixed, at least what was rigged

13   in 2009 doesn't get fixed, is the illegal price inflation

14   caused by the bid rigging and price fixing continues to occur

15   and continues to harm GEICO today and will frankly continue

16   to harm GEICO into the future.

17              You know, I suspect and we understand there has

18   been some settlement by car manufacturers, but as far as we

19   know, there has been no fix put into place on the parts, with

20   respect to the parts.

21              THE COURT:  No what?

22              MR. GOLDFINE:  No fix put into place.  So if you

23   rigged a 2009 part that is sitting on my neighbor's 2015

24   Camry, if that rig takes place, that -- the main place we go

25   to get that part, Your Honor, is the OEM, we get that part,

1    and that's the part that the price was rigged and it is being

2    passed on to GEICO and GEICO directly pays for it.

3            In the total loss scenario which Mr. Amato spent

4    some time on, I admit the total loss poses some significant

5    litigation problems but doesn't pose a standing problem for

6    the same reason the end payors who have a car doesn't pose a

7    standing problem.  The car itself -- an Article III or

8    antitrust standing.  The car itself, the purchase of the car

9    is at an inflated price, illegally inflated due to this

10    conspiracy that's being passed on to us in the total loss

11    scenario addressed by Mr. Amato.  Admittedly that's going to

12    be probably the smallest segment of GEICO's damages and

13    admittedly it is going to be hard work and GEICO may not be

14    able to make the burden on the total loss for all of the

15    reasons the fancy slide said we wouldn't make our burden, but

16    that doesn't mean we don't get our day in court in attempt to

17    make our burden.  That's an issue of whether we can prove

18    injury and damages.

19            A couple other comments on the AGC factors as

20    briefed primarily.  The market participant argument, I mean,

21    with respect to replacement parts, we are -- GEICO is a

22    significant, as is all the auto insurers, market participant.

23    As the various paradigms demonstrate aptly, GEICO's

24    activities as a payor for the replacement parts are

25    inextricably linked to the replacement market.  They are a

1    market participant, they suffer the antitrust injury.

2         Duplicate the issues, the last three factors, I

3    think this Court frankly properly addressed those factors in

4    its earlier decisions.  The risk of duplication, speculative

5    and complexity are matters that can be addressed during the

6    trial.  Again, they are factors, they are not requirements.

7    GEICO is a party that suffered an antitrust injury.  GEICO is

8    a party that alleges that it has paid directly for

9    overcharges in the setting, and I will get to the release and

10   I will get to the new arguments about subrogation which

11   weren't made there.

12        I will be quick about the statute of limitations

13   since they didn't argue it.  Again, we -- as the Court has

14   recognized, the tail end, particularly with respect to the

15   replacement parts, the tail end is well into the future as,

16   again, that 2009 example of a request that was rigged long

17   before the raids in 2010, you end up with a three-year lag

18   time, you end up with four to six years for the model, and

19   GEICO is stuck replacing the parts that were rigged in

20   that -- using -- paying for the replacement parts that were

21   rigged in the 2009.  If defendants can prove that they fixed

22   it, they get that defense at trial.  They are not asserting

23   that in their briefs, and I have not seen anything in the

24   marketplace that would suggest that any fix took place with

25   respect to that.

1    In the state-specific nexus, I will also -- I think

2    our briefs stand on it fairly well.  The defendants want to

3    pick apart the complaint, but GEICO insures vehicles in all

4    50 states.  GEICO's insureds have accidents in all 50 states.

5    GEICO pays for replacement parts in all 50 states as alleged

6    in this complaint, and only those parts GEICO has paid more

7    than $770 million for the replacement parts in total in all

8    50 states.

9    As the insurance paradigms show, these $770 million

10   of the illegally inflated parts were delivered to body shops

11   and put on cars in all 50 states.  GEICO tracks this and will

12   be able to show at trial where each vehicle was located when

13   they were repaired, and obviously we only get the claims that

14   the law permits us to get.  GEICO pays for total losses in

15   each of the 50 states, and GEICO will show where those

16   payments were made.  In addition, GEICO has adjusters in each

17   of the 50 states and buys cars for them in those states.  And

18   frankly, our adjusters get in accidents and we buy

19   replacement parts in each of those states.

20   You know, when you take the complaint as a whole

21   and you understand the size and allow common sense to apply

22   to the size of GEICO, the idea that in any of these states,

23   you know, the wrongdoing causing GEICO to have to pay an

24   overcharge didn't occur, to be candid, I think is silly.  I

25   mean, it is a pretty straightforward claim.

```
 1              The release arguments.  I will take -- the release
 2    arguments and the statute of limitations arguments are
 3    interesting.  They are interesting in that they are
 4    affirmative defenses, and the case law, the Supreme Court
 5    case law and the Court of Appeals case law is pretty clear
 6    that affirmative defenses are not proper on the motions to
 7    dismiss.  Both of them brought exceedingly detailed
 8    materials, exigent materials from outside of the allegations
 9    that are set forth.
10              So like the defendants' statute of limitations
11    argument, defendants bear the burden of proof and persuasion
12    to establish their affirmative defense of the release.  In
13    meeting their burdens on their own affirmative defense of
14    release, defendants go well beyond the allegations of
15    complaints.  First of all, these are class settlements, while
16    referenced because we had to opt out, are not incorporated
17    into the complaint.  It is black letter law that such tactic
18    in the context of affirmative defenses is inappropriate for a
19    motion to dismiss, and the question of fact on the releases
20    are immense.  The slides establish that one after one after
21    another that there are issues of questions of fact.
22              Even assuming that the -- that the Court entertains
23    this release argument, the defendants have it entirely wrong.
24    Yes, settling defendants cleverly put in the release in their
25    class settlement where the class is defined as frankly
```

 1    including GEICO as an indirect payor, but this purported

 2    release requires two preconditions which they ignore, two

 3    preconditions to be present to be effective.  First, the

 4    release depends on GEICO's claims to be derivative on class

 5    plaintiffs' claims.  That is not the case as we've talked

 6    already.  GEICO pays, they pay the body shop in the vast

 7    majority of these cases, they pay for the parts.  As alleged

 8    and will be proven at trial, GEICO paid for the parts

 9    directly, owns its claims here wholly separate and

10    independent from the insureds as the release pretends

11    otherwise.  And second, even if all of GEICO's claims are

12    somehow derivative of the insureds' antitrust unjust

13    enrichment and consumer protection claims, defendants'

14    release argument still misses the point completely.

15            Defendants presume that the insureds at the time of

16    class settlement, so in each insured's context, years after

17    the accident where there is a payment, had the rights to

18    release GEICO's antitrust unjust enrichment and consumer

19    protection claims, they didn't, and the condition precedent

20    to be affected for the release, the right and power to

21    release such rights, had been assigned to GEICO years

22    earlier.  The insurance policy that every one of the insureds

23    that they are representing, that they rely on, provides that

24    the insured and the complainants assign the rights to GEICO

25    in return for GEICO's payment.  Okay.  The policy expressly

```
 1    provides that assignment, and, two, quote, the insured will

 2    do nothing after a loss to prejudice GEICO's rights.

 3           Now, they make a big a -- defendants make a big

 4    stink about how they thought they were sandbagged because we

 5    didn't object.  We had a choice.  The law says you can either

 6    opt out or you can object, but you can't opt out and object.

 7    Okay.  We didn't have that option.  They make a big stink

 8    that they didn't have notice.  Hogwash.  They had absolute

 9    notice.  We opted out long before this Court approved the

10    settlement.  Okay.  They knew that we were standing on the

11    opt-out.  Now, yes, did we identify the hundreds of thousands

12    of parts by part number there?  Of course not.  And there is

13    no case law that says that we are required to identify by

14    part number and that -- to the opt-out.  The issue is whether

15    they had notice that GEICO was opting out, and they

16    absolutely had that notice.

17           Just give me a second here.  I want to make sure I

18    covered this.

19           THE COURT:  Give me dates when you say they had

20    that notice.

21           MR. GOLDFINE:  I'm going to have to defer to

22    Ms. Hazel.  May she have a couple minutes to come up with

23    those dates?

24           THE COURT:  Sure.  Yes.

25           MR. GOLDFINE:  We were required -- what I do know,
```

1    Your Honor, without knowing the dates, there was an opt-out

2    deadline.

3            THE COURT:  Right.

4            MR. GOLDFINE:  You had -- prior to your final

5    fairness settlement conference, you had a conference where

6    the defendants had to tell you that we had opted out.  They

7    didn't, and then I can't remember what it was, but somehow

8    you all corrected that either mid-hearing or post-hearing,

9    but it was long -- it has to be by rule before the final

10   settlement.  But we will get you those dates.  If we can't

11   get them here, we will get them to the Court.

12           MS. HAZEL:  Your Honor, it was April 2016.

13           THE COURT:  2016?

14           MS. HAZEL:  Yes.

15           THE COURT:  Thank you.

16           MR. GOLDFINE:  So the defendants attempt to bully

17   GEICO into suing its insureds for the defendants'

18   manufactured release, the release that they have the

19   affirmative -- that is an affirmative defense in the case,

20   that they have the duty -- the burden to prove here.  If they

21   prove that, which we don't think that they will be able to,

22   you know, GEICO would have the right to go after its

23   insureds, but the issue starts with whether the release is

24   effective.  It is not.  It also depends on whether the

25   release is an appropriate topic for a motion to dismiss.  It

1    is not.  The release never could have possibly applied to

2    GEICO's direct claims.  And as to the assigned claims, as to

3    the subrogated claims, defendants will have to prove the

4    insureds at the time that they signed the release, that they

5    knew this.

6          And the question of whether this was fair to these

7    defendants, they are very -- oh, how sophisticated is GEICO?

8    God, I can hardly can get my -- their lawyers, how can I get

9    my head out the courtroom door?  These are amongst the best

10   lawyers in America, and they didn't think to find out whether

11   or not the insureds had the right to release before entering

12   into it if they paid a penny for that release?  You know,

13   my -- you know, based on my experience, my guess is they paid

14   nothing for the release.

15          Unjust enrichment, I think the briefing is pretty

16   clear on that so I'm not going to go through all the issues

17   on it.  This Court has already ruled, even in the indirect

18   purchaser in the Illinois Brick states, that the unjust

19   enrichment claim can move forward.

20          I do want to talk about the unjust enrichment claim

21   in the setting of -- the small setting, but given the size of

22   GEICO, it is a big deal, but the small percentage where

23   GEICO -- there is a car accident, the insured brings the car

24   in, there is an estimate, the adjuster for GEICO and the

25   estimator for the body shop decide what parts go into it, an

 1    estimate is made, GEICO informs the insured of the estimate

 2    and the insured directs GEICO to write them a check as

 3    opposed to paying for a part.

 4              I have been doing antitrust case for 30 years, I've

 5    spent ten years in the antitrust division.  I have to tell

 6    you, it is an unusual antitrust claim, but, boy, does that

 7    sound an unjust enrichment.  Defendants engage in a wrongful

 8    conduct from which the defendants benefited, defendants'

 9    wrongful conduct caused GEICO to pay more and otherwise

10    suffer a detriment.  That to me is what an unjust enrichment

11    claim, the equitable unjust enrichment claim is meant to play

12    here if, in fact, the antitrust claim doesn't apply.

13              We addressed misjoinder.  I think -- I mean, I'm

14    happy to go back to it.  I think we have got pretty good -- I

15    do want to talk a little bit about the PowerPoint.

16              THE COURT:  Okay.

17              MR. GOLDFINE:  A couple of the issues in the

18    PowerPoint.  The first thing I would like to point out is the

19    first time we saw the PowerPoint was about five minutes

20    before you walked into the courtroom.  That would be fine if

21    it was solely based on arguments made in their briefs; it is

22    not.  They have expanded well beyond that.  I will talk about

23    a few of those options, a few of those opportunities.

24              First off, you go to page --

25              THE COURT:  Do you want to have the PowerPoint put

 1    on the screen?  Can you do that?

 2           MR. GOLDFINE:  Can you go to screen three, please?

 3    Thank you.  Thank you.  I don't know who I should direct that

 4    to.  I just don't want to be rude.  Jeff, thank you.

 5           MR. AMATO:  I will run the PowerPoint.

 6           MR. GOLDFINE:  Would you go to page 3, Jeff?  Thank

 7    you.  I will just be quick here.

 8           You know, it is clever they highlight reimbursed

 9    insureds and claimants, but the purchase of parts is laid

10    out, this is paragraph 165.

11           I believe it is page 6 -- no.  That one.

12           The fleet is the end payors there.  Replacement

13    parts as the classes were defined as a settling class was

14    defined is at the end payors there.  You know, the only one

15    that deviates from this syllogism by picture is the total

16    loss scenario.  All other paradigms are laid out here when

17    GEICO sits in the exact same shoes as the end payors.

18           I made this point already, but Hitachi's counsel

19    made such a big stink about it that we should have objected.

20    We couldn't.  We could opt out or object, that was our

21    choices under the rules.  The case law is clear.

22           You know, they talk about suffering plain legal and

23    defendants paid princely sums to buy final labor piece, final

24    piece on this dispute, they talk about this at the bottom of

25    the slide here.  I don't know if they paid princely sums or

```
 1    not.  I mean, from GEICO who has 15 percent of the market
 2    for, you know, where they -- during this period they are
 3    spending $770 million, 15 percent of 80 percent of the market
 4    they are spending $770 million, I don't know if they paid
 5    princely sums.  I don't know if the insureds or the end
 6    payors gave them a discount.  All of that is outside of the
 7    record for this motion to dismiss, and on this motion to
 8    dismiss it is GEICO's claims and allegations.
 9              Thank you.
10              I just want to point out here, this slide here,
11    again, most of our claims are direct.  The fleet claims are
12    direct.  We paid body shops.  Those are direct claims.  We
13    may have an issue on when we make the payment directly to the
14    insured or the reimbursement to the insured, but we don't
15    believe so under the case law, but they say it is dependent
16    on the facts and circumstances of each claim.
17              That begs the question why we are on this motion to
18    dismiss.  If on summary judgment we cannot establish as to
19    particular claims, which we understand we are going to have
20    to go through each and every one of the claims and establish
21    it, that is our burden of proof, we understand that.
22              But if it is based on their release, the flip side
23    is true.  If they are going to try to establish on the facts
24    and circumstances that the release is effective, then they
25    have that burden, and they will have that burden on summary
```

1    judgment or at trial to prove that.  That is just not

2    appropriate and it is virtually laid out clearly here that

3    it's not appropriate on the motion to dismiss.  I have

4    pointed out to the contract language where it is broader than

5    any common law subrogation.

6              Just because the slide is in front of you and it is

7    inaccurate -- can you go to this slide here?  Thanks.

8              So B on this slide here, I don't know if you have

9    it in front of Your Honor, again, they are presuming that as

10   a matter of fact the defendants were unaware of GEICO opting

11   out of the case prior to entering the final settlement.  They

12   were, they chose not to -- they chose to go forward with the

13   settlement, which leads me to believe that they had adjusted

14   for this in the first place, which frankly the manufactured

15   release identifying the insurers calls for that.

16             This slide here, Jeff.  Thanks.

17             So this is the slide with the opt-out notice.  The

18   case law is absolutely clear: strict adherence to the opt-out

19   form is not required as long as notice was given.  What is

20   clear in this case is that they knew that GEICO was opting

21   out.  It was before this Court in an oral argument that GEICO

22   was opting out.  They knew the basis of GEICO's claims.  And

23   the idea that they didn't have a notice is baseless, but

24   that's their burden.  It is not appropriate for the motion to

25   dismiss.

1        Can I consult with --

2        THE COURT:  Sure.

3        (An off-the-record discussion was held at

4        3:20 p.m.)

5        MR. GOLDFINE:  She is going to handle one topic

6   area now.

7        THE COURT:  Okay.

8        MR. GOLDFINE:  Ms. Hazel, I apologize.

9        MS. HAZEL:  Good afternoon, Your Honor.

10        THE COURT:  Good afternoon.

11        MS. HAZEL:  I'm going to briefly address consumer

12   protection claims.  GEICO has brought consumer protection

13   claims in states this Court already addressed and declined to

14   dismiss in the end payor class cases, and defendants do not

15   make any new arguments as to these state claims that would

16   give the Court reason to depart from its well-reasoned

17   decisions before.  However, GEICO does bring two new consumer

18   protection claims in two new states so I want to focus on

19   those two, and if the Court would like me to address

20   defendants' other argument, please let me know.

21        So those two new states are Nevada and

22   New Hampshire.  For Nevada, defendants argued that GEICO's

23   Nevada consumer protection claims are merely derivative of

24   its antitrust claims.  GEICO's Nevada consumer protection

25   claims stands on its own and is not derivative of its

1   antitrust claims or the claims of its insureds or third-party
2   claimants as my colleague has just explained.
3          The Nevada Deceptive Trade Practices Act includes a
4   borrowing provision in Section 598.0923, subsection 3, making
5   it a violation to violate a state or federal statute, but the
6   statute also makes it a violation to fail to disclose a
7   material fact in connection with the sale or lease of goods
8   or services, and that's under subsection 2 of the statute.
9          GEICO alleges that the conduct violated
10  Section 598.0903, et seq, which, as the Court knows, means
11  and the following, and does not limit its claims to violation
12  of another statute.  The complaint specifically mentioned
13  subsection 3 because defendants knowingly violated the
14  antitrust statute when they participated in the auto parts
15  conspiracy that GEICO alleged.  But even if GEICO was limited
16  to subsection 3, GEICO is confident it will prevail on
17  antitrust claims.
18          As to New Hampshire, defendants argue that
19  New Hampshire's consumer protection claims should be
20  dismissed in the context that GEICO has not alleged any acts
21  in New Hampshire and has failed to allege any effect on
22  intrastate commerce.
23          This is simply false.  For each of GEICO's state
24  consumer protection claims, GEICO alleges that defendants
25  marketed, sold and/or distributed auto parts in each state,

1    in this case New Hampshire.  The defendants' unlawful conduct

2    resulted in inflated prices throughout each state, in this

3    case New Hampshire.  And defendants' unlawful practices

4    caused GEICO to pay super-competitive prices in each state,

5    in this case New Hampshire.

6              This Court already rejected intrastate nexus

7    arguments in California, New York, and North Carolina which

8    GEICO also brings.

9              Now, as to New Hampshire, specifically the

10   New Hampshire Supreme Court has emphasized that this statute

11   is broad in sweep and that allegations of conduct that had

12   direct or indirect effects on New Hampshire are enough, and

13   that case is LaChance vs. U.S. Smokeless Tobacco.  Would you

14   like the pincite?

15             THE COURT:  No.

16             MS. HAZEL:  Okay.  So Chocolate Confectionary

17   looked at this broad standard articulated by the

18   New Hampshire Supreme Court.  And the cause of plaintiffs

19   there the court found had sufficiently stated a claim for

20   relief under New Hampshire's consumer protection law because

21   the complaint alleged that defendants colluded to fix the

22   price of chocolate products that were then introduced into

23   the New Hampshire market.  This purported behavior

24   encompassed conduct that was part of trade or commerce and,

25   at the very least, the Court found had indirect effects in

```
 1    New Hampshire market and on its residents, and that supported
 2    a plausible claim for relief.
 3           I have one other consumer protection point I would
 4    like to briefly mention, and that's as to Florida.
 5    Defendants argued, as they have before, that GEICO had to
 6    plead Florida's -- the Florida claim with particularity under
 7    Rule 9(b).  This Court already found that under Gastaldi vs.
 8    Sunvest Communities, GEICO was not bound by Rule 9(b), and
 9    even if it did apply, GEICO included allegations of how
10    defendants wrongfully concealed their conspiracies and the
11    particularities of that.
12           However, on the reply, and I'm not sure if this was
13    a mistake or not, but defendants did not reply on the Florida
14    argument but actually then replied on New York.  I'm not sure
15    what happened there but I did want to mention that.  That's
16    all I have for consumer protection.
17           THE COURT:  They may have mislabeled it.  Thank you
18    very much.
19           MS. HAZEL:  Thank you.
20           MR. AMATO:  Your Honor, if I may briefly respond?
21           THE COURT:  Mr. Amato.
22           MR. AMATO:  Thank you for all the time you have
23    devoted to this.
24           And I apologize, we would have shared the slides
25    earlier but they were in formulation right up to the last
```

```
 1   minute.  And I will gladly share the next set of slides for
 2   the second argument on the motion to dismiss in this case
 3   hopefully when that comes because what we just heard was a
 4   stunning amount of factual information from Mr. Goldfine
 5   that's not pleaded in the complaints.  And I do admit that
 6   the defendants have done that in their arguments, but I think
 7   that's our prerogative to test the sufficiency of the
 8   allegations as to whether there's standing, especially when
 9   the allegations are so barebone.
10           And, I mean, one of the difficulties that we have
11   had, and I will just touch on the joinder part, is
12   coordinating actually as defendants because we are not
13   jointly and severally liable, so it takes a lot of effort and
14   time to determine who is actually going do what argument and
15   where because it is not your typical situation as it is in
16   the other auto parts cases where you are alleged to have
17   conspired with other defendants and share the burden jointly
18   and severally.
19           So -- and I think Your Honor has picked up on how
20   this doesn't comply with Rule 20.  And if I were in two
21   separate auto accidents and I sued GEICO and I sued Allstate
22   for each of the separate accidents, I think they would be the
23   first ones to stand up to say that those two accidents were
24   separate and had nothing to do except they have the common
25   plaintiff who is injured.  That's the same situation here.
```

1    It definitely requires severance.

2           Now, on the antitrust standing points, we heard now

3    for the first time that GEICO does not buy parts for our

4    insureds.  We pay for our insureds' parts in reimbursement

5    payments, I suppose, and that they have a fleet of vehicles

6    that they make their own purchases for.  This is not --

7           THE COURT:  They aren't really reimbursing.  Aren't

8    they just paying to the service provider, the mechanic?

9           MR. AMATO:  They either pay the repair shops or

10   sometimes they -- at least according to their allegations,

11   which is what we are basing this off of.  Now, there is, of

12   course, the vague allegation that we have on our slide too

13   that says GEICO purchased auto parts, but when you go to

14   their allegations that they recite over and over again in

15   their complaints, like paragraph 79, GEICO either directly

16   paid repair professionals for HID ballasts after the repair

17   professional repaired one of its insureds' or claimants'

18   vehicles or reimbursed its insureds or claimants for their

19   purchase of HID ballasts from repair professionals.  GEICO

20   also reimbursed its insureds and claimants for the full value

21   of the vehicle, including HID ballast, when the vehicle was

22   declared a total loss.  No mention of GEICO paying for auto

23   parts for its own fleet vehicles.

24          Now, on standing, on insurance company standing, I

25   would like to direct the Court's attention to the cases that

1    we cited in our brief in the opening motion, page 16, in

2    which the Second Circuit, D.C. Circuit and the Ninth Circuit

3    all found with respect to RICO claims brought against tobacco

4    companies -- and I will note that the Supreme Court has said

5    that standing in RICO cases and antitrust cases are very

6    similar with respect to causation and are analyzed under very

7    similar circumstances -- that in those instances, the

8    insurance companies did not have standing to recover amounts

9    paid on behalf of their insureds that were incurred as a

10   result of the defendants' alleged conduct, and I think the

11   Second Circuit, the D.C. Circuit called that rule settled.

12            And the case that the plaintiffs cite with respect

13   to this, if I may, Your Honor, I think it was referenced in

14   their argument which was the Blue Cross and Blue Shield case

15   against Marshfield Clinic.  That case, the health insurer was

16   actually directly contracting for physician services from

17   Marshfield Clinic, a much different scenario than here where

18   GEICO is not contracting with any of the auto parts

19   suppliers.

20            Now, with respect to the incentive to enforce, I

21   will just point out that the end purchasers have already

22   enforced the loss and so they would be the most efficient

23   enforcer because those payments have already been made to the

24   end payors.

25            Similarly, as to adding information that's not in

1  the complaint, there's nothing about adjusters, there's

2  nothing about payments in particular states.  And if you look

3  at the allegations for the state-by-state allegations, all it

4  alleges is that there was an injury in those states.  There's

5  no allegation about purchasing parts.  There's no allegation

6  that GEICO purchased defendants' auto parts or conspirators'

7  auto parts.  In fact, GEICO's website mentions competitive

8  auto replacement parts, and that's parts where they look for

9  alternative suppliers that meet or exceed the quality of the

10  original manufacturers' parts but cost less.  And those are

11  important things to consider and that should be considered if

12  we had a properly pled complaint.

13          Now, Mr. Goldfine candidly admitted that the total

14  loss scenario would be difficult to prove and that it is not

15  a basis for dismissal, but I respectfully submit that under

16  the antitrust laws and Associated General Contractors, that

17  the Supreme Court has directed courts to draw a line on

18  causation and consider it at the pleading stage, and that

19  when the claims are too attenuated, too speculative, too

20  remote, that they should be dismissed at this stage.

21          THE COURT:  Okay.

22          MR. AMATO:  Thank you, Your Honor.

23          THE COURT:  Thank you.  Counsel?

24          MR. ATKINS:  Just a few points, Your Honor, on the

25  release, the settlement and release point.

1            First, Mr. Goldfine said that he's unaware that the

2      plaintiffs paid any -- I'm sorry, the defendants paid

3      anything for these releases and he doubts that there was, in

4      fact, a princely sum.  As you will recall from your fairness

5      hearings and from your studies of the settlements submitted,

6      they were substantial sums.  As I said, for Hitachi

7      Automotive, it is $46.7 million.  You found that the amounts

8      in each of the settlements was fair, reasonable and adequate.

9      And when considering the application for attorney fees by the

10     EPPs' counsel, you commended them for such success in

11     recovering so much.  These are princely sums that we paid.

12           Mr. Goldfine says that anything relating to the MDL

13     is outside the face of the complaint.  Of course, that defies

14     reality.  Every one of us know this is all about what is in

15     the MDL, and, in fact, paragraph 4 of their second-amended

16     complaint refers specifically to the MDL and, of course, Your

17     Honor, you can consider, if necessary as a matter of judicial

18     notice, the pleadings that are part of the public record in

19     this very same court.

20           Mr. Goldfine quoted to you provisions of the

21     policies concerning subrogation rights.  Of course, that's

22     what is not alleged in the second-amended complaint but it is

23     the sort of thing that should be for him -- for GEICO to be

24     able to step into the shoes of the end payors as they say

25     that they are.

1        Mr. Goldfine has formulated what I don't understand
2   him to have made this argument before, but that some of the
3   payments that they make are directly to body shops and
4   therefore they are the payor themselves and therefore it's
5   not a subrogation claim.  I would be interested to find out
6   whether GEICO takes that same position in situations where
7   they seek to recover from the tortfeasor, for example, the
8   person who causes an automobile accident, and say no, that
9   was not, in fact, a subrogation claim when I paid the body
10  shop directly.  They are paying under an insurance contract.
11  It is a contract of indemnity.  They are paying on behalf of
12  the owner of the vehicle whose car is being repaired.  They
13  may facilitate the payment by making arrangements directly
14  with the body shop, perhaps that's more efficient, but the
15  reality is it is under a contract of indemnity that they have
16  with their insured.
17        And finally, I would like to say, you know, my
18  third point that I would like you to take away from this is
19  that they would have you believe that the end payors do not
20  have the claims that they are asserting in this -- in the MDL
21  or that they don't own the claims that they are sitting
22  across the table from us when they are negotiating, and
23  Mr. Goldfine embraced that.  He said that they -- the claims
24  were assigned years earlier.  Of course, we have no idea
25  which claims those are, we have no idea what amounts they

 1    are, we have no idea who the class members are because they

 2    have not identified them, which takes us back to the point

 3    that there is not a proper opt-out under the standards that

 4    you, yourself, established when you approved the notice

 5    program.

 6            Thank you, Your Honor.

 7            THE COURT:  Thank you.  Okay.  Mr. Iwrey.

 8            MR. IWREY:  I was going to address the consumer

 9    protection and state law claims in the unjust enrichment that

10    was brought up in plaintiffs' argument and not take you -- I

11    promise I won't go on a 50-state road trip.

12            THE COURT:  Okay.

13            MR. IWREY:  We have extensively briefed these

14    issues on a state-by-state basis but I would only add the

15    following:  For certain states the Court had dismissed, and

16    for the reasons stated in your prior decisions, they should

17    continue to be dismissed here.

18            There are some fundamental differences that need to

19    be brought out with respect to the other states.  We sought

20    dismissal in the state law claims even when the Court has

21    denied them in the class actions because GEICO stands in a

22    significantly different position.  In the bearings case when

23    you talked about the nexus case, you had stated that the --

24    if EPPs, talking about end purchasers, failed to allege that

25    their purchases occurred in the jurisdictions in which they

Case 2:12-md-02311-SFC-RSW  ECF No. 1843, PageID.34200  Filed 11/28/17  Page 79 of 107
*Motions to Dismiss • November 9, 2017*

**79**

 1   reside in, the Court finds that the pleadings create a

 2   reasonable inference that the purchases occurred where the

 3   individual plaintiffs reside.

 4        GEICO satisfies neither the purchase element nor

 5   the resident element and so they are not entitled to this

 6   presumption because as you heard today, in many cases GEICO

 7   has made claims where GEICO has not been the purchaser of the

 8   product.  In some cases no one is the purchaser of the

 9   product.  And even where GEICO has paid a repair shop,

10   Mr. Goldfine admitted that GEICO is not the purchaser of the

11   product.

12        Secondly, as I mentioned, GEICO only alleged that

13   they are headquartered only in D.C., Texas, Maryland and

14   Nebraska, and they have principal places of business in

15   Texas, Maryland and D.C.  So they are not entitled to a

16   presumption of nexus either for the purposes of the antitrust

17   nexus states or the consumer protection nexus states because

18   they haven't alleged that purchases have occurred in any

19   other state.  And furthermore, they have not alleged that

20   even the GEICO entities in these four locations have made any

21   purchases.  They haven't alleged which entity has paid, they

22   haven't alleged where the payments are, so therefore the

23   nexus states should be dismissed.

24        And I would like to address very briefly the unjust

25   enrichment.

1            THE COURT:  All right.

2            MR. IWREY:  As you've stated in many of your

3    previous decisions, when stripped to its essence, a claim of

4    unjust enrichment requires IPPs to allege sufficient facts to

5    shows that the defendants received a benefit.  So I'm reading

6    from your bearings decision -- excuse me, the fuel senders

7    decision, 29 Fed. Supp. 2nd, and that is at page 1014.  So I

8    would like to focus on the benefit.  In those cases -- if I

9    could approach this screen, in those cases, Your Honor, we

10   had a clearly defined vertical relationship where the alleged

11   overcharge flowed down, was passed on, was allegedly passed

12   on, was allegedly passed on, was purchased, and the benefit

13   flowed up.

14            We don't have that here.  We don't have that here

15   because GEICO made the payments to or on behalf of its

16   insured.  There are no benefits that were conferred to

17   defendants here; they were to the insureds.  The example that

18   Mr. Goldfine gave is perfect where the insured didn't have

19   the vehicle repaired or where there was a total loss, the

20   money stopped with the insured.  There was absolutely no

21   benefit conferred on any of the defendants so they couldn't

22   possibly be an unjust enrichment claim.

23            Let's take the example where defendant made a

24   fraudulent statement that caused GEICO or somebody to make a

25   payment to a bank by mistake.  Certainly, they could have an

1    unjust enrichment claim for the bank that received the

2    benefit.  They don't have an unjust enrichment claim against

3    the alleged -- the other party who allegedly said -- made the

4    fraudulent statement.  So that's my -- because the -- there

5    was no benefit conferred on defendants, there could not

6    possibly be an unjust enrichment claim here.

7         Thank you.

8         THE COURT:  Thank you.  Who's responding?

9         MR. GOLDFINE:  Yeah.  I mean, I'm not going to go

10   into a lengthy rhetoric.  I think our brief handles the

11   benefit -- the direct benefit argument other than pointing

12   out that to the extent that they are alleged -- they are

13   taking the tail end where no part is bought, you know, the

14   direct benefit is still that they had the conspiracy in place

15   for which they benefited from.  That's just the tail bit of

16   GEICO's cases.

17        The direct benefit cases -- or this Court has

18   rejected this precise argument several times.  With the

19   exception of pointing to that one little scenario, defendants

20   don't put -- and they didn't do it in their briefs and they

21   didn't do it in their reply, they have not identified

22   anything that is different for GEICO.  All other

23   circumstances the part is purchased as alleged.  Indeed, that

24   argument was also rejected by the -- defendants' argument was

25   rejected by the district in the Cardizem case.  As I said,

```
 1     the defendants abandoned this argument.  And if a direct

 2     benefit is legally required for the UE claim, GEICO at

 3     paragraphs 45 through 125, as to each and every one of the

 4     states, alleges a direct benefit in the second-amended

 5     complaint.

 6               THE COURT:  Thank you.  All right.  We have the

 7     Lear motion yet, but let's take a short break, okay?  We will

 8     take ten minutes.

 9               THE LAW CLERK:  All rise.

10               (Court recessed at 3:43 p.m.)

11                         —   —   —

12               (Court reconvened at 3:57 p.m.; Court, Counsel and

13               all parties present.)

14               THE COURT:  All right.  May I have your

15     appearances, please?

16               MR. MAROVITZ:  Good afternoon.  Andrew Marovitz on

17     behalf of Lear Corporation.  I will also be arguing for

18     KL Sales as well.

19               THE COURT:  Okay.

20               MR. MAROVITZ:  Judge, may I hand up two copies of

21     the PowerPoint we are going to be using?  I handed a couple

22     copies to counsel for GEICO at the break.

23               Your Honor, it is nice to see you again.  It has

24     been a while.

25               THE COURT:  Yes, it has.
```

1    MR. MAROVITZ:  Because wire harness was the first

2  action filed in this case and because Lear resolved its cases

3  so early to avoid exactly what is going on here today, I

4  never thought I would have an opportunity to present another

5  motion before you.  On a personal level --

6    THE COURT:  You just never know.

7    MR. MAROVITZ:  You never know.  Judge, here we are.

8    Almost five years ago on December 5th, 2012 we

9  argued that Lear should never have been a part of this case.

10  Remember that Lear and KL Sales never pled guilty to

11  anything.  Lear and KL Sales were never investigated by the

12  United States Department of Justice.  Lear and KL Sales had

13  the misfortune of selling the same parts that had been fixed

14  by others and therefore got swept along, and as a result back

15  in 2012 when this argument occurred and shortly thereafter,

16  the end payors were allowed to proceed against Lear and

17  KL Sales because of the argument five years ago that

18  discovery might bring evidence against them in a market where

19  others had pled guilty and developments could have occurred.

20    GEICO relies heavily on this argument at the bottom

21  of page 1 and top of page 2 of its brief.  In a nutshell, it

22  tries its best to stand in the shoes of the end payors in

23  this case, but it is now 2017, it's five years later.  None

24  of the discovery taken by very good lawyers on both sides of

25  this case revealed any wrongdoing by Lear or KL Sales, none.

 1    None of it led to a guilty plea or federal investigation of
 2    Lear or KL Sales, none.   The contrary is true: the Department
 3    of Justice stood before you, Your Honor, and submitted papers
 4    saying that it had closed its wire harness investigation so
 5    there will be no investigation of Lear or KL Sales, there
 6    will be no guilty plea, and Lear and KL Sales should have
 7    been done with this case years ago.   The very reason that
 8    GEICO says that the end payor case was allowed to proceed,
 9    the prospect of discovery, the prospect of guilty pleas in
10    the investigation, now cuts 180 degrees against their
11    position.
12            Mr. Goldfine stood before you last hour and said
13    something that I found very interesting.   He said that they
14    have talked to cooperating witnesses and he said they have
15    talked to cooperating defendants.   There is not a single word
16    from any of those cooperating witnesses or cooperating
17    defendants about Lear or KL Sales' involvement in the case in
18    their second-amended complaint, which is, as you know, Your
19    Honor, the third complaint they have brought against our
20    client in this case.
21            There is, however, an even more fundamental reason
22    that Lear and KL Sales should be dismissed.   GEICO simply
23    does not stand in the shoes of the end payors the way that it
24    has pled its complaint.   It has followed a very different
25    course.   It filed a notice of exclusion but it also filed its

1    own complaint, and in several material ways that complaint,
2    which is aimed at a large variety of defendants, pleads GEICO
3    out of court as to Lear and KL Sales.  It requires dismissal.
4    It leads the Court down a road where there is only one place
5    to go, and that's dismissal.
6         Unlike the end payors, GEICO's complaint at
7    paragraph 127 expressly alleges that the guilty pleas and the
8    DOJ statements described how the conspiracy was carried out.
9    I don't like to repeat myself in arguments, but I'm going to
10   do it here because this is such an important point.
11   Paragraph 127 of their complaint expressly alleges that the
12   guilty pleas and DOJ's public statements described how the
13   conspiracy was carried out.  We are going to look at that
14   paragraph in detail in a couple of minutes to confirm that.
15   But to summarize, by doing that, GEICO has pled itself out of
16   court against Lear and KL Sales in a way that simply cannot
17   fix or amend.  Lear and KL Sales never pled guilty.
18        So how does GEICO respond to this argument that we
19   made in our opening brief?  It responded to it on pages 16
20   and 17 of its 17-page brief.  It spends the first 15 pages of
21   its brief pretending that it is just like the end payors.  I
22   will show you what they did and how they did it in a couple
23   of minutes.
24        In the meantime, I want to stress that pleadings
25   matter, particularly at the motion to dismiss stage; they are

 1    not just words on a page.  The law makes clear that

 2    plaintiffs are the masters of their complaint, but it also

 3    makes clear that plaintiffs are responsible for what they put

 4    in their complaint.

 5          Mr. Smith will gauge whether I wrote the words down

 6    properly, but Mr. Goldfine in his argument a few minutes ago

 7    said something like the following:  Quote, "GEICO is a

 8    plaintiff and it can define the case it wants to pursue."

 9    Exactly.  That's what they did.  They defined this case as a

10    conspiracy as described by the DOJ pleas and as described by

11    the public announcements.  Lear and Kyungshin-Lear Sales did

12    not plead guilty.  Lear and Kyungshin-Lear Sales must be

13    dismissed.

14          Whatever you decide on the weighty issues that have

15    been argued by the defendants and by GEICO for the last I

16    guess couple of hours, the case against Lear and KL Sales

17    cannot proceed.  This is GEICO's third try, and it must be

18    dismissed.  I'm going to walk through the three independent

19    reasons for this, but I want to emphasize that none of these

20    reasons applied when we argued before you in 2012.  All of

21    them apply now in 2017, they squarely apply, so it is not

22    enough for GEICO to say this is all been done before.

23          First, let's look at GEICO's pleading.  I have

24    turned to the second slide in the handout I have given you

25    and it is also on the screen, Judge.  GEICO's pleading

```
 1    provides a roadmap of its case against defendants, so we have
 2    illustrated that.  I want you to take a look at the
 3    demonstrative because it puts the key points in here.  We
 4    described it as a road like a roadmap, and the GEICO car, as
 5    you can see, is on the second-amended complaint road.  The
 6    first stop is, as you can see, second-amended complaint,
 7    paragraph 127, and it is the point that I have been making.
 8    Quote from GEICO, "The DOJ in its public announcements
 9    described how the defendants and their co-conspirators
10    carried out these multiple conspiracies."  That appears at
11    docket number 53.
12            The next place to go to is the fourth paragraph of
13    the amended complaint.  Defendants, quote, "Agreed to plead
14    guilty to conspiracies to fix prices and rig bids for
15    specific auto parts."  That's just false as to Lear and
16    KL Sales, it just didn't happen.  And there is frankly -- I
17    don't know how GEICO explains that, but that didn't happen as
18    to us.  It is judicially noticeable, this Court knows it for
19    the past five years much.
20            So what does GEICO say about that?  Well, it says
21    look at -- as I said, look at the guilty pleas, look at the
22    public announcements.  So that's what we did to try to figure
23    out what it was that GEICO was alleging against Lear and
24    KL Sales.  And in our brief at appendix A, docket number
25    61.2, we listed all 43 entries that we could find of guilty
```

      1      pleas and of public announcements by DOJ.  We did this

      2      because that's what GEICO told you, that's what GEICO told

      3      us, that's what GEICO told anybody who wanted to read from

      4      the public docket was their case against all the defendants.

      5      We wanted to see what their case was against Lear, and after

      6      scouring them, we didn't see a word implicating Lear or

      7      KL Sales, not one.

      8                We waited for GEICO to tell us in its response

      9      brief what we missed in the roadmap, but they couldn't point

     10      to any language in any of these 43 entities, and that's why

     11      we put it's a total roadblock of their claims.  There is no

     12      way the car can get beyond that because that is their own

     13      complaint.

     14                In fact, they went an extra step, Judge.  If you

     15      look at their opposition brief at page 12, note 7, GEICO

     16      conceded at the end of that footnote that, quote, "The plain

     17      record is there's no allegation about a DOJ investigation of

     18      Lear."

     19                Now, in response to this, all GEICO can do is point

     20      to generalized conclusory allegations about all defendants,

     21      but we know, having been in this courtroom for the past five

     22      years, that conclusory allegations get no credit under

     23      Twombly.

     24                They also suggest at page 9 of their brief that

     25      their complaint describes the inner workings of the wire

1   harness and other conspiracies when we said, you know, what

2   is it in your complaint that shows that Lear and

3   Kyungshin-Lear should be in?  So what do they say about those

4   inner workings?  Let's take a look exactly at what they say.

5   On the left of the chart, Your Honor, is a copy of

6   paragraph 127 of the complaint, which begins with a sentence

7   the DOJ in its public announcements described how the

8   defendants and their co-conspirators carried out these

9   multiple conspiracies.  When they say in their response brief

10  that they are defining the inner workings of the wire harness

11  and other conspiracies, they type in their response brief

12  every single word from that paragraph except for the first

13  sentence.  They leave out the first sentence: "The DOJ in its

14  public announcement describes how the defendants and their

15  co-conspirators carried out these multiple conspiracies."

16          Why do you think, Your Honor, they left out that

17  key sentence from their brief?  They left it out because they

18  pled themselves out of court, and they frankly didn't want to

19  repeat that in their brief.  That's just plain as day.

20          GEICO also pled that Lear was implicated in the EC,

21  but as we have shown, that's just not true.  Our opening

22  brief at Exhibit 1 and 2 revealed the case was dropped

23  against Lear, this is indisputable.  In sum, GEICO has run

24  away as fast as it can from its own complaint.  It hopes that

25  you will look at the end payors' complaint and your rulings

1    on the end payors' complaint instead of looking at what it

2    has pursued in its own complaint.  Its complaint is

3    different, and GEICO cannot stand in the shoes for pleading

4    purposes of the end payors.  That's the first reason.

5         The second is that even if you get beyond the fact

6    that they pled themselves out of court, the second-amended

7    complaint does not allege any properly pled facts showing

8    that Lear conspired.  I want to walk through that as well.

9    GEICO tries to resuscitate its arguments with conclusory

10   general allegations, none of which comes close to stating a

11   claim, and what I did is I took those allegations and tried

12   to drop them into each of three buckets depending on the type

13   of allegations they were.

14        So bucket number 1 on the left contains GEICO's

15   allegations specific to Lear and, of course, KL Sales.  It

16   shows that Lear manufactured automotive wire harnesses.  AWH

17   is automotive wire harnesses.  That GEICO bought them.  That

18   Lear settled the U.S. class action.  That the EC

19   investigated, but as we pointed out, there was no finding

20   against Lear.

21        Each of those things would be true whether or not

22   Lear was part of a conspiracy.  They proved nothing about

23   whether or not Lear was part of a conspiracy.  That Lear

24   manufactured the parts, that GEICO bought the parts, that

25   Lear settled the case so that five years later it wouldn't

1    have to send a lawyer to argue against an insurance company

2    that it settled years and years ago.  And then finally the EC

3    investigation frankly speaks to why Lear shouldn't be here at

4    all.

5         Bucket 2 contains allegations about defendants

6    collectively, which, for some reason, GEICO believes that

7    these stand against Lear.  The first allegation is defendants

8    pled guilty.  Well, Lear and KL Sales did not.  That

9    defendants attended industry conferences.  Well, lots of

10   people have been to the auto show, Judge.  I have been to the

11   auto show.  I hope I'm not accused some day of being in a

12   conspiracy.

13        Bucket Number 3 has general allegations about the

14   marketplace.  This has nothing at all to do with a

15   conspiracy, whether you describe the request for quotation

16   process, describe the industry characteristics and describe

17   GEICO's payments.  Again, that's not probative of a

18   conspiracy in the least.  None of this comes close to

19   alleging a claim against Lear or KL Sales.

20        Third and finally, Your Honor, the wire harness

21   raids in February 2010 were plastered across the news.

22   Everybody was on notice regarding wire harnesses as of

23   February 2010 as this Court previously has ruled, and we put

24   that ruling on page -- I guess the defendants' joint brief

25   put that ruling on page 18 of the reply.

1          GEICO disputes that it was on notice for other

2    parts beside wire harnesses because the news reports focused

3    on wire harnesses in February of 2010, but, of course, Lear

4    and KL Sales are only in this case because of wire harnesses

5    so that doesn't help GEICO in the least.

6          And, in fact, if you look at this slide that I put

7    forward, the February 2010 announcement came, and the statute

8    of limitations, it is undisputed, stopped running on June of

9    2016.  We had this handy chart in the defendants' reply,

10   Exhibit A, the joint defendants' reply, at docket number

11   67-2, showing on a state-by-state basis what would be

12   dismissed and what might not be depending upon the number of

13   years.  For Lear and KL Sales it is a breeze, it is all over

14   six years, everything is gone.  So, again, this is a function

15   of the fact that we were in the case so early and there is

16   nothing left.

17         Now, today Mr. Goldfine argued something that was

18   not in the brief as against Lear, and I'm not complaining

19   about that but I do want to respond.  He argued essentially a

20   continuing violation theory, but there is a case that

21   discusses that issue in the State of Michigan where the

22   statute of limitations would apply because it is a procedural

23   issue, and I will encourage Your Honor to take a look at it.

24   It is the City of Fraser vs. Almeda University, and the cite

25   is 886 Northwest Second 730, 744, year 2016.  In that case

1   the court says pretty clearly that Michigan courts do not

2   recognize continuing violation exception to the statute.  So

3   I would encourage the Court to take a look at that in

4   response to the argument that was made about the continuing

5   violation earlier.  In any event, it has been way too long.

6           The Court asked a question of when we were put on

7   notice by GEICO about their potential claim or opting out.

8   We settled the case in May of 2014.  GEICO sent its opt-out

9   letter in April of 2016, 23 months later.  All right.  They

10  knew about this case going on.  They could have told us there

11  was no requirement that they wait until the last possible

12  minute to file a formal opt-out notice.  They didn't.  It is

13  two years.

14          Judge, for five years Lear and KL Sales have been

15  collateral damage in this case against others who were

16  investigated and others who pled guilty.  This is and has

17  been massively unfair to Lear and KL Sales.  It has been

18  massively unfair to their shareholders and it has been

19  massively unfair to their employees, many of whom work

20  20 miles down the road in Southfield.  It is time for that to

21  end right now.

22          This case should be dismissed with prejudice.  It

23  is not enough simply to get up before Your Honor and say this

24  is just like the case that occurred five years ago.  GEICO

25  has to address these arguments.  It can't.  It doesn't in its

1    reply, and it can't now because of the way it pled its case.

2    This case should be dismissed.

3            THE COURT:  Thank you, Counsel.

4            Response?

5            MS. HAZEL:  Good afternoon again, Your Honor.

6            Your Honor, Lear and KL Sales do not raise anything

7    new that this Court has not previously considered and

8    rejected with the class cases.  GEICO's complaint notifies

9    Lear of the claims against it and is substantially similar to

10   the end-payor plaintiffs' complaint and claims.  Although

11   Lear tries to disclaim any involvement in the wire harness

12   conspiracy, from a practical standpoint, an 11-year wire

13   harness conspiracy would not have been effective if it did

14   not have participation from all manufacturers.  This is so

15   because if Lear was not part of the conspiracy, it could have

16   undercut prices and stolen away customers from the other

17   co-conspirators, but that didn't happen.

18           Now, in an attempt to repackage the same arguments

19   this Court dismissed in the end payor cases, Lear puts

20   forward a nonsensical pled-out-of-court theory.  This doesn't

21   work for three reasons:

22           First, although Lear seeks to hold GEICO to a

23   heightened pleading standard under Rule 9, that is not

24   GEICO's obligation under Rule 8, and GEICO has alleged

25   sufficient facts linking Lear to a wire harness conspiracy.

```
 1          Second, GEICO's complaint is not limited to the DOJ
 2   investigations and guilty pleas.
 3          And third, the supposed closure of the European
 4   Commission and DOJ investigations without charges as to Lear,
 5   which were presented as extrinsic evidence attached to Lear's
 6   motion, do not affect the plausibility of GEICO's claims.
 7          I will start with the first point.  Contrary to
 8   what Lear has argued, GEICO's complaint includes allegations
 9   specific to Lear which GEICO has identified for this Court in
10   its opposition response.  GEICO has defined the case it wants
11   to pursue.  It is incredulous that Lear claims it doesn't
12   know what it has been alleged to do.  I will walk through
13   some of these allegations specifically.
14          Lear conspired with other wire harness
15   manufacturers from as early as 1999 to at least 2010.  That's
16   paragraph 126-D of GEICO's complaint.
17          Lear and its co-conspirators had meetings and
18   conversations in which they agreed to allocate the supply and
19   coordinate prices on a model-to-model basis.  That's
20   paragraph 127.
21          Lear sold wire harnesses during the relevant period
22   and had significant sales, paragraphs 32, 33 and 34.
23          Lear sold wire harnesses to OEMs for manufacture in
24   cars that were manufactured and/or sold in the United States.
25   Lear also sold wire harness to repair professionals located
```

1    in the U.S., paragraph 63.

2           GEICO purchased and reimbursed its insureds and

3    third-party claimants for wire harnesses.  That's Paragraph

4    64.

5           GEICO paid inflated super-competitive prices as a

6    result of the wire harness conspiracy, paragraph 126-D.

7           The European Commission investigated Lear.  I will

8    address this in more detail in a few minutes of why Lear's

9    arguments regarding the EC investigation carry no weight

10    here, but that's paragraph 131.

11           In addition to these Lear-specific allegations

12    notifying Lear of the claims against it, this Court has found

13    that guilty pleas and investigations by other wire harness

14    manufacturers may support conspiracy allegations against

15    co-conspirators, such as Lear, at the pleading stage.

16           All of these allegations form the building blocks

17    of GEICO's claim against Lear and are enough to satisfy

18    GEICO's burden at this stage of alleging a plausible claim

19    for relief.

20           Relatedly, Lear argues in its brief and mentions

21    here that GEICO cannot use the term -- the collective term

22    defendants for acts that are common across the different auto

23    parts conspiracy.  GEICO's use of the term defendants in

24    sections of the complaint is appropriate when there are

25    common themes and courses of conduct, including rigging bids,

1    secret meetings amongst competitors, criminal investigations

2    and inflated prices.

3         As this Court already has found, detailed

4    allegations about the involvement of each defendant, each

5    defendant's role in the specific parts conspiracy and overt

6    acts are not needed for pleading purposes.

7         GEICO has a good-faith belief that all defendants

8    named in its complaint engaged in similar conduct related to

9    the auto parts conspiracies.  There is no indication this is

10   not true at this point.  GEICO must satisfy Rule 8, not

11   Rule 9.

12        This is just another illustration of Lear

13   attempting to impose this heightened pleading standard.

14   However, GEICO at this juncture must only make allegations

15   that plausibly link Lear to a wire harness conspiracy.  Since

16   we filed the complaint over a year ago, my colleague

17   mentioned we have received cooperation from some settling and

18   non-settling defendants and have learned more about these

19   conspiracies and the necessity for all manufacturers to

20   participate to insure a particular parts conspiracy's

21   success.

22        As to the second point, GEICO's complaint is not

23   limited to the DOJ investigations and guilty pleas as I have

24   just detailed to the Court.  The government allegations only

25   comprise five pages of GEICO's complaint.  If we accept

1    Lear's version of the complaint, there is nothing else in

2    there.   Now, Lear's counsel pulls out paragraph 127 from the

3    complaint and the first sentence states the DOJ in its public

4    announcements described how the defendants and their

5    co-conspirators carried out these multiple conspiracies.

6    This is one allegation, as the Court has seen, of the

7    totality of allegations in GEICO's complaint linking Lear to

8    a wire harness conspiracy.

9        But GEICO also includes other allegations, as I

10    mentioned, the specific ones as to Lear, but there's also

11    allegations about the structure and culture of the wire

12    harness industry which facilitated collusion, including high

13    barriers to entry and high market concentration.   There were

14    numerous opportunities to conspire which GEICO has alleged,

15    including at these industry events and conferences.   These

16    are all allegations this Court previously found, viewed in

17    their entirety, supported that Lear and KL Sales' involvement

18    in the wire harness conspiracy was plausible.

19        THE COURT:   What about the argument that now five

20    years has gone by and nothing else has come up about Lear,

21    according to Lear?

22        MS. HAZEL:   So Lear claims the circumstances are

23    now different than the class cases because five years has

24    gone by, supposedly DOJ and the European Commission completed

25    their wire harness investigation, but this does not change

1  anything as to the plausibility of GEICO's allegations as to

2  Lear's participation of wire harness conspiracy.

3          So, first of all, as to the closure of the

4  European Commission investigation, Lear points to a letter

5  from the European Commission that essentially says nothing

6  about Lear's culpability or participation in a wire harness

7  conspiracy other than there was an investigation and that it

8  was closed.

9          Set aside that Lear provides no basis for why this

10  Court should consider this extrinsic evidence at a motion to

11  dismiss, this letter does not change that Lear was still a

12  target of the investigation and that many of its competitors

13  were fined by the EC, including its joint venture partner

14  Furukawa, in addition to entering guilty pleas with the DOJ.

15          As this Court knows, as held before, civil

16  antitrust complaints should not be dismissed because the

17  government decides not to pursue charges.  There are a

18  multitude of reasons why the government may close an

19  investigation, including government resources or the

20  possibility of civil enforcement.  And equally important, DOJ

21  will not indict unless confident it can prove its case beyond

22  a reasonable doubt.  It is under a more stringent standard

23  than civil plaintiffs.

24          Now, as to GEICO -- I'm sorry, as to Lear's timing

25  that it has given, I think this is very interesting, and I

 1    want to direct the Court back to what my colleague discussed

 2    as to the RFQ process.  So, again, if an RFQ went out in

 3    2009, we know it was for a model year 2011 or 2012, and that

 4    model year car would then be sold roughly four to six years.

 5    So just because Lear alleges and says oh, we settled a long

 6    time ago, we shouldn't be brought back in, it doesn't mean

 7    that the effects of Lear's conduct as part of a wire harness

 8    conspiracy aren't still being felt and that GEICO is still

 9    paying the inflated prices for these cars.

10            Again, going back to Lear's focus on paragraph 127,

11    Lear is wrong to argue the allegations may be read in

12    isolation.  I know Lear put up on its PowerPoint that I just

13    saw right before counsel argued and put up that paragraph

14    127, but counsel did not put all the other paragraphs that

15    show specific allegations as to Lear.  Recognizing that its

16    chance of succeeding on the same motion to dismiss it raised

17    with end payor are limited, Lear imaginatively tries to

18    present this as a situation where GEICO has plead itself out

19    of court.  But the cases that relies on its briefs are

20    nothing like here.  In NicSand, the plaintiff in both the

21    complaint and opposition had disclaimed the antitrust claims

22    that it sought to pursue.  GEICO has done nothing of the

23    sort.  In Bright vs. Gallia County, the plaintiff brought

24    equal protection claims but in the complaint cited the reason

25    his employer had given for his termination.  The court found

 1    the reason cited was rational and ultimately defeated in his

 2    equal protection claim.

 3          The District Court in the District of Columbia

 4    rejected a similar attempt by defendants there in the

 5    Vitamins case to limit a conspiracy to government allegations

 6    and guilty pleas.  Defendants there argued that since a

 7    plaintiff attached the government's indictments and plea

 8    bargains to their pleadings, they were somehow bound by those

 9    documents.  The court disagreed finding that there was no

10    legal requirement the plaintiffs be bound by the scope of

11    those documents.

12          To limit GEICO's claims only to government

13    investigations and guilty pleas is parsing out select

14    allegations from GEICO's complaint and asking this Court to

15    view them in isolation.  This Court has already recognized it

16    must read the complaint as a whole and Lear's motion should

17    fail on that point alone.

18          I want to touch on one final point.  In addition to

19    trying to attach unwarranted significance to the closure of

20    these wire harness investigations as well as the time that

21    has passed, Lear also argues, and GEICO should rely on its

22    unsupported representations, that, one, it allegedly never

23    received a subpoena from DOJ; two, DOJ allegedly never

24    requested that Lear informally produce documents; or three,

25    the DOJ allegedly never interviewed a Lear witness.

1          Once again, this extrinsic unsupported evidence is

2     improper for consideration on a motion to dismiss.  However,

3     we don't know what DOJ did or did not specifically do as to

4     its wire harness investigation.  We know DOJ conducted a very

5     broad wire harness investigation and chose to pursue charges

6     in some instances.  At this point in time this is a disputed

7     issue of fact inappropriate for resolution here.

8          Lear again confuses GEICO's burden at this stage

9     and attempts to jump the gun.  Presenting evidence is one of

10    the obligations imposed under Rule 56, not Rule 12.  GEICO

11    does not have to prove that Lear engaged in any wrongdoing at

12    this stage, nor is it obligated to meet a higher probability

13    standard.  Instead, its obligation is to allege a plausible

14    claim for relief and to notify Lear of the claims against it.

15    GEICO has done just that.

16          On a final note -- I want to ask Lear's counsel if

17    we could put back up the PowerPoint?

18          MR. MAROVITZ:  Sure.  Which one?

19          MS. HAZEL:  If we can go to this slide.

20          So I actually like this PowerPoint.  I think it

21    lays out the building blocks of GEICO's claim against Lear.

22    First, we have the specific allegations, and I detailed those

23    allegations for the Court.  We know that Lear manufactured

24    wire harnesses, GEICO bought them, we know the time period.

25    This is all the who, what, when and where.

 1          Now, the second bucket, this is how the

 2   conspiracies worked.  These are general allegations

 3   describing the scope of these conspiracies, things that we

 4   have learned from the DOJ investigations and guilty pleas.

 5          And then last we have general allegations about the

 6   marketplace, including the wire harness industry, and the

 7   wire harness industry facilitated and served as sort of the

 8   means at which they were able to effectuate their

 9   conspiracies.

10          Can we go to this slide?

11          MR. MAROVITZ:  Sure.

12          MR. HAZEL:  This slide illustrates, you know, the

13   scenario we have already given with the 2009 RFQ and how it

14   can go forward, so I think as far as there being any statute

15   of limitations problem, that that's just -- it just has no

16   merit.

17          I do want to mention, I mean, these are some new

18   arguments that we have not had an opportunity to address,

19   particularly the City of Fraser case, and that Michigan

20   doesn't recognize a continued violation of the statute.

21   GEICO would appreciate an opportunity to respond to that.

22   And if that's the case, it is also specific as to Michigan.

23   GEICO brings a number of state claims in determining whether

24   there is a statute of limitations problem and whether there

25   is tolling or continued violation would likely lead to look

1    to those state claims.  Again, if this is an issue the Court

2    would like more briefing on, GEICO is happy to do that.

3              THE COURT:  No.  Thank you.

4              MS. HAZEL:  All right.  Thank you.

5              Reply?

6              MR. MAROVITZ:  Thank you, Your Honor.

7              Growing up, one of my favorite movies was the

8    Wizard of Oz.  Loved it, loved it, loved it.  And I love the

9    scene at the end where Dorothy finally catches on and the

10   wizard says, "Pay no attention to the man behind the

11   curtain."  This is one of those moments.

12             We haven't argued that GEICO has some heightened

13   pleading standard, that appears nowhere in our brief.  They

14   are arguing against a, pardon the pun, straw man.

15             Second, we have argued that they should be held to

16   what they said, and, yeah, it's true they said a lot of

17   things, but the top sentence of paragraph 127 says exactly

18   what they said: the DOJ in its public announcements described

19   how the defendants and their co-conspirators carried out

20   these conspiracies.  You can't get around that, Judge.

21   That's just plain as day.  They can say whatever else they

22   want to in the complaint.  That's their pleading, they are

23   stuck with it, they are the masters of their complaint, just

24   as Mr. Goldfine said before.

25             On the European Commission point, this continues to

1    be a mystery to me.  We attached to our brief the letter from

2    the European Commission back in July of 2013, so four and a

3    half years ago the EC made clear that we were not under any

4    jeopardy in that jurisdiction, four and a half years ago.

5    And now GEICO comes before you and says, well, gee, we really

6    don't know, we can't be sure.  That was four and a half years

7    ago, Judge.  If there was something else, GEICO has very

8    capable lawyers, they would have put something in front of

9    you.  They didn't.  There is nothing else.

10            The final -- I guess two other points.  City of

11   Fraser is just what it is.  You will take a look at it, you

12   will see what it says.

13            But the final point I want to make is one about

14   guilty pleas and what they mean, and I can say this with some

15   confidence because Mr. Goldfine told you beforehand that he

16   worked in the antitrust division at DOJ and Ms. Hazel worked

17   for the FTC.  These are very capable antitrust knowledgeable

18   lawyers.  Okay.  They know that when you are an industry

19   where there are lots of cooperators and lots of guilty pleas

20   and a case that gets high profile like this one, the

21   government has the opportunity to talk to anybody it wants

22   to.  And, in fact, one of the typical obligations of someone

23   who pleads guilty is that that person will provide full

24   answers to questions that are asked.

25            The DOJ right now and before it closed its

```
 1    investigation had all of this information available to it
 2    from the very people who pled guilty, including, if there
 3    were, any leniency applicants, it had it all.  So it won't do
 4    for an antitrust division lawyer or an FTC lawyer to stand
 5    before you and say there could be something else.  This is
 6    not that case, Judge.  This is not a case where the
 7    government didn't expend any resources.  It expended a lot of
 8    resources on this case on a lot different parts.  It had a
 9    lawyer before you.  It has guilty pleas in many different
10    parts.  They have everything there is to have, and there is
11    nothing against Lear and there is nothing against KL Sales.
12    It would be an injustice to keep those two parties in this
13    case.
14              THE COURT:  All right.  Thank you.
15              MR. MAROVITZ:  Thank you.
16              THE COURT:  Okay.  Anybody have anything else?
17              (No response.)
18              THE COURT:  No.  All right.  We are done.  The
19    Court will issue an opinion.  Thank you very much.
20              THE LAW CLERK:  All rise.  Court is in recess.
21              (Proceedings concluded at 4:34 p.m.)
22                        —   —   —
23
24
25
```

*Motions to Dismiss • November 9, 2017*

1

2                                    *CERTIFICATION*

3

4              I, Robert L. Smith, Official Court Reporter of

5     the United States District Court, Eastern District of

6     Michigan, appointed pursuant to the provisions of Title 28,

7     United States Code, Section 753, do hereby certify that the

8     foregoing pages comprise a full, true and correct transcript

9     taken in the matter of GEICO Corporation, et al., vs.

10    AutoLiv, et al., Case No. 16-13189, on Thursday,

11    November 9, 2017.

12

13

14                           *s/Robert L. Smith*
                             Robert L. Smith, RPR, CSR 5098
15                           Federal Official Court Reporter
                             United States District Court
16                           Eastern District of Michigan

17
      Date:  11/28/2017
18    Detroit, Michigan

19

20

21

22

23

24

25