UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

— — —

IN RE:  AUTOMOTIVE WIRE HARNESS
SYSTEMS ANTITRUST

MDL NO. 2311
_____/


STATUS CONFERENCE / MOTION HEARINGS / FAIRNESS HEARINGS

BEFORE THE HONORABLE MARIANNE O. BATTANI
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan

APPEARANCES:
Direct Purchaser Plaintiffs:

THOMAS C. BRIGHT
**GOLD, BENNET, CERA & SIDENER, L.L.P.**
595 Market Street, Suite 2300
San Francisco, CA  94105
(415) 777-2230


DAVID H. FINK
**FINK & ASSOCIATES LAW**
100 West Long Lake Road, Suite 111
Bloomfield Hills, MI  48304
(248) 971-2500


NATHAN FINK
**FINK & ASSOCIATES LAW**
100 West Long Lake Road, Suite 111
Bloomfield Hills, MI  48304
(248) 971-2500

```
 1   APPEARANCES: (Continued)
     Direct Purchaser Plaintiffs:
 2
     GREGORY P. HANSEL
 3   PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
     One City Center
 4   Portland, ME  04112
     (207) 791-3000
 5

 6   STEVEN A. KANNER
     FREED, KANNER, LONDON & MILLEN, L.L.C.
 7   2201 Waukegan Road, Suite 130
     Bannockburn, IL  60015
 8   (224) 632-4502

 9
     JOSEPH C. KOHN
10   KOHN, SWIFT & GRAF, P.C.
     One South Broad Street, Suite 2100
11   Philadelphia, PA  19107
     (215) 238-1700
12

13   MICHAEL S. SMITH
     PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
14   One City Center
     Portland, ME  04112
15   (207) 791-3000

16
     EUGENE A. SPECTOR
17   SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
     1818 Market Street, Suite 2500
18   Philadelphia, PA  19103
     (215) 496-0300
19

20   RANDALL B. WEILL
     PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
21   One City Center
     Portland, ME  04112
22   (207) 791-3000

23

24

25
```

```
 1   APPEARANCES: (Continued)
     End-Payor Plaintiffs:
 2
     DEVON ALLARD
 3   THE MILLER LAW FIRM, P.C.
     950 West University Drive, Suite 300
 4   Rochester, MI  48307
     (248) 841-2200
 5

 6   E. POWELL MILLER
     THE MILLER LAW FIRM, P.C.
 7   950 West University Drive, Suite 300
     Rochester, MI  48307
 8   (248) 841-2200

 9
     WILLIAM V. REISS
10   ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
     601 Lexington Avenue, Suite 3400
11   New York, NY  10022
     (212) 980-7405
12

13   HOLLIS L. SALZMAN
     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
14   601 Lexington Avenue, Suite 3400
     New York, NY  10022
15   (212) 980-7405

16
     STEVEN M. SHEPARD
17   SUSMAN GODFREY, L.L.P
     190 Avenue of the Stars, Suite 950
18   Los Angeles, CA  90067
     (310) 789-3102
19

20   ELIZABETH T. TRAN
     COTCHETT, PITRE & McCARTHY, L.L.P.
21   840 Malcolm Road
     Burlingame, CA  94010
22   (650) 697-6000

23   ADAM J. ZAPALA
     COTCHETT, PITRE & McCARTHY, L.L.P.
24   840 Malcolm Road
     Burlingame, CA  94010
25   (650) 697-6000
```

```
 1    APPEARANCES: (Continued)
      Dealership Plaintiffs:
 2
      DON BARRETT
 3    BARRETT LAW OFFICES
      P.O. Drawer 927
 4    Lexington, MS  39095
      (601) 834-2376
 5

 6    ALEXANDER E. BLUM
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
 7    1361 East Big Beaver Road
      Troy, MI  48083
 8    (248) 457-9200

 9
      ERICA FRUITERMAN
10    DUANE MORRIS, L.L.P.
      30 South 17th Street
11    Philadelphia, PA  19103
      (215) 979-1342
12

13    EVELYN LI
      CUNEO, GILBERT & LaDUCA, L.L.P.
14    507 C Street NE
      Washington, D.C.  20002
15    (202) 789-3960

16
      J. MANLY PARKS
17    DUANE MORRIS, L.L.P.
      30 South 17th Street
18    Philadelphia, PA  19103
      (215) 979-1342
19

20    VICTORIA ROMANENKO
      CUNEO, GILBERT & LaDUCA, L.L.P.
21    507 C Street NE
      Washington, D.C.  20002
22    (202) 789-3960

23

24

25
```

1  APPEARANCES: (Continued)
   For the Defendants:

2

3  JEFFREY J. AMATO
   **WINSTON & STRAWN, L.L.P.**
   200 Park Avenue

4  New York, NY  10166
   (212) 294-4685

5

6  MATTHEW BACHRACH
   **CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.**

7  2000 Pennsylvania Avenue NW
   Washington, D.C.  20006

8  (202) 974-1500

9

10 MICHAEL G. BRADY
   **WARNER, NORCROSS & JUDD, L.L.P.**
   2000 Town Center, Suite 2700

11 Southfield, MI  48075
   (248) 784-5032

12

13 STEVEN F. CHERRY
   **WILMER HALE**

14 1875 Pennsylvania Avenue NW
   Washington, D.C.  20006

15 (202) 663-6321

16

17 EILEEN M. COLE
   **WHITE & CASE, L.L.P.**
   701 Thirteenth Street NW

18 Washington, DC  20005
   (202) 626-3642

19

20 JAMES L. COOPER
   **ARNOLD & PORTER, L.L.P.**

21 555 Twelfth Street NW
   Washington, DC  20004

22 (202) 942-5000

23

24 KENNETH R. DAVIS, II
   **LANE POWELL, P.C.**
   601 SW Second Avenue, Suite 2100

25 Portland, OR  97204
   (503) 778-2100

```
1   APPEARANCES: (Continued)
    For the Defendants:
2
    MICHAEL R. DEZSI
3   DETTMER & DEZSI, P.L.L.C.
    615 Griswold Street, Suite 1600
4   Detroit, Michigan 48226
    (313) 879-1206
5


6   DAVID P. DONOVAN
    WILMER HALE
7   1875 Pennsylvania Avenue, NW
    Washington, D.C.  20006
8   (202) 663-6868

9
    ABRAM ELLIS
10  SIMPSON, THACHER & BARTLETT, L.L.P.
    1155 F Street, N.W.
11  Washington, D.C. 20004
    (202) 636-5579
12

13  J. CLAYTON EVERETT, JR.
    MORGAN, LEWIS & BOCKIUS, L.L.P.
14  1111 Pennsylvania Avenue NW
    Washington, DC  20004
15  (202) 739-5860

16
    KEVIN FEE
17  SIDLEY AUSTIN, L.L.P.
    One South Dearborn Street
18  Chicago, IL  60603
    (312) 853-4155
19

20  DANIEL T. FENSKE
    JENNER & BLOCK
21  353 N. Clark Street
    Chicago, IL 60654-3456
22  (312) 222-9350

23  LOUIS GABEL
    JONES DAY
24  150 West Jefferson, Suite 2100
    Detroit, MI  48226
25  (313) 733-3939
```

```
 1    APPEARANCES: (Continued)
      For the Defendants:
 2
      LARRY S. GANGNES
 3    LANE POWELL, P.C.
      1420 Fifth Avenue, Suite 4100
 4    Seattle, Washington  98101
      (206) 223-7000
 5

 6    JASON R. GOURLEY
      BODMAN P.L.C.
 7    1901 Street Antoine Street, 6th Floor
      Detroit, MI  48226
 8    (313) 259-7777

 9
      FRED K. HERRMANN
10    KERR, RUSSELL & WEBER, P.L.C.
      500 Woodward Avenue, Suite 2500
11    Detroit, MI  48226
      (313) 961-0200
12

13    ELLEN MAXWELL-HOFFMAN
      BOWLES RICE
14    600 Quarrier Street
      Charleston, WV 25325
15    (304) 343-2867

16
      HOWARD B. IWREY
17    DYKEMA GOSSETT, P.L.L.C.
      39577 Woodward Avenue, Suite 300
18    Bloomfield Hills, MI  48304
      (248) 203-0526
19

20    JEFFREY L. KESSLER
      WINSTON & STRAWN, L.L.P.
21    200 Park Avenue
      New York, NY  10166
22    (212) 294-4655

23
      FRANKLIN LISS
24    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
25    Washington, DC  20004
      (202) 942-5000
```

```
 1   APPEARANCES: (Continued)
     For the Defendants:
 2
     CARL L. MALM
 3   CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
     2000 Pennsylvania Avenue NW
 4   Washington, D.C.  20006
     (202) 974-1959
 5

 6   MICHELLE A. MANTINE
     REED SMITH, L.L.P.
 7   225 Fifth Avenue, Suite 1200
     Pittsburgh, PA  15222
 8   (412) 288-4268

 9
     RONALD M. McMILLAN
10   CALFEE, HALTER & GRISWOLD, L.L.P.
     1405 East Sixth Street
11   Cleveland, OH  44114
     (216) 622-8621
12

13   STEFAN M. MEISNER
     McDERMOTT WILL & EMERY
14   500 North Capitol Street, NW
     Washington, DC 20001
15   (202) 756-8000

16
     MARK MILLER
17   BAKER BOTTS, L.L.P.
     1299 Pennsylvania Ave NW
18   Washington, DC 20004
     (202) 639-7714
19

20   W. TODD MILLER
     BAKER & MILLER, P.L.L.C.
21   2401 Pennsylvania Avenue NW, Suite 300
     Washington, DC  20037
22   (202) 663-7822

23
     BRIAN M. MOORE
24   DYKEMA GOSSETT, P.L.L.C.
     39577 Woodward Avenue, Suite 300
25   Bloomfield Hills, MI  48304
     (248) 203-0772
```

```
 1   APPEARANCES: (Continued)
     For the Defendants:
 2
     GARY MOUW
 3   VARNUM, L.L.P.
     333 Bridge Street NW
 4   Grand Rapids, MI 49504
     (616) 336-7000
 5

 6   GEORGE A. NICOUD, III
     GIBSON, DUNN & CRUTCHER, L.L.P.
 7   555 Mission Street
     San Francisco, CA  94105
 8   (415) 393-8200

 9
     KEITH PALFIN
10   WINSTON & STRAWN, L.L.P.
     200 Park Avenue
11   New York, NY  10166
     (212) 294-4743
12

13   JOSEPH E. PAPELIAN
     DELPHI CORPORATION
14   5725 Delphi Drive
     Troy, MI  48098
15   (248) 813-2535

16
     JOHN ROBERTI
17   ALLEN & OVERY, L.L.P.
     1101 New York Avenue, NW
18   Washington, DC  20005
     (212) 683-3682
19

20   MICHAEL RUBIN
     ARNOLD & PORTER, L.L.P.
21   555 Twelfth Street NW
     Washington, DC  20004
22   (202) 942-5094

23
     LARRY J. SAYLOR
24   MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
     150 West Jefferson Avenue, Suite 2500
25   Detroit, MI  48226
     (313) 496-7986
```

```
1    APPEARANCES: (Continued)
     For the Defendants:
2
     SCOTT T. SEABOLT
3    SEABOLT LAW FIRM
     17199 N. Laurel Park Drive, Suite 215
4    Livonia, MI  48152
     (248) 717-1302
5

6    MICHAEL LEONARD SIBARIUM
     PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.
7    1200 Seventeenth Street, NW
     Washington, DC 20036-3006
8    (202) 663-9202

9
     PRIYA SRINVASAN
10   WHITE & CASE
     1221 Avenue of the Americas
11   New York, NY  10020
     (212) 819-2624
12

13   ANITA STORK
     COVINGTON & BURLING, L.L.P.
14   One Front Street
     San Francisco, CA  94111
15   (415) 591-7050

16
     JOANNE GEHA SWANSON
17   KERR, RUSSELL & WEBER, P.L.C.
     500 Woodward Avenue, Suite 2500
18   Detroit, MI  48226
     (313) 961-0200
19

20   JOHN TANSKI
     AXINN, VELTROP & HARKRIDER
21   950 F Street, NW
     Washington, DC 20004
22   (202) 912-4700

23
     LARA TRAGER
24   WEIL, GOTSHAL & MANGES, L.L.P.
     767 Fifth Avenue
25   New York, NY  10153
     (212) 310-8281
```

```
 1   APPEARANCES: (Continued)
     For the Defendants:
 2
     MICHAEL F. TUBACH
 3   O'MELVENY & MYERS, L.L.P.
     Two Embarcadero Center, 28th Floor
 4   San Francisco, CA  94111
     (415) 984-8700
 5

 6   LINDSEY ROBINSON VAALA
     VINSON & ELKINS, L.L.P.
 7   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, DC  20037
 8   (202) 639-6585

 9
     A. PAUL VICTOR
10   WINSTON & STRAWN, L.L.P.
     200 Park Avenue
11   New York, NY  10166
     (212) 294-4655
12

13   OTHER APPEARANCES:
     Non-Party Original Equipment Manufacturers:
14
     ELLIOT H. SCHERKER
15   GREENBERG TRAURIG, L.L.P
     3333 Piedmont Road NE, 25th Floor
16   Atlanta, GA  30305
     (678) 553-2100
17

18   DOMINIC SURPRENANT
     QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.
19   865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
20   (213) 443-3000

21

22

23

24

25
```

1   TABLE OF CONTENTS

2                                                   Page

3   Report of Master..................................13

4   Status Conference.................................14

5   <u>Motion Hearings</u>
         Direct Purchaser Plaintiffs' Motion to
6        Exclude  Portions of the Expert Report and
         Opinions of Kevin McCloskey.....................38

7

8   <u>Fairness Hearings</u>
         Direct Purchaser Plaintiffs' Motion for
9        Final Approval of Proposed Settlement with
         Minebea Defendants and Award of Attorneys'
10       Fees and Litigation Costs and Expenses..........84

11  Truck and Equipment Dealer Plaintiffs'
         Motion for Final Approval of Proposed
12       Settlement with Mitsubishi Electric and Award
         of Attorneys' Fees and Reimbursement of
13       Litigation Costs and Expenses...................98

14

15

16

17

18

19

20

21

22

23

24

25

STATUS CONFERENCE / MOTION HEARINGS / FAIRNESS HEARINGS

**13**

```
 1 │ Detroit, Michigan
 2 │ February 28, 20189
 3 │ At about 10:03 a.m.
 4 │                         —   —   —
 5 │          (Court and Counsel present.)
 6 │          THE CASE MANAGER:  Please rise.
 7 │          The United States District Court for the Eastern
 8 │ District of Michigan is now in session, the Honorable
 9 │ Marianne O. Battani presiding.
10 │          You may be seated.
11 │          The Court calls Case No. 12-md-02311,
12 │ In Re: Automotive Parts Antitrust Litigation.
13 │          THE COURT:  Thank you, Kay.  Good morning.
14 │          THE ATTORNEYS:  (Collectively) Good morning.
15 │          THE COURT:  We ordered this nice weather compared
16 │ to all of our snow for you, so I was glad to see that.  I got
17 │ a little worried the last few weeks but we're okay.
18 │          All right.  Let's start with the report from the
19 │ Special Master.  Mr. Esshaki?
20 │          MASTER ESSHAKI:  Yes, Your Honor.  Thank you very
21 │ much.  Good morning, everybody.
22 │          I can report that the motions before the Special
23 │ Master seem to be dwindling, which is a good thing, and I
24 │ think that's a natural occurrence of the fact that we have
25 │ handled as of yesterday 78 of those, and in so handling them,
```

1   we have expressed the views of how we will handle those style

2   motions so they can be used for precedent when they come up

3   in other cases.  So that I believe is the reason that the

4   motions are dwindling down.

5          Yesterday, as I said, we handled motion number 78,

6   the Denso motion, we made a ruling on that, the order is to

7   follow.  I'm aware that there was a motion to compel Tokai

8   Rika to produce -- or discovery against Tokai Rika which has

9   been held in abeyance or withdrawn.  I am not aware of any

10  other motions that have been currently filed.

11         Has anyone on any other motions that I'm not aware

12  of that have been filed for consideration by the Master?

13         (No response.)

14         MASTER ESSHAKI:  I don't think so, so that's the

15  extent of it, Your Honor.

16         THE COURT:  Okay.  Does anybody have any questions

17  or comments for the Master?

18         (No response.)

19         THE COURT:  All right.  Thank you much.

20         The next item is the status of the settlements.

21  Good morning.

22         MS. SALZMAN:  Good morning, Your Honor.

23  Hollis Salzman for the end payor plaintiffs.

24         I'm pleased to report the indirect purchaser

25  plaintiffs, that is the end payors and the auto dealers,

1  we've been working very hard in the case, working through

2  discovery issues, but we also are pleased to present that we

3  have since the last status conference 22 new settlements.

4  Some of those are not yet public but we will be filing

5  preliminary approval papers with the Court we hope in short

6  order.  That brings the number of cases that are fully

7  settled up to 28.

8        THE COURT:  I'm sorry.

9        MS. SALZMAN:  28, leaving 13 cases remaining to be

10 fully settled.  Of those 13 cases, those cases all have at

11 least one settling defendant, and ten of those cases only

12 have a single defendant remaining in them.  We currently have

13 only ten remaining defendants in the indirect purchaser

14 plaintiff cases.

15        And we -- just skipping to the next bullet point on

16 your agenda to round it out, we have been working, the

17 indirect purchaser plaintiffs and the defendants, the ten

18 remaining defendants, have been working diligently with the

19 Settlement Master exchanging the necessary discovery or

20 working through issues to exchange the necessary discovery

21 and to tee those cases up for mediation.

22        THE COURT:  Let me see if I understand this.  As to

23 the end payors --

24        MS. SALZMAN:  Yes.

25        THE COURT:  -- you have in total ten remaining

1   defendants?

2          MS. SALZMAN:  Correct.

3          THE COURT:  In how many parts?

4          MS. SALZMAN:  In 13 cases.  Some of those

5   defendants are in multiple cases.

6          THE COURT:  And you are working with the --

7          MS. SALZMAN:  We are working with the

8   Settlement Master, Judge Weinstein.  Not all the cases are

9   mediated with him.  If the parties want to use another

10  mediator, we do so, but it all gets coordinated through his

11  office.

12         THE COURT:  Okay.  And as to the auto dealers?

13         MR. BARRETT:  Good morning, Your Honor.  This is

14  Don Barrett for the auto dealers.

15         We work hand in hand with the end payors and have

16  for -- since this case started as far as settlements are

17  concerned, and everything that Hollis said is correct.

18         The only thing that I would add is that there is

19  one defendant that sticks out, and that's Toyoda Gosei.  They

20  are the sole defendant in six of the remaining cases.  And

21  they -- I don't know, it seems like when I was a little boy

22  and I fished a lot, there was -- you know, we had cricket

23  boxes in the south, and it always seemed like the last two or

24  three crickets were the hardest ones to catch, but we always

25  did.

1        THE COURT:  All right.  Defendants, do you hear

2    that?  Who is the cricket in here?  I don't know.  Okay.

3    Thank you.

4        MS. SALZMAN:  Thank you, Your Honor.

5        THE COURT:  Thank you very much.

6        MR. KANNER:  Good morning, Your Honor.

7    Steve Kanner on behalf of the direct purchaser plaintiffs.

8        I'm pleased to tell the Court that we are currently

9    concluding settlements, some of which have been sitting

10   around for a little too long, and by -- what I mean when I

11   say concluding, it involves the fine points of the settlement

12   agreement, things like cooperation clauses, production of

13   additional materials at trial, if that's necessary.

14       Nonetheless, Your Honor, these three settlements,

15   and that doesn't include the one that was submitted to the

16   Court yesterday, that was with respect to Tokai Rika, we

17   filed a motion for preliminary approval which effectively

18   concludes the active OSS litigation.  I say effectively

19   because, of course, Takata is in bankruptcy, and our

20   colleagues have been active with the bankruptcy court and in

21   perfecting our claim, and we do expect the class to receive

22   some benefit as a result of our activity in the bankruptcy

23   court.  So OSS seems to be, with the exception of the

24   bankruptcy matter, off the books.

25       Now, with respect to the settlements --

```
 1            THE COURT:  Do you have some exception in the
 2   bankruptcy court to continue this action or discussions
 3   with --
 4            MR. KANNER:  We have.  We filed a claim, we are
 5   discussing this with Tokai Rika bankruptcy counsel.
 6            THE COURT:  Takata.
 7            MR. KANNER:  Takata's bankruptcy counsel.  Excuse
 8   me.
 9            THE COURT:  Okay.
10            MR. KANNER:  And I do -- I'm optimistic with
11   respect to the amount, I don't know, but there will be some
12   benefit to the class.
13            THE COURT:  Okay.
14            MR. KANNER:  Now, the settlements I was referring
15   to, the three additional settlements, they cover nine
16   separate cases, and we are truly in the final settlement
17   stages of concluding any agreements that are out there, and I
18   expect to report to the Court -- I expect the Court to hear
19   from us certainly within the next few weeks as motions for
20   preliminary approval are filed.
21            THE COURT:  All right.  Now, there I know was a
22   requirement that directs submit dates for mediation on all
23   parts.  How is that?
24            MR. KANNER:  Indeed, Your Honor.  Judge Weinstein
25   created a new sense of urgency which has created a momentum
```

```
 1  to remove the remaining cases into that posture.  And that
 2  includes all cases with live complaints that have been served
 3  or otherwise not subject to binding arbitration.  And we are,
 4  in fact, in multiple discussions with multiple defendants to
 5  coordinate those dates.  I believe March 16th or 17th is our
 6  deadline to get back to Judge Weinstein and report on who we
 7  are going to be mediating before, the dates and related
 8  information.  So we are moving ahead.
 9           THE COURT:  Thank you.
10           MR. KANNER:  Thank you very much, Judge.
11           THE COURT:  A little faster, please.
12           MR. KANNER:  Well, that's right.  It is -- actually
13  it is much faster now with these --
14           THE COURT:  It is moving faster now.
15           MR. KANNER:  Thank you.
16           THE COURT:  Okay.
17           MR. PARKS:  Good morning, Your Honor.
18           THE COURT:  Good morning.  TEDs.
19           MR. PARKS:  Manly Parks, from Duane Morris, on
20  behalf of the truck and equipment dealer plaintiffs.
21           We have three truck and equipment dealer plaintiff
22  cases with claims remaining.  One of those three cases is
23  occupant safety systems, and the claim relates to Takata, and
24  as Your Honor knows, that's bound up in the bankruptcy
25  proceeding, and we are, as other plaintiffs' counsel in the
```

```
 1    other classes, are involved in those discussions and

 2    perfecting our claims there and that will take its course.

 3              With respect to radiators, one of the two other

 4    remaining cases, we have reached an executed settlement

 5    agreement with Mitsuba, and we will be filing a motion for

 6    preliminary approval of that settlement with the Court.  What

 7    we are hopeful of doing, and we have ongoing settlement

 8    discussions with the last remaining defendant in radiators,

 9    and should we be able to reach a settlement there, ideally

10    we'll be able to present the Court with a motion for

11    preliminary approval of those two settlements together, and

12    that's becomes important from the perspective of trying to

13    mitigate the cost of notice, which are significant given the

14    size of the potential class here, and to the extent that we

15    can bundle those notices together, we will try to do that.

16              That leaves starters and alternators, which we

17    think of as kind of a single case for discussion purposes and

18    administrative purposes.  There are two remaining defendants

19    there, and we have ongoing active settlement discussions with

20    the involvement of the mediators as to both defendants there.

21    So in sum, we have four total remaining defendants in three

22    parts cases.

23              THE COURT:  Four defendants in three parts.  Okay.

24              MR. PARKS:  And one of those four defendants is

25    Takata, so that's kind of a special case.
```

```
 1            THE COURT:  And you are mediating or have dates

 2   for --

 3            MR. PARKS:  We are actively involved with the

 4   mediators.  We -- as to one of the three defendants, putting

 5   aside Takata, we have not had a mediation that I would

 6   describe as a hearing but rather it was a full briefing of

 7   the positions.  As to the other two, we've been moving

 8   forward sufficiently, I guess, in the judgment of the

 9   mediators, with our sort of offers and demands process that

10   they haven't seen fit yet to schedule a mediation because the

11   conversations continue to be moving forward at a reasonable

12   pace, although we do give reports to the mediators probably

13   every two weeks or so on where things stand and whether the

14   ball continues to move forward or not, so they are actively

15   monitoring.  And we are working with Jed Melnick and Simone

16   Lelchuk from Judge Weinstein's team on those.

17            THE COURT:  Okay.  Thank you very much.

18            MR. PARKS:  You're welcome.

19            THE COURT:  Thank you.  Those were very good

20   reports.  I also appreciate the written report.  Who is doing

21   this again?

22            MR. SHEPARD:  Good morning, Your Honor.

23            THE COURT:  Good morning.

24            MR. SHEPARD:  My name is Steven Shepard with the

25   firm Susman Godfrey.
```

```
 1              On behalf of end payor plaintiffs, we are grateful
 2     to the Court for recent approvals of the preliminary approval
 3     motions that had been filed.  We know how busy the Court is,
 4     and we saw that five of the seven that were outstanding were
 5     entered in just the last few days.
 6              We're happy to report that the round three notice
 7     motion has been unopposed by the 32 round three defendants
 8     who are in the motion, and we look forward to getting started
 9     soon on the notice program, which, as Your Honor will have
10     seen, is closely modeled on the programs previously approved
11     by the Court for round two and round one.
12              THE COURT:  Okay.  You had a date of August 18th?
13              MR. SHEPARD:  We had proposed the fairness hearing
14     for August 1st, Your Honor.
15              THE COURT:  August 1st.  Okay.  Thank you.
16              MR. SHEPARD:  Thank you, Your Honor.
17              THE COURT:  All right.  Very good.  Thank you.
18              And Randall Weill?
19              MR. WEILL:  Yes, Your Honor.
20              THE COURT:  You've done the reports?
21              MR. WEILL:  Yes, Your Honor.
22              THE COURT:  Coordinated it anyway, right?
23              MR. WEILL:  Coordinated, right.  I think everybody
24     here has contributed immensely to putting those together so
25     it is a joint effort by all counsel.
```

```
 1          THE COURT:  I appreciate it.  Thank you very much.
 2   They are very helpful.  Thank you.
 3          MR. WEILL:  Thank you.
 4          THE COURT:  I try to remember all of this but I
 5   don't.  Now I know I have to look at a paper before I say
 6   anything to make sure I am on the right part and right
 7   settlement.  Okay.
 8          MR. SHEPARD:  Your Honor, if I may, Steve Shepard
 9   again.
10          I was prompted by my co-counsel to ask to confirm
11   if August 1st would work for the Court's calendar so we could
12   plan on the fairness hearing on that date.
13          THE COURT:  Let me just take a look at that.
14          MR. SHEPARD:  Thank you, Your Honor.
15          THE COURT:  Okay.  August 1st is a Wednesday.  Is
16   there any possibility -- I don't know the days -- to do it in
17   July -- wait a minute.  How's July 26th, or would that not be
18   enough days -- enough time?
19          MR. SHEPARD:  Let me take a moment and confer with
20   the other counsel who would like to be present, Your Honor.
21          THE COURT:  Yes.
22          MS. SALZMAN:  Good morning, Your Honor.
23   Hollis Salzman.
24          If it is at all possible if we could have a couple
25   of dates that would work for your schedule and then we can
```

1    check with the notice provider because we just want to make

2    sure that the publications and the time for the class members

3    to be noticed work with the fairness date.

4           THE COURT:  Have you already verified that for

5    August 1st?

6           MS. SALZMAN:  We have.

7           THE COURT:  Let's keep it August 1st.

8           MS. SALZMAN:  Okay.  Thank you.

9           THE COURT:  We will keep August 1st.

10          MS. SALZMAN:  Thank you, Your Honor.

11          THE COURT:  Okay.  Status of scheduling orders.

12          MR. REISS:  Good morning, Your Honor.  Will Reiss

13   for the end payor plaintiffs.

14          THE COURT:  Good morning, Mr. Reiss.

15          MR. REISS:  Good morning.  So approximately a month

16   ago end payor plaintiffs, in conjunction with the other

17   plaintiffs groups, began reaching out to defendants in nine

18   separate cases to start the process of scheduling the 26(f)

19   discovery conferences.  We also sent each of the non-settling

20   defendants draft protective orders, a proposed discovery plan

21   and the various documents that Your Honor has reviewed and

22   ordered in numerous cases.

23          Unfortunately, to our frustration, there has been

24   quite a bit of pushback from the defendants.  There has been

25   a few exceptions.  But we are getting pushback that, for

 1    instance, direct purchaser plaintiffs and some of the other

 2    plaintiffs are in different time frames in terms of when they

 3    filed their cases and some have motions to dismiss that are

 4    pending. And from the perspective of end payor plaintiffs,

 5    and I think automotive dealers are also on the same track as

 6    we are, we very much want to move forward with these cases.

 7    I know Your Honor during the last status conference urged us

 8    to move forward. Typically these documents take months to

 9    negotiate, and we are not even dealing with getting

10    defendants' documents.

11          So, again, we are doing everything in our power. I

12    think we have some meet and confers scheduled with some of

13    these defendants, but if we still continue to get resistance,

14    we will likely be filing motions to compel to really move

15    forward with this.

16          THE COURT: Well --

17          MASTER ESSHAKI: Did I mention I'm slow?

18          MR. REISS: Well, we heard, so we wanted to try to

19    fill your plate again.

20          THE COURT: Yeah. You need to move forward on

21    this, so why don't you do your motions to compel in the next

22    30 days if you don't get some resolution. All right. I

23    would rather that they be before the Master and have it set

24    than to be delayed any longer.

25          MR. REISS: Yes, Your Honor. We will do that.

1  Thank you.

2           THE COURT:  Uh-huh.

3           MR. SPECTOR:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MR. SPECTOR:  Eugene Spector on behalf of the

6  direct payor plaintiffs.

7           THE COURT:  How are you, Mr. Spector?

8           MR. SPECTOR:  Fine.  Thank you, Your Honor.  And

9  you?

10          THE COURT:  Good.

11          MR. SPECTOR:  In terms of the scheduling orders, we

12 are working with the end payors and the auto dealers to try

13 to get that done.  We have a few cases where we're on our

14 own, and we are dealing with those where we now are getting

15 service.  We have arbitration issues where we are getting

16 pushback on trying to schedule conferences, but we will

17 within the next 30 days get the process fully started with

18 all of those cases and see where we can move them along.

19          THE COURT:  Okay.

20          MR. SPECTOR:  All right.

21          THE COURT:  Keep that 30 days, so we will need to

22 push the end of this to get going.

23          MR. SPECTOR:  All right.  We will, Your Honor.

24          THE COURT:  I'm getting anxious.  We are either

25 going to settle it or we are going to have a trial and start

1    something so we can see where this goes, seriously.

2             MR. SPECTOR:  Fair enough.

3             THE COURT:  I'm not kidding you.

4             MR. SPECTOR:  Thank you, Your Honor.

5             THE COURT:  All right.

6             MR. PARKS:  Your Honor, last time we were here I

7    spoke about the two cases where we are -- the truck and

8    equipment dealers were taking the lead on the scheduling

9    orders.

10            Radiators was one.  That's now been resolved.  That

11   scheduling order is in place.  As I mentioned, we really have

12   one defendant remaining in that case in any event with active

13   settlement discussions, but that's in place.

14            The other is the starters and alternators matter.

15   We have circulated to the direct purchasers, who we believe

16   are also in that matter, a draft scheduling order.  Once we

17   have their input, to the extent that they have some on that,

18   we will get that out, and our intention is to do that within

19   a week or so and get that out to the two defendants that

20   remain in that case for us.  And there may be other

21   defendants in that case for the directs, I just don't know

22   yet.  But we are moving forward with that, and we understand

23   it is a priority for the Court.

24            THE COURT:  Good.  That's good.  All right.  The

25   next is the date for the status conference.  We have a status

1    conference filed -- schedule already for June 6th, and I

2    think you know about that.  And I was thinking the next one

3    would be September 26th.  September 26th, does anybody --

4    does that ring a bell to anybody?  Anything else planned?

5              MR. BARRETT:  Did you say the 25th or 26th?

6              THE COURT:  The 26th.  Now, what I have to tell you

7    is we will not be in this courtroom but I don't know where we

8    will be.  They are doing, as you can see from the hallways,

9    re -- it is really the HVAC system in here that's going to be

10   redone, but the whole floor will be closed off for probably

11   the next six months.  So it will be these two conferences.

12   Obviously we are well aware we need a courtroom that's

13   larger.  If we can't get a courtroom, if we can't, we will be

14   down on the first floor.  There is a room called the

15   Detroit Room, which is like a big conference room but I think

16   it would do fine for us, and so we will go down there.  But

17   we will notify you in the next agenda.  I just would like to

18   tell you so in case you don't look at the agenda, please look

19   for where you are going to come because you will not be able

20   to get on this floor.

21             MASTER ESSHAKI:  Your Honor, can we just confirm

22   6/5 and 9/25 would be the Master's motion day?

23             THE COURT:  Yes.

24             MASTER ESSHAKI:  Thank you.

25             THE COURT:  All right.  Is there anything else?

1    MS. CASTILLO:  Good morning, Your Honor.  Elizabeth

2  Castillo for the end payor plaintiffs.

3    I believe we skipped over Section 2-C.

4    THE COURT:  The update on -- yes, we did.

5    MS. Castillo:  So for the end payor plaintiffs,

6  we've received all the DOJ productions from the defendants in

7  the later cases, except I would like to point out that two

8  defendants, Panasonic and Maruyasu, haven't produced their

9  DOJ productions to us.  And I followed up with counsel for

10  these defendants, and they've declined to produce their DOJ

11  productions to us.

12    Panasonic, as you know, did not plead guilty with

13  respect to AC systems, but Panasonic did plead guilty with

14  respect to switches, steering angle sensors and HID ballasts.

15  So we would like the Court to order Panasonic to produce the

16  DOJ docs relating to AC systems to plaintiffs.

17    And with respect to Maruyasu, Maruyasu hasn't pled

18  guilty but it has been indicted, its U.S. subsidiary has been

19  indicted as well, and I believe four executives have been

20  indicted, so we would like Maruyasu's DOJ production.

21    THE COURT:  Okay.  I think we have a defendant

22  here.

23    MR. KESSLER:  Good morning, Your Honor.

24  Jeffery Kessler, and I will speak for Panasonic.

25    First of all, Your Honor, I'm very surprised to

1    hear this because on this particular issue we had proposed a

2    meet and confer with the plaintiffs about this, and they have

3    yet to schedule a meet and confer, and it is very unusual to

4    have it presented not only before the meet and confer but it

5    would go to the magistrate if there was a dispute, but

6    instead we find ourselves here in open court discussing this.

7        Having said that, just so Your Honor understands

8    what the issue is, Your Honor issued an order which was very

9    clear and specific.  It said that there were a group of

10   identified cases, including air conditioners, which we are

11   in, and the Court then said the following -- let me just get

12   the correct language, please.  This is from page 4 of Your

13   Honor's order.  The Court orders all defendants -- this is

14   paragraph 3 -- named in air-conditioning systems and then a

15   variety of other cases that have entered a guilty plea in

16   connection with the products at issue in these cases, the

17   named cases, to produce their DOJ production in those cases.

18       Panasonic's situation is it has never entered into

19   a guilty plea in any of these cases, including air

20   conditioners.  What it has done is it had guilty pleas in

21   other cases for which we have previously produced years ago

22   all of our DOJ productions in those cases.

23       So we settled switches, we produced all of our

24   production in switches, we did that earlier.

25       With respect to air conditioners, we informed

```
 1   plaintiffs we have no guilty plea and therefore there is
 2   nothing for us to produce with respect to air conditioners.
 3   I think we are very clearly in compliance with the Court's
 4   order, but in any event, if they wish to discuss this
 5   further, we should have a meet and confer, and if there is an
 6   issue for the magistrate, it could be presented there, but
 7   there really should be no dispute given the terms of the
 8   Court's order.
 9             THE COURT:  Okay.
10             MR. KESSLER:  Thank you.
11             THE COURT:  Let me hear a response.  Okay -- oops,
12   go ahead, another defendant.
13             MS. COLE:  Good morning, Your Honor.  Eileen Cole
14   with White and Case on behalf of Maruyasu.
15             As counsel for the EPPs pointed out, Maruyasu has
16   not pled guilty, and there has not been, according to the
17   order -- the order requires Maruyasu and other defendants to
18   produce the documents that have entered a guilty plea in
19   connection with the products at issue in the case or for
20   which there has been an announcement of such a plea agreement
21   by DOJ.  Neither has occurred with respect to Maruyasu.
22             The criminal case is currently pending before
23   Judge Dlott in the Southern District of Ohio, and all of the
24   deadlines in that case have currently been stayed until
25   April 23rd.
```

1    Your Honor, if and when any such action should

2    occur, we certainly would produce any documents that we have

3    or have -- that we have provided to the division, but, Your

4    Honor, currently the order -- the terms in the order do not

5    apply to Maruyasu, and that's what we advised the EPP.

6    We are also similarly situated to Panasonic in that

7    there has been no meet and confer with the EPPs, and the EPPs

8    did not identify that this would be brought before Your Honor

9    instead of the magistrate.

10    Thank you, Your Honor.

11    THE COURT:  I didn't know that either, but we are

12    talking about the order of October 25th, 2017 that the Court

13    entered, and on the top of page 5, after it lists all of the

14    parts, it does say those defendants that have entered a

15    guilty plea in connection with the products at issue or for

16    which there has been announcement of such a plea.

17    So let's hear your response.

18    MS. CASTILLO:  So this issue previously came up

19    with -- I believe with respect to the Mitsuba and Koito

20    defendants.  And we brought the issue up before Special

21    Master Esshaki, and he ruled that Mitsuba and Koito were to

22    produce their DOJ productions to plaintiffs in all cases, not

23    just the ones that they pled guilty to.  So this issue has

24    come before the Special Master even if it relates to other

25    defendants, and I don't think Panasonic or Maruyasu here

```
 1  should have an excuse not to produce these to plaintiffs.
 2          With respect to --
 3          THE COURT:  Wait a minute.  Let's stop there.
 4  Mr. Esshaki?
 5          MASTER ESSHAKI:  Your Honor, I do not recall when I
 6  made that ruling, whether it preceded or was post your order.
 7          THE COURT:  Okay.
 8          MS. CASTILLO:  It was from November of 2015.
 9          THE COURT:  2016?
10          MS. CASTILLO:  '15.
11          THE COURT:  Oh, '15.
12          MS. CASTILLO:  It was a while ago.
13          MR. KESSLER:  Your Honor, there was an order three
14  years ago involving one defendant in a very specific set of
15  facts that the Special Master ruled upon.  Two years later
16  Your Honor entered this specifically negotiated order.  It
17  was presented to Your Honor by stipulation which specifically
18  said what was to be produced or not.  That is what we are
19  complying with.
20          THE COURT:  Okay.
21          MR. KESSLER:  We obviously are not looking at a
22  dispute for another defendant three years ago that has
23  nothing to do with your subsequent issued order.
24          THE COURT:  Here is what we are going to do.  I
25  want you to do your meet and confer and I want you to do that
```

 1   within the next 21 days, okay, so that's three weeks to give

 2   you time to do it, and then I want you to file a motion

 3   before Mr. Esshaki to resolve this.  He can go back and look

 4   at what he ordered if he believes it applies, he can look at

 5   what the Court ordered a couple years later, and we will get

 6   it resolved.  I would like to resolve it today but I don't

 7   recall that last order -- I mean the order that Mr. Esshaki

 8   did, and I think we need to give you an opportunity to meet

 9   and confer.

10          MS. CASTILLO:  Okay.

11          MR. KESSLER:  That's exactly the process we thought

12   would be followed, Your Honor.  Thank you.

13          MS. COLE:  Your Honor, I just would like to note

14   for the record that my understanding is that the earlier 2015

15   order dealt with a plaintiff where there was a plea agreement

16   on record or an announcement from the DOJ, and, again,

17   Maruyasu is not in that situation currently.

18          THE COURT:  Okay.

19          MR. REISS:  Your Honor, this is Will Reiss again

20   for the end payor plaintiffs.

21          Just for the record, Maruyasu and I had extensive

22   communications about this, and we even said that since this

23   wasn't resolved, we were going to file a motion to compel.

24   So the idea that we haven't met and spoken and addressed this

25   issue is not correct.  But we are happy again to communicate

```
 1    if there are additional issues to discuss, but it is our
 2    position that we have met and conferred.
 3             THE COURT:  I do want you to meet and confer.  As I
 4    said, I think the three weeks is sufficient time to set up a
 5    meeting, and after you meet and confer if you can't resolve
 6    it I would say within a couple weeks, let's say two weeks
 7    after, that you file a motion, and then Mr. Esshaki will set
 8    it for a hearing.
 9             MS. COLE:  Thank you, Your Honor.
10             MR. KESSLER:  Thank you, Your Honor.
11             THE COURT:  Okay.  Counsel?
12             MR. WEILL:  Your Honor, Randall Weill again.  Good
13    morning.
14             On behalf of direct purchasers, this is more of a
15    Greenshade report and request about this order that you
16    entered.  We have looked at the --
17             THE COURT:  We are talking about the October --
18             MR. WEILL:  The October order that you entered.  It
19    listed the cases that are in the agenda.
20             THE COURT:  Yes.
21             MR. WEILL:  We've looked it over and found that
22    there were some cases that the direct purchasers were not
23    part of at the time that the Court entered the order.  So
24    going through it and trying to figure out the status, what we
25    wanted to do was to ask the Court if it were possible, and
```

 1    certainly the defendants could comment, to allow the direct

 2    purchasers to be included with respect to the alternators

 3    case and the starters case because those I believe were

 4    limited to the truck dealer cases.

 5            There are some other cases that are subject to the

 6    order that direct purchasers are going to pursue once we've

 7    had an opportunity to have service conducted, and we are not

 8    asking for -- you know, we are not saying there is a dispute

 9    of any kind, but we will pursue that.  But we did also note

10    that there are some cases that not are listed in this report

11    that we would ask to be added, and let me identify those, and

12    to the extent I have listed cases for which productions have

13    already been made by guilty plea parties and we received

14    them, I apologize, but let me list them.

15            For anti-vibration rubber parts, I know that

16    Bridgestone and Toyo Tire pled guilty.  For ignition coils,

17    Diamond Electric pled guilty.  For power window motors,

18    Mitsuba pled guilty.  For switches, Panasonic and Omron plead

19    guilty.  And for valve timing control devices, Aisin Seiki

20    pled guilty.

21            And all we are saying is that if it is possible if

22    we could propose an order we would circulate to the

23    defendants that simply supplements what you issued in October

24    so that it includes the direct purchasers and some cases

25    where there are guilty pleas but we don't think there have

```
 1   been any productions made.  And if defendants indicate no,
 2   no, we've done this, then that's fine, we can sort that out.
 3             THE COURT:  Why don't you submit a proposed order
 4   to amend this order to add these defendants, and then the
 5   defendants can agree, object or whatever, and we will deal
 6   with that.  If they do, then that would go before the Master
 7   also in the timely fashion as the others.
 8             MR. WEILL:  Thank you very much, Your Honor.
 9             THE COURT:  Thank you for bringing that up.
10   Anything else on this October order?
11             (No response.)
12             THE COURT:  No.  All right.  Our next item is the
13   motion hearing.  Mr. Esshaki, you are free to stay but you
14   are also free to leave.
15             MASTER ESSHAKI:  Thank you very much, Your Honor.
16   It is good it see you.
17             MR. WEILL:  Your Honor, could we have a couple
18   minutes to set up and also to talk to defense counsel for a
19   moment?
20             THE COURT:  Yeah.  We can take a five-minute break.
21             MR. WEILL:  Thank you.
22             THE COURT:  We will just resume in five minutes.
23             THE LAW CLERK:  All rise.  Court is in recess.
24             (Court recessed at 10:37 a.m.)
25                       —   —   —
```

1        (Court reconvened at 10:45 a.m.; Court and Counsel

2        present.)

3            THE LAW CLERK:  All rise.  Court is again in

4    session.  You may be seated.

5            THE COURT:  Okay.  This is the direct purchaser

6    plaintiffs' motion to exclude portions of the expert report

7    and opinions of Mr. McCloskey.

8            MR. WEILL:  Randall Weill, this time arguing on

9    behalf of direct purchaser plaintiffs.

10           If I may approach the bench, I have a copy of a

11   couple -- of a single PowerPoint.

12           THE COURT:  All right.

13           MR. WEILL:  Sometimes PowerPoints aren't as legible

14   or responsive as I would hope.

15           THE COURT:  I had indicated to -- somebody had

16   asked me if anybody wanted to leave if you are not involved

17   in the motions, and you can feel free to leave or stay.

18   Okay.

19           Mr. Weill.

20           MR. WEILL:  First, thank you very much, Your Honor,

21   for hearing argument on this motion.  I think it is -- it

22   presents some important issues and I look forward for the

23   opportunity to explain what our views are with respect to

24   Mr. McCloskey's testimony.

25           Nate, could you put up the second slide, please.

```
 1          So if we go to page 2 of the handout, Your Honor,
 2   it is a recitation from Scrap Metals of the Daubert framework
 3   and legal standard that I know the Court is very familiar
 4   with this.  I just put this up here to start to talk about
 5   Mr. McCloskey's experience, and so sort of set that in the
 6   framework of what we are talking about.
 7          I think as the Court is aware, when we talk about
 8   his qualifications, it -- the Scrap Metals court says it
 9   requires knowledge, skill, experience, training or education.
10          So we know Mr. McCloskey spent his career in the
11   industrial distribution field.  His employers have been
12   involved in industrial distribution extensively.  When he
13   left his most recent employer, Command Industries, he started
14   a consulting business, and he self-describes his consulting
15   expertise as in the, quote, industrial distribution space,
16   closed quote.
17          So that's I think important when we talk about
18   automotive bearings and his opinions about automotive
19   bearings.  He doesn't say he's consulting or offering his
20   expertise with respect to automotive bearings.  For that
21   matter, he doesn't say he's offering his expertise with
22   respect to the manufacture of bearings.
23          I would also note that Mr. McCloskey in his
24   declaration appended what I think is a pamphlet in
25   attachment 4 from the Bearing Specialists Association that
```

1   describes a program that the Bearing Specialists Association

2   sponsors through I believe Southern Illinois University for

3   individuals to become verified bearing specialists.

4          Again, Mr. McCloskey indicates he's not a certified

5   bearings specialist, and so that I think informs us of -- at

6   least from our perspective, it informs the nature of his

7   testimony.

8          Finally, Mr. McCloskey has never testified as an

9   expert before so we don't have a track record of his being

10  qualified as an expert in a court proceeding or to look at

11  what his expertise was deemed as qualifying for purposes of

12  testimony.  So that piece is missing as well.

13         So I would like to move on then to the automotive

14  bearing piece of our argument, which, as the Court knows, is

15  the -- what we feel is the very significant issue for us.  If

16  I could start with putting a little perspective on the

17  automotive bearing field.

18         If you could go to the next slide, you will see

19  page 3 is the first page of the deposition testimony of a

20  Dina Gehlke [sic] at McGuire Bearings.

21         And could you go to the next page, please.

22         And this McGuire Bearings, as the Court knows, is

23  one of the class representatives in the case, and at her

24  deposition she testified, if you go to page 4, can you tell

25  me the types of bearings that McGuire sells?

 1          And she responded, we sell ball bearings, we sell

 2    roller bearings, automotive bearings, mounted bearings, and

 3    continues as to the type of bearings they sell.

 4          On the next page she said -- the question is, you

 5    mentioned automotive bearings.  What are you referring to

 6    when you say automotive bearings?

 7          Bearings used in autos.

 8          And then down lower in the page, when I say

 9    automotive bearings, a lot of manufacturers designate those

10    bearings in their catalogues as automotive bearings.

11          You go to the next slide, the first page of the

12    deposition of Mr. Steven McGuire at McGuire Bearings.  If you

13    go to page 70, the next page there, you will see on page 71

14    he responds to similar questions as to the types of bearings

15    that are sold by McGuire, which include many different kinds:

16    tapered roller bearings, ball bearings, also auto bearings.

17    And he continues to say you can't look at a bearing and say,

18    oh, this is an automotive bearing or this is an industrial

19    bearing because most bearings that are used in automobiles

20    are also used in other things.

21          And then he goes on in the next page, on page 8, to

22    say in response to a question about dimensions, he says it is

23    very -- let me read the question.  And would the size and

24    dimensions of the tapered roller bearing used for the

25    automobile be the same size and dimensions for the one used

1    for the speed reducer?

2          Yes, it very much could because these are our

3    standard parts where the standards have been set for a long

4    time, and multiple manufacturers manufacture the part and

5    normally there are just a lot of crossover between the two.

6          So in that context we obviously have a distributor

7    who sells industrial bearings but also automotive bearings.

8    We know that the defendants sell all types of bearings,

9    industrial bearings and automotive bearings.  In fact,

10   although there's some reference to the uniqueness of

11   customized bearings insofar as they relate to automobiles, if

12   you can turn the page, you will see here, this is one of the

13   exhibits from Mr. McCloskey's deposition, number 4256, this

14   is a little ad from SKF, one of the defendants, that is

15   obviously geared toward the replacement aspect of wheel hub

16   bearings.  Wheel hub bearings are for automobiles.  They are

17   a customized bearing for automotive use, but they aren't

18   unique bearings because they are -- they are available,

19   readily available.

20         And obviously if -- I have a 2007 Ford 500, great

21   car, but if I need a wheel bearing, I don't need to go to

22   Ford to get it.  I can get that wheel bearing, and SKF says

23   here on page 10, touting its expertise, our premium quality

24   hub bearings are manufactured using high-quality steel and

25   surface finishes, premiums seals, OE sensors, precision

1    manufacturing techniques, precise assembly balances.  Every

2    SKF premium hub is 100 percent tested to the actual OE

3    specifications per part number for fit, form and function,

4    and that means it will fit correctly and work correctly and

5    last as long as the original hub that came with the car when

6    it was new.

7           So clearly industrial and automotive bearings share

8    a supply chain commonality from both the defendants and the

9    distributors.  In fact, Mr. McCloskey indirectly confirms

10   that because in his testimony he talks about his expertise

11   because he served on a distributors' advisory council that

12   was put together by NTN.  It turns out this was a

13   distributors' advisory council for industrial bearings.  We

14   will get to that in a minute.

15          It turns out Mr. McCloskey says, well, there also

16   was an NTN distributor advisory council for automotive

17   bearings.  I didn't serve on that council but Command, his

18   employer, was a participant with NTN, and it just reinforces

19   this commonality of these bearings and their availability.

20          So turning to Mr. McCloskey.  As we have mentioned

21   in our submissions, Mr. McCloskey has no training in the sale

22   of auto bearings, he never sold an auto bearing, he never

23   responded to an RFQ for an automotive bearing.

24   Interestingly, he was aware of such an RFQ coming to him from

25   an automobile source manufacturer, apparently to Command, an

1    industrial distributor, for bearings.  It turned out that it

2    didn't go anywhere because they felt they couldn't respond

3    adequately, but the idea -- that idea that automotive

4    manufacturers will send an RFQ to an industrial distributor

5    speaks, in our view, volumes about the nature of bearings and

6    their uses, and they can be standardized bearings, they can

7    be customized bearings, but they can be had from all sources,

8    including distributors and certainly from all of the

9    defendants.

10            Now, we get to the bottom of Mr. McCloskey's

11   expertise I think with his testimony that says -- if we could

12   go to page 12 which is an excerpt from his testimony where he

13   says in response to a question -- the question:  So the

14   extent of your knowledge is that automotive OEMs use RFQs; is

15   that correct?  He says yes.

16            So we feel that Mr. McCloskey -- Mr. McCloskey's

17   experience is non-existent with respect to automotive

18   bearings, and that's the reason that we requested that those

19   portions of his declaration that relate to opinions about

20   automotive bearings should not be permitted to -- should not

21   be admitted because they simply aren't reliable because they

22   are not based on knowledge or experience.

23            Turning to manufacturing, Mr. McCloskey's

24   declaration contains numerous references to manufacturing and

25   the implications of manufacturing and what appears to -- he

1  appears to state the -- are the differences or the

2  difficulties manufacturing different types of bearings, yet

3  Mr. McCloskey was never involved in the manufacture of

4  bearings.  His knowledge on manufacturing appears to be based

5  solely on visits to NTN plants, most recent some five years

6  ago.  It's clear he has no access, had no access to any

7  internal financials of the manufacturers, so he has no

8  knowledge of how those -- what those costs are.  For example,

9  he doesn't know how they are allocated so he doesn't know

10  anything about how you amortize or price or allocate costs

11  for materials or tooling or labor or the treatments for

12  bearings or inventory compliance.  He simply doesn't have

13  that kind of background to offer those kinds of opinions.

14       With respect to markets, this is more specified in

15  terms of our concerns.  There are a couple of instances

16  where, first of all, Mr. McCloskey's experience appears to be

17  more generalized in nature, but, for example, when he talks

18  about Timken, he offers no basis for an opinion about the

19  majority of bearings that Timken sold are X, but he never

20  worked with Timken.  He may have knowledge about what Command

21  purchased from Timken, but that doesn't speak to what

22  Timken's experience is.  So we don't feel that -- and he

23  didn't look at any Timken data.  So that very narrow

24  perspective on what Command's experience with Timken is we

25  don't think serves as an adequate support for a broad

1    statement about what Timken, the nature of Timken's business

2    is.

3              Similarly, with respect to Chinese imports, he was

4    asked but gave no support or sources for his statements about

5    the percentages of bearings that were imported from China

6    over this time period.  Most significantly, he offers no

7    opinions or knowledge about what kind of bearings they were.

8    Were they high-quality bearings, which the defendants

9    certainly specialize in?  I -- and this is perhaps not the

10   best analogy, but I can think of needing a tool for some

11   purpose at my home, and depending on what it is, if I want

12   something cheap just to get the job done once, I might go to

13   Harbor Freight and I will get something that is made in China

14   and it is okay.  But if I want something to work on my

15   automobile, I would go to Sears and I would get a Craftsman

16   tool to do it because I know that's going to be reliable.

17             So there is a big distinction in terms of quality

18   in that respect that I think that analogy suggests is

19   important as well with respect to any discussions about

20   bearings that are imported from China.  Where Mr. McCloskey

21   cannot even tell us where he got this information, we would

22   ask that that data be stricken from his declaration.

23             Next, with respect to substitutions, this -- these

24   opinions in Mr. McCloskey's declaration appear to be used to

25   support a proposition by defendants that there has to be some

Case 2:12-md-02311-SFC-RSW ECF No. 1866, PageID.34914 Filed 03/29/18 Page 47 of 116
*STATUS CONFERENCE / MOTION HEARINGS / FAIRNESS HEARINGS*

47

1    kind of Precambrian bearing that's used as a benchmark for

2    all other bearings, and that if you have a notion of what the

3    price is for this Proto bearing, then that's the only way you

4    can tell an impact of price fixing on all other bearings.

5    That's not the direct purchasers' position and far from it.

6          We believe firmly that there are many types of

7    bearings.  As Mr. Kessler said at the class certification

8    hearing, they can be as small as a grain of rice, they could

9    be in a wristwatch, or they could be in a windmill or I think

10   his example was a Ferris wheel.  But those have to -- those

11   issues have to deal with the different sizes that are used

12   for a particular function, and that does not have anything to

13   say about what types of bearings are available from whom for

14   any particular source, and that goes to the heart of whether

15   a defendant or any of the defendants can make that bearing

16   for the Ferris wheel or the bearing for the wristwatch.  And

17   that's where the substitutions come down to the question of

18   are bearings -- is it possible to substitute bearings.

19         Now, Mr. McCloskey, if we go to page 14, this is

20   Mr. McCloskey's declaration, at paragraph 13, he says in the

21   highlighted portion, for the majority of applications,

22   however, bearings simply are not interchangable, meaning that

23   a buyer is unable to substitute one bearing for another

24   without the possibility of undesired changes in performances

25   and liability exposure.

1          Well, we have already seen as example the SKF
2   brochure with the little child in a baby seat saying we can
3   make a customized hub bearing that's going to protect your
4   child just the same as that original OEM part.
5          We believe Mr. -- in particular, that paragraph 13
6   statement by Mr. McCloskey is not reliable for a number of
7   reasons, including what we already described as his lack of
8   knowledge of manufacturing, so he can't really speak to the
9   capability of the defendants to produce a particular bearing
10  for a particular use.  He, as mentioned, is not familiar with
11  the term form, fit or function, was not apparently.  But it
12  is certainly used as a way to describe how bearings can be
13  used in different places.  He's never, as he testified,
14  worked with customers to decide an appropriate substitute
15  bearing, and as I mentioned at the beginning, he's not a
16  certified bearing specialist.
17         And I mentioned that attachment 4.  If you go to
18  page 15 of the handout, we will look at attachment or
19  appendix 4 to Mr. McCloskey's declaration, and this is the
20  brochure I mentioned.  And if we look on the first page, it
21  says in the highlighted portion the program is designed to
22  certify industry personnel as bearing specialists,
23  individuals with excellent knowledge in the selection,
24  application and analysis of bearings.
25         If you go to the next page, it has a description of

 1   the skill sets that are performed by bearing specialists,

 2   among them in the highlighting, of course, is the

 3   recommending interchanges and substitutions, identifying

 4   bearing type, application source, and manufacture, verifying

 5   bearing dimensions, match part numbers, justifying change to

 6   alternate bearings based on availability, service life and

 7   cost.

 8          So I'm not saying that Mr. McCloskey has to be a

 9   bearing certified -- a certified bearing specialist to

10   testify about bearings if he has the appropriate experience,

11   which he doesn't have.  But it is clear that someone who has

12   knowledge of bearings and is certified as such is well versed

13   in the adaptability of bearings for different uses and the

14   substitution of those bearings and the interchangeability of

15   those bearings.  And this is something that Mr. McCloskey

16   provided in connection -- in support of his declaration.

17          Next, Mr. McCloskey has a statement in his

18   declaration, if we could go to page 18, that I found rather

19   remarkable in that it is -- it's easy to overlook, but it

20   says that in this report the term performance will refer to a

21   bearing's ability to meet or exceed a buyer's expectation of

22   acceptable operating life.

23          Now, if this is the standard for someone who is

24   familiar with the bearings -- the substitution of bearings,

25   there is no expertise involved because the customer is the

1    expert, not the bearings specialist, certainly not the

2    certified bearings specialist.  This definition, in our view,

3    is not -- it's not a methodology, it's not scientific, it's

4    not reliable because it simply says I will give the customer

5    whatever he wants, and if it doesn't work, it's not my

6    problem.  He's not offering any expertise in that

7    conclusion -- in that definition.

8           And I will point out that that definition of

9    performance, although it appears in paragraph 19 and other

10   paragraphs, and I will name the paragraphs, 13, 27 and 33

11   through 36, you'll find that the term performance is used but

12   in its regular sense, not in the sense of what a customer

13   thinks about it but how it actually performs in usage to

14   determine whether a particular bearing is appropriate for

15   that particular use.

16          So we feel that that odd definition of performance,

17   in abnegation of any expertise in that respect, is, in

18   conjunction with his inexperience in actually working through

19   substitutions, a very telling aspect of his testimony that

20   suggests he should not be able to talk about substitutions or

21   to say that the vast majority of applications are not

22   interchangable.

23          In fact, and this is the part I find most

24   interesting, if we look at the references Mr. McCloskey cites

25   in the I think appendix 2 of his declaration, he's got a list

Case 2:12-md-02311-SFC-RSW   ECF No. 1866, PageID.34918   Filed 03/29/18   Page 51 of 116
STATUS CONFERENCE / MOTION HEARINGS / FAIRNESS HEARINGS

51

1    of citations.  He was asked what are these documents, and he

2    says these are reliable documents from manufacturers, and I

3    rely on -- I would rely on these documents, these are

4    reliable documents.

5         So I looked through these documents, and if we

6    start -- because you don't get a sense of them, let me pull

7    them to show you what we are talking about here.

8         So if we could start with page 19.  So page 19 is

9    the first page of a document that's call SKF Bearings Master

10   Interchange.  And if we turn to the second page, you will see

11   there on page 20 a little statement that says this catalogue

12   is presented in a simple to use sequence similar to a

13   dictionary listing.  So it is -- to me it is like a telephone

14   book.  If I know a particular bearing, and they have a list

15   of abbreviations at the beginning that show that some 400

16   types of bearings that are listed here so I can go to that

17   particular bearing, a Koyo bearing, and then I go next to the

18   Koyo bearing and there is the SKF equivalent.

19        So this is one example of how the defendants spend

20   considerable resources explaining how their bearings can be

21   used to replace other bearings -- other manufacturers'

22   bearings.  In fact, at the bottom of page 20 -- on the bottom

23   of page 20 it says, note, interchanges listed here will

24   provide a fast conversion of manufacturer or competitor

25   numbers to the SKF equivalent.

1    So that is pretty much it.  The dictionary provides

2  a fast conversion.  It is a tool that certainly someone

3  familiar with bearings would be able to use.

4    So then we -- I will go to the next reference.

5  This is a little heftier.  This is another SKF reference, and

6  this takes a little more time to go through but --

7    THE COURT:  I'm glad you are not submitting those

8  into evidence.

9    MR. WEILL:  I thought the Court might appreciate

10  that, but you have to enjoy, you know, this looks official.

11    Anyhow, if we go to page 22, I'm guessing, yes, we

12  will see here an interesting statement that says as far as

13  SKF is concerned, experience has shown that the requirements

14  of the vast majority of bearing applications can be met using

15  bearings with these standardized dimensions.

16    So here is a document that Mr. McCloskey relies on,

17  and it says pretty specifically something that appears to be

18  directly a contrast of his statement that the vast majority

19  of applications are not interchangable, but that's not all.

20  That's SKF.

21    We move on to NTN, another defendant, page 23, ball

22  and roller bearings, another reference source.

23    If we go to slide 24, we have a statement or a

24  couple of statements that I find very interesting.  It talks

25  about the characteristics of rolling bearings, and it says

 1    rolling bearings come in many shapes and variables, each with

 2    its own distinctive feature.  However, when compared with

 3    sliding bearings, those are like plain bearings that just go

 4    on the edge of a shaft and that don't have balls or rollers.

 5    Rolling bearings have the following advantages.  And I've

 6    highlighted item 2 because I thought that most interesting.

 7    They are internationally standardized, interchangable and

 8    readily obtainable.

 9         Now, that's significant because of what the

10    statement on -- the next highlight statement says at

11    paragraph 1.3.4.  It says the boundary dimensions and shapes

12    of bearings conforming to international standards are

13    interchangable and can be easily -- obtained easily and

14    economically over the world over -- over the world over.  It

15    is therefore better to design mechanical equipment to use

16    standard bearings.

17         Now, I thought that was interesting because if we

18    go to slide 25, we have a snapshot of a page from the

19    Command -- a Command website, Command being Mr. McCloskey's

20    employer for some ten years where he was, I believe, a senior

21    vice president, and it says a number of things about his

22    business.  But the one I thought most interesting was at the

23    bottom of the page, which is underlined in red, which says,

24    in extract, our core business lies in the supply and

25    application of standard components.  So in contrast to the

1    idea that there are a vast majority of applications that are

2    not interchangable, Mr. McCloskey's own employer prided

3    itself on providing its customers the ability to use

4    bearings, standard bearings in order to ensure that its

5    business -- that they could offer value to its customers and

6    reduce their costs.

7           Now, finally another document that Mr. McCloskey

8    cites is an NSK document, and if we turn to page 26, there

9    you go, there's the cover page.  If we turn to page 27 and

10   then 28, I highlighted in the table of contents where the

11   catalogue shows for each of the type of bearings that there

12   are interchanges for those bearings that are provided by NSK.

13   So, for example, ball bearings, and we talk about single road

14   deep grove ball bearings.  Well, the interchange is on

15   page B2.  For double row angular contact ball bearings, the

16   interchange is on page B24, and so on.  It goes into

17   cylindrical roller bearings, spherical roller bearings,

18   tapered roller bearings, as the Court can see.

19          And then if we go to page 29, and I thought this

20   was perhaps the most interesting part of this catalogue, and

21   it is a flow chart.  And if the Court were to look at this --

22   if we start, for example, at the top, it says -- my copy is

23   hard to read so I'm going to go to the catalogue here.  At

24   the top it says extract failed bearing.  Question one, does

25   the bearing have a destination?  No.  So you go to the right

 1   and it says, determining the basic bearing type, ball,

 2   roller, et cetera.  Measure the basics, and then go to NSK

 3   and ask for a quote.  Obtain the bearing once you have the

 4   quote.  And then at bottom it says fit new NSK bearing.

 5        Well, if we go back to the top of the flow chart

 6   and we ask does the bearing have a designation, you say yes.

 7   Does it have an NSK reference?  Let's say yes.  We go to the

 8   left, it says get a quote at.  And at the bottom it says the

 9   same thing, fit new NSK bearing.

10        Well, if it doesn't have an NSK reference, you

11   identify the bearing designation.  Does the designation have

12   an interchange in this section of the book?  If it does, you

13   find it, the bottom result, fit new NSK bearing.  If it

14   doesn't have a designation on the interchange, it says

15   consult the NSK -- an NSK authorized distributor, and then

16   you are going to get a quote from NSK and it is going to

17   result in fitting the new NSK bearing.

18        So, you know, these documents that Mr. McCloskey

19   put together clearly indicate that the statement -- that a

20   vast majority of applications are not interchangable is not a

21   reliable statement.

22        If we could go to the last page, that brings us to

23   where we feel that the Scrap Metal court tells us that

24   Mr. McCloskey cannot either provide -- that his testimony is

25   based on sufficient facts or data or uses reliable principles

     1   and methods, and whether -- and it doesn't show he's applied

     2   those principles and methods reliably to the facts of the

     3   case.

     4            And for those reasons, Your Honor, we submit that

     5   we believe Mr. McCloskey's testimony with respect to the

     6   topics we have described, not all of the topics in his

     7   declaration but with respect to those topics is not

     8   admissible, it is not reliable, and therefore should not be

     9   permitted.

    10            THE COURT:  All right.

    11            MR. WEILL:  Thank you very much, Your Honor.

    12            THE COURT:  Thank you.  Response?

    13            MR. PALFIN:  Your Honor, Keith Palfin from Winston

    14   & Straun for the JTEKT defendants, and I will be arguing on

    15   behalf all of defendants.

    16            We might just need a minute to get the slides set

    17   up.

    18            Your Honor, I have some hard copies, if I may

    19   approach.

    20            THE COURT:  All right.  Thank you.

    21            MR. PALFIN:  If we can go to the first slide.  My

    22   apologies, Your Honor.  I think we are having some technical

    23   difficulties.

    24            Your Honor, the experience that Mr. McCloskey has

    25   accumulated in his 40 years in the bearings industry renders

1    him well qualified to testify on all of the topics in his

2    report, and that is especially the case because his

3    testimony, his report consists of basic industry facts, and

4    those facts are corroborated by the record in this action as

5    I will show in subsequent slides.

6         And the courts are crystal clear, particularly in

7    the Sixth Circuit, that where you have an expert who has

8    relevant expertise that challenges like plaintiffs to the

9    breadth of that expertise go to the weight the factfinder

10   gives to his testimony, not to its admissibility.

11        So if we go to the next slide.  And so here is the

12   basic standard for measuring expert testimony: it has to be

13   relevant and reliable.  I think that's undisputed so I am

14   just going to go to the next slide.

15        So the question here, because they are challenging

16   his qualifications and they are solely challenging therefore

17   the reliability of his testimony, the question is how do you

18   assess the reliability of a non-scientific expert testimony

19   that reflects a person from the industry sort of laying out

20   basic facts about the industry?  And courts have held that

21   under those circumstances the reliability inquiry doesn't

22   focus on some of the more technical scientific Daubert

23   elements such as, you know, applying principles and methods

24   to facts, but you focus on the expert's knowledge or

25   experience.  It is very simple, very direct, you know, does

1   he have a basis in his background for providing this

2   testimony?

3            And in the quote on the bottom of that slide you

4   have the Sixth Circuit finding that the testimony from an

5   expert in the banking industry was reliable based on the

6   expert's practical experiences with 40 years in that

7   industry.

8            And that -- that First Tennessee Bank case, the

9   Sixth Circuit case we are quoting there, is a useful case

10  here because it involved a very similar argument to the ones

11  that plaintiffs are making.  The opposing party in this case

12  argued that this banking industry expert, who has spent

13  40 years in the banking industry, did not have sufficient

14  experience with a particular aspect of the banking industry

15  that was relevant to the case.  And what the court held, and

16  you can see this on the next slide, the Sixth Circuit held

17  that the extent that this banking expert may have lacked

18  familiarity with some aspects of the industry, the district

19  court correctly reasoned that such unfamiliarity merely

20  affect the weight and credibility of his testimony, not its

21  admissibility.  And we think that principle should be applied

22  here and should result in denial of plaintiffs' motion.

23            So if we go to the next slide.  So I think the

24  appropriate starting point in assessing Mr. McCloskey's

25  testimony is to look very specifically at what testimony is

 1    being challenged.  Here you have -- on the left you have a

 2    list of the topics that plaintiffs identified in their brief

 3    that they were challenging, and on the right you have topics

 4    that they are not challenging.

 5           And I think there are two key takeaways from this

 6    slide.  The first is that Mr. McCloskey is an undisputed

 7    expert on many facets of the bearing industry.  Many topics

 8    addressed in his report plaintiffs don't challenge his

 9    qualifications to testify to those matters.

10           And I think the second takeaway is that the

11    categories -- so those are on the left, those are just taken

12    straight from plaintiffs' briefs -- that those categories

13    aren't really entirely accurate with respect to the testimony

14    that is being challenged.  So, for example, in the briefs

15    they say they are challenging his testimony on bearings

16    markets, but if you actually look at specifically what they

17    are challenging, they don't challenge his qualifications to

18    testify with respect to the industrial OEM bearings market,

19    they don't challenge his qualifications to testify with

20    respect to the industrial aftermarket for bearings, you know,

21    which would fall under the categories of bearing market.

22           So to understand, you know, what testimony is at

23    issue, you have to look at the exhibit to their motion, and

24    that's -- we will take a look at the excerpt.  This is an

25    excerpt of the exhibit to plaintiffs' motion where they

 1     identify specifically the testimony that they are

 2     challenging, and they do that by crossing out the language

 3     that they are asking this Court to strike from -- from

 4     Mr. McCloskey's report.  And this excerpt I think again

 5     illustrates the breadth of Mr. McCloskey's -- undisputed

 6     breadth of his experience.  Plaintiffs don't dispute that

 7     he's qualified to testify about bearings fundamentals, the

 8     characteristics, designs, applications, customers, sales in

 9     the U.S., procurement, pricing or inventory management, but

10     they challenge in this paragraph his ability to testify to

11     manufacturing competitors and markets.

12            And I think the Sixth Circuit cases we have cited

13     before, you know, when you are here, when you are at this

14     point, when your undisputed expert on so many facets of the

15     industry and you are challenging his qualifications with

16     respect to a few areas, that goes to weight, not

17     admissibility.  Your Honor is perfectly capable of taking

18     their arguments, which they went on at length about, you

19     know, why his testimony is wrong and the nature of his

20     qualifications in various areas and applying the appropriate

21     weight to his testimony.  And that's what the Sixth Circuit

22     says is the right result with this sort of challenge.

23            So if we go to the next slide.  So this is another

24     excerpt from the exhibit to the motion where they are

25     identifying what they are challenging.  And here again, you

```
 1    know, undisputed expert in industrial markets, on the
 2    industrial aftermarket, but they challenge his ability to
 3    testify about the automotive market and the automotive
 4    aftermarket.
 5              Now, I think it bears noting that the notion that
 6    this person who spent 40 years, you know, in this industry to
 7    the point where he's an undisputed expert in the industrial
 8    and industrial aftermarket, but plaintiffs say he's not -- he
 9    can't testify to the basic facts he has in his report on the
10    automotive, automotive aftermarket, you know, an essential
11    premise of that argument is that the different markets for
12    bearings have highly differentiated features.  And with
13    respect to that aspect of plaintiffs' argument, they are
14    right, the markets are highly differentiated.  They are --
15    the purchasers buy bearings in different ways, they buy
16    different bearings.  They, you know, for example, in the
17    automotive OEMs, will generally purchase customized bearings
18    through a heavily negotiated RFQ process, whereas industrial
19    aftermarket distributors will purchase standard catalogue
20    bearings off of price lists typically with no negotiations.
21    So there's very different purchasing behavior results in very
22    different pricing and have very different, just very
23    different market dynamics in the different markets, in the
24    different bearings markets.
25              And, you know, the impact of that is, you know,
```

Case 2:12-md-02311-SFC-RSW   ECF No. 1866, PageID.34929   Filed 03/29/18   Page 62 of 116
STATUS CONFERENCE / MOTION HEARINGS / FAIRNESS HEARINGS

62

  1   these differences in the markets require, as we explained
  2   last time, and I'm not going to go on -- I'm not going to
  3   repeat myself, repeat what we discussed last time too much,
  4   but really the differences require individualized inquiries
  5   to assess any impact from the alleged conspiracy here, and
  6   that, you know, the market differences, which, you know, are
  7   an essential premise of plaintiffs' argument here really show
  8   that the one-size-fits-all single aggregate overcharge
  9   approach that plaintiffs have offered for showing impact here
 10   just doesn't fit, it is not a reliable way of showing common
 11   impact, especially given the failure of Dr. McClave to
 12   account for those very important meaningful differences
 13   between the markets.
 14           So the question then, coming back to the present
 15   motion, given the markets are so very different, automotive
 16   and industrial, how can Mr. McCloskey testify about the
 17   automotive market when he spent his career -- he spent his
 18   career in the industrial aftermarket, and the answer to that
 19   question is two-fold.  First, his testimony consists of basic
 20   industry facts about the automotive markets, about --
 21   everything in his report is -- just puts in one place just
 22   the basic contours of the bearings industry.  And a person
 23   who spends -- a businessman who spends 40 years of his life
 24   in the industrial aftermarket will naturally learn the basic
 25   features of related bearings markets.  That's exactly what

 1    happened here.  When we get to Mr. McCloskey's experience, we

 2    will show he has the experience to -- the background to

 3    testify reliably on those subjects.

 4          So here are some examples of the challenged

 5    testimony.  So he testifies that automotive industrial

 6    bearing markets are distinct.  He testifies that automotive

 7    OEMs are large companies, that the OEMs use RFQs and

 8    multi-year contracts, and that's different from how bearings

 9    are purchased in the industrial aftermarket.  That automotive

10    distributors purchase catalogue bearings at list prices.  So

11    these are just examples, but if you look at his report, it is

12    all basic industry facts.  You wouldn't need the 40 years of

13    experience that he has to testify reliably on those subjects.

14          And further, all of those facts are corroborated by

15    the record.  So, you know, we have on the right just examples

16    from the record that support each those principles, and you

17    could do the same thing for his entire report.  It is basic

18    industry facts corroborated by the record.  Mr. McCloskey,

19    the purpose of his report is to just put basic facts about

20    the industry in one place, you know, in one organized place,

21    as opposed to those facts being scattered throughout the

22    record, but he doesn't bring anything sort of new or

23    different or something that is not established already by the

24    record the case, so it is, you know, basic facts corroborated

25    by the record.

```
 1                Let's go to the next slide.

 2                In particular, his testimony about

 3    interchangeability.  Now, Mr. Weill relied on a number of

 4    documents, well, to -- you know, to challenge Mr. McCloskey's

 5    testimony regarding interchangeability.  Mr. McCloskey's

 6    testimony, the thrust of his testimony is that bearings are

 7    not interchangable generally, and that is corroborated, first

 8    of all, by plaintiffs' own industry expert.  They submitted

 9    an expert from John Farmer.  He testified at a deposition,

10    and he testified and he agreed with the proposition that

11    different types of bearings are generally not interchangable.

12    So there's no meaningful dispute between Mr. McCloskey and

13    Mr. Farmer, plaintiffs' expert, on this issue.

14                Now, the interchange guides and the other documents

15    that Mr. Weill brought to the Court's attention do not

16    establish otherwise, and I will give you a few examples.  So

17    Mr. Weill quoted this SKF product guide, and he had the first

18    two pages and then the third page was omitted.  And he used

19    the first two pages to try to show that, you know, bearings

20    are just -- a bearing is a bearing, you can just interchange

21    it at will.  And the third page shows that's not the case,

22    and the third page corroborates further Mr. McCloskey's

23    testimony that you have to take into account performance

24    characteristics.  Even if you have two bearings that are

25    dimensionally identical, you to take into account performance
```

1    characteristics.

2              So this guide that Mr. Weill relied on, the next

3    page that was not in his presentation, has a Q and A section.

4    For example, it says, question:  Why are value grade hub

5    units a risky choice?  Answer:  Many manufacturers sell

6    replacement hub bearings that are very low priced.  Initially

7    you may think that's a great deal or value.  Unfortunately,

8    with that low price you get a low quality hub bearing that is

9    inferior to a premium original equipment quality hub bearing.

10             And then the document continues on to identify the

11   potential problems with putting in, again, a dimensionally

12   identical bearing that has very different performance

13   characteristics.  It says those value grade hub units can

14   last less than half as long as a premium unit.  Their cheaply

15   made seals can allow moisture and contaminants to enter and

16   destroy the bearing prematurely.  They can produce annoying

17   wheel vibration and noise.  They can cause your anti-lock

18   braking systems to malfunction.  So all sorts of reasons why

19   you need to assess the performance of a bearing, even if it

20   is dimensionally identical, to determine if it is a suitable

21   substitute.  And that's the basic thrust of Mr. McCloskey's

22   testimony.

23             And with the interchange -- and to address the

24   interchange guides, those phonebooks that Mr. Weill's

25   referenced, those guides show -- you know, they are

 1   phonebooks, and what they do is they identify bearings that

 2   are dimensionally identical or similar to each other that

 3   could potentially be replacements.  But what those -- what

 4   those guides tell you is not that bearings are generally

 5   interchangeable.  They reinforce the conclusion, which is the

 6   basis for our class certification arguments in this case,

 7   that they are not because those phonebooks will list one

 8   bearing and it will list maybe one, two, three others that

 9   are dimensionally identical and potential substitutes.  The

10   rest of the phonebook are bearings that are not substitutes.

11   So any one of these phonebooks will list thousands and

12   thousands of bearings, and for any one there might be one or

13   two, three substitutes.  Most are not.

14         And that is the point.  It is the diversity, it is

15   the variety of bearings.  It is -- and again, the lack of

16   interchangeability also established by plaintiffs' expert

17   when he says bearings of different sizes cannot be

18   substituted for each other, and I think the picture

19   establishes that as well.  And you know, again, there --

20   plaintiffs' expert, bearings have numerous different

21   characteristics, that's what those interchange guides are

22   telling you, numerous different characteristics.

23         And also by the way, almost all of those guides

24   contain, you know, some equivalent of a warning saying to the

25   effect of, you know, you can't just throw in a dimension

 1    identical bearing that we are saying is a potential

 2    substitute.  You have got to be careful and look at your

 3    application, you've got to look at performance issues.

 4          So, for example, on slide 24 of Mr. Weill's

 5    presentation below the highlighted part that he had read, it

 6    says, however, depending on the type of machine they are to

 7    be used in and the expected application and function, a

 8    nonstandard or specially designed bearing may be best to use.

 9    And so that's just one example.  I have seen these warnings

10    in various different ways in these interchange guides.

11          But it really sort of takes away from the main

12    point that there is just massive diversity, massive variety

13    of bearings with tons of different characteristics, and just

14    more examples here, all from plaintiffs' expert, plaintiffs'

15    industry expert, and just further sort of supports and

16    corroborates Mr. McCloskey's testimony.  Different bearings

17    to handle -- there are different bearings that handle

18    different magnitudes of load.  There are different bearings

19    to handle different directions of load.  There are different

20    bearings that tolerate different speeds.  There are different

21    bearings to deal with different types of contaminations.  All

22    sorts of different bearings with different functions and

23    characteristics that you have to take into account whenever

24    you're determining an appropriate bearing for an application.

25    And it just further establishes different bearings for

1    different purposes.  They are not broadly interchangable as

2    the interchange guides show.

3         So -- so that takes us to -- so the question then

4    is in light of the very sort of basic nature of his

5    testimony, he's just outlining the basic contours of the

6    industry, providing basic facts about the industry, does he

7    have the experience to give reliable testimony about that,

8    about -- you know, that is in his report?  The answer is yes.

9         So, first of all, Mr. McCloskey has worked in the

10   bearings industry for over 40 years, held positions from

11   customer service all the way up to senior management.  He was

12   on a board of directors level and everything in between.

13   He's involved with training on bearings, he's been trained on

14   bearings, he's given training on bearings.  He's -- and he

15   has had to -- let's go to the next slide.  For example, he

16   spent 30 years at Dodge Newark, an industrial aftermarket

17   distributor.  He managed bearing customer contracts and

18   training, supervised product development, was involved in all

19   aspects of the business from engineering to sales, hired and

20   trained sales staff.

21        Let's go to the next one.

22        And all of these are sort of just summary,

23   high-level bullets.  If you look at his CV, it provides even

24   more detail, sort of further establishing that he has the

25   experience that is necessary to testify reliably in this

1    case.

2          So he was also spent -- he also spent ten years at

3    Command, which is another industrial aftermarket distributor.

4    He hired, trained and supervised sales staff.  He helped

5    develop Command's first private brand bearings offering and

6    was involved in all aspects of that from design and

7    selection, evaluating manufacturing facilities.  So this

8    notion that he had -- you know, that he had one tour -- that

9    NTN gave him a tour and that's his sole basis for knowing

10   anything about manufacturing is just not supported by the

11   record.

12         He evaluated pricing strategies, performance

13   metrics.

14         Next slide.

15         And he was also on a number of advisory councils

16   that -- for bearing manufacturers.  So various bearing

17   manufacturers, including NTN, you know, have these advisory

18   councils where they invite their customers to discuss issues

19   of relevance to the industry, and he was a part of those

20   councils and supported employees on other councils, other

21   manufacturers' councils.  And as part of those councils he

22   would exchange ideas about market dynamics, he would learn

23   bearing suppliers' views on manufacturing and on tradeoffs

24   between the automotive industrial markets.  He -- and he did

25   tour manufacturing facilities, and that's another way which

1    he learned sort of how bearings are manufactured.

2           Again, not -- not -- you know, if he was putting in

3    his report sort of chemical formulas for the composition of

4    steel and bearings, you know, I could see an argument he --

5    he -- you know, his background wouldn't suggest that he would

6    be able to opine on that subject, but that's not what he

7    does.  He provides very basic information about the

8    manufacturing of bearings, you know, such as, you know, there

9    are manufacturers in dedicated lines, that changing that line

10   involves varying costs.  Those are the type of high-level

11   basic facts that are set forth in his report, and those are

12   the types of facts you would expect someone with 40 years in

13   the industry to know.

14          And let's go to the next slide.

15          So his experience also embraces each of the four

16   challenged subjects.  So, you know, as we discussed, it is

17   interchangeability, manufacturing, markets and automotive.

18   So we just sort of compiled a list of bullets identifying his

19   various experience.  These all come from our briefs in our

20   opposition where you can find the cites thereto.  But, you

21   know, 40 years in the industry, training, responsible for

22   bearings customer accounts, on advisory councils, you know,

23   observing manufacturing processes, studied processes and

24   compositions in connection with sales pitches, you know,

25   monitored market developments, coordinated with suppliers and

1    market strategy.  He studied -- and he studied -- he

2    testified he studied automotive bearings, you know, the

3    market for automotive bearings to inform strategies in his

4    market, the industrial market.  And he did on occasion assess

5    supply inquiries from automotive customers.  This was very

6    rare.  You know, I'm not trying to exaggerate his experience

7    here.  This was very rare, but he did have a few over his

8    40 years, a few supply inquiries from customers, including an

9    automotive OEM RFQ.  And again, not to exaggerate his

10   experience because that happened once.  In his 40 years he

11   received one automotive OEM RFQ.  And what he testified

12   happened with that is he was part of the team that analyzed

13   that RFQ and ultimately determined that his company could

14   not -- could not fulfill that demand, and so they ended up

15   not responding to it.  But he has experience in all facets of

16   the industry.

17            If we go to the next slide.

18            And so the Sixth Circuit has ruled that the basic

19   test, non-scientific expert testimony, and we talked before

20   about how it focuses on just experience and knowledge, you

21   know, where the expert has adequately explained how their

22   experience leads to the conclusion, why that experience is a

23   sufficient basis for the opinion, and how that experience is

24   reliably applied to the facts, it is reliable.  And

25   Mr. McCloskey's report satisfies this standard.  His CV, his

1    deposition testimony identifies his experience, and his

2    report shows how he's applying it.

3         Their challenge should be rejected for the same

4    reason that a similar challenge was rejected in First

5    Tennessee that it goes -- you know, that their challenge goes

6    to the weight to be given to his testimony and not his

7    admissibility.

8         THE COURT:  Okay.  Thank you very much.

9         MR. KESSLER:  Your Honor, just one minute before we

10   turn it over to plaintiffs.

11        So I listened to the presentation, and it struck me

12   that much of the presentation of plaintiffs was actually not

13   in support of excluding Dr. McCloskey because their McCloskey

14   argument is that he's an industrial guy, he's not an

15   automotive guy.  That's essentially their argument.

16        Instead, they spent the good part of their argument

17   saying, well, it is all interchangable together; automotive,

18   industrial, they all fit together.  We spent six and a half

19   hours, Your Honor will recall, on that subject.  I'm not

20   asking for any time to reargue that, but I think that subject

21   is well presented to Your Honor.

22        And if you look at one slide here, 14, a picture is

23   worth a thousand words.  So the sole point is that

24   Dr. McClave, who we challenge that point, treats that bearing

25   that has hundreds of people inside of it the same way as this

1  bearing that fits on the point of your finger and makes no

2  adjustment in his regression to account for any of that.

3  That was six and a half hours.

4         I'm not going to do it again, Your Honor, but I

5  would urge you when you get to that point not be distracted

6  by today's argument, which is supposed to be about

7  Dr. McCloskey, and I'm sure you will go back and spend a lot

8  of time looking at what both sides presented in those issues.

9         THE COURT:  Okay.

10         MR. KESSLER:  Thank you.

11         THE COURT:  Reply?

12         MR. PALFIN:  So there was an amended errata to

13  Mr. McCloskey's deposition testimony and I don't believe it

14  made it to the Court's record, but we can discuss with

15  plaintiffs how best to put that on the record.

16         THE COURT:  Submit it.

17         MR. PALFIN:  I don't think it has an impact on

18  anything we have been discussing.

19         MR. WEILL:  Thank you, Keith.  I have copies of the

20  amended errata by Mr. McCloskey.

21         THE COURT:  All right.

22         MR. WEILL:  And the reason it has some

23  significance -- I'm sorry.  The reason that the direct

24  purchasers believe it has some significance is because

25  footnote 12 of the defendants' opposition to the motion to

1    strike portions of Mr. McCloskey's testimony contain

2    references to the original errata that are incorrect.

3           Briefly, Your Honor, defendants make several

4    comments that I would like to respond to.  Specifically, for

5    example, with respect to the page 8 of their presentation,

6    they list among the unchallenged topics bearings pricing.  In

7    fact, that the plaintiffs do challenge Mr. McCloskey's

8    ability to discuss bearings pricing insofar as it relates to

9    manufacturing because he doesn't have that information that

10   would enable him to tell us what pricing results from what

11   costs.

12          With respect to the notion -- let me address this

13   first, this notion here on page 14 of the defendants'

14   presentation.  There is this idea the defendants present that

15   the direct purchasers are claiming that every bearing of

16   every type and every size is completely interchangable with

17   every other bearing, and that doesn't make any sense and we

18   are not arguing that.

19          In fact, the references to Mr. Farmer's testimony I

20   think demonstrate that.  For example, on page 13 of the

21   defendants' presentation, they cite that -- Mr. Farmer's

22   testimony to the effect that different types of bearings are

23   not inter -- are generally not interchangable.  That's true

24   because we are talking -- as page 13 shows in the picture, we

25   are talking about different types of bearings, a type being a

1    roller bearing versus a ball bearing or tapered roller

2    bearing.  They are not interchangable, Your Honor.  That is

3    certainly something that we understand and have not presented

4    as any kind of defensible position.  We are talking about

5    bearings and the capability of defendants to make those

6    bearings.

7            And the same goes with respect to not only the type

8    of bearing but the size of bearing, bearings.  That picture

9    on page 14 that Mr. Kessler is fond of, talking about a small

10   bearing versus a very large bearing, that's a different size

11   bearing.  And I will take a small bearing -- I will take the

12   large bearing, and the question is can the defendants make

13   that large bearing and sell it, and can they price fix that

14   bearing, and how does that impact the price of that bearing?

15   And so that comes within the rubric, the simplified rubric of

16   form, tapered versus roller versus needle, so on, fit, size.

17           THE COURT:  So this whole argument of whether they

18   are interchangable is --

19           MR. WEILL:  It only bears --

20           THE COURT:  -- it doesn't really have relevance

21   here.

22           MR. WEILL:  Well, it is --

23           THE COURT:  This big bearing isn't interchangeable

24   with the small bearing?

25           MR. WEILL:  That's absolutely correct, Your Honor.

1    And what these catalogues tell us is that if you've got a

2    wheel hub bearing for your 2007 Escape, you can't substitute

3    it -- you can't use a roller bearing to substitute it, put it

4    in place; you have to get another wheel hub bearing.  Or if

5    you have some other functions, you get the same type of

6    bearing.  And the point is that the defendants manufacture

7    those bearings as these catalogues suggest.

8            In fact, when I got ready to depose Mr. McCloskey,

9    one of the puzzles I couldn't understand was his -- as I

10   mentioned, his statement, you know, this summarizes a lot of

11   what he says, but the vast majority of applications are not

12   interchangable; that's that page 14, paragraph 13.  And I am

13   thinking I don't understand why he says that because I'm

14   looking at all of these materials that he says are reliable

15   and I relied on, and they are filled with information that

16   the defendants have put together, spent I'm sure millions of

17   dollars to demonstrate to the world that they can make every

18   kind of bearing that is necessary, they can supply every type

19   of bearing.

20           So I asked Mr. McCloskey, why do you say the vast

21   majority of applications are not interchangeable and yet you

22   have these documents that say -- and also this performance

23   definition, which is odd, but you have these documents that

24   the defendants and the manufacturers that you represented

25   when you were at Command, they tell you we can interchange

1    it.  You have this -- this brochure for a bearing specialist

2    that says that's part of their job to figure out what can you

3    do to substitute.  And his -- he agreed that, yes, that could

4    happen.  And what appears to be the reason for his statement

5    that the vast majority of applications are not

6    interchangeable is because of this notion from the defendants

7    that you can't substitute this tiny bearing here for this big

8    bearing here, but that's not what we are trying to say, Your

9    Honor.

10        And Mr. McCloskey's testimony -- let me get back to

11    Mr. McCloskey's testimony -- suggests that he doesn't seem to

12    understand that or comprehend that distinction.  That if he

13    had this knowledge about bearings that is -- he's given

14    credit for, then he would be able to respond to the fact that

15    there is this entire industry built around the notion that

16    every one of these defendants can supply these bearings.  And

17    the fact that these bearings are highly specialized and

18    customized doesn't make any difference, and if you get them

19    through an RFQ or if they have been sold over and over again,

20    you can get them out of catalogue, doesn't make any

21    difference because the defendants are supplying these

22    bearings.

23        There is this reference to this performance -- this

24    SKF guide, and he said I didn't put in the last page about

25    this thing, and it talks about value bearings.  Value

1    bearings is the way you describe a cheap bearing.  It is the

2    Chinese bearing.  People don't want to put a Chinese -- I am

3    not being pejorative about Chinese, you know, as a rule, but

4    the Chinese bearings have had a history of being a lower

5    quality bearing.  And that's why they don't compete with the

6    defendants' product because the defendants are at the top of

7    their game with respect to bearings.  They have the best

8    bearings in the world, no questions about it.

9            And the fact that Mr. McCloskey was unaware of this

10   distinction between interchangeability among defendants and

11   the idea that, you know, you can't put a two-inch bearing

12   into a three-inch space, it just doesn't make sense.  We

13   suggest it supports the notion that he really doesn't have

14   the background sufficient to make the statements that he does

15   in these -- in his declaration.

16           THE COURT:  Do you think he's really saying that

17   they are interchangable when they are different sizes or they

18   are not interchangable?  I'm not understanding this whole

19   argument because it makes no sense to me.  It seems to me,

20   using your catalogue -- your phonebook example, that you have

21   a bearing that's a particular size or dimension and that

22   could be substituted for another, but you have to consider

23   other things, the force on it, et cetera.  Why would he not

24   have been talking about that when he's talking about that

25   most are not interchangable?  I mean --

```
 1          MR. WEILL:  I can only chalk it down to being he
 2   doesn't know, he doesn't know.  He says these things and
 3   yet --
 4          THE COURT:  Or is he coming at it from a different
 5   angle?  Is he coming at it --
 6          MR. WEILL:  He doesn't seem to have the basic
 7   understanding about this notion of how you can substitute
 8   these bearings.
 9          THE COURT:  I mean, how can somebody work for
10   40 years in the bearing industry and think you can change a
11   humongous bearing for a little bearing?  I mean, a common
12   person would know that.
13          MR. WEILL:  That's the point we are trying to make,
14   Your Honor, that we don't think Mr. McCloskey has the
15   background sufficient for him to present evidence that's
16   reliable.
17          THE COURT:  All right.  Thank you very much.
18          MR. WEILL:  Thank you, Your Honor.
19          THE COURT:  All right.  The Court will give you an
20   opinion.
21          I want to go to -- before I hear the next motion
22   because it might affect those of you who want to stay or
23   leave.  We have 6-A, the Bosal motion.  I don't know what's
24   going on because we have looked and we have nothing from
25   direct purchasers.
```

1      MR. HANSEL:  Understood, Your Honor.

2      THE COURT:  I mean, you're not opposing it?

3      MR. HANSEL:  We are.  We have conferred with

4  counsel for Bosal, and at this time I would like to make a

5  motion that direct purchasers be permitted to file their

6  opposition to the motion to dismiss two weeks from today, and

7  I have discussed it with counsel for Bosal who is present

8  here and I understand they do not object to that.

9      THE COURT:  Bosal?

10      MR. MOUW:  Your Honor, we filed --

11      THE COURT:  What's your name?

12      MR. MOUW:  Gary Mouw, M-O-U-W, on behalf of Bosal.

13      We filed a motion to dismiss Bosal Nederland back

14  in August of last year to which there was no response from

15  direct purchaser plaintiffs.  And in light of that lack of

16  response, we anticipated that it was unopposed, similar to

17  what happened with respect to the indirect purchaser

18  plaintiffs.  They named one of our foreign entities, we filed

19  a motion to dismiss for lack of personal jurisdiction, and

20  after reviewing that motion they agreed to dismiss that

21  party.  So not having a response, we expected that an order

22  would be issued when this finally reached a point for the

23  Court to do so.

24      A few weeks ago direct purchasers contacted us, and

25  not to put words in their mouth but I think they would say

 1    that it slipped through the crack, and we agreed we weren't

 2    going to request the Court to issue a decision.  We were --

 3    once the Court got to it and reviewed it, we anticipated a

 4    decision would be reached.  So now they have reviewed it, and

 5    obviously it was our hope that they would say, like indirect

 6    purchasers did, that we will agree to dismiss, but they want

 7    to file a response in opposition.

 8          So we -- it is our position that the correct

 9    procedure needs to be followed for them to do so, which would

10    include a motion -- we think it should be a written motion

11    rather than one here made to the Court for leave to file a

12    response, a late response, to which then we can bring back to

13    our client and review it and address it at that time.  And,

14    of course, filing a motion for leave to file a late response

15    would obviously include their proposed response brief to

16    which we can file our response, including a reply if

17    necessary.  So that's what we propose in terms of the

18    procedure in light of where we stand today.

19          THE COURT:  Okay.  So your -- Mr. Hansel, your

20    comment they don't object, apparently they may object?

21          MR. MOUW:  We need an opportunity, Your Honor -- we

22    spoke before.  It was just this morning where I heard from

23    Mr. Hansel that they are, in fact, going to oppose our motion

24    to dismiss.  Obviously we were hoping otherwise.  So we will

25    need an opportunity to see their motion.  I haven't had an

```
 1    opportunity to consult with my client with respect to a
 2    motion for leave to file.  So it will be our position that
 3    perhaps we will see the motion and we will just say we don't
 4    object to the motion for leave and we will just deal with the
 5    personal jurisdiction issue.  But given the timing of this
 6    morning and this just hearing of their position at 10:00, I
 7    need the --
 8              THE COURT:  Do you want argument on your motion?
 9              MR. MOUW:  Sorry?
10              THE COURT:  Will you want argument on your motion?
11              MR. MOUW:  We have requested it so far, but, again,
12    that may change in response to what we see from -- from DPPs,
13    and we might agree to stipulate for no oral argument.  But
14    when we filed our motion in August, we did request at that
15    point oral argument obviously to preserve that opportunity.
16              THE COURT:  Well, my inclination is I want to give
17    them -- because it slipped through a crack, I guess it was a
18    big crack because that was a long time ago.  I want to get to
19    the merits, my aim is always to get to the merits, so I think
20    what I'm going to do, over your objection maybe, is to allow
21    them to file a answer and then set it for a hearing, and you
22    can argue the whole thing then at the hearing.  You can
23    include the fact that they were late --
24              MR. MOUW:  Sure.
25              THE COURT:  -- if you wish, but let's just move on.
```

1   You respond --

2           MR. HANSEL:  Yes, Your Honor.

3           THE COURT:  -- to the motion, include in your

4   response to the motion just the fact that it wasn't addressed

5   before for whatever reason, and let's just set it up for a

6   hearing at -- we can do it at our next status conference.

7   Okay.

8           MR. MOUW:  That sounds good, Your Honor.

9           THE COURT:  Otherwise we just delay things.

10          MR. MOUW:  Great.

11          MR. HANSEL:  Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you.  All right.  I guess

13  now we will go back to steering sensors.

14          MR. MILLER:  Your Honor, Todd Miller for

15  Tokai Rika.

16          The Court was notified that the motion on the

17  steering angle sensors is being deferred in light of a

18  resolution of the case by settlement, so we have --

19          THE COURT:  I'm sorry, I didn't --

20          MR. MILLER:  The EPPs had notified the Court

21  earlier this week.

22          THE COURT:  Oh, wonderful.  That takes care of that

23  motion.

24          MR. MILLER:  Sorry.

25          THE COURT:  It takes care of that motion?

1        MR. MILLER:  Yes, it does, Your Honor, we hope.

2        THE COURT:  Okay.  All right.  Then the next thing

3   we have on the schedule is the fairness hearing, but we have

4   to wait until 1:00 to make sure nobody shows up, so let's

5   take a lunch break.  We will resume at 1:00.  Thank you very

6   much.

7        THE LAW CLERK:  All rise.  Court is in recess.

8        (Court recessed at 12:01 p.m.)

9                    —   —   —

10       (Court reconvened at 1:01 p.m.; Court and Counsel

11       present.)

12       THE LAW CLERK:  All rise.  Court is again in

13   session.

14       THE COURT:  Good afternoon.

15       THE ATTORNEYS:  (Collectively) good afternoon, Your

16   Honor.

17       THE COURT:  All right.  We have the fairness

18   hearing in the ball bearings.  Let's take that one.

19       MR. KOHN:  Good afternoon, Your Honor.  Joseph Kohn

20   for the direct purchaser plaintiffs.

21       I'm pleased to be before you on these related

22   motions.  I will be addressing the approval of the

23   settlement, and Mr. Hansel will address the counsel request

24   for costs and fees.

25       THE COURT:  Okay.

1            MR. KOHN:   This is a settlement between the direct
2    purchaser class and defendants MinebeaMitsumi Inc., NMB USA,
3    Inc. and MNB Technologies Corp, together are referred to as
4    the Minebea defendants.

5            Just to place a few dates on the record, we did
6    file the standard report with respect to dissemination of
7    notice dated February the 14th of 2018, and that recited that
8    pursuant to the notice order, which was entered October 25th,
9    2017, the notices were mailed to the direct purchasers.
10   There were a total of 1,047 notices mailed to class members
11   as appeared on the information from the defendants.  And the
12   publication notice appeared on November 27th, 2017 in
13   The Wall Street Journal and Automotive News and on the
14   website.

15           Your Honor, this settlement agreement was executed
16   just about a year ago, February 15th, 2017.  It calls for a
17   payment of $9,750,000, which was made, has been deposited in
18   escrow, as well as the defendants' cooperation.

19           This settlement had no provisions for reduction of
20   the settlement amounts.  It did have the right of the
21   defendant to walk away, a recision right, which obviously has
22   not occurred.  We were happy to report that there were no
23   opt-outs or objections with respect to this settlement, at
24   least as of the report and as of the last time we checked.  I
25   don't know if somebody has shown up in the courtroom, but I

1    think I recognize everyone here and I don't see any class

2    members.

3            Your Honor, this settlement was the result of

4    fairly lengthy negotiations.  The small bearing matter came

5    to light with an indictment in February of 2015 with respect

6    to Minebea.  The first direct purchaser action -- we

7    immediately began discussions with Minebea at that time.  The

8    first direct purchaser action was filed in November of 2015

9    naming NSK as a defendant.  We have continued our

10    discussions, exchange of information with Minebea, and really

11    at the time that we concluded the settlement agreement was

12    when we filed the complaint naming Minebea at that time,

13    which was filed in March of 2017.

14            We have briefed the law with respect to settlement

15    approval, Your Honor, beginning at page 5 of the brief with

16    respect to this motion.  I don't want to repeat the

17    standards, obviously the couple we touch on; the complexity,

18    likelihood of success in the case.  I think the past month

19    and a half has given another layer of meat on the bones to

20    the complexity and the risks that are present in these types

21    of litigation.  I will just say that I'm a little more

22    relaxed today than I was the last time I was here and perhaps

23    more sanguine about the result of this motion than the last

24    one.

25            We did have a certain amount of discovery, we did

```
 1    have the benefit of proffers, we have received documents from
 2    NSK, we have received documents from Minebea, which were
 3    reviewed in connection of reaching this agreement.
 4            I think the other factor to highlight or factors is
 5    the reaction of the class.  We have had a handful of opt-outs
 6    in some of the settlements.  We had no opt-outs in this one,
 7    and as has been throughout the --
 8            THE COURT:  I was going to say I thought you were
 9    talking about this one and I was going to say I didn't see
10    any opt-outs.
11            MR. KOHN:  Yeah.  No, just I would say, you know,
12    in the others where there has been, you know, two, three,
13    four, five.  And here and also no objections at any time in
14    the DPP case, and happy to report again no objections from
15    class members with respect to this settlement.
16            We submitted the proposed final judgment order
17    which is a subject of the negotiation and stipulation with
18    the defendant, and I had a revised final one because of the
19    reference to -- some of the drafts will reference there were
20    opt-outs, et cetera, so we just cleaned that language up.
21            So we believe on February 14th was the last time we
22    submitted by the utility, and I have a paper copy of that
23    version as well.
24            THE COURT:  If you have a paper copy to give to --
25            MR. KOHN:  Yes.
```

1      THE COURT:  -- Molly, I just want to make sure we

2   have the last one.

3      MR. KOHN:  You can crosscheck it against the one

4   submitted on the 14th.

5      So with that, Your Honor, unless the Court has any

6   questions, I would then respectfully request the Court grant

7   approval of this settlement, which would conclude the

8   litigation for the Minebea defendants.  They were an entity

9   that were not named by any of the other plaintiff classes or

10  any of the other parties.  Thank you.

11     THE COURT:  Okay.  You've gone over the dates so

12  I'm not going to go over all of the dates on this when I give

13  my opinion.

14     Okay.  Mr. Hansel.

15     MR. HANSEL:  May it please the Court, Your Honor,

16  I'm here to speak in support of direct purchaser plaintiffs'

17  settlement class counsel's motion for an award of attorney

18  fees and out-of-pocket expenses in connection with Minebea

19  settlement.

20     As the Court is aware, the settlement amount is

21  $9,750,000 plus the intangible qualitative relief of

22  cooperation, which is significant and something that we

23  believe is a major component of the settlement in connection

24  with pursuing the remaining claims against the NSK defendants

25  who are NSK Limited, NSK Americas, Inc. and NSK Corporation.

1    So that litigation continues.

2         Plaintiffs' counsel have diligently pursued this

3    claim and worked hard to efficiently resolve the Minebea

4    portion of the claim with the results that the Court has

5    before Your Honor.  That work included investigating the

6    case, including the small bearings industry, drafting

7    complaints, reviewing, analyzing and coding extensive

8    documents, including many documents that we have reviewed and

9    coded in the last couple of months.  We deposed an NSK

10   employee.  We informally obtained relevant information

11   through a proffer from the ACPERA applicant.  We've engaged

12   in lengthy arm's length settlement negotiations, prepared the

13   settlement agreement, settlement notices and briefing on

14   preliminary and final approval of the settlement.  We worked

15   with the claims administrator, and that work continues, and

16   we continue the litigation against NSK.

17        We respectfully request an award of 30 percent of

18   the settlement fund, which is consistent with some of our

19   previous requests and our sort of generic attorneys' fee

20   brief that we filed with the Court some time ago at the

21   Court's request.

22        The percentage of the fund approach is the

23   preferred approach in this circuit, and at this point in the

24   litigation with this MDL having lasted as long as it has and

25   there has been so many settlements presented to the Court, we

 1    find ourselves citing to Your Honor as much as any judge or

 2    circuit for the authorities that we rely on, but -- so the

 3    Court -- this Court, Your Honor, has awarded 30 percent

 4    before, most recently for the direct purchasers in the case

 5    of the wire harness settlements.

 6          The Court has awarded the truck and equipment

 7    dealers 33 percent of a $4.6 million settlement fund in the

 8    wire harness and OSS cases, and the auto dealers 33 and a

 9    third percent of a $55 million wire harness settlement fund.

10          Other courts in the Sixth Circuit have also awarded

11    fees in the 30 percent to one-third range.

12          There are the Pfizer -- Bowling vs. Pfizer factors

13    for attorneys' fees, which the Court is familiar with, and I

14    will try to just walk through those very quickly.

15          One is the benefit -- the value of the benefit, and

16    here it is both the settlement amount and the cooperation.

17          The value of the services on an hourly basis, that

18    takes a little more explanation.  So with our original motion

19    for attorneys' fees, at the time the lodestar of direct

20    purchaser plaintiffs' counsel was about 1.2 million, which,

21    if the Court granted a 30 percent fee, would result in a

22    multiplier of 2.4.  Since then with substantial additional

23    work, particularly on document review and coding, our

24    lodestar increased through the end of 2017 to 1.63 million,

25    which, if the Court granted our requested fee of 30 percent,

1    would result in a multiplier of 1.79 times. That multiplier

2    is well within the range of positive lodestar multipliers

3    found in the Sixth Circuit. For example, the Cardinal case

4    cited in our brief observed that most courts agree that

5    ranges of multipliers can go from 1.3 to 4.5 times, but in

6    that case the Court awarded a multiplier of 6. So we are

7    requesting a 30 percent fee, which would be a multiplier of

8    1.79, and, again, that's through the end of the year and we

9    have occurred additional time since then and continued to

10   litigation so it is actually lower than that.

11            And, in fact, some courts suggest that counsel use

12   current rates because of the delay in payment, and our

13   practice is generally to use historic rates. So we -- you

14   know, that if we use current rates, that would further reduce

15   the multiplier, but we have not done that.

16            So let's see here. The class's reaction to the

17   settlement also supports the requested fee and expense award.

18   In the notice to the class we informed the class that

19   plaintiffs' counsel would request a fee of up to 33 and a

20   third percent of the Minebea settlement fund plus --

21            THE COURT: That was in your notice?

22            MR. HANSEL: That's in the notice, Your Honor,

23   correct. And as the Court is aware, we are actually asking

24   for a lower fee than that, but notwithstanding that, there

25   were no objections and no requests for exclusion or opt-outs

```
 1   from the class.  So it suggests that the class overwhelmingly
 2   supports the settlement as a whole, which in the notice did
 3   include the proposed fee.
 4           Our costs that we are seeking reimbursement of the
 5   settlement fund are $18,475.47.  We submitted on
 6   December 20th a proposed order to chambers using either
 7   e-mail or ECF utility.  I do not have that hard copy with me
 8   today, but we would be happy to have one hand-delivered to
 9   chambers if that would be helpful.  So --
10           THE COURT:  I would like to have it because I would
11   like the final last one to make sure that's the one we enter.
12           MR. HANSEL:  Yes.  We will have that hand-delivered
13   to chambers today.
14           THE COURT:  Okay.
15           MR. HANSEL:  Thank you.  And so based on all of
16   that, we respectfully ask the Court to award an attorneys'
17   fees of 30 percent of the settlement fund plus the expenses
18   of $18,475.47.
19           THE COURT:  Okay.
20           MR. HANSEL:  Thank you, Your Honor.
21           THE COURT:  Okay.  And there is nobody here
22   objecting?
23           (No response.)
24           THE COURT:  All right.  In terms of the approval of
25   the settlement, I'm not going to repeat everything that
```

1    counsel said, but I find the notice was sufficient, it was

2    very much in align with what we have been doing in all of our

3    cases, and I think, Mr. Kohn, you said there was like a

4    thousand something in terms of actual --

5              MR. KOHN:  1,047, and there's a declaration of the

6    claims administrator that's attached to that report.

7              THE COURT:  Okay.  Thank you.  And I find that that

8    along with the publication and I think it was The Wall Street

9    Journal and Automotive News I think is sufficient notice.

10   The deadlines for objections came and went and the Court

11   received none.  The Court received no notice of any opt-outs

12   and there are none here today.

13             The Court finds the proposed settlement is fair,

14   reasonable and adequate.  The Court looks at any number of

15   factors.  The likelihood of success, and we have gone over

16   this in our other ones, and we know that this is a very

17   complex matter and certainly success is not guaranteed in

18   these.  It is, as I said, complex, and it has gone on for a

19   long time, and it could have gone on for a lot longer,

20   although Minebea is a relatively new party to our litigation

21   here, but given the complexities and the expense and duration

22   of the case, I find it is very reasonable.

23             Certainly the Court relies on the recommendation

24   and the work of experienced counsel, and I have indicated

25   this before that I think is counsel is -- has handled this

1    case extremely well, and I do rely on their arm's length

2    negotiations, which I believe has gone on here.

3          The discovery has been extensive in the whole

4    litigation, and the class members as indicated appear to be

5    satisfied because there is no commentary by way of either

6    objection or opt out.  And obviously as a class, the public

7    is served to have this resolved.  So the Court does find that

8    this is a fair, reasonable and adequate settlement given all

9    of the factors.

10          Now, the Court looked at the expenses here of the

11    $19,145, and the Court will award the expenses.  I want the

12    expenses as I have done before to come out of the total

13    settlement first.

14          After that we look at attorney fees.  Well, before

15    I actually get to the attorney fees, I should get to the

16    class issue, and the Court does find that the class should be

17    certified.  I want to say that first before I forget that.

18    Certainly there is numerosity in terms of the numbers that we

19    have indicated already, and there are questions of law that

20    are common to the question as is typical of these antitrust

21    cases, and this is a typical case, and here the direct

22    purchasers' injuries arise from the named -- from the same

23    wrong as the named representatives.

24          And I find that their representation is adequate.

25    I also find that Rule 23(b)(3) is satisfied in that the

```
 1    plaintiffs demonstrate the common questions predominate over
 2    questions affecting individual members.
 3            So going back to the fees now, the fees are always
 4    the thing that give me -- I have to tell you -- that give me
 5    the most concern because I want to be fair to all parties.
 6    And I have read -- you referred back to those briefs which we
 7    had some time ago, and the Court has read those, and I have
 8    read any number of cases, and I will say that I have attended
 9    an any number of seminars on fees, and none it makes it any
10    clearer to me unfortunately.
11            We talked about lodestar and there are so many
12    factors that go into that timekeeping.  The Court is aware
13    that some courts hire auditors and appear to think that
14    that's a very good thing to look at the timekeeping.  I have
15    not taken that approach, and I appreciate the approach but I
16    don't find it to be truly satisfactory.
17            I think when we come down to it, the Court is going
18    to here award the 30 percent that has been asked for.  I have
19    gone over the percentages, as you know, in other cases, 20,
20    and I said I would look at it again later, and as wise as I
21    guess I'm not, I couldn't come up with any good explanation
22    between 20, 25 and 30, and I'm being perfectly blunt with
23    you.  We know these percentages stem from our personal injury
24    before we got into all of these class actions, which was
25    typical at 33 and a third percent.
```

```
 1            I look at this case and I say these parties
 2   probably -- the plaintiffs would not have gotten anything.  I
 3   mean, it would be so difficult to do this case on a
 4   one-on-one basis, and there is so much iffyness in it that to
 5   get involved in this and expend the money that you plaintiffs
 6   have expended in order to prosecute the civil litigation, I
 7   think you should be awarded, and since I know nothing better
 8   since defendants, of course, they don't care what you get,
 9   I'm going to go with the 30 percent.
10            I do look at the lodestar, for the record I want
11   that to be clear, and I have looked at this one, which is a
12   positive lodestar as to some of our others which were
13   negative.  But as I said, there's ways around this.  I mean,
14   if you raise your fees and the fees are crazy -- excuse me, I
15   mean they are extremely high right now, you can change that
16   lodestar.  If you go to the fee that you started with, you
17   know, it is a different lodestar.
18            So I have just determined that given the work that
19   I have observed now through these years from the attorneys, I
20   believe that -- I do really believe that you have given the
21   time and the tremendous effort to do this and that you should
22   be appropriately compensated, so I am awarding the 30 percent
23   of the net settlement after the costs have been taken out,
24   and you may present an order to that effect.
25            MR. KOHN:  Thank you, Your Honor.
```

1     THE COURT:  Anything else?

2     MR. HANSEL:  Your Honor, one question.  Your Honor

3  read a number of costs, and the number I have from our brief

4  is 18,475.47, and Your Honor read a $19,000 number.  I'm not

5  sure where you got that from.

6     THE COURT:  Yes.  Where did I get that from?  I

7  have 18,475 --

8     MR. HANSEL:  That's --

9     THE LAW CLERK:  It is because they had two

10  different numbers in the brief at two different spots.

11     MR. HANSEL:  We did.

12     THE COURT:  Okay.  The actual cost, Counsel.

13     MR. HANSEL:  Thank you, Your Honor.

14     THE COURT:  Oh, you need to resubmit an order,

15  Molly tells me, because the order you submitted before is

16  different from what we have today.

17     MR. HANSEL:  The order is different because it was

18  not net of cost, and we'll submit one that's net of cost.

19     THE LAW CLERK:  Not on the attorney fees; on the

20  approval of the settlement.

21     MR. HANSEL:  We will do.

22     THE COURT:  Which is why I always like it at the

23  last minute because the ones before sometimes get changed.

24  All right.  Thank you.

25     (At 1:23 p.m. court recessed.)

```
 1                          _   _   _

 2               (Court reconvened at 2:31 p.m.; Court and Counsel

 3          present.)

 4               THE COURT:  Good afternoon.

 5               MS. FRUITERMAN:  Good afternoon.

 6               MR. PARKS:  Good afternoon, Your Honor.

 7               THE COURT:  We are going to do the fairness hearing

 8     on the TED matters.

 9               MS. FRUITERMAN:  Good afternoon, Your Honor.

10     Erica Fruiterman, from Duane Morris, on behalf of the truck

11     and equipment dealership plaintiffs.

12               THE COURT:  Just one second while I clear out some

13     of these papers here.  Okay.

14               MS. FRUITERMAN:  Your Honor, as you know, this

15     motion concerns our settlement with Mitsubishi Electric

16     Corporation, Mitsubishi Electric U.S. Holdings, Inc., and

17     Mitsubishi Electric Automotive America, Inc., collectively

18     the Mitsubishi Electric defendants.

19               This is the --

20               THE COURT:  Could you speak into the microphone a

21     little louder please.

22               MS. FRUITERMAN:  This is the first settlement we

23     have reached in starters and alternators, and the total in

24     cash benefits to the class are $1.3 million in addition to

25     the cooperation we are receiving from Mitsubishi Electric.
```

1    As set forth in our moving papers, we believe that
2  this settlement is fair, reasonable and adequate, and on that
3  basis should be granted final approval.

4    This specific definition of the settlement class is
5  found in the settlement itself and is part of the public
6  record in this case.

7    Regarding the cash amount of settlement, the amount
8  was a function of several factors, including evidence of the
9  defendants' conduct and our assessment of it, the volume of
10  commerce affected or potentially affected, and the value of
11  the noncash components of the settlement such as the
12  cooperation I mentioned.

13    We believe that accounting for the prospects of
14  success the defense has asserted, the volume of commerce
15  impacted or potentially impacted, the risks of proceeding, we
16  think that the settlement is a great outcome for the class.

17    On the topic of notice, notice was provided to the
18  prospective class members in accordance with the notice plan
19  approved by this Court.  That notice plan is the same as the
20  notice plan previously approved by the Court in bearings and
21  also employed in settlements involving the ADP and their
22  classes.

23    The notice plan was reviewed and determined to be
24  fair and reasonable and appropriate by the firm that we are
25  using, RG2, which the Court has previously approved for us to

 1    use as consultants on notice-related issues.

 2            RG2 oversaw the execution of the notice plan as

 3    detailed in the declaration of Tina Chiango from RG2, which

 4    is attached to our moving papers.

 5            Part of the notice procedure involved setting up a

 6    landing page on our website specifically for starters and

 7    alternators.  That page went live on October 25th, 2017.  RG2

 8    also worked with a third-party marketing firm and arranged

 9    for summary notice to be e-mailed on November 20th, 2017 to

10    56,425 C level executives who worked at medium and heavy duty

11    truck dealerships as well as agricultural, construction,

12    mining, railroad and other commercial equipment dealers

13    within the U.S.

14            We also mailed by first class bearings notice --

15    sorry, starters and alternators notices to 47,230 addresses.

16    In addition to those mailings, an ad was placed in the weekly

17    newsletter of America Truck Dealers Association, and that

18    appeared each week for a month.  Summary notice was also

19    released via a PR newswire and printed in The Wall Street

20    Journal, Automotive News and the November 2017 issue of Work

21    Truck.  Also an ad was included in the National Trailer

22    Dealer Association e-newsletter.

23            We believe and represent to the Court that this

24    notice program was thorough and was designed to reach and did

25    reach a very large percentage of the potential class members.

1    As has been the case with all our settlements, the

2   reaction of the class members has been positive.  There have

3   been no objections filed, no appearances entered, and no

4   opt-outs from the class.

5    We think given that, that it is important to

6   emphasize their silence in terms of recognizing the approval

7   of the class.

8    Turning to Rule 23 requirements, we believe that

9   the requirements of Rule 23 are satisfied by the settlement.

10   Just quickly walking through the factors considered by the

11   Sixth Circuit, the first, likelihood of success on the merits

12   weighed against the amount and form of relief in the

13   settlement.  In weighing the risks, we note that we are

14   providing a large cash benefit of $1.3 million to the class.

15   This is in no way a nuisance value settlement amount.  It is

16   a substantial cash benefit to the class and reflects the

17   strengths and claims and risks -- the strengths and claims of

18   our claims and the risk the settling defendants may prevail

19   on some of their arguments.

20    The second factor is the complexity, expense and

21   likely duration of further litigation.  I think at this point

22   the Court is well aware of the complexity of these cases and

23   the claims and defenses in this litigation.  With regard to

24   expense, there would be significant expense for both the

25   plaintiffs and the defendant to continue.  And as to

```
 1   duration, we do not have class cert schedule and the
 2   litigation could continue for some time.  So the second
 3   factor leans in favor of resolving these cases.
 4          Our opinions concerning the settlement are set
 5   forth in our moving papers.  Obviously we would not be here
 6   today if we did not think these were reasonable and fair
 7   settlements for the class.
 8          And although formal discovery has not begun in
 9   these cases, we received extensive proffers from the ACPERA
10   applicant in the cases but also pursued and obtained
11   discovery directly from the settling defendants within the
12   scope of Federal Rule of Evidence 408.
13          Through these means were able to obtain adequate
14   information about the strengths and weaknesses of the claims
15   and defenses and to evaluate the benefit of the settlement.
16          For these reasons, we find that the settlement is
17   fair, reasonable and in the best interest of the class.
18          Again, the reaction of absent class members was
19   positive.  No objections, no opt-outs, and we believe their
20   silence is a strong indication that the settlement class
21   supports the adequacy of the settlement.
22          Moving to the sixth factor, no fraud or collusion
23   took place in negotiating the settlement.  This was an arm's
24   length negotiation that occurred over many months over the
25   phone and by e-mail.
```

1           Finally, we believe that the settlements are in the

2    public interest.  Settlements generally are, especially when

3    resources are being provided to class members instead of

4    funding the litigation.

5           Briefly, with regard to the Rule 23(a) and 23(b)

6    requirements as to numerosity, you know, given the number of

7    named plaintiffs and the number of notices mailed, joinder

8    here would be impractical.  There are just simply too many

9    parties for joiner.

10          As to commonality, common questions of law

11    generally occur in price fixing cases such as this one.  The

12    main question was did the defendant enter into an illegal

13    arrangement to affect the prices of starters and alternators,

14    and that question was common for all plaintiffs and

15    defendants.

16          Typicality.  The claims of the class representative

17    are indistinguishable from those of any class member.

18          And finally adequacy.  In our opinion, the class

19    representatives have adequately and fairly protected the

20    interests of the class.

21          All right.  In sum, the settlement is fair,

22    reasonable, meets the Sixth Circuit factors as well as the

23    Rule 23 requirements, and we respectfully ask that it be

24    granted final approval.

25          THE COURT:  All right.  Thank you.

 1          MS. FRUITERMAN:  Your Honor, would you like a copy

 2   of the proposed order?

 3          THE COURT:  Yes, you could give it to my clerk,

 4   please.

 5          MS. FRUITERMAN:  May I approach?

 6          THE COURT:  You may.  Defense have any comment on

 7   this?

 8          MR. FENSKE:  Your Honor, Dan Fenske for the

 9   Mitsubishi Electric defendants.

10          We have nothing to add.  We just urge the Court to

11   grant final approval to the settlement as fair, reasonable

12   and adequate for the reasons that counsel just discussed.

13          THE COURT:  All right.

14          MR. FENSKE:  Thank you.

15          THE COURT:  The Court will rule on this before I

16   get to the attorney fee motion.

17          Here the issue for the Court, as counsel has

18   indicated, is whether the settlement was fair, reasonable and

19   adequate.  Defense agrees with plaintiff that it is.  And the

20   settlement terms are 1.3 million I believe for the TED

21   plaintiffs.

22          The Court looks at a number of factors that have

23   been referenced by plaintiff's counsel.  I'm going to go over

24   them briefly for the record.

25          Likelihood of success.  Certainly success is not

 1    guaranteed in these cases, and by doing a settlement it does

 2    guarantee a recovery for the plaintiffs, and the class

 3    counsel believes in this case that the benefits of a

 4    settlement outweigh any risk of continued litigation.

 5        Certainly this is complex.  All of these antitrust

 6    cases have been quite complex, lengthy, and expensive.  And

 7    as been indicated, we do not know when the case would be done

 8    as we haven't even gotten to the class cert timeline.

 9        Experienced counsel believes that this is a fair,

10    reasonable and adequate settlement, and the Court relies

11    heavily on the -- on the beliefs of counsel, finding that

12    counsel is well served, well experienced and able to

13    negotiate these things at arm's length negotiations.

14        And obviously the settlement appears to be fair.

15    There were the notices which we will get into in a little

16    bit, but we have no opt-outs and we have no objectors.  The

17    public is certainly served by having these matters resolved

18    and saving the expense and time of the Court and the parties.

19        The next issue is about this notice, and the Court

20    is satisfied that the notice is appropriate, that the service

21    that provides -- I think it is RG2 -- is it RG2?  Reminds me

22    of a -- isn't there some movie about RDD2 or something?  It

23    just reminds me of that.  But RG2 has done appropriate

24    notices.  The numbers have been, you know, 50-some thousand

25    notices in one case and publications.  So I find the notice

 1   has been appropriate to actually notify, and including the --

 2   there was direct mail, wasn't there, also in this case?

 3   Yeah, direct mail and e-mail that targeted the class members,

 4   so I find that this is appropriate.

 5          I also find that the class should be certified

 6   pursuant to Rule 23.  Certainly the -- there are questions of

 7   fact that are common to the class, and we know here that the

 8   common question is whether these defendants engaged in this

 9   conspiracy or combination amongst themselves to fix, raise,

10   maintain or stabilize the price of the component parts.  And

11   it is also -- also typicality is satisfied in that the claims

12   of the representative parties are typical of the claims of

13   the class in that the class representatives can satisfy this

14   claim.

15          I think there is also service awards, is there not,

16   in your motion, Counsel -- yes -- coming up for the named

17   class plaintiffs because of the work that they have, in fact,

18   done in this case.

19          There is -- not only do these individuals

20   adequately represent the class counsel but adequately

21   represents the class, and I believe that the plaintiff

22   representatives will fairly and adequately protect the

23   interests of the class and also the attorneys.

24          Because TED plaintiffs meet the requirements of

25   23(a), then I look at 23(b)(3), that the class demonstrates

1   common questions predominate over questions affecting only

2   individual members, and the evidence here that would show a

3   violation to one settlement class member is, in fact, common

4   to the class and will provide a violation to all.

5          A class action is a superior method, I firmly

6   believe, in adjudicating these claims.  And as we know, all

7   of these claims have been centralized here, and I think that

8   this is an efficient mechanism to resolve these claims.

9          So I do find that the class as named and defined in

10  the pleadings is the appropriate way to handle this.  So the

11  Court approves the settlement and I approve the -- certify

12  the class for purposes of the settlement.

13          MS. FRUITERMAN:  Thank you, Your Honor.

14          THE COURT:  Let's go to attorney fees and service

15  awards.

16          MS. FRUITERMAN:  So as Your Honor mentioned, this

17  motion is for attorney fees, reimbursement of litigation

18  expenses and service awards.  This motion covers the period

19  from the inception of the case until January 26th, 2018.

20          As the Court is aware, we have been litigating this

21  case, like our other cases, on a contingency fee basis with

22  no guarantee of recovery of our fees.  We are seeking fees

23  here equal to 30 percent of the settlement amount after

24  notice and claims administration costs and escrow fees have

25  been deducted.  30 percent equals approximately $367,000.

1    With regards to the lodestar crosscheck employed by

2    the Court, the $367,000 in fees is approximately 100 percent

3    of the lodestar and represents a multiplier of one.  This

4    lodestar includes attorney hours for attorneys at

5    Duane Morris, paralegals, library staff and technology

6    assistants who are similar to our project managers but mostly

7    manage the processing of data and preparing files for review

8    and production.

9        The total hours is approximately 630, and these

10   hours do not include time spent after January 26th preparing

11   motion papers and dealing with claims administration.  The

12   specific hours and amounts are set forth in my declaration

13   attached to this motion.

14       And I would like to note that although not as

15   active as the bearings and wire harness case because formal

16   discovery has not yet commenced, informal discovery has been

17   a significant part of our efforts in the settlement context,

18   including review of information received in proffers and

19   Rule 408 volume of commerce materials.

20       The multiplier here is approximately one, but as

21   Your Honor has stated, the multiplier may be useful as a

22   crosscheck but it is not necessary in this circuit in

23   assessing the appropriate percentage in the percentage of the

24   fund approach.

25       Although we have received 33 and a third in earlier

1    requests for attorney fees from this Court, we now ask for

2    30 percent in response to Your Honor's decision at our last

3    final approval hearing where you found that 30 percent was a

4    reasonable percentage in light of the common range of 25 to

5    35 percent.

6            In our opinion, a 30 percent fee based on the

7    percentage of the fund approach that we set forth in our

8    motion is well within the range of reasonable attorney fees

9    awards approved of and awarded in the Sixth Circuit as well

10   as this Court in the truck and equipment dealers prior

11   settlements, and so we respectfully request that award here

12   as well as reimbursement of our litigation expenses.

13           With respect to the requested services awards, here

14   the class --

15           THE COURT:  How many named plaintiffs do you have?

16           MS. FRUITERMAN:  Twenty, Your Honor.

17           THE COURT:  Pardon me?

18           MS. FRUITERMAN:  Twenty.

19           THE COURT:  And you are looking for the $5,000 for

20   each of those 20?

21           MS. FRUITERMAN:  Correct.  Here the class

22   representatives performed and continue to perform an

23   invaluable service to the class.  As you are aware, the class

24   representatives have produced and continue to produce

25   documents in response to the discovery efforts of the MDL

 1    defendants.  Specifically, recently the class has been asked

 2    to locate dealer files in accordance with Your Honor's motion

 3    that truck and equipment dealer plaintiffs needed to produce

 4    those.  So the location and identification of those dealer

 5    files, as we set forth in our opposition, is quite a burden

 6    and involves not just one centralized location but requires

 7    each individual dealership to go to their files and sometimes

 8    go off site to locations where those files are stored.

 9         THE COURT:  Do you have an estimate of how much

10    time these individual plaintiffs put into this?

11         MS. FRUITERMAN:  On an individual plaintiff by

12    plaintiff basis, I do not, Your Honor.  I can say that it is

13    certainly over -- at least over 100 hours in terms of back

14    and forth conversations and discussions with the class

15    representatives.  I know that in addition to the

16    conversations that we have had, the class representatives

17    have had to go to each of their dealerships and talk to them.

18    There is also extensive time spent in finding out where the

19    dealer files are located and figuring out what the most cost

20    effective way of extracting those files from those locations

21    is.

22         THE COURT:  So your experience in working with

23    them, you are telling me that they expended at least

24    100 hours each gathering this information?

25         MS. FRUITERMAN:  No, I could not break it down by

1    dealership, Your Honor.

2              THE COURT:  You're saying 100 hours total?

3              MS. FRUITERMAN:  100 hours in our direct

4    negotiations with counsel for the class representative.  And

5    in addition to that back and forth with counsel, I know that

6    each dealership has had to search its own files.  I can't

7    speak to exactly how much time each of those searches took.

8              THE COURT:  Okay.  I'm trying to pinpoint the

9    $5,000 to each and find what -- you know, if they should get

10   that, so if they in total spent 100 hours, so they are

11   basically five hours each one, and then they had to get their

12   records.

13             MS. FRUITERMAN:  It's more than five hours each

14   one, Your Honor.  I can't speak to how much more, but in --

15   so, if you will remember, lots of the dealer files are

16   located off site and housed with Iron Mountain, so as an

17   initial matter, the dealership needs to determine whether it

18   has those files in its -- in the location.  If it doesn't,

19   then it needs to contact Iron Mountain, find out where those

20   files are, and in many cases those files will be labeled by

21   box but not in any way -- you know, you can't go straight

22   into the box and know that it is going to there be or where

23   it is going to be in the box.  So that sifting process of

24   trying to locate the files is going to be different for each

25   dealership because they don't store their files all in the

1    same method.

2            THE COURT:  All right.

3            MS. FRUITERMAN:  In addition, I just want to

4    mention without these class representatives' willingness to

5    bring claims and undertake these efforts, there would be no

6    settlement for the truck and equipment dealership class.  And

7    as discovery proceeds, the class representatives are likely

8    to incur significant burden and expense.

9            So because of the efforts expended by the class

10   representatives and the reasonableness of the award, we

11   respectfully request $5,000 for each named plaintiff.

12           THE COURT:  Okay.  In terms of the named

13   plaintiffs, I'm a little more concerned because I don't know

14   their time as to what they put in.  I'm trying to make this

15   reasonable.

16           MS. FRUITERMAN:  I understand, Your Honor.  In the

17   past we have requested a larger fee that I think represents

18   some of those earlier efforts at the initial document

19   collection at the start of the wire harness and bearings

20   litigation and so request $5,000 here because acknowledging

21   that the burden, although it still exists, doesn't involve

22   quite the same search for documents and production as it did

23   in the early stages of the case.

24           THE COURT:  All right.  Thank you.

25           MS. FRUITERMAN:  Thank you, Your Honor.

1       THE COURT:  All right.  The Court will award the

2   service fee of the $5,000 to each of the named plaintiffs

3   because I find, though I don't have records, which does

4   concern me, of time that they spent, I am aware of the

5   records and the volume of the records that they had to

6   discover and submit in discovery, plus the time that they

7   spent individually with the counsel.

8       The Court will award the costs which come to

9   $38,347.78.

10       MS. FRUITERMAN:  That's correct.

11       THE COURT:  That will come out of -- off the top of

12   the settlement, along with the amount that's being paid to

13   the individual plaintiffs as a service award, and then the

14   attorneys will get their one -- their 30 percent.  The Court

15   has gone back and forth I realize with these attorney fees,

16   and as I indicated, you probably weren't here, but in the

17   last fairness hearing we had earlier this afternoon I've just

18   come to the conclusion that the Court would use a percentage

19   of the fund -- a flat percentage of the fund of 30 percent in

20   these cases and I would crosscheck it.  Now, here the

21   lodestar crosscheck is one, so it is like you are getting

22   paid actually what you put into it, and I believe -- I'm not

23   going over all of those numbers, but the multiplication works

24   out to what you had in your brief.

25       We know that the Court has to look at various

```
 1   factors, and that's the value of the benefit rendered, the
 2   society's stake in awarding attorney fees, whether the
 3   services were undertaken on a contingency fee basis, the
 4   complexity, the professional skill and the value of the
 5   services on an hourly basis.  We are not breaking these down
 6   individually because we have touched on a lot of these.  I
 7   have indicated to you that the Court is impressed with the
 8   skill of counsel and I have no problem with the hourly basis
 9   and the number of hours that it's put in here.
10        And most importantly, that this was taken with no
11   guarantee of success and that the plaintiffs have put forth
12   their own -- counsel have put forth the funds in order to
13   proceed and to get these results and I think the results are
14   excellent.  And that there's a strong national interest in
15   these antitrust cases to enforce and to vindicate public
16   policy.  That the case is very complex, and I think obviously
17   here the lodestar confirms the percentage.  So the Court will
18   award the 30 percent of the net proceeds.
19        MS. FRUITERMAN:  Thank you, Your Honor.  I also
20   have a copy of the proposed order if you would like.
21        THE COURT:  Okay.  Thank you.  If you would give
22   that to my clerk, we can get that entered.  Anything else?
23        MR. FENSKE:  No, Your Honor.
24        THE COURT:  Defense?  No?  I'm not used to seeing
25   defense on the plaintiff's side.  You know, this is -- we
```

1    always do this in this MDL, I don't know why, maybe because

2    our defense counsel generally sits in the jury box, so

3    that's --

4              MR. FENSKE:  There are a few more of us, Your

5    Honor.

6              THE COURT:  Okay.  Yeah.  Thank you very much.

7              MR. FENSKE:  Thank you, Your Honor.

8              MS. FRUITERMAN:  Thank you, Your Honor.

9              (Proceedings concluded at 2:59 p.m.)

10                            —  —  —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CERTIFICATION*

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of In Re: Automotive Parts Antitrust Litigation, Case No. 12-02311, on Wednesday, February 28, 2018.

*s/Robert L. Smith*
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date:  03/23/2018

Detroit, Michigan