1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MICHIGAN
2                SOUTHERN DIVISION

3                    —   —   —

4

IN RE:  AUTOMOTIVE WIRE HARNESS
5                                    Master File No. 12-02311

SYSTEMS ANTITRUST
6                                    Hon. Marianne O. Battani

_____/
7

THIS DOCUMENT RELATES TO:
8

ALL ACTIONS
9  _____/

10

11

         STATUS CONFERENCE/MOTION HEARINGS
12

13    BEFORE THE HONORABLE MARIANNE O. BATTANI
              United States District Judge
14     Theodore Levin United States Courthouse
             231 West Lafayette Boulevard
15                 Detroit, Michigan
             Wednesday, September 26, 2018
16

17

18

19

20

21

22

23

24

25

1   APPEARANCES:

2   **Direct Purchaser Plaintiffs:**

3   WILLIAM G. CALDES
    **SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.**
4   1818 Market Street, Suite 2500
    Philadelphia, PA  19103
5   (215) 496-0300

6

7   DAVID H. FINK
    **FINK & ASSOCIATES LAW**
    100 West Long Lake Road, Suite 111
8   Bloomfield Hills, MI  48304
    (248) 971-2500
9

10  NATHAN FINK
    **FINK & ASSOCIATES LAW**
11  100 West Long Lake Road, Suite 111
    Bloomfield Hills, MI  48304
12  (248) 971-2500

13

14  GREGORY P. HANSEL
    **PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.**
    One City Center
15  Portland, ME  04112
    (207) 791-3000

16

17  ROD M. JOHNSTON
    **SOMMERS SCHWARTZ**
18  1 Towne Square, Suite 1700
    Southfield, MI  48076
19  (248) 236-5752

20

21  STEVEN A. KANNER
    **FREED, KANNER, LONDON & MILLEN, L.L.C.**
    2201 Waukegan Road, Suite 130
22  Bannockburn, IL  60015
    (224) 632-4502

23

24

25

```
 1  APPEARANCES: (Continued)

 2  Direct Purchaser Plaintiffs:

 3  JOSEPH C. KOHN
    KOHN, SWIFT & GRAF, P.C.
 4  One South Broad Street, Suite 2100
    Philadelphia, PA  13107
 5  (215) 238-1700

 6

 7  RANDALL B. WEILL
    PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
    One City Center
 8  Portland, ME  04112
    (207) 791-3000

 9

10  End-Payor Plaintiffs:

11  DENIRRO LAZAR
    THE MILLER LAW FIRM, P.C.
12  950 West University Drive, Suite 300
    Rochester, MI  48307
13  (248) 841-2200

14

15  CHANDLER A. LANGHAM
    SUSMAN GODFREY, L.L.P.
    1000 Louisiana, Suite 5100
16  Houston, TX 77002-5096
    (713) 651-9366

17

18  E. POWELL MILLER
    THE MILLER LAW FIRM, P.C.
19  950 West University Drive, Suite 300
    Rochester, MI  48307
20  (248) 841-2200

21

    WILLIAM V. REISS
22  ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
    601 Lexington Avenue, Suite 3400
23  New York, NY  10022
    (212) 980-7405

24

25
```

```
 1    APPEARANCES:   (Continued)

 2    End-Payor Plaintiffs:

 3    HOLLIS L. SALZMAN
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 4    601 Lexington Avenue, Suite 3400
      New York, NY  10022
 5    (212) 980-7405

 6

 7    ELIZABETH T. TRAN
      COTCHETT, PITRE & McCARTHY, L.L.P.
 8    840 Malcolm Road
      Burlingame, CA  94010
 9    (650) 697-6000

10    Dealership Plaintiffs:

11    DON BARRETT
      BARRETT LAW OFFICES
12    P.O. Drawer 927
      Lexington, MS  39095
13    (601) 834-2376

14

15    JONATHAN W. CUNEO
      CUNEO, GILBERT & LaDUCA, L.L.P.
16    507 C Street NE
      Washington, D.C.  20002
17    (202) 789-3960

18    J. MANLY PARKS
      DUANE MORRIS, L.L.P.
19    30 South 17th Street
      Philadelphia, PA  19103
20    (215) 979-1342

21

22    KEVIN POTERE
      DUANE MORRIS, L.L.P.
23    1540 Broadway
      New York, NY 10036
24    (212) 692-1000

25
```

```
 1  │ APPEARANCES:   (Continued)

 2  │ Dealership Plaintiffs:

 3  │ SHAWN M. RAITER
    │ LARSON KING, L.L.P.
 4  │ 30 East Seventh Street, Suite 2800
    │ Saint Paul, MN  55101
 5  │ (651) 312-6500

 6  │
    │ VICTORIA ROMANENKO
 7  │ CUNEO, GILBERT & LaDUCA, L.L.P.
    │ 507 C Street NE
 8  │ Washington, D.C.  20002
    │ (202) 789-3960
 9  │

10  │ For the Defendants:

11  │ JEFFREY J. AMATO
    │ WINSTON & STRAWN, L.L.P.
12  │ 200 Park Avenue
    │ New York, NY  10166
13  │ (212) 294-4685

14  │
    │ ALDEN L. ATKINS
15  │ VINSON & ELKINS, L.L.P.
    │ 2200 Pennsylvania Avenue NW, Suite 500 West
16  │ Washington, D.C.  20037
    │ (202) 639-6613

17  │
18  │ MICHAEL G. BRADY
    │ WARNER, NORCROSS & JUDD, L.L.P.
19  │ 2000 Town Center, Suite 2700
    │ Southfield, MI  48075
20  │ (248) 784-5032

21  │
    │ JEREMY CALSYN
22  │ CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
    │ 2000 Pennsylvania Avenue NW
23  │ Washington, D.C.  20006
    │ (202) 974-1500
24  │

25  │
```

```
 1 │ APPEARANCES:  (Continued)

 2 │ For the Defendants:

 3 │ STEVEN F. CHERRY
   │ WILMER HALE
 4 │ 1875 Pennsylvania Avenue NW
   │ Washington, D.C.  20006
 5 │ (202) 663-6321

 6 │

 7 │ EILEEN M. COLE
   │ WHITE & CASE, L.L.P.
 8 │ 701 Thirteenth Street NW
   │ Washington, D.C.  20005
 9 │ (202) 626-3642

10 │ MULAN CUI
   │ WINSTON & STRAWN, L.L.P.
11 │ 200 Park Avenue
   │ New York, NY  10166
12 │ (212) 294-6700

13 │

14 │ ABRAM ELLIS
   │ SIMPSON, THACHER & BARTLETT, L.L.P.
15 │ 1155 F Street, N.W.
   │ Washington, D.C. 20004
16 │ (202) 636-5579

17 │ J. CLAYTON EVERETT, JR.
   │ MORGAN, LEWIS & BOCKIUS, L.L.P.
18 │ 1111 Pennsylvania Avenue NW
   │ Washington, D.C.  20004
19 │ (202) 739-5860

20 │

21 │ PETER M. FALKENSTEIN
   │ JAFFE, RAITT, HEUER & WEISS, P.C.
22 │ 535 W. William, Suite 4005
   │ Ann Arbor, MI  48103
23 │ (734) 222-4776

24 │ MICHAEL FELDBERG
   │ ALLEN & OVERY, L.L.P.
   │ 1221 Avenue of the Americas
25 │ New York, NY  10020
   │ (212) 610-6360
```

1  APPEARANCES:  (Continued)

2  **For the Defendants:**

3  DAVID C. GIARDINA
   **SIDLEY AUSTIN, L.L.P.**
4  One South Dearborn Street
   Chicago, IL  60603
5  (312) 853-4155

6

7  ERIN GLAVICH
   **BAKER & MILLER, P.L.L.C.**
   2401 Pennsylvania Avenue NW, Suite 300
8  Washington, D.C.  20037
   (202) 663-7822

9

10  FRED K. HERRMANN
    **KERR, RUSSELL & WEBER, P.L.C.**
11  500 Woodward Avenue, Suite 2500
    Detroit, MI  48226
12  (313) 961-0200

13

14  ELLEN MAXWELL-HOFFMAN
    **BOWLES RICE**
15  600 Quarrier Street
    Charleston, WV 25325
16  (304) 343-2867

17  MAURA L. HUGHES
    **CALFEE, HALTER & GRISWOLD, L.L.P.**
18  1405 East Sixth Street
    Cleveland, OH  44114
19  (216) 622-8335

20

21  HOWARD B. IWREY
    **DYKEMA GOSSETT, P.L.L.C.**
22  39577 Woodward Avenue, Suite 300
    Bloomfield Hills, MI  48304
    (248) 203-0526

23

24

25

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3    HEATHER LAMBERG KAFELE
      SHEARMAN & STERLING, L.L.P.
 4    801 Pennsylvania Avenue, NW
      Washington, D.C.  20004
 5    (202) 508-8097

 6

 7    FRANK LISS
      ARNOLD & PORTER, L.L.P.
 8    555 Twelfth Street NW
      Washington, D.C. 20004
      (202) 942-5969
 9

10    BRADLEY R. LOVE
      BARNES & THORNBURG, L.L.P.
11    11 South Meridian Street
      Indianapolis, IN 46204
12    (317) 261-7896

13

14    MICHELLE A. MANTINE
      REED SMITH, L.L.P.
15    225 Fifth Avenue, Suite 1200
      Pittsburgh, PA  15222
16    (412) 288-4268

17    ALLYSON M. MALTAS
      LATHAM & WATKINS, L.L.P.
18    555 Eleventh Street NW, Suite 1000
      Washington, D.C.  20004
19    (202) 637-2200

20    STEFAN M. MEISNER
      MCDERMOTT WILL & EMERY
21    500 North Capitol Street, NW
      Washington, D.C. 20001
22    (202) 756-8000

23

24

25
```

1    APPEARANCES:   (Continued)

2    **For the Defendants:**

3    BRIAN M. MOORE
     **DYKEMA GOSSETT, P.L.L.C.**
4    39577 Woodward Avenue, Suite 300
     Bloomfield Hills, MI  48304
5    (248) 203-0772

6

7    GEORGE A. NICOUD, III
     **GIBSON, DUNN & CRUTCHER, L.L.P.**
     555 Mission Street
8    San Francisco, CA  94105
     (415) 393-8200

9

10   RACHEL B. PECK
     **STEPTOE & JOHNSON, L.L.P.**
11   1330 Connecticut Avenue, N.W.
     Washington, D.C.  20036
12   (202) 429-6272

13

14   STEVEN REISS
     **WEIL, GOTSHAL & MANGAS L.L.P.**
     767 Fifth Avenue
15   New York, NY 10153
     (212) 310-8174

16

17   KAJETAN ROZGA
     **WEIL, GOTSHAL & MANGES L.L.P.**
18   767 Fifth Ave,  STE. 3360
     New York, NY 10153
19   (212) 310-8518

20

21   MICHAEL RUBIN
     **ARNOLD & PORTER, L.L.P.**
     555 Twelfth Street NW
22   Washington, D.C.  20004
     (202) 942-5094

23

24

25

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    DARIN M. SANDS
      LANE POWELL, P.C.
 4    601 SW Second Avenue, Suite 2100
      Portland, OR  97204
 5    (503) 778-2100

 6

 7    LARRY J. SAYLOR
      MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
      150 West Jefferson Avenue, Suite 2500
 8    Detroit, MI  48226
      (313) 496-7986

 9

10    SCOTT T. SEABOLT
      SEABOLT LAW FIRM
11    17199 N. Laurel Park Drive, Suite 215
      Livonia, MI  48152
12    (248) 717-1302

13

14    CRAIG SEEBALD
      VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
15    Washington, D.C.  20037
      (202) 639-6585

16

17    MICHAEL LEONARD SIBARIUM
      PILLSBURY, WINTHROP, SHAW, PITTMAN, L.L.P.
18    1200 Seventeenth Street, NW
      Washington, D.C. 20036-3006
19    (202) 663-9202

20

      STEPHEN J. SQUERI
21    JONES DAY
      901 Lakeside Avenue
22    Cleveland, OH  44114
      (216) 586-3939

23

24

25
```

```
 1    APPEARANCES: (Continued)

 2    For the Defendants:

 3    ANITA STORK
      COVINGTON & BURLING, L.L.P.
 4    One Front Street
      San Francisco, CA  94111
 5    (415) 591-7050

 6

 7    DAVID SUGGS
      WHITE & CASE, L.L.P.
 8    701 Thirteenth Street NW
      Washington, D.C.  20005
      (202) 626-3642
 9

10    JOANNE GEHA SWANSON
      KERR, RUSSELL & WEBER, P.L.C.
11    500 Woodward Avenue, Suite 2500
      Detroit, MI  48226
12    (313) 961-0200

13

14    MATTHEW TABAS
      ARNOLD & PORTER, L.L.P.
15    555 Twelfth Street NW
      Washington, D.C.  20004
16    (202) 942-5000

17    THOMAS TALLERICO
      BODMAN, P.L.C.
18    201 West Big Beaver Road, Suite 500
      Troy, MI  48084
19    (248) 743-6000

20

21    MICHAEL F. TUBACH
      O'MELVENY & MYERS, L.L.P.
22    Two Embarcadero Center, 28th Floor
      San Francisco, CA  94111
      (415) 984-8700
23

24

25
```

```
 1   APPEARANCES: (Continued)

 2   For the Defendants:

 3   LINDSEY ROBINSON VAALA
     VINSON & ELKINS, L.L.P.
 4   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, D.C.  20037
 5   (202) 639-6585

 6

 7   A. PAUL VICTOR
     WINSTON & STRAWN, L.L.P.
     200 Park Avenue
 8   New York, NY  10166
     (212) 294-4655

 9

10   L. PAHL ZINN
     DICKINSON WRIGHT
11   500 Woodward Avenue, Suite 4000
     Detroit, MI  48226
12   (313) 223-3500

13
     OTHER APPEARANCES:
14
     REBECCA J.S. CASSELL
15   MYERS & MYERS, P.L.L.C.
     915 North Michigan Avenue
16   Howell, MI 48843
     (517) 540-1700

17

18   DAN GOLDFINE
     LEWIS, ROCA, ROTHGERBER, CHRISTIE, L.L.P.
19   201 East Washington Street, Suite 1200
     Phoenix, AZ 85004
20   (602) 262-5392

21

     DIANE R. HAZEL
22   LEWIS, ROCA, ROTHGERBER, CHRISTIE, L.L.P.
     1200 Seventeenth Street, Suite 3000
23   Denver, CO 80202
     (303) 628-9545

24

25
```

1  TABLE OF CONTENTS

2

Page

3

4  Report of Special Master............................. 15

5  Status Conference................................... 17

6  Motion Hearings
      Round 3 Settling Defendants' Motion to Deny
7    GEICO Exclusion Request as Invalid and Ineffective
     and to Enforce Litigation Stays.................... 41
8
     GEICO's Motion to Intervene and Stay Final
9    Fairness Determination............................ 46

10   Truck and Equipment Dealer Plaintiffs' Motion for
     Final Approval of proposed Settlements with MITSUBA,
11   T.RAD, Bosch, and HIAMS Defendants in Alternators,
     Radiators and Starters............................ 54
12
     Truck and Equipment Dealer Plaintiffs' Motion for
13   Award of Attorneys' Fees, Litigation Costs and
     Expenses.......................................... 61
14
     Automobile Dealership Plaintiffs' Motion for
15   Final Approval of Settlements and Application
     for Interim Expenses, Attorneys' Fees, and
16   Service Awards....................................101

17   Direct Purchaser Plaintiffs' Motion for Final
     Approval of Proposed Settlements with Tokai Rika
18   and Toyoda Gosei Defendants and Proposed Plan of
     Distribution of Settlement Funds in OSS............71
19
     Direct Purchaser Plaintiffs' Motion for Final
20   Approval of Proposed Settlement with Valeo
     Defendants in Air Conditioning Systems.............81
21
     Direct Purchaser Plaintiffs' Motion for an
22   Award of Attorneys' Fees, Litigation Costs and
     Expenses, and Incentive Awards for the Class
23   Representatives....................................87

24

25

1  Detroit, Michigan

2  Wednesday, September 26, 2018

3  at about 10:01 a.m.

4                        —   —   —

5          (Court and Counsel present.)

6          THE CASE MANAGER:  Please rise.

7          The United States District Court for the Eastern

8  District of Michigan is now in session, the Honorable

9  Marianne O. Battani presiding.

10          All persons having business therein, draw near,

11  give attention, you shall be heard.  God save these

12  United States and this Honorable Court.

13          You may be seated.

14          The Court calls Case No. 12-02311, In Re:

15  Automotive Parts Antitrust Litigation.

16          THE COURT:  Good morning.

17          THE ATTORNEYS:  (Collectively) Good morning.

18          THE COURT:  Oh, my gosh.  We have a standing room

19  only?  Can you move over a little bit here?  Let's get

20  everybody seated so you don't have to stand.  I guess this

21  courtroom might be a little bit smaller than my courtroom --

22  prettier, but smaller.  I think that by our next meeting we

23  will be back in our usual chambers, not that I don't like

24  these, but it's kind of hard to be moving around all the

25  time.

1           Okay.  All right.  Let us begin, as always, with

2    the report of Mr. Esshaki.  Gene.

3           MASTER ESSHAKI:  Thank you very much, Your Honor.

4           I would like to report that since we last met, I

5    believe we've had an additional six motions that have been

6    disposed of.  I apologize to counsel for having to conduct

7    them in my offices, but it's much easier than trying to

8    arrange a courtroom here when construction is going on, and I

9    think we've accommodated everybody comfortably, and until

10   such time as the Judge's chambers are restored, we will

11   continue to do that.

12          There was no motion hearing yesterday because there

13   were no motions ripe.  There is currently one pending motion,

14   that is the JTEKT motion, which, by agreement of the parties,

15   will be heard again in my office on October 30th if I'm

16   remembering correctly.

17          And I would like everyone to know that with that --

18   that motion is number 92 that I've handled since being

19   appointed to this case.  And recently I've had the unique

20   opportunity to receive an entire education about the

21   European Union Secrecy Act -- Privacy Act, and some

22   well-written reports from some of the Europeans' best minds

23   on that Act, so it was very fascinating.

24          But otherwise, the motions are coming in and they

25   are moving along quickly.  I don't believe counsel has

1   anything other than that, so --

2          THE COURT:  That's it?

3          MASTER ESSHAKI:  Yes, Your Honor.

4          THE COURT:  Anybody have any questions or comments

5   for the Master?

6          (No response.)

7          THE COURT:  All right.  Thank you very much, Gene.

8   Much appreciated.  I don't know anything about the European

9   Privacy Act.

10          MASTER ESSHAKI:  Yes, Your Honor, European Union --

11          THE COURT:  But I hope it doesn't interfere with

12   our United States' litigation.

13          Okay.  The next thing -- oh, I know, I wanted to

14   ask -- no, I wanted to comment.  First of all, is it

15   Randy Weill?

16          MR. WEILL:  Randall Weill, yes, Your Honor.

17          THE COURT:  Thank you.  I appreciate you working on

18   the agenda and also the status report.  Everything looks

19   great.

20          MR. WEILL:  Thank you, Your Honor.  I would mention

21   that it is a collaborative effort that all counsel

22   participates in.

23          THE COURT:  Well, I would thank them individually

24   but it would take me too long, but I know that you had a hand

25   in it.  Thanks a lot.

1              Okay.  As we go through this next part, the status,

2    I would like for you to tell me a little bit if you have a

3    situation with the opt-outs.  I'm kind of curious as to where

4    the opt-outs are in the various parts.  I know there was some

5    discussion in one of them about waiting to see what the

6    payouts might be before they decided to do anything, but,

7    anyhow, some time has gone by, so if you have opt-outs in

8    your area, please update me about them.

9              Let's start with the direct purchasers, the status

10   of settlement and mediation update.

11             MR. KANNER:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MR. KANNER:  Steve Kanner, Freed, Kanner,

14   London & Millen, on behalf of the direct purchaser

15   plaintiffs.

16             THE COURT:  Could you speak right into the

17   microphone?  I understand it is very difficult to hear in --

18             MR. KANNER:  I will try again.  Is that better?

19             THE COURT:  Yes.

20             MR. KANNER:  I'm here to talk about the current

21   status of settlements and mediation, and I thought the

22   easiest way of doing this and the most efficient way would be

23   to give you some idea numerically where we are.

24             As of now there are 16 cases where there's at least

25   one settlement with a defendant.  There are seven cases with

 1    only one defendant remaining.  We have -- out of the various

 2    68 defendant groups, 22 of those cases have been settled.

 3            With respect to what's happened between the last

 4    status conference when I gave a similar report and today, I'm

 5    pleased to advise the Court that we have 18 additional

 6    settlements since our last status conference in June.  I can

 7    run through the names, but I think Your Honor is well aware

 8    of them since in the last week or so we've seen a flurry of

 9    preliminary approval orders coming down, for which we

10    appreciate, and we will be moving ahead on those with due

11    diligence.

12            With respect to mediations, we've been working both

13    with Judge Weinstein and with several other mediators to

14    accomplish the results that are included in those 18

15    additional settlements.  There are other cases which are

16    pending mediation as we speak.  One of -- one or two of those

17    may not go to mediation because the parties are speaking

18    directly.  And, of course, we are in touch with

19    Judge Weinstein on a regular basis to let him know what cases

20    are on top of our list in terms of priorities.  And I'm also

21    here to tell you that at least two of the cases, the

22    defendants have indicated that they are not willing to

23    discuss mediation at this point because of the pendency of

24    motions to dismiss.

25            With that little blip, we recently submitted a list

 1    of cases to Judge Weinstein which we believe are ripe for

 2    mediation, and there's discussion back and forth on a fairly

 3    regular basis for scheduling of those.

 4            THE COURT:  Okay.  As I look at these numbers,

 5    there has to be 30-some cases that have not -- defendant

 6    groups, excuse me, that have not settled.  Is that about

 7    right?

 8            MR. KANNER:  That's correct, and those are -- many

 9    of those are in the process of discussion right now, and

10    those preliminary approvals would have to be added to that

11    group -- or would reduce the number, I should say, from that

12    group.

13            THE COURT:  Could you give me some type of time

14    frame?  I mean, if you were to say that the direct cases are

15    probably going to be resolved or be ready for trial within

16    what period of time?

17            MR. KANNER:  You know, Your Honor, someone asked me

18    that question, a colleague, and I said I'm certainly hoping

19    that we are done before my 18-year-old, who we dropped off to

20    school at the end of August, my youngest, will be done with

21    college.

22            THE COURT:  Well, I thought you were going to say

23    was an infant but --

24            MR. KANNER:  No, no, been there, done that.  The

25    18-year-old is the youngest.

1          But the reality is, as we move ahead, the pace of
2    the settlements is picking up, and the pace of discussions
3    about settlements are picking up, so I'm optimistic it would
4    be -- I think it would be foolhardy on my part to put a
5    specific date on it, but I would hope within a couple of
6    years we could be cleared, that's certainly our intention.
7          THE COURT:  I get asked this question all the time.
8    You still have that case?  When is that case going to finish?
9    And I feel very ignorant in not being able to answer a case
10   that has been on my docket for so long.
11         MR. KANNER:  Well --
12         THE COURT:  But since you have the same feeling and
13   you are the attorney --
14         MR. KANNER:  It is even worse with my partners,
15   they are far more insistent on when we are going to be done
16   with this series of cases.  But, again, the reality is we are
17   moving -- I think there's a momentum issue involved; as these
18   cases are aging, there seems to be an increased desire both
19   on our part and on the various defendants through their
20   counsel to have rational discussions about resolution.
21         THE COURT:  Okay.
22         MR. KANNER:  It's my hope that we can continue on
23   that path, and if it does not, we will certainly advise the
24   Court.
25         THE COURT:  Thank you.

1          MR. KANNER:  Thank you very much.

2          THE COURT:  Next on the agenda is the end payors.

3    Ms. Salzman.

4          MS. SALZMAN:  Good morning, Your Honor.

5    Hollis Salzman for the end payors.  How are you?

6          THE COURT:  Good.

7          MS. SALZMAN:  On the end payors and the status of

8    the settlements, of the 41 cases that we filed with regard to

9    the publicly disclosed settlements, 32 cases are fully

10   settled.  We have an additional five settlements that we have

11   agreements in principle; we are working on negotiating the

12   language of those settlement agreements, and hope to be able

13   to present those to Your Honor for preliminary approval in

14   the next month.  And if you include those additional five

15   settlements, it brings the number of remaining cases to four,

16   and remaining defendants to five -- I'm sorry, I got that

17   backwards.  The remaining defendants are four, and the

18   remaining cases are five.  One of the defendants is a

19   defendant in two cases.

20          Of those four remaining defendants, we have a

21   mediation scheduled in two weeks, and we also have active

22   bilateral discussions with another one of the four.  With the

23   remaining two, they are a little more difficult, but we are

24   working through the issues with the mediation team, and we

25   are still hopeful at this point that we will be able to

1  resolve them.

2          THE COURT:  Okay.  Very good.  And I neglected to

3  ask you, Steve, about the opt-outs.

4          MS. SALZMAN:  I will go over that briefly.

5          THE COURT:  Let me ask you.

6          MS. SALZMAN:  So the opt-outs, we have the GEICO

7  issue that's before Your Honor later today, but other than

8  that, we have had very few opt outs in our case, maybe one or

9  two end payors throughout the three -- the three settlement

10  rounds.

11          THE COURT:  Okay.

12          MS. SALZMAN:  Okay.

13          THE COURT:  Thank you.

14          MS. SALZMAN:  You're welcome.

15          THE COURT:  Mr. Kanner.

16          MR. KANNER:  Judge, to answer your question very

17  briefly with respect to opt outs in our cases, they are

18  typically OEMs and occasional entities and tier 2s.  Because

19  we generally have an idea who's opting out, we baked that

20  into the settlement numbers, and in some cases there is a

21  built-in, as the Court knows, reduction of the ceiling for

22  what can be paid.  For example, today's --

23          THE COURT:  Fiat-Chrysler.

24          MR. KANNER:  The Chryslers, the Fords.  Ford has

25  opted out of all of these cases, but we still need to

1    calculate for that.  And so with us it has never been an

2    issue in terms of objections or what have you, that's baked

3    into the numbers.

4            THE COURT:  Okay.  Thank you very much.

5            MR. BARRETT:  Good morning, Your Honor.

6    Don Barrett for the auto dealers.

7            Your Honor, as you know, we've worked in settlement

8    discussions as a team with the end payors, and what

9    Ms. Salzman told you is accurate.  I would like to put a

10   little bit different take on it, and I think it might be

11   helpful.

12           There were 41 different auto parts cases that were

13   filed by both the ADPs and the end payors.  And 37 of them

14   have had settlements reached -- settlements in principle, and

15   they are moving right along, they will be accomplished.

16   There are just five of the 41 cases that remain, and we just

17   have four defendants in those five cases, but the five cases

18   that we have, we each have just one, just one, and I would

19   like to be a little more specific about that.

20           In the fuel injection system case, there were nine

21   different defendant families.  We've settled with eight of

22   them.  Only Mikuni remains.  Mikuni declines to give us their

23   affected sales information, and without that we are at a loss

24   as to how to formulate a demand.

25           Valve timing control devices, again, it's Mikuni,

1    and, again, they won't give us any of their sales information

2    which has been the basic thing that all the settlement

3    discussions have primarily revolved around.  So we are at a

4    loss as to how to deal with Mikuni.

5            The exhaust systems case, we've settled with four

6    of the defendant families.  The remaining defendant is Bosal.

7    We are in discussion with Bosal.  We have had a mediation.

8    We remain far apart, but the mediator is helping us and hope

9    springs eternal about that.

10           Shock absorbers, the fourth case, and KYB is the

11   only defendant.  There were three, two of them have settled.

12   We have a mediation set in San Francisco on the 9th of

13   October, and we are hopeful that that case will be resolved.

14   That is a substantial case, one of the bigger cases.

15           And then the last case is the automotive steel

16   tubes.  There were three defendants.  We've -- there were

17   four defendants.  We've settled with three of them.  Sanoh is

18   the only one left.  We are in bilateral settlement

19   discussions that are proceeding in good faith, and we are

20   confident that that -- that that should resolve barring some

21   glitch.

22           As far as the time frame, when we come back up here

23   in February we -- I mean, there's no reason we shouldn't be

24   completely done with these.  There is just no reason for it.

25   We are going to have to deal with these glitches, but I

1    assume --

2             THE COURT:  With steel tubes or --

3             MR. BARRETT:  Well, I'm talking about all four of

4    them.

5             THE COURT:  All four?

6             MR. BARRETT:  All four defendants, there is no

7    reason on earth we can't settle with those defendants and do

8    it promptly.

9             And so as far as opt outs are concerned, the -- the

10   groups, it's a fairly small group, it's like as far as the

11   number of cars, it's 1.2 percent or something like that,

12   they -- they've opted out of the last round as well.

13            That's it, Your Honor.

14            THE COURT:  Okay.  Do you know or hear anything in

15   terms of the opt-outs, whether they will be filing separate

16   suits?

17            MR. BARRETT:  No, ma'am, we do not.

18            THE COURT:  Nothing.

19            MR. BARRETT:  We do not.  They may be -- they may

20   be reaching some private settlement, but we haven't heard, we

21   don't know.

22            THE COURT:  Okay.

23            MR. BARRETT:  Thank you.

24            THE COURT:  The other thing I wanted to ask you is,

25   you indicated that -- is it Mikuni in the fuel injection,

Case 2:12-md-02311-SFC-RSW   ECF No. 1954, PageID.36221   Filed 10/11/18   Page 26 of 123
*Status Conference/Motion Hearings • September 26, 2018*

26

 1    that remains.  You are not getting some information from

 2    them?

 3              MR. BARRETT:  We are not getting -- all of these

 4    cases mainly settle on the basis of affected sales; you know,

 5    how much did, you know, on the -- how much commerce was

 6    there; was it $100 million worth or was it $2 million worth?

 7    And that information has to come from the defendants.  If we

 8    are going to do it before full discovery we can -- you know,

 9    we can ramp up and do that but we can't, of course, make them

10    tell us, but they have declined to do it, and we don't know

11    why and -- but that's where we are.

12              THE COURT:  You will use the services of

13    Mr. Esshaki, if need be, for a hearing on that.

14              MR. BARRETT:  We have not filed a motion; that may

15    be the next thing to do.

16              THE COURT:  Okay.

17              MR. BARRETT:  Thank you.

18              THE COURT:  Thank you.  Is this truck and equipment

19    or are you --

20              MR. SIBARIUM:  No, just a brief word.

21    Mike Sibarium for Mikuni.

22              We have provided, I think, two out of essentially

23    six figures that they wanted.  There were no sales of valve

24    timing control devices in the United States, no direct sales

25    into the United States from abroad, and no sales at all by

 1    the U.S. subsidiary.  We are working on the figures for fuel

 2    injection systems.

 3               THE COURT:  For what?

 4               MR. SIBARIUM:  For fuel injection systems, we are

 5    working on those figures.  We are, I think, the only

 6    defendant in this entire MDL that not only has closing

 7    letters from the DOJ but closing letters from the EU as well.

 8    We never had to calculate volume of commerce sales for either

 9    of these for any governmental entity.  We had no plea

10    anywhere in the world.  So it's just taking a little longer,

11    but we are working on it.

12               THE COURT:  Okay.  Glad you are working on it.

13    Thank you.

14               Good morning.

15               MR. PARKS:  Good morning.  Manly Parks for the

16    truck and equipment dealer plaintiffs.

17               We are at the point of we have a series of four

18    settlements that are scheduled for final approval hearing

19    this afternoon, as Your Honor is aware.  Aside from those

20    settlements, we will be -- we will have no other matters

21    pending in this proceeding with the exception of the claim in

22    occupant safety systems against Takata which, as Your Honor

23    is aware, is in bankruptcy.  I am happy to report that we

24    have actually reached an agreement in principle with Takata

25    regarding that claim as well, as of yesterday, so that will

| | |
|---|---|
| 1 | take some time to document and go through the various -- it's |
| 2 | conditional upon approval by a trust and the bankruptcy court |
| 3 | and a bunch of other things, and ultimately we will have to |
| 4 | bring it to this Court for approval in a class setting, as I |
| 5 | understand, but there -- there is an agreement in principle, |
| 6 | and assuming that we can get that put to bed the way we want |
| 7 | to, then we will be complete in all of our claims and |
| 8 | proceedings in this MDL. |
| 9 | THE COURT:  So at that point you will be ready to |
| 10 | be -- I mean, you will be done and you will be ready for |
| 11 | distribution? |
| 12 | MR. PARKS:  Yes, absolutely.  We are -- we are |
| 13 | hopeful that we can move that process along so that we can |
| 14 | begin distribution.  We have a number of -- we have a system |
| 15 | in place for distribution.  We have a portal developed for -- |
| 16 | that can go live on our website for the claims process. |
| 17 | We've gone pretty far down that road, but we did not want to |
| 18 | incur the additional administrative expenses of multiple |
| 19 | levels of distribution -- |
| 20 | THE COURT:  Right. |
| 21 | MR. PARKS:  -- particularly given that the |
| 22 | magnitude of our settlements is at a different order than |
| 23 | say, for example, the end payors or auto dealers.  So we |
| 24 | don't have any additional -- it would represent too much of a |
| 25 | cost of the overall settlement pool, in our assessment, to |

1    try to do that multiple times and incur layers of

2    administrative expenses.

3            THE COURT:  It makes a lot of sense to do it one

4    time, and it sounds like you have things in order, so as soon

5    as you are ready, which will be soon --

6            MR. PARKS:  Yes, correct.  And we have no opt outs

7    in any of our settlements.

8            THE COURT:  Thank you.

9            MR. PARKS:  Thank you.

10           MR. REISS:  Good morning, Your Honor.  Will Reiss

11   for the end payor plaintiffs, and I'm going to be speaking on

12   behalf of the auto dealer plaintiffs as well.

13           THE COURT:  Okay.

14           MR. REISS:  Just to update you on the status of our

15   26F conferences and our discovery plans.

16           As you heard before, most of our cases are settled,

17   and we have settlements in principle.  So there are only very

18   few cases in which we have been negotiating the schedules.

19           The good news is in the fuel injection systems,

20   this is the case in which Mikuni is a defendant.  We have

21   submitted a discovery schedule.  Obviously hopefully we get

22   the transactional data from them sooner, but the schedule

23   obligates them to produce transactional data early next year,

24   so at a minimum we'll be getting it then if not sooner

25   hopefully.

*Status Conference/Motion Hearings • September 26, 2018*

```
 1            Valve timing control devices is also a case in
 2    which Mikuni is a defendant.  We are going to be negotiating
 3    that.  That's going to be substantially similar to the fuel
 4    injection systems.  We hope that will be submitted within the
 5    next week or two.
 6            Exhaust systems, we have not submitted a discovery
 7    plan.  We just recently yesterday filed a motion to amend,
 8    that is a case in which Bosal is the sole remaining
 9    defendant.  And our motion to amend seeks leave to name
10    several additional Bosal entities; so until that motion
11    shakes out, we are not going to be submitting a discovery
12    plan, but we hope that will be resolved soon.
13            And then the only really other case of note is the
14    shock absorbers case, and that's a case in which we have a
15    discovery plan that has been submitted.  And I think Your
16    Honor is aware we've had some motion practice on that, and
17    the Special Master ruled that our discovery plan was
18    operative.  KYB has moved to shorten the plan, and KYB has
19    filed an objection to the Special Master's decision.
20            We just very recently submitted an order which we
21    think is appropriate.  It follows the decision which you just
22    recently reached with respect to KYB's expedited motion, and
23    it's just awaiting entry.
24            THE COURT:  Okay.  Good.
25            MR. REISS:  Thank you, Your Honor.
```

1          THE COURT:  Thank you very much, Mr. Reiss.

2          MR. LOVE:  Briefly, Your Honor.  Bradley Love from

3     Barnes & Thornburg.  I represent the KYB defendants.

4          I just wanted to note regarding the order that

5     Mr. Reiss mentioned, we received that at 1:00 a.m. this

6     morning.  I think it was --

7          THE COURT:  Electronic filing.

8          MR. LOVE:  I know.  I think it was filed sometime

9     yesterday, but they waited to send that to us, so we are

10    reviewing it.  And I think we plan to submit a proposed

11    amended order to address the changes in our objections since

12    the discovery plan was entered in May of this year.

13         Some minor things to note.  We've already produced

14    all the transactional data in the case and met that deadline,

15    complied with all the plaintiffs' requests.  There's just

16    some issues with the custodial documents.  And as you are

17    aware, we would like to also get a date certain for

18    plaintiffs to complete any downstream discovery and fully

19    respond to KYB's pending summary judgment motion on

20    passthrough.

21         THE COURT:  Okay.  Thank you.

22         MR. CALDES:  Good morning, Your Honor.  Bill Caldes

23    on behalf of the direct purchaser plaintiffs.

24         In regards to the scheduling orders, excluding

25    motions -- pending motions to dismiss, cases with arbitration

1    issues, or where we are still in the process of performing

2    services.  There's only one case that's outstanding that

3    needs a scheduling order, and that is air conditioning

4    systems.  We are currently exchanging drafts with defense

5    counsel, so we hopefully will have that completed relatively

6    shortly.

7              THE COURT:  Okay.  That's the only case without

8    one?

9              MR. CALDES:  Yes, Your Honor.

10             THE COURT:  Good.  All right.  Thank you.

11             MR. CALDES:  Thank you.

12             THE COURT:  Ah, out of the jury box.

13             MR. SEEBALD:  Your Honor, Craig Seebald for the

14   Hitachi Automotive Systems defendants.

15             Just a minor point related to our settlements with

16   the direct purchasers in the fuel injection system case.  We

17   had settled that case with the then plaintiff Irving Levine

18   on -- earlier this week you approved our settlement in the

19   Irving Levine case, and I think on the same day you also

20   approved a motion that allowed the plaintiffs to substitute

21   Irving Levine in for VITEC, so now VITEC is the plaintiff,

22   but our settlement agreement is with Irving Levine.

23             So I just want to let you know we will be filing

24   some type of stipulation with the direct purchasers.  We have

25   already been in contact with them, to allow us to amend our

```
 1    settlement agreement so it is with VITEC, the now viable
 2    plaintiff, rather than Irving Lavine, which is no longer the
 3    plaintiff in the case.  So hopefully by the end of the week,
 4    you will have something from us to allow us to do that, but
 5    under our settlement agreement we need the Court's approval
 6    to amend our settlement agreement.
 7              THE COURT:  Okay.  You can amend, and we will see
 8    what happens when you do the amended pleading.  There should
 9    be no problem, right?
10              MR. SEEBALD:  Yes, I agree.  Thank you.
11              MR. KANNER:  Your Honor, I agree, it should not be
12    an issue.
13              THE COURT:  Okay.  Good.  Thank you.  Anyone else
14    on the status?
15              (No response.)
16              THE COURT:  All right.  I am pleased with the fact
17    that things are moving along.  They seem to be moving along
18    on a little more rapid pace as has been said.  Of course, the
19    Court is always interested in what it can do, if anything, to
20    move it along.  I know one thing we can do better is to get
21    our motions out more quickly, and I know that some of them
22    are longer than at least I like, and we are working on it to
23    push them out.  It is just that we are overwhelmed with -- we
24    are overwhelmed with paper, just trying to sort through it to
25    get to all of these motions.
```

 1          But I appreciate particularly, and I want to say

 2   that on the status report that there is that listing so

 3   everybody knows what motions are outstanding because

 4   obviously it would be difficult to go through the internet to

 5   CM/ECF to determine that unless you are on a particular case.

 6   So you all know and I want you to review very carefully

 7   the -- that report because I know many of you worked on it,

 8   but, please, review it carefully because if you have anything

 9   else that's outstanding...

10          There are some perfunctory motions, I know,

11   substitution of counsel, miscellaneous things like that, that

12   just need data entry that we are working on.  But in terms of

13   any substantive motion, if you don't see it on the list and

14   you have filed it, please call us.  All right.  Don't be one

15   of these well, we don't want to remind her because she might

16   rule against me, because that's -- I mean, that will not

17   happen, but I do need to know in case there's any problem.

18          So far we seem to have done very well, but every

19   once in a while there will be a glitch in CM/ECF where

20   something doesn't get into the right spot and causes a

21   problem.  So I am really depending on you to let me know if

22   you have outstanding motions that are not listed.

23          Okay.  Our next status conference is February 6th.

24   It will be a nice, sunny day with no snow.

25          And then we need a date for the next conference.  I

```
 1   was looking at the calendar, and June 5th looks good.  I

 2   don't know -- does anybody know of a conflict with June 5th,

 3   2019?

 4            (No response.)

 5            THE COURT:  I know right now you're probably free

 6   that day.  Okay.  We will set the next conference for

 7   June 5th, 2019.

 8            Is there anything else before we get to the motion

 9   hearings?

10            MR. WEILL:  Thank you, Your Honor.  Randall Weill

11   again.

12            I would like to raise an issue relating to the

13   production of Department of Justice documents that were

14   produced by guilty plea defendants.  Just by way of

15   background, if you recall, the direct purchasers asked last

16   winter if the Court would supplement its original order from

17   October of 2017 to add a number of cases that were not in

18   that order especially because the direct purchasers had not

19   at that time had cases pending.

20            The Court entered that order on May 31, and it

21   directed that the guilty plea defendants in those listed

22   cases produce to each separate plaintiff group within 90 days

23   of the entry of the order, the documents that were produced

24   in all cases that were pending, non-settled and not otherwise

25   stayed.
```

 1          And I am -- the direct purchasers have had

 2   discussions with various of these defendants, and one of the

 3   groups involving the auto -- the anti-vibration rubber

 4   product defendants, and those are Yamashita, Toyo Rubber,

 5   Toyo Tire and Bridgestone, did not produce documents within

 6   90 days.  The 90-day date fell on August 29th of this year.

 7          So I wrote a letter to those guilty plea defendants

 8   and asked that they produce those documents on -- by

 9   September 14th, or that we would take it up with the Court.

10   I got a response that is identical in content from each of

11   the defendants that said, in substance, the defendants on

12   April 13th, 2018, in the AVRP case, filed a 1292(b) motion

13   seeking interlocutory appeal of the Court's denial of their

14   motion to dismiss the direct purchaser complaint.  In that

15   motion, defendants requested that the Court stay discovery

16   pending disposition by the Sixth Circuit.  Therefore, our

17   position is that no discovery of the DOJ productions or

18   otherwise should proceed while the 1292(b) motion remains

19   sub judicial.

20          So we are apparently at an impasse.  The direct

21   purchasers believe that the documents are readily available

22   since they've been collected, they've been reviewed, and

23   they've been produced to the Department of Justice.  And we

24   would ask that the -- the Court give us direction about how

25   we proceed given the Court's prior order and this response

*Status Conference/Motion Hearings • September 26, 2018*

**37**

```
 1    from the AVRP defendants.

 2            And that's our situation.  I would be happy to have

 3    the AVRP defendants address those questions.

 4            MR. REISS:  Thank you, Your Honor.  Steve Reiss for

 5    the Bridgestone defendants, and I believe I speak for the

 6    other two AVRP defendants that are involved.

 7            As Mr. Weill said, I mean, he was quite, I think,

 8    open in the situation; we filed a 1292(b) motion with the

 9    Court on April 13th.  I think the motion was fully briefed by

10    May 21st, and it's still pending.  As part of that motion, we

11    asked for a stay of all discovery because I think Your

12    Honor -- I know Your Honor has been inundated with motions

13    and papers, but that motion basically says there is no

14    jurisdiction in this Court.  We've challenged the basic

15    bona fide plaintiffs.  We think there are very substantial

16    grounds for 1292(b).

17            And our position is simply that while that motion

18    is pending, including a request for a stay of discovery, we

19    should not engage in any discovery because our basic position

20    is the Court has no jurisdiction over that case.  We are

21    awaiting a ruling on the 1292(b).  In fact --

22            THE COURT:  Can I ask you a question because I'm

23    not --

24            MR. REISS:  Sure, sure.

25            THE COURT:  -- really familiar with the
```

1    interlocutory appeal, I haven't had very many of them.  How

2    long do they take?  Are they within the normal course of an

3    appeal?

4            MR. REISS:  Your Honor, the procedure first is we

5    request that the District Court certify the case for

6    interlocutory appeal, and that's been fully briefed.  If the

7    District Court grants that motion, the Sixth Circuit still

8    has to accept the case.  So there has been a round of

9    briefing which is rather expedited to the Sixth Circuit that

10   says you should take this case.  If they take the case, then

11   the case is typically on the normal appellate court briefing

12   schedule.  So -- so that will take a bit of time, Your Honor.

13           THE COURT:  No.  Wait a minute.  Is the status that

14   they are waiting to see if they will take the case, or they

15   have taken the case and now --

16           MR. REISS:  Well, first we need the order from this

17   Court.  If the Court -- if this Court grants the 1292(b), we

18   then have to file papers with the Sixth Circuit asking that

19   they accept the case.  Frankly, most of the time if the

20   District Court grants the motion, they will.  And I have a

21   fair degree of confidence that we -- on the merits of this

22   case, they will take the 1292(b).  How long the Sixth Circuit

23   takes to decide that?  Usually they are -- the appellate

24   courts are pretty quick about that.  But if they take the

25   case, then typically there is the normal appellate briefing

```
 1    schedule in the Sixth Circuit.
 2            And as I said, we -- you know, this motion actually
 3    had been up for argument before the Court in May and it was
 4    taken off the argument schedule.  It actually was placed on
 5    the schedule again, and it was taken off the schedule for
 6    this status conference.  So we honestly believe that until
 7    the motion is decided, including its request for a stay, as
 8    Mr. Weill points out, the Court's order asks for the
 9    production except for matters that were stayed.
10            THE COURT:  And did you ask for oral argument on
11    it?
12            MR. REISS:  We did, Your Honor, we have asked
13    twice, and so far the Court has taken it off twice.  We are
14    happy to argue it now, you know, but I think the Court has a
15    schedule and --
16            THE COURT:  Are you ready to argue it now?
17            MR. WEILL:  Not competently, Your Honor, no.
18            MR. REISS:  Well, I think we should go ahead, Your
19    Honor.
20            THE COURT:  We wouldn't want any incompetence in
21    this courtroom, not at these hourly rates.  Okay.  Molly.
22            (An off-the-record discussion was held at
23            10:39 a.m.)
24            THE COURT:  All right.  Molly reminds me that we
25    have heard extensive argument before.
```

```
 1            MR. REISS:  We did argue the motion to dismiss,

 2   Your Honor.

 3            THE COURT:  And, you know, I think we will do it on

 4   the briefs, and we will submit that -- to have that up next,

 5   so you will get that soon.

 6            MR. REISS:  Thank you, Your Honor.

 7            THE COURT:  Okay.

 8            MR. WEILL:  Does that mean, Your Honor, that we

 9   should await your decision before we --

10            THE COURT:  Yes, you should.  We will include in

11   the motion whether or not we stay the production, okay -- or

12   stay anything pending the Court of Appeals.

13            MR. WEILL:  Thank you very much, Your Honor.

14            MR. REISS:  Thank you, Your Honor.

15            THE COURT:  Thank you.  Anything else before we get

16   to motions?

17            (No response.)

18            THE COURT:  Okay.  GEICO.  What's going on with

19   GEICO?  I read and -- oh, you are leaving?  Thank you,

20   Mr. Esshaki.

21            (Special Master Esshaki was excused at 10:40 a.m.)

22            THE COURT:  We read and read and got to the last

23   pleading and see that there's some agreement, so --

24            MR. RUBIN:  Your Honor, Mike Rubin for the

25   Yamashita defendants in the AVRP case, speaking on behalf of
```

1    the Round 3 GEICO defendants.

2          So your question is exactly right, Your Honor, why

3    are we here?  We are here really in an effort to achieve

4    clarity as to who is in and who is not in the settlement

5    classes.

6          GEICO's exclusion request, as we laid out, did not

7    comply with the Court's notice requirements to identify

8    GEICO's purchases, which is the reason there is a lack of

9    clarity as to what purchases and by whom GEICO was seeking to

10   opt out.

11          Coupled with that was the Round 1 briefing in which

12   GEICO said, it's virtually verbatim, exclusion request

13   excluded not only GEICO's purchases but also purchases by

14   other class members who were insured by GEICO, with GEICO

15   arguing that as a subrogee GEICO was standing in their shoes

16   to assert claims for purposes when GEICO reimbursed its

17   insureds and other third-party claimants for their purchases

18   of auto parts.

19          GEICO specifically argued that in part the

20   defendants couldn't challenge GEICO's right to bring those

21   claims because GEICO was listed as an opt out in the final

22   judgments, and the defendants in Round 1 had not objected to

23   GEICO being listed as an opt out.

24          So where are we after all of this briefing?  Well,

25   GEICO now says it didn't seek and was not seeking and has not

1    sought to opt out any other class members.  That its current

2    complaint --

3                THE COURT:  Is this in Round 3 only or 1, 2 and

4    3?

5                MR. RUBIN:  Round 3 only, Your Honor.  And it says

6    that its complaint does not -- is not based upon and is not

7    asserting any subrogation claims or subrogation rights or

8    other rights derivative of those of class members that have

9    not opted out.  And that with respect to its insurance

10   payment claims, GEICO says emphatically that it's only

11   bringing its own claims if it has any, and it's not bringing

12   claims of class members who didn't opt out, and that GEICO is

13   not seeking to stand in the shoes of its class members.

14               And if that's where things ended, Your Honor, we

15   would have probably reached stipulation and withdrawn our

16   papers, and we could have moved on.  The issue, Your Honor,

17   is that GEICO then dropped footnotes in the briefs.  It's

18   footnote 21 in the opposition brief to our motion.

19               THE COURT:  I don't like footnotes.

20               MR. RUBIN:  Understood.  I --

21               THE COURT:  I don't like to read them.

22               MR. RUBIN:  And it is footnote 8 in their reply

23   brief to their motion to reply in which the footnote -- the

24   first one says, "If it's found that GEICO cannot recover for

25   its direct injuries caused by defendants' unlawful conduct,

1    GEICO also has subrogation rights."

2            And then it says in the second footnote, "Although

3    GEICO premises its claims on its direct injury in paying for

4    auto parts, which are not derivative of its insureds, GEICO's

5    subrogation rights when it had made payments to insureds or

6    claimants remain intact."

7            So it's unclear exactly what those footnotes mean

8    and what GEICO intends by them, but what we think they are

9    saying is that they are not bringing the claims that the

10    defendants are concerned about on behalf of non-opt out class

11    members, but they might in the future do so.

12            So where are we in terms of at -- in our reply

13    brief?  Based on GEICO's representations of what its

14    exclusion request is doing, if that exclusion request were

15    granted, that it would not be seeking to exclude any other

16    entity or person other than GEICO and its affiliates, the

17    defendants no longer object to GEICO's failure to comply with

18    the Court's notice requirements, namely identifying which

19    purchases they made, which vehicles, which parts.

20            Of course, it is ultimately up to the Court to

21    decide whether or not to accept the GEICO's opt out as

22    effective and valid, but for the defendants we no longer

23    object to it because of the clarification as to its scope.

24            As to the broader issues of the other claims that

25    GEICO is bringing and the footnotes about subrogation, they

 1   are saying they are not bringing subrogation claims.  They

 2   obviously have to amend their complaint to comply with the

 3   Round 1 court order separating them into parts, but until

 4   GEICO does something in line with their footnotes, there's

 5   really nothing ripe for the Court to decide.  The Court

 6   always in approving the settlements retains jurisdiction to

 7   enforce the settlements.

 8           So where we think the Court should proceed from

 9   here, as we said in our papers, and as the end payors have

10   also said, is the Court should enter the proposed final

11   approval orders as they have been submitted by the settlement

12   class counsel, along with the proposed final judgments which

13   generally retain jurisdiction over the settlement agreements

14   and to enforce the settlement agreements.

15           And to further resolve these issues and make sure

16   the record is clear, the Court should specifically state that

17   only GEICO, its expressly identified affiliates, and then the

18   one individual opt out, Mr. Terry -- I'm not going to

19   pronounce the last name right -- Sershion.

20           THE COURT REPORTER:  Would you spell that?

21           MR. RUBIN:  S-E-R-S-H-I-O-N.  They are excluded

22   from the settlement class, no other class members are

23   excluded.  And then what the defendants would request is that

24   the Court, in addition to, and without limiting, or quite

25   frankly consistent with its general retention of

1  jurisdiction, state that to the extent that any party or a

2  person or an entity attempts in the future to assert claims

3  of class members that haven't opted out, claims derivative of

4  other class members that haven't opted out, or that any party

5  contends may be pursued -- may not be pursued in the absences

6  of an opt out, but the Court retains jurisdiction to address

7  those in the future and resolve any disputes.

8          And with that I think the settlements can be

9  approved, the final judgments may be entered, and GEICO can

10  proceed with its underlying cases consistent with presumably

11  Round 1 -- the Round 1 order, and we will see what GEICO

12  actually does -- what arguments they actually make and what

13  claims they actually assert. And if we need to, the Court

14  has retained jurisdiction, so we can come back and address

15  the issues concretely and not sort of speculating about what

16  they may or may not do in the future.

17          THE COURT: Don't you -- or maybe in your proposed

18  order you have that second provision about retaining

19  jurisdiction? I mean, do we need to have something separate?

20  The Court retains jurisdiction.

21          MR. RUBIN: We don't necessarily, but for clarity

22  and just -- you were suggesting that language. As long as

23  it's understood, Your Honor, that the Court continues to

24  retain jurisdiction and that the defendants may, if GEICO

25  does go beyond what they say, if they try to revert back and

1    bring subrogation claims or assert claims that are really

2    class members, or they argue they are standing in the shoes

3    of the class members that didn't opt out, the proper place

4    procedurally is to come back to the class action because

5    that's where the Court has exclusive jurisdiction.  It is not

6    a motion to dismiss in the GEICO case; it is not a summary

7    judgment motion in the GEICO case which have limitations on

8    what the Court can do in terms of resolving facts.  It's

9    coming to enforce the Court's injunction in the final

10   judgment and doing that in front of the settlement court.

11   Obviously, Your Honor, you are the same person, but as a

12   procedural matter, it would be brought in the docket for the

13   class actions.  So that's why we wanted to clarify that so

14   the parties know, but if that's -- it is not technically

15   required for retaining jurisdiction.

16        THE COURT:  I don't mind any clarification if you

17   feel more comfortable with it, but let's see what GEICO has

18   to say about this before we resolve it.

19        MR. RUBIN:  Thank you.

20        MR. GOLDFINE:  Well, I agree with -- first, may I

21   have leave of the Court to make a special appearance, since

22   we are not parties in this MDL on our case, that was our

23   motion to intervene.  Dan Goldfine on behalf of the law firm

24   of Lewis Roca, on behalf of GEICO, except for the Toyo

25   defendants.  Ms. Cassell is here on behalf of GEICO as to the

1    Toyo defendants.

2              THE COURT:  Are you admitted?  Is this --

3              MR. GOLDFINE:  I'm admitted in a different case,

4    but this case is not part of the MDL, and that's why we filed

5    a motion to intervene here to appear.

6              THE COURT:  Okay.  Can I have the spelling of your

7    last name?

8              MR. GOLDFINE:  G-O-L-D-F-I-N-E.

9              THE COURT:  F-I-N-E.  Okay.  You may proceed.

10             MR. GOLDFINE:  Thank you.  I agree with Mr. Rubin

11   that whatever their motion was seeking over and above the

12   technical complaints was material that doesn't belong here

13   and is not ripe.  Any conditions in his proposed order which

14   was filed in the reply -- buried in the reply for which we

15   didn't get to respond to are conditions that are wishful

16   thinking on the part of the defendants.

17             Our claims, as we've briefed for you in the first

18   wave of cases, we believe are direct and they belong to GEICO

19   directly.  GEICO pays for the parts in the insureds' -- I

20   mean, we went through this presentation, there are four

21   different buckets, but the one he's talking about is we paid

22   for the parts.  We don't believe that that is derivative as

23   we have alleged it.

24             However, if the Court concludes, which it didn't in

25   the original motion to dismiss, that they are not direct, we

Case 2:12-md-02311-SFC-RSW  ECF No. 1954, PageID.36243  Filed 10/11/18  Page 48 of 123
*Status Conference/Motion Hearings • September 26, 2018*

48

1   would have subrogation rights per contract and per common law

2   that would allow us to pursue those claims.

3        THE COURT:  Did you read the opinion in GEICO?

4        MR. GOLDFINE:  I did read the opinion in the GEICO

5   case.

6        THE COURT:  It seems like the only thing you have

7   left is your own fleet claims.

8        MR. GOLDFINE:  On the antitrust claims, Your Honor,

9   but the unjust enrichment claims and state consumer

10  protection claims remain, and we are going to pursue that.

11  And to be candid, we are going to replead the antitrust

12  claims.  We think with all due respect, Your Honor, you are

13  mistaken on the antitrust standing issue, but we are going to

14  replead them according to the structure you asked us to

15  replead them; we are going to do that.  You may continue to

16  dismiss them, and we will preserve that for appeal.

17       But the -- you preserved the other buckets of

18  claims, the unjust enrichment and the consumer protection

19  claims, as well as the fleet claims on the antitrust -- all

20  three buckets as to the fleet claims.

21       So I agree with Mr. Rubin that this motion is no

22  longer ripe, it wasn't ripe to begin with.  They are really

23  challenging whether we have stated a claim, and that is

24  properly done in the other case on a Rule 12 motion as

25  opposed to this abbreviated proposition as to whether we can

1    state a claim under a direct theory or on a subrogation

2    theory.

3            So, you know, our opt out notice and our 226-page

4    complaint contemporaneously filed gave them sufficient

5    notice, which is what the case law requires, as to what we

6    were claiming.  It laid out in detail as to each of the

7    conspiracies -- frankly more detail than the first and second

8    wave of complaints that we had filed in the case because we

9    have learned more as this has gone along, and it lays out

10   exactly what we are claiming which is primarily that we

11   suffer because we had to pay more.

12           I mean, the easy example is when -- for an example,

13   an insured doesn't have to replace the part, a bumper cover,

14   for example.  They don't have to replace it; we still have to

15   pay more for that bumper cover, and that claim still exists.

16   It's not derivative of the insured, and is a direct claim as

17   a result of the wrongful conduct that the defendants engaged

18   in.

19           The defendants may be able to prove at trial that

20   their wrongful conduct didn't cause us to pay more or --

21   and/or disprove all our elements, or, as you pointed out in

22   your opinion, they may be able to prove their affirmative

23   defense of release, but that's why we are here.  Had they not

24   tried to release our claims in the settlements, we would not

25   be -- you know, I suspect we would have been in the class and

1  trying to recover as part of the class.  It was clear that we

2  were end payors for these parts.

3        I'm happy to address any questions, but given the

4  position that the defendants think that their motion is not

5  ripe or is now moot, I don't want to belabor the Court's

6  time.

7        THE COURT:  Okay.  Thank you.  Counsel.

8        MR. RUBIN:  Your Honor, the caveat of they may come

9  back with subrogation claims if what they are bringing now

10  doesn't work for them, that's where we would then come back

11  to the Court and raise our argument about those claims and

12  why those are not claims that they can bring.  Those are

13  claims of class members that didn't opt out.  Again, that's

14  not ripe because they are not asserting that now, but if they

15  do, we will be back.

16        THE COURT:  So there is nothing -- we need to enter

17  the order though still --

18        MR. RUBIN:  Yes.

19        THE COURT:  -- of the Round 3 --

20        MR. RUBIN:  Right.  I believe, Your Honor, what's

21  pending right now is the proposed final approval order.  You

22  orally approved the settlement at the fairness hearing in

23  August, then final judgments for each of the defendants, and

24  then an order reflecting resolution of these issues.

25        THE COURT:  Right.  Do you have any objections to

1   the order as proposed?

2          MR. GOLDFINE:  Okay.  Let me just take it

3   separately.

4          THE COURT:  Come to the microphone.

5          MR. GOLDFINE:  I apologize.  As to the order on the

6   opt out issue, we object to the additional language which was

7   meant to prejudge what's going on here.  You know, they have

8   admitted it is not ripe or it is moot, that that should be

9   the grounds for the order.  We will be happy to do a proposed

10  order.  I'm sure we can come to an agreement on just no

11  additional language as it's laid out in the reply brief.

12  They didn't attach a proposed order to their initial brief.

13         As to the other issues, if they -- if we're out of

14  the case, if our opt out is permitted to stand, as you -- as

15  I recall, I'm sure you don't recall, we discussed -- we

16  can't -- at the motion to dismiss, we cannot object and opt

17  out.  We are opting out so --

18         THE COURT:  And I have no problem with you opting

19  out.  I would rather -- really, I read all of your briefs,

20  but I think the fairest thing is to allow you to opt out.  I

21  think they had notice of you -- of you opting out, so that's

22  not a problem, and I will allow you to opt out.  You filed

23  your complaint.

24         I do have a problem with the 400-some paragraphs.

25  Could you have done it more concise?  I couldn't even read

1  it.  I mean, once you get to 100, it's pretty boring.

2      MR. GOLDFINE:  My kids will get a kick out of that,

3  Your Honor.

4      You've asked us to now split them up.  In total

5  there will be a lot more paragraphs, but by part or part

6  group, they will be shorter.  You know, we were facing what

7  evidence we had and tried to present it, and there's just a

8  lot of parts, as you know, as we've discussed at length.

9      THE COURT:  I know.

10      MR. GOLDFINE:  So we are cognizant of your

11  concerns, and we will try to be more cognizant of the notice

12  pleadings.  Of course, in our shoes, you know, we've got in

13  this room alone 100 lawyers who are ready to file motions to

14  dismiss challenging the adequacy of our complaint, so we want

15  to make sure we nip that in the bud as well.

16      THE COURT:  How long do you think it will take to

17  file your complaints?

18      MR. GOLDFINE:  The new complaints?

19      THE COURT:  The separate complaints.

20      MR. GOLDFINE:  My team, including Ms. Hazel here

21  from our office, would like us to have at least two months,

22  and that's what our plan is.  We discussed that with some of

23  the defendants, I didn't get any objections to the two-month

24  period of time.  And what we are going to end up doing -- we

25  have some issues because we've got different case numbers and

 1    different statute of limitation issues that -- I don't want

 2    to create a gap that I have to relitigate when I re-add this,

 3    so we are going to try to figure through those issues.  I

 4    didn't get the sense from the defendants that they were going

 5    to fight us tooth and nail in trying to create gaps out

 6    there, but hopefully we can work through all of those issues

 7    as part of the motion to amend that was previously filed,

 8    adding the complaints.  I think they were all in that first

 9    case including the second wave and third wave.

10        I do want to just come back.  The proposed order

11    that's in the body of their reply, we don't agree with.  We

12    think it should just be -- the motion -- the motion on the

13    opt-outs should be denied.

14        THE COURT REPORTER:  I'm sorry.

15        MR. GOLDFINE:  It should be denied, which is fine.

16    It doesn't have to have an explanation.

17        THE COURT:  Okay.

18        MR. GOLDFINE:  Thank you, Your Honor.

19        THE COURT:  Anything else?

20        MR. RUBIN:  I don't think so.

21        THE COURT:  Okay.  Thank you.  Ms. Salzman.

22        MS. SALZMAN:  Hollis Salzman.

23        I don't know if we are moving to the next motion

24    here or not, given what was just resolved, but the end payors

25    submitted final judgments to Your Honor that carved out this

*Status Conference/Motion Hearings • September 26, 2018*

**54**

```
 1   issue on GEICO, and we're asking the Court to please enter
 2   those final judgments so we can get the class settlements
 3   finalized.  We do not think and I'm not sure that GEICO is
 4   even pushing it, that GEICO should be permitted to intervene
 5   in our case.  At this juncture it's not appropriate and --
 6            THE COURT:  They are not going to intervene, the
 7   Court is allowing them to opt out.
 8            MS. SALZMAN:  I just wanted to make sure.  Thank
 9   you.
10            THE COURT:  And the Court will enter the final
11   judgment.
12            MR. RUBIN:  Thank you, Your Honor.
13            MS. STORK:  Thank you, Your Honor.
14            THE COURT:  Okay.  That takes care of one and two.
15   We have the TED motion.
16            THE LAW CLERK:  It's set for 1:00.
17            THE COURT:  I wonder if we could move it up.  There
18   are no objections.  Is anybody here for the TED's motion for
19   final approval?
20            (No response.)
21            THE COURT:  No.  There were no objectors.  Okay.
22            MR. PARKS:  Your Honor, Manly Parks for the truck
23   and equipment dealers.
24            We are not aware of any objections or opt outs.
25            THE COURT:  Do you want to put your settlement on
```

1    the record then?

2          MR. PARKS:  I would be happy to do that right now,

3    Your Honor.

4          THE COURT:  Okay.  Let's do that.

5          MR. PARKS:  Great.

6          THE COURT:  All right.

7          MR. PARKS:  Good morning, Your Honor.  I'm here

8    with my colleague, Kevin Potere, from our New York office --

9          THE COURT:  And Mr. Tallerico is sitting here.

10          MR. PARKS:  -- who handled the briefing for this,

11    and I wanted to give him credit for doing a nice job with

12    that.  I'm going to handle the argument because he's not

13    admitted to this court, otherwise he would be here for us.

14          The motion for final approval that is before the

15    Court covers four settlements in the radiators, starters and

16    alternators cases.  These settlements would yield cash

17    proceeds in excess of $3.1 million.  If approved, these

18    settlements would resolve the last of the truck and equipment

19    dealer cases pending in this action, aside from the Takata

20    claims in the occupant safety systems matter, which are tied

21    up with the bankruptcy proceeding.

22          This particular motion involves settlements with

23    the T.RAD defendants, Hitachi Automotive Systems on behalf of

24    some other Hitachi entities, the MITSUBA defendants and the

25    Bosch defendants.

1        As set forth in our moving papers, we believe that

2    each of the settlements is meaningful, substantial, fair,

3    reasonable and adequate.  On that basis we believe that final

4    approval should be granted.

5        The amount of each settlement was a function of

6    several factors including evidence of defendants' misconduct

7    and the volume of commerce potentially affected.  The volume

8    of commerce information, because we were in the pre-discovery

9    phase, was obtained through, in many cases, a mediation or

10   settlement master assisted in discussions with the defendant

11   groups and provided for settlement purposes only, and that

12   references back to the process that Mr. Barrett was referring

13   to earlier today, and it is occurring in connection with

14   these mediations and negotiations, the volume of commerce or

15   volume of affected commerce data that is the touchstone

16   ultimately for these settlement conversations in the

17   pre-discovery phase for all of these cases.

18       We did have access to that information as well as

19   other information from cooperators, ACPERA applicants,

20   et cetera, to help us evaluate the conduct evidence in

21   addition to the volume of commerce evidence.

22       We believe that accounting for the prospects of

23   success the defense has asserted, the volume of commerce

24   impacted, and the risks, cost and time associated with

25   proceeding, these settlements represent a great outcome for

1    the class.

2            Now, on the subject of notice, notice was provided

3    to punitive class members in accordance with the notice plan

4    approved by this Court, and that notice plan is detailed in

5    the declaration of Tina Chiango from RG/2, the settlement

6    administrator and notice service provider, that we are using

7    in connection with these proceedings.  They are the same

8    vendor we have used with our other settlements.

9            The notice was e-mailed to nearly 125,000 C-level

10   executives at truck and equipment dealerships.  It was sent

11   via first-class mail to over 100,000 C-level executives at

12   truck and equipment dealerships.  It was posted on the

13   www.truckdealersettlement.com website that we had set up --

14   or that our settlement administrators have set up in

15   connection with this proceeding to post information about our

16   settlements in this case.  It was printed in

17   The Wall Street Journal, The Automotive News, Automotive

18   Week, and in the e-newsletters of the American Truck Dealers

19   and The National Trailer Dealers.  We are confident that this

20   notice program was thorough and reached a very large

21   percentage of the potential class members.

22            THE COURT:  You mentioned you think it reached 80

23   or 90 percent of the class members?

24            MR. PARKS:  That is the assessment, I believe, of

25   the settlement administration firm that we are using, and I

1  have no reason to doubt that at all.

2          THE COURT:  Okay.

3          MR. PARKS:  In terms of reaction of class members,

4  it has been as positive as it could possibly be because we

5  have received no objections and are aware of no opt outs.

6          Now, I would mention that this is, I think,

7  particularly significant in the context of the types of class

8  members we have here.  These are large, sophisticated,

9  well-capitalized businesses in some instances with their own

10  in-house legal teams or in-house lawyers, and these are

11  participants who are certainly capable of appreciating the

12  significance of a class action settlement and of making their

13  positions known in the event that they do not agree with the

14  settlements or are not comfortable with the parameters of a

15  settlement.  They have not spoken up in not even a single

16  one.

17          Now, with respect to the Rule 23 elements, our

18  moving papers reviewed each of those elements and explained

19  why we believe they are satisfied.  Unless Your Honor has any

20  particular question about that aspect of our motion, I would

21  simply rely on our motion papers with respect to those

22  points.

23          THE COURT:  No, I've read it.

24          MR. PARKS:  Does Your Honor have any further

25  questions for me about the motion for final approval?

1            THE COURT:  No.  Okay.  The Court has reviewed this

2    motion for final approval with the defendants and the truck

3    and equipment dealers, and the Court notes that the -- I want

4    to address the notice first.  I'm not going to go through

5    everything you said, where the notice was published and that,

6    I've read it, and it appears to me that's adequate.  I had

7    approved the plan before, and I am pleased with the -- what

8    is represented as the percentage of individuals or companies

9    who know that they have this settlement, and so the notice

10   has been proper -- properly executed.

11           There have been no objections, and no opt outs that

12   you know of or the Court is aware of.

13           And in terms of the reasonableness, that is, is the

14   settlement fair, reasonable and adequate.  There, of course,

15   is -- are a number of factors the Court must look at.  I

16   would like to briefly touch upon those.

17           That's the likelihood of success is number one,

18   and, of course, plaintiffs are always optimistic about their

19   success, but in this case it certainly is not guaranteed, and

20   there are some extremely difficult issues.  It's complex.  It

21   will go on -- it has gone on for a lengthy period of time,

22   and, of course, it will go -- continue to go on, if not

23   settled, for a significant period of time at great expense.

24           The Court relies tremendously on the judgment of

25   counsel.  I've said this before in other settlements, and

 1     here I will repeat that the Court is very impressed with the

 2     ability of counsel and how they have handled these cases, how

 3     you have done in these cases, Counsel, and certainly you know

 4     the strengths and weaknesses of the case, and I believe it

 5     has been negotiated at arm's length, and that gives the Court

 6     great comfort in knowing and believing it's a fair,

 7     reasonable settlement.

 8            Obviously we've talked about the reaction of class

 9     members, and certainly the factor on public interest.  The

10     public is always interested for this type of litigation to be

11     taken care of with these complexities as soon as possible.

12            The Court also looks to whether the settlement

13     class should be certified in this case, and I believe that

14     given the numerosity which you have referred to and the

15     common question -- the commonality, that is the question of

16     law or fact that are common to the class, and we know that in

17     antitrust price-fixing conspiracies by its very nature they

18     deal with common legal and factual issues.

19            And the claims of the represented parties appear to

20     be typical of the claims of the class as they all arise from

21     the same event or practice or course of conduct.

22            Adequacy of representation, that relates to the --

23     to both the individually named plaintiffs, and the Court

24     finds that they have adequately, according to the information

25     submitted by counsel, represented the class.  And obviously

1    the attorneys who have been appointed -- or who have -- who

2    are taking on this class I believe have adequately protected

3    the interest.

4           Therefore, the Court turns to the final question of

5    whether the class plaintiffs demonstrated that common

6    questions predominate over questions affecting only

7    individual members, and, of course, I find that they do, and

8    they have the same issues here.

9           So therefore the Court finds that the class action

10    is a superior method to adjudicating these -- this matter.  I

11    can't imagine it being done in any other way, to be honest.

12    The Court approves the final settlement, and certifies the

13    class for purposes of the settlement.

14           MR. PARKS:  Thank you, Your Honor.

15           THE COURT:  The next motion we have is the award of

16    attorneys' fees and litigation expenses.

17           MR. PARKS:  Correct, Your Honor.  Interim class

18    counsel, my firm, Duane Morris, has moved for the award of

19    attorneys' fees in connection with this latest round of

20    settlements and for reimbursement of litigation expenses that

21    we've incurred in connection with prosecuting these claims.

22           We are seeking an award of fees representing

23    30 percent of the settlement proceeds of approximately

24    $1.1 million after deduction of the cost of class notice and

25    claims administration expenses and escrow agent costs.

```
 1              The claims administration expenses are taken across
 2    the four settlements and capped at $240,000 of expenditures
 3    under those agreements, and the escrow agent costs are capped
 4    at $6,000, and those relate to the cost the escrow agents
 5    charge to set up the escrow account in the first instance,
 6    and then there's an annual fee.  We've determined the $6,000
 7    assuming one year of the annual fee because there will be
 8    some time between now and the proceeds are fully distributed,
 9    and I'm estimating that will be ideally by the end of next
10    year.  So we would only ever have one annual fee in the
11    renewal period, so that's where we came up with the numbers
12    there.
13              THE COURT:  Do you have any awards for the named
14    plaintiffs?
15              MR. PARKS:  We have --
16              THE COURT:  Okay.
17              MR. PARKS:  We have already sought and obtained one
18    round of awards from the starters and alternators case for
19    the named plaintiffs.
20              THE COURT:  Okay.
21              MR. PARKS:  We have not sought any awards in
22    connection with the radiators case for the named plaintiffs,
23    but they have received awards in wire harnesses.  It's the
24    same group of named plaintiffs in wire harnesses, in
25    bearings, in occupant safety systems, in starters and
```

1    alternators, and our assessment was that they have been well

2    compensated for their time and efforts.  That, in particular,

3    serving as class representatives, is that the Court had been

4    interested in a demonstrated investment of specific hours

5    that relate to a particular award, and because there was an

6    award for the starters and alternators matter already, and

7    the intervening period has really been just since January

8    until now of 2018, it was going to be in our assessment

9    difficult to quantify any meaningful time that was unique to

10   radiators during that period of time, and we thought all

11   other things being equal that it would be the most fair way

12   to proceed, to forego a request for an award with respect to

13   the radiators settlements.

14          THE COURT:  All right.  So that won't be coming up?

15          MR. PARKS:  It will not be coming up, that's

16   correct.

17          THE COURT:  And that sounds reasonable.

18          MR. PARKS:  That's correct.  So the dollar amount

19   just so it is on the record here, it is certainly in our

20   papers, of the fee award that we are requesting is $857,697.

21   Again, that's 30 percent of the proceeds of the settlement

22   after subtracting the costs I mentioned a moment ago.

23          Counsel is also seeking an award of $37,297.32 for

24   cost reimbursement.  The schedule of costs for which we are

25   seeking reimbursement is set forth in Exhibit 1C to our fee

 1    petition motion.  The lion's share of the costs relate to

 2    payments to cover court-appointed settlement masters for

 3    their services related to the facilitation of settlement

 4    discussions between the parties.

 5         Regarding the requested fee award, that represents

 6    a multiple of 1.38 of the lodestar which here is

 7    approximately $620,000.  I would note that that runs through

 8    August 30th, 2018 only.  It would not include the time

 9    associated with preparing the motion for final approval, for

10    coming here today, for all of the future settlement

11    administration efforts that we will have to oversee.  And so

12    my strong suspicion is that once all of the final accounting

13    is done and following all of those activities, we will have

14    invested significant additional time on these files, and this

15    will be, as I mentioned, our final round of settlements in

16    this proceeding, certainly for radiators, starters and

17    alternators meaning that there aren't further settlements

18    from which we could be compensated for that future time.

19         And while the 1.38 multiple on lodestar is in

20    excess of 1.0, it's, first of all, well within the range that

21    courts in the Sixth Circuit have approved, and, second of

22    all, in the final accounting likely to be much closer to 1.0

23    once all of the time in this proceeding is ultimately wrapped

24    up after the administration of the -- and distribution of the

25    settlement proceeds.

1              During the relevant --

2              THE COURT:  As to the costs, before you leave

3     that --

4              MR. PARKS:  Yes.

5              THE COURT:  For the arbitrators and mediators, are

6     you satisfied that these are the costs that they actually

7     expended and are reasonable?

8              MR. PARKS:  Absolutely.  I mean, we are talking

9     about some of the best mediators in the United States.  I'm

10    sure that's part of why the Court has brought them into this

11    process.  They don't come cheap.

12             THE COURT:  Well, I guess --

13             MR. PARKS:  But they did provide effective service

14    and oversight and help in many cases, not every one of these

15    settlements, but I would say for three of the four helped

16    actively bring the parties together and achieve a resolution.

17             In one of the four I would say that we had

18    extensive involvement of the mediators in trying to

19    facilitate discussions, and frankly most of the time relates

20    to that particular undertaking with this particular defendant

21    group.

22             THE COURT:  I question some of these costs.  This

23    is somewhat picky, but telephone/fax expenses?

24             MR. PARKS:  I believe those are expenses for

25    conference calls for -- you know, we have a firm dial-in

```
 1   number that we can use as a standing -- for long-distance
 2   phone calls, and those charges are charged back.  That is
 3   not, my understanding, a fee for a standard long-distance
 4   call, but it's for the conference call services.  That's at
 5   least my understanding.  I would have to talk to our
 6   telecommunication folks to confirm that that's what that is,
 7   but that's my understanding.
 8            THE COURT:  What about the $1.82 for postage?
 9            MR. PARKS:  That's a good question.  I can't tell
10   you about that.  My guess is something at some point was sent
11   snail mail or maybe a couple of things were sent via regular
12   mail, although frankly in these --
13            THE COURT:  Don't some of these outrageous fees
14   include some overhead that might be telephone and $1.82?  I
15   mean, I'm serious, this really gets me angry -- -
16            MR. PARKS:  I do --
17            THE COURT:  -- when I see this.
18            MR. PARKS:  I do not know frankly how these are
19   calculated.  I rely on our accounting department to track
20   these matters.  And this is the same exact way that we would
21   track them for any hourly-rate client.  And as Your Honor may
22   be aware, my firm is primarily a defense firm and so we are
23   primarily representing clients who pay by the hour, and
24   these -- this would be exactly the costs that they would pay
25   in a standard hourly-rate arrangement where they have agreed
```

1    to pay litigation costs on an hourly fee.

2         THE COURT:  Well, the Court is going to strike

3    photocopying and the postage of $1.82, and the telephone.

4    You may have the rest.

5         MR. PARKS:  Thank you, Your Honor.

6         Now during the relevant period, which was from

7    January 27th, 2018 to August 30th, 2018 for the starters and

8    alternators case, and from inception through August 30th,

9    2018 for the radiators case, Duane Morris attorneys and staff

10   billed approximately 1,250 total hours to these cases as

11   reflected in the billing details attached as Exhibit 1B to

12   the fee petition.

13        You will note that the lion's share of that time is

14   my time, the time of Mr. Shotzbarger and the time of

15   Mr. Potere because we have been the lawyers most active in

16   these matters during that period of time.  Mr. Shotzbarger

17   and Mr. Potere are associates with our firm, and I am a

18   partner.

19        So while there are a number of billers listed, many

20   of them have billed a limited amount.  For example, Mr. Mack,

21   who is the chairman of our trial department, and to whom I

22   report on this matter internally, has a limited number of

23   hours, but that's -- he's checking with me to make sure

24   things are on track and getting status reports and that sort

25   of thing, but the time is primarily mine, Mr. Shotzbarger's

1      and Mr. Potere's.

2              Now has been the case with virtually all of the

3      actions brought on behalf of the truck and equipment dealers

4      by my firm in this MDL proceeding, I think it's important to

5      consider that in these three cases the enforcement actions

6      were focused entirely on passenger vehicles. As a result, my

7      firm had to develop the claims of the truck and equipment

8      dealers from scratch, and we are very proud to have been able

9      to do so, and in so doing create a meaningful recovery for

10     the class where otherwise there would have been none, and we

11     would submit that that should be considered an important

12     factor in determining what our fee award should be.

13             With that, Your Honor, I'm happy to answer any

14     questions that you have.

15             THE COURT: All right. I have no questions. I

16     think that obviously in these attorneys' fees matters there

17     is a lodestar method and there is a percentage of the fund

18     approach. I prefer the percentage of the fund approach. I

19     think it most accurately sets forth compensation at a rate

20     that everybody understands versus looking at the individual

21     hours. I do the lodestar crosscheck -- you have done that

22     for me actually in this case, and the Court has verified it,

23     and it is certainly within the range acceptable in the

24     Sixth Circuit.

25             And I note there is, as you know in this case -- in

1    these cases, a great variation between like 20 percent and

2    30 percent, I think there was one that was 33.3 percent.  In

3    this case, the Court looks at the factors that it has to

4    consider, and the Court finds that the results achieved is

5    very strong in this case, that you -- that you had a great

6    stake, you took it on a contingency fee basis and it was

7    clearly not a clear-cut case for plaintiff, and it was very

8    complex.  The Court looked at the hourly rates and also your

9    skill and standing in the community in which you work.  And

10   the Court, most importantly in this case, as with much of the

11   directs, looked at the fact, as you indicated, that you have

12   large sophisticated members of your class and that many of

13   them have their own in-house counsel, and to me that means

14   that these individuals understand what it means to have a

15   contingency fee of 30 percent.

16          I feel differently in the end payor class, but I

17   think that there are no objections to this fee.  It seems to

18   be fair and reasonable, and the Court will grant the fee of

19   30 percent.

20          MR. PARKS:  Thank you very much, Your Honor.  We

21   will get an amended order reflecting the modifications the

22   Court has requested to the expenses component to the Court

23   directly.

24          THE COURT:  Thank you.

25          MR. PARKS:  Thank you, Your Honor.

1          THE COURT:  Amongst all of these papers, I lost my

2    agenda.

3          Mr. Tallerico, I didn't call on you, I'm sorry.

4    Who do you represent?  You show up here and there.

5          MR. TALLERICO:  I represent the T.RAD defendants.

6    I do want to note, these are the fewest words I have ever

7    said in this courtroom.

8          THE COURT:  Well said -- well spoken.

9          I want to make clear the attorneys' fees were after

10   the deduction of the expenses.  I think you said that

11   in your --

12         MR. PARKS:  We will make sure that our order

13   reflects that.  Just by point of clarification as we speak,

14   that would be both the expenses identified as well as the

15   expenses that the firm advanced for which we will be

16   reimbursed?

17         THE COURT:  Yes.

18         MR. PARKS:  Okay.  We will make sure that the

19   revised order reflects that.

20         THE COURT:  Thank you.  Direct purchaser -- auto

21   dealers or direct purchasers, who's ready?

22         MR. KANNER:  For the direct purchasers, we are

23   ready.

24         THE COURT:  And there are no objections, so you

25   don't expect anybody to come here?

1          MR. KANNER:  None that I am aware of.

2          THE COURT:  Just one minute while I find my papers.

3    All right.  This is the direct purchaser plaintiffs' motion

4    for final approval of settlement with Tokai Rika.

5          MR. KANNER:  Tokai Rika and Toyoda Gosei.

6          THE COURT:  Okay.

7          MR. KANNER:  And there will be three altogether,

8    Your Honor.  I'm going to do those two.

9          THE COURT:  Okay.

10          MR. KANNER:  And Mr. Kohn will be handling the

11   third one on air conditioning systems.

12          THE COURT:  All right.

13          MR. KANNER:  Your Honor, my name is Steve Kanner,

14   again, for the record, and on behalf of direct purchaser

15   plaintiffs.

16          It's my pleasure to address the Court today with

17   respect to final approval including proposed orders of final

18   judgment releasing the defendants, and an order approving the

19   proposed plan for distribution of settlement funds for

20   Tokai Rika and Toyoda Gosei.

21          If Your Honor deems it appropriate to grant final

22   approval on these settlements, one of the other co-counsel,

23   my colleague, Greg Hansel, seated at the table, will be

24   addressing the Court on the motions for attorneys' fees and

25   litigation costs.

 1           With respect to Tokai Rika and Toyoda Gosei, with

 2    the Court's permission I would like to proceed with both

 3    approval motions together since the facts are similar, and

 4    they both are based on the common history of what took place

 5    in the OSS or occupant safety systems case, and, of course,

 6    the standard required for the Court's approval of those

 7    settlements are identical.

 8           If I can go into the litigation history for the

 9    record.  The Court appointed the four co-lead counsel firms

10    here today, and Mr. Fink's firm as liaison counsel back in

11    August of 2012.  We've gotten to know each other a little bit

12    since then, Your Honor.  You consolidated this matter in

13    January of 2012, and our first consolidated complaint was

14    filed later on that year, which was followed by a

15    second-amended complaint in February of 2014 which had the

16    effect of extending the class period back to 2003.

17           The defendants filed multiple motions to dismiss

18    the direct purchaser plaintiffs' consolidated amended

19    complaint, which included 12(b)(6) motions filed on

20    October 21st, 2013, and after argument the motions were

21    denied in August of 2014.

22           In July of 2015, Your Honor approved the settlement

23    in the amount of $35.516 million with AutoLiv, which was our

24    icebreaker settlement in that case.  And you -- excuse me.

25    Your Honor granted final approval for that in January of

1   2015.

2          Shortly thereafter in February of that year, we

3   announced a settlement with TRW in the amount of

4   $6.5 million, which was preliminarily approved in April of

5   2015, and final approval was granted in July of 2015 as well.

6          Fast forward to 2017.  November 14, 2017 plaintiffs

7   announced proposed settlements with the Toyoda Gosei

8   defendants in the amount of $34 million, which was

9   preliminarily approved by Your Honor this past April.

10          And finally, we reached a settlement with the

11   Tokai Rika defendants in the amount of $4 million the end of

12   January of this year, and you also gave preliminary approval

13   of that on April 25th.

14          With those settlements only one other defendant,

15   Takata, currently remains in the case.  Of course, as you

16   heard earlier today from one of my colleagues, the Takata

17   bankruptcy continues.  Each group has been working with the

18   trustee as has ours, the direct purchaser plaintiffs, and in

19   the last 30 days, we are actually getting down to serious

20   numbers which we believe are doable, and I think the trustee

21   believes they are doable.

22          I hate to be optimistic, it's not my nature as a

23   plaintiff's lawyer, but I think aspirationally we can say

24   that within six months that resolution should be accomplished

25   with Takata, and we'll advise the Court accordingly.  We

*Status Conference/Motion Hearings • September 26, 2018*

 1    would like to clean this up because that would be the last

 2    remaining defendant in this case.

 3              THE COURT:  Good.

 4              MR. KANNER:  Let's talk briefly about the terms of

 5    the agreement and payments for the class.  For Toyoda Gosei,

 6    as I mentioned, it is a $34 million settlement, and that's

 7    subject to stipulations which I briefly mentioned earlier

 8    today, and I've provided that the total value of that given

 9    settlement could not be reduced below $14.25 million

10    depending on the opt-outs.  The information, of course, is

11    disclosed in the notice with the range of the settlements.

12              With respect to Tokai Rika, I also mentioned that

13    is a $4 million settlement, and that settlement is not

14    subject to a reduction clause, but it is, as is often the

15    case, subject to what is referred to as a blow provision; in

16    case 10 percent or more of the class opts out, the defendant

17    has the option to scotch the agreement.  We don't believe

18    that is going to take place based on the responses thus far.

19              Another element of the settlement as is typically

20    the case is cooperation.  Each of the settlement agreements

21    list the nature of the cooperation.  I'm not going to go

22    through each element individually, but I can tell the Court

23    that they generally include production of documents and data

24    not previously produced, assistance and understanding the

25    data in particular, declarations and affidavits of the

1   relevant witnesses, and proffers by defense counsel, all of

2   which will go to further inculpate Takata, but, of course,

3   Takata is in a unique position of being in bankruptcy.

4        With respect to the settlement status as being

5   fair, adequate and reasonable.  The settlements before you

6   today were obtained, as we set forth in the brief, through

7   diligent hard work of counsel on both sides of the V.  In

8   each case the negotiations were, indeed, arm's length by

9   experienced counsel who made decisions recognizing the

10   inherent uncertainties of law and, in fact, along with the

11   related risks of -- and costs of highly complex litigation.

12        Plaintiffs' counsel determined that the dollar

13   value, coupled with the cooperation elements, provided ample

14   justification to enter into these settlements.

15        In the course of the litigation, plaintiffs'

16   counsel reviewed millions of documents, I think it's about

17   3.5 million.  I did the analysis last night.

18        THE COURT:  Could you speak a little more into the

19   microphone.

20        MR. KANNER:  I'm sorry.  Bad habit.  I was just

21   saying that about 3.5 million documents were produced and

22   reviewed by plaintiffs' counsel in connection with this

23   litigation, in addition to those documents produced by class

24   representatives and working with them on their materials.

25        Additionally, plaintiffs conducted interviews of

1   potential witnesses provided by defendants as part of the

2   cooperation agreement as well as detailed proffers by the

3   earlier settling defendants.

4           Accordingly, Your Honor, we believe it is

5   appropriate to conclude that the settlement and our decision

6   to reach these settlements was well founded and falls within

7   the range of reasonableness.

8           With respect to the notice settlement.  Following

9   preliminary approval by Your Honor, there was 1,342

10  individual copies of the notice of proposed settlement that

11  were mailed to all potential class members identified by the

12  defendants.  On May 16th of this year, pursuant to the

13  Court's direction, a summary notice of proposed settlement

14  with today's hearing date was published in one edition of

15  the Automotive News and in the national edition of

16  The Wall Street Journal.  Both of those notices took place on

17  May 21st of this year.

18          Additionally, copies of the notice are posted

19  online at autopartslitigation -- I'm sorry,

20  autopartsantitrustlitigation.com, which has been the direct

21  purchaser plaintiffs' website.

22          The declaration of Mr. Ryan Kao, who is a senior

23  project manager with Epiq Class Action & Claims Solutions,

24  reflects that as of September 6th of this year there were 692

25  page views of the settlement website, and 508 unique visits

1  to the settlement website, per se.  And Mr. Kao's report is

2  attached as Exhibit 1 to the settlement counsel's report on

3  dissemination of notice and proposed settlements.

4          Finally, counsel for both of the settling

5  defendants today have advised us that they have, indeed,

6  fulfilled their respective obligations under the Class Action

7  Fairness Act by disseminating requisite notices to the

8  appropriate federal and state officials on April 11th, 2018

9  for Tokai Rika, and January 19th, 2018 for Toyoda Gosei.

10          With respect to any requests for exclusion, as the

11  Court knows, the class members here are some of the largest,

12  extraordinarily sophisticated OEMs in the world represented

13  by highly competent in-house and outside counsel.

14          As of September 6th, Epiq has received -- Epiq, of

15  course, is the settlement administrator -- has received three

16  requests for exclusion from the Tokai Rika settlement, those

17  being Ford, Nissan and Toyota, and remember each of those

18  entities have various subentities, and only one request in

19  the Toyoda Gosei defendant settlement class, and that would

20  be Toyota.

21          Finally, Your Honor, you asked earlier if there

22  were any objections, and for the record I want to clarify

23  that we have received no objections to any of the settlements

24  that we are discussing today.

25          In short, Your Honor, the direct purchaser

```
 1    plaintiffs' counsel believe that the request for final
 2    approval of these two settlements, which I am describing for
 3    the Court now, have met the requirements of Rule 23 in terms
 4    of commonality, numerosity, typicality and adequacy.  We
 5    firmly believe that the settlements are fair, reasonable and
 6    adequate, and submit that the class' interest in this case
 7    are best served by the orders of final approval for the
 8    settlements.  Of course, Your Honor, this is the point where
 9    I will ask or answer any questions the Court might have.
10              THE COURT:  Okay.  No questions.  The Court has
11    reviewed the settlement in this matter, and I'm not going to
12    repeat everything that you said, I don't think I need to do
13    that.  I do find that the settlement is fair, reasonable and
14    adequate, and the Court judged it under the numerous factors
15    set forth, and that is the likelihood of success on the
16    merits, and, again, you're optimistic, but success is not
17    guaranteed, and these issues create great risk in this case.
18              Certainly, the case is complex, expensive, and we
19    know the duration, and that if it was not settled as such, it
20    would go on for a considerable period of time.
21              The Court relies heavily, as it has said numerous
22    times before, on the experience and judgment of counsel, and
23    I find that counsel has made an informed decision in this
24    case as to how it should be resolved and how it is resolved,
25    and that they did so at arm's length after much discovery,
```

 1  and it's shown in the reaction of class members where we know

 2  that there are no opt outs -- at least none received by the

 3  Court or counsel.

 4          MR. KANNER:  No objections, Your Honor.  The

 5  opt-outs --

 6          THE COURT:  No objections.  I'm sorry.  There are

 7  the few opt outs that you had mentioned, which the Court is

 8  aware of.  And the Court finds it is in the public interest

 9  to settle this complex antitrust litigation.

10          The Court looks at whether the notice was proper,

11  and as you stated in this case, Mr. Kanner, about the notice

12  and who received it and how it was done, the Court finds that

13  that was reasonable -- it was a reasonable plan and

14  reasonably executed.

15          The class should be certified the Court finds in

16  this matter to effectuate the settlement.  There certainly is

17  numerosity.  We know there are over a thousand -- you

18  said 1,300-something of number of direct purchaser entities.

19  There's commonality in this antitrust action.  There is also

20  typicality, and the representatives are typical of the issues

21  raised in this case; they arise from the same practice.

22  There is the adequacy of representation in that the attorneys

23  are also adequately representing the parties, as I've

24  referenced before.  And the common question predominates, I

25  don't think there is any question about that here, it has

1    never been raised, so the Court approves that.

2            The next issue is the distribution of this matter.

3    The Court looks at it, and it must be fair, reasonable and

4    adequate.  There is a plan of allocation based on the type

5    and extent of the damages or the injuries on this -- in this

6    case, and an allocation formula is developed.  I can't say I

7    know that formula, but I rely on counsel and on the firm

8    executing it, that it has a reasonable and rational basis,

9    and that the opinion of counsel is entitled to considerable

10   weight.

11           The notice sent out describes the plan of

12   allocation here, and I want to say the same thing that I said

13   in the last case.  Here with the direct purchasers, you have

14   a more sophisticated group, and that they are well able to

15   understand what this is, and I'm sure looked at that plan of

16   allocation, and the Court has certainly approved similar

17   pro rata distributions in the past, and I will approve this

18   plan also.  Okay.

19           MR. KANNER:  Thank you very much, Your Honor.  I

20   believe drafts of each of those orders has already been

21   presented to the Court, but if not, we will certainly make

22   sure that if they can't be located we will provide them

23   again.

24           THE COURT:  Okay.  Molly will let you know if they

25   can't be located.

1       MR. KANNER:  Thank you very much, Your Honor.

2       THE COURT:  Thank you.  All right.

3       MR. KOHN:  I can still say good morning, Your

4  Honor.

5       THE COURT:  Good morning.

6       MR. KOHN:  Joseph Kohn, Kohn, Swift & Graf, in the

7  air conditioning systems case.

8            I am pleased to be here to present as briefly as

9  the Court will allow, the motion for final approval of the

10  initial settlement, and that action is between direct

11  purchaser plaintiffs and a defendant, and this is the Valeo

12  defendant.

13           I will do my best not to repeat the law and the

14  presentations that Your Honor's very familiar with and not to

15  repeat what the Court has just heard from my colleague,

16  Mr. Kanner.

17           With respect to the Valeo settlement, our

18  colleague, Mr. Hansel, will also be addressing the issue with

19  respect to our request for fees and costs in the event that

20  Your Honor were to approve the settlement.

21           Your Honor, plaintiffs in this action -- the direct

22  purchaser plaintiffs are Tiffin Motor Homes and the trustee

23  for Fleetwood Entities.

24           The settlement agreement was entered into

25  significantly on February 14th of 2017 of last year,

1    Valentine's Day, so we do have affection for defense counsel

2    nonetheless.  We did deal at arm's length throughout the

3    process.  And maybe a moment in this case in the history of

4    this, Your Honor, we in the antitrust bar, I think on both

5    sides of the V, are really lucky to be in this bar, and the

6    cordiality and professionalism that we deal with, and I think

7    the stewardship and direction of this Court and Mr. Esshaki

8    has underlined that throughout these proceedings, and really

9    as has the mediators to be able to facilitate these

10    settlements.

11          A second amended consolidated complaint was filed

12    as recently as May 28th, 2018, so we have been continuing our

13    investigation, proving this case as this settlement has been

14    pending.  Your Honor entered the notice order on June 14th,

15    2018, and the notice was provided by first-class mail

16    June 28th, 2018, and I have a similar affidavit from the

17    gentleman from Epiq.

18          There were 1,732 notices mailed directly to class

19    members.  We also have the publication programs through

20    Automotive News and press releases which to the extent in the

21    direct purchaser cases, unlike some of the other classes

22    where we have a direct mailing list of the purchasers from

23    the records of the defendant, the publication is really a

24    belt and suspenders or a cherry on top.  The best notice is

25    the mailed notice, but we also do the publication notice to

 1   make sure we are not missing someone.  And through the course

 2   of the case, we really zeroed in and updated that and focused

 3   more on the Automotive News and that particular industry as

 4   opposed to the more generic The Wall Street Journal and

 5   USA Today notices.

 6        With respect to the settlement, we -- as with all

 7   of the settlements, the direct purchasers have presented to

 8   the Court; there has been no objections from any of the class

 9   members.  We did receive opt outs from, in this case, six

10   separate groups of purchaser entities.  Ford has opted out in

11   every single one of them, Ford plus five, and in this case it

12   was General Motors, Daimler, Mercedes Benz, Nissan and BMW;

13   they are different entities.

14        Again, why they choose one case and not the other?

15   A few moments ago Mr. Kanner mentioned Toyota.  Well, Toyota

16   stayed in this case.  Honda stayed in this case.  Chrysler

17   and Subaru.  I thought maybe we had done something to offend

18   the Germans, but Volkswagen stayed in, so it wasn't anything

19   with them, but I think significantly as well, that the

20   hundreds and hundreds of the tier 1 and tier 2, the smaller

21   direct purchasers, have stayed in the class uniformly.

22        Your Honor, the brief we had filed on July 30, 2018

23   we believe goes into detail on the well-established standards

24   for settlement approval, the relevant factors of risk,

25   et cetera.  That's pages 7 through 15 of the brief, and we

1    would respectfully rely upon those discussions.

2         The key points are that with respect to this case,

3    air conditioning systems, Valeo is the icebreaker settlement,

4    and we think that that phenomena is proving effective.  Once

5    again, I'm not in a position to recite results but hopefully

6    by the next time we are here, I think in November, we have

7    some other settlements, and we can give Your Honor some

8    concrete results with respect to the effect of the icebreaker

9    settlement, but they can say the temperature is getting

10   warmer and the ice is melting in air conditioning.

11        This settlement is in the range of reasonableness.

12   The total amount was $9.5 million, and that could be reduced

13   based on opt outs to a low of $8 million as a result of the

14   six entities that I recited earlier.  We came out right in

15   the middle of that, so the net final amount of the settlement

16   is $8.75 million.

17        So that while there was protection for the settling

18   defendants if additional entities opted out, there was a

19   benefit to the class, which they didn't, and we ended up

20   right in the midpoint of that range that the settlement --

21        THE COURT:  Well, that is the final amount, the

22   8.75?

23        MR. KOHN:  The 8.75 is the final amount which would

24   be available.  And this is a case we are not yet proposing

25   the claim form process, unlike in occupant safety systems

1   where there were multiple settlements.  Again, that relates

2   to the issue that our colleague, Mr. Parks, talked about

3   earlier that there is some efficiency to try to accumulate

4   several settlements before we go through the distribution

5   process.

6          So, again, the reaction of the class which we had

7   recited in the filing dated September 12th, 2018, that was

8   our report with respect to the notice program which included

9   the declaration from the Epiq people and the list of the

10  opt-outs, so all of that material is on the record.

11         Your Honor, we would respectfully request that

12  Your Honor approve this settlement between our class and

13  Valeo.  Actually it is the largest of any single-class

14  settlement with Defendant Valeo, which is a factor in terms

15  of other settlements that the Court has approved.

16         And the order has been submitted.  Again, if not,

17  Messrs. Fink will have a copy of the final judgment which was

18  negotiated between the parties.

19         Thank you, Your Honor.

20         THE COURT:  All right.  The Court approves the

21  settlement of what is now with the opt-outs $8.75 million.

22  The Court finds it is fair, reasonable and adequate under the

23  standards as set forth in our rules, and we note that there

24  are no objections.  There are the opt-outs that have been

25  named, I think Ford, GM, Daimler, AG Daimler Truck, Mercedes,

 1   Nissan and BMW, and that's what caused the reduction in the

 2   proposed settlement.

 3         The Court notes that the settlement certainly is

 4   one that -- excuse me while I find it -- that meets the

 5   standards.  The likelihood of success is, as we have talked

 6   about before, is hopeful but very technical and certainly not

 7   guaranteed in this case.

 8         The case is complex.  It costs a lot of money and

 9   could go on for a lot longer if not resolved.  And the amount

10   of the discovery in this case has been extensive, and we know

11   that -- what the reaction of the class is as the Court

12   referred to it.

13         The judgment of experienced counsel.  Again, I

14   stated this is one the Court relies on, and finds that

15   counsel has the experience to evaluate the massive discovery

16   that was done in here in this class and negotiated this

17   settlement at arm's length.

18         It is certainly in the public's interest to resolve

19   these antitrust actions which are notoriously difficult and

20   unpredictable.

21         So the next issue is the notice, and the Court is

22   satisfied with the notice.  As Mr. Kanner indicated, there

23   were direct mailings so you know who your plaintiff class is,

24   you know the individual members, and there were direct

25   mailings, plus additional notices that have been referenced

1     with the publication and the online site.

2           The settlement class the Court finds should be

3     certified here because of the numerosity.  We know that there

4     are at least 1,700 members, the questions of law or fact are

5     common in antitrust cases, and the -- certainly the claims

6     are typical of the parties here; there's adequacy of

7     representation by both the named plaintiffs and the

8     attorneys.  There's a common question that predominates over

9     any individual action.  And the Court finds, considering all

10    of these factors, and the notice, which was submitted and

11    effectuated in this case, is fair, reasonable and adequate,

12    and the Court does approve the settlement and certifies the

13    class.

14           MR. KOHN:  Thank you, Your Honor.

15           THE COURT:  Thank you.  Okay.

16           MR. HANSEL:  May it please the Court, good morning,

17    Your Honor.  Greg Hansel for the direct purchaser plaintiffs.

18           THE COURT:  Good morning, Mr. Hansel.

19           MR. HANSEL:  This morning, Your Honor, I will be

20    asking the Court to award attorneys' fees, expenses and

21    incentive awards to direct purchaser counsel and direct

22    purchaser named plaintiffs and proposed class representatives

23    in the three settlements that the Court has just approved;

24    the two settlements in occupant safety systems, Toyoda Gosei

25    and Tokai Rika, and the one settlement in air conditioning

1    systems with Valeo.

2         With the Court's permission, in the spirit of

3    efficiency, there are many common points, and I would just

4    ask if I may argue them together?

5         THE COURT:  You may.

6         MR. HANSEL:  Thank you.  Starting with OSS, some of

7    this the Court has already heard, so I'll try to be brief.

8    The total settlement with Toyoda Gosei was $34 million.

9    Their largest customer, Toyota, opted out, and that reduces

10   the settlement to $14.25 million.  The Tokai Rika settlement

11   in OSS is for the fixed amount of $4 million, so that was not

12   reduced.  So the two OSS settlements total $18.25 million.

13        Notice was mailed to the 1,342 class members --

14   potential class members.  Also, as the Court noted, notice

15   was provided by publication and online.  And there were -- in

16   addition to there being no objections to the settlements

17   themselves, there were also no objections to this motion for

18   fee expenses, expenses and incentive awards.

19        Turning to air conditioning systems in the Valeo

20   settlement, the original total amount of the settlement was

21   $9.5 million, and after the opt-outs that Mr. Kohn recited,

22   the final settlement amount is $8.75 million.  Notice was

23   published, was distributed by mail to 1,732 class members,

24   and online.  And, again, there were no objections to either

25   the settlements or for purposes of this motion, the

1    attorneys' fees, expenses and incentive awards requested.

2         Direct purchaser plaintiffs' counsel respectfully

3    requests an attorney fee of 30 percent in connection with

4    both the OSS and the air conditioning systems settlements.

5    And we request that as the Court ordered in the last ruling

6    you made on an attorney-fee motion that we made, that the

7    30 percent be applied to the settlement after deducting

8    litigation expenses.

9         Here are some of the key points as noted in our

10   briefs in favor of this request.  The settlements themselves

11   are fair, reasonable and adequate, and the Court has so

12   found.  The reaction of the class members has been excellent

13   with very few opt outs and no objections, so there's an

14   indication of broad support.

15        We ask the Court to apply, as the Court discussed

16   earlier in the case of the truck and equipment dealers, the

17   percentage of the fund approach.  This approach conserves

18   judicial resources, eliminates disputes about the

19   reasonableness of rates and hours, aligns the interest of

20   counsel with that of the class -- with those of the class,

21   and is typical in this type of litigation.  The 30 percent we

22   request is consistent with the other fee awards in this

23   Circuit, as noted in our brief, and in this very MDL case

24   that the Court has awarded in the past.

25        In both cases direct purchaser plaintiffs' counsel

1    vigorously prosecuted and effectively pursued the DPP actions

2    in OSS and air conditioning through our factual

3    investigation, drafting of pleadings, reviewing and analyzing

4    a vast number of documents in the millions of pages.  And I

5    would just note that many of these documents were produced

6    under the Court's order, which was a subject of discussion

7    earlier today, that all guilty plea defendants must produce

8    the documents they produced to the Department of Justice.

9    That order, which the Court entered a long time ago, and has

10   updated from time to time in the MDL, resulted in a vast

11   trove of evidence which direct purchaser counsel have been

12   able to analyze.

13        We analyzed this using -- it sounds strange to say

14   it, but human review as well as sophisticated analytics.  We

15   have used Japanese language reviewers as well as English

16   language reviewers, who are also attorneys.  We have found

17   these people, and they have assisted in the review.

18        In addition, we have received productions of

19   documents from ACPERA applicants -- from the amnesty

20   applicants which have been very helpful.

21        And the Valeo settlement is the first settlement in

22   the air conditioning case, but the Toyoda Gosei and

23   Tokai Rika settlements are not the first settlements in the

24   OSS case.  In that case we had previous settlements with

25   AutoLiv and TRW, and as a result of the cooperation of those

1   settlements, we received substantial cooperation of those

2   settling -- those early settling defendants against the

3   remaining defendants at the time, and that took the form of

4   witness interviews, productions of documents, and attorney

5   proffers which are very helpful in giving us a roadmap to the

6   conduct.

7        As an example of a witness interview, I can attest

8   personally, I spent three days interviewing a senior Japanese

9   executive in the seatbelt industry, who was employed by one

10  of the settling defendants in OSS, in the Lompoc Federal

11  Prison in California along with attorneys representing the

12  end payors and the auto dealers.  We interviewed this

13  gentleman for three days in the prison with the cooperation

14  of the federal prison authorities, and it gave us a great

15  deal of insight into the conduct and the nature of the

16  industry and the culture that gave rise to the conduct in the

17  MDL as a whole, frankly but certainly in the OSS case.

18  That's just one example of the type of work that counsel have

19  done in the case.

20        In addition, we took a great deal of time

21  negotiating settlements.  The mediators have been very

22  effective and continue to be.  It happens that in the case of

23  all three of these settlements, there has been what's

24  referred to as bilateral, which means we didn't use the

25  mediators.  The attorneys talked directly with each other,

1    and the parties participated in direct negotiations.

2            THE COURT:   Imagine that.

3            MR. HANSEL:   And it goes back to the

4    professionalism that Mr. Kohn mentioned, so you can still do

5    it, and it happens especially in the antitrust bar, and it

6    certainly happened in these settlements, and it saves some of

7    the expense that the Court noted that mediators can cost, but

8    I think that expense is usually well worth it, having said

9    that.  We also prepared the settlement documents and motion

10   papers that are before the Court today.

11           The Court, in addition to applying the usual

12   percentage of fund standard, the Court has employed the

13   lodestar crosscheck in the past.

14           In the OSS case, as of July 31, 2018, direct

15   purchaser counsels' lodestar was $8,697,966.49.  If the Court

16   were to award the 30 percent requested, and taking into

17   consideration the fees that the Court awarded in the earlier

18   OSS settlements in AutoLiv and TRW, the overall lodestar

19   multiplier would be 1.84, which is below 2 obviously and well

20   within the range that courts have approved for the

21   crosscheck.

22           And the actual fee that we are requesting in

23   dollars, 30 percent of $18,250,000, minus costs and expenses

24   of $32,847.34, would result in a fee of $5,465,145.80.

25   That's in OSS.

1    Turning to air conditioning systems, as of

2  June 30th, 2018, the lodestar of DPP counsel was

3  $1,810,061.25, and the fee requested represents a multiplier

4  of 1.44 times lodestar.  By the way, there is an error in the

5  notice report which said it was 1.38, it's actually 1.44.

6    So if the Court granted a 30-percent fee in the

7  Valeo air conditioning settlement, out of the settlement fund

8  of $8.75 million, after deducting costs and expenses of

9  $46,704.52, the fee in dollars would be $2,610,988.64.

10    The Sixth Circuit factors in evaluating a fee

11  include the value of the benefit rendered to the class, the

12  value of the services on an hourly basis, that's the lodestar

13  crosscheck we've just discussed, whether the services were

14  undertaken on a contingency fee basis meaning that there was

15  a risk that plaintiffs' counsel would recover nothing or an

16  insufficient amount to cover their lodestar.  This did happen

17  in the wire harness case where the fee awarded was less than

18  half of the lodestar, so it varies from part to part even

19  within this MDL.

20    Another factor is society's stake.  The Court

21  mentioned the public interest earlier today, and in rewarding

22  attorneys who produce such benefit in order to maintain an

23  incentive for others, the complexity of the litigation, and

24  professional skill and standing of counsel.

25    With respect to the allocation of fees among lead

1    counsel, liaison counsel and supporting counsel for direct

2    purchasers, we ask the Court to authorize interim lead

3    counsel to allocate the fee among the law firms who have

4    contributed to the result.

5           Finally, I already recited the amounts of

6    litigation costs and expenses, and we respectfully request

7    that the Court approves reimbursement of those amounts.

8           Finally, we request the Court grant incentive

9    awards to the class representatives in both cases, and we

10   request that those be in the amount of $30,000 each.

11          In the OSS case there are three class

12   representatives, Findlay Industries, Beam's Seatbelts and

13   NM Holdings.

14          In air conditioning there is one -- two class

15   representatives, Tiffin and Fleetwood -- the trustee of

16   Fleetwood, as Mr. Kohn mentioned.

17          None of the class representatives were promised any

18   incentive awards, it is within the Court's discretion.  We

19   note that we are requesting lower incentive awards in this

20   case than we did in the wire harness case in which the Court

21   awarded seven class representatives $50,000 each because this

22   case settled at an earlier stage than the wire harness case.

23          Having said that, the class representatives did

24   substantial work on behalf of the class, and I would like to

25   briefly highlight a few of the types of work that they have

1    done.

2        Probably the most -- of most immediate importance

3    to counsel and the claim was that they educate us on occupant

4    safety systems.  As the Court knows, those are made up of

5    seatbelts, steering wheels and air bags; not something we

6    knew a lot about before investigating this case, and the

7    class representatives were right in that industry, and they

8    knew a lot about those products and how they are procured

9    from the defendants and how they become part of systems that

10   are then sold to OEMs.

11       So our three class members were all tier 1

12   suppliers to OEMs who bought directly from defendants.  They

13   taught us about the technology, purchasing, and how it fits

14   into a system in the car.

15       The class representatives have devoted significant

16   time and effort.  There have been numerous meetings with

17   counsel, they have communicated with counsel extensively,

18   they've preserved electronic and hard copy documents, and

19   took steps to implement their preservation plans.  They've

20   communicated with us to discuss collecting documents for

21   review and production to the defendants.  They've worked on

22   questionnaires that we've given them.  They've reviewed

23   pleadings such as the complaints, and they have kept abreast

24   with interest on the status of the litigation for many years.

25   Finally, they've reviewed the details of and conferred with

1   counsel regarding proposed -- well now approved settlements.

2          In conclusion, Your Honor, direct purchaser

3   plaintiff counsel respectfully ask the Court for the

4   30-percent award after deducting expenses, also for

5   reimbursement of the expenses, and for the incentive award of

6   $30,000 per class representative.

7          Thank you, Your Honor.

8          THE COURT:  All right.  Let me ask you this

9   question, in terms of the costs, where are those costs?  I've

10  got any number of pages with very minor costs, so where's the

11  explanation, is it in another book?

12         MR. HANSEL:  The costs are -- in the case of OSS,

13  they are in Exhibit A.  It's actually ECF Document Number

14  164-1, there's an index of declarations from each of the 16

15  law firms who are -- who constitute the plaintiffs' counsel,

16  the DPP counsel in the OSS case, and for each firm there is a

17  list of expenses.

18         And in the air conditioning case --

19         THE COURT:  Where is that?

20         MR. HANSEL:  It's -- the document is 117-1, it's a

21  similar document with all the different law firms who

22  participated in the work and their respective expenses.  The

23  expenses are itemized.

24         THE COURT:  So it's the total of all of these

25  individuals?

1      MR. HANSEL:  That's correct.

2      THE COURT:  Okay.  Then I have looked at it.

3      MR. HANSEL:  Thank you.

4      THE COURT:  Thank you.  All right.  The Court has

5  reviewed this matter, and I have reviewed the individual

6  expenses, but I hadn't added them all up to that, but I

7  understand what you are saying, and the Court does award the

8  expenses as indicated.  There were some phone expenses, I

9  think, on one of those, I'm not quite sure if there are, but

10  I want those deleted.

11      MR. HANSEL:  Delete phone expenses?

12      THE COURT:  Yes.

13      MR. HANSEL:  Yes, Your Honor.

14      THE COURT:  Phone, fax, copying, those are the ones

15  I do not allow.

16      MR. HANSEL:  Okay.

17      THE COURT:  In terms of the awards for the -- the

18  incentive awards for the named plaintiffs, the Court again

19  relies on counsels' representation of what these individuals

20  did, and how much time and effort was put into the named

21  plaintiffs both in terms of educating plaintiffs' counsel, in

22  terms of submitting the discovery, whether it be hard copy or

23  electronic, and in cooperating with counsel in terms of

24  resolving this litigation, and the Court will award the

25  incentive, in this case it was asked for $30,000 each, and

1    the Court will award that.

2            In terms of the attorneys' fees, I think as you all

3    know, the Court has grappled with attorneys' fees every time

4    this has come up, but I have come to this resolution on these

5    matters here with the direct purchasers.  I want to stress

6    the overall thing is that the Court believes the direct

7    purchasers are well-informed, competent companies, and -- I

8    guess they are all companies, there may be some individuals

9    but they know what's going on, and they would understand what

10   is requested here in terms of the attorneys' fees.

11           I understand there was -- the multiplier was wrong

12   in one of the notices by a very small figure.

13           And the Court looks at the fee to see whether it

14   meets the standard as required by our law.  The Court notes

15   that, as counsel has said, the percentage of fund approach

16   has been used here regularly, and the Court prefers the

17   percentage of fund method as opposed to the lodestar.

18           The lodestar creates an interesting crosscheck, but

19   the Court also recognizes that that crosscheck is only as

20   accurate as the records are.  And the Court notes that in

21   records sometimes hours are expanded, not deliberately, I

22   don't mean in any deceitful way, I just mean like if you get

23   a telephone call or a memo, it is so much percentage, so many

24   minutes allocated to it, and it might not take that time, and

25   every single minute as I understand it is accounted for, but

1    the Court finds that that is just not a very accurate method

2    of measuring what the compensation should be for the

3    attorneys.

4              I think going into it we all know the standard is,

5    as I see it in the Sixth Circuit, is somewhere between 20 and

6    33 percent.  I mean, obviously there, both ends have some

7    impressions, but we know here that the Court appointed

8    counsel after looking at their achievements, so to speak, to

9    that -- to the point of the beginning of this case.  And the

10   Court is very pleased and impressed with counsel, and I think

11   the complexity of this case shows that it takes competent

12   counsel and it takes a lot of effort to earn this money.  And

13   the Court notes that it was taken on a contingency fee basis

14   so that there's an opportunity to put in years of work with

15   no final compensation.

16             Obviously there's complexity in this matter.  There

17   is -- it's just a tremendously complex matter involving

18   tremendous organization in order to complete it.

19             I think given all of the factors and given the

20   factors that you have a known set of plaintiffs who are

21   educated, I'm assuming that many of them have their own

22   counsel or hire outside counsel if they don't have inside

23   counsel to review this, and therefore the Court will award

24   the attorney fee of 30 percent after deduction of the

25   expenses, the service cost -- the costs and service awards.

1    Okay.

2              MR. HANSEL:  Thank you, Your Honor.

3              THE COURT:  There is one other --

4              MR. HANSEL:  Your Honor, if it is acceptable, we

5    will submit a revised proposed order that backs out the

6    faxes, copies and telephone calls.

7              THE COURT:  Yes, they weren't a lot.

8              MR. HANSEL:  We will back that out and get that to

9    chambers as soon as possible.

10             THE COURT:  And I would also like --

11             MR. HANSEL:  Two orders, one in each case.

12             THE COURT:  Yes.  I would also like to indicate

13   that you are asking for -- you are asking for you to be able

14   to distribute the attorney fee amongst other attorneys

15   working on this -- to allocate, I should say, the fee.  I

16   think I said that in the original order, and I don't think I

17   need to say it again.  It says you are appointed to do that

18   in that appointment, it says allocation if I'm not -- I don't

19   have the order here, but I think we said that exactly, so I

20   don't want to do it again to stress it.  I don't think we

21   have had much trouble -- we had one instance in the

22   beginning, but that is the order of the Court.  Okay.

23             Anything else?

24             (No response.)

25             THE COURT:  Do we have anything else on your

```
 1    agenda, which I have also now lost?  Now we have the auto
 2    dealers' motion, I have three of them.
 3              MR. RAITER:  You do, Your Honor.
 4              THE COURT:  Now these were set for later also, but
 5    nobody has objected; is that correct?
 6              MR. RAITER:  No one has objected, no one has
 7    indicated that they wish to appear, and no one has indicated
 8    that they intend to appear to counsel for the auto dealers.
 9              THE COURT:  All right.
10              MR. RAITER:  Your Honor, I'm Shawn Raiter on behalf
11    of the auto dealers.
12              You are correct, we have three motions before you
13    today.  The first is for the final approval of what we have
14    called our Round 3 settlements.  The second is for a set
15    aside of potential service awards for our auto dealers.  And
16    the third is for attorneys' fees and cost reimbursement, and
17    hopefully an award from the Court for those.
18              So I will start with the final approval motion.
19    You've had two of those today already, you've had a number of
20    them already before.  They have been well briefed by all
21    parties.  You are completely familiar with the standard and
22    the factors.  I will hopefully address the facts that should
23    be important to you rather than the law and the standards.
24              THE COURT:  Okay.
25              MR. RAITER:  So we have 23 defendant groups in the
```

1    Round 3 auto dealer settlements.  There are 37 separate

2    settlement classes within those settlements.  The total

3    amount is approximately $115 million -- it actually exceeds

4    $115 million by about $180,000.

5           As before, Your Honor, the settlements are lump

6    sum, they are cash, there is no reversion.  There is

7    substantial cooperation for each defendant.  Some of these

8    defendants have agreed to injunctive relief for two years

9    going forward, others have not.  Some have agreed to kind of

10    quasi injunctive relief.  They don't agree to call it as

11    such, but they agree not to participate in a certain conduct

12    going forward.

13           THE COURT:  Okay.

14           MR. RAITER:  The total now recovered for auto

15    dealers and presented to the Court for final approval is

16    approximately $299 million with this 115.

17           We made our Round 1 payments in April 2018 to

18    approximately 3,400 dealerships that filed eligible claims.

19    The only way -- when I say we've made the payments, remember

20    we had these reserves on the allocation plans.  So we've not

21    issued the reserves on either Round 1 or Round 2, but we made

22    approximately 85 percent distribution of Round 1 in April of

23    2018.

24           We made the distribution of Round 2 last week, so

25    Round 2 payments have been made; they have either been wired

 1    or checks have been sent to approximately 4,700 eligible

 2    dealership claims.

 3            THE COURT:  What was their average -- is there an

 4    average?

 5            MR. RAITER:  Well, yeah, so here's the problem.

 6    Some of them file one claim for four dealership locations.

 7    Let's say, hypothetically, some of them file one claim for

 8    several hundred dealership locations; others may be a

 9    dealership group but they file dealer by dealer by dealer by

10    dealer.  So the question is a good one, and it is little bit

11    hard to answer directly.

12            As we stated in the papers, some of the dealership

13    groups have already received millions of dollars in payouts.

14    The average, if there is such a thing, is approximately

15    $30,000 paid right now as of Round 1 and Round 2.  This will

16    obviously increase that roughly another 30 percent or so,

17    maybe a little more.  So again, it depends on if you are

18    looking at rooftops, roofs, root claims, bundled claims, it

19    is a little bit challenging, but most average-sized dealers

20    are getting tens of thousands of dollars in each settlement

21    round, and has thus far been quite happy.

22            As you can see, we had 3,400 claims filed in

23    Round 2, we had 4,700 -- excuse me.  In Round 1 we had 3,400,

24    and 4,700 in Round 2, and there are new dealers filing claims

25    in Round 3 as we speak because they realize, we think, these

1    are good settlements, and it is worth participating.

2              So our claim deadline for Round 3 is January 19th,

3    2019, so we will continue to take in new claims.  There are

4    people out there wrestling up more claims.  There are these

5    claim filing groups who have an incentive to go find

6    dealerships to file claims on their behalf, which is a good

7    thing; we want people to file claims and participate.

8              The notice plan was carried out as Your Honor had

9    ordered.  It was disseminated to approximately 14,000

10   dealership physical addresses, and this is a list that has

11   evolved over time.  The claim administrator gathered those

12   from several different places of known new vehicle

13   dealerships in the included states.  Some of them might be

14   out of the business; some of them were, in fact, out of

15   business and still filed claims.  Some of them have changed

16   names.  So you've got a list that's not precise, but it's

17   pretty darn good because it's really known new car

18   dealerships.

19             They then sent e-mails to approximately 44,000

20   e-mail addresses associated with new car dealerships over the

21   same class periods, and then they advertised in all of the

22   normal automobile dealership publications, Automotive News,

23   Auto Dealer Monthly, and then also a very substantial online

24   campaign as well, Twitter, Facebook and some others, along

25   with press releases.  We believe that the plan reached 90 to

1    95 percent of potential class members in the indirect

2    purchaser states.

3           We stated in our papers that all of the defendants

4    had sent a timely CAFA notice.  I was told today that one

5    maybe did not send it as soon as we had hoped.  And if you

6    remember last time for the auto dealer settlements, we had a

7    couple of CAFA notices that were late going out, and because

8    of the CAFA requirement, that the notice did go to the state

9    attorney generals and the district attorney generals,

10   Puerto Rico and the District of Columbia, that you have to

11   give time for them to respond before you can enter judgment.

12   So I believe we are going to have one defendant that we will

13   have to hold off on their final judgment.  We did that last

14   time with a handful.  So I will have to revise our final

15   approval order to address that just like we did last time,

16   but we will communicate with the Court about the timing of

17   that, and then also remind your chambers when it is time to

18   enter judgment, assuming that you approve the settlement, of

19   course.

20          We submitted these to you like we did last time,

21   which is with an omnibus final approval order, and then

22   individual judgments for each settling defendant.  Those

23   judgments have been reviewed and approved by defense counsel.

24          So what I think the process here would be is that

25   if you agree with the settlement, approve the settlements, we

 1   would issue the omnibus order and then the individual

 2   judgment for each defendant in each of their appropriate

 3   cases.  Again, we did that in Round 2.

 4        The class member reaction was, again, good in our

 5   opinion; we had no objections.  The opt-outs were essentially

 6   the same three dealership groups, as you know, has brought

 7   their own actions here or are pursuing their own actions.

 8   The out opts, what they have done is they opt out every

 9   dealership associated with those groups including many that

10   are not in the included states or the indirect purchaser

11   states.

12        So if you sort the list by the included or indirect

13   purchaser states, there are roughly 290 addresses or

14   dealerships listed.  A good number of them say collision

15   centers or hail repair or used cars, which would not be part

16   of our settlement class unless they are a licensed new car

17   dealership as well.  They don't appear to be, so that number

18   comes down a bit.  Then they also have a lot of dealerships

19   that are listed at the same physical address, so we're not

20   sure if they are, in fact, different rooftops, different

21   dealerships.

22        We think the total numbers of opt outs in Round 3

23   in the included states is approximately 260 dealerships,

24   which, if you crunch the math again using a denominator of

25   potentially eligible dealerships of somewhere north of

 1   14,000, we believe it is more like 16,000, your opt-out

 2   percentage is between 1 and 2 percent.  Again, those are the

 3   same dealerships that opted out of Round 2.  Many of them

 4   filed claims in Round 1 but then elected to participate on

 5   their own thereafter.

 6          We had a very engaged campaign with them to try to

 7   persuade them to stay in the classes because we thought the

 8   benefits were good and that they would come out ahead by

 9   doing this rather than pursuing claims with their own

10   lawyers.  They chose not to.

11          We didn't have any requests to appear.  We didn't

12   have any requests for additional information other than claim

13   handling or claim filing information where people asked how

14   do I file a claim or how do I get a claim, how do I do

15   things?  We directed those to the claim administrator

16   primarily, but we didn't have anybody saying I don't

17   understand your notice, I don't understand the settlement

18   terms, I don't understand what's being offered, I don't

19   understand anything that I need help with.  So we didn't have

20   a lot of reaction.

21          THE COURT:  What do you think these opt outs, it's

22   kind interesting for the dealerships, do you think they are

23   going to file their own claims or they didn't want to be

24   bothered or --

25          MR. RAITER:  They think they can make more money,

1    and they have been told that by lawyers who are going to work

2    on a contingent basis to try to get them more money.  That's

3    the reality.  We, having weathered the discovery that we

4    weathered in that case, we don't know how that makes any

5    sense, or how that would work out.

6            When you really look at the settlements here,

7    there's a lot of value to an MDL because the defendants have

8    an incentive kind of to settle in these waves and be done and

9    be over and really have this whole part of this litigation

10   behind them, and we think that that really improves the

11   settlement prospects in the MDL rather than going on your

12   own.

13           But we had discussions with them, with the

14   dealerships.  We talked with them about the reality of what

15   they are facing, the reality of what this kind of case would

16   look like if they were to litigate it for -- and I put this

17   in quotes -- only 260 dealerships, and we don't think the

18   economics make sense, but they have been told or persuaded

19   that they do or that they might, so that's what's happening.

20           Sometimes logic is not something you can understand

21   when coming from someone else, so --

22           THE COURT:  Do these 260 have the same attorney or

23   are we talking about different --

24           MR. RAITER:  Yeah, they do.  They have essentially

25   a group of two or three law firms, and they -- it was Group 1

1    Automotive Asbury, and then another dealership group who
2    objected through their own essentially in-house lawyer, and
3    then they are all being represented to our understanding by
4    two or three law firms who believe that they can do better.
5        There is a cottage industry here in antitrust and
6    securities cases in particular of opting out individual
7    plaintiffs hoping to do better, so you have the non-class
8    action lawyers who obviously don't have the opportunity to
9    participate here because you have appointed counsel and
10   therefore they don't have an opportunity to earn a fee here.
11   So they try to opt people out and they litigate elsewhere.
12   And I'm not casting any aspersions on whether that's a good
13   or bad thing, that's just what has happened.
14       So the reaction though if you look at our
15   settlements is quite good.  No objections, and this is our
16   third round of no objections.  The first round we had no opt
17   outs, and then Round 2 and 3 we have essentially the same
18   groups opting out, and group three they have added some
19   additional dealership locations that may or may not have been
20   part of their Round 2 opt out.  Again, our data isn't great
21   because we don't exactly know -- we get a list from them, a
22   letter which has been attached to the notice providers'
23   declaration, telling us here is who is going out.  Some of
24   them may have filed a claim in Round 1, some of them may have
25   been bundled in other claims, but what we know is in Round 3

1    they have expressly asked not to participate.

2            THE COURT:  Okay.

3            MR RAITER:  So as you have noted already about the

4    other plaintiffs' groups here, these dealerships are often

5    represented by their own in-house lawyers.  They undoubtedly

6    have outside counsel even if they don't have their own

7    in-house lawyers, and so some of them are publicly traded

8    companies who remain in the litigation.  So when we look at

9    the value of the settlement, the benefits, whether they are

10   reasonable, fair and adequate, we think that really speaks

11   loudly to the quality of these settlements; that we don't

12   have sophisticated businesses who are really willing to try

13   to make a dollar with their own in-house lawyers and their

14   own outside lawyers looking at these and not objecting and

15   electing instead to participate, and we think that speaks

16   very loudly about the quality of these settlements.

17            We've went -- we've gone through the factors

18   before; again, cash benefits, lump sums, no reversion,

19   substantial cooperation from each of the settling defendants.

20   Some of these were settlements that were either icebreakers

21   for certain parts or the second or so settling defendants

22   that are still early in some of these parts cases, although

23   we are getting close to being done, which I know Your Honor

24   will be happy about.

25            I have mentioned how the orders are presented.  And

 1    unless you have questions about the factors or anything else

 2    about the facts of the final approval motion, I will allow

 3    Your Honor to speak.

 4              THE COURT:  Okay.  Thank you.

 5              All right.  The Court has reviewed this matter.

 6    You certainly have gone over the factual basis for these

 7    settlements with these -- what did it involve, 25 component

 8    parts, I think, or 24?

 9              MR. RAITER:  It's 23.

10              THE COURT:  23.  And the Court will just very

11    quickly review what I have done today in several other cases

12    with the factors here that need to be looked at to see

13    whether this settlement is also fair, reasonable and

14    adequate.

15              The Court, as you indicated before, notes that the

16    likelihood of success is certainly not guaranteed in these

17    matters, and it could be that these classes would litigate

18    this for a long time and receive no compensation.

19              The litigation is extremely complex, it takes a lot

20    of time, and it is very expensive to deal with.  But we do

21    have experienced counsel in this matter that the Court gives

22    great deference to, and the Court finds that counsel has done

23    significant discovery in this case and analysis with the

24    facts, and that it negotiated -- counsel negotiated a

25    settlement at arm's length.

```
 1            We know that none of the class members have
 2   objected to the settlement.  And the Court does want to -- I
 3   note this in the notice, but I want to notice it here, and,
 4   Mr. Raiter, you referenced it, that these plaintiffs are
 5   sophisticated plaintiffs with counsel -- maybe not themselves
 6   but sophisticated enough to have counsel, either in-house or
 7   retained, to advise them in these -- in the resolution of
 8   this matter.  So I would think that they would understand,
 9   and with counsels' advice there have still been no
10   objections.
11            There have been opt outs -- there's a group of opt
12   outs, perhaps more than in any of our other settlements, but
13   not necessarily a great percentage.  It is not a great
14   percentage; as you indicated, it's 1 to 2 percent of the
15   potential dealerships.
16            So the Court finds that also the public would be
17   interested in settling this complex litigation that the Court
18   finds was fair, reasonable and adequate.
19            The question next is whether the notice was proper,
20   and we know that here the notice was believed to have -- I
21   think you indicated or the papers indicated somewhere about a
22   90 percent reach to the potential claimants, and the Court
23   finds that that is sufficient.
24            The settlement class should be certified because it
25   satisfies all of Rule 23(a)(1) factors; that is there's
```

1   numerosity in that there is approximately 14,000 or, I

2   believe, 16,000 prospective automotive dealerships, that

3   there is commonality of questions of law or facts common to

4   the class.  There is typicality of the represented parties,

5   the claims are typical of the class.  There is adequacy of

6   representation, as the Court has already gone into.  And

7   there's the common question in these antitrust cases that

8   predominates over any individual question.

9        So the Court does certify the class, and it

10  appoints class counsel, the same class counsel that was

11  appointed sometime ago, that is Cuneo, Gilbert & LaDuca,

12  Barrett Law Group and Larson King, LLP, as the settlement

13  counsel.  Okay.

14       MR. RAITER:  Thank you, Your Honor.

15       The next motion I think should be quick.  We have

16  filed a motion to obtain leave from the Court to set aside

17  1 percent of these settlements that are before the Court for

18  potential future service awards for the dealerships.

19       THE COURT:  Okay.  I'm not ruling on whether they

20  are entitled to service awards now but simply the set aside,

21  and I think that it is appropriate to do the set aside at

22  this point, and then we will deal with the actual findings

23  later.

24       MR. RAITER:  Exactly, Your Honor.  The thinking

25  behind this, just so you know, and we did this in Round 2 as

 1    well, but the thinking is these dealerships that have served

 2    as representatives have done so across all rounds, and we

 3    didn't think it would be fair to fund any service awards from

 4    only one settlement group or the other.  So we thought we

 5    need to set that aside, and if we were to come back and ask

 6    for additional awards, you could tell us how we would

 7    allocate it, or we could make a suggestion about how to

 8    allocate across the rounds of settlements.

 9         THE COURT:  Okay.

10         MR. RAITER:  So it is simply a set aside.  We

11    noticed it in the notice to the class, and told them we would

12    ask for a 1 percent set aside, and, again, no one commented

13    or objected on that request.

14         THE COURT:  Thank you.  The 1 percent may be set

15    aside.  Then we have a motion for attorneys' fees?

16         MR. RAITER:  Yes, Your Honor.  So the attorneys'

17    fees, the fun part.  We again will not go through the factors

18    other than to note a few that we think are important facts

19    about our circumstances in this litigation and the results

20    that we have obtained.

21         As you know, we have made a request for

22    reimbursement of past expenses for only those cases in

23    Round 3 in which the Court did not already approve a

24    litigation fund.  In other words, these would be the new

25    parts for which there was no money set aside and that counsel

1    therefore funded these costs until this time.  The request

2    there is for $358,125.09.

3         We heard Your Honor very clearly today about

4    postage and long distance, and the Exhibit A to Marie Thomas'

5    declaration you will see did not make a request for those

6    things in this round of settlements.  We understand you loud

7    and clear going forward, and will be sure we don't do that in

8    the future.  So I hope those costs and expenses you will find

9    to be appropriate and reimbursable.

10        Primarily what we have right now in this stage of

11   the litigation, we have document hosting.  We continue to

12   have expert costs for potential certification and damage

13   issues with certain of the defendants that have not settled.

14   We have a substantial amount of mediation expense and travel

15   related to mediation and settlement discussions, which

16   obviously have borne some fruit.  And so that's really what

17   you are seeing here now is more kind of hosting, potential

18   preparation for certification, and settlement-related

19   matters.  So we would request reimbursement of $358,125.09 as

20   costs that were not reimbursed from a prior settlement fund.

21        THE COURT:  I will allow those costs less the ones

22   that I have stricken in the other cases.

23        MR. RAITER:  Yes, and that request doesn't include

24   any of those.

25        THE COURT:  Okay.

1      MR. RAITER:  So I think we are good there.

2      We had again noticed this.  We had only asked -- I

3  think in the notice we asked for costs and expenses, and we

4  also then noticed to the class members a request for a

5  set-aside of future litigation expense fund money for, again,

6  these cases involved in Round 3 settlements.  We've taken

7  care to establish independent funds, as you have allowed

8  these future litigation expenses to be sure that those

9  expenses are only spent in cases involved in those

10  settlements.  Again, it wouldn't be fair in our mind or make

11  sense to have one group of settlements pay for litigation

12  expenses that were not the same parts or not included in

13  there.  So we've asked for a set aside here going forward of

14  3 percent of the settlement funds.  We again provided notice

15  to the class of that in the notices.  There were no

16  objections, no responses to that request.

17      You previously awarded 8 percent in Round 2.  Here

18  we are only asking for 3.  We see our expenses declining, and

19  we just need to be sure though that if we are going to go to

20  class certification or trial with someone that we have funds

21  set aside to do that from these settlements.  Again, it is a

22  fairness issue that these settlements bare their own share of

23  what may be needed to go forward.

24      THE COURT:  I will grant that.  I have no problem

25  with the set-aside, and we can deal with what they are spent

1    for later.

2         MR. RAITER:  And as we have talked about, to the

3    extent those funds are not spent, they will revert back to

4    the settlement class fund.

5         THE COURT:  Right.

6         MR. RAITER:  So the attorneys' fees.  We, again,

7    have asked for 30 percent of the settlement funds after

8    deduction of notice expenses, costs including the future

9    litigation expense that you just mentioned, which is roughly

10   $3.4 million, so we are asking for 30 percent of the -- it is

11   roughly 112,000 -- excuse me, 112,087,000, 30 percent of

12   that.  That translates to 29 percent of the gross settlement

13   funds at issue here roughly, just over 29 percent.  We

14   noticed again to the class that we would ask for 30 percent

15   of the settlement funds, so what is actually being asked for

16   is less than the notice said.

17        Your Honor has seen the case law, and there's

18   plenty of case law that allows 33 and half percent or less.

19        I understand -- we have watched the hearing today.

20   I would like to make the point for our 30 percent as well.  I

21   understand that you have -- if we look at the orders that you

22   have issued on fees, you ordered more and you have ordered

23   less, and we think 30 percent is appropriate here for these

24   settlements, and here's why.

25        Our goal in this, in our opinion as counsel for the

 1   auto dealers, was to get money recovered for THE auto

 2   dealerships and to get money in their hands as quickly as

 3   possible, and we've done that in Round 1 and Round 2.  We

 4   expect to do it in Round 3 in pretty short order, and that's

 5   a relative term, following the conclusion of the claim

 6   process.  That, as you know, requires us to go through a

 7   deficiency process.  Somebody files a claim that is

 8   deficient, so the claim administrator says we need more

 9   information, they give them warnings, and that takes months.

10   But ultimately what we have now in place is a system that is

11   very, very complicated with a number of defendants and a

12   number of parts, the class periods, the money involved and

13   the number of claimants.  It is an incredibly complex claim

14   calculation in order to calculate and tell everybody what

15   they are getting on a parts or vehicle basis, but we have

16   that in place, and we expect for Round 3 that we are going to

17   be able to do that sometime in 2019.  Again, the claim

18   process closes end of January.

19           We have been at -- really, you've heard us say

20   this, and you can assess our emotion in doing it or what we

21   were thinking, but we were at ground zero of the discovery

22   process for both the end payors' damages analysis and their

23   class certification analysis and the auto dealers because of

24   where we sit in the distribution chain.  The defendants were

25   very focused on us; what are your damages, what are your

 1     pass-ons, how can you certify a class?  All of what we did

 2     there affects the end payors in a case like this.  So we were

 3     the target of a ton of discovery that others in this

 4     litigation didn't face, a ton of stress, a ton of work.

 5          And then we also did the same things that the other

 6     groups have done as well; reviewed documents, filed motions,

 7     opposed motions, appeared, done all of these other things.

 8          So if you look at the settlements for the end

 9     payors, they are roughly three times larger than ours, and

10     the fee award that you issued recently to the end payors, I

11     believe was around $108 million 175, and that alone is more

12     than the first two rounds of fees to the auto dealers and

13     what we are requesting here substantially.  And the lodestar

14     multiplier for the end payors, for example, after that award

15     was 1.62.

16          If you award 30 percent to the auto dealers today,

17     our multiplier will be 1.09.  And I appreciate the Court's

18     decreasing reliance on lodestar and multiplier, but that

19     shows you we did a lot of work to get to where we are at with

20     these settlements.  And we think the value of what we

21     provided to us and to the other plaintiff groups in this

22     litigation, the value of what we provided to our class

23     members by getting them the money soon, I'm not sure if

24     anybody else has distributed yet, I believe the directs may

25     have, but our focus has been to get this litigation done, to

1    get it done well for the dealerships.

2            It's a very unique litigation for the dealerships.

3    If you look at indirect purchaser litigations, to find a

4    level of success for intermediate indirect purchasers, like

5    we have had here for the auto dealers, is very difficult to

6    do.  I could argue with you that you won't find another case

7    where intermediate level indirect purchasers have done as

8    well as the auto dealers here have.

9            So, Your Honor, I believe that we are well within

10   reason and are certainly within the case law to request

11   30 percent of the settlement funds after the deduction of the

12   future litigation costs, past litigation costs, and the cost

13   of notice and administration of this round of settlement.

14   Thank you.

15           THE COURT:  And the --

16           MR. RAITER:  I should make one more point.

17           THE COURT:  And the setoff for the named plaintiffs

18   here, the incentive awards?

19           MR. RAITER:  Correct.  I'm sorry.  One last point

20   as well.  And this isn't lost on you, I know you have talked

21   about the risk, but the firms involved in this litigation,

22   some of them are larger, have more lawyers and more

23   resources; some of them are smaller and by participating in a

24   litigation like this they really take a great risk of the

25   financial well-being of their law firm.  Now, you sure hope

1    it pays off and you sure hope you do well, but it is very

2    true that there are certain of the firms in our group who

3    really put the financial well-being of their law firms on the

4    line when they started in this litigation with no guarantee

5    of being paid.

6          Thank you.

7          THE COURT:  Thank you.  All right.  The Court does

8    prefer the percentage of the fund versus the lodestar, and I

9    won't go into why, I have done it several times today, but

10   considering the percentage of the fund, the Court has to

11   review the factors.

12         There are six factors to be considered.  There is

13   the value of the benefit rendered, and that is great.  There

14   is the -- society is served well by these settlements.  And

15   the Court -- excuse me one minute.  It is important to reward

16   the attorneys who produce such benefits to maintain -- to

17   award them appropriately and to maintain an incentive to

18   others.  The services were undertaken on a contingency fee

19   basis, and as counsel indicates in this case, certainly true

20   as you indicated for some of these attorneys, but I think

21   overall this -- there is always the chance that there is no

22   recovery on a case as major as this.  It certainly is complex

23   litigation, and it involves great skill of the attorneys and

24   standing of counsel, really on both sides to litigate.

25         So I affirm everything that you said that you have

 1    done in this, Counsel.  And when I look at the lodestar,

 2    which the Court uses as a crosscheck, of 1.09, it is

 3    certainly within the realm of lodestar and lodestars

 4    approved in the Sixth Circuit.

 5           The Court also notes, as I said before, this is

 6    important to me that you are dealing with auto dealers who

 7    had notice of exactly what you are seeking for compensation

 8    in this matter, and they have access to legal advice, and

 9    there has been no objection to the attorney fee as set forth,

10    so the Court does award the 30 percent after the deductions

11    that we have specified here in court.  All right.  Thank you.

12           MR. RAITER:  Thank you, Your Honor.

13           THE COURT:  Anything else?

14           (No response.)

15           THE COURT:  You have been very quiet, Mr. Cuneo.

16           MR. CUNEO:  I'm happy to say hello to Your Honor.

17           THE COURT:  Hello.

18           MR. CUNEO:  We never argue into a yes answer.

19           THE COURT:  Anything else?  Any of the defendants?

20           (No response.)

21           THE COURT:  Okay.  Thank you very much.  We will

22    see you next year.  Happy holidays.

23           (Proceedings concluded at 12:56 p.m.)

24                      —  —  —

25

1

2                                  *CERTIFICATION*

3

4              I, Robert L. Smith, Official Court Reporter of

5    the United States District Court, Eastern District of

6    Michigan, do hereby certify that the foregoing pages comprise

7    a full, true and correct transcript taken in the matter of In

8    Re: Automotive Parts Antitrust Litigation, Case No. 12-02311,

9    on Wednesday, September 26, 2018.

10

11                            *s/Robert L. Smith*
                             Robert L. Smith, CSR 5098
12                           Federal Official Court Reporter
                             United States District Court
13                           Eastern District of Michigan

14

15

16   Date:  10/10/2018

17   Detroit, Michigan

18

19

20

21

22

23

24

25