# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

**ALAN M. DOWNES and TERRY KUMBERA,**

       **Plaintiffs,**

    **v.**                              **Case No. 09-C-0637-LA**

**WISCONSIN ENERGY CORPORATION
RETIREMENT ACCOUNT PLAN and
WISCONSIN ENERGY CORPORATION,**

       **Defendants.**

---

### MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, RECOMMENDED PLAN OF ALLOCATION, CLASS CERTIFICATION AND <u>APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL</u>

Eli Gottesdiener
Andrew P. Carter
Steven D. Cohen
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
Telephone:   (718) 788-1500
Telecopier:   (718) 788-1650

*Counsel for Plaintiffs and the proposed Class*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

FACTUAL BACKGROUND...............................................................................................6

I.      Background, Case History, Settlement Negotiations....................................................6

II.     The Proposed Settlement..........................................................................................10

      A.     The Total Settlement Amount and the Settlement Class ................................10

      B.     The Net Settlement Benefit ...........................................................................11

            1.     Attorney's Fees and Expenses............................................................11

            2.     Named Plaintiff Case Contribution Payments ...................................12

            3.     Notice and Plan Administration Costs................................................12

      C.     The Recommended Plan of Allocation..........................................................13

            1.     The Value of the Class's Claims .......................................................13

                 a.     The Four Cash Balance Formula Claims ..................................14

                 b.     The Three Traditional Plan Formula Claims ..........................15

             2.     The Probability of Success Risk Factors Applied ..............................15

                 a.     Success Factors Applied to the Cash Balance
                        Formula Claims.........................................................................16

                 b.     Success Factors Applied to Prior Plan
                          Formula Claims.........................................................................16

             3.     The Statute of Limitations Risk Factor ..............................................17

             4.     Individual Gross Settlement Benefits, the Expense
               Charge and the $250 Minimum Benefit................................................18

      D.     Individual Settlement Benefits.......................................................................19

III.    Proposed Notice to the Class – Releases of Liability from the Class...........................19

      DISCUSSION ........................................................................................................21

i

I.      The Proposed Settlement Meets the Standard for
        Preliminary Approval.................................................................................23

II.     The Proposed Plan of Allocation Should Be Preliminarily Approved.......................25

III.    The Proposed Class Should Be Conditionally Certified and the
        Named Plaintiffs and Plaintiffs' Counsel Appointed to
        Represent the Class.................................................................................26

        A.      The Proposed Class Satisfies the Requirements of Rule 23(a) .......................27

        B.      The Proposed Class Satisfies Rule 23(b)(1)(A), (b)(1)(B)
                and/or (b)(2)..............................................................................29

                1.      The Requirements of Rule 23(b)(1)(A) Are Met ...................................30

                2.      The Requirements of Rule 23(b)(1)(B) Are Met ...................................31

                3.      The Requirements of Rule 23(b)(2) Are Met .......................................32

        C.      The Court Should Appoint Undersigned Counsel as
                Class Counsel Under Rule 23(g) .....................................................34

IV.     The Proposed Notice Satisfies Rule 23 ...............................................................36

        A.      The Content of the Proposed Notice Satisfies Rule 23......................................37

        B.      The Method of Disseminating Notice to Class Members
                Satisfies Rule 23.........................................................................37

CONCLUSION ............................................................................................................38

CERTIFICATE OF SERVICE ....................................................................................39

## INTRODUCTION

In August 2011, after two years of hard-fought litigation and with the assistance of a private mediator, the parties to this ERISA pension benefits putative class action reached an agreement in principle to settle it. *See* 8/17/11 Joint Motion to Stay (Doc. 129) at 2. Now, after more than three months of additional negotiations over the concrete terms of the agreement and working with the parties' actuaries to ensure the completeness of the participant benefit calculations data needed to implement it, the parties' agreement has been fully memorialized and is ready for the Court to consider on this motion for preliminary approval. *See* Ex. 1, 11/18/11 Class Settlement Agreement ("Agreement").

Under the Agreement, Defendant Wisconsin Energy Corporation Retirement Account Plan, including the Wisconsin Energy Corporation Legacy Plan (collectively, the "Plan," as defined below) and Wisconsin Energy Corporation ("WE") (collectively, "Defendants") will pay a total of $45 million (the "Total Settlement Amount") to settle all claims in this case and to address claims that the Plan miscalculated the pension benefits that approximately 4,100 former WE employees accrued between 1996 and August 2011 in return for their service to the company (the proposed settlement "Class").

Plaintiffs have developed and propose, and Defendants take no position with respect to, a Plan of Allocation, *see* Ex. 1 at 9-11, under which the Net Settlement Benefit (approximately $31 million assuming deduction of the maximum possible Court-approved attorney's fees and cost, settlement-related administrative expenses, named plaintiff case contribution payments, and mail and publication notice costs, discussed below) would be divided among class members on an individualized basis, based on a calculation, by an ERISA enrolled actuary specially retained by Plaintiffs for this purpose, of the amounts class members could recover if the litigation continues

– more specifically, if the seven benefit claims raised in the First Amended Complaint (the "Complaint"), generally calculated using plaintiff-favorable assumptions, were successful through trial and the exhaustion of all defense appeals and the Court awarded prejudgment interest at the average prime rate on all underpayments from the original payment date to today. *Id.* at 10.  The amounts those calculations would thus yield each member would then be adjusted, first, on a claim-by-claim basis using plaintiff-favorable assumptions (such as a 9% future indexing or "projection" rate for Plaintiffs' "whipsaw" and related 4% year-of-distribution claims), based on class counsel's assessment of the likelihood that each would actually succeed if the case is resolved via litigation rather than settlement.  *Id.*  A second adjustment would account for the risk posed by Defendants' statute of limitations defense.  *Id.*

The probability-of-success adjustment all participants would be treated identically as to each claim for which they are eligible (not all participants have all seven benefit claims).[1]  The statute of limitations risk adjustment would differ depending on whether or not the member received a payment from the Plan prior to June 30, 2003, *i.e.,* more than six years before the date suit was filed on June 30, 2009.  As discussed more fully below, differential treatment is appropriate because while all participants face statute of limitations risk, under the Seventh Circuit's recent decision in *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600 (7th Cir. 2011), those paid prior to June 30, 2003 face a significantly greater risk of being held time-barred.  Plaintiffs recommend a relative weighting of 85%-20%, meaning "post-SOL" participants (*i.e.,* paid on or after June 30, 2003, in Plan of Allocation "Subgroup A") would be assumed to have a 85% chance of surviving a limitations challenge while "Pre-

---

[1] For example, the proposed class includes 452 annuitants, *see* Gottesdiener Decl. ¶ 4, who would never be eligible to recover on any of the three lump sum claims asserted in the Complaint.  To cite another example, the proposed class includes 1,442 participants who just joined the Plan after its conversion to a cash balance format in 1996, *id.*; they would never be eligible to recover on any of the prior plan formula claims.

2

SOL" participants (*i.e.,* paid before June 30, 2003, in Plan of Allocation Subgroup B) would be assumed to have a 20% chance of surviving a limitations challenge. Ex. 1 at 10.

According to Plaintiffs' actuarial experts, if the proposed settlement is approved, under the recommended plan of allocation it would represent for Subgroup A members (*i.e.,* those paid on or after June 30, 2003), a gross recovery of almost <u>57%</u> of what they were underpaid (including prejudgment interest from the date of the original alleged underpayment to today at the average prime rate for the period) under Plaintiffs' realistic best case damages scenario. *See* Gottesdiener Decl. ¶ 5 (detailing assumptions and explaining that under time value of money principles, inclusion of prejudgment interest is needed to accurately assess the extent to which participants are being made whole). Even after deducting the maximum possible fees and expenses under the Agreement – *i.e.,* the maximum possible award of attorney's fees under the Agreement, *see* Ex. 1 at 4 (30% of the Total Settlement Amount or $13,500,000); the maximum estimated expenses ($525,000, which includes settlement implementation-related expenses), *id.*; the maximum possible named plaintiff compensation, *id.* at 7 ($7,500 per plaintiff); and the maximum estimated notice costs, *id.* ($50,000) – Subgroup A members would receive, on average, an additional <u>$9,300</u> payment from the Plan, offered on the same tax-favored basis as their original payment was offered. Gottesdiener Decl. ¶ 5.

Subgroup B participants (*i.e.,* those paid before June 30, 2003) would not do nearly as well as Subgroup A members under the proposed plan of allocation but that is as it should be. While obviously not scientific, weighting for statute of limitations risk the relative value of the two SOL subgroups' claims on a 85%-20% basis is reasonable in light of *Thompson. Id.* ¶ 6. According to Plaintiffs' actuarial experts, under the proposed plan of allocation Subgroup B members would receive a gross recovery of approximately <u>14.5%</u> of what they were underpaid

3

under Plaintiffs' realistic best case damages scenario plus prejudgment interest. Gottesdiener Decl. ¶ 7. Even after deducting the maximum possible award of attorney's fees and estimated expenses, the maximum possible named plaintiff compensation, and the maximum estimated notice costs, members of Subgroup B would receive, on average, an additional $3,300 payment from the Plan, offered on the same tax-favored basis as their original payment. *Id.*

These are exceptional results in a case where all of proposed class's 4,100 members face the real risk of non-recovery or significantly reduced recovery compared to what they would receive under the proposed settlement.       For now, however, the Court is not being asked to finally approve the proposed settlement, but instead only find that it is within the range of possible approval and preliminarily appears to be fair, reasonable and adequate. Fed. R. Civ. P. 23(e). So too the Court is not now being asked to finally approve the proposed plan of allocation, but instead only find that it too appears preliminarily to be fair, reasonable and adequate. This will permit notice of the terms of the proposed settlement to be sent to the proposed Class, certification of which under Rule 23 is also sought via this motion for settlement purposes only. As explained below, certification should be granted because all of the requirements of Rule 23(a) and (b) are satisfied here and indeed this case is ideally suited for class treatment for settlement purposes under Rule 23.[2] The Court should also approve the proposed mailed notice and publication notice to the Class (attached as Exhibits B and C, respectively, to Ex. 1, the Settlement Agreement), in terms of both their content and their manner of dissemination, because they satisfy the requirements of Rule 23 and due process. Defendants have authorized Plaintiffs to represent that they concur that Preliminary Approval of the

---

[2] Of course, class certification can only be granted if the Rule 23's prerequisites are established even when certification is sought for settlement purposes only. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

4

Settlement Agreement should be granted and Notice to the Class should issue.  *See* Gottesdiener Decl. ¶ 1.

To provide sufficient time for notice and objections, Plaintiffs respectfully request that the fairness hearing be scheduled not less than ninety days (90) days after entry of the proposed Preliminary Approval Order (Ex. D to the Agreement), or at the Court's convenience.  The parties have agreed to the schedule of events set forth below, tied to a specified number of days following preliminarily approval or preceding the final approval hearing.  The schedule provided below is for illustrative purposes only; it assumes that preliminary approval is granted on December 5, 2011, and the fairness hearing set for April 3, 2012, in which case the schedule, if approved, would proceed as follows:

| Event | Days following Preliminary Approval or Preceding Final Approval Hearing | December 5, 2012 Assumed Preliminary Approval Entry Date |
|---|---|---|
| Defendants send CAFA Notices | Within 10 days of the filing of the Motion for Preliminary Approval | Thursday, December 1, 2011 |
| Parties send Participant + Participant Successor Lists to Notice Administrator | Within 5 business days of Entry of Preliminary Approval Order | Monday, December 12, 2011 |
| Administrator mails Notice to Class Members | To be completed within 30 days of Entry of Preliminary Approval Order | Wednesday, January 4, 2012 |
| Publication Notice Published | To be published no later than within 30 days of Preliminary Approval Order | Wednesday, January 4, 2012 |
| Petition for Class Counsel Fees and Named Plaintiffs' Compensation | No later than 45 days prior to Final Approval Hearing | Monday, February 20, 2012 |
| Publish fee petition to website | Within 3 business days of Fee Petition filing | Thursday, February 23, 2012 |
| Class Member Settlement Objections and Underlying Plan Data Objections filed + served/ postmarked | No later than 30 days prior to Final Approval Hearing | Tuesday, March 6, 2012 |
| Election form due date - Rollover request deadline | No later than 5 business days prior to Final Approval Hearing | Tuesday, March 27, 2012 |

5

| Motion for Final Approval | No later than 7 days prior to Final Approval Hearing | Tuesday, March 27, 2012 |
|---|---|---|
| Administrator files proof of mailing and publication | No later than 7 days prior to Final Approval Hearing | Tuesday, March 27, 2012 |
| Final Approval ("Fairness") Hearing | NA | Tuesday, April 3, 2012 |

## FACTUAL BACKGROUND

### I.    Background, Case History, Settlement Negotiations.

1.    This case principally involves Plaintiffs' claims that the Plan, a "cash balance" defined benefit pension plan, failed to calculate the lump sum pension benefits it paid to pre-retirement age participants requesting their Plan benefit in that form in accordance with ERISA's minimum lump sum distribution requirements, during the period January 1, 1996 to August 17, 2006 (the effective date of the Pension Protection Act of 2006).  *See Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 762 (7th Cir. 2003).

2.    The Plan converted to the use of a "cash balance" formula effective January 1, 1996.  First Amended Compl. (Doc. 56) ¶ 20-26 & n.6.  Under the Plan's cash balance formula, a participant's accrued benefit is determined by reference to a notional account.  *Id.*  For participants with service both before and after January 1, 1996, the participant's accrued benefit under the Plan is the greater of the cash balance formula benefit or the benefit based on the pre-1996 prior plan formula.  *Id.*  For new employees as of January 1, 1996, the accrued benefit is solely the benefit under the cash balance formula.  *Id.*

3.    In general, under the Plan's cash balance formula, the account is increased with benefit credits ("Yearly Accruals") based on compensation earned during the year.  *Id.*  The balance of each participant's account is increased each year with an "Indexing Rate" (or "interest credit"), which for the period at issue was a variable percentage equal to 4% plus 75% of the

6

excess (if any) of the annual time weighted trust investment return for the current Plan Year over 4%. *Id.*

4.      Various benefit forms were and are available under the Plan. Plan participants seeking a lump sum distribution of their benefit received the greater of the then-current balance of their notional account or the present value of their prior plan formula. *Id.*

5.      On June 30, 2009, Plaintiff Downes, a former employee of Wisconsin Electric Power Company, a subsidiary of the Plan's sponsor, WE, who received a lump sum distribution from the Plan, filed a complaint against Defendants on behalf of a proposed class of former Plan participants who had received lump sum distributions between January 1, 1996 and August 17, 2006, seeking additional benefits from the Plan. *See* Original Compl. (Doc. 1). The original complaint alleged that while the cash balance formula benefits paid may have been correctly calculated under the terms of the Plan, the law in effect during the relevant time required the lump sum to be calculated as no less than the present value of the participant's benefit under the Plan payable at (*i.e.,* reflecting the account projected to) normal retirement age (age 65, under the Plan) and that had that been done Plaintiff Downes and the proposed class would have received a larger lump sum than they were paid. *Id.* ¶¶ 29-30.

6.      More specifically, the complaint alleged that the law required the Plan to set forth a definitely determinable methodology for reflecting the value of future Indexing Rates in the calculation of a participant's cash balance formula benefit that did not understate the value of that indexing which required the Plan to determine the amount to which the departing participant's account would have grown had he or she deferred distribution of his or her benefit until age 65 and had the Plan continued to index the participant's account at the Indexing Rate until that time. *Id.* ¶ 31. The Complaint alleged that rather than make that determination, the

Plan simply assumed that rate of growth would have been no more than the rate the Plan was required to use when discounting that future value to a present value. *Id.* ¶ 29. The Complaint alleged that the Plan's failure to project future indexing rates at a rate that reflected the true value of those future indexing rates in the calculation of participants' accrued benefits caused all participants receiving a pre-age 65 distribution of their Plan benefit to suffer impermissible forfeitures of a portion of their lawfully defined accrued benefits under ERISA § 203(a), 29 U.S.C. § 1053(a); IRC § 411(a), and to receive less than the amount required under ERISA § 205(g), 29 U.S.C. § 1055(g); IRC § 417(e). Orig. Compl. ¶ 32.

7. Defendants denied liability and raised a number of affirmative defenses, including but not limited to the defense that the statute of limitations barred all of Plaintiffs' and the proposed class's claims. *See* Defs. Ans. (Doc. 10) ¶¶ 32-33 & at 17.

8. On September 6, 2010, Plaintiffs filed a First Amended Complaint (Doc. 56), alleging that Defendants miscalculated participants' benefits under each of the Plan's two formulas in a total of seven different ways, four of which (including the original "whipsaw" claim) pertain to the cash balance formula benefit; three of which pertain to the traditional, prior plan formula benefit. *See* First Amended Compl. ¶¶ 56-81, 92-97; *see also* Pl. Opp. to Defs. Mtn. to Dismiss (Doc. 77) at 8-11. Plaintiffs discuss these claims in great detail in the context of Plaintiffs' discussion of the recommended plan of allocation in Section II.C. below.[3]

9. In February 2011, Defendants admitted liability on the whipsaw claim, subject to their statute of limitations defense, *see* Defs. Mtn. to Amend Ans. (Doc. 97) but suggest that lump sums could be recalculated using an assumed future indexing projection rate that would not

---

[3] In addition to the seven benefit claims, the Complaint also included a claim for breach of fiduciary duty against WE under ERISA's fiduciary duty provisions. *See* Compl. ¶¶ 127-130.

8

be significantly higher than the rates previously used and, in Plaintiffs' view, would have still grossly understated the value of future indexing credits.

10.     In June 2011, the parties agreed to mediate the case and retain a private mediator, Karen M. Wahle, a former ERISA defense lawyer and partner of O'Melveny & Myers, LLP with extensive ERISA class action experience as a litigator and who has served as a private mediator in such cases since retiring from the active practice of law several years ago.  An all-day mediation, held on July 14, was unsuccessful and active litigation resumed.  When Defendants subsequently informed the mediator they were prepared to make Plaintiffs a higher offer, a break-through was achieved which led to the agreement in principle the parties announced to the Court on August 17.  *See* Gottesdiener Decl. ¶ 8.

11.     Prior to Plaintiffs' agreeing to the July 14 mediation, the parties spent over two years engaging in often highly-contentious motions practice, and merits and class certification-related discovery.  By the time Plaintiffs agreed to settle, the Court had ruled on several important discovery disputes, *see* Docs. 23, 45, 48, 53, 58, 67, 81, 87, 99-100, 105, 117; on Defendants' motion to require Plaintiffs to exhaust their claims, *see* Docs. 123, 125, 126, 127; and the parties had fully briefed Plaintiffs' motion for class certification, *see* Docs. 48, 94, 107, 114, 127, and Defendants' motion for partial dismissal, see Docs. 69, 77, 83, 127.  By then, Plaintiffs had received and analyzed over 16,000 distinct electronically stored information ("ESI") and hard-copy documents, numbering over 170,000 pages, having served several rounds of document requests, requests for admission and interrogatories on Defendants and having subpoenaed:  (1) Towers Watson & Co. (the Plan's actuary and WE's actuarial consultant); (2) Robert W. Baird & Co. Incorporated (the Plan's and WE's current investment consultant); (3) Callan Associates, Inc. (the Plan's and WE's former investment consultant); (4) Fidelity

Employer Services Company (an entity that performed various investment-related and actuarial-related services for the Plan and WE); (5) Mercer LLC (former investment consultant to participating companies Wisconsin Gas and WICOR and their plans, subsequently merged into the Plan); and (6) Winklevoss Technologies, LLC (consultant to Callan Associates and the designer of the software ProVal, which Callan Associates used in its investment consulting role to the Plan and WE).  *See* Gottesdiener Decl. ¶ 9.  Also by that time, Plaintiffs' actuarial and economic finance experts, one of whom attended the July 14 mediation and all of whom assisted Plaintiffs' counsel in preparing for it, had already begun significant work on their experts' reports which played an important part in enabling counsel to thoroughly analyze the strengths and weaknesses of Plaintiffs' and the proposed class's claims.  *Id.*

## II.      The Proposed Settlement

### A.      The Total Settlement Amount and the Settlement Class.

As outlined above, the Settlement Agreement provides for the creation of a common fund via Defendants' payment of the "Total Settlement Amount" of $45 million.  *See* Ex. 1 at 12.  The Net Settlement Benefit – the Total Settlement Benefit less Court-authorized deductions – would be distributed to the members of the following non-opt-out Class, which the Agreement contemplates the Court would conditionally certify for settlement purposes only under Fed. R. Civ. P. 23(b)(1)(A), 23(b)(1)(B), and/or 23(b)(2), consisting of:

(1)      All persons (referred to sometimes herein as "participant-Members") who (i) accrued a vested benefit under the Plan since January 1, 1996; (ii) were, as of August 1, 2011, no longer employed by Wisconsin Energy Corporation or an "Affiliated Company," as that term is defined in the Plan, or is a person who has been rehired by Wisconsin Energy Corporation or an "Affiliated Company" and who previously received a Plan distribution; and (iii) are listed on the final Participant List; and

(2)      All persons (referred to sometimes herein as "successor-Members") who (i) are the beneficiaries, estates, or alternate payees under a Qualified Domestic Relations Order

10

(QDRO") of such participant-Members; and (ii) are listed on the Participant Successor
List

Ex. 1 at 4-5.

The Participant List referenced in the Class definition (1)(iii) is comprised of the 4,111

participants known to the parties who fit the criteria of Class definition (1)(i) and (1)(ii) and

hence are entitled to an additional payment under the provision of the Agreement.  *Id.* at 9; Ex.

F..  Defendants represent to Plaintiffs and the Court that they have used best efforts to make sure

that the Participant List is accurate and complete.  *Id.* at 17, § 8J.  However, because of the

possibility that some claimants may have been inadvertently left off the Participant List, the

Agreement provides that any such person is not subject to the Agreement and does not waive any

rights or claims he or she may have with respect to the sufficiency or correctness of any lump

sum from the Plan.  *Id.*  As a further safeguard, the Agreement specifies that nothing prevents

Class Counsel from representing such persons in bringing a claim against the Plan in the future

should such persons, if they exist, seek his representation for that purpose.  *Id.,* § 8K.

**B.     The Net Settlement Benefit**

The Net Settlement Benefit available for payment to the Class is defined as the Total

Settlement Amount ($45 million) less (1) whatever amount the Court approves as attorney's fees

and expenses; (2) whatever amount of named plaintiffs' case contribution payment the Court

approves if any; and (3) certain defined notice costs, discussed below.  *Id.* at 8.

**1.     Attorney's Fees and Expenses.**  Plaintiffs' counsel will seek an award of

attorney's fees of no more than 30% of the Total Settlement Award ($13,500,000), in addition to

costs and expenses that are estimate not to exceed $525,000 (which includes the cost of the

ERISA enrolled actuary who will calculate all 4,100 class members' individual settlement

benefits according to whatever plan of allocation the Court approves and also includes all other

11

costs and expenses in connection with the future work that will be necessary to oversee and monitor implementation of the settlement and distribution of its proceeds). *Id.* at 4-5. To ensure that Class members have an adequate opportunity to review and make objections to the request, counsel will file their fee petition at least forty-five (45) days prior to the final approval hearing, *id.,* Ex. A, proposed Preliminary Approval Order ¶ 7 at 4, and promptly post it on the internet website dedicated to the proposed settlement (www.downespensionclassaction.com), which would be activated upon the Court's grant of preliminary approval. The proposed Mailed Notice to the Class will also apprise proposed Class members of counsel's potential fee request and direct Class members to the website for a copy of the fee petition, the Agreement and other information about the proposed settlement. Ex. B, proposed Mailed Notice, Item 9 at 7; Ex. C, proposed Publication Notice. The Notice specifically explains to class members that their net benefit would be proportionately higher if the Court awards class counsel less than the amount requested and reminds them again of their objection rights and that the Court will consider any such objections. Ex. B, Item 4A at 4-5.

       **2.**    **Named Plaintiff Case Contribution Payments.** The named plaintiffs will petition the Court for an award of no more than $7,500 each for services rendered to the Class at the same time counsel files the fee petition. *Id.* at 8. The Mailed Notice discloses Plaintiffs' intention to make this request and, again, that class members' net benefit would be proportionately higher if the Court awards less than the amount requested and that the Court will consider any objections class members may have. Ex. B, Item 4A at 4-5.

       **3.**    **Notice and Plan Administration Costs.** The maximum estimated cost of mailed notice and publication notice to the Class is $50,000. *Id.* These costs are the responsibility of the proposed Class under the Agreement. *Id.* However, the Plan has agreed to

shoulder the costs that will be incurred in making the required payments, including processing of the election forms of class members previously electing or who will now receive lump sums, the cost of distributing settlement checks and implementing rollover requests, and the application of additional credits to the existing account balances of terminated vested participants or rehires who have not yet received a distribution of their Plan benefits who receive their settlement benefit in that form. *Id.* at 9.

      **C.**    **The Recommended Plan of Allocation.**

As outlined above, under Plaintiffs' recommended Plan of Allocation, a participant-Class Member's Individual Gross Settlement Benefit is calculated using class counsel's estimate of the potential value of each of the claims the participant-Member has under the Complaint generally using plaintiff-favorable assumptions, carried forward prior to distribution (if applicable) at the Plan's Indexing Rate and brought forward after distribution (if applicable) to an assumed February 1, 2012 settlement payment date at the average prime rate, ***multiplied by*** the assumed Probability of Success Risk Factors applicable to each claim and the assumed Statute of Limitations Risk Factor applicable to the member depending on his or her SOL subgroup. *Id.* at 9-10.

      **1.**    **The Value of the Class's Claims**

The point of departure of the plan of allocation is the value of all claims raised in the First Amended Complaint, carried forward with Plan and/or average prime rate interest, as the case may be, if those claims were fully successful through final judgment and the exhaustion of all appeals. *See* Ex. 1 at 7. As noted, the Complaint alleges Defendants miscalculated participants' benefits under each of the Plan's two formulas in a total of seven different ways, four of which (including the original "whipsaw" claim) pertain to the cash balance formula benefit; three of

13

which pertain to the traditional, prior plan formula benefit.  *See* Compl. ¶¶ 56-81, 92-97; *see also* Pl. Opp. to Defs. Mtn. to Dismiss (Doc. 77) at 8-11.[4]  These seven claims, and assumptions used for purposes of calculating their values under the recommended plan of allocation, are reviewed (in subsections a. and b.) immediately below before showing how the resultant amounts would be specifically adjusted for probability of success on the merits risk and statute of limitations risk.

### a.      The Four Cash Balance Formula Claims

The four cash balance formula miscalculation claims are:

- **The cash balance indexing or "whipsaw" claim.**  As outlined above, under this claim, Plaintiffs allege that Defendants improperly undervalued future interest credits.  *Id.* ¶¶ 69-75. Properly valued, Plaintiffs maintain, and for purposes of the plan of allocation assume, that those future credits should have been projected at <u>no less a rate than 9%</u> per annum between the participant's year of distribution and the year in which he or she attained age 65, normal retirement age under the Plan.

- **The 4% year-of-distribution claim**.  This claim asserts Defendants' use of a 4% assumption for crediting participant accounts with a partial year's interest in the participant's final year in the Plan also understated the true value of that partial year's worth.  *Id.* ¶¶ 76-81.  Again, properly valued, Plaintiffs maintain, and for purposes of the plan of allocation assume, that no less than a 9% assumption should have been applied when crediting participants with a partial year's interest in his or her final year in the Plan.

- **The 7% improper conditioning claim.**  The Plan's cash balance formula provides a minimum yearly accrual of 5% of an employee's pensionable pay, *see* Plan § 4.3(a), plus the right to an "award" of as much as "an additional 2%," *id.* § 9.6, conditioned only upon the discretionary "action of the [Employee Benefit] Committee," *id.*   Plaintiffs allege that, under the governing regulations, conferring upon the Plan's fiduciaries the discretion to set the yearly accrual rate above 5%, up to an additional 2% violates ERISA. *Id.* ¶¶ ¶¶ 56-58.  Plaintiffs maintain, and for purposes of the plan of allocation assume, that the remedy for conditioning benefits in this way upon impermissible employer discretion would be for the Court to remove the impermissible condition in which case the accrual rate would become 7% for all years.

---

[4] The Complaint also alleged breaches of ERISA's fiduciary duties.  The Plan of Allocation distributes settlement benefits by reference to the Complaint's claims for additional benefits.  The settlement releases WE from the breach of fiduciary duty claim and the amounts paid by WE under the settlement and distributed according to the Plan of Allocation serve as consideration for that release.

14

- **The 5% year-of-distribution claim.** This claim asserts that, under the governing regulations, for years in which the yearly accrual was (or the Court declares it should have been) above 5%, Defendants should have credited participants with a partial year's service in their final year of service with a prorated portion of the yearly accrual above 5% that would have applied had those participants worked for the entire year. Compl. ¶¶ 59-68. Again, for purposes of the plan of allocation, Plaintiffs assume that this alleged violation would be fully remedied and members awarded participants the credits previously denied.

### b.  The Three Traditional Plan Formula Claims

The three prior plan formula miscalculation claims are:

- **The pre-retirement mortality discount claim**. This claim contends that Defendants improperly used a pre-retirement mortality discount to reduce participants' prior plan formula lump sum based on the statistical probability that they might die before reaching age 65 and therefore not received their benefits despite the fact that under the Plan a participant's pre-age 65 triggers a death benefit to the surviving spouse of equal value. Compl. ¶¶ 96-97. Plaintiffs assume for purposes of the plan of allocation that this alleged violation would be remedied in its entirety.

- **The early commencement adjustment claim.** Plaintiff contends that, as written, the prior plan formula lump sum is to be calculated, like the cash balance formula benefit, without any adjustment for early commencement, *see* Plan § 5.2(b), and that Defendants violated the Plan's terms when calculating grandfathered lump sums by reducing the benefit for early commencement. Compl. ¶¶ 98-100. Plaintiffs assume for purposes of the plan of allocation that this alleged violation would be remedied in its entirety.

- **The prior plan formula indexing claim**. Plaintiffs contend that notwithstanding the Plan's conversion to a cash balance format and the grandfathering of the prior plan formula benefit, based on the way the Plan is written the prior plan formula benefit was not merely preserved but significantly enhanced through the requirement that the benefit be indexed in the same manner that the cash balance formula benefit is indexed. Compl. ¶¶ 92-95. Plaintiffs are unable to calculate the potential value of this claim in part due to the limitations of the data received and in part due to its sheer complexity. *See* Gottesdiener Decl. ¶ 10. Indeed, Plaintiffs' actuaries report that it would cost tens of thousands of dollars and take many person hours to perform the calculations for what, as shown below, is Plaintiffs' least viable claim. *Id.* Plaintiffs have assigned this claim for purposes of the plan of allocation a value of $3,000. *Id.*

### 2.  The Probability of Success Risk Factors Applied

As discussed above, the Probability of Success Risk Factors are the percentage

adjustments selected by class counsel to be applied on a claim-by-claim basis to the values

15

calculated using the assumptions referenced above.  They are based on counsel's assessment of

the probability that the claim would have been successful in the face of one or more risks of non-

success other than statute of limitations risk had the case been litigated through final judgment

and the exhaustion of all appeals.

    **a.**   **Success Factors Applied to the Cash Balance Formula Claims**

   The four cash balance formula miscalculation claims are:

- **The cash balance indexing or "whipsaw" claim.**  Counsel recommends a 85% factor be assigned to this claim, meaning the assumption for the plan of allocation would be that Plaintiffs had a 85% chance of establishing that lump sums should be recalculated using a 9% projection rate.  While Plaintiffs are confident that they can establish that no less than 9% should be used for projection purposes, Defendants have arguments that the Court may have found persuasive for setting the rate lower.

- **The 4% year-of-distribution claim**.  Counsel recommends that a 50% factor be assigned to this claim (using a 9% projection rate assumption), to account not only for the fact that the rate achieved might be lower but that the claim itself has thus far not met with success, at least as raised in the *Ruppert* and *Thompson* actions.  *See Thompson, et al. v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc., et al.*, No. 07-CV-1047, 2010 WL3282666, at *7-8 (E.D. Wis. Aug. 19, 2010); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 3:08-cv-00127-bbc, Doc. 425 at 7-8 (W.D. Wis. March 18, 2011).

- **The 7% improper conditioning claim.**  Counsel recommends that a 35% factor be assigned to this claim because Defendants have recently produced documents which they have represented are *bona fide* annual plan amendments which could support their contention that the annual increases above 5% were the result not of acts of discretion but sponsor plan design choice.  *See* Gottesdiener Decl. ¶ 11.

- **The 5% year-of-distribution claim.**  Counsel recommends that a 95% factor be assigned to this claim.  Defendants have thus far not articulated any defense to this claim and, to the contrary, have amended the Plan, in the wake of this action, on a going-forward basis to discontinue the practice in question.  *See* Defs. Mtn. to Amend Ans., Doc. 97 at 2.

    **b.**   **Success Factors Applied to Prior Plan Formula Claims**

- **The pre-retirement mortality discount claim**.  Counsel recommends that a 50% factor be assigned to this claim.  While the Seventh Circuit in *Berger* ruled that the Xerox plan could not apply such a discount because under the terms of the plan, as here, the risk of loss of benefits due to mortality is non-existent because the participant's beneficiary fills

16

his shoes upon his death, Defendants can be expected to argue that *Berger* and the other applicable precedent supporting this claim is confined to the cash balance plan claim context. While Plaintiffs would respectfully submit that this is the proverbial distinction without a difference, Defendants might succeed in convincing the Court that *Berger* is distinguishable on this basis.

- **The early commencement adjustment claim and the prior plan formula indexing claim.** Counsel recommends that a 5% factor be assigned to both of these claims because the Court has ordered Plaintiffs to exhaust them, the claims turns entirely on arguably ambiguous language and, as a backup, Defendants could persuasively argue that if the Plan reads as Plaintiffs contends it does that is solely the result of a scrivener's error which the Plan should be able to correct without untoward unintended consequences, as in *Young v. Verizon's Bell Atl. Cash Balance Plan,* 615 F.3d 808, 816 (7th Cir.2010).

## 3.    The Statute of Limitations Risk Factor

Statute of limitations risk has always loomed large in this case for all participants and all claims, a point underscored by the Seventh Circuit's June 2011 decision in *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600 (7th Cir. 2011), which affirmed Judge Stadtmueller's March 2010 statute of limitations rulings holding time-barred the claims of all participants receiving payment more than six years prior to the date suit was filed but finding the claims of those paid within six years could proceed. *Id.* at 604-07. Defendants here contend not merely that Subgroup B participants are necessarily time-barred under *Thompson* but so are Subgroup A participants, pointing to the fact that *Thompson* found it a "very close question" whether the equivalent participants in that case were also time-barred, *id.* at 605, and the fact (so Defendants would argue) that their Summary Plan Descriptions ("SPD's") and other Plan communications were clearer than those in *Thompson,* sufficiently so to serve as an unequivocal repudiation barring all participants' claims (not merely the claims of participants who were paid outside the applicable limitations period). *See, e.g,* Defs. Exh. Mtn. Reply (Doc. 126) at 2-3 n.2.

17

Plaintiffs disagree and would show that all claims here are timely whether participants were paid within or outside of the applicable limitations period but, for plan of allocation purposes, had to develop adjustments to account for these differing risks.  As previously noted, the 85%-20% weighting for statute of limitations risk is a non-scientific but reasonable assessment of the relative value of the respective subgroup members' claims.  Gottesdiener Decl. ¶ 6.  Counsel notes that Mr. Downes and Mr. Kumbera, who both attended the full-day mediation and took an active role in the settlement process, *id.*, specifically agree that the proposed weighting is a fair, reasonable and adequate division of the Net Settlement Benefit under the circumstances.  *Id.*

### 4. Individual Gross Settlement Benefits, the Expense Charge and the $250 Minimum Benefit

Once the above calculations have been performed, the member's Individual Gross Settlement Benefit can then be derived by taking the excess of the amount resulting from the preceding calculation steps over the value of the benefit that the member has already received from the Plan (or, if the member has not yet drawn a benefit, the value of the benefit the member would otherwise receive from the Plan absent the proposed settlement).  *See* Ex. 1 at 7.

The member's Individual Net Settlement Benefit is the Individual Gross Settlement Benefit multiplied by the Expense Charge Factor which represents a *pro rata* reduction for the member's share of the Court-approved attorneys' fees and expenses, named plaintiffs' case contribution payments, and notice costs.  *Id.* at 6-7.  In no event will a member's Individual Net Settlement Benefit be less than $250.  *Id.* at 7.

* * *

It is the Court, not Plaintiffs or their counsel, that has the final say as to the plan of allocation:  the parties remain bound by the Agreement even if the Court were to order a

18

different division of the proceeds upon a more complete record. Ex. 1 at 12, § 2C. For now, the Court need only conclude that the recommended plan of allocation is within the range of reasonableness based on the foregoing considerations and thus that the proposed settlement and proposed plan of allocation should be presented to the proposed class for class members' objections or comment. Even if the Court thinks it may ultimately order a different allocation of the Net Settlement Benefit, notifying the proposed Class and seeking their reactions and input would still be appropriate now.

### D. Individual Settlement Benefits.

However the basic net settlement proceeds are allocated, each class member's Individual Settlement Benefit would be paid, to the greatest extent possible, from the Plan as a tax-qualified Settlement Benefit. *Id.* at 17, § 9D. If all or a portion of a class member's Settlement Benefit cannot be paid from the Plan as a tax-qualified Settlement Benefit, Defendants will arrange to pay the amount as a non-qualified Settlement Benefit. *Id.*[5] Class members previously electing or who will now be receiving lump sums will have the option of electing to roll the payment over or receive a direct distribution, net of the Plan's withholding for federal income taxes. *Id.* at 17-19. If they do not make a timely election between a rollover and a direct distribution, they will receive a direct distribution, net of the Plan's withholding for income taxes. *Id.*.

### III. Proposed Notice to the Class – Releases of Liability from the Class.

The parties have agreed on the form and content of both mailed individualized notice ("Mailed Notice") and a general, newspaper publication notice ("Publication Notice"), attached as Exhibits B and C to the Settlement Agreement, in order to adequately inform all known class members of their rights under the terms of the proposed Settlement.

---

[5] Because the Plan is a tax-qualified entity under the Internal Revenue Code, it is limited in the amount and type of benefits that it can distribute as tax-qualified benefits. *See* IRC § 415.

19

The Mailed Notice explains the case history; the settlement reached; the proposed plan of allocation; the procedure for obtaining final approval and procedures for objecting to or commenting on the proposed settlement and/or the requested attorney's fee and named plaintiff case contribution payments once they are submitted; and the procedure for questioning the the completeness or accuracy of the data used to calculate the participant-member's estimated Individual Net Settlement Benefit. *See* Ex. B.

Each Mailed Notice is personal to the recipient and contains a specific estimate of the individual Class Member's Settlement Benefit calculated by the enrolled actuary referenced above, and based on the assumption that the plan of allocation is approved with the Court awarding the maximum attorney's fee, the maximum estimated expense award, the maximum named plaintiff compensation that can be requested and expending the maximum estimated cost of administration and mailed notice. *Id.* As noted above, the notice informs class members that should these deductions be less than maximum, their net benefit would be proportionately higher than estimated and reminds them in that context of their rights to object. *Id.*

The Mailed Notice will also display the underlying data used to calculate the participant-member's benefit and describes the process by which any class member who has an objection to the completeness or accuracy of that data ("Underlying Plan Data Objection"), can make such an objection. The Mailed Notice explains that participants are to make such a data challenge through serving an objection on class counsel and Defendants' counsel on or before (*i.e.,* postmarked no later than) thirty (30) days prior to the Fairness Hearing. Defendants and class counsel will address all valid challenges to the accuracy or completeness of the participant-member's underlying data and correct for any errors in the data used to calculate the participant-

20

member's estimated net settlement benefit.  Ex. 1 at 14 § 4A.[6]

The Publication Notice will be published in *Milwaukee Journal Sentinel* and will also discuss the case history, the proposed Settlement, the procedure for obtaining final approval and procedures for objecting to or commenting on the Settlement and/or the class counsel's and named plaintiffs' case contribution payments once they are submitted.  Ex. C.  It also advises persons who believe they are members of the Class but have not received an individualized Mailed Notice to contact Class Counsel immediately.  *Id.*

In return for the payment and benefits described above, Plaintiffs and the Class will seek entry of a Final Order and Judgment in accordance with the terms of the Agreement dismissing with prejudice all claims in the Lawsuit and releasing Defendants.  Ex. 1 at 15, § 7.  As described in the Notice, in addition, after final approval, each member of the Class will be deemed to have released claims in accordance with the terms of the Agreement.  *Id.* & *id.* at 11-12.  The Mailed Notice in particular fully apprises proposed Class members of the effect the final approval of the proposed settlement will have on their rights in all these regards.  *Id.,* Ex. B, Item 4C at 5.

## DISCUSSION

## I.      The Proposed Settlement Meets the Standard for Preliminary Approval

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1996 (7th Cir. 1996).  However, before a class action may be compromised, court approval must be obtained and notice of the proposed compromise must be given to class members in the manner the court directs.  *See* Fed. R. Civ. P. 23(e).  The procedure for review of

---

[6] To ensure that the benefits of other participants are not unduly diluted and the premises upon which Plaintiffs negotiated the Total Settlement Amount consistent with the representations received from Defendants, if these data corrections in the Underlying Plan Data arising from objections result in upward adjustments to the Individual Gross Settlement Benefit of those who filed objections in an increased aggregate amount of more than $1.125 million, the Agreement shall be null and void unless the Parties jointly agree by written amendment to modify the provisions of this Agreement.  *Id.* at 14 § 4D.

21

a proposed class action settlement is a well-established three-step process. First, the district court must issue a "preliminary approval" order if it determines that the proposed settlement is "within the range of possible approval." *In re General Motors Corporation Engine Interchange Litigation*, 594 F.2d 1006, 1124 (7th Cir. 1979); *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). Second, notice of the proposed settlement must be sent to all class members. Third, the district court must issue a "final approval" order after notice of the settlement is provided to the class and a hearing to consider the fairness of the hearing is held. *Manual for Complex Litigation (Fourth)*, § 21.632 (2004).

Preliminary approval does not require the district court to answer the ultimate question of whether a proposed settlement is "fair, reasonable, and adequate." *See Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980).[7] Rather, that determination is made only at the final approval stage, after notice of the settlement has been provided to the class members and they have had an opportunity to voice their views of the settlement or to exclude themselves from the settlement. *Id.*

A proposed settlement falls within the range of possible approval under Rule 23(e) when the proposed settlement likely will meet the standards applied for final approval. *See, e.g., Kessler v. Am. Resorts International's Holiday Network, Ltd.*, No. 05 C 5944, 07 C 2439, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (preliminary approval is a "more summary version" of the final approval inquiry). Thus, preliminary approval only requires the Court to "determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion."

---

[7] At the final settlement approval hearing, the district court considers: (i) the strength of the plaintiffs' case compared to the amount of the settlement; (ii) the likely complexity, length, and expense of continued litigation; (iii) the extent of opposition to the settlement; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and the amount of discovery completed. *See Isby*, 75 F.3d 1199. Additional factors often include the presence (or absence) of collusion, the defendant's ability to pay, the reaction of class members, and the public interest. *See Mirfasihi v. Fleet Mortgage Corp.*, 450 F.3d 745, 748 (7th Cir. 2006).

*Sutton v. Bernard*, No. 00 C 6676, 2002 WL 1794048, at *1 (N.D. Ill. Aug. 5, 2002) (citing

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002)) (preliminary approval).

Here, the proposed Settlement is certainly "within the range of possible approval," as

reference to the factors to be considered on final approval strongly confirms.

*First*, it is well-settled that "[t]he 'most important factor relevant to the fairness of a class

action settlement' is ... 'the strength of plaintiffs case on the merits balanced against the amount

offered in the settlement.' " *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653

(7th Cir. 2006) (citation omitted). To evaluate this factor, "[i]n essence, a court must weigh the

value of the proposed settlement against the total amount that the class could recover, discounted

by the weaknesses and risks inherent in the class' claims." *Schulte v. Fifth Third Bank,* No. 09-

cv-6655, 2011 WL 3269340, at *13 (N.D. Ill. July 29, 2011).  Here, because the settlement

promises to yield benefits to the class quite significant in light of the potentially strong defenses

available to the Plan, the first factor under *Synfuel* counsels approval.  The proposed Settlement

would provide class members with both a substantial dollar recovery and, especially for SOL

Subgroup A members, a very significant portion of the amounts they could only recover at

considerable risk of loss and additional delay, if the litigation were to continue.  Although

Defendants have now conceded that lump sums have to be recalculated, they assert that they

need not be re-calculated using a projection rate that is all that much higher than the original

rates used.  While Plaintiffs believe they would succeed in the convincing the Court to set the

projection rate at 9% or over higher, there is no guarantee that the Court would have selected a

rate that high or nearly that high.  Nor can Plaintiffs assume they will also prevail on their

improper conditioning, PRMD and year-of-distribution claims, without which it would be very

unlikely that for Plaintiffs to do better in court than they can do via settling.

23

*Second,* the complexity, length, and expense of continued litigation also support

preliminary approval of the settlement. If the Court approves the settlement, the litigation will

end and Class members "will realize both immediate and future benefits as a result." *Schulte,*

2011 WL 3269304, at *18; *In re AT & T Mobility,* 789 F.Supp.2d 935, 961 (N.D. Ill. 2011) ("A

dollar recovered today is worth more than a dollar recovered in the future, which is relevant

because the Settlement provides for a combination of present and future benefits."). Absent

settlement, the litigation would likely continue for years.

*Third*, counsel for both parties, who have significant experience in class action and other

complex litigation and have negotiated numerous other class action settlements, recommend

approval of the Settlement Agreement. The Court can give weight to the opinion of experienced

counsel in determining whether to preliminarily approve a settlement. *See In re Mexico Money*

*Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000), *aff'd,* 267 F.3d 143 (7th Cir. 2001)

(placing "significant weight on the unanimously strong endorsement of these settlements" by

"well-respected attorneys").

*Fourth*, the Settlement Agreement was reached only after serious, arms-length

negotiations between experienced and informed counsel with the assistance of a mediator who

was herself one of the top ERISA litigators in the country before retiring from the active practice

of law. There is usually a presumption that a proposed settlement is fair and reasonable when it

was, as this one was, the result of arm's length negotiations between experienced counsel. *See*

*Great Neck Capital Appreciation Inv. Partnership, L.P. v. PricewaterhouseCoopers, L.L.P.,* 212

F.R.D. 400, 410 (E.D. Wis. 2002) (Adelman, J.) ("A strong presumption of fairness attaches to a

settlement agreement when it is the result of [arm's-length negotiations]"). The involvement of

an independent, professional mediator in helping broker the proposed settlement should give the

Court added confidence that the proposed settlement was indeed the result of arm's-length negotiations. *See, e.g., Hainey v. Parrott*, 617 F.Supp.2d 668, 673 (S.D. Ohio 2007) ("The participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties").

*Fifth*, the advanced stage of these proceedings and extensive discovery conducted by the parties also supports preliminary approval of the settlement. *Synfuel,* 463 F.3d at 653.  This factor is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Schulte,* 2011 WL 3269304, at *22 (citation omitted). As discussed above, the parties have vigorously litigated their claims and defenses through two years of extensive motion practice and discovery – all of which positioned the parties' counsel to assess the strengths and weaknesses in their respective positions and to approach settlement on a reasoned basis.

Finally, in addition to the significant relief for all class members, the Agreement provides that the Class representatives may seek case compensation payments of $7,500 each, which the Court can find preliminarily reasonable.  *See, e.g., In re Continental Illinois Sec. Litig*., 962 F.2d 566, 571-72 (7th Cir. 1992) (holding that incentive compensation payments to class representatives are necessary to induce named plaintiffs' participation, and should be used to compensate plaintiffs for their risk and time).  As noted, the contemplated request will be disclosed to the class in the Mailed Notice, so that the Court may consider any objections that the class raise to the incentive awards.  The same is true in the case of counsel's anticipated 30% fee plus expenses request, which the Court can also find preliminarily reasonable.  *See Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("the market rate for ERISA class action attorneys is a contingency fee between 25% and 33%").

25

## II.     The Proposed Plan of Allocation Should Be Preliminarily Approved.

Assessment of a plan of allocation of settlement proceeds in a class action under Rule 23 is governed by the same standards of review applicable to the settlement as a whole - the plan must be fair, reasonable and adequate.  *See E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985) (considering reasonableness of settlement disbursement).  An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. NFL*, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993).

The proposed plan of allocation here should be preliminarily approved because, as demonstrated above, it is a carefully-designed plan for allocating the net settlement proceeds tied as closely as possible to strengths and weaknesses of the respective class members' individual claims.  As noted above, even if the Court thinks it may ultimately order a different allocation of the Net Settlement Benefit, notifying the proposed Class and seeking their reactions and input would still be appropriate now.

## III.    The Proposed Class Should Be Conditionally Certified and the Named Plaintiffs and Plaintiffs' Counsel Appointed to Represent the Class.

ERISA pension benefit cases such as this one are regularly certified as class actions and are ideally suited for treatment under Rule 23 when, as here, the named plaintiffs bring the same claims raising issues common to all members of the proposed classes having nothing to do with the individual characteristics of the Plan participants or proposed class members affected by the challenged conduct, the factual underpinnings and legal theories plaintiffs advance apply to each member of the proposed classes, and the relief plaintiffs personally seek is no different than the relief they seek on behalf of the respective proposed classes.  *See, e.g., Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc.*, 265 F.R.D. 405 (E.D. Wis. 2010); *Ruppert v.*

26

*Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628 (W.D. Wis. 2009). This case is tailor-made for treatment under Rule 23.

To maintain a class action, Plaintiffs must satisfy the four requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation) and demonstrate that the case is "maintainable" under any one of the three prongs of Rule 23(b): Rule 23(b)(1) ((A) or (B)), (b)(2) or (b)(3). *E.g., Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008); *Bzdawka v. Milwaukee County*, 238 F.R.D. 469, 472 (E.D.Wis. 2006) (Adelman, J.). Here, all the requirements of Rule 23(a) are met, and the case may be maintained as a "mandatory" class action under Rule 23(b)(1) and/or (b)(2), which are preferred for their relative ease of administration and superior *res judicata* effects over Rule 23(b)(3), which provides for automatic notice and the right to opt-out. *See Berger,* 338 F.2d at 763-64; *Clarke v. Ford Motor Co*., 220 F.R.D. 568, 579-80 (E.D. Wis. 2004) (Adelman, J.); *Thompson,* 265 F.R.D. at 412 ("allowing members to opt out under Rule(b)(3) is counterproductive"); *Ruppert*, 255 F.R.D. at 637 (same).

## A.    The Proposed Class Satisfies the Requirements of Rule 23(a).[8]

The first Rule 23(a) factor ("numerosity") requires the court to find that the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement is met here. The proposed Class consists of over 4,100 participant-members. *See* Ex. F.. This is obviously sufficient to satisfy numerosity. *See Barden v. Hurd Millwork Company, Inc.,* 249 F.R.D. 316, 319 (E.D.Wis. 2008) (Adelman, J.).

---

[8] Before reviewing the Rule 23(a) factors, Plaintiffs note that this Court has identified two additional threshold requirements for class certification, both of which are met in this case. *Bzdawka,* 238 F.R.D. at 472. First, the named class representatives must have standing, in that they are members of the class they propose to represent. *Id.* Second, the definition of the proposed class must be definable. *Id.* Here, the named class representatives both fall squarely within the class and subclass definitions and therefore have standing to sue on behalf of the class and subclasses. Further, the class and subclass definitions are clear and well-defined.

27

The second Rule 23(a) factor ("commonality") requires a finding that there are questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  This is a permissive standard. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) ("[s]o long as [plaintiff's] and the class members' injuries arose out of the same violative conduct, she may properly represent [the classes]"); *Hazelwood v. Bruck Law Offices* SC, 244 F.R.D. 523, 524 (E.D. Wis. 2007) (Adelman, J.) ("[p]laintiffs may satisfy…commonality…by a single common issue").

The proposed class raise common questions including, most notably, Defendants' alleged failures to comply with the applicable benefit calculation requirements set forth in Compl. ¶¶ 42-51 and elsewhere in the Complaint.  *See, e.g., Esden v. Retirement Plan of the First Nat'l Bank of Boston,* 182 F.R.D. 432, 441 (D.Vt. 1998), *aff'd,* 229 F.2d 154 (2d Cir. 2000) (certifying class; correct methodology for calculating the lump sum presents a common issue). Clearly, the requirements of Fed. R. Civ. P. 23(a)(2) are satisfied here.

The third Rule 23(a)(3) factor ("typicality") requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). The typicality requirement of Rule 23(a)(3) is satisfied if the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."  *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983).  Here, the seven benefit miscalculation claims and fiduciary breach claim brought by Mr. Downes and Mr. Kumbera are typical of those of the proposed class in that they challenge Defendants' calculation provisions and practices and alleged fiduciary misconduct, applied in the same manner to all participants, that gives rise to the proposed representatives' claims and the claims of the proposed class.  Neither of the proposed

28

representatives assert any claims relating to the Plan in addition to or different than those of the proposed class members they seek to represent.  Typicality is clearly established.

The final Rule 23(a) factor ("adequacy") requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and suffer the same injury as the class members."  *Blihovde v. St. Croix County, Wis.,* 219 F.R.D. 607, 619 (W.D. Wis. 2003) (*quoting Amchem Products, Inc. v. Windso*r, 521 U.S. 591, 625-626 (1997); *accord Great Neck Capital Appreciation,* 212 F.R.D. at 408.  Additionally, class counsel must be qualified to conduct the litigation.  *Id.*

Here, the adequacy requirement is also met in this case.   There is no basis for questioning either Mr. Downes or Mr. Kumbera as representatives of the proposed class. Plaintiffs have the same legal and financial interest in establishing liability and damages to the greatest extent possible as do the members of the proposed class, and there is no reason to believe that they will not zealously represent the interests of the class.  Moreover, as discussed below in undersigned counsel's declaration, proposed class counsel have the necessary training, experience and resources to competently represent the proposed Class, as discussed below in the context of Rule 23(g).  *See* Gottesdiener Decl. ¶¶ 2-3.

### B.     The Proposed Class Satisfies Rule 23(b)(1)(A), (b)(1)(B) and/or (b)(2)

A proposed class that meets the four requirements of Rule 23(a) should be approved if it complies with any of the three provisions of Rule 23(b).  The proposed Class here can and should be certified under Rule 23(b)(1)(A), (b)(1)(B) and/or (b)(2).

29

### 1.     The Requirements of Rule 23(b)(1)(A) Are Met.

Rule 23(b)(1)(A) certification is appropriate when multiple suits would create a risk of

"inconsistent or varying adjudications with respect to individual members of the class which

would establish incompatible standards of conduct for the party opposing the class."  Rule

23(b)(1)(A) comes into play when a party is obligated by law to treat the members of a class in a

like manner.  *Amchem*, 521 U.S. at 614.  It is precisely for this reason, that "[p]erhaps unique to

ERISA class actions," the requirements of Rule 23(b)(A)(1) are more often met in ERISA than in

any other kind of case – because "[u]nder ERISA, the plan and its fiduciaries generally owe the

same duty to all participants, and a violation of ERISA with respect to one may establish a

violation with respect to all other similarly situated participants."  Gary L. Sasso, *Defense of*

*Federal Class Actions,* 710 PLI/Lit 149, * 250 (July 2004).  *Accord Richards v. FleetBoston*

*Financial Corp.,* 04-cv-1638 (JCH), 2006 WL 2979373, *8-9 (D. Conn. Oct. 16, 2006) (statutory

obligation to treat all class members alike in an ERISA plan and the number of affected class

members made challenge to the legality of a pension plan formula "well-suited" to treatment

under Rule 23(b)(1)(A); "inconsistent rulings on these claims by different courts could create an

untenable situation").

Here, indeed, individual lawsuits pose the risk of inconsistent judgments, whereas

adjudication of the dispute as a class action, by contrast, would provide a uniform direction for

the Defendants.  *In re Amsted Indus., Inc. ERISA Litig.*, No. 01-C-2963, 2002 WL 31818964, *2

(N.D. Ill. Dec. 16, 2002) (granting certification under (b)(1)(A) because of risk of inconsistent

judgments in case challenging plan amendments eliminating lump sum distribution option and

changing retirement requirements); *Esden,* 182 F.R.D. at 441 (certifying whipsaw case under

Rule 23(b)(1)(A)).[9]

## 2. The Requirements of Rule 23(b)(1)(B) Are Met.

Certification is also appropriate here under Rule 23(b)(1)(B) because multiple lawsuits would create the risk that the judgment with respect to some members of the proposed class would, "as a practical matter, be dispositive of the interests of . . . other members . . . or otherwise impair or impede their ability to protect their interests." *Id.,* Rule 23(b)(1)(B). "For a suit to qualify as a class action under this subdivision, it is not necessary for the nonclass judgment to be technically dispositive of the interests of the other members of the putative class, but it must as a practical matter conclude the interests of those members." *Larionoff v. United States,* 533 F.2d 1167, 1181 n.36 (D.C. Cir. 1976) (*citing* Wright & Miller, *Federal Practice & Procedure*, citation omitted). Quoting the Advisory Committee Notes, the Supreme Court has noted that one such case properly certified under Rule 23(b)(1)(B) is a case that "involve[s] the adjudication of the rights of all participants in a fund in which the participants had common rights" where "the adjudication would determine the operating rules governing the fund for all participants." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 n.14 (1999). In such a case, the *stare decisis* effect of the judgment with respect to the claim of one individual is likely to have a compelling impact on future litigation by persons similarly situated because no real individual issues exist to distinguish the earlier precedent.

That is certainly the case here. As a practical matter, if this case is not certified as a class action, it will dispose of the class members' interests without them ever having representation in the case because, as the district court said in *Berger* in finding Rule 23(b)(1)(B) satisfied, "the

---

[9] *Accord Kohl v. Association of Trial Lawyers of America,* 183 F.R.D. 475, 485-86 (D. Md. 1998) (ERISA case challenging an alleged denial of a COLA certified under (b)(1)(A)); *Clauser v. Newell Rubbermaid, Inc.,* No. Civ. A. 99-5753, 2000 WL 1053395, *6 (E.D. Pa., July 31, 2000); *Schutte v. Maleski,* No. 93-0961, 1993 WL 218898, *9 (E.D. Pa. June 18, 1993).

31

Plan's challenged actions are clearly either legal or illegal as to all members of the class."

*Berger v. Nazametz,* Civ. No. 00-584, slip op. at 5 (S.D. Ill. Feb. 7, 2001), *aff'd on other grounds sub nom. Berger v. Xerox,* 338 F.3d 755 (7th Cir. 2003). Certification under Rule 23(b)(1)(B) is designed for just such a case and is therefore a proper vehicle for certification. *See In re Amsted Indus., Inc. ERISA Litig.*, 2002 WL 31818964, *8 (granting certification under (b)(1)(B) "[b]ecause the rights of current employees will necessarily be adjudicated in this action, we find that the class action is the proper device to assure that all parties are fairly represented"). *See also Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir. 1993) (reversing district court and ordering case challenging employer's method of estimating participants' social security offsets in ERISA defined benefit plan certified under Rule 23(b)(1)(B)).[10]

### 3.    The Requirements of Rule 23(b)(2) Are Met.

Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Cases may be certified under Rule 23(b)(2) if they seek monetary relief or even damages provided the monetary relief sought is "incidental" or "secondary" to predominant claims for declaratory or injunctive relief. *Berger v. Xerox,* 338 F.3d at 763-64. That is the case here, as is often true in retirement benefits cases. *See Clarke*, 220 F.R.D. at 580-81 (certifying ERISA pension benefit action under (b)(2) on comparable facts). Such cases rarely present anything like the kind of obstacles to Rule 23(b)(2) certification as can exist in many other kinds of cases – such as the gender

---

[10] Among the many other pension benefit cases certified under Rule 23(b)(1)(B), *see In re J.P. Morgan Cash Balance Litig.*, 242 F.R.D. 265, 276 (S.D.N.Y. 2007) (cash balance plan case); *Walker v. Monsanto,* 04-cv-436-JPG-PMF, Doc. 276 at 6 (S.D. Ill. May 22, 2008) (cash balance plan case); *Helms v. Local 705 Int'l Bdh. of Teamst. Pens. Plan,* 97 C 4788, 1998 WL 182513, at *2 (N.D.Ill. Apr.16, 1998); *Schutte*, 1993 WL 218898, *9; *Church v. Consolidated Frgt'wavs,* No. C-90-2290 DLJ, 1991 WL 284083, *14 (N.D. Cal. 1991).

discrimination case the Supreme Court recently decided, *Wal-Mart Stores, Inc. v. Dukes*, 131

S.Ct. 2541 (U.S. June 20, 2011), which did not qualify under Rule 23(b)(2) because it

predominantly sought individualized monetary relief, *id.* at *2557–61. This is true not only

because compensatory and punitive damages are not even available under ERISA, *see Mass.*

*Mutual Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), but first and foremost because in cases like

the instant case, the monetary relief sought would flow directly and indeed "mechanically" from

liability to the class as a whole. *Berger*, 338 F.3d at 764 (holding (b)(2) certification of whipsaw

case proper for that reason even when relief characterized as "damages"). Once the correct

crediting and projection rates are determined, the calculations are mechanistic as illustrated by

whipsaw decisions ordering complete relief on summary judgment as in *Berger. See Berger v.*

*Xerox Corp. Ret. Income Guar. Plan*, 231 F.Supp.2d 804 (S.D. Ill. 2002), *aff'd*, 338 F.3d 755

(7th Cir. 2003).

In other words, this case would satisfy even the Fifth Circuit's exacting *Allison v. Citgo*

*Petroleum Corp*., 151 F.3d 402 (5th Cir.1998) test, which *Dukes* indicates would have to be

satisfied in a monetary relief case, *Dukes,* 131 S.Ct. at *2557–61, because the different amounts

participants will be due will be determined solely by reference to standardized actuarial

computations based on a common methodology applied to the same undisputed, objective

participant data the Plan has always used to calculate benefits – no individualized damages

determinations of disparate claims would be involved. That is why, both before and since

*Berger,* numerous other courts, including this Court, *see Clarke, infra,* have correctly approved

the certification of classes under Rule 23(b)(2) in suits by pension plan participants seeking

declaratory and injunctive relief and a corresponding increase in their pension benefits, *i.e.,*

"monetary relief." *E.g., Kifafi v. Hilton,* 189 F.R.D. 174, 177 (D.D.C.1999) ("[t]he method used

33

to calculate the rate of benefit-accrual is a practice applicable across the board to all class members, 'thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole'").[11]

In *Ruppert,* Judge Crabb certified the subclasses in that case under Rule 23(b)(2), finding that "[a]s in *Berger*, the ultimate monetary relief is simply a direct consequence of the requested declaration that the lump sums must be calculated as plaintiffs believe ERISA requires, therefore, plaintiffs' class may be maintained under Rule 23(b)(2)." *Ruppert,* 255 F.R.D. at 637. In *Thompson,* Judge Stadtmueller did likewise. *Thompson*, 265 F.R.D. at 412. Certification here under Rule 23(b)(2) is thus clearly appropriate.

### C.     The Court Should Appoint Undersigned Counsel as Class Counsel Under Rule 23(g).

Under Rule 23(c)(1)(B) and Rule 23(g), a court certifying a class must appoint class counsel based on a consideration of a variety of common sense factors.  Fed. R. Civ. P. 23(c)(1)(B), 23(g).  The Court should find that Plaintiffs' counsel has considerable experience in both ERISA and class actions, are qualified to represent the proposed class; and can be expected to perform his responsibilities adequately in light of that experience, the record to date in this case, and related considerations.

Eli Gottesdiener has practiced law for 25 years, the great majority of it spent litigating complex federal civil matters, with the past 12 years devoted almost exclusively to the

---

[11] *Accord Shields v. Local 705,* No. 96 C 1928, 1996 WL 616548, *5-7 (N.D. Ill. Oct. 23, 1996) (Rule 23(b)(2) certification granted; pension participants primarily sought determination regarding the crediting of service for purposes of benefit calculations even though they also sought an order directing the plan to make any payments still due); *Diehl v. Twin Disc., Inc.*, No. 94 C 50031, 1995 WL 330637, *6 (N.D. Ill. May 30, 1995); *LaFlamme v. Carpenters Local #370 Pension Plan*, 212 F.R.D. 448, 456 (N.D.N.Y. 2003); *Richards v. FleetBoston Financial Corp.,* 235 F.R.D. 165, 174 (D. Conn. 2006)  ("For purposes of subsection (b)(2), an injunction requiring the payment of monies unlawfully withheld in the past may be considered injunctive relief," *citing Walsh v. Northrop Grumman Corp.,* 162 F.R.D. 440 (E.D.N.Y.1995)).

representation of current and former participants in ERISA-governed pension plans. Gottesdiener

Decl. ¶¶ 2-3. He has been appointed as class counsel in the following ERISA pension benefit

class actions:

- A pension benefits and 401(k) case involving, among other things, a $3 billion transfer of 401(k) plan assets to a pension plan, pursuant to which the participants were stripped of their right to the gains earned through the investment of their 401(k) accounts. *Pender v. Bank of America Corp.*, 269 F.R.D. 589 (W.D.N.C. 2010) (lead counsel; case filed in 2004, certified in 2010, still pending).

- The *Thompson* cash balance case discussed above, which has been remanded to Judge Stadtmueller for the re-determination of damages for the class of participants whose claims were determined to be timely. *Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc.*, 265 F.R.D. 405 (E.D. Wis. 2010) (lead counsel; case filed in 2007, certified in 2010, still pending).

- The *Ruppert* case also discussed above, in which a variety of post-trial motions are pending. *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628 (W.D. Wis. 2009) (lead counsel; case filed in 2008, certified in 2009, still pending).

- A cash balance lump sum underpayment case involving a complex algorithm-based interest crediting rate. *Moody v. The Turner Corp. et al.*, Civ. No. 1:07-CV-692 (S.D. Ohio) (lead counsel; settled for $14.5 million, 2011).

- A whipsaw case involving a complex age-weighted interest crediting rate designed to exactly replicate, in cash balance form, the traditional formula under the plan. *Traylor v. Avnet, et al.*, No. 08-cv-00918-PHX (FJM) (D. Ariz.) (lead counsel; certified in 2009; settled for $34 million 2010).

- Another whipsaw case involving a variable interest crediting rate with a complicated lesser-of minimum based on a fixed rate and the mid-range of rates set by regulation. *Flagg v. Skadden, Arps, Slate, Meagher & Flom Pension Plan,* No. 07 Civ. 7392 (S.D.N.Y.) (PKC) (lead counsel; certified in 2009; settled for $12.4 million in 2009).

- A fiduciary breach case involving the defined benefit and defined contribution plans sponsored New York Life Insurance Co. on behalf of employees and agents. *Mehling v. New York Life Ins. Co.*, Civ. No. 99-CV-5417 (E.D. Pa.) (co-lead counsel; $14 million settlement, 2008).

- A pension benefit case pending against the AT&T Pension Benefit Plan in the District Court for the District of Columbia, *Wagener v. SBC Pension Benefit Plan-Nonbargained Program*, Civ. No. 03-769 (RCL) (D.D.C.) (co-lead counsel; $16 million settlement, 2008).

- A fiduciary breach case involving Enron Corp.'s 401(k), ESOP and cash balance pension plans. *Tittle, et al. v. Enron Corp., et al.*, H-01-3913 (S.D. Tex.) (liaison class counsel; settled in phases between 2003-06 for an amount exceeding $225 million).

- A fiduciary breach case with respect to the investment of defined benefit plan assets. *Bell v. UFCW*, Civ. No. 01-236 (ESH) (D.D.C.) (co-lead counsel; settled for $10 million, 2003).

- A 401(k) fiduciary breach class action. *Gottlieb v. SBC Communications, Inc.*, CV-00-4139 AHM (C.D. Calif.) (co-lead counsel; settled for $10 million, 2002).

Gottesdiener Decl. ¶ 3.

Counsel is clearly qualified to be appointed as Class Counsel pursuant to Rule 23(g).

## IV.    The Proposed Notice Satisfies Rule 23

Assuming the Court preliminarily determines that the Settlement is within the range of possible approval, conditionally certifies the Class, and appoints Plaintiffs' counsel as Class Counsel, it must then address the notice to be given to the Class.

Rule 23(e) requires that the district court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  Rule 23(e) notice is designed "to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation."  *In re Prudential Ins. Co.,* 148 F.3d 283, 327 (3d Cir.1998).  Notice to the putative class members is essential to providing each member with due process because members of the settlement class will be bound to the resolution of this case.  *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313-14 (1950).

Here, the proposed mailed and publication Notice, in terms of both their content and their manner of dissemination, satisfy the requirements of Rule 23(e) and due process.

### A.   The Content of the Proposed Notice Satisfies Rule 23

The content of the Mailed and Publication Notice provide all of the required information concerning Class Members' rights and obligations under the proposed settlement.  The Notice sets forth the background of the litigation, the definition of the Class and the key terms of the Settlement.  It contains sufficient detail to permit each member of the proposed Settlement to make an informed decision about whether to support or oppose Settlement as well as how to obtain additional information about the Settlement, whether through the website dedicated to the lawsuit or by contacting Class Counsel directly.  *See In re Gen. Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1086 (6th Cir.1984) (upholding notice that "described the terms of the settlement, the reasons for [class representatives' decision to settle], the legal effect of the settlement and the rights of the [class members] to voice their objections").  It details the procedures for filing objections to the Settlement, Class Counsel's fee petition and/or the request for an award of special payments to the two Named Plaintiffs and for requesting to be heard at the final approval hearing.  It also apprises participants of their right to question the underlying plan data used to calculate their additional payments. It explains how to make the elective choice between a rollover and a direct payment via easy-to-understand enclosed forms and instructions.  The Mailed Notice arguably goes beyond the requirements of the Rule by providing a specific estimate of each Class Member's Settlement Benefit.

### B.   The Method of Disseminating Notice to Class Members Satisfies Rule 23

The method of transmitting the Notice also satisfies Rule 23.  Upon preliminary approval of the Settlement, Defendants and class counsel will transmit the last known address of all Class Members via the Participant and Participant Successor Lists to the Notice Administrator which will confirm or update the valid postal addresses for the Class members and cause the Notices to

be mailed by first class mail to each identified member of the Class. *See* Ex. 1 at 13, § 3A.  In the event that the Postal Service returns any of the Notices as undeliverable, the Notice Administrator will take further steps to obtain correct addresses and re-mail the Notice to those recipients. *Id.* at 13 § 3C.  Dissemination of the mailed Notice by first class mail is the usual notification method for class action certifications and settlements. *See In re Prudential Ins.,* 148 F.3d at 326-28 (opt-out class requiring claims); *In re IKON Office Solutions, Inc*., 209 F.R.D. 94, 101 (E.D. Pa. 2002) (non-opt out class, published notice program also used).

Under the circumstances, it is sufficient to make only one publication of the Published Notice in the *Milwaukee Journal Sentinel.*  The extra expense of multiple publications of published notice is not warranted.  The Plan's last known address information coupled with the Notice Administrator's address update efforts will assure the best practicable communication with the Settlement Class members which will provide individualized notice via first class mail, which is the preferred method for disseminating class notice.

## CONCLUSION

WHEREFORE, for the reasons stated and such other reasons as may appear to the Court, Plaintiffs respectfully request that the Court grant preliminary approval of the proposed Settlement and Plan of Allocation, conditionally certify the proposed Class, appoint Plaintiffs' counsel as Class Counsel, and enter the proposed Order attached hereto, authorize mailed and published notice to the Class, and schedule the hearing on final approval of the Settlement.

Dated:  November 22, 2011                              Respectfully submitted,


                                                              s/ *Eli Gottesdiener*
                                                            Eli Gottesdiener (#4045464)
                                                            Andrew P. Carter (#4709796)
                                                            Steven D. Cohen (#038172009)

38

Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
Telephone:   (718) 788-1500
Telecopier:   (718) 788-1650
Email:         eli@gottesdienerlaw.com

*Counsel for Plaintiff and the proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2011, I caused to be electronically filed Motion for Preliminary Approval of Class Action Settlement, Recommended Plan of Allocation, Class Certification and Appointment of Class Representatives and Class Counsel, using the ECF system which will send notification of such filing to counsel listed below.  .

Mark Casciari (mcasciari@seyfarth.com)
Ian H Morrison (imorrison@seyfarth.com)
Amanda A. Sonneborn (asonneborn@seyfarth.com)
Sam Schwartz-Fenwick (sschwartz-fenwick@seyfarth.com)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603-5577
Telephone: (312) 460-5000
Fax: (312) 460-7000

Matthew W. O'Neill (mwo@ffsj.com)
Robert H. Friebert (rhf@ffsj.com)
Friebert, Finerty & St. John, S.C.
Two Plaza East, Suite 1250
330 East Kilbourn Ave.
Milwaukee, WI 53202
Telephone: (414) 271-0130
Fax: (414) 272-8191

s/*Eli Gottesdiener*

39