# EXHIBIT 7

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | : | Master File No. 12-md-02311 |
|  | : | Honorable Marianne O. Battani |
|  | : |  |
|  | : |  |
| In Re: Wire Harness | : | 2:12-cv-00103 |
| In Re: Instrument Panel Clusters | : | 2:12-cv-00203 |
| In Re: Fuel Senders | : | 2:12-cv-00303 |
| In Re: Heater Control Panels | : | 2:12-cv-00403 |
| In Re: Bearings | : | 2:12-cv-00503 |
| In Re: Alternators | : | 2:13-cv-00703 |
| In Re: Anti-Vibrational Rubber Parts | : | 2:13-cv-00803 |
| In Re: Windshield Wiper Systems | : | 2:13-cv-00903 |
| In Re: Radiators | : | 2:13-cv-01003 |
| In Re: Starters | : | 2:13-cv-01103 |
| In Re: Ignition Coils | : | 2:13-cv-01403 |
| In Re: Motor Generator | : | 2:13-cv-01503 |
| In Re: HID Ballasts | : | 2:13-cv-01703 |
| In Re: Inverters | : | 2:13-cv-01803 |
| In Re: Electronic Powered Steering Assemblies | : | 2:13-cv-01903 |
| In Re: Fan Motors | : | 2:13-cv-02103 |
| In Re: Fuel Injection Systems | : | 2:13-cv-02203 |
| In Re: Power Window Motors | : | 2:13-cv-02303 |
| In Re: Automatic Transmission Fluid Warmers | : | 2:13-cv-02403 |
| In Re: Valve Timing Control Devices | : | 2:13-cv-02503 |
| In Re: Electronic Throttle Bodies | : | 2:13-cv-02603 |
| In Re: Air Conditioning Systems | : | 2:13-cv-02703 |
| In Re: Windshield Washer Systems | : | 2:13-cv-02803 |
| In Re: Spark Plugs | : | 2:15-cv-03003 |
| In Re: Automotive Hoses | : | 2:15-cv-03203 |
| In Re: Ceramic Substrates | : | 2:16-cv-03803 |
| In Re: Power Window Switches | : | 2:16-cv-03903 |
|  | : |  |
|  | : |  |
| THIS DOCUMENT RELATES TO: | : |  |
| End-Payor Actions | : |  |

# END-PAYOR PLAINTIFFS' OMNIBUS RESPONSE TO OBJECTIONS TO
# ROUND 2 SETTLEMENTS

# TABLE OF CONTENTS

BACKGROUND ..........................................................................................................9

    I.     The separate and independent proposed settlement classes.............................9

    II.    Notice and Objections ..................................................................................10

ARGUMENT ...........................................................................................................13

    I.     The Court Should Overrule the Objections and Approve the Round 2 Settlements..................................................................................................13

         A.     The Court should overrule objections not previously raised in connection with the Round 1 Settlements...................................13

              i.     Potential Class Members were provided with sufficient information................................................................13

              ii.    Class Notice satisfied due process requirements. .........................19

              iii.   The Court should not create subclasses. .......................................21

              iv.   Class Members' due process rights have not been violated..................................................................................23

         B.     The Court should overrule objections previously raised in connection with the Round 1 Settlements...................................25

              i.     The Scope of the Release of Claims is Reasonable and Limited by the Claims and Products Alleged in the Complaints. .................................................................25

              ii.    Administration ..............................................................................25

              iii.   Rule 23 .........................................................................................26

    II.    Attorneys' fees. ............................................................................................27

         A.     The Court should not apply a reduced percentage simply because of the size of the Round 2 Settlements.........................27

         B.     The Court should again reject the notion that Class Counsel "piggybacked" off the DOJ's investigation. ..............................33

         C.     The Court should again reject Sweeney's cy pres objection. ...................35

         D.     The Court should strike blanket joinder objections. .................................35

III.    The Court should reject objections related to the administration of the settlement funds. ...................................................................................35

IV.    Not All Settlements Are Subject to the Objections. ...............................37

V.    The Court Should View With Skepticism the Arguments of "Serial" or "Professional" Objector Counsel. .........................................................38

CONCLUSION .....................................................................................................41

Appendix A ........................................................................................................... 44

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allapattah Servs. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla 2006) .......................................................................... 27

*Bailey v. AK Steel Corp.*, No. 06-cv-468,
    2008 U.S. Dist. LEXIS 18838, at *8 (S.D. Ohio Feb. 28, 2008)..................................... 31

*Barnes v. Fleetboston Fin. Corp.*,
    No. CA 01-10395-NG, 2006 WL 6916834 (D. Mass. Aug. 22, 2006)............................ 39

*Barton v. Drummond Co.*,
    636 F.2d 978 (5th Cir. 1981) .......................................................................................... 35

*Boeing v. Van Gemert*,
    444 U.S. 472 (1980)........................................................................................................ 35

*Bowling v. Pfizer*,
    102 F.3d 777 (6th Cir. 2006) .......................................................................................... 25

*Bowling v. Pfizer, Inc.*,
    143 F.R.D. 141 (S.D. Ohio 1992) .................................................................................. 14

*Cantrell v. GAF Corp.*,
    999 F.2d 1007 (6th Cir. 1991) ........................................................................................ 23

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) ................................................................................. 16

*Fidel v. Farley*,
    534 F.3d 508 (6th Cir. 2008) .......................................................................................... 18

*Gascho v. Glob. Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) ..................................................................................... 35, 36

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) .......................................................................................... 19

*Hasman*,
    106 F.R.D.......................................................................................................................... 23

*In re Agent Orange Prod. Liab. Litig.*,
    818 F.2d 216 (2d Cir. 1987)............................................................................................ 36

*In re Budeprion XL Mktg. & Sales Litig.*,
    No. 09-MD-2107, 2012 WL 2527021 (E.D. Pa. July 2, 2012)........................................ 21

*In re Cardinal Health Inc. Sec. Litigations,*
528 F. Supp. 2d 752 (S.D. Ohio 2007) ........................................................ 28

*In re Cardinal Health, Inc. Sec. Litig.,*
550 F. Supp. 2d 751 (S.D. Ohio 2008) ........................................................ 39

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
281 F.R.D. 531 (N.D. Cal. 2012) ................................................................ 38

*In re Corrugated Container Antitrust Litig.,*
643 F.2d 195 (5th Cir. 1981) ...................................................................... 14

*In re Databank Antitrust Litigation,*
209 F. Supp. 2d 96 (D.D.C. 2002) ............................................................... 33

*In re Domestic Air Transp. Antitrust Litig.,*
141 F.R.D. 534 (N.D. Ga. 1992) ................................................................. 18

*In re Dry Max Pampers Litig.,*
724 F.3d 713 (6th Cir. 2013) ...................................................................... 13

*In re Gen. Elec. Co. Sec. Litig.,*
No. 09 Civ. 1951(DLC), 2014 WL 534970 (S.D.N.Y. Feb. 11, 2014) ........................ 38

*In re High Sulfur Content Gasoline Prod. Liab. Litig.,*
517 F.3d 220 (5th Cir. 2008) ...................................................................... 36

*In re Kendavis Holding Co.,*
249 F.3d 383 (5th Cir. 2001) ...................................................................... 20

*In re Linerboard Antitrust Litig.,*
292 F.Supp.2d 631 (E.D.Pa.2003) ........................................................ 16, 17

*In re Lloyds' Am. Trust Fund Litig.,*
2002 WL 31663577 (S.D.N.Y. Nov.26, 2002) ................................................ 21

*In re Packaged Ice Antitrust Litig.,*
No. 08-MD-01952, 2010 WL 3070161 (E.D. Mich. Aug. 2, 2010) ...................... 16

*In re Pet Food Prod. Liab. Litig.,*
629 F.3d 333 (3d Cir. 2010) ...................................................................... 20

*In re Polyurethane Foam Antitrust Litig.,*
135 F. Supp. 3d 679 (N.D. Ohio 2015) ............................................... 28, 29, 36

*In re Prandin Direct Purchaser Antitrust Litig.,*
No. 10-cv-12141, 2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) .................. 26

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F.Supp.2d 697 (M.D.Pa.2008) ............................................................... 16

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    164 F.R.D. 362 (S.D.N.Y. 1996) .................................................................... 19

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005) ...................................................................... 21

*In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208,
    2013 WL 2155387 (E.D. Tenn. May 17, 2013) ...................................... 26, 28

*In re Sumitomo Copper Litig.*,
    74 F. Supp. 2d 393 (S.D.N.Y. 1999) ............................................................. 31

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. MDL 3:07-MD-1827 SI, 2011 WL 7575004 (N.D. Cal. Dec. 27, 2011) ................. 21

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab.
Litig.*,
    No. 8:10ML 02151 JVS, 2013 WL 3224585 (C.D. Cal. June 17, 2013) ........................ 34

*In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Practices Act
(FDCPA) Litig.*,
    No. 2:13-MD-2426-DBH, 2016 WL 543137 (D. Me. Feb. 10, 2016) ........................... 37

*In re Vitamins Antitrust Litig.*,
    2000 WL 1737867 (D.D.C. Mar.31, 2000) ................................................... 21

*Insurance Brokerage*,
    282 F.R.D. 92 ................................................................................................ 31

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ........................................................................ 14

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ...................................................................... 14

*Lobatz v. U.S. West Cellular of California, Inc.*,
    222 F.3d 1142 (9th Cir. 2000) ...................................................................... 30

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ...................................................................................... 18

*Nichols v. SmithKline Beecham Corp.*,
    No. 00-6222, 2005 WL 950616 (E.D. Pa. April 22, 2005) ............................ 31

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ........................................................ 35

*Pelzer v. Vassalle,*
    655 Fed. App'x. 352 (6th Cir. 2016) ........................................... 13

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985) ..................................................................... 18

*Prandin Direct Purchaser Antitrust Litig.*, No. 2:10-cv-12141,
    2015 U.S. Dist. LEXIS 5964, at *14 (E.D. Mich. Jan. 20, 2015) .................. 31

*Saunders v. Berks Credit Collections, Inc.,* No. 00-3477,
    2002 U.S. Dist. LEXIS 12718, at *42 (E.D. Pa. July 12, 2002) ....................... 35

*Shane Group, Inc. v. Blue Cross Blue Shield of Michigan,*
    825 F.3d 299 (6th Cir. 2016) ................................................. 13, 15, 29

*Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343,
    2014 U.S. Dist. LEXIS 91661, at *5-6 (E.D. Tenn. June 30, 2014) ................. 26

*Southeastern Milk,*
    2013 U.S. Dist. LEXIS 70167, at *26-27 ........................................ 30

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. 2011) ................................................ 21, 22, 23

*UAW,*
    497 F.3d ....................................................................................... 18

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.,*
    436 F. App'x 496 (6th Cir. 2011) ............................................... 33

*Vassalle v. Midland Funding LLC,*
    708 F.3d 747 (6th Cir. 2013) ................................................... 13, 33

*Walsh v. Great Atl. & Pac. Tea Co.,*
    726 F.2d 956 (3d Cir. 1983) ........................................................ 20

*Zoran Corp. Derivative Litig.*,
    2008 U.S. Dist. LEXIS 48246, at *31 (N.D. Cal. Apr. 7, 2008) .................... 24

## Rules

Fed. R. Civil P. 23 ........................................................................... 19

Other Authorities

Manual For Complex Litigation (Fourth) § 21.311, at 288 (2004) ............................................... 17

End-Payor Plaintiffs' ("EPPs") respectfully request that the Court overrule the objections made to the settlements with twelve defendants ("Round 2 Settlements") in the above-captioned actions. For the reasons given in EPPs' final approval papers and application for fees and costs, the Round 2 Settlements are plainly fair, reasonable, and adequate, and the requests for attorneys' fees and costs reasonable.

Only a handful of perfunctory and meritless objections have been made to the Round 2 Settlements.[1] Many of the objections are identical to those previously made and rejected in connection with the settlements previously approved by the Court (the "Round 1 Settlements") and are lodged by attorneys who have made it a cottage industry to object to class action settlements regardless of their merits. The few objections presented here that were not raised during the Round 1 Settlements are simply inapplicable, boilerplate arguments that smack of cut-and-paste briefing.

The objections now before the Court ignore the fact that the Round 2 Settlements were all negotiated in good faith by very experienced and knowledgeable counsel, provide very substantial benefits to the classes at issue, and are not tainted with the slightest hint of fraud or collusion. Accordingly, the Court should overrule the instant objections, grant final approval to the settlements, and grant EPPs' application for an award of attorneys' fees and costs.

## BACKGROUND

### I. The separate and independent proposed settlement classes.

EPPs provided a detailed description of the Round 2 Settlements in their final approval motion and in their application for fees and costs. In sum, forty-one settlement classes make up the "Round 2 Settlement Classes." Each proposed settlement is separate and independent from

---

[1] There were no opt outs of the Round 2 Settlements.

1

the others. The Round 2 Settlement Classes are listed within the EPPs' motion for final approval of the Round 2 Settlements. *See* Motion for Final Approval, 12-cv-00103, ECF No. 558, at 4-6.

In total, the settlements provide $379,401,268 million in cash for the benefit of the Round 2 Settlement Classes. Each settlement entered into with the twelve settling defendants ("Round 2 Settling Defendants") also provides significant discovery and other cooperation to the EPPs in the continued prosecution of EPPs' claims against non-settling defendants in the above-captioned actions. In addition, the Round 2 Settlements provide, with one exception, that each of the Round 2 Settling Defendants will for a period of two years refrain from engaging in certain specified conduct that would violate the antitrust laws involving the automotive parts at issue in the actions.

## II.    Notice and Objections

The Court previously found each of the Round 2 Settlements to be "sufficiently fair, reasonable and adequate" to warrant sending notice of the settlements to the Round 2 Settlement Classes. The Court scheduled a fairness hearing for April 19, 2017, and set March 16, 2017 as the deadline for objections to the settlements. *See, e.g.*, *Wire Harness*, 2:12-cv-00103, ECF No. 535.

The paucity of objections received is telling in light of the extensive notice provided and the large number of potential class members. Through a preeminent class action notice expert, Kinsella Media, LLC ("Kinsella"), EPPs implemented the September 2016 Notice Program,[2]

---

[2] Pursuant to the Court's Order granting EPPs' Motion for Authorization to Disseminate Combined Notice to the EPP Settlement Classes ("Combined Notice Order"), Kinsella previously implemented a notice program to provide notice of the Round 1 Settlements ("Combined Notice Program") to potential members of the Round 1 Settlement Classes. *See, e.g.*, Combined Notice Order, *Wire Harness,* 2:13-cv-00103, ECF No. 421.

which the Court previously approved.[3] *See, e.g.*, *Wire Harness*, 2:12-cv-00103, ECF No. 542.
Kinsella and Garden City Group ("GCG"), the Court-appointed settlement administrator,
implemented each element of the September 2016 Notice Program. *See* Declaration of Shannon
R. Wheatman, Ph.D., on Implementation of the September 2016 Notice Program ("Wheatman
Decl."), 12-cv-00103, ECF No. 560 ¶ 7. The Court-approved September 2016 Notice Program
included individual notice, paid media (including published notice in national publications and
Internet advertising), earned media, sponsored keywords with all major search engines, and
continued use of and updates to the settlement website and toll-free telephone number. *Id.* ¶¶ 11-
23, 25-29. The September 2016 Notice Program was well designed and effective, reaching an
estimated 80.1% of new vehicle owners or lessees, with an average frequency of 2.5 times. *Id.* ¶¶
24, 31, 36.

Notice was given in publications such as *Field & Stream*, *ESPN The Magazine*, *People*,
*Reader's Digest*, *Southern Living*, *Woman's Day*, *The Wall Street Journal*, *Auto Rental News*,
and *Automotive Fleet*, *id.* ¶¶ 16-17, as well as *Reuters*, *NBC Money*, *Consumer Reports,* and
*Automotive Weekly*, *id.* ¶ 25. Other earned media notice included notice given in press releases
issued in the indirect purchaser *Illinois Brick*-repealer states as well as outreach to 275 national
and local reporters for print and television media that generated national news stories and sixty-
three local outlet reprints. *Id.*

Members of the Round 2 Settlement Classes were notified that they can contact a toll-free
helpline or register online at the settlement website, www.AutoPartsClass.com, both of which are

---

[3] In addition to approving the September 2016 Notice Program, the Court authorized EPPs to
disseminate a Claim Form to potential members of the Round 1 and Round 2 Settlement Classes.
*See Auto Parts Master Docket*, 2:12-md-2311, ECF No. 1473. Potential members of the Round 1
and Round 2 Settlement Classes may submit claims electronically by completing the Claim Form
online at www.AutoPartsClass.com or in paper form by downloading the form and completing
and mailing it to GCG. Ex. 5, Castaneda Decl. ¶¶ 11, 20.

3

maintained by GCG. *See* Ex. 5, Castaneda Decl. ¶¶ 11-12. The website provides answers to frequently asked questions, information about important deadlines, a list of the Round 2 Settling Defendants, and access to important documents, such as the long form notice and relevant Court filings. *Id* ¶¶ 10-11. The website includes a drop down menu that allows potential class members to confirm whether they are a member of any of the settlement classes by inputting their vehicle or replacement part purchase information. *Id.* ¶ 12. The website has been operational since October 12, 2015, and is accessible 24 hours a day, seven days a week. *Id.* ¶ 10. To date, the website has received visits from 1,285,228 unique visitors. *Id.* ¶ 12. GCG also sent an email notice to each of the 35,216 individuals who previously registered on the settlement website[4] and provided an email address and mailed a postcard notice to each of the 17,938 individuals who had previously registered on the settlement website but did not provide an email address. *Id.* ¶¶ 19-20.

In contrast to the very large number of registrants and unique viewers of the notice (which to date is approximately 1,368,899 combined registrants and unique viewers), EPPs received only five objections. This is an even lower number than the objections to the Round 1 Settlements. And the majority of the Round 2 Settlement objectors are repeat objectors reasserting the same arguments previously rejected by the Court as lacking in merit:

|     | Objectors                          | Counsel              | Dkt. No.         | Dkt. Date | Round 1 Objector |
| --- | ---------------------------------- | -------------------- | ---------------- | --------- | ---------------- |
| 1.  | Patrick S. Sweeney                 | *pro se*             | 1714 (Master)    | 3/14/17   | Yes              |
| 2.  | Olen York, Amy York, Nancy York    | George W. Cochran    | 1712 (Master)    | 3/14/17   | Yes              |
| 3.  | Benjamin Feury                     | Marla A.             | 1715             | 3/15/17   | Yes              |

---

[4] The email alert was deliverable to 33,132 individuals. For all individuals for whom the email alert bounced back as undeliverable, GCG mailed them a postcard notice. Castaneda Decl. ¶ 19.

| | Objectors | Counsel | Dkt. No. | Dkt. Date | Round 1 Objector |
|---|---|---|---|---|---|
| | | Linderman | (Master) | | |
| 4. | Mary Ray, Sean Hull | Christopher A. Bandas | 1717 (Master) | 3/16/17 | No |
| 5. | Sandra Singer | *pro se* | 1713 (Master) | 3/14/17 | No |

## ARGUMENT

**I.    The Court Should Overrule the Objections and Approve the Round 2 Settlements.**

The objectors raise several often overlapping issues. The following responds, by issue, to the objections.

### A.  The Court should overrule objections not previously raised in connection with the Round 1 Settlements.

#### i.    Potential Class Members were provided with sufficient information.

Several objectors argue that the Notice did not provide sufficient information about the settlements.  These objections are unsound.

*Incentive Awards.* Objectors Ray and Hull argue that the Court cannot conduct a fairness inquiry because Class Counsel has "not indicated whether they will seek incentive awards for the class representatives." Ray/Hull Brief at 9-10.[5] As a result, they assert, class members cannot know "whether the class representatives will take disproportionately more than the unnamed class members." *Id.* at 10. This argument, and all of the case law Objectors Ray and Hull cite in

---

[5]  Ray and Hull expressly limit their objection to (1) the DENSO Settlement Agreement as it pertains to fuel injection systems, radiators, fan motors, power window motors, windshield wiper systems, and windshield washer systems; and (2) the MELCO Settlement Agreement as it pertains to fuel injection systems. *See* Ray/Hull Brief, at 3, 5. Thus, any argument asserted by these objectors necessarily applies to only these Round 2 Settlements and the settlement classes relating to these parts.

support, is completely inapplicable here because Class Counsel have not requested that the Court

grant any incentive awards.[6]

*Value of the claims.* Objectors Ray and Hull, along with Feury,[7] also assert that class

members have not been informed of the potential value of their claims and cite *Shane Group,*

*Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 303 (6th Cir. 2016), in support. The

facts of *Shane Group*, however, are readily distinguishable. In *Shane Group*, the Sixth Circuit

remanded a class action settlement to the district court upon determining that "various filings and

194 exhibits" were sealed and completely unreviewable by class members. *Id.* at 308-09. The

Sixth Circuit took specific issue with the failure to make available an expert report that provided

a "valuation of the class's claims" and "by all accounts was the keystone of the settlement

agreement." *Id.* at 306.

Here, Class Counsel have not obtained an expert report estimating damages allegedly

sustained by the proposed classes, much less filed such a report under seal.  Instead, Class

Counsel considered a variety of factors when negotiating the Round 2 Settlements, such as the

available evidence regarding the conduct of Round 2 Defendants, the estimated volume of

commerce potentially affected by the particular Round 2 Settling Defendant's conduct, including

the volume of commerce data used in calculating the amount of criminal fines imposed on

certain of the defendants, and information from parties and non-parties, and their consulting

experts, concerning impact, overcharge, and pass-through, as well as their knowledge about

---

[6] *See In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013); *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013); *Pelzer v. Vassalle*, 655 Fed. App'x. 352, 356–57 (6th Cir. 2016).  These cases are all inapposite because no incentive awards or special compensation is being sought for the named plaintiffs.

[7] Objector Feury asserts he purchased a 2015 Toyota Corolla and 2010 Hyundai, without specifying the model of the Hyundai. Feury's objections are limited to the Round 2 Settlements and settlement classes implicated by the parts and defendants covered by these purchases, shown in Appendix A below.

potential recoveries obtained through many years of experience in litigating and settling antitrust class actions. Of course, the defendants in these actions vigorously assert that the EPPs will not be able to prove that the classes they week to represent suffered any damages and have asserted numerous defenses to EPPs' claims.

Unlike *Shane Group*, Class Counsel have not yet obtained an expert damages report because none of the cases at issue in the Round 2 Settlements are at that point. The lack of an expert report is not a basis to reject the Round 2 Settlements. A damages model is not needed to approve a class action settlement. Indeed, "formal discovery [is not] a necessary ticket to the bargaining table." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981); *see also Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1240 (9th Cir. 1998). And the Court is not "required to find a specific monetary value corresponding to each of the plaintiff class's statutory claims and compare the value of those claims to the proffered settlement award." *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012).

Objectors Ray and Hull further complain that they do not have access to evidence and volume of commerce information and, therefore, cannot evaluate the value of their claims. This is not true. There is voluminous information about the Round 2 Settling Defendants and their conduct available to the public. *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 162 (S.D. Ohio 1992). In *Bowling*, a court in this circuit determined that publicly available documents gave class counsel and objectors alike an adequate basis to determine whether a settlement was fair and reasonable. *Id.* at 161-62. Here, information about the alleged conduct is publicly available in online court filings, the settlement website, and news articles. For example, much volume of commerce data is publicly available in the criminal proceedings regarding Round 2 Settling Defendants, which

7

are included in the record in this litigation. *See, e.g., United States v. DENSO Corp.*, No. 2:12-cr-20063 (E.D. Mich. 2012), ECF No. 9 (noting dollar amounts of sales of products).

To the extent Objectors Ray and Hull complain that important information is under seal, they do not point to any specific information filed under seal that they believe is necessary to evaluate their claims. Nor could they. Class Counsel, even before the *Shane Group* decision, have filed documents under seal only sparingly, and in any case have always concurrently filed a redacted version of the documents that are publicly available. For example, as to complaints, Class Counsel redacted only confidential information obtained from cooperating defendants, such as the names of unindicted persons involved in collusive activities. Redactions in those complaints were minimal. None of the Objectors specify any particular redactions as problematic or inhibiting them from understanding the claims asserted in this litigation.

After the *Shane Group* decision, Class Counsel and the defendants developed a protocol predicated on complying with the document-sealing standards laid out in *Shane Group*. That protocol was submitted to and approved by the Court (the "Sealing Protocol"). *See* Stip. Order Regarding Sealed Filings, 12-md-2311, ECF No. 1690.

The Sealing Protocol addresses the filings of sealed documents by parties and non-parties alike and provides court-approved procedures for unsealing documents previously filed under seal. Defendants have sought to keep only a relatively small subset of documents under seal pursuant to *Shane Group*. *See, e.g.*, Motion to Seal (In Whole or In Part) Certain Documents Previously Filed Under Seal, 12-cv-00101, ECF No. 399; Defendants' Motion to Seal (In Part) Certain Documents Filed Under Seal, 12-cv-00300, ECF No. 156. As a result, dozens of previously sealed documents are no longer sealed. For example, all of the operative complaints

naming DENSO as a defendant are now available on the settlement website with redactions of only the names of unindicted persons involved in collusive activities.

For their part, Objectors Ray, Hull, and Feury acknowledge none of these facts, and instead assert a completely inapplicable argument. But as should be clear from the above, the massive sealing of pertinent materials that occurred in *Shane Group* limiting class members' access to critical documents has never been present here.

Similarly, Objectors Ray and Hull's assertion that there is no value in the cooperation provisions or the injunctive relief is meritless. Courts have widely accepted that both types of relief are valuable. *See In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2010 WL 3070161, at *4 (E.D. Mich. Aug. 2, 2010) ("Courts approving partial settlements in antitrust class actions recognize the significant value of cooperation such as Home City agrees to provide in this case."); *In re Pressure Sensitive Labelstock Antitrust Litig.,* 584 F.Supp.2d 697, 702 (M.D.Pa.2008) (recognizing the immediate value to the class of a settling defendants' proffer of facts in ongoing litigation against the non-settling defendants); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 294 (W.D. Tex. 2007) (noting that the "injunctive relief provided by the settlement has significant value to the class"); *In re Linerboard Antitrust Litig.,* 292 F.Supp.2d 631, 643 (E.D.Pa.2003) (substantial benefit to the class of significant cooperation by settling defendants strongly supported approval of proposed settlement).

Indeed, the cooperation provisions have proven to be very valuable for the settlement classes. Momentum has been building in favor of settlement in these cases in large part because of the discovery cooperation obtained from settling defendants. Class Counsel initially settled with eleven defendants after three years of litigation. Within a year, Class Counsel were able to settle with twelve more defendants that are the subject of the Round 2 Settlements. Since then,

9

Class Counsel have settled with more than fifteen defendants. All of this increasing settlement activity is due, in part, to the pressure put on non-settling defendants derived from the incriminating information provided by settling defendants.

*Confirmation of Valid Claims.* Objector Singer asserts that the Court must reject all of the Round 2 Settlements because Class Counsel did not confirm to Singer that she has a valid claim as a member of any of the Round 2 Settlement Classes. Whether a single potential class member has received confirmation that her claim is valid is hardly a basis to determine that a settlement for an entire class should be rejected. At any rate, as demonstrated in the correspondence between Singer and the claims administrator, GCG, Singer was simply told on February 14, 2017 that the "[t]he claims review process has not yet begun." Ex. 1. Further, Class Counsel subsequently conferred with GCG and have advised Singer that there are no deficiencies in her claim and that they will recommend that the Court approve her claim. *See* Ex. 2.

Objector Singer also argues that the Round 2 Settlements should be rejected because requiring verification of purchase creates a "restrictive claims process." Singer speculates that she may have to pay to obtain documentation from the registry of motor vehicles to verify her vehicle purchases, and the cost to do so may be more than what she would receive as a class member. Singer was never told she had to provide such additional information. In fact, she was expressly told "You do not need to take any further action currently." *Id.* And although the notice requests proof of purchase from potential class members, documentation will not be required if it is not reasonably available. In any event, Singer has been advised that her claim appears to be in order and that the Court will ultimately be requested to approve it. In all, Singer's argument is not a proper basis to reject the Round 2 Settlements.

ii.     **Class Notice satisfied due process requirements.**

Objectors Singer[8] and Sweeney[9] assert various alleged due process deficiencies with the notice program. Under Rule 23(e) of the Federal Rules of Civil Procedure, a class settlement notice must contain a summary sufficient "to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." *UAW*, 497 F.3d at 629 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). The notice must clearly and concisely state: (1) the nature of the action; (2) the class definition; (3) the class claims, issues, or defenses; (4) that a class member may enter an appearance through counsel; (5) that the court will exclude from the class any member who requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members. *See* Fed. R. Civ. P. 23(c)(2)(B).

Similarly, due process requires that absent class members be provided the best notice practicable, reasonably calculated to apprise them of the pendency of the action, and affording them the opportunity to opt out or object. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *see also UAW*, 497 F.3d at 629 (quoting *Mullane,* 339 U.S. at 314). The "best notice practicable" does not mean actual notice, nor does it require individual, mailed notice where there are no readily available records of class members' individual addresses or where it is otherwise impracticable to send notice by mail. *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 548-53 (N.D. Ga. 1992); Manual For Complex Litigation (Fourth) § 21.311, at 288 (2004) ("Manual"). The mechanics of

---

[8] Objector Singer does not list in her brief the qualifying new vehicles she leased or purchased.

[9] Objector Sweeney asserts he purchased a 2006 Land Rover LR 3, a 2006 Chevy Tahoe, and a 2006 Chevy Suburban. Sweeney's objections are limited to the Round 2 Settlements and settlement classes implicated by the parts and defendants covered by these purchases, shown in Appendix A below.

11

the notice process "are left to the discretion of the court subject only to the broad 'reasonableness' standard imposed by due-process." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975). Each class member need not receive actual notice for the due process standard to be met, "so long as class counsel acted reasonably in selecting means likely to inform persons affected." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996).

The undisputed evidence shows the notice program in this case was developed and implemented by a nationally recognized expert in class action notice. The class notice program was extensive and specifically structured to reach most potential class members and did, in fact, reach an estimated 80.1% of new vehicle owners or lessees, with an average frequency of 2.5 times. Wheatman Decl., 12-cv-00103, ECF No. 560 ¶¶ 24, 31, 36. The program was based on a scientific methodology customarily used in the advertising industry. Specifically, to reach the identified targets directly and efficiently, the notice program utilized a multi-layered approach, which included national magazines, magazines specifically appropriate to the targeted audiences, and newspapers. Accordingly, any claim that notice was insufficient is contradicted by the record.

Singer argues in a footnote that the notice program was discriminatory against women because notice "was published in Sports Illustrated and Automotive News (publications disproportionately read by men), but not any publications disproportionately read by women." Singer Brief, 1-2 n.2. Singer provides no basis for her argument. Moreover, as detailed above, the notice program was broad and far reaching and included more publications than *Sports Illustrated* and *Automotive News*, such as *Field & Stream*, *People*, *Reader's Digest*, *Southern Living*, and *Woman's Day*.

Objector Sweeney alleges the notice program was deficient because he did not receive notice, even though he registered on the Settlement Website, and "assumes" others who registered on the Website similarly did not receive the notice. Sweeney Brief, at 4. Sweeney is mistaken. The Claims Administrator confirms that, pursuant to the September 2016 Notice Program, it sent an email alert on November 28, 2016 to the email address provided by Sweeney that he used when he registered on the Settlement Website. Ex. 5, Castaneda Decl. ¶ 26. Sweeney provides no proof in support of his assertion, and no other objectors have asserted that they did not receive the notice. Indeed, Sweeney's knowledge of the settlements, and his submission of objections according to the terms of the notice, illustrates the effectiveness of the notice program used in this case. *See In re Kendavis Holding Co.,* 249 F.3d 383, 387 (5th Cir. 2001) (determining that one "usually has adequate notice that his rights could be jeopardized and should take steps to protect his rights" when one knows of legal proceeding); *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 964 (3d Cir. 1983) (noting that objector's "vigorous objection to the settlement, and that of the other objectors, demonstrates that the notice selected was adequate").

### iii.    The Court should not create subclasses.

Objectors Ray and Hull argue that subclasses should have been created, and separate counsel appointed for those subclasses, because the repealer states each allow varying recoveries that create "intra-class conflict." Ray/Hull Brief, at 16. They assert that Class Counsel have erred by treating class members "equally" and by not "advocat[ing] the relative strength of state antitrust laws to protect any specific state's class members' interests." *Id.* at 18.

The Court should reject this objection. Objectors Ray and Hull have not shown that the Round 2 Settlement Class members have interests so divergent that subclassing is necessary.

Courts around the country have rejected this exact argument. *See In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 348 (3d Cir. 2010) ("We disagree and find no merit in objectors' argument that state law differences created conflicts among class members that defeat adequacy of representation and preclude certification of a nationwide class."); *In re Budeprion XL Mktg. & Sales Litig.*, No. 09-MD-2107, 2012 WL 2527021, at *8 (E.D. Pa. July 2, 2012) (finding "no conflict present or any reason to suggest that the named Plaintiffs were unable or unwilling to vigorously advocate on behalf of the entire class" where the "litigation [was] based upon different states' laws"); *Cf. In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 63 (D. Mass. 2005) (noting that end-payor counsel modified a settlement agreement "to favor [class members from] *Illinois Brick* repealer states in the event funds were insufficient" in a class that included both repealer states and non-repealer states, but not favoring *particular* class members from particular repealer states over others).

Courts commonly approve similar allocation plans that provide for all indirect purchaser class members in *Illinois Brick*-repealer states on a share and share alike basis. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07-MD-1827 SI, 2011 WL 7575004, at *4 (N.D. Cal. Dec. 27, 2011) ("[A]pro-rata allocation has been used in many antitrust cases including in this District."); *In re Vitamins Antitrust Litig.,* 2000 WL 1737867 at *6 (D.D.C. Mar.31, 2000); *In re Lloyds' Am. Trust Fund Litig.,* 2002 WL 31663577 at *19 (S.D.N.Y. Nov.26, 2002); *see also Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 302-03 (3d Cir. 2011) (variations in state antitrust laws do not defeat commonality or predominance, particularly in the context of settlement). The reason for doing so is simple: rather than rendering the settlements more reasonable, the creation of subclasses would needlessly complicate the settlement process for both the members of the Settlement Classes and the Court.

Accordingly, Ray and Hull's subclassing proposal should be rejected.

### iv.    Class Members' due process rights have not been violated.

Objectors Feury and the Yorks[10] argue that class members' due process rights have been violated by the Court's case management order. They complain that the "separate filings/cases" provisions make the action "overwhelming and unduly burdensome" and force objectors to appeal each case separately to the Sixth Circuit, resulting in expensive filing fees. *See* Feury Brief, at 10-11; Yorks Brief, at 8-10. It is not clear from their briefs on what basis these arguments demonstrate that the Round 2 Settlements should not be approved. The objectors appear to imply that the Court's administration of these actions as separate cases is the result of "collusion" or a "strategic attempt by the parties to discourage class members from exercising their rights." *See* Feury Brief, at 10; Yorks Brief, at 10.

Although this Court has not previously addressed this purported "due process" argument, the Sixth Circuit has. The Yorks made precisely the same argument in response to show cause orders from the Sixth Circuit in connection with the Yorks' appeal of this Court's approvals of the Round 1 Settlements. The Sixth Circuit rejected the argument entirely. *See* Ex. 3, Order, Appeal No. 16-2025, ECF No. 62; Appeal No. 16-2085, ECF No. 43; Appeal No. 16-2086, ECF No. 36. The Court of Appeals noted that each of the nineteen cases at issue in the Round 1 Settlements "retain their individual identity" and centralization of those cases for pretrial purposes by the MDL Panel "does not merge the actions into a single case." *Id.* The Court also expressly held that "[r]equiring appellants to either pay the required filing fee or move for pauper status does not violate due process." *Id.*

---

[10] The York Objectors assert they purchased a 2003 Toyota Corolla, 2009 Ford Escape XLT 2.5L, and a 2010 Ford Focus SE 2.0L. The Yorks' objections are limited to the Round 2 Settlements and settlement classes implicated by the parts and defendants covered by these purchases, shown in Appendix A below.

Far from being a product of collusion, the case management plan is the product of reasonable determinations by this Court. In fact, EPPs previously moved the Court to consolidate class claims in eighteen of the cases included in this litigation.[11] The Court denied the motion for consolidation because it found that, based on the record at the time, each case involved: (1) different, albeit similar fact patterns; (2) different defendants; (3) different automotive parts; and (4) different conspiracies. *See* Order Denying Motion to Consolidate Claims, 12-cv-00203, ECF No. 162. As the Court explained

> First, because all of the Relevant Cases have been placed in the MDL, the risk of inconsistent rulings on legal issues is not a factor. Second, although the alleged conduct by Defendants follows a similar pattern, the facts are not the same. Third, the existence of different Defendants weighs against consolidation. Even though the Relevant Cases involve overlapping parties, there are twenty-two different Defendant Groups, six Settling Defendant Groups, and eighteen different product markets.

*Id.*

The Court concluded that "rather than simplify this already complex litigation, consolidation will serve only to confuse the legal claims/defenses of the parties and delay a definite outcome for the parties." *Id.* (citing *Hasman*, 106 F.R.D. at 460). "Therefore, the Court decline[d] to consolidate the Relevant Cases pursuant to Rule 42(a), as it would not serve judicial economy or the convenience of the court and of the parties." *Id.* (citing *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1991)).

**B. The Court should overrule objections previously raised in connection with the Round 1 Settlements.**

**i. The Scope of the Release of Claims is Reasonable and Limited by the Claims and Products Alleged in the Complaints.**

---

[11] *See* Motion to Consolidate Claims and Amend Complaints, 12-cv-00203, ECF No. 131.

Objector Sweeney argues here, as he did when he objected to the Round 1 Settlements, that the settlement agreements "release the Defendants from future antitrust claims for new products." Sweeney Brief, at 5. Just as before, Sweeney quotes no specific language in the settlement agreements to support his argument.

Sweeney's assertion is as untrue now as it was then. Generally, released claims relate to claims asserted in the operative complaints and those closely related thereto. *See, e.g., In re Zoran Corp. Derivative Litig.*, 2008 U.S. Dist. LEXIS 48246, at *31 (N.D. Cal. Apr. 7, 2008). Here, the releases comply with this standard and generally provide, in part, as follows:

> [T]he Releasees shall be completely released, acquitted, and forever discharged from any and all claims . . . under any federal, state or local law of any jurisdiction in the United States, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may ever have, that now exist or may exist in the future, on account of . . . any **conduct alleged in the Complaints** . . . concerning Automotive Wire Harness Systems . . . .[12]

The releases therefore are plainly limited to past conduct alleged in the applicable complaints and to the particular automotive part or parts at issue. The releases expressly preserve claims based on the purchase of "any automotive part other than" the automotive part or parts at issue in the agreements.

### ii. Administration

Objector Sweeney also reargues that the Court should reject the Round 2 Settlements because Class Counsel does not provide a time frame for completing the administration of the Round 2 Settlement Classes. But it would be imprudent for EPPs' counsel or the Court to establish an artificial time limit for completion of the claims administration process at this stage in the litigation. Litigation against non-settling defendants is ongoing, additional settlements have already been obtained and others are likely, and the final distribution amounts have not yet

---

[12] *See, e.g.*, Sumitomo Settlement Agreement ¶ 21 (emphasis added).

been determined. The Court previously rejected this argument, and no new facts or circumstances have arisen requiring a different decision.

### iii. Rule 23

Objector Feury reargues that the prerequisites under Rule 23 for class certification are not satisfied. Specifically, Feury argues that the predominance requirement is not met and the proposed classes are not ascertainable for the same reason: potential class members cannot "specifically connect the multiple component parts with specific vehicles" to determine whether they are members of a settlement class. Feury Brief, at 4-5. Notably, this argument was presented by almost every objector to the Round 1 Settlements and rejected by the Court. But with respect to the Round 2 Settlements, Feury alone lodges this objection.

The reasons why most Objectors have abandoned this argument is simple. First, as noted above, the Court squarely rejected the argument, holding that "[t]he fact that an objector cannot personally identify whether his motor vehicle contained a part does not render the criteria [of class membership] subjective." ECF No. 497 at 19. Second, since the Court's approval of the Round 1 Settlements, Class Counsel have provided a tool that allows potential settlement class members to easily determine whether the new vehicle they purchased or leased or the replacement part they purchased is included in the settlements and, thus, which class or classes they are members of. The tool appears on the homepage of the Settlement Website at www.AutoPartsClass.com. Feury's objection is therefore completely unsound.

## II. Attorneys' fees.

The majority of the Objectors' arguments address EPPs' application for an award of attorneys' fees and costs. An award of attorneys' fees is a matter separate and apart from the determination whether a proposed settlement is fair, adequate, and reasonable. *See Bowling v.*

*Pfizer*, 102 F.3d 777, 779 (6th Cir. 2006). Therefore, none of these objections should have any impact on whether the Court should approve the settlements. Class Counsel have provided detailed support for the fees requested in the papers filed with the Court on February 10, 2017. *See, e.g.*, Case No. 12-cv-000103, ECF No. 562. EPPs applied for fees using the percentage-of-the-fund approach, specifically requesting 27.5% of the settlement amount, which is also supported by an attorneys' fee lodestar cross-check. To that end, EPPs provided a summary of the total lodestar incurred in this litigation supported by attorney declarations that list the hours spent by each attorney and their hourly rates, and further demonstrate the reasonableness of the application.

### A.   The Court should not apply a reduced percentage simply because of the size of the Round 2 Settlements.

All of the Objectors except Sweeney[13] argue that the Court should apply a declining fee percentage simply because the settlement achieved is a sizable result, an argument that was also briefed in connection with the Round 1 Settlements. The York Objectors refer to this reduction of the requested fee percentage as a "long standing principle" in the Sixth Circuit; it is anything but.

Courts in the Eastern District of Michigan routinely approve attorneys' fees of 30% or more of the common fund created for a settlement class. *In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141, 2015 WL 1396473 (E.D. Mich. Jan. 20, 2015); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, 2014 U.S. Dist. LEXIS 91661, at *5-6 (E.D. Tenn. June 30, 2014). Likewise, awards of 30% or more of the settlement funds are common in antitrust class actions, including those with very substantial recoveries. *See, e.g., In re Se. Milk*

---

[13] Sweeney instead asserts with no support or explanation that Class Counsel's fee request is simply "far too high," without specifying any alternative.

*Antitrust Litig.*, No. 2:07-CV 208, 2013 WL 2155387, at *4 (E.D. Tenn. May 17, 2013) (awarding one-third of $158 million settlement fund); *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210-11 (S.D. Fla 2006) (awarding 31.5% of a $1.06 billion settlement fund and citing fourteen cases involving settlement funds between $40-696 million with fee awards between 25–35% of the fund). And the requested fee percentage is in line with attorneys' fees in large private, non-class litigation. *See ETSI Pipeline Project v. Burlington Northern, Inc.*, Misc. No. 87-0615, (D.D.C. 1987) (plaintiff recovered over $630 million and, pursuant to the retention agreement, paid its attorneys at Vinson & Elkins one-third of that amount, or just over $210 million); Yuki Noguchi, D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue, WASHINGTON POST, March 18, 2006, D03, available at https://www.washingtonpost.com/archive/business/2006/03/18/dc-law-firms-big-blackberry-payday-span-classbankheadcase-fees-of-more-than-200-million-are-said-to-exceed-its-2004-revenuespan/8a76dbb5-0918-46b9-a7b2-4d9284d5e0d3/?utm_term=.06608ec06f76 (accessed February 8, 2017) (plaintiff's attorney recovered a contingent fee of $200 million after the case settled for $612.5 million); "NCUA Reveals it paid $1 billion to Lawyers in Fight to Recover Credit Union Crisis Losses," HOUSINGWIRE, Oct. 21, 2006, available at http://www.housingwire.com/articles/38346-ncua-reveals-it-paid-1-billion-to-lawyers-in-fight-to-recover-credit-union-crisis-losses (accessed February 8, 2017) (National Credit Union Administration, a federal agency, paid attorneys' fees of just over $1 billion for recoveries of $4.3 billion in lawsuits against banks regarding the sale of residential mortgage-backed securities).

None of the Objectors even attempts to fairly address the substantial case authority EPPs' provided in their fee application justifying the amount requested. Objectors Ray and Hull assert

that *Southeastern Milk* can be distinguished because the settlement recovery in that case amounted to 70% of the total damages calculated by plaintiffs' expert. These Objectors fail to acknowledge, however, that the court did not rely on that percentage to approve the requested fees. Instead, the court expressly disavowed the declining percentage principle for the same reasons it should not apply here: (1) no Sixth Circuit case has endorsed the approach; (2) the approach can incentivize quick and cheap settlements and discourage counsel from investing the time necessary to maximize class member recovery, (3) there is "no good reason" why class action lawyers who represent clients on a contingency-fee basis in a case such as this should receive lower fees on a percentage basis than that received by contingency-fee lawyers in litigation representing individual clients, which typically amount to 33% or more of the recovery, and (4) the approach "would penalize these class action attorneys given the actual number of hours spent on the case, rather than compensate them fairly." 2013 WL 2155387, at *3-8.

Objectors Ray and Hull alone cite two examples of cases where courts utilized a declining percentage approach, *see In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679 (N.D. Ohio 2015), *reconsideration denied*, No. 1:10 MD 2196, 2015 WL 12748013 (N.D. Ohio Dec. 21, 2015); *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752 (S.D. Ohio 2007). Both cases are easily distinguished. In *Cardinal Health*, plaintiffs requested a 24% fee award from a $600 million settlement fund, but the district court found that "the requested lodestar multiplier of 7.89 is far beyond the range courts have found acceptable in other large securities actions." 528 F. Supp. 2d at 767. Still, the court determined that 18% was "a reasonable award" even after acknowledging that it "would yield a lodestar multiplier of six" which was "significantly above average," but which the court determined was "reasonable under the circumstances." *Id.* at 768. In *Polyurethane*, the district court awarded a fee of 20% instead

of the requested 30% in part because the court had previously granted three 30% fee awards pursuant to three previous requests. 135 F. Supp. 3d at 683, 691-92.

Here, Class Counsel undertook substantial effort to perform a detailed analysis of all EPP attorney time submissions received to date and included information about the resulting lodestar in EPPs' fee motion. In contrast to the above cases, the Court has provisionally granted Class Counsel to date 20% of the Round 1 Settlements, and that award combined with the award requested here would yield a modest 1.37 multiplier of the total lodestar.[14]

Objectors Ray and Hull argue that Class Counsel's rates used to calculate the lodestar are "exceedingly high," and draw comparisons to the *dicta* discussion in *Shane Group*.[15] There, the Court noted that "some 20 lawyers billed the class more than $700 per hour, and some billed more than $900 per hour." 825 F.3d at 310. This argument is misplaced because the *Shane Group* discussion, although *dicta*, applied to an award of attorneys' fees calculated using the lodestar method rather than a percentage-of-the-fund basis.

Moreover, the rates charged by Class Counsel are more than justified. Among the co-lead counsel firms, only five attorneys list hourly rates above $700. This small list consists of Steve Williams, Hollis Salzman, Bernard Persky, Terry Oxford, and Marc Seltzer. They each are lawyers with many years of experience in leading complex antitrust class actions, and have brought their experience to bear in this case on behalf of the classes. They are all senior

---

[14] As previously noted, if the Court awarded the full fee amount requested by Class Counsel in connection with the Round 1 Settlements, the multiplier would be 1.56. Joint Decl. at ¶25.

[15] Objector Feury asserts that Class Counsel did not provide enough documentation to justify the requested fee. This argument cannot be taken seriously. Feury's only asserted deficiencies are that Class Counsel did not "provide a breakdown of the hours worked and costs expended" and did "not even provide the hourly rate charged." Feury Brief, at 9-10. Both assertions are clearly wrong. Similarly, Objector Sweeney erroneously asserts that Class Counsel did not "includ[e] hourly rates of the professionals, hours accumulated and reasonable costs incurred" in support of his argument that the fee application lacks documentation. In fact, that information was provided. *See, e.g.*, *Wire Harness*, 2:12-cv-00103, ECF No. 563, and accompanying exhibits.

attorneys with track records of extraordinary success. It is also worth noting that the defendants in these cases are represented by the most prominent antitrust defense lawyers in the world, making it all the more necessary for the classes to be represented by experienced antitrust attorneys. Further, a comparison of the co-lead firms' hourly rates with hourly rates of the thirty-two firms included in EPPs' fee application demonstrate that the rates submitted are in-line with the market. In each firm, only the most senior attorneys list rates above $700.[16] These rates are well in line with the market, with recent reports explaining that senior lawyers at top law firms routinely charge well over $1,000. *See* Sara Randazzo & Jacqueline Palank, *Legal Fees Cross New Mark: $1,500 an Hour*, WALL ST. J., Feb. 9, 2016, available at https://www.wsj.com/articles/legal-fees-reach-new-pinnacle-1-500-an-hour-1454960708 ("Despite low inflation and weak demand for legal services, rates at large corporate law firms have risen by 3% to 4% a year since the economic downturn.").

Objectors Ray and Hull further urge that the time included with the Round 1 Settlement fee request should not be included in the lodestar cross-check for the Round 2 Settlements. EPPs provided substantial authority in their fee application to explain why it is appropriate to include all of the time incurred to date in performing a lodestar cross-check. In particular, EPPs cited cases explaining why it would be impractical to compartmentalize and isolate the work that Class Counsel performed in any one case when that work provided and continues to provide significant benefits to all settlement classes. *See Southeastern Milk*, 2013 U.S. Dist. LEXIS 70167, at *26-27 (rejecting objection based on the proposition that the calculation of class counsel's lodestar should be limited to work performed after the period covered by a prior fee award); *Lobatz v.*

---

[16] It is also extremely likely that the rates billed by plaintiffs' counsel are no higher than those charged by defendants' counsel.

*U.S. West Cellular of California, Inc.*, 222 F.3d 1142 (9th Cir. 2000) (same); *Insurance Brokerage*, 282 F.R.D. 92 (calculating lodestar and lodestar multiplier using the same method).

Rather than address this persuasive authority, Objectors Ray and Hull simply ask the Court to ignore it while providing no explanation as to why Class Counsel's previous work has not benefited all of the settlement classes. But even if Ray and Hull's preferred calculation method were used (*i.e.*, by using only the lodestar amount and requested fee for the Round 2 Settlements) the requested award would yield a lodestar multiplier of 2.8, which is still reasonable. *See* Order Granting Fees, *Occupant Safety Systems*, 2:12-cv-00601, ECF No. 128 (awarding attorneys' fees resulting in a multiplier of approximately 2.09 of direct purchaser plaintiffs' lodestar); *In re Prandin Direct Purchaser Antitrust Litig.*, No. 2:10-cv-12141, 2015 U.S. Dist. LEXIS 5964, at *14 (E.D. Mich. Jan. 20, 2015) (awarding attorneys' fees in the amount of one-third of a $19 million settlement fund, which equated to a multiplier of 3.01); *Bailey v. AK Steel Corp.*, No. 06-cv-468, 2008 U.S. Dist. LEXIS 18838, at *8 (S.D. Ohio Feb. 28, 2008) (awarding attorneys' fees with a multiplier of approximately 3.01); *Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 WL 950616, at *24 (E.D. Pa. April 22, 2005) (awarding attorneys' fees in an antitrust action totaling 30% of $65 million settlement fund, which yielded a multiplier of 3.15); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999) (awarding attorneys' fees in a commodities manipulation action totaling 27.5% of $116.6 million settlement fund, which amounted to a multiplier of 2.5).

**B.    The Court should again reject the notion that Class Counsel "piggybacked" off the DOJ's investigation.**

Objectors Feury and the Yorks argue that the fee request is unreasonable because the Department of Justice's investigation reduced Class Counsel's risk in bringing these actions. This argument and the cases cited in support are identical to the arguments Objectors previously

presented in connection with the Round 1 Settlements. The Court rejected the argument then, recognizing that EPPs' counsel have the burden to obtain class certification, and prove defendants' liability for overcharges and "classwide impact from the conspiracy," which are not elements in the government's case. Final Approval Order, 12-cv-00103, ECF No. 497 at 11. Neither Feury nor the Yorks cite any new cases or give any new explanation as to why the Court now should deviate from its previous decision.

In fact, the Department of Justice did not need to address several critical issues unique to EPPs' actions. Those issues include: (1) the amount of the overcharges, (2) the economic and business relationships between parties occupying different places in the chain of distribution and the relationship of defendants' sales to OEMs, OEMs sales to auto dealers, and auto dealers' sales to end-users, (3) measuring and tracing the pass-through of overcharges, (4) class-wide impact and standing of indirect purchasers, or (5) the many other issues which private plaintiffs must prove in order to recover in a complex, indirect-purchaser antitrust class action case such as these actions.

Aside from the additional evidentiary hurdles confronting EPPs' counsel, the EPPs' cases are also significantly broader than the government's cases, including claims against defendants and involving time periods that were not part of the indictments or guilty pleas that resulted from the government's investigation.[17] EPPs' counsel also secured discovery the government would not have been able to obtain because of jurisdictional limits, such as documents located beyond the borders of the United States, and interviews and depositions of persons residing outside of the country.

---

[17] Indeed, some of the settling defendants, such as Lear and KL Sales, did not plead guilty in any criminal case.

Moreover, Class Counsel's work resulted in obtaining tremendous value for the classes. The government secured no money or other compensation for the classes in this litigation. *See, e.g., United States v. DENSO Corp.*, No. 2:12-cr-20063 (E.D. Mich. 2012), ECF No. 9 (explicitly noting "no order of restitution" contained in the guilty plea). Any such relief has only come through this private litigation and Class Counsel's diligence and hard work that enabled them to overcome the substantial substantive and procedural defenses asserted by defendants. The existence of the common funds created in this case is solely attributable to the efforts of Class Counsel.

The Objectors mistakenly rely in part on the holding in *In re Databank Antitrust Litigation*, 209 F. Supp. 2d 96, 98 (D.D.C. 2002). There the court used a 30% rate to award fees, but applied that percentage to only $8 million of the common fund rather than the fund's entire $24 million amount. *Id.* at 101. But the court did so because the Federal Trade Commission *itself* had secured $16 million of the $24 million total fund as disgorgement from the defendants. *Id.* at 98. In contrast, the entirety of the common funds established here were created solely due to the efforts of Class Counsel.[18]

**C.     The Court should again reject Sweeney's *cy pres* objection.**

Objector Sweeney again asserts here, just as he did in his objection to the Round 1 Settlements, that Class Counsel must articulate a detailed *cy pres* procedure prior to final approval. Just as before, Sweeney provides no support for his argument. The Court previously

---

[18] The Objectors' reliance on *Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013), and *Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 436 F. App'x 496 (6th Cir. 2011), is completely misplaced. In *Vassalle*, the court held that a settlement which provided vastly disproportionate benefits to the named plaintiffs was unfair. There are no such inequities here. Further, the court held that in light of its vacating the approval of the settlement, the attorneys' fee award challenge was moot. In *Van Horn,* the 6th Circuit affirmed a trial court's fee award made on requested lodestar/multiplier basis as not being an abuse of the trial court's discretion.

rejected this argument, *see id.* at 22-23, and Sweeney has given no reason for the Court to decide differently here.

    **D.**    **The Court should strike blanket joinder objections.**

    Objector Sweeney and the Yorks attempt to incorporate all other objections made to the Round 2 Settlements. The Court should strike these blanket joinder attempts as improper because they serve no function other than to allow these objectors to argue that they may appeal from this Court's rejection of other objections, thus circumventing the general rule that an objector may only raise matters on appeal that he or she raised in the district court. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, No. 8:10ML 02151 JVS, 2013 WL 3224585, at *13 (C.D. Cal. June 17, 2013) (striking "those portions of any objection that purports to incorporate the objections raised by others in other documents").

**III.**    **The Court should reject objections related to the administration of the settlement funds.**

    The Objectors raise a number of arguments related to the administration of the settlement funds. Some of these arguments are lodged as objections to the settlements themselves while others are asserted as reasons why the Court should deny Class Counsel's fee request. Most of these arguments were raised and rejected in connection with the Round 1 Settlements.

    Objectors Sweeney and Feury ask the Court to reject the Round 2 Settlements because the claims administration process fails to require reliable future oversight. Objector Sweeney goes so far as to request, once again, that a portion of Class Counsel's fee be withheld until the conclusion of the claims administration process. Objector Sweeney also asks, once again, that the amount of fees awarded should somehow be tied to the amount class members ultimately receive. Similarly, Objector Feury asks, once again, that Class Counsel not receive any award

until class members receive their distribution. Just as with their previous identical objections, neither Feury nor Sweeney provides any support for their arguments or suggested "solutions."

The Court rejected each of these arguments previously, and there is no reason not to do the same for the Round 2 Settlements. First, these proposals are contrary to the principles underlying the common fund doctrine. *See, e.g., Barton v. Drummond Co.*, 636 F.2d 978, 982 (5th Cir. 1981) (noting that "it is well settled that the 'common benefit' or 'common fund' equitable doctrine allows for the assessment of attorneys' fees against a common fund created by the attorneys' efforts").

Second, the limitations that the Objectors propose would result in an enormous disincentive to counsel in future cases—a result which runs counter to the very purpose of Rule 23. *See, e.g., Saunders v. Berks Credit Collections, Inc.,* No. 00-3477, 2002 U.S. Dist. LEXIS 12718, at *42 (E.D. Pa. July 12, 2002) (concluding that an inadequate award of attorneys' fees "would deter counsel from undertaking such socially beneficial litigation").

Third, the Sixth Circuit's recent decision in *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269 (6th Cir. 2016), *cert. denied sub nom. Blackman v. Gascho*, No. 16-364, 2017 WL 670215 (U.S. Feb. 21, 2017), *cert. denied sub nom. Zik v. Gascho*, No. 16-383, 2017 WL 670216 (U.S. Feb. 21, 2017), demonstrates that fee awards need not be tied to amounts class members receive. *See id.* at 279 (affirming award of attorneys' fees where amount awarded was greater than the amount class members claimed and received). In doing so, the Court expressly declined to follow *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), a Seventh Circuit decision upon which the Objectors rely. The Sixth Circuit held in *Gascho* that, under *Boeing v. Van Gemert*, 444 U.S. 472, 480 (1980), the amount made available to the class is what is important, even if it that amount is not claimed. 822 F.3d at 279. *Gascho* is all the more noteworthy because the

28

settlement at issue there was a claims-made settlement, unlike the settlements at issue here where the entire settlement fund will be paid to class members who submit valid claims, with no reversion to the defendants. *Id.* at 275.

For their part, Objectors Ray and Hull argue that the Court should not award a lump sum fee to co-lead counsel to be distributed among the various firms that represent EPPs. The Objectors cite two cases in support of their assertion that a district court must order fees for each eligible firm. *See In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216 (2d Cir. 1987). But no such requirement exists in the Sixth Circuit. Courts in this Circuit have entrusted lead counsel to distribute fees awarded from a common fund. *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d at 694 ("Co-lead Counsel are empowered to 'distribute the fees in a manner that, in the judgment of Co-Lead Counsel, fairly compensates each firm for its contribution to the prosecution of the Plaintiffs' claims'"). Indeed, this Court has done the same in this litigation. Objectors Ray and Hull provide no authority supporting any change.

## IV. Not All Settlements Are Subject to the Objections.

The members of a settlement class for a particular settling defendant have the right to object to the settlement with that defendant as a member of that class. Here, based on the objectors' vehicle purchases that they list in their respective briefs, certain Round 2 Settlements and Settlement Classes—listed in the table below—are not implicated. Those Round 2 Settlement Classes are listed in table below. Because no objector qualifies as a potential member of these Round 2 Settlement Classes, they are not subject to the objections filed here.

| | |
|---|---|
| ATF Warmers | DENSO |
| Ceramic Substrates | DENSO |
| Fuel Senders | DENSO |
| HID Ballasts | DENSO |

|  | MELCO |
| Inverters | DENSO |
| Motor Generators | DENSO |
| Spark Plugs, Oxygen Sensors, and Air Fuel Ratio Sensors | DENSO |
| Power Window Switches | Omron |
| Automotive Hoses | Sumitomo Riko |

## V.   The Court Should View With Skepticism the Arguments of "Serial" or "Professional" Objector Counsel.

Many of the Objectors' counsel have been recognized by other courts as serial objectors. George Cochran, counsel for the York Objectors, is a serial objector who routinely files non-meritorious appeals. *See, e.g.,* Second Amended Notice of Appeal, *In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827 (N.D. Cal. April 18, 2012), ECF No. 7951; Notice of Appeal, *In re National Football League Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa. May 15, 2015), ECF No. 6546; Notice of Appeal, *Golloher v. Todd Christopher Int'l, Inc.*, No. 3:12-cv-06002 (N.D. Cal. June 4, 2014), ECF No. 82 (filed on ECF by George Cochran). The same goes for Objector Patrick Sweeney. *See In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Practices Act (FDCPA) Litig.*, No. 2:13-MD-2426-DBH, 2016 WL 543137, at *6 (D. Me. Feb. 10, 2016) (noting that Sweeney's objections to a class action settlement were "without merit and appear to be a form document that he has filed in other class action settlements).

Christopher Bandas, counsel for Objectors Ray and Hull, was recently named as a defendant in a civil RICO class action alleging that Bandas is "among the most notorious and prolific 'professional objectors' in the United States" and is a ring leader in a scheme to "plan and coordinate actions to extort unjustified profits from themselves from legitimate and court-

approved class action settlements." Ex. 4, *Edelson PC v. The Bandas Law Firm PC*, 1:16-cv-11057, ECF No. 50, at 1 (N.D. Ill. Mar. 8, 2017). The complaint details the scathing admonishments Mr. Bandas has received from courts around the country as a serial objector. *Id.* at 13, citing and quoting *In re Gen. Elec. Co. Sec. Litig.*, No. 09 Civ. 1951(DLC), 2014 WL 534970, at *9 (S.D.N.Y. Feb. 11, 2014) (describing Bandas as "a known vexatious appellant" who has been "repeatedly admonished for pursuing frivolous appeals of objections to class action settlements"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) ("Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain [and] has been excoriated by Courts for this conduct."); *Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85, Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission at 2 (Ill. Cir. Ct. 14th Cir. Oct. 29, 2009) ("Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'"). Objector Hull himself recently testified that Bandas has represented him numerous times as an objector to class action settlements, but Hull "has ***never*** received funds" after settling an objection, "where Bandas has." *Garber v. Office of the Comm'r of Baseball*, No. 12-cv-3704, slip op. at 11-12 (S.D.N.Y. Feb. 27, 2017) (emphasis added); *see also Edelson PC v. The Bandas Law Firm PC*, 1:16-cv-11057, ECF. No. 50 at 2 (N.D. Ill. Mar. 8, 2017) (First Amended Class Action Complaint) (naming Bandas as one of "the most notorious and prolific 'professional objectors' in the United States").

     Although allowing class members to object provides an important safeguard against collusive or unfair settlements, serial objectors have turned class action objections into a cottage

industry, objecting to class action settlements as unfair, inadequate, and unreasonable, regardless of the benefits to class members and the merits of the settlements. Rather than serve a useful purpose, this practice has needlessly added years of delay to the conclusion of litigation.

Many courts have voiced genuine concern about serial objectors, their counsel and their tactics. It is well known that "serial" or "professional" objectors have sought to extract payments from parties in the litigation to avoid years of delay caused by to their unmeritorious objections:

> Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements. The larger the settlement, the more cost-effective it is to pay the objectors rather than suffer the delay of waiting for an appeal to be resolved (even an expedited appeal). Because of these economic realities, professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose behalf the appeal is purportedly raised, gains nothing.

*Barnes v. Fleetboston Fin. Corp.*, No. CA 01-10395-NG, 2006 WL 6916834, at *1 (D. Mass. Aug. 22, 2006)

This litigation is the latest victim of this practice. As another court has observed:

> [C]lass actions also attract those in the legal profession who subsist primarily off of the skill and labor of, to say nothing of the risk borne by, more capable attorneys. These are the opportunistic objectors. Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counsel or the class in the hope that lead plaintiff will pay them to go away. Unfortunately, the class-action kingdom has seen a Malthusian explosion of these opportunistic objectors, which now seem to accompany every major securities litigation.

*In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 754 (S.D. Ohio 2008).

Such lawyer-driven objections, such as those we have here, cast serious doubt on the *bona fides* of the positions advanced by these Objectors.

# CONCLUSION

The settlements are plainly fair, reasonable, and adequate. Indeed, given the risks of ongoing litigation and other factors addressed in EPPs' prior submission regarding these settlements, the settlements represent a truly excellent result for the settlement classes and were only achieved after years of hard-fought litigation in these very complex antitrust cases. Only eight individuals objected to these settlements, many of whom are serial objectors who have recycled arguments this Court has already expressly rejected. In all, none of the objections presented have any merit. It is respectfully submitted that the Court should overrule these objections and grant final approval to the settlements and the application for fees and costs.

Date: April 5, 2017                    Respectfully submitted,

                                       */s/ Marc M. Seltzer*
                                       Marc M. Seltzer
                                       Steven G. Sklaver
                                       **SUSMAN GODFREY L.L.P.**
                                       1901 Avenue of the Stars, Suite 950
                                       Los Angeles, CA 90067-6029
                                       Telephone: (310) 789-3100
                                       Facsimile: (310) 789-3150
                                       mseltzer@susmangodfrey.com
                                       ssklaver@susmangodfrey.com

                                       Terrell W. Oxford
                                       Chanler A. Langham
                                       Omar Ochoa
                                       **SUSMAN GODFREY L.L.P.**
                                       1000 Louisiana Street, Suite 5100
                                       Houston, Texas 77002
                                       Telephone: (713) 651-9366
                                       Facsimile: (713) 651-6666
                                       toxford@susmangodfrey.com
                                       clangham@susmangodfrey.com
                                       oochoa@susmangodfrey.com

                                       */s/ Hollis Salzman*

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
BPersky@RobinsKaplan.com
WReiss@RobinsKaplan.com

*/s/ Steven N. Williams*
Steven Williams
Demetrius X. Lambrinos
Elizabeth Tran
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
dlambrinos@cpmlegal.com
etran@cpmlegal.com

*Settlement Class Counsel and Interim Co-Lead Counsel for the Proposed End-Payor Plaintiff Classes*

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Devon P. Allard (P71712)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com
dpa@millerlawpc.com

*Interim Liaison Counsel for the Proposed End-Payor Plaintiff Classes*

34

# APPENDIX A

**Ben Feury**

| Air Conditioning Systems | DENSO Valeo |
|---|---|
| Alternators | DENSO MELCO |
| Automotive Wire Harness Systems | DENSO Furukawa G.S. Electech Tokai Rika |
| Fuel Injection Systems | DENSO MELCO |
| Heater Control Panels | DENSO |
| Instrument Panel Clusters | DENSO |
| Power Window Motors | DENSO |
| Radiators | DENSO |
| Starters | DENSO MELCO |
| Windshield Washer Systems | DENSO |
| Windshield Wiper Systems | DENSO |
| Electronic Powered Steering Assemblies | MELCO NSK |
| Automotive Bearings | NSK Schaeffler |

**Patrick S. Sweeney**

| Air Conditioning Systems | DENSO Valeo |
|---|---|
| Ignition Coils | DENSO MELCO |
| Fuel Injection Systems | DENSO MELCO |

**Mark Ray & Sean Hull**

| Fan Motors | DENSO |
|---|---|
| Fuel Injection Systems | DENSO MELCO |
| Power Window Motors | DENSO |
| Windshield Wiper Systems | DENSO |
| Windshield Wiper Systems | DENSO |

**Olen York, Amy York, Olen York, Jr.**

| Air Conditioning Systems | DENSO<br>Valeo |
|---|---|
| Alternators | DENSO<br>MELCO |
| Automotive Wire Harness Systems | DENSO<br>Furukawa<br>G.S. Electech<br>Tokai Rika |
| Automotive Bearings | NSK<br>Schaeffler |
| Anti-Vibrational Rubber Parts | Sumitomo Riko |
| Fuel Injection Systems | DENSO<br>MELCO |
| Ignition Coils | DENSO<br>MELCO |
| Power Window Motors | DENSO |
| Radiators | DENSO |
| Starters | DENSO<br>MELCO |
| Valve Timing Control Devices | Aisin Seiki |
| Windshield Washer Systems | DENSO |
| Windshield Wiper Systems | DENSO |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2017, I caused the foregoing to be electronically filed with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

                                                    */s/ E. Powell Miller*____
                                                    E. Powell Miller