# Exhibit 4

failure by defendants to make an adequate showing of entitlement to summary judgment, as to whether USI was a debt collector by virtue of the second sentence of 15 U.S.C. § 1692a(6), whether USI violated 15 U.S.C. § 1692e(3) & (10), whether Durand and PLdD violated 15 U.S.C. § 1692j(a) (and are hence subject to debt collector liability by virtue of section 1692j(b)), and whether USI or Durand and PLdD are shielded from liability for any such violations by virtue of section 1692a(6)(A) or (B) or by 15 U.S.C. § 1692k(c).

With respect to the standard for interpreting the letter quoted in Judge Dennis's opinion for purposes of sections 1692e(3) & (10) and 1692j(a), I note that the Second Circuit in *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir.1993), observed that "the least-sophisticated consumer standard" had been "consistently applied ... in a manner that protects debt collectors against liability for unreasonable misinterpretations of collection notices." As the Seventh Circuit suggested in *Gammon v. GC Services, Ltd.*, 27 F.3d 1254, 1257 (7th Cir.1994), this raises the question whether "least sophisticated consumer" is a misnomer. *See also id.* at 1259 (Easterbrook, J., concurring). In my view, summary judgment here was inappropriate whether or not we use a "least sophisticated consumer" standard, or an "unsophisticated consumer" standard, or a standard similar to that suggested by Judge Easterbrook's thoughtful concurrence in *Gammon*, a standard such as that of "a reasonable consumer with intelligence and experience typical of or average for those consumers to whom the communication was directed." I do not understand us to choose between these or like formulations. I also do not understand us to determine whether section 1692j(a) reaches instances where there *is* meaningful third party participation in the debt collection effort, and the form furnished is misleading merely as to the degree or character of that participation. Nor do I understand us to hold that as a matter of law Durand and PLdD were not participating in the debt collection; only that such participation remains at least a fact issue on this record. Finally, I do not understand us to pass upon plaintiff's entitlement to summary judgment.

With these observations, I concur in the reversal and remand.



**MICHIGAN STATE AFL–CIO, a voluntary, unincorporated labor association; International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), a voluntary, unincorporated labor association; Metropolitan Detroit AFL–CIO; Seafarers International Union of North America, a voluntary, unincorporated labor association; Franklin D. Garrison; Edgar A. Scribner, Plaintiffs–Appellees,**

v.

**Candice MILLER, Secretary of State (95–1858), Defendant–Appellant,**

**Frank J. Kelley, Attorney General, Defendant,**

**Michigan Chamber of Commerce (95–1397), Proposed Intervenor–Appellant.**

Nos. 95–1397, 95–1858.

United States Court of Appeals, Sixth Circuit.

Argued May 17, 1996.

Decided Jan. 7, 1997.

Labor unions and union presidents filed complaint seeking declaratory and injunctive relief with respect to four provisions of Michigan's Campaign Finance Act. Michigan Chamber of Commerce moved to intervene, but motion was denied. Thereafter, the United States District Court for the Eastern District of Michigan, Paul B. Borman, J., 891 F.Supp. 1210, granted injunctive relief as to three of four challenged provisions. Chamber of Commerce appealed from order denying intervention, and Michigan Secretary of

State appealed from preliminary injunction, limited to one provision. The Court of Appeals, Alan E. Norris, Circuit Judge, held that: (1) Chamber of Commerce satisfied all elements for intervention as of right, and (2) statute requiring labor unions and corporations to obtain affirmative consent at least once per year from members utilizing automatic payroll deduction to make contributions to a political contribution fund did not violate the First Amendment, under intermediate scrutiny analysis.

Orders denying intervention reversed; preliminary injunction vacated; remanded.

Daughtrey, Circuit Judge, filed dissenting opinion.

**1. Federal Civil Procedure ⇐314.1**

Elements which must be satisfied before intervention as of right will be granted are: timeliness of application to intervene; applicant's substantial legal interest in the case; impairment of applicant's ability to protect that interest in the absence of intervention; and inadequate representation of that interest by parties already before the court. Fed. Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**2. Federal Courts ⇐776, 817**

On appeal of district court's denial of motion to intervene as of right, Court of Appeals reviews district court's determination as to timeliness of motion for abuse of discretion, and district court's determinations concerning remaining elements which must be satisfied for such intervention are examined de novo. Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**3. Federal Civil Procedure ⇐320**

Motion to intervene as of right, which was filed just two weeks after complaint, when case was obviously in its initial stage, was timely as a matter of law. Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**4. Federal Civil Procedure ⇐331**

Michigan Chamber of Commerce had substantial legal interest in suit by unions contesting sections of Michigan's Campaign Finance Act, satisfying requirement for intervention as of right, considering that Chamber was vital participant in political process which resulted in adoption of challenged provisions, that it was significant party adverse to challenging unions, and was an entity also regulated by at least three of the four statutory provisions challenged by unions. Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.; M.C.L.A. §§ 169.252(9), 169.254(1), 169.255(4, 6).

**5. Federal Civil Procedure ⇐315**

To satisfy impairment element of intervention as of right test, would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied; thus, burden is minimal. Fed. Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**6. Federal Civil Procedure ⇐331**

Michigan Chamber of Commerce demonstrated impairment of its substantial legal interest if it was denied intervention as of right in suit by unions challenging provisions of Michigan's Campaign Finance Act, thus satisfying intervention element, based on its assertion that adverse ruling in district court would hinder its efforts to litigate validity of Michigan's system for regulating campaign finance in current ongoing cases and in future challenges; moreover, Chamber might lose opportunity to ensure that one or more election campaigns in Michigan were conducted under legislatively approved terms that Chamber believed to be fair and constitutional. Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.; M.C.L.A. §§ 169.201–169.282.

**7. Federal Civil Procedure ⇐316**

Although would-be intervenor as of right shoulders burden with respect to establishing that its interest is not adequately protected by existing parties to the action, burden is minimal because it is sufficient that movant prove that representation may be inadequate, not that the representation will in fact be inadequate; thus, it may be enough to show that the existing party who purports to seek the same outcome will not make all of prospective intervenor's arguments. Fed.Rules Civ.Proc.Rule 24(a), 28 U.S.C.A.

**8. Federal Civil Procedure ⇐316**

Decision not to appeal by an original party to the action can constitute inadequate

representation, for purpose of satisfying inadequate representation element of test for intervention as of right. Fed.Rules Civ.Proc. Rule 24(a), 28 U.S.C.A.

**9. Federal Civil Procedure ⟷331**

Michigan Chamber of Commerce which sought to intervene as of right in suit by unions challenging provisions of Michigan's Campaign Finance Act made sufficient showing of inadequate representation by the state of Michigan, satisfying element of intervention test; interest of state as regulator and of Chamber as target of statute's regulations were divergent, and decision of state not to seek interlocutory review of preliminary injunction as it related to two of three temporarily invalidated provisions also demonstrated divergence of interests. Fed.Rules Civ. Proc.Rule 24(a), 28 U.S.C.A.

**10. Federal Courts ⟷817**

So long as motion for permissive intervention is timely and there is at least one common question of law or fact, district court's balancing of undue delay, prejudice to original parties, and any other relevant factors is reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 24(b), 28 U.S.C.A.

**11. Federal Civil Procedure ⟷321**

If Court of Appeals is to review district court's exercise of discretion on motion for permissive intervention, district court must, except where basis for decision is obvious in light of the record, provide enough of an explanation for its decision to enable Court of Appeals to conduct meaningful review; it is insufficient merely to quote the rule and to state the result. Fed.Rules Civ.Proc.Rule 24(b), 28 U.S.C.A.

**12. Federal Courts ⟷815**

Court of Appeals reviews grant of preliminary injunctive relief for abuse of discretion, reversing where district court has committed legal error or relied upon clearly erroneous factual findings.

**13. Injunction ⟷138.1**

Factors to consider in determining appropriateness of preliminary injunction include: whether plaintiffs are likely to succeed on the merits, whether plaintiffs will suffer irreparable injury in absence of injunction, whether granting injunction will cause substantial harm to others, and whether issuance of injunction is in the public interest.

**14. Injunction ⟷138.1**

Not all factors in test for issuance of preliminary injunction need be fully established for injunction to be proper.

**15. Injunction ⟷138.18**

While none of the four factors in test for issuance of preliminary injunction are generally given controlling weight, preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.

**16. Constitutional Law ⟷90(3)**

Law restricting speech on basis of content is subject to strict scrutiny on First Amendment challenge, which requires that the law be necessary to serve a compelling state interest and narrowly tailored to achieve that end. U.S.C.A. Const.Amend. 1.

**17. Constitutional Law ⟷90(3)**

Law neutral with respect to content is subject to intermediate scrutiny on First Amendment challenge, which is satisfied where the law furthers an important governmental interest without burdening substantially more speech than necessary. U.S.C.A. Const.Amend. 1.

**18. Constitutional Law ⟷90.1(1.2)**

Section of Michigan's Campaign Financing Act requiring corporations and labor unions to obtain affirmative consent at least once per year from members making contributions to political contribution fund by means of automatic payroll deduction was content neutral, and intermediate scrutiny was appropriate standard of review for First Amendment challenge to provision. U.S.C.A. Const.Amend. 1; M.C.L.A. § 169.255(6).

**19. Constitutional Law ⟷90(3)**

On First Amendment challenge, content-neutral law will satisfy intermediate scrutiny if: it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of

free expression; and if the incidental restriction of alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. U.S.C.A. Const. Amend. 1; M.C.L.A. § 169.255(6).

**20. Constitutional Law ⇐90.1(1.2)**

**Elections ⇐311**

Section of the Michigan Campaign Finance Act requiring corporations and labor unions to obtain affirmative consent at least once per year for members utilizing automatic payroll deduction to make contributions to political contribution fund does not violate the First Amendment, under intermediate scrutiny analysis; statute furthers substantial governmental interest in striking balance between right to solicit political contributions and coequal right not to contribute, interest is wholly unrelated to suppression of free speech, and statute does not burden substantially more speech than necessary. U.S.C.A. Const.Amend. 1; M.C.L.A. § 169.255(6).

Andrew Nickelhoff (argued), Theodore Sachs (briefed), Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, MI, for Michigan State AFL–CIO in both cases.

Theodore Sachs (briefed), Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, MI, for International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), Metropolitan Detroit AFL–CIO, Seafarer's International Union of North America, Franklin D. Garrison, Edgar A. Scribner in both cases.

John D. Pirich (argued and briefed), John S. Kane, Honigman, Miller, Schwartz & Cohn, Lansing, MI, for Michigan Chamber of Commerce in No. 95–1397.

Richard P. Gartner, Asst. Attorney Gen. (argued and briefed), Office of the Attorney General of Michigan, Lansing, MI, for Candice Miller in No. 95–1858.

John P. Pirich (argued and briefed), John S. Kane, Honigan, Miller, Schwartz & Cohn, Lansing, MI, for Michigan Chamber of Commerce, Amicus Curiae in No. 95–1858.

Thomas A. Baird, Okemos, MI, Kathleen Corkin Boyle, White, Przybylowicz, Schneider & Baird, Okemos, MI, for Michigan Education Association, Amicus Curiae in No. 95–1858.

Before: WELLFORD, NORRIS, and DAUGHTREY, Circuit Judges.

NORRIS, J., delivered the opinion of the court, in which WELLFORD, J., joined. DAUGHTREY, J. (pp. 1253–56), delivered a separate dissenting opinion.

ALAN E. NORRIS, Circuit Judge.

In this consolidated appeal, the Michigan secretary of state challenges the district court's order preliminarily enjoining enforcement of Mich. Comp. Laws Ann. § 169.255(6) (West 1996), a section of the Michigan Campaign Finance Act requiring labor unions to obtain affirmative consent at least once per year from members utilizing an automatic payroll deduction to make contributions to their union for political purposes. The Michigan Chamber of Commerce appeals the district court's denial of its motion to intervene, either permissibly or as of right, as a defendant in order to argue for the constitutionality of § 169.255(6) and of the other statutory provisions contested by plaintiffs. We reverse on both grounds.

**I. FACTS**

Throughout the latter half of the 1980s, the Michigan Chamber of Commerce (the "Chamber"), a non-profit Michigan corporation whose membership comprises more than six thousand Michigan corporations, litigated the question of whether the Michigan Campaign Finance Act then in effect unfairly discriminated against corporations in favor of labor organizations. The Chamber contended that allowing labor unions, their traditional political adversaries, to make political contributions directly from their treasuries, while at the same time restricting corporate contributions to monies earmarked for statutorily mandated "separate segregated funds," substantially weakened the political influence of corporations vis-à-vis labor unions. In 1990, the Supreme Court ruled that prohibiting corporations, but not labor unions, from

making political expenditures from their general treasuries does not violate the Constitution. *See Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 660–66, 110 S.Ct. 1391, 1397–1401, 108 L.Ed.2d 652 (1990).

The Chamber then shifted its focus from litigation to legislation, seeking to have the statutory restrictions on corporate political expenditures applied to unions as well. With the Chamber's support, Michigan's legislature in May of 1994 enacted Public Act 117, amending its Campaign Finance Act, Mich. Comp. Laws Ann. §§ 169.201–.282 (West 1996). *See* 1994 Mich. Pub. Acts 117.

On February 14, 1995, plaintiffs, four labor unions and two union presidents, filed a complaint seeking declaratory and injunctive relief as to four provisions of the 1994 amendments. Plaintiffs contested sections establishing that (1) contributions by all branches, subsidiaries, and local units of a corporation or labor union would be aggregated for purposes of the contribution limit, *see* § 169.252(9); (2) labor unions would be subject to the proscription, already applicable to corporations, on making contributions from general funds, *see* § 169.254(1); (3) labor unions would be permitted to solicit donations to their separate segregated fund from only those individuals and entities listed in the statute, *see* § 169.255(4); and (4) corporations and labor unions would be required to obtain affirmative consent at least once per year from members making contributions to a separate segregated fund by means of an automatic payroll deduction, *see* § 169.255(6). On February 28, 1995, two weeks after the filing of the complaint and prior to any hearings in the case, the Chamber filed a motion to intervene. Defendants did not oppose intervention.

On March 10, 1995, the district court issued a short order denying the Chamber intervenor status. After quoting the language of Fed.R.Civ.P. 24(a), the order continued as follows: "It is the Court's opinion that the Michigan Chamber of Commerce does not fulfill the necessary requirements for intervention as of right. As to permissive intervention, the court chooses not to exercise its discretion and allow the applicant to intervene pursuant to Federal Rule of Civil Procedure 24(b)." The district court then indicated that it would permit the Chamber to participate as an amicus curiae. The Chamber filed a timely notice of appeal from this order, and we have jurisdiction under 28 U.S.C. § 1291 (1994) and the collateral order doctrine. *Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 377, 107 S.Ct. 1177, 1182–83, 94 L.Ed.2d 389 (1987); *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949); *Purnell v. City of Akron,* 925 F.2d 941, 944 & n. 2 (6th Cir.1991).

Also on March 10, 1995, the district court held a hearing on plaintiffs' motion for a preliminary injunction. The Chamber was allowed to present oral argument as an amicus curiae. On March 31, 1995, the day before the 1994 amendments were to become effective, the district court issued an opinion purporting to deny injunctive relief as to § 169.254(1) and to enjoin preliminarily §§ 169.252(9), 169.255(4), and 169.255(6). The district court entered an order on July 19, 1995, formally granting in part and denying in part the preliminary injunction in accordance with its earlier opinion.

The Michigan Secretary of State filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) (1994). The Secretary of State's notice of appeal, as well as the subsequent briefs and oral argument to this court, are limited to challenging the district court's preliminary injunction with respect to § 169.255(6). The Michigan Attorney General has not appealed any aspect of the proceedings before the district court.

After the decisions below and the filing of appellate briefs, Michigan again amended its Campaign Finance Act. *See* 1995 Mich. Pub. Acts 264. Public Act 264, which went into effect on March 28, 1996, did not materially change any of the statutory language relevant to this case, although it did renumber two of the four provisions at issue. For the sake of clarity, any citations or quotations of the Campaign Finance Act in this opinion refer to the current version, which incorporates the amendments from Public Act 264.

## II. INTERVENTION

We first address the district court's denial of intervenor status to the Chamber. "[A] lawsuit often is not merely a private fight and will have implications on those not named as parties." 7C Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1901 (1986). At stake is more than just the opportunity to present argument to the district court, an interest that can be accommodated by amicus participation. What the Chamber also desires is the ability to seek appellate review in the event that the district court ultimately determines that one or more of the 1994 amendments are unconstitutional and the original defendants fail to appeal that ruling.

### A. Intervention of Right

[1, 2] Under the Federal Rules of Civil Procedure, an outsider may intervene as "of right":

(2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a). This court has interpreted Rule 24(a) as establishing four elements, each of which must be satisfied before intervention as of right will be granted: (1) timeliness of the application to intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the court. *Cuyahoga Valley Ry. Co. v. Tracy,* 6 F.3d 389, 395 (6th Cir.1993). We review a district court's determination as to timeliness for an abuse of discretion, and the remaining three elements are examined de novo. *Id.*

### 1. Timeliness

[3] While the district court made no finding concerning the timeliness of the Chamber's application to intervene, it appears that timeliness is not a problem here. The intervention motion was filed just two weeks after the complaint, and the case was obviously in its initial stage. Plaintiffs themselves do not argue that the motion was late. We consider the Chamber's motion timely as a matter of law.

### 2. Substantial Legal Interest

[4] The focus of the parties' arguments concerning intervention was, appropriately, on the question of whether the Chamber has a legal interest in this case that is substantial enough to warrant intervention as of right. Plaintiffs characterize the Chamber's interest as remote, consisting of nothing more than a desire to see a law enforced against someone else. The Chamber responds that its involvement in the political process that culminated in adoption of the 1994 amendments and its status as an entity similarly regulated by the challenged statutes deserve legal protection.

This circuit has opted for a rather expansive notion of the interest sufficient to invoke intervention of right. *See Purnell,* 925 F.2d at 948; *Bradley v. Milliken,* 828 F.2d 1186, 1192 (6th Cir.1987) ("[T]his court has acknowledged that 'interest' is to be construed liberally."). We have, for example, noted that an intervenor need not have the same standing necessary to initiate a lawsuit, *Purnell,* 925 F.2d at 948, and cited with approval decisions of other courts "reject[ing] the notion that Rule 24(a)(2) requires a specific legal or equitable interest." *Id.; cf. Associated Builders & Contractors v. Perry,* 16 F.3d 688 (6th Cir.1994) (noting that intervenor need not have standing before district court but distinguishing standing required for appeal). The inquiry into the substantiality of the claimed interest is necessarily fact-specific.

While none of our cases have addressed the significance to be accorded a proposed intervenor's interest in the validity of legislation, the Ninth Circuit has adopted a broader rule that a public interest group that is involved in the process leading to adoption of legislation has a cognizable interest in defending that legislation. *See Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1397

(9th Cir.1995); *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525, 527 (9th Cir.1983); *see also State of Idaho v. Freeman,* 625 F.2d 886 (9th Cir.1980). *Idaho Farm Bureau* supports our conclusion in this case that the rules governing intervention are "construed broadly in favor of the applicants." 58 F.3d at 1397 (citing *United States v. Oregon,* 913 F.2d 576, 587 (9th Cir.1990), *cert. denied, Makah Indian Tribe v. United States,* 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991)). There, the intervening public interest group had been involved in a separate suit in a matter related to the issues in controversy. It had filed a timely motion to intervene, had supported the action of the defendant in the case—just as the Chamber has supported the legislation challenged in the instant case—and "had been active in the process" leading to the litigation. *Id.* at 1398. The court was also satisfied that the Fish & Wildlife Agency (FWA) (the government entity defendant) would not have adequately represented the intervenor's interest. Members of the intervening group, moreover, had "direct contact" with the subject of the litigation and FWA had failed to appeal an important ruling on a significant issue of great concern to the intervenor. If anything, however, the successful intervenors in *Idaho Farm Bureau* had less direct interest and exposure to potential injury than does the Chamber in this case, although the bases for intervention were generally the same. Similarly, in *Sagebrush Rebellion, Inc. v. Watt,* the intervening public interest group also supported the position of the government defendant and had actively opposed the plaintiff in the administrative process leading to the governmental action. 713 F.2d at 525.

In *Meek v. Metropolitan Dade County,* 985 F.2d 1471 (11th Cir.1993), the Eleventh Circuit, in a suit challenging the country's at-large system for electing county commissioners, ordered intervention as of right for individuals seeking to uphold that system. There, the court identified the intervenors' interest as "maintaining the election system that governed their exercise of political power, a democratically established system that the district court's order had altered." *Id.* at 1480. The situation now before us is analogous, as the Chamber seeks to vindicate the statutory scheme that regulates political contributions by labor unions and corporations, contributions that can have a substantial impact upon the exercise of political power in Michigan by influencing the outcome of elections. Under somewhat similar circumstances, in the State of New York, pharmacists and their association were permitted to intervene as of right in order to defend their financial interests with respect to a state regulation prohibiting the advertising of prescription drug prices that was under attack in a lawsuit brought by consumers. *New York Pub. Interest Research Group, Inc. v. Regents,* 516 F.2d 350 (2d Cir.1975).

Plaintiffs rely principally upon *Athens Lumber Co. v. Federal Election Comm'n,* 690 F.2d 1364 (11th Cir.1982). In that case, Athens Lumber sued the Federal Election Commission challenging a provision of the Federal Elections Commission Act that limited corporate expenditures. *Id.* A labor union and its president sought to intervene on behalf of defendant, claiming an interest in not being harmed financially in federal elections by corporate contributions. *Id.* at 1366. The union had no contact at all with the corporation, nor had it been shown to have been a part of the legislative process. The corporation challenged only the application of the law to its own contributions. The court denied the application, correctly in our view, because the union lacked a "direct, substantial, legally protectable interest" inasmuch as it was not a "real party in interest in the transaction which is the subject of the proceeding." *Id.* The court went on to state that the "sole basis of [the union's] interest is general concern ... shared with all unions and all citizens concerned about the ramifications of direct corporate expenditures." *Id.* The court denied the application, holding that the "interest is so generalized it will not support a claim for intervention as of right." *Id.*

We acknowledge that our holding is not without limit, and do not disagree with *Athens Lumber* on its facts. However, based upon the particularly compelling facts presented in the case before us, we find it to be clearly distinguishable. The evidence shows

that the Chamber was (1) a vital participant in the political process that resulted in legislative adoption of the 1994 amendments in the first place, (2) a repeat player in Campaign Finance Act litigation, (3) a significant party which is adverse to the challenging union in the political process surrounding Michigan state government's regulation of practical campaign financing, and (4) an entity also regulated by at least three of the four statutory provisions challenged by plaintiffs. Admittedly, the intervention issue raised in this appeal is a close one, but in view of the facts unique to this particular case, and in the belief that close cases should be resolved in favor of recognizing an interest under Rule 24(a), we hold that the Chamber has a substantial legal interest in this litigation.

### 3. Impairment

[5, 6] To satisfy this element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. *Purnell,* 925 F.2d at 948. This burden is minimal. The Chamber asserts that the precedential effect of an adverse ruling in the district court could hinder its own efforts to litigate the validity of Michigan's system for regulating campaign finance both in currently ongoing cases and in future challenges. This court has already acknowledged that potential stare decisis effects can be a sufficient basis for finding an impairment of interest. *Linton v. Commissioner of Health & Env't,* 973 F.2d 1311, 1319 (6th Cir.1992).

Moreover, this court has recognized that the time-sensitive nature of a case may be a factor in our intervention analysis. An analogous situation was presented in *Americans United for Separation of Church and State v. City of Grand Rapids,* 922 F.2d 303 (6th Cir.1990), where denial of intervention would have resulted in the inability of a would-be intervenor to display a menorah on public property during Chanukah. The extra time involved in initiating a separate lawsuit could easily have pushed a resolution of the matter beyond the coming Chanukah season. Even though a separate suit might have adequately settled rights with respect to future years,

the opportunity to display the menorah in the coming season would be lost forever. We held that intervention was appropriate. *Id.* at 305–06. We further noted that in such a case the potential intervenor's interest "dissipates with every passing day," and therefore the policies underlying Rule 24(a) support intervention so that the interest may be protected while there is still time to do so. *Id.* at 306.

The same concern exists in this case, as elections will come and go. If the Chamber is not permitted to intervene and the case does not move quickly to final judgment, then the labor unions in Michigan might not be subject to one or more of the 1994 amendments in forthcoming elections. The Chamber may lose the opportunity to ensure that one or more electoral campaigns in Michigan are conducted under legislatively approved terms that the Chamber believes to be fair and constitutional. The Chamber has demonstrated impairment of its interest.

### 4. Inadequate Representation

[7] Although a would-be intervenor is said to shoulder the burden with respect to establishing that its interest is not adequately protected by the existing parties to the action, this burden "is minimal because it is sufficient that the movant[ ] prove that representation may be inadequate." *Linton,* 973 F.2d at 1319. One is not required to show that the representation will in fact be inadequate. For example, it may be enough to show that the existing party who purports to seek the same outcome will not make all of the prospective intervenor's arguments. *See Forest Conservation Council v. United States Forest Serv.,* 66 F.3d 1489, 1498–99 (9th Cir.1995). One would expect that the Chamber, as a target of the statutes' regulations, would harbor an approach and reasoning for upholding the statutes that will differ markedly from those of the state, which is cast by the statutes in the role of regulator. And while the Chamber's ultimate design may be to improve its members' political clout in comparison to that of the unions, that will not be the focus of the state's efforts since they are aimed at creating a level playing field.

**[8, 9]** Moreover, "a decision not to appeal by an original party to the action can constitute inadequate representation of another party's interest." *Americans United*, 922 F.2d at 306. The Secretary of State has not sought interlocutory review of the preliminary injunction as it relates to two of the three temporarily invalidated provisions, and Michigan's attorney general has not appealed at all. While passively tolerating a preliminary injunction pending a final resolution of the merits may serve the interests of the State of Michigan, it cannot be said to represent the Chamber's interests, in view of its concern with timeliness. The decision not to appeal certain aspects of the district court's preliminary injunction may amount to sound litigation strategy and a prudent allocation of Michigan taxpayers' money, but this decision also further illustrates how the interests of the state and of the Chamber diverge. The State of Michigan has already demonstrated that it will not adequately represent and protect the interests held by the Chamber. Accordingly, the Chamber has made a sufficient showing in this regard.

Under the circumstances of this case, then, we conclude that the Chamber has satisfied the four elements found in Fed. R. Civ. R. 24(a) and is entitled to intervention as of right.

*B. Permissive Intervention*

**[10]** Rule 24 also provides the standard for permissive intervention, stating that:

Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed.R.Civ.P. 24(b). So long as the motion for intervention is timely and there is at least one common question of law or fact, the balancing of undue delay, prejudice to the original parties, and any other relevant factors is reviewed for an abuse of discretion. *Purnell*, 925 F.2d at 950–51. As noted earlier, the motion was timely. The Chamber's claim that the 1994 amendments are valid presents a question of law common to the main action. Accordingly, we turn to the district court's exercise of its discretion.

**[11]** Unfortunately, the district court did not provide us with its reasoning for denying permissive intervention. All that we are told is that "the court chooses not to exercise its discretion and allow the applicant to intervene pursuant to Federal Rule of Civil Procedure 24(b)." If we are to review a district court's exercise of discretion, the court must, except where the basis for the decision is obvious in light of the record, provide enough of an explanation for its decision to enable this court to conduct meaningful review. It is insufficient merely to quote the rule and to state the result. *See United States v. Woods*, 885 F.2d 352, 353–54 (6th Cir.1989); *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 545 (1st Cir.1996).

The existence of a zone of discretion does not mean that the whim of the district court governs. Under Rule 24(b), the district court "shall consider" whether intervention would result in undue delay or excessive prejudice to the original parties. In light of the district court's decision permitting the Chamber to participate in briefing and oral argument as an amicus curiae, it is difficult to see how granting intervention would have materially increased either delay or prejudice. If the district court denied permissive intervention for some other reason, then it should have explained its decision on the record. Had we not concluded that the district court should have granted the Chamber intervention as of right, we would be compelled to remand for further development of the record as to the appropriateness of permissive intervention.

**III. THE FIRST AMENDMENT AND § 169.255(6)**

Section § 169.255(6) provides in pertinent part:

A corporation organized on a for profit or nonprofit basis, a joint stock company, a domestic dependent sovereign, or a labor organization may solicit or obtain contributions for a separate segregated fund estab-

lished under this section from an individual described in subsection (2), (3), (4), or (5) on an automatic basis, including but not limited to a payroll deduction plan, only if the individual who is contributing to the fund affirmatively consents to the contribution at least once in every calendar year.

Mich. Comp. Laws Ann. § 169.255(6) (West 1966). Applying strict scrutiny, the district court concluded that this section violates the First Amendment and issued a preliminary injunction. *Michigan State AFL-CIO v. Miller,* 891 F.Supp. 1210, 1217–18 (E.D.Mich. 1995).

[12–14] We review the grant of preliminary injunctive relief for an abuse of discretion, reversing where the district court has committed legal error or relied upon clearly erroneous factual findings. *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1480 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1421, 134 L.Ed.2d 545 (1996). This court considers four factors in determining the appropriateness of a preliminary injunction: (1) whether the plaintiffs are likely to succeed on the merits, (2) whether the plaintiffs will suffer irreparable injury in the absence of an injunction, (3) whether granting the injunction will cause substantial harm to others, and (4) whether the issuance of the injunction is in the public interest. *Id.* Not all of these factors fully need be established for an injunction to be proper.

[15] While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed. In *Sandison v. Michigan High School Athletic Association,* 64 F.3d 1026, 1037 (6th Cir.1995), for example, we concluded that there was no likelihood of success on the merits and reversed the grant of injunctive relief without considering it necessary to address the other three factors. Because we believe that the district court applied the incorrect level of constitutional scrutiny and that plaintiffs have no likelihood of success under the appropriate legal standard, we reverse.

*A. Precedential Force of KEPAC*

The district court relied upon *Kentucky Educators Public Affairs Council v. Kentucky Registry of Election Finance,* 677 F.2d 1125 (6th Cir.1982) ("*KEPAC*"), as support for the proposition that restrictions on the solicitation of political contributions are unconstitutional unless the government can prove that these restrictions are necessary to remedy coercion of unwilling donors. The district court invalidated § 169.255(6) at least in part because Michigan had offered no proof of actual coercion. This reliance on *KEPAC* was misplaced.

In *KEPAC,* this court reviewed a district court's holding that the denial to a union of the right to collect funds by "reverse check-off," whereby funds for political activities would be deducted from union members' pay checks automatically unless the members affirmatively requested that no such deduction be made, was inconsistent with both the Kentucky statutory prohibition on coercion in collecting funds for political activity and the First Amendment. This court's opinion focused nearly all of its analysis on affirming the statutory holding—that "reverse check-off" could not be deemed to violate the Kentucky statute absent evidence of coercion of union members. The court in *KEPAC* made a cryptic reference to the constitutional issue:

The district court did not err in finding that there was no substantial evidence to support the findings of fact, conclusions of law, and order of the Kentucky Registry of Election Finance, *and in finding that the Registry had applied KRS 121.320 in a manner that violated KEPAC's First Amendment rights to collect money for political purposes by use of a reverse check-off system.*

*Id.* at 1133 (emphasis added).

The opinion includes no analysis of the constitutional question, and no rule of law is stated. In discussing and attempting to explain what this court did in *KEPAC,* one court has commented as follows:

Kentucky law permitted employee organizations to participate in payroll deductions, and, since the evidence indicated the reverse check-off system was not coercive,

the Kentucky Corrupt Practices Act was not deemed violated. The First and Fourteenth Amendment issues raised by Plaintiffs here were not clearly addressed by the Sixth Circuit.

. . . .

. . . . [T]he issue before that Court was not constitutionality of removal of the right to check off; the issue there was whether reverse check-off was "coercive" under Kentucky law and therefore illegal. The Sixth Circuit held it was not coercive and, therefore, was legal.

*Toledo Area AFL–CIO Council v. Pizza*, 898 F.Supp. 554, 569–70 (N.D.Ohio), *modified on other grounds*, 907 F.Supp. 263 (N.D.Ohio 1995).

Although the district court relied upon the single brief statement in *KEPAC* that purports to decide the First Amendment issue, a fair reading of that opinion reveals that the resolution of the appeal there under consideration rested entirely on statutory grounds. That conclusion is buttressed by the fact that the opinion undertook no analysis of a First Amendment issue. Accordingly, *KEPAC* cannot be said to amount to binding precedent on the First Amendment issue in this appeal. We do not take issue with the dissent's view that the First Amendment allows organizations to express their political views.

## B. First Amendment Scrutiny

The First Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, *see, e.g., 44 Liquormart, Inc. v. Rhode Island*, — U.S. —, — n. 1, 116 S.Ct. 1495, 1501 n. 1, 134 L.Ed.2d 711 (1996), proscribes laws "abridging the freedom of speech . . . or the right of the people peaceably to assemble." Plaintiffs claim that § 169.255(6) violates the speech and associational rights protected by the Constitution. In particular, plaintiffs allege that the annual consent requirement unduly interferes with their right to solicit funds for the furtherance of protected speech, an activity recognized as falling within the scope of the First Amendment. *See Riley v. National Fed'n of the Blind*, 487 U.S. 781, 789, 108 S.Ct. 2667, 2673–74, 101 L.Ed.2d 669 (1988).

[16,17] It is well-settled that a law restricting speech on the basis of content is subject to strict scrutiny, which requires that the law be necessary to serve a compelling state interest and narrowly tailored to achieve that end. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). It is an equally familiar principle that a law neutral with respect to content is subject to intermediate scrutiny, which is satisfied where the law furthers an important governmental interest without burdening substantially more speech than necessary. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989). Whether a law is content-based or content-neutral is not, however, always an easy question to answer.

[18] Plaintiffs contend that § 169.255(6) is content-based, pointing to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), where the Supreme Court applied strict scrutiny to various provisions of state and federal campaign finance statutes. In *Buckley*, the Court addressed federally-imposed dollar limits on political contributions by individuals and political action committees and on expenditures by candidates and political parties. In *Austin*, the Court considered Michigan's outright ban on political contributions made from corporate general treasuries. Plaintiffs reason that these cases establish the rule that any law relating to "political speech" warrants strict scrutiny. *See also McIntyre v. Ohio Elections Comm'n*, — U.S. —, —–—, 115 S.Ct. 1511, 1516–18, 131 L.Ed.2d 426 (1995) (applying strict scrutiny to invalidate state ban on circulation of anonymous political literature).

Plaintiffs also argue that the content-basis of the statute is established by the fact that it applies only to automatic payroll deductions that involve political contributions and not to all automatic payroll deductions. Relying upon *Carey v. Brown*, 447 U.S. 455, 460–62, 100 S.Ct. 2286, 2289–91, 65 L.Ed.2d 263 (1980), and *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530,

537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980), they suggest that a government regulation confined to a particular type of speech is always content-based. The claim is that strict scrutiny must apply because compliance with § 169.255(6) can be determined only by examining the nature of the speech.

The Secretary of State responds that the annual consent provision is merely a reasonable regulation of the time, place, and manner of speech subject to the less-exacting intermediate scrutiny standard. *See United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Under *O'Brien* and its progeny, the non-expressive aspects of speech may be regulated so long as the legislative goal is not to stifle speech itself. *See id.* at 376, 88 S.Ct. at 1678–79 (concerning destruction of draft card); *Ward,* 491 U.S. at 792, 109 S.Ct. at 2754 (addressing regulation of volume at outdoor concert). The Secretary of State argues that § 169.255(6), rather than limiting any political expression, merely ensures that the contributions to separate segregated funds by means of automatic payroll deductions are voluntarily made.

We are aided in our decision by the Supreme Court's recent clarification of the applicable tiers of review:

[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny. In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

. . . .

As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based. By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral.

*Turner Broadcasting Sys., Inc. v. Federal Communications Comm'n,* 512 U.S. 622, 640–43, 114 S.Ct. 2445, 2458–59, 129 L.Ed.2d 497 (1994) (citations omitted). In *Turner,* the Court reaffirmed that the "principal inquiry in determining content-neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Id.* at 642, 114 S.Ct. at 2459 (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754). *See also Madsen v. Women's Health Ctr.,* 512 U.S. 753, 763, 114 S.Ct. 2516, 2523, 129 L.Ed.2d 593 (1994) ("We thus look to the government's purpose as the threshold consideration.").

The question, then, is whether the Michigan legislature adopted the annual consent requirement because of agreement or disagreement with the message inherent in political contributions made via the automatic payroll deduction system, or based upon some other concern unrelated to the message conveyed. The language of § 169.255(6) gives rise to no inference of legislative hostility toward any particular speaker. The statute applies evenhandedly to the Chamber and to plaintiffs alike. By its terms, the section covers "[a] corporation organized on a for profit or nonprofit basis, a joint stock company, a domestic dependent sovereign, or a labor organization." We discern no invidious attempt to limit contributions made to separate segregated funds or to favor one class of voters over another. The Secretary of State asserts that the annual consent requirement is necessary to preserve the right of individuals not to contribute to the advocacy of a political message, a right accorded the same constitutional status as plaintiffs' right to solicit political funds. *See Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261 (1977). There is no basis in the record for doubting that claim. *See also One World One Family Now v. City and County of Honolulu,* 76 F.3d 1009, 1012 n. 5 (9th Cir.1996).

As for the claim that the statute's application only to political speech renders the provision content-based, it must be remembered that the focus is on whether the government has addressed a class of speech in order to suppress discussion of that topic. *See, e.g., Turner,* 512 U.S. at 642–43, 114 S.Ct. at 2459; *Blount v. Securities and Exchange Comm'n,* 61 F.3d 938, 942 (D.C.Cir.1995), *cert. denied,* ––– U.S. ––––, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996); *American Library Ass'n v. Reno,* 33 F.3d 78, 87 (D.C.Cir.1994), *cert. denied,* ––– U.S. ––––, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995). The cases upon which plaintiffs rely highlight the danger inherent in singling out a particular class of speech for special legislative treatment. In *Carey,* a state statute that prohibited generally the picketing of places of employment but exempted the picketing of places of employment involved in a labor dispute was considered to be content-based because the government had placed speech relating to labor disputes in a favored position with respect to other topics of discussion. *Carey,* 447 U.S. at 460–62, 100 S.Ct. at 2289–91. In *Consolidated Edison,* an order of the state Public Service Commission prohibiting a utility from including in its monthly statements inserts discussing controversial issues of public policy, including specifically the desirability of nuclear power, was held to be content-based because it attempted to limit public debate on certain issues. *Consolidated Edison,* 447 U.S. at 537, 100 S.Ct. at 2333 ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.").

As *Turner Broadcasting* makes clear, the real issue is whether the law is aimed at the communicative impact of speech. 512 U.S. at 642–43, 114 S.Ct. at 2459. We do not conclude that the law was content-based simply because it practically applied only to political speech because such a conclusion does not necessarily address that fundamental issue. "[T]he Supreme Court does not regard a [law]'s use of subject based categories as automatically establishing it as content-based. The critical issue is whether the state's justification for the distinction is the 'content' of the speech itself or some other

concern...." *Blount v. S.E.C.,* 61 F.3d 938, 942 (D.C.Cir.1995). In this case, the statute at issue (§ 169.255(6)) is not facially discriminatory inasmuch as the statute makes no explicit reference to any particular type of speech and treats all speakers evenhandedly. Therefore, we must consider whether there is any concern that the government is subjectively attempting to suppress the communicative aspect of speech.

While the subject matter of § 169.255(6) is confined to political speech, there is no basis for concern that the state is trying to suppress that speech. Nothing in the statute evinces a hostility to political speech, whether in the form of contributions or solicitations. Where there is no reason to believe that a legislature has singled out a class of speech in order to give it favored or disfavored status, the policies meriting strict scrutiny are not implicated. That Michigan has evidenced concern about political contributions rather than all contributions of individuals as groups involved does not subject this statute to strict scrutiny.

We conclude that the annual affirmative consent provision is content-neutral and that intermediate scrutiny is the appropriate standard of review.

## C. *Intermediate Scrutiny and § 169.255(6)*

**[19]** The *Turner* Court noted that a content-neutral law will satisfy intermediate scrutiny if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner,* 512 U.S. at 662, 114 S.Ct. at 2469 (quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679). Moreover, "[n]arrow tailoring in this context requires ... that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758.) While plaintiffs do not try to argue that the annual consent provision fails intermediate scrutiny, opting instead to argue exclusively that strict

scrutiny applies, we review this issue independently in order to determine the likelihood of success on the merits under the appropriate constitutional standard.

[20] The first prong of this test is that the statute "furthers an important or substantial governmental interest." As noted earlier, the right not to contribute to political causes that they do not favor is as central a First Amendment right as is the right to solicit funds. *See Abood*, 431 U.S. at 234, 97 S.Ct. at 1799. The protection of this right is certainly at least "important or substantial," if not compelling. By verifying on an annual basis that individuals intend to continue dedicating a portion of their earnings to a political cause, § 169.255(6) both reminds those persons that they are giving money for political purposes and counteracts the inertia that would tend to cause people to continue giving funds indefinitely even after their support for the message may have waned. The annual consent requirement ensures that political contributions are in accordance with the wishes of the contributors.

The second element is that "the governmental interest is unrelated to the suppression of free speech." In stark contrast to *Buckley*, *Austin*, and *McIntyre*, the Michigan statute does not impose any direct limits on speech. It does not determine who can speak, how much they can speak, or what they may say. Plaintiffs may continue to raise just as much money now as they could before the annual consent requirement was made applicable to them. The only qualification is that they may lose the contributions of individuals who decide that they no longer wish to continue the automatic deductions. That risk was one that existed before the enactment of § 169.255(6), and there is no reason to think that the level of contributions will drop significantly now. Even if contributions were to decline, however, the cause would be the exercise of informed choice by individuals, not the governmental suppression of political advocacy. The governmental interest at stake here is striking a balance between the right to solicit political contributions and the co-equal right not to contribute, an interest wholly unrelated to the suppression of free speech.

The third and final criterion is that the law not "burden substantially more speech than is necessary." While plaintiffs and amicus curiae, the Michigan Education Association, suggest that the administrative burden of the annual consent provision will be crushing, they offer no support for that claim. An annual mailing to a union's contributing members, asking them to check a box and to return the notice to the union, would seem to suffice under the statute. Labor unions surely maintain some sort of records on their members already, and requiring the unions to make space in their files or databases for the inclusion of one more piece of information seems minimal, certainly a burden insufficient to rise to the level of a constitutional violation. Similarly, the suggestion that asking people to check a box once a year unduly interferes with the speech rights of those contributors borders on the frivolous.

The annual consent requirement withstands intermediate scrutiny. Because the statute is constitutional, plaintiffs have no likelihood of succeeding with their claim as it relates to § 169.255(6). Accordingly, the grant of preliminary injunctive relief as to that section cannot stand.

## IV. CONCLUSION

We hold that the Chamber is entitled to intervenor status under Fed.R.Civ.P. 24(a). We further hold that Michigan's annual consent provision, § 169.255(6), is a content-neutral law that satisfies the requirements of intermediate scrutiny. Accordingly, we **reverse** the district court's orders denying intervention to the Chamber and holding § 169.255(6) unconstitutional, we **vacate** the district court's preliminary injunction insofar as it applies to § 169.255(6), and we **remand** for further proceedings.

DAUGHTREY, Circuit Judge, dissenting.

While I agree with the majority's reiteration of the four elements necessary to justify intervention of right, I cannot agree that the Chamber of Commerce has shown a "substantial legal interest" justifying intervention. In *Grubbs v. Norris*, 870 F.2d 343 (6th Cir.1989), we held that a proposed inter-

venor must have a "direct and substantial" interest in the litigation, one that is "significantly protectable." Our past cases illustrate the type of interest warranting mandatory intervention. In *Grubbs*, for example, a local government sought to intervene in a challenge by state prison inmates to state prison conditions. This court found that the proposed intervenor had a significantly protectable interest in the civil rights action because the district court's restriction on the state prison population would increase the local jail population, giving the local government a direct and substantial interest in the outcome of the suit. *Grubbs*, 870 F.2d at 346–7. Similarly, in *Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir.1990), black applicants and employees of a city's fire department sought to intervene in a reverse discrimination lawsuit challenging the department's use of a quota system. This court noted that the proposed intervenors were parties to an earlier consent decree setting goals for minority hiring. Thus, the court found that the proposed intervenors had a significantly protectable interest in the affirmative action challenged in the lawsuit, and were entitled to intervene. *Id.* at 341–2. Such examples illustrate the appropriateness of intervention when one will be directly affected by the outcome of litigation.

The Chamber of Commerce, by contrast, has no "direct" or "substantial" interest in the litigation in this case. As a political adversary of the unions, the Chamber of Commerce acknowledgedly has a general interest in restricting unions' political expenditures. This broad interest, however, is not the same type of direct interest described in *Grubbs* and *Jansen*. The Eleventh Circuit made this distinction in *Athens Lumber Co., Inc. v. Fed. Election Comm'n*, 690 F.2d 1364 (11th Cir.1982), in which it denied intervention under circumstances similar to those in this case. In *Athens Lumber*, a labor union that sought to intervene in a corporation's challenge to federal election laws alleged, as the Chamber of Commerce does here, that it would lose political strength if the court lifted federal restrictions on corporate political expenditures. The court of appeals, however, found the union's interest too indirect to warrant intervention, observing that the un-

ion's "alleged interest is shared with all unions and all citizens concerned about the ramifications of direct corporate expenditures." *Id.* at 1366. Similarly, in this case the Chamber's interest is too attenuated to justify mandatory intervention. Its interest is nothing more than a general concern with the relative political power of the two organizations.

The Seventh Circuit has also found an organization's general lobbying interest in a statute insufficient to justify intervention. In *Keith v. Daley*, 764 F.2d 1265, 1269–70 (7th Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985), physicians sought to prohibit the state of Illinois from enforcing its statute regulating abortions. The Illinois Pro-Life Coalition, which lobbied extensively for the statute, moved to intervene, citing its lobbying efforts and its willingness to intervene as sufficient interests to justify intervention. The Seventh Circuit, however, denied its motion, finding that the organization's history as a lobbyist was not an interest direct enough to warrant intervention. *See also Wade v. Goldschmidt*, 673 F.2d 182 (7th Cir.1982).

The majority, however, seeks to adopt Ninth Circuit case law holding that a public interest group has a sufficient interest in litigation concerning legislation if the group was involved in the process leading to adoption of the legislation. *See, e.g., State of Idaho v. Freeman*, 625 F.2d 886 (9th Cir. 1980); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir.1995); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir.1983). The distinction between this case and those cases, however, is critical. The majority fails to recognize that the directness and substantiality of the proposed intervenor's goal with respect to the specific litigation at hand is the relevant inquiry, whereas indirect and futuristic policy goals do not warrant intervention. In *Freeman*, for example, the National Organization for Women was allowed to intervene in a suit challenging the procedures for ratification of the proposed Equal Rights Amendment to the United States Constitution. This litigation, which directly and tremendously affected the rights of women,

justified the organization's intervention. In *Idaho Farm Bureau Fed'n,* the proposed intervenor, a conservation group, had been involved in the process listing a certain snail as an endangered species, so the court allowed it to intervene in an action challenging the validity of the endangered species listing. The litigation directly and immediately threatened the group's position on a specific issue with which the group had been involved. Finally, in *Sagebrush Rebellion,* the court allowed the National Audubon Society to intervene in a suit challenging the federal government's creation of a conservation area because an adverse decision would have directly impaired the Society's interest in preserving birds and their habitats. All of these cases involved the intervenors' attempts to achieve specific, identifiable goals. By contrast, the Chamber in this case seeks only to weaken the general political power of labor unions, without identifying a specific interest of the Chamber that will be impaired if the statute is invalidated. Because I find the Chamber's interest too remote to justify intervention, either mandatory or permissive, I must dissent from my colleagues' decision in that regard.

I must also disagree with the majority's conclusion that Mich. Comp. Laws § 169.255(6) is a content-neutral statute requiring only intermediate scrutiny. The majority accurately describes the difference between content-based and content-neutral regulations by citing *Turner Broadcasting Sys., Inc. v. Federal Communications Comm'n,* 512 U.S. 622, 642–43, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). *Turner* stated that

[o]ur precedents ... apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content.... In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, ... because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

*Id.* As the majority points out, *Turner* added that "the principal inquiry in determining content-neutrality ... is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Id.* (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989)). In response to this inquiry, the majority concludes that Mich. Comp. Laws § 169.255(6), requiring annual affirmative consent for political contributions, "gives rise to no inference of legislative hostility toward any particular speaker" because it applies "evenhandedly to the Chamber and to plaintiffs alike." This reasoning, however, ignores the statute's clear application only to political contributions. A regulation does not have to be directed at a particular speaker, but can be directed at a particular topic of speech, in order to be content-based.

Although the majority half-heartedly acknowledges this point, it then concludes that "[n]othing in the statute evinces a hostility to political speech...." However, by requiring annual affirmative consent for political contributions only, the statute disfavors organizational efforts to gather political contributions. The statute displays a unique concern for the voluntariness of political contributions, but does not similarly concern itself with the voluntariness of other contributions. Although we may well agree that the assurance of the voluntariness of contributions is a worthwhile effort, and while the voluntariness of political contributions in particular may drive the quest for reform, our approval or disapproval of legislative intent should not color our determination of whether a statute is content-based or content-neutral. The Michigan legislature's decision to protect only the voluntariness of political contributions, rather than from all types of contributions, makes this statute clearly content-based, and consequently, subject to "the most exacting scrutiny."

I also find troubling the majority's ready dismissal of our constitutional analysis in *Kentucky Educators Pub. Affairs Council v. Ky. Registry of Election Fin.,* 677 F.2d 1125 (6th Cir.1982)("*KEPAC*"). *KEPAC* concerned a Kentucky statute that prohibited the use of coercion in obtaining political con-

tributions from state employees. The state teachers' political action committee had instituted a "reverse check-off" system for collecting contributions, and the Kentucky Registry of Election Finance challenged the system as violative of the Kentucky law. Although most of the court's analysis focused on whether the reverse check-off system violated Kentucky law, the majority understates *KEPAC*'s significance when it finds that the *KEPAC* court made only "a cryptic reference to the constitutional issue."

The *KEPAC* court held that:

The district court did not err in finding that there was no substantial evidence to support the findings of fact, conclusions of law, and order of the Kentucky Registry of Election Finance [finding the reverse check-off system violative of Kentucky law], *and in finding that the Registry had applied [the Kentucky statute] in a manner that violated KEPAC's First Amendment rights to collect money for political purposes by use of a reverse check-off system.*

677 F.2d at 1133 (emphasis added). The majority minimizes the constitutional dimension of the *KEPAC* court's analysis, which explained its conclusion that the reverse check-off could not be banned under the First Amendment. The *KEPAC* court discussed the United States Supreme Court's decision in *Consolidated Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), holding that a state agency could not prevent a utility company from including in its bills insertions about the company's position on controversial public policy issues. Furthermore, the court cited *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), in which the Supreme Court forbade, as violative of the First Amendment, a state agency's ban on a utility company's promotion of electricity during a fuel shortage. *KEPAC* also discussed *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 769, 98 S.Ct. 1407, 1412, 55 L.Ed.2d 707 (1978), in which the Supreme Court struck down on First Amendment grounds a state statute that disallowed corporations from

making political expenditures unrelated to the corporation's business. The court then distinguished *Bellotti* from case law protecting dissenters' rights not to contribute unwillingly to political candidates. After the court had explained that the challenged reverse check-off system was not coercive under Kentucky law, the court engaged in this discussion of the First Amendment rights of corporations to express controversial views. This analysis clarifies the court's view that the First Amendment allows organizations to express their political views as long as sufficient protections remain for dissenting members. *KEPAC*'s discussion and its holding deserve deference.

In light of the fact that strict scrutiny is the appropriate standard for reviewing the constitutionality of the Michigan statute, we should ask whether the state had a compelling state interest. Although the Secretary claims that the legislation is justified by Michigan's desire to ensure the voluntariness of political contributions, it has presented no evidence that contributions are currently involuntary. *KEPAC* requires some evidence in order to impair a union's First Amendment rights. At this stage of the litigation, the Secretary's failure to present evidence sufficient to warrant the ban on the union's reverse check-off procedure suggests that the unions have a strong likelihood of success on the merits. The other considerations in our review of preliminary injunctions also weigh in favor of upholding the injunction. The unions will suffer irreparable harm without an injunction; no evidence exists that the injunction will harm others; and finally, the injunction serves the public interest in protecting political speech.

Based on this reasoning, I must dissent both from the majority's conclusion that the Chamber of Commerce is entitled to intervene in this suit, and from its decision to reverse the preliminary injunction.

