# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
| THIS DOCUMENT RELATES TO:<br><br>ALL END-PAYOR ACTIONS | Hon. Sean F. Cox<br>Mag. Judge R. Steven Whalen |

## DECLARATION OF JEFFREY N. LEIBELL IN SUPPORT OF FINANCIAL RECOVERY SERVICES, LLC'S EMERGENCY MOTION TO COMPEL ACCEPTANCE AND PROCESSING OF VEHICLE DATA

I, Jeffrey N. Leibell, declare:

1.      I am Chief Legal and Financial Officer of Financial Recovery Services, LLC d/b/a Financial Recovery Strategies ("FRS"). I previously submitted two declarations in support of FRS's motion to intervene.[1] I submit this declaration in support of FRS's Emergency Motion to Compel Acceptance and Processing of Vehicle Data. This declaration is based on my personal knowledge and that of FRS

---

[1] Declaration of Jeffrey N. Leibell, No. 2:12-md-02311, PageID.37726-919, ECF No. 2060-2 ("Leibell Decl."); Reply Declaration of Jeffrey N. Leibell, No. 2:12-md-02311, PageID.38083-88, ECF No. 2073-1 ("Leibell Reply Decl."). All terms with initial capitalization that are not defined in this declaration have the same meanings as those set forth in the Memorandum of Law in Support of Financial Recovery Services, LLC's Motion to Intervene, No. 2:12-md-02311, PageID.37697-721, ECF No. 2060.

personnel acting under my supervision, as well as my extensive experience with class action settlements and their distribution.

## RELEVANT EXPERIENCE

2.     I joined FRS in June 2014 with more than 35 years of experience litigating class and other actions, providing expert legal advice concerning class action settlements and their administration and distribution, managing corporate risk and compliance, and auditing companies of all sizes. I am responsible for handling all of FRS's legal matters, including, when necessary, challenging the adverse treatment of proofs of claim that, on behalf of its clients, FRS submits to settlement administrators like Epiq Class Action & Claims Solutions ("Epiq"), the Court-appointed Settlement Administrator for the End-Payor Settlements.

3.     Before joining FRS, I spent more than six years at the Garden City Group, Inc. ("GCG") as its Vice President of Class Action Services. When I left GCG at the end of 2013, GCG was one of the nation's leading claims administrators, having been retained by defense and plaintiff counsel alike, as well as by federal, state and municipal government agencies, to design, implement and oversee notice and claims administration programs for class actions settlements, including some of the largest and most complex class action settlements on record, that collectively involved tens of billions of dollars and tens of millions of class members. GCG was

appointed as the Settlement Administrator for the End-Payor Actions in this MDL; GCG was subsequently acquired by Epiq.

4.     As GCG's Vice President of Class Action Services, and as relevant here, I:

      a.     regularly provided to its executives and class counsel advice on complex class action settlement, allocation and distribution legal issues;

      b.     developed and presented to lawyers across the U.S. continuing legal education programs concerning class action settlements and their administration and distribution;

      c.     supervised and developed protocols and procedures for GCG's "Attorney Team," a group of approximately 125 lawyers who, in connection with GCG's retention by Kenneth Feinberg to administer the $20 billion *Gulf Coast Claims Facility*, addressed all legal representation and related issues for over 350,000 putative claimants;

      d.     successfully defended GCG's determinations concerning thousands of proofs of claim before courts in the U.S. and Canada; and

      e.     managed GCG's risk and compliance matters.

5.     Prior to joining GCG, I spent 13 years at Bernstein Litowitz Berger & Grossmann, LLP, one of the nation's preeminent class action law firms, where I prosecuted complex class and other actions and became nationally recognized as a

leading authority on class action settlement- and distribution-related legal issues.[2] For example, I:

a. was the partner responsible for negotiating, documenting, administering and developing the allocation plans for over $16.4 billion of class action settlements, including five of the ten largest securities class action settlements in U.S. history to that time;

b. managed the pre-distribution reviews that independent auditors conducted on the processes and results employed by the claims administrators for major securities settlements to determine claims processing accuracy and adherence to plans of allocation;

c. consulted with the SEC concerning its distributions and worked closely with that agency in connection with numerous coordinated joint claims administration and distributions; and

_____

[2] *See*, *e.g.*, GCG Press Release, "The Garden City Group Names Jeffrey N. Leibell Vice President, Class Action Services (Apr. 22, 2009) ("A nationally recognized expert in class action settlements, Leibell joined GCG in September 2008 . . . . 'GCG has been successful at identifying and attracting the nation's best minds and litigators in class actions. The experience Jeff brings as an acknowledged leader in class actions will enhance the level of service provided to our clients. We recognize his abilities and expertise and are proud to add him to our team' said Chief Executive Officer David Isaac. . . . [And according to Neil Zola, GCG's President,] 'Jeff possesses the expertise and experience that distinguishes our organization and enables us to deliver exceptional quality, particularly in the most complex cases.'"); *see also* https://www.linkedin.com/in/jeffrey-leibell/.

d. worked with damages experts to develop highly complex plans of allocation, including, as described above, in settlements that have involved multiple securities with different federal securities claims against different settling defendants for varying claims periods.

6. I received my law degree from Columbia Law School, where I was a Harlan Fiske Stone Scholar and the Senior Notes Editor of the *Columbia Business Law Review*.

## BACKGROUND

7. On December 13, 2019, after reaching an impasse with Class Counsel concerning the rights of Insurers to subrogate to their clients' rights to participate in the End-Payor Settlements, FRS sought a judicial confirmation of its Insurer clients' rights.[3] Both Class Counsel and the Court were on notice of those subrogation rights as early as 2016, when GEICO opted out of the End-Payor Settlements to pursue claims that were, in substance, based on principles of subrogation. Notwithstanding the events surrounding GEICO's opt outs, each notice disseminated to the End-Payor Settlement classes was silent as to the legal rights of subrogees and their potential impact on subrogors.

---

[3] *See* Leibell Decl. ¶¶ 7-8 & Ex. A.

8.    GEICO submitted its request for exclusion from the Round 1 End-Payor Settlements on April 11, 2016,[4] which opt out was not challenged by any party and was approved by the Court.[5]    GEICO's opt-out request described that GEICO suffered significant damages as a result of, among other things, reimbursing insureds and claimants for the full value of their Total Loss Vehicles.[6]    GEICO's opt-out complaint, which was filed on September 2, 2016, asserted subrogation-based claims against the Round 1 defendants for Total Loss Vehicles.[7]

---

[4] *See* 2:16-cv-13189, Compl., PageID.53, ECF No. 1 ¶ 183.

[5] *See*, *e.g.*, *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 808 (E.D. Mich. 2018) (Battani, J.); 2:12-cv-00603, EPPs' Mot. to Amend Op. & Order Granting Final Approval of Class Action Settlements, PageID.5231, ECF No. 150 (requesting that the Court amend its opinion and order to reflect that there were opt outs, including GEICO); Final J. Approving Settlement Agreement between End-Payor Pls. and AutoLiv and Entering Dismissal with Prejudice as to Autoliv, PageID.5299, ECF No. 158 ¶ 12 & PageID.5301, Ex. A (including GEICO as an approved opt out).

[6] *See*, *e.g.*, 2:12-cv-00403, GEICO Putative Opt Out Letter, July 11, 2018, PageID.9752, ECF No. 266-2 (Round 3).

[7] *See*, *e.g.*, 2:16-cv-13189, Compl., PageID.6-8, ECF No. 1 ¶ 8 ("GEICO paid and reimbursed its insured . . . for artificially inflated prices for Auto Parts . . . ."); *id.* ¶ 190 ("GEICO has been injured . . . because it paid—either directly or through reimbursement to its insureds or claimants—inflated, supra-competitive price for Auto Parts and for vehicles declared a total loss."); *GEICO*, 345 F. Supp. 3d at 830-34 ("As explained by the Sixth Circuit, the doctrine of equitable subrogation, 'as applied in the insurance context, allows an insurer to sue a third party for injuries that the third party caused to the insured, when the insurer compensated the insured for those injuries.'") (quoting *National Surety Corp. v. Hartford Cas. Ins. Co.*, 493 F.3d 752, 756 (6th Cir. 2007)).

9.   GEICO thus advised Class Counsel and the Court that, for GEICO to pursue its own claims based on indemnification payments for Total Loss Vehicles, GEICO first had to opt out of the Round 1 End-Payor Settlement classes.[8]  Although GEICO chose to opt out, it was just one of at least hundreds of automobile insurers in the United States. Accordingly, GEICO's opt out highlighted a substantial likelihood that many such insurers, including FRS's Insurer clients, had not opted out because they believed that they could recover from the End-Payor Settlements and preferred recovery via those Settlements to pursuing their own litigation.

10.   Nevertheless, Class Counsel neglected to address the subrogation issue when crafting the settlement class definitions.  Given how Class Counsel and the Court treated GEICO's opt out, Class Counsel could have modified the notices disseminated to the End-Payor Settlement classes to make clear that auto insurers may recover for their indemnification of Total Loss Vehicles, as class counsel have done in other settlements that involved indemnity payments.[9]  Alternatively, Class

---

[8] *See, e.g.*, 2:12-cv-00603, Final J. Approving Settlement Agreement between End-Payor Pls. and AutoLiv and Entering Dismissal with Prejudice as to Autoliv, PageID.5298, ECF 158 ¶ 7.

[9] *See, e.g.*, *In re Zurn Pex Plumb. Prods. Liab. Litig.*, No. 08-md-1958, 2012 WL 5055810, at *3 (D. Minn. Oct. 18, 2012) ("Insurance carriers are members of the Settlement Class . . . if they paid insurance claims . . . ."); *Klug v. Watts Regulator Co.*, 8:15-cv-00061, 2016 WL 7156480, at *1-2, *5 (D. Neb. Dec. 07, 2016) ("notice plan . . . apprise[d] . . . subrogated insurers of the pendency of the Action"; proof of claim sent to insurers).

Counsel either could have sought an order to modify the settlement class definitions to exclude insurers expressly,[10] or, at the least, could have included an appropriate disclosure in settlement notices so that automobile insurers and all other Settlement Class members would know whether they were included or excluded from the End-Payor Settlement classes.[11] Because Class Counsel chose neither option, and instead said nothing about subrogation, Insurers were unable to determine conclusively from the class definitions alone whether, by standing in the shoes of their End-Payor Settlement class member insureds, they were de facto members of the End-Payor Settlement classes. Accordingly, Insurers required a judicial determination to resolve the matter.

11.     When Class Counsel suggested that the resolution of the subrogation issue should occur only after the Insurers submitted data for Total Loss Vehicles and

---

[10] Based on my experience, such a modification likely would have been strenuously opposed by the Round 1 defendants, which collectively paid approximately $225 million to settle the claims that the EPPs had asserted against them, and those defendants likely would have sought to renegotiate the Round 1 settlements. That is, the Round 1 defendants paid what they did at least in part because they were getting complete peace with respect to these alleged overcharges. And expressly excluding subrogated insurers from the settlement classes likely would have reduced the amounts that the remaining defendants were willing to pay to settle with the End-Payors.

[11] *See*, *e.g.*, *Roberts v. Electrolux Home Prods., Inc.*, Master File No. SACV12-1644, 2014 WL 4568632, at *13 (C.D. Cal. Sept. 11, 2014) ("Excluded from the Settlement Class are . . . (c) subrogees or entities claiming to be subrogated to the rights of Dryer purchasers, owners, or a Settlement Class Members").

those proofs of claim were rejected, I advised them of the impracticality and burden on Insurers and Epiq of Insurers collecting and submitting data for hundreds of thousands of Total Loss Vehicles without first having a judicial resolution of the threshold subrogation issue.[12]  To do so would have taken an enormous amount of time and required the expenditure of substantial sums both by the Insurers and by Epiq.[13] Class Counsel agreed with the procedure and timing that FRS proposed to obtain that judicial determination.[14]  And although Class Counsel opposed FRS's position on subrogation, they did not, in their opposition to the relief that FRS sought in its December 13, 2019 letter to the Court, argue that FRS first needed to intervene as a party to obtain the relief it sought.[15]

12.   When FRS's letter brief did not appear on the docket for the MDL, I asked my colleague, Randi Alarcon, to contact Judge Battani's Chambers to inquire

---

[12] *See* Leibell Decl. ¶¶ 6-7.

[13] In the wake of the Court's denial of FRS's motion to intervene, the appeal of which is pending, FRS and Insurers have begun collecting the relevant vehicle data without such a resolution. Given the enormity of the task, FRS has consulted economic experts to assist. In addition to the time spent by FRS and each Insurer, the total out-of-pocket costs incurred to date and those estimated by the economic experts to be incurred may exceed $525,000.

[14] *See* Leibell Decl. ¶¶ 6-7.

[15] *See* 2:12-md-02311, EPPs' Resp. to FRS's Req. Decl. Relief …, PageID.37513, ECF No. 2034.

about the status of that letter brief.[16] Ms. Alarcon advised me that Molly Roehrig, the clerk responsible for all MDL matters assigned to Judge Battani, had suggested that we may need to intervene to obtain the relief sought in our letter.[17] Upon further inquiry of Ms. Alarcon, I learned that Ms. Roehrig:

      a.      did not advise Ms. Alarcon that Ms. Roehrig had conferred with the Court on the matter or that she was speaking on behalf of the Court, but instead was expressing her own views;

      b.      advised that Chambers did not file on the docket letters received from non-parties;

      c.      had further advised that FRS would need to file its letter on each of the scores of dockets in the MDL; and

      d.      remarked about the possibility of intervention solely because she did not know how else FRS administratively could accomplish docketing the letter.

Given Class Counsel's agreement to the briefing process and their lack of objection to it based on any asserted need by FRS to intervene, and given the docketing of Class Counsel's letter brief, I understood Ms. Roehrig's statements to be her own

---

[16] *See* 2:12-md-02311, Decl. of Randi E. Alarcon, PageID.37921-22, ECF No. 260-12.

[17] *See id.*

"advice" and not a direction from the Court. That advice also was contrary both to my extensive experience in class action settlement matters and to my understanding of the relevant legal principles. I understood Ms. Roehrig's statements to relate solely to the ministerial step of docketing FRS's letter, not to any further action FRS was required to take to have the legal issue—as to which Class Counsel also sought guidance in a letter to the Court that had been docketed—heard by the Court.

13.     In this regard, in the scores of class actions I have prosecuted and settled, class action settlements I have administered, and class action settlements in which I have managed proofs of claim, I have never been advised by a Court that it would disregard correspondence from putative class members absent their intervention. On the contrary, such correspondence is customarily docketed, either on its own or attached to an order directing class counsel to respond to it; I have been on both the sending and receiving ends of such correspondence. To do otherwise— that is, to impose upon putative class members the practical and financial burdens of seeking intervention in order to have their status as class members adjudicated— would erect obstacles contrary to the purpose of class actions.[18]

14.     In addition, I was then, and continue to be, unaware of any legal precedent that requires a putative or actual class member to intervene in a class

---

[18] FRS thus far has paid in excess of $250,000 in legal fees attempting to obtain a judicial determination whether it and the Insurers may recover from the End-Payor Settlements.

action either to object to the adverse treatment of a proof of claim or to have a court determine its class membership. After all, it is fundamental to due process that persons potentially affected by the prosecution and settlement of a class action be able to determine from reading the class definition whether they are class members and, if so, their corresponding benefits, including participating in any settlement, and burdens, including releasing their claims. As a result, FRS, in accordance with the agreement we reached with Class Counsel, submitted its reply letter on January 20, 2020.[19] Given the foregoing, and that the Court took no official action regarding FRS's letters, such as issuing an order directing FRS to seek intervention or striking Class Counsel's docketed opposition as moot, FRS believed that the Court would rule on FRS's request for relief in due course.

15. On March 9, 2020, without any response from the Court and with the then-current March 16, 2020 claim filing deadline approaching, FRS submitted to Epiq, with a copy sent to Class Counsel, a letter that supplemented each of the claim forms that FRS had already timely filed for the Insurers.[20] FRS submitted its March 9 letter in an abundance of caution. At that time, Class Counsel had agreed to have the equitable subrogation issue resolved by the Court prior to the Insurers being compelled to incur the burden and expense of collecting and marshalling an

---

[19] *See* Leibell Decl. ¶ 8 & Ex. B.

[20] *See id*. ¶ 10 & Ex. H.

enormous amount of data for Total Loss Vehicles.[21]   But out of an abundance of caution, FRS took the additional step of sending to Class Counsel and Epiq a letter that explained (again) why no data for Total Loss Vehicles had been submitted, and advised that FRS would supplement each such claim in a reasonable amount of time after the Court granted the relief that FRS was seeking.[22]   Although FRS and Class Counsel had previously agreed that the legal issue should be resolved before vehicle data was submitted, FRS's March 9 letter was the first time that FRS ever communicated with either Epiq or Class Counsel about submitting after the claim-filing deadline vehicle data for Total Loss Vehicles in support of timely filed claims.[23]   And although FRS expressly requested that it be contacted immediately if Class Counsel or Epiq had any objection to that approach, so that we could bring the matter to the Court's attention, no response was received either from Epiq or from Class Counsel.

16.    Had Class Counsel or Epiq harbored any objection to FRS's March 9 proposal, it would have been consistent with their prior course of conduct with FRS to voice that objection promptly.  Over the years that FRS has corresponded with Class Counsel and Epiq in these End-Payor Actions, it has been the practice and

---

[21] *See id.* ¶¶ 6-7.

[22] *See id.*

[23] *See* Leibell Reply Decl. ¶¶ 3-8.

habit of Class Counsel and Epiq promptly to respond, including when they disagree with FRS.  Accordingly, when I solicited objections to my March 9 proposal and received none, I understood that silence to mean that Class Counsel and Epiq had no objections and had acquiesced in our proposed course of action, which was plainly in the interests of putative members of the End-Payor Settlement classes. FRS was not surprised that neither Class Counsel nor Epiq raised any objection to the approach described in the March 9 letter because that approach was consistent both with the Plan of Allocation, which does not address "placeholder" claims, and with our prior agreement with Class Counsel.

17.    In my experience, so-called "placeholder" claims are a necessary and common occurrence in substantially all class action settlement administrations, especially in those that require large amounts of data from long class periods that began well before the claims filing period, and courts that have addressed them have so found. The example provided by *In re Electrical Carbon Products Antitrust Litigation*, in which the court rejected class plaintiffs' argument that timely submitting blank proofs of claim demonstrated bad faith, addresses directly the situation presented here:

> It is certainly understandable and likely that a claimant would become aware of its class membership before it was able to calculate its claims. The fact that these claimants attempted to notify the Administrator that claims would be forthcoming by filing blank forms, instead of waiting

until all the information was gathered, does not appear to be an act of bad faith.[24]

Another holding in a situation similar to the circumstances present here was the district court's finding in *In re Crazy Eddie Securities Litigation*, where "the Notice of Claim did not advise claimants of the right to cure and the importance of simply filing a claim within the original deadline, even if the claim were incomplete."[25] Neither Class Counsel nor Epiq responded to FRS's March 9, 2020 letter before the then-imminent March 16, 2020 claims filing deadline, and no response from either of them was received prior to the new (and last) June 18, 2020 claims filing deadline. Given these facts and each of Class Counsel's and Epiq's fiduciary duty to members of the End-Payor Settlement classes, FRS understood and relied on their silence as agreement with the approach set forth in the March 9 letter.

## SUBMISSION OF SUPPLEMENTAL DATA

18.     On or about December 22, 2020, FRS submitted supplemental data for seven timely filed claim forms.  Epiq did not respond to that submission except to confirm that it had "downloaded the files" FRS had sent. A true and correct copy of this email exchange is attached as **Exhibit A**.

---

[24] 622 F. Supp.2d 144, 165 (D.N.J. 2007).

[25] 906 F. Supp. 840, 843 (E.D.N.Y. 1995).

19.    On January 4, 2021, FRS submitted supplemental data for fourteen timely filed claim forms. For the first time, FRS received a response that appeared to state that the data submitted would not be "accepted":

> Please be aware that we are no longer accepting new data for the settlements. We will file the records submitted, but please be aware that any new data will be considered untimely.

In response to FRS's follow-up inquiry, Epiq confirmed that, as expected, there would be a process of notifying claimants who submitted deficient vehicle information to afford them an opportunity to cure those deficiencies, but that "the project is simply not at that point yet."  Epiq further advised that, for claims that "have been submitted timely, any data submitted after the claims deadline will be considered untimely."  Epiq stopped short of saying that such supplemental data would not be processed. A true and correct copy of this email exchange is attached as **Exhibit B**.

20.    On February 10, 2021, in response to supplemental data that FRS had submitted the prior day for two timely filed claim forms, Epiq stated that, contrary both to the Court-approved Plan of Allocation and to each judgment entered by the Court in the End-Payor MDL, data submitted after the claims filing deadline would not be processed in support of timely filed claim forms if such data pertained to so-called "placeholder" claims like those that FRS filed for the Insurers:

> [A]s you know, the claims deadline expired on June 18, 2020. For claimants who identified no vehicles or only one placeholder vehicle

before the claims deadline expired, and have identified vehicles for the first time after the claims deadline expired, the submission of such claims are late and will not be allowed. Claimants who have previously submitted vehicle data and have some deficiency in the information or documentation that was submitted for those claims, may submit additional information to correct the deficiency. However, claimants who merely registered their name with no vehicle information, and did not identify the requisite vehicle information by the June 18, 2020 claims deadline have not timely submitted a valid claim, and late-filed claims will not be accepted.

A true and correct copy of this email exchange is attached as **Exhibit C**. As was made evident by the court in *Electrical Carbon Products*, the failure to process data when received is tantamount to a constructive, but extra-judicial, rejection of the corresponding proof of claim:

> Further, the Administrator processed the claims when supplemented with the required information. Therefore, the fact that these claimants first filed blank forms is irrelevant—both in calculating their filing date and in determining whether they acted in good faith. [26]

21.     No basis was provided for Epiq's or Class Counsel's authority without the Court's prior approval: [27] (a) to refuse to process for timely claims data submitted

---

[26] 622 F. Supp.2d 144, 165 (D.N.J. 2007); *see Lyngaas v. Curaden AG*, 2019 WL 6210690, at *19 (E.D. Mich. Nov. 21, 2019) (Goldsmith, J.) (claims administrator "shall afford an individual claimant a second chance to fill out an incomplete form"); *Krakauer v. Dish Network, LLC*, 2017 WL 3206324, at *11 (M.D.N.C. July 27, 2017) (same); *Lessard v. City of Allen Park*, 2005 WL 3671354, at *3 (E.D. Mich. Nov. 28, 2005) (Feikens, J.) (claimants who submitted incomplete claim forms were given "an opportunity to cure any defects in their submissions").

[27] Class Counsel and Epiq previously acknowledged that they do not have the authority to act outside of the parameters of the Plan of Allocation. In response to FRS's June 19, 2020 email, Epiq responded as follows:

after the claims filing deadline, especially given the fact that the deficiency process has not begun; or (b) to define a new category of claims called "placeholder" claims and treat them differently than all other timely filed claims, especially given that no such distinction appears in the Court-approved Plan of Allocation.[28]  Epiq also did

---

> It will be up to the parties to determine whether to accept late claims. They will be marked as late, and will be treated in accordance with the Court's direction based on recommendations from the Parties.

A true and correct copy of this email exchange is attached as **Exhibit D**. The issue whether late claim forms would be accepted is not present here, because all of the Insurers' claim forms were submitted before the claims filing deadline.  But Class Counsel and Epiq thus acknowledged that they may only make recommendations to the Court, which has the final authority whether to accept late claim forms. Class Counsel and Epiq likewise surely lack the authority unilaterally to refuse to process data submitted after the claims filing deadline for timely filed claim forms.

[28] As was the case in *Crazy Eddie*, Class Counsel provided no notification to members of the End-Payor Settlement classes that all of their vehicle data must be submitted prior to the claims filing deadline or their claims would be rejected. *See* 906 F. Supp. at 843 (quoted above). Had Class Counsel desired to compel members of the End-Payor Settlement classes to submit all of their vehicle data before the deadline for filing claim forms, they should have made that requirement clear in the several notices and in the proof of claim form that were disseminated to them. But they did not. An example of such a notification is provided by the proof of claim form that the Illinois Attorney General used in connection with the settlement of the *parens patriae* action it prosecuted and settled on behalf of purchasers of cathode ray tubes.  The notice states, in response to question 13 "Can I submit an incomplete claim form by the deadline and supply further information later?":

> No. In order to be a valid claim, your claim form must be complete at the time of filing. You should not leave any part of the claim form blank or include inaccurate information that you intend to update later.

And the proof of claim form states in highlighted typeface: "Incomplete or inaccurate claim forms submitted as placeholders to be completed later will not be valid."  True and correct copies of the notice and the proof of claim form are attached as **Exhibit E** and **Exhibit F**, respectively.

18

not provide any reasoning for treating so-called "placeholder" claims differently than any other claim that lacks complete vehicle data, given that neither kind of claim form can be used to calculate a claim amount without additional data. A distinction between a "placeholder" claim form and an incomplete claim form is inconsistent with the standard custom and practice that I have observed across scores of class actions during my twenty-five years of experience in this area.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of February 2021, in Ludlow, Vermont.

Jeffrey N. Leibell