# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : : | Master File No. 12-md-02311 Honorable Sean F. Cox |
| THIS DOCUMENT RELATES TO: ALL END-PAYOR ACTIONS | : : : : : : : : : : : : | DECLARATION OF BRIAN A. PINKERTON IN SUPPORT OF END-PAYOR PLAINTIFFS' OPPOSITION TO FINANCIAL RECOVERY SERVICES, LLC'S MOTION TO COMPEL ACCEPTANCE AND PROCESSING OF VEHICLE DATA |

I, BRIAN A. PINKERTON, declare under penalty of perjury:

1.     I am a Senior Project Manager at Epiq Class Action & Claim Solutions, Inc. ("Epiq") and a former Assistant Director of the Court-appointed claims administrator, Garden City Group, LLC ("GCG"). GCG was acquired by Epiq in 2018. All references to "Epiq" herein incorporate the work performed while operating as either GCG or Epiq.

2.     As the Project Manager for settlements reached by the End-Payor Plaintiffs, I am responsible for the day-to-day supervision and management of the claims-administration process. I am an attorney admitted to practice in the State of

1

Washington and have personally managed dozens of class action settlement administrations, including consumer, wage and hour, and large antitrust class actions. I have extensive experience handling large data sets and developing creative strategies for reviewing and assessing complex data. I have served as the Project Manager on this matter since October 2015, when the Court appointed Epiq to serve as the claims administrator.

3.     I submit this declaration in support of End-Payor Plaintiffs' Memorandum in Opposition to Financial Recovery Services, LLC's Motion to Compel Acceptance and Processing of Vehicle Data. No. 2:12-md-2311, Dkt. 2114. The following statements are based on my personal knowledge and/or information provided by other experienced Epiq employees working under my supervision and, if called on to do so, I could and would testify competently thereto.

4.     Epiq is the premier provider for class action settlement administrations, restructuring and bankruptcy matters, mass tort settlement programs, regulatory settlements, and data breach response programs in the United States and internationally. Epiq has efficiently and effectively managed class action settlement administrations for more than three decades. Epiq's team comprises attorneys, paralegals, finance and banking experts, software engineers, in-house legal notice specialists, graphic artists with extensive website design experience, and U.S.-based contact center professionals hired, trained and managed by Epiq.

2

5.    Epiq was established in 1968 as a client services and data processing company. Epiq has administered bankruptcies since 1985 and settlements since 1993. Epiq has routinely developed and executed notice programs and administrations in a wide variety of mass and class action contexts including settlements of consumer, antitrust, products liability, and labor and employment class actions, settlements of mass tort litigation, Securities and Exchange Commission enforcement actions, Federal Trade Commission disgorgement actions, insurance disputes, bankruptcies, and other major litigation. Epiq has administered more than 4,500 settlements, including some of the largest and most complex cases ever settled.

6.    In class actions such as this, Epiq's administration services include administering notice requirements, designing direct-mail notices, implementing notice fulfillment services, coordinating with the United States Postal Service, developing and maintaining notice websites and dedicated telephone numbers with recorded information and/or live operators, processing exclusion requests, objections, claim forms and correspondence, maintaining class member databases, adjudicating claims, managing settlement funds, and calculating claim payments and distributions. As an experienced neutral third-party administrator working with settling parties, courts, and mass action participants, Epiq has handled hundreds of millions of notices, disseminated hundreds of millions of emails, handled millions

of phone calls, processed tens of millions of claims, and distributed hundreds of billions in payments.

7.     As the Court-appointed claims administrator, Epiq is responsible for the development and implementation of efficient, secure, and cost-effective methods to properly handle the voluminous data and mailings associated with claims administration, claims processing, and the disbursement of settlement funds in an orderly manner that ensures the fair treatment of class members and all parties in interest.

8.     Epiq's duties include, among other things: (1) creating and maintaining a dedicated settlement website, (2) disseminating the class notice to potential class members, (3) mailing direct notice to individuals who request direct notice, (4) establishing a dedicated P.O. Box for the settlements and handling mail received, such as questions, objections, exclusion requests, requests for direct notice, and inquiries from potential members of the settlement classes, and (5) maintaining a toll-free helpline for potential members of the settlement classes.

9.     Now that the final claims submission deadline passed in this matter on June 18, 2020, Epiq's duties further include: (1) receiving and processing claims, (2) determining whether claims have been timely filed, (3) determining whether claims qualify for payment under any of the terms of the settlements and plan of allocation, (4) analyzing whether claims are deficient or compliant with the Court's orders, (5)

sending and handling notices of deficiency, (6) calculating the claim amounts of qualifying claimants, (7) determining the qualifying claim amounts available to all claimants, (8) determining the *pro rata* share of each qualifying claimant to be paid out of the settlements, and (9) making recommendations for the payment or disallowance of settlement shares to each qualifying claimant.

10.    Under this Court's Orders, only class members are entitled to submit claims to share in the settlements. Specifically, only persons or entities who purchased or leased a qualifying new vehicle, not for resale, or purchased a qualifying replacement part during the applicable class periods can submit a claim.

11.    Under this Court's Orders, the last day to submit a claim was June 18, 2020. Specifically, in order to participate in the settlements, this Court's Orders required a class member to timely provide the following information in their claim form regarding the class member's purchase or lease of a qualifying new vehicle by June 18, 2020:

> (1)    The make, model, model year, and VIN number of the qualifying new vehicle the class member purchased or leased;
>
> (2)    The date the class member purchased or leased the qualifying new vehicle; and
>
> (3)    The state where the purchase or lease was made or in which the class member resided or, for businesses that are class members, the state or state where the principal place of business was located at the time of the purchase or lease.

This information was explicitly required by the Plan of Allocation.

12.     The June 18, 2020, claims deadline was the third claims deadline as two prior extensions had been granted by the Court.

13.     The operable Further Revised Plan of Allocation was approved by this Court on December 20, 2019.

### Entry of the Further Revised Plan of Allocation

14.     The Further Revised Plan of Allocation explained, in part, that:

- As to businesses, only those Settlement Class Members who purchased or leased a new Vehicle or purchased a replacement Automotive Part in the states listed below, or had their principal place of business at the time of such purchase or lease in the states listed below, will be entitled to share in the Net Settlement Funds.

- If you did not indirectly purchase, or purchased for resale, any Automotive Parts during the applicable time periods or in any of the states listed below you will not be entitled to share in any of the Net Settlement Funds.

- The Court may deny, in whole or in part, any claim if it determines that the claimant is excluded from the definition of the Settlement Classes or if there are legal or equitable grounds for the rejection of such claim.

- All Class Members who fail to complete and submit a valid and timely Claim Form shall be barred from participating in distributions from the Net Settlement Funds (unless otherwise ordered by the Court), but otherwise shall be bound by all of the terms of the settlements, including the terms of the judgments entered and the releases given pursuant to the settlements.

15.     The Further Revised Plan of Allocation provides no mechanism for allocating settlement funds based upon alleged subrogation claims.

**December 2019 Notice**

16.     The same day that the court approved the Further Revised Plan of Allocation, the Court entered an Order Granting EPP's Unopposed Motion for Authorization to Disseminate Supplemental Notice to the Settlement Classes ("December 2019 Supplemental Notice").

17.     The December 2019 Supplemental Notice explained, in part, that:

- Purchasers or lessees of qualifying new vehicles or indirect purchasers of any of the replacement parts listed in Question 6 may be members of the settlement Classes entitled to monetary recovery. Only those members of the Settlement Classes who, during the relevant time periods listed above, purchased or leased a vehicle or purchased a replacement part in, or while (1) residing in or (2) as to businesses, having the principal place of business located in the District of Columbia or the states listed below will be entitled to share in the monetary recovery.

- [Y]ou will be required to submit a Claim Form to be eligible to receive a payment from any of the Settlement Funds. Claims may be submitted online at www.AutoPartsClass.com or by printing and mailing your completed form postmarked by **March 16, 2020**.

- Payments will be based on a number of factors, including at least the number of valid claims filed by all members of the Settlement Class in question and the number of (1) qualifying new vehicles purchased or leased or (2) qualifying replacement parts purchased.

- In order to receive a payment from any of the Settlements (Round 1 through Round 4), you will need to file a valid Claim Form (see Question 12).

18.     The Court's December Supplemental 2019 Notice did not suggest in any way that insurance carries could participate in the settlements based on subrogation rights.

19.    The Court's December Supplemental 2019 Notice did not provide that automobile insurers could recover from the EPP Settlements as claimed subrogees of certain class member insureds who may have received insurance payments for vehicles that automobile insurers deemed a total loss due to automobile accidents.

20.    The Court's December Supplemental 2019 Notice did not provide that the recovery of a class member might be reduced by subrogation claims asserted by an automobile insurer. Nor did it state or otherwise suggest that subrogation claims of an automobile insurer would be included as a factor in determining payments to class members.

## Last Notice and June 18, 2020 Claims Deadline

21.    On March 24, 2020, the Court entered an Order Granting EPP's Unopposed Motion for Extension of the Claims-Filing Deadline until June 18, 2020. This allowed additional time for Authorized Claimants to file claims. But it did not change the language in the December 2019 Supplemental Notice.

## FRS

22.    Financial Recovery Services ("FRS") is a third-party claims-filing company. FRS does not claim to have purchased or leased any qualifying vehicle or replacement part. FRS has not submitted any claim on its own behalf, and FRS has not asserted that it is a class member.

23.    Instead, prior to the passage of the June 18, 2020 claims-filing deadline, FRS submitted the names of 308 companies on whose behalf it was purportedly acting to submit claims.[1] Of the 308 companies named by FRS, seven of them were on behalf of insurance companies.

### FRS' Only Timely Claims Submissions Were Related to Direct Purchases For Five of Seven Named Insurance Companies

24.    FRS submitted timely claims information on behalf of five insurance companies: AIG, Utica Mutual Insurance Company, Mapfre USA Corporation, Mercury Insurance Services, and Selective Insurance. Correspondence from FRS indicates that the claims information submitted for these five insurance companies is for purchases or leases of vehicles made for their own account. Nothing indicates that these insurance companies were asserting any rights based on subrogation.

25.    FRS previously asserted that it submitted claims information on behalf of two additional insurance companies: W.R. Berkeley Corporation and Liberty Mutual Holdings. However, Epiq has no record of receiving any timely vehicle claims information for these two companies at all with the exception of a single vehicle listed for Liberty Mutual Holdings, a 1996 Mercedes-Benz M-Class—the same vehicle also claimed by 147 other FRS clients.

---

[1] In my prior declaration dated November 11, 2020, I noted that FRS had submitted 307 timely claims on behalf of others. However, in the time since my submission of that declaration, Epiq discovered one additional timely FRS submission.

26.     FRS also has asserted that the insurance companies listed above (AIG, Utica Mutual Insurance Company, Mapfre USA Corporation, Mercury Insurance Services, Selective Insurance, W.R. Berkeley Corporation, and Liberty Mutual Holdings) seek to share in the settlements as subrogees of class member insureds whose vehicles were declared a total loss due to a collision or  other accident. However, FRS, has yet to submit any of the information that would be needed to substantiate any claims based on subrogation, assuming any subrogation claims would be allowable at all.

27.     FRS does not claim that the insurance companies are class members in their capacity as insurers, or that any class definition includes insurance companies that made insurance payments to class members for vehicles declared a total loss. Thus, under the terms of the settlements and the plan of allocation, no insurance company is entitled to a share in the settlements based upon payments made by the insurance company to a class member pursuant to the terms of an insurance policy.

28.     In addition, neither the settlements, nor the plan of allocation makes any provision for insurance companies to submit claims to share in the settlements as subrogees of class member insureds who may have received insurance payments relating to vehicles that an insurance company deemed a total loss. Thus, under the terms of the settlements and the plan of allocation, there is no provision for any insurance company to share in the settlements as a subrogee of any class member.

10

29.     To date, FRS has not submitted any proof of claims information on behalf of any insurance company in support of any subrogation claim. Thus, any proof of claim information submitted now would be several months late and properly treated as untimely.

### Other Submissions Made By FRS Prior to the June 18, 2020 Deadline

30.     Not including the five insurance companies for whom timely claims were made, FRS submitted registrations or so-called "placeholders" on behalf of 303 other companies. For all of these 303 claimants, FRS provided its own Florida-based address on the claim form. With the exception of a handful of companies for which it included a read only .pdf copy of its representation agreement,  FRS did not provide any address associated with the company for whom it purported to file the claim.

31.     Of those claims it submitted on behalf of 303 companies, FRS submitted no information identifying the vehicle or part purchased whatsoever for 58 companies (nearly 20%). The claims contained no VIN numbers, no purchase data, no make/model information, and no supporting documentation. As a Claims Administrator, these claims are facially unsupported submissions and do not qualify as claims complying with the Court's notice.

32.     The remaining 245 companies for which FRS field claim forms claimed only a single vehicle and included only the following information for that single car:

make, model, model year, place of purchase, and date of purchase.[2] No VIN vehicle numbers were provided relating to any of these purported claimants.

33.     Suspiciously, the claim forms submitted by FRS on behalf of 242 of these 245 companies were universally comprised of one of the following three sets of information, with only slight variations in "Date of Purchase" and "Model Year":

| Make | Model | Model Year | Place of Purchase | Date of Purchase |
|------|-------|-----------|-------------------|------------------|
| Mercedes-Benz | M-Class | 1996 | Florida | 1/1/1995 |
| Chevrolet | Camaro | 1995 | Florida | 1/1/1994 or 1/1/1995 |
| Mazda | MPV | 1990 | Florida | 1/1/1990,   6/1/1990, or 1/1/1995 |

The fact that 242 of the 245 company claims recycled the same three sets of standard vehicle information was suggestive of fraud. For example, FRS identified a "1996 Mercedes-Benz M-Class" as the single vehicle purchased by 147 different claimants; a "1995 Chevrolet Camaro" as the vehicle purchased by 83 different claimants; and a "1990 Mazda MPV" as the vehicle purchased by 12 different claimants. Also suggestive of fraud is the fact that all of these vehicles were allegedly purchased on January 1st of the years in question.

34.     Of the 245 companies in this category, I have only been able to confirm that 13 have locations in Florida. And the vast majority of the 245 companies have a business location that does not match up with the place of purchase claimed for the

---

[2] This updates my November 11, 2020 declaration to provide additional details regarding the information in the original registrations.

single vehicle identified in association with the company. This is problematic because, in my experience as a claims administrator, one indicia of potential fraud is that a company is located in a state that is different from the place of purchase. The repetition of identical vehicles among purportedly different claimants and the fact that all were listed as having been purchased in Florida, where FRS is located, rather than in the states where the companies are located, indicates that it is unlikely that these vehicles were actually purchased by these companies as FRS's claim submissions suggest.

35.    In addition, of the 245 companies in this category, it appears that at least 22 companies were not even in existence during the year the single vehicle associated with their claim was purchased. This is also suggestive of fraud.

36.    Based on the only information that FRS timely provided, Epiq determined that the 242 submissions with overlapping vehicle information were insufficiently supported and suspicious and therefore did not qualify as claims complying with the Court's notice. The three other claims with one vehicle purchase claimed identified unique vehicles and listed the place of purchase as either California or New York. Only one of these three claims, the one for LA School of Gymnastics, was supplemented after the claims-filing deadline. Notably, it was supplemented to claim only one additional vehicle, a 2019 Ford Fusion Hybrid. The suspicious nature of these claims as described in the foregoing paragraphs would

certainly require at the very least additional investigation to determine their legitimacy.

37. Just after the lapse of the June 18, 2020 claims-filing deadline, FRS contacted Epiq's staff and asked whether late claims were being accepted. FRS was informed that any late information would be "marked as late, and will be treated in accordance with the Court's direction based on recommendations from the Parties."

## Untimely Supplemental Information Provided By FRS

38. Despite this knowledge, after June 18, 2020, FRS attempted to provide untimely or new vehicle claims in the form of "supplements on three separate occasions." But these "supplements" were an improper attempt to submit thousands of entirely new claims involving previously unidentified vehicles after the claims deadline. Many of these claims were associated with companies for whom FRS had previously filed an empty or single-vehicle claim.

39. First, on December 22, 2020, FRS sent Epiq a link to an FTP site with supplemental claims data for the following seven non-insurance company claimants: (1) DPNY Hospitality (Claim No. 10048260); (2) Go Staff, Inc. (Claim No. 10181873); (3) LA School of Gymnastics (Claim No. 10131452); (4) Maintenx International Service Management Group, Inc. (Claim No. 10014185); (5) Mountain View Child Care (Claim No. 10182069); (6) Orora Packing Solutions (Claim No. 10068163); and (7) PK Enterprises (Claim No. 1007773).

14

40.    Second, on January 4, 2021, FRS sent Epiq a link to an FTP site with supplemental claims data for the following fourteen non-insurance company claimants: (1) BASF Corporation (Claim No. 10122334); (2) Bashas, Inc. (Claim No. 10007417); (3) Brookdale Senior Living (Claim No. 10048171); and (4) Capatain Ds, LLC (Claim No. 10070642); (5) Catholic Charities of Broome (Claim No. 10048252); (6) Graceland University (Claim No. 10182140); (7) Hospital for Special Surgery (Claim No. 10068180); (8) Illinois Tool Works (Claim No. 10178418); (9) Inter Con Security Systems (Claim 8187No. 10122362); (10) Kerry, Inc. (Claim No. 10014110); (11) LKQ Corp. (Claim No. 10048214); (12) MaineGeneral Health (Claim No. 10064127); (13) Providence College (Claim No. 10048187); and (14) The Great Atlantic and Pacific (Claim No. 1007807).

41.    In total, of the 21 claim "supplements" provided by FRS after the claim-filing deadline for non-insurance company claims, FRS added claims for 12,204 additional vehicles.[3] The thousands of newly-identified vehicles claimed by FRS after the deadline dwarf the 19 total vehicles FRS identified on behalf of these same claimants prior to the June 18, 2020 claim-filing deadline. Moreover, none of the late claim "supplements" for the 21 claimants includes the vehicle initially listed on the initial placeholder submission for the claimant.

---

[3] The actual number is even higher since one of the spreadsheets sent by FRS could not be opened.

42.     On January 4, 2021, a Project Coordinator from Epiq responded to one of FRS' late submissions and noted that "we are no longer accepting new data for the settlements," further stating that, although Epiq would "file the records submitted," "any new data will be considered untimely." A follow-up email on January 6, 2021, that was acknowledged by an FRS project manager again reiterated that "any data submitted after the claims deadline will be considered untimely."

43.     Third, on January 7, 2021, FRS sent Epiq an email with a "claim addendum" for insurance company WR Berkley. No vehicle or parts purchase data had previously been claimed for that insurance company.

44.     FRS improperly submitted "supplements" consisting of scores of untimely claims. In total, these untimely claims identified additional vehicles for twenty-one claimants—19 of which had originally identified a single vehicle before the June 18, 2020 claims-filing deadline and 2 of which originally failed to provide any vehicle information at all.

45.     All untimely "supplements" provided brand new vehicle claims. They are untimely and do not qualify as claims complying with the Court's notice.

46.     But, even if the "supplemental information" submitted to date by FRS were considered, it remains the case that of the 245 claimants for which FRS

submitted a single vehicle "placeholder" claim,[4] FRS never even attempted to "supplement" claims for 226 of those claimants. And FRS also never attempted to "supplement" claim forms filed on behalf of 56 of the 58 claimants that were originally filed "empty" without any vehicle information whatsoever. For these alleged claimants, FRS has not provided an iota of vehicle information, either before or after the claims-filing deadline.

47.    To the degree FRS claims that its timely filing of "placeholder" claims for specific companies excuses it from complying with the June 18, 2020 deadline set by the Court, that is incorrect. The Court's orders and the class notices did not authorize the making of placeholder claims. And I have never personally worked on a class action case where placeholder claims were permitted.

## Prejudice to Administration Process and Actual Class Members

48.    Allowance of late claims has never been authorized and would be prejudicial to class members. This is especially true of subrogation claims, which have never been contemplated in the settlements or the Plan of Allocation.

49.     Specifically, to allow the submission of subrogation claims now – much less at some indefinite time in the future—would substantially delay and prejudice the claims administration process. The additional expense of administering

---

[4] The five timely claims for insurance companies for which vehicle purchase data was provided before the June 18, 2020 deadline are not included in this count.

and processing subrogation claims would also reduce the recoveries to be paid to qualifying class member claimants, because the additional administration costs would have to be paid out of the settlement funds.

50.     Validation of subrogation claims by an insurance company would at least require satisfactory proof of the following:

- the identification of each vehicle owned by an insured class member, including the year, make, and model of the vehicle, the VIN number, the identity and name of the purchaser, the time and place where the purchase occurred, the residence or principal place of business of the purchaser at the time of purchase, and the date when the vehicle was declared a total loss;

- the existence of a policy of insurance between the insurance company and the class member covering each vehicle in question, including proof that the insurance policy provided for subrogation in the event that a vehicle was declared a total loss;

- proof that the vehicle that was insured at the time of the loss was purchased or leased as a new vehicle by the insured, and had not been acquired by the insured as a used vehicle;

- proof that a qualifying vehicle was in an accident and declared a total loss;

- proof that the insurance carrier made a payment to a class member for the vehicle that was declared a total loss;

- documentation showing the purchase price paid by an insured class member, or agreed-value of the vehicle at the time of lease;

- documentation showing the value of the vehicle at the time of the loss;

- documentation of the payments made to a class member by the insurance company;

- documentation of any payments the insurance company obtained from a third-party or tortfeasor regarding the collision or accident that caused the total loss, because any such payments would reduce the amount of any subrogation claim.

51.    FRS has provided no estimate as to how long it would take to submit information necessary to support subrogation claims, or how long it would take to submit the additional information required to process subrogation claims or other claims. FRS has stated that the process of gathering and submitting data regarding the many thousands of specific vehicles that underlie their subrogation claims would be "an enormous task" for FRS that is "substantial and time consuming." *See, e.g.*, No. 2:12-md-02311, ECF Nos. 2060 [Page ID: 37719], 2060-5.

52.    Further, if subrogation claims were allowed, such claims and the information necessary to support such claims would necessarily be provided months after the claims submission deadline has passed. The same is true for placeholder claims. In addition, Epiq would still need to compare any additional claims information submitted by FRS to the claims already submitted by class members to avoid duplicate claims and ensure that subrogation claims are only applied to class members that (a) submitted valid claims, (b) were insured by one of the insurance companies identified by FRS, (c) received a payment from one of those insurance companies for a qualifying vehicle that was declared a total loss, and (d) have not reduced or eliminated any subrogation claim.

53.     This additional claims administration process would likely require the Court to approve additional procedures for Epiq to apply in (1) evaluating whether any subrogation claim would be eligible for any payment under the terms of the settlements, and (2) creating a proportionate sharing calculation for the potential split of the settlement payment between the class member insured who purchased a qualifying new vehicle at the full purchase price, and the insurance company that made a total loss payment for the "actual cash value" of the vehicle, adjusted for depreciation, physical deterioration, and obsolescence. Because the *pro rata* distribution of settlement funds assumes that each class member has purchased a qualifying new vehicle at the purchase price charged for the qualifying new vehicle, and an insurance company would have only paid the actual cash value of a used vehicle at the time of loss (adjusted for depreciation and deterioration), an insurance company seeking to recover as a subrogee would have no claim based on the purchase price a class member insured paid for a qualifying new vehicle.

54.     Due to significant differences in a claims administration process for subrogation claims, Epiq would need to contact class members whose claims were potentially affected by a subrogation claim and obtain additional information about their vehicles, including vehicle identification numbers, purchase price information, agreed-upon lease values, and vehicle valuations at the time of loss. Out of fairness to class members, Epiq would also need to provide notice to class members that an

insurance company has claimed that it is entitled to receive all or a portion of the settlement payments that would otherwise be paid to the class member, and provide the class member an opportunity to challenge the insurance company's claim. This would add additional complexity and expense to the claims-administration process.

55.     Processing subrogation claims would further require Epiq to create procedures for handling subrogation claims that do not currently exist under the plan of allocation as approved by the Court. If subrogation claims were allowed, Epiq would need to:

- Create and implement procedures for matching subrogation claims to class members who submitted claims;

- Create and implement procedures for reviewing documentation concerning auto insurance coverage and total loss payments, including procedures for requesting additional documentation and information that is missing or incomplete;

- Create and implement procedures for comparing the new vehicle purchase price to the depreciated, actual cash value of the vehicle declared to be a total loss;

- Create and implement procedures for determining a proportional or pro-rated payment for subrogation claims that appropriately considers the depreciated, actual cash value of the vehicle at the time of loss;

- Create and implement procedures for determining whether an insurer previously obtained subrogation payments from a third-party tortfeasor involved in the loss, and determine how and in what proportions such payments should reduce the proportional recovery of any subrogation claim;

- Create and implement procedures for class members to challenge the alleged subrogation claims of insurance companies, including a process for adjudicating or resolving such challenges;

- Create and implement a secondary settlement payment calculation that excludes subrogation claims from the initial calculation in which each claimant is entitled to a minimum payment of $100 because the proportional payment required for subrogation claims would necessarily affect claims already included in the initial calculation.

56.     The creation and implementation of each of these additional processes and procedures will require significant time, expense, and resources. Currently, it is difficult to assess the amount of additional time, expense, and resources it would take to create and implement the above processes and procedures.  It is also difficult to estimate the additional time, expense, and resources it will require to process subrogation claims that FRS might submit. However, Epiq anticipates that the time, expense, and resources required to create and implement additional procedures for subrogation claims would be significant. It may delay the claims administration process a year.

57.     At a minimum the processing and verification of subrogation claims would add many additional months to the claims-administration process. Distribution of the settlement funds would be further, and indefinitely, delayed by any objections or appeals filed by class members or Class Counsel to address subrogation claims that are not contemplated by the existing plan of allocation. The same is true to a slightly lesser degree for acceptance of non-subrogation late claims.

58.     If a new notice to the class would be required by the Court, the cost of the new notice would be substantial. The additional administrative expenses would

also cost many hundreds of thousands of dollars. Indeed, the information required to validate subrogation claims would be extensive and require considerable time and effort that goes well beyond the time and effort required to vet the claims of individual class members who complied by timely submitting claims in accordance with the Court's notice requirements and the Court-ordered claims deadline.

59.     Accordingly, the resources needed to process and verify late-filed subrogation claims would be significant, require substantial additional expenses to be paid out of the class settlement funds, and prejudice the efficient and cost-effective administration of this already complex claims administration process.

60.     Receiving new late claims of any kind is problematic and delays distribution of settlement funds.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3rd day of March 2021, in Seattle Washington.


_____
Brian A. Pinkerton

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

/s/ Jenna G. Farleigh
Jenna G. Farleigh
**SUSMAN GODFREY L.L.P.**

12