# EXHIBIT 23

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PRECISION ASSOCIATES, INC.; ANYTHING GOES LLC d/b/a MAIL BOXES ETC., and JCK INDUSTRIES, INC., on behalf of themselves and all others similarly situated, | **Case No.: 08-CV-00042 (BMC) (PK)** |
| Plaintiffs, |  |
| *vs*. |  |
| PANALPINA WORLD TRANSPORT (HOLDING) LTD., et al., |  |
| Defendants. |  |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RENEWED MOTION TO DISTRIBUTE NET SETTLEMENT FUNDS, AMEND THE PLAN OF ALLOCATION, DISTRIBUTE FUNDS TO LATE-FILED CLAIMANTS, AND SET DEADLINES FOR OBJECTIONS TO CLAIM DETERMINATIONS

Christopher Lovell
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

Adam J. Zapala
**COTCHETT, PITRE & MCCARTHY LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010

Daniel E. Gustafson
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN  55402

45565
45493

# TABLE OF CONTENTS

**Page**

I.     Factual Background ................................................................................. 1

II.    Claims Administration Process .......................................................... 5

III.   Claim Form Deadline and Documentation ........................................ 6

IV.   Deficiency Review and High-Level Review Process ....................... 10

V.     Proposed Distribution of Settlement Fund ...................................... 16

VI.   Process for Claimants to Object to a Denial or to the Award Amount ............................ 18

VII.   The Plan of Allocation Should be Amended to Include a Minimum $100 Award for All Authorized Claimants .................................. 20

VIII.   Conclusion ....................................................................................... 22

i

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Blank v. Jacobs*,
No. 03-CV-2111 JS WDW, 2013 WL 1310503 (E.D.N.Y. Mar. 27, 2013) ............................... 5

*In Re "Agent Orange" Prod. Liability Litig.*,
689 F.Supp.1250, 1261-63 (E.D.N.Y. 1998) ................................................................ 17, 20

*In re Amaranth Natural Gas Commodities Litig.*,
07 Civ. 6377 (SAS), ECF No. 413 ¶ 6 (S.D.N.Y. May 23, 2012) ........................................ 20

*In re Citigroup Inc. Sec. Litig.*,
No. 07 CIV. 9901 SHS, 2014 WL 2445714 (S.D.N.Y. May 30, 2014) ................................. 5

*In re Crazy Eddie Sec. Litig.*, 4)
906 F. Supp. 840 (E.D.N.Y. 1995) ...................................................................................... 5

*In re Holocaust Victim Assets Litig.*,
424 F.3d 158 (2d Cir. 2005) .......................................................................................... 4, 5

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
246 F.3d 315 (3d Cir. 2001) .............................................................................................. 5

*In re Oxford Health Plans, Inc.*,
383 F. App'x 43, 45 (2d Cir. 2010) .................................................................................. 17

*In re Platinum and Palladium Commodities Litig.*, 10 Civ. 3617 (WHP),
2014 WL 3500655  (S.D.N.Y. July 15, 2014) .................................................................. 20

*In re Worldcom, Inc. Sec. Litig.*, 02 CIV. 3288 (DLC),
2005 WL 3577135 (S.D.N.Y. Dec. 30, 2005) .............................................................. 20, 21

*Zients v. Lamorte*,
459 F.2d 628 (2d Cir 1972) .............................................................................................. 20

**Rules**

Federal Rule of Civil Procedure 23 ........................................................................................ 4

Federal Rule of Civil Procedure 23(e) .................................................................................... 1

**Introduction**

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs, through Class Counsel,
respectfully submit this memorandum in support of their motion to authorize distribution of the
Rounds 1, 2, and 3 settlement funds to claimants who made qualifying purchases of freight
forwarding services ("Authorized Claimants"), to amend the Plan of Allocation slightly to allow
for $100 minimum payments to those Authorized Claimants whose *pro rata* award was less than
$100, to authorize distribution of funds to late-filed claimants, and to set deadlines for any
objections to Epiq's claim determinations.

As explained below, the claims administrator, Epiq Class Action & Claims Solutions,
Inc. ("Epiq"), in close consultation with Class Counsel, has worked hard to process claims and
verify each claimant's eligibility.  After court-approved notice, Class Members participated
broadly in in the claims process: 18,923 claims were submitted for Rounds 1, 2, and 3, and
12,428 claims have been recommended for partial or full approval.  Those claims will be paid
promptly upon the Court's approval of the plan of distribution presented in this motion, and
resolution of any objections to the proposed awards, as described in more detail below.  Finally,
as discussed in Section VI, because a reserve fund will be established to address the appeal of
any objections overruled by the Court, Class Counsel asks that the Court authorize the prompt
distribution now of proceeds to all authorized claims to which no appeal of any objections
remain pending.   Separately, we request the Court enter an order setting deadlines for objections
to Epiq's claim determinations.

**Background**

The Court has granted final approval of settlements with all Defendants in this case,
grouped in three rounds.  "Round 1" Defendants are: (1) Schenker Deutsche Bahn AG, Schenker

1

AG, Schenker, Inc., Bax Global Inc. and DB Schenker (collectively "Schenker"); (2) Vantec Corporation and Vantec World Transport (USA), Inc.; (3) EGL, Inc. and EGL Eagle Global Logistics, LP, Inc.; (4) Expeditors International of Washington, Inc.; (5) Nishi-Nippon Railroad Co., Ltd.; (6) United Aircargo Consolidators, Inc. ("UAC"); (7) Kuehne + Nagel International and Kuehne + Nagel, Inc.; (8) Morrison Express Logistics Pte. Ltd (Singapore) and Morrison Express Corporation (U.S.A.); (9) UTi Worldwide, Inc.; and (10) ABX Logistics Worldwide NV/SA.

"Round 2" Defendants are: (1) SDV Logistique Internationale; (2) Panalpina World Transport (Holding) Ltd. and Panalpina, Inc.; (3) Geodis S.A. and Geodis Wilson USA, Inc.; (4) DSV A/S; DSV Solutions Holding A/S; and DSV Air & Sea Ltd.; (5) Jet Speed Logistics, Ltd., also known as Jet Speed Air Cargo Forwarders (HK), Ltd; Jet Speed Logistics (USA), LLC; and Jet-Speed Air Cargo Forwarders, Inc. (USA); (6) Toll Global Forwarding (USA), Inc. and Baltrans Logistics, Inc. (collectively "Toll"); (7) Agility Holdings, Inc.; Agility Logistics Corp.; Geologistics Corp.; and Geologistics International Management (Bermuda) Limited (collectively "Agility"); (8) United Parcel Service, Inc. and UPS Supply Chain Solutions, Inc. (collectively "UPS"); (9) Dachser GmbH & Co., KG, doing business as Dachser Intelligent Logistics, and Dachser Transport of America, Inc.; (10) Hankyu Hanshin Express Holding Corporation; Hankyu Hanshin Express Co., Ltd.; Hanshin Air Cargo USA, Inc.; Japan Aircargo Forwarders Association; Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.) Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.) Inc.; Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Nissin Corporation; Nissin International Transport U.S.A., Inc.; Yamato Global Logistics Japan Co., Ltd.; Yamato Transport U.S.A. Inc.; Yusen Air & Sea Service Co., Ltd.; and Yusen Air & Sea

Service (U.S.A.), Inc. (collectively "the Japanese Defendants"); and (11) Deutsche Post AG;

Danzas Corporation, doing business as DHL Global Forwarding; DHL Express (USA) Inc.; DHL

Global Forwarding Japan K.K.; DHL Japan Inc.; Exel Global Logistics, Inc.; and Air Express

International USA, Inc. (collectively "DHL"), for the Japanese severed claims only (the "DHL

Japanese agreement").

"Round 3" Defendants are: (1) DHL, for non-severed claims only (the "DHL Non-

Severed agreement") and (2) Hellmann Worldwide Logistics GmbH & Co. KG; Hellmann

Worldwide Logistics Ltd. Hong Kong; and Hellmann Worldwide Logistics, Inc.

On July 28, 2017 Class Counsel moved this Court for distribution of the settlement funds

for Rounds 1 and 2. After discovering materially inflated claim amounts by certain large

claimants, Class Counsel withdrew the motion for distribution and requested Epiq perform

additional review and analysis of certain claims. ECF No. 1423. In close consultation with

Class Counsel, Epiq engaged in a subsequent review of higher value claimants. *See* ECF No.

1503, at 3; *See* Declaration of Michael O'Connor, dated January 28, 2019 ("O'Connor Decl."), at

¶¶ 27-36. Although Class Counsel regretted the delay caused by this further review, this

additional oversight resulted in significant downward revisions by higher value claimants,

resulting in substantial increases to all other claimants' *pro rata* allocations, and therefore

increased payments for many of the claimants. O'Connor Decl., at ¶ 36. Because of the delay

caused by the further review of Round 1 and 2 claims, the claims for Round 3 settlements were

processed and readied for distribution.[1] Thus, delaying the Round 1 and 2 distributions –

---

[1] The deadline to submit claims to recover from the Round 3 settlements was April 3, 2017.
Round 3 was the final round of settlements in this litigation.

although unfortunate – will actually save administrative expenses by eliminating the need for one additional distribution for Round 3 claims.

In this motion, Class Counsel seek the Court's approval to distribute Round 1, 2, and 3 settlement proceeds to Authorized Claimants. As Judge Gleeson noted in approving the Round 1 settlements, "This litigation is irrefutably complex." ECF No. 866, at 30; *see also* ECF No. 1330, at 16 (reaffirming complexity of litigation in approving Round 2 settlements). Plaintiffs alleged eleven different conspiracies against 28 groups of corporate defendants (many with multiple subsidiaries), with a class period spanning ten years and a class comprising many thousands of members ranging from very small to very large purchasers. The complexity of the case, the number of claimants and the range of their affected purchases, the fact that purchase data was often incomplete and difficult to retrieve, and the need to fairly allocate the settlement funds to Class Members impacted by the various conspiracies, all informed the plan of allocation, the claim form, and the claims process.

Epiq, with advice and supervision of Class Counsel, performed the claims administration process with respect to the Round 1, 2, and 3 settlements. That administration process is now complete, and the Round 1, 2, and 3 settlement funds are ready to be distributed to eligible claimants.[2] *See generally* O'Connor Decl.

Federal Rule of Civil Procedure 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." "[T]he district court has broad supervisory powers with respect to the administration and allocation of settlement funds." *In re Holocaust Victim Assets Litig.*, 424 F.3d 158, 165 (2d

---

[2] In preparation for filing this motion, Epiq identified one claimant that it and Class Counsel have decided to contact with additional questions about a portion of its claim. Epiq expects final adjudication of that claim prior to the Court hearing on this motion. O'Connor Decl. ¶ 45. Any adjustments to the claim would not materially change the awards to other claimants.

Cir. 2005) (internal quotation and citation omitted). "When a court acts as fiduciary for a settling class, it pursues the 'goal [ ] of expedient settlement distribution.'" *In re Citigroup Inc. Sec. Litig.*, No. 07 CIV. 9901 SHS, 2014 WL 2445714, at *2 (S.D.N.Y. May 30, 2014) (quoting *In re Orthopedic Bone Screw Prod. Liab. Litig.,* 246 F.3d 315, 321 (3d Cir. 2001)). Courts in this district have held that, "as a matter of judicial administration and fairness to all parties, [certain] concern[s] for protecting class members must give way to finality." *In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 846 (E.D.N.Y. 1995); *see also Blank v. Jacobs*, No. 03-CV-2111 JS WDW, 2013 WL 1310503, at *5 (E.D.N.Y. Mar. 27, 2013) ("there must eventually be some finality to these inquiries").

## Claims Administration Process

Epiq began the claims process after a robust notice program approved by the Court. Plaintiffs' notice program provided for: (1) individual direct mail notice to potential Class Members whose identity was derived from Defendants' transactional data, (2) publication notice (i.e., paid media), based on expert demographic studies, in various magazines, newspapers, trade journals and websites throughout the world in several foreign languages, (3) an "earned media" publication campaign designed to reach 18,783 worldwide media outlets and an additional 5,600 websites, and (4) a settlement website dedicated to providing Class Members with detailed information regarding the case. ECF No. 596-1; ECF No. 666 (approving first round notice); ECF No. 1229 (approving second round notice); ECF No. 1367 (approving third round notice).

Epiq performed numerous administrative tasks including: disseminating mail notice; receiving and processing claims and requests for exclusion; responding to class member inquiries; establishing and maintaining a settlement website; conferring with Class Counsel; and performing such other duties as was directed by the Court or Class Counsel. *See* O'Connor Decl.

at ¶ 3.  Epiq also conducted the administrative tasks associated with collecting claim forms, evaluating and reviewing those claim forms, sending follow-up or deficiency letters to claimants and ultimately calculating the appropriate allocated amount for each Authorized Claimant.  *See id*.  The high-level claims review and quality control process was complex and involved numerous telephonic and in-person meetings with Class Counsel to ensure claims were accurately calculated so they could be paid fairly.

### Claim Form Deadline and Documentation

The deadline for filing timely claims for Round 1 settlements was August 24, 2015.[3]  *Id.* at ¶ 4.  After the Round 1 filing deadline Epiq continued to receive Round 1 claims.  As in a common practice in class-action settlement administration, Epiq continued to accept late-filed claims submitted by September 24, 2015 and now recommends that the Court approve accepting those claims to permit the highest number class members to have eligible claims.  *Id.* at ¶ 11. Any late-filed Round 1 claims received after September 24, 2015 were considered timely filed Round 2 claims.  *Id.*

The deadline for filing timely claims for Round 2 settlements was March 31, 2016.  *Id.* at ¶ 5.  Again, consistent with its normal practice, Epiq continued to accept late-filed claims submitted between April 1, 2016 and May 31, 2016.  *Id.*  Epiq recommends that the Court approve these late-filed Round 2 claims that were received by May 31, 2016 to allow more class members to have eligible claims.  *Id.* at ¶ 12. Any late-filed Round 2 claims received after May 31, 2016 were considered timely filed Round 3 claims.  *Id.*

---

[3] Given the necessary complexity of the claim form and the effort required to obtain corroborating purchase data, the Round 1 claim filing deadline was extended twice with court approval.  ECF No. 929 (extending the filing deadline from November 22, 2013 to August 22, 2014); ECF No. 1093 (extending the filing deadline from August 22, 2014 to August 24, 2015).

The deadline for filing timely claims for Round 3 settlements was April 3, 2017. *Id.* at ¶ 6. Epiq continued to accept late-filed claims submitted between April 4, 2017 and December 15, 2017. *Id.* Again, in this round, Epiq recommends that the Court approve these late-filed Round 3 claims that were received by December 15, 2017 to allow the highest number of class members to receive settlement funds. *Id.* at ¶ 13. Class Counsel and Epiq recommend that any new claims filed after December 15, 2017 be denied entirely as untimely. *Id.* Untimely claims filed after December 15, 2017 have not been processed and have not been considered for distribution. Epiq was required to cut-off processing of late filed claims in order to avoid delaying processing and payment of all other Authorized Claimants. *Id.* at ¶ 13, n.4.

The total amount now sought to be distributed is funded by settlements from nine different surcharge conspiracies, one regional conspiracy, and one overarching conspiracy. Although there was substantial overlap among Defendants in the several surcharge conspiracies, only one Defendant was alleged to have participated in all conspiracies. Some surcharge conspiracies were route specific (*e.g.* Japan to US), and others were limited to air or ocean shipments only. Further, some surcharges conspiracies involved a flat fee whereas others were based upon weight.

Therefore, in order to ensure that claimants who were injured by these conspiracies receive a *pro rata* allocation of settlement funds based upon the conspiracies that caused them injury, and consistent with the Court-approved Plan of Allocation (ECF No. 855; ECF No. 866; ECF No. 1307; ECF No. 1330), the claim form requested data consistent with how each surcharge conspiracy was implemented by Defendants. The claim form required each claimant to answer various questions, each correlating with a specific conspiracy and corresponding surcharge-related settlement pot. For example, Schedule B requested the dollar amounts of

purchases, the currency, freight forwarder and origins/destinations of the purchases of affected freight forwarding services, for claims against the Worldwide Freight Forwarding Services pot. O'Connor Decl. at ¶ 9. Schedule B also used shipping data provided in response to the Schedule to determine eligibility for a *pro rata* distribution from the NES settlement surcharge pot. *Id.* Questions 1A, 1B, 1C, 2A, 2B, 2C, 3A, and 3B of the claim form requested data used as proxies in determining payouts from the various other surcharge pots as detailed in the Plan of Allocation. *Id.* Although certain shipping data was produced from defendants, the data was not complete, and there was no good comprehensive data set that could be used for claims processing. As a result, Epiq was forced to rely primarily on data originating from claimants.

Because claimants submitted claim forms in various foreign currencies, foreign currencies were converted to USD using the average exchange rate throughout the class period, based on data purchased from a third-party vendor, XE. *Id.* at ¶ 16. Lastly, Epiq also made adjustments where a Round 2 or 3 claim form was filed in time for Round 1 eligibility or a Round 1 claim form was filed during the Round 2 filing period to account for differences in class periods reflected on those forms and ensure the submissions were treated consistently. *Id.* at ¶ 7. Because the claim form for Round 1 claims requested information for a longer class period, when Round 1 claim forms were calculated for payments as part of the Round 2 distribution, these claim forms were adjusted to take into account the differing class periods. *Id.* The differing class periods were as a result of differing release periods in the settlements.

Consistent with the Plan of Allocation, 10% of each Defendant's settlement funds were allocated to the Worldwide Freight Forwarding Services pot. As set forth in the Plan of Allocation, the remaining 90% of each Defendant's settlement funds were allocated to the surcharge-specific pots associated with those surcharges in which that Defendant was alleged to

have participated.  *See* O'Connor Decl., Exhibit H.  Epiq then calculated a *pro rata* distribution from each surcharge pot, based on each Authorized Claimant's demonstrated purchase of freight forwarding services associated with a particular surcharge.

Thus, the total amount any claimant will receive will not correspond directly to its total purchases of freight forwarding services.  Instead, claimants' proposed awards were determined by which surcharges they paid and, therefore, the harm they suffered.  For example, the largest surcharge pot was for the Security Surcharge conspiracy, where disbursements are calculated *pro rata* based on the total weights of *air* shipments into and out of the United States.  Thus, if a claimant only purchased *ocean* freight forwarding services, it would not be entitled to any recovery from the Security Surcharge pot because it was not harmed by the Security Surcharge conspiracy.

It is important to note that the "claim amount" does not equal the actual or estimated overcharges Class Members paid.  The "claim amount" is the total *purchase amount* (total dollars spent, weight, shipments, dollars spent on a particular route) for freight forwarding services, not the total *surcharge amount.*  Surcharges were a small subset of the total purchase amount.  But because surcharges were not consistently itemized in claimants' invoices or other purchase documents, Eqiq – consistent with the Plan of Allocation, Notice and Claim Forms – used the claim amount as a proxy to determine the amount of surcharges class members likely paid.  Thus, the amounts class members ultimately receive will be in proportion to the surcharges paid, and necessarily will be a significantly lower percentage of the total claim amount than the surcharge percentage itself.

All claimants were required to attest under penalty of perjury that, among other things, the information they submitted in support of their claim was true and correct.  In addition, third-

party filers (Claims' Aggregators) and companies filing on behalf of subsidiaries were required to demonstrate that they possessed authority to file on behalf of their claimed clients. Although claimants were not required to submit complete documentation or all the invoices supporting their claimed freight forwarding services purchases with their claim forms, the claim form instructed each claimant to save all relevant documents supporting their claim in case the claims administrator requested this information at a later date during its high-level review process. As discussed below, the claims administrator requested supporting documentation from certain higher value claimants as part of its review process.

### Deficiency Review and High-Level Review Process

Epiq received a total of 13,116 claims for Round 1. O'Connor Decl. at ¶ 11. Epiq received an additional 4,377 claim forms for Round 2. *Id.* at ¶ 12. Epiq further received an additional 1,430 claim forms for Round 3, resulting in 18,923 total claim forms considered. *Id.* at ¶ 13. A claimant who filed a claim in Round 1 did not need to file another claim to participate in subsequent rounds. Thus, any claimant who submitted a Claim Form in Round 1 was automatically considered for Rounds 2 and 3. Similarly any claimant who submitted a Claim in Round 2 was automatically considered for Round 3.

Epiq reviewed the claims and identified claims that were deficient because they failed to provide the required information. *Id.* at ¶ 17. Epiq then contacted claimants with identified deficiencies and provided them an opportunity to cure such deficiencies. *Id.* Epiq also included an NES surcharge letter to certain claimants with the deficiency mailing, to ensure all eligible claimants had an opportunity to receive a disbursement from the NES pot.[4] *Id.* at ¶ 9.

---

[4] Each claimant's share of NES damages was determined from the total amount of purchases from the UK to the US in Schedule B. *See* O'Connor Decl., Exhibit H (Plan of Allocation). The NES letter sought more detail on the routes of claimants' shipments listed on Schedule B.

Case 2:13-cv-00311-BMC-PK Document 131-25 Filed 01/25/19 Page 14 of 26 PageID #: 2902

The claims with remaining uncured deficiencies then were divided into "non-fatal deficiencies" and "fatal deficiencies." Non-fatal uncured deficiencies include claims with some: (1) missing dates; (2) missing origins or destinations; (3) dates outside the class period; (4) transactions with non-defendant freight forwarders; (5) missing freight forwarders; (6) Schedule B corrupt or unreadable; or (7) no Schedule B provided. *Id.*

Non-fatal deficiencies were not wholly unpayable, but instead resulted in various reductions to the value of the claim depending on the deficiencies. *Id.* at ¶ 18. Awards for claims with non-fatal deficiencies were calculated based only upon the payable portion of the claim. *Id.* Claimants with non-fatal uncured deficiencies were sent a letter explaining how their claims were valued based upon their uncured fatal deficiencies.

Claims with non-cured fatal deficiencies were denied and were sent a denial letter on September 28, 2018. *See id.* at ¶ 19. Uncured fatal deficiencies include claims in which: (1) all shipment dates claimed were outside the class period; (2) none of the freight forwarding services were purchased from Defendants; (3) no listed purchase amounts; (4) no valid currencies; (5) no purchase dates were listed, and therefore, it was impossible to determine whether the purchases occurred during the class period; (6) no origins or destinations for shipments were provided, making it impossible to determine whether they fit into the class definition; (7) inadequate proof of authority was provided;[5] (8) the claim form was unsigned;[6] or (9) the claim was identified as fraudulent or unreliable through Epiq's quality control processes described in more detail below. *Id.*

---

[5] As mentioned above, third-party filers that submitted claims on behalf of Class Members were required to demonstrate that they had actual authority to file on behalf of the Class Members.

[6] The claim form required claimants to sign and certify under penalty of perjury that, among other things, the information provided in the Claim Form was accurate and complete to the best of the claimant's knowledge and the claimant was a member of the Settlement Class and had not otherwise settled these claims or submitted duplicative claims.

In addition to the deficiency review, Epiq identified claimants with multiple claims or conflicting claims and reached out to those claimants to determine which claim form was the operative claim. *Id.* at ¶ 20. If claimants did not respond, consistent with the instructions provided in the conflicting claims letter, the last-filed claim form was considered the operative claim. Epiq also engaged in reliability review, and mailed thousands of letters requesting that claimants provide affidavits in support of their claims and, where necessary, provide additional documentation in support of their claims. *Id.* at ¶¶ 21-23.

Express shipments (aka small shipments or parcel post) were ineligible for distribution from settlement funds because these shipments were not impacted by Defendants' anticompetitive behavior. Epiq eliminated ineligible "express" shipments and notified claimants by mailing letters to claimants who utilized UPS or DHL (the two primary express service providers among the Defendants) seeking verification that their purchases, or at least a certain identifiable portion thereof, were for freight forwarding services and not express shipments. *Id.* at ¶¶ 24-25.

In addition, because there was a difference in question 2A (Security Surcharge) on the claim forms used in Rounds 1 and 2, Epiq mailed Round 2 and 3 claimants requesting certain additional information regarding question 2A where necessary in order to ensure claimants were treated the same whether they filed a claim form in Rounds 1 or 2. *Id.* at ¶ 26.

Epiq next engaged in an initial outreach and manual review of some of the larger claims for each surcharge pot. *Id.* at ¶¶ 27-28. Epiq identified the larger responses to each question on the claim form and reached out to each of those claimants. Based on this review, Epiq requested detailed underlying claims data and/or additional proof of the veracity of these claimed amounts. *Id.* Epiq also studied the claimant data to identify any claims whose response to one of the

questions on the claim form seemed disproportionate to the claimed freight forwarding purchases on the remainder of the claim form.

Following the initial large claim review and after Class Counsel initially moved for distribution of the settlement funds, Epiq and Class Counsel discovered what appeared to be material inaccuracies in several higher-value claims.[7]  As a result, Class Counsel withdrew their initial motion and directed Epiq to conduct a further detailed review of all claims with proposed awards over $150,000 and any claimants under that dollar threshold who were nonetheless projected to receive substantial increases to their proposed awards as a result of reductions of proposed awards to other higher-value claims ("Phase 1 High-Value").  O'Connor Decl. ¶ 30.

This additional Phase 1 High-Value review involved a detailed additional review of supporting claims data and, where necessary, additional requests for data, affidavits, or other information necessary to support the claimed amounts.  Epiq distributed Data Request Letters to the Higher-Value population asking for detailed purchase and shipping data in support of their claims, a description of extrapolation methodology if applicable, and an explanation of how the claim was derived. *Id.* at ¶ 31.  As a result of its review of supporting data and correspondence on record, and responses to Data Request Letters, Class Counsel and Epiq identified several common issues that had resulted in material inaccuracies for some claimants which required further follow-up. *Id.* at ¶ 32.  Epiq mailed letters requesting additional information about claimant data and explanations provided by certain claimants that Epiq determined was insufficient to support their claims ("Phase 1 Data Cure Letters").

Phase 1 Data Cure Letters were customized based on an individual analysis of each Higher-Value claim, but focused on one or more areas of concern: a) apparent duplication of data used to

---

[7] Class Counsel withdrew their 2017 motion for distribution as result.  ECF No. 1423.

support claims; b) outlier claim amounts—i.e., claims far exceeding the amounts claimed by other high value claimants; c) claim totals supported by non-Defendant purchases, or purchases outside the class period; d) incorrect use of units (cost, count of shipments, weight); e) internal inconsistencies in the claim; and f) inconsistencies or outliers as compared to all claims data. *Id.* In addition to written correspondence, outreach often included lengthy telephone calls with claimants and/or their representatives to assess the integrity of the data provided.

Of the 159 claims subject to the Phase 1 Higher-Value review, Epiq found 26 claims fully supported and accepted in whole, and 75 claims fully supported after material revisions by claimants. *Id.* at ¶ 33. Epiq received insufficient supporting data, explanation, or no response for 53 claims, resulting in reductions to one or more eligible claim total. Five claims were ultimately withdrawn by Phase 1 Higher-Value claimants or denied in whole. *Id.*

As a result of these claim reductions, the projected *pro rata* distribution to other claimants increased significantly, moving nearly 225 new claimants into the Higher-Value category ("Phase 2 High-Value"). *Id.* at ¶ 34; *See also* Status Report, ECF No. 1509, at 3. Preliminary reviews of the Phase 2 High-Value population identified certain inaccuracies similar to the Phase 1 High-Value population. In the interest of efficiency, and to ensure that all potentially "new high value" claims were captured in the Phase 2 High-Value review, Epiq reviewed all claimants whose pro rata distribution was anticipated to be $150,000 or above and all claimants whose pro rata distribution was anticipated to be below $150,000 but whose claim forms contained certain material inconsistencies that, based upon Epiq's review of other records, suggested that the form might contain inaccurate information. After careful consultation, Class Counsel and Epiq determined that, even if substantial revisions were made to Phase 2 High-Value claims, this level of review would capture all claimants slated to receive a substantial dollar award. In fairness to

all claimants, the Phase 2 High-Value population was subject to outreach and data analysis modeled after Phase 1 High-Value additional review. O'Connell Dec. ¶ 34. Class Counsel and Epiq determined that further High-Value outreach was unnecessary given the extensive high value outreach and as discussed below, the additional outreach made to lower value claims which were internally inconsistent.

After reviewing 221 claims during the Phase 2 High-Value reviews, Epiq found 19 claims fully supported and accepted in whole, and 69 claims fully supported after material revisions by claimants. Epiq received insufficient supporting data, explanation, or no response for 131 Phase 2 High-Value claims, resulting in reductions to those claims. Two claims were ultimately withdrawn by Round 2 High-Value claimants or denied in whole. *Id.* at ¶ 35.

The Phase 1 and Phase 2 High-Value reviews resulted in a significant reallocation of settlement funds, resulting in higher awards for most Authorized Claimants. Prior to the Phase 1 and Phase 2 High-Value reviews, 91.1% in total awards were allocated to High-Value claimants, and 8.9% total awards were allocated to all other claimants. *Id.* at ¶ 36. After the Phase 1 and Phase 2 High-Value reviews, 79.8% in total awards were allocated to High-Value claimants and 20.2% total awards allocated to all other claimants. Overall reductions and corrections to the Phase 1 and Phase 2 High-Value review populations resulted in substantial increases to *pro rata* percentages awarded to all other lower-value claimants. O'Connor Decl. ¶ 36. Although the High Value Review resulted in an unfortunate delay of payments, in our view, the delay was worth it because of the substantial increase in dollar payments to the majority of claimants and the overall improvement of fairness of the process. *Id.* at Exhibit V.

In parallel with high-value reviews, Epiq reached out to 275 claimants whose claims were internally inconsistent, but were not in the Phase 1 and Phase 2 High-Value review populations.

O'Connor Decl. ¶ 37. Claims were deemed inconsistent where responses to any question 1A through 3B were higher than the initial summary of all purchases in Schedule B. Because Schedule B requested all purchase totals for all settlements over the entire Class Period, one would expect the dollars claimed for all purchases to be higher than total claims under subsections 1A through 3B, which requested counts of shipments (questions 1A – 1C), weight of shipments (2A and 2B), and route-specific dollar amounts from China to the US (3A), and Hong Kong to the United States, (3B). Claimants were given an opportunity to cure or explain the inconsistency. For claimants who did not respond, a standard reduction was applied.

### Proposed Distribution of Settlement Fund

The Net Settlement Funds for Rounds 1, 2, and 3 total $341,623,566.56. *Id.*, Exhibit AA. In total, the Defendants have paid $470,809,480.67 in Gross Settlement Funds. The Gross Settlement Funds have been reduced by three primary expenses. First, certain settlement agreements authorized payments related to class notice and, pursuant to these provisions, $8,859,045.96 was paid for notice and claims administration. Second, the Court awarded attorney's fees and expenses in connection with all three rounds of settlements.[8] *See* ECF Nos. 984, 1330, 1396, 1397.

Finally, the Gross Settlement Funds were further reduced to account for certain bank fees and other administrative expenses. Additionally, when calculating the net settlement fund for distribution, Class Counsel held in reserve sufficient settlement funds to account for unpaid settlement claims administration expenses and other expenses related to the finalizing claims

---

[8] Pursuant to the Court's November 2016 order, Class Counsel was authorized to take additional attorney's fees from Round 1 and 2 settlement funds earned, but not yet received in the amount of a maximum future-looking award of $22,500,000.00, or 25% of the Future Available Settlement Fund up to a cap of $90,000,000.00 in future deposits, to be paid upon each such contribution to the Settlement Fund. Attorney's fees earned from the additional Round 1 and 2 settlement funds did not exceed the Court-ordered cap.

administration and distributing settlement funds pending Court approval of this motion.  Class Counsel will file a separate motion requesting Court approval for expenses related to the claims administration process.  Any settlement funds reserved in excess of claims administration expenses or amounts withheld for appeals over objections will be distributed to the claimants together with uncashed checks and any amounts reserved for any appeals in a subsequent final distribution.

After a thorough review and an extensive administration process, Epiq has submitted *pro rata* award calculations to Class Counsel for approval.  O'Connor Decl. at ¶ 39, Exhibit X.  Based on Class Counsel and Epiq's analysis, processing and auditing procedures, Class Counsel recommends issuing payments to 10,857 Authorized Claimants who filed complete claim forms for Rounds 1, 2, and 3.  *Id.*  Class Counsel recommends issuing partial payment to 1,571 incomplete claims from Rounds 1, 2, and 3.  *Id.* at ¶ 40.  Class Counsel recommends denying 2,749 claims in their entirety.[9]  *Id.* at ¶¶ 42-43.  Class Counsel also recommends allowing late Claims for Round 1 filed on or before September 24, 2015, late Claims for Round 2 filed on or before May 31, 2016, and late claims for Round 3 filed on or before December 15, 2017.  *Id.* at ¶ 11-13.  *See In re Oxford Health Plans, Inc.*, 383 F. App'x 43, 45 (2d Cir. 2010) ("A district court overseeing a settlement distribution has inherent power to accept late claims...") (quoting *In re Agent Orange Prod. Liab. Litig.,* 821 F.2d 139, 145 (2d Cir. 1987).  There will be little prejudice and no disruption by allowing these late-submitted claims.  *See id.*

The distribution will be made pursuant to the chart attached as Exhibit X to the O'Connor Declaration, which includes Epiq's calculated *pro rata* distribution to each claimant.  The chart

---

[9] 1,117 claims were withdrawn.  *Id.* at ¶ 42.

lists the per surcharge settlement pot claim award as determined by the Plan of Allocation as

modified, identifying claimants by numbers as opposed to names for purposes of confidentiality.

After the Court approves the distribution, Epiq will mail distribution checks to

Authorized Claimants. *Id.* at ¶ 48. Authorized Claimants will have 90 days to cash the checks

before the checks will be voided. *Id.* at ¶ 49. Any unclaimed funds (along with unused

settlement administration funds and holdback funds) will be distributed to qualifying claimants

in a subsequent distribution, so long as a distribution is economically feasible.[10]

### Process for Claimants to Object to a Denial or to the Award Amount

On September 28, 2018, all claimants were mailed determination letters informing them

of the status of their claim and the amount of their eligible claim amounts for each claim

question. *Id.* at ¶ 44. Claimants were given 30 days to raise objections with Epiq about their

determination. *Id.* The letter also advised all claimants that they could object to Class Counsel's

recommendation to this Court, but only after they gave Epiq the opportunity to resolve their

objection, and that failure to first object to Epiq would constitute a waiver of any claimants' right

to object to the Court.

Out of 15,205 determinations mailed, Epiq received 147 objections to its initial claim

determinations. *Id.* Epiq and Class Counsel worked diligently to address the concerns of all

claimants, and where possible, resolve the objection. *Id.* Of the 147 objections, Epiq was able to

resolve 105 objections in agreement with the objecting claimant. Epiq denied 42 objections in

whole or in part.

---

[10] In the event that Class Counsel determines that any future distribution to Authorized Claimants would not be
economically feasible, Class Counsel will raise the matter with the Court and post appropriate notice on this claims
administration website.

Class now respectfully request that the Court approve the following process for further objections. For Claimants that filed objections with Epiq and who wish to object to this Court, Class Counsel suggests that those Claimants must file with the Court and serve Class Counsel with any objections by March 1, 2019 or whatever date is ordered by the Court. *See* Proposed Order to Set a Briefing Schedule for Objections to Claim Determinations (filed contemporaneously). Class Counsel will have 14 days after this deadline to respond to any objections. Class Counsel will notify the objectors by mail of this process and also post on the claims administration website a copy of this motion for distribution, the Court's order and the instructions for filing an objection.

Class Counsel proposes not to calculate current reserve funds for objections. Instead, Class Counsel proposes (if it is acceptable to the Court) to wait until all objections are resolved, either by agreement (with appropriate disclosure to the Court and website notice to the Class) or by the Court. If the Court should sustain any objections, the award amounts listed in Exhibit X may be reduced in order to pay revised award amounts by successful objectors. Should any objectors appeal this Court's determination, Class Counsel will request that the Court set aside a sufficient reserve amount to assure that the claim be paid if the party is successful on appeal of the objection.

The creation of a reserve fund based on any appeals filed with the Second Circuit will allow timely distribution of the bulk of the Net Settlement Funds to Authorized Claimants thirty-days (the time period for appeal) after this Court grants Class Counsel's motion for distribution, regardless of how any objections ultimately are resolved. By basing the reserve amount on objections actually filed and appealed, Plaintiffs proposed reserve fund strikes an equitable

balance between preserving the rights of claimants who object and the rights of Authorized Claimants who are entitled to timely receipt of their awards.

If the Court grants the motion for distribution, then following the expiration of the period to appeal the Court's order, Epiq will finalize the *pro rata* distribution amounts for all claimants found eligible by the Court, including adjustments necessary due to sustained objections. Epiq will then print and mail distribution checks to claimants with claims eligible for award calculation. Epiq will also process undelivered checks and continue to assist claimants.

### The Plan of Allocation Should be Amended to Include a Minimum $100 Award for All Authorized Claimants

Class Counsel, after consulting with Epiq, recommends all Authorized Claimants whose *pro rata* distribution would be $100 or less receive a minimum $100 award. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 1:06-md-1775, ECF No. 1668-1, at 6 (E.D.N.Y. April 16, 2012) (including a $5 per round minimum provision).

Courts in the Second Circuit have approved both altered and supplemental plans of allocation. A court may change a plan of allocation of a settlement fund up until the point the fund is actually distributed. *See Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir 1972) (holding that "[u]ntil the fund created by the settlement is actually distributed, the court retains its traditional equity powers."); *see also In Re "Agent Orange"*, 689 F.Supp. at 1261-63 (allowing for late claims and permitting opt-outs to opt back in which had the effect of diluting the claims of other Class members); *In re Platinum and Palladium Commodities Litig.*, 10 Civ. 3617 (WHP), 2014 WL 3500655, at *3 (S.D.N.Y. July 15, 2014) (involving plan of allocation that was "subject to revision by this court"); *In re Amaranth Natural Gas Commodities Litig.*, 07 Civ. 6377 (SAS), ECF No. 413 ¶ 6 (S.D.N.Y. May 23, 2012) (modifying final judgment to reflect plan of allocation); *In re Worldcom, Inc. Sec. Litig.*, 02 CIV. 3288 (DLC), 2005 WL 3577135, at

*1 (S.D.N.Y. Dec. 30, 2005) (supplemental plan of allocation approved over objections that

certain class members would then not share in settlement proceeds).

Class Counsel's initial investigation suggested that large corporations made up the

greatest number of customers who utilized freight forwarders and were the Class Members that

suffered the greatest impact.  In addition, Defendants in certain settlements required the

settlement funds to be allocated to certain routes in which they primarily participated.  For

example, the Japanese Defendants required 90% of their settlement funds to be allocated to

Japan-to-United States shippers, leaving only 10% to be allocated to the Worldwide Freight

Forwarding Services pot.  *E.g.,* Nishi-Nippon Settlement Agreement, ECF 590-2, at 23-24.  In

fact, once claims were submitted, thousands of class members elected to participate in the

settlement, ranging from individuals with small purchases to multinational corporations with

multi-billion dollar claims.  Many of these smaller claimants' freight forwarding purchases only

qualified for payment from the Worldwide Freight Forwarding Services pot, which accounted for

only 10% of the total settlement funds.

After Epiq made its final *pro rata* calculations, Class Counsel learned that thousands of

Authorized Claimants would receive an amount so small (in hundreds of cases less than one

dollar) that it would not be economical to process their award and issue them a check.  Class

Counsel originally recommended a minimum award of $25.  ECF No. 1402.  Due to the delay

caused by the material inaccuracies of certain large claimants, the payment of small claim

awards was delayed. Because of the time and expense Authorized Claimants expended

participating in the claims process and the delay caused by large award claimants, Class Counsel

believes all Authorized Claimants should receive an increased minimum award of $100.

Changing the Plan of Allocation to provide a $100 minimum to 6,723 Authorized Claimants will

cost the Net Settlement Fund approximately $672,300, a very tiny *de minimis* fraction (0.19%) of

the total Round 1, 2, and 3 Net Settlement Fund distribution of $ $341,623,566.56.[11]  *See*

O'Connor Decl. ¶ 41, Exhibit AA.

Accordingly, Class Counsel requests that the Court approve this amendment to the Plan

of Allocation to include a $100 minimum provision.  *See* Declaration of Daniel C. Hedlund,

dated January 28, 2019 ("Hedlund Decl."), Exhibit 1 (a proposed Amended Plan of Allocation

with a redlined change to add in this minimum award).  Concurrent with the filing of this motion,

Epiq posted this motion and a summary of Class Counsel's request that the Plan of Allocation be

amended to allow for a minimum payment of $100 for all qualifying claimants on the claims

administration website.  Epiq has also posted on the website Class Counsel's request to issue a

$100 minimum award to certain Authorized Claimants.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court authorize

distribution of the Net Settlement Fund as described above, amend the Plan of Allocation to

Include a $100 minimum payment, authorize distribution of funds to late-filed claims and set a

briefing schedule for objections to claim determinations.


Dated: January 28, 2019                                    Respectfully Submitted,

                                                           /s/*Daniel C. Hedlund*
                                                           Daniel E. Gustafson
                                                           Daniel C. Hedlund
                                                           Michelle J. Looby

---

[11] Class Counsel recommends that any Authorized Claimant who receives a $100 minimum payment should not
receive any future payment from any additional Round 1, Round 2, or Round 3 disbursements, unless the total *pro
rata* award calculation from this disbursement and the future disbursements amounted to over $100.  If the total *pro
rata* calculations from all disbursements is over $100, then those Authorized Claimants would receive their actual
*pro rata* award, minus the $100 award unless the administrative expense of issuing such a payment exceeds the
actual award.

Joshua J. Rissman
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        mlooby@gustafsongluek.com
        jrissman@gustafsongluek.com

Adam J. Zapala
COTCHETT, PITRE & McCARTHY, LLP.
San Francisco Airport Office Center
840 Malcolm Road, Ste. 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: azapala@cpmlegal.com

W. Joseph Bruckner
Heidi M. Silton
Anna M. Horning Nygren
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
1000 Washington Avenue South, Suite 2200
Minneapolis MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: wjbruckner@locklaw.com
        hmsilton@locklaw.com
        amhorningnygren@locklaw.com

Christopher Lovell
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
E-mail:clovell@lshllp.com
        bjaccarino@lshllp.com

*Counsel for Plaintiffs and Interim Class*