# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
|---|---|
| THIS DOCUMENT RELATES TO:<br><br>ALL END-PAYOR ACTIONS | Hon. Sean F. Cox<br>Mag. Judge R. Steven Whalen |

**DECLARATION OF JEFFREY N. LEIBELL IN FURTHER SUPPORT OF FINANCIAL RECOVERY SERVICES, LLC'S EMERGENCY MOTION TO COMPEL ACCEPTANCE AND PROCESSING OF VEHICLE DATA**

I, Jeffrey N. Leibell, declare:

1.      I am Chief Legal and Financial Officer of Financial Recovery Services, LLC d/b/a Financial Recovery Strategies ("FRS"). I previously submitted two declarations in support of FRS's motion to intervene in this litigation (the "Intervention Motion"),[1] and a declaration in support of FRS's Emergency Motion to Compel Acceptance and Processing of Vehicle Data (the "Data Motion").[2] I

---

[1] Unless otherwise specified, all references herein to docket entries are to the docket in 12-md-02311. *See* Declaration of Jeffrey N. Leibell (June 18, 2020), PageID.37726, ECF No. 2060-2 ("Leibell Intervention Mot. Decl."); Reply Declaration of Jeffrey N. Leibell (July 9, 2020), PageID.38083, ECF No. 2073-1. All terms with initial capitalization that are not defined in this declaration have the same meanings as those set forth in the Memorandum of Law in Support of Financial Recovery Services, LLC's Motion to Intervene (PageID.37697, ECF No. 2060).

[2] Declaration of Jeffrey N. Leibell Supp. of FRS's Emergency Mot. to Compel (Feb. 17, 2021), PageID.38335, ECF No. 2114-2 ("Leibell Data Mot. Decl.").

submit this declaration in further support of FRS's Data Motion and, more specifically, in response to the Declaration of Brian A. Pinkerton in support of Class Counsel's Opposition to FRS's Data Motion (the "Pinkerton Declaration") and the Declaration of Chanler Langham in Support of Class Counsel's Opposition to FRS's Data Motion (the "Langham Declaration").[3] This declaration is based on my personal knowledge and, as described in the declaration that I submitted in support of FRS's Emergency Motion, the expertise that I gained in my two-and-a-half decades of experience in class action settlements and their distributions.[4]

## PLACEHOLDER CLAIMS

2.      As FRS's Chief Legal Officer, as class counsel while at Bernstein Litowitz Berger & Grossmann, LLP, and as Vice President of Class Action Services at the Garden City Group, Inc. ("GCG") (Mr. Pinkerton's employer and the predecessor to Epiq Class Action & Claims Solutions ("Epiq")), I personally worked on, or have direct personal knowledge of, hundreds of class action settlements and their administrations. Other than in connection with the administration of a very few settlements in which, unlike in this MDL, putative class members were explicitly advised in the court-approved notices and proofs of claim that all proof of claim data

---

[3] Declaration of Brian A. Pinkerton in Supp. of Pls.' Opp. to FRS's Mot. to Compel (Mar. 3, 2021), PageID.38479, ECF No. 2120-1 ("Pinkerton Decl."); Declaration of Chanler Langham in Supp. of Pls.' Opp. to FRS's Mot. to Compel (Mar. 3, 2021), PageID.38503, ECF No. 2120-2 ("Langham Decl.").

[4] Leibell Data Mot. Decl. ¶¶ 2-6, PageID.38336-38339.

must be submitted by the claims filing deadline,[5] I know of no administration of a class action settlement that did not treat timely filed placeholder claims the same as timely filed claims that included partially incomplete data. Whether the claim form was blank or partially incomplete, the claimant, as part of the claims administrator's regular and customary deficiency process, was sent a notice that advised that, to the extent that missing data was not submitted by a deadline set forth in that notice, the claim would be rejected.

3.     The reasoning for the identical treatment of the two types of claim forms is practical: neither claim may be approved if data required for conducting calculations and determining eligibility is missing. That is, there is no difference, from the claim administrator's perspective, between a timely filed partially incomplete claim and a timely filed blank one. Once the deadline for data submission lapses, only claim forms that are properly documented are considered.

4.     Mr. Pinkerton, whose experience is the sole support for Class Counsel's assertions about placeholder claims, states that he has never personally worked on a class action in which placeholder claims were permitted.[6] But Mr. Pinkerton did not

---

[5] *See, e.g.*, Leibell Data Mot. Decl. ¶ 21 n.28, PageID.38352 (description of the Illinois Attorney General's *parens patriae* action on behalf of purchasers of cathode ray tubes).

[6] Pinkerton Decl. ¶ 47, PageID.38495. Notably, Mr. Pinkerton does not state whether the issue of placeholder claims was actually presented in any of the settlements that he managed, nor does he state that blank claims and partially incomplete claims were treated differently. Also, while Class Counsel base their argument on Mr. Pinkerton's "long career," the Pinkerton Declaration does not describe the length of his career beyond stating that he has "managed dozens of class action settlement administrations" and has "served as the Project Manager on this matter since

provide information concerning the number of settlements administered either by his employer, Epiq, or by its predecessor, GCG, in which timely placeholder claims were treated differently than timely partially incomplete claims. That is a glaring omission of information peculiarly within Class Counsel's control, because, as Mr. Pinkerton acknowledges, "Epiq has administered more than 4,500 settlements," while he has managed personally only a few dozen.[7] That omission also is not surprising because it is commonplace for both Epiq and GCG, as well as other claims administrators, to treat placeholder claims the same as partially incomplete claims. Attached as an **Appendix** hereto is a partial list of settlements in which FRS received deficiency notices in connection with blank claim forms that FRS timely submitted on behalf of its clients; Epiq and GCG administered 14 of those 48 settlements, and Class Counsel here were class counsel in 7 of them. And while Class Counsel purport to quote the Pinkerton Declaration as saying that "placeholder claims are 'not routinely allowed in the claims administration process,'"[8] that statement does not appear in the declaration Mr. Pinkerton signed. Given the information identified in

---

October 2015." Pinkerton Decl. ¶ 2, PageID.38480; *see* End-Payor Pls.' Mem. in Opp. to FRS's Mot. to Compel (Mar. 3, 2021), PageID.38443, ECF No. 2120 ("EPPs' Mem.").

[7] Pinkerton Decl. ¶¶ 2-3, PageID.38479-38480.

[8] EPPs' Mem. at 24, PageID.38471 (purporting to quote Pinkerton Decl. ¶ 47, PageID.38495).

the Appendix, the omission of that statement from his sworn declaration is understandable.

5.      Class Counsel do not explain why, when their duty is to include in the recovery as many class members as possible to the maximum amount possible, they would prevent any class member from adding vehicles to their timely filed claims.[9] Class Counsel's position here is contrary to the position they took earlier when they sought the Court's approval to modify the Plan of Allocation to "distribute a minimum payment amount of $100 per claimant to encourage the submission of claims and more broadly distribute the benefits of the settlements,"[10] and expand the class definitions "to allow Settlement Class members who purchased or leased a new Vehicle or purchased a replacement Automotive Part in a damages state to be entitled to share in the Net Settlement Funds,"[11] which they said would "broaden[]

---

[9] *See, e.g., Rubio-Delgado v. Aerotek, Inc.*, 2015 WL 3623627, at *7 (N.D. Cal. June 10, 2015) ("[T]he goal [of a class action settlement] should be to distribute settlement payments to as many class members as possible."); *Park v. The Thomson Corp.*, 2008 WL 4684232, at *5 (S.D.N.Y. Oct. 22, 2008) ("Because the Amended Settlement enables as many Class Members as possible to receive a fair share of the settlement amount, the allocation plan is approved, and final approval is granted to the Amended Settlement."); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 126 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010) (same).

[10] End-Payor Pls.' Unopposed Mot. for Order Approving Proposed Further Revised Plan of Allocation at 3, No. 2:15-cv-03303, PageID.7054 (E.D. Mich. Dec. 10, 2019), ECF No. 136.

[11] *Id.* at 4-5, PageID.7055-7056.

eligibility, enabling more Settlement Class members to share in the settlement funds."[12]

6.     Mr. Pinkerton (and Class Counsel) also point to the word "valid" in the Plan of Allocation to argue that timely filed placeholder claims are not permitted.[13] That position, however, proves too much. It would mean that *any* claim form that is not complete by the claim-filing deadline—not just a placeholder claim—would not be "valid," and, therefore, the deficiency process would not be necessary. In other words, under Mr. Pinkerton's and Class Counsel's contrived interpretation of the Plan of Allocation, only claim forms containing all requested information filed by the claim-filing deadline would be accepted. That would conflict with relevant legal precedent,[14] and Class Counsel's stated approach for the deficiency process in this MDL, which is to permit claimants to cure deficient claims.[15] Whether or not a timely filed claim form, including any timely filed placeholder claim, is "valid"

---

[12] *Id.* at 8, PageID.7059 (citing Fairness Hr'g Tr. at 8:25-10:6 (Aug. 1, 2018), ECF No. 1937, PageID.36042-36044 (noting among other things that the low number of claims filed as of last summer "just didn't ring well with me")).

[13] *See* Pinkerton Decl. ¶ 14, PageID.38484; EPPs' Mem. at 21, PageID.38468.

[14] *See*, *e.g.*, Leibell Data Mot. Decl. ¶ 20 n.26, PageID.38351.

[15] *See* Langham Decl. ¶ 17, PageID.38509 ("Claimants who have previously submitted vehicle data and have some deficiency in the information or documentation that was submitted for those claims, *may submit additional information to correct the deficiency*.") (emphasis added); EPPs' 2d Am. Unopp. Mot. Auth. Disem. July 2019 Notice to EPP Settlment. Class at 11, No. 2:15-cv-03303, PageID.6422 ("The Claim Form, meanwhile, has minor changes for ease of use and *to allow claims to be filed with incomplete information, with the administrator to follow up on incomplete claims as necessary*.") (emphasis added), ECF No. 126.

should depend on whether the claim form is complete at the conclusion of the deficiency process.

## PLACEHOLDER CLAIM DATA

7.      Mr. Pinkerton (and Class Counsel) also each cast aspersions on the data included in the placeholder claims that FRS submitted.[16] Mr. Pinkerton states that he does not have any experience managing placeholder claims, but as anyone who *has* been involved with placeholder claims will attest, the entire point of a placeholder claim is to preserve the timeliness of the claim and to provide the claims administrator with timely notice that the claimant is making a claim and intends to submit additional information in support of that claim.[17] The data, if any, included in a placeholder claim at the time that it is filed is just that—a stand-in for information to be provided later. No one, not the claimant nor the claims administrator, expects any determinations to be made on the basis of that data. If the claim is not timely updated with appropriate data, it either will be withdrawn or rejected. Class Counsel's and Mr. Pinkerton's protestations are about the validity of data that never purported to be the basis for recovery and was simply standing in temporarily for data to be provided later.

---

[16] *See* Pinkerton Decl. ¶¶ 30-37, 42, 46, PageID.38489-38492, 38494-38495; EPPs' Mem. at 16-20, PageID.38463-38467.

[17] *See, e.g.*, Leibell Data Mot. Decl. ¶ 17, PageID.38348-38349 (citing *In re Electrical Carbon Prods. Antitrust Litig.*, 622 F. Supp. 2d 144, 165 (D.N.J. 2007)).

8.      Class Counsel also misrepresent the impact of allowing placeholder claims. The opportunity to cure deficiencies, whether for a timely incomplete claim or for a timely blank one, ends on the date set forth in the deficiency notices that every claims administrator sends to affected claimants. Placeholder claims thus do not cause an administration to go on "in perpetuity" or "delay claim payments indefinitely."[18] That red herring is no more accurate than stating that conducting a deficiency process for partially incomplete claims would extend the administration indefinitely. Notably, the Pinkerton Declaration does not include this assertion.

## INSURER SUPPLEMENTAL VEHICLE DATA

9.      FRS has consistently advised Class Counsel, Epiq, and the Court that the task of identifying, collecting and marshalling the data necessary to complete Insurers' claim forms would require a huge expenditure of time and money both for Insurers, which would need to do it, and for Epiq, which would need to process it, and, therefore, that the task should not be undertaken until the Court rules on whether the Insurers are subrogated to their insureds' claims.[19] The burden associated with

---

[18] EPPs' Mem. at 21, PageID.38468. Class Counsel use the contrived term "registration claimant" even though this settlement does not involve "registration," and they use their own definition intentionally to refer to placeholder claims as "late."

[19] *See, e.g.*, Leibell Intervention Mot. Decl. ¶¶ 6, 10, PageID.37727-37728, 37729; Ex. A to Leibell Intervention Mot. Decl. at 2 (June 18, 2020), PageID.37735, ECF No. 2060-3; Ex. C to Leibell Intervention Mot. Decl. at 1 (June 18, 2020), PageID.37777, ECF No. 2060-5; Ex. E to Leibell Intervention Mot. Decl. at 1 (June 18, 2020), PageID.37818, ECF No. 2060-7; Leibell Data Mot. Decl. ¶ 17, PageID.38348-38349.

Case 2:12-md-02311-SFC-RSW   ECF No. 2126-2, PageID.39121   Filed 03/10/21   Page 10 of 28

this vehicle data has two primary sources. The first is the sheer volume of vehicles that each Insurer indemnified during the relevant 23-year period. FRS and the Insurers must sift through that data to determine which indemnified vehicles are eligible for recovery in the End-Payor Settlements. The second reason, as described immediately below, is that auto insurers do not maintain or retain, in the ordinary course of business, records designed easily to identify all of the information requested by the claim form. Accordingly, FRS and the Insurers must supplement the Insurers' business records with commercially available data.

10.    Although an insurance company's claims department is likely to maintain records of the vehicles deemed a total loss for which indemnity payments were made, that department likely would not also maintain records of where the purchaser/lessee of that vehicle resided at the time that the vehicle was purchased or leased, nor would the claims department usually maintain records of whether that vehicle was purchased or leased or whether it was new or used at the time it was totaled. Such information would be maintained by an insurance company, if at all, in its underwriting department. To the extent that an insurance company does not now have each of those data points reasonably obtainable within its own records— not all of that information is relevant to the business of insuring automobiles—they will need to obtain it from their salvage vendors (each, a "Salvage Vendor"), which track the vehicles that they handle that were deemed a total loss. And if their Salvage

Vendors do not have one or more of the data points, such as whether the vehicle was new or used or where the purchaser resided at the time of purchase or lease, an alternative source is needed for that missing information. And all of this data gathering is made more complex by business combinations that each Insurer may have completed during the 23-year relevant period, as well as by changes that, during that timeframe, an Insurer made to its information technology and data storage platforms.

11.    As a result, FRS, in consultation with Insurers, identified and vetted economic consultants that are well-versed in the automobile industry, and retained one to assist in the following tasks: (a) identifying which data are available from the Insurers' claim and underwriting departments and from their Salvage Vendors; (b) compiling, combining, and analyzing the data provided from those various internal and external databases; (c) identifying which data was missing and locating alternative sources for the data for each Insurer; (d) vetting those alternative sources based on the information they maintain, and determining how easily and quickly that information may be obtained and the cost of doing so; (e) selecting, based on the foregoing criteria, the best alternative data source; and (f) coordinating with the alternative source to obtain the data and then combine it with the data already provided by each Insurer and its Salvage Vendors. Competently assembling

Insurers' data for submission is thus a time-consuming, expensive, and cumbersome undertaking that requires the coordinated participation of a variety of personnel.

12.     Although neither FRS nor Insurers have tracked the time that has been expended to date or have estimated the time likely needed to complete the task, a good faith estimate would place the total number of person-hours in the several hundred. And FRS estimates that the out-of-pocket cost of the economic consultant and the alternative data sources may exceed $525,000. While that expense and the amount of time spent are entirely justified to obtain a recovery based on recognized rights of subrogation, it is quite another matter to incur those costs without any confirmation of those rights.

## FRS'S SOLICITATIONS

13.     Mr. Langham's assertions concerning FRS's solicitations are incomplete and misleading.[20] He ignores the responsive letter that FRS's counsel, Matthew Huppert, sent to Class Counsel (with a copy to Mr. Langham) on January 19, 2021.[21] In that letter (at 2-3), FRS's counsel corrected the many misstatements Class Counsel had made in support of their accusations. Mr. Huppert, quoting the relevant documents, (1) rebutted Class Counsel's accusations by explaining that the solicitations disseminated by an FRS independent contractor and

---

[20] *See* Langham Decl. ¶¶ 17-18, PageID.38509.

[21] A true and correct photocopy of that letter is attached hereto as **Exhibit J**.

the information included on FRS's website were neither misleading nor contrary to any statements from the Court, from Class Counsel, or from Epiq, and (2) informed Class Counsel that neither they nor Epiq has the authority to deny any claims because the Court alone has that authority.

14.     After advising Class Counsel that they had no basis for the threats contained in their letter, Mr. Huppert advised (at 3) that FRS, as a gesture of good faith to put the matter to rest, would:

> (1) instruct the independent contractor who sent the Solicitation not to disseminate the Solicitation further, (2) remove from its website the "Class Action Summary" for the End-Payor Actions, and (3) send a further communication to recipients of the Solicitation that reiterates that (a) the deadline for submitting claim forms has passed, and (b) payment for claim forms filed after the deadline are subject to the court's approval.

FRS refused to take any of the many other actions demanded by Class Counsel. Class Counsel never responded or took any further action, including carrying out their threat to seek injunctive relief from this Court.[22]

## EPIQ'S PURPORTED CONCERNS

### General Observations

15.     The gravamen of much of the Pinkerton Declaration is that processing the claims of Insurers to recover from the End-Payor Settlements would be too administratively complicated for Epiq and result in less of the settlement funds being

---

[22] Ex. C to Langham Decl. at 3, PageID.38523.

distributed to other members of the End-Payor Settlement classes.[23] Although the long list of purported complications he claims will accompany the inclusion of Insurers' claims takes up seven pages of his declaration, Mr. Pinkerton fails to provide any rational explanation for why those hypothesized complications will, in fact, materialize. In my experience, processing the claims of Insurers would not, as Mr. Pinkerton claims, "substantially delay and prejudice the claims administration process."[24]

16.    Even if processing Insurers' claims would require additional work by Epiq, the same could be said about any group of eligible claimants. While Mr. Pinkerton acknowledges that "Epiq is responsible for," *inter alia*, "ensur[ing] the fair treatment of class members and all parties in interest,"[25] which includes all eligible claimants, he and Class Counsel ignore that those responsibilities are not discretionary—they do not get to pick and choose which class members they treat fairly and which they do not.

17.    At the outset, Mr. Pinkerton does not claim that Epiq has completed any steps in the claims-administration process. Two of the duties of the claims administrator that Mr. Pinkerton lists are "analyzing whether claims are deficient or

---

[23] *See*, *e.g.*, Pinkerton Decl. ¶¶ 48-60, PageID.38495-38501.

[24] *Id.* ¶ 49, PageID.38495-38496.

[25] *Id.* ¶ 7, PageID.38482.

compliant" and "sending and handling notices of deficiency."[26] In my experience, identifying and providing notice of deficiencies in proofs of claim is designed to provide claimants an opportunity to cure deficiencies so that correctable errors in, or omissions from, their claim forms do not deprive them of their right to recover. Class Counsel has confirmed that this is the process that Epiq will follow.[27] This notice-and-cure process, which can take several months to complete, typically takes place early on in the claims-administration process because a claims administrator must first ascertain the universe of valid claims before it may complete the remainder of its tasks, such as calculating claim amounts and *pro rata* shares.

18.    Epiq has not yet provided FRS or any of the Insurers notice of any deficiency in their proofs of claim, FRS is not aware of any other claimants that have received such notices, and Mr. Pinkerton does not claim that Epiq has sent any such notices. This suggests to me, based on my experience, that Epiq's claims-administration process for the End-Payor Settlements remains at an early stage. If Epiq has not yet sent deficiency notices, it is nowhere close to completing the other steps in the claims-administration process, including calculating claim amounts, determining *pro rata* shares, making recommendations for payment, or distributing

---

[26] *Id.* ¶ 9, PageID.38482-38483.

[27] Langham Decl. ¶ 17, PageID.38509 ("Claimants who have previously submitted vehicle data and have some deficiency in the information or documentation that was submitted for those claims, may submit additional information to correct the deficiency.").

settlement funds. The Insurers' vehicle information could be processed alongside all of the other vehicle information that will be submitted in connection with the notice-and-cure process. Accordingly, there is no basis for Mr. Pinkerton's assertion that processing Insurers' vehicle data would cause any delay in the distribution of settlement funds.

19.    Mr. Pinkerton also ignores that, prior to any distribution being conducted, Insurers have the right to bring to this Court their objections to Epiq's rejection or diminution of their claims.[28] In fact, that is exactly the process that Class Counsel suggested to FRS for resolving the subrogation issue that is now pending before the Court.[29] That appeal process would take many months, at a minimum, to conclude. First, Epiq would need to formally reject Insurers' claims and make a recommendation to the Court to deny recovery to them. That submission alone is not likely to occur for several months. Second, FRS, other subrogees and other claimants who object to the adverse treatment of their claims would need to file with the Court objections to Epiq's recommendations, and Epiq and Class Counsel would need to

---

[28] *See* Reply Mem. of Law in Supp. of FRS's Mot. to Intervene at 7 (July 9, 2020), PageID.38079, ECF No. 2073 ("If the Court denies intervention now, Insurers will continue to pursue subrogation claims for Total Loss Vehicles, the Claims Administrator will disallow those claims under a cloud of uncertainty, and the Court will still need to decide the subrogation issue many months from now. That delay, not FRS's intervention, would prejudice class members.") (footnotes omitted).

[29] *See* Leibell Intervention Mot. Decl. ¶ 6, PageID.37727-37728.

file their responses. Third, the Court would need to rule on those objections, which ruling would be subject to appeal to the Sixth Circuit.

20.     Mr. Pinkerton also claims that "any proof of claim information submitted now would be several months late and properly treated as untimely."[30] Even if true, that statement is not a basis to reject or refuse to process such information, given Mr. Pinkerton's and Class Counsel's acknowledgements that Epiq plans to conduct a notice-and-cure process for deficient claim forms.[31] That process will necessarily involve Epiq accepting and processing "late" vehicle information, and Mr. Pinkerton gives no reason for accepting and processing some "late" vehicle information as timely, but refusing to process other "late" vehicle information as "untimely."

21.     Mr. Pinkerton also offers legal argument concerning the effects of subrogation on class participation, though he does not appear to assert that claims from subrogees should be treated any differently, as a matter of timeliness, than claims from non-subrogees.[32] The question of whether Insurers are subrogated to the claims of class members is a legal issue, and FRS's position—that Insurers are indeed subrogated to certain claims—is set forth in the pleadings before the Court.

---

[30] Pinkerton Decl. ¶ 29, PageID.38489.

[31] *See id.* ¶ 9, PageID.38482-38483; Langham Decl. ¶ 17, PageID.38509.

[32] *See* Pinkerton Decl. ¶¶ 15, 18-20, PageID.38484, 38485-38486.

Although that question remains pending, Insurers' vehicle information nevertheless should be processed the same as that of all other claimants.

## Mr. Pinkerton's Specific Claims of Delay and Complication

22.     None of the specific concerns expressed by Mr. Pinkerton are valid. They appear to have been concocted specifically to prejudice the Insurers' interests and for no other purpose.

a.   **Timing of Data Submissions**.[33] FRS will submit all vehicle data within 90 days. Absent a showing of good cause, any placeholder claim that remains incomplete by that time will be withdrawn. This date certain for the submission of additional information alleviates any concern about an open-ended process for supplementing Insurers' timely filed claim forms.

b.   **Additional Proof for Subrogees**.[34] Within the time frame discussed above, FRS will provide for each vehicle included in each Insurer's proof of claim precisely the information set forth on the Court-approved proof of claim: the year, make, model, VIN, residence or principal place of business of the purchaser/lessee at the time of purchase/lease, date of purchase or lease, and whether it was purchased or leased. As set forth below, there is no rational basis for the other information that Mr. Pinkerton asserts Epiq needs.

i.    Should Epiq determine that a VIN submitted by an Insurer also was claimed by another class member, that Insurer will withdraw its claim for that Total Loss Vehicle. FRS said as much in its December 13, 2019 letter to the Court.[35] There is thus no need for Insurers to provide the identity and name of the purchaser, or for Epiq to contact class members regarding Insurers' claims.

---

[33] *See*, *e.g.*, *id.* ¶¶ 49, 51-52, PageID.38495-38496, 38497.

[34] *See id.* ¶ 50, PageID.38496-38497.

[35] *See* Ex. A to Leibell Intervention Mot. Decl. at 3 n.8, PageID.37736.

ii.    Mr. Pinkerton fails to explain the need for Insurers to provide the time at which the purchase occurred.

iii.    There is no need for Insurers to provide for each Total Loss Vehicle the existence of an insurance policy, including its contractual subrogation provision. Each Insurer's possession of the VIN for each vehicle is *prima facie* proof that the Insurer insured the vehicle. Additionally, each Salvage Vendor and the commercial vendor with which FRS contracted to provide and confirm Insurers' data (the "Commercial Vendor") has reported each vehicle as a total loss. And because FRS is asserting that Insurers are entitled to recover under the *equitable* subrogation doctrine, rather than under *contractual* subrogation, the existence of a contractual subrogation provision is irrelevant.

iv.    Nowhere in the proof of claim is any claimant required to prove that a vehicle claimed was new at the time that it was purchased or leased. Instead, all that is required of any other claimant is the checking of a box on that form that asks, "Are you making a new claim for the purchase or lease of a new vehicle?" Insurers will represent that all vehicles included in their supplemental information were new when purchased or leased. Further, the Commercial Vendor has identified whether the Total Loss Vehicle was new at the time of purchase or lease.

v.    Mr. Pinkerton asserts that if a Total Loss Vehicle was insured and deemed a total loss, that there is a possibility that the Insurer did not indemnify its insured; that is, that the Insurer breached its contract. Each Insurer will attest under penalty of perjury that it indemnified each Total Loss Vehicle included in its proof of claim. Further, each Total Loss Vehicle will have had its title transferred to a salvage title, as reported by the Commercial Vendor, and, therefore, it is extraordinarily unlikely that any insured would turn over its title to a Salvage Company without receiving an indemnity check. If Epiq wishes to audit a reasonable sample of those vehicles, Insurers can provide the address to which the indemnity payment was sent and/or its amount.

vi.    Nowhere in the proof of claim is any claimant required to provide documentation of the purchase price it paid; the agreed value of

18

the vehicle at the time of lease; the length of the lease; the residual value of the leased vehicle; or the value of the vehicle at the time that it was traded in, returned at the end of a lease, sold privately, or indemnified when deemed a total loss. Accordingly, there is no basis on which to seek that information for Total Loss Vehicles. Whether or to what extent a claimant recouped secondary value for a vehicle is irrelevant to whether the claimant can recover from the End-Payor Settlements.

c.   **Additional Procedures for Subrogees; Contacting Affected Class Members.**[36] Once the Court determines that Insurers may rely upon the equitable subrogation doctrine to recover from the End-Payor Settlements, no special procedures will be needed to process Insurers' claims. They can be processed the same way as all other claims.[37] And because, as explained above, Insurers will yield to their insureds if an insured claims a vehicle with the same VIN as a Total Loss Vehicle claimed by an Insurer, there is no need to contact class members about the Insurers' claims, develop a procedure for "splitting" claim amounts, or afford insured class members the right to appeal such a division. If any such overlap exists, the insured class member will recover the entire allowed amount for the Total Loss Vehicle in question.

d.   **Creating Procedures for Handling Insurers' Claims.**[38] As described above, there is no need for Epiq to create the variety of seemingly complex new procedures to handle Insurers' claims. Specifically:

   i.   any matching of the Total Loss Vehicles to vehicles claimed by other class members may be done by matching VINs, which is a process Epiq is likely already using to verify that only the original owner (and not successive owners) of a vehicle is permitted to recover for that vehicle;

   ii.   there is no need for Epiq to evaluate insurance coverage because Insurers, by providing the VINs, establish the existence of

---

[36] *See* Pinkerton Decl. ¶¶ 53-54, PageID.38498-38499.

[37] *See id.* ¶ 9, PageID.38482-38483.

[38] *See id.* ¶ 55, PageID.38499-38500.

coverage, and they are asserting their rights under equitable, not contractual, subrogation;

iii.　　because Insurers stand in the shoes of their insureds, comparing the new purchase price to the amount of the indemnity payment is irrelevant;

iv.　　because Insurers will yield to their insureds for any duplicate vehicle claimed, and because Insurers stand in the shoes of their insureds for all other Total Loss Vehicles claimed, there is no need (a) to create a procedure for splitting the payment, (b) to consider the amount of the market value of the Total Loss Vehicle at the time of the total loss, or (c) to permit class members to challenge a claim of subrogation;

v.　　because no other claimant is required to provide documentation of the residual value of a leased vehicle or the value received when a vehicle was traded in, sold privately or indemnified when deemed a total loss, and, therefore, Insurers may not be compelled to do so, there is no need to develop a procedure to determine whether an Insurer obtained any recovery from a tortfeasor; and

vi.　　any revised calculation of distribution payments necessitated by including Insurers cannot be material to this issue, and, in any event, if Insurers are proper class members, the need for such a revision cannot form the basis for excluding them.

e.　　**Significant Additional Time and Expense.**[39] Given the foregoing, there is no basis for Mr. Pinkerton's assertion that allowing Insurers to supplement their timely filed claim forms would require significant time and expense beyond that already required to process all other claims. Insurers' claims will require no different processing than any other claim. Their data will be submitted electronically, and FRS will work with Epiq, as we do with every claims administrator, to provide the data in a format that will allow for the most efficient processing.

---

[39] *See id.* ¶¶ 56-60, PageID.38500-38501.

f.   **New Notice.**[40] As insured class members will not have their claims reduced if an Insurer claims a vehicle with the same VIN, no new notice is required.

## CLASS COUNSEL'S INACCURATE FACTUAL CLAIMS

23.   Class Counsel and Mr. Pinkerton also make certain claims that are factually inaccurate.

24.   Class Counsel assert that they owe no duty to Insurers because Insurers are not class members, and, in any event, that, because they only owe a fiduciary duty to the class as a whole, they owe no duty to individual class members.[41] However, Mr. Pinkerton admits that 5 out of 7 Insurers timely filed claims based on their direct purchases of Fleet Vehicles.[42] And Class Counsel acknowledge in their brief, as they must, that such purchasers are class members: "The class is limited to persons who purchased or leased vehicles for themselves (not vehicles they insured)."[43] Accordingly, even Epiq agrees that those five Insurers are class

---

[40] *See id.* ¶ 58, PageID.38500-38501.

[41] *See* EPPs' Mem. at 25, PageID.38472. To support the utterly remarkable assertion that class counsel do not owe any duty to members of the class that they were appointed by the Court to represent—an assertion that is directly contrary to Sixth Circuit law—Class Counsel (mis)cite one case from another circuit that does not support their argument. In *Medical & Chiropractic Clinic, Inc. v. Oppenheim*, the Eleventh Circuit "clarif[ied] class counsel's fiduciary obligations in th[e] unique context" of a putative class representative claiming that it was "owed a heightened fiduciary duty." 981 F.3d 983, 989-90 (11th Cir. 2020). The court held that "in evaluating this claim, we must first determine whether class counsel owes a fiduciary duty to class representatives that is distinct from the fiduciary duty owed to the class. We conclude class counsel does not." *Id.* at 990. FRS is not asserting that Class Counsel owe Insurers any duty that they do not also owe to every other class member.

[42] *See* Pinkerton Decl. ¶¶ 24, 46 n.4, PageID.38487, 38495.

[43] EPPs' Mem. at 16, 26, PageID.38463, 38473.

members. I have never in all my years of practice encountered a class counsel that argued, as Class Counsel do here, that it did not owe a fiduciary duty to class members.[44]

25.    Class Counsel also persist in claiming, contrary to fact, that they gave FRS reasonable notice that placeholder claims would not be accepted.[45] That simply is not true. As I have previously stated, the issue of so-called "placeholder" claims and post-deadline supplementation of claim forms was not discussed at all, expressly or implicitly, during the meet and confer call that occurred on January 24, 2019. Mark Seltzer and William V. Reiss were the only individuals on that call representing Class Counsel; Mr. Langham was not.

---

[44] Class Counsel also falsely characterize FRS's March 9, 2020 letter as making a demand (rather than seeking their permission) and go on to fault FRS for not following up on Class Counsel's and Epiq's failure to respond to it. *Id.* at 9, PageID.38456; Langham Decl. ¶ 10, PageID.38506-38507. However, FRS's March 9, 2020 letter made the following request, not demand: "If GCG has any objection to the foregoing, *please* advise FRS immediately so that we may advise the Court as soon as possible," Ex. H to Leibell Intervention Mot. Decl. at 2 (June 18, 2020), PageID.37916, ECF No. 2060-10 (emphasis added), and the email that I sent to Mr. Langham (with copies to Class Counsel) in which I transmitted the March 9, 2020 letter read as follows: "The attached letter was sent yesterday afternoon to info@autopartsclass.com with a copy to Brian Pinkerton. *If you have any questions, please let me know*," *id.* at 1, PageID.37914 (emphasis added). Having received no response to this simple request, especially given the customary acceptance of placeholder claims and Class Counsel's agreement to a process that postponed Insurers' data collection and submission until the Court ruled on the equitable subrogation issue, FRS's reliance was eminently reasonable. Had FRS received any objection, we would immediately have brought the matter to the Court's attention.

[45] *See* Langham Decl. ¶ 5, PageID.38505 (*E.g.*, "FRS explicitly sought permission to file 'placeholder' claims for its insurance company clients with the intention of supplementing them with specific vehicle information after the claims-filing deadline. Class Counsel flatly rejected FRS' request to file these null claims during that discussion.").

26.     After my declaration in support of FRS's motion to intervene was submitted, Class Counsel had three distinct opportunities—namely, when they opposed FRS's Intervention Motion; when they supplemented the record in connection with that motion; and now, when they opposed FRS's current motion—to have either Mr. Seltzer or Mr. Reiss submit a declaration in which either of them could have stated under penalty of perjury that they advised FRS that placeholder claims would be rejected. They did not do so. Instead, they have consistently claimed that I admitted this highly contested fact. Class Counsel have never specifically identified which words in my declaration they say constitute an admission; Mr. Langham states only that he "believe[s]" that paragraphs five and six of my declaration "admit[ ] these facts."[46] But those paragraphs, which read in their entirety as follows, do no such thing:

> 5.     On behalf of FRS and the Insurers, I met and conferred by telephone with counsel for the End-Payor Plaintiffs, Marc Seltzer and William V. Reiss, on January 24, 2019. On January 14, 2019, in anticipation of that call, Robin Niemiec, FRS's Chief Operating Officer, sent to Mr. Reiss a research memorandum that FRS prepared concerning the subrogation issue. Ex. D.

> 6.     During that call, class counsel disagreed with FRS that the Insurers may recover from the End-Payor Settlements as subrogees, and class counsel referred FRS to legal authority they believed supported their position. FRS and class counsel also discussed potential mechanisms for bringing the legal issue regarding subrogation to the attention of the Court in the event

---

[46] *Id.*

that FRS and class counsel continued to disagree. Class counsel suggested that the Insurers should file claims, wait for them to be rejected, and then appeal that rejection to the Court. In response, I explained why it would not be practical to submit claims for many thousands of total loss vehicles before resolving the threshold legal question whether such claims would be permitted. In the interest of avoiding litigation, we agreed to discuss the matter further at a later point.[47]

27.     As has been explained and not contested by Class Counsel, Class Counsel did not insist on the proposal that they had suggested but, instead, agreed to FRS's proposal to seek and obtain the Court's ruling on equitable subrogation before requiring Insurers to undertake a process that, as described above, would be extremely burdensome.[48]

---

[47] Leibell Intervention Mot. Decl. ¶¶ 5-6, PageID.37727-37728.

[48] *See, e.g.*, Leibell Data Mot. Decl. ¶¶ 11, 15, PageID.38343, 38346-38347; Leibell Intervention Mot. Decl. ¶ 7, PageID.37728; Ex. G to Leibell Intervention Mot. Decl. at 1 (June 18, 2020), PageID.37901, ECF No. 2060-9 (email in which Mr. Langham provided Class Counsel's proposed briefing schedule for resolution of the equitable subrogation issue).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of March 2021, in Ludlow, Vermont.

Jeffrey N. Leibell

25

# APPENDIX

## PARTIAL LIST OF SETTLEMENTS IN WHICH PLACEHOLDER CLAIMS WERE ACCEPTED

| CASE NAME | CAIMS ADMINISTRATOR | CLASS COUNSEL |
|---|---|---|
| Aggrenox Indirect | A B Data Ltd | |
| Air Cargo | Garden City Group LLC | Robins Kaplan LLP |
| Apple iPhone | Angeion Group | Cotchett, Pitre & McCarthy LLP |
| Auto Parts Canada | Siskinds LLP | |
| Auto Parts Dealer | Gilardi And Co LLC | |
| Bearings Direct | Epiq Systems Inc | |
| Caterpillar Engine | Epiq Systems Inc | |
| Containerboard Products | A B Data Ltd | |
| CRT Canada | Ricepoint Administration Inc | |
| Download Insurance (Norton Download) | Garden City Group LLC | |
| Drywall Direct | KCC LLC | |
| Drywall Indirect | Heffler Claims Group | |
| Ductile Iron Pipe | Garden City Group LLC | |
| Euribor Products | A B Data Ltd | |
| Euroyen | A B Data Ltd | |
| FOREX (Direct & Exchange-Only Class) | Garden City Group LLC | |
| Fresh Potatoes Direct | KCC LLC | |
| Hydrogen Peroxide Canada | Ricepoint Administration Inc | |
| Illinois LCDI | A B Data Ltd | |
| Interest Rate Derivatives (ISDA) | Epiq Systems Inc | |
| Intuitive Surgical Securities | Garden City Group LLC | |
| Libor Lender | JND Legal Administration LLC | |
| Libor OTC | Rust Consulting Inc | Susman Godfrey LLP |
| Lidoderm Indirect | KCC LLC | |
| Linear Resistors Indirect | A B Data Ltd | Cotchett, Pitre & McCarthy LLP |
| Liquid Aluminum Sulfate Direct | Angeion Group | |
| Liquid Aluminum Sulfate Indirect | A B Data Ltd | |
| Lithium Ion Direct | Epiq Systems Inc | |
| Lithium Ion Indirect | Epiq Systems Inc | Cotchett, Pitre & McCarthy LLP |
| Lloyds London Syndicate | A B Data Ltd | |
| Loestrin TPP | A B Data Ltd | |
| Lovenox TPP | A B Data Ltd | |
| Navistar | JND Legal Administration LLC | |
| Northeast Dairy | Rust Consulting Inc | |
| Parking Heaters - Indirect Purchaser | Rust Consulting Inc | |
| Polyurethane Foam Canada | Ricepoint Administration Inc | |
| Polyurethane Foam Direct | Garden City Group LLC | |
| Polyurethane Foam Indirect | A B Data Ltd | |
| Processed Eggs | Garden City Group LLC | Susman Godfrey LLP |
| Provigil (Modafinil) TPP | A B Data Ltd | |
| Solodyn Indirect | A B Data Ltd | |
| Steel | Garden City Group LLC | |
| Sysco Fuel Surcharge | Dahl Administration | |
| Transpacific Passenger Air | Rust Consulting Inc | Cotchett, Pitre & McCarthy LLP |
| Urethane Polyether Polyol | Garden City Group LLC | |
| Washington LCDI | A B Data Ltd | |
| Waste Industries | Dahl Administration | |
| Western States Wholesale Natural Gas | Dahl Administration & A B Data Ltd | |