# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
| THIS DOCUMENT RELATES TO:<br><br>ALL END-PAYOR ACTIONS | Hon. Sean F. Cox<br>Mag. Judge R. Steven Whalen |

**DECLARATION OF DANIEL W. SHOAG, Ph.D.,
CONCERNING TOTAL LOSS VEHICLE DATA
SUBMITTED BY FINANCIAL RECOVERY SERVICES, LLC**

I, DANIEL W. SHOAG, declare:

1. I am an economics professor. I have been teaching economics and econometrics at Harvard University and Case Western Reserve University for the past 10 years. I have been engaged by Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen"), which represents Financial Recovery Services, LLC d/b/a Financial Recovery Strategies ("FRS") in connection with FRS's retention by automobile insurers (the "Insurers"), each a putative member of the End-Payor Settlement classes, to prepare, submit, and manage their proofs of claim (each, a "Claim Form") to recover from the End-Payor Settlements as a result of the

Page **1** of **17**

indemnity payments they made in connection with Total Loss Vehicles.[1] This declaration is based on my personal knowledge and the knowledge of my colleagues at Coherent Economics, LLC, the economic consulting firm also retained by Kellogg Hansen in connection with this engagement, working under my supervision.

## I.
## SCOPE OF ENGAGEMENT

2.    I have been tasked with identifying, processing, and compiling the data for each Total Loss Vehicle (the "Total Loss Vehicle Data"), as requested by the Claim Form, for vehicles eligible to recover from the End-Payor Settlements (each, an "Eligible Vehicle"),[2] to complete the Claim Form that each Insurer submitted on or before June 18, 2020.[3] In summary, I obtained from or on behalf of the Insurers data concerning vehicles that were deemed a "total loss" and were indemnified by the Insurers (the "Indemnified Vehicles"), which data is of the type

---

[1] All terms with initial capitalization that are not defined in this declaration have the same meanings as those set forth in the Memorandum of Law in Support of Financial Recovery Services, LLC's Motion To Intervene, No. 2:12-md-02311, ECF No. 2060, PageID.37697-37721.

[2] Prior to June 18, 2020, the Claim Form approved by the Court was available on the official settlement website, http://www.autopartsclass.com/. The list of Eligible Vehicles may be found at http://www.autopartsclass.com/included.

[3] I understand that the expert retained by the End-Payor Plaintiffs determined, for each covered automobile part, the amount of overpayment caused by the alleged antitrust violations. I have made no independent investigation of those issues; I describe in this declaration only the work that I have performed and will perform to prepare the Total Loss Vehicle Data necessary to complete the Claim Form for each Total Loss Vehicle.

commonly relied upon by economic experts and that, for the reasons set forth below, I determined to be reliable and sufficient to complete the Claim Form.[4] I then processed such data to identify which of the Indemnified Vehicles are Total Loss Vehicles. As set forth below, it is my opinion that the Total Loss Vehicle Data that will be submitted when my work is completed will be accurate and complete for each Total Loss Vehicle set forth therein.

3.  This declaration is organized as follows: In **Section II**, I present my qualifications as an expert. In **Section III**, I describe the sources that, for each Total Loss Vehicle, I am using to provide the Total Loss Vehicle Data. And in **Section IV**, I offer a summary of the methodology that I am using to prepare the Total Loss Vehicle Data for the Claim Form.

## II.
## QUALIFICATIONS

4.  I received my BA, MA, and Ph.D. in economics from Harvard University. My statistical research has been published in major academic journals, including the *Quarterly Journal of Economics* and the *Review of Economics and Statistics*, and has been featured in, among other outlets, *The New York Times*, *Bloomberg*, *The Washington Post*, and *The Wall Street Journal*. In 2012, I was selected as one of *Forbes*' "30 Under 30 in Law & Policy."

---

[4] As discussed below, the data I obtained is from third-party data providers that maintain such data records in the ordinary course of business.

5. I have worked as a visiting scholar at the Federal Reserve Bank of Boston and as a visiting professor at Tel Aviv University, and I was selected by the Stanford University Center on Poverty and Inequality as a "rising new scholar."

6. I have received research grants from the U.S. Department of Transportation, the Russell Sage Foundation, and the Laura and John Arnold Foundation. In 2017, I was awarded a prize for Best Paper on State, Local, and Regional Economic and Fiscal Issues at the Brookings Conference on Municipal Finance.

7. I co-founded and co-chaired the more than 200-person HumTech conference in Boston, and I have co-edited the annual peer-reviewed conference proceedings volume. I have worked as an economic consultant for over a decade.

8. My qualifications, publications, and expert engagements are summarized in detail in my *curriculum vitae*, which is attached to this report as **Exhibit C**. For this matter, I am being compensated at a rate of $550 per hour.

### III.
### SOURCES OF TOTAL LOSS VEHICLE DATA

9. Using my education and my experience as an economist, together with my extensive and wide-ranging experience in statistical research, I have obtained for Indemnified Vehicles and will prepare for Total Loss Vehicles Total Loss Vehicle Data sufficient to complete each Insurer's Claim Form. As described below, because not all of the data requested by the Claim Form for all Total Loss Vehicles was

readily accessible from the Insurers' own records, I identified alternative sources of reliable data, namely (i) the independent third-party salvage vendors (each, a "Salvage Vendor") that each Insurer contracted to process vehicles deemed to be a total loss, and (ii) the AutoCheck® platform provided by Experian Information Solutions, Inc. ("Experian"), a well-known commercial data vendor.

**The Insurers**

10. To prepare the Total Loss Vehicle Data, I first coordinated with each Insurer. I determined that, due to the nature of recordkeeping necessary for providing automobile insurance as compared to that for automobile ownership, none of the Insurers had or could reasonably collect from its own records certain information about the Total Loss Vehicles—specifically, whether each Total Loss Vehicle was new when purchased or leased, whether it was among the vehicles listed as Eligible Vehicles, and whether it was purchased or leased during the relevant class periods (collectively, the "Class Periods") by purchasers or lessees who resided in one of the eligible jurisdictions. I learned that, for example, to the extent that the Insurers continued to maintain relevant records for such data points decades after an Indemnified Vehicle was initially insured, those records are maintained in different departments and are not maintained for the entirety of the Class Periods. This is due to, among other customarily occurring events, ordinary document retention and destruction policies, acquisitions and divestitures of business units, and

modifications and upgrades to information technology and data storage systems. Accordingly, it was necessary to identify alternative sources of data to reliably provide all vehicle information requested by the Claim Form.

**Salvage Vendors**

11. I identified the Salvage Vendors as one alternate source of data. In connection with an insurer's contractual indemnification obligations concerning vehicles that the insurer has deemed to be a total loss, the insurer contracts with and pays a Salvage Vendor to take possession of and process the vehicle. I learned through my investigation that each of the Insurers' Salvage Vendor maintains for each of its clients, including the Insurers, digital records of all Indemnified Vehicles.

12. The two Salvage Vendors used by the Insurers were Copart Inc. ("Copart") and Insurance Auto Auctions, Inc. ("IAA"). I obtained from Copart and IAA the Vehicle Identification Number, or "VIN," for each of the Indemnified Vehicles that Copart and IAA processed for one of the Insurers over the period for which they were able to provide such records.[5] Each Salvage Vendor maintains records by client name; therefore, each Salvage Vendor provided the datasets separately for each Insurer. Across all Insurers, the Salvage Vendors provided data for in excess of 3.5 million Indemnified Vehicles.

---

[5] This Declaration does not address Total Loss Vehicles for which records were not provided by the Salvage Vendors.

13. I consider the Salvage Vendors' records to be reliable given their clientele and their credentials, which I describe in more detail below:[6]

    a. **Copart.** Copart was founded in 1982. It operates more than 200 locations in 11 countries with more than 175,000 vehicles up for auction each day. Copart specializes in the resale and remarketing of used, wholesale, and salvage title vehicles for a variety of sellers, including insurance companies, rental car companies, local municipalities, financial institutions, and charities.[7]

    b. **IAA.** Like Copart, IAA (NYSE: IAA) facilitates the marketing and sale of total loss, damaged, and low-value vehicles. IAA has nearly 4,000 employees and has more than 200 facilities throughout the United States, Canada, and the United Kingdom.[8]

14. Copart confirmed that neither it nor IAA will process any vehicle deemed by an insurer to be a total loss unless directed by the insurer to do so, which results in a fee being charged to the insurer and, therefore, occurs only when the affected insurer has a contractual obligation under a policy of insurance to indemnify

---

[6] I have made no independent assessment of the VINs provided to me by the Salvage Vendors.

[7] Information available at https://www.copart.com/ (last visited Mar. 31, 2021).

[8] Information available at https://www.iaai.com/ (last visited Mar. 31, 2021).

the vehicle. In those rare cases in which an insurer, having previously directed a Salvage Vendor to process a vehicle deemed to be a total loss and later determines that the insurer does not have a contractual obligation to provide indemnity for that vehicle (*e.g.*, the damage resulted from a flood, but the coverage is limited to liability and collision, not comprehensive), the Salvage Vendor will discontinue processing the vehicle for the insurer and will instead work with the owner/lessee to resolve the matter. The only VINs provided by the Salvage Vendors were for Indemnified Vehicles that, because one of the Insurers had a contractual obligation to indemnify it, the Salvage Vendors fully processed. Therefore, I find it reasonable to conclude that, for the vehicles identified by the Salvage Vendors for each of the Insurers, it was insured by the Insurer identified by the Salvage Vendor, it was deemed a total loss by that Insurer, and the Insurer indemnified the vehicle.

15.     The data provided by the Salvage Vendors did not include the following data points requested by the Claim Form: (a) whether an Indemnified Vehicle was new when purchased or leased, (b) where the purchaser or lessee resided at that time, and (c) whether the Indemnified Vehicle was leased or purchased. Therefore, it was necessary to identify an additional source of data reliably to provide all of the vehicle information requested by the Claim Form.

**Experian's AutoCheck® Platform**

16. I selected Experian's AutoCheck® platform as the best source for the remaining Total Loss Vehicles Data. As described on its website, the AutoCheck® platform is relied upon by "automobile industry experts" and includes "industrial-strength data backed by Experian, the global market leader in information services."[9] For these reasons, as well as the reasons I discuss below, it is my opinion that the Experian AutoCheck® platform is a robust and reliable source of vehicle information.

17. Experian's AutoCheck® platform relies on data from 11 unique data sources, including, among others, state departments of motor vehicles ("DMVs"), auto and salvage auctions, insurance companies, car dealerships, and manufacturers.[10] From these sources, Experian obtains the vehicle-level data necessary to complete the Claim Form but that were not provided by the Insurers or the Salvage Vendors. For example, Experian obtains directly from state DMVs such information as branded titles, including salvage/junk, flood, hailstorm, and fire damage; the city and state of previous registration; the number of owners; and lien

---

[9] More information is available on the AutoChcck® website, https://www.autocheck.com/ (last visited Mar. 31, 2021).

[10] The full list of data sources for the Experian AutoCheck® database may be found at https://www.autocheck.com/vehiclehistory/backed-by-experian (last visited May 5, 2021).

and ownership transfer information. From insurance companies, Experian obtains the identification of the vehicles they deemed a total loss and the reasons that they were deemed as such. From salvage auctions, Experian obtains whether a vehicle was salvaged or junked. Finally, from service and maintenance facilities and/or car dealerships and vehicle inspection stations, Experian obtains a vehicle's odometer reading.

18. Before deciding to rely upon the data obtainable from Experian, I considered publicly available independent reviews of vehicle history reports in general, as well as of those available from Experian's AutoCheck® platform in particular. For example:

    a. A September 26, 2019 article by *Edmunds.com, Inc.*, "Carfax or AutoCheck: Which Vehicle History Report Is Best for You?," states:

> Vehicle history reports have become an integral part of any used-car purchase. They are one of the best ways to learn about a given vehicle's past and help make your search for a used car much easier. Most importantly, the report tells shoppers if a car has a "branded" title. Branding means an insurance company has declared the vehicle a total loss and given it a salvage title because of an accident, flood damage or other catastrophic event. …
>
> **The car's vehicle identification number (VIN) is the key to the vehicle history report. The 17-digit VIN is like the car's Social Security number: It's used to note nearly every major event in a vehicle's lifetime.** Typically, the information on a vehicle history report includes a summary and an overall evaluation of the vehicle, supported with details, dates and locations. **The report makes it easy to see**

> **if the car has been registered in numerous states. Other information can include a description of the vehicle, the number of previous owners, accident information**, verification of recent mileage (which could include an alert for an odometer rollback), and lemon-law and recall checks. …
>
> Most major used-car dealers and some car-selling sites will provide a free Carfax report or AutoCheck report. …
>
> All dealers have vehicle history report subscriptions, usually for either AutoCheck or Carfax, and will run a free report for interested buyers. …[11]

b. Another article, "AutoCheck vs Carfax – Which One Should I Use?," published on January 14, 2021 by *Autolist*, states that "[t]here are two main companies that provide information about vehicles: AutoCheck and Carfax." In describing the merits of vehicle history research, *Autolist* points out that they "offer a thorough look at the history of a vehicle's service records, accident history, and emissions records. A vehicle history report will show salvage titles and other red flags for used vehicles, such as branded titles (sometimes also called salvage titles)." The review goes on to state:

> Both services draw information from the National Motor Vehicle Title Information System (NMVTIS), which is run by the federal Department of Justice. This agency collects its title information from state motor vehicle registries. It's the only publicly-available system in the U.S. that all auto recyclers,

---

[11] Montoya, Ronald, "Carfax or AutoCheck: Which Vehicle History Report Is Best for You?," *Edmunds*, Sept. 26, 2019, available at https://www.edmunds.com/car-buying/which-vehicle-history-report-is-right-for-you.html (last visited May 5, 2021) (emphasis added).

> junk yards and salvage yards – as well as insurance carriers – must report to regularly.
>
> In other words, both Carfax and **AutoCheck let you analyze the vehicle's past** so you can make an informed purchase.

In its review of AutoCheck®, *Autolist* advises that "AutoCheck is owned by Experian, and it has relationships with industry leaders, including CarMax (different than Carfax), eBay Motors, Edmunds.com, NADAguides.com, and Kelley Blue Book." *Autolist* also notes that AutoCheck® "provides registration and title data from all 50 states, as well as the District of Columbia. The platform also delivers collision records from police reports and other sources, as well as event data from insurance companies and salvage yards." *Autolist* identifies as "[o]ne of AutoCheck's key advantages over Carfax," its "exclusive access to auction data from the two largest United States auctions, potentially giving prospective buyers a more comprehensive look at a vehicle's history (this is why their reports have a better reputation with used car dealers)." And *Autolist* points out that, among other things, AutoCheck® "checks for records of the vehicle being abandoned, damaged, junked or scrapped. … The platform also reports any

documented fire, hail or water damage, as well as any frame or structural damage or odometer damage." [12]

19. The Experian data includes each of the data points requested by the Claim Form for each Total Loss Vehicle. Set forth in **Table 1** below is the list of the relevant data fields provided by Experian, which I discuss further below in **Section IV**:

**Table 1**
**Relevant Data Fields Provided by Experian AutoCheck®**
**Sufficient to Complete the Claim Form**

| Vehicle Year | Vehicle Make | Vehicle Model |
|---|---|---|
| Number of Owners / Ownership History | State of Vehicle's First Title and/or Registration Event | Estimated Date of Purchase or Lease |
| Reported State Brand | Date of Total Loss | Purchase or Lease |

### IV.
### DETERMINING THE TOTAL LOSS VEHICLE DATA NECESSARY TO COMPLETE INSURERS' CLAIM FORMS

20. To identify and provide the Total Loss Vehicle Data necessary to complete the fields on the Claim Form, I input into the Experian AutoCheck® platform the VINs provided by the Salvage Vendors, and I received the data fields listed above in **Table 1**, among others.

---

[12] Per "AutoCheck vs Carfax - Which One Should I Use?," *Autolist Editorial*, Jan. 14, 2021, available at https://www.autolist.com/guides/autocheck-vs-carfax (last visited May 5, 2021).

21. I discuss below the processing methodology that I am applying to the Experian AutoCheck® data to determine (i) whether each Indemnified Vehicle was purchased or leased as a new vehicle (each, a "New Indemnified Vehicle"), (ii) whether each New Indemnified Vehicle was purchased or leased in an eligible jurisdiction, and (iii) whether each New Indemnified Vehicle that was purchased or leased in an eligible jurisdiction is an Eligible Vehicle, which would result in it being a Total Loss Vehicle for which I can provide the information necessary to complete the Claim Form. This analysis is ongoing and has not yet been completed. Therefore, the methodology described below is subject to revision.

22. As a starting point, I used the Experian AutoCheck® data to identify the Indemnified Vehicles that were new when purchased or leased (the "New Indemnified Vehicles"). To identify New Indemnified Vehicles, I first identified Indemnified Vehicles for which Experian reported only one historical owner, which indicates that the insured was the original owner. I consider these vehicles to be New Indemnified Vehicles.

23. Next, because I obtained the Experian AutoCheck® data in 2021 and because Experian tracks a vehicle's ownership over time, including after a salvage event, I processed Experian's ownership history data for Indemnified Vehicles for which Experian reported multiple historical owners as of 2021 to determine the number of owners for each of those Indemnified Vehicles at the time they were

deemed a total loss. If Experian's ownership history data shows that an Indemnified Vehicle only had one historical owner at the time that it was deemed a total loss, I consider such an Indemnified Vehicle to be a New Indemnified Vehicle.

24. To determine whether, at the time of purchase or lease, a purchaser or lessee of a New Indemnified Vehicle resided or had a principal place of business in one of the eligible jurisdictions, I identified in the Experian AutoCheck® data the state associated with the first title or registration event for each New Indemnified Vehicle. If the first title or registration event for a New Total Loss Vehicle is in an eligible jurisdiction, I consider the New Indemnified Vehicle to be eligible based upon the jurisdictional criteria.[13]

25. Finally, to determine whether the New Indemnified Vehicles that were purchased or leased in an eligible jurisdiction also are Eligible Vehicles, I compared for those vehicles the year, make, and model from the Experian AutoCheck® data with the corresponding information on the list of Eligible Vehicles provided on the official settlement website.[14] I considered each New Indemnified Vehicle that was

---

[13] I understand that the eligible jurisdictions are the District of Columbia, Arizona, Arkansas, California, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[14] The list of Eligible Vehicles may be found at http://www.autopartsclass.com/included.

purchased or leased in an eligible jurisdiction for which the year, make, and model matches the eligible list to be a Total Loss Vehicle.

26. In sum, I have used the Experian AutoCheck® data to identify for each of the Insurers Indemnified Vehicles that, because they (i) were new when they were purchased or leased, (ii) were purchased or leased by a purchaser or lessee who or which resided or had a principal place of business in one of the eligible jurisdictions, and (iii) were included on the list of Eligible Vehicles provided on the official settlement website, are Total Loss Vehicles.

27. In the next stage of my analysis, I will use the data provided by the Salvage Vendors and Experian to provide the Total Loss Vehicle Data necessary to complete for each Insurer the fields on the Claim Form. Specifically, for each Total Loss Vehicle, I will provide the following information: (i) that it was new when purchased or leased; (ii) vehicle year, (iii) vehicle make, (iv) vehicle model, (v) VIN, (vi) state of residence or principal place of business of the purchaser or lessee at the time of purchase or lease, (vii) estimated date of purchase or lease, and (viii) whether the vehicle was purchased or leased. It is my opinion, based on my education and my experience as an economist, together with my extensive and wide-ranging experience in statistical research, that the Total Loss Vehicle Data that will be submitted when my work is completed will be accurate and complete for each Total Loss Vehicle set forth therein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of May 2021, in Cleveland, Ohio.

_____
Daniel W. Shoag, Ph.D.