# EXHIBIT 4

472 U.S. 797, 86 L.Ed.2d 628

⌐797**PHILLIPS PETROLEUM
COMPANY, Petitioner**

v.

**Irl SHUTTS, et al.**

**No. 84–233.**

Argued Feb. 25, 1985.

Decided June 26, 1985.

Class action was brought by gas company investors to recover interest on royalties suspended pending final administrative approval of gas price increase. The District Court, Seward County, Keaton G. Duckworth, J., entered judgment for the class, and gas company appealed. The Supreme Court of Kansas, 235 Kan. 195, 679 P.2d 1159, affirmed as modified. Certiorari was granted. The Supreme Court, Justice Rehnquist, held that: (1) gas company had standing to assert that Kansas did not possess jurisdiction over investors who were not Kansas residents and had no connection to Kansas where gas company would suffer injury by being bound by the judgment without having non-Kansas investors also bound; (2) procedure followed by Kansas whereby fully descriptive notice was sent first-class mail to each member with explanation of right to opt out satisfied due process; and (3) Kansas law was not applicable to claims of all class members.

Affirmed in part, reversed in part, and remanded.

Justice Stevens filed an opinion concurring in part and dissenting in part.

Opinion on remand, 240 Kan. 764, 732 P.2d 1286.

**1. Federal Civil Procedure ⬤103.1**

Standing to sue in any Article III court is federal question which does not depend on party's prior standing in state court. U.S.C.A. Const. Art. 3, § 1 et seq.

**2. Federal Civil Procedure ⬤103.2**

Generally stated, federal standing requires allegation of present or immediate injury in fact, where party requesting standing has alleged such personal stake in outcome of controversy as to assure that concrete adverseness which sharpens presentation of issues; there must be some causal connection between asserted injury and challenged action, and injury must be of the type likely to be redressed by favorable decision.

**3. Federal Civil Procedure ⬤103.4**

One prudential limit on standing is that litigant must normally assert his own legal interests rather than those of third parties.

**4. Judgment ⬤660½**

Judgment issued without proper personal jurisdiction over absent party is not entitled to full faith and credit elsewhere and thus has no res judicata effect as to that party.

**5. Judgment ⬤677**

The only way class action defendant can assure itself of binding effect of judgment is to ascertain that forum court has jurisdiction over every plaintiff whose claim it seeks to adjudicate, sufficient to support defense of res judicata in later suit for damages by class members.

**6. Federal Civil Procedure ⬤103.7**

Gas company against which class action was brought by investors to recover interest on royalties suspended pending final administrative approval of gas price increase had standing to assert claim that Kansas did not have jurisdiction over investors in the class who were not Kansas residents and had no connection to Kansas where gas company would sustain injury by being subjected to res judicata effect of the Kansas judgment while non-Kansas investors would not be so bound.

**7. Federal Courts ⬤76.5**

Purpose of minimum contacts test is to protect defendant from travail of defending in distant forum, unless defendant's con-

**2966**  105 SUPREME COURT REPORTER  472 U.S. 797

tacts with forum make it just to force him to defend there.

**8. Constitutional Law ⬬309(1.5)**

Because states place fewer burdens upon absent class plaintiffs than they do upon absent defendants in nonclass suits, due process clause need not and does not afford former as much protection from state court jurisdiction as it does the latter. U.S.C.A. Const.Amend. 14.

**9. Constitutional Law ⬬309(1.5)**

Forum state may exercise jurisdiction over claim of absent plaintiff in class action seeking to bind known plaintiffs concerning claims wholly or predominantly for money judgments, even though that plaintiff may not possess minimum contacts with forum which would support personal jurisdiction over defendant; if forum state wishes to bind absent plaintiff concerning claim for money damages or similar relief at law, it must provide minimal procedural due process protection: plaintiff must receive notice plus opportunity to be heard and participate in litigation, whether in person or through counsel, and notice must be the best practicable, reasonably calculated under all the circumstances to apprise interested parties of pendency of action and afford them opportunity to present their objections. U.S.C.A. Const.Amend. 14.

**10. Constitutional Law ⬬309(1.5)**

Due process requires at a minimum that an absent plaintiff in class action seeking to bind known plaintiffs concerning claims wholly or predominantly for money judgments be provided with opportunity to remove himself from the class by executing and returning "opt out" or "request for exclusion" form to the court. U.S.C.A. Const.Amend. 14.

**11. Federal Courts ⬬31**

Any plaintiff may consent to jurisdiction.

**12. Constitutional Law ⬬309(1.5)**

Kansas' procedure in class action seeking to bind absent but known plaintiffs concerning claims wholly or predominantly for money judgments whereby fully descriptive notice is sent first-class mail to each class member with explanation of right to "opt out" satisfied due process. Rules Civ.Proc., K.S.A. 60–223 et seq.; U.S. C.A. Const.Amend. 14.

**13. Constitutional Law ⬬305(1)**
 States ⬬5½

In class action brought by gas company investors to recover interest on royalties suspended pending final administrative approval of gas price increase, application of Kansas law to all of the investors' claims for interest violated due process and full faith and credit clauses where Kansas law conflicted with Oklahoma and Texas law on award of interest and where over 99% of gas leases involved and some 97% of investors had no apparent connection to Kansas. U.S.C.A. Const. Art. 4, § 1; Amend. 14.

*Syllabus*[*]

During the 1970's, petitioner produced or purchased natural gas from leased land located in 11 States. Respondents, royalty owners possessing rights to leases from which petitioner produced the gas, brought a class action against petitioner in a Kansas state court, seeking to recover interest on royalty payments that had been delayed by petitioner. The trial court certified a class consisting of 33,000 royalty owners. Respondents provided each class member with a notice by first-class mail describing the action and informing each member that he could appear in person or by counsel, that otherwise he would be represented by respondents, and that class members would be included in the class and bound by the judgment unless they "opted out" of the action by returning a "request for exclusion." The final class consisted of some 28,000 members, who reside in all 50

[*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the

reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

472 U.S. 799     **PHILLIPS PETROLEUM CO. v. SHUTTS**     **2967**
Cite as 105 S.Ct. 2965 (1985)

States, the District of Columbia, and several foreign countries. Notwithstanding that over 99% of the gas leases in question and some 97% of the plaintiff class members had no apparent connection to Kansas except for the lawsuit, the trial court applied Kansas contract and equity law to every claim and found petitioner liable for interest on the suspended royalties to all class members. The Kansas Supreme Court affirmed over petitioner's contentions that the Due Process Clause of the Fourteenth Amendment prevented Kansas from adjudicating the claims of all the class members, and that that Clause and the Full Faith and Credit Clause prohibited application of Kansas law to all of the transactions between petitioner and the class members.

*Held:*

1. Petitioner has standing to assert the claim that Kansas did not have jurisdiction over the class members who were not Kansas residents and had no connection to Kansas. Whether it wins or loses on the merits, petitioner has a distinct and personal interest in seeing the entire plaintiff class bound by res judicata just as petitioner is bound. The only way petitioner can assure itself of this binding effect is to ascertain that the forum court has jurisdiction over every plaintiff whose claim it seeks to adjudicate, sufficient to support a res judicata defense in a later suit by class members. The alleged injury petitioner would incur if the class-action judgment against it became final without binding the plaintiff class is sufficient to give petitioner standing on its own right to raise the jurisdiction claim in this Court. Pp. 2969–2971.

<sub>⌊798⌋</sub>2. The Kansas trial court properly asserted personal jurisdiction over the absent plaintiff class members and their claims against petitioner. The Due Process Clause requires notice, an opportunity to appear in person or by counsel, an opportunity to "opt out," and adequate representation. It does not require that absent class members affirmatively "opt in" to the class, rather than be deemed members of the class if they did not "opt out." The

procedure followed by Kansas, where a fully descriptive notice is sent by first-class mail to each class member, with an explanation of the right to "opt out," satisfies due process. The interests of the absent plaintiff class members are sufficiently protected by the forum State when those plaintiffs are provided with a request for exclusion that can be returned within a reasonable time to the trial court. Pp. 2971–2976.

3. The Kansas Supreme Court erred in deciding that the application of Kansas law to all claims would be constitutional. Kansas must have a "significant contact or aggregation of contacts" to the claims asserted by each plaintiff class member in order to ensure that the choice of Kansas law was not arbitrary or unfair. Given Kansas' lack of "interest" in claims unrelated to that State, and the substantive conflict between Kansas law and the law of other States, such as Texas, where some of the leased land in question is located, application of Kansas law to every claim in this case was sufficiently arbitrary and unfair as to exceed constitutional limits. Pp. 2976–2980.

235 Kan. 195, 679 P.2d 1159 (1984) affirmed in part, reversed in part, and remanded.

---

Arthur R. Miller, for petitioner.

Joel I. Klein, Washington, D.C., for respondents.

---

<sub>⌊799⌋</sub>Justice REHNQUIST delivered the opinion of the Court.

Petitioner is a Delaware corporation which has its principal place of business in Oklahoma. During the 1970's it produced or purchased natural gas from leased land located in 11 different States, and sold most of the gas in interstate commerce. Respondents are some 28,000 of the royalty owners possessing rights to the leases from which petitioner produced the gas; they reside in all 50 States, the District of Columbia, and several foreign countries.

Respondents brought a class action against petitioner in the Kansas state court, seeking to recover interest on royalty payments which had been delayed by petitioner. They recovered judgment in the trial court, and the Supreme Court of Kansas affirmed the judgment over petitioner's contentions that the Due Process Clause of the Fourteenth Amendment prevented Kansas from adjudicating the claims of all the respondents, and that the Due Process Clause and the Full Faith and Credit Clause of Article IV of the Constitution prohibited the application of Kansas law to all of the transactions between petitioner and respondents. 235 Kan. 195, 679 P.2d 1159 (1984). We granted certiorari to consider these claims. 469 U.S. 879, 105 S.Ct. 242, 83 L.Ed.2d 181 (1984). We reject petitioner's jurisdictional claim, but sustain its claim regarding the choice of law.

Because petitioner sold the gas to its customers in interstate commerce, it was required to secure approval for price increases from what was then the Federal Power Commission, and is now the Federal Energy Regulatory Commission. Under its regulations the Federal Power Commission permitted petitioner to propose and collect tentative higher gas prices, subject to final approval by the Commission. If the Commission eventually denied petitioner's proposed price increase or reduced the proposed increase, petitioner would $_{800}$have to refund to its customers the difference between the approved price and the higher price charged, plus interest at a rate set by statute. See 18 CFR § 154.102 (1984).

Although petitioner received higher gas prices pending review by the Commission, petitioner suspended any increase in royalties paid to the royalty owners because the higher price could be subject to recoupment by petitioner's customers. Petitioner agreed to pay the higher royalty only if the royalty owners would provide petitioner with a bond or indemnity for the increase, plus interest, in case the price increase was not ultimately approved and a refund was due to the customers. Petitioner set the interest rate on the indemnity agreements

at the same interest rate the Commission would have required petitioner to refund to its customers. A small percentage of the royalty owners provided this indemnity and received royalties immediately from the interim price increases; these royalty owners are unimportant to this case.

The remaining royalty owners received no royalty on the unapproved portion of the prices until the Federal Power Commission approval of those prices became final. Royalties on the unapproved portion of the gas price were suspended three times by petitioner, corresponding to its three proposed price increases in the mid-1970's. In three written opinions the Commission approved all of petitioner's tentative price increases, so petitioner paid to its royalty owners the suspended royalties of $3.7 million in 1976, $4.7 million in 1977, and $2.9 million in 1978. Petitioner paid no interest to the royalty owners although it had the use of the suspended royalty money for a number of years.

Respondents Irl Shutts, Robert Anderson, and Betty Anderson filed suit against petitioner in Kansas state court, seeking interest payments on their suspended royalties which petitioner had possessed pending the Commission's approval of the price increases. Shutts is a resident of Kansas, and the Andersons live in Oklahoma. Shutts and the Andersons$_{801}$ own gas leases in Oklahoma and Texas. Over petitioner's objection the Kansas trial court granted respondents' motion to certify the suit as a class action under Kansas law. Kan.Stat.Ann. § 60–223 *et seq.* (1983). The class as certified was comprised of 33,000 royalty owners who had royalties suspended by petitioner. The average claim of each royalty owner for interest on the suspended royalties was $100.

After the class was certified respondents provided each class member with notice through first-class mail. The notice described the action and informed each class member that he could appear in person or by counsel; otherwise each member would be represented by Shutts and the

Andersons, the named plaintiffs. The notices also stated that class members would be included in the class and bound by the judgment unless they "opted out" of the lawsuit by executing and returning a "request for exclusion" that was included with the notice. The final class as certified contained 28,100 members; 3,400 had "opted out" of the class by returning the request for exclusion, and notice could not be delivered to another 1,500 members, who were also excluded. Less than 1,000 of the class members resided in Kansas. Only a minuscule amount, approximately one quarter of one percent, of the gas leases involved in the lawsuit were on Kansas land.

After petitioner's mandamus petition to decertify the class was denied, *Phillips Petroleum v. Duckworth*, No. 82–54608 (Kan., June 28, 1982), cert. denied, 459 U.S. 1103, 103 S.Ct. 725, 74 L.Ed.2d 951 (1983), the case was tried to the court. The court found petitioner liable under Kansas law for interest on the suspended royalties to all class members. The trial court relied heavily on an earlier, unrelated class action involving the same nominal plaintiff and the same defendant, *Shutts, Executor v. Phillips Petroleum Co.*, 222 Kan. 527, 567 P.2d 1292 (1977), cert. denied, 434 U.S. 1068, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978). The Kansas Supreme Court had held in *Shutts, Executor* that a gas company owed interest to royalty owners for royalties suspended pending final Commission approval of a price increase. No federal statutes |802 touched on the liability for suspended royalties, and the court in *Shutts, Executor* held as a matter of Kansas equity law that the applicable interest rates for computation of interest on suspended royalties were the interest rates at which the gas company would have had to reimburse its customers had its interim price increase been rejected by the Commission. The court in *Shutts, Executor* viewed these as the fairest interest rates because they were also the rates that petitioner required the royalty owners to meet in their indemnity agreements in order to avoid suspended royalties.

The trial court in the present case applied the rule from *Shutts, Executor*, and held petitioner liable for prejudgment and postjudgment interest on the suspended royalties, computed at the Commission rates governing petitioner's three price increases. See 18 CFR § 154.102 (1984). The applicable interest rates were: 7% for royalties retained until October 1974; 9% for royalties retained between October 1974 and September 1979; and thereafter at the average prime rate. The trial court did not determine whether any difference existed between the laws of Kansas and other States, or whether another State's laws should be applied to non-Kansas plaintiffs or to royalties from leases in States other than Kansas. 235 Kan., at 221, 679 P.2d, at 1180.

Petitioner raised two principal claims in its appeal to the Supreme Court of Kansas. It first asserted that the Kansas trial court did not possess personal jurisdiction over absent plaintiff class members as required by *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and similar cases. Related to this first claim was petitioner's contention that the "opt-out" notice to absent class members, which forced them to return the request for exclusion in order to avoid the suit, was insufficient to bind class members who were not residents of Kansas or who did not possess "minimum contacts" with Kansas. Second, petitioner claimed that Kansas courts could not apply Kansas law to every claim in the dispute. The trial court should have looked to the laws of each State |803 where the leases were located to determine, on the basis of conflict of laws principles, whether interest on the suspended royalties was recoverable, and at what rate.

The Supreme Court of Kansas held that the entire cause of action was maintainable under the Kansas class-action statute, and the court rejected both of petitioner's claims. 235 Kan. 195, 679 P.2d 1159 (1984). First, it held that the absent class members were plaintiffs, not defendants, and thus

the traditional minimum contacts test of *International Shoe* did not apply. The court held that nonresident class-action plaintiffs were only entitled to adequate notice, an opportunity to be heard, an opportunity to opt out of the case, and adequate representation by the named plaintiffs. If these procedural due process minima were met, according to the court, Kansas could assert jurisdiction over the plaintiff class and bind each class member with a judgment on his claim. The court surveyed the course of the litigation and concluded that all of these minima had been met.

The court also rejected petitioner's contention that Kansas law could not be applied to plaintiffs and royalty arrangements having no connection with Kansas. The court stated that generally the law of the forum controlled all claims unless "compelling reasons" existed to apply a different law. The court found no compelling reasons, and noted that "[t]he plaintiff class members have indicated their desire to have this action determined under the laws of Kansas." 235 Kan., at 222, 679 P.2d, at 1181. The court affirmed as a matter of Kansas equity law the award of interest on the suspended royalties, at the rates imposed by the trial court. The court set the postjudgment interest rate on all claims at the Kansas statutory rate of 15%. *Id.,* at 224, 679 P.2d, at 1183.

I

As a threshold matter we must determine whether petitioner has standing to assert the claim that Kansas did not possess proper jurisdiction over the many plaintiffs in the ₁₈₀₄class who were not Kansas residents and had no connection to Kansas. Respondents claim that a party generally may assert only his own rights, and that petitioner has no standing to assert the rights of its adversary, the plaintiff class, in order to defeat the judgment in favor of the class.

**[1, 2]** Standing to sue in any Article III court is, of course, a federal question which

does not depend on the party's prior standing in state court. *Doremus v. Board of Education,* 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Generally stated, federal standing requires an allegation of a present or immediate injury in fact, where the party requesting standing has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." *Ibid.* There must be some causal connection between the asserted injury and the challenged action, and the injury must be of the type "likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). See *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–1926, 48 L.Ed.2d 450 (1976); *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).

**[3]** Additional prudential limitations on standing may exist even though the Article III requirements are met because "the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979). One of these prudential limits on standing is that a litigant must normally assert his own legal interests rather than those of third parties. See *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

Respondents claim that petitioner is barred by the rule requiring that a party assert only his own rights; they point out that respondents and petitioner are adversaries and do ₁₈₀₅not have allied interests

such that petitioner would be a good proponent of class members' interests. They further urge that petitioner's interference is unneeded because the class members have had opportunity to complain about Kansas' assertion of jurisdiction over their claim, but none have done so. See *Singleton, supra*, 428 U.S., at 113–114, 96 S.Ct., at 2873–2874.

**[4, 5]** Respondents may be correct that petitioner does not possess standing *jus tertii*, but this is not the issue. Petitioner seeks to vindicate its own interests. As a class-action defendant petitioner is in a unique predicament. If Kansas does not possess jurisdiction over this plaintiff class, petitioner will be bound to 28,100 judgment holders scattered across the globe, but none of these will be bound by the Kansas decree. Petitioner could be subject to numerous later individual suits by these class members because a judgment issued without proper personal jurisdiction over an absent party is not entitled to full faith and credit elsewhere and thus has no res judicata effect as to that party. Whether it wins or loses on the merits, petitioner has a distinct and personal interest in seeing the entire plaintiff class bound by res judicata just as petitioner is bound. The only way a class action defendant like petitioner can assure itself of this binding effect of the judgment is to ascertain that the forum court has jurisdiction over every plaintiff whose claim it seeks to adjudicate, sufficient to support a defense of res judicata in a later suit for damages by class members.

**[6]** While it is true that a court adjudicating a dispute may not be able to predetermine the res judicata effect of its own judgment, petitioner has alleged that it would be obviously and immediately injured if this class-action judgment against it became final without binding the plaintiff class. We think that such an injury is sufficient to give petitioner standing on its own right to raise the jurisdiction claim in this Court.

Petitioner's posture is somewhat similar to the trust settlor defendant in *Hanson v.*

*Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), who we found to have standing to challenge the forum's personal |806jurisdiction over an out-of-state trust company which was an indispensable party under the forum State's law. Because the court could not proceed with the action without jurisdiction over the trust company, we observed that "any defendant affected by the court's judgment ha[d] that 'direct and substantial personal interest in the outcome' that is necessary to challenge whether that jurisdiction was in fact acquired." *Id.*, at 245, 78 S.Ct., at 1235, quoting *Chicago v. Atchison, T. & S.F.R. Co.*, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).

## II

Reduced to its essentials, petitioner's argument is that unless out-of-state plaintiffs affirmatively consent, the Kansas courts may not exert jurisdiction over their claims. Petitioner claims that failure to execute and return the "request for exclusion" provided with the class notice cannot constitute consent of the out-of-state plaintiffs; thus Kansas courts may exercise jurisdiction over these plaintiffs only if the plaintiffs possess the sufficient "minimum contacts" with Kansas as that term is used in cases involving personal jurisdiction over out-of-state defendants. *E.g., International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Since Kansas had no prelitigation contact with many of the plaintiffs and leases involved, petitioner claims that Kansas has exceeded its jurisdictional reach and thereby violated the due process rights of the absent plaintiffs.

In *International Shoe* we were faced with an out-of-state corporation which sought to avoid the exercise of personal jurisdiction over it as a defendant by a Washington state court. We held that the

extent of the defendant's due process protection would depend "upon the quality and nature of the activity in relation to the fair and orderly administration of the laws...." 326 U.S., at 319, 66 S.Ct., at 159. We noted that the Due Process Clause did not permit a State to make a binding judgment against a person with whom the State had no contacts,[807] ties, or relations. *Ibid.* If the defendant possessed certain minimum contacts with the State, so that it was "reasonable and just, according to our traditional conception of fair play and substantial justice" for a State to exercise personal jurisdiction, the State could force the defendant to defend himself in the forum, upon pain of default, and could bind him to a judgment. *Id.*, at 320, 66 S.Ct., at 160.

[7] The purpose of this test, of course, is to protect a defendant from the travail of defending in a distant forum, unless the defendant's contacts with the forum make it just to force him to defend there. As we explained in *Woodson, supra*, the defendant's contacts should be such that "he should reasonably anticipate being haled" into the forum. 444 U.S., at 297, 100 S.Ct., at 567. In *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702–703, and n. 10, 102 S.Ct. 2099, 2104–2105, and n. 10, 72 L.Ed.2d 492 (1982), we explained that the requirement that a court have personal jurisdiction comes from the Due Process Clause's protection of the defendant's personal liberty interest, and said that the requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." (Footnote omitted.)

Although the cases like *Shaffer* and *Woodson* which petitioner relies on for a minimum contacts requirement all dealt with out-of-state defendants or parties in the procedural posture of a defendant, cf. *New York Life Ins. Co. v. Dunlevy*, 241 U.S. 518, 36 S.Ct. 613, 60 L.Ed. 1140 (1916); *Estin v. Estin*, 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948), petitioner claims that the same analysis must apply to absent

class-action plaintiffs. In this regard petitioner correctly points out that a chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). An adverse judgment by Kansas courts in this case may extinguish the chose in action forever through res judicata. Such an adverse judgment, petitioner claims, would be every bit as onerous to an absent plaintiff as an adverse judgment on the merits would be to a defendant.[808] Thus, the same due process protections should apply to absent plaintiffs: Kansas should not be able to exert jurisdiction over the plaintiff's claims unless the plaintiffs have sufficient minimum contacts with Kansas.

We think petitioner's premise is in error. The burdens placed by a State upon an absent class-action plaintiff are not of the same order or magnitude as those it places upon an absent defendant. An out-of-state defendant summoned by a plaintiff is faced with the full powers of the forum State to render judgment *against* it. The defendant must generally hire counsel and travel to the forum to defend itself from the plaintiff's claim, or suffer a default judgment. The defendant may be forced to participate in extended and often costly discovery, and will be forced to respond in damages or to comply with some other form of remedy imposed by the court should it lose the suit. The defendant may also face liability for court costs and attorney's fees. These burdens are substantial, and the minimum contacts requirement of the Due Process Clause prevents the forum State from unfairly imposing them upon the defendant.

A class-action plaintiff, however, is in quite a different posture. The Court noted this difference in *Hansberry v. Lee*, 311 U.S. 32, 40–41, 61 S.Ct. 115, 117–118, 85 L.Ed. 22 (1940), which explained that a "class" or "representative" suit was an exception to the rule that one could not be bound by judgment *in personam* unless one was made fully a party in the tradition-

al sense. *Ibid.*, citing *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 24 L.Ed. 565 (1878). As the Court pointed out in *Hansberry*, the class action was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the litigation was too great to permit joinder. The absent parties would be bound by the decree so long as the named parties adequately represented the absent class and the prosecution of the litigation was within the common interest.[1] 311 U.S., at 41, 61 S.Ct., at 117.

|809|Modern plaintiff class actions follow the same goals, permitting litigation of a suit involving common questions when there are too many plaintiffs for proper joinder. Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually. For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available.

In sharp contrast to the predicament of a defendant haled into an out-of-state forum, the plaintiffs in this suit were not haled anywhere to defend themselves upon pain of a default judgment. As commentators have noted, from the plaintiffs' point of view a class action resembles a "quasi-administrative proceeding, conducted by the judge." 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.45[4.–5] (1984); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments to the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 398 (1967).

A plaintiff class in Kansas and numerous other jurisdictions cannot first be certified unless the judge, with the aid of the named plaintiffs and defendant, conducts an in-quiry into the common nature of the named plaintiffs' and the absent plaintiffs' claims, the adequacy of representation, the jurisdiction possessed over the class, and any other matters that will bear upon proper representation of the absent plaintiffs' interest. See, *e.g.*, Kan.Stat.Ann. § 60–223 (1983); Fed.Rule Civ.Proc. 23. Unlike a defendant in a civil suit, a class-action plaintiff is not required to fend for himself. See Kan.Stat.Ann. § 60–223(d) (1983). The court and named plaintiffs protect his interests. Indeed, the class-action defendant itself has a great interest in ensuring that the absent plaintiff's claims are properly before the forum. In this case, for |810|example, the defendant sought to avoid class certification by alleging that the absent plaintiffs would not be adequately represented and were not amenable to jurisdiction. See *Phillips Petroleum v. Duckworth*, No. 82–54608 (Kan., June 28, 1982).

The concern of the typical class-action rules for the absent plaintiffs is manifested in other ways. Most jurisdictions, including Kansas, require that a class action, once certified, may not be dismissed or compromised without the approval of the court. In many jurisdictions such as Kansas the court may amend the pleadings to ensure that all sections of the class are represented adequately. Kan.Stat.Ann. § 60–223(d) (1983); see also, *e.g.*, Fed.Rule Civ.Proc. 23(d).

Besides this continuing solicitude for their rights, absent plaintiff class members are not subject to other burdens imposed upon defendants. They need not hire counsel or appear. They are almost never subject to counterclaims or cross-claims, or liability for fees or costs.[2] Absent plaintiff

---

**1.** The holding in *Hansberry*, of course, was that petitioners in that case had not a sufficient common interest with the parties to a prior lawsuit such that a decree against those parties in the prior suit would bind the petitioners. But in the present case there is no question that the named plaintiffs adequately represent the class, and that all members of the class have the same interest in enforcing their claims against the defendant.

**2.** Petitioner places emphasis on the fact that absent class members might be subject to discovery, counterclaims, cross-claims, or court costs. Petitioner cites no cases involving any such imposition upon plaintiffs, however. We are convinced that such burdens are rarely imposed upon plaintiff class members, and that the disposition of these issues is best left to a case which presents them in a more concrete way.

class members are not subject to coercive or punitive remedies. Nor will an adverse judgment typically bind an absent plaintiff for any damages, although a valid adverse judgment may extinguish any of the plaintiff's claims which were litigated.

Unlike a defendant in a normal civil suit, an absent class-action plaintiff is not required to do anything. He may sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for his protection. In most class actions an absent plaintiff is provided at least with an opportunity to "opt out" of the class, and if he takes advantage of that opportunity he is removed from the |₈₁₁litigation entirely. This was true of the Kansas proceedings in this case. The Kansas procedure provided for the mailing of a notice to each class member by first-class mail. The notice, as we have previously indicated, described the action and informed the class member that he could appear in person or by counsel, in default of which he would be represented by the named plaintiffs and their attorneys. The notice further stated that class members would be included in the class and bound by the judgment unless they "opted out" by executing and returning a "request for exclusion" that was included in the notice.

Petitioner contends, however, that the "opt out" procedure provided by Kansas is not good enough, and that an "opt in" procedure is required to satisfy the Due Process Clause of the Fourteenth Amendment. Insofar as plaintiffs who have no minimum contacts with the forum State are concerned, an "opt in" provision would require that each class member affirmatively consent to his inclusion within the class.

[8–10] Because States place fewer burdens upon absent class plaintiffs than they do upon absent defendants in nonclass suits, the Due Process Clause need not and does not afford the former as much protection from state-court jurisdiction as it does the latter. The Fourteenth Amendment does protect "persons," not "defendants," however, so absent plaintiffs as well as absent defendants are entitled to some protection from the jurisdiction of a forum State which seeks to adjudicate their claims. In this case we hold that a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant. If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law,[3] it must provide minimal₈₁₂ procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S., at 314–315, 70 S.Ct., at 657; cf. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174–175, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974). The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members. *Hansberry,* 311 U.S., at 42–43, 45, 61 S.Ct., at 118–119, 120.

[11] We reject petitioner's contention that the Due Process Clause of the Four-

---

**3.** Our holding today is limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments. We intimate no view concerning other types of class actions, such as those seeking equitable relief. Nor, of course, does our discussion of personal jurisdiction address class actions where the jurisdiction is asserted against a *defendant* class.

teenth Amendment requires that absent plaintiffs affirmatively "opt in" to the class, rather than be deemed members of the class if they do not "opt out." We think that such a contention is supported by little, if any precedent, and that it ignores the differences between class-action plaintiffs, on the one hand, and defendants in nonclass civil suits on the other. Any plaintiff may consent to jurisdiction. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). The essential question, then, is how stringent the requirement for a showing of consent will be.

[12] We think that the procedure followed by Kansas, where a fully descriptive notice is sent first-class mail to each class member, with an explanation of the right to "opt out," satisfies due process. Requiring a plaintiff to affirmatively ₈₁₃request inclusion would probably impede the prosecution of those class actions involving an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit. See, *e.g., Eisen, supra,* 417 U.S., at 161, 94 S.Ct., at 2144. The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually, nor would he affirmatively request inclusion in the class if such a request were required by the Constitution.[4] If, on the other hand, the plaintiff's claim is sufficiently large or important that he wishes to litigate it on his own, he will likely have retained an attorney or have thought about filing suit, and should be fully capable of exercising his right to "opt out."

In this case over 3,400 members of the potential class did "opt out," which belies the contention that "opt out" procedures result in guaranteed jurisdiction by inertia. Another 1,500 were excluded because the notice and "opt out" form was undeliverable. We think that such results show that the "opt out" procedure provided by Kansas is by no means *pro forma,* and that the Constitution does not require more to protect what must be the somewhat rare species of class member who is unwilling to execute an "opt out" form, but whose claim is nonetheless so important that he cannot be presumed to consent to being a member of the class by his failure to do so. Petitioner's "opt in" requirement would require the invalidation of scores of state statutes and of the class-action provision of the Federal Rules of Civil Procedure,₈₁₄[5] and for the reasons stated we do not think that the Constitution requires the State to sacrifice the obvious advantages in judicial efficiency resulting from the "opt out" approach for the protection of the *rara avis* portrayed by petitioner.

---

4. In this regard the Reporter for the 1966 amendments to the Federal Rules of Civil Procedure stated:

"[R]equiring the individuals affirmatively to request inclusion in the lawsuit would result in freezing out the claims of people—especially small claims held by small people—who for one reason or another, ignorance, timidity, unfamiliarity with business or legal matters, will simply not take the affirmative step." Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 397–398 (1967).

5. The following statutes or procedural rules permit "opt out" notice in some types of class actions.

Fed.Rule Civ.Proc. 23(c)(2)(A); Ala.Rule Civ. Proc. 23(c)(2)(A); Alaska Rule Civ.Proc. 23(c)(2)(A); Ariz.Rule Civ.Proc. 23(c)(2)(A); Cal.Civ.Code Ann. § 1781(e)(1) (West 1973)

(consumer class action); Colo.Rule Civ.Proc. 23(c)(2)(A); Del.Ch.Ct.Rule 23(c)(2)(A); D.C.Super.Ct.Rule Civ.Proc. 23(c)(2)(A); Fla.Rule Civ. Proc. 1.220(d)(2)(A); Idaho Rule Civ.Proc. 23(c)(2)(A); Ind.Rule Trial Proc. 23(C)(2)(a); Iowa Rule Civ.Proc. 42.8(b); Kan.Stat.Ann. § 60–223(c)(2) (1983); Ky.Rule Civ.Proc. 23.-03(2)(a); Me.Rule Civ.Proc. 23(c)(2)(A); Md. Rule Civ.Proc. 2–231(e)(1); Mich.Ct.Rule 3.501(C)(5)(b); Minn.Rule Civ.Proc. 23.03(2)(A); Mo.Rule Civ.Proc. 52.08; Mont.Rule Civ.Proc. 23(c)(2)(A); Nev.Rule Civ.Proc. 23(c)(2)(A); N.J.Civ.Prac.Rule 4:32–2; N.Y.Civ.Prac.Law § 904 (McKinney 1976); N.D.Rule Civ.Proc. 23(g)(2)(B); Ohio Rule Civ.Proc. 23(C)(2)(a); Okla.Stat., Tit. 12, § 2023(C)(2)(a) (Supp.1984–1985); Ore.Rule Civ.Proc. 32 F(1)(b)(ii); Pa. Rule Civ.Proc. 1711(a); Tenn.Rule Civ.Proc. 23.-03(2)(a); Vt.Rule Civ.Proc. 23(c)(2)(A); Wash. Ct.Rule 23(c)(2)(i); Wyo.Rule Civ.Proc. 23(c)(2)(A).

We therefore hold that the protection afforded the plaintiff class members by the Kansas statute satisfies the Due Process Clause. The interests of the absent plaintiffs are sufficiently protected by the forum State when those plaintiffs are provided with a request for exclusion that can be returned within a reasonable time to the court. See *Insurance Corp. of Ireland*, 456 U.S., at 702–703, and n. 10, 102 S.Ct., at 2104–2105, and n. 10. Both the Kansas trial court and the Supreme Court of Kansas held that the class received adequate representation, and no party disputes that conclusion here. We conclude that the Kansas court properly asserted personal jurisdiction over the absent plaintiffs and their claims against petitioner.

III

[13] The Kansas courts applied Kansas contract and Kansas equity law to every claim in this case, notwithstanding that over 99% of the gas leases and some 97% of the plaintiffs in the case had no apparent connection to the State of Kansas

**6.** The Commission approved petitioner's price increases in Opinion Nos. 699, 749, and 770. Petitioner reimbursed royalty owners $3.7, $2.9, and $4.7 million in suspended royalties, respectively. The States where the leases were located and their resident plaintiffs are as follows.

except for this lawsuit.[6] Petitioner protested that the Kansas courts should apply the laws of the States where the leases were located, or at least apply Texas and Oklahoma law because so many of the leases came from those States. The Kansas courts disregarded this contention and found petitioner liable for interest on the suspended royalties as a matter of Kansas law, and set the interest rates under Kansas equity principles.

Petitioner contends that total application of Kansas substantive law violated the constitutional limitations on choice of law mandated by the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV, § 1. We must first determine whether Kansas law conflicts in any material way with any other law which could apply. There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit.

Petitioner claims that Kansas law conflicts with that of a number of States con-

OPINION 699

| States | No. leases in state | Royalties to state leases | No. royalty owners in state |
|---|---|---|---|
| Oklahoma ..... | 1,266 | $    83,711.35 | 2,653 |
| Texas .......... | 4,414 | 839,152.73 | 9,591 |
| Kansas ........ | 3 | 152.88 | 496 |
| Arkansas ..... | 6 | 3,228.22 | 173 |
| Louisiana ..... | 68 | 2,187,548.06 | 1,244 |
| New Mexico .. | 941 | 433,574.85 | 621 |
| Illinois ........ | — | — | 397 |
| Wyoming ..... | 690 | 148,906.93 | 413 |
| Mississippi .... | — | — | 67 |
| Utah .......... | — | — | 29 |
| West Virginia . | — | — | 20 |
| No State Code | 1 | [.05] | 1,025 |
| | 7,389 | $3,696,274.97 | |

OPINION 749

| States | No. leases in state | Royalties to state leases | No. royalty owners in state |
|---|---|---|---|
| Oklahoma ..... | 1,948 | $  243,163.49 | 3,591 |
| Texas .......... | 3,479 | 2,171,217.36 | 7,881 |
| Kansas ........ | 15 | 2,619.24 | 553 |
| Arkansas ...... | 32 | 1,769.33 | 171 |
| Louisiana ..... | 178 | 352,539.45 | 740 |
| New Mexico .. | 350 | 22,670.27 | 339 |
| Illinois ........ | 1 | 1.30 | 357 |
| Wyoming ..... | 68 | 67,570.01 | 37 |
| Mississippi .... | 3 | 694.93 | 88 |
| Utah .......... | 1 | 184.60 | 18 |
| W. Virginia ... | 32 | 10,364.61 | 246 |
| No State Code | 2 | 1,032.59 | 1,553 |
| | 6,109 | $2,873,827.18 | |

OPINION 770

| States | No. leases in state | Royalties to state leases | No. royalty owners in state |
|---|---|---|---|
| Oklahoma ..... | 1,430 | $  471,122.53 | 2,684 |
| Texas .......... | 3,702 | 2,615,744.46 | 8,550 |
| Kansas ........ | 4 | 115.10 | 504 |
| Arkansas ..... | 2 | 552.83 | 162 |
| Louisiana ..... | 26 | 516,248.13 | 361 |
| New Mexico .. | 591 | 194,799.95 | 469 |
| Illinois ........ | 1 | .01 | 353 |
| Wyoming ..... | 476 | 945,441.09 | 272 |
| Mississippi .... | — | — | 36 |
| Utah .......... | — | — | 18 |
| West Virginia . | — | — | 22 |
| No State Code | — | — | 1,046 |
| | 6,232 | $4,744,024.10 | |

nected to this litigation, especially Texas and Oklahoma. These putative conflicts range from the direct to the tangential, and may be addressed by the Supreme Court of Kansas on remand under the correct constitutional standard. For example, there is no recorded $_{|817}$Oklahoma decision dealing with interest liability for suspended royalties: whether Oklahoma is likely to impose liability would require a survey of Oklahoma oil and gas law. Even if Oklahoma found such liability, petitioner shows that Oklahoma would most likely apply its constitutional and statutory 6% interest rate rather than the much higher Kansas rates applied in this litigation. Okla. Const., Art. XIV, § 2; Okla.Stat., Tit. 15, § 266 (Supp. 1984–1985); *Rendezvous Trails of America, Inc. v. Ayers,* 612 P.2d 1384, 1385 (Okla.App.1980); *Smith v. Robinson,* 594 P.2d 364 (Okla.1979); *West Edmond Hunton Lime Unit v. Young,* 325 P.2d 1047 (Okla.1958).

Additionally, petitioner points to an Oklahoma statute which excuses liability for interest if a creditor accepts payment of the full principal without a claim for interest, Okla.Stat., Tit. 23, § 8 (1951). Cf. *Webster Drilling Co. v. Sterling Oil of Oklahoma, Inc.,* 376 P.2d 236 (Okla.1962). Petitioner contends that by ignoring this statute the Kansas courts created liability that does not exist in Oklahoma.

Petitioner also points out several conflicts between Kansas and Texas law. Although Texas recognizes interest liability for suspended royalties, Texas has never awarded any such interest at a rate greater than 6%, which corresponds with the Texas constitutional and statutory rate.[7] Tex. Const., Art. 16, § 11; Tex.Rev.Civ.Stat. Ann., Art. 5069–1.03 (Vernon 1971). See *Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480 (Tex.1978); *Phillips Petroleum Co. v. Adams,* 513 F.2d 355 (CA5), cert. denied, 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259 (1975); cf. *Maxey v.*

*Texas Commerce Bank,* 580 S.W.2d 340, 341 (Tex.1979). Moreover, at least one court interpreting Texas law appears to have held that Texas excuses interest$_{|818}$ liability once the gas company offers to take an indemnity from the royalty owner and pay him the suspended royalty while the price increase is still tentative. *Phillips Petroleum Co. v. Riverside Gas Compression Co.,* 409 F.Supp. 486, 495–496 (ND Tex.1976). Such a rule is contrary to Kansas law as applied below, but if applied to the Texas plaintiffs or leases in this case, would vastly reduce petitioner's liability.

The conflicts on the applicable interest rates, alone—which we do not think can be labeled "false conflicts" without a more thoroughgoing treatment than was accorded them by the Supreme Court of Kansas—certainly amounted to millions of dollars in liability. We think that the Supreme Court of Kansas erred in deciding on the basis that it did that the application of its laws to all claims would be constitutional.

Four Terms ago we addressed a similar situation in *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). In that case we were confronted with two conflicting rules of state insurance law. Minnesota permitted the "stacking" of separate uninsured motorist policies while Wisconsin did not. Although the decedent lived in Wisconsin, took out insurance policies and was killed there, he was employed in Minnesota, and after his death his widow moved to Minnesota for reasons unrelated to the litigation, and was appointed personal representative of his estate. She filed suit in Minnesota courts, which applied the Minnesota stacking rule.

The plurality in *Allstate* noted that a particular set of facts giving rise to litigation could justify, constitutionally, the application of more than one jurisdiction's laws. The plurality recognized, however,

---

7. The Kansas interest rate also conflicts with the rate which is applicable in Louisiana. At the time this suit was filed that rate was 7%. See La.Civ.Code Ann., Art. 1938 (1977) (amended in 1982); *Wurzlow v. Placid Oil Co.,* 279 So.2d 749, 772–774 (La.App.1973) (applying Art. 1938 to oil and gas royalties).

that the Due Process Clause and the Full Faith and Credit Clause provided modest restrictions on the application of forum law. These restrictions required "that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.*, at 312–313, 101 S.Ct., at 639–640. The |819dissenting Justices were in substantial agreement with this principle. *Id.*, at 332, 101 S.Ct., at 650 (opinion of POWELL, J., joined by BURGER, C.J., and REHNQUIST, J.). The dissent stressed that the Due Process Clause prohibited the application of law which was only casually or slightly related to the litigation, while the Full Faith and Credit Clause required the forum to respect the laws and judgments of other States, subject to the forum's own interests in furthering its public policy. *Id.*, at 335–336, 101 S.Ct., at 651–652.

The plurality in *Allstate* affirmed the application of Minnesota law because of the forum's significant contacts to the litigation which supported the State's interest in applying its law. See *id.*, at 313–329, 101 S.Ct., at 640–648. Kansas' contacts to this litigation, as explained by the Kansas Supreme Court, can be gleaned from the opinion below.

Petitioner owns property and conducts substantial business in the State, so Kansas certainly has an interest in regulating petitioner's conduct in Kansas. 235 Kan., at 210, 679 P.2d, at 1174. Moreover, oil and gas extraction is an important business to Kansas, and although only a few leases in issue are located in Kansas, hundreds of Kansas plaintiffs were affected by petitioner's suspension of royalties; thus the court held that the State has a real interest in protecting "the rights of these royalty owners both as individual residents of [Kansas] and as members of this particular class of plaintiffs." *Id.*, at 211–212, 679 P.2d, at 1174. The Kansas Supreme Court pointed out that Kansas courts are quite familiar

with this type of lawsuit, and "[t]he plaintiff class members have indicated their desire to have this action determined under the laws of Kansas." *Id.*, at 211, 222, 679 P.2d, at 1174, 1181. Finally, the Kansas court buttressed its use of Kansas law by stating that this lawsuit was analogous to a suit against a "common fund" located in Kansas. *Id.*, at 201, 211–212, 679 P.2d, at 1168, 1174.

We do not lightly discount this description of Kansas' contacts with this litigation and its interest in applying its law. There is, however, no "common fund" located in Kansas that |820would require or support the application of only Kansas law to all these claims. See, *e.g.*, *Hartford Life Ins. Co. v. Ibs*, 237 U.S. 662, 35 S.Ct. 692, 59 L.Ed. 1165 (1915). As the Kansas court noted, petitioner commingled the suspended royalties with its general corporate accounts. 235 Kan., at 201, 679 P.2d, at 1168. There is no specific identifiable res in Kansas, nor is there any limited amount which may be depleted before every plaintiff is compensated. Only by somehow aggregating all the separate claims in this case could a "common fund" in any sense be created, and the term becomes all but meaningless when used in such an expansive sense.

We also give little credence to the idea that Kansas law should apply to all claims because the plaintiffs, by failing to opt out, evinced their desire to be bound by Kansas law. Even if one could say that the plaintiffs "consented" to the application of Kansas law by not opting out, plaintiff's desire for forum law is rarely, if ever controlling. In most cases the plaintiff shows his obvious wish for forum law by filing there. "If a plaintiff could choose the substantive rules to be applied to an action ... the invitation to forum shopping would be irresistible." *Allstate, supra*, 449 U.S., at 337, 101 S.Ct., at 652 (opinion of POWELL, J.). Even if a plaintiff evidences his desire for forum law by moving to the forum, we have generally accorded such a move little or no significance. *John Hancock Mut.*

*Life Ins. Co. v. Yates,* 299 U.S. 178, 182, 57 S.Ct. 129, 131, 81 L.Ed. 106 (1936); *Home Ins. Co. v. Dick,* 281 U.S. 397, 408, 50 S.Ct. 338, 341, 74 L.Ed. 926 (1930). In *Allstate* the plaintiff's move to the forum was only relevant because it was unrelated and prior to the litigation. 449 U.S., at 318–319, 101 S.Ct., at 643. Thus the plaintiffs' desire for Kansas law, manifested by their participation in this Kansas lawsuit, bears little relevance.

The Supreme Court of Kansas in its opinion in this case expressed the view that by reason of the fact that it was adjudicating a nationwide class action, it had much greater latitude in applying its own law to the transactions in question than might otherwise be the case:

|₈₂₁"The general rule is that the law of the forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred.... Where a state court determines it has jurisdiction over a nationwide class action and procedural due process guarantees of notice and adequate representation are present, we believe the law of the forum should be applied unless compelling reasons exist for applying a different law.... Compelling reasons do not exist to require this court to look to other state laws to determine the rights of the parties involved in this lawsuit." 235 Kan., at 221–222, 679 P.2d, at 1181.

We think that this is something of a "bootstrap" argument. The Kansas class-action statute, like those of most other jurisdictions, requires that there be "common issues of law or fact." But while a State may, for the reasons we have previously stated, assume jurisdiction over the claims of plaintiffs whose principal contacts are with other States, it may not use this assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law. It may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a "common question of law." The issue of personal jurisdiction over plaintiffs in a class action is entirely distinct from the question of the constitutional limitations on choice of law; the latter calculus is not altered by the fact that it may be more difficult or more burdensome to comply with the constitutional limitations because of the large number of transactions which the State proposes to adjudicate and which have little connection with the forum.

Kansas must have a "significant contact or significant aggregation of contacts" to the claims asserted by each member of the plaintiff class, contacts "creating state interests," in order to ensure that the choice of Kansas law is not arbitrary |₈₂₂or unfair. *Allstate,* 449 U.S., at 312–313, 101 S.Ct., at 639–640. Given Kansas' lack of "interest" in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits.[8]

When considering fairness in this context, an important element is the expecta-

---

**8.** In this case the Kansas Supreme Court held that "[t]he trial court did not determine whether any difference existed between the laws of Kansas and other states or whether another state's law should be applied." 235 Kan. 195, 221, 679 P.2d 1159, 1180 (1984). Respondents contend that the trial court and the Supreme Court actually incorporated by reference the opinion in *Shutts, Executor,* 222 Kan. 527, 567 P.2d 1292 (1977), where the court looked to the Texas and Oklahoma interest rate statutes and found them inapplicable. We do not think that the Kansas Supreme Court fully adopted the choice-of-law discussion in *Shutts, Executor* as its holding in this case. But even if we agreed that *Shutts, Executor* was somehow incorporated below, that would be insufficient. *Shutts, Executor* was a pre-*Allstate* case involving only 2 other States, rather than the 10 present here. Moreover, the gas region involved in *Shutts, Executor* was primarily within Kansas borders. *Shutts, Executor* only considered the conflict involving interest rate liability and state statutes, and in finding the 6% Texas rate inapplicable it cited but did not follow contrary Texas precedent. 222 Kan., at 562–565, 567 P.2d, at 1317–1319.

**2980**  **105 SUPREME COURT REPORTER**  **472 U.S. 822**

tion of the parties. See *Allstate, supra,* 449 U.S., at 333, 101 S.Ct., at 650 (opinion of POWELL, J.). There is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control. Neither the Due Process Clause nor the Full Faith and Credit Clause requires Kansas "to substitute for its own [laws], applicable to persons and events within it, the conflicting statute of another state," *Pacific Employees Ins. Co. v. Industrial Accident Comm'n,* 306 U.S. 493, 502, 59 S.Ct. 629, 633, 83 L.Ed. 940 (1939), but Kansas "may not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them." *Home Ins. Co. v. Dick, supra,* 281 U.S., at 410, 50 S.Ct., at 342.

Here the Supreme Court of Kansas took the view that in a nationwide class action where procedural due process guarantees₈₂₃ of notice and adequate representation were met, "the law of the forum should be applied unless compelling reasons exist for applying a different law." 235 Kan., at 221, 679 P.2d, at 1181. Whatever practical reasons may have commended this rule to the Supreme Court of Kansas, for the reasons already stated we do not believe that it is consistent with the decisions of this Court. We make no effort to determine for ourselves which law must apply to the various transactions involved in this lawsuit, and we reaffirm our observation in *Allstate* that in many situations a state court may be free to apply one of several choices of law. But the constitutional limitations laid down in cases such as *Allstate* and *Home Ins. Co. v. Dick, supra,* must be respected even in a nationwide class action.

We therefore affirm the judgment of the Supreme Court of Kansas insofar as it upheld the jurisdiction of the Kansas courts over the plaintiff class members in this case, and reverse its judgment insofar

as it held that Kansas law was applicable to all of the transactions which it sought to adjudicate. We remand the case to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice POWELL took no part in the decision of this case.

Justice STEVENS, concurring in part and dissenting in part.

For the reasons stated in Parts I and II of the Court's opinion, I agree that the Kansas courts properly exercised jurisdiction over this class action. I also recognize that the use of the word "compelling" in a portion of the Kansas Supreme Court's opinion, when read out of context, may create an inaccurate impression of that court's choice-of-law holding. See *ante,* at 2980. Our job, however, is to review judgments, not to edit opinions, and I am firmly convinced that there is no constitutional defect in the judgment under review.

As the Court recognizes, there "can be no [constitutional] injury in applying Kansas law if it is not in conflict with that₈₂₄of any other jurisdiction connected to this suit." *Ante,* at 2976. A fair reading of the Kansas Supreme Court's opinion in light of its earlier opinion in *Shutts v. Phillips Petroleum Co.,* 222 Kan. 527, 567 P.2d 1292 (1977) (hereafter *Shutts I*), cert. denied, 434 U.S. 1068, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978), reveals that the Kansas court has examined the laws of connected jurisdictions and has correctly concluded that there is no "direct" or "substantive" conflict between the law applied by Kansas and the laws of those other States. Cf. *ante,* at 2976–2980. Kansas has merely developed general common-law principles to accommodate the novel facts of this litigation—other state courts either agree with Kansas or have not yet addressed precisely similar claims. Consequently, I conclude that the Full Faith and Credit Clause of the Constitution¹ did not require

---

1. "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial

Proceedings of every other State. And the Congress may by general Laws prescribe the Man-

**PHILLIPS PETROLEUM CO. v. SHUTTS**
Cite as 105 S.Ct. 2965 (1985)

Kansas to apply the law of any other State, and the Fourteenth Amendment's Due Process Clause[2] did not prevent Kansas from applying its own law in this case.

The Court errs today because it applies a loose definition of the sort of "conflict" of laws required to state a *constitutional* claim, allowing Phillips a tactical victory here merely on allegations of "putative" or "likely" conflicts. *Ante*, at 2977. The Court's choice-of-law analysis also treats the two relevant constitutional provisions as though they imposed the same constraints on the forum court. In my view, however, the potential impact of the Kansas choice on the interests of other sovereign States and the fairness of its decision to the litigants should be separately considered. See *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 320, 101 S.Ct. 633, 644, 66 L.Ed.2d 521 (1981) (STEVENS, J., concurring in judgment). For both inquiries, it <sub>|825</sub>is essential to have a better understanding of the merits of the underlying dispute than can be gleaned from the Court's opinion. I therefore begin with an explanation of the background of this litigation.

## I

Petitioner (Phillips) is a large independent producer, purchaser, and seller of natural gas. Beginning in 1954, the prices at which it sold natural gas to interstate pipeline companies were regulated by the Federal Power Commission (Commission).[3] *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). As a party to a large number of producing oil and gas leases, Phillips is obligated to pay a percentage of the value of the production, usually one-eighth, to persons owning an interest in the leased areas, so-called "royalty owners." Some royalty owners are due monthly royalties by contractual agreements made directly with Phillips. See *Shutts I, supra*, 222 Kan. at 532, 567 P.2d, at 1298. Others are due royalties under contracts made with other gas producers who then sell their gas to Phillips—by separate contract with those producers, Phillips has "assumed the producer's responsibility to distribute the royalties ... to the royalty owners." 235 Kan. 195, 218, 679 P.2d 1159, 1178 (1984). The relationship between Phillips and the royalty owners is not regulated by the Commission although it is, of course, materially affected by the Commission's control over the pricing relationship between Phillips and its customers.

In a series of orders entered after 1954, the Commission established a practice of suspending price increases proposed by Phillips until approved by the Commission, but allowing Phillips to collect the higher proposed prices upon the filing by Phillips with the Commission of a corporate undertaking to refund to its customers any portion of an increase <sub>|826</sub>that is ultimately disapproved by the Commission. Pursuant to Commission regulation, Phillips agrees that unapproved prices it collects are subject to refund "with interest at seven percent (7%) per annum from the date of receipt until September 18, 1970, and eight percent (8%) per annum thereafter until paid out, if the FPC [does] not approve the sales price." *Shutts I, supra*, 222 Kan., at 533, 567 P.2d, at 1299 (emphasis deleted) (citing 18 CFR § 154.102(c) (1977) and Commission opinion No. 586, 44 F.P.C. 761, 791 (1970)). Phillips' receipts during periods when its proposed price increases have not yet received final approval therefore include two components—the "firm" proceeds and the "FPC suspense money." For example, while an increase in price from 11

---

ner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. Const., Art. IV, § 1. See also 28 U.S.C. § 1738.

**2.** "No State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const., Amdt. 14, § 1.

**3.** The responsibilities of the Federal Power Commission were transferred to the Federal Energy Regulatory Commission in 1977. See 91 Stat. 578, 582–584.

cents per Mcf (thousand cubic feet) to 13 cents is under consideration, the collection of the higher price would include firm proceeds of 11 cents and 2 cents of FPC suspense money.

In July 1961, while a price increase applicable to the tri-state Hugoton-Anadarko area (Kansas, Oklahoma, and Texas) was pending, Phillips sent a notice to the royalty owners for that area advising them that "until further notice" they would be paid royalties on the basis of firm proceeds only and that royalties based on suspense money would be paid only after it was "determined that the sums collected are no longer subject to refund." The notice also advised the royalty owners that they could receive ongoing payment of royalties on the suspense money as well if they furnished Phillips with an "acceptable indemnity to cover their proportionate part of any required refunds, *plus the required interest.*" *Shutts I,* 222 Kan., at 534, 567 P.2d, at 1299 (emphasis added).[4] The indemnity which Phillips required was a corporate security bond covering a principal amount based on estimated production for a 2-year period, plus the 7% interest rate Phillips would be required to pay to its customers if the price increase were not approved. Only 17 royalty owners provided Phillips with such an indemnity; approximately 6,400 royalty owners who did not do so did not receive royalties on the suspense proceeds until 11 years later, after the price increase was finally approved. The situation was succinctly summarized by the Kansas Supreme Court in *Shutts I:*

"From June 1, 1961, to October 1, 1970, Phillips deposited the increased rate monies collected *in its general account and commingled it with its other funds,* without ever giving notice of this fact to royalty owners during the time it was holding money. It is important to note that during this period of time *Phillips had no entitlement to the gas royalty owners' share of the 'suspense royalties,' whether or not the rates were approved by the FPC.* Phillips never owned this money. While Phillips collected eight-eighths (8/8) of the increased rates, under no condition was the one-eighth (1/8) of the increase attributable to the royalty owners ever to go to Phillips. That royalty share, according to eventual FPC ruling, was either to go to Phillips' royalty owners, or back to Phillips' gas purchasers with interest, or part to one and part to the other." *Id.,* 222 Kan., at 535, 567 P.2d, at 1300 (emphasis in original).

In 1970, the Commission entered an order approving Phillips' Hugoton-Anadarko price increases to the extent of approximately $153,000,000 and disapproving them to the extent of approximately $29,000,000. Thus, over 18% of the suspense money had to be refunded to Phillips' customers, with interest at the rates to which Phillips had agreed under Commission regulation. Having no jurisdiction over the relationship between Phillips and the royalty owners, however, the Commission's order was silent on the subject of royalties on the $153 million of suspense money that did not have to be refunded. After the Commis-

---

4.  The relevant portion of the 1961 notice provided in full:

    "Effective June 1, 1961, and until further notice, royalties paid you will be computed by excluding that portion of any price being collected subject to refund which exceeds 11 [cents] per Mcf (presently the maximum area price level for increased rates as recently announced by the Federal Power Commission in its Statement of General Policy). Payment of royalty based on the balance of the sums collected will be made at such time as it is determined that the sums collected are no longer subject to refund.

    "Interest owners desiring to receive payments computed currently on the full sums being collected may arrange to do so by furnishing Phillips Petroleum Company acceptable indemnity to cover their proportionate part of any required refunds, plus the required interest." *Shutts I,* 222 Kan., at 534, 567 P.2d, at 1299.

    The practice of withholding suspense royalties pending final Commission price approval was sustained in *Ashland Oil & Refining Co. v. Staats, Inc.,* 271 F.Supp. 571, 579 (Kan.1967), and *Boutte v. Chevron Oil Co.,* 316 F.Supp. 524 (ED La.1970), aff'd, 442 F.2d 1337 (CA5 1971) (*per curiam*).

sion's order was finally affirmed by the Ninth Circuit in 1972, *In re Hugoton-Anadarko Area Rate Case,* 466 F.2d 974, Phillips mailed checks to the royalty owners for their share of the suspense moneys based on the approved higher prices that had been collected since 1961. However, "Phillips neither paid nor offered to pay any interest for the use of the money, nor did Phillips say anything about interest or how long the money had been held or used by Phillips." *Shutts I, supra,* 222 Kan., at 537, 567 P.2d, at 1301.

The foregoing facts gave rise to *Shutts I.* This case (*Shutts II*) involves suspense royalties due on similar price increases approved in 1976, 1977, and 1978 to a larger number of royalty owners (28,100) with interests in leased areas located in 11 States, including Kansas. Otherwise, however, "[w]ith a few exceptions this case is similar in legal issues and factual situation to that presented in *Shutts [I]*." 235 Kan., at 198, 679 P.2d, at 1165. Both cases involve what the Kansas Supreme Court has

characterized as a "common fund" consisting of the suspense royalties undeniably owed by Phillips<sub>829</sub> but not paid for periods of several years while Commission approval of rate increases were pending.[5] It is undisputed that Phillips enjoyed the unfettered use of that money. See 222 Kan., at 560, 567 P.2d, at 1316 (testimony of Phillips' Treasurer). It is also undisputed that when the Commission proceedings ended, none of the money could be retained by Phillips. To the extent that a price increase was disapproved, a refund to the purchasing pipelines, plus interest at the rate set by the Commission, would be required; to the extent that the increases were approved, the money was contractually owed to the royalty owners. As the Kansas court noted: "What is significant is these gas royalty suspense monies never did nor could belong to Phillips." *Ibid.* (emphasis deleted).[6]

<sub>830</sub>In *Shutts I,* the Kansas Supreme Court held that general equitable principles

---

5. "Had Phillips put the 'suspense royalties' into a common trust fund, separate from its operating funds, to be used solely to pay either the pipeline companies or the gas royalty owners once the FPC ultimately decided the rate increase question, this case would dovetail nicely into the 'common fund' cases." *Shutts I,* 222 Kan., at 552, 567 P.2d, at 1311. Accord, 235 Kan., at 201, 212, 679 P.2d, at 1168, 1174. The Court criticizes Kansas' use of the "common fund" concept as applied to these funds. *Ante,* at 2979. Kansas is not alone, however, in applying the common fund concept in a class action to a pool of readily identifiable moneys placed within the court's power by a liability determined by the lawsuit itself. See, *e.g., Perlman v. First National Bank of Chicago,* 15 Ill.App.3d 784, 799–802, 305 N.E.2d 236, 247–250 (1973) (cited in *Shutts I,* 222 Kan., at 553, 567 P.2d, at 1311–1312); see also *Sprague v. Ticonic National Bank,* 307 U.S. 161, 166–167, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939) (common fund may be "recovered" in litigation); Dawson, Lawyers and Involuntary Clients: Attorney Fees From Funds, 87 Harv.L.Rev. 1597, 1615 (1974) ("Funds can also be created by the litigation itself"). Moreover, it is of course no concern of this Court how Kansas chooses to develop its state common-law doctrines. Absent some constitutional foundation plainly lacking here, the Court's criticism of Kansas' substantive state law is entirely gratuitous.

6. Phillips argued below that some distinction should be made for purposes of interest liability between royalties owed on gas sold to pipeline companies who paid the higher "suspense" price and royalties owed on gas used by Phillips itself rather than sold. Yet "Phillips acknowledges ... that its obligation to pay royalties under the various ... contracts *exists without regard to the actual disposition of the gas.*" 235 Kan., at 215, 679 P.2d, at 1177 (emphasis added). Thus, "[b]y choosing to withhold payment Phillips was allowed the use of the suspense monies during the suspense period which rightfully belonged to the royalty owners, and the royalty owners, in turn, were deprived of receiving and using those monies during that time." *Id.,* at 216, 679 P.2d, at 1177. Applying the same unjust enrichment theory developed in *Shutts I,* the Kansas Supreme Court accordingly rejected Phillips' proffered distinction. 235 Kan., at 217, 679 P.2d, at 1178. Significantly, Phillips does not claim here that even a "putative" conflict of laws might turn on this distinction. Phillips pursues the argument only to contend in a footnote that, because it never actually collected higher prices on gas that it used itself, no "fund" actually existed. Brief for Petitioner 21, n. 18. As the Kansas court noted, however, the fund at issue is the "easily computed" amount of *royalties* that were due the royalty owners in any case, not the moneys collected by Phillips in return for sales. 235 Kan., at 217, 679 P.2d, at 1178.

required the award of interest on royalties owed to royalty owners but used by Phillips for a number of years. In support of that conclusion it relied on general statements in two Kansas cases [7] and a long line of federal cases applying *Texas* law and concluding that equity requires "the award of interest on suspense royalties under similar circumstances." *Id.*, at 561, 567 P.2d, at 1317.[8] The court noted that Oklahoma had no decisions allowing interest on suspense royalties, but concluded that "several Oklahoma decisions hold that interest may be awarded on equitable grounds where necessary to arrive at a fair compensation. (*Smith v. Owens*, 397 P.2d 673 [Okla.1963]; and *First Nat. Bank & T. Co. v. Exchange Nat. Bank and T. Co.*, 517 P.2d 805 [Okla.App.1973])." [9] Finally, the court construed the royalty agreements at issue as containing a "contractual ₈₃₁obligation" to pay interest on the royalties "for the period of time the suspense money was held and used by Phillips." *Id.*, 222 Kan., at 562, 567 P.2d, at 1317. Thus the Kansas court also found its result consistent with the only Texas state-court decision on point, *Stahl Petroleum Co. v. Phillips Petroleum Co.*, 550 S.W.2d 360 (Tex.Civ.App. 1977), which had "awarded interest on suspended royalties" based on "the terms of the royalty agreement ... rather than unjust enrichment." 222 Kan., at 561, 567

P.2d, at 1317. Significantly, when the Texas Supreme Court subsequently affirmed the *Stahl* judgment, it relied on the Kansas Supreme Court's decision in *Shutts I* to decide that equity as well as contract law requires interest on suspense royalties. *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 485–488, and n. 5 (1978).

After determining that Phillips was liable for interest on the suspense royalties, the court reversed the trial court's decision that the rate should be 6% because that was the statutory interest rate in Kansas, Oklahoma, and Texas. The Kansas Supreme Court noted that the statutory rate in all three States expressly applied only when no other rate had been agreed upon,[10] and that in this case Phillips had made an express agreement, evidenced by its corporate undertaking, to pay interest at the rate set by the Commission on suspense moneys found refundable. 222 Kan., at 564, 567 P.2d, at 1319. The Kansas Supreme Court therefore declined to apply *any* State's interest statute, including its own. "[E]quitable principles require, and contractual principles dictate, that the royalty owners receive the same treatment" as refunded purchasers,₈₃₂ that is, payment at the same FPC rate of interest.[11] *Id.*, at 563, 567 P.2d, at 1318.

---

**7.** *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1, cert. denied, 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977); *Shapiro v. Kansas Public Employees Retirement System*, 216 Kan. 353, 357, 532 P.2d 1081, 1084 (1975).

**8.** The court cited six cases, four from the Fifth Circuit and two from the Northern District of Texas, in all of which Phillips was a named party.

**9.** The Kansas court also pointed out that "the United States Supreme Court has noted the imposition of interest on refunds ordered by the FPC is not an inappropriate means of preventing unjust enrichment. (*United Gas v. Callery Properties*, 382 U.S. 223 [86 S.Ct. 360, 15 L.Ed.2d 284])." 222 Kan., at 562, 567 P.2d, at 1317–1318.

**10.** See Kan.Stat.Ann. § 16–201 (1974) ("Creditors shall be allowed to receive interest at the rate of six percent per annum, *when no other*

rate of interest is agreed upon"); Okla.Stat., Tit. 15, § 266 (1971) ("The legal rate of interest shall be six per cent *in the absence of any contract* as to the rate of interest"); Tex.Rev.Civ.Stat.Ann., Art. 5069–1.03 (Vernon 1971) ("*When no specified rate of interest is agreed upon by the parties*, interest at the rate of 6% per annum shall be allowed") (all emphasis added).

**11.** The court also held that interest accruing after the entry of judgment should be determined by Kansas' postjudgment interest statute. Kan.Stat.Ann. § 16–204 (1974). Phillips does not and could not contend that the Constitution bars a Kansas court from applying the Kansas postjudgment interest statute to judgments entered by Kansas courts. Such statutes demonstrate an irrefutable state interest in the force carried by judgments entered by a State's own courts. See also *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 498, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941) (State interest statutes con-

472 U.S. 834     **PHILLIPS PETROLEUM CO. v. SHUTTS**     **2985**

Cite as 105 S.Ct. 2965 (1985)

Finally, the Kansas Supreme Court rejected Phillips' contention that royalty owners had "waived" their claims to interest by accepting payment of the royalties later or by failing to post an indemnity "acceptable" to Phillips in order to receive contemporaneous payment of suspense royalties. The court noted that the "conditions imposed by Phillips were far more stringent than the corporate undertaking Phillips filed with the FPC," *id.*, at 567, 567 P.2d, at 1320, and concluded that it was "apparent [that] Phillips' previous imposition of burdensome conditions upon royalty owners ... was designed to accomplish precisely what the facts disclose. Virtually none of the royalty owners complied with the conditions, thereby leaving the suspense royalties in the hands of Phillips as stakeholder to use at its pleasure...." *Id.*, at 566, 567 P.2d, at 1320. The court found the rule that "payment of the principal sum is a legal bar to a subsequent action for interest" inapplicable on these facts. *Id.*, at 567, 567 P.2d, at 1321. Instead, because "payment of [the royalties due] to the plaintiff class members, instead of extinguishing the debt, constituted only a partial payment on an interest-bearing debt[,] [t]his situation invokes application of the so-called 'United States Rule,' which provides that in applying partial payments to

an interest-bearing debt which is due, in |₈₃₃the absence of an agreement or statute to the contrary, the payment should be first applied to the interest due." *Ibid.*[12]

In *Shutts II*, the case now under review, the Kansas Supreme Court adopted its earlier analysis in *Shutts I* without repeating it. "Although a larger class is involved than in *Shutts I*, the legal issues presented are substantially the same. While these issues are complex they were thoroughly reviewed in *Shutts I*." 235 Kan., at 211, 679 P.2d, at 1174.[13] Noting that "Phillips has not satisfactorily established why this court should not apply the rule enunciated in *Shutts I*," the Kansas court went on to state that once jurisdiction over |₈₃₄a "nationwide class action" is properly asserted, "the law of the forum should be applied unless compelling reasons exist for applying a different law." *Id.*, at 221, 679 P.2d, at 1181.

### II

This Court, of course, can have no concern with the substantive merits of common-law decisions reached by state courts faithfully applying their own law or the law of another State. When application of purely state law is at issue, "[t]he power

cern "an incidental item of damages, interest, with respect to which courts at the forum have commonly been free to apply their own or some other law as they see fit").

12. The court noted that the "'United States Rule' is also followed in Oklahoma and Texas," and that Phillips had "raised and lost" its contention of waiver in a similar case in Texas. 222 Kan., at 568, 567 P.2d, at 1321, citing *Phillips Petroleum Co. v. Riverview Gas Compression Co.*, 409 F.Supp. 486 (ND Tex.1976). Moreover, because the relevant Oklahoma statute expressly stated that payment of a principal sum must be accepted "as such" to support a finding of waiver, Okla.Stat., Tit. 23, § 8 (1971), the statute was inapplicable here inasmuch as the royalty payments were not so accepted. 222 Kan., at 568, 567 P.2d, at 1321.

13. The only apparently new argument raised by Phillips in *Shutts II* was that it should not be liable for interest to a subclass of the affected royalty owners whose direct contractual agree-

105A S.Ct.—28

ment for royalties was with other producers who sold their gas to Phillips under a separate agreement. Although Phillips assumed the obligation to pay royalties directly to the royalty owners in these separate agreements, the separate agreements also stated that if a suspended price increase were ultimately approved by the Commission, Phillips would pay the *other producers* additional money "without interest." Phillips argued that this "without interest" clause barred interest to the royalty owners as well as to the other producers. The Kansas Supreme Court rejected this argument, however, because the royalty owners were not parties to the separate agreements and because no consideration was paid to the royalty owners by Phillips in return for this purported waiver of interest. 235 Kan., at 220, 679 P.2d, at 1180. "[T]hese provisions, entered into between Phillips and the producers, cannot unilaterally deprive royalty owners of interest which they would otherwise be entitled to receive under casinghead gas contracts in which the provisions do not appear." *Ibid.*

delegated to us is for the restraint of unconstitutional [actions] by the States, and not for the correction of alleged errors committed by their judiciary." *Commercial Bank of Cincinnati v. Buckingham's Executors,* 5 How. 317, 343, 12 L.Ed. 169 (1847). The Constitution does not expressly mandate particular or correct choices of law. Rather, a state court's choice of law can invoke constitutional protections, and hence our jurisdiction, only if it contravenes some explicit constitutional limitation.[14]

Thus it has long been settled that "a mere misconstruction by the forum of the laws of a sister State is not a violation of the Full Faith and Credit Clause." *Carroll v. Lanza,* 349 U.S. 408, 414, n. 1, 75 S.Ct. 804, 807, n. 1, 99 L.Ed. 1183 (1955) (Frankfurter, J., dissenting).[15] That Clause requires only that States accord "full faith and credit" to other States' laws—that is, acknowledge the validity and finality of such laws and attempt in good faith to apply them when necessary as they would be applied by home state |835courts.[16] But as Justice Holmes explained, when there is "nothing to suggest that [one State's court] was not candidly construing [another State's law] to the best of its ability, ... even if it was wrong something more than an error of construction is necessary" to invoke the Constitution. *Pennsylvania Fire Ins. Co. v. Gold Issue Mining & Mill-*

ing Co., 243 U.S. 93, 96, 37 S.Ct. 344, 345, 61 L.Ed. 610 (1917).

Merely to state these general principles is to refute any argument that Kansas' decision below violated the Full Faith and Credit Clause. As the opinion in *Shutts I* indicates, the Kansas court made a careful survey of the relevant laws of Oklahoma and Texas, the only other States whose law is proffered as relevant to this litigation. But, as the Court acknowledges, *ante,* at 2976–2977, no other State's laws or judicial decisions were precisely on point, and, in the Kansas court's judgment, roughly analogous Texas and Oklahoma cases supported the results the Kansas court reached. The Kansas court expressly declared that, in a multistate action, a "court should also give careful consideration, as we have attempted to do, to any possible conflict of law problems." 222 Kan., at 557, 567 P.2d, at 1314.[17] While a common-law judge might disagree with the substantive legal determinations made by the Kansas court (although nothing in its opinion seems erroneous to me), that court's approach to the possible choices of law evinces precisely the "full faith and credit" that the Constitution requires.

|836It is imaginable that even a good-faith review of another State's law might still "unjustifiably infring[e] upon the legit-

**14.** See 28 U.S.C. § 1257: "Final judgments or decrees rendered by the highest court of a State ... may be reviewed by the Supreme Court ... (3) [b]y writ of certiorari ... where any title, right, privilege or immunity is specially set up or claimed *under the Constitution*" (emphasis added).

**15.** This principle was settled in a number of cases decided on either side of the turn of this century. See, *e.g., Pennsylvania Fire Ins. Co. v. Gold Issue Mining & Milling Co.,* 243 U.S. 93, 96, 37 S.Ct. 344, 345, 61 L.Ed. 610 (1917); *Western Life Indemnity Co. v. Rupp,* 235 U.S. 261, 275, 35 S.Ct. 37, 41, 59 L.Ed. 220 (1914); *Louisville & Nashville R. Co. v. Melton,* 218 U.S. 36, 51, 52, 30 S.Ct. 676, 679, 680, 54 L.Ed. 921 (1910); *Allen v. Alleghany Co.,* 196 U.S. 458, 464–465, 25 S.Ct. 311, 313, 49 L.Ed. 551 (1905); *Johnson v. New York Life Ins. Co.,* 187 U.S. 491, 496, 23 S.Ct. 194, 195, 47 L.Ed. 273 (1903); *Glenn v. Garth,*

147 U.S. 360, 367–370, 13 S.Ct. 350, 352–353, 37 L.Ed. 203 (1893).

**16.** Cf. *Guaranty Trust Co. v. New York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945) (federal courts should apply state law in furtherance of the goal that "the outcome of the litigation in the federal court should be substantially the same ... as it would be if tried in a State court").

**17.** The Kansas court also stated that Kansas' statutory class-action requirements would "not be fulfilled" if "liability is to be determined according to varying and inconsistent state laws." 222 Kan., at 557, 567 P.2d, at 1314. This belies any notion that the Kansas court plans to "bootstrap," *ante,* at 2979, its choice-of-law decisions onto its assertion of jurisdiction over multistate actions; precisely the opposite is suggested.

imate interests of another State" so as to violate the Full Faith and Credit Clause. *Allstate,* 449 U.S., at 323, 101 S.Ct., at 645 (STEVENS, J., concurring in judgment). If, for example, a Texas oil company or a Texas royalty owner with an interest in a Texas lease were treated directly contrary to a stated policy of the State of Texas by a Kansas court through some honest blunder, the Constitution might bar such "parochial entrenchment" on Texas' interests. *Thomas v. Washington Gas Light Co.,* 448 U.S. 261, 272, 100 S.Ct. 2647, 2656, 65 L.Ed.2d 757 (1980) (plurality opinion).[18] But this case is so distant from such a situation that I need not pursue this theoretical possibility. Even Phillips does not contend that any stated policies of other States have been plainly contravened, and the Court's discussion is founded merely on an *absence* of reported decisions and the Court's speculation of what Oklahoma or Texas courts might "most likely" do in a case like this. *Ante,* at 2978. There is simply no demonstration here that the Kansas Supreme Court's decision has impaired the legitimate interests of any other States or infringed on their sovereignty in the slightest.

⎿837III

It is nevertheless possible for a State's choice of law to violate the Constitution because it is so "totally arbitrary or ... fundamentally unfair" to a litigant that it violates the Due Process Clause. *Allstate,* 449 U.S., at 326, 101 S.Ct., at 647 (STEVENS, J., concurring in judgment). If the forum court has no connection to the lawsuit other than its jurisdiction over the parties, a decision to apply the forum State's law might so "frustrat[e] the justifiable expectations of the parties" as to be unconstitutional. *Id.,* at 327, 101 S.Ct., at 647.[19]

Again, however, a constitutional claim of "unfair surprise" cannot be based merely upon an unexpected choice of a particular State's law—it must rest on a persuasive showing of an unexpected *result* arrived at by application of that law. Thus, absent any *conflict* of laws, in terms of the results they produce, the Due Process Clause simply has not been violated. This is because the underlying theory of a choice-of-law due process claim must be that parties plan their conduct and contractual relations based upon their legitimate expectations₈₃₈

residents over nonresidents or representing a "dramatic departure from the rule that obtains in most American jurisdictions." 449 U.S., at 327, 101 S.Ct., at 647. The first possibility is not applicable here; all royalty owners were treated exactly alike in the Kansas court's analysis. As for the second possibility, a "dramatic departure" must be distinguished from the application of general equitable principles to address new situations. Phillips may criticize Kansas' allegedly "unique notions of contract and oil and gas law," Brief for Petitioner 33, but such is not a *constitutional* objection. State courts, like this Court, constantly must apply and develop general legal principles to accommodate novel factual circumstances with the overarching goal of achieving a just result. Today's decision, for example, newly establishes lawful jurisdiction over a multistate plaintiffs' class action that Phillips likely could not have anticipated 15 years ago. Absent some demonstration of a *departure* from some clear *rule* obtaining in other States, an argument merely that "[n]o other state ever has hinted" at Kansas' result, *id.,* at 32, is unavailing.

---

18. As I noted in *Allstate,* however, the litigant challenging a court's choice of law clearly "bears the burden of establishing" a constitutional infringement. 449 U.S., at 325, n. 13, 101 S.Ct., at 647, n. 13. "*Prima facie* every state is entitled to enforce in its own courts its own statutes.... One who challenges that right ... assumes the burden of showing, upon some rational basis, that of the conflicting interests involved those of the foreign state are superior to those of the forum." *Alaska Packers Assn. v. Industrial Accident Comm'n,* 294 U.S. 532, 547, 55 S.Ct. 518, 523, 79 L.Ed. 1044 (1935). See *Western Life Indemnity Co. v. Rupp,* 235 U.S., at 275, 35 S.Ct., at 41 ("It does not appear that the court's attention was called to any decision by the courts of Illinois placing a different construction, or indeed any construction, upon the section in question. If such decision existed, it was incumbent upon defendant to prove it"). Thus, if a litigant has failed to call a state court's attention to relevant law in other jurisdictions, it cannot raise that law here to create a constitutional issue.

19. I noted in *Allstate* that choice of forum law might also violate the Due Process Clause in other ways, such as by irrationally favoring

concerning the subsequent legal consequences of their actions. For example, they might base a decision on the belief that the law of a particular State will govern. But a change in that State's law in the interim between the execution and the performance of the contract would not violate the Due Process Clause. Nor would the Constitution be violated simply because a state court made an unanticipated ruling on a previously unanswered question of law—perhaps a choice-of-law question.

In this case it is perfectly clear that there has been no due process violation because this is a classic "false conflicts" case.[20] Phillips has not demonstrated that any significant conflicts exist merely because Oklahoma and Texas state case law is *silent* concerning the equitable theories developed by the Kansas courts in this litigation, or even because the language of some Oklahoma and Texas statutes suggests that

those States would "most likely" reach different results. *Ante*, at 2976–2977. The Court's heavy reliance on the characterization of the law provided by Phillips is not an adequate substitute for a neutral review. *Ante*, at 2976–2977 ("Petitioner claims," "petitioner shows," "petitioner points to," "Petitioner also points out ..."). As is unmistakable from a review of *Shutts I*, the Kansas Supreme Court has examined the same laws cited by the Court today as indicative of "direct" conflicts, and construed them as supportive of the |839 Kansas result.[21] Our precedents, to say nothing of the Constitution and our statutory jurisdiction to review state-court judgments, do not permit the Court to second-guess these substantive judgments. Moreover, an independent examination demonstrates solid support for the Kansas court's conclusions.[22]

**20.**  " '[F]alse conflict' really means 'no conflict of laws.' If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." R. Leflar, American Conflicts Law § 93, p. 188 (3d ed. 1977). See also E. Scoles & P. Hay, Conflict of Laws § 2.6, p. 17 (1982) ("A 'false conflict' exists when the potentially applicable laws do not differ"). The absence of any direct conflicts here distinguishes this case from decisions such as *Home Ins. Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930), and *John Hancock Mutual Life Ins. Co. v. Yates*, 299 U.S. 178, 57 S.Ct. 129, 81 L.Ed. 106 (1936), where the interstate legal conflicts were clear, conceded, and dispositive.

**21.**  In *Shutts II* the Kansas Supreme Court noted that "the legal issues presented are substantially the same" as in *Shutts I*, and that "[w]hile these issues are complex they were thoroughly reviewed in *Shutts I*." 235 Kan., at 211, 679 P.2d, at 1174. The court then addressed the award and rate of interest as "damages to compensate the plaintiffs for the unjust enrichment derived by Phillips from the use of the plaintiffs' money," and concluded that "[i]n the instant case Phillips has not satisfactorily established why this court should not apply the rule enunciated in *Shutts I*" respecting this claim. *Id.*, at 221, 679 P.2d, at 1181. Two sentences later in the same paragraph, the court made the broad statement that its forum law should apply absent "compelling reason." The only fair reading of this statement in context is that the Kansas court in *Shutts II* adopted its multi-state choice-of-law survey performed in *Shutts I*, and proper-

ly placed the burden on Phillips, see n. 18, *supra*, to show why the *Shutts I* conclusions should be reexamined. Even if this were ambiguous, this Court should give the Kansas Supreme Court the benefit of the doubt when reviewing its judgment. Thus, I frankly do not understand the Court's summary rejection of that court's attempt to incorporate *Shutts I*. *Ante*, at 2979, n. 8. As for the implication in that same footnote that the choice-of-law discussion in *Shutts I* may have been erroneous on the merits, the statement that the Kansas court "did not follow *contrary* Texas precedent" (emphasis added), is simply wrong. See n. 22, *infra*.

**22.**  The Court provides a list of "putative conflicts" *ante*, at 2976–2977. The errors and omissions apparent in the Court's discussion demonstrate the dangers of relying on characterizations of state law provided by an interested party.

  1. Although there technically may be "no recorded Oklahoma decision dealing with interest liability *for suspended royalties*," *ante*, at 2977 (emphasis added), Oklahoma law expressly provides that the damages "caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the obligation, *with interest thereon*." Okla. Stat., Tit. 23, § 22 (1981) (emphasis added); see also § 6 ("Any person who is entitled to recover damages certain, or capable of being made certain by calculation, ... is entitled also to recover interest thereon"). The Oklahoma Supreme Court has specifically held that oil field royalty owners may sue as a class to recover royalties

|840The crux of my disagreement with the Court is over the standard applied to evaluate the sufficiency of allegations of choice-of-law conflicts necessary to support a constitutional|841claim. Rather than potential, "putative," or even "likely" conflicts, I would require demonstration of an *unambiguous* conflict with the *established* law of another State as an essential element of a constitutional choice-of-law claim. Arguments that a state court has merely applied general common-law principles in a novel manner, or reconciled arguably|842conflicting laws erroneously in the face of unprecedented factual circumstances should not suffice to make out a constitutional issue.

due them and may recover interest on the amount of recovery. *West Edmond Hunton Line Unit v. Young,* 325 P.2d 1047 (1958).

2. No authority in the Court's string citation regarding Oklahoma's 6% statutory interest rate supports the statement that Oklahoma would "most likely" impose that rate in a suit such as this. *Ante,* at 2977. The constitutional and statutory provisions merely provide that "in the absence of any contract" the rate is indeed 6%. Okla.Stat.Ann., Tit. 15, § 266 (1981). The cited judicial decisions merely hold that interest is recoverable on certain obligations, including royalties due to oil field royalty owners, without discussing applicable limitations on the rate.

After examining these Oklahoma authorities, the Kansas Supreme Court found the Oklahoma statutory rate, as well as that of Texas *and Kansas,* inapplicable by its own terms, because here Phillips had contractually agreed to the higher federal rate. 235 Kan., at 220–221, 679 P.2d, at 1180; 222 Kan., at 563–565, 567 P.2d, at 1318–1319. No reported Oklahoma decision contradicts this judgment, and the express terms of the Oklahoma statute permit it. See also *McAnally v. Ideal Federal Credit Union,* 428 P.2d 322, 326 (Okla.1967) (where federal law provides for interest in excess of 12% per year, that rate "must govern" over Oklahoma statutory rate).

3. The Kansas court similarly reviewed Texas' 6% interest statute and found that Phillips' contractual agreement to the FPC rate rendered the statute inapplicable. 235 Kan., at 220, 679 P.2d, at 1180; 222 Kan., at 563–565, 567 P.2d, at 1318–1319. It is true that Texas has not awarded suspense royalty interest at a rate higher than 6%—it is equally plain from the cited cases that no higher rate has been sought. Texas courts have, however, specifically permitted recovery at higher rates when a contract, even an implied or oral contract, evidences agreement to such rates. *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises,* 625 S.W.2d 295 (Tex.1981); *Moody v. Main Bank of Houston,* 667 S.W.2d 613 (Tex.App.1984).

4. While noting Phillips' reliance on an Oklahoma statute stating that "accepting payment of the whole principal, as such, waives all claim to interest," Okla.Stat.Ann., Tit. 23, § 8 (1981), the Court itself demonstrates that this statute's application here is open to question, by citing as "cf." *Webster Drilling Co. v. Sterling Oil of Okla.,*

*Inc.,* 376 P.2d 236, 238 (Okla.1962). In that case, the Oklahoma Supreme Court held that when a right to interest is "based upon a contract, the interest has become 'a substantive part of the debt itself,'" and Title 23, § 8, "is not applicable." *Id.,* at 238 (citation omitted). The claim to interest upheld in *Webster Drilling* was based on an implied contract, exactly as the Kansas Supreme Court found in *Shutts I.* 222 Kan., at 562, 565, 567 P.2d, at 1317, 1319. The Kansas Supreme Court explicitly considered Title 23, § 8, and relied on *Webster Drilling* to find it inapplicable. 222 Kan., at 568, 567 P.2d, at 1321. It is therefore impossible to suggest, as the Court does, that the Kansas court "ignor[ed]" the Oklahoma statute. *Ante,* at 2978.

5. Finally, the Court plainly misconstrues Texas law by suggesting that a mere "offer" to pay suspended royalties in return for an indemnity agreement would, by itself, excuse interest. In the federal decision cited by the Court, which mentions no Texas cases at the relevant pages, *Phillips Petroleum Co. v. Riverside Gas Co.,* 409 F.Supp., at 495–496, indemnity agreements were *actually entered into. Id.,* at 490. The Fifth Circuit case relied on for authority, which *did* cite Texas cases, states that an *"unconditional* offer to give up possession of a disputed fund" is necessary before a bar to interest is created. *Phillips Petroleum Co. v. Adams,* 513 F.2d 355, 370 (1975) (emphasis added). The Texas Supreme Court has subsequently agreed that *Adams* correctly stated Texas law. *Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480, 487 (1978). See also *Fuller v. Phillips Petroleum Co.,* 408 F.Supp. 643, 646 (ND Tex.1976) (entering indemnity agreement terminates interest liability because Phillips "lost the reasonably free use of the money"). No indemnity agreements were entered into by the plaintiffs here, however, and as the Kansas Supreme Court found, Phillips' indemnity offer was not "unconditional"—to the contrary, it was "far more stringent than the corporate undertaking Phillips filed with the FPC." 222 Kan., at 567, 567 P.2d, at 1320. It is also uncontested that Phillips continued to use freely the unpaid suspense royalties long after its "burdensome" conditions were not accepted by the royalty owners. *Id.,* at 566, 567 P.2d, at 1320. The Court errs drastically by relying on what one Federal District Court "appears" to have held to sustain a *constitutional* choice-of-law claim.

In this case, the Kansas Supreme Court's application of general principles of equity, its interpretation of the agreements, its reliance on the Commission's regulations,[23] and its construction of general statutory terms contravened no established legal principles of other States and consequently cannot be characterized as either arbitrary or fundamentally unfair to Phillips. I therefore can find no due process violation in the Kansas court's decision.[24]

⌊843IV

In final analysis, the Court today may merely be expressing its disagreement with the Kansas Supreme Court's statement that in a "nationwide class action . . . the law of the forum should be applied unless compelling reasons exist for applying a different law." 235 Kan., at 221, 679 P.2d, at 1181. Considering this statement against the background of the Kansas Supreme Court's careful analysis in *Shutts I*, however, I am confident that court would agree that every state court has an obligation

under the Full Faith and Credit Clause to "respect the legitimate interests of other States and avoid infringement upon their sovereignty." *Allstate*, 449 U.S., at 322, 101 S.Ct., at 645 (STEVENS, J., concurring in judgment); see *Nevada v. Hall*, 440 U.S. 410, 421, 424, n. 24, 99 S.Ct. 1182, 1188, 1190, n. 24, 59 L.Ed.2d 416 (1979).

It is also agreed that "the fact that a choice-of-law decision may be unsound . . . does not necessarily implicate the federal concerns embodied in the Full Faith and Credit Clause." *Allstate*, 449 U.S., at 323, 101 S.Ct., at 645 (STEVENS, J., concurring); see *ante*, at 2981 ("in many situations a state court may be free to apply one of several choices of law"); *Allstate*, 449 U.S., at 307, 101 S.Ct., at 637 (plurality opinion). When a suit involves claims connected to States other than the forum State, the Constitution requires only that the relevant laws of other States that are brought to the attention of the forum court be examined fairly prior to making a choice of law.[25] Because this Court "reviews

---

**23.** The fact that the Kansas court rejected its own State's statute in favor of the uniform federal interest rate, to which it found Phillips had contractually agreed, demonstrates the absence of parochialism from its decision. There is absolutely no indication that Texas or Oklahoma courts would have decided differently had the same claim been presented there.

**24.** Neither Phillips nor the Court contends that Kansas cannot constitutionally apply its own laws to the claims of Kansas residents, even though the leased land may lie in other States and no other apparent connection to Kansas may exist. Phillips has done business in Kansas throughout the years relevant to this litigation and it seems unarguable that application of Kansas law, or indeed the law of any of the 50 States where royalty owners reside, to the claims of at least some of the plaintiff class members was thus "perceived as possible" by Phillips "at the time of contracting." *Allstate*, 449 U.S., at 331, n. 24, 101 S.Ct., at 649, n. 24 (STEVENS, J., concurring in judgment); see *id.*, at 316–318, and n. 22, 101 S.Ct., at 642–643, and n. 22. It was also possible, of course, that any number of royalty owners might have moved to Kansas in the years Phillips held their suspense royalties, and that Kansas has a substantial interest in seeing its residents treated fairly when they invoke the jurisdiction of its courts. See Weinberg, Conflicts Cases and the Problem of Relevant Time, 10 Hofstra L.Rev. 1023, 1040–

1043 (1982). Because Phillips must have anticipated application of Kansas law to some claims, the eventual geographic distribution of royalty owners' residences goes only to "likelihood" and not to fairness of the application of Kansas law. *Allstate*, 449 U.S., at 331, n. 24, 101 S.Ct., at 649, n. 24 (STEVENS, J., concurring in judgment). Additionally, it is easy enough for national firms like Phillips to make clear their expectations by placing express choice-of-law clauses in their contracts. See *Allstate*, 449 U.S., at 318, n. 24, 101 S.Ct., at 643, n. 24; *id.*, at 324, 328, 101 S.Ct., at 646, 648 (STEVENS, J., concurring in judgment); *Clay v. Sun Ins. Office, Ltd.*, 377 U.S. 179, 182, 84 S.Ct. 1197, 1199, 12 L.Ed.2d 229 (1964). No such clauses are present here, however.

**25.** See *Allstate*, 449 U.S., at 326, 101 S.Ct., at 647 (STEVENS, J., concurring in judgment) (footnote omitted): "I question whether a judge's decision to apply the law of his own State could ever be described as wholly irrational. For judges are presumably familiar with their own state law and may find it difficult and time consuming to discover and apply correctly the law of another State. The forum State's interest in fair and efficient administration of justice is therefore sufficient, in my judgment, to attach a presumption of validity to a forum State's decision to apply its own law to a dispute over which it has jurisdiction."

judgments, not opinions," *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), criticism of a portion of the Kansas₈₄₄ court's opinion taken out of context provides an insufficient basis for reversing its judgment. Unless the actual *choice* of Kansas law violated substantial constitutional rights of the parties, see 28 U.S.C. § 2111, our power to review judgments of state law—including the state law of choice of law—does not extend to reversal based on disagreement with the law's application. A review of the record and the underlying litigation here convincingly demonstrates that, despite Phillips' protestations regarding Kansas' development of common-law principles, no disregard for the laws of other States nor unfair application of Kansas law to the litigants has occurred.[26] Phillips has no constitutional right to avoid judgment in Kansas because it might have convinced a court in another State to develop its law differently.

I do not believe the Court should engage in detailed evaluations of various States' laws. To the contrary, I believe our limited jurisdiction to review state-court judgments should foreclose such review.[27] Accordingly, I trust that today's ₈₄₅decision is no more than a momentary aberration, and

that the Court's opinion will not be read as a decision to constitutionalize novel state-court developments in the common law whenever a litigant can claim that another State connected to the litigation "most likely" would reach a different result. The Court long ago decided that state-court choices of law are unreviewable here absent demonstration of an unambiguous conflict in the established laws of connected States. See n. 15, *supra.* "To hold otherwise would render it possible to bring to this court every case wherein the defeated party claimed that the statute of another State had been construed to his detriment." *Johnson v. New York Life Ins. Co.,* 187 U.S. 491, 496, 23 S.Ct. 194, 195, 47 L.Ed. 273 (1903). Having ignored this admonition today, the Court may be forced to renew its turn-of-the-century efforts to convince the bar that state-court judgments based on fair evaluations of other States' laws are final.

Accordingly, while I join Parts I and II of the Court's opinion, I respectfully dissent from Part III and from the judgment.



---

26. Accord, 3 H. Newberg, Newberg on Class Actions § 13.28, p. 63 (2d ed. 1985) ("the Kansas court in *Shutts II* may have committed only harmless error in applying its own law because there appears to be no significant conflict of laws among the states involved").

27. The Court's decision in *Allstate* has been criticized on the ground that there may well have been no true conflict of laws present, and, therefore, no need for extended constitutional discussion. See Weintraub, Who's Afraid of Constitutional Limitations on Choice of Law?, 10 Hofstra L.Rev. 17, 18–24 (1981). As I have demonstrated, the Court is once again open to this criticism.

Indeed, unless our review is restricted to cases in which conflicts are unambiguous, the

Court will constantly run the risk of misconstruing the common law of any number of States. For example, the Kansas Supreme Court has already decided that Oklahoma would not apply its statutory interest rates where there is evidence of a contractual agreement to a different rate, and that such an agreement is present here. 235 Kan., at 220, 679 P.2d, at 1180; 222 Kan., at 562–565, 567 P.2d, at 1318–1319. Yet today the Court speculates that Oklahoma "would most likely apply" its statutory rates in this lawsuit. *Ante,* at 2977. Since this Court has no more authority to resolve such issues of Oklahoma law than does the Kansas Supreme Court, however, the latter court remains free to abide by its former judgment.