# EXHIBIT A

No. 20-2260

_____

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

_____

IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION

----------------------------------------------

THIS RELATES TO: END-PAYOR ACTIONS

----------------------------------------------

END-PAYOR PLAINTIFFS,

*Plaintiffs-Appellees*,

v.

FINANCIAL RECOVERY SERVICES, LLC,

*Intervenor-Appellant.*

_____

On Appeal from the United States District Court for the
Eastern District of Michigan, No. 2:12-md-02311 (Hon. Sean F. Cox)

_____

**OPENING BRIEF FOR APPELLANT
FINANCIAL RECOVERY SERVICES, LLC**

_____

AARON M. PANNER
MATTHEW R. HUPPERT
DANIEL S. SEVERSON
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921

*Counsel for Appellant Financial
Recovery Services, LLC*

April 21, 2021

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 20-2260      Case Name: In re Auto Parts Antitrust Litigation

Name of counsel: Aaron M. Panner

Pursuant to 6th Cir. R. 26.1, Financial Recovery Services, LLC
*Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No publicly owned company "has a substantial financial interest in the outcome of litigation" "by reason of insurance, a franchise agreement, or indemnity agreement." However, the following publicly owned companies are settlement claimants or have corporate affiliates that are settlement claimants: Mercury General Corporation, MAPFRE Insurance, Liberty Mutual Holding Company, Inc., American International Group, Inc., W. R. Berkley Corporation, and Selective Insurance Company of America.

---

CERTIFICATE OF SERVICE

I certify that on _____ April 21, 2021 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Aaron M. Panner
Counsel for Appellant Financial
Recovery Services, LLC

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Page

DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST ...................................................................i

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ....................... vii

PRELIMINARY STATEMENT .................................................................1

STATEMENT OF JURISDICTION..........................................................3

STATEMENT OF THE ISSUES...............................................................4

STATEMENT OF THE CASE...................................................................4

I.    The End-Payor Settlements and the *GEICO* Subrogation Claims ..................4

II.   FRS and the Insurers Submit Claims To Recover as Subrogees
      from the End-Payor Settlements........................................................7

III.  Class Counsel Dispute the Insurers' Subrogation Rights, and
      FRS and Class Counsel Seek a Ruling from the District Court ....................8

IV.   Class Counsel and the Claims Administrator Acquiesce in
      FRS's Proposal To Defer Submission of Vehicle Information....................12

V.    The District Court Denies FRS's Motion To Intervene ................................13

SUMMARY OF ARGUMENT ................................................................17

STANDARD OF REVIEW.....................................................................18

ARGUMENT .........................................................................................19

I.    FRS's Motion To Intervene Was Timely ......................................................22

      A.    FRS Diligently Pursued a Ruling on the Insurers'
            Subrogation Rights ...............................................................................22

B.      The District Court's Untimeliness Ruling Ignored the
        Litigation Context and Erred in Finding Prejudice ............................27

II.  FRS and the Insurers Have Subrogation Rights That Permit
     Them To Recover from the End-Payor Settlements ....................................39

A.      FRS and the Insurers Have a Substantial Legal Interest in
        Recovering as Subrogees from the End-Payor
        Settlements .........................................................................................40

B.      The Arguments Raised by Class Counsel and Cited by
        the District Court Against FRS's and the Insurers'
        Subrogation Rights Are Incorrect .....................................................43

CONCLUSION .........................................................................................................45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM:  Designation of Documents

# TABLE OF AUTHORITIES

Page

## CASES

*Allstate Ins. Co. v. Mazzola*, 175 F.3d 255 (2d Cir. 1999) ......................................40

*Blount-Hill v. Zelman*, 636 F.3d 278 (6th Cir. 2011) ..................................17, 19, 39

*Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123 (2d Cir. 2001) .........................18, 20

*Capers v. Cuyahoga Cty. Bd. of Election*, 472 F.2d 1225
    (6th Cir. 1973) ......................................................................................37

*Devlin v. Scardelletti*, 536 U.S. 1 (2002)..................................................31

*Dry Max Pampers Litig.*, *In re*, 724 F.3d 713 (6th Cir. 2013) ...............................24

*Fine Paper Antitrust Litig.*, *In re*, 695 F.2d 494 (3d Cir. 1982)...........................26

*GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799
    (E.D. Mich. 2018).......................................................5, 6, 7, 40, 44

*Grubbs v. Norris*, 870 F.2d 343 (6th Cir. 1989) ................................................19, 28

*Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999) ...............................................18

*Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir. 1990)..............................24, 29

*Knowles v. Butz*, 358 F. Supp. 228 (N.D. Cal. 1973) ............................................26

*Krueger v. Cartwright*, 996 F.2d 928 (7th Cir. 1993) .......................................19, 39

*McDonald v. E.J. Lavino Co.*, 430 F.2d 1065 (5th Cir. 1970) .........................20, 39

*Mich. State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997)............18, 20, 21, 39

*Moulton v. U.S. Steel Corp.*, 581 F.3d 344 (6th Cir. 2009) .............................. 26-27

*Nat'l Surety Corp. v. Hartford Cas. Ins. Co.*, 493 F.3d 752
    (6th Cir. 2007) .............................................................................18, 40, 43

iv

*NLRB v. Newcor Bay City Div. of Newcor, Inc.*, 219 F. App'x 390
(6th Cir. 2007) ........................................................................ 24-25

*Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*,
880 F.3d 791 (6th Cir. 2018) ......................................................19

*Price v. Jefferson Cty.*, 9 F. App'x 369 (6th Cir. 2001) ...................................19, 21

*Sales v. Marshall*, 873 F.2d 115 (6th Cir. 1989) .......................................................4

*Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080
(8th Cir. 1999) ...............................................................................20

*United Airlines, Inc. v. McDonald*, 432 U.S. 385 (1977) .......................................24

*United States v. City of Detroit*, 712 F.3d 925
(6th Cir. 2013) .......................................................17, 22, 27, 29, 30,
31, 32, 33, 35, 36, 37

*US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013) ...............................................40

*Weaver v. Univ. of Cincinnati*, 970 F.2d 1523 (6th Cir. 1992) ...............................21

*Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266
(7th Cir. 1998) ...............................................................................19

## STATUTES AND RULES

15 U.S.C. § 4 ...............................................................................................................3

28 U.S.C. § 1291 ........................................................................................................3

28 U.S.C. § 1331 ........................................................................................................3

28 U.S.C. § 1337 ........................................................................................................3

Fed. R. App. P. 4(a)(1)(A) .........................................................................................4

Fed. R. Civ. P. 12(b)(6) ............................................................................................44

Fed. R. Civ. P. 23 ..........................................................................................2, 26, 27

Fed. R. Civ. P. 23(c)(2)(B)(iv)............................................................................26

Fed. R. Civ. P. 24 ..................................................................................................2, 17

Fed. R. Civ. P. 24(a).............................................................................................18

Fed. R. Civ. P. 24(a)(2)....................................................................14, 19, 20, 21, 40

## OTHER AUTHORITIES

16 *Couch on Insurance* (3d ed.)...............................................................................40

3 *Newberg on Class Actions* (5th ed.)....................................................................26

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

FRS requests oral argument under 6 Cir. R. 34(a).  Oral argument likely will prove helpful to the Court because this case involves important legal issues related to class action procedure and equitable subrogation of insurers.

## PRELIMINARY STATEMENT

In the underlying class action litigation pending before the district court, auto parts manufacturers, accused of fixing prices, agreed to pay $1.2 billion to settle the antitrust claims of consumers in 30 states and the District of Columbia— "End-Payor Plaintiffs"—who purchased overpriced replacement parts or new cars that included overpriced parts.  Financial Recovery Services, LLC ("FRS") is a class action claims management firm that prepares, submits, and manages its clients' claims to recover amounts that are due to them under class action settlements like the ones in this case.  This appeal involves the claims of insurers (including claims assigned to FRS itself) that made payments to insureds for vehicles that, as the result of theft or damage, were deemed a "total loss."  FRS maintains (and no one seriously questions as a factual matter) that these market-value payments included compensation to the vehicle owners for their antitrust overcharges.  Accordingly, the insurers (and FRS as assignee) are *subrogated* to the claims of their insureds, and have a right to recover damages on account of those total loss vehicles.

Counsel for the End-Payor Plaintiffs ("Class Counsel") disputed that the insurers have any right to recover as subrogees, arguing that, because the relevant insurance policies did not specifically cover antitrust losses, the insurers could not recover any amounts paid to insureds.  FRS disagreed, arguing that the key

question for purposes of the insurers' subrogation rights is whether *compensation was paid* to indemnify the insureds for the injuries compensated via the settlements (as it admittedly was), not whether the policies, by their terms, insured against the particular type of loss.

FRS and Class Counsel were unable to resolve this issue and accordingly agreed to submit the question to the district court, which they did through an exchange of briefs beginning in December 2019.  In June 2020, with the deadline for submission of settlement claims imminent and with no ruling from the court, FRS moved to intervene under Rule 24 to expedite resolution of the subrogation question, even though, under Rule 23, class members need not intervene to ascertain their membership in the class or their right to recover from a class settlement.  The district court declined to consider FRS's earlier briefing on the subrogation issue and denied FRS's motion to intervene exclusively on the ground that the motion was untimely.  Citing Class Counsel's terms-of-coverage argument, the court also questioned (though it did not resolve) whether the insurers had a substantial legal interest to protect.  FRS—to avoid any risk of waiver— appealed the district court's ruling, while continuing to pursue recovery through the court-approved claims process.

This Court should reverse the district court's ruling.  *First*, the ruling that FRS's motion to intervene was untimely is incorrect because FRS acted diligently

to obtain a ruling on the subrogation question, and, in any event, there was no prejudice to any party from the timing of FRS's intervention motion.  Indeed, FRS should not have been required to intervene to obtain a legal ruling concerning the insurers' status as members of the class, an issue that, by agreement, FRS and Class Counsel had appropriately placed before the district court months earlier.

*Second*, Appellees cannot defend the decision below on the ground that FRS lacks a substantial legal interest based on subrogation.  The district court did not rule on this ground or resolve this issue, and this Court need not resolve it either: All that is required for intervention is a *claimed* legal interest—here, a claim to recover settlement funds based on a subrogation interest—which FRS unquestionably has.  In any event, the claimed subrogation interest is valid: Because subrogation turns on whether the subrogee compensated an injured party for its injuries under a legal duty—as the insurers did—the insurers have a right to stand in the shoes of their insureds to the extent of the compensation that the insurers paid.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337, and 15 U.S.C. § 4 because the End-Payor Plaintiffs' claims arise under the federal antitrust laws, including the Sherman Act.  This Court has jurisdiction under 28 U.S.C. § 1291 over a timely appeal of a complete denial of a motion to intervene.  "[A]n

order completely denying intervention is immediately reviewable by way of an interlocutory appeal." *Sales v. Marshall*, 873 F.2d 115, 120 (6th Cir. 1989). The present appeal is timely because the district court issued its order denying intervention on November 17, 2020, Op. and Order, RE 2101, Page ID ## 38264-38270, and FRS filed its notice of appeal on December 16, 2020, Notice of Appeal, RE 2105, Page ID ## 38278-38279. *See* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in denying FRS's motion to intervene solely on the grounds that it was untimely, when FRS diligently sought clarification of putative class members' legal right to recover settlement amounts based on subrogation, and the timing of its motion did not prejudice any party.

2.      Whether the district court's order denying intervention may properly be affirmed based on the conclusion that FRS—which claims a valid subrogation interest in settlement funds—lacks a substantial legal interest, a question that the district court did not resolve.

## STATEMENT OF THE CASE

### I.      The End-Payor Settlements and the *GEICO* Subrogation Claims

This appeal arises from a series of settlements reached in a subset of class actions, known as the "End-Payor Actions," in the *Automotive Parts Antitrust* multi-district litigation. The plaintiffs in those actions (the End-Payor Plaintiffs,

4

Appellees here) are consumers and businesses that purchased or leased vehicles containing certain automotive parts, or who indirectly purchased certain replacements parts.  They alleged that the defendant manufacturers and suppliers unlawfully agreed to fix prices of auto parts and that, as a result, the plaintiffs paid elevated prices for their vehicles or replacement parts.  *See*, *e.g.*, Third Am. Compl., No. 2:12-cv-00403, RE 229, Page ID ## 8250-8252, 8294-8300 (¶¶ 1, 3-4, 179-196).

From December 2013 to July 2019, the End-Payor Plaintiffs, on behalf of nationwide classes, settled claims against 73 defendants or groups of defendants, and the district court approved each of those class settlements (collectively, the "End-Payor Settlements") in four groups, or "rounds," starting in 2016.  Op. and Order, RE 2101, Page ID ## 38264, 38269.  The End-Payor Settlements, which totaled approximately $1.2 billion, encompassed thousands of vehicle makes and models sold in, or purchased or leased by residents of, 30 states and the District of Columbia over a 30-year period.

In 2016, GEICO, one of the largest writers of automobile insurance policies in the United States, opted out of the first round of the End-Payor Settlements and instead pursued individual claims against 14 defendants.  *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 808 (E.D. Mich. 2018).  GEICO was a "putative member of the proposed classes" in the End-Payor Actions by virtue of (1) "its

own purchase of [certain] auto parts for use in a fleet of vehicles that it owns," often called "fleet vehicles," and (2) "its reimbursement of insureds and third-party claimants," including for "the full value of a vehicle that has been declared a total loss," often called "total loss vehicles." *Id*. at 809.

In April 2017, the Round 1 End-Payor defendants moved to dismiss GEICO's opt-out claims. The district court held that GEICO's claims based on payments for total loss vehicles were "properly analyzed under the law governing an insurer's right of subrogation." *Id*. at 831. Subrogation "allows insurers to 'stand in the shoes' of their insured" and "require[s] the party who caused the damage [to the insured] to reimburse the insurer for the payment the insurer has made to its insured." *Id*. GEICO alleged that the total loss payments it made to its insureds included overcharges that resulted from defendants' anticompetitive conduct, and that GEICO therefore had a subrogation right to recover those overcharges from defendants. Notwithstanding GEICO's subrogation rights, the defendants argued that GEICO's insureds had, in the first round of settlements resolving the End-Payor classes' claims against the moving defendants, released the claims on which GEICO's subrogation rights depended. *See id*. at 830-31.

In August 2018, the district court denied defendants' motion to dismiss as to GEICO's subrogation-based claims, holding that the affirmative defense of release depended on factual questions not addressed by GEICO's complaint. *Id*. at

833-34.  The district court therefore permitted GEICO "to pursue its claimed right

of subrogation" in an amended complaint.  *Id*.  GEICO repleaded its subrogation

theory of recovery in December 2018, *see* Am. Compl., *GEICO Corp. v. Alps Elec.*

*Co.*, No. 2:16-cv-13189 (E.D. Mich. Dec. 20, 2018), RE 77-8, Page ID ## 3123-

3124 (¶¶ 111-114), and settled with defendants in December 2019 for an

undisclosed amount.

## II.   FRS and the Insurers Submit Claims To Recover as Subrogees from the End-Payor Settlements

Appellant FRS manages its clients' claims to recover funds they are entitled

to receive from class action settlements.  Ltr. Br., RE 2060-3, Page ID # 37734.

Eight automobile insurers (the "Insurers") retained FRS to file and manage their

claims in the End-Payor Settlements.  Leibell Decl., RE 2060-2, Page ID ##

37728-37729 (¶ 9).  One Insurer (Selective) also assigned its claims in the End-

Payor Actions, and all related interests, to FRS.  Assignment, RE 2064-3, Page ID

## 38024-38025.  All of the Insurers made contractually required payments to End-

Payor Settlement class members for eligible total loss vehicles (the "Total Loss

Vehicles")—that is, the Insurers paid the market value of class members' damaged

vehicles when the cost of repairing those vehicles exceeded that value.  Ltr. Br.,

RE 2060-3, Page ID # 37737.  Several Insurers also purchased or leased eligible

vehicles for their own use (the "Fleet Vehicles").  Leibell Decl., RE 2060-2, Page

ID # 37729 (¶ 9).

Just as GEICO made claims both as a subrogee and as a purchaser of vehicles, the Insurers seek to recover from the End-Payor Settlements both as subrogees—based on their payments for Total Loss Vehicles—and as purchasers or lessees of Fleet Vehicles. *See id.* (Their claims for Fleet Vehicles are not implicated in this appeal.) Accordingly, between May 4, 2018, and March 12, 2020, FRS, on behalf of the Insurers, submitted claim forms for Total Loss Vehicles and Fleet Vehicles to Epiq Class Action & Claims Solutions ("Epiq" or the "Claims Administrator"), *id.*, Page ID # 37728 (¶ 9), which the district court appointed to administer claims in the End-Payor Settlements, *see* Pinkerton Decl., RE 2098-1, Page ID # 38210 (¶ 1).

## III.   Class Counsel Dispute the Insurers' Subrogation Rights, and FRS and Class Counsel Seek a Ruling from the District Court

In November 2018, shortly after FRS had begun submitting claim forms on behalf of the Insurers, FRS contacted Class Counsel to discuss an efficient process for the Insurers to collect and submit vehicle information in support of their claims. R. Niemiec 11/14/18 Email, RE 2060-5, Page ID # 37777 (asking "to address now any data collection issues that may exist so that the process is more efficient"). The Insurers' claim forms did not initially contain vehicle information because, as the Insurers' claims encompass hundreds of thousands of vehicles that their insureds purchased or leased over the course of decades, it is costly and time-consuming to identify, collect, and properly evaluate for eligibility the volume of

data associated with that many vehicles. *Id.*; *see also* Leibell Decl., RE 2114-2, Page ID # 38343 (¶ 11 n.13) (estimating it could cost hundreds of thousands of dollars to complete this work). In December 2018, FRS continued to discuss these issues with Class Counsel via email and sent to them a memorandum setting forth the legal bases for the Insurers' right, as subrogees, to recover from the End-Payor Settlements. 1/14/19 Email and Research Mem., RE 2060-6, Page ID ## 37779-37816.

In January 2019, FRS and Class Counsel met and conferred by phone to discuss the Insurers' claims. Leibell Decl., RE 2060-2, Page ID # 37727 (¶ 5). During that call, Class Counsel disagreed with FRS that the Insurers, as subrogees, may recover from the End-Payor Settlements, and they referred FRS to legal authority they believed supported their position. *Id.* (¶ 6). The parties also "discussed potential mechanisms for bringing the legal issue regarding subrogation to the attention of the Court in the event [they] continued to disagree." *Id.* Class Counsel originally "suggested that the Insurers should file claims, wait for them to be rejected, and then appeal that rejection to the Court," but FRS objected to that approach because "it would not be practical to submit claims for many thousands of total loss vehicles before resolving the threshold legal question whether such claims would be permitted." *Id.*, Page ID ## 37727-37728 (¶ 6). The parties

9

ultimately agreed to defer any further discussion of the subrogation issue and the
potential mechanism for raising it with the court.  *Id.*, Page ID # 37728 (¶ 6).

In August 2019, the district court authorized Class Counsel to disseminate to
potential class members notice of the fourth round of End-Payor Settlements and
ruled that "all members of the Round 1, 2, 3, and 4 Settlement Classes who have
not previously filed claims" could do so on or before December 31, 2019.  *See*
Order, No. 2:12-cv-00403, RE 291, Page ID ## 10398-10399, 10401.  The Court,
at Class Counsel's request, later extended that deadline twice—once on December
20, 2019 to provide additional time to disseminate a supplemental class notice, and
again on March 24, 2020 due to a cyber attack experienced by the Claims
Administrator—and ultimately set June 18, 2020 as the deadline for filing claim
forms.  *See* Order, RE 2032, Page ID # 37511; Order, RE 2044, Page ID # 37658.

In October 2019, "[w]ith the [then-current] December 31, 2019 filing
deadline approaching," FRS once again contacted Class Counsel "to reach an
agreement or to seek the Court's assistance" regarding "whether auto insurers may
recover from the [End-Payor] settlements the indemnity payments they made for
eligible vehicles that were deemed a total loss."  Leibell 10/17/19 Email, RE 2060-
7, Page ID ## 37818-37819.  FRS tried one last time to persuade Class Counsel of
its position, providing them with a draft letter that FRS intended to submit to the
district court about the Insurers' subrogation claims.  *Id.*, Page ID # 37818.  On

November 2, 2019, however, Class Counsel responded:  "[T]here is no question that Auto Insurers are not class members and therefore have no rights as class members or as subrogees of class members."  Class Counsel 11/2/19 Ltr., RE 2060-8, Page ID # 37822.

Although Class Counsel's November 2 letter invited FRS "to further discuss these matters if [it] would like," *id.*, Page ID # 37828, it had become clear by then, especially as the claim filing deadline approached, that the parties' dispute about the subrogation issue would need to be resolved by the district court.  FRS and Class Counsel agreed to submit the subrogation issue to the district court right away, which would defer the burden of submitting vehicle information until after the court resolved the threshold legal dispute.  11/25-26/19 Email Exchange, RE 2060-9, Page ID ## 37901-37902.  The parties therefore agreed to a "briefing schedule for FRS's letter to the Court."  *Id.*, Page ID # 37901.

In accordance with that schedule, FRS submitted to the district court a letter brief on December 13, 2019, asking for "an order declaring that" the Insurers "are subrogees" of End-Payor Settlement class members "and, therefore, may recover from the [End-Payor] Settlements to the extent of their indemnity payments."  Ltr. Br., RE 2060-3, Page ID ## 37734-37735.  Although FRS's letter was not docketed, the response of Class Counsel, filed on January 16, 2020, was docketed.  Pls.' Resp. Br., RE 2034, Page ID ## 37513-37539.  In that response, Class

Counsel opposed on the merits FRS's request for a ruling confirming the Insurers'

subrogation rights.  Class Counsel did not argue that such a request was untimely

or that FRS or the Insurers were required to intervene to obtain a legal ruling on

the subrogation issue.  As agreed, FRS submitted its reply letter brief on

January 30, 2020.  Reply Ltr. Br., RE 2060-4, Page ID ## 37768-37775.

## IV.    Class Counsel and the Claims Administrator Acquiesce in FRS's Proposal To Defer Submission of Vehicle Information

On March 9, 2020, several weeks after the parties had completed briefing

FRS's request for a ruling on the subrogation issue, and one week before the then-

current deadline for filing claims, FRS notified the Claims Administrator and Class

Counsel in writing that FRS would "supplement the timely-filed proof of claim for

each Auto Insurer" with vehicle information once the district court ruled that the

Insurers could recover as subrogees.  Leibell 3/9/20 Ltr., RE 2060-10, Page ID #

37916.  FRS proposed this course of action, which is commonplace in class action

settlement administration, in light of (1) the pending threshold dispute about

Insurers' subrogation rights, (2) the "considerable undertaking" required to

"identify[], collect[], and marshal[] the Total Loss Vehicle data necessary to

update each Auto Insurer's proof of claim," and (3) the "rapidly approaching"

claim filing deadline (which the court later extended by three months).  *Id.*  FRS

asked that, if the Claims Administrator or Class Counsel "ha[d] any objection" to

FRS's proposed course of action, they should "advise FRS immediately so that we may advise the Court as soon as possible." *Id.*[1]

Neither Class Counsel nor the Claims Administrator objected to this proposal (or responded to it at all), though they did respond to communications from FRS on unrelated matters. *See* 6/19/20 Email Exchange, RE 2114-6, Page ID ## 38367-38368 (email exchange about potential late claims for other FRS clients). FRS accordingly deferred submission of vehicle information in support of the Insurers' claims until after the district court ruled as to whether the Insurers could recover as subrogees.

## V.     The District Court Denies FRS's Motion To Intervene

A.     By early June 2020, with the claim filing deadline set to expire in two weeks, the district court still had taken no action on FRS's request for a ruling on the subrogation issue, which had been pending for more than four months. Therefore, FRS filed a motion to intervene on June 18, 2020, for the sole purpose of obtaining a ruling on the subrogation issue that FRS and Class Counsel had submitted to the district court. *See* Mot. To Intervene, RE 2060, Page ID # 37704 ("[I]ntervention is intended solely to give effect to the procedure to which Class

---

[1] On June 18, 2020, FRS provided similar notice to the Claims Administrator and Class Counsel for two additional Insurers.  6/18/20 Rivera Email, RE 2060-11, Page ID ## 37918-37919.

Counsel already agreed:  submission for the Court's determination of the discrete *legal* issue concerning the Insurers' subrogation rights[.]").

FRS argued that it satisfied the requirements to intervene as of right under Federal Rule of Civil Procedure 24(a)(2):  (1) FRS claimed a subrogation right to recover from the End-Payor Settlements that are the subject of the action; (2) End-Payor Plaintiffs and Class Counsel refused to represent (and, indeed, affirmatively opposed) FRS's and Insurers' subrogation interests; and (3) the right of FRS and Insurers to recover as subrogees could be impaired unless the district court resolved the parties' dispute about the subrogation issue.  *Id.*, Page ID ## 37712-37717.  FRS also argued that its motion was timely because (1) it had diligently sought to clarify rights of putative class members months earlier and was now seeking that same clarification through intervention; and (2) it did so before the deadline for filing claim forms, before the Claims Administrator had begun to process claims, and likely more than one year before the claims administration process would conclude or the distribution of settlement funds would occur.  *Id.*, Page ID ## 37717-37719.

In opposing intervention, Class Counsel argued that (1) FRS and the Insurers have no subrogation rights because the Insurers' policies did not cover antitrust overcharges; (2) FRS's request for a ruling on the subrogation issue in December 2019, a procedure to which Class Counsel had agreed and to which Class Counsel

had not previously objected, "was insufficient to raise [the subrogation] issue," and
(3) FRS should have sought intervention in January 2019, immediately after its
first discussion with Class Counsel.  Opp. to Mot. To Intervene, RE 2066, Page ID
## 38032-38057.  They also stated that, "[w]ith respect to the subrogation claims,"
they had "rejected" any representation of FRS's interests.  *Id.*, Page ID # 38054.

     **B.**     On November 17, 2020, the district court denied FRS's motion to
intervene as untimely.  Op. and Order, RE 2101, Page ID ## 38264-38270.  The
court stated that "the length of time between FRS' knowledge of its interest in the
case and the June 18[, 2020] motion weighs against intervention."  *Id.*, Page ID
# 38270.  The court suggested that the lapse of "several months" between
December 2019 and June 2020 was unjustified, and that FRS's December 2019
letter "was not a proper means by which to proceed."[2]  *Id.*, Page ID ## 38269-
38270.  It also observed that FRS had not participated in any of the pre-settlement
phases of the litigation and did not "file any objection to the settlements."  *Id.*,
Page ID # 38269.  It further concluded that "intervention" would cause "prejudice
to the original parties" because "allow[ing] potentially thousands of claims to be

---

[2] The district court also appeared to take issue with the fact that "there was
no stipulation and order entered on the docket regarding the briefing schedule."
Op. and Order, RE 2101, Page ID # 38269.  FRS had requested that the district
court enter the briefing schedule to which Class Counsel and FRS had stipulated,
Ltr. Br., RE 2060-3, Page ID # 37735 n.4, but the district court never acted on that
request.

submitted after the deadline" "would delay the distribution of settlement proceeds." *Id.*, Page ID # 38270.

The district court also declined to rule on FRS's pending request for a ruling on FRS's and the Insurers' subrogation rights. In denying intervention, the district court questioned in a footnote whether "FRS [has] sufficient interest to intervene" because, though FRS is a "subrogee," and though "some subrogees may have" a "sufficient interest to invoke intervention," it was nevertheless "unclear whether *these* subrogees have such an interest." *Id.*, Page ID # 38268 n.1.

**C.** On December 16, 2020, FRS timely noticed this appeal. Notice of Appeal, RE 2105, Page ID ## 38278-38279. On January 5, 2021, FRS filed a motion to hold this appeal in abeyance pending a further order from the district court regarding whether FRS and the Insurers may recover from the End-Payor Settlements. Dkt. 6. Class Counsel opposed that motion and contended that the district court's order denying intervention had already determined that FRS and the Insurers could not recover. Dkt. 13. On February 9, 2021, this Court denied FRS's motion. Dkt. 15-2.[3]

---

[3] Because the subrogation issue still has not been resolved, FRS is collecting and submitting detailed data regarding the Total Loss Vehicles as part of the claims administration process. The resolution of those claims is likely to render this appeal moot. FRS will promptly inform the Court of developments in the district court that may affect the justiciability of this appeal.

## SUMMARY OF ARGUMENT

FRS's motion to intervene should have been granted because it represented an appropriate effort to place before the district court a threshold legal issue—the right of FRS and Insurers to recover as subrogees—that FRS and Class Counsel had already asked the district court to decide, and which was necessary to the appropriate distribution of settlement funds. The motion satisfied all the requirements of Rule 24: FRS claimed an interest in the settlement proceeds; disposition of the settlement funds might impair FRS's ability to protect its interest; Class Counsel do not purport to represent FRS's interest; and the motion was timely filed. *See Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011).

**I.**     The district court's determination that FRS's intervention was untimely—the sole basis for its ruling—ignored the narrow purpose of the intervention motion and was an abuse of discretion. *See United States v. City of Detroit*, 712 F.3d 925, 930-33 (6th Cir. 2013). At the outset, FRS should not have had to intervene at all—the district court should have resolved the subrogation issue based on the months-earlier submissions by FRS and Class Counsel. In any event, FRS appropriately sought intervention at the beginning of the claims administration process to ascertain whether specific persons could recover settlement funds. The Insurers always had the option of pursuing their claims and challenging any denial at the end of the process (as Class Counsel originally

17

advised FRS to do and as FRS is now doing). It can only help the classes—not hurt them—if the subrogation issue is resolved sooner rather than later.

II. The district court's order cannot be defended on the alternative ground that FRS lacks a sufficient legal interest to support intervention: What matters is whether FRS has a *claimed* interest that it seeks to vindicate through participation in the case, which it unquestionably does. Fed. R. Civ. P. 24(a) ("the court must permit anyone to intervene who," among other things, "claims an interest relating to the property or transaction that is the subject of the action"); *see, e.g., Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129-30 (2d Cir. 2001). Moreover, FRS's subrogation interest is valid as a matter of law: Because the Insurers paid settlement class members for the very antitrust losses that are the basis for the settlement payments at issue, the Insurers have a right to recover to the extent of the compensation they paid. *Nat'l Surety Corp. v. Hartford Cas. Ins. Co.*, 493 F.3d 752, 756 (6th Cir. 2007).

STANDARD OF REVIEW

"A district court's denial of intervention as of right is reviewed *de novo*, except for the timeliness element, which is reviewed for an abuse of discretion." *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999). "The existence of a zone of discretion does not mean that the whim of the district court governs," *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997), and "Rule 24(a)

18

considerably restricts the court's discretion whether to allow intervention of right," *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 799 (6th Cir. 2018).

A district court's "legal determinations involving class membership" are reviewed *de novo*. *Price v. Jefferson Cty.*, 9 F. App'x 369, 370 (6th Cir. 2001) (citing *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 272 (7th Cir. 1998)).

## ARGUMENT

FRS's motion to intervene should have been granted because FRS satisfied all of the requirements for intervention as of right under Rule 24(a)(2); in particular, and contrary to the district court, FRS's motion was timely. *See* Fed. R. Civ. P. 24(a)(2); *Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011).

It cannot be reasonably disputed that most of the elements of the test under Rule 24(a)(2) are satisfied. FRS "claims" a subrogation interest in settlement funds, which is plainly "an interest relating to the property . . . that is the subject of the action." Fed. R. Civ. P. 24(a)(2); *see Krueger v. Cartwright*, 996 F.2d 928, 932 (7th Cir. 1993) ("[An] insurer who is partially subrogated may intervene . . . to

19

protect its pro rata share of the potential recovery."); *McDonald v. E.J. Lavino Co.*,
430 F.2d 1065, 1071 (5th Cir. 1970) (similar).  Because all that is required is a
*claimed* interest, any dispute about the ultimate merits of the Insurers' subrogation
interests provided no basis for denial of the motion.  *See Brennan v. N.Y.C. Bd. of
Educ.*, 260 F.3d 123, 129-30 (2d Cir. 2001) ("an application to intervene cannot be
resolved by reference to the ultimate merits of the claims which the intervenor
wishes to assert following intervention"); *Turn Key Gaming, Inc. v. Oglala Sioux
Tribe*, 164 F.3d 1080, 1081 (8th Cir. 1999) (similar); *see also Miller*, 103 F.3d at
1245 (recognizing the "rather expansive notion of the interest sufficient to invoke"
Rule 24(a)(2)).  And even if FRS had to establish the *validity* of the claimed
interest to make it across the threshold—a matter that the district court did not
resolve in denying intervention—the subrogation interest is legally valid for
reasons we discuss below.  *See infra* Part II.

There is likewise no dispute that "disposing of the action"—that is,
distributing the settlement funds—could "as a practical matter impair" FRS's
ability to protect that interest.  Fed. R. Civ. P. 24(a)(2).  To be sure, FRS and the
Insurers can pursue their subrogation claims through the claims administration
process (and are doing so); they will have a right to pursue appeals if their claims
are ultimately denied.  *See* Plan of Allocation, RE 2005-2, Page ID # 36628
(requiring court approval of Claims Administrator recommendations); *see also*,

20

*e.g.*, *Price*, 9 F. App'x at 369-70 (reviewing denial of claim to class settlement funds). But the Federal Rules do not restrict intervention as of right to circumstances in which such intervention is the *sole* way to protect the claimed interest. Rather, intervention is broadly permitted when "as a practical matter" the resolution of the action *could* adversely affect the movant's interest. *Miller*, 103 F.3d at 1247 ("a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied"; "[t]his burden is minimal").

Furthermore, no "existing part[y] adequately represent[s]" the claimed subrogation interest. On the contrary, Class Counsel have declared themselves adverse to the interests of FRS and the Insurers and are seeking to impair those interests by attempting to exclude the Insurers from the End-Payor Settlements. *See Weaver v. Univ. of Cincinnati*, 970 F.2d 1523, 1531 (6th Cir. 1992) (intervention permitted when interests even partially "diverg[e] from" those of existing parties).

In denying the motion to intervene, the district court did not hold that any of the above requirements of Rule 24(a)(2) were not satisfied; rather, it denied intervention on the sole basis that FRS's motion was untimely. Because that holding was incorrect, this Court should reverse.

I.    **FRS's Motion To Intervene Was Timely**

A.    **FRS Diligently Pursued a Ruling on the Insurers' Subrogation Rights**

FRS's motion to intervene was timely because its sole purpose was to clarify the rights of would-be claimants to settlement funds, and it was filed before the evaluation of settlement class members' claims had begun.  The subrogation issue that FRS sought to raise has nothing to do with the merits of the action or the adequacy of the settlement; rather, the issue only affects the actual distribution of funds, which had not—and still has not—even started.  Accordingly, the intervention motion was timely, and its timing prejudiced no one.

"Timeliness is to be determined from all the circumstances," including: (1) "the point to which the suit has progressed"; (2) "the purpose for which intervention is sought"; (3) "prejudice to the original parties"; (4) "the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his or her interest in the case"; and (5) "the existence of unusual circumstances militating against or in favor of intervention." *United States v. City of Detroit*, 712 F.3d 925, 930-31 (6th Cir. 2013).

All of these factors support the timeliness of FRS's motion.  With respect to the first and second factors, FRS filed its motion at the conclusion of the period for submissions of claims, after class members (including the Insurers) had timely submitted claims, but before the actual claims administration process had begun,

solely for the purpose of clarifying rights to recovery from the settlement proceeds. The Claims Administrator had not yet had occasion to evaluate any claim to settlement funds based on a subrogation interest.  Resolution of the legal question that FRS sought to present through its intervention motion would have permitted the timely processing of the Insurers' claims without uncertainty regarding the legal validity of the claimed subrogation interests underlying a portion of those claims.

For related reasons, far from threatening any prejudice to the existing parties—the focus of the third factor—granting intervention could only benefit them.  With respect to the defendants in the underlying action (who did not take a position on the motion), intervention was of no moment because clarification of the Insurers' subrogation interest would not affect the amount of the settlement.  And a prompt ruling on the validity of the Insurers' subrogation interest would facilitate the prompt and efficient evaluation of claims and reduce the costs associated with the claims administration process.  Because any such costs reduce the amount of the settlement proceeds available for distribution, *see* Pinkerton Decl., RE 2098-1, Page ID # 38215 (¶ 20), avoiding unnecessary costs benefits the other members of the class.

With regard to the fourth factor, FRS pursued the interest at issue in the intervention motion from the start.  FRS communicated for several months with

Class Counsel to try to reach an agreement about the Insurers' subrogation rights. That effort was an appropriate first step:  Insurers are members of the class (by virtue of their purchases of Fleet Vehicles, even leaving their subrogation interests aside), and Class Counsel accordingly owed them a fiduciary duty of representation.  *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). There was no need to seek the court's assistance—indeed, doing so likely would have been inappropriate—until Class Counsel rejected any duty to represent the Insurers' subrogation interests.  *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977) (intervention timely where it occurred "as soon as it became clear to the [movant] that the interests of the unnamed class members would no longer be protected by the named class representatives"); *Jansen v. City of Cincinnati*, 904 F.2d 336, 341 (6th Cir. 1990) (intervention motion was timely when filed shortly after events that "alerted the proposed intervenors that their interest was not being adequately protected").

Until November 2019, Class Counsel had expressed willingness to continue discussing the subrogation issue, *see*, *e.g.*, Leibell Decl., RE 2060-2, Page ID # 37728 (¶ 6), and they had taken the position that FRS should wait to raise that issue until after the Insurers' claims were rejected, *id.*, Page ID # 37727 (¶ 6). Therefore, the need to litigate that issue was not a foregone conclusion.  *See*, *e.g.*, *NLRB v. Newcor Bay City Div. of Newcor, Inc.*, 219 F. App'x 390, 396-97 (6th Cir.

2007) (parties "not at impasse because [one party] was willing to continue negotiations").  Once it became clear that Class Counsel would refuse to protect the Insurers' subrogation interests or advance legal arguments to the court to advance those interests, FRS came to the court less than one month later to seek a ruling on the underlying legal issue.  Class Counsel joined in FRS's request for a ruling on the issue (though disagreeing on the merits), without raising any objection about timeliness or the need for formal intervention.  Pls.' Resp. Br., RE 2034, Page ID # 37537 (asking district court to "deny FRS's request for a declaration determining that Auto Insurers are entitled to [recover] as purported subrogees").

FRS's June 2020 motion to intervene simply renewed its earlier request for a ruling on the subrogation issue because the original request remained pending as the claim filing deadline approached.  FRS made plain in its motion that it "did not believe formal intervention was necessary" because it had already "present[ed] the dispute to the Court," Mot. To Intervene, RE 2060, Page ID # 37718, and was seeking intervention solely "to perfect the submission of [the] motion [for a ruling on the subrogation issue]" that it had filed six months earlier, *id.*, Page ID # 37711. Intervention was a procedural vehicle FRS invoked only because its request for a ruling had gone unaddressed for months.

Fifth and finally, the fact that the motion to intervene was filed in the context of an effort to clarify the rights of persons claiming membership in a certified class is an "unusual circumstance[]" that further "militat[es]" in favor of finding FRS's motion timely. Rule 23 entitles class members to "enter an appearance through an attorney if the member so desires," Fed. R. Civ. P. 23(c)(2)(B)(iv); a putative class member need not "go[] the full length of becoming a party through intervention" in order to ascertain its rights, 3 *Newberg on Class Actions* § 9:37 (5th ed.); *accord Knowles v. Butz*, 358 F. Supp. 228, 230 (N.D. Cal. 1973) ("There is, therefore, no need for these new class members to formally intervene."). Because Insurers were class members (by virtue of their purchase of Fleet Vehicles at a minimum) and also claimed a right of recovery by virtue of subrogation, the district court should have ruled on FRS's December 2019 request, on behalf of Insurers, for a ruling on their rights to recover settlement funds, without the need for a motion to intervene. "[P]urported members of the class" need not formally intervene in the class proceeding to "request . . . that the court interpret the class order so as to include [them] and on that basis direct the payment of [their] claims." *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 499 (3d Cir. 1982). In that circumstance, a putative class member need only "present [a] motion for resolution by the court," *id.*, which is what FRS did here. *See also Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 353 (6th

Cir. 2009) (Rule 23 requires "accept[ing] . . . filings" from class members or their counsel).

Because FRS should not have been required to intervene to obtain a ruling on the subrogation issue, and because obtaining that same ruling was the sole purpose for FRS's motion to intervene, the six months that elapsed between FRS's original and renewed requests for a ruling on the subrogation issue should not count against FRS in assessing "the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his or her interest in the case." *City of Detroit*, 712 F.3d at 930.

## B. The District Court's Untimeliness Ruling Ignored the Litigation Context and Erred in Finding Prejudice

The district court's determination that FRS's motion was untimely was an abuse of discretion: The court failed to take into account the narrow purpose of FRS's motion, the litigation context in which it was filed, and the circumstances that accounted for the motion's timing. *See City of Detroit*, 712 F.3d at 931-32. And in finding that intervention could prejudice other class members, the district court committed legal error by considering only the impact on class members of legally justified recovery *not* the impact of delay in seeking intervention.

1. The district court erred in concluding that "the length of time between FRS' knowledge of its interest in the case and the June 18 motion weighs against intervention," Op. and Order, RE 2101, Page ID # 38270, because, as explained

above, FRS requested that the district court acknowledge the Insurers' subrogation interests in December 2019, shortly after learning that Class Counsel had declined to represent those interests.  FRS's June 2020 motion to intervene was a renewal of that same request.  The district court incorrectly disregarded FRS's earlier effort to protect its and the Insurers' interests, leading it to find undue delay where there was none.

In this regard, the district court both ignored the second timeliness factor (purpose for intervention) and misapplied the fourth timeliness factor (length of time following knowledge of interest).  Because the relief FRS sought through intervention in June 2020 was the same relief it already had sought six months earlier, and because FRS was seeking intervention only "to perfect the submission of its [earlier] motion," Mot. To Intervene, RE 2060, Page ID # 37711, FRS's purpose for seeking intervention was fundamental to the timeliness of its motion.

As explained above, FRS's original request for a ruling on the subrogation issue in December 2019 was undoubtedly timely.  *See supra* pp. 8-12.  Indeed, Class Counsel's pre-November 2019 position "that the Insurers should . . . wait for [their claims] to be rejected" before raising the subrogation issue, Leibell Decl., RE 2060-2, Page ID # 37727 (¶ 6), indicated Class Counsel's opposition to raising the issue any sooner, *see Grubbs*, 870 F.2d at 346 (finding it "unacceptable" that proposed intervenor "was . . . squeezed from both ends in its efforts to intervene").

28

It was error for the district court to ignore the "context" surrounding FRS's

application, *Jansen*, 904 F.2d at 340, because "[t]imeliness is to be determined

from *all* the circumstances," *City of Detroit*, 712 F.3d at 930 (emphasis added).

      The narrow and forward-looking nature of FRS's purpose for intervening—

ascertaining whether the Insurers could recover from the settlements as

subrogees—further highlights the district court's error.  This Court reversed on the

basis of a similar error in *City of Detroit*.  In that case, the district court was

overseeing a long-running action that sought to bring Detroit into compliance with

environmental laws.  In September 2011, the court tasked a municipal committee

(the "Root Cause Committee") with proposing a plan to achieve long-term

compliance, which the court warned would require "structural changes . . . that will

likely override . . . some existing contracts."  712 F.3d at 928-29 (emphases

omitted).  About two months later, the court concluded that the committee's

recommendations did not go far enough, and so it abrogated several provisions of

the municipal-worker unions' collective bargaining agreements ("CBAs").  *Id*. at

929.  Ten days later, one of the unions moved to intervene, contending that the

injunction violated its constitutional rights; four days after that, the district court

denied the motion as untimely.  *Id*. at 929-30.

      This Court reversed, holding that it was an abuse of discretion to "deny[]

intervention outright" because "the district court's legitimate concerns with

29

finality, prejudice, and efficiency could . . . have been addressed by limiting the scope of intervention." *Id*. at 932. Specifically, this Court concluded that there were "matters on which, at a bare minimum, the Unions must be permitted to intervene," including "participation in shaping future remedial efforts and the right to appeal or challenge" the order partially abrogating the CBAs, even though there were "other[] [matters] on which intervention is inappropriate." *Id*. at 933. A similar abuse of discretion occurred here, where FRS sought limited intervention to clarify a single, unresolved legal issue that would shape the forthcoming administration of claims to settlement funds.

*City of Detroit* underscores that consideration of an intervenor's purpose is crucial when, as here, that purpose concerns the nature of future relief only, and intervention for that limited purpose would "promote[] an effective and fair solution," *id*. at 932, as resolving the dispute about subrogation rights would have done here, and still could. *See id*. at 931 ("Where future progress remains and the intervenor's interests are relevant, intervention may be the most effective way to achieve a full and fair resolution of the case."). The district court abused its discretion by ignoring that context.

      **2.**     The district court's conclusion that no "unusual circumstances . . . prevented [FRS] from docketing the motion several months earlier," Op. and Order, RE 2101, Page ID # 38270, was incorrect because FRS's earlier request, on

behalf of class members, for a ruling on the subrogation issue was just such a circumstance.  As discussed *supra* pp. 26-27, a request by putative class members to confirm their membership in the class is not a request that requires intervention. Absent class members in particular enjoy rights to participate in class proceedings that other kinds of non-parties do not.  *See*, *e.g.*, *Devlin v. Scardelletti*, 536 U.S. 1, 9-10 (2002) (non-intervening class members may appeal approval of class settlement because "nonnamed class members are parties to the proceedings in the sense of being bound by the settlement").  The district court erred in ignoring the existence and unusual context of FRS's earlier request.

     **3.**     The district court also erred in citing as a basis for denying intervention the fact that "the suit has progressed to a very advanced stage after years of litigation," Op. and Order, RE 2101, Page ID # 38270, because it focused on "[t]he mere passage of time," rather than "the stage of the proceeding" to which intervention was relevant, *City of Detroit*, 712 F.3d at 931, which was the claims administration process.  The district court failed to consider that FRS was seeking intervention to resolve the subrogation issue at the *beginning* of the claims administration process, rather than at its end, to avoid prejudice to class members that would result if claims were administered based on an incorrect understanding of the subrogation issue that would determine who is eligible to recover.  Granting intervention to resolve the subrogation issue early in the claims administration

process would have been better for the existing parties than deferring resolution of that issue until after all claims are processed.

*City of Detroit* is once again instructive. There, the district court had likewise found the progress of the suit to disfavor intervention because "the long history of remedial attempts, court orders, and expert reports makes clear the 'extensive progress in this case.'" 712 F.3d at 931. The unions had "waited to intervene until after the completion of the Root Cause Committee report," and that "delay weigh[ed] strongly against re-running that process." *Id*. Nevertheless, this Court held that the district court had abused its discretion in denying intervention because "future progress remain[ed]" to be achieved in the remedial phase of the litigation, and the district court had "failed to consider the potential prejudice resulting from complete denial of intervention," *i.e.*, "significant delay" caused by the unions mounting "collateral challenges" to the district court's orders. *Id*. at 931, 933. In those circumstances, this Court held, "intervention may be the most effective way to achieve a full and fair resolution of the case," even when—unlike here—the proposed intervenor's prejudicial delay was a "substantial ground[] for denying intervention." *Id*. at 931.

The point at which FRS sought intervention and the benefits of granting intervention to resolve the subrogation issue weighed in favor of intervention, not against it. FRS's purpose for seeking intervention was to clarify that it and the

Insurers could claim settlement funds. Therefore, "the long history" behind the

End-Payor Settlements "is not particularly important to the progress-in-suit factor"

here. *Id*. What matters is how much progress had been made in the relevant "stage

of the proceedings," *id*., which here is the claims administration process, as to

which "future progress remains," *id*. The district court's denial of intervention at

the outset of the claims administration process, and its refusal to resolve the

subrogation issue, threaten delay because, in any event, the Insurers will be able to

challenge at the end of the process any denial of their subrogation-based claims.

By contrast, granting intervention and resolving the subrogation issue at the

beginning of the claims administration process would avoid this "potential

prejudice," and was therefore "the most effective way to achieve a full and fair

resolution of the case" in light of "all the circumstances." *Id*. at 930-31.

The context of FRS's motion here presents an even stronger case for

intervention than the labor unions' motion in *City of Detroit*. The labor unions had

ignored the district court's well-publicized warnings that their bargaining rights

were "likely" going to be "overrid[d]e[n]" by the remedy the court was

considering, and instead "opted to 'wait and see' what the results of the Root

Cause Committee report would be." *Id*. at 929, 931 (emphasis omitted). They also

"made no attempt to limit the scope of [their] interventions," and their motion

"obscured what relief [they] were actually seeking." *Id*. at 931. By contrast, FRS

promptly raised a legal issue, crucial to the future distribution of settlement funds, that the district court had not resolved, and FRS expressly sought intervention solely for the narrow purpose of resolving that issue.

    **4.**    The district court also erred in finding that the timing of FRS's June 2020 motion to intervene prejudiced other class members.  Prior to June 2020, the submission of claim forms remained ongoing, and the claims administration process had not yet begun.  As a result, when FRS moved to intervene, the Claims Administrator had not started processing claims—the first step of the process—let alone begun the other steps of (1) notifying claimants of deficiencies, (2) processing additional information submitted to cure deficiencies, (3) evaluating whether claims qualify for payment based on that additional information, (4) calculating claim amounts, (5) determining the *pro rata* share for each claimant, and (6) making recommendations to the district court about which claims to pay.  *See* Pinkerton Decl., RE 2098-1, Page ID ## 38212-38213 (¶ 9).  The distribution of settlement funds was (and remains[4]) remote.  Given these circumstances, the district court's determination that "intervention would delay the distribution of settlement proceeds" and thereby "prejudice . . . the original

---

    [4] As of today, more than ten months after FRS moved to intervene, the Claims Administrator does not appear to have begun notifying claimants of deficiencies, which means that it still has not concluded the initial steps of receiving and processing all information from claimants.

Case 2:12-md-02311-SFC-RSW   ECF No. 2138-4, PageID.39372   Filed 05/15/21   Page 44 of 59

parties," Op. and Order, RE 2101, Page ID # 38270, was an abuse of discretion for two independent reasons.

*First*, the legal premise of the district court's prejudice finding was incorrect because it evaluated the effect of intervention itself, rather than the effect of any untimeliness. *See*, *e.g.*, *City of Detroit*, 712 F.3d at 930 (district court abuses its discretion when it "improperly applies the law or uses an erroneous legal standard"). The fact that an intervenor's "assertion of [its] relevant interests may cause delay . . . is not grounds for denial of intervention" because "the analysis must be limited to the prejudice caused by the *untimeliness*, not the intervention itself." *Id*. at 933.

All of the bases for "prejudice" that Class Counsel belatedly put forward—in a declaration filed in November 2020—and which the district court "considered" in denying intervention, Op. and Order, RE 2101, Page ID # 38265,[5] relate to purported delays from FRS's and Insurers' "assertion of [their] relevant interests," rather than any "prejudice caused by the *untimeliness*" of FRS's motion, 712 F.3d at 933. In that declaration, an Epiq employee claimed that the additional work that

---

[5] The order on appeal here granted Class Counsel leave to file a declaration from a Claims Administrator employee named Brian Pinkerton, Op. and Order, RE 2101, Page ID # 38265, but declined to grant FRS's request to submit its own declaration responding to Mr. Pinkerton's inaccurate claims, *see* Resp. in Opp., RE 2100, Page ID ## 38228, 38233-38234. FRS, in support of a subsequent motion, later submitted a declaration that responded to each of those claims. Leibell Decl., RE 2126-2, Page ID ## 39124-39133 (¶¶ 15-22).

the Claims Administrator would need to do to process the Insurers' claims might delay completion of the claims administration process. *See*, *e.g.*, Pinkerton Decl., RE 2098-1, Page ID # 38215 (¶ 20) (claiming "[t]he additional expense of administering and processing subrogation claims" "would substantially . . . prejudice the claims administration process").[6] But those purported delays, if they occur at all, would relate to the consequences of FRS and Insurers asserting subrogation rights, not the six-month period that the district court characterized as FRS's delay, *see* Op. and Order, RE 2101, Page ID ## 38269-38270.

Therefore, all of the bases for "prejudice" advanced by Class Counsel below and considered by the district court are irrelevant to the timeliness of FRS's motion. If the district court granted intervention, decided the subrogation issue in FRS's favor, and permitted the Insurers to submit claims as subrogees, any delay occasioned by "allow[ing] . . . [those] claims to be submitted," *id.*, Page ID # 38270, would have been an effect of "intervention itself," *City of Detroit*, 712 F.3d at 933. Neither the four months that the district court took to decide FRS's intervention motion, nor any delay that the Claims Administrator would experience

---

[6] *See also* Pinkerton Decl., RE 2098-1, Page ID # 38219 (¶ 28) (claiming "the processing and verification of subrogation claims would add many additional months to the claims-administration process"); *id.* (¶ 30) (claiming "resources needed to process and verify" FRS's and Insurers' claims would "prejudice the efficient and cost-effective administration" of the End-Payor Settlements because it would "require substantial additional expenses").

by having to process additional valid claims, may properly count against FRS in determining the timeliness of its motion.

*Second*, the district court's prejudice conclusion was also based on two factual findings that were clearly erroneous because they were "not supported" by the record. *See Capers v. Cuyahoga Cty. Bd. of Election*, 472 F.2d 1225, 1226 (6th Cir. 1973) (per curiam). The first clearly erroneous finding was that granting intervention would require the district court "to allow potentially thousands of claims to be submitted after the deadline." Op. and Order, RE 2101, Page ID # 38270. This finding is incorrect because the Insurers had already submitted their claims before the claim filing deadline, and FRS moved to intervene before that deadline as well. Therefore, FRS's motion did not implicate "submi[ssion] [of claims] after the deadline."

The district court's other clearly erroneous finding was that "intervention would delay the distribution of settlement proceeds." Op. and Order, RE 2101, Page ID # 38270. The record contains no evidence to support this determination. As discussed above, *see supra* pp. 34-35, the claims administration process is moving gradually, remains in an early phase even now, and "cannot be expected to end any time soon." *City of Detroit*, 712 F.3d at 931. The district court cited no basis to conclude that processing the Insurers' vehicle information would slow down the process any further. And the Claims Administrator's acknowledgment

37

that it is already planning to process additional vehicle information from other claimants after the claim filing deadline, Pinkerton Decl., RE 2098-1, Page ID # 38212 (¶ 9), underscores that processing vehicle information from the Insurers at this time would cause no prejudice (and is legally required) because it would merely treat the Insurers the same as all other claimants.

The Claims Administrator's employee, Mr. Pinkerton, admitted that it was "difficult to estimate" how much "additional time" it would take to process FRS's and the Insurers' claims, and he speculated, without considering any actual vehicle information from the Insurers, that it "would [take] many additional months" to process that information. *Id.*, Page ID ## 38218-38219 (¶¶ 27-28). The district court's apparent reliance on Mr. Pinkerton's assertion, *see* Op. and Order, RE 2101, Page ID # 38265 (the court "has considered" Pinkerton's declaration), was an abuse of discretion because (1) the assertion was a speculative conclusion, unsupported by any facts; (2) the assertion failed to account for the additional vehicle information the Claims Administrator has yet to process from other claimants trying to cure informational deficiencies in their claim forms; and (3) the district court denied FRS the opportunity to submit rebuttal evidence.

## II.  FRS and the Insurers Have Subrogation Rights That Permit Them To Recover from the End-Payor Settlements

In denying intervention, the district court suggested that FRS and the Insurers might lack "a substantial legal interest" in the End-Payor Settlements, *see Blount-Hill*, 636 F.3d at 283, concluding that "Plaintiffs . . . make a compelling argument that FRS lacks sufficient interest to intervene."  Op. and Order, RE 2101, Page ID # 38268 n.1.  Contrary to Appellees' arguments, this observation, by its express terms, did not "resolv[e] the substantive question of whether FRS may submit subrogation claims," Dkt. 13, at 3; in any event, such a conclusion would not be a basis to affirm the district court because FRS and the Insurers, as subrogees, have claims to funds in the End-Payor Settlements.  Those subrogation rights are a "substantial legal interest" warranting intervention.

This Court "has opted for a rather expansive notion of the interest sufficient to invoke intervention [as] of right," *Miller*, 103 F.3d at 1245, and a claimed subrogation interest satisfies that standard, *see*, *e.g.*, *Krueger*, 996 F.2d at 932 ("[An] insurer who is partially subrogated may intervene . . . to protect its pro rata share of the potential recovery."); *McDonald*, 430 F.2d at 1071 ("Since [insurer's] purpose in moving to intervene was to protect its subrogation interest . . . , it is clear that the proposed intervention was cognizable as intervention of right under Rule 24(a)(2).").  On behalf of the Insurers, FRS claims a right to be paid a portion of the End-Payor Settlements, and is an assignee of an Insurer's claims, as a

subrogee, to those settlements, which is part of "the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2); *see supra* pp. 4-8.

### A.    FRS and the Insurers Have a Substantial Legal Interest in Recovering as Subrogees from the End-Payor Settlements

Under the doctrine of equitable subrogation, the Insurers and FRS (as an assignee of an Insurer's interests) may recover from the End-Payor Settlements. Subrogation is an equitable doctrine that, "as applied in the insurance context, allows an insurer to sue a third party for injuries that the third party caused to the insured, when the insurer compensated the insured for those injuries." *Nat'l Surety Corp. v. Hartford Cas. Ins. Co.*, 493 F.3d 752, 756 (6th Cir. 2007), *quoted in GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 831 (E.D. Mich. 2018). "Subrogation simply means substitution of one person for another," and "involves the substitution of the insurer . . . to the rights of the insured." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 n.5 (2013) (citations omitted). In other words, subrogation "allows insurers to 'stand in the shoes' of their insured to seek indemnification by pursuing any claims that the insured may have had against third parties legally responsible for the loss." *GEICO*, 345 F. Supp. 3d at 831 (quoting *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999)); *see also*, *e.g.*, 16 *Couch on Insurance* § 222:5 (3d ed.) ("on paying a loss, an insurer is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss") (footnotes omitted).

40

Under a straightforward application of equitable subrogation, the Insurers (and FRS as assignee) stand in the shoes of their insureds to recover from the End-Payor Settlements for the antitrust overcharges included in indemnity payments the Insurers made for Total Loss Vehicles.

*First*, the Insurers had a duty under insurance contracts to pay their insureds for the market value of Total Loss Vehicles. *See* Leibell Decl., RE 2060-2, Page ID # 37727 (¶ 4); Ltr. Br., RE 2060-3, Page ID ## 37734-37740. The Insurers' automobile insurance contracts—which were substantially similar to those of other major automobile insurers, such as GEICO, State Farm, and Farmers—provided coverage for damage to the insureds' vehicles caused by collisions, among certain other covered events. *See*, *e.g.*, Class Counsel 11/2/19 Ltr., RE 2060-8, Page ID # 37838; *id.*, Page ID # 37857; *id.*, Page ID ## 37885-37886. The Insurers were contractually required to pay the lesser of (1) the cost to repair the damage to the insured vehicle or (2) the "actual cash value" of the vehicle at the time of the loss. *Id.*, Page ID # 37839; *id.*, Page ID # 37861; *id.*, Page ID ## 37887-37888.[7] Thus, when the cost of repairing a vehicle exceeded its value—that is, when it became a "total loss"—Insurers were obligated to pay their insureds the "actual cash value" of the vehicle, and they did so. Class Counsel have never disputed this.

---

[7] "Actual cash value" is the cost to replace the vehicle in the marketplace, adjusted for the vehicle's depreciation and wear-and-tear. *See* Class Counsel 11/2/19 Ltr., RE 2060-8, Page ID ## 37839-37840; *id.*, Page ID # 37857.

*Second*, the indemnity payments that the Insurers made to settlement class members for Total Loss Vehicles included anticompetitive overcharges incurred at the time of purchase.  Underlying the End-Payor Settlements were allegations that the settling defendants' conduct—conspiring to raise, fix, or maintain the prices of certain automotive parts—inflated the market price of eligible vehicles that contained those parts.  *See, e.g.*, Meritor Settlement Agreement, No. 2:16-cv-03703 (E.D. Mich. June 5, 2018), RE 112-1, Page ID ## 3815-3816.  And End-Payor Plaintiffs alleged that "all persons who purchased or leased new [eligible] Vehicles not for resale were affected by the conspiracy," Mot. for Approval, RE 1454, Page ID # 25790, based on the economic principle that "unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component," Third Am. Compl., No. 2:12-cv-00403, RE 229, Page ID # 8296 (¶ 186).  The Insurers' indemnity payments were lower than the original purchase price of the vehicles, reflecting depreciation and wear-and-tear, but there is no factual dispute that the anticompetitive overcharge remained part of the vehicles' "actual cash value," such that the Insurers compensated their insureds for those overcharges when they paid claims for Total Loss Vehicles.  Pls.' Resp. Br., RE 2034, Page ID # 37526; Ltr. Br., RE 2060-3, Page ID # 37739; Reply Ltr. Br., RE 2060-4, Page ID # 37771.

*Third*, the antitrust overcharges included in the Insurers' indemnity payments are the same overcharges caused by the settling defendants' alleged unlawful conduct. The Insurers' claims to the End-Payor Settlement funds are based only on indemnity payments to settlement-class-member insureds for the actual value of eligible vehicles. Accordingly, by virtue of those payments, the Insurers paid their insureds for the overcharges that the End-Payor Settlements are designed to compensate, and, therefore, the Insurers are subrogated to those class members' claims to recover from the End-Payor Settlements.

**B.    The Arguments Raised by Class Counsel and Cited by the District Court Against FRS's and the Insurers' Subrogation Rights Are Incorrect**

Class Counsel have not contested that (1) the Insurers had a duty to pay their insureds for the value of Total Loss Vehicles, (2) antitrust overcharges remained part of the vehicles' value, and (3) the settling defendants caused those overcharges. Class Counsel have instead contested FRS's and the Insurers' subrogation rights by arguing that the insurance contracts that obligated the Insurers to make indemnity payments for Total Loss Vehicles did not, by their express terms, provide *coverage* for antitrust overcharges. That argument, however, misconceives the nature of subrogation. The right of subrogation accrues "when the insurer *compensate[s]* the insured for [the] injuries" "that the third party caused to the insured." *Nat'l Surety Corp.*, 493 F.3d at 756 (emphasis added). So

long as insurers have a duty to compensate the injury and do so, as the Insurers undisputedly did here, they may step into the shoes of the insured and recover the amount of their indemnity payments from any third party that caused the injury.

The district court noted (without deciding the question) that Class Counsel "make a compelling argument that FRS lacks sufficient interest to intervene." Op. and Order, RE 2101, Page ID # 38268 n.1. The district court appeared to base that observation on the absence of "any insurance policy that covers the overcharges at issue here or any insured members who submitted such claims to their insurance companies," and the district court's view that the decision in *GEICO* did not "explicitly 'determine the viability' of the subrogation theory in that context." *Id.* These statements, however, do not support denial of intervention.

The statement about insurance policies misconceives subrogation by focusing on the scope of the insurance policy rather than the fact of payment under that policy. *See supra* pp. 43-44. And the statement about *GEICO* is incorrect because the *GEICO* court's inability to "determine the viability" of GEICO's opt-out subrogation claim was due to a *factual* question, which could not be resolved in the context of a Rule 12(b)(6) motion, about an *affirmative defense* that the settling defendants had asserted. *See GEICO*, 345 F. Supp. 3d at 829-33. That affirmative defense was relevant to defendants' potential liability for GEICO's opt-out claims, but the *GEICO* court did not suggest that it had any bearing on the existence of

GEICO's subrogation rights, and it has no application to the Insurers' non-adversarial claims to settlement funds here.

## CONCLUSION

The order of the district court denying intervention should be reversed.

Respectfully submitted,

/s/ *Aaron M. Panner*

AARON M. PANNER
MATTHEW R. HUPPERT
DANIEL S. SEVERSON
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921
apanner@kellogghansen.com
mhuppert@kellogghansen.com
dseverson@kellogghansen.com

*Counsel for Appellant Financial Recovery Services, LLC*

April 21, 2021

**Form 6.  Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit  of Fed. R. App. P.
[ **32(a)(7)(B)**                                                   ]] [the word limit of
Fed. R. App. P. [                                                           ]]
because, excluding the parts of the document exempted by Fed. R. App. P. 32(f)
[and [ **6 Cir. R. 32(b)(1)**                                           ]]:

   ☑  this document contains **10,755**                      words, or

   ☐  this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑  this document has been prepared in a proportionally spaced typeface using
   **Microsoft Word 2013**                                          in

   **Times New Roman, 14- point type**                              , or

   ☐  this document has been prepared in a monospaced typeface using

   _____ with

   _____ .

   /s/ **Aaron M. Panner**

   Attorney for **Appellant Financial Recovery Services, LLC**

   Dated: **April 21, 2021**

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d) and Sixth Circuit

Rule 25(f), I certify that, on April 21, 2021, I caused a true and correct copy of the

foregoing Opening Brief for Appellant Financial Recovery Services, LLC to be

served upon all counsel of record through the Court's CM/ECF system.


 /s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Appellant Financial*
*Recovery Services, LLC*

**ADDENDUM**

**Designation of Documents for Appellant Financial Recovery Services, LLC**

| RE # | Description of Entry | Page ID ## |
|------|---------------------|------------|
| *Automotive Parts Antitrust Litigation*, No. 2:12-md-02311 (E.D. Mich.) | | |
| 1454 | End-Payor Plaintiffs' Motion for Approval of Plan of Allocation of Settlement Proceeds (Sept. 8, 2016) | 25775-25793 |
| 2005-2 | Ex. A to End-Payor Plaintiffs' Amended Unopposed Motion for Authorization to Disseminate June 2019 Notice to the End-Payor Plaintiff Settlement Classes – Proposed Revised Plan of Allocation and Distribution of the Automotive Parts Settlement Funds (June 25, 2019) | 36627-36632 |
| 2032 | Order Granting End-Payor Plaintiffs' Unopposed Motion for an Order Approving the Proposed Further Revised Plan of Allocation and for Authorization To Disseminate Supplemental Notice to the Settlement Class (Dec. 20, 2019) | 37505-37511 |
| 2034 | End-Payor Plaintiffs' Response to Financial Recovery Services, LLC's Request for Declaratory Relief (Jan. 16, 2020) | 37513-37539 |
| 2044 | Order Regarding End-Payor Plaintiffs' Unopposed Motion for an Extension of the Claims-Filing Deadline (Mar. 24, 2020) | 37658 |
| 2060 | Final Recovery Services, LLC's Motion To Intervene (June 18, 2020) ("FRS Mot. To Intervene") | 37695-37722 |
| 2060-2 | Ex. 1 to FRS Mot. To Intervene – Declaration of Jeffrey N. Leibell (June 18, 2020) ("Leibell Decl.") | 37725-37732 |
| 2060-3 | Ex. A to Leibell Decl. – Letter Brief from Financial Recovery Services, LLC to Hon. Marianne O. Battani (Dec. 13, 2019) | 37733-37766 |

| RE # | Description of Entry | Page ID ## |
|---|---|---|
| 2060-4 | Ex. B to Leibell Decl. – Reply Letter Brief from Financial Recovery Services, LLC to Hon. Marianne O. Battani (Jan. 30, 2020) | 37767-37775 |
| 2060-5 | Ex. C to Leibell Decl. – Email from Robin Niemiec to Adam J. Zapala, Marc M. Seltzer, and Hollis Salzman (Nov. 14, 2018) | 37776-37777 |
| 2060-6 | Ex. D to Leibell Decl. – Email from Robin Niemiec to William V. Reiss, attaching FRS research memorandum (Jan. 14, 2019) | 37778-37816 |
| 2060-7 | Ex. E to Leibell Decl. – Email from Jeffrey N. Leibell to Marc M. Seltzer and William V. Reiss, attaching draft letter brief from FRS to Hon. Marianne O. Battani (Oct. 24, 2019) | 37817-37819 |
| 2060-8 | Ex. F to Leibell Decl. – Email from Chanler A. Langham to Jeffrey N. Leibell, attaching letter from Adam J. Zapala, Hollis Salzman, and Marc M. Seltzer to Jeffrey N. Leibell (Nov. 2, 2019) | 37820-37899 |
| 2060-9 | Ex. G to Leibell Decl. – Email from Chanler A. Langham to Jeffrey N. Leibell, Adam Zapala, Hollis Salzman, Marc Seltzer, and Richard A. Wojtczak, attaching proposed stipulation (Nov. 26, 2019) | 37900-37912 |
| 2060-10 | Ex. H to Leibell Decl. – Email from Jeffrey N. Leibell to Chanler Langham, attaching letter from Jeffrey N. Leibell to GCG, Settlement Administrator (Mar. 10, 2020) | 37913-37916 |
| 2060-11 | Ex. I to Leibell Decl. – Email from Angela Rivera to Claims Administrator (June 18, 2020) | 37917-37919 |
| 2064-3 | Ex. A to Supplemental Declaration of Jeffrey N. Leibell – Assignment of Claims Agreement (June 24, 2020) | 38023-38025 |
| 2066 | End-Payor Plaintiffs' Memorandum in Opposition to Financial Recovery Services, LLC's Untimely Motion To Intervene (July 2, 2020) | 38032-38057 |

| RE # | Description of Entry | Page ID ## |
|------|---------------------|------------|
| 2098-1 | Ex. A to End-Payor Plaintiffs' Motion for Leave To Supplement the Record – Declaration of Brian A. Pinkerton in Support of Opposition to Financial Recovery Services, LLC's Motion To Intervene (Nov. 12, 2020) | 38209-38219 |
| 2100 | Financial Recovery Services, LLC's Response in Opposition to End-Payor Plaintiffs' Motion To Supplement the Record (Nov. 16, 2020) | 38223-38236 |
| 2101 | Opinion and Order Denying Financial Recovery Services, LLC's Motion To Intervene (Nov. 17, 2020) | 38264-38270 |
| 2105 | Financial Recovery Services, LLC's Notice of Appeal (Dec. 16, 2020) | 38278-38280 |
| 2114-2 | Ex. 1 to Financial Recovery Services, LLC's Emergency Motion To Compel Acceptance and Processing of Vehicle Data – Declaration of Jeffrey N. Leibell (Feb. 17, 2021) ("Leibell Decl.") | 38334-38354 |
| 2114-6 | Ex. D to Leibell Decl. – Email from Jeremy Bailey to Angela Rivera (June 19, 2020) | 38366-38368 |
| 2126-2 | Ex. 1 to Financial Recovery Services, LLC's Reply in Support of Motion To Compel Acceptance and Processing of Data – Declaration of Jeffrey N. Leibell (Mar. 10, 2021) | 39112-39139 |
| *Heater Control Panels*, No. 2:12-cv-00403 (E.D. Mich.) | | |
| 229 | Third Consolidated Amended Class Action Complaint (Mar. 30, 2017) | 8249-8350 |
| 291 | Order Granting End-Payor Plaintiffs' Second Amended Unopposed Motion for Authorization To Disseminate July 2019 Notice to the End-Payor Plaintiff Settlement Classes (Aug. 2, 2019) | 10395-10401 |