**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE: AUTOMOTIVE PARTS** | ) | |
| **ANTITRUST LITIGATION,** | ) | |
| | ) | |
| | ) | **Master File No. 12-md-02311** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| **ALL END-PAYOR ACTIONS** | ) | |
| _____ | ) | |

**ELEMENT FLEET CORPORATION, WHEELS, INC.,
DONLEN LLC, AND AUTOMOTIVE RENTALS, INC.'S MOTION
TO ENFORCE SETTLEMENT AGREEMENTS**

Element Fleet Corporation, Wheels, Inc., Donlen LLC, and Automotive Rentals, Inc., all of which are fleet management companies (collectively, the "FMCs"), hereby move this Court to enforce the settlement agreements in the End-Payor Actions by (1) declaring these FMCs to be Settlement Class Members because they are included by the plain language of the settlement agreements, and (2) directing the Claims Administrator to apply the Court-approved Plan of Allocation to the FMC's claims.

The FMCs rely on the following brief in support of their motion.

In accordance with E.D. Mich. LR 7.1(a)(2), counsel for the FMCs explained to Class Counsel the nature of the motion and its legal basis. Class Counsel advised that they oppose the motion. Defendants take no position on the motion.

Respectfully submitted this 15th day of September, 2021.

/s/ L. Conrad Anderson IV

Gregory C. Cook
L. Conrad Anderson IV
**BALCH & BINGHAM LLP**
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203
Telephone:   (205) 251-8100
Facsimile:   (205) 226-8799
Email: gcook@balch.com
Email: canderson@balch.com

Tyler P. Bishop
**BALCH & BINGHAM LLP**
30 Ivan Allen, Jr. Blvd., NW, Suite 700
Atlanta, Georgia 30308-3036
Telephone:   (404) 962-3521
Email: tbishop@balch.com

*Counsel for Element Fleet Corporation, Wheels, Inc., Donlen LLC, and Automotive Rentals, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: AUTOMOTIVE PARTS** ) | |
| **ANTITRUST LITIGATION,** ) | |
| ) | |
| ) | |
| ) | **Master File No. 12-md-02311** |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | |
| **ALL END-PAYOR ACTIONS** ) | |
| ) | |
| _____ ) | |

**MEMORANDUM OF LAW IN SUPPORT OF ELEMENT FLEET
CORPORATION, WHEELS, INC., DONLEN LLC, AND AUTOMOTIVE
RENTALS, INC.'S MOTION TO ENFORCE SETTLEMENT AGREEMENTS**

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................. 1

II.  BACKGROUND .............................................................................. 3

    A.  The FMCs' purchase of Vehicles and lease to their corporate
        customers ........................................................................... 3

    B.  The End-Payor Actions and the resulting settlement agreements ........ 6

III.  ARGUMENT ................................................................................. 8

    A.  The settlement agreements' plain language governs whether FMCs
        are Settlement Class Members. ................................................ 8

    B.  FMCs are clearly and unambiguously Settlement Class Members
        under the settlement agreements' plain language. ....................... 8

        1.  The FMCs "purchased" new vehicles. ............................. 9
        2.  The FMCs did not purchase vehicles "for resale." ............. 9
        3.  Manufacturers bought global peace with broad settlement
            agreement language. ................................................ 13

    C.  Whether FMCs' customers may also be Class Members is irrelevant.
        ........................................................................................ 15

    D.  Postponing resolution of this dispute will further delay distribution.
        ........................................................................................ 18

IV.  Conclusion ................................................................................. 19

## ISSUE PRESENTED

Whether the Court should enforce the settlement agreements in the End-Payor Actions by entering an order (1) declaring the FMCs to be Settlement Class Members, and (2) directing the Claims Administrator to apply the Court-approved Plan of Allocation to the FMCs' claims.

Brief Answer: Yes. The Settlement Class consists of "[a]ll persons and entities that . . . purchased or leased a new Vehicle in the United States not for resale, which included one or more [of the applicable component parts]." PageID.12034-36. The FMCs purchased new Vehicles that they subsequently leased to their customers, but they still maintained ownership and title, and an FMC lease is not considered a "resale" under settled commercial law. Thus, they "purchased a new Vehicle . . . not for resale" and are Settlement Class Members.

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

<u>**Cases**</u>

*Converge, Inc. v. Topy Am., Inc.,*
  316 F. App'x 401 (6th Cir. 2009) ................................................................. 8
*Fletcher v. Bd. of Educ. of Sch. Dist. Fractional No. 5,*
  323 Mich. 343 (1948) ................................................................................ 8
*In re Architectural Millwork of Virginia,*
  226 B.R. 551 (Bankr. W.D. Va. 1998) ..................................................... 12
*In re Auto. Parts Antitrust Litig.,*
  997 F.3d 677 (6th Cir. 2021) ........................................................ 8, 13, 14
*In re Beckham,*
  275 B.R. 598 (D. Kan.) ............................................................................ 12
*In re Charles,*
  278 B.R. 216 (Bankr. D. Kan. 2002) ....................................................... 12
*In re Damron,*
  275 B.R. 266 (Bankr. E.D. Tenn. 2002) .................................................. 12
*In re Double G Trucking of the Arklatex,*
  432 B.R. 789 (Bankr. W.D. Ark. 2010) ................................................... 12
*In re Fine Paper Antitrust Litig.,*
  695 F.2d 494 (3rd Cir. 1982) ..................................................................... 2
*In re HP Distribution,*
  436 B.R. 679 (Bankr. D. Kan. 2010) ....................................................... 12
*In re HP Logistics,*
  460 B.R. 291 (Bankr. N.D. Ala. 2011) .................................................... 12
*In re MEPCO, Inc.,*
  276 B.R. 94 (Bankr. W.D. Va. 2001) ....................................................... 12
*In re Otasco, Inc.,*
  196 B.R. 554 (N.D. Okla. 1991) .............................................................. 12
*In re Owen,*
  221 B.R. 56 (Bankr. N.D.N.Y. 1998)........................................................ 11
*Michigan Mut. Ins. Co. v. Dowell,*
  204 Mich. App. 81 (1994) .......................................................................... 8

<u>**Statutes**</u>

La. Stat. Ann. § 32:1252(66).......................................................................... 17
N.Y.V. & TL § 397-b....................................................................................... 11
Tex. Transp. Code Ann. § 501.002 (31) (West) ............................................ 17

## **Other Authorities**

UCC § 1-103(a) .................................................................................... 12, 13

UCC § 1-201(b)(35) ................................................................................ 10

UCC § 1-203 ........................................................................................... 10

UCC § 2-106(1) ....................................................................................... 10

UCC § 2A-103(j) ..................................................................................... 10

## I.      INTRODUCTION

Element Fleet Corporation ("Element"), Wheels, Inc. ("Wheels"), Donlen LLC ("Donlen"), and Automotive Rentals, Inc. ("ARI"), all of which are fleet management companies (collectively, the "FMCs"), purchased millions of new vehicles containing component parts manufactured by the settling defendants ("Manufacturers" or "Defendants").[1] The FMCs purchased those vehicles not for resale, but rather to lease to their corporate customers. Class Counsel nevertheless contend FMCs are not Class Members under the settlement agreements and have presumably instructed (or will instruct) the Claims Administrator to deny their claims.

The FMCs thus move to enforce the settlement agreements. Specifically, the FMCs move for an order declaring them to be "Settlement Class Members" because they are included in each settlement agreement's definition of "Settlement Class":

> **All persons and entities that . . . purchased or leased a new Vehicle in the United States not for resale, which included one or more [of the applicable component parts].**

*See*, *e.g.*, PageID.12034-36.

Under the Plan of Allocation, no settlement funds will be distributed until after the Claims Administrator determines "the amounts recommended to be paid to Authorized Claimants" and the Court approves those recommendations. *See*, *e.g.*, PageID.10328. Although the Claims Administrator has not yet notified the FMCs (or

---

[1] This Motion relates to the distribution of settlement funds recovered in all of the End-Payor Actions and has therefore been filed in Master File No. 12-md-02311. All citations are to the Master File unless otherwise noted. Should the Court prefer to receive a separate Motion in each action, the FMCs will file in the individual cases.

any other claimants) that it will recommend the Court deny their claims, there is no reason to wait until the end of the administrative process to resolve this issue. This dispute is simply a matter of interpreting and enforcing the settlement agreements. Indeed, because the settlement funds will be distributed *pro rata* among all eligible Class Members, setting aside the claims for the millions of vehicles purchased by the FMCs and waiting months—if not longer—to review and process their claims will only add to an already substantial delay.

The circumstances giving rise to this Motion are distinguishable from those recently brought before the Court via a motion to intervene by Financial Recovery Services, LLC ("FRS"). The Court denied that motion to intervene because it was untimely and would prejudice other parties by allowing thousands of contested claims to be submitted after the deadline. PageID.38269. Unlike FRS, the FMCs do not claim to be subrogated to the rights of Settlement Class Members and therefore entitled to recovery—rather, the FMCs *are* Settlement Class Members. *See In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 499 (3rd Cir. 1982) ("As purported members of the class, [claimants] did have standing" to request "that the court interpret the class order so as to include [claimants] and on that basis direct the payment of [their] claims."). And the FMCs are not requesting permission to file untimely claims once this Motion is granted; the FMCs all timely filed their claims, with most having filed

almost four years ago.[2] For the reasons set forth below, this Court should grant this Motion.

## II.   BACKGROUND

### A.   The FMCs' purchase of Vehicles and lease to their corporate customers

Many companies require a sizeable fleet of vehicles to carry out their business.[3] Numerous legal and financial attributes uniquely apply to the FMC lease and fleet management model that attract corporate fleets to utilize FMCs, as opposed to purchasing the vehicles themselves or pursuing a normal lease from a manufacturer-authorized dealership. Pfeifle & Ley, *supra* note 3, at 15.

Under this arrangement, an FMC purchases and takes title to the new vehicles; the FMC maintains exclusive ownership, while the customer is merely granted the right to possession and use of the vehicles. *Id.* at 5 & 8. This provides customers flexibility in managing the size and composition of their fleet while

---

[2] Element, Wheels, and ARI initially filed their claims in September 2017. Declaration of Matt Farley (Element), attached hereto as **Exhibit A**, at ¶ 5; Declaration of Shlomo Y. Crandus (Wheels), attached hereto as **Exhibit B**, at ¶ 5; and Declaration of Brian Creelman (ARI), attached hereto as **Exhibit C**, at ¶ 5. All three sets of claims were supplemented and re-submitted in March 2020 to include additional vehicles that had become eligible under subsequent settlements and to meet the parameters of the revised Plan of Allocation approved in December 2019. Farley Decl. at ¶ 6; Crandus Decl. at ¶ 6; Creelman Decl. at ¶ 6. Donlen first filed its claims on March 16, 2020—within the deadline. Declaration of Khalid Latif (Donlen), attached hereto as **Exhibit D**, at ¶ 5.

[3] *See* Sebastian Pfeifle & Christopher Ley et al., *Fleet leasing & management in North America*, Deloitte: Future of Mobility, at 5, available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/consumer-business/us-cp-fleet-leasing-and-management-in-north-america.pdf. (January 2018; s*ee also What is a Fleet Management Company?*, CARADVISE, https://caradvise.com/what-is-a-fleet-management-company/ (October 3, 2018.

outsourcing the legal and financial burdens associated with vehicle purchase and ownership. The vast majority of the leases used by FMCs are open-ended TRAC leases,[4] which are different than those used by dealerships.[5] *See id.* at 30-31. Standard terms in these FMC leases include:

| FMC's Ownership | • **Element:** "Lessor will be the sole legal and equitable owner of the Vehicles and Lessor has the right to mark the Vehicles stating its interest as owner." Farley Decl. at Exhibit 1, § 1.(d).<br><br>• **Wheels:** "It is expressly agreed that the Lessee by virtue of this Lease acquires no ownership, title, property, right, interest, *(or any option therefor)* in any leased motor vehicle." Crandus Decl. at Exhibit 1, § 15.<br><br>• **Donlen:** "This agreement is one of leasing only, and Lessee shall not have or acquire any right, title, or interest in or to any Vehicle except the right to use and operate it as provided herein." Latif Decl. at Exhibit 1, § 3.<br><br>• **ARI:** "All vehicles leased hereunder shall be owned by, and titled and/or registered in the name of Lessor." Creelman Decl. at Exhibit 1, art. 1. |
| Title in name of FMC | • **Element:** "Vehicles will be titled in the name of Lessor or such other name as Lessor may designate from time to time in its sole discretion." Farley Decl. at Exhibit 1, § 1.(d).<br><br>• **Wheels:** "All motor vehicles shall be registered in the name of Lessor during the entire term of the Lease, and any certificates of title required shall likewise be |

---

[4] TRAC is an acronym for "Terminal Rental Adjustment Clause." TRAC leases, which are used only for titled equipment (like motor vehicles), provide for a final rental adjustment on the lease after the vehicle is removed from service and sold.

[5] *See also Lease v. ownership: 4 reasons to lease your fleet*, HERTZ LEASING, https://images.hertz.com/pdfs/lease-verse-ownership.pdf, at 2, 5.

| | |
|---|---|
| | in the name of the Lessor." Crandus Decl. at Exhibit 1, § 4. |
| | • **Donlen:** "Lessee shall pay for the initial registration, titling and licensing for each Vehicle and shall thereafter obtain and pay for all required plates, permits or licenses (in the name of Lessor as applicable) and for all inspections required by any governmental authority." Latif Decl. at Exhibit 1, § 7. |
| | • **ARI:** "All vehicles leased hereunder shall be owned by, and titled and/or registered in the name of Lessor." Creelman Decl. at Exhibit 1, art. 1. |
| <u>Lessee's Limited Rights</u> | • **Element:** "Lessee has no right, title or interest (neither legal nor equitable) in any Vehicle, nor to the proceeds of Sale of any Vehicle, except as expressly set forth in this Agreement." Farley Decl. at Exhibit 1, § 1.(d). |
| | • **Wheels:** "During the term of this Lease, Lessee shall have possession of and right to use the said motor vehicle[.]" Crandus Decl. at Exhibit 1, § 4. "It is expressly agreed that the Lessee by virtue of this Lease acquires no ownership, title, property, right, interest, *(or any option therefore)* in any leased motor vehicle[.]" *Id.* at § 14 (emphasis in original). |
| | • **Donlen:** "This Agreement is one of leasing only and Lessee shall not have or acquire any right, title or interest in or to any Vehicle except the right to use and operate it as provided herein." Latif Decl. at Exhibit 1, § 3 (emphasis added). |
| | • **ARI:** Only a right to use. Creelman Decl. at Ex. 1, art. 11 ("Lessee may ***use*** the vehicles at any and all times for any and all legal purposes.") (emphasis added). |
| <u>Intent of the Parties</u> | • **Element:** "Lessor and Lessee agree [] this Agreement will be characterized as a lease for income tax purposes . . . ." Farley Decl. at Exhibit 1, § 21.(a). "The parties intend the lease of Vehicles to be a true lease . . . ." *Id.* at § 21.(b). |

|  | • **Wheels:** "*COMMERCIAL LEASE*. This Lease is for agricultural, business or commercial purposes, and is not primarily for personal, family or household purposes." (emphasis in original). Crandus Decl. at Exhibit 1, § 16. |
|  | • **Donlen:** "This Agreement is intended to be and shall be treated by the parties hereto as a true lease." Latif Decl. at Exhibit 1, § 3. |
|  | • **ARI:** "[T]he parties to this Agreement intend to create a true lease." Creelman Decl. at Ex. 1, art. 1. |

The FMCs also provide a variety of other ancillary, turn-key fleet management services, saving their customers from having to devote their own internal resources and personnel. Pfeifle & Ley, *supra* note 3, at 15 ("fleet customers also value the transfer of paperwork and risk responsibility of fleet compliance and regulatory requirements into the hands of the [FMCs], which typically have dedicated regulatory and legal departments to assist their clients"), 26 ("Fleet management is evolving into a service business to lower operating costs for customers.").

### B.     The End-Payor Actions and the resulting settlement agreements

These actions were commenced nearly a decade ago by a putative class of vehicle purchasers (EPPs), alleging that the Manufacturers conspired to fix prices of vehicle component parts. The EPPs asserted claims under the antitrust laws of states that allow indirect purchasers to recover monetary damages, and under various states' consumer protection statutes. Settlements have been reached with all but one

of the Manufacturers.[6] This Court approved those settlements and certified

nationwide classes ("Settlement Class") encompassing:

> All persons and entities that . . . purchased or leased a new Vehicle in
> the United States not for resale, which included one or more [of the
> applicable component parts].

*See*, *e.g.*, PageID.12034-36.

The settlement agreements define "Settlement Class Member[s]" as "each

member of the Settlement Classes who has not timely elected to be excluded from the

Settlement Classes." PageID.12036. The only entities excluded from these definitions

are Defendants and their related entities, governmental entities, direct purchasers,

purchasers for resale, and timely objectors. *Id*.

In exchange, the Settlement Class Members "completely released, acquitted,

and forever discharged" each Manufacturer "from any and all claims, demands,

actions, suits, causes of action"—whether class or individual in nature—that each

Class Member "ever had, now has, or hereafter can, shall or may ever have . . . in any

way arising out of or relating in any way" to the conduct alleged in the subject

complaint or to "any act or omission" of any of the Manufacturers concerning the parts

at issue (the "Released Claims"). PageID.5306.

---

[6] This Court granted preliminary approval to the settlement with the last defendant
in the Exhaust Systems Action on September 8, 2021. No. 2:16-cv-03703, at
PageID.7071.

III.   **ARGUMENT**

A.   **The settlement agreements' plain language governs whether FMCs are Settlement Class Members.**

A settlement agreement is a contract governed by principles of state contract law. *Converge, Inc. v. Topy Am., Inc.,* 316 F. App'x 401, 404–05 (6th Cir. 2009). Under Michigan law, where the contract language is clear and unambiguous, "the terms are to be taken and understood in their plain, ordinary, and popular sense." *Id.* (quoting *Michigan Mut. Ins. Co. v. Dowell,* 204 Mich. App. 81, 87 (1994)). "Courts are governed by what the parties said and did, and not merely by their unexpressed subjective intent." *Id.* at 405 (quoting *Fletcher v. Bd. of Educ. of Sch. Dist. Fractional No. 5,* 323 Mich. 343, 348 (1948)).

The Sixth Circuit recently illustrated the application of this plain language analysis when it held that the end-payor settlement agreements' exclusion of direct purchasers from the "settlement class" definitions prevented certain plaintiffs from filing subsequent actions against the same Manufacturers (or entities they owned or controlled) as direct purchasers. *See In re Auto. Parts Antitrust Litig.*, 997 F.3d 677, 683-84 (6th Cir. 2021), attached hereto as **EXHIBIT E** ("*Yamashita*"). The *Yamashita* plain language analysis applies with equal effect here and leads to the inescapable conclusion that the FMCs are settlement class members.

B.   **FMCs are clearly and unambiguously Settlement Class Members under the settlement agreements' plain language.**

The settlement agreements define Settlement Class Members as:

All persons and entities that . . . **[1]** purchased or leased a new Vehicle in the United States **[2]** not for resale, which included one or more [of the applicable component parts].

*See*, *e.g.*, PageID.12034-36.

Whether FMCs are Settlement Class Members turns on the answers to two objective questions derived from the class definition:

      (1)    Did the FMCs purchase new vehicles? The answer must be: "Yes"; and

      (2)    Did the FMCs purchase those vehicles for resale? The answer must be: "No."

The FMCs answer both questions correctly. Therefore, they are Settlement Class Members who can enforce and participate in the settlements.

              1.      <u>The FMCs "purchased" new vehicles.</u>

The FMCs do not believe there is any dispute that they "purchased" new vehicles, nor could there be—they paid for and took title to the vehicles. More specifically, the FMCs purchased new vehicles from a dealership (or ordered them directly from a manufacturer's fleet department, a non-defendant, in which case the order still goes through a selling dealership). *See* Farley Decl. at ¶ 2; Latif Decl. at ¶ 2; Creelman Decl. at ¶ 2; Crandus Decl. at ¶ 2.

              2.      <u>The FMCs did not purchase vehicles "for resale."</u>

The FMCs did not purchase the new vehicles "for resale" because they do not sell the vehicles that they purchase; they lease them to their corporate customers. As a matter of law, a lease is not a "sale." Sales and leases are different types of transactions governed by different sections of the UCC (sales by Article 2, and leases by Article 2A). And although a TRAC lease has features that resemble a sale or the creation of a security interest (e.g., by adjusting rental prices based on later sale of

the vehicle), all 50 states have enacted laws specifically establishing that a TRAC lease is by law *not* a sale.

a.    *Sales and leases are different under the UCC and statute.*

The UCC explicitly defines a "sale" as "the passing of title from the seller to the buyer for a price." UCC § 2-106(1). As noted above, the FMCs' lease agreements provide that the FMC is the owner and that the customer does not acquire title to the vehicles. Farley Decl. at Exhibit 1, § 1.(d) ("Lessor will be the sole legal and equitable owner of the Vehicles . . . . Lessee has no right, title or interest (neither legal nor equitable) in any Vehicle. . . . Vehicles will be titled in the name of Lessor"); Crandus Decl. at Exhibit 1, § 14 ("It is expressly agreed that the Lessee by virtue of this Lease acquires no ownership, title, property, right, interest, *(or any option therefore)* in any leased motor vehicle[.]") (emphasis in original) Latif Decl. at Exhibit 1, § 3 ("This Agreement is one of leasing only and Lessee shall not have or acquire any right, title or interest in or to any Vehicle except the right to use and operate it as provided herein."); Creelman Decl. at Exhibit 1, art. 1. ("All vehicles leased hereunder shall be owned by, and titled and/or registered in the name of Lessor.").

Moreover, the UCC's definition of "lease" explicitly excludes sales: "'Lease' means a transfer of the right to possession and use of goods for a term in return for consideration, ***but a sale***, including a sale on approval or a sale or return, or retention or creation of a security interest ***is not a lease***." UCC § 2A-103(j) (emphasis added). *See also* Official Comment, UCC § 2A-103(j) ("Further, ***a lease is neither a sale*** (Section 2-106(1)) nor a retention or creation of a security interest (Sections 1-201(b)(35) and 1-203).") (emphasis added); *id.* (explaining that under UCC § 1-203,

10

"***a sale or a security interest is not a lease. Since there is no passing of title, there is no sale***.") (emphasis added).

> b.      *TRAC leases do not create a "sale" or "security interest."*

In response to concerns by lessors wanting to protect their investment but also wanting to ensure that these transactions qualify as "true leases" (as opposed to a "sale" or "security interest"), all 50 states and the District of Columbia have enacted "TRAC Statutes" in substantially the form originally promulgated by the draftsmen of the UCC and providing generally as follows:

> Notwithstanding any other provision of law, in the case of motor vehicles or trailers which are not vehicles or trailers leased or used primarily for personal, family, or household purposes, a transaction ***does not create a conditional sale or security interest*** merely because it provides that the rental price is permitted or required to be adjusted under the agreement either upward or downward by reference to the amount realized upon sale or other disposition of the motor vehicle or trailer.

*See, e.g.,* N.Y.V. & TL § 397-b.

> c.      *Commercial law recognizes that TRAC leases are "true leases"—not sales.*

Courts have uniformly observed that the legislative intent in enacting TRAC statutes was "to provide that fleet leasing contracts that contain TRAC provisions are true leases and should be accorded the same treatment in the area of bankruptcy which currently exists in the area of taxation. . . . TRAC leasing is a commercial custom and has been specifically validated as such in our federal tax laws." *See, e.g.*, *In re Owen*, 221 B.R. 56, 63 (Bankr. N.D.N.Y. 1998) (internal citation omitted).

Bankruptcy courts, for example, universally hold that because these transactions are "true leases" and not sales, the vehicles are not part of an FMC

customer-debtor's bankruptcy estate and the customer must assume or reject the leases. *See, e.g., In re Otasco, Inc.*, 196 B.R. 554 (N.D. Okla. 1991) (holding that vehicles leased from FMC were not the debtor's property, and specifically finding "that the provision for the sale of vehicles, with proceeds credited toward the stipulated cost, and the obligation of the Lessee to pay a shortfall, was not designed to create an equity interest in the lessee, but rather to protect the lessor from untoward abuse of its vehicle during the lease term, and any resultant loss in *its* equity, upon reversion of a vehicle.") (emphasis in original).[7]

These bankruptcy courts' holdings are consistent with the UCC's rules of construction and purpose. The Uniform Commercial Code "must be liberally construed and applied to promote its underlying purposes and policies, which are: (1) to simplify, clarify, and modernize the law governing commercial transactions; (2) to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and (3) to make uniform the law among the various jurisdictions." UCC § 1-103(a). Whether a transaction constitutes a sale is question of law governed by the UCC. The UCC's purpose is to make the law governing commercial transactions such as FMC leases uniform among jurisdictions and allow

---

[7] *Accord In re HP Logistics*, 460 B.R. 291 (Bankr. N.D. Ala. 2011) (same); *In re HP Distribution*, 436 B.R. 679 (Bankr. D. Kan. 2010) (same); *In re Double G Trucking of the Arklatex*, 432 B.R. 789 (Bankr. W.D. Ark. 2010) (same); *In re Beckham*, 275 B.R. 598, 606 (D. Kan.), affirmed, 52 F. App'x 119 (10th Cir. 2002) (same); *In re Charles*, 278 B.R. 216, 224 (Bankr. D. Kan. 2002) (same); *In re Damron*, 275 B.R. 266, 270 (Bankr. E.D. Tenn. 2002) (same); *In re Architectural Millwork of Virginia*, 226 B.R. 551, 556 (Bankr. W.D. Va. 1998) (same); *In re MEPCO, Inc.*, 276 B.R. 94, 103 (Bankr. W.D. Va. 2001) (same).

for certainty and clarity. *Id.* This uniformity has been enforced by the bankruptcy courts holding FMC leases are <u>not</u> sales. It should not be destroyed by another court holding the leases <u>are</u> sales for some other purpose (e.g., class membership). Such a result is antithetical to the purposes of the UCC and interpretive precedent.

There is no basis in statute or precedent to treat the FMC leases as resales, and concluding otherwise would create conflicts with well-settled commercial law. Consequently, the Court should determine that FMCs are Settlement Class Members.

        3.     <u>Manufacturers bought global peace with broad settlement agreement language.</u>

In discussions preceding this Motion, Class Counsel have taken the blanket position that FMCs are not part of these settlements because, according to Class Counsel, they are not "end payors" under antitrust law. Class Counsel submit that FMCs are simply part of a chain of indirect purchasers that passed costs through to businesses and consumers that ultimately leased the vehicles. Class Counsel are incorrect based on the unambiguous terms of the FMCs' leases and the financial obligations and risks of the parties. Further explanation is unnecessary (nor even permitted), however, because whether FMCs are "end payors" is a question of antitrust standing that is moot in light of the settlements; it has no bearing on whether FMCs are Settlement Class Members as defined by the settlement agreements.[8] *Yamashita*, 997 F.3d at 683 ("Whether Plaintiffs can maintain their

---

[8] The term "end payor" is not used or defined in any of the settlement agreements or the public notices. Whether an indirect purchaser is also an "end payor" with standing to seek damages under state antitrust statutes is a question of law that is almost

direct-purchaser lawsuit under the ownership-or-control exception of *Illinois Brick* is a question of antitrust standing. **It is not a question that bears on our interpretation of the settlement agreements**.") (internal citation omitted, emphasis added).

Had the EPPs and Manufacturers intended to exclude FMCs (or any lessor for that matter) as Class Members, they could easily have excluded vehicles purchased "for resale *or lease*." But they did not. Under Michigan law, courts are prohibited from considering extrinsic evidence to determine the parties' intent where, as here, the contract language is clear and unambiguous. *Id.* at 684. Presumably, the parties did not preclude lessors that purchase new vehicles not for resale because it would be inconsistent with the goal of obtaining a global resolution and the broadest possible release of further liability. The Manufacturers undoubtedly did not intend to pay in excess of $1 billion to a certain group of purchasers only to litigate these same issues with another group—especially where the omitted group purchased millions of vehicles containing the overpriced parts. The *Yamashita* Defendants admitted as much in their brief to the Sixth Circuit. *Yamashita*, 20-1599 [Doc 28] at 38 ("The

---

always disputed. The parties in this case resolved that dispute by virtue of Court-approved settlement agreements, which contained terms explicitly defining who is entitled to recover. Indeed, the Round 4 Final Approval Order noted that "the purpose of a settlement is to *avoid* the determination of contested issues," and [a] court considering whether to approve a settlement should be mindful that a settlement 'represents a compromise in which the highest hopes for recovery are yielded *in exchange for certainty and resolution*." PageID.7513 (internal citations omitted) (emphases added).

Manufacturers thus bargained for and obtained a global release, subject only to enumerated exceptions.").

For that reason, the settlement agreements provided for the release of any and all claims that were or could have been brought related in any way to the conduct alleged in the complaints. And importantly, those include not only claims under antitrust law but also claims arising under various states' consumer protection statutes, which contain no "end payor" requirement for standing.

C.   **Whether FMCs' customers may also be Class Members is irrelevant.**

Class Counsel also have suggested that allowing FMCs to recover from the settlements could lead to duplicate claims for the same vehicle: one by the FMC who purchased the vehicle, and one by the FMC's customer who leased the vehicle.[9] This possibility is not one the FMCs created, but rather, it is contemplated by the terms of the settlement agreements and the Plan of Allocation. In 2016—before the first settlement agreements received final approval—the parties were made aware of the FMCs' business model and their intention to submit claims, and yet the settlement agreements continued to contain a clear and unambiguous class definition consisting of  entities that "purchased *or* leased" a new vehicle. PageID.12034-36 (emphasis added).[10]

---

[9] FMC leases are different than those used by dealerships, which generally use closed-end leases containing a set lease term and mileage limits.

[10] Even the most recent *Proposed Further Revised Plan of Allocation and Distribution of the Automotive Parts Settlements Funds*, filed in December 2019 and approved by this Court in December 2019, PageID.37511, made clear that the settlement class included "Persons or entities who purchased or leased a new Vehicle," and that such

The settlement agreements define Class Members as those who "purchased or leased a new Vehicle," without regard to whether the same Vehicle was purchased by one Class Member and leased by another. *Id*. Likewise, the Plan of Allocation expressly states that "*Authorized Claimants*[11] will share and share alike on a *pro rata* basis in the Net Settlement Funds established for each Settlement Class of which they are members . . . ." 12-cv-00403 PageID.11014 (emphasis added). Thus, Settlement Class Members are treated the same, regardless of whether they are a purchaser or a lessee.

As explained in the Notices, "[t]he pro rata portion of the payment amount will be based on a ratio consisting of the *claimant's* total number of vehicles purchased or leased or replacement parts purchased, and the total number of vehicles purchased or leased and replacement parts purchased by other *claimants*." *Id*. at PageID.7590 (emphases added). Nothing in either the settlement agreements or the Plan of Allocation provides any basis for either recognizing claims or apportioning claim proceeds on a "per vehicle" basis. Had the settling parties intended to otherwise, they could easily have created (or at least proposed) a Plan of Allocation that provides for a *pro rata* distribution based on the number of eligible vehicles rather than claimants, as has been done in other cases. *Compare In re Navistar MaxxForce Engines*

persons or entities "can submit a claim." PageID.36629. The proposed revisions went further, specifically clarifying that, "[a]s to businesses. . . . those . . . who purchased or leased a new Vehicle . . . will be entitled to share in the Net Settlement Funds." PageID 11012-13. Based on the plain language, there is no ambiguity as to whether entities that purchased a qualifying new vehicle not for resale are Class Members.

[11] "Authorized Claimants" are defined as Settlement Class members who submit timely and valid claim forms. 12-cv-00403 PageID.11012.

*Marketing*, Case No. 1:14-cv-10318 PageID.13703-4 (N.D. Ill.) (Class Members defined as "All entities and natural persons who owned or leased" vehicles at issue); *also* Longform Notice, *In re Navistar MaxxForce Engines Marketing*, available at https://www.maxxforce11and13.com/admin/services/connectedapps.cms.extensions/1.0.0.0/asset?id=4dd90b53-8f14-4ea6-ab12-27c2922cb9b7&languageId=1033&inline=true, at 3 (explaining in notice of settlement that "both the lessor (owner) and lessee of the Class Vehicle are Class Members and are each eligible for half of the Cash Option or Rebate Option" but "[e]ach lessor and lessee may instead independently elect the full Individual Prove-Up Option.").

Moreover, there is at least a question as to whether or not the FMCs' customers who lease vehicles are themselves Class Members. The Settlement Classes comprise individuals and entities who purchased or leased a "***new*** Vehicle." Under many states' laws, the vehicles purchased by and titled to the FMCs are no longer considered "new" when they are leased to the customer. *See, e.g.,* Tex. Transp. Code Ann. § 501.002 (31) (West) ("'Used motor vehicle' means: (A) a motor vehicle that has been the subject of a first sale; or (B) an assembled vehicle that has been issued a title."); La. Stat. Ann. § 32:1252(66) ("'Used motor vehicle' means a motor vehicle, recreational product, or specialty vehicle, the legal title of which has been transferred by a manufacturer, distributor, or dealer to an ultimate purchaser[,]" with "ultimate purchaser" defined as "the first person, other than a dealer purchasing in his capacity as a dealer," to purchase the vehicle).

17

To be clear, the FMCs are not asking this Court to determine that their customers are or are not Class Members. The FMCs simply wish to point out that, as to new vehicles purchased by the FMCs and leased to their customers, Class Counsel's opinion—i.e., the customers are Class Members, but the FMCs are not—is not supported by the plain language of the settlement agreements, the notices, or any other settlement terms.

### D.   Postponing resolution of this dispute will further delay distribution.

Because settlement funds will be distributed *pro rata* to all Authorized Claimants, the Claims Administrator cannot determine how much to pay *any* Claimant until *all* Claimants have been identified. In a declaration attached to Class Counsel's recent opposition to a FRS's motion to intervene, the Claims Administrator averred that processing the subrogation claims that insurers sought permission to file "would add many additional months to the claims-administration process" and "[d]istribution of the settlement funds would be further, and indefinitely, delayed by any objections or appeals[.]" PageID.38202. Postponing the disposition of these FMCs' claims for millions of purchased vehicles until after the Administrator has reviewed all other claims and submitted its recommendations to the Court would have the same undesirable effect.

The delay in distributing settlement funds to Class Members is already substantial. This Court approved the Round 1 settlements on June 20, 2016—more than <u>five years ago</u>. The deadline to file claims was June 18, 2020—more than <u>one year ago</u> (and that was after two previous extensions of the deadline). To date,

however, the Claims Administrator has yet to send notice to claimants indicating that their claims are approved, denied, or deficient in some manner. In fact, there has been no disclosure whatsoever as to the status of claims processing—e.g., what has been done, what remains to be done, or a reasonable estimate as to when the process may be completed.[12] Just recently, however, the Administrator advised that it does not expect deficiency notices to be sent until <u>the 4th quarter of this year</u>.

Meanwhile, individuals and businesses that are eligible claimants have suffered severe financial harm as a result of the global pandemic, with many companies on the verge of filing bankruptcy (and some having already filed). The anticipated recovery from these settlements may be the lifeline needed to save some of these Class Members, as long as it doesn't come too late.

## IV.    Conclusion

For the foregoing reasons, the FMCs respectfully urge the Court to enforce the settlement agreements by (1) declaring these FMCs to be Settlement Class Members, and (2) directing the Claims Administrator to apply the Court-approved Plan of Allocation to the FMCs' claims.

---

[12] Undersigned counsel for the FMCs requested that Class Counsel and/or the Administrator agree to provide interim status reports as to the progress being made, the steps that remain, and an approximate timeline for completion. Class Counsel declined this request. The FMCs and/or other Class Members will soon be filing a separate motion on this issue.

Respectfully submitted this 15th day of September, 2021.

/s/ L. Conrad Anderson IV

Gregory C. Cook
L. Conrad Anderson IV
**BALCH & BINGHAM LLP**
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203
Telephone: (205) 251-8100
Facsimile:  (205) 226-8799
Email: gcook@balch.com
Email: canderson@balch.com

Tyler P. Bishop
**BALCH & BINGHAM LLP**
30 Ivan Allen, Jr. Blvd., NW, Suite 700
Atlanta, Georgia 30308-3036
Telephone: (404) 962-3521
Email: tbishop@balch.com

*Counsel for Element Fleet Corporation, Wheels, Inc., Donlen LLC, and Automotive Rentals, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of September, 2021, I caused the foregoing document to be electronically filed with the Clerk of Court via the Court's CM/ECF system, which will automatically notify all counsel of record.

<div align="right">

*/s/ L. Conrad Anderson IV*
L. Conrad Anderson IV

</div>

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION, | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| ALL END-PAYOR ACTIONS | ) ) ) |
| _____ | ) |

Master File No. 12-md-023111

I, Matt Farley, declare as follows:

1.      I am Vice President and Assistant General Counsel of Element Fleet Corporation, successor-in-interest to Element Vehicle Management Services, LLC ("Element"). I make this declaration in support of Element, Wheels, Inc., Donlen LLC and ARI Fleet Management's Motion to Enforce Settlement Agreements in the End-Payor Actions based on my personal knowledge.

2.      Element purchases new vehicles from dealerships throughout the United States. Element also orders new vehicles directly from manufacturers, in which case the order still goes through a selling dealership.

3.      A true and correct copy of Element's standard, open-ended Terminal Rental Adjustment Clause ("TRAC") Lease is attached hereto as **Exhibit 1.**

DocuSign Envelope ID: 7495BEA2-19A9-47B4-8AB2-754638B1B6C4

4.     The lessor in the TRAC Lease attached as Exhibit 1 is Gelco Fleet Trust, a titling trust affiliated with Element from which Element's United States customers lease vehicles.

5.     Element initially filed its claims in the above-referenced action on September 8, 2017.

6.     The claims were supplemented and re-submitted in March 2020 to include additional vehicles that had become eligible under subsequent settlements and to meet the parameters of the revised Plan of Allocation approved in December 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 12, 2021.

By: _____

                    DocuSigned by:

                    Matt Farley
                    ────────────
                    20E05AB6936A4C6...

                    Matt Farley

2

# EXHIBIT 1

# VEHICLE FLEET OPEN-END LEASE AGREEMENT
## CLIENT NO(S). [_____]

This Vehicle Fleet Open-End Lease Agreement (this "**Agreement**"), dated as of _____ (the "**Effective Date**"), is entered into between Gelco Fleet Trust, a Delaware statutory trust ("**Lessor**"), with offices at 940 Ridgebrook Road, Sparks, MD 21152, and                 , with offices at                 ("**Lessee**"). In consideration of the covenants herein, the sufficiency of which is acknowledged, Lessor and Lessee agree as follows:

**1.  Lease of Vehicles.**

(a)   This Agreement commences on the Effective Date and continue until terminated by Lessor or Lessee upon 30 days' written notice to the other, or by Lessor in the event of default by Lessee. Notwithstanding termination of this Agreement or end of the Lease Term of a Vehicle, the terms of this Agreement will remain in full force and effect with respect to each Vehicle then leased and each Vehicle Order.

(b)   Lessee agrees to lease from Lessor the vehicles, trailers, and other equipment (each, a "**Vehicle**") that Lessee orders by placing Vehicle orders with Lessor (each, a "**Vehicle Order**"), as accepted by Lessor. Each Vehicle Order is incorporated into this Agreement. Upon placing a Vehicle Order, Lessee will be obligated to lease the Vehicle under this Agreement, but Lessor may in its sole discretion reject or cancel any Vehicle Order at any time prior to Lessee taking possession of the Vehicle.  Lessor will not be liable to Lessee in the event Lessor is unable to obtain any Vehicle ordered by Lessee. Neither Lessor nor Lessee will be obligated to lease any minimum number of Vehicles hereunder.

(c)   Lessor transfers and assigns to Lessee all standard assignable warranties and will make available to Lessee all of Lessor's rights under the manufacturers' warranties for a Vehicle through its Lease Term. **Lessee agrees that (i) Lessor is not the manufacturer, designer or distributor of the Vehicles, (ii) Lessor has no obligation to review a Vehicle Order to determine whether the Vehicle is appropriate for Lessee's intended use or business operations, and (iii) each Vehicle ordered (including specified modifications) by Lessee is of the make and model and is equipped as required and suitable for Lessee's purposes.  Lessor makes no representations or warranties, express or implied, with respect to any Vehicle, including, without limitation, its (i) merchantability or fitness for a particular purpose, (ii) design or quality, or (iii) compliance with any applicable law or intellectual property rights.**

(d)   Lessor will be the sole legal and equitable owner of the Vehicles and Lessor has the right to mark the Vehicles stating its interest as owner. Lessee has no right, title or interest (neither legal nor equitable) in any Vehicle, nor to the proceeds of Sale of any Vehicle, except as expressly set forth in this Agreement. Vehicles will be titled in the name of Lessor or such other name as Lessor may designate from time to time in its sole discretion. The certificates of title for the Vehicles may note as lienholder any entity Lessor may designate in its sole discretion.

(e)   Element Fleet Corporation or its parent, subsidiary or affiliate ("**Servicer**") will act as Lessor's agent in connection with the administration of, and provision of any services required by Lessor under, this Agreement. Lessee will look to Servicer and not the Lessor for the performance of Lessor's obligations under this Agreement including, without limitation, billing and collections.

(f)   For each Vehicle, Lessor will make available to Lessee a New Unit Notice (or an equivalent record), which describes the Vehicle, the monthly rent payments and certain other information (each, a "**NUN**"). Each NUN is incorporated into this Agreement.

**2.  Acceptance and Lease-Related Periods.**

(a)   "**Acceptance**" in respect of any Vehicle will mean the earlier of the day on which Lessee or its representative takes possession of such Vehicle, or the business day after notice to Lessee that the Vehicle is available for its possession. Lessee or its representative will have an opportunity to inspect the Vehicle and removal of the Vehicle from such location will constitute taking possession of the Vehicle.

(b)   "**Lease Term**" for any Vehicle is the period from Acceptance to the date of Surrender in accordance with this Agreement.

(c)   "**Monthly Rental Term**" for a Vehicle commences on the first calendar day of the month after Acceptance and ends on the last calendar day of the month preceding the month in which the Vehicle is sold, subject to final settlement as provided in Sections 7(c) and 9.

(d)   "**Minimum Lease Term**" for a Vehicle commences on the date of Acceptance and will continue for the next complete 12 calendar months for which monthly rental charges are due, and will not be less than 367 days from the date of Acceptance.  Lessee is not entitled to terminate the lease of any Vehicle prior to expiration of the Minimum Lease Term, except in the event of theft, loss, or damage beyond repair of the Vehicle (a "**Casualty Vehicle**").

(e)   "**Maximum Lease Term**" will be set forth in the NUN and will be no greater than the maximum amortization term set forth in the Rate Schedule.  After expiration of the Minimum Lease Term, the Lease Term may be renewed for successive monthly renewal periods until the end of the Maximum Lease Term. At the end of the Minimum Lease Term Lessee may, and by the end of the Maximum Lease Term Lessee will, Surrender the Vehicle in accordance with this Agreement.

(f)   Lessee acknowledges that it is responsible for determining the Lease Term for a Vehicle for all purposes including its statement of accounting standards no. 13 or similar analysis, and Lessor makes no representation or warranty as to the accounting treatment of this Agreement or timing of accruals of rentals hereunder for financial statement or tax purposes. Lessee agrees that Lessor is an independent contractor and does not act as agent or fiduciary of Lessee.

**3.  Use and Maintenance of Vehicles.**

(a)   Lessee will maintain the Vehicles in good operating order and conditions and will use or permit the use of Vehicles only in its trade or business, for lawful purposes, and within the United States. In no event will a Vehicle be used for transportation for hire of goods or passengers, towing any property other than in accordance with the Vehicle manufacturer's specifications, or transporting illegal, explosive, radioactive, flammable or hazardous materials. Lessee will maintain the Vehicles as required and recommended by the manufacturer and will not operate any Vehicle in an unsafe condition.

(b)   Lessee will comply, and cause all persons operating the Vehicles to comply, with all applicable laws and regulations relating to the registration, leasing, insurance, use, maintenance, operation or alteration of the Vehicles, including driver licensing requirements, and all conditions of insurance coverage for the Vehicles. Lessee will inform Lessor of the name and address of the person(s) anticipated to act as operator(s) of any Vehicle.

(c)   If Lessee is not in default of this Agreement or any other agreement it has with a Lessor Entity, Lessee may retain possession and quiet enjoyment of a Vehicle until the end of its Lease Term.

(d)   Lessor will have the right to inspect any Vehicle at any time during normal business hours upon reasonable notice to Lessee. Upon such notice Lessee will promptly furnish information to Lessor regarding the location where the Vehicle can be inspected.  Lessee will at its sole cost and expense transport the Vehicle to such location.

(e)   Lessee agrees that neither Lessor nor Servicer has any duty to warn Lessee or any third party about the condition, maintenance, operation or use of any Vehicle or the appropriateness or practices of any driver.

(f)   Federal and state law requires Lessee to disclose the mileage of each Vehicle to Lessor in connection with the transfer of ownership of such Vehicle by Lessor. Lessee will provide accurate odometer readings and failure to do so may result in fines and/or imprisonment.

**4.  Sublease or Assignment; Use by a Lessee Entity.**

(a)   Lessee will not (i) lien, encumber or transfer any interest in any of the Vehicles, (ii) lien, encumber or transfer any interest in this Agreement, or (iii) sublease or assign any interest in any of the Vehicles or any interest in this Agreement, without the prior written consent of Lessor, which consent may be withheld for any reason within Lessor's sole discretion. Consent by Lessor to any sublease or assignment will not relieve Lessee of its obligations and liabilities under this Agreement or any other agreement to which Lessee is a party with any of Lessor, Servicer or their affiliates (each, a "**Lessor Entity**").

(b)   In the event that: (i) Lessor permits any Vehicle subject to this Agreement to be delivered to, possessed by, used by, or operated by any separately identifiable business unit, subsidiary, parent or affiliate of Lessee (each, a "**Lessee Entity**"), and/or (ii) Lessor issues additional client numbers in respect of a Lessee Entity to facilitate Lessee's identification of Vehicles under this Agreement as being delivered to,

possessed by, used by, or operated by a Lessee Entity, which Lessor may agree to in its sole discretion, Lessee agrees that notwithstanding (w) any invoice issued to a Lessee Entity on account of any Vehicle or (x) any payment made by a Lessee Entity on account of any Vehicle, all Vehicles will at all times remain subject to the terms and conditions of this Agreement, and Lessee will at all times remain liable for all obligations under this Agreement. Any delivery to, or possession, use or operation by, a Lessee Entity of any Vehicle will not constitute a sale, assignment, transfer, sublease or other disposition of such Vehicle, or any interest therein, or of any rights or obligations of Lessee under this Agreement, and any such delivery to, or possession, use or operation of a Vehicle by, a Lessee Entity will be subordinate to the rights of Lessor hereunder.

**5.   Third Party Upfitting/Additions.**
Lessee may request that Lessor deliver a Vehicle to a third party vendor for upfitting, i.e., for the addition of equipment or parts not installed by the manufacturer prior to Acceptance. Lessee assumes all risks of doing business with such vendor, including, without limitation, the quality of work provided by, and the creditworthiness of, such vendor. All such items installed prior to Acceptance will be considered a part of the Vehicle and all costs for such items will be included in the Capitalized Cost (as defined in the Rate Schedule).  All such items installed after Acceptance and not included in the Capitalized Cost may be removed by Lessee at its sole cost and expense prior to Surrender of the Vehicle, provided Lessee is not in default under this Agreement or any other agreement with any Lessor Entity and such removal will not cause damage to the Vehicle.

**6.   Carrying Costs.**
Lessee is responsible for interim interest on all Vehicle Costs (as defined in the Rate Schedule) from the date of invoice payment by Lessor through the date of Acceptance of the Vehicle ("**Carrying Costs**").

**7.   Payment of Rent and Other Charges.**
(a)   Lessee will pay all rent and any other charges for the Vehicles as provided in this Agreement and/or applicable Rate Schedule executed in connection with this Agreement (each, a "**Rate Schedule**"). Each Rate Schedule is incorporated into this Agreement. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ No restrictive endorsements will be valid or binding.
(b)   Rent and other charges under this Agreement will be billed by Lessor on a monthly basis. All rent and other charges are due and payable by Lessee within ___days of the date of the invoice.  Monthly invoices will be dated the first day of the month for which such rent and other charges are due, and will be made available to Lessee in accordance with parameters mutually agreed upon by Lessee and Lessor. Rent and other charges related to the Vehicles will be subject to a late payment charge in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ per month, or fraction of a month, for any amounts  not received by Lessor by the rent due date.
(c)   Lessee agrees to pay monthly rent from the first day of the Monthly Rental Term until the last day of the Monthly Rental Term. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
(d)   Any present or future law to the contrary notwithstanding, Lessee's obligation to pay rent and other charges will be absolute and unconditional and will not be subject whatsoever to any claim, counterclaim, waiver, release, abatement, defense, adjustment, recoupment or setoff (each, a "**Claim**"), including, without limitation, any Claim relating to the condition of, damage to, destruction of, loss of, or defect in, any Vehicle.
(e)   Lessee will review all invoices or statements of account and will notify Lessor in writing within 10 days of the date of the invoice or statement of account of any asserted error or inaccuracy.  Lessor will work with Lessee in good faith to resolve any invoicing issue identified by Lessee. Lessor's sole liability and Lessee's exclusive remedy in

respect of any such issue will be an appropriate adjustment to Lessee's account as determined by Lessor.  All invoices or statements of account issued by Lessor to which Lessee does not within 10 days identify to Lessor in writing any asserted error or inaccuracy will be deemed accurate and otherwise in accordance with this Agreement. The reconciliation and resolution process described herein will not relieve Lessee from its obligation to timely pay all rent and other charges included on an invoice or statement of account that are not identified by Lessee as in dispute and it will be a default by Lessee of this Agreement if such undisputed rent and other charges are not timely paid in accordance with this Agreement. Charges under this Agreement are based upon Lessor's and/or Servicer's standard operating routines, policies and systems capabilities.
(f)   Lessor may in its sole discretion apply payments to the youngest, oldest, or any other amounts due and owing.
(g)   Lessee will not prepay any rental by more than 1 month. Lessor will be entitled to retain any accrued interest for any prepayments.
(h)   Lessee agrees that the obligations represented by any invoice or statement of account issued by Lessor pursuant to this Agreement will be considered as first arising on each day from and after issuance of the invoice until the invoice has been paid in full.

**8.   Net Lease.**
Lessee will pay all costs, expenses, fees, charges, fines and taxes (without offset for any tax deductions or credits) incurred in connection with or attributable to any Vehicles, including (i) the titling, registration, garaging, delivery, purchase, Sale, rental, Surrender, recalls and related notifications, and upfitting relating to the Vehicles, (ii) the use and operation of the Vehicles during their respective Lease Terms, including, but not limited to, purchases of fuel, lubricants, replacement parts and accessories, and the incurrence of obligations for repairs, maintenance, storage, parking, tolls, fines, registration or license fees and tags, and (iii) all taxes and fees whatsoever by whomsoever payable (except any tax measured by the net income of Lessor) on or relating to the Vehicles including, without limitation, their purchase, sale, rental, use, or operation, (iv) preparing and filing any Uniform Commercial Code ("**UCC**") financing statements in connection with any Vehicles, (v) obtaining certificates of good standing, incorporation or formation (or their equivalent) and any other filings related to Lessee's legal creation and existence, (vi) conducting lien searches with respect to any Vehicles, Lessee and/or any guarantor, and (vii) all administrative fees assessed by Lessor from time to time in its sole discretion, including, but not limited to, any fees for retaining a Vehicle under management by Lessor. If Lessor pays any of the foregoing amounts, Lessee will promptly reimburse Lessor in full for such amounts (plus any and all related costs and expenses), without offset, recoupment or credit for any reason whatsoever. Lessee and Lessor will be responsible for their respective referral or consulting fees with respect to this Agreement, and each may pay, and will be solely liable for, payment of any broker fee, commission or other compensation related thereto. Lessor and/or Servicer may charge Lessee separate fees for any additional tasks, services or special handling requested by Lessee hereunder. Lessor and Servicer may receive and retain certain rebates, discounts and other compensation directly or indirectly from manufacturers, suppliers and vendors with respect to the Vehicles leased hereunder. If Lessee is party to another agreement with a Lessor Entity and amounts payable by Lessee under this Agreement are billed under such other agreement, such amounts remain obligations under this Agreement until paid. Lessee's obligations set forth in this Section 8 will survive the termination of this Agreement.

**9.   Surrender and Sale of Vehicles.**
(a)   At any time after the Minimum Lease Term Lessee may, and at the end of the Maximum Lease Term Lessee will, terminate the lease of such Vehicle. In such case, Lessee will notify Lessor and will, at Lessee's expense, surrender the Vehicle at a place that is mutually agreeable to Lessee and Lessor (a "**Surrender**"). Surrender of the Vehicle will not be effective until Lessor or its representative has actual physical possession of the Vehicle and has received all license plates, registration certificates, documents of title, odometer and damage disclosures and other documentation necessary for the Sale or other disposition of the Vehicle. Any personal property in a Vehicle upon Surrender will be deemed abandoned and may be disposed of by Lessor or its agent without liability of either Lessor or its agent. As soon as practicable after Surrender, Lessor will sell the Vehicle, subject to any applicable fees, to a purchaser

selected by, or approved by, Lessor (a "**Sale**"). From the Sale proceeds of any Vehicle sold, Lessor will deduct all direct and indirect expenses as well as any applicable fees in connection with the Sale, the balance remaining to constitute the net Sale proceeds ("**Net Sale Proceeds**"). Lessee shall also promptly Surrender any Casualty Vehicle in its possession. Any Vehicle, except a Casualty Vehicle that is returned prior to the first 367 days of the Lease Term shall be subject to an additional charge of an amount equal to the monthly rent for such Vehicle less the depreciation portion of such monthly rent for each month or portion thereof of the Lease Term that is less than 367 days.

(b)  Should the Net Sale Proceeds exceed the Book Value (as defined in the Rate Schedule) of the Vehicle (such excess being the "**Disposition Funds**"), Lessor, at its sole discretion, may either (i) set off or recoup (as a refund of rental) the Disposition Funds against any amounts owed by Lessee under this Agreement or any amounts owed by Lessee under any other agreement between Lessee and any Lessor Entity, (ii) credit the Disposition Funds to Lessee's account as a refund of rental, or (iii) remit the amount of the Disposition Funds to Lessee as a refund of rental.

(c)  Should the Net Sale Proceeds be less than the Book Value, Lessee will pay such deficiency to Lessor as an additional rental.

(d)  Reserved.

(e)  Lessee has no option to purchase a Vehicle. However, Lessor may, in its sole discretion, accept an offer to purchase a Vehicle from Lessee or a purchaser identified by Lessee, and in such case, if Lessor does not take actual physical possession of the Vehicle, (i) the Lease Term for the Vehicle will continue, and neither Surrender nor Sale will be deemed to have occurred, until both (y) payment of the purchase price and all fees and costs incurred by Lessor in connection with such Sale has been received by Lessor and (z) Lessor has delivered the Vehicle's certificate of title to the buyer, and (ii) the Monthly Rental Term for such Vehicle will end on the last calendar day of the month preceding the month of Sale.

(f)  Any adjustments in rent or other charges paid or payable due to the Sale or other disposition of a Vehicle will be reflected in a statement of final settlement to be rendered by Lessor to Lessee.

(g)  Lessee covenants that a Vehicle will be in an environmentally clean and safe condition and free of any hazardous substance or residue thereof when Surrendered. Lessor will not accept and will not be responsible for the removal of, any personal property, which will be considered abandoned property at the time of Surrender. Costs related to abandoned property will be the sole responsibility of Lessee.

## 10. Loss of or Damage to Vehicles.

Lessee assumes all risk of loss or damage to a Vehicle from Acceptance until Surrender. If a Vehicle is lost, stolen or damaged beyond repair, Lessee will promptly notify Lessor in writing and pay to Lessor all damages, unpaid rent and other amounts relating to such Vehicle as invoiced by Lessor, including, but not limited to, the current Book Value of the Vehicle. Upon payment of all such sums, the Lease Term will end.

## 11. Insurance.

(a)  Lessee will maintain the following coverages on each Vehicle from Acceptance until Surrender:

(i)  Automobile liability insurance for the use, operation, and possession of the Vehicles covering liability for bodily injury and property damage with minimum limits of coverage as Lessor may require, but not less than $2 million combined single limit per occurrence for bodily injury and property damage ($5 million for Vehicles capable of transporting more than 8 passengers). No self-insured retention or deductible is permissible.

(ii)  Comprehensive and collision insurance covering loss or damage to the Vehicles in an amount not less than the actual cash value of each of the Vehicles, with a deductible not to exceed $1,000. Lessee will bear all risk of loss, damage, theft or destruction to the Vehicle, which may exceed actual cash value, however caused, from the time of Acceptance until Surrender to Lessor. With Lessor's prior written consent, Lessee may self-insure for collision and comprehensive insurance coverage.

(b)  Such insurance coverage will (i) be with an insurance company acceptable to Lessor, (ii) name Lessor, Lessor's beneficial owners, Element Vehicle Management Services Group, LLC, and Servicer (together with its successors and assigns as servicer on behalf of Lessor), and/or such other entities as directed by Lessor from time to time, as additional insureds and loss payees, (iii) be acknowledged by such insurance company to be the primary coverage, and (iv) contain a policy

endorsement or provision that the insurance shall not be invalidated by any action or inaction of any person, including but not limited to the breach of any policy warranty, declaration or condition. Lessee will furnish Lessor with a certificate of insurance evidencing the required insurance coverage. Lessor will be under no duty to examine such certificate of insurance or other evidence or to advise Lessee in the event Lessee's insurance is not in compliance with this Agreement.

(c)  All insurance policies will provide for no more than 30 days' prior written notice to Lessor of any cancellation or reduction in coverage. Lessee authorizes Lessor as Lessee's servicing agent to endorse Lessee's name to insurance checks related to the Vehicles.  To the extent that any State requires electronic reporting of Lessee's insurance coverage, Lessee's insurer will be responsible for reporting such coverage.

(d) The lapse of insurance required by this Section 11 will entitle Lessor to immediately obtain comparable insurance, the cost of which will be due by Lessee upon demand.

## 12. Indemnity.

**(a)  In addition to any and all other obligations of Lessee under this Agreement, Lessee will indemnify, defend, save and hold harmless Lessor, each other Lessor Entity, each of Lessor's beneficial owners and each of Lessor's and Servicer's respective successors and assigns, from and against any action, claim, cost, damage, expense, judgement, lawsuit, loss or liability, including attorney's fees and costs, whether directly or indirectly incurred in connection with, relating to, or arising out of (i) the design, manufacture, selection, acquisition, purchase, upfitting, titling, registrations, lease, ownership, delivery, possession, use, operation, maintenance, condition, repair, Surrender or Sale of any Vehicle, (ii) any action, lawsuit, matter in equity, or legal, judicial, administrative, regulatory or similar proceeding of any kind or nature with respect to any Vehicle and/or this Agreement, and/or (iii) any action or omission of Lessee, or Lessee's misrepresentation or breach of any warranty or covenant in this Lease or any related document, or (iv) any replacement of any Vehicle, directly or indirectly causing the disallowance, recapture, or change in timing of lawful interest, depreciation or amortization deductions taken by Lessor for each Vehicle, and in each case regardless whether such actions, lawsuits, matters or proceedings are based on tort, contract, statute, regulation, strict liability, breach of warranty or otherwise ("Indemnification Obligations"). Indemnification Obligations include, without limitation any: (a) claims for injury to or death of persons and/or for damage to property, (b) claims relating to patent or latent defects, whether or not discoverable, product liability claims, and any claims related to the condition of any Vehicle at Surrender or other defects in the Vehicle, and (c) loss or damages incurred by Lessor or its Assignee arising from Lessee directly or indirectly causing the disallowance, recapture, or change in timing of lawful interest, depreciation or amortization deductions taken by Lessor or its Assignee as to any Vehicle.**

**(b)  If Lessee sells any Vehicle to Lessee, any of Lessee's employees or a buyer designated by Lessee, Lessee's Indemnification Obligations with respect to such Vehicle will continue.**

**(c)  Lessee's Indemnification Obligations are absolute and unconditional and will survive both the Surrender of a Vehicle and the termination of this Agreement.**

## 13. Default.

(a)  Lessee will be in default of this Agreement in the event: (i) Lessee fails to comply with any insurance requirement herein; (ii) Lessee fails to pay timely any rental or any other amounts payable under this Agreement; (iii) Lessee fails to perform any of its covenants or obligations under this Agreement; (iv) Lessee prevents Lessor from realizing the tax benefits and depreciation rights in the Vehicles; (v) there will be filed by or against Lessee or any guarantor any action under any state or federal law relating to insolvency or bankruptcy, provided that in the case of an involuntary action, such action is not dismissed within 60 days of the filing; (vi) a receiver or trustee will be appointed for Lessee's or any guarantor's property, and such appointment is not withdrawn within 60 days of the date of appointment; (vii) Lessee or any guarantor makes an assignment for the benefit of creditors; (viii) Lessee will be in default in the payment of any amounts due or the performance of any other obligation owed by Lessee to a Lessor Entity under any other agreement or instrument; (ix) Lessee or any guarantor discontinues

business, enters into a merger or consolidation where such party is not the surviving entity or undergoes a change in controlling ownership or sells or leases all, or substantially all, of its assets; (x) Lessee's or any guarantor's financial or operating condition materially changes, in the reasonable opinion of Lessor, so as to impair Lessor's title or rights in the Vehicles, increase Lessor's credit risk or impair Lessee's or any guarantor's ability to perform its obligations hereunder or under any other agreement or instrument to which Lessee or any guarantor is a party with a Lessor Entity; (xi) there is any material inaccuracy or incompleteness with respect to any of the financial information provided by Lessee; (xii) Lessee or any guarantor makes any representation or warranty herein or in any document delivered to Lessor in connection herewith or filed with any governmental entity in connection herewith which is false or misleading in any material respect, (xiii) Lessee or any guarantor defaults under any material loan, lease or credit agreement and the applicable grace period, if any, will have expired, (xiv) any guarantor repudiates, revokes or attempts to revoke its obligations under its guaranty of Lessee's obligations under this Agreement or under any other agreement or instrument to which Lessee is a party with a Lessor Entity, or (xv) Lessee or a person who owns a controlling interest in or otherwise controls Lessee (a) is listed on the Specialty Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control ("**OFAC**"), U.S. Department of the Treasury, and /or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation, or (b) is designated under Section 1 (b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, or (c) fails to comply with all applicable Bank Secrecy Act ("**BSA**") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations, or (d) fails to comply with the requirements of the U.S. Patriot Act, including the validation in writing of any person executing on behalf of Lessee this Agreement or any documentation provided hereunder.

(b) Upon any default of this Agreement by Lessee, Lessor may proceed by appropriate court action and shall have all rights and remedies available to it either at law or in equity to enforce performance by Lessee of all provisions hereof and recover damages for the breach of this Agreement, and will have the right but not the obligation to terminate this Agreement. Upon termination of this Agreement, all rights of Lessee with respect to the Vehicles will immediately terminate and Lessee at its sole cost and expense will immediately Surrender all Vehicles to Lessor. If any Vehicles are not Surrendered immediately, Lessor may repossess such Vehicles and Lessor and/or its agents may enter upon the premises where the Vehicles are located to repossess. Upon a default by Lessee, Lessor also will have the right to repossess the Vehicles without terminating this Agreement. The Lease Term for each Vehicle Surrendered or repossessed will terminate in accordance with the provisions of this Agreement.

(c) A default of this Agreement will constitute a default under any other agreement to which Lessee is a party with a Lessor Entity.

(d) In the event of a default and either the Surrender and/or repossession of any Vehicles, Lessor may, but will not be obligated to, sell any or all of the Vehicles without notice to Lessee, at such price, in such manner, and upon such terms, as it deems reasonable. Lessor will retain all amounts including, without limitation, all rents, payments, and resale proceeds received, and any refunds and other sums, if any, whether under this Agreement or otherwise. Lessor may apply Net Sale Proceeds generated by such sales by recoupment and/or setoff against any and all amounts owed to it by Lessee under any of the provisions of this Agreement and to pay any amounts owed by Lessee to a Lessor Entity under any other agreement or instrument. Lessor and Servicer also may apply Net Sale Proceeds to any and all costs and expenses, including attorneys' fees, incurred by Lessor and/or Servicer (i) in the enforcement of rights and remedies under this Agreement or under any other agreement or instrument, (ii) in connection with the Surrender and/or repossession of any of the Vehicles, (iii) in any legal proceedings commenced by a Lessor Entity to collect any and all amounts due from Lessee under this Agreement or under any other agreement or instrument, and (iv) in connection with the enforcement of rights and remedies under this Agreement, with respect to the Vehicles leased hereunder, or under any other agreement or instrument, in any bankruptcy case under Title 11 of the United States Code or in any insolvency proceeding, receivership, assignment for the benefit of creditors or similar proceeding.

Notwithstanding any amounts received through the sale of the Vehicles, Lessee shall remain liable to Lessor for an amount not less than the current Book Value for each Vehicle.

(e) To the extent permitted by applicable law, Lessee waives all rights and remedies conferred upon Lessee by Article 2A of the UCC (including but not limited to all rights and remedies set forth in Sections 401, 402 and 508 through 522 therein). In addition to all other rights or remedies, Lessor will be entitled to recover from Lessee all rentals and other amounts owed by Lessee under this Agreement, whether arising before or after such default and/or termination or cancellation of this Agreement.

## 14. Assignment by Lessor.

Lessor may from time to time assign, sell, participate, grant a security interest in, or sell beneficial interests in (each, a "**Transfer**") all or any part of Lessor's right, title, and interest in this Agreement and/or the Vehicles, including claims for monies due and/or to become due to Lessor hereunder, to others (each such other party being an "**Assignee**"). Following any such Transfer, any reference to "Lessor" herein shall include a reference to such Assignee. Upon notice of any such Transfer (a "**Notice**"), Lessee will become obligated to make payment to any such Assignee in accordance with the Notice, and Lessee's obligation to make payment to an Assignee will be absolute and unconditional and will not be subject to any claim, defense, recoupment or setoff whatsoever. Lessee agrees that it will not assert against any such Assignee any claim, counterclaim, abatement, defense, recoupment or setoff it may have against Lessor, Servicer, or any other person or entity, regardless of whether such claim, counterclaim, abatement, defense, recoupment or setoff had accrued or existed before or after such Transfer. Lessee agrees to comply with reasonable directions provided by any Assignee with respect to payments or other rights of Lessor as assigned. Lessee further agrees that Lessor and Servicer may share information about this Agreement and Lessee and any Lessee Entity with each other, as well as with any current or potential Assignee. This Agreement and any right, title, or interest of Lessee created in the Vehicles will be subject, and subordinate in all respects, to any security interests in the Vehicles granted by Lessor to an Assignee.

## 15. Financial Information.

(a) If not publicly available, within 90 days of the close of Lessee's and any guarantor's fiscal years, Lessee will deliver to Lessor each of Lessee's and any guarantor's annual financial statements, prepared in accordance with generally accepted accounting principles, consistently applied, and certified by a recognized firm of chartered professional accountants; and within 45 days of the close of Lessee's and any guarantor's fiscal quarter, Lessee will deliver to Lessor each of Lessee's and any guarantor's quarterly financial reports, certified by the chief financial officer of Lessee and any guarantor. Lessee will provide Lessor with any additional financial information with respect to Lessee and any guarantor reasonably requested by and satisfactory to Lessor.

(b) Lessee acknowledges that in entering into this Agreement Lessor relied on the accuracy and completeness of the financial information provided by Lessee and any guarantor of Lessee's obligations hereunder as well as publicly available information as of execution of this Agreement. The creditworthiness of Lessee and any guarantor as evidenced by such financial information was, and remains, a material condition to this Agreement. Lessor will continue to rely on the accuracy and completeness of such information and the additional information provided pursuant hereto in Lessor's ongoing evaluation of Lessee's and any guarantor's creditworthiness, in pricing under this Agreement, and in the overall credit risk Lessor will be willing to take hereunder.

## 16. Limitation of Damages.

Lessee agrees that its sole and exclusive remedy for any matter or cause of action related to, or arising out of, directly or indirectly, any claim related to the subject matter hereof will be a contract action. Damages claimed against Lessor will be limited to actual and direct damages incurred, and Lessee will not claim any indirect, consequential or punitive damages against Lessor.

## 17. Representations and Warranties.

Lessee represents and warrants to Lessor and to Servicer on the date hereof, of each Rate Schedule and each Acceptance that: (a) Lessee has adequate capacity to enter into, and perform under, this Agreement; (b) no approval or withholding of objections is required from any third party or governmental authority with respect to the entry into or performance by Lessee of this

Agreement except such as have already been obtained; (c) the entry into and performance by Lessee of this Agreement will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's organizational documents; or (ii) result in any breach of, constitute a default under, or result in the creation of any lien (except per this Agreement) or other encumbrance upon any Vehicle pursuant to, any indenture, mortgage, deed of trust, loan, agreement or other instrument to which Lessee is a party; (d) there are no suits or proceedings pending or threatened in court or before any commission, agency, forum or other tribunal affecting Lessee which could have a material adverse effect on Lessee's ability to fulfill its obligations under this Agreement; (e) since the date of Lessee's or any guarantor's most recent financial statement, there has been no material adverse change in the financial condition of Lessee or any guarantor; and (f) Lessee is and will be at all times in good standing in the jurisdiction in which it is organized.

**18. Entire Agreement; Further Assurances.**
(a) This Agreement, each Vehicle Order, each NUN, each Rate Schedule, and any exhibits and schedules made a part of this Agreement contain the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior oral or written agreements and understandings related thereto. This Agreement, together with the Vehicle Orders, NUNs and Rate Schedules or similar exhibits or schedules in respect of the Vehicles leased hereunder, constitutes a single, unitary, non-severable, lease agreement for all Vehicles.

(b) Lessor may allocate its beneficial interest in respect of one or more Vehicles to special units of beneficial interests in Lessor (each, a "**SUBI**"). Upon such allocation, this Agreement together with any such Vehicle Orders, NUNs and Rate Schedules or any exhibits or schedules in respect of the Vehicles so allocated will be construed as one or more single, unitary, non-severable, lease agreements for all Vehicles allocated to such SUBI and the beneficial owner of such SUBI will have all rights of Lessor with respect to such Vehicles. Such allocations will have no effect on Lessee's rights or obligations under this Agreement.

(c) Lessee agrees to execute and deliver to a Lessor Entity any additional agreements, documents or copies thereof requested by Lessor and/or Servicer and take such action as Lessor and/or Servicer may request to carry out the purpose of this Agreement and to protect the rights and remedies of Lessor and Servicer.

**19. Binding Effect; Waivers, Modifications, Severability.**
(a) This Agreement has been duly authorized, executed and delivered by Lessee, is binding upon and inures to the benefit of the parties hereto and their respective permitted successors and assigns and is enforceable in accordance with its terms.

(b) No waiver or amendment of a provision of this Agreement will be binding unless made in writing and signed by the parties hereto. Lessee may issue purchase orders for convenience, but they will not amend this Agreement.

(c) Failure of either party to require performance of any provision of this Agreement will not affect the right to later enforce such provision.

(d) If any provision of this Agreement will be held invalid, illegal, or unenforceable, it will not affect any other provision of this Agreement.

**20. Governing Law; Waiver of Jury Trial; Confession of Judgment.**
This Agreement will be governed by, and construed in accordance with, the laws of the State of Maryland, without regard to choice of law principles. **Lessor, Servicer and Lessee waive all right to any trial by jury in any action or proceedings arising directly or indirectly hereunder. If Lessee fails to pay any rent or charges due and owing under this Agreement or otherwise fails to perform or fulfill its obligations under this Agreement, Lessee authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of Lessee in a proceeding in any court of competent jurisdiction to confess judgment in favor of Lessor and against Lessee for any unpaid rental charges and other sums due and owing under this Agreement, plus reasonable costs and attorneys' fees. Lessee further consents to entry of judgment in favor of Lessor and against Lessee by any clerk, prothonotary or other court official without prior notice or opportunity for hearing.** Lessee consents to the jurisdiction and venue of the Circuit Court for Baltimore City, Maryland, the Circuit Court for Baltimore County, Maryland, and the United States District Court for the District of Maryland. To the extent permitted by applicable law, Lessee waives (a) all rights of exemption, homestead or appeal and (b) all rights to relief from inquisition, levy,

immediate execution or other post-judgment remedies and enforcement actions. Lessor may confess judgment against Lessee on one or more occasions, in the same or different jurisdictions. Lessor's right to confess judgment against Lessee is in addition to all of Lessor's other rights and remedies under this Agreement and applicable law.

**21. Covenants Regarding Nature of Agreement.**
(a) Lessor and Lessee agree: (i) this Agreement will be characterized as a lease for income tax purposes; (ii) Lessor is the only party entitled to claim income tax deductions for asset cost recovery, or depreciation, and investment tax credits, if any, with respect to the Vehicles, under the Internal Revenue Code of 1986 and applicable state laws, and (iii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any person to take or omit to take, any action, which will result in the disallowance, recapture, or change in timing of lawful interest, depreciation or amortization deductions taken by Lessor as to any Vehicle. All tax benefits arising out of ownership of the Vehicles (including, but not limited to, tax benefits from tax law changes occurring during the Lease Term) are and will remain vested in Lessor. Lessee's obligations as set forth in this section will survive the termination or cancellation of this Agreement.

(b) The parties intend the lease of Vehicles to be a true lease pursuant to Md. Code Ann., Transp. Law §13-211. Without prejudice to the intention of the parties that this Agreement be a lease, Lessee grants Lessor a security interest in the Vehicles and all proceeds, accessions, upfitting, documents, instruments, accounts, chattel paper, equipment and general intangibles related thereto to secure all obligations of Lessee to any Lessor Entity, now existing or hereafter arising, under this Agreement or any other agreement. A photocopy or other reproduction of this Agreement will be sufficient as a financing statement. Lessee further grants Lessor and/or Servicer its power of attorney to act as its duly authorized agent and attorney-in-fact for and on behalf of Lessee in respect to titling, registration of a Vehicle or otherwise noting Lessor's interest, including, without limitation, in all matters relating to the preparation, execution and filing of the UCC financing and termination statements to evidence the ownership by Lessor and/or lienholder interest of all upfitting leased under this Agreement. This power granted includes the power for Lessor to appoint additional attorneys-in-fact on behalf of Lessee for the purposes specified herein and for the revocation of such appointments, and for endorsing Lessee's name on any insurance checks and payments and otherwise taking any actions with respect to the insurance required pursuant to this Agreement.

(c) The parties hereto agree that time is of the essence with respect to all provisions and obligations of this Agreement.

(d) This Agreement may be executed in counterparts, which together constitute one instrument. Electronic delivery of this executed document will be effective as delivery of a manually executed document. The parties agree that the electronic copy of this Agreement, any Vehicle Order, any Rate Schedule, the electronic record on Servicer's system of each NUN and any exhibits, schedules, and amendments hereto and thereto retained by Servicer or its successors, assigns and affiliates, will be the original chattel paper and authorized copy of record.

**22. Data.**
Lessor and Servicer have the right to use and market de-personalized statistical data collected in connection with this Agreement and the lease-related services provided to Lessee with respect to the Vehicles. Lessor shall not retain, use or disclose any personal information for any purpose other than for the specific purpose of performing the obligations specified in this Agreement for the Lessee.

**23. Greenhouse Gas Regulations.**
The California Tractor-Trailer Greenhouse Gas Regulation requires (1) heavy-duty tractors that pull a 53-foot or longer box type trailer and (2) a 53-foot or longer box type trailers must be compliant with Sections 95300-95311, Title 17, of the California Code of Regulations, requiring low rolling resistance tires and aerodynamic technologies that are U.S. Environmental Protection Agency Verified SmartWay Technologies prior to current or future use in California. Lessee shall comply with, and accepts the delegation of compliance from the Lessor of, all applicable

federal and state laws, ordinances, regulations, acts, governmental orders and insurance requirements and policies as related to the Vehicles.

**24. Notice.**
Notice to Lessee will be sent by email or to the address of Lessee set forth above. Notice to Lessor will be sent c/o Element Fleet Corporation, as Servicer, Regional Processing Center, 940 Ridgebrook Road, Sparks, Maryland 21152-9390, Attn: Legal Department, or to such other address designated by Lessor.

**25. Exhibits.**  The exhibits listed below are incorporated into this Agreement as if fully set forth herein.  The Parties agree that each of the exhibits listed below will be deemed accepted by each Party upon such Party's execution of this Agreement.  Unless otherwise expressly stated in an exhibit, the effective date of each exhibit listed below shall be the same date as the Effective Date of this Agreement.
Exhibit 1 – Hazmat Supplement
Exhibit 2 – Equipment Supplement
Exhibit 3 – Rate Schedule

IN WITNESS WHEREOF, Lessor and Lessee have caused this Agreement to be executed and delivered by their respective duly authorized officers or representatives as of the date first above written.

**GELCO FLEET TRUST (Lessor)**
By: Element Fleet Corporation, Attorney-in-Fact

**(Lessee)**

By: _____
    Authorized Signatory

By: _____

Title: _____

Print Name: _____

State of Incorporation:
Tax ID number:

**ACKNOWLEDGED AND ACCEPTED:**

**ELEMENT FLEET CORPORATION**
solely in its capacity as Servicer

By: _____
    Authorized Signatory

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BUSINESS USE CERTIFICATION

To comply with the requirements of Section 7701(h)(2)(C) of the Internal Revenue Code of 1986, as amended from time to time, Lessee makes the following certification and acknowledgement as a part of the foregoing Agreement.

1.   Lessee hereby certifies, under penalty of perjury, that Lessee intends that more than 50 percent of the use of the Vehicles under the Agreement is to be in a trade or business of Lessee;

2.   **Lessee hereby acknowledges that in accordance with Section 21(a) of the Agreement it has been advised that it will not be treated as the owner of the Vehicles under the Agreement for federal income tax purposes.**

IN WITNESS WHEREOF, Lessee has caused this certification to be executed as of the date first above written.

    (Lessee)

By: _____

Title:_____

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION, | ) ) ) ) ) ) ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | Master File No. 12-md-023111 |
| ALL END-PAYOR ACTIONS | |

I, Shlomo Y. Crandus, declare as follows:

1.      I am Shlomo Y. Crandus of Wheels, Inc. ("Wheels"). I make this declaration in support of Element Vehicle Management Services, LLC, Wheels, Donlen LLC and ARI Fleet Management's Motion to Enforce Settlement Agreements in the End-Payor Actions based on my personal knowledge.

2.      Wheels purchases new vehicles from dealerships throughout the United States. Wheels also orders new vehicles directly from manufacturers, in which case the order still goes through a selling dealership.

3.      A true and correct copy of Wheels' standard, open-ended Terminal Rental Adjustment Clause ("TRAC") Lease is attached hereto as **Exhibit 1.**

4.      The lessor in the TRAC Lease attached as Exhibit 1 is Wheels LT, a titling trust from which Wheels' customers lease vehicles.

5.      Wheels initially filed its claims in the above-referenced action on September 8, 2017.

6.      The claims were supplemented and re-submitted in March 2020 to include additional vehicles that had become eligible under subsequent settlements and to meet the parameters of the revised Plan of Allocation approved in December 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 26, 2021.

By: _____

Shlomo Y. Crandus
SVP & CFO

2

10494678.3

# EXHIBIT 1

**WHEELS LT NATIONAL VEHICLE LEASING**

**LEASE**

*AGREEMENT* made this [Date] day of [Month], 2020, by and between WHEELS LT, a Delaware statutory trust (*hereinafter called* "Lessor"), and [CLIENT NAME], a corporation duly organized under the laws of the State of _____ (*hereinafter called* "Lessee").

*1.* **POSSESSION.** Lessee hereby leases one motor vehicle for delivery as specified by Lessee and other motor vehicles as may hereafter be ordered by Lessee and accepted by Lessor. The Lessor hereby agrees to deliver to the Lessee the motor vehicles described herein, with the Lessee to have possession of and right to use said motor vehicles in accordance with the terms of this Agreement. For each vehicle delivered to Lessee, Lessor shall make available documentation describing in detail the motor vehicle and equipment delivered, and the parties hereto agree that all the terms and provisions of this Lease shall apply and extend to each motor vehicle delivered on such documentation, in the same manner as if said motor vehicle were herein specifically described.

*2.* **LESSEE'S PAYMENTS.** Amounts due under this Lease are billed monthly, in advance, and payment is due on the first day of the month billed. Payments received within

shall be considered Prompt.



The *Monthly Payment* for each motor vehicle shall be computed on the basis of the rider hereto attached marked "Lease Schedule" and made a part hereof, and is intended to include the *Reserve* accrued for the estimated depreciation of the leased vehicle.

The Lessor will also render to the Lessee details of the *Stipulated Cost* together with the term of the Lease thereof, and charges of all motor vehicles delivered to the Lessee.

3.     ***LESSEE ACCOUNT.*** The Lessor, upon receipt of a leased motor vehicle from the Lessee after the termination of the lease of said motor vehicle, will proceed to sell said motor vehicle at wholesale on the best terms available for cash, in the discretion of the Lessor (the net amount received from the sale of the motor vehicle after deducting any expenses and charges incurred from the time of delivery of the motor vehicle to the Lessor to the final completion of the sale thereof being called the *"*Net Proceeds"*)*. If the *Net Proceeds* plus the amount accrued for the *Reserve* for said motor vehicle (the *Total Recovery*) is in excess of the *Stipulated Cos*t of the motor vehicle, then the amount of such excess shall be promptly credited to the Lessee by the Lessor. If the *Total Recovery* is less than the *Stipulated Cost* of the motor vehicle, then the Lessee shall promptly pay such deficiency to the Lessor; provided that in the event of any such sale the Lessor shall guaranty to Lessee that the *Net Proceeds* shall at least equal *(a)* the following percentages of the fair value of the vehicle as of the beginning of the 12-month period during which the date of termination occurs:

| *Period* | *Percentage* |
|---|---|
| Initial 12-month period of lease ................................ | ■ |
| Each subsequent 12-month period ............................ | ■ |

less, in any case, *(b)* the amount of any loss or damage to be insured or borne by Lessee under *Section 5 or 11* hereof. ████████████████████████████████

4.     ***USAGE, LICENSE, TAXES AND FEES.*** During the term of this Lease, Lessee shall have possession of and right to use the said motor vehicle for lawful purposes only and for exclusive use within the United States and Puerto Rico. The limitation as to use of the vehicle within the United States and Puerto Rico, shall not restrict casual or occasional crossing into Canada where the vehicle is used principally and primarily by the Lessee within the United States and Puerto Rico.  All motor vehicles shall be registered in the name of the Lessor during the entire term of the Lease, and any certificates of title required shall likewise be in the name of the Lessor.

5.    *MAINTENANCE AND REPLACEMENT.* Lessee shall, at all times, at its own expense, cause the leased motor vehicles to be maintained in good working condition and appearance, and Lessor shall have no responsibility therefor, or for any damages sustained by the Lessee, or others in privity with him, by virtue of any mechanical or operational failure of the leased motor vehicle during the term of the Lease. Lessee agrees that all maintenance and replacement expense, including repairs, gasoline, oil, grease, tires, tubes, storage, parking, tolls, adjustments and other services shall be solely at the expense of the Lessee, it being the intent herein that the Lessor shall not be responsible for any charges or claims in connection with the operation of the leased vehicle.

6.    *SERVICE OF LESSOR.* In addition to making delivery of the motor vehicles, as herein above described, the Lessor agrees that upon delivery by the Lessee to the Lessor of a leased motor vehicle at the termination of the Lease on said motor vehicle, the Lessor will render efficient service in sale or disposal of the leased motor vehicle to obtain the largest net return for the Lessee.

7.    *LIABILITY OF LESSOR.* The Lessor shall not be liable for any loss of business or profit, or other damages caused by any interruption of the service herein specified to be given by the Lessor. Lessor shall be responsible for obtaining and delivering to the agents of the Lessee the motor vehicles to be covered by this Lease, but Lessor shall not be liable to the Lessee if failure to deliver motor vehicles under this Agreement be due to strike or other causes beyond the control of the Lessor in the exercise of reasonable care. It is expressly understood and agreed that Lessor assumes no liability for any acts or omissions of Lessee, or of Lessee's agents, servants or employees, or for any property of Lessee and any persons in privity with Lessee, damaged, lost or stolen in or from the motor vehicles. Lessor expressly disclaims any and all warranties, whether express, implied or statutory, not specifically and expressly set forth herein, including without limitation any warranty as to merchantability, fitness for a particular purpose, description or otherwise.

8.    *LEGAL COVENANTS.* Lessee shall maintain and operate said motor vehicles in strict conformity with all laws and ordinances, State, Federal or Local and shall not permit said motor vehicles to be used for the unlawful transportation of alcoholic beverages or narcotics. Lessee may use said motor vehicles at any and all times for any and all legal purposes, but the Lessee agrees not to permit the leased vehicles to be driven except by agents, employees of the Lessee or persons authorized to drive such vehicles by the Lessee and it is the sole responsibility of the Lessee to provide drivers for the leased vehicles, this responsibility to include Lessee's exclusive control of said drivers, assumption of full responsibility for drivers' wages, employment and workmen's compensation insurance, social security and other requirements, and any traffic violations in which said leased vehicles may be involved. Lessee is responsible for all violations and toll charges associated with violations. Lessee hereby authorizes Lessor to pay and settle any violations incurred on Lessee's vehicles and received by Lessor (including any late payment fees and any charges incurred in processing the violation), in accordance with parameters to be agreed upon between Lessee and Lessor, which may include

forwarding first notifications of all or certain types of violations to Lessee or Lessee's drivers, except for toll violations and all violations in jurisdictions where failure to timely pay a violation may jeopardize the registrations of all Lessor vehicles or other jurisdictions specified by Lessor or where multiple violation notices go unpaid or where unpaid violations are forwarded to collection agencies ("hostage jurisdictions"), where Lessor will pay all violations received. If the Lessor transfers liability to Lessee to permit Lessee or Lessee's driver to challenge a particular toll violation, Lessee shall be responsible for paying all tolls and violations directly to the jurisdiction. Lessee agrees to pay Lessor an administrative charge for all violations identified and forwarded or processed by Lessor. If Lessee uses or allows any vehicles to be used for illegal purposes or for purposes not permitted under this Lease, Lessee agrees to pay any fines or penalties thereby incurred, and to reimburse Lessor for all damages sustained by Lessor as a result of such misuse. In addition to and notwithstanding its right to such reimbursement, Lessor may in such event at its option cancel this Contract. The possession of the leased vehicle by someone other than the Lessee and its agents, during the time in which the leased motor vehicle is leased to the Lessee, shall be the responsibility of the Lessee and shall require its continued strict compliance with all the terms of this Agreement as relates to said motor vehicle. Lessee hereby agrees to comply with regulations issued by the National Highway Traffic Safety Administration *(NHTSA)* in connection with the Federal *Truth in Mileage Act of 1986* and Lessee acknowledges receipt of the following notification in accordance with the law: Federal law *(and State law, if applicable)* requires that the Lessee disclose the mileage to the Lessor in connection with the transfer of ownership of any vehicle operated under the Lease. Lessor is required by law to advise Lessee, and hereby does advise Lessee, that failure to complete the appropriate disclosure documentation, or making a false statement, may result in fines and/or imprisonment.

*9.* **INSIGNIA.** Lessee shall have the right, at its own expense, to affix to every motor vehicle so leased or loaned to it, any appropriate advertisement or insignia of its own design indicating that it is being used in the service of the Lessee.

*10.* **DEFAULT.** Lessee will be in default if any of the following occurs:

*a.* Lessee does not make a payment when due;

*b.* Lessee or its property is the subject of a proceeding in bankruptcy, receivership or insolvency or Lessee makes an assignment for the benefit of creditors or Lessee liquidates or dissolves itself (or suffers any liquidation or dissolution);

*c.* Lessee enters into any transaction of merger or consolidation or acquires or is acquired by any person or entity, or conveys, sells, loans or otherwise disposes of all or substantially all of its property or business;

*d.* Lessee fails to comply with the insurance requirements of this Lease;

*e.* Lessee makes any material misrepresentation to Lessor; or

*f.* Lessee breaches, defaults under, or fails to comply with, any terms or conditions of this Lease or of any other agreement(s) made between Lessee or any affiliate of Lessee and Lessor or any affiliate of Lessor.

If Lessee is in default, Lessor shall have the right to declare this Lease terminated and take immediate possession of said motor vehicles wherever found, with or without process of law, and hold Lessee responsible for any damage which Lessor sustains by virtue of said occurrence.

11. ***INSURANCE.*** [redacted]

12. ***TERM OF THE LEASE.*** Either Lessee or Lessor may terminate Lessee's contractual right to order and lease additional or replacement vehicles at any time upon written notice to the other party. Such termination shall be effective immediately following the giving of such notice and shall be limited to precluding delivery of additional or replacement vehicles not previously ordered, but this Lease shall continue in full force and effect with respect to all vehicles under lease hereunder on the date of such termination and until the expiration of the Lease terms for such vehicles. Notwithstanding the expiration of any term that may be specified in this Lease or any master agreement related hereto, should

Lessee continue to place orders and lease new vehicles after such expiration, and in the event that Lessor has not terminated this Lease, the terms of this Lease shall fully apply as to all vehicles so ordered and leased by Lessee. Each motor vehicle shall be leased for an initial term of 12 months (except for vehicles located in the State of Illinois where the initial term will be 367 days) from the date of the delivery of such vehicle to Lessee, and thereafter for successive 12-month renewal terms; provided that Lessee shall have the right to cancel any vehicle at any time after the end of the first 12 months (367 days in Illinois) of the initial lease term for such vehicle by giving written notice of such cancellation to the Lessor.

Lessee agrees that upon termination of the lease of a motor vehicle for any reason whatsoever, the Lessee will cause the motor vehicle to be returned to the Lessor within the Continental United States, or if such vehicle is originally delivered in Hawaii, Alaska or Puerto Rico, Lessee will cause such vehicle to be returned to the point of original delivery.

13. **ASSIGNMENT.** Lessee agrees not to assign, transfer, sublet or otherwise transfer its rights hereunder, whether by operation of law or otherwise, without the prior written consent of Lessor, and will not pledge, mortgage or otherwise encumber or permit said vehicle to be subjected to any lien, charge, right or interest of the Lessee hereunder. Lessor may at any time assign all or any part of Lessor's right, title and interest in, to and under this Lease and in, to and under the monthly payments and other sums at any time due or to become due or at any time owing or payable by Lessee under any provision of this Lease. No such assignee shall be obligated to perform any duty, covenant or condition required to be performed by Lessor and any such assignment shall not relieve the Lessor from any of its obligations hereunder. Without limiting the generality of the foregoing, Lessee agrees that, in the event of any such assignment, the rights of any assignee under this Lease and in and to the sums payable by Lessee under this Lease shall not be subject to any abatement whatsoever and Lessee shall be unconditionally obligated and continue to pay such sums to such assignee, and same shall not be subject to any defense, setoff, counterclaim or recoupment whatsoever, arising between Lessor and Lessee hereunder for any other reason whatsoever.

14. **OWNERSHIP.** It is expressly agreed that the Lessee by virtue of this Lease acquires no ownership, title, property, right, interest, *(or any option therefor)* in any leased motor vehicle save as herein provided, and that the Lessor at its option may title a leased motor

vehicle in the name of a trustee instead of in the name of the Lessor, with the same force and effect as though the leased motor vehicle were titled in the name of the Lessor.

15.    ***GENERAL.*** This Lease together with the attached *Lease Schedules* and *Pricing Addendum* [and XXX] constitutes the entire agreement between the parties with respect to its subject matter, and supersedes all oral and all other written agreements and representations with respect to all motor vehicles now or hereafter leased by Lessor to Lessee.  Any terms or conditions set forth in any other document, including without limitation in any purchase order, statement of work or invoice, shall be of no force or effect and shall not be binding upon the parties.  The provisions of this Lease shall be interpreted according to the laws of the State of Illinois, without regard to conflict of laws principles. No change or modification of the terms of this Lease shall be binding on the Lessor, unless such change or modification be in writing and signed by an executive officer of Lessor. The term "Lessee" includes any subsidiary of Lessee, and any division of Lessee or any such subsidiary, to whom motor vehicles are delivered hereunder. The Lessee agrees to provide Lessor, upon Lessor's request, financial statements concerning Lessee's creditworthiness and further agrees to inform Lessor in a timely manner of any material change in Lessee's financial condition.  The section headings herein are for convenience only and shall not affect the interpretation of any of the provisions hereof.

16.    ***COMMERCIAL LEASE.*** This Lease is for agricultural, business or commercial purposes, and is not primarily for personal, family or household purposes.

*THIS LEASE* is executed in duplicate and a copy thereof delivered to Lessee, receipt of which copy is hereby acknowledged by Lessee.

*IN WITNESS WHEREOF*, Lessor and Lessee have caused these presents to be executed the day and year first above written.

**LESSEE**                                                       **LESSOR**

**[CLIENT NAME]**                                      **WHEELS LT**
                                                                         **by WHEELS, INC. as Attorney in Fact**


BY: _____            BY: _____


TITLE:_____            ITS: _____


DATE:_____            DATE:_____

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION, | ) ) ) ) | |
| | ) | Master File No. 12-md-023111 |
| THIS DOCUMENT RELATES TO: | ) ) | |
| ALL END-PAYOR ACTIONS | ) ) ) | |
| _____ | ) | |

I, Brian Creelman, declare as follows:

1.     I am Vice President, Finance, of Automotive Rentals, Inc. ("ARI"). I make this declaration in support of Element Vehicle Management Services, LLC, Wheels, Inc., Donlen LLC and ARI's Motion to Enforce Settlement Agreements in the End-Payor Actions based on my personal knowledge.

2.     ARI purchases new vehicles from dealerships throughout the United States. ARI also orders new vehicles directly from manufacturers, in which case the order still goes through a selling dealership.

3.     A true and correct copy of ARI's standard, open-ended Terminal Rental Adjustment Clause ("TRAC") Lease is attached hereto as **Exhibit 1.**

4.     The lessor in the TRAC Lease attached as Exhibit 1 may be either ARI Fleet LT, a titling trust from which ARI's customers lease vehicles, or Automotive Rentals, Inc.

10496057.2

5. ARI initially filed its claims in the above-referenced action in September 2017.

6. The claims were supplemented and re-submitted in March 2020 to include additional vehicles that had become eligible under subsequent settlements and to meet the parameters of the revised Plan of Allocation approved in December 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 8, 2021.

By: _____

Brian Creelman

2

# EXHIBIT 1

3.13.2020

## <u>TRAC CERTIFICATION</u>

CERTIFICATION RELATING TO
"MOTOR VEHICLES OPERATING LEASES"
UNDER SECTION 7701 (h) OF THE INTERNAL REVENUE CODE

COMPANY: _____

ADDRESS: _____

_____

FEDERAL IDENTIFICATION NUMBER:_____-_____

The undersigned, _____, acting in
<div style="text-align:center">(Name)</div>

the capacity of _____
<div style="text-align:center">(Officer's Title)</div>

of _____
<div style="text-align:center">(Corporate Name)</div>

(Herein the "Corporation") does hereby certify under penalties of perjury:

    1. That the Corporation intends that the motor vehicles leased from Automotive Rentals, Inc. or ARI Fleet LT (herein, "Lessor"), under any lease agreement executed on or after August 28, 1987, to which Section 7701 (h) of the Internal Revenue Code of 1986 as amended applies, will be used more than fifty percent (50%) in the trade or business of the Corporation, and

    2. That the Corporation has been advised that it will not be treated as the owner of the property subject to the agreements for Federal Income Tax purposes.

_____
<div style="text-align:center">(Signed)</div>

_____
<div style="text-align:center">(Corporate Name)</div>

_____
<div style="text-align:center">(Date)</div>

# LEASE AGREEMENT

## Parties

The Lease Agreement is hereby entered into as of the  day of      , 201 ("Agreement"), by and between ARI Fleet LT, a Delaware business trust, hereinafter called "ARI Fleet" and Automotive Rentals, Inc., a New Jersey corporation, located at 4001 Leadenhall Road, PO Box 5039, Mt. Laurel, New Jersey 08054, hereinafter called "ARI" and             , a corporation, with its principal place of business at          , hereinafter called "Lessee".  ARI and ARI Fleet are at times referred to herein, individually or collectively as the context may require, as the "Lessor".

## WITNESSETH THAT

The parties hereto intending to be legally bound hereby agree as follows:

## Lease of Vehicles

**ARTICLE 1.**  Lessor shall lease for Lessee new vehicles as may be ordered by Lessee. The Lessor of each vehicle leased hereunder will be either ARI or ARI Fleet, as indicated on the individual Motor Vehicle Lease Agreement in the form attached hereto and marked Exhibit I ("MVLA"), pertaining to such vehicle.  All vehicles leased hereunder shall be owned by, and titled and/or registered in the name of Lessor.  Should ARI Fleet be named as Lessor, ARI shall act as servicer in providing all duties under this Agreement.  Each MVLA (including the portions of this Agreement incorporated therein by reference) issued hereunder is and will be an agreement of lease only and Lessee has no right or option to purchase the related vehicle at any time.  Notwithstanding the fact that the parties to this Agreement intend to create a true lease and not a security agreement, to the extent that any court may determine that the lease or any MVLA is intended as security, Lessee hereby grants to Lessor a security interest in all of Lessee's right, title and interest in and to the vehicle leased pursuant to each MVLA issued hereunder and in all proceeds, products and substitutes or replacements thereof.

## Ordering, Delivery and Acceptance of Vehicles

**ARTICLE 2.  a.**  Lessee shall furnish written orders for vehicles specifying make, model, equipment, and delivery point within the United States of America, excluding the Commonwealth of Puerto Rico.  For vehicle deliveries in Puerto Rico, Lessor shall advise the cost of such vehicles for Lessee's acceptance.  Purchases from dealer inventory (stock purchases) will be priced as indicated on Exhibit A.

**b.**  Lessor agrees to deliver such vehicles to Lessee, subject to Lessor's ability to obtain sufficient vehicles of the type ordered in the time specified by Lessee, and subject to any other contingency beyond the control of Lessor.  Lessor shall not be obligated to purchase and deliver any vehicles unless Lessor has accepted Lessee's request for such delivery.

**c.**  Lessee agrees to accept delivery of each vehicle ordered promptly upon notice of availability from Lessor's delivering agent.  After acceptance of each leased vehicle, Lessee shall incur a lease activation fee of $___ per vehicle.

2

3.13.2020

**Leased Vehicles/Vehicle Lease Term**

    **d.**  The term over which each vehicle leased hereunder will be depreciated shall be for the period as specified in Exhibit A ("Depreciation Period"), or such other period mutually agreed upon. The initial lease term, commencing on the date that such vehicle is delivered by Lessor to Lessee, shall be for a minimum of 367 days for passenger and light duty vehicles up to 10,000# GVW and a minimum of 24 months for vehicles over 10,000# GVW.  After the initial lease term, an extension of the lease on a month to month basis shall be presumed until the Depreciation Period specified in Exhibit A shall expire, unless termination with respect to the subject vehicle occurs as otherwise provided hereunder.

    With the Lessor's consent, at the expiration of the Depreciation Period as specified in Exhibit A, the lease shall be extended on a month to month basis as provided for in Article 4e herein until terminated by written notification from Lessee to Lessor.

**Receipt Forms**

    **ARTICLE 3.  a.**  Lessee or its representative shall execute a Courtesy Delivery/License and Title Instruction form, in the form attached hereto and marked Exhibit II, which shall be supplied by Lessor to Lessee's representative and the delivering dealer.

**Individual Motor Vehicle Lease Agreement**

    **b.**  Upon delivery of each leased vehicle, Lessor shall deliver to Lessee an MVLA, identifying the vehicle, setting forth the monthly rental payments to be made with respect thereto, as determined under Article 4, the date delivered and other appropriate information as provided for in said form. The MVLA for each vehicle will also indicate whether the Lessor for that vehicle is ARI or ARI Fleet.  The placing by Lessee of the order to lease a vehicle shall, subject to review and audit of the MVLA relating to the vehicle for plain error, legally bind the Lessee to all the terms, provisions and obligations set forth in such MVLA, to the extent as though Lessee had physically executed such MVLA.

    **c.**  For convenience, this Agreement provides certain standard terms and conditions that shall govern the terms of the lease of each vehicle under each MVLA.  The terms of this Agreement will therefore be incorporated by reference into each MVLA.  For purposes of this incorporation by reference, all references herein to Lessor, unless the context otherwise requires, shall be deemed to refer to whichever of ARI or ARI Fleet is designated as the Lessor under the MVLA.

    **d.**  Each MVLA will be a separate, independent lease agreement relating solely to the vehicle or vehicles named therein.  Each MVLA will therefore be separate and distinct from each other MVLA and any other agreement between Lessee and ARI and/or ARI Fleet.  Lessee, ARI and ARI Fleet each agree to treat each MVLA for all purposes in such manner.

**Payments**

    **ARTICLE 4.  a.**  For each leased vehicle Lessee agrees to pay Lessor, at Mt. Laurel, New Jersey, or its Assignee as described in Article 7 and Exhibit C, or as otherwise specified in writing by Lessor, monthly rental payments for the use of each vehicle hereunder during the term of the lease.

    **b.**  With respect to each vehicle, all invoices shall be sent electronically with payment due and payable on or before the fifteenth (15th) day of each month, WHICH TIME SHALL BE

OF THE ESSENCE.  Lessee shall pay Lessor a late payment penalty in the amount of one and one half percent (1 ½%) or the highest legal interest rate, whichever is less, per month or fraction thereof of any invoice the payment of which is not in the possession of Lessor, or Assignee, by the due date.  Should Lessee request that Lessor adopt a third party or non-standard billing process, Lessor reserves the right to charge a reasonable processing fee to accommodate such request.

Monthly rental payments for each vehicle shall begin on the first day of the first full calendar month following the delivery of the vehicle and shall cease accruing at the end of the last full calendar month prior to the day the vehicle is surrendered.  Lessee agrees that it will pay an interim rent charge in the amount of the monthly rental payment for the full month in which each vehicle is delivered.  In addition, Lessee agrees to pay an interim rent charge for the full month of surrender in an amount equal to the monthly rental payment.  Lessee agrees to pay to Lessor interim financing from the date Lessor is invoiced by the manufacturer, or the applicable vehicle source of supply, for each vehicle to the date preceding the first day of interim rent.  The interest rate charged for such interim financing shall be the then current prime rate of interest.

**c.**  For each leased vehicle during the Depreciation Period, the monthly rental shall be computed as set forth in Exhibit B herein.

**d.**  Should Lessee request Lessor to have a vehicle upfitted after production by the vehicle manufacturer, and it shall become necessary or desirable for Lessor to pay for such unit, Lessor, in such event, may charge Lessee an interim financing amount and the cost of such interim financing is to be the then current prime rate of interest.  All incomplete units thus acquired shall, with the exception of the payment of rentals, be subject to the terms and conditions of this Agreement; including but not limited to, the indemnity provisions of Article 16 hereof.

**e.**  For each leased vehicle remaining in service on a month-to-month basis after the completion of the Depreciation Period, the monthly rental shall be $40.00 per month.

## Capitalized Value

**ARTICLE 5.**  The Capitalized Value for each leased vehicle listed on Exhibit A shall consist of the sum of the following amounts:

**a.**  The vehicle manufacturer's invoice price to its dealers plus a Procurement & Handling amount for each vehicle as indicated on Exhibit A.  For vehicle makes other than those listed on Exhibit A, Lessor shall advise the cost of such vehicles for Lessee's acceptance.

**b.**  The amount of the cost of vehicle upfitting requested by Lessee plus the Procurement & Handling amount of _%.

**c.**  Lessor's cost of any optional equipment and/or accessories requested by Lessee which are not furnished or included by the vehicle manufacturer and additional transportation charges incurred by reason of a change of delivery point requested by Lessee prior to delivery.

## Costs Paid by Lessee

**ARTICLE 6.**  Lessee shall be responsible for the cost of state and local inspections, license tags, plates, and any certificates of title, notary fees, lien recording fees, clerk fees, registrations and any other compliances or regulations required by law whether local, state or federal, and all federal, state and local taxes (including personal property taxes) not included in the cost of the vehicle as defined in Article 5.  The above shall include, but not be limited to, California Air Resources Board Regulations with regards to vehicle emissions.

4

3.13.2020

**Assignment of Rentals**

      **ARTICLE 7.**  Lessor may assign all rights, title and interest of Lessor in and to each MVLA and all monies due and to become due to Lessor under this Agreement to a financing institution (hereinafter called "Assignee") and in the event of such assignment, Lessee will pay direct to such Assignee, if so directed by Assignee in writing, all payments due and to become due with respect to all matters under such MVLA and with respect to all monies due under this Agreement; such Assignee's right to payment of all sums due thereunder shall not be subject to any defense by Lessee, except payment to the Assignee and as otherwise provided herein.

      In the event of any such assignment, the liability of Lessee to pay rental to the Assignee shall not be terminated, notwithstanding anything herein contained to the contrary, unless the Assignee shall have been paid the full depreciated value for such vehicle as set forth in the MVLA.

**Vehicle Replacement**

      **ARTICLE 8.  a.**  Lessee may, at any time after the minimum lease terms described in Article 2d, require Lessor to replace any vehicle pursuant to this Agreement by giving to Lessor written notice of intent, which notice shall contain the same information as is required for a delivery order by Article 2a of this Agreement, and shall state, in addition, that the vehicle to be delivered is in replacement of a specifically identified vehicle presently leased, which will be surrendered to Lessor upon delivery of the replacement vehicle.  The lease as to such replaced vehicle shall terminate upon surrender to Lessor of the replaced vehicle.

**Vehicles Not Replaced**

      **b.**  Lessee may, at any time after the minimum terms described in Article 2d, retire from service any vehicle leased pursuant to this Agreement without replacement by giving to Lessor advance written notice stating when said vehicle will be surrendered to Lessor, in accordance with Article 9 herein.  The lease as to such vehicle shall terminate upon the date Lessor takes possession of said vehicle, or in the event Lessor agrees a vehicle is not to be surrendered to Lessor, the lease as to such vehicle shall terminate upon the date of Lessor's receipt of all necessary sale paperwork from Lessee.

**Surrender Upon Replacement or Retirement**

      **ARTICLE 9.**  Upon replacement or retirement of any leased vehicle hereunder, Lessee shall surrender possession of such vehicle to Lessor at the point where same was originally delivered to Lessee or at such other point agreeable to the parties.

**Disposition Upon Sale of Vehicles**

      **ARTICLE 10.  a.**  Lessor shall sell every vehicle after possession thereof shall have been surrendered by Lessee as provided in Article 8 for the best price obtainable.  Upon sale of a vehicle, Lessor shall retain out of the sale price any costs which it may have incurred in transportation and marketing of the vehicle, fees paid (including auction fees), a used vehicle termination fee of $\underline{\$\quad}$, and repairs or replacements necessary to merchandise the vehicle, to arrive at the net resale proceeds for calculation of rental adjustments.

**b.** Lessor shall pay to Lessee as a rental adjustment, 100% of any excess of the net resale proceeds over the depreciated value of the vehicle.  If the net resale proceeds are less than the depreciated value of the vehicle, Lessee shall pay to Lessor as rental adjustment the amount of such deficiency, provided that Lessor shall guarantee to Lessee minimum net resale proceeds equal to 20% of the Capitalized Value at the beginning of the initial lease term.  If Lessee elects to extend beyond the initial lease term, Lessor shall guarantee 20% of the depreciated value of the vehicle at the inception of the concluding month's extension period.

**Depreciated Value**

**c.**  The depreciation percentage shall be that percentage amortized over the entire Depreciation Period such that at the end of the Depreciation Period the vehicle's depreciated value is fully amortized. The depreciated value of each vehicle shall be the Capitalized Value less the "total depreciation reserve" paid by Lessee.  The "total depreciation reserve" shall be the amount of depreciation included in the monthly rental payment paid by Lessee for the number of months a vehicle was in billed service and paid by Lessee.  Such rental payments shall be computed on an amortized level pay basis such that as the interest component decreases the principal shall increase while at all times the rental payments remain constant.  Any applicable interim rent charges do not apply towards the depreciated value.

**Use of Vehicles**

**ARTICLE 11.**  Lessee may use the vehicles at any and all times for any and all legal purposes. Title to each vehicle leased hereunder shall remain in Lessor, but Lessor shall have no control or supervision of the operation of any vehicle leased hereunder.  Nothing herein contained shall authorize Lessee or any person to operate or otherwise use any vehicle contrary to law or to incur any liability or obligation on behalf of Lessor.  Lessor reserves the right to charge Lessee a reasonable processing fee for any violation, summons, citation or toll infraction issued against any Lessor leased vehicle and/or for any new titles which must be obtained due to driver state changes.

Lessee agrees that it shall not modify, add or alter all or part of any vehicle leased hereunder without the prior written permission of Lessor.  Lessee shall not cause any lien to be attached to any equipment installed on a leased vehicle without the prior written consent of Lessor.

**Registration**

**ARTICLE 12.**  Lessor will deliver to Lessee, not later than fifteen ███ days prior to the expiration of the first and any subsequent license period, documents which may be necessary for Lessee to obtain state license tags, certificates of title and similar permits for the authorized operation of the vehicle, which certificates and permits shall indicate that ownership of said vehicle is in Lessor.  When obtained, such certificates and permits, unless required to be carried in the vehicle, shall be sent by Lessee to Lessor.  Lessee shall notify Lessor if documents to obtain state license tags, certificates of title and similar permits for the authorized operation of the vehicle are not received by Lessee or Lessee's representative ten ███ days prior to the expiration of same.

**Responsibility for Maintenance**

**ARTICLE 13.**  ARI and ARI Fleet shall have no responsibility for the maintenance and upkeep of any vehicle after it is delivered to and accepted by Lessee and until such time as Lessor thereafter accepts possession of the vehicle as provided in Article 9 herein; during such time, Lessee shall maintain, service and keep in good repair each vehicle at its own expense.

**Damage or Destruction of Vehicles**

6

3.13.2020

ARTICLE 14.  a.  In the event a leased vehicle is damaged, its repair shall be the responsibility and obligation of Lessee; in every such instance, Lessor will assign to Lessee all rights Lessor may have to be reimbursed for such damage pursuant to insurance coverage.

b.  In the event a leased vehicle is damaged or destroyed to such extent that Lessee finds it undesirable to continue its use, Lessee may terminate the lease pursuant to Article 8 herein, and Lessor shall dispose of said vehicle pursuant to Article 10 herein except that Lessor will not be required to guarantee minimum resale as provided for in Article 10b.

## Lost or Stolen Leased Vehicle

c.  In the event a leased vehicle is lost or stolen, Lessee shall terminate the lease pursuant to Article 8 herein and, upon payment of the depreciated value, Lessor shall forward to Lessee necessary documents to transfer ownership of said vehicle as directed by Lessee.

## Insurance

ARTICLE 15.  Lessee will carry for the benefit of ARI, ARI Fleet, Lessee's employees and others who operate the vehicle with the permission of Lessee, and pay the cost thereof, insurance against liability for bodily injury in a minimum single limit of ███████, and against liability for property damage in a minimum limit of ██████.  All such coverages shall be primary and non-contributory.  Lessee will furnish written evidence of said insurance issued by carriers acceptable and satisfactory to Lessor in certificate form naming Automotive Rentals, Inc. and ARI Fleet LT as Additional Insured.  Lessee shall bear all risk of loss or damage to each leased vehicle and the contents thereof.

If for any reason Lessee shall fail to provide said insurance, Lessor, at its sole option may:  (a) provide same and upon demand shall be reimbursed by Lessee the actual cost thereof, plus ████ of said cost to defray administrative expense; or, (b) terminate the lease of any and all vehicles leased hereunder, effective immediately, at any time by giving written notice of termination to Lessee.

## Indemnification

ARTICLE 16.  Except for the sole negligence of Lessor in the performance of the administrative services provided by it as defined in this Agreement, Lessee shall indemnify, defend and hold harmless ARI, ARI Fleet and its parent, subsidiaries, divisions, affiliates, directors, officers, employees and agents against all loss or liability (including costs and reasonable attorney's fees) arising out of or connected with the delay in delivery of any vehicle, and/or the use, condition, operation, maintenance and possession of any vehicle during Lessee's possession thereof or any loss or liability resulting from any repair, maintenance or service work performed on any vehicle.  Lessee will take upon itself the settlement of all such claims and the defense of any suit or suits, or legal proceedings of any kind brought to enforce any such claim or claims, and the payment of all judgments entered in any such suit or suits, whether or not Lessor is a party-defendant thereto.

The provisions of this Article comprehend, but without limitation, claims, howsoever arising, whether by reason of negligence, breach of warranty, defect in manufacture or maintenance or otherwise, and even though strict liability be claimed.

## Statement of Odometer Warranty and Indemnification

Federal law and any applicable state law require that Lessee disclose the mileage of each vehicle returned to Lessor in connection with the transfer of ownership of each vehicle.  The regulations provide that failure to make this disclosure (or the making of a false statement) may

7

result in fines and/or imprisonment.  Lessee warrants to Lessor that the mileage indicated on the odometer of any vehicle returned to Lessor is the true and actual reading and that no tampering with said odometer has taken place while such vehicle was operated by Lessee or any other agent of Lessee.  Lessee shall indemnify and save ARI and ARI Fleet harmless from any and all liability, loss, damage, expense, causes of action, suits, claims, or judgments arising from breach of the warranty hereinbefore stated in this Article and shall, at its own cost and expense, defend any and all suits which may be brought against ARI and/or ARI Fleet, either alone or in conjunction with others, upon any such liability or claim or claims and shall satisfy, pay, and discharge any and all judgments and fines that may be levied against ARI or ARI Fleet, provided however, that ARI or ARI Fleet shall give Lessee written notice of any such claim or demand within thirty (30) days from receipt thereof.

## No Warranties by Lessor

**ARTICLE 17.**  As to any vehicle or service provided hereunder, except as provided in Article 20, ARI and ARI Fleet each hereby disclaim all warranties, either expressed or implied, including any implied warranties of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the use, condition, operation and possession of any vehicle.  Neither party shall be entitled to recover from the other party any consequential damages, damages for loss of use, loss of profits, or income, or any other incidental damages.  It is agreed that third party vendors such as manufacturers, dealers, upfitters, auctions, drive-away companies, service/fuel outlets, licensing agents and telematics providers are independent contractors and are neither the subcontractors nor agents of the Lessor.

## Default

**ARTICLE 18.**  Any default by Lessee of this Agreement, any MVLA hereunder, or any other instrument between Lessee and ARI and/or ARI Fleet (collectively "Agreements") shall be deemed a default under all such Agreements.  In the event Lessee shall default in any payments due Lessor, or in performance of any covenant or condition under this Agreement, any MVLA hereunder, or any other Agreement, and Lessor notifies Lessee of such default and it thereafter remains uncorrected for ten (10) days, Lessor may pursue any remedies it may have under all such Agreements, including taking possession of any or all vehicles leased hereunder, the demand for payment of all sums due Lessor and the immediate payment of any remaining unpaid charges for the balance of the terms of the MVLAs or other  Agreements between Lessor  and Lessee.  Lessee shall pay any and all reasonable attorney's fees incurred in the collection thereof. ARI and ARI Fleet shall each have the right to offset any sums owing or to be owing to Lessee by it against any sums owing or to be owing to ARI or ARI Fleet, whether under an MVLA or otherwise.  No remedy pursued under this section shall be deemed an act of termination of this Agreement.

## Bankruptcy

**ARTICLE 19.**  Upon notice to Lessee, Lessor may terminate this Agreement, if in either a state or federal court, a receiver is appointed for the Lessee, or if a petition in bankruptcy or for reorganization shall be filed by or against the Lessee, or if Lessee shall fail to give immediate notice to Lessor of any distress or levy or execution purported to be made or laid against the property hereby leased or any part of it.  Lessor may take possession of any or all vehicles leased hereunder and may cancel any unfilled vehicle orders.

## Lessor's Warranty

**ARTICLE 20.**  As to each vehicle leased hereunder, Lessor warrants that it is the sole and absolute owner thereof, that it has the right to lease the vehicle to Lessee, that the vehicle is free of all encumbrances at time of delivery to Lessee (other than the interest of an Assignee pursuant to Article 7), that Lessor will not cause the vehicle to become subject to any lien or

3.13.2020

encumbrance, that it will not sell, assign, lease or otherwise dispose of the vehicle except as provided for in Article 7 and 10 hereof, and that it will do nothing to disturb Lessee's full right of possession and enjoyment of the vehicle and the exercise of all of Lessee's rights with respect thereto as provided by this Agreement.

**Assignment/Related Entities**

**ARTICLE 21.a.** This Agreement shall be binding on the respective parties, their successors, legal representatives and assigns but neither party hereto shall, except as permitted herein, assign or sublease any rights under this Agreement without the prior written consent of the other party.

**b.** In the event that Lessee permits any vehicles or services subject to this Agreement to be used or operated by any present or future subsidiary, parent or affiliate of Lessee (each a "Related Entity"), Lessee agrees that notwithstanding: (a) use or operation by a Related Entity; (b) any direction by Lessee to Lessor to invoice a Related Entity; and (c) any payment made by a Related Entity with respect to any vehicle and any services, all such vehicles and services shall at all times remain subject to the terms and conditions of this Agreement and Lessee shall at all times remain liable for all of the duties and obligations (for payment or otherwise) under this Agreement. Any use or operation by a Related Entity of any vehicle shall not, in any way, constitute a sale, assignment or transfer, sublease or other disposition of such vehicle, or any interest therein, or of any rights granted to or obligations of Lessee under this Agreement.

**Cancellation**

**ARTICLE 22.** This Agreement shall remain in effect until cancelled by either party upon thirty (30) days written notice to the other party. The termination of this Agreement shall not affect any vehicles under lease pursuant hereto at the time of such termination; all such vehicles shall remain subject to the terms hereof and Lessor and Lessee shall have the mutual rights and obligations provided for herein as to such vehicles.

**Financial Statements/Ownership**

**ARTICLE 23. a.** Lessee agrees to provide Lessor each year a copy of Lessee's complete year end financial statements promptly upon expiration of each fiscal year and any such other financial information as may be requested by Lessor. Lessor retains the right to limit vehicle orders and deliveries based upon Lessor's credit evaluation of Lessee.

**b.** Lessee shall notify Lessor, in writing, of any change in name, address, ownership or control of Lessee. Such notification to be supplied to Lessor within fifteen (15) days of such change.

**Agreement Binding**

**ARTICLE 24.** This Agreement, together with Exhibits attached hereto and any MVLA's which may be executed hereafter, constitute and will constitute the full, complete, absolute and entire Agreement between Lessor and Lessee. There are no oral agreements or understandings affecting this instrument. Any future agreements, understandings or waivers to be binding upon the parties hereto must be reduced to writing and attached hereto and Lessor's or Lessee's failure to enforce any provision of this Agreement shall not be construed as a waiver thereof or as excusing Lessee or Lessor respectively from future performance. Neither the failure of either party to insist upon the performance of any term or condition of this Agreement or to exercise any right or privilege conferred by this Agreement nor the waiver by either party of any such term or condition shall be construed as thereafter waiving any such term, condition, right or privilege.

9

**State Law**

      **ARTICLE 25.**  This Agreement shall be governed by and shall be construed according to the laws of the State of ███████.  Should any part, term or provision of this Agreement be by the courts decided to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected thereby.

**Authority to Sign**

      **ARTICLE 26.**  Any person who signs as an officer or agent for a corporation, partnership or other entity warrants that he has authority from such corporation, partnership or other entity to enter into this Agreement on its behalf.

**Publicity**

      **ARTICLE 27.**  Neither party will use, or permit the use of, the name or logo of the other party in any press release or other public disclosure, or in any website, social media or other media, whether for advertising, publicity, business solicitation or other purposes, without the prior written consent of the other party, except as required by applicable law or regulation, such as securities laws or rules of a national securities exchange to which a party is subject.

      IN WITNESS WHEREOF, Lessor and Lessee have caused this Agreement to be duly executed as of the day and year first written above.


**("LESSEE")**

BY:_____

TITLE:_____

WITNESS:_____

DATE:_____

**AUTOMOTIVE RENTALS, INC.**
**("ARI" OR "LESSOR")**

BY:_____

TITLE:_____

WITNESS:_____

DATE:_____


**ARI FLEET LT**
**("ARI FLEET" OR "LESSOR")**

BY:_____

TITLE:_____

WITNESS:_____

DATE:_____


10

# EXHIBIT D

DocuSign Envelope ID: 91CF397D-0B1A-4C96-8774-E5FFFFEA9190

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION, | ) ) ) ) ) | |
| THIS DOCUMENT RELATES TO: | ) ) | Master File No. 12-md-023111 |
| ALL END-PAYOR ACTIONS | ) ) ) ) | |

I, Khalid Latif, declare as follows:

1.      I am the Senior Vice President, Operations and Supply Chain for Donlen LLC ("Donlen"). I make this declaration in support of the Motion to Enforce Settlement Agreements in the End-Payor Actions by Element Vehicle Management Services, LLC, Wheels, Inc., Donlen LLC and ARI Fleet Management based on my personal knowledge.

2.      Donlen purchases new vehicles from dealerships throughout the United States. Donlen also orders new vehicles directly from manufacturers, in which case the order still goes through a selling dealership.

3.      A true and correct copy of Donlen's standard, open-ended Terminal Rental Adjustment Clause ("TRAC") Lease is attached hereto as **Exhibit 1.** The Lease has been redacted to remove information that is confidential and proprietary to Donlen and not relevant to the Motion.

4.      The lessor in the TRAC Lease attached as Exhibit 1 is Donlen Trust, a titling trust from which Donlen's customers lease vehicles.

5.      Donlen filed its claims in the above-referenced action on March 16, 2020.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 17, 2021.

By: _____

Khalid Latif

10521314.1

# EXHIBIT 1

CONFIDENTIAL SAMPLE – SUBJECT TO CREDIT AND PRICING APPROVALS



## MASTER MOTOR VEHICLE LEASE AGREEMENT
### (OPERATING LEASE)

This Master Motor Vehicle Lease Agreement (Operating Lease) (this "**Agreement**") is dated as of the date of the last signature below (the "**Effective Date**"), and is by and between DONLEN TRUST, a Delaware Business Trust with offices at 3000 Lakeside Drive, 2nd Floor, Bannockburn, Illinois 60015 ("**Lessor**") and          whose address is          ("**Lessee**"). The parties agree as follows:

**1. LEASED VEHICLES; LEASE TERM.**

(a)   Each vehicle to be leased hereunder shall be requested by Lessee from time to time either by placing an order for such vehicle on FleetWeb®, Lessor's internet-based fleet management system, or by such other means as is reasonably agreed by the parties. Lessor may order any such vehicles so requested by Lessee, and upon placement of an order, such order is non-cancelable and Lessee shall be obligated to lease such vehicle pursuant to the terms hereof. As used herein, the term "**Vehicle**" shall mean each such vehicle ordered hereunder and shall include all equipment specified in the order or necessary for its lawful operation. In no event shall this Agreement constitute a commitment by Lessor to lease any vehicle to Lessee until delivery of any such vehicle to Lessee.

(b)   Each Vehicle shall be specifically identified (including VIN and individual pricing terms) in a supplement to this Agreement designated as "**Schedule A**", which forms a part of this Agreement as if set forth in full herein. Schedule A with respect to each Vehicle shall be made available to Lessee in electronic form (via FleetWeb® or by other commercially reasonable means) by Lessor on or prior to commencement of the Lease Term for such Vehicle and shall thereupon be binding on the parties hereto; provided, (i) Schedule A shall be consistent with the terms hereof, including the applicable agreed master pricing terms set forth in "**Schedule B**" hereto at such time; (ii) Lessor shall revise the terms of Schedule A to correct any manifest error thereon promptly upon discovery of such error; and (iii) any modification to Schedule A made by Lessor from time to time in a manner consistent with the terms hereof shall be binding upon the parties as soon as Schedule A, as so modified, is made available to Lessee.

(c)   The term of the lease (the "**Lease Term**") for each Vehicle shall begin on (i) for Vehicles factory-ordered through Lessor, the earlier of the date six days after such Vehicle arrives at the delivering dealer and the date that Lessee's representative takes possession of the Vehicle, and (ii) for all other Vehicles, the date that Lessor pays the seller for such Vehicle (the "**Lease Commencement Date**") and shall end on the date such Vehicle is surrendered or is deemed surrendered pursuant to Section 12(b) hereof (due to theft, casualty loss or similar event as described therein). The Schedule Term ("**Schedule Term**") for each Vehicle shall begin on the Lease Commencement Date for such Vehicle and shall extend for 365 days (except for any Vehicle garaged in Illinois, for which the Schedule Term shall extend for 367 days from the Lease Commencement Date for such Vehicle); provided, that the Schedule Term shall end early upon any such deemed surrender (due to theft, casualty loss, or similar event) as described in the preceding sentence. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████

(d)   Lessee shall surrender each Vehicle to Lessor on or after the end of the Schedule Term and on or prior to the end of the intended maximum Lease Term for such Vehicle, unless Lessor consents to Lessee retaining possession thereafter. The intended maximum Lease Term shall be the period commencing on the Rental Start Date and continuing: (i) for automobiles, fifty (50) months; (ii) for light duty trucks, seventy-two (72) months and (iii) for medium and heavy duty trucks, ninety-six (96) months.

**2. PAYMENT TERMS.**

(a)   Each Vehicle to be leased hereunder shall be priced in accordance with the master pricing schedule attached hereto as "**Schedule B**" and forming part hereof, as such schedule may be modified from time to time by notice from Lessor to Lessee with respect to new vehicle orders.

(b)   ████████████████████████████████████████████████████████████████████████████████████████████████████

CONFIDENTIAL SAMPLE

1

3. **LEASE ONLY**. This Agreement is one of leasing only and Lessee shall not have or acquire any right, title or interest in or to any Vehicle except the right to use and operate it as provided herein. This Agreement is intended to be and shall be treated by the parties hereto as a true lease. Neither the Lessee nor any of its agents or employees is in any way the agent of Lessor in possessing, using or operating any Vehicle. Neither party is a partner or joint venturer of the other. This Agreement evidences a net lease and Lessee's obligation to pay rent and all other amounts payable by Lessee hereunder is absolute, unconditional and irrevocable and shall be paid without abatement, reduction, set-off or defense of any kind.

4. **TAXES AND OTHER CHARGES**. Lessee shall be liable for all use, excise, personal property, sales, gross receipts and other taxes (other than federal or state income taxes on Lessor's income) and governmental assessments, and all other costs, expenses, fees and charges with respect to the use, ownership, possession, rental, transportation, delivery or operation of each Vehicle. Lessee shall pay such liabilities directly or shall pay to Lessor the amount thereof if Lessor has advanced payment thereof (without regard to governmental credits that may be available to Lessor with respect to its fleet generally). Sales tax may be included in the capitalized cost of the Vehicle rather than charged separately to Lessee. Lessee shall keep each Vehicle free of all fines, liens and encumbrances and shall promptly pay or discharge all such fines, liens or encumbrances, including, without limitation, all fines and assessments arising out of toll or parking violations by its operators. In addition, Lessee shall pay to Lessor a reasonable administrative charge for each unpaid violation or other amount owed by Lessee that is paid by Lessor.

5. **OPERATING EXPENSES; MAINTENANCE; RISK OF LOSS**. Lessee shall pay all costs and expenses of using and operating each Vehicle until it is surrendered hereunder, including without limitation, gasoline, oil, grease, anti-freeze, adjustments, repairs, tires, tubes, storage, parking, tolls, fines, towing and servicing. Lessee, at Lessee's own expense, shall at all times maintain each Vehicle in good working order and condition and make all necessary repairs and replacements thereto. Title to any parts, modifications, improvements, additions or replacements shall vest in Lessor as soon as installed in or attached to any Vehicle. Lessor shall in no way be liable for any direct or indirect damage or inconvenience resulting from any defect in or loss, theft, damage or destruction of each Vehicle or of the cargo or contents thereof or the time consumed in recovery, repairing, adjusting, servicing or replacing the same and there shall be no abatement or apportionment of rental during such time. Upon surrender, Lessee shall return the Vehicle to Lessor in good working condition, ordinary wear and tear excepted.

6. **QUIET ENJOYMENT; TERMINATION.** Lessee shall have the right to peaceably hold and quietly enjoy the Vehicles without interruption by Lessor or any person or entity lawfully claiming through Lessor at all times on or prior to termination of this Agreement, so long as no default pursuant to Section 16 hereof has occurred, and subject to applicable law and the terms and provisions of this Agreement. Either party may declare a termination date (the "**Termination Date**") under this Agreement upon thirty (30) days prior written notice to the other; provided that in the event of a default by Lessee, this Agreement may be terminated sooner by Lessor as provided in Section 16 hereof. All Vehicles on lease prior to the Termination Date shall continue to be governed by the terms hereof, and no such Termination Date shall affect the obligations of either party arising prior or subsequent thereto. This Agreement shall terminate on the date after the Termination Date in which all Vehicles have been surrendered and obligations due or accrued hereunder (liquidated or unliquidated, absolute or contingent) have been indefeasibly paid in full.

7. **TITLING, REGISTRATIONS AND INSPECTIONS; UPFITTING**. Lessee shall pay for the initial registration, titling and licensing for each Vehicle and shall thereafter obtain and pay for all required plates, permits or licenses (in the name of Lessor as applicable) and for all inspections required by any governmental authority. Lessor shall provide a power of attorney if needed for Lessee to act for it for such purposes. Lessor may charge a reasonable administrative charge if Lessor performs any of the foregoing upon failure of Lessee to so perform (other than with respect to the initial registration, titling and licensing for each Vehicle). If Lessee requests that prior to delivery to Lessee, a Vehicle be delivered to an upfitter, body company, installer or other third party and/or obtain certain equipment or parts from a specific vendor, (i) Lessee assumes all risks of doing business with such third party, including, without limitation, the creditworthiness of such third party and (ii) the obligations of Lessee hereunder with respect to indemnities and insurance shall apply to such Vehicle during the period such Vehicle is with such vendor. Lessor makes no representations or warranties with respect to any work performed or parts and/or accessories added to any Vehicle by such third party. Lessee agrees that its obligation to pay rent and other amounts hereunder with respect to such Vehicles are unconditional and may not be reduced by claims against such third party.

8. **USAGE**. Lessee shall use and operate, and permit use and operation of each Vehicle in a careful manner and in compliance with all requirements of law and any governmental authority, including such requirements as pertain to the age and licensing of drivers and to disclosure of Lessor's interest in the Vehicle. In no event shall any Vehicle be used or operated for any illegal purpose, or by a person under the influence of alcohol or narcotics, or for the transportation of goods or persons for hire, or for towing any property other than in accordance with the manufacturer's specifications for any such Vehicle or, unless the Lessor has given its express consent, for transportation of explosive, radioactive, flammable or hazardous materials, or in any manner or for any purpose that would cause any insurance required hereunder to be canceled or suspended, or outside of the United States of America. Default of this provision by Lessee shall be deemed an incurable default, regardless of whether Lessee discontinues the proscribed usage constituting the default. Notwithstanding the foregoing, unless an event of default has occurred and is continuing or Lessor otherwise withdraws its consent, a Vehicle may be operated in Mexico or Canada for up to (but not to exceed) 30 consecutive days so long as, (i) the Vehicle is used principally and primarily within the United States of America and (ii) the insurance described in Section 10 hereof has full and uninterrupted coverage during such operation outside of the United States of America. In any event, Lessee agrees that it shall continue to be obligated to pay all rent and all other sums due hereunder even if such Vehicle is located or becomes stranded or impounded outside of the United States of America and shall pay (or reimburse Lessor) promptly upon demand for all costs and expense (including reasonable fees of local counsel) for obtaining possession of any Vehicle located, impounded, or stranded in Mexico or Canada and transporting such Vehicle back to the United States of America. Vehicles leased hereunder shall be used and operated solely by Lessee and its affiliates in their respective trades or businesses and not any other third party. Lessee shall promptly supply Lessor with the name and address of each driver (if any) assigned to each Vehicle and the location of each

CONFIDENTIAL SAMPLE – SUBJECT TO CREDIT AND PRICING APPROVALS

Vehicle, and shall promptly update such information as it may change from time to time. Lessee shall permit Lessor to inspect any Vehicle during normal business hours and upon reasonable notice.

**9. INDEMNITY.**

 

**10. INSURANCE.**

(a)  Without limiting any of the other provisions of this Agreement, Lessee shall, at Lessee's own expense, provide the following insurance on each of the Vehicles without interruption (in such form and with such deductibles as are satisfactory to Lessor): (i) comprehensive fire and theft insurance for the actual cash value of the Vehicle; (ii) collision insurance for the actual cash value of the Vehicle; and (iii) motor vehicle liability insurance in the amount specified from time to time by Lessor, which, if not otherwise specified, shall be a combined single limit of not less than $2,000,000 for any one accident for bodily injury or property damage (or $5,000,000 for Vehicles capable of transporting 9 or more passengers). No self-insurance retention or deductible is permissible with respect to the required liability insurance.

(b)  Lessee shall also, at Lessee's expense, provide any other insurance and post any bond that may be required by any governmental authority as a condition to or in connection with the use or operation of any Vehicle. Lessee shall procure and maintain workers' compensation insurance (or maintenance of a legally permitted and governmentally approved program of self-insurance) covering Lessee's employees pursuant to applicable state workers' compensation laws for work related injuries suffered by employees of Lessee.

(c)  All insurance with respect to the Vehicles shall protect, as their interests may appear, the Lessee, the Lessor, any lender, lien-holder or similar party having an interest in the Vehicle through the Lessor (upon request of Lessor), and any person or organization responsible for the use or operation of the Vehicle.

(d)  Lessee will provide Lessor on the date hereof and annually hereafter with an updated certificate of insurance (w) evidencing the required coverages for the Vehicles as set forth above; (x) naming Lessor as an additional insured and loss payee; (y) providing a thirty (30) day cancellation, non-renewal or reduction in coverage notification to Lessor provision; and (z) stating each underwriter will waive all rights of recovery, under subrogation or otherwise, against Lessor. Failure of Lessor to demand any insurance certificate required hereunder or other evidence of full compliance with these insurance requirements or failure of Lessor to identify a deficiency from evidence provided will not be construed as a waiver of Lessee's obligation to maintain such insurance. All coverages required of Lessee will be primary over any insurance or self-insurance program carried by Lessor. Upon request by Lessor in connection with any actual or threatened litigation or for other valid business purposes, Lessee shall provide Lessor with certified copies of all insurance policies required hereunder.

(e)  Lessee shall provide the foregoing insurance through insurance companies that either have an AM Best rating of A- or better or are otherwise approved by Lessor; provided, however, that Lessee may self-insure for the risks described in clause (i) and clause (ii) of subsection (a) above solely if approved by Lessor in its discretion. Lessor may withdraw approval for such self-insurance at any time upon a default hereunder, upon any bankruptcy filing by Lessee or if, in the judgment of Lessor, Lessee can no longer bear financial responsibility for the liabilities covered by self-insurance.

(f)  All insurance policies (other than liability) with respect to the Vehicles (excluding self-insurance) shall provide that the proceeds payable thereunder shall be paid directly to Lessor or as Lessor otherwise directs. Lessee hereby authorizes Lessor to endorse Lessee's name on any insurance checks related to the Vehicles. Lessee shall cooperate with Lessor in all matters pertaining to claims involving any Vehicle. Any insurance proceeds received by Lessor for any loss or casualty shall be paid or applied in accordance with Section 12 hereof in the event of a total loss or otherwise shall be remitted to Lessee upon proof satisfactory to Lessor that such proceeds have been or will be applied to repair of such Vehicle unless Lessee is then in default in the fulfillment of any obligation hereunder or under any other agreement with Lessor or its affiliates, in which case such proceeds may, at option of Lessor, be held as cash collateral by Lessor or applied toward satisfaction of such obligations.

(g)  Lessee shall bear all risk of loss for damage, loss, theft or destruction of each Vehicle as set forth in this Agreement, regardless of the level of insurance coverage and regardless of whether or not the amount of the loss exceeds the value of any policy. By requiring insurance, Lessor does not represent that coverage and limits will necessarily be adequate to protect Lessee or Lessor. Insurance provided or procured by Lessee will not reduce or limit Lessee's contractual obligation to indemnify and defend Lessor to the extent set forth in this Agreement. To the extent Lessee has insurance which covers any of its obligations or liabilities under this Agreement, Lessee shall file a claim under its policy to cover such obligation or liability or, upon request of Lessor, diligently assist Lessor in filing same.

**11. REIMBURSEMENT.** If Lessee shall fail, for any reason, to perform any provision of Sections 4, 5, 7 or 10 hereof, Lessor may, at its option, perform the same and Lessee shall reimburse Lessor upon demand for all reasonable sums paid or incurred by Lessor.

**12. SURRENDER AND SALE OF VEHICLES.**

     CONFIDENTIAL SAMPLE

CONFIDENTIAL SAMPLE – SUBJECT TO CREDIT AND PRICING APPROVALS

(a)   At any time on or after the completion of the Schedule Term for any Vehicle (subject to the terms hereof), Lessee shall surrender such Vehicle to Lessor for sale. Surrender of any Vehicle shall not be effective until Lessor or its agent has actual physical possession of such Vehicle and has received all license plates, registration certificates, documents of title, odometer and damage disclosures and other documentation necessary to sell such Vehicle. Any personal property in a Vehicle upon surrender shall be deemed abandoned and may be disposed of by Lessor or its agent without liability.

(b)   If any Vehicle shall be damaged to the extent that, in the Lessee's opinion, it does not warrant repairs or further maintenance, Lessee shall promptly notify Lessor of such event and hold the Vehicle or wreckage thereof for disposal by Lessor. Such Vehicle shall be deemed surrendered by Lessee to Lessor as of the date Lessor or its agent takes possession of such wreckage. Lessor shall, as soon as practicable, cause the Vehicle (or wreckage) to be sold. If any Vehicle is lost or stolen, or wreckage is not held by Lessee for disposal by Lessor, or any Vehicle (including any Vehicle that is not located in the United States of America) becomes impounded, stranded, seized or otherwise unavailable to Lessee, Lessee shall notify Lessor thereof and upon such notice the same shall be deemed to have been surrendered to Lessor, and sold at a price of zero; provided, however, that the indemnity obligations with respect to such Vehicle shall be ongoing and Lessee shall promptly, and in any event within twenty days of such notice, provide Lessor with a copy of a valid and duly filed police report with respect to any such stolen Vehicle, evidence of disposal, if any, and such other documents with respect to such Vehicle as is reasonably requested by Lessor.

(c)   

13.  **OPERATING LEASE PROVISIONS.** Section 12 shall be subject to the following level of residual loss retention by Lessor. If the Net Proceeds are less than the Residual Floor (as hereafter defined), Lessor shall bear the loss equal to the difference between the Residual Floor and the Net Proceeds. In such event, Lessee shall bear the remaining loss pursuant to Section 12, which shall be equal to the difference between the Depreciated Value (calculated upon surrender) and the Residual Floor. The "**Residual Floor**" shall be an amount equal to the Retention Percentage of the Reference Value. For Vehicles sold at the end of the Schedule Term, "**Retention Percentage**" shall mean ▮% and "**Reference Value**" shall mean the capitalized cost of the Vehicle. For all other Vehicles, "**Retention Percentage**" shall mean ▮% and "**Reference Value**" shall mean the Depreciated Value at the beginning of the last full calendar month prior to surrender.

14.  **ODOMETER DISCLOSURE STATEMENT.** Federal Law (and certain State laws) requires that Lessee disclose, and Lessee shall disclose, the mileage of each Vehicle to Lessor in connection with the transfer of ownership of each Vehicle. **Failure to complete an odometer disclosure statement or making a false statement may result in fines and/or imprisonment in accordance with law.** Lessee agrees to pay an administrative fee reasonably determined by Lessor in its discretion if Lessee fails to provide a required odometer or damage disclosure statement at the time of surrender of any Vehicle.

15.  **ASSIGNMENT OF WARRANTIES; NO CONSEQUENTIAL DAMAGES; FORCE MAJEURE.** The Lessor will assign or otherwise make available to the Lessee all of the Lessor's rights, if any, under the manufacturer's warranty on each Vehicle fully to the extent that such rights are assignable. The occurrence of the Lease Commencement Date for a Vehicle constitutes Lessee's acknowledgement and agreement hereunder that: (i) such Vehicle is the make and model and is equipped as specified by Lessee; and (ii) such Vehicle is an authorized addition under this Agreement. LESSOR IS NOT A PRODUCER, MANUFACTURER, DESIGNER OR DISTRIBUTOR OF THE VEHICLES AND LESSEE ACKNOWLEDGES THAT EACH VEHICLE ORDERED HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY USED VEHICLE, IS OF A DESIGN SELECTED BY LESSEE AND IN ITS JUDGMENT IS SUITABLE FOR ITS PURPOSES. LESSEE HEREBY CONFIRMS AND AGREES THAT THE LESSOR HAS MADE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESSED OR IMPLIED, WITH RESPECT TO ANY VEHICLE INCLUDING, WITHOUT LIMITATION, ANY USED VEHICLE, AND LESSOR SHALL NOT BE LIABLE FOR ANY SUCH REPRESENTATIONS OR WARRANTIES INCLUDING WARRANTIES AS TO DESIGN, QUALITY OR CAPACITY, AND THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR CONSEQUENTIAL, SPECIAL OR INCIDENTAL DAMAGES OF

CONFIDENTIAL SAMPLE – SUBJECT TO CREDIT AND PRICING APPROVALS

THE OTHER EXCEPT WITH RESPECT TO THIRD PARTY INDEMNITY CLAIMS. Neither party shall be liable for any failure or delay in the performance of any provision hereof (including, in the case of Lessor, delivery of any Vehicle) resulting from acts of God, acts of civil or military authority, acts of public enemy or terrorism, epidemic, civil disturbance, insurrection, explosion, earthquake, the elements, fire or other casualty, riots, strikes or other labor difficulties, governmental regulations or restrictions or any cause beyond such party's control provided that such party acts with reasonable diligence provided, however, in no event shall either party be excused pursuant to the terms of this Section from the performance of any payment obligation hereunder (which, in the event of a casualty loss, shall be as set forth in Section 12(b) hereof), compliance with law or, in the case of Lessee, compliance with the insurance requirements set forth herein.

**16. DEFAULT.**



**17. ASSIGNMENTS.** This Agreement may not be assigned nor any Vehicle subleased by Lessee without Lessor's prior written consent. In no event shall Lessee assign, lien, encumber or transfer any interest in any Vehicle leased hereunder or any interest in this Agreement to any third party. Lessor may assign this Agreement or any rentals or charges due or to become due hereunder at any time. After notice of any assignment, Lessee shall make all payments to the assignee(s). Lessor shall also have the right to place a security interest or assign as part of a financing this Agreement and the Vehicles. Lessee agrees that any such security interest or assignment shall be superior to this Agreement and that it will not assert against any secured party or assignee any claim, defense or set-off it may have against the Lessor.

**18. REPORTING; INTEGRATED AGREEMENTS; OTHER ADDITIONAL PROVISIONS.**

(a)

CONFIDENTIAL SAMPLE

CONFIDENTIAL SAMPLE – SUBJECT TO CREDIT AND PRICING APPROVALS

(b)  The parties hereto hereby acknowledge that this Agreement and each Other Agreement (as defined in Section 16 hereof) collectively are integrated agreements with each other and arise out of integrated business transactions. The Lessor and each of its affiliates, collectively, have a right of recoupment and set-off with respect to any obligations owing to Lessee under any such agreement and any obligations owing by Lessee under any such agreement (whether the obligations owing to Lessee arise under the same or different agreement as the obligations owing by Lessee). In addition, Lessor has the right to hold any credits and proceeds (from resale, insurance or otherwise) otherwise payable to Lessee hereunder as cash collateral to secure any obligations owed by Lessee or any affiliate hereunder or under any such Other Agreement, whether such obligations are then existing or may be thereafter arising until all such agreements have been terminated and all such obligations have been paid in full (and subject to retention of such amounts in accordance with Section 16 hereof), and Lessee hereby grants Lessor a security interest therein.

(c)  Lessee does hereby constitute and appoint Lessor (and any employee of Lessor with responsibility for the same) as its attorney in fact with full authority to sign and/or endorse in the name of Lessee and to file on behalf of Lessee, all documentation required or useful in connection with the disposition of a Vehicle, any police report for any lost or stolen Vehicle or other evidence that such Vehicle has been lost or stolen as Lessor shall deem necessary or desirable, any documentation required by any governmental authority with respect to each Vehicle and any insurance checks or other payments or proceeds related to the Vehicles. Lessee does hereby ratify and confirm all acts that may lawfully be done in pursuance of the foregoing power. Lessee further agrees to provide Lessor with a separate power of attorney with respect to a particular Vehicle and such other documentation as is reasonably requested by Lessor from time to time to further the legitimate purposes of this Agreement.

(d)  Lessee hereby acknowledges and agrees that in using FleetWeb® or other computer-based services of Lessor, it is bound by all terms and conditions of use set forth therein and all online agreements for users. Lessee shall bear the risk and hold harmless Lessor with respect to the accuracy and completeness of all information provided by Lessee on FleetWeb® or otherwise, including, without limitation, the selection of vehicles and components thereof in connection with any vehicle ordering hereunder.

(e)  Lessee acknowledges and agrees that Lessor is not providing accounting, legal, tax or other professional advice or services to Lessee in connection with this Agreement including, without limitation, Lessee's leasing of any Vehicles hereunder.

19. **CONFIDENTIALITY.** Each of the parties will regard and preserve as confidential and proprietary to the other party all such other party's Confidential Information (as hereinafter defined), whether written, oral or computer based, to which it had access in connection with this Agreement. As used herein, "**Confidential Information**" means any information that is disclosed by or on behalf of either party (the "**Disclosing Party**") to the other party (the "**Receiving Party**") that is identified as "confidential" or reasonably should be considered to be proprietary or confidential. Confidential Information includes, without limitation: (a) the terms of this Agreement (including, with respect to Lessor as Disclosing Party, all pricing and charges hereunder and all data files provided by Lessor in connection with any services provided to Lessee by Lessor); (b) all financial information; and (c) all technology, technology applications, computer programs, and software (expressly including, with respect to Lessor as Disclosing Party, all FleetWeb information and its tools), including, proprietary computer-based design, operational or consulting tools, screen shots, reports resulting therefrom, hardware/software licenses, computer source code, algorithms, and modules (with respect to any of the foregoing, whether owned or licensed. "**Confidential Information**" does not include any information which: (i) the Receiving Party rightfully knew before the Disclosing Party disclosed it to the Receiving Party; (ii) is or becomes generally available to the public through no wrongful act of the Receiving Party; (iii) the Receiving Party develops independently and without the use of any Confidential Information of the Disclosing Party, or (iv) the Receiving Party rightfully obtains from a third party who has the right to disclose it to the Receiving Party. The Receiving Party may disclose Confidential Information on a confidential basis to agents, representatives, subcontractors, investors, lenders, rating agencies, and actual or prospective assignees. Upon termination of this Agreement, Lessor may retain one archival copy of Lessee's Confidential Information on a strictly confidential basis for audit purposes (and the terms of this Section will survive termination of this Agreement with respect to such retained Confidential Information). Notwithstanding anything to the contrary set forth herein, the Receiving Party will have a right to comply with any court order, subpoena, or requirement of law in disclosing any Confidential Information. Breach of this Section may cause irreparable harm and the injured party will be entitled to injunctive relief for unauthorized disclosures.

20. **MISCELLANEOUS PROVISIONS.**

(a)  Any notice which may be required to be given hereunder shall be in writing and delivered personally, sent by registered or certified mail, return receipt requested, postage prepaid, or sent by overnight delivery by a nationally recognized air courier, such as, but not limited to Federal Express or UPS, or, in the case of notices sent by Lessor, sent by email or regular mail, postage prepaid, in any case, addressed to the parties at the respective addresses as set forth in the preamble to this Agreement (or a subsequent address for which either party shall have given written notice to the other thereof). Notices mailed by registered, certified or regular mail shall be effective three (3) business days after the date of mailing; notices sent by nationally recognized air courier shall be effective upon confirmed receipt. Email notices shall be effective when sent to any email address provided by a duly authorized representative of Lessee (with no automated out of office return).

(b)

CONFIDENTIAL SAMPLE – SUBJECT TO CREDIT AND PRICING APPROVALS

(c)  This Agreement shall be construed and interpreted in accordance with the internal laws of the State of Illinois (without regard to conflict of law principles). Lessee consents to the jurisdiction of the state and federal courts in Cook County, Illinois, over any dispute which may arise between the parties hereto. Both parties waive any and all right to any trial by jury in any such action.

(d)  This Agreement shall be binding upon and inure to the benefit of the parties, their respective successors and assigns and upon all affiliates of Lessee, if any, which may use any Vehicle leased hereunder. No use by an affiliate of Lessee shall constitute a sublease or assignment to such affiliate. Each signatory as "Lessee" hereto and each such affiliate that may use a Vehicle shall be jointly and severally liable for all payment and performance obligations hereunder, and Lessee hereby guarantees performance by such affiliates until such time as all payments owed hereunder have been paid in full. Use of the Vehicles by such affiliate shall evidence acceptance of this subsection (d) without further action. This provision shall survive the termination of this Agreement.

(e)  In the event that any petition in bankruptcy under any state or federal law is filed by or against Lessee ("**Lessee Bankruptcy**"), Lessee will be obligated and shall pay to Lessor all costs and expenses, including reasonable attorneys' fees and costs, incurred by Lessor in connection with such Lessee Bankruptcy to enforce this Agreement, collect amounts owed under this Agreement, protect the rights of Lessor under this Agreement, including the rights regarding assumption or rejection of this Agreement, and/or protect the interests of Lessor in connection with such Lessee Bankruptcy.

(f)  The headings set forth in this Agreement are inserted for convenience of reference only and shall not be deemed to constitute part of the Agreement. This Agreement may be signed in any number of counterparts, each constituting a duplicate original. A facsimile or photocopy of a fully executed version of this Agreement shall have the same force and effect as an original. The parties agree that this Agreement may be electronically signed. The parties agree that electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability and admissibility.

(g)  In addition to those express provisions of this Agreement, any provision of or obligation under this Agreement, which contemplates performance or observance subsequent to any termination or expiration of this Agreement, shall survive any such termination or expiration, and shall continue in full force and effect. In addition, all provisions of this Agreement shall survive the termination or expiration of this Agreement to the fullest extent necessary to give the parties the full benefit of the bargain expressed herein and of the intent contemplated hereunder.

(h)  Upon request of Lessee, Lessor or its affiliate will: (i) use its best efforts to arrange transportation, storage, and other incidental services for Vehicles (each such service a "**Transportation Service**") by a third party transportation or storage specialist (the "**Transportation Vendor**"); and/or (ii) provide financing for, and payment services to any applicable Transportation Vendor in connection with, any Transportation Service arranged by Lessee. Lessee will provide information (including, but not limited to, VIN number, starting and ending location of vehicle and driver information) and/or execute all documentation reasonably requested by the applicable Transportation Vendor, Lessor, or the applicable affiliate of Lessor with respect to each Transportation Service. Lessee will pay Lessor the charges and expenses assessed by any applicable Transportation Vendor and a reasonable administrative fee.

IN WITNESS WHEREOF, the parties have executed this Agreement through their duly authorized representatives as of the Effective Date.

LESSOR:                                         LESSEE:

DONLEN TRUST
BY: Donlen LLC, as Servicer

By: _____            By: _____

Name: _____            Name: _____

Title: _____          Title: _____

Date: _____           Date: _____

# EXHIBIT E

997 F.3d 677
United States Court of Appeals, Sixth Circuit.

IN RE: AUTOMOTIVE PARTS ANTITRUST
LITIGATION and In re: Anti-Vibrational
Rubber Parts Cases, End-Payor Actions.
Direct Purchaser Plaintiffs,
Interested Parties-Appellees,
v.
Yamashita Rubber Company, Ltd.; YUSA
Corporation; DTR Industries, Inc.; Bridgestone
Corporation; Bridgestone APM Company; Toyo Tire
& Rubber Company, Ltd.; Toyo Tire North America
OE Sales LLC; Toyo Automotive Parts (USA),
Inc., Sumitomo Riko Company Limited, fna Tokai
Rubber Industries, Ltd., Defendants-Appellants.

No. 20-1599
|
Argued: March 11, 2021
|
Decided and Filed: May 14, 2021

**Synopsis**
**Background:** Purported direct purchasers of automotive anti-
vibration rubber parts brought putative antitrust class action
against manufacturers. The United States District Court for
the Eastern District of Michigan, Marianne O. Battani, Senior
District Judge, denied manufacturers' motion to enforce
prior settlement agreement against purchasers. Manufacturers
appealed.

**[Holding:]** The Court of Appeals, Bush, Circuit Judge, held
that settlement agreement in prior class action barred this
action.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Enforce
Settlement.

West Headnotes (17)

**[1]    Antitrust and Trade Regulation** 🔑 **Indirect
purchasers**

Under federal antitrust law, private plaintiff
generally must be direct purchaser to have
suffered injury and thus have standing to sue
manufacturer or supplier.

**[2]    Antitrust and Trade Regulation** 🔑 **Indirect
purchasers**

An indirect purchaser might have standing to sue
a manufacturer or supplier under federal antitrust
law if it purchased from an intermediary that was
owned or controlled by the ultimate seller.

**[3]    Federal Courts** 🔑 **Compromise and
Settlement**

The Court of Appeals reviews a district court's
denial of a motion to enforce a settlement
agreement for an abuse of discretion.

**[4]    Federal Courts** 🔑 **Abuse of discretion in
general**

A district court abuses its discretion when it
applies the incorrect legal standard, misapplies
the correct legal standard, or relies upon clearly
erroneous findings of fact.

**[5]    Federal Courts** 🔑 **Compromise and
Settlement**

Where the issue involves the interpretation of
a settlement agreement, the Court of Appeals'
review of the district court's determination is de
novo.

**[6]    Federal Courts** 🔑 **Contracts**

If contractual language is unclear or susceptible
to multiple meanings, interpretation becomes a

question of fact subject to appellate review for clear error.

**[7]** **Compromise, Settlement, and Release** 🔑 Contractual Nature and Requisites in General

A settlement agreement is a contract governed by principles of state contract law.

**[8]** **Contracts** 🔑 Intention of Parties

Under Michigan law, the primary goal of contract interpretation is to honor the intent of the parties.

**[9]** **Contracts** 🔑 Construction as a whole

Under Michigan law, a court interpreting a contract must read the contract as a whole.

**[10]** **Contracts** 🔑 Language of Instrument

Under Michigan law, if contractual language is clear and unambiguous, terms are to be taken and understood in their plain, ordinary, and popular sense.

**[11]** **Contracts** 🔑 Intention of Parties

Under Michigan law, a court interpreting a contract is governed by what the parties said and did, and not merely by their unexpressed subjective intent.

**[12]** **Compromise, Settlement, and Release** 🔑 Persons Affected

Under Michigan law, settlement agreement in prior class action antitrust suit, which released all past and future claims of settlement class consisting of all indirect purchasers of automotive anti-vibration rubber parts manufactured by or sold by manufacturers or any current or former subsidiary of the manufacturers, applied to bar purported "direct purchasers" of automotive anti-vibration rubber parts from bringing anti-trust suit against

manufacturers, where purchasers conceded that they did not purchase parts immediately from manufacturers or subsidiaries, and that their purchases were two or more steps removed from the alleged anti-trust violators.

**[13]** **Contracts** 🔑 Language of Instrument

Under Michigan law, a court interpreting a contract can look to dictionary definitions to find the plain and ordinary meaning of terms and phrases that are not defined in the contract.

**[14]** **Antitrust and Trade Regulation** 🔑 Indirect purchasers

For purposes of federal antitrust law, "direct purchasers" are those who buy immediately from alleged antitrust violators, and "indirect purchasers" are those who are two or more steps removed from the violator in distribution chain.

**[15]** **Antitrust and Trade Regulation** 🔑 Indirect purchasers

The ownership-or-control exception to the general rule that only direct purchasers have standing to sue manufacturer or supplier for federal antitrust violations permits courts to treat indirect purchasers from intermediary that is owned or controlled by manufacturer or supplier as direct purchasers for standing purposes so that antitrust violators cannot simply integrate vertically to escape federal antitrust liability.

**[16]** **Evidence** 🔑 Showing Intent of Parties as to Subject-Matter

Under Michigan law, courts are prohibited from considering extrinsic evidence to determine the parties' intent when the contract language is clear and unambiguous.

**[17]** **Contracts** 🔑 Application to Contracts in General

Under Michigan law, where the language in the contract is clear and unambiguous, a court interpreting it looks only within the four corners of the relevant contract to accomplish that task.

**\*678** Appeal from the United States District Court for the Eastern District of Michigan at Detroit. Nos. 2:12-md-02311; 2:13-cv-00803—Marianne O. Battani, District Judge.

**Attorneys and Law Firms**

ARGUED: Zachary D. Tripp, WEIL, GOTSHAL & MANGES LLP, Washington, D.C., for Appellants. David H. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellees. ON BRIEF: Zachary D. Tripp, WEIL, GOTSHAL & MANGES LLP, Washington, D.C., Adam C. Hemlock, David Yolkut, WEIL, GOTSHAL & MANGES LLP, New York, New York, Frederick R. Juckniess, JUCKNIESS LAW FIRM PLC, Ann Arbor, Michigan, Matthew J. Turchyn, HERTZ SCHRAM PC, Bloomfield Hills, Michigan, Robert N. Hochman, SIDLEY AUSTIN LLP, Chicago, Illinois, Joanne G. Swanson, KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, J. Clayton Everett, Jr., MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., Larry J. Saylor, MILLER, CANFIELD, PADDOCK & STONE P.L.C., Detroit, Michigan, for Appellants. David H. Fink, Nathan J. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellees.

Before: BATCHELDER, GRIFFIN, and BUSH, Circuit Judges.

## OPINION

JOHN K. BUSH, Circuit Judge.

**\*\*1 \*679** [1] [2] Under federal antitrust law, a private plaintiff generally must be a "direct purchaser" to have suffered injury and thus have standing to sue a manufacturer or supplier. In *Illinois Brick Co. v. Illinois*, however, the Supreme Court recognized an exception to the direct-purchaser rule, holding that an "indirect purchaser" might have standing to sue if it purchased from an intermediary that was "owned or controlled" by the ultimate seller. 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The present dispute raises the question whether *Illinois Brick* has any effect on the interpretation of certain antitrust class-action settlement agreements under Michigan law.

Specifically, we consider *Illinois Brick* to address whether Plaintiffs, who purchased automotive anti-vibration rubber parts, are barred from maintaining a purported direct-purchaser class-action lawsuit against the manufacturers and sellers of those parts. Defendants argue that Plaintiffs settled all their claims as part of a class composed of certain "persons and entities" that "indirectly purchased" anti-vibration rubber parts. Plaintiffs argue that, in accordance with *Illinois Brick*, they are not part of the settlement class because they purchased "directly" from subsidiaries of a manufacturer.

As explained below, regardless of whether *Illinois Brick* applies to Plaintiffs' underlying claims, Plaintiffs fit within the class definition because they "indirectly purchased" parts under the plain meaning of the settlement agreements. Their suit is therefore barred by those agreements. We reverse the district court's contrary holding.

### I.

This appeal is part of the litigation that arose from the manufacture and sale of automotive anti-vibration rubber parts. Those parts are used, as their name suggests, to absorb and reduce vibration transmission in various sections of a vehicle. In 2013, a putative class of anti-vibration rubber part purchasers, referred to as end-payor purchasers, sued several manufacturers and suppliers, alleging that they conspired to fix prices of anti-vibration **\*680** rubber parts. [1] The end payors brought claims under the Clayton Act, 15 U.S.C. § 26, for violations of the Sherman Act, 15 U.S.C. § 1 *et seq*. They also sued under certain state antitrust laws.

The end-payor litigation settled in 2016 and 2017, after the district court certified a nationwide settlement class comprising persons and entities who indirectly purchased anti-vibration rubber parts that were manufactured or sold by the defendant manufacturers and suppliers. Notably, the settlement class excludes persons or entities who purchased parts directly or for resale. In total, the defendants agreed to pay $80.4 million to the settlement class. In exchange for that sum, the class members "completely released, acquitted, and forever discharged ... any and all claims" against the defendants arising out of or relating to the conduct alleged

in the complaint. The agreements bind all settlement class members except those who timely opted out. Finally, the agreements contain a list of exclusions from the releases, including for all direct purchasers and specific indirect purchasers.

**\*\*2** Before the district court entered final judgments approving the settlement agreements in the end-payor lawsuit, Jerry Anderson, Laura LaRue, and Christopher Lee filed a separate putative class action against the same manufacturers and suppliers defending the end-payor litigation, in the same court, in front of the same judge.[2] As Plaintiffs in that new lawsuit, they seek money damages under the Clayton Act on behalf of a putative class of all "direct purchasers" of anti-vibration rubber parts.

Specifically, Plaintiffs allege that they purchased parts "from an entity of which one of the Defendants is the ultimate parent." Of note, the entity that Plaintiffs allegedly purchased parts from is not a defendant in their direct-purchaser lawsuit or the end-payor lawsuit. They purchased anti-vibration rubber parts from a Firestone repair shop (Bridgestone Retail Operations, dba Firestone Complete Auto Care), which is owned by Bridgestone Americas, a subsidiary of one of the defendants in both lawsuits, Bridgestone Corporation. The trial record also reflects that Plaintiffs purchased from a couple of other retail shops, "Tires Plus" and "Wheel Works," which too are allegedly "part of the Bridgestone ... family." Like the end-payor class, Plaintiffs claim that Defendants conspired to raise prices for anti-vibration rubber parts and passed down the increased costs to their putative class of direct purchasers.

Soon after Plaintiffs filed the direct-purchaser lawsuit, the district court entered final judgments approving the settlement agreements in the end-payor lawsuit. In doing so, the court enjoined all settlement class members from "commencing, prosecuting, or continuing ... any and all claims" arising out of or relating to the released claims.

About a year later, after Plaintiffs filed their first discovery request in the direct-purchaser lawsuit, Defendants filed a motion to enforce the judgments from the **\*681** end-payor lawsuit against Plaintiffs. They asked the district court to enjoin Plaintiffs from litigating their claims in the direct-purchaser lawsuit because the settlement agreements in the end-payor lawsuits prohibited Plaintiffs, as indirect purchasers, from maintaining their federal antitrust claims against Defendants. The district court denied the motion

because, in its view, Plaintiffs were properly considered direct purchasers under the ownership-or-control exception to the standing rule of *Illinois Brick*. It also reasoned that Defendants' litigation tactics and other post-settlement actions tipped the scales of justice in Plaintiffs' favor. Defendants appeal.

## II.

**[3]  [4]  [5]  [6]** We review a district court's denial of a motion to enforce a settlement agreement for an abuse of discretion. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 419 (6th Cir. 2000). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *United States v. Fowler*, 819 F.3d 298, 303 (6th Cir. 2016) (quoting *United States v. Bridgewater*, 606 F.3d 258, 260 (6th Cir. 2010)). Where, as here, the issue involves the interpretation of a settlement agreement, our review is de novo. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). But if contractual language is "unclear or susceptible to multiple meanings, interpretation becomes a question of fact" subject to review for clear error. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016) (quoting *Port Huron Educ. Assn. v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 550 N.W.2d 228, 237 (1996)).

## III.

### A. THE SETTLEMENT AGREEMENTS

**\*\*3  [7]** The only issue on appeal is whether the settlement agreements bar Plaintiffs from maintaining their direct-purchaser lawsuit. A settlement agreement is a contract governed by principles of state contract law, here Michigan law. *See Converge, Inc. v. Topy Am., Inc.*, 316 F. App'x 401, 404–05 (6th Cir. 2009); *Kloian v. Domino's Pizza L.L.C.*, 273 Mich. App. 449, 452, 733 N.W.2d 766 (2006). So this case simply requires us to apply that law to interpret the parties' contracts.

**[8]  [9]  [10]  [11]** Under Michigan law, "[t]he primary goal of contract interpretation is to honor the intent of the parties." *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63,

620 N.W.2d 663 (2000). To achieve that goal, we must read the contract as a whole. *Id.* If the contractual language is "clear and unambiguous, the terms are to be taken and understood in their plain, ordinary, and popular sense." *Michigan Mut. Ins. Co. v. Dowell,* 204 Mich. App. 81, 87, 514 N.W.2d 185 (1994). We "are governed by what the parties said and did, and not merely by their unexpressed subjective intent." *Fletcher v. Bd. of Educ. of Sch. Dist. Fractional No. 5,* 323 Mich. 343, 348, 35 N.W.2d 177 (1948).

 **[12]**   Read in light of those rules, the settlement agreements clearly and unambiguously bar Plaintiffs from maintaining their direct-purchaser lawsuit. The district court's contrary legal determination was incorrect and thus an abuse of discretion.

First, we consider the relevant contractual language.[3] The agreements release all  **\*682**  the past and future claims of the settlement class. The settlement class includes:

> All persons and entities that, from March 1, 1996 through the Execution Date, purchased or leased a new Vehicle in the United States not for resale, which included one or more Anti-Vibration Rubber Part(s) as a component part, or indirectly purchased one or more Anti-Vibration Rubber Part(s) as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

That definition excludes those persons and entities that purchased anti-vibration rubber parts "directly or for resale." If Plaintiffs are indirect purchasers who did not timely elect to be excluded from the settlement class, the settlement agreements bar their direct-purchaser lawsuit.[4] But, if they are direct purchasers, the settlement agreements cannot stand in their way.

 **[13]**   The settlement agreements do not define "indirectly purchased" or "directly purchased," or any variation of those phrases. Those omissions, however, do not make the agreements ambiguous. *See* *McGrath v. Allstate Ins.*

*Co.,* 290 Mich. App. 434, 439, 802 N.W.2d 619 (2010) ("A[ ] ... contract is not ambiguous merely because a term is not defined in the contract."). We can look to the plain and ordinary meaning of those terms and phrases as described in dictionary definitions. *Id.* "Direct" means "[s]traightforward, uninterrupted, immediate"; "[e]ffected or existing without intermediation or intervening agency; immediate." *Direct*, Oxford English Dictionary (2d ed. 1989); *see also Direct*, Webster's Third New International Dictionary (1986) ("immediate"; "stemming immediately from a source"; without an "intervening agency, instrumentality, [ ] influence ... or intervening step"; "without use of a broker or other middleman."). And "indirect" is just the opposite; it means "[n]ot direct." *Indirect*, Oxford English Dictionary (2d ed. 1989).

 **\*\*4**   Plaintiffs alleged that they purchased anti-vibration rubber parts from Bridgestone Retail Operations, LLC, (dba Firestone) and the other retailers noted, which purchased the parts from Bridgestone Americas, Inc., which in turn purchased them from the Bridgestone Corporation—one of the defendants and alleged antitrust violators in both the end-payor and direct-purchaser lawsuits. Plaintiffs' purchasing arrangement was not "[s]traightforward, uninterrupted," or "immediate." And it certainly was not "without intermediation," an "intervening step" or a "middleman." By definition then, it was not direct. It was indirect.

 **[14]**   To the extent "indirectly" or "directly purchased" are used in the settlement agreements as "legal phrase[s] or term[s] of art," Michigan law instructs us to further consider "case law explanation[s] that those familiar with such terms of art are held to understand." *Henderson v. State Farm Fire and Cas. Co.,* 460 Mich. 348, 357 n.9, 596 N.W.2d 190 (1999). Examination of the relevant antitrust case-law explanations of the terms "indirectly" and "directly purchased" (or "indirect" and "direct purchaser") confirms the plain meaning of the agreements. The Supreme Court has "consistently stated" that, for purposes of federal antitrust law, direct purchasers are those who buy "immediately from the alleged antitrust violators," and indirect purchasers are those "who are two or  **\*683**  more steps removed from the violator in a distribution chain[.]" *Apple Inc. v. Pepper,* ––– U.S. ––––, 139 S. Ct. 1514, 1520, 203 L.Ed.2d 802 (2019) (quoting *Kansas v. UtiliCorp United Inc.,* 497 U.S. 199, 207, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990)). Here, Plaintiffs concede that they did not purchase "immediately" from Defendant Bridgestone Corporation, or any of the other Defendants.

They acknowledge that their purchases were "two or more steps removed" from the alleged violator. *Id.* Plaintiffs are thus indirect purchasers. Accordingly, they fall within the settlement class defined above and are barred by the settlement agreements from maintaining their federal antitrust claims as the named Plaintiffs in the direct-purchaser lawsuit.

B. *ILLINOIS BRICK* & THE OWNERSHIP-OR-CONTROL EXCEPTION

To circumvent the plain meaning, Plaintiffs argue that, as a matter of law, we should treat them as direct purchasers under the ownership-or-control exception to the antitrust-standing rule of *Illinois Brick Co. v. Illinois.* We find their theory unpersuasive.

[15] *Illinois Brick* recognized the general rule that a plaintiff has no standing under federal antitrust law to sue an alleged antitrust violator if the plaintiff did not directly purchase the overcharged product from the alleged violator. *431 U.S. at 729–30, 97 S.Ct. 2061.* But it hinted that that standing rule might not apply if plaintiffs bought from a direct purchaser that was "owned or controlled" by the alleged antitrust violator. *Id.* at 736 n.16, 97 S.Ct. 2061. That hint has since turned into an exception allowing an indirect purchaser to bring a federal antitrust suit when, for example, an alleged antitrust violator owns or controls its direct purchaser. *See Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.,* 628 F.2d 971, 975 (6th Cir. 1980); *see also, e.g.,* Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 424 F.3d 363, 371 (3d Cir. 2005). In practice, the ownership-or-control exception permits courts to treat indirect purchasers as direct purchasers for standing purposes so that antitrust violators cannot simply integrate vertically to escape federal antitrust liability.

As highlighted above, Plaintiffs allege that at least some of Defendants are vertically integrated such that they own their direct purchasers. Accordingly, the argument goes, Plaintiffs are the only purchasers that Defendants do not own, and so, under the "ownership" prong of the ownership-or-control exception, they can proceed against Defendants as its direct purchasers. Defendants assert that Plaintiffs' argument is irrelevant to our interpretation of the settlement agreement.

**5 We agree with Defendants. Whether Plaintiffs can maintain their direct-purchaser lawsuit under the ownership-

or-control exception of *Illinois Brick* is a question of antitrust standing. *See Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602, 613–14 (6th Cir. 2004). It is not a question that bears on our interpretation of the settlement agreements. That Plaintiffs might be considered to have standing under *Illinois Brick* does not alter the reality that they indirectly purchased anti-vibration rubber parts from Defendant Bridgestone Corporation. [5] *See, e.g.,* *684 Jewish Hosp.,* 628 F.2d at 975; *Howard,* 424 F.3d at 371. The ownership-or-control exception mentioned in *Illinois Brick* is ultimately a pragmatic carveout to a federal antitrust standing rule, not a redefinition of indirect purchaser.

By nevertheless claiming that the exception applies to them, Plaintiffs concede that they are in fact indirect purchasers. How so? Well, because the ownership-or-control exception applies *only* to indirect purchasers. *See Jewish Hosp.,* 628 F.2d at 975. If Plaintiffs had directly purchased anti-vibration rubber parts from Defendants, they would have no reason to rely on the exception; the settlement agreements would expressly permit their new lawsuit.

What's more, the settlement agreements include eight express exclusions from the class-wide releases, none of which references this ownership-or-control exception. The exclusions allow only certain indirect purchasers to bring federal antitrust claims against Defendants. *See Bridgestone Settlement Agreement,* R. 265-2 at PageID 9859–60 (permitting claims asserted by "automobile dealerships" and "equipment dealerships," that are "indirect purchasers of Anti-Vibration Rubber Parts," or claims asserted by "any state, state agency, or instrumentality or political sub-division of a state"). The exclusions also permit any "claims for damages under the state or local laws of any jurisdiction other than an Indirect Purchaser State." [6] *Id.* at PageID 9860. That means that persons or entities who indirectly purchased anti-vibration rubber parts can sue Defendants under state antitrust laws in states, like Michigan, that do not follow the special standing rule of *Illinois Brick. See* Mich. Comp. Laws Ann. § 445.778. Thus, it seems that the settlement agreements explicitly mention how Plaintiffs might sue the manufacturers in the future—namely, under certain state antitrust laws. The failure of the agreements to provide in their exclusions a means by which Plaintiffs, as indirect purchasers, might sue under federal antitrust law (*e.g.,* through the ownership-or-

control exception) strongly suggests that Plaintiffs cannot maintain their federal claims.

### C. "OTHER FACTORS"

**\*6** Two final matters bear mentioning before we conclude. First, the district court mentioned in its order that a number of "other factors" tipped the scale in Plaintiffs' favor. Those factors included its observations that (1) Defendants' counsel did not file a notice in the direct-purchaser lawsuit that it had settled Plaintiffs' claims in the end-payor settlement agreements, (2) Defendants' counsel also did not notify Plaintiffs of its motion to enforce judgment, and finally, (3) Plaintiffs' claims would not be duplicative of the end-payor claims because the end payors sought injunctive relief against Defendants whereas Plaintiffs now seek money damages.

[16] None of those factors has anything to do with the language in the settlement agreements. Under Michigan law, courts are prohibited from considering extrinsic evidence to determine the parties' intent when the contract language is clear **\*685** and unambiguous. *See Kyocera Corp. v Hemlock Semiconductor*, *LLC*, 313 Mich. App. 437, 446, 886 N.W.2d 445 (2015). The district court did not purport to find ambiguity in the agreements. We do not find ambiguity either. Therefore, the district court's consideration of post-

contracting, external evidence of the parties' intent was an abuse of discretion.

[17] Second, the manufacturers raise a number of policy considerations in their briefing on appeal. We decide this case without reference to those considerations. This is a contract case that requires us to interpret a set of terms. Where, as here, the language in the contracts is clear and unambiguous, we look only within the four corners of the relevant contracts to accomplish our task. *See, e.g.*, *Old Kent Bank*, 243 Mich. App. at 63, 620 N.W.2d 663.

### IV.

Having evaluated the terms of the settlement agreements, we hold that they unambiguously bar Plaintiffs from maintaining their alleged direct-purchaser lawsuit. The district court abused its discretion in holding otherwise. We therefore reverse the district court and remand for further proceedings consistent with this opinion.

### All Citations

997 F.3d 677, 2021 WL 1940427, 2021-1 Trade Cases P 81,653

---

## Footnotes

1   Those manufacturers and suppliers include Bridgestone Corporation, Bridgestone APM Company, Yamashita Rubber Co., YUSA Corporation, Tokai Rubber Industries, DTR Industries, Toyo Tire & Rubber Co., Toyo Tire North American OE Sales, and Toyo Automotive Parts (USA) and "unnamed co-conspirators."

2   Judge Marianne O. Battani of the Eastern District of Michigan oversaw the *In re: Automotive Parts Antitrust Litigation* MDL for about eight years. In June of 2020, she removed herself from the MDL for health reasons. Judge Sean F. Cox, of the same district, is now presiding over the MDL.

3   Because each manufacturer settled with the class separately, there are several settlement agreements. The relevant language is identical in all the agreements, so our analysis applies to all Defendants.

4   Plaintiffs concede that they did not timely opt out of the settlement class, and they do not contend that Defendants provided them insufficient notice of the settlement agreement, or of their ability to opt out of the class.

5   In resolving this appeal, we do not decide whether Plaintiffs are appropriately considered direct purchasers for purposes of antitrust standing. Just a year ago, after the district court denied Defendants' motion to dismiss the direct-purchaser lawsuit, we held, on review of a petition to appeal under 28 U.S.C. § 1292(b), that the facts were not sufficiently "fleshed out" to decide whether Plaintiffs had antitrust standing under the ownership-or-control exception. *In re: Auto parts Antitrust Litig, et al.*, Dkt. No. 19–106, Doc. No. 13 at 2. No additional discovery has been conducted in the interim to alter that holding.

In re Automotive Parts Antitrust Litigation, 997 F.3d 677 (2021)

2021 WL 1940427, 2021-1 Trade Cases P 81,653

6    After Illinois Brick was decided, several states passed statutes rejecting the logic of the special standing rule in Illinois Brick. Those states that amended their antitrust laws to specifically allow indirect purchasers to bring suit are often called "Repealer States"; the states that did not amend their laws after Illinois Brick are referred to as "Indirect Purchaser States."

---

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   8