# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>Deborah S. Hunt<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed: May 12, 2022

Mr. Chanler A. Langham
Susman Godfrey
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Mr. Aaron Martin Panner
Kellogg, Hansen, Todd, Figel & Frederick
1615 M Street, N.W.
Suite 400
Washington, DC 20036

Mr. Marc M. Seltzer
Susman Godfrey
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

Re: Case No. 20-2260, *In re: Auto Parts Antitrust Litig*
    Originating Case No. : 2:12-md-02311

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION,
End-Payor Actions.

_____

END-PAYOR PLAINTIFFS,

                                 *Plaintiffs-Appellees,*

    *v.*

FINANCIAL RECOVERY SERVICES, LLC,

                    *Proposed Intervenor-Appellant.*

No. 20-2260

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:12-md-02311—Sean F. Cox, District Judge.

Argued:  April 27, 2022

Decided and Filed:  May 12, 2022

Before:  SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Aaron M. Panner, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Appellant.  Chanler A. Langham, SUSMAN GODFREY L.L.P., Houston, Texas, for Appellees.  **ON BRIEF:**  Aaron M. Panner, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Appellant.  Chanler A. Langham, SUSMAN GODFREY L.L.P., Houston, Texas, Marc M. Seltzer, SUSMAN GODFREY L.L.P., Los Angeles, California, for Appellees.

———————————

### OPINION

———————————

KAREN NELSON MOORE, Circuit Judge.   More than a year and a half after final approval of third-round settlements in a billion-dollar multidistrict litigation, Financial Recovery Services, LLC (FRS), a company that manages and files claims on behalf of its insurer clients, moved to intervene.   The district court denied FRS's motion, finding FRS's intervention untimely.   Because the district court did not abuse its discretion, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

The parties dispute FRS's claims to a subset of class-action settlement recoveries in the *Automotive Parts Antitrust* multi-district litigation.   In those actions, a subset of consumers and businesses known as the End-Payor Plaintiffs (Appellees in this case), alleged that defendant automotive-part manufacturers fixed prices in violation of antitrust laws.   *See, e.g.*, R. 229 (No. 2:12-cv-00403) (Third Am. Compl. ¶ 1, 210–21) (Page ID #8250–51, 8304–06).   End-Payor Plaintiffs alleged that they paid elevated prices for defendants' parts or purchased or leased vehicles containing defendants' parts.   *Id.* ¶ 3–4 (Page ID #8251–52).

After eight years of motion practice, negotiations, approval hearings, and objections, the district court granted final approval to settlements between End-Payor Plaintiffs and defendants in four rounds, on June 20, 2016, September 25, 2017, November 8, 2019, and September 17, 2020.   *In re Auto. Parts Antitrust Litig.*, No. 12-MD-2311, 2020 WL 6737545, at \*1, 3 (E.D. Mich. Nov. 17, 2020).   The settlement agreements, as well as the class notices and plans of allocation for each settlement agreement, defined the classes of plaintiffs to include consumers and businesses that bought or leased certain qualifying vehicles or paid to replace certain qualifying vehicle parts during designated time periods.   *See, e.g.*, R. 2027-23[1] (Round 3 Settlement Class Notice at 9) (Page ID #37485); R. 112-1 (No. 2:16-cv-03703)

———————————

[1]Unless indicated otherwise, record cites in this opinion refer to the *Automotive Parts* multi-district litigation docket, Case No. 2:12-md-02311.

(Exhaust Systems Settlement Agreement ¶ 13, 15) (Page ID #3819). The class definitions did not include insurers, assignees, or subrogees.

     In May 2018, FRS, a third-party company that manages and files claims for its clients, began to submit claims on behalf of eight insurers. R. 2060-3 (12/13/2019 Letter from FRS to Judge Battani at 1) (Page ID #37734); R. 2060-2 (Leibell Decl. ¶ 9) (Page ID #37728–29). These insurers sought to recover portions of the settlement based on two theories. First, and only marginally relevant to this appeal, FRS submitted claims on behalf of insurers that purchased or leased eligible vehicles for company use (what the parties call "Fleet Vehicles"). R. 2060-2 (Leibell Decl. ¶ 9) (Page ID #37728–29). Second, FRS submitted claims that are at issue in this appeal based on what it perceived as its clients' subrogation rights to class members' claims. *Id.* ¶ 10–11) (Page ID #37729); R. 2060-3 (12/13/2019 Letter from FRS to Judge Battani at 1–2) (Page ID #37734–35). Under the common-law theory of equitable subrogation, an insurer who compensated its insureds for injuries that another party inflicted may assume the right of the insureds to sue the party that caused the injury. *Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*, 493 F.3d 752, 756 (6th Cir. 2007). FRS alleges that the insurance companies that FRS represents paid insured class members for vehicles that were deemed a "total loss" due to theft or damage. R. 2060-3 (12/13/2019 Letter from FRS to Judge Battani at 1–2, 4–7) (Page ID #37734–35, 37737–40). The insurers allegedly paid an inflated market value for these vehicles when the cost of repairing them exceeded the value of these so-called "Total Loss Vehicles." As a result, FRS argues, the insurers are equitably subrogated to their insureds' claims against defendants. *Id.*

     Under the settlement plan of allocation, each claimant was required to submit information about the vehicle that the claimant purchased or leased, the date the claimant purchased the vehicle, and the residence of the claimant. *See, e.g.*, R. 2005-2 (Plan of Allocation at 2) (Page ID #36629). Because FRS represented eight insurance companies with many clients, retrieving and submitting all the information needed to support these claims would expend much time and resources. R. 2060-5 (11/14/2018 Email from FRS to End-Payor Plaintiffs) (Page ID #37777); R. 2114-2 (Third Leibell Decl. ¶ 11) (Page ID #38342–43). Thus, when FRS submitted these Total Loss Vehicle claims to the claims administrator between May 2018 and March 2020, it did not provide any of this supporting information with the claims. R. 2060-2 (Leibell Decl. ¶ 9–10)

(Page ID #37728–29).  Instead, FRS submitted so-called "placeholder claims," hoping that the claims administrator would allow FRS to supplement those claims later.  *Id.* ¶ 10 (Page ID #37729).

Shortly after FRS began submitting claims, in August 2018, the district court issued a decision that, according to FRS, "invited . . . a claim based on subrogation" in the *Automotive Parts* litigation.  Reply Br. at 6–7 (citing *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799 (E.D. Mich. 2018)).  Two years earlier, the insurance company GEICO had opted out of the first round of End-Payor Plaintiff settlements and pursued individual claims against a subset of defendants.  *GEICO*, 345 F. Supp. 3d at 808.  GEICO pursued theories of recovery based on its own purchase of automotive parts in its own Fleet Vehicles and its reimbursement of insureds for the full value of total-loss vehicles, similar to the theories FRS now advances.  *Id.* at 809.  The defendants moved to dismiss, and the district court allowed GEICO to amend its complaint to include a claim based on equitable subrogation.  *Id.* at 830–34.  In granting GEICO leave to amend its complaint, however, the district court did not "determine the viability" of GEICO's "potential subrogation rights."  *Id.* at 830, 833.

A couple of months after the *GEICO* decision, in November 2018, FRS contacted End-Payor Plaintiffs' class counsel to discuss the most efficient way to supplement FRS's placeholder claims.  R. 2060-5 (11/14/2018 Email from FRS to End-Payor Plaintiffs) (Page ID #37777).  The following month, FRS discussed its subrogation claims with class counsel, and in January 2019, sent class counsel a research memorandum outlining the legal support for its theory.  R. 2060-6 (1/14/2019 Email from FRS to End-Payor Plaintiffs) (Page ID #37779).

During a later January 2019 phone call between the parties, End-Payor Plaintiffs "disagreed with FRS that the Insurers may recover from the End-Payor Settlements as subrogees."  R. 2060-2 (Leibell Decl. ¶ 6) (Page ID #37727–28).  FRS inquired about potential ways to raise this issue with the district court should the disagreement continue.  *Id.*  End-Payor Plaintiffs responded that "the [i]nsurers should file claims, wait for them to be rejected, and then appeal that rejection to the [district court]."  *Id.*  FRS protested that submitting claims for "many thousands" of vehicles would be impractical.  *Id.*  The parties agreed to revisit the matter later. *Id.*

FRS did not contact End-Payor Plaintiffs again until October 17, 2019, nine months later. R. 2060-7 (10/17/2019 Email from FRS to End-Payor Plaintiffs) (Page ID #37818). The district court in August 2019 had set a December 31, 2019 deadline to file claims. R. 291 (No. 2:12-cv-00403) (8/2/2019 Order ¶ 16) (Page ID #10401). With the claims-filing deadline "approaching," FRS again asked End-Payor Plaintiffs about their position on subrogation. R. 2060-7 (10/17/2019 Email from FRS to End-Payor Plaintiffs) (Page ID #37818–19). FRS provided counsel with a draft letter that it intended to file with the district court, seeking resolution of these issues. *Id.*

End-Payor Plaintiffs responded in a letter on November 2, 2019, rejecting FRS's claims to recovery based on a subrogation theory. R. 2060-8 (11/2/2019 Letter from End-Payor Plaintiffs to FRS at 1) (Page ID #37822). End-Payor Plaintiffs insisted that "there is no question that Auto Insurers are not class members and therefore have no rights as class members or as subrogees of class members." *Id.* Following a November 26, 2019 call, the parties agreed to a briefing schedule before the district court on the issue, "subject of course to the [district court]'s approval." R. 2060-9 (11/25–26/2019 Emails between FRS and End-Payor Plaintiffs) (Page ID #37901–02).

After this discussion, FRS did not formally enter an appearance in the case, let alone enter a stipulation and briefing schedule on the docket or move to intervene as a party. Instead, on December 13, 2019, FRS sent a letter to the district judge via FedEx, requesting a declaration that FRS may recover from the settlements under an equitable-subrogation theory. R. 2060-3 (12/13/2019 Letter from FRS to Judge Battani) (Page ID #37734). FRS did not electronically file the letter pursuant to local court rules, nor did it serve the letter on all the parties. Recognizing a week later that the district court had not docketed its letter, FRS contacted the district court's chambers. The district court's law clerk advised FRS that it "may need to intervene to perfect the submission of its motion and obtain the relief it sought." R. 2060-12 (Alarcon Decl. ¶ 3) (Page ID #37921–22). End-Payor Plaintiffs responded to the letter "out of an abundance of caution," filing their opposition electronically. R. 2034 (Resp. to FRS Letter Br. at 1 & n.1) (Page ID #37518). Although End-Payor Plaintiffs' response appeared on the docket, FRS's reply—which FRS again sent to the district judge via FedEx despite chambers' suggestion

to intervene—did not.  R. 2060-4 (1/3/2020 Reply Letter from FRS to Judge Battani) (Page ID #37768).

Meanwhile, on December 20, 2019, the district court had granted End-Payor Plaintiffs' request to extend the claims-filing deadline to March 16, 2020.  R. 2032 (12/20/2019 Order ¶ 12) (Page ID #37511).  One week before that deadline, on March 9, 2020, FRS sent a letter to the claims administrator, informing it of FRS's intent to supplement its claims with the appropriate vehicle data once the district court ruled on the subrogation issue.  R. 2060-10 (3/9/2020 Letter from FRS to Claims Administrator) (Page ID #37915–16).  FRS forwarded this letter to End-Payor Plaintiffs the next day.  R. 2060-10 (3/10/2020 Email from FRS to End-Payor Plaintiffs) (Page ID #37914).  End-Payor Plaintiffs did not respond to this request.  The district court did not rule on the briefing letter or approve FRS's plan to supplement its claims.

Around the same time, End-Payor Plaintiffs again requested an extension of the claims-filing deadline to June 18, 2020, and the district court granted their request.  R. 2044 (3/24/2020 Order) (Page ID #37658).  On the day of that already twice-postponed deadline—one and a half years after End-Payor Plaintiffs first informed FRS that they rejected FRS's subrogation theory—FRS moved to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a).  R. 2060 (Mot. to Intervene) (Page ID #37695).  FRS argued that it was intervening "solely to give effect" to its earlier "letter motion" asking for the district court to determine that FRS may assert its subrogation rights.  *Id.* at 2–3 (Page ID #37703–04).  End-Payor Plaintiffs opposed the motion, arguing both that the motion was untimely and that FRS lacked a cognizable interest in the action.  R. 2066 (Opp'n to Mot. to Intervene at 1–5) (Page ID #38036–41).

The district court denied the intervention motion as untimely.  *Auto. Parts*, 2020 WL 6737545, at *4.  Although the district court questioned in a footnote whether FRS claimed a valid interest to intervene by virtue of its subrogation right, the court declined to address any other intervention requirements except timeliness.  *Id.* at *2 & n.1.  FRS timely appealed.  After the parties briefed the issues, End-Payor Plaintiffs moved to strike references in FRS's briefs to facts that were not before the district court.

## II.  STANDARD OF REVIEW

A party seeking intervention as of right under Federal Rule of Civil Procedure 24(a)(2) must show that "1) the application [to intervene] was timely filed; 2) the applicant possesses a substantial legal interest in the case; 3) the applicant's ability to protect its interest will be impaired without intervention; and 4) the existing parties will not adequately represent the applicant's interest."  *Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011).   We review under the abuse-of-discretion standard a district court's denial of intervention as of right based on timeliness. *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999).  Only if we are convinced that the district court misapplied the law, relied on clearly erroneous factual findings, improperly applied the law to the facts, or made a clear error of judgment can we conclude that a district court abused its discretion.  *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 799 (6th Cir. 2018).

## III.  TIMELINESS OF INTERVENTION

We evaluate five factors in determining whether an intervention motion was timely:

1) the point to which the suit has progressed; 2) the purpose for which intervention is sought; 3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; 4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and 5) the existence of unusual circumstances militating against or in favor of intervention.

*Blount-Hill*, 636 F.3d at 284 (quoting *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990)).  In evaluating these factors, we view them "in the context of all relevant circumstances." *Id.* (quoting *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472–73 (6th Cir. 2000)).

### A.  Stage of Litigation

The first factor that we consider is the point to which the suit had progressed at the time of intervention.  The absolute duration of the litigation matters little to this inquiry; "the stage of the proceedings and the nature of the case" govern the analysis.  *United States v. City of Detroit*, 712 F.3d 925, 931 (6th Cir. 2013); *see also Stupak-Thrall*, 226 F.3d at 475.  Litigation is in its

final stages when the district court has already ruled on dispositive motions, *Salem Pointe Cap., LLC v. BEP Rarity Bay, LLC*, 854 F. App'x 688, 696 (6th Cir. 2021), closed discovery, *Stupak-Thrall*, 226 F.3d at 475, certified classes, *Clarke v. Baptist Mem'l Healthcare Corp.*, 427 F. App'x 431, 437 (6th Cir. 2011), or held fairness hearings that lead to settlement approval, *In re S. Ohio Corr. Facility*, 24 F. App'x 520, 532 (6th Cir. 2001).

All those benchmarks had long passed in this case when FRS moved to intervene. By any measure, FRS sought intervention at the final stage of the "litigation continuum." *See Stupak-Thrall*, 226 F.3d at 475. FRS did not intervene or otherwise participate during the class-certification process, settlement negotiations, and final-approval hearings in over forty-one coordinated cases. Instead, FRS waited to intervene until the final claims submission deadline—which had already been twice postponed—after the district court had approved the final version of the *third* round of settlement.

Recognizing that the case was nearing its final stages at the time of intervention, FRS asks us to zoom into the remedial stages of litigation. The parties here resolved the merits through settlement, but the remedial claims-administration process, FRS argues, was just beginning at the time it sought intervention. In FRS's view, its decision to intervene at the beginning, rather than the end, of the claims-processing stage thus tips the first factor in its favor.

In support, FRS cites *United States v. City of Detroit*, in which we indeed recognized that limited intervention may sometimes foster efficiency in a case's remedial stages. 712 F.3d at 932. In that case, a union sought to intervene in a lawsuit involving a consent decree between the City of Detroit and the Environmental Protection Agency after the district court entered an order that affected the union's contractual rights. *Id.* at 928–30. Because the union could participate in new matters without relitigating settled issues, we held that the district court should allow intervention for the limited purpose of "shaping future remedial efforts." *Id.* at 933. FRS argues that here, like in *City of Detroit*, "future progress remains" on the remedial front, and that it merely seeks to clarify its rights in those prospective remedial efforts. *Id.* at 931.

FRS's comparison fails for two reasons. First, the finish line of litigation remained out of sight in *City of Detroit*; in which we acknowledged that "despite significant progress, [the case]

cannot be expected to end any time soon." *Id.* The parties in this case face none of the moving targets that extend the remedial process in litigation implementing injunctive relief—namely organization, compliance, and human resources challenges. After the claims-administration process, there remains "very little" for the district court to do in this case. *See United States v. Tennessee*, 260 F.3d 587, 592 (6th Cir. 2001).

Second, unlike in *City of Detroit*, allowing intervention would revisit settled issues. *Cf. id.*, 712 F.3d at 932. If it were to allow intervention, the district court would have to decide whether FRS has a right to any of the settlement proceeds. This would require, for all practical purposes, revisiting the class definition and the plan of allocation, issues that have long been resolved. *See* R. 2097 (Pinkerton Decl. ¶ 24–26) (Page ID #38200–01). Intervention would thus require the parties to "re-litigate issues that [FRS] watched from the sidelines." *See City of Detroit*, 712 F.3d at 932. Because the district court did not abuse its discretion in finding that "the suit has progressed to a very advanced stage," *Auto. Parts*, 2020 WL 6737545, at \*4, this factor weighs against FRS.

## B.  Purpose of Intervention

The second relevant factor is the purpose of the intervention. Our approach to this factor has been "somewhat inconsistent"—at times, we have peeked behind the timeliness curtain at the legitimacy of the intervenors' purported interest, and at others, we have analyzed whether the would-be intervenors acted promptly in light of their stated purposes. *See Kirsch v. Dean*, 733 F. App'x 268, 275–76 (6th Cir. 2018). Here, although the district court briefly mused about the legitimacy of FRS's subrogation interests in a footnote, its opinion addressed timeliness only. *Auto. Parts*, 2020 WL 6737545, at \*2 & n.1. Because we review the district court's opinion under the abuse-of-discretion standard, *Grutter*, 188 F.3d at 397, we view the "purpose" inquiry as the district court did: through the lens of timeliness. Without deciding the legitimacy of the underlying subrogation right, we ask whether FRS promptly intervened to pursue its stated interest.

FRS argues that its interest is "narrow"—it seeks merely to clarify whether its insurer clients have a right to equitable subrogation. Appellant Br. at 29. We are indeed more inclined

to grant intervention when the purpose of intervention is limited in scope. *See City of Detroit*, 712 F.3d at 931–32. As End-Payor Plaintiffs point out, however, FRS's purpose for intervention is broader than FRS suggests on appeal. If the district court were to find that FRS possesses a subrogation right, FRS would also have to seek to supplement its claims with the requisite supporting information. *See* R. 2060 (Mem. in Supp. of Mot. to Intervene at 3) (Page ID #37704) (requesting that the district court "clarify that the [i]nsurers may supplement their claims in accordance with the [district court]'s resolution of the threshold legal issue"). Because of the practical consequences of processing the supplemental information, the ultimate end-goal of FRS's intervention—to determine whether it had a subrogation right *and* to assert that right if it did—reaches far beyond mere clarification of a legal issue. Due to the likelihood of delay that would result from such a far-reaching request, FRS should have asserted its interest as early as possible to avoid the resulting prejudice to class members. As discussed in the next section, however, FRS waited far too long to assert its claimed interest.

## C. Length of Time Between Knowledge of Interest and Intervention

Under the next factor, we evaluate how long the intervenor took to move after it knew or should have known that its interests in the case were implicated. *Stupak-Thrall*, 226 F.3d at 477. More precisely, we ask when the intervenor should have known that the parties in the case would not protect its interests. *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1012 (2022). The district court did not clearly articulate when FRS should have intervened. In any event, multiple triggering points—all significantly earlier than June 2020—should have alerted FRS that it needed to act.

We note that FRS was aware of this litigation by at least May 2018, when it submitted claims for the first two rounds of settlement. Even at that point, it was clear that the litigation impacted FRS's interests and that End-Payor Plaintiffs' interests were not aligned with FRS's interests. Allowing FRS to claim subrogation rights after settlement would uproot earlier efforts to define classes, expend considerable resources to amend allocation plans, and increase costs associated with the claims-administration process, thereby reducing the amount of settlement proceeds available. Recognizing that FRS's "interests were implicated," even at that juncture, would not require "unusual prescience." *Cuyahoga Valley Ry. Co. v. Tracy,* 6 F.3d 389, 396

(6th Cir. 1993). In other words, FRS should have been aware by at least May 2018 that End-Payor Plaintiffs would inadequately represent its subrogation interests. *Cf. Jansen*, 904 F.2d at 341 (intervention proper when parties' interests were aligned at the beginning of the litigation); *see also CE Design Ltd. v. King Supply Co.*, 791 F.3d 722, 726 (7th Cir. 2015). Rather than participating in settlement discussions, or at least in the fairness hearings approving the settlement agreements, FRS watched from the sidelines. *See S. Ohio Corr. Facility*, 24 F. App'x at 532.

FRS argues that the district court recognized the legitimacy of its clients' subrogation rights in its *GEICO* decision, so FRS reasonably believed before its January 2019 call that End-Payor Plaintiffs would too. But FRS reads too much into the *GEICO* opinion. As the district court correctly observed in its opinion denying intervention, the court in *GEICO* did not "determine the viability" of the subrogation theory; it merely allowed GEICO to amend its complaint to plead it. *Auto. Parts*, 2020 WL 6737545, at *2 n.1 (citing *GEICO*, 345 F. Supp. 3d at 830–34). The district court in *GEICO* was equivocal on the legal basis for the theory and recognized that it needed more facts to evaluate the theory. *See GEICO*, 345 F. Supp. 3d at 833–34 (referring to GEICO's "potential" or "claimed" subrogation rights). Nothing in the *GEICO* opinion suggests that FRS could recover a portion of the settlement proceeds without filing its own complaint with its own allegations to give the parties notice of the facts underlying FRS's claims. In fact, *GEICO* suggests just the opposite: GEICO was required to replead the facts supporting its claims and "properly assert[]" its theory in an amended complaint. *Id.* That GEICO could potentially include a claim in a 2018 complaint by opting out of the settlement does not mean that FRS was secure in knowing that End-Payor Plaintiffs would represent its clients' interests.

Even if we find reasonable FRS's belief that End-Payor Plaintiffs would not object to its assertion of subrogation rights before January 2019, that still leaves a year and a half before FRS's intervention. During the January 2019 call, End-Payor Plaintiffs made clear that they did not recognize FRS's clients' asserted subrogation rights. R. 2060-2 (Leibell Decl. ¶ 6) (Page ID #37727). At that point, FRS knew that End-Payor Plaintiffs' interests were adverse. Even so, FRS waited nine more months, until October 2019, to broach the subject with End-Payor

Plaintiffs again, R. 2060-7 (10/17/2019 Email from FRS to End-Payor Plaintiffs) (Page ID #37818), and waited two months beyond that before asking the district court to resolve the dispute. R. 2060-3 (12/13/2019 Letter from FRS to Judge Battani at 1) (Page ID #37734).

FRS protests that its communications with counsel obviated any need to intervene. First, it argues that insurers are class members by virtue of their purchases of their own Fleet Vehicles, and this class membership gives rise to class counsel's duty to represent insurers' subrogation interests. Any entreaty to the district court would have been premature, even inappropriate, according to FRS, until class counsel formally rejected any duty to represent those interests. FRS claims that such a rejection did not happen until class counsel told FRS that its clients were not class members in November 2019.

On this point, FRS mischaracterizes the law and the facts. Class counsel indeed have a fiduciary duty to protect the interests of all class members; counsel cannot, for example, place their own interests and the interests of named class members above unnamed class members. *See In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). None of our precedent suggests, however, that class counsel's fiduciary duty extends to a class member's interests outside of its status as a class member, especially when those interests conflict with those of existing class members. In any case, class counsel did reject any perceived duty to represent FRS's interests in January 2019 when they told FRS that they did not recognize FRS's claimed subrogation right. R. 2060-2 (Leibell Decl. ¶ 6) (Page ID #37727). Even if class counsel formally told FRS only in November 2019 that they did not recognize FRS's clients as class members, the January 2019 rejection should have tipped off FRS that End-Payor Plaintiffs' interests were not aligned.

FRS next relies on class counsel's representations to excuse FRS's late intervention. It argues that End-Payor Plaintiffs never mentioned in the January 2019 discussions that FRS should intervene and in fact encouraged FRS to wait until the end of the claims processing deadline to appeal any denied claims. Whatever End-Payor Plaintiffs' suggestions, FRS was not entitled to "wait and see" if negotiations would have been fruitful when it had actual notice that its interests were adverse. *See Kirsch*, 733 F. App'x at 278 (citing *Cuyahoga Valley Ry. Co.*, 6 F.3d at 396); *cf. Midwest Realty Mgmt. Co. v. City of Beavercreek*, 93 F. App'x 782, 787–88

(6th Cir. 2004) (relevant triggering point for intervention was when there "was reason to believe [proposed intervenors'] interests were not being adequately represented" during settlement negotiations); *see also United States v. Tennessee*, 260 F.3d at 594 (holding would-be intervenor should have moved earlier notwithstanding "broken promises" of the opposing party). FRS "must now bear the consequences of its chosen path" to rely on the outcome of discussions with End-Payor Plaintiffs. *See Kirsch*, 733 F. App'x at 278.

FRS thus knew that End-Payor Plaintiffs would not adequately represent FRS's interests in January 2019. But even if we ignore that fact and most charitably construe the facts in FRS's favor, FRS should have known of the necessity to intervene when the district court rejected its letter motion in December 2019. The suggestion to consider intervention, from the court in which FRS was seeking discretionary relief, no less, should have sounded the intervention alarm. FRS nonetheless waited six months, until the last day of the claim-submission deadline, to act. In finding that FRS sat on its hands, the district court did not abuse its discretion. *See Salem Pointe*, 854 F. App'x at 698 (upholding district court's denial of intervention as untimely where intervenor did not move for five months after it should have known its interests were not adequately represented). Because FRS should have known that End-Payor Plaintiffs were not representing its interests far earlier than June 2020, this factor weighs against intervention.

**D. Prejudice**

Under the fourth factor, we consider the prejudice to the original parties due to the failure to intervene earlier. *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 584 (6th Cir. 1982). We examine the prejudice caused by the delay in intervention, rather than prejudice caused by the intervention itself. *City of Detroit*, 712 F.3d at 933. Therefore, the district court could not consider in isolation any hardships that would result from FRS's intervention and was required to look to the incremental prejudice that resulted from FRS's late filing. *See Salem Pointe*, 854 F. App'x at 699. The district court found that "intervention would delay the distribution of settlement proceeds" and that claims processing "would be delayed if the [c]ourt were to allow potentially thousands of claims to be submitted after the deadline." *Auto. Parts*, 2020 WL 6737545, at *4.

These findings were not clearly erroneous. Allowing FRS to intervene in June 2020 would cause delay—at least more delay than would result had FRS intervened earlier. Of course, any time it would take for the claims administrator to process FRS's valid submissions would be a product of intervention, not delay. FRS ignores, however, its own role in the claims-administration process. As of June 2020, FRS had not submitted information to support most of its claims. R. 2097 (Pinkerton Decl. ¶ 11, 13–16) (Page ID #38196–97). Even if, as FRS contends, the claims process was still in its early stages at the time of intervention, the claims administrator would not have been able to proceed to the next steps of processing until FRS submitted the requisite information supporting its claims, which FRS admits would take considerable time. *See id.* ¶ 20–23 (Page ID #38198–99); R. 2060 (Mot. to Intervene at 7 n.8) (Page ID #37708).

FRS maintains that its claims were timely because it was merely seeking to supplement its already filed claims, a practice that the claims administrator has apparently allowed for other non-subrogation claims that contain deficiencies. The district court could reasonably conclude, however, that such placeholder claims are not considered timely when, as FRS admits, compiling the data to support these claims would involve herculean efforts. Even if placeholder claims are routinely permitted in other class actions as FRS argues, *see* R. 2114-2 (Third Leibell Decl. ¶ 17) (Page ID #38348), a district court, exercising its broad discretion to manage its own docket, *ACLU of Ky. v. McCreary County*, 607 F.3d 439, 451 (6th Cir. 2010), could decide that claims and all supporting documentation must be submitted as quickly as possible.

In sum, the district court reasonably found that FRS's intervention in June 2020 would involve the submission of untimely claims and delay the distribution of settlement proceeds. In finding that "the prejudice to the original parties is clear," the district court did not abuse its discretion. *Auto. Parts*, 2020 WL 6737545, at *4.

**E. Unusual Circumstances**

Finally, FRS argues that unusual circumstances render its late submission timely because, under Rule 23 of the Federal Rules of Civil Procedure, its clients are class members that did not need to intervene. FRS claims that it was exercising its rights as an absent class member in

submitting its December 2019 letter to the district court, and that the district court abused its discretion in declining to rule on the letter. Although FRS maintained in its intervention motion below that it "did not believe formal intervention was necessary," FRS did not argue that it was seeking to clarify its rights as an absent class member under Rule 23. R. 2060 (Mem. in Supp. of Mot. to Intervene at 17) (Page ID #37718). Arguments not raised below are generally considered forfeited. *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 443 (6th Cir. 2021).

Forfeiture aside, FRS's purported status as an absent class member did not render its December 2019 letter to the district court a sufficient procedural mechanism to assert its rights. We are skeptical that a subrogation right—should one exist here—transforms a third-party into an absent class member that does not need to intervene, especially when that third-party's interests are adverse to the class. *Cf. United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 873, 903 (11th Cir. 2003) (allowing government to pursue a claimed subrogation right against members of a class after it filed a complaint in intervention). Even if FRS were an absent class member, whether a purported absent class member may move under Rule 23 to clarify its membership without intervention remains unsettled. *Compare In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 499 (3d Cir. 1982) (holding absent class members may move the district court to interpret scope of the class), *with* Newberg on Class Actions § 9:37 (5th ed. 2021) (suggesting that Rule 23 does not confer upon absent class members a right to intervene and district courts retain substantial discretion to fashion the scope of rights held by absent class members). And even if FRS could properly clarify its status as an absent class member without formal intervention, a district court retains broad discretion to manage class actions under Rule 23(d). *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 353 (6th Cir. 2009); *see also* 7B Charles Alan Wright, Arthur Miller, & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 1799 (3d ed. 2021) ("[R]egardless of which procedure is followed by class members seeking to intervene, intervenors still are subject to the court's power under Rule 23(d)[(1)(C)] to impose conditions on their participation in the action.").

In its December 2019 letter, FRS did not seek to clarify its status as a class member, did not notify the district court that it was moving under Rule 23, and did not follow the proper procedures for submitting motions to the district court. R. 2060-3 (12/13/2019 Letter from FRS

to Judge Battani at 1) (Page ID #37734)*; see also* E.D. Mich. Local Rule 5.1.1 (requiring all papers to be filed electronically).  When submitting its letter motion to the magistrate judge via FedEx, moreover, FRS did not file an appearance or properly serve all the parties in the case.  No matter what kind of submission the December 2019 letter was, the district court acted within its broad discretion to reject it.  As such, no unusual circumstances prevented FRS from moving earlier.

## IV.  CONCLUSION

The district court did not abuse its discretion in rejecting FRS's assertion of rights to settlement claims months after the terms of the settlement were decided.  FRS offers no legitimate excuse for failing to intervene after End-Payor Plaintiffs repeatedly expressed their adverse position and the district court alerted FRS to a deficient filing.  In fact, End-Payor Plaintiffs would have suffered delay-related prejudice had the district court found otherwise.  Finding no abuse of discretion, we **AFFIRM** the district court's judgment and **DENY** End-Payor Plaintiffs' Motion to Strike as moot.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-2260

In re: AUTOMOTIVE PARTS ANTITRUST LITIGATION,
End-Payor Actions.
_____

END-PAYOR PLAINTIFFS,

　　　Plaintiffs - Appellees,

　　v.

FINANCIAL RECOVERY SERVICES, LLC,

　　　Proposed Intervenor - Appellant.

┌─────────────────────────────┐
│ **FILED** │
│ May 12, 2022 │
│ DEBORAH S. HUNT, Clerk │
└─────────────────────────────┘

Before: SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of Financial Recovery Services LLC's motion to intervene is AFFIRMED. IT IS FURTHER ORDERED that End-Payor Plaintiffs' motion to strike is DENIED AS MOOT.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk